# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,
*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,
*Defendant-Appellant*,

DOES 1-5, inclusive,
*Defendants*.

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## BRIEF FOR DEFENDANT-APPELLANT INTERNET ARCHIVE
## (PUBLIC)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20036
Telephone:  (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*

DECEMBER 15, 2023

## CORPORATE DISCLOSURE STATEMENT

Internet Archive, a 501(c)(3) nonprofit organization, has no parent corporation. There is no publicly held corporation that owns 10% or more of Internet Archive's stock.

Dated: December 15, 2023                              s/ Joseph R. Palmore

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... i

JURISDICTIONAL STATEMENT ....................................................1

INTRODUCTION ....................................................................2

STATEMENT OF ISSUES ....................................................5

STATEMENT OF CASE ....................................................5

I.      FACTUAL BACKGROUND....................................................5

      A.      Internet Archive's Free Digital Library .................................5

              1.      Internet Archive began lending digital versions of print books in 2011 ....................................................6

              2.      Internet Archive expanded lending through the Open Libraries project ....................................................7

              3.      Internet Archive's lending provides important public benefits ....................................................8

              4.      Internet Archive temporarily operated a National Emergency Library during the COVID-19 shutdown ...............9

      B.      The Publishers And The Works In Suit .................................10

II.     PROCEDURAL BACKGROUND ................................................12

      A.      Summary Judgment For Publishers ....................................12

      B.      Permanent Injunction ....................................................14

SUMMARY OF ARGUMENT ....................................................15

STANDARD OF REVIEW ....................................................17

ARGUMENT ....................................................................18

I.   INTERNET ARCHIVE'S OPEN LIBRARIES PROJECT IS FAIR
     USE ...................................................................................................18

     A.   The First Factor Favors Fair Use Because Internet Archive's
          Lending Is Noncommercial, Transformative, And Justified By
          Copyright's Purposes ........................................................................20

          1.   Internet Archive's free digital library is noncommercial .........20

               a.   Internet Archive's free lending makes no profit and
                    benefits the public..........................................................20

               b.   The district court erred by adopting an unworkably
                    expansive definition of "commercial"............................23

          2.   Internet Archive's controlled digital lending is
               transformative .......................................................................30

               a.   Controlled digital lending expands books' utility by
                    improving efficiency of library borrowing....................30

               b.   The district court's grounds for holding that
                    controlled digital lending is not transformative are
                    baseless ...........................................................................33

          3.   Internet Archive's use serves the purposes of copyright..........35

               a.   Internet Archive's free digital library furthers
                    copyright's purposes.......................................................36

               b.   The district court erroneously discounted fair use's
                    traditional role of ensuring copyright serves the
                    public interest..................................................................39

     B.   The Second Factor Is Neutral Because The Works In Suit Are
          Published Books Of Both Fact and Fiction.........................................42

     C.   The Third Factor Is Neutral Because Copying The Entire Work
          Is Necessary For Controlled Digital Lending .....................................43

    D.    The Fourth Factor Favors Fair Use Because Internet Archive's Lending Causes No Cognizable Harm To Publishers' Markets .........44

            a.    Internet Archive's controlled digital lending is distinct from Publishers' ebook markets .......................45

            b.    All available evidence establishes that Publishers have not and will not suffer market harm......................49

            c.    Even if there were market harm, it is substantially outweighed by the public benefits of Internet Archive's lending...........................................................59

    E.    Weighed In Light Of Copyright's Purposes, The Factors Support Fair Use ................................................................60

II.    THE DISTRICT COURT ERRED IN HOLDING THAT THE NATIONAL EMERGENCY LIBRARY WAS NOT FAIR USE ...............61

III.    AT THE LEAST, THIS COURT SHOULD NARROW THE DISTRICT COURT'S HOLDING .................................................62

CONCLUSION .......................................................................62

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
   239 F.3d 1004 (9th Cir. 2001) ...........................................................................34

*Am. Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994) .......................................................20, 21, 22, 25, 47

*Am. Soc'y for Testing & Materials v. Public.Resource.Org*,
   82 F.4th 1262 (D.C. Cir. 2023)...............................................................50, 56, 57

*American Society for Testing & Materials v. Public.Resource.Org*,
   896 F.3d 437 (D.C. Cir. 2018)................................................................27, 28, 29

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
   143 S. Ct. 1258 (2023)...................................... 17, 18, 20, 35, 37, 51, 58, 59, 61

*Arica Inst., Inc. v. Palmer*,
   970 F.2d 1067 (2d Cir. 1992) ........................................................................4, 60

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) .......................................................32, 36, 41, 43, 46

*Authors Guild, Inc. v. HathiTrust*,
   902 F. Supp. 2d 445 (S.D.N.Y. 2012) .................................................................41

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ....................... 19, 30, 33, 34, 35, 42, 43, 45, 49, 59

*Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.*,
   27 F.4th 313 (5th Cir. 2022) .........................................................................26, 36

*Bell v. Powell*,
   350 F. Supp. 3d 723 (S.D. Ind. 2018)............................................................24, 29

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2d Cir. 2006) .........................................................................44, 46

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006) ....................................................................22, 42, 43

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
  619 F.3d 301 (4th Cir. 2010) ...............................................................21

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ....................................................22, 36

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)....................................... 18, 19, 30, 35, 40, 42, 58

*Capitol Records, LLC v. ReDigi, Inc.*,
  910 F.3d 649 (2d Cir. 2018) .......................................31, 34, 39, 40, 41

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) .................................................30, 31, 44

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021).................................. 19, 20, 30, 32, 39, 40, 59

*Hachette Book Grp., Inc. v. Internet Archive*,
  No. 20-cv-4160, 2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023) .......................13

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985).........................................................21, 24, 42, 43

*Marano v. Metropolitan Museum of Art*,
  844 F. App'x 436 (2d Cir. 2021) .......................................................29

*Nat'l Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*,
  15 F.3d 559 (6th Cir. 1994) .............................................................27

*Potenze v. N.Y. Shipping Ass'n, Inc.*,
  804 F.2d 235 (2d Cir. 1986) ...........................................................18

*Princeton Univ. Press v. Mich. Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ...........................................................58

*Righthaven, LLC v. Jama*,
  No. 10-cv-1322, 2011 WL 1541613 (D. Nev. Apr. 22, 2011) ..........................28

*Sega Enterprises Ltd. v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ..............................................22, 40, 41

vi

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012)............................................................26, 27

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984).................................... 4, 18, 30, 49, 50, 56, 58, 59

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014) ................................. 17, 25, 30, 36, 43, 46

*Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
953 F.3d 638 (9th Cir. 2020) ..................................................23, 28, 29

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989) .......................................................25, 26

*Williams & Wilkins Co. v. United States*,
487 F.2d 1345 (Cl. Ct. 1973).......................................................57, 59

*Worldwide Church of God v. Phila. Church of God, Inc.*,
227 F.3d 1110 (9th Cir. 2000) .....................................................26, 27

**Statutes**

17 U.S.C. § 107................................................ 4, 12, 19, 20, 35, 40, 43, 44

17 U.S.C. § 108................................................................................38

20 U.S.C. § 9121..............................................................................38

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

Conn. Gen. Stat. § 11-25....................................................................9

Library Services Act, Pub. L. 84-597 (1956) .........................................37

Library Services and Technology Act, Pub. L. 104-208 (1996) ...........................37

N.Y. Civil Practice Law & Rules § 4509 .................................................9

U.S. Const., art. I, § 8, cl. 8..............................................................18

**Other Authorities**

Am. Libr. Ass'n, *State Privacy Laws Regarding Library Records*
(updated Nov. 2021),
https://www.ala.org/advocacy/privacy/statelaws .................................................9

Benjamin Franklin Historical Society, http://www.benjamin-franklin-
history.org/lending-library (accessed Dec. 11, 2023)...........................................2

Brooklyn Public Library, https://www.bklynlibrary.org
(accessed Dec. 12, 2023) ......................................................................................28

Fed. R. App. Proc. 4(a) .............................................................................................1

H.R. Rep. 94-1476 (1976)........................................................................................38

Metropolitan Museum of Art, https://www.metmuseum.org
(accessed Dec. 12, 2023) ......................................................................................29

New York Public Library, https://www.nypl.org
(accessed Dec. 12, 2023) ......................................................................................28

PublicResource.Org, https://public.resource.org
(accessed Dec. 12, 2023) ......................................................................................29

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered judgment on August 11, 2023. A-6458-6461. Internet Archive timely appealed on September 11, 2023. A-49-50; Fed. R. App. Proc. 4(a).

**INTRODUCTION**

For centuries, libraries have served patrons by purchasing books and lending them for free. In the United States, lending libraries predated the founding of the nation and, according to Benjamin Franklin, contributed to it by facilitating access to knowledge.[1] Today, libraries serve many purposes, but the heart of their mission remains unchanged: lending.

What has changed is how that core mission is accomplished. Like copyright law itself, library lending has evolved as systems and technologies have created new ways to meet patron needs; from delivering books though mail or bookmobiles; to sending articles via fax machine; to creating online catalogs that help readers explore their collections.

For the past decade, that evolution has also included controlled digital lending—a modern, more efficient version of lending that is used by libraries across the country. Controlled digital lending allows libraries to lend books via the Internet subject to strict controls, for a limited period, to one patron at a time. Defendant

---

[1] "[T]hese Libraries have improved the general Conversation of Americans, made the common Tradesmen and Farmers as intelligent as most Gentlemen from other Countries, and perhaps have contributed in some Degree to the Stand so generally made throughout the Colonies in Defence of their Priviledges." Benjamin Franklin Historical Society, http://www.benjamin-franklin-history.org/lending-library (accessed Dec. 11, 2023).

Internet Archive ("IA") is a nonprofit organization that is part of this evolution: it uses controlled digital technology to lend books for free.

Publishers claim this public service is actually copyright infringement. They ask this Court to elevate form over substance by drawing an artificial line between physical lending and controlled digital lending. But the two are substantively the same, and both serve copyright's purposes. Traditionally, libraries own print books and can lend each copy to one person at a time, enabling many people to read the same book in succession. Through interlibrary loans, libraries also share books with other libraries' patrons. Everyone agrees these practices are not copyright infringement.

Controlled digital lending applies the same principles, while creating new means to support education, research, and cultural participation. Under this approach, a library that owns a print book can scan it and lend the digital copy *instead* of the physical one. Crucially, a library can loan at any one time only the number of print copies it owns, using technological safeguards to prevent copying, restrict access, and limit the length of loan periods.

Lending within these limits aligns digital lending with traditional library lending and fundamentally distinguishes it from simply scanning books and uploading them for anyone to read or redistribute at will. Controlled digital lending serves libraries' mission of supporting research and education by preserving and

enabling access to a digital record of books precisely as they exist in print. And it serves the public by enabling better and more efficient access to library books, *e.g.*, for rural residents with distant libraries, for elderly people and others with mobility or transportation limitations, and for people with disabilities that make holding or reading print books difficult. At the same time, because controlled digital lending is limited by the same principles inherent in traditional lending, its impact on authors and publishers is no different from what they have experienced for as long as libraries have existed.

Congress has recognized the importance of the library mission, including through specific statutory exemptions such as Sections 108 and 109 of the Copyright Act. And Congress has never passed a law restricting libraries' longstanding right to lend books they own. But copyright statutes inevitably leave gaps, and that is where Section 107's codification of fair use comes into play—as it does here.

As the Supreme Court has recognized, fair use creates space for the development and use of new technologies. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431-32 (1984). The core question for every fair use case is whether copyright's goals "would be better served by allowing the use than by preventing it." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992).

The district court lost sight of that question. Its rejection of IA's fair use defense was wrongly premised on the supposition that controlled digital lending is

equivalent to indiscriminately posting scanned books online. That error caused the court to misapply the fair use factors, give improper weight to speculative claims of harm, and discount the tremendous public benefits controlled digital lending offers. Given those benefits and the lack of harm to rightsholders, allowing IA's use would promote the creation and sharing of knowledge—core copyright purposes—far better than forbidding it.

The district court's judgment should be reversed.

## STATEMENT OF ISSUES

Whether Internet Archive's controlled digital lending is fair use.

## STATEMENT OF CASE

### I. FACTUAL BACKGROUND

### A. Internet Archive's Free Digital Library

IA is a nonprofit 501(c)(3) public charity. SPA-7; A-5777-5778. Its mission is to promote the availability of knowledge and culture by improving access to and preservation of information. A-5778. For example, it preserves historical versions of billions of webpages in an archive called the Wayback Machine, which serves as a valuable resource for journalists, researchers, lawyers, and the public. SPA-7; A-5778-5779. It also works with libraries, museums, and universities to preserve and offer free online access to their collections. SPA-7; A-5779.

### 1.    *Internet Archive began lending digital versions of print books in 2011*

California has recognized IA as a library since 2006. A-5779-5780. In keeping with its mission, in 2011, IA worked with the Boston Public Library and other libraries to begin lending digital versions of library-owned print books, a practice later called controlled digital lending. A-5782. This project was endorsed by all 50 state libraries through the Chief Officers of State Library Agencies. A-5782; A-4300-4301.

Together with another nonprofit, Open Library of Richmond, IA purchases print books or receives them by donation. SPA-10; A-5785.[2] Each book is scanned and withheld from circulation. SPA-10; A-5785. IA then makes the digital copy available for borrowing on its website. SPA-10; A-5785-5786. Through this method, IA has built a library of over 3 million books. SPA-10, SPA-13; A-5782. IA's policy is not to lend books published within the past five years because book sales generally peak within the first years of publication. A-5789-5793.

After signing up for a free IA account, a patron may borrow up to ten books simultaneously, for up to fourteen days per book, at no charge. SPA-12; A-5786. The patron can read a borrowed book online through a custom-built BookReader or

---

[2] This brief refers to IA and Open Library of Richmond collectively as "Internet Archive" or "IA."

download an encrypted PDF or ePub version.  SPA-14; A-5786-5787; A-3878.

Unlike a print book, BookReader enables borrowers to zoom in on images, enlarge

text, search text, and have it read aloud.  A-5787; SPA-15.  All downloaded versions

are secured using "digital rights management" software—the same measures

publishers use to secure their ebooks.  SPA-15; A-5787-5788.  That software

prevents borrowers from copying the book, distributing it, or accessing it after the

loan expires.  A-5788.

Every loan automatically expires at the end of the loan period, after which the

borrower cannot access the book.  A-5787.  As with physical lending, while a copy

of a book is checked out, other patrons may not borrow that copy.  A-5787.

### 2. Internet Archive expanded lending through the Open Libraries project

In 2018, IA expanded its lending capacity through the Open Libraries project.

SPA-13;  A-5794-5795.  Open Libraries allows other libraries to contribute their

non-circulating books to the number of total copies available through IA's digital

library, thus increasing the number of patrons who can simultaneously borrow that

book.  SPA-13; A-5794-5795; A-4275; A-3463, A-3469.

IA determines the number of available borrows through an "overlap analysis."

SPA-13.  Each partner library sends a catalog of non-circulating books to IA.  SPA-

13; A-3463; A-3469.  If the catalog includes a book already in IA's library, IA

increases the number of its available concurrent borrows by one.  SPA-13.  Thus,

7

each concurrent loan is still associated with one non-circulating physical copy of the book, located either at IA or a partner library.[3]  As of 2021, 62 partner libraries had contributed to Open Libraries.  SPA-13.

### 3.  *Internet Archive's lending provides important public benefits*

IA's digital library has facilitated education, research, and scholarship.  A-5798-5801.  In 2019, for example, IA received federal funding to digitize and lend books about internment of Japanese Americans during World War II, as well as to enhance the Wikipedia entry on this subject by adding citations and links directly to the relevant page of these books in IA's library.  A-5799-5800.  Indeed, IA's library has made thousands of Wikipedia entries and other online resources more accurate, reliable, and verifiable by enabling efficient citation checking and research.  A-5800-5801; A4367-4704.  In 2022, librarians curated a collection of books banned by many school districts but available through IA's library.  A-5801.  Teachers have also provided students access via IA to books for research that were not available locally.   A-4259-4262.   Controlled digital lending also allows patrons to access books without providing data about their reading choices to commercial entities that

---

[3] Even if a partner library owns multiple copies of a book, IA adds only one additional copy per library.  A-5794-5795.  If a partner library owns a book not already in IA's lending library, IA does not add it.  A5785, A-5794-5796. Open Libraries thus increased the number of available copies for certain titles, but not the number of titles in IA's library.

may not share librarians' traditional commitment—supported by law in some states[4]—to protecting reader privacy.

### 4. Internet Archive temporarily operated a National Emergency Library during the COVID-19 shutdown

In response to the COVID-19 pandemic, IA in 2020 temporarily expanded access to its library through a project called the National Emergency Library. SPA-14; A-5803-5804.

At the pandemic's start, many schools and libraries closed. A-5801. School districts and libraries contacted IA with concerns that students, teachers, and patrons could not access the physical books they needed, including books schools had already assigned and purchased. A-5801-5802 (library closures removed 650 million print books from circulation).

In response, IA launched the National Emergency Library on March 24, 2020, temporarily lifting IA's normal restrictions on the number of concurrent borrows. A-5802-5804. Although this technically deviated from controlled digital lending,

---

[4] *See, e.g.,* N.Y. Civil Practice Law & Rules § 4509; Conn. Gen. Stat. § 11-25; Am. Libr. Ass'n, *State Privacy Laws Regarding Library Records* (updated Nov. 2021), https://www.ala.org/advocacy/privacy/statelaws.

IA believed—correctly[5]—that, even without those controls, the number of concurrent borrows would never exceed the number of inaccessible copies. A-5802-5803.

IA intended the National Emergency Library to be temporary, lasting only "through June 30, 2020, or the end of the US national emergency, whichever is later." A-5803-5804. On June 16, 2020, after libraries began reopening and this lawsuit was filed, IA ended the National Emergency Library and reinstated its lending controls. A-5810. The program lasted twelve weeks.

## B. The Publishers And The Works In Suit

Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC (collectively, "Publishers") are four of the largest and most profitable American publishers. SPA-7; A-5810-5811. This case involves a subset of Publishers' books that were available for borrowing via IA's library—specifically, books that Publishers make commercially available in both print and ebook formats. SPA-15-16; SPA-1-5; A-6458-6461.

While that category includes roughly 33,000 books (SPA-10; A-6068), Publishers selected 127 (the "Works in Suit") as the basis for this lawsuit (SPA-15;

---

[5] The largest number of concurrent borrows for a Work in Suit was 888 for *The Lion, the Witch, and the Wardrobe*. A-5809. Far more than 888 of the 9,000 public libraries nationwide own a copy of *The Lion, the Witch, and the Wardrobe* and were closed during the pandemic. A-5809-5810; A-4097-4101.

A-1198).  The Works in Suit include diverse genres and subjects, from novels like *Gone Girl* to educational books like *Basic Physics*.  A-1198.  All but two were published more than five years before this lawsuit commenced.[6]  A-6018-6019.  IA lawfully owns at least one print copy of each Work in Suit.  A-5785.

Publishers sell the Works in Suit and other books to libraries as print books, but they refuse to sell ebooks to libraries.  A-6029-6032, 6035-6036.  Instead, they make ebooks available only for licensing.  A-6035-6036.  This license does not allow libraries to own the ebook; rather, libraries pay for patrons to access it through a commercial vendor called an "aggregator," like OverDrive.  A-6035-6036.

Publishers' ebook licenses generally permit loans on a "one-copy, one-user" basis.  A-6038.  Like controlled digital lending, this means each copy can be borrowed by one person at a time.  A-6038.  But that is where the similarity ends.  Publishers' licenses to public libraries restrict lending to a certain period of time or number of borrows, after which the license expires.  A-6039-6041.  For example, Hachette and Penguin offer a two-year license.  A-6040, A-6042-6043.  HarperCollins offers a choice between a license for 26 borrows or pay-per-use.  A-6040-6042.  Only Wiley offers perpetual access licenses to public libraries.  A-6043.  The licenses also impose restrictions, such as limiting ebook lending only to

---

[6] Those two books were made available for borrowing due to human error.  A-3673.  IA removed them as soon as it learned of the mistake.  A-3673.

residents of a "geographic area" or, in academic settings, to current students, faculty, and staff.  A-6037-6038.  Such license terms prevent libraries from adding ebooks to their permanent collections or loaning them to other libraries.

IA is willing to buy Publishers' ebooks if they would sell them, as IA has done with other publishers.  A-5815-5816.  Publishers have refused that offer.  A-5816.

## II.    PROCEDURAL BACKGROUND

Publishers sued IA, claiming that both IA's controlled digital lending and the National Emergency Library violated their copyrights in the Works in Suit.  They sought damages and a permanent injunction.  A-105-157.

### A.    Summary Judgment For Publishers

The parties cross-moved for summary judgment.  IA argued that its free digital library is fair use.  The Copyright Act permits "fair use" of a copyrighted work without authorization and provides four non-exhaustive factors to consider: (1) "the purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the amount and substantiality of the portion used," and (4) "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107.  IA explained that the first and fourth factors strongly favor fair use here while the others are neutral.  A-4792-4815.

Specifically, IA explained that controlled digital lending is a noncommercial, transformative use that allows libraries to improve access to books they own.  A-

4794-4797. IA also introduced expert evidence showing that its lending is not a substitute for Publishers' ebooks and has no effect on Publishers' markets. A-4802-4811. Weighing these factors together, IA argued that controlled digital lending and the National Emergency Library serve copyright's purposes by promoting public availability of knowledge. A-4792-4815.

The district court (Judge Koeltl) granted summary judgment for Publishers, finding that neither IA's controlled digital lending nor the National Emergency Library is fair use. *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160, 2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023).

On IA's controlled digital lending, the court ruled that all four statutory factors weigh against fair use. On the first factor, it deemed IA's use commercial because, even though IA makes no profit, IA derives tangential "benefits" from operating its free digital library. SPA-31-32. The court also concluded IA's use is not transformative. SPA-21-39. Although IA explained that controlled digital lending expands the utility of the works (A-4794-4797), the court viewed IA's lending as no more than format-shifting (SPA-22-31).

On the second factor, the district court recognized that the Works include both fiction (which is close to copyright protection's core) and factual works (which are not), but it found this factor favors Publishers on the ground that even nonfiction involves protected expression. SPA-40.

13

On the third factor, the district court ruled that the amount of work copied favors Publishers. The court acknowledged that copying an entire work can be fair use when doing so is necessary to the use's transformative purpose, but it reiterated its view that IA's use is not transformative. SPA-42.

On the fourth factor, the court ruled Publishers had or were likely to suffer economic harm. SPA-43-50. Two expert economists presented empirical evidence showing otherwise. A-4823-4870; A-4898-4944. Publishers did not attempt to refute that evidence with empirical data, relying instead on what they called "basic economic common sense." A-3735; A-5831-5832. The court credited Publishers' "common sense" over IA's evidence by noting IA bore the burden of proof. SPA-45-46 n.11.

Weighing the factors together, the district court concluded they all point against fair use. SPA-50-51. It did not consider whether such a ruling would further or hinder the purposes of copyright. SPA-50-51. It then held the same reasoning applied to the National Emergency Library. SPA-51.

## B. Permanent Injunction

Pursuant to the district court's order, the parties submitted a joint proposed judgment. ECF No. 214. Subject to IA's right to appeal, the parties entered a confidential agreement on monetary relief and proposed a permanent injunction requiring IA to remove any "Covered Book" from its library. *Id.* at 1. The district

court issued judgment, limiting the injunction's definition of "Covered Book" to works available as ebooks because "this case did not concern copyrighted works that are not yet available in electronic form." A-6458-6461.[7]

## SUMMARY OF ARGUMENT

I. This Court should reverse and hold that IA's controlled digital lending is fair use. This practice, like traditional library lending, furthers copyright's goal of promoting public availability of knowledge without harming authors or publishers. The first and the fourth factors strongly favor fair use, while the second and third factors are neutral.

*First*, the purpose and character of the use favor fair use because IA's controlled digital lending is noncommercial, transformative, and justified by copyright's purposes. IA is a nonprofit charity that offers digital library services for free. Controlled digital lending is transformative because it expands the utility of books by allowing libraries to lend copies they own more efficiently and borrowers to use books in new ways. There is no dispute that libraries can lend the print copy of a book by mail to one person at a time. Controlled digital lending enables libraries to do the same thing via the Internet—still one person at a time. And even if this use were not transformative, it would still be favored under the first factor because it

---

[7] Publishers did not appeal the injunction order.

furthers copyright's ultimate purpose of promoting public access to knowledge—a purpose libraries have served for centuries.

**Second**, the nature of the copyrighted works is neutral because the works are a mix of fiction and non-fiction and all are published.

**Third**, the amount of work copied is also neutral because copying the entire book is necessary: borrowing a book from a library requires access to all of it.

**Fourth**, IA's lending does not harm Publishers' markets. Controlled digital lending is not a substitute for Publishers' ebook licenses because it offers a fundamentally different service. It enables libraries to efficiently lend books they own, while ebook licenses allow libraries to provide readers temporary access through commercial aggregators to whatever selection of books Publishers choose to make available, whether the library owns a copy or not. Two experts analyzed the available data and concluded that IA's lending does not harm Publishers' sales or ebook licensing. Publishers' expert offered no contrary empirical evidence.

Weighing the fair use factors in light of copyright's purposes, the use here is fair. In concluding otherwise, the district court misunderstood controlled digital lending, conflating it with posting an ebook online for anyone to access at any time. The court failed to grasp the key feature of controlled digital lending: the digital copy is available only to the one person entitled to borrow it at a time, just like lending a print book. This error tainted the district court's analysis of all the factors,

particularly the first and fourth. The court compounded that error by failing to weigh the factors in light of the purposes of copyright.

II. Fair use must be analyzed separately for each "specific use." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1277 (2023). Accordingly, the Court should remand and instruct the district court to separately apply the fair use factors to the National Emergency Library, which it did not do.

III. By the same token, even if the Court agrees with the district court's analysis of the Open Libraries version of controlled digital lending, it should narrow the decision's reach. The district court's holding, particularly under the fourth factor, relied significantly on IA's overlap analysis with partner libraries. That analysis would not apply to IA's lending of only its own books, for which there is no evidence of market harm at all.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014). Fair use is a mixed question of law and fact. *Id.* at 81. It can be resolved "at the summary judgment stage where there are no genuine issues of material fact," but this Court has "reversed district courts that too hastily resolved factual questions relevant to fair use on summary judgment." *Id.* (citation omitted).

## ARGUMENT

Three different "specific uses" are at issue here (*Warhol*, 143 S. Ct. at 1277): IA's controlled digital lending of its own books, its expanded lending through Open Libraries' overlap analysis, and the National Emergency Library. Each of these uses was fair.

Open Libraries, which was the focus of the district court's analysis, is fair use, and summary judgment should have been granted to IA. *See Potenze v. N.Y. Shipping Ass'n, Inc.*, 804 F.2d 235, 239 (2d Cir. 1986) (Court can grant summary judgment to appellant). The National Emergency Library was also fair use because the unique circumstances of the COVID-19 pandemic justified it. Finally, even if neither of the above were fair use, at the very least IA's controlled digital lending of only the books it owns is fair use.

## I. INTERNET ARCHIVE'S OPEN LIBRARIES PROJECT IS FAIR USE

Fair use must be assessed "in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). Those purposes are "[t]o promote the Progress of Science and useful Arts." *Id.* at 575 (quoting U.S. Const., art. I, § 8, cl. 8). To that end, copyright law grants certain time-limited rights to authors, but that "reward to the owner" is merely "a secondary consideration." *Sony*, 464 U.S. at 429. Those rewards "must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Warhol*, 143 S. Ct. at 1273

(citation omitted).  Copyright's "primary" goal is to provide the public with "access to knowledge."  *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015) ("*Google Books*").

Fair use serves this purpose by "permit[ting] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is destined to foster."  *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1195 (2021).  That doctrine, codified in 17 U.S.C. § 107, provides that "fair use of a copyrighted work . . . is not an infringement of copyright."  The statute sets out explicit factors (discussed *supra* at 12 and in detail below) to guide courts' fair use analysis.  It also provides examples of favored fair use purposes, *e.g.*, "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."  *Id.*  Congress did not intend for the statutory factors or examples to be exhaustive or applied mechanically.  *Google*, 141 S. Ct. at 1197.

Congress understood that fair use had long been an "equitable rule of reason" developed by courts on a case-by-case basis, and Section 107 preserves that judicial flexibility.  *Id.* at 1196.  Thus, fair use under Section 107 continues to "require[] judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'"  *Id.* at 1197; *see Campbell*, 510 U.S. at 577.

A.     **The First Factor Favors Fair Use Because Internet Archive's Lending Is Noncommercial, Transformative, And Justified By Copyright's Purposes**

The first factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." § 107(1).  Under this factor, courts consider whether a use is commercial, whether it is transformative, and whether there is "some other justification for copying." *Warhol*, 143 S. Ct. at 1277.  Here, all three considerations favor fair use.

1.     *Internet Archive's free digital library is noncommercial*

a.     **Internet Archive's free lending makes no profit and benefits the public**

"[T]here is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google*, 141 S. Ct. at 1204.   Here, IA's *free* digital library is not a close call:  it is both noncommercial and publicly beneficial.

This Court has explained that "the commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994), *as amended* (1995).  While commerciality does not require that "the sole motive of the use [be] monetary gain," it does require that "the user *stands to profit* from exploitation of the copyrighted material without paying the customary

20

price." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (emphasis added).

"[C]ommercial exploitation" occurs "when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material," as opposed to "produc[ing] a value that benefits the broader public interest." *Texaco*, 60 F.3d at 922. Thus, "the greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Id.* Conversely, the less the private profit and greater the public benefit, the more likely the use is fair.

Here, the undisputed facts show that IA receives no profit or other private benefit—financial or otherwise—from its free digital library, much less from the Works in Suit. IA is a 501(c)(3) public charity. SPA-7; A-5777-5778. IA does not charge patrons to create an account or borrow books. SPA-13; A-5786; *see Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 314 (4th Cir. 2010) (even *for-profit* entity's display of copyrighted logo was noncommercial where "no fee is charged to view the displays"). Nor does IA place revenue-generating ads on its website. In fact, IA spends millions of dollars of its own funding to pay for books, equipment, personnel, and storage to lend its books for free. A-6170.

At the same time, IA's free digital library provides significant public benefits. Courts are more solicitous toward uses that have "value that benefits the broader public interest." *Texaco*, 60 F.3d at 922; *Blanch v. Koons*, 467 F.3d 244, 254 (2d Cir. 2006); *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1267 (11th Cir. 2014). That is true even when "the alleged infringer may gain commercially." *Sega*, 977 F.2d at 1523. It should be even more so here where there is no profit motive at all.

IA invests in purchasing and lending books because preserving and providing access to cultural and scholarly works is important for societal progress. A-5778. To that end, IA provides online library access to people unable to travel to a physical library and those with print-disabilities. A-5797. It brings a wider selection of books to areas where libraries are under-funded or certain books have been banned. A-5801. It also provides a convenient way to access books briefly or spontaneously, *e.g.,* to check a citation or fact. A-5797-5798. Among other things, this improves the reliability of online resources. A-5799. For example, the ability to link from a website to a particular book page and immediately access it enables Wikipedia authors to create new articles and users to improve and confirm their accuracy. A-5799; A-4358-4366.

Together, these important public benefits and the absence of any private profit both favor fair use.

>    b.    **The district court erred by adopting an unworkably expansive definition of "commercial"**

The district court recognized that IA's free lending makes no profit but still deemed this lending commercial because IA derives other tangential "benefits." SPA-32. Its reasoning suffers from numerous flaws.

>    i.    *The district court misunderstood the facts*

The district court overstated the alleged "benefits" IA derives from its lending. The court noted that IA's BookReader includes a link to a bookseller, Better World Books, which patrons can click to buy a print copy of the borrowed book. SPA-14.[8] IA receives a small payment when someone does so. SPA-31-32. From 2016 when the links were first added to February 10, 2021, IA received only *$5,561.41* from Better World Books—a minuscule amount compared to the millions of dollars IA spends to operate its free digital library. A-6170, A-6001.

Even that tiny amount provided no private benefits to IA; it was put back into IA's efforts to make more books available for lending. *See, e.g., Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 648-49 (9th Cir. 2020) (noncommercial use where choir show's proceeds "support[ed] other

---

[8] Publishers erroneously claimed below that IA has "effective ownership" of Better World Books. A-3723. Better World Books is a separate legal entity whose sole shareholder is Better World Libraries, a nonprofit 501(c)(3) organization that has no owner or shareholders. A-6087-6088. IA does not control either entity.

aspects of the music education program and the work of the show choir"); *Bell v. Powell*, 350 F. Supp. 3d 723, 730 (S.D. Ind. 2018) ("no commercial use" where conference registration "fees were used to further [defendant's] mission of educating professionals on how to reduce sexual assault").

The district court also noted that IA's website features a small "Donate" button (SPA-14), but IA does not "use" the Works in Suit to solicit donations. The button is located at the top of nearly every IA webpage, not just the lending pages. A-6001. Borrowing a book does not display the button more prominently or encourage the borrower to donate. A-1231-1235; A-3773-3781. And there is no evidence that lending Publishers' works has increased donations.

Finally, the district court thought that IA "uses its Website to attract new members, solicit donations, and bolster its standing in the library community." SPA-31. But the only facts the court cited for that assumption are IA's communications encouraging libraries to join Open Libraries. SPA-31; A-6098-6101. IA receives no private benefit from increasing the number of partner libraries. The only "benefit" is the ability to better serve its public-benefit mission.

### ii.    The district court misread this Court's precedents

Even accepting the district court's characterization of these tangential "benefits," they do not add up to commercial use. While "monetary gain" is not always required, commerciality requires "profit from exploitation." *Harper & Row*,

24

471 U.S. at 562; *see Texaco*, 60 F.3d at 921-22.  The district court erroneously expanded the definition of "profit" to include any benefit at all.

That is contrary to this Court's precedents.  To count as "profit," a benefit must be a "*direct* consequence of copying the original work." *Texaco*, 60 F.3d at 922 (emphasis added).  That excludes the tangential side-effects cited by the district court.  Even in cases involving *for-profit* companies, this Court has treated commerciality as merely "intermediate" or neutral when a use related only indirectly to the company's profits.  *See, e.g., Texaco*, 60 F.3d at 921-22 ("intermediate use" when "the link between Texaco's commercial gain and its copying is somewhat attenuated: the copying, at most, merely facilitated [employee's] research that might have led to the production of commercially valuable products"); *Swatch*, 756 F.3d at 83 (assigning "relatively little weight" to commerciality when "commercial enterprise" used copyrighted recording in "a subscription service available to paying users," but recording did not "more than trivially affect[] the value of that service").  No coherent rule could treat those profit-serving uses as neutral or "intermediate" but a charitable free library—which generates no profit, directly or indirectly—as commercial.

The only Second Circuit case the district court cited is fundamentally different.  In *Weissmann v. Freeman*, a professor copied his student's article for use in a lecture course but presented it as his own.  868 F.2d 1313, 1316 (2d Cir. 1989).

The Court found his use commercial because he gained "recognition among his peers in the profession and authorship credit." *Id.* at 1324. The Court emphasized that its holding was "context specific," explaining that profit is not measured in dollars "in the academic setting." *Id.* Instead, "what is valuable is recognition because it so often influences professional advancement and academic tenure." *Id*.

*Weissmann*'s reasoning does not extend to a nonprofit organization like a library; for IA, recognition does not translate to professional or monetary benefits. *See Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.*, 27 F.4th 313, 322 (5th Cir. 2022) (distinguishing school district's tweet of copyrighted quote from *Weissmann* "because scientists are judged by the quality of their research, so a scientist who takes credit for another's good work enhances her professional status and likely her salary down the road").

The district court's reliance on out-of-circuit decisions about a religious leader or organization copying and distributing a "core" religious text (SPA-32) is misplaced for the same reason. Those courts found the uses commercial because the religious infringers "profited." *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012). Comparing the case to *Weissman*, the Ninth Circuit noted that, "like academia, religion is generally regarded as 'not dollar-dominated.'" *Worldwide Church*, 227 F.3d at 1118. As the court explained,

the religious organization's use "unquestionably profits [it] by providing it at no cost with the core text essential to its members' religious observance, by attracting through distribution of [the text] new members who tithe ten percent of their income to [the organization], and by enabling the ministry's growth." *Id.*; *see Gregory*, 689 F.3d at 61. Notably, the "profit" the infringers obtained in all three cases was the same "profit" the original author—be it student researcher or religious leader— sought when creating the work. Not so here, where Publishers sought monetary profit and IA did not.

The logic of these circumstance-specific decisions about academia and religion does not apply more broadly to all nonprofit organizations or all benefits. Indeed, circuit courts considering nonprofit organizations outside of those unique contexts have declined to deem a use commercial just because it results in any kind of benefit. For example, in *American Society for Testing & Materials v. Public.Resource.Org*, the D.C. Circuit found noncommercial the posting of copyrighted technical standards online by a nonprofit whose mission was to make the law more accessible. 896 F.3d 437, 449 (D.C. Cir. 2018) ("*ASTM I*"). The organization "did not earn revenue directly from the display of the standards," but plaintiffs argued that "distributing the standards [was] part of [defendant's] fundraising appeal." *Id.* at 449. The court held that this fundraising appeal "hardly rises to the level of making this a 'commercial' use." *Id.*; *see Nat'l Rifle Ass'n of*

*Am. v. Handgun Control Fed. of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) (nonprofit's distribution of copyrighted list of legislators was noncommercial where primary benefit was "to further its own lobbying goals"); *Tresona*, 953 F.3d at 648-49.

### iii.   The district court's test would render virtually all nonprofit uses commercial

Rather than focus on profit, as precedent requires, the district court considered *any* benefit to be commercial. No use would qualify as noncommercial under that broad test, except perhaps counterproductive or pointless ones.

Here, there is no connection between IA's donations and its use of the Works in Suit. IA simply has a "Donate" button on its website. SPA-14. But the same is true of many charities and would render them all commercial under the district court's approach. *Contra, e.g., Righthaven, LLC v. Jama*, No. 10-cv-1322, 2011 WL 1541613, at *3 (D. Nev. Apr. 22, 2011) ("defendants' solicitation of donations on their website is immaterial, and no reasonable jury could conclude that the defendants used the disputed article for a commercial purpose"); *ASTM I*, 896 F.3d at 449 ("fundraising" not commercial). Many public libraries, including the New York Public Library[9] and Brooklyn Public Library,[10] also have "Donate" buttons on their websites. As do many other nonprofits, including those—like the Metropolitan

---

[9] https://www.nypl.org (accessed Dec. 12, 2023).
[10] https://www.bklynlibrary.org (accessed Dec. 12, 2023).

Museum of Art[11] and Public.Resource.Org[12]—whose work courts have deemed noncommercial. *See Marano v. Metropolitan Museum of Art*, 844 F. App'x 436, 438-39 (2d Cir. 2021); *ASTM I*, 896 F.3d at 449.

Similarly, attracting members or receiving recognition are common results of many nonprofit activities. Every nonprofit whose mission benefits the public will likely be appreciated for contributing to the public good. If that were enough to render a nonprofit's use commercial, then using music in a school performance would be commercial because it garners recognition for the school's music program. *Contra Tresona*, 953 F.3d at 648-49. And using a photo in a brochure promoting a nonprofit conference about reducing sexual assault would be commercial because it furthers the nonprofit's mission of "educating professionals on how to reduce sexual assault." *Contra Powell*, 350 F. Supp. 2d at 730.

The Court should reject the district court's virtually limitless conception of commerciality and adhere to its precedent that commerciality requires some kind of profit, whether financial or otherwise, directly derived from the copying. Under any reasonable interpretation of that rule, IA's free lending is noncommercial and favors fair use.

---

[11] https://www.metmuseum.org (accessed Dec. 12, 2023).
[12] https://public.resource.org (accessed Dec. 12, 2023).

### 2. *Internet Archive's controlled digital lending is transformative*

#### a. Controlled digital lending expands books' utility by improving efficiency of library borrowing

The Supreme Court has "used the word 'transformative' to describe a copying use that adds something new and important." *Google*, 141 S. Ct. at 1203. Such uses are more likely to be fair because they will further "the goal of copyright, to promote science and the arts." *Campbell*, 510 U.S. at 579.

There are many ways to "transform" a work. One is to "alter[]" the work "with new expression, meaning or message," such as through commentary or criticism. *Id.* at 569. But a use can be transformative even "without altering or actually adding to the original work." *Swatch*, 756 F.3d at 84 (citation omitted); *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177-78 (2d Cir. 2018). Instead, a use might "expand[] [the] utility" of the work (*Google Books*, 804 F.3d at 214), such as by "utiliz[ing] technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder" (*TVEyes*, 883 F.3d at 177).

In *Sony*, for example, the Supreme Court held it was fair use for consumers to record television broadcasts and watch them later. 464 U.S. at 448. Notably, viewers copied "the entire work" without alteration, and they used the copy for the same purpose as the original—to view the program's content. *Id.* at 450. But this

30

did not militate against fair use because, as this Court later explained, the use was still transformative: it enhanced efficient delivery by allowing viewers to watch "at a time and place that is convenient to them, rather than at the time and place of broadcast." *TVEyes*, 883 F.3d at 178. And "the improved delivery was to one entitled to receive the content." *Capitol Records, LLC v. ReDigi, Inc.*, 910 F.3d 649, 661 (2d Cir. 2018).

In *TVEyes*, another example, a for-profit company recorded all television broadcasts and allowed paying subscribers to search them and watch clips matching their search inquiries. 883 F.3d at 173-74. As in *Sony*, the service enabled subscribers to access all content of interest; did not alter that content; and served the same purpose as the original broadcast—"learning the information reported." *TVEyes*, 883 F.3d at 178. Yet this Court nonetheless found the use modestly transformative in the "manner in which it deliver[ed] content" because it "render[ed] convenient and efficient access" to the works. *Id.* at 178, 180-81.[13]

IA's use is likewise transformative because it uses technology to make lending more convenient and efficient. There is no dispute that IA could lend its books to anyone in the world by shipping the books to them. Controlled digital lending does

---

[13] Although the Court ultimately held the commercial service was not fair use, that was based on other factors, not lack of transformativeness. *TVEyes*, 883 at 180-81.

this more efficiently by replacing the burdens of physical transportation with the benefits of digital technology. As in *Sony*, IA uses technology to deliver the work only to one already entitled to view it—the one person borrowing the book at a time. This is at least as transformative as the uses in *Sony* and *TVEyes*.

IA's lending is further transformative because it enables uses not possible with print books and physical borrowing. For example, authors writing online articles can link directly to a particular page in a particular edition, and readers can use that link to immediately borrow the book and read the cited material, search the full text, and more. *Cf. Google*, 141 S. Ct. at 1203 (fair use "provided a new collection of tasks operating in a distinct and different computing environment"). Thus, IA's lending "serves a new and different function from the original work and is not a substitute for it." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

**b.** **The district court's grounds for holding that controlled digital lending is not transformative are baseless**

The district court correctly recognized that expanding utility is transformative but misunderstood controlled digital lending's central feature in erroneously concluding that IA's lending did not expand utility. SPA-27-29.[14]

*First*, the district court mischaracterized IA's use as merely scanning a print book and turning it into an ebook, which the court described as a "paradigmatic example of a derivative work." SPA-23. But the point of controlled digital lending is to facilitate book *borrowing*. Although controlled digital lending involves scanning a print book into a digital copy, that format change is not by itself what makes the use transformative, nor is it the thrust of Publishers' infringement claim. Rather, the transformative purpose is the sort of lending the scanning enables. Neither of the uses in *Sony* or *TVEyes* changed the original work, but they were still transformative because they expanded the utility of the unaltered work. So too here.

---

[14] The district court also criticized IA for not policing partner libraries' compliance with controlled digital lending's requirements. SPA-36-37. But IA communicated to partner libraries that its lending was limited to non-circulating books (A-3458-3459), and it is permitted to rely in good faith on its partner libraries. *Google Books*, 804 F.3d at 229 (refusing to hold Google liable for sharing digital scans of books with libraries where "the possibility that libraries may misuse their digital copies is sheer speculation"). IA does not know of any incident in which a partner library caused the number of copies of a book concurrently borrowed at a given time to exceed the number of copies owned, and Publishers did not identify one. A-6379. At the very least, partner library compliance is a disputed fact question.

*Second*, the district court erroneously accused IA of "lend[ing] the digital copies en masse." SPA-29. But a basic premise of controlled digital lending is that digital copies *cannot* be accessed "en masse" by "the general public." SPA-29. Rather, for each print copy, only one person can access the digital copy at a time, just as with physical lending. If all copies are checked out, a borrower must wait until one is returned. Just as in *Sony*, access to the digital copy is limited to the number of people who would be "entitled to receive the content" by borrowing the physical book, which everyone agrees is permitted. *ReDigi*, 910 F.3d at 661.

The district court's misunderstanding of controlled digital lending is highlighted by the authorities upon which it relied: dicta in *Google Books* and a Ninth Circuit case about a file-sharing program for digital music. SPA-29 (citing *Google Books*, 804 F.3d at 225; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001)). Both considered programs that made works available to everyone online *simultaneously*.

Indeed, in *Napster*, the Ninth Circuit found *Sony* "inapposite" precisely because the file-sharing program there made copyrighted music available "to the general public" without restriction. 239 F.3d at 1019. When a user uploaded songs, they became "available to millions of other individuals" to download simultaneously. *Id.*

Similarly, in *Google Books*, Google created a database of digital copies of books and allowed users to search and read "snippets" containing the searched term. 804 F.3d at 207. These "snippets" were publicly available to anyone on the Internet and could be accessed by an unlimited number of users concurrently. *Id.* In that context, the Court suggested in dicta: "If Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong." *Id.* at 225. Because Google's database was open to all, millions of people then could have simultaneously accessed a book posted in its entirety. That was the hypothetical the Court suggested would trigger a "strong" infringement claim. *Id.*

Neither *Napster* nor the *Google Books* hypothetical addressed a situation where, as here, access is restricted to the one person at a time permitted to borrow the work from the lender who bought and owned a physical copy.

### 3. *Internet Archive's use serves the purposes of copyright*

Even if the Court finds IA's lending not transformative, the first factor would still favor fair use. Transformativeness "is not absolutely necessary for a finding of fair use." *Campbell*, 510 U.S. at 579; *Warhol*, 143 S. Ct. at 1276 (courts must look at "the justification for the use"). Indeed, Section 107's list of exemplary purposes includes a non-transformative use (making "multiple copies for classroom distribution") as an example of fair use. *Campbell*, 510 U.S. at 579 n.11.

This Court and others have found non-transformative uses fair where, as here, the use was justified by its service to copyright's purpose. In *HathiTrust*, for example, this Court found that making digital copies of books for the print-disabled was not transformative, but it held that the first factor nonetheless favored fair use. 755 F.3d at 101. Similarly, in *Patton*, the Eleventh Circuit found that making excerpts of books available online to students was not transformative, but it concluded the first factor still favored fair use because the use was "for a nonprofit educational purpose." 769 F.3d at 1263. Noting that "copyright has always been used to promote learning," the court found the copying "further[ed] the purpose of copyright by providing students and teachers with a means to lawfully access works in order to further their learning in circumstances where it would be unreasonable to require permission." *Id.* at 1263-64 (citation omitted); *see also Eagle Mountain*, 27 F.4th at 323 (tweeting motivational quotes for school softball team and color guard was fair use even though not transformative); *Swatch*, 756 F.3d at 85 (news service's reproducing of earnings call recording was fair use "regardless of how transformative the use").

### a. Internet Archive's free digital library furthers copyright's purposes

For the reasons given above, IA's free digital library is transformative. But even if not, it would still be justified because it furthers copyright's purpose of

36

"promoting broad public availability of literature, music, and the other arts."
*Warhol*, 143 S. Ct. at 1273.

Libraries have long served that goal. As Publishers themselves recognize,
libraries provide access to a broader array of books and resources than any individual
could acquire on their own. *See* A-6035. Libraries equalize access to knowledge
for people of all socioeconomic backgrounds and preserve that knowledge for future
generations. A-4977-4979, A-4993. They promote literacy (A-6035) and facilitate
learning, scholarship, and research (A-4973-4979). They benefit authors and other
creators because they buy books and help introduce them to new readers. Indeed,
Publishers acknowledge that libraries can "often increase the visibility of the
Publishers' works." A-6035.

Congress has recognized libraries' important contributions, which pre-date
copyright itself, and it has continuously supported libraries' mission by funding
them. *See, e.g.,* Library Services Act, Pub. L. 84-597 (1956); Library Services and
Technology Act, Pub. L. 104-208 (1996) (codified at 20 U.S.C. § 9121 *et seq*.).
Congress's intent has been "to encourage resource sharing among all types of
libraries for the purpose of achieving economical and efficient delivery of library
services to the public"; "to enable libraries to develop services that meet the needs
of communities throughout the Nation," including, *e.g.,* "people of diverse
geographic, cultural, and socioeconomic backgrounds," "individuals with

disabilities," and "residents of rural and urban areas"; and "to ensure the preservation of knowledge and library collections in all formats and to enable libraries to serve their communities during disasters."  20 U.S.C. § 9121(4), (6), (9).  Controlled digital lending directly serves all these public interests.

Congress's solicitude toward libraries is further reflected in multiple statutory copyright exemptions.  For example, Congress enacted Section 108 to permit libraries to reproduce works they own under certain conditions, when necessary to serve library purposes such as "preservation and security," "deposit for research use in another library," and "replacement" of a "damaged, deteriorating, lost, or stolen" copy.  17 U.S.C. § 108(b)-(c).  Congress also codified the judge-made first-sale doctrine in Section 109 to permit owners of a copy of a work to "sell or otherwise dispose of" that copy, including by lending it to others for free.  Congress intended this provision to protect libraries, stating:  "A library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose."  H.R. Rep. 94-1476, at 79 (1976).  Together, these provisions reflect Congress's recognition that libraries, and specifically library lending, serve copyright's purposes.

Controlled digital lending enables libraries to do the same thing more effectively, thereby better serving their mission in the digital environment.  *See* A-4993 ("CDL has become an accepted practice for libraries.").  As the International Federation of Library Associations and Institutions has recognized, controlled

digital lending "has helped to fulfill the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws." A-4063; A-4992.  That serves the very purposes of copyright discussed above.

> **b.** **The district court erroneously discounted fair use's traditional role of ensuring copyright serves the public interest**

The district court erroneously failed to recognize these justifications because it did not give sufficient weight to Congress's intent that fair use preserve the purposes of copyright by filling the inevitable gaps between copyright statutes and technological developments.  *Google*, 141 S. Ct. at 1197.  Fair use ensures that copyright jurisprudence continues to align with the public interest.  Here, fair use helps the principles embodied in Sections 108 and 109 survive in the digital age.  It ensures that technological innovation allows libraries to improve access to books, so that advancements in technology can benefit the public rather than only benefiting Publishers.

The district court gave short shrift to fair use's role because it misread this Court's holding in *ReDigi*, 910 F.3d 649, that Section 109's first-sale defense does not extend to digital reproductions.  SPA-36-38.  The district court concluded that *ReDigi* also precluded fair use arguments based on first-sale principles.  SPA-38.  Publishers similarly argued that Sections 108 and 109 set the outer bounds of library

copying permitted by Congress.  A-5851.  If a use is not within those exceptions, they claimed, it could not be fair.  SPA-38.

That reasoning misses the point.  Unlike other defenses, fair use is flexible and court-driven.  *See supra* Section I.A.  *ReDigi* recognized as much, noting that Section 108 "dictated the terms of the statutory entitlements," restricting courts' discretion to expand the exception.  910 F.3d at 664.  That makes sense because expanding exceptions like Sections 108 and 109 that create a blanket rule for entire categories of copying could have consequences far beyond what Congress intended. With Section 107's fair use defense, however, Congress instead "summarized common law developments, implicitly leaving further such development to the courts" on a case-by-case basis.  *Id.*

Accordingly, as the Ninth Circuit observed in *Sega*, fair use and other statutory exceptions "serve entirely different functions."  977 F.2d at 1521.  Rather than spell out every permitted use by statute, Congress expected courts to deploy fair use to fill the gaps and prevent copyright law's rigid application from undermining that law's very purpose.  *See, e.g., Google*, 141 S. Ct. at 1196-97; *Campbell*, 510 U.S. at 577.  Thus, fair use may permit activities, as here, that fall outside the boundaries of another statutory exemption but nonetheless serve the purposes behind that exemption.

The guiding question must be whether the use is justified, and part of that justification may be whether it serves goals Congress itself has identified as public interests. In *HathiTrust*, for example, this Court found a use fair where the use fulfilled the purpose of a statutory exemption allowing reproductions for the print-disabled, without requiring the use to actually satisfy the conditions of that exemption. 755 F.3d at 102. *HathiTrust* refutes the suggestion, advanced by Publishers below, that the existence of a statutory exception should weigh *against* fair use if the exception's conditions are not satisfied. *Id.*; *see also Authors Guild, Inc. v. HathiTrust*, 902 F. Supp. 2d 445, 465 & n.33 (S.D.N.Y. 2012) ("Defendants may certainly rely on fair use, as explained above, to justify copies made outside of these categories or in the event that they are not authorized entities."). The Ninth Circuit rejected such logic as "verg[ing] on the frivolous." *Sega*, 977 F.2d at 1520-21 (refusing to treat Section 117 as precluding a fair use defense for uses that fall outside that exception).

Accordingly, there is nothing inconsistent in holding that IA's free digital library is fair use, but the digital resale in *ReDigi* was not. *ReDigi* involved a platform for reselling digital music. 910 F.3d at 661. Unlike IA, ReDigi did not "deliver the content in more convenient and usable form to one who has acquired an entitlement to receive the content," and it created a "remunerative marketplace" for a "commercial purpose." *Id.* Whether *ReDigi*'s commercial marketplace serves the

41

purposes of copyright has no bearing on whether controlled digital lending by a nonprofit library does.

**B.    The Second Factor Is Neutral Because The Works In Suit Are Published Books Of Both Fact and Fiction**

The district court also erred in determining that "the nature of the copyrighted work" favored Publishers.  SPA-39-41.  This factor "rarely play[s] a significant role in the determination of a fair use dispute."  *Google Books*, 804 F.3d at 220; *see Campbell*, 510 U.S. at 586.  To the extent the second factor carries any weight, it should be neutral here.

This factor encompasses two considerations.  *First*, courts consider "whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational."  *Blanch*, 467 F.3d at 256 (citation omitted).  Here, this consideration is neutral because the works at issue include both fact and fiction.

The district court's speculation that even the non-fiction works might contain "subjective descriptions and portraits . . . whose power lies in the author's individualized expression" (SPA-40 (quoting *Harper & Row*, 471 U.S. at 563)) should not change the analysis, especially absent any actual review of the Works in Suit.  The same degree of expression is not present in all non-fiction works, which range from the presidential memoir in *Harper & Row* to textbooks.  A-1198-1200.

*Second*, courts also consider "whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256. This is because copying an unpublished work interferes with "the author's right to control the first public appearance of his expression." *Harper & Row*, 471 U.S. at 564. All of the books in IA's library are published. A-6018-6019. Thus, IA's use had no effect on the first public appearance of the books. *See, e.g., Swatch*, 756 F.3d at 89 ("publication status" of publicly disseminated recording "favors fair use").

## C. The Third Factor Is Neutral Because Copying The Entire Work Is Necessary For Controlled Digital Lending

The "amount and substantiality of the portion used in relation to the copyrighted work as a whole" (17 U.S.C. § 107(3)) is also neutral. The district court again erred by ruling that it strongly favored Publishers. SPA-42.

Courts assess the amount copied relative to the use's purpose. *HathiTrust*, 755 F.3d at 98. "The crux of the inquiry is whether 'no more was taken than necessary.'" *Id.* Thus, even where an entire work was copied, the third factor "does not weigh against a finding of fair use" if complete copying is "necessary" for the purpose at issue. *Id.*; *Google Books*, 804 F.3d at 221; *Swatch*, 756 F.3d at 90. Here, scanning the entire book is necessary because library lending requires providing the borrower access to the whole book.

43

The district court did not disagree, but instead collapsed the first and third factors. Having already decided that controlled digital lending did not serve a transformative purpose, the court concluded that the copying necessary to achieve that purpose was improper as well. SPA-42. *But see* § 107 (permitting "multiple copies for classroom use" although not transformative). As discussed above, the district court's transformativeness analysis was wrong (and failed to consider other justifications for copying). Its third-factor analysis thus is wrong for the same reasons.

### D. The Fourth Factor Favors Fair Use Because Internet Archive's Lending Causes No Cognizable Harm To Publishers' Markets

The fourth factor requires courts to consider "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). Courts must balance "the benefit the public will derive if the use is permitted and the personal gain the copyright owner will receive if the use is denied." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (citation omitted). The copyright holder's personal gain is assessed by considering "whether the copy brings to the marketplace a competing substitute for the original, or its derivative," or whether it impacts "potential licensing revenues for 'traditional, reasonable, or likely to be developed markets.'" *TVEyes*, 883 F.3d at 179-80. As with the other factors, the "crucial question" is whether allowing or precluding the use "best serve[s] the overall objectives of the copyright law to expand public learning while protecting

the incentives of authors to create for the public good." *Google Books*, 804 F.3d at 213.

Here, Publishers claimed two markets—one for ebook licensing to libraries and another for book sales to consumers (A-3729-3731), but the district court focused only on the former (SPA-44-50). IA's controlled digital lending causes no cognizable harm to either market for three independent reasons. As a legal matter, IA's lending offers a distinct service from Publishers' ebook markets, not a substitute, and the fourth factor's market harm analysis cannot be used to preclude such transformative uses. As an empirical matter, even if harms caused by transformative uses could somehow be cognizable, all available evidence shows that IA's lending caused no harm at all to either of Publishers' alleged markets. Finally, even if Publishers could show such harm, it would be significantly outweighed by the public benefits of controlled digital lending.

### a. Internet Archive's controlled digital lending is distinct from Publishers' ebook markets

As with the other factors, the district court's misapplication of the fourth factor began with its misunderstanding of controlled digital lending. Publishers sell print books and license ebooks. Controlled digital lending does something different and transformative: allow libraries to use technology to make fuller use of the print books they, or a donor, bought from Publishers. Copyright law does not permit Publishers to preclude or charge for IA's distinct transformative use.

45

The mere assertion that Publishers have a market for licensing ebooks does not establish cognizable harm. That is because the fourth factor's market analysis does not include harms caused by transformative uses, even if any such harms could be shown: "The only market harms that count are the ones that are caused because the secondary use serves as a substitute for the original, not when the secondary use is transformative." *HathiTrust*, 785 F.3d at 99; *see Bill Graham*, 448 F.3d at 615. If copyright holders could "prevent others from entering fair use markets merely 'by developing or licensing a market for . . . transformative uses of [their] own creative work'" (*Bill Graham*, 448 F.3d at 615), they could thwart the very purpose of the fair use doctrine.

This means that copyright holders cannot complain of market harms based on a defendant's failure to pay licensing fees for their transformative use. Of course, copyright holders may wish to extract royalties for any new uses of their works, and they may argue "in every fair use case that [they] suffer[ed] a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar." *Swatch*, 756 F.3d at 91 (citation and emphasis omitted). This Court has rejected that "very circular reasoning," however, because it would mean that "the fourth fair use factor would *always* favor the copyright holder." *Id.*; *Bill Graham*, 448 F.3d at 614 (emphasis in original). Instead, the loss of potential licensing fees

is cognizable only if the defendant's use impacts "traditional, reasonable, or likely to be developed markets." *Texaco*, 60 F.3d at 930.

There is no such market for licensing controlled digital lending. Publishers do not license the ability to digitally loan books a library (or anyone else) already owns, nor is a market for such licensing reasonable or likely to develop. IA (or its donors) have already paid Publishers to purchase a copy of each book, and the customary price for lending a book one already owns is zero.

Publishers argue instead that they have established ebook markets—for both libraries and consumers—but this is misdirection. Those markets are distinct from controlled digital lending, which offers a different service to meet different needs.

Publishers allow consumers to buy a print book or pay for a perpetual license to download access to an ebook. A-6031-6033. Consumers can then add the book to their collection and read it an unlimited number of times. If it is a print book, they can also loan it, give it as a gift, donate it, or resell it. For both types, they can highlight and write comments in the book, use it as a reference, and never lose access to it because it is theirs. IA's controlled digital lending, in contrast, allows readers to *borrow* the book for a limited time and return it when finished. These are different services that serve different purposes.

As for libraries, Publishers allow them to buy print books or pay for their patrons to access ebooks available on commercial aggregators like OverDrive.

Controlled digital lending enables libraries to lend a digital copy of a physical book they already own via their own technology. Publishers' ebook licenses do not require libraries to own and maintain a non-circulating copy of each book they loan. Libraries pay the same licensing fee whether they own the print book or not. And that fee does not enable them to own and lend the book permanently. Instead, they can offer borrowers temporary access to only whatever selection Publishers allow on commercial aggregators' platforms at a given time. A-5009.[15]

Ebook licensing and controlled digital lending thus serve different library and patron needs. For example, libraries cannot use ebook licenses to build permanent collections. A-5012-5013 But they can use licensing to easily change the selection of ebooks they offer to adapt to changing interests. Because they have not purchased actual copies, they can choose not to renew a license if a book's popularity decreases and instead use that money for other books. A-504-505; A-648. Controlled digital lending, by contrast, allows libraries to lend only books from their own permanent collections. They can preserve and lend older editions, maintaining an accurate historical record of books as they were printed. They can also provide access that does not depend on what Publishers choose to make available. But libraries must

---

[15] For example, in fall of 2022, George Washington University's students were unable to borrow 1,379 ebooks because Wiley suddenly decided to stop licensing them to academic libraries. A-6238. After public backlash, Wiley temporarily extended those licenses. *Id.*

own a copy of each book they lend, so they cannot easily swap one book for another when interest or trends change.

### b. All available evidence establishes that Publishers have not and will not suffer market harm

Even if harm allegedly caused by IA's controlled digital lending could theoretically be cognizable under the fourth factor, the evidence shows that IA's lending caused no such harm. As this Court has held, "the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original." *Google Books*, 804 F.3d at 224. Instead, the loss must be "meaningful or significant" to count. *Id.* And where there is substantial, unrefuted evidence showing a *lack* of harm, the fourth factor favors fair use because "a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony*, 464 U.S. at 450.

### i. Expert analysis establishes that Internet Archive's lending does not harm Publishers' ebook licensing market

The district court focused primarily on Publishers' market for licensing ebooks to libraries and erroneously found that IA's lending harms that market. SPA-44-47. That conclusion is contrary to the record evidence.

To start, library demand for ebooks through commercial aggregators has only increased since 2018 (when IA launched Open Libraries). A-4917; A-5002-5004; A-5448 nn.145,148, A-5479. Library expenditures on electronic formats increased by more than 50% between 2017 and 2019, from $166.7 million to $257.1 million. A-4917; A-1081. Publishers' revenues, including from ebook licensing, have also increased. A-5810-5811; A-746-750; A-637-638, A-649, A-651-653; *see Sony*, 464 U.S. at 454 (no market harm where "[t]elevision production by plaintiffs today is more profitable than it has ever been"); *Am. Soc'y for Testing & Materials v. Public.Resource.Org*, 82 F.4th 1262, 1271 (D.C. Cir. 2023) ("*ASTM II*") (doubting plaintiffs' claim of market harm where rights-holders' "sales have increased" during time defendant engaged in secondary use).

IA also introduced expert evidence showing lack of harm. Economist Dr. Rasmus Jorgensen analyzed the relationship between IA's lending and demand for libraries' ebook lending using OverDrive, which represents ███ of the library ebook market. A-4832, 4840-4842. He found "no measurable impact." A-4880.

He used the National Emergency Library's closure as a "natural experiment" to measure the effect of IA's lending. A-4841. During the National Emergency Library, IA's lending increased dramatically because limits on concurrent borrows were lifted. A-5802-5803; A-6140. That period of broader lending provides an empirical sample of what would happen if IA's practice "bec[ame] widespread."

SPA-44-45 (quoting *Warhol*, 11 F.4th at 48). In June 2020, when IA ended the National Emergency Library, available and actual loans through IA decreased significantly. A-4841-4842; A-4927.

Dr. Jorgensen compared ebook lending of the Works in Suit on OverDrive before and after this dramatic decrease. By comparing two closely related time periods with markedly different IA lending rates (the second and third quarters of 2020), he could measure the effect of that lending. A-4879-4880. Dr. Jorgensen explained that, if IA's lending was a substitute for ebook lending through OverDrive, the significant decrease in availability of the former should correspond to an increase in demand for the latter. A-4841.

████████████████████████████████████ A-4841-4842. ██████

████████████████████████████████████████████████████████████

██████████████████████ A-4841-4842. Dr. Jorgensen concluded that this ██████ was "not consistent with Plaintiffs' theory that IA's loan volume of the Works-in-Suit reduced digital lending through OverDrive." A-4841-4842. Publishers concede that libraries' licensing decisions—and thus Publishers' ebook licensing revenues—are driven by patron demand on OverDrive. A-3734; A-5460; A-660-661. If IA's lending has no effect on demand for borrowing on OverDrive, as Dr. Jorgensen's analysis shows, there is no reason to imagine, much less assume, that digital lending affects Publishers' ebook license revenue at all.

Overall, Dr. Jorgensen's analysis shows that controlled digital lending has no statistically significant effect on OverDrive ebook licensing. A library's ability to put IA's link on its website does not stop it from also buying ebook licenses from Publishers. It is reasonable for libraries to do both in order to give borrowers more options—these forms of lending are thus not an either-or, but a both-and. Indeed, expert library administrator Susan Hildreth opined that, in her decades of experience, she was not aware of "any instance of a library paying for access to fewer ebook copies of a title—or buying fewer copies of a physical book for a title—where that title is available for borrowing through CDL, either from the IA or from another library." A-5024, A-5028-5029. Nor have Publishers identified any instance in which a library chose not to license an ebook because of its availability on IA's website for controlled digital lending.[16]

---

[16] At most, Publishers identified a single school that decided not to purchase from Penguin during the pandemic because it "needed the materials more urgently" than Penguin could accommodate and used IA's library instead. A-3617-3618. It is telling that, for the decade-plus that IA has offered controlled digital lending, Publishers were able to identify only a single instance of alleged substitution resulting in a lost license deal—and even that was not substitution by controlled digital lending, but by the National Emergency Library under uniquely urgent conditions.

> ii. **Expert analysis establishes that Internet Archive's lending does not harm Publishers' book sales**

Although Publishers identified sales to consumers as another market allegedly harmed by IA's lending (A-3729-3731), the district court did not rely on that market. Nevertheless, all available evidence shows that IA's lending does not affect that market either. Experts examined this market through different methodologies and reached the same conclusion: people do not buy fewer books because those books are available for borrowing via IA.

Dr. Jorgensen used the same natural experiment to assess the effect of the National Emergency Library's closure on Hachette's monthly print and ebook sales for the Works in Suit.[17] A-4843-4845. As with the ebook licensing market, if IA's lending were a substitute for Hachette's sales, the closing of the National Emergency Library should correlate to an increase in Hachette's sales. A-4844. Instead, Hachette's print sales for the Works in Suit *decreased* by 21%, and its ebook sales *decreased* by 29%. A-4844-4845. Dr. Jorgensen opined that this was inconsistent with Publishers' theory that IA's lending was a "competing substitute" for Publishers' sales. A-4844-4845.

---

[17] The other three Publishers refused to provide monthly sales data for Dr. Jorgensen to analyze. A-4843.

Dr. Imke Reimers, another expert economist, studied the effect of IA's lending on Amazon sales rankings for print sales of the Works in Suit. A-4919-4934.[18] Because Amazon sales rankings are relative to other books, this approach enabled Dr. Reimers to control for global changes in the book market. A-4919-4920. Dr. Reimers examined whether sales rankings for the Works changed (1) when the book was first added to IA's library; (2) when the National Emergency Library was launched; and (3) when the book was removed from IA's library in response to this lawsuit. A-4920-4921. She found "no statistically significant evidence" that either inclusion in IA's library or increased lending through the National Emergency Library harmed a book's sales ranking. A-4905, A-4934. She also found that removal from IA's website correlated with a *decrease* in sales ranking. A-4927-4930. Thus, Dr. Reimers concluded there was "no evidence that availability of these titles for borrowing from [IA's] digital lending program depressed book sales of print books through other channels." A-4905.

The absence of any effect on Publishers' markets for book sales makes sense. First, when assessing the effect of controlled digital lending, the relevant comparison is traditional library lending, not no lending at all. Publishers' complaint that people will not buy books they can borrow for free applies to all library lending. Second,

---

[18] Dr. Reimers was not able to analyze the effect on ebook sales because Publishers refused to produce the necessary data. A-4948&n.1.

unlike traditional libraries, which lend books immediately after publication, IA waits five years before lending—after most of the book's lifetime sales have already occurred. A-5789-5793, A-5836; A-4909-4917 (90% of lifetime sales to date for most Works in Suit occurred in first five years); A-4957-4959. Third, borrowing a book may actually increase sales through the "discovery effect" when borrowers who enjoyed a book buy a copy or recommend it to others. A-5835-5836; A-4262.

### iii.  Publishers introduced no evidence of market harm

While Publishers objected to IA's experts' methodologies, they offered no concrete evidence in response. Publishers and their experts conceded they made no attempt to analyze empirical data to show any market harm. A-5831-5832; A-4209-4214. Publishers' other witnesses also admitted they had no evidence supporting their harm allegations. A-4109-4110 ("I don't have any evidence."); A-4220 (Hachette conducted no harm analysis); A-4221; A-4227-4228 ("But there's no, you know, there's no factual analysis. It's just one inference you could make."); A-6260, A-6266-6268.

Instead, Publishers based their allegations on what they called "decades of experience and basic economic common sense." A-3735. They placed heavy weight on language IA used to encourage libraries to join its Open Libraries project, assuming—but not showing—that libraries would choose any free option over

55

paying for licenses. SPA-44.[19] Their expert, too, relied only on "theoretical reasoning" and asserted without evidence that "there's reason to believe that those numbers [losses] are not de minimis." A-4211, A-4214. But these assertions remain pure speculation, and the fourth factor does not credit speculative harms. *See, e.g., Sony*, 464 U.S. at 452-53 (finding fair use where "plaintiffs' predictions of harm hinge on speculation about audience viewing patterns and ratings" (citation omitted)).

The D.C. Circuit recently found plaintiffs' absence of data "telling" in similar circumstances. *ASTM II*, 82 F.4th at 1271. There, as here, plaintiffs relied on "a common-sense inference: If users can download an identical copy of [a work] for free, few will pay to buy the [work]." *Id.* The D.C. Circuit refused to credit that "common sense inference" because plaintiffs "d[id] not provide any quantifiable evidence, and instead rel[ied] on conclusory assertions and speculation long after [defendant] first began posting the standards." *Id.* at 1272 (citation omitted). The court found it "telling" that defendant had been posting standards for fifteen years,

---

[19] For example, Publishers quoted, and the district court relied on, an Open Libraries presentation stating the project "ensures that a library will not have to buy the same content over and over, simply because of a change in format." SPA-44; A-6099 ("Maximizing institutional investments in print resources through controlled digital lending"—"Or, You Don't Have to Buy it Again!"). But mere rhetorical flourishes do not prove that IA actually caused or will cause Publishers market harm, especially when empirical evidence proves the opposite. *See* Section I.E.b.i.

yet plaintiffs were "unable to produce any economic analysis" showing market harm. *Id.*; *see Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1358 (Cl. Ct. 1973) (rejecting plaintiff's reliance on "general business common sense" where plaintiff "never made a detailed study of the actual effect of photocopying on its business"), *aff'd by an equally divided court*, 420 U.S. 376 (1975).

Publishers' absence of evidence is equally telling. IA has practiced controlled digital lending for over a decade and operated Open Libraries for five years. Publishers have direct access to their own data to analyze any alleged harm to their own markets. Yet, like the *ASTM II* plaintiffs, they made "no serious attempt to quantify past or future harms." 82 F.4th at 1271. Their supposedly "common sense" inference fails for the same reason.

### iv.    The district court erred in crediting Publishers' speculation over Internet Archive's evidence

Despite all the evidence, the district court based its conclusion that the fourth factor tilted against fair use on several errors.

*First*, the court misread IA's expert's opinions. It claimed their analysis merely showed "positive financial indicators for the Publishers *in other areas*," which, it stated, could not offset alleged harms to Publishers' ebook licensing revenues. SPA-48 (emphasis added). But the indicators the experts analyzed captured precisely the two markets Publishers claimed would be harmed: ebook licensing and retail book sales. Dr. Jorgensen's analysis of ebook lending on

57

OverDrive spoke directly to the ebook licensing market the district court assumed would be harmed—and refuted that assumption. *See supra* Section I.E.b.i.

*Second*, the district court justified allowing speculation to defeat empirical evidence by noting that IA bears the burden of proof. Defendants do bear the overall burden in this Circuit (*Warhol*, 11 F.4th at 49),[20] which means that if defendant has not produced evidence, plaintiffs can win without producing evidence of their own. It does not mean plaintiffs can stand on conjecture where, as here, a defendant *has* offered substantial and compelling empirical evidence.

*Third*, even if Publishers' speculation were considered "evidence," on this record it would create a genuine dispute of material fact at most, precluding summary judgment for Publishers.

---

[20] Although the Supreme Court has stated fair use is an affirmative defense for which defendants bear the burden (*Campbell*, 510 U.S. at 1177), it has also suggested this burden may apply differently to noncommercial uses than commercial ones. *Sony* stated that noncommercial cases require "a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists." 464 U.S. at 417; *see Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385-86 (6th Cir. 1996) ("The burden of proof as to market effect rests with the copyright holder if the challenged use is of a 'noncommercial' nature."). Notwithstanding this Court's categorical statement on burden in *Warhol*, IA maintains that plaintiffs should bear the burden of showing market harm for noncommercial uses. In any event, the district court erred for the reasons stated above regardless of who bore the burden.

### c. Even if there were market harm, it is substantially outweighed by the public benefits of Internet Archive's lending

The fourth factor also requires courts to weigh any possible market effects against "the public benefits [the] copying will likely produce." SPA-49 (quoting *Warhol*, 11 F.4th at 50); *see Google*, 141 S. Ct. at 1206; *Sony*, 464 U.S. at 454 (considering "societal benefits" because "time-shifting expands public access to freely broadcast television programs"). The "crucial question" is "how to define the boundary limit of the original author's exclusive rights in order to best serve the overall objectives of the copyright law to expand public learning while protecting the incentives of authors to create for the public good." *Google Books*, 804 F.3d at 213.

As explained above (*supra* Section I.B.1.b), IA's lending provides significant public benefits. Like the transformative use in *Sony*, these benefits expand public access to free services by making library lending more available and efficient, thus serving copyright's purpose of "expand[ing] public learning." *Google Books*, 804 F.3d at 213; *see supra* Section 1.B.3. And prohibiting controlled digital lending would cause harm, including to those who have difficulty accessing physical libraries and to researchers and authors who use controlled digital lending in creating new works. *Williams & Wilkins*, 487 F.2d at 1356-57.

The district court did not deny that controlled digital lending benefits the public, but it concluded those benefits were outweighed by the harms to Publishers. SPA-49. That, too, was error. Even if there existed some (unproven) market harms, they are at best small, given the lack of any evidence of their existence. The benefits, on the other hand, are substantial and supported by numerous record examples where IA's library was used to further education, research, and scholarship. *See, e.g.,* A-4259-4262 (university instructor providing students access to books not available locally for use in research projects); A-5799-5801. These benefits far outweigh any minimal harms, so the fourth factor favors fair use.

### E. Weighed In Light Of Copyright's Purposes, The Factors Support Fair Use

The district court compounded its prior errors by failing to consider whether precluding IA's use would serve or undermine copyright's purpose of promoting access to and creation of knowledge—the central inquiry driving fair use. *See* SPA-50-51.

Here, copyright's goals surely "would be better served by allowing the use than preventing it." *Palmer*, 970 F.2d at 1077. IA and other libraries have been practicing controlled digital lending for more than a decade without harm to Publishers (*supra* Section I.E.b). IA's controlled digital lending provides significant benefits to the public (*supra* Section I.B.1.b) and furthers the purposes of copyright

by making library services more accessible (*supra* Section 1.B.3). Restricting this practice would harm this essential work.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT THE NATIONAL EMERGENCY LIBRARY WAS NOT FAIR USE

The district court extended its fair use analysis to the National Emergency Library without separately applying the factors to that distinct use. SPA-51. If the Court reverses the district court's ruling on IA's non-emergency lending, its remand order should instruct the court to remedy that error. As the Supreme Court has stressed, fair use "requires an analysis of *the specific 'use'* of a copyrighted work" because the "same copying" may be fair for some uses but not others. *Warhol*, 143 S. Ct. at 1277 (emphasis added).

At a minimum, the justifications for the National Emergency Library differ from those for ordinary controlled digital lending. *See Warhol*, 143 S. Ct. at 1280 (recognizing possibility of "some other justification for copying" beyond the statutory factors). With libraries inaccessible during the shutdown, copyright's purpose of promoting public availability of knowledge was significantly hindered, justifying emergency measures. IA's free digital library filled that gap, enabling education, research, and scholarship to continue. Consistent with its emergency purpose, the National Emergency Library lasted only as long as necessary to address the most urgent period of the pandemic.

## III.   AT THE LEAST, THIS COURT SHOULD NARROW THE DISTRICT COURT'S HOLDING

Even if the Court agrees with the district court that the Open Libraries project is not fair use, it should limit its holding to that use.  The district court did not separately analyze whether IA's controlled digital lending of its own books was fair use, even if lending copies owned by partner libraries was not.

These distinct uses alter the fair use analysis.  For example, the district court was primarily concerned that Open Libraries would replace Publishers' ebook license market by allowing libraries to link to IA's website instead of buying ebook licenses from Publishers.  SPA-44.  But IA's lending its own books, one at a time, would not have any such effect.  Multiple libraries could not rely on IA's single copy to meet their lending needs, and IA's potential to expand would be limited by the costs of buying and storing additional books.  The fourth factor thus favors fair use for IA's own controlled digital lending, even if it does not for Open Libraries.

### CONCLUSION

This Court should reverse and grant summary judgment for Internet Archive.

62

Dated:  December 15, 2023         Respectfully submitted,

                                       <u>s/ Joseph R. Palmore</u>

JOSEPH C. GRATZ                     JOSEPH R. PALMORE

MORRISON & FOERSTER LLP      DIANA L. KIM

425 Market Street                   ADITYA V. KAMDAR

San Francisco, CA 94105         MORRISON & FOERSTER LLP

                                      2100 L Street NW, Suite 900

CORYNNE M. MCSHERRY        Washington, DC 20036

ELECTRONIC FRONTIER FOUNDATION   Telephone:  (202) 887-6940

815 Eddy Street                    JPalmore@mofo.com

San Francisco, CA 94109

*Counsel for Defendant-Appellant Internet Archive*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Rule 32.1(a)(4) because it contains 13,993 words, excluding those parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016, in 14-point Times New Roman font.

Dated: December 15, 2023                       s/ Joseph R. Palmore

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit via the CM/ECF system on December 15, 2023. I have also submitted six paper copies to the Court via overnight delivery the same day.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: December 15, 2023

s/ Joseph R. Palmore