# 23-1260

## United States Court of Appeals
## for the Second Circuit

---

Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC,

*Plaintiffs-Appellees,*

v.

Internet Archive,

*Defendant-Appellant*,

Does 1-5, inclusive,

*Defendants*.

---

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

---

### JOINT APPENDIX (PUBLIC) – VOLUME 1 OF 26 (A-1-A253)

---

Joseph C. Gratz
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105

Corynne M. McSherry
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109

Joseph R. Palmore
Diana L. Kim
Aditya V. Kamdar
Morrison & Foerster LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

December 15, 2023

MATTHEW JAN OPPENHEIM        ELIZABETH A. MCNAMARA
DANAE TINELLI                LINDA J. STEINMAN
SCOTT A. ZEBRAK              JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP      JESSE M. FEITEL
4530 Wisconsin Avenue, NW,   CARL MAZUREK
5th Floor                    DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016         1251 Avenue of the Americas, 21st Floor
                             New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

### Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|----------|------|----------|---------------|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
|  |  | Exhibit 7 – Open Libraries Web Page | A-798 |
|  |  | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
|  |  | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
|  |  | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
|  |  | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
|  |  | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
|  |  | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
|  |  | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
|  |  | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
|  |  | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
|  |  | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
|  |  | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
|  |  | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
|  |  | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
|  |  | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | **Vol. 5** | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | **Vol. 6** | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | **Vol. 7** | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | **Vol. 10** | | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | Vol. 16 | | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| **Vol. 20** | | | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| | | **Vol. 21** | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|----------|------|----------|---------------|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
HACHETTE BOOK GROUP, INC.,                    :
HARPERCOLLINS PUBLISHERS LLC, JOHN            :    Case No. 1:20-cv-04160-GJK
WILEY & SONS, INC., and PENGUIN               :
RANDOM HOUSE LLC,                             :    **STIPULATION AND**
                              Plaintiffs,     :    **PROTECTIVE ORDER**
                    -against-                 :
INTERNET ARCHIVE and DOES 1 through 5,        :
inclusive,                                    :
                              Defendants.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Subject to the Court's approval, Plaintiffs Hachette Book Group, Inc. ("Hachette"),

HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley"), and

Penguin Random House LLC ("Penguin Random House") (together, "Plaintiffs"), by and through

their undersigned counsel, and Defendant Internet Archive (individually, a "Party," and

collectively, the "Parties") hereby stipulate to the following protective order pursuant to Rule 26(c)

of the Federal Rules of Civil Procedure.

### Confidential and Attorneys' Eyes Only Material

1.      Any Party producing information ("Disclosing Party") may designate as

"Confidential" any information, whether or not embodied in any physical or electronic medium,

that the Disclosing Party believes in good faith constitutes (a) non-public information that must be

maintained in confidence pursuant to a confidentiality agreement, contractual provision, law, or

court order; and/or (b) business, strategic, proprietary, or otherwise commercially sensitive

business information, trade secrets, or other similar information not generally known, the public

disclosure of which would, in the good faith judgment of the Disclosing Party, be detrimental to

the conduct of the Disclosing Party's operations or business or the business of any of the Disclosing

Party's customers or clients; and/or (c) information that falls into one or more of the following

categories: (i) sensitive personally identifying information such as personal addresses, phone numbers, e-mail addresses, birth dates, financial account information, Social Security numbers, driver's license numbers, and IP addresses; (ii) medical, psychological, or mental health records, and other medical information, provided, however, that any person or entity has the right to waive confidentiality with respect to information pertaining to him, her, or it to the extent permitted under law (all such information shall be referred to as "Confidential Material").

2.     Any Disclosing Party may designate as "Attorneys' Eyes Only" any information, whether or not embodied in any physical or electronic medium, that the Disclosing Party believes in good faith contains non-public and confidential business, strategic, proprietary, or otherwise commercially sensitive business information, trade secrets, or other similar information not generally known and that, in the good faith judgment of the Disclosing Party, is substantially likely to cause injury to the commercial, financial, strategic, or business interests of such Disclosing Party or its employees, customers, or clients if disclosed to the other parties in this litigation ("Attorneys' Eyes Only Material").

3.     Confidential Material and Attorneys' Eyes Only Material could include but is not limited to: (a) information disclosed in depositions; (b) documents produced in response to requests for production of documents; (c) answers to interrogatories; (d) responses to requests for admissions; (e) all other discovery in any form; and (f) all copies thereof and information contained therein.

4.     Confidential Material and Attorneys' Eyes Only Material shall be treated as confidential and not disclosed, except to the extent provided in this Stipulation and Protective Order or as otherwise ordered by the Court.

2

## Designation of Confidential and Attorneys' Eyes Only Material

5.      Other than deposition transcripts and exhibits, the Disclosing Party or counsel thereof shall designate Confidential Material and Attorneys' Eyes Only Material by stamping or otherwise clearly marking the material as "Confidential" or "Attorneys' Eyes Only" in a manner that will not interfere with legibility or audibility.

6.      If a Disclosing Party has designated a document or information as "Confidential" or "Attorneys' Eyes Only," that Disclosing Party may remove such document or information from the scope of that protection by notifying all Parties in writing and re-producing the document or information without such designation.

## Deposition Transcripts

7.      All transcripts of depositions taken in this action will be treated as Confidential Material in their entirety for thirty (30) days after receipt of a final copy of the deposition transcript, except to the extent that a Party designates any portion of a deposition as "Attorneys' Eyes Only" at the time of such deposition, in which case said portion of the testimony shall be treated as Attorneys' Eyes Only Material for thirty (30) days after receipt of the final deposition transcript. During that thirty (30) day period, any party may designate as Confidential Material or Attorneys' Eyes Only Material any portion of the transcript, by page and line, and any deposition exhibits related to the subject areas described in Paragraphs 1 and 2 herein, and such designation must be provided to the Parties' counsel in writing to be deemed effective. Any portion of a deposition transcript or exhibits not so designated during the thirty (30) day period will not be treated as Confidential Material or Attorneys' Eyes Only Material.

## Use of Confidential and Attorneys' Eyes Only Material

8.      Confidential Material and Attorneys' Eyes Only Material subject to this Stipulation

Case 1:20-cv-04160-JGK Document 38 Filed 10/08/20 Page 4 of 15

and Protective Order may be used only for purposes of this action and shall not be disclosed by the Party receiving such material ("Receiving Party") to any persons other than those listed in Paragraphs 11 and 12 herein, except by prior written agreement of the Parties or by order of the Court. Any person receiving Confidential Material or Attorneys' Eyes Only Material shall use reasonable measures to prevent unauthorized disclosure of such material. Reasonable measures include, but are not limited to, taking any necessary action to maintain the security and integrity of data and files.

9.      Persons to whom Confidential Material or Attorneys' Eyes Only Material is disclosed per Paragraphs 11 and 12 herein shall be informed, prior to being shown Confidential Material or Attorneys' Eyes Only Material, that he/she (i) is being shown such materials solely for use in this action and (ii) shall not retain any Confidential Material or Attorneys' Eyes Only Material after the termination of this action.

10.     The recipient of any Confidential Material or Attorneys' Eyes Only Material shall use reasonable efforts to prevent any disclosure thereof, except in accordance with the terms of this Stipulation and Protective Order. All copies, reproductions, summarizations, extractions, and abstractions of Confidential Material or Attorneys' Eyes Only Material shall be subject to the terms of this Stipulation and Protective Order and labeled in the same manner as the designated material upon which they are based.

11.     In the absence of an order of the Court or by agreement of the Parties, Confidential Material may be disclosed or made available only to the following persons:

a.      The named parties to this Action and the attorneys working on this Action on behalf of any party, including both outside counsel and in-house attorneys, as well as any paralegals, staff, stenographic, and clerical

4

employees and contractors working under the direct supervision of such counsel, including but not limited to any electronic discovery vendors;

b.   Any expert or consultant expressly retained by any attorney described in Paragraph 11(a) to assist in this action and their employees, with disclosure only to the extent reasonably necessary to perform such work;

c.   Any deponent: (i) if it appears that the deponent authored or received a copy of the Confidential Material; (ii) if it appears that the deponent was involved in the subject matter described therein; (iii) if the deponent is employed by the Disclosing Party; or (iv) if the Disclosing Party consents to such disclosure.

d.   The Court, jury, court personnel, court reporters, and other persons connected with the Court; and

e.   Any other person whom the Disclosing Party agrees in writing may have access to such Confidential Material.

12.   In the absence of an order of the Court or by agreement of the Parties, Attorneys' Eyes Only Material may be disclosed or made available only to the following persons:

a.   The individual attorneys who have filed notices of appearance in this action and are actively participating in the prosecution or defense of the action;

b.   Any paralegals, staff, stenographic, and clerical employees and contractors working on this action under the direct supervision of any attorney described in Paragraph 12(a), including but not limited to any electronic discovery vendors, with disclosure only to the extent reasonably necessary to perform work related to this action;

5

A-5

c.   Any expert or consultant expressly retained by any attorney described in Paragraph 12(a) to assist in this action and their employees, with disclosure only to the extent reasonably necessary to perform such work;

d.   The Court, jury, court personnel, court reporters, and other persons connected with the Court; and

e.   Any other person who the Disclosing Party agrees in writing may have access to such Attorneys' Eyes Only Material.

13.   The persons described in Paragraphs 11(b), 11(e), and 12(c) herein shall have access to Confidential Material or Attorneys' Eyes Only Material only after: (a) those persons are provided a copy of this Stipulation and Protective Order for review; and (b) those persons manifest their assent to be bound by the provisions of this Stipulation and Protective Order by signing a copy of the Nondisclosure Agreement attached hereto as Exhibit A. Counsel shall produce a copy of any executed Nondisclosure Agreement to opposing counsel upon request prior to such person being permitted to testify (at deposition or trial) in the action or at the conclusion of the action, whichever comes first, except that counsel need not produce a Nondisclosure Agreement executed by any expert or consultant retained only for consulting purposes. Counsel shall retain copies of any signed Nondisclosure Agreement until the completion of this action and the return or destruction of Confidential Material or Attorneys' Eyes Only Material in accordance with Paragraph 32 herein. Inadvertent failure to provide the Nondisclosure Agreement to any individual shall not be deemed a material breach of this Stipulation and Protective Order and shall be remedied immediately upon discovery.

14.   If the Receiving Party is required by law to disclose any Confidential Material or Attorneys' Eyes Only Material, it will immediately notify the Disclosing Party in order to permit

6

A-6

the Disclosing Party to seek a protective order or take other appropriate action. The Receiving Party will cooperate in the Disclosing Party's efforts to obtain a protective order or other assurance that the Confidential Material or Attorneys' Eyes Only Material will remain confidential. If, in the absence of a protective or other order prohibiting disclosure, the Receiving Party, in the written opinion of its legal counsel, is advised to disclose the Confidential Material or Attorneys' Eyes Only Material, it may disclose only the part of such material its legal counsel advises to be disclosed.

### Objections to Confidentiality or Attorneys' Eyes Only Designations

15.     In the event a Party disagrees at any stage of this action with any "Confidential" or "Attorneys' Eyes Only" designation, such Party shall provide to the Disclosing Party written notice of its disagreement with the designation, describing with particularity the material in question and stating the grounds for its objection. The Disclosing Party shall respond to the objection in writing within fourteen (14) days and shall state with particularity the grounds for asserting that the Confidential Material or Attorneys' Eyes Only Material is properly designated. If no written response to the objection is made within fourteen (14) days, the challenged designation shall be deemed void. If a timely written response to the objection is made, counsel for the Parties shall first try to resolve the dispute in good faith by meeting and conferring. If the dispute cannot be resolved, the Party challenging the designation may request appropriate relief from the Court consistent with the Court's discovery rules. The burden shall be on the Disclosing Party to make an adequate showing to the Court that the challenged confidentiality designation is appropriate.

### Filing of Confidential and Attorneys' Eyes Only Material and Use at Trial

16.     Any Party that intends to use portions of a document designated as "Confidential" or "Attorneys' Eyes Only" that do not contain Confidential Material or Attorneys' Eyes Only

Material and those portions are reasonably separable from portions containing such material, at trial or as part of a letter, motion, or deposition, may request that the Disclosing Party provide a redacted version of that document and the Disclosing Party shall promptly comply with such a request.

17.     A Party may not file in the public record in this action any information, documents, or material designated as "Confidential" or "Attorneys' Eyes Only" without written permission from the Disclosing Party. A Party that seeks to file any information, documents, or material designated as "Confidential" or "Attorneys' Eyes Only" must do so under seal and must comply with Section 6 of the SDNY Electronic Case Filing Rules & Instructions, Rule VI of the Individual Practices of Judge John G. Koeltl, and any other applicable federal or local rules regarding the filing of materials under seal.

18.     Any documents designated as "Confidential" and "Attorneys' Eyes Only" that are designated in advance by any Party as proposed trial exhibits, either pursuant to applicable pretrial procedures or otherwise, may be offered into evidence in open court after such Party gives notice to the Disclosing Party and affords the Disclosing Party at least fourteen (14) days' written notice to obtain an appropriate protective order from the Court.

<div align="center">**Notice of Breach**</div>

19.     If Confidential Material or Attorneys' Eyes Only Material is disclosed to any person other than in the manner authorized by this Stipulation and Protective Order, the person or Party responsible for the unauthorized disclosure must, within five (5) days of discovering the disclosure, bring all pertinent facts relating to such disclosure to the attention of the Disclosing Party and, without prejudice to any other rights and remedies of the Parties or third parties, make every effort to prevent further disclosure by it or by the person who was the unauthorized recipient

<div align="center">8</div>

of such material, and seek prompt return or destruction of the Confidential Material or Attorneys' Eyes Only Material from the unauthorized recipient.

**Clawback of Confidential and Attorneys' Eyes Only Material and Privileged Information**

20.     If at any time prior to the termination of this Action, a Party realizes that it has produced Confidential Material or Attorneys' Eyes Only Material without designating it as such, that Party may designate such material as "Confidential" or "Attorneys Eyes Only" by promptly notifying the Parties in writing. The notification must designate the material as "Confidential" or "Attorneys' Eyes Only" according to the terms of this Stipulation and Protective Order. Such material will thereafter be treated as Confidential Material or Attorneys' Eyes Only Material under the terms of this Stipulation and Protective Order. In addition, the Disclosing Party shall provide the Parties with replacement versions of such Confidential Material or Attorneys' Eyes Only Material and follow the designation requirements of Paragraph 5 within ten (10) business days of providing such notice.

21.     Whether inadvertent or otherwise, the production of any privileged information, Confidential Material, or Attorneys' Eyes Only Material without an appropriate designation shall not be deemed a waiver or impairment of any claim of privilege or protection, including, but not limited to, the attorney-client privilege, the protection afforded to work product materials, or the subject matter thereof, or the confidential nature of any such information, in this action or in any other federal or state proceeding. This order shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence 502(d).

22.     The Disclosing Party must notify the Receiving Party promptly, in writing, upon discovery that any privileged information or Confidential Material or Attorneys' Eyes Only Material has been produced. Upon receiving written notice from the Disclosing Party that any

privileged information or Confidential Material or Attorneys' Eyes Only Material has been produced, all such information, and all copies thereof, shall be returned to the Disclosing Party within ten (10) business days of receipt of such notice and the Receiving Party shall not use such information for any purpose. The Receiving Party shall also attempt, in good faith, to retrieve and return or destroy all copies of the documents or information in electronic format.

23.     The Receiving Party may contest any privilege, work-product, or confidentiality designation made by the Disclosing Party by following the procedures set forth in Paragraph 15 herein. However, the Receiving Party may not challenge any privilege, immunity, or confidentiality claim by arguing that the disclosure itself is a waiver of any applicable privilege or protection.

### Rights, Limitations, and Modifications

24.     Compliance with the terms of this Stipulation and Protective Order shall not operate as an admission that any particular document or information is or is not responsive, privileged, reflective of personally identifying information, or admissible in this action.

25.     Nothing in this Stipulation and Protective Order overrides any attorney's ethical responsibilities to refrain from examining or disclosing materials that the attorney knows or reasonably should know to be privileged and to inform the Disclosing Party that such materials have been produced. Nothing contained herein will prevent, limit, or restrict the Parties in any way from objecting to or asserting an immunity or privilege in any prior or subsequent litigation with respect to any material produced in this action. Nothing herein is intended to limit a Party's right, if any, to properly redact information that is privileged or otherwise confidential prior to disclosure.

10

26.     Nothing contained herein is intended to or shall serve to limit a Party's right to conduct a review of documents and related information (including metadata) for responsiveness, personally-identifying information, and/or any privilege or protection recognized by law prior to production and/or disclosure.

27.     This Stipulation and Protective Order may be changed only by further agreement of the Parties in writing or by order of the Court and is without prejudice to the right of any Party to seek modification or judicial relief of this Stipulation and Protective Order by application to the Court on notice to counsel for the other Party.

28.     This Stipulation and Protective Order shall remain in full force and effect until modified, superseded, or terminated either by consent of the Parties, or by order of the Court.

### Right to Assert Other Objections

29.     This Stipulation and Protective Order shall not be construed to waive or diminish any right to assert a claim of privilege or an objection of relevance, overbreadth, proportionality, or other grounds for not producing material requested during discovery. Access to all material (whether or not designated as "Confidential" or "Attorneys' Eyes Only") shall be granted only as provided by the discovery rules and other applicable law.

### Severability

30.     The invalidity or unenforceability of any provision of this Stipulation and Protective Order shall not affect the validity or enforceability of any other provision of this order, which shall remain in full force and effect.

### Termination of the Action

31.     This Stipulation and Protective Order shall survive the termination of this action, including any and all appeals, and remain in full force and effect unless modified by an order of this Court.

32.     Within sixty (60) days of the termination of this action, including final appellate action or the expiration of time to appeal or seek further review, all Confidential Material and Attorneys' Eyes Only Material that has been designated in accordance with all of the requirements of Paragraph 5 herein, and all copies, reproductions, summarizations, extractions, and abstractions thereof, shall be returned to the Disclosing Party or destroyed. At the conclusion of this sixty-day period, counsel for each Receiving Party shall provide to counsel for the Disclosing Party a certification stating that, to counsel's knowledge and belief, the Receiving Party has either returned or made commercially-reasonable efforts to destroy all Confidential Material in accordance with this Stipulation and Protective Order. Notwithstanding the foregoing, counsel may retain Confidential Materials and Attorneys' Eyes Only Materials that (i) constitute attorney-work product, (ii) were filed with the Court and/or marked as trial exhibits, or (iii) constitute deposition transcripts and exhibits, provided that such counsel otherwise comply with the provisions of this Stipulation and Protective Order with respect to such retained material.

33.     This Court shall retain jurisdiction over all persons subject to this Stipulation and Protective Order for so long as such persons have Confidential Material or Attorneys' Eyes Only Material and to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

        //

        //

12

A-12

STIPULATED AND AGREED BY:

DAVIS WRIGHT TREMAINE LLP

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Meredith I. Santana
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        meredithsantana@dwt.com

OPPENHEIM + ZEBRAK, LLP

Matthew J. Oppenheim
Scott A. Zebrak
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
        scott@oandzlaw.com

*Attorneys for Plaintiffs*

Dated: October 7, 2020
       New York, NY

DURIE TANGRI LLP

*/s/ Joseph C. Gratz*
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
Phone: (415) 362-6666
Email: jgratz@durietangri.com
        jlanier@durietangri.com
        akamdar@durietangri.com

Allyson R. Bennett (*Pro Hac Vice*)
953 East 3rd Street
Los Angeles, CA 90013
Phone: (213) 992-4499
Email: abennett@durietangri.com

ELECTRONIC FRONTIER FOUNDATION

Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
Phone: (415) 436-9333
Email: corynne@eff.org
        kit@eff.org
        cara@eff.org

*Attorneys for Defendant*

Dated: October 8, 2020
       San Francisco, CA

SO ORDERED:

Dated: _____10 / 8_____, 2020

Honorable John G. Koeltl

This Order is not binding
on the Court or Court personnel.
The Court reserves the right
to amend it at any time.
                        So ordered.
                        J.G. Koltl.
                        10/8/20  US D, ~

13

A-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HACHETTE BOOK GROUP, INC.,                    :
HARPERCOLLINS PUBLISHERS LLC, JOHN            :     Case No. 1:20-cv-04160-GJK
WILEY & SONS, INC., and PENGUIN               :
RANDOM HOUSE LLC,                             :     **NONDISCLOSURE AGREEMENT**
                          Plaintiffs,         :
                    -against-                 :
INTERNET ARCHIVE and DOES 1 through 5,        :
inclusive,                                    :
                          Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

I, _____, state that:

1.      My personal / work (circle one) address is

_____.

2.      My present employer, if applicable, is _____.

3.      I have received a copy of the Stipulation and Protective Order entered in the

above-entitled action.

4.      I have carefully read and understand the provisions of the Stipulation and

Protective Order and will comply with all of the provisions thereof.

5.      I will hold in confidence, will not disclose to anyone not qualified under the

Stipulation and Protective Order, and will use only for purposes of this Action, any Confidential

Material that is disclosed to me.

6.      I will return all Confidential Material or Attorneys' Eyes Only Material that

comes into my possession, and documents or things that I have prepared relating thereto, to

counsel for the party by whom I am employed or retained, or to counsel from whom I received

such material.

14

A-14

7.     I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Stipulation and Protective Order in this Action, and I understand that my willful violation of any term of the Stipulation and Protective Order could subject me to punishment for contempt of Court.

_____
Signature

_____
Printed Name

_____
Date

15

A-15



**Davis Wright Tremaine** LLP

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Elizabeth A. McNamara**
(212) 489-8230 tel
(212) 489-8340 fax

lizmcnamara@dwt.com

July 1, 2022

**VIA ECF**
Hon. John G. Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

APPLICATION GRANTED
SO ORDERED

John G. Koeltl, U.S.D.J.

Re:  *Hachette Book Group, Inc., et al. v. Internet Archive, et al.*, 20-cv-04160-JGK

Dear Judge Koeltl:

We write on behalf of plaintiffs Hachette Book Group, Inc., HarperCollins Publishers
LLC, John Wiley & Sons, Inc. and Penguin Random House LLC (the "Plaintiffs"). Pursuant to a
joint call with Chambers earlier this afternoon, we write jointly on behalf of the Plaintiffs and
Defendant Internet Archive to request that certain exhibits and deposition testimony to be
annexed to the parties' respective cross-motions for summary judgment be filed under seal. The
exhibits and testimony have been designated by the respective parties as either "Confidential" or
"Attorneys' Eyes Only" pursuant to the October 8, 2020 Stipulation and Protective Order (ECF
No. 39) in this action.

The parties' cross-motions are due to be filed on July 7, 2022. Unless Your Honor
directs otherwise, we propose to file our respective motion papers (including Local Rule 56.1
Statements, Memoranda of Law, and supporting declarations) via ECF on July 7, with references
in the motion papers to material designated Confidential or Attorney's Eyes Only (if any)
redacted. Given that several of the exhibits to be filed under seal are complex files that would be
impractical to file in PDF-A form via ECF, upon this letter being so-ordered, we will then submit
unredacted sealed versions of all filings on disc (or in whatever form Your Honor prefers) to the
Clerk of the Court.[1] Once all motion briefings are completed by October 7, 2022, the parties will
submit unredacted courtesy copies to Chambers, consistent with Your Honor's rules.

We thank the Court for its consideration of this matter.

---

[1] In a separate case, *Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, No. 1:17-cv-02532-JGK
(S.D.N.Y.), the Court approved the parties' joint request to similarly file unredacted sealed versions of documents
on disc to the Clerk of the Court that were annexed to those parties' respective cross-motions for summary
judgment. *See* No. 1:17-cv-02532-JGK, ECF No. 50.

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.
4882-0009-2455v.3 0092453-000002

Hon. John G. Koeltl
July 1, 2022
Page 2

> Respectfully submitted,
>
> Davis Wright Tremaine LLP
>
> /s/ Elizabeth A. McNamara
>
> Elizabeth A. McNamara

cc:     To all counsel of record (via ECF)



**Davis Wright Tremaine LLP**

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Elizabeth A. McNamara**
(212) 489-8230 tel
(212) 489-8340 fax

lizmcnamara@dwt.com

July 8, 2022

**VIA ECF**
Hon. John G. Koeltl
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:     *Hachette Book Group, Inc., et al. v. Internet Archive, et al.*, 20-cv-04160-JGK

Dear Judge Koeltl:

        We write on behalf of plaintiffs Hachette Book Group, Inc., HarperCollins Publishers
LLC, John Wiley & Sons, Inc. and Penguin Random House LLC (the "Plaintiffs"). On July 7,
Plaintiffs filed their Rule 56.1 Statement of Material Facts as to Which There is No Genuine
Issue to be Tried, in support of Plaintiffs' Motion For Summary Judgment (ECF No. 107). The
version filed on the docket mistakenly reveals part of one sentence that contains confidential
information.

        Pursuant to SDNY Electronic Case Filing Rule 21.7, Plaintiffs have contacted the ECF
Help Desk by email to request that the filing at ECF No. 107 be temporarily sealed and made not
publicly available. Plaintiffs now request that the filing at ECF No. 107 be formally sealed by
the Court.

        Finally, pursuant to Rule 21.7, Plaintiffs will file a corrected, redacted version of the
document on the public docket momentarily.

        We thank the Court for its consideration of this matter.

                Respectfully submitted,

                Davis Wright Tremaine LLP

                /s/ Elizabeth A. McNamara

                Elizabeth A. McNamara

APPLICATION GRANTED
SO ORDERED

John G. Koeltl, U.S.D.J.

7/8/22

cc:     To all counsel of record (via ECF)

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.
4871-4338-1800v.2 0092453-000002

CLOSED,APPEAL,CASREF,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:20−cv−04160−JGK−OTW

Hachette Book Group, Inc. et al v. Internet Archive et al
Assigned to: Judge John G. Koeltl
Referred to: Magistrate Judge Ona T. Wang
Cause: 17:101 Copyright Infringement

Date Filed: 06/01/2020
Date Terminated: 08/11/2023
Jury Demand: Both
Nature of Suit: 820 Copyright
Jurisdiction: Federal Question

**Plaintiff**

**Hachette Book Group, Inc.**

represented by **Carl Mazurek**
Davis Wright Tremaine LLP
1251 Avenue of the Americas
21st Floor
New York, NY 10020
917−294−6481
Email: carlmazurek@dwt.com
*ATTORNEY TO BE NOTICED*

**Danae Tinelli**
Oppenheim and Zebrak LLP
4530 Wisconsin Ave NW, Fifth Floor
Washington, DC 20016
202−851−4070
Email: danae@oandzlaw.com
*ATTORNEY TO BE NOTICED*

**Jesse Feitel**
Davis Wright Tremaine LLP
1251 Avenue of the Americas
New York, NY 10020
212−489−8230
Email: jessefeitel@dwt.com
*ATTORNEY TO BE NOTICED*

**John Moses Browning**
Davis Wright Tremaine LLP (NYC)
1251 Avenue of the Americas
New York, NY 10020
212−489−8230
Email: jackbrowning@dwt.com
*ATTORNEY TO BE NOTICED*

**Linda Jane Steinman**
Davis Wright Tremaine LLP (NYC)
1251 Avenue of the Americas
New York, NY 10020
212−603−6409
Fax: 212−489−8340
Email: lindasteinman@dwt.com
*ATTORNEY TO BE NOTICED*

**Matthew Jan Oppenheim**
Oppenheim & Zebrak LLP
4530 Wisconsin Ave, NW
5th Floor
Washington, DC 20016
202−450−3958
Email: matt@oandzlaw.com
*ATTORNEY TO BE NOTICED*

**Meredith Ivana Santana**
Davis Wright Tremaine LLP (NYC)
1251 Avenue of the Americas
New York, NY 10020
(212)–603–6417
Fax: (212)–489–8340
Email: meredithsantana@dwt.com
*ATTORNEY TO BE NOTICED*

**Rebecca Weissman**
Oppenheim and Zebrak, LLP
4530 Wisconsin Avenue, NW
5th Floor
Washington, DC 20016
202–480–2999
Email: rweissman@loeb.com
*TERMINATED: 06/03/2022*

**Scott A. Zebrak**
Oppenheim & Zebrak, LLP
4530 Wisconsin Ave NW
5th Floor
Washington, DC 20016
202–480–2999
Email: scott@oandzlaw.com
*ATTORNEY TO BE NOTICED*

**Elizabeth A. McNamara**
Davis Wright Tremaine LLP (NYC)
1251 Avenue of the Americas
New York, NY 10020
212 489–8230
Fax: 212 489–8340
Email: lizmcnamara@dwt.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **HarperCollins Publishers LLC** | represented by | **Carl Mazurek**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Danae Tinelli**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jesse Feitel**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **John Moses Browning**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Linda Jane Steinman**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Matthew Jan Oppenheim**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Meredith Ivana Santana**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

Rebecca Weissman
(See above for address)
*TERMINATED: 06/03/2022*

Scott A. Zebrak
(See above for address)
*ATTORNEY TO BE NOTICED*

Elizabeth A. McNamara
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**John Wiley & Sons, Inc.**              represented by    **Carl Mazurek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Danae Tinelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jesse Feitel**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Moses Browning**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Linda Jane Steinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Jan Oppenheim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Ivana Santana**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Weissman**
(See above for address)
*TERMINATED: 06/03/2022*

**Scott A. Zebrak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth A. McNamara**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Penguin Random House LLC**              represented by    **Carl Mazurek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Danae Tinelli**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jesse Feitel**

(See above for address)
*ATTORNEY TO BE NOTICED*

**John Moses Browning**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Linda Jane Steinman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew Jan Oppenheim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Meredith Ivana Santana**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Weissman**
(See above for address)
*TERMINATED: 06/03/2022*

**Scott A. Zebrak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elizabeth A. McNamara**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Internet Archive**                represented by   **Joseph C. Gratz**
                                                      Morrison & Foerster LLP
                                                      425 Market Street
                                                      San Francisco, CA 94105
                                                      415−268−7000
                                                      Fax: 415−268−7522
                                                      Email: JGratz@mofo.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Aditya Kamdar**
                                                      Morrison & Foerster LLP
                                                      Morrison & Foerster LLP
                                                      2100 L Street NW
                                                      Suite 900
                                                      Washington, DC 20037
                                                      202−887−1500
                                                      Fax: 202−887−0763
                                                      Email: AKamdar@mofo.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Allyson R. Bennett**
                                                      Morrison & Foerster LLP
                                                      Durie Tangri LLP
                                                      707 Wilshire Boulevard
                                                      Suite 6000
                                                      Los Angeles, CA 90017−3543
                                                      213−892−5200
                                                      Fax: 213−892−5454
                                                      Email: ABennett@mofo.com

*ATTORNEY TO BE NOTICED*

**Annie Lee**
Morrison & Foerster LLP
425 Market Street
San Francisco, CA 94105
415–268–7000
Fax: 415–268–7522
Email: AnnieLee@mofo.com
*ATTORNEY TO BE NOTICED*

**Cara Lorraine Gagliano**
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415–436–9333
Fax: 415–436–9993
Email: cara@eff.org
*ATTORNEY TO BE NOTICED*

**Christopher C. Walsh**
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
415–436–9333
Email: kit@eff.org
*ATTORNEY TO BE NOTICED*

**Corynne McSherry**
Electronic Frontier Foundation
815 Eddy St.
San Francisco, CA 94109
415–436–9333
Email: corynne@eff.org
*ATTORNEY TO BE NOTICED*

**Jessica Elaine Lanier**
Conrad Metlitzky Kane LLP
Four Embarcadero Center
Suite 1400
San Francisco, CA 94111
415–343–7100
Fax: 415–343–7101
Email: jlanier@conmetkane.com
*TERMINATED: 07/07/2023*

**Moon Hee Lee**
Quinn Emanuel Urquhart & Sullivan LLP
865 South Figueroa Street
Ste 10th Floor
Los Angeles, CA 90017
213–443–3627
Email: moonheelee@quinnemanuel.com
*TERMINATED: 03/15/2022*

**Defendant**

**Does 1 Through 5**
*inclusive*

**Amicus**

**Library Futures Institute, EveryLibrary Institute, and ReadersFirst**     represented by     **Yuliya Ziskina**
150 Crown St.
#F9
Brooklyn, NY 11225

206–819–1015
Email: j.ziskina@gmail.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**AMICI CURIAE INTELLECTUAL PROPERTY LAW PROFESSORS**

represented by **Rebecca Tushnet**
Rebecca Tushnet
1575 Massachusetts Ave.
Hauser 520
02138
Cambridge, MA 02138
703–593–6759
Email: rtushnet@lex–lumina.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Michelle M Wu**

represented by **Max Ephraim Rodriguez**
Pollock Cohen LLP
111 Broadway
Suite 1804
New York, NY 10006
646–290–7509
Email: max@pollockcohen.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Copyright Scholars**
NYU School of Law
5th floor
245 Sullivan Street
New York, NY
212–992–7365

represented by **Jason Michael Schultz**
Washington Square Legal Services
245 Sullivan Street
Room 609
New York
New York, NY 10012
212–992–7365
Email: jason.schultz@law.nyu.edu
*ATTORNEY TO BE NOTICED*

**Amicus**

**Authors Alliance**
2705 Webster St.
#5805
Berkeley, CA 94705

represented by **Rachel Brooke Leswing**
1509 Fifth St., Apt. B
Oakland, CA 94607
703–217–4968
Email: rmbrooke@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Kenneth D. Crews**

represented by **Christopher Theodore Bavitz**
EMI Music North America
150 Fifth Avenue
New York, NY 10011
212–786–8000
Fax: 212–786–8743
Email: christopher.bavitz@emicap.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**Kevin L. Smith**

represented by **Christopher Theodore Bavitz**
(See above for address)
*LEAD ATTORNEY*

                                                    *ATTORNEY TO BE NOTICED*

**Amicus**

**Professors and Scholars of Copyright**          represented by **Jacqueline C. Charlesworth**
**Law**                                                          Charlesworth Law
                                                                 15671 Royal Ridge Road
                                                                 Sherman Oaks, CA 91403
                                                                 917–432–7343
                                                                 Email: jacqueline@charlesworthlaw.com
                                                                 *ATTORNEY TO BE NOTICED*

**Amicus**

**International Rightholders**                     represented by **Theodore Michael Shapiro**
*IPA, FEP, STM, CISAC, FIAPF, IVF and*                           Wiggin LLP
*IFPI*                                                           Brussels Office
                                                                 Rue de Namur, 72
                                                                 Brussels
                                                                 Belgium
                                                                 32478966012
                                                                 Email: ted.shapiro@wiggin.eu
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Matthew Aaron Leish**
                                                                 Miller Korzenik Sommers Rayman LLP
                                                                 The Paramount Building
                                                                 1501 Broadway
                                                                 Suite 2015
                                                                 New York, NY 10036
                                                                 212–752–9200
                                                                 Email: mleish@mkslex.com
                                                                 *ATTORNEY TO BE NOTICED*

**Amicus**

**Copyright Alliance**                             represented by **Alexander Gigante**
                                                                 Cowan, Debaets, Abrahams & Sheppard
                                                                 LLP
                                                                 41 Madison Avenue, 34th Floor
                                                                 New York, NY 10010
                                                                 (212)–974–7474
                                                                 Fax: (212)–974–8474
                                                                 Email: agigante@cdas.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Elizabeth Safran , I**
                                                                 Cowan, DeBaets, Abrahams & Sheppard
                                                                 LLP
                                                                 41 Madison Avenue
                                                                 38th Floor
                                                                 New York, NY 10010
                                                                 212–974–7474
                                                                 Email: ealtman@cdas.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Nancy Evelyn Wolff**
                                                                 Cowan, DeBaets, Abrahams & Sheppard
                                                                 LLP
                                                                 41 Madison Avenue, 38th Floor
                                                                 New York, NY 10010
                                                                 (212)974–7474
                                                                 Fax: (212)974–8474

Email: nwolff@cdas.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **The Authors Guild, Inc., Western Writers of America, Canadian Authors Association, American Photographic Artists, The Writers Union of Canada, International Authors Forum, American Society of Media Ph** | represented by | **Robert William Clarida** Reitler Kailas & Rosenblatt LLP 885 3rd Ave. Ste 20th Floor New York, NY 10022 212–209–3044 Email: rclarida@reitlerlaw.com *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 06/01/2020 | 1 | COMPLAINT against Does 1 Through 5, Internet Archive. (Filing Fee $ 400.00, Receipt Number ANYSDC–20052153)Document filed by Penguin Random House LLC, Hachette Book Group, Inc., John Wiley & Sons, Inc., HarperCollins Publishers LLC. (Attachments: # 1 Exhibit A).(McNamara, Elizabeth) (Entered: 06/01/2020) |
| 06/01/2020 | 2 | CIVIL COVER SHEET filed..(McNamara, Elizabeth) (Entered: 06/01/2020) |
| 06/01/2020 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Internet Archive, re: 1 Complaint,. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 06/01/2020) |
| 06/01/2020 | 4 | AO 121 FORM COPYRIGHT – NOTICE OF SUBMISSION BY ATTORNEY. AO 121 Form Copyright for case opening submitted to court for review..(McNamara, Elizabeth) (Entered: 06/01/2020) |
| 06/01/2020 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying Other Affiliate News Corporation for HarperCollins Publishers LLC; Other Affiliate Bertelsmann SE & Co. KGaA for Penguin Random House LLC; Other Affiliate Hachette Livre USA, Inc. for Hachette Book Group, Inc.. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 06/01/2020) |
| 06/01/2020 | 6 | NOTICE OF APPEARANCE by Linda Jane Steinman on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Steinman, Linda) (Entered: 06/01/2020) |
| 06/01/2020 | 7 | NOTICE OF APPEARANCE by Meredith Ivana Santana on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Santana, Meredith) (Entered: 06/01/2020) |
| 06/01/2020 | 8 | NOTICE OF APPEARANCE by John Moses Browning on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Browning, John) (Entered: 06/01/2020) |
| 06/01/2020 | 9 | NOTICE OF APPEARANCE by Elizabeth A. McNamara on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 06/01/2020) |
| 06/02/2020 | | ***NOTICE TO ATTORNEY REGARDING CIVIL CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Elizabeth A. McNamara. The following case opening statistical information was erroneously selected/entered: County code Albany; Fee Status code due (due);. The following correction(s) have been made to your case entry: the County code has been modified to New York; the Fee Status code has been modified to pd (paid);. (jgo) (Entered: 06/02/2020) |
| 06/02/2020 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge John G. Koeltl. Please download and review the Individual Practices of the assigned District Judge, located at |

| | | |
|---|---|---|
| | | https://nysd.uscourts.gov/judges/district–judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf–related–instructions..(jgo) (Entered: 06/02/2020) |
| 06/02/2020 | | Magistrate Judge Ona T. Wang is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018–06/AO–3.pdf. (jgo) (Entered: 06/02/2020) |
| 06/02/2020 | | Case Designated ECF. (jgo) (Entered: 06/02/2020) |
| 06/02/2020 | 10 | ELECTRONIC SUMMONS ISSUED as to Internet Archive..(jgo) (Entered: 06/02/2020) |
| 06/02/2020 | 11 | AO 121 FORM COPYRIGHT – CASE OPENING – SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a court action has been filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e–mailed to Register of Copyrights..(jgo) (Entered: 06/02/2020) |
| 06/02/2020 | | ***NOTICE TO ATTORNEY REGARDING DEFICIENT COPYRIGHT FORM. Notice to Attorney Elizabeth A. McNamara re: Document No. 4 AO 121 Form Copyright – Notice of Submission by Attorney. The filing is deficient for the following reason(s):. the Docket Number field on the AO 121 Copyright form was not completed by the attorney;. DO NOT re–file the form. The Court has corrected the deficiency/deficiencies.. (jgo) (Entered: 06/02/2020) |
| 06/03/2020 | 12 | NOTICE OF APPEARANCE by Matthew Jan Oppenheim on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Oppenheim, Matthew) (Entered: 06/03/2020) |
| 06/25/2020 | 13 | MOTION for Joseph C. Gratz to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20424699. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Internet Archive. (Attachments: # 1 Declaration of Joseph C. Gratz, # 2 Text of Proposed Order).(Gratz, Joseph) (Entered: 06/25/2020) |
| 06/25/2020 | 14 | LETTER MOTION for Extension of Time to File Answer re: 1 Complaint, addressed to Judge John G. Koeltl from Joseph C. Gratz dated 6/25/2020. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 06/25/2020) |
| 06/25/2020 | 15 | MOTION for Aditya V. Kamdar to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Internet Archive. (Attachments: # 1 Declaration of Aditya V. Kamdar, # 2 Text of Proposed Order).(Kamdar, Aditya) (Entered: 06/25/2020) |
| 06/25/2020 | | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 13 MOTION for Joseph C. Gratz to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20424699. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq) (Entered: 06/25/2020) |
| 06/25/2020 | 16 | MOTION for Corynne Marette McSherry to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20424999. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Internet Archive. (Attachments: # 1 Affidavit, # 2 Exhibit CA Certificate of Good Standing, # 3 Text of Proposed Order).(McSherry, Corynne) (Entered: 06/25/2020) |
| 06/25/2020 | 17 | MOTION for Cara Lorraine Gagliano to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20425151. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Internet Archive. (Attachments: # 1 Affidavit, # 2 Exhibit CA Certificate of Good Standing, # 3 Text of Proposed Order).(Gagliano, Cara) (Entered: 06/25/2020) |

| 06/26/2020 |  | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 15 MOTION for Aditya V. Kamdar to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq) (Entered: 06/26/2020) |
|---|---|---|
| 06/26/2020 |  | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 16 MOTION for Corynne Marette McSherry to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20424999. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq) (Entered: 06/26/2020) |
| 06/26/2020 |  | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 17 MOTION for Cara Lorraine Gagliano to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20425151. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (laq) (Entered: 06/26/2020) |
| 06/26/2020 | 18 | MOTION for Scott A. Zebrak to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20445533. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit Certificates of Good Standing, # 2 Text of Proposed Order, # 3 Affidavit).(Oppenheim, Matthew) (Entered: 06/26/2020) |
| 06/26/2020 |  | >>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE–FILE Document No. 18 MOTION for Scott A. Zebrak to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20445533. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): Affidavits not notarized. Re–file the motion as a Corrected Motion to Appear Pro Hac Vice – attach the correct signed PDF – select the correct named filer/filers – attach valid Certificates of Good Standing issued within the past 30 days – attach Proposed Order. (laq) (Entered: 06/26/2020) |
| 06/26/2020 | 19 | MOTION for Jessica E. Lanier to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20449160. Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Internet Archive. (Attachments: # 1 Declaration of Jessica E. Lanier, # 2 Text of Proposed Order).(Lanier, Jessica) (Entered: 06/26/2020) |
| 06/26/2020 |  | >>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 19 MOTION for Jessica E. Lanier to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20449160. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ad) (Entered: 06/29/2020) |
| 06/29/2020 | 20 | ORDER granting 14 Letter Motion for Extension of Time to Answer. Application granted. SO ORDERED. (Signed by Judge John G. Koeltl on 6/29/2020) Internet Archive answer due 7/28/2020 (ks) (Entered: 06/29/2020) |
| 06/29/2020 | 21 | ORDER FOR ADMISSION PRO HAC VICE granting 13 Motion for Joseph C. Gratz to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 6/29/2020) (ks) (Entered: 06/29/2020) |
| 06/29/2020 | 22 | ORDER FOR ADMISSION PRO HAC VICE granting 15 Motion for Aditya V. Kamdar to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 6/29/2020) (ks) (Entered: 06/29/2020) |
| 06/29/2020 | 23 | ORDER granting 16 Motion for Corynne Marette McSherry to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 6/29/2020) (ks) (Entered: 06/29/2020) |
| 06/29/2020 | 24 | ORDER granting 17 Motion for Cara L. Gagliano to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 6/29/2020) (ks) (Entered: 06/29/2020) |
| 06/29/2020 | 25 | MOTION for Allyson R. Bennett to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff. Document filed by Internet Archive. (Attachments: # 1 DECLARATION OF ALLYSON R. BENNETT IN SUPPORT OF MOTION FOR ADMISSION PRO HAC VICE, # 2 ORDER FOR ADMISSION PRO |

| | | |
|---|---|---|
| | | HAC VICE).(Bennett, Allyson) (Entered: 06/29/2020) |
| 06/29/2020 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice re: Document No. <u>25</u> MOTION for Allyson R. Bennett to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The filing is deficient for the following reason(s): the filing fee was not paid;. Pay the filing fee using the event Pro Hac Vice Fee Payment found under the event list Other Documents. (ad)** (Entered: 06/30/2020) |
| 06/29/2020 | | Pro Hac Vice Fee Due: for <u>25</u> MOTION for Allyson R. Bennett to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff..** (ad) (Entered: 06/30/2020) |
| 06/29/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>25</u> MOTION for Allyson R. Bennett to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (ad)** (Entered: 07/01/2020) |
| 06/30/2020 | | Pro Hac Vice Fee Payment: for <u>25</u> MOTION for Allyson R. Bennett to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff..** Filing fee $ 200.00, receipt number ANYSDC–20485809..(Bennett, Allyson) (Entered: 06/30/2020) |
| 07/03/2020 | <u>26</u> | AFFIDAVIT OF SERVICE. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Santana, Meredith) (Entered: 07/03/2020) |
| 07/03/2020 | <u>27</u> | ORDER FOR ADMISSION PRO HAC VICE granting <u>19</u> Motion for Jessica E. Lanier to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 7/3/2020) (rro) (Entered: 07/06/2020) |
| 07/03/2020 | <u>28</u> | ORDER FOR ADMISSION PRO HAC VICE granting <u>25</u> Motion for Allyson R. Bennett to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 7/3/2020) (rro) (Entered: 07/06/2020) |
| 07/06/2020 | <u>29</u> | NOTICE OF APPEARANCE by Scott A. Zebrak on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Zebrak, Scott) (Entered: 07/06/2020) |
| 07/07/2020 | <u>30</u> | MOTION for Christopher Cody Walsh to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20585342. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Internet Archive. (Attachments: # <u>1</u> Affidavit, # <u>2</u> Exhibit Mass. Certificate of Good Standing, # <u>3</u> Exhibit CA Certificate of Good Standing, # <u>4</u> Text of Proposed Order).(Walsh, Kit) (Entered: 07/07/2020) |
| 07/07/2020 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. <u>30</u> MOTION for Christopher Cody Walsh to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–20585342. Motion and supporting papers to be reviewed by Clerk's Office staff. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 07/07/2020) |
| 07/24/2020 | <u>31</u> | ORDER granting <u>30</u> Motion for Christopher Cody Walsh to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 7/23/2020) (ks) (Entered: 07/24/2020) |
| 07/28/2020 | <u>32</u> | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/28/2020) |
| 07/28/2020 | <u>33</u> | ANSWER to <u>1</u> Complaint, with JURY DEMAND. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/28/2020) |
| 08/13/2020 | <u>34</u> | ORDER. The parties should submit a Rule 26(f) report by August 28, 2020. SO ORDERED. (Signed by Judge John G. Koeltl on 8/13/20) (yv) (Entered: 08/14/2020) |
| 08/28/2020 | <u>35</u> | RULE 26(f) DISCOVERY PLAN REPORT.Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 08/28/2020) |
| 09/01/2020 | <u>36</u> | CIVIL SCHEDULING ORDER: The parties shall be ready for trial on 48 hours notice on or after 11/12/2021. The parties will notify the Court by 12/01/2020 whether a |

| 10/08/2020 | 37 | reference to the Magistrate Judge would be useful for purposes of settlement and whether they consent to trial before the Magistrate Judge. Dispositive Motions due 10/8/2021. Motions due by 10/29/2021. Discovery due by 9/20/2021. (Signed by Judge John G. Koeltl on 8/31/2020) (nb) (Entered: 09/01/2020) |
| --- | --- | --- |
| 10/08/2020 | 37 | PROPOSED STIPULATION AND ORDER. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 10/08/2020) |
| 10/08/2020 | 38 | PROPOSED PROTECTIVE ORDER. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 10/08/2020) |
| 10/08/2020 | 39 | STIPULATION AND PROTECTIVE ORDER:...regarding procedures to be followed that shall govern the handling of confidential material. This Order is not binding on the Court or Court Personnel. The Court reserves the right to amend it at any time. SO ORDERED. (Signed by Judge John G. Koeltl on 10/08/2020) (ama) (Entered: 10/08/2020) |
| 10/08/2020 | 40 | JOINT STIPULATION AND ORDER SETTING DISCOVERY DEADLINES: NOW, THEREFORE, the parties jointly stipulate to the following supplemental discovery deadlines: Deadline to complete fact discovery May 21, 2021; Deadline to complete expert disclosures on issues where parties bear burden of proof July 6, 2021; Deadline to serve rebuttal expert disclosures August 20, 2021. SO ORDERED. (Fact Discovery due by 5/21/2021.) (Signed by Judge John G. Koeltl on 10/8/2020) (jca) (Entered: 10/08/2020) |
| 12/01/2020 | 41 | JOINT LETTER addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated December 1, 2020 re: September 1, 2020 Civil Scheduling Order (ECF No. 36 ). Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 12/01/2020) |
| 12/21/2020 | 42 | NOTICE OF APPEARANCE by Jesse Feitel on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Feitel, Jesse) (Entered: 12/21/2020) |
| 04/05/2021 | 43 | JOINT LETTER MOTION for Extension of Time to Complete Discovery addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated 4/5/2021. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 (Proposed) Order).(McNamara, Elizabeth) (Entered: 04/05/2021) |
| 04/06/2021 | 44 | REVISED SCHEDULING ORDER granting 43 Motion for Extension of Time to Complete Discovery. After reviewing the Letter Motion dated April 2, 2021 and for good cause shown, the Court hereby orders that the following schedule will govern this civil action: Fact Depositions due by 9/24/2021. Discovery due by 1/21/2022. Motions due by 2/22/2022. Response due by 3/31/2022. Reply due by 4/22/2022. SO ORDERED. (Signed by Judge John G. Koeltl on 4/6/2021) (ks) (Entered: 04/06/2021) |
| 05/11/2021 | 45 | MOTION for Moon Hee Lee to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–24526245. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Internet Archive. (Attachments: # 1 Affidavit of Moon Hee Lee, # 2 Exhibit A (Certificate of Good Standing), # 3 Text of Proposed Order).(Lee, Moon Hee) (Entered: 05/11/2021) |
| 05/12/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 45 MOTION for Moon Hee Lee to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–24526245. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (wb)** (Entered: 05/12/2021) |
| 05/12/2021 | 46 | ORDER FOR ADMISSION PRO HAC VICE granting 45 Motion for Moon Hee Lee to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 5/12/2021) (ks) (Entered: 05/12/2021) |
| 08/09/2021 | 47 | LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Joseph C. Gratz dated August 9, 2021. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 08/09/2021) |

| 08/09/2021 | 48 | ORDER OF REFERENCE TO A MAGISTRATE JUDGE: Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for Motion/ Dispute: * ECF. No. 47. Referred to Magistrate Judge Ona T. Wang. SO ORDERED. Motions referred to Ona T. Wang. (Signed by Judge John G. Koeltl on 8/09/2021) (ama) (Entered: 08/09/2021) |
| 08/12/2021 | 49 | LETTER RESPONSE to Motion addressed to Magistrate Judge Ona T. Wang from Elizabeth A. McNamara dated August 12, 2021 re: 47 LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Joseph C. Gratz dated August 9, 2021. . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 08/12/2021) |
| 09/07/2021 | 50 | JOINT LETTER MOTION for Extension of Time to Complete Discovery *(Second Revised Scheduling Order annexed)*, addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated September 7, 2021. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Text of Proposed Order (Revised Scheduling Order)).(McNamara, Elizabeth) (Entered: 09/07/2021) |
| 09/08/2021 | 51 | REVISED SCHEDULING ORDER granting 50 Letter Motion for Extension of Time to Complete Discovery. Deadline to complete fact depositions (close of fact discovery) Friday December 17, 2021. Briefs in opposition to dispositive motions due Friday June 10, 2022. Reply briefs in further support of dispositive motions due Friday July 8, 2022. Discovery due by 4/1/2021. Motions due by 4/29/2022. SO ORDERED. (Signed by Judge John G. Koeltl on 9/8/2021) (mml) (Entered: 09/08/2021) |
| 09/08/2021 | | Set/Reset Deadlines: Deposition due by 12/17/2021. Fact Discovery due by 12/17/2021. Responses due by 6/10/2022 Replies due by 7/8/2022. (mml) (Entered: 09/08/2021) |
| 10/01/2021 | 52 | MOTION for Annie A. Lee to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25139940. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Internet Archive. (Attachments: # 1 Affidavit of Annie A. Lee in Support of Motion for Admission Pro Hac Vice, # 2 Exhibit A to Affidavit of Annie A. Lee in Support of Motion for Admission Pro Hac Vice, # 3 Proposed Order for Admission Pro Hac Vice).(Lee, Annie) (Entered: 10/01/2021) |
| 10/04/2021 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 52 MOTION for Annie A. Lee to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25139940. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 10/04/2021) |
| 10/04/2021 | 53 | ORDER FOR ADMISSION PRO HAC VICE: granting 52 Motion for Annie A. Lee to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 10/04/2021) (ama) (Entered: 10/04/2021) |
| 10/29/2021 | 54 | LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Joseph C. Gratz dated 10/29/2021. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 10/29/2021) |
| 11/01/2021 | 55 | AMENDED ORDER OF REFERENCE TO A MAGISTRATE JUDGE. Order that case be referred to the Clerk of Court for assignment to a Magistrate Judge for General Pretrial (includes scheduling, discovery, non−dispositive pretrial motions, and settlement). Referred to Magistrate Judge Ona T. Wang. Motions referred to Ona T. Wang. SO ORDERED. (Signed by Judge John G. Koeltl on 11/1/2021) (ks) (Entered: 11/01/2021) |
| 11/03/2021 | 56 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Ona T. Wang from Scott A. Zebrak dated November 3, 2021 re: 54 LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Joseph C. Gratz dated 10/29/2021. . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Zebrak, Scott) (Entered: 11/03/2021) |
| 11/04/2021 | 57 | ORDER: The Court is in receipt of Defendants requests for pre−motion discovery conferences regarding motions to compel and Plaintiffs corresponding oppositions. |

| | | |
|---|---|---|
| | | (ECF 47, 49, 54, 56). The parties are directed to appear for an in–person status conference on December 2, 2021 at 4:00 pm in Courtroom 20D, United States Courthouse, 500 Pearl Street, New York, New York 10007. Status Conference set for 12/2/2021 at 04:00 PM in Courtroom 20D, 500 Pearl Street, New York, NY 10007 before Magistrate Judge Ona T. Wang. (Signed by Magistrate Judge Ona T. Wang on 11/4/2021) (rro) (Entered: 11/04/2021) |
| 11/19/2021 | 58 | LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Scott Zebrak dated 11/19/2021. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Zebrak, Scott) (Entered: 11/19/2021) |
| 11/24/2021 | 59 | LETTER RESPONSE in Opposition to Motion addressed to Magistrate Judge Ona T. Wang from Joseph C. Gratz dated November 24, 2021 re: 58 LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Scott Zebrak dated 11/19/2021. . Document filed by Internet Archive..(Gratz, Joseph) (Entered: 11/24/2021) |
| 12/02/2021 | | Minute Entry for proceedings held before Magistrate Judge Ona T. Wang: Status Conference held on 12/2/2021. (Quinn, Diane) (Entered: 12/15/2021) |
| 12/03/2021 | 60 | ORDER: As ordered at the December 2, 2021 conference, the parties are directed to meet and confer to resolve the disputes raised at the conference and update the Court via joint status letter, due January 14, 2022, on the status of discovery and whether any disputes remain. The fact discovery end date is extended to January 31, 2022. SO ORDERED. ( Fact Discovery due by 1/31/2022.) (Signed by Magistrate Judge Ona T. Wang on 12/3/2021) (rro) (Entered: 12/03/2021) |
| 12/22/2021 | 61 | NOTICE OF APPEARANCE by Carl Mazurek on behalf of Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(Mazurek, Carl) (Entered: 12/22/2021) |
| 12/24/2021 | 62 | TRANSCRIPT of Proceedings re: CONFERENCE held on 12/2/2021 before Magistrate Judge Ona T. Wang. Court Reporter/Transcriber: Raquel Robles, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/14/2022. Redacted Transcript Deadline set for 1/24/2022. Release of Transcript Restriction set for 3/24/2022..(Moya, Goretti) (Entered: 12/24/2021) |
| 12/24/2021 | 63 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 12/2/21 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 12/24/2021) |
| 01/06/2022 | 64 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** MOTION for Danae Tinelli to Appear Pro Hac Vice *for Plaintiffs*. Filing fee $ 200.00, receipt number ANYSDC–25548068. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Text of Proposed Order Order for Admission Pro Hac Vice).(Tinelli, Danae) Modified on 1/7/2022 (bcu). (Entered: 01/06/2022) |
| 01/06/2022 | 65 | DECLARATION of Danae Tinelli in Support re: 64 MOTION for Danae Tinelli to Appear Pro Hac Vice *for Plaintiffs*. Filing fee $ 200.00, receipt number ANYSDC–25548068. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit Certificates of Good Standing).(Tinelli, Danae) (Entered: 01/06/2022) |
| 01/07/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE–FILE Document No. 64 MOTION for Danae Tinelli to Appear Pro Hac Vice *for Plaintiffs*. Filing fee $ 200.00, receipt number ANYSDC–25548068. Motion and supporting papers to be reviewed by Clerk's** |

| | | |
|---|---|---|
| | | Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from Superem Court of New York and the District of Columbia;. Re–file the motion as a Motion to Appear Pro Hac Vice – attach the correct signed PDF – select the correct named filer/filers – attach valid Certificates of Good Standing issued within the past 30 days – attach Proposed Order.. (bcu) (Entered: 01/07/2022) |
| 01/07/2022 | 66 | MOTION for Danae Tinelli to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit Certificates of Good Standing, # 2 Text of Proposed Order).(Tinelli, Danae) (Entered: 01/07/2022) |
| 01/07/2022 | 67 | ORDER FOR ADMISSION PRO HAC VICE granting 66 Motion for Danae Tinelli to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 1/7/2022) (ks) (Entered: 01/07/2022) |
| 01/10/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 66 MOTION for Danae Tinelli to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (aea)** (Entered: 01/10/2022) |
| 01/14/2022 | 68 | JOINT LETTER addressed to Magistrate Judge Ona T. Wang from Elizabeth A. McNamara dated January 14, 2022 re: Status Report concerning the discovery disputes before the Court. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit A (Current Scheduling Order), # 2 Exhibit B (Proposed Scheduling Order)).(McNamara, Elizabeth) (Entered: 01/14/2022) |
| 01/21/2022 | 69 | ORDER re: 58 LETTER MOTION for Local Rule 37.2 Conference addressed to Judge John G. Koeltl from Scott Zebrak dated 11/19/2021. filed by John Wiley & Sons, Inc., Penguin Random House LLC, HarperCollins Publishers LLC, Hachette Book Group, Inc. ECF 58 letter Motion denied as moot. Clerks office is to remove gavel. (HEREBY ORDERED by Magistrate Judge Ona T. Wang) (Text Only Order) (Quinn, Diane) (Entered: 01/21/2022) |
| 01/21/2022 | 70 | REVISED SCHEDULING ORDER: After reviewing the Joint Letter dated January 14, 2022 and for good cause shown, the Court hereby orders that the following schedule will govern this civil action: Deadline to complete fact discovery (close of fact discovery): 1/31/2022. End of all discovery, including expert depositions: 6/10/2022. Deadline for dispositive motions: 7/7/2022. Filings in opposition to dispositive motions due.: 9/2/2022. Reply filings in further support of dispositive motions due: 10/7/2022. ( Deposition due by 6/10/2022., Discovery due by 6/10/2022., Fact Discovery due by 1/31/2022., Motions due by 7/7/2022., Responses due by 9/2/2022, Replies due by 10/7/2022.) (Signed by Magistrate Judge Ona T. Wang on 1/21/2022) (rro) Modified on 1/26/2022 (rro). (Entered: 01/21/2022) |
| 01/31/2022 | 71 | **FILING ERROR – DEFICIENT DOCKET ENTRY –** MOTION for Rebecca Weissman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–25661323. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Certificates of Good Standing, # 2 Text of Proposed Order Order for Admission).(Weissman, Rebecca) Modified on 2/1/2022 (bcu). (Entered: 01/31/2022) |
| 01/31/2022 | 72 | DECLARATION of Rebecca Weissman in Support re: 71 MOTION for Rebecca Weissman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–25661323. **Motion and supporting papers to be reviewed by Clerk's Office staff.**. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Certificates of Good Standing).(Weissman, Rebecca) (Entered: 01/31/2022) |
| 02/01/2022 | | **>>>NOTICE REGARDING DEFICIENT MOTION TO APPEAR PRO HAC VICE. Notice to RE–FILE Document No. 71 MOTION for Rebecca Weissman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC– 25661323. Motion and supporting papers to be reviewed by Clerk's Office staff... The filing is deficient for the following reason(s): missing Certificate of Good Standing from** |

| | | |
|---|---|---|
| | | **Supreme Court of California. We do not accept certificates from state bar for this state.; Notarized Attorney Affidavit missing.;. Re–file the motion as a Motion to Appear Pro Hac Vice – attach the correct signed PDF – select the correct named filer/filers – attach valid Certificates of Good Standing issued within the past 30 days – attach Proposed Order.. (bcu)** (Entered: 02/01/2022) |
| 02/15/2022 | 73 | MOTION for Rebecca Eve Weissman to Appear Pro Hac Vice . **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Attorney Affidavit, # 2 Certificates of Good Standing, # 3 Text of Proposed Order proposed Order).(Weissman, Rebecca) (Entered: 02/15/2022) |
| 02/16/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 73 MOTION for Rebecca Eve Weissman to Appear Pro Hac Vice . Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 02/16/2022) |
| 02/26/2022 | 74 | ORDER FOR ADMISSION PRO HAC VICE granting 73 Motion for Rebecca Eve Weissman to Appear Pro Hac Vice. IT IS HEREBY ORDERED that Applicant is admitted to practice pro hac vice in the above–captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the rules governing discipline of attorneys. (Signed by Judge John G. Koeltl on 2/26/2022) (mml) (Entered: 02/28/2022) |
| 03/14/2022 | 75 | NOTICE of of Withdrawal of Counsel Moon Hee Lee. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 03/14/2022) |
| 03/15/2022 | 76 | MEMO ENDORSEMENT on NOTICE OF WITHDRAWAL OF COUNSEL on re: 75 Notice (Other) filed by Internet Archive, ENDORSEMENT: APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 3/15/2022) Attorney Moon Hee Lee terminated. (ks) (Entered: 03/15/2022) |
| 06/02/2022 | 77 | MOTION for Rebecca Weissman to Withdraw as Attorney *for Plaintiffs*. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. Return Date set for 6/2/2022 at 12:00 PM. (Attachments: # 1 Text of Proposed Order Permitting Withdrawal and Termination).(Weissman, Rebecca) (Entered: 06/02/2022) |
| 06/03/2022 | 78 | ORDER PERMITTING WITHDRAW AL AND TERMINATING APPEARANCE OF REBECCA E. WEISSMAN granting 77 Motion to Withdraw as Attorney. IT IS HEREBY ORDERED THAT the appearance of Rebecca E. Weissman in this matter is terminated. IT IS FURTHER ORDERED THAT the Clerk of Court shall remove Rebecca E. Weissman from the docket in this matter. It is SO ORDERED.. (Signed by Judge John G. Koeltl on 6/3/2022) Attorney Rebecca E. Weissman terminated (ks) (Entered: 06/03/2022) |
| 06/09/2022 | 79 | LETTER MOTION for Conference addressed to Judge John G. Koeltl from Joseph C. Gratz dated June 9, 2022. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 06/09/2022) |
| 06/10/2022 | 80 | ORDER terminating 79 Letter Motion for Conference re: 79 LETTER MOTION for Conference addressed to Judge John G. Koeltl from Joseph C. Gratz dated June 9, 2022. The defendant may proceed with the summary Judgement on the schedule set by M.J. Wang and with the word count requested, although the Court seriously questions whether the requested word count is necessary. SO ORDERED.. (Signed by Judge John G. Koeltl on 6/10/2022) (ks) (Entered: 06/10/2022) |
| 06/10/2022 | 81 | LETTER MOTION for Conference *Re: Pre–Motion Conference Letter for Plaintiffs' anticipated Motion for Summary Judgment,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated June 10, 2022. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 06/10/2022) |
| 06/10/2022 | 82 | ORDER terminating 81 Letter Motion for Conference re: 81 LETTER MOTION for Conference *Re: Pre–Motion Conference Letter for Plaintiffs' anticipated Motion for* |

| | | |
|---|---|---|
| | | *Summary Judgment,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated June 10, 2022. The plaintiffs may proceed with a motion for summary judgement on the same schedule and with the same word counts that the Court has afforded the defendant, and with the same caution that the Court doubts the need for such lengthy papers. SO ORDERED.. (Signed by Judge John G. Koeltl on 6/10/2022) (ks) (Entered: 06/10/2022) |
| 06/14/2022 | 83 | ORDER PERMITTING WITHDRAWAL AND TERMINATING APPEARANCE OF REBECCA E. WEISSMAN: The appearance of Rebecca E. Weissman in this matter is terminated. The Clerk of Court shall remove Rebecca E. Weissman from the docket in this matter. (Signed by Magistrate Judge Ona T. Wang on 6/14/2022) (tro) (Entered: 06/14/2022) |
| 06/30/2022 | 84 | ORDER: The Court received the attached letter, which it forwards to the parties. SO ORDERED. (Signed by Judge John G. Koeltl on 6/29/2022) (ks) (Entered: 06/30/2022) |
| 07/01/2022 | 85 | JOINT LETTER MOTION to Seal *Re: The parties' respective cross−motions for summary judgment,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated July 1, 2022. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/01/2022) |
| 07/05/2022 | 86 | ORDER granting 85 Letter Motion to Seal. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 7/5/2022) (tg) (Entered: 07/05/2022) |
| 07/07/2022 | 87 | MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.* Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. Responses due by 9/2/2022.(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 88 | LETTER MOTION for Oral Argument *Re: 87 Motion for Summary Judgment against Internet Archive with respect to the causes of action set forth in the Complaint,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated July 7, 2022. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 89 | DECLARATION of Sandra Cisneros in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint..* Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 90 | DECLARATION of Ian Foster in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint..* Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Appendix A (full curriculum vitae), # 2 Exhibit 1 (Assoc. of works in suit), # 3 Exhibit 2 (Max acutal loans), # 4 Exhibit 3 (Total loans), # 5 Exhibit 4 (ISBNs), # 6 Exhibit 4A (ISBNs), # 7 Exhibit 5 (Number of additions), # 8 Exhibit 5A (Number of additions), # 9 Exhibit 6 (max actual concurrent loans)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 91 | DECLARATION of Tracy Offner in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint..* Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit A (Book list), # 2 Exhibit B (IA details), # 3 Exhibit C (Openlibrary_work pages), # 4 Exhibit D (About the book pages), # 5 Exhibit E (Borrow pages), # 6 Exhibit F (Front covers), # 7 Exhibit G (Digitization pages), # 8 Exhibit H (Book rights pages), # 9 Exhibit I (Book title pages), # 10 Exhibit J (Pages 32), # 11 Exhibit K (Last book pages)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 92 | DECLARATION of Ben Sevier in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint..* Document filed by Hachette Book Group, Inc., HarperCollins Publishers |

| | | |
|---|---|---|
| | | LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (HACHETTE0012376), # 2 Exhibit 2 (HACHETTE0012377), # 3 Exhibit 3 (HACHETTE0002473), # 4 Exhibit 4 (HACHETTE0010909), # 5 Exhibit 5 (HACHETTE0010980), # 6 Exhibit 6 (HACHETTE0010973), # 7 Exhibit 7 (HACHETTE0002476), # 8 Exhibit 8 (Jorgensen rpt excerpts), # 9 Exhibit 9 (INTARC00328780)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 93 | DECLARATION of Alan Pavese in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.*. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (WILEY0000344, WILEY0000349, WILEY0000444), # 2 Exhibit 2 (WILEY0011723), # 3 Exhibit 3 (WILEY0005650), # 4 Exhibit 4 (WILEY0011641), # 5 Exhibit 5 (WILEY0006143), # 6 Exhibit 6 (WILEY0011693), # 7 Exhibit 7 (WILEY0011694)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 94 | DECLARATION of Chantal Restivo−Alessi in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.*. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (HC0030132), # 2 Exhibit 2 (HC0036522), # 3 Exhibit 3 (Amazon.com Help_ Kindle Store Terms of Use), # 4 Exhibit 4 (HC0011426), # 5 Exhibit 5 (HC0036464), # 6 Exhibit 6 (HC0036520), # 7 Exhibit 7 (Hildreth Report Excerpt), # 8 Exhibit 8 (INTAR00151363), # 9 Exhibit 9 (INTARC00354190), # 10 Exhibit 10 (INTARC00142194), # 11 Exhibit 11 (INTARC466104)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 95 | DECLARATION of Jeffrey Weber in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.*. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (PRH0072244), # 2 Exhibit 2 (PRH0058941), # 3 Exhibit 3 (Nat'l survey), # 4 Exhibit 4 (OverDrive Press Releas), # 5 Exhibit 5 (PRH0072294), # 6 Exhibit 6 (PRH0052943), # 7 Exhibit 7 (OL web page), # 8 Exhibit 8 (For the love of literacy), # 9 Exhibit 9 (Temp NEL closes), # 10 Exhibit 10 (Jorgensen Rpt Ex.), # 11 Exhibit 11 (Jorgensen rpt excerpts), # 12 Exhibit 12 (PRH0072389), # 13 Exhibit 13 (INTARC00142017 – part 1), # 14 Exhibit 13 (INTARC00142017 – part 2), # 15 Exhibit 13 (INTARC00142017 – part 3), # 16 Exhibit 13 (INTARC00142017 – part 4), # 17 Exhibit 13 (INTARC00142017 – part 5), # 18 Exhibit 14 (PRH0072194), # 19 Exhibit 15 (Kindle store terms), # 20 Exhibit 16 (PLAINTIFFS0001005), # 21 Exhibit 17 (Wired article), # 22 Exhibit 18 (PRH0007011), # 23 Exhibit 19 (PRH0067413), # 24 Exhibit 20 (PRH0072195), # 25 Exhibit 21 (PRH0007002), # 26 Exhibit 22 (PRH0006999), # 27 Exhibit 23 (PRH0007008), # 28 Exhibit 24 (PRH0072384), # 29 Exhibit 25 (PRH0068803), # 30 Exhibit 26 (Dye deposition excerpts)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 96 | DECLARATION of Elizabeth A. McNamara in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.*. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (Complaint), # 2 Exhibit 2 (Answer), # 3 Exhibit 3 (Books to Borrow), # 4 Exhibit 4 (Cheng Declaration), # 5 Exhibit 5 (Kahle deposition excerpts), # 6 Exhibit 6 (users page), # 7 Exhibit 7 (Freeland deposition excerpts), # 8 Exhibit 8 (INTARC00445486), # 9 Exhibit 9 ( IA responds to publishers law suit), # 10 Exhibit 10 (INTARC00138760), # 11 Exhibit 11 (Reimers deposition excerpts), # 12 Exhibit 12 (openlibrary.org home page), # 13 Exhibit 13 (Gibbs deposition excerpts), # 14 Exhibit 14 (1 hr limit complaints), # 15 Exhibit 15 (Borrowing From The Lending Library), # 16 Exhibit 16 (loans renewable every hour), # 17 Exhibit 17 (Exhibit A to Cplt), # 18 Exhibit 18 (Stipulation Regarding Undisputed Facts), # 19 Exhibit 19 (Hildreth deposition excerpts), # 20 Exhibit 20 (Potash deposition excerpts), # 21 Exhibit 21 (checkout data), # 22 Exhibit 22 (Book data), # 23 Exhibit 23 (IMLS stats), # 24 Exhibit 24 (Cheng deposition excerpts), # 25 Exhibit 25 (IA's Resp. to Pltfs' RFAs), # 26 Exhibit 26 (Hildreth Expert Report – part 1), # 27 Exhibit 26 (Hildreth Expert Report – part 2), # 28 Exhibit 27 (INTARC00142017 – part 1), # 29 Exhibit 27 (INTARC00142017 – part 2), # 30 Exhibit 27 (INTARC00142017 – |

part 3), # 31 Exhibit 27 (INTARC00142017 – part 4), # 32 Exhibit 27 (INTARC00142017 – part 5), # 33 Exhibit 28 (INTARC00153397), # 34 Exhibit 29 (INTARC00391312), # 35 Exhibit 30 (INTARC00405932), # 36 Exhibit 31 (Reminiscences of a stock operator), # 37 Exhibit 32 (INTARC00165712), # 38 Exhibit 33 (PRH0052627), # 39 Exhibit 34 (PRH0052629), # 40 Exhibit 35 (INTARC00462005), # 41 Exhibit 36a ( INTARC00322407), # 42 Exhibit 36b (INTARC00322581), # 43 Exhibit 36c (INTARC00323031), # 44 Exhibit 37 (INTARC00463590), # 45 Exhibit 38 (INTARC00409223 – part 1), # 46 Exhibit 38 (INTARC00409223 – part 2), # 47 Exhibit 38 (INTARC00409223 – part 3), # 48 Exhibit 39 (INTARC00165266), # 49 Exhibit 40 (INTARC00405737), # 50 Exhibit 41 (Ken Kesey), # 51 Exhibit 42 (INTARC00167070), # 52 Exhibit 43 (Rachael treasure – search), # 53 Exhibit 44 (2019 990–PF Kahle–Austin Foundation), # 54 Exhibit 45 (Cressaty deposition excerpts), # 55 Exhibit 46 (INTARC00151083 – part 1), # 56 Exhibit 46 (INTARC00151083 – part 2), # 57 Exhibit 46 (INTARC00151083 – part 3), # 58 Exhibit 46 (INTARC00151083 – part 4), # 59 Exhibit 46 (INTARC00151083 – part 5), # 60 Exhibit 46 (INTARC00151083 – part 6), # 61 Exhibit 46 (INTARC00151083 – part 7), # 62 Exhibit 46 (INTARC00151083 – part 8), # 63 Exhibit 47 (About Internet Archive), # 64 Exhibit 48 (INTARC00390085), # 65 Exhibit 49 (PLAINTIFFS0001109), # 66 Exhibit 50 (Zdnet article), # 67 Exhibit 51 (NYT Article), # 68 Exhibit 52 (ebook lending program launched), # 69 Exhibit 53 (INTARC00471120), # 70 Exhibit 54 (Let's Build a Great Digital Library Together), # 71 Exhibit 55 (Internet Archive's Modern Book Collection), # 72 Exhibit 56 (The Guardian article), # 73 Exhibit 57 (Table Top Scribe System), # 74 Exhibit 58 (Mills deposition excerpts), # 75 Exhibit 59 (INTARC00421456), # 76 Exhibit 60 (INTARC00137278), # 77 Exhibit 61 (INTARC00151080), # 78 Exhibit 62 (INTARC00355369), # 79 Exhibit 63 (Digitize your collections), # 80 Exhibit 64 (Most 20th Century Books Unavailable), # 81 Exhibit 65 (Library Genesis), # 82 Exhibit 66 (INTARC00393109), # 83 Exhibit 67 (CNBC – Plagiarism is rampant in China), # 84 Exhibit 68 (Digitization Saves Marygrove College Library), # 85 Exhibit 69 (Marygrove College Library), # 86 Exhibit 70 (Calculating the True Value of A Library that is Free), # 87 Exhibit 71 (Pineapple Fund Gifts $1M in Bitcoin), # 88 Exhibit 72 (INTARC00142757), # 89 Exhibit 73 (INTARC00142715), # 90 Exhibit 74 (OLRs 2019 Form 990), # 91 Exhibit 75 (INTARC00136985), # 92 Exhibit 76 (BWB Home page), # 93 Exhibit 77 (Patton–Schmitt testimony), # 94 Exhibit 78 (About Better World Books), # 95 Exhibit 79 (INTARC00388928), # 96 Exhibit 80 (INTARC00391222), # 97 Exhibit 81 (INTARC00414923), # 98 Exhibit 82 (INTARC00413052), # 99 Exhibit 83 (INTARC00395793), # 100 Exhibit 84 (INTARC00397105), # 101 Exhibit 85 (INTARC00397183), # 102 Exhibit 86 (BWB_000255), # 103 Exhibit 87 (BWB_00277), # 104 Exhibit 88 (INTARC004029628), # 105 Exhibit 89 (For the Love of Literacy), # 106 Exhibit 90 (BWB_000249), # 107 Exhibit 91 (BWB Borrow Option), # 108 Exhibit 92 (BWB links to IA ebooks), # 109 Exhibit 93 (IA links to BWB), # 110 Exhibit 94 (Wikipedia), # 111 Exhibit 95 (BWB), # 112 Exhibit 96 ( In–Library eBook Lending Program Launched), # 113 Exhibit 97 (INTARC00405779), # 114 Exhibit 98 (INTARC00165237), # 115 Exhibit 99 (INTARC00407188), # 116 Exhibit 100 (Wasted_ A case study for CDL), # 117 Exhibit 101 (PLAINTIFFS0000857), # 118 Exhibit 102 (Open Libraries – Join), # 119 Exhibit 103 (INTARC00439657), # 120 Exhibit 104 (INTARC00416930), # 121 Exhibit 105 (INTARC00426084), # 122 Exhibit 106 (INTARC00421687), # 123 Exhibit 107 (INTARC00141826), # 124 Exhibit 108 (INTARC00141472), # 125 Exhibit 109 (INTARC00142194), # 126 Exhibit 110 (INTARC00418710), # 127 Exhibit 111a (INTARC00417976), # 128 Exhibit 111b (INTARC00417978), # 129 Exhibit 112 (INTARC00418249), # 130 Exhibit 113 (Implementation & Integration), # 131 Exhibit 114 (IA's Resps to Pltfs 2d Set of Rogs), # 132 Exhibit 115 (INTARC00142801), # 133 Exhibit 116 (INTARC00141514), # 134 Exhibit 117 (Dartmouth CL.), # 135 Exhibit 118 (library links), # 136 Exhibit 119 (Orphan Works And Mass Digitization), # 137 Exhibit 120 (Judiciary hearing trnscrpt), # 138 Exhibit 121 (Bailey deposition excerpts), # 139 Exhibit 122 (Michelle Wu Hero Award), # 140 Exhibit 123 (White Paper on CDL), # 141 Exhibit 124 (INTARC466850), # 142 Exhibit 125 (INTARC466829), # 143 Exhibit 126 (WU00003022), # 144 Exhibit 127 (INTARC00415490), # 145 Exhibit 128 (INTARC466748), # 146 Exhibit 129 (INTARC00412869), # 147 Exhibit 130 (Lila Bailey wins IP3 Award), # 148 Exhibit 131 (INTARC00474640), # 149 Exhibit 131 (INTARC00474640), # 150 Exhibit 132 ( INTARC465698), # 151 Exhibit 133 (INTARC00458735), # 152 Exhibit 134 (AAP Publishers statement), # 153 Exhibit

| | | |
|---|---|---|
| | | 135 (Authors Guild statement on CDL), # <u>154</u> Exhibit 136 ( INTARC00420085), # <u>155</u> Exhibit 137 (IA Redigi Amicus), # <u>156</u> Exhibit 138 ( Band – ARL Policy Notes), # <u>157</u> Exhibit 139 (Why we released the NEL), # <u>158</u> Exhibit 140 (Signatories to CDL position statement), # <u>159</u> Exhibit 141 (INTARC00415834), # <u>160</u> Exhibit 142 (INTARC465732), # <u>161</u> Exhibit 143 (INTARC00418249), # <u>162</u> Exhibit 144 (INTARC00420223), # <u>163</u> Exhibit 145 (INTARC00141736), # <u>164</u> Exhibit 146 (Mythbusting CDL), # <u>165</u> Exhibit 147 (INTARC00463054), # <u>166</u> Exhibit 148 (INTARC00423818), # <u>167</u> Exhibit 150 (How IA and CDL can help course reserve), # <u>168</u> Exhibit 151 (INTARC00445585), # <u>169</u> Exhibit 152 (INTARC00420192), # <u>170</u> Exhibit 153 (INTARC00142679), # <u>171</u> Exhibit 154 (INTARC00151748), # <u>172</u> Exhibit 155 (INTARC00395593), # <u>173</u> Exhibit 156 (INTARC00374675), # <u>174</u> Exhibit 157 (Karpeles deposition excerpts), # <u>175</u> Exhibit 158 (IA ebooks by publication year), # <u>176</u> Exhibit 159 (IA Pre–motion letter), # <u>177</u> Exhibit 160 (Overdrive holds), # <u>178</u> Exhibit 161 (Mens Health article), # <u>179</u> Exhibit 162 (INTARC467709), # <u>180</u> Exhibit 163 (Detroit and Austin – Ovedrive), # <u>181</u> Exhibit 164 (Open Library Design Ecosystem), # <u>182</u> Exhibit 165 (Smith deposition excerpts), # <u>183</u> Exhibit 166 (Use and Pub. Cost of Pub. Lib. Mtrls), # <u>184</u> Exhibit 167 (Rural Libraries), # <u>185</u> Exhibit 168 (Announcing NEL), # <u>186</u> Exhibit 169 (Open library – member stats), # <u>187</u> Exhibit 170 (OL stats – ebooks borrowed), # <u>188</u> Exhibit 171 (INTARC00462951), # <u>189</u> Exhibit 172 (Sen–Udall–Response–NEL), # <u>190</u> Exhibit 173 (INTARC00436106), # <u>191</u> Exhibit 174 (INTARC00437003), # <u>192</u> Exhibit 175 (INTARC00400154), # <u>193</u> Exhibit 176 (PRH0029336), # <u>194</u> Exhibit 177 (INTARC00399901), # <u>195</u> Exhibit 178 (Advisory Board to the Authors Alliance), # <u>196</u> Exhibit 179 (INTARC00462974), # <u>197</u> Exhibit 180 (NEL, who needs it), # <u>198</u> Exhibit 181 (Temp NEL to close), # <u>199</u> Exhibit 182 (INTARC00448939), # <u>200</u> Exhibit 183 (PRH0070363), # <u>201</u> Exhibit 184 (HathiTrust Emergency Temporary Access Service), # <u>202</u> Exhibit 185 (Google Search)).(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | <u>97</u> | MOTION for Summary Judgment . Document filed by Internet Archive. Responses due by 9/2/2022.(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | <u>98</u> | RULE 56.1 STATEMENT. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | <u>99</u> | MEMORANDUM OF LAW in Support re: <u>87</u> MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint*. . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | <u>100</u> | DECLARATION of Joseph C. Gratz in Support re: <u>97</u> MOTION for Summary Judgment .. Document filed by Internet Archive. (Attachments: # <u>1</u> Exhibit A – Stipulation of Undisputed Facts, # <u>2</u> Exhibit B – Stipulation of Undisputed Facts, # <u>3</u> Exhibit C – REDACTED IN ITS ENTIRETY, # <u>4</u> Exhibit D – REDACTED IN ITS ENTIRETY, # <u>5</u> Exhibit E – REDACTED IN ITS ENTIRETY, # <u>6</u> Exhibit F – REDACTED IN ITS ENTIRETY, # <u>7</u> Exhibit G – IFLA Position on Controlled Digital Lending, # <u>8</u> Exhibit H – Public Libraries Survey of COVID Responses, # <u>9</u> Exhibit I – School Closures Map, # <u>10</u> Exhibit J – Excerpts, Silverman Deposition Transcript, # <u>11</u> Exhibit K – New Yorker article re NEL, # <u>12</u> Exhibit L – Public Libraries Survey, # <u>13</u> Exhibit M – Availability of The Lion, the witch, and the wardrobe, # <u>14</u> Exhibit N – Excerpts, Dye Deposition Transcript, # <u>15</u> Exhibit O – PW article ranking largest publishers, # <u>16</u> Exhibit P – Excerpts, Bertelsmann 2018 Annual Report, # <u>17</u> Exhibit Q – Excerpts, Bertelsmann 2019 Annual Report, # <u>18</u> Exhibit R – Excerpts, Bertelsmann 2021 Annual Report, # <u>19</u> Exhibit S – Excerpts, Wiley 2020 10–K, # <u>20</u> Exhibit T – Excerpts, Wiley 2021 10–K, # <u>21</u> Exhibit U – Excerpts, 2019 News Corp. Annual Report, # <u>22</u> Exhibit V – Excerpts, 2021 News Corp. Annual Report, # <u>23</u> Exhibit W – Excerpts, Lagardere 2018 Registration Documents, # <u>24</u> Exhibit X – Excerpts, Lagardere 2020 Registration Documents, # <u>25</u> Exhibit Y – Excerpts, Lagardere 2021 Registration Documents, # <u>26</u> Exhibit Z – PW article, A Year for the Record Book in Publishing, # <u>27</u> Exhibit AA – PW article, Americas Biggest Publishers Keep Posting Profits, # <u>28</u> Exhibit BB – NYT article, Surprise Ending for Publishers, # <u>29</u> Exhibit CC – Excerpts, Marwell Deposition Transcripts, # <u>30</u> Exhibit DD – REDACTED IN ITS ENTIRETY, # <u>31</u> Exhibit EE – Excerpts, Prince Deposition Transcripts, # <u>32</u> Exhibit FF – Excerpts, Lazarus Deposition |

| | | |
|---|---|---|
| | | Transcripts, # 33 Exhibit GG – Excerpts, Restivo–Alessi Deposition Transcript, # 34 Exhibit HH – Excerpts, Restivo–Alessi Deposition Transcript Excerpts, Pavese Deposition, # 35 Exhibit II – H.R. Report 94–1476, Copyright Law Revision, # 36 Exhibit JJ – REDACTED IN ITS ENTIRETY, # 37 Exhibit KK – REDACTED IN ITS ENTIRETY, # 38 Exhibit LL – REDACTED IN ITS ENTIRETY, # 39 Exhibit MM – REDACTED IN ITS ENTIRETY, # 40 Exhibit NN – REDACTED IN ITS ENTIRETY).(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 101 | DECLARATION of Lauren Sherman in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 102 | DECLARATION of Ben Saracco in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 103 | DECLARATION of Laura Gibbs in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 104 | DECLARATION of Daniel Smith in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 105 | DECLARATION of Brewster Kahle in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive. (Attachments: # 1 Exhibit 1 – Notification of Grant Award, # 2 Exhibit 2 – Webpage Recording Grant Award, # 3 Exhibit 3 – In–Library eBook Lending Program Launched – IA Blog, # 4 Exhibit 4 – COSLA Endorsement of IA, # 5 Exhibit 5 – White Paper on Controlled Digital Lending of Library Books, # 6 Exhibit 6 – Position Statement on CDL, # 7 Exhibit 7 – Signatories to Position Statement on CDL, # 8 Exhibit 8 – Weaving Books into the WebStarting with Wikipedia – IA Blog, # 9 Exhibit 9 – Wikipedia Links to IA CDL Books, # 10 Exhibit 10 – Books related to Japanese American Internment – IA Blog, # 11 Exhibit 11 – Books banned by schools available on IA – IA Blog, # 12 Exhibit 12 – Announcing a National Emergency Library, # 13 Exhibit 13 – Public Statement Supporting Waitlist Suspension at IA, # 14 Exhibit 14 – Teachers & the NEL, # 15 Exhibit 15 – Impacts of the temporary NEL – IA Blog, # 16 Exhibit 16 – More Impacts of the National Emergency Library – IA Blog, # 17 Exhibit 17 – Even More Impacts of the NEL – IA Blog).(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 106 | MEMORANDUM OF LAW in Support re: 97 MOTION for Summary Judgment . . Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 107 | RULE 56.1 STATEMENT. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/07/2022) |
| 07/07/2022 | 108 | DECLARATION of Rasmus Jrgensen in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive. (Attachments: # 1 Exhibit 1 – Excerpts, Jorgensen Expert Rpt., # 2 Exhibit 2 – Excerpts, Jorgensen Expert Rpt.).(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 109 | DECLARATION of Imke Reimers in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive. (Attachments: # 1 Exhibit 1 – Excerpts, Reimers Expert Rpt., # 2 Exhibit 2 – Excerpts, Reimers Rebuttal Expert Rpt.).(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/07/2022 | 110 | DECLARATION of Susan H. Hildreth in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive. (Attachments: # 1 Exhibit 1 – Excerpts, Hildreth Expert Rpt., # 2 Exhibit 2 – Excerpts, Hildreth Expert Rpt.).(Gratz, Joseph) (Entered: 07/07/2022) |
| 07/08/2022 | 111 | LETTER MOTION for Oral Argument re: Defendant Internet's Motion for Summary Judgment addressed to Judge John G. Koeltl from Joseph C. Gratz dated 7/7/2022. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/08/2022) |
| 07/08/2022 | 112 | LETTER MOTION to Seal the filing at ECF No. 107, addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated July 8, 2022. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/08/2022) |

| 07/08/2022 | 113 | RULE 56.1 STATEMENT. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/08/2022) |
|---|---|---|
| 07/11/2022 | 114 | ORDER granting 112 Letter Motion to Seal. APPLICATION GRANTED SO ORDERED. (Signed by Judge John G. Koeltl on 7/8/2022) (ate) (Entered: 07/11/2022) |
| 07/11/2022 | 115 | SEALED DOCUMENT placed in vault. (nmo) (Entered: 07/11/2022) |
| 07/13/2022 | 116 | NOTICE OF APPEARANCE by Yuliya Ziskina on behalf of Library Futures Institute, EveryLibrary Institute, and ReadersFirst..(Ziskina, Yuliya) (Entered: 07/13/2022) |
| 07/14/2022 | 117 | SEALED DOCUMENT placed in vault..(jus) (Entered: 07/14/2022) |
| 07/14/2022 | 118 | NOTICE OF APPEARANCE by Rebecca Tushnet on behalf of AMICI CURIAE INTELLECTUAL PROPERTY LAW PROFESSORS..(Tushnet, Rebecca) (Entered: 07/14/2022) |
| 07/14/2022 | 119 | LETTER MOTION to File Amicus Brief *by Michelle M. Wu* addressed to Judge John G. Koeltl from Max Rodriguez dated July 14, 2022. Document filed by Michelle M Wu. (Attachments: # 1 Supplement Proposed Amicus Brief of Michelle M. Wu, # 2 Exhibit A (Michelle M. Wu Curriculum Vitae)).(Rodriguez, Max) (Entered: 07/14/2022) |
| 07/14/2022 | 120 | MOTION to File Amicus Brief . Document filed by AMICI CURIAE INTELLECTUAL PROPERTY LAW PROFESSORS. (Attachments: # 1 Exhibit Proposed amicus brief, # 2 Text of Proposed Order Proposed order allowing amicus brief, # 3 Exhibit Notice of motion for leave to file amicus).(Tushnet, Rebecca) (Entered: 07/14/2022) |
| 07/14/2022 | 121 | NOTICE OF APPEARANCE by Jason Michael Schultz on behalf of Copyright Scholars..(Schultz, Jason) (Entered: 07/14/2022) |
| 07/14/2022 | 122 | MOTION to File Amicus Brief . Document filed by Library Futures Institute, EveryLibrary Institute, and ReadersFirst. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order Proposed order allowing amicus brief, # 3 Exhibit Notice of motion for leave to file amicus).(Ziskina, Yuliya) (Entered: 07/14/2022) |
| 07/14/2022 | 123 | NOTICE OF APPEARANCE by Rachel Brooke Leswing on behalf of Authors Alliance..(Leswing, Rachel) (Entered: 07/14/2022) |
| 07/14/2022 | 124 | MOTION for RACHEL BROOKE LESWING to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−26416675. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Authors Alliance. (Attachments: # 1 Affidavit Affidavit in Support of Admission Pro Hac Vice, # 2 Exhibit California Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order for Pro Hac Vice Admission).(Leswing, Rachel) (Entered: 07/14/2022) |
| 07/14/2022 | 125 | MOTION to File Amicus Brief . Document filed by Authors Alliance. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Exhibit Exhibit A to Proposed Amicus Brief).(Leswing, Rachel) (Entered: 07/14/2022) |
| 07/14/2022 | 126 | NOTICE of Notice of Motion for Leave to File Amicus. Document filed by Copyright Scholars. (Attachments: # 1 Exhibit DECLARATION OF JASON M. SCHULTZ IN SUPPORT OF MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF).(Schultz, Jason) (Entered: 07/14/2022) |
| 07/14/2022 | 127 | NOTICE OF APPEARANCE by Christopher Theodore Bavitz on behalf of Kenneth D. Crews, Kevin L. Smith..(Bavitz, Christopher) (Entered: 07/14/2022) |
| 07/14/2022 | 128 | **FILING ERROR – DEFICIENT DOCKET ENTRY – (SEE DOCUMENT#130)** MOTION to File Amicus Brief . Document filed by Kenneth D. Crews, Kevin L. Smith. (Attachments: # 1 Supplement Notice of Motion for Leave to File Amicus Brief, # 2 Appendix Amicus Brief of Kenneth D. Crews and Kevin L. Smith in Support of Defendant Internet Archives Motion for Summary Judgment and in Opposition to Plaintiffs Cross−Motion for Summary Judgment).(Bavitz, Christopher) Modified on 7/15/2022 (lb). (Entered: 07/14/2022) |

| 07/14/2022 | 129 | FIRST MOTION to File Amicus Brief *in Support of Defendants' Motion for Summary Judgment*. Document filed by Copyright Scholars. (Attachments: # 1 Exhibit Amici Curiae Brief of 17 Copyright Scholars in Support of Defendants' Motion for Summary Judgment).(Schultz, Jason) (Entered: 07/14/2022) |
|---|---|---|
| 07/15/2022 | 130 | MOTION to File Amicus Brief . Document filed by Kenneth D. Crews, Kevin L. Smith. (Attachments: # 1 Supplement Notice of Motion for Leave to File Amicus Brief, # 2 Appendix Amicus Brief of Kenneth D. Crews and Kevin L. Smith in Support of Defendant Internet Archives Motion for Summary Judgment and in Opposition to Plaintiffs Cross–Motion for Summary Judgment w/Corrected Certificate of Compliance).(Bavitz, Christopher) (Entered: 07/15/2022) |
| 07/15/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 124 MOTION for RACHEL BROOKE LESWING to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–26416675. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 07/15/2022) |
| 07/15/2022 | 131 | MEMO ENDORSEMENT on MOTION TO LEAVE TO FILE AMICUS CURIAE IN SUPPORT OF INTERNET ARCHIVE: granting 125 Motion to File Amicus Brief. ENDORSEMENT: Application Granted. SO ORDERED (Signed by Judge John G. Koeltl on 7/15/2022) (ama) (Entered: 07/15/2022) |
| 07/15/2022 | 132 | ORDER: granting 119 Letter Motion to File Amicus Brief. Application Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 7/15/2022) (ama) (Entered: 07/15/2022) |
| 07/15/2022 | 133 | MEMO ENDORSEMENT on MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF OF 17 COPYRIGHT SCHOLARS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT: granting 129 Motion to File Amicus Brief. ENDORSEMENT: Application Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 7/15/2022) (ama) (Entered: 07/15/2022) |
| 07/15/2022 | 134 | MEMO ENDORSEMENT on MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF AND MEMORANDUM OF LAW IN SUPPORT THEREOF: granting 120 Motion to File Amicus Brief. ENDORSEMENT: Application Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 7/15/2022) (ama) (Entered: 07/15/2022) |
| 07/15/2022 | 135 | MEMO ENDORSEMENT on MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF THE INTERNET ARCHIVE: granting 122 Motion to File Amicus Brief. ENDORSEMENT: Application Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 7/15/2022) (ama) (Entered: 07/15/2022) |
| 07/15/2022 | 136 | MEMO ENDORSEMENT on MOTION FOR LEAVE TO FILE AMICUS BRIEF OF KENNETH D. CREWS AND KEVIN L. SMITH IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT: granting 130 Motion to File Amicus Brief. ENDORSEMENT: Application Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 7/15/2022) (ama) (Entered: 07/15/2022) |
| 07/15/2022 | 137 | RESPONSE in Opposition to Motion re: 122 MOTION to File Amicus Brief ., 119 LETTER MOTION to File Amicus Brief *by Michelle M. Wu* addressed to Judge John G. Koeltl from Max Rodriguez dated July 14, 2022., 129 FIRST MOTION to File Amicus Brief *in Support of Defendants' Motion for Summary Judgment*., 125 MOTION to File Amicus Brief . . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/15/2022) |
| 07/15/2022 | 138 | RESPONSE in Opposition to Motion re: 122 MOTION to File Amicus Brief ., 119 LETTER MOTION to File Amicus Brief *by Michelle M. Wu* addressed to Judge John G. Koeltl from Max Rodriguez dated July 14, 2022., 129 FIRST MOTION to File Amicus Brief *in Support of Defendants' Motion for Summary Judgment*., 125 MOTION to File Amicus Brief . *(Unredacted)*. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/15/2022) |

A-41

| 07/15/2022 | 139 | DECLARATION of Elizabeth A. McNamara in Opposition re: 122 MOTION to File Amicus Brief ., 119 LETTER MOTION to File Amicus Brief *by Michelle M. Wu* addressed to Judge John G. Koeltl from Max Rodriguez dated July 14, 2022., 129 FIRST MOTION to File Amicus Brief *in Support of Defendants' Motion for Summary Judgment.*, 125 MOTION to File Amicus Brief .. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (REDACTED), # 2 Exhibit 2 (INTARC00454127_VOL0009), # 3 Exhibit 3 (Bailey Excerpts), # 4 Exhibit 4 (INTARC00395813_VOL0009)).(McNamara, Elizabeth) (Entered: 07/15/2022) |
| 07/18/2022 | 140 | ORDER FOR ADMISSION PRO HAC VICE granting 124 Motion for Rachel Brooke Leswing to Appear Pro Hac Vice. Applicant having requested admission Pro Hac Vice to appear for all purposes as counsel for amicus curiae Authors Alliance, Inc. in the above captioned action; IT IS HEREBY ORDERED that Applicant is admitted to practice Pro Hac Vice in the above–captioned case in the United States District Court for the Southern District of New York. All attorneys appearing before this Court are subject to the Local Rules of this Court, including the Rules governing the discipline of attorneys. (Signed by Judge John G. Koeltl on 7/15/2022) (mml) (Entered: 07/18/2022) |
| 07/19/2022 | 141 | BRIEF re: 133 Order on Motion to File Amicus Brief, *in Support of Defendants' Motion for Summary Judgment*. Document filed by Copyright Scholars..(Schultz, Jason) (Entered: 07/19/2022) |
| 07/19/2022 | 142 | BRIEF re: 135 Order on Motion to File Amicus Brief *in Support of Defendant's Motion for Summary Judgment*. Document filed by Library Futures Institute, EveryLibrary Institute, and ReadersFirst..(Ziskina, Yuliya) (Entered: 07/19/2022) |
| 07/19/2022 | 143 | BRIEF re: 134 Order on Motion to File Amicus Brief, . Document filed by AMICI CURIAE INTELLECTUAL PROPERTY LAW PROFESSORS..(Tushnet, Rebecca) (Entered: 07/19/2022) |
| 07/19/2022 | 144 | BRIEF re: 125 MOTION to File Amicus Brief . . Document filed by Authors Alliance. (Attachments: # 1 Exhibit Exhibit to Amicus Brief).(Leswing, Rachel) (Entered: 07/19/2022) |
| 07/20/2022 | 145 | BRIEF re: 136 Order on Motion to File Amicus Brief, . Document filed by Kenneth D. Crews, Kevin L. Smith..(Bavitz, Christopher) (Entered: 07/20/2022) |
| 07/20/2022 | 146 | BRIEF re: 132 Order on Motion to File Amicus Brief *by Michelle M. Wu as Amicus Curiae*. Document filed by Michelle M Wu..(Rodriguez, Max) (Entered: 07/20/2022) |
| 08/05/2022 | 147 | THIRD PARTY MOTION to File Amicus Brief *of Professors and Scholars of Copyright Law*. Document filed by Professors and Scholars of Copyright Law. (Attachments: # 1 Appendix Notice of motion, # 2 Appendix Proposed amicus brief).(Charlesworth, Jacqueline) (Entered: 08/05/2022) |
| 08/08/2022 | 148 | MOTION for Theodore M. Shapiro to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–26516190. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by International Rightholders. Return Date set for 8/8/2022 at 05:00 PM. (Attachments: # 1 Affidavit Affidavit of TM Shapiro, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order Proposed PHV Order).(Shapiro, Theodore) (Entered: 08/08/2022) |
| 08/08/2022 | 149 | MEMO ENDORSEMENT granting 147 Motion to File Amicus Brief ENDORSEMENT: Motion for leave to file Amici Curiae Brief is granted. SO ORDERED. (Signed by Judge John G. Koeltl on 8/8/2022) (ks) (Entered: 08/08/2022) |
| 08/09/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 148 MOTION for Theodore M. Shapiro to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC–26516190. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (sgz)** (Entered: 08/09/2022) |
| 08/09/2022 | 150 | NOTICE OF APPEARANCE by Matthew Aaron Leish on behalf of International Rightholders..(Leish, Matthew) (Entered: 08/09/2022) |

A-42

| 08/09/2022 | 151 | MOTION to File Amicus Brief . Document filed by International Rightholders. (Attachments: # 1 Exhibit Notice of Motion, # 2 Exhibit Proposed Amicus Brief).(Leish, Matthew) (Entered: 08/09/2022) |
|---|---|---|
| 08/10/2022 | 152 | ORDER FOR ADMISSION PRO HAC VICE granting 148 Motion for Theodore M. Shapiro to Appear Pro Hac Vice. (Signed by Judge John G. Koeltl on 8/9/2022) (ks) (Entered: 08/10/2022) |
| 08/10/2022 | 153 | MOTION FOR LEAVE TO FILE AMICI CURIAE BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT: granting 151 Letter Motion to File Amicus Brief. Request to file Amici Curiae Brief is Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 8/10/2022) (ama) Modified on 8/10/2022 (ama). (Entered: 08/10/2022) |
| 08/11/2022 | 154 | BRIEF re: 153 Order on Motion to File Amicus Brief, . Document filed by International Rightholders..(Leish, Matthew) (Entered: 08/11/2022) |
| 08/12/2022 | 155 | NOTICE OF APPEARANCE by Nancy Evelyn Wolff on behalf of Copyright Alliance..(Wolff, Nancy) (Entered: 08/12/2022) |
| 08/12/2022 | 156 | NOTICE OF APPEARANCE by Alexander Gigante on behalf of Copyright Alliance..(Gigante, Alexander) (Entered: 08/12/2022) |
| 08/12/2022 | 157 | NOTICE OF APPEARANCE by Elizabeth Safran, I on behalf of Copyright Alliance..(Safran, Elizabeth) (Entered: 08/12/2022) |
| 08/12/2022 | 158 | MOTION for Leave to File Amicus Brief . Document filed by Copyright Alliance. (Attachments: # 1 Exhibit Notice of Motion, # 2 Exhibit Proposed Copyright Alliance Amicus Brief, # 3 Text of Proposed Order Proposed Order).(Wolff, Nancy) (Entered: 08/12/2022) |
| 08/12/2022 | 159 | CONSENT MOTION to File Amicus Brief *in Support of Plaintiffs' Motion for Summary Judgment*. Document filed by The Authors Guild, Inc., Western Writers of America, Canadian Authors Association, American Photographic Artists, The Writers Union of Canada, International Authors Forum, American Society of Media Photographers, Romance Writers of America, Society of Childrens Book Writers and Illustrators, European Writers Council, National Writers Union, Graphic Artists Guild, American Society for Collective Rights Licensing, Society of Authors, Sisters in Crime, International Federation of Journalists, Dramatists Guild of America, National Press Photographers Association, Novelists Inc., Association of Authors Agents, The American Society of Journalists and Authors, The Union des crivaines et des crivains Qubcois, and European Visual Artists..(Clarida, Robert) (Entered: 08/12/2022) |
| 08/12/2022 | 160 | MEMORANDUM OF LAW in Support re: 159 CONSENT MOTION to File Amicus Brief *in Support of Plaintiffs' Motion for Summary Judgment*. . Document filed by The Authors Guild, Inc., Western Writers of America, Canadian Authors Association, American Photographic Artists, The Writers Union of Canada, International Authors Forum, American Society of Media Ph. (Attachments: # 1 Exhibit A – Memorandum of Law of Amici Curiae).(Clarida, Robert) (Entered: 08/12/2022) |
| 08/15/2022 | 161 | MEMO ENDORSEMENT granting 158 Letter Motion for Leave to File Document. ENDORSEMENT: Application to file amicus brief granted. SO ORDERED. (Signed by Judge John G. Koeltl on 8/13/2022) (ks) (Entered: 08/15/2022) |
| 08/15/2022 | 162 | BRIEF re: 161 Order on Motion for Leave to File Document *Copyright Alliance Amicus brief*. Document filed by Copyright Alliance..(Wolff, Nancy) (Entered: 08/15/2022) |
| 08/15/2022 | 163 | BRIEF re: 149 Order on Motion to File Amicus Brief . Document filed by Professors and Scholars of Copyright Law..(Charlesworth, Jacqueline) (Entered: 08/15/2022) |
| 08/16/2022 | 164 | MEMO ENDORSEMENT granting 159 Motion to File Amicus Brief ENDORSEMENT: Application to file amicus granted. SO ORDERED.. (Signed by Judge John G. Koeltl on 8/16/2022) (ks) (Entered: 08/16/2022) |
| 08/17/2022 | 165 | BRIEF re: 164 Order on Motion to File Amicus Brief . Document filed by The Authors Guild, Inc., Western Writers of America, Canadian Authors Association, American Photographic Artists, The Writers Union of Canada, International Authors Forum, American Society of Media Ph..(Clarida, Robert) (Entered: 08/17/2022) |

| 09/02/2022 | 166 | DECLARATION of Elizabeth A. McNamara in Opposition re: 97 MOTION for Summary Judgment .. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (IA Resp to Pltfs 2d ROGs No 21), # 2 Exhibit 2 (Restivo–Alessi dep excerpts), # 3 Exhibit 3 (Weber dep excerpts), # 4 Exhibit 4 (Pavese dep excerpts), # 5 Exhibit 5 (Reimers Depo Ex 4), # 6 Exhibit 6 (Lazarus dep excerpts), # 7 Exhibit 7 (OverDrive data), # 8 Exhibit 8 (discovery letters), # 9 Exhibit 9 (IA priv log), # 10 Exhibit 10 (Bailey dep excerpts), # 11 Exhibit 11 ( IA Launches New Pilot Program), # 12 Exhibit 12 (Cressaty dep excerpts), # 13 Exhibit 13 (The Glass Castle et al), # 14 Exhibit 14 (Palace of Illusions et al), # 15 Exhibit 15 (Saracco dep excerpts), # 16 Exhibit 16 (Sigs to the Position Stmt), # 17 Exhibit 17 (HC0015518 REDACTED)).(McNamara, Elizabeth) (Entered: 09/02/2022) |
| 09/02/2022 | 167 | DECLARATION of Jeffrey T. Prince in Opposition re: 97 MOTION for Summary Judgment .. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit 1 (Prince Rprt REDACTED), # 2 Exhibit 2 (Prince dep excerpts REDACTED), # 3 Exhibit 3 (Jorgensen dep excerpts REDACTED), # 4 Exhibit 4 (Reimers dep excerpts), # 5 Exhibit 5 (Hildreth dep excerpts), # 6 Exhibit 6 (Reimers 2016)).(McNamara, Elizabeth) (Entered: 09/02/2022) |
| 09/02/2022 | 168 | COUNTER STATEMENT TO 98 Rule 56.1 Statement. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 09/02/2022) |
| 09/02/2022 | 169 | MEMORANDUM OF LAW in Opposition re: 97 MOTION for Summary Judgment . . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 09/02/2022) |
| 09/02/2022 | 170 | DECLARATION of Joseph C. Gratz in Opposition re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.*. Document filed by Internet Archive. (Attachments: # 1 Exhibit 1 – OverDrive Distribution Agreement (UNDER SEAL), # 2 Exhibit 2 – Mills Deposition EXCERPTS, # 3 Exhibit 3 – Patton–Schmitt Deposition EXCERPTS, # 4 Exhibit 4 – Karpeles Deposition EXCERPTS, # 5 Exhibit 5 – Hildreth Deposition EXCERPTS, # 6 Exhibit 6 – Hildreth Deposition Errata, # 7 Exhibit 7 – Judgment, CJEU Copyright Case, # 8 Exhibit 8 – AG Opinion, CJEU Copyright Case).(Gratz, Joseph) (Entered: 09/02/2022) |
| 09/02/2022 | 171 | DECLARATION of Brewster Kahle in Opposition re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.*. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 09/02/2022) |
| 09/02/2022 | 172 | COUNTER STATEMENT TO 107 Rule 56.1 Statement. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 09/02/2022) |
| 09/02/2022 | 173 | MEMORANDUM OF LAW in Opposition re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint.* . Document filed by Internet Archive..(Gratz, Joseph) (Entered: 09/02/2022) |
| 09/09/2022 | 174 | SEALED DOCUMENT placed in vault..(jus) (Entered: 09/09/2022) |
| 10/07/2022 | 175 | REPLY MEMORANDUM OF LAW in Support re: 97 MOTION for Summary Judgment . . Document filed by Internet Archive..(Gratz, Joseph) (Entered: 10/07/2022) |
| 10/07/2022 | 176 | DECLARATION of Joseph C. Gratz in Support re: 97 MOTION for Summary Judgment .. Document filed by Internet Archive. (Attachments: # 1 Exhibit 1 – Excerpts of the transcript of the deposition of Dr. Jeffrey T. Prince, # 2 Exhibit 2 – Excerpts of the transcript of the deposition of Dr. Rasmus Jrgensen).(Gratz, Joseph) (Entered: 10/07/2022) |
| 10/07/2022 | 177 | RULE 56.1 STATEMENT. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 10/07/2022) |

| 10/07/2022 | 178 | RESPONSE re: 172 Counter Statement to Rule 56.1 . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 10/07/2022) |
|---|---|---|
| 10/07/2022 | 179 | REPLY MEMORANDUM OF LAW in Support re: 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint*. . Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 10/07/2022) |
| 10/10/2022 | 180 | ORDER with respect to 87 Motion for Summary Judgment; with respect to 97 Motion for Summary Judgment. The plaintiffs should submit courtesy copies of all papers filed in connection with their motion for summary judgment. See ECF No. 87. Defendant Internet Archive should submit courtesy copies of all papers filed in connection with its motion for summary judgment. See ECF No. 97. SO ORDERED. (Signed by Judge John G. Koeltl on 10/10/2022) (va) (Entered: 10/11/2022) |
| 10/14/2022 | 181 | SEALED DOCUMENT placed in vault..(jus) (Entered: 10/14/2022) |
| 01/30/2023 | 182 | NOTICE OF CHANGE OF ADDRESS by Joseph C. Gratz on behalf of Internet Archive. New Address: Morrison & Forester LLP, 425 Market Street, San Francisco, California, USA 94105, 415−268−7000..(Gratz, Joseph) (Entered: 01/30/2023) |
| 01/30/2023 | 183 | NOTICE OF CHANGE OF ADDRESS by Jessica Elaine Lanier on behalf of Internet Archive. New Address: Morrison & Forester LLP, 425 Market Street, San Francisco, California, USA 94105, 415−268−7000..(Lanier, Jessica) (Entered: 01/30/2023) |
| 01/30/2023 | 184 | NOTICE OF CHANGE OF ADDRESS by Annie Lee on behalf of Internet Archive. New Address: Morrison & Forester LLP, 425 Market Street, San Francisco, California, USA 94105, 415−268−7000..(Lee, Annie) (Entered: 01/30/2023) |
| 01/30/2023 | 185 | NOTICE OF CHANGE OF ADDRESS by Aditya Kamdar on behalf of Internet Archive. New Address: Morrison & Forester LLP, 2100 L Street NW, Suite 900, Washington, DC, USA 20037, 202−887−1500..(Kamdar, Aditya) (Entered: 01/30/2023) |
| 01/31/2023 | 186 | NOTICE OF APPEARANCE by Aditya Kamdar on behalf of Internet Archive..(Kamdar, Aditya) (Entered: 01/31/2023) |
| 02/17/2023 | 187 | ORDER granting 88 Letter Motion for Oral Argument; granting 111 Letter Motion for Oral Argument. The parties are directed to appear by phone for oral argument on Monday, March 20, 2023, at 1 p.m. in connection with the motions for summary judgment. Dial−in: 888−363−4749, with access code 8140049. The Clerk is respectfully directed to close ECF Nos. 88 and 111. SO ORDERED. (Signed by Judge John G. Koeltl on 2/17/23) (yv) (Entered: 02/21/2023) |
| 02/17/2023 | | Set/Reset Hearings: Telephone Conference set for 3/20/2023 at 01:00 PM before Judge John G. Koeltl. (yv) (Entered: 02/21/2023) |
| 03/20/2023 | | Minute Entry for proceedings held before Judge John G. Koeltl: Oral Argument held on 3/20/2023 re: 87 MOTION for Summary Judgment against Internet Archive with respect to the causes of action set forth in the Complaint. Filed by John Wiley & Sons, Inc., Penguin Random House LLC, HarperCollins Publishers LLC, Hachette Book Group, Inc.. (Entered: 04/07/2023) |
| 03/24/2023 | 188 | OPINION & ORDER re: 97 MOTION for Summary Judgment . filed by Internet Archive, 87 MOTION for Summary Judgment *against Internet Archive with respect to the causes of action set forth in the Complaint*. filed by John Wiley & Sons, Inc., Penguin Random House LLC, HarperCollins Publishers LLC, Hachette Book Group, Inc.. The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion for summary judgment is granted and the defendants' motion for summary judgment is denied. The parties should submit their respective proposals (or preferably a joint proposal) for the appropriate procedure to determine the judgment to be entered in this case. The submission or submissions should be made within fourteen (14) days of the date of this Opinion and Order. The Clerk is respectfully directed to close all pending motions. SO ORDERED. (Signed by Judge John G. Koeltl on 3/24/2023) (ks) (Entered: 03/24/2023) |

| 03/28/2023 | 189 | TRANSCRIPT of Proceedings re: HEARING held on 3/20/2023 before Judge John G. Koeltl. Court Reporter/Transcriber: Pamela Utter, (212) 805–0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/18/2023. Redacted Transcript Deadline set for 4/28/2023. Release of Transcript Restriction set for 6/26/2023..(McGuirk, Kelly) (Entered: 03/28/2023) |
|---|---|---|
| 03/28/2023 | 190 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a HEARING proceeding held on 3/20/2023 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(McGuirk, Kelly) (Entered: 03/28/2023) |
| 04/05/2023 | 191 | JOINT LETTER MOTION for Extension of Time *of deadline set in the March 24, 2023 order (ECF No. 188)* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated 4/5/2023. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 04/05/2023) |
| 04/07/2023 | 192 | ORDER granting 191 Letter Motion for Extension of Time. APPLICATION GRANTED. SO ORDERED.. (Signed by Judge John G. Koeltl on 4/7/2023) (ks) (Entered: 04/07/2023) |
| 04/13/2023 | 193 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated April 13, 2023. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 04/13/2023) |
| 04/13/2023 | 194 | ORDER granting 193 Letter Motion for Extension of Time. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 4/13/2023) (tg) (Entered: 04/13/2023) |
| 04/18/2023 | 195 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case,* addressed to Judge John G. Koeltl from Joseph C. Gratz dated 04/18/2023. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 04/18/2023) |
| 04/18/2023 | 196 | ORDER: granting 195 Letter Motion for Extension of Time. Application Granted. SO ORDERED. Motions due by 4/27/2023. (Signed by Judge John G. Koeltl on 4/18/2023) (ama) (Entered: 04/19/2023) |
| 04/26/2023 | 197 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case,* addressed to Judge John G. Koeltl from Joseph C. Gratz dated April 26, 2023. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 04/26/2023) |
| 04/26/2023 | 198 | ORDER granting 197 Letter Motion for Extension of Time. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 4/26/2023) (ks) (Entered: 04/26/2023) |
| 05/11/2023 | 199 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case,* addressed to Judge John G. Koeltl from Joseph C. Gratz dated May 11, 2023. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 05/11/2023) |
| 05/11/2023 | 200 | ORDER granting 199 Letter Motion for Extension of Time. APPLICATION GRANTED SO ORDERED. (Signed by Judge John G. Koeltl on 5/11/2023) (jca) (Entered: 05/11/2023) |
| 05/25/2023 | 201 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case until and including June 9, 2023,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated May 25, 2023. Document filed by Hachette Book Group, Inc., |

| | | HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 05/25/2023) |
|---|---|---|
| 05/25/2023 | 202 | ORDER granting 201 Letter Motion for Extension of Time. APPLICATION GRANTED. SO ORDERED. (Signed by Judge John G. Koeltl on 5/25/2023) (ks) (Entered: 05/25/2023) |
| 06/08/2023 | 203 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case until and including June 23, 2023,* addressed to Judge John G. Koeltl from Elizabeth A. McNamara dated June 8, 2023. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 06/08/2023) |
| 06/15/2023 | 204 | ORDER granting 203 Letter Motion for Extension of Time. Application GRANTED. SO ORDERED. (Signed by Judge Katherine Polk Failla on 6/15/2023) (rro) (Entered: 06/15/2023) |
| 06/22/2023 | 205 | JOINT LETTER MOTION for Extension of Time *to submit a proposal for the appropriate procedure to determine the judgment to be entered in this case until and including July 14, 2023,* addressed to Judge John G. Koeltl from Elizabeth McNamara dated 6/22/2023. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 06/22/2023) |
| 06/22/2023 | 206 | ORDER granting 205 Letter Motion for Extension of Time. APPLICATION GRANTED SO ORDERED. (Signed by Judge John G. Koeltl on 6/22/2023) (ate) (Entered: 06/22/2023) |
| 07/06/2023 | 207 | MOTION for Jessica E. Lanier to Withdraw as Attorney . Document filed by Internet Archive. (Attachments: # 1 Text of Proposed Order re Motion to Withdraw as Counsel of Record).(Lanier, Jessica) (Entered: 07/06/2023) |
| 07/06/2023 | 208 | DECLARATION of Jessica E. Lanier in Support re: 207 MOTION for Jessica E. Lanier to Withdraw as Attorney .. Document filed by Internet Archive..(Lanier, Jessica) (Entered: 07/06/2023) |
| 07/07/2023 | 209 | ORDER OF WITHDRAWAL OF JESSICA E. LANIER AS COUNSEL OF RECORD granting 207 MOTION for Jessica E. Lanier to Withdraw as Attorney. ORDERED that Jessica E. Lanier, be withdrawn as counsel of record for Defendant and it is further, ORDERED that the clerk is directed to remove Ms. Lanier from the Court's electronic service list. SO ORDERED. Attorney Jessica Elaine Lanier terminated. (Signed by Judge John G. Koeltl on 7/7/2023) (jca) (Entered: 07/07/2023) |
| 07/13/2023 | 210 | JOINT LETTER MOTION for Extension of Time *To Submit A Proposal For The Appropriate Procedure To Determine The Judgment To Be Entered In This Case Until And Including July 28, 2023,* addressed to Judge John G. Koeltl from Joseph C. Gratz dated July 13, 2023. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 07/13/2023) |
| 07/13/2023 | 211 | ORDER: granting 210 Letter Motion for Extension of Time. Application Granted. SO ORDERED. (Signed by Judge John G. Koeltl on 7/13/2023) (ama) (Entered: 07/13/2023) |
| 07/28/2023 | 212 | JOINT LETTER MOTION for Extension of Time *re: Deadline to submit proposal.* addressed to Judge John G. Koeltl from Elizabeth McNamara dated 7/28/2023. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., Penguin Random House LLC..(McNamara, Elizabeth) (Entered: 07/28/2023) |
| 07/28/2023 | 213 | ORDER: granting 212 Letter Motion for Extension of Time. Application Granted. No further extensions. SO ORDERED. (Signed by Judge John G. Koeltl on 7/28/2023) (ama) (Entered: 07/28/2023) |
| 08/11/2023 | 214 | LETTER addressed to Judge John G. Koeltl from Elizabeth A. McNamara and Joseph C. Gratz dated August 11, 2023 re: Joint submission of [Proposed] Consent Judgment and Permanent Injunction Subject to Reservation of Right of Appeal. Document filed by Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, |

| | | |
|---|---|---|
| | | Inc., Penguin Random House LLC. (Attachments: # 1 Exhibit A – [Proposed] Consent Judgment, # 2 Exhibit B – Plaintiffs' Position, # 3 Exhibit C – Internet Archive's Position).(McNamara, Elizabeth) (Entered: 08/11/2023) |
| 08/11/2023 | 215 | CONSENT JUDGMENT AND PERMANENT INJUNCTION SUBJECT TO RESERVATION OF RIGHT OF APPEAL: NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows: Judgment is entered for Plaintiffs and against Defendant on Plaintiffs' claims against Defendant for copyright infringement under 17 U.S.C. § 501. The Court hereby enters the following permanent injunction (the "Permanent Injunction"): "Covered Book" shall mean any in–copyright book or portion thereof, whether in existence as of the date hereof or later created, in which any Plaintiff (or any subsidiary or corporate affiliate of a Plaintiff) (a) owns or controls an exclusive right under the Copyright Act and makes the title commercially available for sale or license [in any electronic text format]; and (b) has provided notice to the Internet Archive regarding such title by sending the Internet Archive a machine readable catalog in a standardized form identifying such commercially available titles (including any updates thereto in the Plaintiffs' discretion), or other similar form of notification, once 14 days have elapsed since the receipt of such notice. A "Covered Book" includes all in–copyright editions of such title. Pursuant to the Opinion and Order, the Clerk of the Court shall enter judgment for Plaintiffs. The Clerk of the Court is directed to close this case. APPROVED AND ORDERED THIS 11TH day of August, 2023. (Signed by Judge John G. Koeltl on 8/11/2023) (ate) (Entered: 08/14/2023) |
| 08/11/2023 | 216 | ORDER: Accordingly, the Court has narrowly tailored the injunctive relief in this case to cover only copyrighted works, like the Works in Suit, that are available from the Publishers in electronic form. (Signed by Judge John G. Koeltl on 8/11/2023) (ate) (Entered: 08/14/2023) |
| 08/11/2023 | 217 | AO 121 FORM COPYRIGHT – CASE TERMINATED– SUBMITTED. In compliance with the provisions of 17 U.S.C. 508, the Register of Copyrights is hereby advised that a final decision was rendered on 8/11/2023 in a court action filed on the following copyright(s) in the U.S. District Court Southern District of New York. Form e–mailed to Register of Copyrights. (ate) (Entered: 08/14/2023) |
| 09/11/2023 | 218 | **FILING ERROR – NO ORDER SELECTED FOR APPEAL –** NOTICE OF APPEAL. Document filed by Internet Archive. Filing fee $ 505.00, receipt number ANYSDC–28265690. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Gratz, Joseph) Modified on 9/11/2023 (km). (Entered: 09/11/2023) |
| 09/11/2023 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Joseph Gratz to RE–FILE Document No. 218 Notice of Appeal.. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected;. Re–file the appeal using the event type Notice of Appeal found under the event list Appeal Documents – attach the correct signed PDF – select the correct named filer/filers – select the correct order/judgment being appealed. (km)** (Entered: 09/11/2023) |
| 09/11/2023 | 219 | NOTICE OF APPEAL from 215 Consent Judgment,,,,,, 188 Memorandum & Opinion,,,,. Document filed by Internet Archive. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Gratz, Joseph) (Entered: 09/11/2023) |
| 09/11/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 219 Notice of Appeal.(km) (Entered: 09/11/2023) |
| 09/11/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 219 Notice of Appeal filed by Internet Archive were transmitted to the U.S. Court of Appeals.(km) (Entered: 09/11/2023) |
| 09/11/2023 | 220 | DECLARATION of Brewster Kahle re: 215 Consent Judgment,,,,, *Declaration of Compliance*. Document filed by Internet Archive..(Gratz, Joseph) (Entered: 09/11/2023) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> INTERNET ARCHIVE and DOES 1 through 5, inclusive, <br><br> Defendants. | Case No. 1:20-cv-04160-JGK-OTW |

## DEFENDANT INTERNET ARCHIVE'S NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Notice is hereby given that Defendant Internet Archive appeals to the United States Court of Appeals for the Second Circuit from the August 11, 2023 Judgment and Permanent Injunction (Dkt. No. 215); the March 24, 2023 Opinion and Order Granting Plaintiffs' Motion for Summary Judgment and Denying Defendant's Motion for Summary Judgment (Dkt. No. 188); and from any and all orders, rulings, findings, and/or conclusions adverse to Defendant Internet Archive. True and correct copies of Dkt. Nos. 215 and 188 are attached hereto as Exhibits 1-2.

Dated:   September 11, 2023            Respectfully submitted,
         San Francisco, CA
                                       MORRISON & FOERSTER LLP

                                       By:  _/s/ Joseph C. Gratz_
                                           Joseph C. Gratz (*Pro Hac Vice*)
ELECTRONIC FRONTIER                        Annie A. Lee (*Pro Hac Vice*)
FOUNDATION                                 425 Market Street
                                           San Francisco, CA 94105
Corynne McSherry (*Pro Hac Vice*)          Telephone: (415) 268-7000
Kit Walsh (*Pro Hac Vice*)                 Fax: (415) 268-7522
Cara Gagliano (*Pro Hac Vice*)             JGratz@mofo.com
815 Eddy Street                            AnnieLee@mofo.com
San Francisco, CA 94109
Telephone: (415) 436-9333                  Aditya V. Kamdar (*Pro Hac Vice*)
Fax: (415) 436-9993                        2100 L Street NW, Suite 900
corynne@eff.org                            Washington, DC 20037
kit@eff.org                                Telephone: (202) 887-1500
cara@eff.org                               Fax: (202) 887-0763
                                           AKamdar@mofo.com

              *Counsel for Defendant Internet Archive*

                                 2

                               A-50

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY   :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,
                                            :     Case No. 1:20-cv-04160-JGK
            Plaintiffs,
                                            :
-against-
                                            :
INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                  :

            Defendants.                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

[PROPOSED] CONSENT JUDGMENT AND PERMANENT INJUNCTION SUBJECT
TO RESERVATION OF RIGHT OF APPEAL

WHEREAS, on June 1, 2020, Hachette Book Group, Inc., HarperCollins Publishers LLC,
John Wiley & Sons, Inc., and Penguin Random House LLC (the "Plaintiffs") commenced this
action (the "Action") against Internet Archive alleging copyright infringement of literary works,
namely unauthorized creation of ebooks from print copies of books and public display,
distribution, and performance of the ebooks through www.archive.org and/or
www.openlibrary.org; and

WHEREAS, on March 24, 2023, the Court issued an "Opinion and Order" in the Action
(ECF No. 188) ("Opinion and Order") granting the Plaintiffs' motion for summary judgment and
holding the Internet Archive liable for copyright infringement of the Plaintiffs' works in suit;

WHEREAS, prior to the entry hereof, the Internet Archive has worked in active concert
and participation with the Open Library of Richmond, the owner of physical books scanned and
made available to the public by the Internet Archive on its website under its "Books to Borrow"
collection;

WHEREAS, in the interest of efficiency and judicial economy, Plaintiffs and Internet
Archive (the "Parties") have agreed to a stipulated monetary judgment payment in the Action
under and subject to the terms set forth in a separate confidential agreement ("Monetary
Judgment Payment"), expressly conditioned upon the Internet Archive's reservation of its right
to appeal the finding of liability for copyright infringement set forth in the Opinion and Order
and as incorporated into any final judgment; and

WHEREAS, in the interest of efficiency and judicial economy, Plaintiffs and the Internet
Archive stipulate to the declaratory relief and terms of a permanent injunction set forth below
expressly conditioned upon Internet Archive's reservation of its right to appeal the finding of

liability for copyright infringement set forth in the Opinion and Order and as incorporated into any final judgment and its right to appeal the Permanent Injunction on the ground that the Internet Archive should not have been held liable for copyright infringement and as further described below.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

A.     This Court has subject matter jurisdiction over this action, which arises under the Copyright Act of 1976, 17 U.S.C. §§101 et seq, pursuant to 28 U.S.C. §§ 1331 and 1338.

B.     Judgment is entered for Plaintiffs and against Defendant on Plaintiffs' claims against Defendant for copyright infringement under 17 U.S.C. §501.

C.     The activities of the Internet Archive in engaging in "controlled digital lending" of the 127 Works in Suit as further described in the Opinion and Order constitute copyright infringement;

D.     The activities of the Internet Archive in engaging in the "National Emergency Library" in connection with the 127 Works in Suit as further described in the Opinion and Order constitute copyright infringement; and

E.     The Court hereby enters the following permanent injunction (the "Permanent Injunction"):

1.     "Covered Book" shall mean any in-copyright book or portion thereof, whether in existence as of the date hereof or later created, in which any Plaintiff (or any subsidiary or corporate affiliate of a Plaintiff) (a) owns or controls an exclusive right under the Copyright Act and makes the title commercially available for sale or license [~~in any format OR~~ in any electronic text format]; and (b) has provided notice to the Internet Archive regarding such title by sending the Internet Archive a machine readable catalog in a standardized form identifying such commercially available titles (including any updates thereto in the Plaintiffs' discretion), or other similar form of notification, once 14 days have elapsed since the receipt of such notice. A "Covered Book" includes all in-copyright editions of such title.

2.     Subject to the terms of Paragraphs 4, 5 and 6 below, the Internet Archive, its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with such persons (collectively, the "Internet Archive Parties" and each individually an "Internet Archive Party"), are permanently enjoined and restrained from engaging in any of the following acts in, from or to the United States:

a)     the distribution to the public, public display, and/or public performance, of Covered Books in, from or to the United States in

any digital or electronic form, including without limitation on the Internet Archive website (collectively "Unauthorized Distribution");

b) the reproduction of Covered Books for Unauthorized Distribution;

c) the creation of derivative works of the Covered Books for Unauthorized Distribution;

d) inducing, or knowingly and materially contributing to, any individual or entity's infringing reproduction, public distribution, public display and/or public performance of Covered Books in any digital or electronic form, as those terms are used in the law of contributory copyright infringement applied by the Second Circuit; and/or

e) profiting from another individual or entity's infringing reproduction, public distribution, public display and/or public performance of Covered Books in any digital or electronic form while declining to exercise a right to stop or limit it, as those terms are used in the law of vicarious copyright infringement applied by the Second Circuit.

3. This Permanent Injunction is effective immediately and shall not be stayed pending appeal of the Opinion and Order. Internet Archive shall provide a copy of this Permanent Injunction to each of its officers, agents, servants, employees, and attorneys. Internet Archive shall also provide a copy of this Permanent Injunction to Open Library of Richmond, libraries whose print books have been counted by Internet Archive toward its maximum lendable digital copies on Internet Archive's website, and all persons in active concert or participation with Internet Archive or its officers, agents, servants, employees, or attorneys in connection with the Covered Books.

4. The Internet Archive Parties shall not be in violation of the terms of Paragraph 2 with respect to:

a) Any uses to which exceptions and limitations set forth in 17 U.S.C. § 108, and §§ 110-122 are properly applicable (with Plaintiffs reserving all rights to contest such applicability);

b) An Internet Archive Party's use of any Covered Book for which such party obtains express written authorization for that use from a party that owns or controls the applicable rights to such Covered Book, provided such authorization is in force and valid at the time of such party's use of the Covered Book;

c) An Internet Archive Party's use of Covered Books for the purpose of accessibility for "eligible persons," as that term is defined in 17

Case 1:20-cv-04160-JGK-OTW Document 214-1 Filed 08/11/23 Page 5 of 5

U.S.C. § 121(d)(3), provided that such use meets the statutory conditions of 17 U.S.C §§ 121 or 121A, or is consistent with fair use, for example as set forth in *Authors Guild v. Hathitrust*, 755 F.3d 87 (2d Cir. 2014); or

d) Notwithstanding the foregoing definition of a Covered Book as including a portion thereof, an Internet Archive Party's use of Covered Books for the purpose of distribution, public display, or public performance of short portions of a Covered Book, provided that such use is consistent with fair use, for example as set forth in *Authors Guild v. Google, Inc.*, 804 F.2d 202 (2d Cir. 2015) and *Andy Warhol Foundation v. Goldsmith*, 143 S. Ct. 1258 (2023).

5. By way of clarification:

a) nothing herein constitutes a grant to the Internet Archive Parties or any other person of a license, right, permission, consent, or authorization with respect to any copyrighted works, whether any Covered Books or otherwise;

b) nothing herein means that acts outside the scope of the specific prohibitions in Paragraph 2 are non-infringing or excused under any of the exceptions or limitations set forth in the United States Copyright Act or that Plaintiffs waive any claims regarding such acts; and

c) nothing herein impacts any right of Plaintiffs to seek to recover damages under 17 U.S.C. § 504, or costs, including attorneys' fees, under 17 U.S.C. § 505.

6. By way of further clarification and without modifying Paragraph 2(d) or 2(e) of this Permanent Injunction, nothing herein (i) limits any Internet Archive Party's ability to assert that it is not liable for monetary relief, or injunctive or other equitable relief, with respect to any infringement of copyright that arises from acts described in 17 U.S.C. § 512(a)-(e) ("Section 512"), or (ii) enjoins any act which qualifies for a limitation on remedies under Section 512.

7. Nothing herein limits the Internet Archive's right to appeal the finding of liability for copyright infringement as addressed in the Opinion and Order and as incorporated into any final judgment.

8. Nothing herein limits the Internet Archive's right to appeal this Permanent Injunction on the ground that Internet Archive should not have been held liable for copyright infringement. Further, nothing herein limits any Party from appealing the Court's resolution of the Parties' dispute concerning whether the definition of Covered Book in Paragraph E(1) of this Consent

Judgment pertains to books "in any format" or only "in any electronic text format."

9. Internet Archive shall provide a sworn declaration of compliance with this Court's Permanent Injunction within 30 days of its issuance.

10. During the first 60 days following the entry of this Permanent Injunction, in the event that any Plaintiff believes that any enjoined party is not in compliance with this Permanent Injunction and wishes to seek appropriate relief from the Court, such Plaintiff shall first provide notice to the Internet Archive Party of its intent to file for relief 7 days prior to such filing, except in instances in which the Covered Book was initially published within five years preceding such notice. Such notice to the Internet Archive Party does not need to identify individual Covered Books. This provision has no effect after the expiration of the 60 day period.

11. This Court shall retain exclusive and continuing jurisdiction over the parties and over the subject matter of this Action for purposes of interpreting, implementing, and enforcing the Permanent Injunction.

12. Pursuant to the Opinion and Order, the Clerk of the Court shall enter judgment for Plaintiffs. The Clerk of the Court is directed to close this case.

APPROVED AND ORDERED THIS 11TH day of August, 2023

John G. Koeltl, U.S.D.J.

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HACHETTE BOOK GROUP, INC.,
ET AL.,                                              20-cv-4160 (JGK)

              Plaintiffs,              <u>OPINION & ORDER</u>

    - against -

INTERNET ARCHIVE, ET AL.,

              Defendants.

---

**JOHN G. KOELTL, District Judge:**

The plaintiffs in this action, four book publishers, allege
that the defendant, an organization whose professed mission is to
provide universal access to all knowledge, infringed the
plaintiffs' copyrights in 127 books (the "Works in Suit") by
scanning print copies of the Works in Suit and lending the
digital copies to users of the defendant's website without the
plaintiffs' permission. The defendant contends that it is not
liable for copyright infringement because it makes fair use of
the Works in Suit. <u>See</u> 17 U.S.C. § 107. The parties now cross-
move for summary judgment. For the following reasons, the
plaintiffs' motion for summary judgment is **granted,** and the
defendant's motion for summary judgment is **denied.**[1]

---

[1] The Complaint also names five John Doe defendants. ECF No. 1
("Compl."), ¶ 27. The cross-motions for summary judgment concern only
Internet Archive, the named defendant.

**I.**

**A.**

The following facts are undisputed unless otherwise noted.

The plaintiffs -- Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons., Inc. ("Wiley"), and Penguin Random House LLC ("Penguin") (together, the "Publishers") -- are four of the leading book publishers in the United States. Pls.' 56.1, ECF No. 113, ¶ 1. They obtain from authors the exclusive rights to publish books in print and digital formats, including electronic copies of books, or "ebooks." Id. ¶¶ 63-68. Publishers and authors generally are paid for sales of each format in which a book is published. Id. ¶ 65.

The defendant, Internet Archive ("IA"), is a non-profit organization dedicated to providing "universal access to all knowledge." Def.'s 56.1, ECF No. 98, ¶¶ 1-2. Brewster Kahle, IA's Chairman, founded the organization in 1996. Pls.' 56.1 ¶ 216. One of IA's first projects was to document the history of the Internet by archiving every public webpage on the World Wide Web through IA's "Wayback Machine." Def.'s 56.1 ¶ 5. IA also works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts. Id. ¶ 6.

2

This dispute concerns the way libraries lend ebooks. Public and academic libraries in the United States spend billions of dollars each year obtaining print books and ebooks for their patrons to borrow for free. Pls.' 56.1 ¶ 113. Libraries usually buy their print books from publishers or wholesalers. Id. ¶ 114. Copies of ebooks, however, are typically not bought but licensed to libraries from publishers through distributors called "aggregators." Id. ¶ 117. The Publishers task aggregators with ensuring that a library lends its ebooks only to the library's members. Id. ¶¶ 123, 125. The Publishers also require aggregators to employ approved "digital rights management" ("DRM") software and other security measures to prevent unauthorized copying or distribution of ebook files. Id. ¶ 126. Demand for library ebooks has increased over the past decade. In 2012, OverDrive, the largest aggregator, processed 70 million digital checkouts of ebooks and audiobooks; by 2020, that number had risen to 430 million. Id. ¶¶ 119, 164.

The Publishers use several licensing models to profit from the distribution of ebooks to libraries. Id. ¶¶ 120, 122. All four Publishers offer a "one-copy, one-user" model: Libraries pay a single fee for an ebook and patrons check out a copy of that ebook successively, subject to community-based and DRM restrictions. Id. ¶ 127. Each Publisher offers academic libraries

3

a perpetual term under this model, and Wiley grants perpetual one-copy, one-user licenses to academic and public libraries alike. Id. ¶¶ 130-132. Hachette and Penguin limit their one-copy, one-user licenses for public libraries to one- or two-year terms, during which there is no limit on the number of times an ebook can be read and after which a library must purchase a new license. Id. ¶¶ 134, 147. HarperCollins uses a "26-Circ Model," which allows libraries to circulate an ebook twenty-six times, over any time period, before the license expires. Id. ¶¶ 135-140. HarperCollins and Penguin also use a Pay-Per-Use model -- a one-time circulation to a single patron at a significantly reduced fee -- and Wiley has experimented with various subscription models. Id. ¶¶ 141-146, 155, 191. The Publishers' library expert testified, and IA does not dispute, that this "thriving ebook licensing market for libraries" has "increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive." Id. ¶ 168. For example, library ebook licenses generate around $59 million per year for Penguin. Id. ¶ 170. Between 2015 and 2020, HarperCollins earned $46.91 million from the American library ebook market. Id. ¶ 172.

IA offers readers a different way to read ebooks online for free. Over the past decade, IA has scanned millions of print books and made the resulting ebooks publicly available on its

4

archive.org and openlibrary.org websites (together, the
"Website"). Id. ¶¶ 7, 236; Def.'s 56.1 ¶ 12. IA's basic modus
operandi is to acquire print books directly or indirectly,
digitally scan them, and distribute the digital copies while
retaining the print copies in storage. The Open Library of
Richmond (the "Open Library"), another non-profit organization
run by Brewster Kahle, buys or accepts donations of print books,
primarily from Better World Books ("BWB"), a for-profit used
bookstore affiliated with IA and the Open Library. Pls.'
56.1 ¶¶ 313-314, 317, 322, 338. The Open Library then sends the
books to IA scanning centers, where operators turn and photograph
each page using a book-digitization device called a "Scribe." Id.
¶¶ 281-283. After scanning, the print books are stored in double-
stacked shipping containers and are not circulated. Id. ¶¶ 310-
312; Def.'s 56.1 ¶ 23.

IA's Website includes millions of public domain ebooks that
users can download for free and read without restrictions. Def.'s
56.1 ¶¶ 158, 160. Relevant to this action, however, the Website
also includes 3.6 million books protected by valid copyrights,
including 33,000 of the Publishers' titles and all of the Works
in Suit. Pls.' 56.1 ¶¶ 14, 240; Def.'s 56.1 ¶ 160. The Publishers
did not authorize IA to create digital copies of the Works in

5

A-62

Suit or to distribute those unauthorized ebook editions on IA's Website. Pls.' 56.1 ¶ 243.

IA does not make its ebook copies of copyright-protected works available for mass download. Instead, it professes to perform the traditional function of a library by lending only limited numbers of these works at a time through "Controlled Digital Lending," or "CDL." Def.'s 56.1 ¶ 11. CDL's central tenet, according to a September 2018 Statement and White Paper by a group of librarians, is that an entity that owns a physical book can scan that book and "circulate [the] digitized title in place of [the] physical one in a controlled manner." Pls.' 56.1 ¶ 436. CDL's most critical component is a one-to-one "owned to loaned ratio." Id. Thus, a library or organization that practices CDL will seek to "only loan simultaneously the number of copies that it has legitimately acquired." Id. "For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization." Id. According to IA, CDL is especially helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, patrons with disabilities that make it difficult

6

to hold or read print books, and patrons who want brief or spontaneous access to books and for whom it would not be worth a trip to a brick-and-mortar library. Def.'s 56.1 ¶¶ 55-56.

Under IA's implementation of CDL, two factors determine the number of digital copies of a book that can be borrowed at any time from IA's Website. Id. ¶ 50. First, IA makes available one digital copy for each non-circulating print book it keeps in storage. Id. ¶ 51. Second, IA partners with libraries to "contribute" the number of their print copies of the book toward the number of lendable copies on IA's Website. Id. ¶ 52. Even if a partner library has multiple copies of a book, IA counts only one additional copy per library. Id. For example, if IA owns one non-circulating print copy of Laura Ingalls Wilder's Little House on the Prairie (1932), and three partner libraries each contribute a copy of the book, IA would lend its digital copy of Little House on the Prairie to up to four patrons at a time. Id. ¶ 53.[2]

_____

[2] IA, which also has scanning agreements with libraries, will only lend ebooks scanned from print copies owned by IA or the Open Library. Pls.' 56.1 ¶¶ 293-294; Def.'s 56.1 ¶ 36. IA's policy is also not to lend books published within the previous five years, as a "belt-and-suspenders accommodation to publishers." Def.'s 56.1 ¶¶ 37-38. As a result of "human error," however, two Works in Suit published in 2019 were made available for digital lending. Id. ¶ 49. Soon after IA realized the error, the titles were removed. Id.

7

Around 2018, IA began expanding significantly its lending
capacity of copyright-protected works through the "Open
Libraries" project. Pls.' 56.1 ¶ 355. Libraries now can "pool[]
their physical collections" with IA "in order to make more
lendable copies of digital books available to their users and the
world." Id. ¶ 363. To participate, a Partner Library sends its
catalogue to IA to run an "overlap analysis" that compares ISBN
numbers for the Partner Library's physical holdings with IA's
digital holdings. Id. ¶ 365. Whenever a book in the Partner
Library's catalogue matches an ebook on IA's Website, IA
increases by one the number of concurrent checkouts of that book
allowed on the Website. Id. ¶ 367. As of late 2021, 62 Partner
Libraries, including 13 public libraries, had contributed books
through IA's overlap analysis. Id. ¶ 392. IA encourages Partner
Libraries to populate their websites with links to IA's Website.
Id. ¶¶ 393-396.

Anyone can become a patron of IA, and borrow up to ten
ebooks at a time for up to fourteen days each, by submitting a
valid email address. Def.'s 56.1 ¶¶ 25-26. IA never charges
patrons fees for any service, including borrowing books.
Id. ¶ 25. The Website has titles in popular categories, including
Romance, Thrillers, "Books we Love," and "Trending Books." Pls.'
56.1 ¶¶ 514-516. Patrons can read books they have checked out on

8

A-65

IA's BookReader web browser platform, or they can download a "High Quality" encrypted PDF or ePub version of the ebook.[3] Id. ¶¶ 207-209, 277; Def.'s 56.1 ¶¶ 32, 34. IA secures its downloadable versions with software that prevents the patron from copying, accessing, or distributing the book after the loan period. Def.'s 56.1 ¶ 34. The BookReader application also has a "Read Aloud" feature that converts the text to audio and plays it aloud. Pls.' 56.1 ¶ 276. After a book is checked out, a "Purchase at Better World Books" button appears at the top of the browser window. Id. ¶ 346. This button links to BWB's website, where patrons can buy a used print copy of the book. Id. ¶ 347. BWB pays IA whenever someone buys a book after using the "Purchase at Better World Books" link. Id. IA's Website also includes a link to "Donate" to IA. Id. ¶ 348.

In March 2020, the Covid-19 pandemic closed libraries nationwide and, by IA's estimation, took 650 million print books out of circulation. Def.'s 56.1 ¶ 70. Judging itself "uniquely positioned to be able to address this problem quickly and efficiently," on March 24, 2020, IA launched what it called the National Emergency Library ("NEL"), intending it to "run through

---

[3] PDF and ePub are file formats.

9

June 30, 2020, or the end of the US national emergency, whichever is later." Id. ¶¶ 72, 74. During the NEL, IA lifted the technical controls enforcing its one-to-one owned-to-loaned ratio and allowed up to ten thousand patrons at a time to borrow each ebook on the Website. Pl.'s 56.1 ¶¶ 542-543, 547. IA ended the NEL on June 16, 2020, shortly after this action was filed, and returned to its "traditional controlled digital lending," which remains in effect. Id. ¶ 571; Def.'s 56.1 ¶ 96.

In the two years after the NEL, IA's user base increased from 2.6 million to about 6 million. Pls.' 56.1 ¶¶ 248, 250. As of 2022, IA hosts about 70,000 daily ebook "borrows." Id. ¶ 249.

**B.**

The Publishers filed this action on June 1, 2020, alleging that IA infringed their copyrights in the 127 Works in Suit. Compl. ¶ 2. The Works in Suit are a range of published fiction and non-fiction works, including William Golding's Lord of the Flies (1954), Toni Morrison's The Bluest Eye (1970), Zora Neale Hurston's Their Eyes Were Watching God (1937), young adult novels by Daniel Handler (pen name Lemony Snicket), and Patrick Lencioni's best-selling management books. Pls.' 56.1 ¶ 199; see also ECF No. 1, Ex. A (listing the Works in Suit). The author of each Work in Suit assigned to one of the Publishers the exclusive rights to publish the Work in print and ebook form. Id. ¶ 33. All

10

the Works in Suit are available as authorized ebooks that may be purchased by retail customers or licensed to libraries. Id. ¶ 201.

On July 28, 2020, IA answered the Complaint, principally asserting a defense of "fair use" with respect to its lending of the Works in Suit through IA's online library generally and during the NEL specifically. Answer, ECF No. 33, at 24. After extensive discovery, the parties now cross-move for summary judgment on IA's liability for copyright infringement. See ECF Nos. 87, 97.

## II.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears

11

the initial burden of "informing the district court of the basis of its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[4]

In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). When there are cross motions for summary judgment, the Court must assess each of the motions and determine

_____

[4] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

12

A-69

whether either party is entitled to judgment as a matter of law. Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am., 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).

### III.

The Constitution empowers Congress to enact copyright laws "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. "The Copyright Act furthers this core purpose by granting authors a limited monopoly over (and thus the opportunity to profit from) the dissemination of their original works of authorship." Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 95 (2d Cir. 2014). "The owner of a copyright has the exclusive right to -- or to license others to -- [1] reproduce, [2] perform publicly, [3] display publicly, [4] prepare derivative works of, and [5] distribute copies of, his copyrighted work." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). "To establish copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in § 106." Arista, 604 F.3d at 117.

13

The Publishers have established a prima facie case of
copyright infringement. First, the Publishers hold exclusive
publishing rights in the Works in Suit pursuant to 17
U.S.C. § 106, and the Works were timely registered with the
Copyright Office. Pls.' 56.1 ¶¶ 210-214. Second, IA copied the
entire Works in Suit without the Publishers' permission. See
id. ¶¶ 242-245. Specifically, IA does not dispute that it
violated the Publishers' reproduction rights, by creating copies
of the Works in Suit, 17 U.S.C. § 106(1); the Publishers' rights
to prepare derivative works, by "recasting" the Publishers' print
books into ebooks, id. § 106(2); the Publishers' distribution
rights, by distributing ebook copies of the Works in Suit to IA's
users, id. § 106(3); the Publishers' public performance rights,
through the "read aloud" function on IA's Website, id. § 106(4);
and the Publishers' display rights, by showing the Works in Suit
to users through IA's in-browser viewer, id. § 106(5).[5]

---

[5] The Publishers also allege, and IA does not dispute, that IA
committed secondary copyright infringement by contributing to, inducing,
and vicariously causing direct infringement by users who obtained ebooks on
IA's Website. Compl. ¶¶ 138-150; Pls.' 56.1 ¶ 209; see also Metro-Goldwyn-
Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) ("One
infringes contributorily by intentionally inducing or encouraging direct
infringement and infringes vicariously by profiting from direct
infringement while declining to exercise a right to stop or limit it.").

14

IA argues, however, that this infringement is excused by the doctrine of fair use. This doctrine allows some unauthorized uses of copyrighted works "to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 575 (1994). While rooted in the common law, fair use is a statutory exception to copyright infringement. The Copyright Act of 1976 provides that "the fair use of a copyrighted work" for "purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." Id. § 107.

"In determining whether the use made of a work in any particular case is a fair use," the Copyright Act directs courts to consider the following factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

The four factors are not exclusive, but each must be considered in a "case-by-case analysis," with the results "weighed together[] in light of the purposes of copyright." Fox

15

A-72

News Network, LLC v. TVEyes, Inc., 883 F.3d 169, 176 (2d Cir. 2018). Fair use presents a mixed question of law and fact and may be resolved on summary judgment where, as here, the material facts are undisputed. Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1985). Because fair use is an affirmative defense, the party asserting fair use bears the burden of proof. TVEyes, 883 F.3d at 176.[6]

### A.

The first fair use factor addresses "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Courts "consider the extent to which the

---

[6] A separate provision of the Copyright Act gives "libraries and archives" limited authorization to reproduce and distribute certain copyrighted works without permission for preservation, replacement, and research. 17 U.S.C. § 108. Section 108 does not define "library," although some legislative history suggests that Congress did not intend Section 108 to encompass "online digital 'libraries' . . . that exist only in the virtual (rather than physical) sense." S. Rep. No. 105-190, 62 (1998). It is unnecessary to decide whether IA's online library is protected under Section 108, because IA does not justify its infringing acts under that section. Nonetheless, the Publishers argue that the Court should not deem IA's conduct to be fair use under Section 107 because doing so "would undermine the Congressional intent behind the limited exceptions" of Section 108. Pls.' Opp. to Def.'s Memo., ECF No. 169, at 8. This argument wrongly entwines Sections 107 and 108. Section 108 "in [no] way affects the right of fair use as provided by section 107." 17 U.S.C. § 108(f)(4); cf. HathiTrust, 755 F.3d at 94 n.4 ("[W]e do not construe § 108 as foreclosing our analysis of the Libraries' activities under fair use[.]"). Whether IA's conduct is fair use turns on an analysis of the Section 107 factors and any other relevant factors and is not foreclosed by the existence of Section 108.

secondary work is 'transformative,' as well as whether it is commercial." <u>Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith</u>, 11 F.4th 26, 37 (2d Cir. 2021), <u>cert. granted</u>, 142 S. Ct. 1412 (2022).

**1.**

In this Circuit, consideration of the first factor focuses chiefly on the degree to which the secondary use is "transformative." <u>Id.</u> A transformative use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message, rather than merely superseding the original work." <u>Capitol Recs., LLC v. ReDigi Inc.</u>, 910 F.3d 649, 660 (2d Cir. 2018). A secondary use also may be transformative if it "expands [the] utility" of the original work. <u>TVEyes</u>, 883 F.3d at 176. "Although transformative use is not absolutely necessary for a finding of fair use, transformative works lie at the heart of the fair use doctrine, and a use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use." <u>Id.</u> at 176-77.

17

There is nothing transformative about IA's copying and unauthorized lending of the Works in Suit.[7] IA does not reproduce the Works in Suit to provide criticism, commentary, or information about them. See 17 U.S.C. § 107. IA's ebooks do not "add[] something new, with a further purpose or different character, altering the [originals] with new expression, meaning or message." Campbell, 510 U.S. at 579. IA simply scans the Works in Suit to become ebooks and lends them to users of its Website for free. But a copyright holder holds the "exclusive[] right" to prepare, display, and distribute "derivative works based upon the copyrighted work." 17 U.S.C. § 106. An ebook recast from a print book is a paradigmatic example of a derivative work. Authors Guild v. Google, Inc., 804 F.3d 202, 215 (2d Cir. 2015) ("Google Books") (citing 17 U.S.C. § 101). And although the changes involved in preparing a derivative work "can be described as transformations, they do not involve the kind of transformative purpose that favors a fair use finding." Id.; see also Penguin Grp. (USA) v. Am. Buddha, No. 13-cv-2017, 2015 WL 11170727, at

---

[7] The Publishers do not challenge certain uses IA makes of the Works in Suit, including "indexing them for the purpose of searching, displaying short excerpts in response to searches and citations, and supporting research in text and data mining." Def.'s Memo., ECF No. 106, at 16-17. The Publishers limit their claims to IA's digital lending of entire ebook versions of the Works in Suit.

18

*2-4 (D. Ariz. May 11, 2015) (service that made complete copies of copyrighted print works and published them online was not transformative because republication did "not imbue the Works with new expression or meaning").[8]

The Court of Appeals for the Second Circuit previewed as much in HathiTrust and Google Books, cases that "test[ed] the boundaries of fair use." Google Books, 804 F.3d at 206. The defendant in HathiTrust scanned whole copies of millions of books, including those protected by valid copyrights, to create a database on which the general public could search for particular terms across the scanned works. 755 F.3d at 91. The creation of this "full-text searchable database [was] a quintessentially transformative use," the court held, because "the result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it

---

[8] Other cases consistently have held that the first fair use factor weighs against infringers who do nothing more than "change[] the format" of a preexisting work, as IA does here. Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 n.2 (2d Cir. 1998); accord Disney Enters. v. VidAngel, 869 F.3d 848, 862 (9th Cir. 2017) (explaining that courts "unanimously reject the view that "space-shifting" is fair use under § 107" and holding that it was not fair use to "make[] illegal copies of pre-selected movies [on discs] and then sell[] streams . . . . in a different format than that in which they were bought"); UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d 349, 350-52 (S.D.N.Y. 2000) (service that "simply repackage[d] [] recordings to facilitate their transmission through another medium" was not transformative). These cases further support the conclusion that IA's use of the Works in Suit is not transformative.

19

is drawn." Id. at 97. Importantly, the database did not "allow
users to view any portion of the books they [were] searching" and
therefore, unlike IA's Website, "d[id] not add into circulation
any new, human-readable copies of any books" or "merely repackage
or republish the originals." Id.

Google Books similarly found transformative use in Google's
scanning of copyrighted books to create a database that included
a "snippet view" search function that allowed readers to view a
few lines of text containing searched-for terms. 804 F.3d at 208.
The snippet view showed the searcher "just enough context
surrounding the searched term" to help the searcher evaluate
whether the book fell within the scope of the searcher's interest
"without revealing so much as to threaten the author's copyright
interests." Id. at 208, 216. But the Court of Appeals cautioned
that "[i]f Plaintiffs' claim were based on Google's converting
their books into a digitized form and making that digitized
version accessible to the public," precisely what the Publishers
allege in this case, the "claim [for copyright infringement]
would be strong." Id. at 225. If HathiTrust and Google Books
demarcated the boundaries of fair use, this case shows what
conduct remains squarely beyond fair use.

Asked at oral argument on the current motions for its best
authority on the first fair use factor, IA directed the Court to

20

a second holding in HathiTrust: that fair use allowed the
defendant to provide "print-disabled patrons with versions of all
the works contained in its digital archive in formats accessible
to them." 755 F.3d at 101. But HathiTrust's endorsement of this
distribution of complete ebooks was carefully limited to print-
disabled readers. See id. at 102 (relying on the Supreme Court's
and Congress' endorsement of "[m]aking the copy of a copyrighted
work for the convenience of a blind person" as an example of fair
use); see also 17 U.S.C. § 121 (Limitations on exclusive rights:
Reproductions for blind or other people with disabilities).
HathiTrust reiterated that outside this context, when a defendant
"recasts copyrighted works into new formats," it appears to
"creat[e] derivative works over which the author ordinarily
maintains control." 755 F.3d at 101. IA's ebooks are available to
the general public, not only to the print-disabled. HathiTrust's
second holding therefore does not begin to support IA's copying
and distribution of the Works in Suit.

The principal argument IA raised in its papers was that it
expands the "utility" of the Works in Suit. See TVEyes, 883 F.3d
at 176. By scanning print books and lending them one at a time
over the Internet while retaining a copy of the print originals,
IA claims that it performs the transformative function of making
the delivery of library books more efficient and convenient.

21

A-78

But IA distorts the way courts have treated utility-expanding transformative uses. IA does not expand the utility of the Works in Suit by "provid[ing] information about" them. ReDigi, 910 F.3d at 661. Creating a full-text searchable database "in a manner that [does] not allow users to read the texts," as in HathiTrust, is an example of such a utility-expanding transformative use. Id. The same is true for copying protected work into a database to detect plagiarism, see A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 639 (4th Cir. 2009), and displaying tiny, low-resolution "thumbnail" art reproductions that link to the websites containing the originals, see Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1165 (9th Cir. 2007); Kelly v. Arriba Soft Corp., 336 F.3d 811, 818-19 (9th Cir. 2003). Far from providing information about the Works in Suit, IA's ebooks merely replace those authorized by the Publishers.

Nor does IA expand the utility of the Works in Suit in the other way recognized in this Circuit: by using technology to "improv[e] the efficiency of delivering content" to "one entitled to receive the content" in a way that does not "unreasonably encroach[] on the commercial entitlements of the rights holder." ReDigi, 910 F.3d at 661 (citing Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417 (1984)); see also TVEyes, 883 F.3d at 177. IA relies heavily on Sony. Sony was accused of

22

A-79

contributory copyright infringement based on its sale of Betamax machines to customers who could then copy programs to be viewed at a later time even though the customers could have viewed the programs for free when they were broadcast. 464 U.S. at 421, 448-55. The Supreme Court held that customers who used the Betamax machines to "time-shift" satisfied the first fair use factor, because "time-shifting for private home use" was a "noncommercial, nonprofit activity" and the Betamax machine "merely enable[d] a viewer to see such a work which he had been invited to witness in its entirety free of charge." Id. at 449. IA argues that its digital lending is "at least as transformative as the use at issue in Sony," because IA and its Partner Libraries already paid for print copies of the Works in Suit and because a patron who digitally borrows one of IA's ebooks is "the one person in the world who is then borrowing that particular . . . library book." Def.'s Memo., ECF No. 106, at 17-18.

But Sony is plainly inapposite. IA is not comparable to the parties in Sony -- either to Sony, the alleged contributory copyright infringer, or to the home viewers who used the Betamax machine for the noncommercial, nonprofit activity of watching television programs at home. Unlike Sony, which only sold the machines, IA scans a massive number of copies of books and makes

23

them available to patrons rather than purchasing ebook licenses from the Publishers. IA is also unlike the home viewers in Sony, who engaged in the "noncommercial, nonprofit activity" of viewing at a more convenient time television programs that they had the right to view for free at the time they were originally broadcast. 464 U.S. at 449. The home viewers were not accused of making their television programs available to the general public. Although IA has the right to lend print books it lawfully acquired, it does not have the right to scan those books and lend the digital copies en masse. To hold otherwise would be to ignore the teaching of the Court of Appeals for the Second Circuit in Google Books that there would be a "strong" claim for copyright infringement if Google had distributed digitized copies of complete books. 804 F.3d at 225; see also A&M Recs., Inc. v. Napster, Inc., 239 F.3d 1004, 1019 (9th Cir. 2001) (finding Sony to be "inapposite" because its time shifting did not "involve distribution of the copyrighted material to the general public").[9]

_____

[9] TVEyes, another case involving transformative use in a utility-expanding technology, helps IA even less than Sony does. The defendant in that case copied all television programming in the United States, as well as its closed-captioning text, into a database, then offered a commercial subscription service that allowed business and professional clients to search the transcripts and watch up to ten minutes of selected video segments. 883 F.3d at 175. The court found the defendant's secondary use "at least somewhat transformative" because "it enable[d] nearly instant access to a subset of material -- and to information about the material -- that would otherwise be irretrievable, or else retrievable only through

24

A-81

Finally, IA argues that its digital lending is transformative because it "facilitates new and expanding interactions between library books and the web." Def.'s Memo. at 18. For example, "writers of Wikipedia articles" can "borrow books from the Internet Archive's collection, and then link from their article to a particular page" on IA's Website, and librarians can "curate, and make available online, collections of banned books." Id.; see also Def.'s 56.1 ¶¶ 60-65. But these purported uses are not transformative. "[A] use does not become transformative by making an invaluable contribution to the progress of science and cultivation of the arts." HathiTrust, 755 F.3d at 96. Instead, "a transformative work is one that serves a new and different function from the original work and is not a substitute for it." Id. IA offers no transformative use of the

---

prohibitively inconvenient or inefficient means." Id. at 177. IA appropriately does not analogize its library to the service in TVEyes: The court ultimately held that any modest transformative uses were easily outweighed by the harm to the rights holders' market under the fourth fair use factor. Id. at 180-81. By providing Fox's copyrighted programming to its clients "without payment to Fox, TVEyes . . . usurped a market that properly belong[ed] to the copyright-holder." Id. at 180. As discussed below, the same is true here. Any "efficiency" IA offers by giving users instant, unauthorized access to the Works in Suit is easily outweighed by the harm that this access inflicts on the Publishers' commercial entitlements as the copyright holders to market the ebooks that IA produces and provides.

25

Works in Suit, which strongly suggests that the first fair use
factor favors the Publishers.

**2.**

The first factor also directs courts to consider whether the
secondary use "is of a commercial nature or is for nonprofit
educational purposes." 17 U.S.C. § 107(1).

IA argues that its library is "wholly noncommercial" because
IA is a non-profit organization that does not charge patrons to
borrow books and because private reading is noncommercial in
nature. Def.'s Memo. at 16. However, IA's non-profit status and
decision not to charge patrons are not dispositive. See Weissmann
v. Freeman, 868 F.3d 1313, 1324 (2d Cir. 1989) ("The absence of a
dollars and cents profit does not inevitably lead to a finding of
fair use."). "The crux of the profit/nonprofit distinction is not
whether the sole motive of the use is monetary gain but whether
the user stands to profit from exploitation of the copyrighted
material without paying the customary price." Harper & Row, 471
U.S. at 562.

IA exploits the Works in Suit without paying the customary
price. IA uses its Website to attract new members, solicit
donations, and bolster its standing in the library community. See
Pls.' 56.1 ¶¶ 379-388. Better World Books also pays IA whenever a
patron buys a used book from BWB after clicking on the "Purchase

26

A-83

at Better World Books" button that appears on the top of webpages for ebooks on the Website. Id. ¶¶ 340, 346-347; see also id. ¶ 349 (testimony of IA's Director of Finance that "every single page of the Archive is monetized"). IA receives these benefits as a direct result of offering the Publishers' books in ebook form without obtaining a license. Although it does not make a monetary profit, IA still gains "an advantage or benefit from its distribution and use of" the Works in Suit "without having to account to the copyright holder[s]," the Publishers. Worldwide Church of God v. Phila. Church of God, Inc., 227 F.3d 1110, 1118 (9th Cir. 2000). The commercial-noncommercial distinction therefore favors the Publishers. See also, e.g., Weissmann, 868 F.2d at 1324 (finding commercial use where professor's verbatim copying of academic work could allow him to "profit" by gaining authorship credit and recognition among his peers); Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory, 689 F.3d 29, 61 (1st Cir. 2012) (church official's posting of religious texts on website was "commercial" because he "benefitted by being able to provide, free of cost, the core text of the [copyrighted] Works to members of [his] faith, and by standing to gain at least some recognition within [his] religious community for providing electronic access"); Am. Buddha, 2015 WL 11170727, at *4 (finding commercial use where online library solicited donations and stood

27

to gain recognition and financial support by posting copyrighted books).

It is "largely irrelevant" that an IA patron's private reading of an ebook provided by IA is noncommercial. See De Fontbrune v. Wofsy, 39 F.4th 1214, 1224 (9th Cir. 2022); see also Princeton Univ. Press v. Michigan Document Servs., Inc., 99 F.3d 1381, 1386 (6th Cir. 1996) (rejecting fair use defense where college-town copy shop copied portions of books and sold them to students in "coursepacks" intended for educational use). What matters is whether IA profited from copying the Works. And although the "commercial nature of a secondary use is of decreased importance when the use is sufficiently transformative such that the primary author should not reasonably expect to be compensated," Andy Warhol Found., 11 F.4th at 44, this is far from that situation. The Publishers reasonably expect to be compensated for the reproduction of their copyrighted works, and IA stands to profit from its non-transformative exploitation of the Works in Suit. The commercial-noncommercial distinction, like the transformativeness inquiry, therefore counsels against a finding of fair use.

**3.**

IA makes a final argument that the first factor favors fair use because, according to IA, by reproducing and distributing

28

only ebook editions of print books that were lawfully acquired, IA furthers the goals of copyright's "first sale" doctrine. This argument is without merit.

A "common-law doctrine with an impeccable historic pedigree," Kirtsaeng v. John Wiley & Sons, Inc., 568 U.S. 519, 538 (2013), the first sale doctrine is codified at 17 U.S.C. § 109(a).[10] The doctrine provides that a "rights holder's control over the distribution of any particular copy or phonorecord that was lawfully made effectively terminates when that copy or phonorecord is distributed to its first recipient." ReDigi, 910 F.3d at 655. Thus, "the lawful purchaser of a copy of a book is free to resell, lend, give, or otherwise transfer that copy without violating the copyright holder's exclusive right of distribution," and "[t]he copy so resold or re-transferred may be re-transferred again and again without violating the exclusive distribution right." Id.

Section 109(a) does not excuse IA's unauthorized reproduction of the Works in Suit. The first sale doctrine limits a copyright owner's distribution right under § 106(3), but

---

[10] "Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." 17 U.S.C. § 109(a).

29

Section 109(a) "says nothing about the rights holder's control under § 106(1) over <u>reproduction</u> of a copy or phonorecord." <u>ReDigi</u>, 910 F.3d at 656. Although Section 109 entitles IA and its Partner Libraries to resell or lend their lawfully acquired print copies of the Works in Suit, "unauthorized reproduction," which is at the heart of IA's online library, "is not protected" by § 109(a). <u>Id.</u> at 659.

Acknowledging this, IA refashions a first sale argument within its fair use analysis. IA argues that although "Section 109 does not expressly encompass the reproduction right, neither does it abrogate the common-law principle favoring the ability of the owner of a copy to freely give, sell, or lend it." Def.'s Memo. at 19-20. But IA points to no case authorizing the first recipient of a book to reproduce the entire book without permission, as IA did to the Works in Suit. IA cites only <u>Doan v. American Book Co.</u>, 105 F. 772 (7th Cir. 1901), for the proposition that the "common-law doctrine of exhaustion can encompass reproduction of copyrighted material." Def.'s Memo. at 21. That century-old case merely held that the owner of a schoolbook could reproduce new copies of the book's cover, because the right of ownership "includes the right to maintain the book as nearly as possible in its original condition, so far, at least, as the cover and binding of the book is concerned." 105

30

A-87

F. at 777. By its terms, Doan does little to help IA, which seeks
permission to do far more than replace for personal use the cover
and binding of print books it already owns.

Moreover, the Court of Appeals has cautioned courts against
relying on "the purported breadth of the first sale doctrine as
originally articulated by the courts" in older cases, given
Section 109(a)'s narrower reach. See ReDigi, 910 F.3d at 664
(citing Bureau of Nat'l Literature v. Sells, 211 F. 379, 381-82
(W.D. Wash. 1914), which found no infringement, in light of the
first sale doctrine, where reseller re-bound used books and held
them out as new books). In ReDigi, the Court of Appeals plainly
held that the first sale doctrine has now been codified in
Section 109(a), that it does not include a right of reproduction,
and that any broader scope of the first sale doctrine should be
sought from Congress, not the courts. Id.

Nor does IA's promise not to lend simultaneously its
lawfully acquired print copies and its unauthorized reproductions
help its case. As an initial matter, IA has not kept its promise.
Although the Open Library's print copies of the Works in Suit are
non-circulating, IA concedes that it has no way of verifying
whether Partner Libraries remove their physical copies from
circulation after partnering with IA. Pls.' 56.1 ¶¶ 495-496. To
the contrary, IA knows that some Partner Libraries do not remove

31

the physical books from their shelves, and even if a Partner
Library puts a physical book into a non-circulating reference
collection, it could be read in the library while the ebook
equivalent is checked out. Id. ¶¶ 494, 497. IA also does not
inform Partner Libraries when an ebook in its collection is
checked out, and Partner Libraries do not tell IA when their
physical copies are circulating. Id. ¶ 498. IA admits it has
never taken action against a Partner Library that did not
suppress circulation properly. Id. ¶ 499.

Even full enforcement of a one-to-one owned-to-loaned ratio,
however, would not excuse IA's reproduction of the Works in Suit.
ReDigi is instructive. The defendant in that case created a
computer program that allowed users to resell lawfully acquired
digital music files. 910 F.3d at 652-54. ReDigi sought to ensure
that its files never existed in more than one place at once by
deleting the original file from the seller's computer once a copy
was made on ReDigi's servers. See id. at 656. Echoing CDL's core
principle -- that a physical book should not be in use at the
same time as its digital copy -- ReDigi argued that, under the
first sale doctrine, it did not unlawfully reproduce new copies
but merely facilitated the transfer of copies lawfully acquired.
Id.

32

The Court of Appeals rejected this argument. It explained
that the measures ReDigi took to avoid increasing the total
number of copies in existence did "not rebut or nullify the fact
that" ReDigi's program unquestionably created new copies of each
work and involved unauthorized reproduction. Id. at 657. As the
court explained, in language that applies equally to IA: "We are
not free to disregard the terms of [Section 109(a)] merely
because the entity performing an unauthorized reproduction makes
efforts to nullify its consequences by the counterbalancing"
removal from circulation of the preexisting copies. Id. at 658.

IA accepts that ReDigi forecloses any argument it might have
under Section 109(a). But in pressing its first sale argument
under the guise of fair use, IA ignores that ReDigi also rejected
the fair use defense. Id. at 660-64. The ReDigi software was not
transformative because the company "ma[d]e no change in the
copyrighted work[s]," but merely "provide[d] a market for the
resale of digital music files, which resales compete[d] with
sales of the same recorded music by the rights holder." Id. at
661. The same is true of IA's online library. IA in no way
transforms the use of the Works in Suit. It merely creates
derivative ebooks that, when lent to the public, compete with
those authorized by the Publishers. The promise of a one-to-one

33

"owned-to-loaned ratio," whether cast under Section 109 or fair use, is no defense.

<center>* * *</center>

The crux of IA's first factor argument is that an organization has the right under fair use to make whatever copies of its print books are necessary to facilitate digital lending of that book, so long as only one patron at a time can borrow the book for each copy that has been bought and paid for. See Oral Arg. Tr. 31:10-15. But there is no such right, which risks eviscerating the rights of authors and publishers to profit from the creation and dissemination of derivatives of their protected works. See 17 U.S.C. §§ 106(1), (2). IA's wholesale copying and unauthorized lending of digital copies of the Publishers' print books does not transform the use of the books, and IA profits from exploiting the copyrighted material without paying the customary price. The first fair use factor strongly favors the Publishers.

<center>**B.**</center>

The second fair use factor directs courts to consider "the nature of the copyrighted work." Id. § 107(2). "[S]ome works are closer to the core of intended copyright protection than others," and "fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. Two distinctions

<center>34</center>

are relevant to this analysis: (1) "whether the work is
expressive or creative, such as a work of fiction, or more
factual, with a greater leeway being allowed to a claim of fair
use where the work is factual or informational," and (2) "whether
the work is published or unpublished, with the scope of fair use
involving unpublished works being considerably narrower." Blanch
v. Koons, 467 F.3d 244, 256 (2d Cir. 2006).

The second factor favors the Publishers. "[C]reative
expression for public dissemination falls within the core of the
copyright's protective purposes." Campbell, 510 U.S. at 586. The
Works in Suit are published works of fiction and non-fiction. The
fiction books, as paradigmatic creative works, are close to the
core of intended copyright protection. See, e.g., Am. Buddha,
2015 WL 11170727, at *5. But the Copyright Act also values and
seeks to protect the non-fiction Works in Suit, which contain
"subjective descriptions and portraits . . . whose power lies in
the author's individualized expression," Harper & Row, 471 U.S.
at 563, and are "far removed from the . . . factual or
descriptive work more amenable to fair use," MP3.com, 92 F. Supp.
2d at 351; cf. Nihon Keizai Shimbun, Inc. v. Comline Bus. Data,
Inc., 166 F.3d 65, 72-73 (2d Cir. 1999) (explaining that
"predominantly factual news articles" are "less close to the core

35

A-92

than more fictional pieces" or pieces whose "expressive elements"
are "dominant features of the works").

IA argues that because most of the Works in Suit were
published more than five years before IA copied them, IA has not
interfered with the authors' "right to control the first public
appearance of [their] expression." Def.'s Memo. at 22
(citing Harper & Row, 471 U.S. at 562). IA is correct that the
unpublished nature of a work tends to negate a defense of fair
use. Harper & Row, 471 U.S. at 554. However, "the converse is not
necessarily true; neither Harper & Row nor any principle of fair
use counsels that the publication of the copyrighted work weighs
in favor of fair use." Dr. Seuss Enters., L.P. v. ComicMix LLC,
983 F.3d 443, 456 (9th Cir. 2020). Published works do not lose
copyright protection after five years.

Finally, although the second factor is not "likely to help
much in separating the fair use sheep from the infringing goats"
in cases involving transformative copying, Campbell, 510 U.S. at
586, IA has not made transformative use of the Works in Suit. IA
has simply copied the Works in Suit wholesale and made the copies
available for lending. That this dispute involves original works
close to the core of copyright protection further counsels
against a finding of fair use.

36

A-93

**c.**

Under the third fair use factor, courts consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). IA copied the entire Works in Suit and made the copies available for lending. Wholesale copying like this "tends to disfavor a finding of fair use." ReDigi, 910 F.3d at 662; see also, e.g., On Davis v. The Gap, Inc., 246 F.3d 152, 175 (2d Cir. 2001); Am. Buddha, 2015 WL 11170727, at *5.

It is true that copying an entire work is sometimes necessary to make a fair use of the work. Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 613 (2d Cir. 2006). In Google Books and HathiTrust, for example, it was "reasonably necessary" for the defendants "to make use of the entirety of the works in order to enable" the transformative uses of portions of the underlying works. See Google Books, 804 F.3d at 221; HathiTrust, 755 F.3d at 98. In this case, however, IA copied the Works in Suit wholesale for no transformative purpose and created ebooks that, as explained below, competed directly with the licensed ebooks of the Works in Suit. IA's wholesale copying therefore cannot be excused, and the third factor weighs strongly in the Publishers' favor.

37

**D.**

The fourth fair use factor is "the effect of the [copying] use upon the potential market for or value of the copyrighted work[s]." 17 U.S.C. § 107(4). This factor focuses on whether a secondary use "usurps the market for the [original] by offering a competing substitute." Andy Warhol Found., 11 F.4th at 48. "When a secondary use competes in the rightsholder's market as an effective substitute for the original, it impedes the purpose of copyright," which is "to incentivize new creative works by enabling their creators to profit from them." ReDigi, 910 F.3d at 662. The fourth factor necessarily relates to the first and third factors. The less transformative a secondary use is under the first factor, the more "likely it will supplant the commercial market for the original." Id. So too, the larger the amount of the original that is taken under the third factor, "the greater the likelihood that the secondary work might serve as an effectively competing substitute for the original." Google Books, 804 F.3d at 221.

Like the other three factors, the fourth factor strongly favors the Publishers. "[A] copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work," and "the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."

38

A-95

TVEyes, 883 F.3d at 180. In this case, there is a "thriving ebook licensing market for libraries" in which the Publishers earn a fee whenever a library obtains one of their licensed ebooks from an aggregator like OverDrive. Pls.' 56.1 ¶¶ 577-578. This market generates at least tens of millions of dollars a year for the Publishers. Id. ¶¶ 170, 172. And IA supplants the Publishers' place in this market. IA offers users complete ebook editions of the Works in Suit without IA's having paid the Publishers a fee to license those ebooks, and it gives libraries an alternative to buying ebook licenses from the Publishers. Indeed, IA pitches the Open Libraries project to libraries in part as a way to help libraries avoid paying for licenses. See Pls.' 56.1 ¶ 383 (presentation IA gave to libraries asserting that pairing with IA means that "You Don't Have to Buy It Again!"); id. ¶ 382 (different presentation promising that the Open Libraries project "ensures that a library will not have to buy the same content over and over, simply because of a change in format"). IA thus "brings to the marketplace a competing substitute" for library ebook editions of the Works in Suit, "usurp[ing] a market that properly belongs to the copyright-holder." TVEyes, 833 F.3d at 179.

It is equally clear that if IA's conduct "becomes widespread, it will adversely affect the potential market for

39

A-96

the" Works in Suit. <u>Andy Warhol Found.</u>, 11 F.4th at 48. IA could expand the Open Libraries project far beyond the current contributing partners, allowing new partners to contribute many more concurrent copies of the Works in Suit to increase the loan count. New organizations like IA also could emerge to perform similar functions, further diverting potential readers and libraries from accessing authorized library ebooks from the Publishers. This plainly risks expanded future displacement of the Publishers' potential revenues. <u>See, e.g.</u>, <u>Gregory</u>, 689 F.3d at 65 ("If anyone could freely access the Works, electronically or otherwise, the [plaintiff] would have no market in which to try and publish, disseminate, or sell its [Works]."); <u>Am. Buddha</u>, 2015 WL 11170727, at *6 ("[U]nrestricted and widespread conduct of the sort engaged in by American Buddha would essentially gut the potential market for the Works.").[11]

---

[11] It is no answer for IA to argue that the Publishers have provided "no concrete evidence" of past market harm. Def.'s Memo. at 28. That is not the Publishers' burden. A rightsholder bears only "some initial burden of identifying relevant markets." <u>Andy Warhol Found.</u>, 11 F.4th at 49; <u>see also id.</u> ("[W]e have never held that the rightsholder bears the burden of showing actual market harm. Nor would we so hold."). In this case, the Publishers have met their burden by identifying the thriving library ebook licensing market, with its tens of millions of dollars in annual revenue, as a market that IA's copying stands to harm. <u>See Ringgold v. Black Ent. Television, Inc.</u>, 126 F.3d 70, 81 (2d Cir. 1997) ("Ringgold is not required to show a decline in the number of licensing requests for the 'Church Picnic' poster since the ROC episode was aired. The fourth factor will favor her if she can show a 'traditional, reasonable, or likely to be developed' market for licensing her work as set decoration.").

40

IA argues that it does not compete in the library ebook market because it only offers libraries a way to "lend a copy the library owns," while library ebook licenses "are not tied to what print books the library owns or what the library does with them." Def.'s Memo. at 30. But IA's free library ebook model need not mimic the Publishers' licensing schemes in every respect to provide a significantly competing substitute. An accused infringer usurps an existing market "where the infringer's target audience and the nature of the infringing content is the same as the original." Cariou, 714 F.3d at 709; see also Andy Warhol Found., 11 F.4th at 50. That is the case here. For libraries that are entitled to partner with IA because they own print copies of books in IA's collection, it is patently more desirable to offer IA's bootleg ebooks than to pay for authorized ebook licenses. To state the obvious, "[i]t is difficult to compete with a product

---

There is also no merit to IA's contention, raised for the first time at argument, that "in the situation where the use is non-commercial . . . it remains an open question where the burdens lie." Oral Arg. Tr. At 43:17-19. As explained above, IA's use of the Works in Suit is commercial under the first factor. In any event, IA unequivocally bears the burden to show a lack of market harm. See Andy Warhol Found., 11 F.4th at 49 (collecting cases uniformly explaining that because "[f]air use is an affirmative defense," the "ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense: the secondary user").

offered for free." <u>Sony BMG Music Ent. v. Tenenbaum</u>, 672 F. Supp. 2d 217, 231 (D. Mass. 2009).

Equally unavailing is IA's reliance on various metrics that allegedly demonstrate that its online library has not harmed, or is not likely to harm, the Publishers' financial bottom lines. IA's experts observed that print sales of the Works in Suit and general demand for library ebooks did not decrease while the Works in Suit were available on IA's Website; that Amazon rankings for the Works in Suit improved when IA's digital lending skyrocketed (and government lockdowns were in full effect) at the beginning of the Covid-19 pandemic; and that, despite the removal of the Works in Suit from IA's library in June 2020, OverDrive checkouts of the Works in Suit did not increase. <u>See</u> Def.'s 56.1 ¶¶ 121-122, 138, 140-141, 150. IA attributes these outcomes to the "discovery" effect of its book lending: Patrons decide they enjoy the books they have borrowed through IA enough to purchase those books and recommend them to others. <u>See</u> Def.'s Memo. at 25.[12]

---

[12] The Publishers argue that, were there a trial, they would move under Federal Rule of Evidence 702 to exclude the entire testimony of two of IA's experts, as well as portions of IA's third expert's opinions, on the grounds that they are based on insufficient facts and impermissibly flawed principles and methods. Pls.' Opp. to Def.'s Memo. at 18 n.1. It is unnecessary to assess the reliability of IA's expert opinions, because even

42

But these metrics do not begin to meet IA's burden to show a lack of market harm. Taking them at face value, they show at best that the presence of the Works in Suit in IA's online library correlated, however weakly, with positive financial indicators for the Publishers in other areas. They do not show that IA's conduct caused these benefits to the Publishers. In any event, IA cannot offset the harm it inflicts on the Publishers' library ebook revenues, see, e.g., Andy Warhol Found., 11 F.4th at 48; TVEyes, 883 F.3d at 180, by pointing to other asserted benefits to the Publishers in other markets. Nor could those asserted benefits tip the scales in favor of fair use when the other factors point so strongly against fair use. See, e.g., Campbell, 510 U.S. at 590 n.21 ("Even favorable evidence, without more, is no guarantee of fairness. Judge Leval gives the example of the film producer's appropriation of a composer's previously unknown song that turns the song into a commercial success; the boon to the song does not make the film's simple copying fair." (citing Pierre Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1124 n.84 (1990)). Ultimately, the question under the fourth factor is whether the infringing use "pose[s] cognizable harm" in

---

accepting their conclusions, they do not help IA meet its burden to show a lack of market harm in this case.

43

the relevant market, in this case the market for authorized library ebook licenses. See Andy Warhol Found., 11 F.4th at 51. That harm here is evident.

It is also irrelevant to assessing market harm in this case that IA and its Partner Libraries once purchased print copies of all the Works in Suit. The Publishers do not price print books with the expectation that they will be distributed in both print and digital formats, Pls.' 56.1 ¶ 92, and "[a]ny allegedly positive impact of [a] defendant's activities on [the] plaintiffs' prior market in no way frees [the] defendant to usurp a further market that derives from the reproduction of the plaintiffs' copyrighted works." MP3.com, 92 F. Supp. 2d at 352; see also Infinity Broadcast, 150 F.3d at 111. The Publishers are entitled to revenue from all formats of the Works in Suit, regardless whether IA lawfully acquired the Works in print first.

Finally, the Court must consider "the public benefits [IA's] copying will likely produce." Andy Warhol Found., 11 F.4th at 50. IA argues that its digital lending makes it easier for patrons who live far from physical libraries to access books and that it supports research, scholarship, and cultural participation by making books widely accessible on the Internet. But these alleged benefits cannot outweigh the market harm to the Publishers. "Any copyright infringer may claim to benefit the public by increasing

44

public access to the copyrighted work." <u>Harper & Row</u>, 471 U.S. at
569. It is clear that IA's distribution of ebook copies of the
Works in Suit without a license deprives the Publishers of
revenues to which they are entitled as the copyright holders. <u>See</u>
<u>TVEyes</u>, 883 F.3d at 179. The fourth factor therefore strongly
favors the Publishers.

**E.**

Each enumerated fair use factor favors the Publishers, and
although these factors are not exclusive, IA has identified no
additional relevant considerations. At bottom, IA's fair use
defense rests on the notion that lawfully acquiring a copyrighted
print book entitles the recipient to make an unauthorized copy
and distribute it in place of the print book, so long as it does
not simultaneously lend the print book. But no case or legal
principle supports that notion. Every authority points the other
direction. Of course, IA remains entitled to scan and distribute
the many public domain books in its collection. <u>See</u> Pls.'
56.1 ¶ 294. It also may use its scans of the Works in Suit, or
other works in its collection, in a manner consistent with the
uses deemed to be fair in <u>Google Books</u> and <u>HathiTrust</u>. What fair
use does not allow, however, is the mass reproduction and
distribution of complete copyrighted works in a way that does not
transform those works and that creates directly competing

45

substitutes for the originals. Because that is what IA has done with respect to the Works in Suit, its defense of fair use fails as a matter of law.

## IV.

IA also argues that it made fair use of the Publishers' copyrights during the National Emergency Library. The analysis above applies even more forcefully to the NEL, during which IA amplified its unauthorized lending of ebook versions of the Works in Suit by lifting the one-to-one owned-to-loaned ratio. IA's defense of fair use with respect to the NEL therefore also fails.

## V.

Finally, IA asks that statutory damages be remitted if the Court rejects IA's fair use defense. See Def.'s Memo. at 35-36. Section 504 of the Copyright Act directs courts to remit statutory damages where, as relevant here, the infringer is a "nonprofit educational institution, library, or archives," or one of its agents or employees, and the defendant "infringed by reproducing the work in copies" and "believed and had reasonable grounds for believing" that its use of the work was fair use. 17 U.S.C. § 504(c)(2). At this point, IA's statutory remittance argument is premature. IA may renew the argument in connection with the formation of an appropriate judgment.

46

A-103

**CONCLUSION**

The Court has considered all of the parties' arguments. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the plaintiffs' motion for summary judgment is **granted** and the defendants' motion for summary judgment is **denied.** The parties should submit their respective proposals (or preferably a joint proposal) for the appropriate procedure to determine the judgment to be entered in this case. The submission or submissions should be made within fourteen (14) days of the date of this Opinion and Order. The Clerk is respectfully directed to close all pending motions.

**SO ORDERED.**

**Dated:**     **New York, New York**
            **March 24, 2023**

                                     _____
                                       **John G. Koeltl**
                                 **United States District Judge**

47

A-104

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HACHETTE BOOK GROUP, INC.,                          :
HARPERCOLLINS PUBLISHERS LLC, JOHN
WILEY & SONS, INC., and PENGUIN RANDOM              :     20 Civ. _____
HOUSE LLC,
                                                    :          ECF Case
                     Plaintiffs,
                                                    :

                                                    :     **COMPLAINT**

           -against-                                :     TRIAL BY JURY DEMANDED

                                                    :

INTERNET ARCHIVE and DOES 1 through 5,              :
inclusive,
                                                    :
                     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

     Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC

("HarperCollins"), John Wiley & Sons, Inc. ("Wiley"), and Penguin Random House LLC

("Penguin Random House"), by and through their attorneys Davis Wright Tremaine LLP and

Oppenheim + Zebrak, LLP, for their Complaint, hereby allege against Defendant Internet

Archive ("IA or "Defendant") and Does 1 through 5 as follows:

## <u>NATURE OF THE ACTION</u>

    1.    Plaintiffs Hachette, HarperCollins, Penguin Random House, and Wiley

(collectively, "Plaintiffs" or "Publishers") bring this copyright infringement action against IA in

connection with website operations it markets to the public as "Open Library" and/or "National

Emergency Library." Plaintiffs are four of the world's preeminent publishing houses.

Collectively, they publish some of the most successful and leading authors in the world,

investing in a wide range of fiction and nonfiction books for the benefit of readers everywhere.

All of the Plaintiffs are member companies of the Association of American Publishers, the

mission of which is to be the voice of American publishing on matters of law and public policy.

<div align="center">1</div>

2.      Defendant IA is engaged in willful mass copyright infringement.  Without any
license or any payment to authors or publishers, IA scans print books, uploads these illegally
scanned books to its servers, and distributes verbatim digital copies of the books *in whole* via
public-facing websites.  With just a few clicks, any Internet-connected user can download
*complete* digital copies of in-copyright books from Defendant.

3.      The scale of IA's scheme is astonishing:  At its "Open Library," located at
www.openlibrary.org and www.archive.org (together, the "Website"), IA currently distributes
digital scanned copies of over *1.3 million* books.  And its stated goal is to do so for millions
more, essentially distributing free digital copies of every book ever written.  Despite the "Open
Library" moniker, IA's actions grossly exceed legitimate library services, do violence to the
Copyright Act, and constitute willful digital piracy on an industrial scale.  Consistent with the
deplorable nature of piracy, IA's infringement is intentional and systematic:  it produces mirror-
image copies of millions of unaltered in-copyright works for which it has no rights and
distributes them in their entirety for reading purposes to the public for free, including
voluminous numbers of books that are currently commercially available.

4.      Books have long been essential to our society.  Fiction and non-fiction alike, they
transport us to new worlds, broaden our horizons, provide us with perspective, reflect the ever-
growing knowledge of humanity in every field, spark our imaginations and deepen our
understanding of the world.  Yet, books are not self-generating.  They are the product of training
and study, talent and grit, perseverance and creativity, investment and risk, and untold hours of
work.

5.      The publishing ecosystem not only depends upon copyright law, it is historically
intertwined with the founding of the United States.  In 1787, the Framers adopted the Copyright

2

A-106

Clause of the Constitution, explicitly authorizing Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., Art. I, §8, cl. 8. In 1790, the First Congress enacted the first Copyright Act, focused on incentivizing both the creation *and legal dissemination* of books, maps, and charts. Congresses ever since have carefully balanced copyright amendments to advance the public good and for more than 200 years have prescribed to authors a suite of enforceable exclusive rights to their writings—which publishers, in turn, encourage, invest in, license, and distribute to readers through bookstores, libraries, and a multitude of e-commerce platforms. In this process of publishing books that educate, entertain, and inspire the public, publishers rely not only on the exclusive rights that are their lifeblood, but on the expectation that Congress has carefully considered and appropriately tailored any limitations and exceptions to said rights.

6. IA not only acts entirely outside any legal framework, it does so flagrantly and fraudulently. And it proceeds despite actual notice that its actions constitute infringement. For the avoidance of doubt, this lawsuit is *not* about the occasional transmission of a title under appropriately limited circumstances, nor about anything permissioned or in the public domain. On the contrary, it is about IA's purposeful collection of truckloads of in-copyright books to scan, reproduce, and then distribute digital bootleg versions online. IA's Website includes books of every stripe—from bestsellers to scholarly monographs, from entertaining thrillers and romances to literary fiction, from self-help books to biographies, from children's books to adult books. IA often suggests that the Website is limited to twentieth-century books, but this is neither accurate nor a defense. IA scans, uploads, and distributes huge numbers of in-copyright books published in both the twentieth and twenty-first centuries, including many books

3

published within just the past few years. IA's unauthorized copying and distribution of Plaintiffs' works include titles that the Publishers are currently selling commercially and currently providing to libraries in ebook form, making Defendant's business a direct substitute for established markets. Free is an insurmountable competitor.

7. Publishers have long supported public libraries, recognizing the significant benefits to the public of ready access to books and other publications. This partnership turns upon a well-developed and longstanding library market, through which public libraries buy print books and license ebooks (or agree to terms of sale for ebooks) from publishers, usually via book wholesalers or library ebook aggregators. IA's activities are nothing like those of public libraries, but rather the kind of quintessential infringement that the Copyright Act directly prohibits. Moreover, while Defendant promotes its non-profit status, it is in fact a highly commercial enterprise with millions of dollars of annual revenues, including financial schemes that provide funding for IA's infringing activities. By branding itself with the name "Open Library," it thus badly misleads the public and boldly misappropriates the goodwill that libraries enjoy and have legitimately earned.

8. IA defends its willful mass infringement by asserting an invented theory called "Controlled Digital Lending" ("CDL")—the rules of which have been concocted from whole cloth and continue to get worse. For example, at first, under this theory IA claimed to limit the number of scanned copies of a title available for free download at any one time to the number of print books of that title in its collection—though no provision under copyright law offers a colorable defense to the systematic copying and distribution of digital book files simply because the actor collects corresponding physical copies. Then, in the face of the COVID-19 pandemic, IA opportunistically seized upon the global health crisis to further enlarge its cause, announcing

with great fanfare that it would remove these already deficient limitations that were purportedly in place. Today, IA offers an enormous universe of scanned books to an unlimited number of individuals simultaneously in its "National Emergency Library." IA's blatant, willful infringement is all the more egregious for its timing, which comes at the very moment that many authors, publishers, and independent bookstores, not to mention libraries, are both struggling to survive amidst economic uncertainty and planning deliberatively for future, changing markets.

9.     Under whatever guise IA attempts to frame its massive infringement—whether adopting the invented CDL theory or filling the self-appointed role as "National Emergency Library"—its actions find no support in the Copyright Act. IA's defenses of its actions—both before and after the onset of the COVID-19 crisis—are baseless. First, while IA claims to serve an educational purpose, education has long been a primary mission and market of publishers. It is authors and publishers who create the books of scholarship and literature for educators, students, and other readers; IA creates nothing. IA plays no role in the hard work of researching, writing, or publishing the works or, for that matter, in creating or sustaining the overall publishing ecosystem and its distinct partnerships and markets. Nor does IA contribute to the underlying scholarship through commentary or criticism. Moreover, IA's massive book digitization business has no new purpose that is fundamentally different than that of the Publishers: both distribute entire books for reading. In short, Defendant merely exploits the investments that publishers have made in their books, and it does so through a business model that is designed to free-ride on the work of others. Defendant pays for none of the expenses that go into publishing a book and is nothing more than a mass copier and distributor of bootleg works. In so doing, IA undermines the balance and promise of copyright law by usurping the

5

Publishers' ability to license and sell the books that they have lawfully produced on behalf of authors and for the benefit of readers.

10.    IA's self-serving assertion and promotion of "Controlled Digital Lending" as both an actual legal doctrine and a justification for its infringement affronts the most basic realities of the law and the markets it propels.  As a matter of markets, IA's one-to-one conflation of print and ebooks is fundamentally flawed.  Digital books are inherently different from physical books.  They can fly around the world in a second; they do not degrade over time as physical books do; and they require devices to read them.  For these reasons, the Publishers have established independent and distinct distribution models for ebooks, including a market for lending ebooks through libraries, which are governed by different terms and expectations than print books.  IA's end-run around these differences and restrictions is aggressive and unlawful.  In short, all of the reasons why IA has scanned print books to create digital files are the very same reasons why authors and publishers provide digital books under different terms than print books—as they are entitled to do under the Copyright Act.

11.    No concept of fair use supports the systematic mass copying or distribution of entire books for the purpose of mass reading, or put another way, for the purpose of providing to readers the very thing that publishers and authors provide in the first place through lawful and established channels.  IA does not add something new to the Plaintiffs' books, with a different purpose or character; thus, it cannot even begin to make the all-important showing that its use of the works is transformative.  Separately, Section 109 of the Copyright Act is clear that, pursuant to the doctrine of first sale, the owner of a lawfully acquired print book may dispose only of her/his particular print copy.  One who makes and distributes reproductions of that physical copy—such as IA's low quality scans—is well outside the bounds of the law.

12.     Nor do IA's efforts to brand itself as a library somehow imbue it with any right to digitize and distribute unauthorized digital copies of books.  Libraries are trusted institutions that serve the communities that fund them.  When Congress contemplated the making of digital copies by libraries under 17 U.S.C. §108, it engaged all relevant stakeholders and created a set of rational, targeted exceptions to infringement liability—exceptions that have no application to IA's actions.  As the Copyright Office observed in a relevant public study titled "Legal Issues in Mass Digitization" (October 2011), "The Section 108 exception does not contemplate mass digitization."

13.     The creation, publication, and distribution of books is an ecosystem.  IA disaggregates itself from this ecosystem, ignores the law, and asserts that its goal of providing free copies of books somehow excuses it from any responsibility to those who have created the works and hold exclusive rights under the Copyright Act.  Its goal of creating digital copies of books and providing them to whomever wants to download them reflects a profound misunderstanding of the costs of creating books, a profound lack of respect for the many contributors involved in the publication process, and a profound disregard of the boundaries and balance of core copyright principles.  IA does not seek to "free knowledge"; it seeks to destroy the carefully calibrated ecosystem that makes books possible in the first place—and to undermine the copyright law that stands in its way.

14.     In sum, IA's massive taking violates the Plaintiffs' exclusive rights under 17 U.S.C §106.  Plaintiffs bring this action to halt IA's assault on their rights.

## THE PARTIES

**A.     Plaintiffs**

15.     Plaintiffs are four of the leading book publishers in the United States.  Working closely with their authors, Plaintiffs source, develop, edit, publish, market, and distribute tens of

7

thousands of books per year, across the full spectrum of genres and topics.

16.     Plaintiff Hachette is a publishing company, organized under the laws of Delaware, with its principal place of business at 1290 Sixth Avenue, New York, NY 10104. With a history stretching back to 1837, Hachette works with bestselling authors who have been published all over the world.  Hachette books and authors have won Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes.  Its many publishing imprints include prominent brands such as Little, Brown and Company, Little, Brown Books for Young Readers, Grand Central Publishing, Basic Books, Public Affairs, Orbit, FaithWords and Center Street.

17.     Plaintiff HarperCollins is a publishing company, organized under the laws of Delaware, with its principal place of business at 195 Broadway, New York, NY 10007. HarperCollins has more than 200 years of history in the book publishing industry and the company now operates more than 120 imprints and brands in 17 countries worldwide.  Each year, HarperCollins publishes approximately 10,000 new books in more than a dozen languages and boasts a catalogue of more than 200,000 titles in print and digital formats.  Working across a wide range of genres, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among other honors.

18.     Plaintiff Penguin Random House is a publishing company, organized under the laws of Delaware, with its principal place of business at 1745 Broadway, New York, NY 10019. Penguin Random House can trace its history back to the mid-nineteenth century and one of its progenitors, Random House, published the first authorized edition of James Joyce's *Ulysses* in the English-speaking world, among other landmark titles.  The portfolio operated by Penguin

Random House has grown to encompass nearly 275 independent imprints and brands across five

continents. Penguin Random House publishes 15,000 new titles per year—catering to readers of

all ages and at every stage of life—and sells close to 800 million print books, audiobooks, and

ebooks annually. It has published hundreds of the most widely read authors in the world.

19.     Plaintiff Wiley is a publishing company, organized under the laws of New York,

with its principal place of business at 111 River Street, Hoboken, NJ 07030. Founded in 1807,

Wiley has over 200 years of experience publishing scientific, professional, and education books

and journals in print and digital formats. Wiley has published works by over 450 Nobel

Laureates. It publishes over 2,000 new books each year and currently offers over 120,000 titles.

20.     Plaintiffs are the copyright owners or owners of exclusive rights under copyright

in, *inter alia*, each of the works listed in Exhibit A (the "Works"), on which they bring suit here.

Exhibit A is an illustrative, non-exhaustive list of in-copyright works that Defendant(s) infringed

through the activities complained of herein. Upon information and belief, all of the Works have

been scanned and uploaded to the Website by IA. All of these titles are commercially available.

21.     The Works represent a cross-section of the exceptional books that are made

possible by a functioning publishing ecosystem, from perennial classic novels to more recent

highly acclaimed works of non-fiction and everything in between. Some of the greatest works of

fiction ever published find their place among the Works in suit, including *The Lord of the Flies*

by William Golding (winner of the 1983 Nobel Prize for Literature)*, Song of Solomon* by Toni

Morrison (winner of the 1993 Nobel Prize for Literature), and *Their Eyes Were Watching God* by

Zora Neal Hurston. The Works also include *New York Times* bestselling authors like John

Grisham and James Patterson and equally popular thrillers like *Gone Girl* by Gillian Flynn as

well as hard-hitting contemporary novels, such as *The Miseducation of Cameron Post* by Emily

M. Danforth and *The Road* by Cormac McCarthy, which won the 2007 Pulitzer Prize for Fiction. Children's books are well-represented, from old favorites like *Little House on the Prairie* and *The Lion, The Witch and the Wardrobe* to more recent treasures, like the works of Lemony Snicket and *Escape from Mr. Lemoncello's Library*. Books for young adults are also included, like *Scat* by Carl Hiaasen and *The House on Mango Street* by Sandra Cisneros.

22.     No less important than the works of fiction are the outstanding examples of non-fiction books represented by the Works. The Works contain multiple titles from the ever-popular "For Dummies" series, which have taught intrepid readers the basics of everything from oil painting to comparative religion. For those looking for success in business, the Works include books by the management guru Patrick Lencioni and books on investment by billionaire analyst Ken Fisher. Also included are Malcolm Gladwell's highly influential works on psychology and behavioral economics, a work by Nobel Peace Prize winner Elie Wiesel, and the well-loved *A Short History of Nearly Everything* by Bill Bryson.

### B.     Defendant

23.     Defendant IA is a 501(c)(3) corporation, organized under the laws of California, with its principal place of business at 300 Funston Avenue, San Francisco, CA 94118.

24.     IA is registered with the New York Department of State to transact business and accept service of process within the State of New York. IA currently transacts business within the State of New York and this District by, *inter alia*, distributing digital copies of books (and other content) to New York residents over the Internet, by providing New York residents with services-for-a-fee related to the digitization of books, and by soliciting and accepting contributions from New York residents to further its digitization and distribution of books. In addition, certain Works were copied and digitized by IA in New York.

10

25.     IA harms the Publishers in this District because IA has copied and uploaded the Publishers' copyrighted books to its Website, including each of the Works in suit, without permission, and IA currently distributes copies to users of the Website, in New York or elsewhere.  Upon information and belief, many of the acts of copyright infringement committed by IA set forth in this Complaint occurred within this State and District—including illegal reproductions, distributions, public displays, and/or public performances.  Both the Publishers' economic and author relations damages are primarily felt in this State, where three of the Plaintiffs have their principal place of business and the fourth (Wiley) is incorporated.  IA knew it would cause injury to Publishers in this State and District, or it should have reasonably expected injury to occur here.  Indeed, IA acknowledges that in the last thirty days over 151,000 views on its site came from New York State, making New York the jurisdiction with the third highest IA views in the world.  *See* Internet Archive, Books to Borrow, https://archive.org/details/inlibrary?tab=about (last accessed May 29, 2020).

26.     IA derives substantial revenue from interstate and international commerce. According to public filings, IA has earned over $100 million in the last ten years from a national network of supporters, at least some of whom are based in New York, and from the services it sells to clients in New York and all over the United States, including industrial-scale book scanning services.

27.      Defendants Doe 1 through Doe 5 are certain individuals or entities whose true identities are not currently known to Plaintiffs.  Defendants Doe 1 through Doe 5, who are sued under fictitious names, are those who also may be responsible for the unlawful activities complained of herein.  (Doe 1 through Doe 5 do not include any public, university, or academic

11

libraries.) Once Plaintiffs ascertain their identities, Plaintiffs will seek leave of the Court to amend the Complaint to include Defendants Doe 1 through Doe 5 as named defendants.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action, which arises under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*., pursuant to 28 U.S.C. §§ 1331 and 1338.

29.     This Court has personal jurisdiction over Defendant pursuant to CPLR 302 because, *inter alia,* Defendant transacts business within the State of New York and supplies services in this State; because Defendant has committed tortious acts within the State of New York, including the direct and indirect infringement of Plaintiffs' exclusive rights in copyrighted books; and, because Defendant has caused injury to Plaintiffs in this State by allowing Internet users to download and view Plaintiffs' Works for free on the infringing Website and knew or reasonably should have known its acts would have consequences in this State, all while deriving millions of dollars in revenue from interstate commerce,.

30.     This Court independently has personal jurisdiction over Defendant pursuant to CPLR 301 because IA is registered to do business in the State of New York and has pervasive corporate ties to the State that are sufficient to justify the imposition of general jurisdiction here.

31.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

**A.      The Book Publishing Ecosystem**

**i.      Publishers and Authors Rely on Copyright Law to Create Functioning Markets for Books**

32.     Books are a cornerstone of our culture and system of democratic self-government and play a critical role in education. Because books require so much time and effort to write and develop, they offer the promise of high-quality expression, important insights, and long-term

value to society.  But the qualities that make books among the most reliable conduits of learning and most intensive sources of creative expression come at a high cost.  Publishers are largely responsible for bearing these costs and, in doing so, act as leading defenders of free speech, promoters of literacy and scientific knowledge, and creators of the stories people thrive on.

33.    Authors devote great effort and care in researching and writing books, a skill which requires training and imagination.  It is not unusual for an author to spend years writing a single book of fiction or nonfiction.  Many authors, from the most celebrated *New York Times* bestsellers to new talents still making a name for themselves, write books for a living and rely on income from writing as their primary means of support.  Writing is an expert craft, but one that is commercially unpredictable.  Authors who find success with one book may benefit from renewed interest in and sales of their previous titles.  Copyright law supports this long potential by ensuring a lengthy term of protection, as well as licensing and sale possibilities.

34.    In the United States, publishing dates back to the dawn of our democracy.  Over hundreds of years, book publishers like Plaintiffs have invested in the talent of authors and developed unparalleled expertise in the art of publishing high-quality books by providing a variety of vital services including editing, marketing, and distribution.  Publishers expend the necessary resources, financial and otherwise, in reliance on the enforceable exclusive rights afforded by copyright law that make recouping expenditures possible.  The steadfastness of the law, in turn, promotes new technologies and new business models and distribution mechanisms by which to reach new audiences, no matter the circumstances.  Indeed, at a time of crisis such as we have now with COVID-19, the continued viability of publishing is more important than ever to society.

13

35.     The founders of this nation wrote a copyright clause into the Constitution to empower Congress to incentivize authors to create and publish their work, yielding a robust history of Copyright Acts that date to 1790 and have always squarely addressed the protection of books.  The Copyright Act of 1976—which enacts the constitutional imperative into law and balances the rights of readers with the rights of copyright owners—enables authors to profit from writing books by granting them the legal right to control the reproduction, distribution, public display, and public performance of their work, and to create derivative works, among other exclusive rights.  Each of these rights is implicated in this action.

36.     In a related fashion, copyright law gives authors and publishers, as rightsholders, exclusive control over how to publish their content in order to allow book markets to develop and thrive.  This includes empowering publishers to tailor their means of distribution and terms of sale or license depending on the format or medium in which a particular title is released.  These carefully calibrated markets are precisely the markets that IA seeks to disrupt and destroy by arrogating to itself the right to engage in bulk digitization of the Publishers' in-copyright books without a license and without any compensation, and by distributing the resulting illegal bootleg copies for free over the Internet to individuals worldwide.

37.     Over hundreds of years publishers have found ways to maintain viable markets for books even as revolutions in publishing have driven changes in format, from leather-bound hardcover books to paperbacks to the paperless ebooks we read on digital devices.  The ability of publishers to develop a diversity of new channels as technology evolves is crucial to meeting the high cost of publishing.

38.     This includes the market for both new and "backlist" books.  Book publishers derive substantial revenue from backlist books, which range from venerable classics like *The*

*Bell Jar* by Sylvia Plath or *Winds of War* by Herman Wouk to works written only a few years ago, including bestselling works such as *Eat, Pray, Love* by Elizabeth Gilbert and *Commonwealth* by Ann Patchett, all of which are Works in suit. Moreover, a great deal of the most successful children's books, including many of the Works, are backlist books.

> ii.      **The Development of Functioning Markets for Ebooks**

39.      The rise of a commercial market for ebooks provides an example of publishers' adapting to new technologies to create new and diverse channels to meet the demands of readers. Since the early 2000s, Plaintiffs and other publishers have offered readers digital versions of their books, which can be read on portable electronic devices such as the Kindle, Nook, iPad, and other smart devices. Since that time, ebooks have grown to become a major source of revenue for authors and publishers. Publishers have invested heavily to expand the ebook market, including by publishing their backlist titles in ebook form. They have devoted considerable time, money, and professional expertise to create high-quality ebooks to deliver to readers. Authors rely on publishers to present their works well to readers.

40.      The fundamental differences between print and digital formats require publishers to market print books and ebooks in different ways. Not only are the cost structures and distribution systems different for these two formats, but ebooks are digital files that can pose significant security concerns. Without protective measures, digital files can be copied perfectly, instantaneously and in practically infinite quantity at virtually no cost, and distributed all over the world in a split second.

41.      Because of these material differences in format, publishers do not distribute ebooks the same way that they sell traditional paper books. Like other copyright sectors that license education technology or entertainment software, publishers either license ebooks to consumers or sell them pursuant to special agreements or terms established by each publisher

15

and the platforms on which the ebooks may be read. By contrast, they sell copies of print books without any restrictions.

42. When an ebook customer obtains access to the title in a digital format, there are set terms that determine what the user can or cannot do with the underlying file. Publishers also use digital rights management technology ("DRM") to restrict the use and further distribution of ebook files. The commercial ebook market would not be viable if publishers lacked the ability to place any control over the means of distribution of ebooks or to prevent unlimited copying or distribution of the files.

43. Copyright law recognizes and enforces the right of copyright owners to control their works through DRM technology. In 1998, Congress enacted the Digital Millennium Copyright Act ("DMCA"), which made it illegal to circumvent DRM technology. The rights that enable publishers to control the publication of ebooks ultimately benefit readers because they enable publishers to provide their ebooks to a variety of channels and at a variety of price points that make sense for the specific authors and titles in their catalog.

44. Over the past twenty years, publishers have embraced the shift to digital commerce and correspondingly offered consumers an ever-evolving variety of formats, distribution, and access models. Indeed, Plaintiffs have collectively made thousands of the books in their catalogs available in ebook form, including the Works identified in this suit and hundreds of thousands of other works, backlist titles included. Virtually all of the trade books being offered for sale by Plaintiffs, including backlist books, are available in both print and ebook form.

45. At the same time, it is a basic tenet of copyright law that the copyright holder retains the exclusive right to decide whether or not to publish a copyrighted book in a digital

16

format.  At times, authors and publishers make the purposeful decision not to publish particular titles as ebooks.  Some niche categories of books are excluded from the ebook market because they are not suitable for that market.  In other cases, authors and publishers decide not to publish ebooks because a digital edition would be far inferior to a print version—as with some heavily illustrated books, art books, or creatively designed children's books.

### iii.     The Established Market Equilibrium Between Authors, Publishers, and Libraries

46.      Public libraries are among the most cherished institutions in this country.  To Plaintiffs, libraries are not just customers but allies in a shared mission to make books available to those who have a desire to read, including, especially, those who lack the financial means to purchase their own copies.  Much like a publisher must decide which books to invest in— balancing all sorts of considerations—librarians must make reasoned decisions about which books to purchase in order to best serve the needs of their communities.

47.      Plaintiffs have worked with libraries and library aggregators such as OverDrive to pioneer an innovative and highly successful service that enables library patrons to easily and lawfully obtain digital copies of books.  Under negotiated terms, publishers provide their ebooks to library aggregators, who, in turn, work with libraries and their patrons to host a platform that permits and tracks the lending of ebooks.  In this way, library patrons can log onto their library accounts from their homes or any other location, download ebooks onto their computers, smartphones, or e-reading devices for a limited time period under stated terms of use and read them without physically visiting their local library.  Each library focuses its services on its community, making ebook (and other) acquisition decisions based on the specific needs of local patrons.

48.     As competitors in the marketplace, Plaintiffs have each worked with libraries and library aggregators to develop innovative models capable of sustaining a functioning market for their respective ebooks.  These pricing and agreed terms of use—which vary from publisher to publisher and can vary by market segment—continue to evolve based on the feedback from libraries and other considerations.  There is a vibrant market for selling and licensing ebooks to libraries to provide their patrons with lawful copies of ebooks.  But that market cannot be sustained if, rather than patronize their local library, individuals can freely download unauthorized scanned copies of Plaintiffs' books from IA's Website.

### iv.     Plaintiffs and Libraries Reacted Rapidly to Ensure Library Patrons Have Access to Books During the COVID-19 Lockdown

49.     The advent of the COVID-19 pandemic has shown that online commerce is more important than ever to publishers, authors, bookstores, and libraries.  During this time period, many customers have been well-served by existing digital business models, both commercial and noncommercial.  Additionally, publishers and libraries have engaged in numerous emergency-related initiatives to ensure that readers retain access to books while nationwide stay-at-home orders remained in effect.  They have ranged from providing free ebook copies to library patrons during the shutdown in specific instances, to donating hundreds of thousands of print books, to working closely with schools, colleges, and teachers to ensure access to and availability of books necessary for online learning.

50.     The Publishers have used their exclusive rights to strike an appropriate balance between the interests of the relevant parties, particularly authors and readers.  Moreover, the measures taken by the Publishers in response to the COVID-19 pandemic also take into account the needs of booksellers, particularly independent bookstores, most of which are small businesses that have been crippled by the shutdowns.  Copying and giving books away to

everybody for free—as IA has done with Plaintiffs' and others' works—deprives booksellers of the sales that they need to stay afloat and authors of royalties they otherwise count on as compensation for their work.

51.     Libraries have been equally proactive in meeting the challenges of the COVID-19 pandemic.  For example, despite the closure of their physical locations, many libraries have allowed new patrons to sign up for library cards online.  Patrons are still able to lawfully download hundreds of thousands of ebooks and online materials through the digital lending systems that libraries and publishers have developed.  IA's Website steers readers away from the digital platforms that local public libraries continue to operate.

**B.      Internet Archive Unlawfully Disrupts the Book Publishing Ecosystem by Infringing Copyright on an Industrial Scale**

52.     Despite its efforts to cast itself as the hero in this story, IA's business model for the Website—which is essentially to freely disseminate scanned copies of every physical book it can lay its hands on—is parasitic and illegal.  IA exploits the invaluable work that authors and publishers do without investing in any of the effort or paying any of the costs associated with the creation and publication of the books.  What IA does is copyright infringement, plain and simple, and it must be stopped.

**i.       Internet Archive**

53.     Brewster Kahle founded Internet Archive in 1996.  Internet Archive provides a number of services not at issue in this action, including its Wayback Machine and digitization of public domain materials.  At issue here is IA's scanning of in-copyright books and distribution of digital copies via its Website.  Notably, it operates with a surprisingly unsubtle penchant for money-making behind its non-profit 501(c)(3) tax code designation.

54.     IA reported more than $150 million of revenue in the last ten years, according to publicly available tax filings.  As per its 2017 tax filings, it employed 150 employees.  IA's headquarters are located in an exclusive area of San Francisco.  Kahle expanded the IA empire in 2019 by purchasing through Better World Libraries, a shell company he controls, the for-profit Better World Books, an online retailer that predominantly sells used books.

55.     The bulk of IA's revenue is derived from contributions from large donors, including tens of millions of dollars from the Kahle/Austin Foundation.  The Kahle/Austin Foundation is an entity established by Brewster Kahle and his wife to give money to IA and other favored projects.  In 2018, the Kahle/Austin Foundation reported assets of $104,483,456. IA also has reported sizeable donations from other large foundations, some of which are based in New York.

56.     IA has an interlocking web of contributions and commercial services that support its Website.  In addition to receiving large-dollar donations, IA has made tens of millions of dollars from selling commercial services.  One of the services it offers is industrial-scale book scanning and digitization, which has generated more than $25 million in revenue since 2011.  IA provides this service to customers nationwide, and as its marketing materials tout, employs a Regional Digitization Manager for customers in the "NJ/NY/PA" area.  Upon information and belief, this employee currently resides in New York City.  This same employee helped to set up and manage IA's first digitization center, which was housed for an extended period of time in this District.

### ii.     The Open Library

57.     IA started the "Open Library" in or around 2006 with the goal of providing "one web page for every book published."  An online catalog of all the books in the world was not a novel concept.  Since 1998, the WorldCat database run by the Online Computer Library Center

has provided an exhaustive online catalogue of library books, which currently contains over 450 million bibliographic references.

58.    But IA was not content with a resource tool designed to help users find books. Taking a step further, IA created the Website with the goal of providing free downloads of entire copies of every book ever published.  Over the course of several years, IA has gradually built up a program designed to obtain vast quantities of print books in bulk, scan them on an industrial scale, and distribute digital copies through the Website without any license from the copyright owner.

59.    IA engages in this massive, industrialized scanning of print books to create digital files in large part to evade the Publishers' commercial terms for ebooks and because DRM precludes the duplication of Plaintiffs' ebooks.  In other words, IA employs this end-run as a means to avoid both the Publishers' ebook use restrictions and the dictates of the DMCA by creating its own bootleg electronic versions of the books through scanning.  But that end-run is unlawful and equally harmful to the Publishers and their authors, who receive no compensation for IA's reproduction and distribution of their works in digital form and whose paid offerings cannot readily compete with IA's free but unlawful versions.

60.    The basic purpose of IA's massive book digitization project is the same as Plaintiffs' basic purpose in publishing books, which is to distribute reading material.  This is in stark contrast to other large-scale book digitization projects, like the ones carried out by Google and the HathiTrust, which created digital indexes of the contents of books that could be used for the purpose of online search, but which never made the contents of entire books freely available to the general public.  Here, IA allows every person in the world to instantly download complete

books or download them—without ever receiving the necessary permission from the copyright owner.

61.     In a 2017 interview, IA's founder stated, "We're trying to . . . make all the published works of humankind available to people, permanently.  If you're curious enough to want to have access, we can make it available [sic] to all the books, music, video, web page, software, lectures, available to anybody wanting to have access."  Mary Kay Magistad, *Where to find what's disappeared online, and a whole lot more: Internet Archive*, PRI.org (Feb. 23, 2017, 8:00 p.m.), https://www.pri.org/stories/2017-02-23/where-find-whats-disappeared-online-and-whole-lot-more-internet-archive.

62.     In recent years, IA has started to ramp up its efforts.  The annual income reported by IA has nearly doubled since 2013 and the rapid accumulation of funds has been accompanied by public statements promising aggressive expansion.  In 2019, for instance, the Director of Open Libraries told *Library Journal* that he aimed to increase the acquisition of books in bulk and speed up the rate of book digitization to 500,000 books per year.  The goal of this accelerated activity is to put "more than four million books online for the public," which would match the number of books in the collection of a large metropolitan library system.  Matt Enis, *Internet Archive Expands Partnerships for Open Libraries Project*, Library Journal (May 2, 2019), https://www.libraryjournal.com/?detailStory=internet-archive-expands-partnerships-for-open-library-project.

63.     As the number of scanned books on the Website increases exponentially, the misrepresentations IA employs to justify its infringing activities are exposed.  For example, IA frequently characterizes the books on the Website as twentieth-century works that do not have active sales or available ebooks, as if infringement is allowed if a work is not readily available

(which it is not).  But this "old books" defense is a fantasy.  As is evident from IA's own figures and the Works in suit, many of the books that IA provides in the most popular categories, such as biographies, were published in the years leading up to 2000 and in the twenty-first century, with relatively few books from earlier in the twentieth century.  This is evident from the Open Library's own graph illustrating the year of publication for its biographies:



64.     Indeed, the Works in suit include books first published in 2019, including *The Man Who Solved the Market: How Jim Simons Launched the Quant Revolution* by Gregory Zuckerman, with a publication date of November 2019.

65.     In short, IA directly harms the Plaintiffs' print *and* ebook markets in all market segments by providing competing substitutes for numerous original works currently available in their catalogs.

66.     IA knows that it cannot proceed with the mass digitization and distribution reflected by the Website without an agreement with the Publishers on mutually agreed terms. The Publishers and/or their trade association AAP have put IA on direct notice that Open Library's unauthorized reproduction and distribution of copyrighted works is infringing.  For example, in 2018, HarperCollins put IA on express written notice that its actions in connection with Open Library with respect to HarperCollins' titles were infringing and not justified under its various manufactured defenses.  Despite actual notice that its actions were illegal and without any basis in law, IA has willfully persisted with its infringing activities.

23

### iii. The User Experience of the Website

67.     From the perspective of the Website user, IA offers an ostensibly attractive proposition: free copies of about 1.3 million books.  Anyone with an Internet connection and an email address can sign up for an account to use the Website in a matter of minutes.  The process requires no verification of the user's identity, and there is nothing to prevent users from creating multiple accounts with dummy email addresses in order to circumvent limits, assuming any are in place at all.

68.     Once on the Website, a user is taken to a landing page that suggests titles under categories such as "Books We Love," "Romance," "Science," "Kids" and "Thrillers."  Users can also search for books according to title, author, subject, ISBN, and other categories.

69.     Clicking on a book title takes the user to the title's webpage on the Website, which contains a picture of the cover, a description of the book and bibliographic information, such as the publication date and the WorldCat catalog number.  As shown in the screenshot on the following page, which is a typical webpage on the Website, the user is also presented with links through which he or she can buy a copy of the book.



70.     The first—and most prominent—"Buy this book" link is to Better World Books, the online, largely used bookseller owned by a shell company controlled by IA founder, Brewster Kahle.  Notably, IA does not provide links to the book publisher's or author's website.

71.     For each book on the Website, IA gives users one of two options, which it calls "read" or "borrow."  The books in the "read" category are books that IA presumably has concluded are in the public domain.  For books in the "read" category, the Website has no limit on how many users can download them, either at any point in time or in the aggregate.  Users who choose the "read" option can download to their computers, e-readers, or mobile devices a scanned copy of the entire book in a variety of digital formats that lack any DRM protection,

25

including as a .pdf file.  Once a user downloads a book as a .pdf, he or she is free to make
unlimited copies of the book and can distribute it to whomever they wish at no cost.
Alternatively, users can read these books through the IA's "Book Reader" interface described
below.

72.    Although the books that IA classifies in the "read" category are presumably
supposed to be in the public domain, sometimes the books are in fact protected by copyright.
For instance, at one point, any Internet-connected individual could download copies of the
modern classic *To Kill a Mockingbird*, which is still under copyright, without any restrictions.  In
other cases, copyrighted books have been distributed without DRM restrictions because, upon
information and belief, IA erroneously decided that they were public domain works based on
elementary misunderstandings of copyright law.

73.    Under the second option, IA permits users to "borrow" titles from the Website
that it recognizes are not in the public domain through its so-called "controlled digital lending"
protocols.  "Borrow" is a euphemism for an illegal reproduction and distribution.  As described
below, "controlled digital lending" is a manufactured legal paradigm, conceived by IA, to cast
aside well-established copyright jurisprudence.

74.    Under IA's "controlled digital lending," a Website user can download a certain
number of books at a given time, which IA has currently set at ten.  Once IA has distributed the
maximum number of books the user is allowed, he or she must check a book back in before
taking another one out, although there is nothing to prevent a user from circumventing this limit
by setting up multiple accounts.  Each such "loan" lasts for a two-week period.  When the period
ends, the book is supposedly "checked in" by the Website.

26

75. Until the recent pandemic and the advent of IA's so-called "National Emergency Library," IA claimed that it also enforced an "owned to loaned" ratio that restricted the number of users who could borrow a copyrighted book at once. In theory, this means that the number of scanned copies of a title downloaded from the Website at any one time cannot exceed the number of print copies of that title owned by IA or its partner libraries. If that number is exceeded, then the user is ostensibly put on a "waitlist."

76. Users that have successfully checked out a book can read it immediately on the Website's Book Reader platform. IA publicly displays a copy of the work on that platform. This interface operates in the user's web browser and provides a digital replica of a hard copy book, as shown in the screenshot below:

166 BLINK

entire principle of a blind taste test was ridiculous. They shouldn't have cared so much that they were losing blind taste tests with old Coke, and we shouldn't at all be surprised that Pepsi's dominance in blind taste tests never translated to much in the real world. Why not? *Because in the real world, no one ever drinks Coca-Cola blind.* We transfer to our sensation of the Coca-Cola taste all of the unconscious associations we have of the brand, the image, the can, and even the unmistakable red of the logo. "The mistake Coca-Cola made," Rhea says, "was in attributing their loss in share to Pepsi entirely to the product. But what counts for an awful lot in colas is the brand imagery, and they lost sight of that. All their decisions were made on changing the product itself, while Pepsi was focusing on youth and making Michael Jackson their spokesman and doing a lot of good branding things. Sure, people like a sweeter product in a sip test, but people don't make their product decisions on sip tests. Coke's problem is that the guys in white lab coats took over."

Did the guys in the white lab coats take over in Kenna's case as well? The market testers assumed that they could simply play one of his songs or part of one of his songs for someone over the telephone or on the Internet and the response of listeners would serve as a reliable guide to what music buyers would feel about the song. Their thinking was that music lovers can thin-slice a new song in a matter of seconds, and there is nothing wrong with that idea in principle. But thin-slicing has to be done in context. It is possible to quickly diagnose the health of a marriage. But you can't just watch a couple playing Ping-

KENNA'S DILEMMA 167

Pong. You have to observe them while they are discussing something of relevance to their relationship. It's possible to thin-slice a surgeon's risk of being sued for malpractice on the basis of a small snippet of conversation. But it has to be a conversation with a patient. All of the people who warmed to Kenna had that kind of context. The people at the Roxy and the No Doubt concert saw him in the flesh. Craig Kallman had Kenna sing for him, right there in his office. Fred Durst heard Kenna through the prism of one of his trusted colleagues' excitement. The viewers of MTV who requested Kenna over and over had seen his video. Judging Kenna without that additional information is like making people choose between Pepsi and Coke in a blind taste test.

4. *"The Chair of Death"*

Several years ago, the furniture maker Herman Miller, Inc., hired an industrial designer named Bill Stumpf to come up with a new office chair. Stumpf had worked with Herman Miller before, most notably on two previous chairs called the Ergon and the Equa. Yet Stumpf wasn't satisfied with his two previous efforts. Both had sold well, but Stumpf thought that the Ergon was clumsy — an immature effort. The Equa was better, but it had since been copied by so many other firms that it no longer seemed special to him. "The chairs I had done previously all looked alike," Stumpf says. "I wanted to come up with something that looked different." He called his new project the Aeron, and the story of the Aeron illustrates a second, deeper



Users can turn the pages by clicking on them or using buttons below the page. The Book Reader also allows users to click an "audio" button, at which time IA's software mechanically reads the book aloud.

77.    IA also enables users to download and view copies of books using a software program called Adobe Digital Editions ("ADE"). The ADE files are purportedly protected by DRM technology that restricts certain copying and only allows users to access the file during the fourteen-day loan period, at which time it locks them out.

78.    The Website allows users to "borrow" books in two ADE formats: "Encrypted Adobe PDF" (which is billed as containing "High Quality Page Images" of the entire hard copy book) and "Encrypted Adobe ePub." The Encrypted Adobe PDF is not the kind of specially-formatted ebook that a user would purchase as an authorized ebook. Rather, it is a digital file consisting of a scan (*i.e.*, photograph) of the pages of a physical book. IA generates the Encrypted Adobe ePub file from scanned books using optical character recognition technology. The Website distributes the Encrypted Adobe ePub as a "smaller file," but acknowledges it "may contain errors." This is an understatement. The ePub files tend to be rife with transcription errors and are sometimes entirely illegible, as can be seen from the example on the following page.



79.     Users can read the books they download as ADE files on devices such as smartphones, tablets, and e-readers like Kindle, Nook or iPad.  The Book Reader platform has been designed to work on mobile devices as well.  IA has boasted on its blog that Website users can borrow books and read them on their devices just as easily as they can read ebooks legitimately purchased or borrowed from licensed services.  While the quality of the digital format scans that IA provides are inferior to the quality of Publishers' ebooks, these bootleg versions act as a substitute for the authorized versions, since readers select titles for their content. No one reads a James Patterson thriller after downloading a scan of the book from Open Library and then declares, "I liked it so much, I am going to read an authorized ebook again on my Kindle for a different experience."

29

    **iv.**      **The Open Library Is Not a Library, It Is an Unlicensed Aggregator and Pirate Site**

80.      Defendant bills its Website as "an accredited California State Library run by the non-profit Internet Archive," but this branding fraudulently misleads on several levels.

81.      The Open Library is not an "accredited library" by any commonly understood definition of those words. The reference to accreditation refers, upon information and belief, to the fact that the State of California provided IA with federal funding through the Library Services and Technology Act ("LSTA") in or around 2011. LSTA awards are available to a wide array of organizations, not just actual libraries, including for example the Los Angeles Philharmonic Association. In short, the fact that Internet Archive was able to meet the broad criteria for LSTA funds does not make it an "accredited library," and it most certainly does not make it the trusted equivalent of a public or academic library.

82.      More fundamentally, the Website lacks the characteristics shared by actual libraries. Instead, the service it provides more closely resembles that provided by aggregators like OverDrive, that Plaintiffs routinely engage to distribute ebooks, with defined terms of use and at an agreed-to fee—except IA operates without authorization or remuneration. For instance, whereas libraries serve local and academic communities, the Website distributes copies indiscriminately to everybody on the planet, or at least everybody with a connection to the Internet.

83.      IA tries to wrap itself in the flag of an "educational" enterprise, but it is not. First, it is not an educational institution or even an affiliated academic library serving a defined university community. It is devoted to education no more specifically than any platform that transmits, streams, or otherwise delivers content on the global Internet. Moreover, the notion that the Website specializes in educational material is pure fiction. A quick glance at the

Website's landing page shows that it lists thrillers and romance novels more prominently than textbooks or other works that may be used in schools. Further, upon information and belief, many of the non-fiction books on the Website are read for personal entertainment or edification, not classroom use:



84. Branding itself as a "library" does not imbue Defendant with the right to engage in behavior that would otherwise be considered wholesale theft.

**v. IA's Industrial Book-Scanning Machine and Global Scanning Operations**

85. IA has devised a commercial full-service loop that funds its quest to distribute digital copies of every book, and at the same time, provides millions of copies of the very works it needs to stock its Website.

86. To this end, IA has implemented an industrial process that enables it to scan the many millions of books it has acquired and continues to amass. The "Scribe system" developed by IA uses a sophisticated scanner operated by manual labor. *See* Internet Archive, Internet Archive Digitization Services – Partner Documents, https://archive.org/details/partnerdocs (last accessed May 31, 2020). IA invented the Scribe scanner for the purpose of scanning books in bulk:





87.     Upon information and belief, a single Scribe scanner can digitize a *300-page* book in five minutes. According to its promotional materials, IA operates seven "regional digitization centers" and eleven "satellite locations" in the United States, Canada, and the United Kingdom, with multiple Scribe scanners at each location. Upon information and belief, IA has employed more than 50 "book scan center staff" to work within facilities housing Scribe scanners, who are responsible for digitizing the books to add to the Website. Upon information and belief, IA has also engaged low-wage contractors in other countries, such as the Philippines and China, to scan bulk quantities of books that are shipped there from the United States. Upon information and belief, IA also has recruited and used unpaid volunteers to scan copyrighted books for the Website. IA can scan 3,000 books in a single day when operating at full capacity, according to its Archivist and Software Creator, Jason Scott (believed to be a New York resident).

88.     At one point, IA operated a digitization center in this District and, although it has been discontinued, the Website currently contains many copyrighted books that were scanned in New York, including some of Plaintiffs' Works in suit.

89.     IA makes multiple reproductions of Plaintiffs' books at various stages.  As IA photographs each page of a book using the Scribe scanner, the scanner creates a digital copy of those pages and then combines them with copies of all the other pages to make a single digital copy of the entire book.  IA then copies each digital book file onto its main computer servers located in San Francisco, together with metadata about the book and the scan or file.  Multiple copies of the scanned book pages are made in the course of this process as IA converts the file into different formats (including, *inter alia*, .pdf, ePub, OCR text files and audio formats) and then reproduces all of those files onto its servers.

### vi.     Internet Archive Shifts the Costs of Its Illegal Book Digitization Project Onto Publishers, Libraries, Open Library Users, and Other Third Parties

90.     IA's business model for Open Library is predicated upon infringement, and it willfully inverts the carefully balanced book publishing ecosystem.  Whereas publishers, authors and libraries actually invest the time and money that it costs to publish and distribute a book, IA refuses to pay for any of these costs and has even devised a parasitic system to shift the costs of its large-scale infringement onto other people.

91.     IA attempts to present the Website as an altruistic non-commercial enterprise. But despite its technical not-for-profit status, IA has set itself up to generate huge amounts of revenue from the very people and entities it is supposed to be helping in order to fuel its copyright infringement project, as the following examples illustrate.  IA should be seen for what it actually is: a commercial actor.

a.    **Internet Archive is Paid Millions of Dollars to Infringe Copyrighted Books and Put Them on the Open Library**

92.    IA operates a major commercial business performing scanning and hosting services.  This provides a critical revenue stream that IA uses to fund and facilitate its piracy scheme.  IA first induces various libraries to pay to have books in their collections scanned at a set price, and, at the same time, copies of all the works scanned are provided to the Open Library.  While most public libraries have agreed to scan only public domain materials, on information and belief, IA also has earned substantial fees scanning and uploading some library collections of copyrighted books.

93.    In a recent blog post, Brewster Kahle admits that "[l]ibraries paying for our scanning services is a major source of earned income for the Internet Archive." *See* Brewster Kahle, *Internet Archive Staff and Covid-19: Work-at-Home for Most, Full-Pay Furlough and Medical for Scanners* (Mar. 25, 2020), https://blog.archive.org/author/brewster/.  Evidence from IA's publicly available tax records confirm that it has made over $25 million from book scanning since 2011.  Of course, IA also profits from adding copies of the books it scans to the Website, using funds from donations, foundations, and elsewhere.

94.    Plaintiffs obviously have no objection to the digitization of public domain titles.  Nor do they object to anyone granting IA a license to put books or journals that they own the rights to on the Website.  But IA has designed its bulk book scanning service for libraries to be a pipeline that feeds the Website with extensive copyrighted material in addition to the permitted copying of any public domain or licensed material, all at no cost to IA.

b.    **Better World Books Feeds the Open Library with Copyrighted Books**

95.    The acquisition of Better World Books by a shell company controlled by Brewster Kahle in 2019 has provided IA with yet another way to acquire books for the Website without

35

A-139

actually paying for them. As part of its business model, Better World Books acquires mass quantities of used print books, including what it refers to as a "Library Discards & Donations" program that it claims works with librarians to "reuse or recycle" surplus library books. Better World Books funnels books to IA, which scans and uploads them to the Website. Moreover, the complex series of circular relationships between IA and Better World Books further contributes to the commercial nature of IA.

96.     This arrangement creates a perfect closed loop system that benefits IA in several ways. As IA stated in the press release accompanying the acquisition, the new relationship between Better World Books and IA "will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books."

97.     Upon information and belief, the system works as follows: first, Better World Books acquires millions of used print edition books (provenance unknown), which it provides to IA to be scanned and added to the Website for widespread downloading and distribution. Second, the webpage for every digital format book on the Website—including the pages for the books provided by Better World Books—includes a prominent link inviting the user to buy a print copy of the book from Better World Books. Upon information and belief, this sale not only benefits Brewster Kahle's shell corporation, but the traffic that IA drives to Better World Books results in more book sales, which enables IA to acquire more books to scan and upload to the Website. And the cycle repeats. Better World Books also encourages its customers to donate funds to IA by topping off their purchases to a higher dollar amount.

### c.     Users "Sponsor" Books that Internet Archive Wants to Infringe

98.     IA also earns revenue from users in exchange for special access to individual book titles through its "sponsorship" program. In some ways, this is little different from

36

A-140

"selling" limited access to digital books to these sponsors. In brief, IA gives users the option to "sponsor" books that it does not have and wants to add to its collection. The sponsorship program is so central to IA that the main landing page for the Website features at the very top the selection of books it would like users to sponsor:



99.     Users who click on the sponsor option are taken to a webpage that informs them that a "tax deductible donation can add this book to Internet Archive's lending library, forever." The book page informs the user of the cost of the "donation" required to purchase the book.



100.     In this case, users were given the option to purchase for IA a copy of *Back to the Batcave* by the late actor Adam West, who played Batman in the cult-classic 1960's television show, for a hefty donation of $93.12. As an inducement to sponsor the book, users are given the right to be the first to borrow the book when it becomes available and to add a "personalized sponsorship message." IA uses donations it receives for sponsored books to obtain a physical

copy of the book, scan it, and upload the digital copy to the Website for download.  It is not clear how IA uses any money left over.

101.    IA's book sponsorship scheme is breathtakingly brazen.  In essence, IA tells its users which copyrighted books it wants to infringe.  Then it asks users to pay a "donation" far in excess of the list price of the book for IA to go out and buy a print copy from an undisclosed source, possibly Better World Books.  Finally, IA uses the user's money to scan the book and put it online, where anyone can get a copy for free—completing the copyright infringement process without spending a single dollar of its own money.  Tax-deductible donations are not meant to foster piracy.

102.    The sponsorship option is also designed to drive an accelerating cycle of infringement.  By encouraging users to sponsor the books they most want, IA incentivizes its users to select popular books.  Once IA obtains the print book, scans it, and uploads it to the Website, that infringing file will attract new users.  The new users will, in turn, sponsor even more popular books, which will attract even more users and so on, *ad infinitum*.

### d.    Internet Archive Absorbs Entire Libraries for the Website

103.    Yet another way IA acquires books for free is to solicit and accept bulk donations of books from struggling or defunct libraries.  In a May 2019 article, Open Libraries Director Chris Freeland described IA's "acquisition program," stating that it "involves collecting donations of *in-copyright* materials from libraries and booksellers, digitizing this content in [IA's] scanning center in Cebu, the Philippines, and then storing the physical copies in archive facilities in Richmond, CA" (emphasis added).

104.    Ironically, the many thousands of hard copy books IA obtains from defunct colleges or libraries will likely end up in "archive facilities in Richmond, CA," which consist of large shipping containers owned by IA.  Once locked away, upon information and belief, IA will

make no effort to make the print books available to be read, like books in actual library collections. Instead, the print copies primarily exist to rationalize, or provide the predicate for, IA's argument that there is a one-to-one correlation between print copies legitimately owned and their illegitimate ebook scanned copies.

105.     Through its acquisition program—and similarly aggressive book scanning, Better World Books and "sponsorship" schemes—IA seeks to achieve its next benchmark of putting 4 million copyright-protected books on the Website.

106.     Remarkably, every one of the systems for acquiring books described above is designed so that IA avoids paying authors or publishers anything, while simultaneously ensuring that IA rakes in money from its infringing services and, at the same time, obtains free books for the Website.

**vii.     Controlled Digital Lending**

107.     IA relies on the contrived theory of "controlled digital lending" described above as its central defense to charges of copyright infringement. But CDL is an invented paradigm that is well outside copyright law, appears to have sprung up in response to the objections of copyright owners to IA's infringing activities and, in any event, does not excuse IA's massive infringement.

108.     IA is a leader and organizer of a larger proselytizing movement of academics and activists seeking to find a way to justify a "scan first, figure out the details later" approach to the mass digitization of copyrighted books. In 2018-19, IA sponsored the drafting of a "White Paper on Controlled Digital Lending of Library Books" by law professors David R. Hansen and Kyle K. Courtney. IA and Brewster Kahle broadly promote CDL, speaking widely and engaging in a broad public relations campaign, inducing others, including libraries, to join their cause and

40

A-144

cynically using them to reflect their glow of legitimacy onto the Website.  But IA's "controlled digital lending" finds no actual support in the law.

109.    As a preliminary matter, Plaintiffs' challenge whether IA maintains the detailed records or practical control necessary to sustain the so-called "owned to loaned ratio" that is the cornerstone of CDL, *i.e.*, the notion that the number of electronic copies of a book for download from the Website at a given time never exceeds the number of physical copies of the book owned by IA or one of its partner libraries.  With respect to the Website's titles for which the corresponding print books are allegedly stored at partner libraries, it defies reason that the partner libraries will have the wherewithal to faithfully and consistently remove a book from circulation each time it is borrowed on the Website, and put it back on the shelf when the Website version is checked back in.  As for the truckloads of books warehoused by IA,  IA archivist Jason Scott admitted in a recent tweet that for the millions of physical copies acquired by IA, "[o]nly one or two unique copies are kept" and "stored at the physical archive." "[D]uplicates (which have increased over time) are donated to various charities and non-profits."

110.    But even if IA were scrupulously following its own invented theory of "controlled digital lending," the theory has no legal justification.  First, IA and its supporters relied heavily on the "first sale doctrine" codified at 17 U.S.C. §109, which entitles the lawful "owner of a particular … lawfully made" copy of a copyrighted work, like a book, "to sell or otherwise dispose of the possession of that copy or phonorecord."  The central thesis of the White Paper sponsored by IA was that the broader principles reflected in this doctrine should be imported into the fair use doctrine to protect IA's actions.  But as enacted by Congress, the first sale doctrine is carefully confined as a limitation on only the distribution right.  It permits the owner of a copy to *distribute* the particular copy that has been lawfully acquired—for example, as in the secondary

41

A-145

sale of a hardcover book or a painting—but it provides no exemption from the copyright holder's exclusive right to *reproduce* a work. The lynchpin of IA's whole operation is that it scans a print book to create a digital file—a classic unauthorized *reproduction* of a work that puts the application of Section 109 clearly out of reach.

111.    Faced with these inconvenient facts, IA has also advanced the illogical premise that its massive illegal copying and distribution is "format shifting" protected by the fair use doctrine. But the rudimentary use of a scanner to "format shift" print books into digital works for distribution to the public does not constitute either a permitted personal use or a transformative use. The activity squarely intrudes upon the exclusive rights under 17 U.S.C. § 106, and no exception of any kind applies.

112.    At bottom, CDL is based on the false premise that a print book and a digital book share the same qualities. But, as outlined above, they are fundamentally different mediums, and they exist as distinct economic markets. As the Copyright Office phrased it in a key report, "Time, space, effort and cost no longer act as barriers to the movement of [digital] copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost." Digital Millennium Copyright Act (DMCA) Section 104 Report: Before the Subcommittee on Court, the Internet and Intellectual Prop., 107th Cong. (Aug. 2001) at p. 82, available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. In stark contrast, a range of physical obstacles impact the distribution of books as material objects—from the need to transport them to each reader, to the need for library patrons to travel to libraries to take them out and return them. Further, print books deteriorate over time, unlike digital files. Copyright law vests the copyright owner with the right to develop each market based on terms appropriate to the medium, as well as the right to extract the full value of

publication in digital form. These economic rights would be severely undermined if IA can circumvent the rightsholder entirely and copy millions of print books into digital copies to be widely distributed, even if it maintains an "owned to loaned ratio."

113.    IA's mass digitization of books is potentially even more pernicious than ordinary online piracy. First, its use of "library" branding deceives some users into thinking the Website is a legitimate site. Moreover, IA not only makes millions of dollars as outlined above in ways related to its systematic infringement but also uses those profits to fuel its mission to fill the digital Library of Alexandria with every book ever written. Allowing IA to operate the "Open Library" for in-copyright works will create an indelible impression for libraries and readers that digital format books should be free—and can be free just as soon as IA scans a print copy. This, in turn, will impair the sales and licensing of books and ebooks that actually make it possible to pay the high cost of writing and publishing the quality books that IA purports to value so much, yet pays little or nothing to sustain.

      **viii.    The National Emergency Library**

114.    On March 24, 2020, IA doubled down on its infringement, announcing that in light of the COVID-19 pandemic, it would suspend the "owned to loaned" ratio aspect of CDL, while retaining other aspects of it. In other words, Defendant altered how the Website operates so that it could distribute as many copies of any book it wanted, no matter the number of print copies on hand purportedly because the pandemic required it. This so-called "National Emergency Library" was tantamount to asserting an emergency copyright act unilaterally and by private action.

115.    IA admits that it did not bother to "engage with the creator community and the ecosystem in which their works are made and published" before launching this revised approach for the Website. When IA was roundly criticized by publishers, authors, individual librarians,

and the bookselling community for disregarding their interests and legal rights, IA responded that it had merely "moved in 'Internet Time' and the speed and swiftness of our solution [to the COVID-19 lockdown] surprised some and caught others off guard."

116.    In a feigned act of magnanimity, IA assured authors that it would abide by a notice and takedown system.  But this turns copyright law on its head.  Copyright owners have the power to decide in advance how their exclusive rights will be exercised.  Copyright is not an "opt-out" system whereby infringers can distribute copyrighted works for free, with impunity, until they are told to stop.  The Copyright Act does not and never has put the burden on authors and publishers to police the unlawful actions of direct infringers, which in the case of the IA not only copies, uploads, and distributes infringing files, but asserts conditions and procedures for agreeing to stop the infringement.

117.    Defendant does not qualify as an intermediary entitled to certain protections under the Digital Millennium Copyright Act.  The DMCA allows the operators of online services that host content *posted by users* and meet certain conditions to avoid copyright liability by responding expeditiously to a takedown request from the rightsholder.  The DMCA notice and takedown system is inapplicable to this case because IA, not third-party users, uploads the infringing files to the Website.  And to add insult to injury, both before and since the "National Emergency Library," when faced with the frustrated demands of authors or publishers, IA has often failed to stand by its proclamation to honor takedown requests, or opt-outs, thereby further exposing the overall lack of integrity that surrounds this process.

118.    The Website as operated under the "National Emergency Library" parameters does not qualify as a fair use.  Among other reasons, no one anointed IA to address the educational needs of the nation, and the Website has not been designed to meet specific

44

A-148

educational needs or even to focus only on books that are not commercially available. Section 110 of the Copyright Act, known as the TEACH Act, already grants teachers broad rights regarding the use of literary works, and book publishers, libraries and schools have on their own initiative sought to address educational needs directly during the health crisis while keeping in mind the needs of all stakeholders. In short, Defendant opportunistically seized upon the COVID-19 pandemic as an excuse to accomplish its long-desired goals while ignoring the law and harming the publishing ecosystem so critical to the world of books.

**C.    Defendant's Infringement Causes Harm to Publishers**

119.    In all its different iterations (including under its "controlled digital lending" protocols), IA's Website causes substantial harm to Plaintiffs, who produce and distribute books on behalf of themselves and their authors, to whom they pay royalties. Without the Publishers' permission, IA and its Open Library business are using the unauthorized book scans to exploit existing markets (and potentially new related markets), causing authors and Plaintiffs substantial and irreparable harm. This includes, but is not limited to, the types of market harm outlined below.

120.    First, a verbatim copy is a classic non-transformative use and a substitute for the original work. By operating the Website, IA competes directly with Publishers' works in all formats (including, without limitation, print and digital) and market segments (including, without limitation, commercial, library, and school).

121.    Second, by providing copies of digital books for free, IA devalues the book market. Consumers begin to view works as cheap and become increasingly unappreciative of what it takes to produce them and unwilling to pay fair value for them.

122.    Relatedly, IA's decision to provide free and full copies of Plaintiffs' books, including the Works, to anybody who wants them interferes with Plaintiffs' relationships with

customers and distributors, including libraries, who had already paid full value for them. The willingness of those distributors and customers to acquire digital formats in the future is diminished by the free distribution of Plaintiffs' books, including the Works, on the Website.

123.    Third, public libraries are evolving to meet the changing needs of their patrons and trying hard to remain at the center of their communities. Defendant's Website undercuts public libraries by disintermediating them. Harm to and loss of community support for public libraries, in turn, hurts the Publishers, since these libraries pay for their books, which, in turn, hurts authors, who share in and depend upon compensation for their copyrights.

124.    Fourth, the Website's .pdf and ePUB files are often of inferior quality. Authors expect their publishers to be guardians, ensuring the high-quality of their works as delivered to the marketplace. Websites like Open Library, thus, hurt Plaintiffs' relations with authors.

125.    Likewise, inferior quality scans affect the Publishers' relationships with consumers. For example, in certain instances book scans from IA have surfaced on retailer websites such as Amazon as offerings by sponsored third-party vendors, leading to negative reviews on the product pages. When a consumer gives such a work a one-star review because of the scan quality, other consumers may only focus on the negative rating, even if it has nothing to do with the content of the work. More generally, consumers may be confused about whether the publisher has authorized the IA scan, leading to a negative impact on the publisher's goodwill.

126.    Fifth, IA interferes with the author's and publisher's right to decide which works will be distributed in which format and at which time. For example, as noted above, some works or authors are ill-served by the conversion of print editions into digital works, either for commercial or artistic reasons. IA has appropriated to itself this right that belongs exclusively to the rightsholder.

127.    Finally, Plaintiffs have legitimate fears regarding the security of their works both as stored by IA on its servers and subsequently publicly displayed or transmitted to users.  For example, upon information and belief, IA has not developed and does not enforce sufficiently rigorous DRM protocols and related logistical systems that aggregators must employ to ensure that books appearing on their websites are not pirated or unlawfully infringed by users.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)

128.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

129.    The Works are original, creative, and copyrightable subject matter under the laws of the United States.

130.    The copyrights in the Works are registered, and the Copyright Office has issued valid Certificates of Registration for the Works.

131.    By its actions, alleged above, Defendant has infringed and will infringe the Publishers' copyrights in and to the Works by, *inter alia*, reproducing, distributing, publicly displaying, publicly performing, and making derivative works of the Works without any authorization or permission from Plaintiffs.

132.    Each infringement of the rights of Plaintiffs in one of the Works constitutes a separate and distinct act of infringement.

133.    Defendant's infringement of Plaintiffs' copyrights, including the Plaintiffs' Works, is willful.

134.    Upon information and belief, as a direct and proximate result of its wrongful conduct, Defendant has and will obtain benefits, including, but not limited to, profits to which Defendant is not entitled.

135.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, Defendant will cause further irreparable injury to Plaintiffs.

136.    As a direct and proximate result of Defendant's infringement, Plaintiffs are entitled to recover statutory damages, pursuant to 17 U.S.C. § 504(c), with respect to each work infringed.  Alternatively, at the election of Plaintiffs, pursuant to 17 U.S.C. § 504(b), Plaintiffs are further entitled to recover from Defendant the damages they have sustained and will sustain, as well as any gains, profits and advantages obtained by Defendant as a result of its acts of infringement alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Plaintiffs.

137.    Plaintiffs are entitled to recover their attorney's fees and costs.

### SECOND CAUSE OF ACTION
**Secondary Copyright Infringement (17 U.S.C. § 101 *et seq.*)**

138.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

139.    Although it is clear that IA is directly liable for copyright infringement, Plaintiffs also bring claims for secondary liability, in the alternative, to the extent IA attempts to evade responsibility for its own direct liability by blaming the conduct on others, such as users of the Website.

140.     Defendant is secondarily liable under theories of contributory liability, inducement liability, and vicarious liability for the underlying reproduction, distribution, public display, and public performance of Plaintiffs' Works, as well as the making of infringing derivatives of Plaintiffs' Works.

141.     Defendant is contributorily liable as it knows, or has reason to know, that Plaintiffs' Works are infringed each time Plaintiffs' Works are scanned, uploaded, downloaded, publicly displayed, or publicly performed in connection with the Website, and it has caused and/or materially contributed to those infringements.

142.     Defendant is also secondarily liable under a theory of inducement.  Defendant is responsible at every level for scanning copyrighted books, including the Works, uploading the scanned copies to its Website, and then distributing, displaying, and performing the works publicly.  Defendant could take simple measures to prevent further infringement, such as by not scanning books under copyright, limiting the books on the Website to works in the public domain, or obtaining licenses to distribute ebooks.  Instead, the infringement of copyrighted books, including Plaintiffs' Works, is a central focus of Defendant's business strategy.  Defendant affirmatively encourages individuals to use the Website to infringe copyright, including by downloading digital copies of copyright protected books without a license, including the Works.

143.     Further, Defendant is vicariously liable for copyright infringement because it has the right and ability to supervise the infringement of its users and possesses a financial interest in the infringement.  As detailed above, Defendant has the right and ability to supervise the infringement of Plaintiffs' copyrighted books, including the Works.  Defendant provides the sites and facilities on which the infringing activity occur.  Defendant can stop allowing users of the

49

A-153

Website to download Plaintiffs' copyrighted books, including the Works. In brief, Defendant is in charge of the Website.

144. Defendant possesses an obvious and direct financial interest in the infringement. The uploading and downloading of increasing numbers of copyrighted works to the Open Library, including the Works, enhances the reputation of Defendant and its Website as a comprehensive source of free digital books. It draws more user registrations from people wishing to download from the Website and more donations of funds and books. The infringing files also increase the number of visitors to the Website, in turn increasing the numbers of people who view the link to purchase books at the Defendant's affiliate, Better World Books, which as it acquires more books, provides them to IA for scanning. Further, Defendant obtains a direct financial benefit by charging for the costs of scanning copyrighted books, which are then uploaded to the Website.

145. Each infringement of the rights of Plaintiffs in one of the Works constitutes a separate and distinct act of infringement.

146. Defendant's infringement of Plaintiffs' copyrights, including Plaintiffs' Works, is willful.

147. Upon information and belief, as a direct and proximate result of its wrongful conduct, Defendant has and will obtain benefits, including, but not limited to, profits to which Defendant is not entitled.

148. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendant will cause further irreparable injury to Plaintiffs.

149.    As a direct and proximate result of Defendant's infringement, Plaintiffs are entitled to recover statutory damages, pursuant to 17 U.S.C. § 504(c), with respect to each work infringed.  Alternatively, at the election of Plaintiffs, pursuant to 17 U.S.C. § 504(b), Plaintiffs are further entitled to recover from Defendant the damages they have sustained and will sustain, as well as any gains, profits, and advantages obtained by IA as a result of its acts of infringement alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Plaintiffs.

150.    Plaintiffs are entitled to recover their attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Hachette, HarperCollins, Penguin Random House, and Wiley, respectfully request judgment against Defendant Internet Archive as follows:

A.    Declaring that the practices of Internet Archive in connection with "Open Library" constitute willful copyright infringement;

B.    Issuing a preliminary and permanent injunction enjoining Internet Archive, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in active concert or participation with it, from directly or indirectly reproducing, distributing, publicly displaying, creating derivative works, otherwise infringing, or causing, enabling, facilitating, encouraging, or inducing the reproduction, distribution, public display, creation of derivative works, or other infringement of, any of the respective copyrights owned or exclusively controlled, in whole or in part, by Plaintiffs, whether now in existence or hereinafter created, and ordering that all unlawful copies be destroyed;

C.   Entering judgment for Plaintiffs against Internet Archive for statutory damages in an amount based upon Internet Archive's willful acts of infringement of the Works, as alleged above, pursuant to the Copyright Act, 17 U.S.C. §§ 101, *et seq*.;

D.   Alternatively, ordering Internet Archive to render a full and complete accounting to Plaintiffs of Internet Archive's profits, gains, advantages, or the value of business opportunities received from the foregoing acts of infringement of the Works and entering judgment for Plaintiffs against Internet Archive for all damages suffered by Plaintiffs and for any profits or gain by Internet Archive attributable to the infringements alleged above of Plaintiffs' copyrights in amounts to be determined at trial;

E.   Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505;

F.   Awarding Plaintiffs pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

G.   Granting such other further and different relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable in this action.

Dated: June 1, 2020
         New York, New York

                              DAVIS WRIGHT TREMAINE LLP

                              */s/ Elizabeth A. McNamara*
                              Elizabeth A. McNamara
                              Linda Steinman

John M. Browning
Meredith I. Santana
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      meredithsantana@dwt.com


OPPENHEIM + ZEBRAK, LLP

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice* motion forthcoming)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com

*Attorneys for Hachette Book Group, Inc.,*
*HarperCollins Publishers LLC, John Wiley & Sons,*
*Inc., and Penguin Random House LLC*

53

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC, | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive, | |
| Defendants. | |

**DEFENDANT INTERNET ARCHIVE'S ANSWER AND AFFIRMATIVE DEFENSES**
**TO THE COMPLAINT**

Defendant Internet Archive, by its undersigned counsel, hereby answers the Complaint of Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC (collectively, "Plaintiffs") as follows, based on information reasonably available to the Internet Archive.

## PRELIMINARY STATEMENT

The Internet Archive, a 501(c)(3) public charity, is a nonprofit library that has had one guiding mission for almost 25 years: to provide universal access to all knowledge. It is a Library of Alexandria for the twenty-first century that, thanks to digital technologies and the Internet, excels in a way the Library of Alexandria never could. Through the Internet Archive, people who do not live in world capitals can access the same cultural and informational resources as those who do.

The Internet Archive does what libraries have always done: buy, collect, preserve, and share our common culture. In furtherance of that mission, the Internet Archive has received grant funding from the National Endowment for the Humanities, the National Science Foundation, and the federal government's Institute of Museum and Library Services, among many other sources. Many libraries and archives, including the Library of Congress, Boston Public Library, University of Illinois at Urbana-Champaign, and smaller community libraries like the Allen County Public Library trust the Internet Archive to digitize books and other materials in their collections in order to preserve physical texts and to facilitate public access. The Internet Archive is part of a network of libraries around the world—each of which is using digital technologies to meet the many challenges of serving patrons with diverse needs and differing abilities and to ensure that the growing storehouse of human creativity is not lost because no one has the capacity to preserve it.

Like Plaintiffs, the Internet Archive believes that "[b]ooks are a cornerstone of our culture and system of democratic self-government" and "play a critical role in education." Accordingly, democratizing access to information, and facilitating access to books in particular, has been a core part of the Internet Archive's mission for decades. But, for many people,

1

distance, time, cost, or disability pose daunting and sometimes insurmountable barriers to accessing physical books. Digitizing and offering books online for borrowing unlocks them for communities with limited or no access, creating a lifeline to trusted information. Readers in the Internet age need a comprehensive library that meets them where they are—an online space that welcomes everyone to use its resources, while respecting readers' privacy and dignity.

To make this vision of a comprehensive Internet library a reality, the Internet Archive offers digitized books in a variety of ways. Books published prior to 1924 can be downloaded without restriction, and people with visual impairments can access more recent books using specially-designed encrypted technologies. The corpus of digitized books is used by data scientists to do computational analysis of texts, yielding a broader picture of human thought. To mirror traditional library lending online for everyone else, the Internet Archive allows patrons to borrow modern books via a process called Controlled Digital Lending ("CDL").

Under CDL, the Internet Archive and other libraries make and lend out digital scans of physical books in their collections. Replicating longstanding brick-and-mortar practice, only one person can borrow one copy at a time. With the support and participation of hundreds of other libraries, the Internet Archive has been digitizing books lawfully acquired through purchase or donation and, since 2011, lending those digitized books on this own-to-loan basis. The Internet Archive loans books to its patrons using the same industry-standard technical protections that publishers themselves use to make books available electronically. Libraries have collectively paid publishers billions of dollars for the books in their print collections and are investing enormous resources in digitization in order to preserve those texts. CDL helps them take the next step by making sure the public can make full use of the books that libraries have bought.

This activity is fundamentally the same as traditional library lending and poses no new harm to authors or the publishing industry. In fact, the Internet Archive fosters research and learning by making sure people all over the world can access books and by keeping books in circulation when their publishers have lost interest in providing access. Nevertheless, where authors or publishers wish to deny the public access to their works through CDL, the Internet

Archive honors those requests. (All of the works at issue in this case have been removed from the Internet Archive's websites.)

The Internet Archive has made careful efforts to ensure its uses are lawful. The Internet Archive's CDL program is sheltered by the fair use doctrine, buttressed by traditional library protections. Specifically, the project serves the public interest in preservation, access and research—all classic fair use purposes. Every book in the collection has already been published and most are out of print. Patrons can borrow and read entire volumes, to be sure, but that is what it means to check a book out from a library. As for its effect on the market for the works in question, the books have already been bought and paid for by the libraries that own them. The public derives tremendous benefit from the program, and rights holders will gain nothing if the public is deprived of this resource.

During the early days of the COVID-19 crisis, in response to urgent pleas from teachers and librarians whose students and patrons had been ordered to stay at home, the Internet Archive decided to temporarily permit lending that could have exceeded the one-to-one owned-to-loaned ratio. With millions of print books locked away, digital lending was the only practical way to get books to those who needed them. The Internet Archive called this program the "National Emergency Library" and planned to discontinue it once the need had passed. Twelve weeks later, other options had emerged to fill the gap, and the Internet Archive was able to return to the traditional CDL approach.

Contrary to the publishers' accusations, the Internet Archive and the hundreds of libraries and archives that support it are not pirates or thieves. They are librarians, striving to serve their patrons online just as they have done for centuries in the brick-and-mortar world. Copyright law does not stand in the way of libraries' right to lend, and patrons' right to borrow, the books that libraries own.

3

## NATURE OF THE ACTION[1]

1.      The Internet Archive admits that the Plaintiffs allege copyright infringement, that Internet Archive is a named Defendant, and that the Complaint alleges facts concerning "Open Library" and/or "National Emergency Library."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

2.      Denied.

3.      The Internet Archive admits that more than 1.3 million books are available on archive.org for one patron to borrow at a time.  The Internet Archive denies the remaining allegations of this paragraph.

4.      Admitted.

5.      The Internet Archive admits that, in 1787, the Framers adopted the Copyright Clause of the Constitution, explicitly authorizing Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const., Art. I, § 8, cl. 8.  The Internet Archive further admits that, in 1790, the First Congress enacted the first Copyright Act.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

6.      The Internet Archive admits that books from a variety of genres are available to patrons for borrowing on archive.org.  The Internet Archive denies the remaining allegations of this paragraph.

7.      Denied.

8.      Denied.

9.      Denied.

10.      Denied.

---

[1] Internet Archive neither admits nor denies the contents of the various headings and subheadings in the Complaint, which are reproduced herein solely for convenience.

4

11.     Denied.

12.     The Internet Archive admits that libraries are trusted institutions that serve communities.  The Internet Archive admits that a study authored by the Copyright Office titled "Legal Issues in Mass Digitization" published in October 2011 contains the statement "The Section 108 exception does not contemplate mass digitization."  The Internet Archive denies the remaining allegations of this paragraph.

13.     Denied.

14.     Denied.

## THE PARTIES

### A.     Plaintiffs

15.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

16.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

17.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

18.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

19.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

20.     The Internet Archive admits that the works identified in Exhibit A to the Complaint were at one time available for patrons to borrow via archive.org.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

21.     The Internet Archive lacks sufficient knowledge or information to admit or deny

the allegations in this paragraph and on that basis denies them.

22.    The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

**B.    Defendant**

23.    Admitted.

24.    The Internet Archive admits that it is registered with the New York Department of State to transact business and accept service of process in the State of New York.  The Internet Archive further admits that some of its patrons live in New York.  The Internet Archive further admits that some New York libraries have engaged the Internet Archive to digitize books for them.  The Internet Archive further admits that some of its donors are located in New York.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

25.    The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

26.    The Internet Archive admits that it provides some services to other nonprofit institutions and that those institutions help defray the costs of providing those services.  The Internet Archive admits that over the last 10 years, the Internet Archive has received donations, grants, and other revenue totaling more than $100 million.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

27.    The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

## JURISDICTION AND VENUE

28.    The Internet Archive does not contest that this Court may exert subject matter jurisdiction over Plaintiffs' claims.  The remaining allegations in this paragraph are legal

conclusions to which no response is required. To the extent any response is required, the Internet Archive denies the allegations in this paragraph.

29. For the purposes of this action only, the Internet Archive does not contest it is subject to personal jurisdiction in New York State. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

30. For the purposes of this action only, the Internet Archive does not contest it is subject to personal jurisdiction in New York State. The Internet Archive admits that it is registered to do business in New York State. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

31. For this purposes of this action only, the Internet Archive admits that venue is proper in this District.

## FACTUAL BACKGROUND

**A.     The Book Publishing Ecosystem**

  **i.     Publishers and Authors Rely on Copyright Law to Create Functioning Markets for Books**

32. The Internet Archive admits that books are a cornerstone of our culture and system of democratic self-government and play a critical role in education. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

33. The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

34. Internet Archive lacks sufficient knowledge or information to admit or deny the

7

allegations in this paragraph and on that basis denies them.

35.     The Internet Archive admits that the first Copyright Act was passed in 1790, that there is a Copyright Clause in the Constitution, and that a subsequent Copyright Act was passed in 1976.  The remaining allegations in this paragraph are legal conclusions to which no response is required.  To the extent any response is required, the Internet Archive denies the allegations in this paragraph.

36.     Denied.

37.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

38.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

### ii.     The Development of Functioning Markets for Ebooks

39.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

40.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

41.     The Internet Archive admits that publishers sell copies of print books without any restrictions.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

42.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

43.     The Internet Archive admits that Congress passed the DMCA in 1998.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

44.     The Internet Archive lacks sufficient knowledge or information to admit or deny

the remaining allegations in this paragraph and on that basis denies them.

45.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

### iii.     The Established Market Equilibrium Between Authors, Publishers, and Libraries

46.     The Internet Archive admits that public libraries are among the most cherished institutions in this country.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

47.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

48.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

### iv.     Plaintiffs and Libraries Reacted Rapidly to Ensure Library Patrons Have Access to Books During the COVID-19 Lockdown

49.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

50.     Denied.

51.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

### B.     Internet Archive Unlawfully Disrupts the Book Publishing Ecosystem by Infringing Copyright on an Industrial Scale

52.     Denied.

### i.     Internet Archive

53.     The Internet Archive admits that Brewster Kahle founded the Internet Archive in

9

1996.  The Internet Archive further admits that it provides the Wayback Machine and digitization of public domain materials.  The Internet Archive further admits that such services are excluded from Plaintiffs' allegations in this lawsuit.  The Internet Archive denies the remaining allegations of this paragraph.

54.     The Internet Archive admits that its headquarters are located in San Francisco, but denies that the corner of Funston and Clement Streets is an "exclusive area."  The Internet Archive further admits that, as listed on its 2017 tax filings, it employed 150 employees in calendar year 2017.  The Internet Archive admits that Better World Libraries is a nonprofit organization that owns book seller Better World Books.  The Internet Archive denies the remaining allegations of this paragraph.

55.     The Internet Archive admits that it has received grants from the Kahle/Austin Foundation.  The Internet Archive admits that the Kahle/Austin Foundation was established by Brewster Kahle and his wife.  The Internet Archive admits that its programs are funded by a variety of philanthropic entities.  The Internet Archive lacks sufficient knowledge or information to admit or deny any remaining allegations in this paragraph and on that basis denies them.

56.     The Internet Archive admits that income from offering services and from donations help defray costs the Internet Archive incurs.  The Internet Archive further admits that it provides book scanning and digitization to institutions nationwide.  The Internet Archive admits that the New York Public Library hosted the Internet Archive's digitization activities in New York at one time.  The Internet Archive denies the remaining allegations in this paragraph.

### ii.     The Open Library

57.     The Internet Archive admits that it started Open Library in 2006 with the goal of providing "one web page for every book published."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

58.     Denied.

59.     Denied.

10

60.     Denied.

61.     The Internet Archive admits that an article titled *Where to find what's disappeared online, and a whole lot more: the Internet Archive* by Mary Kay Magistad is dated February 23, 2017.  The Internet Archive further admits that this article contains the following quote attributed to Brewster Kahle: "We're trying to build a Library of Alexandria, Version 2, so can we make all the published works of humankind available to people, permanently. If you're curious enough to want to have access, can we make it available to all the books, music, video, web pages, software, lectures, available to anybody wanting to have access."  The Internet Archive lacks sufficient knowledge or information to admit or deny any remaining allegations in this paragraph and on that basis denies them.

62.     The Internet Archive admits that an article titled *Internet Archive Expands Partnerships of Open Libraries Project* by Matt Enis is dated May 2, 2019.  The Internet Archive further admits that this article states that "The organization's goal is to ramp up digitization to 500,000 books per year," and the Internet Archive further admits that the article characterizes a component of that goal is "to have more than four million books online for the public."  The Internet Archive further admits that the article attributes the quote "to have more than four million books online for the public" to Chris Freeland, whom the article identifies as the director of Open Libraries.  The Internet Archive lacks sufficient knowledge or information to admit or deny any remaining allegations in this paragraph and on that basis denies them.

63.     Denied.

64.     The Internet Archive admits that *The Man Who Solved the Market: How Jim Simons Launched the Quant Revolution* by Gregory Zuckerman is listed in Exhibit A to the Complaint.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

65.     Denied.

66.     Denied.

11

### iii.    The User Experience of the Website

67.    The Internet Archive admits that a patron may sign up for an account using an Internet connection.  The Internet Archive further admits that, once a patron has created an account, the patron can borrow books.  The Internet Archive denies the remaining allegations of this paragraph.

68.    Admitted.

69.    The Internet Archive admits that clicking on a book title takes the patron to the title's webpage on the Open Library website, which contains a picture of the cover, a description of the book and bibliographic information, such as the publication date and the WorldCat catalog number.  The Internet Archive admits that the image in Paragraph 69 of the Complaint appears to be a screenshot of the Open Library page for the book *Blink*.  The Internet Archive admits that this screenshot contains links to book retailers.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

70.    The Internet Archive admits that in the screenshot in Paragraph 69 of the Complaint, the first link to a book retailer is to Better World Books.  The Internet Archive further admits that Better World Books is an online seller of books which is owned by Better World Libraries, a nonprofit organization.  The Internet Archive denies the remaining allegations of this paragraph.

71.    The Internet Archive admits that it labels some books on Open Library with the terms "read" and "borrow."  The Internet Archive further admits that patrons may "read" or borrow" a book if that book is available on archive.org.  The Internet Archive further admits that patrons who choose books available to "read" can download the digitized book in a variety of digital formats, including as a .pdf file.  The Internet Archive further admits that there is no limit on the number of patrons that can download books available to "read" on archive.org.  The Internet Archive further admits that books available to "read" on archive.org lack DRM restrictions.  The Internet Archive further admits that patrons can access books available on

12

archive.org to "read" using the BookReader interface. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

72. The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

73. The Internet Archive admits that books available for patrons to borrow on archive.org are not known by the Internet Archive to be in the public domain. The Internet Archive denies the remaining allegations of this paragraph.

74. The Internet Archive admits that a patron is currently limited to borrowing ten books at a time, to the extent those ten books are available to borrow from archive.org. The Internet Archive further admits that some books are available to borrow from archive.org for two weeks. The Internet Archive further admits that when a patron has borrowed ten books that are available to borrow from archive.org, the patron must return one of these borrowed books before he or she may borrow another book that is available to borrow from archive.org. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

75. The Internet Archive admits that it enforces an "owned to loaned" ratio that restricts the number of patrons who can at the same time borrow a book that is available to borrow from archive.org. The Internet Archive further admits that its patrons are put on a waitlist when there are no available copies of a book to borrow from archive.org. The Internet Archive denies the remaining allegations in this paragraph.

76. The Internet Archive admits that patrons that have checked out a book can read it on the BookReader interface. The Internet Archive further admits that this interface operates in a

13

web browser.  The Internet Archive further admits that the image in Paragraph 76 purports to be a screenshot of pages 166 and 167 of the book *Blink*, viewable on a web browser.  The Internet Archive further admits that, in BookReader, patrons can turn pages by clicking on the pages or using left- and right-facing triangles at the bottom of the screen.  The Internet Archive further admits that, in BookReader, patrons have the option to click a button to hear the text of a book read aloud.  The remaining allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

77.     The Internet Archive admits that Adobe Digital Editions ("ADE") facilitates patron access to a borrowed book.  The Internet Archive further admits that ADE files are protected by DRM technology that restricts copying and allows patrons to access the file during the fourteen-day borrowing period, after which time the patron can no longer open or access the file.  The Internet Archive denies the remaining allegations in this paragraph.

78.     The Internet Archive admits that patrons can borrow books available to "borrow" from archive.org in two ADE formats: "Encrypted Adobe PDF" and "Encrypted Adobe ePub." The Internet Archive admits that the image in Paragraph 78 purports to be a screenshot of a page from a book presented using ADE.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

79.     The Internet Archive admits that patrons can read books they borrow on capable devices and that examples of such devices include smartphones, tablets, and e-readers.  The Internet Archive admits that patrons can access the BookReader interface on mobile devices.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

### iv.     The Open Library Is Not a Library, It Is an Unlicensed Aggregator and Pirate Site

80.     The Internet Archive admits that the website OpenLibrary.org states that Open

14

Library is "an accredited California State Library run by the non-profit the Internet Archive." The Internet Archive denies any remaining allegations in this paragraph.

81.     The Internet Archive admits that it received a Library Services and Technology Act ("LSTA") grant in 2010/2011.  The Internet Archive further admits that, in order to be eligible for such a grant, the Internet Archive must meet certain eligibility requirements.  The Internet Archive further admits that one of those eligibility requirements is that it be a library. The Internet Archive denies any remaining allegations in this paragraph.

82.     Denied.

83.     The Internet Archive admits that the image in Paragraph 83 of the Complaint appears to be a screenshot of part of the homepage of OpenLibrary.org.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

84.     The Internet Archive admits that the image in Paragraph 83 of the Complaint appears to be a screenshot of part of the homepage of OpenLibrary.org.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

> **v.      IA's Industrial Book-Scanning Machine and Global Scanning Operations**

85.     Denied.

86.     The Internet Archive admits that it developed the Scribe System and invented the Scribe scanner in order to digitize printed materials.  The Internet Archive further admits that individuals operate the Scribe scanners to digitize printed materials and that the images in Paragraph 86 are of individuals using Scribe scanners to digitize printed materials.  The Internet Archive denies the remaining allegations of this paragraph.

87.     The Internet Archive admits that it has employed more than fifty employees to work at locations with Scribe scanners and that those employees are responsible for digitizing physical materials.  The Internet Archive further admits that volunteers have also digitized

15

A-173

materials.  The Internet Archive further admits that it can have 3,000 books digitized in a day when it is operating at full capacity.  The Internet Archive denies the remaining allegations in this paragraph.

88.     The Internet Archive admits that, in the past, it operated a digitization center housed at facilities provided by the New York Public Library in the Southern District of New York and that it digitized books there.  The Internet Archive further admits that some of the works listed in Exhibit A were digitized in New York.  The Internet Archive denies any remaining allegations in this paragraph.

89.     The Internet Archive admits that it digitizes materials using the Scribe scanner, which photographs each page of a physical book in order to make a digital version of the book.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

<div align="center">

**vi.     Internet Archive Shifts the Costs of Its Illegal Book Digitization Project Onto Publishers, Libraries, Open Library Users, and Other Third Parties**

</div>

90.     Denied.

91.     The Internet Archive admits that archive.org is an altruistic non-commercial enterprise.  The Internet Archive denies the remaining allegations of this paragraph.

<div align="center">

**a.      Internet Archive is Paid Millions of Dollars to Infringe Copyrighted Books and Put Them on the Open Library**

</div>

92.     The Internet Archive admits that archive.org is an altruistic non-commercial enterprise.  The Internet Archive denies the remaining allegations of this paragraph.

93.     The Internet Archive admits that the blog post by Brewster Kahle titled *Internet Archive Staff and Covid-19: Work-at-Home for Most, Full-Pay Furlough and Medical for Scanners* and dated March 25, 2020 contains the quote "Libraries paying for our scanning services is a major source of earned income for the Internet Archive."  Internet Archive denies the remaining allegations in this paragraph.

<div align="center">

16

A-174

</div>

94.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

         **b.**     **Better World Books Feeds the Open Library with Copyrighted Books**

95.     Denied.

96.     The Internet Archive admits that the quote "will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books" appears in a press release accompanying the acquisition of Better World Books by Better World Libraries, a non-profit.  The Internet Archive denies that it is or is part of a "perfect closed loop system."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

97.     Denied.

         **c.**     **Users "Sponsor" Books that Internet Archive Wants to Infringe**

98.     The Internet Archive admits that it gives patrons the option to "sponsor" books.  The Internet Archive further admits that the image in Paragraph 98 appears to be a screenshot of the Open Library homepage.  The Internet Archive denies the remaining allegations in this paragraph.

99.     The Internet Archive admits that the image in Paragraph 99 appears to be a screenshot of a page for the book *Back to the Batcave*.  The Internet Archive further admits clicking on a "Sponsor" button on a book's page opens the sponsorship page for that book and that the sponsorship page for a book states that a "tax deductible donation can add this book to the Internet Archive's lending library, forever" and lists a cost to sponsor the book.  The Internet Archive denies any remaining allegations in this paragraph.

100.     The Internet Archive admits that the image in Paragraph 99 appears to be a

screenshot of a page for the book *Back to the Batcave*, written by Adam West. The Internet Archive further admits that the sponsorship cost of $93.12 appears in the image in Paragraph 99.To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations. The Internet Archive denies the remaining allegations in this paragraph.

101.    Denied.

102.    Denied.

**d.      Internet Archive Absorbs Entire Libraries for the Website**

103.    The Internet Archive admits that a May 2019 article quotes Chris Freeland as saying IA's acquisition program "involves collecting donations of in-copyright materials from libraries and booksellers, digitizing this content in [IA's] scanning center in Cebu, the Philippines, and then storing the physical copies in archive facilities in Richmond, CA." The Internet Archive further admits that Chris Freeland is director of Open Libraries. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

104.    The Internet Archive admits that physical books that have been digitized for the purposes of providing access to patrons through archive.org are stored in archive facilities in Richmond, California. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations. The Internet Archive denies the remaining allegations in this paragraph.

105.    Denied. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

106.    Denied.

**vii.     Controlled Digital Lending**

107.    The Internet Archive admits that Controlled Digital Lending is not copyright infringement. The Internet Archive denies any remaining allegations in this paragraph.

108.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.  The remaining allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, The Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

109.     The Internet Archive admits that Jason Scott tweeted "Only one or two unique copies are kept – duplicates (which have increased over time) are donated to various charities or non-profits.  The books are stored at the physical archive."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

110.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, The Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

111.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

112.     IA admits that the Digital Millennium Copyright Act (DMCA) Section 104 Report issued by the Copyright Office states: "Time, space, effort and cost no longer act as barriers to the movement of [digital] copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost."  IA further admits that this report is available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.  IA lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, IA denies the allegations.

113.     Denied.

19

viii.    **The National Emergency Library**

114.    The Internet Archive admits the National Emergency Library was announced on March 24, 2020.  The Internet Archive further admits that the National Emergency Library was made available to the public in response to the pandemic.  To the extent allegations in this paragraph state a legal conclusion they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

115.    The Internet Archive admits that a blog post written by Brewster Kahle dated April 7, 2020 states: "We moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

116.    To the extent allegations in this paragraph state legal conclusions they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

117.    To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

118.    To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

C.    **Defendant's Infringement Causes Harm to Publishers**

119.    Denied.

120.    Denied.

121.    Denied.

122.    Denied.

20

123.    Denied.

124.    Denied.

125.    The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

126.    Denied.

127.    Denied.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**
### Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)

128.    The Internet Archive repeats and realleges each and every response to Plaintiffs' foregoing allegations.

129.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

130.    The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

131.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

132.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

133.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

21

134.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

135.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

136.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

137.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

## SECOND CAUSE OF ACTION
### Secondary Copyright Infringement (17 U.S.C. § 101 *et seq.*)

138.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

139.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

140.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

141.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

142.     The allegations in this paragraph state legal conclusions and therefore do not

require a response.  To the extent a response is required, the Internet Archive denies the allegations.

143.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

144.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

145.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

146.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

147.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

148.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

149.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

150.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

## PRAYER FOR RELIEF

In response to the Prayer for Relief, the Internet Archive denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

In further answer to the allegations made by Plaintiffs in the Complaint, the Internet Archive asserts the following affirmative defenses. The Internet Archive does not concede that it has the burden of proof on the defenses listed below.

### First Affirmative Defense
### (*Failure to State a Claim*)

The Complaint fails to state a claim on which relief can be granted.

### Second Affirmative Defense
### (*Fair Use*)

To the extent there was any use of Plaintiffs' copyrighted materials, such use is protected by the Fair Use Doctrine, including under 17 U.S.C. § 107.

### Third Affirmative Defense
### (*First Sale Doctrine*)

Plaintiffs' claims are barred in whole or in part by the First Sale Doctrine, including under 17 U.S.C. § 109.

### Fourth Affirmative Defense
### (*Safe Harbor*)

To the extent they arise by reason of the storage at the direction of a user of allegedly infringing material, Plaintiffs' claims are barred in whole or in part by 17 U.S.C. § 512(c).

### Fifth Affirmative Defense
### (*No Statutory Damages*)

Pursuant to 17 U.S.C. § 504(c)(2), Plaintiffs are not entitled to statutory damages, and statutory damages must be remitted, because the Internet Archive believed and had reasonable

24

A-182

grounds for believing that the accused use of the copyrighted work was a fair use, including under section 107, and the Internet Archive is an institution, library, or archives accused of having infringed by reproducing works in copies or phonorecords.

### Sixth Affirmative Defense
*(Statutes of Limitations)*

Plaintiffs' remedies are barred at least in part by the applicable statutes of limitations under 17 U.S.C. § 507(b).

### Seventh Affirmative Defense
*(Laches)*

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

### PRAYER FOR RELIEF

WHEREFORE, the Internet Archive respectfully prays that the Court:

1. Deny Plaintiffs' prayer for relief in it its entirety;

2. Dismiss the Complaint with prejudice and enter judgment in favor of IA;

3. Award the Internet Archive its attorneys' fees and costs incurred in this action, and any other amounts recoverable under law; and

4. Award the Internet Archive such other and further relief as the Court deems just and equitable.

The Internet Archive hereby demands a trial by jury in this action.

Dated: July 28, 2020                    DURIE TANGRI LLP

                                        By: _____/s/ Joseph C. Gratz_____
                                            JOSEPH C. GRATZ (*Pro Hac Vice*)
                                            JESSICA E. LANIER (*Pro Hac Vice*)
                                            ADITYA V. KAMDAR (*Pro Hac Vice*)

25

217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com

ALLYSON R. BENNETT (*Pro Hac Vice*)
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
abennett@durietangri.com

CORYNNE MCSHERRY (*Pro Hac Vice*)
KIT WALSH (*Pro Hac Vice*)
CARA GAGLIANO  (*Pro Hac Vice*)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant INTERNET ARCHIVE

26

A-184

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2020 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

<div align="right">

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

</div>

27

A-185

# Durie Tangri

Joseph C. Gratz
415-376-6407 (direct)
415-362-6666 (main)
jgratz@durietangri.com

August 9, 2021

<u>**VIA ECF**</u>

Hon. John G. Koeltl
U.S. District Judge
Daniel Patrick Moynihan
United States Courthouse
Courtroom 14A
500 Pearl St.
New York, NY 10007-1312

Re:  *Hachette Book Group, Inc. et al. v. Internet Archive*
     Case No. 1:20-CV-04160-JGK

Your Honor:

Pursuant to Local Civil Rule 37.2, Defendant Internet Archive respectfully requests a pre-motion discovery conference regarding a motion to compel the production of information regarding the commercial performance of books published by Plaintiffs.

In the above-captioned lawsuit, Plaintiffs contend that the Internet Archive infringed Plaintiffs' copyrights by the non-profit digital lending of library books.  The Internet Archive maintains that the challenged lending constitutes fair use under 17 U.S.C. § 107.

In considering fair use, one factor courts consider is "the effect of the use upon the potential market for or value of the copyrighted work."  Plaintiffs claim that the Internet Archive's digital library lending has a negative effect on the market for or value of the works.  The Internet Archive disagrees, and wishes to bring forward evidence showing that lending had little or no effect on the commercial performance of the books being lent, compared to books that were not lent.  "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).  The Internet Archive submits this letter-motion in order to gather that evidence.

Specifically, in order to show that lending had little or no effect on commercial performance, the Internet Archive wishes to compare the commercial performance of books that were available for digital lending with books that were not available for digital lending.  The Internet Archive has requested data

Hon. John G. Koeltl
August 9, 2021
Page 2

about the commercial performance[1] of all of Plaintiffs' books, broken down by month, since 2011. Plaintiffs have provided some commercial performance data, but (1) Plaintiffs have refused to provide data about books other than the works-in-suit, and (2) the data they have provided is not broken down by month. For reasons explained below, Plaintiffs can and should produce this data, and the Internet Archive asks that this Court compel them to do so.

> **A.  Commercial performance data about books other than the works-in-suit is necessary to understand whether lending had any effect on commercial performance.**

In order to argue that the challenged library lending practice did not affect commercial performance, one needs commercial performance data not only for the books that were lent out, but also of other books that were not loaned. Without that data, the Internet Archive has nothing to compare. *See, e.g.*, *Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 261 (S.D.N.Y. 2008) (granting motion to compel production of data about all videos not accused of infringement because such data was necessary "to compare the attractiveness of allegedly infringing videos with that of non-infringing videos.").

Plaintiffs object that data about other books would be irrelevant. They have argued that, because there are too many other factors that could affect their commercial performance, the data won't show whether the Internet Archive's digital library lending affected commercial performance. We have no doubt that Plaintiffs will press that line of argument in cross-examination of the Internet Archive's witnesses, but such estimates are a necessary part of litigation about alleged copyright infringement. *See, e.g.*, *Davis v. The Gap, Inc.*, 246 F.3d 152, 166–67 (2d Cir. 2001) ("Many of the accepted methods of calculating copyright damages require the court to make uncertain estimates in the realm contrary to fact."). Plaintiffs' line of argument provides no justification for withholding the data necessary to perform the comparison in the first place.

Plaintiffs also object that producing data about *all* other books would be unduly burdensome, because there are only 127 works-in-suit. The Internet Archive agrees that the comparison does not require each and every book; instead, it requires, for each work-in-suit, one or more comparable books that were not available for digital lending at the same time as that work-in-suit. One way to identify potentially comparable books would be to identify books whose commercial performance was very similar before either book was made available for digital lending. But Plaintiffs, who are in possession of the data one would need to do that analysis, have declined to identify books they regard as comparable—because, as discussed above, they take the position that no book is comparable to any other book. Given this refusal, Plaintiffs must produce data about all books, so that the Internet Archive can identify books it

---

[1]The types of commercial performance data the Internet Archive seeks are: the number of physical copies embodying works by distribution channel, the prices for those physical copies, the number of ebooks embodying works by distribution channel, the number of ebook loans divided by distribution channel, prices for any transaction related to ebooks, income from sales of physical books by distribution channel, and income from ebook transactions by distribution channel. RFPs 20-22, 60-67.

Hon. John G. Koeltl
August 9, 2021
Page 3

regards as comparable, and the parties can then debate, on a level playing field, whether such books are or are not comparable.

Nor is there any particular burden in retrieving the information requested. This is commercial data stored in databases, indexed by book. Plaintiffs were able to provide data about the works-in-suit by accessing such databases; this motion simply seeks the result of querying the same systems for a larger set of books.

**B.     Plaintiffs must produce *monthly* commercial performance data, not just annual data.**

Hachette, Penguin Random House, HarperCollins, and Wiley have produced annual commercial performance data for the works-in-suit. They do not contend that monthly data does not exist; they contend only that producing monthly data would be more difficult, so they have not produced it. Indeed, Hachette produced monthly data for 2020, but not for the other requested years. And, of course, as discussed above, Plaintiffs have not produced any data for books that are not works-in-suit.

Monthly data is necessary because each book began to be available for digital lending on a particular known date, so it makes sense to compare the commercial performance *before* that particular date with the commercial performance *after* that date. Purely annual data does not provide enough detail, particularly because sales of a particular book change so drastically within a year. (*The New York Times* publishes its bestseller lists weekly, after all, for this reason.)

Monthly data is also necessary because one issue in the case is whether commercial performance was affected differently during the National Emergency Library. This was the approximately three-month period, during the first wave of shelter-in-place orders that shuttered schools and libraries, when the Internet Archive made books available for lending without imposing the strict one-to-one "paper-copies-owned-to-digital-copies-loaned" ratio it imposes during normal operations. Without monthly data, there is no way to tell whether that short-lived emergency practice affected commercial performance.

For the reasons explained above, and pursuant to Local Rule 37.2 and Your Honor's Individual Practices Paragraphs 1F and 2B, Defendant respectfully requests a pre-motion conference with the Court to discuss: Plaintiffs' production of monthly commercial performance data since 2011 for all of their books in print during that period.

Respectfully submitted,

Joseph C. Gratz

JCG:co

LC2HHac1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  HACHETTE BOOK GROUP, INC., et
   al.,
4
                Plaintiffs,
5
        v.                          20 Civ. 4160 (JGK)(OTW)
6
   INTERNET ARCHIVE,
7
                Defendant.
8  ------------------------------x          Conference

9                                   New York, N.Y.
                                    December 2, 2021
10                                  4:15 p.m.

11 Before:

12                   HON. ONA T. WANG,

13                                  U.S. Magistrate Judge

14                      APPEARANCES

15 DAVIS WRIGHT TREMAINE LLP
        Attorneys for Plaintiffs
16 BY:  ELIZABETH A. McNAMARA
        -and-
17 OPPENHEIM & ZEBRAK, LLP
   BY:  SCOTT A. ZEBRAK
18
   DURIE TANGRI LLP
19      Attorneys for Defendant
   BY:  JOSEPH C. GRATZ
20

21

22

23

24

25

LC2HHac1

```
 1            (Case called)
 2            THE DEPUTY CLERK:  Counsel, please state your
 3    appearances for the record.
 4            MS. McNAMARA:  Yes, Good afternoon, your Honor.
 5    Elizabeth McNamara of Davis Wright Tremaine, for the
 6    plaintiffs.
 7            MR. ZEBRAK:  Good afternoon, your Honor.  Scott
 8    Zebrak, also for the plaintiffs, Oppenheim & Zebrak LLP.
 9            MR. GRATZ:  Good afternoon, your Honor.  Joseph Gratz
10    from Durie Tangri in San Francisco, on behalf of defendant
11    Internet Archive.
12            THE COURT:  We've had so many travelers come in today.
13            All right.  Welcome.  As you can see, we are still
14    observing full masking protocols in the courtroom.  Make sure
15    your mask is over your nose and mouth.  Addressing the Court,
16    you don't need to stand up.  Just make sure you speak into the
17    microphone and make sure that it's fairly close so the court
18    reporter can hear you.  OK.
19            All right.  Let's see.  Pulling up my agenda, let's
20    look at the issues in ECF 47 and the letters that followed.
21            Defendant seeks to compel production of information
22    regarding commercial performance of books published by
23    plaintiff.  I think I'm a little bit concerned that the request
24    is so broad, and maybe you can show me otherwise or show me
25    that you've tried to meet and confer and come up with something
```

 1   that's more proportional.  If anybody wants to talk about where

 2   the parties are at this point on this request.

 3          MR. GRATZ:  Absolutely, your Honor.  So I agree with

 4   you that production of monthly commercial performance data for

 5   every book of the plaintiffs is not the ideal and most narrowly

 6   tailored way to go about doing this analysis.  We would like,

 7   as the defendants, to do it a different way.  We would like to

 8   do it by comparing to comparable books, and in meet-and-confer

 9   that's what we proposed, that we try and reach a set of

10   mutually agreeable comparable books and have the data produced

11   for those.  Plaintiffs weren't interested in talking about

12   reaching an agreeable set of comparable books, based on their

13   view that no book is comparable with any other book for these

14   purposes, notwithstanding the fact that, based on what we've

15   learned in discovery, the plaintiffs compare books to the

16   performance of other books that they consider comparable all

17   the time for forecasting purposes.

18          So in order to be able to develop a view of what the

19   comparable books may be, we think we may need all of it.

20   Again, we don't think that's the most narrowly tailored way to

21   do it, but it is --

22          THE COURT:  I don't think that's proportional.  So go

23   on.

24          MR. GRATZ:  We don't think that's the most narrowly

25   tailored way to do it.  We would like to do it in a narrower

LC2HHac1

1    way.  We tried to meet and confer and find something narrower,

2    and plaintiffs weren't interested in trying to find some middle

3    ground on what books may be comparable.

4            THE COURT:  Before I let Ms. McNamara speak, I'm

5    admittedly not as well versed in the area of the law.  I assume

6    that you all are experts in this area of the law compared to

7    me.  But this does sound to me a lot like some of the disputes

8    I hear in employment cases where one is trying to find what the

9    comparators are, right, that -- what is similarly situated in

10   terms of the employee -- plaintiff employee and other -- when a

11   plaintiff is alleging, say, discrimination on the basis of sex

12   or race or something else, what is the appropriate comparator,

13   right?  This seems like it's the same general concept, and we

14   talk a lot about what's proportional.

15           So I guess now I want to ask Ms. McNamara to explain

16   to me what your thoughts are on this dispute.

17           MS. McNAMARA:  Thank you, your Honor.

18           Let me begin by underscoring I think you're correct in

19   saying what's being demanded here is just extraordinary and

20   clearly not proportional, but we need to take a step back, I

21   think, initially, and focus on the fact that the rationale for

22   this demand, however you establish the comparables, is that

23   they want to establish evidence that they believe might support

24   market harm or lack of market harm, and there's two means of

25   market harm that are primarily at issue in this litigation.

LC2HHac1

1    One is that Internet Archive is not paying the customary

2    license fee that actual libraries versus the Internet Archive

3    paid to acquire and distribute e-books.  And we've established,

4    and there's no dispute, that there's a thriving market for

5    licensing e-books to lending libraries.  Internet Archive just

6    refuses to pay that customary license fee.  This demand has

7    nothing to do with that form of economic harm.  That is

8    established, and I think the lens in looking on this and to

9    further underscore the lack of proportionality is the fact that

10   in the case they cited in support of this motion on *Davis v.*

11   *The Gap*, there's a reference to *Ringgold v. BET*, which is a

12   Second Circuit decision, where the court observed that the fact

13   that an infringement had little likelihood of adversely

14   affecting sales deserves little weight in the fair use analysis

15   against a plaintiff alleging appropriation without payment of a

16   customary license fee.

17          So that's the lens we need to look at this is that the

18   lost sales, which is the only thing they're focusing on with

19   this demand, in this context where we have a customary license

20   fee established in the market is given little weight in the

21   fair use analysis.  So with that predicate, we can step back,

22   and I think what's important here is that the plaintiffs have

23   already produced a massive amount of financial data concerning

24   the 127 representative works at issue in this litigation.  That

25   data includes more than 670,000 lines in an Excel spreadsheet.

LC2HHac1

1    That data allows them to provide the comparison that they're

2    seeking.  That data, for the most part, while it varies from

3    book to book but goes back as far back as 1996 for some of the

4    works, they can run a comparison of sales of those books prior

5    to the time they appeared on the Internet archive and after the

6    time they appeared on the Internet Archive and make whatever

7    argument they want to make about lost sales or lack of lost

8    sales.  And that is a comparison that is an apples-to-apples

9    comparison with the same books and the sales and pre- and

10   post-times on Internet Archive.

11        What they are proposing here is finding other books

12   that are supposedly comparable.  They want, in effect, to make

13   an apples-to-zebras comparison.  Mr. Gratz is correct when he

14   says that we have objected to identifying comparable books for

15   purposes of this type of comparison, because we can't do that,

16   nor do we really believe that you can, in fact, do that in any

17   coherent, concrete way.  These works, like, for example, the

18   works-in-suit include *Song of Solomon* by Toni Morrison, Sylvia

19   Plath, *The Bell Jar*, Salinger's *Catcher in the Rye*.  What other

20   novels, whether they had comparable sales or not, would be

21   deemed actually comparable to those books?

22        And no one can dispute, nor do they, that book sales

23   rise and fall based on myriad and random events.  An author

24   dies, often the sales go up.  An author gets arrested, the

25   sales go down.  They appear on Oprah, they go up.  The book is

LC2HHac1

1    made into a movie, there's myriad ways that sales are dictated,

2    and so being able to pick out of this choice and finding actual

3    coherent comparables makes no sense.

4         Now, the testimony that he's referencing from certain

5    witnesses, they have described and made it crystal clear that

6    it's an art, not a science.  That when they sometimes are

7    determining -- when they're trying to determine what advance to

8    pay an author, they sometimes run comparisons to kind of just

9    make a gist.  But it's like a back-of-the-envelope issue that

10   really doesn't have any kind of scientific proof, and what

11   they're trying to establish is evidence to put into a court

12   record showing comparable sales and an increase or loss.

13        Finally, I'll note, your Honor, on the burden here,

14   the burden here is beyond extraordinary, as your Honor has

15   already recognized.  This literally would take months in order

16   to gather.  There are multiple databases that the data would

17   have to be drawn from.  There will be literally billions of

18   lines of data concerning these works.  We're talking about a

19   half a million books published by these four publishers in the

20   ten-year period.  The burden would just be extraordinary.  We

21   don't know how to begin to find the comparables.

22        I end with underscoring, again, they have the data to

23   run comparables.  They have all this massive data, and we're at

24   a loss on why that isn't sufficient.

25        THE COURT:  All right.  What I'm hearing, and for my

LC2HHac1

```
 1    simple mind, is that you're also making a relevance argument
 2    and also that the data is not -- that the information that you
 3    would use to support sales calculations pre and post a book's
 4    appearance in the Internet Archive has already been provided?
 5               MS. McNAMARA:  Correct, your Honor.
 6               MR. GRATZ:  May I address those, your Honor?
 7               THE COURT:  Sure.
 8               MR. GRATZ:  As to relevance, there isn't any
 9    comparable license for what the Internet Archive is doing, that
10    is, owning a physical copy of a book, digitizing it, and
11    lending it to one patron per owned physical copy.  So you can't
12    just look to the license fee and say nothing else is important;
13    that is, if what Internet Archive did didn't affect at all the
14    revenues either from print sales, e-book sales, or library
15    lending licenses, that that just doesn't matter to the question
16    that the statute asks, the question being to what extent did
17    this have an effect on the market for or value of the
18    copyrighted work?
19               So as to relevance, we want to be able to say, and we
20    think we will be able to say, they didn't lose a dime.  They
21    didn't lose one licensing opportunity.  They made 100 percent
22    of their value; that is, this wasn't replacing transactions
23    that otherwise would have happened in a way that got them
24    money.  We think we can do that by showing that compared to
25    things that this wasn't happening to that are comparable,
```

LC2HHac1

1   there's no difference.

2          As to --

3          THE COURT:  Wait, wait.  How does Internet Archive

4   make its money?

5          MR. GRATZ:  Internet Archive does not make its money.

6   It's a 501(c)(3) public charity.  Internet Archive operates on

7   grants, including government grants that support what it does

8   in the public interest.

9          THE COURT:  All right.  The other thing I'm hearing --

10   I know I cut you off on the relevance argument, but I'm also

11   concerned about the burden.  Even if you got this information,

12   if you're talking about billions of lines, of 500,000 books,

13   how would you even analyze that?

14          MR. GRATZ:  Let me respond on burden and then

15   answer -- let me actually start by answering your Honor's

16   question and then move to burden.

17          We would analyze it using statistical software.  What

18   we want to do is look for books that had sales -- sales graphs

19   or things about their sales that looked pretty similar, looking

20   for, effectively, twins that are out there before they were

21   included in controlled digital lending through Internet Archive

22   and then see whether at the time that changed, the time they

23   started getting offered for controlled digital lending through

24   Internet Archive, whether one twin diverged from the other.

25   And we can't do that analysis, we can't find those twins,

LC2HHac1

 1    without the whole set of the population.  We're happy to try
 2    doing it some other way, that is, taking a random sample,
 3    seeing whether -- trying to find the twins some other way,
 4    taking a random sample of 127 other books and see how they
 5    match up.  That, I think, your Honor, is my answer on burden.
 6          One answer on burden, your Honor, is their witnesses
 7    have testified that this data's just sitting in a database.
 8    They can just pull it up; that is, they can just put in a book
 9    and get the data.  Doing that on a mass basis may be harder.
10    We're happy to talk about ways to lessen that burden.  But this
11    is not data that is in some inaccessible form.  Their witnesses
12    have testified that even the folks we are talking to are able
13    just, on their computers, to pull up this granularity of data.
14          MS. McNAMARA:  May I address that, your Honor, because
15    that isn't actually accurate?
16          THE COURT:  Just a moment.
17          MS. McNAMARA:  Sure.
18          THE COURT:  I guess before you address that,
19    Ms. McNamara, I have just another question for Mr. Gratz.
20          Why can't you compare each book and the data from
21    before and after that book appeared in the Internet Archive?
22    Why is that not sufficient, or why is that not an appropriate
23    first step at least?
24          MR. GRATZ:  So that is one thing that we can do, your
25    Honor.  Certainly, that's something I think we're going to try

LC2HHac1

1    and do.  One thing, by the way, that is hampering that is that

2    they didn't produce monthly data even for the books-in-suit,

3    which is another thing we're asking for in this motion.

4         But here's why we think we need to do more than that

5    if we can, and that is, there's lots of extrinsic factors that

6    affect the sales of lots of books.  One of those, a really big

7    one, is one that's central to this case: the COVID-19 pandemic.

8    That is, comparing sales of a book in the past to sales of a

9    book in the present doesn't necessarily tell the whole story

10   without knowing something about the book market as a whole, at

11   least for comparable books.  So the concern, your Honor, with

12   comparing a book to itself is that there may be confounding

13   factors over time.

14        THE COURT:  With that big fancy statistical analysis,

15   you can do that analysis.  I agree it might be harder if you

16   don't have monthly data, and maybe we can explore that, but why

17   can't you control for that factor in the analysis of pre and

18   post and then see what you see?

19        MR. GRATZ:  Well, I have a number of responses to that

20   your Honor.  One of them is we want to have the most robust

21   analysis that we can.  It is not that we don't think that would

22   be a potentially valid way to do it.  We're just thinking about

23   what their expert's going to say in that expert --

24        THE COURT:  What I'm saying here is let's take a

25   measured -- let's not wholesale throw money at the problem

LC2HHac1

1    perspective of -- I'm trying to come up with an analogy, and

2    I'm coming up short at this hour.

3         You don't necessarily need gold-plated Tiffany garden

4    shears, if they even exist, to prune a bush.  What I'm

5    concerned about is that let's see if you can get some

6    information out of what's already been produced and do that

7    comparison, because you know what?  If it turns out that you

8    can make arguments from the comparison that you've already done

9    that warrant going further, then I think you're in a much

10   better position.  But right now it just sounds like an almost

11   inconceivably huge burden to put plaintiffs to to produce the

12   information, and then also an exceedingly large burden on your

13   part to analyze that data when you actually have a smaller data

14   set, and maybe that data set could be expanded, but a smaller

15   data set that you can do some preliminary analyses on and

16   figure out whether this is an appropriate way to go forward.

17        The reason why I'm suggesting that is because

18   otherwise I would be making you brief with case law the point

19   that Ms. McNamara raised about what is actually an appropriate

20   measure of damages, and I'm not quite sure we're there yet.  We

21   may get there in a month anyway, but I'd like to see what you

22   can get with what you already have or some expansion on what

23   you already have.

24        So, Ms. McNamara, you mentioned 670,000 lines on an

25   Excel spreadsheet that relates to 127 representative works.

LC2HHac1

```
 1   What's the form of that data?  Because Mr. Gratz just said that
 2   that doesn't contain monthly sales.
 3          MS. McNAMARA:  Actually, I have a flash drive that has
 4   the data if your Honor wants to have it.
 5          THE COURT:  I shake my head for a number of reasons.
 6   One of which is our IT department would --
 7          MS. McNAMARA:  Kill you.
 8          THE COURT:  -- kill me.  They have to go through their
 9   whole process to make sure that I don't take down the entire
10   federal judiciary by plugging something into a computer here.
11          MS. McNAMARA:  Of course.
12          THE COURT:  And we've had concerns.
13          But the other part of it is if you can explain to me
14   as a layperson, because you would have to do this or you'd have
15   to have your expert do this to a jury later --
16          MS. McNAMARA:  Yes.
17          THE COURT:  -- or is this a bench trial?  But anyway,
18   you have to have your expert explain what this data is anyway.
19          MS. McNAMARA:  Yes.
20          THE COURT:  I'd rather not get into this briefing
21   about what the appropriate measure of damages is this early in
22   the case.  So go ahead.
23          MS. McNAMARA:  Thank you, your Honor.  I'm happy to
24   try to do that, although I probably suffer from some of the
25   same problems/burdens you have with explaining all this.
```

```
 1          But at any rate, what we have produced for each of the
 2   127 works-in-suit is data that shows all the comparable factors
 3   that they've identified and that they want, the various
 4   distribution channels, the prices, the revenue streams broken
 5   down between paper, hard cover, e-books, and the related data.
 6   In order to do that, they had to pull that data.  That's what I
 7   wanted to correct Mr. Gratz seemingly suggesting that this is
 8   like a button you can push.  This data had to be aggregated
 9   from multiple databases and pulled together and pulled out over
10   the -- dealings going back 10, 15, 20 years for some of these
11   works, and it was an enormous undertaking even for the 127
12   works.
13          Now, some of the publishers, namely, specifically
14   Hatchette, routinely have this data in monthly indications, and
15   we have produced for all the Hatchette books monthly data.
16   We've similarly produced monthly data for many of the Harper
17   Collins works.  The two publishers, Penguin Random House and
18   Wiley are the ones that there has not been a production of
19   monthly data.  We would entertain some limited supplement on
20   the monthly data in order for them, the defendant, to make this
21   comparison that we think is readily available from this data.
22   But I would underscore that we don't need monthly data going
23   back from the first time this book appeared, like when Salinger
24   first published in the -- whenever that was, in the '70s or
25   whatever.
```

1          THE COURT:  OK.

2          MS. McNAMARA:  Because, really, the monthly data is

3    only important, arguably, in my mind, for two purposes:  One is

4    what Mr. Gratz already identified, which is during the

5    pandemic, the world kind of shifted, as we all know, within a

6    month or two, and so for that period of time in 2019, during

7    the early stage of the pandemic, it seems to me that there's a

8    rational reason to have monthly data so you can see what

9    changed.  It was also during that period of time that the

10   Internet Archive for three months instituted what they called

11   the "National Emergency Library," during which they threw all

12   their supposed rules to the wind and just made these books

13   available to anyone anywhere anyhow across the board.  So for

14   that period of time, I think there's a logic to monthly sales

15   reports, and we can endeavor to provide some of that.

16          The other rational, I think, reason would be if

17   there's a change.  The Internet Archive knows -- and I'm not

18   sure whether it's clear in the data they have provided to us --

19   but when each of these 127 works were originally published on

20   the Internet Archive and made available to the world for free,

21   and so I think that they indicate in their letter that if that

22   happened in March of whatever year, there might be a reason to

23   kind of do a comparison around months concerning when they were

24   initially posted.  If Internet Archive wants to provide us with

25   that data or that information for the 127 works, I can speak to

LC2HHac1

1    my clients about whether there's some accommodation to be made

2    on the monthly sales figures.

3           THE COURT:  Mr. Gratz, anything to add?

4           MR. GRATZ:  Yes, your Honor.  That sounds like a fine

5    first step; that is, what we need is monthly -- in order to do

6    what your Honor is suggesting, which we are happy to do, that

7    is, try to boil the pot before we see whether we need to

8    collect the ocean, we would be happy to see whether monthly

9    data about the works-in-suit for some reasonable period before

10   they first appeared in Internet Archive's lending library,

11   which data we have produced, but we're happy to point out or

12   produce in a more readily usable form.

13          We also, your Honor, would need monthly data about the

14   book market as a whole, or at least about these publishers'

15   sales as a whole, in order to try and pull out macro trends

16   that may have been sort of versus the micro trends versus the

17   effect, which we don't think exists, of what Internet Archive

18   was doing.

19          MS. McNAMARA:  Your Honor, on that point, obviously, I

20   don't object to the two other points regarding the time periods

21   I suggested, but this macro -- there's been an ongoing back and

22   forth with the defendant in this action about what data is

23   provided from their data sets concerning the books and how

24   they've made these books available for free and our data, and

25   the parties have consistently tried to keep this to data points

1    surrounding the works-in-suit, and they have limited our

2    ability to get a lot of information from them beyond the

3    works-in-suit.  So I really object to trying to backdoor all of

4    a sudden getting data concerning entire book sales for these

5    entire publishers for all the book sales that they have.  I

6    don't see the logic of that.  I don't see why it's relevant and

7    what the macro necessity is.

8              MR. GRATZ:  Your Honor, as to that last point, this is

9    data that they already make publicly available.  They just

10   didn't want to produce it and offered to sell it to us at its

11   normal retail price when --

12             THE COURT:  Wait, wait, wait.

13             MS. McNAMARA:  What are you talking about?

14             MR. GRATZ:  The Association of American Publishers,

15   your Honor, which the same counsel already represents, we had

16   asked Association of American Publishers for macro sales data,

17   which it compiles.

18             THE COURT:  Are we talking about the 127 works or

19   the --

20             MR. GRATZ:  We are not, your Honor.  And this is --

21             THE COURT:  Can we -- go on, but --

22             MR. GRATZ:  I'll focus down, your Honor.  I am not

23   talking about per-book numbers.  I am talking about single

24   industry-wide numbers on a monthly basis.  And the reason for

25   that, your Honor, is if book sales as a whole doubled in a

 1  particular month or halved in a particular month, the fact that
 2  the sales of one of the works-in-suit doubled in a particular
 3  month or halved in a particular month, one would want to take
 4  that into account in the analysis.
 5          Does that answer your Honor's question?
 6          THE COURT:  Yes.  But, I mean, these are -- this is
 7  information that you may be able to use without demanding that
 8  it be produced in a certain format.
 9          MR. GRATZ:  I agree, your Honor.
10          THE COURT:  Yes.  You can do -- I say a lot of "you
11  can do" here without actually knowing.
12          Wouldn't that be a factor that you could account for
13  in an analysis based on publicly available information?
14          MR. GRATZ:  We think that we could try, although we
15  would like, to the extent possible, to avoid a dispute about
16  which publicly available information about overall monthly book
17  sales is the reliable kind, which is why we wanted to get it
18  from Association of American Publishers.  And they said we
19  won't give it to you in discovery.  You should buy it from us.
20          THE COURT:  How much does it cost?
21          MR. GRATZ:  It was like $16,000.
22          THE COURT:  There was a part of me that, when
23  Ms. McNamara was talking about the burden of production of some
24  of the data that you wanted, that I thought about mentioning
25  that a lot of the time the burden is because it will be costly

1    and time-consuming, and sometimes the party that wants the data

2    could pay for it or pay for the cost of -- or share the cost or

3    pay for the cost of collecting, aggregating, and maintaining

4    that data.

5              MR. GRATZ:  But we have no objection, your Honor, to

6    paying the actual cost of the Association of American

7    Publishers giving us a copy of the reports they have already

8    created, to the extent there is such a cost, but we don't think

9    that's the number that they have suggested to us.

10             THE COURT:  Go ahead.

11             MR. ZEBRAK:  Thank you, your Honor.  I appreciate your

12   allowing me to chime in on this.

13             So if I'm understanding Mr. Gratz correctly, the data

14   he's referring to with AAP, I think he's mixing apples and

15   oranges here again, or apples and zebras, to use Ms. McNamara's

16   reference.  AAP collects data across the industry for kind of

17   industry-wide sales figures and reporting, but I believe what

18   they've been interested in is library sales information, which

19   is not something that they track or report on.  I believe this

20   has already been explained to them.

21             And just on the whole notion of monthly data, the

22   other thing that sort of sticks out to us is that if they

23   understand that in year Y they scanned and started distributing

24   copies of a work, I don't know why they couldn't use the sales

25   figure on a yearly basis for what they have in the following

LC2HHac1

 1   years and do comparisons that way rather than sort of turning

 2   the companies upside down for this data.

 3         Thank you, your Honor.

 4         THE COURT:  Normally, I like parties to try to work

 5   something out.  What I heard that was some kind of quasi

 6   agreement was whether defendants might work with some of the

 7   information that they have from the 670,000-line Excel

 8   spreadsheet.  Particularly, once I learned that at least two of

 9   the publishers have already provided monthly -- have provided

10   monthly information, why can't you do that in the first

11   instance and then see if you can make a better claim for why

12   you need more?  If you can't agree on a resolution to this

13   discovery dispute, I'm going to have to ask you -- I'm going to

14   have to order you to brief it, which is going to be expensive

15   for both of you.

16         One of my favorite rules to cite is Rule 37(a)(5).  So

17   think about the cost to brief it, think with the potential cost

18   if you were to lose a motion like that and how badly you really

19   need this information as opposed to making the sufficient

20   defense, because I think whether or not you get to this whole

21   commercial performance of plaintiffs' books and finding the

22   comparators is a question that any -- that remains in this case

23   is Internet Archive was not paying the customary license fee

24   paid to this -- that normally is paid to distribute these

25   particular e-books.

LC2HHac1

```
 1              What does that mean as far as liability and damages on
 2      whether plaintiffs are entitled to the license fee at all,
 3      right?  Even if you were to get this information that you seek,
 4      and I'm not suggesting that you would, but even if you did and
 5      you put plaintiffs to all that trouble, does that have any
 6      bearing on what I'm hearing as defendant's failed to pay the
 7      customary license fee and that, at a minimum, is a measure of
 8      damages?
 9              So think about that.  I'm not going to rule on it, but
10      I'm going to really suggest that we focus on the case and
11      making sure that the case moves forward in an expedient and
12      cost-sensitive way.
13              MS. McNAMARA:  Thank you, your Honor.
14              MR. GRATZ:  Thank you, your Honor.
15              THE COURT:  Next issue is the issue on -- let me see,
16      on the privilege, withholding on privileged or arguably
17      privileged communications.  I thought it was an ECF 47.  I
18      guess I'm not sure I'm seeing it.
19              MR. GRATZ:  It is.  If I may, your Honor, it's ECF 54,
20      and the response is ECF 56.
21              THE COURT:  I missed ECF 54, but I have ECF 56.
22              ECF 54, I guess, was plaintiffs, right?
23              MR. GRATZ:  ECF 54 was defendants, your Honor.
24              THE COURT:  All right.  Why don't you tell me what the
25      dispute is.
```

LC2HHac1

1          MR. GRATZ:  Certainly, your Honor.  There are two

2    deeply intertwined disputes here.  They both relate to

3    communications among members of the Association of American

4    Publishers, the trade group that instigated this lawsuit about

5    the Internet Archive and about library lending.  Some of those

6    communications are likely to be privileged, communications

7    about selection of counsel, communications about legal

8    strategy, communications among the plaintiffs, things like

9    that.  Many of those communications we think are not

10   privileged, that is, communications about the business aspects

11   of how to think about what the Internet Archive is doing, how

12   to think about what libraries in general are doing and how it

13   affects the plaintiffs' businesses.

14          Many of the withheld communications with respect to --

15   that have been logged by the plaintiffs include people who are

16   neither plaintiffs nor the AAP, and the plaintiffs are claiming

17   that the AAP, the trade association, is acting as their lawyer

18   in this context.  While it's conceivable that a trade

19   association can act as a lawyer for members under some

20   circumstances, the case law sets forth a variety of showings

21   that would need to be made in order for there to be a finding

22   that a trade association, who isn't a lawyer but might employ

23   lawyers, is acting as counsel for a particular member in a

24   particular communication.

25          THE COURT:  You already have a privilege log?

LC2HHac1

```
 1              MR. GRATZ:  So with respect to the plaintiffs', your
 2    Honor, we do.  With respect to the AAP, they've refused to
 3    produce a log.
 4              MS. McNAMARA:  Your Honor, do you want me to address
 5    this?
 6              THE COURT:  Yes, please.
 7              MS. McNAMARA:  Thank you very much, your Honor.
 8              THE COURT:  You can bring it right up to your mouth.
 9    That's better for all of us.
10              MS. McNAMARA:  OK.  Great.
11              In reviewing the exchange of letters in preparation
12    for this hearing today, I was struck by the fact that there is
13    no issue that the Internet Archive is really presenting to this
14    Court.  There's nothing concrete that they have identified
15    where they have a concern about the production, or lack of
16    production, looking at actual documents that have been
17    withheld.  There's no dispute amongst the parties as to the
18    legal principles at issue here.  Mr. Gratz just identified some
19    of them.  No one disputes that some communications can be
20    privileged between the AAP and its members.  There's no dispute
21    that some communications concerning lobbying, and the like,
22    with Congress can be protected by a First Amendment privilege,
23    and there's no dispute that a privilege doesn't arise just out
24    of mere membership in an organization.
25              But the plaintiffs have not withheld any documents
```

LC2HHac1

1    based on that contention.  Internet Archive doesn't point to a

2    single example, doesn't identify for this Court a single

3    example, that reflects that the plaintiffs did withhold

4    documents simply because they were communications with AAP.

5    Instead, it's clear that the privilege log makes clear, and the

6    plaintiffs know this, that we have produced a number and large

7    number of documents, of communications between AAP and the

8    plaintiffs or others, including others when they dealt with

9    business issues.  No one disputes that you have to analyze

10   documents as to whether this is rendering legal advice or

11   concerning business issues.  The documents have been carefully

12   reviewed to withhold only those documents that dealt with

13   privilege issues, and that's reflected on the privilege log,

14   and the letter to your Honor doesn't identify a single example

15   where it appears to be citing to business issues.  Instead, the

16   log would say something like "legal advice re anticipation of a

17   copyright infringement litigation against IA."  That is clearly

18   legal advice.

19        Now, when this issue first arose and they said, well,

20   you need to establish that there was a attorney-client

21   relationship between the parties, that testimony has now been

22   rendered in this case, that has been asked in depositions.

23   There was the deposition of Skip Dye, who's one of the key

24   witnesses here, and he had indicated -- was asked squarely:

25        Does the AAP serve as its attorney outside of this

LC2HHac1

1   lawsuit?

2         Yes.

3         Does it provide legal advice?

4         Yes.

5         And the testimony of Alison Lazarus from Hatchette --

6   Skip Dye is from PRH -- was asked similarly:  Does the AAP act

7   as Hatchette's counsel, and do they give legal advice from AAP?

8   And the answer is:  Yes, I believe we do.

9         Now, these are not -- you have to understand who the

10  AAP is and who its executive director is in order to appreciate

11  that this is bona fide, compelling legal advice.  The executive

12  director of the AAP is a woman by the name of Maria Pallante.

13  She was the former register of copyrights and the director of

14  the U.S. Copyright Office.  She is far more equipped to give

15  advice on copyright issues than I could begin to be, and even

16  though I practice in the area of copyright quite a lot, she is

17  far more of an expert than I.

18        THE COURT:  Let me just pause, because it's getting

19  late.

20        MS. McNAMARA:  Yes.

21        THE COURT:  I feel like an air traffic controller or

22  maybe, yes, the LaGuardia during a thunderstorm.

23        What are the documents that defendants seek to compel,

24  who produced them, and is there a log?

25        MR. GRATZ:  So, sorry, is that a question?

LC2HHac1

```
 1                THE COURT:  Yes.

 2                MR. GRATZ:  So the answer is with respect to the

 3     documents in the possession of the publishers, we have not at

 4     this point in the dispute process teed up in our letter which

 5     log lines we think should be produced.  We have identified them

 6     instead by category, for example, communications between --

 7     solely between nonparty third parties and communications

 8     between plaintiffs and third parties who are not the AAP, and

 9     we think they need to redact a number of the documents that are

10     likely to be mixed.

11                THE COURT:  OK.

12                MR. GRATZ:  Then with respect to the AAP, who we have

13     subpoenaed, your Honor, they haven't produced a log.

14                THE COURT:  AAP isn't here.

15                MR. GRATZ:  They are here, your Honor.

16                MS. McNAMARA:  Yes, AAP, but, your Honor, this is not

17     the proper jurisdiction for AAP.  They were subpoenaed in

18     Washington, D.C., and I think that if there's any motion to

19     compel with regard to the AAP, it needs to be held in D.C., not

20     before your Honor.

21                THE COURT:  So the AAP is in D.C.  They're a nonparty.

22                MR. GRATZ:  May I be heard on that?

23                THE COURT:  No, not yet.

24                AAP is in D.C.  They're a nonparty.  AAP and AAP's

25     docs are in D.C., is that right?
```

LC2HHac1

```
 1          MS. McNAMARA:  Correct, your Honor.
 2          THE COURT:  Let's go back to the documents in the
 3   publishers' productions.
 4          Do you want to brief it?  I'm not sure that you're
 5   ready to brief it.  I think you probably need to meet and
 6   confer and have another round because what I heard was we're
 7   complaining about particular categories, and we think that
 8   things something should be produced in redacted form.  I could
 9   put you on a briefing schedule or I could put you on a briefing
10   schedule after you have had another chance to meet and confer
11   on the documents produced by plaintiffs for which you have a
12   log.
13          MR. GRATZ:  We think, your Honor, in light of today's
14   discussion, that it might make sense to see whether there is at
15   least some common ground we can reach with respect to the
16   things to which we have a log, with respect to at least the
17   production of redacted documents where there is mixed business
18   and --
19          THE COURT:  How about this?  Let's set a date for a
20   status letter for you to tell me where, if any, dispute remains
21   on this issue.  I don't want to make people work over the
22   holidays if they weren't already planning to.  I don't even
23   want to say "if they weren't already planning to."  I don't
24   want to be the cause of an attorney, particularly an attorney
25   not in this room, having to make changes to their holiday plans
```

LC2HHac1

 1    or giving up time spent with their family to deal with this

 2    issue.

 3              MS. McNAMARA:  Thank you, your Honor.

 4              THE COURT:  I'd like you to spend some time to meet

 5    and confer, get back -- is a status letter in January

 6    appropriate?

 7              MS. McNAMARA:  That's fine.

 8              MR. ZEBRAK:  That's fine, your Honor.

 9              THE COURT: Mr. Gratz wants to say something.  Now

10    that you're not sitting next to each other because of this

11    strange COVID arrangement, you can't see when Mr. Gratz wants

12    to say something.  Yes, Mr. Gratz.

13              MR. GRATZ:  I will wait a moment for Mr. Zebrak to

14    finish whatever Mr. Zebrak was saying.

15              What I was going to say was --

16              THE COURT:  No, but you're not waiting because you

17    just said you would wait and then you started talking.

18              Go ahead.

19              MR. GRATZ:  I'm sorry, your Honor.

20              A status letter in January sounds fine.  We currently

21    have close of discovery in two weeks, and I think we need to do

22    something about that.

23              THE COURT:  Yes, I will extend that date.

24              Mr. Zebrak, what were you going to say?

25              MR. ZEBRAK:  Thank you, your Honor.

LC2HHac1

1      So there's actually a third discovery dispute that the
2    plaintiffs brought here.
3           THE COURT:  I know.  I'm just trying to --
4           MR. ZEBRAK:  Very quickly.
5           THE COURT:  -- get through.
6           MR. ZEBRAK:  I think we could do it very quickly, your
7    Honor.
8           THE COURT:  No, but I want to close out this issue
9    unless you're -- I want to set a date for a joint status
10    letter.
11           MR. ZEBRAK:  Yes, your Honor.
12           THE COURT:  We close out one issue, and then we move
13    to the next one, right?
14      What's the date for your joint status letter on this?
15    Is mid-January OK, or would you like the end of January?
16           MS. McNAMARA:  Mid-January's fine, your Honor.
17           THE COURT:  January 14 status letter on the privilege
18    log issues.
19      Although I hate to burden a sister court, my question
20    is why couldn't you or wouldn't you bring any subpoena issues
21    with AAP's production in D.C.?
22           MR. GRATZ:  I think the answer, your Honor, is we
23    could, but I think it would be exceptionally inefficient to
24    spin up something else there.  At the time we served the
25    subpoena, the place for production was in D.C. since we didn't

LC2HHac1

1    know that Ms. McNamara would be representing with -- her office

2    in New York would be representing the AAP in this matter.  We

3    can just serve a subpoena with the place of performance to be

4    New York and solve it that way.  Of course, Rule 45(f) also

5    allows us to file it there and then consent to bring it here.

6          THE COURT:  OK.  Yes.

7          MR. ZEBRAK:  Your Honor, the place of compliance is

8    where the nonparty's located, it's not where counsel chooses to

9    bring the document.

10         THE COURT:  Right.  My question is if this is going to

11   end up being a motion to compel AAP, and I'm not sure that it's

12   ripe yet because it doesn't sound like there's been production

13   or a log, but I'm just trying to get a little bit ahead of this

14   problem.  Can you guys please agree on a place to deal with

15   this motion, if you can't actually address it without having to

16   file a motion?

17         MR. ZEBRAK:  Yes, your Honor, we will endeavor to

18   resolve this with defendant's counsel.  The issue here is that

19   it's an incredibly broad subpoena that they've made no effort

20   to narrow.

21         THE COURT:  I don't want to hear your argument about

22   the subpoena.  I understand you have a dispute about the

23   subpoena.  I'm just trying to see whether the dispute has -- if

24   you can't resolve the dispute, whether it has to be brought

25   here or whether you can agree to either have it brought here.

LC2HHac1

1    I'm happy to hear it if I have jurisdiction.  I'm happy to hear

2    it if you agree, and I would actually prefer that you find a

3    way to agree.  Whether it's to agree to bring it here or

4    whether you agree to litigate it in D.C., I don't really care.

5    I mean, obviously, it would be a little easier if I didn't have

6    to deal with it.  At the same time, since I'm dealing with the

7    main case, it does make some sense for me to deal with it.  So

8    please work that out.

9          I think that does mean that -- meet and confer status

10   letter on the logs of the documents that have already been

11   produced is January 14.  OK.  I think that now goes to

12   Mr. Zebrak's issue.  That's ECF 58 and 59?

13         MR. ZEBRAK:  Yes, your Honor.  Thank you.

14         Several issues have been resolved, so it would help me

15   to address --

16         THE COURT:  Why don't we start out with the issues

17   that have been resolved.

18         MR. ZEBRAK:  Thank you, your Honor.

19         I can begin by saying that the numbers that I believe

20   have been resolved are Categories 3, 5, 6, and 7.  For Category

21   3, the defendant produced documents after we filed our letter.

22   For Category 6, the defendant produced documents after we filed

23   our letter.  For Category 7, we haven't yet reviewed the

24   documents, but we understand that last night the defendant

25   produced documents.  And for Category 5, the defendant has

LC2HHac1

1   indicated that the documents are inaccessible to them without

2   undue burden.  And at this time, I think we'll leave it at

3   that.  The defendant -- I can get into more detail, but I think

4   we can just focus on the three that still remain outstanding.

5        MR. GRATZ:  With respect to Category 5, we may

6   actually turn out to have some additional documents for you

7   that I will give you an update on as soon as I have it,

8   Mr. Zebrak.

9        THE COURT:  OK.

10       MR. ZEBRAK:  Thank you.

11       THE COURT:  All right.  Let's look at Category 1.

12  What is Category 1?

13       MR. ZEBRAK:  Sure.  Category 1, just one quick

14  backdrop.  The defendant distributes e-books.  The defendant

15  does it two ways.  Some are e-books in the public domain that

16  the defendant distributes without any restrictions; someone you

17  can just download and keep a permanent copy forever.  The other

18  way the defendant distributes e-books, typically, e-books that

19  the defendant has scanned from physical form into a digital

20  version, the defendant does it from what it calls its lending

21  library.  That's what this focuses on.  It concerns defendants'

22  rules, policies, procedures, specifications for how it's

23  supposed to work, and the actual computer code that designates

24  something into the lending library.  This is very significant

25  because they distribute millions of copyrighted books that

LC2HHac1

```
 1  they've digitized from a physical form.  So their rules for how
 2  something makes its way in the lending library and what's
 3  associated with that are quite relevant in this case.  It's at
 4  the center in a lot of ways.
 5          We've been following up on this for quite some time,
 6  and what the defendant has done is indicate that there's a
 7  single document from July of 2018 that they've produced that
 8  supposedly lays out essentially their intent for what gets
 9  designated into different collections, including the lending
10  library.
11          Your Honor, that just doesn't quite make sense that
12  there would be one document only from 2018, from three years
13  ago, when this is so central to a process that's been the
14  subject of so much controversy, that there's not documents
15  concerning the implementation of these rules, updates to these
16  rules.  It's a single two-page document from 2018 they've
17  identified to us as being the only thing that they have that
18  they've produced.  We would like them to be ordered to produce
19  whatever else exists that they have not yet collected and
20  produced.
21          THE COURT:  Mr. Gratz.
22          MR. GRATZ:  Two observations, your Honor:  One, we are
23  not making a relevance or a burden or an anything else
24  argument.  We have looked for documents.  We have produced what
25  we were able to find.  We have identified by Bates number the
```

1    key document.  And I think, most relevantly, plaintiffs are

2    taking the deposition in about a week and a half of the person

3    responsible for this, the 30(b)(6) designee on this topic.

4    They can ask about this topic.  They can ask about what

5    documents are there, and they can satisfy themselves that they

6    understand this document, they understand the procedures.  And

7    to the extent they can get testimony about some document that,

8    despite our diligence, we haven't found, we'll give it to them.

9             THE COURT:  When's the 30(b)(6) depo again?

10            MR. GRATZ:  The 17th, which is currently the last day

11   of fact discovery.

12            THE COURT:  Right.  Yes, I know.  I will extend it.

13            All right.  So on Category 1, take your deposition,

14   see if you can resolve this one with a meet-and-confer after

15   the deposition, and then you can put that in a status letter.

16            MR. ZEBRAK:  We will, your Honor.  Of course, the

17   difficulty is that a witness is not going to be able from

18   memory to cite different documents, and documents others --

19            THE COURT:  But it's a 30(b)(6) deposition, right?  So

20   what he says is binding the corporation, right?

21            MR. ZEBRAK:  Well, OK.

22            THE COURT:  I have had cases where one would expect

23   certain documents to exist, and it turns out after discovery,

24   some discovery into processes, that such documents never

25   existed in the first place or they were destroyed before the

LC2HHac1

1    litigation ever began.

2            MR. ZEBRAK:  True.  There is one thing now that I know

3    exists which they haven't produced, which is the code that

4    actually moves stuff into the lending library and indicates

5    where it's pulled from and the records it's pulling from for

6    all.  So that's just one I know about right now that they can

7    produce but haven't.

8            THE COURT:  Mr. Gratz, what about that?

9            MR. GRATZ:  I think we have produced that.

10           MR. ZEBRAK:  We'll confer with them afterwards.

11           THE COURT:  Yes.

12           MR. ZEBRAK:  I don't believe that they have, but we

13   will confer.

14           THE COURT:  Category 2.

15           MR. ZEBRAK:  Category 2, your Honor, so again one

16   quick second of backdrop, otherwise this will also seem like

17   it's written in a foreign language.

18           What the defendant does when it starts with a physical

19   book is that it digitizes that book and then distributes copies

20   of it from its website.  Except during this period of what --

21   for three months during 2020, what the defendant says it does

22   is that it limits one user at a time to that digitized copy of

23   the book.  However, what the defendant wants to do in order to

24   scale how many copies it can deliver at a time to the world is

25   that it reaches out to libraries and does what it calls an

LC2HHac1

1    "overlap analysis" with a library where the Internet Archive

2    compares Internet Archive's data about the Internet Archive

3    digital holdings of books to whatever data the library has

4    about what the library thinks is in its physical holdings.  The

5    Internet Archive calls this an "overlap analysis."  In this

6    overlap analysis, the Internet Archive has what it calls

7    "direct matches," and it also has what's called "similar

8    matches."

9            THE COURT:  OK.

10           MR. ZEBRAK:  And after this overlap analysis occurs,

11   libraries that participate in the analysis with the Internet

12   Archive, afterward the Internet Archive will then just

13   sometimes on the basis of this data comparison -- it doesn't

14   just scan the library books.  Essentially, Internet Archive

15   treats all books as fungible and it then increases the

16   concurrent lending count based on whatever match it thinks

17   happened.  And we've asked for the policies and procedures for

18   how this works, not just stray emails here and there, and we

19   said, including how you implement, whether you're going to use

20   just the direct match or a similar match, again, you're using

21   this as the basis to distribute millions of copyrighted books.

22   You couldn't imagine that there aren't policies or procedures

23   for this.

24           The defendant, despite our request, has not identified

25   which documents they've produced that supposedly speak to this.

LC2HHac1

1    What they've said in their letter to your Honor is that they've

2    produced documents relating to the overlap analysis.  They

3    haven't said they produced the documents that we've asked for,

4    the policies the procedures, how do you implement this?  We

5    have none of that, and that's what we're asking for your Honor

6    to compel them to produce.

7            (Continued next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC2THAC2

```
 1              THE COURT:  I mean again, I can direct Mr. Gratz to
 2      produce things, but if they don't exist, I have a slight
 3      concern.
 4              MR. GRATZ:  This is the same witness who is --
 5              THE COURT:  Okay, but before we get to the witness, do
 6      documents exist?
 7              MR. GRATZ:  So documents do exist that describe this
 8      process, the documents Mr. Zebrak has been talking about.
 9              Are there policies or sort of formal procedural
10      documents or the things that Mr. Zebrak would sort of I think
11      prefer exist that we're withholding?  No, not that we found.
12              THE COURT:  Okay.
13              MR. ZEBRAK:  Your Honor, where I get hung up is when
14      they say not that they were found, because, for instance the
15      person that handles the designation "The Lending Library,"
16      that's Category 1, that's a non-custodian.  They chose not to
17      make that witness a custodian.
18              So we're deposing different witnesses, but this
19      individual, Mr. Freeland, might have no idea about the
20      documents that are in Category 1, and we're not going to learn
21      of that unless he educates himself on it.
22              And it's the same thing here in Category 2.
23      Mr. Freeland is not an engineer, he has an engineer that works
24      for him and others that have done these overlap analyses, and
25      Mr. Freeland, when he's deposed, may not know of documents.
```

LC2THAC2

1  And this is key.

2  THE COURT:  Again, you are making an argument about

3  the sufficiency of the 30(b)(6) witness's prep before the

4  deposition has happened.  Number one, I hope that your 30(b)(6)

5  notice topics are broad enough to cover, and I hope that

6  Mr. Gratz doesn't impose any bad faith objections on this so

7  that you can understand and satisfy yourselves whether

8  documents actually exist and also whether the preparation was

9  sufficient.

10  MR. ZEBRAK:  Thank you, your Honor.

11  THE COURT:  And like I said, sometimes documents don't

12  exist, and there is -- if you get to trial, they're not going

13  to get to use that and they're not going to get to use a new

14  document that they suddenly discovered.  You all have laid the

15  basis for excluding that document, so you're not without any

16  recourse if it turns out that such documents that you would

17  expect to exist don't exist or no longer exist.

18  MR. ZEBRAK:  Thank you, your Honor.  Fully understood.

19  THE COURT:  Same thing, January 14, '21 status on

20  whether this is remains to be an issue.

21  Category 4, which I understand is our last category.

22  Then we push the discovery end date and the people who have

23  been waiting patiently in my courtroom for hours today, I will

24  then talk to them.

25  MR. GRATZ:  I hope that I can shortcut Category 4,

LC2THAC2

1    your Honor --

2              THE COURT:  Okay.

3              MR. GRATZ:  -- by saying I think we have some

4    additional data that I think will satisfy this.  I'm happy to

5    explain a little bit, but we think it is work we are -- we have

6    additional data that I expect us to be producing, frankly

7    today, that will provide at least sort of some additional

8    information on Category 4, and the witness who is to testify

9    about Category 4 and how those records are kept, his

10   deposition, as of now, is tomorrow.

11             THE COURT:  Okay.  Mr. Zebrak, response?

12             MR. ZEBRAK:  Your Honor, I'm not sure what to do with

13   that exactly because we have been trying to obtain an answer on

14   this for really months, and --

15             THE COURT:  Funny how an in-person court conference

16   often shakes things loose.

17             MR. ZEBRAK:  First of all, I don't know what they

18   intend to produce the night before his deposition, but we have

19   not been getting our questions answered about an issue that is

20   something that they believe is core to their case.  The

21   defendant wants to argue that there's no harm here because the

22   books are only borrowed and used for a short period of time.

23   And that's something they trumpet again and again and again.

24   And we said if you want to make that claim, we have to see the

25   background for it.  You can't go to trial on statistical and

LC2THAC2

1    other claims without providing background.

2         And they referred us in two directions; both have

3    been, thus far, dead ends.  For the works in suit they produced

4    essentially two different types of files with technical data,

5    your Honor.  We are referring to them in file format just for

6    shorthand, but one is a CSV file.  And the CSV file, there is

7    data there on loans, but you can't use it to see when one loan

8    begins and one ends because they do this thing with concurrent

9    multiple loans, and it gets in the weeds quickly, but we're all

10   in agreement between the plaintiffs and the defendants that you

11   can't see when one loan begins and when one loan ends looking

12   at that data.

13        THE COURT:  But I thought you said earlier that

14   Internet Archives supposedly only loans one copy, like one user

15   at a time.

16        MR. ZEBRAK:  That's one model, and sometimes they will

17   do concurrent users where if they believe there's a library

18   that also has a physical copy --

19        THE COURT:  That's where you get to the overlap

20   analysis.

21        MR. ZEBRAK:  So without digitizing that book, they

22   just said now it goes to two, three, four, then it's all thrown

23   into these files in a suit and you can't see where one begins

24   and one ends.  That's the CSV files.

25        We then said OK, there's these JSON files that you

LC2THAC2

1    produced but there's a lot of essentially encrypted or

2    scrambled or obfuscated data.  We said:  What does that mean?

3    Can you produce it in a way that will allow us to see when

4    loans begin and end?  So we contest your narrative.  And we

5    have never gotten an answer to that question, including in

6    response to their letter.  So that's the technical data.

7         And then the other place they referred us, they

8    referred us to two places, the technical data, and then they

9    referred us to a bunch of handwritten analysis about how long

10   books were supposedly used, I think it was on a given day, I

11   don't recall the specifics right now, but we said so there's a

12   lot of summary level data and analysis there by whoever wrote

13   this by hand, give us the back-up data.  You can't just give

14   your summary without that backup.

15        And again, they didn't respond to it here, and our

16   basic proposition is if you want to make claims about how long

17   books are borrowed, you got to produce the data to support it.

18   And that's essentially what we're looking to see compelled

19   here, and that's Category 4.

20        THE COURT:  Okay.  Mr. Gratz, briefly, please.

21        MR. GRATZ:  We have no objection to producing what we

22   have that is reasonably accessible.  As I said, there is some

23   additional data on this that I think ought to be

24   satisfactory -- although whether it will be, I don't know --

25   that has just shaken loose that will allow you to get some

 1   breakdowns of buckets of how many loans were how long in

 2   certain period of time.

 3          There is other more granular data that is truly

 4   stupendously difficult to get at, which is in the form of what

 5   we call web logs.  It's just so voluminous that it's hard to

 6   get at.  We're happy to talk about sampling or something to

 7   lessen that burden.  That is a discussion that's ongoing that I

 8   hope, in light of what I hope we produce today, that it won't

 9   even be a discussion we need to have.

10          THE COURT:  Okay.  Again, let's put this in the

11   January 14 status also, whether you resolved it or whether a

12   dispute remains.

13          I wrote down summary analysis with handwriting, maybe

14   that's an appropriate witness for deposition if there aren't

15   documents.

16          Mr. Zebrak?

17          MR. ZEBRAK:  It will be helpful to know what data he's

18   producing tonight.

19          MS. McNAMARA:  If this is for the witness tomorrow, we

20   might need to have a supplemental deposition of that witness.

21          THE COURT:  I expect that you would work together to

22   make that happen.

23          MR. GRATZ:  Or kick the deposition if we need to.

24          THE COURT:  It's scheduled for tomorrow.  They have

25   been preparing.  The deposition is going to go forward.  I

LC2THAC2

```
1    don't think it's really appropriate to use last-minute produced
2    documents to adjourn the deposition.
3            MR. GRATZ:  We are happy to proceed either way.
4            THE COURT:  Please do, because if it turns out that
5    because of some of these document issues that there might need
6    to be additional time allocated to a certain witness's
7    deposition, again, you know how to write letters to the Court
8    and ask for things, so we'll deal with that if and when it
9    becomes ripe.
10           Let's set a fact discovery end date now of January 31.
11   I don't expect -- I start out the day supremely optimistic, and
12   by the time I get to the end of each day my optimism gets
13   tarnished and wanes and sometimes falls into the gutter, but
14   let's set a discovery end date of January 31, 2022, which
15   perhaps, if you were able to resolve all of the disputes, and
16   you were able to say so on January 14, that might be a
17   realistic end date, but I won't hold you to it because I
18   understand there are a lot of issues outstanding.  But let's
19   keep that as a placeholder so that come January 14 I will see
20   what remains.
21           Let's make that a wholesale discovery status letter
22   also, because then at that point if you do need more time, you
23   will be able to tell me with some specificity what is still
24   outstanding, what disputes remain, and sort of where along the
25   ripeness scale they are.  And probably what I will do is have
```

LC2THAC2

1    another in-person conference, but we'll schedule it after the
2    January 14 letter.  Okay?
3            MR. ZEBRAK:  Thank you very much, your Honor.
4            THE COURT:  Anything else that we need to do at this
5    time?
6            MR. GRATZ:  No, your Honor.
7            THE COURT:  Have a happy and safe and healthy holiday.
8    We are adjourned.  Please order a copy of the transcript, split
9    it 50/50.
10           (Adjourned)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Elizabeth A. McNamara**
(212) 603-6437 tel
(212) 379-5237 fax

lizmcnamara@dwt.com

January 14, 2022

Hon. Ona T. Wang
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007-1312

Re:     *Hachette Book Group, Inc. et al. v. Internet Archive et al.*,
         1:20-CV-04160-JGK (S.D.N.Y)

Dear Judge Wang:

        Pursuant to this Court's order at the December 2, 2021 conference (Dkt. 62), we write on behalf of all parties to provide the Court with a status report concerning the discovery disputes before the Court.  At the December 2 conference, three letter motions were before the Court: Defendant's August 9, 2021 letter motion (Dkt. 47), Defendant's October 29, 2021 letter motion (Dkt. 54), and Plaintiffs' November 19, 2021 letter motion (Dkt. 58) (together, the "Letter Motions").

        We are pleased to inform the Court that, subject to meaningful compliance with the agreements reached, which are memorialized in a separate document, the parties have resolved the various issues identified in the Letter Motions, together with related discovery disputes. More specifically, the parties have agreed that in lieu of additional depositions, certain witnesses will provide declarations addressing identified issues/questions, and have agreed that certain additional documents will be produced (if available).  Further, the parties have agreed that particular non-party depositions (and related document discovery) will occur at mutually agreed times outside the close of fact discovery pursuant to the Scheduling Order.

        Finally, the parties have mutually agreed on the attached proposed revisions to the current scheduling order dated September 8, 2021 (Dkt. 51), as amended by this Court at the December 2, 2012 conference (Dkt. 60).  Because the Court extended the fact discovery deadline, it becomes necessary to also grant an extension of other case deadlines to ensure that the parties have sufficient time to complete expert discovery and summary judgment briefing.[1] The parties

---

[1] Pursuant to this Court's Individual Rule I.e., the parties state that they requested two amendments of the case deadlines in this action.  These requests were both granted.  *See* Dkt. 44, 51.

DWT.COM

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.
4895-8366-6185v.4 0092453-000002

A-234

Hon. Ona T. Wang
January 14, 2022
Page 2

also have adjusted the schedule to address the anticipated nature of expert testimony and
briefing. We attach as Exhibit A the current scheduling order. We attach as Exhibit B the
proposed dates for the Second Revised Scheduling Order.  All parties respectfully request that
the Court so-order this new proposed schedule.

       Thank you for your consideration of this request.

Respectfully submitted,

Davis Wright Tremaine LLP

/s/ Elizabeth A. McNamara

Elizabeth A. McNamara


cc:     Counsel of Record (via ECF)

4895-8366-6185v.4 0092453-000002

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC.,<br>HARPERCOLLINS PUBLISHERS LLC,<br>JOHN WILEY & SONS, INC., and<br>PENGUIN RANDOM HOUSE LLC<br><br>                 Plaintiffs,<br><br>  v.<br><br>INTERNET ARCHIVE and DOES 1 through<br>5, inclusive<br><br>                Defendants. | Case No. 1:20-CV-04160-JGK |

## [~~PROPOSED~~] REVISED SCHEDULING ORDER

After reviewing the Letter Motion dated September 7, 2021 and for good cause shown,

the Court hereby orders that the following schedule will govern this civil action:

| | |
|---|---|
| Deadline to complete fact depositions (close of fact discovery) | Friday December 17, 2021 |
| Deadline to complete expert reports: issues on which each party bears the burden of proof | Thursday January 14, 2022 |
| Deadline to serve rebuttal expert reports: issues on which each party does not bear the burden of proof, but not limited to responding to the opening reports. Any response to the opening reports must be contained in the rebuttal reports, however. | Friday February 25, 2022 |
| Deadline to serve reply reports. Reply reports are limited to responding to the rebuttal reports. | Friday March 25, 2022 |
| End of all discovery | Friday April 1, 2022 |

| Deadline for dispositive motions | Friday April 29, 2022 |
|---|---|
| Briefs in opposition to dispositive motions due | Friday June 10, 2022 |
| Reply briefs in further support of dispositive motions due | Friday July 8, 2022 |

**SO ORDERED.**

Dated: _____9/8/21_____, 2021

Honorable John G. Koeltl
United States District Judge

2

A-238

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

## [PROPOSED] REVISED SCHEDULING ORDER

After reviewing the Joint Letter dated January 14, 2022 and for good cause shown, the

Court hereby orders that the following schedule will govern this civil action:

| | |
|---|---|
| Deadline to complete fact depositions (close of fact discovery). | January 31, 2022 |
| Deadline to complete expert reports on issues on which each party bears the burden of proof (the "Opening Reports"). | February 25, 2022 |
| Deadline to complete expert reports on issues on which each party does not bear the burden of proof, but not limited to responding to the opening reports (the "Rebuttal Reports"). Any response to the Opening Reports must be contained in the Rebuttal Reports, however. | April 29, 2022 |
| Deadline to serve reply reports to the Rebuttal Reports. Reply reports are limited to responding to the Rebuttal Reports. | May 27, 2022 |
| End of all discovery, including expert depositions. | June 10, 2022 |
| Deadline for dispositive motions. | July 7, 2022 |
| Filings in opposition to dispositive motions due. | September 2, 2022 |

1

| Reply filings in further support of dispositive motions due. | October 7, 2022 |
|---|---|

**SO ORDERED.**

Dated: _____, 2022

_____
Honorable Ona T. Wang
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC.,<br>HARPERCOLLINS PUBLISHERS LLC,<br>JOHN WILEY & SONS, INC., and<br>PENGUIN RANDOM HOUSE LLC<br><br>                  Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through<br>5, inclusive<br><br>                  Defendants. | Case No. 1:20-CV-04160-JGK |

~~**[PROPOSED]**~~ **REVISED SCHEDULING ORDER**

After reviewing the Joint Letter dated January 14, 2022 and for good cause shown, the

Court hereby orders that the following schedule will govern this civil action:

| | |
|---|---|
| Deadline to complete fact depositions (close of fact discovery). | January 31, 2022 |
| Deadline to complete expert reports on issues on which each party bears the burden of proof (the "Opening Reports"). | February 25, 2022 |
| Deadline to complete expert reports on issues on which each party does not bear the burden of proof, but not limited to responding to the opening reports (the "Rebuttal Reports"). Any response to the Opening Reports must be contained in the Rebuttal Reports, however. | April 29, 2022 |
| Deadline to serve reply reports to the Rebuttal Reports. Reply reports are limited to responding to the Rebuttal Reports. | May 27, 2022 |
| End of all discovery, including expert depositions. | June 10, 2022 |
| Deadline for dispositive motions. | July 7, 2022 |
| Filings in opposition to dispositive motions due. | September 2, 2022 |

1

| Reply filings in further support of dispositive motions due. | October 7, 2022 |
|---|---|

**SO ORDERED.**

Dated: _____, 2022

     January 21

_____

Honorable Ona T. Wang
United States Magistrate Judge

2

A-243

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., | : |
| HARPERCOLLINS PUBLISHERS LLC, JOHN | : |
| WILEY & SONS, INC., and PENGUIN RANDOM | :　Case No. 1:20-cv-04160-JGK |
| HOUSE LLC, | : |
| Plaintiffs, | : |
| -against- | : |
| INTERNET ARCHIVE and DOES 1 through 5, | : |
| inclusive, | : |
| Defendants. | : |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**NOTICE OF MOTION OF PLAINTIFFS HACHETTE BOOK GROUP, INC.,**
**HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC. AND**
**PENGUIN RANDOM HOUSE LLC FOR SUMMARY JUDGMENT**

**PLEASE TAKE NOTICE** that Hachette Book Group, Inc. ("Hachette"), HarperCollins

Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random

House LLC ("PRH") (together, "Plaintiffs") will move this Court, before the Honorable John G.

Koeltl, United States District Judge, Southern District of New York, for an order pursuant to Rule

56 of the Federal Rules of Civil Procedure granting Plaintiffs' motion for summary judgment

against Internet Archive with respect to the causes of action set forth in the Complaint for direct

and indirect copyright infringement of the Works in Suit.[1]  In support of this motion, Defendants

rely upon the accompanying (1) Memorandum of Law in Support of Plaintiffs' Motion for

Summary Judgment, (2) Statement of Undisputed Material Facts, (3) Declaration of Jeffrey Weber

---

[1] Plaintiffs' motion for summary judgment addresses only Internet Archive's liability under the causes of
action set forth in the Complaint.  Plaintiffs will address damages and other remedies at a later stage of
this case.

and exhibits annexed thereto, (4) Declaration of Chantal Restivo-Alessi and exhibits annexed thereto, (5) Declaration of Ben Sevier and exhibits annexed thereto, (6) Declaration of Alan Pavese and exhibits annexed thereto, (7) Declaration of Ian Foster and exhibits annexed thereto, (8) Declaration of Sandra Cisneros, (9) Declaration of Tracey Offner and exhibits annexed thereto, and (10) Declaration of Elizabeth McNamara and exhibits annexed thereto.

PLEASE TAKE FURTHER NOTICE that, pursuant to the scheduling ordered entered by this Court on January 21, 2022 (ECF No. 70), opposing papers, if any, must be served upon the undersigned on or before September 2, 2022; and reply papers, if any, must be served on or before October 7, 2021. Any oral argument will occur on a date and at a time designated by the Court.

Dated: New York, New York
      July 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

2

*Attorneys for Hachette Book Group,*
*Inc., HarperCollins Publishers LLC,*
*John Wiley & Sons, Inc., and Penguin*
*Random House LLC*

TO:

DURIE TANGRI LLP
Joseph C. Gratz
Jessica E. Lanier
Aditiya V. Kamdar
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry
Kit Walsh
Cara Gagliano
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

*Attorneys for Defendant*
*Internet Archive*

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | |
| Plaintiffs, | Case No. 1:20-CV-04160-JGK |
| v. | **DECLARATION OF SANDRA CISNEROS** |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, **SANDRA CISNEROS**, declare as follows:

1.     I am the author of 13 books of fiction, poetry and essays, including *The House on Mango Street*, *Caramelo* and *A House of My Own: Stories from My Life*.  I submit this declaration in support of the motion for summary judgment filed in this action by plaintiffs Penguin Random House LLC, Hachette Book Group. Inc., HarperCollins Publishers LLC, and John Wiley & Sons, Inc. (collectively, "Plaintiffs").  This declaration is based on my personal knowledge except as stated herein.

2.     I am a professional author and I am very proud to earn a living by my pen.  This was not a foregone conclusion or an easy achievement.  I am the granddaughter of people who came to this country and could not read or write until they were elders.  I am also the daughter of a man, an immigrant from Mexico, who labored with his hands.  I am a woman of color who comes from working class roots, but my father – who was an upholsterer – taught me about craft and taking pride in what I make.

3.     I also consider myself to be a product of the Chicago Public Library.  My family did not own the books that I read when I was a child, we borrowed them from the library.  The

public libraries that raised me up as an author, like the Chicago Public Library, bought their books with money from the local community and paid authors for their work. When I read those books, I knew I was not dealing with stolen goods and I would never want to rip off authors by reading bootleg books that a library had acquired dishonestly.

4.　　I knew I wanted to be an author from a young age, and published my first book at 21, but it was not easy to make a living from my writing. I obtained an undergraduate degree in English from Loyola University of Chicago and then a Master of Fine Arts Degree in poetry from the University of Iowa Writers' Workshop in 1978. After I graduated, I started working at the Latino Youth Alternative High School in Chicago because I was unable to make a living from writing at that time.

5.　　But I kept writing nevertheless. I was primarily writing poetry during this period of my life but I was also writing a prose novel. That novel became *The House on Mango Street* – which I started at the University of Iowa and continued while I was working at the high school. I wrote that book with care and labored honestly on my writing, as my father had taught me to do, in order to make it the very best it could be. It took many hours to construct each page and many years to complete all 103 pages of the book, which was finally published in 1984.

6.　　*The House of Mango Street* has sold over six million copies and won the American Book Award among other prestigious prizes, but the publication of that book did not translate into instantaneous financial security for me. About three years after *The House of Mango Street* was published, when I was 33 years old, I found myself unable to pay the rent and considered killing myself because it was so painful to feel like I was of no value to society, even though I knew I was a gifted writer. Fortunately, I received a grant for the National Endowment of the Arts that provided the temporary financial support I needed to continue.

2

7.      I was also fortunate that my agent of the last thirty-five years, Susan Bergholz, approached me at this time and helped me to enforce my rights as an author. From this point onwards, my agent advised me on contracts and defended me against economic abuse by former publishing partners. She also worked very hard to get major publishing houses to pay attention to a writer like me, who had previously only worked with small presses. My life was changed after I started working with Susan because I no longer had to concern myself so much with the business part of book publishing, which I am not very good at. I could concern myself instead with the creative part that I have devoted my life to.

8.      I signed my first publishing agreement with Random House (Vintage Books), which is now an imprint of Penguin Random House, in 1990. For the last thirty years, Penguin Random House has provided me with the full range of editorial support – including the payment of advances, editors to provide notes on my manuscripts, cover art designers and distribution of royalties. It has also provided me with incredible marketing support to ensure that my books and my voice reach as far as possible. My experiences with Penguin Random House is very different from when I published my first book at a small press and had to be the publicist, the distributor and sometimes a travelling sale person. I carried a big bag with five hundred or so copies of my book and it was my job to sell them. I am so glad that Penguin Random House now does that work for me.

9.      I did not start earning significant money from my writing until I was in my mid-forties, approximately twenty-five years after I published my first book, and I was forced to work a day job throughout that time. I worked hard to earn the financial security that I now have and which enables me to earn a living from my pen without fear of poverty. And, as my agent reminds me, the royalty revenues I receive from the sales of books I have written are precious

3

and must be closely guarded because this is ultimately going to generate the money that supports me in old age.

10.     For many years, I (and my agent) were fearful to publish ebook editions of my work. Everything was so new, and changing rapidly, that we had serious concerns that people would swap my books online and never pay for them again. But my agent did the research necessary to make astute business decisions that protected me and made sure that I would be protected in the future. We ultimately made an agreement with Penguin Random House to publish my work as ebooks in 2013 and, from that time onwards, I have relied on my publisher to make sure that my ebooks are distributed responsibly and in a controlled manner that ensures that I do not risk losing the present or future income from book sales that I have worked so hard to secure.

11.     When I went on the Internet Archive's website and saw that scans of my books were being distributed to anybody who wanted them for free – without my permission or any payment – I was appalled. I found the experience so viscerally upsetting that I could not stay on the website for long. It was like I had gone to a pawn shop and seen my stolen possessions on sale.

12.     To this day, I am angry that Internet Archive tells the world that it is a library and that, by bootlegging my books, it is simply doing what libraries have always done. Real libraries do not do what Internet Archive does. The libraries that raised me paid for their books, they never stole them. Any libraries that want to provide ebook versions of my books to the public for free can do so because I have authorized Penguin Random House to license my work to any library that is willing to pay for the authorized digital formats. I consider Internet Archive's

4

distribution of my books to be a terrible violation of the control I have worked so hard to establish over my work.

13.     I am also insulted by the fact that Internet Archive seems to think that it needs to make my books available for free because I do not care about people who are too poor to pay for my work.  For more than forty years, I have travelled across the country to talk to speak with those in disadvantaged communities whenever I can and I have distributed free copies of my books to thousands of people who could not otherwise afford them, often at my own expense. Penguin Random House has supported me in this endeavor and there are even terms in my publishing agreements that require it to cover the costs of providing free books and tapes to 13 libraries or schools that I designate each year based on requests that I had received personally. Internet Archive's website, by contrast, is of no use to many of the people I meet and provide with books because many of them lack the good fortune to have reliable internet connections.  In short, it is my discretion to determine when and to whom I provide free copies of my books.  It is not Internet Archive's (or anyone else's) right to make that decision.

14.     There is also no doubt in my mind that I lost money because Internet Archive has posted my work online.  It is common sense that if someone is willing to download one of my books for free from the internet, they are not going to pay for it later.  Given the fact that even over a relatively short period of time, almost a thousand people have already obtained *The House on Mango Street* on Internet Archive's website, there cannot be any serious doubt that at least some of those people would have paid for the book if Internet Archive did not exist.  In addition, I have lost money because Internet Archive has not paid me any of the fees that actual libraries pay to license my work and lend it to the public.

5

15.     I am proud to make a living from my pen, especially because I labored honestly and expended a lifetime's worth of creative energy on my craft – as my father taught me to do. But my financial security is only possible because I have learned to enforce my rights.  This is what has made it possible to focus on my art and to spend the rest of my working life writing, which I believe will benefit our culture.  I make this declaration because Internet Archive's disregard for my rights disrespects the contributions I have made and would threaten my livelihood if this sort of theft was permitted to become more widespread.

16.     I also make this declaration because I want to ensure that other writers, who are starting their careers and struggling like I did, know that they stand a chance of earning a living and that their books matter.  If Internet Archive had stolen my work when I was still in a vulnerable stage of my writing career, I do not know if I could have kept going to become what I am today.  Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of making a living from their pen.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

6

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on July 5, 2022.

SANDRA CISNEROS