# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 3 OF 26 (A-517-A-787)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM

DANAE TINELLI

SCOTT A. ZEBRAK

OPPENHEIM + ZEBRAK, LLP

4530 Wisconsin Avenue, NW,

5th Floor

Washington, DC 20016

ELIZABETH A. MCNAMARA

LINDA J. STEINMAN

JOHN M. BROWNING

JESSE M. FEITEL

CARL MAZUREK

DAVIS WRIGHT TREMAINE LLP

1251 Avenue of the Americas, 21st Floor

New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| **Vol. 5** | | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| **Vol. 6** | | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | | **Vol. 7** | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | **Vol. 16** | | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

17

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| | **Vol. 18** | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| | **Vol. 19** | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| **Vol. 20** | | | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

26

# Exhibit 4 to Sevier Declaration

# Filed Under Seal (A-517-561)

**Exhibit 5 to Sevier Declaration**

**Filed Under Seal (A-562-569)**

# Exhibit 6 to Sevier Declaration
# Filed Under Seal (A-570-576)

Sevier Declaration

Exhibit 7

FILED UNDER SEAL

# Exhibit 8 to Sevier Declaration

# Filed Under Seal (A-578-579)

# Sevier Declaration

# Exhibit 9

| | |
|---|---|
| **From:** | remedies@attributor.com |
| **Sent:** | Thursday, April 9, 2020 1:14 AM EDT |
| **To:** | info@archive.org |
| **Subject:** | This is a verified DMCA Removal Request from Attributor |

\*\*\* Sent via Email - DMCA Notice of Copyright Infringement \*\*\*

Dear Sir/Madam,

I certify under penalty of perjury that I am an agent authorized to act on behalf of the owner of the intellectual property rights and that the information contained in this notice is accurate.

I have a good faith belief that the page or material listed below is not authorized by law for use by the individual(s) associated with the identified page listed below or their agents and therefore infringes the copyright owner's rights.

I HEREBY DEMAND THAT YOU ACT EXPEDITIOUSLY TO REMOVE OR DISABLE ACCESS TO THE PAGE OR MATERIAL CLAIMED TO BE INFRINGING.

This notice is sent pursuant to the Digital Millennium Copyright Act (DMCA), the European Union's Directive on the Harmonisation of Certain Aspects of Copyright and Related Rights in the Information Society (2001/29/EC), and/or other laws and regulations relevant in European Union member states or other jurisdictions.

My contact information is as follows:

Organization name: Attributor Corporation as agent for the rights holders listed below
Email: counter-notice@attributor.com
Phone: +██████████████
Mailing address:

██████████████████

My electronic signature follows:
Sincerely,
/Devon E. E. Weston/
Devon E. E. Weston
Attributor, Inc.

\*\*\* INFRINGING PAGE OR MATERIAL \*\*\*

Infringing page/material that I demand be disabled or removed in consideration of the above:


Rights Holder: Hachette Book Group

Original Work: The Art of Choosing

Infringing URL: https://archive.org/details/artofchoosing00shee


Rights Holder: Hachette UK

Original Work: The String Diaries

**CONFIDENTIAL**                                                        **INTARC00328780**

Infringing URL: https://archive.org/details/stringdiaries0000lloy

Original Work: The Winds of War

Infringing URL: https://archive.org/details/windsofwar00wouk_0

Original Work: An Introduction to Medical Dance/Movement Therapy

Infringing URL: https://archive.org/details/introductiontome0000good

Original Work: Contact

Infringing URL: https://archive.org/details/contact00saga_0

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

Original Work: Naamah's Blessing

Infringing URL: https://archive.org/details/isbn_9780446198080

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: Frankenstein

Infringing URL: https://archive.org/details/isbn_9781411403239

Original Work: Four Blind Mice

Infringing URL: https://archive.org/details/fourblindmicenov00patt_0

Original Work: How Google Works

Infringing URL: https://archive.org/details/howgoogleworks0000schm

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: The Heroes

Infringing URL: https://archive.org/details/heroes00aber

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: Before They Are Hanged

Infringing URL: https://archive.org/details/beforetheyarehan00aber

Original Work: Before They Are Hanged

Infringing URL: https://archive.org/details/beforetheyarehan00aber

Original Work: The Art Of Choosing

Infringing URL: https://archive.org/details/artofchoosing00shee

Original Work: Four Blind Mice

Infringing URL: https://archive.org/details/fourblindmicenov00patt_0

Original Work: Black Cherry Blues

Infringing URL: https://archive.org/details/blackcherryblues00burk_1

Original Work: Ship Breaker

Infringing URL: https://archive.org/details/shipbreakernovel00baci

Original Work: The Caine Mutiny

Infringing URL: https://archive.org/details/cainemutiny00herm

Original Work: Your Best Life Now

Infringing URL: https://archive.org/details/yourbestlifenow700oste_0

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: Before They Are Hanged

Infringing URL: https://archive.org/details/beforetheyarehan00aber

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

Original Work: The String Diaries

Infringing URL: https://archive.org/details/stringdiaries0000lloy

Original Work: The Green Mile

Infringing URL: https://archive.org/details/bp_TGM

Original Work: Best Served Cold

Infringing URL: https://archive.org/details/bestservedcold00aber

Original Work: Another One Bites The Dust

Infringing URL: https://archive.org/details/anotheronebitesd00rard

Original Work: Best Served Cold

INTARC00328782

Infringing URL: https://archive.org/details/bestservedcold00aber

Original Work: The Heroes

Infringing URL: https://archive.org/details/heroes00aber

Original Work: The Witness

Infringing URL: https://archive.org/details/witnesshardcover00sand
Infringing URL: https://archive.org/details/witness00brow_0

Original Work: First Blood

Infringing URL: https://archive.org/details/firstblood00morr

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: The Caine Mutiny

Infringing URL: https://archive.org/details/cainemutiny00herm

Original Work: The Winds of War

Infringing URL: https://archive.org/details/windsofwar00wouk_0

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

Original Work: Jude the Obscure

Infringing URL: https://archive.org/details/judeobscure00hard_4

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Rights Holder: Hachette Book Group

Original Work: Your Best Life Now

Infringing URL: https://archive.org/details/yourbestlifenow700oste_0
Infringing URL: https://archive.org/details/yourbestlifenows00oste

Original Work: The String Diaries

Infringing URL: https://archive.org/details/stringdiaries0000lloy

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Original Work: The Heroes

Infringing URL: https://archive.org/details/heroes00aber

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: Your Best Life Now

Infringing URL: https://archive.org/details/yourbestlifenow700oste_0
Infringing URL: https://archive.org/details/yourbestlifenows00oste

Original Work: Naamah's Blessing

Infringing URL: https://archive.org/details/isbn_9780446198080

Original Work: Four Blind Mice

Infringing URL: https://archive.org/details/fourblindmicenov00patt_0

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

CONFIDENTIAL

INTARC00328784

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: Before They Are Hanged

Infringing URL: https://archive.org/details/beforetheyarehan00aber

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: Best Served Cold

Infringing URL: https://archive.org/details/bestservedcold00aber

Original Work: First Blood

Infringing URL: https://archive.org/details/firstblood00morr

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Original Work: The Witness

Infringing URL: https://archive.org/details/witnesshardcover00sand
Infringing URL: https://archive.org/details/witness00brow_0

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: The Cube and the Cathedral

Infringing URL: https://archive.org/details/cubecathedraleur00weig

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: Best Served Cold

Infringing URL: https://archive.org/details/bestservedcold00aber

**CONFIDENTIAL**

INTARC00328785

Original Work: The Celestine Vision

Infringing URL: https://archive.org/details/celestinevision00redf
Infringing URL: https://archive.org/details/celestinevision00jame_0

Original Work: The Caine Mutiny

Infringing URL: https://archive.org/details/cainemutiny00herm

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Original Work: Your Best Life Now

Infringing URL: https://archive.org/details/yourbestlifenow700oste_0
Infringing URL: https://archive.org/details/yourbestlifenows00oste

Original Work: The Heroes

Infringing URL: https://archive.org/details/heroes00aber

Original Work: Another One Bites the Dust

Infringing URL: https://archive.org/details/anotheronebitesd00rard

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: First Blood

Infringing URL: https://archive.org/details/firstblood00morr

Original Work: Your Best Life Now

Infringing URL: https://archive.org/details/yourbestlifenow700oste_0

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

Original Work: The Winds of War

Infringing URL: https://archive.org/details/windsofwar00wouk_0

Original Work: How Google Works

Infringing URL: https://archive.org/details/howgoogleworks0000schm

Original Work: Ship Breaker

INTARC00328786

Infringing URL: https://archive.org/details/shipbreakernovel00baci

Original Work: Lifeguard

Infringing URL: https://archive.org/details/lifeguardlargety00patt

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: At First Sight

Infringing URL: https://archive.org/details/atfirstsight00spar_1

Original Work: The Wedding

Infringing URL: https://archive.org/details/wedding00spar_0

Original Work: Night Fall

Infringing URL: https://archive.org/details/nightfall00demi

Original Work: The Witness

Infringing URL: https://archive.org/details/witnesshardcover00sand
Infringing URL: https://archive.org/details/witness00brow_0

Original Work: True Believer

Infringing URL: https://archive.org/details/truebeliever00spar_0

Original Work: Before They Are Hanged

Infringing URL: https://archive.org/details/beforetheyarehan00aber

Original Work: Four Blind Mice

Infringing URL: https://archive.org/details/fourblindmicenov00patt_0

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC <br><br>                 Plaintiffs, <br><br>     v. <br><br> INTERNET ARCHIVE and DOES 1 through 5, inclusive <br><br>                 Defendants. | Case No. 1:20-CV-04160-JGK <br><br> <u>**DECLARATION OF**</u> <br> <u>**ALAN PAVESE**</u> |

Pursuant to 28 U.S.C. § 1746, I, **ALAN PAVESE**, declare as follows:

1.     I am a Senior Vice President, Pricing, Data & Operations at John Wiley & Sons, Inc. ("Wiley").  I submit this declaration in support of the motion for summary judgment filed in this action by Wiley and plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, and Penguin Random House LLC (collectively, "Plaintiffs").  This declaration is based on my personal knowledge except as otherwise stated.  This action concerns the Internet Archive's free ebook website ("Website"), which can be accessed either through the Internet Archive's "Open Library" website, http://openlibrary.org, or the Internet Archive's general website at http://archive.org, which actually hosts the ebook files.  This lawsuit concerns the works in the Internet Archive's "Books to Borrow" collection – which have been scanned and uploaded by the Internet Archive rather than third parties.

<u>**Introduction**</u>

2.     Founded in 1807, Wiley is a leading publisher of scientific and medical works, including works written by over 450 Nobel Laureates.  Wiley publishes both academic journals with scholarly articles and books – including textbooks, reference works, professional books and

"trade books." Its publications span a broad array of subjects, including physical sciences and engineering, medicine, mathematics and statistics, life sciences, business, computer science and information technology. Trade books, which are general interest books that one might find in a bookstore chain or community bookstore, constitute a comparatively small portion of Wiley's catalog. The nineteen Works in Suit published by Wiley at issue in this lawsuit are all trade books, ranging from popular business leadership books by Patrick Lencioni to several works in the well-known *"For Dummies"* series of "how to" books.

3.       Given the academic and scientific nature of Wiley's list, libraries are its largest sales channel in both print and digital. Wiley licenses an enormous amount of content to library ebook aggregators, who in turn license the ebooks to libraries for use by their patrons. In particular, Wiley works closely with ebook aggregators focused on serving academic libraries and markets such as EBSCO/GOBI ("EBSCO") and ProQuest. While much of the content licensed to EBSCO and ProQuest is geared for an academic audience, Wiley also licenses its general trade book ebook titles to EBSCO and ProQuest in light of its existing relationship with them. Likewise, Wiley works with library ebook aggregators like OverDrive that focus more heavily on licensing general trade book ebooks to public libraries.

4.       As set forth below, Wiley has worked closely with libraries and library ebook aggregators in a collaborative fashion and is constantly experimenting with a wide array of different models to determine those that best serve the interests of libraries and their patrons. Thus, for example, in addition to the most commonplace model under which libraries lend ebooks on a One Copy/One User basis, Wiley collaborates with EBSCO and ProQuest and licenses many of its trade books in ebook form to libraries on a One Copy/Three User basis, subscription models, and concurrent access models.

2

5.      Wiley's One Copy/One User model for library ebooks is both similar to and different from the other Plaintiffs in this case.  The essential nature of this model is the same for all of us – namely, one library patron at a time is able to borrow the ebook.  Further, like the other Publishers, Wiley licenses ebooks to both public and academic libraries via aggregators based on the fundamental premise that each individual library may only lend the ebooks to its registered members – whether the local inhabitants of the town with a library card, or for academic libraries, the students, faculty and staff.  However, the other Plaintiff publishers set a one or two-year term or a limit on the number of circulations for ebooks licensed to public libraries, while using a perpetual term for their licenses to academic libraries (i.e., the license does not expire).  In contrast, we use a perpetual term for all our library ebook licenses under the One Copy/One User model.  Despite the long term, we set the digital list price for the library ebook as the same price as our print list price.  Although we devised this model with academic libraries in the forefront of our minds, it has been simpler for us to offer a perpetual term for all ebook titles, including trade book titles, licensed to all libraries under the One Copy/One User model.  The company understands that some libraries prefer a perpetual model to a time-limited one, and Wiley has been able to maintain its perpetual model for its trade ebook titles because the market for its trade titles is comparatively small.

6.      Internet Archive's Website harms Wiley, as further detailed below.  As the Foster Declaration dated June 29, 2022 recounts, the Internet Archive has scanned close to 5,000 of our print titles, and made each of these texts available in full and for free in ebook form to any person around the globe.  Any person can visit the Website and immediately access a free electronic copy of over 15% of all of the books published by Wiley in print and digital formats, without any payment to us or our authors.  (Foster Decl.¶ 115(i).)  Internet Archive has continued with its operation despite our takedown notices.  (True and correct copies of examples of takedown notices

3

A-591

Wiley submitted to Internet Archive are annexed hereto as Exhibit 1.)

7.     While Wiley believes that the Website is illegal and causing financial harm to our company and our authors, the Internet Archive has argued that its service constitutes a fair use because it is merely increasing the efficiency with which libraries can lend books to their patrons. But it is Wiley, working with its authors, that has both invested the time and funds necessary to create high quality content, and that has provided libraries with many options to make library ebook lending more versatile and affordable.  As noted above, Wiley's library ebook lending models afford libraires an array of lending options, including an option to obtain a perpetual license for a similar price as the print book, the ability for multiple patrons to access an ebook at the same time, or for a library to offer a large selection of titles for lending through a subscription-based product.  These are the ways that Wiley has tangibly increased the efficiency with which libraries can lend ebooks to the public.

8.     I also understand that the Internet Archive attempts to justify its actions as in the public interest by arguing that the terms under which publishers license ebooks to libraries – including the metering limitations and pricing structures – make ebooks quite expensive for libraries and allegedly harm libraries by depriving them of the key benefits of acquiring print books.  But Wiley, because of its principal role as an academic publisher, licenses its trade book ebooks to libraries for a perpetual term at the same price as a print book – in other words, in a fashion closely akin to the acquisition of print books.  Yet the Internet Archive posts thousands of our books on its Website along with everyone else's – suggesting that this public interest argument is a pretext.

## A.     **Background**

9.     Wiley has over 200 years of experience publishing scientific, professional, and education books and journals in print and digital formats.  In its early years, Wiley was best known

for publishing works of 19th century American literary giants like Washington Irving and Edgar Allan Poe. By the 20th century, Wiley had focused in the critical areas of scientific, technical, medical, and scholarly research. Wiley currently publishes over 2,000 new books each year and now offers over 157,000 titles.

10.    I joined Wiley in May 2018. For most of the last ten years I have been working in Pricing, Commercial Model, Data & Operations roles in the publishing industry. Prior to Wiley, I worked at Macmillan for two years. Prior to Macmillan I worked at Cengage Group for almost six years. In my current role, I am responsible for Pricing, Data, Operations and business management of Wiley's Academic & Professional Learning Division.

**B.    To Expose Their Books to the Widest Possible Audience, Wiley's Authors Expect the Company to Successfully Develop and Utilize New Book Formats**

11.    I have reviewed the declarations of Ben Sevier of Hachette Publishing Group, Jeffrey Weber of Penguin Random House and Chantal Restivo-Alessi of HarperCollins and concur with their themes. I will not repeat those here, but rather will focus solely on material subjects that differ for Wiley.

12.    Like the other Plaintiffs, Wiley and its authors invest significant time and resources to write and publish their books. Indeed, the nature of Wiley's books – including its trade books – often require extensive research and mastery over a technical subject. (A true and correct copy of a spreadsheet detailing Wiley's company-wide costs, including royalty and overhead costs, for trade books and books published in the *For Dummies* series is annexed hereto as Exhibit 2.)

13.    Likewise, like the other Plaintiffs, whenever Wiley acquires new works to publish, our authors grant the company the exclusive rights to develop and distribute that work in different formats. In order to secure an adequate return on the significant investment the company makes

<div align="center">5</div>

in its authors, Wiley must be compensated for the sale of each of its titles in each format the title is sold in.

14.    Similar to the other Plaintiffs, Wiley depends on its backlist, including titles that are more than five years old, to act as the steady sellers that permit it to invest in newer, more risky books.  Indeed, many of the non-fiction books that Wiley publishes aim to address topics of long-standing interest, as compared with, for example, commercial fiction published by trade publishers that may well have a shorter shelf-life.

15.    Likewise, similar to the other Plaintiffs, Wiley has invested heavily in the development of new forms of digital delivery for its works, including Wiley E-Text, which provides students with the option to study Wiley-published materials on their laptop, on a desktop, or on-the-go on a mobile device.  If Wiley were unable to reap the rewards of the sale of its works in each different format, it would not have the same incentives to invest in them.

16.    In the last twenty or so years, ebook sales for our trade books have become a critical source of revenue for Wiley and our authors, as readers have flocked to ebooks.  As demonstrated in Exhibit 2, which tracks our revenues for all our trade books including the *For Dummies* series, Wiley earned over $114 million in print revenues and over $36 million in digital revenues in fiscal year 2021.

17.    As compared to the longstanding print library lending market, Wiley's library ebook market is relatively new and continues to evolve.  But at this stage, it is clearly a well-established market for the company.  Every newly-released Wiley trade book title that is published as an ebook is available as a library ebook on the same publication date.  For certain types of content outside of the Works in Suit and outside of the trade business in general, like textbooks, some content is not made available through the library channel.

6

A-594

18.     The nineteen Works in Suit published by Wiley are all available as ebooks and as library ebooks, and libraries have obtained them for lending via library ebook aggregators.  The Works in Suit include *The Energy Bus: 10 Rules to Fuel Your Life, Work, and Team* (Jon Gordon), a bestselling guide to business success, and *The Five Dysfunctions of a Team: a Leadership Fable* (Patrick Lencioni), which has served as a guide to countless executives and organizations. Evergreen academic title *Basic Physics* (Karl F. Kuhn) is one of the Works in Suit, along with *Ages and Stages: a Parent's Guide to Normal Childhood Development* (Charles E. Schaefer; Theresa Foy DiGeronimo), which has helped guide many parents through sleepless nights.  The Works in Suit also include five selections from Wiley's extensive *For Dummies* series. For decades, *For Dummies* books have transformed complicated subjects into easy-to-use guides that enable learners of all ages to advance their personal and professional goals.  Revenue earned from the sale of Wiley books across multiple channels – including ebooks – allows the company to invest in publishing *For Dummies* books on numerous niche or highly specific subjects, including oil painting and the study of comparative religion, the focus of two of the Works in Suit.

19.     Wiley earned over $87,000 in revenue from the license of the Works in Suit as ebooks in the library market, through its aggregator partners OverDrive, EBSCO, and ProQuest, between 2001 and 2021.  (A true and correct copy of a spreadsheet reflecting Wiley's sales records for the Works in Suit is annexed hereto as Exhibit 3.)

20.     Finally, like the other Plaintiffs, Wiley's experience is that unauthorized digital copies of its works distributed on the internet hurt its sales – an issue that is particularly problematic with textbooks.  Wiley devotes considerable resources to fighting digital piracy. The company has escalated its efforts to attack digital piracy in recent years, including a recent $10 million investment in strengthening its in-house anti-piracy team and its relationships with third-party vendors that engage in significant anti-piracy efforts on Wiley's behalf.  In fact, the Internet

7

Archive first came to my attention after it was included in a round-up of websites making pirated versions of Wiley ebooks available for free. The company's significant investments in these efforts are consistent with industry data reflecting that publishing companies have suffered hundreds of millions of dollars in losses attributable to widespread pirated content that is available on the Internet. This pirated content damages Wiley, its authors, and its aggregator partners. Wiley plans to continue to make additional investments to strengthen its efforts to fight piracy, including investing in new technologies; for instance Wiley is experimenting with techniques including automation, artificial intelligence, and web scraping – all in an effort to identify and remove unauthorized Wiley content from the Internet.

**C.** **Recognizing the Significant Benefits Afforded by Library Ebooks, Wiley Has Invested In Creating Balanced Terms to Govern the Market**

21. Wiley and its library ebook aggregators have invested untold hours in developing different models for library ebook lending that will best serve the interests of libraries and their patrons. We continue to experiment to this day.

22. Wiley's most popular lending models for its trade titles are a One-Copy/One-User model or One-Copy/Three Users model, both with a perpetual term. Under these models, when a library obtains a license for one ebook copy of a Wiley title, only one – or three – users at a time can access that copy. A library's license to lend out the copy under the terms of the license does not expire.

23. This model includes a critical restriction – namely each library or library consortium may only make Wiley titles available to the narrow universe of its own community, thus setting an important territorial restriction that prevents against the widespread distribution of a digital book file. For example, Wiley's Ebook Distribution Agreement with ProQuest defines an "Authorized User" as follows: "For public libraries: library staff, individual residents of

8

A-596

Customer's reasonably defined geographic area served, and walk-in patrons while they are on site"

and "For schools and other academic institutions: currently enrolled students, faculty, staff and

visiting scholars, as well as walk-in patrons while they are on-site. (A true and correct copy of the

ProQuest agreement is annexed hereto as Exhibit 4.) Similarly, in its agreement with library ebook

aggregator OverDrive, Wiley requires OverDrive to "require participating [libraries] to take

reasonable measures to ensure that only Authorized Patrons of their libraries . . . may access the

offline or download collection" and that "OverDrive will require that participating [libraries]

provide it the right to audit their access control systems." (A true and correct copy of the Overdrive

agreement is annexed hereto as Exhibit 5.)

24.     Putting in place this critical territorial restriction protects Wiley's return on its

investment in its works, and allows it to advance the interests of its authors. Otherwise, a limited

number of ebook licenses to a handful of libraries could serve broad geographic demand for a title.

This limitation is particularly crucial since Wiley is licensing the ebook on a perpetual term with

a digital list price that equals the print list price – and yet an ebook would be capable of far more

efficient reproduction and distribution than a print book, allowing it to serve exponentially greater

demand.

25.     The One Copy/One User model with a perpetual term was devised largely with the

interests of academic libraries in mind. These libraries are the primary customers of Wiley's

science and academic-focused titles, which make up the vast majority of its list. While all libraries

exist to serve patrons and expand access to information, academic libraries have a slightly different

mission than their public counterparts. Academic libraries highly prioritize the building of long-

term collections, whereas public libraries often weed their collections. Further, professors and

college students tend to make somewhat different uses of academic-focused ebooks than the

general public does with trade ebooks in the public library context. As a result of these differences,

a perpetual licensing model is particularly attractive to academic libraries.

26.     Nevertheless, Wiley has continued to make its One-Copy/One User model available with a perpetual term for all of Wiley's licenses of trade titles to public libraries.  We have done so for the sake of simplicity, because of our sense of the how libraries view our trade titles, and because comparatively this is not a very large market for Wiley.  We believe that our license terms provide significant value to libraries.

        **1.**        **<u>Wiley Has Worked Closely and Collaboratively with its Aggregator Partners to Adopt Lending Models Not Generally Adopted by Trade-Focused Publishing Companies</u>**

27.     Additionally, because so many of Wiley's books are in demand in the academic context and consumed by readers in these settings, our company has been fortunate to work in close tandem with the leading academic-focused aggregators, EBSCO and ProQuest, to develop additional lending models that better serve the specific needs of libraries and readers of Wiley's science-focused titles.  (A true and correct copy of a spreadsheet produced by Wiley, which summarizes the various terms offered by two of Wiley's key aggregator partners, EBSCO and ProQuest, is annexed hereto as Exhibit 6.)  I know firsthand the work that went into assessing these lending models for Wiley, which aim to make it more efficient, cost-effective, and economical for large academic institutions to make thousands of works available to thousands of students and faculty.

28.     In addition to the One Copy/One User model,  these library ebook aggregators offer subscription-based models. Rather than setting aside funding for particular titles, these subscription models offer libraries the prospect of paying a comparatively low price for students to have unlimited access to a large volume of ebooks.  While a subscription model may not be desirable in other contexts where demand may spike sharply for a given period of time, as with the release of a bestselling commercial book, the model works better in the context of lending

10

academic-focused works.

29.     The decision of which titles to make available through a subscription model is one that is made carefully by Wiley after consideration of all the relevant factors.  We are always thinking about the question:  How do people want to access our titles?  If the company includes certain titles as part of a subscription model, how will this serve our readers and our library partners?  Three of the Works in Suit published by Wiley are available under these subscription models.  (A true and correct copy of a spreadsheet reflecting which of the Works in Suit are available pursuant to one of the EBSCO or ProQuest academic subscription models is annexed hereto as Exhibit 7.)

30.     Exhibit 6 provides several other examples of the potpourri of lending models offered by Wiley's aggregator partners.  We offer many of our trade books under these various models.  The "Concurrent User Access Model" is specifically designed to account for the frequent but brief use of titles in academic settings.  Under that model, content is available for a maximum of 365 "uses" within a particular year.  A use is defined to exclude a brief consultation of less than 10 minutes.  Likewise, Wiley offers a number of "Short Term Loans" – ranging from one-day, seven-day, 14-day, and 28-day periods – where a library purchases access to a title for only that specific period of time, at a lower price than what one copy would cost under the One-Copy/One User model with a perpetual term.

31.     Wiley generally strives to comply with the accessibility needs of the market and spends millions of dollars each year to improve and increase access and accessibility of its products and content.

### D.     The Internet Archive Causes Significant Harm to Wiley and its Authors

32.     The Internet Archive causes the company harm for all the reasons set forth in the declarations from our co-plaintiffs and incorporated herein.  At the most fundamental level,

Internet Archive harms Wiley by failing to pay us a fee for distributing our ebooks for short-term lending. Internet Archive claims it is a library, but libraries customarily pay us a fee to engage in the short-term lending of Wiley's books. Viewed from another perspective, Wiley is also harmed because the Internet Archive's Website directly competes with our library ebook market and our consumer ebook market.[1] The Internet Archive's free, unauthorized ebooks serve the same purpose as our authorized ebooks – they can be read to use or enjoy their contents. Thus, they are capable of displacing both library and consumer ebook sales.

33.     The Internet Archive also devalues Wiley's ebooks by making them broadly available for free, which is a particularly pervasive problem as digital piracy has become more prolific and sophisticated.

34.     In sum, the Internet Archive disrupts our digital strategies and free-rides on our significant investments to create informative non-fiction works. By scanning print books to turn them into digital assets, it appropriates for itself the benefits of digital, without compensating the rightsholders. Wiley – not Internet Archive – should be the one to set the terms for how our ebooks are distributed, and to be compensated for those circulations.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

---

[1] While Wiley contends that the Internet Archive also harms its print book sales revenues in the commercial and library markets, its summary judgment motion is solely based on ebook sales. Wiley reserves the right to address print sales in the event of a trial in this matter.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct and that this declaration was executed on June 30, 2022.

ALAN PAVESE

13

A-601

Pavese Declaration

Exhibit 1

| From: | Murphy, Patrick - Hoboken |
|-------|---------------------------|
| To: | info@archive.org |
| BCC: | Shettleton, Amanda - Hoboken; Cummins, Margaret - Hoboken |
| Sent: | 8/19/2016 2:19:15 PM |
| Subject: | DMCA Notice – Infringement of John Wiley & Sons, Inc.'s Copyrights |

DMCA Notice – Infringement of John Wiley & Sons, Inc.'s Copyrights

To Whom It May Concern:

I, the undersigned, CERTIFY UNDER PENALTY OF PERJURY that I am an agent authorized to act on behalf of the owner of certain intellectual property rights, said owner being named John Wiley & Sons, Inc., a global publisher of books, journals, and other products, or one of its related companies ("Wiley").

We recently learned that an unauthorized copies of the material listed below are being made available for purchase and/or download on a website hosted by your company at the following URL address:

https://archive.org/details/AGlobalHistoryOfArchitectureArtEbook

https://archive.org/compress/AGlobalHistoryOfArchitectureArtEbook/formats=ABBYY%20GZ&file=/AGlobalHistoryOfArchitectureArtEbook.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/A%20Global%20History%20of%20Architecture%20%28Art%20Ebook%29_scandata.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/AGlobalHistoryOfArchitectureArtEbook_archive.torrent
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/AGlobalHistoryOfArchitectureArtEbook_files.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/AGlobalHistoryOfArchitectureArtEbook_meta.sqlite
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/AGlobalHistoryOfArchitectureArtEbook_meta.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition#page/n1/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architectural%20Graphics%206th%20Edition_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook

WILEY0000344

/Architectural%20Graphics%206th%20Edition_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Architectural%20Graphics%206th%20Edition_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2C%20Space%20and%20Order%204th%20Ed#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Architecture%20-%20Form
%2c%20Space%20and%20Order%204th%20Ed_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed#page/n11/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Structures%20Illustrated%202nd%20Ed_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed#page/n81/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Building%20Construction%20Illustrated%205th%20Ed_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing.djvu

WILEY0000345

https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Design%20Drawing_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process_scandata.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Drawing-A-Creative-Process_text.pdf

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Green%20Building%20Illustrated_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated.djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/European%20Building%20Construction%20Illustrated_scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed.#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed..djvu
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed..gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed..pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed._abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed._djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook
/Interior%20Design%20Illustrated%203rd.%20Ed._djvu.xml

WILEY0000346

https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Interior%20Design%20Illustrated%203rd.%20Ed._jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Interior%20Design%20Illustrated%203rd.%20Ed._scandata.xml

https://archive.org/stream/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20#page/n0/mode/2up
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20.gif
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20.pdf
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20_abbyy.gz
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20_djvu.txt
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20_djvu.xml
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20_jp2.zip
https://archive.org/download/AGlobalHistoryOfArchitectureArtEbook/Visual%20Dictionary%20of%20Architecture%20_scandata.xml

The material is as follows:

A Global History of Architecture, 2nd Edition (ISBN: 978-0-470-40257-3) by Francis D. K. Ching
Architectural Graphics, 6th Edition (ISBN: 978-1-119-07338-3) by Francis D. K. Ching
Architecture: Form, Space, and Order, 4th Edition (ISBN: Francis D. K. Ching) by Francis D. K. Ching
Building Structures Illustrated: Patterns, Systems, and Design, 2nd Edition (ISBN: 978-1-118-45835-8) by Francis D. K. Ching
Building Construction Illustrated, 5th Edition (ISBN: 978-1-118-45834-1) by Francis D. K. Ching
Design Drawing, 2nd Edition (ISBN: 978-0-470-53369-7) by Francis D. K. Ching
Drawing: A Creative Process (ISBN: 978-0-471-28968-5) by Francis D. K. Ching
Green Building Illustrated (ISBN: 978-1-118-56237-6) by Francis D. K. Ching
European Building Construction Illustrated (ISBN: 978-1-119-95317-3) by Francis D. K. Ching
Interior Design Illustrated, 3rd Edition (ISBN: 978-1-118-09071-8) by Francis D. K. Ching
A Visual Dictionary of Architecture (ISBN: 0-471-28451-3) by Francis D. K. Ching

I have a good faith belief that the use of the title(s) identified above is not authorized by Wiley, its agent, or the law and therefore constitute a serious infringement of, inter alia, Wiley's copyrights, trademarks and trade dress.

We understand that many responsible ISPs inadvertently infringe the copyrights of others, and that this may be one such case. Accordingly, we will forbear legal action against your company provided that you remove or block access to the infringing matter within 48 hours of the time and date of this e-mail.

Thank you in advance for your cooperation.

Sincerely,
Patrick Murphy
Senior Enforcement Specialist
John Wiley & Sons, Inc.
111 River Street, Mail Stop 9-01
Hoboken, NJ 07030
Phone: 201-748-6014 / Fax: 201-748-6500
E-Mail Address: pmurphy@wiley.com

My name, typed above, constitutes an electronic signature under Federal law, and is intended to be binding.

This message and any files transmitted with it may contain privileged, confidential and/or proprietary information. It is intended solely for the individual or entity named above. Unauthorized use of these materials is strictly prohibited. If you have received this message in error, please immediately contact the sender by replying to this message and delete the original message. Thank you.

WILEY0000347

WILEY0000348

| From: | Murphy, Patrick - Hoboken |
|---|---|
| To: | info@archive.org |
| BCC: | Chen, Gina - Taipei |
| Sent: | 3/17/2016 9:54:37 AM |
| Subject: | DMCA Notice – Infringement of John Wiley & Sons, Inc.'s Copyrights |

DMCA Notice – Infringement of John Wiley & Sons, Inc.'s Copyrights

To Whom It May Concern:

I, the undersigned, CERTIFY UNDER PENALTY OF PERJURY that I am an agent authorized to act on behalf of the owner of certain intellectual property rights, said owner being named John Wiley & Sons, Inc., a global publisher of books, journals, and other products, or one of its related companies ("Wiley").

We recently learned that an unauthorized copies of the material listed below are being made available for purchase and/or download on a website hosted by your company at the following URL address:

https://archive.org/details/AdvancedEngineeringMathematics10thEdition
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition.djvu
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition.epub
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition.gif
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition.pdf
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition_abbyy.gz
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition_djvu.txt
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition_djvu.xml
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition_jp2.zip
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/Advanced%20Engineering%20Mathematics%2010th%20Edition_scandata.xml
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/AdvancedEngineeringMathematics10thEdition_archive.torrent
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/AdvancedEngineeringMathematics10thEdition_files.xml
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/AdvancedEngineeringMathematics10thEdition_meta.sqlite
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/AdvancedEngineeringMathematics10thEdition_meta.xml
https://archive.org/download/AdvancedEngineeringMathematics10thEdition
/AdvancedEngineeringMathematics10thEdition_reviews.xml

The material is as follows:

Advanced Engineering Mathematics, 10th Edition (ISBN: 978-0-470-45836-5) by Erwin Kreyszig

I have a good faith belief that the use of the title(s) identified above is not authorized by Wiley, its agent, or the law and therefore constitute a serious infringement of, inter alia, Wiley's copyrights, trademarks and trade dress.

We understand that many responsible ISPs inadvertently infringe the copyrights of others, and that this may be one such case. Accordingly, we will forbear legal action against your company provided that you remove or block access to the infringing matter within 48 hours of the time and date of this e-mail.

WILEY0000349

Thank you in advance for your cooperation.

Sincerely,
Patrick Murphy
Senior Enforcement Specialist
John Wiley & Sons, Inc.
111 River Street, Mail Stop 9-01
Hoboken, NJ  07030
Phone: 201-748-6014 / Fax: 201-748-6500
E-Mail Address: pmurphy@wiley.com

My name, typed above, constitutes an electronic signature under Federal law, and is intended to be binding.


This message and any files transmitted with it may contain privileged, confidential and/or proprietary information.  It is intended solely for the individual or entity named above.  Unauthorized use of these materials is strictly prohibited.  If you have received this message in error, please immediately contact the sender by replying to this message and delete the original message.  Thank you.

WILEY0000350

| **From:** | Internet Archive |
|---|---|
| **To:** | Chatterjee, Ayantika |
| **Sent:** | 10/15/2019 2:32:44 PM |
| **Subject:** | Re: [Arin-abuse-mail] DMCA Notice – Infringement of Wiley Copyrights |

Hello,

Please correct your records.

Per our copyright policy and our registration with the us copyright office, all dmca notices must be sent only to info@archive.org: archive.org/about/terms.php

Do not send email notices to any other address. Sending emails to addresses other than archive.org may result in lost email, or delayed response.

Please acknowledge that your records have been corrected.

On 10/15/19 11:29 AM, Chatterjee, Ayantika wrote:

To Whom It May Concern:

I, the undersigned, CERTIFY UNDER PENALTY OF PERJURY that I am an agent authorized to act on behalf of the owner of certain intellectual property rights, said owner being named Choose an item. hereafter "Wiley".

We recently learned that an unauthorized copy of the material listed below is available for download on a website hosted by your company at the following URL address:

https://archive.org/details/FundamentalsOfPhysics10thEditionHallidayResnick_201702/page/n2

https://archive.org/details/OrganicChemistryThirdEditionKlein/page/n20

The material is as follows:

**Fundamental of Physics, Halliday 10th edition**

**Organic Chemistry BY David Klein, 3rd edition**

I have a good faith belief that the use of the title(s) identified above is not authorized by Wiley, its agent, or the law and therefore constitute a serious infringement of, inter alia, Wiley's copyrights.

We understand that many responsible ISPs inadvertently infringe the copyrights of others, and that this may be one such case. Accordingly, we will forbear legal action against your company provided that you remove or block access to the infringing matter within 48 hours of the time and date of this e-mail.

Thank you in advance for your cooperation.

Sincerely,

WILEY0000444

A-610

Ayantika Chatterjee
Piracy Monitoring Associate
Wiley, Hoboken, USA
Phone +1(201) 748-5696 | aychatterj@wiley.com

My name, typed above, constitutes an electronic signature under Federal law, and is intended to be binding.

**WILEY**

_____
Arin-abuse-mail mailing list
Arin-abuse-mail@archive.org
http://mail.archive.org/cgi-bin/mailman/listinfo/arin-abuse-mail

--
Admin Team
Internet Archive
archive.org

WILEY0000445

# Exhibit 2 to Pavese Declaration
# Filed Under Seal (A-612)

# Exhibit 3 to Pavese Declaration

# Filed Under Seal (A-613)

# Exhibit 4 to Pavese Declaration
# Filed Under Seal (A-614-630)

# Exhibit 5 to Pavese Declaration
# Filed Under Seal (A-631-633)

# Exhibit 6 to Pavese Declaration
# Filed Under Seal (A-634)

# Exhibit 7 to Pavese Declaration

# Filed Under Seal (A-635)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr>
<td>

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN
WILEY & SONS, INC., and PENGUIN
RANDOM HOUSE LLC

                      Plaintiffs,

      v.

INTERNET ARCHIVE and DOES 1 through 5,
inclusive

                      Defendants.

</td>
<td>

Case No. 1:20-CV-04160-JGK

**DECLARATION OF**
**CHANTAL RESTIVO-ALESSI**

</td>
</tr>
</table>

Pursuant to 28 U.S.C. § 1746, I, **CHANTAL RESTIVO-ALESSI**, declare as follows:

1.    I am the Chief Digital Officer and CEO, International Foreign Language for HarperCollins Publishers LLC ("HarperCollins"). I submit this declaration in support of the motion for summary judgment filed in this action by HarperCollins and plaintiffs Hachette Book Group, Inc., John Wiley & Sons, Inc., and Penguin Random House LLC (collectively, "Plaintiffs"). This declaration is based on my personal knowledge except as otherwise stated. This action concerns the Internet Archive's free ebook website which can be accessed either through the Internet Archive's "Open Library" website, http://openlibrary.org, or the Internet Archive's general website at http://archive.org, which actually hosts the ebook files (together, "Website"). This lawsuit concerns the works in the Internet Archive's "Books to Borrow" collection – which have been scanned and uploaded by the Internet Archive rather than by third parties.

2.    The Internet Archive has scanned over 7,000 printed books published by HarperCollins, and is distributing the resulting bootleg ebooks for free to anyone around the world without making any payment to us or our authors. As detailed below, the Internet Archive radically

A-636

interferes with HarperCollins' digital strategy as rightsholders and representatives of its authors. A thriving publishing industry requires enormous investments of time, money and resources to publish books. The revenues earned from all formats of a work are critical to preserving the incentives to create and publish books and to invest in new technologies, as well as the viability of our publishing business. We do not price print books with the expectation that they will serve as both print books and ebooks readily capable of free worldwide distribution. Moreover, print books and ebooks have very different characteristics. Ebooks can be reproduced and distributed instantaneously and at minimal cost. For that reason, we set different terms and conditions and pricing structures for commercial ebooks and library ebooks than for print books. In our view, Internet Archive has no right to take the benefits of the digital medium for itself without compensating the parties who own the rights and have created the works.

3. Notably, while the Internet Archive claims to be improving the efficiency of delivering content, there is already a thriving library ebook market. After years of investments and innovation, HarperCollins has developed economically viable lending terms that impose limits on the distribution of library ebooks while promoting broad free public access to ebooks for library patrons. All new HarperCollins titles released as ebooks are available as library ebooks on the publication date. From 2017-2020, libraries licensed approximately 7.5 million copies of HarperCollins ebooks, with slightly more than 75% being older "backlist" titles. (A true and correct copy of a spreadsheet reflecting this data is annexed hereto as Exhibit 1.) Library ebook lending of HarperCollins titles has only increased since then. Moreover, our library ebooks are reasonably priced, with 26 circulations of the ebook (a rough approximation of the life span of a library print book) costing only slightly more than the suggested retail price of the corresponding print book. And prices under our Pay Per Use model, described in more detail below, are a small

2

fraction of the print retail price. All of this has made library ebook lending tremendously popular among these institutions and their patrons: in 2021 alone, HarperCollins made more than 63 million e-book checkouts available to patrons.

4.      The Internet Archive's widespread, unauthorized distribution of thousands of our ebooks, with no payments to HarperCollins or its authors, jeopardizes this vibrant and important market as well as consumer ebook sales. As I explain below, the conduct of Internet Archive causes several types of significant economic harm to the company.

**A.      <u>Background</u>**

5.      HarperCollins, founded in 1817 in New York, is the second-largest consumer book publisher in the world. HarperCollins' current catalog of works exceeds 50,000 titles. Writing in virtually every genre, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among others. The company proudly serves as the publishing house for literary legends – including J. R. R. Tolkien, Agatha Christie, and Harper Lee – along with a myriad of important contemporary voices, including Louise Erdrich, Ann Patchett, and Angie Thomas.

6.      The thirty-three Works in Suit published by HarperCollins include monumental works of fiction that have been beloved by countless readers for decades, including *Their Eyes Were Watching God* (Zora Neale Hurston), *The Lion, the Witch and the Wardrobe* (C.S. Lewis) and Sylvia Plath's *The Bell Jar.* Also included are works of contemporary fiction such as *The Miseducation of Cameron Post* (Emily M. Danforth) and mysteries, such as *Dance of the Bones* (J.A. Jance), as well as the dystopian novel *Breathe* (Sarah Crossan). Likewise, the Works in Suit include non-fiction works such as Benjamin Graham's *The Intelligent Investor*, which has been described by Warren Buffet as "the best book on investing ever written." Finally, the Works in

Suit include many imaginative children's titles, ranging from Laura Ingalls Wilder's timeless *Little House on the Prairie* and Patrick Skene Catling's lesson-filled *The Chocolate Touch*, to more contemporary titles like *Simon vs. the Homo Sapiens Agenda* (Becky Albertalli) and *Red: A Crayon's Story* (Michael Hall). All the Works in Suit are sold by HarperCollins in print and digital formats. (A true and correct copy of a spreadsheet reflecting U.S. sales for the Works in Suit is annexed hereto as Exhibit 2.) While our records do not go back beyond 1992, since that date HarperCollins has earned over $192 million in revenue from the sale of the thirty-three Works in Suit in all formats, including over $15 million in revenue from ebook sales alone.

7.     HarperCollins provides its authors with editorial and production excellence, marketing reach, long-standing connections with booksellers, and industry-leading insight into consumer behavior. Our authors and their literary works are at the center of everything our company does.

8.     I joined HarperCollins as Chief Digital Officer in May 2012. My role expanded to CEO, International Foreign Language in April 2015. In these roles I lead the overall global digital strategy for the company as well is its foreign language publishing program. I work with each worldwide division to manage commercial relationships with new and existing digital partners and to grow digital revenues. I also serve as a member of the company's executive committee.

9.     While at HarperCollins, I have pioneered the use of new digital sales channels. I have secured numerous deals with new distributors such as subscription services Scribd and Storytel, and I have overseen an exponential growth in digital sales. I also led the launch of HarperCollins' e-commerce platform on our website HC.com and have spearheaded efforts for the company's other direct-to-consumer programs across the globe.

10.     I graduated from Sapienza University of Rome in 1987 with a Bachelor's Degree

in International Political Sciences and from Columbia University in 1993 with a Master of Business Administration degree.  I also hold a Masters in Foreign Trade and International Marketing from ICE Italian Institute.  Before joining HarperCollins, I worked for three years at ING Bank in London, where I was Head of Media Corporate Finance.  Prior to my role at ING Bank, I worked for ten years at EMI Music, one of the largest record labels in the world, where I eventually served as COO, Rest of World and Head of Music Corporate Strategy.  I also have worked for Aegis Group PLC, and Booz & Company.

### B.    The Lessons of the Music Piracy Made Clear That We Need to Offer Ebooks But Under Terms and Conditions to Protect our Assets

11.    HarperCollins consistently has been at the forefront of innovation and technological advancement in book publishing.  Indeed, much of my work as Chief Digital Officer is to ensure that HarperCollins pioneers and develops the use of digital technology to expand our audiences and innovatively delivers creative content to the public.  It is my job to exploit opportunities to deliver healthy royalties for our authors and choice and ease of access to consumers.

12.    Our authors grant HarperCollins the exclusive rights to distribute each title in multiple formats.  The company considers hardcovers, trade paperbacks, mass-market paperbacks, ebooks, and audiobooks each to constitute a different format.  Indeed, HarperCollins' publishing agreements contain royalty payment rates that differ by each format.  Not only are the actual rates different, but royalties on print books are based on retail cover price, and royalties on ebooks and audiobooks are based on net receipts.  It is critical that HarperCollins be compensated for the sale of each format.  If that were not the case, the company would have little financial incentive to invest in the development of new book formats (or new books).

13.    Over the last two decades, HarperCollins has invested tens of millions of dollars in digital publishing, developing technologies, infrastructure, licensing models and pricing structures

5

for ebooks in both the retail and library markets.

14.     The ebook was developed in the shadow of rampant piracy in the music industry in the late 1990s and early 2000s. Concerns about the widespread unauthorized distribution of digital copies were front of mind when the company first began to evaluate the ebook format decades ago and have remained in the forefront of my thoughts once I joined the company in 2012. I know this history first-hand because I worked in the record industry from 1996 to 2007.

15.     At that time, the music industry witnessed the growth and eventual dominance of file sharing sites like Napster, Limewire, and Kazaa. Napster, for example, allowed users to search for virtually any popular song and download an unauthorized, unrestricted MP3 music file onto the user's computer for free. The record companies had not yet developed a legitimate alternative for consumers to access digital music, and by the time the industry took legal action against the file sharing sites or took steps to create an easily accessible alternative, the pirate sites had proliferated in popularity. Countless unauthorized MP3 files had already been uploaded and shared on the Internet with users around the world, and consumers had already internalized that there was no barrier to an unauthorized and free copy of a song.

16.     After these services were identified as copyright infringers and ordered to cease operations, the music publishing industry largely embraced authorized streaming services (Spotify is one example) as a primary means to deliver music files over the Internet. But after allowing piracy to become rampant, the music recording industry was effectively forced to offer a subscription model as a low-priced alternative to piracy, so that consumers would not be tempted by free illegal copies. It has been widely reported that this streaming model tends to disproportionality favor the most popular artists while less popular artists are less favored and often get mere fractions of a cent per stream. In short, these streaming services offered an

6

alternative to piracy and afforded the record companies with a modicum of control, but at the expense of artist revenue.

**C.** **With Distinct Pricing and Terms and Conditions, HarperCollins Has Fostered a Commercially Viable and Successful Ebook Market**

17.     Given the travails of the music industry, HarperCollins needed to develop a sustainable digital book market in which it offered affordable ebooks but with critical controls. The very nature of the digital medium dictated that distribution be reasonably limited so as not to threaten HarperCollins' overall markets.  Further, the experience of the music industry taught book publishers that it was critical to fight against those illegally converting their analog works into digital files and distributing them on the internet – much as Internet Archive does today.  As HarperCollins' Chief Digital Officer, fighting the distribution of unauthorized free copies of our ebooks on the Internet is one of my top concerns.  There is a truism in the book publishing and music industries: paid content cannot compete with free.  And the widespread availability of content for free has an enormously detrimental effect on paid content and cheapens the overall value of all formats.

18.     While ebooks display the same text as print books and both are used by consumers for the same intrinsic purpose – namely use and enjoyment of the content via reading – there are several key differences between these two formats that inform our discrete terms and conditions and pricing for ebooks.

19.     For one, print books are tangible objects.  Critically, they need to be physically moved from place to place, costing time and money that both increase with distance.   Over time, they exhibit wear and tear.  For both these reasons, there is a practical limit to the number of people who are able to access a print book as a material object.

20.     Ebooks present a number of advantages that print books cannot offer.  Readers do

7

not need to travel to a store or library to access an ebook. Instead, they can instantly download an ebook to a device from any location and begin reading in seconds. Readers can store numerous ebooks on a single device without the burden of carrying multiple print books.

21. That said, the characteristics of an ebook that make the format so attractive to consumers present a potential risk for both authors and publishers. Critically, an unrestricted digital file containing the text of a book can be infinitely and rapidly replicated at virtually no cost. Likewise, an unrestricted digital file can be distributed in an instant to millions of users around the world at no or minimal cost. Unlike a print book, the digital file never deteriorates and takes up no physical space. Indeed, one digital copy of an ebook file without any limitations could satisfy all ebook demand for all time for that title. For all these reasons, it was critical for HarperCollins to develop business models that set limits on the broad dissemination capabilities of an electronic file so as not to decimate its broader book markets.

22. HarperCollins first began offering commercial ebooks in 2001 and currently considers ebooks to be one of its major formats and markets. Given the critical differences between print and digital, HarperCollins uses a different business model for the two formats. Most notably, the distribution of a commercial ebook is limited to one user account – which differs, of course, from print books, which can be shared and otherwise re-distributed. This has allowed HarperCollins to price commercial ebooks at a price that is generally lower than the comparable print book price.

23. HarperCollins uses Digital Rights Management technology as one prong of its effort to prevent unauthorized copying and ensure limited distribution of its digital book files to one user account. Moreover, HarperCollins uses an agency model for distributing commercial ebooks, and its retained agents, such as Amazon or Barnes & Noble, impose critical terms and

8

conditions on those downloading commercial ebooks. The Terms of Use set by Amazon in connection with ebooks purchased through its Kindle platform state as follows: "Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees . . ., the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times . . ., solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use. Kindle Content is licensed, not sold, to you by the Content Provider." Further, the Amazon Terms of Use provide under "Limitations" that the purchaser "may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party. . . ." (A true and correct copy of the Amazon Kindle Store Terms of Use is annexed hereto as Exhibit 3.)

24. While print books remain HarperCollins' largest sales format, millions of consumers have acquired our authorized ebooks – whether because they generally prefer the ebook format or wish to switch between print and digital in different situations. While the figures have varied over time, in fiscal year 2021, ebooks constituted approximately 14% of our U.S. book revenue (not including audiobooks). Today, HarperCollins offers virtually all new titles in its catalog in ebook format. (The exceptions are generally books that are not well-suited to the digital realm or reprints of books originally published by other publishers for which we do not have the digital rights.) HarperCollins has digitized reams of books that were initially published long before the advent of modern ebook technology. And during the pandemic, the ebook market allowed us to satisfy increased consumer demand.

**D.** **HarperCollins Develops a Sustainable Model to Foster Library Ebook Lending that Is Free to Patrons**

25. HarperCollins was one of the first trade publishers to offer ebooks to libraries. As

early as 2003, it entered into a library ebook distribution agreement with OverDrive, Inc., the first and now dominant library ebook aggregator in the market. Public libraries provide countless services to their local communities, ranging from a curated selection of books and other media geared towards the interests and needs of community members to services like free internet and community-tailored tutoring sessions. And of course they help to promote literacy.

26. Libraries pay for their books – typically from local tax revenue funds. These earnings are shared with our authors and reinvested by the company into publishing new works. In the print book market, HarperCollins, like most trade book publishers, primarily sells print books to libraries through wholesalers, such as Baker & Taylor, who in turn sell them to libraries, independent bookstores and other retailers.

27. Public libraries also provide a critical service to HarperCollins by increasing the visibility of our books and our authors through direct engagement with local patrons. For example, public libraries hold author talks, organize book clubs, create virtual and physical displays to promote certain books for different occasions, and engage in email communications directed to the local interest of library patrons. This is true for both frontlist titles and older backlist titles.

28. Since HarperCollins first entered the library ebook market in 2003, it has provided ebooks to library distributors (or "aggregators"), who in turn license them to libraries, rather than selling them outright as with print books. Licensing allows HarperCollins to set critical limits on the reproduction and distribution of digital files – which is why most media industries, including the music, movie, and television industries, use licensing for digital goods.

29. HarperCollins started with a One-Copy/One-User model, which allows multiple library patrons to check out a single copy *seriatim*. Under this model, libraries can lend HarperCollins ebooks to their patrons for a time-limited loan only on a One-Copy/One-User basis,

in a fashion that mimics how a library typically operates with a print book.  Critically, a library or library consortia can lend its ebooks only to its own verified library members – generally, for a public library, the local residents with a library card or, for school and university libraries, their students and professors.  For example, according to HarperCollins' agreement with leading library ebook aggregator OverDrive, only school and university libraires and "public entities that maintain a physical collection of books for lending to its registered patrons" may distribute HarperCollins ebooks to their patrons, and OverDrive must require participating Institutional Accounts to take reasonable measures to ensure that only registered and authorized patrons of their physical collections have access to the ebook collection.  (A true and correct copy of the agreement between HarperCollins and OverDrive, dated September 1, 2013, is annexed hereto as Exhibit 4.) (*See id.*, Schedule C, Section B.1 and B.2; Schedule F.)  This limitation on borrowers is critical.  Given the ease of distributing digital books, HarperCollins needs to ensure that a small number of ebooks licensed to a few local libraries do not serve national demand.  That scenario would have been impossible with a print book, but an ebook has far greater distribution capabilities.  This requirement also ensures that the municipal funding each library spends on ebooks is actually dedicated to patrons in that local community.  The Internet Archive seeks to evade such limitations by scanning print books and distributing them worldwide, greatly enhancing their ability to substitute for other sales.

30.     HarperCollins initially set a perpetual term for our One-Copy/One-User model.  In the early 2000s, when HarperCollins' first introduced its initial library ebook lending model, ebooks were read predominantly on desktop computers and the sales across all channels were a fraction of one percent of the company's revenue.  But by 2011, ebook sales had exploded, resulting in a rapid acceleration of ebook retail and library sales.  A "perpetual" term was a very

11

long time for a product like an ebook that does not degrade, and our pricing of ebooks was not consistent with the number of readers who would read, respectively, print and ebook formats.

31.     Moreover, while HarperCollins feels strongly about supporting libraries, it is always critical to it to ensure that library pricing does not unduly impact our commercial sales. For the consumer, borrowing a free ebook from a library's website, on the one hand, or obtaining it from Amazon or other e-retailers, on the other hand, are extremely similar experiences except that one is free and one is not.  "Free" books present a considerable allure.

32.     In considering how to adjust our model, the company engaged with librarians to understand purchasing preferences and how ebooks fit into the library ecosystem.  After taking these considerations into account, HarperCollins introduced a revised term for its library channel model in 2011.  Rather than materially raise its prices, HarperCollins adopted a One-Copy/One-User Model with a total of 26 circulations ("26-Circ Model"), which remains in effect today. Under the 26-Circ Model, a library ebook is only available for twenty-six (26) circulations.  Once the twenty-six circulations are exhausted, the library can decide whether to re-order the ebook for an additional twenty-six circulations, or use their resources to buy other titles more currently in demand in their community.

33.     For many years, HarperCollins priced the 26-Circ model at the same price as the suggested retail price for print books; currently it is priced at slightly more than the suggested retail price for print books.  This model is intended to be similar to the economics that govern the sale of print books that show wear and tear from usage and need to be replaced or are lost over time. At the same time this model keeps the prices down and maintains the major benefits to libraries inherent in ebooks, including ease of circulation, remote access, and no need to sort and re-shelve. Notably, the price per circulation of a library ebook under the 26-Circ Model is also far lower than

12

the price of a commercial ebook. Again, the Internet Archive interferes with these metering limits in our library ebook model by copying print books and distributing them for unlimited numbers of circulations.

34.     While librarians have a wide range of opinions on library ebook lending models, the 26-Circ Model presents important advantages to libraries while protecting interests we share with our authors. Libraries tend to have significant patron demand for popular new books and order many copies in multiple formats. Demand from library patrons for some of those titles, however, tends to decline over time – although other books remain of steady interest. The 26-Circ Model allows libraries to calibrate the use of their public funding based on current demand spending more only where demand is highest.

35.     Libraries have embraced the 26-Circ Model. For example, the 26-Circ Model generated just over $3.45 million in revenue for us in fiscal year 2014; by fiscal year 2019, the model generated over $9.95 million. (A true and correct copy of a spreadsheet reflecting this data is annexed hereto as Exhibit 5.)

36.     In 2017, HarperCollins was the first major trade publisher to adopt an additional library distribution model to supplement its 26-Circ Model: the Pay-Per-Use model ("PPU Model"). The PPU Model allows a library to license the right to a single circulation of an ebook for a fraction of the price of an ebook license under the 26-circ model. Under this model, libraries offer their patrons an opportunity to borrow an ebook from our catalog and pay a fee for a single, individual use only when a particular title is checked out by a patron. Currently, all HarperCollins titles qualify for the PPU Model twelve months after the initial publication date, although libraries retain the option to obtain these backlist titles under the 26-Circ Model as well.

37.     The PPU Model addresses two specific needs in the library channel. First, smaller

13

libraries with few members that are less likely to fully exhaust all twenty-six circulations in the standard model can access a far broader catalog for their patrons and manage their budgets on a month-to-month basis.  Second, larger libraries that have focused on widely read titles can provide their patrons with access to a much broader selection of books at a lower cost:  if only a few members of a public library are interested a book with an esoteric subject, the library can obtain ebook copies for that handful of individuals at a price point far lower than the 26-Circ Model.  Since the introduction of the PPU Model, HarperCollins has encouraged all its library ebook aggregators to adopt this model.

38.     The PPU Model has exploded in popularity over the last several years.  In fiscal year 2018, just after it was introduced, the model generated $154,789 in revenue for the company.  By fiscal year 2020, HarperCollins earned over $2 million in revenue from library ebook checkouts via the PPU Model.  (*See* Exhibit 5.)

39.     In sum, the 26-Circ and PPU Models have been tremendously successful and have resulted in patrons accessing tens of millions of ebooks for free, with ease.  Between 2017 and 2020, HarperCollins licensed approximately 7.5 million ebook units to libraries.  (Under the 26-Circ Model, HarperCollins calculates one unit for each time a library purchases a 26-Circ license (not for each successive checkout); under the PPU Model, one unit is calculated each time a library purchases a license to lend out a title one time.)  The number of units sold increased dramatically over those years and continues to do so.

40.     Further, HarperCollins has continued to experiment with new lending models.  In fiscal year 2018, HarperCollins began making ebooks for select academic titles available for licensing by academic libraries on a perpetual basis.  Academic libraries highly prioritize the building of long-term collections.

<div align="center">14</div>

41.     During the COVID-19 pandemic, HarperCollins has taken significant steps to ensure that we adapted to the needs of readers and libraries, once again demonstrating a willingness to experiment to meet an evolving library ebook market.  In an effort to help libraries maximize federal funding provided under the American Rescue Plan Act, the company temporarily instituted a prorated, time-metered model, which allowed libraries to spend time-limited ARPA funding on HarperCollins ebooks.  At the outset of the pandemic, the company also significantly reduced prices on approximately 1,000 popular backlist trade and children's ebook titles for several months.  Further, the company expanded the titles in the PPU model.  While the PPU Model had previously been confined to books published more than eighteen months ago, the company temporarily moved up the time frame for frontlist books to enter the PPU Model to six months post publication.  Additionally, from the earliest days of the pandemic, HarperCollins has extended permission to authors, educators, and librarians to read the company's titles online and on video.

42.     While HarperCollins has invested to develop the ebook and library ebook market, so too have library ebook aggregators.  These aggregators make the experience of checking out a library ebook seamless and easy.  For example, once patrons download OverDrive's Libby app and enter details from their library card, access is granted to their local library's entire ebook holdings.  A user can open Libby, search for a title, and access the title from anywhere through the Libby app in mere seconds.  The ebook can be downloaded onto any Internet connected device, and from any location.

43.     Aggregators also provide libraries with a dedicated platform to license ebooks, manage their digital collections, and manage the lending and return of ebooks from patrons, which relieves libraries of dedicating staff time to these administrative tasks.  Finally, aggregators provide a service to HarperCollins and its authors by enforcing the terms of the library ebook licenses and

15

A-650

implementing price and lending model changes in a seamless fashion.

44.     Currently HarperCollins works with nearly a dozen library ebook aggregators in the United States.  Some of these aggregators focus on particular libraries (e.g., academic libraries) or on a particular distribution model (i.e., the PPU model), but all service the library market.

45.     The Internet Archive makes an end-run around all of the ebook licensing terms reviewed above by scanning print books and distributing them worldwide without any metering limit and without paying the customary fees associated with authorized ebook licenses.

**E.**     **The Library Ebook Market is Thriving and Provides Access to Instant, Free Ebooks to Tens of Millions of Americans**

46.     While revenues from our print book sales to libraries exceed our library ebook revenues, the library ebook market has become a core part of our business.  While it is relatively new and continues to develop, after a decade or so of striking growth, the library ebook market is currently a well-established market.

47.     With its investments in the ebook format and its partnership with library ebook aggregators, HarperCollins has helped drive a dramatic industry-wide increase in free, authorized ebooks that are available to library patrons throughout the United States.  Our figures for library ebooks licensed through OverDrive, Hoopla and Bibilo show a sharp rise in the popularity of library ebooks, even before the impact of COVID.  In 2017, we licensed 757,097 units.  In 2018, we licensed 1,075,189 units.  In 2019, we licensed 1,631,705 units.  In 2020, we licensed 4,027,465 units.  (*See* Exhibit 1.)

48.     HarperCollins earned $46.91 million in revenue from ebooks in the United States library market between 2015 and 2020, revenues that are shared with our authors.  Library ebook licenses make up a growing and significant portion of HarperCollins' overall ebook revenue.  In fiscal year 2015, library ebook licenses in the United States constituted 2.3% of HarperCollins'

16

total U.S. ebook revenue.  By fiscal year 2020, that share grew substantially to 7.4% and reached 12.9% of all U.S. ebook revenue by mid-2021.  (HarperCollins' fiscal year ends June 30.)  Indeed, as of mid-2021, HarperCollins earned over $19 million in revenue from library ebook licenses in the United States, which was nearly twice as much revenue as we earned from library ebook licenses in the United States during FY 2020.  (*See* Exhibit 5.)

49.     The thirty-three Works in Suit published by HarperCollins are all available as library ebooks and have been acquired as ebooks for lending by libraries, via library aggregators, pursuant to the lending models I explained above.  (A true and correct copy of a spreadsheet reflecting sales to libraries in all formats for the Works in Suit between 2017 and 2020 is annexed hereto as Exhibit 6.)  Between 2017 and 2020, the thirty-three Works in Suit published by HarperCollins generated over $768,000 in revenue from the license of library ebooks alone.

50.     The thriving nature of the library ebook market is perhaps best illustrated by the numbers of Americans reading ebooks free from the library, as compared with the number of Americans purchasing an ebook.  In 2021, through its 26-Circ and PPU models, HarperCollins made over 63 million ebook checkouts available to library patrons through its library ebook sales,[1] exceeding retail ebook sales by more than 30 million.  While HarperCollins thus made far more "reads" available through library ebook sales than through retail sales, library ebook revenue accounted for 10-15% of HarperCollins' ebook revenue in 2021.  These figures starkly illustrate the balance that HarperCollins has achieved by making free, authorized ebooks widely available to all Americans, while still ensuring that authors are fairly compensated for creating new works.

51.     Finally, to support readers who are visually impaired, HarperCollins was among the earliest publishers to support Bookshare.org in its mission to provide the world's largest

---

[1] This figure reflects all potential check-outs under the 26-Circ model, not actual check-outs.

accessible online library for people with disabilities. Bookshare is free for all qualified U.S. students. Individuals who are not students or international patrons can pay a nominal annual fee for their membership. Bookshare makes content available through a range of assistive technologies (e.g., braille readers, text to speech and ebooks). If a reader requested title is print exclusive or has never yet been available in ebook format, HarperCollins either provides a PDF of the title to the reader or, if no PDF is available, makes other arrangements to enable access.

52.　　For the general population who don't access content through Bookshare, HarperCollins produces ebooks with the typical features of type resizing, page magnification, and screen contrast so readers can adjust the text to their preference. In addition, HarperCollins enables text-to-speech functionality on our ebooks that are sold through major retailers such as Amazon. And we are in the progress of updating our catalog to comply with the emerging standards for accessible ebooks, using the Web Content Accessibility Standards ("WCAG") that are being advanced by the World Wide Web Consortium (W3C). HarperCollins has been an active member of the ebook trade organizations – the W3C and its predecessor the International Digital Publishing Form ("IDPF") – that are driving the push to make all content accessible.

### F.　　HarperCollins' Significant Investments Allow Authors to Create Books

53.　　The Internet Archive's scanning of millions of print books and distribution of the resulting ebooks for free to any user around the world fundamentally interferes with the critical incentives that encourage authors to write books and publishers like HarperCollins to invest in publishing and distributing them. At its core, it is based on the false premise that once a physical book or other creative work is sold, the author and publisher's right to obtain revenue from its digitization is extinguished, and they have no right to collect additional revenues for licensing the work in a digital format, or to control the related terms and conditions of its license. This is a radical premise in any media industry – whether books, film, television or music. Moreover, by

18

scanning print books to turn them into digital books, Internet Archive misappropriates the value of the digital format for itself.

54.     As I have witnessed, authors are required to make enormous creative investments to write and must be compensated for those efforts in order to incentive their continued investments.  Works of fiction require an author to develop a story with a distinctive narrative voice and style.  Nonfiction books require an author to investigate, research or explore their personal experiences to create a work that illuminates the human experience.  Writing a book is extremely time-consuming, frequently taking a year or longer to complete.  Authors frequently give up other professional responsibilities to devote adequate time to their writing.

55.     Like its authors, HarperCollins must be compensated in order to be incentivized to make its investments of time, money and labor, which are extensive.  HarperCollins incurs the same general types of costs set forth below and recounted in the Declaration of Ben Sevier of Hachette at paragraphs 13-30, which I will incorporate by reference and not repeat here.  First, HarperCollins exclusively bears the upfront costs to get a book published, with no guarantee that it will recoup those costs.  This includes paying the author a non-refundable advance against future royalties before the book is published.  Advance payments are critical to the livelihood of authors, because they allow writers to earn income while the book is being researched and written.  In short, HarperCollins assumes the significant and genuine financial risk of commercial failure for each book that it publishes.

56.     HarperCollins also provides authors with professional editorial, production and marketing services.  The company employs hundreds of editors, art department employees, and design professionals.  HarperCollins' marketing department engages in a wide array of promotional activities, including social media campaigns, website development, trade and

consumer advertising, distribution of promotional copies to reviewers and influential readers prior to the publication date, in-store displays, author tours, media appearances, and other promotional placements. HarperCollins invests in marketing resources not only on initial publication, but over the course of the life cycle of each title – including for its perennial bestselling backlist books. Separately, HarperCollins employs sales professionals dedicated to each of the various channels that HarperCollins serves, including retail outlets, wholesale sellers, and public libraries. Sales professionals are our experts and points of contact with each channel and they both manage relationships with our customers and help us set prices and terms strategically. HarperCollins also incurs substantial expenses related to the costs of production (including paper, printing and binding for print books), warehouse and inventory management, and shipping.

57.    In exchange for all our investments in their works, authors typically assign to HarperCollins in their publishing agreement the exclusive rights to publish their new books in print, ebook, and audiobook within a defined geographical area. Both the author's and our own financial ability to continue publishing books depends on our ability to have exclusive rights over print and digital formats. The company naturally seeks to recoup its investments and to make a profit, while sharing with the author the revenues generated by each title. HarperCollins also continually reinvests its earnings to fund the creation of new works. Our ability to rely on the fact that we hold exclusive rights, that we can charge separately for each format, and that we can control the terms and conditions of our digital sales is a critical incentive to our investments.

58.    In sum, HarperCollins makes tremendous investments in its authors that can last decades while ensuring that the company and its authors are fairly compensated. This model is premised on our and our authors' ability to enforce the exclusive rights granted them in the Copyright Act, including the creation of a derivative digital work.

### G. Revenue from Backlist Books Sustains HarperCollins' Ability to Invest in Authors

59. The Internet Archive purports to limit its unauthorized distribution of ebooks to works initially published more than five years ago. This hardly excuses its conduct given the economic realities of publishing – especially our enormous reliance on steady-selling older books to fund our more risky publication of new books, which do not have predicable sales.

60. HarperCollins defines a "backlist" book to be one that has been published for more than a year. (By contrast, "frontlist" books are ones that have been published for less than one year.) While this is the formal definition, most of our bestselling backlist books have been published for far more than one year, and many were first published over a decade ago. Outstanding books may remain popular indefinitely – or have a resurgence in popularity at a later date. In our view, one of our key obligations to our authors is to promote and maximize the sale of their backlist titles.

61. Backlist book sales make up more than 60% of the company's annual print unit sales from adult and children's titles. Backlist books in all formats constitute a considerable portion of HarperCollins' sales revenue in both the library and retail markets. For example, between 2017 and 2020, the number of backlist library ebook units sold vastly exceeded the number of frontlist library ebook units sold. More specifically, in 2020, HarperCollins sold approximately 700,000 frontlist units versus 3.3. million backlist units. (*See* Exhibit 1.) Thus, revenue from backlist book titles is crucially important to HarperCollins.

62. HarperCollins has continued to invest in new ways to fully capture the value of its robust backlist catalog. Both e-commerce platforms and ebooks have enabled us to more broadly promote and profit from our backlists, as compared to the days when brick and mortar bookstores could stock only a limited number of titles.

63.     While HarperCollins maintains a valuable collection of backlist books, its steady perennial sellers are particularly important.  These books – which are often years or decades old – have either become "classics" or are otherwise well-known, highly regarded titles.  These are the books that provide HarperCollins with the ability to invest so robustly into the creation of new titles.  A review of the sales revenues for the Works in Suit quickly demonstrates our reliance on books published more than five years ago for substantial revenue.  (*See* Exhibit 2.)

64.     For example, the timeless C. S. Lewis classic "*The Lion, the Witch and the Wardrobe (The Chronicles of Narnia)*," one of the Works in Suit, was first published in 1950.  Over the course of the last 72 years, the book has been named to TIME Magazine's 100 Best Young-Adult Books of All Time and 100 best English-language novels published since 1923.  It has been adapted for television, the stage, and as a major theatrical film by Walt Disney Pictures in 2005 (which was followed by two more films adapting books in the Narnia series).  Since 1950, sales from the title have generated HarperCollins over $47.5 million.  (*See id.*)

65.     Another Work in Suit, Zora Neale Hurston's "*Their Eyes Were Watching God*," a classic of the Harlem Renaissance and Hurston's best-known work, was originally published in 1937.  Between 1992 and 2020, HarperCollins sold more than five million copies of the title, earning the company over $38 million in net sales.  (*See* Exhibit 2.)  The classic "Little House in the Big Woods," published in 1932 as the first book in the "Little House" series, earned HarperCollins over $7 million in net sales between 1992 and 2020.  (*See id.*)

66.     A backlist title does not have to be many decades old to generate extraordinary revenue for the company.  For example, one of the Works in Suit is "*Big Nate Goes for Broke*" by Lincoln Pierce, which is the fourth book in the popular Big Nate series.  The book was published in 2012, and since then, through 2020, the title has sold nearly 800,000 copies to generate over

22

well over $3 million in net sales for the company and the author.  (*See id.*)

67.     It is also common for works to have substantially increased sales many years after initial publication for a variety of reasons, including because the author published another work that "broke out" or because the original title has been adapted as a movie or television program. The commercial potential of a particular book cannot possibly be known after five years, Internet Archive's inclusion date.

68.     These examples underscore why it is so important for HarperCollins to maintain control over its backlist books.  The revenue that HarperCollins earns from backlist titles provides essential financial stability to the company and the ability to invest in the next generation of authors in the creation of new works.  The company has always focused on backlist titles, but the availability of e-commerce platforms and the development of ebook markets has provided HarperCollins with even more opportunities to expand the reach of its rich backlist catalog. Exposing consumers to that catalog is a core part of HarperCollins' purpose as a publisher.

**H.      Internet Archive Harms HarperCollins and its Authors**

69.     The Internet Archive's unlicensed and unpaid distributions of our ebooks to worldwide users for free directly harms us.  These harms can be conceived in several ways.

70.     **Lost Customary Fee from Internet Archive:**  HarperCollins is directly harmed by Internet Archive's unauthorized distribution of our titles because it fails to pay the company the fees customarily paid by libraries engaged in short-term loans of ebooks.  As reviewed above, when a library obtains an ebook for lending to its patrons, HarperCollins is paid a fee.  There is a well-established market where libraries pay library ebook aggregators, who in turn pay publishers, to provide short term loans of ebooks to their patrons.  The Internet Archive brands itself a "non-profit library."  (*See* https://archive.org.)  The Internet Archive has distributed each of the 33 HarperCollins Works in Suit without payment to us.  By failing to pay us this revenue, Internet

Archive has caused financial harm to HarperCollins.

71.    While this lawsuit focuses on the Works in Suit, Internet Archive's practices are already widespread with respect to our entire catalog, and thus their failure to pay us a customarily paid fee for short term ebook lending causes us substantial financial harm.  I understand (from having reviewed the relevant paragraphs of Ian Foster's declaration) that Internet Archive distributes over 7,000 titles published by HarperCollins, which constitutes approximately 37% of the titles currently published by HarperCollins in print and digital form.  (*See* July 7, 2022 Declaration of Ian Foster ("Foster Decl.") ¶117 and Table 1.)  He indicates that the percentage is even higher if one looks at books initially published more than five years ago, which the Internet Archive claims is its prime focus; for these books, the Internet Archive is distributing free ebooks for over half (namely 54.6%) of our titles published in print and digital form.  Internet Archive has failed to pay us the fee customarily paid by libraries engaged in Short Term Ebook Lending for each of these titles.  The Plaintiffs' lost fees are highly significant in monetary terms, since it would cost Internet Archive millions of dollars to license authorized library versions of the Works in Suit and the Plaintiff Publishers' 33,000 other titles that currently reside on the Internet Archive for national, unlimited distribution without a metering limit.

72.    I understand from Foster's declaration that both the number of scans of our titles being distributed by the Internet Archive, and the number of its members and borrows has grown rapidly, including since we filed suit in 2020.  (*See* Foster Decl. ¶¶18, 118, and Figure 12; Declaration of Elizabeth A. McNamara ("McNamara Decl.") ¶¶1-2.)

73.    In short, by scanning the Works in Suit and our other print books, the Internet Archive has both taken for itself the greater benefits of the digital medium and avoided paying the separate fee charged by book publishers for each separate format, namely the separate fee for

24

digital books with all their benefits.

74.     Finally, more broadly, it is basic common sense that if third parties can obtain and distribute our ebooks for Short Term Ebook Lending without paying us the fees customarily paid, that will damage our ability to collect future fees in this well-established market.

75.     **Lost Library Ebook Sales**: Viewed from another angle, Internet Archive has harmed HarperCollins' library ebook sales, leading to lost sales revenues.  Internet Archive provides libraries with an attractive free alternative to licensing authorized ebooks.  It is obvious from simply viewing the Internet Archive's Website and the OverDrive website side-by-side that Internet Archive operates as a competitor to the authorized library ebook aggregators, since both perform a highly similar function, namely providing short term ebook lending to users.  The key difference, of course, is that HarperCollins and its authors are compensated for authorized ebooks. Moreover, by creating ebooks through the scanning of print books, the Internet Archive interferes with our comprehensive digital strategy by allowing public and academic libraries to evade the reasonable licensing restrictions that HarperCollins has devised for the library ebook market.  For example, in contrast to the licensing limitations imposed by HarperCollins, Internet Archive users around the country can check out the ebooks from Internet Archive without regard for whether they are tax-paying residents of a given library community, and the Internet Archive distributes its ebooks without a limiting term or number of circulations.

76.     To fully understand the impact of the Internet Archive on publishers it is important to understand the Internet Archive's "Open Libraries" program with "partner libraries" contributing to the Internet Archive's lending count, described in the McNamara Declaration at ¶¶62-76.   That declaration indicates that the Internet Archive's current version of "Controlled Digital Lending" no longer envisions that the maximum number of ebooks that it will loan does

not exceed the number of physical copies in its *own* collection. Instead, the declaration explains that the Internet Archive has become a centralized hub, which counts as available for lending in digital form millions of copies of print books located in libraries scattered across the country. Further, when a library puts a link on its website sending its local patrons to the Internet Archive, as Internet Archive suggests, its local patrons would have the ability to borrow from a collection of far more ebooks of that title than its own local library's collection. (*See* McNamara Decl. ¶¶68, 103.) Once patrons have been routed to the Internet Archive, demand for library ebooks is sure to decline. In our experience, libraries are sensitive to patron demand and prone to order fewer copies of an ebook if their patrons do not seek it.

77. Upon information and belief, through the Open Libraries program, the Internet Archive has added two million additional copies of its existing titles. (*See id.* at ¶72.) For example, I understand that through the Open Libraries program, the Internet Archive has increased by approximately 39 the number of copies of *The Lion, the Witch and the Wardrobe* available for lending and has increased by approximately 37 the number of copies of *Their Eyes Were Watching God* available for lending. (*See* Foster Decl. Exhibit 5A.) With a greater number of copies to circulate, the Internet Archive's harm to HarperCollins increases.

78. I have been made aware of the following examples in which the Internet Archive advises libraries that they need not spend money on authorized ebooks because their patrons can instead access ebook titles on the Internet Archive's Website and/or use their print copies to leverage them into digital copies. The expert report of Internet Archive's own expert Susan Hildreth states that "Controlled Digital Lending" allows libraries to "leverage their existing physical collection" by using these assets as ebooks. (A true and correct copy of Section II of the Expert Report of Susan H. Hildreth is annexed hereto as Exhibit 7.) (*See id.* at ¶11.) The Internet

26

Archive's short form click-through agreement with its Open Libraries partners explicitly states: "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own." (A true and correct copy of the agreement to participate in Open Libraries is annexed hereto as Exhibit 8.) In presentations to libraries, Internet Archive has explained that its model "***ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format***." (A true and correct copy of Internet Archive's presentation to the Library Leaders Forum is annexed hereto as Exhibit 9 (emphasis added).) As yet another example, in a document titled "**Maximizing institutional investment in print resources through controlled digital lending,**" Internet Archive pithily summarizes its program as ***"Or, You Don't Have To Buy It Again."*** (A true and correct copy of this document is annexed hereto as Exhibit 10 (emphasis added).) This is exactly the harm to us. In short, the Plaintiff publishers experience lost library ebook sales as a result of the Internet Archive when libraries do not "purchase the same content again" in a different format and instead make use of an ebook created from a scanned print book posted on the Internet Archive's Website. When that occurs, we are deprived of the revenue due for each format. Critically, the loss is greater than any one library's decision not to purchase a given title in ebook form because the Internet Archive acts as a central hub pooling and lending all the copies contributed by itself and its partner libraries.

79.     Further, if Internet Archive's conduct continues unrestricted or other similar websites spring up, their collective impact on HarperCollins' library ebook sales would be even more substantial. As indicated above, Internet Archive or similar websites could act as a central hub, lending digital books anywhere in the country based on hundreds of libraries somewhere having a print copy of a book that is not being currently borrowed. There are many millions of print books housed in libraries scattered nationwide. These are books that have been priced and

sold based on the assumption that they are material objects with limited distribution capabilities. If the Internet Archive or its equivalents were able to act as a centralized hub using all those now-dispersed physical books to leverage them into digital books that can be distributed worldwide in seconds at minimal cost, with none of the licensing limitations imposed by our library ebook licenses, our library ebook market for backlist books will be radically diminished if not destroyed.

80. **Lost Commercial Ebook Sales**: The Internet Archive also competes with commercial retailers that sell HarperCollins' ebooks. A consumer who wishes to read a title can read the ebook for free from the Internet Archive, rather than purchasing the ebook from Amazon, B&N.com or any of our other e-vendors. As noted above, in our experience "free" is an insurmountable competitor. Therefore, the Internet Archive has a substantial potential impact on our consumer ebooks sales revenue (and likely has already diminished our ebook sales revenue). Moreover, unlike in the music industry where consumers tend to listen to songs over and over again, I believe that in most instances adults do not read trade books repeatedly. For example, someone who reads the Internet Archive's copy of *Night Watch*, a fantasy novel by bestselling author Terry Pratchett, or *Defiance*, a gripping story of the largest armed rescue operation of Jews by Jews in World War II (both Works in Suit), and knows the ending of those books, is unlikely to read it, check it out of a library, or buy it again.

81. The potential material harm to our ebook sales from a free unauthorized copy is likewise born out through my professional experience in supervising our efforts against book piracy. As HarperCollins' Chief Digital Officer, I believe that book piracy – namely the distribution of free unauthorized digital copies of our books from internet websites – leads to lost sales revenue, and that anti-piracy protections increase our sales by reducing such piracy. It is based on that conviction that we employ anti-piracy vendors to send takedown notices and

delisting requests to search engines, as well as engaging in other efforts to combat such free unauthorized digital distribution of our works. Further, if there were widespread and unrestricted adoption of the conduct practiced by the Internet Archive, including if its practices are held to be legal, that would inevitably lead to a greater supply of copies of each backlist title available for free loan with no waitlists, posing a dire threat to our commercial ebook market.[2]

82. **Devaluing Our Products**: Additionally, Internet Archive's creation of unauthorized digital copies of HarperCollins books has devalued our company's products. As I witnessed in the music industry, the broad availability of a song for free from unauthorized sources makes it very difficult to convince consumers to pay a fair fee for the song. In the music context, this harmed the industry, where most music is now sold through subscription services which pay minimal royalties to creators, far lower than in earlier times. In the same vein, while currently at a lower scale, the Internet Archive has cheapened HarperCollins' ebooks by making them easily available as a free substitute. Once again, this concern will only mushroom if the Internet Archive's conduct were to scale up or become widespread as others embraced its practices.

83. **Inadequate Protection of Our Intellectual Property**: Finally, the Internet Archive has exposed HarperCollins to the risk of the inadequate protection of our intellectual property. Recognizing this, HarperCollins has tried for years to put a stop to Internet Archive's scheme. In 2018, counsel for HarperCollins sent Internet Archive a letter "demand[ing] that you immediately disable the 'Borrow eBook' function for our books still under copyright." (A true and correct copy of that correspondence is annexed hereto as Exhibit 11.) After Internet Archive failed to comply with this cease and desist letter, HarperCollins was forced to have its anti-piracy

---

[2] While HarperCollins contends that the Internet Archive also harms its print book sales revenues in the commercial and library markets, its summary judgment motion is solely based on ebook sales. HarperCollins reserves the right to address print sales in the event of a trial in this matter.

vendor send takedown notices to Internet Archive for hundreds of links to in-copyright works on the Website, to no or little avail. Despite these notices, Internet Archive has continued to upload and make thousands of HarperCollins works available for lending. Indeed, as the Foster Declaration documents, after the complaint was filed in this action, Internet Archive added 4,171 additional scans of HarperCollins titles to its Website. (*See* Foster Decl. Figure 12.) Further, the Foster Declaration is replete with examples in which the Internet Archive has made metadata errors or other mistakes with wide-ranging ramifications. (*See* Foster Decl. ¶¶ 86-95.) While we do not believe that the Internet Archive's reliance on "Controlled Digital Lending" provides any defense, its failures to actually abide by those principles further harms our intellectual property.

84. In conclusion, the Internet Archive of today inflicts harm on us, but that harm will be exponentially greater and threaten our library ebook market and incentives to invest if it were allowed to scale up or its practices were to become widespread.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

30

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on July 1, 2022.

CHANTAL RESTIVO-ALESSI

**Exhibit 1 to Restivo-Alessi Declaration**

**Filed Under Seal (A-667)**

# Exhibit 2 to Restivo-Alessi Declaration

# Filed Under Seal (A-668)

# Restivo-Alessi Declaration

# Exhibit 3

Case 1:20-cv-04160-JGK-OTW Document 94-35 Filed 07/07/22 Page 28 of 5

Hello
Select your address

All ▾

Hello, Sign in
Account & Lists ▾

Returns
& Orders

0

All | Best Sellers | Customer Service | Prime ▾ | New Releases | Books | Pharmacy | Epic Daily Deals | Registry | Fashion | Shop tech gifts

# Help & Customer Service

‹ All Help Topics

**Amazon Device and Digital Services Terms, Warranties, and Notices**

**Kindle Store Terms of Use**

Activity Center FAQ

Kindle for Windows 8 Legal Notices

Customer FAQ for Attorneys General eBook Settlements

Send to Kindle Legal Notices

Kindle for Android Legal Notices

Additional Notices for Kindle Fire

Kindle Store Terms of Use

Location Services

Kindle for Mac Legal Notices

Kindle for PC Legal Notices

Source Code Notice

Kindle (U.S. Wireless) One-Year Limited Warranty

comiXology Unlimited Terms of Use

IEEE 1725 Battery Safety Statements

Kindle for iPad/iPhone Legal Notices

Kindle E-Reader and Fire Tablet Terms

Amazon Maps Terms of Use

Kindle Cloud Reader Legal Notices

Kindle for Windows Phone Legal Notices

Kindle Unlimited Terms of Use

Kindle Personal Documents Distributor Terms of Use

Unlimited Cloud Storage for Photos on Fire Tablets

Send to Kindle Button Terms of Use

## Quick solutions

 **Devices & Content**
Deliver books, apps to your device

 **Digital Purchases**
View purchased books & apps

 **Your Subscriptions**
Edit payment info

 **1-Click Settings**
Change your address

 **Digital & Device Forum**
Ask the community

## Find more solutions



Digital Services and Device Support  ›  Amazon Device and Digital Services Terms, Warranties, and Notices  ›
Kindle E-Reader and Fire Tablet Terms, Warranties, and Notices  ›

# Kindle Store Terms of Use

**Last updated: August 30, 2021**

This is an agreement between you and Amazon.com Services LLC (with its affiliates, "Amazon", "we" or "us"). Please read these Amazon Kindle Store Terms of Use, the Amazon.com Privacy Notice (https://www.amazon.com/privacy), the Amazon.com Conditions of Use (http://www.amazon.com/conditionsofuse), and the other applicable rules, policies, and terms posted on the Amazon.com website or the Kindle Store or provided with any Service (collectively, this "Agreement") before purchasing or using any aspect of the Service. By using the Kindle Store, purchasing or using any Kindle Content, using any Kindle Application, or using any aspect of the Service, you agree to be bound by the terms of this Agreement on behalf of yourself and all members of your household and others who use the Service under your account. If you do not accept the terms of this Agreement, then you may not use the Kindle Store, any Kindle Content, any Kindle Application or the Service.

For the purposes of this Agreement:

"Content Provider" means the party offering Kindle Content in the Kindle Store, which may be us or a third party.

"Kindle Application" means software we make available that permits users to shop for, download, browse, or use the Kindle Store or Kindle Content on Supported Device.

"Kindle Content" means digital content obtained through the Kindle Store, such as books, comics, newspapers, magazines, and other content.

"Kindle Vella Content" means digital content obtained through the Kindle Vella Service.

"Kindle Store" means our stores, on Kindle Applications and on our website, the homepage of which is located at https://www.amazon.com/kindlestore.

"Subscription Content" means Kindle Content made available for access only for so long as you remain an active member of a subscription or membership program, such as Kindle Unlimited, comiXology Unlimited, or Amazon Prime.

"Service" means the provision of the Kindle Store, Kindle Content, Kindle Vella, Kindle Application, and support and other services that we provide Kindle Store, Kindle Content, Kindle Vella, and Kindle Application users.

"Supported Device" means a mobile, computer or other supported electronic device on which you are authorized to operate a Kindle Application.

## 1. Kindle Content

Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees (including applicable taxes), the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times (for Subscription Content, only as long as you remain an active member of the underlying membership or subscription program), solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use. Kindle Content is licensed, not sold, to you by the Content Provider. The Content Provider may include additional terms for use within its Kindle Content. Those terms will also apply, but this Agreement will govern in the event

Case 1:20-cv-04160-JGK-OTW Document 94-35 Filed 07/07/22 Page 38 of 5

Contact Us

of a conflict. Some Kindle Content, such as interactive or highly formatted content, may not be available to you on all Kindle Applications.

Limitations. Unless specifically indicated otherwise, you may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party, and you may not remove or modify any proprietary notices or labels on the Kindle Content. In addition, you may not attempt to bypass, modify, defeat, or otherwise circumvent any digital rights management system or other content protection or features used as part of the Service.

Book Returns; Subscription Cancellations and Termination. You may return a book you purchase from the Kindle Store or cancel newspaper and magazine subscriptions as permitted in our return and cancellation policy in the Kindle Store. A newspaper or magazine subscription may be terminated at any time, for example, if a magazine is no longer available. If a magazine or newspaper subscription is terminated before the end of its term, you will receive a prorated refund. We reserve the right to change newspaper and magazine subscription terms and fees from time to time, effective as of the beginning of the next subscription term.

Risk of Loss. Risk of loss for Kindle Content transfers when you download or access the Kindle Content.

2. Use of Kindle Applications. You may use the Kindle Applications only on Supported Devices. For additional terms that apply to the Kindle Applications, see the Additional Amazon Software Terms contained in the Amazon.com Conditions of Use (http://www.amazon.com/conditionsofuse) and the terms contained in the Legal or similar section in the Settings menu of your Kindle Application.

3. Kindle Vella Tokens

Use of Tokens; Expiration. Kindle Vella is an offering of the Service that allows customers to receive and purchase tokens ("Tokens") and to redeem those Tokens for eligible Kindle Vella Content we offer through the Kindle Store. Eligible products may change over time. Not all devices support the use of Tokens. Kindle Vella Content may only be unlocked with Tokens, and the entire Token amount for the applicable product, plus any applicable taxes, must be redeemed with Tokens. Tokens do not expire. We are not responsible if any Tokens are used without your permission.

Purchases and Returns. Purchases of Tokens will be charged to the 1-Click payment method associated with your Amazon account. All purchases of Tokens are final. We do not accept returns of Tokens except where required by law. If you believe any purchased Tokens were not properly credited to your account, please contact Amazon customer service for assistance. If we offer discounts on the purchase of Tokens, we may modify or discontinue those discounts at any time without notice to you.

Restrictions. Tokens are a digital good and have no monetary value (i.e., are not cash or equivalent), and do not constitute currency or property of any type. Tokens can only be redeemed for eligible Kindle Vella digital products we offer through the Kindle Store. Tokens cannot be resold, transferred for value, or redeemed for cash, except to the extent required by law. Tokens in one Amazon account may not be transferred to another Amazon account. We may limit the number of Tokens you can purchase or receive within certain periods of time, or implement other restrictions on the receipt or use of Tokens. If we give you Tokens in connection with your purchase of a product and you later return or receive a refund for that product, we may revoke those Tokens. If you have already used those Tokens, we may deduct the same number of Tokens from your account or charge your credit card or other payment instrument for any products you redeemed using those Tokens.

Limited to U.S. Kindle Vella is currently only available to customers located in the United States. You may not purchase, receive, or redeem Tokens if you are outside the United States. "United States" refers to the 48 contiguous states, the District of Columbia, Alaska, Hawaii, Puerto Rico, American Samoa, Guam, the Northern Mariana Islands, and the U.S. Virgin Islands.

4. General

Information Provided to Amazon. The Kindle Application will provide Amazon with information about use of your Kindle Application and its interaction with Kindle Content and the Service (such as last page read, content archiving, available memory, up-time, log files, and signal strength). Information provided to Amazon may be stored on servers outside the country in which you live. We will handle any information we receive in accordance with the Amazon.com Privacy Notice (http://www.amazon.com/privacy).

Information Provided to Others. You are responsible for any information you provide to others using the Service. Use of information you provide to these third parties will be subject to any privacy notice or other terms that they may provide to you.

A-671

Termination; Fraud. Your rights under this Agreement will automatically terminate if you fail to comply with any term of this Agreement. We may also terminate your right to use the Service at any time, including if we determine your use violates any term of this Agreement or involves any fraud or misuse of the Service. In case of such termination, you must cease all use of the Service, and Amazon may immediately revoke your access to the Service without refund of any fees. If we determine you fraudulently obtain or use any Tokens, we may revoke those Tokens and charge your credit card or other payment instrument for any products redeemed using those Tokens. Amazon's failure to insist upon or enforce your strict compliance with this Agreement will not constitute a waiver of any of its rights.

Changes to Service; Amendments. We may change, suspend, or discontinue the Service, in whole or in part, including adding or removing Subscription Content from a Service, at any time without notice. We may amend any of this Agreement's terms at our sole discretion by posting the revised terms on the Amazon.com website. Your continued use of the Kindle Application or any aspect of the Service after the effective date of the revised Agreement terms constitutes your acceptance of the terms.

Disputes. Any dispute or claim arising from or relating to this Agreement or the Service is subject to the sections on dispute resolution, governing law, disclaimer of warranties and limitation of liability and all other terms in the Amazon.com Conditions of Use (http://www.amazon.com/conditionsofuse).

Limitation of Liability. Without limiting the Disclaimer of Warranties and Limitation of Liability in the Amazon.com Conditions of Use (http://www.amazon.com/conditionsofuse), (1) in no event will our or our software licensors' total liability to you for all damages (other than as may be required by applicable law in cases involving personal injury) arising out of or related to your use or inability to use the Kindle Application exceed the amount of fifty dollars ($50.00); and (2) in no event will our or any other Content Provider's aggregate liability to you for all damages arising from your use of the Service (excluding the Kindle Application) exceed the amount you actually paid for the Kindle Content or for the aspect of the Service related to your claim for damages. These limitations will apply to you even if the remedies fail of their essential purpose.

Contact Information. For help with your Kindle Application, the Service, the Kindle Store, Kindle Content, or resolving other issues, please contact Customer Service at https://www.amazon.com/contact-us/ (or by email at kindle-cs-support@amazon.com).

For communications concerning this Agreement, please write to Amazon, Attn: Legal Department, P.O. Box 81226, Seattle, WA 98108-1226.



Was this information helpful?

Yes  No

Back to top

## Get to Know Us

Careers
Blog
About Amazon
Sustainability
Press Center
Investor Relations
Amazon Devices

## Make Money with Us

Sell products on Amazon
Sell apps on Amazon
Become an Affiliate
Become a Delivery Driver
Start a package delivery business
Advertise Your Products
Self-Publish with Us
Host an Amazon Hub
› See More Make Money with Us

## Amazon Payment Products

Amazon Rewards Visa Signature Cards
Amazon.com Store Card
Amazon Secured Card
Amazon Business Card
Amazon Business Line of Credit
Shop with Points
Credit Card Marketplace
Reload Your Balance
Amazon Currency Converter

## Let Us Help You

Amazon and COVID-19
Your Account
Your Orders
Shipping Rates & Policies
Amazon Prime
Returns & Replacements
Manage Your Content and Devices
Amazon Assistant
Help

| English | United States |
|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| **Amazon Music**<br>Stream millions<br>of songs | **Amazon<br>Advertising**<br>Find, attract,<br>and<br>engage<br>customers | **Amazon Drive**<br>Cloud storage<br>from Amazon | **6pm**<br>Score deals<br>on fashion brands | **AbeBooks**<br>Books, art<br>& collectibles | **ACX**<br>Audiobook Publishing<br>Made Easy | **Alexa**<br>Actionable<br>Analytics<br>for the Web |
| **Sell on Amazon**<br>Start a Selling<br>Account | **Amazon<br>Business**<br>Everything For<br>Your Business | **Amazon Fresh**<br>Groceries & More<br>Right To Your Door | **AmazonGlobal**<br>Ship Orders<br>Internationally | **Home<br>Services**<br>Experienced<br>Pros<br>Happiness<br>Guarantee | **Amazon Ignite**<br>Sell your original<br>Digital Educational<br>Resources | **Amazon Web<br>Services**<br>Scalable Cloud<br>Computing<br>Services |
| **Audible**<br>Listen to Books &<br>Original<br>Audio<br>Performances | **Book<br>Depository**<br>Books With<br>Free<br>Delivery<br>Worldwide | **Box Office Mojo**<br>Find Movie<br>Box Office Data | **ComiXology**<br>Thousands of<br>Digital Comics | **DPReview**<br>Digital<br>Photography | **East Dane**<br>Designer Men's<br>Fashion | **Fabric**<br>Sewing, Quilting<br>& Knitting |
| **Goodreads**<br>Book reviews<br>&<br>recommendations | **IMDb**<br>Movies, TV<br>& Celebrities | **IMDbPro**<br>Get Info Entertainment<br>Professionals Need | **Kindle Direct<br>Publishing**<br>Indie Digital & Print<br>Publishing<br>Made Easy | **Amazon<br>Photos**<br>Unlimited Photo<br>Storage<br>Free With Prime | **Prime Video Direct**<br>Video Distribution<br>Made Easy | **Shopbop**<br>Designer<br>Fashion Brands |
| **Amazon<br>Warehouse**<br>Great Deals on<br>Quality Used<br>Products | **Whole Foods<br>Market**<br>America's<br>Healthiest<br>Grocery Store | **Woot!**<br>Deals and<br>Shenanigans | **Zappos**<br>Shoes &<br>Clothing | **Ring**<br>Smart Home<br>Security<br>Systems | **eero WiFi**<br>Stream 4K Video<br>in Every Room | **Blink**<br>Smart Security<br>for Every Home |
| | **Neighbors<br>App**<br>Real-Time<br>Crime<br>& Safety Alerts | **Amazon Subscription<br>Boxes**<br>Top subscription boxes –<br>right to your door | **PillPack**<br>Pharmacy Simplified | **Amazon<br>Renewed**<br>Like-new<br>products<br>you can trust | **Amazon Second Chance**<br>Pass it on, trade it in, give it<br>a second life | |

Conditions of Use    Privacy Notice    Interest-Based Ads    © 1996-2021, Amazon.com, Inc. or its affiliates

A-673

# Exhibit 4 to Restivo-Alessi Declaration
# Filed Under Seal (A-674-698)

# Exhibit 5 to Restivo-Alessi Declaration

# Filed Under Seal (A-699)

# Exhibit 6 to Restivo-Alessi Declaration

# Filed Under Seal (A-700)

Restivo-Alessi Declaration
Exhibit 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and
PENGUIN RANDOM HOUSE LLC

                    Plaintiffs,

    v.

INTERNET ARCHIVE and DOES 1 through
5, inclusive

                    Defendants.

Case No. 1:20-CV-04160-JGK

**EXPERT REPORT OF SUSAN H. HILDRETH**

**ATTORNEYS' EYES ONLY**

DocuSign Envelope ID: 52562761-326C-4E74-B088-5EFBF00A5904

## II.    SUMMARY OF OPINIONS

10.    I have been asked to provide expert opinions regarding library processes, service trends, patron behavior, and library finances, particularly acquisitions and the impacts of ebook licensing models on library services.

11.    In brief, my opinions are that:

- In the twenty-first century, libraries strive for improved patron access to knowledge and to adapt to increasing patron demand for digital access.  To do so, libraries must leverage their investments in their print collections.  See Section III.

- Patrons by and large prefer to browse or sample a title, digital or print, before making the decision to borrow it.  See Section III.

- Libraries have shared their physical collections through interlibrary loans and regional resource-sharing for many years.  Interlibrary lending is a way for libraries to conserve resources and focus acquisition-based spending on works their patrons are most likely to frequently request.  See Section IV.

- The growing practice of CDL by libraries is but one method libraries use to leverage their existing physical collection to better serve the reading population. The Digital Lending Library is one example.  See Section IV.

- Library budgets are both limited and finite.  Libraries strive to maximize their acquisition budgets to meet patron demand, but acquisition budgets are often one of the few discretionary line items in a library budget and so may be constrained based on other required library expenses.  Library budgets for acquisition of works are never large enough to meet patron demand.  See Section V.

- As to physical book acquisitions, libraries initially buy multiple copies of popular titles, and then subsequently reduce the number of copies in their collection of a title.  Sometimes reduction happens when a physical copy wears out or is damaged, and other times a reduction happens when libraries sell or giveaway additional copies of a title after demand for that title has decreased.  Libraries seldom buy replacement copies of a title.  Demand for popular titles diminishes rapidly, and one-to-one replacement would not be a good use of a library's limited acquisition budget.  Moreover, libraries can and do make small repairs (example: taping a torn page) to damaged physical copies.  Only a small percentage of a library's acquisition budget is spent purchasing new replacement copies of a title. See Section VI.

- Ebooks have presented particular challenges for libraries.  Patron demand for ebooks has been increasing.  But, when libraries pay for the ability to loan ebooks to patrons, libraries pay only for a temporary license.  The purchase of ebook

4

DocuSign Envelope ID: 52562761-326C-4E74-B088-5E5FBE00A5804

licenses therefore does not add to a libraries' permanent collection. Moreover, ebook collection management requires heavy use of libraries' staff resources. In many cases it takes more staff resources to manage library ebook licensing systems than it does to manage physical collections. See Section VII.

- CDL does not result in less library spending on books. Libraries spend all of their allocation budgets each period. If a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books. See Section VIII.

## III. BACKGROUND ON LIBRARY SERVICES

### A. The Role of Libraries in the Twenty-First Century

12. Provision of access to information is the primary goal of the twenty-first century library, yet libraries have expanded far beyond that primary role. Libraries serve as meeting places for community members, workforce development centers for the unemployed or under-employed, family learning centers for literacy support for all ages, telehealth venues for patients who do not have access to personal devices or wifi, and go-to partners for a myriad of services that reflect the needs and aspirations of their communities.

### B. Print Collection Investment

13. The primary role of libraries for many years was the development and curation of print collections. These collections were initially developed to provide educational materials to improve the lives of patrons. As communities changed and additional formats of resources evolved, libraries expanded their collections to include recreational reading materials, serials (magazines), children's materials, and varying formats, i.e. paperbacks, audio-visual materials, etc.[1] No matter what the format, libraries have worked to develop collections that present

---

[1] Michael Kevane & William A. Sundstrom, The Development of Public Libraries in the United States, 1870–1930: A Quantitative Assessment. Information & Culture: A Journal of History, 117–144 (2014).

# Restivo-Alessi Declaration
# Exhibit 8

**Custom confirmation message**

Thank you for participating in Open Libraries! You can view the books available for lending at https://www.archive.org/details/inlibrary. For additional questions, please contact Chris Freeland, Director of Open Libraries, at chrisfreeland@archive.org

# Agreement to participate in Open Libraries

Email address *

_____

Your Name *

_____

Your Title *

_____

1/3

A-706

Case 1:20-cv-04160-JGK-OTW Document 96-35 Filed 07/07/22 Page 38 of 4

## RECITALS 

By participating in the Open Libraries project, libraries, together, are building an at-scale controlled digital lending service to provide digital learners and print-disabled patrons access to digital versions of books residing in their stacks.

Internet Archiveâ€™s Open Libraries project offers the prospect of making every libraryâ€™s collection into a digital collection by allowing a library to lend a digital version of physical volumes they own.  Our priority is to provide access to books that are not yet available in digital form.

Leveraging the Internet Archiveâ€™s controlled digital lending platform we aim to eventually offer access to four million books, through purchase or digitization, while honoring the rights of creators using digital rights management software.

## AGREEMENT 

### Your Organization's Name ("the Library") *

-----------------------------------------------------------------------------------

2/3

The Library will share their catalog of books with the number of copies of each book with the Internet Archive. The Library has the option to do this via MARC record exports, OCLC, or through Library Link.  This will be updated quarterly.

The Library may set parameters as to which books may be lent digitally (â€œBooksâ€), and adjust this from time to time.  The Internet Archive will make appropriate adjustments to those offered for lending as time permits.

The Library may sign up for the Books for the Print Disabled program via https://docs.google.com/forms/d/e/1FAIpQLSfClhUkTvF5z29hhxoi5UgaB1_50Ir8F7H V5Cq0ABdztX9CkA/viewform and promote it to the appropriate communities they serve.

The Library may integrate links to the borrowable Books in their catalog and other services.

The Internet Archive will add Books to the collections offered on the Internet Archiveâ€™s sites.  The Internet Archive has the option to exclude any Books for any reason.

The Internet Archive will offer online access to statistics as to how many Books were borrowed each month in their state or country.

Termination of participation in Open Libraries can be made by the Library at any time with 7 days notice by emailing info@archive.org.

This form was created outside of your domain.

Google Forms

Restivo-Alessi Declaration

Exhibit 9

# OPEN LIBRARIES:  PRESENTATION FOR LIBRARY LEADERS FORUM

**Wendy Hanamura**

DIRECTOR OF PARTNERSHIPS at INTERNET ARCHIVE

**I'm Wendy Hanamura.  What if I could wave a wand over your collections--and turn a large portion of it digital?**

Delaware County, OH Library
**That's what we did for George Needham's collection in Delaware County Ohio. Turns out we had 47,612 digital versions of his physical books.**

St. Mary's County, MD Library
**Or how about Michael Blackwell's St. Mary's County Library in Maryland? 30,490 digital versions of his hardcopies were just added to his collection. That's 34% of his 89,000 ISBN books.**

Smithsonian Libraries
**And when our friend, Martin Kalfatovic asked us to see which of his 296,000 books we could turn e-.  It turns out we had 32,561 of them.  (That's only 11%. But what if we digitized 4 M more--the missing century of books**

Bar graph showing gap of digital ebook collection
**Meanwhile, libraries--including us--have not been able to keep up with this digital demand.  Take a look at our eBook collection, listed by decade of publication.  Libraries are doing well with books up to 1923 in the public domain. And after about 2000, with books that were born-digital. But in the decades between, there's a huge gap. Ebook restrictions, copyright limitations, and a lack of resources have led to almost a century of missing ebooks.**

CONFIDENTIAL
INTARC00354190

Bar graph showing book availability at Amazon by decade

**And it's not just libraries. Even Amazon reflects this chasm between 1923 and the eBooks era. How do we discover the out-of-print books. Orphan works. The important books that are missing online today?**

Free digital access to 4 million books

**We have the opportunity to fill in that gap of knowledge.  To provide both libraries and learners with free digital access to 4 million books.  The books most useful to students. From communities and cultures that have gone largely unheard.**

One physical book and One digital copy

**But here's why I think this a game changer. We're not proposing creating just one digital library in this country. We want to make every library in the US a digital library.  If you have the physical book, we will give you the digital version.**

Picture of Red-Hook Library

**And if you are a small library--like this one in Red Hook, NY without engineers on staff?  We will build a circulation platform that integrates with your system and lends the ebook for you.**

Physical distance is a barrier to access

**Why?  Because for many communities--ebooks have been a gamechanger. Something magical happens when you digitize a book. It unlocks it for communities with virtually no access to those texts. Because of distance, time-constraints, costs or disabilities, people in marginalized populations are too often denied access to physical books.   Digitizing content bridges that divide.**

Reader Privacy

**There's another reason we think libraries are so important.  Librarians take the privacy of their patrons very seriously. Librarians will always protect people's ability to browse and read freely ---without fear of being identified. By establishing this core principle we differentiate ourselves from for-profit companies that want to sell your personal information. We can build this project upon the values and morals of our profession.**

Slide with quote

**"We can democratize the stream of eBooks to include not just what's popular, but what's important"**
**John Szabo**
**CITY LIBRARIAN,**
**LA PUBLIC LIBRARY**
**As John Szabo who is City Librarian of LA told us, "We can democratize the stream of eBooks to include not just what's popular, but what's important."**

Long-term, public access to knowledge

**We have the opportunity to spark a new Carnegie moment----in which all libraries across North America become stewards of digital knowledge. The prize here is free, long-term, public access to knowledge. Next, I'm going to turn it over to our Director of Engineering, John Gonzalez.**

## John C. Gonzalez

DIRECTOR OF ENGINEERING & SERVICE AVAILABILITY INTERNET ARCHIVE

**Thanks Wendy.**
**I'm going to highlight some of our technology Innovations and where we see the big opportunities moving forward.**

Today: 250,000 books/year in 28 Scanning Centers

**One of the first questions we face: How to scale from where we are today-- digitizing a quarter million books per year in 28 scanning centers... to digitizing a million books per year? One solution: centralize scanning for efficiency. Our approach is to do this in a super scanning center.**

Super Scanning Center: Reduce Costs by 50%

**So we built one of those. And we've started filling it with our Table Top Scribes.**
**We have been developing this new scanning machine, hardware and software for four years**
**Our goal has been to optimize speed and quality in our book scanning.**
**With these innovations we have already reduced scanning costs by 50%.**

20 years of improvement

**For 20 years, we've been configuring, operating, and improving our own server racks for long-term preservation.**
**This allows us to store and access data at a fraction of commercial costs.**

Improving scanned texts

**with the help of readers**
**Our scanning process may not be perfect... and when it isn't, we want ways to capture reader corrections, so that the digital versions will get better and better.**

**CONFIDENTIAL**                                                          INTARC00354192

### Support for citations and annotations
**And we want scholars and students to be able to cite and annotate their reading...**
**AND to keep and share those citations.**

### Creating a delightful reading experience across devices
**Ultimately, we want patrons to have a delightful reading experience, on their device of choice: phone, tablet, kindle, or computer.**
**The beautiful thing is: Because these books are digital, we can deliver services in ways not possible with physical books.**

**Years ago, we started with 1M modern works in DAISY formats for the print disabled. We've built a bookreader that reads books aloud.**

### Improving accessibility
**But we can do better.**
**We're going to work with accessibility leaders including Benetech, LOC National Library Service, National Foundation of the Blind, Learning Ally, and Lighthouse for the Blind to improve our accessibility, and allow anyone with a certifiable print disability to access our millions of books.**
**Part of what we will be exploring during this conference is HOW to do that at scale while preserving reader privacy.**

### Building Interoperable systems
**With technology partners**
**The big goal is to make all of this interoperable with existing library systems...**
**And to work with partners, so we won't reinvent the wheel.**
**Now I'm going to turn it to Jim Michalko to talk about why we think this can work.**


## Jim Michalko

### SR. STRATEGIST, INTERNET ARCHIVE

### Focus on format shifting and circulation control
**Wendy described the motivation and benefits of a digitize and lend service and John described some of the technology. I'm going to suggest some of the ways a service might work but first an important nod to the legal foundation for this type of service as I'm sure a lot of you are wondering how this can work legally. You'll hear a lot more about that in the next panel. But in a nutshell: the Internet Archive's contribution focuses on format shifting and circulation control. This ensures that a library will not have to repurchase the**

CONFIDENTIAL

INTARC00354193

same content repeatedly simply because of a change in format, and that the author is not damaged by the proliferation of additional unauthorized copies to the market.

### One to One copies

From the perspective of copyright holders, there is assurance that unauthorized copies are not replacing sales. IA's Open Library model builds in circulation control, such that no more copies can circulate than have been acquired legitimately. For example, if a library purchases 2 copies of 1984 and wants to replace one with an e-copy,

### Screen Image of Online Digital Copy

IA will provide the e-copy but will restrict its use to one of this library's patrons at a time. The library would simultaneously allow only one of its print copies to circulate. Therefore, both before and after the conversion, only two copies of 1984 could be accessed by the library's users at any given time.

### Full and fair use

In the words of Michelle Wu, Professor of Law: The Internet Archive's proposal does not deprive authors or publishers of payment, but simply contemplates full and fair use of each work purchased.

### Photo showing books in storage, and involved in inter-library loan

Offsite storage: $20
Interlibrary loan: $35
2012 Total: : $300 million

There are lots of benefits including the way this kind of lending can overcome physical barriers to access - time, distance, and physical handicaps. From an institutional perspective there are real dollars and cents reasons for libraries to adopt this model. For instance, the Harvard library spends $20 every time it has to retrieve a book for a professor from the off-site repository. It's pays $35 for every Interlibrary loan. In 2012, an IMLS survey revealed libraries spent more than $300 million on Interlibrary loans.

### Photo showing those same books as eBooks.

Offsite storage: $20
Interlibrary loan: $35
eBook: $0
If you turn those into eBooks, the resources spent shipping physical books could be largely eliminated, and the money could be re-directed to digitizing new texts or to other priority library needs..

### One Time Investment: Digitizing A Century of Knowledge

Of course, we had hoped that we would have a patron who made this large one-time investment. We now know it's not going to happen that way so part

of what we will be discussing over the next two days is what's the best alternative approach to implement a service that delivers immediate benefit on a trajectory that continues to grow towards the ultimate vision we've been proselytizing.

### Cost recovery that fits libraries

#### While maintaining absolutely free access to books for patrons

Even with that one-time investment we knew that continuing operations of a digitize and lend service would need to actively build in the necessary cost recovery flows to be sustainable long-term. We will be talking during our working sessions about the possible cost recovery models that fit into current library practice and budgeting while maintaining absolutely free access to books for patrons.

### Why do we think this will work?

#### Screen shot of Open Library web site.

Well, we've been piloting a model for collaborative collection building, digitizing and lending for six years now, through our site, Open Library. With 500 partners, we have bought or digitized 2.5 million public domain volumes and more than 500,000 copyrighted books.
Legal counsel in many organizations have signed off on this form of lending.
Journals have published articles supporting this digitize and lend model.

#### Screen shot of book in Internet Archive online book reader

And other libraries like Boston Public have used the IA portal to lend digital versions of their collections.
Boston Public Library card holders can borrow the book and read it in the browser. Or download a PDF or ePub version, conveniently from home.
After two weeks, the book or PDF is automatically returned.

#### Screen shot showing a user joining a waiting list for a book.

Our program mirrors traditional library practices: one reader at a time can borrow a book, and others must wait for that book to be returned.

#### Screen shot of online book at the Mechanics Institute Library

Using IA as a portal is just one way a service could work. We know that isn't likely to be optimal for all libraries. Many would like the digital edition to be mobilized inside their own discovery system with a link to borrow the digital edition. Other libraries will want integration of these texts with their current ebook lending solution. During this forum we're going to talk about the different ways a service could be manifested and think about what mechanisms get us to a useful solution for the most libraries in the quickest time.

Screen shot of logos of prominent libraries

Logos of Boston Public, Georgetown Law, Califa, University of Alberta, and others.
**And we have some confidence that we can find that path and determine priorities for our work because of the motivated libraries that have indicated they would be early adopters of a digitize and lend solution. All of them are represented at the Forum and ready to work alongside their colleagues to arrive at a shared way forward.**

## Wendy Hanamura
**Let me invite Wendy back to the podium to explain what will happen next in the program.**

**WENDY: Fast forward 6 years from now, when 4 million books are now accessible online forever, for free--and this vital part of our cultural heritage is preserved...What tangible outcomes will we see?**

**Fast forward 6 years from now, when 4 million books are now accessible online forever, for free--and this vital part of our cultural heritage is preserved...What tangible outcomes will we see?**

Photo of small, cloth-bound book
**Here's one humble example. Take a look at this eBook in our collection, "Gardening in Southern California."**

Photo of that book's circulation record
**At the UC Berkeley Library it was checked out 3 times from 1934 to 1985.**

Screen shot of that book online
**Since we digitized it in 2005, 1346 people have viewed it. A new generation found value in these chapters about pansies and roses and dahlias. We were able to unlock the value between the covers of this 1918 book. Magnify that impact across 4 million of the most important books--available in thousands of libraries, not just ours.**

Photo of a man
**And what does this mean for people? Meet John Szabo. He runs the 73 branches of the Los Angeles Public Library. Serving 1.2 million library card holders, including every public school student in LA.**

More equitable access to patrons
**John told us that this project will provide his patrons with more equitable access to knowledge. Working people could access books after-hours.**

**More people-oriented space**
In his prime downtown location, a lot of space is devoted to closed stacks. He could make it more people-oriented space.

**Save money**
And LA Public Library would save money they now spend shipping items between branches every day. .

**Photo of man of native-american ancestry.**
And what about Wikimedia Editors such as Michael Connolly Miskwish? He's working with his Kumeyaay Tribe to re-write historical accounts to include Native American perspectives.
At this edit-a-thon at the San Diego Public Library, only a few of his people's histories were available.

**Screen shots of Wikipedia pages**
Having more diverse books online would allow Wikipedia editors to tell a more culturally accurate story. It will allow readers to click through citations to the books themselves. Ultimately, it allows editors like Miskwish to change this Wikipedia Gold Rush article with its illustration of murderous Indians….
….to one on the "Impact on Native Americans."

**Photo of man**
Another beneficiary? Meet Josh Miele. He's a blind scientist and educator who builds new technologies that make information accessible. But those works must first be digital. We can make millions of scholarly works more accessible to print disabled researchers like Josh.

**Photo of Woman**
And let's not forget about publishers. Like Houghton Mifflin's Archivist, Susan Steinway. Thanks to her, the venerable Boston publishing house is working with Boston Public Library to digitize and lend its back catalog stretching back to 1865.
The Internet Archive will digitize Houghton-Mifflin volumes by some of the 20th's Century's best minds and lend them via Open Library--one eBook at a time.

**Quote from Susan Steinway**
"…. accessibility to all published literature is possible while still protecting the rights of authors, illustrators, designers and publishers."

Their MOU reaffirms their conviction that it is possible to build a "modern digital library system" in which "accessibility to all published literature is possible while still protecting the rights of authors, illustrators, designers and publishers."

Photo of young girl of Hispanic heritage

But for me, no one looms larger than Eileen Alfaro. She's the Internet Archive's rising star--a SF 5th grader whose mother Roxana works with us. So Eileen does here homework at our offices every day.

I organized a Summer Reading Club just for her. So I know that Eileen loves to read, in fact, her favorite books is Esperanza Rising, the story of a young Latina in Early California. Eileen told me she looks for books that feature Latinas like herself in the library, but often she can't find them  We have a chance to expand her collection--and her horizons--by putting millions of great, diverse books under her arm.

Composite Photo of all previous personages

So who benefits?  The Librarian.  The Wikipedia editor.  The Scientist. The Publisher. The public school student.  Learners everywhere are better off when we can provide 4 million free digital books to libraries and learners.

Librarians:

Provide 4M eBooks to your patrons
 What can you do?
If you are a librarian-- join us as a partner and bring millions of ebooks to your patrons.

Publishers:

Let us digitize your backlist
If you are a PUBLISHER: digitize your backlist with us for lending

ILS Vendors:

Integrate 4M eBooks into OPACs
If you are an ILS vendor-- integrate our 4M ebooks into every library's OPAC

Writers & Editors:

Link your footnotes to eBooks
If you are a Educator or Wikipedia Editor:  Link your footnotes and citations directly back to these eBooks

Readers:

Suggest important books to you
And, If you are a reader-- suggest the books most important to you.

Logos of DLF and DPLA

 It's going to take all of us working together-- to curate the right books.  A more inclusive, diverse set of books.  That's what's our partners at DLF, DPLA and ALA's Office of Intellectual Freedom will be doing with us.  ALA's Our Voices-- Chicago project will be seeking our publishers and authors of diverse literature, which we will buy as part of our collaborative collection.

**CONFIDENTIAL**

**INTARC00354198**

### Logos or MIT Press, Boston Public Library, and Houghton Mifflin Harcourt

**And we want to be working with you publishers on this project, too. MIT Press is the first University publisher to sign up to allow us to digitize and lend its back list books. And Boston Public Library and HMH created their groundbreaking partnership to scan their backlist books right in our Boston Public Library digitization center.**

### 119,000 libraries: A Giant Step Forward

**But most of all it's going to take you. We can only scale if some of the 119,000 libraries out there--all of you--join us. I think the time is right to take a giant step forward. And thanks to the MacArthur Foundation, we took a big step to think big.**

### BREWSTER:

**At the Internet Archive, we are building the technology. We understand the policies. We are calling for partners who will help curate and source the best collections. And the leaders bold enough to push into new territory. Above all, we have the passion to get this done. What's at stake? Free, long-term, public access to knowledge.**

CONFIDENTIAL

INTARC00354199

# Restivo-Alessi Declaration
# Exhibit 10

# Maximizing institutional investment in print resources through controlled digital lending

Chris Freeland
Director of Open Libraries
Internet Archive
@chrisfreeland



INTERNET ARCHIVE

CONFIDENTIAL                                    INTARC00142194



CONFIDENTIAL

INTARC00142195

CONFIDENTIAL

INTARC00142196



-Show of hands
-Developed by copyright community
-

CONFIDENTIAL

INTARC00142197



Our physical inventory

CONFIDENTIAL

INTARC00142198



This is the basis of our lending collection. This is the collection we offer to our library partners for consideration of how to use in your library.

INTARC00142199



CONFIDENTIAL

INTARC00142200



CONFIDENTIAL

INTARC00142201



Turn a private resource into a public good



CONFIDENTIAL

INTARC00142203







CONFIDENTIAL

INTARC00142206

# Shared Print/Print Retention

allow your group to shed more of designated titles without jeopardizing last copy and ensure that they have access to those books that they do choose to take off the shelf
Use our collection as a comparitor in OCLC to make decisions about your holdings

CONFIDENTIAL

INTARC00142207

## Recap

- Libraries are actively participating in CDL
- Open Libraries has a growing collection of digitized books that you can offer your patrons & use to make decisions about your physical collections
- Our new partnership with Better World Books is helping build out that collection

CONFIDENTIAL

INTARC00142208

# Learn more...

- OpenLibraries.online
- Talk to me
  - Chris Freeland - chrisfreeland@archive.org
- Next webinar:
  - Tues, Feb 11 @ 11am CST - register



CONFIDENTIAL INTARC00142210

# Restivo-Alessi Declaration

# Exhibit 11



| | 195 Broadway | Telephone 212 207-7264 | Victor Hendrickson |
| | New York, NY | Fax 855 554-9204 | Assistant General Counsel |
| | 10007 | www.harpercollins.com | |
| | | victor.hendrickson@harpercollins.com | |

January 11, 2018

**By UPS and Email** (brewster@archive.org)
Brewster Kahle
Founder and Digital Librarian
Internet Archive
300 Funston Ave.
San Francisco, CA 94118

Re:     **Open Library's Distribution of Copyrighted Works**

Dear Mr. Kahle:

I am Assistant General Counsel of HarperCollins Publishers, and I write regarding copyright concerns we have in connection with the Internet Archive's Open Library project.

It appears that Open Library is distributing unauthorized digital copies of hundreds of books to which we and our affiliate companies hold the exclusive publication rights. Below are examples:

1. MAP OF BONES by James Rollins
2. THE PURPOSE DRIVEN LIFE by Rick Warren
3. DO NOT DISTURB by Christie Ridgway
4. GOOD TO GREAT AND THE SOCIAL SECTORS by Jim Collins

Screenshots from the books' Open Library pages are annexed hereto as Exhibit A. As far as we can tell, Open Library is making digital copies of the books available to its users without authorization. The digital copies are unauthorized reproductions of our books, and their distribution is unauthorized. Based on the information available to us, we do not see how it is not copyright infringement. And this is but a sample of the HarperCollins books freely available on Open Library's platform.

We are aware of Open Library's Sonny Bono Memorial Collection as described in the November 30, 2017 article in *Slate* titled, "The Copyright Mavericks: The geniuses behind the Wayback Machine have a new way to help libraries bring old books to the public." The Sonny Bono Memorial Collection, available at https://archive.org/details/last20m, purports to fall within the Copyright Act's Section 108(h) exception to infringement for certain activities relating to certain works in their last twenty years of copyright. The works we are concerned about, however, are not among the 61 books that currently make up the Collection.

Nor do we see how the first sale doctrine, 17 U.S.C. § 109, could exempt Open Library's activity from infringement. While Open Library would be free to loan out lawfully made physical copies of copyrighted books, the first sale doctrine does not apply to Open Library's distribution of digital scans or other digital versions of the physical copies.

**CONFIDENTIAL**                                                                                              **INTARC466104**

– 2 –                                                                        January 11, 2018

We also have confirmed with our authorized library distributors that they are not working with the Internet Archive or the Open Library project, and we note that Open Library's distribution of DAISY-format versions of our books is not a subject of this letter.[1]

Open Library's unauthorized distribution of our books also seems to go beyond the scope of Open Library's stated purpose. Open Library describes itself on its website home page as "an open, editable library catalog, building towards a web page for every book ever published." The FAQ section of the website describes further how Open Library, where possible, provides WorldCat and retailer links to help users legitimately borrow or buy books. But when Open Library is the entity directly providing copies of the books, it is acting as far more than just an online library catalog. We might question whether libraries and other organizations would donate books to the Open Library project if they were aware of the extent of Open Library's active distribution role.

All that said, we welcome an explanation if we are not understanding how Open Library's reproduction and direct distribution of copyright-protected digital copies of books to which we hold exclusive publication rights is not infringement. We otherwise demand that you immediately disable the "Borrow eBook" function for our books still under copyright, and that you provide us with the number of times the digital versions of all such books have been checked out or otherwise accessed by Open Library users, itemized by ISBN.

I can be reached at victor.hendrickson@harpercollins.com or 212-207-7264. Thank you for your attention to this matter, and we look forward to hearing from you.

This letter does not represent a complete statement of HarperCollins' position and is without prejudice to our legal and equitable rights and remedies, all of which are expressly reserved.

Sincerely yours,

Victor Hendrickson

Encls.

cc:
Internet Archive Copyright Agent (info@archive.org)
Internet Archive
300 Funston Ave.
San Francisco, CA 94118

---

[1] HarperCollins is committed to accessibility initiatives. Like Open Library, we partner with Benetech and its well-known accessible online library Bookshare. We are also a signing member of the WIPO-affiliated Accessible Books Consortium Charter for Accessible Publishing, and we participate in the ABC's Global Book Service, which serves the print-disabled through authorized libraries and organizations throughout the world. We still must reserve all rights to the extent Open Library's distribution of DAISY files of our books is unauthorized and is not exempt from infringement under Section 121 of the Copyright Act.

**CONFIDENTIAL**                                                            **INTARC466105**

# EXHIBIT A

**1. MAP OF BONES by James Rollins**
https://openlibrary.org/works/OL5727600W/Map_of_bones

| | EDITION | READ | BORROW | BUY |
|---|---|---|---|---|
|  | **2006, Avon Books**<br>Map of bones<br>in English | DAISY | This eBook is checked out.<br>You'll be next in line.<br>Join waiting list<br>Physical copy via WorldCat | Amazon<br>Better World Books |
|  | **2004, Morrow**<br>Map of bones<br>in English - 1st ed. | DAISY | This eBook is checked out.<br>Readers waiting for this title: 1<br>Join waiting list<br>Physical copy via WorldCat | Amazon<br>Better World Books |
|  | **2005, Thorndike Press**<br>Map of bones<br>in English | DAISY | Read in-browser or download the ePub / PDF from Internet Archive<br>Borrow eBook<br>Physical copy via WorldCat | Amazon<br>Better World Books |

## 2. THE PURPOSE DRIVEN LIFE by Rick Warren

https://openlibrary.org/works/OL16335306W/The_Purpose-Driven_Life

| | | | | |
|---|---|---|---|---|
| | **2003, Zondervan Publishing House**<br>Purpose-driven Life<br>Paperback | DAISY 🔒 | Physical copy<br>via WorldCat | Amazon<br>Better World Books |
| | **2002, Zondervan**<br>The purpose driven life<br>in English | DAISY 🔒 | Read in-browser or<br>download the ePub /<br>PDF from Internet<br>Archive<br><br>**Borrow eBook**<br><br>Physical copy<br>via WorldCat | Amazon<br>Better World Books |
| | **2002, Zondervan**<br>The purpose-driven life<br>in English | DAISY 🔒 | Read in-browser or<br>download the ePub /<br>PDF from Internet<br>Archive<br><br>**Borrow eBook**<br><br>Physical copy<br>via WorldCat | Amazon<br>Better World Books |
| | **2004, Inspirio**<br>The purpose driven life<br>in English | DAISY 🔒 | Read in-browser or<br>download the ePub /<br>PDF from Internet<br>Archive<br><br>**Borrow eBook**<br><br>Physical copy<br>via WorldCat | Amazon<br>Better World Books |
| | **October 1, 2002, Zondervan**<br>The Purpose-Driven Life<br>Hardcover in English – 1st ed edition | DAISY 🔒 | This eBook is checked<br>out.<br><br>You'll be next in line.<br><br>**Join waiting list**<br>Physical copy<br>via WorldCat | Amazon<br>Better World Books |

**3. DO NOT DISTURB by Christie Ridgway**
https://openlibrary.org/works/OL554456W/Do_not_disturb

| EDITION | | READ ↑ | BORROW | BUY |
|---|---|---|---|---|
|  | **2004, Avon Books**<br>Do not disturb<br>in English | DAISY | Read in-browser or download the ePub / PDF from Internet Archive<br>Borrow eBook<br>Physical copy via WorldCat | Amazon<br>Better World Books |

**4. GOOD TO GREAT AND THE SOCIAL SECTORS by Jim Collins**
https://openlibrary.org/works/OL3486273W/Good_to_great_and_the_social_sectors

## Good to great and the social sectors

*why business thinking is not the answer : a monograph to accompany Good to great : why some companies make the leap--and others don't*

Jim Collins.
Published **2005** by J. Collins] in [Boulder, Colo.?.
Written in English.

### Edition Notes

Includes bibliographical references (p. [36]).

### Classifications

| | |
|---|---|
| Dewey Decimal Class | 658 |
| Library of Congress | HD57.7 .C6452 2005 |

Add Cover Image

**Read**
DAISY

**Borrow**
This eBook is checked out.
Readers waiting for this title: 2
Join waiting list

Find a physical copy near you — powered by WorldCat



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>　　　　　　　　　　　Defendants. | Case No. 1:20-CV-04160-JGK<br><br>**DECLARATION OF**<br>**JEFFREY WEBER** |

Pursuant to 28 U.S.C. § 1746, I, **JEFFREY WEBER**, declare as follows:

1.　　I am the Senior Vice President, Online and Digital Sales, for Penguin Random House LLC ("PRH"). I submit this declaration in support of the motion for summary judgment filed in this action by PRH and plaintiffs Hachette Book Group. Inc., HarperCollins Publishers LLC, and John Wiley & Sons, Inc. (collectively, "Plaintiffs"). This declaration is based on my personal knowledge except as stated herein. This action concerns the Internet Archive's free ebook website ("Website"), which can be accessed either through the Internet Archive's "Open Library" website, http://openlibrary.org, or the Internet Archive's general website at http://archive.org, which actually hosts the digital files. This lawsuit concerns the works in the Internet Archive's "Books to Borrow" collection – which have been scanned and uploaded by the Internet Archive rather than third parties.

**A.      Background**

2.       PRH is a publishing company that represents more than 70,000 authors.  Its history stretches back to the mid-nineteenth century founding of several venerable imprints – including Putnam (1838, publisher of Edgar Allan Poe), Dutton (1852, publisher of H.G. Wells and Gore Vidal) and Frederick Warne & Co. (1865, publisher of the Beatrix Potter books).  In 1936, Random House, Inc. ("Random House") published the first authorized edition of James Joyce's *Ulysses* in the English-speaking world.  Today, the global PRH portfolio contains more than 275 independent imprints, which annually publish approximately 15,000 fiction and non-fiction books for readers of all ages and tastes.  Each year, PRH sells roughly 800 million books across print, audiobook and ebook formats.

3.       I joined Random House in 2001 as a Sales Assistant.  After advancing through a series of marketing and sales roles, I became Random House's Director, Digital Sales in 2010.  One year later, I was promoted to Vice President, Director, Online & Digital Sales, which is a position that I maintained after Random House merged with Penguin Publishing Group in 2012 to form PRH.  I was promoted to Senior Vice President, Online and Digital Sales in January 2018 and have held that position ever since.

4.       In my current role, I have three primary areas of responsibility.  I am the main point person for online accounts – which encompasses platforms like Amazon, Apple, Google, or Kobo that sell PRH books online in any format, including physical books, ebooks and audiobooks.  I also oversee a metadata and advertising group, which handles things like search engine optimization and paying for advertisements on retailer sites.  And my third main area of responsibility is running an online-and-digital-focused business development group.  In this

2

capacity, I oversee the creation and adoption of new terms (including for library ebooks) as well as onboarding new accounts.

**B.      The Library Ebook Market Is Well-Established and Continues to Evolve**

5.      There has been an explosion in both the popularity and diversity of digital distribution channels for books within the last twenty years, which I have experienced firsthand during my time at PRH.  First, the sales of physical books via online retailers started to grow exponentially in the 1990s and continued to increase as more of the population participated in online shopping.  Then came the rise of retail ebooks in the early to mid-2000s, which by 2020 represented somewhere between 12 and 15% of the book market.  And then, only within the last ten years, there has been a massive growth in the market for library eBooks (*i.e.*, lendable ebook files licensed by libraries for a fee).

6.      Despite its relative newness, the data clearly shows that the market for lendable ebook files has already established itself as an important and growing channel for distributing PRH content and one that is serving the needs of many Americans.  An analysis performed by PRH showed that for titles published or distributed by PRH that were first published between January 2017 and August 2019, library patrons checked out the PRH ebooks a total of 34.3 million times using OverDrive, the predominant library ebook aggregator platform.  These checkouts constituted 39% of all ebook "reads" for these titles, including commercial ebooks purchased from Amazon and other retail platforms.  (A true and correct copy of a document reflecting the data from this analysis is annexed hereto as Exhibit 1.)  Which means that, of all the Americans reading PRH ebooks released during this nearly three-year period, 39% obtained the ebook for free from a library.  Indeed, this percentage is likely even higher, since PRH distributes library ebooks through other library ebook aggregators in addition to OverDrive.  Moreover, the 39% percent of ebook

3

reads from library patrons accounted for only 25% of PRH's total ebook revenue for that same time period, with the remaining approximately 75% of ebook revenue coming from consumers that purchased their ebooks. This ratio demonstrates the support that PRH has provided to the library community and its patrons in the ebooks arena.

7.    PRH has increased its commitment to library ebook lending as demand for library ebooks has surged. When Random House started distributing ebooks through OverDrive in August of 2010, it made its then entire ebook catalogue -- approximately 12,000 titles – available through that channel. After the merger between Random House and Penguin, the complete ebook catalogue from both publishers was made available through OverDrive, which was more than 50,000 titles in 2015 and today is 70,000 titles. And, as a matter of practice, the lendable library ebook format and the consumer ebook format of any given title are released simultaneously.

8.    PRH also has seen significant revenue growth as library ebooks have become more popular. In 2010, for instance, PRH earned over $5 million from U.S. digital library sales, which includes both ebooks and digital audio. By 2020, that figure had grown more than fifteen-fold to over $83 million. (A true and correct copy of a spreadsheet produced by PRH containing this data is annexed hereto as Exhibit 2.)

9.    The money generated from ebook licenses provides authors with a return on investment for their work in the form of royalty payments and generates significant revenue that PRH uses to invest in new authors, new books and new distribution and format technologies.

10.   The growth of ebooks licensed to libraries is not limited to PRH, but rather is a phenomenon felt across the entire book publishing industry. I understand that the total number of library ebook checkouts via OverDrive, for example, increased by approximately ███████ in a decade. I further understand, as reflected in the Declaration of Elizabeth A. McNamara

4

("McNamara Decl."), that during that same time period, the number of ebook titles loaned to patrons jumped by a magnitude of over eleven. Today, according to the American Library Association, more than 93% of libraries in the United States lend ebooks to their patrons. (A true and correct copy of an August 31, 2021 article published by the American Library Association, titled "National survey finds libraries play expanded role in digital equity, bridging gaps in access to technology," is annexed hereto as Exhibit 3.) And in 2020, more than 100 public library systems exceeded one million digital checkouts via OverDrive alone. (A true and correct copy of a press release issued by OverDrive on January 7, 2021 titled "33% Growth for Digital Books from Public Libraries and Schools in 2020 Sets Records" is annexed hereto as Exhibit 4.)

11.    Library ebooks serve many constituents but are particularly helpful to patrons who find it difficult to visit physical libraries – including busy professionals, those in rural areas with limited branches, or the disabled. The benefits of library ebooks are being felt strongly in rural areas. The biggest growth in ebook adoption between 2014 and 2018, for instance, was "among rural libraries (14 percent) compared to other locales (between 1 and 8 percent) and was larger for libraries serving small populations (19 percent) compared to other population size groups (between 4 and 9 percent)."[1] A "library system" in many rural states actually covers the entire state, which allows local branches within the system with limited resources to pool their resources by licensing

---

[1] "The Use and Cost of Public Library Materials: Trends Before the COVID-19 Pandemic," Institute of Museum and Library Services (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/pls_fy18_research_brief.pdf.

ebooks collectively and making them available to patrons anywhere in the state, no matter how far away they might be from a brick-and-mortar branch.[2]

12.     Even in non-rural areas, library ebooks often are purchased by library consortia which offers efficiencies beyond simply resource pooling.  The automatic check out and check in functions offered by aggregators like OverDrive eliminate the time consuming and costly processes involved with interlibrary loans of physical books shared between branches.

13.     As PRH learns more about the economics of library ebook lending and its effects on the broader publishing market, it continues to develop new terms and technologies for its library ebook products (as discussed in greater detail below).  PRH also has endeavored to respond to the needs and concerns of libraries whenever it makes decisions affecting library ebooks.  To this end, Skip Dye, PRH's Senior Vice President of Library Sales and Digital Strategy regularly consults with librarians, library directors, state librarians, and ALA leaders, staying abreast of developments in that industry.

14.     To recap: in ten years, library ebook lending has grown into a vibrant, well-established market for ebooks.  In that short time, library ebook lending has experienced  massive growth in every meaningful dimension – including the number of titles available to libraries, the volume of free ebooks checked out by readers and the amount of revenue generated for rightsholders.  PRH investment into the development and distribution of the lendable library ebook

---

[2] Idaho Digital Consortium, "Home Page." (https://idahodigital.overdrive.com/, viewed on April 28, 2022), (Idaho); Library2Go, "Digital Media" (https://ndlibrary2go.overdrive.com/, viewed on April 28, 2022), (North Dakota); OK Virtual Library, "Home Page." (https://okvirtuallibrary.overdrive.com/, viewed on April 28, 2022), (Oklahoma); Mississippi eBook Consortium, "Home Page." (https://mlpebooks.overdrive.com/, viewed on April 28, 2022), (Mississippi).

format has contributed to the growth in this distribution channel and, as the market evolves, will continue to work to make sure that it remains viable for all stakeholders, including libraries and authors. Maintaining library ebook revenue streams is critical to growing this vibrant market.

**C. Internet Archive's Infringement Undermines Authorized Library Ebook Lending**

15. Internet Archive scans physical copies of PRH's books in industrial quantities and distributes the resulting ebooks through its website under a so-called theory named "controlled digital lending." By doing so, it operates a black market version of the authorized platforms that currently exist for the same basic purpose – *i.e.*, to distribute PRH ebooks to library patrons.[3]

16. Libraries already have the ability to license tens of thousands of PRH titles in ebook formats and loan them out to their patrons, instantaneously and for free. But Internet Archive distributes a staggering number of unauthorized ebook versions of those very same titles, which were created without permission or payment as part of a mass digitization project. According to a report commissioned by Plaintiffs' expert in this case, there were 16,496 PRH titles published in print and digital – or 35.8% of our catalogue – available to "borrow" from Internet Archive's website. This percentage jumps to 48.4% of the titles first published through 2015. (*See* July 7, 2022 Declaration of Ian Foster ("Foster Decl.") at ¶116(k).) Further, the Internet Archive is continually adding more scans of our works, including a substantial number after we filed suit. (*Id.* at ¶¶18, 118, and Figure 13.) And while Internet Archive's scans are inferior in quality to PRH's specially formatted ebooks, they are certainly legible and can satisfy a consumer's demand for a particular book.

---

[3] PRH does not take issue with services offered by Internet Archive that are unrelated to its mass digitization of in-copyright ebooks, including the Wayback Machine.

17.     PRH has tried to put a stop to this blatant infringement for many years, but to no avail.  In 2014, PRH sent Internet Archive correspondence demanding that it remove "the "[u]nauthorized scanned versions of Penguin Random House books being lent to patrons … immediately" – and sent a spreadsheet containing "close to 60,000 unique isbns" to assist the takedown process.  (A true and correct copy of that correspondence is annexed hereto as Exhibit 5.)  The Internet Archive provided assurances that it would comply with this demand.  (A true and correct copy of that correspondence is annexed hereto as Exhibit 6.)  Nonetheless, Internet Archive was soon distributing thousands of PRH titles on its Website.  After that, PRH paid anti-piracy vendors to engage in a game of "whack a mole" in which they sent thousands of takedown requests for individual titles, which were frequently ignored or proved ineffective when books reappeared after being temporarily removed.  As our expert Ian Foster reports, today, approximately 48% of the titles listed in PRH's 2014 spreadsheet are currently present on the Internet Archive website. That is over 28,000 of our titles.  (*See* Foster Declaration ¶134.)

18.     Keep in mind, these serious concerns preceded the exponential growth Internet Archive has experienced in the last few years and its now-stated goals, which give us far greater concern.  PRH has been particularly concerned about several developments regarding the Internet Archive.  The first is the Internet Archive's so-called "Open Libraries" program.  As I understand it, under this program, the Internet Archive is now acting as a centralized hub; rather than merely lending out ebooks made from scanning the print books in its *own* warehouse collection, it is now counting toward its maximum loan count over three million print copies of books housed in academic and public libraries scattered around the country.  The Internet Archive has not created any new scans of these books, but increases its own loan count based on an "overlap analysis" comparing its partner libraries' holdings and its own, and makes loans of its scanned copy on the

8

A-751

premise that the partner library will not circulate its print copy to local patrons at the same time as the ebook copy is distributed by Internet Archive. (A true and correct copy of the Open Libraries webpage on Internet Archive's website is annexed hereto as Exhibit 7.) Further, it was particularly alarming to learn from a 2019 public announcement that Internet Archive had effectively acquired the world's largest online used book store in order "to provide a steady stream of books to be digitized by the Internet Archive" – including thousands upon thousands of PRH titles. (A true and correct copy of Internet Archive's blog post dated November 6, 2019, titled "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books," is annexed hereto as Exhibit 8.) The confluence of several developments and their deeply concerning and potentially far reaching implications inspired PRH to join this suit against the Internet Archive.

19.     Finally, it was likewise alarming to learn about Internet Archive's decision to unilaterally abandon lending caps during its so-called National Emergency Library so that a functionally infinite number of people could read its unauthorized versions of PRH's ebooks at once, as is referenced in the attached. (A true and correct copy of Internet Archive's blog post dated June 10, 2020, titled "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending," is annexed hereto as Exhibit 9.) Loosening of the (already inadequate) restrictions Internet Archive imposes on its ebooks led to more usage of its website, as is clear from the spike in circulation immediately after lending caps were lifted for the National Emergency Library. (A true and correct copy of Exhibit 12 of the February 25, 2022 report of Rasmus Jørgensen, Ph.D. ("Jorgensen Report") is annexed hereto as Exhibit 10.) (A true and correct copy of relevant excerpts of the Jorgensen Report is annexed hereto as Exhibit 11.) (*See id.* ¶ 40.) Internet Archive's own expert confirmed that the number of users borrowing *Lord*

9

*of the Flies*, a PRH title, during that period exceeded the number of people who checked out the authorized version on OverDrive. (*See* Exhibit 10.)

20.     On June 1, 2020, the Plaintiffs sued Internet Archive for copyright infringement for scanning their print books and distributing the resulting ebooks on the Website, citing a sample of 127 books, including 48 in-copyright books published by PRH. Each of the PRH Works in Suit has been available as an ebook and an authorized library ebook since before this lawsuit was filed. (A true and correct copy of a spreadsheet reflecting the sales records of the Works in Suit from 2010- 2020 is annexed hereto as Exhibit 12.)

21.     The Works in Suit include fiction masterpieces by landmark authors like *Song of Solomon* by Toni Morrison (winner of the 1993 Nobel Prize for Literature) and Sandra Cisneros' *The House on Mango Street* (winner of the 1985 American Book Award). There are also several important works of contemporary fiction, including *The Road* (Cormack McCarthy, winner of the 2007 Pulitzer Prize for Fiction), *Station Eleven* (Emily St. John Mandel), and *A Brief History of Seven Killings* (Marlon James, winner of the 2015 Man Booker Prize).

22.     In addition to prizewinning literary novels, the PRH Works in Suit include bestselling thrillers like *Gone Girl* by Gillian Flynn and works by John Grisham, romances by Sandra Brown, and a fantasy novel from George R.R. Martin's epic *Game of Thrones* series. The list also contains popular non-fiction titles ranging from Bill Bryson's *A Short History of Nearly Everything* and Elizabeth Gilbert's *Eat Pray Love*, to *Neurotribes* by Steve Silberman, Jon Krakauer's *Into the Wild,* and *The Body Keeps the Score* by Bessel van der Kolk. And it includes beloved titles for children and adolescents, including the *Junie B. Jones* series, *Simon v. the Homo Sapiens Agenda, The One and Only Ivan,* and *Lord of the Flies*.

10

23.     As set forth above, there is an active licensing market for library ebook versions of the PRH Works in Suit.  Between 2017 and 2020, the 48 PRH Works in Suit were checked out approximately ███████ times via OverDrive.  (*See* Jorgensen Report ¶ 40.)  The Works in Suit generated approximately $1.23 million of U.S. library ebook revenue in the same time period, much of which was distributed as royalties to PRH authors pursuant to the terms of their publishing agreements.  (*See* Exhibit 12.)

24.     Internet Archive's Website provides competing versions of PRH's authorized and licensed ebooks: verbatim and complete digital copies of the PRH Works in Suit.  The primary difference being that IA (unlike the public libraries that OverDrive serves) never paid PRH (or the author of any of the books) the license fees that it charges libraries via legitimate library ebook aggregators.  Internet Archive has suggested that its unlicensed free ebook website does not harm PRH and does not diminish authorized library ebook lending or the book publishing market more generally.  For example, in one presentation urging prospective partner libraries to join its program, Internet Archive claimed that its Website does not cause PRH any financial harm because each "Library owns a legitimate copy of the book" and that "The digital copy substitutes for the owned item."  (A true and correct copy of a powerpoint document reflecting the presentation is annexed hereto as Exhibit 13.)  But this false contention is based on basic misunderstandings about aspects of PRH's business – including but not limited to how authors are paid for their books, the immense costs of publishing books, the investments PRH has historically made in developing new book formats and distribution technologies, and the careful balance PRH has struck between the competing needs of libraries, on the one hand, and authors, booksellers and publishers, on the other hand, to make library ebook lending the viable and dynamic market that exists today.

**D.      PRH Operates a Complex Business Geared Towards Shouldering the Immense Costs Required to Publish Books**

11

25.    Every book that PRH publishes is the result of a true partnership with an author, a partnership that requires PRH to make substantial and risky investments both upfront and over the long term.  MacArthur Genius grant winning novelist and poet Sandra Cisneros, who has been a PRH author for more than thirty years, has submitted her own declaration in this action that speaks to the importance of these investments to her work.  But from PRH's perspective, its business depends on the ability to act as the exclusive steward of the publishing rights that authors entrust to it.  The right to curate and control the timing of each book's release into each commercially viable format and distribution channel  is of critical importance.  This is how publishers cover the daunting costs required to publish books in a commercially sustainable way, including the cost of investment in new formats or technologies (like library ebooks) required to reach new audiences.

### i.    The Heavy Costs of Publishing Books

26.    The collective time, money and effort PRH invests in publishing each individual book is extensive.  PRH's average annual investment as measured by its operating expenses between 2017 and 2020 was over $600 million.  (A true and correct copy of a spreadsheet containing this data is annexed hereto as Exhibit 14.)  Not only does PRH make significant investment in its books, but it takes on the financial risk of publishing a new work by paying an advance to the author to fund his or her writing of the book.  A significant portion of our investment in each year's book publishing efforts comes in the form of author advances and editorial and marketing services that support the author through every stage of the publication process and a sales force that effectuates our sales.

27.    PRH also makes significant investment into new and innovative ways to expand the audience for each author's works.  Print on demand technology is but one such example, in addition to the specific examples discussed below.  PRH has invested millions of dollars in

developing technologies and systems capable of introducing readers to books in whatever format they prefer and in improvements to those formats, including in the digital age.

28.     Whether any given title will provide the needed return on these investment in order to fund an on-going publishing program is never certain.  The success of any given title is never guaranteed and inherently unpredictable. Every book is unique.  Its commercial success or failure will depend on countless factors that are impossible to fully predict, even after publication.

### ii.     Paying the Costs of Publishing a Book and the Importance of the Backlist

29.     Over the course of more than one hundred years, the varied publishing divisions that now make up PRH have not only shouldered the enormous costs of book publishing but also generated (wherever possible) a lifelong stream of royalty revenue for many authors.  A significant amount of the profits earned on PRH books is reinvested to pay the costs of publishing new authors or books and developing products capable of reaching new audiences.  The ability to invest in new authors, create life long royalty streams for authors and to run a profitable business depends on the ability to *exclusively* exercise two of the rights it obtains from authors – the right to sell books for their copyright term and the right to collect separate income streams for each different format, including the right to control the pricing and terms and conditions governing each different format.

30.     The exclusive right to publish the books acquired for the term of copyright enables PRH to rely on the sales of "backlist books" – defined as titles that were published more than a year ago – as a source of steady income to subsidize the publication of new books.  New books are a risky proposition and may not succeed; our backlist is a reliable engine that fuels our ability to invest in new works.  Particularly important are the sales of perennial sellers, which can be relied upon to generate significant revenue year on year for decades after first publication – and offset the costs of new books that underperform and result in a loss.  (*See* Exhibit 11.)  A review of PRH's

13

sales records for the Works in Suit further demonstrates that many of our backlist books published more than five years ago are bringing in very substantial revenues. (*See id.*) Even those bringing in steady but smaller sums are important to us on a cumulative basis and remain important to their authors, on an individual basis.

31. Backlist sales are also important because many books do not achieve their full commercial potential in their first year of publication. It may take years for a book to start selling in large quantities for countless, often unpredictable, factors. For example, a book that is critically well-received, may not be a top seller in its first year of publication. Such books often achieve peak sales later in their life cycle after they win a prestigious literary award or as they begin to be incorporated into the curriculum of high school and college literature classes. Likewise, a book that is adapted into film or television series inevitably experiences increased sales even if it did not initially sell well as a frontlist title. A prime example of this is *Crazy Rich Asians* by Kevin Kwan, which PRH published in 2013 and, upon information and belief, as reflected in the McNamara Declaration, featured a dramatic increase in library ebook checkouts when a blockbuster movie version was released five year later.

32. Overall, PRH's backlist revenue between 2017 and 2020 exceeded revenue from frontlist titles (*i.e.*, books published within the last year). (*See* Exhibit 14.) This means that backlist sales overshadowed frontlist sales even in a period that includes the years which PRH published the immensely successful biographies of Michelle and Barack Obama (2018 and 2020, respectively).

33. Equally important to the funding of the book publishing process is the ability to sell its authors' books in different formats – including paper backs, ebooks and audiobooks. In our experience, and as a matter of common sense, readers generally read a book once; they do not

14

typically buy the paperback edition of a book if they've already read it in hardcover. Nor will they buy the print edition, if they already have the digital edition.

34. Publishing agreements typically have separate provisions for royalties on hard cover sales versus paperback versus audiobook versus ebooks. Our current publishing contracts explicitly contemplate publication of one title in multiple formats and specifically address the royalties owed on a format by format basis and by sales channel. In the case of books initially published before the eBook form existed, PRH makes sure to obtain permission from the author (or the author's estate) before publishing a digital version of that title. If PRH loses control over how each format enters the market, it can't possibly hope to recoup its investment in the book or maximize the author's royalty earnings. Without the ability to set terms and prices that reflect the different characteristics of each format, PRH cannot effectively market each title to different audiences and generate sustainable revenue streams.

35. In my role as Senior Vice President, Online and Digital Sales, I have learned that if the publisher cannot exercise this control (or do so effectively), the different formats and channels may fall out of balance in a way that has significant negative effects on the publisher's overall market. This phenomenon is discussed in greater detail below with respect to ebooks specifically, but the general principle is that a glut of underpriced (or even free) books in one format poses a clear threat of loss of revenue from consumers who would have paid more for the book in their preferred format if the price in the underpriced format was not so low. The same is true for different channels. We watch for these effects as we assess dynamic discounts for our commercial ebooks and keep an eye on the impact of library ebooks on commercial ebook sales. This is why piracy is a danger that book publishers constantly guard against. In our experience, it is impossible for a publisher to compete effectively against easily obtainable, free substitutes for

15

their books, especially if they appear to be legitimate. The general economic principle – which we refer to as "cannibalization" – is that saturation of the market with unsustainably underpriced books will drive down revenue overall for both us and our authors.

36.     Copyright law gives book authors the exclusive rights to control the timing and format of the publication and dissemination of their works, not only in their first year of publication, but for the term of copyright. Authors are able to license those exclusive rights to publishers which, in turn, enables publishers to both generate revenue from backlist books and control the distribution of books in different formats in a way that maximizes revenue for author, publisher and bookseller. In this way, the copyright law aims to give authors their best chance to achieve the stable and long term income required to make a living from writing.

### iii.     The Controlled Digital Lending Fallacy

37.     The controlled digital lending theory espoused by Internet Archive threatens to undermine the book publishing business – and, indeed, all content industries – because it recklessly collapses the boundaries between formats. Internet Archive's position, as I understand it, is that the publisher's right to control the publication of a book in different formats is extinguished as soon as a physical copy of a book is lawfully purchased. Which, according to Internet Archive, means that a library or other non-profit entity that owns a physical book can scan that book and distribute the resulting ebook as if it were a proxy for the physical version (at least as long as the two copies are not in use simultaneously). This theory fundamentally misunderstands the basic reality that the ebook format is fundamentally different from the physical book format.

38.     To state the obvious, print books are physical objects (*i.e.*, ink printed on bound paper pages) that inhabit the real material world. They need to be physically transported from place to place, which costs time and money, especially across long distances. They also cannot be

<div align="center">16</div>

instantaneously replicated, since reproducing the book requires each page to be scanned or copied by some other means. Like all physical objects, they take up space on a shelf or other furniture or in warehouses. They periodically get lost or worn out, requiring those like libraries to buy new copies. And, because a physical book can only be read by one person at a time and has limited distribution capacities, it is necessary as a practical matter to sell individual copies of the book in large quantities and disperse those copies widely in order to enable large numbers of people to read the book simultaneously.

39.     An ebook, by contrast, is a digital file that consists of specially formatted text (and sometimes illustrations) that readers typically download from the internet and consume on personal computers or devices, like e-readers, smartphones or tablets. Electronic formats offer many valuable features that, due to the immutable laws of physics, paper editions cannot match. Ebook files last forever without degrading and do not get damaged or lost. Readers of ebooks can instantly access many millions of titles, which would fill entire buildings in hard copy form, on devices that fit comfortably in a purse or trouser pocket. Readers of ebooks also do not need travel to a bookstore or library during business hours, or even wait for a book to arrive in the mail, but rather have the option anytime of the day or night to download ebooks to their computer, phone or e-reader device from the comfort of their home or any other location with an internet connection – and start reading any book of their choosing in a matter of seconds. Ebook readers also enable readers to run searches for particular words in the text, look up the meaning of words via a dictionary function or even read in the dark.

40.     The ebook format also has additional benefits for libraries themselves. For example, ebooks reduce the time and costs related to check outs and check ins; and the sharing of

17

ebooks between individual members of library consortia does not require physical books to be somehow shipped or delivered to and from consortium members.

41.     The characteristics that make ebooks valuable also mean that there is a significant threat to the company if third parties scan our books or otherwise obtain unauthorized digital copies of our books.  This is because anyone in possession of an unprotected digital file containing the text of a book can (for all intents and purposes) replicate it infinitely, instantaneously and at practically no cost.  And ebooks can be distributed instantaneously anywhere, anytime and to anyone with an internet connection, again at practically no cost.  And if consumers can easily get ebooks for free, they have no incentive to purchase their own copy.  Likewise, if public libraries can send their patrons to free ebooks on the internet, they have less of an incentive to expend tax dollars on those titles.

42.     These inherent differences between physical books and ebooks require publishers to handle the two products very differently – which is chiefly expressed in the terms and conditions on which they are sold and priced (which are of course interrelated).  The book publishing business actually has a long history of publishing in a variety of different formats and channels, with different pricing models -- such as hardcover, trade paperback, mass market paperback, book club editions, and audiobook.  Having different terms and conditions and pricing for digital works as opposed to analog works, or different formats or modes of delivery, is hardly unique to the book publishing industry.  As any consumer of movies, television and music is aware, there are a plethora of choices to enjoy these media (ranging, for movies, from visiting a movie theater to DVDs to streaming), all with different terms and pricing models.

43.     PRH's model for commercial ebooks is premised on the notion that distribution is limited to one user account.  Whereas PRH largely sells print books to wholesalers, it uses a form

18

of an agency model for commercial ebooks,[4] and its agents, such as Amazon, both apply DRM (digital rights managements) and impose terms and conditions to enforce its "one user account" model. For example, the Terms of Use set by Amazon in connection with ebooks obtained through its Kindle platform state as follows:

> "Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees . . ., the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times . . ., solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use. Kindle Content is licensed, not sold, to you by the Content Provider."

Further, the Amazon Terms of Use provide under "Limitations" that the purchaser "may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party. . . ." (A true and correct copy of the Amazon Kindle Store Terms of Use is annexed hereto as Exhibit 15.)

44. Library aggregators license our ebooks to libraries on set terms and conditions to enforce the various models that we have selected for that market, as detailed below. Licenses make infinitely more sense in the digital realm – which is why all manner of copyrighted content

---

[4] Under an agency model, the publisher sets the price that appears on the retailers website and that is paid by the consumer. The retailer is compensated by taking a commission on the sale, typically 30%. By contrast, in the wholesale model, the publisher sets a recommended price for the print book (the "list price") and then sells the books to wholesalers at a discount on that price – whereupon the wholesaler can sell the book to consumers at a price of their choosing.

(ranging from software to music) is licensed for digital formats, not sold. This is because rightsholders need to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing. The license terms also limit reproduction and distribution, providing legal contract terms that reinforce the DRM to prevent rampant piracy.

45.     The sale of print books to libraries makes sense for us, because of the practical limitations on the distribution of a print book. Digital books, however, can readily be distributed around the world. Thus, one of the crucial requirements that a license allows us to enforce is that each library or library consortium can only distribute their ebooks to their own local community members or academic community, and not nationwide.

46.     The other control mechanism that publishers rely on to ensure that ebook distribution is economically sustainable is price. PRH offers different prices for each of its formats, and the way that price is calculated for ebooks differs from physical books to reflect the characteristics of each product. The prices of ebooks factor in the greater value posed by the format, but also the limitations imposed by the licensing terms. Prices for retail ebooks, for instance, are calculated in part on the basis that the ebook can only be downloaded onto devices associated with the purchasing account. If the ebook could be shared among devices belonging to multiple users, the cost would be significantly higher to reflect the broader distribution. And the price to purchase an ebook file, without restrictions on its further use or distribution, would be utterly unaffordable as a practical matter given that it could potentially satisfy global ebook demand for that title.

47.     In a similar vein, prices for lendable, library ebooks typically exceed the prices for consumer ebooks because there is an expectation that each copy will be read by multiple people on multiple devices. The prices of library ebooks exceed the prices of physical library books to

reflect both the benefits conferred by the electronic formats on librarians and consumers. The pricing of lendable ebooks at a rate higher than the price for a single ebook also helps to avoid a scenario where cheap ebooks flood the market and satisfy the demands of many or even most readers who might otherwise have paid for their own ebook. The pricing thus reflects the fact that library ebooks have far more potential to satisfy consumer demand than physical books, particularly because (unlike physical books) they are instantaneously accessible from anywhere at any time and because the experience of both obtaining and reading a library ebook is essentially indistinguishable from reading a commercial ebook.

48. The control PRH exerts over ebook pricing also gives it latitude to offer discounts on ebook titles. PRH has fairly recently, for instance, responded to requests from colleges and some companies that wish to give ebook copies of a particular title to their students or employees. PRH also frequently discounts retail ebook prices for a limited time period for a range of promotional purposes, including themed promotions. Control over ebook prices also allows PRH to discount an author's earlier works before the release of a new book in order to prime consumer interest in advance of the upcoming title. These are strategic pricing decisions that PRH makes in order to serve the interests of author, publisher and bookseller.

49. For all of these reasons, Internet Archive's notion that physical and electronic formats are freely interchangeable according to the whims of the purchaser of a print book is profoundly dangerous. If Internet Archive is permitted to acquire outright ownership of PRH ebooks for the cost of acquiring and scanning a secondhand paperback, it will undermine the carefully calibrated ebook formats that are economically sustainable in large part because PRH retains control over licensing terms and price.

21

50.     If controlled digital lending were given a legal green light, there would likely be widespread and unrestricted adoption of mass digitization and distribution of copyrighted content under the guise of legitimate library activity.  Any large tech company, for instance, could incorporate or partner with a not-for-profit organization to digitize huge numbers of books.

51.     Other entities would be emboldened to push the boundaries, either by experimenting with ways to monetize the content taken or by branching out into other media.  It is not difficult to imagine similar "controlled digital lending" services for movies, television shows, music, video games or any other type of content.  There would be nothing, for instance, to stop a non-profit entity from purchasing and digitizing old music cassettes or movies on video, and distributing the music or movies for free over the internet in numbers equal to the physical copies.

52.     Yet another practical effect of allowing Internet Archive to continue with its mass digitization project would be to strongly disincentivize PRH from investing significant time and money into pursuing new formats that it cannot reasonably expect to control and monetize.  In other words, our willingness to invest in new formats depends on the baseline expectation that we will be able to sell each format separately, and control the terms on which each format exists in the market.  Internet Archive's activities are contrary to the public interest since the well-established and still evolving marketplace for library ebook lending that currently exists simply would not be possible in its current form without the long term investments and enthusiastic participation of book publishers like PRH.

**E.     PRH Has a Proud Legacy of Innovation in Book Publishing**

53.     PRH has long played a prominent role in the development of publishing technology and new book formats designed to reach new audiences.  When Penguin Books was founded in 1935, for instance, it revolutionized the publishing business with its paperback editions of high-

quality fiction and non-fiction titles. By creating a lower-price alternative to hardcover editions, establishing its iconic brand of color-coded cover designs, and aggressively distributing books through popular main street stores like Woolworths, Penguin was one of the first publishers to bring serious content to the mass market and was rewarded by finding larger audiences for its authors' works than were previously thought possible. Penguin Books' business thrived and generated revenue that was reinvested in developing and publishing important new voices.

54.     The audiobook divisions that are now part of PRH also were integral to the development of the audiobook. PRH's audiobook division has its roots in Listening Library, which was founded in 1955 by Helen and Anthony Ditlow, who was partially blind. It was one of the first companies to distribute audiobooks on vinyl LPs to schools, libraries and other special markets like VA hospitals. PRH also operates the iconic Books on Tape brand, which started out nearly 50 years ago by lending cassette tapes of unabridged audiobooks via direct mail order and now offers more than sixteen thousand audio titles on compact discs or as downloads. In recent years, PRH has invested heavily in digital audiobooks as audiences for audiobooks have grown exponentially, as many consumers discover that they prefer listening to books over reading books, at least in certain situations like long car journeys or during exercise. Across its whole audiobook division, which also includes Penguin Audio and Random House Audio, PRH annually publishes 1,500 to 2,000 audio titles in multiple formats.

55.     The spirit of innovation has continued to drive PRH in the late 20th and early 21st century. PRH spent millions of dollars and untold employee hours on pioneering ebook products – which were embryonic when I joined Random House more than two decades ago. Foremost in our minds was the havoc wrought on the music industry by piracy and uncontrolled distribution of digital content. Random House was acutely aware that the music industry imploded during the

23

early 2000s in large part because anyone could purchase a single compact disc containing an album for less than $20, effortlessly rip all the songs onto a computer in mp3 format and then disseminate the content on those files over the internet for anybody else in the world to download for free – which is how millions of people became accustomed to consuming music, to the detriment of musical artists and record labels that have never truly recovered. Internet Archive's mass digitization of books has worrisome echoes of the free music websites that were rampant at that time.

56.     Starting at least in the late 1990's, some of the divisions of what is now PRH began investing heavily in creating authorized mechanisms for distributing digital books in order to create viable products for consumers to read as an affordable alternative to using pirate websites. By pursuing the goal of unleashing the potential of digital books while maintaining the control necessary to avoid tanking the entire publishing industry, PRH and other publishers have created thriving markets for in-copyright ebooks where essentially none existed less than twenty-five years ago. For example, ebooks are now a core part of our business that generates $59 million per year from library channels.

57.     By 2000, Random House had invested more than $5 million into the development of ebook publishing software and pledged to invest $10 million more within the next three to five years after that. In the late 1990s, Random House was (together with McGraw Hill and Wiley) a member of the Open Ebook consortium that designed the original standard format for ebooks that evolved into the ePub ebook format that was launched in 2007 and remains in wide use today. We continue invest in studying and developing new distribution systems, sales systems, and formats for our titles, as well as in improving the systems we have.

24

58.     Random House also invested heavily in the creation of production and business systems in support of its digital publishing products and created Random House Ventures, L.L.C. ("Random House Ventures"), a wholly owned e-investment subsidiary, on March 3, 2000 in order to advance digital publishing technology.  On November 1, 2000, the Random House imprint Modern Library announced that it would offer 100 classic backlist books in ebook format at an average cost of $4.93.  In order to make this project feasible, Random House partnered with Reciprocal, Inc., an epublishing technology company that implemented digital rights management technology ("DRM").

59.     In 2002, PRH began distributing ebook editions of selected books to consumers through specialized electronic retail platforms.  The popularity of ebooks grew rapidly after the release and widespread adoption of dedicated e-readers like Amazon's Kindle (2007), the Barnes & Noble Nook (2008) and the Kobo ereader (2010), as well as Apple's iPad (2010), which was released with its dedicated ebook reading app, iBooks.  Between 1998 and the launch of Amazon's Kindle device in 2007, the Random House division of what is now PRH published approximately 3800 titles in ebook format.  Between 2007 and 2010, Random House published about 12,000 additional ebook titles.  By 2015, the total PRH number exceeded 50,000 titles and ebooks reached their peak of 25% of total book revenue as compared with 71% from print (with the remainder from digital audiobooks).  Although retail ebook sales declined from this peak (and then rose again during COVID), in all recent years they have been a substantial percentage of our book revenues.

60.     PRH's commitment to ebooks is also amply reflected in the range of titles it offers as ebooks.  By 2007, Random House offered approximately 3800 ebook titles and Penguin had approximately 300 ebook titles available.  Today, virtually all original titles in the adult trade books category are available as an ebook – including the 48 PRH titles at issue in this lawsuit.  In

25

general, the few original titles that are not distributed as ebooks are highly graphical works that do not translate well to ebook formats. But the vast majority of new titles are published simultaneously as ebooks and in print. And PRH has invested millions in creating ebook versions of works published before the format came into widespread use. The process to turn older works into ebooks involved an extra step beyond creating the digital files, since it often was necessary for PRH to negotiate amended agreements with authors to publish an electronic version of their work.

61.     Despite the challenges and following decades of sustained investment, PRH and other publishers have built up the technology, terms and trust with authors necessary to create and develop sustainable retail markets for ebooks. The recent pandemic illustrated the importance of the publishing community's investment in ebooks, since the presence of an established ebook market permitted consumers to access books even when bookstores were closed and complex supply chain issues impacted the delivery of some physical books.

**F.      PRH Invested Heavily in Library Ebooks and Continues to Help the Market Evolve**

62.     Although the bulk of its library revenue still comes from the sale of physical books, PRH has embraced library ebook lending and it now accounts for roughly 30% of its overall library business (with digital audio books contributing another 16%). PRH views libraries as immensely beneficial to society. They play an integral role both in fostering public literacy and serving their communities, including by selecting titles of local interest and serving as community gathering places. Public libraries do much to publicize our authors and titles, including by hosting author readings and book clubs, as well as circulating updates to their communities on books of interest.

63.     Libraries also spend enormous amounts of money on purchasing books published by PRH and other book publishers. In 2019 alone, for instance, public libraries spent almost $1.19

<div align="center">26</div>

billion on physical and ebooks. (A true and correct copy of a spreadsheet reflecting this data is annexed hereto as Exhibit 16.) This money ultimately translates into royalties for authors and revenue for publishers that can be reinvested into new book projects or efforts to find new audiences.

64. A striking feature of the library ebook market is the number of Americans who read their ebooks for free from libraries, as compared with buying them the commercial ebook market. As noted above, PRH did a preliminary study of the universe of consumers accessing titles in ebook form from OverDrive, using titles published and distributed by PRH and first published between January 2017 and August 2019. (*See* Ex. 1.) PRH determined that library patrons checked out these titles 34.3 million times as ebooks, which accounted for approximately 39% of all ebook reads for these titles. In other words, for these nearly 87,000 titles, when PRH compared the number of Americans who borrowed a free ebook from a library with the number of Americans purchasing a commercial ebook, it found that approximately 39% obtained the ebook free from the library.[5] This is the case even though approximately 75% of ebook revenue was generated from retail channels. This ratio illustrates the extraordinary support that PRH has provided to the library community in connection with library ebooks and the fact that authorized library ebooks already contribute greatly to the public interest in the widespread free availability of content, without the help of unauthorized bootleg copies from the Internet Archive.

65. But it took considerable time and effort to calibrate economically viable library ebook products and to build the library ebook market into what it is today. This is because the

---

[5] When looking only at the period within three months after each title was released – when initial library holds for each title are at their highest and ebook availability at libraries is lower – library reads accounted for 24% of all digital reads for these titles.

27

economics of distributing ebooks through libraries are considerably more complicated than retail ebook channels, which are hardly straightforward. The challenges of library ebooks derive, once again, from the unique characteristics of digital media. The dilemma has been apparent for decades.

66.     As one journalist noted in the April 1993 edition of *Wired Magazine*, "[t]he world's great libraries share a great vision: books once hoarded in subterranean stacks will be scanned into computers and made available to anyone, anywhere, almost instantly, over high-speed networks." But, he continued, "[i]f someday in the future anybody can get an electronic copy of any book from a library free of charge, why should anyone ever set foot in a bookstore again?" Thus "compromise is badly needed" in order to unlock the potential of ebook lending while avoiding a scenario in which "libraries … put publishers out of business with free competition." (A true and correct copy of that article, "Libraries Without Walls for Books Without Pages" by John A. Browning, is annexed hereto as Exhibit 17.)

67.     In the nearly thirty years since that article was written, PRH and other rightsholders have taken the lead in making the tricky compromises necessary to develop the thriving and still-evolving market for library ebooks that currently exists. It took many years of investment and experimentation for PRH to strike the balance needed to create viable ebook lending channels and products for its titles. In or around 1998, for instance, publishers worked with a company called netLibrary to create a database that offered full-text, online access to thousands of mostly scholarly books. And in October 2000 Random House Ventures made a substantial investment in ebrary, which was a service that made scholarly content in books, periodicals and other traditionally printed documents accessible on the Internet via a non-subscription, pay-per-use model.

<div align="center">28</div>

68.     One important innovation in the library ebook market was the development of partnerships between publishers and aggregators like OverDrive, EBSCO, ProQuest and Hoopla. Aggregators operate the digital platforms that make library ebook lending technologically feasible. And they are responsible for enforcing the terms prescribed by publishers and, as trusted partners, provide the control required for publishers to distribute library ebooks that readers will ultimately access for free.   They also provide crucial administrative services to publishers, including administering and collecting licensing revenue.

69.     Eventually, and in consultation with librarians and aggregators, PRH settled on terms that were designed to unlock the potential of library ebooks while also protecting the economic interests of publishers and authors.  The first model adopted by PRH is reflected in the terms of sale that were in place as of January 1, 2016, which reconciled the previously different terms offered by Random House and Penguin Books prior to their merger.  (A true and correct copy of those terms is annexed hereto as Exhibit 18.)  To some extent, these terms roughly approximated the process of physical lending by adopting a "one copy/one registered user" model that permitted libraries to pay for perpetual access to ebooks so long as they were loaned out to one user at a time.[6]  A library that wanted to loan to multiple users at once would have to pay for multiple ebook copies, just like it would for physical books.

70.     Some of the most crucial terms in the library ebook terms are the limitations designed to ensure that ebook lending remains localized within a geographic or academic library community (or consortium of libraries) in order to avoid the scenario in which a few pooled ebooks can satisfy nationwide demand for a popular title.  This is a critical difference between library

---

[6] The same terms also governed library lending of PRH's digital audiobooks, which are also distributed through aggregators.

ebooks and the print books purchased by libraries, and one necessitated by the far greater distribution capabilities of digital media.  To this end, the 2016 terms state that aggregators  can only distribute ebooks to a "Public Library" (defined as "an entity that is established to serve a defined community, district or region, supported in whole or in part with public funds") or a "School Library" (which is an entity "affiliated with a public, private or religious educational institution").  The terms also impose a critical "[o]ne copy/one registered user" requirement on these libraries, which dictates that "[a]t any given time, a library or institution may loan out only as many digital copies as it has actually purchased from the [aggregator], and only to its registered patrons who have hard copy lending privileges."  There also are requirements that the aggregator's platform "prohibit patrons from copying the file," "utilize digital rights management and security technology approved by PRH" and impose limited "check-out periods" to prevent patrons from obtaining indefinite access to the book.

71.  In 2018, PRH determined that the perpetual term for its "one copy/one registered user" model was not in the best interests of its authors or many of its library customers.  By 2018, the library ebook market had grown exponentially and PRH realized that a perpetual term with endless circulations into the distant future was not a good value proposition for its authors.  At that time, the digital list price was set at three times the cover price of the hardcover, but was too low for an ebook product that could potentially satisfy consumer demand for generations.

72.  But even as the digital list price for the perpetual model was too low for rightsholders, it was also relatively high for libraries and inefficient because the licenses did not allow libraries to follow the natural rhythms of patron demand.  In the course of its discussions with librarians, PRH discovered the specific problem that libraries were having with perpetual

ebooks.  Libraries are highly responsive to patron demand for new releases of bestselling titles, like a new thriller by John Grisham or a Sandra Brown romance.

73.     In practical terms, this means that librarians buy large numbers of blockbuster books to meet the initial rush of interest even though they know that the interest will wane within a year or less, leaving the library with a large number of surplus copies.  In the world of physical books, libraries "weed out" these copies in order to free up shelf space.  But under the perpetual model, libraries were forced to pay for more ebooks than they would need over the long term.  Even worse, some libraries' funding was tied to the circulation rates of their inventory – which meant that holding onto excess copies of ebooks that were not circulating could mean that the libraries receive less money.  These libraries were eager for a way to get rid of excess stock.

74.     In order to hopefully alleviate this issue, PRH launched a pilot ebook buyback program in May of 2018 whereby libraries could "return" unwanted ebook copies for credit that could be put towards new ebook purchases.  (A true and correct copy of an email outlining the terms of the buyback program is annexed hereto as Exhibit 19.)  In total, PRH bought back 48,275 ebooks and paid out $289,650.00 in credit.  (A true and correct copy of a spreadsheet summarizing the results of the buyback program is annexed hereto as Exhibit 20.)

75.     But in order to address the broader problems with its perpetual term, PRH ultimately decided to change its library ebook terms and, on October 1, 2018, adopted a two-year metered model for public library, school library and "special library" wholesalers.[7]  (A true and

---

[7] "Special Library" was a new category of libraries that was added to the entities previously listed in the 2016 terms, which is defined as "an entity that provides an organized collection of specialized printed materials or other media maintained for use by or lending to a specialized and limited clientele, not as merchandise or for sale, and the facilities

31

correct copy of the October 1, 2018 public library terms is annexed hereto as Exhibit 21.)  The terms of the metered license allow libraries to lend ebooks to an unlimited number of patrons on a "one-copy/one-registered-user" basis, but for "a limited term of two (2) years from the time that each such copy is first purchased and available for lending by that institution…"  At the end of the two-year period, the ebook copy "will expire" and the library must obtain another copy if it wants to keep lending that ebook through the aggregator's platform.

76.     The change to a two-year metered model allowed publishers to reduce digital library list prices to a maximum of fifty-five dollars for adult trade titles, forty-five dollars for young adult titles and thirty-five dollars for children's titles while also securing a fairer return on investment for authors, who would receive periodic payments for popular books that libraries wanted to keep in their digital collections over time.  (These prices are maximum amounts and actual pricing is dynamic.)  The metered terms also mitigated the problem libraries had when they were forced to over-purchase perpetual ebooks that they knew they would not need in the medium or long term.  Under the metered model, libraries can purchase enough copies to meet initial demand at a lower per-copy price and then let unused copies drop out of their collection as demand wanes, as they would weed physical books.

77.     While it is impossible to make everybody happy and some libraries would prefer to buy cheap, perpetual ebooks without meaningful restrictions, it must be noted that the current costs of PRH ebooks are a fraction of the cost of a commercial ebook on a per circulation basis.  And the terms on which PRH licenses to libraries are constantly being evaluated and refined as the

---

necessary to house and support such a collection."  PRH does not consider Internet Archive to be a "special library" because it does not have "a specialized and limited clientele."

32

relatively new markets become more widely understood. For instance, PRH adopted a special model offering a perpetual term for academic libraries (at a higher price point) when it adopted its two-year metered model for public, school and special libraries, given their different needs and patterns. (A true and correct copy of the October 1, 2018 terms for academic libraries is annexed hereto as Exhibit 22.)

78.     Another innovation was PRH's introduction of a specially metered classroom distribution channel, which was introduced on February 2, 2020. (A true and correct copy of the February 2, 2020 ebook terms for the classroom distribution channel is annexed hereto as Exhibit 23.) Under these terms, schools purchase time-limited access to ebooks that can be loaned to students on a one-copy/one registered user for a sixty day period, which is typically enough time to complete a classroom assignment. And the sixty day time limit enables PRH to offer ebooks to schools at a severely discounted digital list price, which is about 10% of the Library Wholesale List Price. In January 2021, PRH amended the model to expand the loan period from sixty to ninety days. (A true and correct copy of the January 10, 2021 ebook terms for the classroom distribution channel is annexed hereto as Exhibit 24.)

79.     PRH also made changes to its ebook licensing terms for public, school and special libraries in response to the COVID-19 pandemic. In order to meet the needs of libraries struggling during lockdown and in anticipation of surging demand for library ebooks, PRH implemented two library ebook models in the spring of 2020. The first is a one-year metered model under which libraries can purchase ebooks for half the digital list price than the standard two-year model. The second is a pay-per-use model. The pay-per-use model gives library patrons the option to check out a single copy of any ebook in PRH's catalogue; each time a book is checked out, the library pays 10% of the two-year digital list price to provide a one-time temporary loan to that user. This

33

model makes it particularly affordable for libraries to obtain less popular backlist books for their interested patrons. (A true and correct copy of an email setting out the terms for these models is annexed hereto as Exhibit 25.)

80. The one-year and pay-per-use models have given libraries greater flexibility in responding to surges in ebook demand, and they remain in effect. These models also enabled libraries to spend federal COVID relief money on ebooks because that funding came with a time limited spending requirement that precluded the purchase of ebooks on the two-year metered model. PRH is open to the possibility of continuing to offer these terms for the long term and is constantly seeking new ways to balance its economic prerogatives with the desires of libraries.

81. In addition to its own direct relations with libraries, PRH has supported libraries in other forums. The Association of American Publishers, the leading book publishing trade group of which PRH is a member, publicly has advocated for a legislative expansion and modernization of the rights of libraries to engage in certain preservation activities under the Copyright Act and, more generally, for their ability to distribute so-called "orphan works" under appropriate circumstances. In common parlance, orphan works are older books for which it is impossible to locate their authors, author's estates or publishers after a diligent inquiry.

82. From PRH's perspective, library ebook lending is a success story that is still being written. The benefits of a functioning ebook lending market to libraries, patrons, publishers and authors is clear. Libraries have access to tens of thousands of authorized ebook titles, which they can distribute seamlessly to patrons through aggregator platforms that provide many benefits, including an automated and integrated platform for checking books in and out (thus reducing administrative costs and increasing the frequency with which ebooks can be circulated compared to physical books). Library patrons have the ability to check these books out for free anytime,

34

anywhere and in an instant – which they do tens of millions of times – on convenient platforms that run on their devices, like the popular Libby app. And publishers get to impose sustainable licensing terms and prices that ensure a return on investment for themselves and their authors.

### G. Internet Archive's Website Harms PRH

83. The Internet Archive has caused real and significant harm to PRH. This harm can be viewed in a number of interrelated ways.

84. First, Internet Archive deprives PRH of the revenue that libraries, via the authorized platforms like OverDrive, customarily pay in order to distribute our ebooks to library consumers for short-term loans. The Internet Archive and its "Open Library" website hold itself out as a library. There is an established market for short term "lending" of ebooks, and the Internet Archive fails to pay a fee, like all others in the authorized library ebook market. Withholding this revenue causes substantial financial harm to Plaintiffs. Internet Archive's practices are already significant – and increasing at an exponential rate – because it distributes 35.8% of PRH's catalogue (which equates to more than 16,000 works). The cumulative loss of the fees that Internet Archive should have paid to lend out that volume of ebooks is already very substantial and would run to millions of dollars.

85. Viewed from another perspective, Internet Archive is actively encouraging libraries to direct patrons to use its free ebook website as an alternative to authorized library aggregator platforms – which some libraries have opted to do either by integrating links to Internet Archive's websites onto their online catalogues or by contributing books through the Open Libraries program. (*See* McNamara Decl. ¶¶67-74.) This inevitably reduces demand for authorized library ebooks, which in turn will incentivize libraries to purchase fewer of them and harms PRH by depriving it of revenues that it would have otherwise collected from library ebook licenses.

86.     Further, as my colleague Skip Dye, SVP Library Sales and Digital Strategy,
testified, it is "common sense" that if a library patron "can't find it on their library's website, [they]
will go to Internet Archive and see it there and download it."  (A true and correct copy of relevant
excerpts from the transcript of the November 18, 2021 deposition of Skip Dye (the "Dye Tr.") is
annexed hereto as Exhibit 26.)  (*See id.* at 106:10-107:7; *see also id.* at 96-110, 372-74.)  Moreover,
the fact that the Internet Archive's own communications with libraries repeatedly emphasize that
they can leverage controlled digital lending and IA's website to provide their patrons with free
ebooks (McNamara Decl. ¶71), that libraries are linking to Internet Archive on their webpages (*id.*
at ¶¶73-74), and that  Internet Archive is making 25 million loans a year makes it very obvious to
me that it is acting as an alternative source to authorized library ebooks.

87.     Likewise, Internet Archive harms PRH because there are consumers who may be
willing to purchase ebooks, but instead decide to read the free alternative offered by Internet
Archive that does not compensate the author or publisher.[8]  The Internet Archive's ebooks are
capable of serving the same purpose as our commercial ebooks – allowing the consumer to use
and enjoy the contents of the literary work by reading it.  PRH ultimately cannot compete with a
free substitute for its ebooks.  And the allure of Internet Archive's bootleg products is particularly
pernicious because its promotion of the controlled digital lending theory lends the Website a
deceptive veneer of legitimacy that makes readers feel like they are using a legitimate resource
and are not, in fact, stealing copyrighted content.  Internet Archive's free ebooks also devalue
publishers' authorized products because these zero-price alternatives put downward price pressure

---

[8] While Penguin Random House contends that the Internet Archive also harms its print book sales revenues in the
commercial and library markets, its summary judgment motion is solely based on ebook sales.  Penguin Random
House reserves the right to address print sales in the event of a trial in this matter.

on PRH's incumbent products, and consumers may perceive that authorized books are cheapened by the availability of a free substitute.

88.　　I understand that the Internet Archive's experts have tried to determine the financial impact of the Internet Archive on the Plaintiffs by looking at OverDrive checkouts, sales figures and Amazon print sales rankings. As Mr. Dye aptly testified when asked what factors might affect how a title performs, "I have a list that's an arm long or longer, your arm or mine or both, of factors that play[ ] into it," and "every book has its own life and its own life story." (Dye Tr. at 109:12-16.) (*See also id.* at 100-101, 109-110.) Based on my long-term experience as a sale executive at PRH, any economic analysis of the Internet Archive's impact on publishers revenues that does not take into account the innumerable factors impacting each individual book differently at different times cannot be reliable given the nature of the book publishing industry.

89.　　Further, Internet Archive's conduct also exposes Plaintiffs to harm via the inadequate protection of their intellectual property – including harm caused by IA's poor metadata that allows in-copyright books to be confused with public domain works and distributed without any restrictions and due to takedown failures. And the circulation of Internet Archive's scans – which are good enough to read but of obviously lower quality than licensed ebooks – puts pressure on PRH's relationships with authors, who expect their work to be distributed in optimal formats.

90.　　All of these harms will compound exponentially if Internet Archive is permitted to continue on its current trajectory. If the Internet Archive's conduct were unrestricted and it scaled up further, its impact on Plaintiffs library ebooks sales would be even more substantial. As of December 24, 2021, only about 58 libraries participated in the Internet Archive's Open Libraries program, but there are approximately 9,000 public libraries in the U.S. – not to mention academic and research libraries – that could participate in an overlap analysis and increase the number of

37

copies of books available for borrowing from the Internet Archive (especially if the Court were to condone its practices). With a greater number of copies available for borrowing, Internet Archive can meet much broader demand without wait lists.

91. This impact of the Internet Archive's conduct will be greatly accelerated if it is sanctioned by a court of law and scales up its activities further. A decision in Internet Archive's favor would also incentivize it and other entities engaged in mass digitization to loosen the flimsy controls Internet Archive purports to impose on its unauthorized ebooks, which it already showed a willingness to do when it lifted lending caps in order to create the National Emergency Library. Internet Archive could easily drop its self-imposed (and spottily enforced) policy of excluding titles published within the last five years from its Website.

92. But even if Internet Archive and other similar entities did not deviate from its current practices, the effects on PRH and the publishing industry would be devastating. This would create a world with a platform providing free ebooks of all our titles, created and stockpiled by scanning and stockpiling millions of physical copies of books, and counting as metaphysical additional copies print books allegedly taken off the shelf in academic and public libraries or other similar entities scattered around the country. It would be impossible for PRH ebooks to effectively compete with these free substitute products, especially if there were multiple Websites with centralized hubs containing millions of books from different publishers sourced from numerous different libraries, using no geographic limitations or metering (like Internet Archive) on the distribution of their bootleg ebooks.

93. Given the importance of maintaining separate channels for books in different formats (which are fundamentally different products) and the centrality of backlist book revenues to PRH's business, it is my professional judgment based on more than that twenty years of

38

experience working in the book publishing industry that the lost customary fees from the Internet Archive and its followers, and the lost library and consumer ebook sales that would result from these scenarios, would significantly impair our ability to invest in new books and destabilize our industry.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY BLANK]

39

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on July 2, 2022.

JEFFREY WEBER

# Exhibit 1 to Weber Declaration

# Filed Under Seal (A-784)

# Exhibit 2 to Weber Declaration

# Filed Under Seal (A-785)

# Weber Declaration

# Exhibit 3

 **American Library Association**

My Account     ALA     ALA Websites     Job Board     GiveALA     Join ALA     Renew     Login

Visit our **COVID-19 Recovery** pages for updates and recommended resources.

| About ALA | Advocacy, Legislation & Issues | Awards, Grants & Scholarships | Conferences & Events | Education & Careers | Membership | News & Press Center | Tools, Publications & Resources |

SUBMIT NEWS ITEMS     CONTACT CONGRESS     FEEDBACK

ALA  >  News  >  National survey finds libraries play expanded role in digital equity, bridging gaps in access to technology

Email ✉     Print 🖶     Cite ✎     Share This Page ⬆

## ALAnews

**National survey finds libraries play expanded role in digital equity, bridging gaps in access to technology**

For Immediate Release
Tue, 08/31/2021

**Contact:**
Communications and Marketing Office
ALA Media Relations
CMO
cmo@ala.org

CHICAGO – As the nation celebrates Library Card Sign-up Month this September, a new report from the Public Library Association (PLA) details how libraries are further extending their technology services and resources in the face of pandemic limitations. The 2020 Public Library Technology Survey report provides the most current and complete picture of how libraries serve as digital equity hubs.

Survey data, captured for the first time, show more than half of public libraries report circulating technology (e.g., hotspots, laptops, and tablets) for patron use off-site. A similar percentage provided streaming public programs (e.g., storytimes and author events) in the previous 12 months, as well as diverse digital content, resources, and training. With public Wi-Fi now ubiquitous, many libraries also offered 24/7 internet access by leaving on or extending their Wi-Fi signal so that visitors can log on to the web in and outside of buildings.

"Library workers make technology more accessible for every person of every age in our communities, including students, jobseekers, and the millions of Americans who still lack broadband access and skills," said PLA President Melanie Huggins. "The new survey report details how our nation's public libraries serve as critical infrastructure for bridging digital divides, empowering lifelong learning, and advancing economic recovery."

PLA, a division of the American Library Association, fielded the nationally representative survey in collaboration with the American Institutes for Research late last year. It examines library patron resources, technology infrastructure, digital literacy programming, technology staffing, and funding.

More than 63 percent of public libraries offer online job and employment resources. By deploying augmented reality for job training, videoconferencing resources, and in-person and virtual coworking spaces, libraries advance community economic recovery and empower users to find new work and careers as the labor market adjusts.

E-books and e-audiobooks dominate public library technology-enabled services. More than 93 percent of U.S. public libraries offer digital collections in high demand. Library e-book provider Overdrive recently reported an unprecedented 33% increase in e-book checkouts in 2020.

Students and families who rely on their cell phones to access the internet look to libraries for support. In response, more than half of U.S. libraries offer access to library materials, homework help, and other services through intuitive and innovative library mobile apps. Nearly two-thirds of libraries now offer wireless printing as well.

While libraries sustain and expand technology offerings, the survey also reveals areas of concern. Data shows gaps in available general technology resources and staffing among city, suburban, and town/rural public libraries. For example, 40.4 percent of town/rural libraries have upgraded their bandwidth, compared to 51.4 percent of city libraries. In addition, more than 65 percent of city libraries reported having full-time library IT staff, but only 32 percent of suburban and 11 percent of town/rural libraries report this is the case. Further, more than one-third (34.6%) cannot improve bandwidth because faster speeds are not available.

"Investing in affordable, high-speed internet for our communities and libraries is essential to building an inclusive digital future," Huggins said. "Congress has recognized the indispensable role of libraries in recent pandemic relief and recovery legislation and must continue to do so as it debates how to rebuild our nation's infrastructure."

In addition to broadband access, libraries play an essential role in advancing digital literacy:

- More than 88% of all public libraries offer formal or informal digital literacy programming.
- More than one-third (36.7%) of public libraries have dedicated digital literacy and technology programs and training staff.
- More than one in five libraries provide classes or informal help related to coding/computer programming, robotics, and 3D printing.

While 3D printers (offered by 20% of libraries), virtual reality headsets (13%), and smart boards (7%) are the "new kids on the block," libraries are often among the few public places maintaining ready access to the older technology (e.g., copy machines, printers, and fax machines) still needed by many people.

Additional 2020 Public Library Technology Survey findings and information are available at https://www.ala.org/pla/sites/ala.org.pla/files/content/data/PLA-2020-Technology-Survey-Summary-Report.pdf.

From e-books to online test preparation, a library card provides access to a world of free resources, whether logging in from home or checking out technology such as hotspots to use wherever you are. Additional information regarding Library Card Sign-up Month and the value of library service is available at ala.org/librarycardsignup.

**About the Public Library Association**

The Public Library Association (PLA), a division of the American Library Association, is the largest association dedicated to supporting public library professionals' unique and evolving needs. Founded in 1944, PLA serves nearly 10,000 members in public libraries large and small in communities across the United States and Canada, with a growing presence worldwide. PLA strives to help its members shape the essential institution of public libraries by serving as an indispensable ally for public library leaders.

###

**Tags**

Diversity, COVID-19, Digital Literacy, Public Library Association

🔖 Subscribe
**Related Images**
(Click for full-size)

**2020 Public Library Technology Survey**
Summary Report

Download

COMMITTEES     DIVISIONS     OFFICES     ROUND TABLES     CONTACT ALA

Copyright Statement | Privacy Policy | User Guidelines | Site Index | Feedback | Work at ALA
© 1996–2022 American Library Association

ALA American Library Association
225 N Michigan Ave, Suite 1300 Chicago, IL 60601 | 1.800.545.2433

A-787