# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 5 OF 26 (A-1050-A-1286)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM ELIZABETH A. MCNAMARA
DANAE TINELLI LINDA J. STEINMAN
SCOTT A. ZEBRAK JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP JESSE M. FEITEL
4530 Wisconsin Avenue, NW, CARL MAZUREK
5th Floor DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016 1251 Avenue of the Americas, 21st Floor
 New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
|  |  | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
|  |  | **Vol. 3** | |
|  |  | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
|  |  | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
|  |  | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
|  |  | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
|  |  | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
|  |  | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
|  |  | Exhibit 1 – Wiley Takedown Notice | A-602 |
|  |  | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
|  |  | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
|  |  | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
|  |  | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
|  |  | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
|  |  | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
|  |  | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
|  |  | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
|  |  | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
|  |  | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
|  |  | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| **Vol. 5** |  |  |  |
|  |  | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
|  |  | Exhibit 1 – Complaint | A-1143 |
|  |  | Exhibit 2 – Answer | A-1201 |
|  |  | Exhibit 3 – Internet Archive's Webpage | A-1230 |
|  |  | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
|  |  | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
|  |  | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| **Vol. 6** |  |  |  |
|  |  | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
|  |  | Exhibit 8 – Email From Chris Freeland | A-1347 |
|  |  | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
|  |  | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
|  |  | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
|  |  | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | **Vol. 7** | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

9

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

11

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

13

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

14

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **_Vol. 17_** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

19

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| **Vol. 22** | | | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| **Vol. 23** | | | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# Weber Declaration
# Exhibit 26

1                UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------------x

4    HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

5    JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

6

7                     Plaintiffs,

8    vs.                          Case No.

                                  1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11                    Defendants.

12   --------------------------------------------x

13

14      VIDEOTAPED RULE 30(B)(1) AND RULE 30(B)(6)

15         DEPOSITION OF HACHETTE BOOK GROUP

16          CORPORATE DESIGNEE: SKIP DYE

17            Remote Zoom Proceedings

18           Thursday, November 18, 2021

19

20

21

22   Job No. 4867650

23   Reported By: Lynne Ledanois, CSR 6811

24   Pages 1 - 390

25

                                          Page 1

```
 1    for a number of reasons."              12:25PM
 2            And we've talked about two     12:25PM
 3    of those reasons, their view of        12:25PM
 4    ownership and their relationship with  12:25PM
 5    the Internet Archive.                  12:25PM
 6            Were there any others?         12:25PM
 7      A    The SimplyE app was an app      12:25PM
 8    that was created by the New York       12:25PM
 9    Public Library and some other          12:25PM
10    libraries I referred to.               12:25PM
11            It was having problems         12:25PM
12    crashing.  Some of our other           12:25PM
13    aggregators, Baker & Taylor for one,   12:26PM
14    was also using the SimplyE app along   12:26PM
15    with some other apps that they had     12:26PM
16    well.                                  12:26PM
17            And so it was constantly       12:26PM
18    having -- it being down.               12:26PM
19      Q    Okay.  Any other reasons?       12:26PM
20      A    Not that I recall.              12:26PM
21      Q    Okay.  One last question        12:26PM
22    about this.                            12:26PM
23            If you go to the second page   12:26PM
24    of this thread, at the very top, the   12:26PM
25    sentence that says, in an email you    12:26PM
```

Page 95

```
 1    wrote, "The Internet Archive is trying        12:26PM
 2    to use an as yet unproven legal               12:26PM
 3    argument called 'controlled digital           12:26PM
 4    lending' as legal cover for the Open          12:26PM
 5    Library."                                      12:26PM
 6              Do you see that?                      12:26PM
 7        A     Yes.                                  12:26PM
 8        Q     Do you remember what you              12:26PM
 9    meant by that sentence?                        12:26PM
10        A     That -- yes, that they               12:26PM
11    were -- Internet Archive was believing        12:27PM
12    and supporting the whole idea of              12:27PM
13    controlled digital lending.  And they         12:27PM
14    believed that the open -- that they --        12:27PM
15    was supporting some of the people             12:27PM
16    on -- it's a sort of internal                 12:27PM
17    controversy at DPL itself was that.           12:27PM
18    So that's what that was about.                12:27PM
19        Q     What is your understanding           12:27PM
20    of "controlled digital lending" as            12:27PM
21    you've used the term in your email            12:27PM
22    here?                                          12:27PM
23        A     Controlled digital lending          12:27PM
24    is if an institution or a library has         12:27PM
25    a physical copy of a title that they          12:27PM
```

Page 96

```
 1    can scan and put that book aside,              12:27PM
 2    physical book aside and do a                   12:27PM
 3    one-for-one lend of the digital scan           12:27PM
 4    that they made of that book.                   12:27PM
 5         Q    And by "one-for-one lend,"           12:27PM
 6    what do you mean?                              12:28PM
 7         A    That it is one book, one             12:28PM
 8    user.  So if they have scanned that            12:28PM
 9    book, that physical book, they cannot          12:28PM
10    lend out that physical book if they've         12:28PM
11    also lent out the scanned version of           12:28PM
12    that book, both of which is not -- if          12:28PM
13    it is under copyright is illegal to            12:28PM
14    do.                                            12:28PM
15         Q    Why do you think that is             12:28PM
16    illegal to do?                                 12:28PM
17         A    Because an e-Book is not the         12:28PM
18    same thing as a hardcover book.  An            12:28PM
19    e-Book is lendable umpteen multiple of         12:28PM
20    times.                                         12:28PM
21              They are not equal, they are         12:28PM
22    not the same.  An e-Book can be -- one         12:28PM
23    file could satisfy the needs of the            12:28PM
24    world.                                         12:28PM
25         Q    What do you mean by "satisfy         12:28PM
```

Page 97

| | | |
|---|---|---|
| 1 | the needs of the world"? | 12:28PM |
| 2 | A    That one e-Book file could | 12:28PM |
| 3 | be checked out a multitude of times. | 12:29PM |
| 4 | You don't need to basically | 12:29PM |
| 5 | distribute -- like a physical book | 12:29PM |
| 6 | you'd have to distribute multiple | 12:29PM |
| 7 | copies of. | 12:29PM |
| 8 | For an e-Book, you can just, | 12:29PM |
| 9 | with very little to no cost, make a | 12:29PM |
| 10 | copy and distribute that e-Book. | 12:29PM |
| 11 | Q    Okay.  I want to switch | 12:29PM |
| 12 | gears a little bit here.  I wanted to | 12:29PM |
| 13 | ask you about the type of market | 12:29PM |
| 14 | research and analysis that PRH does. | 12:29PM |
| 15 | And my first question in | 12:29PM |
| 16 | this line is:  Has PRH studied or | 12:29PM |
| 17 | analyzed how long after publication of | 12:29PM |
| 18 | a title peak sales of that title | 12:29PM |
| 19 | typically occur? | 12:29PM |
| 20 | MS. STEINMAN:  Objection.  I | 12:29PM |
| 21 | would also note that is not a | 12:29PM |
| 22 | 30(b)(6) topic of Mr. Dye.  He can | 12:29PM |
| 23 | answer if he knows within his | 12:29PM |
| 24 | personal knowledge. | 12:29PM |
| 25 | MS. LANIER:  He's designated | 12:29PM |

Page 98

```
 1        for Topic 17 and that's literally      12:29PM
 2        in Topic 17.                           12:30PM
 3        Q     Go ahead, Mr. Dye.               12:30PM
 4        A     I know that many groups in       12:30PM
 5   our -- look at the life span of a           12:30PM
 6   title and there's sales up and down.        12:30PM
 7             So I am aware of a variety        12:30PM
 8   of stuff as people look at to acquire       12:30PM
 9   new books by the same author, look to       12:30PM
10   see different subject matters.              12:30PM
11        Q     Okay.  When is the -- when       12:30PM
12   is the typical peak of sales relative       12:30PM
13   to when a title is published?               12:30PM
14             MS. STEINMAN:  Could we           12:30PM
15        pause for a second?  Off the           12:30PM
16        record.                                12:30PM
17             I do not believe this is one      12:30PM
18        of his topics.  So give me a           12:30PM
19        second, please.                        12:30PM
20             MS. LANIER:  Should we go         12:30PM
21        off the record?                        12:30PM
22             MS. STEINMAN:  Yes.               12:30PM
23             MS. LANIER:  Let's go off         12:30PM
24        the record, John.  Thank you.          12:30PM
25             VIDEOGRAPHER:  We're off the      12:30PM
```

Page 99

```
1      record.  It's 12:30 p.m.                12:30PM

2           (Recess taken.)                     12:30PM

3           VIDEOGRAPHER:  We're back on        12:31PM

4      the record.  It's 12:31 p.m.            12:31PM

5           MS. LANIER:  Ms. Steinman           12:31PM

6      has objected that this question is      12:31PM

7      outside of Topic 17 and it falls        12:32PM

8      under Topic 17G.  At any rate, I        12:32PM

9      will pose the question again.           12:32PM

10           MS. STEINMAN:  Yes.  And           12:32PM

11      that was revised by the parties in      12:32PM

12      their agreement.                        12:32PM

13           Again, you can go ahead and        12:32PM

14      question him, but this is not a         12:32PM

15      30(b)(6) topic.                         12:32PM

16           MS. LANIER:  Objections            12:32PM

17      noted.                                  12:32PM

18      Q     When for a typical book does      12:32PM

19   the peak sales revenue occur relative      12:32PM

20   to when that book is published?           12:32PM

21      A     I can't speculate for that.       12:32PM

22   All children are different, as I say.     12:32PM

23      Q     Okay.  For a nonfiction           12:32PM

24   book, when is the typical peak of         12:32PM

25   sales relative to their publication?      12:32PM
```

Page 100

```
 1        A     Again, I cannot -- sorry,        12:32PM
 2     but I cannot really address that          12:32PM
 3     because every book has its own life       12:32PM
 4     and its own story.                        12:32PM
 5        Q     You mentioned that PRH and       12:33PM
 6     different divisions in PRH have           12:33PM
 7     studies those or analyzed when peak       12:33PM
 8     sales of titles occur.                    12:33PM
 9            What have been the results         12:33PM
10     of those studies?                         12:33PM
11            MS. STEINMAN:  Objection.          12:33PM
12            THE WITNESS:  I don't know         12:33PM
13        what has been the results of those     12:33PM
14        studies.  I only know when we talk     12:33PM
15        about that, you know, books, gift      12:33PM
16        books sell a lot in the fall           12:33PM
17        season for Christmas gift giving.      12:33PM
18            But basically it's more            12:33PM
19        around things we do in sales           12:33PM
20        related to promotions and              12:33PM
21        Halloween books sell best during       12:33PM
22        Halloween.                             12:33PM
23     BY MS. LANIER:                            12:33PM
24        Q     Okay.  So it would be            12:33PM
25     variable, then, when peak sales would     12:33PM
```

Page 101

```
 1    occur for a title?                         12:33PM
 2         A     It could be.                    12:34PM
 3         Q     Has PRH studied when peak       12:34PM
 4    circulation at libraries occurs for        12:34PM
 5    e-Books relative to when a title is        12:34PM
 6    published?                                 12:34PM
 7         A     We have tried to study that.    12:34PM
 8    Again, it's hard to get conducive          12:34PM
 9    information because a lot of that           12:34PM
10    information is either in an aggregate       12:34PM
11    that's not always -- it's more             12:34PM
12    directional.                               12:34PM
13         Q     What do you mean by "more       12:34PM
14    directional"?                              12:34PM
15         A     You can't get exact numbers     12:34PM
16    from stuff like you can from book          12:34PM
17    store sales that are going on that are     12:34PM
18    directly things that are sold directly     12:34PM
19    from our -- we sell direct to book         12:34PM
20    stores.  We do not sell direct            12:34PM
21    necessarily to libraries.                  12:34PM
22         Q     Do aggregators provide PRH      12:34PM
23    with circulation information?              12:35PM
24         A     They do, yes.  They can.       12:35PM
25         Q     Is the circulation data that   12:35PM
```

Page 102

```
 1    aggregators provide to PRH, does that        12:35PM
 2    enable PRH to conduct this kind of           12:35PM
 3    analysis?                                    12:35PM
 4        A    It's difficult because the         12:35PM
 5    data is not presented easily in a way.       12:35PM
 6    There is no way -- there's not a way         12:35PM
 7    for me to easily pull out chunks of          12:35PM
 8    information which is purposeful on            12:35PM
 9    that information.                            12:35PM
10             Also, it depends on if the          12:35PM
11    library refuses to share it.  Again,         12:35PM
12    it's a transaction between the               12:35PM
13    aggregator.                                  12:35PM
14        Q    When you say the data is           12:35PM
15    difficult to pull out, is that because       12:35PM
16    of the way it's formatted or is it           12:35PM
17    encrypted?  I'm just not sure I'm            12:35PM
18    understanding.                               12:35PM
19        A    It's the way the platform is       12:35PM
20    created.  It's not related to                12:35PM
21    encryption.  It's just the ease of           12:35PM
22    use.                                         12:36PM
23        Q    Got it.  Based on the              12:36PM
24    analysis PRH has been able to do about       12:36PM
25    circulation data, is there a time            12:36PM
```

Page 103

```
 1    relative to when a title is published        12:36PM
 2    where circulation peaks?                     12:36PM
 3        A     Factors are similar to that        12:36PM
 4    in the consumer world.  So if it's a         12:36PM
 5    movie that's coming out or if it's --        12:36PM
 6    if it is a TV show that's coming out         12:36PM
 7    or if it's a new book by an author,          12:36PM
 8    all of those could be factors.               12:36PM
 9           The work we do is basically           12:36PM
10    trying to look at -- we've never been        12:36PM
11    able to look at it holistically.             12:36PM
12    There is no way to get a picture of          12:36PM
13    all the library activity that goes on        12:36PM
14    in the United States.                        12:36PM
15        Q     Okay.  So if I'm                    12:36PM
16    understanding your explanation               12:37PM
17    correctly, factors that would affect         12:37PM
18    circulation of a title would also            12:37PM
19    affect factors of revenue for that           12:37PM
20    title; is that accurate?                     12:37PM
21        A     Potentially, it can.               12:37PM
22        Q     Okay.  When would it not?          12:37PM
23        A     When would it not?  Well,          12:37PM
24    you can't conducively say based              12:37PM
25    upon -- we don't have conducive data         12:37PM
```

Page 104

```
 1      to really bring out that point.              12:37PM

 2          Q     Okay.  So you mentioned            12:37PM

 3      seasonal factors having an effect.           12:37PM

 4          A     Uh-huh.                            12:37PM

 5          Q     You mentioned I think the          12:37PM

 6      type of book might have an effect.           12:37PM

 7                What other factors might           12:37PM

 8      affect circulation numbers relative to       12:37PM

 9      data publication or revenue relative         12:37PM

10      to data publication?                         12:38PM

11          A     It would be availability of        12:38PM

12      the title in open archive because we         12:38PM

13      don't necessarily see the circulation        12:38PM

14      data that library -- the library -- we       12:38PM

15      don't get that data, what is                 12:38PM

16      circulated, by that particular library       12:38PM

17      if it's -- if they have that book            12:38PM

18      available from that piece.                   12:38PM

19                So we do see that that has         12:38PM

20      the harm to our marketplace.                 12:38PM

21                So there could be factors to       12:38PM

22      where circulation we may see is down         12:38PM

23      but that may be attributed to the            12:38PM

24      patrons are getting and circulating          12:38PM

25      and downloading that book from               12:38PM
```

Page 105

| | | |
|---|---|---|
| 1 | Internet Archive instead of going | 12:38PM |
| 2 | through their legitimate means. | 12:38PM |
| 3 | Q    Does PRH have any data to | 12:38PM |
| 4 | suggest that fluctuations in | 12:38PM |
| 5 | circulation or revenue are tied to | 12:38PM |
| 6 | titles being available on the Internet | 12:38PM |
| 7 | Archive? | 12:38PM |
| 8 | MS. STEINMAN:  Objection. | 12:38PM |
| 9 | Go ahead. | 12:38PM |
| 10 | THE WITNESS:  It's just | 12:39PM |
| 11 | common knowledge.  If it's | 12:39PM |
| 12 | available someplace else -- if | 12:39PM |
| 13 | somebody is looking for it and | 12:39PM |
| 14 | it's available someplace else for | 12:39PM |
| 15 | them to check out, because it's | 12:39PM |
| 16 | not available from the library, it | 12:39PM |
| 17 | stands to reason that people who | 12:39PM |
| 18 | are wanting to read it will | 12:39PM |
| 19 | download it where they can get it. | 12:39PM |
| 20 | That patron, if they can't | 12:39PM |
| 21 | find it on their library's | 12:39PM |
| 22 | website, will go to Internet | 12:39PM |
| 23 | Archive and see it there and | 12:39PM |
| 24 | download it. | 12:39PM |
| 25 | | |

Page 106

```
 1   BY MS. LANIER:                        12:39PM
 2       Q     Do you have evidence that   12:39PM
 3   that occurred?                        12:39PM
 4       A     I would say it's common     12:39PM
 5   sense that if a reader wants to read, 12:39PM
 6   they're going to try to find how to   12:39PM
 7   read the book.                        12:39PM
 8       Q     Okay.  So you don't have    12:39PM
 9   evidence then apart from common sense? 12:39PM
10           MS. STEINMAN:  Objection.     12:39PM
11       Go ahead, Skip.                   12:39PM
12           THE WITNESS:  I don't         12:39PM
13       have -- I don't have any evidence. 12:39PM
14   BY MS. LANIER:                        12:39PM
15       Q     We sort of started talking  12:39PM
16   about this a little bit, but I do want 12:39PM
17   to talk about other factors that might 12:40PM
18   affect how a title would perform both 12:40PM
19   in terms of revenue and circulation.  12:40PM
20           Might the fact that -- I'll   12:40PM
21   list some ideas.  You tell me if that 12:40PM
22   might affect a title or not.          12:40PM
23           The identity of the author    12:40PM
24   and whether the author has published a 12:40PM
25   book before?                          12:40PM
```

Page 107

```
 1            MS. STEINMAN:  Objection.        12:40PM
 2       Go ahead.                             12:40PM
 3            THE WITNESS:  Can I ask you       12:40PM
 4       for clarification?                    12:40PM
 5            MS. LANIER:  Please.             12:40PM
 6            THE WITNESS:  I apologize.       12:40PM
 7       I don't understand what you're        12:40PM
 8       asking when you -- can you ask        12:40PM
 9       again that question that you're       12:40PM
10       wanting answers to your variety of    12:40PM
11       situations that you're going to       12:40PM
12       relay?                                12:40PM
13            I apologize, I just didn't       12:40PM
14       grasp the two in my head.            12:40PM
15  BY MS. LANIER:                             12:40PM
16       Q    No trouble at all.  Happy to     12:40PM
17    do it.  It was an inartfully worded      12:40PM
18    question, so I'll take another stab at   12:40PM
19    it.                                      12:40PM
20       A    Okay.                           12:40PM
21       Q    So I'm trying to get a sense     12:40PM
22    of factors that might affect how a       12:40PM
23    title will perform commercially.        12:40PM
24            Revenue, circulation, you        12:41PM
25    mentioned earlier that sometimes the     12:41PM
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | same factors might affect each. | 12:41PM |
| 2 | So I just wanted to get a | 12:41PM |
| 3 | sense from you of factors based on | 12:41PM |
| 4 | your experience, long experience in | 12:41PM |
| 5 | publishing that might affect how a | 12:41PM |
| 6 | title performs or how popular a title | 12:41PM |
| 7 | is. | 12:41PM |
| 8 | Can you think of examples of | 12:41PM |
| 9 | factors? | 12:41PM |
| 10 | MS. STEINMAN: Objection to | 12:41PM |
| 11 | form. Go ahead. | 12:41PM |
| 12 | THE WITNESS: I mean, I | 12:41PM |
| 13 | don't know how -- I'll list -- I | 12:41PM |
| 14 | have a list that's an arm long or | 12:41PM |
| 15 | longer, your arm or mine or both, | 12:41PM |
| 16 | of factors that played into it. | 12:41PM |
| 17 | So I don't -- the other | 12:41PM |
| 18 | stuff would be speculation at this | 12:41PM |
| 19 | point. If I knew, then it would | 12:41PM |
| 20 | be a lottery ticket that I would | 12:41PM |
| 21 | need to play because then I could | 12:42PM |
| 22 | have and get some stuff. | 12:42PM |
| 23 | But there is a myriad of | 12:42PM |
| 24 | factors, not least of -- it's the | 12:42PM |
| 25 | author, the topic, publicity, | 12:42PM |

Page 109

```
 1          marking, promotion.                    12:42PM
 2    BY MS. LANIER:                                12:42PM
 3          Q     Okay.  Would it be accurate       12:42PM
 4    to say that some of the myriad of            12:42PM
 5    factors to which you alluded might           12:42PM
 6    affect revenue for one title but not         12:42PM
 7    another?                                      12:42PM
 8          A     That, again, is it's             12:42PM
 9    possible; but again, it's hard to be         12:42PM
10    specific because the -- again,               12:42PM
11    overthinking your question is that           12:42PM
12    what you're saying -- each of them are       12:42PM
13    different.  If you have a title,             12:42PM
14    specific title you want to talk about,       12:42PM
15    if I know about it, I can speculate.         12:42PM
16          But that's not really what            12:42PM
17    I'm here to do.  I'm -- I'll just            12:42PM
18    telling you what I know, so...               12:43PM
19          Q     Do you ever -- strike that.      12:43PM
20    Let's back up.                               12:43PM
21          Are you aware of any                   12:43PM
22    forecasting or projection of how much       12:43PM
23    revenue a title will earn that's done       12:43PM
24    at PRH?                                       12:43PM
25          A     I know that we do basically      12:43PM
```

Page 110

| | | |
|---|---|---|
| 1 | P&Ls for each of our titles, yes.  I | 12:43PM |
| 2 | do know that. | 12:43PM |
| 3 | Q    At what stage in the | 12:43PM |
| 4 | publication of the title does that P&L | 12:43PM |
| 5 | occur? | 12:43PM |
| 6 | MS. STEINMAN:  Objection, | 12:43PM |
| 7 | assumes -- go ahead. | 12:43PM |
| 8 | THE WITNESS:  This is not my | 12:43PM |
| 9 | expertise.  I mean, I'm not in the | 12:43PM |
| 10 | acquisition piece of it. | 12:43PM |
| 11 | I know that it's part of the | 12:43PM |
| 12 | acquisition process.  Where it | 12:43PM |
| 13 | comes in that acquisition process | 12:43PM |
| 14 | and the decision, that's the | 12:43PM |
| 15 | decision of the publishers to | 12:43PM |
| 16 | make. | 12:43PM |
| 17 | So the decisions they make | 12:43PM |
| 18 | are their decisions they make for | 12:44PM |
| 19 | their publishing division. | 12:44PM |
| 20 | BY MS. LANIER: | 12:44PM |
| 21 | Q    So when you say "acquisition | 12:44PM |
| 22 | process," is that before PRH gets the | 12:44PM |
| 23 | rights to publish a title? | 12:44PM |
| 24 | A    I'm talking about when they | 12:44PM |
| 25 | sit down and decide if they want to | 12:44PM |

Page 111

```
 1    acquire a book, there is a whole           12:44PM
 2    process in place that they go through.      12:44PM
 3          Just as if you're wanting to          12:44PM
 4    go and buy a car, there is a process        12:44PM
 5    that you go through to assess what          12:44PM
 6    kind of car you want to buy.                12:44PM
 7       Q    Got it.  So what data, what         12:44PM
 8    factors does PRH look at when putting       12:44PM
 9    together a P&L in the acquisition           12:44PM
10    phase of the title?                         12:44PM
11          MS. STEINMAN:  Objection.             12:44PM
12       You can ask Mr. Dye whether he is        12:44PM
13       involved and/or he does this, but        12:44PM
14       you can't ask him what PRH does on       12:44PM
15       this topic.                              12:44PM
16          This is so far beyond what            12:44PM
17       he does in his daily work and he's       12:44PM
18       not a 30(b)(6) witness on this           12:45PM
19       topic.                                   12:45PM
20    BY MS. LANIER:                              12:45PM
21       Q    Please answer the question,         12:45PM
22    Mr. Dye.                                    12:45PM
23       A    This is not my -- I mean,           12:45PM
24    it's not my -- this is not what I do.       12:45PM
25          You know, I -- as I said              12:45PM
```

Page 112

```
 1    earlier, I'm involved in the              12:45PM
 2    pediatrician side.  The kid is already    12:45PM
 3    born.  I'm not in the whole creation      12:45PM
 4    side.                                     12:45PM
 5           So I really can't speak to         12:45PM
 6    that.                                     12:45PM
 7       Q   Okay.  What kind of analysis       12:45PM
 8    does PRH do when it's considering what    12:45PM
 9    licensing structures to use to convey     12:45PM
10    e-Books?                                  12:45PM
11           MS. STEINMAN:  Objection.          12:45PM
12       Go ahead, Skip.                        12:45PM
13           THE WITNESS:  Again,               12:45PM
14       Ms. Lanier, I'm confused by your       12:45PM
15       question.  It may be terminology       12:46PM
16       in my head.  I'm sorry.                12:46PM
17  BY MS. LANIER:                              12:46PM
18       Q   No problem.                        12:46PM
19       A   So there is no -- they are         12:46PM
20    not related in my viewpoint.  But --      12:46PM
21    so that's why I'm having difficulty       12:46PM
22    answering that question because I see     12:46PM
23    them as not -- it's two different         12:46PM
24    things, two different -- I don't know     12:46PM
25    if I'm explaining myself well.            12:46PM
```

Page 113

```
 1        Q     What was the name of the          7:22PM
 2   attorney that you made that                   7:22PM
 3   communication to?                             7:22PM
 4        A     It would be Carolyn Foley.         7:22PM
 5        Q     When was that communication        7:22PM
 6   made?                                         7:22PM
 7        A     I do not know exactly.             7:22PM
 8        Q     Where was it made?                 7:22PM
 9        A     Probably here in my house on       7:22PM
10   a video conversation with her.                7:22PM
11              MS. LANIER:  Mr. Dye, I want       7:22PM
12        to thank you for giving us your          7:22PM
13        time today.  I know it was a tough       7:22PM
14        day, and for reasons hopefully not       7:22PM
15        all tethered to the lawsuit.             7:22PM
16              It is not a fun experience         7:22PM
17        to be deposed, but I hope we made        7:22PM
18        it as painless as possible for           7:23PM
19        you.  Thank you for your time            7:23PM
20        today, sir.                              7:23PM
21              MS. STEINMAN:  I'm going to        7:23PM
22        do a short redirect.                     7:23PM
23                     EXAMINATION                 7:23PM
24   BY MS. STEINMAN:                              7:23PM
25        Q     Mr. Dye, has the Internet          7:23PM
```

Page 372

```
 1      Archive created current harm to PRH?        7:23PM
 2          A    Yes.                               7:23PM
 3          Q    What type of harm?                 7:23PM
 4          A    They are acting as an              7:23PM
 5      aggregator.  They are basically taking      7:23PM
 6      our content, distributing it without        7:23PM
 7      paying any fees related to it.              7:23PM
 8               They are also hurting our          7:23PM
 9      library direct sales by instructing         7:23PM
10      libraries that it's okay to scan books      7:23PM
11      that they have, physical books that         7:23PM
12      they have on the shelves and offer          7:23PM
13      them up through controlled digital          7:23PM
14      lending.                                    7:23PM
15               They are also affecting us         7:23PM
16      in our consumer sales.  The consumer        7:23PM
17      can go and find the book available on       7:23PM
18      Internet Archive and download it for        7:23PM
19      free without paying any cost back to        7:24PM
20      the right holder or to the publisher        7:24PM
21      and/or the author.                          7:24PM
22          Q    And if Internet Archive has        7:24PM
23      not paid an aggregator license fee for      7:24PM
24      all the books available for                 7:24PM
25      downloading on open library, is that        7:24PM
```

Page 373

| | | |
|---|---|---|
| 1 | evidence of harm to Penguin Random | 7:24PM |
| 2 | House? | 7:24PM |
| 3 | A    Yes.  You've lost that | 7:24PM |
| 4 | income. | 7:24PM |
| 5 | Q    Has Internet Archive | 7:24PM |
| 6 | provided all the data to Penguin | 7:24PM |
| 7 | Random House that it would need to | 7:24PM |
| 8 | accurately calculate the harm to | 7:24PM |
| 9 | Penguin Random House from Internet | 7:24PM |
| 10 | Archive? | 7:24PM |
| 11 | A    No, they have not. | 7:24PM |
| 12 | Q    What data would that | 7:24PM |
| 13 | include? | 7:24PM |
| 14 | A    I would need to know the | 7:24PM |
| 15 | circulation of all people at Random | 7:24PM |
| 16 | House titles that are on and available | 7:24PM |
| 17 | and have been distributed illegally by | 7:24PM |
| 18 | Internet Archive, whether they be | 7:24PM |
| 19 | through a loan or a person has | 7:24PM |
| 20 | downloaded it and kept it for that -- | 7:24PM |
| 21 | it's data that we would need for all | 7:25PM |
| 22 | ISBNs because there's multiple | 7:25PM |
| 23 | versions of the same title but | 7:25PM |
| 24 | different ISBNs. | 7:25PM |
| 25 | MS. STEINMAN:  Thank you. | 7:25PM |

Page 374

```
 1              I, LYNNE M. LEDANOIS, a Certified
 2       Shorthand Reporter of the State of
 3       California, do hereby certify:
 4              That the foregoing proceedings were
 5       taken before me at the time and place herein
 6       set forth; that a record of the proceedings
 7       was made by me using machine shorthand which
 8       was thereafter transcribed under my
 9       direction; that the foregoing transcript is a
10       true record of the testimony given.
11              Further, that if the foregoing
12       pertains to the original transcript of a
13       deposition in a Federal Case, before
14       completion of the proceedings, review of the
15       transcript [X] was [] wasn't requested.
16              I further certify I am neither
17       financially interested in the action nor a
18       relative or employee of any attorney or party
19       to this action.
20              IN WITNESS WHEREOF, I have this
21       date subscribed my name.
22  Dated: 11/22/2021
23
24
                LYNNE MARIE LEDANOIS
25              CSR No. 6811
```

Page 387

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | |
| Plaintiffs, | Case No. 1:20-CV-04160-JGK |
| v. | **DECLARATION OF ELIZABETH A. MCNAMARA** |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, **ELIZABETH A. MCNAMARA**, declare as follows:

1.      I am an attorney duly admitted to practice law before this Court and a partner of Davis Wright Tremaine LLP, counsel for plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House ("PRH") (collectively, the "Publishers") in the above-captioned action. I submit this declaration in support of the Publishers' motion for an order granting summary judgment on the Publishers' copyright infringement claims against defendant Internet Archive ("Internet Archive" or "IA"). Except as otherwise indicated, I make this declaration based on discovery in this case, as referenced by citation, or my personal knowledge.

**INTERNET ARCHIVE OPERATES A WEBSITE THAT INFRINGES IN-COPYRIGHT BOOKS ON AN INDUSTRIAL SCALE**

1.      This action concerns the unlicensed reproduction and distribution of in-copyright ebooks on Internet Archive's interrelated archive.org and openlibrary.org websites (collectively, the "Website"). (A true and correct copy of the Complaint in this action is annexed as Exhibit 1.) More specifically, this action concerns the "Books to Borrow" portion of the Website to which

Internet Archive directly uploads ebooks. When this lawsuit was commenced, Internet Archive admitted that "more than 1.3 million [in-copyright] books" were available to read in their entirety on the Website. (A true and correct copy of the Answer filed in this action (the "Answer") is annexed as Exhibit 2.) (*See id.* at ¶3.) Since that time, the number of unlicensed in-copyright ebooks available on the Website's "Lending Library" has increased to over 3.4 million. (A true and correct copy of the "Books to Borrow" page on archive.org is annexed hereto as Exhibit 3.)

### A. IA's Website

2. The Website effectuates about 70,000 "borrowing events" per day – which amounts to 25 million per year. (A true and correct copy of the Declaration of Brenton Cheng dated January 31, 2022 is annexed hereto as Exhibit 4.) (*See id.* ¶¶40-41.) (A true and correct copy of relevant excerpts from the transcript of the December 9, 2021 deposition of Brewster Kahle (the "Kahle Tr.") is annexed hereto as Exhibit 5.) (*See id.* at 23:21-23.) Internet Archive lists 5.9 million users, up from 2.6 million when this action was filed. (A true and correct copy of the "users" webpage is annexed hereto as Exhibit 6.)

3. Anybody can "sign up" for free access to the Website "from anywhere in the world" by entering "[b]asic contact information including [an] email address." (A true and correct copy of relevant excerpts from the transcript of the December 17, 2021 deposition of Chris Freeland ("Freeland Tr.") is annexed hereto as Exhibit 7.) (*See id.* at 177:7-12.) In other words, IA "[l]end[s] to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into [controlled digital lending] by particular users." (A true and correct copy of the relevant email from Chris Freeland is annexed hereto as Exhibit 8.) "Controlled digital lending" or "CDL" refers to the theory that Internet Archive and its allies developed to try to argue that it should be lawful for it to scan print books to create ebooks and then loan them out subject to certain limitations,

including lawfully acquiring a print copy for each ebook loan and digital rights management ("DRM") technology to prevent further reproduction of the ebooks by the user. (A true and correct copy of a July 29, 2020 blog post on archive.org titled "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" is annexed hereto as Exhibit 9.) ("Through CDL, libraries lend a digitized version of the physical books they have acquired as long as the physical copy doesn't circulate and the digital files are protected from redistribution.")

4.      At the time this action was filed and long before, any user who logged in with a valid IA account could "borrow" for free in-copyright ebooks for a period of 14 days.  (*See* Answer, ¶77; Kahle Tr. 235:4-9, stating Internet Archive permitted users to "borrow" all books for a 14 day period through the period before this action was filed; July 7, 2022 Declaration of Ian Foster ("Foster Decl.") at ¶ 45.)  After this action was filed, IA changed its practices and now allows valid users to "borrow" free in-copyright ebooks for a period of one hour or 14 days, depending on how many physical copies of the book Internet Archive has in its possession.  (*See* Freeland Tr. 177:18-179:25.)  If the lending cap for a particular ebook title has been exceeded, the user goes on a waitlist until it becomes available.  (Foster Decl. ¶ 44.)  Once an ebook is checked out, a user can "flip through or read all the pages, absolutely."  (Kahle Tr. 89:21-25.)  Internet Archive, by its own account, offers "High Quality Page Images" of the books available for download on its Website.  (A true and correct copy of a document titled "Lending & Book Reader" is annexed hereto as Exhibit 10.) (*See id.* at INTARC00138770.)  Internet Archive's expert, Dr. Imke Reimers, testified that the quality of the scans was "fine," "quite similar to the Google Books scans" and sufficiently clear to serve as a "potential substitute" for authorized library or commercial ebooks.  (A true and correct copy of relevant excerpts from the transcript of the June

3

3, 2022 deposition of Dr. Imke C. Reimers ("Reimers Tr.") is annexed hereto as Exhibit 11.) (*See id.* at 21:19-23:11.)

5.      Users of the IA Website use that platform to read books and Internet Archive encourages them to do so.  The top of the homepage of openlibrary.org invites readers to "Read Free Library Books Online."  (A true and correct copy of the openlibrary.org homepage is annexed hereto as Exhibit 12.)  An Internet Archive user testified in this action that they "can read the whole book" they check out from the Website and have "sometimes read long enough that I reach the end of the hour limit and had to renew."  (A true and correct copy of relevant excerpts from the transcript of the March 24, 2022 deposition of Laura Gibbs ("Gibbs Tr.") is annexed hereto as Exhibit 13.) (*See id.* at 44:11-45:3.)  When Internet Archive changed its default loan period from 14 days to one hour, it received dozens of complaints from users with complaints like "How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading."  (True and correct copies of correspondence from Website users are annexed hereto as Exhibit 14.)  There are more than 1.1 million ebooks still listed for 14-day downloads on the Website.  (*See* Exhibit 3.)

6.      The IA's FAQs address a scenario where "[t]he book I want to read is only available for a 1 hour loan, but I can't read the whole book in that time.  Can I renew a book that I have borrowed for 1 hour?"  The answer is: "Yes.  If there are available copies, patrons can check the book out again. Also, if a patron continues reading the book, turning pages, after the 1 hour duration has passed and there is still a copy available, the book will be auto-renewed for another hour."  (A true and correct copy of the archive.org  FAQ page titled "Borrowing From The Lending Library" is annexed hereto as Exhibit 15.)  And, for the books that are available for one hour loans only, the top of the page view reassures users that the loans are "[r]enewable every hour, pending

4

availability." (A true and correct copy of the book view page for *Middle School* by James Patterson and Chris Tebbets is annexed hereto as Exhibit 16.)

**B.    The Works in Suit**

7.      The Publishers commenced this copyright infringement action on June 1, 2020, alleging that Internet Archive was infringing 127 of their in-copyright books (the "Works in Suit"), which range from literary classics, like *The Bell Jar* and *Lord of the Flies*, to groundbreaking masterpieces, like Zora Neale Hurston's *Their Eyes Were Watching God* or Toni Morrison's *Bluest Eye*, to popular non-fiction and fiction titles, like Malcolm Gladwell's *Blink*, Gillian Flynn's *Gone Girl*, Ann Patchett's *Commonwealth*, and George R.R. Martin's *A Dance with Dragons* (from the *Game of Thrones* series), to perennial children's titles, like the *Big Nate* or *Lemony Snicket* books, to biographies, to romance novels, like CJ Redwine's *Defiance*, and even Patrick Lencioni's best-selling management books. (A true and correct copy of Exhibit A to the Complaint listing the Works in Suit is annexed hereto as Exhibit 17.) The Works in Suit are a small fraction of the more than 33,000 in-copyright books published by the Publishers that Internet Archive has posted as ebooks on the Website without authorization, license or any compensation. (*See* Foster Decl. ¶¶ 110-115.)

8.      By virtue of their respective publishing agreements with authors, the Publishers collectively hold the exclusive rights to publish the Works in Suit pursuant to 17 U.S.C. § 106. (A true and correct copy of the June 10, 2022 Stipulation Regarding Undisputed Facts is annexed hereto as Exhibit 18.) (*See id.* ¶¶3-6.) For the respective Works in Suit, the Publishers obtained from the author the exclusive rights to publish the underlying work in multiple formats, including hardcover, paperback, and ebook formats. For most (if not all) Works in Suit, the Publishers also hold audiobook rights in digital and analogue formats. The Publishers generate revenue – and pay

authors royalties – by exercising their exclusive rights over their books in all formats, no less for ebooks than for print or audio editions. All 127 Works in Suit are available as authorized ebooks, which retail consumers pay to read and libraries pay to license so that they can be loaned for free to their patrons. (*See* Declaration of Ben Sevier ("Sevier Decl.") ¶9; Declaration of Jeffrey Weber ("Weber Decl.") ¶20; Declaration of Chantal Restivo-Alessi ("Restivo-Alessi Declaration") ¶20; Declaration of Alan Pavese ("Pavese Decl.") ¶18.) Over the three years prior to this action, the Works in Suit collectively generated over $1 million in library ebook revenues alone for the respective Publishers and their authors. (*See* Restivo-Alessi Decl. ¶49; Weber Decl. ¶23.)

        **C.**     **Library Ebook Market and IA's Refusal to License Ebooks**

9.      Internet Archive's library expert, Susan Hildreth, testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive." (A true and correct copy of relevant portions of the transcript for the May 17, 2022 deposition of Susan Hildreth ("Hildreth Tr") is annexed hereto as Exhibit 19.) (*See id.* at 47:11-23.)

10.     The "one-copy/one-user" models under which PRH, Hachette, HarperCollins and Wiley license ebooks to libraries charge a fee to provide access to the work regardless of whether patrons ultimately read short excerpt from a book or the whole thing. (*See* Weber Decl. Ex. 21, PRH ebook terms of sale for public libraries, school libraries and special library wholesalers; Restivo-Alessi Decl. Ex. 4, HarperCollins agreement governing distribution of digital content to libraries by OverDrive; Sevier Decl. Ex. 6, Hachette ebooks and digital audiobooks terms of sale for libraries; Pavese Decl. Ex. 5, Wiley agreement governing distribution of ebooks to libraries by OverDrive.) The same is true for commercial licenses – like print books, a purchaser pays for the work regardless of whether they actually read any or all of the book.

<div align="center">6</div>

11.     Library ebook lending is facilitated by aggregators, the largest being OverDrive which licenses authorized ebooks to more than 8,000 public and academic libraries for free distribution to their patrons.  (A true and correct copy of relevant portions of the transcript for the January 31, 2022 deposition of Steve Potash ("Potash Tr") is annexed hereto as Exhibit 20.) (*See id.* at 141:6-13, 161:12-162:3.)  The number of licensed library ebooks checked out via OverDrive was ▮▮▮▮ in 2010, but this increased ▮▮▮▮ to nearly ▮▮▮▮ checkouts in 2020; additionally, in 2012, OverDrive processed 70 million total digital checkouts (including both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million. (A true and correct copy of checkout data produced by OverDrive in this action, along with two press releases issued by OverDrive, is annexed hereto as Exhibit 21.)  During that same time period, the number of different ebook titles checked out by library patrons via OverDrive increased from ▮▮▮▮ to more than ▮▮▮▮ – reflecting the profusion of choice as book publishers committed more books to library ebook lending.  (A true and correct copy of book data produced by OverDrive in this action is annexed hereto as Exhibit 22.)  And total library expenditure on electronic materials (which incorporates digital text materials like ebooks) increased from $373 million in 2017 to more than $440 million in 2019, which is a measure of the established and growing demand for these products and a source of vital income for authors. (True and correct copies of spreadsheets compiled by the Institute of Museum and Library Studies reflecting this data are attached hereto as Exhibit 23.)  The Publishers are all active in the library ebook market, as detailed in their declarations for summary judgment in this action.  (*See* Restivo-Alessi Decl. ¶28; Sevier ¶10l; Weber Decl. ¶6; Pavese Decl. ¶3.)

12.     Unlike the thousands of libraries that pay the Publishers for authorized ebooks, Internet Archive does not "license materials" for its website, apparently as a matter of principle.

7

(*See* Freeland Tr. 96:14-15; Kahle Tr. 80:20-85:23.)  Rather, to the highly limited degree that it buys ebooks (instead of creating its own by scanning paper books), Internet Archive insists on "purchasing" ebooks "in the clear" – *i.e.*, buying "non-encrypted" files outright without any contractual preconditions on their further use.  (Kahle Tr. 191:21-195:1.)  Internet Archive has identified only a handful of publishers that have agreed to sell ebook files on these terms – the literary press 11:11 and the affiliated anarchist publishers PM Press and AK Press.  (*See* Kahle Tr. 139:23-140:12.)

13.     In the absence of permission to distribute the ebooks on its Website – and despite thousands of demands from copyright owners to remove their in-copyright books (*see* ¶¶16-26, *infra*) – Internet Archive scans physical books in bulk and "republishes" unauthorized ebook editions on the Website.  (A true and correct copy of relevant portions of the transcript for the December 3, 2011 deposition of Brenton Cheng ("Cheng Tr.") is annexed hereto as Exhibit 24.)  (*See id.* at 59:18-60:6.)  With respect to the Works in Suit, Internet Archive admits that it "digitally scanned physical books embodying the Works" and "provided one or more logged-in patrons with one or more digital versions of the physical books embodying the Works through the lending functions of [the Website]."  (A true and correct copy of Defendant Internet Archive's Objections and Responses to Plaintiffs' First Set of Requests for Admission is annexed hereto as Exhibit 25.)  (*See id.* at 5-6.)  Internet Archive has admitted that it lacked permission from rightsholders to engage in any of these activities.  (*See* Kahle Tr. 66:22-67:5; 69:8-14.)

14.     Internet Archive's conduct will deprive the Publishers (and their authors) of revenue.  Internet Archive does not pay the license fees that libraries pay for authorized ebooks.  And, because IA's ebooks offer a free substitute for authorized ebooks, the Publishers lose the income they would have received from paying consumers of their authorized ebook products who

use IA ebooks instead. Susan Hildreth, Internet Archive's library expert, stated in her report that libraries engage in CDL "to leverage their existing physical collection to better serve the reading population." (A true and correct copy of the February 25, 2022 Expert Report of Susan Hildreth is annexed hereto as Exhibit 26.) (*See id.* at ¶ 11.) She also opined that "if a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title – or on purchasing print books." (*Id.*) At her deposition, Hildreth further testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL." (Hildreth Tr. 226:24-4.) This testimony confirms that the logical outcome of CDL is less revenues for the publisher and author of the particular titles IA distributes for free on its website.

15.     Kahle has stated that he sees the copying and distribution of unauthorized ebook versions of in-copyright books as a "rebellious" act that "SIMPLY ASSUME[s]" that IA "can [p]erform a function in the online environment that [libraries] routinely perform in the physical print environment…." (A true and correct copy of a document produced by Internet Archive in this action titled "Everyone Deserves to Learn" is annexed hereto as Exhibit 27.) (*See id.* at INTARC00142135.) Internet Archive continues to grow its Website of free, unlicensed, in-copyright ebooks for anyone in the world with an internet connection (*see* ¶¶62-76, 99-109, *infra*), notwithstanding opposition from the Publishers, numerous author organizations (like the Authors Guild), the Association of American Publishers, the U.K. Society of Authors and many individual authors, who have all expressly demanded that IA stop its practices and remove works it does not own or license.

**INTERNET ARCHIVE HAS RECEIVED THOUSANDS OF COMPLAINTS FROM AUTHORS AND PUBLISHERS OVER ITS WEBSITE**

9

16.     Internet Archive has fielded complaints and concerned inquiries about its practices ever since it started republishing in-copyright books without permission.  It has claimed that it responds to takedown requests from rightsholders by removing their content. (A true and correct copy of correspondence between author Mark Stein and Internet Archive's Jeff Kaplan is annexed hereto as Exhibit 28.)  When contacted in May 2016, for instance, by a librarian expressing concerns about contributing in-copyright books to the Website, Kahle replied that "[i]n general, we try to put things up and see if there are any problems.  In 99% of cases people are just happy, and if there are any issues we just take the material down."  (A true and correct copy of relevant email correspondence between Kahle and Elliot Wrenn of the United States Holocaust Memorial Museum is annexed hereto as Exhibit 29.)

17.     Notwithstanding Kahle's representation, each of the Publishers has requested that Internet Archive take down many thousands of its authors' books – including Works in Suit – and Internet Archive has failed to comply with those requests or prevent the books from reappearing on the Website.  (*See* Foster Decl. ¶¶ 119-35.)  Wiley sent Internet Archive a request to take down *Reminiscences of a Stock Operator* by Edwin Lefevre on November 14, 2011.  (A true and correct copy of the relevant email from Wiley to Internet Archive is annexed hereto as Exhibit 30.)  That book is still available to be downloaded from the Website.  (A true and correct copy of the webpage for *Reminiscences of a Stock Operator* on openlibrary.org and the browser view for the checked out book is annexed hereto as Exhibit 31.)

18.     In March 2014, counsel for PRH sent Internet Archive emails stating that its "library lending platform" was "infringing our copyrights" and undermining the "vital and important business segment" for authorized library ebooks.  (A true and correct copy of the relevant emails from PRH to Internet Archive is annexed hereto as Exhibit 32.)  PRH demanded,

10

as a first step, that Internet Archive remove 29 Random House titles, including *The Bluest Eye* by Toni Morrison. *The Bluest Eye* is a Work in Suit that, despite IA's assurances that "borrowing access ha[d] been disabled," was available to download from the Website when this action was commenced on June 1, 2020.

19.     PRH followed up with an email dated July 23, 2014 stating that all "[u]nauthorized, scanned versions of Penguin Random House titles being lent to patrons need to removed from the Open Library site immediately." (A true and correct copy of this email is annexed hereto as Exhibit 33.) A "full list of Penguin Random House titles and isbns" – including several Works in Suit – was sent to Internet Archive to facilitate the takedown and Internet Archive agreed to "process the disablement of lending access for these items," but ultimately failed to effectively remove PRH titles from the Website. (*Id.*) (A true and correct copy of the relevant spreadsheet is annexed hereto as Exhibit 34.) Recently there were 16,496 PRH titles available on the Website. (*See* Foster Decl. ¶ 115.)

20.     On January 11, 2018, counsel for HarperCollins sent Internet Archive a letter demanding that it "immediately disable the 'Borrow eBook' function for our books still under copyright." (A true and correct copy of this email is annexed hereto as Exhibit 35.) There were recently 7,055 HarperCollins books available on the Free Ebook Website. (*See* Foster Decl. ¶ 115.)

21.     Since at least 2015, Hachette and its affiliates submitted hundreds of notices listing URLs for Internet Archive to take down from the Website. In 2019, for instance, Hachette (through its anti-piracy vendor) sent multiple requests to remove Malcolm Gladwell's *Blink* and *What the Dog Saw* – which are both Works in Suit that were still available on the Website when this action commenced in June 2020. (True and correct copies of relevant portions of takedown

11

requests for Malcolm Gladwell books are annexed hereto as Exhibit 36.) There were recently 4,519 Hachette books available on IA's Website. (*See* Foster Decl. ¶ 115.) In addition to the specific instances listed above, the Publishers and their agents have sent Internet Archive requests to take down hundreds of titles that Internet Archive has failed to effectuate. (*See* Foster Decl. ¶¶ 117-33.)

22.     Internet Archive has also received requests from authors to remove many thousands of books from the Website. To select a few examples from many, Internet Archive received correspondence from a lawyer representing two authors who suffered "significant damage" from IA posting an ebook copy of their book because "their publisher has now decided not to move forward with the release of a new edition." (A true and correct copy of this correspondence is annexed hereto as Exhibit 37.) Another author told Internet Archive that she was "spending every waking hour of my life sending take-down notices. I am spending 50 hours a week to send take-down notices to mitigate the damage this has done to my career." (A true and correct copy of this email is annexed hereto as Exhibit 38.) Yet another informed Internet Archive that "[m]any authors (like me) are releasing their out-of-print-titles as ebooks" and "[i]f we lose a sale because you offer our work for free, that is a definite profit issue for us." (A true and correct copy of this email is annexed hereto as Exhibit 39.)

23.     In 2011, the son of Ken Kesey contacted Internet Archive to request that his fathers' books be removed from the Website. (A true and correct copy of relevant emails from Zane Kesey to Internet Archive's Office Manager, Chris Butler, are annexed hereto as Exhibit 40.) Despite Butler's assurance that "[t]he digital lending feature ha[s] been disabled for all [Kesey's] titles…" (*Id*.), works of Ken Kesey – including *One Flew Over the Cuckoo's Nest*, *Sometimes a Great*

12

*Notion* and *Demon Box* – are all currently available to borrow from the Website. (A true and correct copy of the author page for Ken Kesey on openlibrary.org is annexed hereto as Exhibit 41.)

24. And Internet Archive received an email from an author writing "from a little farm house in Tasmania where [she had] existed on a meager writer income for the past ten years in order to support my two children as a single mother," who told IA that it was "stealing" from her by posting her books and had imperiled her ability to "feed [her] kids and pay [her] house loan." (A true and correct copy of this email and Internet Archive's response is annexed hereto as Exhibit 42.) The author asked "[c]ould you please consider an agreement between myself and my publishers that will offer remuneration for any future lendings. If not could you remove [my] titles from your system." "Incidentally," the email continued, "I noticed *Girls Night In 4* was listed... the authors in that collection gave those stories over for free to support the War Child charity. I'm concerned that [a] valuable charity is missing out on sales. Could you also please consider within your heart and soul if what you are doing is honourable [sic] towards authors. We all love books and we all love sharing books, but the original creator needs to be paid at some stage in your system."

25. In response, Internet Archive did not acknowledge the author's request for payment. Instead, a stock response was sent by "The Internet Archive Team" stating that "we have made a good faith effort to disable lending access to any ebook instances of the identified works" on the Website. The email further stated that "[w]e seek to be respectful to creators and operate within the traditional norms and functions of libraries" – and directs the author to "[a] statement from legal scholars about th[e] model" under which Internet Archive republished her books without permission. As of June 29, 2022, seven in-copyright books by the author from Tasmania were still available to read on Internet Archive's Website. (True and correct copies of

the webpage for that author on openlibrary.org and screenshots of checked out pages from her books are annexed hereto as Exhibit 43.)

26.     Sandra Cisneros, the author of the acclaimed *The House on Mango Street* and 12 other books of fiction, poetry and essays, testified that she found the experience of seeing her works distributed to anyone for free on IA's Website "so viscerally upsetting that I could not stay on the website for long."  (*See*  Declaration of Sandra Cisneros dated July 5, 2022 ("Cisneros Decl.") ¶ 11.)  She considers "Internet Archive's distribution of my books to be a terrible violation of the control I have worked so hard to establish over my work."  (Cisneros Decl. ¶ 12.)

### INTERNET ARCHIVE'S PURSUIT OF "UNIVERSAL ACCESS TO KNOWLEDGE" WITHOUT PERMISSION FROM RIGHTSHOLDERS

27.     The Website embodies the aspirations expressed in Internet Archive's motto: "Universal Access to All Knowledge."  Kahle Tr. 23:24-24:6.

28.     The Internet Archive was founded in 1996 by Brewster Kahle, who currently serves as its Chairman.  (*See* Kahle Tr. 23:21-23.)  Kahle is a computer scientist who sold two technology companies in the 1990s, one to AOL and another to Amazon.  (Kahle Tr. 17:10-12, 19:23-21:2.)  The considerable profits from those sales were used, in part, to fund the Kahle/Austin Foundation, which Kahle runs (as President) with his wife and which reported assets worth approximately $120 million in 2019.  (A true and correct copy of the 2019 990-PF Return of the Kahle/Austin Foundation is annexed hereto as Exhibit 44.)  (*See id.* at p. 2.)

29.     Internet Archive is set up as a 501(c)(3) corporation. (A true and correct copy of relevant excerpts from the transcript of the October 22, 2021 deposition of Jacques Cressaty ("Cressaty Tr.") is annexed hereto as Exhibit 45.) (*See id.* at 96:22-97:9.)  Internet Archive is funded primarily from Kahle's wealth: he has provided tens of millions of dollars of funding to support IA's activities and "he would use various ways of channeling these funds," including via

14

the Kahle/Austin Foundation.  (*Id*. at 42:2-9; 62:20-24.) (A true and correct copy of the Internet Archive *Open Libraries* Proposal to the MacArthur Foundation 100&Change program is annexed hereto as Exhibit 46.) (*See id.* at INTARC00151161**,** "IA . . . has a guaranteed source of philanthropic support to sustain its basic services in perpetuity.")  Government funding made up only 1.8% of Internet Archive's revenue between 2011 and 2020.  (Cressaty Tr. at 179:13-180:1.)

30.     The primary focus of the Internet Archive at its founding was to "archiv[e] the Internet itself" by copying and preserving webpages.  (A true and correct copy of an "About the Internet Archive" webpage from IA's website is annexed hereto as Exhibit 47.) (*See id.* at p. 1.)  To that end, Internet Archive used software to "crawl" webpages and copy them into a searchable, chronological database that allows internet users to see what webpages looked like on the dates they were captured.  That database is known as the Wayback Machine and it is not at issue in this litigation.

31.     Kahle wrote in a March 1, 1997 article for *Scientific American* that "the continued reduction in price of data storage, and also data transmission, could lead to interesting applications as all the text of a library, music of a radio station, and video of a video store become cost effective to store and later transmitted [sic] in digital form."  (A true and correct copy of Kahle's *Scientific American* article is annexed hereto as Exhibit 48.) (*See id.* at INTARC00390088.)  Internet Archive engaged in "building a digital library" and, around 2000 to 2001, it started uploading public domain books to its website.  (Kahle Tr. 25:2-27:24.)

32.     Kahle gave a speech entitled "Universal Access to Knowledge" on August 4, 2006.  (A true and correct copy of an article reproducing that speech is annexed hereto as Exhibit 49.) In that speech, Kahle stated that "[w]e could actually make the dream of the Library of Alexandria a

15

reality – the dream of having it all.  The idea of having all published – and I'd even suggest the bulk of unpublished – things be universally accessible." (*Id.* at PLAINTIFFS0001110.)

33.    For Kahle, the "universal access to knowledge" ethos appeared to clash with the limited access afforded by the "snippets" from books made available on Google Books (the book scanning project at issue in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 209-11 (2d Cir. 2015)). In a December 20, 2006 article Kahle was quoted as saying "[t]he whole Google Books Search looks like Amazon's Search Inside the Book.  Let's go open with these collections.  These are beautiful books."  (A true and correct copy of the December 20, 2006 zdnet.com article titled "Grant funds open-source challenge to Google library" is annexed hereto as Exhibit 50.) (*See id.* at p. 2.)

34.    Within a year, Internet Archive announced that "together with the Boston Public library and the Woods Hole Library, that it would start scanning out-of-print but in-copyright works to be distributed through a digital interlibrary loan system." (A true and correct copy of an October 22, 2007 *New York Times* article titled "Libraries shun deals to place books on web" is annexed hereto as Exhibit 51.)  (*See id.* at p. 1.)  The article noted by way of contrast that "Google scans copyrighted works as well, but it does not allow users to read the full text of those books online, and it allows publishers to opt out of the program."  (*Id.* at p. 3.)

35.    Internet Archive later discarded its "out-of-print" limitation for scanning in-copyright books.  (A true and correct copy of a February 22, 2011 blog post on archive.org titled "Internet Archive and Library Partners Develop Joint Collection of 80,000+ eBooks To Extend Traditional In-Library Lending Model" is annexed hereto as Exhibit 52.)  As its practices have increased, it now scans any in-copyright books it can acquire and posts ebook versions on its Website, with the only (current) restriction being that it claims to not post books published within

16

the last five years – a "rule" that it intermittently violates. (A true and correct copy of a document setting out internal limitations for Internet Archive's in-library collection titled "Notes about Book Collections and Availability" it attached hereto as Exhibit 53.) (*See id.* at INTARC00471120, specifying that the publication date of any book in the collection must be "between 1925 (inclusive) and ~5 years ago."))

36.     Internet Archive subsequently announced that its interim goal is to digitize more than 4 million in-copyright books and add them to the Website. (A true and correct copy of a March 14, 2018 blog post on archive.org titled "Let's Build a Great Digital Library Together…Starting with a Wishlist" is annexed hereto as Exhibit 54.) Eight months after this lawsuit was filed, IA announced that it had added its two millionth in-copyright book to the Website on February 3, 2021. (A true and correct copy of a February 3, 2021 blogpost on archive.org titled "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" is annexed hereto as Exhibit 55.) IA currently lists more than 3 million in-copyright books on its Website and is on track to meet its 4 million-book milestone within a year. (*See* Exhibit 3.) Kahle has also stated that he has "a realistic goal of 10 million books – the equivalent of a major university library." (A true and correct copy of an August 1, 2011 article in *The Guardian* reporting this statement is annexed as Exhibit 56.)

37.     None of the ebooks that Internet Archive republishes are licensed and Internet Archive does not "pay authors royalties for making their books available for free" on the Website. (Freeland Tr. 98:12-20.)

### INTERNET ARCHIVE BUILT AN INDUSTRIAL – OFTEN COMMERCIAL -- INFRASTRUCTURE TO MEET ITS GOALS AND STOCK THE WEBSITE WITH EBOOKS

38.     To meet its goals, Internet Archive has developed and scaled up technology to facilitate its mass scanning operation. It has also established multiple channels for obtaining the

17

physical books it needs to scan in order to distribute the resulting unauthorized ebooks on its Website.

39. By 2006, Internet Archive had "developed [its] own little book scanner to get the cost per page – if you were to scan inside the United States – down to ten cents." (Exhibit 49 at PLAINTIFFS0001111.) That machine, known as a Scribe, photographs the pages of books, which are turned manually by an operator raising and lowering a V-shaped pane of glass that keeps the pages flat. (A true and correct copy of an IA webpage advertising the "Table Top" version of the Scribe machine is annexed hereto as Exhibit 57.) The photographs of each page of the book are run through software developed by Internet Archive, also called Scribe, to create ebooks. (A true and correct copy of the of relevant excerpts from the transcript of the October 14, 2021 deposition of Andrea Mills ("Mills Tr.") is annexed hereto as Exhibit 58.) (*See id.* at 84:20-85:24.) The Scribe machine and software are collectively known as the Scribe system. (*Id.*)

40. Internet Archive subsequently created "digitization centers," where operators run multiple Scribe machines to scan high volumes of books. Around 2009, Internet Archive partnered with a company called Data Datum to scan books in China, where labor is cheap. (Mills Tr. 130:19-134:23.) IA also operates scanning centers in the United States, United Kingdom and Canada. (*Id.*) In or about 2019, IA opened a "superscanning" center in Cebu, Philippines that receives shipping containers full of books and digitizes them for inclusion on the Website. (Mills Tr., 132:3-7.) ███████████████████████████████████████████
████████████████████████ (*See id.* at INTARC00421456, describing process of shipping books to Cebu facility.) Using these facilities, Internet Archive currently scans about 3,500 books a day, which amounts to 1.28 million books annually. (*See* Exhibit 55.)

18

41.     Despite the considerable resources available to it from the Kahle/Austin Foundation and related Kahle entities, Internet Archive does not license ebooks and does not pay any royalties to authors or publishers in connection with its digitizing and posting books on its Website for free. (Freeland Tr. 98:10-20.)  Instead, it stocks its Website by scanning and digitizing physical books that it obtains primarily via two channels – (1) by partnering with libraries to scan their collections, and (2) acquiring print books.

42.     Internet Archive enters into contracts with certain libraries to scan their collections as part of a "commercial" book scanning business, which has generated more than $35 million of income since 2011.  (Cressaty Tr. 168:19-169:3).  (A true and correct copy of Internet Archive's profit and loss statement for 2011-2020 is attached hereto as Exhibit 60.)  Internet Archive produced a flier inviting libraries to "Digitize your Collections [a]t one of our Regional Digitization centers or on your Table Top Scribe locally" that promises "[u]nlimited downloads of your items, with perpetual access.  Keep and distribute copies!"  (A true and correct copy of this flier is annexed hereto as Exhibit 61.)  Participating libraries enter into an agreement to provide IA with print books from their collections to scan, which can be done on premises or offsite.  (A true and correct copy of Internet Archive's scanning agreement with Providence Public Library (the "Scanning Agreement") is annexed hereto as Exhibit 62.)  The scanning process keeps the book intact and, once scanned, the physical books return to the library for further circulation.  (*Id.* at INTARC00355369.)

43.     Under standard terms in the Scanning Agreement, Internet Archive "provide[s] one digital copy of each digitized [book] … to the Library and will retain additional Digital Copies. Internet Archive will post Digital Copies on the Internet Archive in a newly created sub-collection… The Digital Copies will be freely available from Internet Archive via HTTP, Torrent

19

or a similar method." (*Id.*.)  The terms further state that both the library and Internet Archive "may freely use their Digital Copies … in any manner" that is "permitted under applicable copyright law," including "reproducing, displaying, storing, modifying, or distributing the Digital Copies." (*Id.* at INTARC00355370.)  The majority of the books Internet Archive scanned from library collections were in the public domain, but some books are in-copyright.  Chris Freeland, Internet Archive's Director of Open Libraries, first testified that in-copyright books scanned from library collections cannot be checked out on its Website.  (Freeland Tr. 296:22-305:9.)  But, after he was shown an example of a work scanned from the collection of the Boston Public Library that apparently was available for borrowing, Freeland later testified that in-copyright "books may well be available for lending on archive.org that were obtained via scanning agreement..."  (*Id.* at 314:15-316:16) (A true and correct copy of Exhibit 295 from the Freeland deposition, showing the archive.org page for the work, is attached hereto as Exhibit 63.)

44.     Internet Archive discovered that it could not meet its goals by scanning books from library collections alone.  As Kahle wrote in a July 1, 2019 blog post,"[t]he IA has worked with 500 libraries over the last 15 years to digitize 3.5M books.  But based on copyright concerns the selection has often been restricted to [public domain] books."  (A true and correct copy of the July 1, 2019 blog post on archive.org titled "Most 20th Century Books Unavailable to Internet Users – We Can Fix That" is annexed hereto as Exhibit 64.)  IA's former Director of Finance also testified that, by 2016, "our library partners ran out of books that were out of copyright, so pre-1923, and they're reluctant to give us books that were in copyright." (Cressaty Tr. 174:24-175:2.)

45.     Given the reluctance of libraries to permit the scanning of in-copyright books due to "copyright concerns," Internet Archive looked elsewhere to acquire physical copies of in-copyright print books to scan.  As early as 2011, Internet Archive had "gathered about 500,000

20

books" from donations. Then, in or around 2012 to 2013, IA downloaded nearly 1 million ebooks from the "pirate site" Library Genesis (also known as "LibGen"), including a copy of *Song of Solomon* by Toni Morrison – which is a Work in Suit in this action. (*See* Kahle Tr. 208:8-211:25.) (True and correct copies of the webpage for *Song of Solomon* identifying it as a "Library Genesis" book and a June 23, 2021 screenshot of the Library Genesis collections page listing 920,366 items are attached hereto as Exhibit 65.) Internet Archive denies distributing LibGen via the Website, but Kahle did ask at least one publisher whether she would "be ok with our opening up the 3k mit press books from libgen for one-at-a-time lending on openlibrary…" (A true and correct copy of an email from Kahle to Amy Brand of MIT is annexed hereto as Exhibit 66.) Internet Archive also purchased books that its scanning contractor, "Datum Data," had obtained "through their connections in China." (Mills Tr. 92:13-23.) Internet Archive's former Digitization Program Manager testified that she is "not aware of where the books come from." (Mills Tr. 113:7-14.) There are notorious problems with counterfeit books in China. (A true and correct copy of a January 23, 2018 CNBC article titled "Plagiarism is rampant in China, and its media companies are raking in billions" is attached hereto as Exhibit 67.)

46.    Internet Archive has also obtained books by absorbing entire library collections. In 2020, for instance, the defunct Marygrove College donated its entire collection of "70,000 books" and other works. (A true and correct copy of an October 20, 2020 blog post on archive.org announcing the donation is annexed hereto as Exhibit 68.) Those materials were packed for shipping, digitized and resulting ebook copies were posted on the Website. (A true and correct copy of the Marygrove College Library page on archive.org is annexed hereto as Exhibit 69.)

47.    Internet Archive also has operated a book sponsorship program that allows users to contribute money towards the purchase and scanning of particular books they want to see added

to the Website.  As Internet Archive's former Director of Finance described it, "[i]f you have a book that you are interested in and interested in in having a digital copy of …, you can send us money or you can send us a book plus a donation to cover the cost of … the digitization of that book."  (Cressaty Tr. 167:21-168:7.)  In other words, "the donor gives Internet Archive money in excess of the price of the book, and that money covers the purchase of the book and its scanning." (*Id.*; *see also* Complaint ¶99, showing webpage requesting donation of $93.13 to digitize a copy of Adam West's biography "Back to the Batcave.") (A true and correct copy of an October 24, 2019 blog post on openlibrary.org describing the book sponsorship program is annexed hereto as Exhibit 70.)

48.     Internet Archive also has funded its projects with donations of large amounts of bitcoin.  For instance, Internet Archive received "$1M in Bitcoin" from the anonymous donor behind the "Pineapple Fund."  (A true and correct copy of a December 26, 2017 blog post on archive.org announcing the donation is annexed hereto as Exhibit 71.)  (*See also* Cressaty Tr. 126:24-127:20.)  Internet Archive testified that "there's no way you can tell" where this money is coming from and the source "could be ISIS, for all you know."  (Cressaty Tr. 114:12-116:18.)

49.     The books Internet Archive obtains are typically packed into shipping containers and sent to offshore digitization facilities in Cebu or China, where they are rendered into ebooks by the Scribe system.  (Mills Depo Tr. at 131:17-132:7.)  The books are then shipped back to facilities operated by IA's affiliates, where they "are stored in double-stacked shipping containers in … physical archive facilities in Richmond, CA and Pennsylvania."  (A true and correct copy of a presentation by Chris Freeland titled "How controlled digital lending works for libraries" is annexed hereto as Exhibit 72.)  (*See id.* at INTARC00142783.)  Unlike the physical books in the collections of public libraries, the physical books Internet Archive "preserves" in shipping

22

containers are not available to the public. (A true and correct copy of a presentation on Internet Archive's lending and digitization programs is attached hereto as Exhibit 73.) (*See id.* at INTARC00142733; Mills Tr. 176:2-8.)

50.    The books and the facilities housing the shipping containers are legally owned by a separate entity, Open Library of Richmond Inc. ("OLR"). (A true and correct copy of OLR's 2019 990-PF Return is annexed hereto as Exhibit 74.) (A true and correct copy of IA's 2016 990-PF Return is attached hereto as Exhibit 75.) (*See id.*, reflecting that Open Library of Richmond paid Internet Archive a $4,840,000 grant; *see also* Kahle Tr. 44:23-45:2, "[T]he Open Library of Richmond [] is actually the organization that stores and owns the books."; Cressaty Tr. 62:11-14). Kahle is the principal officer of OLR and he funds that entity from his personal finances. (Cressaty Tr. 42:10-14.) Internet Archive has a number of other affiliate companies in addition to OLR. (Cressaty Tr. 37:3-47:4, 78:24-81:10, 60:1-61:1, referring to the companies as "Kahle/Austin Empire.") These companies – which own IA's "headquarters, warehouses and some distributed data centers" – were created "[a]s a strategy to mitigate risk." (*See* Exhibit 46 at INTARC00151161.)

51.    In or around 2013, Internet Archive started sourcing physical books from the "socially conscious for profit" company Better World Books ("BWB"), which is a used book retailer that has "reused or recycled" nearly 400 million print books, including from libraries discarding (or "weeding") unwanted copies. (A true and correct copy of BWB's homepage listing the number of "books reused or recycled" is annexed hereto as Exhibit 76) (*See id.* at p. 2.) (A true and correct copy of relevant excerpts from the transcript of the December 6, 2021 deposition of Ginger Patton-Schmitt ("Patton-Schmitt Tr.") is attached hereto as Exhibit 77.) (*See id.* at 85:18-86:10, confirming BWB's for-profit status.) (A true and correct copy of BWB webpage titled

23

"About Better World Books," describing BWB as a "for-profit social enterprise," is attached hereto as Exhibit 78.) In April 2013, Internet Archive and BWB drafted a memorandum of understanding stating that ███████████████████████████████████████████ ███████████████████████████████ (A true and correct copy of the draft memorandum of understanding is annexed hereto as Exhibit 79.)

52.      During this time period, Internet Archive periodically identified print books that it wanted to acquire based on what was available from BWB's inventory, which BWB either donated or sold to IA for a modest fee.  In an email from Brewster Kahle to BWB's Director, Strategic Sales & Partnerships, for instance, Kahle stated that IA had identified "about 13k books that were … 'desirable' for us" from BWB's available inventory and offered to purchase those "books for $1 each."  (A true and correct copy of this email is annexed hereto as Exhibit 80.)

53.      Eventually a system developed whereby Internet Archive sent a "wish list" containing approximately "1.5M ISBNs" for BWB to run against its inventory to determine which books were available.  (A true and correct copy of relevant emails between Freeland and a BWB Project Manager is annexed hereto as Exhibit 81.)  Kahle and Freeland "agreed that our best path to millions of books is arm-in-arm with BWB…"  (*Id.* at INTARC00414924.)  By April 2018, IA was ███████████████████████████████████████████████ (A true and correct copy of a memorandum entitled ███████████████████████████████ is annexed hereto as Exhibit 82.)

54.      In the fall of 2018, Internet Archive started exploring the possibility of acquiring Better World Books.  In an email sent to Kahle on November 12, 2018, the founder of BWB wrote that ███████████████████████████████████████████ ███████████████████████████████████████████

24

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████ (A true and correct copy of emails between Kahle and Xavier Helgesen is annexed hereto as Exhibit 83.)

55.    On April 17, 2020, Kahle wrote to a potential investor that Better World Books "get[s] 30 million books a year, and sell[s] 10 million – the others are donated or recycled.  We want more of the flow… This is a bold move and our library colleagues believe it can help rearrange how books work in the library field in general: libraries buy books, and now consign or donate them to BWB, the new non-profit would keep 1 copy for digitization and preservation, the rest get sold.  This is what BWB does already, but we would ramp this up.  As a self sustaining business, this will keep the books flowing year after year."  (A true and correct copy of emails between Kahle and Peter Mounce are annexed hereto as Exhibit 84.)  Kahle also wrote that "they are a going concern and hopefully even profitable.  If they generate money then they could pay for the digitization…"  (*Id*.; *see also id*., "The successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world…")  And, Kahle wrote, Internet Archive would obtain "maybe 7 million [books] over the next few years" (*id*.) at a rate of "1mm books per year."  (A true and correct copy of a relevant email Kahle sent on May 6, 2019 is annexed hereto as Exhibit 85.)

56.    In June 2019, Internet Archive effectively acquired Better World Books in return for ███████████████████████████████████████████ (A true and correct copy of ██████████████████████████████ is attached hereto as Exhibit 86.)  (*See also* Patton-Schmidt Tr. at 70:10-15, ██████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███).   Kahle used funds from his personal fortune to fund the transaction, which were channeled through OLR.  (Cressaty Tr. 148:7-25.)  As part of the deal, ████████████

███████████████████████████████████████████████

██████████████   (A true and correct copy of the July 10, 2019 Donation Agreement between Better World Books and OLR is annexed hereto as Exhibit 87.)  Under the terms of the acquisition, Better World Libraries – a 501(c)(3) shell corporation controlled by Kahle – became the sole shareholder of Better World Books.  (A true and correct copy of Better World Libraries' 2019 990-PF Return is attached hereto as Exhibit 88.)  (*See id.* at INTARC00402986.)  Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire."  (Cressaty Tr. 241:7-16; 248:14-249:10.)

57.     Internet Archive announced the acquisition on November 6, 2019 in a blog post that stated that "[t]his new relationship will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books… Any book that does not yet exist in digital form will go into a pipeline for further digitization, preservation and access."  (A true and correct copy of the November 6, 2019 blog post is annexed hereto as Exhibit 89.)

58.     Internet Archive and Better World Books have explored and adopted a number of "synergies" – *i.e.*, "ways that BWB could work with IA and its affiliates to make both business perform better."  (Patton-Schmitt Tr. 119:19-23) (A true and correct copy of a document entitled ████████████████████████████ is annexed hereto as Exhibit 90.)   For instance, webpages for books on the Better World Books website were provided with links to "borrow" those books from

26

the Internet Archive's Website. (A true and correct copy of an illustrative book webpage on Better World Books' website is annexed hereto as Exhibit 91.) Better World Books also links to IA ebooks on the Website for its "Preview" feature. (A true and correct copy of the Better World Books preview page for *Americanah* by Chimamanda Ngozi Adichie is annexed hereto as Exhibit 92.)

59.     Webpages for ebooks on the Internet Archive's Website also contain links to purchase that title from Better World Books – including a "Purchase at Better World Books" button that appears at the top of the window when users read an ebook on Internet Archive's ebook browser. (True and correct copies of documents illustrating the Website's links to Better World Books are annexed hereto as Exhibit 93.) Internet Archive receives a payment from Better World Books every time a user clicks on a link to purchase a used book from Better World Books' website. (*See* Patton-Schmitt Tr. 142:25-154:5.) The webpages on Internet Archive's Website also include links to "Donate" to the Internet Archive. *See* Exhibit 43. As Internet Archive's former Director of Finance testified, "every single page of the Archive is monetized." Cressaty Tr. 202:14-208:4.



(Excerpt of Exhibit 43.)

27



(Excerpt of Exhibit 93.)

60.     Post-merger, Better World Books ██████████████████████ ███████████████ (Patton-Schmitt Tr. 198:2-9.)   "Better World Books has vast management experience in libraries e-commerce and supply chain management that can be beneficial to IA."  (*Id*. at Tr. 120:23-121:8.)  Between 2020 and 2021, ████████████ ████████████████████████████████████████████ ████████████████████ (A true and correct copy of a Wikipedia page summarizing BWB's book donations to IA is annexed hereto as Exhibit 94.) (A true and correct copy of ████████████████████████████ during this time period is annexed hereto as Exhibit 95.)

61.     Between the merger in July 2019 and June 30, 2021 Better World Books identified and packed up approximately 2.8 million books from Internet Archive's wishlist, many of which have been shipped off to the Cebu scanning center for digitization, posting on the Website and (ultimately) delivery to the facilities operated by Internet Archive affiliates for "preservation." (True and correct copies of dashboard entries showing Better World Books fulfilment for Internet Archive during this time period are annexed hereto as Exhibit 95.) (*See* also Patton-Schmitt Tr. 155:1-11.)

**INTERNET ARCHIVE'S EVOLUTION FROM "IN-LIBRARY LENDING" TO THE "OPEN LIBRARIES PROJECT"**

28

62.     As previously noted, at present anybody in the world with a valid email account can obtain an account to access any of the millions of in-copyright books available on the Website. Internet Archive has unilaterally placed certain limits on how the ebooks on their website circulate, which have changed over time and could change again.

63.     In 2011, Internet Archive had "80,000+" in-copyright ebooks in its "In-Library eBook Lending Program." (A true and correct copy of the February 22, 2011 blog post on archive.org announcing the launch of the In-Library Ebook Lending Program is annexed hereto as Exhibit 96.) Under this system, each ebook scan could "only be borrowed by one person at a time" for two weeks and patrons could "borrow up to 5 eBooks at a time." (*Id.*) Ebook scans could "only be borrowed by a patron of a physical library that participates in [Internet Archive's] program" and the ebooks must be "access[ed] through our site from the physical library's network." (A true and correct copy of email correspondence between Chris Butler, Internet Archive Office Manager, and Zane Kesey is annexed hereto as Exhibit 97.)

64.     By 2013, Internet Archive had relaxed the geographical limits so that its ebooks could "be borrowed by those in an area served by a physical library which participates in our program." (A true and correct copy of a February 2013 email from Chris Butler to James D. Jenkins is annexed hereto as Exhibit 98.) (*See id.* at INTARC00165238) (A true and correct copy of a 2012 email from a Library of Michigan librarian is attached hereto as Exhibit 99.) (*See id.*, reporting concern that "[i]t seems like anyone in Michigan can access copyrighted material available through your Open Library In-Library Lending program without authentication.") Within approximately one year, Internet Archive completely removed geographical limits so that anybody in the world with an internet connection could access in-copyright books on the Website – which remains true to this day. (Kahle Tr. 97:11-18.)

29

65.     The number of concurrent ebook loans permitted has also shifted over time.  For several years, Internet Archive loaned books "one at a time" – which meant that it set a cap on the number of users who could simultaneously check out a book based on the number of books Internet Archive itself owned.  (Foster Decl. ¶70)  So if there were five physical copies of a book in an OLR shipping container, five users could read the ebook version on the Website and any subsequent users would be offered a place on the waitlist.  On November 13, 2018, Freeland published a blog post stating that the "own one, loan one principle" based on the books Internet Archive owned was "viable, but limited," and "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist and become part of a major news story."  (A true and correct copy of the November 13, 2018 blog post on archive.org is annexed hereto as Exhibit 100.)

66.     Kahle explained the idea in broad strokes in a statement entitled "Transforming Our Libraries into Digital Libraries:  A digital book for every physical book in our libraries."  (A true and correct copy of this statement is annexed hereto as Exhibit 101.) In that document, he proposed a "collaborative effort [with libraries] to select and digitize the most useful books of the 20th and 21st centuries, and to build a robust system to circulate the resulting e-books to millions, and eventually billions of people."  (*Id*. at PLAINTIFFS0000858.)  In order to do this, he proposed collaborating with libraries "to digitize the materials efficiently, minimizing duplication, and lend the digital texts with the same limitations placed on physical books."  (*Id*. at PLAINTIFFS0000860.)  Kahle wrote that "Internet Archive could create a circulation system that would administer the lending [for libraries].  In effect, then, each library can choose from a variety of methods to lend digital versions of the physical books in their collection.  This would keep the local libraries in control but leverage the convenience of a cloud-based system that others maintain

30

and update." (*Id.* at PLAINTIFFS0000865.)   To accomplish this, "in each library's online card catalog, when a digital version of a book exists [on Internet Archive], we can include a web-link on the record for the physical book, giving readers the ability to browse the book on screen or to borrow it from the convenience of their homes.  In this way, we can smoothly enhance a library's collection, from analog to digital, at scale. . . . To build this future, we will need the participation of multiple sectors to bring thousands of libraries digital." (*Id.* at PLAINTIFFS0000859.)  This "collaborative digital library collection and circulations system," Kahle hypothesized, "could help deliver e-books to millions of patrons with a flip of a digital switch."   (*Id.* at PLAINTIFFS0000865-86.)

67.    This concept was embodied in the "Open Libraries" project that Internet Archive promoted in 2018 as a solution to the "limitations of scale for titles with wide appeal" that Internet Archive was experiencing.  (Exhibit 100.)  This project essentially allows libraries to "pool[] their physical collections" with Internet Archive "in order to make more lendable copies of digital books available to their users and the world."  (*Id.*; *see also* Freeland Tr. 106:1-4.)  The purpose of the Open Libraries project is "to increase lending counts" on the Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches."  (A true and correct copy of the "Join Open Libraries" webpage on openlibraries.online is annexed hereto as Exhibit 102.)

68.    Under this system Internet Archive is a central hub and libraries participating in the Open Libraries project – each known as a "Partner Library" – send their catalogues to Internet Archive to "run an overlap analysis that compares [ISBN numbers for] their physical holdings with our digital holdings."  (Freeland Tr. 51:19-24.)  Internet Archive does not make new scans of the libraries' books identified by the overlap analysis (nor take possession of the matching print

editions in the libraries' collections). (*Id.* at 64:6-19.) Rather, every time a book in the libraries' catalogue matches an ebook on the Website, Internet Archive "just increases by one the number of concurrent checkouts of that book" permitted on the Website. (*Id.*) Since Internet Archive does not "set any upper limit to the number of copies available via concurrent lending," the overlap analysis dictates that "if a hundred partner libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously." (*Id.* at 65:2-15.) And if there were "a thousand libraries that had the same book and put them into controlled digital lending," then one thousand users would be able to view the ebook scan on the Website." (*Id.*)

69. In order to become a Partner Library in the Open Libraries project, libraries need only submit a short "online form." (*See* Exhibit 102.) That form forthrightly admits that "Internet Archive's Open Libraries project offers the prospect of making every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own." (A true and correct copy of the "Agreement to participate in Open Libraries" (the "Open Libraries Form Agreement") is annexed hereto as Exhibit 103.) Partner Libraries agree to "share their catalog of books with the number of copies of each book with the Internet Archive." The Open Libraries Form Agreement imposes no substantive restrictions on the Partner Libraries' use of the physical books that match the ebooks on the Website. (*Id.*) The Open Libraries Form Agreement further provides that any partner "Library may integrate links to the borrowable Books in their catalog and other services. The Internet Archive will add books to the collections offered on the Internet Archive's sites." (*Id.*)

70. While it is currently free for libraries to become Partner Libraries, Kahle has stated that "it would be understandable if we charged libraries that did not contribute digitization or backend services for access to digital books. It would be equally understandable to charge a one-

time transfer fee to libraries that wanted to store their own local copies" of the ebooks on the IA Website. (Exhibit 101.)

71. Internet Archive has marketed the Open Libraries project and related digitization projects to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining "free ebooks for your patrons" with "no cost involved." (A true and correct copy of a relevant email from Freeland to a librarian at Arizona State University is annexed hereto as Exhibit 104.) For instance:

    a. Freeland sent an email to the Associate Dean of University of Oklahoma Libraries stating that "[t]he main offer we have in hand with the Open Libraries today is the ability to match your physical holdings with the 1.1M in-copyright books we have *already* digitized and where there's a match, provide you back a link to the digitized book." (True and correct copies of emails making this offer are annexed hereto as Exhibit 105.)

    b. An Internet Archive representative sent a librarian an email stating that the Open Libraries project "can leverage controlled digital lending to provide your patrons with free ebooks of your physical collections. As an Open Libraries member, we match your in-copyright holdings with our digital holdings and serve free ebooks where they overlap. Join Open Libraries, access free ebooks – so simple, we had to share!" (A true and correct copy of relevant emails from Internet Archive Senior Digitization Manager Jeff Sharpe to Karl Stutzman of Anabaptist Mennonite Biblical Seminary is annexed hereto as Exhibit 106.)

    c. Freeland gave a presentation entitled "Open Libraries Introduction & Internet Archive programs" that included the following slide:

<div align="center">33</div>

How do you participate?

Join Open Libraries

Cost: $0

Share your catalog
- Overlap study by IA engineers
- Returns matches, used to increase lending counts

Integrate links back into your catalog

(A true and correct copy of the presentation entitled "Open Libraries Introduction & Internet Archive programs" is annexed hereto as Exhibit 107.)

d.  The notes to a slide for a separate presentation Freeland gave to libraries stated that the Open Libraries project "ensures that a library will not have to buy the same content over and over, simply because of a change in format."  (A true and correct copy of the presentation entitled "Addressing the 20th century gap: Controlled digital lending for in-copyright material" is annexed hereto as Exhibit 108.)

e.  Another presentation was titled "Maximizing institutional investments in print resources through controlled digital lending" – with the subtitle, "**Or, You Don't Have to Buy it Again!**"  (A true and correct copy of the presentation entitled "Maximizing institutional investments in print resources through controlled digital lending" is annexed hereto as Exhibit 109.)

f.  A vendor acting on behalf of Internet Archive sent an email to one of the subscribers to its Library.Link Network, the Evergreen Indiana Library Consortium, with a subject line of "Free eBooks for Indiana Evergreen."  (A true and correct email dated January 3, 2019 from Lauri McIntosh is annexed hereto as Exhibit 110.)  That

34

email stated that "Open Libraries provides a way for you to offer digitized books to your patrons for free" and that joining as a partner would "bring this added value to your libraries." (*Id.*) (True and correct copies of additional emails from Lauri McIntosh asking subscribers if they "would like to participate and get free ebooks for your end users" are annexed hereto as Exhibit 111.)

g. The same vendor sent a librarian an email inviting them to join the Open Libraries project, which stated that the "1, 2, 3 of it is, once you sign the form we do the rest… would you like to participate and get free ebooks for your end users?... Internet Archive now offers FREE ebooks for all Library.Link libraries when you participate in the Open Libraries Controlled Digital Lending (CDL) project." (True and correct copies of emails making this offer are annexed hereto as Exhibit 112.)

h. Internet Archive's Website contains a video of a July 14, 2021 presentation entitled "Implementation & Integration: CDL for All Libraries" that describes controlled digital lending as a "[l]ow risk, reasonable solution that preserves legal and fiscal value in collections" and contains the following slide:



(A true and correct copy of the "Implementation & Integration" presentation is annexed hereto as Exhibit 113.)

35

     i.    Internet Archive gave a presentation at the 2019 Library Leaders Forum that summed up the "[s]teps to participate in Open Libraries: Join Open Libraries, Share your catalog, Overlap study, Integrate links back into your catalog, Lend digital books to your patrons." (*See* Exhibit 27 at INTARC00142079.)

72.    Internet Archive has testified that it has 81 Partner Libraries as of December 2021 (Freeland Tr. 71:4-10) – the majority of which are academic libraries and a small handful of which are public libraries. (As of December 24, 2021, 62 Partner Libraries contributed books to the overlap analysis and 13 of those were public libraries. *See* a true and correct copy of Defendant Internet Archive's Objections and Responses to Plaintiffs' Second Set of Interrogatories annexed hereto as Exhibit 114, Response to Interrogatory No. 12.) At the 2020 Library Leaders summit, Kahle announced that "2.8M copies" of in-copyright books were added to concurrent lending counts through the Open Libraries' project. (A true and correct copy of the "Library Leaders Forum 2020 Partner Summit" presentation is annexed hereto as Exhibit 115.) (*See also* Freeland Tr. 71:1-12.) The number of books added through overlap analysis has increased since that time. (Freeland Tr. 71:14-25.)

73.    Many libraries – both Partner Libraries and unaffiliated libraries – have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their library catalog websites. For instance, the Georgetown University Law Library's catalog features the language "Full text availability" and presents a link to access the "full text" of the title through "Internet Archive Controlled Digital Lending." (A true and correct copy of a screen capture from the Georgetown Law Library catalog is annexed hereto as Exhibit 116.) Additionally, the Dartmouth College Library's catalog entry for "The Catcher in the Rye," which is one of the Works in Suit published by Hachette, features a link to access an ebook version through the Internet Archive's

website.  (A true and correct copy of a screen capture from the Dartmouth College Library catalog is annexed hereto as Exhibit 117.)

74.     Many other unaffiliated libraries have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their main library websites, including public library systems in New York, California, and elsewhere.  (A true and correct copy of screen captures from the Burlingame, CA Public Library, the Denver, CO Public Library, the Mesa County, CO Public Library, and Onondaga County, NY Public Library, is annexed hereto as Exhibit 118.)

75.     Internet Archive benefits from the overlap analysis by substantially increasing the number of users who can borrow its unlicensed ebooks at one time.  For each Partner Library that contributes its catalogue for overlap analysis, Internet Archive gets "an additional copy to lend" of every matching book "without … having to incur the cost associated with scanning."  (Freeland Tr. 66:8-67:14.)  "As a result of the Internet Archive implementing overlap analysis … wait lists [have] been reduced on" the Website "for certain titles."  (*Id.*)  And the overlap analysis expands the Website's collection in tandem with the book pipeline from Better World Books because "the more books Internet Archive has been able to obtain and scan, the greater likelihood there would be matches in the overlap analysis with potential partner libraries."  (*Id.*)

76.     As detailed below, in order to induce libraries to become Partner Libraries in the Open Libraries project, the Internet Archive made various statements suggesting that the whole scheme was legal under the Copyright Act.

### INTERNET ARCHIVE SPEARHEADS THE CREATION OF THE "CONTROLLED DIGITAL LENDING" THEORY

77.     Internet Archive did not publish a formal legal theory to justify its scanning and republication of in-copyright books without permission until 2017.  As Kahle stated in the

37

"Universal Access to Knowledge" speech he gave in 2006, Internet Archive had "found that if you put things out there in a nonprofit setting, it works for people in the sense that they don't gripe. The idea of opt-out as opposed to opt-in – putting it up and then if somebody complains, taking it down – works very well in these sorts of communities. I would suggest being a bit bold and making things available..." (Exhibit 49 at PLAINTIFFS0001113.)

78.     By 2015, the Copyright Office had issued a report concluding that "[t]here is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety." (A true and correct copy of U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) is annexed hereto as Exhibit 119.) The previous year a subcommittee of the Judiciary Committee of the House of Representatives held hearings about the first sale doctrine, including on whether to adopt a digital first sale doctrine, with strong opposition to a digital first sale doctrine from the Association of American Publishers and others. (A true and accurate copy of the hearing transcript is annexed hereto as Exhibit 120.) While the subcommittee announced reforms for the Copyright Office and Congress passed the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, the Copyright Act was never amended to recognize a digital first sale defense.

79.     In 2017, Internet Archive was in the running for a $100 million grant from the MacArthur Foundation, which Internet Archive intended to use to "turn 80% of library collections digital by 2023." (A true and correct copy of relevant excerpts from the transcript of the October 18 and 19, 2021 deposition of Lila Bailey (the "Bailey Tr.") is annexed hereto as Exhibit 121.) (*See id.* at 130-38; *see also* Exhibit 46 at INTARC00151089.) Internet Archive's in-house policy counsel testified that "as part of the grant proposal, barriers to solving the problem are identified. One of the significant barriers to libraries being able to loan out their digital collections was …

38

copyright uncertainty, lack of clarity in the law." (Bailey Tr. 130:15-19.) The need to articulate a legal theory behind IA's practices in the application for the McArthur grant is "what precipitated having a meeting in May of 2017 concerning Controlled Digital Lending." (*Id*. at 130:3-8.) Internet Archive convened the "Open Libraries Copyright Workshop" on May 23-24 to "consider the digitize and lend model that the Internet Archive is proposing to expand through the MacArthur Foundation's 100%Change grant." (Exhibit 46 at INTARC00151184.) The Workshop was led by one of IA's advisors for the grant, the copyright scholar Pamela Samuelson, and was "modeled after a meeting that she did around the Google books case." (Bailey Tr. 129:19-22.)

80.     As per Bailey, Samuelson "wanted to basically have an open discussion, an academic discussion with other scholars and library practitioners who understood how libraries were engaging in this practice." (Bailey Tr. 130:22-25.) The participant roster for the Workshop submitted as part of the MacArthur Foundation Application included Bailey, Kahle, two other Internet Archive employees, two of the lawyers that have appeared for IA in this action (Joseph Gratz and Corynne McSherry) and several other individuals who would be enlisted to formulate a lending theory – including David Hansen, Kyle Courtney, Jason Schultz, Mary Minow and Michelle Wu. (*See* Exhibit 46 at INTARC00151185.) Bailey admitted that she was not aware of "any copyright lawyers who represent copyright creators at this panel." (Bailey Tr. 134:18-135:3.)

81.     At a dinner shortly after the Workshop, Bailey "started talking about the idea of writing something up" with Courtney, Hansen and Wu. (*Id*. at 138:1-19.) Michelle Wu was a Georgetown law professor and librarian who was another advisor to Internet Archive for the McArthur Grant and, according to Internet Archive, "crafted the legal theory behind Controlled Digital Lending." (A true and correct copy of an October 20, 2020 blogpost announcing that Wu was awarded the Internet Hero Award for Establishing the Legal Basis for Controlled Digital

Lending is annexed hereto as Exhibit 122.)  Wu also was retained by Internet Archive as its counsel, but did not reveal that affiliation in her letter submitted in support of IA's MacArthur grant application. (*See* Exhibit 46 at INTARC0015123).  Kyle Courtney is a Copyright Advisor at Harvard University and David Hansen was the Lead for Copyright and Information Policy and Associate University Librarian at Duke University.  (A true and correct copy of a white paper on controlled digital lending by Courtney and Hansen (the "White Paper") is annexed hereto as Exhibit 123.)  Bailey has described Wu, Courtney and Hansen as "[f]riends of the Internet Archive."  (Bailey Tr. 115:6-10.)  At their dinner, Bailey and the "friends of the Archive" decided to draft "something short and easy for a non-lawyer to understand about the legal underpinning of Controlled Digital Lending."  (Bailey Tr. at 138:1-19.)  They subsequently decided to also publish a white paper that would address the legal issues more fully. (*Id*. at 138:5-10.)

82.     The MacArthur Foundation rejected the Internet Archive's application for the $100 million grant, but the project to draft a statement defining controlled digital lending (the "Statement") continued.  The core drafters of the Statement were IA's in-house counsel (Bailey), Courtney, Hansen, Wu, Mary Minow and Jason Schultz, a law professor at NYU.  (A true and correct copy of an email from Kyle Courtney to Wu, Bailey, Minow, Schultz and Hansen attaching a draft of the White Paper that "addressed nearly all of your comments, edits, suggestions, and grammatical insights" is annexed hereto as Exhibit 124)  Courtney and Hansen were also subsequently selected to draft the White Paper, which Bailey edited prior to publication.  On July 12, 2018, for instance, Bailey sent Courtney and Hansen an email with "higher level and structural thoughts," including revising the analysis of the first factor from stating that CDL is not transformative to indicate "that at least some stakeholders in the library community think CDL is transformative." (A true and correct copy of this email is annexed hereto as Exhibit 125.)  Bailey

40

also asked Courtney and Hansen to revise the fourth factor to "hit really hard on why the 6 controls are why we win on the market harm analysis" and emphasize cases under the third factor where wholesale copying was held to be fair use. (*Id.* at INTARC466830.) Bailey provided a further round of edits on August 3, 2018. (A true and correct copy of Bailey's August 3, 2018 email is annexed hereto as Exhibit 126.)

83. When asked about the status of the White Paper, Freeland stated that "IA is officially NOT leading the effort for the sake of being impartial." (A true and correct copy of Freeland's August 20, 2018 email is annexed hereto as Exhibit 127.) But, IA has otherwise stated that the project was "led by Internet Archive's legal counsel, Lila Bailey." (*See* Exhibit 46 at INTARC00151102.) When the release of the White Paper was delayed, Bailey wrote to the group to say that "[t]he Internet Archive has more than an academic interest in this moving forward" and that "it will be deemed a complete failure and waste of our time if it's not released by [an upcoming IA event]. I'm just being real about the impact of delay on my client (and potentially on my job if this isn't done… seriously guys)." (A true and correct copy of the relevant email from Lila Bailey is annexed hereto as Exhibit 128.)

84. Other scholars were consulted during the project for their thoughts on the draft Statement, including Peter Jaszi – a copyright expert and advisor to the Internet Archive who attended the Workshop. (*See* Exhibit 46 at INTARC00151184.) (A true and correct copy of an email copying Jaszi on an email from Internet Archive to "Open Libraries Advisors & Supporters" is attached hereto as Exhibit 129.) An IA blog post refers to Jaszi as one of Bailey's "heroes." (A true and correct copy of the relevant blog post is annexed hereto as Exhibit 130.) Jaszi wrote to at least one librarian to state that the draft Statement was a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursing the strategy" and that

41

controlled digital lending "serve[s] the institutional interests of the IA." (A true and correct copy of the relevant email from Peter Jaszi is annexed hereto as Exhibit 131.)

85.    The library copyright expert Kenneth Crews also identified a number of problems with the draft Statement. (A true and correct copy of the relevant email from Crews is annexed hereto as Exhibit 132.) For instance, he wrote that "CDL use is NOT identical to current physical lending." And he noted that if physical copies of books "are still available for non-circulating use, one could argue that you have doubled the number of readable and useable copies." (*Id*.)

86.    The Statement and White Paper on controlled digital lending were published simultaneously in September 2018. The Statement lists as co-authors Bailey, Courtney, Hansen, Minow, Shultz and Wu. (A true and correct copy of the Statement is annexed hereto as Exhibit 133.) The Statement does not disclose that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March of 2018. (Bailey Tr. 82:9-17; 90:14-24.) The Statement asserts that "[p]roperly implemented, CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. *Essentially, CDL must maintain an 'owned to loaned' ratio*. Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies." (Statement at INTARC00458737 (emphasis added).)

42

87.     The Statement further claims that "there are two main areas of copyright law that support CDL: the principle of exhaustion and the fair use doctrine." (*Id.*)  The primary thesis is that the "first sale" doctrine – which allows libraries to distribute lawfully acquired physical books – allows creating and lending digital files of the physical books because "any time there is a lawful transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or 'exhausted.'" (*Id.*)  The Statement further asserts, in the absence of a "directly analogous case on point," that "fair use and copyright exhaustion can work together to effectuate CDL practices." (*Id.*)  In essence, the Statement argues that controlled digital lending is not unlawful because the "purposes of library lending … all focus on socially beneficial outcomes that favor fair use" and because there is no market harm "because properly implemented CDL programs maintain an 'owned to loaned ratio' that is comparable to physical lending." (*Id.* at INTARC00458737-38.)

88.     The White Paper provides additional legal analysis and detailed advice on how controlled digital lending should be implemented.  The White Paper notes weaknesses to the controlled digital lending theory.  For instance, it acknowledges that there is a "considerable point of concern that CDL is not clearly transformative." (Exhibit 123 at INTARC00358262.)  The White Paper also acknowledges that in "mass digitization cases involving books – *Google Books* …, for example – courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses, such as text and data mining." (*Id.*)

89.     In terms of advice for practitioners of controlled digital lending, the White Paper stresses, with italics, that "libraries must truly exercise *control* in the process." (White Paper at INTARC00358246.)  Thus, steps must be taken to ensure that "[w]hen the digital copy is being

43

read by a patron, … the corresponding physical copy is restricted and unavailable for consultation" – for instance, by "rapidly removing [physical] books from open circulation" when the ebook copy is lent. (*Id*. at INTARC00358245, INTARC00358280.) Libraries must also "ensure that original works are acquired lawfully," "lend each digital version only to a single user at a time just as a physical copy would be loaned," "limit the time period for each lend" and "use digital rights management to prevent wholesale copying and redistribution." (*Id*. at INTARC00358246.)

90.     The White Paper also sets forth a number of "risk mitigation" measures that controlled digital lenders can implement to further reduce legal risk, including:

> a. adding artificial "friction" by extending the time between digital lends, more closely mirroring how physical books are lent and returned;
>
> b. "introduce characteristics that mimic physical degradation" (*e.g.*, each ebook can only be circulated a limited number of times;"
>
> c. limit the audience to "particular communities of users" (*e.g.*, students of an academic institution or "local residents") "to limit the overall reach of the copy and therefore the potential market effect;"
>
> d. only distribute older works published pre-1989 and public domain books;
>
> e. only distribute out-of-print or orphan works;
>
> f. only distribute highly factual books.

(Exhibit 123 at INTARC00358278-85.) Internet Archive's Policy Counsel testified that Internet Archive does not practice any of these risk mitigation suggestions. (*See* Bailey Tr. 219:7-229:1.)

91.     The Statement and the White Paper received significant criticism, including from the Association of American Publishers ("AAP") and the Authors Guild. The AAP released a "Statement on Flawed Theory of 'Controlled Digital Lending'" on February 4, 2019, which stated

44

that "AAP strongly disagrees with the analysis of the White Paper and its call to libraries to copy and transmit entire books to the public in disregard of the law. CDL not only rationalizes what would amount to systematic infringement, it denigrates the incentives that copyright law provides to authors and publishers to document, write, invest in, and disseminate literary works for the benefit of the public ecosystem." (A true and correct copy of the AAP's "Statement on Flawed Theory of 'Controlled Digital Lending'" is annexed hereto as Exhibit 134.)

92. The Authors Guild released a statement on January 8, 2019 entitled "Controlled Digital Lending is Neither Controlled nor Legal." (A true and correct copy of the Author's Guild's "Controlled Digital Lending is Neither Controlled not Legal" statement is annexed hereto as Exhibit 135.) In their statement, opposing CDL, the Authors Guild noted that Internet Archive had "started rejecting notices sent by Guild members asking for unauthorized digital copies of their books to be taken down, citing that it 'operates consistently with the "Controlled Digital Lending [sic].'" (*Id.*)

93. The Authors Guild statement explained that Internet Archive's "threat to author income and the ebook market comes from two directions: 1) unauthorized scanning and e-lending of books that were previously published only in physical formats would usurp the market for creating new ebook versions; and 2) instead of purchasing library ebook licenses (which are more expensive than consumer editions for good reason), libraries would simply digitize the print book from their collection, depriving authors and publishers of important licensing income." (*Id.*) "Needless to say," the statement continued, "if Internet Archive's plans to expand Open Library to all libraries are realized, it would eventually decimate the market for library ebooks, put a massive dent in the ebook market in general, and usurp authors' rights to bring their older works back to the market." (*Id.*)

45

94.     IA's Director of Open Libraries, Chris Freeland, mocked similar complaints from an English authors' union.  After Tom Blake, a librarian at the Boston Public Library, forwarded him emails from the union's chief executive complaining that CDL "prevent[s] [authors from] making a living by licensing the content of [their] work," Freeland wrote, "Nice that they included their real interest: 'negotiate and purchase lending licenses from the copyright owners.'"  (A true and correct copy of emails from Freeland to Boston Public Library Librarian Tom Blake are annexed hereto as Exhibit 136.)

95.     In December 2018, the Second Circuit issued its decision in *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 659 (2d Cir. 2018), in which the Court, among other things, rejected the first sale doctrine as a basis for reproducing used music files, finding that "[u]nauthorized reproduction is not protected by" the first sale doctrine and that "the making of such reproductions is not a fair use."

96.     Jonathan Band, who is counsel for the American Library Association ("ALA"), submitted an amicus brief to the Second Circuit in *ReDigi* on behalf of Internet Archive, the ALA and others.  (A true and correct copy of the Internet Archive's amicus brief is annexed hereto as Exhibit 137.)  The brief stated that, "[l]ike *ReDigi*, Open Library seeks to replicate in the digital realm the sorts of uses that are permissible with a physical copy of a work. . . ."  (*Id*. at p. 20.)  Band thus urged the court to hold that *ReDigi's* practices were covered by the first sale doctrine or fair use "to spur investment and innovation in digital services by libraries" – including Internet Archive's "platform that makes millions of books available in various formats, and with varying degrees of technical restrictions on copying and further distribution."  (*Id*. at p. 19-21.)  The brief explained that "A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library."  (*Id*. at p. 5.)  After

46

the *ReDigi* decision came down, Band published an article stating that it "raises questions concerning the viability of Controlled Digital Lending … by libraries," which "must be carefully reevaluated in light of this decision." (A true and correct copy of Band's article entitled "The Implications of the ReDigi Decision for Libraries" is annexed hereto as Exhibit 138.) Band warned that, "the decision calls into question the theoretical underpinnings of CDL. Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment. Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis." (*Id*.)

97. Despite these concerns expressed by its own counsel in the *ReDigi* matter, Internet Archive has not made significant changes to its practices in response to *ReDigi*.

98. While some public libraries and individuals became "Signatories to the Position Statement on Controlled Digital Lending by Libraries," academic libraries were the majority of signatories. (A true and correct copy of the list of "Signatories to the Position Statement on Controlled Digital Lending by Libraries is annexed hereto as Exhibit 140.) Of the 9,000 public libraries in the United States, which tend to have widely circulating collections of general interest books and circulate high volumes of authorized ebooks, only a handful endorsed the Statement. (*See id.*) Many copyright experts, including Band, Crews and Jaszi, did not sign on to the Statement. (*Id.*) Nor did the American Library Association. (*Id.*) And the MIT Press, which allowed IA to digitize some of its backlist books, also declined to become a signatory because "being able to monetize digital sales of trade books and text books is currently a significant part of what allows us to survive as an [open access] friendly mission driven publisher." (A true and correct copy of relevant emails from Amy Brand, Director of MIT Press, is annexed hereto as Exhibit 141.) (*See also* email from Hansen to Bailey, Wu, Minow, Courtney and Schultz

indicating that Brandon Butler, an early signatory of the statement, wished to remove his name, a true and correct copy of which is attached hereto as Exhibit 142.)

### INTERNET ARCHIVE IMPLEMENTS AND MARKETS THE OPEN LIBRARY PROJECT

99.     Starting in about 2019, Internet Archive marketed its Website and CDL to libraries in connection with their outreach concerning the Open Libraries project (*see, supra* at ¶¶67-76) by relying on the Statement and White Paper to provide assurances on the legality of the project.  For instance:

    a.  On November 28, 2018, Chris Freeland sent an email to Janet Snowhill, the System Librarian for Chemeketa Cooperative Regional Library Service, following up on a solicitation to participate in Open Libraries to inform her of the publication Statement and White Paper.  (A true and correct copy of this email is attached hereto as Exhibit 143.)

    b.  On March 3, 2019, Chris Freeland sent an email in response to a question from Kristy Draper, the Digital Project Manager at Houghton Mifflin Harcourt about the security of IA's ebook storage by informing her that  "The team of copyright experts that authored the white paper on Controlled Digital Lending have just published an FAQ that addresses file security.")   (A true and correct copy of these emails is attached hereto as Exhibit 144.)

    c.  Internet Archive published a blog post on July 29, 2020 stating that "CDL is a respectful and secure way to bring the breadth of our library collections to digital learners… Publishers are seeking to shut this library down, claiming copyright law does not allow it.  Our response is simple:  Copyright law does

not stand in the way of libraries' rights to own books, to digitize their books, and to lend those books to patrons in a controlled way." (Exhibit 9.)

d. In February 2019, Internet Archive convened a panel at the Boston Public Library "to seek to educate the public on the work of the Internet Archive and Open Libraries" and the event description stated that "[t]hrough controlled digital lending, libraries can make twentieth century scholarship available that is largely absent from their digital holdings in a way that respects the rights of authors and publishers." (A true and correct copy of the event description for the panel is annexed hereto as Exhibit 145.)

e. A July 1, 2019 blogpost by Kahle stated that "[w]e believe that every library can transform itself into a digital library. If you own the physical book, you can choose to circulate a digital version instead." (Exhibit 64.)

f. Another Internet Archive presentation entitled "How Controlled Digital Lending Works for Libraries" contained a slide stating that "Controlled digital lending is a longstanding widespread library practice that you can use to help your patrons access digitized books. The Internet Archive has more than 1.8M digitized books you can claim & offer your patrons today. Your library can participate by joining Open Library." (Exhibit 72.)

g. A February 11, 2021 "mythbusting" panel that "dispelled myths about CDL" by emphasizing "the limited and controlled aspect of the practice" and describing fair use as a "superpower" that "allows libraries to responsibly lend materials, and experts say logically includes both print and digital works [sic]." (A true and correct copy of the February 11, 2021 blogpost entitled

49

"Mythbusting Controlled Digital Lending: Community Rallies to Fight Misinformation About the Library Practice" is annexed hereto as Exhibit 146.)

100.    Internet Archive does not indemnify Partner Libraries for liability arising from its infringement.  As Freeland wrote to a librarian at Duke University, Kahle "generally gets allergic to indemnification clauses…"  (A true and correct copy of the relevant email from Freeland is annexed hereto as Exhibit 147.)  At least four Partner Libraries have withdrawn from the Open Libraries project since this action was filed. (*See* Exhibit 114.)

101.    Internet Archive confirms that the "most critical" principle of CDL is the owned-to-loaned principle.  (Freeland Tr. 224:24-225:4.)  To comply with the "owned-to-loan" principle, a "library may only loan simultaneously the number of copies that it has legitimately acquired." (Statement at INTARC00458736.)   But the overlap analysis conducted as part of the Open Libraries project enables libraries to "pool[] their physical collections in order to make more lendable copies of digital books available…" (Exhibit 100.)  Or, as Freeland put it in an email to a librarian, "libraries put one copy in for our matched records (even if you have multiple copies), and those counts are added to a pool for a given book.  When a patron checks out a book, they are checking out a copy from the pool, not an individual library; for a variety of reasons, including reader privacy, we don't connect the circulation back to an individual library." (A true and correct copy of emails between Freeland and Kevin French is annexed hereto as Exhibit 148.)

102.    Internet Archive admits that a match under the overlap analysis will "increase the number of concurrent borrowers by one, independent of the number that [the Partner Library] ha[s] in the library."  (Kahle Tr. 204:21-22.)  It further acknowledges that this means that if three Partner Libraries contributed a book to the concurrent lending count under an overlap analysis and one of those libraries, for instance the MIT Library, only had one physical copy, three MIT patrons would

50

A-1124

be able to read the ebook on the Website at once. (*Id.* at 205:23-207:16.) As Freeland testified, the overlap analysis dictates that, "under controlled digital lending, if a hundred Partner Libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously." (Freeland Tr. 65:2-15.) And "if there were a thousand libraries that had the same book and put them into controlled digital lending," Internet Archive could lend one thousand copies regardless of how many physical copies it owned. (*Id.*) Freeland also conceded that the overlap analysis allows Partner Libraries to loan more copies than they individually own (Freeland Tr. 92:24-94:13) – which creates inevitable "more loaned than owned" scenarios.

103.    With its Open Libraries project, Internet Archive has turned itself into a centralized hub for ebooks by dropping geographic limits, "pooling" books to increase concurrent lending caps and encouraging libraries to incorporate links to ebooks on the IA Website regardless of what is in that particular libraries actual holdings. Under the current system, "[a]ll users have equitable access to the materials [Internet Archive] lend[s]. When a library adds a copy into [the] lending counts, that book can be checked out by any user." (A true and correct copy of emails between Chris Freeland and Ellen Finnie, Hear of Scholarly Communications & Collections Strategy for MIT Libraries, is attached hereto as Exhibit 149.) Even non-partner libraries can integrate links to Internet Archive ebooks into their websites. (A true and correct copy of a July 30, 2020 blog post on archive.org is attached hereto as Exhibit 150.) (*See id.*, "To be clear, you don't have to join the program to access our books. Anyone can link to our books right now.")

104.    Librarians have identified concerns with these practices. A librarian at Fordham University, for instance, contacted Internet Archive in July 2020 about the possibility of "digitiz[ing] approximately 450 volumes … to support CDL for distance learning." (A true and correct copy of relevant emails between Freeland and Michael Weiss, Assistant Director of

51

Technical Services at Fordham University Libraries is annexed hereto as Exhibit 151.) The Fordham librarian specifically flagged that "[t]hese are largely or entirely in-copyright books, so the scans could not be made public, and will only be released to our users in proportion to the number of physical copies which we have embargoed." (*Id.* at INTARC00445587.) In response, Freeland replied "[t]hat's not how our implementation of CDL *currently* works – we lend to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into CDL by particular users, so there's no way for us to limit use to only your patrons." (*Id.* at INTARC00445585.)

105. Similarly, Freeland received an inquiry from Wendy Knapp, the Deputy Director of Indiana State Library, asking whether its copies of a book, in this case *Slaughterhouse Five*, "would be added to the total number of copies in OpenLibrary.org" or whether those books would start "a new waitlist just for Indiana patrons…" (A true and correct copy of the email exchange between Freeland and Knapp is annexed hereto as Exhibit 152.) Freeland responded that the Indiana State Library's copies "would decrease the waitlist and be loaned to all users" of IA's website. (*Id.*) Indiana's Deputy Director responded that her Library "still have hesitation around the idea that a format shift has not been indisputably set as a fair use" and declined to join as an Open Libraries Partner Library. (*Id.*)

106. Internet Archive also admits that it exercises no actual controls over Partner Libraries that join the Open Libraries project, even though CDL instructs that "libraries must truly exercise *control* in the process." (*See* White Paper at INTARC00358246.) Specifically, IA admits that it does nothing to require that the Partner Libraries who contribute books to the concurrent lending count ensure that the physical copies remain locked down while the ebooks circulate. The Open Libraries Form, for instance, contains no provisions on how libraries implement CDL

52

because Internet Archive considers this to be a "local decision." (A true and correct copy of the Open Libraries Form is attached hereto as Exhibit 153.) (*See id.* at INTARC00142704.) In response to an email from a librarian expressing "concern[] about being in compliance," Freeland wrote that "how libraries limit circulation for books in CDL is a local decision made by the library… [Some] libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all our digital copies and all the physical copies across our network of partners are all checked out at the same time." (*See* Exhibit 148.) Thus, as Freeland testified, Internet Archive "was aware … that some partner libraries did not suppress circulation when they agreed to bec[o]me a partner library and put their books into controlled digital lending." (*See id.*)

107.    Internet Archive also acknowledges that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously." (Freeland Tr. 174:3-175.) Nor does it know how Partner Libraries store the physical books counted in the overlap analysis. (*Id.* at 114:15-25.) Freeland is also aware that even if a library puts a physical book into a non-circulating reference collection, it could be read in the library while the ebook equivalent is checked out. (*Id.* at 171:6-172:18.) There is also no technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating. (*Id.* at 166:23-167:2.) And Internet Archive has never "taken any action against a library that did not suppress circulation properly." (*Id.* at 174:24-175:3). IA's founder has testified that "monitoring" libraries would amount to "hav[ing] people going and snooping around," which it will not do. (Kahle Tr. 173:4-11.)

<div align="center">53</div>

108.     According to the Open Libraries Form, Internet Archive requires Partner Libraries
to submit their catalogues on a "quarterly" basis so that Internet Archive can re-run the overlap
analysis to periodically add new books that the library acquired and subtract books that dropped
out of the collection as a result of weeding.  (*See* Exhibit 153.)  In fact, IA admits that in the first
years of the Open Library project it did not "require updates at a specific time frame" and
"sometimes Internet Archive did annual updates" depending on "the library's preferences."
(Freeland Tr. 106:5-19.)  Internet Archive also does nothing to ensure the accuracy of the
catalogues it receives, but rather "depends on our partners for verifying the data."  (Freeland Tr.
62:11-17.)  While IA began to run the overlap analysis on a monthly basis after this action was
filed (Freeland Tr. at 105:22-24; 107:24-108:4), it still does not require Partner Libraries to inform
it when they weed out books and no longer physically own the titles. (*See* Freeland Tr. at 108:15-
109:3.) This means that concurrent lending counts for an ebook could routinely exceed the number
of Partner Libraries with that physical book in their collection.  (*Id*.)  Internet Archive also does
not "audit library collections to ensure that the library still owns the physical copy it's lending
against" because, as Kahle put it, the "Internet Archive doesn't snoop around dumpsters or things."
(Kahle Tr. 176:7-11.)

109.     There are also flaws in the overlap analysis that lead to inflated concurrent loan
caps due to certain inaccurate or not properly organized data and metadata  (*See* Foster Decl. ¶ 86.)
As a blog post inviting users to "Volunteer @ Open Library" put it, "Open Library's book catalog
has millions of books and thousands of data errors.  Sometimes author names are misspelled, book
covers are missing, or works and authors are duplicated or conflated."  (A true and accurate copy
of the blog post is annexed hereto as Exhibit 154.)

**INTERNET ARCHIVE'S VARIOUS AND SHIFTING POLICY RATIONALES FOR ITS
ACTIVITES ARE NOT SUPPORTED BY THE EVIDENCE**

54

110.    When seeking to garner support, participation from libraries, or funding, Internet
Archive has claimed that CDL advances numerous important public interests – such as digitizing
older books that do not exist as authorized ebooks, catering to the visually impaired, serving rural
communities and enabling datamining – but these interests are not reflected on the homepage of
openlibary.org,, which reads that the Website is to enable anybody in the world to "Read Free
Library Ebooks Online," including the "[m]illions of books available through Controlled Digital
Lending."  (*See* Exhibit 12.)

111.    Internet Archive asserted in the first paragraph of the Executive Summary to its
application for the $100 million McArthur Foundation grant that "there's almost a century of
knowledge still living only on the printed page, missing from our digital shelves."  (Exhibit 46 at
INTARC00151088.)  In 2018, Kahle wrote to the Librarian of Congress, Carla Hayden, stating
that controlled digital lending was "a way to get 20th century books onto the net respectfully."  (A
true and correct copy of a relevant email dated September 27, 2018 from Kahle to Hayden is
annexed hereto as Exhibit 155.)  In that email, Kahle also forwarded a blog post by Courtney and
Hansen to the Librarian of Congress, Carla Hayden, stating that the goal of controlled digital
lending is "particularly to help address access to the large number of books published in the '20th
Century black hole' that have little hope of otherwise being made available to readers" (*Id*.)  More
specifically, the "black hole" refers to the gap between the date when books enter the public
domain (currently 1926) and "the 1990s."  (*See* Exhibit 64 at p. 2.)

112.    The evidence shows, however, that Internet Archive actively seeks to post popular
and widely read books.  Kahle stated in "Transforming Our Libraries into Digital Libraries paper,
that "[t]he Internet Archive, working with library partners, proposes bringing millions of books
online, through purchase or digitization, *starting with the books most widely held and used in*

55

*libraries and classrooms*." (*See* Exhibit 101 (emphasis added).)  He continues, "[f]or the books we can not [sic] buy in electronic form, I am proposing a collaborative effort to select and digitize the most useful books of the 20th *and 21st centuries*." (*Id*. (emphasis added).)

113.    Internet Archive's focus on popular books and genres is reflected in the homepage for its Website, which lists books in categories like "Trending Books," "Romance," "Thrillers," "Kids," "Classic Books" and "Books We Love." (*See* Exhibit 12)  There is no category on the homepage for "Lost 20th Century Books" or anything similar. (*Id*.)  The "program lead for OpenLibrary.org," Michael "Mek" Karpeles, confirmed that "there are tens of thousands of readers on Open Library who are looking for romance novels, self-help books, kids books, and modern thrillers." (A true and correct copy of the relevant email from Karpeles to Cheng is annexed hereto as Exhibit 156) (A true and correct copy of relevant portions of the transcript of the October 27, 2021 deposition of Michael "Mek" Karpeles ("Karpeles Tr.") is annexed hereto as Exhibit 157.) (*See id.* at 242:6-242:18.)

114.    Nor does the data support IA's suggestion that its Website primarily stocks mid-20th Century titles.  The breakdown of ebooks by publication date on the Website shows that 78.9% of the in-copyright books were published after 1980 and only 6.2% of those books were published before 1963. (A true and correct copy of a spreadsheet of publication year data from archive.org/details/inlibrary is annexed hereto as Exhibit 158.)

115.    Internet Archive has represented that it "limits its digital lending to books published in the past five or more years." (A true and correct copy of IA's pre-motion letter for its summary judgment motion in this case is annexed hereto as Exhibit 159.)  But, two of the Works in Suit – *All the Presidents' Women* and *The Man Who Solved the Market* – were published in 2019 and republished on the IA's Website that same year. (*See* Foster Decl. ¶ 67.)  Further, the remaining

56

Works in Suit were all published more than five years before the action was filed and continue to be significant sources of revenue for their authors and the Publishers. And OverDrive's evidence documents that the sales of a particular work can spike years after the book is first published. As but one example, the book *Crazy Rich Asians* saw an enormous spike in popularity – including increased demand for library ebooks – when a major motion picture version was released five years after the book was first published. (A true and correct copy of Exhibit 13 to the Deposition of Steve Potash, reflecting OverDrive checkout data, is attached hereto as Exhibit 160.)

116. Another example is the book "The 5 Simple Fixes That Will Make You Healthy, Fit, and Eternally Awesome," by Darin Olien, which was published by an imprint of HarperCollins in February 2015. For the first five years after it was published, the title had been checked out by library patrons across the United States in the low double-digits (and sometimes in the single digits) each month. (*See id.*) Then, in July 2020, checkouts spiked – eventually resulting in nearly 700 checkouts in September 2020 alone. The increased interest in the book – over five years after its publication – coincided with the July 2020 release of the Netflix series "Down to Earth with Zac Efron," in which the famous actor Zac Efron would promote the "5 Simply Fixes" book at the beginning of each episode. (A true and correct copy of a July 10, 2020 *Men's Health* article titled "Darin Olin is More than Zac Efron's Travel Partner in Netflix's *Down to Earth*" is annexed hereto as Exhibit 161.)

117. The Internet Archive also has represented to the Librarian of Congress that controlled digital lending is "not meant to be a competitor to *Overdrive*, nor a replacement for licensing e-books of best-sellers or other currently licensable e-book content." (A true and correct copy of a September 27, 2018 email from Kahle to Carla Hayden of the Library of Congress is attached hereto as Exhibit162.) This representation is not consistent with the representations that

57

IA made to libraries that participation in the Open Libraries project means "free ebooks for your patrons" with "no cost involved." (*See* Exhibit 104; *see also* ¶71 *supra*.) Freeland has also testified that Internet Archive "add[s] ebooks" to the Website that are "available to purchase commercially or to license to libraries." (Freeland Tr. 85:17-25.) Internet Archive does not do anything "to make sure that the books they add to the Open Libraries projects are not yet available in digital form" and does not "instruct libraries to segregate out books that are otherwise available in digital form." (*Id*. at 85:3-9.) The 127 Works in Suit – which are all available as authorized library ebooks – were republished as unauthorized ebooks on the Website, together with 33,000 other titles available from the Publishers in digital formats. (*See* Foster Decl. ¶¶ 110-115.)

118. Any claim that Internet Archive is supposed to be different from aggregators like OverDrive is undermined further by the striking similarity between the two platforms. The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebooks via OverDrive. (A true and correct copy of the OverDrive homepage for the Detroit and Austin Public Libraries is annexed hereto as Exhibit 163.) (*Compare* Exhibit 12, Open Library homepage). Both websites display rows of thumbnail book covers available to be "borrowed," organized into categories of general interest such as "Trending" books. (*Id*.)

119. Internet Archive has acknowledged that its Website competes with distributors of the Publisher's authorized ebooks. Karpeles wrote an email stating – and confirmed at his deposition – that "reality has it that we are competing for eyeballs with Amazon, Goodreads (45M monthly users), Overdrive, OCLC Worldcat, and countless other websites…" (*See* Karpeles Tr. 19:16-21; 240:24-242:5.) Karpeles also created a document listing the library ebook aggregators OverDrive and Hoopla, as well as the ebook retail platforms Amazon and Google Books – all of which make available the Publishers' full list of works – as "similar services" to Internet Archive.

58

(A true and correct copy of the "Open Library Design Ecosystem" document is annexed hereto as Exhibit 164.) (*See id.* at pp. 2-3.)

120.    Internet Archive's witnesses also admit that the ebooks on the Website can be used as substitutes for authorized ebooks.  For instance, Internet Archive's library expert, Susan Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL."  (Hildreth Tr. 226:24-4.) Hildreth further testified that "I think it could be likely that with CDL materials meeting some patron requests, the result that [sic] the library would not necessarily have to license the specific title to make patron demand, they would be able and it is likely that they would purchase additional e-materials … to meet other patron demand."  (*Id*. at 43:8-45:5.)  Hildreth acknowledged "that a specific author would not receive a royalty for a specific title" if revenue was shifted in this way. (*Id*.)  Finally, Hildreth admitted that "certainly some [ebooks]" on the Website "could be read in an hour."  (*Id.* at 254:17-255:1)

121.    Internet Archive users view the Website as a substitute for authorized library ebooks.  A user of Internet Archive testified that he read an ebook on IA's Website that he could have read in an authorized ebook format through his university library because "it didn't matter to me … whether I was using Internet Archive or [the authorized platform]… [I]t didn't … matter to me.  Or it didn't factor into my thinking because I was more concerned with getting these materials I needed…"  (A true and correct copy of relevant portions of the transcript for the April 6, 2022 deposition of Daniel Smith ("Smith Tr.") is annexed hereto as Exhibit 165; *see* Smith Tr. 73:4-77:16.)  Another Internet Archive user who writes blogs distributing links to ebooks on Internet Archive testified IA's Website is one of "lots of ways to acquire books" but she would not incorporate links to authorized library ebooks to her bibliographies because their distribution is

59

limited to members of particular public libraries, whereas Internet Archive is accessible to anybody in the world. (Gibbs Tr. 112:25-116:12; 122:11-123:22.)

122. Internet Archive also emphasizes that the ebooks on its Website serve the needs of print disabled users and stated in the Executive Summary of the MacArthur Foundation application that "[w]orking with US libraries and Benetech, operator of the world's largest digital library for people with disabilities that impact reading, the Internet Archive (IA) will bring millions of free digital ebooks to billions of people. For the blind, ebooks are a lifeline…" (*See* Exhibit 46 at INTARC00151088.) But the vast majority of Internet Archive users are not print disabled. Only 2 print disabled users were added in 2017 and, by 2021, there were only 10,891 such users – which is less than 0.2% of the accounts currently registered with the Website. (*See* Exhibit 114, Response to Interrogatory 16.) Moreover, the needs of print disabled readers are already served by HathiTrust, which "provides print-disabled patrons with versions of all of the [20 million +] works contained in its digital archive in formats accessible to them" – and, unlike Internet Archive, HathiTrust truly focuses on the print disabled by prohibiting the general population from accessing full ebooks. *Authors Guild, Inc., v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014).

123. Internet Archive also stated in the Executive Summary of their application for the MacArthur Foundation grant that by "digitizing millions of books, we unlock them for communities with limited or no access" – particularly "people in rural areas." (*See* Exhibit 46 at INTARC00151088.) But Internet Archive does not target particular geographic locations because "someone could sign up from anywhere in the world." (Freeland Tr. 177:7-12.) Internet Archive also has acknowledged that it would not know whether a user checking out an ebook from the Website "was coming from New York City or coming from some small town in Upstate New

60

York" because Internet Archive only maintains "state- or country-level" geographic data about users. (*Id*. at 117:5-25.)

124.    When commenting on the Statement, the library copyright expert Kenneth Crews noted that the argument that CDL is particularly necessary to serve individuals in rural areas is "not very convincing.  Many rural communities are well served.  Sometime[s] the biggest need is in the cities, where parking is miserable, and realistically students and profs are doing their research at home." (*See* Exhibit 132.)  The founder of OverDrive testified that "many of the public libraries that are [his] customers … serve rural communities," "serve disabled communities," "serve poor communities or impoverished communities" – including by OverDrive making donations when appropriate.  (*See* Potash Tr. 172:23-173:12.)  National data indicates that rural communities have seen more growth and value from authorized library ebooks than libraries serving more densely populated districts.  (A true and correct copy of the Institute of Museum and Library Services report entitled "The Use and Cost of Public Library Materials" is annexed hereto as Exhibit 166.)

125.    Further, in many rural states, the state-wide or regional library systems pool their resources to collectively license ebooks that are made "available to all residents of that state, whether urban or rural" and "creates greater availability to all types of potential readers, whether they be rural or disabled or poor or whatever." (Potash Tr. 191:6-9, 20-23.)  Many rural libraries make use of this opportunity to lend on a state-wide basis or as part of regional consortia.  (A true and correct copy of the webpages reflecting the North Dakota Digital Consortium, Mississippi eBook Library Partnership, Oklahoma Virtual Library, and the Idaho Digital Consortium) is annexed hereto as Exhibit 167.)

61

126. Internet Archive also has indicated in its MacArthur Foundation application that the ebooks on its Website can be used for data or text mining because "[a] digital repository of more than four million books and related metadata creates a dataset of great interest to researchers and data scientists." (Exhibit 46 at INTARC00151100; Answer at p. 2). But Freeland testified in his capacity as Internet Archive's 30(b)(6) witness on this topic that he does not know "what percentage of users engage" in those practices and knows of only three projects that could be described as datamining. (Freeland Tr. 204:10-208:25.)

### THE NATIONAL EMERGENCY LIBRARY

127. On March 24, 2020, Internet Archive launched a "National Emergency Library" in the wake of COVID-19 pandemic shutdowns of libraries. (A true and correct copy of the March 24, 2020 blogpost announcing the National Emergency Library is annexed hereto as Exhibit 168.) The National Emergency Library drew from the same pool of ebooks that were previously available on the Website, but it "suppressed the wait-list function" – *i.e.*, "[d]id away with the one-to-one ratio." (Kahle Tr. 182:11-22.)

128. In practical terms, IA "did away with waitlists" and "did away with the one-to-one ratio" by raising the cap on concurrent loans to 10,000. (Freeland Tr. 223:5-20.) Demand for ebooks on the Internet Archive spiked after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels. For example, as of September 2019, IA reported over 2.7 million total "Members" of the Website; by April 2022, that figure had nearly doubled to over 5.5 million. (A true and correct copy of captures from the Open Library Stats page is annexed hereto as Exhibit 169.) Likewise, as of March 2020, IA reported that the number of "ebooks borrowed" "over the last 28 days" on the Website was 41,296; by July 2022, the number of ebooks borrowed over the last 28 days is listed as over 349,984 – a more than eightfold increase. (A true and correct

62

copy of captures from the Open Library home page reflecting this data is annexed hereto as Exhibit 170.)

129. Since Internet Archive did not require users "to certify that they were directly impacted by COVID-19" to access IA's ebooks on demand and without waitlists, anybody in the world with an internet connection could access the National Emergency Library. (Freeland Tr. 242:11-18.) Bailey wrote that this was because "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19." (A true and correct copy of Bailey's email containing this statement is annexed hereto as Exhibit 171.) And while Internet Archive offered rightsholders an option to "opt-out" by sending takedown requests, books that "were taken out of the National Emergency Library, … were not taken out of controlled digital lending." (Freeland Tr. 250:12-20.)

130. Internet Archive was aware that there were "copyright concerns" about the National Emergency Library. (Freeland Tr. 221:15-223:4.) Senator Tom Udall of New Mexico wrote to Maria Strong, the U.S. Register of Copyrights, to urge her "to examine the National Emergency Library that has been organized by the Internet Archive which is operating without typical library license and is causing authors in New Mexico concern about the integrity of their copyrights." (A true and correct copy of Sen. Udall's letter and Register Strong's response is annexed hereto as Exhibit 172.) Senator Udall noted that "[s]ince the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties." (*Id.*) But given the National Emergency Libraries distribution of ebooks without payment, he had "heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time." (*Id.*)

63

131.    In response, Register Strong explained that despite the Internet Archive's claim "that the books in the National Emergency Library 'focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook,' and which therefore would not be publicly available when schools and libraries are closed[,]" "the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists." (*Id.*)

132.    In her letter, Register Strong also explained that "[t]he types of materials included in the National Emergency Library, which include Stephen King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes" and that, as a general matter, "[t]he Copyright Office has also consistently expressed doubt that providing digital access to complete works can be considered a fair use." (*Id.*)

133.    Two days after the launch of the National Emergency Library, Alan Harvey, the Director of Stanford University Press made "a formal request to exclude all [its] content from the National Emergency library." (A true and correct copy of Harvey's email is annexed hereto as Exhibit 173.) He explained that "[w]e do not grant those rights to our content, and do not agree that the current coronavirus emergency constitutes an argument for copyright violation. To support the community during this crisis, we are in the process of making all our content more liberally available through the existing library aggregators, and responding to individual requests for content access." (*Id.*) In a subsequent email to Freeland, the Stanford University Press Director stated Internet Archive's practices were "entirely unacceptable" given that "IA simply grabbed everything without any discussion and the bad will is now oozing through us all." (*Id.*)

64

134.    On March 31, 2020, the Director the University of Minnesota Press wrote an email to Freeland stating that "the National Emergency Library goes further than we can legally or ethically allow." (A true and correct copy of this email is annexed hereto as Exhibit 174.) After noting that takedown requests had been sent, the Director stated that he would "be happy to discuss making limited Minnesota content available as part of the National Emergency Library, understanding that we *always* consult authors or rights holders before making such decisions – indeed, we've just done a round of that for course books we've made openly available for emergency course use on our Manifold OA platform. We'd also need some kind of binding legal agreement." (*Id*.)

135.    On April 2, 2020, the Executive Director of the Authors Guild, Mary E. Rasenberger, wrote to Kahle to "set up a time to talk" about the National Emergency. (A true and correct copy of Rasenberger's email is annexed hereto as Exhibit 175.) She wanted to "dispel any rumors you have heard that the Authors Guild is planning to bring suit…We are instead addressing this bold infringement by letting authors know how they can request IA to take their books down, and we hope to appeal to your decency in asking you to shut this ill-planned (even if well-intentioned) initiative down. There are plenty of other sources for books for students and teachers right now. We can help you point people to them." (*Id*.)

136.    Kahle's response:  "We talked before, and I felt deposed by a lawyer… I talked with multiple of your board members with no apparent effect. We are actively working with others and are making great progress. Wish us all luck, we are all trying to get a digital world that works for everyone." (*Id*.)  Internet Archive also ignored public complaints by the AAP. (*See* Exhibit 134.)

65

137. On April 8, 2020, PRH approved a request by a school for special COVID-19 class set pricing for *Interview with the Vampire* by Anne Rice and *Lolita* by Vladimir Nabokov. (A true and correct copy of the emails indicating PRH's approval of the request is annexed hereto as Exhibit 176.) But PRH was informed by OverDrive that "the school will not be moving forward with a purchase. They cited that they needed the materials more urgently and the professor was able to find both titles on the Internet Archive / DPLA site with simultaneous checkout so they used those versions." (*Id.*)

138. On April 14, 2020, Kahle wrote an email to the Executive Director of the Authors Alliance and Pamela Samuelson (who sits on its Board of Directors) to notify them that "the Authors Guild is going to be meeting with some staffers [in Congress] about copyright matters, and possibly about NEL as well. I thought I would alert you to this, as the Authors Alliance, I think, was formed to be at the table when these discussions were happening." (A true and correct copy of Kahle's email is annexed hereto as Exhibit 177.) Kahle himself is on the Advisory Board to the Authors Alliance and Dave Hansen – one of the White Paper's co-authors – is on the Staff. (A true and correct copy of the webpage for the Author's Alliance Advisory Board is annexed hereto as Exhibit 178.) Internet Archive asked the Authors Alliance to endorse the National Emergency Library but it ultimately did not "endorse the National Emergency Library." (A true and correct copy of an email from Brianna Schofield to Bailey, Samuelson and Freeland is annexed hereto as Exhibit 179.) (*See also* Freeland Tr. 255:5-24.)

139. Kahle also posted a blog post on April 14, 2020 entitled "The National Emergency Library – Who Needs It? Who Reads It? Lessons from the First Two Weeks." (A true and correct copy of the blog post is annexed hereto as Exhibit 180.) He wrote that "[W]e moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In

66

our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published. We hear your concerns and we've taken action: the Internet Archive has added staff to our Patron Services team and we are responding quickly to the incoming requests to take books out of the National Emergency Library. While we can't go back in time, we can move forward with more information and insight based on data the National Emergency Library has generated thus far." (*Id.*)

140.    Internet Archive ended the National Emergency Library on June 10, 2020, ten days after the Publishers filed this action and two weeks before the earliest possible date IA had previously announced for its closure. (A true and correct copy of the blog post announcing the end of the National Emergency Library is annexed hereto as Exhibit 181.) Kahle announced that Internet Archive would return to "traditional controlled digital lending" pursuant to overlap analysis, which it continues to practice to this day. (*Id.*)

141.    On September 4, 2020, the Executive Director of HathiTrust, Mike Furlough, declined an invitation from Kahle to speak on a panel called "Digital Lending in a Pandemic." (A true and correct copy of Furlough's email is annexed hereto as Exhibit 182.) During COVID-19, HathiTrust expanded access to its ebooks in the wake of school library closures but imposed "many limitations" that IA did not, including restrictions on access to "students, faculty and staff as designated by the affected institution" and "access ratios in proportion to the number of physical copies already owned by a given library that are temporarily inaccessible." (A true and correct copy of Skip Dye's email summarizing HathiTrust's and IA's approaches s annexed hereto as Exhibit 183.) (*See also* the terms for HathiTrust's Emergency Temporary Access Service a true and correct copy of which is annexed hereto as Exhibit 184.)

67

142.    Furlough declined the invitation to speak because "[i]f I am asked to define the difference between what we have done and what you have done and are now doing, I will end up pointing out that we have put a good many more *controls* on the service that you did for NEL or for ongoing lending … I may have to end up directly contrasting some things, which would implicitly suggest a criticism of your approach.  And we made some very different decisions – when we did our legal analysis, it pointed us in directions that are quite different from those you have taken.  And we did not feel that the methods you were employing were ones *we* could defend.  We didn't think we could rely on the same legal theories that you were relying on.  I'd rather keep all that to ourselves and not be quoted or paraphrased as suggesting that your actions are NOT defensible, especially at your own party."  (*See* Exhibit 182.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on July 7, 2022.

　　　　　　　　　　　　　　　　　　　　　　_/s/ Elizabeth A. McNamara __
　　　　　　　　　　　　　　　　　　　　　　ELIZABETH A. MCNAMARA

68

# McNamara Declaration

# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC, | : : : : |
| Plaintiffs, | : |
| -against- | : : : |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive, | : : |
| Defendants. | : |

20 Civ. _____

ECF Case

**COMPLAINT**

TRIAL BY JURY DEMANDED

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC

("HarperCollins"), John Wiley & Sons, Inc. ("Wiley"), and Penguin Random House LLC

("Penguin Random House"), by and through their attorneys Davis Wright Tremaine LLP and

Oppenheim + Zebrak, LLP, for their Complaint, hereby allege against Defendant Internet

Archive ("IA or "Defendant") and Does 1 through 5 as follows:

## **NATURE OF THE ACTION**

1.       Plaintiffs Hachette, HarperCollins, Penguin Random House, and Wiley

(collectively, "Plaintiffs" or "Publishers") bring this copyright infringement action against IA in

connection with website operations it markets to the public as "Open Library" and/or "National

Emergency Library."  Plaintiffs are four of the world's preeminent publishing houses.

Collectively, they publish some of the most successful and leading authors in the world,

investing in a wide range of fiction and nonfiction books for the benefit of readers everywhere.

All of the Plaintiffs are member companies of the Association of American Publishers, the

mission of which is to be the voice of American publishing on matters of law and public policy.

1

2.      Defendant IA is engaged in willful mass copyright infringement.  Without any license or any payment to authors or publishers, IA scans print books, uploads these illegally scanned books to its servers, and distributes verbatim digital copies of the books *in whole* via public-facing websites.  With just a few clicks, any Internet-connected user can download *complete* digital copies of in-copyright books from Defendant.

3.      The scale of IA's scheme is astonishing:  At its "Open Library," located at www.openlibrary.org and www.archive.org (together, the "Website"), IA currently distributes digital scanned copies of over *1.3 million* books.  And its stated goal is to do so for millions more, essentially distributing free digital copies of every book ever written.  Despite the "Open Library" moniker, IA's actions grossly exceed legitimate library services, do violence to the Copyright Act, and constitute willful digital piracy on an industrial scale.  Consistent with the deplorable nature of piracy, IA's infringement is intentional and systematic:  it produces mirror-image copies of millions of unaltered in-copyright works for which it has no rights and distributes them in their entirety for reading purposes to the public for free, including voluminous numbers of books that are currently commercially available.

4.      Books have long been essential to our society.  Fiction and non-fiction alike, they transport us to new worlds, broaden our horizons, provide us with perspective, reflect the ever-growing knowledge of humanity in every field, spark our imaginations and deepen our understanding of the world.  Yet, books are not self-generating.  They are the product of training and study, talent and grit, perseverance and creativity, investment and risk, and untold hours of work.

5.      The publishing ecosystem not only depends upon copyright law, it is historically intertwined with the founding of the United States.  In 1787, the Framers adopted the Copyright

Clause of the Constitution, explicitly authorizing Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., Art. I, §8, cl. 8. In 1790, the First Congress enacted the first Copyright Act, focused on incentivizing both the creation *and legal dissemination* of books, maps, and charts. Congresses ever since have carefully balanced copyright amendments to advance the public good and for more than 200 years have prescribed to authors a suite of enforceable exclusive rights to their writings—which publishers, in turn, encourage, invest in, license, and distribute to readers through bookstores, libraries, and a multitude of e-commerce platforms. In this process of publishing books that educate, entertain, and inspire the public, publishers rely not only on the exclusive rights that are their lifeblood, but on the expectation that Congress has carefully considered and appropriately tailored any limitations and exceptions to said rights.

6.     IA not only acts entirely outside any legal framework, it does so flagrantly and fraudulently. And it proceeds despite actual notice that its actions constitute infringement. For the avoidance of doubt, this lawsuit is *not* about the occasional transmission of a title under appropriately limited circumstances, nor about anything permissioned or in the public domain. On the contrary, it is about IA's purposeful collection of truckloads of in-copyright books to scan, reproduce, and then distribute digital bootleg versions online. IA's Website includes books of every stripe—from bestsellers to scholarly monographs, from entertaining thrillers and romances to literary fiction, from self-help books to biographies, from children's books to adult books. IA often suggests that the Website is limited to twentieth-century books, but this is neither accurate nor a defense. IA scans, uploads, and distributes huge numbers of in-copyright books published in both the twentieth and twenty-first centuries, including many books

3

published within just the past few years. IA's unauthorized copying and distribution of Plaintiffs' works include titles that the Publishers are currently selling commercially and currently providing to libraries in ebook form, making Defendant's business a direct substitute for established markets. Free is an insurmountable competitor.

7. Publishers have long supported public libraries, recognizing the significant benefits to the public of ready access to books and other publications. This partnership turns upon a well-developed and longstanding library market, through which public libraries buy print books and license ebooks (or agree to terms of sale for ebooks) from publishers, usually via book wholesalers or library ebook aggregators. IA's activities are nothing like those of public libraries, but rather the kind of quintessential infringement that the Copyright Act directly prohibits. Moreover, while Defendant promotes its non-profit status, it is in fact a highly commercial enterprise with millions of dollars of annual revenues, including financial schemes that provide funding for IA's infringing activities. By branding itself with the name "Open Library," it thus badly misleads the public and boldly misappropriates the goodwill that libraries enjoy and have legitimately earned.

8. IA defends its willful mass infringement by asserting an invented theory called "Controlled Digital Lending" ("CDL")—the rules of which have been concocted from whole cloth and continue to get worse. For example, at first, under this theory IA claimed to limit the number of scanned copies of a title available for free download at any one time to the number of print books of that title in its collection—though no provision under copyright law offers a colorable defense to the systematic copying and distribution of digital book files simply because the actor collects corresponding physical copies. Then, in the face of the COVID-19 pandemic, IA opportunistically seized upon the global health crisis to further enlarge its cause, announcing

4

with great fanfare that it would remove these already deficient limitations that were purportedly in place. Today, IA offers an enormous universe of scanned books to an unlimited number of individuals simultaneously in its "National Emergency Library." IA's blatant, willful infringement is all the more egregious for its timing, which comes at the very moment that many authors, publishers, and independent bookstores, not to mention libraries, are both struggling to survive amidst economic uncertainty and planning deliberatively for future, changing markets.

9.    Under whatever guise IA attempts to frame its massive infringement—whether adopting the invented CDL theory or filling the self-appointed role as "National Emergency Library"—its actions find no support in the Copyright Act. IA's defenses of its actions—both before and after the onset of the COVID-19 crisis—are baseless. First, while IA claims to serve an educational purpose, education has long been a primary mission and market of publishers. It is authors and publishers who create the books of scholarship and literature for educators, students, and other readers; IA creates nothing. IA plays no role in the hard work of researching, writing, or publishing the works or, for that matter, in creating or sustaining the overall publishing ecosystem and its distinct partnerships and markets. Nor does IA contribute to the underlying scholarship through commentary or criticism. Moreover, IA's massive book digitization business has no new purpose that is fundamentally different than that of the Publishers: both distribute entire books for reading. In short, Defendant merely exploits the investments that publishers have made in their books, and it does so through a business model that is designed to free-ride on the work of others. Defendant pays for none of the expenses that go into publishing a book and is nothing more than a mass copier and distributor of bootleg works. In so doing, IA undermines the balance and promise of copyright law by usurping the

Publishers' ability to license and sell the books that they have lawfully produced on behalf of authors and for the benefit of readers.

10. IA's self-serving assertion and promotion of "Controlled Digital Lending" as both an actual legal doctrine and a justification for its infringement affronts the most basic realities of the law and the markets it propels. As a matter of markets, IA's one-to-one conflation of print and ebooks is fundamentally flawed. Digital books are inherently different from physical books. They can fly around the world in a second; they do not degrade over time as physical books do; and they require devices to read them. For these reasons, the Publishers have established independent and distinct distribution models for ebooks, including a market for lending ebooks through libraries, which are governed by different terms and expectations than print books. IA's end-run around these differences and restrictions is aggressive and unlawful. In short, all of the reasons why IA has scanned print books to create digital files are the very same reasons why authors and publishers provide digital books under different terms than print books—as they are entitled to do under the Copyright Act.

11. No concept of fair use supports the systematic mass copying or distribution of entire books for the purpose of mass reading, or put another way, for the purpose of providing to readers the very thing that publishers and authors provide in the first place through lawful and established channels. IA does not add something new to the Plaintiffs' books, with a different purpose or character; thus, it cannot even begin to make the all-important showing that its use of the works is transformative. Separately, Section 109 of the Copyright Act is clear that, pursuant to the doctrine of first sale, the owner of a lawfully acquired print book may dispose only of her/his particular print copy. One who makes and distributes reproductions of that physical copy—such as IA's low quality scans—is well outside the bounds of the law.

6

12.     Nor do IA's efforts to brand itself as a library somehow imbue it with any right to digitize and distribute unauthorized digital copies of books.  Libraries are trusted institutions that serve the communities that fund them.  When Congress contemplated the making of digital copies by libraries under 17 U.S.C. §108, it engaged all relevant stakeholders and created a set of rational, targeted exceptions to infringement liability—exceptions that have no application to IA's actions.  As the Copyright Office observed in a relevant public study titled "Legal Issues in Mass Digitization" (October 2011), "The Section 108 exception does not contemplate mass digitization."

13.     The creation, publication, and distribution of books is an ecosystem.  IA disaggregates itself from this ecosystem, ignores the law, and asserts that its goal of providing free copies of books somehow excuses it from any responsibility to those who have created the works and hold exclusive rights under the Copyright Act.  Its goal of creating digital copies of books and providing them to whomever wants to download them reflects a profound misunderstanding of the costs of creating books, a profound lack of respect for the many contributors involved in the publication process, and a profound disregard of the boundaries and balance of core copyright principles.  IA does not seek to "free knowledge"; it seeks to destroy the carefully calibrated ecosystem that makes books possible in the first place—and to undermine the copyright law that stands in its way.

14.     In sum, IA's massive taking violates the Plaintiffs' exclusive rights under 17 U.S.C §106.  Plaintiffs bring this action to halt IA's assault on their rights.

### THE PARTIES

**A.      Plaintiffs**

15.     Plaintiffs are four of the leading book publishers in the United States.  Working closely with their authors, Plaintiffs source, develop, edit, publish, market, and distribute tens of

7

thousands of books per year, across the full spectrum of genres and topics.

16.     Plaintiff Hachette is a publishing company, organized under the laws of Delaware, with its principal place of business at 1290 Sixth Avenue, New York, NY 10104. With a history stretching back to 1837, Hachette works with bestselling authors who have been published all over the world.  Hachette books and authors have won Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals, and Nobel Prizes.  Its many publishing imprints include prominent brands such as Little, Brown and Company, Little, Brown Books for Young Readers, Grand Central Publishing, Basic Books, Public Affairs, Orbit, FaithWords and Center Street.

17.     Plaintiff HarperCollins is a publishing company, organized under the laws of Delaware, with its principal place of business at 195 Broadway, New York, NY 10007. HarperCollins has more than 200 years of history in the book publishing industry and the company now operates more than 120 imprints and brands in 17 countries worldwide.  Each year, HarperCollins publishes approximately 10,000 new books in more than a dozen languages and boasts a catalogue of more than 200,000 titles in print and digital formats.  Working across a wide range of genres, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among other honors.

18.     Plaintiff Penguin Random House is a publishing company, organized under the laws of Delaware, with its principal place of business at 1745 Broadway, New York, NY 10019. Penguin Random House can trace its history back to the mid-nineteenth century and one of its progenitors, Random House, published the first authorized edition of James Joyce's *Ulysses* in the English-speaking world, among other landmark titles.  The portfolio operated by Penguin

8

Random House has grown to encompass nearly 275 independent imprints and brands across five continents.  Penguin Random House publishes 15,000 new titles per year—catering to readers of all ages and at every stage of life—and sells close to 800 million print books, audiobooks, and ebooks annually.  It has published hundreds of the most widely read authors in the world.

19.     Plaintiff Wiley is a publishing company, organized under the laws of New York, with its principal place of business at 111 River Street, Hoboken, NJ 07030.  Founded in 1807, Wiley has over 200 years of experience publishing scientific, professional, and education books and journals in print and digital formats.  Wiley has published works by over 450 Nobel Laureates.  It publishes over 2,000 new books each year and currently offers over 120,000 titles.

20.     Plaintiffs are the copyright owners or owners of exclusive rights under copyright in, *inter alia*, each of the works listed in Exhibit A (the "Works"), on which they bring suit here.  Exhibit A is an illustrative, non-exhaustive list of in-copyright works that Defendant(s) infringed through the activities complained of herein.  Upon information and belief, all of the Works have been scanned and uploaded to the Website by IA.  All of these titles are commercially available.

21.     The Works represent a cross-section of the exceptional books that are made possible by a functioning publishing ecosystem, from perennial classic novels to more recent highly acclaimed works of non-fiction and everything in between.  Some of the greatest works of fiction ever published find their place among the Works in suit, including *The Lord of the Flies* by William Golding (winner of the 1983 Nobel Prize for Literature)*, Song of Solomon* by Toni Morrison (winner of the 1993 Nobel Prize for Literature), and *Their Eyes Were Watching God* by Zora Neal Hurston.  The Works also include *New York Times* bestselling authors like John Grisham and James Patterson and equally popular thrillers like *Gone Girl* by Gillian Flynn as well as hard-hitting contemporary novels, such as *The Miseducation of Cameron Post* by Emily

9

M. Danforth and *The Road* by Cormac McCarthy, which won the 2007 Pulitzer Prize for Fiction. Children's books are well-represented, from old favorites like *Little House on the Prairie* and *The Lion, The Witch and the Wardrobe* to more recent treasures, like the works of Lemony Snicket and *Escape from Mr. Lemoncello's Library*. Books for young adults are also included, like *Scat* by Carl Hiaasen and *The House on Mango Street* by Sandra Cisneros.

22. No less important than the works of fiction are the outstanding examples of non-fiction books represented by the Works. The Works contain multiple titles from the ever-popular "For Dummies" series, which have taught intrepid readers the basics of everything from oil painting to comparative religion. For those looking for success in business, the Works include books by the management guru Patrick Lencioni and books on investment by billionaire analyst Ken Fisher. Also included are Malcolm Gladwell's highly influential works on psychology and behavioral economics, a work by Nobel Peace Prize winner Elie Wiesel, and the well-loved *A Short History of Nearly Everything* by Bill Bryson.

**B.      Defendant**

23. Defendant IA is a 501(c)(3) corporation, organized under the laws of California, with its principal place of business at 300 Funston Avenue, San Francisco, CA 94118.

24. IA is registered with the New York Department of State to transact business and accept service of process within the State of New York. IA currently transacts business within the State of New York and this District by, *inter alia*, distributing digital copies of books (and other content) to New York residents over the Internet, by providing New York residents with services-for-a-fee related to the digitization of books, and by soliciting and accepting contributions from New York residents to further its digitization and distribution of books. In addition, certain Works were copied and digitized by IA in New York.

10

25.     IA harms the Publishers in this District because IA has copied and uploaded the Publishers' copyrighted books to its Website, including each of the Works in suit, without permission, and IA currently distributes copies to users of the Website, in New York or elsewhere.  Upon information and belief, many of the acts of copyright infringement committed by IA set forth in this Complaint occurred within this State and District—including illegal reproductions, distributions, public displays, and/or public performances.  Both the Publishers' economic and author relations damages are primarily felt in this State, where three of the Plaintiffs have their principal place of business and the fourth (Wiley) is incorporated.  IA knew it would cause injury to Publishers in this State and District, or it should have reasonably expected injury to occur here.  Indeed, IA acknowledges that in the last thirty days over 151,000 views on its site came from New York State, making New York the jurisdiction with the third highest IA views in the world.  *See* Internet Archive, Books to Borrow, https://archive.org/details/inlibrary?tab=about (last accessed May 29, 2020).

26.     IA derives substantial revenue from interstate and international commerce. According to public filings, IA has earned over $100 million in the last ten years from a national network of supporters, at least some of whom are based in New York, and from the services it sells to clients in New York and all over the United States, including industrial-scale book scanning services.

27.      Defendants Doe 1 through Doe 5 are certain individuals or entities whose true identities are not currently known to Plaintiffs.  Defendants Doe 1 through Doe 5, who are sued under fictitious names, are those who also may be responsible for the unlawful activities complained of herein.  (Doe 1 through Doe 5 do not include any public, university, or academic

11

libraries.) Once Plaintiffs ascertain their identities, Plaintiffs will seek leave of the Court to amend the Complaint to include Defendants Doe 1 through Doe 5 as named defendants.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action, which arises under the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq*., pursuant to 28 U.S.C. §§ 1331 and 1338.

29.     This Court has personal jurisdiction over Defendant pursuant to CPLR 302 because, *inter alia,* Defendant transacts business within the State of New York and supplies services in this State; because Defendant has committed tortious acts within the State of New York, including the direct and indirect infringement of Plaintiffs' exclusive rights in copyrighted books; and, because Defendant has caused injury to Plaintiffs in this State by allowing Internet users to download and view Plaintiffs' Works for free on the infringing Website and knew or reasonably should have known its acts would have consequences in this State, all while deriving millions of dollars in revenue from interstate commerce,.

30.     This Court independently has personal jurisdiction over Defendant pursuant to CPLR 301 because IA is registered to do business in the State of New York and has pervasive corporate ties to the State that are sufficient to justify the imposition of general jurisdiction here.

31.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

**A.      The Book Publishing Ecosystem**

**i.       Publishers and Authors Rely on Copyright Law to Create Functioning Markets for Books**

32.     Books are a cornerstone of our culture and system of democratic self-government and play a critical role in education.  Because books require so much time and effort to write and develop, they offer the promise of high-quality expression, important insights, and long-term

12

value to society.  But the qualities that make books among the most reliable conduits of learning and most intensive sources of creative expression come at a high cost.  Publishers are largely responsible for bearing these costs and, in doing so, act as leading defenders of free speech, promoters of literacy and scientific knowledge, and creators of the stories people thrive on.

33.     Authors devote great effort and care in researching and writing books, a skill which requires training and imagination.  It is not unusual for an author to spend years writing a single book of fiction or nonfiction.  Many authors, from the most celebrated *New York Times* bestsellers to new talents still making a name for themselves, write books for a living and rely on income from writing as their primary means of support.  Writing is an expert craft, but one that is commercially unpredictable.  Authors who find success with one book may benefit from renewed interest in and sales of their previous titles.  Copyright law supports this long potential by ensuring a lengthy term of protection, as well as licensing and sale possibilities.

34.     In the United States, publishing dates back to the dawn of our democracy.  Over hundreds of years, book publishers like Plaintiffs have invested in the talent of authors and developed unparalleled expertise in the art of publishing high-quality books by providing a variety of vital services including editing, marketing, and distribution.  Publishers expend the necessary resources, financial and otherwise, in reliance on the enforceable exclusive rights afforded by copyright law that make recouping expenditures possible.  The steadfastness of the law, in turn, promotes new technologies and new business models and distribution mechanisms by which to reach new audiences, no matter the circumstances.  Indeed, at a time of crisis such as we have now with COVID-19, the continued viability of publishing is more important than ever to society.

13

35.     The founders of this nation wrote a copyright clause into the Constitution to empower Congress to incentivize authors to create and publish their work, yielding a robust history of Copyright Acts that date to 1790 and have always squarely addressed the protection of books.  The Copyright Act of 1976—which enacts the constitutional imperative into law and balances the rights of readers with the rights of copyright owners—enables authors to profit from writing books by granting them the legal right to control the reproduction, distribution, public display, and public performance of their work, and to create derivative works, among other exclusive rights.  Each of these rights is implicated in this action.

36.     In a related fashion, copyright law gives authors and publishers, as rightsholders, exclusive control over how to publish their content in order to allow book markets to develop and thrive.  This includes empowering publishers to tailor their means of distribution and terms of sale or license depending on the format or medium in which a particular title is released.  These carefully calibrated markets are precisely the markets that IA seeks to disrupt and destroy by arrogating to itself the right to engage in bulk digitization of the Publishers' in-copyright books without a license and without any compensation, and by distributing the resulting illegal bootleg copies for free over the Internet to individuals worldwide.

37.     Over hundreds of years publishers have found ways to maintain viable markets for books even as revolutions in publishing have driven changes in format, from leather-bound hardcover books to paperbacks to the paperless ebooks we read on digital devices.  The ability of publishers to develop a diversity of new channels as technology evolves is crucial to meeting the high cost of publishing.

38.     This includes the market for both new and "backlist" books.  Book publishers derive substantial revenue from backlist books, which range from venerable classics like *The*

14

*Bell Jar* by Sylvia Plath or *Winds of War* by Herman Wouk to works written only a few years ago, including bestselling works such as *Eat, Pray, Love* by Elizabeth Gilbert and *Commonwealth* by Ann Patchett, all of which are Works in suit. Moreover, a great deal of the most successful children's books, including many of the Works, are backlist books.

### ii.    The Development of Functioning Markets for Ebooks

39.    The rise of a commercial market for ebooks provides an example of publishers' adapting to new technologies to create new and diverse channels to meet the demands of readers. Since the early 2000s, Plaintiffs and other publishers have offered readers digital versions of their books, which can be read on portable electronic devices such as the Kindle, Nook, iPad, and other smart devices. Since that time, ebooks have grown to become a major source of revenue for authors and publishers. Publishers have invested heavily to expand the ebook market, including by publishing their backlist titles in ebook form. They have devoted considerable time, money, and professional expertise to create high-quality ebooks to deliver to readers. Authors rely on publishers to present their works well to readers.

40.    The fundamental differences between print and digital formats require publishers to market print books and ebooks in different ways. Not only are the cost structures and distribution systems different for these two formats, but ebooks are digital files that can pose significant security concerns. Without protective measures, digital files can be copied perfectly, instantaneously and in practically infinite quantity at virtually no cost, and distributed all over the world in a split second.

41.    Because of these material differences in format, publishers do not distribute ebooks the same way that they sell traditional paper books. Like other copyright sectors that license education technology or entertainment software, publishers either license ebooks to consumers or sell them pursuant to special agreements or terms established by each publisher

and the platforms on which the ebooks may be read. By contrast, they sell copies of print books without any restrictions.

42. When an ebook customer obtains access to the title in a digital format, there are set terms that determine what the user can or cannot do with the underlying file. Publishers also use digital rights management technology ("DRM") to restrict the use and further distribution of ebook files. The commercial ebook market would not be viable if publishers lacked the ability to place any control over the means of distribution of ebooks or to prevent unlimited copying or distribution of the files.

43. Copyright law recognizes and enforces the right of copyright owners to control their works through DRM technology. In 1998, Congress enacted the Digital Millennium Copyright Act ("DMCA"), which made it illegal to circumvent DRM technology. The rights that enable publishers to control the publication of ebooks ultimately benefit readers because they enable publishers to provide their ebooks to a variety of channels and at a variety of price points that make sense for the specific authors and titles in their catalog.

44. Over the past twenty years, publishers have embraced the shift to digital commerce and correspondingly offered consumers an ever-evolving variety of formats, distribution, and access models. Indeed, Plaintiffs have collectively made thousands of the books in their catalogs available in ebook form, including the Works identified in this suit and hundreds of thousands of other works, backlist titles included. Virtually all of the trade books being offered for sale by Plaintiffs, including backlist books, are available in both print and ebook form.

45. At the same time, it is a basic tenet of copyright law that the copyright holder retains the exclusive right to decide whether or not to publish a copyrighted book in a digital

16

format.  At times, authors and publishers make the purposeful decision not to publish particular titles as ebooks.  Some niche categories of books are excluded from the ebook market because they are not suitable for that market.  In other cases, authors and publishers decide not to publish ebooks because a digital edition would be far inferior to a print version—as with some heavily illustrated books, art books, or creatively designed children's books.

### iii.    The Established Market Equilibrium Between Authors, Publishers, and Libraries

46.    Public libraries are among the most cherished institutions in this country.  To Plaintiffs, libraries are not just customers but allies in a shared mission to make books available to those who have a desire to read, including, especially, those who lack the financial means to purchase their own copies.  Much like a publisher must decide which books to invest in—balancing all sorts of considerations—librarians must make reasoned decisions about which books to purchase in order to best serve the needs of their communities.

47.    Plaintiffs have worked with libraries and library aggregators such as OverDrive to pioneer an innovative and highly successful service that enables library patrons to easily and lawfully obtain digital copies of books.  Under negotiated terms, publishers provide their ebooks to library aggregators, who, in turn, work with libraries and their patrons to host a platform that permits and tracks the lending of ebooks.  In this way, library patrons can log onto their library accounts from their homes or any other location, download ebooks onto their computers, smartphones, or e-reading devices for a limited time period under stated terms of use and read them without physically visiting their local library.  Each library focuses its services on its community, making ebook (and other) acquisition decisions based on the specific needs of local patrons.

48.     As competitors in the marketplace, Plaintiffs have each worked with libraries and library aggregators to develop innovative models capable of sustaining a functioning market for their respective ebooks.  These pricing and agreed terms of use—which vary from publisher to publisher and can vary by market segment—continue to evolve based on the feedback from libraries and other considerations.  There is a vibrant market for selling and licensing ebooks to libraries to provide their patrons with lawful copies of ebooks.  But that market cannot be sustained if, rather than patronize their local library, individuals can freely download unauthorized scanned copies of Plaintiffs' books from IA's Website.

### iv.     Plaintiffs and Libraries Reacted Rapidly to Ensure Library Patrons Have Access to Books During the COVID-19 Lockdown

49.     The advent of the COVID-19 pandemic has shown that online commerce is more important than ever to publishers, authors, bookstores, and libraries.  During this time period, many customers have been well-served by existing digital business models, both commercial and noncommercial.  Additionally, publishers and libraries have engaged in numerous emergency-related initiatives to ensure that readers retain access to books while nationwide stay-at-home orders remained in effect.  They have ranged from providing free ebook copies to library patrons during the shutdown in specific instances, to donating hundreds of thousands of print books, to working closely with schools, colleges, and teachers to ensure access to and availability of books necessary for online learning.

50.     The Publishers have used their exclusive rights to strike an appropriate balance between the interests of the relevant parties, particularly authors and readers.  Moreover, the measures taken by the Publishers in response to the COVID-19 pandemic also take into account the needs of booksellers, particularly independent bookstores, most of which are small businesses that have been crippled by the shutdowns.  Copying and giving books away to

18

everybody for free—as IA has done with Plaintiffs' and others' works—deprives booksellers of the sales that they need to stay afloat and authors of royalties they otherwise count on as compensation for their work.

51.    Libraries have been equally proactive in meeting the challenges of the COVID-19 pandemic.  For example, despite the closure of their physical locations, many libraries have allowed new patrons to sign up for library cards online.  Patrons are still able to lawfully download hundreds of thousands of ebooks and online materials through the digital lending systems that libraries and publishers have developed.  IA's Website steers readers away from the digital platforms that local public libraries continue to operate.

**B.    Internet Archive Unlawfully Disrupts the Book Publishing Ecosystem by Infringing Copyright on an Industrial Scale**

52.    Despite its efforts to cast itself as the hero in this story, IA's business model for the Website—which is essentially to freely disseminate scanned copies of every physical book it can lay its hands on—is parasitic and illegal.  IA exploits the invaluable work that authors and publishers do without investing in any of the effort or paying any of the costs associated with the creation and publication of the books.  What IA does is copyright infringement, plain and simple, and it must be stopped.

**i.    Internet Archive**

53.    Brewster Kahle founded Internet Archive in 1996.  Internet Archive provides a number of services not at issue in this action, including its Wayback Machine and digitization of public domain materials.  At issue here is IA's scanning of in-copyright books and distribution of digital copies via its Website.  Notably, it operates with a surprisingly unsubtle penchant for money-making behind its non-profit 501(c)(3) tax code designation.

19

54.     IA reported more than $150 million of revenue in the last ten years, according to publicly available tax filings.  As per its 2017 tax filings, it employed 150 employees.  IA's headquarters are located in an exclusive area of San Francisco.  Kahle expanded the IA empire in 2019 by purchasing through Better World Libraries, a shell company he controls, the for-profit Better World Books, an online retailer that predominantly sells used books.

55.     The bulk of IA's revenue is derived from contributions from large donors, including tens of millions of dollars from the Kahle/Austin Foundation.  The Kahle/Austin Foundation is an entity established by Brewster Kahle and his wife to give money to IA and other favored projects.  In 2018, the Kahle/Austin Foundation reported assets of $104,483,456.  IA also has reported sizeable donations from other large foundations, some of which are based in New York.

56.     IA has an interlocking web of contributions and commercial services that support its Website.  In addition to receiving large-dollar donations, IA has made tens of millions of dollars from selling commercial services.  One of the services it offers is industrial-scale book scanning and digitization, which has generated more than $25 million in revenue since 2011.  IA provides this service to customers nationwide, and as its marketing materials tout, employs a Regional Digitization Manager for customers in the "NJ/NY/PA" area.  Upon information and belief, this employee currently resides in New York City.  This same employee helped to set up and manage IA's first digitization center, which was housed for an extended period of time in this District.

### ii.     The Open Library

57.     IA started the "Open Library" in or around 2006 with the goal of providing "one web page for every book published."  An online catalog of all the books in the world was not a novel concept.  Since 1998, the WorldCat database run by the Online Computer Library Center

has provided an exhaustive online catalogue of library books, which currently contains over 450 million bibliographic references.

58.     But IA was not content with a resource tool designed to help users find books. Taking a step further, IA created the Website with the goal of providing free downloads of entire copies of every book ever published.  Over the course of several years, IA has gradually built up a program designed to obtain vast quantities of print books in bulk, scan them on an industrial scale, and distribute digital copies through the Website without any license from the copyright owner.

59.     IA engages in this massive, industrialized scanning of print books to create digital files in large part to evade the Publishers' commercial terms for ebooks and because DRM precludes the duplication of Plaintiffs' ebooks.  In other words, IA employs this end-run as a means to avoid both the Publishers' ebook use restrictions and the dictates of the DMCA by creating its own bootleg electronic versions of the books through scanning.  But that end-run is unlawful and equally harmful to the Publishers and their authors, who receive no compensation for IA's reproduction and distribution of their works in digital form and whose paid offerings cannot readily compete with IA's free but unlawful versions.

60.     The basic purpose of IA's massive book digitization project is the same as Plaintiffs' basic purpose in publishing books, which is to distribute reading material.  This is in stark contrast to other large-scale book digitization projects, like the ones carried out by Google and the HathiTrust, which created digital indexes of the contents of books that could be used for the purpose of online search, but which never made the contents of entire books freely available to the general public.  Here, IA allows every person in the world to instantly download complete

21

books or download them—without ever receiving the necessary permission from the copyright owner.

61.    In a 2017 interview, IA's founder stated, "We're trying to . . . make all the published works of humankind available to people, permanently.  If you're curious enough to want to have access, we can make it available [sic] to all the books, music, video, web page, software, lectures, available to anybody wanting to have access."  Mary Kay Magistad, *Where to find what's disappeared online, and a whole lot more: Internet Archive*, PRI.org (Feb. 23, 2017, 8:00 p.m.), https://www.pri.org/stories/2017-02-23/where-find-whats-disappeared-online-and-whole-lot-more-internet-archive.

62.    In recent years, IA has started to ramp up its efforts.  The annual income reported by IA has nearly doubled since 2013 and the rapid accumulation of funds has been accompanied by public statements promising aggressive expansion.  In 2019, for instance, the Director of Open Libraries told *Library Journal* that he aimed to increase the acquisition of books in bulk and speed up the rate of book digitization to 500,000 books per year.  The goal of this accelerated activity is to put "more than four million books online for the public," which would match the number of books in the collection of a large metropolitan library system.  Matt Enis, *Internet Archive Expands Partnerships for Open Libraries Project*, Library Journal (May 2, 2019), https://www.libraryjournal.com/?detailStory=internet-archive-expands-partnerships-for-open-library-project.

63.    As the number of scanned books on the Website increases exponentially, the misrepresentations IA employs to justify its infringing activities are exposed.  For example, IA frequently characterizes the books on the Website as twentieth-century works that do not have active sales or available ebooks, as if infringement is allowed if a work is not readily available

22

(which it is not). But this "old books" defense is a fantasy. As is evident from IA's own figures and the Works in suit, many of the books that IA provides in the most popular categories, such as biographies, were published in the years leading up to 2000 and in the twenty-first century, with relatively few books from earlier in the twentieth century. This is evident from the Open Library's own graph illustrating the year of publication for its biographies:



64. Indeed, the Works in suit include books first published in 2019, including *The Man Who Solved the Market: How Jim Simons Launched the Quant Revolution* by Gregory Zuckerman, with a publication date of November 2019.

65. In short, IA directly harms the Plaintiffs' print *and* ebook markets in all market segments by providing competing substitutes for numerous original works currently available in their catalogs.

66. IA knows that it cannot proceed with the mass digitization and distribution reflected by the Website without an agreement with the Publishers on mutually agreed terms. The Publishers and/or their trade association AAP have put IA on direct notice that Open Library's unauthorized reproduction and distribution of copyrighted works is infringing. For example, in 2018, HarperCollins put IA on express written notice that its actions in connection with Open Library with respect to HarperCollins' titles were infringing and not justified under its various manufactured defenses. Despite actual notice that its actions were illegal and without any basis in law, IA has willfully persisted with its infringing activities.

23

### iii.     The User Experience of the Website

67.     From the perspective of the Website user, IA offers an ostensibly attractive proposition: free copies of about 1.3 million books. Anyone with an Internet connection and an email address can sign up for an account to use the Website in a matter of minutes. The process requires no verification of the user's identity, and there is nothing to prevent users from creating multiple accounts with dummy email addresses in order to circumvent limits, assuming any are in place at all.

68.     Once on the Website, a user is taken to a landing page that suggests titles under categories such as "Books We Love," "Romance," "Science," "Kids" and "Thrillers." Users can also search for books according to title, author, subject, ISBN, and other categories.

69.     Clicking on a book title takes the user to the title's webpage on the Website, which contains a picture of the cover, a description of the book and bibliographic information, such as the publication date and the WorldCat catalog number. As shown in the screenshot on the following page, which is a typical webpage on the Website, the user is also presented with links through which he or she can buy a copy of the book.

24



70.     The first—and most prominent—"Buy this book" link is to Better World Books, the online, largely used bookseller owned by a shell company controlled by IA founder, Brewster Kahle.  Notably, IA does not provide links to the book publisher's or author's website.

71.     For each book on the Website, IA gives users one of two options, which it calls "read" or "borrow."  The books in the "read" category are books that IA presumably has concluded are in the public domain.  For books in the "read" category, the Website has no limit on how many users can download them, either at any point in time or in the aggregate.  Users who choose the "read" option can download to their computers, e-readers, or mobile devices a scanned copy of the entire book in a variety of digital formats that lack any DRM protection,

25

including as a .pdf file.  Once a user downloads a book as a .pdf, he or she is free to make unlimited copies of the book and can distribute it to whomever they wish at no cost. Alternatively, users can read these books through the IA's "Book Reader" interface described below.

72.     Although the books that IA classifies in the "read" category are presumably supposed to be in the public domain, sometimes the books are in fact protected by copyright. For instance, at one point, any Internet-connected individual could download copies of the modern classic *To Kill a Mockingbird*, which is still under copyright, without any restrictions.  In other cases, copyrighted books have been distributed without DRM restrictions because, upon information and belief, IA erroneously decided that they were public domain works based on elementary misunderstandings of copyright law.

73.     Under the second option, IA permits users to "borrow" titles from the Website that it recognizes are not in the public domain through its so-called "controlled digital lending" protocols.  "Borrow" is a euphemism for an illegal reproduction and distribution.  As described below, "controlled digital lending" is a manufactured legal paradigm, conceived by IA, to cast aside well-established copyright jurisprudence.

74.     Under IA's "controlled digital lending," a Website user can download a certain number of books at a given time, which IA has currently set at ten.  Once IA has distributed the maximum number of books the user is allowed, he or she must check a book back in before taking another one out, although there is nothing to prevent a user from circumventing this limit by setting up multiple accounts.  Each such "loan" lasts for a two-week period.  When the period ends, the book is supposedly "checked in" by the Website.

26

75. Until the recent pandemic and the advent of IA's so-called "National Emergency Library," IA claimed that it also enforced an "owned to loaned" ratio that restricted the number of users who could borrow a copyrighted book at once. In theory, this means that the number of scanned copies of a title downloaded from the Website at any one time cannot exceed the number of print copies of that title owned by IA or its partner libraries. If that number is exceeded, then the user is ostensibly put on a "waitlist."

76. Users that have successfully checked out a book can read it immediately on the Website's Book Reader platform. IA publicly displays a copy of the work on that platform. This interface operates in the user's web browser and provides a digital replica of a hard copy book, as shown in the screenshot below:

166 BLINK

entire principle of a blind taste test was ridiculous. They shouldn't have cared so much that they were losing blind taste tests with old Coke, and we shouldn't at all be surprised that Pepsi's dominance in blind taste tests never translated to much in the real world. Why not? *Because in the real world, no one ever drinks Coca-Cola blind.* We transfer to our sensation of the Coca-Cola taste all of the unconscious associations we have of the brand, the image, the can, and even the unmistakable red of the logo. "The mistake Coca-Cola made," Rhea says, "was in attributing their loss in share to Pepsi entirely to the product. But what counts for an awful lot in colas is the brand imagery, and they lost sight of that. All their decisions were made on changing the product itself, while Pepsi was focusing on youth and making Michael Jackson their spokesman and doing a lot of good branding things. Sure, people like a sweeter product in a sip test, but people don't make their product decisions on sip tests. Coke's problem is that the guys in white lab coats took over."

Did the guys in the white lab coats take over in Kenna's case as well? The market testers assumed that they could simply play one of his songs or part of one of his songs for someone over the telephone or on the Internet and the response of listeners would serve as a reliable guide to what music buyers would feel about the song. Their thinking was that music lovers can thin-slice a new song in a matter of seconds, and there is nothing wrong with that idea in principle. But thin-slicing has to be done in context. It is possible to quickly diagnose the health of a marriage. But you can't just watch a couple playing Ping-

KENNA'S DILEMMA 167

Pong. You have to observe them while they are discussing something of relevance to their relationship. It's possible to thin-slice a surgeon's risk of being sued for malpractice on the basis of a small snippet of conversation. But it has to be a conversation with a patient. All of the people who warmed to Kenna had that kind of context. The people at the Roxy and the No Doubt concert saw him in the flesh. Craig Kallman had Kenna sing for him, right there in his office. Fred Durst heard Kenna through the prism of one of his trusted colleagues' excitement. The viewers of MTV who requested Kenna over and over had seen his video. Judging Kenna without that additional information is like making people choose between Pepsi and Coke in a blind taste test.

*4. "The Chair of Death"*

Several years ago, the furniture maker Herman Miller, Inc., hired an industrial designer named Bill Stumpf to come up with a new office chair. Stumpf had worked with Herman Miller before, most notably on two previous chairs called the Ergon and the Equa. Yet Stumpf wasn't satisfied with his two previous efforts. Both had sold well, but Stumpf thought that the Ergon was clumsy — an immature effort. The Equa was better, but it had since been copied by so many other firms that it no longer seemed special to him. "The chairs I had done previously all looked alike," Stumpf says. "I wanted to come up with something that looked different." He called his new project the Aeron, and the story of the Aeron illustrates a second, deeper



Users can turn the pages by clicking on them or using buttons below the page. The Book Reader also allows users to click an "audio" button, at which time IA's software mechanically reads the book aloud.

77. IA also enables users to download and view copies of books using a software program called Adobe Digital Editions ("ADE"). The ADE files are purportedly protected by DRM technology that restricts certain copying and only allows users to access the file during the fourteen-day loan period, at which time it locks them out.

78. The Website allows users to "borrow" books in two ADE formats: "Encrypted Adobe PDF" (which is billed as containing "High Quality Page Images" of the entire hard copy book) and "Encrypted Adobe ePub." The Encrypted Adobe PDF is not the kind of specially-formatted ebook that a user would purchase as an authorized ebook. Rather, it is a digital file consisting of a scan (*i.e.*, photograph) of the pages of a physical book. IA generates the Encrypted Adobe ePub file from scanned books using optical character recognition technology. The Website distributes the Encrypted Adobe ePub as a "smaller file," but acknowledges it "may contain errors." This is an understatement. The ePub files tend to be rife with transcription errors and are sometimes entirely illegible, as can be seen from the example on the following page.

28



79.    Users can read the books they download as ADE files on devices such as

smartphones, tablets, and e-readers like Kindle, Nook or iPad.  The Book Reader platform has

been designed to work on mobile devices as well.  IA has boasted on its blog that Website users

can borrow books and read them on their devices just as easily as they can read ebooks

legitimately purchased or borrowed from licensed services.  While the quality of the digital

format scans that IA provides are inferior to the quality of Publishers' ebooks, these bootleg

versions act as a substitute for the authorized versions, since readers select titles for their content.

No one reads a James Patterson thriller after downloading a scan of the book from Open Library

and then declares, "I liked it so much, I am going to read an authorized ebook again on my

Kindle for a different experience."

<div align="center">29</div>

iv.  **The Open Library Is Not a Library, It Is an Unlicensed Aggregator and Pirate Site**

80.  Defendant bills its Website as "an accredited California State Library run by the non-profit Internet Archive," but this branding fraudulently misleads on several levels.

81.  The Open Library is not an "accredited library" by any commonly understood definition of those words.  The reference to accreditation refers, upon information and belief, to the fact that the State of California provided IA with federal funding through the Library Services and Technology Act ("LSTA") in or around 2011.  LSTA awards are available to a wide array of organizations, not just actual libraries, including for example the Los Angeles Philharmonic Association.  In short, the fact that Internet Archive was able to meet the broad criteria for LSTA funds does not make it an "accredited library," and it most certainly does not make it the trusted equivalent of a public or academic library.

82.  More fundamentally, the Website lacks the characteristics shared by actual libraries.  Instead, the service it provides more closely resembles that provided by aggregators like OverDrive, that Plaintiffs routinely engage to distribute ebooks, with defined terms of use and at an agreed-to fee—except IA operates without authorization or remuneration.  For instance, whereas libraries serve local and academic communities, the Website distributes copies indiscriminately to everybody on the planet, or at least everybody with a connection to the Internet.

83.  IA tries to wrap itself in the flag of an "educational" enterprise, but it is not.  First, it is not an educational institution or even an affiliated academic library serving a defined university community.  It is devoted to education no more specifically than any platform that transmits, streams, or otherwise delivers content on the global Internet.  Moreover, the notion that the Website specializes in educational material is pure fiction.  A quick glance at the

30

Website's landing page shows that it lists thrillers and romance novels more prominently than textbooks or other works that may be used in schools. Further, upon information and belief, many of the non-fiction books on the Website are read for personal entertainment or edification, not classroom use:



31

84.     Branding itself as a "library" does not imbue Defendant with the right to engage in behavior that would otherwise be considered wholesale theft.

### v.     IA's Industrial Book-Scanning Machine and Global Scanning Operations

85.      IA has devised a commercial full-service loop that funds its quest to distribute digital copies of every book, and at the same time, provides millions of copies of the very works it needs to stock its Website.

86.     To this end, IA has implemented an industrial process that enables it to scan the many millions of books it has acquired and continues to amass.  The "Scribe system" developed by IA uses a sophisticated scanner operated by manual labor.  *See* Internet Archive, Internet Archive Digitization Services – Partner Documents, https://archive.org/details/partnerdocs (last accessed May 31, 2020).  IA invented the Scribe scanner for the purpose of scanning books in bulk:





87.     Upon information and belief, a single Scribe scanner can digitize a *300-page* book in five minutes.  According to its promotional materials, IA operates seven "regional digitization centers" and eleven "satellite locations" in the United States, Canada, and the United Kingdom, with multiple Scribe scanners at each location.  Upon information and belief, IA has employed more than 50 "book scan center staff" to work within facilities housing Scribe scanners, who are responsible for digitizing the books to add to the Website.  Upon information and belief, IA has also engaged low-wage contractors in other countries, such as the Philippines and China, to scan bulk quantities of books that are shipped there from the United States.  Upon information and belief, IA also has recruited and used unpaid volunteers to scan copyrighted books for the Website.  IA can scan 3,000 books in a single day when operating at full capacity, according to its Archivist and Software Creator, Jason Scott (believed to be a New York resident).

33

88.     At one point, IA operated a digitization center in this District and, although it has been discontinued, the Website currently contains many copyrighted books that were scanned in New York, including some of Plaintiffs' Works in suit.

89.     IA makes multiple reproductions of Plaintiffs' books at various stages.  As IA photographs each page of a book using the Scribe scanner, the scanner creates a digital copy of those pages and then combines them with copies of all the other pages to make a single digital copy of the entire book.  IA then copies each digital book file onto its main computer servers located in San Francisco, together with metadata about the book and the scan or file.  Multiple copies of the scanned book pages are made in the course of this process as IA converts the file into different formats (including, *inter alia*, .pdf, ePub, OCR text files and audio formats) and then reproduces all of those files onto its servers.

### vi.     Internet Archive Shifts the Costs of Its Illegal Book Digitization Project Onto Publishers, Libraries, Open Library Users, and Other Third Parties

90.     IA's business model for Open Library is predicated upon infringement, and it willfully inverts the carefully balanced book publishing ecosystem.  Whereas publishers, authors and libraries actually invest the time and money that it costs to publish and distribute a book, IA refuses to pay for any of these costs and has even devised a parasitic system to shift the costs of its large-scale infringement onto other people.

91.     IA attempts to present the Website as an altruistic non-commercial enterprise. But despite its technical not-for-profit status, IA has set itself up to generate huge amounts of revenue from the very people and entities it is supposed to be helping in order to fuel its copyright infringement project, as the following examples illustrate.  IA should be seen for what it actually is: a commercial actor.

34

### a. Internet Archive is Paid Millions of Dollars to Infringe Copyrighted Books and Put Them on the Open Library

92.     IA operates a major commercial business performing scanning and hosting services. This provides a critical revenue stream that IA uses to fund and facilitate its piracy scheme. IA first induces various libraries to pay to have books in their collections scanned at a set price, and, at the same time, copies of all the works scanned are provided to the Open Library. While most public libraries have agreed to scan only public domain materials, on information and belief, IA also has earned substantial fees scanning and uploading some library collections of copyrighted books.

93.     In a recent blog post, Brewster Kahle admits that "[l]ibraries paying for our scanning services is a major source of earned income for the Internet Archive." *See* Brewster Kahle, *Internet Archive Staff and Covid-19: Work-at-Home for Most, Full-Pay Furlough and Medical for Scanners* (Mar. 25, 2020), https://blog.archive.org/author/brewster/. Evidence from IA's publicly available tax records confirm that it has made over $25 million from book scanning since 2011. Of course, IA also profits from adding copies of the books it scans to the Website, using funds from donations, foundations, and elsewhere.

94.     Plaintiffs obviously have no objection to the digitization of public domain titles. Nor do they object to anyone granting IA a license to put books or journals that they own the rights to on the Website. But IA has designed its bulk book scanning service for libraries to be a pipeline that feeds the Website with extensive copyrighted material in addition to the permitted copying of any public domain or licensed material, all at no cost to IA.

### b. Better World Books Feeds the Open Library with Copyrighted Books

95.     The acquisition of Better World Books by a shell company controlled by Brewster Kahle in 2019 has provided IA with yet another way to acquire books for the Website without

actually paying for them. As part of its business model, Better World Books acquires mass quantities of used print books, including what it refers to as a "Library Discards & Donations" program that it claims works with librarians to "reuse or recycle" surplus library books. Better World Books funnels books to IA, which scans and uploads them to the Website. Moreover, the complex series of circular relationships between IA and Better World Books further contributes to the commercial nature of IA.

96. This arrangement creates a perfect closed loop system that benefits IA in several ways. As IA stated in the press release accompanying the acquisition, the new relationship between Better World Books and IA "will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books."

97. Upon information and belief, the system works as follows: first, Better World Books acquires millions of used print edition books (provenance unknown), which it provides to IA to be scanned and added to the Website for widespread downloading and distribution. Second, the webpage for every digital format book on the Website—including the pages for the books provided by Better World Books—includes a prominent link inviting the user to buy a print copy of the book from Better World Books. Upon information and belief, this sale not only benefits Brewster Kahle's shell corporation, but the traffic that IA drives to Better World Books results in more book sales, which enables IA to acquire more books to scan and upload to the Website. And the cycle repeats. Better World Books also encourages its customers to donate funds to IA by topping off their purchases to a higher dollar amount.

### c. Users "Sponsor" Books that Internet Archive Wants to Infringe

98. IA also earns revenue from users in exchange for special access to individual book titles through its "sponsorship" program. In some ways, this is little different from

36

"selling" limited access to digital books to these sponsors.  In brief, IA gives users the option to
"sponsor" books that it does not have and wants to add to its collection.  The sponsorship
program is so central to IA that the main landing page for the Website features at the very top the
selection of books it would like users to sponsor:



99.     Users who click on the sponsor option are taken to a webpage that informs them that a "tax deductible donation can add this book to Internet Archive's lending library, forever." The book page informs the user of the cost of the "donation" required to purchase the book.



100.    In this case, users were given the option to purchase for IA a copy of *Back to the Batcave* by the late actor Adam West, who played Batman in the cult-classic 1960's television show, for a hefty donation of $93.12.  As an inducement to sponsor the book, users are given the right to be the first to borrow the book when it becomes available and to add a "personalized sponsorship message."  IA uses donations it receives for sponsored books to obtain a physical

38

copy of the book, scan it, and upload the digital copy to the Website for download.  It is not clear how IA uses any money left over.

101.    IA's book sponsorship scheme is breathtakingly brazen.  In essence, IA tells its users which copyrighted books it wants to infringe.  Then it asks users to pay a "donation" far in excess of the list price of the book for IA to go out and buy a print copy from an undisclosed source, possibly Better World Books.  Finally, IA uses the user's money to scan the book and put it online, where anyone can get a copy for free—completing the copyright infringement process without spending a single dollar of its own money.  Tax-deductible donations are not meant to foster piracy.

102.    The sponsorship option is also designed to drive an accelerating cycle of infringement.  By encouraging users to sponsor the books they most want, IA incentivizes its users to select popular books.  Once IA obtains the print book, scans it, and uploads it to the Website, that infringing file will attract new users.  The new users will, in turn, sponsor even more popular books, which will attract even more users and so on, *ad infinitum*.

### d.    Internet Archive Absorbs Entire Libraries for the Website

103.    Yet another way IA acquires books for free is to solicit and accept bulk donations of books from struggling or defunct libraries.  In a May 2019 article, Open Libraries Director Chris Freeland described IA's "acquisition program," stating that it "involves collecting donations of *in-copyright* materials from libraries and booksellers, digitizing this content in [IA's] scanning center in Cebu, the Philippines, and then storing the physical copies in archive facilities in Richmond, CA" (emphasis added).

104.    Ironically, the many thousands of hard copy books IA obtains from defunct colleges or libraries will likely end up in "archive facilities in Richmond, CA," which consist of large shipping containers owned by IA.  Once locked away, upon information and belief, IA will

make no effort to make the print books available to be read, like books in actual library collections. Instead, the print copies primarily exist to rationalize, or provide the predicate for, IA's argument that there is a one-to-one correlation between print copies legitimately owned and their illegitimate ebook scanned copies.

105.     Through its acquisition program—and similarly aggressive book scanning, Better World Books and "sponsorship" schemes—IA seeks to achieve its next benchmark of putting 4 million copyright-protected books on the Website.

106.     Remarkably, every one of the systems for acquiring books described above is designed so that IA avoids paying authors or publishers anything, while simultaneously ensuring that IA rakes in money from its infringing services and, at the same time, obtains free books for the Website.

### vii.     Controlled Digital Lending

107.     IA relies on the contrived theory of "controlled digital lending" described above as its central defense to charges of copyright infringement. But CDL is an invented paradigm that is well outside copyright law, appears to have sprung up in response to the objections of copyright owners to IA's infringing activities and, in any event, does not excuse IA's massive infringement.

108.     IA is a leader and organizer of a larger proselytizing movement of academics and activists seeking to find a way to justify a "scan first, figure out the details later" approach to the mass digitization of copyrighted books. In 2018-19, IA sponsored the drafting of a "White Paper on Controlled Digital Lending of Library Books" by law professors David R. Hansen and Kyle K. Courtney. IA and Brewster Kahle broadly promote CDL, speaking widely and engaging in a broad public relations campaign, inducing others, including libraries, to join their cause and

40

cynically using them to reflect their glow of legitimacy onto the Website. But IA's "controlled digital lending" finds no actual support in the law.

109. As a preliminary matter, Plaintiffs' challenge whether IA maintains the detailed records or practical control necessary to sustain the so-called "owned to loaned ratio" that is the cornerstone of CDL, *i.e.*, the notion that the number of electronic copies of a book for download from the Website at a given time never exceeds the number of physical copies of the book owned by IA or one of its partner libraries. With respect to the Website's titles for which the corresponding print books are allegedly stored at partner libraries, it defies reason that the partner libraries will have the wherewithal to faithfully and consistently remove a book from circulation each time it is borrowed on the Website, and put it back on the shelf when the Website version is checked back in. As for the truckloads of books warehoused by IA, IA archivist Jason Scott admitted in a recent tweet that for the millions of physical copies acquired by IA, "[o]nly one or two unique copies are kept" and "stored at the physical archive." "[D]uplicates (which have increased over time) are donated to various charities and non-profits."

110. But even if IA were scrupulously following its own invented theory of "controlled digital lending," the theory has no legal justification. First, IA and its supporters relied heavily on the "first sale doctrine" codified at 17 U.S.C. §109, which entitles the lawful "owner of a particular … lawfully made" copy of a copyrighted work, like a book, "to sell or otherwise dispose of the possession of that copy or phonorecord." The central thesis of the White Paper sponsored by IA was that the broader principles reflected in this doctrine should be imported into the fair use doctrine to protect IA's actions. But as enacted by Congress, the first sale doctrine is carefully confined as a limitation on only the distribution right. It permits the owner of a copy to *distribute* the particular copy that has been lawfully acquired—for example, as in the secondary

41

sale of a hardcover book or a painting—but it provides no exemption from the copyright holder's exclusive right to *reproduce* a work. The lynchpin of IA's whole operation is that it scans a print book to create a digital file—a classic unauthorized *reproduction* of a work that puts the application of Section 109 clearly out of reach.

111.    Faced with these inconvenient facts, IA has also advanced the illogical premise that its massive illegal copying and distribution is "format shifting" protected by the fair use doctrine. But the rudimentary use of a scanner to "format shift" print books into digital works for distribution to the public does not constitute either a permitted personal use or a transformative use. The activity squarely intrudes upon the exclusive rights under 17 U.S.C. § 106, and no exception of any kind applies.

112.    At bottom, CDL is based on the false premise that a print book and a digital book share the same qualities. But, as outlined above, they are fundamentally different mediums, and they exist as distinct economic markets. As the Copyright Office phrased it in a key report, "Time, space, effort and cost no longer act as barriers to the movement of [digital] copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost." Digital Millennium Copyright Act (DMCA) Section 104 Report: Before the Subcommittee on Court, the Internet and Intellectual Prop., 107th Cong. (Aug. 2001) at p. 82, available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. In stark contrast, a range of physical obstacles impact the distribution of books as material objects—from the need to transport them to each reader, to the need for library patrons to travel to libraries to take them out and return them. Further, print books deteriorate over time, unlike digital files. Copyright law vests the copyright owner with the right to develop each market based on terms appropriate to the medium, as well as the right to extract the full value of

42

publication in digital form. These economic rights would be severely undermined if IA can circumvent the rightsholder entirely and copy millions of print books into digital copies to be widely distributed, even if it maintains an "owned to loaned ratio."

113.   IA's mass digitization of books is potentially even more pernicious than ordinary online piracy.  First, its use of "library" branding deceives some users into thinking the Website is a legitimate site.  Moreover, IA not only makes millions of dollars as outlined above in ways related to its systematic infringement but also uses those profits to fuel its mission to fill the digital Library of Alexandria with every book ever written.  Allowing IA to operate the "Open Library" for in-copyright works will create an indelible impression for libraries and readers that digital format books should be free—and can be free just as soon as IA scans a print copy.  This, in turn, will impair the sales and licensing of books and ebooks that actually make it possible to pay the high cost of writing and publishing the quality books that IA purports to value so much, yet pays little or nothing to sustain.

### viii.   The National Emergency Library

114.   On March 24, 2020, IA doubled down on its infringement, announcing that in light of the COVID-19 pandemic, it would suspend the "owned to loaned" ratio aspect of CDL, while retaining other aspects of it.  In other words, Defendant altered how the Website operates so that it could distribute as many copies of any book it wanted, no matter the number of print copies on hand purportedly because the pandemic required it.  This so-called "National Emergency Library" was tantamount to asserting an emergency copyright act unilaterally and by private action.

115.   IA admits that it did not bother to "engage with the creator community and the ecosystem in which their works are made and published" before launching this revised approach for the Website.  When IA was roundly criticized by publishers, authors, individual librarians,

and the bookselling community for disregarding their interests and legal rights, IA responded
that it had merely "moved in 'Internet Time' and the speed and swiftness of our solution [to the
COVID-19 lockdown] surprised some and caught others off guard."

116.    In a feigned act of magnanimity, IA assured authors that it would abide by a
notice and takedown system.  But this turns copyright law on its head.  Copyright owners have
the power to decide in advance how their exclusive rights will be exercised.  Copyright is not an
"opt-out" system whereby infringers can distribute copyrighted works for free, with impunity,
until they are told to stop.  The Copyright Act does not and never has put the burden on authors
and publishers to police the unlawful actions of direct infringers, which in the case of the IA not
only copies, uploads, and distributes infringing files, but asserts conditions and procedures for
agreeing to stop the infringement.

117.    Defendant does not qualify as an intermediary entitled to certain protections
under the Digital Millennium Copyright Act.  The DMCA allows the operators of online services
that host content *posted by users* and meet certain conditions to avoid copyright liability by
responding expeditiously to a takedown request from the rightsholder.  The DMCA notice and
takedown system is inapplicable to this case because IA, not third-party users, uploads the
infringing files to the Website.  And to add insult to injury, both before and since the "National
Emergency Library," when faced with the frustrated demands of authors or publishers, IA has
often failed to stand by its proclamation to honor takedown requests, or opt-outs, thereby further
exposing the overall lack of integrity that surrounds this process.

118.    The Website as operated under the "National Emergency Library" parameters
does not qualify as a fair use.  Among other reasons, no one anointed IA to address the
educational needs of the nation, and the Website has not been designed to meet specific

44

educational needs or even to focus only on books that are not commercially available. Section 110 of the Copyright Act, known as the TEACH Act, already grants teachers broad rights regarding the use of literary works, and book publishers, libraries and schools have on their own initiative sought to address educational needs directly during the health crisis while keeping in mind the needs of all stakeholders. In short, Defendant opportunistically seized upon the COVID-19 pandemic as an excuse to accomplish its long-desired goals while ignoring the law and harming the publishing ecosystem so critical to the world of books.

**C.      Defendant's Infringement Causes Harm to Publishers**

119.    In all its different iterations (including under its "controlled digital lending" protocols), IA's Website causes substantial harm to Plaintiffs, who produce and distribute books on behalf of themselves and their authors, to whom they pay royalties. Without the Publishers' permission, IA and its Open Library business are using the unauthorized book scans to exploit existing markets (and potentially new related markets), causing authors and Plaintiffs substantial and irreparable harm. This includes, but is not limited to, the types of market harm outlined below.

120.    First, a verbatim copy is a classic non-transformative use and a substitute for the original work. By operating the Website, IA competes directly with Publishers' works in all formats (including, without limitation, print and digital) and market segments (including, without limitation, commercial, library, and school).

121.    Second, by providing copies of digital books for free, IA devalues the book market. Consumers begin to view works as cheap and become increasingly unappreciative of what it takes to produce them and unwilling to pay fair value for them.

122.    Relatedly, IA's decision to provide free and full copies of Plaintiffs' books, including the Works, to anybody who wants them interferes with Plaintiffs' relationships with

customers and distributors, including libraries, who had already paid full value for them. The willingness of those distributors and customers to acquire digital formats in the future is diminished by the free distribution of Plaintiffs' books, including the Works, on the Website.

123.    Third, public libraries are evolving to meet the changing needs of their patrons and trying hard to remain at the center of their communities. Defendant's Website undercuts public libraries by disintermediating them. Harm to and loss of community support for public libraries, in turn, hurts the Publishers, since these libraries pay for their books, which, in turn, hurts authors, who share in and depend upon compensation for their copyrights.

124.    Fourth, the Website's .pdf and ePUB files are often of inferior quality. Authors expect their publishers to be guardians, ensuring the high-quality of their works as delivered to the marketplace. Websites like Open Library, thus, hurt Plaintiffs' relations with authors.

125.    Likewise, inferior quality scans affect the Publishers' relationships with consumers. For example, in certain instances book scans from IA have surfaced on retailer websites such as Amazon as offerings by sponsored third-party vendors, leading to negative reviews on the product pages. When a consumer gives such a work a one-star review because of the scan quality, other consumers may only focus on the negative rating, even if it has nothing to do with the content of the work. More generally, consumers may be confused about whether the publisher has authorized the IA scan, leading to a negative impact on the publisher's goodwill.

126.    Fifth, IA interferes with the author's and publisher's right to decide which works will be distributed in which format and at which time. For example, as noted above, some works or authors are ill-served by the conversion of print editions into digital works, either for commercial or artistic reasons. IA has appropriated to itself this right that belongs exclusively to the rightsholder.

<div align="center">46</div>

127.     Finally, Plaintiffs have legitimate fears regarding the security of their works both as stored by IA on its servers and subsequently publicly displayed or transmitted to users.  For example, upon information and belief, IA has not developed and does not enforce sufficiently rigorous DRM protocols and related logistical systems that aggregators must employ to ensure that books appearing on their websites are not pirated or unlawfully infringed by users.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)

128.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

129.     The Works are original, creative, and copyrightable subject matter under the laws of the United States.

130.     The copyrights in the Works are registered, and the Copyright Office has issued valid Certificates of Registration for the Works.

131.     By its actions, alleged above, Defendant has infringed and will infringe the Publishers' copyrights in and to the Works by, *inter alia*, reproducing, distributing, publicly displaying, publicly performing, and making derivative works of the Works without any authorization or permission from Plaintiffs.

132.     Each infringement of the rights of Plaintiffs in one of the Works constitutes a separate and distinct act of infringement.

133.     Defendant's infringement of Plaintiffs' copyrights, including the Plaintiffs' Works, is willful.

47

134.    Upon information and belief, as a direct and proximate result of its wrongful conduct, Defendant has and will obtain benefits, including, but not limited to, profits to which Defendant is not entitled.

135.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination.  Unless restrained by this Court, Defendant will cause further irreparable injury to Plaintiffs.

136.    As a direct and proximate result of Defendant's infringement, Plaintiffs are entitled to recover statutory damages, pursuant to 17 U.S.C. § 504(c), with respect to each work infringed.  Alternatively, at the election of Plaintiffs, pursuant to 17 U.S.C. § 504(b), Plaintiffs are further entitled to recover from Defendant the damages they have sustained and will sustain, as well as any gains, profits and advantages obtained by Defendant as a result of its acts of infringement alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Plaintiffs.

137.    Plaintiffs are entitled to recover their attorney's fees and costs.

## SECOND CAUSE OF ACTION
**Secondary Copyright Infringement (17 U.S.C. § 101 *et seq.*)**

138.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

139.    Although it is clear that IA is directly liable for copyright infringement, Plaintiffs also bring claims for secondary liability, in the alternative, to the extent IA attempts to evade responsibility for its own direct liability by blaming the conduct on others, such as users of the Website.

48

140.    Defendant is secondarily liable under theories of contributory liability, inducement liability, and vicarious liability for the underlying reproduction, distribution, public display, and public performance of Plaintiffs' Works, as well as the making of infringing derivatives of Plaintiffs' Works.

141.    Defendant is contributorily liable as it knows, or has reason to know, that Plaintiffs' Works are infringed each time Plaintiffs' Works are scanned, uploaded, downloaded, publicly displayed, or publicly performed in connection with the Website, and it has caused and/or materially contributed to those infringements.

142.    Defendant is also secondarily liable under a theory of inducement.  Defendant is responsible at every level for scanning copyrighted books, including the Works, uploading the scanned copies to its Website, and then distributing, displaying, and performing the works publicly.  Defendant could take simple measures to prevent further infringement, such as by not scanning books under copyright, limiting the books on the Website to works in the public domain, or obtaining licenses to distribute ebooks.  Instead, the infringement of copyrighted books, including Plaintiffs' Works, is a central focus of Defendant's business strategy. Defendant affirmatively encourages individuals to use the Website to infringe copyright, including by downloading digital copies of copyright protected books without a license, including the Works.

143.    Further, Defendant is vicariously liable for copyright infringement because it has the right and ability to supervise the infringement of its users and possesses a financial interest in the infringement.  As detailed above, Defendant has the right and ability to supervise the infringement of Plaintiffs' copyrighted books, including the Works.  Defendant provides the sites and facilities on which the infringing activity occur.  Defendant can stop allowing users of the

Website to download Plaintiffs' copyrighted books, including the Works. In brief, Defendant is in charge of the Website.

144. Defendant possesses an obvious and direct financial interest in the infringement. The uploading and downloading of increasing numbers of copyrighted works to the Open Library, including the Works, enhances the reputation of Defendant and its Website as a comprehensive source of free digital books. It draws more user registrations from people wishing to download from the Website and more donations of funds and books. The infringing files also increase the number of visitors to the Website, in turn increasing the numbers of people who view the link to purchase books at the Defendant's affiliate, Better World Books, which as it acquires more books, provides them to IA for scanning. Further, Defendant obtains a direct financial benefit by charging for the costs of scanning copyrighted books, which are then uploaded to the Website.

145. Each infringement of the rights of Plaintiffs in one of the Works constitutes a separate and distinct act of infringement.

146. Defendant's infringement of Plaintiffs' copyrights, including Plaintiffs' Works, is willful.

147. Upon information and belief, as a direct and proximate result of its wrongful conduct, Defendant has and will obtain benefits, including, but not limited to, profits to which Defendant is not entitled.

148. As a direct and proximate result of Defendant's wrongful conduct, Plaintiffs have been, and will continue to be, substantially and irreparably harmed in an amount not readily capable of determination. Unless restrained by this Court, Defendant will cause further irreparable injury to Plaintiffs.

50

149.     As a direct and proximate result of Defendant's infringement, Plaintiffs are entitled to recover statutory damages, pursuant to 17 U.S.C. § 504(c), with respect to each work infringed.  Alternatively, at the election of Plaintiffs, pursuant to 17 U.S.C. § 504(b), Plaintiffs are further entitled to recover from Defendant the damages they have sustained and will sustain, as well as any gains, profits, and advantages obtained by IA as a result of its acts of infringement alleged above.  At present, the amount of such damages, gains, profits, and advantages cannot be fully ascertained by Plaintiffs.

150.     Plaintiffs are entitled to recover their attorney's fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Hachette, HarperCollins, Penguin Random House, and Wiley, respectfully request judgment against Defendant Internet Archive as follows:

A.     Declaring that the practices of Internet Archive in connection with "Open Library" constitute willful copyright infringement;

B.     Issuing a preliminary and permanent injunction enjoining Internet Archive, and its agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in active concert or participation with it, from directly or indirectly reproducing, distributing, publicly displaying, creating derivative works, otherwise infringing, or causing, enabling, facilitating, encouraging, or inducing the reproduction, distribution, public display, creation of derivative works, or other infringement of, any of the respective copyrights owned or exclusively controlled, in whole or in part, by Plaintiffs, whether now in existence or hereinafter created, and ordering that all unlawful copies be destroyed;

51

C.   Entering judgment for Plaintiffs against Internet Archive for statutory damages in an amount based upon Internet Archive's willful acts of infringement of the Works, as alleged above, pursuant to the Copyright Act, 17 U.S.C. §§ 101, *et seq.*;

D.   Alternatively, ordering Internet Archive to render a full and complete accounting to Plaintiffs of Internet Archive's profits, gains, advantages, or the value of business opportunities received from the foregoing acts of infringement of the Works and entering judgment for Plaintiffs against Internet Archive for all damages suffered by Plaintiffs and for any profits or gain by Internet Archive attributable to the infringements alleged above of Plaintiffs' copyrights in amounts to be determined at trial;

E.   Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorney's fees, pursuant to 17 U.S.C. § 505;

F.   Awarding Plaintiffs pre-judgment and post-judgment interest, to the fullest extent available, on the foregoing; and

G.   Granting such other further and different relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable in this action.

Dated: June 1, 2020
New York, New York

DAVIS WRIGHT TREMAINE LLP

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman

52

John M. Browning
Meredith I. Santana
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        meredithsantana@dwt.com

OPPENHEIM + ZEBRAK, LLP

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice* motion forthcoming)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
        scott@oandzlaw.com

*Attorneys for Hachette Book Group, Inc.,
HarperCollins Publishers LLC, John Wiley & Sons,
Inc., and Penguin Random House LLC*

53

# EXHIBIT A

| | AUTHOR | TITLE | COPYRIGHT REGISTRATION NUMBER | PUBLISHER |
|---|---|---|---|---|
| 1 | Ahern, Cecelia | PS, I Love You | TX0005895532 | Hachette |
| 2 | Albertalli, Becky | Simon vs. the Homo Sapiens Agenda | TX0008021205 | HarperCollins |
| 3 | Applegate, Katherine | The One and Only Ivan | TX0007555692 | HarperCollins |
| 4 | Bacigalupi, Paolo | Ship Breaker | TX0007254031 | Hachette |
| 5 | Brown, Brené | Daring Greatly: How the Courage to Be Vulnerable Transforms the Way We Live, Love, Parent, and Lead | TX0007634717 | Penguin Random House |
| 6 | Brown, Pierce | Golden Son | TX0008016409 | Penguin Random House |
| 7 | Brown, Sandra | Best Kept Secrets | TX0002539419 | Hachette |
| 8 | Brown, Sandra | The Witness | TX0005069323 | Hachette |
| 9 | Bryson, Bill | A Short History of Nearly Everything | TX0005819304 | Penguin Random House |
| 10 | Bryson, Bill | A Short History of Nearly Everything: Special Illustrated Edition | TX0006307243 | Penguin Random House |
| 11 | Cabot, Meg | The Bride Wore Size 12 | TX0007783913 | HarperCollins |
| 12 | Carter, Les | Enough About You, Let's Talk About Me: How to Recognize and Manage the Narcissists in Your Life | TX0006325485 | Wiley |
| 13 | Catling, Patrick Skene | The Chocolate Touch | A00000069921, RE0000055493 | HarperCollins |
| 14 | Cisneros, Sandra | The House on Mango Street | TX0003739076 | Penguin Random House |
| 15 | Conti, Peter; Harris, Peter | Commercial Real Estate Investing for Dummies | TX0007025526 | Wiley |
| 16 | Corey, James S.A. | Leviathan Wakes | TX0007439248 | Hachette |
| 17 | Corey, James S.A. | Caliban's War | TX0007617575 | Hachette |
| 18 | Crossan, Sarah | Breathe | TX0007683648 | HarperCollins |
| 19 | Crossan, Sarah | Resist | TX0007793191 | HarperCollins |
| 20 | Danforth, Emily M. | The Miseducation of Cameron Post | TX0007538437 | HarperCollins |
| 21 | Demuth, Patricia | Who is Bill Gates? | TX0007733894 | Penguin Random House |
| 22 | Dugoni, Robert | The Jury Master | TX0006525282 | Hachette |
| 23 | Epstein, David J. | The Sports Gene: Inside the Science of Extraordinary Athletic Performance | TX0007771878 | Penguin Random House |
| 24 | Evanovich, Janet | Foul Play | TX0002495088 | HarperCollins |
| 25 | Fisher, Kenneth L. | The Only Three Questions that Still Count: Investing by Knowing What Others Don't | TX0007513212 | Wiley |
| 26 | Fitzpatrick, Huntley | My Life Next Door | TX0007565514 | Penguin Random House |
| 27 | Flynn, Gillian | Gone Girl | TX0007548935 | Penguin Random House |
| 28 | Forman, Gayle | If I Stay | TX0006970259 | Penguin Random House |
| 29 | Gardner, Lisa | Fear Nothing | TX0007509675 | Penguin Random House |
| 30 | Giddings, Anita; Clifton, Sherry Stone | Oil Painting for Dummies | TX0007089078 | Wiley |
| 31 | Gilbert, Elizabeth | Eat, Pray, Love: One Woman's Search for Everything Across Italy, India and Indonesia | TX0006375345 | Penguin Random House |
| 32 | Gladwell, Malcolm | David and Goliath: Underdogs, Misfits, and the Art of Battling Giants | TX0007814165 | Hachette |
| 33 | Gladwell, Malcolm | What the Dog Saw | TX0007118941 | Hachette |
| 34 | Gladwell, Malcolm | Blink: The Power of Thinking Without Thinking | TX0006120724 | Hachette |
| 35 | Gladwell, Malcolm | Tipping Point: How Little Things Can Make a Big Difference | TX0005861769 | Hachette |
| 36 | Golding, William | Lord of the Flies | A00000207331, RE0000165908 | Penguin Random House |
| 37 | Gordon, Jon | The Energy Bus | TX0006916245 | Wiley |
| 38 | Grabenstein, Chris | Escape from Mr. Lemoncello's Library | TX0007770723 | Penguin Random House |
| 39 | Graham, Benjamin | The Intelligent Investor | A33116, R661874, A411612, RE369865, A141550, RE127674 | HarperCollins |
| 40 | Grant, Adam M. | Give and Take: a Revolutionary Approach to Success | TX0007685330 | Penguin Random House |
| 41 | Grisham, John | The Innocent Man: Murder and Injustice in a Small Town | TX0006447726 | Penguin Random House |
| 42 | Grisham, John | Theodore Boone: Kid Lawyer | TX0007198794 | Penguin Random House |
| 43 | Grisham, John | Theodore Boone: The Accused | TX0007558149 | Penguin Random House |
| 44 | Hall, Michael | Red: A Crayon's Story | TX0008019464 | HarperCollins |
| 45 | Herman, Gail | Who was Jackie Robinson? | TX0007326367 | Penguin Random House |
| 46 | Hiaasen, Carl | Scat | TX0006920819 | Penguin Random House |
| 47 | Hurston, Zora Neale | Their Eyes Were Watching God | A108603, R357931 | HarperCollins |
| 48 | Jahren, Hope | Lab Girl | TX0008263021 | Penguin Random House |
| 49 | James, Marlon | A Brief History of Seven Killings | TX0007950885 | Penguin Random House |
| 50 | Jance, J.A. | Judgment Call | TX0007580015 | HarperCollins |
| 51 | Jance, J.A. | Dance of the Bones | TX0008123060 | HarperCollins |
| 52 | Kalanithi, Paul | When Breath Becomes Air | TX0008170188 | Penguin Random House |
| 53 | Kate, Lauren | Fallen | TX0007162746 | Penguin Random House |
| 54 | Kelly, Martha Hall | Lilac Girls | TX0008288854 | Penguin Random House |
| 55 | Klay, Phil | Redeployment | TX0007856163 | Penguin Random House |
| 56 | Krakauer, Jon | Into the Wild | TX0004242389 | Penguin Random House |
| 57 | Kraynak, Cecie; Kraynak, Joe | Spanish All-in-One for Dummies | TX0007152269 | Wiley |
| 58 | Kuhn, Karl F. | Basic Physics | TX0004294866 | Wiley |
| 59 | L'Amour, Louis | Hondo | A00000113543, RE0000107198 | Penguin Random House |
| 60 | Larson, Edward J. | The Return of George Washington | TX0007922775 | HarperCollins |
| 61 | Larson, Erik | Dead Wake: the Last Crossing of the Lusitania | TX0008257868 | Penguin Random House |
| 62 | Lazarus, William P.; Sullivan, Mark | Comparative Religion for Dummies | TX0007241296 | Wiley |

| 63 | Lehane, Dennis | World Gone By | TX0008039819 | HarperCollins |
| 64 | Lencioni, Patrick | The Five Dysfunctions of a Team: a Leadership Fable | TX0005757057 | Wiley |
| 65 | Lencioni, Patrick | The Advantage: Why Organizational Health Trumps Everything Else in Business | TX0007503919 | Wiley |
| 66 | Lencioni, Patrick | Overcoming the Five Dysfunctions of a Team | TX0006165385 | Wiley |
| 67 | Lencioni, Patrick | The Three Signs of a Miserable Job: a Fable for Managers (and Their Employees) | TX0007006036 | Wiley |
| 68 | Lencioni, Patrick | Getting Naked: a Business Fable About Shedding the Three Fears that Sabotage Client Loyalty | TX0007161860 | Wiley |
| 69 | Levine, Barry | All the President's Women: Donald Trump and the Making of a Predator | TX0008836048 | Hachette |
| 70 | Lewis, C. S. | The Lion, the Witch, and the Wardrobe | AI-2945, R678216 | HarperCollins |
| 71 | Lewis, C. S. | The Magician's Nephew | A00000203269, AI0000004618, RE0000172597 | HarperCollins |
| 72 | Lu, Marie | Legend | TX0007477993 | Penguin Random House |
| 73 | Mandel, Emily St. John | Station Eleven | TX0007946421 | Penguin Random House |
| 74 | Martin, George R. R. | A Dance with Dragons | TX0007400734 | Penguin Random House |
| 75 | McCarthy, Cormac | The Road | TX0006556613 | Penguin Random House |
| 76 | Miller, Donalyn | The Book Whisperer | TX0007254399 | Wiley |
| 77 | Morgenstern, Erin | The Night Circus | TX0007425933 | Penguin Random House |
| 78 | Morrison, Toni | Song of Solomon | A00000904465, RE0000921551 | Penguin Random House |
| 79 | Morrison, Toni | The Bluest Eye | A00000222644, RE0000785522 | Penguin Random House |
| 80 | Nelson, Marilyn | How I Discovered Poetry | TX0007846518 | Penguin Random House |
| 81 | O'Connor, Jane; Glasser, Robin | Fancy Nancy: Too Many Tutus | TX0007690991, VA0001862482 | HarperCollins |
| 82 | O'Connor, Jane; Glasser, Robin | Fancy Nancy: Super Secret Surprise Party | TX0008070920, VA001967523 | HarperCollins |
| 83 | Palmer, Parker J. | Let Your Life Speak: Listening for the Voice of Vocation | TX0005080321 | Wiley |
| 84 | Park, Barbara | Junie B., First Grader: Boss of Lunch | TX0005623738 | Penguin Random House |
| 85 | Patchett, Ann | Commonwealth | TX0008316769 | HarperCollins |
| 86 | Patterson, James | Middle School, the Worst Years of My Life | TX0007593552 | Hachette |
| 87 | Patterson, James | Invisible | TX0007953870 | Hachette |
| 88 | Patterson, James; Grabenstein, Chris | I Funny: A Middle School Story | TX0007629856 | Hachette |
| 89 | Peirce, Lincoln | Big Nate: Mr. Popularity | TX0007908851 | HarperCollins |
| 90 | Peirce, Lincoln | Big Nate: Genius Mode | TX0007715101 | HarperCollins |
| 91 | Peirce, Lincoln | Big Nate Goes for Broke | TX0007521998 | HarperCollins |
| 92 | Pinker, Steven | The Better Angels of Our Nature: Why Violence has Declined | TX0007454376 | Penguin Random House |
| 93 | Plath, Sylvia | The Bell Jar | A275047 | HarperCollins |
| 94 | Pratchett, Terry | Night Watch | TX0005702246 | HarperCollins |
| 95 | Redwine, C. J. | Defiance | TX0007683441 | HarperCollins |
| 96 | Ritchhart, Ron | Making Thinking Visible: How to Promote Engagement, Understanding, and Independence for All Learners | TX0007397014 | Wiley |
| 97 | Rohr, Richard | Falling Upward: a Spirituality for the Two Halves of Life | TX0007368227 | Wiley |
| 98 | Salinger, J. D. | The Catcher in the Rye | A00000056070, RE0000018341 | Hachette |
| 99 | Salinger, J. D. | Nine Stories | TX0000625326, RE0000130457 | Hachette |
| 100 | Salinger, J. D. | Franny and Zooey | A00000591015, RE0000438737 | Hachette |
| 101 | Salinger, J. D. | Raise High the Roof Beam, Carpenters, and Seymour: An Introduction | B00000776866, RE0000340311, B00000564939, RE0000157487 | Hachette |
| 102 | Sandford, John | Phantom Prey | TX0007189422 | Penguin Random House |
| 103 | Schaefer, Charles E.; DiGeronimo, Theresa Foy | Ages and Stages: a Parent's Guide to Normal Childhood Development | TX0005277840 | Wiley |
| 104 | Schneider, Robyn | Extraordinary Means | TX0008104539 | HarperCollins |
| 105 | Semple, Maria | Today Will Be Different | TX0008324577 | Hachette |
| 106 | Silberman, Steve | Neurotribes: the Legacy of Autism and the Future of Neurodiversity | TX0008202678 | Penguin Random House |
| 107 | Snicket, Lemony | Who Could That Be at This Hour? | TX0007615258 | Hachette |
| 108 | Snicket, Lemony | When Did You See Her Last? | TX0007818551 | Hachette |
| 109 | Stewart, Trenton Lee | The Extraordinary Education of Nicholas Benedict | TX0007552463 | Hachette |
| 110 | Stewart, Trenton Lee | The Mysterious Benedict Society | TX0006577654 | Hachette |
| 111 | Stewart, Trenton Lee | The Mysterious Benedict Society and the Perilous Journey | TX0007018489 | Hachette |
| 112 | Stone, Douglas | Thanks for the Feedback: the Science and Art of Receiving Feedback (Even When it is Off-Base, Unfair, Poorly Delivered, and Frankly, You're Not in the Mood) | TX0007885277 | Penguin Random House |
| 113 | Strout, Elizabeth | The Burgess Boys | TX0007729095 | Penguin Random House |
| 114 | Tahir, Sabaa | An Ember in the Ashes | TX0008301050 | Penguin Random House |
| 115 | Turnage, Sheila | Three Times Lucky | TX0007558141 | Penguin Random House |
| 116 | van der Kolk, Bessel A. | The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma | TX0007949079 | Penguin Random House |
| 117 | Wiesel, Elie | Open Heart | TX0007647478 | Penguin Random House |
| 118 | Wilder, Laura Ingalls | Little House in the Big Woods | A50595, R240866 | HarperCollins |
| 119 | Wilder, Laura Ingalls | Little House on the Prairie | A86517, R321069 | HarperCollins |
| 120 | Wilder, Laura Ingalls | Farmer Boy | A67106, R270763 | HarperCollins |

| 121 | Winspear, Jacqueline | A Dangerous Place | TX0008047542 | HarperCollins |
| 122 | Winspear, Jacqueline | Journey to Munich | TX0008265362 | HarperCollins |
| 123 | Winspear, Jacqueline | Elegy for Eddie | TX0007508297 | HarperCollins |
| 124 | Woofenden, Ian | Wind Power for Dummies | TX0007154083 | Wiley |
| 125 | Wouk, Herman | The Winds of War | A00000278899, RE0000652979 | Hachette |
| 126 | Wouk, Herman | The Caine Mutiny: A Novel of World War II | A00000053612, RE0000018386 | Hachette |
| 127 | Zuckerman, Gregory | The Man Who Solved the Market | TX0008865827 | Penguin Random House |

A-1200

# McNamara Declaration
# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC, | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive, | |
| Defendants. | |

**DEFENDANT INTERNET ARCHIVE'S ANSWER AND AFFIRMATIVE DEFENSES
TO THE COMPLAINT**

Defendant Internet Archive, by its undersigned counsel, hereby answers the Complaint of Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC (collectively, "Plaintiffs") as follows, based on information reasonably available to the Internet Archive.

## PRELIMINARY STATEMENT

The Internet Archive, a 501(c)(3) public charity, is a nonprofit library that has had one guiding mission for almost 25 years: to provide universal access to all knowledge.  It is a Library of Alexandria for the twenty-first century that, thanks to digital technologies and the Internet, excels in a way the Library of Alexandria never could.  Through the Internet Archive, people who do not live in world capitals can access the same cultural and informational resources as those who do.

The Internet Archive does what libraries have always done: buy, collect, preserve, and share our common culture.  In furtherance of that mission, the Internet Archive has received grant funding from the National Endowment for the Humanities, the National Science Foundation, and the federal government's Institute of Museum and Library Services, among many other sources.  Many libraries and archives, including the Library of Congress, Boston Public Library, University of Illinois at Urbana-Champaign, and smaller community libraries like the Allen County Public Library trust the Internet Archive to digitize books and other materials in their collections in order to preserve physical texts and to facilitate public access. The Internet Archive is part of a network of libraries around the world—each of which is using digital technologies to meet the many challenges of serving patrons with diverse needs and differing abilities and to ensure that the growing storehouse of human creativity is not lost because no one has the capacity to preserve it.

Like Plaintiffs, the Internet Archive believes that "[b]ooks are a cornerstone of our culture and system of democratic self-government" and "play a critical role in education." Accordingly, democratizing access to information, and facilitating access to books in particular, has been a core part of the Internet Archive's mission for decades.  But, for many people,

1

distance, time, cost, or disability pose daunting and sometimes insurmountable barriers to accessing physical books. Digitizing and offering books online for borrowing unlocks them for communities with limited or no access, creating a lifeline to trusted information. Readers in the Internet age need a comprehensive library that meets them where they are—an online space that welcomes everyone to use its resources, while respecting readers' privacy and dignity.

To make this vision of a comprehensive Internet library a reality, the Internet Archive offers digitized books in a variety of ways. Books published prior to 1924 can be downloaded without restriction, and people with visual impairments can access more recent books using specially-designed encrypted technologies. The corpus of digitized books is used by data scientists to do computational analysis of texts, yielding a broader picture of human thought. To mirror traditional library lending online for everyone else, the Internet Archive allows patrons to borrow modern books via a process called Controlled Digital Lending ("CDL").

Under CDL, the Internet Archive and other libraries make and lend out digital scans of physical books in their collections. Replicating longstanding brick-and-mortar practice, only one person can borrow one copy at a time. With the support and participation of hundreds of other libraries, the Internet Archive has been digitizing books lawfully acquired through purchase or donation and, since 2011, lending those digitized books on this own-to-loan basis. The Internet Archive loans books to its patrons using the same industry-standard technical protections that publishers themselves use to make books available electronically. Libraries have collectively paid publishers billions of dollars for the books in their print collections and are investing enormous resources in digitization in order to preserve those texts. CDL helps them take the next step by making sure the public can make full use of the books that libraries have bought.

This activity is fundamentally the same as traditional library lending and poses no new harm to authors or the publishing industry. In fact, the Internet Archive fosters research and learning by making sure people all over the world can access books and by keeping books in circulation when their publishers have lost interest in providing access. Nevertheless, where authors or publishers wish to deny the public access to their works through CDL, the Internet

Archive honors those requests. (All of the works at issue in this case have been removed from the Internet Archive's websites.)

The Internet Archive has made careful efforts to ensure its uses are lawful. The Internet Archive's CDL program is sheltered by the fair use doctrine, buttressed by traditional library protections. Specifically, the project serves the public interest in preservation, access and research—all classic fair use purposes. Every book in the collection has already been published and most are out of print. Patrons can borrow and read entire volumes, to be sure, but that is what it means to check a book out from a library. As for its effect on the market for the works in question, the books have already been bought and paid for by the libraries that own them. The public derives tremendous benefit from the program, and rights holders will gain nothing if the public is deprived of this resource.

During the early days of the COVID-19 crisis, in response to urgent pleas from teachers and librarians whose students and patrons had been ordered to stay at home, the Internet Archive decided to temporarily permit lending that could have exceeded the one-to-one owned-to-loaned ratio. With millions of print books locked away, digital lending was the only practical way to get books to those who needed them. The Internet Archive called this program the "National Emergency Library" and planned to discontinue it once the need had passed. Twelve weeks later, other options had emerged to fill the gap, and the Internet Archive was able to return to the traditional CDL approach.

Contrary to the publishers' accusations, the Internet Archive and the hundreds of libraries and archives that support it are not pirates or thieves. They are librarians, striving to serve their patrons online just as they have done for centuries in the brick-and-mortar world. Copyright law does not stand in the way of libraries' right to lend, and patrons' right to borrow, the books that libraries own.

3

## NATURE OF THE ACTION[1]

1. The Internet Archive admits that the Plaintiffs allege copyright infringement, that Internet Archive is a named Defendant, and that the Complaint alleges facts concerning "Open Library" and/or "National Emergency Library."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

2. Denied.

3. The Internet Archive admits that more than 1.3 million books are available on archive.org for one patron to borrow at a time.  The Internet Archive denies the remaining allegations of this paragraph.

4. Admitted.

5. The Internet Archive admits that, in 1787, the Framers adopted the Copyright Clause of the Constitution, explicitly authorizing Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  U.S. Const., Art. I, § 8, cl. 8.  The Internet Archive further admits that, in 1790, the First Congress enacted the first Copyright Act.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

6. The Internet Archive admits that books from a variety of genres are available to patrons for borrowing on archive.org.  The Internet Archive denies the remaining allegations of this paragraph.

7. Denied.

8. Denied.

9. Denied.

10. Denied.

---

[1] Internet Archive neither admits nor denies the contents of the various headings and subheadings in the Complaint, which are reproduced herein solely for convenience.

4

11.     Denied.

12.     The Internet Archive admits that libraries are trusted institutions that serve communities.  The Internet Archive admits that a study authored by the Copyright Office titled "Legal Issues in Mass Digitization" published in October 2011 contains the statement "The Section 108 exception does not contemplate mass digitization."  The Internet Archive denies the remaining allegations of this paragraph.

13.     Denied.

14.     Denied.

## THE PARTIES

### A.     Plaintiffs

15.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

16.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

17.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

18.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

19.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

20.     The Internet Archive admits that the works identified in Exhibit A to the Complaint were at one time available for patrons to borrow via archive.org.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

21.     The Internet Archive lacks sufficient knowledge or information to admit or deny

5

the allegations in this paragraph and on that basis denies them.

22.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

**B.     Defendant**

23.     Admitted.

24.     The Internet Archive admits that it is registered with the New York Department of State to transact business and accept service of process in the State of New York.  The Internet Archive further admits that some of its patrons live in New York.  The Internet Archive further admits that some New York libraries have engaged the Internet Archive to digitize books for them.  The Internet Archive further admits that some of its donors are located in New York.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

25.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

26.     The Internet Archive admits that it provides some services to other nonprofit institutions and that those institutions help defray the costs of providing those services.  The Internet Archive admits that over the last 10 years, the Internet Archive has received donations, grants, and other revenue totaling more than $100 million.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

27.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

## JURISDICTION AND VENUE

28.     The Internet Archive does not contest that this Court may exert subject matter jurisdiction over Plaintiffs' claims.  The remaining allegations in this paragraph are legal

6

conclusions to which no response is required. To the extent any response is required, the Internet Archive denies the allegations in this paragraph.

29. For the purposes of this action only, the Internet Archive does not contest it is subject to personal jurisdiction in New York State. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

30. For the purposes of this action only, the Internet Archive does not contest it is subject to personal jurisdiction in New York State. The Internet Archive admits that it is registered to do business in New York State. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

31. For this purposes of this action only, the Internet Archive admits that venue is proper in this District.

## FACTUAL BACKGROUND

**A.** **The Book Publishing Ecosystem**

**i.** **Publishers and Authors Rely on Copyright Law to Create Functioning Markets for Books**

32. The Internet Archive admits that books are a cornerstone of our culture and system of democratic self-government and play a critical role in education. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

33. The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

34. Internet Archive lacks sufficient knowledge or information to admit or deny the

7

allegations in this paragraph and on that basis denies them.

35.     The Internet Archive admits that the first Copyright Act was passed in 1790, that there is a Copyright Clause in the Constitution, and that a subsequent Copyright Act was passed in 1976.  The remaining allegations in this paragraph are legal conclusions to which no response is required.  To the extent any response is required, the Internet Archive denies the allegations in this paragraph.

36.     Denied.

37.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

38.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

ii.     **The Development of Functioning Markets for Ebooks**

39.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

40.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

41.     The Internet Archive admits that publishers sell copies of print books without any restrictions.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

42.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

43.     The Internet Archive admits that Congress passed the DMCA in 1998.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

44.     The Internet Archive lacks sufficient knowledge or information to admit or deny

8

the remaining allegations in this paragraph and on that basis denies them.

45.     The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

### iii.     The Established Market Equilibrium Between Authors, Publishers, and Libraries

46.     The Internet Archive admits that public libraries are among the most cherished institutions in this country.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

47.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

48.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

### iv.     Plaintiffs and Libraries Reacted Rapidly to Ensure Library Patrons Have Access to Books During the COVID-19 Lockdown

49.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

50.     Denied.

51.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

### B.     Internet Archive Unlawfully Disrupts the Book Publishing Ecosystem by Infringing Copyright on an Industrial Scale

52.     Denied.

### i.     Internet Archive

53.     The Internet Archive admits that Brewster Kahle founded the Internet Archive in

9

1996.  The Internet Archive further admits that it provides the Wayback Machine and digitization of public domain materials.  The Internet Archive further admits that such services are excluded from Plaintiffs' allegations in this lawsuit.  The Internet Archive denies the remaining allegations of this paragraph.

54.     The Internet Archive admits that its headquarters are located in San Francisco, but denies that the corner of Funston and Clement Streets is an "exclusive area."  The Internet Archive further admits that, as listed on its 2017 tax filings, it employed 150 employees in calendar year 2017.  The Internet Archive admits that Better World Libraries is a nonprofit organization that owns book seller Better World Books.  The Internet Archive denies the remaining allegations of this paragraph.

55.     The Internet Archive admits that it has received grants from the Kahle/Austin Foundation.  The Internet Archive admits that the Kahle/Austin Foundation was established by Brewster Kahle and his wife.  The Internet Archive admits that its programs are funded by a variety of philanthropic entities.  The Internet Archive lacks sufficient knowledge or information to admit or deny any remaining allegations in this paragraph and on that basis denies them.

56.     The Internet Archive admits that income from offering services and from donations help defray costs the Internet Archive incurs.  The Internet Archive further admits that it provides book scanning and digitization to institutions nationwide.  The Internet Archive admits that the New York Public Library hosted the Internet Archive's digitization activities in New York at one time.  The Internet Archive denies the remaining allegations in this paragraph.

### ii.     The Open Library

57.     The Internet Archive admits that it started Open Library in 2006 with the goal of providing "one web page for every book published."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

58.     Denied.

59.     Denied.

10

60.     Denied.

61.     The Internet Archive admits that an article titled *Where to find what's disappeared online, and a whole lot more: the Internet Archive* by Mary Kay Magistad is dated February 23, 2017.  The Internet Archive further admits that this article contains the following quote attributed to Brewster Kahle: "We're trying to build a Library of Alexandria, Version 2, so can we make all the published works of humankind available to people, permanently. If you're curious enough to want to have access, can we make it available to all the books, music, video, web pages, software, lectures, available to anybody wanting to have access."  The Internet Archive lacks sufficient knowledge or information to admit or deny any remaining allegations in this paragraph and on that basis denies them.

62.     The Internet Archive admits that an article titled *Internet Archive Expands Partnerships of Open Libraries Project* by Matt Enis is dated May 2, 2019.  The Internet Archive further admits that this article states that "The organization's goal is to ramp up digitization to 500,000 books per year," and the Internet Archive further admits that the article characterizes a component of that goal is "to have more than four million books online for the public."  The Internet Archive further admits that the article attributes the quote "to have more than four million books online for the public" to Chris Freeland, whom the article identifies as the director of Open Libraries.  The Internet Archive lacks sufficient knowledge or information to admit or deny any remaining allegations in this paragraph and on that basis denies them.

63.     Denied.

64.     The Internet Archive admits that *The Man Who Solved the Market: How Jim Simons Launched the Quant Revolution* by Gregory Zuckerman is listed in Exhibit A to the Complaint.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

65.     Denied.

66.     Denied.

### iii.    The User Experience of the Website

67.     The Internet Archive admits that a patron may sign up for an account using an Internet connection.  The Internet Archive further admits that, once a patron has created an account, the patron can borrow books.  The Internet Archive denies the remaining allegations of this paragraph.

68.     Admitted.

69.     The Internet Archive admits that clicking on a book title takes the patron to the title's webpage on the Open Library website, which contains a picture of the cover, a description of the book and bibliographic information, such as the publication date and the WorldCat catalog number.  The Internet Archive admits that the image in Paragraph 69 of the Complaint appears to be a screenshot of the Open Library page for the book *Blink*.  The Internet Archive admits that this screenshot contains links to book retailers.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

70.     The Internet Archive admits that in the screenshot in Paragraph 69 of the Complaint, the first link to a book retailer is to Better World Books.  The Internet Archive further admits that Better World Books is an online seller of books which is owned by Better World Libraries, a nonprofit organization.  The Internet Archive denies the remaining allegations of this paragraph.

71.     The Internet Archive admits that it labels some books on Open Library with the terms "read" and "borrow."  The Internet Archive further admits that patrons may "read" or borrow" a book if that book is available on archive.org.  The Internet Archive further admits that patrons who choose books available to "read" can download the digitized book in a variety of digital formats, including as a .pdf file.  The Internet Archive further admits that there is no limit on the number of patrons that can download books available to "read" on archive.org.  The Internet Archive further admits that books available to "read" on archive.org lack DRM restrictions.  The Internet Archive further admits that patrons can access books available on

12

archive.org to "read" using the BookReader interface. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

72. The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

73. The Internet Archive admits that books available for patrons to borrow on archive.org are not known by the Internet Archive to be in the public domain. The Internet Archive denies the remaining allegations of this paragraph.

74. The Internet Archive admits that a patron is currently limited to borrowing ten books at a time, to the extent those ten books are available to borrow from archive.org. The Internet Archive further admits that some books are available to borrow from archive.org for two weeks. The Internet Archive further admits that when a patron has borrowed ten books that are available to borrow from archive.org, the patron must return one of these borrowed books before he or she may borrow another book that is available to borrow from archive.org. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

75. The Internet Archive admits that it enforces an "owned to loaned" ratio that restricts the number of patrons who can at the same time borrow a book that is available to borrow from archive.org. The Internet Archive further admits that its patrons are put on a waitlist when there are no available copies of a book to borrow from archive.org. The Internet Archive denies the remaining allegations in this paragraph.

76. The Internet Archive admits that patrons that have checked out a book can read it on the BookReader interface. The Internet Archive further admits that this interface operates in a

web browser.  The Internet Archive further admits that the image in Paragraph 76 purports to be a screenshot of pages 166 and 167 of the book *Blink*, viewable on a web browser.  The Internet Archive further admits that, in BookReader, patrons can turn pages by clicking on the pages or using left- and right-facing triangles at the bottom of the screen.  The Internet Archive further admits that, in BookReader, patrons have the option to click a button to hear the text of a book read aloud.  The remaining allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

77.      The Internet Archive admits that Adobe Digital Editions ("ADE") facilitates patron access to a borrowed book.  The Internet Archive further admits that ADE files are protected by DRM technology that restricts copying and allows patrons to access the file during the fourteen-day borrowing period, after which time the patron can no longer open or access the file.  The Internet Archive denies the remaining allegations in this paragraph.

78.      The Internet Archive admits that patrons can borrow books available to "borrow" from archive.org in two ADE formats: "Encrypted Adobe PDF" and "Encrypted Adobe ePub." The Internet Archive admits that the image in Paragraph 78 purports to be a screenshot of a page from a book presented using ADE.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

79.      The Internet Archive admits that patrons can read books they borrow on capable devices and that examples of such devices include smartphones, tablets, and e-readers.  The Internet Archive admits that patrons can access the BookReader interface on mobile devices.  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

     **iv.**     **The Open Library Is Not a Library, It Is an Unlicensed Aggregator and Pirate Site**

80.      The Internet Archive admits that the website OpenLibrary.org states that Open

14

Library is "an accredited California State Library run by the non-profit the Internet Archive." The Internet Archive denies any remaining allegations in this paragraph.

81. The Internet Archive admits that it received a Library Services and Technology Act ("LSTA") grant in 2010/2011. The Internet Archive further admits that, in order to be eligible for such a grant, the Internet Archive must meet certain eligibility requirements. The Internet Archive further admits that one of those eligibility requirements is that it be a library. The Internet Archive denies any remaining allegations in this paragraph.

82. Denied.

83. The Internet Archive admits that the image in Paragraph 83 of the Complaint appears to be a screenshot of part of the homepage of OpenLibrary.org. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

84. The Internet Archive admits that the image in Paragraph 83 of the Complaint appears to be a screenshot of part of the homepage of OpenLibrary.org. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

     **v.    IA's Industrial Book-Scanning Machine and Global Scanning Operations**

85. Denied.

86. The Internet Archive admits that it developed the Scribe System and invented the Scribe scanner in order to digitize printed materials. The Internet Archive further admits that individuals operate the Scribe scanners to digitize printed materials and that the images in Paragraph 86 are of individuals using Scribe scanners to digitize printed materials. The Internet Archive denies the remaining allegations of this paragraph.

87. The Internet Archive admits that it has employed more than fifty employees to work at locations with Scribe scanners and that those employees are responsible for digitizing physical materials. The Internet Archive further admits that volunteers have also digitized

15

materials. The Internet Archive further admits that it can have 3,000 books digitized in a day when it is operating at full capacity. The Internet Archive denies the remaining allegations in this paragraph.

88.     The Internet Archive admits that, in the past, it operated a digitization center housed at facilities provided by the New York Public Library in the Southern District of New York and that it digitized books there. The Internet Archive further admits that some of the works listed in Exhibit A were digitized in New York. The Internet Archive denies any remaining allegations in this paragraph.

89.     The Internet Archive admits that it digitizes materials using the Scribe scanner, which photographs each page of a physical book in order to make a digital version of the book. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations. The Internet Archive denies the remaining allegations in this paragraph.

> **vi.     Internet Archive Shifts the Costs of Its Illegal Book Digitization Project Onto Publishers, Libraries, Open Library Users, and Other Third Parties**

90.     Denied.

91.     The Internet Archive admits that archive.org is an altruistic non-commercial enterprise. The Internet Archive denies the remaining allegations of this paragraph.

> **a.     Internet Archive is Paid Millions of Dollars to Infringe Copyrighted Books and Put Them on the Open Library**

92.     The Internet Archive admits that archive.org is an altruistic non-commercial enterprise. The Internet Archive denies the remaining allegations of this paragraph.

93.     The Internet Archive admits that the blog post by Brewster Kahle titled *Internet Archive Staff and Covid-19: Work-at-Home for Most, Full-Pay Furlough and Medical for Scanners* and dated March 25, 2020 contains the quote "Libraries paying for our scanning services is a major source of earned income for the Internet Archive." Internet Archive denies the remaining allegations in this paragraph.

16

94.     The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations. The Internet Archive denies any remaining allegations in this paragraph.

**b.     Better World Books Feeds the Open Library with Copyrighted Books**

95.     Denied.

96.     The Internet Archive admits that the quote "will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books" appears in a press release accompanying the acquisition of Better World Books by Better World Libraries, a non-profit. The Internet Archive denies that it is or is part of a "perfect closed loop system." The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

97.     Denied.

**c.     Users "Sponsor" Books that Internet Archive Wants to Infringe**

98.     The Internet Archive admits that it gives patrons the option to "sponsor" books. The Internet Archive further admits that the image in Paragraph 98 appears to be a screenshot of the Open Library homepage. The Internet Archive denies the remaining allegations in this paragraph.

99.     The Internet Archive admits that the image in Paragraph 99 appears to be a screenshot of a page for the book *Back to the Batcave*. The Internet Archive further admits clicking on a "Sponsor" button on a book's page opens the sponsorship page for that book and that the sponsorship page for a book states that a "tax deductible donation can add this book to the Internet Archive's lending library, forever" and lists a cost to sponsor the book. The Internet Archive denies any remaining allegations in this paragraph.

100.     The Internet Archive admits that the image in Paragraph 99 appears to be a

17

screenshot of a page for the book *Back to the Batcave*, written by Adam West. The Internet Archive further admits that the sponsorship cost of $93.12 appears in the image in Paragraph 99. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations. The Internet Archive denies the remaining allegations in this paragraph.

101. Denied.

102. Denied.

> **d.      Internet Archive Absorbs Entire Libraries for the Website**

103. The Internet Archive admits that a May 2019 article quotes Chris Freeland as saying IA's acquisition program "involves collecting donations of in-copyright materials from libraries and booksellers, digitizing this content in [IA's] scanning center in Cebu, the Philippines, and then storing the physical copies in archive facilities in Richmond, CA." The Internet Archive further admits that Chris Freeland is director of Open Libraries. The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

104. The Internet Archive admits that physical books that have been digitized for the purposes of providing access to patrons through archive.org are stored in archive facilities in Richmond, California. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations. The Internet Archive denies the remaining allegations in this paragraph.

105. Denied. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

106. Denied.

> **vii.      Controlled Digital Lending**

107. The Internet Archive admits that Controlled Digital Lending is not copyright infringement. The Internet Archive denies any remaining allegations in this paragraph.

<center>18</center>

108.    The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.  The remaining allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, The Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

109.    The Internet Archive admits that Jason Scott tweeted "Only one or two unique copies are kept – duplicates (which have increased over time) are donated to various charities or non-profits.  The books are stored at the physical archive."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

110.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, The Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

111.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

112.    IA admits that the Digital Millennium Copyright Act (DMCA) Section 104 Report issued by the Copyright Office states: "Time, space, effort and cost no longer act as barriers to the movement of [digital] copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost."  IA further admits that this report is available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.  IA lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.  To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, IA denies the allegations.

113.    Denied.

19

####### viii.     The National Emergency Library

114.     The Internet Archive admits the National Emergency Library was announced on March 24, 2020.  The Internet Archive further admits that the National Emergency Library was made available to the public in response to the pandemic.  To the extent allegations in this paragraph state a legal conclusion they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

115.     The Internet Archive admits that a blog post written by Brewster Kahle dated April 7, 2020 states: "We moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published."  The Internet Archive lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph and on that basis denies them.

116.     To the extent allegations in this paragraph state legal conclusions they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

117.     To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies any remaining allegations in this paragraph.

118.     To the extent allegations in this paragraph state legal conclusions, they do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.  The Internet Archive denies the remaining allegations in this paragraph.

**C.     Defendant's Infringement Causes Harm to Publishers**

119.     Denied.

120.     Denied.

121.     Denied.

122.     Denied.

20

123. Denied.

124. Denied.

125. The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them.

126. Denied.

127. Denied.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Direct Copyright Infringement (17 U.S.C. § 101 *et seq.*)

128. The Internet Archive repeats and realleges each and every response to Plaintiffs' foregoing allegations.

129. The allegations in this paragraph state legal conclusions and therefore do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

130. The Internet Archive lacks sufficient knowledge or information to admit or deny the allegations in this paragraph and on that basis denies them. To the extent allegations in this paragraph state legal conclusions, they do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

131. The allegations in this paragraph state legal conclusions and therefore do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

132. The allegations in this paragraph state legal conclusions and therefore do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

133. The allegations in this paragraph state legal conclusions and therefore do not require a response. To the extent a response is required, the Internet Archive denies the allegations.

21

134.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

135.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

136.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

137.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

## SECOND CAUSE OF ACTION
### Secondary Copyright Infringement (17 U.S.C. § 101 *et seq.*)

138.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

139.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

140.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

141.     The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

142.     The allegations in this paragraph state legal conclusions and therefore do not

22

require a response.  To the extent a response is required, the Internet Archive denies the allegations.

143.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

144.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

145.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

146.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

147.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

148.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

149.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

150.    The allegations in this paragraph state legal conclusions and therefore do not require a response.  To the extent a response is required, the Internet Archive denies the allegations.

## PRAYER FOR RELIEF

In response to the Prayer for Relief, the Internet Archive denies that Plaintiffs are entitled to the requested relief, or to any relief whatsoever.

## AFFIRMATIVE DEFENSES

In further answer to the allegations made by Plaintiffs in the Complaint, the Internet Archive asserts the following affirmative defenses. The Internet Archive does not concede that it has the burden of proof on the defenses listed below.

### First Affirmative Defense
### (*Failure to State a Claim*)

The Complaint fails to state a claim on which relief can be granted.

### Second Affirmative Defense
### (*Fair Use*)

To the extent there was any use of Plaintiffs' copyrighted materials, such use is protected by the Fair Use Doctrine, including under 17 U.S.C. § 107.

### Third Affirmative Defense
### (*First Sale Doctrine*)

Plaintiffs' claims are barred in whole or in part by the First Sale Doctrine, including under 17 U.S.C. § 109.

### Fourth Affirmative Defense
### (*Safe Harbor*)

To the extent they arise by reason of the storage at the direction of a user of allegedly infringing material, Plaintiffs' claims are barred in whole or in part by 17 U.S.C. § 512(c).

### Fifth Affirmative Defense
### (*No Statutory Damages*)

Pursuant to 17 U.S.C. § 504(c)(2), Plaintiffs are not entitled to statutory damages, and statutory damages must be remitted, because the Internet Archive believed and had reasonable

24

grounds for believing that the accused use of the copyrighted work was a fair use, including under section 107, and the Internet Archive is an institution, library, or archives accused of having infringed by reproducing works in copies or phonorecords.

### Sixth Affirmative Defense
*(Statutes of Limitations)*

Plaintiffs' remedies are barred at least in part by the applicable statutes of limitations under 17 U.S.C. § 507(b).

### Seventh Affirmative Defense
*(Laches)*

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

## PRAYER FOR RELIEF

WHEREFORE, the Internet Archive respectfully prays that the Court:

1. Deny Plaintiffs' prayer for relief in it its entirety;

2. Dismiss the Complaint with prejudice and enter judgment in favor of IA;

3. Award the Internet Archive its attorneys' fees and costs incurred in this action, and any other amounts recoverable under law; and

4. Award the Internet Archive such other and further relief as the Court deems just and equitable.

The Internet Archive hereby demands a trial by jury in this action.

Dated: July 28, 2020                DURIE TANGRI LLP

By:                */s/ Joseph C. Gratz*          
          JOSEPH C. GRATZ (*Pro Hac Vice*)
          JESSICA E. LANIER (*Pro Hac Vice*)
          ADITYA V. KAMDAR (*Pro Hac Vice*)

25

217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com

ALLYSON R. BENNETT (*Pro Hac Vice*)
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
abennett@durietangri.com

CORYNNE MCSHERRY (*Pro Hac Vice*)
KIT WALSH (*Pro Hac Vice*)
CARA GAGLIANO  (*Pro Hac Vice*)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant INTERNET ARCHIVE

26

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2020 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

        */s/ Joseph C. Gratz*
        JOSEPH C. GRATZ

# McNamara Declaration

# Exhibit 3

# Books to Borrow

Share
Favorite
RSS
Play All

Books in this collection may be borrowed by logged in patrons. You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans.

More...

ABOUT COLLECTION

3,495,193 RESULTS

SORT BY VIEWS · TITLE · DATE PUBLISHED · CREATOR

Search this Collection

- Metadata
- Text contents

**Part Of**

eBooks and Texts

**Media Type**

| | |
|---|---|
| collections | 1 |
| texts | 3,495,372 |

**Availability**

| | |
|---|---|
| Lending Library | 3,299,214 |
| Borrow 14 Days | 1,109,287 |
| Always Available | 2 |

**Year**

| | |
|---|---|
| 2016 | 53,315 |
| 2015 | 62,381 |
| 2014 | 68,359 |
| 2013 | 72,843 |
| 2012 | 78,687 |
| 2011 | 80,417 |

More

**Topics & Subjects** Aa

| | |
|---|---|
| microfilm | 391,428 |
| Trade Journals | 180,002 |
| United States | 112,180 |
| Scholarly Journals | 103,548 |
| Magazines | 100,017 |
| Great Britain | 49,966 |

More

**Collection**

| | |
|---|---|
| Books for People with Print Disabilities | 3,490,100 |
| Internet Archive Books | 3,079,530 |
| Scanned in China | 740,617 |
| Periodicals | 391,428 |
| Serials in Microfilm | 391,428 |

More

**Creator** Aa

| | |
|---|---|
| none | 16,350 |
| shakespeare, william, 1564-1616 | 1,704 |
| blyton, enid | 1,088 |
| christie, agatha, 1890- | 928 |

A da lu zong
1010
228 · 8 · 0

The natural history of "bores" / / by Angus B.
1847
1,684 · 36 · 1

Coal Age 1915-08-07: Vol 8 Iss 6
Aug 7, 1915
635 · 9 · 1

The Hibbert Journal 1926 - 1927: Vol 25 Iss 1
1926
145 · 1 · 0

The Public Health Nurse 1926-01: Vol 18 Iss 1
1926
203 · 4 · 0

Punch January-June 1926: Vol 170
1926
1,574 · 40 · 0

Bell Laboratories Record 1926-01: Vol 1 Iss 5
1926
141 · 2 · 0

Classical Bulletin 1926: Vol 2 Supplement
1926
180 · 5 · 0

The Bookman 1926: Vol 71 Supplement
1926
125 · 4 · 0

Radio 1926-01: Vol 8 Iss 1
1926
429 · 5 · 0

The Feed Bag 1926-01: Vol 2 Iss 1
1926
40 · 2 · 0

The Nineteenth Century and After 1926-01: Vol 99
1926
213 · 5 · 0

The Institute of Petroleum. Journal 1926: Vol 12 Iss
1926
71 · 1 · 0

The English Review 1926-01: Vol 42
1926
412 · 6 · 0

Bogens Verden 1926: Vol 8
1926
43 · 1 · 0



1976
- time-life books 861
- ganeri, anita, 1961- 816

More

Language

- English 3,071,128
- French 136,439
- Chinese 79,582
- German 59,392
- Spanish 55,950
- Dutch 23,152

More

Bulletin of Bibliography January-April 1926: Vol 12
1926
23 1 0

Scribner's Magazine 1926-01: Vol 79 Iss 1
1926
66 1 0

The National Review 1926-01: Vol 86 Iss 515
1926
68 1 1

The Bookman 1926-01: Vol 69 Iss 412
1926
103 2 0

The English Electric Journal January-March
1926
94 2 0

American Childhood 1926-01: Vol 11 Iss 5
1926
117 3 0

Ainslee's The Magazine That Entertains 1926-01:
1926
109 1 0

The American Mercury 1926-01: Vol 7 Iss 25
1926
52 1 0

The American Foreign Service Journal 1926-01:
1926
129 7 0

The Hibbert Journal 1926 - 1927: Vol 25 Iss 2
1926
23 0 0

The Institute of Petroleum. Journal 1926: Vol 12 Iss
1926
29 0 0

The Bridge 1926-01: Vol 2 Iss 8
1926
46 1 0

The Canadian Nurse 1926-01: Vol 22 Iss 1
1926
106 0 0

Classical Bulletin 1926: Vol 2 Supplement
1926
25 1 0

The Institute of Petroleum. Journal 1926: Vol 12
1926
19 0 0

La Revue de Paris 1926-01-01: Vol 192 Iss 1
1926
66 1 0

The Hibbert Journal 1926 - 1927: Vol 25 Iss 4
1926
58 2 0

The Bulletin of The Cleveland Museum of Art

Monthly Review 1926-01-01
1926

Bulletin of Bibliography and Dramatic Index
1926



Page 3
Books to Borrow : Free Texts : Free Download, Borrow and Streaming : Internet Archive
https://archive.org/details/inlibrary



The Institute of Petroleum. Journal 1926-01: Vol 12 Iss
1926
13  0  0

Classical Bulletin 1926-01: Vol 2 Iss 4
1926
13  0  0

Medical Times 1926-01: Vol 54 Iss 1
1926
27  0  0

The Institute of Petroleum. Journal 1926: Vol 12 Iss
1926
11  0  0

The Bookman 1926: Vol 71 Supplement
1926
29  1  0

1926
26  0  0

7  0

12  0

The Bulletin of The Cleveland Museum of Art
1926
24  0  0

Academy Architecture and Architectural Review
1926
126  6  0

Blackwood's Magazine 1926-01: Vol 219 Iss 1323
1926
35  1  0

The Cornhill Magazine 1926-01: Vol 60 Iss 355
1926
38  0  0

The Hibbert Journal 1926 - 1927: Vol 25 Iss 3
1926
14  0  0

The Month. A Catholic Magazine 1926-01: Vol
1926
22  1  0

The Institute of Petroleum. Journal 1926: Vol 12 Iss
1926
5  0  0

Motor Boating & Sailing 1926-01: Vol 37 Iss 1
1926

Drama 1926-01: Vol 4 Iss 8
1926

Child Life 1926-01: Vol 5 Iss 1
1926

A-1233

Page 4
Books to Borrow : Free Texts : Free Download, Borrow and Streaming : Internet Archive
https://archive.org/details/inlibrary

The Institute of Petroleum. Journal 1926: Vol 12 Iss
1926

Business Conditions 1926-01-01: Vol 9 Iss 1
1926

1926
34 0 0

80 1 0

180 11 0

The Catholic School

2022.06.21 - Restivo-Al...
2022.06.29 - Pavese De...
2022.06.29 - Restivo Al...
2022.07.04 - Sevier Dec...
2022.07.04 - Weber De...
2022.07.05 - Foster Dec...
2022.07.05 McNamara ...
0026517.000208 Dersh...
49264.000092

Recents
Starred
Shared
File requests
Deleted files

| | | | |
|---|---|---|---|
| McNamara Decl. Ex. 001 - Complaint.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 002 - Answer.pdf | ☆ | 7/5/2022 4:50 pm | 4 members |
| McNamara Decl. Ex. 005 - Declaration of Brenton Cheng.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 008 - INTARC00445486.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 009 - IA responds to publishers law suit .pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 010 - INTARC00138760.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 012 - openlibrary.org home page.pdf | ☆ | 7/5/2022 4:52 pm | 4 members |
| McNamara Decl. Ex. 015 - Borrowing From The Lending Library .pdf | ☆ | 7/5/2022 4:50 pm | 4 members |
| McNamara Decl. Ex. 018 - Stipulation Regarding Undisputed Facts .pdf | ☆ | 7/5/2022 4:53 pm | 4 members |
| McNamara Decl. Ex. 021 - OverDrive Checkout Data - CONFIDENTIAL.xlsx | ☆ | 7/5/2022 4:52 pm | 4 members |
| McNamara Decl. Ex. 025 - IA's Obj. and Resp. to Pltfs' 1st Set of RFAs.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 026 - Hildreth Expert Report (with Attachments A-C) (002).pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 027 - INTARC00142017.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 028 - INTARC00153397.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 029 - INTARC00391312.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 030 - INTARC00405932.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 031 - Reminiscences of a stock operator (2006 edition) I Open Library' - openlibrary.org.pdf | ☆ | 7/5/2022 4:53 pm | 4 members |

Tags   Who can see my tags?
# Add a tag

Properties
Saved in DWT
Modified 7/5/2022 4:57 pm

Add a few details about this folder here.

Pinned items

2022.06.21 - Restivo-Al...
2022.06.29 - Pavese De...
2022.06.29 - Restivo Al...
2022.07.04 - Sevier Dec...
2022.07.04 - Weber De...
2022.07.05 - Foster Dec...
2022.07.05 McNamara ...
0026517.000208 Dersh...
49264.000092

Recents
Starred
Shared
File requests
Deleted files

| | | | |
|---|---|---|---|
| McNamara Decl. Ex. 001 - Complaint.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 002 - Answer.pdf | ☆ | 7/5/2022 4:50 pm | 4 members |
| McNamara Decl. Ex. 005 - Declaration of Brenton Cheng.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 008 - INTARC00445486.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 009 - IA responds to publishers law suit .pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 010 - INTARC00138760.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 012 - openlibrary.org home page.pdf | ☆ | 7/5/2022 4:52 pm | 4 members |
| McNamara Decl. Ex. 015 - Borrowing From The Lending Library .pdf | ☆ | 7/5/2022 4:50 pm | 4 members |
| McNamara Decl. Ex. 018 - Stipulation Regarding Undisputed Facts .pdf | ☆ | 7/5/2022 4:53 pm | 4 members |
| McNamara Decl. Ex. 021 - OverDrive Checkout Data - CONFIDENTIAL.xlsx | ☆ | 7/5/2022 4:52 pm | 4 members |
| McNamara Decl. Ex. 025 - IA's Obj. and Resp. to Pltfs' 1st Set of RFAs.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 026 - Hildreth Expert Report (with Attachments A-C) (002).pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 027 - INTARC00142017.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 028 - INTARC00153397.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 029 - INTARC00391312.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 030 - INTARC00405932.pdf | ☆ | 7/5/2022 4:51 pm | 4 members |
| McNamara Decl. Ex. 031 - Reminiscences of a stock operator (2006 edition) I Open Library' - openlibrary.org.pdf | ☆ | 7/5/2022 4:53 pm | 4 members |

Tags   Who can see my tags?
# Add a tag

Properties
Saved in DWT
Modified 7/5/2022 4:57 pm

Add a few details about this folder here.

Pinned items

The Therapeutic Gazette 1926-01-15: Vol 50 Iss 1
Jan 15, 1926
9 0 0

La Revue de Paris 1926-01-15: Vol 192 Iss 2
Jan 15, 1926
19 0 0

Notes and Queries 1926-01-16: Vol 150 Iss 3

Gas Journal 1926-01-20: Vol 173 Iss 3271

National Petroleum News 1926-01-20: Vol 18 Iss 3
Jan 20, 1926



Page 5
Books to Borrow : Free Texts : Free Download, Borrow and Streaming : Internet Archive
https://archive.org/details/inlibrary



Notes and Queries 1926-01-23: Vol 150 Iss 4
Jan 23, 1926

Gas Journal 1926-01-27: Vol 173 Iss 3272
Jan 27, 1926

National Petroleum News 1926-01-27: Vol 18 Iss 4
Jan 27, 1926

Notes and Queries 1926-01-30: Vol 150 Iss 5
Jan 30, 1926

Scribner's Magazine 1926-02: Vol 79 Iss 2
Feb 1, 1926

Fetching more results

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, |  |
| v. |  |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive |  |
| Defendants. |  |

## DECLARATION OF BRENTON CHENG

*CONFIDENTIAL*



39. The Loan Analytics Database output produced includes data from April 25, 2020 onward. This was around the time the Loan Analytics Database was implemented. The table contains the following columns:

| Column | | Description |
| --- | --- | --- |
| time | | the time of the event |
| identifier | | book item identifier |
| username | | username (hashed for privacy) |
| loan_id | | identification of the particular loan |
| event_type | | type of lending-related event |
| | borrow | initiate 14-day loan |
| | return | return 14-day loan |
| | expire | old loan record purged from system by internal maintenance cleanup task runs (the actual expiration time of the loan is reflected in the "extra" column after "until") |
| | access_epub | download encrypted ePub token for use with Adobe DRM-compatible reader |

10

|  | access_pdf | download encrypted PDF token for use with Adobe DRM-compatible reader |
|--|--|--|
|  | browse | initiate 1-hour loan |
|  | return_browse | return 1-hour loan |
|  | expire_browse | old loan record purged from system by internal maintenance cleanup task (as described above) |
| extra |  | detailed data about loan |
| temp_id |  | temporary ID generated for internal processing |

40.     The following paragraph is in response to the prompts, "Please confirm that approximately 70,000 books are currently borrowed on a daily basis from Internet Archive under its Controlled Digital Lending program (we are seeking clarification because Kahle's testimony was unclear as to whether this is 70,000 borrows per day, not 70,000 users borrowing books per day). Please confirm that this figure does not include borrows by users with accounts for people with print disabilities. If it does, please indicate what percentage of the 70,000 borrows per day are by users with accounts for people with print disabilities."

41.     Approximately 70,000 borrow events take place each day across all books. This statistic does include printdisabled loans. Approximately 0.6% of the borrows per day are printdisabled loans. This statistic does not include DAISY downloads, which are not loans.



11

Attorneys for Plaintiffs
HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on February 14, 2022, at San Francisco, California.

*/s/ Aditya V. Kamdar*
ADITYA V. KAMDAR

14

McNamara Declaration

Exhibit 5

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5    HACHETTE BOOK GROUP, INC.,
     HARPERCOLLINS PUBLISHERS LLC,
6    JOHN WILEY & SONS, INC., and
     PENGUIN RANDOM HOUSE LLC,

7

                Plaintiffs,

8

          vs.                    No. 1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1
10   through 5, inclusive,

11              Defendants.
     _____/

12

13

14            -- ATTORNEYS' EYES ONLY --

15

16       VIDEOTAPED RULE 30(B)(6) DEPOSITION OF

17          INTERNET ARCHIVE, BY BREWSTER KAHLE

18             Remote Zoom Proceedings

19             San Francisco, California

20             Thursday, December 9, 2021

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 288                    Job No. 4882313

1    publishing system that allowed publishers -- and many of

2    our clients were publishers -- to go and make their

3    information available on the internet.

4         Q.  And did you ultimately sell WAIS Inc.?

5         A.  Yes.

6         Q.  Who did you sell it to?

7         A.  America Online.

8         Q.  And was that in about 1995?

9         A.  Correct.

10         Q.  And you sold it for approximately $15 million;

11    is that right?

12         A.  Approximately.

13         Q.  And as part of that sale, did the sale include

14    computer code?

15         A.  Yes.

16         Q.  And did it include any patents?

17         A.  I'm not sure.  I -- I'm not sure.

18         Q.  And so the computer code that you sold to AOL,

19    those copyrights are now held by AOL; is that right?

20         A.  I believe AOL dispensed with them either to

21    another company or just abandoned them.

22         Q.  But at the time they paid you $15 million, it

23    was in part for the copyrights, that they were acquiring

24    the source code; isn't that right?

25         A.  They were acquiring the company, and the company

E   E E

 1     Q.  And did it -- did it register those copyrights?

 2     A.  You mean by going and posting them to the

 3  Copyright Office of the United States?

 4     Q.  Yes.

 5     A.  It did not do that, no.

 6     Q.  But they were, in fact, copyrights; were they

 7  not?

 8     A.  If I understand it, everything expressed.  I'm

 9  not a lawyer, but how copyrights -- and I think

10  everything's copyrighted.

11     Q.  Was Alexa's internet services --

12     A.  Actually, that's not true.  Not everything is

13  copyrighted.  But I think the code that Alexa wrote, by

14  writing it and expressing it in the United States at that

15  time made it copyrighted, I think.  That's.

16     Q.  That's --

17     A.  But that's -- not a lawyer.

18     Q.  Thank you.  No, I think you're right.  I don't

19  think we would disagree with that.

20         And during the time that you owned Alexa

21  Internet, were services offered for free?

22     A.  Yes.

23     Q.  And ultimately, though, it was -- it was sold to

24  Amazon; is that not correct?

25     A.  The company Alexa Internet was sold to Amazon,

eritext  e  al  ol tion

Page 23

1   this context as shorthand for the book services provided

2   by the Internet Archive and available on various Internet

3   Archive websites, whether that's Open Library or Open

4   Libraries or Archive.org.  Okay?

5            I don't want to get confused on terminology.

6   I'm just going to say "Internet Archive," and what I'm

7   meaning in this context are the book services offered by

8   Internet Archive.

9        A.  So how would I express things that are outside

10  of that context if the words Internet Archive are now

11  defined to be just the book services --

12           Go ahead.

13       Q.  Thank you.

14           And if you need clarification, please ask me to

15  clarify.  I just don't want to get tripped up if I use

16  the word "Open Library" and you're referring to Open

17  Libraries with an "S" or if it's Archive.org.  I'm

18  generally always talking about the book services that are

19  provided.

20       A.  Okay.  I'll -- I'll -- I'll try to be clear.

21       Q.  Good.  Thank you.

22           Now when did you found Internet Archive?

23       A.  I -- the organization started in 1996.

24       Q.  And is it fair to say that from the outset, the

25  mission of Internet Archive is universal access to

A-1244

Page 24

1    acknowledge?

2        A.   That's our motto.

3        Q.   And when you say "motto," what do you mean?

4        A.   That's -- it's the colloquial phrase that's used

5    by the Internet Archive to express what its aspirations

6    are.

7        Q.   Okay.  And has the purpose or this motto of

8    Internet Archive changed over time concerning books?

9        A.   Concerning books?  It has changed.  It -- the

10   beginning of the Internet Archive as a company, as a

11   non-profit library it -- it didn't have that phrase.  The

12   phrase that was used most frequently back then was

13   building a digital library.

14       Q.   And when you say "back then," what are you

15   talking about?

16       A.   1996.

17       Q.   Okay.  When was it decided that Internet Archive

18   should distribute digital books?  Was that in 1996?

19       A.   The Internet Archive in 1996 crawled websites

20   and then made those -- well, actually...

21            In 1996, the Internet Archive did not do

22   anything more than preserve digital materials that were

23   donated to it.

24       Q.   When did Internet Archive decide that it was

25   going to distribute digital books to the public?

Page 25

1          MR. GRATZ:  Objection to form.

2          THE WITNESS:  I'm not sure what it means for a

3   non-profit to decide, but I can tell you when we -- the

4   Internet Archive started doing things.  Is that helpful?

5      Q.  BY MS. MCNAMARA:  Yes.  Tell me when did the

6   Internet Archive begin to distribute digital books to the

7   public.

8          MR. GRATZ:  Objection to form.

9          THE WITNESS:  The Internet Archive started to

10  host digitized books probably approximately 2000, 2001.

11     Q.  BY MS. MCNAMARA:  When you say "host digitized

12  books," a person who went to the Internet Archive site,

13  they could either read on the site those books or

14  download those books; is that right?

15         MR. GRATZ:  Objection to form.

16         THE WITNESS:  To be clear, the -- there were

17  books that were keyed in by Project Gutenberg that were

18  then uploaded to the Internet Archive website servers,

19  and those would then be available for free public access

20  as a library.

21     Q.  BY MS. MCNAMARA:  And as -- and when you say

22  "free public access" to answer my question, someone who

23  came to the site could either read the book on the site

24  or download it and read it that way; is that right?

25     A.  The files would be on the Internet Archive

eritext  e  al  ol tion

eritext co                                                    6

A-1246

Page 26

1    servers, and a user would come and click on them.  And in

2    that era, I think you would download the public domain

3    text that is the Project Gutenberg text of public domain

4    materials.

5        Q.  And ultimately -- I'm going to get to this, but

6    ultimately, Internet Archive did not only host and make

7    available for reading public domain materials; is that

8    right?

9        A.  In sort of the 2000 -- what we were talking

10   about, 2000, 2001, the -- the first collections were --

11   the first collection was Project Gutenberg, which they

12   attested were public domain materials.

13       Q.  Maybe I wasn't clear, Mr. Kahle.

14       A.  Yeah, I'm sorry.  Maybe I should ask --

15       Q.  No.  So if you don't understand, and please, you

16   know, tell me.

17           I asked at some point -- I'm not asking right

18   now precisely when, but at some point, Internet Archive

19   began to host and make available for reading or download

20   in copyright books as well as public domain; isn't that

21   right?

22           MR. GRATZ:  Objection to form.

23           THE WITNESS:  It's not the way that I look at

24   it.  They -- much later, the Internet Archive digitized

25   books and made those available to the blind and dyslexic

Page 27

1    in a controlled encrypted way.

2        Q.  BY MS. MCNAMARA:  You're not -- you're not

3    testifying here under oath, Mr. Kahle, that Internet

4    Archive only makes books available to the blind; is

5    that -- are you?

6        A.  The Internet Archive holds books, physically

7    digitizes them, and makes them available in many

8    different ways.

9        Q.  And so you're -- the answer is "no," you're not

10   testifying that only the blind can read books from

11   Internet Archive, are you?

12       A.  Other people can read books from the -- that

13   they receive from the Internet Archive site.

14       Q.  Thank you.  Thank you.

15           When you -- when Internet Archive began making

16   books available for people to read for free on the

17   internet, was the purpose ultimately to make all

18   information available?

19           MR. GRATZ:  Objection to form.

20           THE WITNESS:  The -- the statement that we put

21   up on the site and also was what we used when we

22   described ourselves is we were building a digital

23   library.  And so is that all information?  I would say

24   it's building a digital library.

25       Q.  BY MS. MCNAMARA:  And I believe you've indicated

Page 44

1    available at times to different institutions and

2    individuals.

3         Q.  Do you agree, Mr. Kahle, that digital books have

4    qualities distinct from physical books, print books?

5         A.  Yes.

6         Q.  Digital books can be stored more efficiently

7    than physical books?

8         A.  Physical books and -- and digitized versions of

9    those books; is that what you're referring to?

10        Q.  I'm saying that the digital books rather than

11   the physical books can be stored more efficiently.

12        A.  The Internet Archive in general stores both

13   physical books and digital, digitized copies on -- in

14   different facilities.  One's on a computer and one's

15   in -- on shelves and in boxes.

16            But in general, the Internet Archive handles

17   media in many different forms.

18        Q.  Mr. Kahle, largely Internet Archive stores

19   physical books in warehouses; isn't that right?

20        A.  The Internet Archive stores them in physical

21   archives.

22        Q.  Containers, physical containers in boxes?

23        A.  The -- well, the Open Library of Richmond, which

24   is actually the organization that stores and owns the

25   physical books, those are -- most of the Open Library of

Page 45

1   Richmond's collections are in boxes in physical archive
2   facilities.
3        Q.   Thank you.
4             Now is it fair to say that with a digital
5   book -- I believe you said this -- it would take 26
6   terabytes to store all the words in the Library of
7   Congress?
8             MR. GRATZ:  Objection to form.
9        Q.   BY MS. MCNAMARA:  In current terms, that's a
10  computer that's about the size of this podium and costs
11  about $60,000?
12       A.   If the -- if they're just the words were on
13  computer hard drives, as like a Microsoft Word documents,
14  a book is about 1 megabyte, and then it's very dense.  If
15  they're digitized materials, they're much larger.
16       Q.   And that's a distinction between a digital book
17  and a physical book; is it not?
18            MR. GRATZ:  Objection to form.
19       Q.   BY MS. MCNAMARA:  The storage capacity.
20       A.   Digitized --
21            MR. GRATZ:  Same objection.
22            THE WITNESS:  Digitized books are stored on
23  computers, and physical books are stored on shelves and
24  in boxes.  So they are -- are they different?  They are
25  different.

1      Q.  And does -- with regard to those books to the

2   degree that they are in-copyright books, did you obtain

3   permission from the copyright owners?

4      A.  The Internet Archive, as part of its

5   digitization, has -- has permission from copyright owners

6   as well as doing it based on fair use.

7      Q.  Do you have a -- can you give me a percentage of

8   the -- let me -- let me start this way:  Approximately

9   how many books today are available on Internet Archive?

10         MR. GRATZ:  Objection to form.

11         THE WITNESS:  The number of things that may have

12   been originally codexes and therefore photographed

13   versions of those codexes, including the public domain, I

14   think the number is approximately 5 million.

15      Q.  BY MS. MCNAMARA:  Of the 5 million,

16   approximately what percentage of those books are

17   in-copyright books?

18      A.  I don't know -- they're modern books.  I'm not a

19   lawyer.  So they're probably in -- in-copyright books.

20   The books that are available for lending are about

21   2 million.

22      Q.  Of the approximately 2 million books, modern

23   books available for lending, what percentage of those

24   books do you have express permission from the copyright

25   owners to lend?

1    A.  The Internet Archive has -- of the 2 million

2    books that are available for lending, small percentage

3    are acquired based on explicit permission to digitize

4    them.  Most of these are acquired through donation or

5    through acquisition of the -- of the books.

6    Q.  The vast majority of books available for lending

7    are -- you do not have permission from the owners.

8    You're relying on fair use; isn't that right?

9    A.  The -- the Internet Archive has legal titles to

10    the books that have been digitized.  So they have been

11    acquired through donation or acquisition in the way that

12    libraries acquire physical books.

13    Q.  Mr. Kahle, my question to you is:  Of the modern

14    books that's made available for lending on Internet

15    Archive, what percentage do you have permission from the

16    copyright owners to copy and distribute those?

17    A.  The -- it's not the way that we -- we look at

18    this.  The Internet Archive acquires books legally and

19    then digitizes those books for multiple purposes,

20    including digital lending, and so it's done properly.

21    Q.  Mr. Kahle, did you obtain permission from the

22    copyright owners for the copying and distribution of any

23    of the works-in-suit?  Do you know what I mean by the

24    term "works-in-suit"?

25    A.  I believe so.

Page 69

1   plaintiffs to scan and make their 127 books available?

2       A.  The -- I think I -- I answered that.  There's no

3   special contract beyond how libraries and the Internet

4   Archive acquires books.  In my knowledge on those 127,

5   did you say, 127 books?  127 books were acquired in the

6   same way that libraries and the Internet Archive

7   generally acquire books.

8       Q.  And so you did not have express permission from

9   the plaintiffs to scan those books, did you?

10      A.  The -- the -- the Internet Archive does -- in my

11  knowledge for those 127 books, does not have a special

12  contract for how those books should be dealt with on

13  Archive.org beyond how publishers normally distribute

14  their books.

15      Q.  You obtain permission to publish music on

16  Internet Archive on occasion, don't you?

17          MR. GRATZ:  Objection to form.

18          THE WITNESS:  The Internet Archive hosts files

19  that are uploaded.  I would not use the term "publish."

20      Q.  BY MS. MCNAMARA:  I'm saying did you obtain

21  permission from the copyright owners of music to host and

22  make those available on Internet Archive?

23          MR. GRATZ:  Objection to form.  Outside the

24  scope.

25          THE WITNESS:  The -- are -- the Internet Archive

A-1253

1   you?

2       A.  I would imagine that many books that are older

3   than five years are still in print.

4       Q.  And available for purchase as an eBook; isn't

5   that right?

6           MR. GRATZ:  Objection to form.

7           THE WITNESS:  The Internet Archive has had a

8   very difficult time purchasing eBooks from publishers,

9   but there are some publishers that are selling eBooks,

10  and the Internet Archive actively acquires those.

11      Q.  BY MS. MCNAMARA:  What efforts, if any, has

12  Internet Archive made to try to acquire eBooks from any

13  of the plaintiffs?

14      A.  The Internet Archive employed a person 10,

15  15 years ago for a couple of years to go and attempt to

16  purchase eBooks and was only somewhat successful.  And

17  about a year or so ago, the Internet Archive now has

18  another person full-time attempting to purchase eBooks

19  from publishers.

20      Q.  And has the Internet Archive purchased any

21  eBooks from any of the plaintiffs in this litigation?

22      A.  The plaintiffs of the litigation, to my

23  understanding, have not -- with repeated requests to

24  purchase their eBooks, have not made those -- have not

25  allowed the Internet Archive to purchase those eBooks.

Page 81

1      Q.   And you're making a distinction between purchase
2   and license; are you not?
3      A.   Yes.   Our library purchases materials.
4      Q.   And you're unwilling to agree to the terms of
5   licensing an eBook; isn't that right?
6      A.   The -- we've requested to purchase books from
7   those large and small publishers and do that as much as
8   we can.   License terms are often problematic.
9      Q.   When in the last five years have you requested
10   to purchase an eBook from any of the plaintiffs in this
11   litigation?
12      A.   I believe I have seen an email specifically
13   requesting it from one of the plaintiffs, and they turned
14   us down, and that was, you know, within the last five,
15   ten years.
16      Q.   Would that be Penguin Random House?
17      A.   I don't remember.
18      Q.   Do you believe that publishers should offer
19   eBooks on a perpetual license?
20          MR. GRATZ:   Objection to form.
21          THE WITNESS:   Our library would be happy to
22   purchase eBooks in the same way that the -- our library
23   purchases and acquires physical books.
24      Q.   BY MS. MCNAMARA:   Are you aware that one of the
25   plaintiffs licenses eBooks to libraries for a flat fee on

A-1255

Page 82

1   a perpetual basis?

2          MR. GRATZ:  Objection to form.

3          THE WITNESS:  The -- if the publishers would be

4   willing to sell their eBooks to us, we would be very

5   happy to engage in volume purchasing.

6      Q.  BY MS. MCNAMARA:  Mr. Kahle, when you say

7   "willing to sell the books," are you saying that there

8   can be no license terms associated with that sale?

9      A.  The Internet Archive is always up for

10  conversations.

11     Q.  Mr. Kahle, in the last -- since 19 -- since

12  2015, has the Internet Archive attempted to acquire any

13  book from any major publisher on a perpetual-use basis?

14     A.  The Internet Archive has tried to buy ePubs on a

15  continuous basis over the last -- I don't know --

16  15 years, yes.  We -- the Internet Archive wants to buy

17  eBooks.

18     Q.  Has -- has the Internet Archive purchased any

19  books from Wiley Publishers, a plaintiff?

20     A.  The Internet Archive has purchased many books

21  from -- from -- from Wiley and gotten donations.

22     Q.  I'm talking not about -- I'm talking about

23  ePubs, Mr. Kahle.

24     A.  EPubs, not -- not that I'm aware of.  I don't

25  think they --

Page 83

1       Q.  Has Internet Archive --

2            MR. GRATZ:  I'm sorry, I'm not sure if the

3   witness was finished with his answer to the previous

4   question.

5       Q.  BY MS. MCNAMARA:  Please continue.

6            MR. GRATZ:  Mr. Kahle, were you finished with

7   your answer?

8            THE WITNESS:  I don't think that Wiley has made

9   eBooks available to the Internet Archive to purchase.

10  It's...

11      Q.  BY MS. MCNAMARA:  If Wiley made its books

12  available on a perpetual-use basis, would the Internet

13  Archive purchase those books?

14      A.  If the Internet Archive could purchase ePubs the

15  same -- with the same basic structures that libraries

16  have always bought books from -- from booksellers --

17  usually it's not directly from publishers; there are book

18  resellers and distribution channels -- we'd be thrilled.

19           But that has not been my understanding of the --

20  of the license terms that have been offered.

21      Q.  Are you aware that in 2017, all of the

22  plaintiffs made their eBooks available under perpetual

23  licenses --

24      A.  No.

25      Q.  -- to libraries?

Page 84

1      A.   I -- the license terms that you're talking about

2   are -- that I have seen are not identical or within a

3   hair's breath of what selling a book has meant for

4   centuries.

5      Q.   So because you don't approve of the licensing

6   terms offered by the book publishers; is that fair?

7           MR. GRATZ:  Objection to form.

8           THE WITNESS:  The Internet Archive engages in

9   engages in conversations big and small publishers all the

10  time and attempts to purchase books.  So I -- there's

11  been no -- no change.

12     Q.   BY MS. MCNAMARA:  How -- of the percentage of

13  books available on the Internet Archive as ePubs, what

14  percentage were at the ePub version purchased by Internet

15  Archive?

16          MR. GRATZ:  Objection to form.

17          THE WITNESS:  Wow.  Let me see if I can say this

18  back.

19          The -- actually, no.  Can you please be precise?

20     Q.   BY MS. MCNAMARA:  Yes.

21          Internet Archive makes available, you said,

22  through CDL approximately 70,000 books a day or 70,000

23  users; is that right?

24          MR. GRATZ:  Objection to form.

25          THE WITNESS:  The Internet Archive, it is my

eritext  e al  ol tion

A-1258

Page 85

1    understanding, lends about 70,000 books a day.

2         Q.  BY MS. MCNAMARA:  And what percentage of those

3    were purchased by the Internet Archive, the ePub version,

4    not the physical book?  What percentage were purchased?

5         A.  I don't -- I don't know the answer to that.  And

6    there are many other ePubs that are freely available on

7    the Internet Archive.

8         Q.  I'm talking about in-copyright works that are

9    being --

10        A.  I'm --

11        Q.  That are being distributed through Controlled

12   Digital Lending.

13        A.  Okay.

14        Q.  Okay?  What percentage of the books being

15   distributed in an ePub version through Controlled Digital

16   Lending were purchased by the Internet Archive?

17             MR. GRATZ:  Objection to form.

18             THE WITNESS:  I don't know the answer.

19        Q.  BY MS. MCNAMARA:  And do you know whether it's

20   more than 10 percent?

21        A.  I think it's unlikely to be more than

22   10 percent.

23        Q.  Thank you.

24             Now early on, I think you've already testified

25   Controlled Digital Lending was coined relatively

eritext  e al  ol tion

eritext co                                                          6

A-1259

Page 89

1    user that checks out a book from the Internet Archive

2    only looks at it for a few minutes?

3        A.  No.

4        Q.  You're well aware that thousands and thousands

5    of users who check out books from Internet Archive are

6    capable and may well read the entire book; isn't that

7    right?

8        A.  Patrons in a library that check out a book, a

9    book from the Internet Archive, can look at all of the

10   pages in the book, as I have repeatedly said, yes.  They

11   can do that.

12       I was just trying to be helpful in giving you

13   context of how do people actually use the service.

14       Q.  Well --

15       A.  But that may not be what you're after.

16       Q.  Well, I'm not asking -- it's not what I'm

17   asking.  I'm asking for the truth, Mr. Kahle.

18       You are well aware that a user who checks out a

19   book from the Internet Archive are capable of reading the

20   entire book; isn't that right?

21       A.  A patron of the Internet Archive can check out a

22   book from -- using Controlled Digital Lending and flip

23   through or read all of the pages, absolutely.  They

24   can --

25       Q.  Thank you.

1      MS. MCNAMARA:  This witness is testifying as to

2  how Controlled Digital Lending and how the Internet

3  Archive provide books to readers.

4      Q.  And you're telling me you don't have any

5  knowledge as to whether any other limitation is placed on

6  users other than the three limitations you identified?

7      MR. GRATZ:  Same objection.

8      THE WITNESS:  I don't feel comfortable saying

9  absolute things under oath about all possible systems of

10  the Internet Archive.  I think that's...

11      Q.  BY MS. MCNAMARA:  Is it fair to say that as of

12  about 2013, Internet Archive got rid of any geographic

13  limitations on a user's ability to read books?

14      A.  I don't remember the -- what time that was

15  changed, but yes, the -- the Internet Archive made the

16  books under the controlled systems more available than

17  just the network's addresses and geographies that were

18  supplied by -- by libraries.

19      Q.  And now books are available on the Internet

20  Archive websites to anyone in the world?

21      A.  The Internet Archive's -- if you're talking

22  about the Controlled Digital Lending, the books via

23  Controlled Digital Lending?

24      Q.  Yes.  They're available to anyone in the world

25  who has access to an internet connection; isn't that

Page 139

1   responsibilities associated with owning a physical book.

2       Q.  Have -- has Internet Archive purchased or

3   licensed any books from HarperCollins after January 2018,

4   to your knowledge?

5       A.  Purchased books?

6       Q.  No, purchased or licensed any eBooks.

7       A.  EBooks.

8       Q.  Right.

9       A.  Not that I'm aware of.  The big publishers have

10  not been selling books -- eBooks, at least to us, that

11  we're -- that I'm aware of.

12      Q.  You are aware that over the years, book

13  publishers make eBooks available under a perpetual

14  license; are you not?

15          MR. GRATZ:  Objection to form.

16          THE WITNESS:  Didn't we cover this?

17      Q.  BY MS. MCNAMARA:  Well --

18      A.  So the big -- so we've asked to purchase eBooks

19  from many publishers, and some publishers have said yes

20  and are happy to take our money.  I'm not aware that --

21  this publisher was HarperCollins -- allowed us to -- or

22  offered, really, or made -- allowed us to buy eBooks.

23      Q.  Can you identify for me, other than the

24  publisher you previously identified in your testimony

25  that I believe was in San Francisco, can you identify any

eritext  e  al  ol tion

A-1262

Page 140

1   publisher where you have purchased eBooks?

2        A.  Yes.

3             MR. GRATZ:  Objection to form.

4             You can answer.

5        Q.  BY MS. MCNAMARA:  Tell me the -- tell me the

6   name of the publisher.

7        A.  So PM Press, which I mentioned before.  AK Press

8   has sold us eBooks.  I believe 11:11 has sold us eBooks.

9   There's -- it's a program of the Internet Archive to

10  purchase eBooks from authors, from publishers.  Just as

11  any library would buy a physical book, we're attempting

12  to buy eBooks.

13       Q.  But you're aware that thousands of libraries

14  across the United States license eBooks from the

15  publishers; are you not?

16       A.  I don't know how they -- how they work.  I think

17  a lot of libraries have deals with OverDrive where they

18  direct their users to OverDrive.  So I'm not sure how

19  they -- how they work.

20       Q.  Are you aware, Mr. Kahle, that Hachette is

21  another plaintiff in this litigation?

22       A.  Yes.

23       Q.  Are you aware that Hachette has sent takedown

24  notices for hundreds, if not thousands of its titles

25  prior to filing this litigation?

Page 173

```
 1   back to MIT Press, and we don't know if they -- what they
 2   have done with those books, and we are not sort of in
 3   conversation with them on that.
 4       Q.  BY MS. MCNAMARA:  But you're not monitoring your
 5   partner libraries, you've already indicated.  You're not
 6   monitoring them to know whether they have books in open
 7   stacks that could be lent at the same time as a digital
 8   version, are you?
 9       A.  We don't have people going and snooping around
10   Boston Public Library, no.  That doesn't -- no.
11   Libraries are honorable institutions.
12       Q.  In fact, you're aware, are you not, or Internet
13   Archive is aware that some libraries don't even try to do
14   anything to suppress circulation and instead assume that
15   the large number of physical and eBooks included for IA's
16   site, based on the overlap analysis, the likelihood is
17   slim that the physical and eBooks are going to be checked
18   out at the same time.
19           Are you aware of that?
20           MR. GRATZ:  Objection to form.
21           THE WITNESS:  No.
22           MS. MCNAMARA:  Okay.  Let me show you.  Let's
23   have marked as the next exhibit, tab 169.
24           MR. BROWNING:  It will be available in just a
25   minute.
```

Page 173

1    back to MIT Press, and we don't know if they -- what they

2    have done with those books, and we are not sort of in

3    conversation with them on that.

4        Q.  BY MS. MCNAMARA:  But you're not monitoring your

5    partner libraries, you've already indicated.  You're not

6    monitoring them to know whether they have books in open

7    stacks that could be lent at the same time as a digital

8    version, are you?

9        A.  We don't have people going and snooping around

10   Boston Public Library, no.  That doesn't -- no.

11   Libraries are honorable institutions.

12       Q.  In fact, you're aware, are you not, or Internet

13   Archive is aware that some libraries don't even try to do

14   anything to suppress circulation and instead assume that

15   the large number of physical and eBooks included for IA's

16   site, based on the overlap analysis, the likelihood is

17   slim that the physical and eBooks are going to be checked

18   out at the same time.

19            Are you aware of that?

20            MR. GRATZ:  Objection to form.

21            THE WITNESS:  No.

22            MS. MCNAMARA:  Okay.  Let me show you.  Let's

23   have marked as the next exhibit, tab 169.

24            MR. BROWNING:  It will be available in just a

25   minute.

1   conversations with their attorneys are to be figured out

2   how they want to comply.

3       Q.  BY MS. MCNAMARA:  So also, you're aware that

4   libraries routinely weed out books from their

5   collections; isn't that correct?

6       A.  Correct.

7       Q.  And does Internet Archive audit library

8   collections to ensure that the library still owns the

9   physical copy it's lending against?

10      A.  No.  The -- the Internet Archive doesn't snoop

11  around dumpsters or things.  I -- so no.  The

12  libraries -- this is a partnership with libraries to

13  operate on their behalf, lending books on their behalf

14  under the Controlled Digital Lending principles.

15          So this is -- this is not represented as the

16  Internet Archive; this is represented as theirs, and they

17  understand that.

18      Q.  But you -- you're aware that the user on

19  Archive.org is, in fact, acquiring the books from the

20  Internet Archive?

21          MR. GRATZ:  Objection to form.

22          THE WITNESS:  The -- the libraries are not -- in

23  this case, they do not acquire a book from the Internet

24  Archive, no.

25      Q.  BY MS. MCNAMARA:  I'm saying that users of

1   levels, and who was using it and who it was affecting.

2          And so based on all of those controls, because

3   in the early pandemic, we couldn't get through to the IT

4   groups of those libraries to be able to do overlap

5   guides, and the -- and the urgency was very acutely felt

6   by parents, teachers, and librarians.

7          Q.  Thank you, Mr. Kahle.

8          I didn't ask you why you implemented the

9   National Emergency Library.  I asked you a very technical

10  question.

11         When the National Emergency Library was

12  implemented, Internet Archive turned off any restriction

13  on the number of copies that a book could -- a number of

14  copies of a book that could be lent at the same time?

15         A.  The Internet Archive suppressed the wait-list

16  function and then monitored extremely carefully what was

17  going on on the systems so that there was no runaway

18  usage, I think as your question implies.

19         Q.  I just asked you a very simple question, which

20  is:  Who you say "suppress the wait lists," is that

21  synonymous with doing away with the one-to-one ratio?

22         A.  Yes.  The -- we --

23         Q.  Thank you.  That's -- that's the answer.  Thank

24  you.

25         A.  Oh, great.  I wish you'd asked the question that

eritext  e  al  ol tion

eritext co                                                          6

Page 191

1      A.   The Internet Archive tries to buy all the eBooks

2    it possibly can so that it can go and make those

3    available, but it does not take things off to make a hole

4    in the library based on its being made available as an

5    eBook from other places.

6      Q.   And you're aware that virtually -- you're aware

7    that every one of the books at issue in this litigation,

8    the representative sample of 127 books, you're aware that

9    those books are all available in eBook form for purchase;

10   are you not?

11           MR. GRATZ:  Objection to form.

12           THE WITNESS:  I'm not -- I'm not aware of that,

13   but it's probably a pretty good guess.  That's why they

14   picked them.

15     Q.   BY MS. MCNAMARA:  Are you aware that there are

16   thousands of other books published by publishers that are

17   available in eBook form that are also available on

18   Internet Archive's website?

19     A.   Similarly, I -- I -- I don't know that, but

20   I'm -- thousands of books, yeah.  I don't doubt it.

21     Q.   And when you previously testified, Mr. Kahle, to

22   purchasing eBooks, I believe you indicated a few

23   publishers.  PM Publisher was one of them; is that right?

24     A.   PM Press.  They're a great press.

25     Q.   Okay.  How do you -- how does Internet

eritext  e al  ol tion

1   Archive -- what is the -- what are the terms of that

2   purchase of an eBook from PM Press?

3       A.  We pay them money and they give us a digital

4   file.

5       Q.  They -- and are there any restrictions on your

6   ability to disseminate that digital file?

7       A.  Absolutely.  They're all embedded -- they're

8   embedded in law.

9       Q.  They're embedded in what?

10      A.  In law.

11      Q.  In law.  What do you mean by that?

12      A.  We can do what is permitted by law.

13      Q.  What do you mean by that?  What can you do that

14  is permitted by law?

15      A.  Makes books available to the blind and dyslexic,

16  make books available through Controlled Digital Lending,

17  and there's going to be evolution of how laws change.

18  Just as the Chaffee Amendment came along at some point,

19  the -- even now countries are ratifying the Marrakech

20  Treaty.

21          So there is an evolution according to law as

22  opposed to license or contract.

23      Q.  What terms, if any, are imposed by PM Press

24  concerning the digital books it sells to you?

25      A.  That we are law-abiding citizens.

Page 193

1       Q.   Is there DRM on the -- on the book file that you

2   get from PM Press?

3       A.   PM Press gives us an in-the-clear ePubs that we

4   can then load in an our DRM systems.

5       Q.   I'm sorry, could you repeat that again?

6       A.   PM Press gives us files that are in the clear

7   that we can then load into our DRM systems for patron

8   access.

9       Q.   What does "in the clear" mean?

10      A.   Non-encrypted.

11      Q.   So they give you non-encrypted files that you

12   then load into your Adobe system?

13      A.   Correct.

14      Q.   And is there any restrictions placed on those

15   sales as to how long or how often those books are lent?

16      A.   The restrictions are embedded in law.

17      Q.   But there's no restrictions placed on the

18   publisher, by the publisher?

19      A.   No more than is just in law.  So the Internet

20   Archive obeys the law as libraries are wont to do.

21      Q.   So when they give you that file, you could just

22   reproduce it if you wanted?

23           MR. GRATZ:  Objection to the form.

24           THE WITNESS:  The Internet Archive obeys the

25   law, so...

Page 194

1        Q.  BY MS. MCNAMARA:  And central to the law is the

2   one-to-one ratio; is it not?

3            MR. GRATZ:  Objection to the form.

4        Q.  BY MS. MCNAMARA:  Central to the law, as you

5   understand it, Mr. Kahle, is the one-to-one ratio is

6   complied with; correct?

7        A.  There are many uses that one can make of a book

8   based on -- on law, and that -- and what is understood as

9   what is proper in law evolves over time.

10            So there's Controlled Digital Lending is one

11   aspect of the use that the Internet Archive makes of the

12   books, eBooks from PM Press.

13        A.  I'm not sure if I understand your answer,

14   Mr. Kahle, and it's probably me, not you.

15            But are you saying that -- that PM Press places

16   no restrictions on you that you could reproduce the file

17   it provides you?

18            MR. GRATZ:  Objection to form.

19            THE WITNESS:  The -- PM Press assumes, and

20   properly assumes, that we obey the law.

21        Q.  BY MS. MCNAMARA:  And similar to the fact that

22   you assume that your cooperating libraries or partner

23   libraries comply with the one-to-one ratio; is that

24   right?

25        A.  We assume that other libraries obey the law as

Page 195

1    they understand it.

2        Q.  So you assume that they will comply with the

3    one-to-one ratio and always keep the physical copy not

4    available for circulation; is that right?

5            MR. GRATZ:  Objection to form.

6            THE WITNESS:  We assume they obey the law.  They

7    understand the Controlled Digital Lending idea.  They

8    also understand the -- the blind and dyslexic provisions.

9    These are commonly understood laws within the library

10   field.

11       Q.  BY MS. MCNAMARA:  Do you recall that -- one of

12   the advisors you have relied on with regard to Controlled

13   Digital Lending is Pam Samuelson; is it not?

14       A.  I think "relied on" would be not necessarily the

15   right way to put it.  Pam Samuelson was one of the

16   participating academic librarians and academic lawyers,

17   but also with other lawyers that came up with the

18   principles, the Controlled Digital Lending principles.

19       Q.  Back on purchasing books, Mr. Kahle, is it a

20   condition for Internet Archive to purchase an eBook from

21   a publisher that that eBook not have DRM on it?

22       A.  I'm sorry.  Can you he please repeat?

23       Q.  Is it a condition for the Internet Archive to

24   purchase an eBook from a book publisher that the eBook

25   should not have DRM on it?

Page 204

1  in that way.

2      Q.  Okay.  Well, let's find a participating -- a

3  public library that -- can you identify a public library

4  that participates in Controlled Digital Lending through

5  the overlap analysis with Internet Archive?

6      A.  Well, let's see.  I'm coming short on public

7  libraries.  How about MIT Libraries?

8      Q.  Well, MIT is special because MIT only puts into

9  circulation books that they have obtained permission from

10  the owner or -- or the like.

11      A.  Are you thinking of MIT Press?

12      Q.  Yes, I'm thinking of MIT Press.

13      A.  MIT Press actually is the publisher of those

14  books.

15      Q.  Right.

16      A.  But there's MIT Libraries is a participate in --

17  participant in the Open Libraries program.

18      Q.  Okay.

19      A.  So they're a partner library with the Internet

20  Archive.

21      Q.  Okay.  So if MIT Press did a match with Internet

22  Archive, and they had -- and they physically owned one

23  copy of The Bell Jar and that matched with the Internet

24  Archive's, then the number of copies, of digital copies

25  that Internet Archive could lend of The Bell Jar would

Page 205

1   increase by one; isn't that right?

2        A.  If I could just make a minor -- you did so well,

3   but you said MIT Press.  If I just stuck in -- take out

4   "Press" and stuck in "Libraries," the whole rest of your

5   statement, then -- and they had a copy of, you know,

6   actually some chemistry treatise, and we did as well,

7   then it would go from one to two copies to -- our catalog

8   would then show two such that there could be two

9   simultaneous borrowers of that book, and they could read

10  it at any -- at one time.

11       Q.  And then if another library became a partner

12  library and there was a match of the exact same book,

13  then you would increase the number of concurrent users by

14  one again; would you not?  So now you have two copies of

15  concurrent users; is that right?

16            MR. GRATZ:  Objection -- objection to form.

17            You can answer.

18            THE WITNESS:  The -- in general, that's the --

19  the approach, is to have only one each partner library if

20  there is a direct match, then it will increase the number

21  of concurrent borrowers by one, independent of the number

22  that they have in the library.

23       Q.  BY MS. MCNAMARA:  So -- so I'm just making I

24  understand -- I'm making sure I understand this process.

25            So now if we are up to three concurrent users

eritext  e al  ol tion

E   E E

Page 206

1   can download the same book because there's been matches

2   from these different libraries; is that right, that

3   that's what's happened?

4       A.  You've just slipped the term.  I don't know if

5   you realized it.

6           People don't download these; they -- they borrow

7   the books through the Controlled Digital Lending and the

8   DRM systems so the --

9       Q.  When I say --

10      A.  On purpose.

11      Q.  No.  Mr. Kahle, when I say "download," the

12  borrower can read the book via the Internet Archive

13  website; correct?

14      A.  Okay.  They -- they can read it through the

15  different readers that are controlled.  But "download," I

16  think, would be not the right way to -- to look at it.

17      Q.  Okay.  So now we're up to three copies of the

18  same book that can be concurrently read off of the

19  Internet Archive; correct?

20      A.  Correct.

21      Q.  Okay.  So now if we're back at the MIT

22  Libraries, it only has one copy.  A use --

23      A.  How's that?

24      Q.  One physical copy.  A user of MIT, three

25  different users at the MIT Libraries could go on Internet

eritext  e al  ol tion

eritext co                                                          6

A-1275

E   E E

Page 207

1   Archive and down -- and read the same book at the same

2   time; is that correct?

3       A.  While those books are registered as

4   noncirculating physically, then three could check out

5   that book on Archive.org.

6       Q.  Okay.  Even though MIT Libraries only purchased

7   and owns one physical copy of the book?

8           MR. GRATZ:  Objection to form.

9           THE WITNESS:  How they acquired their books,

10  I -- I -- I -- I don't know.

11      Q.  BY MS. MCNAMARA:  I'm not asking you --

12      A.  But the three different patrons of the Internet

13  Archive can borrow a book.

14      Q.  And three of -- and those same three patrons

15  could also be patrons of the MIT Libraries; correct?

16      A.  Correct.

17      Q.  Okay.  Now another component to Controlled

18  Digital Lending, as I understand it, is that the book

19  must be -- the physical book must have been lawfully

20  acquired; is that correct?

21      A.  I -- that sounds like what the lawyers would put

22  in their briefs.

23      Q.  But is that what you understand?  You're the

24  guru of Controlled Digital Lending of -- of Internet

25  Archive.

eritext  e  al  ol tion

eritext co                                                    6

A-1276

Page 208

1      A.  No, I'm sorry.  I am -- I'm -- I'm the -- I'm

2  the digital librarian of the Internet Archive.

3      Q.  Okay.  And a feature of Controlled Digital

4  Lending is that the work is lawfully acquired; isn't that

5  correct?

6      A.  That -- the Internet Archive lawfully acquires

7  the -- the books we have in Controlled Digital Lending.

8      Q.  Okay.  Are you familiar with a pirate site

9  called Libgen?

10      A.  Yes.

11      Q.  And are you aware that it has been the subject

12  of multiple injunctions for copyright infringement?

13      A.  No.

14      Q.  Are you aware that the Internet Archive has

15  downloaded digital copies of its copyright websites --

16      A.  Yes.

17      Q.  -- from Libgen?

18          MR. GRATZ:  I'm sorry.  Objection to form.

19          THE WITNESS:  So I'm aware that the Internet

20  Archive has archived in a dark archive the -- the

21  collection that is commonly understood to be Libgen.  But

22  what website that is and things like that are all -- it's

23  a fuzzy, fuzzy issue.

24      Q.  BY MS. MCNAMARA:  Do you know how many Libgen

25  books are currently hosted on Internet Archive's web

Page 209

1    servers?

2             MR. GRATZ:  Objection to form.

3             THE WITNESS:  The Internet Archive doesn't host

4    them on our web servers.  The Internet Archive holds

5    preservation copies of some of the files from Libgen.

6        Q.  BY MS. MCNAMARA:  Do you know how many?

7        A.  No, I don't.

8        Q.  Do you know who uploaded the books from Libgen

9    at the Internet Archive?

10       A.  I believe so.

11       Q.  Who?

12       A.  Aaron Zimm.

13       Q.  Who is that?

14       A.  An engineer that works for the Internet Archive.

15       Q.  Had he been told to upload books from that

16   source?

17       A.  It was -- it was a project of the Internet

18   Archive to archive the internet and the -- and a lot of

19   different factors of the internet, and Libgen is part of

20   that.  So it's part of our mission.

21       Q.  And you at one time inquired or suggested to

22   Amy Brand that she could -- would she be okay with

23   opening up 3,000 MIT Press books from Libgen?

24       A.  That's not how I remember it.

25       Q.  Tell me how you remember it.

Page 210

1      A.   Amy asked me how many books were in -- MIT Press
2  books were in Libgen, and I said I could probably answer
3  that question.
4           MS. MCNAMARA:  Let me show you.
5           Jack, why don't we post tab 186.
6           MR. BROWNING:  Coming up now.  I'll let you know
7  when to refresh.
8           (Exhibit 262, Email string from Brewster Kahle
9           to Amy Brand, 02/12/17, with attachements,
10          INTARC00393109 - 111, was marked for
11          identification by counsel electronically.)
12          MR. BROWNING:  Okay.  Tab 186 has been
13  introduced as Plaintiffs' Exhibit 262, and if you refresh
14  your browser, you should be able to see it.
15          THE WITNESS:  Spinning.
16     Q.   BY MS. MCNAMARA:  Do you see it now, Mr. Kahle?
17     A.   No.  It's still spinning.  Coming in, coming in.
18  Okay.  Exhibit 262?
19     Q.   Yes.
20     A.   Okay.
21     Q.   Do you see that there's an email to you from
22  Amy Brand on February 12th, 2017?
23     A.   It appears so, yes.
24     Q.   And can you identify who Amy Brand is?
25     A.   Amy Brand is the executive director of the

eritext  e  al  ol tion
eritext co                                                          6

Page 211

1   MIT Press.  And actually, I don't know what her title

2   exactly -- director.  She's director.

3       Q.  And do you see here in February 2017 you say to

4   Ms. Brand:  "Would you be okay with our opening up the

5   3K" -- or 3,000 -- MIT Press books from Libgen for

6   one-at-a-time lending on Open Library (we do not have the

7   borrow in your local library thing yet)"?

8       A.  I see that.

9       Q.  So you were proposing to Ms. Brand that you

10  upload 3,000 MIT books from Libgen?

11          MR. GRATZ:  Objection to form.

12          THE WITNESS:  No.

13      Q.  BY MS. MCNAMARA:  What were you doing?

14      A.  Since she's the publisher of the MIT Press, she

15  would be in the position to be able to give us permission

16  to use scans of MIT Press books, and I was asking --

17  after she had asked how many MIT Press books were in

18  Libgen, and that's the reason why I went and did the --

19  the analysis, I asked can we make them available through

20  lending.

21      Q.  And did you, in fact, make them available

22  through lending?

23      A.  We did not make those -- those available through

24  lending, but we did make a large number of other MIT

25  Press books available for lending.

Page 235

1   offered to delay today's deposition until you were ready

2   to take it, and you said no.  Let's keep going.

3           MS. MCNAMARA:  Okay.

4       Q.  The -- Mr. Kahle, prior to the commencement of

5   this action, books that were available on Archive.org for

6   reading were available generally for 14 days; isn't that

7   right?

8       A.  Yes.  When we went into -- when the pandemic

9   hit, it was a 14-day-only system.

10      Q.  And after the commencement of this action,

11  Internet Archive changed its policies so that the default

12  was a one-hour loan; is that right?

13      A.  The -- I don't remember what the date of the

14  action on all this.  The HathiTrust demonstrated the

15  one-hour loan version, and based on our analysis of how

16  short people were using sort of these books as reference,

17  we introduced the one-hour loan.

18      Q.  Would it be consistent with your understanding

19  that that introduction of the default one-hour loan came

20  in approximately June of 2020?

21      A.  It came approximately -- approximately then.

22      Q.  And it's your understanding that a book is

23  available for a one-hour loan only if the library has one

24  physical copy in its system; is that right?

25          MR. GRATZ:  Objection to form.

eritext  e  al  ol tion

Page 287

```
 1   STATE OF CALIFORNIA      ) ss:

 2   COUNTY OF MARIN          )

 3

 4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6          That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21   this 12th day of December, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

# McNamara Declaration
# Exhibit 6



INTERNET ARCHIVE | SIGN UP | LOG IN | UPLOAD | Search

ABOUT BLOG PROJECTS HELP DONATE CONTACT JOBS VOLUNTEER PEOPLE

# users

Share
Favorite
RSS
Play All

ABOUT COLLECTION

5,924,746 RESULTS

SORT BY VIEWS · TITLE · DATE ARCHIVED · CREATOR

Search this Collection
Metadata
Text contents

Part Of
Data Collection

Media Type

| | |
|---|---|
| account | 5,924,746 |
| data | 1 |
| movies | 1 |
| texts | 1 |

Year

| | |
|---|---|
| 2014 | 1 |
| 2012 | 1 |
| 2005 | 1 |
| (No Date) | 5,924,746 |

Topics & Subjects

| | |
|---|---|
| 80s music videos | 1 |
| Eyewitness News | 1 |
| GOOD FELLAZ | 1 |
| That's Dancing | 1 |
| The Dance Show | 1 |
| arson | 1 |

More

Collection

| | |
|---|---|
| Data Collection | 54,581 |

More

Creator

| | |
|---|---|
| lexic@nic | 5 |
| abdel salam a. el-koumy | 1 |
| author | 1 |
| bp090960 | 1 |
| itay oshri | 1 |
| montgomery bell academy | 1 |

More

Language

| | |
|---|---|
| English | 8 |
| Cs;sk;ru;pl;hr;sr;en | 1 |
| English,Hindi,Marathi | 1 |
| German | 1 |

| Name | Archivist | Type | Uploads | Reviews | Favorites |
|---|---|---|---|---|---|
| unknown user | | archive.org account | 0 | 0 | 0 |
| Bree16 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| anjalitiwari2501 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| mrsvalbuena | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Prashil01 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| ameliemarie | archivist for 4 years | archive.org account | 1 | 0 | 1 |
| mysteriousbadger | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| housemac1968 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Manu Prashar | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| PANTHER-911 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| maroonblues42 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Dianri5020 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Bepsiman | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Kellijane | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| JackieOhh98 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| khari3 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| ananiou | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Florence Stanley | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| kbezy0 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Rasel Rana00517 | archivist for 4 years | archive.org account | 1 | 0 | 1 |
| GiliB | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| jjcty | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| anne07 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| gabriel yao | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Maph100 | archivist for 4 years | archive.org account | 1 | 0 | 0 |

- Russian 1
- Spanish 1

More

| User | Archivist for | Account | Uploads | Reviews | Favorites |
|---|---|---|---|---|---|
| Kristopher Smith | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| JudyPurrington | archivist for 12 years | archive.org account | 1 | 0 | 0 |
| DaveMB | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| spbnew777 | archivist for 3 years | archive.org account | 1 | 0 | 0 |
| jeremyc9 | archivist for 6 years | archive.org account | 1 | 0 | 0 |
| webindiacrown | archivist for 3 years | archive.org account | 1 | 0 | 0 |
| ninetyfive89 | archivist for 2 years | archive.org account | 0 | 0 | 0 |
| jtbailey | archivist for 3 years | archive.org account | 1 | 0 | 7 |
| Aidan Brown | archivist for 3 years | archive.org account | 4 | 0 | 0 |
| Randolores | archivist for 4 years | archive.org account | 3 | 0 | 1 |
| SegunAkiodePodcast | archivist for 6 years | archive.org account | 80 | 0 | 0 |
| eubiedubieblake | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| SellAnyHouseDallas | archivist for 5 years | archive.org account | 1 | 0 | 0 |
| GodZoro | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| moodypiper | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| I.Wonderr | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| CAF.SBG | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Morfeanath | archivist for 4 years | archive.org account | 1 | 0 | 1 |
| nipradigital | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| tel40045 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Ana0307 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Eclipsico1 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| NCpal1 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| AngelAckermann | archivist for 4 years | archive.org account | 1 | 0 | 2 |
| drazenbojagic | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Nelly2100 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Stormagedden | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| JuliannaRobinette | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Amirhosseiniali | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| KBulk | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| zia496 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Elton Stryker | archivist for 4 years | archive.org account | 1 | 0 | 1 |
| cjloeffler | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Jayce24 | archivist for 4 years | archive.org account | 1 | 0 | 0 |
| Cam T | archivist for 5 years | archive.org account | 1 | 0 | 3 |



Kat2009
archivist for 4 years
archive.org account
1 0 0

o_newms
archivist for 4 years
archive.org account
1 0 0

gyoffe
archivist for 4 years
archive.org account
1 0 0

espositomb
archivist for 4 years
archive.org account
1 0 0

TimourMaar6615
archivist for 4 years
archive.org account
1 0 0

calvin ongera
archivist for 4 years
archive.org account
1 0 0

Kevin Bolanos
archivist for 4 years
archive.org account
1 0 0

zelrox
archivist for 3 years
archive.org account
1 0 0

jozilish
archivist for 4 years
archive.org account
1 0 0

Pedro Calcavecchia
archivist for 4 years
archive.org account
1 0 0

ahdamcolman
archivist for 4 years
archive.org account
1 0 0

GVKNTC
archivist for 3 years
archive.org account
1 0 0

xKatiex
archivist for 4 years
archive.org account
1 0 0

mcarranza39
archivist for 4 years
archive.org account
1 0 1

Frasfrallan
archivist for 4 years
archive.org account
1 0 0

Fetching more results