# 23-1260

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

**JOINT APPENDIX (PUBLIC) – VOLUME 6 OF 26 (A-1287-A-1526)**

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM
DANAE TINELLI
SCOTT A. ZEBRAK
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW,
5th Floor
Washington, DC 20016

ELIZABETH A. MCNAMARA
LINDA J. STEINMAN
JOHN M. BROWNING
JESSE M. FEITEL
CARL MAZUREK
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

**Joint Appendix Table of Contents**

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, “For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books” (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, “Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending” (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive’s Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, “Libraries Without Walls For Books Without Pages” By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | | **Vol. 5** | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | | **Vol. 6** | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | | **Vol. 7** | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle “Universal Access To Knowledge” Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, “Grant Funds Open-Source Challenge To Google Library” (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, “Libraries Shun Deals To Place Books On Web” by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, “Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model” (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive’s Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, “Let’s Build A Great Digital Library Together…Starting With A Wishlist” (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, “Internet Archive’s Modern Book Collection Now Tops 2 Million Volumes” (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, “Internet Archive Founder Turns To New Information Storage Device – The Book,” (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive’s Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive’s Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive’s Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive’s Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive’s Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| **Vol. 10** | | | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| **Vol. 11** | | | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| | | **Vol. 21** | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# McNamara Declaration
# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - -- - - - - - - - - - - - x
HACHETTE BOOK GROUP, :
INC., HARPERCOLLINS :
PUBLISHERS LLC, JOHN : Case No.
WILEY & SONS, INC., : 1:20-cv-04160-JGK-OTW
and PENGUIN RANDOM :
HOUSE LLC, :
Plaintiffs, :
v. :
INTERNET ARCHIVE and :
DOES 1 through 5, :
inclusive, :
Defendants. :
- - - - - - - - - - - - - - - x

REMOTE ZOOM VIDEO 30(b)(6)
DEPOSITION PURSUANT TO NOTICE
CHRIS FREELAND
December 17, 2021
9:35 CST

Job No.: 4993446
Reported By: Cynthia J. Conforti

book outright -- I'm just trying to understand. What do you mean by "purchase the book outright"? How do you define that?

A A receipt, not a license.

Q So you -- you would only purchase a book, an eBook, if it was received with no conditions placed on the use of that book; is that right?

MR. GRATZ: Objection to form.

THE WITNESS: We would purchase books, not license books.

BY MS. McNAMARA:

Q Okay. And by purchasing books, you understand that to be a purchase without any conditions on how those books could be used?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q Thank you.

Now, you've made reference to the overlap analysis. Can you tell me what that means?

A When a library is interested in becoming a partner with Open Libraries, we run an overlap analysis that compares their physical holdings with our digital holdings.

Q And what results from that comparison?

Q And do you know whether the libraries actually book-by-book verify that their physical holdings contain the works that are identified as matches?

A Can you -- can you ask the question again?

Q Yes, of course. And please do that if for some reason you don't understand the question. I -- really, I want you to ask, so please do. So thank you.

So if I can restate it:

Do you -- when you say that libraries verify the match records that you provide to them, do you have an understanding as to what, if anything, the library does to verify the accuracy of those records?

A We depend on our partners for verifying the data.

Q So you don't place any requirements on them to -- to physically check that each of the books are -- exist in their -- in their system?

A No.

Q Has Internet Archive ever run an audit to review the physical copies at libraries to verify that the matches are accurate?

A At our partner libraries?

A Correct.

Q So you're -- in effect you're relying on the library to be -- that their records are accurate, aren't you?

A Yes.

Q When the Internet Archive determines using the overlap analysis that a partner library possesses a copy of a book of which IA already possess as a scanned copy, does the Internet Archive make a new scan of that book?

A No.

Q So instead it just increases by one the number of concurrent checkouts of that book that would be allowed; is that right?

MR. GRATZ: Objection to form.

THE WITNESS: If the library agrees to put its copy into controlled digital lending, then yes, we increment by one.

BY MS. McNAMARA:

Q And has Internet Archive set any upper limit to the number of copies available for concurrent lending via the Open Libraries or archive.org?

MR. GRATZ: Objection to form.

THE WITNESS: No.

BY MS. McNAMARA:

Q So if I'm understanding, under controlled digital lending, if a hundred partner libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously; is that right?

A If all of the libraries put one copy into controlled digital lending, then in that example, there would be a hundred copies.

Q And you could -- it would be the same answer if there were a thousand libraries that had the same book and put them into controlled digital lending; is that right?

A If all of the partners put their copies in, yes.

Q Is there anything in the partner library agreement that would limit how many concurrent copies could be -- could be lent?

MR. GRATZ: Objection to form.

THE WITNESS: There is nothing in the partner agreement to that effect.

BY MS. McNAMARA:

Q And as you understand the concept of controlled digital lending, does it place any upper limit on the number of concurrent copies

that could be lent at one time?

A Not to my knowledge.

MR. GRATZ: I -- sorry. I had an objection to form to the prior -- to the prior question.

MS. McNAMARA: Sure.

BY MS. McNAMARA:

Q Do you have an understanding as to what the goal or purposes are for implementing the overlap analysis?

A The purpose of the overlap is to let our partners know what of our digital collection is available that matches their print collection.

Q And via the overlap analysis and the participation of partner libraries in Open Library, does this increase the number of people who can view a title -- a given title at one time?

A If the library opts to move their collection into -- the matched records into controlled digital lending, then it would give us an additional copy to lend.

Q And Internet Archive is -- those copies are available to lend without Internet Archive having to incur the cost associated with scanning?

A Correct.

Q Is the overlap analysis conducted by Internet Archive, is it specific to works that are in copyright?

A Yes.

Q As a result of the Internet Archive implementing the overlap analysis have wait lists been reduced on Open Library?

A Yes, for certain titles.

Q And presumably, the more books Internet Archive has been able to obtain and scan, the greater likelihood there would be matches in the overlap analysis with potential partner libraries; isn't that right?

A Yes.

Q And so does the overlap analysis to some degree work in tandem with the book pipeline that is operated by BetterWorldBooks?

MR. GRATZ: Objection to form.

THE WITNESS: No, they're independent processes.

BY MS. McNAMARA:

Q But, in fact, there is a book pipeline that the BetterWorldBooks provides more and more books to Internet Archive for scanning; isn't that right?

Q Were you at the 2020 Library Leaders Forum?

A Yes.

Q I've seen quoted from materials there that Brewster Kahle had indicated that 81 libraries had signed on to Open Library and that 2.8 million copies have been added to Open Library through your participation. Do those numbers sound correct to you?

A Yes.

Q And do you know whether those numbers have changed since that presentation in 2020?

MR. GRATZ: Objection to form.

THE WITNESS: Have the numbers changed since 2020? Yes.

BY MS. McNAMARA:

Q Have they increased?

A Yes.

Q Do you know approximately how many copies of books have been added -- if not 2.8 million, what the number of copies of books that have been added to the Open Libraries project?

A I don't know what our current number is.

Q But it's in excess of 2.8 million?

A I believe so, yes.

priority, if it does?

A I'm not clear on the question.

Q What, if anything, does the Internet Archive do to make sure that the books they add to the Open Libraries projects are not yet available in digital form?

MR. GRATZ: Objection, misstates the content of the document. Objection to form.

THE WITNESS: We don't.

BY MS. McNAMARA:

Q So it's correct that Internet Archive does not only add books that are not available in digital form; isn't that right?

A I'm unclear with the phrasing.

Q Yes, I was double negative, so it's not surprising you were unclear with it.

Does Internet Archive limit books -- when they're adding books to the Open Libraries project, do they only add books that are not available in digital form?

A No.

Q So they add books that are in fact available for purchase commercially or to license to libraries; isn't that right?

A Yes.

that?

MR. GRATZ: Object -- I'm sorry. Objection, vague in its use of the term "users of a particular library" and "their library."

THE WITNESS: Can you restate the question?

BY MS. McNAMARA:

Q Yes. Let me try to be very specific.

So, if, for example, the Internet Archive possessed one copy of Catcher in the Rye that it scanned and made available via the lending library and then a partner library possessed two copies of Catcher in the Rye that were added to the lending library through the overlap analysis, there would now be three copies of Catcher in the Rye available to be borrowed by Internet Archive users concurrently; is that right?

A We would only add one copy from a partner library --

Q Okay.

A -- for example.

Q Okay. So thank you. So let's refine the exam- -- the example.

If the Internet Archive possessed one copy of Catcher in the Rye and then the partner -- a

partner library had one copy, one copy was added from its system, and then another partner library added a third copy to the Open Library system, there would be available for concurrent borrowing from Internet Archive users of three copies; is that right?

A Correct.

Q And so if the first library in this example only physically owned one copy, patrons of that library could nonetheless go to the Internet Archive -- two or more patrons of that library could go to Internet Archive and check out the book; is that right?

A If there were available copies, yes.

Q And this would be true even though the partner library in the example only physically owned one copy; is that right?

A Yes.

Q How does that comport with the basic principle of owned-to-loan under the controlled digital lending?

MR. GRATZ: Objection to form.

You can answer.

THE WITNESS: In your -- in your example there were three copies, so one from the

Internet Archive and two from partner libraries, so there would be three physical copies and three -- the possibility of three digital concurrent loans.

BY MS. McNAMARA:

Q Right. But the partner library only physically owns one copy, yet their patrons are able to check out more than one -- well, more than one copy of that book at a time; is that correct?

MR. GRATZ: Objection to form.

THE WITNESS: There are three copies, three digital copies that could be on a concurrent loan.

BY MS. McNAMARA:

Q Okay. Thank you.

Now, in that same sentence I had read to you that began with "leveraging" --

A Yes.

Q -- it indicates that Internet Archive seeks to honor or honoring the rights of creators using digital rights management software.

Do you see that?

A Yes.

Q Does the Internet Archive honor the rights of creators in any other way other than putting on

expect that some portion of those license fees are paid to authors?

MR. GRATZ: Same objection.

THE WITNESS: I'm not clear on compensation structures.

BY MS. McNAMARA:

Q And you're not clear on compensation structures because Internet Archive does not pay license fees in order to obtain digital copies of books; isn't that right?

MR. GRATZ: Objection to the question asked as compound and to form.

You can answer.

THE WITNESS: We don't license materials. We purchase books outright when provided.

BY MS. McNAMARA:

Q So Internet Archive does not pay license fees to obtain digital copies of books, correct?

MR. GRATZ: Objection to form.

THE WITNESS: Correct.

BY MS. McNAMARA:

Q Are you aware that authors are paid royalties when commercial sales of their books are made via Amazon or some other outlet?

MR. GRATZ: Objection to form.

question.

BY MS. McNAMARA:

Q Well, when the Internet Archive acquires books that are then made available to users on the Open Libraries forum, the user can read that book, can download it, can open it on the platform, but they are -- the book is disseminated to the reader is my question.

MR. GRATZ: Objection, compound, vague.

THE WITNESS: Yes, we make books available for lending on archive.org.

BY MS. McNAMARA:

Q And does Internet Archive pay royalties in connection with the digitization of their work?

A No.

Q Does the Internet Archive pay authors royalties for making their books available for free on their website?

MR. GRATZ: Objection to form.

THE WITNESS: No.

BY MS. McNAMARA:

Q Wouldn't it honor the rights of creators more to pay them for making their eBook versions available?

MR. GRATZ: Objection to form.

BY MS. McNAMARA:

Q Do you see where it indicates that the library shares its catalog of books with the number of copies of each book with the Internet Archive?

And then the Internet Archive allows one additional user to check out the digital version of any book that overlaps with what Internet Archive has already digitized. Right?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q The first sentence is:

The library will share their catalog of books with the number of copies of each book with Internet Archive.

A Yes.

Q And then it says: This will be updated quarterly.

Do you see that?

A Yes.

Q Does Internet Archive actually engage in quarterly updates of all its library partners?

A We are doing monthly updates now.

Q From the time this was originally

implemented in -- well, I think we've established this was started around 2017, the overlap analysis?

A Yes.

Q In the first years that the Internet Archive engaged in this overlap analysis and this project, did they do quarterly updates?

A I'm not sure of the frequency of the updates in the early years of the program.

Q Did they -- I'm -- did they require updates at a specific time frame? And by "they" I mean, Internet Archive.

A No.

Q And sometimes Internet Archive did annual updates; isn't that right?

A Yes.

Q And it -- that would depend upon the library's preference; isn't that correct?

A Yes.

Q Were there any libraries that no updates were ever done once they signed on for the program?

A No.

Q So there was some update done over some period of time dependent upon the library's

preference for each of the partners?

A Yes.

Q When Internet Archive receives an updated catalog from a library partner, what does it do?

A We reprocess their overlap.

Q And do you -- if there -- if certain books have been weeded out or no longer owned by the library, do you reduce the number of concurrent loans available by one?

A Yes.

Q And are there employees who are responsible for that?

A Employees where?

Q At the Internet Archive.

A I'm not clear on the question.

Q Is there a particular person or somebody who is responsible for reviewing the updated catalog and ensuring that the concurrent user number is correct?

A Again, we rely on our libraries for that.

Q So what about, let's say in years -- the first two or three years -- well, strike that. Let me ask you a question.

When did Internet Archive move to monthly updates with their partner libraries?

A I believe that was last fall.

Q So the fall of 2020 -- 2021? I'm sorry.

A Fall of 2020.

Q Fall of 2020, okay.

So prior to the fall of 2020, when Internet Archive was conducting updates either quarterly or annually based upon a library's preference, what about the period between the original overlap analysis and the update? What -- would Internet Archive have any way to know if the library had discarded a book?

A During that time?

Q Yes.

A No.

Q So it could be possible that Internet Archive included a book in its concurrent user numbers based upon the supposition or understanding that a library actually physically owned a book, but in fact that library could have weeded it out, that same book, the week after you had done the original overlap analysis; isn't that right?

MR. GRATZ: Objection, incomplete hypothetical, form.

You can answer.

THE WITNESS: It's unlikely. We've asked our partners if they did major weeding projects to send us updated holdings.

BY MS. McNAMARA:

Q And that was something that you asked them back in 2017?

A Yes.

Q And did -- has any library, to your knowledge, provided the Internet Archive with an update concerning weeding projects by them voluntarily, not through the auditing process or updating process?

A I'm not sure.

Q In the time that you've been the director of Open Libraries, have you received an update analysis from a library that was not the result of the quarterly or annual update?

MR. GRATZ: Objection, misstates the witness's previous testimony, vague.

THE WITNESS: I'm not clear on the question.

BY MS. McNAMARA:

Q What I'm trying to understand is, Internet Archive, you know, until last fall, conducted either quarterly or annual updates of

A I don't have a count, no.
Q Do you have a sense whether it's 10 percent of the 81 or some other percentage?
A No, I don't.
Q Do you know whether that's an unusual parameter?
A I don't know.
Q Wouldn't that be something you should know or be aware of given the importance of the one-to-one ratio in controlled digital lending, that you would want to know whether libraries have the books on offsite storage or whether they're still on the shelves in the library?
MR. GRATZ: Objection to form.
THE WITNESS: We don't know where libraries store their books.
BY MS. McNAMARA:
Q And you don't do anything to require them to store them in one way or another, do you?
A No, that's a local library decision.
Q And that is the policy of Internet Archive that what -- how libraries comply with the requirements of controlled digital lending is a local library decision; isn't that right?
A Yes.

multiple users at a time; isn't that right?

A Correct, within the owned-to-loan ratio.

Q Looking again at Exhibit 274, it indicates that:

The Internet Archive will offer online access to statistics as to how many books were borrowed each month in their state or country.

Do you see that?

A Yes.

Q Does the Internet Archive provide those statistics to the partners?

A We have usage statistics that show where geographically users are coming to when they visit the partner library's collection.

Q Tell me about those geographic statistics.

A So it's state- or country-level access.

Q It's not more granular than state or country?

A No.

Q So you wouldn't know whether someone was coming to check out the book -- in the state of New York, you would not know whether they were coming from New York City or coming from some small town in Upstate New York?

A Correct.

in the e-mail, Jeff Kaplan has responded back that all items and collections have been removed.

BY MS. McNAMARA:

Q And so you did nothing further to make sure that those titles remained off the system; is that right?

A Correct.

Q Okay. Turning back to the one-to-one ratio which, A, you've been designated; and, B, I think we've established is central to controlled digital lending.

Let me ask you, Mr. Freeland, it is true that under controlled digital lending a library may only lend a digital copy of a book if it has a corresponding physical copy of that book that is not simultaneously checked out; isn't that correct?

A Not exclusively. If the library has the permission of the rights holder, then the library doesn't have to have the physical copy.

Q Okay. Setting aside that the library has the permission of the rights holder, otherwise if it does not have permission of the rights holder, then central to the one-to-one concept is that a physical copy and a digital copy cannot be checked

out at the same time?

MR. GRATZ: Objection to form.

You can answer.

THE WITNESS: Correct.

BY MS. McNAMARA:

Q You said if -- if the partner library has the permission of the rights holder, tell me about that. Do some partner libraries have permissions of the rights holders?

MR. GRATZ: Objection, misstates the witness's previous testimony.

THE WITNESS: Not the library, the publisher.

BY MS. McNAMARA:

Q I see. We're talking here -- I'm now moving to partner libraries. I've changed direction. I apologize if that wasn't clear.

I'm not talking about the partner presses, the partner publishers.

I'm talking about partner libraries in the Open Libraries program.

A Can you restate the question?

Q Well, I didn't ask you a question yet. I was just -- I was just making it clear, because I think your answer to the last question assumed we

were talking about partner publishers.

I'm now talking about -- this line of questions I'm going to ask you from here on out are dealing with partner libraries in the Open Libraries program, okay?

A Understood.

Q And so I believe that it is -- as we've established, it's central to the controlled digital lending that a physical copy cannot be checked out at the same time as a digital copy, correct?

A Correct.

Q And so is there -- and I know I've talked -- I've asked you questions, and I'm not going to repeat them about what obligations, if any, Internet Archive places on partner libraries concerning how they maintain physical copies, but I don't believe I asked you whether Internet Archive has implemented any technology so that it is aware if a partner library checks out a book.

A Is there a question?

Q Yes. Does the Internet -- has the Internet Archive implemented any technology so that it is automatically aware that a partner library has checked out a book that is covered by

the one-to-one ratio?

A No.

Q And are you aware that some libraries in fact do not limit the circulation of the books that are available on Open Library?

A Not to my knowledge.

Q Let's look at what's been previously marked as Plaintiffs' Exhibit 261.

MR. MAZUREK: Put that up right now. That should be in your folders.

(Plaintiffs' Exhibit 261 is introduced for the record.)

BY MS. McNAMARA:

Q Mr. Freeland, this is what's been marked as Plaintiffs' Exhibit 261. It's an e-mail chain between you, a Kevin French, copying Lauri McIntosh dated August 26th and August 23, 2019.

A Yes, I have that.

Q Okay. First of all, who is Lauri McIntosh?

A Lauri McIntosh is a program director at Zepheira.

Q And we've previously identified that Zepheira has a relationship with Internet Archive; is that right?

A There are a number of reference collections. Some are on the floor, some are held behind a desk, some are in offsite storage. There's a variety of ways a collection can be a noncirculating reference collection.

Q When the noncirculating reference collection is on the floor, could a visitor to the library look at the book?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q And they could take that book to a library table and read it for whatever period of time they stayed in the library; is that right?

A Again, that would depend on local policies and procedures.

Q I'm not asking about all libraries. I'm asking about your time at the Washington Library where you said you had some noncirculating reference collections, that some were on the floor.

So if the books were on the floor, a patron of the library who was physically there could take that book off the shelf, bring it to a table and read it; isn't that right?

A Yes.

Q And if a partner library had a similar noncirculating reference collection, then a reader -- then a patron at that library could be reading the book at the same time that book was checked out from archive.org; isn't that right?

MR. GRATZ: Objection to form.

THE WITNESS: Possibly. Again, it would depend on what does "circulating" mean in the local library's context.

BY MS. McNAMARA:

Q But if they allow patrons -- if the book was on the shelf and the patrons would take a book off the shelf and go to a library table and start to read it, Internet Archive would have no way of knowing that was happening, would it?

MR. GRATZ: Objection to form.

THE WITNESS: Correct.

BY MS. McNAMARA:

Q Now, going on in this e-mail, Mr. Freeland, you go on to write:

Other libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all of our digital copies and all of the physical copies

Is that correct?

A Correct.

Q So you would have no -- not you, but Internet Archive would have no way of knowing whether a book had been checked -- whether a book was being read in a particular library at any given time; is that right?

A Correct.

Q And in effect, you would have no way of knowing whether the physical and digital copies of the book were in circulation simultaneously, do you?

MR. GRATZ: Objection to form.

THE WITNESS: I'm not clear on the question.

BY MS. McNAMARA:

Q Internet Archive would have no way to know whether the physical and digital copies of a book were in circulation simultaneously; isn't that right?

MR. GRATZ: Objection to form.

THE WITNESS: Correct.

BY MS. McNAMARA:

Q During the time that you've been director of Open Libraries, has Internet Archive taken any

action against a library that did not suppress circulation properly?

A No.

Q Are you familiar with the term "reserve shelves"? Does that mean something different than noncirculating reference collections?

MR. GRATZ: Objection, compound, form.

THE WITNESS: Yes, I'm familiar with course reserves.

BY MS. McNAMARA:

Q And -- well, I didn't say course reserves.

When I reference the term "reserve shelves," what does that mean to your mind?

A The term "reserve shelves" doesn't mean anything to me.

Q So the only way you understand that term is "course reserve shelves"?

A Yes.

Q Explain to me. What does course reserve shelves mean?

A Course reserves are in an academic library where a faculty member will select a book from -- to be used in a class and ask the library to hold that book out of circulation but on the -- on the reserve -- the course reserves system and

A Complete an online form.

Q What's involved in that online form?

A Basic contact information including e-mail address.

Q Anything else?

A I'm not familiar with the form.

Q Are there any geographic limitations on signing up?

A No.

Q So someone could sign up from anywhere in the world?

A Yes.

Q So once a user is signed up for an archive.org account, do they need to do anything else in order to be able to borrow books from the lending library?

A No.

Q Now, when a book is checked out from the lending library, is there a default loan period?

MR. GRATZ: Objection to form.

THE WITNESS: Yes. Our default loans are one-hour loans.

BY MS. McNAMARA:

Q And they didn't always -- the default loan was not always one hour; isn't that right?

A Correct.
Q When was it changed to one hour?
A That change was made in June of 2020.
Q Why was it made?
A There were two primary reasons.
One was after observing how our users were interacting with our lending library and also following the lead of the HathiTrust Digital Library which implemented one-hour loans for their collection at about the same time.
Q Tell me about following how users use.
How did that inform the decision to change the default period to one hour?
A Engineers at the Internet Archive did a study to look at borrowing patterns for our collection and determined that the majority of our users were in and out of the book in less than an hour, in most cases less than 15 minutes.
Q Was the decision to move to default one hour informed in any way by the lawsuit that was filed in this action?
A No.
MR. GRATZ: Objection.
BY MS. McNAMARA:
Q Pardon me?

A No.

Q You're aware, are you not, that this action was commenced in approximately the beginning of June 2020?

A Yes.

Q And this change occurred in June 2020, shortly after the action was commenced; is that right?

A Yes.

Q Prior to the default, one-hour loan, what was the previously default?

A Fourteen days.

Q So back on the one-hour loan, when a user borrows a book for one hour, can it renew the loan after the hour has expired?

A Yes.

Q Is there any limit to the number of consecutive times a user can renew a one-hour loan?

A I don't know.

Q Are there any circumstances in which a user can borrow a book for more than one hour?

A Yes. If we have additional copies of -- additional digital copies of the book, then those additional copies are available for a 14-day loan.

that correct?

A Yes.

Q Okay. So if a user goes to archive.org, can they do a data search for, let's say the Gettysburg Address across the millions of books that are available on the platform?

A Yes.

Q And do you -- do you know how that works?

A No.

Q Do you have any information as to what percentage of users engage in data or text mining?

A No.

Q Do you have any knowledge as to whether it's more than 1 percent?

A I don't know.

Q Do you -- do you know whether Internet Archive has information as to what percentage of users engage in data or text mining?

A I don't know.

Q You were designated to testify on behalf of the Internet Archive concerning data and text mining. So when you say you don't know, are you stating that no one at Internet Archive has information on the percentage of users who engage in text mining?

MR. GRATZ: Objection to form. And I think that misstates the topic a little bit.

But you can answer the question.

THE WITNESS: I know about specific data mining uses. I don't know about percentage and numbers across the Internet Archive user population.

BY MS. McNAMARA:

Q So my question, Mr. Freeland, is, do you know whether Internet Archive has data concerning the percentage of uses -- percentage of users who engage in text mining?

MR. GRATZ: Objection --

BY MS. McNAMARA:

Q Not whether you know it personally, but whether Internet Archive has that information.

MR. GRATZ: Objection, outside the scope of the noticed topics, form.

You can answer.

THE WITNESS: I don't know.

MS. McNAMARA: I'm reading into the record, so it's clear, the topic that was agreed that Mr. Freeland would be prepared to testify to, and it is as follows:

"The Internet Archive will designate Chris

Freeland to testify to users' reasons for borrowing books on Open Library, as well as the Internet Archive's contention that its lending library is used by data scientists to do computational analysis of texts."

BY MS. McNAMARA:

Q So with that preamble, Mr. Freeland, I ask the question again:

Do you have any information as to the percentage of users of the Internet Archive platform that engages in computation analysis of text?

MR. GRATZ: Objection, outside the scope of the noticed topics.

THE WITNESS: I know about individual research projects. I don't know about number or percent across the user population.

BY MS. McNAMARA:

Q Okay. Tell me about what you know about individual research projects.

A I know of a couple of -- I know of two data mining projects that come to mind.

The first is a project that I previously used to work on, the Biodiversity Heritage Library, which was analyzing the scientific texts

at the Internet Archive to extract out all of the scientific names published within books, so that scientists could have a names-based index to literature.

Q Okay. On that particular project that you've just identified, who was engaged in that, to your knowledge?

A So that was the member libraries of the Biodiversity Heritage Library for which I used to be the technical director.

Q And do you know how many members there are?

A Dozens. I don't know the exact number today.

Q It's under a hundred, though; is it not?

A I believe so, yes.

Q That was one example that you were aware of concerning a computation analysis of the text.

You said there was a second example you were aware of.

A Yes, we have a -- there was another user who was compiling an Isaac Asimov bibliography and was searching through relevant texts -- searching -- trying to find occurrences of Asimov's name for his bibliography.

Q And was he successful in that endeavor, to your knowledge?

A Yes, we wrote a blog post about his research.

Q Are you aware of any other users other than the members of the Biodiversity Directive and its single user who was doing research on Isaac Asimov? Do you know of any other users of Open Library that have engaged in computational analysis of texts?

MR. GRATZ: Objection to form.

THE WITNESS: There are other users. I believe the academic who comes to mind, I believe her name is Laura Gibbs. She is also compiling a -- it's a bibli- --

BY MS. McNAMARA:

Q And how were you aware of Ms. Gibbs' compilation?

A Notices -- messages on Twitter for use of our collection.

Q Okay. So that's a third person. Do you know of any other --

MR. GRATZ: Objection to form.

THE WITNESS: Those are the ones that come to -- readily come to mind.

endorse; is that right?

A That's not accurate. MIT Press did endorse the statement.

MS. McNAMARA: Let's have marked as Plaintiffs' Exhibit 283, tab 188.

MR. MAZUREK: Get that up.

MS. McNAMARA: Actually, this is not the document I was looking for. So let's take that down. That is...

MR. MAZUREK: It has not been introduced, so we're good.

MS. McNAMARA: I'll have to find -- and I apologize for the confusion.

BY MS. McNAMARA:

Q Setting aside speaking to some of the library partners, did the Internet Archive receive any negative feedback on its implementation of the National Emergency Library?

A Yes.

Q Tell me about that.

A There were op-eds in the Washington Post and elsewhere about the National Emergency Library.

Q Other than the Washington Post and other op-eds, did the Internet Archive receive direct

communication from authors, publishers, groups, concerning the National Emergency Library?

A Yes.

Q Tell me about what you know about that.

A There were a number of people who objected to the National Emergency Library.

Q And what reasons, if any, were given as to why people objected to the National Emergency Library?

A There were a variety of reasons.

Q Tell me any reasons that you can recall?

A There were copyright concerns.

Q What copyright concerns were brought to the attention of Internet Archive concerning the National Emergency Library?

A Authors stating their concern about the copyright and the National Emergency Library.

Q Besides authors, did publishers express concern?

A Yes.

Q And were -- certain organizations expressed concerns, author or publisher organizations?

A Yes.

Q And were their concerns similar, that they

believed this was perhaps not followed -- was not consistent with copyright law, the National Emergency Library?

A Yes.

Q And so just so that it's clear what happened when Internet Archive implemented the National Emergency Library, it did away with wait lists; is that correct?

A Correct.

Q And it allowed -- and so it in effect did away with the one-to-one ratio; is that not right?

A Correct.

Q Are you aware whether there was any maximum number of concurrent users put into the system during the National Emergency Library?

A Yes.

Q And what was the maximum number that was put into the system that -- a book -- a number of people that could check out the same book?

A 10,000.

Q So do you know why the National Emergency Library was implemented?

A Yes.

Q Why?

A To respond to the total shutdown of the

educational and library systems in the United States and the world.

Q And it was intended to facilitate students and teachers and others to have access to books that they were otherwise shut out from; is that right?

A Correct.

Q Was the system designed in such a way that it was -- that users were limited to students or teachers?

A No.

Q So someone could just be, you know, in their home and wanting to read Huckleberry Finn or Catcher in the Rye and could check it out without a wait list; isn't that right?

A Yes.

Q And the National Emergency Library was in no way consistent with the principles of controlled digital lending, was it?

MR. GRATZ: Objection to form.

THE WITNESS: The National Emergency Library had all of the controls of controlled digital lending except the owned-to-loan ratio.

BY MS. McNAMARA:

Q And I believe we've previously established

that the owned-to-loan ratio was perhaps the most critical component to controlled digital lending; isn't that right?

A Yes.

Q Let me show you a document. It may have been previously marked.

MS. McNAMARA: So, Carl, correct me if I'm...

If it has, that -- that's at tab 82.

MR. MAZUREK: One sec. I don't believe it's previously been marked, so I can introduce it.

Should be in your folders as Exhibit 283.

(Plaintiffs' Exhibit 283 is introduced for the record.)

BY MS. McNAMARA:

Q Mr. Freeland, this appears to be an e-mail dated March 24th, 2020, from Lila Bailey to CDL Policy. Do you see that?

A Yes.

Q Do you have an understanding as to what the list of people is that -- is meant by CDL policy?

A Generally. I don't know all the list of the members.

Mr. Freeland, when you received this e-mail, not what Ms. Bailey intended by writing it.

I'm asking you as a recipient, how did you understand this?

A I don't recall.

Q As you sit here today, do you have an understanding as to the fact that access was not limited in the National Emergency Library to -- only to people directly impacted by COVID-19?

MR. GRATZ: Objection to form.

THE WITNESS: There were no limitations to access to the National Emergency Library.

BY MS. McNAMARA:

Q So in order to access the National Emergency Library during its tenure, someone didn't need to certify that they were directly impacted by COVID-19, did they?

A No.

Q Ms. Bailey is also indicating that the reason she -- the Internet Archive is implementing this opt-out policy is to address authors who think that their sales might be impacted.

Do you see that?

A Yes.

Q Did you have an understanding that

digital lending?

MR. GRATZ: Objection to form. Also outside the scope of the noticed topics.

MS. McNAMARA: I don't agree with that, but --

MR. GRATZ: I'm happy to discuss it off the record. We've designated somebody else on takedowns.

MS. McNAMARA: This isn't takedown. This is controlled digital lending.

BY MS. McNAMARA:

Q Do you know, Mr. Freeland, whether if -- when Internet Archive complied, if they did, with demands to take works out of the National Emergency Library, whether they also removed those works from Open Library?

MR. GRATZ: Same objection.

THE WITNESS: When books were taken out of the National Emergency Library, they were not taken out of controlled digital lending.

BY MS. McNAMARA:

Q Thank you.

And was that something made explicit, to your knowledge, to the people demanding that their books be removed?

with our publishing partners.

Q And you believe that was an error; is that right?

A Yes.

Q Do you know whether -- are you familiar with the organization Authors Alliance?

A Yes.

Q And Brewster Kahle is an adviser to the Authors Alliance; isn't that right?

A I don't know.

Q Do you -- are you aware that Pam Samuelson is on the board of the Authors Alliance?

A I don't know.

Q Do you know who Pam Samuelson is?

A Yes.

Q Who is she?

A She's a faculty member at UC Berkeley.

Q And to your knowledge, has the Authors Alliance often supported the Internet Archive?

A Generally, yes.

Q But it didn't support the National Emergency Library, did it?

A Not to my knowledge.

MS. McNAMARA: Let's have marked tab 211.

of that. So I apologize for that confusion. I don't know why the system -- they need different coding so that it goes in the right place.

So, Mr. Freeland, this is Plaintiffs' Exhibit 292, which appears to be a template form for a scanning agreement.

Have you seen this document before?

MR. GRATZ: I'm going to object while we are on the topic of making our record.

In our response to the 30(b)(6) topics, we said expressly that Internet Archive objects to the inclusion of digitization agreements that are unrelated to the Internet Archive's lending library as irrelevant as part of our objections and responses to this topic which were served on September 1, 2021, and so we don't regard this as being one of documents that is within the scope of what this witness is designated on. You are welcome to go ahead and ask questions about it and make whatever record you feel like you need to.

BY MS. McNAMARA:

Q Mr. Freeland, do you know -- you're aware, are you not, that Internet Archive has entered into scanning agreements with libraries to scan various books; is that correct?

A Yes.

Q And as a result of those scanning agreements, Internet Archive receives digital or creates digital copies of the works that are scanned; isn't that right?

A Yes.

Q And the digital copies that are obtained as a result of the scanning agreement, are those works included on archive.org?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q So if I'm understanding correctly, as a result of the scanning agreements that have been entered into by Internet Archive, the scanned digital works are amongst the holdings held by Internet Archive and counted in the overlap -- not -- counted in the Open Libraries; is that right?

MR. GRATZ: Objection to form.

THE WITNESS: That is not accurate.

BY MS. McNAMARA:

Q Explain to me how it's not accurate.

A So our overlap only runs against the books that the Internet Archive has acquired and that we

digitized.

Q So the -- explain that to me, when you say "only against works that have been acquired."

A We only run our overlaps against the collection of books that the Internet Archive has acquired and digitized and make available through controlled digital lending.

Q And the digital copies of works that are created as a result of the -- as the scanning agreements entered into with libraries, do you not consider those acquired works?

MR. GRATZ: Objection, vague.

You can answer.

THE WITNESS: No, those books have not been acquired.

BY MS. McNAMARA:

Q So are any of those books included on archive.org for lending by users?

MR. GRATZ: Objection to form.

THE WITNESS: Can you -- can you clarify the question, please?

BY MS. McNAMARA:

Q Yes.

In the digital copies that are obtained by Internet Archive as a result of the scanning

agreements entered into by Internet Archive, are any of those scanned digital works included for lending on archive.org?

A No, those books are not included in lending.

Q What happens to those books, those digital copies?

A Those books are available on archive.org, but they are not part of our lending system.

Q So a user going to archive.org could not download or check out a book that had been obtained through a scanning agreement; is that right?

MR. GRATZ: Objection to form.

THE WITNESS: They could not check them out.

BY MS. McNAMARA:

Q And what -- how is the system put in place so that there is a distinction between books obtained through scanning and books acquired for checking out? Mechanically, how is that established?

A We have had a field in our metadata that's called the Internet Archive Boxid. I think its tag is IA Boxid. And that indicates that it is a

book that the Internet Archive owns in physical form, and then that book is made available in lending.

Q Thank you.

And if it doesn't have that IA Boxid, it cannot be lent to a user; is that right?

A Correct.

Q So is that a -- is that a condition of the process of the scanning agreement, that those books are never included in lending by the Internet Archive?

A I am not clear on the question.

Q And I don't think it was very clear, so I'm not surprised that you're not clear.

Is that a -- is that an express provision, to your knowledge, in the agreement reached with libraries that agree to scanning, that those scanned books will not be made available for lending?

A Yes.

Q Can users of Internet Archive, if they visit archive.org, look at the books or read the books but they can't check them out?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q So the only distinction is that the books obtained -- the digital eBooks obtained as a result of the scanning agreement cannot be checked out, but they can be read by a user on Internet or archive.org; is that right?

MR. GRATZ: Objection, lacks foundation, vague in its use of the term "digital eBooks." Form.

You can answer.

THE WITNESS: So the only books that are available for checkout and borrowed through controlled digital lending are the books that the Internet Archive has acquired and digitized.

BY MS. McNAMARA:

Q But I guess I was asking a little different question.

I understand that they're not available for checkout or lending, but they are available to be read by visitors to archive.org; isn't that right?

MR. GRATZ: Objection, vague in its use of the term "they."

THE WITNESS: Yes.

BY MS. McNAMARA:

Q And the practices you've just been describing, these are the current practices followed by Internet Archive?

A Yes.

Q Do you know whether Internet Archive has always made the distinction that you've described that books are not available for lending if they were simply obtained through the -- through scanning agreements?

MR. GRATZ: Objection, vague in its use of the word "obtained," lacks foundation.

You can answer.

THE WITNESS: I don't know.

BY MS. McNAMARA:

Q So during the time that you've been employed by Internet Archive, have you ever been aware of books that were digital copies that were obtained as a result of a scanning agreement? Have you ever been aware whether those books were able to be checked out on archive.org?

A I'm not sure.

MR. GRATZ: Objection, vague as to time, form.

THE WITNESS: I'm not sure.

BY MS. McNAMARA:

Q You're not.

If you would direct your attention to this agreement that has been marked as Exhibit 292, this form agreement?

A Yes.

Q Under Services, if you look at the second paragraph under Services, the last sentence, it reads:

Internet Archive will provide one digital copy of each digitized item (a "Digital Copy") to the library and will retain additional digital copies.

Do you see that?

A Yes.

Q Do you know what Internet Archive does with the retained additional copies?

MR. GRATZ: Objection to form.

THE WITNESS: I don't know.

BY MS. McNAMARA:

Q One copy is presumably posted on archive.org; is that right?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q And it goes on the -- two sentences later, it says:

The digital copies will be freely accessible and downloadable from Internet Archive via HTTP, Torrent or a similar method.

Do you see that?

A Yes.

Q What do you understand the use of "downloadable" in that sentence to mean if, as you've testified, these works are not available for lending?

A So our partner libraries are scanning materials that are in the public domain. So they are not available for lending, and they're made available for download.

Q So is it your understanding that the scanning agreements only apply to public domain material?

MR. GRATZ: Objection, vague.

THE WITNESS: No.

BY MS. McNAMARA:

Q So if the scanned digital copies were works that were not in the public domain per this agreement, would those copies be accessible and

downloadable from the Internet Archive?

MR. GRATZ: Objection to form.

THE WITNESS: No.

BY MS. McNAMARA:

Q And how do you know that?

A Because books that are in copyright are only made available through controlled digital lending, and those are only books that the Internet Archive owns and is digitized.

Q Thank you. Let me see.

MS. McNAMARA: Can we put in, if it hasn't been marked before, tab 33, please.

MR. MAZUREK: Should be in your folders as Exhibit 293.

(Plaintiffs' Exhibit 293 is introduced for the record.)

BY MS. McNAMARA:

Q Mr. Freeland, this is an e-mail from Brewster Kahle to Robert Newland dated November 24, 2016, and I appreciate that this predates your time with the Internet Archive, but I'm -- given your experience and knowledge, I was wondering if you could help me to understand what is being said here. At the beginning Mr. Kahle is saying:

MR. GRATZ: And, Liz, you can keep going. I'm not stopping you. But I do want to note that we're past 7 hours.

MS. McNAMARA: Oh, we are? I apologize. I didn't think we were.

Well, I'm almost done. I thought I had plenty of time. But anyway, thank you, Joe. I am really almost done. I appreciate your courtesy.

MR. MAZUREK: I'm introducing this as Exhibit 295, and it will -- should be in your folders now.

(Plaintiffs' Exhibit 295 is introduced for the record.)

BY MS. McNAMARA:

Q Mr. Freeland, do you see what's been marked as Plaintiffs' Exhibit 295, which is a listing of a book that's available for checkout on Open Libraries today? And the book is called The Passmores in America: A Quaker family through six generations.

Do you see that?

A Yes.

Q And the publication date is 1992.

Do you see that?

A Yes.

Q You wouldn't expect this book to be in the public domain, would you?

MR. GRATZ: Objection, calls for a legal conclusion, lacks foundation.

You can answer.

THE WITNESS: I don't know.

BY MS. McNAMARA:

Q Do you see for this book the digitizing sponsor was Boston Public Library and the contributor was the Boston Public Library?

A Yes.

Q And do you see that the publisher is Lewiston, New York, E. Mellen Press?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q Does this appear to be another book that is available for lending on the Internet Archive that was scanned -- that was obtained -- the digital copy was obtained by scanning?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. McNAMARA:

Q So does this help you reconsider whether it is in fact true that books that are obtained by

the Internet Archive via a scanning agreement are never included in digital lending?

MR. GRATZ: Objection, vague in its use of the term "scanning agreement." Objection to form.

You can answer.

THE WITNESS: I'm not clear on the question.

BY MS. McNAMARA:

Q Let me rephrase it.

Does this help you to realize that books may well be available for lending on archive.org that were obtained via scanning agreement versus owned by Internet Archive?

MR. GRATZ: Objection to form, vague in its use of the term "scanning agreements."

THE WITNESS: Yes.

MS. McNAMARA: Okay. Thank you very much. I very much appreciate your time today and you answering all these questions.

And, Joe, I appreciate you allowing me to inadvertently go over seven hours.

So I wish everybody a great weekend and wonderful holidays, and we will be back in touch. But thank you very much, Mr. Freeland.

MR. GRATZ: Very good. I just have a few

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Cynthia J. Conforti, Certified Shorthand Reporter No. 084-003064, CSR, CRR, and a Notary Public in and for the County of Cook, State of Illinois, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 4th day of January, 2022.

Cynthia J. Conforti

My commission expires: October 30, 2023

Notary Public in and for the
State of Illinois

# McNamara Declaration
# Exhibit 8

| | |
|---|---|
| **From:** | Chris Freeland |
| **Sent:** | Tuesday, July 21, 2020 5:49 PM EDT |
| **To:** | Michael Wares; Jeff Sharpe |
| **CC:** | [redacted]@archive.org; Linda LoSchiavo; Mariah Lewis |
| **Subject:** | Re: Digitizing books for Controlled Digital Lending, Fordham University Libraries |

Michael - I'm happy to chat with you tomorrow, Wednesday, any time before 1pm CDT. Lots of libraries are asking us about course reserves and controlled digital lending. I noted part of your question is about Of note, we lend to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into CDL by particular users.

On 7/21/20 11:06 AM, Michael Wares wrote:

> Hi, Jeff. Hi Chris.
> Thanks for your extremely quick response!
> Would you have some time today or tomorrow for a brief phone call to go over some details?
> Thanks!
> Regards
> Michael
> *Michael Wares*
>
> *Assistant Director for Technical Services*
>
> *Fordham University Libraries*
>
> [redacted]
>
> **See the Fordham University Libraries' COVID-19 page for details of all our 24x7 services**
> **(including live Reference Librarian support) and other useful information, at**
> **https://fordham.libguides.com/coronavirus**
>
> On Tue, Jul 21, 2020 at 11:22 AM Jeff Sharpe <[redacted]@archive.org> wrote:
>
>> Hi Michael,
>> I am copying Chris Freeland [redacted]@archive.org to this email as he is in charge of CDL. We can digitize the books for you here in Fort Wayne and have them go directly into CDL. I know that he puts on webinars and could include you in that or contact him directly.
>> Below are our standard fees. I believe these also apply to CDL material but we should confirm with Chris.
>>
>> Cost
>>
>> $3.00 set up fee for each digital item, this covers Quality Assurance, collections setup, cropping, file storage and re-packing of materials, indefinite online presence, etc.
>>
>> $0.12 per page able to fit on our 'Scribe' machines (Max. size 11w x 15h, in inches)

$2.40 per foldout page which cannot fit our Scribes and requires a separate workflow

$0.30 per folio item an entire bound item that does not fit on the Scribe

$0.30 cents per page for newspapers

Partner pays for shipping to and from partner library with prepaid return labels with each shipment.

I think we could have those done within 30 days from the time we receive them.
450 x $3. = $1350.
150,000 x .12 = 1800.
Total= $3150
I would add a couple hundred just in case some material has foldout maps or something unforeseen.

In order to get going we would have to have an agreement signed with Chris and a spreadsheet with the items you want digitized.

Please let me know if you have any other questions or comments.
Thanks,
Jeff

Jeff Sharpe
Internet Archive
Senior Digitization Manager, Mid-West Region, US
Allen County Public Library
900 Library Plaza
Fort Wayne, IN 46802
[redacted]

"Universal Access To All Knowledge"
WWW.Archive.org
WWW.OpenLibrary.org
> I hope this email finds you well.
> The Fordham University Libraries are looking into digitizing approximately
> 450 volumes, about 150, 000 pages, to support CDL for distance learning. These are largely or entirely in-copyright books, so the scans could not be
> made public, and will only be released to our users in proportion to the number of physical copies which we have embargoed.

> Is this something which the Internet Archive could undertake for us? If so, could you let us have a price quote and proposed turnaround time? I am CCing our Metadata Librarian Mariah Lewis, who can provide more information on our output requirements.
> Thank you! Be well.
> Sincerely,
> Michael
> *Michael Wares*
> *Assistant Director for Technical Services*
> *Fordham University Libraries*
> *[redacted]@fordham.edu <[redacted]@fordham.edu>*
> *See the Fordham University Libraries' COVID-19 page for details of all our
> 24x7 services *
> *(including live Reference Librarian support) and other useful
> information,
> at*
> *https://urldefense.proofpoint.com/v2/url?u=https-3A__fordham.libguides.com_coronavirus&d=DwIDAw&c=aqMfXOEvEJQh2iQMCb7Wy8l0sPnURkcqADc2guUW8IM&r=eEDODyyVam28baRMOr3flPLNHRUfSNVyCHqbQNiyWDs&m=Ar_Ok8iHSChUlgvKdUb3gK90ECRzCyDaKoLe6fWes6w&s=MudfxV0JctDuJjYCoN5MBliC3MOSsoOCPIxjlZk9ehA&e=
> <https://urldefense.proofpoint.com/v2/url?u=https-3A__fordham.libguides.com_coronavirus&d=DwIDAw&c=aqMfXOEvEJQh2iQMCb7Wy8l0sPnURkcqADc2guUW8IM&r=eEDODyyVam28baRMOr3flPLNHRUfSNVyCHqbQNiyWDs&m=Ar_Ok8iHSChUlgvKdUb3gK90ECRzCyDaKoLe6fWes6w&s=MudfxV0JctDuJjYCoN5MBliC3MOSsoOCPIxjlZk9ehA&e= >*

--
Chris Freeland
Director of Open Libraries
Internet Archive
[redacted]@archive.org
@chrisfreeland
[redacted]

# McNamara Declaration

# Exhibit 9

Case 23-1260, Document 67, 12/15/2023, 3597403, Page93 of 267

Page 1
Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit - Internet Archive Blogs
https://blog.archive.org/2020/07/29/internet-archive-responds-to-publishers-lawsuit/

# Internet Archive Blogs

*A blog from the team at archive.org*

25
The Internet's Library
for 25 years
From Wayback
to way forward
anniversary.archive.org

Blog | Announcements | 25th Anniversary | archive.org | About | Events | Developers | Donate

## Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit

Posted on July 29, 2020 by Brewster Kahle

Yesterday, the Internet Archive filed our response to the lawsuit brought by four commercial publishers to end the practice of Controlled Digital Lending (CDL), the digital equivalent of traditional library lending. CDL is a respectful and secure way to bring the breadth of our library collections to digital learners. Commercial ebooks, while useful, only cover a small fraction of the books in our libraries. As we launch into a fall semester that is largely remote, we must offer our students the best information to learn from—collections that were purchased over centuries and are now being digitized. What is at stake with this lawsuit? Every digital learner's access to library books. That is why the Internet Archive is standing up to defend the rights of hundreds of libraries that are using Controlled Digital Lending.

The publishers' lawsuit aims to stop the longstanding and widespread library practice of Controlled Digital Lending, and stop the hundreds of libraries using this system from providing their patrons with digital books. Through CDL, libraries lend a digitized version of the physical books they have acquired as long as the physical copy doesn't circulate and the digital files are protected from redistribution. This is how Internet Archive's lending library works, and has for more than nine years. Publishers are seeking to shut this library down, claiming copyright law does not allow it. Our response is simple: Copyright law does not stand in the way of libraries' rights to own books, to digitize

Search

### Recent Posts

- Decentralized Apps, the Metaverse, and the "Next Big Thing"
- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books

### Recent Comments

- aho on Decentralized Apps, the Metaverse, and the "Next Big Thing"
- Superman on Decentralized Apps, the Metaverse, and the "Next Big Thing"
- Superman on Decentralized Apps, the Metaverse, and the "Next Big Thing"
- Superman on Decentralized Apps, the Metaverse, and the "Next Big Thing"
- Superman on Decentralized Apps, the Metaverse, and the "Next Big Thing"

### Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation

A-1352

Case 23-1260, Document 67, 12/15/2023, 3598433, Page94 of 267

Page 2
Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit - Internet Archive Blogs
https://blog.archive.org/2020/07/29/internet-archive-responds-to-publishers-lawsuit/

their books, and to lend those books to patrons in a controlled way.

---

> *What is at stake with this lawsuit? Every digital learner's access to library books. That is why the Internet Archive is standing up to defend the rights of hundreds of libraries that are using Controlled Digital Lending.*

---

"The Authors Alliance has several thousand members around the world and we have endorsed the Controlled Digital Lending as a fair use," stated Pamela Samuelson, Authors Alliance founder and Richard M. Sherman Distinguished Professor of Law at Berkeley Law. "It's really tragic that at this time of pandemic that the publishers would try to basically cut off even access to a digital public library like the Internet Archive…I think that the idea that lending a book is illegal is just wrong."

These publishers clearly intend this lawsuit to have a chilling effect on Controlled Digital Lending at a moment in time when it can benefit digital learners the most. For students and educators, the 2020 fall semester will be unlike any other in recent history. From K-12 schools to universities, many institutions have already announced they will keep campuses closed or severely limit access to communal spaces and materials such as books because of public health concerns. The conversation we must be having is: how will those students, instructors and researchers access information — from textbooks to primary sources? Unfortunately, four of the world's largest book publishers seem intent on undermining both libraries' missions and our attempts to keep educational systems operational during a global health crisis.

*Ten percent of the world's population experience disabilities that impact their ability to read. For these learners, digital books are a lifeline. The publishers' lawsuit against the Internet Archive calls for the destruction of more than a million digitized books.*

- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News
- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

**Archives**

Select Month

**Meta**

- Log in
- Entries feed
- Comments feed
- WordPress.org

A-1353

Case 23-1260, Document 67, 12/15/2023, 3598438, Page95 of 267

# McNamara Declaration

# Exhibit 10

Case 23-1260, Document 67, 12/15/2023, 3598433, Page96 of 267

# Lending & Book Reader

Thu Oct 6, 2016 by Richard Caceres

CONFIDENTIAL INTARC00138760

A-1355

# Book Reader

https://github.com/internetarchive/bookreader



Before

10 PRINT CHR$(205.5+RND(1)); : GOTO 10

Search inside GO

Figure 10.1
From left to right and top to bottom, the 10 PRINT program is typed into the Commodore 64 and is run. Output scrolls across the screen until it is stopped.

Computer programs process and display critical data, facilitate communication, monitor and report on sensor networks, and shoot down incoming missiles. But computer code is not merely functional. Code is a peculiar kind of text, written, maintained, and modified by programmers to make a machine operate. It is a text nonetheless, with many of the properties of more familiar documents. Code is not purely abstract and mathematical; it has significant social, political, and aesthetic dimensions. The way in which code connects to culture, affecting it and being influenced by it, can be traced by examining the specifics of programs by reading the code itself attentively.

Like a diary from the forgotten past, computer code is embedded with stories of a program's making, its purpose, its assumptions, and more. Every symbol within a program can help to illuminate these stories and open historical and critical lines of inquiry. Traditional wisdom might lead one to believe that learning to read code is a tedious, mathematical chore. Yet in the emerging methodologies of critical code studies, software studies, and platform studies, computer code is approached as a cultural text reflecting the history and social context of its creation. "Code . . . has been inscribed, programmed, written. It is conditioned and concretely historical," new media theorist Rita Raley notes (2006). The source code of contemporary software is a point of entry in these fields into much larger discussions about technology and culture. It is quite possible, however, that the code with the most potential to incite critical interest from programmers, students, and scholars is that from earlier eras.

This book returns to a moment, the early 1980s, by focusing on a single line of code, a BASIC program that reads simply:

```
10 PRINT CHR$(205.5+RND(1)); : GOTO 10
```

One line of code, set to repeat endlessly, which will run until interrupted (figure 10.1).

Programs that function exactly like this one were printed in a variety of sources in the early days of home computing, initially in the 1982 *Commodore 64 User's Guide*, and later online, on the Web. (The published versions of the program are documented at the end of this book, in "Variants of 10 PRINT.") This well-known one-liner from the 1980s was recalled by one of the book's authors decades later, as discussed in "A Personal

After

10 PRINT CHR$(205.5+RND(1)); : GOTO 10
Back to item details
Search inside this book

Figure 10.1
From left to right and top to bottom, the 10 PRINT program is typed into the Commodore 64 and is run. Output scrolls across the screen until it is stopped.

(2) 10 PRINT CHR$(205.5+RND(1)); : GOTO 10

Computer programs process and display critical data, facilitate communication, monitor and report on sensor networks, and shoot down incoming missiles. But computer code is not merely functional. Code is a peculiar kind of text, written, maintained, and modified by programmers to make a machine operate. It is a text nonetheless, with many of the properties of more familiar documents. Code is not purely abstract and mathematical; it has significant social, political, and aesthetic dimensions. The way in which code connects to culture, affecting it and being influenced by it, can be traced by examining the specifics of programs by reading the code itself attentively.

Like a diary from the forgotten past, computer code is embedded with stories of a program's making, its purpose, its assumptions, and more. Every symbol within a program can help to illuminate these stories and open historical and critical lines of inquiry. Traditional wisdom might lead one to believe that learning to read code is a tedious, mathematical chore. Yet in the emerging methodologies of critical code studies, software studies, and platform studies, computer code is approached as a cultural text reflecting the history and social context of its creation. "Code . . . has been inscribed, programmed, written. It is conditioned and concretely historical," new media theorist Rita Raley notes (2006). The source code of contemporary software is a point of entry in these fields into much larger discussions about technology and culture. It is quite possible, however, that the code with the most potential to incite critical interest from programmers, students, and scholars is that from earlier eras.

This book returns to a moment, the early 1980s, by focusing on a single line of code, a BASIC program that reads simply:

```
10 PRINT CHR$(205.5+RND(1)); : GOTO 10
```

One line of code, set to repeat endlessly, which will run until interrupted (figure 10.1).

Programs that function exactly like this one were printed in a variety of sources in the early days of home computing, initially in the 1982 *Commodore 64 User's Guide*, and later online, on the Web. (The published versions of the program are documented at the end of this book, in "Variants of 10 PRINT.") This well-known one-liner from the 1980s was recalled by one of the book's authors decades later, as discussed in "A Personal

INTRODUCTION (3)

Case 23-1260, Document 67, 12/15/2023, 3598439, Page100 of 267

Case 23-1260, Document 67, 12/15/2023, 3598438, Page101 of 267

Carrier
9:07 PM
www-richard.archive.org
10 PRINT CHR$(205.5+RND(1)); :
Figure 10.1
From left to right and top to bottom, the 10 PRINT program is typed into the Commodore 64 and is run. Output scrolls across the screen until it is stopped.
10 PRINT CHR$(205.5+RND(1)); : GOTO 10

CONFIDENTIAL

INTARC00138765

A-1360



Case 23-1260, Document 67, 12/15/2023, 3598430, Page102 of 267

Carrier
9:51 PM
www-richard.archive.org
Internet Archive
Settings
About This Book
Share This Book
Carrier
9:51 PM
www-richard.archive.org
About This Book
Title
10 PRINT CHR$(205.5+RND(1)); : GOTO 10
Publish Date
2012-11
Language
eng
More information on Archive.org
Other formats
PDF

CONFIDENTIAL INTARC00138766

A-1361

Case 23-1260, Document 67, 12/15/2023, 3598139, Page103 of 267

Lending

Borrow This Book
This book is part of the lending collection and can be borrowed for 14 days
You currently have 3 of 5 books on loan.
Borrow This Book
Admin Access
richard-ia
Search
Introduction to art, an illustrated topical manual
by Eitner, Lorenz
DOWNLOAD OPTIONS

CONFIDENTIAL INTARC00138767

A-1362



Case 23-1260, Document 67, 12/15/2023, 3598433, Page104 of 267

Introduction to art, an illust
Back to item details
13 days left in loan
Search inside this book
INTRODUCTION TO ART
AN ILLUSTRATED TOPICAL MANUAL
BY LORENZ EITNER
Burgess Publishing Company

CONFIDENTIAL INTARC00138768

A-1363



Case 23-1260, Document 67, 12/15/2023, 3598438, Page105 of 267

Introduction to art, an illust
Back to item details
13 days left in loan
Search inside this book
Early Book Return
Return this book to the collection early to make it available for other patrons. If there is another patron waiting for this book you will need to join the waitlist to borrow this book again.
Cancel
Return Book
TION TO ART
ATED TOPICAL MANUAL
BY LORENZ EITNER
Burgess Publishing Company

CONFIDENTIAL INTARC00138769

A-1364



Case 23-1260, Document 67, 12/15/2023, 3598433, Page106 of 267

Downloads are fulfilled by our own instance of Adobe Content Server (ACS4).

They can be opened in Adobe Digital Editions.

Introduction to art, an illust
Back to item details
13 days left in loan
sculpture
The mission of the artist is not merely to interpret visual reality or to make satisfying arrangements of forms and colors. On the highest level, he comments on the world and on human fate - exactly like the philosopher or poet, only in a different "language" which sometimes enables him to say things that philosophers or poets have difficulty in expressing. The power and depth of an artist's comment determines the greatness of his art. We value the work of Michelangelo, Rembrandt and Goya (to name three very great artists) not only because of their supreme mastery of painting and sculpture, but because of the wisdom and insight into life which their work expresses. Page 63

Search works within lending books.

It uses our Elastic Search backend.





New Mobile Interface.

Built with "mmenu" plugin.

Mobile interface is activated with a css media query.

The cutoff is currently 800px.

# McNamara Declaration
# Exhibit 11

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------

HACHETTE BOOK GROUP, INC., et al., )
Plaintiff )
vs. ) C.A. No. 1:20-CV-041160-JGK
INTERNET ARCHIVE, et al., )
Defendant )

---------------------------------

HIGHLY CONFIDENTIAL
ZOOM VIDEOTAPED DEPOSITION OF
IMKE C. REIMERS, PH.D.
FRIDAY, JUNE 3, 2022
10:13 a.m. - 6:40 p.m.
BOSTON, MASSACHUSETTS

Reported by: Sandra A. Deschaine, SCR, RPR, CLR, CRA
Job No. 5255420.

I read the complaint to see what the experience was like. I ended up reading about 10 pages of the book, and then I put it away. I don't usually read books on my laptop.

Q. Was it relatively easy to borrow the book?

A. Yes.

Q. And are you aware that the Internet Archive permits users to download the e-book on their iPad or other tablet?

A. I haven't looked that closely.

Q. Internet Archive provides the entire book, the full book, correct?

A. As far as I know, yes.

Q. And it doesn't change the book or add anything to it, correct?

A. Again, as far as I know, yes.

Q. How did you find the quality of the PDF scan?

MR. GRATZ: Lacks foundation.

A. I found it fine.

BY MS. STEINMAN:

Q. Were the Internet Archive -- you know, the e-book that you downloaded from the

Internet Archive, was it of a similar quality to the Google Books scans? I know you studied those.

A. I think my -- so the one book that I borrowed seemed quite similar to the Google Books scans. I mean, they all vary in quality, so --

(Reporter clarification.)

THE WITNESS: They all vary in quality or their quality varies.

BY MS. STEINMAN:

Q. If a member of the public wants to read a given book that is available through the Internet Archive, can he or she read the free e-book on the Internet Archive instead of taking the e-book out at a public library?

MR. GRATZ: Lacks foundation.

A. Yes, if it's available.

BY MS. STEINMAN:

Q. And if a member of the public wants to read a given e-book that is available on the Internet Archive, can he or she read the free e-book on the Internet Archive instead of buying the commercial e-book?

MR. GRATZ: Lacks foundation.

A. Similarly, yes.

BY MS. STEINMAN:

Q. So the e-books on the Internet Archive serve as a potential substitute for the authorized e-books, correct?

MR. GRATZ: Objection, vague, lacks foundation.

A. Potentially, they can. However, it's going to be -- it's an empirical question if they really do.

BY MS. STEINMAN:

Q. Are you familiar with the term "controlled digital lending"?

A. Yes, I've come across it.

Q. And what do you know about the Internet Archive's controlled digital lending protocols? Is that something you've looked into or is that something you just didn't focus on in your report?

A. I didn't focus on this part in my report.

Q. Fair enough.

So you haven't conducted any investigation into the Internet Archive's

# McNamara Declaration
# Exhibit 12

INTERNET ARCHIVE
Donate
OPEN LIBRARY
Browse
More
All
Search
Log In
Sign Up
Welcome to Open Library
Read Free Library Books Online
Millions of books available through Controlled Digital Lending
Keep Track of your Favorite Books
Organize your Books using Lists & the Reading Log
Try the virtual Library Explorer
Digital shelves organized like a physical library
Trending Books
Preview
Checked Out
Borrow
Join Waitlist
Borrow
Not in Library
Classic Books
Read
Read
Read
Read
Read
Read
Books We Love
Borrow
Borrow
Borrow
Borrow
Borrow
Borrow
Recently Returned
Borrow
Borrow
Borrow
Borrow
Borrow
Borrow
Romance
Borrow
Borrow
Borrow
Borrow
Borrow
Borrow

Kids

Borrow Borrow Borrow Borrow Borrow Borrow

Thrillers

Borrow Borrow Borrow Borrow Borrow Borrow

Textbooks

Borrow Borrow Borrow Borrow Borrow Borrow

Authors Alliance & MIT Press

Borrow Borrow Borrow Borrow Borrow

Browse by Subject

Art 71,567 Books | Science Fiction 16,703 Books | Fantasy 12,891 Books | Biographies 14,764 Books | Recipes 8,628 Books | Romance 20,306 Books

## Around the Library

Here's what's happened over the last 28 days. More recent changes.

3,124,813 UNIQUE VISITORS | 84,555 NEW MEMBERS | 233,852 CATALOG EDITS | 882 LISTS CREATED | 349,709 EBOOKS BORROWED

## About the Project

Open Library is an open, editable library catalog, building towards a web page for every book ever published. More

Just like Wikipedia, you can contribute new information or corrections to the catalog. You can browse by subjects, authors or lists members have created. If you love books, why not help build a library?

**Latest Blog Posts**

It takes a Classroom to build an Open Library - June 30, 2022

A High Schooler's Experience Contributing to the Open Book Genome Project - April 27, 2022

Introducing Trusted Book Providers - December 20, 2021

**Open Library**
Vision
Volunteer
Partner With Us
Careers
Blog
Terms of Service
Donate

**Discover**
Home
Books
Authors
Subjects
Collections
Advanced Search
Return to Top

**Develop**
Developer Center
API Documentation
Bulk Data Dumps
Writing Bots
Add a Book

**Help**
Help Center
Report A Problem
Suggesting Edits

**Change Website Language**
Čeština (cs)
Deutsch (de)
English (en)
Español (es)
Français (fr)
Hrvatski (hr)
తెలుగు (te)
Українська (uk)
中文 (zh)

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org

version c3560fb

# McNamara Declaration
# Exhibit 13

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------

HACHETTE BOOK GROUP, INC., et al.,

Plaintiff,

v. Civil Action No. 1:20-CV-04160-JGK

INTERNET ARCHIVE, et al.,

Defendant.

------------------------------

VIDEO CONFERENCE VIA ZOOM DEPOSITION OF

LAURA GIBBS

March 24, 2022

11:04 a.m.

Chapel Hill, North Carolina

Reported by: Audra M. Smith, RPR, FCRR

Video by: Sean Lowther

APPEARANCES OF COUNSEL

A I don't know anything about library e-books. I own a Kindle version of this book so I know it's available as an e-book because that's how I read it. I read the Kindle version.

MR. BROWNING: Clint, could you put up tab 12, please?

CONCIERGE TECH: Exhibit 8 has been marked.

MR. BROWNING: I apologize, again, this has come out tiny, let me know if you can get it in an original form.

(Exhibit Number 8 was identified.)

A Oh, man, these screenshots -- because, yeah, the images are definitely getting degraded. Let me download it again because that seems to be working.

BY MR. BROWNING:

Q Yeah.

A Okay. The image I'm looking at says OverDrive.

Q Yes. Let me just make an introduction. This is -- this is Gibbs Exhibit 8. It is a copy of a web page I captured yesterday on overdrive.com for the book Every Tongue Got to Confess.

My first question to you, Laura, is: Do

you know what OverDrive is?

A I actually don't.

Q Okay. I'm going to represent to you that OverDrive is a company that licenses books, like Every Tongue Got to Confess from the publishers, and then makes a platform available to libraries which can then purchase electronic versions of the books and lend them to patrons. Just as a bit of background.

Do you see here where it says -- there's a blue box, and the heading is Title Found At These Libraries. Then it says below that, Davidson County Public Library System, Thomasville Library, North Carolina Digital Library.

Do you know what the North Carolina Digital Library is?

A Actually, I don't. I know a lot about libraries in Oklahoma, strangely enough, but not so many here.

Q They actually have an Oklahoma Digital Library with this book as well. Do you know about e-book lending in Oklahoma?

A No. As I said before, I don't borrow e-books from libraries. I buy them. So I have a Kindle of this book. I've never looked for an

opportunity to borrow an e-book.

Q I'm going to represent to you that if you click through one of these links and you're a member of the North Carolina Digital Library, you will be able to borrow the book.

MR. BROWNING: And to illustrate that, Clint, could you do me a favor and please introduce tab number 13.

CONCIERGE TECH: Exhibit 9 has been marked.

(Exhibit Number 9 was identified.)

BY MR. BROWNING:

Q Let me know if and when you can see it, please. Laura.

A Now, it's North Carolina Digital Library and it's got a gold banner.

Q Great. This is Gibbs Exhibit 9. It's another web page from the North Carolina Digital Library's platform on OverDrive. It's the page Every Tongue Got to Confess. There's a big button there that says "Borrow" underneath saying "only one copy available."

Laura, I'm going to represent to you two things. The first is that members or patrons of the North Carolina Digital Library can borrow this

e-book by clicking that button for free, and that they will be able to read an electronic version of Every Tongue Got to Confess.

I'm also going to represent to you that Zora Neale Hurston's estate has authorized this version of the book and receives payment each time a library purchased it.

I assume you don't have any knowledge of that, but is that correct?

A From my understanding what you're saying, and so now I understand something about OverDrive and e-books at libraries. I did not know this before.

Q Now that you know this, would you consider linking to or putting a link to this authorized e-book in your blog post?

A Well, I'm not sure why I would do that. I mean, there are lots of ways to acquire books, right? You can acquire them from your local library, which is great. You can acquire them from your local libraries. There's physical books or you gave this example of an e-book. You can buy new copies of books. You can buy e-books from Kindles or you can buy used copies of books. I'm not in the business of being a collector of all the links for

all the ways you can gain access to a book.

The task I've taken on is to tell people what they can find at the Internet Archive, which includes public domain books and books available by controlled digital lending. They're not e-books like this. They don't have all the conveniences. I assume, this is an e-book that renders nicely on people's cell phones and on and on the way e-books do. But I'm not a cataloger of all the book links in the world. So, no, I have learned about OverDrive from you. I'm not going to be adding those links to my blogs.

Q Great. We were discussing before your rights over your books as an author, and one of the hypothetical examples we were discussing was your rights to control the use of your books on standardized test websites. Do you remember that?

A Right. We talked about different kinds of derivative works and reuse, yes.

Q And if Zora -- with that in mind, if Zora Neale Hurston's estate asked the Internet Archive to remove its controlled digital lending copy of Every Tongue Got to Confess, do you think Internet Archive should do that?

MS. LEE: Objection, form.

A Right. E-books are not a particular interest of mine. For the most part, there aren't e-books available for the kinds of books I mostly work on. I think it's great that there's a Kindle edition of, I think, probably every one of Zora Neale Hurston's published books now, and that's one way for people to get access to those books. And if they're available through the libraries, too, I think that's great. I love libraries, so that's good news.

Q My question to you is: As you sit here today, does it matter to you whether you use the Internet Archive version of the Zora Neale Hurston title or the OverDrive version of the Zora Neale Hurston title?

MS. LEE: Objection, form.

A Right. My goal is to write a blog that reaches a wide audience, and so by providing a link to the Internet Archive version of a book, the scan of the physical book, et cetera, et cetera, I'm confident that anyone reading my blog will find that link potentially useful.

At the same time, I'm very glad for anybody reading my blog who goes to their local bookstore or goes to their local library or who

borrows a book from their neighbor, however people get books, is up to them. My goal is to write a blog that's useful to a wide range of readers. Not all my readers are in North Carolina and not all my readers are even in the United States.

BY MR. BROWNING:

Q And so is it correct to say that Internet Archive is more broadly accessible -- I'm trying to find a shorthand for the terms you just gave me. Would it be accurate to say that the Internet Archive's books are more broadly accessible than the alternatives you just listed?

MS. LEE: Objection, form.

A Right. I mean, what you have specifically shown here is that as someone who's able to go get a Chapel Hill library card, I would be able to access the North Carolina Digital Library, and because of that, I would be able to borrow that e-book. To me, that's an entirely separate question from what the Internet Archive is doing. The Internet Archive is reaching potentially a broader audience than the North Carolina Digital Library.

BY MR. BROWNING:

Q And when you are making a decision or determination on which electronic platform to

STATE OF NORTH CAROLINA )
COUNTY OF FORSYTH )

REPORTER'S CERTIFICATE

I, Audra Smith, Registered Professional Reporter in and for the above county and state, do hereby certify that the deposition of the person hereinbefore named was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and the foregoing answers made by the witness which were duly recorded by me by means of stenotype; which is reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

I further certify that I am neither of counsel to either party nor interested in the events of this case.

IN WITNESS WHEREOF, I have hereto set my hand this 29th day of March, 2022.

Audra Smith, RPR, FCRR
Notary Number: 201329000033
Commission Expires: June 26, 2025

# McNamara Declaration
# Exhibit 14



**mek**
2020-06-16 02:43
https://internetarchive.slack.com/archives/C0ETZV72L/p1592275357267300

**mek**
2020-06-16 02:44
Open Library's Session Loan code is now live and we're trying to get early feedback from the community as early as possible so we have time to respond

**mek**
2020-06-16 16:58
```How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading. ``` ```How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading. how can I download this book to my kindle or iphone? I've tried everything. I bought bluefire, can't figure out how to move it there. I downloaded adobe digital can't figure out how to move it there? Theres no download button. When I hit share, that doesn't help. Trying read off phone as is, is impossible, either to small or to big. Can you help with easy instructions? Thanks``` ```Today, I am unable to borrow any OL books for longer than one hour. This will make OL almost useless to me,and I am sure many other users. Please fix this and return OL to its for 14 day loan period. Thank you.``` ```I was reading Daniel Silva's Gabriel Allon series when suddenly none of the books was available in the library anymore? In fact I was busy reading one of the books and it just returned itself and nothing was available? It has been 3 months now since it happened so can you please advise why has it been taken out or how and when will it be available again.``` ```I keep trying to borrow a book, and it opens, but says I only have a one hour preview. Whatks up with that? I clicked on borrow, not preview.``` ```Hello Whichever book I want to borrow I am only allowed to borrow it for 1 hour. Maybe there is something wrong??? Furthermore I cannot return a book I have read. Kind regards Dorothea Schmelcher ``` ```I am trying to borrow books for my lessons tomorrow but everything I am trying to borrow is on a 1 hr rental only. Is there a problem with the book rentals? ``` ```Books are only available for one hour. This only a preview offer. How do you download a book this way``` ```Why have I suddenly been limited to a 1 hour time limit on borrowing books?``` @jeff, @brenton, @brewsterkahle

**brenton**
2020-06-16 17:03
Thanks, Mek. Points made. You can help distill feedback into concrete, specific asks, in support of whatâ€™s live.

```

**mek**
2020-06-16 17:14

I don't know that I have a specific ask, just trying to indicate volume; these were from the last half hour. I don't think most are "bugs" just reflections of what patrons are asking for. The 2 main classes are: â€¢ wanting to borrow for 2 weeks (and us removing the option, for books w/ 1 copy) â€¢ wanting to read offline Both may be addressed by a flexible pool where we enable 2wk borrows for any/every book



**mek**
2020-06-16 17:43

The issue with returning 1h borrows from Open Library is one we're actively looking into and I sent @jeff copy about how we might answer those emails (with info from our blog)



**mek**
2020-06-16 17:48

I think :openlibrary: is especially egregious because our UI still shows "Borrow" without messaging.



**mek**
2020-06-16 17:48

@brenton + @jshelton suggestions on how we may want to update this without doing a whole redesign?



**jshelton**
2020-06-16 17:56

Assuming you can determine the availability: â€¢ You could consider using a drop-click button for any borrow with multiple loan options â€¢ You could change the labels to "Borrow 1 hour" or "Borrow 14 days"



**jshelton**
2020-06-16 18:03

Hmmm... your split Borrow | Listen button won't be quite as tidy next to a drop-click button.



**mek**
2020-06-16 18:25

I wonder if it even works right now for borrowable books :sweat_smile:

PRODUCED IN NATIVE FORMAT AT INTARC00293954



**jeff**
2020-06-16 18:43

mouseover tooltip: if you only need it for a short time this will let the next patron borrow it sooner



**brenton**
2020-06-16 18:44

Please recall our design directives: The 14 day option should not be an immediately visible option.



**jeff**
2020-06-16 18:45

the second buttons are on the bookreader page after you click the first borrow button



**jeff**
2020-06-16 18:46

clicking the first one by default gets you a 1 hour loan



**jeff**
2020-06-16 18:47

idea is to let borrowers know from the outset that a 14 day loan is available

PRODUCED IN NATIVE FORMAT AT INTARC00293954



**brenton**
2020-06-16 18:57
On http://Archive.org, we have disclosure triangle, so that users may _discover_ through action that a 14 day loan is available, but the default is 1 hour. It is what we are encouraging.

**jeff**
2020-06-16 19:06
guess i just dont agree with hiding that 14 day loans are available (dont think this is something you should need to "discover" in a library.)

**brenton**
2020-06-16 19:12
Starting today (well, yesterday), 14 day loans are a special feature, not the norm. Letâ€™s take further discussion offline with me or others. BTW: I just talked with @chrisfreeland, and apparently, across the board, librarians are in favor of the 1-hour loans baseline. (Was a surprise to me.)

**mek**
2020-06-16 19:43
https://internetarchive.slack.com/archives/C075DJ6G1/p1592333866232600?thread_ts=1592329727.229400&cid=C075DJ6G1 I am *fully* on board with this (prioritizing 1h as default) I don't like that hundreds of thousands of books have no option at all for 2wk borrow

**mek**
2020-06-16 19:46
I think :openlibrary: will/should follow http://Archive.org's lead (the designs by @jshelton and others) to have a dropdown which does 1h by default. I agree this is a good direction. I think completely disallowing 2 week loans when we only have 1 copy *hurts our readers*.

**mek**
2020-06-16 20:40
@jeff I am doing my best to help w/ questions on mail



Case 23-1260, Document 67, 12/15/2023, 3598433, Page132 of 267

**mek**
2020-06-16 20:41
1. Many folks who are experiencing issues with lending may need to log back in (so their account has s3 keys). The code *should* log them out; I'm double checking. 2. It seems returning 1h loans may work different from 2wk loans. :openlibrary:'s return button isn't working for 1h borrows; we'll need to send them to the IA book or their IA loans page. Working on a fix.

**mark**
2020-06-16 20:57
Could we please start a Google Doc of FAQs ref. this?

**jeff**
2020-06-16 21:01
@judec this is no longer working `https://www-judec.archive.org/services/loans/beta/admin/index.php?action=book&lookup=gunslingerthedar00step_2`

PRODUCED IN NATIVE FORMAT AT INTARC00293954

**From:** Naheed Khan
**Sent:** Thursday, June 18, 2020 4:22 AM EDT
**To:** Brenton Cheng
**Subject:** Re: Borrowing books at the Internet Archive

Hi Brenton,
It's great to hear from you and have the opportunity to correspond with a developer!
Going from a 2 week loan to 1 hour is quite a big jump, what if I'm reading a book on an hour's loan and someone else checks it out before I've finished it?
I don't mind reducing the borrowing time to say 1 day, which would be a lot more usable time limit. Personally I return books quickly and wouldn't mind having them for a shorter time period. But an hour is not really enough time for anyone.
I hope you will reconsider this new borrowing period and also return the waiting list option which is still not available for many books.
Best regards,
Naheed
Sent from my Samsung Galaxy smartphone.
-------- Original message --------
From: Brenton Cheng <brenton@archive.org>
Date: 18/06/2020 06:34 (GMT+00:00)
To: needo65@hotmail.com
Subject: Borrowing books at the Internet Archive
Hey Naheed,

I lead the website development team at the Internet Archive. As you know, we recently launched a new one-hour loan system for borrowing books.

With this new system, even though the loans are for one hour, once that hour is finished, you can check out the book again, as long as you're the first person to do so. Does that take care of your needs?

Or: If you feel that you need a 14 day borrow, could you tell me a little bit about why? Knowing how you use our books would help us make our services better.

Thank you!

-Brenton

-----
Brenton Cheng
Team Lead, Archive.org website
Internet Archive / Open Library

-------- Original Message --------
Subject: Re: Support case *Borrowing Books*
Date: 2020-06-17 11:08
From: Naheed Khan <needo65@hotmail.com>
To: "openlibrary@archive org" <openlibrary@archive.org>

Thank you for your prompt reply, unfortunately it is very difficult if
not impossible to read a book in 1 hour!

I think it's pointless having 1 hour loans as not many people can read
that quickly. You should do research on the issue to see if it's a
viable time limit.

Best regards,
Naheed Khan

On 17 June 2020, at 17:36, openlibrary <openlibrary@archive.org> wrote:

Hi,

Thanks for contacting us.

Lending has changed back to Controlled Digital Lending, which will mean

there are fewer copies available, some only with 1-hour lending
periods. If we have enough copies, then some will be lent for 14 days.

Hope this helps.

Thanks for using archive.org

Best,
Jeff
Internet Archive Team

On 6/17/20 9:32 AM, needo65@hotmail.com wrote:
>
> Description:
>
> Hi, I'm trying to borrow 'Reputation for Revenue ' by Jennie Lucas
but it says 1 hour loan! Is this correct?
>
>
>
> A new support case has been filed by Naheed Khan
<needo65@hotmail.com>.
>
> Topic: Borrowing Books
> URL:
https://nam10.safelinks.protection.outlook.com/?url=https%3A%2F%2Fopenlibrary.org%2Fbooks%2FOL26287697M&data=02%7C01%7C%7Cb39b2075cc8e45e14d3808d813494a5b%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637280552790638633&sdata=zoIXt82Br4cyiXd6ueDVWR5LhxvJythjHtCYwaQf4Y4%3D&reserved=0
[1]

> User-Agent: Mozilla/5.0 (Linux; Android 7.1.2; KFKAWI) AppleWebKit/537.36 (KHTML, like Gecko) Silk/81.2.16 like Chrome/81.0.4044.138 Safari/537.36
> OL-username: Naheed1965

Links:
------
[1]
https://nam10.safelinks.protection.outlook.com/?url=https%3A%2F%2Fopenlibrary.org%2Fbooks%2FOL26287697M&data=02%7C01%7C%7Cb39b2075cc8e45e14d3808d813494a5b%7C84df9e7fe9f640afb435aaaaaaaaaaaa%7C1%7C0%7C637280552790648627&sdata=OWPAQGXn0pImKJbsnc%2B6XnvkTxAPoAqYP5v345gzJWI%3D&reserved=0

# McNamara Declaration

# Exhibit 15

 INTERNET ARCHIVE Go to the Internet Archive

# BORROWING FROM THE LENDING LIBRARY

Home / Archive.org / Borrow a Book from Archive.org / Borrowing From The Lending Library 0 581 89

## What is the loan duration for Internet Archive books?

Books are available for 1 hour, or a longer 14-day loan. If we only have 1 copy of that edition of a book, it is only available for 1 hour loan. If we have more than one copy of a book, it can be checked out for either 1 hour or 14 days, depending on availability. If there are no copies available for 14-day loans, users can join a waitlist. There is no waitlist available for books that only offer 1-hour loans.

## Can I download an encrypted PDF or EPUB of the book?

When patrons check out a book for 1 hour, they can only use it through the web BookReader interface. When patrons check out a book for 14 days, they can either read the book through the web BookReader interface or download an encrypted file using Adobe Digital Editions – the same technical protection software used by commercial publishers on their ebooks.

## The book I want to read is only available for a 1 hour loan, but I can't read the whole book in that time. Can I renew a book that I have borrowed for 1 hour?

Yes. If there are available copies, patrons can check the book out again. Also, if a patron continues reading the book, turning pages, after the 1 hour duration has passed and there is still a copy available, the book will be auto-renewed for another hour.

## How does borrowing a book work through archive.org or OpenLibrary.org?

The Internet Archive and participating libraries have selected digitized books from their collections that are available to be borrowed by one patron at a time, from anywhere in the world for free.

These books are in BookReader, PDF and ePub formats (and Daisy for the print disabled).

For 14 dy loans, you can choose which format you prefer as you complete the borrowing process.

BookReader editions may be read online immediately in your web browser. No special software is required.

Books in the lending library (PDF and ePub) are managed through Adobe Digital Editions, which you may need to download to manage your library of borrowed books.

For mobile devices we recommend downloading Aldiko (ios) (android) or Bluefire reader apps through your app store.

## Is there a video tour for borrowing books through Open Library?

Yes, this tour of Open Library also guides you through the borrowing process and gives you some tips for finding books.

openlibrary

## How do I get set up to borrow books through archive.org?

Follow these steps:

1. Sign up for an archive.org account

Search

Search

Accounts
Archive-it Service
Archive.org General Information
Audio and Music Items Information
Books and Texts Information
Borrow a Book from Archive.org
Charges & Refunds
Collections
Company Matching & Amazon Smile
Disability Access
Donating Physical Items to the Archive
Donating to the Internet Archive
Donations
Downloading
Favorites
Files, Formats, and Derivatives
Forums
General Interest
Kid-Friendly
Managing and Editing Your Items
Media Players
Most Frequently Asked Questions
Movies and Videos
Organization Information
Reporting problems or errors
Search
Software
Tax Information
Technical Information
Uploading
Wayback Machine & Web Archiving

Recent Posts
InterLibrary Loan (ILL) at the Internet Archive
Borrowing From The Lending Library
General kid-friendly resources
Books and Texts – Tips & Troubleshooting
Forums – A Basic Guide



2. Find a book to borrow

There are a number of ways to find a book.

Click on the text icon BOOKS on the top left-hand corner of the black bar, or you can click on **Books to Borrow**, **Open Library** (which has suggested books and categories), or any of the featured texts at the top of the page.

You can also enter the title of the book or the author into the **Search** bar.

3. Borrow the book

Click on the book you would like to borrow. You will be taken to the item page and will be given the option to **Borrow This book**. Click on Borrow this Book. (If the book is on loan, you will be given an option to **Join Waitlist**)

4. If a **BookReader** edition is available, you can read it instantly online in your web browser. Other formats will require that you download a file and open it in **Adobe Digital Editions.** You will be able to read in full screen by clicking on the expand icon.

5. Some eBooks require Adobe Digital Editions (This is where you can read the books you've borrowed, manage your current loans, or return books).

Get an Adobe.com account (If you create an Adobe account, you can access your library from a variety of locations. If not, your loans will be tethered to a specific computer or device.)

Want to sign up for an Internet Archive account? Archive.org account

## Where do I get Adobe Digital Editions?

You can download Adobe Digital Editions from adobe.com. It's free.

If you are using a device that can't run Adobe Digital Editions, you still need an Adobe account.  You can get one online here.

## Where do I get reader apps for my mobile device?

For mobile devices we recommend downloading Aldiko (ios) (android) or Bluefire reader apps through your app store.

## How do I authorize Adobe Digital Editions? Who is my ebook vendor?

The first time you run Adobe Digital Editions, it will prompt you for authorization. This is completely optional and is not linked to your archive.org ID.

If you do not want to set up an Adobe ID, check the box in the lower left where it says: I want to Authorize my computer without an ID and click Authorize.

If you do want to set up an ID, click the create an Adobe ID link next to the eBook vendor line (which should remain set on Adobe ID).

You can authorize your computer at a later date by going under the Help menu of ADE and selecting the Authorize computer... option.

## How many books can I check out at once?

You can borrow 10 books at a time from archive.org.

Each loan will expire after 2 weeks and will automatically "return" at the end of that time period.

## How can I see which books I've checked out?

To find your loans, just follow these steps:

1. Click on your **Username** a drop-down menu will appear. Click on **My Loans**.



2. You will be able to view your loans.



## Which reading devices can be used to read the eBooks borrowed through archive.org?

Internet Archive offers borrowable books in BookReader,  PDF and ePub formats.

BookReader editions may be read online immediately in any web browser.

Downloadable eBooks are readable in Adobe Digital Editions and some other software platforms. Here is a list of supported devices on Adobe's website.

ADE also provides support for Sony's Reader.

## Can I borrow books on my Ipad or Android tablet?

Yes! You can read our books using our BookReader via your browser or by using a reader app like **Aldiko Book Reader** or **Bluefire Reader**.

For more information on Bluefire, go to their site at  bluefirereader.com. Before you start, register an Adobe ID. You'll need to do this once. If you don't have one, create one on this page.

**Using Aldiko Reader:**

1. Download and install "**Aldiko Book Reader**" from Google Play Store.
2. Open Aldiko, Select **Other Catalogs** under the **Get Books** section of the menu.
3. Select **My Catalogs** at the top and tap **New Catalog** on the green bar at the top.
4. Create an entry for the archive.org using openlibrary.org for the URL. Tap on the library and sign in.
5. When you have found a book you like, check it out.
6. When the next screen comes up, select the pdf or ePub version.
7. You will be prompted to enter your Adobe id and password.
8. Your book will then download into Aldiko and you can open it and read it at your leisure.

The only downside to this process is that books can't be returned early via non-Adobe applications, so you'll just have to let them expire or we can return them early if you need to free up space on your loans list.

**Using Nook:**

You will need  Adobe Digital Editions(ADE) to use your Nook. Once you have ADE follow these instructions:

1. Quit Digital Editions, if it's running
2. Plug in the Nook, and start ADE
3. ADE should recognize the Nook, and offer to associate with it. Make sure you can see the Nook under **Bookshelves** on the left.
4. Go to the  Lending Library and borrow a book in pdf or ePub format.
5. If ADE is working properly, you should see your book.
6. Next, go to **Library View** in ADE – in the upper left.
7. In the **Library View**, drag your new book over to the **Nook** icon under **Bookshelves**.
8. Quit ADE and eject your Nook.



**To read on the Nook:**

1. Go to your **Library** (on a Nook Color, do this by touching the bottom of the touchscreen)
2. Go to **my files** – at the top – and open **Digital Editions**
3. Open your book! (If it says "sorry, can't open this book," try again.)

**To return your book early so that others can borrow it:**

1. Quit ADE if it's running
2. Plug in your Nook and start ADE
3. Open **Library View** and click **All Items** on the left
4. On your book icon, there's a drop-down menu (a little triangle) in the upper left – select **Return Borrowed Item**
5. Open the Nook, in the **bookshelf area** on the left
6. On your book icon – select **Return Borrowed Item**
7. Your book should now be available to borrow again!

If you run into trouble, have a look at the Barnes & Noble Help Center

## Can I read or borrow books on my Kindle?

We do not currently offer Kindle file formats.

## What about using e-readers?

Regardless of which e-reader you have, you can read archive.org eBooks online in your browser with our BookReader.

Many devices support PDF files, which can be downloaded from archive.org.

## What happens if the book I want is on loan?

If you try to borrow a book that is currently on 14 day loan you will be offered a link to be put on a waiting list.

When you click on **Join waitlist** you will receive confirmation that you are on the list. You will also be given the option to leave the waitlist. You will be notified via email when your loan is ready.

## Can I return a library book early?

Yes, usually.

If you borrowed a BookReader edition, simply return it from your Loans page.

If you downloaded another type of eBook, you'll need to do that through **Adobe Digital Editions**.

If you checked out your book with other software like **Aldiko** or **Bluefire** Reader, you will not be able to return your book early.

To return in Adobe Digital Editions, look for your **Library**.



Right click on the book. A pop-up will appear with the option to **Return Borrowed Item**

Click on **Return Borrowed Item**

A confirmation pop-up will appear. Select **Return**.

The book will be removed from your library.

If you used other software to access your book, you may not be able to return it early but the item will be automatically returned at the end of the loan period.

Please contact us if you are having trouble returning your items.

## Are there late fees?

No, we are a free library. After 14 days, the book loan will automatically be disabled.

## Can I renew a book or extend the loan?

No. At this time you would need to borrow the book again. This may require that you join the waiting list if there is one.

Was this helpful? Yes No 581 / 69

Case 23-1260, Document 67, 12/15/2023, 3598433, Page142 of 267

Page 6
Borrowing From The Lending Library – Internet Archive Help Center
https://help.archive.org/help/borrowing-from-the-lending-library/

© 2022 Internet Archive

A-1401

# McNamara Declaration
# Exhibit 16

Page 1
How I survived bullies, broccoli, and Snake Hill : Patterson, James, 1947- author : Free Download, Borrow, and Streaming : Internet Archive
https://archive.org/details/howisurvivedbull0000patt_a1s6/mode/2up?view=theater

Log In and Borrow | Purchase at Better World Books | Renewable every hour, pending availability.



Page 2
How I survived bullies, broccoli, and Snake Hill : Patterson, James, 1947- author : Free Download, Borrow, and Streaming : Internet Archive
https://archive.org/details/howisurvivedbull0000patt_a1s6/mode/2up?view=theater



(1 of 340)

# McNamara Declaration
# Exhibit 17

| | AUTHOR | TITLE | COPYRIGHT REGISTRATION NUMBER | PUBLISHER |
|---|---|---|---|---|
| 1 | Ahern, Cecelia | PS, I Love You | TX0005895532 | Hachette |
| 2 | Albertalli, Becky | Simon vs. the Homo Sapiens Agenda | TX0008021205 | HarperCollins |
| 3 | Applegate, Katherine | The One and Only Ivan | TX0007555692 | HarperCollins |
| 4 | Bacigalupi, Paolo | Ship Breaker | TX0007254031 | Hachette |
| 5 | Brown, Brené | Daring Greatly: How the Courage to Be Vulnerable Transforms the Way We Live, Love, Parent, and Lead | TX0007634717 | Penguin Random House |
| 6 | Brown, Pierce | Golden Son | TX0008016409 | Penguin Random House |
| 7 | Brown, Sandra | Best Kept Secrets | TX0002539419 | Hachette |
| 8 | Brown, Sandra | The Witness | TX0005069323 | Hachette |
| 9 | Bryson, Bill | A Short History of Nearly Everything | TX0005819304 | Penguin Random House |
| 10 | Bryson, Bill | A Short History of Nearly Everything: Special Illustrated Edition | TX0006307243 | Penguin Random House |
| 11 | Cabot, Meg | The Bride Wore Size 12 | TX0007783913 | HarperCollins |
| 12 | Carter, Les | Enough About You, Let's Talk About Me: How to Recognize and Manage the Narcissists in Your Life | TX0006325485 | Wiley |
| 13 | Catling, Patrick Skene | The Chocolate Touch | A00000069921, RE0000055493 | HarperCollins |
| 14 | Cisneros, Sandra | The House on Mango Street | TX0003739076 | Penguin Random House |
| 15 | Conti, Peter; Harris, Peter | Commercial Real Estate Investing for Dummies | TX0007025526 | Wiley |
| 16 | Corey, James S.A. | Leviathan Wakes | TX0007439248 | Hachette |
| 17 | Corey, James S.A. | Caliban's War | TX0007617575 | Hachette |
| 18 | Crossan, Sarah | Breathe | TX0007683648 | HarperCollins |
| 19 | Crossan, Sarah | Resist | TX0007793191 | HarperCollins |
| 20 | Danforth, Emily M. | The Miseducation of Cameron Post | TX0007538437 | HarperCollins |
| 21 | Demuth, Patricia | Who is Bill Gates? | TX0007733894 | Penguin Random House |
| 22 | Dugoni, Robert | The Jury Master | TX0006525282 | Hachette |
| 23 | Epstein, David J. | The Sports Gene: Inside the Science of Extraordinary Athletic Performance | TX0007771878 | Penguin Random House |
| 24 | Evanovich, Janet | Foul Play | TX0002495088 | HarperCollins |
| 25 | Fisher, Kenneth L. | The Only Three Questions that Still Count: Investing by Knowing What Others Don't | TX0007513212 | Wiley |
| 26 | Fitzpatrick, Huntley | My Life Next Door | TX0007565514 | Penguin Random House |
| 27 | Flynn, Gillian | Gone Girl | TX0007548935 | Penguin Random House |
| 28 | Forman, Gayle | If I Stay | TX0006970259 | Penguin Random House |
| 29 | Gardner, Lisa | Fear Nothing | TX0007509675 | Penguin Random House |
| 30 | Giddings, Anita; Clifton, Sherry Stone | Oil Painting for Dummies | TX0007089078 | Wiley |
| 31 | Gilbert, Elizabeth | Eat, Pray, Love: One Woman's Search for Everything Across Italy, India and Indonesia | TX0006375345 | Penguin Random House |
| 32 | Gladwell, Malcolm | David and Goliath: Underdogs, Misfits, and the Art of Battling Giants | TX0007814165 | Hachette |
| 33 | Gladwell, Malcolm | What the Dog Saw | TX0007118941 | Hachette |
| 34 | Gladwell, Malcolm | Blink: The Power of Thinking Without Thinking | TX0006120724 | Hachette |
| 35 | Gladwell, Malcolm | Tipping Point: How Little Things Can Make a Big Difference | TX0005861769 | Hachette |
| 36 | Golding, William | Lord of the Flies | A00000207331, RE0000165908 | Penguin Random House |
| 37 | Gordon, Jon | The Energy Bus | TX0006916245 | Wiley |
| 38 | Grabenstein, Chris | Escape from Mr. Lemoncello's Library | TX0007770723 | Penguin Random House |
| 39 | Graham, Benjamin | The Intelligent Investor | A33116, R661874, A411612, RE369865, A141550, RE127674 | HarperCollins |
| 40 | Grant, Adam M. | Give and Take: a Revolutionary Approach to Success | TX0007685330 | Penguin Random House |
| 41 | Grisham, John | The Innocent Man: Murder and Injustice in a Small Town | TX0006447726 | Penguin Random House |
| 42 | Grisham, John | Theodore Boone: Kid Lawyer | TX0007198794 | Penguin Random House |
| 43 | Grisham, John | Theodore Boone: The Accused | TX0007558149 | Penguin Random House |
| 44 | Hall, Michael | Red: A Crayon's Story | TX0008019464 | HarperCollins |
| 45 | Herman, Gail | Who was Jackie Robinson? | TX0007326367 | Penguin Random House |
| 46 | Hiaasen, Carl | Scat | TX0006920819 | Penguin Random House |
| 47 | Hurston, Zora Neale | Their Eyes Were Watching God | A108603, R357931 | HarperCollins |
| 48 | Jahren, Hope | Lab Girl | TX0008263021 | Penguin Random House |
| 49 | James, Marlon | A Brief History of Seven Killings | TX0007950885 | Penguin Random House |
| 50 | Jance, J.A. | Judgment Call | TX0007580015 | HarperCollins |
| 51 | Jance, J.A. | Dance of the Bones | TX0008123060 | HarperCollins |
| 52 | Kalanithi, Paul | When Breath Becomes Air | TX0008170188 | Penguin Random House |
| 53 | Kate, Lauren | Fallen | TX0007162746 | Penguin Random House |
| 54 | Kelly, Martha Hall | Lilac Girls | TX0008288854 | Penguin Random House |
| 55 | Klay, Phil | Redeployment | TX0007856163 | Penguin Random House |
| 56 | Krakauer, Jon | Into the Wild | TX0004242389 | Penguin Random House |
| 57 | Kraynak, Cecie; Kraynak, Joe | Spanish All-in-One for Dummies | TX0007152269 | Wiley |
| 58 | Kuhn, Karl F. | Basic Physics | TX0004294866 | Wiley |
| 59 | L'Amour, Louis | Hondo | A00000113543, RE0000107198 | Penguin Random House |
| 60 | Larson, Edward J. | The Return of George Washington | TX0007922775 | HarperCollins |
| 61 | Larson, Erik | Dead Wake: the Last Crossing of the Lusitania | TX0008257868 | Penguin Random House |
| 62 | Lazarus, William P.; Sullivan, Mark | Comparative Religion for Dummies | TX0007241296 | Wiley |

| 63 | Lehane, Dennis | World Gone By | TX0008039819 | HarperCollins |
|---|---|---|---|---|
| 64 | Lencioni, Patrick | The Five Dysfunctions of a Team: a Leadership Fable | TX0005757057 | Wiley |
| 65 | Lencioni, Patrick | The Advantage: Why Organizational Health Trumps Everything Else in Business | TX0007503919 | Wiley |
| 66 | Lencioni, Patrick | Overcoming the Five Dysfunctions of a Team | TX0006165385 | Wiley |
| 67 | Lencioni, Patrick | The Three Signs of a Miserable Job: a Fable for Managers (and Their Employees) | TX0007006036 | Wiley |
| 68 | Lencioni, Patrick | Getting Naked: a Business Fable About Shedding the Three Fears that Sabotage Client Loyalty | TX0007161860 | Wiley |
| 69 | Levine, Barry | All the President's Women: Donald Trump and the Making of a Predator | TX0008836048 | Hachette |
| 70 | Lewis, C. S. | The Lion, the Witch, and the Wardrobe | AI-2945, R678216 | HarperCollins |
| 71 | Lewis, C. S. | The Magician's Nephew | A00000203269, AI0000004618, RE0000172597 | HarperCollins |
| 72 | Lu, Marie | Legend | TX0007477993 | Penguin Random House |
| 73 | Mandel, Emily St. John | Station Eleven | TX0007946421 | Penguin Random House |
| 74 | Martin, George R. R. | A Dance with Dragons | TX0007400734 | Penguin Random House |
| 75 | McCarthy, Cormac | The Road | TX0006556613 | Penguin Random House |
| 76 | Miller, Donalyn | The Book Whisperer | TX0007254399 | Wiley |
| 77 | Morgenstern, Erin | The Night Circus | TX0007425933 | Penguin Random House |
| 78 | Morrison, Toni | Song of Solomon | A00000904465, RE0000921551 | Penguin Random House |
| 79 | Morrison, Toni | The Bluest Eye | A00000222644, RE0000785522 | Penguin Random House |
| 80 | Nelson, Marilyn | How I Discovered Poetry | TX0007846518 | Penguin Random House |
| 81 | O'Connor, Jane; Glasser, Robin | Fancy Nancy: Too Many Tutus | TX0007690991, VA0001862482 | HarperCollins |
| 82 | O'Connor, Jane; Glasser, Robin | Fancy Nancy: Super Secret Surprise Party | TX0008070920, VA0001967523 | HarperCollins |
| 83 | Palmer, Parker J. | Let Your Life Speak: Listening for the Voice of Vocation | TX0005080321 | Wiley |
| 84 | Park, Barbara | Junie B., First Grader: Boss of Lunch | TX0005623738 | Penguin Random House |
| 85 | Patchett, Ann | Commonwealth | TX0008316769 | HarperCollins |
| 86 | Patterson, James | Middle School, the Worst Years of My Life | TX0007593552 | Hachette |
| 87 | Patterson, James | Invisible | TX0007953870 | Hachette |
| 88 | Patterson, James; Grabenstein, Chris | I Funny: A Middle School Story | TX0007629856 | Hachette |
| 89 | Peirce, Lincoln | Big Nate: Mr. Popularity | TX0007908851 | HarperCollins |
| 90 | Peirce, Lincoln | Big Nate: Genius Mode | TX0007715101 | HarperCollins |
| 91 | Peirce, Lincoln | Big Nate Goes for Broke | TX0007521998 | HarperCollins |
| 92 | Pinker, Steven | The Better Angels of Our Nature: Why Violence has Declined | TX0007454376 | Penguin Random House |
| 93 | Plath, Sylvia | The Bell Jar | A275047 | HarperCollins |
| 94 | Pratchett, Terry | Night Watch | TX0005702246 | HarperCollins |
| 95 | Redwine, C. J. | Defiance | TX0007683441 | HarperCollins |
| 96 | Ritchhart, Ron | Making Thinking Visible: How to Promote Engagement, Understanding, and Independence for All Learners | TX0007397014 | Wiley |
| 97 | Rohr, Richard | Falling Upward: a Spirituality for the Two Halves of Life | TX0007368227 | Wiley |
| 98 | Salinger, J. D. | The Catcher in the Rye | A00000056070, RE0000018341 | Hachette |
| 99 | Salinger, J. D. | Nine Stories | TX0000625326, RE0000130457 | Hachette |
| 100 | Salinger, J. D. | Franny and Zooey | A00000591015, RE0000438737 | Hachette |
| 101 | Salinger, J. D. | Raise High the Roof Beam, Carpenters, and Seymour: An Introduction | B00000776866, RE0000340311, B00000564939, RE0000157487 | Hachette |
| 102 | Sandford, John | Phantom Prey | TX0007189422 | Penguin Random House |
| 103 | Schaefer, Charles E.; DiGeronimo, Theresa Foy | Ages and Stages: a Parent's Guide to Normal Childhood Development | TX0005277840 | Wiley |
| 104 | Schneider, Robyn | Extraordinary Means | TX0008104539 | HarperCollins |
| 105 | Semple, Maria | Today Will Be Different | TX0008324577 | Hachette |
| 106 | Silberman, Steve | Neurotribes: the Legacy of Autism and the Future of Neurodiversity | TX0008202678 | Penguin Random House |
| 107 | Snicket, Lemony | Who Could That Be at This Hour? | TX0007615258 | Hachette |
| 108 | Snicket, Lemony | When Did You See Her Last? | TX0007818551 | Hachette |
| 109 | Stewart, Trenton Lee | The Extraordinary Education of Nicholas Benedict | TX0007552463 | Hachette |
| 110 | Stewart, Trenton Lee | The Mysterious Benedict Society | TX0006577654 | Hachette |
| 111 | Stewart, Trenton Lee | The Mysterious Benedict Society and the Perilous Journey | TX0007018489 | Hachette |
| 112 | Stone, Douglas | Thanks for the Feedback: the Science and Art of Receiving Feedback (Even When it is Off-Base, Unfair, Poorly Delivered, and Frankly, You're Not in the Mood) | TX0007885277 | Penguin Random House |
| 113 | Strout, Elizabeth | The Burgess Boys | TX0007729095 | Penguin Random House |
| 114 | Tahir, Sabaa | An Ember in the Ashes | TX0008301050 | Penguin Random House |
| 115 | Turnage, Sheila | Three Times Lucky | TX0007558141 | Penguin Random House |
| 116 | van der Kolk, Bessel A. | The Body Keeps the Score: Brain, Mind, and Body in the Healing of Trauma | TX0007949079 | Penguin Random House |
| 117 | Wiesel, Elie | Open Heart | TX0007647478 | Penguin Random House |
| 118 | Wilder, Laura Ingalls | Little House in the Big Woods | A50595, R240866 | HarperCollins |
| 119 | Wilder, Laura Ingalls | Little House on the Prairie | A86517, R321069 | HarperCollins |
| 120 | Wilder, Laura Ingalls | Farmer Boy | A67106, R270763 | HarperCollins |

| | | | | |
|---|---|---|---|---|
| 121 | Winspear, Jacqueline | A Dangerous Place | TX0008047542 | HarperCollins |
| 122 | Winspear, Jacqueline | Journey to Munich | TX0008265362 | HarperCollins |
| 123 | Winspear, Jacqueline | Elegy for Eddie | TX0007508297 | HarperCollins |
| 124 | Woofenden, Ian | Wind Power for Dummies | TX0007154083 | Wiley |
| 125 | Wouk, Herman | The Winds of War | A00000278899, RE0000652979 | Hachette |
| 126 | Wouk, Herman | The Caine Mutiny: A Novel of World War II | A00000053612, RE0000018386 | Hachette |
| 127 | Zuckerman, Gregory | The Man Who Solved the Market | TX0008865827 | Penguin Random House |

# McNamara Declaration
# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>Defendants. | Case No. 1:20-CV-04160-JGK |

**STIPULATION REGARDING UNDISPUTED FACTS**

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley"), and Penguin Random House LLC ("PRH") (together, "Plaintiffs") and Defendant Internet Archive ("Internet Archive") (collectively, "Parties"), by and through their respective counsel of record, hereby stipulate as follows:

The following facts are undisputed for purposes of the Parties' summary judgment motions.

1.     The Internet Archive and Open Library of Richmond are both duly organized nonprofit entities that have been designated as 501(c)(3) public charities by the IRS.

2.     The Internet Archive or Open Library of Richmond owns at least one lawfully made print copy of each of the 127 Works in Suit.

3.     Hachette Book Group, Inc. holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Hachette Book Group, Inc. is identified as the publisher.

4.     HarperCollins Publishers LLC holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which HarperCollins Publishers LLC is identified as the publisher.

5.     Penguin Random House LLC holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Penguin Random House LLC is identified as the publisher.

6. John Wiley & Sons, Inc. holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which John Wiley & Sons, Inc. is identified as the publisher.

7. Each of the 127 Works in Suit was registered with the United States Copyright Office within the time period required to recover statutory damages and attorneys' fees under 17 U.S.C. § 412 with respect to the allegations set forth in the Complaint.

**IT IS SO STIPULATED.**

Dated: June 10, 2022

DAVIS WRIGHT TREMAINE LLP

By: ______________________________

ELIZABETH A. MCNAMARA (SBN 1930643)
LINDA STEINMAN (SBN 2137305)
JOHN M. BROWNING (SBN 5213038)
JESSE FEITEL (SBN 5481403)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
lizmcnamara@dwt.com
lindasteinman@dwt.com
jackbrowning@dwt.com
jessefeitel@dwt.com

OPPENHEIM + ZEBRAK, LLP
MATTHEW J. OPPENHEIM (NY SBN 4314605)
SCOTT A. ZEBRAK (NY SBN 5620125)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
(202) 450-3958
matt@oandzlaw.com
scott@oandzlaw.com

Attorneys for Plaintiffs
HACHETTE BOOK GROUP, INC.,

Case 23-1260, Document 67, 12/15/2023, 3598433, Page154 of 267

_______________________________
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

Dated: June 10, 2022

DURIE TANGRI LLP

By:_______________________________

JOSEPH C. GRATZ (*Pro Hac Vice*)
JESSICA E. LANIER (*Pro Hac Vice*)
ADITYA V. KAMDAR (*Pro Hac Vice*)
ANNIE A. LEE (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ALLYSON R. BENNETT (*Pro Hac Vice*)
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
abennett@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
CORYNNE MCSHERRY (*Pro Hac Vice*)
KIT WALSH (*Pro Hac Vice*)
CARA GAGLIANO (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

________________________________
JOSEPH C. GRATZ

# McNamara Declaration
# Exhibit 19

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and
PENGUIN RANDOM HOUSE LLC,

Plaintiffs,

vs. Case No. 1:20-cv-04160-JGK

INTERNET ARCHIVE and DOES 1
through 5, inclusive,

Defendants.

-----------------------------------------------------x

REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

SUSAN HILDRETH

Monday, May 17, 2022

Reported By: Lynne Ledanois, CSR 6811
Job No. 5228055

BY MS. McNAMARA:

Q And if I understand your testimony, you believe that's fair if those -- if that flexibility results in less money being paid to the publishers or authors?

MS. LANIER: Objection, mischaracterizes previous testimony. Go ahead, Susan.

THE WITNESS: My comment was that I think it could be likely that with CDL materials meeting some patron requests, the result that the library would not necessarily have to license that specific title to meet a patron demand, they would be able and it is likely that they would purchase additional e-materials, other materials -- other e-materials to meet other patron demand.

BY MS. McNAMARA:

Q When you say that they wouldn't have to pay for that specific title, you understand then that that specific author would not receive a royalty even if they -- even if they acquired e-books from another publisher or another author; is that correct?

MS. LANIER: Objection. Again, I'm not sure I understand that question or who "they" refers to in the context --

MS. McNAMARA: Jessie, and I would suggest to you we have had a strict rule in these depositions that you do not have speaking objections.

You can say objection to form. You can say, you know, something like vague. But you get into specifics, you're coaching the witness and I ask you to stop.

MS. LANIER: Well, I respectfully object to your classification of my objections as coaching the witness. I also don't think that was a speaking objection.

I'd just ask you to rephrase the question, please.

MS. McNAMARA: I'll ask the witness to do so, not you.

Q Ms. Hildreth --

MS. McNAMARA: Can we have read back the last question?

(Discussion off the record.)

(Requested testimony read by the reporter.)

MS. LANIER: Same objection.

BY MS. McNAMARA:

Q Can you answer the question, Ms. Hildreth?

A I understand that a specific author would

not receive a royalty for a specific title. I am looking at the situation in my mind more globally in terms of overall what royalties would go to not a specific author but a number of authors.

So that's my response to that.

Q If the specific title that was available through CDL was Catcher in the Rye by J.D. Salinger, let's say, and you would agree that then the Salinger estate would not receive a royalty if that work was available via the Internet Archive and CDL?

MS. LANIER: Objection, calls for speculation.

THE WITNESS: I'd have to know the context of that question and I mean -- frankly, I'd have to know the context of the question and there could be many other avenues for obtaining access to The Catcher in the Rye than purely relying necessarily on CDL or the Digital Lending Library for it.

BY MS. McNAMARA:

Q Do you have a general opinion, Ms. Hildreth, as to whether the plaintiffs have suffered any economic harm as a result of the Digital Lending Library?

A I'm challenged in answering that question

A My opinion is not necessarily based on fact. But from what I know of the e-book demand for -- generally in public libraries in the CD O or available at a Digital Lending Library is a factor there.

But the demand for e-books and the revenue that publishers and authors have had from the expansion of the e-book market in public libraries would lead me to the opinion that publishers and authors are receiving -- are receiving funds as a result of e-books in the library marketplace.

Q The question really was not whether they are receiving funds in the library marketplace, because as I understand your testimony, you recognize that there is a thriving e-book licensing market for libraries; isn't that right?

A Yes.

Q And it's a thriving e-book market that has increased in recent years; isn't that right?

A Correct, yes.

Q And that e-book market is predicated on licensing revenues that are paid by libraries to entities like OverDrive; is that right?

A Correct, yes.

Q And CDL does not pay those same licensing revenues or Internet Archive's CDL practices do not

A Yes.

Q Are you suggesting that acquisition budgets are at particular risk of being squeezed because they are discretionary?

MS. LANIER: Objection, vague as to "squeezed."

THE WITNESS: I am suggesting that it is not uncommon that required expenses -- legally required expenses, say insurance or updating of fire equipment or a variety of expenses that are required to keep a building open to the public may take priority over expenses allocated to materials.

BY MS. McNAMARA:

Q In Paragraph 109 of your report, you indicate that "In light of the priority of materials acquisition and the current state of limited budgets for those materials, libraries would not reduce their materials budgets if reliance on CDL for certain digital content reduced their spending on the particular titles that were provided through CDL."

Do you see that?

A Yes.

Q Is it your expert opinion that libraries will spend less money on licensing the e-book

habits and book habits of patrons over many years.

Q Have you done any -- are you aware of any research that has been made available to you concerning why patrons of the Internet Archive use the one-hour option?

A No. No, I've not seen anything, any research.

Q So as you sit here today, you have no information that would substantiate that most users of the one-hour option are in order to browse?

MS. LANIER: Objection, mischaracterizes her prior testimony and asked and answered.

THE WITNESS: I don't have any factual information on how anyone might be using that one hour of browsing.

BY MS. McNAMARA:

Q But we can agree that someone could read most, if not all of the work in that one hour?

MS. LANIER: Objection, asked and answered multiple times, vague, calls for speculation and lacks foundation.

THE WITNESS: I think it really is a determination based on the type of e-book, the amount of content, the length, the subject matter, whether -- certainly some could be read in an hour

but many could not be read in an hour at all.

BY MS. McNAMARA:

Q You have not done any survey to determine what percentage of books available on Internet Archive for the one-hour option could be read in their entirety?

MS. LANIER: Objection --

MS. McNAMARA: Excuse me.

MS. LANIER: Sorry, Liz, I could not tell when you finished the question because you paused. Forgive me.

MS. McNAMARA: I was pausing.

MS. LANIER: I understand that now.

BY MS. McNAMARA:

Q Did you hear the question, Ms. Hildreth?

A Yes, I heard the question. And I have no research in regard to how the one-hour browsing is used.

MS. McNAMARA: Let's go off the record and I'm going to go through a few things. I'm very close to being done, you'll be happy to hear, Ms. Hildreth. And so let me go through and see what, if anything, I need to ask you.

Let's come back probably in five or ten minutes.

I, LYNNE M. LEDANOIS, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript was wasn't requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: May 19, 2022

Lynne Marie Ledanois

LYNNE MARIE LEDANOIS
CSR No. 6811

# McNamara Declaration
# Exhibit 20

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY SONS, INC., and PENGUIN RANDOM HOUSE, LLC,

Plaintiffs,

v.

INTERNET ARCHIVE and DOES 1 through 5, inclusive,

Defendants.

Case No. 1:20-CV-04160-JGK

CONFIDENTIAL - ATTORNEYS EYES ONLY

REMOTE PROCEEDINGS OF THE VIDEOTAPED DEPOSITION OF STEVE POTASH, INDIVIDUALLY AND AS A 30(B)(6) WITNESS FOR OVERDRIVE, INC.

MONDAY, JANUARY 31, 2022

REPORTED BY NANCY J. MARTIN

CSR. NO. 9504, RPR, RMR

PAGES 1 - 204

A. This would be the amount we invoiced the library.

Q. The library.

And this would apply -- the dollar amount isn't necessarily -- actually, let me ask this. Sorry.

When there is -- when a library gets access to a book or makes a purchase on a model other than cost per checkout, when would the revenue appear? In other words, if a library purchases a 24-month -- access for 24 months for a certain amount of money, does that money appear at the beginning or spread out over the 24 months?

A. When a title is set live in the library's catalog available to be borrowed, in that month we will invoice a library as activity for the month.

Q. So it's the month -- the money -- the dollar amount appears in the month in which the library was used is that right?

A. The month that the library placed the order, yes.

Q. And for cost per circulation transactions, that would be the month in which the circulation occurred is that right?

A. At the end of the month, the library would be

A. Generally, yes.

Q. What is -- what is the differential?

A. I mean are you asking as far as number of actual library accounts and academic versus public?

Q. Yes.

A. As stated earlier, there are thousands of individual communities that have access to OverDrive to consortium insured collections. So if we look at every community as an individual library, we would be in the thousands of public libraries.

If we look at U.S. university libraries, academic libraries, we would be in the low hundreds, maybe 2-, 300, I'm going to guess, in the U.S.

Q. Okay. And so as OverDrive acquires -- is it fair to say that OverDrive acquires digital works from publishers under various terms and models?

A. OverDrive is granted permission to redistribute and service institutions under agreements with suppliers, publishers, and aggregators.

Q. And that generally involves some compensation paid by -- paid by OverDrive for the digital works is that right?

A. It typically involves following a sale to an institution or a license or access plan, sharing the revenue under the agreed distribution terms we

Q. And are you aware that Internet Archive calls these libraries "partner libraries"?

A. I'm not familiar with all their terminology or their public pages, but that doesn't surprise me as they may label participating libraries as partners.

Q. Do you have a sense of how many libraries have become partner libraries with the Internet Archive?

A. No.

Q. Can you tell me approximately how many public libraries there are in the United States?

A. I believe there's approximately 9,000 libraries that operate with branches and extensions that may total in the 15,000 if you count every location, and I think that's -- I recollect those general numbers.

Q. And those are just public library numbers is that correct?

A. Correct.

Q. And of those, you said a total of approximately 15,000 public libraries, how many are customers, approximately, of OverDrive?

A. Again, that larger number would include all the branches of some of the large metro systems. So it's a smaller number. But I will approximate that 93

to 94 percent of the U.S. public libraries have some access to digital book lending with OverDrive, 90-plus percent.

Q. Okay. And if I were to tell you that there are today only about 2 or 3, 4 public libraries that have signed on to be partner libraries with Internet Archive, would that surprise you?

MR. GRATZ: Objection to form.

THE WITNESS: No. I do recall, when I was reviewing some of the materials, the names of San Francisco Public Library and one or two others. So I know it was -- there were -- just from my recollection, more academic libraries and few public libraries in that list. I don't recall the date I may have seen that, but...

BY MS. MCNAMARA:

Q. Do you have any sense as to why there would be more academic libraries than public libraries that might -- that would be partner libraries with Internet Archive?

MR. GRATZ: Objection to form.

THE WITNESS: Yes.

BY MS. MCNAMARA:

Q. What is your sense?

A. Well, academic libraries have, for decades,

Q. Okay. While I wait for him, let me ask you something, Mr. Potash.

The -- I'd like to address, if I might, what might appear to be some self-evident facts concerning OverDrive's library customers who all buy or license the digital works they distribute, and these questions only go to the public library customers of OverDrive. Okay?

You would agree with me that the public libraries are not commercial entities is that right?

A. Yes.

Q. And you would agree that these libraries support the teaching and research and scholarship of their communities, did they not?

A. Yes.

Q. And would you agree that these public libraries, that they buy or license digital works, that they often own a physical copy of the same work?

MR. GRATZ: Objection to form. Lacks foundation.

THE WITNESS: Yes.

BY MS. MCNAMARA:

Q. And would you agree with me that many of the public libraries that are your customers, that they serve rural communities?

A. Yes.

Q. And that they serve disabled communities?

A. Yes.

Q. And that they serve poor communities or impoverished communities in certain circumstances. Isn't that right?

A. Yes.

Q. And yet, they are all licensing the right to distribute the digital works from OverDrive. Isn't that right?

A. We are a supplier of significant amounts of digital books, and we donate also. So yes.

Q. And one of the by-products of the libraries who are your clients or customers and who purchase from OverDrive is that they're making digital copies in a more convenient way to their members.

MR. GRATZ: Objection to form.

BY MS. MCNAMARA:

Q. Let me ask it this way. That wasn't very clear.

The eBooks that are made available through the libraries who are your customers, I believe we determined those eBooks can be available 24 hours a day. Isn't that right?

A. Yes.

A. Yes.

Q. And so they're -- these statewide collections are customers of OverDrive, and so they have eBooks available is that correct?

A. Yes.

Q. So if they have statewide collections, those works would be available to all residents of that state, whether urban or rural is that correct?

A. Yes.

Q. And then you indicated that several states have reciprocal lending arrangements.

Do you recall that?

A. It's not states having reciprocal lending. Typically, within a state, two or more libraries or two or more consortiums, we enable reciprocal access to the members' collections for any cardholder.

Q. And that creates greater ability of the works to the public. Isn't that correct?

A. Absolutely, yes.

Q. And so it would be greater availability to all types of potential readers, whether they be rural or disabled or poor or whatever is that right?

A. Yes.

Q. You mentioned the -- I forget the term of art for it, your kind of library card or digital library

**[juvenile - libraries]**

**juvenile**   6
    6

**k**

**keep**  1      3  18
    3     63 16 6
    171 1
**kept**  119  3
    1  1 11 1     3 11
**key**  1  1  9  7
**kids**      8 73 1
**kin**     1 11
**kind**           6
    9   16 163 1
    16     17  13
    171 17 17   7
    176 1 191
**kindle**  83 19  1
**knew**        1 73 11
**know**  1   6 7 16 7
        1   3 8 9 1
        1   3 1  3  7
    3     38 18  6
       8    9   6  7 8
    6  3 66 1   13  3
    68     7   8 73 1
    8  8    81 1
    83 9 8   1  87 1
    87 1     3 88
    89    7 91 3 96 8
    97 1   99    7
    1     19 1      1
    1      1
    1  7   1 1 8 1  17
    1 9 3 11
    111      11  1
    11   7 116 18
    1  1 1   13 1     1
    1    13 17 18
    1    11 1     3
    1    7 8 9 1 6
    1  7    1 8

1  7 8 1  9
16  1   16     1
167     171 9 18
176 11 177 8 18
178 7 18   13 1
18   19   3 183 3 9
183 9 186 18 19
188 3 6     193 9
196 9 197   1
197     198 16
**knowledge**   87 19
    1  3  1 1    1
    1  6 19 1 7
    171 1
**knowledgeable**
    163
**knows**  186 17
**kobo**   1  3 18

**l**

**label**  7      1 8 1
    161
**labels**  1      1    3
**lacks**  1     1 17  19
    181 1
**landing**  1   1    1
**language**  116 1
    176 1
**languages**  11  16
**lanier**  171 19
**large**     9 8 7   11
    91 13 1  7
    161     17  13
    178 1  198 1
**larger**  7    1 97 13
    1    7 161   3
**las**  9   19     19   8
    19  1
**late**   13
**launch**  9  1
**launched**   19

**law**  3 3 1   17 1
    17 17 18   6
**laws**   178 3
**lawyer**  17   3
**lawyers**  13 13
**lazzaro**   3 19 7 1
    8 1   13 8   6   1
    13   16 16
**lead**   1  6
    1  7      1 8 7
    1  6  3
**leaders**  166 1
    19   17
**leadership**   1  9 1
**leading**   1  8 1
**leads**   13
**learned**  1     8
    1  6   1 171 8
**learning**   176 1
**led**   1  6 18 19   1
**left**   96 1   1  6 8
**legacy**   19 1
**legal**   3     6
    1  7 11 163 17 18
        18     3 7
**legitimately**
    199 17
**leidesdorff**   3 1
**lending**   1  1  17
    16   1   3 17 11
        6 11 18 19
        1 1 3 7     19
             7      8 1
    38   3      6 13
        9   3  3   8 19
        8     9 7  6 9
        7 6 17     8 1
        8 16   9 7 6   3
    66 1   1   19 67
    67 1   69 1   1   16
    69 18 7   7 76

79     81 8 8   8
    8   16 8   19 91
    97           98 1
    98 6 11     99
    99 1   1   17 18
    1  1     1  8 17
    139 7 9 1
    1  3 6 1   1  6 11
    1  8 1   16
    163 16     16
    17     19
    191 11 13 199 19
    199
**libby**   8    3 83 1
    8   8 9   6 13   7 7
    1  3 6 8 13 19
    187 11
**liberty**  187
**librarian**          16 19
    1  9 13
**librarians**     3 18
    61 1      9  1
    1    6 1   18  13
    193 3 9
**libraries**        1  1  7
    16 17 18 1
    19         7
        7 1      31 6
    3    33 11 13
    3   11 3  1   37 16
    38 7 39 1  11 13
    3        8  7
    8 3 13 1   19
         9   1 1 1    7
    7 3     6  8 1
    6   18   3 6  17
    63 8 66    67   3
    7      71 1 73
    7    1 76 1    3
    77    7   1 78 7 9
    79     81 9 88

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription that the deposition is a true and correct record of the testimony given by the witness and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Nancy J. Martin, RMR, CSR

Dated: February 2, 2022

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and or supervision of the certifying shorthand reporter.)

# McNamara Declaration
# Exhibit 21
# Partially Filed
# Under Seal

# 21A

Case 23-1260, Document 67, 12/15/2023, 3598430, Page179 of 267

Page 1
Public Libraries Power eBook Discovery to New Heights in 2012 - OverDrive
https://company.overdrive.com/2013/01/15/public-libraries-power-ebook-discovery-to-new-heights-in-2012/

OverDrive Services Apps News & Blogs Events & Programing Company Profile Contact Us

Blog Post

Home > Press Releases > Public Libraries Power eBook Discovery to New Heights in 2012

# Public Libraries Power eBook Discovery to New Heights in 2012

January 15, 2013 2015 AND EARLIER, PRESS RELEASES

*Readers turn to the digital library to discover, browse and sample eBooks and audiobooks*

**Cleveland – Jan. 15, 2013**—Readers browsing eBook and audiobook collections at OverDrive-powered libraries and schools viewed 2.7 billion book and title catalog pages and generated 192 million registered visitor sessions last year. As more readers visit their library's digital collection to find their next great read, the digital library has become a critical hub of book discovery. Across OverDrive's network of 22,000 libraries and schools, browsing and sampling skyrocketed in 2012, giving fresh exposure to titles throughout OverDrive's catalog of more than 1 million eBooks and audiobooks. To find a library near you, visit search.overdrive.com.

"As a result of the continued expansion of OverDrive's library service platform and the addition of over 300,000 titles, including Harry Potter and other bestsellers, digital libraries saw record traffic last year,"

said Shannon Lichty, OverDrive's Manager of Library Partner Services. "For decades, readers have turned to the library to discover new books, and OverDrive's new responsive library platform is based on web-centric open standards to carry that tradition to the next generation of readers." For an example of OverDrive's Next Generation services, visit Los Angeles Public Library's e-Media site (http://lapl.lib.overdrive.com).

Key statistics:

- 192 million registered visitor sessions, up 93 percent from 2011
- 2.7 billion book and title catalog pages viewed, up 65 percent
- Sampling is up more than 500 percent, with a significant spike following the release of OverDrive Read samples in Sept. 2012
- Discovery has increased by more than 60 percent, with more than 1 billion cover image impressions in Dec. 2012
- OverDrive catalog now includes 1 million eBook, audiobook, music and video titles in 65 languages, including 300,000 titles added in 2012
- Mobile visits increased to 47 percent of all visits
- 16 million downloads of the OverDrive Media Console app in 2012
- 70 million digital titles checked out in 2012

At the American Library Association Midwinter Meeting (Washington State Convention Center, Booth 1115) in Seattle, Jan. 25 to 28, OverDrive will share additional eBook data and demonstrate how reader engagement is soaring at Next Generation libraries. The Cleveland-based digital distributor is pioneering a series of Next Generation enhancements that extend the value of its industry-leading eBook-lending platform.

Currently in pilot at 35 public libraries, OverDrive's Next Generation websites streamline the digital library experience with One-Step Checkout™, a powerful search engine, and the new HTML5-powered, instant-access eBook-reading technology OverDrive Read. In 2013, OverDrive will also implement streaming audio and video technology and release additional APIs that enable libraries to fully integrate digital and print catalogs.

Browse blog and media articles

Select Category

Public Library Training

OverDrive
NEW YEAR
NEW WEBINARS!
LEARN SOMETHING NEW IN 2022
REGISTER

K-12 Library Training

OverDrive
NEW YEAR
NEW WEBINARS!
LEARN SOMETHING NEW IN 2022
REGISTER

How Reading is Changing the World
Visit Persepectives on Reading
PERSPECTIVES
ON READING

A-1438





OverDrive offers a catalog of more than 1 million eBooks and audiobooks with support for all major computers and devices, including iPhone®, iPad®, Nook®, Android™ phones and tablets, and Kindle® (U.S. only). To find a library near you, visit search.overdrive.com.

**About OverDrive**
OverDrive is a leading multichannel digital distributor of eBooks, digital audiobooks, music and video. We supply a secure lending platform for 22,000 libraries, schools and retailers worldwide with support for all major computers and devices, including iPhone®, iPad®, Nook®, Android™ phones and tablets, and Kindle® (U.S. only). OverDrive has been named to the EContent 100 as a company that matters most in the digital content industry and is a member of the 2012 Technology Fast 500. Founded in 1986, OverDrive is based in Cleveland. www.overdrive.com

**Contact:**
David Burleigh
OverDrive, Inc.
216-573-6886 x218
dburleigh@OverDrive.com

###

SHARE

 177 / 2200 

Using OverDrive
Meet Libby
Sora
Getting Started
Help
Troubleshooting
Support
About us
Company
Libraries
Education
Resource Center
Marketplace
Careers with OverDrive
Policies
Privacy Policy
Terms and Conditions
Attributions
Accessibility
Get OverDrive updates
Email Sign-Up
Certified
B
Corporation
© OverDrive, Inc. All Rights Reserved

# 33% Growth for Digital Books from Public Libraries and Schools in 2020 Sets Records

*Social justice and remote learning were key factors in ebook and audiobook usage*

**CLEVELAND – January 7, 2021** – Librarians and educators achieved record levels of digital book circulation in 2020. Readers worldwide borrowed 430 million ebooks, audiobooks and digital magazines in the past 12 months, a 33% increase over 2019. This significant growth was influenced by the pandemic, social justice and remote learning. Data was reported by OverDrive, the leading digital reading platform for 65,000 libraries and schools worldwide.

Social unrest and widespread civil protests had a profound impact on the world and libraries expertly responded. Digital books about social justice and those written by Black, Indigenous, People of Color (BIPOC) or by a member of the marginalized community from which it depicts (Own Voices) experienced 165% YoY circulation growth. *White Fragility*, *So You Want to Talk about Race*, *The Hate U Give* and others became top 10 titles checked out during 2020.

The most significant genre growth in 2020 was children's and YA fiction and nonfiction because of remote and hybrid learning. In addition, more than 2 million checkouts occurred through Public Library CONNECT partnerships and the Sora student reading app. More public library and school partnerships than ever enabled students to use their school credentials to borrow ebooks and audiobooks from both their school and local public library.

**2020 digital book lending records from the OverDrive global network:**

- Total digital checkouts from libraries and schools: 430 million (+33% over 2019)
    - Ebooks borrowed: 289 million (+40%)
    - Audiobooks borrowed: 138 million (+20%, lower growth rate due to less commuting)
    - Children/YA genre checkouts: 111 million (+79%)

- Ebook and audiobook holds/wait listed: 187 million (+44%)
- 102 public library systems around the world (+72%) achieved more than 1 million digital book checkouts
  - Includes 26 systems over 2 million checkouts, 10 over 3 million, 6 over 4 million, 2 over 5 million, 3 over 6 million, 2 over 7 million and 1 over 8 million (full list available soon)
- Millions of installs of the award-winning Libby reading app

The Sora app also drove massive growth in schools' digital content usage at a faster rate than expected. Since the app was launched in September 2018, schools rapidly adopted Sora for the classroom and at home. This adoption accelerated even more in 2020, with over 43,000 schools worldwide now utilizing Sora.

In 2020 overall, OverDrive added more than 20,000 new libraries and schools in 12 additional countries, bringing the total to 65,000 in 84 countries. OverDrive announced the acquisition of RBdigital in June of 2020 which resulted in hundreds of libraries and schools joining its network. Other significant changes: 9 new languages were added into the Libby reading app's interface, including Spanish and French, and OverDrive's industry leading catalog expanded to include 3,000 digital magazines supplied by ZINIO.

***Most popular ebooks borrowed from libraries in 2020:***

1. *Where the Crawdads Sing* by Delia Owens (Penguin Publishing Group) (Putnam)

2. *Becoming* by Michelle Obama (Crown)

3. *Educated* by Tara Westover (Random House Publishing Group)

4. *Little Fires Everywhere* by Celeste Ng (Penguin Publishing Group)

5. *The Giver of Stars* by Jojo Moyes (Penguin Publishing Group) (Viking/Dorman)

**Most popular audiobooks borrowed from libraries in 2020:**

1. *Harry Potter and the Sorcerer's Stone* by J. K. Rowling (Pottermore)

2. *Becoming* by Michelle Obama (Penguin Random House Audio)

3. *Where the Crawdads Sing* by Delia Owens (Penguin Random House Audio)

4. *Talking to Strangers* by Malcolm Gladwell (Hachette Audio)

5. *Educated* by Tara Westover (Penguin Random House Audio)

**Top digital books borrowed from libraries by genre:**

- Adult fiction: *Where the Crawdads Sing* by Delia Owens (Penguin Publishing Group) (Putnam)
- Adult nonfiction: *Becoming* by Michelle Obama (Crown)
- Young adult fiction*: The Hate U Give* by Angie Thomas (Balzer + Bray)
- Children's fiction: *Harry Potter and the Sorcerer's Stone* by J. K. Rowling (Pottermore)

A full set of most popular lists can be found here.

To find a public library near you, download the Libby app (iOS, Android) or visit www.overdrive.com.

**About OverDrive**

OverDrive strives to create "a world enlightened by reading." Serving a growing network of 65,000 libraries and schools in 84 countries, OverDrive delivers the industry's largest digital catalog of ebooks, audiobooks, magazines and other content through award-winning apps. The Libby reading app for libraries is one of *Popular Mechanics*' 20 Best Apps of the Decade, while the student reading app Sora is one of *TIME*'s Best Inventions of 2019. Founded in 1986, OverDrive is based in Cleveland, Ohio USA and was named a Certified B Corp in 2017. www.overdrive.com

Contact:

David Burleigh
Director of Brand & Communications
dburleigh@overdrive.com

# EXHIBT 21B

## OverDrive Check Out Data Spreadsheet

## FILED UNDER SEAL

# Exhibit 22 to McNamara Declaration
# Filed Under Seal (A-1444)

# McNamara Declaration
# Exhibit 23

**Table 11A. Total collection expenditures of public libraries in the 50 states and the District of Columbia and percentage distribution of expenditures, by type of expenditure and population of legal service area: Fiscal year 2017**

| State | Number of public libraries | Total collection expenditures (In thousands) | Percentage of total collection expenditures: Print materials expenditures | Electronic materials expenditures[1] | Other materials expenditures[2] |
|---|---|---|---|---|---|
| Total[3] | 9,045 | 1,373,683 | 54.8 | 27.2 | 18.0 |
| 1,000,000 or more | 35 | 225,557 | 54.1 | 32.0 | 13.9 |
| 500,000 to 999,999 | 55 | 229,139 | 48.2 | 34.0 | 17.8 |
| 250,000 to 499,999 | 112 | 175,411 | 50.9 | 29.5 | 19.6 |
| 100,000 to 249,999 | 366 | 209,372 | 53.4 | 27.2 | 19.4 |
| 50,000 to 99,999 | 578 | 162,236 | 55.0 | 26.3 | 18.8 |
| 25,000 to 49,999 | 989 | 151,676 | 57.8 | 23.2 | 19.0 |
| 10,000 to 24,999 | 1,757 | 129,252 | 61.2 | 20.1 | 18.7 |
| 5,000 to 9,999 | 1,494 | 50,020 | 66.8 | 13.8 | 19.4 |
| 2,500 to 4,999 | 1,263 | 22,436 | 70.9 | 10.3 | 18.8 |
| 1,000 to 2,499 | 1,461 | 13,957 | 73.2 | 8.7 | 18.1 |
| Less than 1,000 | 935 | 4,628 | 72.8 | 10.4 | 16.8 |

[1]Electronic materials expenditures include all operating expenditures for electronic (digital) materials. Types of electronic materials include e-books, e-serials (including journals), government documents, databases (including locally mounted, full text or not), electronic files, reference tools, scores, maps, or pictures in electronic or digital format, including materials digitized by the library. Electronic materials can be distributed on magnetic tape, diskettes, computer software, CD-ROM, or other portable digital carrier, and can be accessed via a computer, via access to the Internet, or by using an e-book reader. This includes expenditures for materials held locally and for remote electronic materials for which permanent or temporary access rights have been acquired. It also includes expenditures for database licenses.

[2]This includes all operating expenditures for other materials, such as microform, audio, video, DVD, and materials in new formats.

[3]Total includes the 50 states and the District of Columbia but excludes outlying areas, libraries that closed or temporarily closed in FY 2017, and libraries that do not meet the FSCS Public Library Definition.

NOTE: Detail may not sum to totals because of rounding. For item(s) with response rates below 100 percent, data for nonrespondents were imputed and are included in the table. Data were not imputed for the outlying areas. Although the data in this table come from a census of all public libraries and are not subject to sampling error, the census results may contain nonsampling error. Additional information on nonsampling error, response rates, and definitions may be found in *Data File Documentation Public Libraries Survey: Fiscal Year 2017.*

SOURCE: IMLS, Public Libraries Survey, FY 2017. Data elements TOTEXPCO, PRMATEXP, ELMATEXP, OTHMATEX, POPU_LSA from the Public Library System Data File (PLS_FY2017_AE_pupld17a) were used to produce this table.

Case 1:20-cv-04160-JGK-OTW Document 96-23 Filed 07/07/22 Page 3 of 3
Case 23-1260, Document 67, 12/15/2023, 3598433, Page188 of 267

**Table 11A. Total collection expenditures of public libraries in the 50 states and the District of Columbia and percentage distribution of expenditures, by type of expenditure and population of legal service area: Fiscal year 2019**

| State | Number of public libraries | Total collection expenditures (In thousands) | Percentage of total collection expenditures | | |
|---|---|---|---|---|---|
| | | | Print materials expenditures | Electronic materials expenditures[1] | Other materials expenditures[2] |
| Total[3] | 9,057 | 1,427,447 | 52.4 | 31.1 | 16.5 |
| 1,000,000 or more | 35 | 236,717 | 52.1 | 36.3 | 11.5 |
| 500,000 to 999,999 | 57 | 244,557 | 45.0 | 38.2 | 16.8 |
| 250,000 to 499,999 | 113 | 181,330 | 47.4 | 35.0 | 17.7 |
| 100,000 to 249,999 | 367 | 217,011 | 50.7 | 31.7 | 17.6 |
| 50,000 to 99,999 | 577 | 166,642 | 53.1 | 29.6 | 17.3 |
| 25,000 to 49,999 | 996 | 156,263 | 56.1 | 26.1 | 17.8 |
| 10,000 to 24,999 | 1,761 | 132,404 | 59.5 | 22.6 | 17.9 |
| 5,000 to 9,999 | 1,488 | 50,753 | 65.9 | 15.9 | 18.2 |
| 2,500 to 4,999 | 1,266 | 22,864 | 71.0 | 11.4 | 17.5 |
| 1,000 to 2,499 | 1,467 | 14,398 | 73.1 | 10.0 | 16.9 |
| Less than 1,000 | 930 | 4,510 | 73.6 | 8.4 | 18.0 |

[1]Electronic materials expenditures include all operating expenditures for electronic (digital) materials. Types of electronic materials include e-books, e-serials (including journals), government documents, databases (including locally mounted, full text or not), electronic files, reference tools, scores, maps, or pictures in electronic or digital format, including materials digitized by the library. Electronic materials can be distributed on magnetic tape, diskettes, computer software, CD-ROM, or other portable digital carrier, and can be accessed via a computer, via access to the Internet, or by using an e-book reader. This includes expenditures for materials held locally and for remote electronic materials for which permanent or temporary access rights have been acquired. It also includes expenditures for database licenses.

[2]This includes all operating expenditures for other materials, such as microform, audio, video, DVD, and materials in new formats.

[3]Total includes the 50 states and the District of Columbia but excludes outlying areas, libraries that closed or temporarily closed in FY 2019, and libraries that do not meet the FSCS Public Library Definition.

NOTE: Detail may not sum to totals because of rounding. For item(s) with response rates below 100 percent, data for nonrespondents were imputed and are included in the table. Data were not imputed for the outlying areas. Additional information on nonsampling error, response rates, and definitions may be found in Data File Documentation Public Libraries Survey: Fiscal year 2019.

SOURCE: IMLS, Public Libraries Survey, FY 2019. Data elements TOTEXPCO, PRMATEXP, ELMATEXP, OTHMATEX, POPU_LSA from the Public Library System Data File (PLS_AE_PUD19i) were used to produce this table.

# McNamara Declaration
# Exhibit 24

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE, LLC, | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive, | |
| Defendants. | |

REMOTE PROCEEDINGS OF THE VIDEOTAPED DEPOSITION OF BRENTON CHENG, INDIVIDUALLY AND AS A 30(B)(6) WITNESS FOR INTERNET ARCHIVE

FRIDAY, DECEMBER 3, 2021

REPORTED BY NANCY J. MARTIN

CSR. NO. 9504, RPR, RMR

PAGES 1 - 272

corrected color, you know, the cleaned up images that come from the book are then used to -- during the derive process is where the OCR is run, optical character recognition. It's where the underlying PDF or ePUB gets created. A bunch of metadata gets adjusted and put into its right place. It's essentially the core processing pipeline for the book.

Q. So the output of the derive process results in the initial scan of the book after it's been -- sorry. Strike that.

The output of the derive process results in the first digitized scan of the book that the Internet Archive has made being turned into copies in various other forms; is that correct?

A. That's right, among other things. Metadata, various other changes, supplemental data, that kind of thing.

Q. And so the scan that the Internet Archive has made of a physical book is in a JPEG format initially, and then the Internet Archive, you know, after it's done what it has done to crop the book and adjust metadata, you know, and what not, it then creates copies of the book in various formats, including ePUB, PDF, DJVU, several other forms; correct?

A. That's right. If you're looking for one

word, the terminology of that clean-up process, we call it republishing.

Q. So the Internet Archive views itself as republishing the physical book but as a digital version; correct?

A. Yeah.

MS. LEE: Sorry, Brenton. Objection. Mischaracterizes testimony.

THE WITNESS: Yes. Okay. Maybe that wasn't helpful. But it's an internal term. It's not connected with -- not intended to connect with any other meaning around publishing. It's simply an internal term that we use to summarize the book image correction process. Maybe I should just stick with that.

BY MR. ZEBRAK:

Q. So the output of the derive process is that the Internet Archive is putting into its -- onto its website the digital version that the Internet Archive has made of the physical book; is that correct?

A. Right. To the degree that one has access to it. So on the website and our servers, and then access depends on what the user has access to.

Q. So how many different -- so the initial JPEG scan of the book that the Internet Archive makes, how

Case 23-1260, Document 67, 12/15/2023, 3598433, Page193 of 267

C E R T I F I C A T E

I do hereby certify that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

Nancy J. Martin, RMR, CSR

Dated: December 6, 2021

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and or supervision of the certifying shorthand reporter.)

# McNamara Declaration
# Exhibit 25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

Plaintiffs,

v.

INTERNET ARCHIVE and DOES 1 through 5, inclusive

Defendants.

Case No. 1:20-CV-04160-JGK

**DEFENDANT INTERNET ARCHIVE'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION**

Defendant Internet Archive, by its undersigned legal counsel and pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure and Local Rule 26 of the United States District Court for the Southern District of New York, hereby provides the following Objections and Responses to the First Set of Requests for Admission ("Requests") propounded by Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley"), and Penguin Random House LLC ("PRH") (collectively, "Plaintiffs") on May 25, 2021.

## GENERAL OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

The Internet Archive makes the following objections to Plaintiffs' instructions and definitions:

1. The Internet Archive objects to the definitions contained in Plaintiffs' Requests that violate Local Rule 26.3, including without limitation the definitions of "Plaintiffs" and "Defendant" as well as a party's full or abbreviated name or pronoun referring to a party, such as "You."

2. The fact that the Internet Archive has responded to part or all of a Request is not intended to and shall not be construed as a waiver by the Internet Archive of any objection to such Request.

3. The Internet Archive objects to the preface, instructions, and definitions to this set of Requests to the extent that they purport to impose obligations that exceed those imposed by the Federal Rules of Civil Procedure, relevant local rules, Judge Koeltl's standing orders, and applicable case law. In responding to these Requests, the Internet Archive has followed the applicable law and has ignored the improper preface, instructions, and definitions.

4. The Internet Archive further objects to each and every Request to the extent it seeks disclosure of information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege. The Internet Archive will not provide such documents, and any inadvertent disclosure thereof shall not be deemed a waiver of any privilege or other protections that may attach thereto with respect to such information or documents.

5. In responding to these Requests, the Internet Archive does not concede the relevancy or materiality of any Request or of the subject to which any Request refers. The Internet Archive's responses to these Requests are made expressly subject to and without waiving any objections in any proceeding, including trial of this action, as to competency, relevancy, materiality, or privilege of any of the responses given.

6. The Internet Archive has not yet completed its investigation of the facts relating to this case. Indeed, Plaintiffs seek information that depends on (among other things) fact discovery, expert discovery, third-party discovery, and legal analysis and conclusions. Any and all responses to the following Requests are therefore based solely on information presently known to the Internet Archive, or in its possession, custody, or control. The Internet Archive reserves its right to conduct further discovery and investigation and to use at trial or any other proceeding evidence of any subsequently discovered facts, documents, or information.

7. The Internet Archive hereby incorporates by reference each and every objection to definitions or instructions set forth herein into each and every specific response set forth below, whether or not separately set forth therein. A specific response may repeat an objection for emphasis or for some other reason. Failure to include any objection in any specific response is not a waiver of any objection to that response.

**OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION**

**REQUEST FOR ADMISSION NO. 1:**

For each of the Works, Admit that You added to Open Library one or more digital copies of the physical book.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers listed in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "added," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that the Internet Archive made available one or more digital versions of physical books embodying the Works through the lending functions of archive.org. The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 2:**

For each of the Works, Admit that Users accessed from Open Library one or more digital copies of the physical book that You added to Open Library.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "accessed," "added," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that one or more logged-in patrons accessed one or more digital versions of physical books embodying the Works that the Internet Archive made available through the lending functions of archive.org. The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 3:**

For each of the Works, Admit that You provided Users with one or more digital copies of the physical book that you added to Open Library.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "provided," "added," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that the Internet Archive provided one or more logged-in patrons with one or more digital versions of physical books embodying the Works the Internet Archive made available through the lending functions of archive.org. The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 4:**

For each of the Works, Admit that You made one or more digital copies of the physical book.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "made," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that the Internet Archive digitally scanned physical books embodying the Works. The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 5:**

For each of the Works, Admit that You made one or more digital copies of the physical book and added such copy or copies to Open Library.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "made," "added," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that the Internet Archive made available one or more digital versions of physical books embodying the Works through the lending functions of archive.org. The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 6:**

For each of the Works, Admit that You made one or more digital copies of the physical book and added such copy or copies to Open Library for Users to access.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound.  The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1).  The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit.  Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1).  The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "made," "added," "access," "digital copies," and "physical book."  Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs.  Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive.  And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that the Internet Archive made available to one or more patrons with registered log-in credentials, one or more digital versions of physical books embodying the Works through the lending functions of archive.org.  The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 7:**

For each of the Works, Admit that Users accessed from Open Library one or more digital copies of the physical book that You made and added to Open Library.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "accessed," "made," "added," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that one or more logged-in patrons accessed one or more digital versions of physical books embodying the Works through the lending functions of archive.org. The Internet Archive otherwise denies the Request.

**REQUEST FOR ADMISSION NO. 8:**

For each of the Works, Admit that You provided Users with one or more digital copies of the physical book that You made and added to Open Library.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

In addition to its General Objections, the Internet Archive objects to this Request, which asks for admissions related to "each of the Works," as compound. The Request seeks information involving 127 distinct sets of facts required to address 127 separate works-in-suit, as identified in Exhibit A of the Complaint (Dkt. No. 1). The Internet Archive further objects to the Request to the extent it calls for the Internet Archive to make legal conclusions regarding the validity of any copyright registrations in the works-in-suit. Hence, the Internet Archive's response to this Request should not be interpreted as an admission concerning any of the purported copyright registration numbers in Exhibit A to the Complaint (Dkt. No. 1-1). The Internet Archive also objects to this Request as vague and ambiguous, specifically with regard to the terms "provided," "made," "added," "digital copies," and "physical book." Moreover, the Request is incomprehensible because the term "Open Library" is nonsensical as defined by Plaintiffs. Plaintiffs define "Open Library" in a manner that is contrary to how the term is used or understood by the Internet Archive. And the Internet Archive objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege.

Without waiving the foregoing objections, the Internet Archive admits that the Internet Archive provided one or more logged-in patrons with one or more digital versions of physical books embodying the Works through the lending functions of archive.org. The Internet Archive otherwise denies the Request.

Dated: June 24, 2021

DURIE TANGRI LLP

By: */s/ Joseph C. Gratz*

JOSEPH C. GRATZ (*Pro Hac Vice*)
JESSICA E. LANIER (*Pro Hac Vice*)
ADITYA V. KAMDAR (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com

ALLYSON R. BENNETT (*Pro Hac Vice*)
MOON HEE LEE (*Pro Hac Vice*)
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
abennett@durietangri.com
mlee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
CORYNNE MCSHERRY (*Pro Hac Vice*)
KIT WALSH (*Pro Hac Vice*)
CARA GAGLIANO (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

**PROOF OF SERVICE**

I am employed in San Francisco County, State of California, in the office of a member of

the bar of this Court, at whose direction the service was made. I am over the age of eighteen

years, and not a party to the within action. My business address is 217 Leidesdorff Street, San

Francisco, CA 94111.

On June 24, 2021, I served the following documents in the manner described below:

**DEFENDANT INTERNET ARCHIVE'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION**

     BY ELECTRONIC SERVICE: By electronically mailing a true and correct copy
through Durie Tangri's electronic mail system from jposada@durietangri.com to
the email addresses set forth below.

On the following part(ies) in this action:

        Elizabeth A. McNamara
        Linda Steinman
        John M. Browning
        Jesse Feitel
        DAVIS WRIGHT TREMAINE LLP
        1251 Avenue of the Americas, 21st Floor
        New York, NY 10020
        lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        jessefeitel@dwt.com

        Attorneys for Plaintiffs
        HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC,
        JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

        Mathew J. Oppenheim
        Scott A. Zebrak (pro hac vice)
        OPPENHEIM + ZEBRAK, LLP
        4530 Wisconsin Avenue, NW, 5th Floor
        Washington, DC 20016
        matt@oandzlaw.com
        scott@oandzlaw.com

        Attorneys for Plaintiffs
        HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC,
        JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 24, 2021, at San Francisco, California.

/s/ Jennifer Posada
Jennifer Posada

# McNamara Declaration

# Exhibit 26

# part 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>Defendants. | Case No. 1:20-CV-04160-JGK |

**EXPERT REPORT OF SUSAN H. HILDRETH**

**ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ....1
A. Background and Qualifications ....1
II. SUMMARY OF OPINIONS ....4
III. BACKGROUND ON LIBRARY SERVICES ....5
A. The Role of Libraries in the Twenty-First Century ....5
B. Print Collection Investment ....5
C. Patron Demand for Digital Access ....7
1. In-person Visits to Libraries ....8
2. Circulation of Digital Items Including Ebooks ....10
3. Ebook Availability ....11
4. Digital Discovery ....14
IV. LEVERAGING LIBRARIES' EXISTING COLLECTIONS TO SERVE THE PUBLIC ....16
A. Interlibrary Loans, Special Collections, and the Sharing of Library Resources ....16
B. Controlled Digital Lending ....19
C. The Internet Archive is a Library that Practices CDL ....21
V. LIBRARY FINANCES ....22
A. Organization and Funding ....22
B. Library Budget Trends ....26
C. Components of Library Budgets ....28
D. Acquisition Budgets ....29
VI. PRINT MATERIALS CIRCULATION/ACQUISITION ....32
A. Circulation of Print Materials ....32
B. Collection Management ....34
VII. EBOOK ACQUISTION CHALLENGES ....36

     A. Ebook Access Models ....................................................................................38

B. Challenges in Acquiring and Managing Ebook Collections ..................................40

VIII. CDL'S IMPACT ON LIBRARY SPENDING ........................................................................41

# I. INTRODUCTION

## A. Background and Qualifications

1. My name is Susan H. Hildreth. I have served as a library administrator at the local, state, and federal level during my career spanning over forty-eight years. I am currently working as a library consultant, focusing on library executive recruitment, strategic planning, organizational review, and community engagement. I served as the Interim Director for the Sonoma County, California, Library from July 2018 to March 2019. In my last permanent position, I served as the inaugural Distinguished Practitioner in Residence, a Gates Foundation-funded professorship at the University of Washington Information School designed to infuse curriculum with skill building relevant to the twenty-first century library and bring theory and practice together for an impactful student experience.

2. I also served as the Director of the federal Institute of Museum and Library Services ("IMLS") from 2011 to 2015. I was appointed to this post by President Barack Obama and confirmed by the United States Senate. In this position, I administered a $250 million annual budget and worked with library organizations, other federal agencies, foundations, and interested stakeholders to develop partnerships to leverage federal investments in libraries and museums. I also provided advice to the Obama Administration and Congress on information policy and was responsible for the annual national data collection of public libraries and national census of museums. I worked closely with the Federal Communications Commission and the National Telecommunications and Information Administration to ensure that broadband capacity and digital literacy were available for all, with a specific focus on underserved communities and at-risk populations.

3. Following the completion of my term at IMLS, I served as the Aspen Institute Fellow for the Dialogue on the Future of Public Libraries, an initiative funded by the Gates

Foundation. I provided advice to this program that explored and championed new thinking on U.S. public libraries, developing concrete actions to transform public libraries to serve a more diverse, mobile, and connected society, with a specific focus on the impact of the digital revolution on access to information, knowledge, and the conduct of daily life.

4. I served as the State Librarian of California from 2004 to 2009. I was appointed to this post by Governor Arnold Schwarzenegger and confirmed by the California State Senate. In this position, I was responsible for the annual distribution of over $16 million in federal funding and $59 million in state funding as well as library service development for the 181 public library systems serving over 37 million residents at that time. I also supervised a $350 million public library construction bond program and a $128 million cultural facilities bond program.

5. I have also served as the City Librarian for both the Seattle Public Library and the San Francisco Public Library. Both library systems are widely recognized as international leaders in library programming, service delivery, facility design, and innovation. Prior to these posts, I held a number of leadership positions in public libraries in California and New Jersey. Although I have led large and complex public libraries, I have also worked in small, single-facility organizations and library systems serving rural communities.

6. I have been active in professional library and literacy associations throughout my career. Most recently, I served as the Treasurer of the American Library Association ("ALA") from 2016 to 2019. ALA is the largest library association in the United States, with 57,000 members, an annual budget of $45 million, and an endowment of over $63 million. I also served as President of the Public Library Association, a division of ALA, in 2007, and as President of the California Library Association in 2004. During my career, I have presented and/or

participated with colleagues in a number of professional programs. I served as a founding member and chair of the Library of Congress Literacy Awards Advisory Board from 2012 to 2021 and served as a board member and governance chair for the Reach Out and Read Board, a pediatric literacy intervention program.

7.      I have a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services. I have served on the Advisory Council of the Panorama Project since 2018 and have provided advice on the impact libraries have on book discovery, promotion, and sales. I am thus well-qualified to provide information and expert opinion on libraries and their operations. I have provided my resume (see Attachment A).

8.      I have a high-level understanding of the case. I was informed that several major publishers have asserted that the controlled digital lending ("CDL") model used by the Internet Archive's Digital Lending Library ("Digital Lending Library") results in an infringement of copyright. I am being compensated at the rate of $150 per hour for my time. I have reviewed documents, deposition transcripts in this case, and have interviewed several library professionals (see Attachment B) who have in-depth knowledge of CDL and/or work closely with print and digital acquisitions as well as a wide variety of ebook platforms and aggregators.

9.      There are no cases in which, during the past four years, I have testified as an expert at trial or by deposition. My work in this case is ongoing. I reserve the right to supplement my analysis if additional information becomes available to me. I intend to review reports submitted by Plaintiffs' experts, and I reserve the right to prepare a reply expert report at the appropriate time.

## II. SUMMARY OF OPINIONS

10. I have been asked to provide expert opinions regarding library processes, service trends, patron behavior, and library finances, particularly acquisitions and the impacts of ebook licensing models on library services.

11. In brief, my opinions are that:

In the twenty-first century, libraries strive for improved patron access to knowledge and to adapt to increasing patron demand for digital access. To do so, libraries must leverage their investments in their print collections. See Section III.

Patrons by and large prefer to browse or sample a title, digital or print, before making the decision to borrow it. See Section III.

Libraries have shared their physical collections through interlibrary loans and regional resource-sharing for many years. Interlibrary lending is a way for libraries to conserve resources and focus acquisition-based spending on works their patrons are most likely to frequently request. See Section IV.

The growing practice of CDL by libraries is but one method libraries use to leverage their existing physical collection to better serve the reading population. The Digital Lending Library is one example. See Section IV.

Library budgets are both limited and finite. Libraries strive to maximize their acquisition budgets to meet patron demand, but acquisition budgets are often one of the few discretionary line items in a library budget and so may be constrained based on other required library expenses. Library budgets for acquisition of works are never large enough to meet patron demand. See Section V.

As to physical book acquisitions, libraries initially buy multiple copies of popular titles, and then subsequently reduce the number of copies in their collection of a title. Sometimes reduction happens when a physical copy wears out or is damaged, and other times a reduction happens when libraries sell or giveaway additional copies of a title after demand for that title has decreased. Libraries seldom buy replacement copies of a title. Demand for popular titles diminishes rapidly, and one-to-one replacement would not be a good use of a library's limited acquisition budget. Moreover, libraries can and do make small repairs (example: taping a torn page) to damaged physical copies. Only a small percentage of a library's acquisition budget is spent purchasing new replacement copies of a title. See Section VI.

Ebooks have presented particular challenges for libraries. Patron demand for ebooks has been increasing. But, when libraries pay for the ability to loan ebooks to patrons, libraries pay only for a temporary license. The purchase of ebook

licenses therefore does not add to a libraries' permanent collection. Moreover, ebook collection management requires heavy use of libraries' staff resources. In many cases it takes more staff resources to manage library ebook licensing systems than it does to manage physical collections. See Section VII.

CDL does not result in less library spending on books. Libraries spend all of their allocation budgets each period. If a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books. See Section VIII.

## III. BACKGROUND ON LIBRARY SERVICES

### A. The Role of Libraries in the Twenty-First Century

12. Provision of access to information is the primary goal of the twenty-first century library, yet libraries have expanded far beyond that primary role. Libraries serve as meeting places for community members, workforce development centers for the unemployed or under-employed, family learning centers for literacy support for all ages, telehealth venues for patients who do not have access to personal devices or wifi, and go-to partners for a myriad of services that reflect the needs and aspirations of their communities.

### B. Print Collection Investment

13. The primary role of libraries for many years was the development and curation of print collections. These collections were initially developed to provide educational materials to improve the lives of patrons. As communities changed and additional formats of resources evolved, libraries expanded their collections to include recreational reading materials, serials (magazines), children's materials, and varying formats, i.e. paperbacks, audio-visual materials, etc.[1] No matter what the format, libraries have worked to develop collections that present

[1] Michael Kevane & William A. Sundstrom, The Development of Public Libraries in the United States, 1870–1930: A Quantitative Assessment. Information & Culture: A Journal of History, 117–144 (2014).

current and balanced viewpoints on a wide variety of critical topics. Collections are developed to address general informational needs of the community yet are also focused on topics that are of *particular interest* to the community. For instance, if the community being served is the headquarters of a specific industry, the collection could reflect deep resources regarding that industry. If the community is the birthplace of a famous individual, materials regarding that person's life could be included in the collection. Library collections are always a balance of materials of general interest and topics that may be of specific interest to the community.

14. Public libraries are distinct from other types of libraries in that their mandate is to serve the public's information needs generally. Public libraries lend materials—including books—to their patrons, and they also maintain collections of reference materials, many of which are not available for check-out. Public libraries typically focus on acquiring and making available materials of general interest to the public and materials that will be popular with patrons.

15. Another key role libraries play is preservation. Many libraries have collections that focus on local history or collections that are unique to their community or region, as noted above. Moreover, libraries are often responsible for maintaining local archives including governmental documents. While libraries can and do preserve physical embodiments of works, libraries also use digitization—particularly in circumstances where the physical condition of a work is deteriorating or the work or its contents are not widely available elsewhere (for example: works in a library's "special collections"). Also, libraries with multiple branches that purchase many copies of titles at a time, will strive to retain the "last copy" when the title has outlived its popularity.

16. Library preservation activity is primarily focused on print collections, either by taking special care of print books and/or digitizing it. Preservation of digital materials is more challenging for public libraries, due to the equipment required for preservation of digital materials as well as the need to monitor and address changes in digital formats and platforms—both of which are expensive.

17. Resource-sharing and convenient borrowing are hallmarks of impactful library services. When libraries share resources, whether a patron is borrowing a mystery or a cookbook, the patron does not have to use or travel to the nearest local branch to obtain the material. Models for regional resource-sharing and cooperative access among neighboring libraries have been prevalent throughout the United States since the early 1970s. As an example, in the greater New York metropolitan region, as long as you live, work, own property, or go to school in New York state, you can obtain a free library card at the New York Public Library ("NYPL," serving the Bronx, Manhattan, and Staten Island), the Brooklyn Public Library, and the Queens Public Library. With your Queens Public Library card, you can visit NYPL in person or virtually, obtain an ecard or traditional library card, and borrow materials from NYPL.

**C. Patron Demand for Digital Access**

18. Patron behavior and their interaction with libraries and their resources have changed significantly over the last several years. As the availability of electronic resources has increased, the ability of patrons to access those resources online has also increased. The use of ebooks and digital content increased even more rapidly as a result of COVID-19. Although many libraries have provided ebooks for a number of years, the pandemic accelerated discovery

of digital resources[2] by eager (and desperate) readers who were stuck at home during the pandemic.

19. Libraries collect many statistics, yet these statistics may not demonstrate all emerging use patterns. For instance, libraries document their total number of registered borrowers but, at least at this point in time, the IMLS, which collects data annually from public libraries, does not differentiate between borrowers who use only electronic resources (digital borrowers), those who use only print resources, and those who use both. In fiscal year ("FY") 2020 (July 2019 – June 2020), the California State Library ("CSL")[3] began collecting data on whether libraries had issued ecards prior to COVID-19 and during COVID-19. 51.6% of libraries reported issuing ecards prior to the pandemic, and a whopping 90.8% of libraries reported that they began issuing ecards during the pandemic and will continue to do so.[4]

### 1. In-person Visits to Libraries

20. Over the last ten years, the number of patrons coming into libraries in person has decreased. All U.S. public libraries are required to provide an annual report of statistics to their

[2] The pandemic also appears to have increased the number of libraries who now offer digital library cards (ecards) so that patrons can sign up to borrow resources online and obtain their traditional library card when they visit their library in person. Some libraries also offer an "instant digital card" that is provided in cooperation with OverDrive. As described by Mr. Steve Potash, founder and CEO of OverDrive, Inc., in his deposition, "Instant digital card is a service select libraries have enabled to provide readers in their communities access to digital books using their cell phone to authenticate them." Potash Dep. Tr. 94:10–13, Jan. 31, 2022.

[3] The CSL provides detailed and in-depth analysis of statistics it collects. Other states do not necessarily provide this level of analysis, and I am most familiar with the statistics collections and trends in California public libraries. Having been responsible for the national data collection program, I know that trends in other states are similar to trends seen in the California data.

[4] California State Library Statistics Portal, *Summary Report, 2019-2020*, (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

state library agency, and all the state library agencies are required to provide those statistics to IMLS, where a summary of that data is compiled into the annual Public Libraries Survey. The California State Library, for example, provides information regarding the five and ten-year library use trends. A picture of trends at the national and state level is provided in these annual statistical reports. Please note that the persons represented in this data are the number of persons that are served by a public library. This is a higher number than library patrons as not all persons are registered patrons in a library system. A sample of that data is shown in the chart below:

| **Fiscal Year** | **Average library visits per person (national)** | **Average library visits per person (California)**[5] |
|---|---|---|
| FY 2020 | Not yet available | 3.46 |
| FY 2019 | 3.9[6] | 4.98 |
| FY 2015 | 4.28[7] | 5.88 |
| FY 2011 | 5.1[8] | 6.28 |

21. California State Library trend data shows that per person visits have decreased by half—from 6.28 in FY 2011 to 3.46 in FY 2020. (The national visit statistics are not yet available for FY 2020.) There is little doubt that statistics for FY 2021 visits will demonstrate continued decline in in-person library visits, due to prolonged pandemic-related library closures

[5] California State Library Statistics Portal, *Library Visits per Capita*, (2022), https://ca.countingopinions.com/pireports/report.php?4753b73dacc5b971763b4de81b0650f9&live.

[6] Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* 3 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[7] Institute of Museum and Library Services, *Public Libraries in the United States: Fiscal Year 2015* viii (July 2018), https://www.imls.gov/sites/default/files/publications/documents/plsfy2015.pdf.

[8] Institute of Museum and Library Services, *Public Libraries in the United States Survey: Fiscal Year 2011* at 16 (June 2014), https://www.imls.gov/sites/default/files/legacy/assets/1/AssetManager/PLS2011.pdf.

and related restrictions. Over the past decade, there has been an increased need for libraries to serve their patrons remotely, and the availability of digital resources has enhanced that trend.

**2. Circulation of Digital Items Including Ebooks**

22. It is also clear that the circulation of digital items has increased significantly over the recent years. The CSL began collecting data on the use of electronic materials in 2012–2013. Data is shown in the chart below:

| Fiscal Year | Median Circulation | Average Circulation |
|---|---|---|
| FY 2020[9] | 61,050 | 447,039 |
| FY 2016[10] | 21,410 | 224,673 |
| FY 2013[11] | 8,912 | 103,075 |

23. The median and average circulations for electronic materials are derived from the total electronic materials circulation reported by each library in a fiscal year. In FY 2013, in my experience with libraries, this large disparity between the median and average circulation demonstrates that many libraries had barely begun to build their electronic collections whereas larger institutions with more resources were acquiring electronic resources quickly. In this seven-year period (from FY 2013 to FY 2020), there were significant increases in the circulation of electronic materials.

[9] California State Library Statistics Portal, *Circulation 2019-20* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

[10] California State Library Statistics Portal, *Circulation 2015-16* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

[11] California State Library Statistics Portal, *Circulation 2012-13* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

24. The IMLS survey has recently begun to separately report electronic circulation from print/total circulation. Data is shown in chart below:

| Fiscal Year | Total electronic circulations nationwide in U.S. | Per person electronic circulation |
|---|---|---|
| FY 2019[12] | 343 million | 1.1 |
| FY 2018[13] | 294 million | 0.93 |

25. This data shows there was a 14% increase in ebook circulation *in just one year*. Additional data on electronic collections is shown below:

| Electronic Materials (IMLS) | Ebooks per person |
|---|---|
| FY 2017[14] | 1.5 |
| FY 2013[15] | 0.4 |

26. This data shows there was a 74% increase in electronic materials in library collections over a four-year period.

**3. Ebook Availability**

27. Libraries are one of the first and best examples of sustainable institutions. They are built on the concept of sharing and reuse of materials for the public good. Patrons never "own" materials they access—they have the privilege of using them at no charge for a limited

[12] Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* at 4 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[13] Lisa M. Frehill et al., Institute of Museum and Library Services, *Public Libraries Survey: Fiscal Year 2018* at 4 (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/fy2018_pls_tables.pdf.

[14] 1 Institute of Museum and Library Services, *Public Libraries in the United States: Fiscal year 2017* at 12 (June 2020), https://www.imls.gov/sites/default/files/publications/documents/publiclibrariesintheunitedstatessurveyfiscalyear2017volume1.pdf.

[15] *Id.*

period of time.  Based on my experience working in libraries, most libraries have similar check-out periods for materials in all formats, normally 2–3 weeks.  Most libraries provide at least one "renewal" check-out period for a time period that is the same as the initial loan period if there are no other requests for that item.  Some libraries provide automatic renewal if an item is not returned by its due date, which is convenient for the patron and counts as a circulation.  Most licensed ebooks are not eligible to be renewed, either automatically or by the patron, because of the high demand and limited supply of that format.

28.     There are times when libraries may limit circulation periods on items.  A good example would be limiting holiday books at Christmastime to a one-week check-out.  At times, formats have had limited check-out times.  For instance, when videotapes were in high demand years ago, those items had limited circulation periods.  When CDs and DVDs were in great demand, those formats also had limited circulation periods.  Limiting circulation periods based on format or seasonal factors is not a current practice in most libraries.

29.     Meeting patron demand for all types of materials is always a challenge in libraries.  Libraries maintain long waiting lists when patrons want to borrow books and ebooks, and the library does not have sufficient copies to meet that demand.  Because of this imbalance of supply and demand, libraries often limit the number of books or ebooks patrons can borrow.  Of course, patrons must be registered as a borrower in good standing to obtain material in person or virtually from the library.

30.     The Digital Lending Library follows similar procedures as other libraries.  Patrons must be registered as borrowers; they may borrow digital books for a fourteen-day period and

then access to the content expires. They can borrow up to ten books at a time and can request specific titles.[16]

31. The traditional process of checking out and returning library materials can be time-consuming. A traditional check-out of a physical resource required a physical trip to the library—taking up the patron's and the library staff's time.[17]

32. Providing patron access to digital content including ebooks is much simpler. Without a trip to the library, the ebook can be downloaded onto a variety of devices and is ready for use as soon as it is accessible. The ebook can be returned to the library as soon as the patron is finished with the item and prior to its due date. When the loan period is completed, patron access is automatically no longer available. (This virtually eliminates the situation common to the check-out and return process for print books—where a waitlist for a popular title is prolonged due to a patron's late return of a book.) Borrowing ebooks is faster and more straightforward with much less "friction" than borrowing print materials.

33. The circulation function has become highly automated in recent years—for physical and digital resources. Digital resources checkout in most cases needs no staff intervention or assistance, and, for physical resources, many libraries have implemented self-check-out equipment and have automated sorting systems to re-shelve books to reduce the time staff spends facilitating patron check-outs. In addition to increasing efficiency, these systems

[16] One-hour loans are also available. Those are discussed below on page 15.

[17] Many libraries now have equipment that allows the patron the opportunity to personally check out their own material (self-check) but this process still requires a physical visit to the library.

decrease the staff injuries associated with the handling of physical materials.[18] Ebooks eliminate staff injury entirely in addition to the other efficiencies discussed here.

**4. Digital Discovery**

34. One of the most impactful experiences a library can offer its patrons is the discovery of new ideas, information, and formats. Sometimes discovery occurs as the result of purposeful searching, and sometimes discovery occurs by accident or serendipity. Librarians may classify materials with standard organization systems such as Dewey Decimal or Library of Congress; and they may also organize materials by subject matter related to specific needs of the communities they serve.

35. Many patrons relish browsing the actual physical shelves for new authors, fiction, genres, or non-fiction books that may relate to a topic of interest for them or a topic new to their knowledge. Browsing and discovery are also available through the library's online catalog. Although patrons are not touching the actual material, they can browse by format, by audience (i.e. kids, teens, job-seekers), world languages, reading recommendations, and, of course, the more traditional subject search that provides access to materials based on primary subjects, somewhat similar to searching card catalogs many years ago. Library discovery platforms provide patrons the opportunity to have lists of materials they want to read, they have read, or are in the progress of reading. There are many intuitive online services to manage a patron's personal reading.

36. The discovery function for print and ebooks is different. Depending on the platforms that are being used to provide ebooks, the patron may have to check on several

[18] Richard W. Boss, ALAIR, *Materials Handling Systems for Libraries* (Sept. 7, 2010), https://alair.ala.org/bitstream/handle/11213/258/Materials%20Handling%20Systems.pdf?sequence=95

different online locations in addition to the library's online catalog to determine if specific ebooks are available for borrowing. Librarians are constantly asking for seamless access to digital materials.[19]

37. Although ebook discovery can be challenging for libraries to facilitate, once discovered, digital content may be sampled to determine if the patron wants to borrow the material. For example, OverDrive offers a sampling feature that provides approximately 10% of the digital content in an ebook.[20]

38. The Digital Lending Library offers the feature of one-hour of browsing of digital books. The one-hour digital browsing enables patrons to have access to the entire digital content of the digital book and allows them to determine if they want to borrow the digital book. If they don't borrow the digital book after the one-hour browsing period, the book is immediately checked back in and then made available for another potential reader.[21]

39. Once the patron has access to the library holdings information, if they wanted a new fiction title or discovered a new author and wanted to read more of their work, the patron, when doing an online search, which is most common, would see that the library had a print copy and/or ebook version of the title. Depending on a patron's reading format preference, they might

[19] There are some new offerings in this category. SimplyE, used by the New York Public Library, is a discovery system that interacts with a variety of ebook platforms and is beginning to be used as a digital search tool in libraries throughout the United States.

[20] Mr. Steve Potash, founder and CEO of OverDrive, Inc, in his deposition noted that the sampling feature "enable(s) users to preview a title or to sample the book." Potash Dep. Tr. 97:8–9, Jan. 31, 2022. The amount of the sample varies depending on the ebook. In his deposition, Mr. Potash stated "In some cases with an eBook you might get not much because the whole thing is a 24-page board book, and then there are some where it seems like it's 100 pages. So it varies." *Id.* at 97:14–17.

[21] Internet Archive*, Borrowing Books Through Open Library* (Sept. 13, 2021), https://openlibrary.org/help/faq/borrow#how.

place a request on the available print copy and physically retrieve it from the library. Or, if they preferred ebooks, hopefully they could download the content immediately on their device and avoid traveling to the library to retrieve the item. Particularly with popular titles and bestsellers, though the library may have both print and ebook copies of the title, all the copies are in use. Libraries have limits on the number of requests any patron can place on print books (normally fifty to one hundred); and many libraries have lower limits on the number of ebook requests (often ten to fifteen) due to the limited inventory of ebooks libraries can afford.

## IV. LEVERAGING LIBRARIES' EXISTING COLLECTIONS TO SERVE THE PUBLIC

### A. Interlibrary Loans, Special Collections, and the Sharing of Library Resources

40. Although libraries attempt to provide materials that their patrons want and need, this is not possible in all cases. As noted above, regional resource-sharing is common and enables patrons to borrow materials from libraries other than their primary library or the library that is geographically closest to them. Interlibrary loan is a service that addresses the situation where the patron's primary library does not have the material the patron wants. Interlibrary loan is a service that has been in place since at least 1212 when monks began developing collections for loan to other monasteries. In the late 1890's, Joseph C. Rowell, University of California, Berkeley's first full-time university librarian, established one of the first U.S. interlibrary loan systems that began as a relationship between the University of California campuses and other libraries. The framework for that system remains in place today: 1) borrowing (recipient) libraries are responsible for securing and returning books; 2) borrowing (recipient) librarians must keep detailed records of patron receipt and usage; and 3) rare or frequently used texts are

loaned at the discretion of the librarian.[22]  Resource-sharing among all types of libraries was

identified as a national priority when the Library Services Act was passed in 1956 and resulted in

the creation of regional cooperative library systems or consortia comprised of libraries from

neighboring geographic areas that participated in resource-sharing and interlibrary loan.[23]

41.     Although interlibrary loan is a valuable service, it can be a labor-intensive process

that requires much personal interaction and processing to enable borrowing materials from

libraries other than the patron's primary library.  The patron must contact their primary library

and work with a library staff member either in person or virtually to complete a request form.

Then the library staff member has to complete a form to generate the request from the owning

library, process the request when the material is received, contact the patron to let them know

that their requested material is available, and then facilitate the actual check-out.  When the book

is returned, the borrowing library has to complete the process in reverse.

42.     Some libraries participate in unmediated library loan.  Unmediated interlibrary

loan is a service in which the patron can request the material online without requiring staff

intervention at the point of the request.  One example is Link+, a service which allows patrons,

with no staff mediation, to request material not available at their local library.  This service is

available in California and Nevada, providing access to a catalog of materials from over 70

participating libraries, with access to over 9 million titles from academic, public, and special

libraries.  Patrons can place requests directly, no forms required, using a single online catalog

---

[22]  Nick Ripatrazone, Literary Hub, *InterLibrary Loan Will change Your Life* (Aug. 7, 2019), https://lithub.com/interlibrary-loan-will-change-your-life/.

[23]  Library Services Act, Pub. L. No. 84-597, 70 Stat. 293 (1956), https://www.govinfo.gov/content/pkg/STATUTE-70/pdf/STATUTE-70-Pg293.pdf.

from the library, home or office at any time. For a variety of reasons, including the support of library system platforms, this service is not consistently available in the U.S.

43. Interlibrary loan is an amazing service for patrons searching for print materials, but the service is not currently possible with licensed ebooks. The licensing agreements that most publishers extend to aggregators like OverDrive, who then pass those requirements onto library customers, do not allow for borrowing or sharing of ebooks beyond the subscribing libraries' users. In other words, most of these licenses prevent libraries from lending ebooks to other libraries.[24]

44. Most libraries have non-circulating collections of physical items. Libraries have collections that are unique, rare, specialized or in such delicate condition that these materials are not available for circulation. Access to these materials may be given under controlled conditions in which the library staff monitors the patron's use of the material for a limited period of time. Researchers often want to be able to see the actual physical documents—the primary source material—for their topic of interest. Even the condition of the book, notes in the columns, damages or stains, can reveal significant information that's of value to researchers.

45. Most libraries with these "special collections" have digitized, with the greatest of care, as much of this unique material as possible. Libraries often offer digitized material in the first instance, in order to limit the potential for damage to the print material. The availability of digitized materials has made a huge difference in the accessibility of this specialized and unique content. These digitized materials are not similar to ebooks that are accessed freely by patrons for convenient use.

---

[24] One exception to this is Bibliotheca, an international library vendor, which supports ebook sharing between different libraries through its "cloudLibrary" platform which is currently being tested.

46. Libraries also have reference collections comprised of print material that is not loaned due to the cost of the book, the necessity to have constant access to the book by staff to respond to inquiries, and the format of the documents, often weekly unbound paper issues that are collected in binders for patron use. Most reference materials are available online and are able to be updated in real time, unlike print materials that are often updated on a much less frequent basis.

**B. Controlled Digital Lending**

47. CDL is a method that allows libraries to loan print books to digital patrons in a "lend like print" fashion. Through CDL, libraries use technical controls to ensure a consistent "owned-to-loaned" ratio, meaning the library circulates the exact number of copies of a specific title it owns, regardless of format, putting controls in place to prevent users from redistributing or copying the digitized version. Controlled Digital Lending by Libraries (controlleddigitallending.org) includes a 2018 position paper on CDL.[25] The paper provides an interpretation of United States copyright law for libraries implementing traditional lending functions using digital technology that balances the public benefit of this service while protecting the interests of private rights holders. Many libraries and individuals support this statement, including Boston Public Library, Los Angeles Public Library, Multnomah County (OR) Library, San Francisco Public Library, Sacramento Public Library, and the Metropolitan New York Library Council, that includes Brooklyn Public Library, Queens Public Library, and New York Public Library.[26]

---

[25] *Position Statement on Controlled Digital Lending* (Sept. 2018), https://controlleddigitallending.org/statement.

[26] *Signatories to the Position Statement on Controlled Digital Lending by Libraries*, https://controlleddigitallending.org/signatories.

48. Ex Libris, a major integrated library system vendor in the academic library integrated library system market, is promoting the value of using CDL in libraries. According to Ex Libris, key reasons for libraries to implement CDL are:

Items are more accessible to patrons;

Digital formats allow for enhanced functionality;

Digital formats can aid in preservation of materials; and

Digital lending reduces environmental impact.[27]

49. The International Federation of Library Associations and Institutions ("IFLA") also released a statement on CDL in 2021.[28] IFLA represents library members throughout the world and strongly supports CDL. IFLA identified three key principles that support the use of CDL:

Freedom to acquire and lend represents a core function of the work of libraries;

Digital uses should have at least the same flexibility as physical ones; and

It is acceptable to make use of more than one copyright exception or limitation at a time.

50. IFLA notes that CDL is based on exceptions and limitations or "user rights" in copyright law, in contrast to market-based licensing solutions. IFLA believes that there is a strong socio-economic case for enabling CDL in libraries around the world. Where desirable

---

[27] Ex Libris, *Implementing Controlled Digital Lending (CDL) Responsibly and Effectively: A Primer for Librarians*, at 3, https://page.exlibrisgroup.com/hubfs/HQ_General/Ex%20Libris%20Controlled%20Digital%20Lending%20White%20Paper.pdf?hsLang=en

[28] IFLA, *Position on Controlled Digital Lending* (June 2, 2021), https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf.

and widely-shared principles are respected (libraries' ability to freely acquire and lend, the technological neutrality of law, and the possibility to combine exceptions), CDL's legal basis supports the wider public interest.

51. CDL has become an accepted practice for libraries. The use of CDL leverages the significant investment that libraries have made in developing well-rounded print collections that provide access to information their communities need. Collections that are important to be available to patrons but may not be in constant demand can be available digitally, based on the library's ownership of the print copy. Libraries are able to digitize the physical copy of a book they own, control the access to the print copy, often by putting the book in storage, and make the digital copy available to a patron, with the print copy still being owned by the library though not accessible. When accessed, these materials have limited use periods, similar to check-out times for print materials. The Digital Lending Library provides this service for their patrons.

52. Providing equitable and convenient access to digital and print materials is foundational for libraries to fulfill their primary mission of information-sharing which ultimately contributes to successful communities. CDL is a practice that supports and enhances that information-sharing function and is part of a foundation for a sustainable library ebook ecosystem.

**C. The Internet Archive is a Library that Practices CDL**

53. There are many definitions of libraries. The ODLIS defines a library as "[a] collection or group of collections of books and/or other print or nonprint materials organized and maintained for use (reading, consultation, study, research, etc.)."[29] The definition of a "public

[29] Joan M. Reitz, ODLIS: Online Dictionary of Library and Information Science, *Library*, (2004), https://products.abc-clio.com/ODLIS/odlis_about.aspx.

library" per the IMLS Federal-State Cooperative Program ("FSCS") for data collection includes the following elements: 1) organized collection of materials; 2) paid staff; 3) schedule when services are available; 4) facilities to support collections; and 5) supported in whole or in part public funds.[30]

54. The Digital Lending Library provides services to its patrons that are similar to the services other libraries provide their patrons. The Digital Lending Library provides an organized collection of material for use, with paid staff and facilities providing 24/7 access to content. Under any of these definitions, the Digital Lending Library is a library.

## V. LIBRARY FINANCES

### A. Organization and Funding

55. Public libraries are organized and funded in a variety of ways from a myriad of revenue sources—with local funding providing the greatest share of revenue for most. The organization, funding mechanisms, and revenue sources for libraries vary widely throughout the country.

56. Library organization varies from state to state. In California, for example, libraries are generally organized and funded in the following ways:[31]

County libraries supported by funds dedicated for library purposes;

County libraries supported by non-dedicated funds;

---

[30] Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* 1 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf..

[31] For an in-depth analysis of California public library organization and funding, California Public Library Organization 2013 is an excellent primer. The report was issued in 2013, and the organizational and funding information in the report has not changed significantly since its publication.

Municipal (city) libraries supported by non-dedicated funds;

Independent district libraries supported by funds dedicated for library purposes; and

Joint Powers Authority ("JPA") libraries organized according to an agreement between the governing boards of two or more governmental entities which may have a mix of dedicated and non-dedicated support.

57. Each state has its own unique framework for organizing libraries. In Maryland, library services can only be provided by a county library system.[32] Types of public libraries in New York State include Association Public Libraries, Municipal Public Libraries, School District Public Libraries, and Special Legislative District Public Libraries.

An association public library is a private corporation established by the members of the association. It contracts with a unit of local government to provide library service to the residents of that jurisdiction and is supported by public funds.

A municipal public library is formed either by a vote of the governing body of a municipality (village, town, city, or county) or by a public referendum to serve the residents of the municipality and is supported by public funds.

A school district public library is organized to serve the residents who live within the boundaries of a given school district (hence the name). The library and the library board are independent of the school district and the school board.

A special district public library is created by a special act of the New York State Legislature and a local public vote, to serve all or part of one or more

[32] The exception to this is the Enoch Pratt Free Library in Baltimore, which serves as a resource to all libraries in Maryland.

municipalities as defined by the special legislation and is supported by public funds.[33]

58. Most libraries are supported with general public funds that are managed by a municipality (a city or county, whichever serves as the host agency for the library). These funds are budgeted annually to support the operations of the library by actions of the governing body and are not specifically earmarked for the library. In some cases, there are dedicated funds for the library that are often a result of voter-approved taxes. These dedicated funds may come from additional property tax levies, sales taxes, hotel or transient occupancy taxes, or other forms of revenue. Some of these revenue sources are established in perpetuity yet most of these special sources are time-limited, requiring regular elections for continuation or may be subject to caps on amount of taxes that can be levied. Often you will find a combination of general property tax support supplemented by an additional revenue source for library operations. There also may be unique funding sources for library-related capital projects.

59. The amount of funding for libraries varies greatly. IMLS collects data annually on library funding. Data is shown in the chart below:

**Sources of Library Funding (Per Capita)**

| FY 2019 IMLS[34] | Total | Federal | State | Local | Other |
|---|---|---|---|---|---|
| Average | $44.88 | $0.12 | $2.99 | $38.55 | $3.21 |
| New York | $79.65 | $0.25 | $3.27 | $65.54 | $10.59 |
| California | $43.74 | $0.08 | $0.53 | $40.73 | $2.40 |

[33] Rebekkah Smith Aldrich, Handbook for New Public Library Directors in New York State, 18–19 (2010), http://midhudson.org/directors_handbook.pdf.

[34] Institute of Museum and Library Services, *Public Libraries Survey* "FY 2019: Table 8. Total per capita operating revenues of public libraries" (2021), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

| FY 2019 IMLS[34] | Total | Federal | State | Local | Other |
|---|---|---|---|---|---|
| Texas | $22.44 | $0.07 | NA | $21.53 | $0.83 |

60.     This data shows per person operating revenues aggregated at the state level.  The primary source of funds for all public libraries is local, with state and federal funds providing limited support.  Funds in the "other" category include monetary gifts and donations received in the current year, interest, library fines, fees for library services, or grants.  There are disparities in available funding at all levels.

61.     Funding levels can depend on local economic conditions, local priorities, or non-discretionary services that must be provided.  Unlike police or fire protection, library services are discretionary and not required to be provided by governmental entities.  Based on my experience, I have seen that the discretionary nature of library services results in inconsistent funding levels that are often in competition with local services that are required or seen as more critical for the community.  For instance, during difficult budget times in 2016, the Kern County (California) District Attorney suggested that all branch libraries be closed to fund law enforcement.[35]

Although the libraries did not close in this situation, there are other situations where libraries and their patrons suffer funding and service losses.

62.     Most libraries operate on a fiscal year[36] that is set by their host agency.  Depending on the source of funds, the library may or may not be able to retain funds if they were

---

[35]  Jeffrey Hess, KVPR, *Kern County Libraries Face Uncertain 2017* (Dec. 20, 2016), https://www.kvpr.org/education/2016-12-20/kern-county-libraries-face-uncertain-2017.

[36]  A common fiscal year for public institutions is July through June, yet there are some jurisdictions that operate on a calendar fiscal year or the federal fiscal year, which is October through September.

allocated in a fiscal year and not all spent in that fiscal year. In other words, for most sources of funding libraries have to spend their budget each year. They lose any leftover money.

63. Libraries with dedicated taxes usually can retain or "carryover" any unspent funds from one fiscal year to the next whereas libraries with general, non-specific support are likely to be required to return any unspent funds from a fiscal year to the host agency. If libraries are allowed to "carry over" unspent funds, they have additional flexibility to allocate funds. Independent library districts have their own taxing authority and can manage funds as they determine most appropriate for their services. These districts have more stable and predictable funding patterns compared to libraries that are affiliated with their local cities or counties.[37]

**B. Library Budget Trends**

64. In reviewing budget trends for libraries, the IMLS Public Libraries Survey provides clear comparisons. The most recent information available in the IMLS survey is from FY 2019 (July 2018 – June 2019). Comparisons in revenues and expenditures per person based on data for all public libraries in the U.S. can be reviewed in the chart below:

**Comparisons in Revenue and Expenditures for U.S. Public Libraries**

| Fiscal Year | Total Revenue | Revenue per Person | Total Operating Expenditure | Expenditure per Person |
|---|---|---|---|---|
| FY 2019[38] | $14.2 B | $44.88 | $13.3 B | $41.90 |
| FY 2015[39] | $12.42 B | $39.94 | $11.62 B | $37.38 |

[37] Lisa Peet, Library Journal, *Holding Pattern: Budgets and Funding* (Feb. 16, 2018), https://www.libraryjournal.com/story/holding-pattern-budgets-funding.

[38] Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* at 3 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[39] Institute of Museum and Library Services, *Public Libraries in the United States: Fiscal Year 2015* at viii (July 2018), https://www.imls.gov/sites/default/files/publications/documents/plsfy2015.pdf.

| Fiscal Year | Total Revenue | Revenue per Person | Total Operating Expenditure | Expenditure per Person |
|---|---|---|---|---|
| FY 2011[40] | n/a | $38.09 | n/a | $35.83 |

65. Both total and per person revenues and operating expenditures have increased over the last nine years but not significantly. The revenues and expenditures over a five-year period have increased by about 13%. Increases in library budgets, both revenue and expenditures, vary. In 2018, the predicted increase for public library budgets was 1.9%, slightly better than the 2017 prediction of 1.4%, but not beating the predicted 2018 inflation rate of 2.38%.[41] Assuming a 1.5% annual average budget increase for most libraries, this five-year period would have resulted in a 7.5% increase for most libraries. Please note that these are national averages and the per person revenues and expenses can vary greatly depending on the economic resources of the local area. For instance, in FY 2020 in California, the Beverly Hills Public Library reported the highest per person expenditures in the state at $390.15 while the Pomona Public Library reported the lowest per person expenditures in the state at $5.33.[42]

66. Libraries have faced a number of funding-related challenges in the last ten to fifteen years. Libraries suffered reduced funding in the "great recession of 2008-09" when many public agencies were challenged. Some libraries recovered within the next ten years. Often

[40] Deanne W. Swan et al., Institute of Museum and Library Services, *Public Libraries in the United States Survey: Fiscal Year 2011* at 29 (June 2014), https://www.imls.gov/sites/default/files/legacy/assets/1/AssetManager/PLS2011.pdf.

[41] Lisa Peet, Library Journal, *Holding Pattern: Budgets and Funding* (Feb. 16, 2018), https://www.libraryjournal.com/story/holding-pattern-budgets-funding.

[42] California State Library Statistics Portal, *Total Expenditures per Capita* (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

# McNamara Declaration

# Exhibit 26

# part 2

recovery for these libraries was achieved by voter-approved tax measures. Other libraries have continued to suffer from reduced funding which negatively impacted their services.

67.     Aside from funding challenges, the explosion of digital media has been trying for libraries. Given budget constraints, the movement to provision of digital materials and the equipment to enable access to those materials has completely re-ordered the service balance that libraries must provide and the resource allocation to address that balance. There are still patrons who want to read print books and don't see technology or digital materials as their primary method of engaging in the world. Libraries struggle to serve these patrons as well as patrons who have embraced digital media.

**C.     Components of Library Budgets**

68.     The Public Libraries Survey FY 2019 shows that staff salaries and benefits represent 67% of most library budgets, the largest type of expense of all of the categories.[43] In FY 2019, libraries spent $4.51 per person on library collections materials or acquisitions representing 11% of their operating budgets.[44] Libraries strive to spend 15–20% of their budgets on library materials, yet most libraries are practically able to allocate 5–10% of their annual budget to collections. Because the acquisition budgets are so limited, regardless of budget flexibility due to source of funding, most material allocations are practically spent by the end of each fiscal year. With staffing and materials costs representing about 78% of most library budgets, the remaining 22% is stretched to cover equipment, broadband connectivity, facility maintenance, capital projects, and vehicles, as well as other ongoing expenses, i.e. insurance

---

[43]  Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* at 5 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[44]  *Id.*

costs. Often, if the library is part of a city or county, they may be charged administrative costs for general operational services, i.e., human resources, financial management, and legal counsel.

**D. Acquisition Budgets**

69. With the limited funding for acquisitions, decisions for allocation of those resources must be made carefully. Here are categories of acquisition expenditures for libraries:

"Standing orders"—annual orders for magazines (both print and digital) and reference materials;

Fiction collections in digital and print formats—children, teen, adult;

Non-fiction collections in digital and print formats—children, teen, adult;

Non-print physical items—CD's DVD's, videos, streaming service subscriptions;

Objects to loan—"library of things", tools, games; and

Replacements/binding of damaged/lost materials or periodicals.

70. Libraries struggle to balance the acquisition of print and digital materials. The division of the allocation of the budget between print and digital media is influenced by both the cost of materials and patron demand. The determination of effective format often depends on the specific user and type or book/material.

71. Most libraries strive to spend their entire annual materials allocation within the fiscal year in which funds were allocated. In fact, it is highly unusual for a library not to spend the entire allocation each year. A possible consequence of not spending that budget could be that the following year's allocation is reduced by the unspent amount or more. As stated earlier, depending on how the library is organized and/or funded, they may be able to "carry over" unspent funds for the next fiscal year but in most cases the library may lose access to any funds not spent in the fiscal year allocated. The inability to retain unspent funds can result in

acquisition decisions that are focused on short-term rather than long-term priorities, for example, meeting immediate patron demand rather than planning for the permanent collection.

72.     Most libraries now develop separate budgets for acquisitions of physical and digital materials.  The IMLS Public Libraries Survey data demonstrates that the average percentage of acquisition budgets spent on print and digital materials has changed over the last eight years.  Data is shown in the chart below[45]:

**Materials Expenditures Per Year**

| Fiscal Year | Print average percentage | Digital average percentage |
|---|---|---|
| FY 2019[46] | 52.4 | 31.1 |
| FY 2016[47] | 56.1 | 25.3 |
| FY 2011[48] | 65.4 | 14.3 |

73.     The funds spent on digital materials have increased by 46% over the last eight years.

---

[45]  Please note that these percentages do not add to 100 as there are smaller percentages of expenditures spent on serial subscriptions and other types of materials that are not reflected in the chart.

[46]  Institute of Museum and Library Services, *Public Libraries Survey* "FY 2019: Table 11. Total collection expenditures of public libraries and percentage distribution of expenditures, by type of expenditure and state: Fiscal year 2019" (2021), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

[47]  Institute of Museum and Library Services, *Public Libraries Survey* "FY 2019: Table 26. Number of paid full-time-equivalent (FTE) staff in public libraries, by type of position; percentage of total FTE librarians and total FTE staff with ALA-MLS degrees; and number of public libraries with ALA-MLS librarians, by state: Fiscal year 2019" (2019), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey

[48]  Institute of Museum and Library Services, *Public Libraries Survey* "Table 25, Total collection expenditures of public libraries and percentage distribution of expenditures, by type of expenditure and state: Fiscal year 2011" https://www.imls.gov/sites/default/files/fy2011_pls_tables_20-30a.pdf.

74. Commensurate with this, the balance of materials in library collections has also been shifting. California State Library data demonstrates these shifts. Data is shown in the chart below:

**Materials Per 1,000 Persons**

| Fiscal Year | Books | Ebooks |
|---|---|---|
| FY 2020[49] | 3,925 | 7,111 |
| FY 2016[50] | 4,075 | 1,651 |
| FY 2011[51] | 4,188 | 154 |

75. The average number of ebooks per 1,000 persons has increased tremendously during the recent four-year period, with a huge jump of 77% from FY 2016 to FY 2020. Remember that there were very limited ebook collections prior to the mid-2000's, so these percentage increases will be very large. Print materials have decreased over the last nine years by about 6%. The size of long-standing print collections is much larger than ebook collections so the reduction in size will be at a much smaller percentage. Although specific data is difficult to find, the majority of all public library collection expenditures were focused on print materials until the most recent ten to twelve year period.

76. Again, California State Library data show the following:

---

[49] California State Library, *Collection 2019-20* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

[50] *Id.* at *Collection 2015-16.*

[51] *Id.* at *Collection 2010-11.*

**Average Items Held by Libraries**

| Fiscal Year | Print Materials | Ebooks |
|---|---|---|
| FY 2020[52] | 294,224 | 191,899 |
| FY 2016[53] | 327,302 | 63,121 |

77. Please note that print materials are the total number of books held on June 30 of the report year. Books are non-serial printed publications (including music and maps) that are bound in hard or soft covers, or in loose-leaf format. The average number of print materials and ebooks in library collections is changing, with the number of print materials decreasing and the number of ebooks increasing. As noted previously, California data is useful as California is a large state with similar average spending levels to other states.

## VI. PRINT MATERIALS CIRCULATION/ACQUISITION

### A. Circulation of Print Materials

78. California State Library data also show that the circulation of print materials has decreased. Data is shown in the chart below:

**Circulation for all Physical Items Available at Libraries**

| Fiscal Year | Median Circulation | Average Circulation |
|---|---|---|
| FY 2020 – physical items[54] | 252,824 | 716,955 |
| FY 2016 – physical items[55] | 398,777 | 1,057,035 |
| FY 2011 – total[56] | 449,598 | 1,322,931 |

---

[52] California State Library Statistics Portal, *Summary Report, 2019-20*, (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

[53] *Id.* at *Summary Report, 2015-16.*

[54] California State Library Statistics Portal, *Circulation 2019-20* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

[55] *Id.* at *Circulation 2015-16.*

[56] *Id.* at *Circulation 2010-11.*

79. Although these numbers are not totally comparable to each other due to the California State Library using total circulation statistics in FY 2011 (which does not separate physical from electronic items), decreases in the circulation of print materials are clear. The median physical item circulation in FY 2020 decreased by 37% from the FY 2016 circulation; and the FY 2020 average physical item circulation decreased by 33% from the FY 2016 circulation.

80. IMLS recently published a detailed study[57] on the use and cost of public library materials, comparing data from public libraries throughout the U.S. collected in FY 2014 and FY 2018, prior to the pandemic. Key findings include the following:

> Although median circulation of physical materials per person decreased 16% nationally from FY 2014 to FY 2018, the median circulation of electronic materials per person increased *by nearly 150%*; and
>
> From FY 2014 to FY 2018, median per person spending on physical materials decreased by 6%, while median per person spending on electronic materials increased 31%.

81. The COVID-19 pandemic has had a tremendous impact on library circulation tendencies. A timely article in the *San Francisco Chronicle* on December 5, 2021 showed that total circulation for the San Francisco Public Library for FY 2021 fell by 23%. Note that all libraries were closed as of March 2020 and patrons were not welcomed back into many buildings until May 2021. Circulation of physical items dropped by 64% while circulation of digital items increased by 29%. The increase in digital circulation was not a new phenomenon—since 2017,

---

[57] Institute of Museum and Library Services, *The Use and Cost of Public Library Materials: Trends Before the COVID-19 Pandemic* (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/pls_fy18_research_brief.pdf.

digital circulation had been increasing by 25–31% each year. Although digital circulation increases may lessen to some extent when services are completely restored, the extensive use of digital materials in the "new normal". [58]

**B. Collection Management**

82. Library collections are constantly changing, with new materials added, older materials withdrawn or "weeded," and in-demand titles replaced—a true ecosystem of content. The most common challenge of collection management is dealing with multiple copies of best-selling titles. Most libraries develop a "requests to copies" ratio that informs their purchasing decisions or patterns. Although these ratios may vary, a fairly common one is five to six holds (or persons waiting on a waitlist) for every print or ebook copy purchased or licensed.

83. For print materials, particularly best-sellers, libraries will usually purchase a significant number of copies in response to patron requests. The spike in demand for popular titles usually happens at the same time in all libraries so the option of borrowing best-sellers via interlibrary loan is not feasible. But libraries will not need the number of copies they initially purchased because, in my experience with libraries, the demand for the best sellers usually decreases within six months to one year after publication.

84. When the book's popularity has diminished, the library will review the condition of all the copies, keep a small number of copies in the best condition, and weed or discard the remaining copies. For these reasons, libraries will rarely purchase replacement copies of a title. In fact, it is more common for the libraries to find ways to remove excess copies of once-best sellers.

---

[58] Nami Sumida, San Francisco Chronicle, *The Pandemic Transformed San Francisco's Libraries. This Data Shows How* (Dec. 5, 2021), https://www.sfchronicle.com/sf/article/How-the-pandemic-transformed-San-Francisco-s-16667414.php

85. The number of circulations for copies of some of these best-sellers could go from ten circulations to fifty or sixty, given the longevity of the popularity of the title. Circulations depend on a number of factors: 1) A large number of copies were purchased in anticipation of heavy use and that use did not occur; 2) A copy could have been damaged after a few uses and was taken out of circulation; or 3) A title was extremely popular and remained in good condition for a number of uses. Limited copies of new or best-selling books in the best condition after their popularity has waned are kept due to space constraints of the library and/or to provide a supply of replacement copies if a library supports collections in other facilities.

86. When the copies are withdrawn from a library's circulation collection, one of the key goals of the library is to repurpose those copies. There are a number of processes that libraries are able to utilize to manage withdrawn materials, ranging from donating materials to library support groups for sales, donating materials to non-profit institutions or schools, sending materials to libraries in countries that have limited collections, and/or disposing of the materials in a sustainable manner.

87. In some cases, physical books are repaired or rebound—particularly if they are out of print or of special interest to the library. Most libraries do not have the capacity to make extensive repairs of material and find that purchasing replacements is a more efficient option.

88. If materials are rebound, the cost is borne by the library, with the library either having staff or a bindery bind the material and have use of the bound item as long as it lasts. The library does not have to pay the publisher to extend the life of a rebound book which the library owns, unlike the situation with ebooks where libraries must pay publishers for extended access to

ebooks. In any case, most libraries spend a very small percentage of their acquisitions budget on purchasing new replacement copies or binding existing copies of books.[59]

## VII. EBOOK ACQUISTION CHALLENGES

89. For ebooks, the collection management process is somewhat different than with print materials. These differences are not due to anything inherent about ebooks but result from the limitations imposed by publishers regarding the terms on which they are willing to make ebooks available to libraries. In contrast to print books, most publishers do not permit libraries to own ebooks. Publishers will only license access to most ebooks, including to libraries.

90. Publishers have developed a wide variety of licensing models including access metered based on amount of time, the number of loans, or combinations of factors; subscriptions to bundles of titles with varying use and time limitations; pay per use; simultaneous access; and other models as well. These models can be confusing and challenging for libraries to navigate.

91. Many libraries obtain their digital content through OverDrive, Inc., a major library ebook platform that often serves as the broker between publishers and libraries. Mr. Steve Potash, founder and CEO of OverDrive, Inc. noted in his deposition, "We advocate to all suppliers to consider and enable OverDrive to have all models. So our input is advocacy that libraries should have the options to look at a title or group of titles and have flexible opportunities to acquire permission for lending. So we strongly recommend all of the models, including simultaneous access, and more recently are getting more (suppliers) to enable that permission."[60] When asked why Mr. Potash would support this approach, he responded,

[59] Libraries might purchase used books as replacement copies, but only in the case of a very rare or otherwise unavailable book.

[60] Potash Dep. Tr. 48:1–8, Jan. 31, 2022.

"Because we want to serve all communities and enable all readers of all ages, all genres, and libraries have a variety of budgets or other strategies. So we stand with libraries so they can have as many of the options for the library to evaluate the best way to build their collections."[61]

92. In most licensing agreements, publishers allow libraries to have access to ebooks with specifically limited timeframes and/or publishers may impose additional charges as ebooks circulate. When licenses are about to expire, the library must determine if they want to retain access to the title and renew the licensing agreement or forego access to the title. The library also must determine if they want to retain access for a limited number of copies of the ebook and retain access for some copies and forego access for other copies.

93. Access decisions regarding ebook copies are a constant challenge for library staff. The condition of the material is not a defining factor for what to acquire; it is the amount of demand and cost of access that are key considerations in how to allocate the acquisition budget for ebooks.

94. Access to ebooks is not always in the hands of the library staff. Publishers may not provide library access to new digital content at its initial publishing date. A publisher can withdraw an ebook from its collection or change the terms of access. In regard to a publisher requiring a term limit for access to digital content, Mr. Potash noted in his deposition that "If we no longer have permission from the rights holder, we would be no longer offering that title in our offering . . ."[62] Authors may also change their publishing houses which results in possible limitations/changes in access to that author's materials previously published by another publisher.

---

[61] *Id.* at 48:11–17.

[62] *Id.* at 66:7–9.

95. Libraries may create digital copies of print books that they own. These digitization decisions may be made on the condition or content of the print material. The decisions could also be made on space or capacity available to the library. For instance, if a library had an extensive collection of local government documents that were important for that community but would not be digitized by any other institution and/or might take up valuable public space in their print format, that library may determine that digitizing those documents is the best method for preservation and long-term access. In any case, most libraries do not have the capacity to create digitized copies of materials and are required to outsource that process to other institutions with that capacity (such as Internet Archive) or other commercial companies.

**A. Ebook Access Models**

96. With the increased demand for ebooks, libraries have faced significant challenges in acquiring those materials. The prices and acquisition/subscription models for ebooks are far different from the world of print books. In acquiring print materials, libraries pay for physical items that they own in perpetuity. Often, libraries purchase print materials through an aggregator or book jobber, i.e. Baker and Taylor or the Ingram Content Group, where they receive a pre-negotiated discount for specific types of materials.

97. Ebook acquisitions are much more challenging than print book acquisition. The variety of access models for ebooks, i.e. access metered by time, number of checkouts, pay per use, etc., can be difficult for a library to manage. Also, the content and user audience can impact which model might work best for the specific ebook collection. Mr. Potash noted in his deposition that the one copy/one user model was in place "[a]pproximately (from) 2006 for a period of at least 10 years."[63] The one copy/one user model, which is an access model that gives

[63] *Id.* at 52:18–19.

libraries permanent access to an ebook, was much simpler for libraries to manage than the

variety of licensing models in place currently.[64]

98.     Libraries also use electronic platform aggregators to access ebooks.  OverDrive,

as noted previously, and Baker and Taylor's Axis 360 are platforms that many libraries use.

Additional costs may be incurred by libraries to provide patron access to these platforms.  Also

the cost of access to an ebook for the library is normally three to five times higher than the retail

cost of the ebook for an individual customer.[65]  (This price mark-up does not exist for print

books.)

99.     When publishers introduced ebooks to the mainstream library marketplace, a

common subscription model was one digital copy/one user at a time, with no time or use

limitations.  This model was similar to print library acquisitions although the libraries never

owned a copy of the digital content.  In contrast to the one user/one copy model, publishers

adopted models where metered licenses were limited by time and/or number of uses.

100.     Currently, publishers offer only limited options for one copy/one use (permanent

access) licensing, and the pricing may be higher than pricing for other models.  Some libraries

are fortunate enough to have the resources to pay for permanent access to digital content.  But,

even if the library has the resources to purchase permanent access, many publishers are not

offering a perpetual access model for that digital content at all.  In any case, the digital access is

still more expensive than the purchase of a print copy.

---

[64]  "Every time a title is added, it has a metered access component. So it added overhead and workflow (for library staff) as a component of offering the material."  *Id.* at 53:20–23.

[65]  Denver Public Library, *Libraries and eBooks: An Introduction* (Oct. 30, 2019), https://www.denverlibrary.org/blog/books-research/lauren/libraries-and-ebooks-introduction.

101. Publishers claim that the higher price of a digital asset reflects the fact that there is not physical wear and tear on the ebook, in contrast to a print book that may become damaged or worn out from constant use and would be replaced at additional cost to the library and revenue to the publisher. Based on my knowledge and experience, that rationale does not align with library practice. Most libraries provide access to print and ebook versions of most popular titles. In the case of popular print books, where the library may purchase multiple copies of the same title, the library would keep copies in the best condition for long-term use after the popularity wanes and not necessarily buy any replacement copies. In the case of ebooks, libraries acquire multiple licenses or bundles of ebooks to meet patron demand and, as that demand wanes, they reduce the number of copies or access points they include in their inventory.

**B. Challenges in Acquiring and Managing Ebook Collections**

102. Acquiring and managing ebook collections is difficult, time-consuming, and expensive for library staff. As noted by Mr. Potash in response to a question regarding library ebook licenses with time limits, "it imposes more work for librarians . . . librarians have to -- instead of buying a book once for their collection in ebook form, have to engage in additional transactions upon expiration of the term" and "[m]aking decisions on which books to select, forecasting demand over the next 24-month period."[66]

103. Library staff must understand and determine if a publisher's access model is useful, appropriate, and affordable for the library's collection and patron use patterns. They have to constantly be mindful of when access to specific ebooks will end and determine if that access should be extended and/or how many copies of the ebook should be retained. In contrast to the cost of purchasing print materials, the cost of licensing for ebooks is a recurring expense rather

[66] Potash Dep. Tr. 61:1–11, Jan. 31, 2022.

than a one-time expense. Publishers' digital content access models make it very difficult to establish or maintain a permanent collection which is one of the primary goals of a library. Although the collection is always changing, the ability to obtain permanent ownership and/or permanent access to specific materials is critical.

104. For libraries with limited resources, the provision of a diverse ebook collection that meets patron demand can be very difficult. Libraries cannot totally abandon purchase of print materials to be able to support their ebook collections. Availability of mid-list or lesser-known authors or titles may be limited because most resources have to be allocated to costs for multiple copies of best-selling, popular ebook titles. The "pay per circulation always available" access model, i.e Kanopy or Hoopla, can be extremely challenging. Because the library cannot predict the usage level of the materials, they cannot estimate with clear knowledge the cost of content provided through this access model. Some libraries have developed usage parameters for these pay per circulation collections, i.e. each card holder can have a certain number of downloads per week. These use limits may be required for budget predictability, but they are not positive experiences for the patron who does not understand the metering of access to digital material.

105. The ability to meet patron demand for digital content has stretched the capacity of materials budget in most libraries. Many small and large libraries rely, in part, on private support for digital content collections from their library friends groups, foundations, or other private funders. This private support has historically been used by libraries for programming or other supplementary services but is increasingly directed to basic licensing of library ebooks.

## VIII. CDL'S IMPACT ON LIBRARY SPENDING

106. Because library acquisition budgets are limited and scarce, the existence of CDL does not result in less spending than what has been allocated for materials acquisitions. In fact,

even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions. They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.

107. As noted previously, library acquisitions budgets represent an average of 11% of most library budgets. For institutions dedicated to providing access to print and digital content, this is a rather sad state of affairs. The aspirational acquisition budget is 15–20% of the annual operating budget, almost twice what is spent on materials currently and a goal achieved by very few institutions. Library budgets are constrained primarily by the amount of funding that must be spent on staffing (67% on average) which represents a key service component of a successful library as well as the materials collections. Libraries also must make significant investments in provision of safe and secure facilities as well as up-to-date information technology infrastructure and equipment. Because of these required expenses, the materials budget, which is discretionary compared to other expenditures, is often used as the budget balancer on an annual basis—meaning that where reductions must be made to balance the budget, those reductions are often made to the materials budget.

108. Yet even in light of its discretionary nature, the materials allocation remains the heart of the library's expenditures. Librarians diligently spend their limited materials budgets as effectively as possible, regularly searching for the best prices for materials, determining the most affordable collection balance that is responsive to patron demand, and always on the look-out for grant opportunities to augment their capacity to obtain materials.

109. In light of the priority of materials acquisition and the current state of limited budgets for those materials, libraries would not reduce their materials budgets if reliance on CDL for certain digital content reduced their spending on the particular titles that were provided through CDL. On the contrary, the libraries would immediately find other ways to allocate those precious resources, through purchase of ebook licenses or print copies of other titles. With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products. This flexibility would provide for the increased expenditures for digital and print content, as libraries would recalibrate their spending patterns to continue to most effectively meet the needs of their patrons, without any net effect on their total expenditures on publishers' products.

Dated: February 25, 2022

DocuSigned by:
Susan H. Hildreth
4AF2CEED802C4EB...

SUSAN H. HILDRETH

**ATTACHMENT A**

**SUSAN H. HILDRETH**

**PROFESSIONAL EXPERIENCE**

**Library Consultant** **Variety of public sector clients** **4/19 – current**

Focusing on executive recruitment, strategic planning, organizational review and broadband adoption. Recent projects include:

Boise (ID) Public Library Strategic Plan, 2021 – 2023
Placer County Library (CA) Organizational Assessment, 2021 – 2022
Cooperative Personnel Services (CA) – Executive Recruitment and Organizational Analysis, 2020 -
NTIA Merit Reviewer, Broadband USA Tribal Libraries Program, 2021
Wisconsin Community Engagement/Leadership Training, 2020 – 2021
Humboldt County Library (CA) Strategic Plan, 2020
Tacoma Public Library (WA) Strategic Plan, 2020
Feasibility Study to Establish Carpinteria Municipal Library (CA), 2020

**Interim Director** **Sonoma County Library** **7/18 – 3/19**
**Rohnert Park, CA**

Served as interim director and primarily responsible for identifying a permanent director and managing library operations.

**Distinguished Practitioner In Residence** **University of Washington Information School Seattle, WA** **8/16 – 6/18**

Inaugural appointee to this Gates-funded position (Professor of Practice) designed to infuse curriculum with skill building relevant to the 21st century library and bring theory and practice together for an impactful student experience.

Taught courses in library management, community engagement and advocacy
Served as guest lecturer in library management, community engagement and future of libraries – 2020-21

**Treasurer** **American Library Association** **6/16 – 6/19**
**Chicago, IL**

**Aspen Fellow** **Aspen Institute, Washington, DC** **3/15 – 12/19**
**Communications/Society Program**

Provided counsel on issues related to public libraries and represented the Institute's Dialogue on the Future of Public Libraries.

**Executive Director** **Peninsula Library System** **3/15 – 6/16**
**Pacific Library Partnership**
**The Califa Group**

Responsible for the operation of the Peninsula Library System that supports the online library system for public libraries in San Mateo County, CA; the Pacific Library Partnership, a consortium of public libraries in the greater San Francisco Bay area; and the Califa Group, a non-profit organization that provides aggregated procurement services and other statewide programs for California libraries.

**Director** **Institute of Museum and Library Services** **1/11 – 1/15**

Responsible for the operation of the Institute, a federal agency that provides support for the nation's museums and libraries. Appointed by President Obama and confirmed unanimously by Senate.

- Administer a $250 million annual budget, including $150 million in population-based grants to states for libraries and $100 million in competitive grants for museums and libraries. Work with library organizations, foundations and other interested stakeholders to develop partnerships to leverage federal investments.
- Advise Administration and Congress on information policy. Responsible for annual national data collection of public libraries and national census of museums.
- Work closely with Federal Communications Commission and National Telecommunications and Information Administration to ensure that broadband capacity and digital literacy is available for all with specific focus on underserved communities and populations
- Work closely with other federal agencies to leverage the capacity and potential of libraries and museums to strengthen communities.

**City Librarian** **The Seattle Public Library** **2/09 – 1/11**

Responsible for the operation of The Seattle Public Library, including the world-famous Central Library (363,000 sf), 26 branches and Mobile Services, serving 600,000 people. Annual circulation is over 11.2 million from a collection of over 2.5 million items, with a staff of 565 FTE. Annual operating budget is $50 million with an additional $3 million in private funds.

- Report to the Library Board of Trustees, a five-member policy-making body appointed by the Mayor and confirmed by the City Council.
- Serve as Library's liaison and ex-officio board member of The Seattle Public Library Foundation and the Friends of The Seattle Public Library.
- Responsible for development of Library's strategic plan and management of a highly successful enterprise during a period of limited resources.

**State Librarian** **California State Library** **8/04 – 2/09**

Responsible for the operation of the California State Library, including library services for the Executive Branch, the Legislature and all state employees. Collection is 2.7 million items, with a staff of 178 FTE. 2008/09 operating budget was $75 million. Appointed by Governor Arnold Schwarzenegger July 2004 and confirmed by the State Senate April 2005.

- Responsible for annual distribution of over $16 million in federal funding and $59 million in state funding.
- Responsible for library service development activities for 181 public library systems serving over 37 million residents.
- Supervised a $350 million public library construction bond program.
- Supervised a $128 million cultural facilities bond program.

**City Librarian** **San Francisco Public Library** **3/01 – 6/04**
**Acting City Librarian** **San Francisco Public Library** **2/00 – 3/01**
**Deputy City Librarian** **San Francisco Public Library** **7/98 – 2/00**

Responsible for the operation of the San Francisco Public Library, including the Main Library (376,000 sf), 26 branches and two bookmobiles, serving 800,000 people. Annual circulation was over 6 million from a collection of over 2 million items, with a staff of 650 FTE. 2003/04 operating budget was $58 million. Began serving in the capacity of Acting City Librarian in May 1999, when the City Librarian suffered a massive stroke. Mayor Willie Brown made the official City Librarian appointment in March 2001.

- Reported to Library Commission, Library's policy-making body, and Mayor.
- Served as Library's liaison and ex-officio board member of the Friends and Foundation of the San Francisco Public Library.
- Developed successful $106 million branch bond program renovating 19 branch libraries and building five new facilities.
- Responsible for execution of a post-occupancy evaluation of the Main Library and implementation of modifications to address key issues in the evaluation.
- Responsible for development of Library's strategic plan.

**Planning Consultant** **California State Library** **12/96 – 7/98**

Responsible for assisting California public libraries in utilizing appropriate planning techniques to effectively develop, organize, administer and manage public library services. Analyzed current planning and management methodologies in public libraries, identified future trends, designed programs and training events to strengthen abilities of public library administrators to make informed decisions.

**Deputy Library Director** **Sacramento Public Library** **12/91 – 11/96**

Responsible for fiscal, personnel and facilities services for the Sacramento Public Library, including the Central Library (165,000 sf), 23 branches and two bookmobiles, serving over one million people. Annual circulation was over four million from a collection of over two million items, with a staff of 200. 1995/96 operating budget was $15 million.

- Reported to Library Director and was member of Management Team.
- Responsible for annual budget preparation and planning for additional funding.
- Served as member of team that planned and implemented the reorganization of the Library as a Joint Powers Authority of the City and County of Sacramento.

**County Librarian** **Placer County Library, CA** **5/89 – 12/91**
**Assistant County Librarian Placer County Library, CA** **9/88 – 5/89**
Responsible for daily operation of a county library system, including the Main Library in Auburn, ten branches and a bookmobile. Annual system circulation was over 500,000 from a collection of over 180,000 items, with a staff of 40. 1990/91 operating budget was $1.5 million.

Initiated development, with citizens committee, of first Long-Range Plan.
Awarded $1.5 million state construction funds for Granite Bay Branch, 1991.
Planned major upgrade of automated system and expansion of Main Library.

**Library Director** **Benicia Public Library, CA** **10/84 – 9/88**
Responsible for daily operation of a small, independent library. Annual circulation of 110,000, collection of 40,000 items, with a staff of 5.

Established and worked closely with first Friends of the Library.
Established state-funded adult literacy program in 1987.
Established citizens' Library Building Committee to design new library.

**Central Services Librarian** **Yolo County Library, CA** **7/81 – 10/84**
Responsible for the Central Services Program, including acquisitions, cataloging, processing, inter-library loan and branch services, supporting 7 branches with 6.5 FTE.

**Davis Branch Librarian** **Yolo County Library, CA** **2/80 – 7/81**
Responsible for operation of busiest branch in the county system.

**Branch Librarian** **Edison Township Library, NJ** **7/73 – 12/78**
Responsible for operation of a busy branch in a growing suburban community.

**PUBLICATIONS SINCE 2012**

Ask, Listen, Empower: Grounding Your Library Work in Community Engagement, ALA Publishing, 2021; Co-author with Erica Freudenberger, "Empowering Communities: From Public Trust to Impact" (Chapter 2); "Culture Shift: The Path to Becoming Community-Centered" (Chapter 8)

Co-creating MLIS Curriculum for Cultural Competence and Community- Driven Learning: Making Progress for the Future of Libraries, University of Washington Information School, 2018

Library Management Problems Today: Case Studies, Rowman & Littlefield, 2021:" A Failure to Communicate" (Chapter 18)

Library 2020: Today's Leading Visionaries Describe Tomorrow's Libraries, Scarecrow Press, 2013; "Community" (Chapter 15)

**PROFESSIONAL ACTIVITIES/AWARDS**

Please note that professional and community activities were limited during my tenure as a Presidential appointee 2011-2015.

Budget and Finance Committee, American Library Association. 2021-2022
Syracuse University Library Advisory Board, Member, 2009-2011, 2015 - present
Library of Congress Literacy Awards, Advisory Board Chair, 2012-2021
Reach Out and Read California Advisory Board, 2021 - present
Reach Out and Read National Board, 2015-2020
Panorama Project Advisory Council, 2018-present
University of Washington Information School, Library Advisory Board, Member, 2009-2011, 2016 – June 2018
Library Council of Washington, Board Member, 2010-2011, 2016 – June 2018
Corporation for Education Network Initiatives in California (CENIC) Board, Member, 2015-2017
Freedom to Read Foundation, Board Member, 2009-2011
Public Library Association (PLA) Endowment Committee, Chair, 2009-2010
PLA Leadership Task Force, Member, 2006-2011
PLA Vice-President, President, Past-President, 2006-2008
ALA Councilor At-Large, ALA Council, 2002-2005
PLA Board, Library Development Cluster, Member, 2000-2003
CLA President, 2004, Treasurer, 1995-2000

California Library Association (CLA) Library Hall of Fame, 2019
California Emerging Technology Fund Champion, 2014
Association of Rural and Small Libraries Champion, 2014
Distinguished Public Service Award, State University of New York, Albany, NY, 2012
SF Municipal Fiscal Advisory Committee Public Managerial Excellence Award, 2000
CLA First Annual Member of the Year, 1993
Public Library Delegate to White House Conference on Libraries, 1991

**EDUCATION**

**Master's in Business Administration**, Rutgers University, Newark, NJ — December 1979
**Master's in Library Science**, State University of New York, Albany, NY — May 1973
**Bachelor of Arts cum laude**, Syracuse University, Syracuse, NY — June 1972

**ATTACHMENT B**

**LIST OF INDIVIDUALS INTERVIEWED**

Michael Blackwell, Director
ReadersFirst Leadership Group
St. Mary's County Library
23630 Hayden Farm Lane, Leonardtown, MD 20650

Nick Buron, Chief Librarian/Senior Vice President
Queens Public Library
89-11 Merrick Blvd., Jamaica, NY 11432

Shellie Cocking, Chief of Collections and Technical Services
San Francisco Public Library
100 Larkin St., San Francisco, CA 94102

Erica Freudenberger, Outreach and Marketing Consultant
Southern Adirondack Library System
22 Whitney Place, Saratoga Springs, NY 12866

Nate Hill, Executive Director
Metropolitan New York Library Council
599 11th Ave., New York, NY 10036

Paula MacKinnon, Executive Director
Califa Group, 330 Townsend St., #133, San Francisco, CA 94107

Mary Minow, Consultant, LibraryLaw.com
Board Member, Institute of Museum and Library Services
Chicago, IL

**ATTACHMENT C**

**LIST OF MATERIALS CONSIDERED**

**NON-EVIDENTIARY DOCUMENTS**

Stipulated Protective Order (ECF No. 39)

Discovery Hearing Transcript (Dec. 2, 2021)

**DEPOSITION TRANSCRIPTS AND EXHIBITS**

Dye, Skip

Gaudet, Michael

Lazarus, Alison

Marwell, Josh

Pavese, Alan

Potash, Steve

Restivo-Alessi, Chantal

Saletan, Rebecca

Sevier, Ben

Silverman, Adam

Weber, Jeff

**EVIDENTIARY DOCUMENTS**

HACHETTE0006560

HACHETTE0010650

PRH0052319

PRH0052321

PRH0052605

PRH0057091

PRH0057114

PRH0057123

PRH0057133

PRH0058900

PRH0065931

PRH0065933

PRH0065964

PRH0070813

PRH0070814

PRH0070815

PRH0070818

PRH0071726

**<u>WEBSITES, JOURNALS, AND NEWSPAPER ARTICLES</u>**

California State Library Statistics Portal, Circulation 2012-13 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

California State Library Statistics Portal, Circulation 2015-16 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

California State Library Statistics Portal, Circulation 2019-20 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

California State Library Statistics Portal, Library Visits per Capita, (2022), https://ca.countingopinions.com/pireports/report.php?4753b73dacc5b971763b4de81b0650f9&live.

California State Library Statistics Portal, Circulation 2012-13 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

California State Library Statistics Portal, Circulation 2015-16 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

California State Library Statistics Portal, Summary Report, 2019-20, (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

California State Library Statistics Portal, Total Expenditures per Capita (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

California State Library, Collection 2010-11 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

California State Library, Collection 2016-16 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

California State Library, Collection 2019-20 (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b0313240656d821&live.

Controlled Digital Lending By Libraries, Position Statement on Controlled Digital Lending (Sept. 2018), https://controlleddigitallending.org/statement

Deanne W. Swan et al., Institute of Museum and Library Services, Public Libraries in the United States Survey: Fiscal Year 2011 at 29 (June 2014), https://www.imls.gov/sites/default/files/legacy/assets/1/AssetManager/PLS2011.pdf

Denver Public Library, Libraries and eBooks: An Introduction (Oct. 30, 2019), https://www.denverlibrary.org/blog/books-research/lauren/libraries-and-ebooks-introduction.

Ex Libris, Implementing Controlled Digital Lending (CDL) Responsibly and Effectively: A Primer for Librarians, 3https://page.exlibrisgroup.com/hubfs/HQ_General/Ex%20Libris%20Controlled%20Digital%20Lending%20White%20Paper.pdf?hsLang=en.

IFLA, Position on Controlled Digital Lending (June 2, 2021), https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf.

Institute of Museum and Library Services, Public Libraries in the United States Survey: Fiscal Year 2011 at 16 (June 2014), https://www.imls.gov/sites/default/files/legacy/assets/1/AssetManager/PLS2011.pdf.

Institute of Museum and Library Services, Public Libraries in the United States: Fiscal Year 2015 at viii (July 2018), https://www.imls.gov/sites/default/files/publications/documents/plsfy2015.pdf.

Institute of Museum and Library Services, Public Libraries in the United States: Fiscal year 2017 at 12 (June 2020), https://www.imls.gov/sites/default/files/publications/documents/publiclibrariesintheunitedstatessurveyfiscalyear2017volume1.pdf.

Institute of Museum and Library Services, *Public Libraries Survey* "Table 25, Total collection expenditures of public libraries and percentage distribution of expenditures, by type of expenditure and state: Fiscal year 2011" https://www.imls.gov/sites/default/files/fy2011_pls_tables_20-30a.pdf. Institute of Museum and Library Services, Public Libraries Survey "FY 2019: Table 11. Total collection expenditures of public libraries and percentage distribution of expenditures, by type of expenditure and state: Fiscal year 2019" (2021), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

Institute of Museum and Library Services, Public Libraries Survey "FY 2019: Table 26. Number of paid full-time-equivalent (FTE) staff in public libraries, by type of position; percentage of total FTE librarians and total FTE staff with ALA-MLS degrees; and number of public libraries with ALA-MLS librarians, by state: Fiscal year 2019" (2019), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

Institute of Museum and Library Services, Public Libraries Survey "FY 2019: Table 8. Total per capita operating revenues of public libraries" (2021), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

Institute of Museum and Library Services, The Use and Cost of Public Library Materials: Trends Before the COVID-19 Pandemic (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/pls_fy18.

Internet Archive, Borrowing Books Through Open Library (Sept. 13, 2021), https://openlibrary.org/help/faq/borrow#how.

Jeffrey Hess, KVPR, Kern County Libraries Face Uncertain 2017 (Dec. 20, 2016), https://www.kvpr.org/education/2016-12-20/kern-county-libraries-face-uncertain-2017.

Joan M. Reitz, ODLIS: Online Dictionary of Library and Information Science, Library, (2004), https://products.abc-clio.com/ODLIS/odlis_about.aspx.

Library Services Act, Pub. L. No. 84-597, 70 Stat. 293 (1956), https://www.govinfo.gov/content/pkg/STATUTE-70/pdf/STATUTE-70-Pg293.pdf.

Lisa M. Frehill et al., Institute of Museum and Library Services, Public Libraries Survey: Fiscal Year 2018 at 4 (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/fy2018_pls_tables.pdf.

Lisa Peet, Library Journal, Holding Pattern: Budgets and Funding (Feb. 16, 2018), https://www.libraryjournal.com/story/holding-pattern-budgets-funding.

Michael Kevane & William A. Sundstrom, The Development of Public Libraries in the United States, 1870–1930: A Quantitative Assessment. Information & Culture: A Journal of History, 117–144 (2014).

Michael Pelczar et al., Institute of Museum and Library Services, Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey at 3 (Aug, 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

Nami Sumida, San Francisco Chronicle, The Pandemic Transformed San Francisco's Libraries. This Data Shows How (Dec. 5, 2021), https://www.sfchronicle.com/sf/article/How-the-pandemic-transformed-San-Francisco-s-16667414.php.

Nick Ripatrazone, Literary Hub, InterLibrary Loan Will change Your Life (Aug. 7, 2019), https://lithub.com/interlibrary-loan-will-change-your-life/.

Institute of Museum and Library Services, Public Libraries in the United States: Fiscal Year 2015 at viii (July 2018), https://www.imls.gov/sites/default/files/publications/documents/plsfy2015.pdf.

Rebekkah Smith Aldrich, Handbook for New Public Library Directors in New York State, 18–19 (2010), http://midhudson.org/directors_handbook.pdf.

Richard W. Boss, ALAIR, Materials Handling Systems for Libraries (Sept. 7, 2010), https://alair.ala.org/bitstream/handle/11213/258/Materials%20Handling%20Systems.pdf?sequence=95.