# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

### JOINT APPENDIX (PUBLIC) – VOLUME 13 OF 26 (A-3010-A-3282)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM        ELIZABETH A. MCNAMARA
DANAE TINELLI               LINDA J. STEINMAN
SCOTT A. ZEBRAK             JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP     JESSE M. FEITEL
4530 Wisconsin Avenue, NW,  CARL MAZUREK
5th Floor                   DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016        1251 Avenue of the Americas, 21st Floor
                            New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| **Vol. 5** | | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| **Vol. 6** | | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | **Vol. 7** | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | **Vol. 16** | | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# McNamara Declaration
# Exhibit 120

# FIRST SALE UNDER TITLE 17

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## COURTS, INTELLECTUAL PROPERTY,
## AND THE INTERNET

OF THE

## COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

ONE HUNDRED THIRTEENTH CONGRESS

SECOND SESSION

JUNE 2, 2014

## Serial No. 113–98

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

U.S. GOVERNMENT PRINTING OFFICE

88–109 PDF          WASHINGTON : 2014

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov  Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104  Mail: Stop IDCC, Washington, DC 20402–0001

## COMMITTEE ON THE JUDICIARY

BOB GOODLATTE, Virginia, *Chairman*

F. JAMES SENSENBRENNER, JR.,
  Wisconsin
HOWARD COBLE, North Carolina
LAMAR SMITH, Texas
STEVE CHABOT, Ohio
SPENCER BACHUS, Alabama
DARRELL E. ISSA, California
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio
TED POE, Texas
JASON CHAFFETZ, Utah
TOM MARINO, Pennsylvania
TREY GOWDY, South Carolina
RAUL LABRADOR, Idaho
BLAKE FARENTHOLD, Texas
GEORGE HOLDING, North Carolina
DOUG COLLINS, Georgia
RON DeSANTIS, Florida
JASON T. SMITH, Missouri
[Vacant]

JOHN CONYERS, JR., Michigan
JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR.,
  Georgia
PEDRO R. PIERLUISI, Puerto Rico
JUDY CHU, California
TED DEUTCH, Florida
LUIS V. GUTIERREZ, Illinois
KAREN BASS, California
CEDRIC RICHMOND, Louisiana
SUZAN DelBENE, Washington
JOE GARCIA, Florida
HAKEEM JEFFRIES, New York
DAVID N. CICILLINE, Rhode Island

SHELLEY HUSBAND, *Chief of Staff & General Counsel*
PERRY APELBAUM, *Minority Staff Director & Chief Counsel*

————

### SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY, AND THE INTERNET

HOWARD COBLE, North Carolina, *Chairman*
TOM MARINO, Pennsylvania, *Vice-Chairman*

F. JAMES SENSENBRENNER, JR.,
  Wisconsin
LAMAR SMITH, Texas
STEVE CHABOT, Ohio
DARRELL E. ISSA, California
TED POE, Texas
JASON CHAFFETZ, Utah
BLAKE FARENTHOLD, Texas
GEORGE HOLDING, North Carolina
DOUG COLLINS, Georgia
RON DeSANTIS, Florida
JASON T. SMITH, Missouri
[Vacant]

JERROLD NADLER, New York
JOHN CONYERS, JR., Michigan
JUDY CHU, California
TED DEUTCH, Florida
KAREN BASS, California
CEDRIC RICHMOND, Louisiana
SUZAN DelBENE, Washington
HAKEEM JEFFRIES, New York
DAVID N. CICILLINE, Rhode Island
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee

JOE KEELEY, *Chief Counsel*
HEATHER SAWYER, *Minority Counsel*

(II)

# CONTENTS

————

JUNE 2, 2014

Page

OPENING STATEMENTS

The Honorable Bob Goodlatte, a Representative in Congress from the State of Virginia, and Chairman, Committee on the Judiciary ................................. 1
The Honorable Jerrold Nadler, a Representative in Congress from the State of New York, and Ranking Member, Subcommittee on Courts, Intellectual Property, and the Internet ........................................................................ 2

WITNESSES

Stephen M. Smith, President and Chief Executive Officer, John Wiley & Sons, Inc.
  Oral Testimony ......................................................................................... 6
  Prepared Statement ................................................................................. 8
John Ossenmacher, Founder and Chief Executive Officer, ReDigi
  Oral Testimony ......................................................................................... 19
  Prepared Statement ................................................................................. 21
Ed Shems, Illustrator and Graphic Designer, edfredned Illustration & Design
  Oral Testimony ......................................................................................... 39
  Prepared Statement ................................................................................. 41
Jonathan Band, Counsel, Owners' Rights Initiative
  Oral Testimony ......................................................................................... 46
  Prepared Statement ................................................................................. 48
Greg Cram, Associate Director, Copyright and Information Policy, The New York Public Library
  Oral Testimony ......................................................................................... 63
  Prepared Statement ................................................................................. 65
Matthew B. Glotzer, Media Consultant
  Oral Testimony ......................................................................................... 80
  Prepared Statement ................................................................................. 82
Sherwin Siy, Vice President, Legal Affairs, Public Knowledge
  Oral Testimony ......................................................................................... 87
  Prepared Statement ................................................................................. 89
John Villasenor, Nonresident Senior Fellow, The Brookings Institution, and Professor of Electrical Engineering and Public Policy, University of California, Los Angeles
  Oral Testimony ......................................................................................... 95
  Prepared Statement ................................................................................. 97
Emery Simon, Counselor, BSA | The Software Alliance
  Oral Testimony ......................................................................................... 108
  Prepared Statement ................................................................................. 110

APPENDIX

MATERIAL SUBMITTED FOR THE HEARING RECORD

Prepared Statement of the Association of American Publishers (AAP) .............. 138
Letter from ACT | The App Association ............................................................. 155
Prepared Statement of Sandra M. Aistars, Chief Executive Officer, Copyright Alliance ........................................................................................................ 157

(III)

IV

Page

Prepared Statement of Keith M. Kupferschmid, General Counsel and Senior Vice President, Intellectual Property Software & Information Industry Association ........................................................................................................ 166
Letter from the United Network Equipment Dealers Association (UNEDA) ..... 181
Prepared Statement of Kim Fender, Director of the Public Library of Cincinnati and Hamilton County, OH ....................................................... 182

# FIRST SALE UNDER TITLE 17

---

**MONDAY, JUNE 2, 2014**

House of Representatives

Subcommittee on Courts, Intellectual Property, and the Internet

Committee on the Judiciary

*Washington, DC.*

The Subcommittee met, pursuant to call, at 9:41 a.m., in Ceremonial Courtroom 9C, Daniel Patrick Moynihan Southern District of New York Courthouse, 500 Pearl Street, New York, New York 10007, the Honorable Bob Goodlatte (Chairman of the Committee) presiding.

Present: Representatives Goodlatte, Chaffetz, Holding, Nadler, Deutch, and Jeffries.

Staff Present: (Majority) Joe Keeley, Subcommittee Chief Counsel; Olivia Lee, Clerk; (Minority) Heather Sawyer, Chief Counsel; and Jason Everett, Counsel.

Mr. GOODLATTE. Good morning. The Subcommittee on Courts, Intellectual Property, and the Internet will come to order.

And without objection, the Chair is authorized to declare recesses of the Subcommittee at any time.

We welcome all of our witnesses today. I will begin with an opening statement.

This morning, the Subcommittee on Courts, Intellectual Property, and the Internet of the House Judiciary Committee will hold its first field hearing in our ongoing comprehensive review of our Nation's copyright rights.

First, let me thank the Southern District of New York for their willingness to host this Congressional hearing, along with the efforts of the staff of the court as well as Mr. Nadler's district staff to ensure that this hearing would be a success.

New York City is an appropriate location for this hearing. As a business hub for decades, this city has witnessed the growth of international commerce that has enabled American copyrighted works to have a positive balance of trade in our economy. As a growing eCommerce hub, this city is also at the heart of several copyright policy challenges that have arisen in the digital era. One could even say that this hearing returns to the birthplace of first sale jurisprudence.

In a 1908 decision in a case of first impression, the United States Supreme Court heard arguments involving the 1897 Copyright Act

(1)

2

between a book seller and two brothers by the names of Isidor and Nathan Straus. In the early 1900's, the Straus brothers had just opened a new location of their store nearby in Harold Square, where they sold books at a lower price than that desired by the publisher. The publisher had printed a minimum resale price directly below the copyright notice. That retailer was then and is still known today as R.H. Macy and Company.

In its 1908 decision, the Supreme Court held that the first sale doctrine prevented such conditions of sale. In the following year, the first sale doctrine was codified as Section 47 of the 1909 Copyright Act and continues today at Section 109 of Title 17.

Building upon this 1908 case and several others after that, in 2013, the Supreme Court provided additional interpretation of the first sale doctrine in the context of reimported items. The Kirtsaeng case is something we will learn more about this morning, including from the CEO of the company that was the opposing party in this case. Although some legal doctrines may be invisible to Americans, the first sale doctrine is not one of them.

First sale has been such an integral part of our economy that entire businesses have been built upon it, such as Blockbuster video stores and Netflix by mail. Consumer expectations have also been built on this doctrine. Laws and consumer expectations are developed independently, but they can help shape each other. This morning we will hear about both as they apply in the first sale context.

As digital business models have grown and in many cases supplanted analog business models, the role of licensing has become more important. From software offered at lower prices in educational settings to movies offered at lower prices for 24-hour viewing periods, licensing enables a greater range of business models that benefit consumers.

Expectations in the digital context are still developing. For example, consumers seem to have embraced business models that set a lower price for educational uses than commercial uses of software. Consumers are also accustomed to files such as apps, songs, and movies being accessible on any device on a consumer's home network at one purchase price without having to pay for multiple copies.

Consumer expectations in other areas appear to be more fluid. For example, do most consumers expect to be able to sell their digital files? One of our witnesses this morning provides such a service, but has been involved in litigation over his business model.

Finally, several of our witnesses have ongoing experience in the business-to-business context where consumer expectations do not necessarily apply. The Subcommittee looks forward to hearing their perspective on first sale as well.

In closing, the first sale doctrine is an essential part of our Nation's commerce, and understanding its impact in the digital age is something this Committee looks forward to hearing more about.

It is now my pleasure to recognize the Ranking Member of the Courts and Intellectual Property Subcommittee, Mr. Nadler of New York, for his opening statement.

Mr. NADLER. Thank you, Mr. Chairman and welcome to New York. I also want to welcome my other colleagues, Representative

3

Deutch from Florida, my colleague from New York City, Representative Jeffries, Representative Chaffetz from Utah, and Representative Holding from North Carolina. We appreciate your traveling to be with us in the greatest city in the world.

I would have liked to say, "welcome to my district." This was my district for 20 years, but my district is across the street.

I would also like to welcome and thank our witnesses and everyone else with us today. Many of you also traveled to be here today. Thank you for doing so. And welcome.

New York City is home to thousands of creators, song writers, performers, musicians, playwrights, journalists, authors, and inventors. It is the heart of the publishing industry. Some of the Nation's leading technology companies call New York City their home, or at least one of their homes. Several of the country's leading colleges and universities are located here, including my alma mater, Columbia University, and we have one of the finest public libraries in the Nation.

Given the wealth of talent, experience, and expertise in the city, it is fitting that Chairman Goodlatte chose to hold one of the Subcommittee's comprehensive Copyright Act review hearings here.

Today we explore the first sale doctrine codified in Section 109 of the Copyright Act. First sale allows the owner of a particular copy of a copyrighted work to resell or otherwise dispose of that copy without the right-holder's consent. Once a copyright owner sells or transfers ownership of a particular copy of the work, the exclusive right to distribute that particular copy is exhausted, and the person who now owns that copy is free to gift, resell, or otherwise dispose of it.

Because of first sale, I can give a book that I have purchased and read to a friend, donate it to my public library, or sell to it a secondhand book store. Our public libraries rely heavily on first sale to lend books, thus providing access to thousands of creative works that help inspire lifelong learning and greater engagement in this Nation's rich cultural and historical heritage.

First sale had its origins in a world of physical, not digital, goods. The Supreme Court first announced the doctrine in the 1908 case of *Bobbs-Merrill Company v. Straus*. And Congress first codified it in the Copyright Act of 1909. It is a gross understatement to say that much has changed since that time, more than a century ago.

Innovative technologies have made it possible to create, access and share content through digital platforms. At the same time, the marketplace for physical goods has become increasingly international, raising questions about whether the law currently strikes the proper balance between first sale and the right to control importation of one's creative works. Today's hearing gives us an opportunity to explore these critical issues.

More than a decade ago, the Copyright Office reported to Congress on the first sale doctrine in the digital age, concluding in 2001 that the first sale doctrine in Section 109 does not extend to digital works. Because first sale exhausts the right of distribution but not the right of reproduction, and because the transmission of digital works results in the creation of a new digital copy, the

4

Copyright Office concluded that first sale was not a defense to infringement for digital transmissions.

More recently, in August of last year, the Department of Commerce's Internet policy task force reached the same conclusion. The Internet policy task force also recently announced that it will conduct roundtables in Nashville, Tennessee; Cambridge, Massachusetts; Los Angeles and Berkeley, California; to discuss numerous topics, including the relevance and scope of the first sale doctrine in the digital environment. These roundtables will provide an opportunity to continue to hear from relevant stakeholders about this issue.

After concluding that Section 109 does not protect digital transmissions, the Copyright Office recommended against expanding Section 109 to do so. It noted that because a digital transmission results in a perfect copy, the market for original goods would be harmed significantly. It also raised concerns that digital distribution would introduce vast numbers of pirated copies into the marketplace. At that time, the Copyright Office also felt that the likely harm of expanding Section 109 outweighed any need for doing so.

I am interested in hearing from our witnesses today whether they believe this remains true today. Is there any greater need for expansion now? And if so, how would any changes impact copyright holders, consumers, and the existing marketplace for digital works?

In addition to exploring first sale in a digital environment, I am also interested in hearing whether the Supreme Court's recent decision in *Kirtsaeng v. John Wiley & Sons* appropriately interpreted and applied the first sale doctrine to imported goods. In that case, books manufactured and sold abroad were imported without the copyright holder's consent and resold in the United States. At issue was the interplay between the first sale doctrine and the prohibition on importation without consent of the copyright owner in Section 602 of the act.

The court ruled that the first sale doctrine applies to copies of works lawfully made abroad, and that importation and resale of such goods is therefore permissible without the copyright owner's consent. In so ruling, the court noted that book sellers, libraries, museums, and secondhand stores rely on first sale to protect them when lending or reselling copyrighted works made outside the United States.

At the same time, the court acknowledged that its ruling would make it impossible for copyright holders to produce and price works differently for domestic and foreign markets. Several amici warned that this would discourage U.S. copyright owners from competing in foreign markets at all because goods sold abroad could be imported to compete in the domestic market. They cautioned that this would harm American workers and businesses and reduce access to works, both here and abroad.

While it may be too soon to know the full impact of the *Kirtsaeng* decision, I am interested in hearing from the witnesses on how, if at all, publishers and other rights holders have modified their business practices to accommodate the ruling, the impact on consumers as well as American workers and companies, and whether any response from Congress is warranted.

5

These are just a few of the many issues that we'll begin grappling with today as part of Subcommittee's ongoing comprehensive review of the Copyright Act.

Once again, we are fortunate to have a broad range of witnesses to provide a diversity of perspectives and wide range of experience, and I look forward to hearing from them.

With that, I yield back the balance of my time. I thank you.

Mr. GOODLATTE. Thank you, Mr. Nadler.

Mr. GOODLATTE. And, without objection, other Members' opening statements will be made a part of the record.

We have a very distinguished panel today, and I will begin by swearing in our witnesses before introducing them.

So if you could all please rise.

[Witnesses sworn.]

Mr. GOODLATTE. Thank you.

Let the record reflect that all of the witnesses answered in the affirmative.

Each of the witnesses' written statements will be entered into the record in its entirety. We have an extremely large panel, nine witnesses. So I ask that each witness summarize his testimony in 5 minutes or less. To help you stay within that time, there is a timing light on your table. When the light switches from green to yellow, you will have 1 minute to conclude your testimony. When the light turns red, that's it. Your 5 minutes have expired.

Our first witness this morning is Mr. Stephen Smith, President and Chief Executive Officer of John Wiley & Sons, a global publishing company that specializes in academic publishing. Mr. Smith joined Wiley in 1992 as Vice President, where he oversaw all operations in the Asia region. He received his bachelor of science degree in psychology from Oxford Brookes University.

Our second is Mr. John Ossenmacher, Chief Executive Officer of ReDigi, the world's first marketplace for the resale of used digital goods. He holds his M.S. in economics from Trinity College and his B.S. in electromechanical engineering from Michigan State.

Our third witness is Mr. Ed Shems, founder, illustrator, and graphic designer of edfredned illustration & design. He is an award-winning graphic designer and freelance illustrator, specializing in editorial illustrations and kids books. Mr. Shems has also served as head of the Boston Graphic Artists Guild. He received his degree from Rhode Island School of Design.

Our fourth witness is Mr. Jonathan Band, Counsel for the Owners' Rights Initiative. Mr Band has long been active in intellectual property and Internet policy issues. He received his J.D. from Yale Law School and his B.A. from Harvard College.

Our fifth witness is Mr. Matthew Glotzer, a media consultant. Mr. Glotzer helped found the Digital Media Group at 20th Century Fox and spent 15 years with the company. Mr. Glotzer received his M.B.A. from Anderson School at the University of California, Los Angeles, and his B.A. in economics from Wesleyan University.

Our sixth witness is Mr. Greg Cram, Associate Director of Copyright and Information Policy for the New York Public Library. In his position, Mr. Cram assists the library in its efforts to make its collections more broadly available to researchers and the general

6

public. Mr. Cram received his J.D. from the Cardozo School of Law and his B.A. in political science from Boston University.

Our seventh witness Mr. Sherwin Siy, Vice President of Legal Affairs for Public Knowledge. Before joining Public Knowledge, he served as Staff Counsel for the Electronic Privacy Information Center, working on consumer and communications issues. Sherwin received his J.D. with a certificate in law and technology from U.C. Berkeley's Boalt Hall School of Law.

Our eighth witness today is Mr. John Villasenor, professor of electrical engineering and public policy at the University of California, Los Angeles. He is also a fellow at the Brookings Institution back in Washington, D.C. He received his Ph.D. and M.S. from Stanford University and his B.S. from the University of Virginia.

A very good school, I might add.

Our ninth witness and final witness is Mr. Emery Simon, Counselor at BSA | The Software Alliance. In his position, Mr. Simon advises BSA and its member companies on a broad range of domestic and international policy issues, including intellectual property, technology, and trade. Mr. Simon holds his J.D. from Georgetown University, his master's degree from Johns Hopkins University School of Advanced International Studies, and his bachelor's degree from Queens College.

Welcome to you all.

And we will start with you, Mr. Smith.

## TESTIMONY OF STEPHEN M. SMITH, PRESIDENT AND CHIEF EXECUTIVE OFFICER, JOHN WILEY & SONS, INC.

Mr. SMITH. Mr. Chairman, Members of the Committee, good morning.

At the risk of appearing to be the witness from the quaint old world of print, I would like to spend most of my 5 minutes talking about the impact of the *Kirtsaeng* ruling on Wiley's business, on our authors, our customers, and on the U.S. political, cultural, and economic interests around the world. I will briefly touch on the issue of digital first sale. Given that Wiley now earns 55 percent of its revenues from digital products, that is also of paramount importance to us.

I speak to you as Wiley's 11th president and CEO in our 200-year history but also as someone who has personal experience selling, publishing, and distributing books into international markets for over 35 years. I have personally spent much of my career with hands-on experience selling books in over 40 countries in Asia, the Middle East, Africa, and Latin America.

At the point when I joined the industry in the late 1970's, piracy was a major issue, and I have spent a lot of time working together with publisher associations, such as the AAP and others, on anti-piracy issues. Where available to us, we have used enforcement remedies and the law in countries where we face heavy piracy. But, of course, we also have sought to build our market by pricing differentially by offering market-based pricing to enable us to compete in international markets and serve the needs of students, teachers, and consumers in those markets.

For most of my career, we were able to depend on those copyright laws and enforcement remedies to protect our interests. We

7

were able to price differentially based on consideration of those international sales as being incremental to the overall life of a title or a publication. We were able to operate international pricing on the basis that this was a market entry strategy. We have invested heavily to create brand awareness, to create trust around our content and our products to bring the work of our authors to those markets with the expectation that as economic conditions improved around the world we would be able to benefit from that as prices increased.

The *Kirtsaeng* ruling has changed all of that. As a result of the *Kirtsaeng* ruling, we are no longer able to use enforcement remedies to protect our core markets against those who would seek to use arbitrage to create a gray market and reimport those books for commercial gain into the U.S. and European markets.

As a result, we have changed our policies, and in many cases, we are no longer operating in important emerging and international markets. We have either sought to address the challenge by moving to parity pricing, and moving to parity pricing effectively means withdrawal from certain markets, or in some markets, where we have good knowledge of the distribution network and trusted distributors, we have been able to operate on a basis of restricted access. But it means that we are selling fewer copies into those markets. And we have also sought to get around the impact of *Kirtsaeng* by creating unique and clearly differentiated international editions for specific markets. But that is a substantial, significant further investment.

So we feel that the *Kirtsaeng* ruling is not in accordance with the initial intention of Congress. It has had no benefit on pricing in the U.S. What, in fact, it has done is damage export revenues for the country. It has limited the ability of our authors to reach their audience around the world, and in many cases it has taken away valuable content from students and teachers in strategically important marketplaces where previously we were building awareness and friendship for the United States and U.S. scholarship.

So, in addition to the impact of *Kirtsaeng*, as I said, we do see digital products as being potentially a way to continue to operate in international markets, but of course, that would depend on us being able to continue to have protection for copyright for digital products in the marketplace as well. Thank you.

Mr. GOODLATTE. Thank you, Mr. Smith.

[The prepared statement of Mr. Smith follows:]

8

# WILEY

**Written Statement of**

**Stephen M. Smith**

**President and Chief Executive Officer**

**Wiley**

before the

**Subcommittee on Courts, Intellectual Property and the Internet**

**Committee on the Judiciary**

**United States House of Representatives**

**FIRST SALE UNDER TITLE 17**

June 2, 2014

New York, NY

9

Mr. Chairman, Ranking Member Nadler, Members of the Subcommittee, thank you for this opportunity to testify before the Subcommittee on the subject of the first sale doctrine in U.S. copyright law.

I am Stephen Smith, President and CEO of Wiley. Founded more than 200 years ago, Wiley has evolved from a small, family-owned printing shop to a publicly-traded global publishing corporation with revenues of $1.8 billion in which the Wiley family still retains a controlling interest and leadership of its independent board of directors. Headquartered in Hoboken, New Jersey, we serve customers in 211 countries and territories worldwide. We have 5500 employees worldwide including facilities and employees in Massachusetts, Florida, Indiana, Iowa, Arizona, Texas, Colorado, California, Minnesota, Illinois and Virginia.

Our core mission is to educate communities around the world through our publications, technologies and content-enabled solutions. Our knowledge and knowledge-enabled products and services improve outcomes in Research, Professional Development and Education.

Through our Research segment, we provide digital and print scientific, technical, medical and scholarly journals; reference works; books; database services; and advertising. Our Professional Development segment provides digital and print books, online assessment and training services, and test prep and certification. In Education, we provide print and digital content and education solutions, including online program management services for higher education institutions and course management tools for instructors and students.

We are a global company with operations around the world. Our ability to operate effectively in the global marketplace depends heavily on the protections provided by copyright law in the U.S. and in foreign markets. The copyright system plays a significant role in fostering investment in the development of new content, underpinning innovation and economic growth.

10

**THE FIRST SALE DOCTRINE**

The proper application of the first sale doctrine represents a crucial component of copyright law. It places a clear, but narrow, limit on the copyright owner's right to control the subsequent distribution of a lawfully-made physical copy of a work. This generates a number of important consumer benefits that Wiley supports, including lending and resale of such physical copies of published works. When properly applied, it also avoids interference with a copyright owner's importation rights in order to ensure that authors, publishers and other distributors of works that depend upon copyright in making these works available to the public can operate effectively in the full range of industrialized and developing world markets by implementing market-appropriate price differentials.

In 1976, intending to redress the impracticability of the unitary copyright and to create the ability for copyright owners to license separate limited rights in an original work, Congress enacted amendments to the Copyright Act to establish the principle of divisibility, along with prohibitions on unauthorized importation. In doing so, Congress established the predicates for market segmentation, allowing U.S. content owners to manage their rights efficiently by allocating them to different markets, with the understanding that the economic interests of the copyright owner are endangered if they cannot be exercised on a territorial basis. Price differentials arising from economic differences among countries are necessary to facilitate participation in diverse markets.

Both the foreign buyer and the U.S. seller benefit from market segmentation. Consumers overseas can purchase copies of copyrighted works that they value at a price that is reasonable for their market. The U.S. seller gains effective access to a market which would otherwise not sustain an unsuitably higher price point.

A-3024

11

In the U.S., the first sale doctrine – historically implemented alongside and consistent with these key concepts – did not hinder or prevent such participation in global markets and allowed the benefits of such participation to flow not just to the publisher, but to the entire value chain that creates and markets high-quality content. This chain includes skilled authors, artists, researchers, editors, production workers and marketers, in high-paying jobs that are the hallmark of our industry. Moreover, the proper application of the first sale doctrine benefits U.S. consumers as well by allowing U.S. copyright owners to recoup their investment and to extend production costs over a broader number of transactions, thereby helping to contain price increases.

The benefits are not limited to economic advantages that accrue to content creators, providers and consumers. They include less tangible but equally important social benefits that result from disseminating our high-quality and innovative content and technology. This is especially true in the case of underserved populations who would not have access to our products if we could not use local prices. We foster the global dissemination of knowledge by making our products legally available at local prices. And we believe that by doing so, we enhance the global reputation of the United States as a primary source of leading-edge, knowledge-based content.

The social benefits of market segmentation are an especially important feature of our educational products. Price differentials allow us to make legally available to students around the world materials which reflect U.S. cultural, social and political values, exposing successive generations of emerging leaders to this country's vision of a just, peaceful and prosperous world.

**THE IMPACT OF *KIRTSAENG V. WILEY***

These aspects of the U.S. copyright system, which have enabled U.S.-produced copyrighted works to so richly benefit the U.S. economy by becoming the most successful category of

12

exported U.S. products in our national export-import balance of trade,[1] were seriously undermined by the U.S. Supreme Court's split ruling in the case of *Kirtsaeng v. Wiley* in March of last year. A Thai national came to the U.S. in 1997 for university studies. While living in this country, he asked his relatives in Thailand to purchase Wiley Asia's English-language textbooks in Thai bookshops and ship them to him in the U.S., where he sold them for a profit. Printed warnings in Wiley Asia's books state that they are not to be taken into the U.S. without our permission.

In 2008, we filed suit against this illegal importation of copyrighted works. After our suit was successful in both the federal district court and court of appeals in New York, the case was eventually appealed to the Supreme Court.

In March 2013, the Court, in a split 6-3 decision, ruled that the unauthorized importation and resale of copyrighted works manufactured and intended for distribution only outside the U.S. was permissible under Sections 109(a) and 602(a)(1) of the Copyright Act. The Court's ruling destroyed a copyright owner's importation rights, creating new barriers for them to overcome in order to successfully compete in global markets.

We believe that the majority opinion in this case is inconsistent with Congressional intent, longstanding U.S. trade policy and the Court's own established practice of deferring to Congress on copyright policy.

The *Kirtsaeng* decision broadened the traditional scope of the first sale doctrine's effect from "national exhaustion" to "international exhaustion" of the copyright owner's distribution right regarding physical copies. By adopting an international exhaustion regime, the U.S. has broken from conformity with the policies of trading partners where the sale of a physical copy of a

---

[1] *Copyright Industries in the U.S. Economy: The 2013 Report*, by Stephen E. Siwek of Economists Incorporated, prepared for the International Intellectual Property Alliance (IIPA), November 2013.

13

copyrighted work outside their country does not exhaust the copyright owner's distribution right. This has created confusion and disruption in the global marketplace, lessening the availability of our products and placing us at a competitive disadvantage. As a result, the Supreme Court ruling creates a disincentive for U.S. publishers to participate in foreign markets.

In effect, the Court's ruling in favor of "international exhaustion" encourages and facilitates international arbitrage in copyrighted products, which undermines a copyright owner's ability to segment markets and establish necessary price differentials. This has unintended, adverse consequences.

In educational products, for example, allowing the importation into the U.S. of textbooks produced abroad for an overseas market is not leading to lower costs for students. Instead, publishers have either withdrawn from certain international markets completely or are obliged to work with fewer, more trusted distributors, thus lessening the availability of legitimate versions of their products in underserved foreign markets and reducing the overall number of transactions through which they can recoup their various production and dissemination costs. To prevent arbitrage, some publishers are now only offering their products abroad at higher, non-local prices which students cannot afford.

The Court's rewriting of the law in *Kirtsaeng* is also leading to a disturbing increase in piracy, another unintended consequence. As publishers lose the ability to supply non-pirated content on a price-to-market basis, former overseas customers turn to counterfeiters to fulfill their needs at prices that are sustainable in their economies. This causes a palpable increase in print piracy outside the U.S. and a higher incidence of those copies being sent into the U.S.

In addition, the ruling places upward pressure on prices. At Wiley, in order to maintain our ability to successfully participate in foreign markets, we have invested more heavily in International Student Versions (ISV) of our products. These products may be organized differently, contain different problem sets or contain other material content differences.

Page **5**

14

Preparing these products and producing a separate version of a book for the international market substantially increases our editorial, production and other costs. These higher costs, when added to the loss of foreign sales revenue, lead to higher U.S. prices. Moreover, students and educators around the world often want the U.S. version of the work, not a special international version.

Notably, two members of the Court who participated in the majority opinion in *Kirtsaeng*, Justices Kagan and Alito, indicated in their separate concurring opinion that the ruling was essentially required, based on the Court's earlier ruling in *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135 (1998), which held that the first sale doctrine limits the applicability of the Copyright Act's prohibition against unauthorized importation, and thus led the Court in *Kirtsaeng* to "unavoidably diminish" the scope of that prohibition and "limit it to a fairly esoteric set of applications."

They explained that, had the earlier decision come out the opposite way, it would have permitted a copyright owner to restrict the importation of copies irrespective of the first-sale doctrine, enabling the copyright owner to segment markets through price differentials without imposing down-stream liability on libraries or others who purchase and resell in the U.S. physical copies of the works that were manufactured abroad. Their concurrence, along with the dissenting opinion of Justices Ginsburg, Kennedy and Scalia, invites Congress to clarify the importation right and reaffirm the traditional interpretation of the first sale doctrine's effect as being one of national exhaustion, not international exhaustion.

Consistent with the concurrence of Justices Kagan and Alito, Wiley recommends that Section 602(a)(1) of the Copyright Act (as amended) be revised to clarify that "importation" is not simply a synonym for "distribution," and that the copyright owner's right to control importation is a critical aspect of U.S. international trade law and policy which, unlike the right to control the distribution of copies within the U.S., is not subject to the application of the first sale doctrine. Importation is a distinct type of distribution and an action that should be regulated

15

under the Copyright Act without limitation by the first sale doctrine. That is because Section 109, which codified the first sale doctrine, deals with selling or otherwise disposing of copies, but does not address importing them.

The reference to Section 106 in Section 602(a)(1) should be eliminated so that the language would make clear that the unauthorized importation of copies that "have been acquired outside the United States is an infringement of the copyright owner's right to import or authorize the importation of such copies or phonorecords." The first sale doctrine would then, as a general matter, apply to copies "lawfully made under this title" without regard to the place of their manufacture, whenever the owner of such copies sells or otherwise disposes of possession of them. It would not provide a defense, however, to the unauthorized importation of such copies.

In Section 602(a)(3), Congress provided for exceptions to the right to control unauthorized importation, such as importation of copies "for private use" and "not for distribution," in order to avoid adverse impacts on certain U.S. importers. The *Kirtsaeng* decision renders these exceptions essentially meaningless, since they are now subsumed in the new "rule" that non-pirated copyrighted works manufactured and sold anywhere in the world can now be imported into the U.S. without limitation.

Congress could consider whether reasonable limitations and exceptions, in addition to those already set out in Section 602(a)(3), are necessary and appropriate to mitigate concerns about possible adverse impacts on, for example, libraries and museums in the U.S., while still providing copyright owners with the legal basis for managing unauthorized importation that was the entire purpose of Section 602(a)(1). It should be noted, however, that the concurring opinion of Justices Kagan and Alito explains that such a clarification, as recommended above, would "target unauthorized importers alone" and not the libraries, used-book dealers, technology companies, consumer-goods retailers and museums whose asserted "parade of

Page 7

A-3029

16

horribles" that might have resulted from a contrary ruling so significantly influenced the majority opinion and the Court's split decision.

Although the specific issue considered in the *Kirtsaeng* case was whether the reference in Section 109(a) to copies "lawfully made under this title" carried with it an implied geographic limitation to copies made in the U.S., Congress need not change Section 109(a) to expressly create such a limitation. While that would have the desired effect of reinstating the right of copyright owners to control unauthorized importation of at least some copies of their works, it could have unintended consequences, including providing an incentive for U.S. entities to manufacture their products outside the United States. Instead, changes to Section 602(a)(1) can accomplish the goal of restoring meaningful rights to control unauthorized importation without creating such risks.

At Wiley, we have succeeded in developing markets around the world for knowledge-based content which educates communities and disseminates this country's values. The expansion of the effect of the first sale doctrine from national exhaustion to international exhaustion severely disrupts ongoing operations, undercuts decades of investment and limits our potential to expand our global footprint. I urge Congress to return the U.S. copyright system to its pre-*Kirtsaeng* state by clarifying longstanding Congressional intent through an amendment to Section 602(a)(1) of the Copyright Act.

**DIGITAL FIRST SALE**

The expansion of the effect of the first sale doctrine from national exhaustion to international exhaustion is causing unintended adverse consequences for buyers, sellers and creators of content in tangible forms, such as books. There are also proposals to extend the first sale doctrine to digital copies of copyrighted works, ignoring widespread market trends and consumer preferences favoring access rather than ownership models, as well as the critical differences between physical and digital copies.

Page **8**

A-3030

17

Wiley believes that creating a "digital first sale" would undermine existing businesses and halt the development of new businesses that use licensing to offer consumers an unprecedented variety of ways and price points for accessing and using creative content.

For example, in 2007, Wiley and four other key education publishers (Cengage Learning, Palgrave Macmillan, McGraw-Hill and Pearson) founded CourseSmart to offer students, teachers and educational institutions new ways to access digital textbooks anytime, anywhere, in the form of short-term rentals, customizable coursepacks and accessible formats, all at significantly less cost than the traditional purchase of a physical copy of the work.

A digital copy of a textbook has significantly different properties than a physical copy. Whereas the transfer of a physical copy of a book places that book in the hands of the recipient and leaves the original owner with no copy, perhaps requiring time and money, the transfer of a digital copy can be instantaneous and virtually costless. Moreover, once transferred, the physical copy will deteriorate over time, and will deteriorate more quickly the more often it is used, whereas the digital copy does not deteriorate. There is no difference between a new and a used digital copy: they complete directly in the marketplace. Lastly, producing multiple copies of a physical book would be time-consuming and expensive, but reproducing a digital copy takes little more than the click of a button.

This is true despite the claims that there are technological means of ensuring that the party who transfers a digital copy immediately deletes it and retains no copies. A robust technology of this sort would be difficult to develop and police, without seriously intruding on personal privacy, and would likely be continually subject to circumvention in the rapidly evolving digital realm.

License-based business models like CourseSmart pass the benefits of digital course materials, such as portability and durability, on to consumers such as students and teachers in a variety of

A-3031

18

cost and access models that would be significantly undermined, if not impossible to sustain, under an ownership-based model subject to the digital first sale doctrine.

In 2001, the Copyright Office produced a report for Congress analyzing the first sale doctrine in detail, including the implications of extending it to digital content transferred electronically. The Office concluded that the first sale doctrine should not apply in the digital world because doing so would unreasonably jeopardize copyright's fundamental goal of promoting the creation and dissemination of new content.  That conclusion remains valid.

I recommend that Congress reject any proposal to extend the first sale doctrine to digital copies, in order to guard against adversely impacting thriving new digital markets and business models and inhibiting the development of new ways to disseminate digital content to users.

Thank you.

_____

A-3032

19

Mr. GOODLATTE. Mr. Ossenmacher, welcome.

### TESTIMONY OF JOHN OSSENMACHER, FOUNDER AND CHIEF EXECUTIVE OFFICER, ReDigi

Mr. OSSENMACHER. Thank you, Chairman and Ranking Member Nadler and other Congressional members.

Thank you for the opportunity to testify today before the Subcommittee on an issue of significant importance to the American economy and culture and to approximately 200 million Americans who buy digital goods.

I am the founder and CEO of a company called ReDigi. Our company has been on the front lines of digital copyright and first sale doctrine, which this panel is addressing.

For those of you who are not aware of it, ReDigi started technological initiatives about 5 years ago and launched its service just over 2 years ago.

Our company has built an innovative mechanism that verifies digital ownership and authenticity. We then built a technology-enabled marketplace that allows users to transfer title of their lawfully acquired preowned digital goods to a willing buyer or charity without making copies.

American consumers have responded to ReDigi enthusiastically. They do so because of the frustration they feel, that we all feel, when we buy digital goods. When we buy a digital song from iTunes or an eBook from Amazon, we expect the same deal we have always been offered when we buy a physical book or song: to own the song or book until we are done with it and take advantage of the free market to resell it, donate it, or give it away.

Yet this deal isn't available to us from digital vendors today. So ReDigi was created to give consumers that option for digital goods and to ensure that first sale doctrine, the right to sell what you have purchased, a fundamental principle from early common law and a long mainstay of commerce, lives into the digital age.

Every year, American consumers lose billions of dollars in resale value because digital goods they lawfully purchased remained locked up on devices without a mechanism to permit them to resell or donate the books or music they no longer want simply because the goods are in digital form. That is wrong.

During the 106 years since the first sale doctrine was applied by the U.S. Supreme Court in a case involving the resale of books, the combination of case law and statutory law worked well. The balance between consumers and copyright holders began to tilt away from consumers. Consumers found they could no longer make use of software they thought they owned.

The same thing is happening now with digital books and music. Consumers are given the option to buy music, movies, and books on the screen and the "buy" button looks identical for digital and physical items alike. But in largely unintelligible legalese that no one reads, the rights of ownership are watered down or, worse, dissolved altogether. Content holders are attempting to take away a fundamental consumer choice by styling what they call long-term leases, or licenses, into their less-than-forthright marketing strategies.

20

If the consumer wants a lease, that is fine. But ownership has always been and always should remain an option. More importantly, if a transaction involves an upfront payment for a digital good, not limited in time, then it should be considered a sale. The European Court of Justice took exactly this approach to apply the principle of copyright exhaustion to cases in which a publisher sought to prevent sales of software originally licensed.

The first sale doctrine is premised on a simple concept: You bought it, you own it. And has never concerned itself on the issue of ownership with a specific format or technology, nor with the condition of the goods being sold. It establishes the legal and common-sense principle that the creator deserves to be paid once, and then the buyers and subsequent buyers have the right to resell that good, to donate it, to give it away, without further compensation to the copyright holder.

This is the status quo. It is not an extreme position. It is a logical, conservative position. It applies to every other type of good. The reason it applies to those goods are the same reasons that should apply here as well. I am always surprised when I hear, unlike paper, a book or physical medium, digital, does not get old, so we cannot allow a used market. Friends have purchased used diamonds for fiancés. From what I have been told, none of the fiancés objected. The diamonds are as perfect as they were they were first cut. Should we no longer allow a used jewelry market because the quality is too good? And, unlike books or music, the diamonds always remains in favor, regardless of the cut; whereas, with the passage of time, books, songs, may be outdated because culture has shifted, not because the paper has become tattered or yellowed or the vinyl scratched. It is the copyright item that has aged, not the method of delivery.

Those who claim first sale for digital goods would destroy the publishing industry because digital material does not deteriorate and fail to take into account an obvious and simple truth: the secondary markets have always existed and have always supported primary markets.

Mr. GOODLATTE. Thank you, Mr. Ossenmacher.

[The prepared statement of Mr. Ossenmacher follows:]

21

Ossenmacher testimony page 1

**Written Testimony of John Ossenmacher**
Founder and CEO
ReDigi
Before the House Subcommittee on the Courts, Intellectual Property
and the Internet
Hearing on: First Sale Under Title 17
June 2, 2014
New York, New York

22

Ossenmacher testimony page 2

Extended Oral Statement

Chairman Coble, Ranking Member Nadler,

Thank you for the opportunity to testify today before your Subcommittee on an issue of significant importance to the American economy, culture and to approximately 200 million American consumers.

I am the founder and CEO of a company called ReDigi. Our company has been on the front lines of digital copyright and first sale doctrine, which this panel is addressing. For those of you who are not aware of it, ReDigi, largely an MIT based team, started its technological initiatives about 5 years ago and launched its service just over two years ago.

Our company has built an innovative mechanism that verifies digital ownership and authenticity of a users digital goods (kind of a CSI for digital data) we then built a technology enabled marketplace that allows users to transfer title of their lawfully acquired, pre-owned digital goods to a willing buyer or charity without making copies.

Since our launch, American consumers have responded to ReDigi enthusiastically and signed up for our platform. They do so because of a frustration that they feel – that we all feel – when we buy digital goods. When we buy a digital song from iTunes or an e-book from Amazon, we expect the same deal we've always been offered – to own the song or book until we're done with it and then to take advantage of the free market and resell it, donate it, or give it away. Yet these digital vendors don't offer us that deal anymore; there may be a "buy" or "rent" button but there is no "resell" or "donate" button.

ReDigi was invented to give consumers that choice and that option for digital goods and to ensure that the first sale doctrine lives on into the digital age. Every year, American consumers lose billions of dollars in resale value because digital media they lawfully purchased remains locked up in devices they own and they do not have a mechanism resell or donate the books or music they no longer want simply because the content is in digital form. That is wrong.

During the 106 years since the First Sale doctrine was approved by the U.S. Supreme Court in a case involving the resale of books, the combination of court rulings and law worked well for the first 70 years or so. Then the balance between consumers and copyright holders began to tilt away from consumers, slightly at first, then more drastically as digital material like software began to become more common. Consumers found they no longer could make use of the software they thought they owned -- they were told they could only leasing it, and often had no choice in doing so.

The same thing is happening now with digital books and music. Consumers are given the option to "buy" music, movies, and books on their computer screen the buy button looks the same for digital and physical items but in the largely illegible legalese (that no one reads) the rights of ownership are watered down or worse, dissolved all-together for e-books and digital downloads.

Studies show consumers believe that they own what they buy when downloading. Content producers are attempting to take away a fundamental consumer choice by styling what they call a long term lease/license into their less than forthright marketing strategies.

If the consumer wants a lease, and any benefits that might come with it, that's fine. But ownership has been and should always remain an option as well.

The First Sale doctrine is premised on a simple concept – you bought it, you own it – and it has never concerned itself with a specific format or technology, nor with the condition of the goods being resold. It establishes the commonsense principle that the creator deserves to be paid once, and then the owners, and subsequent owners, have the right to resell that good, to donate it or to give it away.

It is not an extreme position to advocate that "you bought it, you own it." It is a logical, conservative position that adheres to the long-standing principles of law. It applies in every other type of good; it should apply here as well.

ReDigi has made progress over the years, and is loved by consumers and creators alike but our service has had its challenges as well as litigation from rights holders. It is those issues, and the industry created lack of clarity that I would like to bring to your attention.

23

Ossenmacher testimony page 3

If a consumer legally buys something do they have the right to dispose of it, donate it, resell it? The answer has historically been a resounding yes. The status quo for consumers, creators and holders is yes, consumers have had the absolute right under title 17 to resell, donate or even destroy the copyright works that they have lawfully acquired. What then is at issue?

The ability to dispose of copyright goods has always been the consumers right and has always been transparent to the method of delivery of the copyright works; ie: paper, vinyl, tape, magnetic disk. Why now is the method of delivery which has nothing at all to do with the copyright and is wholly separate from copyright just as patents/inventions are separate from copyrights, why now is the method of delivery, being considered at issue with copyright law in such a way as if it is part of the copyright itself which, if fact, it is not?

As credible as it may sound by stating that technology has made it easier to pirate copyright works and therefore copyright exclusions need to be changed it is a "red-herring" a mere smokescreen, laws already exist to punish offenders and we have all seen and read about some of the cases to which I am referring, what is really being attempted is to exclude the digital method of delivery from title 17 which would directly diminish consumers rights and the ability to protect the works from removal or deletion by societies and or government's. The exclusion of digital from Title 17 would be no different than the taking away of any property right from Americans simply because technology has changed and even improved our way of life.

But with digital the consumer can cheat the system? I believe the answer here is that copyright law already has many stringent enforcement components, as a matter of fact, copyright violations carry penalties often more stringent that criminal ones. So the argument that the ease of copying a digital file is a reason to take away the rights from law-abiding citizens is preposterous. Ease of access actually improves distribution and a sharing of artistic expression, it is the lack of value, the fact that if title 17 excludes digital that would cause greater issues with protection as consumers would feel cheated and why should they protect something that has no value. CD's are digital and actually are less protected than downloads and they are not excluded from Title 17.

Those who object and claim that first sale for digital goods would maim the publishing industry because digital material doesn't deteriorate fail to take into account three simple truths. One: technology changes and eventually becomes obsolete. Has anyone listened to an eight-track tape or cassette lately? Or tried to run a software program from the 1990s for that matter?

In summary: secondary markets have always existed. They play an important part in our economy; some people just cannot afford to buy new, some people buy knowing that what they own has resale or donation value, should these people be alienated and neglected because of technological advancement? We think not.

Digital media is a multi-billion dollar a year industry, companies wants a bigger piece of the pie, greater profits, less cost. The people want the ability to choose, the ability to own property/media, basically what they have always had, the people are not trying to change the rules or to make the playing field less level, the people are accustom to the status quo of media ownership, resale, donation, gifting, etc. there fore on behalf of consumers everywhere we ask that you do all in your power to insure these ownership/property rights and copyrights and exclusions remain mutually protected.

It is historically apparent that the intent of the law is to have all Copyright goods protected regard of their delivery formats. First sale is not about the medium in which a work is held; it is about the exhaustion of the owner's rights upon the collection of the first payment in consideration of a sale, or even a transfer of a particular copy without payment. Is a copyright good any more or less protected merely because it is on paper, rather than on tape or on plastic or on a magnetic disk, canvas or parchment? The answer is of course not.

The discussion is not, should first sale be "extended" to new forms or means of sale and distribution, but how do policymakers and lawmakers maintain the status quo for all parties? The group includes the creators the owners and the consumers in the marketplace, all of which must be served if the kind of balance and growth of the digital market envisioned by copyright law is to be achieved.

**Benefits of the First Sale Doctrine**

The benefits of the first sale doctrine make a direct and significant impact in our countries financial well-being. Billions of dollars in copyright goods are transacted by consumers each quarter, the First Sale Doctrine is what allows this secondary market to flourish and for consumers to be able to realize the value of their property and to buy and sell and then buy again. As commerce becomes more and more electronic the impact of First Sale on our countries fiscal growth will be critical. Any change in the status quo that would prevent or limit consumers from being able to realize the value of their property through

24

Ossenmacher testimony page 4

digital resale will be a significant and direct blow to our economy.

At present there are minimal benefits being realized; the few copyright monopolies that exist are doing a good job at swaying the legal system in an effort to control their revenue streams while stifling creativity and preventing the fair trade of digital goods in America. Currently, these organizations are resisting any attempt to allow consumers to realize the value of their digital property and at the same time they are controlling and suppressing the rights of the actual creators.

The potential for benefit, however, by including digital commerce, is enormous. The secondary market in physical objects, online and off, far exceeds the size of the market in new object transactions, and buying and selling goods is a way of life for most all Americans. Used Books, CDs LPs, video games, software, educational materials, artwork, and goods of almost every other kind are an important part of our everyday commerce. Hundred's of billions of dollars of used physical goods are transacted each year between buyers and sellers.

Attorney Seth Greenstein, writing in Fortune, regarding digital resale, said: "The economic implications of the first sale doctrine are enormous. According to Commerce Department figures, video rental in the United States is a $9.5 billion industry. Video game retailer GameStop (GME) reported nearly $2.4 billion in 2009 revenue from used game sales. Considering that, in just a few years, Apple (AAPL) has sold more than 10 billion music downloads, 3 billion apps, and 375 million television episodes, the future impact of the first sale doctrine could be huge."

That should be an indication of the demand. Companies like eBay, Amazon (and others like them) which also sell used things, and every used bookstore and clothing store, "previously owned" car lot, etc., in the country show there is a thriving secondary market economy.

The existence and sales of those stores, much less yard sales, which exist but probably can't be quantified, answers the last part. Everything else can be resold. Obviously, consumers are not reaping the benefits in the digital marketplace because of the perception that the law restricts the used market.

This begs the question, why are the benefits of the right of secondary sale, that are applicable to each and every other category of property in America, potentially being discriminated against and withheld from digital commerce? Where does the First Sale Doctrine exclude, prejudicially, digital goods?

By correcting and clarifying digital as part of Copyright law and the First Sale Doctrine the legitimate interests of the creator, the copyright owner, the purchaser, and the interest of society as a whole, a free and efficient digital marketplace will be realized and maximized. It is important to clarify that the first sale doctrine is independent of the medium of the copyright material and applies to all transactions properly considered to be sales, regardless of how they may be characterized by the seller.

The secondary market provides an outlet for copyright goods no longer used by their owner and provides value to that person and at the same time may make a copyright good available to someone who may not have been able to purchase the goods at the "new" price. A secondary market in digital will lessen the divide between the haves and the haves-less and will free up billions of dollars of currently locked up value on peoples personal computers and devices.

**The opportunities for multiple use are severely limited**

Amazon allows you to loan one book one time only, for 14 days. It must be read either on Kindle or on a device with the Kindle software. Amazon has a Kindle Owners Lending Library, with the following terms: The Kindle Owners' Lending Library is available to Amazon Prime members—paid Amazon Prime, paid Amazon Student, 30-day free trial, and customers receiving a free month of Prime benefits with a Kindle Fire device—who own a Kindle device. The Lending Library features over 350,000 titles, including many New York Times bestsellers. Books borrowed from the Lending Library have no due date and can be delivered to other Kindle devices registered to your Amazon account.

Books that are borrowed from the Kindle Owners' Lending Library can be read only on Kindle devices. There are some startups that want to get into the business, but none has made a splash. Scribd, the document service, has announced a plan to get into the business as well.

25

Ossenmacher testimony page 5

Apple does now allow lending and limited sharing is allowed within iTunes accounts.

As an additional point, there often seems to be an assumption that the first sale doctrine somehow implies a "fire sale" in "used goods"; this is also incorrect. Not everyone buys "used" because it is "less-than-full-price". Often older classics or limited editions are worth substantially more than new versions; with today's technology this type of collectability is also a reality.

It is ironic then that good companies like ReDigi who have made sure that legally obtained digital goods can be resold in a very controlled manner have been sued by monopolistic interests motivated by the same instincts that would close all used record stores, flea markets and similar outlets for the legitimate resale of used goods. The justice system needs guidance to prevent such injustices and the damage being caused to legitimate market interests.

**The Future of a Digital Secondary Market**

If the market does not currently provide such opportunities, will it do so in the near future? If not, are there alternative means to incorporate the benefits of the first sale doctrine in the digital marketplace? How would adoption of those alternatives impact the markets for copyrighted works?

Opportunities are extremely limited and complex today so, yes; let's hope legal clarification will come from our lawmakers in the near future to clarify our laws and to help prevent manipulation, in an ever increasingly digital world. Digital is just another medium of delivery and it would appear that the Copyright Act would benefit from an explicit recognition of first sale principles in the digital context, especially given technology available today that facilitates compliance by users.

An update to de-emphasize the role of "reproduction" in a controlled transfer of a digital good, not unlike that forged by the European Court of Justice in its software decision, would go far to reinstate the legitimate balance between the copyright owner's interest and that of the consumer that characterized the copyright world for all time before the emergence of digital commerce.

Such adoption/clarification of Digital First Sale, would greatly expand the markets for copyright works in all areas; purchase, resale, gifting, donation, etc. Ownership should be ownership and paper, plastic, disk or digital all should have the same rights and opportunities in the marketplace. To suggest alternatives is to divorce artificially the long-held right of alienation of property from the essential bundle of property rights recognized by centuries of common law, to the great detriment of both the creator and the consumer (even if it sometimes seems counterintuitive to copyright owners).

Certainly large companies recognize the potential for a digital secondary market, as Amazon and Apple have filed for patents (and Amazon has received one) for methods for a secondary market.

In its application for a patent for a secondary market for digital objects, Amazon said:
"As use of digital objects increases, users may wish to transfer the digital objects to other users. These transfers may include a sale, a rental, a gift, a loan, a trade, etc. ... A secondary market which allows users to effectively and permissibly transfer 'used' digital objects to others while maintaining scarcity is therefore desired."

Apple has filed for a similar patent, also recognizing the potential benefits of such a system. However, it is unlikely that either will come to fruition unless the law is changed to back to the first principles of first sale.

**A Brief History of First Sale**

The concept of First Sale was established by the U.S. Supreme Court in Bobbs-Merrill v Straus in 1908, and codified the next year by Congress. At the time, the law read, "'nothing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained."

The big change came in 1976 when the law was rewritten to center on the owner of the copy. Sec. 109 defines first sale, "...the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner to sell or otherwise dispose of the possession of that copy or phonorecord."

University of North Carolina Law Professor Anne Klinefelter, writing in Information Outlook in May, 2001, described what

26

Ossenmacher testimony page 6

came next: "When software entered the picture and was recognized as a proper subject for the copyright, copyright owners focused new energies on avoiding the first sale doctrine's limitations on their control over each copy sold.

In 1990 Congress passed the Software Rental Amendments Act in response to software publishers' concerns that sales of their products were diminished by the development of a secondary market that would rent the software to other users. This amendment narrowed first sale rights significantly by forbidding the renting or lending of computer programs, providing an exception only for nonprofit libraries serving a nonprofit need."

The test case came the next year, in Step-Saver Data Sys., Inc. v. Wyse Tech, in the Third Circuit U.S. Court of Appeals. On the surface, the case dealt with box-top licensing of software, but the court also made an astute observation about the use of licenses: "When these form licenses were first developed for software, it was, in large part, to avoid the federal copyright law first sale doctrine."

The court wrote: "By characterizing the original transaction between the software producer and the software rental company as a license, rather than a sale, and by making the license personal and non-transferable, software producers hoped to avoid the reach of the first sale doctrine." 7
The result is the system of e-books and digital music that we have today. Where some sellers of digital music and e-books surreptitiously characterized their products as licensees, although few people had any idea that it was not a normal and typical purchase.

The European Court of Justice in the Oracle case said that copyright holders who "license" downloaded software without a time limit on use are deemed to "sell" it, leaving the purchaser free to re-sell it as long as the purchaser takes necessary steps to destroy any additional copies. In short, the Court recognized the applicability of the exhaustion principle to downloaded software, without erecting an insurmountable technological obstacle to the "reproduction" deemed to occur in the act of effecting the transfer. Rather, pay for a single instance, sell a single instance, pay for multiple instances, and sell multiple instances. European creators and consumers have welcomed this clarification of digital rights and significant increases in revenue are expected for all. The secondary market always has supported the primary market--market dynamics 101.

Because the "seller" controls the content, situations can arise as in 2009 in which Amazon deleted copies of George Orwell's "1984" on the Kindle devices of customers. After an outcry, Amazon said it wouldn't do such a thing again.

Yet, a similar case emerged in Europe in which a woman in Norway, where Amazon did not operate, purchased a Kindle in the U.K. When the device acted up, Amazon replaced it once. When the replacement developed a problem, she tried again and found her account, and all her books, had been wiped out for an unexplained violation of Amazon's policies.

Clearly, that could not have happened if she owned the books on the device. Instead, she was an unwilling lessee.

Clearly, as the companies try to amend the law including digital music or e-books is at risk. Reverting to the 1908 definitions would be one way to do it. Another would be to adapt first-sale requirements to meet the expectations of consumers. If a consumer wishes to lease, he may do so. If she wishes to buy, she may do so. It is technically possible to do those things easily enough, and to make certain the original copy is deleted if indeed there is a sale. But make sure that it is transparent to the consumer what they are actually getting and make sure that whatever it is complies with the law.

Such a protocol would have a positive affect at all on the markets for copyrighted works. As shown, the secondary market for video games is going strong, as is the original sale of games, which is actually supported by wealth created by the consumer's secondary sale. A healthy secondary market would develop just as it has in books or in physical music CDs.

Concerns that electronic content does not degrade over time, particularly when concerning e-books, are misplaced. The content may not degrade, but public tastes change. A book or song popular today will be an afterthought next year --except to the person looking for it or the person looking to sell it and nowhere in copyright law was condition contemplated.

**Consideration of New Technologies**

The fundamental issues in the Green Paper inquiry are what has changed since the Copyright Office's 2001 report and, as

A-3040

27

Ossenmacher testimony page 7

importantly, what has not.

Yes, there are substantial changes in technological capabilities. However, the Copyright Office may have been under-reaching in 2001 by simply not clarifying that digital delivery of a copyright good carries all of the same protections and exclusions as a physical delivery method and cleaning up definitions like reproduction and phonorecord.

This would have helped prevent special interests from creating confusion regarding those terms and as to how they should be interpreted in the digital age.

And yes, technology has evolved significantly in the past 12 years in such a way that business and society are even more able to provide copyright protections to digital goods that are far superior to even those protections available for their non-digital counterparts. It is important to note that the fact remains; existing law provides ample remedies to discourage piracy without the need to erect artificial barriers to a legitimate secondary market where participants can innovate and implement systems to prevent copyright abuse.

Furthermore, systems now exist that allow digital files to be secured without device digital rights management (DRM) schemas and provide the transfer of single instances of those protected files, while rendering ancillary copies inoperable. Limited editions are a reality now. Forensic analysis for removal of pirated goods is a reality now, as well as, technologies that provide ongoing monitoring of resold items.

Instantaneous transactions, where copies are never made as part of a transaction between a buyer and seller, eliminated the need for old-fashioned "forward and delete" methods. The technology described is in use and exists today that has surpassed the forward and delete methods.

At the same time, the market place has clearly changed since the original report. Digital materials are now mainstream. Music and books in digital form have become the norm. In that sense, they deserve to be treated much as a book was in the original first sale case, Bobbs-Merrill.

Look at the trends over the years. When the 2001 report was issued, compact discs (CD) accounted for almost 94 percent of revenues in the music business. The cassette was in the final throes of its demise. Downloading of singles and albums wasn't even a blip on the charts, according to data compiled by the Recording Industry Association of America (RIAA). It wasn't until 2004 that downloading even appeared, and the downloading of singles accounted for 1.1 percent of revenue, and downloading of albums for 0.4 percent.

The International Federation of the Phonographic Industry (IFPI) in 2004 issued its first "Online Music Report." One highlight was the 2003 emergence of iTunes, which sold 25 million downloads by mid-December of that year. Ten years later, customer have downloaded 25 billion songs worldwide. The IFPI reported there were between 400,000 and 500,000 tracks available to consumers. Now, consumers have a choice of 26 million – and that is from iTunes alone.

As a result of the growth in legal downloading sources, the technology by which consumers received music continued to evolve. Cassettes disappeared. In 2010, CDs for the first time accounted for less than half of industry revenue. In 2012, CDs accounted for 35.8 percent of revenue, while downloaded songs were 23 percent and downloaded albums were 17.1 percent. Streaming entered the picture in 2005, and now accounts for 8.1 percent of revenue.

The RIAA reported that U.S. revenue from digital formats passed the $4 billion mark in 2012, accounting for about 60 percent "Industry revenues from digital formats continued to grow, and in 2012 surpassed $4 billion for the first time, accounting for about 60 percent of the total market in the U.S. After having crossed the 50 percent mark the year before. Digital downloads of songs accounted for $2.9 billion in revenue in 2012, while digital album downloads were just over $1 billion, according to RIAA's publication "News and Notes on 2012 RIAA Music Industry Shipment and Revenue Statistics."

The curve for e-books is even steeper. According to the Association of American Publishers, digital books accounted for .005% of publisher net revenue in 2002, the year after the Copyright Office report was issued.

By 2009, digital trade books were only 7 percent of the total. In 2012, after the introduction of many new tablets and e-readers, e-books accounted for 22.55 percent of net revenue. The trade books sector, which includes adult fiction and non-

28

Ossenmacher testimony page 8

fiction, young adult, children's and religious books, was worth $7.1 billion last year.

Trends for e-book reading are accelerating, according to the Pew Research Center. In a June 25, 2013 report, 23 percent of Americans age 16 and over read an e-book in 2012, up from 16 percent in 2011. for readers age 16-17, the percentage doubled from 2011 to 2012, from 12 percent to 25 percent.
In the public's mind, their digital music and e-books are interchangeable with traditional phonorecords and printed books, and the copyright law should recognize that evolution and maintain that status quo.
At the same time as the consumer market and expectation have rapidly changed, certain technological realities and their accompanying statutes have not.

The Copyright Office was correct in 2001 to recognize that a change was needed to the definition in Sec. 101. The Office said: "We recommend that Congress enact legislation amending the Copyright Act to preclude any liability arising from the assertion of a copyright owner's reproduction right with respect to temporary buffer copies that are incidental to a licensed digital transmission of a public performance of a sound recording and any underlying musical work."

The recommendation was based on the completely sound observation that: "The economic value of licensed streaming is in the public performances of the musical work and the sound recording, both of which are paid for. The buffer copies have no independent economic significance." A buffer copy is created every time anything is downloaded. It exists for less than a second, yet this ephemeral collection of bits is holding up the creation and development of vast new markets for the resale of digital material that would benefit consumers and booksellers alike.

As an integral part of recommending a new first-sale doctrine, the Office should again make its recommendations regarding temporary buffer copies and a better definition of reproduction. This time, however, it should be in the context of the creation of a new digital age in which commerce is conducted and include the technology sector in drafting these updated note sole the copyright sector that is looking only to protect their self interest.

Also in 2001 the Copyright Office observed that a digital transmission creates a perfect copy of the work, which could both negatively affect the development of the digital marketplace and fuel piracy.

It has become quite obvious that any protection of copyright goods presumed to follow from the Copyright Office's recommended position proved to be wholly illusory; digital piracy in the past decade has been rampant with, for example, numbers of greater that 80% of digital music downloads being from pirated sources.

The failure of the Copyright Act and its amendments to protect creators in the digital age by providing a mechanism of "value" for the digital goods being distributed in secondary transactions has proved, perhaps counter-intuitively, extremely harmful to the creators (not necessarily the copyright owners who are most often different from the creators themselves).

Many file sharers have openly stated "Why should I buy it when as soon as I do, the file I purchase has zero economic value." Never before in the history of property in the United States has a group of powerful monopolies so controlled the legal rights of both creators and consumers. Today there is not a balance between the interests of copyright owners and consumers (a hallmark of every non-digital marketplace in copyrighted goods). Absent digital first sale there is no longer incentive for creators to create or buyers to protect their copyright goods in the current broken digital system.

A system where the few copyright mammoths are permitted to twist the *intent and interpretation of "reproduction" and the common law of exhaustion*—which is the earliest enunciations of the first sale doctrine—they do so simply in order to protect their personal copyright monopolies in the rapidly expanding digital marketplace. This needs to be corrected.

Section III.  Title 17 allows digital first sale

There is no question that Title 17 even as written allows for first sale of digital goods.  The underlined text proves that conclusively.

**HIGHLIGHTED POINTS IN: 17 U.S. Code § 109 - Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord**

29

Ossenmacher testimony page 9

(a) Notwithstanding the provisions of section 106 (3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord. Notwithstanding the preceding sentence, copies or phonorecords of works subject to restored copyright under section 104A that are manufactured before the date of restoration of copyright or, with respect to reliance parties, before publication or service of notice under section 104A (e), may be sold or otherwise disposed of without the authorization of the owner of the restored copyright for purposes of direct or indirect commercial advantage only during the 12-month period beginning on—

(1) the date of the publication in the Federal Register of the notice of intent filed with the Copyright Office under section 104A (d)(2)(A), or

(2) the date of the receipt of actual notice served under section 104A (d)(2)(B),

whichever occurs first.

(b)

(1)

(A) Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording or the owner of copyright in a computer program (including any tape, disk, or other medium embodying such program), and in the case of a sound recording in the musical works embodied therein, neither the owner of a particular phonorecord nor any person in possession of a particular copy of a computer program (including any tape, disk, or other medium embodying such program), may, for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord or computer program (including any tape, disk, or other medium embodying such program) by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution. The transfer of possession of a lawfully made copy of a computer program by a nonprofit educational institution to another nonprofit educational institution or to faculty, staff, and students does not constitute rental, lease, or lending for direct or indirect commercial purposes under this subsection.

(B) This subsection does not apply to—

(i) a computer program which is embodied in a machine or product and which cannot be copied during the ordinary operation or use of the machine or product; or

(ii) a computer program embodied in or used in conjunction with a limited purpose computer that is designed for playing video games and may be designed for other purposes.

(C) Nothing in this subsection affects any provision of chapter 9 of this title.

(2)

(A) Nothing in this subsection shall apply to the lending of a computer program for nonprofit purposes by a nonprofit library, if each copy of a computer program which is lent by such library has affixed to the packaging containing the program a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

(B) Not later than three years after the date of the enactment of the Computer Software Rental Amendments Act of 1990, and at such times thereafter as the Register of Copyrights considers appropriate, the Register of Copyrights, after consultation with representatives of copyright owners and librarians, shall submit to the Congress a report stating whether this paragraph has achieved its intended purpose of maintaining the integrity of the copyright system while providing nonprofit libraries the capability to fulfill their function. Such report shall advise the Congress as to any information or recommendations that the Register of Copyrights considers necessary to carry out the purposes of this subsection.

(3) Nothing in this subsection shall affect any provision of the antitrust laws. For purposes of the preceding sentence, "antitrust laws" has the meaning given that term in the first section of the Clayton Act and includes section 5 of the Federal Trade Commission Act to the extent that section relates to unfair methods of competition.

(4) Any person who distributes a phonorecord or a copy of a computer program (including any tape, disk, or other medium embodying such program) in violation of paragraph (1) is an infringer of copyright under section 501 of this title and is subject to the remedies set forth in sections 502, 503, 504, and 505. Such violation shall not be a criminal offense under section 506 or cause such person to be subject to the criminal penalties set forth in section 2319 of title 18.

30

Ossenmacher testimony page 10

(c) Notwithstanding the provisions of section 106 (5), the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located.

(d) The privileges prescribed by subsections (a) and (c) do not, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it.

(e) Notwithstanding the provisions of sections 106 (4) and 106 (5), in the case of an electronic audiovisual game intended for use in coin-operated equipment, the owner of a particular copy of such a game lawfully made under this title, is entitled, without the authority of the copyright owner of the game, to publicly perform or display that game in coin-operated equipment, except that this subsection shall not apply to any work of authorship embodied in the audiovisual game if the copyright owner of the electronic audiovisual game is not also the copyright owner of the work of authorship.

(Pub. L. 94–553, title I, § 101,Oct. 19, 1976, 90 Stat. 2548; Pub. L. 98–450, § 2,Oct. 4, 1984, 98 Stat. 1727; Pub. L. 100–617, § 2,Nov. 5, 1988, 102 Stat. 3194; Pub. L. 101–650, title VIII, §§ 802, 803,Dec. 1, 1990, 104 Stat. 5134, 5135; Pub. L. 103–465, title V, § 514(b),Dec. 8, 1994, 108 Stat. 4981; Pub. L. 105–80, § 12(a)(5),Nov. 13, 1997, 111 Stat. 1534; Pub. L. 110–403, title II, § 209(a)(1),Oct. 13, 2008, 122 Stat. 4264.)

Historical and Revision Notes

house report no. 94–1476

Effect on Further Disposition of Copy or Phonorecord Section 109 (c) restates and confirms the principle that, where the copyright owner has transferred ownership of a particular copy or phonorecord of a work, the person to whom the copy or phonorecord is transferred is entitled to dispose of it by sale, rental, or any other means. Under this principle, which has been established by the court decisions and section 27 of the present law [section 27 of former title 17], the copyright owner's exclusive right of public distribution would have no effect upon anyone who owns "a particular copy or phonorecord lawfully made under this title" and who wishes to transfer it to someone else or to destroy it.

Thus, for example, the outright sale of an authorized copy of a book frees it from any copyright control over its resale price or other conditions of its future disposition. A library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose. This does not mean that conditions on future disposition of copies or phonorecords, imposed by a contract between their buyer and seller, would be unenforceable between the parties as a breach of contract, but it does mean that they could not be enforced by an action for infringement of copyright. Under section 202 however, the owner of the physical copy or phonorecord cannot reproduce or perform the copyrighted work publicly without the copyright owner's consent.

To come within the scope of section 109 (a), a copy or phonorecord must have been "lawfully made under this title," though not necessarily with the copyright owner's authorization. For example, any resale of an illegally "pirated" phonorecord would be an infringement, but the disposition of a phonorecord legally made under the compulsory licensing provisions of section 115 would not.

Effect on Display of Copy. Subsection (b) ofsection 109 deals with the scope of the copyright owner's exclusive right to control the public display of a particular "copy" of a work (including the original or prototype copy in which the work was first fixed). Assuming, for example, that a painter has sold the only copy of an original work of art without restrictions, would it be possible for him to restrain the new owner from displaying it publicly in galleries, shop windows, on a projector, or on television?

Section 109 (b) adopts the general principle that the lawful owner of a copy of a work should be able to put his copy on public display without the consent of the copyright owner. As in cases arising under section 109 (a), this does not mean that contractual restrictions on display between a buyer and seller would be unenforceable as a matter of contract law.

The exclusive right of public display granted by section 106 (5) would not apply where the owner of a copy wishes to show it directly to the public, as in a gallery or display case; or indirectly, as through an opaque projector. Where the copy itself is intended for projection, as in the case of a photographic slide, negative, or transparency, the public projection of a single image would be permitted as long as the viewers are "present at the place where the copy is located."

On the other hand, section 109 (b) takes account of the potentialities of the new communications media, notably television, cable and optical transmission devices, and information storage and retrieval devices, for replacing printed copies with visual images. First of all, the public display of an image of a copyrighted work would not be exempted from copyright

31

Ossenmacher testimony page 11

control if the copy from which the image was derived were outside the presence of the viewers. In other words, the display of a visual image of a copyrighted work would be an infringement if the image were transmitted by any method (by closed or open circuit television, for example, or by a computer system) from one place to members of the public located elsewhere.

Moreover, the exemption would extend only to public displays that are made "either directly or by the projection of no more than one image at a time." Thus, even where the copy and the viewers are located at the same place, the simultaneous projection of multiple images of the work would not be exempted. For example, where each person in a lecture hall is supplied with a separate viewing apparatus, the copyright owner's permission would generally be required in order to project an image of a work on each individual screen at the same time.

The committee's intention is to preserve the traditional privilege of the owner of a copy to display it directly, but to place reasonable restrictions on the ability to display it indirectly in such a way that the copyright owner's market for reproduction and distribution of copies would be affected. Unless it constitutes a fair use under section 107, or unless one of the special provisions of section 110 or 111 is applicable, projection of more than one image at a time, or transmission of an image to the public over television or other communication channels, would be an infringement for the same reasons that reproduction in copies would be. The concept of "the place where the copy is located" is generally intended to refer to a situation in which the viewers are present in the same physical surroundings as the copy, even though they cannot see the copy directly.

Effect of Mere Possession of Copy or Phonorecord.Subsection (c) ofsection 109 qualifies the privileges specified in subsections (a) and (b) by making clear that they do not apply to someone who merely possesses a copy or phonorecord without having acquired ownership of it. Acquisition of an object embodying a copyrighted work by rental, lease, loan, or bailment carries with it no privilege to dispose of the copy under section 109 (a) or to display it publicly under section 109 (b). To cite a familiar example, a person who has rented a print of a motion picture from the copyright owner would have no right to rent it to someone else without the owner's permission.

Burden of Proof in Infringement Actions. During the course of its deliberations on this section, the Committee's attention was directed to a recent court decision holding that the plaintiff in an infringement action had the burden of establishing that the allegedly infringing copies in the defendant's possession were not lawfully made or acquired under section 27 of the present law [section 27 of former title 17]. American International Pictures, Inc. v. Foreman, 400 F.Supp. 928 (S.D.Alabama 1975). The Committee believes that the court's decision, if followed, would place a virtually impossible burden on copyright owners. The decision is also inconsistent with the established legal principle that the burden of proof should not be placed upon a litigant to establish facts particularly within the knowledge of his adversary. The defendant in such actions clearly has the particular knowledge of how possession of the particular copy was acquired, and should have the burden of providing this evidence to the court. It is the intent of the Committee, therefore, that in an action to determine whether a defendant is entitled to the privilege established by section 109 (a) and (b), the burden of proving whether a particular copy was lawfully made or acquired should rest on the defendant.

References in Text

The date of the enactment of the Computer Software Rental Amendments Act of 1990, referred to in subsec. (b)(2)(H), is the date of enactment of Pub. L. 101–650, which was approved Dec. 1, 1990.

The first section of the Clayton Act, referred to in subsec. (b)(3), is classified to section 12 of Title 15, Commerce and Trade, and section 53 of Title 29, Labor. The term "antitrust laws" is defined in section 12 of Title 15.

Section 5 of the Federal Trade Commission Act, referred to in subsec. (b)(3), is classified to section 45 of Title 15.

Amendments

2008—Subsec. (b)(4). Pub. L. 110–403substituted "and 505" for "505, and 509".

1997—Subsec. (b)(2)(B). Pub. L. 105–80substituted "Register of Copyrights considers appropriate" for "Register of Copyright considers appropriate".

1994—Subsec. (a). Pub. L. 103–465inserted at end "Notwithstanding the preceding sentence, copies or phonorecords of

32

Osenmacher testimony page 12

works subject to restored copyright under section 104A that are manufactured before the date of restoration of copyright or, with respect to reliance parties, before publication or service of notice under section 104A (e), may be sold or otherwise disposed of without the authorization of the owner of the restored copyright for purposes of direct or indirect commercial advantage only during the 12-month period beginning on—

"(1) the date of the publication in the Federal Register of the notice of intent filed with the Copyright Office under section 104A (d)(2)(A), or

"(2) the date of the receipt of actual notice served under section 104A (d)(2)(B),

whichever occurs first."

1990—Subsec. (b)(1). Pub. L. 101–650, § 802(2), added par. (1) and struck out former par. (1) which read as follows: "Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording and in the musical works embodied therein, the owner of a particular phonorecord may not, for purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution."

Subsec. (b)(2), (3). Pub. L. 101–650, § 802(1), (2), added par. (2) and redesignated former pars. (2) and (3) as (3) and (4), respectively.

Subsec. (b)(4). Pub. L. 101–650, § 802(3), added par. (4) and struck out former par. (4) which read as follows: "Any person who distributes a phonorecord in violation of clause (1) is an infringer of copyright under section 501 of this title and is subject to the remedies set forth in sections 502, 503, 504, 505, and 509. Such violation shall not be a criminal offense under section 506 or cause such person to be subject to the criminal penalties set forth in section 2319 of title 18."

Pub. L. 101–650, § 802(1), redesignated par. (3) as (4).

Subsec. (e). Pub. L. 101–650, § 803, added subsec. (e).

1988—Subsec. (d). Pub. L. 100–617substituted "(a) and (c)" for "(a) and (b)" and "copyright" for "coyright".

1984—Subsecs. (b) to (d). Pub. L. 98–450added subsec. (b) and redesignated existing subsecs. (b) and (c) as (c) and (d), respectively.

Effective Date of 1990 Amendment

Pub. L. 101–650, title VIII, § 804,Dec. 1, 1990, 104 Stat. 5136, as amended by Pub. L. 103–465, title V, § 511,Dec. 8, 1994, 108 Stat. 4974, provided that:

"(a) In General.—Subject to subsection (b), this title [amending this section and enacting provisions set out as notes under sections 101 and 205 of this title] and the amendments made in section 802 [amending this section] shall take effect on the date of the enactment of this Act [Dec. 1, 1990]. The amendment made by section 803 [amending this section] shall take effect one year after such date of enactment.

"(b) Prospective Application.—Section 109 (b) of title 17, United States Code, as amended by section 802 of this Act, shall not affect the right of a person in possession of a particular copy of a computer program, who acquired such copy before the date of the enactment of this Act [Dec. 1, 1990], to dispose of the possession of that copy on or after such date of enactment in any manner permitted by section 109 of title 17, United States Code, as in effect on the day before such date of enactment.

"(c) Termination.—The amendments made by section 803 shall not apply to public performances or displays that occur on or after October 1, 1995."

Effective Date of 1984 Amendment

Pub. L. 98–450, § 4,Oct. 4, 1984, 98 Stat. 1728, as amended by Pub. L. 100–617, § 1,Nov. 5, 1988, 102 Stat. 3194; Pub. L. 103–182, title III, § 332,Dec. 8, 1993, 107 Stat. 2114, provided that:

"(a) The amendments made by this Act [amending this section and section 115 of this title and enacting provisions set out as

33

Ossenmacher testimony page 13

a note under section 101 of this title] shall take effect on the date of the enactment of this Act [Oct. 4, 1984].

"(b) The provisions of section 109 (b) of title 17, United States Code, as added by section 2 of this Act, shall not affect the right of an owner of a particular phonorecord of a sound recording, who acquired such ownership before the date of the enactment of this Act [Oct. 4, 1984], to dispose of the possession of that particular phonorecord on or after such date of enactment in any manner permitted by section 109 of title 17, United States Code, as in effect on the day before the date of the enactment of this Act."

[Amendment by Pub. L. 103–182 to section 4 of Pub. L. 98–450, set out above, effective on the date the North American Free Trade Agreement enters into force with respect to the United States [Jan. 1, 1994], see section 335 of Pub. L. 103–182, set out as an Effective Date of 1993 Amendment note under section 1052 of Title 15, Commerce and Trade.]

Evaluation of Impact of Copyright Law and Amendments on Electronic Commerce and Technological Development

Pub. L. 105–304, title I, § 104, Oct. 28, 1998, 112 Stat. 2876, provided that:

"(a) Evaluation by the Register of Copyrights and the Assistant Secretary for Communications and Information.—The Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce shall jointly evaluate—

"(1) the effects of the amendments made by this title [enacting chapter 12 of this title and amending sections 101, 104, 104A, 411, and 507 of this title] and the development of electronic commerce and associated technology on the operation of sections 109 and 117 of title 17, United States Code; and

"(2) the relationship between existing and emergent technology and the operation of sections 109 and 117 of title 17, United States Code.

"(b) Report to Congress.—The Register of Copyrights and the Assistant Secretary for Communications and Information of the Department of Commerce shall, not later than 24 months after the date of the enactment of this Act [Oct. 28, 1998], submit to the Congress a joint report on the evaluation conducted under subsection (a), including any legislative recommendations the Register and the Assistant Secretary may have."

**The legal background and case analysis:**
**THE FIRST SALE DOCTRINE SHOULD PROTECT THE RESALE OF DIGITAL MUSIC AND OTHER DIGITAL GOODS**

It is ReDigi's position that the First Sale Doctrine should apply to digital music, books and other digital files in the same way that it applies to physical goods. Similarly the First Sale Doctrine should protect the provisioning of market place for the re-sale of lawfully purchased digital music and other lawfully purchased digital goods, in the same way that the First Sale Doctrine protects second hand book or CD or record stores.

**I.    FIRST SALE DOCTRINE APPLIES TO DIGITAL SOUND RECORDINGS**

A "phonorecord" as defined in the Copyright Act includes digital music files and as such Section 109 should be applied to digital files in the same way it is applied to traditional physical phonorecords.  Section 109 entitled "Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord" provides that notwithstanding the exclusive rights of copyright owners:

**the owner of** a particular copy or **phonorecord[1] lawfully made** under this title, or any person authorized by such owner, **is entitled, without the authority of the copyright owner, to sell** or otherwise dispose of the possession of **that copy or**

---

[1] Phonorecords are defined as "material objects in which sounds . . . are **fixed** by any **method now known or later developed**, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." (Emphasis Added). *Id.* at §101.

34

Ossenmacher testimony page 14

**phonorecord.** (Emphasis Added). *See* 17 U.S.C. §109(a).

There is no question that digital music files qualify under the definition of "phonorecord" in the Copyright Act. Other Courts have consistently premised findings on the fact that digital music files were "phonorecords" within the meaning of the Copyright Act. *See e.g. London-Sire Records, Inc. v. Doe 1*, 542 F. Supp. 2d 153, 171 (D. Mass. 2008) ("any object in which a sound recording can be fixed is a 'material object' . . . that includes the electronic files.").

As such, to the extent, digital music is purchased from an authorized retailer, such as iTunes, in digital form, and becomes the legal owner of a particular copy and/or phonorecord in digital form that person is the owner of a phonorecord or particular copy lawfully made under the Copyright Act. Thus in accordance with the provisions of Section 109, that individual is entitled to sell or otherwise dispose of the possession of that phonorecord or that particular copy. *See* 17 U.S.C. § 109.

## II. POTENTIAL INTERPRETATIONS OF THE COPYRIGHT ACT

On March 31, 2013, in the case *Capitol Records, LLC v. ReDigi Inc.*, 12 Civ. 95, which is currently pending in the United States District Court for the Southern District of New York, the Honorable Richard J. Sullivan, by his Memorandum and Decision on the parties cross motions for summary judgment, rejected ReDigi's argument that its marketplace was protected by the First Sale Doctrine. Specifically, Judge Sullivan found that "[b]ecause the reproduction right is necessarily implicated when a copyrighted work is embodied in a new material object, and because digital music files must be embodied in a new material object following their transfer over the internet, the Court determines that the embodiment of a digital music file on a new hard disk is a reproduction within the meaning of the Copyright Act." 3/31/13 Memorandum and Order at p. 6. The Court concluded that since "ReDigi's service violates . . . [the] reproduction right, the first sale defense does not apply to ReDigi's infringement of those rights." With respect to the distribution right the Court held that and that because by transferring a music file over the internet ReDigi necessarily 'reproduces' the phonorecord a music file migrated through ReDigi 1.0 and sold on ReDigi is not "lawfully made under this title". 3/31/13 Memorandum and Order at p. 11. Judge Sullivan stated as follows:

[A] ReDigi user owns the phonorecord that was created when she purchased and downloaded a song from iTunes to her hard disk. But to sell that song on ReDigi, she must produce a new phonorecord on the ReDigi server. Because it is therefore impossible for the user to sell her 'particular' phonorecord on ReDigi, the first sale statute cannot provide a defense. Put another way, the first sale defense is limited to material items, like records, that the copyright owner put into the stream of commerce. Here, ReDigi is not distributing such material items; rather, it is distributing *reproductions* of the copyrighted code embedded in new material objects, namely, the ReDigi server in Arizona and its users' hard drives.

3/31/13 Memorandum and Order at p. 12. The Court held that "Section 109(a) still protects a lawful owner's sale of her "particular" phonorecord, be it a computer hard disk, iPod, or other memory device onto which the file was originally downloaded." 3/31/13 Memorandum and Order at p. 13.

As noted by the District Court, "[t]he novel question presented in this action is whether a digital music file, lawfully made and purchased, may be resold by its owner through ReDigi under the first sale doctrine" – where only one file exists before and after the transfer – constitutes reproduction within the meaning of the Copyright Act." Order at 4-5.

ReDigi respectfully disagrees with the District Court's interpretation of the law, and plans to appeal the 3/31/13 Memorandum. However, in the event that other Courts make similar findings, it seems that the language of the Copyright Act needs to be revised to account for technological advancements and changes in the way utilize and dispose of legally purchased digital goods. Following the Court's reasoning in *Capitol Records, LLC v. ReDigi, Inc.*, and each time a digital is fixed on a different particular segment of even a single hard-drive a "reproduction" is made. These processes occur naturally during de-fragmentation and automatic organization processes. Utilizing such a hyper technical interpretation of the exclusive right to "reproduce" in a world where we often move our digital property to and from various personal devices is absurd. Similarly utilizing these definitions to support the proposition that a consumers right to re-sell only allows them to sell the physical hard drive onto which the file was originally downloaded no longer effectuates the basic purpose of the First Sale Doctrine.

The law is not static. To the extent that the Copyright Act is being interpreted in ways that give substantially more control to copyright owners who distribute their works digitally, as opposed to physically, in an increasingly digital world, the law should be revised or clarified so that it continues to effectuate its basic purpose, while taking into account changing

35

Ossenmacher testimony page 15

technology and delivery methods.

### III. THE RESALE OF DIGITAL MUSIC THROUGH THE INTERNET PROMOTES THE GOALS OF COPYRIGHT LAW

Application of the first sale doctrine, as inclusive of the right to re-sell digital goods via the internet, is consistent with overall purposes of the Copyright Act. The Constitution gives Congress the power to "promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries." U.S. Const. Art. 1, §8, cl. 8. "The limited scope of the copyright holder's statutory monopoly, like the limited copyright duration required by the Constitution, reflects a balance of competing claims upon the public interest." *See Sony Corp. of Am. v. Univ.*, 464 U.S. at 432 (quoting *Fox Film Corp. v. Doyal*, 268 U.S. 123, 127 (1932)).

On one hand creative work should be encouraged and rewarded, but the motivations and incentives to create must ultimately serve the cause of promoting broad public availability of literature, music and other arts. *Id.* To this end although the immediate effect of copyright law is to secure a fair return for creative labor, the "ultimate aim, is by this incentive, to stimulate artistic creativity for the general public good." *Id.* The primary object of conferring a limited monopoly lies in the "general benefits derived by the public from the labors of authors." *Id.*

While authors are entitled to a fair return for their creative labor, their entitlement to the monopoly that provides that return is not unlimited. To the contrary, the exclusive rights granted to authors must be limited in order to achieve the greater goal, which is to enrich society as a whole. It is ReDigi's position that ensuring that the First Sale Doctrine applies to the sale of digital goods over the internet will help promote both of these goals. Secondary markets for used goods increases access to works of art that have been put into the stream of commerce by the copyright owner, by allowing donation, re-sale and other disposal, of used works at a decreased price. In addition, ensuring that consumers have the same rights in their digital property as they do in their physical property, including that the work has value in resale, actually increases the perceived value of digital goods as whole. Overall this increases the economic benefit that authors can receive for the sale of their works, as it increases the likelihood that consumers will legally purchase works rather than pirate those same works. Alternatively, if consumers do not have the same rights to use and dispose of digital goods as they have in their physical goods, it creates the perception that those digital goods have less value and only re-enforces the attitude amongst some consumers that piracy is acceptable.

### IV. ALLOWING THE FIRST SALE DOCTRINE TO APPLY TO DIGITAL GOODS SOLD OVER THE INTERNET PROMOTES GOOD POLICY

The importance of ownership rights and the limitations on the exclusive rights given to authors under the copyright act is at the very heart of the First Sale Doctrine. *See Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351 (1908). In *Bobbs-Merill* the court noted that the copyright owner sold copies of the book in quantities and at a price "satisfactory to it" and when it did so it exercised its right to vend. *Id.*

"To add to the right of exclusive sale the authority to control all future retail sales . . . would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning, when interpreted with a view to ascertaining the legislative intent in its enactment." *Id.*

"The whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution." *Quality King Distribs v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998). This reflects the common law rule that: "a general restraint upon alienation is ordinarily invalid." *Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 404-5 (1911).[2] Here basic policy considerations underlying the Copyright Act, dictate that the first sale doctrine is without doubt applicable to phonorecords in digital form. When copyright owners authorize retailers to sell copies of their copyrighted sound recordings in the quantities and at a prices that are satisfactory to them, they have exercised its right to distribution and received the benefit from the limited monopoly that they are entitled to.

As noted in the recent decision *Kirtsaeng v. John Wiley & Sons, Inc.*, like the common law refusal to permit restraints on the

---

[2] Overruled with respect to vertical agreements restraining trade by *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).

36

Ossenmacher testimony page 16

alienation of chattels, a "law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly 'against Trade and Traffi[c], and bargaining and contracting.'" 133 S. Ct. 1351, 1363 (2013). To the extent that Courts are interpreting the Copyright Act, to prohibit the resale and disposition of digital goods in any meaningful way, those laws must be revised so that they do not run afoul of the limitations on these exclusive rights or common law principles which refuse to permit undue restrains on the alienation of property.

Allowing copyright owners to control distribution of digital personal property in perpetuity, does not further the ultimate purpose of copyright law. Rather it stifles the disposition of digital goods by sale or gift. Like traditional physical mediums, authors who distribute their works digitally receive the benefit the limited monopoly that the copyright law provides when they are paid upon the first sale. Upon the completion of that transaction those authors have exercised their distribution right and their right to control distribution is exhausted. Allowing the law to restrict the disposition of lawfully purchased digital goods because the law fails to account for the technology that we now use to transmit those goods, would in effect give copyright owners an extension of their exclusive rights under the copyright act that is not contemplated.

In *Bobbs-Merill*, the Court noted that, the copyright statutes "while protecting the owner of the copyright (in his right to multiply and sell his production, do not create the right to impose ... a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract." *Bobbs-Merill*, at 350-51. The reproduction right should not be implicated where a particular legally purchased copy of a work is merely transferred to a new location so long as more than one copy does not exist at the same time. The essence of duplication and/or reproduction is that more than one of a particular phonorecord or copy could exist at the same time.[3] To the extent courts interpret the current copyright law to differently, the law should be revised so that the reproduction right is understood as the exclusive "right to multiply." In this context for example, if a user legally acquires a digital music the reproduction right is only implicated if the user actually duplicates or makes additional copies. However, to the extent the legally purchased file is transferred from one place to another, so long as two copies i.e. one on the hard drive and one on the cloud, do not exist at the same time, no reproduction has taken place.

When the law was written, and "copy" and "phonorecord" were defined to include "material objects in which [sounds/a work] . . . [is/are] fixed by any method" it contemplated physical goods in which works are permanently fixed, such as records and books, to fix a work required a duplication or multiplication i.e. the making of a second copy of a work. However, with migration technology, like the technology used by ReDigi, that is no longer true. A legally purchased copy of a work can be moved without it ever being fixed in two places at the same time. It is illogical to conclude that Congress intended to prevent movement of a singularly purchased copyrighted good whether tangible or in-tangible, so long as it is not duplicated. In fact the congressional reports are indicative of this conclusion. The legislative history indicates that the reproductive right to produce a material object is concerned with preventing unauthorized duplication. *See* S. Rep. No. 94-473, 58 (1975) ("As under the present law, a copyrighted work would be infringed by reproducing it in whole or in any substantial part, and by **duplicating it** exactly or by imitation or simulation." (Emphasis Added.)). There is no indication that the exclusive right to "reproduce" intended to limit the ability to transfer a purchased work to a new location, as ReDigi does.

Some Courts have come to this conclusion as well. *See also C.M. Paula Co. v. Logan*, 355 F. Supp. 189 (N.D. Tex. 1973) ("plaintiff has the burden of establishing there has been a copying – a 'reproduction or duplication' of a thing" (citing *White Smith Music Pub. Co. v. Appolo Co.*, 209 U.S. 1, 28 (1908)). In *C.M. Paula*, the defendant utilized a process of transferring printed designs from legally purchased greeting cards to other mediums. Essentially the defendant coated greeting cards that plaintiffs copyrighted designs were affixed to with resins and then through the use of chemicals lifted the original image from the greeting card and reapplied that same lifted image elsewhere. *Id.* at 190. The Court held that such a process was not a reproduction. *Id.* at 191. Each plaque sold by defendant required the purchase and use an individual piece of artwork sold by plaintiff. If defendant wanted to make 100 plaques using the identical print, defendant would be required to purchase 100 separate prints, and that process did not "constitute copying." *Id.* The court rejected the notion that merely because the design was affixed to different mediums at different times, that it was "reproduced" or "copied" in violation of the Copyright Act. The design was transferred, but transfer of the work from one physical medium to another does not constitute a reproduction where no reproduction of the work was made.

If technology has made it possible to dispose of legally purchased digital goods without duplicating or multiplying the number of copies that exist, the exclusive right to "reproduce" is not offended and should not be a bar to the right to dispose

---

[3] With reference to ReDigi's migration to the Cloud Locker, and atomic transfer of ownership, there is never an instance when an Eligible File could exist in more than one place or be accessed by more than one user, and as such ReDigi maintains that no reproduction has occurred.

37

of a legally purchased copy of a work. Through ReDigi for 100 copies of *I Walk the Line*, by Johnny Cash to be available for sale, 100 different digital files of that song would have to have been legally purchased and offered for sale on ReDigi.

This proposition that sale of digital goods should be allowed, even if migration is ultimately found not found to fit perfectly within the existing Copyright Act, is further supported by the common law principles of exhaustion, which provide far broader protection than the language of First Sale doctrine as codified in Section 109. *See e.g. Doan v. American Book Co.*, 105 F. 772 (7th Cir. 1901) (holding that the sale of a copy exhausts the exclusive right to vend, but that copy ownership also implies a right to renew or repair, even if repair entails altering or copying the underlying work such as replication of cover designs).

**CONCERNS ABOUT CHANGE TO THE FIRST SALE DOCTRINE**

As mentioned above, it is ReDigi's position that ensuring the legality of re-sale of legally purchased music and other digital goods over the internet will have the effect of reducing piracy by enhancing the perceived value of legal purchase options. The critics of change voice many of the same arguments over and over again. The first argument is that allowing resale of digital goods through the internet will result in more widespread piracy and will make it more difficult to identify infringers. Similar arguments have been rejected by Courts in international jurisdictions. By way of example in a recent decision by the European Court of Justice it was held that to enable a copyright holder to prevent further sales of a digital copy of a work would allow copyright holders to circumvent the rule of exhaustion and divest it of all scope. *See UsedSoft GmbH v. Oracle Int'l Corp.*, 128/11 E.C.J. at 47-49 (2012). That court further held that to avoid infringing the exclusive right to reproduction of a computer program that was being lawfully sold, all the seller had to do was make the copy downloaded to the computer unusable at the time of sale. *Id.* at 78. In response to the argument that this would make infringement more difficult to detect, the court noted that it would be no more difficult for the copyright holder to determine if the copy was made unusable, than it would be to determine if a person selling a CD-ROM had made a copy prior to sale. *Id.* at 79.

Critics further argue that to allow resale of digital music over the internet would violate the First Sale doctrine as it would allow to resell "unlawful copies". ReDigi disagrees. The first sale doctrine is meant to allow an owner of a *particular copy* lawfully made to dispose of it without any further permission from the copyright owner. If an individual legally purchases a digital music track from an authorized retailer that track is a particular copy that is lawfully made. If that same individual then wishes to re-sell that same track, the method of delivery should not render it an unlawful copy on a technicality. ReDigi's migration process does not *reproduce* the music file. The legally purchased particular copy is able to be migrated from the user's local hard drive to the Cloud without ever existing in two places at once. As such the resulting music file that is stored in the Cloud Locker is still the particular copy that was legally purchased. When that particular file is sold, all that is transferred is the Key to the particular segment of the Cloud Locker where it is stored, so that as soon as the track is sold, only the purchaser has access to the track. The law was written at a time when a transfer of a work from one place to another would necessarily result in two copies existing at the same time. Now that is no longer true.

Another criticism is that the ability of used digital copies to be able to compete for market share with new copies is far greater because they do not degrade and time, space and effort do not act as barriers to movement of the copies. As an initial matter, the doctrine of exhaustion upon which the first sale doctrine is founded, is concerned with the alienability of property and *limiting* on the copyright holder's ability to control further distribution. *See Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 152 (1998) ("[t]he whole point of the first sale doctrine is that once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."). These concerns seem irrelevant to this basic purpose.

Moreover, the criticisms are simply without merit. As an initial matter there are differences between used and new digital copies i.e. older digital music may be of lower and inferior file size, it may not contain album artwork, or other enhancements. Additionally, give the ease with which we can purchase physical copies of media via online secondary markets, time, space and effort no longer act as significant barriers to the movement of physical copies either.

Similarly, the criticism that viable technology is not available is no longer viable. In the report from Copyright Office from August 2001 "DMCA Section 104 Report," the Copyright office noted that one of the issues with expansion of the first sale doctrine was that unless a forward and delete technology was employed, transmission of a copy would require an affirmative act which would be very difficult to prove whether it had taken place, and moreover that there was no evidence that such technology was viable. DMCA Section 104 Report at 81-84 (unless a 'forward and delete' technology is employed an additional affirmative act by sender would be required which would make it difficult to prove or disprove whether the act of transfer had taken place and increases the risk of infringement). Although ReDigi is not a "forward and delete," technology, it has achieved this goal. The technology does exist. With ReDigi's recently patented software, an individual can transfer ownership of a legally purchased music file, without duplication. ReDigi's media manager software

38

not only verifies that the each file is legally purchased, but further requires removal of any additional archival or personal copies that the user may have kept on connected devices as part of the sale process.

There is no reason to treat a legally purchased digital property differently or in an inferior manner to legally purchased physical property. The content owners who seek to prevent the first sale doctrine from applying to digital goods sold over the internet, have no right to the unfettered control over the resale of copies of their work that they have put into the stream of commerce. The content owners receive the benefit of their exclusive rights at the time they are paid for the sale of each copy of their work that they authorize. The First Sale Doctrine should give effect to its purpose that after that sale, the rights of the author to control distribution, whether of digital goods over the internet, or physical goods in a brick and mortar store, are exhausted

---

39

Mr. GOODLATTE. Mr. Shems, welcome.

### TESTIMONY OF ED SHEMS, ILLUSTRATOR AND GRAPHIC DESIGNER, edfredned ILLUSTRATION & DESIGN

Mr. SHEMS. Thank you. Mr. Chairman, Ranking Member Nadler, Members of the Subcommittee, thank you for the opportunity to testify today about the experiences of visual artists in making their work available to clients and consumers in the digital age.

It is important when making policy decisions that will impact authors of all types of copyrighted works to hear from creative people from all parts of the creative community, so I thank you all for holding this hearing in New York City. As we have heard already, it is one of the most vibrant centers of creativity and the visual arts and home to the Graphic Arts Guild, as well as for understanding that your deliberations will have far-reaching impacts on artists, such as myself.

Before I received my diploma from RISD 23 years ago, I had already decided to own my own business for one reason: it was important to me that I retain control over the work that I create, and this is something you cannot do when you are a salaried employee. The artwork an employee creates becomes the property of the employer to do with as they will. But an independent business owner is bound only by the contract he or she negotiates with the clients.

Graphic artists are service providers, and we provide a service to our clients through our creativity to enhance their businesses in the marketplace. Our exclusive rights and our original artwork and the potential to earn income from licensing our work to different clients, businesses, and media in different forms and formats are essential to our income as creative professionals and small business owners.

Graphic artists, illustrators, and photographers generally license rather than sell their work commercially, and this allows us to provide our clients exactly the rights that they need and set a price that fairly compensates for those rights while allowing us to retain control over the copyright in our work for other purposes.

This is beneficial to us both because it keeps the costs for the client reasonable and the compensation of the artist appropriate to the rights licensed. We set prices for our work based on how it will be used. If the design or illustration will be featured over an extensive geographical graphical area, fees are significantly higher than when a design or illustration is used only locally or limited usage.

I am not a lawyer, but it is my understanding that two related ideas have been floated which would be relevant to my work: one, whether the first sale doctrine should be expanded in order to grant users greater rights in the digital world, and, two, whether some elements of the first sale doctrine should be imposed even on businesses that are based on licensing rather than selling work.

I am concerned about proposals to expand the first sale doctrine in the digital world to allow reselling of creative works over the Internet. There is no such thing as a used book in the digital world; every copy of a file is as good as the original, doesn't degrade over time. So every digital book sold under the first sale doctrine would compete directly with my client sales. This means my

40

clients will have fewer sales and fewer resources to devote to hire illustrators, photographers, and designers.

As a result, I would likely have fewer clients, and we might see a decline in the industry in which I make my living.

I am also concerned that infringement will become even harder to police than it is now. How will we know that all copies of the original file have been deleted before it has been sold or given away under a digital first sale doctrine? If my artwork is infringed, it may also be altered by an end user in a manner to which I may object. This may include reworking the art in an objectionable way or using it to promote or convey a message with which I do not agree. My artwork represents me and my point of view, and changes unapproved by me might impact negatively upon my reputation and my ability to attract clients.

As a creative professional and small business owner, I am able to choose which clients I will work with. And if requirements of the first sale doctrine were imposed on my licensing relationships and my clients could legally sell copies of my work to others, that right would be taken away from me.

The proposal to expand the first sale doctrine in the digital world would make it wholly unmanageable for creative professionals to oversee the distribution of our work. A change to this doctrine is something that the visual arts community is not asking for and, more importantly, is not something our clients are asking for either.

The second related question is whether artists and other copyright owners should be able to write the terms of our license agreements with our clients based upon their actual needs, without terms being dictated by law. Licensing is core to the business of so many visual artists who work commercially. Intervening in the license agreements we negotiate with our clients would be incredibly destructive to the livelihoods of commercial visual artists and would raise prices for clients.

To sum up, a law expanding first sale could easily cut creators out of value change for their own work and artificially force the price of our work below sustainable levels. It would almost certainly increase sky-high levels of infringement in a way that is impossible to police. If first sale requirements were imposed on licensing relationships allowing my clients to resell my work, it would commoditize that work to the point where it would lose its value for my business.

The effects of such a change would also force me, an independent entrepreneur, into the equivalent of a work-made-for-hire world, where I no longer manage rights to my own artworks. This is a path I explicitly rejected and have been rallying against throughout my career. I would be forced to surrender my most precious economic asset, my copyright. The impact on me as a small business would be monumental.

Thank you.

Mr. GOODLATTE. Thank you, Mr. Shems.

[The prepared statement of Mr. Shems follows:]

41



32 BROADWAY
SUITE 1114
NEW YORK, NY
10004-1612

TEL
(212) 791-3400

FAX
(212) 791-0333

WEB
WWW.GAG.ORG

May 29, 2014

**Testimony of Ed Shems to The House Judiciary Committee Subcommittee on Courts, Intellectual Property and the Internet**

**"First Sale Under Title 17"**

On June 2, 2014
Daniel Patrick Moynihan United States Court House, New York, NY

On Behalf of the Graphic Artists Guild

### INTRODUCTION

Mr. Chairman, Ranking Member Nadler, Members of the Subcommittee, thank you for the opportunity to testify today about the experiences of visual artists in making their work available to clients and consumers in the digital age. It is important when making policy decisions that will impact authors of all types of copyrighted works to hear from creative people from all parts of the creative community, so I thank you all for holding this hearing in New York City – one of the most vibrant centers of creativity in the visual arts, and home to the Graphic Artists Guild, as well as for understanding that your deliberations will have far reaching impacts on artists such as myself.

I graduated with a Bachelor of Fine Arts degree from the Rhode Island School of Design in 1991 and immediately began my career as an illustrator and later as a graphic designer. I am the past President of the Boston Chapter of the Graphic Artists Guild where I worked with the creative community to help educate younger creative professionals with an eye toward elevating our industries. I'm currently on the design advisory committee for DIGMA: The Design Industry Group of Massachusetts and this month I'm celebrating 23 years in my field. That's a lot of time spent being creative designing, illustrating, and problem solving for clients.

Before I received my diploma I had already decided to own my own business for one reason: it was important to me that I retain control over the work that I create, and this is something you cannot do when you are a salaried employee. The artwork of an employee becomes the property of the employer to do with as they will. An independent business owner is bound only by the contract he or she negotiates with a client.

### STANDARD BUSINESS PRACTICES IN THE VISUAL ARTS WORLD

Graphic artists, illustrators and photographers generally license, rather than sell, their work commercially. This allows us to provide our clients exactly the rights they need, and to set a price that fairly compensates for those rights, while allowing us to retain control over the copyright in our work for other purposes. This is beneficial to us both because it keeps the

1

42



32 BROADWAY
SUITE 1114
NEW YORK, NY
10004-1612

TEL
(212) 791-3400

FAX
(212) 791-0333

WEB
WWW.GAG.ORG

costs for the client reasonable, and the compensation to the artist appropriate to the rights licensed.

As a graphic designer and illustrator, I work with individuals and with companies of differing sizes. From major publishing houses in the city to small businesses down the street from me, I'm contracted to create custom illustrations or designs specific to the needs of each client. Many of my smaller clients have very limited budgets and often come to me unaccustomed to working with an illustrator or a designer; part of my responsibility is to educate them on how to work with me and to determine what their actual needs are. In this way I am able to control their costs while ensuring they will be pleased with the results of my work. Without the ability to fine-tune the rights within a contract, I fear the smaller businesses would not be able to afford to hire me.

The standard trade practices for graphic design and illustration are based on copyright law and licensing models. It is the use of the design or illustration that influences the price. If the design or illustration will be featured over an extensive geographical area, or is an all-rights contract, fees are significantly higher than when a design or illustration is only used locally within a selected area, or for limited usage.

If, at a later date, the client needs to use the work for a different purpose than originally contracted for, such as for an electronic database or on a website, the designer or illustrator negotiates what is known as a reuse fee with the client based on the original work and the extended usage.

I had a client a year ago who was starting a new business but couldn't afford to license a logo at my usual rates. So instead I licensed the design to him for up to two years for a reasonable percentage of the actual amount I would normally license the full rights to the logo. After two years he will be able to decide whether he wants to continue the business and acquire all of the rights to the logo for an additional 150%. My ability to be flexible with the rights in our contract enabled him to get a custom, professionally designed logo to help propel his new business forward. If I had to offer him an "all rights" deal – the equivalent of selling him the logo, I would have lost the opportunity to work with him, and he would not have been able to launch with a professionally designed logo.

Graphic artists are service providers. We provide a service to our clients through our creativity to enhance their businesses and/or services in the marketplace. Our exclusive rights in our original artwork, and the potential to earn income from licensing our work to different clients, businesses, and media in different forms and formats, are essential to our income as creative professionals, and small business owners.

**WHY EXPANDING THE FIRST SALE DOCTRINE WOULD HARM ARTISTS AND OUR CLIENTS**

I am not a lawyer, but it is my understanding that the Subcommittee is considering two related issues which would be relevant to my work: (1) whether the first sale doctrine should be expanded in order to grant users greater rights in the digital world; and (2)

2

43



32 BROADWAY
SUITE 1114
NEW YORK, NY
10004-1612

TEL
(212) 791-3400

FAX
(212) 791-0333

WEB
WWW.GAG.ORG

whether artists and other copyright owners should be able to write the terms of our license agreements with our clients based upon their actual needs without being subject to government regulation.

As I understand it, the first sale doctrine is a doctrine intended to limit the rights of a copyright owner to control what a purchaser of a particular copy of a work does with that copy of the work after it is sold. Since in the analog world the doctrine applies only to the specific copy of a work sold to a customer, and doesn't permit the customer to make additional copies of the work, this doctrine has not been particularly relevant to my work, given that most of my work is licensed to clients rather than sold, and the licenses provide for very specific permissions as to how the work may be reproduced and published. Once my work is reproduced and published in book form, for instance, the fact that the first sale doctrine allows a downstream purchaser of that book to later sell the used copy of the book at a yard sale does not trouble me, because the risk in the analog world of my work being reproduced and distributed without my permission as a direct consequence of this doctrine is relatively small.

I am concerned, however, about proposals to expand the first sale doctrine in the digital world to allow reselling of digital works over the internet. In practicality, there is no such thing as a "used book" in the digital world. Every copy of a file is as good as the original, and doesn't degrade over time, so every digital book sold under the first sale doctrine would compete directly with my client's sales – this means my clients will have fewer sales, and fewer resources to devote to illustrate or design their works. As a result, I would likely have fewer clients and we might see a decline in the industry in which I make my living.

Additionally, under the proposed change, I am concerned that because infringement will become even harder to police than it is now, once my artwork has been published, my work may then be altered by an end user in a manner to which I may object. This may include reworking of the art in an objectionable way or using it to promote or convey a message with which I do not agree. My artwork represents me and my point of view and changes unapproved by me might impact negatively upon my reputation and therefore my ability to attract work/clients. As a creative professional and small business owner, I am able to choose which clients I will work with. Under an extension of the first sale doctrine, where copies of my work could be digitally sold to others I don't know or work with, that right would be taken away from me.

Of course, my work, and the work of other visual artists is already subject to infringement – often to a degree which is very burdensome for individual artists and small businesses like my own. The proposal to expand the first sale doctrine in the digital world would make it wholly unmanageable for creative professionals to manage the distribution of our work. A change to this doctrine is something that the visual arts community is NOT asking for. More importantly, it isn't something our clients are asking for either.

The second, related question is whether artists and other copyright owners should be able to write the terms of our license agreements with our clients based upon their actual needs without terms being dictated by law. As I said at the outset, licensing is core to the

3

44



32 BROADWAY
SUITE 1114
NEW YORK, NY
10004-1612
(TEL)
(212) 791-3400
(FAX)
(212) 791-0333
(WEB)
WWW.GAG.ORG

business of so many visual artists who work commercially. If the government were to intervene in the license agreements we negotiate with our clients, (by, for instance, requiring us to allow our clients to resell our work to others), that would be incredibly destructive to the livelihoods of commercial visual artists, and would raise prices for clients.

If I am illustrating a text book for college students, and the publisher does not foresee the need to acquire the rights for an interactive online version of the book at the time we are negotiating the fee and usage rights for the work, I can reflect in my fee the limited use the publisher desires and which fits the budget the publisher has allocated. However, if Congress were to impose the requirements of the first sale doctrine also on license based transactions, my fees would have to reflect that the client is acquiring all rights in the work. As a result, my client would be required to pay for uses beyond what they actually need – driving-up the cost of the project, and likely exceeding their allocated budget.

Moreover, if I were required to allow my clients (and other downstream purchasers) to resell my work it would commoditize that work to the point where it would lose its value for my business. The effect of such a change would also be to essentially force me – an independent entrepreneur – into the equivalent of a work made for hire world where I no longer manage the rights to my own artwork. This is a path I explicitly rejected and have been rallying against throughout my career, where I would be forced to surrender my most precious economic asset: my copyright. The impact on me as a small business would be monumental.

**CONCLUSION**

Graphic art, i.e., illustration and graphic design, is sold primarily on the basis of usage and reproduction rights. Usage rights are generally sold according to the client's needs. Other uses for a work may be sold to other clients as long as they are noncompetitive or do not compromise the commissioning client's market. Clients that manage their businesses well only buy rights that are particular to the project since it is not economical to pay for additional rights that are not needed and that will not be used.

Changing the doctrine of first sale to be more expensive in the digital world than it is in the analog world and/or imposing the requirements of that doctrine on licensing transactions would result in significant changes in the marketplace that would be detrimental to illustrators and graphic artists as well as our clients. The end user would be forced to acquire usage rights they've never had before and weren't paying for, resulting in an increase in expenditures for clients that might make it impossible to contract the services of a graphic artist.

**ABOUT THE GRAPHIC ARTISTS GUILD**

In the course of its 47-year history, the Graphic Artists Guild has established itself as the leading advocate for the rights of graphic artists on a wide range of economic and legislative

4

45



32 BROADWAY
SUITE 1114
NEW YORK, NY
10004-1612

(212) 791-3400

(212) 791-0333

WWW.GAG.ORG

issues, from copyright to tax law. Through its publication of the *Graphic Artists Guild Handbook: Pricing & Ethical Guidelines* (now in its 14th edition), the Guild has raised ethical standards in the industry, and provides an invaluable resource on pricing information that is relied on by both artists and clients. The Guild's newsletter, the *Guild News*, provides lively, provocative, and useful coverage of developments in the visual communications industry for its readers.

The Guild also provides a wealth of services and benefits for its members, including educational programs, discounts on a multitude of products and services, a legal referral network, and grievance handling. The Guild's website offers up-to-date information on Guild activities, updates on advocacy issues, members' portfolios, individual regions, and tools and resources for all graphic artists.

Respectfully submitted,

Ed Shems, edfredned Illustration and Graphic Design, www.edfredned.com
Lisa Shaftel, Advocacy Committee Chair
Haydn Adams, President
Tricia McKiernan, Executive Director

The Graphic Artists Guild is a member of the Copyright Alliance

5

46

Mr. GOODLATTE. Mr. Band, welcome.

## TESTIMONY OF JONATHAN BAND, COUNSEL, OWNERS' RIGHTS INITIATIVE

Mr. BAND. Chairman Goodlatte, Ranking Member Nadler, Members of the Subcommittee.

The Owners' Rights Initiative is an organization of over 20 companies and associations dedicated to protecting the first sale doctrine.

The first sale doctrine reflects a basic feature of property rights. When you own a physical good, you can have the right to dispose of it as you please. You can sell it, lend it, or give it away. The fact that some aspects of the good are covered by copyright does not diminish your rights in the good. If I purchase a legal copy of a novel written by Elmore Leonard, his estate owns the copyright on the novel, but I own the physical copy. Leonard's copyright prevents me from copying the novel, but it doesn't prevent me from selling it or giving it away.

The first sale doctrine protects my property rights in my copy. If I buy a North Face jacket, with is its distinctive logo, North Face's copyright in the logo doesn't prevent me from donating the jacket to the Salvation Army or the Salvation Army from selling the jacket.

The first sale doctrine works because it matches consumer expectations relating to their property. They understand that they can't copy the novel or make counterfeit copies of the North Face jacket. At the same time, they fully expect to be able to sell or give away these products. Whether the copies of the novel are printed in the United States or in Canada makes no difference to the consumer. He expects to be able to resell it regardless of where it was printed or purchased.

The Supreme Court's decision in *Kirtsaeng* makes sense because it is consistent with consumer expectations. The purchaser's right to transfer the copy of the novel or the North Face jacket should not turn on where the copy was made or where it was first sold but on whether the copy was manufactured lawfully. Any other rule would be counterintuitive and impossible to implement.

In today's global market, downstream sellers often have no way of knowing where a product was manufactured or first sold. Mr. Smith, with Wiley, argues that the rule adopted in *Kirtsaeng* will prevent copyright owners from price discriminating against American consumers. But the Supreme Court ruled that nothing in the Constitution suggests that copyright should include the right to price discriminate. Furthermore, price discrimination will not help American workers because most copyrighted products are made overseas, increased foreign sales will not lead to more manufacturing jobs in the U.S.

Remember, we are not just talking about books. The previous Supreme Court cases in this area dealt with the logo on a watch and the label on a shampoo bottle. Even after *Kirtsaeng*, publishers can still price discriminate. They just can't use copyright law to enforce it. Publishers can use contract to prohibit foreign distributors from shipping to the U.S.; publishers can sell only enough copies in any country to meet local demand; publishers can make minor changes

47

in products to discourage importation. In short, they can act exactly as every other business that can't rely on copyright to enforce price discrimination.

Our coalition would like the Subcommittee to examine an aspect of first sale that affects a specific category of tangible good, of products that are distributed with software essential to their operation. Even though consumers buy the physical products, ranging from computers to toasters, some manufacturers claim that they are just licensing the software essential to the product's operation. The manufacturers further claim that because the consumers are just licensees, they do not have the first sale right to transfer the software when they sell the rest of the product. These licenses may have other restrictive terms that interfere with the resale of the products, for example, specifying that only the original licensee will receive security patches or bug fixes. But interfering with resale, these license terms harm both the consumers who want to sell the products and the secondary consumers, often government agencies, that want to buy them.

The license terms are also harmful to cybersecurity. If a manufacturer refuses to provide the secondary consumer with security patches, the security of the computer system could be compromised. Resale rights also help the environment by keeping recycled products out of landfills.

This is a concrete problem of manufacturers attempting to leverage their copyright in a component into control over a much larger device. We believe that this problem can be fixed by relatively simple amendment to the Copyright Act. Thank you for this opportunity to testify.

Mr. GOODLATTE. Thank you, Mr. Band.

[The prepared statement of Mr. Band follows:]

48

**BEFORE THE HOUSE COMMITTEE ON THE JUDICIARY**
**SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY AND THE**
**INTERNET**

**FIRST SALE UNDER TITLE 17**

**TESTIMONY OF JONATHAN BAND**
**COUNSEL, OWNERS' RIGHTS INITIATIVE**

**JUNE 2, 2014**

49

**BEFORE THE HOUSE COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY AND THE
INTERNET**

**FIRST SALE UNDER TITLE 17**

**TESTIMONY OF JONATHAN BAND
COUNSEL, OWNERS' RIGHTS INITIATIVE**

The Owners' Rights Initiative (ORI) is an organization of over 20 companies and trade associations that have joined together to protect ownership rights in the United States.[1] We believe in the fundamental premise that **if you bought it, you own it**, and should have the right to sell, lend, or give away your personal property. ORI formed when the *Kirtsaeng v. Wiley* case was pending before the Supreme Court. We now are dedicated to preserving that holding, and making sure that it is not undermined in Congress, the executive branch, or in the courts. We also work to protect the principles of the first sale doctrine as technology continues to evolve, such as when software is incorporated into other products. Additionally, we try to prevent the misuse of IP law as a trade barrier that obstructs legitimate competition in other countries.

This testimony describes the importance of the first sale doctrine to the U.S. economy. Next, it explains why the international exhaustion rule adopted by the Supreme Court is sound policy. Finally, it identifies a problem that requires Congressional action: ensuring that consumers and resellers can transfer products that contain software.

Before diving into the details of copyright law, we want to stress that the first sale doctrine is the articulation of a basic feature of property rights. When you own a physical good, you have the right to dispose of it as you please. You can sell it, you can lend it,

---

[1] A list of ORI members can be found at http://ownersrightsinitiative.org/about/.

2

50

you can give it away. The fact that some aspect of the good is covered by a copyright owned by an author does not diminish your rights in the good. If I purchase a lawfully published copy of a novel written by Elmore Leonard, his estate owns the copyright in the novel, but I own the physical copy. Leonard's copyright prevents me from copying the novel, but it doesn't prevent me from selling my copy or giving it away. The first sale doctrine is what protects my property rights in my copy. Similarly, if I buy a North Face jacket with its distinctive logo, North Face's copyright in the logo doesn't prevent me from donating the jacket to the Salvation Army, or the Salvation Army from subsequently selling the jacket. And Coca-Cola's copyright in the design of the label on a can of Coca Cola does not prevent the owner of a hot dog stand outside of Yankee Stadium from reselling the cans of Coke that he buys at Costco.

The first sale doctrine works because it corresponds to consumers' expectations relating to their property. They understand that they can't copy the Elmore Leonard novel or make counterfeit copies of the North Face jacket or the Coca Cola can. At the same time, they fully expect to be able to sell or give away legitimate copies of these products. Whether the copies of the Leonard novel are printed in the United States or in Canada makes no difference to the consumer. He expects to be able to resell it regardless of where it was printed or purchased. Likewise, the owner of the North Face jacket expects to be able to give it to the Salvation Army, regardless of whether it is sewn in the United States or Malaysia.

The Supreme Court's decision in *Kirtsaeng* makes sense because it is consistent with consumer expectations. The purchaser's right to transfer the copy of the Leonard novel, or the North Face Jacket, or the can of Coca Cola, should turn not on *where* the

3

51

copy was made or where it was first sold, but on whether the copy was manufactured lawfully. Any other rule would be counterintuitive and impossible to implement. In today's global market, downstream sellers would have no way of knowing where a product was manufactured or originally sold.

**I. The Importance of the First Sale Doctrine**

Justice Breyer, writing for the U.S. Supreme Court in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013), stated that the first sale doctrine "is a common-law doctrine with an impeccable historic pedigree." He quoted a 17th century articulation of "the common law's refusal to permit restraints on the alienation of chattels," *id.*, and observed that "a law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly 'against Trade and Traffi[c], and bargaining and contracting.'" *Id.* Justice Breyer underscored "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of these goods." *Id.* Competition, "including the freedom to resell, can work to the advantage of the consumer." *Id.*

The first sale doctrine operates at every level of our economy. It allows wholesalers to sell products covered by copyright, including products distributed in copyrighted packaging, to retailers without first securing distribution licenses from the manufacturers. The first sale doctrine likewise permits retailers to sell products to consumers without obtaining distribution licenses. Finally, the first sale doctrine permits consumers to rent or lend the products to other consumers, or to sell or give the products away when they no longer need them. The first sale doctrine reduces transaction costs and enables competition between sellers of new products as well as between new and

4

52

used products. In *Kirtsaeng*, the Court recognized the importance of the first sale doctrine to libraries, used-book sellers, car dealers, technology companies, retailers, and consumers. The limitation on the distribution right provided by the first sale doctrine is critical to the functioning of our economy because the distribution right applies not only to products whose primary value is their protected expression, such as books, films, and sound recordings, but also to the protected expression in the packaging of all products.

**II. International Exhaustion**

### A. *Kirtsaeng v. Wiley*

At issue in the *Kirtsaeng* case was how the first sale doctrine applied to goods purchased abroad. Section 106(3) of the Copyright Act grants the copyright owner the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by ... lending."[2] However, the first sale doctrine, codified at section 109(a) of the Copyright Act, terminates the copyright owner's distribution right in a particular copy "lawfully made under this title" after the first sale of that copy.[3] In recent years, there had been extensive litigation over the meaning of the phrase "lawfully made under this title" in section 109(a). Rights holders generally argued that "lawfully made under this title" meant "lawfully made in the United States." This interpretation would allow the rights holder to prohibit some "parallel imports" or "gray market goods"—that is, the rights holder could prevent a third party from importing legal but less expensive foreign-made copies. Conceivably, this interpretation would also allow the rights holder to prohibit the resale of foreign-made goods sold initially in the United States with the rights holder's authorization.

---

[2] 17 U.S.C. § 106(3).
[3] 17 U.S.C. § 109(a).

5

53

On March 19, 2013, by a 6-3 majority, the Supreme Court rejected this interpretation.[4] In an opinion written by Justice Breyer, the Supreme Court found that "lawfully made under this title" meant manufactured in a manner that met the requirements of American copyright law, *e.g.*, manufactured with the permission of the rights holder. The Court reached this conclusion after a careful examination of the context of the words in Section 109(a), the common law history of the first sale doctrine, the legislative history of Section 109(a), and the Court's earlier decisions. In effect, the Court adopted an "international exhaustion" rule; the distribution right in a copy was exhausted after the first sale of that copy anywhere in the world.

**B. The Correct Policy Going Forward**

Now that the Supreme Court has issued its decision, there is no point in arguing over whether the Court properly interpreted the relevant statutory provisions, although we think it did. What matters going forward is whether the Court reached the right policy outcome, or should Congress intervene. We believe that the Court did reach the right policy outcome, and there is no reason for Congress to disturb it.

There are three basic policy choices: 1) the first sale doctrine should apply to all legal copies, regardless of where manufactured or sold (the Court's international exhaustion rule); 2) the first sale doctrine should apply only to legal copies sold in the United States with the rights holder's authorization (domestic exhaustion); or 3) the first sale doctrine should apply only to legal copies manufactured in the United States (the Second Circuit's rule in *Kirtsaeng*).

---

[4] *Kirtsaeng v. John Wiley & Sons*, 133 S. Ct. 1351 (2013).

54

Option 3 makes absolutely no policy sense. Even the Second Circuit agreed that there was no logical reason to give foreign-made copies more protection that U.S.-made copies, as it would encourage the export of jobs. Also, this approach would grant rights holders too much control over the alienation of property, given the large amount of goods that are foreign-made and sold in the U.S. with the rights holder's authorization.

Thus, the real choice is between applying the first sale doctrine to all copies, regardless of where manufactured or sold (international exhaustion), or applying the first sale doctrine only to copies sold in the United States (domestic exhaustion).

The policy argument in favor of domestic exhaustion is that it permits rights holders to price discriminate by preventing arbitrage—to charge U.S. consumers higher prices than foreign, less wealthy, consumers. This in theory enables higher profit margins from U.S. sales while benefiting consumers in less developed countries.[5]

How does this benefit the U.S. economy? Rights holders claim that the additional production for foreign markets means more jobs in the United States. Additionally, the profits from the foreign sales would be reinvested here in the development of new products.

But this argument makes two enormous assumptions. First, it assumes that the copies are manufactured in the United States. But for many copyrighted products, this is not the case. Even if the underlying work was created in the United States, the manufacturing of copies occurs in other countries with lower labor costs. Thus, the jobs resulting from increased production aren't in the United States. A motion picture might

---

[5] However, in some less developed countries, media prices are actually higher in absolute terms than in the United States because the distributors sell only to wealthy, price-insensitive consumers.

7

A-3068

55

be filmed in the United States, but the DVDs could be printed in Mexico.[6] So, the increased production of DVDs to keep up with foreign demand leads to more production jobs in Mexico, not the United States.

Second, this argument assumes that the rights holders are U.S. companies that will reinvest the profits in the United States. But again, in many instances, this isn't true.[7] Four of the six largest English language trade publishers, which sell 70% of the popular books in the U.S., are foreign owned. Four of the five largest science, technical, medical, and professional publishers are foreign owned. Two of the three major record labels are foreign owned. Omega, the plaintiff in the previous first sale case in the Supreme Court, is a Swiss company.[8] Pearson, which brought several cases against book importers, is a British company.

Indeed, Justice Ginsburg said in her dissent that "the Court embraces an international-exhaustion rule that could benefit U.S. consumers but would likely disadvantage *foreign* holders of U.S. copyrights." 133 S. Ct. at 1385 (emphasis supplied). It is hard to see how U.S. consumers paying higher prices to benefit foreign workers and corporations would benefit the U.S. economy. At the same time, the economic benefits of an international exhaustion rule—robust secondary markets resulting in lower prices— are obvious.

---

[6] It should be noted that many motion pictures made by U.S. studios are actually filmed in whole or in part overseas. *See* J. Band and J. Gerafi, *Foreign Ownership of Firms in IP Intensive Industries* 15 (2013), available at http://infojustice.org/archives/28840. The leading special effects companies relied upon by U.S. studios are located in the UK, Canada, and New Zealand. *See* Richard Verrier, "California visual effects artists fight foreign film tax credits," *Los Angeles Times*, December 21, 2012, http://articles.latimes.com/2012/dec/21/business/la-fi-ct-visual-effects-protest-20121221.
[7] J. Band and J. Gerafi, *Foreign Ownership of Firms in IP Intensive Industries* (2013), available at http://infojustice.org/archives/28840.
[8] *Costco v. Omega*, 131 S. Ct. 565 (2010).

8

A-3069

56

At a minimum, much more rigorous study would need to be performed to determine whether a domestic exhaustion rule would be a net positive or negative to the United States in light of our increasingly globalized economy. In the absence of compelling evidence of the benefit of shifting to a domestic exhaustion rule, the default position should be free trade unimpeded by government regulation. As Justice Breyer observed, "the 'first sale' doctrine is a common-law doctrine with an impeccable historic pedigree." 133 S. Ct. at 1363. It is rooted in "the common law's refusal to permit restraints on the alienation of chattels." *Id.*

Further, there is no inherent right under copyright law to price discriminate and segment markets. As Justice Breyer noted, "the Constitution's language nowhere suggests that its limited exclusive right should include a right to divide markets or a concomitant right to charge different purchasers different prices for the same book, say to increase or to maximize gain.... We have found no precedent suggesting a legal preference for interpretations of copyright statutes that would provide for market divisions." *Id.* at 1371.

Moreover, there is a long history of copyright law, through the first sale doctrine, limiting a rights holder's ability to price discriminate and segment markets within the United States. If a rights holder should have the ability to force a U.S. consumer to pay a higher price for a book than a Mexican consumer, then why shouldn't a rights holder have the ability to force a consumer in New York or California to pay higher price for the book than a consumer in Mississippi or West Virginia? If arbitrage is bad in international markets, why is it acceptable in domestic markets?

9

A-3070

57

In any event, even after *Kirtsaeng*, rights holders can still price discriminate and segment foreign markets—it just isn't quite as easy to do so. They can use contracts to prohibit foreign wholesalers from importing to the United States. They can restrict the number of copies distributed in any country to meet local demand. They can engage in modest product differentiation sufficient to discourage importation. In short, they can act exactly as every other business that cannot rely on copyright to enforce price discrimination.

Finally, a domestic exhaustion rule would create a minefield for charitable organizations such as Salvation Army or Hadassah that raise money by selling donated goods. These organizations would have no way of knowing if an item donated to them had first been sold in the United States with the manufacturer's authorization. Thus, they could potentially incur liability for selling a genuine product that had been imported by someone further up the supply chain without the manufacturer's permission.

**III. Applying the First Sale Doctrine to Software Essential to the Operation of Hardware**

Given the importance of the first sale doctrine, we support the Subcommittee's examination of how the doctrine could be applied to digital goods. While we understand the need to assess carefully the nuances involving digital goods, we believe that the concept of ownership and consumer expectations mean that stakeholders ultimately should work towards a solution that enshrines the first sale principle when discussing the rules of the road for the resale of digital goods.

At the same time, the Subcommittee should not overlook an aspect of "digital first sale" of concern to our members that affects a specific category of tangible goods: products that are distributed with software essential to their operation. Software, of

10

58

course, is a digital technology. Even though the consumers buy the physical products, ranging from high-end servers to toasters, the manufacturers can claim that they are just licensing the software essential to the products' operation.[9] These licenses can contain a variety of restrictive terms that limit ownership rights by interfering with resale of the products, thereby harming the consumers that want to sell equipment they no longer want and the secondary market consumers that want to buy that equipment.[10] Often, these secondary market consumers are federal, state, and local government entities. ORI believes that manufacturers should not be permitted to use software licenses to interfere with the resale of products.

Manufacturers currently employ software licenses to place the following impediments on the alienability of physical products:

- **Prohibition on transfer.** Some license agreements provide that the software license is non-transferable. For example, the license for the software that comes installed on a NetApp product is not transferable. As a practical matter, NetApp gets paid twice for the right to use the same software: once by the original purchaser of the product, and a second time by the purchaser of the used product. Purchasers of Cisco equipment often find that it is cheaper to buy new equipment than pay the excessively high price for a license for the software essential to the operation of the used equipment.

- **Refusal to provide updates.** Some license agreements specify that routine updates such as security-patches will be provided only to the original licensee.

---

[9] The software often is pre-installed into the product by the manufacturer or the vendor. However, sometime the user must install the software provided by the manufacturers via the Internet or storage media such as DVDs.
[10] These licenses also interfere with the sale of unused products by resellers.

11

59

For example, Oracle refuses to supply routine updates to the purchasers of used hardware products containing essential Oracle software, unless they make an additional payment.

- **Bundling of maintenance contracts.** Some manufacturers will use control over the essential software as a means of forcing purchasers of used equipment to buy additional services from them. IBM, for example, will charge purchasers of used equipment a fee for software updates, but will provide the updates for free to purchasers that enter into maintenance agreements.[11]

The legal fiction on which these restrictive practices is based is that the essential software is licensed, not sold, to the purchaser of the hardware in which the software is installed. The manufacturers argue that because the purchaser is merely a licensee of the copy of the software, it does not have rights that normally accrue to the owner of a copy, such as the first sale doctrine or the right to make temporary internal copies necessary for the operation of a computer. *See* 17 U.S.C. §§ 109(a) and 117(a). The U.S. circuit courts are split on the validity of the manufacturers' argument. The Ninth Circuit has accepted this argument, *Vernor v. Autodesk*, 621 F.3d 1102 (9th Cir. 2010), while the Second Circuit has rejected it, *Krause v. Titleserv*, 402 F.3d 119 (2d Cir. 2005). Underlying this split concerning whether a person who acquires a copy of a computer program is an owner or a licensee of the copy is an even more profound split concerning preemption of contract terms inconsistent with the Copyright Act. Compare *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317 (Fed. Cir.), *cert. denied*, 539 U.S. 928 (2003)(holding that the

---

[11] Here are links to examples of these restrictive licenses: Palo Alto Networks (https://www.paloaltonetworks.com/support/support-policies/secondary-market-policy.html); and EMC (http://www.emc.com/collateral/software/warranty-maintenance/h2483-sw-use-rights.pdf).

12

60

Copyright Act does not preempt contractual terms prohibiting actions permitted under fair use), with *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir. 1988)(holding that under the Supremacy Clause of the U.S. Constitution, contract terms prohibiting copyright exceptions are unenforceable).

Congress previously dealt with a similar issue in the context of software rental. In 1990, when Congress was considering amending the Copyright Act to prohibit the rental of software because it facilitated infringement by consumers, companies that rented cars and other equipment that contained software expressed concern that the amendment could prevent these rentals. Accordingly, Congress added an exception to the software rental prohibition that applies to "a computer program which is embodied in a machine or product and which cannot be copied during the ordinary operation or use of the machine or product." 17 U.S.C. § 109(b)(1)(B)(i).

Preserving the resale rights of consumers of physical products that contain software is important for reasons that go beyond the protecting the economic interests of these consumers and the secondary market consumers who would purchase these products. If the manufacturer refuses to provide to the secondary market consumer the security patches it provides to the original consumer, the security of the secondary consumer's computer system could be compromised. Such security patches typically are provided to the original consumer free of charge. In essence, the original purchase price entitles the consumer to receive security patches and other patches that fix bugs in the program.

Preserving a secondary market in these physical products is also important for the environment. If older products can be refurbished and resold, those products stay out of

13

61

landfills. Moreover, the recycling of the older products reduces the need to mine raw materials and produce new components.

We recognize that the problem of restrictions placed on software essential to the operation of hardware implicates complex issues of legal theory at the intersection of Constitutional preemption, the Copyright Act, and contract law. Nonetheless, this is a very concrete practical problem of manufacturers attempting to leverage the copyright in a component into perpetual control over a much larger device. At present, primarily manufacturers of computer and telecommunications equipment misuse software license agreements to interfere with resale. Yet as more products are distributed with pre-installed software, such as cars and consumer appliances, this problem will become more widespread. We believe that this problem can be addressed by a relatively simple amendment to the Copyright Act.

### IV. IP as a Trade Barrier

The International Trade Commission (ITC) recently issued a report, *Trade Barriers That U.S. Small and Medium-sized Enterprises Perceive As Affecting Exports to the European Union,* which identifies the European Union's use of trademark law as a trade barrier.[12] The purpose of the ITC's report is to catalogue trade barriers as a tool for the U.S. Trade Representative in conducting the Transatlantic Trade and Investment Partnership (TTIP) negotiations with the EU. The ITC report's list of EU trade barriers specifically includes "excessive rights of original trademark owner," and the EU's restrictive trademark regime is mentioned at several points. In particular, the report focuses on the use of trademark law to prevent the importation of genuine goods outside

---

[12] ORI testified at a hearing that was part of the inquiry that resulted in the report.

14

62

of authorized distribution channels. This harms U.S. businesses and individuals trying to

sell used and new products in the EU. ORI commends the ITC for recognizing that

"overprotecting intellectual property is as harmful as underprotecting it."[13]

---

[13] *White v. Samsung Electronics*, 989 F.2d 1512 (9th Cir.)(Kozinski, J., dissenting), *cert. denied*, 113 S. Ct. 2443 (1993).

15

63

Mr. GOODLATTE. Mr. Cram, welcome.

**TESTIMONY OF GREG CRAM, ASSOCIATE DIRECTOR, COPY-RIGHT AND INFORMATION POLICY, THE NEW YORK PUBLIC LIBRARY**

Mr. CRAM. Chairman Goodlatte, Ranking Member Nadler, and Members of the Subcommittee. Thank you for the opportunity to testify today. My name is Greg Cram, and I am the Associate Director of Copyright and Information Policy at the New York Public Library. My testimony has been endorsed by the Library Copyright Alliance.

The New York Public Library system encompass four world-class research centers and 88 community branches located in Manhattan, Staten Island, and the Bronx. NYPL serves 50 million users annually of all ages, backgrounds, and needs, offering free programs, classes, exhibitions, and, of course, access to our circulating and research collections. NYPL's collections contain more than 57 million books, eBooks, CDs, DVDs, and other archival materials.

The first sale doctrine is critical to the operation of libraries. It makes clear that transferring a legally acquired copy of a work to another individual by sale or lending is not an infringement of the distribution right of the copyright owner.

First sale supports and protects something American libraries have been doing for almost 400 years: lending books and other materials to the public. This function is the cornerstone of public libraries and public education, allowing citizens to become informed and participate in our democracy.

If the scope of the first sale exception were narrowed or reduced, libraries would face a difficult policy decision, accrue significant copyright liability exposure by continuing to lend affected collections, or deprive a public hungry for knowledge by ceasing circulation of those materials. Many libraries with limited and constrained legal budgets would choose to limit access to the affected items to avoid potentially costly copyright liability.

Unfortunately, libraries faced this scenario after the Second Circuit's decision in the *Kirtsaeng* case. The Second Circuit agreed with the publisher John Wiley & Sons that the first sale doctrine did not apply to copies of its textbooks printed outside the U.S. By limiting the doctrine to copies manufactured in the U.S., the Second Circuit's decision threatened the ability to libraries to continue to lend materials in their collections.

Many books have foreign publishers or are printed by U.S. publishers in other countries. Although some books indicate where they were printed, many do not. Libraries, therefore, have no way of knowing whether these books comply with the Second Circuit's rule. Thankfully, the Supreme Court rightly overturned the Second Circuit's discussion and ruled that the first sale doctrine applies to all non-infringing copies, regardless of where they are made.

This means that libraries throughout the U.S. could continue their existing purchasing and lending practices with new confidence. The rule set by the Supreme Court is the right rule for libraries and their users. Congress should not disturb it.

Libraries are increasingly licensing electronic resources, including trade eBooks and databases of academic journals. The license,

64

not copyright laws set the terms under which the library is permitted to make the content available to its users. This is a major shift from the traditional model where libraries buy physical copies of books and other materials and lend them to users pursuant to the first sale doctrine or preserve them for future access.

This new digital model has both advantages and drawbacks. The library license rate for an eBook can be more expensive, both initially and over time, than its print counterpart, putting additional strain on already tight budgets.

Moreover, if the publisher or content provider goes out of business, the library may no longer be able to license or access the content. This would have serious preservation consequences, leaving large holes in the cultural and scholarly record. Libraries preserve materials to ensure they can be studied and enjoyed by future generations. If libraries are unable to access and preserve digital content, then they will be unable to fulfill their preservation mission.

The good news is that libraries and publishers are working collaboratively to resolve digital transition issues. Business models are evolving and experimentation is occurring. NYPL has taken an active role in encouraging publishers to responsibly participate in the library market for eBooks and explore new ways to address their concerns and the needs of library users.

Furthermore, a consortia of libraries have formed partnerships with publishers for digital preservation. NYPL was an early participant in Portico, a digital preservation service that operates in partnership with publishers to protect digital journals others materials.

At the same time, as progressively more content is licensed rather than sold, Congress needs to consider whether to prohibit enforcement of contractual limitations on copyright exceptions in certain circumstances. Congress, therefore, needs to closely monitor the evolving and complex digital marketplace to ensure that it is sufficiently competitive to provide widespread access works.

Thank you, Mr. Chairman.

Mr. GOODLATTE. Thank you, Mr. Cram.

[The prepared statement of Mr. Cram follows:]

65

**BEFORE THE**
**U.S. HOUSE OF REPRESENTATIVES**
**COMMITTEE ON THE JUDICIARY**
**SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY AND THE**
**INTERNET**

**HEARING ON FIRST SALE UNDER TITLE 17**

**TESTIMONY OF**
**GREG CRAM**
**ASSOCIATE DIRECTOR, COPYRIGHT AND INFORMATION POLICY**
**THE NEW YORK PUBLIC LIBRARY**

**JUNE 2, 2014**

1

66



New York
Public
**Library**

**U.S. HOUSE OF REPRESENTATIVES
COMMITTEE ON THE JUDICIARY
SUBCOMMITTEE ON COURTS, INTELLECTUAL PROPERTY AND THE
INTERNET**

**HEARING ON FIRST SALE UNDER TITLE 17**

**JUNE 2, 2014**

**TESTIMONY OF
GREG CRAM
ASSOCIATE DIRECTOR, COPYRIGHT AND INFORMATION POLICY
THE NEW YORK PUBLIC LIBRARY**

Chairman Coble, Ranking Member Nadler, Members of the Subcommittee, my

name is Greg Cram and I am the Associate Director of Copyright and Information Policy

at The New York Public Library, Astor, Lenox and Tilden Foundations ("NYPL") in

New York City. I am the only copyright specialist working at a public library in the

United States, which demonstrates NYPL's commitment to engaging with copyright

issues. My testimony is endorsed by the Library Copyright Alliance ("LCA").[1]

NYPL is virtually unique in that it combines both a world-class research library

and a network of community libraries. NYPL serves, without charge, a broad and diverse

public ranging from toddlers to seniors, and from persons acquiring literacy skills to

---

[1] LCA consists of three major library associations—the Association of Research Libraries
("ARL"), the American Library Association ("ALA"), and the Association of College
and Research Libraries ("ACRL")—that collectively represent over 100,000 libraries in
the United States employing over 350,000 librarians and other personnel. LCA
contributed to the development of this written testimony.

2

67

post-graduate scholars, many of whom may be unaffiliated with academic institutions. Serving close to 50 million users both in person and online, NYPL is one of the largest library systems in the country. Our 88 community branches located in Manhattan, Staten Island, and the Bronx circulate a collection of six million books, e-books, CDs and DVDs each year. Our research collection consists of more than 51 million items, including published books, archival materials, family photographs, sound recordings, and ephemera. NYPL's mission is to inspire lifelong learning, advance knowledge, and strengthen our communities. In addition to offering our users access to the materials in our collection, we further this mission by providing free services and other resources including computer access, classes, exhibitions, programming and more.

I appreciate the opportunity to testify today on the importance of the first sale doctrine to libraries and NYPL's support for the Supreme Court's decision in *Kirtsaeng v. John Wiley & Sons*. I will also explain how the digital first sale issue should be viewed in the broader context of contractual restrictions on copyright exceptions.

## I. THE IMPORTANCE OF THE FIRST SALE DOCTRINE TO LIBRARIES

Section 106(3) of the Copyright Act grants the copyright owner the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by...lending."[2] However, the first sale doctrine, codified at Section 109(a) of the Copyright Act, terminates the copyright owner's distribution right in a particular copy "lawfully made under this title" after the first sale of that copy.[3] The House Judiciary Committee Report on the 1976 Copyright Act explains that under Section 109(a), "[a]

---

[2] 17 U.S.C. § 106(3) (2012).
[3] 17 U.S.C. § 109(a) (2012).

3

68

library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose."[4] The first sale doctrine thus is critical to the operation of libraries: "[w]ithout this exemption, libraries would be unable to lend books, CDs, videos, or other materials to patrons."[5] In short, the first sale doctrine is critical to one of the most basic library functions: lending books and other materials to the public.

**A. Throughout American History, Libraries Have Promoted Democratic Values By Lending Books to the Public**

For almost 400 years, libraries in America have been lending books and other materials. In 1638, John Harvard bequeathed his collection of books to a newly established college in Cambridge, Massachusetts for the use of its faculty and students.[6] Benjamin Franklin in 1731 helped establish the Library Company of Philadelphia, which allowed its stockholders to borrow its books.[7] William Rind created a commercial circulating library in Annapolis in 1763, which rented books for a small fee.[8] By the end of the eighteenth century, many towns throughout the new nation had academic libraries, membership libraries, circulating libraries or church libraries.[9]

---

[4] H.R. REP. NO. 94-1476, § 109, at 79 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5693.

[5] CARRIE RUSSELL, COMPLETE COPYRIGHT: AN EVERYDAY GUIDE FOR LIBRARIANS 43 (2004).

[6] MICHAEL HARRIS, HISTORY OF LIBRARIES IN THE WESTERN WORLD 173 (1999).

[7] *Id.* at 183-84. Benjamin Franklin explained his rationale for organizing a library: "by thus clubbing our Books to a common Library, we should, while we lik'd to keep them together, have each of us the Advantage of using the Books of all the other Members which would be nearly as beneficial as if each owned the whole." BENJAMIN FRANKLIN, THE AUTOBIOGRAPHY OF BENJAMIN FRANKLIN 130 (Leonard W. Labaree ed., 1964).

[8] "In many ways more democratic than the subscription social libraries, the circulating libraries often allowed women to have books, featured reading rooms with long hours, and provided access to a variety of reading matter, including newspapers, popular pamphlets, and novels." Dee Garrison, *Libraries, in* ENCYCLOPEDIA OF THE UNITED STATES IN THE NINETEENTH CENTURY (Paul Finkelman ed., 2001).

[9] HARRIS, *supra* note 6, at 202-03.

4

69

In 1800, Congress established the Library of Congress. President Thomas Jefferson appointed the first Librarian of Congress, and sold his private collection to the Library of Congress in 1815, after its collection burned during the British occupation of Washington, D.C., in the War of 1812.[10] Thomas Jefferson also articulated a vision of libraries across the country providing broad public access to books. In a letter to John Wyche, Jefferson stated that "I have often thought that nothing would do more extensive good at small expense than the establishment of a small circulating library in every county, to consist of a few well-chosen books, to be lent to the people of the county under regulations as would secure their safe return in due time."[11]

During the first half of the nineteenth century, access to books increased. Apprentice libraries were established for the use of young men migrating to the cities to help them "train for the new factory system which had been brought about by the industrial revolution."[12] Mercantile libraries developed for the use of merchants and law clerks. School districts began to invest in libraries for their students. By 1853, New York State had created school district libraries throughout the state with over 1,604,210 volumes.[13] Horace Mann urged Massachusetts to follow New York's lead because he "saw the library as an essential contributor to the educational program of the school, as an

---

[10] *Id.* at 196-97. The Library of Congress circulates materials to Supreme Court Justices, Members of Congress, thousands of Congressional employees, and other libraries (which can make the materials available to users within the library premises). *Interlibrary Loan*, LIBRARY OF CONG., http://www.loc.gov/rr/loan/loanweb1.html (last visited May 28, 2014).
[11] Letter from Thomas Jefferson to John Wyche (May 19, 1809), *in* THOMAS JEFFERSON: A CHRONOLOGY OF HIS THOUGHTS 223 (Jerry Holmes ed. 2002).
[12] JEAN KEY GATES, INTRODUCTION TO LIBRARIANSHIP 70 (1968).
[13] *Id.* at 79.

5

70

invaluable aid in continuing education and in self-improvement, and an indispensable part of the cultural life of the people."[14]

In 1848, the Massachusetts legislature authorized the City of Boston "to establish and maintain a public library, for the use of the inhabitants...."[15] In the following decades, other public libraries were established, but the public library movement accelerated dramatically after 1881 through the philanthropy of steel magnate Andrew Carnegie. Carnegie said that "[t]here is not such a cradle of democracy upon the earth as the Free Public Library, this republic of letters, where neither rank, office, nor wealth receives the slightest consideration."[16] Carnegie ultimately funded the construction of 1,679 public library buildings in 1,412 communities across the United States.[17]

NYPL was founded with this public mission in mind. In 1895, the Astor and Lenox libraries combined with the support of The Tilden Trust to "establish and maintain a free library and reading room in the city of New York...."[18] In 1901, NYPL contracted with the City of New York to operate 39 Carnegie-built public library buildings in

---

[14] *Id.* at 80.

[15] *Founding Legislation*, BOSTON PUB. LIBRARY, http://www.bpl.org/general/legislation.htm (last visited May 28, 2014).

[16] Adam Arensen, *Libraries in Public Before the Age of Public Libraries: Interpreting the Furnishings and Design of Athenaeums and Other "Social Libraries," 1800-1860*, *in* THE LIBRARY AS PLACE: HISTORY, COMMUNITY, AND CULTURE 74 (John Buschman & Gloria J. Leck, eds., 2007). "When mention is made of the dependence of a democratic society on an informed citizenry, the American public library usually comes to mind as the instrument which has had as its fundamental purpose the serving of this crucial need." GATES, *supra* note 12, at 91. *See also* U.S. OFFICE OF EDUC., PUBLIC LIBRARIES IN THE UNITED STATES OF AMERICA iii (1876) ("[O]ur libraries will fulfill in every respect their high station as indispensable aids to public education, to the privilege and responsibility of instructing our American democracy.").

[17] HARRIS, *supra* note 6, at 246-47.

[18] Will of Samuel J. Tilden (Apr. 23, 1884). For more information on the founding of NYPL, *see* The New York Public Library, *Introductory Statement*, BULLETIN OF THE NEW YORK PUBLIC LIBRARY, ASTOR, LENOX AND TILDEN FOUNDATIONS, Jan. 1897, at 3, *available at* http://books.google.com/books?id=waNMAAAAYAAJ.

6

71

Manhattan, Staten Island, and the Bronx. For the last century, NYPL has served a vital

role in the intellectual fabric of American life. Today, NYPL provides free and open

access to its physical and electronic collections of information as well as to its services

for people of all ages, backgrounds and needs.

In the twentieth century, the federal government expanded its support of libraries

far beyond the Library of Congress. During the Great Depression, the Works Progress

Administration built 350 new libraries and repaired many existing ones.[19] In 1941,

President Franklin Roosevelt issued a proclamation identifying libraries as "essential to

the functioning of a democratic society" and "the great tools of scholarship, the great

repositories of culture, the great symbols of the freedom of the mind."[20] Congress enacted

the Library Services Act of 1956 and the Library Services and Construction Act of 1964

to provide federal funding for library construction. Currently, the Institute of Museum

and Library Services, an independent federal agency, administers the Library Services

and Technology Act of 1996 and its 2003 reauthorization to allocate federal funding

annually to libraries throughout the United States.[21]

**B. Americans Borrow Books and Other Materials From Libraries 4.4 Billion Times A Year**

Notwithstanding the spread of digital technology, millions of Americans check

out books and other materials from libraries. The collections of the over 9,225 public

libraries in the country contain 934.8 million materials of which 88.3 percent are printed

---

[19] Byron Anderson, *Public Libraries*, *in* ST. JAMES ENCYCLOPEDIA OF POPULAR CULTURE 133 (Tom Pendergast & Sara Pendergast eds., 2000).
[20] PATTI CLAYTON BECKER, BOOKS AND LIBRARIES IN AMERICAN SOCIETY DURING WORLD WAR II: WEAPONS IN THE WAR OF IDEAS 49 (2005).
[21] *See generally* INSTITUTE OF MUSEUM AND LIBRARY SERVICES, http://www.imls.gov (last visited May 28, 2014).

7

72

materials, 5.7 percent are audio materials, 5.4 percent are video materials, and 1.6 percent are e-books.[22] For these 934.8 million materials, there were a total of 2.241 billion circulation transactions in 2009.[23] Per capita circulation grew by 26.1 percent between 2000 and 2009.[24]

The collections of 81,920 public school media centers contain 959 million books and 42.6 million phonorecords and audiovisual materials.[25] These materials were checked out 2.05 billion times during the 2007-08 school year.[26]

The collections of 3,689 academic libraries include 1.07 billion copies of printed materials, as well as 112 million phonorecords and audiovisual materials and 158 million e-books.[27] There were a total of 176 million circulation transactions for these materials in 2010.[28]

At NYPL, we have seen an increase in lending and use of the collection since 2008. In 2012, NYPL circulated 28 million items, an increase from 18 million items in 2008. This represents a 44 percent increase in circulation since 2008. All this library lending is enabled and protected by the first sale doctrine.

---

[22] INSTITUTE OF MUSEUM AND LIBRARY SERVICES, PUBLIC LIBRARIES SURVEY FISCAL YEAR 2009 10 (2010).
[23] *Id.* at 7.
[24] *Id.*
[25] NATIONAL CENTER FOR EDUCATIONAL STATISTICS, U.S. DEPARTMENT OF EDUCATION, CHARACTERISTICS OF PUBLIC AND BUREAU OF INDIAN EDUCATION ELEMENTARY AND SECONDARY SCHOOL LIBRARY MEDIA CENTERS IN THE UNITED STATES: RESULTS FROM THE 2007–08 SCHOOLS AND STAFFING SURVEY 9 (2009).
[26] *Id.* at 14.
[27] NATIONAL CENTER FOR EDUCATION STATISTICS, U.S. DEPARTMENT OF EDUCATION, ACADEMIC LIBRARIES: 2010 FIRST LOOK 8 (2011).
[28] *Id.* at 4.

8

73

## II. AVOIDING THE PARADE OF HORRIBLES: WHY THE SUPREME COURT'S *KIRTSAENG* DECISION SHOULD NOT BE DISTURBED

The first sale doctrine in Section 109(a) applies only to "copies lawfully made under" Title 17. In an effort to prevent parallel imports, some rights holders had argued that this phrase means lawfully manufactured in the United States. The Second Circuit in *John Wiley & Sons v. Kirtsaeng*[29] agreed with publisher John Wiley & Sons that the first sale doctrine did not apply to copies of its textbooks printed with its authorization in Thailand. Thus, a student who imported these foreign-printed copies into the United States and sold them online infringed copyright.

By restricting the application of Section 109(a) to copies manufactured in the United States, the Second Circuit's decision threatened the ability of libraries to continue to lend materials in their collections. Over 200 million books in U.S. libraries had foreign publishers. Moreover, many books published by U.S. publishers were actually manufactured by printers in other countries. Although some books indicated on their copyright page where they were printed, many did not. Libraries, therefore, had no way of knowing whether these books complied with the Second Circuit's rule. Without the certainty of the protection of the first sale doctrine, librarians would have had to confront the difficult policy decision of whether to continue to circulate these materials in their collections in the face of potential copyright infringement liability. For future acquisitions, libraries would have been able to adjust to the Second Circuit's narrowing of Section 109(a) only by bearing the significant cost of obtaining a "lending license" whenever they acquired a copy that was not clearly manufactured in the United States.

---

[29] 654 F.3d 210 (2d Cir. 2011).

9

74

On March 19, 2013, by a 6 to 3 vote, the Supreme Court overturned the Second Circuit and ruled that the first sale doctrine applies to non-infringing copies, regardless of where they are made. This means that libraries throughout the United States could continue their existing purchasing and circulation practices with new confidence that they would not infringe copyright by doing so.

Writing for the majority, Justice Breyer closely examined the meaning of the five words "lawfully made under this title." After reviewing the context of those words in Section 109(a) and the Copyright Act, the common law history of the first sale doctrine, the legislative history of Section 109(a), and the Court's earlier decisions, Justice Breyer rejected the "geographical interpretation" of lawfully made under this title as meaning made in the United States. Instead, he found that the phrase meant manufactured in a manner that met the requirements of American copyright law, e.g., manufactured with the permission of the rights holder.

Reinforcing this interpretation was the "parade of horribles" that might ensue if the Court adopted the geographical interpretation. The first, and by far the most detailed, example Justice Breyer used was the potentially adverse impact on libraries.

> The American Library Association tells us that library collections contain at least 200 million books published abroad (presumably, many were first published in one of the nearly 180 copyright-treaty nations and enjoy American copyright protection under 17 U.S.C. §104, see supra, at 10); that many others were first published in the United States but printed abroad because of lower costs; and that a geographical interpretation will likely require the libraries to obtain permission (or at least create significant uncertainty) before circulating or otherwise distributing these books. Brief for American Library Association et al. as Amici Curiae 4, 15–20.[30] Cf. id., at 16–20, 28 (discussing limitations of potential defenses, including the fair use and archival exceptions, §§107–108). See also

---

[30] The brief Justice Breyer refers to as the American Library Association brief is the brief submitted jointly by ALA, ARL, and ACRL, referenced above.

10

75

Library and Book Trade Almanac 511 (D. Bogart ed., 55th ed. 2010) (during 2000–2009 "a significant amount of book printing moved to foreign nations").

How, the American Library Association asks, are the libraries to obtain permission to distribute these millions of books? How can they find, say, the copyright owner of a foreign book, perhaps written decades ago? They may not know the copyright holder's present address. Brief for American Library Association 15 (many books lack indication of place of manufacture; "no practical way to learn where [a] book was printed"). And, even where addresses can be found, the costs of finding them, contacting owners, and negotiating may be high indeed. Are the libraries to stop circulating or distributing or displaying the millions of books in their collections that were printed abroad?[31]

The Court's geographic interpretation of Section 109(a) results in an international exhaustion rule: the distribution right is exhausted regardless of where the first sale occurs, meaning that the rights holder cannot prevent the parallel importation of copies purchased abroad. This is the right rule for libraries and for American consumers, and Congress should not disturb it.

## III. DIGITAL FIRST SALE

Libraries are increasingly licensing electronic resources, from e-books in public libraries to databases of academic journals. The license sets the terms under which the library is permitted to make the content available to its users. Often the content is hosted on the server of the publisher or other intermediary, and the library is buying access to the server for its users. An authorized user might be able to download the content onto her computer or device, and digital rights management software will allow the content to reside there until it is automatically deleted in accordance with the license terms. For example, Overdrive provides many public libraries with access to e-books with the

---

[31] Kirtsaeng v. John Wiley & Sons, 133 S. Ct. 1351, 1364 (2013).

11

A-3089

76

publishers' authorization. Currently, for most popular trade titles, a library contracts with vendors like Overdrive to enable users to check out a licensed title based on the print "one copy, one user" model. Libraries must license additional e-book files in order to lend to more than one user at the same time. Similar to the length of time a physical book is borrowed for, after a prescribed period, the e-book is automatically returned and becomes immediately available for digital check-out by another user. Other licenses might not allow digital download, but instead permit a user to print out a limited number of pages, e.g., a journal article. Other licenses permit users to access content only when the user is connected to the Internet, e.g., streaming access.

This obviously is a major shift from the traditional model where libraries bought physical copies of books and other materials, which they then lent to users pursuant to the first sale doctrine. This new model has certain advantages over the traditional model. Libraries do not need to repair torn pages or broken bindings, nor do they need to put the books on a physical shelf. Users get immediate access to materials once they are automatically returned, and, if the license permits, users can access the materials remotely.

At the same time, the new model has certain drawbacks. Under the old model, a book remained in the collection until the book physically wore out or the library chose to replace it. In contrast, under most current business terms applied by publishers to this new digital environment, a library can provide access to licensed content only so long as it has paid the appropriate license fee. As new digital content licensing models evolve, libraries will continue to evaluate licenses against their obligation to act responsibly with

12

77

taxpayer dollars and private funding.[32] Also, when libraries renew licenses, the terms of the renewal may be different than the previous license, adding some unpredictability as to what will be available from year-to-year.

Further, some current licensing models contain arbitrary circulation limits, and the libraries must re-license an e-book after a given period in order to maintain access. Thus, if the library wanted to retain a title for ten years, it would have to license the title ten times in addition to the annual licensing fee for electronic access. The library license rate for an e-book can more expensive than its print counterpart, and sometimes more than ten times the consumer e-book price.[33] Some publishers (or authors who retained their copyright) do not license e-books to libraries at all, or restrict access to the publisher catalog through embargos or particular genres.

Moreover, if the publisher or content provider goes out of business, or decides to discontinue access to certain products because it is no longer profitable, the library might no longer be able to provide access to the content at all under the original terms of the license. This, of course, would have serious preservation consequences, leaving large holes in the cultural and scholarly record. Libraries preserve materials to prevent the loss of vital cultural, historical and scholarly resources so that generations of users to come

---

[32] For smaller libraries, the cost differential between purchasing a physical item and licensing a digital file may be significant. According to one study, a public library on average purchases 59 hardcover copies each of the top 20 New York Times bestseller list titles (1,180 individual copies) at a total cost of $2.4 million. The same public library spends $1.2 million on 19 electronic copies of each of the same bestselling titles (380 individual copies). This represents a 55% increase in cost for the same titles. OCLC ONLINE COMPUTER LIBRARY CENTER, THE BIG SHIFT: PUBLIC LIBRARY STRATEGIES FOR ACCESS TO INFORMATION IN ANY FORMAT 15 (2013), *available at* http://www.oclc.org/content/dam/campaign-landing-pages/en/214936_the-big-shift.pdf.
[33] *See* Douglas County Libraries Report, Price Comparison as of April 3, 2014 (Apr. 2014), http://evoke.cvlsites.org/files/2014/04/DCL-Pricing-Comparison-4-3-14.pdf.

13

78

are able to use them. If libraries are unable to access and preserve digital content, then libraries may not be able to fulfill their mission to protect the record of our cultural heritage for future readers and knowledge creators.

Libraries and publishers are working collaboratively to resolve digital transition issues. Although some publishers have been reluctant to license e-books to public libraries on reasonable terms, business models are evolving and experimentation is occurring. NYPL has taken an active role in encouraging publishers to responsibly re-enter the library market for e-books, and explore new ways to address their concerns and the needs of library users. In 2012, Tony Marx, the president of NYPL, offered NYPL as a pilot-testing lab for virtually any e-book distribution model any publisher wanted to test. These pilots helped both libraries and publishers understand how to work with new business models and how users engage with e-books. These partnerships are consistent with NYPL's role in providing access to content while promoting the discovery of new literature. Furthermore, consortia of libraries with a mission for preserving cultural heritage and the scholarly record have formed partnerships for digital preservation, starting with journal content, with each library taking responsibility for particular titles among its holdings. For example, NYPL was an early participant in Portico, a digital preservation service that operates in partnership with publishers to protect digital journals and other materials.[34]

At the same time, as progressively more content is licensed rather than sold, Congress needs to consider whether to prohibit the enforcement of contractual limitations on copyright exceptions in certain circumstances. Significantly, the suite of statutory

---

[34] *See generally* PORTICO, http://www.portico.org/ (last visited May 28, 2014).

14

79

instruments for amending the U.K. copyright law that will come into force on June 1, 2014, prohibit the "contracting out" of many exceptions in the research and education context.[35] Congress, therefore, needs to closely monitor the evolving digital marketplace to ensure that it is sufficiently competitive to provide widespread public access to works.

## IV. CONCLUSION: PROTECT FIRST SALE FOR PHYSICAL ITEMS AND MONITOR EVOLVING DIGITAL BUSINESS MODELS

Throughout American history, libraries have played a fundamental role in promoting democratic values by providing access to information. By lending materials to users, libraries help users become informed citizens. Recognizing this important activity, U.S. copyright law protects the physical lending of material through the first sale doctrine. Attempts to limit the scope of the first sale doctrine, such as those contemplated in the *Kirtsaeng v. John Wiley & Sons* litigation, are very concerning to libraries. For licensed digital content, Congress should continue to monitor evolving business models to ensure that the public can continue to access content lent by libraries free of charge.

I would like to thank the Committee for holding this hearing and inviting NYPL to participate.

---

[35] *See, e.g.*, The Copyright and Rights in Performances (Research, Education, Libraries and Archives) Regulations 2014, http://www.legislation.gov.uk/ukdsi/2014/9780111112755.

15

---

80

**TESTIMONY OF MATTHEW B. GLOTZER, MEDIA CONSULTANT**

Mr. GOODLATTE. Mr. Glotzer, welcome.

Mr. GLOTZER. Thank you. Chairman Goodlatte, Ranking Member Nadler, Members of the Subcommittee.

I appreciate the opportunity to participate in today's hearing, and I recognize the need to regularly review copyright, given the near constant flux in media landscape.

For content-driven companies, emerging technology represents a mix of opportunity and challenge. And it is incumbent upon IP creators to be proactive in leveraging these new tools to sustain growth.

Any business, no matter how established it may be, is better off working to adapt itself to the future landscape than blindly trying to preserve the past. In the course of such adaptation, the content industry has embraced online licensing as a means to provide consumers the flexibility they demand in the Internet era.

With this forward-leaning view, I submit that the creation of a new first sale doctrine that applies to electronically delivered content is both unnecessary and potentially detrimental to the long-term health of many content markets. I have spent more than two decades working within large organizations designing products and distribution models that are responsive to technological change.

Although I do not appear on behalf of any particular company today, my views are based on firsthand experiences in navigating market shifts and will focus more on commercial and economic reality than legal theory.

There are three primary reasons for my opposition to creating a new first sale doctrine for electronically delivered content. To begin, consumers have eagerly adopted the array of flexible electronically delivered models that are now available alongside physical media. Since the delivery of Internet video became available in the mid-2000's, consumers have led the shift toward access-based models, in sharp contrast to the rabid collection of the tapes and disks that had been prevalent for many years prior.

Screen Digest reports that by 2009, U.S. Households were already accessing to 376 million films and 20 billion television programs online per year. By 2013, annual consumption ballooned to 5.7 billion movies and 56 billion TV shows via electronic delivery.

To be sure, the traditional proposition to own physical media has historically been one of the industry's most potent, and I suspect it will continue to offer this model as long as consumers demand it. But today, consumers increasingly demonstrate a preference for the broad choice and ubiquitous accessibility that is offered by popular online services. The marketplace has turned a corner.

Secondly, the distribution challenges inherent in physical media addressed by the first sale doctrine do not exist in the electronic realm; in other words, there is no incremental problem to solve. Content distribution by a physical technical host, such as paper, tapes, and disks, is subject to a series of costs, including manufacturing inventory risk; there is the degradation of copies over time; and the costs of dissemination, which itself includes the need for a consumer to maintain possession of a copy in order to access the content.

81

But electronic delivery is highly efficient, such that these costs are greatly reduced or eliminated outright. Most importantly, electronic content can be transferred from user to user almost instantaneously, much faster than any physical host could be transferred hand to hand, and with no degradation in quality.

Thirdly, unlike secondary markets for physical media, those for electronic licenses are actually efficient enough to disrupt their primary counterparts. A secondary market for physical media can co-exist with the primary market because the inherent costs and limitations of that physical media make used copies a separate value proposition from new ones.

But the hyper efficiency of electronic delivery is rooted in the speed, ubiquity, and anonymity of Internet-based communications. In this realm, parties wishing to exchange goods need not be co-located and, in fact, need not be known to one another. Low-cost intermediary service could automatically effectuate not only permanent transfers of licenses but also temporary loans of them.

So it is easy to imagine that a single instantiation of a content license could provide utility to hundreds of users as long as only one user wanted the content at any given time.

Such a mechanism would force content owners to price each license based on its capability to serve many rather than one. But how many willing buyers would there be if a film cost 10 to 100 times its customary price? The result would be a failure of the primary market.

My fellow witness, Dr. John Villasenor, has acknowledged this problem and suggests limiting the frequency with which secondary market licences could be exchanged so transfers might be allowed but loans would not.

But where do we draw that line? How would we analyze the problems so that demarcation between a loan and a transfer would be something more than an arbitrary distinction?

In summary, content producers have embraced the efficiency of electronic delivery, arguably at the expense of some of the those most time-tested business models. And they will continue to do so as long as the markets for their products remain robust. Currently, studios are working on exciting mixes of content and services around their intellectual property that are intended to deepen the engagement with fans. But this sustained innovation relies on the elegant balance of producer and consumer incentives. The rise of secondary market for used electronic goods that are indistinguishable from their new equivalents would harm this balance and eventually result in a market failure.

Mr. Goodlatte, Mr Nadler, my opinions today are not in any reflexive defense of old models. I offer them out of a genuine interest in maintaining the market dynamics that have fostered so much innovation to date. The continued investment and experimentation by content creators will yield myriad benefits to the entire value chain.

Again, I appreciate your time, and I look forward to any questions you may have. Thank you.

Mr. GOODLATTE. Thank you, Mr. Glotzer.

[The prepared statement of Mr. Glotzer follows:]

82

**Testimony of Matthew B. Glotzer**
**Before the U.S. House of Representatives**
**Subcommittee on Courts, Intellectual Property, and the Internet**
**Hearing on First Sale Under Title 17**
**June 2, 2014**

## Introduction

Chairman Coble, Ranking Member Nadler, and members of the Subcommittee, thank you for the opportunity to participate in today's hearing on the impact of changing the first-sale doctrine to apply to electronically-delivered content. I testify today in my personal capacity as someone who has spent more than two decades working within content companies (in music, film and television) designing products and distribution models that are responsive to advances in available technology and changes in consumer demand.

It is essential for Hollywood (and other content industries) to be agile in growing new business models. This innovation must be done thoughtfully, accounting for the substantial amounts that creators invest each time they produce a new film or television show, and that is precisely what the movie and television industry has been doing. The high speed of technological advancement in content businesses over the past 15 years is obvious. Today's digital marketplace offers consumers a variety of ways to enjoy content, such as through electronic download, video-on demand, and streaming services. License-based options are designed around flexible access to content, not the acquisition of physical objects. Electronic delivery has increased the value proposition to consumers by enabling access to content virtually anywhere, at any time, to multiple authorized users, and on multiple devices; and this increase is evident in the high rate of user adoption.

The first sale doctrine -- created more than 100 years ago and codified in 1976 -- permits the owner of a physical object containing a work to sell or give away the object. The doctrine addresses limitations inherent in physical objects: they take up space, require the user to maintain possession and expend some effort to transport, impose costs to produce additional units, are often manufactured in limited runs or are otherwise scarce, and typically decay with age. Some are proposing changing the first sale doctrine to apply to non-physical goods. *Doing so is not only unnecessary, it would radically alter the nature and purpose of the doctrine.*

"True north" for any analysis of proposed changes to the Copyright Act should be the maintenance of the central balance that it aims to strike: that is, incentivizing creators to maintain their output of new ideas, and ensuring that consumers have reasonable access to them, irrespective of the particular tools, services or consumer behaviors that may be prevalent at any point. Changing the first sale doctrine to apply to electronically-delivered content would have detrimental effects on that balance. It would do significant harm to creators over time and ultimately hinder the further evolution of flexible, online choices that the content industry currently offers consumers.

For individuals that prefer the traditional ownership model, physical options remain available. But in light of the rapid success of access-based models, it would seem

83

advantageous to let markets continue to drive innovation, rather than intervene and risk the side effects of imposing an old construct on the new, digital landscape.

## The Impact of Electronic Delivery

Prior to the emergence of robust, electronic delivery mechanisms, content distribution required that the intellectual property be bound to a physical "host" for transmission to, and access by consumers. For most of the 20th century, *copies* were manufactured on paper, tape or discs, as applicable. In the 1990s, newer content formats were *digital*, but still distributed via physical discs or tapes.

There are a variety of costs (pecuniary and not) to physical distribution that include:

- **MANUFACTURING:** costs associated with producing the host media (e.g., discs, tapes)
- **INVENTORY:** risk associated with producing too many or too few of a particular title
- **DEGRADATION:** decline in the "quality" of the copy over time and with frequent use
- **DISSEMINATION:** need to coordinate shipments across various geographies to match demand; need for a consumer to have possession of physical media in order to access content

Electronically-delivered content became commercially significant in the early 2000s, as increases in available bandwidth made Internet "pipes" wider, and advances in data compression made digital files smaller. Broadly, there are two mechanisms for this kind of distribution: *downloading*, where the user takes a complete instantiation of the content and stores it locally; and *streaming*, where small, sequential portions of the content are transferred for viewing as needed from a service that stores the content remotely.

The elimination of the physical host requirement from the transfer process yielded tremendous efficiencies, and most conventional costs could be greatly reduced, or eliminated outright.

- There is no longer any substantial manufacturing cost or inventory risk.

- As a file stored digitally, the content does not degrade with repeated use or over time.[1]

- Access to the content no longer requires the presence of any specific

|  | PHYSICAL DELIVERY | ELECTRONIC DELIVERY |
|---|---|---|
| **HOST:** | paper, disc, tape | none |
| **DEGRADATION:** | varies | none |
| **DISTRIBUTION COST:** | relatively high | relatively low |
| **DISTRIBUTION "VELOCITY":** | low | high |

object. As long as a user is connected to the Internet via an authorized device, he/she may access content for which he/she has rights. Most importantly, the speed with which content can be moved is nearly instantaneous, much faster than any physical host could be exchanged, shared or transferred.

---

[1] It is the case that the storage medium on which the files sit may degrade over time, but whether stored locally by a consumer, or remotely by a service, these can be easily transferred to newer storage, and again, without any loss of fidelity.

84

## Problems with Creating an On-Line First Sale Doctrine

There are several reasons why creating a first-sale doctrine for electronically-delivered content would disrupt the balance between creator incentives and consumer access. In weighing them, it is important to recall that first-sale ideas were borne out of the inherent limitations of physical distribution. *These factors (particularly degradation and relatively low "velocity" of exchange) made secondary-market (used) content fairly distinct from primary-market (new) versions of the same IP,* such that the two markets could coexist. From inception, the first-sale doctrine relied on these characteristics to achieve its purpose, and this notion is supported by the U.S. Copyright Office, which has confirmed that the particular limitation to physical objects is not a relic of outdated technology but "a defining element of the doctrine and critical to its rationale."[2]

**Consumer access is not constrained on the electronic distribution mechanisms that content owners have embraced.**

Across a variety of dimensions, content is more accessible than ever.

- **AVAILABILITY:** There are more than 100 legitimate streaming services offering a broad array of film and television content to U.S. consumers. This list includes: Netflix, Hulu, Amazon, VUDU, and HBO GO.[3]
- **ACCESS POINT:** Services (such as those named above) are usable on a wide array of device categories, including desktop and laptop computers, tablets, and smartphones, in addition to televisions.
- **REVENUE MODEL:** The practice of licensing rights, rather than manufacturing copies of content for sale, has enabled distributors to expand available offerings. Film and television can now be obtained via permanent license (EST), temporary license (VOD), or subscription service (SVOD). Recorded music is also widely provided on both permanent license and subscription bases.

And consumers have responded favorably to these offerings. In 2009, U.S. consumers were already accessing 376 million movies and 20 billion TV shows online, according to Screen Digest. By 2013, those numbers were up to 5.7 billion movies and 56 billion TV shows.

So unlike the case with physical media, here there is really no evidence that consumer access is constrained.

**The potential velocity of exchange of "pre-owned" licenses is so high that it would be impossible for a creator to set an appropriate price for new works.**

First-sale may have been conceived to reduce some potential "friction" inherent in physical media, but it also anticipated that much of it was inevitable and would remain. As noted earlier, the characteristics of paper, tapes, discs, etc. were what allowed both a

---

[2] Executive Summary, Digital Millennium Copyright Act Section 104 Report, *available at* http://www.copyright.gov/reports/studies/dmca/dmca_executive.html.

[3] www.wheretowatch.org

primary market and a secondary market to coexist, offering the consumer very different value propositions.

In the physical world, "used" copies are distinct from the original. They are either cheaper because they are no longer new, or more expensive because they are rare. "Used" electronic content, however, is indistinguishable from the original. Consequently, the used market would supplant the original market, depriving creators of a return on their investment and reducing their incentive to create content in the first place.

Electronic distribution turns traditional dynamics on their head, most notably in the way that content is now transferable from one consumer to another. Physical media must be handed off (literally) from *A* to *B*. Therefore:

- *A* and *B* must know one another to communicate, or both must use an intermediary (e.g., a physical storefront) that is willing to take control of the copy between the time that *A* offers the product and *B* wishes to obtain it.
- *B* will then take it away, and *A* will no longer have control, so the nature of the transaction (whether or not it involves an intermediary) will be a permanent sale, rather than a loan, because *A* is unlikely to have recourse when *B* disappears.
- The coordination of multiple buyers and sellers in terms of location, timing and price negotiation is a relatively cumbersome process.

The equivalent mechanism in a realm of electronic licenses is perfectly efficient, so much so that it could have devastating effects on the primary market for like content. In this context, the actual content files are encrypted and are easy to obtain, though difficult to unlock. Licenses to use the content come as separate "key" files that decrypt the content file for playback. Because of this:

- *A* and *B* need not know one another, and the matching by an intermediary could be accomplished by low-cost servers that operate open-source Internet routing software.
- *A* might "sell" the license to *B*, making the transfer relatively permanent, but this is no longer a practical necessity as it was with physical media. The same intermediary could set rules on how long *B* could access the content before the rights reverted, automatically, to *A*. This would enable very short-term "loans" of the content to *B*.

Under this arrangement, one single instantiation of a content license could provide utility to potentially hundreds of users; as long as only one user wanted the content at any given time. If such a mechanism were in place, a rational content owner would anticipate this and price each individual content license based on its capability to serve many, rather than one. But it is highly implausible to expect that a marketplace where film or television content costs 10-100x its "customary" price would find many willing buyers to begin with. The result would be a market failure.

Dr. John Villasenor, a fellow witness in today's hearing, has acknowledged this problem and suggests that, "...a digital first-sale doctrine would need to be structured to ensure that very short-term (e.g., a few minutes), anonymous digital loans are not within the scope of permitted dispositions of copies of works."[4] But addressing this would require the explicit demarcation of short-term and long-term (i.e., permissible) dispositions of these licenses. This would be challenging to analyze appropriately, for legislators and copyright holders alike.

---

[4] Villasenor, John, "Rethinking A Digital first-sale Doctrine In A Post-*Kirtsaeng* World: The Case For Caution", *CPI Antitrust Chronicle*, May 2013

86

## Conclusion

Critics might assume that a reluctance to expand first-sale to electronically-delivered goods is a blind defense of old models, but this is wrong. My opposition is based on three critical points of logic:

- First, that the purpose of first-sale – to limit copyright *only* for purposes of easing the inherent "friction" associated with physical media – is simply unnecessary in a world of electronic licensing, where access to the content itself is relatively costless.

- Second, that because of the hyper-efficiency of electronic distribution, there will be no natural "firewall" between the primary and secondary markets for content. This will substantially compromise the most valuable commercial models that are in place today.

- Finally, content owners are currently developing new models to engage modern audiences more deeply, but these will rely on a market that fosters long-term investment by consumers in their favorite franchises. A mechanism that allows this holistic experience to be broken up and disposed to others breaks the model. As a result, producers will inevitably discontinue investment in these products.

_____

Mr. GOODLATTE. Mr. Siy, welcome.

### TESTIMONY OF SHERWIN SIY, VICE PRESIDENT, LEGAL AFFAIRS, PUBLIC KNOWLEDGE

Mr. SIY. Thank you. Chairman Goodlatte, Ranking Member Nadler, Members of the Subcommittee. Thank you for inviting me to testify here today on the critical issue of the first sale doctrine.

In my testimony today, I would like to emphasize one crucial point, that the first sale doctrine is not just a technical exception or limitation to copyright law but a fundamental principle that balances consumers' basic rights to their personal property with authors' rights to their intellectual property.

The way the Copyright Act is structured today, it grants broad, exclusive rights to copyright holders, rights that are so broad that, without exceptions, the result would be absurd if not intolerable. The exclusive rights of distribution and display, for example, would give copyright holders rights that violated our basic understanding of personal property. The author of a book, for example, would be able to prevent a buyer from giving it to her daughter, lending it to a friend, or donating it to a library.

In other words, first sale is a limitation or exception to copyright that is necessary because copyright creates big exceptions to the ordinary rules of personal property.

While *Bobbs Merrill* stands as a foundational case in the first sale doctrine, over a hundred years later, we can see it be undermined in a number of ways today. One notable example of this happened recently, when Aspen Publishers said they would require students who bought certain legal textbooks to return them at the end of the semester. In essence, Aspen was claiming that these printed books were being licensed and not sold to the students. The point of this presumably was to make sales of the used books copyright infringements and therefore eliminate the market of used books. So more than 100 years after *Bobbs-Merrill*, we see publishers still trying to use disclaimers attached to books to limit ownership and resale. Basically, consumers need to know that they own what they buy. Owning it in this case means being able to distribute it and also the ability to simply use it as intended.

But the use of external language to limit ownership is even more prevalent in the world of software. Typically, software comes with an end-user license agreement that will, among other things, characterize a transaction as a license rather than a sale. Even if the exchange looks in all aspects like a sale and may even be called such in a store or on a Web site, a disclaimer attached to the work will claim otherwise. This not only puts restrictions on the initial buyer, but it also places potential liability on anyone else downstream who might in turn receive the copy, even if they never even signed or never even saw that agreement.

To prevent consumers from being saddled with these burdens, the law should not enforce contracts that result in noncontracting parties facing liability. And it should resist enforcing the text of fine-print agreements that deny a sale is taking place when every other indication from the producer is that the transaction is a sale.

88

It may even be worth investigating whether certain types of licensing structure should be avoided altogether, the way certain type of interests in land are not recognized under property law.

Next, ownership of copies is not just the ability to sell and distribute them. After all, those rights are useless if the copies themselves cannot be used. Yet, often, the owners of digital copies could still infringe copyright by merely using those copies. This is because practically any use of a digital file, merely loading or running it, results in copies of that file being made inside the digital device. Every time you play music or movies on your phone, load an eBook or open up a Web site on your laptop, you are making reproductions of likely copyrighted works.

Currently, a first-sale-like rule in Section 117 prevents owners of the computer programs from becoming inadvertent infringers due to those essential step copies. However, that rule does not extend to other types of digital works, like MP3s, movie files, or eBooks. A simple update of Section 117 would allow for these necessary and harmless reproductions to be made.

As Congress continues its review of copyright law, Section 117 could also be a useful model for addressing the issue of first sale in digital downloads. Just as Section 117 allows you to make reproductions that are essential to the use of a computer program, we can see a provision that would allow for limited and temporary reproductions that are essential for the transfer of a file from one party to another. I believe such a provision would permit the first sale doctrine to continue to be relevant in the digital space, even as so much of our media comes to us only in a digital form.

Every day, thousands of people hand copies of their works that they love to one another. As loans, as gifts, in transactions that are under the law but unseen by commerce. Every day, millions of more people use and thus copy the digital movies, music, and books, that they own. Preserving their first sale and ownership rights is therefore not just important in terms of commercial interactions but to make sure that all of these millions of people continue to have a vibrant cultural world into the future.

Thank you for your time, and I look forward to your questions.

Mr. GOODLATTE. Thank you, Mr. Siy.

[The prepared statement of Mr. Siy follows:]

89



Testimony of Sherwin Siy,
Vice President of Legal Affairs
Public Knowledge

Before the
U.S. House of Representatives
Committee on the Judiciary
Subcommittee on Courts, the Internet, and Intellectual Property

Hearing on:
**The First Sale Doctrine Under Title 17**

New York, NY
June 2, 2014

90

Testimony of Sherwin Siy,
Vice President of Legal Affairs
Public Knowledge

Before the
U.S. House of Representatives
Committee on the Judiciary
Subcommittee on Courts, the Internet, and Intellectual Property

Hearing on: The First Sale Doctrine Under Title 17

June 2, 2014

Chairman Goodlatte, Ranking Member Nadler, and Members of the Committee, thank you for the opportunity to speak today on this critical issue of the first sale doctrine. My name is Sherwin Siy, and I am Vice President of Legal Affairs for Public Knowledge, a nonprofit public interest organization that promotes the public's access to information and culture through open, competitive, and universally accessible and affordable communications networks.

In my testimony today, I would like to emphasize one fundamental point: that the first sale doctrine is not simply an exception or limitation to copyright law, but that it is a fundamental principle that balances people's basic rights to their personal property with authors' rights to their intellectual property.[1]

Our copyright law recognizes the distinction between a work: the creative thing set down by an author, like a novel or a song, and a copy: the physical object that houses that creative work, like a paperback or a CD.[2] The first sale doctrine puts that distinction into practice by making sure that, whether or not a piece of physical property contains copyrighted works, it obeys the same laws as other types of personal property.

In other words, first sale is a limitation or exception to copyright that is necessary because copyright creates big exceptions to the ordinary rules of personal property. I can do what I like with my personal property: for example, I can reproduce my keys, display my furniture, publicly operate and show off my car, I can resell my bicycle, modify my clothes, and so on.

But copyright law restricts these actions when it comes to copies of copyrighted works. Even if you own a particular paperback, you can't reproduce it—reproduction being one of the several things that section 106 of the Copyright Act generally restricts. The Copyright Act also restricts distribution and public display—meaning that, absent some accommodation of the copyright law, used bookstores, garage sales, and gifts of copyrighted works would be illegal--let alone the operation of our thousands of public lending libraries, as well as business models that have emerged for renting various types of copyrighted works over the years—including videotapes, DVDs, computer games, and now even textbooks.

[1] See Sherwin Siy, *Copies, Rights, and Copyrights: Really Owning Your Digital Stuff*, Public Knowledge, June 27, 2013, http://www.publicknowledge.org/files/CopiesRightsCopyrightsPKThinks2013.pdf; Aaron Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 U.C.L.A. L. Rev. 889 (2011).
[2] 17 U.S.C. § 202.

91

The first sale doctrine allows all of these things to happen, and a formative part of its history is outlined in the case of *Bobbs-Merrill v. Straus*,[3] which stands as one of the first and best articulations of the doctrine by the US Supreme Court. Without going into too much detail, in this case, one publisher, as part of a plan by a publishers' association to reduce discounts on books,[4] placed a notice in the front cover of a novel that said the book was not to be sold for less than a dollar, and that selling it for less would constitute a violation of the publisher's copyright.[5] When Macy's sold the book for 89 cents, the publisher sued.

But the Supreme Court rejected the idea that this short notice in the front of the book allowed the publisher to exert its control over the redistribution of the book throughout the lifetime of its copyright. In its current form in section 109,[6] the doctrine is framed by saying that any lawfully made copy of a copyrighted work can be distributed or publicly displayed without the permission of the copyright holder.

This not only preserves the ability of retailers to set market-driven prices on books, DVDs, and other media they have purchased, it allows individual consumers to hold yard sales of copyrighted works and give them as gifts without seeking permission. It permits the existence of lending libraries that otherwise would either have to engage in complex and expensive licensing arrangements, or, in many cases, would simply not exist. In short, respecting the distinction between personal property and copyrights promotes both a vigorous economy and the personal rights and freedoms of consumers.

However, a number of issues are arising that suggest the first sale doctrine may lose some of its effectiveness, if current trends in technology and business continue. These trends include the increasing prevalence of restrictive and often deceptive fine-print licensing agreements, as well as the increase in digital media, including media that is sold as downloads, rather than on physical media like CDs.

**Replacing Sales with Licensing Agreements**

Recently, Aspen Publishers created a controversy when it sent an email to law professors that indicated that it would require students to return the print version of their casebooks at the end of the semester.[7] In essence, Aspen was claiming that the print books were not being sold, but licensed to the students, thus making any resale or other redistribution of the used textbooks a copyright infringement, and destroying the secondary market for their textbooks.[8] After much outcry, including many professors insisting they would refuse to assign such books for their classes, Aspen amended its policy.

Nevertheless, this story illustrates the fact that the incentives of publishers today are the same as they were in *Bobbs-Merrill*, and the techniques for eliminating secondary markets—and ownership of books—are similar to those tried over a hundred years ago.

---

[3] 210 U.S. 339 (1908).
[4] *See, e.g.*, Ariel Katz, The First Sale Doctrine and the Economics of Post-Sale Restraints, 2014 BYU L.R. 55 66-9 (2014).
[5] Verbatim, the notice read, "The price of this book at retail is $1 net. No dealer is licensed to sell it at a lower price, and a sale at a lower price will be treated as an infringement of the copyright."
[6] 17 U.S.C. § 109.
[7] *See* Josh Blackman, *Aspen Casebook Connect Textbooks Must be Returned At End Of Class, Cannot Be Resold*, Josh Blackman's Blog, May 5, 2014, http://joshblackman.com/blog/2014/05/05/aspen-casebook-connect-textbooks-must-be-returned-at-end-of-class-cannot-be-resold/.
[8] Nor was Aspen planning on becoming the sole reseller of its own books; it encouraged students to continue highlighting and annotating their works, meaning that books returned to the publisher were likely to be pulped. *See* James Grimmelmann, *Aspen Doesn't Want You To Own Your Own Casebooks*, The Laboratorium, May 6, 2014, http://laboratorium.net/archive/2014/05/06/aspen_doesnt_want_you_to_own_your_own_casebooks.

92

Aspen's attempt to eliminate the used book market through the use of a licensing agreement should come as no surprise, though, since it reflects a longstanding practice of the software industry. Computer programs frequently come with a fine-print "End User License Agreement" that will, among other things, claim that the copy that the user purchased and installed on their computer was not actually sold to them, but rather a sort of long-term rental. Although software companies rarely, if ever, attempt to reclaim the copies they have sold, and in all other respects act as though the transaction was a sale, they will use the language of an agreement that few consumers have the time to read, and that none have the ability to actually negotiate, to claim that the transaction was actually a rental. These purported license agreements serve to eliminate a secondary market for software of the sort that has traditionally existed for books, music, movies, and other media.

Worse, these agreements can make infringers of people who have never entered into any contracts or agreements with the publisher. One of the most prominent cases about the resale of software involved a reseller who never entered into a licensing agreement.[9] Yet because of the way section 109 and the agreement operated, he was found liable for infringement for buying and then reselling a copy of a computer program that he had never himself copied or installed. These agreements therefore create a sort legal curse that attaches to the object, specifically counter to the values embodied in *Bobbs-Merrill* and the first sale doctrine generally.[10]

The problem is not just that this harms the secondary market in computer programs, or even that it allows a particularly strange bootstrapping of fine print into a copyright complaint. Increasingly, more types of media are being sold digitally, and can easily be offered to consumers with exactly this sort of language buried in a clickthrough, which will claim that, despite the fact that she clicked on a bright yellow "BUY" button, a consumer was only renting her ebook, or album, or TV episode.

**Essential-Step Copies and the Need to Update Section 117**

The growth of digital media beyond computer programs brings me to the last set of issues I wish to discuss today. A fundamental issue with copyrights and digital technology is that merely accessing a digital file usually results in a copy of it being made, even if only in the temporary storage of a computer's Random Access Memory, or RAM. Other routine processes lead to copies being made of digital files in the course of their use, in buffers, caches, and other places. These copies, though temporary, can implicate the reproduction right, and make an ordinary computer user a potential copyright infringer merely for using a digital work as it was intended to be used.

In 1980, Congress recognized the problem this created with regard to computer software, and created essentially what is now section 117 of title 17.[11] Among other things, it ensures that the owner of a copy of a computer program can make any adaptations or reproductions of the program that are created as "essential steps" in the use of the program. This way, RAM or buffer copies of computer programs are not considered infringements.[12]

---

[9] *Vernor v. Autodesk*, 621 F.3d 1102 (9th Cir. 2010)
[10] As the Supreme Court found recently in *Kirtsaeng*, the first sale doctrine's origins predate *Bobbs-Merrill* to at least the 17th, if not the 15th century common law refusal to permit restraints on the alienation of chattels. "A law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly 'against Trade and Traffi[c], and bargaining and contracting.'" *Kirtsaeng v. John Wiley & Sons*, 133 S. Ct. 1351 (2013) *quoting* 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628).
[11] Pub L. No. 96-517 § 10(b) (1980).
[12] Other parts of section 117 allow for other types of reproductions and adaptations for archival and maintenance purposes.

93

However, technology and business practices have led to section 117 covering less ground that it should. For one thing, the clickwrap and shrinkwrap agreements mentioned earlier have been used to claim that computer users were not the "owners" of copies, and therefore were infringing copyrights merely by using the computer programs they paid for in a way disfavored by the copyright holder. While consumers should be held to contracts they have fairly agreed to, the remedies for breach of contract should not be merged with copyright infringement.

Another problem that has emerged as technology progresses is that a vast amount of digital media consists of things other than computer programs. The mp3s being played on a phone, the photos or movies being displayed on a tablet, or the book being read on an e-reader are all subject to the same digital processes that generate RAM copies, buffer copies, and cached copies that computer programs do—yet section 117 does not explicitly cover them.

This problem relates closely to the third issue with digital copies—that transferring them requires reproductions, just as using them does. This is something that has arisen not so much with the increase in digital formats, but the trend of selling them as data, and not as physical media. While CDs are nothing new, the act of selling songs and albums without CDs is, relatively speaking. As a result, the Copyright Act does not specifically account for how consumers might distribute their copies of downloaded digital works without infringing the reproduction right. While some companies have attempted to deal with this by trying to create forward-and-delete systems that could fall within fair use, they have not so far been successful in litigation. Meanwhile, consumers who buy music, movies, or books are unable to resell them when they no longer want them, even if they delete them. Nor, in fact, would someone be able to give away those songs, movies, or books, or bequeath them to family, except in the form of the original hard drives they are stored on.

**Potential Solutions**

There are a number of potential resolutions to each of these problems; I will only focus on a few here.

*1. Not Enforcing Deceptive Licenses*

In the matter of clickthrough and shrinkwrap licenses undermining first sale, a number of consumer protection measures can be brought to bear. For instance, it could be made clear that when consumers are led to believe they are actually making a purchase through the characteristics of the transaction, a retailer may not renege on that through the use of a fine-print clickthrough or hidden license agreement. In case such as this, the most prominent representation of the transaction should hold.

This prevents initial consumers from being deceived into receiving less than they paid for, and it can prevent confusion in later transactions on the secondary market. Nor would it prevent software companies and other copyright holders from offering their works on a rental or lease basis; they would simply need to be clear and upfront about the nature of the transaction.

*2. Numerus Clausus*

Another way of preventing license agreements from creating overly baroque situations might be

---

These are likely to also need updating, but are less directly tied the issues I am discussing here.

94

to, in a certain way, treat the distribution of copies more like the transfer of real estate. Property law (in both the common law and civil law traditions) traditionally limits the types of interests a person might have in a piece of land. This principle of limiting types of ownership is often called "*numerus clausus*," meaning "the number [of types of ownership] is closed."[13] In other words, for the sake of clarity and transactional certainty, pieces of land can only have certain types of ownership and burdens associated with them. This prevents later buyers or tenants from having to engage in meticulous investigations to find out what property rights they may or may not be violating.

The same can be true for copies of copyrighted works. As we have seen, the current system essentially allows intellectual property rights beyond those defined in the statute to be attached to individual copies.[14] Someone who has never signed or even seen a license agreement can be bound by its terms and become an infringer. Limiting the sorts of restrictions that can be placed upon copies of works could prevent just this sort of surprise.

### 3. Updating Section 117 to Deal with Essential Copies

Finally, a number of adjustments to section 117 could clarify the law so that it takes a simpler and more logical approach to digital media.

First, section 117 should apply to copies of works generally, not just computer programs. That way, other forms of digital content, like music and movies, can have essential-step copies made, reducing the need for complicated licensing agreements (or at least reducing the complexity of necessary licensing agreements).

Second, section 117 should apply to users of works, and not just their owners. That way, I don't become an infringer if I borrow a classmate's e-reader to look over the copy of the casebook she bought, or if you watch a movie on a friend's tablet.

Finally, section 117 could be amended—or a new section created in its model—to allow for the distribution of digital copyrighted works owned by consumers, provided that, at the end of the transaction, the seller retains no copies of the work and the buyer has only one. Such a provision would be entirely in keeping with the first sale doctrine, and would help preserve consumers' rights as an increasing number of works are sold primarily, if not solely, as digital downloads.[15] That way, the rights of consumers and creators remain in balance, regardless of the form in which the works are being sold.

### Conclusion:

The first sale doctrine isn't just a convenience created by the Supreme Court in 1908; it's a way to recognize how rights to physical property and intellectual property can be reconciled. As such, it is a fundamental part of the law that should not be undermined by one-sided, fine-print clickthroughs or relegated only to distributions involving the transfer of physical objects. As a foundational part of our law, the first sale doctrine should be clarified so that it might apply, with little need for later adjustment, well into the future.

---

[13] Christina Mulligan, *A Numerus Clausus Rule for Intellectual Property* 80 Tennessee L. Rev. 235 (2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2017023.
[14] *Id.* at 249.
[15] Increasingly, games for mobile devices, personal computers, and gaming consoles, as well as large numbers of popular works of fiction, are being sold only as digital downloads, without any physical versions produced.

95

Mr. GOODLATTE. Mr. Villasenor—is that correct? Say it to me so all of us know when we question you how to pronounce your name.

## TESTIMONY OF JOHN VILLASENOR, NONRESIDENT SENIOR FELLOW, THE BROOKINGS INSTITUTION, AND PROFESSOR OF ELECTRICAL ENGINEERING AND PUBLIC POLICY, UNIVERSITY OF CALIFORNIA, LOS ANGELES

Mr. VILLASENOR. It is Villasenor. Yes.

Good morning, Chairman Goodlatte, Ranking Member Nadler, and Members of the Subcommittee. Thank you very much for the opportunity to testify today regarding the first sale doctrine and U.S. copyright law.

I am a Nonresident Senior Fellow at the Brookings Institution, and I am also on the faculty at UCLA. However, the views I am expressing here are my own and do not necessarily represent those of the Brookings Institution or the University of California.

In my testimony, I would like to make two main points. First, modification of U.S. copyright law to introduce a broad digital first sale doctrine would lead to unintended consequences that would dramatically reduce the ability of content creators to be properly compensated for work sold digitally. For example, consider what would happen if loans that might last only a few minutes or even a few seconds could be made instantly, without the authorization of the copyright holder, and among parties who might be separated by thousands of miles.

A recording artist who sells only a few hundred copies or digital copies of a song might find that 1 million people are sharing those few hundred copies. How could this be possible? Because those few hundred copies could be aggregated into a lending pool serving 1 million people. Listeners would only need to borrow from the lending pool at the very moment when they want to hear the song.

I am not aware of any statutory language that could be used to craft a digital first sale doctrine that would somehow avoid these sorts of unintended consequences while also being practical and workable.

Secondly, the question of digital first sale, as important as it has been, is becoming less so with each passing year. We are moving and in fact have largely already moved to a license-based ecosystem for digital content distribution. And when there is no sale, the first sale doctrine does not apply. Instead, the permissible downstream uses of digital content in a license-based ecosystem are addressed through a combination of contract law and intellectual property law.

Today's consumers have access to a remarkable and quickly growing range of license-based content offerings. But there are also some concerns. Consumers who shop at content-provider Web sites featuring opportunities to "buy" a digital version of a song, movie, or book, can reasonably expect that when the transaction is completed, they will own a copy of the work. But in many cases, that is not what occurs. Instead, consumers who buy digital copies, copies of digital works, are often subject to terms-of-use agreements specifying that they are, in fact, licensees, not owners. Consumers can find these agreements to be mind-numbingly complex, often containing clauses with ambiguous wording susceptible to con-

96

flicting interpretations, even among attorneys who specialize in contract law.

I am not sympathetic to the argument that the onus is on consumers to resolve these ambiguities as a pre-condition to obtaining new digital content. I believe that content providers have at least an ethical obligation and quite possibly a legal obligation under consumer protection laws to clearly structure offerings so that consumers are informed about restrictions accompanying their purchase of digital copies of copyrighted works.

When consumers are weighing offers enabling them to "buy" content that they in fact will not own, that information should be clearly and explicitly conveyed before the transaction is completed.

When consumers are considering acquiring content that they will be prohibited from loaning, selling, giving as a gift, or bequeathing to an heir, that information should be presented in easy-to-understand, unequivocal language before the purchase is completed.

These issues are of vital importance to the creative content ecosystem. But my view is that they cannot and should not be addressed through changes to copyright law. And I do not believe these issues should be addressed through new legislation that would restrict or otherwise alter American contract law.

Instead, they should be addressed by ensuring what in fact should be common sense, that consumers who license copyrighted works have access to clear, upfront descriptions regarding the permitted and prohibited uses of the content. Once that occurs, I am optimistic that market forces will lead to future license space content offerings giving consumers many more options than those commonly available today.

And in contrast with attempting to address digital content dispositions through a one-size-fits-all statutory approach, allowing the market to experiment with the diversity of solutions is more likely to result in balanced approaches. Among other things, this could lead to a growing number of offerings permitting licensees to engage in dispositions of digital content analogous to those that have long been available to owners of tangible copies of works.

Thank you very much, and I look forward to answering your questions.

Mr. GOODLATTE. Thank you.

[The prepared statement of Mr. Villasenor follows:]

97



Written Testimony of John Villasenor

**Nonresident Senior Fellow**
**The Brookings Institution**

and

**Professor of Electrical Engineering and Public Policy**
**University of California, Los Angeles**

before the

**House Committee on the Judiciary**

**Subcommittee on Courts, Intellectual**
**Property, and the Internet**

**"First Sale Under Title 17"**

**June 2, 2014**

98



**John Villasenor** is a nonresident senior fellow in Governance Studies and the Center for Technology Innovation at the Brookings Institution, and a professor of electrical engineering and public policy at UCLA.

ood morning Chairman Coble, Ranking Member Nadler, Chairman Goodlatte, Ranking Member Conyers, and Members of the Subcommittee. Thank you very much for the opportunity to testify today regarding the first sale doctrine in U.S. copyright law.

I am a nonresident senior fellow in Governance Studies and the Center for Technology Innovation at the Brookings Institution. I am also a professor at UCLA, where I hold appointments in the Electrical Engineering Department and the Department of Public Policy. The views I am expressing here are my own, and do not necessarily represent those of the Brookings Institution or the University of California. Portions of my testimony today are adapted from an article I published last year in *Competition Policy International Antitrust Chronicle*.[1]

My testimony today can be summarized as follows: First, modification of U.S. copyright law to introduce a broad "digital first sale"[2] doctrine would lead to unintended consequences that would dramatically reduce the ability of content creators to be properly compensated for works sold digitally. If loans, sales, and other dispositions of such digital content could be made instantly, without the authorization of the copyright holder, and among parties who might be separated by thousands of miles, those dispositions would largely replace the market for initial sales.

Second, the question of digital first sale, as important as it has been, is becoming less so with each passing year. As licensing-based models continue to become more common, fewer creative works are distributed using sales that confer ownership over a particular digital copy of the content. And when there is no sale, the first sale doctrine does not apply. Instead, the permissible downstream uses of digital content in a license-based ecosystem are addressed through a combination of contract law and intellectual property law.

Many licenses today are overly complex and restrictive. Content providers should provide consumers with clearer disclosures regarding the permissible and prohibited

[1] John Villasenor, "Rethinking a Digital First Sale Doctrine in a Post-*Kirtsaeng* World: The Case for Caution," *Competition Policy International Antitrust Chronicle*, May 2013, Vol. 2., *available at* http://ssrn.com/abstract=2273922. Used with permission.
[2] As used herein, "digital first sale doctrine" refers to a hypothetically expanded 17 U.S.C. §109 that would allow for resales absent any physical transfer of an accompanying storage medium, without the authorization of the copyright holder. In addition, as used herein, "digital" refers to works conveyed to consumers through digital transmission, and not to digital works delivered in tangible form such as a music CD or movie DVD.

B

99

uses of licensed content. Once consumers are better informed about license-based offerings, I am optimistic that market pressure will lead content providers to offer licenses that are more flexible, and that in some cases could permit dispositions of digital content analogous to those that have long been available to owners of non-digital content under the existing first sale doctrine.

## The First Sale Doctrine in U.S. Copyright Law

Before considering the issues that would be raised by modifying copyright law to introduce a digital first sale doctrine, it is helpful to set the context by briefly discussing the first sale doctrine as it exists today.

Under U.S. copyright law a copyright owner has a bundle of exclusive rights.[3] More specifically, a copyright owner, subject to some exceptions, has an exclusive right to reproduce (or authorize the reproduction of) the copyrighted work and to distribute (or authorize the distribution of) "copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending."[4] There are other exclusive rights conferred by copyright as well, but in discussing digital first sale it is the reproduction right and the distribution right that usually play the most central role.

One of the exceptions mentioned above is the first sale doctrine, which is an exception to the distribution right, and is codified in the Copyright Act of 1976 as follows:

> Notwithstanding the provisions of section 106(3) the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord.[5]

To see how this operates, consider a person who walks into a bookstore in the United States and purchases a brand new paperback book.[6] Suppose that after she has finished reading the book, she decides to loan it to a friend who lives nearby. Thanks to the first sale doctrine, she is able to do this without obtaining permission from the copyright holder. In the language of the doctrine, as the "owner of a

---

[3] 17 U.S.C. §106.
[4] The reproduction right is codified at 17 U.S.C. §106(1); the distribution right is codified at 17 U.S.C. §106(3).
[5] 17 U.S.C. §109(a). In addition, 17 U.S.C. §109(c), which provides a defense to infringement of the display right in 17 U.S.C. §106(5), is also relevant to the first sale doctrine.
[6] This example assumes, of course, that the book is "lawfully made under this title."

𝔅

*First Sale Under Title 17*

2

100

particular copy" of the book, she is "entitled, without the authority of the copyright owner," "to dispose of the possession of that copy"—in this example by loaning it to a friend.

No new copies are created when she loans the book, donates it to a library, or sells it at a garage sale. In each of these transactions, the single copy purchased at the bookstore simply gains a new custodian. As a result, the copyright holder's reproduction right is not implicated. In addition, while loans, donations, and resales are distributions, the first sale doctrine frees the purchaser of the book to engage in these transactions without obtaining the authorization of the copyright holder. Stated another way, the copyright holder's exclusive distribution right with respect to that particular copy[7] of the book was exhausted after the "first sale."

Although the first sale doctrine is a feature of copyright law, it has roots in a broader recognition that markets are generally healthier when owners of goods have a high degree of flexibility in determing if, when, and under what terms they are later placed back into the stream of commerce. The procompetitive benefits of avoiding restrictions on that flexibility—or more formally, of avoiding restrictions on alienation—have been understood for centuries.

As early as the 1600s, English jurist Lord Coke described the harms to "trade and traffique, and bargaining and contracting"[8] that could accompany transfers of ownership interests encumbered by alienation constraints. In the United States, in the specific context of copyright, the first sale doctrine was articulated by the Supreme Court the 1908 ruling in *Bobbs-Merrill Co. v. Straus*,[9] which held that a copyright owner's "right to vend" did not include the right "to control all future retail sales." The doctrine was codified in the Copyright Act of 1909[10] and again in the Copyright Act of 1976 as noted above.

First Sale in the Digital Era

In the pre-digital era, the transfer of a copyrighted work from one person to another typically involved the movement of a physical storage medium such as a vinyl

---

[7] This example assumes that all of the dispositions described are occurring within the United States. The landscape for international exhaustion has become more complex after the 2013 Supreme Court decision in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351 (2013).
[8] 1 E. Coke, Institutes of the Laws of England § 360, p. 223 (1628), *available at* http://www.constitution.org/18th/coke1st1778/coke1st1778_501-550.pdf.
[9] *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 351 (1908).
[10] *See* the Copyright Act of 1909, Pub. L. No. 60-349, 35 Stat. 1075 (repealed 1976).

3

A-3114

101

record, CD, DVD, or paper. By contrast, transfers today over the Internet are electronic.

In its current form, the first sale doctrine does not enable the owner of a lawfully made digital copy of a work to loan, sell, or otherwise dispose of it through a digital file transfer over the Internet without the authorization of the copyright holder. The reason is simple: The first sale doctrine is an exception to the distribution right, not to the reproduction right. A digital transfer of a file from one location to another implicates both rights, because a new copy of the work is created at the destination of the transfer.[11]

The role of the first sale doctrine with respect to digital transfers was at the core of the recent *Capitol Records, LLC v. ReDigi Inc.* litigation in the Southern District of New York. ReDigi, a company that launched an online digital marketplace in 2011 aimed at enabling users to resell lawfully acquired digital music files, had also developed file deletion technologies. In addition to hosting a website to facilitate the resales, ReDigi provided a downloadable "Media Manager" designed to ensure that users did not retain copies of songs they had sold. After Capitol Records filed a copyright infringement complaint[12] against ReDigi in the Southern District of New York, Judge Richard J. Sullivan ruled in 2013 that the creation of a copy of a work through ReDigi's service "infringes Capitol's exclusive right of reproduction."[13] In addition, Judge Sullivan ruled that the "sale of digital music files on ReDigi's website infringes Capitol's exclusive right of distribution."[14]

Notably, with respect to the reproduction right, the ruling did not cite any failure of the ReDigi technology at issue in the case to ensure that a seller's copy is not retained upon a sale as the basis for infringement. Instead, ReDigi was found to infringe because the creation of a new copy of a file on a buyer's computer (or

---

[11] Notwithstanding extensive jurisprudence to the contrary, various legal theories have been advanced to support an interpretation that resales via digital file transfers are permitted under current copyright law. For example, it is sometimes argued that if the seller's copy is deleted at the moment the buyer's copy is created, there has been no reproduction, and that the distribution that accompanies a file transfer can be accomplished in a manner that is equivalent from a copyright law standpoint to the distribution that accompanies the transfer of a tangible medium containing a copyrighted work to a new owner. However, these theories have not gained a sympathetic reception in the courts.

[12] *See* Complaint, *Capitol Records, LLC v. ReDigi Inc.*, No. 1:12-cv-00095-RJS, (S.D.N.Y. Jan. 6, 2012), ECF No. 1., *available at* http://ia700800.us.archive.org/30/items/gov.uscourts.nysd.390216/gov.uscourts.nysd.390216.1.0.pdf

[13] *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 651 (S.D.N.Y. 2013).

[14] *Id.* In finding that Capitol's distribution right was infringed, Judge Sullivan wrote that because "a digital music file sold on ReDigi is not 'lawfully made under this title,'" its distribution by ReDigi was outside the scope of the first sale doctrine. *Id.* at 655.

𝕭

*First Sale Under Title 17*

4

102

cloud-based locker) falls outside the scope of §109(a). As Judge Sullivan wrote in the conclusion to his decision, "[t]he Court cannot of its own accord condone the wholesale application of the first sale defense to the digital sphere, particularly when Congress itself has declined to take that step."[15]

## Digital First Sale: Considering the Unintended Consequences

Few people would question the vital role that the existing first sale doctrine has played with respect to non-digitally-delivered works. We have the first sale doctrine to thank for libraries, used bookstores, garage sales where we can rummage through used music CDs, and, just in the past few years, the hundreds of "Little Free Libraries"[16] that have sprung up in neighborhoods around the country, and where anyone is free to take or leave a book. The first sale doctrine has been, and continues to be, a powerful and positive force in the broader culture.

Against this backdrop, it is natural to consider whether to modify copyright law to create a "digital first sale doctrine" that would accommodate dispositions of copyrighted works over the Internet. This issue first gained attention in the 1990s as internet distribution of creative works became more common. The Digital Millennium Copyright Act of 1998 contained a provision[17] calling for the U.S. Copyright Office to submit a report to Congress on "the relationship between existing and emergent technology and the operation of sections 109 and 117 of title 17, United States Code." The resulting report,[18] which was delivered in August 2001, devoted nearly 30 pages of discussion to "the first sale doctrine in the digital world," and recommended making "no change to section 109 at this time."[19]

Much more recently, in July 2013, the Department of Commerce Internet Policy Task Force published a report titled "Copyright Policy, Creativity, and Innovation in the Digital Economy."[20] The Task Force discussed digital first sale and concluded that "this is an area that deserves further attention."[21] The Task Force also wrote

---

[15] *Id.* at 660.
[16] http://littlefreelibrary.org
[17] Digital Millennium Copyright Act of 1998, Pub. L. No. 105-304, 112 Stat. 2860, 2876, *available at* http://www.gpo.gov/fdsys/pkg/PLAW-105publ304/pdf/PLAW-105publ304.pdf.
[18] U.S. Copyright Office, *DMCA: Section 104 Report (A Report of the Register of Copyrights Pursuant to Section 104 of the Digital Millennium Copyright Act)* (2001) ("2001 DMCA Report"), *available at* http://www.copyright.gov/reports/studies/dmca/dmca_study.html.
[19] 2001 DMCA Report, Executive Summary Section, p. xx.
[20] U.S. Department of Commerce, Internet Policy Task Force, *Copyright Policy, Creativity, and Innovation in the Digital Economy* (Green paper, July 2013), *available at* http://www.uspto.gov/news/publications/copyrightgreenpaper.pdf.
[21] *Id.* at 37.

First Sale Under Title 17

103

that the "USPTO, in collaboration with the Copyright Office, will solicit public comments and hold a series of roundtables regarding the relevance and scope of the first sale doctrine in the digital age."[22]

Proponents of a digital first sale doctrine often point out, correctly, that owners today have less flexibility than in the past with respect to dispositions of copyrighted works. Thirty years go, a person who purchased a vinyl record became the owner of that copy of the songs it contained and enjoyed a wealth of choices in their later disposition. Today, a person who purchases (as opposed to licenses) a song over the Internet becomes an owner of a digital copy of that song. But, because the first sale doctrine does not provide an exception to the copyright holder's reproduction right, it does not allow the purchaser to electronically transfer the file to someone else pursuant to a loan or sale.

It is tempting to conclude that there is an easy fix: Create a digital first sale doctrine by modifying 17 U.S.C. §109 to add an exception to the reproduction right. This could enable owners of copies of works delivered over the Internet to engage in dispositions analogous to those that have long been possible with non-digital works. But there is a problem: This change would also be exploited to engage in dispositions that are unique to digital content, opening up a Pandora's box of unintended consequences.

One particularly vexing problem would be very short-duration loans of digital works,[23] potentially facilitated by web-based services that would match listeners and owners whose copies of requested songs were sitting unused on hard drives dispersed throughout the country (or, post-*Kirtsaeng*, the world).

Consider a group of one million music fans, each of whom wishes to listen to a certain 3-minute song exactly once a week at a randomly chosen day and time. How many copies of the work would need to be available in the pool of lenders to ensure that multiple simultaneous requests could be satisfied? In the strictest mathematical sense, to account for the infinitesimal chance that all million people might choose to listen to the song at the same time, one million copies would be needed. But the statistical odds of that occurring are so low as to be effectively zero. In practice, the majority of loan requests could be handled with access to an inventory of only a few hundred copies of the song. If this approach were carried to its maximally efficient extreme, a recording artist could only self a number of copies of a song equal to the

---

[22] *Id.*

[23] The 2001 DMCA Report discussed this general scenario, though without any numerical examples. See 2001 DMCA Report, at 83.

*First Sale Under Title 17*

- 6

104

maximum number of people listening to it at any one time. This would dramatically reduce the market for digital music sales.

Suggestions that no one would go to these sorts of extremes to facilitate content access using schemes like this aren't particularly convincing. After all, one need only look at Aereo's approach to using the Internet to connect consumers with over-the-air television broadcasts to see the lengths to which businesses will go to take advantage of perceived loopholes in copyright law.[24] New loopholes created by a digital first sale doctrine would be exploited to the fullest.

Another well-recognized aspect of digital works is that the concept of "used" loses its meaning. On average, used printed books, CDs, and DVDs are less valuable than their brand new counterparts. By contrast, a digital representation of a work can be transferred over the Internet thousands of times and remain literally bit-for-bit identical to the version originally delivered pursuant to a first sale. Markets where works offered for resale are indistinguishable from new works will behave very differently from markets where that distinction is clear.

Content creators who raise these sorts of issues in digital first sale discussions are often waved off with criticisms that they "just don't get" digital, and are trying to deny inevitable technological progress. But the first sale doctrine has historically worked in part *because* physical copies of works degrade with use, because they cannot be traded instantly and temporarily among parties separated by thousands of miles, and because it is impossible to loan a paperback book to a friend while simultaneously keeping it on your own bookshelf.

Due to the inevitable unintended consequences that would result, modification of U.S. copyright law to introduce a broad digital first sale doctrine would be a mistake. And I am not aware of any statutory language that could be used to craft a *narrow* digital first sale doctrine that would somehow avoid these unintended consequences while also being practical and workable.

---

[24] As many people with an interest in copyright issues know, Aereo provides a service involving thousands of very small antennas, each assigned to an individual user who uses the Internet to access the signal received at his or her antenna. The Supreme Court heard arguments in *American Broadcasting Companies, Inc., et al. v. Aereo, Inc.* in April 2014, and a ruling is expected in June.

B

7

A-3118

105

### The Shift to a Licensing-Dominated Ecosystem

More fundamentally, the issue of digital first sale, while important, is becoming less so as license-based content distribution becomes increasingly common.[25] Fewer and fewer digital works are provided pursuant to sales that confer ownership of a copy of a work. Due to this shift, consumers of digital content are now increasingly likely to be licensees as opposed to owners. And the first sale doctrine, which applies to "the owner of a particular copy of a work," does not apply to licensees.[26] For licensees, permissible uses of content are governed by a combination of intellectual property law and contract law.[27]

Today's consumers have access to a remarkable and quickly growing range of license-based content offerings. Some classes of offerings, such as Internet-based music streaming and movie streaming services, do not tend to lead to customer confusion regarding ownership. There is little chance that consumers using these services could reasonably conclude that they are receiving an ownership interest in the temporary copies of works streamed to their devices.

However, consumers who shop at content provider web sites featuring opportunities to "buy" a digital version of a song, movie, or book can reasonably expect that when the transaction is completed, they will own a copy of the work. But in many cases, that is not what occurs. Instead, consumers who "buy" copies of digital works are often subject to terms of use agreements specifying that they are in fact licensees, not owners.

Very few consumers take the time to read these agreements in full. And those who do can find them to be mind-numbingly complex, often containing clauses with

---

[25] Computer software has been distributed pursuant to licenses for decades. But for music, books, and movies, the shift towards license-based distribution is much more recent.
[26] See 17 U.S.C. §109(d) "The privileges prescribed by subsections (a) and (c) do not, unless authorized by the copyright owner, extend to any person who has acquired possession of the copy or phonorecord from the copyright owner, by rental, lease, loan, or otherwise, without acquiring ownership of it." In addition, in 1998 the Supreme Court explicitly noted that 17 U.S.C. §109(a) does not apply to licensees: "[B]ecause the protection afforded by §109(a) is available only to the 'owner' of a lawfully made copy (or someone authorized by the owner), the first sale doctrine would not provide a defense in a §602(a) action against any nonowner such as a bailee, a licensee, a consignee, or one whose possession of the copy was unlawful." *Quality King Distributors, Inc. v. L'anza Research Int'l, Inc.*, 523 U.S. 135, 146–47 (1998).
[27] The issue of when terms constitute contracts is complex, and can depend, for example, on whether the user has taken an action such as clicking an "I agree" button. See, e.g., Ed Bayley, *The Clicks That Bind: Ways Users "Agree" to Online Terms of Service*, ELECTRONIC FRONTIER FOUNDATION, Nov. 16, 2009, https://www.eff.org/wp/clicks-bind-ways-users-agree-online-terms-service.

B

A-3119

106

ambiguous wording susceptible to conflicting interpretations even among attorneys who specialize in contract law.

I am not sympathetic to the argument that the onus is on consumers to resolve these ambiguities as a pre-condition to obtaining new digital content. I believe that content providers have at least an ethical obligation—and quite possibly a legal obligation under consumer protection laws—to clearly structure offerings so that consumers are informed about restrictions accompanying their purchases of digital copies of copyrighted works. When consumers are weighing offers enabling them to "buy" content that they in fact will not own, that information should be clearly and explicitly conveyed before the transaction is completed. When consumers are considering acquiring content that they will be prohibited from loaning, selling, giving as a gift, or bequeathing to an heir, that information should be presented in easy-to-understand, unequivocal language, before the "purchase" is completed.

While these issues are of vital importance to the creative content ecosystem, they cannot and should not be addressed through changes to copyright law. And they should not be addressed through judicial decisions that might retroactively and improperly reclassify contractually valid license agreements as sales.[28] Instead, they should be addressed by ensuring what in fact should be common sense: that consumers who license copyrighted works have access to clear up-front descriptions regarding the permitted and prohibited uses of the content.

Once that occurs, I am optimistic that market forces will lead to future license-based content offerings giving consumers many more options than those commonly available today. And, in contrast with attempting to address digital content dispositions through a one-size-fits-all statutory approach, allowing the market to experiment with a diversity of solutions is more likely to result in balanced approaches that, among other things, could permit licensees to engage in dispositions of digital content analogous to those that have long been available to owners of tangible copies of works.

---

[28] However, courts do have an important role in determining when licenses are contractually binding. For example, in a 2011 decision in *UMG Recordings, Inc. v. Augusto* (628 F.3d 1175 (9th Cir. 2011)), the Ninth Circuit found license terms prohibiting resale to be nonbinding because there was no "indication that the recipients agreed to a license." *Id.* at 1182-1183. See also *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010), cert. denied, 132 S.Ct. 105 (2011), in which the court ruled that a software licensee was indeed bound by terms accepted as a condition of installing the software. More problematically, in Europe in 2012, the Court of Justice of the European Union *did* reclassify an apparently valid license as a sale, ruling in C-128/11, *UsedSoft GmbH v. Oracle Int'l Corp.*, 2012 E.C.R. I-0000 (3 July 2012), that a software licensee holding a perpetual license could resell the license, despite terms prohibiting a transfer. Though *UsedSoft* was not a decision by a U.S. court, it could nonetheless have influence in future U.S. court cases involving analogous fact patterns.

*First Sale Under Title 17*

9

107

Thank you again for the opportunity to testify on this important topic.

Governance Studies
The Brookings Institution
1775 Massachusetts Ave, NW
Washington, DC 20036
Tel: 202.797.6090
Fax: 202.797.6144
www.brookings.edu/governance.aspx

*The views expressed herein are those of the author and should not be attributed to the staff, officers or trustees of the Brookings Institution.*

$\mathbb{B}$

*First Sale Under Title 17*

108

Mr. GOODLATTE. Mr. Simon, you get the last word.

## TESTIMONY OF EMERY SIMON, COUNSELOR, BSA | THE SOFTWARE ALLIANCE

Mr. SIMON. Thank you, Mr. Chairman. It is good for me to be here today. I am a product of New York City Public Schools. I am a product of New York City public universities. And when I stood up to say "I do," it reminded me of being sworn in as a citizen, in I think this very building, some 40 years ago. So it is a little bit of a homecoming for me; it brings back a lot of memories.

So probably of the many issues that this Committee is considering in the area of copyright, this issue, first sale, is the most important to the software industry. Software industry relies on copyright law for three basic purposes: to prevent piracy, to fight piracy; to fight people who freeload by copying code and cloning it; but most importantly, it is the foundation stone on which we build our licensing agreements.

Software is licensed, in most instances, not always. It is a contract. That contract is enforceable. That contract gives rights to the consumer while preserving obligations on the part of the software developer.

So it is in that context that we look at this discussion today, which is, how do you continue to respect the freedom of the parties to engage in contractual relationships? How do you continue to promote the kind of success that the American software industry has had?

BSA members are the dream team of the world's most innovative companies. IBM, Microsoft, Intel unleashed an era of unparalleled change; now we work and live by developing the PC. Apple transformed the smartphone and broke new ground with tablets. And today, we are at the center of the next wave of innovation as we transition to a data-centric economy. Data and analytics powered by software providing insights and unprecedented opportunities from the factory floor, to medicine, to classrooms. All these things are possible because the copyright law provides a sound foundation for licensing.

We have heard that first sale applies only to the owner of a copy of work, and that is right. This Committee, when it issued its report some years back, made it crystal clear, it said, "first sale applies only to outright sales." That is what it should be. It should apply to sales, not to licenses.

Converting the first sale doctrine into a first license doctrine, as some argue, by extending to its licensed copies would brush aside existing law. Such an extension would upturn a cornerstone of our economy, our ability to contract and our ability to rely on contracts. And I agree with Mr. Villasenor on that point very strongly.

And it would especially create confusion among consumers about the rights and quality associated with secondhand software. Buyers of secondhand software will be unable to tell whether the copy they paid for is genuine or counterfeit or, even worse, suffer irreparable harm if the copy is infected with spyware or viruses, as they often are, and purport to be genuine.

Just this morning, I saw a report from one of my colleagues in the Czech Republic, where we are having a slew of illicit copies

109

being distributed by people who allege they are re-selling, they are selling used copies.

Courts are not confused. The courts have been clear. Most recently, in *Vernor v. Autodesk*, the Ninth Circuit said unequivocally, if it looks like a license, if contains use restrictions, and if it restricts transfer, it is an enforceable license. We think that is the right case. There are some other cases, Krause here in the Second Circuit, which previously had a different point of view. But what that distinguishes was not based on enforcement of a license.

Finally, today, nearly one in five copies of software used in the United States is unlicensed. We lose about $10 billion just in the U.S. Threats of infringing use of software would be significantly exacerbated if the first sale doctrine or the first sale rule were applied to licensed copies. Because it is nearly impossible to police whether the person purporting to transfer has actually done so.

I would like to say three things in conclusion. One is, applying the first sale doctrine to licensed copies would substantially increase the infringement risk. Two, it would reduce consumer choice by undermining the legal foundation that software developers rely on. And, finally, it would shake the very notion that licensing, which is completely recognized by the Copyright Act as a legitimate way to commercialize, it would undermine the concept that licensing is an integral part to be protected and nurtured by the Copyright Act.

Thank you very much.

Mr. GOODLATTE. Thank you, Mr. Simon.

[The prepared statement of Mr. Simon follows:]

110



Hearing on

"First-Sale Under Title 17"

**United States House of Representatives Committee on the Judiciary
Subcommittee on Courts, Intellectual Property, and the Internet**

**June 2, 2014**

**New York, N.Y.**

**Testimony of Emery Simon
Counselor
BSA | The Software Alliance**

111

**Testimony of Emery Simon**
**Counselor, BSA | The Software Alliance**
**Hearing on "First-Sale Under Title 17"**
**June 2, 2014**
**New York, N.Y.**

Good morning Chairman Coble, Ranking Member Nadler, and members of the Committee. My name is Emery Simon, and I appreciate the opportunity to testify today on behalf of BSA | The Software Alliance ("BSA"). BSA is the leading advocate for the global software industry in the United States and around the world. Our members are among the world's most entrepreneurial and innovative companies, creating software solutions that spark economic growth and improve modern life.[1]

Since the software industry's inception, developers have relied on copyright law—and copyright licenses in particular—to provide their products and services to users. This licensing-based business model has been instrumental to the industry's success and has generated tremendous benefits for consumers, for example, as developers have tailored their offerings to a wide range of customer needs.

BSA members therefore have a keen interest in today's hearing on whether to extend the first-sale doctrine beyond physical copies of works to include works acquired through digital transmissions. We urge this Committee to reject any proposal to extend the first-sale doctrine to copies of software acquired under a licensing agreement or otherwise to convert the first-sale doctrine into a "first-license" doctrine. We believe such an extension would undermine the licensing models that our business and individual customers depend on today, upsetting long-standing business practices and leading to substantial confusion among consumers about the rights and quality associated with "secondhand" software, resulting in unintended and harmful consequences.

<u>Software and the Economy</u>

The commercial software industry is one of the world's most powerful engines of economic growth. In just the past decade, the global software industry has nearly doubled in size, generating annual revenues of nearly $360 billion in 2012, up from $180 billion on 2000.[2] This represents a compounded annual growth rate of greater than 6 percent—more than double the global GDP growth average of 2.5 percent.

The software industry also generates millions of high-quality, high-paying jobs. The U.S. software services industry today employs nearly two million workers whose median income far exceeds the national average. The U.S. Bureau of Labor Statistics projects that software jobs will grow at an annual rate of 3.1 percent through 2020, and that the software industry as a whole will grow by almost 9 percent annually, making it the second-fastest growing U.S. industry sector over the next few years.[3]

---

[1] BSA's members include: Adobe, Altium, Apple, ANSYS, Autodesk, AVG, Bentley Systems, CA Technologies, CNC/Mastercam, Dell, IBM, Intel, Intuit, Microsoft, Minitab, Oracle, PTC, Rockwell Automation, Rosetta Stone, Siemens PLM, Symantec, Tekla, The MathWorks, and Trend Micro. *See* www.bsa.org.

[2] *See* BSA, *Powering the Digital Economy: A Trade Agenda to Drive Growth* (2014), at http://digitaltrade.bsa.org/pdfs/DTA_study_en.pdf.

[3] *Id.* at 4.

Page 2

112

Software generates even greater economic returns through its use by customers because it enables businesses and individuals across the economy to become more efficient, productive, and competitive, and because it provides them with the tools for further innovation.

The pace of these gains will only accelerate as users transition to cloud computing and other online services. As BSA noted in a recent report:

> "[W]ith infinitely scalable processing power and unimaginably vast data storage at their disposal, banks can now analyze patterns in their transaction records to detect fraud; doctors can assess from historical outcomes the most effective courses of treatment for diseases; and manufacturers can spot the causes of production delays in global supply chains. [Cloud] technologies also collapse distance as never before, allowing companies to operate seamlessly in international markets—interacting with suppliers and serving customers wherever they may be."[4]

### Licensing Models Allow Flexibility for Evolving Software Delivery Models

Licensing-based business models have been core to the software industry's success since its beginning. In 1969, when IBM first began to offer software separate from hardware, it used copyright licenses to do so. This enabled IBM to protect its economic interests in its software while also providing customers with rights that exceeded what they would have acquired from an outright "sale" of the software. Licensing has tremendous benefits for users, including by providing them with more choices, lower prices, and various post-transaction benefits that users would not receive through outright sales of software.

Although the software industry has grown exponentially since 1969 and the terms of software licenses have adapted to changes in technology and the marketplace, licenses remain the industry standard for distributing software to users. Licensing will remain the predominant business model as users transition to software-as-a-service subscription models and businesses devise other innovative ways to meet customers' changing demands for software. It makes little sense to apply first-sale concepts in this context. Just as we would never think that first-sale applies to streaming services such as Netflix, or a subscription to the online version of the Wall Street Journal, it similarly makes no sense to apply these rules to subscriptions to use cloud-computing services.

Such evolving software services business models provide tremendous benefits to users: they are flexible, extremely scalable, and allow customers to access massive computing power quickly and at a small fraction of what they would pay to run these services themselves. Whether offered for a one-time fee, as a subscription service, or under other terms, these services all rely on licensing to provide software functionality to users, rather than a transfer of ownership.

### Licensing Models Offer Substantial Benefits to Consumers

Extending the first-sale doctrine, for example, to copies of software acquired by digital transmission would undermine the substantial consumer benefits that flow from the licensing models that apply to such transmissions today. Licenses provide consumers with an explicit bundle of rights, including in many cases rights that are more extensive than would be conveyed by a sale of software. Licenses also establish a relationship between the software developer and the customer that often continues long after the initial transaction takes place. For example:

---

[4] *Id.* at 1.

Page 3

A-3126

113

- Many software licenses entitle the customer licensee to patches and other updates for improved functionality and to fix security vulnerabilities, and in some cases even provide discounted or free access to new versions of the software. These updates can help protect consumers from malware and other security threats that can have disastrous consequences, including theft of their personal information and corruption of their computers.[5] Critically, licenses also often provide authorization for the developer to install such updates on the consumer's computer—conduct that in some cases could trigger civil or criminal liability in the absence of such authorization—and provide reasonable limitations on liability to ensure that developers are not deterred from making these benefits available to their customers.

- Software licenses also often provide consumers with rights that might not be available with regard to a sale under the Copyright Act. For instance, licenses often permit the customer licensee to install the software on more than one computer (e.g., on up to four devices within a single household).

- Software licenses also enable software developers to tailor their offerings to accommodate a range of customer requirements, allowing them to offer different features and charge fees that reflect the customer's situation (e.g., students, home users, businesses) and that accommodate different customer needs (e.g., per-use, per-user, per-device). A business customer, for instance, might be willing to pay a higher price for a copy of software that has relatively broader use rights, additional features, or network licensing options (e.g., allowing software to be installed on multiple devices for non-concurrent use). A student, by contrast, might prefer a lower-priced version of the software with fewer features and usage options. By enabling software developers to tailor usage rights to very discrete scenarios and customer needs, licensing facilitates a far greater range of choices for consumers than would be possible if digital transmissions of software were treated as sales.

### Courts Have Sternly Rejected Arguments That a Software License Is Really a Sale

Courts have repeatedly upheld the enforceability of software licenses, including against claims that the first-sale doctrine applies to them. For instance, in the recent case of *Vernor v. Autodesk*, the Ninth Circuit confirmed that the first-sale doctrine applies only to *"owners of copies of copyrighted works"* and is "unavailable to those who are only *licensed* to use their copies of copyrighted works."[6] The court articulated a simple test, based on precedent and state-law contract principles, for evaluating whether a user is a "licensee" or an "owner" of a particular copy of software and thus whether the first-sale doctrine applies.[7]

---

[5] The threats posed by malware and other cyber threats—both to a customer's computer or system and to the country's information technology infrastructure more broadly—are well recognized. A 2014 study by the International Data Corporation ("IDC") found "that consumers and enterprises have a 33% chance of encountering malware when they obtain a unlicensed software package or buy a PC with unlicensed software on it." See *The Link between Pirated Software and Cybersecurity Breaches: How Malware in Pirated Software is Costing the World Billions*, IDC White Paper, Mar. 2014.

[6] *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010) (emphasis added), *cert. denied*, 132 S. Ct. 105 (2011).

[7] *Id.* at 1111 ("We hold today that a software user is a licensee rather than an owner of a copy where the copyright owner (1) specifies that the user is granted a license; (2) significantly restricts the user's ability to transfer the software; and (3) imposes notable use restrictions.").

Page 4

A-3127

114

The *Vernor* test, and similar tests adopted by other courts, look to the license agreement to determine whether the parties *intended* the transaction to be a license, or instead a sale.[8] These precedents provide a clear legal framework for licensing-based business models and certainty for both software developers and their customers. Extending the first-sale doctrine to licensed copies acquired by digital transmissions, by contrast, would *override* the parties' intent by formulaically treating licensing transactions as sales regardless of what the license said or the parties intended.

### Applying First-Sale to Licensed Copies Would Create Substantial Consumer Risk

Expanding the first-sale doctrine to apply to software acquired under a license would have substantial detrimental consequences. First, buyers of secondhand software often will be unable to tell whether the copy at issue is genuine or counterfeit, yet will incur liability if the copy turns out to be infringing. Secondhand purchasers also will typically have to rely on representations from the seller about what rights from the original license convey with the software—*e.g.*, to patches, upgrades, after-sales support, etc.—and may have no recourse if these representations turn out to be false.

Secondhand purchasers also have no way of knowing whether the used software they acquire includes security patches, or even might be infected with viruses or other malware. This risk is substantial. A recent IDC study found that 78 percent of counterfeit software downloaded from the Internet was secretly infected with spyware or other malicious code. Installing software infected with malware not only places the user at risk, it also increases the security risks for all other Internet users because the vast "botnet" networks created by infected computers are often used to mount denial-of-service or other attacks on users of non-infected computers.

Creating a right for licensees to transfer copies of software to new users also would raise difficult issues of privity between the software developer and the subsequent transferee. The resulting uncertainty over the parties' respective rights and obligations would complicate efforts to enforce the original license, including provisions specifying the terms of the transaction and the remedies and other rights of the parties. Beyond just casting doubt on whether the subsequent transferee was entitled to services, updates, or other benefits granted to the original licensee, it would also raise the question whether the developer might incur liability in providing such benefits (*e.g.*, providing software updates often requires the licensor to access the user's computing device, which could raise liability concerns absent the user's authorization).

These and related uncertainties would deter developers from offering consumers multiple purchasing options of their works and leave them less able to offer a range of prices for different users and usage scenarios. Developers would be particularly averse to offering these options if they faced the risk of having less-sophisticated versions of their software (*e.g.*, for student use) displace more complex versions intended for commercial settings (*e.g.*, for enterprise use).

### The On-Going Threat of Unlicensed Use

Copyright licenses are also a critical tool in combatting software infringement. Nearly one in five copies of software used in the United States has been installed without proper licensing, at a commercial value of

---

[8] *Cf. Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1373 (2013) (Kagan, J., *concurring*) (endorsing interpretation of the first-sale doctrine and the importation provision set forth in 17 U.S.C. 602(a)(1) that "turns on the *intended market* for copies . . . instead of on their *place of manufacture*") (emphasis in original).

115

nearly $10 billion.[9] To effectively prevent this unauthorized use, software developers will continue to rely heavily on the enforceability of copyright licenses (including for online services).

Extending the first-sale doctrine to software distributed under a license would undermine these benefits by creating substantial consumer confusion and threatening the viability of licensing as a business model. By its terms, the first-sale doctrine applies only to the owner of a particular copy of a work—*i.e.*, one to whom the copy has been sold rather than licensed.[10] Indeed, the House Report on this provision stated that it applied only to those who acquire a copy by "outright sale."[11] Converting the first-sale doctrine into a first-license doctrine, by for example extending it to digital transmission, would brush aside this existing law and ignore the important differences between physical copies that are sold and intangible copies that are licensed.

Such a change would materially increase risks of infringement, particularly for digital works such as software. As the Copyright Office noted in opposing such an extension to the first-sale doctrine in 2001,

> "In applying a digital first sale doctrine as a defense to infringement it would be difficult to prove or disprove whether that act had taken place, thereby complicating enforcement. This carries with it a greatly increased risk of infringement in a medium where such risks are already orders of magnitude greater than in the physical world. Removing, even in limited circumstances, the legal limitations on retransmission of works, coupled with the lack of inherent technological limitations on rapid duplication and dissemination, will make it too easy for unauthorized copies to be made and distributed, seriously harming the market for those works."[12]

These concerns are even more acute today given the rapid growth in online distribution of works. When the owner of a physical copy of a work, sells that copy, the owner losses possession of that copy, and physical copies almost always degrade over time. Thus, application of the first-sale doctrine to sales of physical copies of works poses limited risks against infringing use since the original owner of the copy will necessarily lose possession of his copy when it is sold to a second purchaser.

Threats of infringing use of software would be substantially exacerbated were a digital first-sale rule applied to copies of software acquired online. It is nearly impossible to police in cost-effective ways whether a person who purports to transfer a copy of a computer program actually deletes that program from their system once the copy is sold. In fact, because of this policing problem, it is easy to see how a single copy of a program may end up being resold multiple times and each purchaser believing they have acquired a legitimate copy of the software when in fact they have not.

\*\*\*\*

---

[9] BSA, *Shadow Market: 2011 BSA Global Software Piracy Study* 4 (9th ed., May 2012), at http://globalstudy.bsa.org/2011/downloads/study_pdf/2011_BSA_Piracy_Study-Standard.pdf.

[10] 17 U.S.C. §109(a).

[11] H.R. Rep. No. 1476, 94th Cong., 2d Sess. 79 (1976).

[12] U.S. Copyright Office, *A Report of the Register of Copyrights Pursuant to § 104 of the Digital Millennium Copyright Act* 83-84 (2001), at http://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.

Page 6

116

In sum, extension of the first-sale doctrine to copies acquired under licenses by digital transmissions or other means would reduce consumer choice by undermining the legal foundations that software developers rely on to offer multiple licensing options and sharply increase infringement risks in ways that do not arise with respect to sales of physical copies of works and. For these reasons, BSA and its members urge this Committee to oppose any extension of the first-sale doctrine to copies of software distributed under licensing agreements.

Thank you again for providing this opportunity to share BSA's views on this important matter. I welcome your questions and look forward to continuing to work with members of the Committee.

Page 7

_____

117

Mr. GOODLATTE. Thank you all for excellent testimony.

Before I begin the questioning, I wanted to introduce to our New York audience and our online audience the other Members of the Committee, who have been able to travel to be here in New York. In addition to Mr. Nadler not having to travel very far, since his district is a stone's throw away, across the street—don't throw stones here—the gentleman from New York, Hakeem Jeffries' district is just a few miles away in Brooklyn. And he is a new Member of the Judiciary Committee and keenly interested in intellectual property and technology issues.

As is the gentleman from Florida, Peter Deutch, who spends a lot of time in intellectual property, particularly copyright issues. We are glad to have both of them with us today.

Congressman George Holding from North Carolina, just introduced a significant copyright reform bill last week in the Congress. He is also a new Member.

And Congressman Jason Chaffetz has the record of having traveled the farthest distance to be with us, or at least has to travel the farthest distance to get home to his district in Utah. He also has an obligation later on this morning, so I am going to give him the opportunity to begin the questioning so that he can not feel too much pressure when he has to slip away to get to his other meeting.

Congressman Chaffetz recognized for 5 minutes.

Mr. CHAFFETZ. Thank you. And thank you, Chairman, for holding this hearing.

And to Mr. Nadler and Mr. Jeffries, we appreciate always being in the city. It may be a stone's throw across the street, but I don't think 50 Cent could make that all the way across the street. I would love to try to see him throw a rock all the way across the street.

Listen, we do appreciate it. It is a very difficult issue. If this was simple, we would not be gathered here this day.

And I really appreciate all of the people on this panel. I know Mr. Deutch, in particular, has been very thoughtful on this issue. We have looked at it from some different angles. But I really do want to come to a resolution.

Mr. Band, I would like to start with you, as sort of a two-part question, if I could.

How widespread is the problem you identified with the transfer of software essential to the operation of products? Because that—so many of our products have literally hundreds of different applications involved with them. And then are these restrictions on essential software a copyright issue, a contract issue, or a bit of both?

Mr. BAND. Thank you, Mr. Chaffetz, for that question. With respect—or the two questions.

With respect to the first question, right now, the problem is mainly in sort of the computer and the telecommunications industries. So you see these kinds of restrictions with the sale of computer hardware or telecommunications devices.

But particularly because, as you indicated, the software is everything. I mean, I am sure this microphone probably has some software. That timer probably has software. Our watches have software it in. The problem now is sort of relatively limited. But it is

118

going to be a bigger and bigger problem as we go forward. Cars, of course, have software in it. And so it doesn't take a lot of imagination to see the restrictions that are now used with respect to computers could very soon be applied more broadly.

So I think this is a very appropriate time for Congress to focus and figure out how to resolve it.

With respect to your second question, yes, I think it is a combination of both contract and copyright law. It is in the first order of copyright question because the first sale doctrine, the manufacturers are saying the first sale doctrine does not apply because they are considering it a license of the software rather than a sale of the software when it is part of this bigger product.

But then also you do have a license. And so you are arguably breaching both the copyright and the license when you sell the product. So I think it is one of these overlapping areas, which of course makes it more complicated.

Mr. CHAFFETZ. And that is the concern, right? That ultimately you have got a consumer who is trying to do the right thing. They are not going to weave their way through, you know 72 pages of disclaimers and questions.

And we also have a piracy problem. I mean, let's be honest. We have a big piracy problem in this Nation and certainly globally. So how do we address that? I mean, are we going to facilitate more piracy? How do we solve that?

Mr. BAND. I think with the specific—with the larger digital first sale issue that others have talked about, I mean, I think that is a complicated issue that needs to be considered.

Fortunately, with the specific issue that we are addressing about, you know, the essential—the software essential to the operation of hardware products, you don't really have to worry about that. Because either the software is already embedded in firmware or it is already contained in some manner in the hardware. So you don't— you don't have the proliferation of copies or the potential for the proliferation of copies that you do in the other examples that we have heard about on this panel.

Mr. CHAFFETZ. Mr. Siy, you talked about a simple update of Section 117. Can you elaborate on that a little bit, how simple this could be?

Mr. SIY. Certainly. Well, there is a couple of different things. One of them will account for the sale of used digital goods, which is maybe not as simple.

The simpler part would simply be to—currently, it says that the owner of a computer program can make essential step copies, so that they are not an infringer. Two small changes, one is to change "computer program" to "works or copies of works generally." So that it applies to other forms of digital media that aren't defined as computer programs, like video files, music files, and eBooks. The other one would be so that users of the program aren't found to be infringers.

If I simply hand somebody my phone and they open up a game on it, they wouldn't have the protections of Section 117. So if they are a legitimate, lawful user of that software, they should also be able to afford that protection.

119

Mr. CHAFFETZ. Mr. Chairman, I think that the court got *Kirtsaeng* right. I am a big proponent of that. I believe strongly in it. I also understand and respect the idea that we have a major piracy problem. That innovation and technology is a good thing. That speed, efficiency, and anonymity, as you talked about in your testimony, Mr. Siy, these are all good things for American consumers. And how we find that proper balance, I just don't want the Congress to screw it up.

So thank you, yield back.

Mr. GOODLATTE. I thank the gentleman.

And I am now pleased to recognize the gentleman from New York, Mr. Nadler, for 5 minutes?

Mr. NADLER. Thank you, Mr. Chairman.

In its 2001 report, the Copyright Office concluded that there was no demonstrated need to extend first sale digital works that would outweigh likely harms of such an extension.

Professor Villasenor, has the landscape changed since that report? Is there enough of a need now to warrant extension of first sale of digital works, in your opinion?

Mr. VILLASENOR. I respectfully do not believe that there is. As I mentioned in my testimony, we have largely already moved to a license-based ecosystem, and first sale doctrine doesn't apply when there is no sale.

I think it is very important to respect contract law. And the concerns I have with respect to the license-based distribution content is not that licenses themselves are improper; it is that the disclosures accompanying the delivery of license-based content to consumers are, frankly, often lacking. And I think that consumers have a right to clear disclosures about what the content of those licenses are. And that when that occurs, I think that we will find the market will respond and provide a wealth of solutions, giving consumers the ability to choose to get content on terms that are more favorable to them.

Mr. NADLER. Thank you.

Mr. Smith, are you seeking a legislative fix to the *Kirtsaeng* decision? And, if so, what fix could also adequately protect the interests of entities like libraries and museums, those entities the Supreme Court recognizes as needing and relying on first sale?

Mr. SMITH. Our interest would be to see Congress revisit that decision to look at clarifications in the law around first sale to really protect against distribution and resale into.

Mr. NADLER. Probably a legislative fix.

Mr. SMITH. We think it would be advisable for Congress to look at that again.

In terms of the impact on libraries and downstream uses, we believe that there are legislative options that can protect the interests of those who have legitimate cases to reuse similarly to the way they reused them always. It is really the attrition of copyright protection through the allowance of large-scale redistribution and reimportation that we seek to remedy.

Mr. NADLER. Thank you.

Back to Professor Villasenor.

120

When I buy a book, I know that I own it and can resell it or give to it a friend. Should this same principle, you buy it, you own it, apply to digital works? And why not?

Mr. VILLASENOR. I think that content providers and copyright holders have the option of choosing to provide content under licenses that could allow various levels of flexibility, and I think consumers have a right to make that choice.

I don't think—and as I mentioned earlier in my testimony, I do not think that it is proper to market to consumers with terms that clearly suggest ownership when in fact the ownership is not what happens.

But I don't think that it would be appropriate for Congress to require that content distributors or content providers own or must offer their content pursuant to ownership.

I think that copyright holders should have the flexibility to offer the content under the terms that they see fit, and the market will respond. Consumers have an enormous amount of power over copyright holders because if no one buys or licenses the content, the content will not get into the hands of consumers.

Mr. NADLER. Okay.

Mr. Cram, if the law allowed copyright owners to prevent unauthorized importation, but also kept protections for owners of foreign-made copies once imported and allowed distribution once in the United States, thus penalizing the original importation only, would that have a negative effect on libraries?

Mr. CRAM. It still might. So libraries—when the *Kirtsaeng* decision was being contemplated, we did an analysis on our research collection and found that close to about two-thirds of our research collection could have been manufactured outside the U.S. So we brought that collection in, or we purchased it, or however we acquired the collection, we would be concerned about an importation right that would prevent us from importing those things in. And we are a first buyer. So even those, it might protect downstream uses, we would still be subject to it.

Mr. NADLER. You——

Mr. CRAM. We would be the first importer, the one who brought the works into the country. So we would still be concerned if there weren't adequate exceptions and limitations to that importation right.

Mr. NADLER. Okay. And probably my last question, given that the orange light is on. Mr. Ossenmacher, Professor Villasenor predicted if loans, sales, or other dispositions of digital content could be made instantly through first sale for digital works, then those transactions would largely replace the market for initial sales, to the harm of copyright owners. What is your response? Is this not a risk? And how can it be mitigated?

Mr. OSSENMACHER. Congressman, my response to that would be, I understand his point. But first sale doctrine didn't look at method of delivery or speed of delivery. First sale doctrine was more about how to extinguish——

Mr. NADLER. Maybe now in the digital world, it should?

Mr. OSSENMACHER. I don't think so either. Because I think by doing that, the balance that we all talked about changes greatly. And I think one of the things we worry about is there was always

121

the issue of a physical sale. And in a physical sale, certain rights existed. Everybody marketed their business based on those rights and consumers responded to those rights.

In a digital world, I think there is a lot of hype about the speed of delivery. I mean, I can literally go to Amazon and buy something right now physically, and it almost happens as quickly. I mean, it is shipped—a drone will be delivering it shortly. Does that mean that shouldn't happen? And so I think speed of delivery is kind of a red herring in terms of copyright law.

And I think, again, it is more the issue of "if I do acquire something or I believe I am acquiring something, what are my rights with that," not "how quickly did I get it or how quickly can I dispose of it." So that is how I would respond, Congressman.

Mr. NADLER. My time has expired. I thank you.

I yield back.

Mr. GOODLATTE. I thank the gentleman.

I have a question that I will—since there are nine of you, I am not going to ask each of you to answer it. But I am going to ask those of you who want to volunteer to answer three questions.

First one is, should the law expressly provide some definition as to what constitutes a sale and what constitutes a license?

Do I have volunteers?

Is this something we need to clarify?

Mr. SIY. I am not entirely sure that the law needs a specific definition. However, I do think the law does need to recognize that something might not be a license simply because one of the parties asserts that it is, that the characteristics of the transaction between the two parties should be taken into account.

Mr. GOODLATTE. In what respect are you trying to draw that distinction?

Mr. SIY. So, for instance, Mr. Simon mentioned the *Vernor* decision. And in the *Vernor* decision, the court drew up a test to determine whether or not you had a license or a sale. And it looked at a number of factors: Was there a transfer of title? Were there usage restrictions? Were there restrictions on distribution?

But the question is, how is it determining where those restrictions came from? Is it just because the manufacturer put them in a long, fine-print license? Are we going to take their word for that, that that is what the transaction looked like? Or are we going to also account for whatever conversation happened between buyer and seller, or what the Web site looked like. Did they click a giant button that said "buy"?

So I think the difference is, you know—I don't know that Congress necessarily needs to draw a bright-line definition. But the law does need to recognize that simply because one party says it is so doesn't make it so.

Mr. GOODLATTE. Mr. Simon.

Mr. SIMON. I don't know. But I think it is going to get more complicated over time. And here is why. We know that all content is quickly moving to license-based distribution, whether it is streaming, whether it is in other forms.

A single payment, arm's-length transaction under a license, feels like a sale. That is the Weiss case in the Ninth Circuit from 30

122

years ago. That is the European Court of Justice opinion in the Oracle UsedSoft case.

A lot of content is going to be distributed that way, on a single payment, no ongoing relationship. Software is different, because software does have an ongoing relationship.

But I think you have hit on the right question. And I think figuring out how you maintain the validity of licenses over time when courts are going to have this attraction to turn them into sales is a real challenge.

Mr. GOODLATTE. Let's take it to the point that Mr. Siy raised. Does it matter for consumers if the on-screen button says "license" or "buy"? What are the impacts for consumers?

Mr. SIMON. I bought an Amtrak ticket to come here. I didn't think I bought the seat. I think I licensed the right to sit on the train. So this notion of "buy" buttons being "buy" buttons I find a little fanciful. Because we buy all kinds of things which we know to be licenses. Customers, consumers are pretty smart.

Mr. GOODLATTE. Do we need to clarify that in the law?

Mr. SIMON. I don't think so.

Mr. GOODLATTE. Mr. Band.

Mr. BAND. But I think the example that Mr. Simon gave is a good example of the bigger point. So you—the question is obviously you don't buy the seat, you buy a license to use the seat. But then the question is, is your license transferrable? Should you be able, if you decide you cannot use the ticket, should you be able to let someone else use the ticket? And Amtrak I think says no.

But, you know, those are—the kinds of issues one needs to get into. And at least in the specific issue that I was raising of the installed software, you know, the essential software, rather than start to figure out is it a license, is it is a sale, I think it is better to simply say, you know, if you are the rightful possessor of the hardware, then you are able to transfer that hardware and the software with it.

Mr. GOODLATTE. What about the consumer's expectations? Do users expect to be able to sell digital copies of all works, or do they simply expect to be able to move it around to various devices tied to that user's account?

Mr. BAND. Well, I think——

Mr. GOODLATTE. When I buy a digital book, and I view buying it, because I am going to be on those devices permanently, I don't do it with the expectation that I can do what I do with my hard copies, which is, once I am finished reading this, I can take it down to Too Many Books in Roanoke, Virginia, and they will give me one-quarter of the face value of this, and they will sell it in their bookstore for one-half the face value.

But I don't view my online book as something that I am going to be able to take somewhere and sell it to somebody. Mr. Villasenor.

Mr. VILLASENOR. Can I respond to the question about license sales?

Mr. GOODLATTE. Sure. Whatever.

Mr. VILLASENOR. I think the, you know, it is hard to see what is going to happen in the future. But the courts recently have actually I think had the right decisions on that. There are two cases

123

in the Ninth Circuit. There is the *Vernor* case, which affirmed the licensees' obligations under a license. And the licensee in this case was an organization called CTA. And then also in the Ninth Circuit, there was a case called UMG Recordings, where someone had received a promotional CD that said, you know, you are bound by the terms of the license, but then the court found that the person was not bound, in fact, because the person, the recipient, had never actually agreed to the terms of the license. So there is some, you know, generally good case law on that.

And I think my personal view is that for Congress to wade in as this point and try to tackle that would potentially create more confusion than clarity. I don't see that the system has broken to the extent that it needs fixing in that particular respect.

Mr. GOODLATTE. My time has expired, but I know Mr. Ossenmacher wants to respond to my last point there.

Mr. OSSENMACHER. Thank you very much, Chairman.

I think, should there be a "buy" button? A "lease" button? A "rent" button? I think yes. I mean, our experience is directly with consumers. And unlike most people in this room, the average consumer, when they push a "buy" button, believes they are owning something. And I think that is really important. Because we are not against licensing. I don't think that consumers are against licensing. Consumers are about pro choice. They want to choose, do I own something? Can I choose that I am streaming it? And I think all that we see the consumers asking for is just be clear with us, as the professor had said, about what we are getting.

Mr. GOODLATTE. Okay. But let's use the example I gave you, though. The Amazon book that I have downloaded, I have paid a price for it. That price is lower than I would pay for the hardbound copy. But it is a price I paid for it, and it will be on my devices for as long as I have those devices.

Mr. OSSENMACHER. Unless Amazon deletes it.

Mr. GOODLATTE. What is that?

Mr. OSSENMACHER. Excuse me, sir. Unless Amazon deletes it, like in "1982," you know, the book "1982." I mean. Sorry.

So I think, I guess the issue there is, most consumers like the right that when they buy that—when they push that button from Amazon to buy, it is different than when they are pushing the "movie" button to rent a movie. They think they are buying that book.

And many consumers are alienated in digital goods today because socioeconomically they may not be able to afford that book. And that eBook is not necessarily less expensive than a physical book. Used markets in books have helped our society become smarter and more knowledgeable because the value of that book is less when it is used. And many people in America today cannot afford a $14.99 eBook. But maybe if it is sold used for $8.99 or $9.99, which helps people want to buy the book because they know it has that value, but it also opens the door to people of all socioeconomic levels to be able to enjoy digital, not just the high-income and the middle-income people.

Mr. GOODLATTE. We will come back to this.

Next I want to recognize the gentleman from Florida, Mr. Deutch.

124

Mr. DEUTCH. Thank you, Mr. Chairman.

Thanks for holding the hearing. I think it is a really important discussion.

I just wanted to go back to a couple of themes that we have heard. Mr. Ossenmacher, I think you touched on both. One is this whole idea, if you buy it, you own it. But, two, as a number of our witnesses have referred to, the balance that exists between consumers and copyright holders.

And there are, I think it is worth noting that there are lots of examples of ways that that balance has been struck in very productive and innovative ways. I think that is the case. And I know for a lot of us here, myself included, I watch—I stream shows, I watch movies on Netflix and Hulu. And I listen to music on Spotify, and my kids look to YouTube for their music. And there are lots of ways that actually balance these competing interests that are alive and well.

So we are not making it more difficult; we are making it easier for people to access the content that they need while at the same time protecting the copyright holders.

And on the issue that you buy it, you own it, again, if we look at what currently exists in terms of what we buy, call it a license or not, if I buy music, it will allow me to do a lot of things that go beyond listen to it. It will allow me to sync it across all my devices. I can redownload it if I lose it. I can access my library in the cloud. For some services, I can share my music—my movies—with multiple users in my household or in my family. The mobility and the interoperability is much better than just having a right to resell one file.

And I think, lost unfortunately thus far this morning, is the fact that there are tremendously innovative approaches that provide all kinds of access while at the same time protecting the copyrights of the creators and the innovators who provide this content.

I would like to just touch on a couple of points, though. Mr. Band, and this gets to Mr. Chaffetz' point, a really important one, that there is—a reminder that there is a piracy problem.

Mr. Band, you spoke about, I think you used Elmore Leonard as an example. And you said that Elmore Leonard, Elmore Leonard's copyright prevents you from copying the book. And you said that people understand that they can't make counterfeit copies. And so they don't make a copy of that book before they donate it to someone that they know, love, care about, that they want to share their passion for Elmore Leonard with.

That may be true with respect to the book. It is not true—I mean, let's not kid ourselves. It is not true. There are plenty of people who everyday are working hard to make a lot of money by making counterfeit copies. That exists. That is what we have to combat. We know that is the case.

I guess the question I have first is, is there a service, is there any service at all that allows for transfer and delete without making a copy? Is there any way to do any of this that absolutely guarantees that there wouldn't be copies made? And if there are copies made, then aren't we only furthering the opportunity for counterfeiters to continue to prey upon the folks like Mr. Shems and his

125

clients who try to work hard to provide this content? Mr. Ossenmacher?

Mr. OSSENMACHER. Yes, sir. Technology exists today to be able to do exactly that. And I think in addition to the fact that technology exists, one of the things we should——

Mr. DEUTCH. Let me just ask. So there is technology that ensures that you can't—that one won't copy anything on his—can't make a copy of his hard drive; right? And still transfer after that. Because I am not familiar with it. I have not heard of it. I thought the courts have looked at it.

Mr. OSSENMACHER. So let's now, if we want to look at technology, we can break it up. There are certain ways. You asked if there are ways. There are ways.

If, for example, the original copy or the sold copy goes directly to a user's cloud and that cloud is the only way they can then access it and title can transfer from buyer to seller through the cloud, the technology absolutely exists to allow a digital item to be sold without copies being made.

Mr. DEUTCH. If it goes directly to the cloud—isn't that a big if?

Mr. OSSENMACHER. No, it is not a big if. This is where content providers can decide how the delivery—just like they are allowing today, people who sell digital content allow it to be downloaded. We started years ago with DRM. We thought by putting lots of DRM around things that would control how this process worked. Well, what we found is DRM actually created piracy because people didn't feel comfortable with the fact that the DRM existed. That is why it was removed.

Mr. DEUTCH. Mr. Smith, and then I have one more question for Mr. Ossenmacher.

Mr. SMITH. So I believe there are technologies that exist that may do some of what you suggest. However, I think at the moment enforcement would still be a serious concern for copyright holders, and from my understanding, there are serious privacy issues that are raised by any technology that it seeks to identify.

Mr. DEUTCH. How do you enforce that without going back and checking the computer of the person who transferred it?

But, Mr. Ossenmacher—just last question, Mr. Chairman, if I may.

You had said earlier that—you used the example of diamonds. And you said that the diamonds, diamonds remain unchanged when there is a sale, when someone gives a diamond to someone else to use. That was your example, I think.

But the question I have is, every diamond is unique. Right? Isn't that the difference? Every single diamond is unique. Every copy of a song, every copy of a film is identical to every other copy of the song or film, which is what—or book, which is what gets us into this piracy morass that we are in now.

Mr. OSSENMACHER. So, okay, well, I will respond to that. I think actually, to be technically correct, every digital download is specifically unique. Every digital download has its own unique identifiers. The copyright material may be the same, just as it is in a physical good. But each downloaded item is completely unique. It is that uniqueness that allows us to do certain things with that.

126

When we talk about piracy, though—I just want to point this out because I think it is very important. You know, today, piracy exists in a massive scale, especially in the music industry. Not so much in the book industry, but in the music industry, it is rampant.

Now, when we look and say, should we allow or not allow first sale, is first sale going to hurt piracy, the fact of the matter is piracy is a massive issue that all of us dislike that exists today.

So a simple solution to help piracy, and it may sound too simple, is if we give digital goods value, if the people would actually buy them, feel they own them, like they are going to protect them as their personal property, piracy will decline, there will be no reason for piracy, because if a good is stolen or pirated, the fact that that good now will have no value.

So I think one of the ways to actually combat piracy is to allow digital first sale to exist, give digital items value so that they are not this, you know, thing in cyberspace, and let people realize the value of those digital goods. That will help everybody.

Mr. DEUTCH. Mr. Chairman, I hope as we go forward, this will be the opportunity to pursue further this notion that an Elmore Leonard book that one gives to someone and—versus copies of that, is the same as a musical copy. And the differences in the digital, digital copies and whether or not anyone is ever able to tell the difference between one copy or the other, I would assert not, but I hope that we will give others the opportunity to——

Mr. GOODLATTE. I think that is a good part of this discussion.

And we probably won't have time for a complete second round. But we will allow Members to ask some additional questions.

First let's go to the gentleman from North Carolina, Mr. Holding.

Mr. HOLDING. Thank you, Mr. Chairman.

Picking up what Mr. Ossenmacher left off with, that if we give value to these digital works so that they can be resold, it will cut down on piracy or eliminate piracy.

Who agrees with that?

Mr. Glotzer, do you agree that if they have the—you know, construct some first sale ability on these digital works, that it will cut down piracy in the movie industry?

Mr. GLOTZER. No, not necessarily, not—I think the mechanisms, the economic drivers that create piracy are completely separate from what we are talking about here, which is the notion of whether or not something that is licensed should be re-marketed, essentially, by the holder.

Mr. HOLDING. Mr. Ossenmacher, if we had a government-mandated used market for content in a nonphysical form, you know, what kind requirements of surveillance would there be? How invasive would that surveillance be to ensure that people aren't keeping copies of it or retaining copies?

Because, obviously, the copyright holders would have to have some, you know, assurance that what you are proposing would work, and their copies, you know, really are unique and being passed on and not just being duplicated.

So the surveillance, the invasive surveillance nature of what you would have to give up in order to participate in your business model.

127

Mr. OSSENMACHER. So, Congressman, I think that is an excellent question. But I want to start with an example that may help clarify before I answer.

Today and for many years, it has been very common practice to sell CDs. We go to the store, we go online, we buy a CD. What is the first thing most American consumers do when they buy a CD? They put it in their computer, and they rip a copy. So that CD now is on their hard drive. It ultimately ends up on cellphones, on other devices. And that CD has multiplied.

In today's kind of general acceptable practice, whether it is right or wrong, general acceptable practice has been, I now go to sell my CD on a wonderful site like eBay or Amazon. And I sell my CD. And the next thing I know, what enforcement has the government required? What have you expected of me in selling my CD? That I actually delete and remove copies of that CD I subsequently sold, because I no longer have, theoretically, the right to have them on my other devices? I think if we explore that and look at that, that is what has been happening today.

With digital, in the way at least our system works, and there are many ways to do it, with digital, what we do is we help a user—and so, in that case, when the user sold their CD, the user was violating copyright law because they got rid of their right to access that good.

So what we have done is we have taken the approach of how do we help the consumer be aware of copyright law, which helps the piracy, but how do we help them be aware of copyright law, so when they go to sell a digital good, if they happen to connect their phone or their iPad or any other device, we pop up a notification saying, "Hey, do you know you actually sold this? You need to remove it now."

And just as the law has always required the users to be lawful in their activity, we still give them the tools. We give them better tools today to actually maintain compliance with copyright law than they have ever had before.

Mr. HOLDING. You touch on a point that has come through a lot of the testimony, that the problems arise perhaps not with the law itself but with the consumer awareness of what the law is.

So is the question more of a consumer protection or consumer education issue than actually changing, you know, what the law is?

I mean, Mr. Simon, the software industry, from the get-go, I think licensing has been something that your consumers have understood, that they are buying a license to this software. You can't copy it; you can't pass it on, so forth.

Perhaps as we move forward with other digital works out there, as the consumers become more educated and understand that they just have a license to it, it will ameliorate, if not come close, to eliminating the problem.

Mr. SIMON. Just a couple of points, Mr. Holding, because I guess Mr. Deutch asked a question of, is the technology there?

So we know from, sad fact, NSA revelations, work this Committee and other congressional Committees have done, there is a lot of monitoring that can occur out there. We have a lot of technology to do so. But there is a price associated with it. And we have to balance these things. And we don't want to be overly intru-

128

sive. But we also want to make sure that people do not engage in illicit activity.

The suggestion that somehow moving everything to the cloud solves it all by making it all a streaming business is antithetical to the whole concept of what copyright and the business models are about, which is we want lots of choice. And if we drive everything to a single way of acquiring and enjoying, it is the opposite of what this law has done and the benefit that I think this Congress has created for all of us.

So we have got to be very careful here. We want secondary markets, but not at any price. And the suggestion that secondary markets overwhelm all other considerations I think is a little fanciful.

Mr. HOLDING. Thank you, Mr. Chairman.

Mr. GOODLATTE. Thank you.

Gentleman from New York, Mr. Jeffries, is recognized for 5 minutes.

Mr. JEFFRIES. Thank you, Mr. Chairman.

And thank you, Congressman Nadler, for hosting us here today.

Mr. Ossenmacher, in terms of first sale doctrine, secondary owner has the right to sell, loan, or give away any physical property that it purchases. Is that correct?

Mr. OSSENMACHER. That is—yes, that is correct.

Mr. JEFFRIES. And this is commonly known as the right of distribution. Correct?

Mr. OSSENMACHER. It is part of the first sale doctrine, yes.

Mr. JEFFRIES. Okay.

Mr. OSSENMACHER. It is an exclusion of the copyright holder.

Mr. JEFFRIES. The first sale doctrine does not provide the secondary owner, the initial purchaser with a right of reproduction. Is that right?

Mr. OSSENMACHER. That is correct.

Mr. JEFFRIES. Okay. Now, in the Capitol Records case, the court concluded that in the context of your business, the digital reproduction occurs as part of the transaction. Is that right?

Mr. OSSENMACHER. In one aspect of our software, yes.

Mr. JEFFRIES. But in your view—correct me if I am wrong—but your position is that the actual transfer of the digital item does not constitute a reproduction. Is that right?

Mr. OSSENMACHER. That is correct.

Mr. JEFFRIES. Okay. And can you elaborate on that position?

Mr. OSSENMACHER. Yes. So one of the things that the judge had said in his ruling was that he didn't completely understand technology. And based on his not understanding technology, he would go with a conservative approach. So I wanted that to be said.

But the way our system works is we allow two different types. We had a type where we called it migration. So a lot of times people don't completely understand how things get to our computers, but basically computer code is 0s and 1s that energize a disk either positively or negatively.

And what we did is, just as that song originally came down to our disk, we literally picked up the same 0s and 1s. We reversed the electronic coding going to the disk, the positive and negative charges.

129

And so, for example, if on my disk I have 100 charges, 100 percent of a song, and where I want to move it to where there is 0, as I move 1, there is 1 here, there is 99 here, 98/2, and so forth.

Mr. JEFFRIES. Let me stop you there. That is important, and I appreciate that elucidation.

In terms of your position as it relates to what constitutes reproduction and not under first sale doctrine, there is the transfer; you just talked about that.

Mr. OSSENMACHER. Yes.

Mr. JEFFRIES. But then secondary aspect or the second aspect is whether a deletion occurs. This is Ted Deutch's line of inquiry. I just wanted to explore that for a minute.

So the court concluded, I believe, that a deletion in its view didn't matter. Though I would tend to hold the position and deletion, if it is an actual deletion, is consequential to the discussion that we are having here as part of the Committee. But I want to explore this notion as to whether an actual deletion occurs.

Now, when you hit the "delete" button on an email, is that email actually deleted?

Mr. OSSENMACHER. No.

Mr. JEFFRIES. Okay. Now, that email content is then transferred to a trash folder. Correct?

Mr. OSSENMACHER. Yes.

Mr. JEFFRIES. Now, if you hit the "delete" button, in that trash folder, is that email actually deleted?

Mr. OSSENMACHER. Not necessarily.

Mr. JEFFRIES. Right. Because there is a process, I guess it is called technically recovery and restore. And obviously, there is a ghost of that email that exists that can be recovered. Correct?

Mr. OSSENMACHER. Correct. Typically, deletion is basically an overwriting process. So it leaves the original material there and overwrites it so that it appears it is no longer there. That is not what we are talking about.

Mr. JEFFRIES. Okay. So how can you assure us in the context of the technology that you are talking about that a deletion is actually occurring such that someone cannot subsequently retrieve the digital file that you contend has been deleted?

Mr. OSSENMACHER. We would be happy with technology to submit to forensic people. Our team is primarily MIT-based scientists, who are very, very smart. But I think even more so than that, I think the issue that we have found is we are not actually doing a deletion so that there is nothing left. I mean, there is nothing to actually recover, is how the process is, that we use.

Mr. JEFFRIES. But isn't it possible—and this was pursued in an earlier line of inquiry—isn't it possible that the original content could have been purchased on a smartphone or an iPod, for instance, and then transferred over? In your model, you are saying that you would exclude that type of secondary sale. Is that right?

Mr. OSSENMACHER. We can identify those as having happened that way, yes.

Mr. JEFFRIES. And then you would exclude it if you identify it as having happened that way?

Mr. OSSENMACHER. If we are aware the user has not caused subsequent copies they made to be removed, we would exclude it, yes.

130

Mr. JEFFRIES. Thank you.

Mr. GOODLATTE. Chair thanks the gentleman.

We have 10 or 15 minutes left. So we will, as Mr. Deutch had suggested, entertain on additional questions.

I want to pursue this line. And I will start with you, Mr. Ossenmacher.

So going back to our analogy of the book, the audio book—or not audio book, but digital book—do you think that Mr. Smith and Wiley, have the right to offer that book for sale, for sale under two different conditions? One would be for sale at a price that limits your use within the devices that—generally, when I buy something from Amazon today, it is limited within those devices—and then a second sale at a higher price, presumably, where you could do more with it, where you could sell it through the cloud? Does he have the right to do much now?

And if your answer is no, should Congress legislate that distinction?

Mr. OSSENMACHER. That is an excellent question. I believe Mr. Smith does have the right to offer that now. I think the concern is that only one of those is being offered. That the right for a consumer to make a choice between those does not exist. And so if Mr. Smith were to offer consumers——

Mr. GOODLATTE. He has a right to do it. He also has a right to not do it, though. Is that correct?

Mr. OSSENMACHER. Well, I think that is maybe what this discussion is about.

Mr. GOODLATTE. Correct.

Mr. OSSENMACHER. I think that is what this discussion is about. So if we are only offering a model that, as we have heard from others, is a licensed model but is not transparently a license, I guess the first recommendation we would have is just simply call it a rental. Call it what it is, and let's not try to confuse consumers about what they are actually getting. If they don't actually own something, don't put a "buy" button there.

Mr. GOODLATTE. Do you think we need to legislate that? Or do you think the law covers that already?

Mr. OSSENMACHER. I think the law covers that. But I think there is also confusion, as Mr. Jeffries had pointed out, even in our own court cases, where the court system is not really aware of how technology maybe works or doesn't work. And even back to the original Copyright Office letter that has been referred to, in 2001, I know you started off about this, how fast things change. And they do change quickly. So I think there might be support somewhere in how to help this.

Mr. GOODLATTE. Anybody else want to respond to that? We will go to Mr. Smith and Mr. Villasenor.

Mr. SMITH. So I think we are very clear that all of our digital products are licensed. The technical, technological solution offered by Mr. Ossenmacher's company could actually be an interesting and value-added component to that model.

To actually sell a digital copy for unlimited re-use, I can't conceive a business model that would make that work for the consumer, if there is no limit to the number of copies that can be produced and sold onwards. The point is——

131

Mr. GOODLATTE. Mr. Ossenmacher is suggesting that you could limit the number of copies made available. You could transfer your rights within the cloud. Give up your rights and someone else takes them. Is that correct?

Mr. SMITH. Again, if we had reliable enforcement, if we answered the questions that Mr. Holding raised about surveillance, perhaps the technology solution is possible.

But our belief is that there is no need for Congress to legislate around this. We are offering value today. We are giving consumers more choice than ever before.

Mr. GOODLATTE. Okay. Mr. Villasenor.

Mr. VILLASENOR. The law already provides copyright owners with a huge amount of flexibility in structuring their offerings, and so there is no need to change it in that respect.

If a copyright owner wants to offer a license specifically authorizing resale or transfer, then the copyright owner is free to do that. If a copyright owner wants to offer sales, actual sales conferring ownership but to allow that ownership to be transferred via a reproduction, the copyright owner has the right to offer that because the copyright owner has the exclusive reproduction right. It is just not automatically available to the consumer unless the copyright owner actually authorized it. So there is enormous flexibility under the law already for copyright owners to offer these kinds of things.

Mr. GOODLATTE. I don't want to monopolize the conversation, so let me turn to Mr. Nadler, see if he has questions.

Mr. NADLER. Thank you. I have two questions. I may now only get to one of them.

The concern with reproduction on digital is that, because the product is so identical when digitally reproduced or transferred, is the digital copies will compete directly with and essentially replace the market for initial sales, thus driving creators out of business.

Does anybody see a way around this if first sale is applied digitally? Mr. Shems? Mr. Glotzer?

Mr. SHEMS. Yes, sure. If we price our work or price those files much higher, which will help us cover the costs of losing further business from the secondary use.

Mr. NADLER. That doesn't help society to suddenly——

Mr. SHEMS. No, it does not help society. Right.

Mr. GLOTZER. Yes. As I stated before, you will have a market failure at that point. Which, in practical terms, that is the price, the customary price of a film or a television show, for example, being 10 to 100 times, simply because there are mechanisms in place.

Again, we are not—I think this whole, the construct, needs to be recognized that intellectual property delivered via these various physical hosts is inherently constrained because of the behavior of those hosts. Once you liberate it from that, you are delivering it, it is not to say, well, it just happened to come via the Internet as opposed to on a tape or a disk. That has liberated the content to travel in a way that creates a whole different economic proposition for creators. So if the balance between creators and consumers is to remain balanced and is to remain undisturbed, then we need to treat content that travels via this more liberated means in a different way.

132

Mr. NADLER. Does anybody want to take a contrary view?

Mr. OSSENMACHER. Yes. I think, you know, that all sounds very nice and good. But the fact is the Internet also constrains things. So to transfer a digital good means there is a full trail of documentation of where it went, how it went. To take a physical good and actually illegally make copies of it, distribute them on street corners is very easy to do.

Mr. NADLER. Thank you. Let me very quickly ask one other question. That is, would it be useful to treat the software that enables this cell phone to function differently than the software that you may download onto it?

Mr. SIMON. Let me try, since I am the software guy. Couple of thoughts, so the software industry is evolving very rapidly. And there are lot of different—so apps. You can get apps for free. But if you want additional functions, you pay for it. There are a lot of people out there playing a game called Candy Crush these days. You get it for free. Right. Candy Crush players? I do it.

You get it for free, but if you want to do additional things, you have to pay for it.

Mr. NADLER. Candy Crush or any game is an app, whether it comes with it or not.

I am simply saying, maybe we should have the same first sale doctrine for the software that makes this cell phone other than a hunk of metal, but for anything else that you might want to play on it, read it, use it, have a different——

Mr. SIMON. So the point I was trying to make, Mr. Nadler, and I apologize for being sort of roundabout, is, there are a lot of different layers of software that make that cell phone work. There is a chip in there, which has layers of software in it. There is an operating system in there. There are particular applications. And differentiating between those things and trying to apply the doctrine to some and not to others I think would be enormously complicated.

The better way to go is to look at whether there is a license and enforce the intent of the parties.

Mr. NADLER. What?

Mr. SIMON. Enforce the intent of the parties, as expressed in the license or in the contract.

Mr. NADLER. Thank you.

Mr. GOODLATTE. I want to let everybody get at least one more question in.

Go to Mr. Holding next.

Mr. HOLDING. Mr. Siy, currently, software companies offer significant discounts to educational users. And if we went to a digital first sale system, you know, wouldn't software companies face competition from educational and other discounted versions, kind of the same arbitrage problem that *Kirtsaeng* has produced for Mr. Smith over here?

Mr. SIY. Yes, I think that would be the case if the software was offered as a sale. I think in all of these proposals, certainly the ones that I have looked at, of allowing for there to be a digital first sale, none of them are going to prohibit people from offering things as rentals or leases. The idea is simply that those things that look

133

like sales are sales. And those things that look like rentals or leases act that way.

So if a software company wanted to offer something under a lease to an educational provider, they can do that. And the educational provider reselling that under different terms is in violation of that contract.

The difference being that you don't have the confusion, and the difference being that you are not necessarily going to leverage what should be a contract dispute into a copyright dispute.

Mr. HOLDING. One of the arguments that has been put forward regarding the licensing, is, you know, they are complicated. Even contract attorneys have difficulty figuring out what these licenses mean. So your average consumer, how are they supposed to know what the licensing, you know, what the covenants are and so forth?

You know, the market, you know, will dictate ultimately what consumers—consumers go, in, you know, they are going to purchase what they want. If they find them too complicated, they may decide that they don't want to purchase them.

So, in your view, is it necessary for Congress now to act and get into the realm of the licensing? Or should we just step back and let the market sort out these issues as consumers become more educated in what they are buying?

Mr. SIY. I think these contracts can be so complicated that the consumers acting on their own are not necessarily going to influence the market. Because there will be a long delay between somebody seeing the existence of that contract—they might have already bought it and brought it home and started installing it, let alone read it and understand it and had a lawyer take a look at it—and their decision to, you know, they have already made their purchase decision.

So I think that there are things that can be done to protect consumers other than waiting for the market to act.

There is also the case of a lot of times the terms where they would be technically in violation of these things. Well, the copyright holder or the manufacturer isn't going to enforce against them until much, much later, until they start doing something that they really object to.

Mr. HOLDING. Thank you, Mr. Chairman.

Mr. GOODLATTE. Thank you.

Mr. Deutch.

Mr. DEUTCH. Thanks, Mr. Chairman.

Mr. Villasenor, the fundamental principle behind copyright is that intellectual property rights enable creators to learn a return on their investment and incentivizes them to make it available widely so that that return grows.

If Congress mandated a resale right for Internet-distributed content, would that in any way jeopardize the balance? Ironically, would it discourage those holders of that right from making it more widely available?

Mr. VILLASENOR. To ask, so I can properly answer the question, would you suggest—is this Congress mandating a resale right and then simultaneously prohibiting other methods of distribution? Or simply mandating a resale right for that content which is sold with ownership?

134

Mr. DEUTCH. Mandating a resale right for Internet-distributed content.

Mr. VILLASENOR. In other words, saying it is—you are no longer allowed to offer don't that is nontransferrable under licenses. Yes, I think that would frankly be a disaster. I think it would basically be trampling all over contract law. And I think it would up-end a lot of the dynamic that we have with respect to the balance between content creators and consumers.

That said, as I am on record, that consumers need better disclosure. But I don't think that the step that you mentioned is the right response.

Mr. DEUTCH. Mr. Shems.

Mr. SHEMS. I agree. Thank you for the question.

Expanding the first sale online would greatly limit the creators' abilities—and creators' abilities to innovate and experiment. And I think that that would have a negative effect on the industries.

Mr. DEUTCH. Thanks, Mr. Chairman. I yield back.

Mr. GOODLATTE. Thank you.

Mr. Jeffries.

Mr. JEFFRIES. Thank you, Mr. Chairman.

Mr. Band, in terms of your position, is it your position that we should create a digital first sale doctrine. Is that right?

Mr. BAND. No. My Committee, my coalition—you are the Committee. The coalition I represent does not have a position on digital first sale, per se.

Our position is on this narrower issue that Mr. Nadler raised of, you know, the software in the iPhone that is critical to the operation of the iPhone. So we are just talking about that specific piece and that to make sure that, you know, that when you transfer the iPhone that the operating system goes along with it.

We don't have a position on the bigger digital first sale issue that other people here have been talking about.

Mr. JEFFRIES. Okay.

Mr. Ossenmacher, in terms of, you know, protecting sort of the rights of the owner, which presumably is inherent in the business model that you have set forth as it relates to the person who purchases the digital item from the original owner, let's focus on the original owner initially.

Obviously, I mean, we, I think, Judiciary Committee, Congress, we have a constitutional charge, pursuant to Article 1, Section 8, Clause 8, to create a robust intellectual property system to promote the progress of science and useful arts.

In terms of undermining that constitutional charge, piracy, would you agree, presents a great threat at the end of the day to undermining a robust intellectual property system and isn't the risk of piracy greater in the digital context?

Mr. OSSENMACHER. That is a very complicated and complex question. But, yes, piracy absolutely undermines the creators and the intent of the laws that have been set forth.

How that is enacted or how we protect against that I think is where maybe we differ. We believe that ownership will help protect against that. And, you know, I think consumers believe that as well.

Mr. JEFFRIES. Thank you, Mr. Chairman. I yield back.

135

Mr. GOODLATTE. Thank you Mr. Chairman.

I want to thank all of the Members of this panel for a very enlightening discussion. And all the Members of the Committee for participating today. This concludes today's hearing, and I want to thank again all of the witnesses for attending.

Without objection, all Members will have 5 legislative days to submit additional written questions for the witnesses or additional materials for the record.

And this hearing is adjourned.

[Whereupon, at 11:42 a.m., the Subcommittee was adjourned.]

# A P P E N D I X

───────────

MATERIAL SUBMITTED FOR THE HEARING RECORD

138

Association of American
Publishers, Inc.
www.publishers.org

455 Massachusetts Ave., NW Suite 700
Washington, D.C. 20001
Telephone: (202) 347-3375
Fax: (202) 347-3690



**Association of American Publishers**
**Statement Submitted for the Hearing Record**
**House Judiciary Committee**
**Subcommittee on Courts, Intellectual Property, and the Internet**
**June 17, 2014**

**Hearing on "First Sale Under Title 17"**
**June 2, 2014**

**Introduction**

On behalf of its members, the Association of American Publishers ("AAP") appreciates this opportunity to place its views in the hearing record of the House Judiciary Subcommittee on Courts, Intellectual Property, and the Internet ("IP Subcommittee") regarding the impact of the Supreme Court's recent *Kirtsaeng* decision on the publishing industry and the unprecedented level of access to copyrighted digital content made possible by innovative, new, license-based business models that would be decimated by the creation of a "digital" first sale doctrine.

In particular, AAP submits this post-hearing statement on behalf of the broader publishing industry[1] to support and elaborate upon the oral and written testimony presented at the IP Subcommittee's June 2nd hearing by Stephen Smith, President and CEO of John Wiley & Sons ("CEO Smith"), regarding the importance of three issues: (1) maintaining a properly-tailored first sale doctrine;[2] (2) addressing harms caused by the *Kirtsaeng* decision through a legislative solution that reinstates a meaningful right to control unauthorized importation; and (3) providing effective copyright protections to foster continued innovation in broadening access to

---

[1] The Association of American Publishers (AAP) represents over 400 publishers, ranging from major commercial book and journal publishers to small non-profit, university, and scholarly presses.
[2] The first sale doctrine codified at section 109(a) of the Copyright Act is limited to tangible copies that are owned, rather than licensed or leased, by the person in possession of them, and is an exception only to the exclusive right of distribution.

1

139

digitally transmitted copyrighted works, bearing in mind the harm that a digital first sale doctrine would cause to this robust and growing market.[3]

**Reaffirming a Meaningful Importation Right**

Relevance of First Sale Doctrine to Importation

As a general matter, AAP agrees with hearing witness Greg Cram of the New York Public Library that the first sale doctrine has and continues to provide important public benefits including: the right for U.S. libraries to lend printed books in their collections to the public and for owners of used printed books and physical copies of movies and music (CDs, DVDs)[4] to resell their copies, all without further involvement of the owners of the copyrights to those works.[5] The statutory provision that authorizes these activities is Section 109 of the Copyright Act, officially titled "Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord." In application, the benefits of the limitation become available after the first transfer of ownership, usually the "first sale"[6] of a physical copy of a copyrighted work to an end-user, hence the doctrine is popularly referred to as the "first sale doctrine."

Excluding commercial quantities of books intended for sale exclusively in foreign markets from entering the U.S. market without the authorization of the rights holder, however, is a completely separate issue. As explained below, publishers have never harbored any intention of using a right to control importation to restrict age-old library lending practices for works

---

[3] *See generally BookStats Volume 3*, 2013 (available for purchase at http://bookstats.org/) (showing that in the past five years, unit sales of trade eBooks have increased over 4,450%); *see also* Book Industry Study Group, *Digital Books and the New Subscription Economy* (forthcoming Jun. 2014) https://www.bisg.org/news/digital-subscriptions-inevitable-and-driven-market (studying the market forces that are fueling growth of a multitude of different eBook and journal subscription services).

[4] AAP recognizes that the Copyright Office, as of 2001, believed that, in general, digital works embodied in a *physical* object, *e.g.*, a CD or DVD, would be subject to the traditional first sale doctrine, though, subsequent caselaw has brought this conclusion into question. *Compare* Copyright Office, *DMCA Section 104 Report* at 100 (2011), http://www.copyright.gov/reports/studies/dmca/dmca_study.html; *with Vernor v. Autodesk*, 621 F.3d 1102 (9th Cir. 2010); *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175 (9th Cir. 2011) (establishing a fact-specific balancing test for determining whether a digital work embodied in a physical format can be "owned" (and thus be subject to the first sale doctrine) by a third-party who acquires the physical object, or whether such third-party only acquires a license to use the digital work without reference to the first sale doctrine. Therefore, some CDs and DVDs may be sold via license and not be subject to the first sale doctrine.

[5] *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) available at http://judiciary.house.gov/_cache/files/00f54728-f9f3-41e6-8245-53beeb779d2e/060214-first-sale-testimony-cram.pdf (Written Testimony of Greg Cram, New York Public Library, also noting that publishers and libraries are "working collaboratively to resolve digital issues" and conceding that "business models are evolving and experimentation is occurring" at 14); *see also* American Library Association, *ALA Releases 2014 State of America's Libraries Report* (Apr. 14, 2014) http://www.ala.org/news/press-releases/2014/04/ala-releases-2014-state-america-s-libraries-report (stating that "2013 ended with all the major U.S. publishers participating in the library ebook market, though important challenges, such as availability and prices, remain.").

[6] Section 109 does not actually require a commercial transaction for its benefits to become available, rather *any* transaction that transfers legal ownership of a particular copy of a work is sufficient.

2

140

published abroad.[7] Rather, AAP's proposed solution is intended to increase exports and global access to U.S. content and reverse the damage caused by the *Kirtsaeng* decision to our diplomatic and economic reach.

### Unauthorized Importation Under the Copyright Act

Like Wiley, AAP's member publishers all strive in unique ways to educate, inform, and entertain audiences around the world by making their books and journals available in local markets. Until last March, when the Supreme Court issued its *Kirtsaeng* decision, publishers were able to rely on Section 602(a)(1) of the Copyright Act to prevent the unauthorized importation of non-pirated copies of U.S. works produced and intended only for sale abroad.[8] Specifically, Section 602(a)(1) provides that: "[i]mportation into the United States, without the authority of the owner of copyright under this title, of copies or phonorecords of a work that have been acquired outside the United States is an infringement of the exclusive right to distribute copies or phonorecords under section 106." Section 602(a)(3) also lists several specific exceptions to this general prohibition, which allow the importation of copies: (1) by the U.S. or a state government; (2) for private use and not for distribution; and (3) for certain nonprofit scholarly, educational, or religious purposes, such as library lending.

However, as explained in the concurring opinion of Justice Kagan (joined by Justice Alito) in *Kirtsaeng*, the Court was bound by precedent established in the 1998 *Quality King v. L'Anza* decision, holding that the first sale doctrine limited a copyright owner's right to prevent unauthorized importation as an infringement of the distribution right.[9] The *Quality King* decision only pertained to "re-imported" works that were originally manufactured and sold in the U.S., and therefore did not reach the question of whether this policy should apply to works manufactured and intended only for sale abroad. Still constrained by this precedent, Justices Kagan and Alito joined the majority opinion in *Kirtsaeng*, but recognized that applying the first sale doctrine to limit a copyright owner's control of the importation of U.S. works made and intended for sale abroad significantly diminished the scope of 602(a)(1)'s importation right, "limit[ing] it to a fairly esoteric set of applications."[10] Justice Ginsburg's dissent (joined by

---

[7] *See supra* note 5 at 10-11 (noting that "for almost 400 years, libraries in America have been lending books and other materials"). This long history of lending indicates to AAP that publishers and libraries can operate in mutually beneficial ways. Our suggested legislative fix for the *Kirtsaeng* decision is not intended to disrupt these longstanding lending practices.

[8] *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. __, 133 S.Ct. 1351 (U.S. 2013). However, the Supreme Court did agree with the Solicitor General that "the [Copyright] Act itself makes clear...that foreign-printed *pirated* copies are subject to the Act" under 602(a)(2), which prohibits importation of such copies. *Id.* at 1353 (internal citations omitted).

[9] *Quality King Distributors v. L'Anza Research Int'l*, 523 U.S. 135 (1998).

[10] *Kirtsaeng*, 133 S. Ct. at 1372 (2013) (Kagan, J., concurring).

3

141

Justice Kennedy and, in substantial part, by Justice Scalia) also noted that the majority opinion rendered the exceptions set forth in Section 602(a)(3) essentially meaningless.[11]

<u>What's At Stake for Publishers and the United States</u>

There is substantial demand for U.S. published works around the world, which U.S. publishers strive to satisfy through tailored purchasing and licensing arrangements and the creation of special editions of their works for sale in specific foreign markets.[12] U.S. copyright owners, like other U.S. producers of tangible goods, seek to vigorously compete in foreign markets because such export trade extends their opportunities to recover their R&D and production costs across a larger number of transactions than is possible through dependence on domestic trade alone. Furthermore, the continuing success of such export trade in U.S. copyrighted works substantially benefits the U.S. economy, job markets, and consumers.[13]

However, CEO Smith testified that the *Kirtsaeng* decision has "created confusion and disruption in the global marketplace, lessening the availability of [Wiley] products and placing [the company] at a competitive disadvantage" and has provided a general "disincentive for U.S. publishers to participate in foreign markets."[14] Specifically, the decision eliminates a publisher's ability to engage in foreign market segmentation which, as a practical matter, requires price differentials based on "pricing to the market" to ensure the reasonable affordability of the works to consumers in specific markets; allows arbitrageurs to actively undermine the domestic market for copyrighted works by importing lower-priced foreign copies into the U.S. for commercial resale; offers a new opportunity to counterfeiters to recapture foreign markets as the publishers' legitimate, lower-priced books are stripped out the markets by arbitrageurs; and constrains the development of goodwill for the United States, its people, and their values derived from access to U.S. educational content. This is the present, real-world impact of the *Kirtsaeng* decision—reduced U.S. content in foreign countries, diminishing export revenues and increased piracy.

Publishers understand that library and consumer advocates have concerns regarding overly expansive applications of the importation right.[15] For example, hearing witnesses Cram

---

[11] *Id.* at 1379 (2013) (Ginsburg, J., *dissenting*) (noting that "the Court's decision also overwhelms 17 U.S.C. 602(a)(3)'s exceptions to 602(a)(1)'s importation prohibition…For example, had Congress conceived of §109(a)'s sweep as the Court does, what earthly reason would there be to provide, as Congress did in §602(a)(3)(C), that a library may import "no more than five copies" of a non-audiovisual work for its "lending or archival purposes"?).
[12] *See generally, First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary,* 113th Cong. (2014) available at
http://judiciary.house.gov/_cache/files/f05f0055-75b3-4a01-b2e7-9d770c5b9223/060214-first-sale-testimony-smith.pdf (Written Testimony of Stephen Smith, CEO John Wiley & Sons).
[13] Stephen E. Siwek, *Copyright Industries in the U.S. Economy: The 2013 Report* (Nov. 19, 2013) (http://www.iipa.com/copyright_us_economy.html) (reporting that the U.S. copyright industries contributed over $1 trillion in added value to the U.S. economy in 2012).
[14] *Id.* at 5.
[15] *See supra* note 5 at 10-11 (explaining that despite the fact that "libraries in America have been lending books and other materials" for "almost 400 years," the library community fears that a strong importation prohibition would

4

142

and Band both testified that a decision supporting market segmentation in the *Kirtsaeng* case could have subjected libraries to liability for lending copies of works that were manufactured abroad.[16] The solution proposed in Justice Kagan's concurrence and supported by the publishing industry (detailed below), however, is intended to safeguard existing library lending practices, while providing copyright owners with tools to address unauthorized commercial importation of works intended for foreign markets.

Proposed Legislative Solution

As stated by CEO Smith, "when properly applied, [the first sale doctrine] avoids interference with a copyright owner's importation rights in order to ensure that authors, publishers and other distributors of works that depend upon copyright in making these works available to the public can operate effectively in the full range of industrialized and developing world markets by implementing market-appropriate price differentials."[17] Unfortunately, the Supreme Court majority in *Kirtsaeng*, abandoning the Court's usual deference to Congress regarding the public policy determinations underlying specific statutory provisions and language in the Copyright Act,[18] has unnecessarily broadened the application of the first sale doctrine with regard to unauthorized importation. Still, the divided Court encouraged Congress to clarify its intent regarding Section 602(a) and offered a way for Congress to reinstate a meaningful importation right while maintaining a proper balance between users and copyright owners.[19]

---

require "libraries to stop circulating or distributing or displaying the millions of books in their collections that were printed abroad"); *see also First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) available at http://judiciary.house.gov/_cache/files/f5adac7a-241d-4a7c-b201-5fddcfe05477/060214-first-sale-testimony-band.pdf (Written Testimony of Jonathan Band, Owners' Rights Initiative at 10 discussing burden that a domestic exhaustion rule would place on charitable organization that "have no way of knowing if an item donated to them had first been sold in the United States with the manufacturer's authorization.").

[16] *Id.*

[17] *See supra* note 12.

[18] *Kirtsaeng*, 133 S. Ct. at 1388 (noting that: "The Court['s majority opinion] fails to give meaningful effect to Congress' manifest intent in §602(a)(1) to grant copyright owners the right to control the importation of foreign-made copies of their works." Justice Ginsburg objects to this lack of deference to Congress by citing the following precedent *American Trucking Assns.*, 310 U. S. 534, 542 (1940); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U. S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted). AAP agrees with Justice Ginsburg on this point and supports Congressional reaffirmation of the importation right given the majority's departure from the standard practice of deferring to Congress on matters of copyright law. *See Eldred v. Ashcroft*, 537 U.S. 186, 205 (2003) (assessing "whether the [Copyright Term Extension Act's] extension of existing copyrights exceed[ed] Congress' power under the Copyright Clause," the Supreme Court decided to "defer substantially to Congress" on that point given that "it is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.") (internal citations omitted).

[19] *Kirtsaeng*, 133 S. Ct. at 1371 (stating for the majority opinion that "whether copyright owners should, or should not, have more than ordinary commercial power to divide international markets is a matter for Congress to decide"). The concurrence also notes that "if Congress thinks copyright owners need greater power to restrict importation and thus divide markets, a ready solution is at hand—not the one John Wiley offers in this case, but the one the Court rejected in *Quality King*" (AAP's Proposed Legislative Solution). *Id.* at 1373.

5

143

Specifically, as explained in the concurring opinion in *Kirtsaeng* and argued by the Solicitor General of the United States in the *Quality King* case, importation is a distinct type of distribution and an action that may be regulated under the Copyright Act *without limitation by the first-sale doctrine*.[20] That is because the first sale doctrine deals with selling or otherwise disposing of copies, but does not address *importing* them.

Congress can and should clarify that the right to control importation is not subject to the application of the first sale doctrine. Specifically, the reference to Section 106 in Section 602(a)(1) should be eliminated and the text narrowed to simply state that unauthorized importation of copies that "have been acquired outside the United States is an infringement of the copyright owner's right to import or authorize the importation of such copies or phonorecords." This alteration would leave intact the ruling in *Kirtsaeng* that the first sale doctrine, as a general matter, applies to copies "lawfully made under this title," *without regard to the place of their manufacture*, whenever the owner of such copies sells or otherwise disposes of possession of them; but would not provide a defense to the unauthorized importation of such copies. It would also provide critical copyright protection for U.S. copyright owners while still allowing U.S. consumers to purchase books abroad, bring them to the U.S. and give them away, or in the case of libraries, lend them to the public without fear of infringement liability. This solution incorporates many of the consumer benefits of the *Kirtsaeng* decision supported by the New York Public Library and Owners' Right Initiative

The majority opinion in the divided *Kirtsaeng* Court ignored the fact that Congress, anticipating some of the concerns of libraries and others regarding the potential for U.S. consumers to risk infringement liability for using unauthorized import copies, included specific exceptions in Section 602(a)(3) to address that issue. The legislative fix proposed above would impose liability on the unauthorized importation, but not domestic use, of copies that are manufactured and intended for sale in foreign markets. However, as part of revisions to Section 602(a)(1), and to alleviate concerns regarding the worst-case, hypothetical scenarios described by some of the *amici* in the *Kirtsaeng* case, Congress could also consider whether reasonable limitations and exceptions to the scope and applicability of the right to control unauthorized importation, in addition to those already set out in Section 602(a)(3), are necessary and appropriate. Such reasonable limitations and exceptions would leave no doubt that concerns about potential downstream infringement liability or other possible adverse impact on, for example, libraries and museums in the U.S. have been addressed, while still providing copyright owners with the legal basis for managing the unauthorized importation which was the entire purpose of the enactment of Section 602(a)(1).

---

[20] *Id.* at 1372, 1373 FN 1-2 (highlighting *Quality King*'s application of the 'first sale' doctrine to the importation provisions of Section 602(a)(1) as the real "culprit" of minimizing the scope of 602(a)(1) and describing the Solicitor General's argument that was rejected in the *Quality King* decision as a cogent approach which recognizes that the two provisions can reasonably be read to "regulate separate, non-overlapping spheres of conduct." Justice Kagan goes on to explain that "reversing *Quality King*—would yield a... sensible scheme of market segmentation... because ... [that] approach turns on the *intended market* for copies... instead [of] their *place of manufacture*.").

6

144

### Digital First Sale

Publishers appreciate the attention this issue was given at the hearing, and in particular, found that questions asked by Chairman Goodlatte captured the gravamen of what is at stake and the reality that there is no need for Congress to create a "digital" first sale doctrine.  Specifically, Chairman Goodlatte asked the CEO of ReDigi,[21] John Ossenmacher, whether copyright owners currently have the ability under the Copyright Act to permit resale of digital content by way of contract.  Mr. Ossenmacher, who had originally tried to launch his digital content resale service with the authorization of rights holders,[22] said "Yes." In follow-up, Chairman Goodlatte asserted that the logical conclusion from the fact that the right to authorize digital resale already exists, is that right holders must also have an *equal right to decline to authorize resale of digital content* and that market forces can determine whether digital resale becomes a reality.  From publishers' perspective, the recent and continuing launch of innumerable new business models embracing technology to provide flexible access to unprecedented amounts of content (*see* Appendix for examples), illustrates that market forces are alive and well, and that Congress does not need to take any action to create a new "digital" first sale doctrine.  In fact, with respect to books, many of the benefits associated with the first sale doctrine are becoming more widely available for digital works (e.g., personal sharing and library lending of eBooks) or are even better than what is available in the analog world (e.g., e-textbook rental and chapter-specific purchasing).

Additionally, the first sale doctrine, as codified at Section 109(a) of the Copyright Act, states that "the *owner* of a *particular* copy or phonorecord lawfully made" under the Copyright Act may "without the authority of the copyright owner…sell or otherwise dispose of the possession of *that* copy or phonorecord."[23] While the Supreme Court's *Kirtsaeng* decision may have ignored Congress's intent with respect to Section 602 (unauthorized importation), there is no debate that the Court was correct in stating that "Section 109(a) now makes clear that a lessee of a copy will *not* receive 'first sale' protection but one who *owns* a copy will."[24] This is significant because many of the innovative, new business models (iTunes, Spotify, Scribd, Netflix, Nook, etc.) providing unprecedented levels of access to copyrighted content in digital

---

[21] ReDigi is a company attempting to facilitate the resale of legally downloaded sound recordings (and potentially eBooks and other digital copyrighted works) with or without right holder permission. A federal judge in New York recently issued an injunction against ReDigi on grounds that its facilitation of the resale (without right holder permission) of lawfully acquired copies of such works that are downloaded in digital format is infringing.  The court ruled that the process of transferring a downloaded digital copy of a work necessarily involves *reproduction* of the work, which is distinct from the exclusive *distribution* right that is subject to the first-sale doctrine and, in the case of ReDigi's resale service, was a violation of the copyright owner's exclusive reproduction right. *Capitol Records, LLC v. ReDigi, Inc.* 2013 U.S. Dist. LEXIS 48043 (S.D.N.Y. March 30, 2013).
[22] Presentation, John Ossenmacher, The Resale Market, (May 20, 2013) (noting that "Redigi can, and wants, to participate with you.") (on file with author).
[23] Emphasis added.
[24] *Kirtsaeng,* 133 S. Ct. at 1353.

7

145

formats are commonly, though not exclusively, based on contractual end-user license agreements that do not convey ownership of the content to the purchaser but instead authorize the purchaser to use the digital song, book, adaptive learning content etc. as a licensee subject to certain terms and conditions.[25] Furthermore, in 2001, a Copyright Office study on whether to create a digital first sale doctrine ("First Sale Report") explained that the current first sale doctrine explicitly limits only the copyright owner's exclusive *distribution* right under Section 106(3).[26] Given this narrow scope, the Copyright Office concluded that Section 109(a)'s reference to "a particular copy" and "that copy" meant that the statute only applied to physical copies of copyrighted works, as no right other than the distribution right is implicated by the transfer of a material copy of a work from one person to another.[27]

Divergent Consumer Expectations in the Digital Age: Ownership v. Access

Advocates for creating a "digital" first sale testified that consumers, when they "buy" an eBook or digital copy of a song or movie, expect that they should have the same right to own and resell that book, song, or movie as they have with physical copies.[28] The Copyright Office's First Sale Report, however, found that:

> Digital communications technology enables authors and publishers to develop new business models, with a more flexible array of products that can be tailored and priced to meet the needs of different consumers. Requiring that transmissions of digital files be treated just the same as the sale of tangible copies artificially forces authors and publishers into a distribution model based on outright sale of copies of the work. The sale model was dictated by the technological necessity of manufacturing and parting company with physical copies in order to exploit a work — neither of which apply to online distribution.[29]

---

[25] *See* Appendix for a list of examples of new license-based business models for which the first sale doctrine, under the Supreme Court's reasoning, does not apply; *see also First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) available at http://judiciary.house.gov/_cache/files/1003410c-d1ba-4083-9bdc-0d2ed72fcf09/060214-first-sale-testimony-villasenor.pdf (Written Testimony of John Villasenor at 1, explaining that digital first sale is moot with respect to license-based content); *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (Oral Statement of John Ossenmacher testifying that he is not against licensing, but rather that consumers are "pro choice" regarding options for consuming content and conceding that digital first sale should not apply to streaming and subscription content when it is clearly licensed.).

[26] *DMCA Section 104 Report* at 78 (2011).

[27] *Id.*

[28] *Compare First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (Oral Statement John Ossenmacher describing the expectation of the average consumer that "buys" an eBook on Amazon to be an expectation that he owns the eBook, not a license to access the eBook); *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (Oral Statement of Chairman Goodlatte explaining that he does not expect to acquire the same rights in an eBook as he does when he purchases a paperback).

[29] *DMCA Section 104 Report* at 91-92.

8

146

Based on these findings, the Copyright Office recommended that "if the sale model continues to be the dominant method of distribution, it should be the choice of the market, not due to legislative fiat."[30] Publishers and distributors of books and journals exist in a very competitive marketplace that drives solutions to meet customer needs. Therefore, we continue to agree with the Copyright Office and Chairman Goodlatte that rights holders should be free to react to the demands of the market in deciding whether the sales model should apply to digital content, and that the Copyright Act must continue to incentivize rights holders to invest, develop and offer new methods of accessing content through a full-range of sales and license-based business models.

At the moment, with the continually growing popularity of streaming models for digital music and audio-visual programming, eTextbook and movie rentals, as well as library eBook lending, and eBook subscription services for digital works as well as short-term rental options in the physical realm, such as Car-2-Go and Rent-the-Runway, consumers appear to be embracing the flexibility of access models instead of outright ownership.[31] CourseSmart, an eTextbook rental platform founded by publishers, offers an example of how license-based access models for digital content can provide consumers with greater customization, flexibility, and affordability. The image below[32] shows the rental options presented to the student:

---

[30] *Id* at 92.

[31] *See generally* Mary Meeker, *Internet Trends: End of the Year Report*, KPCB, http://www.kpcb.com/insights/2012-internet-trends-update (Dec. 3, 2012) (describing the 'asset-light generation' with contrasts between old "asset-heavy" preferences and new "asset-light" preferences. For example, slide 67 contrasts paying for "ownership" of albums and CDs in stores with paying for "access" to content through "instant on demand streaming" (slide 68 contrasts VHS and Netflix and slide 72 contrasts physical textbooks and Chegg (an e-Textbook rental company)); Tomio Geron, *Airbnb and the Unstoppable Rise of the Share Economy* http://www.forbes.com/sites/tomiogeron/2013/01/23/airbnb-and-the-unstoppable-rise-of-the-share-economy (Dec. 1, 2013) (discussing numerous new businesses that show how society is "moving from a world where we're organized around ownership to one organized around access to assets"); Alan McGlade, *Steve Jobs was Wrong: Consumers Want to Rent Their Music Not Own It*, http://www.forbes.com/sites/alanmcglade/2013/03/25/steve-jobs-was-wrong-consumers-want-to-rent-their-music-not-own-it (Mar. 25, 2013); *The Rise of Innovative Business Models: Content Delivery Methods in the Digital Age: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2013) (Post-hearing Statement of the Association of American Publishers available at http://www.publishers.org/_attachments/docs/public/statements/aapstatement-riseofinnovativebusinessmodels.pdf (describing a number of new business models, including ones based upon access instead of ownership).

[32] CourseSmart, *Society: The Basics Twelfth Edition* (last visited Jun. 17, 2014) http://www.coursesmart.com/society-the-basics-twelfth-edition/john-j-macionis/dp/9780205899173 (illustrating the various prices and levels of access publishers are providing to student through licensed rentals of eTextbooks).

9

147



Notably, the terms for 120-day; 180-day; or Unlimited rental are clear here.  Although voluntary steps to provide "plain English" explanations of access rights may be desirable for consumers of digital content in other contexts, a regulatory approach for providing such explanations is unnecessary and would be inappropriate in creating static requirements for dynamic markets.[33] Publishers are willing to do their part, individually or perhaps through broader development of voluntary best practices, to help alleviate any consumer confusion that may exist, for example, in scenarios where a consumer "buys" a license (authorizing access or other specified uses) to an eBook from an e-Retailer.

CourseSmart illustrates the commitment of publishers to use new business models to meet more specific consumer demands.  The market is working, and, a robust digital resale segment could develop if consumers demand and the market supports it because there is nothing in the Copyright Act that prevents a rights holder from authorizing outright sales or resale of digital content.  Even though the future of digital resale is uncertain, what is certain is that, if the exclusive rights afforded to copyright owners under Section 106 are meaningfully protected, copyright owners will be able to continue to invest in new ways to enhance their digital products to provide even greater customer experiences.

<u>Physical v. Digital</u>

In addition to the policy considerations discussed above, there are also practical differences between physical and digital copies of copyrighted works that caution against the creation of a "digital" first sale doctrine. While there are many similarities between books in

---

[33] *See First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (Oral Statement of Sherwin Siy, Public Knowledge, testifying that Congress does not need to take legislative action to define the difference between a license and a sale in answer to Chairman Goodlatte's question as to whether Congress should make such a law.); *supra* note 24  (Oral Statement of John Villasenor agreeing that Congress should not define what constitutes a sale or a license, preferring instead for the market and courts to resolve this issue, despite his belief that some aspects of current online transactions may not be clear to some consumers).

10

148

physical and digital form, some key features of digital books that are most appreciated by consumers, such as the ability to access them instantly online, their exponentially-enhanced portability, and their capacity to withstand deterioration from repeated use, are significant differences in functionality that make the acquisition and transfer of digital books implicate the exclusive rights of copyright more substantially than do such transactions involving a physical book.

The Copyright Office's First Sale Report explained that "time, space, effort and cost no longer act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost. The need to transport physical copies of works, which acts as a natural brake on the effect of resales on the copyright owner's market, no longer exists in the realm of digital transmissions. The ability of such 'used' copies to compete for market share with new copies is thus far greater in the digital world."[34]

Moreover, as Rep. Ted Deutch pointed out at the hearing, new business models providing access to digital content give consumers new benefits that are impracticable, if not impossible, with physical works, such as cloud-storage, multi-device access, free re-downloading (if a device is broken, stolen, lost, etc.), not to mention access to vast amounts of content[35] at minimal cost. AAP agrees with Rep. Deutch that the growth of these new access models and their related benefits indicates that the balance between copyright owners and users seems to be "alive and well."[36] However, attempting to apply the "first sale" doctrine to digital books (and other copyrighted works distributed through downloads, streaming or other forms of online transmission) would dismiss the significant practical differences between physical and digital works, in order to create a broad and unnecessary limitation on the exclusive rights of copyright owners that would undermine efforts to provide consumers with more tailored options for accessing content.[37]

---

[34] *DMCA Section 104 Report* at 82-83.
[35] *See e.g.*, Scribd, www.scribd.com (last visited Jun. 17, 2014) (allowing subscribers to "read unlimited books for just $8.99/month" "on any device" offering "thousands of bestsellers" and over 400,000 books).
[36] *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (Oral Statement of Rep. Ted Deutch).
[37] Moreover, as pointed out by a representative of the software community, allowing resale of digital content without right holder authorization through the creation of a digital first sale doctrine would  expose consumers to greater risks from unscrupulous vendors selling pirated content potentially infected with malware or other viruses. *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) http://judiciary.house.gov/_cache/files/9e2b302a-bbe6-4cb4-a529-24a0a101a4ba/060214-first-sale-testimony-simon.pdf (Written Testimony of Emery Simon, BSA: The Software Alliance at 5). Offering vendors of pirated content a legitimate market in which to operate and profit off of unwitting consumers is not worth undermining the variety of legitimate consumer options for accessing digital content at various price points that currently exist.

11

149

<u>Forward and Delete</u>

While publishers are clearly embracing technology to bring new levels of access, interactivity and user benefits to consumers, AAP's members believe the question of whether or not technology can ensure that the original copy of a work no longer exists after it has been resold, should not determine the viability of a digital first sale doctrine. Proponents of digital first sale argue that copyright owners would be protected by the inclusion of a "forward and delete" requirement in any digital first sale legislation, requiring that the owner of the copy being transferred destroy the original copy and, presumably, any incidental, backup or other copies in her possession. At the hearing, the CEO of ReDigi testified that technology exists to implement such a requirement, although questions raised by Rep. Hakeem Jeffries cast serious doubt on whether digital content is ever really "deleted."[38]

Given the fact that many users of digital content (typically, but not always, pursuant to an authorizing license) can currently download multiple copies on multiple devices (desktop computer, laptop, tablet, e-reader, smart phone, etc.) or access copies through remote cloud storage, the practical likelihood that any technology could ensure compliance with a "forward and delete" requirement is virtually nil. Furthermore, as Ranking Member Jerry Nadler pointed out, the copyright owner's ability to enforce such compliance could require intrusive investigation or monitoring of an individual's computer and devices.[39]

**Conclusion**

AAP thanks the IP Subcommittee for having this hearing in New York City, home of many authors and publishers, and appreciates this opportunity to give the publishing industry's perspective on *Kirtsaeng* and digital first sale. At various points in this copyright review, the IP Subcommittee has asked stakeholders to identify what is and is not working in the current Copyright Act. This hearing documents one example in each category with respect to the first sale doctrine. In the wake of the Supreme Court's interpretation of Section 602(a) in *Kirtsaeng*, publishers believe the importation right cannot operate as Congress intended unless Congress acts to ensure that the Copyright Act affords copyright owners a *meaningful* right to control unauthorized importation of copies of their works that are intended for distribution only outside the U.S. in order to facilitate the effective exercise of their exclusive distribution right in the context of global trade.

---

[38] AAP appreciates Rep. Jeffries' efforts to reflect this practical reality in the hearing record through the following exchange with witness Ossenmacher:
Jeffries: "When you hit the delete button on an email, is that email actually deleted? Answer (Ossenmacher): "No."
Jeffries: "Ok, now, that email content is transferred to a trash folder, correct?" Answer: "Yes." Jeffries: "Now if you hit the delete button in that trash folder, is that email now actually deleted?" Answer: "Not necessarily." Question: "There's a ghost of that email that exists that can be recovered, correct." Answer: "Correct."
[39] *First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2014) (Oral Statement of Rep. Jerry Nadler).

12

150

With respect to creating a "digital" first sale doctrine, publishers agree with the CEO of ReDigi and Chairman Goodlatte that there is nothing in the current Copyright Act prohibiting rights holders from authorizing resale of digital content. As explained at the hearing, and hopefully made clear by this statement as well, copyright owners are constantly responding to the demands of the market by developing new ways to deliver more customized, flexible and useful options for consumers to access digital content. Therefore, time and consumer behavior will tell if the market can support a digital resale business, but there is no need for Congress to impose this specific business model by statutory mandate. Rather, publishers ask Congress to respect the constitutional aim of copyright law to provide incentives for copyright owners to disseminate new works, as well as create them, and preserve the current environment facilitating experimentation and innovation instead of undermining it with an unnecessary and inappropriately restrictive requirement in a "digital" first sale doctrine.

We look forward to continued engagement with the IP Subcommittee as it undertakes future hearings on other copyright issues.

Sincerely,

Allan Adler
General Counsel
Vice President for Government Affairs
Association of American Publishers
455 Massachusetts Ave. NW
Washington, D.C. 20001

13

151

**Association of American Publishers**
**Statement Submitted for the Hearing Record**
**House Judiciary Committee**
**Subcommittee on Courts, Intellectual Property, and the Internet**
**June 17, 2014**

**Hearing on "First Sale Under Title 17"**
**June 2, 2014**

**Appendix of New Business Models**[40]

## Business Models Facilitating Library eBook Lending[41]

Lending has been one of the primary benefits of the first sale doctrine. Publishers understand the importance of library lending and are encouraged by the American Library Association and Witness Greg Cram's recognition that, today, all major trade publishers offer eBook lending programs, and that libraries and publishers are working together to find a sustainable way to make eBook lending more available consistent with their mutual and respective interests. Examples of these experimental business models are provided below:

*Hachette* Offers "all of its e-book titles to libraries simultaneously with print editions and with unlimited single-user-at-a-time circulations," reducing the price of the eBook one year after publication.[42]

*HarperCollins* Offers e-book titles to libraries and allows libraries to lend new titles 26 times before the license expires.

*Macmillan* Started offering library lending of e-book titles in March 2013 under licenses that allows libraries to lend the titles for two years or 52 lends, whichever comes first.[43]

*Penguin Random House* Penguin licenses eBook titles to libraries for one-year lending terms.[44] Random House offers e-book titles to libraries under perpetual licenses.

---

[40] This appendix is not intended as either an endorsement or critique of any of the business models provided, but rather is intended to illustrate the array of innovative developments that are making the benefits of the first sale doctrine, such as: library and personal lending as well as more affordable pricing (customarily through buying used books or recouping part of the initial cost through reselling a book) available, often through licensing, with regard to digital content. The examples below also illustrate how license-based business models for digital books, journals and academic content can respect copyright and offer consumers new benefits, such as customization and multi-device access, that are not feasible for print materials.

[42] http://www.ala.org/transforminglibraries/frequently-asked-questions-e-books-us-libraries

[42] Press Release

[43] http://www.macmillanlibrary.com/2013/10/07/ebooks-for-libraries/

14

152

_Simon & Schuster_ Currently offers all of its titles (new and backlist) for one year to New York area libraries under a pilot program testing out a number of different eBook distributors.[45]

_Kindle Owners' Lending Library_ "The Lending Library features over 500,000 titles, including many New York Times bestsellers. Books borrowed from the Lending Library have no due date and can be delivered to other Kindle devices registered to your Amazon account."[46]

_CloudLink_ Permits libraries to lend eBooks within a given consortium, provided the publisher has not expressly prohibited such sharing.[47] AAP has members that permit such lending and others that oppose such lending, but this diversity of licensing practices illustrates how copyright owners and users can competitively experiment with market-based solutions to develop models that address their respective needs.

**Sharing eBooks with Friends and Family**

_Amazon_ "You can lend a Kindle book to another reader for up to 14 days. The borrower does not need to own a Kindle device and can read the book after downloading a free Kindle reading app."[48]

_Nook_ "You can lend eligible books to NOOK friends, or any BN.com account - up to 14 days. You will not have access to your book while it is lent out (similar experience with paper book), and each book can only be lent one time. You can view a list of all your lendable books by tapping LendMe, found under the My Stuff icon along the top of the screen in your Library."[49]

**eTextbook and Journal Rental**

_CourseSmart_ As noted in AAP's post-hearing statement, CourseSmart is an eTextbook rental platform founded by publishers, using licensing to offer faculty and students greater customization, flexibility, and affordability in accessing digital content. Not only does CourseSmart offer eTextbooks at significantly less cost (up to 60% less) than traditional print textbooks, it offers access of multiple devices, sharing of content, digital searching, and enhanced accessibility.[50]

_Kindle Textbook Rental_ "Kindle Textbook Rental is a flexible and affordable way to read textbooks. You can rent for the minimum length, typically 30 days, and save up to 80% off the print list price. If you find you need your textbook longer, you can extend your rental by as little

---

[45] http://www.publishersweekly.com/pw/by-topic/digital/content-and-e-books/article/59255-penguin-expands-e-books-in-libraries-adds-friction-to-kindle-lends.html
[45] http://www.nhpbooks.com/simon-schuster-announce-new-ebook-lending-program-for-libraries/
[46] http://www.amazon.com/gp/help/customer/display.html?nodeId=200757120
[47] Matt Enis, MELSA, _3M Develop New EBook Sharing Feature Consortia,_ LIBRARY JOURNAL: THE DIGITAL SHIFT, http://www.thedigitalshift.com/2013/11/ebooks/melsa-3m-develop-new-ebook-sharing-feature-consortia/ (Nov. 5, 2013).
[48] http://www.amazon.com/gp/help/customer/display.html?ref=hp_left_v4_sib?ie=UTF8&nodeId=200549320
[49] http://www.barnesandnoble.com/u/Support-NOOK-Tablet/379003185
[50] http://www.coursesmart.com/ourproducts

15

153

as 1 day as many times as you want and just pay for the added days."[51]  In describing the rental process, Amazon's information page notes that to complete the order the purchaser clicks on the "Rent now with 1-click" button.

*Chegg*  "Helping students save time, save money and get smarter" by offering eTextbooks at up to 90% less than the list price of print textbooks,[52]  Chegg also offers students a one-stop-shop to buy and sell physical textbooks and provides immediate access to "courtesy eTextbooks" during the time that you wait for the arrival of your print edition.

*DeepDyve*  Leading professional and scholarly publishers, including Elsevier, Wiley, IEEE and others, are experimenting with the rental model for providing more affordable and tailored access to the latest journal content, with no embargo period. DeepDyve allows anyone to rent full articles to read on any device with an Internet connection for 30-days and up to 1-year, depending on the needs of the user, all at nominal rates.[53]

## Subscription Services

As explored in the forthcoming Book Industry Study Group survey of the eBook and journal subscription market, there are a number of different models that range from unlimited access to short-term rental.[54]  Some of these models are described below:

### Popular Fiction and Non-Fiction

Many of AAP's member publishers offer their fiction and non-fiction titles through one or more of the following subscription services.

*Scribd*  Provides customers with unlimited, instant access, on any device to a vast library of over 400,000 eBooks for just $8.99 per month.[55]

*Oyster*  Described as "the Netflix for books," Oyster provides subscribers with unlimited access to over 500,000 titles accessible on their Apple, Android, Nook or Kindle devices, all for just $9.95 per month.[56]

*Entitle*  For just $9.99 a month, Entitle offers subscribers perpetual access (i.e. you can cancel your subscription and keep your books) to two new eBooks each month from among 200,000 titles, including thousands of new releases and bestsellers. Subscribers can read their books online or offline of any device.[57]

---

[51] http://www.amazon.com/gp/feature.html?docId=1000702481
[52] http://www.chegg.com/
[53] http://www.deepdyve.com/
[54] Book Industry Study Group, *Digital Books and the New Subscription Economy* (forthcoming Jun. 2014) https://www.bisg.org/news/digital-subscriptions-inevitable-and-driven-market (studying the market forces that are fueling growth of a multitude of different eBook and journal subscription services).
[55] www.scribd.com;
[56] https://www.oysterbooks.com/about
[57] https://www.entitlebooks.com/

16

A-3167

154

*Safari Books Online*  Starting from $39 per month for individual users to custom-priced/ custom-tailored subscriptions for multi-national companies (including Google and Amazon)[58], Safari offers professional content ranging from "the latest bestsellers, pre-publication exclusives, video courses, cutting-edge conference sessions, or timeless tech and business classics, Safari's selection of tens of thousands of books and courses is unrivaled — and growing every day."[59]

## New Content Models

In addition to more flexible price and access models, many academic publishers are also using licensing to offer more customized and adaptive learning content to faculty and students. A number of these new adaptive content offerings are described in AAP's earlier statement on *The Rise of Innovative Business Models*,[60] another example is provided below:

*MindTap Chemistry*  Cengage Learning's MindTap Chemistry is licensed to the student for the duration of a course at less than the price of a traditional print textbook and is the next generation of educational technology products for the higher education market. Unlike other digital solutions, MindTap is not a static content set, developed around homework and textual material. MindTap is courseware, whose architecture makes personalization by professors or students, the key value proposition.  Using enhanced analytics and immediate feedback, MindTap provides a student with a personalized study plan and remediation loops. Professors can add a wide range of OER, Cengage or their own content to the course to further enrich the learning experience and to make the course their own.

---

[58] http://www.safaribooksonline.com/pricing
[59] http://www.safaribooksonline.com/
[60] *The Rise of Innovative Business Models: Content Delivery Methods in the Digital Age: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the H. Comm. on the Judiciary*, 113th Cong. (2013) (Post-hearing Statement of the Association of American Publishers available at http://www.publishers.org/_attachments/docs/publicstatements/aapstatement-riseofinnovativebusinessmodels.pdf (describing new adaptive learning systems such as ALEKS and LearnSmart Advantage offered by McGraw-Hill and WileyPLUS offered by John Wiley & Sons at page11).

17

155

 **The App Association**

June 25, 2014

The Honorable Howard Coble
Chairman
House Committee on the Judiciary
Subcommittee on Courts, Intellectual Property, and the Internet

Mr. Chairman,

Thank you for your continued leadership in the process of reviewing the effectiveness of the U.S. Copyright Act to protect intellectual property rights, encourage creativity and innovation, and provide consumers with legal access to content in the digital environment. The Subcommittee's hearing on June 2, 2014, "First Sale Under Title 17," provided a forum to discuss this much-debated issue of whether to extend the first sale doctrine to licensed digital content.

ACT | The App Association represents over 5,000 app companies and software firms creating and licensing digital content. ACT is concerned that the extension of the first sale doctrine to licensed digital content will have a significant negative effect on the thriving app industry and the consumers who benefit from it. ACT encourages the Subcommittee to learn more about how the app industry is successfully meeting consumer expectations today.

ACT is concerned that expansion of the first sale doctrine would negatively impact our industry in three ways:

1) It would lead to lower potential revenue for app companies, most of which are small businesses;
2) A decrease in revenue will lead to diminished investment, and harm what is an increasingly important sector of the US economy; and
3) If applied to existing software, expansion would create a legal morass for developers who often license software themselves.

The app industry is growing rapidly as mobile devices are where remarkable innovation is taking place. After the launch of the first app store just six years ago, apps have grown into a $68 billion industry and created over 750,000 U.S. jobs. Industry analysts expect revenues to grow to more than $140 billion by 2016.

Much like content produced by traditional copyright-based industries, apps are digital content licensed for use by consumers. This contrasts with a marketplace for physical goods that can be resold. The "physical" manifestation of software only applies in limited cases when it had been previously installed on a computer that is re-sold. Licensing allows app developers to offer low-cost, consumer-friendly products in a thriving marketplace. It makes it possible for consumers to get amazing, innovative products for as little as $0.99.

Expanding the first sale doctrine to software and the app market would threaten the industry's viability. To treat software as if it had the same attributes as a physical product would require app makers to radically change their pricing structure. Without assurances that the seller deletes the original copy before resale in a secondary market, app developers must assume their sales will decrease substantially. Since most app companies are small businesses, this threat to revenues would force them to dramatically increase prices and forego consumer-friendly business models to ensure a financial return on investment.

In November of last year, ACT member Sébastian Holst, Executive Vice President and Chief Strategy Officer, PreEmptive Solutions, testified before this Subcommittee at the hearing on "The Rise of Innovative Business Models: Content Delivery

1401 K Street NW Suite 502
Washington, DC 20005

202.331.2130    @ACTonline
ACTonline.org   /actonline.org

156

 **The App Association**

Methods in the Digital Age." When asked about digital first sale, Mr. Holst confirmed that should it be made law, he would have no choice but to significantly increase the cost of his products.

Expanding the first sale doctrine to digitally licensed content would discourage investment in one of the fastest growing sectors of our economy. When forced to raise prices, app makers would have far fewer customers, leading to marketplace uncertainty. Investment in mobile services would fall sharply and the pace of new innovations that make our lives easier would slow to a crawl.

App companies not only create and license content but also obtain software licenses in the development of their products. As developers often say, "We just need to know what the rules are so we can get on with making cool stuff." Without the incentive for innovators to license their inventions, many software companies would no longer have access to the component parts of code, created by others, that are necessary to make new apps. Without access to these tools, the vast majority of companies in the app marketplace would lack the resources to continue production.

Finally, ACT cautions that should this become part of a legislative proposal, the Subcommittee refrain from applying the change to currently licensed digital products. Sacrificing the copyright licensing model would threaten the entire existence of a marketplace that has produced an extraordinary rise in innovation, job creation, and new company growth.

Thank you again for your leadership through the years to provide strong intellectual property protection for U.S. content creators and innovators. ACT supports your efforts to review the copyright laws in light of the changing technological environment. We urge the Subcommittee to proceed with caution with respect to extending the first sale doctrine to licensed digital content. ACT staff and members are available to provide any assistance necessary. I respectfully request that this letter be made a part of the record for the hearing.

Sincerely,

*Jonathan Zuck*

Jonathan Zuck
President

CC: The Honorable Jerrold Nadler

1401 K Street NW Suite 502
Washington, DC 20005

202.331.2130

ACTonline.org

@ACTonline

/actonline.org

157

**Statement for the Record by Sandra M. Aistars, Chief Executive Officer,
Copyright Alliance
Before the Subcommittee on Courts, Intellectual Property and the Internet on
"First Sale Under Title 17"**

**June 2, 2014**

**Ceremonial Courtroom, U.S. District Courthouse, New York City**

The Copyright Alliance is a non-profit, public interest and educational organization of artists, creators, and innovators of all types. Our members include artist membership organizations and associations, unions, companies and guilds, representing millions of creative individuals. We also collaborate with and speak for thousands of independent artists and creators and small businesses who are part of our One Voi©e grassroots group.

We submit this statement to aid the Subcommittee in understanding the significant investments made by creative businesses in a variety of disciplines in meeting the interests of consumers online through innovative new digital business models based on licensing creative works, and to explain the destructive effect further limiting authors' exclusive rights to reproduce and distribute their works would have on creative and innovative businesses across the country.

<u>**Calls to Expand the First Sale Doctrine Should Be Rejected**</u>

As the Copyright Office has correctly observed, the first sale doctrine already clearly applies to works in digital form.[1] Physical copies of works in digital formats, such as CDs or BluRay discs, are subject to the limitations of Section 109 when they are sold, in the same way as physical copies of works in analog form. Thus the question before the Subcommittee is not whether the first sale doctrine should apply in the digital world, but rather whether it should be redefined in two unprecedented and unwarranted ways: (1) to limit not only the copyright owner's exclusive right of distribution, but also the exclusive right of reproduction by allowing the copying and resale of digital copies of works on the internet in competition with the author of the works; and (2) by imposing restrictions on

---

[1] U.S. Copyright Office, DMCA Section 104 Report xviii (2001).

158

the use of licensing transactions for the distribution of works. The Subcommittee should reject both calls for expanding the first sale doctrine because they would have a destructive effect on newly-developing digital markets for creative works, as well as on long-standing license-based industries in the visual arts, software and other sectors of the creative economy. At bottom, proponents of redefining the first sale doctrine are asking the Subcommittee to reject new digital business models, and force the Internet to act like the analog world.

Adopting such policies would also cut creators out of the value chain for the works they create and reduce the marketplace value for creative works below sustainable levels. This is because there is no such thing as a "used" digital file, so there can be no such thing as a secondary market for "used" digital goods. The "secondary" market would be interchangeable with the "primary" market and the lowest market price would prevail – regardless of whether it supports the creation and dissemination of new creative works.

**Expanding the First Sale Doctrine to Limit the Exclusive Right of Reproduction Would Run Counter to its Origins**

We welcome this opportunity to review how section 109 is serving authors, motivating the creation of new works of authorship, and the commercialization and dissemination of such works, for the benefit of our society. All three of these purposes are indispensable to a well functioning copyright system that serves consumers and creators alike. Ensuring that authors can support themselves and their families through their creativity, that distributors find value in commercializing copyrighted works, and that copyright owners of both commercial and non-commercial works feel empowered disseminating their works is key to ensuring an appropriate framework of laws. While the focus may begin on the author, the benefits flow to society as a whole.

These principles have been at the heart of policy-making regarding the first sale doctrine since its inception. The first sale doctrine derives from *Bobbs-Merrill Co. v. Straus*, which concerned the setting of retail prices once a book had been sold by the

159

publisher at wholesale.[2] In deciding the case the Supreme Court rejected calls to merely analogize to cases in the patent context and instead undertook a fresh analysis under the copyright laws. The bulk of the Justices' analysis focuses on discerning the statutory motivations animating the protections afforded copyright owners under the law. The Justices began by observing that:

> While the nature of the property and the protection intended to be given the inventor or author as the reward of genius or intellect in the production of his book or work of art is to be considered in construing the act of Congress, *it is evident that to secure the author the right to multiply copies of his work may be said to have been the main purpose of the copyright statutes.* (emphasis added).

Having concluded that guarding against unauthorized reproduction of an author's work was the key consideration at issue, the Court ruled that where a publisher had obtained the price it sought in selling its books in the wholesale marketplace, and had not entered into a license agreement with the retailer of the books, and where the books were not subject to further unauthorized copying and distribution in competition with the publisher, the publisher had obtained the intended benefits of the statute and was not entitled to exert control over the price set by the retailer by virtue of a legend inscribed in the books.

While the Court in *Bobbs-Merrill* did not find in favor of the copyright owner, the decision is notable in several respects. First, it demonstrates the Court's interest in analyzing copyright law through the lens of the author and seeking to interpret the law to ensure that authors' interests are adequately served so that they are motivated to create and disseminate their works. The Court did not look to other factors or policy motivations.

Second, the case leaves no doubt that it would be inconsistent with the goals of the first sale doctrine to expand it to limit the copyright owner's exclusive right of reproduction – a right the protection of which the Court repeatedly refers to as "the main purpose" of the law.[3] Congress has noted that this same reasoning should apply where an

---

[2] 210 U.S. 339 (1908).
[3] *Id.* at 351.

160

entity while not technically duplicating a work distributes it in a way where the author's market for the work is affected.[4]

Finally, the Court's analysis demonstrates that the first sale doctrine and licensing were intended to coexist. The court repeatedly refers to the fact that there was no claim of contractual relationship or license agreement between the parties, and cites this fact in support of its conclusion.[5]

In contrast to the undisputed interest in ensuring the continued incentive to create and disseminate works, many of the policies cited by supporters of an expanded first sale doctrine are of very recent vintage and not found in the historical record. For example, during the revision effort that culminated in the 1976 Copyright Act, inclusion of the doctrine "attracted no opposition"[6] but also attracted little attention. The drafters of the Act did, however, take into account "the potentialities of the new communications media, notably television, cable and optical transmission devices, and information storage and retrieval devices" on authors of literary and visual works by recognizing a right of public display and limiting the ability of an owner of a copy under the first sale only "to display that copy publicly, either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located."

As the House and Senate Reports indicate, the "intention is to preserve the traditional privilege of the owner of a copy to display it directly, but to place reasonable restrictions on the ability to display it indirectly in such a way that the copyright owner's market for reproduction and distribution of copies would be affected."[7] As in *Bobbs-Merrill*, the focus of Congress was on authors and the ability of authors to sustain themselves from disseminating their works. It took care to ensure that the first sale doctrine was not unduly extended to encroach upon those rights.

---

[4] Copyright Law Revision (House Report No. 94-1476) at 80 (1976); Copyright Law Revision (Senate Report No. 94-473) http://www.copyright.gov/history/law/clrev_94-473.pdf at 72 (1976).

[5] *Id.* at 350 ("There is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book").

[6] Second Supplementary Register's Report on the General Revision of the U.S. Copyright Law (1975).

[7] Copyright Law Revision (House Report No. 94-1476) at 80 (1976); Copyright Law Revision (Senate Report No. 94-473) at 72 (1976).

161

Much more recently, the Copyright Office has also reviewed the policies surrounding the first sale doctrine in the digital world and concluded that the risks of expanding the doctrine would outweigh the benefits. As the Copyright Office has noted:

> Physical copies degrade with time and use; digital information does not. Works in digital format can be reproduced flawlessly, and disseminated to nearly any point on the globe instantly and at negligible cost. Digital transmissions can adversely affect the market for the original to a much greater degree than transfers of physical copies. Additionally, unless a "forward-and-delete" technology is employed to automatically delete the sender's copy, the deletion of a work requires an additional affirmative act on the part of the sender subsequent to the transmission. This act is difficult to prove or disprove, as is a person's claim to have transmitted only a single copy, thereby raising complex evidentiary concerns. . . Even if [an effective forward and delete technology existed], it is not clear that the market will bear the cost of an expensive technological measure.[8]

**Innovation in the Digital Economy is Driven by Licensing of Creative Works**

While the history and original policy motivations of the first sale doctrine provide strong support for rejecting a radical new expansion of the doctrine, the dynamic changes that have occurred in the licensing of works in the digital economy provide even more compelling reasons for not forcing constraints on an emerging and innovative digital marketplace.

Innovation in the digital economy is increasingly being driven by licensing access to rather than sales of creative works. This is unsurprising as consumers are turning to access or sharing models for consuming even durable goods (note the success of services such as Zipcars, bikeshares, and the turn to acquiring "experiences" rather than material goods, particularly among younger consumers). Benefits to consumers from such transactions are clear. They are not forced to acquire rights they don't need, and they pay only for what they use. Licensing in the creative sector is no different – it creates a dynamic marketplace that affords creators and distributors the flexibility to give consumers a range of choices — accessing the creative works they want, when they want, at a variety of price points. This sales/license distinction should not be eroded through the imposition of government-mandated requirements on licenses; availability of a greater

---

[8] U.S. Copyright Office, DMCA Section 104 Report xix (2001).

162

selection of expressive works in the marketplace is not merely an abstract societal benefit, it is a principal goal of copyright law.

Customers today have exponentially more options then they did in the analog world. Rather than imposing outdated and rigid sales models from the analog world on consumers, the creative industries have embraced licensing models which offer access on more flexible terms. Licensing allows the management of relationships among copyright owners, distributors, and consumers on a granular level, permitting a degree of customization not possible when a buyer-seller relationship is the only option.

Copyright Alliance member offerings, supported by licensing, surpass what was available in the analog world:

- Digital music—Among the 60+ licensed digital services currently available in the U.S.,[9] iTunes, Rhapsody, Spotify, Pandora, GooglePlay, Amazon all provide flexibility in terms of access by offering, for example, individual songs instead of whole albums; downloads or on demand streaming of millions of songs; and different price points.
- Film and TV[10]—Amazon offers short-term rentals, indefinite access, and on demand streaming; Netflix allows streaming on multiple devices simultaneously; services such as VUDU, Barnes & Noble's Nook Video, iTunes, GooglePlay, UltraViolet, and nearly 100 other services in the U.S. provide cloud storage, downloading, streaming and physical copies.
- Digital books and magazines—eBooks are now part of the mainstream. Amazon enables borrowing from its "library" as well as audio enabled packages. Sony ReadStore gives readers the right to download, read, listen and view digital content. Services such as Kobo, Barnes & Noble; audible.com, and audiobooks.com give readers an array of additional choices.
- Digital photography — Companies like Shutterstock and Getty Images allow access to millions of images under a variety of licensing terms using different price points, sizes, placements and uses. Getty recently announced a free embed service available to individuals and non commercial users which allows such users to legally embed Getty images in their blogs and websites for free.

Moreover, significant sectors of the creative community have long relied on license-based transactions exclusively— or virtually so—to make their copyrighted works available to consumers. This is particularly true of the visual arts and software sectors.

---

[9] *See* http://www.whymusicmatters.org for a list of licensed digital music providers.
[10] *See* http://www.wheretowatch.org for a list of licensed online film and television providers.

163

The software industry is built upon the licensing of products to consumers. This is beneficial to consumers for a variety of reasons – including because licensing relationships are required to facilitate the installation and provision of security updates and patches; often provide rights that might not be available under a normal sale (such as installing software across multiple devices); and allow for more precise tailoring of features and functionality to particular markets or for variations in usage models and pricing (e.g., per device v. per user). Reliance on licensing is only increasing as consumers move to cloud based computing models which are "services" rather than "goods" based. Such services also offer clear consumer benefits like easier access to stored work, flexible and expandable storage and usage models, access to the latest business applications, and better protection from malware and viruses. Interfering with such well-functioning and reliably growing markets which demonstrably serve consumer interests would be unwise.

Similarly photographers, graphic artists and illustrators have historically negotiated licenses with their customers in order to provide them the rights they need to a given work. This allows greater flexibility in meeting client needs, and enables clients who would not be able to afford an "all rights included" deal to use the work for the purposes they require. [11]

Hundreds of stock image businesses exist across the United States ranging from small and medium size enterprises, to leaders in the global media marketplace. These businesses also rely exclusively, or virtually exclusively, on licensing to serve the marketplace for visual works. Getty Images, a leading creator and distributor of still imagery, video footage, and music, employs an entirely licensing-based business model to deliver to its clients worldwide award-winning news, sports and entertainment imagery, rare and contemporary archival imagery and a wide range of pre-cleared music tracks. Getty was the first company to license digital imagery online, and serves a diverse array of clients – from individual bloggers to Fortune 500 companies. It has developed and deployed tools to allow users to intuitively search for, license, and

---

[11] Ed Shems, graphic artist and illustrator, and member of the Copyright Alliance explains how changes to the first sale doctrine would negatively affect visual artists in his field in his testimony for this subcommittee hearing.

164

download images for use online, in publishing, and broadcast settings. Meeting the needs of such a diverse array of clients and making available such breadth of copyrighted work requires the flexibility to set different terms for different uses and users of works. Moreover, because Getty licenses over 30,000 images a day (more than 2 images per second) it must have the ability to efficiently set license terms via automated digital transactions.

Efficient licensing models for digital media serve multiple interests. As noted, they allow consumers of media access to an infinite variety of works that can be used in myriad creative ways. Equally important, the online licensing services deployed by entities like Getty also allow creators of copyrighted works like photographers a variety of options to distribute their work to broad audiences. Whether the subject matter of the work is newsworthy photography of national or international events, or archival photography of iconic personalities or critical cultural moments, there is a shared benefit to the artist and the ultimate audience of the work in ensuring that the image reaches its target most effectively and that the licensing revenues earned can be used to support the creation of new work.

Given the already challenging infringement environment for imagery on line, imposing additional restrictions on the exclusive rights of copyright owners, or interfering with their ability to enter into license based transactions with customers would inject uncertainty into this dynamic and ever evolving marketplace. Among other concerns, depending on the scope of the first sale requirements that could be imposed on licensors of images, it could become difficult/impossible to accurately and transparently negotiate licenses and disclose rights being granted and acquired because previous licensees of an image might have the right to distribute the work in competition with the artist or the stock image service.

Finally, it bears mentioning that licensing rather than selling one's work in the visual arts world also enables artists to use their gifts to benefit society. Often, retaining the right to continue to use an image enables the artist to use his or her work for other, socially beneficial purposes. Because he retains the rights to his work and engages in

165

licensing rather than sales of his photography, one of our grassroots members, New York-based documentary photographer Douglas Menuez was able to produce a book -- *Transcendent Spirit* -- which chronicles the lives of 20 Ugandan orphans. The children travel and perform as a dance troupe to bring attention and raise funds for other Ugandan children orphaned by HIV/AIDS and war. Through auctions of prints of some of the images and sales of copies of the book Doug was able to raise more than $150,000 to support the work of the Ugandan children. If first sale concepts are imposed on licensing transactions, and photographers like Doug are forced to either sell all rights to their images to commercial clients, or if licensees of their works are allowed to sublicense images in competition with the photographer, projects like *Transcendent Spirit* would not be possible.

### Conclusion

The options and benefits available to consumers through licensing and online distribution of creative works in today's digital marketplace are unprecedented. Licensing-based offerings to consumers of software, gaming, visual arts, film, music, books, magazines and newspapers, are driving online enjoyment of creative works and fueling new creativity and authorship. Rather than embrace these new business models and their attendant consumer benefits, proponents of redefining the first sale doctrine would rather sacrifice both new and long standing licensing-based businesses in order to force the Internet to act more like the analog world. We urge the Subcommittee not to interfere with the growth and innovation of digital businesses in the creative sector in this manner.

166



**Statement for the Record**
**of**

**Keith M. Kupferschmid**
**General Counsel and Senior Vice President, Intellectual Property**
**Software & Information Industry Association**

**To the House Judiciary Committee Subcommittee on Courts,**
**Intellectual Property and the Internet**

**"First Sale Under Title 17"**

**June 2, 2014**

The Software & Information Industry Association (SIIA) submits these comments for the record in order to assist the Subcommittee in understanding the role the copyright law's first sale doctrine plays in the creation and distribution of innovative new software and information products and services and the harm to the software and information industries that could be caused if the first sale doctrine were to be expanded to apply to licensed material or digital transfers

SIIA is the principal trade association of the software and information industries and represents over 800 technology companies that develop and market software and digital content for

167

business, education, consumers, the Internet, and entertainment.[1]  SIIA's members range from start-up firms to some of the largest and most recognizable corporations in the world.  They are leading providers of, among other things: software publishing, graphics, and photo editing tools; corporate database and data processing software; financial trading and investing services, news, and commodities exchanges; online legal information and legal research tools; education software and online education services; open source software; and many other products and services in the digital software and content industries.

SIIA is concerned that potential application of the first sale doctrine to licensed material or other undue restrictions that may be placed on either the ability of publishers to license or the manner in which publishers license, will make it more challenging for publishers to recoup the investment they have made to develop new products and update existing ones and to widely distribute their products and services to the public in the manner that consumers enjoy today.  We are also significantly concerned with the fallout from the *Kirtsaeng* decision and the imbalance in the first sale defense caused by the decision

### A.  The Importance of Licensing

The Internet has permanently changed the relationship between users and the software and information industries.  Electronic commerce has provided users with more options, more alternatives and more opportunities than ever before.  The richness and inherent value of electronic commerce and high-tech products to consumers is derived from the wide availability of software and content and the ease by which these products and services can be accessed and used by people with new high-tech products.  For users of products and services that incorporate software and/or information, electronic commerce facilitated through licensing provides a robust new delivery channel.  By using the Internet to deliver software and digital content, users can take advantage of the lower transaction costs, simplified delivery systems, direct interaction with providers, and minimal time-to-market.

---

[1]  A list of the more than 800 SIIA member companies may be found at: http://www.siia.net/membership/memberlist.asp.

168

Through licensing, software and information publishers are able to meet customer needs – whether their customers are the general public or discrete customer groups – and at the same time protect against misuse of their rights. Licenses have allowed software and information publishers the flexibility to tailor their products to their various customers, adjusting features, benefits, rights, and price according to the needs of each customer base rather than a "one size fits all" model – a model which logically could require a higher price. Consequently, more often than not these licenses provide benefits to consumers not provided in a traditional sale limited by the first sale doctrine of current copyright law.

This has resulted in consumers now having unprecedented choice, convenience and access to informational, as well as creative, content and new high-tech products that simplify their lives. Today's consumers benefit from access to a range of software and information products — the likes of which have never been seen before.

Thus, consumers are also enjoying unprecedented access to copyrighted works. Today's online marketplace offers consumers more opportunities to access copyrighted works anytime, anywhere than ever before. Many of the opportunities consumers engage in the analog world made possible by the first sale doctrine are being made available without that doctrine in the digital world, as illustrated in the following examples.

For several decades, the software industry has relied on a licensing model for the distribution, maintenance, and updating of its software products and services to and for its customers. Today, licenses govern most software transactions.[2] The software licensing model permits a wider range of users to access and use software. A publisher need not reduce or degrade the function of its product in order to provide it at a reduced price appropriate for a particular market of users. Rather, the publisher can simply vary the rights of using it. So, for example, a software publisher may offer a fully functional "academic" version of its product to students at a deeply

---

[2]  See Software & Information Industry Association, *Software and Information: Driving the Knowledge Economy* (January 24, 2008) at 7-8, http://www.siia.net/estore/globecon-08.pdf.

3

169

reduced price, but the rights granted do not permit use for commercial purposes.[3]  Similarly, "OEM licenses" bundle software with, or install software directly on, specific hardware, such as a scanner or desktop computer, and require the software to be used and distributed only with that hardware.  Often, the hardware manufacturer was granted a deep discount as part of the OEM license terms.  Another example is "site licenses," which are defined by some geographic restriction on use, such as a specific company, area, or even department or floors of a building.[4]

Because software is virtually always licensed and not sold, the first sale defense does not apply. Someone who purchases a software license is not the "owner of a particular copy" under Section 109 of the Copyright Act, they are an "owner of a license to use a copy" of the software.  Thus, the first sale defense does not apply.  But as shown in the examples above, even though the first sale defense does not apply to these software transactions, consumers are able to enjoy many of the benefits commonly associated with the first sale doctrine.  Any change in the copyright law that made the first sale defense applicable to these software licenses would cause a very significant problem and would jeopardize the future availability of discounted software to those markets.[5]

These examples are not limited to the software industry.  The textbook industry is rapidly moving to a licensing model for online and digital versions of their textbooks.  The new digital textbook licensing model provides numerous benefits to students and teachers.  Digital textbooks often come with special features, like embedded quizzes, electronic flash cards, the ability to share notes online with fellow students and/or embedded links to videos and articles from a professor's lectures.  These digital texts may also allow the teacher to monitor a student's progress, the amount of time the student spends reviewing the material, and the student's performance on the embedded quizzes and then use this information to determine what material

---

[3]  See, e.g., *ProCD, Inc., v. Zeidenberg*, 86 F.3d 1447 (7th Cir. 1996) ("Instead of tinkering with the product . . . [software companies] turned to the institution of contract."); id. at 1455 ("Terms and conditions offered by contract reflect private ordering, essential to the efficient functioning of markets.").

[4]  See, e.g., Software & Information Industry Association & LicenseLogic LLC, *Certified Software Manager Student Manual* (SIIA Publications 2004) at 4:1–4:52

[5]  See *Vernor v. Autodesk*, 621 F.3d 1102, 1114-15 (9th Cir. 2010)

4

170

the student may be struggling with and develop a personalized study plans to keep the student on the right track.  Because these textbooks are digital they can be updated and edited much more quickly than analog texts and distributed to users almost immediately.

These are the new generation of textbooks for a new generation of students and teachers.  The difference between traditional textbooks and the offerings in new digital and online textbooks is astonishing.  But that's not all that is different.  The distribution and pricing model for these textbooks is also very different.

The average eTextbook costs significantly less than a new version of that same print textbook.  For example, the digital version of the widely used textbook, "Biology" by Sylvia Mader and Michael Windelspecht, published by McGraw-Hill Education, costs $120.  Its traditional print counterpart is priced significantly higher at $229.  Many eTextbooks are also available for rental by students – a business model that further lowers students' textbook spending and has begun to reduce the market share of the traditional used book market.

There is one other trend that is further lowering students' textbook spending — campuses and professors increasingly want course materials delivered "inside" their digital classrooms so they can ensure that all students have access to the same materials and they can see how each student is performing.  This leads to increasing situations where the institution is the customer.[6]  The result of all these evolving business models has been a dramatic drop in student textbook spending from $192 in the fall of 2008 to $138 in the spring of 2013.[7]  These business models, and the resulting drop in students textbook spending, might not be possible if textbook publishers were no longer able to rely on licensing models and the inapplicability of the first sale doctrine.

---

[6]  The institution may or may not pass the costs of the course materials onto students in the form of fees.

[7]  See Stephanie Simon and Madeline Will, *Textbook publishers revamp ebooks to fight used market,* 4-traders.com (July 23, 2013) at http://www.4-traders.com/PEARSON-PLC-4000637/news/Textbook-publishers-revamp-ebooks-to-fight-used-market-17119420/.  (This is despite the prices of new textbooks rising about 6 percent a year.  See GAO Report 13-368, *College Textbooks: Students Have Greater Access to Textbook Information* at 6 (June 2013)at http://www.gao.gov/assets/660/655066.pdf.

5

171

Textbook publishers are able to offer their digital textbooks at lower prices because they save on printing, shipping and processing of returns.  But another significant factor in the reduced eTextbook price is the secondary market.  Because the publisher of a print textbook has to factor in the likelihood that the book will be resold by the original student buyer, either directly to another student or indirectly through a campus bookstore offering used books, the publisher has to set a higher price for the new print book in order to recoup its investment.  Because the new features of these digital textbooks support a more personalized and interactive relationship between the publisher and students and teachers than a traditional textbook and the publisher may continue to innovate and update these features more quickly than the traditional print cycle would allow, publishers choose to license these materials.  The license allows a more flexible, nuanced relationship between the publisher and consumers of the book.  It enables teachers and students to use only the features they need, and pay only for what they use and for the time period for which they use it.

In this model, license terms generally do not permit transfer to another user, though, if there were demand, it might be reasonable for publishers to offer a transferable license for a higher price.  It is important to consider that the publisher has higher development and operating costs in offering rapidly changing, personalized features, such as embedded dictionaries or glossaries, highlighter and markup features, support for multiple electronic reader platforms, videos, testing with online scoring, testing analytics, and data storage so it can track and support each user's individual experience.  To recoup these higher costs, publishers structure their licenses to restrict the downstream distribution of their textbooks so they can offer digital books to each of their users at a reduced price.  If they did not restrict the resale of these books, publishers would be forced to raise their prices.  By licensing the textbooks at a lower price, students benefit from the lower cost and increased functionality of the digital textbooks and textbooks publishers are able to secure a reasonable return on their investment.

As is the case with software, discussed above, the first sale defense also does not apply to these licensed digital textbooks because a student who purchases a license to use the textbook is not the "owner of a particular copy" under Section 109 of the Copyright Act.  Even though the first sale defense does not apply to these types of transactions, students, teachers and other users are

6

A-3185

172

able to enjoy many of the consumer benefits intended by the first sale doctrine. Any change in the copyright law that made the first sale defense applicable to these licenses would jeopardize the future availability of these materials.

Extending the first sale defense to licensed content would not only be injurious to publishers and users, but would also be contrary to the foundation of the first sale defense set forth in the *Bobbs-Merrill* case.[8] The Court in *Bobbs-Merrill* – not unlike the Ninth Circuit in the *Vernor v. Autodesk* case[9] – was concerned with the manner in which the customer came into possession of the work. In several parts of the decision the Court clearly restricts the application of its decision to "one who has sold a copyrighted article, *without restriction*"[10] and those who "*made no decision* as to the control of future sales."[11] The Court noted that "[t]here is no claim in this case of contract limitation, nor license agreement controlling the subsequent sales of the book."[12] Given the Court's language, it is clear that the *Bobbs-Merrill* Court had no intention of extending the first sale defense to licensed works.

The same reasoning holds true today. If a consumer obtained a set of rights to a copyrighted work under license, and the consumer resells the work and asserts the first sale defense, the focus of the first sale analysis should be on the terms and conditions of the agreement itself. If there is an agreement between the copyright owner or its agent and the consumer and that agreement makes it clear that a license is being granted (or the copyright owner otherwise reserves title) and that the license contains certain restrictions on transfer and use that are not usually present with ownership, the transaction should be construed as a license for purposes of the first sale defense, and the first sale defense should be inapplicable to the transaction.

---

[8] *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908).

[9] *Vernor v. Autodesk*, 621 F.3d 1102 (9th Cir. 2010).

[10] Id. at 350 (1908) (emphasis added). (stating that "[i]n this case, the stipulated facts show that the books sold by the appellant were sold at wholesale, and purchased by those *who made no agreement as to the control of future sales of the book, and took upon themselves no obligation to enforce the notice printed in the book*, undertaking to restrict retail sales to a price of one dollar per copy." (emphasis added).

[11] Id.

[12] Id.

7

173

For example, software licensors typically limit their conveyance of rights to a licensee in a number of ways: by location of use, term of use, type of user, field of use (academic, non-commercial), use with certain hardware ("OEM"), transferability, and reverse engineering, to name just a few. In contrast to a licensee, a purchaser who becomes an "owner," would have no such limits by contract and could use the copy of software however he/she wanted consistent with applicable laws, statutes, ordinances, etc.

While consideration of the types of restrictions that a licensor places on transfer and use within the agreement is important, it is not necessary or appropriate to also consider the types of restrictions that a licensor does *not* place on transfer and use. It should not be necessary that a license include certain terms to avoid conveyance of ownership, such as multiple payments or return of a worthless plastic CD. It is the code, content and associated rights that are valuable, not the vehicle of delivery or conveyance (whether CD, DVD, or data transmissions on the Internet). While a licensor theoretically could require destruction of the disc or erasing the data file, the transaction costs to enforce that restriction would in many cases dwarf the license fee and serve to do nothing more than inconvenience the customer, and thus it makes no sense to penalize licensors that omit such a requirement.

Consumers will be able to take advantage of new technologies and business models only to the extent that the laws do not inhibit the creation and use of new technologies and business models. If the law creates undue burdens on providers, the result will be increased transactional costs, without producing any corresponding tangible benefits to users, and in the end, both the providers and the users' interests will be harmed. This is especially true where the legal requirement on the provider is one that the user cares little about or has the ability to secure in the absence of any legal requirement.

If undue restrictions are placed on either the ability of publishers to license or the manner in which publishers license it will be more challenging for publishers to recoup the investment they have made to develop new products and update existing ones and to widely distribute their products and services to the public in the manner that consumers enjoy today. This is especially true with mass market click-through agreements and products offered through the cloud. Certain

8

A-3187

174

informational products can only be distributed through the use of license terms and conditions. If these terms could not be enforced, these products may not be distributed, and in some cases, the incentive to create certain products may have been reduced so significantly that these new products would never be created.

Some have argued that copyrighted products come bundled with long, legally complex click-wrap licenses that consumers do not read, and as a result most consumers do not know what they are really getting. This may be the case, but publishers have worked hard to make their agreements shorter and more understandable to their customers and will no doubt continue to make improvements in this area.[13] To the extent this remains a problem, however, it is not solely or even primarily a copyright problem.

We are beginning to see a shift in the way consumers consume *all* products. "The next few decades will witness a massive decline in ownership. Renting, not owning, will become the primary way people [] consume."[14] Consumers may still own certain essential things and things they use very often, but "there will be little need to own things we use only occasionally (a fancy pair of shoes, most jewelry or that really nice pizza-making set)."[15] This move toward licenses to use will have the positive benefit of giving consumers "more choice, convenience and opportunity to experiment."[16] It would be unwise and unfair to single out copyright products and treat them differently by creating licensing standards that apply only to copyrighted goods.

Consumers are faced with lengthy, complex agreements when engaging in common, every-day commercial transactions. They are present when renting a car, obtaining a credit card, getting a

---

[13] See e.g., SIIA webcast, Christopher T. Anderson, LexisNexis, *Content Gone Wild: What Happens to Your Content After It's Published* (Dec. 18, 2013) at
https://copyright.webex.com/ec07011/eventcenter/recording/recordAction.do?theAction=poprecord&AT=pb&isurla ct=true&renewticket=0&recordID=76023507&apiname=lsr.php&kKey=cf95227d3cfce9a4&needFilter=false&fromar=short&&SP=EC&rID=76023507&siteurl=copyright&actappname=ec07011&actname=%2Feventcenter%2Ffram e%2Fg.do&rnd=1669799775&entactname=%2FabrRecordingURL.do&entappname=url02011.

[14] See Auren Hoffman, *The Coming Decline in Ownership*, Summation Blog (Dec. 19, 2013) at
http://blog.summation.net/2013/12/the-coming-decline-in-ownership.html.

[15] Id.

[16] Id.

9

175

new cell phone, buying or selling items on an auction site, agreeing to a website's privacy policy and in numerous other common-place commercial transactions engaged in by your average consumer. SIIA is not unsympathetic to this challenge and should Congress wish to examine ways that customer expectation can be improved by all players in the commercial marketplace, we would have no objection, so long as it is not limited to or focused solely on copyrighted works.

The economic foundations of the software and information industries depend upon a licensing business model. "Overriding" such licenses would have far-reaching, adverse effects on everything from the availability of educational software and content, to warranties and support services, to the development of new products. It is therefore essential that the basic principle of freedom of contract be recognized and preserved by any legislation. Nothing in the law should restrict the rights of parties to enter freely into licenses or any other contracts with respect to the use of copyrighted works. This is more important now than ever before because in an increasingly digital knowledge economy it is almost certain that software and information publishers will make their products and services available subject to critical contractual terms that are essential to ensuring the widespread access to innovative new digital products and services.

### B. The Impact of the Kirtsaeng Decision

There is no better example of the importance of the balance between copyright owners' distribution right and the first sale defense and the effects of upsetting that balance than the case of *Kirtsaeng v. John Wiley & Sons, Inc.*.[17] The case involved the legality of purchasing copyrighted textbooks that were made and sold overseas with the authority of the publisher and then reselling them into the United States without the publisher's authority. At issue in the case was whether the first sale doctrine applies to copyrighted products that were made abroad.

---

[17] 133 S. Ct. 1351 (2013).

10

176

In a 6-3 decision, the Supreme Court overturned an earlier Second Circuit decision and held that the first sale doctrine applies to copies of copyrighted works that are legally manufactured abroad. In reaching this conclusion, the Court "concede[d]" that its decision would "make it difficult, perhaps impossible, for publishers (and other copyright holders) to divide foreign and domestic markets"[18] and that a "publisher may find it more difficult to charge different prices for the same book in different geographic markets."[19]

For years, limitations on use of the first sale defense for imported goods enabled copyright owners to engage in international market segmentation and price differentiation – like many other industries did and continue to do today. As Hal Varian noted regarding cases of this kind, "…differential pricing can provide very significant efficiency gains since it allows markets to be served that would otherwise not be served at all."[20]

Differential pricing also gave publishers and authors another arrow in their international anti-piracy quiver because allowing their works to be sold at lower prices in developing countries – which are also the countries most plagued by counterfeiting and piracy – increases the availability of legitimate copies, invariably lowering these piracy rates and ultimately turning pirates into customers. But the *Kirtsaeng* decision destroyed all that. If developing-market-priced international editions can be freely imported and sold into the United States, then differential pricing for developing-markets becomes unsustainable, legitimate copies of some of the world's best pedagogy becomes unavailable within those developing markets, and, like Cinderella when the clock strikes midnight, consumers will revert back to obtaining and trafficking in pirated copies when publishers are forced to raise prices in those countries.

---

[18] Id. at 416.

[19] Id.

[20] Hal Varian, *Differential Pricing and Efficiency*, First Monday, Volume 1, Number 2 (Aug. 5 1996) at http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0CDMQFjAB&url=http%3A%2F%2Fwww.firstmonday.dk%2Fojs%2Findex.php%2Ffm%2Farticle%2Fview%2F473%2F394&ei=NL7OUuKCMcups ATJn4H4Cw&usg=AFQjCNHj2xzSGgLzEVfBZ0b4NkIDZkFwLEQ&bvm=bv.59026428,d.cWc

11

177

One response to the result in the *Kirtsaeng* decision has been changed business models from price-differentiation by market to a uniform pricing model, because textbooks developed for the United States can no longer be discounted for sale in developing countries without the risk of those lower-priced copies – intended only for developing countries – being exported into the United States to compete with the U.S. versions.[21]  Needless to say, the uniform price is much closer to the higher U.S. price than the discounted, developing–country price.

In this new post-*Kirtsaeng* world, everyone loses.[22]  The uniform pricing of textbooks will in many cases make it impractical for students in foreign countries to obtain these textbooks legitimately.  This will result in publishers selling fewer textbooks abroad which in turn diminishes publishers' opportunity to serve students and teachers in those markets, and consequently impairs U.S. publishers' ability to compete within and profit from these foreign markets, in turn, potentially diminishing future investments in the creation of new textbooks.  As noted above, these higher prices will also encourage piracy, since fewer students may be able to afford the legitimate book.  Since fewer books are sold, uniform prices may also be raised to cover development and production costs previously offset by foreign sales – operating costs that were previously spread over a larger global distribution market.  To summarize, as a result of the *Kirtsaeng* decision, publishers will sell fewer books, U.S. consumers will likely pay more for these books, piracy rates will likely increase, and foreign students and consumers will no longer be able to afford U.S. books.  In short, those ultimately harmed by this imbalancing of the first sale doctrine are not simply publishers and authors but also textbook consumers – students, teachers, universities, boards of education, governments, etc. – both foreign and domestic:  in other words, all of us!  The *Kirtsaeng* result is simply bad economic, social and copyright policy.

This result should be fixed by Congress.  If done in a narrowly tailored and thoughtful way, legislation can restore balance to the first sale defense.  This can be accomplished by – as Justice Kagan recommended in her concurring opinion in *Kirtsaeng* – restoring § 602(a)(1) of the

---

[21]  See e.g., Lisa Campbell, *Cengage adopts global pricing after Kirtsaeng*, The Bookseller (Oct. 6, 2013) at http://www.thebookseller.com/user/login?destination=node%2F210780.

[22]  The *Kirtsaeng* case dealt with the importation of physical goods that were sold.  Thus, it has no direct effect on digital works transmitted in the online marketplace or works that are licensed, rather than sold.

12

178

Copyright Act to its rightful function of enabling copyright holders to prevent the unauthorized importation of copyrighted goods, which would thereby allow them to segment international markets. Addressing the problem in this way would allow copyright owners (under certain circumstances) to control importation and first sale in the U.S. market of copyrighted items manufactured abroad, but appropriately limit controls on resale once the product has been disseminated in the U.S. market.[23]

Under this approach, if someone buys a copyrighted work in the United States, they can be assured that they have the resale rights, and will not need to verify manufacturing location and separately obtain resale rights, obviating any possible concerns from the parade of horribles that were raised in many amicus briefs filed with the Supreme Court. From an economic perspective this approach also makes sense because it reduces transaction costs for U.S. purchasers of copyrighted products who want to re-sell these products in the United States since these purchasers would not need to spend resources verifying where these goods were manufactured.[24]

On the other hand, this approach would permit copyright owners to challenge someone like Kirtsaeng who attempts to operate an international arbitrage regime through unlawful exportation. This policy would sustain geographical market segmentation, and in turn the availability of appropriately-priced products to meet market demand around the world. Unlike the result in the *Kirtsaeng* decision, amending Section 602 in this manner would transform the current "everybody loses" result into a win for U.S. consumers, a win for customers in overseas markets and a win for publishers and authors who desire to sell their products on a global basis.

---

[23] See Keith Kupferschmid, *A Balanced Response to Kirtsaeng*, SIIA Blog Post, (Oct. 18, 2013) at http://www.siia.net/blog/index.php/2013/10/a-balanced-response-to-the-kirtsaeng-decision/.

[24] See Guy A. Rub, *The Economics of Kirtsaeng v. John Wiley & Sons, Inc.: The Efficiency of a Balanced Approach to the First Sale Doctrine*, Fordham Law Review (Feb. 2012) at http://fordhamlawreview.org/articles/2013/02

13

179

*C. Digital First Sale*

It is of critical importance that we not simply heedlessly import the first sale defense into the digital environment without first asking whether doing so is necessary and desirable. Trying to force today's digital works to behave like physical works of the past would be a step in the wrong direction and would have a chilling effect on the development of new business models and innovation.

The world is a very different place today than it was in 1908 when the Supreme Court decided the precedential first-sale case of *Bobbs-Merrill Co. v Straus*.[25] When that case was decided no one could have envisioned how new digital distribution technologies like the Internet would transform the way people access and use copyrighted works and the vast amount of copyrighted works that are available at any time, in any location, to any person.

It has been suggested that, as the marketplace moves toward a born-digital model – one where there is no physical version of the copy – the first sale defense will lose its vitality and consequently the first sale defense should be amended to create a so-called digital first sale defense that would allow the transmission of digital copyrighted works. There are several problems with this view.

First, to enact a so-called digital first sale doctrine would require the creation and implementation of "forward-and-delete" technology that automatically eliminates all copies owned by the original purchaser – no matter where such copies reside – simultaneously upon the digital transfer of the copy by the purchaser. No such technology exists today or in the foreseeable future. Even if such technology were to be available, it would be just a matter of time before it was hacked, allowing anyone to easily circumvent the law and burdening copyright owners with complex, costly and impossible problems of proof – to say nothing of the privacy implications associated with actually proving that someone actually deleted the work.

---

[25] 210 U.S. 339 (1908).

180

Second, even if such a technology were feasible in the future this argument fails to account for the inherent differences between physical and digital copies that dramatically affect the function and implementation of the first sale defense. For example, physical works degrade over time, whereas digital copies do not. Similarly, the more frequently a physical copy is used, the quicker it will degrade, whereas the frequency of usage has no bearing on a digital copy.

Transferring a physical copy is also significantly more difficult than transferring the digital copy. Transferring a digital copy is instantaneous and is unaffected by the identity of the transferee or transferor or by the distance between them. On the other hand, transferring a physical copy may take significantly more time, effort and money and is highly dependent on the identity or location of the parties. As the Copyright Office and many others have recognized, the manner in which physical copies are transferred "acts as a natural brake on the effect of resales on the copyright owner's market."[26] For these reasons, a digital first sale defense would allow "used" digital copies to compete *directly* with "new" digital copies on the secondary market. This is not the case with physical goods.

### D. Conclusion

For the reasons discussed above we strongly urge Congress to retain the first sale defense in its present form and to not make any legislative change to Section 109. Changes to the first sale defense to expand the defense to apply to licenses or to digital transfers will have significant deleterious effects on the software and information industries and their customers and should be avoided at all costs. The only area where legislative change is appropriate would be to restore§ 602(a)(1) of the Copyright Act to its rightful function of enabling copyright holders to prevent the unauthorized importation of copyrighted goods, as Justice Kagan recommended in her concurring opinion in *Kirtsaeng*.

---

[26] Digital Theft Deterrence and Copyright Damages Improvement Act of 1999, Pub. L. No. 106-160, § 2, 113 Stat. 1774, 1774 (increasing minimum to $750, maximum to $30,000, and maximum for willful infringement to $150,000).

15

A-3194



UNITED | NETWORK | EQUIPMENT | DEALERS | ASSOCIATION

June 2, 2014

House Judiciary Committee
Rep Bob Goodlatte
2158 Rayburn House Office Bldg
Washington, DC 20515
202.225.3951

First Sale Under Title 17

UNEDA (United Network Equipment Dealers Association) is an alliance of more than 280 of the top used network equipment dealers worldwide. These secondary market suppliers work together to promote industry best practices, ensure the highest standards of product quality, and eradicate counterfeit and fraud in the secondary market.

We are strongly against any changes that might be made to the First Sale Doctrine as described in Title 17 Section 109 to the US Government Copyright law. We are concerned that many manufacturers are attempting to circumvent this law by writing End User License Agreements (EULA) that create an aura of a lease or rental agreement for the permanent sale of an item containing embedded software or firmware.

Most electrical items manufactured today - from dishwashers to cars to computers to coffee makers - contain circuit boards embedded with software or firmware that is necessary for the equipment to run properly. The possibility that EULAs that may be associated with these products could be used to justify legal action against resellers of this used equipment could create problems for all resellers and for the US economy. Our concern is that manufacturers of goods that have embedded software or firmware will try to extend the definition of software to include any device that contains software. If the item requires software or firmware to function and the sale is permanent without any further requirements for revenue at the time of sale, then the item should be considered to be covered by the first sale doctrine.

The first sale doctrine created a basic exception to the copyright holder's distribution right. The objective of this exception is to exhaust the right of the owner of the copyrights interest in the material object. This gives the owner of the material object the right to re-sell or dispose of the object as he sees fit. UNEDA sees no reason to alter this premise and urges the Judiciary committee to seek ways to strengthen this protection by holders of copyrights that would try to arrange a EULA with the intent of circumventing this protection.

While Kirtsaeng v.s. Wiley saw that the Supreme Court interpreted section 109 to mean manufactured anywhere in the world, UNEDA would also urge the Judiciary committee to strengthen the section of Title 17 to show that Section 109 protection has no limit to where an item is made.

UNEDA would also urge the Judiciary committee not to consider legislation that would weaken the protection extended by Title 17 section 109.

Lyle Goré
President
United Network Dealers Association (UNEDA)

PO Box 390023
Omaha, NE 68139 USA
(402) 898-1641 fax
www.uneda.com

182

Testimony of Kim Fender, Director of the
Public Library of Cincinnati and Hamilton County, Ohio.

Before the U.S. House Judiciary Subcommittee on Courts, Intellectual Property and the
Internet

June 2, 2014

I would like to thank the members of the Courts, Intellectual Property and the Internet
subcommittee, along with the subcommittee staff, for their efforts in scheduling this hearing,
and affording me an opportunity to submit written testimony.

My name is Kim Fender and I am the Director of the Public Library of Cincinnati and Hamilton
County, and Chair of the Ohio Library Council's Government Relations Committee. I am proud
to have devoted my career to the public library system, which enjoys a long, rich history of
serving communities throughout our country. Its ubiquitous presence has played a central role
in fostering our democracy by ensuring that all Americans—regardless of social or economic
status—have open access to information.

The topic of this subcommittee hearing is, "First Sale Under Title 17". While issues pertaining to
the long-established first sale doctrine are broad and complex, the subject matter of the
testimony hereby proffered pertains to a relatively specific issue, to wit: public library access to
information has been significantly compromised by publishing industry standards regarding the
sale of digital content. More specifically, the first sale doctrine's well-established function of
promoting public access to information has been abrogated by publishers who qualify digital
transactions with public libraries as "licensing agreements" rather than "sales".

The first sale doctrine allows the purchaser of a copyright-protected work to sell or give away
that copy without the permission of the owner of the copyright. Traditional application of the
first sale doctrine allows the purchaser of a lawfully acquired copy of work the right to lend or
even resell that copy. As a policy, it has served the American public well for over 100 years; and
has formed the very foundation for public library operating models.

However, most large publishers have avoided application of the first sale doctrine to e-books by
structuring their transactions as "licenses" rather than "sales." Rapid advances in technology
sparking the wide scale utilization of e-book readers have led to serious restrictions on the

183

ability of libraries to fulfill their core mission of providing all Americans with open and equal access to information. The end result has been that library users everywhere have been broadly and unfairly denied access to content.

Publishers now set their own terms in determining which e-books to sell to public libraries. Often times, publishers will refuse to sell some titles to public libraries; or they do so under onerous terms, that include inflated pricing, or severe restrictions on lending rights.

It should be noted that the threat to library operating models is *not* attributable to a failure of libraries to keep pace with changing technology. Libraries have adapted to the computer age by serving as a leading source of internet access for those who have no access at home or work (due to cost or availability issues); and libraries have actively attempted to incorporate e-book content into their operating models. By way of example, my library (Ohio's largest, serving the Cincinnati metropolitan area) first began providing downloadable digital content in 2005. That year 1,851 items were downloaded. In 2013, nearly 1.5 million items, books, music, magazines and movies were downloaded from my library and the demand continues to grow.

The refusal of America's largest publishers to sell e-books to public libraries, or their decision to license use under restrictive conditions or at exorbitant prices, is creating a content divide.

There are those who would argue that a physical copy of the same content is an acceptable substitute for a digital copy. I am not among them. For our society to truly provide equitable access to information it must be available to all in the same formats, with the same portability, access and interactivity a digital copy brings. Those relying upon public libraries should not be relegated to increasingly out-of-date print format when libraries have the ability to responsibly provide access to digital format.

We understand that the world of digital content is bringing about dramatic changes for libraries, readers, researchers and, yes, publishers. There are, however, protections available to the publishing industry to safeguard content and prevent illegal pirating. For example, library-loaned e-books can be made subject to all of the same limitations that have existed for years with traditional hard copy materials: users are subject to loan period limits, software is available that prohibits unauthorized copying or sharing, restrictions can be placed on the number of items that may be simultaneously borrowed, one copy of an e-book can only be borrowed by one user at a time, and library transactions will remain available only to card carrying library members. For your convenience, attached to this testimony, as Appendix A, is a fact sheet summarizing the issues of access and pricing.

184

For several years the American Library Association, our national professional association, has worked with publishers to address the issues of access to content through public libraries with a few, scattered results. Unfortunately, by and large, public libraries—and their users—find themselves with severely restricted access to the fast-growing world of digital content.

The publishing industry's decision to limit library patrons' access to e-books has placed the future of the public library at risk. It requires no leap of reason to suggest that e-books will one day become the norm; and, likewise, it is easy to predict a future that ultimately renders obsolete the time-tested library operating model based on the traditional "first sale" doctrine.

The dilemma is simply stated as thus: Despite the overwhelming popularity of public libraries (which serve communities' educational, cultural and economic needs), changes in technology have circumvented the first sale doctrine, thus fundamentally altering the vital publisher-library relationships, and jeopardizing the long-term sustainability of public libraries as we have come to know them.

We must act now if we are to continue our nation's longstanding support of the principle of an informed citizenry. Given publishers' limitations on the sales of e-books to public libraries, coupled with the fast-growing popularity of digital content, the future viability of public libraries is at risk. It is imperative that Congress analyze this growing trend, and take steps to preserve the public library's proud history of providing open access to information for all.

Thank you for your thoughtful consideration.

○

# McNamara Declaration
# Exhibit 121

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5    HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

6    JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

7

                Plaintiffs,

8

          vs.                    No. 1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11              Defendants.

     _____/

12

13

14   VIDEOTAPED RULE 30(B)(6) DEPOSITION OF INTERNET ARCHIVE

15                   BY LILA BAILEY

16                     Volume 1

17               Remote Zoom Proceeding

18               San Francisco, California

19               Monday, October 18, 2021

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 142                    Job No. 4841846

Page 82

1       MR. GRATZ:  Why don't we go -- why don't we go
2    off the record and figure out when to come back.
3           MS. MCNAMARA:  Okay.
4           THE VIDEOGRAPHER:  Okay.  We're going off the
5    record the time is 11:43 a.m.
6           (Recess.)
7           THE VIDEOGRAPHER:  The time is 12:08 p.m., and
8    we are back on the record.
9       Q.  BY MS. MCNAMARA:  Okay.  So, Lila, I think when
10   we cut off, we were turning to the issue of Michelle Wu
11   acting as counsel for Internet Archive.  Okay?
12      A.  Yes.
13      Q.  So did there come a point in time where Michelle
14   Wu was retained as counsel for Internet Archive?
15      A.  Yes.
16      Q.  And can you tell me when that occurred?
17      A.  Sometime in 2017.
18      Q.  Now we've looked at your privilege log, and you
19   have indicated that there were attorney-client
20   communications with Michelle Wu as of September 15, 2016.
21          Does that change your answer?
22      A.  That could be right as well.
23      Q.  So obviously, if the privilege log is correct,
24   she was acting as counsel in September of 2016; is that
25   right?

1      Q.  Did you have an understanding as, given the

2  prior retention of Ms. Wu, why it was decided seven,

3  eight months later to formalize the retention?

4           MR. GRATZ:  Lacks foundation.

5           THE WITNESS:  I think that decision would be

6  privileged.

7      Q.  BY MS. MCNAMARA:  Okay.  Had the role of the

8  retention changed between 2015 and March of 2017?

9           MR. GRATZ:  Objection.  Calls for

10  attorney-client privileged information.

11           I instruct the witness not to answer.

12      Q.  BY MS. MCNAMARA:  Did that retention agreement

13  last -- how -- strike that.

14           How long did the retention agreement last?

15      A.  So I don't recall exactly what it said in the

16  letter about the duration.  However, I can say that, you

17  know, Michelle Wu would periodically offer legal advice

18  to the Internet Archive, either to me or directly

19  Brewster for at least a year or so following, maybe more,

20  following that retention letter.

21      Q.  So that would have been at least until March,

22  April, May of 2018?

23      A.  At least, yeah, at least until then.  That

24  sounds about right.

25      Q.  Do you have any reason to believe it extended

1    Dave's white paper.  So I feel like I should -- I should

2    stop talking here.

3        Q.  Have you heard -- and by "Kyle and Dave," you

4    mean Kyle Courtney and Dave Hansen; is that correct?

5        A.  That's right.

6        Q.  They're -- they're the fellow band of supporters

7    of Internet Archive or Friends of the Internet Archive;

8    is that right?

9        A.  I would describe Kyle Courtney and Dave Hansen

10   and Michelle Wu as Friends of the Internet Archive.

11       Q.  Okay.  So have you heard Mr. Courtney or

12   Mr. Hansen give a presentation on their white paper to

13   libraries?

14       A.  I have at the Library Leaders Forum that was

15   held in the San Francisco Public Library, which was the

16   2019 one.

17       Q.  And did -- in the course of giving that

18   presentation, would they go through the risk mitigation

19   factors?

20       A.  Kyle likes to talk about buckets of risk, and

21   Dave likes to talk about mission risks, which are the

22   risks associated with not doing Controlled Digital

23   Lending or, you know, living up to a library's mission.

24   I don't remember if they like walked through each

25   recommendation in the white paper or not.  That specific

1      Q.  And so it's -- it's a different organization

2   from the Authors Guild  is that correct?

3      A.  Yes.

4      Q.  Are you familiar with the Authors Guild?

5      A.  I am.

6      Q.  And you're familiar with the -- that the Authors

7   Guild has not supported Controlled Digital Lending  are

8   you not?

9          MR. GRATZ:  Objection.  Lacks foundation,

10   outside the scope.

11          THE WITNESS:  I am aware that the Authors Guild

12   has written a number of things that say they don't agree

13   with the idea of Controlled Digital Lending.

14      Q.  BY MS. MCNAMARA:  Now there came a time, did

15   there not, where there was a May 23 to 24, 2017 meeting

16   of a number of lawyers, intellectual property lawyers,

17   concerning Controlled Digital Lending?

18      A.  There was a meeting.

19      Q.  How did that meeting come to pass?

20      A.  Pam Samuelson convened a group scholars and also

21   library practitioners.  It was modeled after a meeting

22   that she did around the Google Books case.

23      Q.  What does that mean?

24      A.  I don't know enough about that, that meeting.  I

25   just know that that's what Pam said.  She was like, well,

Page 130

1   we did this for Google; it would be interesting to do it

2   here.

3       Q.  Do you know what precipitated -- I mean, the

4   Google Books, there was a litigation pending.  What

5   precipitated having a meeting in May of 2017 concerning

6   Controlled Digital Lending, to your knowledge?

7       A.  I believe it was -- oh, like having to do with

8   the MacArthur -- the MacArthur Grant Challenge.

9       Q.  How did it relate to the MacArthur Grant

10  Challenge?

11      A.  One of the significant barriers to solving -- so

12  let me back up and say the framing of the MacArthur

13  100&Change Grant Challenge is solving one of the world's

14  largest problems or something like that.

15          And as part of the grant proposal, barriers to

16  solving the problem are identified.  One of the

17  significant barriers to libraries being able to loan out

18  their digital collections was copyright -- copyright

19  uncertainty, lack of clarity in the law.

20          I believe that Pam was an advisor on the grant,

21  like among the advisors, as I was, as Michelle was, and

22  she wanted to basically have an open discussion, an

23  academic discussion with other scholars and library

24  practitioners who understood how libraries were engaging

25  in this practice, which, again, at the time was not

1   called Controlled Digital Lending, but we've been over

2   that.

3      Q.  And was one of the goals to mitigate the legal

4   opposition to what became Controlled Digital Lending?

5      A.  No.  The real goal of that meeting was academic

6   in uiry.  It was -- I guess you could say or I would say

7   the one -- among the ways that Pam Samuelson formulates

8   her opinions on subjects of this nature where it's --

9   there is something going on out in the world that is

10   legally untested, is she likes to talk to other academics

11   about it.

12      And so she was in charge of the list of who --

13   who was there and the agenda for the meeting and how it

14   was run.

15      Q.  And the topic, the legally untested topic was

16   what became known as Controlled Digital Lending  isn't

17   that right?

18      A.  The subject was -- yes, digital -- what became

19   known as Controlled Digital Lending.

20      MS. MCNAMARA:  Okay.  So let's have marked as

21   Exhibit 59 the flier for the tab 49,  esse, for the May

22   27th meeting.

23       Exhibit 59, Open Libraries Copyright Scholars

24       Meeting, May 24, 2017, San  rancisco, CA,

25       INTARC00151183 - 185, marked for identification

Page 132

1          by counsel electronically.

2      Q.  BY MS. MCNAMARA:  Are you familiar with this

3  presentation concerning the May 24th, 2017 copyright

4  scholars meeting?

5          MR. GRATZ:  Objection to the form.

6          THE WITNESS:  I have actually not seen this

7  before.

8      Q.  BY MS. MCNAMARA:  Okay.  So you'll see that

9  there's a list of attendees on -- or the participants on

10  the second and third page of this exhibit.

11      A.  h-huh.

12      Q.  Is that right?

13      A.  Yes.

14      Q.  And so amongst the attendees there is Brewster

15   ahle, obviously of Internet Archive, Corynne McSherry of

16  the Electronic  rontier  oundation, your counsel, one of

17  your counsel on this case, David Hansen from Duke, as

18  well as the one and only  oe Gratz, who is there.

19          MS. MCNAMARA:  Is that -- is that a lovely

20  picture of you,  oe, sitting next to  yle Courtney?

21          MR. GRATZ:  It is a picture of me, but it is not

22  a lovely picture of me.  I think it was taken during

23  lunch.

24          MS. MCNAMARA:  I am correct that you are sitting

25  next to one of the fellow travelers, Mr. Courtney  is

Page 133

```
 1    that right?
 2            MR. GRATZ:  In that picture, I am sitting next
 3    to Mr. Courtney.  I don't remember whether I was sitting
 4    next to Mr. Courtney all day.
 5            MS. MCNAMARA:  Okay.
 6            MR. GRATZ:  But also -- yeah.
 7        Q.  BY MS. MCNAMARA:  Okay.  So obviously he's
 8    pictured, but he's also identified as a participant,  yle
 9    Courtney.  And then you were there, Lila Bailey?
10        A.  I was there.
11        Q.  Mary Minow, Michelle Wu, and Pam Samuelson, was
12    the whole gang.
13            And I understand that these were pulled together
14    as 20 copyright experts in the area relevant to kind of
15    the topic of the conference, the Controlled Digital
16    Lending  is that right?
17            MR. GRATZ:  Objection to the form.
18            THE WITNESS:  Well, that is definitely what it
19    says here.  Let me get familiar with this document.
20            So, okay, sorry, ask your  uestion.  Because
21    really this is the first time I'm seeing this document.
22        Q.  BY MS. MCNAMARA:  Okay.  Well, as you see on the
23    first page, the caption to the photograph that is on the
24    bottom right of that, which is a little blurry so -- at
25    least on my --
```

Page 134

```
 1        A.  Yeah.
 2        Q.  -- rendering.  That's Michelle Wu at the bottom
 3   left; is that right?
 4        A.  I'm sorry, which photo are we looking at?
 5   They're very fuzzy.
 6        Q.  Yes.  The photo that is the group of people on
 7   the first page of the exhibit.  That's at the bottom.
 8        A.  Michelle, no.  Michelle is --
 9        Q.  Oh, I see Michelle.  She's to the right of Pam
10   Samuelson in that middle photo.
11        A.  Yeah, she's to Pam's right.
12        Q.  Yes, okay.
13        A.  Yes.
14        Q.  So the caption on this bottom photo is "20 of
15   the nation's top copyright scholars."
16            Do you see that?
17        A.  I see that.
18        Q.  Okay.  Did you -- did Ms. Samuelson include any
19   copyright lawyers who represent content creators at this
20   panel?
21            MR. GRATZ:  Objection to the form.
22            THE WITNESS:  I don't know if -- I mean, they're
23   primarily professors and library practitioners.  I
24   have -- I don't know if any of these people in other
25   capacities may have represented any content creators.  I
```

1  can certainly say I know Corynne McSherry has represented

2  content creators, but I don't know if we'd agree on that

3  term.

4      Q.  BY MS. MCNAMARA:  Okay.  Do you know whether any

5  papers or articles were distributed prior to the

6  conference in connection with the conference?

7      A.  I don't remember.  That was -- I've been a part

8  of a couple these things that Pam has pulled together,

9  these kind of roundtable discussions, and usually there

10  is reading that goes along with it, but I don't know what

11  she pulled together for this.

12     Q.  Do you know whether Michelle Wu's 2016 or 2017

13  articles that we have identified at the deposition,

14  whether they were distributed at the conference or before

15  the conference?

16     A.  I don't remember.

17     Q.  Do you know whether they were discussed at the

18  conference?

19     A.  Not in any kind of detail that I recall.

20     Q.  Do you know whether Mr. Gratz made any kind of

21  presentation at the conference?

22     A.  He did not.

23     Q.  Did he speak at the conference?

24     A.  I -- the thing I remember for all of me and Joe

25  and Corynne was stating at the top of the meeting that we

Page 136

```
 1   had -- had represented the Internet Archive and were
 2   conscious of privilege issues and were mostly there to
 3   listen.
 4        Q.  BY MS. MCNAMARA:  And is that, in fact, what you
 5   did?
 6        A.  That is, in fact, what I did, and that is what I
 7   recall both  oe and Corynne doing.
 8        Q.  Do you know whether the meeting was taped?
 9        A.  It was not.
10        Q.  Do you know whether -- did you or anybody else
11   from the Internet Archive that was present, so that would
12   be you and Mr.  ahle and  im Michalko and  ohn Gonzalez
13   and -- I think those are all the representatives of the
14   Internet Archive at the conference or the meeting.
15            Do you know whether any of those individuals
16   took notes of the meeting?
17        A.  I did take notes.  I will -- I would like to
18   state that with the exception of me, everyone else from
19   the Internet Archive was only there for the first hour.
20        Q.  Okay.  So have you retained the notes that you
21   took at that meeting?
22        A.  They were paper notes and I -- no, I don't
23   believe I still have them.
24        Q.  Do you know when, if you discarded them, when
25   did you discard them?
```

1    A.  Probably in the three to six months after the
2    meeting, as I no longer needed them.
3    Q.  Why would -- why would you no longer need them
4    three to six months after the meeting?
5    A.  It's not in my practice to go back to old notes
6    from old meetings.
7    Q.  Okay.  Do you have a distinct recollection of
8    discarding those notes or are you guessing?
9    A.  I mean --
10    MR. GRATZ:  Objection to the form.
11    THE WITNESS:  I have a distinct recollection of
12    them being paper notes, and I know that I have a practice
13    of shredding my paper notes on a relatively regular
14    basis.  You can see I have a small home office so I
15    regularly purge.
16    Q.  BY MS. MCNAMARA:  As a result of that 2017
17    meeting that was organized by Pam Samuelson, was it
18    agreed that Mr. Courtney and Mr. Hansen would author a
19    white paper concerning the legality of Controlled Digital
20    Lending?
21    A.  No.  At that point, at the end of the meeting --
22    so at the end of the meeting, what I remember is Pam
23    saying something like whoever is interested in writing
24    something else about this should let the group know, that
25    kind of a thing.

1      And then after the meeting had concluded and we

2  were having like a dinner afterwards, I believe that is

3  when Kyle and Dave and Michelle and I started talking

4  about the idea of writing something up.

5      Q.  And so was it agreed at that dinner that the

6  primary authors of the paper would be Mr. Courtney and

7  Hansen?

8          MR. GRATZ:  Objection.  Vague.

9          THE WITNESS:  The white paper idea came quite a

10  bit later.

11      Q.  BY MS. MCNAMARA:  Tell me about that.  How did

12  that come about?

13      A.  The original idea was to write something short

14  and easy for a non-lawyer to understand about the legal

15  underpinning of Controlled Digital Lending.

16      Q.  And that became the statement that you

17  co-authored; is that right?

18      A.  That's right.  That became the Position

19  Statement.

20          As that document crystallized, another kind of

21  need was identified in the community.  Basically people

22  were like -- would say, "My general counsel has

23  questions, has more questions than this document

24  answers."

25          And it was in light of that more lawyerly

Page 141

```
 1    STATE OF CALIFORNIA     ) ss:

 2    COUNTY OF MARIN         )

 3

 4            I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5    hereby certify:

 6            That the foregoing deposition testimony was

 7    taken before me at the time and place therein set forth

 8    and at which time the witness was administered the oath;

 9            That testimony of the witness and all objections

10    made by counsel at the time of the examination were

11    recorded stenographically by me, and were thereafter

12    transcribed under my direction and supervision, and that

13    the foregoing pages contain a full, true and accurate

14    record of all proceedings and testimony to the best of my

15    skill and ability.

16            I further certify that I am neither counsel for

17    any party to said action, nor am I related to any party

18    to said action, nor am I in any way interested in the

19    outcome thereof.

20            IN WITNESS WHEREOF, I have subscribed my name

21    this 22nd ay of October, 2021.

22

23

24

25    LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 146

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4

5    HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

6    JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

7

                 Plaintiffs,

8

          vs.                      No. 1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11              Defendants.

     _____/

12

13

14

15   VIDEOTAPED RULE 30(B)(6) DEPOSITION OF INTERNET ARCHIVE

16                  BY LILA BAILEY

17                    Volume 2

18             Remote Zoom Proceedings

19             San Francisco, California

20             Tuesday, October 19, 2021

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Job No. 4842007

1    the question -- as the question is phrased, I instruct

2    the witness not to answer.

3          MS. MCNAMARA:  Okay.  I don't think that -- I

4    mean, that it calls for attorney-client privilege or work

5    product, but we can go through it methodically if that's

6    easier.

7        Q.  So, Ms. Bailey, one of the suggestions

8    articulated in the white paper is that one way to -- a

9    design feature that may reduce risks and enhance the

10    fair-use position is to introduce additional artificial

11    friction into the system, for example, by extending the

12    time between digital lends more closely mirroring how

13    physical books are lent and returned.

14         Do you see that?

15        A.  Sorry, what page are we on here?

16        Q.  Page 36 in the paragraph that begins:  "One way

17    is to introduce additional artificial friction."

18        A.  So I was on the wrong page that's why I'm not

19    seeing it.  Okay.  I see it now.

20        Q.  Okay.  Are you aware of what this means as to

21    kind of introducing friction and introducing time between

22    digital lends?

23          MR. GRATZ:  Objection to the form.

24          THE WITNESS:  I understand the principle.

25        Q.  BY MS. MCNAMARA:  Okay.  Is that a practice

Page 220

1  followed by Internet Archive?  Do they introduce friction

2  between lends so there's a time period between when a

3  book is returned and when it can be checked out again?

4      A.  Not to my knowledge.

5      Q.  A second suggestion by the authors of the white

6  paper is that in the next paragraph, you'll see it says:

7  "A conservatively designed CDL system could also

8  introduce characteristics that mimic physical

9  degradation.  For example, a library might introduce

10  lending limits based on library experience with physical

11  lending.  If a physical book could be expected to

12  circulate 2000 times before it degrades, the library

13  could place the same limit on circulation of the digital

14  copy."

15          Do you see that?

16          MR. GRATZ:  Objection to the form.

17          THE WITNESS:  I see that.

18      Q.  BY MS. MCNAMARA:  Is that a practice followed by

19  Internet Archive?  Do they take a book out of circulation

20  after it is determined that it might be consistent with

21  how a physical book would degrade?

22          MR. GRATZ:  Objection to the form.

23          THE WITNESS:  Not to my knowledge.

24      Q.  BY MS. MCNAMARA:  The -- on page 37 of the white

25  paper, there is a paragraph that begins:  "Libraries may

Page 221

```
 1   also limit who they will lend digital copies to as an

 2   additional way to limit the overall reach of the copy and

 3   therefore the potential market effect."

 4           Do you see that?

 5       A.  I see that.

 6       Q.  And it goes on to recognize that some libraries

 7   serve particular communities of users, and so it could

 8   restrict lending to the communities of users that it

 9   serves.

10           Do you understand that as an idea that is being

11   put forth by the authors of the white paper as a means to

12   reduce risk?

13           MR. GRATZ:  Objection to the form.

14           THE WITNESS:  I do understand the principle.

15       Q.  BY MS. MCNAMARA:  And I am correct, am I not,

16   that Internet Archive is a global website; isn't that

17   right?

18           MR. GRATZ:  Objection to the form.

19           THE WITNESS:  The Internet Archive -- so

20   Archive.org is a website that is accessible from anywhere

21   in the world.

22       Q.  BY MS. MCNAMARA:  And that's true of the

23   Controlled Digital Lending component of Internet Archive;

24   isn't that right?

25       A.  It is accessible from anywhere in the world,
```

Page 222

1    yes.

2          Q.  So anywhere in the world, someone could lend a

3    book?

4              MR. GRATZ:  Objection to the form.

5          Q.  BY MS. MCNAMARA:  Or could take out a book, I

6    should say.

7          A.  Anyone who has an account with the Internet

8    Archive can borrow a book.

9          Q.  Okay.  So turning now to page 38 of the white

10   paper, do you see under the subhead B, "Collection

11   Choices," the first sentence reads:  "The choice in what

12   books are selected for CDL can also play a significant

13   role in risk mitigation."

14              Do you see that?

15         A.  I do.

16         Q.  And proceeds to say:  "The book candidates with

17   the lowest risk and the strongest fair-use argument,

18   though those analyses are not necessarily tied together,

19   are generally those with the lowest likelihood of market

20   exploitation."

21              Do you see that?

22         A.  I see that.

23         Q.  So, for example, the article goes on to indicate

24   that old books and books in the public domain would be

25   less risky under this analysis; correct?

```
                                                      Page 223

 1            MR. GRATZ:  Objection to the form.

 2            THE WITNESS:  Yeah.  The paper talks about older

 3   books, public domain books posing a lower risk.

 4       Q.  BY MS. MCNAMARA:  And Internet Archive's

 5   practice of Controlled Digital Lending is not limited to

 6   public domain books, is it?

 7       A.  It is not.

 8       Q.  So it circulates books that are in copyright?

 9            MR. GRATZ:  Objection to the form.

10            THE WITNESS:  Circulates -- I'm sorry, the

11   Internet Archive circulates books that are very likely --

12   at least some of them are likely to be protected by

13   copyright.

14       Q.  BY MS. MCNAMARA:  Okay.  And there's a chart

15   that appears on page 39, or a diagram that appears on

16   page 39 of the white paper, and it divides the kind of

17   universal books into pre-1943 books, pre-1963 books,

18   pre-1989 books, and books first published in the United

19   States, and it ascribes different risk analysis to those

20   different categories.

21            Do you understand that?

22            MR. GRATZ:  Objection.  Misstates the content of

23   the document.

24            THE WITNESS:  I understand that there are --

25   this is what Kyle called buckets of risk.
```

Page 224

```
 1        Q.  BY MS. MCNAMARA:  Okay.  So on page 40, there's
 2    a subcategory of out-of-print and off-the-market books.
 3            Do you see that?
 4        A.  I see that.
 5        Q.  Now we've established that Internet Archive
 6    publishes books that are still protected by copyright;
 7    isn't that right?
 8            MR. GRATZ:  Objection to the form.
 9            THE WITNESS:  Did you mean to use the word
10    "publishes"?
11        Q.  BY MS. MCNAMARA:  Well, it distributes, it makes
12    available to -- to -- to its users books that are in
13    copyright; isn't that right?
14            MR. GRATZ:  Objection to the form.
15            THE WITNESS:  Books that may be protected by
16    copyright are included in our Controlled Digital Lending
17    environment.
18        Q.  BY MS. MCNAMARA:  And does the Internet Archive
19    have any time restriction on -- on books that it will not
20    publish or will not make available to its readers?
21            MR. GRATZ:  Objection to the form.
22            THE WITNESS:  The Internet Archive does place a
23    limit based on a date for books that are made available
24    through our Controlled Digital Lending system.
25        Q.  BY MS. MCNAMARA:  And what is that limit?
```

Page 225

```
1        A.   Currently, I believe it is the last two years or
2   five years.  I realize I'm not confident in my answer
3   there.
4        Q.   Okay.  So it's either two years or five years.
5   And by that, means two years or five years from the date
6   of original publication?
7        A.   No -- oh, wait, sorry.  I'm getting myself
8   turned around.  Can you restate the question?
9        Q.   Yes.
10            Does Internet Archive place a time restriction
11  on books that are available on its -- on its Internet
12  Archive lending website?
13       A.   Yes.
14       Q.   What is that time restriction?
15            MR. GRATZ:  Outside the scope.
16            You can answer.
17            THE WITNESS:  So I am not 100 percent certain of
18  the date cutoff as I sit here today.  I don't --
19       Q.   BY MS. MCNAMARA:  I have seen indications
20  that -- that books that were published, originally
21  published within the last five years, are generally --
22  but there's exceptions -- are generally not to be made
23  available to the lending portion of the Internet Archive.
24            Does that sound correct to you?
25       A.   It does sound correct to me, although again,
```

Page 226

```
1    that exact where that cutoff is -- is something that I
2    recognize that I am -- I don't have my head around today.
3         Q.  Okay.  Okay.  So back on page 40, under
4    out-of-print and off-the-market books.  Do you agree that
5    Internet Archive does not limit what is available on its
6    lending library to out-of-print books?
7         A.  The Internet Archive does not limit its lending
8    library to books that are out -- are determined to be out
9    of print.
10        Q.  And similarly, it does not limit its lending
11   library to books that are off the market.
12             MR. GRATZ:  Objection.  Vague.
13        Q.  BY MS. MCNAMARA:  Correct?
14        A.  So if I'm reading the paper correctly, off the
15   market is something closer to orphan works?
16        Q.  I don't think so.  So let's try to clarify
17   because I think your counsel was probably right.  It was
18   vague as said.  So let's clarify it as to how it's being
19   used in the white paper.
20             In the third sentence of the subsection 2 under
21   out of print and off the market, the paper indicates that
22   a key, though not necessarily determinative factor in
23   fair use, is whether or not the work is available to the
24   potential user.  If the work is out of print or
25   unavailable for purchase through normal challenges" --
```

Page 227

1   "channels, the user may have more justification for

2   reproducing it."

3           Do you see that?

4           MR. GRATZ:  Objection.  Objection to the form of

5   the question.

6           THE WITNESS:  That's -- sorry, yeah, it looks

7   like this is trying to quote something, but I don't see

8   where the beginning of the quote is in the paper.  I

9   think there's a typo in the paper.  I'm just noticing as

10  we read it here today.  But I do see that.

11      Q.  BY MS. MCNAMARA:  Okay.

12      A.  Yes.

13      Q.  And so does Internet Archive limit the books

14  that are available through its lending library to books

15  that are unavailable for purchase through normal

16  channels?

17          MR. GRATZ:  Objection to the form.

18          THE WITNESS:  The Internet Archive does not

19  limit works -- sorry.  The Internet Archive does not

20  limit the availability of works in its lending library by

21  whether they are unavailable for purchase through normal

22  channels.

23      Q.  BY MS. MCNAMARA:  Okay.  And we've already

24  established -- this goes on to talk about orphan works.

25  We've already established that Internet Archive does not

Page 228

```
 1    limit the availability of works on its lending library to
 2    orphan work; isn't that right?
 3         A.  That is right.
 4         Q.  Okay.  Then -- and I'm -- and I'm cognizant of
 5    the time.  I know that we're supposed to try to keep to
 6    hour increments, and so I'm almost done so I don't think
 7    want you to think I'm being disrespectful of your time.
 8              On page 41, there's a subhead 3:  "Nonfiction
 9    and Factual Works."
10         A.  I see that.
11         Q.  Do you see that?
12         A.  I do.
13         Q.  It says:  "Finally, a third collection
14    characteristic that may reduce risk and enhance the
15    fair-use position is for libraries to focus their CDL
16    efforts on works that are nonfiction or primarily
17    factual.
18              Do you see that?
19         A.  I see that.
20         Q.  Does Internet Archive in its lending library
21    limit the books that are either nonfiction or primarily
22    factual?
23              MR. GRATZ:  Objection to the form.
24              THE WITNESS:  The Internet Archive lending
25    library is not limited to works that are only nonfiction
```

Page 229

1   or factual.

2          MS. MCNAMARA:  Okay.  This is a good time to

3   break.  So how much time -- where are we in your schedule

4   of kind of what we so here?

5          MR. GRATZ:  So we have, by my count, we've been

6   on the record for about five hours and 53 minutes.  So

7   we've got about another hour and seven minutes to go.

8          Lila, do you want to take a -- take a longer

9   break now and then, you know, go through to the finish

10  line or a shorter break now and break it up into pieces,

11  or how would you prefer to proceed?

12         THE WITNESS:  Are we still on the record?

13         MR. GRATZ:  We should probably go off the

14  record.

15         THE WITNESS:  Yes.

16         THE VIDEOGRAPHER:  We're going off the record.

17  The time is 11:53 a.m.

18         (Recess.)

19         THE VIDEOGRAPHER:  The time is 12:45, and we are

20  back on the record.

21         MS. MCNAMARA:  Okay.  Thank you for that.

22     Q.  So, Lila, I wanted to turn our attention, if I

23  may, to Mary Minow.  I think we haven't really discussed

24  Ms. Minow.  We've referenced her, but we haven't

25  discussed her in any detail.

Page 254

```
 1   STATE OF CALIFORNIA     ) ss:

 2   COUNTY OF MARIN         )

 3

 4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6          That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21   this 25th day of October, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

# McNamara Declaration
# Exhibit 122

## Internet Archive Blogs

*A blog from the team at archive.org*



Blog   Announcements   25th Anniversary   archive.org   About   Events   Developers   Donate

### Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending

Posted on October 20, 2020   by Caralee Adams



*Michelle Wu, Internet Archive Hero Award 2020 recipient*

Michelle Wu is leading libraries to think and act in new ways to fulfill their missions.

For nearly two decades, she has advocated for preserving and expanding access to materials by responsibly digitizing collections. Using her expertise as an attorney, law librarian and professor, Wu crafted the legal theory behind Controlled Digital Lending (CDL) and has dedicated much of her career to showing libraries how to put the concept into practice.

To honor her innovative and tireless work, Wu has been named the recipient of the 2020 Internet Archive Hero Award. The annual award recognizes those who have exhibited leadership in making information available for digital learners of all ages. Past recipients have included Phillips Academy, the Biodiversity Heritage Library, and the Grateful Dead. Michelle received the award during the Library Leaders Forum final session on October 20.

"Michelle Wu was ahead of her time in understanding the transition to the digital era and brought library lending into our new landscape," said Brewster Kahle, founder of the Internet Archive.

"Not only did Michelle see a problem coming, she did something about it," Kahle says. "It's a combination of being both a visionary on how the world could work and then making concrete steps to get us there."



**Search**

### Recent Posts

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

### Recent Comments

- Superman on July Book Talk: The Library: A Fragile History
- abo on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

### Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive

With library buildings closed now for safety, the demand for digital materials has grown. The pandemic magnifies the importance of using CDL as a strategy to expand services to the public, says Pamela Samuelson, a distinguished professor of law and information management at the University of California, Berkeley, who admires Wu's insights as a scholar and librarian.

"She set the example and made people feel comfortable with a concept that was initially a little bit questionable," says Samuelson. In her copyright classes, Samuelson now draws on Wu's work to inform her students.

"Michelle's articles explaining the concept have been very useful for students to have not just the reader's perspective, or law student's perspective, but how librarians are really taking the challenge of the digital age," Samuelson says. "They are making good things happen to carry on the grand tradition of libraries to facilitate as much access as lawfully possible to the public they serve."

Looking back on her career, Wu says she sort of fell into law. She abandoned plans for medical school after helping her roommate at the University of California San Diego study for the Law School Admission Test. Fascinated with the logic puzzles, she took the LSAT on a whim and did well enough to get a scholarship.

"I found I loved theory of the law, looking at issues from all sorts of angles and finding a path through," says Wu, who enrolled at the California Western School of Law and worked part-time at the San Diego County Law Library. She soon realized that the adversarial nature of the legal process didn't suit how she viewed the law. Law librarianship was a better match, one grounded in collaboration and a commitment to using legal knowledge to educate and assist users in finding meaningful solutions to their legal problems . A year after earning her J.D., Wu got her master's degree in librarianship with a certificate in law librarianship at the University of Washington.

She landed her first job at George Washington University Law School Library. In 2001, she was hired by the University of Houston School of Law. It was there, following the massive destruction of the school's library due to Tropical Storm Allison, that Wu focused on the need to protect materials through digitization.

Wu says she began to wonder: "Is there a better way for libraries to prepare society for a world in which there are a growing number of natural disasters?" she recalls. "There are so many risks to our collections, and society depends on long-term access for this information," Wu says.

Wu developed the theory for a digitization program designed with copyright in mind. What came to be known as CDL, she says, strikes a balance between the interest of the users and copyright owners. A library can lend out only the number of copies that it has legitimately acquired, though the copy can be any format.   The flexibility in format facilitates  more effective access for a wide variety of users, including those  who live remotely or have trouble physically coming to a library building, while also ensuring the preservation of content in situations like natural disasters.

After Houston, Wu worked at the Hofstra School of Law and Georgetown University Law Center. As both a library director and law professor, Wu says she has been well-positioned to advocate for CDL and reason with the skeptics.

 "I haven't heard a lot of substantive objections. I have heard fear, which is common and understandable anytime you are changing the status quo, but it is something that must be overcome for advancement." says Wu. "In talking with others about CDL, I  focus on what CDL is and what it is intended to accomplish, which pushes people to engage deeply instead of rejecting the idea out of fear. From my perspective, CDL  is the purest form of balance in copyright that you are going to find in a world of technology, and that balance is difficult to deny when you examine CDL in detail."

Kyle K. Courtney,  the copyright advisor and program manager at the Harvard Library Office for Scholarly Communication, says from the first time he met Wu, he was inspired by her ideas and willingness to challenge norms. Her research was a major influence on Courtney's work and career. Together, they co-authored a position statement on CDL.

"It is great to meet your heroes sometimes — and even better to be able to work with them side by side," says Courtney. "She is not a theoretical scholar. This is what's awesome: She puts the cutting-edge CDL copyright system to work. That's why she's a trailblazer in both words and action, putting libraries at the forefront in our field."

Wu's leadership has helped advance the collaborative work of libraries and enabled there to be  more transparency in sharing information, says Courtney. He and Wu have presented on CDL at several conferences and discussed the concept with Congressional staff on Capitol Hill last year.

- Movie Archive
- Music
- News
- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

**Archives**

Select Month

**Meta**

- Log in
- Entries feed
- Comments feed
- WordPress.org

"She is one of the hardest working members of the library field I know," Courtney says. "She's oriented toward practical results and addresses 21st century challenges in multiple environments – public, private and academic. She is a person of remarkable integrity."

Courtney says Wu's recognition showcases what leaders in librarianship should aspire to: a successful record of progressive scholarship, influence on the next generation of librarians and a legacy of hard work that reflects an enthusiasm for libraries.

Sharing the story of CDL on Capitol Hill, Lila Bailey, policy counsel for the Internet Archive, says she was struck by Wu's ability to connect with staffers. "Michelle explains things in such a clear, intuitive, practical way," says Bailey, who also has collaborated with Wu on research. "She's so competent and conscientious."

Wu has been committed to spreading her knowledge of both academic and practical aspects of the CDL to librarians and policymakers across the country. "She is somebody who came up with a legal theory and spent her career creating a proof of concept for why this is important," Bailey says. "The Internet Archive sets this very ambitious vision of universal access to all knowledge then it tries to live up to the vision. Michelle embodies this ethos of the Internet Archive to be the change you want to see in the world."

In June, Wu retired from academia, but she continues to research and mentor emerging librarians. Too often, (outside of the sciences) academia gives more weight to the risk in innovation instead of imagining the opportunities that creative problem-solving can provide, but Wu says that attitude doesn't serve the public in the best way.

"We can't sit back and expect everyone automatically to understand the importance of libraries long term. We have to stand up for what we believe, advocate for it, and find solutions that better serve society in an ever-changing world." Wu says.

Posted in Lending Books, News | Tagged CDL, controlled digital lending | 5 Replies

---

← Digitization Saves Marygrove College Library After Closure

Want Some Terabytes from the Internet Archive to Play With? →

### 5 thoughts on "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending"


آهنگ جدید
October 20, 2020 at 7:27 pm

im working on cdl . its hard to realy understand facts of cdl


san go
October 21, 2020 at 10:09 am

so cool


**Capptain Mark**
October 22, 2020 at 11:14 am

Congratulations

Pingback: Library Leaders Forum Explores Impact of Controlled Digital Lending - Internet Archive Blogs

Pingback: Library Leaders Forum: Digital Library Practices For a More Equal Society - Internet Archive Blogs

Comments are closed.

Page 4
Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending - Internet Archive Blogs
http://blog.archive.org/2020/10/20/michelle-wu-receives-internet-archive-hero-award-for-establishing-the-legal-basis-for-controlled-digital-lending/

*Proudly powered by WordPress*

# McNamara Declaration
# Exhibit 123

# A White Paper on Controlled Digital Lending of Library Books

David R. Hansen & Kyle K. Courtney[1]

TABLE OF CONTENTS

I.    THE 20TH CENTURY BOOK PROBLEM ........................................................... 4
II.   THE LEGAL FRAMEWORK: FIRST SALE AND FAIR USE ............................. 7
III.  CONTROLLED DIGITAL LENDING AS FAIR USE ...................................... 9
IV.  TAKEAWAYS: SYSTEM DESIGN AND RISK MITIGATION ....................... 32
V.   CONCLUSION ................................................................................................. 42

This paper is about how libraries can legally lend digital copies of books. It explains the legal and policy rationales for the process— "controlled digital lending"— as well as a variety of risk factors and practical considerations that can guide libraries seeking to implement such lending. We write this paper in support of the *Position Statement on Controlled Digital Lending,*[2] a document endorsed by many libraries, librarians, and legal experts. Our goal is to help libraries and their lawyers become more comfortable with the concept by more

---

[1] *These institutional affiliations are for identification purposes only.* David R. Hansen is Associate University Librarian for Research, Collections & Scholarly Communications at Duke University Libraries. Kyle K. Courtney is Copyright Advisor and Program Manager at Harvard Library's Office for Scholarly Communication.

We're grateful for comments and suggestions from a number of people including Lila Bailey, Anne Gilliland, Mary Minow, Rachael Samberg, Pamela Samuelson, Jason Schultz, Kevin Smith, and Michelle Wu. Thanks also to staff, participants, and attendees who helped hone our thoughts in sessions we held on this topic at the 2018 American Association of Law Libraries Annual Meeting, the 2018 Kraemer Copyright Conference, the Lillian Goldman Law Library at Yale University, the 2018 Copyright First Responders Pacific Northwest workshop, and the 2018 University Information Policy Officers Meeting hosted by The Ohio State University Libraries. We also offer our profound thanks to Lacey Chrabaszcz, OSC Copyright Fellow, for her careful editing and *Bluebook* expertise.

© 2018 David Hansen and Kyle Courtney. This paper is licensed for reuse under a Creative Commons Attribution 4.0 International License, https://creativecommons.org/licenses/by/4.0/.

[2] We are both contributors to that statement. We wrote this paper independently, with comments and input from selected *Statement* drafters, signatories, and other parties.

Page   1

fully explaining the legal rationale for controlled digital lending, as well as situations in which this rationale is the strongest.

For this paper we define "controlled digital lending" (CDL) just as the *Statement* does:

> CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. Essentially, CDL must maintain an "owned to loaned" ratio. Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies.[3]

Thus, CDL would permit circulation of copies equal to those that had been legitimately acquired by the participating libraries. When the digital copy is being read by a patron, however, the corresponding physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one. A library can lend a physical book to a patron through standard circulation or to another library through interlibrary loan. What CDL does do is shift that lending to a new format that opens up access possibilities for readers with disabilities, physical access limitations, research efficiency needs, or other needs for digitally-accessible content.

A CDL system is not a brand-new concept. There are multiple versions of CDL-like systems currently being used in libraries. The idea was first explored in the pioneering article "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries"[4] by Michelle Wu, Professor of Law and Law Library Director at Georgetown University School of Law. Later, the Internet Archive created the "Open Library: Digital Lending Library" project, which has

---

[3] *Position Statement on Controlled Digital Lending by Libraries* (hereafter "*Statement*") available at https://controlleddigitallending.org/statement

[4] Michelle M. Wu, *Building a Collaborative Digital Collection: A Necessary Evolution in Libraries*, 103 LAW LIBR. J. 527 (2011). See also Michelle M. Wu, *Piece-by-Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use*, 36 LEGAL REF. SERV. Q. 51 (2017).

Page    2

CONFIDENTIAL

INTARC00358245

successfully utilized a unique CDL-like system for the past 8 years.[5] Multiple libraries have now harnessed the same CDL system and partnered with Internet Archive to loan their digital copies of books. These partners include large library systems such as the Boston Public Library, to smaller specialized libraries such as the Allen County Public Library, which houses the largest genealogical collection of any public library in the country.[6] And, most recently, Georgetown Law Library launched its own CDL service.[7]

At its core, CDL is about replicating with digital lending the legal and economically significant aspects of physical lending. To do so, we libraries must truly exercise *control* in the process. The *Statement* identifies six specific requirements to do so. It states that for CDL, libraries should:

> (1) ensure that original works are acquired lawfully;
> (2) apply CDL only to works that are owned and not licensed;
> (3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio);
> (4) lend each digital version only to a single user at a time just as a physical copy would be loaned;
> (5) limit the time period for each lend to one that is analogous to physical lending; and
> (6) use digital rights management to prevent wholesale copying and redistribution.

Our principal legal argument for controlled digital lending is that fair use—an "equitable rule of reason"[8]—permits libraries to do online what they have always done with physical collections under the first sale doctrine: lend books. The first sale doctrine, codified in Section 109 of the Copyright Act, provides that anyone who legally acquires a copyrighted work from the copyright holder receives the right to sell, display, or otherwise dispose of that particular copy, notwithstanding the interests of the copyright owner. This is how libraries loan books. Additionally, fair use ultimately asks, "whether the copyright law's goal

---

[5] See Open Library, https://openlibrary.org (last visited Sept. 13, 2018). See also Geoffrey A. Fowler, *Libraries Have a Novel Idea*, Wall St. J. (June 29, 2010), https://www.wsj.com/articles/SB10001424052748703279704575335193054884632.

[6] Internet Archive, *Digital Lending Library*, Internet Archive Blogs (June 28, 2010), https://blog.archive.org/2010/06/28/digital-lending-library [https://perma.cc/R4A2-QUW6].

[7] American Association of Law Libraries, *Transforming Our Libraries from Analog to Digital: A Vision For 2020*, American Association of Law Libraries Webinar, https://www.aallnet.org/recording/transforming-libraries-analog-digital-vision-2020/ [https://perma.cc/Q9AB-AEW4].

[8] H.R. Rep. No 94-1476, 94th Cong., 2d Sess 65 (1976).

Page 3

CONFIDENTIAL
INTARC00358246

of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[9] In this case we believe it would be. Controlled digital lending as we conceive it is premised on the idea that libraries can embrace their traditional lending role to the digital environment. The system we propose maintains the market balance long-recognized by the courts and Congress as between rightsholders and libraries,[10] and makes it possible for libraries to fulfill their "vital function in society"[11] by enabling the lending of books to benefit the general learning, research, and intellectual enrichment of readers by allowing them limited and controlled digital access to materials online.

## I.   THE 20TH CENTURY BOOK PROBLEM

For decades, libraries and cultural institutions have sought to provide greater access to their collections with the hope of reaching a broader and more diverse set of readers.[12] A confluence of technological advances and expanding copyright protection have driven the problem.

Copyright terms are now extremely long (95 years or more for many published works), "formalities" that once required rightsholders to take action to obtain and retain rights have been eliminated, rights are infinitely divisible among private parties causing uncertainty about ownership, and the quantity of copyright-eligible works has exploded with the technological ability to easily and quickly create and publish new works.[13]  Librarians now puzzle over questions such as whether a work is actually still protected by copyright (did the rightsholder comply with applicable U.S. copyright formalities?), who owns

---

[9] *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

[10] For users generally, the House Judiciary Committee Report on the 1976 Copyright Act explains that under section 109(a), "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976). The Copyright Act in several other places identifies special considerations with respect to libraries. *See* 17 U.S.C. § 108 (specific exceptions to reproduce and distribute for libraries and archives); 17 U.S.C. § 504(c)(2) (special damage exceptions for libraries and archives).

[11] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 105 (2001), https://perma.cc/59TU-2NKJ [hereinafter, DMCA SECTION 104 REPORT].

[12] For example, Project Gutenberg is a volunteer effort to digitize and archive cultural works, to "encourage the creation and distribution of books." It was founded in 1971 by Michael S. Hart and is the oldest digital library. See http://www.gutenberg.org/. Others efforts include the HathiTrust digital library, https://www.hathitrust.org/, OpenLibrary, http://openlibrary.org/, and—with a corporate partner—Google Books, https://books.google.com/.

[13] In the context of the "orphan works" problem, these and related causes are explained in more detail in David R. Hansen, *Orphan Works: Causes of the Problem* (Berkeley Digital Library Copyright Project White Paper No. 3, 2012), https://ssrn.com/abstract=2038068.

Page   4

CONFIDENTIAL                                              INTARC00358247

digital rights (publisher or author?), and whether the rightsholder can be found (or is the work an orphan?). Attempting to clearly answer those questions on a title-by-title basis has proven costly,[14] making full digital access for large numbers of works based on rightsholder permission difficult. Particularly for books and other published materials for which there was once an active market, libraries have not yet been able to provide broad full-text access online.[15]

Many 20th Century books are not available for purchase as new copies in print or as digital versions online.[16] Libraries would like to provide digital access, but many rightsholders have not offered those titles for sale in that format. The morass of rights management, combined with the orphan works problem and the ever-increasing copyright length, has made it complicated to see a path forward to broad digital access.

For modern libraries with users whose research and information use patterns mean they look to digital access first,[17] this means that a whole world of research is effectively invisible to a variety of types of users. For some, the inability to physically travel to a library because of their remote physical location, economic wherewithal, or homebound limitations means that physical lending is not practical. For others, physical access is a matter of great inefficiency in their research and learning. For users with print disabilities—those who currently

---

[14] *See, e.g.,* Cornell University Library, Response to the Notice of Inquiry Concerning Orphan Works (Mar. 23, 2005), https://perma.cc/NZ8W-UWMK (spending $50,000 in staff time to identify rightsholders for 198 books); Carnegie Mellon University Libraries, Response to Notice of Inquiry about Orphan Works 2 (Mar. 22, 2005), https://perma.cc/95XW-TV4Z (similar). *See also* Maggie Dickson, Due Diligence, Futile Effort: Copyright and the Digitization of the Thomas E. Watson Papers, 73 AM. ARCHIVIST 626 (2010), https://perma.cc/QD2X-F3D8 (reporting on similar efforts in the context of special collections). The same is true in jurisdictions with relative clarity about what steps are necessary for such a search. *See* Victoria Stobo, Kris Erickson, Aura Bertoni & Flavia Guerrieri, *Report 3: Current Best Practices among Cultural Heritage Institutions when Dealing with Copyright Orphan Works and Analysis of Crowdsourcing Options* (EnDOW Report 3, May 2018), https://perma.cc/SQH8-H3CT ("This study shows that digitization remains a paradox for [cultural heritage institutions]. Rights clearance in particular remains expensive and ranges considerably depending on the nature of the work and the approach taken by the institution.").

[15] In contrast, U.S. libraries have increasingly relied on fair use to provide full-text access to archival and special collections materials for which original markets are more clearly limited. *See* DAVID R. HANSEN, DIGITIZING ORPHAN WORKS: REDUCING LEGAL RISKS FOR OPEN ACCESS TO COPYRIGHTED ORPHAN WORKS, 111 (Kyle K. Courtney & Peter Suber eds., Harvard Library 2016), https://dash.harvard.edu/handle/1/27840430 (listing 30 different online digital collections in which libraries have openly disclosed the likely orphan status of their materials and their reliance on fair use as a basis for online digital access).

[16] *See* Paul J. Heald, *How Copyright Keeps Works Disappeared,* 11 J. EMPIRICAL L. STUDIES 829 (2014).

[17] *See, e.g.,* John Palfrey & Urs Gasser, *Born Digital: Understanding the First Generation of Digital Natives* (Basic Books, 2010).

Page  5

INTARC00358248

have some digital access to print collections due to the fair use holding in the *HathiTrust* case which addressed copying and access of books for print-disabled users[18] — access is currently hampered by hurdles that require users to self-identify disabilities and request special access to digital copies. For a large research library, this means holdings of millions of volumes, already purchased at a cost of hundreds of millions of dollars, are not accessible in a format that is more meaningful and easier to use for many researchers today.[19]

For books primarily from the mid-20th Century, presumptively still protected by copyright, but not currently available in electronic form from their rightsholders, we believe CDL holds significant promise. We also believe the legal rationale for lending these works is among the strongest of all types of works.[20] Some of these books may well be described as "orphaned," without identifiable owners. Others may have identifiable owners, but are in practice neglected, unavailable in the digital marketplace and with no plan for revitalization in modern formats. For all, it means that they are not fully meeting the basic goals of copyright to promote "the Progress of Science and the useful Arts."[21] Their unavailability online benefits neither creators nor the reading public.

So, how can libraries provide access? First, we start with a detailed look at the two fundamental copyright law doctrines that already empower libraries to fulfill their missions: first sale and fair use.

---

[18] *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014) (finding it fair use for the HathiTrust digital library to provide access to print-disabled patrons under a system which requires patrons to "submit documentation from a qualified expert verifying that the disability prevents him or her from reading printed materials" before gaining access).

[19] Some of the most popular, commercially-viable books remain in print and are available in a variety of formats. For many 20th Century books, however, the window for commercial viability passes only a few years after first publication. Several copyright scholars have studied the phenomenon. *See* William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright*, 70 U. CHI. L. REV. 471, 474 (2003); Paul J. Heald, *Property Rights and the Efficient Exploitation of Copyrighted Works: An Empirical Analysis of Public Domain and Copyrighted Fiction Bestsellers*, 92 MINN. L. REV. 1031 (2008).

[20] Controlled digital lending may be well adapted to other types of library lending, for example of serials, or of audio or audiovisual works, or even archival materials. The same principles may also support other related activities such as users' donation of ebooks to libraries. The market dynamics and use scenarios that those situations raise are different enough that we believe they merit separate treatment in a subsequent paper. *See* Paul J. Heald, *The Demand for Out-of-Print Works and their (Un)Availability in Alternative Markets* (Illinois Public Law and Legal Theory Research Papers Series No. 14-31, 2014), http://papers.ssrn.com/abstract=2409118 (noting differences between the book markets and music markets).

[21] U.S. CONST., art. I, § 8, cl. 8.

Page    6

CONFIDENTIAL

INTARC00358249

## II.  THE LEGAL FRAMEWORK: FIRST SALE AND FAIR USE

Section 106 of the Copyright Act enumerates the basic bundle of rights granted to copyright owners: the exclusive right to control reproduction of the work, public distribution of the work, public performances, public displays, and creation of derivative works.[22] For individuals who want to lend or resell copies of works they have purchased, the rightsholder's exclusive right to control public distribution[23] is potentially problematic. But, the rights granted in Section 106 are limited by a number of statutory exceptions. Section 109, the statutory first sale doctrine, is one such provision.[24] It states that "[n]otwithstanding the provisions of section 106(3) [the public distribution right], the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."[25]

### A.  First Sale Doctrine

Entire industries and enterprises are built upon the first sale doctrine. Libraries were built on it. eBay relies on the provision when it permits users to sell copyright protected works through its site,[26] used record stores similarly rely on it to distribute copies they have acquired, college bookstores buy and sell used textbooks based on this doctrine, and libraries rely on it to lend physical books in their collections. The first sale doctrine balances the rights of copyright owners to distribute with those of purchasers to dispose of their copies as they wish. Without it, copyright holders could enforce rights in the "secondary market," which would impact selling, loaning, or gifting any copyrighted work. The rationale is that "once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."[27]

A critical limitation in the text of Section 109 is that it only allows the "owner of a copy" to "sell or otherwise dispose" of that particular copy. With distribution of physical copies, such as lending a print book to a library user, that framework works well enough. But to date, courts and legal scholars have

---

[22] 17 U.S.C. § 106.

[23] *Id.* ("copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending").

[24] 17 U.S.C. § 109 (2018). Although the first sale doctrine has been cast as primarily a matter of statutory law, it has a more expansive, common-law pedigree. *See* Aaron Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889, 912-22 (2011).

[25] *Id.* at § 109(a).

[26] *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1180 (9th Cir. 2011).

[27] *Quality King Distributors, Inc. v. L'anza Research Intern., Inc.*, 523 U.S. 135, 152 (1998).

Page   7

CONFIDENTIAL

INTARC00358250

struggled to identify what is a "particular" copy in the digital realm.[28] Is the transfer of a digital copy from one device to another the transfer of a particular copy or the creation of a new copy? While we wait for the courts to sort out this statutory interpretation issue, libraries that seek to utilize CDL should still be able to apply the first sale doctrine's rationale in the fair use context.

Much of the literature on first sale applied in the digital environment recognizes that library lending raises unique concerns requiring special treatment.[29] Though other use scenarios are certainly possible, we view library lending uses as special, as detailed in the sections below, and of all uses among the most likely to be justified under a fair use rationale. Indeed, several libraries have already engaged in limited CDL for years without issue, indicating perhaps a tacit acknowledgement of the strength of their legal position.[30] So, while the concept of digital first sale may have many potential applications, our focus is on a narrow and specialized use by libraries. We limit our analysis to non-commercial, controlled, digital lending by U.S. libraries of digitized copies of print books held in their collections.[31]

B. *Fair Use*

That brings us next to fair use. Fair use applies to uses implicating any or all of the copyright holder's exclusive rights, including both public distribution and the right to control reproductions.[32] Like the first sale doctrine, fair use is widely used and entire industries (e.g., home recording device manufacturers, search engines, filmmakers, publishers ) rely on it.[33] Described as an "equitable rule of

---

[28] *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 649 (S.D.N.Y. 2013).

[29] DMCA SECTION 104 REPORT, *supra* note 11, at 104-105 (addressing library specific issues); U.S. PATENT & TRADEMARK OFFICE, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 48, 50 (2016), https://perma.cc/RJ7Z-5REZ [hereinafter USPTO FIRST SALE STUDY], Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal, Capitol Records, LLC v. Redigi Inc., Case No. 16-2321-cv (2d Cir. 2016), https://perma.cc/79AL-649N; Michelle Wu, *Piece by Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use*, 36 LEGAL REF. SERV. Q. 51 (2017), https://doi.org/10.1080/0270319X.2017.1359059.

[30] Geoggrey A. Fowler, *Libraries Have a Novel Idea*, WALL ST. J. (June 29, 2010) https://perma.cc/H4H3-ZJXZ (describing efforts by the Internet Archive, Boston Public Library and others to engage in digital lending activities).

[31] Fair use is a US legal concept. Our analysis is limited to U.S. law.

[32] 17 U.S.C. § 107 (2018)(Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright.").

[33] *See, e.g.,* COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, FAIR USE IN THE U.S. ECONOMY: ECONOMIC CONTRIBUTION OF INDUSTRIES RELYING ON FAIR USE (2017), https://perma.cc/EGH4-N88D (summarizing industries reliant on fair use).

CONFIDENTIAL

INTARC00358251

reason," fair use was developed by the courts beginning in the 1800s.[34] In 1976 Congress codified the doctrine in Section 107 of the Copyright Act, which provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not copyright infringement."[35] Those examples are "illustrative and not limitative" however.[36] To apply the doctrine, Congress identified four non-exclusive factors that courts and users should consider:

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work."[37]

Those four statutory factors must not be "treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright."[38]  Ultimately, the fair use inquiry asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[39] The next section examines how this flexible doctrine of fair use, together with first sale, supports CDL.

## III.    Controlled Digital Lending as Fair Use

The basic concept of applying first sale principles to digital transactions is not new, either as justified under the first sale doctrine alone, as fair use, or through some combination of the two together. The U.S. Copyright Office, in 2001, studied the issue of "digital first sale," soliciting comments that exhibited a range of views about whether the first sale doctrine does or should be made to apply to digital transactions. In part because the use of digital technology was so new at

---

[34] *See Folsom v. Marsh*, 9. F. Cas. 342 (C.C.D. Mass. 1841); Matthew Sag, *The Pre-History of Fair Use*, 76 Brooklyn L. Rev. 1371 (2011).

[35] 17 U.S.C. § 107 (2018).

[36] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).

[37] 17 U.S.C. § 107 (2018)

[38] *Campbell*, 510 U.S. at 577–78 (1994).

[39] *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006).

Page   9

CONFIDENTIAL

the time, and despite hearing strong arguments and evidence from advocates on both sides of the issue, the Office concluded that it does not and should not apply to digital transactions, mostly because the technology in 2001 was unable to sufficiently guarantee the "owned to loaned" ratio. Instead, it was simply a good faith effort to "forward and delete" copies on a case-by-case basis.[40] More recently, the United States Department of Commerce studied the issue itself and released a white paper in 2016 expressing its own conclusion: the technology and licensing markets were not yet adequately developed, leading it to adopt a "wait and see approach."[41] Scholarship on "digital first sale" and related concepts has flourished in recent years.[42] And most recently *Capitol Records v. ReDigi, LLC,* has raised the question of how these doctrines apply to a commercial, digital resale market for mp3s.[43]

Again, the literature on digital first sale recognizes that library most likely will require special treatment.[44] Other use scenarios are possible, and, as detailed below, we view library lending uses as special. And we also believe that these library uses, of all the varying digital uses, are among the most likely to be justified under a fair use rationale. Several libraries have already engaged in limited CDL for years without issue.[45] It can be inferred that this fact indicates a

---

[40] DMCA Section 104 Report, *supra* note 11, at 80, 90 ("[W]hen the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement" and "we recommend no change to section 109 at this time").

[41] USPTO First Sale Study, *supra* note 29, at 58 (examining a wide range of potential applications, including library uses, but ultimately concluding that "we cannot at this time recommend extending the first sale doctrine to apply to digital transmissions of copyrighted works.").

[42] For some representative work, see Aaron Perzanowski & Jason Schultz, *Digital Exhaustion,* 58 UCLA L. Rev. 889 (2011); R. Anthony Reese, *The First Sale Doctrine in the Era of Digital Networks,* 44 B.C. L. Rev. 577, 584 (2003); Victor F. Calaba, *Quibbles 'n Bits: Making A Digital First Sale Doctrine Feasible,* 9 Mich. Telecomm. Tech. L. Rev. 1 (2002).

[43] 934 F. Supp. 2d 640 (2013), on appeal, Case No. 16-2321-cv (2d Cir. 2016). The district court in this case concluded that neither first sale nor fair use applied, though its analysis on the latter was abbreviated and the case is currently on appeal before the Second Circuit Court of Appeal.

[44] DMCA Section 104 Report, *supra* note 11, at 104-105 (addressing library specific issues); USPTO First Sale Study, *supra* note 29, at 48, 50; Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal, Capitol Records, LLC v. Redigi Inc., Case No. 16-2321-cv (2d Cir. 2016), https://perma.cc/79AL-649N; Michelle Wu, *Piece by Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use,* 36 Legal Ref. Serv. Q. 51 (2017), https://doi.org/10.1080/0270319X.2017.1359059.

[45] Geoggrey A. Fowler, *Libraries Have a Novel Idea,* Wall St. J. (June 29, 2010) https://perma.cc/H4H3-ZJXZ (describing efforts by the Internet Archive, Boston Public Library and others to engage in digital lending activities).

Page 10

CONFIDENTIAL

INTARC00358253

tacit acknowledgement of the strength of their legal position. Our focus is on these narrow and specialized use by libraries. Again, we limit our analysis to non-commercial, controlled, digital lending by U.S. libraries of digitized copies of print books held in their collections.[46]

In applying fair use, not every factor in the analysis will be highly relevant in every situation.[47] As we will show, for CDL, the first factor, "purpose and character of the use," and the fourth factor "effect on the potential market" are the most significant.

### A.    The Purpose and Character of the Use

Under the first fair use factor, "purpose and character of the use," two characteristics of CDL stand out, weighing this factor in favor of fair use: 1) CDL's purpose aligns closely with the statutory purpose of the first sale doctrine, and 2) the noncommercial, temporary, character of the use to fulfill research and learning purposes are aligned with the statutory examples of fair use as well as the underlying purposes of the copyright system to disseminate knowledge.

### 1.    CDL's Alignment with the Statutory Purpose of First Sale

The core concept with CDL is that it closely mimics the economic transaction that Congress has already provided for through the first sale doctrine under Section 109. The purpose of the use with CDL is to fulfill the statutory objectives and balance of rights already identified by Congress in Section 109, effectuating that balance considering a new technological use not contemplated at the time Section 109 was enacted.[48] The crux of the proposition is that the purpose and intent of Section 109 should positively influence the "purpose and character" assessment in the fair use analysis.[49]

---

[46] Fair use is a US legal concept. Our analysis is limited to U.S. law.

[47] *See Kienitz v. Sconnie Nation LLC,* 766 F.3d 756, 759 (7th Cir. 2014) (in a case involving a t-shirt that used a mayor's official photograph in protest to his decision to shut down their annual block party, dismissing two of the four factors as having not much "bite in this litigation," "[t]he other statutory factors don't do much in this case.").

[48] Section 109(a) was enacted in 1976. Congress has requested study of potential changes, but has not substantially modified its text since. See Pub. L. 105–304, title I, § 104, Oct. 28, 1998, 112 Stat. 2876, requiring a study on Section 109 (and 117) and their effect on electronic commerce and associated technology.

[49] For a more detailed discussion, see Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use,* 59 J. COPYRIGHT SOC'Y U.S.A. 453 (2012) (discussing at length the interaction between Section 108—library and archives exceptions—with fair use). *See also at* Jonathan Band, *The Impact of Specific Exceptions on Fair Use: An Update,* 63 J. COPYRIGHT SOC'Y. U.S.A. 325 (2016).

Page  11

CONFIDENTIAL                                                          INTARC00358254

The Copyright Act does not address how fair use should interact with other provisions of the law.[50] In fact, rightsholders have in some cases argued that if a specific statutory exception exists, that specific exception should preclude application of the more general doctrine of fair use. When raised, courts have largely rejected that argument. For example, in *Sega Enterprises Ltd. v. Accolade, Inc.*,[51] Sega argued that the presence of a specific statutory exception regarding computer programs (Section 117) precluded Accolade from asserting a fair use defense for copying and disassembling Sega's computer program. The Ninth Circuit found Sega's argument "verges on the frivolous."[52] The court instead construed Section 117 and fair use together, the former defining a "a narrow category of copying that is lawful per se" and the latter establishing a broader "defense to an otherwise valid claim of copyright infringement." "The fact that Congress has not chosen to provide a per se exemption to section 106 for disassembly does not mean that particular instances of disassembly may not constitute fair use."[53]

As a matter of copyright policy, the presence of a specific copyright exception (or, in some cases, other provisions of federal law) provides persuasive evidence of the kinds of purposes that should be favored in the fair use assessment.[54] What better evidence of the types of uses that align with the goals of the copyright than those most similar to ones Congress has specifically authorized? While not extensively litigated, a number of cases indicate that this is the right approach, which we review here to give a sense of the strength of this position.

In *Authors Guild v. HathiTrust*, for example, one of the uses that the Authors Guild claimed was infringing was HathiTrust's digitization and full-text access to millions of volumes of in-copyright books for print-disabled users. In assessing HathiTrust's fair use defense, the Second Circuit looked closely at legislative history[55] as well as other provisions of the law that spoke to access for the disabled. The Court cited the Americans with Disabilities Act as evidence of "Congress reaffirm[ing] its commitment to ameliorating the hardships faced by

---

[50] One exception is Section 108(f)(4), which provides that the provisions of that nothing in that section, addressing specific library and archives preservation and access copying, "in any way affects the right of fair use as provided by section 107 [fair use]."

[51] 977 F.2d 1510, 1521 (9th Cir. 1992). The plaintiffs in *Authors Guild v. HathiTrust*, 755 F.3d 87, 94 (2d Cir. 2014) raised a similar argument with respect to the role of Section 108 and 107.

[52] *Sega Enters. Ltd. v. Accolade,Inc.*, 977 F.2d 1510, 1520-21 (9th Cir. 1992).

[53] *Id.* at 1521.

[54] Band, *supra* note 49, at 459.

[55] *HathiTrust*, 755 F.3d at 102.

CONFIDENTIAL

INTARC00358255

the blind and print disabled."[56] The court also relied on Section 121 of the Copyright Act, which permits "authorized entities" to make accessible copies for the print disabled, as illustrating "Congress's intent that copyright law make appropriate accommodations for the blind and print disabled."[57]

Some courts have pointed to broader policy objectives, both within and outside of the copyright act, as influencing the purpose and character analysis. For example,[58] in *Swatch Group Management Services Ltd. v. Bloomberg, L.P.*, Swatch argued that Bloomberg infringed its rights when it recorded and distributed a private conference call reporting earnings information from a foreign company.[59] Ultimately concluding that the use was fair, the Second Circuit cited Securities and Exchange Commission ("SEC") public disclosure regulations as significant in assessing the purpose and character of Bloomberg's use. The court found that Bloomberg's purpose in obtaining and disseminating the recording at issue was to make important financial information about Swatch Group available to investors and analysts. "That kind of information is of critical importance to securities markets. Indeed, as Bloomberg points out, the SEC has mandated that when American companies disclose this kind of material nonpublic information, they must make it available to the public immediately. *See* Regulation FD, 17 C.F.R. § 243.100."[60]

The U.S. Copyright Office has also cited specific copyright exceptions as positively influencing the fair use assessment. Under Section 1201 of the copyright act, every three years the Office is required to make recommendations about proposed exceptions to Section 1201's prohibition on circumvention of technological protection measures.[61] Under that provision, the Office must assess for each proposed exception whether users of the class of works are likely to be adversely affected by the anti-circumvention provision in their "ability to make noninfringing uses."[62] The Office has traditionally provided in-depth analysis of the lawfulness of the proposed uses. In its 2015 recommendations, the Office pointed to the basic purpose of other provisions as favorably affecting the

---

[56] *Id.*

[57] *Id.*

[58] Another example is *Am. Inst. of Physics v. Winstead PC*, 3:12-CV-1230-M, 2013 WL 6242843, at *9 (N.D. Tex. Dec. 3, 2013) (copying of scientific articles as evidence of prior art in patent examination weighs the purpose and character assessment in favor of fair use in part because "Defendants' copying of NPL contributes to an efficient patent system").

[59] *Swatch Group Mgt. Servs Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 82 (2d Cir. 2014).

[60] *Id.*

[61] 17 U.S.C. § 1201 (2018).

[62] 17 U.S.C. § 1201(a)(1)(c).

Page 13

purpose and character assessment under the first fair use factor. Those include looking to Section 1201 exceptions for interoperability, Section 110 exceptions for nonprofit public performances and teaching, and Section 117 exceptions for computer program adaptation.[63]

For CDL, the purpose of the use is one that intends to mirror the basic purpose of first sale as embodied in Section 109. In *Kirtsaeng v. John Wiley & Sons, Inc.*, the Supreme Court recognized, "for at least a century the "first sale" doctrine has played an important role in American copyright law."[64] It has a "common-law doctrine with an impeccable historic pedigree," that limits a rightsholders ability to restrain subsequent dispositions, facilitating competition "to the advantage of the consumer"[65] and freeing the courts "from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods."[66]

As technology and markets have shifted, libraries employing CDL seek to use technology to hold up that same balance of rights while allowing users to access materials in formats that are most meaningful to them today. CDL promotes consumer choice in formats and platforms, while avoiding dragging courts into the thicket of restrictions and rights conflicts that would require extensive litigation to resolve.[67] CDL also preserves the balance of rights carved out by Congress through Section 109 by requiring libraries to have legitimately acquired their own copies and limiting access to digital surrogate copies on terms consistent with ownership of the physical copy. Under CDL, if one copy is purchased, a library can only lend one copy—either print or physical—out to a user at a time.

As appealing as the pure application of the principles of first sale to digital distribution may be, we recognize that standing alone, such uses may not tilt the "purpose and character" analysis in favor of the use in all circumstances. There are no cases on point directly addressing the interaction between Section 109 and

---

[63] U.S. COPYRIGHT OFFICE, SECTION 1201 RULEMAKING: SIXTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION (2015), https://www.copyright.gov/1201/2015/registers-recommendation.pdf.

[64] *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 539 (2013). See also *Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. __, 137 S. Ct. 1523 (2017) (noting the importance of first sale in the patent context as well).

[65] *Id.*

[66] *Id.*

[67] *See* Molly Shaffer Van Houweling, *Author Autonomy and Atomism in Copyright Law*, 96 VA. L. REV. 549 (2010); *See also Random H., Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), aff'd, 283 F.3d 490 (2d Cir. 2002) (resolving contractual dispute between publisher and author over ownership of e-book rights).

Page 14

CONFIDENTIAL

INTARC00358257

fair use. There are a few cases in the commercial context that come close, however. Those cases are primarily negative, though as we explain below we believe they are distinguishable from CDL applications, and one case is currently on appeal. First, *Capitol Records, LLC v. ReDigi Inc.*, a district court decision currently on appeal. Capitol sued for copyright infringement over ReDigi's online service that facilitated resale of used digital music files. ReDigi's MediaManager software would allow an owner of a music file to upload their files to a "Cloud Locker," deleting the copy from the user's device and saving a copy to the cloud. Upon sale through the ReDigi marketplace, the file would be downloaded to the purchaser and simultaneously deleted from the Cloud Locker.[68] The district court in that case assessed both ReDigi's fair use defense and a defense based on Section 109. It did not, however, assess the two provisions together. On Section 109's direct applicability, the court noted that the provision "by its own terms [is] limited to assertions of the public distribution right. . . ReDigi's service violates Capitol's reproduction right [and so] the first sale doctrine does not apply. . . ."[69]

For fair use, the *ReDigi* court was fairly dismissive of the purpose factor, focusing almost exclusive on the commerciality of the program. The analysis was brief and considered almost none of the arguments laid out above. In honing in on the commerciality of the use, the court found that the purpose and character of the use weighed against a fair use finding.[70] The court found the use to be "an essential component of ReDigi's commercial enterprise," and that the use was not "transformative."[71] Overall, the court concluded that fair use did not apply. While *ReDigi* is in some ways factually analogous to CDL, the district court's fair use analysis was so cursory and the future of that case so uncertain (the case is currently on appeal and awaiting a decision from the Second Circuit Court of Appeals) that its direct application for CDL remains far from clear.[72]

In a few other cases, defendants have tried unsuccessfully to employ an analogous "format shifting" defense, wherein physical copies were purchased, and digital access metered to users based on the number of copies purchased. For instance, in *Wall Data Inc. v. Los Angeles County Sheriff's Dept*, the L.A. Sheriff's Department purchased licenses for 3,663 copies of Wall Data's software. To make

---

[68] Capitol Records, LLC v. *ReDigi Inc.*, 934 F. Supp. 2d 640, 645-46 (S.D.N.Y 2013) (The court rejected ReDigi's argument that "technological change has rendered its literal terms ambiguous" and so the court should construe the statute under Section 109 in favor of its use.).

[69] *Id.* at 655.

[70] *Id.*

[71] *Id.*

[72] *Capitol Records, LLC v. ReDigi Inc.*, Case No. 16-2321-cv (2d Cir. 2016).

Page 15

CONFIDENTIAL

INTARC00358258

installation more efficient, the Sheriff's Department installed the software on all department computers (6,007 in total), but limited access to the software to a number of user accounts less than the total licenses purchased. In rejecting the Sheriff Department's fair use defense, the court did not explicitly consider first sale in its assessment, but focused instead on a few key characteristics: the use was not "transformative,"[73] the use did not generally advance "public knowledge," or otherwise "enrich[] the general public through access to creative works," and the use was considered commercial, largely because it was made in effort to save the expense of purchasing an authorized copy from the known vendor.[74]

More recently, in *Disney Enterprises, Inc. v. VidAngel, Inc.*, Disney sued VidAngel over its streaming video service, which provided access to edited copies of Disney films. For each user, VidAngel would purchase a physical DVD on behalf of the user, which VidAngel then copied, edited and streamed to the user online. Like in *Wall Data*, the court did not consider how the principles of the first sale doctrine help establish the "purpose and character" of the use under fair use. VidAngel conceded that its use was commercial, and the court did not consider the use to be transformative. Like with *Wall Data*, the streams were provided for videos with known copyright owners who themselves license rights to competing streaming services.[75]

One way these cases are distinguished is just that the issue was not raised; except for *ReDigi* (where the issue was only obliquely argued), first sale and the purpose and character assessment were not raised by the litigants or addressed by the court. The argument was not presented. Another, more significant distinguishing factor is that all three cases involved commercial uses, both in the specific application and in connection with a broader, functioning market place for the works used. This brings us to the second characteristic of CDL that we believe tilts the first factor analysis decidedly in favor of fair use: Libraries engaging in CDL are doing so for non-commercial research and learning purposes.

### 2.    CDL's Non-commercial Research and Learning Purpose

Unlike commercial resale or streaming markets, library use of CDL is non-commercial and designed to promote public benefits by facilitating research and learning. The fair use statute explicitly instructs courts to look at "whether such

---

[73] *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 778–79 (9th Cir. 2006).

[74] *Id.*

[75] *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861-62 (9th Cir. 2017).

Page  16

INTARC00358259

use is of a commercial nature or is for nonprofit educational purposes."[76] And the Supreme Court has explained, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."[77]

Libraries engaging in CDL, as we envision it, will not generate monetary profit. Given the costs of digitizing, building and maintaining the technical infrastructure necessary to lending digitally and controlling physical copies, and personnel time used to restrict print copies when its digital equivalent is circulating, libraries may spend considerable sums with no compensation. To be sure, libraries and their users would stand to benefit from CDL. We would not propose it if they did not. But under the CDL model we envision, libraries have already paid the customary price, and CDL limits access to a work to one person at a time. Further, when 20th century books are in question, no market has emerged for digital access to the majority of these books, meaning that no digital access would otherwise be possible.

Libraries engaging in CDL are doing so to enable broad availability of knowledge for the purpose of promoting research, scholarship and learning. These are uses specifically mentioned as examples of fair use by Congress in the statute,[78] and are at the core of the constitutional purpose of the copyright system. Library lending is a critical conduit for those activities, which courts have recognized. For example, in a 1973 case before the U.S. Court of Claims, a non-profit library's role in supporting scientific research by providing copies of articles to researchers was held to weigh strongly in favor of fair use.[79] Even

---

[76] 17 U.S.C. § 107 (2018).

[77] *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562 (1985). *See also Sundeman v. Seajay Socy., Inc.,* 142 F.3d 194, 203 (4th Cir. 1998) (finding that where an archives provided a copy of an unpublished manuscript to a researcher, the purpose of the use favored fair use where there was no commercial or exploitative motive for the use).

[78] 17 U.S.C. §107. As stated above, most courts have addressed these examples as merely illustrative. A handful of courts have indicated that uses within these categories means that the "purpose and character" analysis presumptively falls in favor of fair use, though that presumption has not been adopted by most circuits. *See* NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) ("[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107.") (quoting Wright v. Warner Books, Inc., 953 F.2d 731, 736 (2d Cir. 1991)).

[79] *Williams & Wilkins Co. v. United States,* 487 F.2d 1345, 1354 (Ct. Cl. 1973), aff'd by an equally divided court, 420 U.S. 376 (1975). In this case Williams & Wilkins challenged the National Library of Medicine's photocopying practices for medical researchers. The U.S. Court of Claims observed the significance that "NIH and NLM are non-profit institutions, devoted solely to the advancement and dissemination of medical knowledge which they seek to further by the challenged practices, and are not attempting to profit or gain financially by the photocopying . . . the medical researchers who have asked these libraries for the photocopies are in this particular

Page 17

CONFIDENTIAL

INTARC00358260

much more recently in a case in which the facts indicated an otherwise uncompelling fair use assertion, the non-commercial educational purpose of library distribution was found by the 10th Circuit Court of Appeals to be "at the heart of the protection of fair use."[80]

Courts have often considered the broader public benefit of the use as well,[81] favoring uses that "typically involve[] the development of art, science, and industry."[82] CDL contributes substantial broad benefits to public knowledge by allowing the public, for the first time, to access particular materials digitally. For public libraries, especially when these collections have been purchased by tax dollars, it is in the public's best interest to have modern access to these works, which were purchased for their benefit.

In summary, we view the purpose and character of the use for CDL to be favored because the purpose is aligned with the principles of another statutory exception (section 109), while the use itself is temporary, non-commercial and leading to important public benefits in research and learning.

### 3.  Concerns

Our goal with this paper is to give libraries and their counsel as complete a view of the law regarding CDL as we can. So, it's fair to note a couple of points of concern under the first factor analysis. The first is, despite the strong trend found in the above cases favoring library and educational use, there are a limited number of library fair use cases from which to draw guidance. These include some cases involving academic or scholarly uses in which courts have held that the first factor did not favor the use.[83] Although libraries rely on fair use routinely, the small number of cases means that when applying a doctrine based

---

case (and ordinarily) scientific researchers and practitioners who need the articles for personal use in their scientific work . . . On both sides–library and requester–scientific progress, untainted by any commercial gain from the reproduction, is the hallmark of the whole enterprise of duplication. . . . This is important because it is settled that, in general, the law gives copying for scientific purposes a wide scope."*Id.*

[80] *Diversey v. Schmidly*, 738 F.3d 1196, 1203 (10th Cir. 2013) (ultimately concluding that the reproduction and distribution of a confiscated, unpublished dissertation by university officials was not fair use).

[81] *Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1523 (9th Cir. 1992).

[82] *Sundeman v. Seajay Socy., Inc.*, 142 F.3d 194, 203 (4th Cir. 1998) (citing *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966)).

[83] *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) (professors' verbatim copying of an academic work was not fair use, partly because "the profit/nonprofit distinction is context specific, not dollar dominated"; a professor can "profit" through citation and enhanced academic reputation); *see also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117–18 (9th Cir. 2000).

Page 18

CONFIDENTIAL

INTARC00358261

on caselaw development, there is some uncertainty. This is a general caution, and could be said for any new application of fair use to library practice.[84] Further, in many ways this is a testament to the low level of risk libraries generally face; libraries seldom attract lawsuits, and on CDL specifically, there are no lawsuits that reflect negatively on the core principles of CDL.

The second and more considerable point of concern is that CDL is not clearly transformative. In recent years, U.S. courts have focused increasingly on whether an alleged fair use is "transformative,[85]" which is, if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message."[86] Use of a quotation from an earlier work in a critical essay to illustrate the essayist's argument is a classic example of transformative use. In mass digitization cases involving books—*Google Books and HathiTrust,* for example—courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses such as text and data mining.

However, even if CDL is not transformative,[87] we believe the purpose and character still strongly weighs in favor of a fair use finding. The courts have been clear that "[w]hile a transformative use is generally more likely to qualify as fair use, 'transformative use' is not absolutely necessary for a finding of fair use.'"[88] In *HathiTrust,* for example, the Second Circuit found that libraries providing full-text access to print-disabled users was not transformative.[89] "The Authors state that they 'write books to be read (or listened to).' . . . By making copies available in formats accessible to the disabled, [HathiTrust] enables a larger audience to read those works, but the underlying purpose of [HathiTrusts's] use is the same as the authors original purpose."[90]

Nevertheless, the court concluded that that the use was fair, and favored under the first fair use factor in part because of is alignment with other

---

[84] *See* Pamela Samuelson, *Unbundling Fair Uses*, 77 FORDHAM L. REV. 2537, 2580 (2009) (reviewing the bulk of fair use caselaw to date and observing that "[t]here is relatively little caselaw on fair use in educational or research settings.").

[85] *See* Patricia Aufderheide & Peter Jaszi, *Reclaiming Fair Use* 86-98 (2d Ed. 2018) (describing ascendancy of the transformative use analysis).

[86] *Campbell v. Acuff Rose Music, Inc.,* 510 U.S. 569, 579 (1994).

[87] There was no agreement among the *Statement* drafters on this point, which is why it takes no position on this matter.

[88] *Authors Guild, Inc. v. HathiTrust,* 755 F.3d 87, 102 (quoting from *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.,* 756 F.3d 17, 84 (2d Cir. 2014) and *Campbell,* 510 U.S. at 579).

[89] *HathiTrust,* 755 F.3d at 101.

[90] *Id.*

Page 19

statutorily favored purposes under Section 121. The court in *Swatch* similarly expressed doubts about whether the use was transformative, but nevertheless concluded that the public benefit and information dissemination purposes—aligned as the Court noted with SEC regulatory guidance—was a favored purpose.[91]

*HathiTrust* is particularly instructive for CDL because like HathiTrust, the use here is aligned with other Congressionally-sanctioned information policies, the use is non-commercial, and it is aimed at opening up access to readers for research and learning purposes. "Transformative use" is a critical part of the fair use assessment, but is not necessary. Indeed, the vast majority of routine academic, educational, and personal study uses are likely not transformative—multiple copies made for classroom use, reproductions of a work for home study, replication of a work into a different format for later consultations— they all happen in large numbers every day and are in most cases not "transformative" but nonetheless permissible. In cases such as with CDL, where the purpose of the use so well aligns with the overall purposes of the Act, transformative use considerations should not override.

### B. *The Nature of the Work*

The second fair use factor, "the nature of the copyrighted work," has rarely played a significant role in the overall fair use assessment. Several recent cases have explicitly denied its significance, finding variously that it may be "of limited usefulness,"[92] is "rarely found to be determinative,"[93] and is "of relatively little importance" in the case at hand.[94] Traditionally, however, courts have used the second factor to examine whether the work used falls at the "core of intended copyright protection"[95] or closer to its fringes.  Use of works of a more scientific or scholarly nature have weighed in favor of fair use;[96] "the law generally

---

[91] *Compare Swatch Group Mgt. Servs Ltd. v. Bloomberg L.P.*, 742 F.3d 17, 29 (2d Cir. 2014) (Bloomberg did not transform Swatch's work), amended and superseded by Swatch Group Mgt. Services Ltd. v. Bloomberg L.P., 756 F.3d 73, 85 (2d Cir. 2014) (Swatch's use gave it an "arguably transformative" character).

[92] *HathiTrust*, 755 F.3d at 98.

[93] *Id.* at 102 (quoting *Davis v. Gap, Inc.*, 246 F.3d 152, 175 (2d Cir.2001).

[94] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1270 (11th Cir. 2014).

[95] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994).

[96] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 925 (2d Cir. 1994) (use of scientific journal articles was favored under the second factor); *Penelope v. Brown*, 792 F. Supp. 132, 137 (D. Mass. 1992) (use of scholarly work favored); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1270 (11th Cir. 2014) (informational educational works may be favored for use under second factor, *but* one

Page 20

CONFIDENTIAL

INTARC00358263

recognizes a greater need to disseminate factual works than works of fiction or fantasy."[97] Use of works that incorporate significant unprotectable elements is also favored.[98] Courts have found that the second factor weighs against the use for unpublished works for which the owner intentionally withheld publication in anticipation of some later public release. Use in those cases risks undercutting the economic incentives that are at the core of the copyright system by allowing others to scoop the initial publication of the work. Similarly, courts have found that use of out-of-print works that are unavailable in the marketplace would tend to weigh in favor of the use under the second factor.[99]

For CDL, application of the second factor in the abstract is difficult. Library collections include a wide variety of works for which CDL may be used, some of which will fare more or less favorably under the second factor. Given the limited usefulness of this factor in the overall fair use assessment, we do not believe the nature of the work should be determinative. Nevertheless, some considerations about the nature of the selected works may be helpful for libraries that seek to bolster their overall fair use assertion. These considerations may include applying CDL to works that are out of print, either in print or digitally; of a scholarly or scientific nature, as opposed to popular literature or fiction works; compilations of data (e.g., city directories); works with significant unprotectable elements (e.g., genealogical materials). We offer some operational suggestions about these practices in Part IV of this paper.

### C. *The Amount and Substantiality of the Work Used*

The third factor looks at the "amount and substantiality of the work used." More than any other factor, the assessment under the third factor has tended to gravitate toward numerical guidelines, though courts have shunned their use.[100] The clear implication is that the more content of the original used, the less likely

---

should look closely at "evaluative, analytical, or subjectively descriptive material" in such a work which may rebalance the second factor either neutrally or against the use).

[97] *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 563 (1985).

[98] *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1526 (9th Cir. 1992).

[99] *Harper & Row,* 471 U.S. at 553 ("If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it.") (quoting S. Rep. No. 94-473, at 64 (1975)); *Hofheinz v. A & E Television Networks,* 146 F. Supp. 2d 442, 447–48 (S.D.N.Y. 2001) (use of trailer for a film released nearly 50 years earlier and not available on the market was favored under the second factor); *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253, 1264 n.8 (2d Cir. 1986) ("[a] key, though not necessarily determinative, factor in fair use is whether the work is available to the potential user"); *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.,* 533 F.3d 1287, 1313–14 (11th Cir. 2008). *But see Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522, 1533 (S.D.N.Y. 1991).

[100] *Cambridge Univ. Press v. Patton,* 769 F.3d 1232, 1272 (11th Cir. 2014).

Page 21

the use is to be fair; lengthier reuse would tend to compete with the original. However, courts have clearly tied the assessment under the third factor to the purpose and character assessment.[101] Courts held on many occasions that use of an entire work, when necessary to fulfill a valid purpose, does not weigh against the use.[102] What matters is how the amount used aligns with an acceptable purpose under the first factor. "The extent of permissible copying varies with the purpose and character of the use."[103]

For CDL, the purpose of the use is to enable full-text access to books, so readers can read them online. Arguably, that means the entire work is used. However, CDL does place limits on use of the work; it imposes temporal limits on use (loans are not indefinite) and calls for technological controls on copying that limit further dissemination. These limitations are in many ways similar, for example, to situations in which search engines have been found to have made fair use with low-resolution images.[104] Technical restrictions on reuse of the files limit their ability to be reused for purposes beyond those intended by the lending library. So, the third factor should be neutral or weigh in favor of the use because copying the entire work is necessary for the purpose of lending, and controls on reuse effectively place limitations on the "amount" of the work the user obtains access to.

---

[101] *Authors Guild, Inc. v. HathiTrust,* 755 F. 3d 87, 96 (2d Cir. 2014) ("In weighing this factor, we assess the quantity and value of the material used and whether the amount copied is reasonable in relation to the purported justification under the first factor.").

[102] *See, e.g., Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 460 (1984) ("the fact that the entire work is reproduced … does not have its ordinary effect of militating against a finding of fair use"); *Bouchat v. Baltimore Ravens Ltd. Partn.,* 737 F.3d 932, 943 (4th Cir. 2013), as amended (Jan. 14, 2014) (use of entire work allowable to achieve permissible purpose); *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009); *Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 629 (7th Cir. 2003) ("there is no per se rule against copying in the name of fair use an entire copyrighted work if necessary"); *Sundeman v. Seajay Socy., Inc.,* 142 F.3d 194, 206 (4th Cir. 1998) (amount and substantiality factor weighed in favor when copy provided to researcher was complete copy because for her scholarly work she "needed access to either the original or an entire copy").

[103] *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S.569, 586-87 (1994). *See also Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 613 (2d Cir. 2006) (finding the third factor favored the use when displaying "reduced versions of the original images and intermingled these visuals with text and original graphic art." "[C]ourts have concluded that [copying an entire work] does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image. . . . Adopting this reasoning, we conclude that the third-factor inquiry must take into account that the "the extent of permissible copying varies with the purpose and character of the use.").

[104] *See Perfect 10, Inc. v. Amazon. com, Inc.,* 508 F. 3d 1146 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.,* 336 F. 3d 811 (9th Cir. 2003).

Page 22

CONFIDENTIAL

INTARC00358265

### D.    Market Harm

The fourth fair use factor is tied closely together with the first factor analysis. It asks courts to examine "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."[105] The fourth factor analysis looks at "not only the . . . market harm caused by the particular actions of the alleged infringer," but also the market harm that would result from "unrestricted and widespread conduct of the [same] sort."[106]

In conducting the analysis, courts have looked at not only market effects for the particular work in the format used, but also at effects on the much broader set of potential licensing markets that may have been usurped by the use.[107] The scope of the relevant licensing markets is not unlimited, however. Courts have acknowledged that examining licensing markets introduces a degree of circularity; in theory the fact that a use was made at all indicates a potential licensing market that the rightsholder could have exploited. So, courts have limited the analysis to only licensing markets that are "traditional, reasonable, or likely to be developed."[108]

Like the first factor analysis, the fourth factor is at its core tied back to the underlying purpose of the copyright system; when examining potential market substitution, the question is would the use "cause *substantial* economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the rightsholders'] incentive to publish the work?"[109]

For CDL, the primary reason why the market harm factor weighs in favor of the use is because the market effect of CDL is nearly identical to the market effect already favored under the first sale doctrine. For the works at issue, the controls that CDL requires ensure that the use closely matches the market effect that the rightsholder was already compensated for upon first sale of the book. A secondary consideration, but one that we feel is powerful and where the case for CDL is strongest, that at least for the 20th Century books which make up the bulk

---

[105] Authors Guild v. *Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015).

[106] *Campbell*, 510 U.S. at 590 (internal quotation marks and alteration omitted).

[107] *Bill Graham Archives*, 448 F.3d at 614.

[108] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) ("It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor.").

[109] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014).

Page 23

of materials that would benefit from CDL, there is not a functioning market in place to be harmed.

### 1. The "First Sale" Market Effect

The "market harm" analysis is tied closely together with assessment of the purpose of the use under the first factor, informing how courts should view the market purportedly being harmed in connection with the one(s) a copyright owner intends to enter and has a right to control. For example, the Copyright Act does not grant a copyright owner the right to control negative commentary or criticism of its work,[110] uses favored under the first factor. If criticism results in lost sales, is not the type of harm recognized under the fourth fair use factor.

The first sale doctrine itself is intended as a limit on the scope of markets that rightsholders can control. After the "first sale" of the work, rightsholders may no longer place controls on resale, lending, or other restraints on alienation of copies transferred.[111] So, while CDL may have some effect on a potential market for the work—a user may theoretically borrow a digital copy that is derived from one purchased in print by a library rather than pursue the rightsholder to purchase a digital license—such uses are within the balance of use rights granted to owners of copies. Thus, CDL does not negatively affect the market any differently than the uses already permitted by libraries when lending books physically.

The six controls identified in the CDL *Statement* identify specifically the ways in which CDL achieves the same market effect that physical "first sale" transactions do. The first two controls are that libraries should (1) "ensure that original works are acquired lawfully," and (2) "apply CDL only to works that are owned and not licensed" meaning that books must have been lawfully acquired and not subject to additional restrictions, just as a library would be required to lawfully acquire a physical book—typically, through a purchase in which the rightsholder is compensated—so would a library engaging in CDL be required to ensure the same.

---

[110] *Campbell,* 510 U.S. at 590.

[111] *See, e.g., Disney Enterprises, Inc. v. Redbox Automated Retail, LLC,* CV 17-08655 DDP (AGRx), 2018 WL 1942139, at *6 (C.D. Cal. Feb. 20, 2018) ("Disney's copyrights do not give it the power to prevent consumers from selling or otherwise transferring the Blu-ray discs and DVDs contained within Combo Packs. Disney does not contend otherwise. Nevertheless, the terms of both digital download services' license agreements purport to give Disney a power specifically denied to copyright holders by § 109(a). RedeemDigitalMovies requires redeemers to represent that they are currently "the owner of the physical product that accompanied the digital code at the time of purchase," while the Movies Anywhere terms of use only allow registered members to "enter authorized ... Digital Copy codes from a Digital Copy enabled ... physical product that is owned by [that member].").

Page 24

The third and fourth CDL controls are that libraries should (3) "limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio)," and (4) "lend each digital version only to a single user at a time just as a physical copy would be loaned." These controls ensure that libraries lending digital copies don't get more than what they bargained for. A library that owns a single copy of a book could only lend a single copy out at a time. If the digital version is checked out and viewed by a patron, the corresponding physical version must be restricted and controlled (e.g., placed in locked stacks or taken out of circulation entirely). Likewise, mimicking the restraints on physical materials in which only one user can typically check out and read a physical book at a time, only one user would be permitted to check out and read the digital book at any given time.

Finally, the fifth and sixth controls are that libraries should (5) "limit the time period for each lend to one that is analogous to physical lending," and (6) "use technical restrictions to prevent copying and redistribution." Those controls, especially the deployment of DRM, ensure that just as with physical books, the digital copies are effectively still in control of the library and cannot (without illegal action on the part of the user) proliferate into additional copies.

From a single transaction standpoint, the library making the CDL use must still have acquired legitimately the book in physical format before lending. What CDL does is allow a change of the format in which that lend is made. When the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one. Similarly, for the aggregated effect question—what if everyone did it?—the analysis is not radically different; any library engaging in CDL would still be required to own a copy of the work, meaning that the market effect would look roughly the same.

We acknowledge that these controls do not address the full range of market concerns raised by others. In the context of broader debates about digital first sale, the primary objections raised by rightsholders were related to market disruption. The two primary collections of these objections are the 2001 U.S. Copyright Office report addressing digital first sale, and a similar and updated 2016 U.S.P.T.O report.[112] In their respective context, both reports were intended to advise Congress on whether to pass new legislation specifically enacting a new digital first sale law. And, in the few cases where these issues have been raised in litigation (most recently in cases involved mp3 sales and streaming

---

[112] DMCA SECTION 104 REPORT, *supra* note 11; USPTO FIRST SALE STUDY, *supra* note 29.

CONFIDENTIAL

INTARC00358268

videos) courts have found it necessary to address the issues raised in those reports.[113]

Those reports raise three additional concerns that may differentiate digital lending from physical lending, that: 1) digital distribution eliminates transactional friction inherent in physical loans; 2) digital copies don't degrade like physical works; and 3) digital distribution raises security and piracy risks. We address each below. Ultimately, we conclude that none should pose an obstacle to well-designed controlled digital lending system. While we do not believe libraries implementing CDL must respond to these concerns, a conservative CDL system may take these factors into account. We identify ways to do so in Part IV of this paper.

>    a)    *"Digital distribution eliminates transactional friction inherent with physical loans."*

Movement of a copy from one location to another takes time; vehicles must drive and deliver copies, acting as a "natural brake on the effect of resales on the copyright owner's market."[114] For libraries, it takes time for returned books to make their way back on to shelves, and to check them out again to the next patron. For loans out to patrons in other locations, interlibrary loan adds an additional layer of delay. For digital transactions factors such as time and space no longer act as major impediments to transfer. The question is, should they, in order to more closely mimic the physical lending environment that exists with print?

By its terms, the Copyright Act does not grant rightsholders a right to transactional friction, nor does the Copyright Act freeze in time the historical conditions under which copies are bought and sold or lent. Amazon has dramatically altered the used book market, removing barriers to the flow of those books. Amazon (or libraries) using drones to deliver physical books to one's doorstep yet faster is no less an impingement on a rightsholder's market than a digital transaction that moves a copy yet more quickly. Such advancements have already occurred; advances in interlibrary loan services such as RapidILL and BorrowDirect mean books now move quickly and seamlessly between libraries in dramatically less time than in the 1970s when the Copyright Act was enacted.[115] Certainly other actors—FedEx, the fuel suppliers, physical book

---

[113] Capitol Records, LLC v. *ReDigi Inc.*, 934 F. Supp. 2d at ; *Disney Enters. Inc. v. Redbox Automated Retail LLC, No. 17-CV-8655*, 2018 WL 1942139, at \*7-9 (C.D. Cal. Feb. 20, 2018).

[114] DMCA SECTION 104 REPORT, *supra note* 11, at 83.

[115] See RapidILL, http://rapidill.org/ (last visited September 14, 2018); BorrowDirect, http://www.borrowdirect.org/ (last visited September 14, 2018) (3-5 day delivery for materials across a federated catalog of 90 million plus volumes from the Ivy Plus libraries).

Page 26

CONFIDENTIAL

INTARC00358269

inventory system manufacturers—may suffer with digital lending. But those markets do not belong to the copyright holder.

We do acknowledge, however, that the first sale doctrine was developed by the courts and embraced by Congress in the context of a physical environment where transaction costs were high. The USPTO in its recent white paper declining to recommend development of a broad conception of "digital first sale" stated that that "[t]o the extent that library lending involves library patrons 'willing and able to wait their turn for the limited loans and use of library materials,' [ ] the inefficiencies built into lending processes may avoid crossing the line of competing with the commercial market."[116] So, while transactional friction may not be necessary for CDL, an implementation that added it could reduce risk for libraries.

### b) *"Digital copies don't degrade like physical works."*

A second, broader, market harm concern is that digital works don't degrade like physical works. With that argument is the implicit suggestion that, like the friction discussed above, degradation was implicitly calculated into the balance of rights Congress arrived at when codifying the first sale doctrine. For one, this argument fails to appreciate that for long-term digital copies do degrade and require significant effort to maintain.[117] Redundancy is a standard requirement for the preservation of digital copies, requiring multiple storage locations, the technology of which needs to be upgraded and replaced every few years. Systems need to be migrated periodically, and platforms updated to interact with current technology. HathiTrust, for example, reports replacing storage hardware every 3-4 years.[118] All are potential failure points at which the particular copy of the work can degrade, sometimes most spectacularly. So, the stored digital copy used for lending does degrade over time and in reaction to use, just in ways that are not entirely analogous to the more gradual and straightforward entropy of the physical book.

Those facts aside, to our knowledge no court has ever tied the application of the first sale doctrine to a required, planned degradation of the format in which the copy exists. Libraries can lend brand new books in perfect condition just as they can older, tattered ones, many of which are repaired and rebound by library

---

[116] USPTO FIRST SALE STUDY, *supra* note 29, at 70.

[117] *See, e.g.,* Bairavasundaram, Lakshmi N., Andrea C. Arpaci-Dusseau, Remzi H. Arpaci-Dusseau, Garth R. Goodson, and Bianca Schroeder, *An Analysis of Data Corruption in the Storage Stack,* ACM TRANSACTIONS ON STORAGE (TOS) 4, no. 3 (2008): 8, DOI: 10.1145/1416944.1416947 ("An important threat to reliable storage of data is silent data corruption.").

[118] *HathiTrust Trustworthy Repository Audit and Certification (TRAC),* HATHITRUST.ORG (2011), https://www.hathitrust.org/trac.

Page 27

CONFIDENTIAL

INTARC00358270

staff or volunteers. Since the first recognition of the first sale doctrine over 100 years ago, the advent of acid-free paper, improved binding technology, media such as microform and magnetic tape and other innovations have extended the life of physical works dramatically.[119] In that time neither Congress nor the courts have altered the balance of rights in response to degradation. What's more, libraries engage in systematic preservation and conservation work to prevent or stop degradation. Driven in part by a lack of market availability, libraries repair, strengthen, and rebind many books in their collections, in large part because replacements cannot be purchased. [120] So as applied to CDL, we don't find degradation as a distinctive digital feature to be a compelling point. The idea has no connection to the statutory or judicial development of the rationale for first sale, and it fails to account for how digital storage and transmission do encounter degradation that is consistent with (if not more severe than) physical degradation.

### c)"Digital distribution raises unique security and piracy risks"

Finally, the third market-harm concern is that digital distribution raises greatly increased risks of piracy. In its 2001 report addressing digital first sale, the U.S. Copyright Office concluded that "the concerns about expanding first sale to limit the reproduction right, harm to the market as a result of the ease of distribution, and the lessened deterrent effect of the law that could promote piracy, outweigh the pro-competitive gains that might be realized from the creation of a digital first sale doctrine."[121] In its 2016 White Paper addressing digital first sale, the USPTO noted similar concerns.[122] The argument is that digital distribution is inherently more prone to negative market effects through

---

[119] *See,* Library of Congress, The Deterioration and Preservation of Paper: Some Essential Facts (n.d.), http://www.loc.gov/preservation/care/deterioratebrochure.html ("If mass deacidification treatment is carried out while the paper still has significant measurable strength, and the treated items are then stored under proper conditions, these once-acidic items are projected to remain in usable condition for several centuries, rather than becoming brittle and unusable in only fifty to one hundred years.").

[120] For example, in one recent survey with just 69 responding institutions, the Association for Library Collections & Technical Services found that respondents provided conservation treatment of a variety of levels to over 200,000 volumes of books and bound volumes. *See* ALCTS, Annie Peterson, Holly Robertson, and Nick Szydlowski, *Preservation Statistics Survey Report FY2015* (2016), http://www.ala.org/alcts/sites/ala.org.alcts/files/content/resources/preserv/presstats/FY2015/FY2015PreservationStatistics.pdf.

[121] DMCA SECTION 104 REPORT, *supra* note 11 ("Asserting, by analogy, that an online digital transmission is the same as a transfer of a material object ignores the many differences between the two events. Digital transmission has a much greater effect on the market for copies provided by the copyright owners. It is also accompanied by a greatly increased risk of piracy.").

[122] USPTO FIRST SALE STUDY, supra note 29, at 51.

Page 28

CONFIDENTIAL

INTARC00358271

piracy because works can be copied and distributed with ease. Courts have taken security concerns seriously. In *Authors Guild v. HathiTrust*, for example, the Second Circuit gave considerable attention to the security precautions *HathiTrust* had put into place for the digitized volumes in its collection.[123]

Digital distribution of copyrighted works is exceedingly common. For CDL, we see the risks as no greater than any other digital transaction. Publishers regularly license electronic books for digital distribution without any discernable market premium added to account for the additional risk of impermissible downstream copying. For libraries, security issues should be taken seriously, which they are by design through the six CDL controls described above. Like the approach taken by HathiTrust, the repository of digital copies must be secured from unintended access. Going even beyond the *HathiTrust* case, CDL would require physical access to works be restricted as well, while digital copies are lent. In addition, the files lent must be controlled in some significant way (e.g., using DRM) that will prevent the patron from retaining perpetual or unrestricted access to the file. Other digital first sale scenarios that involve permanent transfer of files from one party to another, such as sale of mp3s, have struggled with how to effectively implement "forward-and-delete" technology.[124] For libraries lending works, the solution is potentially much easier; lending technology for distribution of licensed e-books is well established. Many publishers use and are comfortable with security implemented through systems like Overdrive, or using Adobe Digital Editions. For CDL, the most effective and defensible approach may be to use those very same copy and piracy controls that publishers themselves employ for distribution of their licensed e-book content.

### 2.    Market Failure for 20th Century Books

Finally, a secondary but important reason why CDL would fare well under the market harm analysis is because it addresses a broad market failure, particularly with respect to the 20th century books that are generally not available in digital formats. It's precisely the kind of consideration fair use is equipped to address.[125] While we believe CDL has broader applications than just to these books, the significance of the market failure is so severe that we believe it

---

[123] *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014).

[124] *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 645 (S.D.N.Y. 2013).

[125] The seminal article on fair use addressing market failure was written by Wendy Gordon in 1982, sparking a wave of scholarship on the ways in which fair use may take into account ideas of market failure both generally and for specific use cases (e.g., parody). Wendy Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and its Predecessors*, 82 COLUM. L. REV. 1600 (1982).

Page  29

INTARC00358272

deserves special consideration. For these 20th century books, we believe the fair use argument is strongest.

The most significant market failure for these books is with truly orphaned works—i.e., books for which the rightsholder cannot be identified or located after a diligent search.[126] For those works, market failure is confirmed through the diligent search, which demonstrates the insurmountable transaction costs just in *searching* for the rightsholder. But the 20th century book market suffers from market failure even when owners are known. Failure of rightsholders to exploit the e-book market likely has many causes. Some of those are production-related transaction costs, some are due to the complex thickets of rights associated with each work,[127] and some are likely due just to competing priorities. In all such cases, books are not commercially available in digital form. High transaction costs make it economically unviable for a willing rightsholder and a willing user to negotiate for a sale.

The Copyright Act does not require rights holders to sell their works in the marketplace; they do not face a "use it or lose it" regime of protection.[128] Beyond the threshold question of protection, even within the fair use analysis, courts have found valid reasons why market harm analysis should weigh against the use when the copyright owner may have had creative or economic reasons for holding back the work.[129] Yet, courts have held that failure to exploit the market can be evidence of lack of market harm under the fourth fair use factor. For example, in *Cambridge University Press v. Patton*, a group of publishers sued Georgia State University, claiming that university-uploaded excerpts of books to

---

[126] *See* Jennifer Urban, *How Fair Use Can Help Solve the Orphan Works Problem*, 27 BERKELEY TECH. L.J. 1379, 1404 -09 (2012).

[127] *See* Pamela Samuelson, *Google Book Settlement as Copyright Reform*, 2011 WISC. L. REV. 479, 495-99 (identifying uncertainty over ownership of e-book rights as contributing to the development of the Google Books Search Settlement, which have provided e-access to millions of books). *See also Random H., Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), aff'd, 283 F.3d 490 (2d Cir. 2002) (resolving contractual dispute between publisher and author over ownership of e-book rights).

[128] Nor must copyright owners sue for each infringement. For example, in concluding that the doctrine of laches is rarely available to copyright defendants, the Supreme Court in *Petrella v. Metro-Goldwyn-Mayer, Inc.* explained: "If the rule were, as MGM urges, 'sue soon, or forever hold your peace,' copyright owners would have to mount a federal case fast to stop seemingly innocuous infringements, lest those infringements eventually grow in magnitude." The Copyright Act's statute of limitations and accrual rules "avoids such litigation profusion. It allows a copyright owner to defer suit until she can estimate whether litigation is worth the candle." 134 S. Ct. 1962, 1976 (2014).

[129] *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir.2012) ("current desire or ability to avail themselves of the market" was irrelevant to the question of potential market harm); *Castle Rock Entm't Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145–46 (2d Cir.1998) (finding market harm and noting that "copyright law must respect that creative and economic choice").

Page 30

INTARC00358273

the course e-reserves practices constituted copyright infringement.[130]  For many of those excerpts, the publishers failed to make licenses for electronic copies available. The Eleventh Circuit found this significant in weighing the fourth factor:

> ...if a copyright holder has not made a license available to use a particular work in a particular manner, the inference is that the author or publisher did not think that there would be enough such use to bother making a license available. In such a case, there is little damage to the publisher's market when someone makes use of the work in that way without obtaining a license, and hence the fourth factor should generally weigh in favor of fair use.[131]

In so concluding, the Eleventh Circuit framed its analysis in terms of the incentive effects of copyright; in this case, whether allowing the use would "frustrate the purposes of copyright by materially impairing Defendant's incentive to publish the work."[132] The Supreme Court has endorsed that approach:

> ...[t]he purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create. The prohibition of such noncommercial uses would merely inhibit access to ideas without any countervailing benefit.[133]

---

[130] Note that in *Cambridge Univ. Press v. Patton,* the district court found fair use even where the excerpts were distributed with no control over the physical original nor any limitation on the number of students who could view the copy at any given time, making the market effect potentially more severe than what would be experienced with CDL. 769 F.3d 1232 (11th Cir. 2014).

[131] *Id.* at 1277. Untapped markets have been cited as persuasive evidence of no or minimal market harm in other cases as well. *Sony Corp of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 451–55 (1984) (no market for home video recording for time-shifting); *Kelly v. Arriba Soft Corp.,* 336 F. 3d 811, 821–22 (9th Cir. 2002); *Field v. Google Inc.,* 412 F. Supp. 2d 1106, 1122 (D. Nev. 2006) (no evidence a "market for licensing search engines to access Web pages through 'cached' links"). *See also Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 592 (1994) (market for licensing critical commentary of copyrighted work is unlikely).

[132] *Id.* at 1276.

[133] *Sony Corp. of Am.* 464 U.S. at 450–51. For large numbers of books in research libraries, the incentives of U.S. copyright protection played no role in their creation. Millions were in the public domain immediately upon publication until that public domain status was rescinded many years later under the Uruguay Round Agreements Act. 17 U.S.C. § 104A (2018).

Page 31

CONFIDENTIAL

INTARC00358274

For print-only books, the potential e-book market has been available for nearly 20 years. Publishers have by and large not exploited that market, for various reasons. Libraries and readers have been waiting,[134] but at this point it cannot be said to be a "reasonable, or likely to be developed"[135] market. Publishers have largely not even maintained a print market presence, allowing books to devolve to out-of-print status quickly. Several studies have suggested that copyright may reduce the availability of books generally.[136]

So, for books published in this time period as a whole, there is a strong argument that they collectively represent a market failure. Part of that failure is due to high costs of determining commercial availability for any given work. The costs of searching and identifying which works are out of print, orphaned, or not available in e-book format is costly itself. However, we believe that there is sufficient data for assessment of commercial availability that can be leveraged for CDL to maximize the case that these particular titles within this 20th century focus are unavailable either in print or electronically. Those, we believe, present the very best case for CDL uses.

## IV.    TAKEAWAYS: SYSTEM DESIGN AND RISK MITIGATION

Libraries thinking about CDL will encounter risk, both positive and negative. On the positive side, we believe there is a significant upside: CDL helps libraries fulfill their missions in the broadest sense, using technology to increase effective, non-discriminatory access to collections for our users, and the world. Libraries have faced existential challenges for decades - "Is the library dead?" - but have survived in part because of their responsiveness to new technology. As new generations of information consumers expect immediate digital access to collections--along with those who have always needed but not been given digital access—libraries that fail to make their substantial collections available face anew the risk of becoming irrelevant or at least minimally effective in users' eyes. How can we help those users find and use the millions of volumes of the past century

---

[134] *See* Paul J. Heald, *The Demand for Out-of-Print Works and their (Un)Availability in Alternative Markets* (Illinois Public Law and Legal Theory Research Papers Series No. 14-31, 2014), http://papers.ssrn.com/abstract=2409118

[135] Am. Geophysical Union v. *Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

[136] William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright*, 70 U. CHI. L. REV. 471, 474 (2003)("[O]nly a tiny fraction of the books ever published are still in print; for example, of 10,027 books published in the United States in 1930, only 174, or 1.7 percent, were still in print in 2001"); Paul J. Heald, *How Copyright Keeps Works Disappeared*, 11 J. EMPIRICAL L. STUDIES 829, 832 (2014) ("Surprisingly, eBooks do not provide a significant alternative marketplace for out-of-print books. For example, only 36 percent of 162 bestselling books from 1923–1932 currently had eBook editions in 2014, and only one of the eBooks in that data set represented an out-of-print bestseller.").

Page 32

CONFIDENTIAL

INTARC00358275

(which makes up the bulk of many library collections) if we cannot get materials to them in the modern (digital) formats they need?

For negative risk, there are three primary types we worry about: 1) the risk that a library is sued in the first place, 2) the risk that the library loses the lawsuit, and 3) the risk of consequences in the face of defeat in a lawsuit. For each aspect of risk, libraries should make an honest assessment of their risk tolerance, accompanied by advice from legal counsel about how to match some of the ideas presented above and below with that risk profile.

For risk of being sued, it's not necessarily about the law itself. The issues are actually about time, resources, and reputational harm in defending a lawsuit. A lawsuit can take a tremendous amount of time. For example, the Georgia State e-reserves case (*Cambridge University Press v. Patton*) has now entered its 10th year of litigation.[137] Lawsuits are rarely resolved in a few months. There can be years of pre-trial action after the complaint is filed. There could be challenges to the pleadings through the motion process, which add additional delay. Answering questions, producing documents, or taking testimony can often take months or years, even before you get to trial. Although the reality is that most lawsuits do not go to trial,[138] the cost of litigation can be high, and these costs often depend on the issues involved and the location of the trial. Attorneys' fees and costs to go through the process from complaint, right up to trial, can range in the tens of thousands of dollars, and, if it does go to trial, that expense can easily double. [139]

Second, the risk that the library loses in court is primarily addressed by the strength of the legal position under fair use, the framework of which is addressed in Part III. The analysis is also general—case law in particular jurisdictions may be more or less favorable—and it doesn't fully take into account some of the particular facts and design choices (addressed below) that libraries may choose to implement to further enhance their position. And again, we caution that there are no fair use cases that square precisely with this use scenario, and so libraries entering this space must embrace a certain degree of legal ambiguity. But, the analysis above shows that there is a good faith, reasonable basis for concluding that such uses constitute fair uses.

---

[137] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014).

[138] "[P]erhaps up to 97% of cases are resolved by means other than by trial." Barkai, Kent and Martin, *A Profile of Settlement*, 42 COURT REVIEW: THE JOURNAL OF THE AMERICAN JUDGES ASSOCIATION 34 (2006).

[139] *See* AIPLA, REPORT OF THE ECONOMIC SURVEY 36; I-175 (2013) (reporting that litigation with less than $1 million at stake costs on average around $150,000 through the discovery process). While we primarily address risks associated with legal action, CDL may raise many other types of reputational, institutional, and political risks that libraries should carefully consider.

Page 33

CONFIDENTIAL

INTARC00358276

Finally, there is the question of what happens if the library loses the lawsuit. Typically, the plaintiff would request that the court enter an order for an injunction or damages, or, on occasion, both against the losing party. Statutory damages are the major concern.[140] Unlike most other jurisdictions, under U.S. law, infringements of works registered with the copyright office (most published books are) can carry a damage award within a statutory pre-set range of up to $150,000 per work infringed in cases of willful infringement.[141]

However, for libraries there is some good news to limit risk exposure. First, Congress created a special provision to protect for teachers, librarians, archivists, public broadcasters and the nonprofit institutions with which they are associated from liability when they believed and had reasonable grounds for believing that the use they were making was a fair use. In that case that statute instructs that the court "shall remit statutory damages."[142] Given the public benefit and generally good faith approach to this issue, it's also important that courts, in applying this provision, may avoid "mechanical application of the statutory damage provision of the Copyright Act" when it would "lead[] to absurd results."[143] The statute "provide[s] the courts with reasonable latitude to adjust recovery to the circumstances of the case, thus avoiding some of the artificial or overly technical awards resulting from the language of the existing statute."[144]

Second, some institutions may benefit from sovereign immunity, a doctrine that protects states from federal court interference, derived in part from the Eleventh Amendment to the United States Constitution.[145] Eleventh amendment sovereign immunity, though not absolute, shields state actors from damage

---

[140] In the few recent cases litigated against libraries, plaintiffs have not sought statutory damage awards. However, statutory damages award are large and have been awarded in other cases. 17 U.S.C. § 504(c) (setting damage ranges up to $150,000 per work infringed).

[141] For CDL, it seems unlikely that a court would find infringement to be "willful."

[142] 17 U.S.C. § 504(C)(2) ("The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118(f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.).

[143] *Doehrer v. Caldwell*, 1980 U.S. Dist. LEXIS 10713, *2.

[144] *Id.* (quoting S. Rep. No. 94-473, 94th Cong., 2d Sess).

[145] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State" U.S. CONST. AMEND. XI

Page 34

CONFIDENTIAL
INTARC00358277

awards in federal court.[146] Because sovereign immunity limits the judicial power of the federal judiciary under Article III of the Constitution, absent a valid retraction of that sovereign immunity by Congress, "a State will ... not be subject to suit in federal court unless it has consented to suit, either expressly or in the plan of the convention."[147]  While Congress has attempted to abrogate states' immunity from liability for federal copyright law violations,[148] over a dozen cases have found those attempts to be ineffective, including appellate decisions from the Eleventh, Fifth, and most recently the Fourth Circuits.[149] Sovereign immunity can be an important factor in assessing the risk of adopting a CDL program. Presently, state and tribal governments and their related departments such as state university libraries, museums, or archives, are immune from damage awards. Of course, plaintiffs could still bring a suit. Sovereign immunity also lowers the risk of such a suit because the outcome may have little reward — there is no money in it for litigants.

While some risks such as exposure to damages may be minimized by sovereign immunity or the statutory damages exception, libraries can also be proactive to minimize risk with CDL by implementing some additional system design and library policies, as well as selecting materials to be lent using CDL with an eye toward risk. We conclude with several practical ideas about how to do so:

> A.    *System Design and Library Policies*

The six basic system design elements identified in the *Statement* and introduced at the outset of this paper are, we believe, all that are necessary to make a compelling legal case for CDL.[150] There are, however, several other

---

[146] See *Nevada v. Hall*, 440 U.S. 410, 420 n. 19 (1979).

[147] *Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775, 779 (1991).

[148] In 1990, Congress passed the Copyright Remedy Clarification Act (CRCA), 17 U.S.C. § 511, as part of an effort by Congress to attempt to remedy imbalances between private and state institutions caused by Eleventh Amendment sovereign immunity in the intellectual property arena. It declared that "any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity" shall not be immune under either the Eleventh Amendment for violation of the exclusive rights of copyright holders. 17 U.S.C. § 511(a).

[149] "We conclude that in enacting the Copyright Remedy Clarification Act, Congress satisfied neither requirement [to abrogate Eleventh Amendment sovereign immunity]." Allen v. Cooper, No. 17-1522, 2018 WL 3352378, at *7 (4th Cir. July 10, 2018); Natl. Ass'n of Boards of Pharm. v. Bd. of Regents of the U. System of Georgia, 633 F.3d 1297 (11th Cir. 2011); Rodriguez v. Texas Commn. on the Arts, 199 F.3d 279 (5th Cir. 2000). *See also* Issaenko v. U. of Minnesota, 57 F. Supp. 3d 985, 1007 (D. Minn. 2014) (citing a dozen cases).

[150] The six design principles state that libraries should:

Page  35

CONFIDENTIAL

INTARC00358278

design features that may reduce risk and enhance the fair use position, primarily by enhancing the argument that CDL does not pose an undue market harm. These design elements attempt to make CDL mimic even more closely the physical environment and attendant friction reuse, as well as the security limitations that physical lending currently requires.

One way is to introduce additional artificial "friction" into the system, for example, is by extending the time between digital lends, more closely mirroring how physical books are lent and returned. For books that would typically take 24 hours to make their way back on to the shelves after being returned, that might be an appropriate waiting time for digital copies as well. For reserve materials that rapidly move in and out of the shelves with little wait, a shorter period may be appropriate to mimic the realities of a physical lend. Libraries may even want to take in user geography—if a user borrows a book while located further away, add more time in between the next loan than if the user is located next door—or other factors that have historically slowed the flow of physical works.

A conservatively designed CDL system could also introduce characteristics that mimic physical degradation. For example, a library might introduce lending limits based on library experience with physical lending. If a physical book could be expected to circulate 2,000 times before it degrades, the library could place the same limit on circulation of the digital copy. For many books, this could pose little practical challenge. Large research libraries hold many books that have circulated very seldom in print,[151] and so for many obscure materials ever hitting a maximum loan threshold may be unlikely (though we recognize, digital availability may itself drive lending). For such an implementation, it would be important for libraries to develop good data on how long an average book actually circulated before it degrades to the point it can no longer be used. Library experience and publisher expectations seem to diverge significantly on

---

(1)  ensure that original works are acquired lawfully;

(2)  apply CDL only to works that are owned and not licensed;

(3)  limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio);

(4)  lend each digital version only to a single user at a time just as a physical copy would be loaned;

(5)  limit the time period for each lend to one that is analogous to physical lending; and

(6)  use digital rights management to prevent wholesale copying and redistribution.

[151] *See* Allen Kent et al. *Use of Library Materials: The University of Pittsburgh Study* (1979) (indicating that fewer than 40% of books purchased in the preceding 10 years had circulated at all, and predicting that fewer than 2% ever would); Cornell University Library, Report of the Collection Development Executive Committee Task Force on Print Collection Usage 2 (2010) (approximately 55% of monographs purchased since 1990 have never circulated).

Page 36

CONFIDENTIAL

INTARC00358279

this; Harper Collins at one point believed that 26 loans was all that an average book would handle before it degraded,[152] while libraries lending some books (e.g., books placed on reserve) will regularly see lending run into the thousands before degradation occurs.

Libraries may also pay special attention to controlling both digital and physical copies. While all applications of CDL should restrict access to physical copies while the digital is lent, some practical strategies may ensure that such restrictions are especially rigorously followed. For libraries with open stacks, this may mean rapidly removing books from open circulation if they are digitized and lent. For others, a more reliable method may be to only lend books whose physical manifestations are already tightly controlled, either in closed stacks or off-site storage.

Libraries may also limit who they will lend digital copies to as an additional way to limit the overall reach of the copy and therefore the potential market effect. Libraries serve particular communities of users--an academic library primarily serves its students and faculty, a public library serves its local residents—and so the rationale would be that digital lending should be made equivalent to the same group of users who would have access to the physical materials. While many libraries make their collections available broadly to many users, user-group considerations may mean that libraries will want to think carefully about issues such as who their core users are and, for example, how lending to partner libraries in local or regional consortia with deeply integrated print collections may work, as opposed to users at libraries with more distant interlibrary loan arrangements. In any case, the aim would be to make collections more accessible for those who would ordinarily, already be entitled to access.

In addition, libraries may apply more or less restrictive controls on what users can do with copies while they are lent to them. Ordinarily, a borrower of a physical book can make photocopies, scans, or other basic reproductions, usually for private study or minimal further sharing. Practicality usually limits users from reproducing the entire physical work over again. While all CDL systems should implement some type of technological protection measures to prevent wholesale copying, libraries that seek to take a conservative approach to CDL may seek to limit any copying at all, while others may allow users to reproduce or print a small selection from the work.

Finally, libraries may choose to limit access to books based on feedback from rightsholders about specific materials loaned through CDL. While ultimately the

---

[152] Jacket Copy, *HarperCollins' 26-checkout Limit on Libraries' Ebooks Starts Today,* March 7, 2011, http://latimesblogs.latimes.com/jacketcopy/2011/03/harpercollins-library-ebook-checkout-limit.html.

Page 37

CONFIDENTIAL

INTARC00358280

rationale for CDL remains the same regardless of a rightsholder objection, libraries may choose to limit risk and exposure to litigation by employing a takedown policy and including in their system design a mechanism for rightsholders to communicate about books that they would prefer not be lent. Many libraries already employ such policies with digitized collections, particularly those that include materials from unknown or unlocatable owners. For CDL, extending those policies may be a natural and simple way to defuse risk before it culminates in a potentially costly dispute.

### B.     Collection Choices

The choice in what books are selected for CDL can also play a significant role in risk mitigation. Book candidates with the lowest risk—and the strongest fair use argument, though those analyses are not necessarily tied together—are generally those with the lowest likelihood of market exploitation. Our analysis above pays special attention to 20th century books generally, but there are several subcategories of works that libraries may select for CDL that would yield further reduction of risk.

#### 1.     Old Books and the Public Domain

There is some practical risk mitigation in selecting older titles for digitization.[153] In addition to aiding in the likelihood that the market is significantly diminished, many older works may in fact be in the public domain, subject to no copyright restrictions on use at all. Because the public domain analysis can be time consuming and costly,[154] for libraries that are unable to undertake a full public domain analysis to each work, using older works as a proxy in combination with a CDL strategy may be an effective way to minimize copyright-related risks.

For published books, there are a few ways to approximate which works are more likely to be in the public domain than others. One is to focus on books first published in the United States, since many of the rules that place published

---

[153] There is also a compelling argument that the fair use case should become stronger the further along the work is in its copyright term. *See* Joseph P. Liu, *Copyright and Time: A Proposal*, 101 Mich. L. Rev. 409 (2002); Justin Hughes, *Fair Use Across Time*, 43 UCLA L. Rev. 775 (2003); William F. Patry & Richard A. Posner, *Fair Use and Statutory Reform in the Wake of Eldred*, 92 Cal. L. Rev. 1639 (2004).

[154] For an excellent and thorough guide, see Melissa Levine et al., *Finding the Public Domain: Copyright Review Management System Toolkit* (2016), https://doi.org/10.18665/sr.289081.

Page 38

CONFIDENTIAL

INTARC00358281

works into the public domain do not apply to works first published abroad.[155] Another is to focus on books within that subset that were published before 1989, since books published before that date must have complied with U.S. copyright notice requirements (the © on the title page, or similar) to obtain protection.[156] A third is to look at U.S. books only published before 1963. Copyright for U.S. works published before that date must have been renewed with the U.S. Copyright Office to have continued protection. Very few rightsholders filed for renewal.[157] Finally, a most conservative library might focus just on books in their last 20 years of copyright protection—books published before 1943—for which the library is willing to do a reasonable investigation to determine if the book is still commercially available. When Congress extended copyright protection by 20 years in the 1998 Copyright Term Extension Act, it granted libraries special rights to use works in that extended term under Section 108(h).[158]



Books first published in the United States

Pre-1989 books

Pre-1963 books

Pre-1943 books

---

[155] *See* Copyright Term and the Public Domain in the United States, Cornell University Library Copyright Information Center (updated January 10, 2018), https://copyright.cornell.edu/publicdomain.

[156] 17 U.S.C. § 401 (2018); Berne Convention Implementation Act of 1988, P.L. 100-568 (1988).

[157] Jamie Carlsteon et al., *Copyright Renewal of U.S. Books Published in 1932: Re-analyzing Ringer's Study to Determine a More Accurate Renewal Rate for Books,* 79 College & Research Libraries 697 (2018), https://doi.org/10.5860/crl.79.5.697 (studying books published in 1932 and concluded that renewal rates were likely between 26 and 33 percent).

[158] 17 U.S.C. § 108(h) (2018); Elizabeth Townsend Gard, *Creating a Last Twenty (L20) Collection: Implementing Section 108(h) in Libraries, Archives and Museums* (October 2, 2017), http://dx.doi.org/10.2139/ssrn.3049158.

Page 39

CONFIDENTIAL

INTARC00358282

Selecting books based on date of publication does not guarantee the that work is in the public domain, but it is an efficient way to use readily available bibliographic data to increase the chances, which in combination with CDL as an access strategy could lower overall risk of making those books digitally available.

### 2. Out of Print and Off the Market

The phrase "out of print" does not mean "out of copyright." In fact, many out of print works may still be under copyright. However, the out of print status of a book is meaningful for the fair use analysis. A key, though not necessarily determinative factor in fair use is whether or not the work is available to the potential user. If the work is out of print and unavailable for purchase through normal channels, the user may have more justification for reproducing it."[159] A library might lower risk by selecting works for CDL implementation that are clearly not available in the marketplace, either "in print" from the publisher or electronically as a licensed e-book. Selecting these works has the practical risk mitigation strategy of also reducing the risk that anyone will bring suit in the first place—if the work is not currently exploited by its owner, chances stand to be higher that whoever that owner is isn't particularly concerned with use of it by libraries.

How to actually determine which books are not currently commercially exploited requires some investment of time and resources. Databases such as Bowker's Books in Print, and online searches through Amazon or Addall.com may be sufficient to give an indication that titles are no longer exploited through normal commercial channels. For older books, especially those without ISBNs, searches are more challenging.[160]

A second and far more severe category of "off the market" books are orphan works, which are works protected by copyright but which a user cannot, after a diligent search, identify the copyright holder.[161] Although there have been

---

[159] S.Rep. No. 94–473 (1975); *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1264 n. 8 (2d Cir. 1986) (out-of-print status of copyrighted book supports fair use determination); *see also* Part III(D)(2) (market failure for 20th century books should favor fair use determination).

[160] Low risk works published in the 1920s through the 1960s, if they have not been reissued after 1970, would not have an ISBN number, and so there is likely no present commercial exploitation. *See* Elizabeth Townsend Gard, "Creating a Last Twenty (L20) Collection: Implementing Section 108(h) in Libraries, Archives and Museums" (October 2, 2017). Available at SSRN: https://ssrn.com/abstract=3049158 or http://dx.doi.org/10.2139/ssrn.3049158

[161] *See* Library of Cong., Copyright Office, Notice of Inquiry: Orphan Works & Mass Digitization, 77 Fed. Reg. 64555 (Oct. 22, 2012), https://perma.cc/6MHS-FZAH . (defining an orphan work as "an original work of authorship for which a good faith, prospective user cannot readily identify and/or locate the copyright owner(s) in a situation where permission from the copyright owner(s) is necessary as a matter of law."). *See also* HANSEN, *supra* note 15.

Page 40

CONFIDENTIAL

INTARC00358283

several legislative proposals in the U.S. to facilitate use of orphan works, none have passed and orphan works do not have special legislative status under U.S. law. Orphan works, as described by the Supreme Court, are "older and more obscure works with minimal commercial value."[162] But with copyright owners that are difficult or impossible to track down, Justices Breyer and Alito lament the "[u]nusually high administrative costs" that "threaten to severely limit distribution and use of those works...which, despite their characteristic lack of economic value, can prove culturally invaluable."[163]

Determining which works may be orphaned is potentially hard. However, it is clear that librarians, information professionals who are experts at searching for materials and determining provenance, are among the best suited to conduct such searches.[164] With the research tools available, such as the online versions of the CCE and the Stanford Renewal Database, searching for the rightsholder for a potential orphan has been aided by the digital availability of these works. And, most recently, the U.S. Copyright Office released its registration card catalog online, which could make discovery of a registered work and its potential rightsholder even more effective.[165]

### 3. Non-fiction and Factual Works

Finally, a third collection characteristic that may reduce risk and enhance the fair use position is for libraries to focus their CDL efforts on works that are non-fiction or primarily factual. As a way to enhance the fair use position, the "nature of the work" factor tends to weigh more in favor of uses of works that are further from the core of what copyright was designed to protect. While courts have not placed significant weight on this factor, it still stands as a potential area for collection selection to enhance the fair use argument and lower risk.

Libraries have many choices. They may choose heavily factual or scientific books, or merely books that are categorized as non-fiction. They might also choose to apply CDL to books that incorporate significant amounts of non-

---

[162] *Golan v. Holder*, 565 U.S. 302, 355 (2012) (Breyer, with whom Alito joined, dissenting).

[163] *Id.*

[164] We do not believe libraries should adhere to rigid search standards that have been implemented in other jurisdictions, though they may provide useful guidance. Experience so far in those jurisdictions has shown that those search standards, rather than reliance on the reasoned expertise of information search professionals in line with general best practices, is not efficient or effective. *See* U.K. Intellectual Property Office, *Orphan Works Dilligent Search Guidance for Applicants*, (March 2018), https://www.gov.uk/government/publications/orphan-works-diligent-search-guidance-for-applicants. *See also* Aura Bertoni, Flavia Guerrieri & Maria Lillà Montagnanim, *Requirements for Diligent Search in 20 European Countries* ( ENDOW REPORT 2, JUNE 2017), http://diligentsearch.eu/wp-content/uploads/EnDOW%20Report%202.pdf.

[165] U.S. Copyright Office, Virtual Card Catalog (n.d.) https://vcc.copyright.gov/

Page 41

CONFIDENTIAL

INTARC00358284

protectable materials. Genealogical works, for example, or un-illustrated cookbooks may tend to include many materials unprotected by copyright. Similarly, works that incorporate significant quantities of U.S. government authored works (which are unprotectable in the United States)[166] may also be targeted under the same rationale.

## V.  CONCLUSION

Controlled digital lending offers an incredible opportunity for opening up access to library collections. The *Statement* illustrates a growing list of libraries and librarians who support CDL as a concept.  We acknowledge that law is not entirely settled. There are no cases directly on point, and some contrary authority in the context of commercial activities. Yet, there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use. We conclude that a library is acting within fair use if it digitizes and lends to users the full text of a copyrighted book, provided it does so within carefully implemented limits and safeguards (i.e. all the controls identified in the *Statement*), and provided that the library's primary purpose for making and using the digitized book is limited to uses that are within the distribution and related rights that all libraries have under the first sale doctrine, as applicable to the original book in the collection.

---

[166] 17 U.S.C. § 105 (2018).

Page  42

CONFIDENTIAL                                                                                     INTARC00358285

# McNamara Declaration
# Exhibit 124

| | |
|---|---|
| **From:** | Courtney, Kyle K. |
| **Sent:** | Friday, August 3, 2018 2:44 AM EDT |
| **To:** | Michelle Wu; Lila Bailey; █████@librarylaw.com; Schultz, Jason |
| **CC:** | Michelle Wu; David Hansen, J.D. |
| **Subject:** | last draft CDL |
| **Attachments:** | DRAFT White Paper on Controlled Digital Lending of Library Books.edit 6.5.docx |

Good Evening -

Yes, its late, but it worth it! Dave and I had the good fortune to both be in Cambridge for the last 4 days together (on and off) and pushed through this final version.

Attached is the last draft version of the White Paper on Controlled Digital Lending. We addressed nearly all of your comments, edits, suggestions, and grammatical insights - many thanks! And, of course, we welcome any further insights - but all in all, this feels to be 99.9% done (so to speak - a few footnote fixes, phrases, etc.). Let us know what you think! Starting next week, we will begin to share with our top affiliates/endorsers (Pam, Kevin Smith, Kenny, etc.) and then I will work on booking meeting time with ALA/ARL.

Thanks all!

Best,

Kyle

CONFIDENTIAL                                                                 INTARC466850

# McNamara Declaration
# Exhibit 125

| | |
|---|---|
| **From:** | David Hansen, J.D. |
| **Sent:** | Thursday, July 12, 2018 5:24 PM EDT |
| **To:** | Lila Bailey; Courtney, Kyle K. |
| **Subject:** | Re: More robust thoughts on the White Paper |

Thanks, Lila! Very much appreciated.

On the 4th factor section vs. risk section, I'm not totally settled on where I think we should put those arguments about friction and 20th century book market failure. I'm tending to think we should have some repetition and they should go in both parts… There is already a small amount of repetition.

I like the idea of explicitly using that enumerated list of 6 things from the *Statement* to define "controlled," and on using those again in the market harm section. I'm curious about whether you have any thoughts on how to talk best about the 6th requirement-- the DRM recommendation. To me that fits in with the other "friction" arguments (it's hard to copy a physical book, which makes proliferation of copies unlikely. We should make it similarly hard to copy a digital book to also make proliferation of digital copies unlikely), but I wonder if there are other/better ways to frame that.

Point taken about transformative use. Personally, I don't think this is transformative and I'm not too interested in trying to make everything fit into that transformative box. But, why concede the argument if we don't need to.

Your thoughts on the risk section are also very helpful! I'm inclined to follow your organizational advice for that section.

Thanks,

Dave

---

**From:** Lila Bailey <██@archive.org>
**Date:** Thursday, July 12, 2018 at 2:48 PM
**To:** "Courtney, Kyle K." ████████@harvard.edu>, "David Hansen, J.D." <████████@duke.edu>
**Subject:** More robust thoughts on the White Paper

Hi guys,

I have some more higher level and structural thoughts and comments about the white paper that seemed to make more sense to just put in an email rather than in the Google Doc. Obviously, normal caveats apply: take these comments as you will, it's your paper. Since these are quite long, I composed them in Word, so I'm also attaching them as a .doc, so you don't have to dig around in our email if you want to go back to something I said. I'm also pasting them in below (formatting may be messed up as a result).

CONFIDENTIAL

INTARC466829

Thanks for all the good and hard work so far, and here are some thoughts I have to make the paper even stronger:

First, I wanted to say that my comments relate to what I see as the two main purposes of the white paper: 1 – to support and flesh out the arguments and concepts presented in the Statement and 2 – to help libraries understand and assess risk.

**On the first purpose:**

1. I think it would clarify and make the whole document stronger to set forth more explicitly what we mean by "controlled." Specifically, we have 6 minimum requirements that we set out in the Statement that must be present for proper implementation of "control." I would put those right up top, then refer back to them in the 4th factor section and again in the risk section. I don't think you can be too redundant on those fundamental points.
2. The statement doesn't take a position on transformativeness, but your paper does. At a minimum, I think you need to acknowledge that the statement doesn't take a position, and explain that there are arguments on both sides (you can cite TVEyes, Sony etc) and that at least some stakeholders in the library community think CDL is transformative. I think it's fine if you two want to come down on the side of not transformative, but I think you need to at least explain why the statement doesn't take a position.
3. I would not recommend underestimating the importance of the third factor. I'm convinced the reason TVEyes went the way it did is that they had no good answer for "10 minute clips." We have arguments in the Statement about the copies being temporary, which can be analogized to the low-resolution thumbnails in Kelly v ArribaSoft, at least in the sense of not being a full market substitute. Further, it would be worth having a long ass string cite to every case that has held that it's OK to use the entire work. Most of those will be in the context of transformativeness, but still. Also worth mentioning that the statutory preamble mentions multiple copies for classroom use, which I generally think means the whole thing. Anyway, I would suggest spending more time on this section.
4. On the 4th factor, I would hit really hard on why the 6 controls are why we win on the market harm argument – because they are what mimic the traditional lending practices. This also fully answers the security concerns topic IMO. If you do decide to go into those additional rights holder arguments (that digital books don't degrade and transactional friction) I think this section should be where you soundly refute those arguments. As currently drafted, it seems like you think they are good points, and systems should be built to accommodate them. But the Statement does NOT say that those are necessary, so at best these arguments and system design options being in the 4th factor section is confusing, at worst it undermines the Statement. On the Market Failure argument and 20th Century books... I think this is a really important point, and I'm not sure it belongs only here in the 4th factor section. First of all, the Statement doesn't limit to those books, so again you want to avoid being confusing. However, it is clear that this is indeed where the strongest case

can be made. I'm a little unsure exactly what to do with this piece, I'm just noting that as it stands as one of 3 prongs under the 4th Factor analysis, it's confusing.

**On the second purpose:**

I was surprised the risk section was so short. I thought it would be at least half of the whole paper, since this is probably the main reason this white paper is viewed as necessary by Jon Band and co. In terms of framing this section, here is a place to reiterate the importance of consulting a lawyer to build the library's own CDL implementation. This section should also be a stand alone "how to think about implementing CDL" even if you haven't read the legal section as I think many folks will just jump to this section, so being a bit redundant here is a good idea. It might also be a good idea to put 504© in the top of this section as well, to explain why having clear library policies in place can help mitigate risk when relying on fair use.

Some additional things that could go in this section are: sovereign immunity for those libraries to whom it applies, and the fact that thus far plantiffs suing libraries over fair use have not sought damages, only injunctions (cite to Hathi and GA State). I think this is a helpful point for those institutions concerned about their endowment.

My main suggestion is expanding this section and organizing it under 3 clear headers: System Design, Collection Choices, and Library Policies.

1. System Design Choices

Reiterate the fundamental importance of the 6 "minimum requirements" from the statement as the first thing, not the last thing. Then go into additional system design issues.

One thing the statement does not take on, which I think the white paper should, is the importance of libraries being able to make sure physical copies are not lent out at the same time as physical ones. This may mean digital lending only happens for off site books, closed stacks, or with a special system built for the purpose. But this is really important and is currently missing.

You could talk in this section about who gets access (is it just students/library patrons? Or broader?), or that could go in the library policy section below.

This is where I would suggest putting in the more conservative design options, like on-site terminals, adding "friction" into the design, caps on total # of loans, and so on. Some of these ideas really do undermine the whole point of going digital, so I would want to be really clear that these are optional and more conservative design ideas, not necessary but recommended for more risk averse institutions.

CONFIDENTIAL

INTARC466831

2. Collection Choices

You already have some of this in there, but I'd suggest expanding on this concept a bit further and being more explicit. You say older books are safer, but not really why. I think you could use 108(h) as a way to say that those really early books from 1923-1942 are very low risk. And then why 1942-64 is another lower risk bucket (higher likelihood of public domain for failure to meet formalities) and so on.

You could also explain more on the searching for commercial availability, right now the work is in the footnote to Melissa Levine's paper, but I think some of the work should be in the text.

You could also mention special collections, rare books or monographs, non-fiction collections such as genealogies, medical reference works, and others that have lesser copyright protection. I think you mention these briefly in the 2nd Factor section, but you should repeat them here.

3. Library Policies

This section should talk about the importance of both internal and external library policies in managing risk. Good policies that document the library's CDL implementation and rationale could help with proving 504(c) and just ensure compliance with best practices. Some security concerns could also be addressed by policy, as well as limiting who has access to the CDL system.

But in this section the most important policy I'd really recommend discussing is a takedown policy. Whether this is internal only, or something clearly stated on the 'library's CDL website interface, a library's willingness to respond to author or publisher takedown notices is a really practical way of managing potential issues as they arise. Some libraries may not want to allow takedowns (I imagine Michelle's would not, for example), which is totally fine, but I think a "bend not break" approach is WAY more important in managing risk than, for example, building extra time between lends and other ways of making the product worse for the user.

**CONFIDENTIAL**

**INTARC466832**