# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 14 OF 26 (A-3283-A-3547)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM
DANAE TINELLI
SCOTT A. ZEBRAK
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW,
5th Floor
Washington, DC 20016

ELIZABETH A. MCNAMARA
LINDA J. STEINMAN
JOHN M. BROWNING
JESSE M. FEITEL
CARL MAZUREK
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | **Vol. 4** | | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | | **Vol. 5** | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | | **Vol. 6** | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | | **Vol. 7** | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | **Vol. 10** | | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

14

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **_Vol. 17_** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| | | **Vol. 18** | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| | | **Vol. 19** | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| **Vol. 20** | | | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| **Vol. 22** | | | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| **Vol. 23** | | | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

24

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# McNamara Declaration

# Exhibit 126

# part 1

| From: | Lila Bailey |
|---|---|
| Sent: | Friday, August 3, 2018 5:58 PM EDT |
| To: | Michelle Wu; Kyle K. C. |
| CC: | Mary Minow; Schultz, Jason; David Hansen, J.D. |
| Subject: | Re: last draft CDL |
| Attachments: | DRAFT White Paper on Controlled Digital Lending of Library Books.edit 6.5 LIB.docx |

Wow, you guys have done a great job on this draft! I think the added length is totally worth it for the depth of analysis and practical considerations. I added a few comments on top of Michelle's (I figured that would be easier than toggling between multiple versions) - it's looking really good.

I will look forward to hearing how the feedback from reviewers goes!

Have a good weekend, and please don't forget to send us any comments you have on the website stuff I sent out earlier this week. Michelle and I need to pin this down early next week so there's time before the semester gets going. I'd appreciate thoughts no later than Sunday.

Best,

Lila


On 8/3/18 7:30 AM, Michelle Wu wrote:

> Thanks to you both! This looks great, and I just had a few additional suggested edits and comments in the attached.
> Best,
> Michelle

> On Fri, Aug 3, 2018 at 2:44 AM Courtney, Kyle K. <░░░░░░░░@harvard.edu> wrote:
> Good Evening -
> Yes, its late, but it worth it! Dave and I had the good fortune to both be in Cambridge for the last 4 days together (on and off) and pushed through this final version.
> Attached is the last draft version of the White Paper on Controlled Digital Lending. We addressed nearly all of your comments, edits, suggestions, and grammatical insights - many thanks! And, of course, we welcome any further insights - but all in all, this feels to be 99.9% done (so to speak - a few footnote fixes, phrases, etc.). Let us know what you think! Starting next week, we will begin to share with our top affiliates/endorsers (Pam, Kevin Smith, Kenny, etc.) and then I will work on booking meeting time with ALA/ARL.
> Thanks all!
> Best,
> Kyle

> --
> Michelle M. Wu  | Associate Dean for Library Services & Professor of Law

CONFIDENTIAL

WU00003022

111 G Street, N.W. | Washington, D.C. 20001
Office: ███████████ | Email: ███████████@law.georgetown.edu

CONFIDENTIAL

WU00003023

# A White Paper on Controlled Digital Lending of Library Books

David R. Hansen & Kyle K. Courtney[1] [2]

This paper is about how libraries can legally lend digital copies of books. It explains the legal and policy rationales for the process— "controlled digital lending"— as well as a variety of risk factors and practical considerations that can guide libraries seeking to implement such lending.  We write this paper in support of the *Position Statement on Controlled Digital Lending,*[3] a document endorsed by many libraries, librarians, and legal experts.  Our goal is to help libraries and their lawyers more fully understand the legal rationale for controlled digital lending, as well as situations in which this rationale is the strongest.

For this paper we define "controlled digital lending" (CDL) just as the *Statement* does:

> CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one

---

[1] David R. Hansen is Associate University Librarian for Research, Collections & Scholarly Communications at Duke University Libraries. Kyle K. Courtney is Copyright Advisor for Harvard Library. *These institutional affiliations are for identification purposes only.*

[2] We're grateful for comments and suggestions from a number of people including Lila Bailey, Mary Minow, and Michelle Wu. Thanks also to participants who helped hone our thoughts in sessions we held on this topic at the 2018 American Association of Law Libraries Annual Meeting, the 2018 Kraemer Copyright Conference, and the 2018 University Information Policy Officers Meeting hosting by The Ohio State University Libraries.

[3] We are both contributors to that statement. We wrote this paper independently, with comments and input from selected *Statement* drafters and endorsers.

Page    1

CONFIDENTIAL

WU00003024

copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. Essentially, CDL must maintain an "owned to loaned" ratio. Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies.[4]

Thus, CDL would permit circulation of copies equal to those that had been legitimately acquired by the participating libraries. When the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one. A library can lend a physical book to a patron through standard circulation or to another library through interlibrary loan. What CDL does do is shift that lending to a new format that opens up access possibilities for readers with disabilities, physical access limitations, research efficiency needs, or other needs for digitally-accessible content.

A CDL system is not a brand-new concept. There are multiple versions of CDL-like systems currently being used in libraries. The idea was first explored in the pioneering article "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries"[5] by Michelle Wu, Professor of Law and Law Library Director at Georgetown University School of Law. Later, the Internet Archive created the "Open Library: Digital Lending Library" project, which has been highly successful and has utilized a unique CDL-like system for the past 8 years.[6] In fact, the program was so successful, multiple libraries have harnessed the same CDL system and partnered with Internet Archive to loan their digital copies of books. These partners include large library systems such as the Boston Public Library, to smaller specialized libraries such as the Allen County Public Library, which houses the largest genealogical collection of any public library in

---

[4] Cite to Statement website?

[5] Michelle M. Wu, "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries," 103 Law Libr. J. 527 (2011). See also Michelle M. Wu, "Piece-by-Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use," 36 Legal Reference Services Q. 51 (2017).

[6] See https://openlibrary.org. See also Geoffrey A. Fowler, "Libraries Have a Novel Idea," Wall St. J., June 29, 2010, available at http://online.wsj.com/article/SB10001424052748703279704575335193054884

Page    2

CONFIDENTIAL

WU00003025

the country.[7] And, most recently, Georgetown Law Library launched its own CDL-like service.[8]

At its core, CDL is about replicating with digital lending the legal and economically significant aspects of physical lending. To do so, we libraries must truly exercise control in the process. The *Statement* identifies six specific ways to do so. It states that for CDL, libraries should:

(1) ensure that original works are acquired lawfully;
(2) apply CDL only to works that are owned and not licensed;
(3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio);
(4) lend each digital version only to a single user at a time just as a physical copy would be loaned;
(5) limit the time period for each lend to one that is analogous to physical lending; and
(6) use digital rights management to prevent wholesale copying and redistribution.

Our principal legal argument for controlled digital lending is that fair use - an "equitable rule of reason"[9]- permits libraries to do online what they have always done with physical collections under the first sale doctrine: lend books. The first sale doctrine, codified in Section 109 of the Copyright Act, provides that anyone who legally acquires a copyrighted work from the copyright holder receives the right to sell, display, or otherwise dispose of that particular copy, notwithstanding the interests of the copyright owner. This is how libraries loan books. Additionally, fair use ultimately asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[10] In this case we believe it would be. Controlled digital lending as we conceive it is premised on the idea that libraries can extend their traditional lending role to the digital environment. The system we propose maintains the market balance long-recognized by the courts and Congress as between rightsholders and libraries,[11] makes it possible for libraries

---

[7] Internet Archive, "Digital Lending Library" Internet Archive Blogs (June 28, 2010), https://blog.archive.org/2010/06/28/digital-lending-library [https://perma.cc/R4A2-QUW6]

[8] [Michelle had a blog post about this?]

[9] HR Rep No 94-1476, 94th Cong, 2d Sess 65 (1976).

[10] Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006).

[11] For users generally, the House Judiciary Committee Report on the 1976 Copyright Act explains that under section 109(a), "[a] library that has acquired ownership of a copy is entitled to

Page  3

CONFIDENTIAL

WU00003026

to fulfill their "vital function in society"[12] by enabling the unrestricted lending of books to benefit the general learning, research, and intellectual enrichment of readers by allowing them limited and controlled digital access to materials online.

## I.    THE 20TH CENTURY BOOK PROBLEM

For decades, libraries and cultural institutions have sought to provide greater access to their collections with the hope of reaching a broader and more diverse set of readers.[13] A confluence of technological advances and expanding copyright protection have driven the problem.

Copyright terms are now extremely long (95 years or more for many published works), "formalities" that once required rightsholders to take action to obtain and retain rights have been eliminated, rights are infinitely divisible among private parties causing uncertainty about ownership, and the quantity of copyright-eligible works has exploded with the technological ability to easily and quickly create and publish new works.[14] Librarians now puzzle over questions such as whether a work is actually still protected by copyright (did the rightsholder comply with applicable U.S. copyright formalities?), who owns digital rights (publisher or author?), and whether the rightsholder can be found (or is the work an orphan?). Attempting to clearly answer those questions on a title-by-title basis has proven costly,[15] making full digital access for large

---

lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976). The Copyright Act in several other places identifies special considerations with respect to libraries. *See* 17 U.S.C. § 108 (specific exceptions to reproduce and distribute for libraries and archives); 17 U.S.C. § 504(c)(2) (special damage exceptions for libraries and archives);

[12] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 105 (2001), https://perma.cc/59TU-2NKJ [hereinafter, DMCA SECTION 104 REPORT].

[13] For example, Project Gutenberg is a volunteer effort to digitize and archive cultural works, to "encourage the creation and distribution of books." It was founded in 1971 by Michael S. Hart and is the oldest digital library. See http://www.gutenberg.org/. Others efforts include the HathiTrust digital library, https://www.hathitrust.org/, OpenLibrary, http://openlibrary.org/, and—with a corporate partner—Google Books, https://books.google.com/.

[14] In the context of the "orphan works" problem, these and related causes are explained in more detail in David R. Hansen, *Orphan Works: Causes of the Problem* (Berkeley Digital Library Copyright Project White Paper No. 3, 2012), https://ssrn.com/abstract=2038068.

[15] *See, e.g.,* Cornell University Library, Response to the Notice of Inquiry Concerning Orphan Works (Mar. 23, 2005), https://perma.cc/NZ8W-UWMK (spending $50,000 in staff time to identify rightsholders for 198 books); Carnegie Mellon University Libraries, Response to Notice of Inquiry about Orphan Works 2 (Mar. 22, 2005), https://perma.cc/95XW-TV4Z (similar). *See also* Maggie Dickson, Due Diligence, Futile Effort: Copyright and the Digitization of the Thomas E. Watson Papers, 73 AM. ARCHIVIST 626 (2010), https://perma.cc/QD2X-F3D8 (reporting on

CONFIDENTIAL

WU00003027

numbers of works based on rightsholder permission difficult. Particularly for books and other published materials for which there was once an active market, libraries have not yet been able to provide broad full-text access online.[16]

So, many 20th Century books are not available for purchase as new copies in print or as digital versions online.[17] Libraries would like to provide digital access, but many rightsholders have largely not offered those titles for sale in that format. The morass of rights management, combined with the orphan works problem and the ever-increasing copyright length, has made it complicated to see a path forward to broad digital access.

For modern libraries with users whose research and information use patterns mean they look to digital access first,[18] this means that a whole world of research is effectively invisible to a variety of types of users. For some, the inability to physically travel to a library because of their remote physical location, economic wherewithal, or homebound limitations means that physical lending is not practical. For others, physical access is a matter of great inefficiency in their research and learning. For users with print disabilities--those who currently have some digital access to print collections due to the fair use holding in the *HathiTrust* case which addressed copying and access of books for print-disabled users[19] — access is currently hampered by hurdles that require users to self-

---

similar efforts in the context of special collections). The same is true in jurisdictions with relative clarity about what steps are necessary for such a search. *See* Victoria Stobo, Kris Erickson, Aura Bertoni & Flavia Guerrieri, *Report 3: Current Best Practices among Cultural Heritage Institutions when Dealing with Copyright Orphan Works and Analysis of Crowdsourcing Options* (EnDOW Report 3, May 2018), https://perma.cc/SQH8-H3CT ("This study shows that digitization remains a paradox for [cultural heritage institutions]. Rights clearance in particular remains expensive and ranges considerably depending on the nature of the work and the approach taken by the institution.").

[16] In contrast, U.S. libraries have increasingly relied on fair use to provide full-text access to archival and special collections materials for which original markets are more clearly limited. *See* DAVID R. HANSEN, DIGITIZING ORPHAN WORKS: REDUCING LEGAL RISKS FOR OPEN ACCESS TO COPYRIGHTED ORPHAN WORKS, 111 (Kyle K. Courtney & Peter Suber eds., Harvard Library 2016), https://dash.harvard.edu/handle/1/27840430 (listing 30 different online digital collections in which libraries have openly disclosed the likely orphan status of their materials and their reliance on fair use as a basis for online digital access).

[17] *See* Paul J. Heald, *How Copyright Keeps Works Disappeared*, 11 J. EMPIRICAL L. STUDIES 829 (2014).

[18] *See, e.g.*, John Palfrey & Urs Gasser, Born Digital: Understanding the First Generation of Digital Natives (Basic Books, 2010).

[19] *See* Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 101 (2d Cir. 2014) (finding it fair use for the HathiTrust digital library to provide access to print-disabled patrons under a system which requires patrons to "submit documentation from a qualified expert verifying that the disability prevents him or her from reading printed materials" before gaining access).

Page   5

CONFIDENTIAL
WU00003028

identify disabilities and request special access to digital copies. For a large research library, this means holdings of millions of volumes, already purchased at a cost of hundreds of millions of dollars, ~~that~~ are not accessible in a format that is most meaningful and easy for many researchers today.[20]

It's this category of book that we are mainly concerned with—books primarily from the mid-20th Century, presumptively still protected by copyright, but not currently available in electronic form from their rightsholders.[21] Some of these books may well be described as "orphaned," without identifiable owners. Others may have identifiable owners, but are in practice neglected, unavailable in the digital marketplace and with no plan for revitalization in modern formats. For all, it means that they are not fully meeting the basic goals of copyright to promote "the Progress of Science and the useful Arts."[22] Their unavailability online benefits neither creators nor the reading public.

So, how can libraries provide access? First, we start with a detailed look at the two fundamental copyright law doctrines that already empower libraries to fulfill their missions: first sale and fair use.

## II.    THE LEGAL FRAMEWORK: FIRST SALE AND FAIR USE

Section 106 of the Copyright Act enumerates the basic bundle of rights granted to copyright owners: the exclusive right to control reproduction of the work, public distribution of the work, public performances, public displays, and creation of derivative works.[23] For individuals who want to lend or resell copies of works they have purchased, the rightsholder's exclusive right to control public

---

[20] Some of the most popular, commercially-viable books remain in print and are available in a variety of formats. For many 20th Century books, however, the window for commercial viability passes only a few years after first publication. Several copyright scholars have studied the phenomenon. *See* William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright*, 70 U. CHI. L. REV. 471, 474 (2003); Paul J. Heald, *Property Rights and the Efficient Exploitation of Copyrighted Works: An Empirical Analysis of Public Domain and Copyrighted Fiction Bestseller*s, 92 MINN. L. REV. 1031 (2008).

[21] Controlled digital lending may be well adapted to other types of library lending, for example of serials, or of audio or audiovisual works, or even archival materials. The same principles may also support other related activities such as users' donation of ebooks to libraries. The market dynamics and use scenarios that those situations raise are different enough that we believe they merit separate treatment in a subsequent paper. *See* Paul J. Heald, *The Demand for Out-of-Print Works and their (Un)Availability in Alternative Markets* (Illinois Public Law and Legal Theory Research Papers Series No. 14-31, 2014), http://papers.ssrn.com/abstract=2409118 (noting differences between the book markets and music markets).

[22] U.S. CONST., Art. I, Sec. 8, Cl. 8.

[23] 17 U.S.C. § 106.

Page    6

CONFIDENTIAL                                                                WU00003029

distribution[24] is potentially problematic. But, the rights granted in Section 106 are limited by a number of statutory exceptions. Section 109 is one such provision. It states that "[n]otwithstanding the provisions of section 106(3) [the public distribution right], the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."[25]

Entire industries and enterprises are built upon the first sale doctrine. Libraries were built on it. eBay relies on the provision when it permits users to sell copyright protected works through its site,[26] used record stores similarly rely on it to distribute copies they have acquired, college bookstores buy and sell used textbooks based on this doctrine, and libraries rely on it to lend physical books in their collections. The first sale doctrine balances the rights of copyright owners to distribute with those of purchasers to dispose of their copies as they wish. Without it, copyright holders could enforce rights in the "secondary market," which would impact selling, loaning, or gifting any copyrighted work. The rationale is that "once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."[27]

A critical limitation in the text of Section 109 is that it only allows the "owner of a copy" to "sell or otherwise dispose" of that particular copy. With distribution of physical copies, such as lending a print book to a library user, that framework works well enough. But digital copies by their very nature require the creation of a *new copy* to be made *even temporarily* in order to transfer from device to device; physical "distribution" of the original copy does not work. So, what could be a practically and economically very similar transaction, such as lending a digital copy of a book to a library user, requires a technical reproduction *and then deletion* of the work that is not clearly permitted under the terms of Section 109.

That brings us to fair use. Unlike first sale, fair use applies to uses implicating any or all of the copyright holder's exclusive rights, including both public distribution and the right to control reproductions.[28] Like the first sale doctrine,

---

[24] *Id.* ("copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending").

[25] *Id.*

[26] UMG Recordings, Inc. v. Augusto, 628 F.3d 1175, 1180 (9th Cir. 2011).

[27] Quality King Distributors, Inc. v. L'anza Research Intern., Inc., 523 U.S. 135, 152 (1998).

Page   7

CONFIDENTIAL

WU00003030

fair use is widely used and entire industries (e.g., home recording device manufacturers, search engines, filmmakers, publishers ) rely on it.[29] Described as an "equitable rule of reason," fair use was developed by the courts beginning in the 1800s.[30] Congress in 1976 codified the doctrine in Section 107 of the Copyright Act, which provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not copyright infringement."[31] Those examples are "illustrative and not limitative" however.[32] To apply the doctrine, Congress identified four non-exclusive factors that courts and users should consider:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

Those four statutory factors must not be "treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright."[33] Ultimately, the fair use inquiry asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[34] The next section examines how this flexible doctrine can apply to CDL.

---

[28] 17 U.S.C. § 107 (Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright.")

[29] *See, e.g.,* Computer & Communications Industry Association, Fair Use in the U.S. Economy: Economic Contribution of Industries Relying on Fair Use (2017), https://perma.cc/EGH4-N88D (summarizing industries reliant on fair use).

[30] *See Folsom v. Marsh,* 9. F. Cas. 342 (C.C.D. Mass. 1841); Matthew Sag, *The Pre-History of Fair Use,* 76 BROOKLYN L. REV. 1371 (2011).

[31] 17 U.S.C. § 107 (2018).

[32] Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577–78 (1994).

[33] *Id.*

[34] Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006).

Page    8

CONFIDENTIAL
WU00003031

## III. CONTROLLED DIGITAL LENDING AS FAIR USE

The basic concept of "digital first sale" is not new, either as justified under the first sale doctrine alone, as fair use, or through some combination of the two together. The U.S. Copyright Office in 2001 examined the issue of "digital first sale," soliciting comments that exhibited a range of views about whether the first sale doctrine does or should be made to apply to digital transactions. In part because the use of digital technology was so new at the time, the Office concluded that it does not and should not.[35] More recently, the U.S. Patent & Trademark Office studied the issue itself and released a white paper expressing similar views in 2016.[36] Scholarship on "digital first sale" and related concepts has flourished in recent years.[37] And most recently the courts in *Capitol Records v. ReDigi, LLC,* have weighed how these doctrines apply to a commercial, digital resale market for mp3s.[38]

Much of the literature on digital first sale recognizes that library lending raises unique concerns requiring special treatment.[39] Though other use scenarios are certainly possible, we view library lending uses as special, as detailed in the sections below, and of all uses among the most likely to be justified under a fair use rationale. Indeed, several libraries have already engaged in limited CDL for years without issue, indicating perhaps a tacit acknowledgement of the strength of their legal position.[40] So, while the concept of digital first sale may have many

---

[35] DMCA SECTION 104 REPORT, *supra* note 30, at 80, 90 ("[W]hen the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement" and "we recommend no change to section 109 at this time").

[36] U.S. PATENT & TRADEMARK OFFICE, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 58 (2016), https://perma.cc/RJ7Z-5REZ [hereinafter USPTO FIRST SALE STUDY] (examining a wide range of potential applications, including library uses, but ultimately concluding that "we cannot at this time recommend extending the first sale doctrine to apply to digital transmissions of copyrighted works.").

[37] For some representative work, see Aaron Perzanowski & Jason Schultz, *Digital Exhaustion,* 58 UCLA L. REV. 889 (2011); R. Anthony Reese, *The First Sale Doctrine in the Era of Digital Networks,* 44 B.C. L. REV. 577, 584 (2003); Victor F. Calaba, *Quibbles 'n Bits: Making A Digital First Sale Doctrine Feasible,* 9 MICH. TELECOMM. TECH. L. REV. 1 (2002).

[38] 934 F. Supp. 2d 640 (2013), on appeal, Case No. 16-2321-cv (2d Cir. 2016).

[39] DMCA SECTION 104 REPORT, *supra* note XX, at 104-105 (addressing library specific issues); USPTO FIRST SALE STUDY, *supra* note XX, at 48, 50; Calba, *supra* note XX, at 31-32 ("special measures for libraries"); Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal, Capitol Records, LLC v. Redigi Inc., Case No. 16-2321-cv (2d Cir. 2016), https://perma.cc/79AL-649N; Michelle Wu, *Piece by Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use,* 36 LEGAL REF. SERV. Q. 51 (2017), https://doi.org/10.1080/0270319X.2017.1359059.

Page  9

CONFIDENTIAL

WU00003032

# McNamara Declaration
# Exhibit 127

| From: | Chris Freeland |
|---|---|
| Sent: | Monday, August 20, 2018 2:15 PM EDT |
| To: | Sebastian Hammer |
| Subject: | Re: CDL Whitepaper? |

Hey Sebastian - The white paper & Statement on controlled digital lending is still on track for this fall.  It's a bit out of my hands (IA is officially NOT leading the effort for the sake of being impartial) but I do believe the authors will be making it available before our Oct 18 Open Libraries Forum.

We should chat. The rest of this week is maxed out, but my schedule is pretty loose next week, especially on Tuesday or Thursday - any chance you've got an hour to spare on either day to catch up?

Chris

```
---
Chris Freeland
Director of Open Libraries
Internet Archive
█████████████@archive.org
@chrisfreeland
█████████████
```

On 2018-08-20 11:51, Sebastian Hammer wrote:

```
Hi Chris,

I just wanted to check if there were any news. I'm getting on a call
with a few library deans this PM to talk about possible implications,
and it'd be nice to know what the latest is.

--Sebastian
```

CONFIDENTIAL

INTARC00415490

McNamara Declaration
Exhibit 128

| From: | David Hansen, J.D. |
|---|---|
| Sent: | Monday, July 2, 2018 5:53 PM EDT |
| To: | Lila Bailey; Courtney, Kyle K.; ████@librarylaw.com; Michelle Wu |
| CC: | Schultz, Jason |
| Subject: | Re: Email to CDL endorsers |

Thanks all. I think this all sounds reasonable, and a reasonable timeline for review. Lilia, the context about timing is helpful.
Aug 31 as final for all pieces in place sounds doable, and the timeline before that sounds good too.

As far as a joint blog post, the IA blog probably has the furthest reach but it may not be the best place for a joint post. I have blog at Duke that I'm am in the process of lining up some posts on, and this would be great to post there. None of my own doing (thanks, Kevin Smith), but it has lots of readers. Another option might be "In the Open" or to Library Journal, as an online opinion piece (I bet they would be open to it). I think either of those later two would be the best.

Dave

**From:** Lila Bailey ████@archive.org>
**Date:** Monday, July 2, 2018 at 5:08 PM
**To:** "Courtney, Kyle K." <████@harvard.edu>, Mary Minow <████@librarylaw.com>, Michelle Wu ████@law.georgetown.edu>
**Cc:** Jason Schultz ████@exchange.law.nyu.edu>, "David Hansen, J.D." ████@duke.edu>
**Subject:** Re: Email to CDL endorsers

Thanks Kyle,

This is a helpful general outline, and I think it gives Kyle and Dave time to get feedback, and time to do the work Jason suggested, while giving IA what we need to move forward. I would like to consider this our "final deadline schedule" so please if anyone has ANYTHING else they'd like to bring up and make sure is covered before launch, please do so soon. This timeline leaves us with very little wiggle room on back end if things come up, so let's try to think things through now!

Just a few further thoughts and questions:

1. Michelle and I will be working in parallel to get the website completed, and will get it ready to go by the end of August. **I would like to set August 31st as the date to have all the individual pieces in place** (meaning the website is complete with the final versions of the Statement and White Paper uploaded). The week after Memorial day can be for any final communications/launch strategy stuff and to deal with any problems that may arise.

2. We still need to exactly figure out what "launching" the website means... are we just going to remove the password? Are we going to make an announcement? If so, who's doing that and where will it go live? I don't think it's a good idea for it to be only announced through an IA blog post, for example. We do have a few opportunities to announce a date (e.g., the AALL CDL

CONFIDENTIAL

INTARC466748

session, our ALA Copytalk webinar) but I also think we might want to write up a blog post written by all of us - I'm just not sure where that should live. LMK if ya'll have ideas.

3. At what point in this timeline would we be previewing the White Paper with endorsers? Looks like mid to late August?

4. We should think about any other people or groups, aside from endorsers and LCA, that we may want to "pre-brief" on this. One group that comes to mind is AAUP - we've had some very productive conversations with them about CDL. There also Houghton-Mifflin-Harcourt (BPL may be in the best position to handle that one). I have a running list in the Google doc... please add any you think of/provide comments on ones we needn't bother with.

5. At some point, I'd like (some of) us to think through our potential response options to the inevitable criticism from Authors Guild and maybe others, so we're prepared for what they throw at us.

Also just FWIW, I will be on vacation August 9-19th, and Brewster will be on his annual "off the grid" trip for the last 3 weeks of August through Memorial Day. So on my end, I'm aiming to have much in place as possible before August 9th.

Please let me know if you all have any other feedback on this timeline. Once we have it pinned down, I will add the edits to the Google Doc. It is always a good idea for us to communicate by phone as well so I can set up a working group call for us any time it might be helpful.

-Lila

On 7/2/18 12:59 PM, Courtney, Kyle K. wrote:
> Greetings from Ireland all -
> I will be heading to an off-the-grid island in Galway tomorrow, but wanted to lay out a fixed timeline before I disappear that I think will work for all parties. (And I do not fear the momentum issue - all the meetings I went to at ALA were still buzzing from the Statement and people are anticipating the "more to come" with great interest - including various ALA/ACRL groups, consortia, amd large library systems!)
>
> 1. Dave and I get this "nearly done" (not perfect) version by July 9th.
> 2. We share it in a Google doc with all of you and ask for comments, additions, and edits, finished by Monday July 16th (or sooner)
> 3. As a professional courtesy, we share a print copy with Krista and Jonathan of ALA/ARL and set up a meeting time (TBA week and date)
> 4. Phase II edits and comments from our other expert peers (Late July to early August)
> 5. Mid August: Dave and I incorporate the Phase II comments and finish
> 6. Internet Archive and others launch sometime after Labor Day (b/c of their project schedule & vacation)
> 7. Sept. 14th (Lila's hard date) and all is done
>
> This schedule allows some flexibility, sufficient time to finish, and still "get it right."

Thanks,
Kyle

---

**From:** Mary Minow ████@librarylaw.com>
**Sent:** Monday, July 2, 2018 2:31:23 PM
**To:** Michelle Wu
**Cc:** Lila Bailey; Schultz, Jason; David Hansen, J.D.; Courtney, Kyle K.
**Subject:** Re: Email to CDL endorsers

These are also excellent points. I will go w whatever majority (minus me) votes

——

Take my advice. I'm not using it.

On Jul 2, 2018, at 1:27 PM, Michelle Wu <████████@law.georgetown.edu> wrote:

> I'm with Lila on not wanting to delay longer and as I've always been comfortable with the idea of releasing the statement without the white paper, I'm fine with that as an alternative.
>
> My concerns on further delay: (1) we've lost most of the momentum from last year, (2) delay has gotten to the point where some signatories are wondering if something's wrong with the statement and that's why we won't release it, and (3) our OGC would actually be happier if there was more robust public debate on this. He's comfortable with our position now but thinks that open debate ultimately would help move the matter forward.
>
> On Mon, Jul 2, 2018 at 2:03 PM Lila Bailey <██@archive.org> wrote:
>
>> All,
>>
>> This project has been delayed for 7 months. I am really troubled by the continued kicking of the can down the road. The Internet Archive has more than an academic interest in this moving forward, and we've been relying on promises that this would be done already. We've already had to embarrass ourselves several times in walking back promised dates.
>>
>> For us, the absolute drop-dead date we need at least the Statement to be fully publicly released is Sept 14th, in advance of our October event. That will be a year since we first announced this project, and it will be deemed a complete failure and waste of our time if it's not released by then. I'm just being real about the impact of delay on my client (and potentially on my job if this isn't done... seriously guys.)
>>
>> So here are my questions at this point:
>>
>> 1. What is the earliest deadline that Kyle and Dave can promise to have fully complete, ready to go publishable White Paper? Can we get this whole project out the door before Sept 14?

CONFIDENTIAL

INTARC466750

2. If the group as a whole is uncomfortable setting a specific date for the white paper, is there a way that we can uncouple the release of the Statement from the release of the White Paper?

For IA, the Statement is the thing we actually need... the white paper isn't going to make any difference to us. We're only waiting for the white paper out of some abstract fear of LCA's response and we don't know if the white paper will even satisfy their concerns. And AFAIK, there is no real plan in place to talk to them and make sure it will. I am now regretting that we ever held up the Statement for the white paper in the first place.

I know this may sound like kind of a freak out, but I feel I need to state in the clearest possible terms the real stakes of continued delay on me and my client. I know I'm not anyone's boss, and so all I can really do is beg.

Please let me know.

-Lila

On 7/2/18 7:53 AM, Mary Minow wrote:

that makes sense to me

Mary

On Jul 1, 2018, at 10:54 PM, Schultz, Jason <████@exchange.law.nyu.edu> wrote:

Yeah - sorry to raise this late in the game but I think it might make more sense to have our internal review done before we announce the white paper is forthcoming. First it prioritizes giving enough time to make sure the white paper is the best it can be. Second I was imagining receiving the email as an endorser and being frustrated and/or filled with questions because there is no access to the white paper yet. I expect anyone receiving the email will want to click and read right away.

So I'd propose waiting until after internal review to send and then providing all endorsers with early access (perhaps in waves) so they aren't surprised by the content when it goes live.

On Jul 2, 2018, at 5:46 AM, David Hansen, J.D. ████@duke.edu> wrote:

Sent something similar to Lila on another thread –

On the paper, I don't think this is quite in shape where comments even from you all would be useful yet. I know we said July 1 and I've been working on it all week, but it's just not there. I think if you can give till the other side of the holiday, it will be worth it. (Let's say Friday this week).

On the email announcement, I remain a bit nervous about the announcing a time / the timeline. On top of me and Kyle having some trouble getting time in on this to wrap it up, after thinking more about the timeline we have sketched out I'm pretty skeptical we're going to have enough time to get feedback in time, with the likelihood of people who we would want feedback from out/on vacation.

Sorry to be a drag on the timing on this...

---

**From:** Lila Bailey <███@archive.org>
**Date:** Sunday, July 1, 2018 at 9:57 PM
**To:** Michelle Wu <███████@law.georgetown.edu>, "David Hansen, J.D." ███████@duke.edu>, "Courtney, Kyle K." ██████████@harvard.edu>, Mary Minow ███████@librarylaw.com>, Jason Schultz <████████@exchange.law.nyu.edu>
**Subject:** Re: Email to CDL endorsers

Speak now or forever hold your piece on the email to our endorsers:https://docs.google.com/document/d/1Iv9L4iyPkaSRGYXb7Ru4bU7bDakjgFRHr16dvntjI1k/edit?usp=sharing

Planning on sending it out tomorrow morning assuming I get no objections.

On 6/27/18 11:58 AM, Lila Bailey wrote:

Hi all,

Here's a draft email:

https://docs.google.com/document/d/1Iv9L4iyPkaSRGYXb7Ru4bU7bDakjgFRHr16dvntjI1k/edit?usp=sharing

There's a question in there about the Statement title... if we're going to change it, this would be a good opportunity to announce/explain. I'm thinking this should go out on Monday of next week, so please get any thoughts/edits in by Friday.

For context, the previous email is on the second page of the Google Doc.

Thanks!

Lila

--

CONFIDENTIAL

INTARC466752

Michelle M. Wu | Associate Dean for Library Services & Professor of Law
111 G Street, N.W. | Washington, D.C. 20001
Office: ████████ | Email: ████████@law.georgetown.edu

CONFIDENTIAL

INTARC466753

# McNamara Declaration
# Exhibit 129

| From: | Wendy Hanamura |
|---|---|
| Sent: | Monday, April 2, 2018 9:53 PM EDT |
| To: | David Rumsey; Abby Smith Rumsey; Paula MacKinnon; Anasuya Sengupta; Bethany Nowviskie; Carole Palmer; Chris Coward; David Rosenthal; Victoria Reich; Geoff Harder; Gerald R. Beasley; Scates Kettler, Hannah R; Lawrence Wilkinson; Jim Fruchterman; Martha Kanter; Lisa A Petrides, Ph.D.; Michelle M. Wu; Michael Furlough; Nirmita Narasimhan; Marlin, Mike@CSL; Pam Samuelson; Susan Hildreth; Vint Cerf; Peter Jaszi; Kyle Courtney; John Fraser; Cohen, Daniel; Beverly Sheppard; Jeff Ubois; Cecilia Conrad; Molyneaux, Kristen |
| CC: | Chris Freeland; Jim Michalko; Brewster Kahle; John C Gonzalez |
| Subject: | Please Meet Our Director of Open Libraries, Chris Freeland |

Dear Open Libraries Advisors & Supporters,

In the last few months, we have been moving forward with Open Libraries--a vision to bring millions of books to digital learners who have little or no access to them.

One of the most exciting developments for Open Libraries is the addition of a new Director to move the project forward. I'm so pleased to introduce you to **Chris Freeland, Director of Open Libraries**--one of four new leaders who are bringing this vision forward. To read more about Chris, click here.

Chris joins us from Washington University in St. Louis, where he was Associate University Librarian. But he's been a friend and partner of the Internet Archive's for a decade, ever since he helped to found the Biodiversity Heritage Library. Chris will be ably assisted by Sr. Advisor, **Jim Michalko**; **John Gonzalez** continues to work toward bringing books to those with disabilities that impact reading.

Other milestones include:

- **Publishing our "wishlist" of books** to build the 4M book collection: click here to learn more
- Moving forward to **build the 4M book collection** with early adopters in California, including SFPL, LAPL and Sacramento Public Library
- Receiving $1.7 million (thus far) from the mysterious Bitcoin philanthropist behind the Pineapple Fund: read more here
- Drafting agreements to offer books to those with disabilities that impact reading through local libraries

Chris would like to meet and learn from you all. He is based in St. Louis and will be at the ALA convention in New Orleans. I hope you will join us for an Open Libraries-focused dinner at ALA. Onward!

best regards,
Wendy
--
**Wendy Hanamura**
Director of Partnerships
█████████
█████████ (mobile)

CONFIDENTIAL
INTARC00412869

**Internet Archive**
300 Funston Ave
San Francisco, CA  94118

████@archive.org
SKYPE: ████████
@whanamura

# McNamara Declaration
# Exhibit 130

Page 1
Knocking Down the Barriers to Knowledge: Lila Bailey wins IP3 Award - Internet Archive Blogs
http://blog.archive.org/2020/08/10/knocking-down-the-barriers-to-knowledge-lila-bailey-wins-ip3-award/

## Internet Archive Blogs

*A blog from the team at archive.org*



| Blog | Announcements | 25th Anniversary | archive.org | About | Events | Developers | Donate |

## Knocking Down the Barriers to Knowledge: Lila Bailey wins IP3 Award

Posted on August 10, 2020 by Wendy Hanamura





*Lila Bailey, Esq.—Policy Counsel for the Internet Archive*

This week, Public Knowledge, the public interest policy group, announced the winners of its 17th annual IP3 Awards. IP3 awards honor those who have made significant contributions in the three areas of "IP"—intellectual property, information policy, and internet protocol. On September 24, the 2020 Intellectual Property award will be presented to **Lila Bailey**, Policy Counsel at the Internet Archive.

"She has been a tremendous advocate and leader behind the scenes on behalf of libraries and archives, ensuring both can serve the public in the digital era," said Chris Lewis, President and CEO of Public Knowledge. "Working at the intersection between copyright and information access, Lila has been instrumental in promoting equitable access to contemporary research through **Controlled Digital Lending** — the library lending practice currently under threat because of a legal challenge from large commercial publishers."

"My whole career has been leading up to this moment," Bailey mused, speaking about her role defending the Internet Archive against the publishers' copyright lawsuit. "This is what I went to law school to do: to fight for the democratization of knowledge."



### Recent Posts

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

### Recent Comments

- Superman on July Book Talk: The Library: A Fragile History
- aho on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

### Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive



*Lila Bailey, center, with lawyers and librarians Michelle Wu, Lisa Weaver, Jim Michalko, Michael Blackwell and Tom Blake in 2019, during visits to Capitol Hill where they helped explain Controlled Digital Lending to key legislators.*

As a law school student at Berkeley Law, Bailey was a student attorney at the Samuelson Law, Technology & Public Policy Clinic, where she laid the legal groundwork for the Internet Archive's Television News Archive.

In private practice at Perkins Coie, Bailey won the Pro Bono Leadership award for her tireless work defending the Internet Archive's Wayback Machine against a legal challenge.

Bailey later went on to work for Creative Commons, helping to ensure that everyone everywhere has access to high quality, open educational resources. She served as a fellow at the Electronic Freedom Foundation, and later returned to Berkeley Law as a Teaching Fellow to help train the next generation of public interest technology lawyers.

> *"Now that our lives are largely online, copyright law, which is supposed to promote creativity and learning, sometimes creates barriers to these daily activities. The work I am doing is to try to clear some of those barriers away so we can realize that utopian vision of universal access to knowledge."*
>
> *–Lila Bailey*

Since joining the Internet Archive as Policy Counsel in 2017, Bailey has focused on building a community of practice around Controlled Digital Lending (CDL). Although the library practice has existed for more than a decade, Bailey has been working with Michelle Wu, Kyle K. Courtney, David Hansen, Mary Minow and other legal scholars to help libraries navigate the complex legal framework that allows libraries to bring their traditional lending function online. Today, with hundreds of endorsers, Controlled Digital Lending defines a legal pathway for libraries to digitize the books they already own and lend them online in a secure way.

"As a copyright lawyer, I find her to be an incredibly inspiring colleague, a natural leader, and great person," said Harvard Copyright Advisor, Kyle Courtney, who works with Bailey on the CDL Task Force. "I know that her work creates a multiplier effect that can inspire others, like myself, to advocate for greater access to culture and enhance a library's role in the modern world."

So what drives this intellectual property warrior forward? "Access to knowledge matters to everyone. It's the great equalizer. That is what the internet has given us—this vision of everyone having equal ability to learn and also to teach, to read and also to speak," she explained. "Now that our lives are largely online, copyright law, which is supposed to promote creativity and learning, sometimes creates barriers to these daily activities. The work I am doing is to try to clear some of those barriers away so we can realize that utopian vision of universal access to knowledge."

- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News
- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

### Archives

Select Month

### Meta

- Log in
- Entries feed
- Comments feed
- WordPress.org

On September 24, IP3 Awards will also be presented to **Matthew Rantanen** (Canadian Cree), Director of Technology for the Southern California Tribal Chairmen's Association and Director for the Tribal Digital Village Network Initiative, and **Geoffrey C. Blackwell** (Chickasaw, Choctaw, Omaha, Muscogee Creek), Chief Strategy Officer and General Counsel for AMERIND, for their work establishing AMERIND Critical Infrastructure, focused on closing the digital divide in Indian Country. Also being honored is Stop Hate for Profit, a campaign that organized a mass boycott of Facebook advertising.

Previous IP3 Award winners include Bailey's mentors Professor Pam Samuelson and Internet Archive founder, Brewster Kahle; along with many of her heroes including professors Peter Jaszi, Lateef Mtima, and Rebecca Tushnet. Be sure to attend the award ceremony on **September 24, 6-8 PM ET**,  by registering here.



Posted in News | Tagged access to knowledge, CDL, controlled digital lending, copyright, intellectual property, internet archive, Public Knowledge | 8 Replies

---

← Even More Impacts of the National Emergency Library and Controlled Digital Lending

Community Networks Adapt to New Realities Under COVID: A DWeb Meetup Recap →

## 8 thoughts on "Knocking Down the Barriers to Knowledge: Lila Bailey wins IP3 Award"



**Reader**
August 11, 2020 at 4:09 am

Lila Bailey is doing great work. So much a burden of a task! Surely, she might need more help to contend with the four firm prosecution team. It's overwhelming odds in how they will nit-pick and so on.



**Flores**
August 16, 2020 at 2:25 pm

Thank You Lila Bailey!! Being able to access knowledge is a basic human right..



**Capptain Mark**
August 11, 2020 at 6:57 am

Amazing lady!!



**Suzanne Smith Schlabs**
August 11, 2020 at 4:54 pm

Thank You Lila Bailey!! Being able to access knowledge is a basic human right.



**Xourx Web Design**
August 11, 2020 at 4:58 pm

Miss with tireless effort

Page 4
Knocking Down the Barriers to Knowledge: Lila Bailey wins IP3 Award – Internet Archive Blogs
http://blog.archive.org/2020/08/10/knocking-down-the-barriers-to-knowledge-lila-bailey-wins-ip3-award/



**เว็บคาสิโนออนไลน์ ฟรีเครดิต**

August 12, 2020 at 3:27 am

You were great and everyone received so much from your experience and knowledge
Absolutely amazing, thank you for sharing your knowledge with me.



**Zilla**

August 15, 2020 at 1:47 pm

it is always great to see people getting the recommendations they deserve especially in a world today where people do not give people their roses when they are alive. Congrats to her. She is a big winner.

**Nancy West**

August 17, 2020 at 1:56 am

Lila Bailey,

You are a roll model to all of us!

Comments are closed.

*Proudly powered by WordPress*

A-3311

Case 1:23-cv-04160-DJC-OTW Document 96-14835 Filed 07/07/22 Page 1 of 3

# McNamara Declaration
# Exhibit 131

| | |
|---|---|
| **From:** | Michelle Wu |
| **Sent:** | Tuesday, November 7, 2017 3:23 PM EST |
| **To:** | Lila Bailey |
| **Subject:** | Fwd: IIMPORTANT: Note re Controlled Digital Lending |

**Attorney Client** ███████████████████████████████

---------- Forwarded message ----------
From: ████████████████ ██████████████████████
Date: Tue, Nov 7, 2017 at 2:24 PM
Subject: Fwd: IIMPORTANT: Note re Controlled Digital Lending
To: Michelle Wu <████████████@law.georgetown.edu>


May need some back up



Begin forwarded message:

> **From:** Peter Jaszi ████████████████████████
> **Date:** November 7, 2017 at 2:21:08 PM EST
> **To:** ███████████████ ████████████████████
> **Subject: IIMPORTANT:  Note re Controlled Digital Lending**


Dear ██████

Forgive the capitals, please, but they are justified.  I understand the ████████████████ has signed onto the Internet Archives legal "analysis" of CDL.  This is a one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursuing the strategy.  It may serve the institutional interests of the IA, but they will not be bearing the costs of the litigation that is bound to follow if this model is rolled out.  I think you know me as a strong advocate for responsibly aggressive reliance on fair use, but this document is beyond the pale.  I'll be speaking out strongly against its conclusions when and if it is publicly released, and I hate to see ████ associated with it in any way.  It would be great to talk about this, if you're interested.  I can be reached more or less continuously on ████████ ████

INTARC00474640

With best wishes, in haste and urgency,

— Peter

--
Michelle M. Wu  | Associate Dean for Library Services & Professor of Law
111 G Street, N.W. | Washington, D.C. 20001
Office: ███████████ | Email: ███████████@law.georgetown.edu

CONFIDENTIAL

INTARC00474641

# McNamara Declaration
# Exhibit 131

| | |
|---|---|
| **From:** | Michelle Wu |
| **Sent:** | Tuesday, November 7, 2017 3:23 PM EST |
| **To:** | Lila Bailey |
| **Subject:** | Fwd: IIMPORTANT: Note re Controlled Digital Lending |

## Attorney Client

---------- Forwarded message ----------
From: ██████████████████████████████████
Date: Tue, Nov 7, 2017 at 2:24 PM
Subject: Fwd: IIMPORTANT: Note re Controlled Digital Lending
To: Michelle Wu <████████@law.georgetown.edu>

May need some back up

██████████████
████████████████████████
██████████████████████
████████████
██████████████████████

Begin forwarded message:

**From:** Peter Jaszi ████████████████████
**Date:** November 7, 2017 at 2:21:08 PM EST
**To:** ████████████████████████████
**Subject: IIMPORTANT:  Note re Controlled Digital Lending**

Dear ████████:

Forgive the capitals, please, but they are justified.  I understand the ████████████████ has
signed onto the Internet Archives legal "analysis" of CDL.  This is a one-sided puff piece that
seriously misrepresents both the state of the law and the risks to institutions of pursuing the
strategy.  It may serve the institutional interests of the IA, but they will not be bearing the
costs of the litigation that is bound to follow if this model is rolled out.  I think you know me
as a strong advocate for responsibly aggressive reliance on fair use, but this document is
beyond the pale.  I'll be speaking out strongly against its conclusions when and if it is
publicly released, and I hate to see ████ associated with it in any way.  It would be great to
talk about this, if you're interested.  I can be reached more or less continuously on ████████
████

**CONFIDENTIAL**

INTARC00474640

With best wishes, in haste and urgency,

— Peter

--
Michelle M. Wu  | Associate Dean for Library Services & Professor of Law
111 G Street, N.W. | Washington, D.C. 20001
Office: ████████ | Email: ████████@law.georgetown.edu

CONFIDENTIAL

INTARC00474641

# McNamara Declaration
# Exhibit 132

| From: | Courtney, Kyle K. |
| --- | --- |
| Sent: | Tuesday, September 19, 2017 11:35 AM EDT |
| To: | Lila Bailey |
| CC: | Wendy Hanamura |
| Subject: | RE: pre-interview for Library Leader panel and legal working sessions |

G'Morning –

I am copying and pasting the note from the back and forth with Kenny Crews.

But to start, Kenny pitched, and I adapted and made a "legal summary" of all of CDL – he thinks we are truly intertwining 107 and 109:

A library or archives is acting within fair use if it digitizes and lends to users the full text of a copyrighted book [work?], provided it does so within carefully implemented limits and safeguards (i.e., all the details of *CDL*), and provided that the library's primary purpose for making and using the digitized book [work?] is limited to uses that are within the distribution and other related rights that the library has under the first sale doctrine, as applicable to the original book [work?] in the collection.

I have been using this statement – in various forms, as I talked with Bob Darnton, John Palfrey, Jonathan Zittrain, and others. It seems to be a good elevator pitch for those that are "in the trenches" on copyright. This could be the beginning basis of our white paper down the road….

The rest below is Kenny, I sent him a reply on most, but wanted you to see all of the comments, especially the ones he mentions that could require edits.  He should be getting back to me again this week.
He is mostly positive about this! (Thankfully). A signature could be forthcoming… not sure.


This statement should have the effect of steering you away from separate analyses of the two legal doctrines.  Instead, you are integrating first sale as a part of fair use.  I am thinking that your "purpose" analysis can rise above the usual educational purpose statements, and add that a purpose is to exercise and fulfill the promise of first sale.

[BTW, I use the same analysis regarding 110(1).  If a prof wants to make copies of movie clips to show in class, the clips are made under fair use.  But in the analysis of the "purpose" factor, I argue in addition to education, that the purpose of the copying is to effectively utilize the performance right under 110(1).]

Some specific points in your draft:

** The statement needs to be stronger than offering a "good faith" interpretation.  That concedes you might be wrong.  At what point are you able to craft a CDL plan that you believe does in fact comport with the law?  Counsel will probably want a legal memo to the file, at the least.

** You limit the number of digital circulation copies to the number of print copies.  If the library owns three print copies, and three digital copies are out for circulation, what happens to the three in the stacks?  If they are still available for non-circulating use, one could argue that you have doubled the number of readable and useable copies.  Prepare for the counter-argument!

CONFIDENTIAL

INTARC465698

** The technological measures to prevent misuse by users are critical to success of CDL. Need to spell out the technology in detail and develop a demo.

** You say fair use is rooted in the Constitution, but you don't explain. Either give a convincing answer or leave out the reference. It opens one more place where critics can attack.

** Nature of the work: I agree that selecting only certain types of books can strengthen this factor. The quandary is that the more carefully your select books, the easier it is for someone to argue that you also could have carefully sought permission. In fact, the first bullet point on the last page is about non-commercial books, etc. Would the library have to search the market for each book?

** Amount used: There is a strong argument to make here for use of the entire book, based on Google Books, HathiTrust, and more.

** Effect on the market: The counter-argument is that the CDL use is NOT identical to current physical lending. For example, lending the digital file does not raise risks of loss or damage to the copy. It is does vanish, the library surely has a backup and does not need to return to the market and buy another copy.

** The example of a negative book review also is not quite right. A strongly negative review might never even include a quotation from the book. In other words, the market harm from a negative review might not be cognizable under copyright law because the review never even touched any of the 106 rights of the owner.

** The last bullet point on the last page is not very convincing. Many rural communities are well served. Sometime the biggest need is in the cities, where parking is miserable, and realistically students and profs are doing their research at home.

Sorry if I seem negative. I am not! I am just looking at the proposal through the eyes of someone on the "other side" so you can anticipate the issues. I like this idea very much, and I would like to talk with you about tightening it.

**From:** Lila Bailey [mailto:█████@archive.org]
**Sent:** Tuesday, September 19, 2017 10:34 AM
**To:** Courtney, Kyle K. ███████████@harvard.edu>
**Cc:** Wendy Hanamura █████@archive.org>; Kinne, Sarah M ███████████@harvard.edu>
**Subject:** RE: pre-interview for Library Leader panel and legal working sessions

Thanks Kyle. Sarah, we look forward to hearing from you with some times that work.

In the meantime, Kyle, can you send me the notes from Kenny Crews on the Statement? I'm hoping to be able to lock down the language this week so we can share it with LLF attendees.

Thanks, and good luck with JZ and Chris. Fingers crossed.

On Sep 19, 2017 5:24 AM, "Courtney, Kyle K." <███████████@harvard.edu> wrote:

CONFIDENTIAL

INTARC465699

Good Morning –

Thanks for writing. At this stage of the semester I am teaching three sections, so it looks like I am booking on average almost a week out.

I am cc'ing Sarah, my office assistant and calendar wizard(!), to try and find a time that fits all our schedules.


Update: In the meanwhile I am so close on Jonathan Zittrain and Chris Bourg (MIT) – I think we will know if they sign this week…

Thanks,

Kyle

---

**From:** Lila Bailey [mailto:██@archive.org]
**Sent:** Monday, September 18, 2017 3:14 PM
**To:** Courtney, Kyle K. ██@harvard.edu>; Wendy Hanamura < ██@archive.org>
**Subject:** pre-interview for Library Leader panel and legal working sessions


Hi Kyle,

Wendy and I would like to set up a time to chat with you to discuss the myriad ways in which you are participating in LLF this year (thank you!). We'll talk about the plenary panel regarding the CDL Statement, as well as the other legal working group sessions.

Some options for times that work for the both of us are:

Tuesday 9/19 from 1-4pm Pacific

Wednesday 9/20 between 9-11am Pacific

Monday 9/25 between 11am and 1pm Pacific

Is there a time in there that works for you? Expect the call to run about an hour.

Thanks!

Lila

CONFIDENTIAL                                                                 INTARC465700

CONFIDENTIAL

INTARC465701

# McNamara Declaration
# Exhibit 133

| From: | Brewster Kahle |
| --- | --- |
| Sent: | Thursday, October 26, 2017 7:02 PM EDT |
| To: | Brianna Schofield; Katie Hafner |
| CC: | ████@archive.org; Caitlin Olson; Wendy Hanamura |
| Subject: | background for the book program |
| Attachments: | statement-controlled lending v6 .pdf, signature.asc |

Katie--

Trying to get a complete library of books to digital learners.

1923 on back is public domain, hurrah, we have digitized 3 million of these and getting 25million reads per month (!).

out of print 1923-1941 can be digitized and made available.

   Announced Oct 11, 2017:
http://blog.archive.org/2017/10/10/books-from-1923-to-1941-now-liberated/

    collection:

  https://archive.org/details/last20

Big deal:  digitize and lend:

  We have been doing it for 6 years with the boston public library and others (500k books), but one reader at a time in the whole world.

    Here are your (katie's) books lent in this way:

https://archive.org/details/texts?&and[]=katie%20hafner%20AND%20scanner:*

    Houghton Mifflin Harcourt explicitly signed on for their backlist

Next big step forward:

  open this up so other libraries can lend books based on their holdings (not just 1 book for the world based on Internet Archive's copy).

   this is called "Open Libraries"

    a paper about the general concept:

https://er.educause.edu/articles/2017/3/transforming-our-libraries-from-analog-to-digital-a-2020-vision

    a website about it:  http://openlibraries.online

    legal folks statement about "Controlled Digital Lending by

CONFIDENTIAL

Libraries" (do not distribute because not public yet) attached to this message

MIT Press explicitly signs on:
https://blog.archive.org/2017/05/30/mit-press-classics-available-soon-at-archive-org/

Macarthur grant narrative, with awesome letters of support:
https://archive.org/details/OpenLibrariesNarrative

Exec Summary:

Open Libraries

Looking for a trusted source of information? For millions of citizens there's only one place to head: their local library—society's great equalizer, where wifi, computers, and knowledge are offered for free, to anyone who can enter the door. Yet, due to distance, time, cost or disability, people in marginalized populations are too often denied access to physical books. Today for many learners, if a book isn't digital, it's as if it doesn't exist. Yet there's almost a century of knowledge that still lives only on the printed page, missing from our digital shelves.

The Internet Archive's Open Libraries offers a solution bringing four million books online, through purchase or digitization, while honoring the rights of creators and expanding their online reach. Added to our existing 2.5 million ebooks, we can build the online equivalent of a great, modern public library. Working with US libraries and Benetech, the world's largest digital library for the print disabled, the Internet Archive (IA) will bring millions of free digital books to billions of people. For the blind, ebooks are a lifeline, yet only one in ten exists in accessible formats. Digital content is instantly available to people in rural areas, with widely ranging physical abilities. By digitizing millions of books, we unlock them for communities with limited or no access.

At the same time, we have a rare opportunity to shape digital collections to serve communities that are increasingly diverse. In 2015, 50% of newborn US babies were children of color, yet over a twenty-year span, on average only 11% of children's books contained multicultural content. Because our library shelves can and must be as diverse as readers, we will curate inclusive content.

IA will select and preserve diverse collections and help libraries greatly expand their digital holdings. In 2013, ebooks comprised an average of 17% of U.S. public libraries collections; we can turn 80% of library collections digital by 2023. We'll build an open infrastructure for at-scale ebook circulation so US libraries that own the hardcopy can offer their patrons temporary digital access, just like loaning a book. Working with Benetech, we'll expand ebooks for the print disabled by 10x. Global agreements allow sharing these ebooks with the vision impaired in 29 nations.

In this era of disinformation, ready access to trustworthy sources is critical. Library books are trusted sources for life-long learning. By bringing them online, we empower journalists and Wikipedia editors to cite "snippets" directly, grounding readers in the vetted, published

CONFIDENTIAL

INTARC00458733

record.

A century ago, Andrew Carnegie funded a vast network of public libraries because he recognized democracy can only exist when citizens have equal access to diverse information. Libraries continue to play that vital role, welcoming the whole of society to use their free resources for individual learning, while respecting citizens' privacy and dignity. Through its support, the MacArthur Foundation can help us build a financially sustainable infrastructure for digital libraries across this nation--ensuring that all citizens, including our most vulnerable, have equal and unfettered access to knowledge.

-brewster

INTARC00458734

# Statement on Controlled Digital Lending by Libraries

October 2017



Co-Authored By:

**Lila Bailey**, Policy Counsel, Internet Archive
**Kyle Courtney**, Copyright Advisor, Harvard University
**David Hansen**, Director of Copyright and Scholarly Communications, Duke University Libraries
**Mary Minow** , Fellow 2017-18, Berkman Klein Center for Internet and Society, Harvard University
**Jason Schultz**, Professor of Clinical Law, NYU Law
**Michelle Wu**, Associate Dean for Library Services, Professor of Law, Georgetown Law

CONFIDENTIAL

INTARC00458735

## Statement on Controlled Digital Lending by Libraries



### The Purpose of This Statement

This Statement offers a good faith interpretation of U.S. copyright law for American libraries considering how to perform traditional lending functions using digital technology while preserving an appropriate balance between the public benefit of such lending and the protected interests of private rights holders. This Statement only applies to in-copyright works, as public domain works may be distributed without restriction. This Statement is not intended to describe the upper limits of the fair use or other rights of libraries, bind the signatories to any legal position, or constitute legal advice. Because the following analysis is general, any library considering implementing controlled digital lending should consult a competent attorney to develop an appropriate program responsive to the specific needs of the institution and community.

### Controlled Digital Lending ("CDL")

One of the most fundamental and socially beneficial functions of libraries is providing broad non-discriminatory access to information by lending books and other materials to their communities.  To lend materials more effectively, libraries can apply CDL to their collections in order to fulfill their missions. CDL techniques like those described in this Statement are designed to mirror traditional library practices permitted by copyright law.

Properly implemented, CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. Essentially, CDL must maintain an "owned to loaned" ratio. Circulation in any format is controlled so that only one user can use any given copy at a given time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies.

### Legal Support For CDL

As U.S. libraries consider implementing CDL, questions may arise about how such programs interact with U.S. copyright law. As with traditional physical lending, there are two main areas of copyright law that support CDL: the principle of exhaustion and the fair use doctrine.

#### First Sale and the Common Law Exhaustion Principle

Traditional library lending has been common practice for hundreds of years, primarily due to the common law principle of exhaustion, which is codified in part at Section 109 of the Copyright Act and is also known as the "first sale" doctrine. This legal set of rules mandates that any time there is an authorized transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy are terminated or "exhausted."

Exhaustion allows the owner of a particular copy of a work to sell, lend, or give away that copy without payment to or permission from the rights holder. Among other important benefits, exhaustion ensures that after copyright holders price and control the initial distribution of their works, secondary outlets (such as libraries) and markets (such as used bookstores) can expand the affordability, preservation, and availability of works. Library CDL approaches that track the principle of exhaustion are thus much more likely to fall within its protections.

#### Fair Use

Fair use has also existed for hundreds of years within U.S. copyright law to protect and preserve socially beneficial secondary uses of copyrighted works. It is an essential part of U.S. copyright law and acts as a First Amendment "safety valve" that protects free speech from encroachment by copyright holders. Section 107 of the U.S. Copyright Act gives several examples of canonical fair use such as " criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research," and expressly states that fair use is not an infringement of copyright. Other socially beneficial purposes, such as increasing public access to works, may also qualify for fair use.  Library CDL approaches that are designed for socially beneficial purposes are much more likely to fall within the protections of fair use.

The law further provides four nonexclusive factors for courts to consider in determining whether a particular use is fair:
> (1) the purpose and character of the use, including whether such use is of a
> commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted
> work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

All four factors must be weighed together in a fact-specific inquiry—each case is decided individually. Courts may consider additional factors, when appropriate, including whether the purpose of the use supports the underlying purpose of copyright law to expand public knowledge and understanding.

### Application of Fair Use and Exhaustion to CDL

Both the exhaustion doctrine and the fair use doctrine support CDL when properly implemented. Because there is no directly analogous case on point, this Statement offers a more detailed explanation of how fair use and copyright exhaustion can work together to effectuate CDL practices:

#### 1. The Purpose and Character of the Use

The purposes of library lending are diverse but all focus on socially beneficial outcomes that favor fair use, including providing access to information in order to encourage literacy, education, criticism, comment, news reporting, teaching, scholarship, and research, creating the informed citizenry essential to a functioning democracy. Both physical lending and

CONFIDENTIAL

INTARC00458736

CDL facilitate these purposes, and CDL substantially enhances them by providing non-discriminatory access and informational self sufficiency to residents in rural communities, the elderly or physically disabled, and others for whom a trip to their local library may be a barrier to access. During natural disasters and severe weather, as well as during health emergencies, CDL may be the only practical way for citizens to access what their libraries have purchased for their use. Moreover, another purpose of CDL is to fulfill the promise of the exhaustion doctrine, enabling libraries to distribute the copies they own, just in a different format, and this also weighs in favor of fair use. Public, school, and academic libraries lend books for noncommercial purposes, also strongly weighing in favor of fair use.

Another consideration under this factor is whether the use is transformative—that is, whether the secondary use has a different purpose or character from the original. A finding of transformativeness weighs heavily in favor of fair use, but a finding of transformation is not necessary when other socially beneficial purposes are present. This Statement is not premised on CDL being transformative. On balance the noncommercial and socially beneficial purposes of CDL favor fair use.

### 2. The Nature of the Copyrighted Work
Under this factor, published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred. CDL will almost always be used for books that have been published, and therefore this factor will generally favor fair use, or at least will not tip against it.

In some fair use cases, the content of the work (e.g., fact vs. fiction) will influence the fair use outcome, with courts allowing more uses when the underlying work is more informational or factual. Although this factor is rarely dispositive, library choices regarding which types of books they lend through CDL can help strengthen the analysis of this factor when weighed together with the other factors. Thus, the case for fair use may be stronger when the underlying work is academic, informational, or nonfiction. Other considerations regarding the nature of the work may also be considered relevant, for example, the case for fair use may be even stronger when the underlying work is commercially inactive, out-of-print, or a so-called "orphan work" whose owner cannot be identified or located.

### 3.  The Amount and Substantiality of the Portion Used
The amount used must be reasonable in light of the purpose of the use and many courts have found use of entire works fair for many purposes. With CDL, a user is typically granted temporary access to the entire work for non-commercial, socially beneficial purposes. After the temporary lending period, the user may no longer access the book, unless she checks it out again. If the library only owns one physical copy of the work, then additional users must wait in line. Just as it is reasonable and customary for brick-and-mortar libraries to lend out entire physical copies of books for a short period, providing temporary access to an entire digital work is reasonable for CDL purposes.

### 4. The Market Effect
The final fair use factor looks at the market effect of the secondary use. For CDL, the arguable negative impact is the loss of sales due to lending as a substitution. However, this effect, to the degree it exists, is unlikely to be counted against fair use because it is comparable to the current effect of physical lending, because properly implemented CDL programs maintain an "owned to loaned" ratio. Because libraries are entitled to distribute copies they own, any market effect from such activities is unlikely to impact the fair use analysis. Fair use jurisprudence recognizes a long-established principle that not all market harms are cognizable copyright injuries. The classic example is the market harm from a negative book review—although sales may be lost, this does not "count" as harm under the fourth factor. Moreover, because CDL depends on all copies having been legitimately acquired, the rights holder will have been compensated for all CDL copies at the time of first acquisition.

### Scope of CDL

Taken together, properly implemented CDL programs stand the best chance of having all the four fair use factors weigh in their favor.

In order to properly position CDL within the analysis above, libraries should (1) ensure that original works are acquired lawfully, (2) apply CDL only to works that are owned and not licensed, (3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio); (4) lend each digital version only to a single user at a time just as a physical copy would be loaned; (5)  limit the time period for each lend to one that is analogous to physical lending, e.g. two weeks; and (6) use digital rights management to prevent copying and redistribution.

The scenarios below are examples of practices that would not be considered properly implemented CDL or qualify for the analysis outlined above:
• A library digitizes an in-copyright book and makes it publicly available without any DRM allowing users to proliferate available copies of the work.
• A library owning one print copy of an in-copyright book digitizes it and makes it available to multiple users simultaneously, with or without DRM.
• A library digitizes an in-copyright book it has borrowed through interlibrary loan and makes it available to its users, even if only to one user at a time, and controlled through DRM.
• A commercial entity implements CDL and lends digitized versions of books it has purchased to customers for a fee or supported by advertising, even if only to one user at a time, and controlled through DRM.

INTARC00458737

## Statement on Controlled Digital Lending by Libraries

(3)

**Endorsed by**

**Institutional:**

**Authors Alliance**
**Duke University Libraries**
**NSCU Libraries**
**Phillips Academy, Andover, Oliver Wendell Holmes Library**
**UNC Chapel Hill Libraries**
**University of Kansas Libraries**

**Individual:**

**Chris Bourg**
Director
MIT Libraries

**Brandon Butler**
Director of Information Policy
University of Virginia Libraries

**Robert Darton,**
University Librarian, Emeritus
Harvard University

**Elizabeth Townsend Gard,**
Jill. H and Avram A. Glazer Professor in Social Entrepreneurship
Co-Director, Tulane Center for IP, Media & Culture
Tulane University Law School

**Ariel Katz,**
Associate Professor, Innovation Chair in Electronic Commerce
Faculty of Law, University of Toronto

**Lydia Loren**
Henry J. Casey Professor of Law
Lewis & Clark Law School

**Teresa Miguel-Stearns,**
Law Librarian and Professor of Law
Yale Law School

**Aaron Perzanowski**
Professor of Law
Case Western Reserve University School of Law

**Pamela Samuelson,**
Richard M. Sherman Distinguished Professor
of Law and Information
University of California - Berkeley

**Ronald E. Wheeler,**
Director of Fineman & Pappas Law Libraries,
Associate Professor of Law and Legal Research
Boston University Law

**Beth Williams,**
Senior Lecturer in Law, Director Robert Crown Law Library
Stanford Law School

**Michael Wolfe,**
Scholarly Communications Officer
University of California - Davis

We welcome additional endorsements. To add your name or institution, please contact: Lila Bailey, lila@archive.org.


Creative Commons Attribution (CC-BY)
https://creativecommons.org/licenses/by/4.0

NATIVE DOCUMENT PLACEHOLDER

Please review the native document INTARC00458739.asc

CONFIDENTIAL                                                                    INTARC00458739

# McNamara Declaration
# Exhibit 134

Page 1
Statement on Flawed Theory of "Controlled Digital Lending" - AAP
https://publishers.org/news/statement-on-flawed-theory-of-controlled-digital-lending/







Join AAP    Jobs in Publishing    Contact Us

Who We Are    Policy Priorities    Data & Statistics    News    Programs



# Press Release

◀ Back To News

February 4, 2019

👍 🐦 🔗 🖨

## Statement on Flawed Theory of "Controlled Digital Lending"



Washington, DC; Feb. 4, 2019 – The Association of American Publishers has reviewed the 2018 documents authored by David R. Hansen and Kyle K. Courtney on the subject of unauthorized library copying for the purpose of digital transmission of entire books to the public. These documents (collectively the "White Paper") argue that libraries engaging in this activity do not infringe copyright in literary works because such copying and transmission falls within the fair use and first sale doctrines under the invented theory and White Paper definition of "controlled digital lending" ("CDL").

AAP strongly disagrees with the analysis of the White Paper and its call to libraries to copy and transmit copies of entire books to the public in disregard of the law. CDL not only rationalizes what would amount to systematic infringement, it denigrates the incentives that copyright law provides to authors and publishers to document, write, invest in, and disseminate literary works for the benefit of the public ecosystem.

AAP notes that the White Paper emerged after copyright owners repeatedly questioned the Internet Archive about its legal basis for making and distributing unauthorized copies of copyrighted books, including by offering copies of both new and backlist titles for download under an "Open Library" project. In 2017, the Internet Archive aimed to redouble its efforts on this project by competing for a $100 million grant from the prestigious MacArthur Foundation (100&Change), thankfully unsuccessfully. As the Authors Guild reported, over the past few years the Internet Archive has inconsistently responded to take down notices under the DMCA. Following the White Paper's release, the Internet Archive, libraries, and academics issued public statements of support for the theory and practice of CDL.

As a major point of confusion, the White Paper repeatedly blurs the line between works and copies in its analysis, ignoring well-established legal distinctions between these terms in the Copyright Act as well as the reality that Congress imposed statutory limitations on library lending. This is a fundamental weakness of the White Paper's first sale argument as well as its market-harm argument under fair use and of the Paper's more general assertion that the law should view CDL as functionally equivalent to hard copy lending. To the contrary, AAP finds it highly unlikely under current law that CDL-sanctioned practices would be shielded by either the first sale doctrine under 17 U.S.C. §109(a) or the fair use doctrine under §107, because such practices involve making and transmitting new digital copies of print books.

Inexplicably, the White Paper proposes that CDL be universally applicable to any book, of any genre, made available to any patron for any purpose. The only condition is that the physical copy must have been acquired lawfully, and that it be owned, not merely licensed, by the library. As proposed, CDL would be equally applicable to current, in-print works for which digital lending licenses are available to libraries. Similarly, the CDL definition is

Page 2
Statement on Flawed Theory of "Controlled Digital Lending" - AAP
https://publishers.org/news/statement-on-flawed-theory-of-controlled-digital-lending/

agnostic as to the uses of the digital copies by the persons to whom they are transmitted. In other words, CDL does not itself constitute any of the favored fair use purposes such as criticism, comment, teaching, scholarship or research, and would clearly permit library patrons to use the copied materials for any reason, including entertainment.

Whatever public benefit libraries may claim results from CDL, it would not be sufficient to justify the harm to publishers' actual and potential markets. Because publishers generally make e-book lending licenses available to libraries for both frontlist and backlist works, and CDL is expressly designed to allow libraries to create their own substitute e-book editions for such works, it is clear that CDL copying would create direct market substitutes for publishers' extensive licensed offerings, not only for digital copies but also for hard copies. The substitutes are not at all transformative of either the copied work or the use of the copied work. Moreover, the Supreme Court has made clear that an actual, present market for a particular derivative use need not exist in order for market harm to be cognizable under the fourth fair use factor, provided that the use is one that "creators of original works would in general develop or authorize others to develop." Campbell, 510 U.S. at 592.

The concept of maintaining a one-to-one "owned to loaned" ratio is at the core of the White Paper's argument for the legality of CDL, under both §109(a) and §107. It constitutes the principal form of "control" that CDL purports to impose on library circulation of self-created e-books. The White Paper argues that by "limit[ing] the total number of copies in any format in circulation at any time to the number of physical copies the library owns," libraries can "maintain[ ] the market balance long-recognized by the courts and Congress." White Paper at 3-4.

The basic underlying assumption here is that the market for print books and the market for e-book lending are the same market, so that circulation of a work "in any format" is fungible with circulation of that work in any other format. This is demonstrably not true, as the publishing industry and libraries have over many years created and participated in entirely separate markets for the sale of physical books and the licensing of e-books, at different prices and on different terms and conditions. The White Paper's optional proposals for risk mitigation, such as limiting the number of digital loans of a single title, either in a given time period or overall, in an attempt to "reflect physical market conditions" similarly miss the point. CDL is designed to compete with copyright owners' digital market, not some hypothetical physical market, making the "owned to loaned" concept in CDL irrelevant to the application of §109(a) and §107.

Although the White Paper identifies orphan works, out-of-print works, and works for which digital licenses are unavailable as significant problems it proposes to solve with CDL, these special cases are not actually part of the crafted definition of CDL, and the Paper ignores the more extensive and balanced analyses that predate the CDL theory. In June 2015, the Copyright Office published a multi-year report on the subject of orphan works and mass digitization, which specifically considered, among other things, whether mass digitization by libraries could be entitled to a fair use defense under §107. The Report was the product of extensive study by the Office, informed by comments and input from libraries as well as many other stakeholders. It was issued after the Second Circuit's decision in Hathi Trust, but several months before the Second Circuit's Google Books decision in October 2015. In discussing a number of statutory solutions (including special licensing pilots) to make orphan works lawfully available, the Copyright Office concluded that "there is broad agreement that no colorable fair use claim exists [for] providing digital access to copyrighted works in their entirety." Since that time, the significant fair use decisions that have spoken to these issues, including Google Books, the Georgia State case, and most recently ReDigi, have cast no doubt on that conclusion and indeed have reinforced it.

The White Paper further asserts that CDL should be favored on public benefit grounds because it is "aligned with the principles" of first sale limitations under §109(a), even if it does not actually qualify for application of the first sale defense by statutory definition. In December 2018, the Second Circuit in ReDigi expressly rejected the notion that §109(a) is a statement of broad "principles," as the White Paper asserts, instead holding that it is a provision "for which Congress has taken control, dictating both policy and the means of its execution." ReDigi at 35. In short, ReDigi makes clear that there is no broad "principle" underlying §109(a) as enacted, and therefore fair use cannot be used as a way of implementing such a "principle" without doing violence to the Copyright Act as Congress has written it.

In issuing this statement, AAP is aware of movements in other countries to similarly bypass the copyrights of authors and publishers. AAP believes that CDL is impermissible under the national laws of these countries as well, and that any hypothetical future foreign legislation to permit controlled digital lending would face significant obstacles, inter alia under the "three-step test" for exceptions and limitations on authors' rights under the Berne Convention (Art. 9(2)) and the TRIPS Agreement (Art. 13).

**AAP** | ASSOCIATION OF AMERICAN PUBLISHERS

455 Massachusetts Ave. NW
Suite 700
Washington, DC 20001
P: 202-347-3375
F: 202-347-3690

**Quick Links**

Who We Are
Contact Us
Career Opportunities at AAP
Blogs

**Follow AAP**

**The Association of American Publishers (AAP)** represents the leading book, journal, and education publishers in the United States on matters of law and policy, advocating for outcomes that incentivize the publication of creative expression, professional content, and learning solutions. As essential participants in local markets and the global economy, our members invest in and inspire the exchange of ideas, transforming the world we live in one word at a time.

Privacy Policy | Terms of Use

© Copyright 2022, Association of American Publishers

Page 1
Controlled Digital Lending Is Neither Controlled nor Legal - The Authors Guild
https://www.authorsguild.org/industry-advocacy/controlled-digital-lending-is-neither-controlled-nor-legal/



SEARCH    DONATE    LOG IN OR JOIN

## THE Authors Guild

WHERE WE STAND    WHO WE ARE    COMMUNITY    NEWS & EVENTS    MEMBER BENEFITS    THE FOUNDATION

Home > News & Events > Industry & Advocacy News > Controlled Digital Lending Is Neither Controlled nor Legal

**INDUSTRY & ADVOCACY NEWS**

# Controlled Digital Lending Is Neither Controlled nor Legal

JANUARY 08, 2019

SHARE








"Controlled Digital Lending" or "CDL" is a recently invented legal theory that allows libraries to justify the scanning (or obtaining of scans) of print books and e-lending those digital copies to users without obtaining authorization from the copyright owners. A position statement on CDL, along with an accompanying white paper, was issued this past October by legal scholars, the culmination of several academic meetings on the subject. The statement and paper argue that it is fair use for libraries to scan or obtain scans of physical books that they own and loan those books through e-lending technologies, provided they apply certain restrictions akin to physical library loans, such as lending only one copy (either the digital copy or the physical copy) at a time and only for a defined loan period.

A couple dozen organizations, including Internet Archive, as well as a number of academics and academic librarians, are listed as signing the position statement. Several major library systems, including the California State University libraries and the Boston and San Francisco public libraries, are signatories and apparently already rely on CDL to e-lend scanned copies of books.

Recently, Internet Archive's Open Library has started rejecting notices sent by Guild members asking for unauthorized digital copies of their books to be taken down, citing that it "operates consistently with the 'Controlled Digital Lending.'" There are two problems with the justification. First, although Internet Archive managed to convince the State of California that it is a "library," as a website open to the whole world, it is not a library with a defined user base in any traditional sense. Second, copyright law does not support the practice of even true, traditional libraries offering unauthorized scans of books to its users on an e-lending basis, despite the patina of legality in the white paper.

### TOP NEWS

06.30.22
What Spotify's Expansion into Audiobooks Could Mean for Authors

03.25.21
What Is the ABC Test?

07.20.21
Everything You Need to Know About Book Advances

Page 2
Controlled Digital Lending Is Neither Controlled nor Legal - The Authors Guild
https://www.authorsguild.org/industry-advocacy/controlled-digital-lending-is-neither-controlled-nor-legal/

CDL relies on an incorrect interpretation of copyright's "fair use" doctrine to give legal cover to Open Library and potentially other CDL users' outright piracy—scanning books without permission and lending those copies via the internet. By restricting access to one user at a time for each copy that the library owns, the proponents analogize scanning and creating digital copies to physically lending a legally purchased book. Although it sounds like an appealing argument, the CDL concept is based on a faulty legal argument that has already been rejected by the U.S. courts.

In *Capitol Records v. ReDigi*, the Second Circuit held that reselling a digital file without the copyright holder's permission is not fair use because the resales competed with the legitimate copyright holder's sales. It found that market harm was likely because the lower-priced resales were sold to the same customers who would have otherwise purchased new licenses. In this regard, the court emphasized a crucial distinction between resales of physical media and resales of digital content, noting that unlike physical copies, digital content does not deteriorate from use and thus directly substitutes new licensed digital copies.

The same rationale applies to the unauthorized resale or lending of ebooks. Allowing libraries to digitize and circulate copies made from physical books in their collection without authorization, when the same books are available or potentially available on the market directly competes with the market for legitimate ebook licenses, ultimately usurping a valuable piece of the market from authors and copyright holders.

CDL's supporters tout their theory as a way to make more readily available older books from the 20th century that are in libraries' stacks but not available in electronic formats. They argue that some of the books may be orphaned and the rights owners cannot be located, but that argument is specious, and can only be made with a straight face by someone who has no idea how to find authors or publishers. The Authors Registry is able to find approximately 90% of authors of out-of-print books in approximately 30 minutes. True orphans do exist but are a small minority. For others, the white paper drafters assume that, if they are "unavailable in the digital marketplace," no one has any plans "for revitalization in modern formats," as though authors lose interest in their older books, even at times when they might need income from those books the most. CDL's proponents seem completely ignorant of the large and growing markets for ebooks of older works, whether they are self-published by the authors, by publishers like Open Road and Rosetta who specialize in such books, or by authors reselling reclaimed rights to traditional publishers.

### CDL WOULD DECIMATE AUTHOR EARNINGS FROM EBOOK LICENSING

CDL's threat to author incomes and the ebook market comes from two directions: 1) unauthorized scanning and e-lending of books that were previously published only in physical formats would usurp the market for creating new ebook versions; and 2) instead of purchasing library ebook licenses (which are more expensive than consumer editions for good reason), libraries would simply digitize the print book from their collection, depriving authors and publishers of important licensing income. Needless to say, if Internet Archive's plans to expand Open Library broadly to all libraries are realized, it would eventually decimate the market for library ebooks, put a massive dent in the ebook market in general, and usurp authors' rights to bring their older works back into the market.

### WE NEED TO STOP THIS NONSENSE!

Positions like CDL serve to widen the misperception that authors and public libraries are on opposing sides of copyright law, which is simply not the case. Most librarians respect authors and copyright law, and they want authors to be able to keep writing. The vast majority of authors, for their part, support and love their libraries and want libraries to own and circulate their works. But authors need to be compensated for their work like everyone else. Trade book authors don't get salaries or other fixed compensation; copyright is their only currency. Open

A-3337

Page 3
Controlled Digital Lending Is Neither Controlled nor Legal - The Authors Guild
https://www.authorsguild.org/industry-advocacy/controlled-digital-lending-is-neither-controlled-nor-legal/

Library and other CDL proponents' failure to understand the importance of respecting authors' copyrights is backwards thinking hidden under a false veil of progressivism. We must stop this Controlled Digital Lending nonsense in its tracks.

The Authors Guild has proposed licensing solutions that would make those works readily available, but the tech and library sectors have refused to work with us on any such proposals, even to engage in a pilot program. If Internet Archive and their followers truly want to provide internet access to those books, they can easily create solutions to do so while respecting authors' rights—namely, they could license them. We have drawn the roadmap for mass licensing of books, starting with the Google Books settlement, then our proposal to the Copyright Office for a pilot for mass digitization extended collective licensing, and for a platform to allow authors to license their books directly to libraries. None of it would be hard to achieve if those who wanted to provide access had the will to do it legally.

Sign our letter to Internet Archive's Open Library and other proponents of CDL to let them know that CDL infringes the rights of authors and demand that they respect the rights of authors. Access to books should not come at the expense of those who create them.

**Click here** to sign.

---

## MORE NEWS



07.05.22

**Member Spotlight: Hillary Leftwich**

07.01.22

Jesmyn Ward Wins Library of Congress Prize for Fiction

07.01.22

The Roundup: July 1, 2022

---

**The Authors Guild** is the nation's professional organization for writers, aiding and protecting author's interest in copyright, fair contracts, and free expression since 1912.

**LEARN MORE ▶**

Contact Us

Donate

Sitebuilder

Join Now

Renew

© AUTHORS GUILD. ALL RIGHTS RESERVED.    PRIVACY POLICY.    TERMS OF USE.    MEMBER CODE OF CONDUCT.    SEARCH INDEX.

By continuing to browse or by clicking "Accept All Cookies," you agree to first- and third-party cookies being stored on your device to enhance navigation of our site, and to help us analyze our site traffic and personalize our content and ads.

**X ACCEPT ALL COOKIES**

# McNamara Declaration
# Exhibit 136

| | |
|---|---|
| **From:** | Chris Freeland |
| **Sent:** | Thursday, February 28, 2019 12:33 PM EST |
| **To:** | Blake, Tom |
| **Subject:** | Re: FW: Open Library and Boston Public Library |

The university presses were NOT amused by the SoA's "purple prose" (their words).  It's like working with someone writing the comments section on Fox News.

On 2/28/19 11:30 AM, Blake, Tom wrote:
> I found this particularly offensive:
> "Physical books deteriorate over time and have a limited lifespan"
> Really? When are all the books going to die?!
>
> Tom Blake
> Content Discovery Manager
> Boston Public Library
> 700 Boylston St.
> Boston, MA 02116
> █████████
> Free To All
>
> From: Chris Freeland [mailto:█████████@archive.org]
> Sent: Thursday, February 28, 2019 12:26 PM
> To: Blake, Tom
> Subject: Re: FW: Open Library and Boston Public Library
>
> Nice that they included their real interest: "negotiate and purchase lending licences from the copyright owners"
> On 2/28/19 11:14 AM, Blake, Tom wrote:
> FYI…
>
> Tom Blake
> Content Discovery Manager
> Boston Public Library
> 700 Boylston St.
> Boston, MA 02116
> █████████
> Free To All
>
> From: Nicola Solomon [mailto:█████████@societyofauthors.org]
> Sent: Thursday, February 28, 2019 12:00 PM
> To: Blake, Tom
> Cc: Bryony Hall; Tim Gallagher; 'John Degen'; 'Rasenberger, Mary'; █████████
> Subject: RE: Open Library and Boston Public Library
>
> Dear Tom Blake,
> I find this reply astonishing and disingenuous. You and the Open Library have absolutely no legal right to digitise an author's books nor to implicitly authorise another to do so by donating them to the Internet Archive. By doing so, far from conferring a benefit on an author you prevent her making a living by licensing the content of her work.
> If the Open Library believes that is valuable to society to lend ebooks and undertake research on usage then it should negotiate and purchase lending licences from the copyright owners as is done by public libraries and other users both here and in the US. It certainly has the funds to do so . Your offer to share a file you do not own or have any rights to and for the author to make use of research derived from the unauthorised usage of the books is equivalent to you forcibly evicting me from my house and then inviting me in to have a cup of coffee and admire the beautiful new kitchen you have installed.

CONFIDENTIAL                                                                     INTARC00420085

> Copyright is there to strike a fair balance between the rights of authors to make a living from their work and the public good in having access to that material. Its rules have been made through legislation and debate over many years. It is not for you to unilaterally overrule them to the detriment of authors. If authors an no longer make a living they will have to stop writing. Evidence from the UK as well as from the US and other countries shows that the number of full time authors is decreasingly alarmingly, precisely for that reason. We are huge supporters of authorised library lending, which strikes a fair balance between the needs of authors and users but unlawful lending such as that practised by the Open Library is piracy and ultimately leads to a decline in the breadth and quality of books available to everybody. I would urge you to reconsider your position and to stop your involvement in copyright theft.
>
>
>
> Nicola Solomon
> Chief Executive
>
> t: ▓▓▓▓▓
>
> e: ▓▓▓▓@societyofauthors.org
>   |
> w: www.societyofauthors.org
>
> a:
> 84 Drayton Gardens
> ,
> London SW10 9SB
>
>
>
>
>
>
>
>
>
>
>
>
>
> Sign our open letter. Help us #EndEbookPiracy
>
> We're calling for the Internet Archive's Open Library to stop
> unlawfully scanning physical books and loaning them as ebooks.
> Find out more and sign our open letter here.
>
> The information in this message is confidential and may be privileged.
> It is indended solely for the addressee.
>
>
> -----Original Message-----
> From: Blake, Tom ▓▓▓▓@bpl.org>
> Sent: 28 February 2019 16:38
> To: Nicola Solomon <▓▓▓▓@societyofauthors.org>
> Cc: Bryony Hall ▓▓▓▓@societyofauthors.org>; Tim Gallagher <▓▓▓▓@societyofauthors.org>; 'John Degen' ▓▓▓▓@writersunion.ca>; 'Rasenberger, Mary' ▓▓▓▓@authorsguild.org>; ▓▓▓▓

> Subject: RE: Open Library and Boston Public Library
>
> Dear Nicola Solomon,
>
> As a point of clarification, The Boston Public Library no longer owns the copies of the books authored by Ms. Finlay that were digitized by the Internet Archive. Further, the Boston Public Library did not own these books when they were digitized by the Internet Archive. These titles were removed from our collection as a standard library weeding procedure based on circulation data and curatorial judgement. Rather than simply dispose of our weeded titles, we offer to donate them to the Internet Archive, a mission driven non-profit library dedicated to the long-term preservation and access to the world's knowledge and cultural heritage collections.
>
> For now, I believe it would be productive to focus on the benefits of Controlled Digital Lending for all parties involved. As I mentioned in my note to Ms. Finlay, as a result of this process and our partnership, we can now provide her with the digital files of her books that she would be free to use, resell, or republish as she and/or her publisher see fit. Lending libraries have irrefutably been an area where commercial interest for books is cultivated and supported – not replaced or dismantled. Lending an author's work helps to create and sustain a market for it – not the opposite. Usage statistics from the Open Library site can be used to help authors and publishers determine if a backlist or out-of-print title is worth reinvesting in as a reprint or a fully functional ebook. The machine readable text that is being generated from the digitization process can be used in text mining and natural language processing analytics, helping publishers and scholars detect linguistic trends over time. These trends can be used for market analysis and academic research. In short, our hope is that Ms. Finlay and other authors and publishers recognize the deep value of this initiative as it pertains to both the market and our cultural heritage as a literate and learned society.
>
> Sincerely,
> Tom Blake
> Content Discovery Manager
> Boston Public Library
> 700 Boylston St.
> Boston, MA 02116
> ▇▇▇▇▇▇▇
> Free To All
>
> From: Nicola Solomon [mailto:▇▇▇▇@societyofauthors.org]
> Sent: Tuesday, February 26, 2019 11:49 AM
> To: Blake, Tom
> Cc: Bryony Hall; Tim Gallagher; 'John Degen'; 'Rasenberger, Mary'; ▇▇▇▇▇▇▇▇▇▇▇
> Subject: RE: Open Library and Boston Public Library
>
> Dear Tom Blake
> I am Chief Executive of the Society of Authors, the UK trade union for more than 10,500 writers. One of our members, Victoria Finlay, forwarded the correspondence below.
> I note your position- but it is incorrect in law and a flagrant breach of our member's rights.
> Open Library is infringing authors' copyright and the process you describe is unlawful under both US and UK law. Making a digital file of a physical book is a copyright act which requires permission. Neither the publisher nor our member has given permission for such use.
> We understand that Open Library justifies the copying and distribution of these books in the USA on the basis of a Position Statement on Controlled Digital Lending, authored by a number of US legal scholars, which argues that Controlled Digital Lending is legal under the US doctrine of fair use. This opinion cannot be sustained following the recent decision in the ReDigi case, which ruled that the resale of digital files is unlawful.
> Furthermore, US fair use doctrine does not apply in the UK where all scanning and lending must be authorised by the copyright owner. There is therefore no legal basis for the practice of scanning books without permission or lending them in the UK. Despite this, users in the UK are currently able to borrow scanned copies of physical books from Open Library. That is a direct and actionable infringement of copyright.
> In your email to Victoria Finlay you claim that CDL makes books 'available on the internet the same way a

physical copy would be lent in a physical library'. This is highly misleading. Owning a physical book does not give you the right to copy it and this is entirely different from library lending for a number of reasons • Physical libraries lend books to library members within a limited territorial range – no such limitation exists on Open Library, which offers books to people from all over the world. • Physical books deteriorate over time and have a limited lifespan, a principle which has been written into the fees charged for legitimate e-lending by libraries. There is no suggestion that books on Open Library will ever be 'retired' in this way.

> • You state that 'there is no financial profit to be gained from this process'. However the process will result in a financial loss for authors, who do not receive any royalties from these loans which undoubtedly compete with legitimate sales and loans. Authors' earnings are in decline and many are struggling financially. A survey carried out by the Authors' Licensing and Collecting Society (ALCS) in 2018 found that an author in the UK earned an average of just £10,500 from their writing per annum. The form of lending that takes place on Open Library has the potential to destroy the e-book market and make it even harder for authors to make a living from their work.

> • It also competes with borrowings from bona fide UK libraries. In the UK, libraries buy licences for the e-books they offer and authors are also compensated by Public Lending Right which affords them a small payment (around 8.5 pence) every time a book is loaned from a library. These payments are of significant value to authors. The Open Library pays nothing at all to the creator.

> We wrote to Internet Archive in January demanding that it ceases this practice which infringes the copyright of writers and is unquestionably unlawful in the UK. We have received no substantive response.

> Authors who do contact Open Library directly have not been answered or have been told that their works will be taken down "as a courtesy". They have not been offered compensation, nor indeed an explanation for the blatant infringement of their rights for which there is no legal defence.

> As a supporter of Internet Archive, we hope that you will inform them that they must take down the Open Library site in the UK and must stop infringing authors' copyrights and damaging their incomes worldwide. If you love books and wish to share them then you must ensure that their creators can receive a fair reward for their work.

> I look forward to hearing from you.
> Yours sincerely,
> Nicola Solomon.
>
>
>
>
> Nicola Solomon
> Chief Executive
>
> t: ███████████
>
>
> e: ███████@societyofauthors.org
> |

w: https://emea01.safelinks.protection.outlook.com/?url=www.societyofauthors.org&amp;data=02%7C01%7Cnsolomon%40societyofauthors.org%7C365f09bbe3834039280308d69d9b22bf%7C847a6df2d21241189081823322693b1c5%7C1%7C1%7C636869686963348534&amp;sdata=SfJAJ9ZqHXcrOb4H%2FYDcgw%2FLY1QXdZ2%2B5E2XVi7Q7bE%3D&amp;reserved=0

>
> a:
> 84 Drayton Gardens
> ,
> London SW10 9SB
>
>
>
>
>
>
>

CONFIDENTIAL
INTARC00420088

> 
> 
> 
> 
> 
> 
> 
> Sign our open letter. Help us #EndEbookPiracy
> 
> We're calling for the Internet Archive's Open Library to stop
> unlawfully scanning physical books and loaning them as ebooks.
> Find out more and sign our open letter here.
> 
> The information in this message is confidential and may be privileged.
> It is indended solely for the addressee.
> 
> 
> 
> From: V Finlay <██████████████@███>
> Sent: 20 February 2019 18:27
> To: The Society of Authors <info@societyofauthors.org>
> Subject: Fwd: QUERY INTL 02.20.19 Open Library Copyright issue BPL donated book ejc
> 
> Dear Society of Authors
> 
> I'm a member and recently I was galvanised by your campaign to let my US agent (Sterling Lord) know that two
> of my books are available on Open Library. I borrowed one and was horrified to find that I could just download it.
> Like I'd bought it.
> 
> They say you can't copy or print, but obviously you can screenshot and read.
> 
> I wrote to Boston Library whose scheme it is, and this is the answer I received. Slightly horrified that Tom Blake,
> Content Discovery Manager, is describing the process as "weeding".
> 
> I send it to you in case you think it might be useful to contact Boston Library and explain that they are violating
> UK copyright law.
> 
> Best wishes
> 
> Victoria
> 
> Begin forwarded message:
> 
> From: "Blake, Tom" <██████@bpl.org>
> Subject: RE: QUERY INTL 02.20.19 Open Library Copyright issue BPL donated book ejc
> Date: 20 February 2019 at 16:24:40 GMT
> To: Ask The Boston Public Library <ask@bpl.org>, Victoria Finlay <████████@arcworld.org>
> Cc: Digital <Digital@bpl.org>, "███████@archive.org" <███████@archive.org>
> 
> Hi Victoria,
> 
> Open Library is a project of the Internet Archive, a non-profit digital library based out of San Francisco, CA.

https://emea01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fen.wikipedia.org%2Fwiki%2FInternet_Ar
chive&amp;data=02%7C01%7Cnsolomon%40societyofauthors.org%7C365f09bbe3834039280308d69d9b22bf%7C
847a6df2d2124118908182322693b1c5%7C1%7C1%7C636869686963348534&amp;sdata=WKAzPUnf0JVt4%2F

CONFIDENTIAL

INTARC00420089

Kw1P5qbhH1kO40mc5v3V7OYS0E4i8%3D&amp;reserved=0
> The copy of your book that you cite below got to them because of our deaccessioning and digitization partnership we have with them. Essentially, we weeded the book from our collection and gave it to them for permanent preservation storage and digitization. The digitized copy that has been made available through Open Library is only viewable by one person at a time at any given time (for a period of two weeks) and the physical book does not circulate. Copy and print features have been disabled. This is referred to as Controlled Digital Lending. Several libraries and publishers here in the US have started using this method as a way of making books that have no digital form available on the internet the same way a physical copy would be lent in a physical library.
>
https://emea01.safelinks.protection.outlook.com/?url=https%3A%2F%2Fcontrolleddigitallending.org%2F&amp;dat
a=02%7C01%7Cnsolomon%40societyofauthors.org%7C365f09bbe3834039280308d69d9b22bf%7C847a6df2d212
4118908182322693b1c5%7C1%7C1%7C636869686963348534&amp;sdata=DvRAKmGDKViGM2XEpLbSyTtW
m6p7sHeu18FOfJduonmI%3D&amp;reserved=0
> There is no financial profit to be gained from this process and there only will ever be one version of the purchased book made available. We believe that this is good balance between respecting the copyright of the author/publisher while still fulfilling our mission as a lending library. Further, digitization of these titles makes them accessible to print-disabled readers. The page images are scanned and then run through special software that converts the text images into machine readable characters that can be rendered as an audio file. Blind readers can now hear your book! We hope you agree that this is a worthy process. We can supply you with the digital version of your book at anytime. You would, of course, be free to use it however you see fit. We hope that, among other things, lending your book online in the manner Open Library has will open up new audiences and potential markets for your work. Please let us know if you have any further questions or concerns.
>
> All the best,
> Tom
>
> Tom Blake
> Content Discovery Manager
> Boston Public Library
> 700 Boylston St.
> Boston, MA 02116
> ▮▮▮▮▮▮▮▮▮▮
> _____
> From: Ask The Boston Public Library
> Sent: Wednesday, February 20, 2019 10:39 AM
> To: Victoria Finlay
> Cc: Digital
> Subject: QUERY INTL 02.20.19 Open Library Copyright issue BPL donated book ejc
>
> Hi Victoria,
>
>
> Your question has been forwarded to the appropriate staff or department; these are noted in the "cc" for this response. You will receive an answer from that department. If you need to follow up on the question, please contact that department directly.
>
>
>
> Thank you for using the Boston Public Library's e-reference service.
>
>
>
> Reference and Information Services
> Boston Public Library
> 700 Boylston St.
> Boston, MA 02116

CONFIDENTIAL

INTARC00420090

> ask@bpl.org
> ██████████ option 3
>
>
> _____
> From: Victoria Finlay <██████@arcworld.org>
> Sent: Wednesday, February 20, 2019 7:02 AM
> To: Ask The Boston Public Library
> Subject: Open Library - question about you giving away my book to be scanned.
>
> Dear Boston Public Library
>
> I'm an author based in the UK. A strange thing has happened. A US based company called Open Library has put two of my books (Color, A Natural History of the Palette and Jewels: a secret history) up onto its website, has scanned it fully and is lending it out free of charge. As you can imagine I'm rather surprised and shocked. In the UK this is against all of our copyright laws. My agent, Sterling Lord, is contacting Random House/Ballantine, which is the US copyright holder, to see whether they can ask for it to be taken down.
>
> As you can imagine, writing books takes ages and is expensive, so as an author you need at least some people to buy them. I'm sure that the publishers feel the same.
>
> You might be wondering why I'm contacting you. And it's because you are recorded as the "donor" of the book - you can see it on the attached screenshot. I don't know what this means, and perhaps you don't either, but I wondered whether you are loaning your books out in order to be scanned like this.
>
> I'd love to know whether other people have contacted you as well.
>
> Best wishes,
>
> Victoria Finlay
>
>
> [cid:A61CFFCD-3959-44EE-B6C2-56E77D1248A4@home]
> <image001.png>
>
>
>

--
Chris Freeland
Director of Open Libraries
Internet Archive
██████@archive.org
@chrisfreeland
████████

CONFIDENTIAL                                                                                           INTARC00420091

# McNamara Declaration
# Exhibit 137

# 16-2321-cv

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

---

CAPITOL RECORDS, LLC, CAPITOL CHRISTIAN MUSIC GROUP, INC., VIRGIN
RECORDS IR HOLDINGS, INC.,

*Plaintiffs – Appellees,*

– *v* –

REDIGI INC., JOHN OSSENMACHER, LARRY RUDOLPH, AKA LAWRENCE S.
ROGEL,

*Defendants – Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 12-CV-0095,
JUDGE RICHARD J. SULLIVAN

---

**BRIEF OF AMICI CURIAE AMERICAN LIBRARY ASSOCIATION,
ASSOCIATION OF COLLEGE AND RESEARCH LIBRARIES, ASSOCIATION
OF RESEARCH LIBRARIES, AND INTERNET ARCHIVE IN SUPPORT OF
REVERSAL**

---

*Counsel of Record*
JONATHAN BAND PLLC
21 Dupont Circle NW, 8th Floor
Washington, DC 20036
(202) 296-5675
jband@policybandwidth.com
*Counsel for Amici Curiae*

Dated: February 14, 2014

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae the American Library Association, the Association of College and Research Libraries, the Association of Research Libraries, and the Internet Archive state that none of these entities has a parent corporation and no publicly held corporation has an ownership stake of 10% or more in any entity.

Dated: February 14, 2017          /s/ Jonathan Band
                                  *Counsel of Record*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................... i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................... iii

INTEREST OF AMICI .......................................................................... 1

SUMMARY OF ARGUMENT .............................................................. 4

ARGUMENT ......................................................................................... 5

I.    The First Sale Doctrine Weighs in Favor of a Fair Use Finding ........... 5

    A. This Court Has Found that Specific Exceptions Positively Influence the First Factor Analysis .................................................................. 6

    B. Specific Exceptions Have Positively Influenced the Copyright Register's Fair Use Analyses. .......................................................... 7

        1. Jailbreaking ............................................................................... 8

        2. 3D Printers ............................................................................... 11

        3. Abandoned Video Game Software .......................................... 11

        4. MOOCs ..................................................................................... 13

    C. The First Sale Right Should Positively Influence the First Factor Analysis in this Case ...................................................................... 14

II.   Finding Fair Use in this Case Would Encourage Innovative Digital Services in Libraries ............................................................................. 16

    A. Fair Use Technology Cases Have Spurred Innovation in Libraries 16

    B. Libraries are Building Innovative Digital Lending Services ........... 18

CONCLUSION ..................................................................................... 22

CERTIFICATE OF COMPLIANCE ......................................................... 23

CERTIFICATE OF SERVICE ................................................................. 24

# TABLE OF AUTHORITIES

## Federal Cases

*Authors Guild v. HathiTrust,*
    755 F.3d 87, 102 (2d Cir. 2014) ...................................................... 4, 6, 21

*Authors Guild, Inc. v. Google,*
    804 F.3d 202 (2d Cir 2015) ...................................................... 17

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569, 579 (2004) ...................................................... 17

*Harper & Row v. Nation Enterprises,*
    471 U.S. 539 (1985) ...................................................... 8

*Kelly v. Arriba Soft,*
    336 F.3d 811 (9th Cir. 2003) ...................................................... 17

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    133 S. Ct. 1351, 1363 (2013) ...................................................... 14

*See Golan v. Holder,*
    132 S. Ct. 873 (2012) ...................................................... 3

*Sony Corp. of Am. v. Universal City Studios, Inc.,*
    464 U.S 417 (1984) ...................................................... 17

## Federal Statutes

17 U.S.C. § 106(3) ...................................................... 3

17 U.S.C. § 107 ...................................................... 4, 5

17 U.S.C. § 108 ...................................................... 14

17 U.S.C. § 109(a) ...................................................... 6

17 U.S.C. § 110(2) ...................................................... 13, 14

17 U.S.C. § 117 ...................................................... 11, 14

17 U.S.C. § 121 ...................................................... 4, 6, 14

iii

17 U.S.C. § 1201 ................................................................................ passim

## Legislative Materials

H.R. Rep. No. 94-1476, § 109 (1976) ............................................. 4

## Other Authorities

Aaron Perzanowski & Jason Schultz, *The End of Ownership: Personal Property in the Digital Economy*, 103 (2016) ......................................... 20

Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y 453 (2012) .................... 6

Michelle Wu, *Collaborative Academic Library Digital Collections Post-Cambridge University Press, HathiTrust and Google Decisions on Fair Use*, Journal of Copyright in Education and Librarianship, p 3 (Vol. 1, Issue 1 2016) ........................................................................... 17

Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Fourth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2010) ................................................... 8, 9

Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2015) ....................................... 8, 10, 11, 13

iv

# INTEREST OF AMICI[1]

The American Library Association ("ALA"), established in 1876, is a nonprofit professional organization of more than 57,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society.

The Association of College and Research Libraries ("ACRL"), the largest division of the ALA, is a professional association of academic and research librarians and other interested individuals. It is dedicated to enhancing the ability of academic library and information professionals to serve the information needs of the higher education community and to improve learning, teaching, and research.

The Association of Research Libraries ("ARL") is an association of 124 research libraries in North America. ARL's members include university libraries, public libraries, government and national libraries. ARL programs

---

[1]All parties consent to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no party's counsel authored this brief in whole or in part, and neither any party, nor any party's counsel, contributed money towards the preparation of this brief. No person other than amici, their members, or their counsel contributed money that was intended to fund preparing or submitting this brief.

1

and services promote equitable access to and effective use of recorded knowledge in support of teaching and research.

Collectively, these three library associations represent over 100,000 libraries and 350,000 librarians and other personnel that serve the needs of their patrons in the digital age. As a result, the associations share a strong interest in the balanced application of copyright law to new digital dissemination technologies.

The Internet Archive is a public nonprofit organization that was founded in 1996 to build an "Internet library," with the purpose of offering researchers, historians, scholars, artists, and the general public permanent access to historical collections in digital format. Located in San Francisco, California, the Internet Archive receives data donations and collects, records, and digitizes material from a multitude of sources, including libraries, educational institutions, government agencies, and private companies. The Internet Archive then provides free public access to its data—which include text, audio, video, software, and archived web pages.

2

One of the most basic functions of libraries is lending books and other materials to the public.[2] Section 106(3) of the Copyright Act grants the copyright holder the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by . . . lending." 17 U.S.C. § 106(3). However, the first sale right, codified at section 109(a) of the Copyright Act, exhausts the copyright holder's distribution right in a particular copy "lawfully made under this title" after the first sale of that copy. 17 U.S.C. § 109(a). The House Judiciary Committee Report on the 1976 Copyright Act explains that under section 109(a), "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976), as reprinted in 1976 U.S.C.C.A.N. 5659, 5693. The first sale right thus is critical to the operation of libraries: "[w]ithout this exemption, libraries would be unable to lend books, CDs, videos, or other materials to patrons." Carrie Russell, *Complete Copyright: An Everyday Guide for Librarians* 43 (2004).

A growing percentage of libraries' collections consist of materials in digital form. And libraries increasingly are using digital technology to perform their everyday activities, including preservation and lending.

---

[2] Libraries circulate a wide variety of materials in addition to books, including journals, dissertations, computer programs, phonorecords, and audiovisual works.

3

Accordingly, libraries need to ensure that they can employ existing copyright exceptions and limitations in the digital environment. The fair use right, codified at 17 U.S.C. § 107, is a built-in mechanism by which the Copyright Act allows itself to be updated. *See Golan v. Holder*, 132 S. Ct. 873, 890 (2012)(describing fair use as a "built-in First Amendment accommodation"). In particular, Amici believe that fair use enables the application of the first sale right with respect to the transmission of digital works in appropriate circumstances.

## SUMMARY OF ARGUMENT

This brief makes two arguments relating to fair use. First, in its truncated fair use analysis, the district court ignored the similarity between the use ReDigi sought to make and uses authorized by Section 109(a). This similarity should have tilted the first fair use factor, the purpose and character of the use, in favor of ReDigi. In *Authors Guild v. HathiTrust,* 755 F.3d 87, 102 (2d Cir. 2014), this Court used the rationale for a specific exception—17 U.S.C. § 121, which permits the making of accessible format copies for people who have print disablilites—to support a finding of a valid purpose under the first factor. Likewise, the Copyright Office has repeatedly based fair use conclusions on specific exceptions in the context of a rulemaking under section 1201 of the Digital Millennium Copyright Act, 17

4

U.S.C. § 1201. As this Court did in *HathiTrust* and the Copyright Office did in the section 1201 rulemaking, the district court should have recognized that the purpose behind the first sale right tilted the first fair use factor in favor of ReDigi.

Second, the brief argues that a positive fair use determination in this case would encourage libraries to provide innovative services to their users. Fair use findings in technology cases have permitted libraries to provide new, digitally-based services such as HathiTrust Digital Library. In addition to enabling researchers to find relevant texts and perform critical data-mining, HathiTrust provides full-text access to over fourteen million volumes to people who have print disabilities. A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library. Such a result would increase users' access to important content without diminishing authors' incentive to create new works.

## ARGUMENT

## I.  The First Sale Doctrine Weighs in Favor of a Fair Use Finding

The district court below rejected ReDigi's fair use claims with little analysis. In particular, the district court's consideration of the first fair use factor, the purpose and character of the use, 17 U.S.C. § 107(1), was limited

5

to asking whether the use was transformative or commercial. The district court overlooked the obvious fact that the use ReDigi sought to enable was analogous to one permitted by a central feature of the Copyright Act: the first sale right, codified at 17 U.S.C. § 109(a). The district court found that ReDigi's uses did not fall within the scope of section 109(a) because the first sale doctrine is a limitation on the distribution right, not the reproduction right, and ReDigi's service involves reproduction. However, the similarity between ReDigi's service and conduct permitted under section 109(a) should have weighed in ReDigi's favor under the first fair use factor.[3]

## A. This Court Has Found that Specific Exceptions Positively Influence the First Factor Analysis

In support of its conclusion that providing access to the print disabled was a valid purpose under the first fair use factor, this Court in *Authors Guild v. HathiTrust,* 755 F.3d 87, 102 (2d Cir. 2014), noted that 17 U.S.C. § 121, which permits "authorized entities" to make accessible format copies for the print disabled, "illustrates Congress's intent that copyright law make appropriate accommodations for the blind and print disabled." In other words, this Court used the rationale behind a specific exception, which

---

[3] *See* Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y 453 (2012), for a more detailed discussion of how specific exceptions should affect the fair use calculus.

6

might not otherwise have applied, to support a finding of a valid purpose under the first factor. In adopting an exception, Congress recognized the strong public policy interest in permitting the use in situations meeting the exception's requirements. The same public policy interest still exists in situations where many, but not all, of the exception's requirements are met. The *HathiTrust* Court understood that this Congressionally recognized public policy interest should influence the fair use calculus. The *HathiTrust* Court likewise gave weight to expressions of Congressional intent outside of the Copyright Act when it noted that Congress, in enacting the Americans with Disabilities Act, "reaffirmed its commitment to ameliorating the hardships faced by the blind and the print disabled." *Id*.

**B. Specific Exceptions Have Positively Influenced the Copyright Register's Fair Use Analyses.**

In the rulemaking under section 1201 of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, the Register of Copyrights is required to make recommendations to the Librarian of Congress on the grant of proposed exemptions to section 1201(a)'s prohibition on the circumvention of technological protection measures. In making this recommendation, the Register must consider whether users of a class of works are likely to be adversely affected by the circumvention prohibition "in their ability to make noninfringing uses" of the class of works. 17 U.S.C.

7

§ 1201(a)(1)(C). Thus, a central issue in this analysis is the lawfulness of the proposed use. In the past six rulemakings, the Register has issued voluminous recommendations that examine in detail the lawfulness of the proposed uses—typically the permissibility of the use under section 107. In the Register's most recent recommendation, issued in October 2015, specific exceptions informed the Register's first factor analysis with respect to four of the proposed uses.

### 1. Jailbreaking

When discussing the first fair use factor in the context of the proposed "jailbreaking" exemption, the Register observed that "the goal of jailbreaking is to allow the operating system on a device to interoperate with other programs, a favored purpose under the law." Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Sixth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention* (2015)("*2015 Recommendation*") at 188. The Register based her statement that interoperability is a favored purpose under the law on the DMCA's interoperability exception, 17 U.S.C. § 1201(f).

The Register's detailed analysis of this issue appears in her 2010 recommendation concerning jailbreaking. Recommendation of the Register of Copyrights, *Section 1201 Rulemaking: Fourth Triennial Proceeding to*

8

*Determine Exemptions to the Prohibition on Circumvention* (2010)("*2010 Recommendation*"). The Register cited language in the Supreme Court's decision in *Harper & Row v. Nation Enterprises*, 471 U.S. 539 (1985), that fair use has traditionally been defined as "a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent." *2010 Recommendation* at 91 (citing 471 U.S. 539, 549 (1985)). The Register then asserted that "in evaluating whether a particular use is being made in such a reasonable manner, it is helpful to look at the judgments Congress has made as to what kinds of uses of copyrighted material are reasonable and should be considered non-infringing." *2010 Recommendation* at 92. The Register observed, "in this case, one does not have to look far. In fact, section 1201 itself offers strong evidence that the conduct at issue here is conduct that, at the time Congress enacted the prohibition on circumvention, it anticipated and considered to be reasonable and lawful." *Id*.

That "evidence" was the interoperability exception in 17 U.S.C. § 1201(f). After describing section 1201(f)'s provisions, the Register stated:

> In the legislative history associated with that provision, Congress expressed a commitment to permit and encourage interoperability between independently created computer programs and existing programs. Endorsing the holding of *Sega Enters. Ltd. v. Accolade, Inc*., Congress stated in the legislative history that the purpose of the reverse engineering exemption, an exemption that it described as

9

permitting "the circumvention of access control technologies for the sole purpose of achieving software interoperability," was to "avoid hindering competition and innovation in the computer and software industry."

*2010 Recommendation* at 92.

On the basis of this legislative history, the Register found that "Congress has determined that reverse engineering for the purpose of making computer programs interoperable is desirable when certain conditions are met, and has crafted a specific exemption from section 1201(a)'s prohibition on circumvention in such cases." *Id*. at 93. The Register reasoned that "while an iPhone owner who 'jailbreaks' does not fall within the four corners of the statutory exemption in section 1201(f), the fact that he or she is engaging in jailbreaking in order to make the iPhone's firmware interoperable with an application specially created for the iPhone suggests that the purpose and character of the use are favored." *Id.*

In sum, the Register viewed a specific exception—17 U.S.C. § 1201(f)—as evidence of a favored purpose under the first fair use factor analysis.[4]

---

[4] The Register cited the foregoing analysis when stating that the fair use calculus with respect to the "unlocking" of mobile devices is "in many respects analogous to the reasoning that has led the Register to conclude in past rulemakings that 'jailbreaking' of smartphones is likely to be a fair use." *2015 Recommendation* at 162.

10

### 2. 3D Printers

As with jailbreaking, the Register gave weight to Congress's enactment of section 1201(f) when considering the copying of computer programs necessary to employ alternative feedstock for 3D printers. With respect to the first factor, "the Register notes that interoperability is recognized as a favored purpose under the law." *2015 Recommendation* at 368. Specifically,

> Congress recognized the importance of compatibility in the DMCA by including a statutory exemption to the prohibition on circumvention for certain reverse engineering activities. See 17 U.S.C. § 1201(f); see also 144 Cong. Rec. E2138 (daily ed. Oct. 13, 1998) (statement of Rep. Bliley) (stating that "section 1201 should not inhibit interoperability of devices 'in the consumer electronics environment'").

*Id.* at 368 n.2481. Guided by this Congressional recognition, the Register found that the first factor favored the proponents because "third-party feedstock often cannot be used without altering the printer operating system software." *Id*. at 368.

### 3. Abandoned Video Game Software

When discussing the copying necessary for video-gamers and libraries to use abandoned video-game software, the Register noted that the proponents had not relied on 17 U.S.C. § 117, which permits the owner of a copy of a computer program to copy or adapt that program when the copy or

11

adaptation is created as an "essential step" in the utilization of the program in conjunction with a machine. Nonetheless, the Register observed that section 117 "evinces Congress's understanding that reverse engineering and the pursuit of interoperability are favored activities under the law." *Id*. at 336. Later, in the context of applying the first fair use factor to continued play by gamers, the Register stated that "[h]ere, where gamers wish to modify a copy of video game software they have lawfully acquired simply to allow its continued personal use on their own computers—akin to the adaptation exception embodied in section 117—the first factor tends to support a finding of fair use." *Id.* at 338. The Register thus suggested that the favored nature of reverse engineering and interoperability indicated by section 117 tilted the first factor in favor of a fair use finding.

The Register then considered the lawfulness of the copies made by librarians and archivists for purposes of preservation, research, and study. The Register stated that "[t]hough it does not address the full range of preservation-related activities advocated by proponents, section 108 of the Copyright Act, which exempts certain activities of libraries and archives, is helpful to this inquiry." *Id*. at 341. She elaborated:

> The Register finds that section 108 provides useful and important guidance as to Congress's intent regarding the nature and scope of legitimate preservation activities, and hence the types of uses that are most likely to qualify as fair in this area. Section 108 suggests that

12

such activities should be carried out by a preservation-oriented institution—a library or archives—and, as noted, must not be for direct or indirect commercial gain. While section 108 is limited to libraries and archives, the record here reflects that museums engage in similar efforts to preserve video games. In light of their similar preservation mission in this context, the Register sees no reason to exclude museums from the reach of the proposed exemption.

*Id*. at 342. Thus, the Register suggested not only that section 108 guide courts as they apply fair use to preservation activities of libraries and archives that might fall beyond the four corners of section 108; she also suggested that section 108 guide courts as they apply fair use to the preservation activities of museums, to which section 108 does not extend.

### 4. MOOCs

Finally, the TEACH Act, 17 U.S.C. § 110(2), informed the Register's evaluation of the lawfulness of using audiovisual clips in Massive Open Online Courses (MOOCS): "While the TEACH Act may not itself provide a comprehensive basis for a finding of noninfringing use in the MOOC context, the Register believes that the Act, which became law in 2002, provides useful and important guidance as to Congress' intentions regarding the need for and nature of excepted uses to permit certain performances and

13

displays of copyrighted works for distance learning." *2015 Recommendation* at 74.[5]

### C. The First Sale Right Should Positively Influence the First Factor Analysis in this Case

This Court in *HathiTrust* relied on 17 U.S.C. § 121 to identify a favored purpose under the first fair use factor. The Register of Copyrights similarly relied on the exceptions in 17 U.S.C. §§ 108, 110(2), 117, and 1201(f) to recognize other purposes favored by Congress. The first sale right should receive no less deference under the first factor than these exceptions. Justice Breyer, writing for the U.S. Supreme Court in *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013), stated that first sale "is a common-law doctrine with an impeccable historic pedigree." He quoted a 17th century articulation of "the common law's refusal to permit restraints on the alienation of chattels," *id.*, and observed that "a law that permits a copyright holder to control the resale or other disposition of a chattel once sold is similarly 'against Trade and Traffi[c], and bargaining and

---

[5] The Register also recommended "that any exemption for uses in connection with MOOCs be tied to key aspects of section 110(2), including its emphasis on implementation of TPMs in distance learning that incorporates copyrighted works." *Id.* "The Register is persuaded that while the strict contours of section 110(2) may be an imprecise fit for the rapid emergence of the MOOC model, section 110(2) nonetheless offers important and meaningful guidance concerning Congress's desire to balance pedagogical needs in distance learning with copyright owners' concerns of harmful impact." *Id.* at 102.

14

contracting.'" *Id*. Justice Breyer underscored "the importance of leaving buyers of goods free to compete with each other when reselling or otherwise disposing of these goods." *Id*. Competition, "including the freedom to resell, can work to the advantage of the consumer." *Id*.

By enacting section 109(a), Congress recognized the value of allowing a person to transfer her right to possess a copy of a work. Enabling transfer of the right of possession thus should be viewed as a favored purpose under the first fair use factor. This, of course, is the purpose of the copies made during the course of the ReDigi service.

Recognizing that the purpose of the ReDigi service is favored does not necessarily mean that ReDigi should "win" the first factor, nor that the ReDigi service is a fair use. Recognition that the purpose of a use is favored is not outcome determinative; it is only one consideration in the broader first factor (and much broader overall fair use) analysis.

However, it is worth noting that the ReDigi service has the same market impact as a distribution under section 109(a). At the beginning of a transfer under section 109(a), the seller has a copy, and the buyer does not. At the end of the process, the buyer has a copy, and the seller does not. The ReDigi service attempts to recreate this process in the digital environment. To be sure, the buyer does not end up with the seller's actual copy. Rather,

15

she has a copy of the seller's copy. Nonetheless, the seller no longer possesses a copy, and the buyer does. In other words, so long as the seller's copy is deleted, the ReDigi service leaves the copyright holder no worse off than it would be due to the transfer of a physical copy under the first sale doctrine.

## II. Finding Fair Use in this Case Would Encourage Innovative Digital Services in Libraries

### A. Fair Use Technology Cases Have Spurred Innovation in Libraries

Very few copyright cases involve libraries directly. Yet copyright law affects libraries in many complex ways because much of a library's work involves accessing, indexing, storing, and giving the public access to copyrighted material. Fair use provides necessary breathing space in copyright law, making sure that control of the right to copy and distribute does not also become control of the right to create and innovate.

When interpreting and applying fair use, libraries must generally look to fair use cases in other contexts and to the actual practices of their peer institutions for guidance. For example, a collaborative mass digitization effort between Google and research libraries resulted in HathiTrust—a digital preservation repository and highly functional, secure access platform which houses millions of digital books today. When this project started in 2005, the legal landscape was less clear than it is today. However, Google

16

and the research libraries were able to move forward based on then-current fair use precedent. *See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S 417 (1984) (holding that time shifting of entertainment content is fair use), *Kelly v. Arriba Soft*, 336 F.3d 811 (9th Cir. 2003) (holding that the operation of an image search engine was fair use), *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (2004) (coining the transformative use test). Together, these cases established a foundation on which libraries could innovate.

HathiTrust makes books in accessible formats available to people who have print disabilities, allowing them to participate fully in academic and civil society. *HathiTrust*, 755 F. 3d at 91. It also provides access to a database allowing full-text searches across all of the items in its repository. *Id*. This promotes the nonconsumptive analysis of a vast corpus of materials for research and scholarship purposes. Finally, HathiTrust preserves works in digital form, permitting members to create a replacement copy of the work, if a library's original copy is lost, destroyed, or stolen. *Id*. at 92.

The mass digitization project was challenged in two lawsuits, one against Google and the other against some of the research libraries. Both cases resulted in fair use victories. *Authors Guild, Inc. v. Google,* 804 F.3d 202 (2d Cir 2015); *HathiTrust*, 755 F. 3d at 87. These decisions have

encouraged efforts to build digital library services by creating further legal certainty around what can be done with in-copyright materials. Michelle Wu, *Collaborative Academic Library Digital Collections Post-Cambridge University Press, HathiTrust and Google Decisions on Fair Use*, Journal of Copyright in Education and Librarianship, p 3 (Vol. 1, Issue 1 2016). A finding of fair use in this case similarly would encourage further innovation and experimentation by libraries, without harm to copyright holders.

### B. Libraries are Building Innovative Digital Lending Services

Libraries serve many different purposes in today's world—from providing Internet access to a large number of Americans to literacy programs for youth. However, providing free access to knowledge, information, and opportunity—in particular by lending copies of books to patrons—has always been a core traditional function of a library. Regardless of what form a work takes, libraries need to be able to lend in order to fulfill their core mission. In today's digital world, it has become clear that libraries need to adapt and offer digital versions of their collections to the public. Indeed, books, journals, music, video, and software are essential resources for the next generation of learners and scholars. Until these materials are

18

available in digital formats, scholars and learners of all kinds will not be able to harness knowledge fully for greater innovation and discovery.[6]

To this end, libraries have developed new and innovative services to offer digital works to the public. For example, the Open Library is a platform that makes millions of books available in various formats, and with varying degrees of technical restrictions on copying and further distribution. Open Library, https://openlibrary.org/ (last visited Feb. 6, 2017). Titles in the public domain (published prior to 1923) are completely readable and downloadable without restriction in a variety of file formats. Certain in-copyright titles are available in the DAISY format only for use by people who have print disabilities. Some titles still under copyright are made available in a managed online system that prevents copying and downloading. These in-copyright titles are available only to one user at a time for a period of two weeks. When a title is checked out digitally, that title is not available to any other user. This program is referred to as "digital lending" or the "lending library" at the Internet Archive. Internet Archive Lending Library, https://archive.org/details/lendinglibrary (last visited Feb. 6, 2017).

---

[6] As this Court observed in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006), "[t]he ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."

19

Over the last five years, the Internet Archive has digitized and lent modern materials originating from the Boston Public Library, University of Toronto, and many other libraries. More than 250,000 modern book titles are currently accessible to scholars and learners worldwide through the lending library, expanding free access to works that otherwise are seldom consulted. Like ReDigi, Open Library seeks to replicate in the digital realm the sorts of uses that are permissible with a physical copy of a work. Library lending is valuable to society in a number of ways. "For many, the library-lending model is a hallmark of achievement for education and public access to knowledge." Aaron Perzanowski & Jason Schultz, *The End of Ownership: Personal Property in the Digital Economy* 103 (2016).

These values do not change with the format of the work. First and foremost, providing free access to library collections encourages literacy and reading—foundational skills for any member of modern society. Allowing digital access to these works expands the reach of these collections, especially to those living in rural communities and to disabled individuals who may not be able to physically access a local library.

Most books in most libraries are not available in eBook form from the publisher. Although publishers do make some of their catalog available through eBook subscriptions, libraries may have reasons for wanting to

20

digitize and lend their own collections in lieu of or in addition to what is available through eBook vendors. Libraries may have unique or special collections that they wish to make more widely available, for example. Alternatively, libraries may not agree to some of the more onerous terms of eBook lending agreements with publishers, which often require the disclosure of user information in violation of library patron privacy policies. Digitization and access also spurs the long-term preservation of the works libraries have carefully curated for their local communities. Finally, technical systems like Open Library that allow digital lending are using the same systems that publishers use for their in-print eBooks and do not affect the market for the work any more than traditional library lending. Assuming the same number of copies of a given work remains available to the public, the author or publisher is in no worse a position by virtue of the format of the book being borrowed.

A finding of fair use in this case would provide additional legal certainty along with cases like *HathiTrust* to spur investment and innovation in digital services by libraries. The resulting availability of comprehensive collections of digital books, and potentially other types of works such as music and films, will have lasting public benefit, without disadvantaging copyright holders.

21

**CONCLUSION**

For the foregoing reasons, amici urge this Court to reverse the decision below.

Respectfully submitted,

*Counsel of Record*
JONATHAN BAND PLLC
21 Dupont Circle NW, 8th Floor
Washington, DC 20036
(202) 296-5675
jband@policybandwidth.com

*Counsel for Amici Curiae*

Dated: February 14, 2017

22

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 4,668 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the types style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

/s/ Jonathan Band

23

# CERTIFICATE OF SERVICE

I hereby certify, that on February 14, 2017, a true and correct copy of the foregoing Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive was timely filed in accordance with FRAP 25(a)(2)(D) and served on all counsel of record via CM/ECF pursuant to Local Rule 25.1(h).

/s/ Jonathan Band

24

# McNamara Declaration
# Exhibit 138

# ARL Policy Notes

A blog of the Association of Research Libraries Influencing Public Policies strategic direction.

HOME     SUBSCRIBE

## The Implications of the ReDigi Decision for Libraries

*Guest blog post by Jonathan Band, Counsel to the Library Copyright Alliance, which consists of the American Library Association, the Association of College and Research Libraries, and the Association of Research Libraries*

**Summary**

The U.S. Court of Appeals for the Second Circuit has finally issued its long-awaited decision in *Capitol Records v. ReDigi*. The Second Circuit affirmed the district court's finding that the ReDigi service, which allowed the resale of iTunes files, infringed copyright. The Second Circuit's reasoning clearly closes the door on the concept of digital first sale in a commercial setting. It also raises questions concerning the viability of Controlled Digital Lending ("CDL") by libraries. Accordingly, CDL initiatives must be carefully reevaluated in light of this decision.

- The Second Circuit affirmed that the first sale right, codified at 17 U.S.C. 109(a), is a limitation on the distribution right, not the reproduction right, and thus does not provide a defense to the making of copies during the course of the sale of digital files.
- The court rejected ReDigi's argument that its technology transferred digital files without reproducing them.
- The court rejected ReDigi's argument that fair use permitted any copies it made.
- The decision is problematic for CDL for two reasons:

1. The decision is the most analogous precedent to the library sharing of digital files of copyrighted works; and
2. The decision could be read as implicitly rejecting the cornerstone of CDL's fair use argument: that the first sale right should have a positive influence on the analysis of the first fair use factor.

- Libraries need to consider whether their CDL programs are likely to pass muster under a more traditional fair use analysis that does not rely on section 109 exercising a positive influence on the first factor.

**Background**

The now defunct ReDigi service allowed a consumer to sell iTunes music files to other consumers. Under ReDigi's technology, the music file on the seller's server was broken into small packets, which were transferred one at a time to ReDigi's server. When a packet was transferred from the seller's computer, it was deleted from her computer. The same process was repeated when the file was transferred from ReDigi's server to the buyer's computer.

Capitol Records and other record labels sued ReDigi for copyright infringement. In 2013, the district court rejected ReDigi's first sale defense on the grounds that the first sale doctrine is an exception to the distribution right and not the reproduction right, and ReDigi's technology infringed the reproduction right. Further, the district court rejected ReDigi's fair use defense with little discussion, noting that ReDigi's use was commercial, non-transformative, and harmful to the market for music files.

Unless otherwise noted, posts dated January 10, 2014,–August 16, 2019, were written by Krista L. Cox, then Director of Public Policy Initiatives at ARL. Some of the content here is not written or created by ARL, but rather is collected from elsewhere on the web. Quotation does NOT imply endorsement!

We tweet @ARLpolicy and @ARLnews. Check out all of ARL's programs and resources at our homepage.

[                    ] Search

**RECENT POSTS**

Fair Use/Fair Dealing Week Day 5 Roundup

Fair Use/Fair Dealing Week Day 4 Roundup

Fair Use in South Africa

Fair Use/Fair Dealing Week Day 3 Roundup

Fair Use/Fair Dealing Week 2020 Day 2 Roundup

**ARCHIVES**

[ Select Month ▾ ]

**LATEST TWEETS**

No Tweets available. Login as Admin to see more details.

RSS Feed

[                    ] Search

The Second Circuit held a marathon two-hour oral argument on August 22, 2017. On December 12, 2018, the Second Circuit affirmed the district court's decision with an opinion written by Judge Leval, one of the country's leading copyright jurists.

**Judge Leval's Opinion**

Judge Leval agreed with the district court that the first sale doctrine provided ReDigi with no defense against Capitol's claim that ReDigi infringed its *reproduction* right; the first sale doctrine was a limitation on the *distribution* right, not the *reproduction* right. Judge Leval then turned to ReDigi's contention that it had not infringed Capitol's reproduction right. ReDigi noted that in its system, each packet was deleted from the seller's computer as soon as it was transferred to ReDigi's server. Accord to ReDigi, at no time was there a copy of a file on both the seller's computer and ReDigi's server. ReDigi argued that this meant that it didn't reproduce the file, but just transferred it. Judge Leval rejected this interpretation, finding that the "phonorecord"—a defined term in the Copyright Act–that ended up on ReDigi's server was a different "material object" from the phonorecord that had existed on the seller's computer. Additionally, Judge Leval observed that as a factual matter, ReDigi could not ensure that a user had not retained duplicates stored on devices other than the computer on which the user installed the ReDigi software.

Next, Judge Leval considered whether the creation of this new phonorecord was a fair use. His analysis of fair use was more thorough and thoughtful than the district court's, although he reached the same conclusion. He focused on the first and fourth factors, the purpose and character of the use and the impact of the use on the market for the work. His first factor analysis centered on whether the use was transformative—whether the use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message, that than merely superseding the original work." He explained, "uses that criticize, comment on, provide information about, or provide new uses for the copyrighted work are those likely to be deemed transformative."

Additionally, Judge Leval stated that a secondary use may be transformative if it expands the utility of the original. Examples of utility-expanding transformative fair uses include scanning books to create a full text searchable database (*Authors Guild v. HathTrust*); copying works into a database to detect plagiarism (*A.V. ex. rel. Vanderhye v. iPardigms*); and displaying low resolution thumbnail images to facilitate image search (*Perfect 10 v. Amazon, Kelly v. Arriba Soft*).

To this familiar list of utility-expanding uses Judge Leval added the Supreme Court's decision in *Sony v. Universal*, where the Court found that fair use permitted a consumer to record a television broadcast for viewing a more convenient time. *Sony* typically is treated as a paradigmatic example of a non-transformative fair use. Judge Leval, however, endorsed the Second Circuit's interpretation earlier this year in *Fox News v. TV Eyes* that the consumers' use in *Sony* was transformative: a use may be fair "if it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder."

Judge Leval found that ReDigi's use was not transformative because "it provides neither criticism, commentary, nor information" about copyrighted works. Moreover, it did not "deliver the content in a more convenient and usable form to one who has acquired an entitlement to receive the content." Instead, it just provided "a market for the resale of digital music files, which sales compete with sales of the same recorded music by the rights holder." Further tilting the first factor against fair use was the commercial nature of ReDigi's activity.

After cursory treatment of the second and third factors, the nature of the copyright work and the amount and substantiality of the portion used, Judge Leval examined the fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, in more detail. Judge Leval noted that ReDigi made reproductions for "the purpose of resale in competition with the Plaintiffs' market for the sale of their sound recordings." ReDigi sold its copies

**RECENT POSTS**

Fair Use/Fair Dealing Week Day 5 Roundup

Fair Use/Fair Dealing Week Day 4 Roundup

Fair Use in South Africa

Fair Use/Fair Dealing Week Day 3 Roundup

Fair Use/Fair Dealing Week 2020 Day 2 Roundup

**ARCHIVES**

Select Month

Unless otherwise noted, posts dated January 10, 2014,–August 16, 2019, were written by Krista L. Cox, then Director of Public Policy Initiatives at ARL. Some of the content here is not written or created by ARL, but rather is collected from elsewhere on the web. Quotation does NOT imply endorsement!

We tweet @ARLpolicy and @ARLnews. Check out all of ARL's programs and resources at our homepage.

"to the same consumers whose objective in purchasing was to acquire Plaintiffs' music." Judge Leval also distinguished the resale of physical copies from digital copies. "The digital files resold by ReDigi, although used, do not deteriorate the way printed books and physical records deteriorate." The only difference between the copies sold by Capitol and the copies sold in ReDigi's secondary market was that ReDigi's copies were less expensive.

Judge Leval then weighed the four factors together. He found that "even if ReDigi is credited with some faint showing of a transformative purpose, that purpose is overwhelmed by the substantial harm ReDigi inflicts on the value of Plaintiffs' copyrights through direct competition in the rights holders' legitimate market, offering consumers a substitute for purchasing from the rights holders."

At the end of the opinion, Judge Leval considered an argument raised in an amicus brief by copyright law professors that the first sale doctrine "must be read to vindicate purchasers' ability to alienate digital copyright works...without regard to technological medium." Judge Leval expressed reluctance to wade into this policy argument. "Courts are poorly equipped to assess the inevitably multifarious economic consequences that would result from such changes of law." Furthermore, reading section 109(a) to accommodate digital resale "would exceed the proper exercise of the court's authority." Here, "Congress dictated the terms of the statutory entitlement." Section 109(a) clearly "negates a claim of unauthorized *distribution* in violation of the author's exclusive rights...but not a claim of unauthorized *reproduction*." Accordingly, "if ReDigi and its champions have persuasive arguments in favor of the change of law they advocate, it is Congress they should persuade."

**Implications for Libraries**

The *ReDigi* decision requires reevaluation of CDL initiatives. The decision is the most analogous precedent to library sharing of digital files of copyrighted works. To be sure, a library would engage in CDL for noncommercial educational purposes, in contrast to ReDigi's clearly commercial motivation. Moreover, a library could design its CDL program to make it as different from ReDigi's as possible. For example, the library might engage in CDL only with respect to out of print scholarly monographs. Nonetheless, libraries cannot ignore the long shadow cast by the decision.

Furthermore, the decision calls into question the theoretical underpinnings of CDL. Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment. Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis.

The Library Copyright Alliance ("LCA") filed an amicus brief in support of ReDigi, where we argued that the similarity between the use ReDigi sought to make and uses authorized by section 109(a) should have tilted the first fair use factor in favor of ReDigi. We noted that in *Authors Guild v. HathiTrust*, the Second Circuit used the rationale for a specific exception—17 U.S.C. § 121, which permits the making of accessible format copies for people who have print disabilities—to support a finding of a valid purpose under the first factor. Likewise, the Copyright Office has repeatedly based fair use conclusions on specific exceptions in the context of a rulemaking under section 1201 of the Digital Millennium Copyright Act, 17 U.S.C. § 1201. We urged the Second Circuit to recognize that the purpose behind the first sale right favored ReDigi in the first fair use factor analysis.

Unfortunately, Judge Leval did not address this argument. The lack of reference to this argument is somewhat surprising given that it was based on the Second Circuit's reasoning in the *HathiTrust* decision, and that the Association of American Publishers filed an amicus brief specifically responding to LCA's brief. Moreover, fair use was the obvious means of addressing the policy concerns raised by the copyright law professors in their amicus brief. Fair use could achieve the objectives of the first sale doctrine in the digital environment without Congress amending the statute.

In one passage, Judge Leval arguably disagreed with this argument. When responding to the law professors' suggestion that section 109(a) be interpreted to apply in the digital context, Judge Leval stated "the copyright statute is a patchwork, sometimes varying from clause to clause, as between provisions for which Congress has taken control, dictating both policy and the details of its execution, and provisions in which Congress approximately summarized common law developments, implicitly leaving further such developments to the courts. The paradigm of the latter category is § 107 on fair use." This could be interpreted to imply that specific exceptions should not influence the first factor analysis—that specific exceptions and fair use should each stick to their own lanes.

On the other hand, by not rejecting it, Judge Leval arguably allowed the argument to live to fight another day. Additionally, Judge Leval's copyright patchwork argument really doesn't make much sense. The first sale right is a judge-made doctrine which was codified in section 109(a), just as the fair use right is a judge-made doctrine which was codified in section 107. Thus, it is completely appropriate for a court to consider the principles underlying the first sale right when applying the fair use right.

The status of the argument is particularly significant for libraries interested in engaging in CDL. CDL relies heavily on the notion that fair use enables libraries to replicate the first sale right in a digital context. In their *White Paper on Controlled Digital Lending of Library Books*, David Hansen and Kyle Courtney state,

> *The core concept with CDL is that it closely mimics the economic transaction that Congress has already provided for through the first sale doctrine under Section 109. The purpose of the use with CDL is to fulfill the statutory objectives and balance of rights already identified by Congress in Section 109, effectuating that balance considering a new technological use not contemplated at the time Section 109 was enacted. The crux of the proposition is that the purpose and intent of Section 109 should positively influence the "purpose and character" assessment in the fair use analysis.*

This, of course, is the same theory LCA articulated in its amicus brief. LCA still believes this theory is correct, and will continue believing in its correctness unless and until the Supreme Court explicitly rejects it. However, Judge Leval's failure to even acknowledge the theory when he had the opportunity to do so should cause libraries to reevaluate their CDL initiatives. In particular, they need to consider whether their CDL programs are likely to pass muster under a more traditional fair use analysis that does not rely on section 109 exercising a positive influence on the first factor.

**Please share...**



This entry was posted in Uncategorized and tagged Fair Use, First Sale, Jonathan Band, Public Policy.

This entry was posted in Uncategorized and tagged Fair Use, First Sale, Jonathan Band, Public Policy on December 21, 2018 by ARL Communications.

← ARL Files Comments in NTIA Request for Comment on Consumer Privacy

Celebrating New Works Entering the Public Domain in the United States →

Proudly powered by WordPress

A-3382

# McNamara Declaration
# Exhibit 139

## Internet Archive Blogs

*A blog from the team at archive.org*



Blog   Announcements   25th Anniversary   archive.org   About   Events   Developers   Donate

### Internet Archive responds: Why we released the National Emergency Library

Posted on March 30, 2020 by chrisfreeland





Last Tuesday we launched a National Emergency Library to users without a waitlist—in response to the rolling wave of school and library closures that remain in place to date. We've received dozens of messages of thanks from teachers and school librarians, who can now help their students access books while their schools, school libraries, and public libraries are closed.

We've been asked why we suspended waitlists. On March 17, the American Library Association Executive Board took the extraordinary step to recommend that the nation's libraries close in response to the COVID-19 outbreak. In doing so, for the first time in history, the entirety of the nation's print collection housed in libraries is now unavailable, locked away indefinitely behind closed doors.

This is a tremendous and historic outage. According to IMLS FY17 Public Libraries survey (the last fiscal year for which data is publicly available), in FY17 there were more than 716 million physical books in US public libraries.  Using the same data, which shows a 2-3% decline in collection holdings per year, we can estimate that public libraries have approximately 650 million books on their shelves in 2020.  Right now, today, there are 650 million books that tax-paying citizens have paid to access that are sitting on shelves in closed libraries, inaccessible to them. And that's just in public libraries.

And so, to meet this unprecedented need at a scale never before seen, we suspended waitlists on our lending collection.  As we anticipated, critics including the Authors Guild and the Association of American Publishers have released statements (here and here) condemning the National Emergency Library and the Internet Archive.  Both statements contain falsehoods that are being spread widely online. To counter the misinformation, we are addressing the most egregious points here and have also updated our FAQs.

---

**Recent Posts**

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

**Recent Comments**

- Superman on July Book Talk: The Library: A Fragile History
- aho on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

**Categories**

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News

**One of the statements suggests you've acquired your books illegally. Is that true?**

No. The books in the National Emergency Library have been acquired through purchase or donation, just like a traditional library. The Internet Archive preserves and digitizes the books it owns and makes those scans available for users to borrow online, normally one at a time. That borrowing threshold has been suspended through June 30, 2020, or the end of the US national emergency.

**Is the Internet Archive a library?**

Yes. The Internet Archive is a 501(c)(3) non-profit public charity and is recognized as a library by the government.

**What is the legal basis for Internet Archive's digital lending during normal times?**

The concept and practice of controlled digital lending (CDL) has been around for about a decade. It is a lend-like-print system where the library loans out a digital version of a book it owns to one reader at a time, using the same technical protections that publishers use to prevent further redistribution. The legal doctrine underlying this system is fair use, as explained in the Position Statement on Controlled Digital Lending.

**Does CDL violate federal law? What about appellate rulings?**

No, and many copyright experts agree. CDL relies on a set of careful controls that are designed to mimic the traditional lending model of libraries. To quote from the White Paper on Controlled Digital Lending of Library Books:

"Our principal legal argument for controlled digital lending is that fair use— an "equitable rule of reason"—permits libraries to do online what they have always done with physical collections under the first sale doctrine: lend books. The first sale doctrine, codified in Section 109 of the Copyright Act, provides that anyone who legally acquires a copyrighted work from the copyright holder receives the right to sell, display, or otherwise dispose of that particular copy, notwithstanding the interests of the copyright owner. This is how libraries loan books. Additionally, fair use ultimately asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it." In this case we believe it would be. Controlled digital lending as we conceive it is premised on the idea that libraries can embrace their traditional lending role to the digital environment. The system we propose maintains the market balance long-recognized by the courts and Congress as between rightsholders and libraries, and makes it possible for libraries to fulfill their "vital function in society" by enabling the lending of books to benefit the general learning, research, and intellectual enrichment of readers by allowing them limited and controlled digital access to materials online."

Some have argued that the ReDigi case that held that commercially reselling iTunes music files is not a fair use "precludes" CDL. This is not true, and others have argued that this case actually makes the fair use case for CDL stronger.

**How is the National Emergency Library different from the Internet Archive's normal digital lending?**

Because libraries around the country and globe are closed due to the COVID-19 pandemic, Internet Archive has suspended our waitlists temporarily. This means that multiple readers can access a digital book simultaneously, yet still by borrowing the book, meaning that it is returned after 2 weeks and cannot be redistributed.

**Is the Internet Archive making these books available without restriction?**

No. Readers who borrow a book from the National Emergency Library get it for only two weeks, and their access is disabled unless they check it out again. Internet Archive also uses the same technical protections that publishers use on their ebook offerings in order to prevent additional copies from being made or redistributed.

**What about those who say we're stealing from authors & publishers?**

Libraries buy books or get them from donations and lend them out. This has been true and legal for centuries. The idea that this is stealing fundamentally misunderstands the role of libraries in the information ecosystem. As Professor Ariel Katz, in his paper Copyright, Exhaustion, and the Role of Libraries in the Ecosystem of Knowledge explains:

"Historically, libraries predate copyright, and the institutional role of libraries and institutions of higher learning in the "promotion of science" and the "encouragement of learning" was acknowledged before legislators decided to grant authors exclusive rights in their writings. The historical precedence of libraries and the legal recognition of their public function cannot determine every contemporary copyright question, but this historical fact is not devoid of legal consequence… As long as the copyright ecosystem has a public purpose, then some of the functions that libraries perform are

- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

## Archives

Select Month

## Meta

- Log in
- Entries feed
- Comments feed
- WordPress.org

not only fundamental but also indispensable for attaining this purpose. Therefore, the legal rules ...
that allow libraries to perform these functions remain, and will continue to be, as integral to the
copyright system as the copyright itself."

**Do libraries have to ask authors or publishers to digitize their books?**
No. Digitizing books to make accessible copies available to the visually impaired is explicitly allowed
under 17 USC 121 in the US and around the world under the Marrakesh Treaty. Further, US courts
have held that it is fair use for libraries to digitize books for various additional purposes.

**Have authors opted out?**
Yes, we've had authors opt out. We anticipated that would happen as well; in fact, we launched with
clear instructions on how to opt out because we understand that authors and creators have been im-
pacted by the same global pandemic that has shuttered libraries and left students without access to
print books. Our takedowns are completed quickly and the submitter is notified via email.

**Doesn't my local library already provide access to all of these books?**
No. The Internet Archive has focused our collecting on books published between the 1920s and early
2000s, the vast majority of which don't have a commercially available ebook. Our collection priori-
ties have focused on the broad range of library books to support education and scholarship and have
not focused on the latest best sellers that would be featured in a bookstore.

Further, there are approximately 650 million books in public libraries that are locked away and inac-
cessible during closures related to COVID-19. Many of these are print books that don't have an
ebook equivalent except for the version we've scanned. For those books, the only way for a patron to
access them while their library is closed is through our scanned copy.

**I've looked at the books and they're just images of the pages. I get better ebooks from
my public library.**
Yes, you do. The Internet Archive takes a picture of each page of its books, and then makes those
page images available in an online book reader and encrypted PDFs. We also make encrypted EPUBs
available, but they are based on uncorrected OCR, which has errors. The experience is inferior to
what you've become accustomed to with Kindle devices. We are making an accessible facsimile of the
printed book available to users, not a high quality EPUB like you would find with a modern ebook.

**What will happen after June 30 or the end of the US national emergency?**
Waitlists will be suspended through June 30, 2020, or the end of the US national emergency, which-
ever is later. After that, the waitlists will be reimplemented thus limiting the number of borrowable
copies to those physical books owned and not being lent.

Posted in Announcements, Books Archive, Lending Books, News | Tagged NEL | 20 Replies



**About chrisfreeland**
Chris Freeland is the Director of Open Libraries at Internet Archive.
View all posts by chrisfreeland →

← The Fantasy Books that Inspired Dungeons &                    Happy 404 Day! →
Dragons

**20 thoughts on "Internet Archive responds: Why we released the National
Emergency Library"**

Pingback: Announcing a National Emergency Library to Provide Digitized Books to Students and the
Public | Internet Archive Blogs

Pingback: 1,426,434 Million Books: The Internet Archive Launches the"National Emergency Library
to Provide Digitized Books to Students and the Public" | LJ infoDOCKET



**BlindWanderer**
March 31, 2020 at 1:38 am

I have no problem with this. Keep up the good work.

 **Pearce Barry**
March 31, 2020 at 2:19 am

Very well written statement. Fight the good fight, y'all.

 **Corinne**
March 31, 2020 at 5:35 pm

Thank you!

 **Reagan Wiles**
March 31, 2020 at 5:46 pm

Thank you. I have found and borrowed books on Internet Archive that are prohibitively expensive and except one buys them are difficult to locate even in university libraries. Thank you for this valuable public service!

 **Bettye W. Harwell**
March 31, 2020 at 5:47 pm

I discovered Internet Archives when as an artist, I needed historical information in a readily accessible form. The research I was able to find was invaluable. My first WordPress blog was based on an Al Jolson sign off of his radio program which was so memorable from my childhood.

I often recommend your work to others. I hope the negative comments do not limit your work.

Pingback: The Internet Archive's National Emergency Library offers 1.4 million free ebooks - GadgetPark Co

 **Roland Paingaud**
March 31, 2020 at 6:00 pm

Thank you so much.

 **CS Slama**
March 31, 2020 at 6:05 pm

Keep up the amazing work! I have long maintained that the internet archive is the internet best-kept secret, and I hope that through this national Emergency Library program it becomes better known and prompts people to become lifelong supporters. Thank you for bringing us light during a dark time. Fantastic initiative! Kudos to you and the entire team

 **Barbara Waldbillig**
March 31, 2020 at 6:06 pm

Having read all the books I had on hand & still in self-isolation in my tiny apt in BC Canada; you have saved my mental health by your generous offer!

 **آهنگ**
March 31, 2020 at 9:33 pm

It was a very good initiative . Thank you

 **آهنگ**
March 31, 2020 at 9:35 pm

It was a very good initiative
Thank you.

**Daniel**
March 31, 2020 at 10:39 pm

Who do these "Authors Guild" and "Association of American Publishers" represent except themselves? The consistency with which they undermine the best interest of authors, who they supposedly support, is baffling. I see similar situations with associations in the music, film, and software industry, and I'm not sure that them being run by technology- and law-illiterate octogenarians is sufficient explanation for their insistent misinformation campaigns.

Although you have to hand it to them, it's a pretty impressive achievement to already spread falsehoods and undermine your own argument in the very first sentence of your statements.

AAP: "We are stunned by the Internet Archive's aggressive, unlawful, and opportunistic attack [...]"

Given that it's a not-for-profit organization that will not benefit from increased traffic or lending either way, what exactly do they believe this "opportunity", that the opportunistic Internet Archive exploits, to be? Looking at the summary box of Wikipedia's article on the Internet Archive would have been enough to make the AAP realize that they fundamentally misunderstood what the Internet Archive is.

AG: "The Authors Guild is appalled by the Internet Archive's (IA) announcement that it is now making millions of in-copyright books freely available online without restriction [...]"

Without restriction? Sorry, wrong again. Reading the official statement by the Internet Archive about the initiative that the AG pretends to be upset about would have been enough to show them that they entirely misunderstood the lending system of the Internet Archive. Or hey, how about actually trying to lend a book first? Or does an organization that arrogates to call itself the "Authors Guild" not think it would be prudent to first try to understand the thing you're going to write a sulky reaction to?

I'm really on the fence if the disinformation spreading from associations like these is based on actual lack of knowledge, or if they somehow benefit from people believing their made-up allegations. Two groups of people who clearly don't benefit are authors and readers.

Pingback: [Internet Archives national emergency library has over a million books to read right now – CNET - Carl Earley](#)



**Adam**
April 1, 2020 at 2:50 am

I'm pretty shocked that the book copyright industry are STILL wanting to ban libraries from using "controlled digital lending", when this entire thing works almost identical to physical book borrowing. The only difference between CDL and real book borrowing is that it is in the digital world.

I mean, the arguments of DRM being able to be circumvented obtained from digital libraries (and the arguments saying that libraries "allowed" piracy), well, this is the same as in this scenario where a person borrows a real book, takes it home and prints copies of it. Therefore, makes no sense in trying to ban CDL just because it makes it possible to pirate books when it is also possible to pirate physical books.

Pingback: [Announcing a National Emergency Library to Provide Digitized Books to Students and the Public – DePaul COE Doctoral Program](#)

Pingback: [Free Educational and Scholarly Resources for Grad Students and Other Humans – Your Grad Life](#)



**Pinta A.**
April 1, 2020 at 7:32 pm

[quote]
Who do these "Authors Guild" and "Association of American Publishers" represent except themselves? The consistency with which they undermine the best interest of authors, who they supposedly support, is baffling.
[/quote]

I wonder if the fundamental problem is that those organizations view the the IA making books available as some sort of zero-sum game whereby the IA making a book available to view means that an author ineluctably loses out?

In my own case, if I like a particular book I have found on the IA, I will seek a paper copy of it. However, that paper copy will, more often than not, be a used one. While this means the publishers did not make any money off of me, it also means the authors are none the poorer for it.

I suspect that the IA *does*, ultimately, help to drive book sales by serving as a venue where people can read older books on a risk-free basis and that their doing so prompts them to seek out other, newer books by the same authors whose older works are available on IA.

(Would it be possible for a supporter of IA to design a survey, say, asking account holders how using the IA regularly has influenced their book purchases?)

What I am trying to get at is that there might be a way for groups like the AG to use the IA to further own goals (e.g. selling more books), but their knee-jerk condemnation of IA has caused them to overlook it because they simply haven't "thought" about it enough.

 ایران نوا
April 1, 2020 at 8:23 pm

I have found and borrowed books on Internet Archive that are prohibitively expensive and except one buys them are difficult to locate even in university libraries. Thank you for this valuable public service!

Comments are closed.

*Proudly powered by WordPress*

# McNamara Declaration
# Exhibit 140

**Controlled Digital Lending by Libraries**    Position Statement ▾   White Paper ▾   ILL Statement ▾   FAQ   Further Reading

Position Statement / Signatories to the Position Statement on Controlled Digital Lending by Libraries

## Signatories to the Position Statement on Controlled Digital Lending by Libraries

**Institutional**

| | | |
|---|---|---|
| Anabaptist Mennonite Biblical Seminary Library | Harvard Graduate School of Education Gutman Library | SCELC |
| Asociación Nacional de Bibliotecarios, Archivistas y Afines de Venezuela (ANBAA) | Institute for the Study of Knowledge Management in Education (ISKME) | South Central Regional Library Council |
| Association of Research Libraries | Internet Archive | SPARC |
| Association of Southeastern Research Libraries (ASERL) | Internet Archive Canada | SportsLibrary.org |
| Authors Alliance | Ithaca College Library | St. Mary's County Library |
| Better World Books | James Madison University | Substance Abuse Librarians & Information Specialists (SALIS) |
| Boston Public Library | James Madison University | Texas A&M University |
| Califa Group | Johns Hopkins University Libraries | The Council of Connecticut Academic Library Directors (CCALD) |
| California Digital Library | Kalamazoo College Library | UC Berkeley Library |
| California State University Libraries | LaGuardia Community College Library Department | UC Davis Library |
| Center for Research Libraries (CRL) | Legal Information Preservation Alliance (LIPA) | UC Riverside Library |
| Chief Officers of State Library Agencies | Lehigh University Library | UC San Francisco Library |
| City University of New York Office of Library Services | Lore Media Inc | UC Santa Barbara |
| Clemson University | Los Angeles Public Library | UConn Library |
| College of Staten Island, CUNY | LSU Libraries | UNC Chapel Hill Libraries |
| Colorado Alliance of Research Libraries | Metropolitan New York Library Council | University of Oklahoma Libraries |
| Cornell University Library | Multnomah County Library | University of Colorado - Boulder |
| Council of Connecticut Academic Library Directors (CCALD) | NCSU Libraries | University of Kansas Libraries |
| Digital Library Federation | New York Theological Seminary | University of Massachusetts, Amherst, University Libraries |
| Digital Public Library of America | Open Humanities Press | Ursula C. Schwerin Library, NYC College of Technology, City University of New York |
| Duke University Libraries | Phillips Academy, Andover, Oliver Wendell Holmes Library | Vermont Mutual Aid Society |
| EveryLibrary | Ruth Enlow Library of Garrett County | |
| Florida Virtual Campus (FLVC) | Sacramento Public Library | |
| Fondazione Casa di Oriani - Ravenna | San Francisco Public Library | |

**Individual**

| | | |
|---|---|---|
| Beth Adelman<br>Director of Charles B. Sears Law Library and Vice Dean for Legal Information Services<br>University at Buffalo School of Law | Neal Baker<br>Library Director<br>Earlham College | Tinghui Duan<br>Mr.<br>Friedrich Schiller University Jena |
| Jonathan Askin<br>Professor of Clinical Law<br>Brooklyn Law School | Michelle Sprague<br>Adult Services & Outreach Library Assistant<br>Goffstown Public Library | Matt Upson<br>Associate Dean, Research & Learning Services<br>Oklahoma State University Libraries |
| Melissa J. Bernstein<br>Library Director and Professor of Law<br>James E. Faust Law Library, S.J. Quinney College of Law<br>University of Utah | Stephen Spong<br>Copyright Services Librarian<br>Centennial College | Andrew White<br>University Librarian<br>Wesleyan University |
| Chris Bourg<br>Director of Libraries<br>Massachusetts Institute of Technology | James O'Donnell<br>University Librarian<br>Arizona State University | Alex R. Hodges<br>HGSE Faculty & Director, Gutman Library<br>Harvard University |
| Jessie Wallace Burchfield<br>Associate Dean for Information and Technology Services, Law Library Director and Associate Professor of Law<br>Bowen School of Law Library University of Arkansas at Little Rock | Tinghui Duan<br>Research Assistant<br>Friedrich Schiller University Jena, Germany | Laurie Taylor<br>Senior Director for Library Technology and Digital Strategies<br>University of Florida |
| Robert Darnton<br>Carl H. Pforzheimer University Professor, Emeritus and University Librarian, Emeritus<br>Harvard University | Lisa Radha Weaver<br>Director Collections and Program Development<br>Hamilton Public Library | NANCY ZANDER<br>PROFESSOR EMERITI<br>ILLINOIS WESLEYAN UNIVERSITY |
| Elizabeth Townsend Gard<br>Jill, H and Avram A. Glazer Professor in Social Entrepreneurship, Co-Director, Tulane Center for IP, Media & Culture<br>Tulane University Law School | Aida Rudnik<br>Manager, Technical Services<br>Hamilton Public Library | Stephanie Gross<br>Librarian<br>Yeshiva University |
| Peggy Hoon<br>Director of Copyright Policy and Education<br>Louisiana State University | Jaimee Anderson<br>Collection Services Division Manager<br>Sonoma County Library | Samuel Trosow<br>Associate Professor<br>University of Western Ontario; Faculty of Law and Faculty of Information & Media Studies |
| Faye E. Jones<br>Director and Clinical Professor of Law<br>Albert E. Jenner Memorial Law Library University of Illinois At Urbana-Champaign College of Law | Karen Milligan<br>Manager, Local History & Archives<br>Hamilton Public Library | Howard Besser<br>Professor of Cinema Studies & Founding Director of Moving Image Archiving & Preservation<br>New York University |
| Ariel Katz<br>Associate Professor, Innovation Chair in Electronic Commerce Faculty of Law<br>University of Toronto | Geoffrey Skinner<br>Librarian<br>Sonoma County Library | Simone Schloss<br>Assistant Acquisitions Librarian<br>Teachers College Columbia University |
| Jocelyn Kennedy<br>Executive Director<br>Harvard Law School Library | Matt Abbott<br>Manager, Collections & Extension Services<br>Hamilton Public Library | Rebecca J. Nesvet<br>Dr<br>University of Wisconsin |
| Yvette Joy Liebesman<br>Professor of Law<br>Saint Louis University School of Law | Monica Socol<br>Manager, Digital Technology Services<br>Hamilton Public Library | Stavros Macrakis<br>Founder<br>Travel Guide Systems |
| Lydia Pallas Loren<br>Henry J. Casey Professor of Law<br>Lewis & Clark School of Law | Laurisa Stubblefield<br>Circulation and Resource Sharing Librarian<br>Boley Law Library, Lewis and Clark School | Matthew Kopel<br>Copyright Specialist<br>Cornell University Library |
| Michael J. Madison<br>Professor of Law<br>University of Pittsburgh School of Law | Tony Del Monaco<br>Director, Finance & Facilities<br>Hamilton Public Library | Amada MARCOS<br>Dean of Librarians<br>IE University |
| | Robert Roose<br>Support Services Director<br>Spokane Public Library | Adriene Lim<br>Dean of University Libraries<br>University of Maryland, College Park |
| | Rebecca Meng<br>Librarian, Document Delivery Services<br>Memorial Sloan Kettering Cancer Center | Corie Dugas<br>Executive Director<br>NELLCO Law Library Consortium, Inc. |
| | Raghavendra K R<br>Head Resource Centre | |

**Susan Nevelow Mart**
Associate Professor and Director of the Law Library
Colorado Law, University of Colorado - Boulder

**Teresa Miguel-Stearns**
Law Librarian and Professor of Law
Yale Law School

**Lateef Mtima**
Professor of Law and Director, Institute for Intellectual
Property and Social Justice
Howard University School of Law

**Aaron Perzanowski**
Professor of Law
Case Western Reserve University School of Law

**Blake E. Reid**
Assistant Clinical Professor
Colorado Law

**Jorge R. Roig**
Associate Professor of Law
Charleston School of Law

**Pamela Samuelson**
Richard M. Sherman Distinguished Professor of Law and
Information
University of California - Berkeley

**Courtney Selby**
Associate Dean for Information Services, Director of the Law
Library and Professor of Law
Maurice A. Deane School of Law at Hofstra University Law
Library

**Chris Shaffer**
University Librarian
University of California, San Francisco

**Jessica Silbey**
Professor of Law
Northeastern University School of Law

**Ronald E. Wheeler**
Director of Fineman & Pappas Law Libraries, Associate
Professor of Law and Legal Research
Boston University Law

**Beth Williams**
Senior Lecturer in Law, Director Robert Crown Law Library
Stanford Law School

**Amanda Watson**
Director of the O'Quinn Law Library and Assistant Professor
of Law
University of Houston Law Center

**Michael Wolfe**
Intellectual Property Fellow
Duke Law Center for the Study of the Public Domain

**Matthew Sag**
Professor of Law
Loyola University Chicago School of Law

**Julie E. Cohen**
Mark Claster Mamolen Professor of Law and Technology
Georgetown Law

**Steven Mandeville-Gamble**
University Librarian
University of California, Riverside

**Paul Heald**
Richard W. and Marie L. Corman Professor of Law
University of Illinois at Urbana-Champaign College of Law

**Jeff MacKie-Mason**
University Librarian, Chief Digital Scholarship Officer,
Professor, School of Information and Professor of
Economics
University of California, Berkeley

**Lea Shaver**
Professor of Law and Dean's Fellow
Indiana University Robert H. McKinney School of Law

**Simon Canick**
Associate Dean for Law Library and Technology and Law
School Professor
University of Maryland, Francis King Carey School of Law

**Jennifer M. Urban**
Clinical Professor of Law
University of California, Berkeley

**Leah Prescott**
Associate Law Librarian for Digital Initiatives and Special
Collections
Georgetown University Library

**Jim O'Donnell**
University Librarian
Arizona State University

**Justin A. Gardner**
Special Collections and Cataloging Librarian
APH Migel Collection

**Rebekah Kim**
Head Librarian
California Academy of Sciences

**Bethany Nowviskie**
Director, Digital Library Federation
Digital Library Federation

National Institute of Fashion Technology, Bengaluru

**Austin Schertz**
Director of Development
Better World Books

**Kenn Rabin**
Owner
Fulcrum Media Services

**Wilhelmina Randtke**
Digital Library Services and Open Educational Resources
Coordinator
Florida Academic Library Services Cooperative

**Jeff Sharpe**
Senior Digitization Manager
Internet Archive

**Ulysses Jaen**
Director & Associate professor
Ave Maria Law

**Michael Rodriguez**
Collections Strategist
University of Connecticut Library

**Lawrence Lessig**
Roy L. Furman Professor of Law and Leadership
Harvard Law School

**Allison R Lightfoot**
Public Services Librarian
Story Library at Central Baptist College

**Peter Mahler**
Curator
The Mahler-Vidal Archives

**Melinda Dolan**
Systems Coordinator Librarian
Phillips Exeter Academy Library

**Rebecca Richardson**
Assistant Dean for Collections and Access
Purdue University Libraries

**Cindy Kristof**
Head, Copyright & Scholarly Communication
Kent State University

**Victoria Murgante**
Public Service Representative
Essa Public Library

**David B. Malone**
Dean of the Library
Calvin University

**Cheryl Gowing**
Assoc.,Dean, Library Information Systems & Facilities
University of Miami

**Daria Masia**
Ms
Brent Libraries

**Meghan Kwast**
Head of Collection Management Services
California Lutheran University

**Rebecca Richie**
Director of Student Resources
Eternity Bible College

**Robin N Sinn**
Coordinator, Office of Scholarly Communication
Johns Hopkins University

**Karen Rupp-Serrano**
Associate Dean, Scholarly Communication and Resources
University of Oklahoma Libraries

**Maria Aghazarian**
Scholarly Communications Librarian
Swarthmore College Libraries

**Renee Kuhles**
Faculty Librarian
Austin Community College

**Robert Heyer-Gray**
Head of Collection Strategies
University of California, Davis

**Adrian Ho**
Director of Digital Scholarship
University of Kentucky Libraries

**Kristen Heidmann**
graduate student
Emporia State University

**Romy Otayek**
Librairie
Coop HEC

**Brian McMillan**
Director, Music Library
University of Western Ontario

**Perry Collins**
Scholarly Communications Librarian
University of Florida

**Barbara J Ramsay**
Evening / Weekend Supervisor
University of WI Law Library

**Joe Lucia**
Dean of Libraries
Temple University

**Stephen Marsh**
Associate Professor of Trust Systems
Ontario Tech University

**Arturo E. García Niño**
Doctor en Historia y estudios Regionales, Profesor
Investigador
Universidad Veracruzana, México

**James Anthony Carneiro**
Digital Lending Advocate
Self

**Lindsay Cronk**
Head of Collection Strategies and Scholarly
Communications
University Of Rochester

**Michelle M. Trumbo**
Executive Director
Legal Information Preservation Alliance

**Howard C Marks**
Director, Learning Resource Center
Midland College

**Robert Heyer-Gray**
Head of Collection Strategies
University of California, Davis

**Yasmine Abou-El-Kheir**
Director, Lapp Learning Commons
Chicago Theological Seminary

**Sue Kunda**
Scholarly Communication and Social Science Librarian
Western Oregon University

**Michelle Tian**
Ms
Princeton University

**Laureano Gomez**
Librarian
Metabiblioteca

**Laura McShane**
Librarian
Cleveland Public Library

**Peter Suber**
Director, Office for Scholarly Communication
Harvard University

**Shruti Kulkarni**
Ms.
Evangelical Lutheran Church in America

**Aly Wepplo**
Media and Digital Librarian
The Community Library, Ketchum

**Daniel Clarkson Fisher**
MLIS student
Western University

**Ellen Dubinsky**
Scholarly Communication Librarian
University of Arizona

**Joshua Finnell**
Interim Associate University Librarian
Colgate University

**Alexis Beaman**
Interlibrary Loan Manager
University of Oklahoma Libraries

**Nancy Falciani-White**
Library Director
McGraw-Page Library, Randolph-Macon College

**Heather Edmonds**
Director of Library Services
New England College of Optometry Library

**Dr. Akash Singh**
Assistant Librarian
National Law University Delhi

**Dr. Priya Rai**
Head, Justice T.P.S. Cahwla Law Library
National Law University Delhi, India

**Patrick R. Wallace**
Digital Projects & Archives Librarian
Middlebury College

**Mothupi Kgatshe**
Editor-at-Large
Gulsue - Online

**Maurine McCourry**
Library Director
Hillsdale College

**Breac Krash**
Associate Dean, Content & Discovery, University Libraries
University of Massachusetts Amherst

**Silvio Muñoz**
International Business Director
Vicens Vives

**Nicholas Gardner**
Library Director
Potomac State College

**Brian Kagywa**
Founder
Bromley&co

Signatories to the Position Statement on Controlled Digital Lending by Libraries | Controlled Digital Lending by Libraries
https://controlleddigitallending.org/signatories

---

Creative Commons Attribution (CC-BY)
creativecommons.org/licenses/by/4.0

# McNamara Declaration
# Exhibit 141

| From: | Amy Brand |
|---|---|
| Sent: | Monday, September 17, 2018 6:09 PM EDT |
| To: | Chris Freeland |
| Subject: | Re: Willing to endorse our Position Statement on Controlled Digital Lending? |

Dear Chris,

Many thanks for reaching out. We've given this lots of thought and discussion, and consulted with MIT's attorneys, and decided we're not prepared to sign on as a press. We're at a pivotal time in the momentum towards OA digital monographs, and I'm optimistic we're not far off finding sustainable ways of funding their production. But many of the books we publish are not scholarly monographs, and being able to monetize digital sales of trade books and text books is currently a significant part of what allows us to survive as an OA-friendly mission-driven publisher. If CDL pertained only to monographs published "X" (TBD) or more years ago, that would be a different story entirely. Then there's the question of my personal endorsement. I would need to delve into the legal particulars further in order to feel comfortable. So I'll continue to ponder this question.

All best,
Amy

**From:** Chris Freeland <c████████@archive.org>
**Date:** Monday, September 10, 2018 at 11:31 AM
**To:** "████████@mit.edu" <████████@mit.edu>
**Subject:** Willing to endorse our Position Statement on Controlled Digital Lending?

Amy,

We are nearing the final push in releasing our Position Statement on Controlled Digital Lending by Libraries (attached).  The authors of the document are releasing it at the end of this month, alongside a more lengthy legal review white paper covering controlled digital lending.  We are seeking endorsements at either the institutional or individual level to include, and wondered if you'd be interested and willing to sign on as well; of note, Chris Bourg has signed individually. I'm also sending a similar request to Dean at Cornell UP, as well as Gerald Beasley in Cornell University Library.  For your consideration,

Chris

```
--
Chris Freeland
Director of Open Libraries
Internet Archive
████████@archive.org
@chrisfreeland
████████
```

CONFIDENTIAL

INTARC00415834

# McNamara Declaration
# Exhibit 142

| From: | David Hansen, J.D. |
| --- | --- |
| Sent: | Monday, September 25, 2017 11:54 AM EDT |
| To: | Lila Bailey; Michelle Wu |
| CC: | Mary Minow; Courtney, Kyle K.; Schultz, Jason |
| Subject: | Re: Signatory list - please confirm |

Hi Lila –

1. Given the small size of the list, I'm inclined to request that this not be shared too widely yet. LLF is one thing, but for broader dissemination I think it would be wise to try to develop a larger list of endorsers. Maybe we should do LLF as a sort of soft-release with version 1, but still hold off on making a splash with in sending to open listservs until we have more institutions/people on board?
2. Have you talked with Brandon Butler? It sounded to me like he may want to remove his name...

Thanks,
Dave

---

**From:** Lila Bailey ███ @archive.org>
**Date:** Friday, September 22, 2017 at 4:59 PM
**To:** Michelle Wu ███████ @law.georgetown.edu>
**Cc:** "David Hansen, J.D." ███████ @duke.edu>, Mary Minow ███████ @librarylaw.com>, "Courtney, Kyle K." ███████ @harvard.edu>, Jason Schultz ███████ @exchange.law.nyu.edu>
**Subject:** Re: Signatory list - please confirm

Assuming we can get the formatting/design stuff all sorted, then I'd say let's set the date of next **Wednesday, September 27th** as the date it will (1) go up on the LLF website and (2) be circulated beyond our small circles to listservs, etc. Does that work for everyone?

We also really need a way to collect additional signatories. I am ok to be the contact person for this, if that works for all. I'd suggest some language on the endorsements page like " To endorse this document, please email ██ @archive.org" as a temporary measure - ideally I'd like for us to put this up on a website, with a button/form for people to add their names directly. At some point, I think it's OK not to have verification (see e.g., the Capetown Declaration or the Manila Principles) but for the early stages of this , I think we want to maintain some form of vetting to ensure credibility.

I'm thinking we can call this v1, to show that we intend to upgrade to a v2 at some pint - which will be the website + ability to add endorsements, and maybe host the white paper or other documentation.

On 9/22/17 1:21 PM, Michelle Wu wrote:

I'm for both titles and institutions for the signatories and authors.

**CONFIDENTIAL**

**INTARC465732**

And do we have a definite date when this will go live in case any of us want to give a heads up to the people we've contacted?

On Fri, Sep 22, 2017 at 2:29 PM, Lila Bailey ████ @archive.org> wrote:

All,

I want to clarify how we will be presenting the signatory list (which will go on the last page of the document under a title saying "ENDORSED BY") so can you please confirm that this (Word doc attached) is exactly as we'd want to present it? Am I missing anyone? It seems shorter than I would like it to be...

Also, should we add individual signatory's titles, or just their institution?

Also for us authors do we want titles or just institutional affiliation?

Thanks, and sorry for so much email this week you guys - final push!!!

-Lila

--
Michelle M. Wu  | Associate Dean for Library Services & Professor of Law
111 G Street, N.W. | Washington, D.C. 20001
Office: ████████ | Email: ████████ @law.georgetown.edu

CONFIDENTIAL                                                                                          INTARC465733

# McNamara Declaration
# Exhibit 143

| From: | Chris Freeland |
|---|---|
| Sent: | Wednesday, November 28, 2018 5:18 PM EST |
| To: | Janet Snowhill |
| CC: | ████@zepheira.com; Doug Yancey; Robena Barton; John Goodyear |
| Subject: | Re: BCV - Opportunity for free eBooks |

Janet - I wanted to follow up on this thread from last week regarding the copyright issues. Last October, a group of copyright scholars, including Michelle Wu from Georgetown Law, Kyle Courtney from Harvard Library, Dave Hansen from Duke University Libraries, and Lila Bailey from Internet Archive worked together on two documents meant to help libraries understand the legal framework for our digital lending, described as "controlled digital lending." Those two documents have been released at https://controlleddigitallending.org/:

- The Statement on Controlled Digital Lending is meant to be a high level overview, suitable for conversations among your administrators and other stakeholders. That document is online at: https://controlleddigitallending.org/statement
- To satisfy your legal counsel or similar, the authors developed a more detailed white paper that goes deep into the details of controlled digital lending. That 42 page white paper is available at: https://controlleddigitallending.org/whitepaper

We've been operating our controlled digital lending service with libraries in the Boston area since 2011 without issue. That experience, coupled with the documents that our community of scholars contributed, have helped other libraries like Los Angeles Public Library, San Francisco Public Library, and others sign onto our program. Hopefully you can consider the same. Would be happy to chat more about these issues if you'd like! My best,

Chris

```
---
Chris Freeland
Director of Open Libraries
Internet Archive
███████████@archive.org
@chrisfreeland
████████████
```

On 2018-11-26 14:20, Janet Snowhill wrote:

Both of these make it appear that the Oregon State Library has the books, when they do not. Is it the case that it will always display a link to every library in our system, even when they don't actually have the book? I'm guessing this is a Yes, since it's only matching on ISBN, not on actual holdings. I can't decide whether that would be helpful,

CONFIDENTIAL
INTARC00418249

or misleading, from a patron perspective. It bothers me less, that Amity is listed for both titles, but doesn't own either, than that the State Library is listed for both/owns neither, as an Amity patron can simply request it, and pick it up at Amity. The State Library doesn't have the same relationship with CCRLS, though.

**Janet Snowhill**
System Librarian
Chemeketa Cooperative Regional Library Service
██████████

Need support from CCRLS? Use the helpdesk portal to open a ticket or email support@ccrls.org

On Tue, Nov 20, 2018 at 12:45 PM Lauri McIntosh < ████@zepheira.com> wrote:
> A couple of other things to let you know about ..
>
> First - Links to the physical copy of books they have, represented in the Network, are now showing up. Here are a couple of links -
> https://labs.library.link/services/borrow/?isbn=9781601420619&embed=True&radius=500&refer=https:/
> /dev.openlibrary.org/books/OL18285347M/Redeeming_love
>
> or https://labs.library.link/services/borrow/?isbn=9780778326823&embed=True&radius=500&refer=http
> s://openlibrary.org/books/OL24030253M/The_Perfect_Christmas
>
> These are done by ISBN match, so at times you will see multiple additions and need to keep in mind you may have the item but a different edition.  This is the first phase of our making your library present within their web pages.  We started with a single item page and will be expanding to other pages over the next few weeks.
>
> Lauri

On Tue, Nov 20, 2018 at 12:11 PM Lauri McIntosh < ████@zepheira.com> wrote:
> No, we do all the work.  On a quarterly basis we will get the ISBN list from the Archive, and then do a match again the most recent refresh of your data.  Right now, we have tentatively scheduled it for Jan/April/July and October.
>
> If you are interested I can send you the list of ISBN's we have for the first overlap.
>
> Lauri

On Tue, Nov 20, 2018 at 10:39 AM Doug Yancey ████████████@ccrls.org> wrote:
> Hi Lauri,
>
> Is your awareness of the overlap between our collection and Open Libraries derived from a list of unique ISBNs which are teased out of our regular/ongoing BC Visibility harvests? If so, does Zepheira commit to routinely sync/compare our holdings with the OL collection? Or, does this task fall to us?
>
>
> Doug Yancey | Web Services & ILL Librarian

Chemeketa Cooperative Regional Library Service

███████████

On Tue, Nov 20, 2018 at 9:36 AM Robena Barton
<███████████@ccrls.org> wrote:
This sounds great but are we talking about a batch extract, edit, and load process for our existing records or just the MARCXML files for the electronic copies if we want 856 link fields in our OPAC? I am not crazy about the idea of having a print, large print, audio, and electronic item record for over 120,000 titles potentially in addition to our ERC titles, at least until our system is better at grouping. My preference would be an 856 to the electronic version on IA in the existing print record if this is possible. Thanks,

Robena

On Tue, Nov 20, 2018 at 9:18 AM Lauri McIntosh
<████@zepheira.com> wrote:
Hi Janet,

I'm going to refer you directly to Chris Freeland, Director of Open Libraries at the Archive. He can give you the full scoop, I just know that they have worked through all the legal issues.

Chris - can you give Janet the information on copyright?

Lauri

On Tue, Nov 20, 2018 at 9:15 AM Janet Snowhill <███████@ccrls.org> wrote:
Lauri, can you explain how the copyright works, with this? How does this avoid fair use issues?

It's pretty cool, but we'd need to know what makes it legal, because people are bound to ask!

**Janet Snowhill**
System Librarian
Chemeketa Cooperative Regional Library Service
███████
Need support from CCRLS? Use the helpdesk portal to open a ticket or email support@ccrls.org

On Tue, Nov 20, 2018 at 9:01 AM John Goodyear
<███████████@ccrls.org> wrote:

John Goodyear
Executive Director
Chemeketa Cooperative Regional Library Service

CONFIDENTIAL
INTARC00418251



@ccrls.org

---------- Forwarded message ---------
From: **Lauri McIntosh** <████zepheira.com>
Date: Fri, Nov 16, 2018 at 4:08 PM
Subject: BCV - Opportunity for free eBooks
To: John Goodyear <████@ccrls.org>
Cc: Lauri McIntosh <████@zepheira.com>, Chris Freeland
<████@archive.org>

Hi John,

I was getting ready for our visit next month and wanted to check with you about the participation with the Open Libraries. I know you have heard bits and pieces, but if this is something you would be interested in I would like to have it live before my visit.

The formal "invite" is the info below, but the 1, 2, 3 of it is, once you sign the form we do the rest. A collection of the overlap between your print and Open Libraries is 122,248. The Archive would create a collection on their site as they have done for Delaware County Library (Ohio), SFPL, Worthington, and others. Open Libraries Collections.

You could easily have a link on an item page that would direct users back to the full Open Libraries Collection for CCRLS. We will be looking for folks to take OPAC Integration to the next level, be it importing of MARC records that can be converted to ERC, or a widget - if you would like to be part of that, we would love to have you come on board.

But, regardless, at the very least, would you like to participate and get free eBooks for your end users? The more official invite information is below.

Lauri



nternet Archive now offers FREE eBooks for all Library.Link libraries when you participate in the Open Libraries Controlled Digital Lending (CDL) project. How do you join and what do you get when you join Open Libraries?

CONFIDENTIAL

INTARC00418252

1. Join Open Libraries.  Simply sign onto the project, our simple Google Form is available here: https://goo.gl/forms/MS335xRFe3aiQ5Fh2 By joining, your library will get a collection at https://archive.org/details/openlibraries and you will become part of the community of practice we're building to support the responsible lending of in-copyright materials.  By participating, you'll continue to help shape Internet Archive's controlled digital lending service for your patrons and the world.

2. Share your catalog. After joining Open Libraries, Zepheira will provide an export of your ISBN's that you have in print that match the collection of digitized books at https://archive.org/details/inlibrary. We will use those matches to increase our lending counts by 1.

3. The Archive has MARCXML records for all of their digitized books in lending - they include the new OCLC number for the electronic resource, as well as links out in 856. Here's a sample: https://archive.org/download/plantphysiology00bidw/plantphysiology00bidw_archive_marc.xml

I did a quick scan for your library and the overlap is currently   122,248.

If you would like to get started complete the link to the form above and we will do the rest!   Once the collection is created on the Open Libray site, the Archive will work with you to get the MARC records so that you can then load them into your catalog for easy access to your patrons.

Specific questions can be emailed to Chris Freeland, Director of Open Libraries at the Internet Archive, ███████████@archive.org.

We look forward to you joining other Library.Link Network libraries to bring this added value to your libraries.

Lauri McIntosh
█████@zepheira.com
████████████

--

CONFIDENTIAL

INTARC00418253

\*\*\*\*\*\*
Lauri McIntosh
Director, Sales and Channel Management
Zepheira, Library.Link Network
tel: ███████
Cell: ███████

Learn more about <u>Zepheira</u> and the
<u>Library.Link Network</u> on our websites.

<u>Subscribe to the Library.Link Newsletter</u>.

--
**Robena Barton**
**Technical Services Coordinator**
**Chemeketa Regional Library Service**
████████
But if this is what a book is... then a library is an extraordinary thing.

--

\*\*\*\*\*\*
Lauri McIntosh
Director, Sales and Channel Management
Zepheira, Library.Link Network
tel: ███████
Cell: ███████

Learn more about <u>Zepheira</u> and the
<u>Library.Link Network</u> on our websites.

<u>Subscribe to the Library.Link Newsletter</u>.

**CONFIDENTIAL**                    **INTARC00418254**

\-\-

******
Lauri McIntosh
Director, Sales and Channel Management
Zepheira, Library.Link Network
tel: ██████████
Cell: ██████████

Learn more about <u>Zepheira</u> and the
<u>Library.Link Network</u> on our websites.

<u>Subscribe to the Library.Link Newsletter</u>.

CONFIDENTIAL

INTARC00418255

# McNamara Declaration
# Exhibit 144

| From: | Chris Freeland |
|---|---|
| Sent: | Wednesday, March 13, 2019 12:50 PM EDT |
| To: | Draper, Kristy |
| CC: | Abe Hsuan ▇▇ @irwinhsuan.com) |
| Subject: | Re: Security Info for eBook File Storage |

Hi Kristy,

The team of copyright experts that authored the white paper on Controlled Digital Lending have just published a FAQ that addresses file security.ï¿½ I believe your questions might be answered within the following: https://controlleddigitallending.org/faq

Please let me know if you have additional inquiries.

Chris

On 3/8/19 2:39 PM, Draper, Kristy wrote:

> Hi Chris,
> Thank you for meeting with Abe and me earlier this week. I am just following up to see if you were able to find a contact or information regarding the security measures around files storage?
> ï¿½
> Thank you,
> Kristy
> ï¿½
> ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½ï¿½
> **Kristy Draper**
> Houghton Mifflin Harcourt
> Digital Project Manager
> HMH Trade Publishing
> ï¿½
> www.hmhco.com
> ï¿½

```
--
Chris Freeland
Director of Open Libraries
Internet Archive
▇▇▇▇▇▇@archive.org
@chrisfreeland
▇▇▇▇▇▇
```

CONFIDENTIAL

INTARC00420223

# McNamara Declaration
# Exhibit 145

# February 21 panel at Boston Public Library

## Event Details

Title: The Future of the Book and Digital Access
Date: Thursday, February 21, 6-7:30 PM
Location: Rabb Hall, Boston Public Library
Panelists: Amy Brand (MIT Press), Brewster Kahle (Internet Archive), Maria McCauley (Cambridge Public Library), and hosted by David Leonard (Boston Public Library) (bios available here)

**Purpose**          **:** The panel will seek to educate the public on the work of the Internet Archive and Open Libraries with a focus on library strategies for digital lending and managing digital materials in the 21st century.

## Event Description & Bios

**Event description:** The ebook landscape is rapidly changing for both libraries and publishers.  While recently published materials are readily available in ebook form, older books often have no ebook equivalent or digital access.  Book scanning projects have made strides in bringing public domain literature online, but materials published after 1923 are still not widely available due to US copyright restrictions. The Internet Archive has developed a controlled digital lending service that enables libraries to lend a digital version of a non-circulating book stored on their shelves. Through controlled digital lending, libraries can make twentieth century scholarship available that is largely absent from their digital holdings in a way that respects the rights of authors and publishers. Publishers, too, can participate in controlled digital lending; projects between Internet Archive, MIT Press, and other university presses are digitizing backlist and out-of-print books and making them available through controlled digital lending.  Facilitated by Boston Public Library's David Leonard, this panel will bring together leaders from the library and publishing communities to discuss the future of the book and digital access, including Amy Brand from MIT Press, Brewster Kahle from Internet Archive, and Maria McCauley from Cambridge Public Library.

**Panelist bios:** available here

## Draft panel outline (90 mins)

1. Welcome & introductions - David (5)
2. Opening remarks / review of current landscape & issues - David (10)
3. CDL description and demo - Brewster (10)
4. View from public library - Maria (10)

5. View from publisher - Amy (10)
6. Moderated questions - David (25)
7. Town hall-style Q&A with audience (20)

**Panel ideas/questions**
(put ideas/topics/themes/questions here as brainstorming & we'll work them into the outline & Q&A)
- Sustainability

**Panelists arrival time & location**
Time: 5pm for runthrough
Location: Rabb Hall green room

## Promotion

- BPL web: https://bpl.bibliocommons.com/events/5c51f60f433d822b0068bd1a
- Eventbrite: https://www.eventbrite.com/e/the-future-of-the-book-and-digital-access-tickets-55660310487
- IA tweet: https://twitter.com/internetarchive/status/1095005781554917376
- Standard image:



## Notes & action items

**Group discussion (2/12):**
- Review event logistics
- Discuss format & outline
  - AV
    - Podium

CONFIDENTIAL
INTARC00141737

- Brewster: demo
- Amy: slides
- Maria: probably not
  - Streaming
    - Facebook Live integrated into AV system
- Messages hope to deliver
- Maria:
  - Social justice, equity & inclusion
  - Lean into these themes
  - Who we are, what we're about
  - See it in our service offerings as well as collections
  - Different platforms is part of our embracing access, equity & inclusion
- Brewster:
  - Help inform digital readers
  - Turn Wikipedia citations blue
  - People want to go further, but content may not be a click away
  - Different than beach reading
  - Lack of availability of 20th century materials
    - As available to the current generation as it was to previous ones
- Amy:
  - Where vision is aligned in supporting UP initiative to bring titles online
  - Balancing sustainability of publishing house
  - Mission-driven, some parts support other parts
  - What was intent of content creator?
    - Some are not in favor, and that's important as well
  - Showing bigger/complexity of what to monetize with digital books / OA
    - What might stop us from putting something into OL
  - Control is around mission, maximizing publishing process & access
  - Tons of piracy anyway and we're still selling books
- Discuss promotion and outreach
  - Globe
  - WGBH
  - Each org
    - Newsletters
    - Social

**Discussion with David Leonard (1/16):**
- Format for panel:
  - David will host & moderate
  - Opening remarks: David will set the stage regarding what BPL has experienced over past year or two with ebook consumption, digital content, physical book circulation data
  - Lightly introduce the topic of CDL
    - "Hey Brewster, can you show us what CDL actually is?"

**CONFIDENTIAL**

INTARC00141738

- Offer Maria & Amy the opportunity to respond
- Move into moderated questions from David for panelists
- Then move to town hall-style Q&A with audience
  - 2 roaming mics in audience
- Open reception following
  - Small dinner after that for select attendees?

**Action Items**
- Host 3 conference calls asap
  - Logistics: IA & BPL to iron out AV & other logistics needs
  - Program: Panelists to discuss talking points, questions
    - Feb 12 @ 1:10pm EST
  - Communications: Communications folks from all institutions to drive attendance


**Discussion with Chris, Emily & Ben (1/9):**
**Action Items:**
- Emily to connect Chris with BPL Communications Department
- Emily to check on possibility of Forum Network taping of program
- Chris to confirm panelists
  - Panelists confirmed: Amy Brand (MIT Press), Maria McCauley (Cambridge Public), Brewster (IA)
- Chris to provide bios and event description to Emily by end of January.
- BPL will create the calendar listing, coordinate with Internet Archive on promotion

INTARC00141739

# McNamara Declaration
# Exhibit 146

**Internet Archive Blogs**

*A blog from the team at archive.org*



Blog   Announcements   25th Anniversary   archive.org   About   Events   Developers   Donate

## Mythbusting Controlled Digital Lending: Community Rallies to Fight Misinformation About the Library Practice

Posted on February 11, 2021 by Caralee Adams



Academics, legal experts, and authors explained the thoughtful reasoning and compelling need for libraries to engage in Controlled Digital Lending (CDL) at a webinar hosted by the Internet Archive and Library Futures on February 11. A recording of the session is now available.

Watch Video

The panel dispelled myths about CDL, the digital lending model in which a library lends a digital version of a print book it owns. Emphasizing the limited and controlled aspect of the practice, the speakers said CDL allows libraries to fulfill their mission of serving the public in the digital age. The global pandemic only underscores the importance of providing flexibility in how people can access information.

Isn't CDL digital piracy? No, CDL is not like Napster, said Kyle K. Courtney, copyright advisor at Harvard University, referring to the music file-sharing service. Twenty years ago, the actions of Napster were ruled illegal because it made unlimited reproductions of MP3 music to anyone, anywhere.

"CDL uses technology to replicate a library's right to loan works in a digital format—one user at a time," Courtney said. Libraries are using rights they already have, leveraging the same technology as publishers to make sure that the books are controlled when they're loaned—not duplicated, copied or redistributed.

"Libraries are not pirates. There is a vast difference between the Napster mission and the library mission," Courtney said. "We can loan books to patrons. Only now we're harnessing that right in the digital space."

In laying out the rationale behind CDL, Courtney described the "superpower" granted to libraries by Congress through copyright law to serve the public. The "fair use" section of the law allows libraries to responsibly lend materials, and experts say logically includes both print and digital works.



*The webinar featured the premiere of 'Controlled Digital Lending Explained,' a short video that describes how CDL works.*

The idea of "fair use" has been around as long as there has been copyright, and it applies to new technologies, said Michelle Wu, attorney and law librarian at the webinar. The Internet Archive did not invent CDL. Wu is the visionary behind CDL, developing the concept in 2002 as a way to protect a library's print collection from natural disaster—an imperative she faced in rebuilding a library destroyed by flooding.

Just as libraries lend out entire books, fair use allows the scanning of whole books, said panelist Sandra Aya Enimil, copyright librarian and contract specialist at Yale University. The law makes no mention of the amount of material that can be made available under "fair use," so for libraries to fulfill their purpose they can make complete books—whether in print or digital—available to patrons, she said.

It's a myth that librarians need author and publisher permission for CDL, explained Jill Hurst-Wahl, copyright scholar and professor emerita in Syracuse University's School of Information Studies. "Authors and publisher control ends at the time a book is published, then fair use begins," she said. "Once a work is legally acquired by you, by a library, the copyright owners' rights are exhausted."

Library lending is viewed as fair use, in part, because it is focused on socially beneficial, non-commercial outcomes, like literacy, said Hurst-Wahl. Also, libraries loan physical books without concern about the market effect—so the same rules apply if a digital version of the book is substituted.



CDL does not harm author or publisher sales, the panelists emphasized. Indeed, it can provide welcome exposure.

"The reality is that CDL can help authors by enhancing discoverability, availability and accessibility of their works," said Brianna Schofield, executive director of Authors Alliance, speaking at the event. "It helps authors to spread their ideas, and it helps authors to build their audiences."

Many of the books that are circulated by CDL are rare, out-of-print books that would otherwise be unavailable. This source material can be useful for writers as they develop their creative works.

### Recent Posts

- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure
- We Can Rebuild It: Using the Internet Archive to Discover Original Order
- A New Approach To Understanding War Through Television News: Introducing The TV News Visual Explorer & The Belarusian, Russian & Ukrainian TV News Archive

### Recent Comments

- Sally G. on Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- Sally G. on Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- Matthew LV on GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure
- aho on GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure
- esal on GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

### Categories

- +8000
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool Items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News
- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

### Archives

Select Month

### Meta

- Log in
- Entries feed
- Comments feed
- WordPress.org

"Digital and physical libraries contribute to a healthy publishing ecosystem and increase sales and engagement for creative works," said Jennie Rose Halpin, executive director of Library Futures, a newly formed nonprofit coalition advocating for libraries to operate in the digital space. Research shows that leveraged digitization increases sales of physical additions by about 34% and increases the likelihood of any sale by 92%, particularly for less popular and out-of-print works.

Because digitized versions can be made more readily available, CDL can extend access to library collections to people with print disabilities or mobility issues, the panelists noted. CDL also allows libraries to preserve material in safe, digital formats with the best interest of the public—not profit—at the center of its work.

"People love books and will buy if they're able. But we have to remember that paper books and even some ebooks do not serve the needs of all readers," said Andrea Mills, digitization program manager at the Internet Archive and lead on the Archive's accessibility efforts. "Accessibility is a human right that must be vigilantly protected."

For anyone interested in learning more about how to get involved with CDL, the Internet Archive now has 2 million books available to borrow for free, and an active program for libraries that want to make their collections available through CDL.

"The CDL community of practice is thriving," said Chris Freeland, director of Open Libraries at the Internet Archive. "We are in a pandemic. Libraries are closed. Schools are closed. CDL just makes sense and solves problems of access."

*To learn more about CDL, and to show your support for the library practice, join the #EmpoweringLibraries movement.*

Posted in Announcements, Books Archive, Event, Lending Books | Tagged CDL, controlled digital lending | 5 Replies

← Meet Eliza Zhang, Book Scanner and Viral Video Star     Library Holdings from the University of Tokyo Now Available Through the Internet Archive →

### 5 thoughts on "Mythbusting Controlled Digital Lending: Community Rallies to Fight Misinformation About the Library Practice"

 **kalbright3375@gmail.com**
February 12, 2021 at 10:10 pm

That's all great, but I've got one comment about the current uploader...

I want to create a collection—from scratch, that is!

 **Adam S Yik**
February 13, 2021 at 12:26 am

Awesome post, so my personal argument against people attacking CDL:
-Author's Guild excuse on Capitol Records v. ReDigi: Guess what: the majority of stuff they obtained were initially physical, and have never sign to any EULAs or contracts that would take away their rights of the first-sale doctrine or fair use. I'm certain there is no such thing as a physical book that require agreeing to some terms that would take away the rights of the user and the library in order to read them. Most physical stuff purchased (not loaned or rented) that is purely NOT digital are rarely ever had such a contract or EULAs attached to it. –"but digital content do not wear and tear unlike physical books, which that last forever", might as well prohibit physical libraries from fixing books with torn pages, damaged covers, and such if you are against this type of digital preservation.

Plus, the DRM are always in effect for the duration of the in-copyright period, even if under the NEL. So if the copyright holders DIDN'T opt out because they're unaware of it or some other cause, by the time the NEL ends, it will go back to normal, as if the NEL didn't happen at all, because the digitized books are STILL protected, and is subject to the (re)checkout and waitlist system after the NEL ended. It is not like people can obtain stuff from the open library during the NEL, and freely pirate them as they wish, and causes long term effects even after the NEL is over. This should weigh in for fair use on the 4th factor, the effects on the market, there is no harm on "the unlicensed use harms the existing or future market for the copyright owner's original work".

Not to mention, this is an EMERGENCY, if the IA had to negotiate licensing to drop the waitlist system of allowed books, that would take too long to address the lockdown issue, plus, we are still paying property (county) taxes, and a part of that goes to libraries, that during the lockdown, we cannot use because they're closed. Furthermore, some books are needed in hospitals because they need manuals for health-related problems, since many hospitals are OVERWHELMED with patients with covid-19.

 **Adam S Yik**
February 13, 2021 at 7:19 pm

Also, guess what, the excuses of DRM being bypassed (such as a loaned book viewed on some browser can be stolen by accessing the browser's cache data), is equivalent to:
-People who borrow physical books from a real library, take it home, use their phone's camera feature and take pictures on it, and distribute it freely.
-The same applies to ebook licenses too.

Plus, no DRM, especially if the content is non-interactive, is perfect.

 **Louise Hopkins**
February 17, 2021 at 2:21 pm

'Fair use' does not specify the time-frame for which an item may be lent. When digital items such as novels are loaned with a limit of, say, 1 hour, as the Internet Archive does for most novels, this does not give the reader 'fair use'. They cannot download an item and read for any significant length of time, in digital terms the Internet Archive is no longer a lending library but a reading room – and one with rather dim lights!

 **Aman samadhiya**
February 22, 2021 at 10:42 am

Such a amazing post very informative and I will definitely suggest other people about it for sure.

Comments are closed.

Proudly powered by WordPress

# McNamara Declaration
# Exhibit 147

| From: | Chris Freeland |
|---|---|
| Sent: | Thursday, May 14, 2020 4:52 PM EDT |
| To: | David Hansen, J.D. |
| Subject: | Re: CDL / Open Library Sign up |

Sorry, was on a call.  BK generally gets allergic to indemnification clauses, but worth a shot in a first draft revision.

On 5/14/20 12:07 PM, David Hansen, J.D. wrote:

> Thanks, Chris. Just tried calling... the main thing I wonder about is an indemnification clause. Would you do one?

**From:** Chris Freeland ████████@archive.org>
**Date:** Thursday, May 14, 2020 at 11:08 AM
**To:** "David Hansen, J.D." ████████@duke.edu>
**Subject:** Re: CDL / Open Library Sign up

Dave - Sure. Some other libraries have taken our agreement and used it as the starting point for a more tailored document.  We're receptive to that path.  Ring me at ████████ if you want to discuss, or just shoot us an update for review.  Currently wading through this with another library, so good timing.

Chris

On 5/13/20 10:13 PM, David Hansen, J.D. wrote:

> Hi Chris –
>
> I have restarted folks here at Duke working on doing an extract to do an overlap analysis for being a partner library for CDL. I was going over the form agreement again today and wonder if there is any flexibility on the terms... would make it easier for us to sign. LMK if you have a moment to talk, or if this is a Lila question I'm happy to talk to her too.
>
> Dave

```
--
Chris Freeland
Director of Open Libraries
Internet Archive
████████@archive.org
@chrisfreeland
████████
```

CONFIDENTIAL
INTARC00463054

```
--
Chris Freeland
Director of Open Libraries
Internet Archive
████████@archive.org
@chrisfreeland
████████████
```

CONFIDENTIAL

INTARC00463055

# McNamara Declaration
# Exhibit 148

| From: | Chris Freeland |
|---|---|
| Sent: | Monday, August 26, 2019 3:23 PM EDT |
| To: | Kevin French |
| CC: | Lauri McIntosh |
| Subject: | Re: Following up from today's Open Libraries webinar |

Hi Kevin,

How libraries limit circulation for books in controlled digital lending is a local decision made by the library. Some libraries are taking the approach that your librarian suggested, which is to just look at the collections that have inherent limitations, such as non-circulating reference collections or materials in closed stacks or off-site facilities. Other libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all our digital copies and all the physical copies across our network of partners are all checked out at the same time. Of note, libraries put one copy in for our matched records (even if you have multiple copies), and those counts are added to a pool for a given book. When a patron checks out a book, they are checking out a copy from the pool, not an individual library; for a variety of reasons, including reader privacy, we don't connect the circulation back to an individual library. We've designed this statistical approach so that libraries don't have to wade through the logistics issues - we determine overlap, put in one copy where there's a match, and give you back links or a MARC record for that book to bring back into your catalog.

Happy to discuss more or help clarify as needed! My best,

Chris

On 8/23/19 9:37 AM, Kevin French wrote:

Hi Chris and Lauri,

One of my librarians who attended had a take on yesterday's webinar that I hadn't considered that she's very concerned about being in compliance. I hadn't thought the amount of borrowing would necessitate any amount of staff time so I wondered if you could address what she says below. Do we get any notification that a library's digital copy is checked out?

*I was just writing up my notes from the webinar to submit my report when I got these emails. My overall takeaway was that the project does sound really worthy and like a neat additional resource. I am going to add a link/instructions on our website to access the OpenLibrary even if we do not link our collection, because just the fact of it being out there and accessible is really great.*
*As far as actually linking our collection, the only way I can think of to manage the logistics behind "own one – loan one" is to only link our reference collection (which is non-circulating). The effort it would take to stay in compliance on circulating items (by removing them from the shelf when the digital copy is checked out) seems like it could be a real issue for libraries with primarily publicly accessible collections. That said, our reference collection is likely to never be available commercially as ebooks, so linking that would be a great improvement of access, if there is enough overlap to be worthwhile. Would it be possible to*

CONFIDENTIAL

INTARC00423818

*see a figure for how many of the titles in our reference collection overlap with the already digitized items at the IA/OL? Reference is a Shelf Location for us here, with non-circulating as a status. Please let me know if there is other information I can provide to narrow the search for our overlap.*

Thank you,
-Kevin

**From:** Chris Freeland <█████████@archive.org>
**Sent:** Thursday, August 22, 2019 16:57
**To:** Kevin French ████████@gmilcs.org>
**Subject:** Following up from today's Open Libraries webinar

Dear Kevin,

I'd like to thank you for your time today participating in the Open Libraries webinar. Hopefully you learned how the Open Libraries program operates and the benefits it can provide to libraries and patrons in providing free access to digitized books.

**Links**
I wanted to pass you links from the discussion so that you can review and share with your colleagues. Those links are listed here:

- Session Recording: https://drive.google.com/file/d/1-G38S3PefTK_ATwDJhjTp6Zotv2Z5oLa/view?usp=sharing
- Presentation: https://docs.google.com/presentation/d/1RNdRijv4JP4hblJs1o8er5y-LAi4e0fwIMQjDIbVTw8/edit?usp=sharing
- Open Libraries, including existing partners: http://openlibraries.online
- Open Libraries lending collection: https://archive.org/details/inlibrary
- Controlled Digital Lending, including the Position Statement that you can endorse and white paper: https://controlleddigitallending.org

**Feedback**
We would welcome your feedback on how to improve this webinar for future sessions, and would appreciate 2-3 minutes of your time in completing the following survey: https://goo.gl/forms/bdlczKeCAdK4K4Aj1

**Next webinar**
Our next Open Libraries webinar will be held on **Tuesday, September 24 at 11am CST**.  Please send the following RSVP to your colleagues who might be interested in learning more about Open Libraries: https://www.eventbrite.com/e/open-libraries-webinar-september-24-tickets-69883703037

**Upcoming events**
Our annual Library Leaders Forum will be held on **Wednesday, October 23** at San Francisco Public Library, with our evening celebration at Internet Archive HQ.  You can learn more and register for the free event at: http://libraryleadersforum.org/

CONFIDENTIAL

INTARC00423819

Finally, if your library is ready to participate in Open Libraries, our onboarding process begins by completing our simple online form, available at: http://openlibraries.online/join/

Please don't hesitate to reach out with follow up questions either through this e-mail or via mobile at ▮▮▮▮▮▮▮ Thanks again, and my best,

Chris

--
Chris Freeland
Director of Open Libraries
Internet Archive
▮▮▮▮▮▮@archive.org
@chrisfreeland
▮▮▮▮▮▮▮

CONFIDENTIAL                                                    INTARC00423820

# McNamara Declaration
# Exhibit 150

# Internet Archive Blogs

*A blog from the team at archive.org*



Blog    Announcements    25th Anniversary    archive.org    About    Events    Developers    Donate

## How Internet Archive and controlled digital lending can help course reserves this fall

Posted on July 30, 2020 by chrisfreeland



*Webster Library's Course Reserves Room, Concordia University* by *Librarianpam* under *CC BY-SA 4.0*

I host regular webinars about the Internet Archive's Open Libraries program, helping librarians and others understand how controlled digital lending works, and how their library can make their print collections available to users online. The question of how to safely handle course reserves is clearly among the top priorities for academic librarians as they approach fall semester, just a few short weeks away. At nearly every webinar session since early March, and certainly every session this summer, librarians have raised the question of how controlled digital lending can work for course reserves.

We're getting such a large number of inquiries on this topic that I thought it would be helpful to outline how Internet Archive's Open Libraries program and controlled digital lending can help your library with course reserves this fall, and where we may have limitations in supporting your full suite of needs.

**What are course reserves?**

Course reserves are books & other materials that instructors and students need for particular courses. Materials are requested to be put "on reserve" by the instructor. The library sources those materials and either provides digital access (born digital or scanned) or physical access to the items.

- If physical, the library holds a copy behind the circulation desk or in a special room (like the beautiful Course Reserves room in Webster Library at Concordia University, above), and students check out & read the book for a limited period of time. After that time expires, the work is returned and made available for the next student.
- If digital, the item goes into the library's e-reserves system and/or the course learning management system, such as Google Classroom, Blackboard, or Canvas, where it can be accessed by students enrolled in the class.

## Recent Posts

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

## Recent Comments

- Superman on July Book Talk: The Library: A Fragile History
- aho on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

## Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News
- Newsletter

A-3425

**What's the challenge with course reserves this fall?**

Academic libraries have remained open and operational throughout COVID-19 closures, many working with limited-to-no onsite staff. Their operations were already digital, but distance learning and health and safety issues related to lending physical materials have put a renewed emphasis on digital delivery for fall semester. As libraries work to meet the needs of students and faculty returning to instruction this fall—either in person, online, or hybrid models—the demand for new ways of managing and serving course reserves is significant.

**How can Internet Archive help?**

- Our lending library of 1.5M digitized books is available to your patrons right now. Our books are available to borrow by anyone with an email address and an internet connection, with a simple signup form.
- By default our books circulate for one hour, following the usage pattern of our own users and HathiTrust's Emergency Temporary Access Service. When we have additional copies, books can also be checked out for 14 days.
- If your library joins the Open Libraries program, we can process your course reserves list (either in MARC format or just a list of ISBNs) and give you back links to the books we've already digitized. You can incorporate those links back into your catalog, course reserves system, or learning management system.
  - To be clear, you don't have to join the program to access our books. Anyone can link to our books right now. If you join, we'll analyze your records for matches and give you back controlled digital lending so that we have an additional copy to lend, but again, that's not required.
- If we don't have a book you need, you can help bump it up higher in our acquisition wish list by completing this Course Reserves request form, which will ask you to submit the book's ISBN, title, author, year published, and anticipated # students in the course.
- If you have a book that we don't have, and you want to make it available to users to check out online through controlled digital lending, we can work with you to upload your book into our CDL environment. Please read our program limitations below, and reach out to learn more.

**Limitations**

Internet Archive's controlled digital lending service is not a perfect match for all course reserve scenarios. You should consider the following program limitations as you plan for fall semester:

- Your patrons will have to create an account at archive.org to check out books. We don't connect to eduroam or Shibboleth for single-sign on. (If you're interested in helping us implement and integrate a Shibboleth connection let us know.)
- You can't limit users for a particular book to students at your school or students in a particular course. We lend to anyone with an archive.org account.
- We don't have a calendaring and notification system for one hour loans. Our one hour borrows are first come, first served. We do have waitlists and a notification system for 14 day loans.
- Books added to CDL or requested to be added to CDL must be published in 2015 or earlier. If you have special needs for accessible texts for more recent books, please reach out.

We understand that our implementation of CDL won't work for every course reserves use case. We offer our collection to assist libraries and schools in connecting students with books this fall semester. We are guided by our library's mission to provide "universal access to all knowledge," especially as library service and educational systems are disrupted due to COVID-19. If you have additional questions about how we can help that are not addressed here, please reach out.

Posted in Announcements, Books Archive, Lending Books, News | Tagged CDL | 8 Replies



**About chrisfreeland**

Chris Freeland is the Director of Open Libraries at Internet Archive.

View all posts by chrisfreeland →

- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

**Archives**

Select Month

**Meta**

- Log in
- Entries feed
- Comments feed
- WordPress.org

Page 3
How Internet Archive and controlled digital lending can help course reserves this fall - Internet Archive Blogs
http://blog.archive.org/2020/07/30/how-internet-archive-and-controlled-digital-lending-can-help-course-reserves-this-fall/

← ESSENTIAL MUSIC: Concerts From Home      Even More Impacts of the National Emergency Library and Controlled Digital Lending →

**8 thoughts on "How Internet Archive and controlled digital lending can help course reserves this fall"**



**when will**
July 31, 2020 at 11:09 am

I didn't know there was a place such this, it's impressive.



**Momoh Ibrahim**
July 31, 2020 at 7:32 pm

Nice to know to importance of how internet archive and controlled digital work. Information such useful and educative. Thanks for sharing



**پارسی موزیک**
August 1, 2020 at 7:49 am

This is a wonderful possibility I was not well aware of this possibility
Thanks for this article



**Check My IP**
August 1, 2020 at 3:38 pm

Course reserves for physical materials (print books, DVDs, etc.) are suspended for the Fall 2020 semester. This guide will link you to some of the electronic resources available through the WSU libraries to support your courses.
Instructors can use our Course Reserves form to request access to a monograph for your course. The libraries will attempt to procure an ebook version to fulfill monograph requests.

The libraries are required to adhere to copyright guidelines when providing scanned content. We can provide limited scanned chapters of books from our collections or through Interlibrary Loan. Please request book chapters through our Interlibrary Loan service.



**Capptain Mark**
August 1, 2020 at 5:36 pm

Very Impressive. Thanks for sharing



**Tehltee**
August 9, 2020 at 7:20 am

Thanks very much for all d free books i can read foc.
Happi i dont need to go 2nd hand bookshops or library anymore.
God bless all who made tis possible worldwide.
Truly appreciate all ur efforts.



**پارسی موزیک**
August 9, 2020 at 11:57 am

This article was very useful for me It is also very positive and excellent



**Preeti Batra**
August 10, 2020 at 5:26 pm

Well explained. Thanls

Comments are closed.

A-3427

*Proudly powered by WordPress*

A-3428

# McNamara Declaration
# Exhibit 151

| From: | Chris Freeland |
| --- | --- |
| Sent: | Wednesday, July 22, 2020 1:11 PM EDT |
| To: | Michael Wares |
| Subject: | Re: Digitizing books for Controlled Digital Lending, Fordham University Libraries |

Sure, I have time until 1:30pm. Ring me at ███████.

On 7/22/20 12:00 PM, Michael Wares wrote:

> Hi, Chris.
> Sorry, hectic morning!  Is this a good time for a call?
> Thanks!
> Michael
> *Michael Wares*
> *Assistant Director for Technical Services*
> *Fordham University Libraries*
> ██████*@fordham.edu*
> **See the Fordham University Libraries' COVID-19 page for details of all our 24x7**
> **services**
> **(including live Reference Librarian support) and other useful information, at**
> **https://fordham.libguides.com/coronavirus**
>
>
> On Tue, Jul 21, 2020 at 5:53 PM Chris Freeland <█████████@archive.org> wrote:
>> Michael - I'm happy to chat with you tomorrow, Wednesday, any time before 1pm CDT.
>> Lots of libraries are asking us about course reserves and controlled digital lending. I noted
>> part of your email mentions that the books would "only be released to our users in
>> proportion to the number of physical copies which we have embargoed." That's not how our
>> implementation of CDL currently works - we lend to anyone with an Internet Archive library
>> card, and there is no way to restrict usage of books put into CDL by particular users, so
>> there's no way for us to limit use to only your patrons.  Happy to discuss further on a call.
>>
>> Chris
>>
>> --
>> Chris Freeland
>> Director of Open Libraries
>> Internet Archive
>> ██████@archive.org
>> @chrisfreeland
>> ████████
>>
>>
>>
>> On 7/21/20 11:06 AM, Michael Wares wrote:
>>> Hi, Jeff.  Hi Chris.

CONFIDENTIAL                                                                 INTARC00445585

Thanks for your extremely quick response!
Would you have some time today or tomorrow for a brief phone call to go over some details?
Thanks!
Regards
Michael
*Michael Wares*

*Assistant Director for Technical Services*

*Fordham University Libraries*

█████████@fordham.edu

**See the Fordham University Libraries' COVID-19 page for details of all our 24x7 services
(including live Reference Librarian support) and other useful information, at
https://fordham.libguides.com/coronavirus**


On Tue, Jul 21, 2020 at 11:22 AM Jeff Sharpe <████@archive.org> wrote:

Hi Michael,
I am copying Chris Freeland ████████@archive.org to this email as he is in charge of CDL. We can digitize the books for you here in Fort Wayne and have them go directly into CDL. I know that he puts on webinars and could include you in that or contact him directly.
Below are our standard fees. I believe these also apply to CDL material but we should confirm with Chris.

Cost

$3.00 set up fee for each digital item, this covers Quality Assurance, collections setup, cropping, file storage and re-packing of materials, indefinite online presence, etc.

$0.12 per page able to fit on our 'Scribe' machines (Max. size 11w x 15h, in inches)

$2.40 per foldout page which cannot fit our Scribes and requires a separate workflow

$0.30 per folio item an entire bound item that does not fit on the Scribe

$0.30 cents per page for newspapers

Partner pays for shipping to and from partner library with prepaid return labels with each shipment.

I think we could have those done within 30 days from the time we receive them.

CONFIDENTIAL
INTARC00445586

450 x $3. = $1350.
150,000 x .12 = 1800.
Total=        $3150
I would add a couple hundred just in case some material has foldout maps
or something unforeseen.

In order to get going we would have to have an agreement signed with Chris
and a spreadsheet with the items you want digitized.

Please let me know if you have any other questions or comments.
Thanks,
Jeff


Jeff Sharpe
Internet Archive
Senior Digitization Manager, Mid-West Region, US
Allen County Public Library
900 Library Plaza
Fort Wayne, IN 46802
██████████████

"Universal Access To All Knowledge"
WWW.Archive.org
WWW.OpenLibrary.org
> I hope this email finds you well.
> The Fordham University Libraries are looking into digitizing
approximately
> 450 volumes, about 150, 000 pages, to support CDL for distance learning.
These are largely or entirely in-copyright books, so the scans could not
be
> made public, and will only be released to our users in proportion to the
number of physical copies which we have embargoed.
> Is this something which the Internet Archive could undertake for us? If
so, could you let us have a price quote and proposed turnaround time? I
am CCing our Metadata Librarian Mariah Lewis, who can provide more
information on our output requirements.
> Thank you!   Be well.
> Sincerely,
> Michael
> *Michael Wares*
> *Assistant Director for Technical Services*
> *Fordham University Libraries*
> ███████@fordham.edu ██████████████
> *See the Fordham University Libraries' COVID-19 page for details of all our
> 24x7 services *

CONFIDENTIAL

INTARC00445587

> *(including live Reference Librarian support) and other useful
> information,
> at*
> *https://urldefense.proofpoint.com/v2/url?u=https-
3A__fordham.libguides.com_coronavirus&d=DwIDAw&c=aqMfXOEvEJQh2iQMCb7
Wy8l0sPnURkcqADc2guUW8IM&r=eEDODyyVam28baRMOr3flPLNHRUfSNVyCH
qbQNiyWDs&m=Ar_Ok8iHSChUlgvKdUb3gK90ECRzCyDaKoLe6fWes6w&s=Mudf
xV0JctDuJjYCoN5MBliC3MOSsoOCPIxjlZk9ehA&e=
> <https://urldefense.proofpoint.com/v2/url?u=https-
3A__fordham.libguides.com_coronavirus&d=DwIDAw&c=aqMfXOEvEJQh2iQMCb7
Wy8l0sPnURkcqADc2guUW8IM&r=eEDODyyVam28baRMOr3flPLNHRUfSNVyCH
qbQNiyWDs&m=Ar_Ok8iHSChUlgvKdUb3gK90ECRzCyDaKoLe6fWes6w&s=Mudf
xV0JctDuJjYCoN5MBliC3MOSsoOCPIxjlZk9ehA&e= >*

--
Chris Freeland
Director of Open Libraries
Internet Archive
███████████@archive.org
@chrisfreeland
███████████

 INTARC00445588

# McNamara Declaration
# Exhibit 152

| From: | Chris Freeland |
|---|---|
| Sent: | Tuesday, March 12, 2019 12:18 PM EDT |
| To: | Knapp, Wendy |
| CC: | Lauri McIntosh; Speer, Jacob |
| Subject: | Re: more controlled digital lending questions |

Wendy - I understand this can be a challenging mode of access to get yourselves and your stakeholders comfortable using. We've found that rather than going all in, some libraries prefer to take a more conservative approach and pilot the service using a collection that makes an easy case for controlled digital lending, such as collection of merit held in closed stacks, or other non-circulating materials with some level of demand. Any collections spring to mind?

Additionally, all 900,000+ books available via controlled digital lending are available without a waitlist to qualified patrons with print disabilities. This is clearly within settled case law, so could be an easy win for you in providing digital books to patrons across Indiana. I can help if you're interested in the program (more here as well).

Chris

On 3/7/19 7:04 AM, Knapp, Wendy wrote:

> Thank you Chris. We would like to watch how things progress over the next few months and revisit this idea in the fall. We still have hesitation around the idea that a format shift has not been indisputably set as a fair use. Jake and I will both follow your growth, as it sounds like you've got more libraries coming in all the time, and we'd like to touch base again in September.
>
> **From:** Chris Freeland [mailto:██████@archive.org]
> **Sent:** Monday, March 04, 2019 4:20 PM
> **To:** Knapp, Wendy ██████@library.IN.gov>
> **Cc:** Lauri McIntosh ██████@zepheira.com>; Speer, Jacob ██████@library.IN.gov>
> **Subject:** Re: more controlled digital lending questions
>
> **** This is an EXTERNAL email. Exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ****
>
> Wendy - Hopefully this info reaches you in time. In the scenario you describe below, your 20 copies of Slaughterhouse Five would decrease the waitlist and be loaned to all users.
>
> ——
> Chris Freeland
> Director of Open Libraries
> Internet Archive
> ██████
>
> On Mar 4, 2019, at 1:07 PM, Knapp, Wendy ██████@library.in.gov> wrote:
>
>> Hi Chris and Lauri,

CONFIDENTIAL
INTARC00420192

I'm going to be talking with Tom Lipinski in about an hour, just to feel him out about this. (He's one of the library copyright folks that we really look up to here.)  I came across a scenario that if we could get clarification on, it would help me get my head around everything.

So, let's take Slaughterhouse Five.  Currently when I do a search on OpenLibrary.org, there are 30 people waiting to read it now.

Evergreen Indiana has 39 copies and right now 4 of those are checked out.

So, let's say we determine that we'll set the dial to 20 copies that can be checked out at one time—figuring there will always be at least 19 on the shelves on some Evergreen libraries.  Does the 30 person waitlist get reduced, thereby saying that as we're involved, the 20 copies we'd make available would be added to total number of copies in OpenLibrary.org?  Or, when we load the records into Evergreen, do we start with a new waitlist just for Evergreen Indiana patrons for the 20 "copies" we've turned on?

Additionally, have you approached EBSCO or any other major EDS provider about uploading the records into their knowledge bases?  Not that I want to detract from use of traditional ILS's, but with all the nonfiction content that you currently have, we could really surface that quickly in something like INSPIRE.

Wendy Knapp
Deputy Director, Statewide Services
Indiana State Library
140 N Senate Ave
Indianapolis, IN 46204
██████████

--
Chris Freeland
Director of Open Libraries
Internet Archive
██████████@archive.org
@chrisfreeland
██████████

CONFIDENTIAL

INTARC00420193

# McNamara Declaration
# Exhibit 153



This session will not be recorded. I'll send you an email after our session that includes link to the slides I'm using and relevant links from the session.

CONFIDENTIAL

INTARC00142679



A lot has changed with the Open Libraries program in a very short time.

As we get started I wanted to address a question that you might have. On Monday it was announced that there is an active lawsuit against the Internet Archive for controlled digital lending & the National Emergency Library.  I won't be able to answer questions about the litigation. I'll talk about controlled digital lending & how it works and the impact it's making while our libraries and schools are closed, but I won't be able to address anything about the litigation itself.

So with that in mind, here's the game plan for today:

CONFIDENTIAL

INTARC00142680





The Internet Archive is a non-profit library that provides access to millions of free books, movies, software, music, websites, and more. This is our headquarters in San Francisco, which, you'll notice, matches our logo (the logo came first). The Internet Archive was founded by Brewster Kahle in 1996 and started its collection by archiving web sites. Brewster saw that the early web had almost entirely vanished-been rewritten, taken down, moved to new servers, otherwise inaccessible-and so he began crawling the web and archiving the content. Those web archives are now available for users to search via the Wayback Machine.

CONFIDENTIAL

INTARC00142683



This work kicked off our mission of providing "Universal Access to All Knowledge". After establishing web archiving, in the early 2000s the Internet Archive began scanning books that were in the public domain (books published before 1923 at the time, now 1924, moving annually).

CONFIDENTIAL

INTARC00142684



I started working in collaboration with the Internet Archive during their early book scanning operations because I was the technical director of a project called the Biodiversity Heritage Library, which was scanning the public domain literature from natural history museum libraries all over the world.

This is Lan Zhu, who was a scanner in our SF scanning center. She's using the custom-developed scanning equipment we developed to digitize books. You can see that there are two cameras that take pictures as the operator raises and lowers the glass plate to turn pages. Our scanning is non-destructive (meaning that the book stays intact) and follows FADGI, the Federal Agencies Digitization Guidelines Initiative.

We have scanning operations embedded in libraries in the US, Canada & the UK, including at the Library of Congress, Boston Public Library, University of Toronto, and Wellcome Trust, to name but a few. We also operate digitization facilities in the Philippines where we scan the books that we own.

CONFIDENTIAL

INTARC00142685



The Internet Archive also has a physical library. We have built a lending library of more than 1.4M modern books, growing at 2k / day. We acquire our books through purchase, from donations from libraries who are weeding their collections or closing, and from booksellers, like Better World Books. These photos are showing the unloading of portions of a large donation of 250,000 books from Trent University in Ontario.

CONFIDENTIAL

INTARC00142686



I mentioned that we get donations from Better World Books. IA & BWB have a special relationship, and as part of our partnership we get a copy of any book we don't already have. So for those of you who are library partners with BWB, your discards and weeded materials are flowing into our digitization queue & our digital library shelves. Today we have _____ on the call from BWB to tell us more.

CONFIDENTIAL

INTARC00142687



We make that library available to the world, meaning that anyone with an internet connection can borrow our books, providing equal access to library materials around the globe. The ability for anyone to be able to get a library card is important for unaffiliated researchers like myself. When I worked at WashU I had access to every database & journal imaginable. Now, I struggle to get research materials to continue my own research & writing.

Under normal circumstances we lend these books one a time to users through a legal framework known as controlled digital lending. If the book is checked out, then users join a waitlist. That's under normal circumstances. But Libraries & schools are closed at global scale. We are not operating under normal circumstances.

CONFIDENTIAL

INTARC00142688



CONFIDENTIAL

INTARC00142689





INTARC00142691

# Here's how we can help:

- Give us your MARC records
- We'll run an overlap with our digital holdings
- We'll give you back links to matched books
- You can bring those links back into your catalog

## Cost: $0

No cost to library or patrons for participating - non-commercial service.

CONFIDENTIAL

INTARC00142692

Results of overlap for Hayden Library:
55k books

CONFIDENTIAL

INTARC00142693



On March 10th

CONFIDENTIAL
INTARC00142694



This screenshot was taken before waitlist suspension.  Note the "Join Waitlist" bars

CONFIDENTIAL
INTARC00142695

