# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 15 OF 26 (A-3548-A-3812)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

Matthew Jan Oppenheim
Danae Tinelli
Scott A. Zebrak
Oppenheim + Zebrak, LLP
4530 Wisconsin Avenue, NW,
5th Floor
Washington, DC 20016

Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Jesse M. Feitel
Carl Mazurek
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

### Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | **Vol. 5** | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | **Vol. 6** | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | | **Vol. 7** | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
|  |  | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
|  |  | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
|  |  | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
|  |  | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
|  |  | Exhibit 149 – Not Filed |  |
|  |  | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
|  |  | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
|  |  | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
|  |  | Exhibit 153 – Open Libraries Form | A-3437 |
|  |  | Exhibit 154 – Open Library Webpage | A-3474 |
|  |  | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
|  |  | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
|  |  | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
|  |  | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
|  |  | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
|  |  | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
|  |  | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | **Vol. 17** | | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| | | **Vol. 18** | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| | | **Vol. 19** | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| **Vol. 20** | | | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| **Vol. 22** | | | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| **Vol. 23** | | | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

26

McNamara Declaration
Exhibit 168

# Internet Archive Blogs

*A blog from the team at archive.org*



Blog    Announcements    25th Anniversary    archive.org    About    Events    Developers    Donate

## Announcing a National Emergency Library to Provide Digitized Books to Students and the Public

Posted on March 24, 2020 by chrisfreeland



To address our unprecedented global and immediate need for access to reading and research materials, as of today, March 24, 2020, the Internet Archive will suspend waitlists for the 1.4 million (and growing) books in our lending library by creating a National Emergency Library to serve the nation's displaced learners. This suspension will run through June 30, 2020, or the end of the US national emergency, whichever is later.

During the waitlist suspension, users will be able to borrow books from the National Emergency Library without joining a waitlist, ensuring that students will have access to assigned readings and library materials that the Internet Archive has digitized for the remainder of the US academic calendar, and that people who cannot physically access their local libraries because of closure or self-quarantine can continue to read and thrive during this time of crisis, keeping themselves and others safe.

This library brings together all the books from Phillips Academy Andover and Marygrove College, and much of Trent University's collections, along with over a million other books donated from other libraries to readers worldwide that are locked out of their libraries.

    Search

### Recent Posts

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

### Recent Comments

- Superman on July Book Talk: The Library: A Fragile History
- abo on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

### Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive

This is a response to the scores of inquiries from educators about the capacity of our lending system and the scale needed to meet classroom demands because of the closures. Working with librarians in the Boston area, led by Tom Blake of Boston Public Library, who gathered course reserves and reading lists from college and school libraries, we determined which of those books the Internet Archive had already digitized. Through that work we quickly realized that our lending library wasn't going to scale to meet the needs of a global community of displaced learners. To make a real difference for the nation and the world, we would have to take a bigger step.

"The library system, because of our national emergency, is coming to aid those that are forced to learn at home," said Brewster Kahle, Digital Librarian of the Internet Archive. "This was our dream for the original Internet coming to life: the Library at everyone's fingertips."

Public support for this emergency measure has come from over 100 individuals, libraries and universities across the world, including the Massachusetts Institute of Technology (MIT). "Ubiquitous access to open digital content has long been an important goal for MIT and MIT Libraries. Learning and research depend on it," said Chris Bourg, Director of MIT Libraries. "In a global pandemic, robust digital lending options are key to a library's ability to care for staff and the community, by allowing all of us to work remotely and maintain the recommended social distancing."

We understand that we're not going to be able to meet everyone's needs; our collection, at 1.4 million modern books, is a fraction of the size of a large metropolitan library system or a great academic library. The books that we've digitized have been acquired with a focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook. This means that while readers and students are able to access latest best sellers and popular titles through services like OverDrive and Hoopla, they don't have access to the books that only exist in paper, sitting inaccessible on their library shelves. That's where our collection fits in—we offer digital access to books, many of which are otherwise unavailable to the public while our schools and libraries are closed. In addition to the National Emergency Library, the Internet Archive also offers free public access to 2.5 million fully downloadable public domain books, which do not require waitlists to view.

We recognize that authors and publishers are going to be impacted by this global pandemic as well. We encourage all readers who are in a position to buy books to do so, ideally while also supporting your local bookstore. If they don't have the book you need, then Amazon or Better World Books may have copies in print or digital formats. We hope that authors will support our effort to ensure temporary access to their work in this time of crisis. We are empowering authors to explicitly opt in and donate books to the National Emergency Library if we don't have a copy. We are also making it easy for authors to contact us to take a book out of the library. Learn more in our FAQ.

A final note on calling this a "National Emergency" Library. We lend to the world, including these books. We chose that language deliberately because we are pegging the suspension of the waitlists to the duration of the US national emergency. Users all over the world have equal access to the books now available, regardless of their location.

**How you can help:**

1. Read books, recommend books, and teach using books from the National Emergency Library
2. Sponsor a book to be digitized and preserved
3. Endorse this effort institutionally or individually
4. Share news about the National Emergency Library with your social media followers using #NationalEmergencyLibrary

If you have additional questions, please check out our FAQ or contact Chris Freeland, Director of Open Libraries.

*Update 3/30*: To read our latest announcement about the National Emergency Library, please read our post Internet Archive responds: Why we released the National Emergency Library

Posted in Announcements, News | Tagged NEL | 76 Replies



About chrisfreeland

Chris Freeland is the Director of Open Libraries at Internet Archive.

View all posts by chrisfreeland →

- Music
- News
- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

### Archives

Select Month

### Meta

- Log in
- Entries feed
- Comments feed
- WordPress.org

← Love, Loss, and Archives

Internet Archive Staff and Covid-19: Work-at-Home for Most, Full-Pay Furlough & Medical for Scanners →

**76 thoughts on "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public"**

Pingback: 1,426,434 Million Books: The Internet Archive Launches a "National Emergency Library to Provide Digitized Books to Students and the Public" | LJ infoDOCKET



**Stephanie T.**
March 24, 2020 at 4:58 pm

Chris Freeland, you are an angel on earth.

Pingback: Announcement: Announcing a National Emergency Library to Provide Digitized Books

Pingback: National Emergency Library | digithek blog



**chrisfreeland** 
March 24, 2020 at 5:46 pm

Many thanks for your kind words, Stephanie, but no, I'm just a librarian.



**Kathy**
March 24, 2020 at 7:52 pm

No such thing,Sir,as JUST a librarian! Two of my very best friends are reference librarians♥



**Hank Bromley**
March 24, 2020 at 7:57 pm

Chris, I think that's actually about the same thing!



**Mary Augusta**
March 26, 2020 at 1:52 pm

Chris

That has to be one of the best comments around. Thank you and the IA for this offering. IA, BHL, and ther digital libraries are more important now than ever before.



**Mark Templeton**
March 28, 2020 at 3:30 pm

not all heroes wear capes.

Pingback: Archive.org ofrece acceso gratis y libre a 1,4 millones de libros (casi 10.000 de ellos en español) | VIRTUALGEEKS

Pingback: Archive.org it offers free access and free to 1.4 million books (nearly 10,000 of them in Spanish) - MeTimeTech



**Stephanie Willen Brown**
March 24, 2020 at 6:57 pm

So, librarian to librarian, is this unlimited simultaneous users? Y'all have digitized a book that one of my faculty wants his students to read (by tomorrow! when they will virtually meet the author!). Author and professor will be thrilled.

♥

Page 4
Announcing a National Emergency Library to Provide Digitized Books to Students and the Public - Internet Archive Blogs
http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/



**chrisfreeland** Post author

March 24, 2020 at 9:03 pm

Stephanie – Yes, for the duration of our waitlist suspension!

Pingback: [Archive.org ofrece acceso gratis y libre a 1,4 millones de libros (casi 10.000 de ellos en español) - Tec Ofertas España](#)

Pingback: [Ceo Bolivia](#)

Pingback: [Internet Archive opens National Emergency Library for shut-in students, commercial vendors agree - World Tech Valley](#)



[**behta**](#)

March 24, 2020 at 9:50 pm

This is great for the students you study



**Cinda van Lierop**

March 24, 2020 at 10:17 pm

This is a wonderful idea and service to the public.
Many thanks!

Pingback: نهان داز شو اینترنت ب حمایت .... | مملکه



**Ginger**

March 24, 2020 at 11:18 pm

Thank you so much!



[ایران نوا](#)

March 25, 2020 at 12:06 pm

Many thanks for your kind words, Stephanie, but no, I'm just a librarian.



**Tucker Taylor**

March 25, 2020 at 1:33 pm

I've already filled 2 requests for our faculty and I haven't even gone through the entire list!



[اهنگ جدید](#)

March 25, 2020 at 3:14 pm

This is a wonderful idea and service to the public.



[**Linda Allcorn**](#)

March 25, 2020 at 6:08 pm

Please advise of the process a public library will follow to make The National Emergency Library available to our library patrons.

Thank you of sharing this great idea!



**chrisfreeland** Post author

March 25, 2020 at 7:56 pm

Hi Linda – The books are available to your patrons now. You can direct users to the National Emergency Library at [https://archive.org/details/nationalemergencylibrary](https://archive.org/details/nationalemergencylibrary) where they can search for books or authors using our "Search the collection" box along the left of the screen. Users can check out up to 10 books at a time with our waitlists are suspended.

Pingback: You Can Now Access 1.4 Million Books for Free Thanks to the Internet Archive – MaryPoter

Pingback: You Can Now Access 1.4 Million Books for Free Thanks to the Internet Archive



**Lucie Comeau**
March 25, 2020 at 8:08 pm

Hi, is this available worldwide ? Would love to share this with our university students in Canada.



**chrisfreeland** `Post author`
March 25, 2020 at 8:49 pm

Hi Lucie – Yes, our books are available equally to all users, regardless of where they are located. Please do share with your university students in Canada!

Pingback: Internet Archive ofrece gratis 1,4 millones de libros al suspender las listas de espera para sus copias digitales - Tenemos Noticias

Pingback: You Can Now Access 1.4 Million Books for Free Thanks to the Internet Archive – Shirley Coyle

Pingback: Internet Archive ofrece gratis 1,4 millones de libros al suspender las listas de espera para sus copias digitales | ReportateRD



**Ellen**
March 25, 2020 at 11:13 pm

Could you help me understand why this is something you can do now but not all of the time? Are normal copyright rules being suspended?



**Nemo**
March 29, 2020 at 8:53 am

Ellen, because copyright in the USA is limited by the Progress Clause in the Constitution and "fair use" is a flexible concept which adapts to circumstances. See also https://kylecourtney.com/2020/03/11/covid-19-copyright-library-superpowers-part-i/ on the topic.

Pingback: You Can Now Access 1.4 Million Books for Free Thanks to the Internet Archive – Thinking Port

Pingback: Internet Archive ofrece gratis 1,4 millones de libros al suspender las listas de espera para sus copias digitales - Diario España



**John Gilmore**
March 26, 2020 at 12:23 am

Thank you for supporting students with this expansion of access to already-digitized books.

I tried to read your FAQ but it sends me to Google. It won't even display for me because I refuse to let Google run Javascript in my browser, since that's part of how they spy on every-body for their own profit.

Surely there is a place on the Internet Archive where you can publish your own FAQ. Friends don't send friends to Google!



**Nemo**
March 29, 2020 at 8:56 am

Indeed it's strange to see such documents on Google Docs. I'm not 100% sure but I think the txt download link works without JavaScript nor cookies:
https://docs.google.com/document/export?

format=txt&id=1QiErbouWG7pUlzcxPcRk4YEtbYs8ItlVTgLa1DfGh68&includes_info
_params=true



**Ellie Kesselman**
March 30, 2020 at 6:47 pm

Yes, that link works by providing a directly downloadable text file of the
Internet Archive FAQ. No JavaScript or cookies is necessary, and Google Docs
can be entirely avoided. Thank you!



AJCV
March 26, 2020 at 12:45 am

Thank you so much!



**derek**
March 26, 2020 at 12:50 am

We need libraries with physical books as well to be prioritized as essential services.

Pingback: Internet Archive ofrece gratis 1,4 millones de libros al suspender las listas de espera para
sus copias digitales



**Gardner Campbell**
March 26, 2020 at 1:07 am

You are a scholar and a gentleman. And I heart the Internet Archive. You folks are amazing,
through and through. Thank you.



Ing Sian
March 26, 2020 at 1:10 am

Thank you so much.

Pingback: Internet Archive ofrece gratis 1,4 millones de libros al suspender las listas de espera para
sus copias digitales – > ingenis



**Diane Gould Hall**
March 26, 2020 at 2:25 am

This is fantastic! Thank you for doing this. I am a regular supporter of your site and love the
books I have access to. So helpful! May the Lord protect all of us during this situation.



Uday Modak
March 26, 2020 at 2:50 am

I have no words to express my whole hearted gratitude to you LIBRARIAN THE GREAT ! The
readers around the world will be thrilled reading this anouncement ! We are all highly obliged
! Hope every and all the librarians around the world follow this example !



**DK Fynn**
March 26, 2020 at 4:53 am

This is really great to hear. I know that authors and publishers have to make money, but that
said, I do hope that they take steps to make their content more easily available to those who
really need them.

One idea that comes to mind–and I'm not sure if it's been done–is a temporary lifting of ex-
clusive copyright, or maybe something can be done with Creative Commons. Maybe some-
thing can be done via ebook readers (like Kindle) where a book can be downloaded for free for
a given period of time, then after such time, the book goes back to paid status. I think that
would be a nice negotiation between authors, publishers, and readers.



**S.M.**

March 26, 2020 at 4:55 am

My waitlist is now empty and ALL of the books I have been patiently waiting for many weeks (some for months) have vanished, with no way to ever know exactly which titles I had been waiting for. Never thought that waitlist was just going to disappear without any advance notice. I can recall some of the titles that were on my waitlist, but some have been on for so long I can not recall their exact title. Hopefully you can look into this & figure out a way to either email us listing of books that WERE on our waitlists so we can now go download them all, or you could automatically "checkout" them out to our accounts & then email us that they are sitting there waiting for us.



**Nemo**

March 29, 2020 at 8:57 am

S.M., have you checked your email, including the spam folder? I got email notifications for the books I had in my waitlist, if I'm not mistaken.



**Marian B.**

March 26, 2020 at 5:29 am

What a great gesture, thank you very much, Chris Freeland.
I'll share this with the elderly women I know, who use internet.
Also, for myself, I'm enjoying reading books much, at archive.org
It's an excellent source of many goodies and documentaries for me,
since about a decade. I'm Dutch and most other Dutchies I know
have no idea about archive.org being such a treasure box library.
Much appreciated, I realize how much work and time goes into it.



**Matthew faerber**

March 26, 2020 at 6:32 am

What do I need to do to download the books to my apple ipad



**Nemo**

March 29, 2020 at 8:59 am

Matthew, the easiest option is probably to just browse them online with any browser on your device which supports HTML and JavaScript. Otherwise you'll need some ebook reader which supports DRM (digital restrictions management).



**Wolf**

March 26, 2020 at 6:43 am

It is great to see that there are people everywhere who do the right thing at the right time.



**Pinta A.**

March 26, 2020 at 6:48 am

[quote]
Users can check out up to 10 books at a time with our waitlists are suspended.
[/quote]

I wanted to ask: When the waitlists come back into effect, will the last 5 books we've borrowed suddenly get returned? Or will they, instead, remain borrowed for whatever time they have left and "then" get returned?

(I ask because I am trying to adjust my reading habits accordingly.)



**Janice Lindner**

March 26, 2020 at 7:03 am

Marvellous and generous gesture.

Thank you so much.



**اهنگ جدید**
March 26, 2020 at 8:26 am

I've already filled 2 requests for our faculty and I haven't even gone through the entire list!



**boualem**
March 26, 2020 at 8:47 am

Thank you..



**Raymond**
March 26, 2020 at 9:15 am

I see you're a Deadhead.

Thanks for this.

Peace!



**Albie**
March 26, 2020 at 10:42 am

Greetings from Nantes in France,

great idea!! does these include audio books? and being in France I suppose there's limits on what's available.

Meanwhile it's back to OTR.

Thanks for all your efforts over the years,

Albie



**Marco De Antoni Ratti**
March 26, 2020 at 11:04 am

It would be helpful to have such an emergency law being introduced in Italy.

I will try on my little possibilites to do that.

Thanks for your precious work.

Best regards

Marco De Antoni Ratti



**Jess**
March 26, 2020 at 12:21 pm

This is such a blessing! My middle school has been scrambling to figure out what to do about classroom novels we currently don't have access to, and so far all of them are up here! THANK YOU!

I have a question though–Since a login is required to access them, could we make sort of a generic school or class login? Some districts might not be super on board with making each student create their own, especially if the students don't all have their own school email address.

and once again, THANK YOU SO MUCH



**The Librarian S**
March 27, 2020 at 5:57 pm

I have the same question as Jess about whether there is a way to offer students access without requiring them to create accounts using email addresses or other personally identifiable information, since our district will also probably not allow. If there is any possibility of using a generic school/class login or other workaround you can recommend (might it be acceptable for a teacher to temporarily share a download file with students on the condition that it be destroyed at the end of the loan period?) that would be a game changer. Thank you for any advice and for your work here. Books save lives, now more than ever.



**Nemo**
March 29, 2020 at 9:05 am

So, to be clear, your school doesn't make students register accounts anywhere else? No accounts ever required on Google, Office365, Facebook, WhatsApp or any other spying corporation, for anything the school or teachers organise? If so, great!

Internet Archive is infinitely more privacy conscious than the services where most schools send students nowadays, but it's good to be extra careful. For instance you could set up an email address on whatever provider which supports email aliases and register each student with nondescript usernames like "MySchoolName_001" at address+001@example.org . This is what we sometimes do at Wikimedia Italia for students registering on Wikimedia wikis.



**Kristin Patrick**
March 26, 2020 at 2:57 pm

Hello! This is wonderful news. Thank you very much. I notice that account setup requires email verification. Our students can't receive email from domains outside of our school district. Are there any potentials workarounds? Thank you in advance for any help you can provide.



**Roberto Garcia Torres**
March 26, 2020 at 3:23 pm

Thanks a lot !



**Meghan McCarthy**
March 26, 2020 at 9:46 pm

Author/illustrator here. I want to help out BUT I rely on school visits to make an income. Those have been cancelled. My other source of income is royalties from my books. If all of my books are now free for all online this could have a big impact on whatever income I have left. Not all authors are rich! Last year I qualified for food stamps (not an exaggeration). Please think of us during this time period as well.



**chrisfreeland** `Post author`
March 27, 2020 at 2:39 am

Meghan – We understand that authors and creators are being impacted during this crisis, which is why we've made a streamlined way for authors to opt out from having their books in the National Emergency Library. You can read more in our FAQs, linked above.



**Sarah**
March 26, 2020 at 11:12 pm

Are any of the digital materials audiobooks for those who are blind and visually impaired?



**Lori Guidis**
March 26, 2020 at 11:55 pm

Yipeeeee!!!!

I am not happy about the circumstances– Covid 19, but I am ecstatic that you are opening wider and wider!!!

Love to you all,

Lori



**Laura**
March 27, 2020 at 2:06 am

Are you doing this with books currently under copyright? Have you cleared it with the copyright holders? While we're all for making books available in times of crisis, it seems unfair to include writers without their knowledge and consent.



ایران نوا
March 27, 2020 at 2:49 pm

Thank you for doing this. I am a regular supporter of your site and love the books I have access to. So helpful! May the Lord protect all of us during this situation.



آهنگ
March 27, 2020 at 6:08 pm

Thanks for all your efforts over the years,



**Mark Templeton**
March 28, 2020 at 3:42 pm

amazingly supportive and generous action. a lot of students rely on shared books and library holds for class reserves and that's not possible these days.

is there any chance you have more recent editions of texts to be added? i need the 8th ed. of something, Readings in Social Psychology by Lesko and you have a much earlier ed. and the articles have changed.



**Dave Gordon**
March 28, 2020 at 3:46 pm

This is a huge step for society and how we use technology, not to mention one of many small, positive changes that are taking place during these unpredictable circumstances. Thank you for doing all you can to help us care for one another–



ایران نوا
March 29, 2020 at 10:14 am

It would be helpful to have such an emergency law being introduced in Italy

Comments are closed.

Proudly powered by WordPress

A-3558

# McNamara Declaration
# Exhibit 169

2019



Page 1
stats | Open Library
https://web.archive.org/web/20190902210355/https:/openlibrary.org/stats

INTERNET ARCHIVE WaybackMachine https://openlibrary.org/stats Go DEC SEP DEC 02 2017 2019 2020
98 captures
12 May 2010 - 25 Apr 2022
About this capture

INTERNET ARCHIVE Donate ♥

OPEN LIBRARY Browse My Books More All Search Log In Sign Up

# Stats

## Edits

EDITS PER DAY

| | Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|---|
| Human | **3,400** | 3,398 | 26,410 | 99,481 |
| Bot | **216** | 1,611 | 28,188 | 79,310 |
| Total | 3,616 | 5,009 | 54,598 | 178,791 |

## Members

NEW ACCOUNTS PER DAY

| Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|
| **2,341** | 2,131 | 17,185 | 62,413 |

| | Last 7 days | Last 28 days | Trend | Total |
|---|---|---|---|---|
| Works | 9,437 | 23,062 | | 18,547,201 |
| Editions | 9,359 | 22,990 | | 26,184,628 |
| Authors | 3,323 | 6,977 | | 7,082,778 |
| Covers | 8,929 | 23,977 | | 8,453,473 |
| Members | 17,185 | 62,413 | | 2,753,827 |
| Lists | 321 | 1,194 | | 115,643 |
| Books Logged | 19,867 | 67,941 | | 1,058,147 |
| Users Logging | 11,892 | 39,560 | | 562,257 |

## Unique Visitors

## Borrows

**Open Library**
Vision
Careers
Blog
Terms of Service
Donate

**Discover**
Home
Books
Authors
Subjects
Advanced Search
Return to Top

**Develop**
Development Center
API Documentation
Bulk Data Dumps
Writing Bots
Add a Book

**Help**
Help Center
Report A Problem
Suggesting Edits

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org

version fedbb9b

Captured by FireShot Pro: 01 June 2022, 17:04:20
https://getfireshot.com

2020



INTERNET ARCHIVE WaybackMachine https://openlibrary.org/stats Go JUL SEP OCT
98 captures 07
12 May 2010 - 25 Apr 2022 2019 2020 2021 About this capture
INTERNET ARCHIVE Donate

OPEN LIBRARY Browse My Books More All Search Log In Sign Up

Subjects | My Loans | Add a Book
Lists | My Reading Lo | Sponsor a Book
K-12 Student | My Reading St | Recent Community Edits
Random Book | My Lists | Developer Center
Advanced Search | | Help & Support

Internet Archive

# Stats

## Edits

PER DAY NEW ACCOUNTS PER DAY

| | Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|---|
| Human | **800** | 5,390 | 47,478 | 674,035 |
| Bot | 257 | 5,948 | 441,878 | 2,795,337 |
| Total | 1,057 | 11,338 | 489,356 | 3,469,372 |

| Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|
| **345** | 2,330 | 19,425 | 71,894 |

| Items Added | Last 7 days | Last 28 days | Trend | Total |
|---|---|---|---|---|
| Works Added | 135,364 | 558,911 | | 20,028,124 |
| Editions Added | 199,448 | 882,295 | | 28,422,487 |
| Authors Added | 54,081 | 218,250 | | 7,769,342 |
| Covers Added | 12,055 | 77,136 | | 10,104,044 |
| New Members | 19,425 | 71,894 | | 3,971,611 |
| Lists Added | 393 | 1,613 | | 135,733 |
| Books Logged | 18,688 | 76,614 | | 2,133,582 |
| Users Logging | 10,674 | 39,133 | | 1,070,853 |

## Unique Visitors

## Borrows

**Open Library**
Vision
Volunteer
Careers
Blog
Terms of Service
Donate

**Discover**
Home
Books
Authors
Subjects
Advanced Search
Return to Top

**Develop**
Development Center
API Documentation
Bulk Data Dumps
Writing Bots
Add a Book

**Help**
Help Center
Report A Problem
Suggesting Edits

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org

version 9afb5a2

Captured by FireShot Pro: 01 June 2022, 17:05:52
https://getfireshot.com

2021



INTERNET ARCHIVE Wayback Machine https://openlibrary.org/stats Go JUL SEP OCT
98 captures 02
12 May 2010 - 25 Apr 2022 2020 2021 2022 About this capture
INTERNET ARCHIVE Donate ♥

# Stats

## Edits

EDITS PER DAY

| | Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|---|
| Human | **17,673** | 16,034 | 130,038 | 578,003 |
| Bot | **3,646** | 4,049 | 34,823 | 205,114 |
| Total | 21,319 | 20,083 | 164,861 | 783,117 |

## Members

NEW ACCOUNTS PER DAY

| Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|
| **2,570** | 2,649 | 17,204 | 60,164 |

| Items Added | Last 7 days | Last 28 days | Trend | Total |
|---|---|---|---|---|
| Works Added | 51,093 | 160,405 | | 22,781,460 |
| Editions Added | 62,163 | 194,949 | | 30,895,864 |
| Authors Added | 14,580 | 53,219 | | 8,675,005 |
| Covers Added | 73,596 | 319,400 | | 11,567,521 |
| New Members | 17,204 | 60,164 | | 4,799,436 |
| Lists Added | 312 | 967 | | 145,845 |
| Books Logged | 16,410 | 60,427 | | 2,951,977 |
| Users Logging | 8,415 | 26,336 | | 1,343,447 |
| Books Review Tags | 152 | 378 | | 1,170 |
| Books Reviewed | 13 | 41 | | 101 |
| Users Reviewing | 10 | 28 | | 31 |

## Unique Visitors

## Borrows

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org

version 9234134

Captured by FireShot Pro: 01 June 2022, 17:06:50
https://getfireshot.com

2022



INTERNET ARCHIVE WaybackMachine https://openlibrary.org/stats Go APR JUL AUG 05 2021 2022 2023
106 captures
12 May 2010 - 16 Jun 2022
About this capture
INTERNET ARCHIVE Donate

# Stats

## Edits

EDITS PER DAY

| | Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|---|
| Human | **4,850** | 7,829 | 55,268 | 233,508 |
| Bot | **310** | 517 | 14,835 | 828,668 |
| Total | 5,160 | 8,346 | 70,103 | 1,062,176 |

## Members

NEW ACCOUNTS PER DAY

| Today | Yesterday | Last 7 days | Last 28 days |
|---|---|---|---|
| **1,696** | 2,979 | 19,261 | 84,399 |

| Items Added | Last 7 days | Last 28 days | Trend | Total |
|---|---|---|---|---|
| Works Added | 6,288 | 214,955 | | 25,529,596 |
| Editions Added | 6,891 | 339,243 | | 35,455,217 |
| Authors Added | 2,145 | 66,783 | | 9,667,520 |
| Covers Added | 4,969 | 39,949 | | 12,496,132 |
| New Members | 19,261 | 84,399 | | 5,559,621 |
| Lists Added | 273 | 907 | | 153,620 |
| Books Logged | 34,155 | 155,037 | | 3,858,180 |
| Users Logging | 15,579 | 61,214 | | 1,655,938 |
| Books Review Tags | 251 | 1,239 | | 11,280 |
| Books Reviewed | 34 | 181 | | 1,431 |
| Users Reviewing | 28 | 151 | | 970 |

## Unique Visitors

## Borrows

Page 2
stats | Open Library
https://web.archive.org/web/20220705141935/https://openlibrary.org/stats

| Partner With Us | Authors | Bulk Data Dumps | Suggesting Edits | English (en) |
| Careers | Subjects | Writing Bots | | Español (es) |
| Blog | Collections | Add a Book | | Français (fr) |
| Terms of Service | Advanced Search | | | Hrvatski (hr) |
| Donate | Return to Top | | | తెలుగు (te) |
| | | | | Українська (uk) |
| | | | | 中文 (zh) |

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org

version c3560fb

# McNamara Declaration
# Exhibit 170



Page 1
Welcome to Open Library | Open Library
https://web.archive.org/web/20200304173514/https:/openlibrary.org/

INTERNET ARCHIVE WaybackMachine https://openlibrary.org/ Go FEB MAR APR
10,501 captures 04
10 Apr 2002 - 4 Jul 2022 2019 2020 2021 About this capture

INTERNET ARCHIVE Donate ♥

OPEN LIBRARY Browse My Books More All Search Log In Sign Up

**Together**, let's build an Open Library for the World. Sponsor a Book

## Browse by Subject

| Art | Fantasy | Biographies | Science | Recipes | Romance |
|---|---|---|---|---|---|
| *45,771 Books* | *11,333 Books* | *8,412 Books* | *49,737 Books* | *6,469 Books* | *16,943 Books* |

## Books to Sponsor

Sponsor Sponsor Sponsor Sponsor Sponsor Sponsor

## Classic Books

Read Read Read Read Read Read

## Books We Love

Borrow Borrow Borrow Borrow Borrow Borrow

## Recently Returned

Borrow | Borrow | Borrow | Borrow | Borrow | Borrow

## Romance

Borrow | Borrow | Borrow | Borrow | Borrow | Borrow

## Kids

Oh boy, Amelia! by Marissa Moss

Miss Butterpat goes wild! by Malcolm Yorke, Malcolm York, Margaret Chamberlain

Borrow | Borrow | Borrow | Read | Borrow | Borrow

## Thrillers

Borrow | Borrow | Borrow | Borrow | Borrow | Borrow





Page 3
Welcome to Open Library | Open Library
https://web.archive.org/web/20200304173514/https://openlibrary.org/

### Textbooks



| | | | | | |
|---|---|---|---|---|---|
| Borrow | Borrow | Borrow | Borrow | Borrow | Borrow |

### Authors Alliance & MIT Press



| | | | | | |
|---|---|---|---|---|---|
| Borrow | Borrow | Borrow | Borrow | Borrow | Borrow |

## Around the Library

Here's what's happened over the last 28 days. More recent changes.



| **6,257,919** | **63,335** | **981,597** | **958** | **41,296** |
|---|---|---|---|---|
| UNIQUE VISITORS | NEW MEMBERS | CATALOG EDITS | LISTS CREATED | EBOOKS BORROWED |

## About the Project

Open Library is an open, editable library catalog, building towards a web page for every book ever published. More

Just like Wikipedia, you can contribute new information or corrections to the catalog. You can browse by subjects, authors or lists members have created. If you love books, why not help build a library?

**Latest Blog Posts**

To the World: Introducing Brad Rubenstein - *November 21, 2019*

Scan On Demand: Building the World's Open Library, Together - *October 23, 2019*

2018 A Year of Victories! - *January 1, 2019*

| **Open Library** | **Discover** | **Develop** | **Help** |
|---|---|---|---|
| Vision | Home | Development Center | Help Center |
| Volunteer | Books | API Documentation | Report A Problem |
| Careers | Authors | Bulk Data Dumps | Suggesting Edits |
| Blog | Subjects | Writing Bots | |
| Terms of Service | Advanced Search | Add a Book | |
| Donate | Return to Top | | |

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org.

version c5dfe5e

Page 1
Welcome to Open Library | Open Library
https://web.archive.org/web/20220704084341/https:/openlibrary.org/

INTERNET ARCHIVE WaybackMachine https://openlibrary.org/ Go JUN JUL AUG 04 2021 2022 2023
10,501 captures
10 Apr 2002 - 4 Jul 2022
About this capture
INTERNET ARCHIVE Donate

OPEN LIBRARY Browse More All Search Log In Sign Up

## Welcome to Open Library

**Read Free Library Books Online**
Millions of books available through Controlled Digital Lending

**Keep Track of your Favorite Books**
Organize your Books using Lists & the Reading Log

**Try the virtual Library Explorer**
Digital shelves organized like a physical library

## Trending Books

Preview | Checked Out | Join Waitlist | Borrow | Join Waitlist | Not in Library

## Classic Books

Read | Read | Read | Read | Read | Read

## Books We Love

Borrow | Borrow | Borrow | Borrow | Borrow | Borrow



Page 2
Welcome to Open Library | Open Library
https://web.archive.org/web/20220704084341/https://openlibrary.org/





## Textbooks

Borrow Borrow Borrow Borrow Borrow Borrow

## Authors Alliance & MIT Press

Borrow Borrow Borrow Borrow Borrow

## Browse by Subject

| Art | Science Fiction | Fantasy | Biographies | Recipes | Romance |
|---|---|---|---|---|---|
| *71,566 Books* | *16,703 Books* | *12,891 Books* | *14,784 Books* | *8,628 Books* | *20,305 Books* |

## Around the Library

Here's what's happened over the last 28 days. More recent changes.

| 3,124,813 | 83,849 | 232,033 | 872 | 349,984 |
|---|---|---|---|---|
| UNIQUE VISITORS | NEW MEMBERS | CATALOG EDITS | LISTS CREATED | EBOOKS BORROWED |

## About the Project

Open Library is an open, editable library catalog, building towards a web page for every book ever published. More

Just like Wikipedia, you can contribute new information or corrections to the catalog. You can browse by subjects, authors or lists members have created. If you love books, why not help build a library?

**Latest Blog Posts**

It takes a Classroom to build an Open Library - *June 30, 2022*

A High Schooler's Experience Contributing to the Open Book Genome Project - *April 27, 2022*

Introducing Trusted Book Providers - *December 20, 2021*

**Open Library**
- Vision
- Volunteer
- Partner With Us
- Careers
- Blog
- Terms of Service
- Donate

**Discover**
- Home
- Books
- Authors
- Subjects
- Collections
- Advanced Search
- Return to Top

**Develop**
- Developer Center
- API Documentation
- Bulk Data Dumps
- Writing Bots
- Add a Book

**Help**
- Help Center
- Report A Problem
- Suggesting Edits

**Change Website Language**
- Čeština (cs)
- Deutsch (de)
- English (en)
- Español (es)
- Français (fr)
- Hrvatski (hr)
- తెలుగు (te)
- Українська (uk)
- 中文 (zh)

Open Library is an initiative of the Internet Archive, a 501(c)(3) non-profit, building a digital library of Internet sites and other cultural artifacts in digital form. Other projects include the Wayback Machine, archive.org and archive-it.org

version c3560fb

# McNamara Declaration
# Exhibit 171

| | |
|---|---|
| **From:** | Lila Bailey |
| **Sent:** | Friday, March 20, 2020 5:27 PM EDT |
| **To:** | David Hansen, J.D.; Chris Freeland; Courtney, Kyle K. |
| **Subject:** | Re: FW: Time sensitive support for a National Emergency Library |

Excellent!

Also, I wanted to let you both know that we are planning to allow authors to opt out (or in!) to the National Emergency Library. We hope most won't do so, but given that we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID19 we think it's important to give authors who think their sales will be impacted a way to take their books out. We are going to encourage readers who are in a position to buy books to do so, ideally from their local bookstores or from BWB or Amazon if they have to. We are trying to be empathetic to rightsholders who are also in this crisis along with everyone else.

On 3/20/20 2:02 PM, David Hansen, J.D. wrote:

> fyi
>
> ---
>
> **From:** "Deborah Jakubs, Ph.D." <deborah.jakubs@duke.edu>
> **Date:** Friday, March 20, 2020 at 4:59 PM
> **To:** "ARL Directors Discussion List (ARL-DIRECTORS@arl.org)" <ARL-DIRECTORS@arl.org>
> **Cc:** "aserl-deans@aserl-lists.org" <aserl-deans@aserl-lists.org>, "David Hansen, J.D." <david.hansen@duke.edu>
> **Subject:** Time sensitive support for a National Emergency Library
>
> Dear ARL and ASERL colleagues,
> Please see below, and consider endorsing this endeavor. I have just done so on behalf of the Duke University Libraries. Although it says "confidential and private," Chris is fine with me circulating it to all of you.
>
> Best wishes --
> Deborah
> Deborah Jakubs
> Rita DiGiallonardo Holloway University Librarian
> Vice Provost for Library Affairs
> 259 Rubenstein Library – Box 90193
> Duke University
> Durham, NC 27708
>
> Tel: 919-660-5800
> Fax: 919-660-5923
> Email: deborah.jakubs@duke.edu

INTARC00462951

*Duke University Libraries value diversity of thought, perspective, experience, and background and are actively committed to a culture of inclusion and respect.*

---

**From:** Chris Freeland <chrisfreeland@archive.org>
**Sent:** Friday, March 20, 2020 3:07 PM
**To:** Deborah Jakubs, Ph.D. <deborah.jakubs@duke.edu>
**Subject:** Time sensitive support for a National Emergency Library

*Apologies if you've received this message in duplicate*

# CONFIDENTIAL AND PRIVATE

Dear Deborah,

We need your help to help others during this pandemic and national emergency. We would like to solicit your support for a time-sensitive announcement.

We've received considerable interest in the Open Libraries program since the nation's universities, schools, and libraries started closing in response to COVID-19. We've also received numerous requests for help from educators, librarians, and individuals in getting access to books while their local libraries are closed. **To address this unprecedented global and immediate need for access to reading and research materials**, next Tuesday, March 24, the Internet Archive is planning to suspend waitlists for the 1.4 million (and growing) books in our lending library, creating a National Emergency Library. This suspension will run through the later of June 30, 2020, or the end of the US national emergency.

To be clear, the books are still protected from redistribution; this just means people can borrow books with the same types of controls that publishers place on the books they distribute.

During the suspension, users will be able to borrow books from the National Emergency Library without joining a waitlist, ensuring that students will have access to assigned readings and library materials that we've digitized throughout the remainder of the US academic calendar, and that people who cannot physically access their local libraries because of closure or self-quarantine can continue to read and thrive during this time of crisis, keeping themselves and others safe.

**We need your support in this endeavor.** We have written a public statement supporting waitlist suspension and are seeking an inaugural round of key individuals and organizations to endorse the statement. We want to have a strong backing and show of support from the library and educational communities as we make this bold move in creating a National Emergency Library, and your endorsement as a leader in our community will help provide a strong, unified front should we receive pushback on our efforts.

INTARC00462952

We're creating a National Emergency Library during this time of crisis because we think it's important, and we think it's a way we can help.  We hope you'll support us in this effort by reading and endorsing the statement.


## CONFIDENTIAL AND PRIVATE

Please contact me direct at chrisfreeland@archive.org with questions or comments.  Thank you for your consideration,

Chris
```
--
Chris Freeland
Director of Open Libraries
Internet Archive
chrisfreeland@archive.org
@chrisfreeland
(314) 518-2412
```

INTARC00462953

# McNamara Declaration
# Exhibit 172

TOM UDALL
NEW MEXICO

531 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224–6621
(202) 228–3261 FAX
http://tomudall.senate.gov

COMMITTEES:
APPROPRIATIONS
COMMERCE, SCIENCE, AND TRANSPORTATION
FOREIGN RELATIONS
INDIAN AFFAIRS
RULES AND ADMINISTRATION



**United States Senate**

WASHINGTON, DC 20510

April 16, 2020

*VIA ELECTRONIC SUBMISSION*

Ms. Maria Strong
Acting Register of Copyrights and Director of Policy and International Affairs
U.S. Copyright Office
101 Independence Ave, S.E.
Washington, D.C. 20559

Dear Ms. Strong,

Thank you for your work and leadership at the U.S. Copyright Office. I write to you in consideration of the COVID-19 pandemic's recent effect on temporary library closures, and the subsequent availability of books and other media to the public, including materials used for distance learning of students facing extended school closures. I encourage your office to work with America's libraries, within existing law, to maximize the availability of educational materials for the benefit of both students and the broader public, while respecting the copyrights of authors who rely on royalties for their livelihoods.

As part of this effort, I also urge you to examine the National Emergency Library that has been organized by the Internet Archive which is operating without typical library licenses and is causing authors in New Mexico concern about the integrity of their copyrights. While the Internet Archive is one outlet, there may be others who are taking similar actions or plan to pursue them in the future, so I believe legal guidance from your office on this topic is in the public interest.

Since the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties. It is my understanding that the Internet Archive has loosened its restrictions on its controlled digital lending library, Open Library, to allow increased lending of materials. Rather than lending one copy at a time, the National Emergency Library opened its digital archive to the public on March 24, 2020, allowing an unlimited number of people from anywhere in the world to download the same digital file.

Authors whose books appeared as digital did not have the ability to opt into their work's availability on the National Emergency Library, but instead, were given the option to opt out only after their books became available through the online library. I have heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time. With average incomes of only $20,300 a year prior to the pandemic, authors are struggling due to cancelled book tours and loss of freelance work.[1] I request

---

[1] The Authors Guild, *Internet Archive's National Emergency Library Harms Authors*, Mar. 27, 2020, https://www.authorsguild.org/industry-advocacy/internet-archives-uncontrolled-digital-lending/.

STATE OFFICES:

ALBUQUERQUE:
400 GOLD AVENUE SW
SUITE 300
ALBUQUERQUE, NM 87102
505–346–6791

LAS CRUCES:
201 N. CHURCH STREET
SUITE 201B
LAS CRUCES, NM 88001
575–526–5475

PORTALES:
100 SOUTH AVENUE A
SUITE 113
PORTALES, NM 88130
575–356–6811

SANTA FE:
120 SOUTH FEDERAL PLACE
SUITE 302
SANTA FE, NM 87501
505–988–6511

TOM UDALL
NEW MEXICO

531 HART SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-6621
(202) 228-3261 FAX
http://tomudall.senate.gov



**United States Senate**

WASHINGTON, DC 20510

APPROPRIATIONS

COMMERCE, SCIENCE, AND TRANSPORTATION

FOREIGN RELATIONS

INDIAN AFFAIRS

RULES AND ADMINISTRATION

that the U.S. Copyright Office examine this arrangement and its effects on authors' work, including whether any harm comes from the release of digital books without their prior permission.

As New Mexico and many other parts of the country face more weeks of social distancing which may keep America's libraries closed for a longer period, I request that you provide guidance to both America's libraries and authors about how more material can be provided online to students and the public under established copyright mechanisms. As part of that effort, please include a legal analysis of the Internet Archive's National Emergency Library under 17 U.S.C.S. § 107 and other relevant law, and recommend any corrective action that you deem necessary to comply with copyright law and protect authors.

At this challenging time, I urge your office to use its expertise and guidance to help libraries, authors, and online outlets to identify potential solutions that respect both the ownership of the creator community's work and the broader public's need to access online collections within legal bounds. Thank you for your work and I appreciate your attention to this matter.

Sincerely,

Senator Tom Udall

STATE OFFICES:

ALBUQUERQUE:
400 GOLD AVENUE SW
SUITE 300
ALBUQUERQUE, NM 87102
505-346-6791

LAS CRUCES:
201 N. CHURCH STREET
SUITE 201B
LAS CRUCES, NM 88001
575-526-5475

PORTALES:
100 SOUTH AVENUE A
SUITE 113
PORTALES, NM 88130
575-356-6811

SANTA FE:
120 SOUTH FEDERAL PLACE
SUITE 302
SANTA FE, NM 87501
505-988-6511



**The Register of Copyrights of the United States of America**
United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000 · (202) 707-8359

The Honorable Tom Udall
United States Senate
531 Hart Senate Office Building
Washington, DC 20510

May 15, 2020

Dear Senator Udall:

I am pleased to provide this response to your letter dated April 16, 2020, requesting that the United States Copyright Office provide legal information and analysis with respect to the Internet Archive's creation of what it calls the "National Emergency Library." You also requested that the Office provide guidance regarding how libraries and authors may offer the public access to written works online within the confines of copyright law during this period when school and library buildings are closed. I appreciate that you are seeking the Office's input on these important issues after receiving inquiries from your constituents.

As you know, the Copyright Office is the expert agency created by Congress to administer the country's copyright laws and provide impartial advice to Congress, federal agencies, and others on matters of copyright law and policy, as well as educational information for the general public.[1] While the Office regularly publishes reports on matters relating to copyright law and policy, it is not the Office's general practice to provide legal advice about specific factual scenarios. The Office is particularly cautious about weighing in on circumstances or disputes between private parties.

In composing this response, the Office has prioritized the need to provide schools and libraries with general guidance about how to be responsive to the public interest in accessing reading materials online in a way that respects copyright law. The Office first provides a brief summary of library and school activities explicitly permitted under the Copyright Act, as well as more general provisions that may prove relevant to this analysis (Parts I-III). In the final section (Part IV), the Office addresses how these provisions and doctrines may relate to an analysis of the Internet Archive's recent activities. The Office has based its analysis of the Internet Archive's National Emergency Library upon the facts of which the Office is currently aware.

---

[1] *See* 17 U.S.C. § 701(b). Copyright functions were first centralized within the Library of Congress 150 years ago in 1870, and the Copyright Office became a separate department of the Library of Congress in 1897.

1

## I.   COPYRIGHT ACT PROVISIONS PERMITTING CERTAIN USES BY SCHOOLS AND LIBRARIES

The Copyright Act includes several provisions that could facilitate activities libraries and schools are engaged in to make educational materials more readily available during this time of crisis. As discussed in detail below, the Copyright Act permits copyright owners to authorize others to use their copyrighted materials. Additionally, section 108 of the Copyright Act permits certain activities of libraries and archives that could otherwise constitute copyright infringement. Section 110 of the Copyright Act likewise permits educators and government bodies who meet certain requirements to use copyrighted materials in distance learning programs. Finally, the fair use doctrine may permit certain uses by schools and libraries. The Copyright Office has published a circular providing information about these provisions and other general information on permitted reproductions of copyrighted works by educators and librarians, which is available to the public on our website.[2]

The Office applauds the creativity shown in all copyright sectors as individuals and organizations respond to the challenges of providing access to educational materials during the current crisis by expanding licensing—including, in some cases, offering zero-cost licenses for educational uses—and relying upon provisions in the Copyright Act that authorize certain uses, including the fair use doctrine. We recognize that many individuals and organizations are making efforts to meet public needs at this time (even as they face challenges of their own) while respecting well-established copyright principles.

### A.   Authorized Use of Copyrighted Materials

Section 106 of the Copyright Act recognizes that the owner of a copyright has the exclusive rights to reproduce, distribute copies of, perform publicly, display publicly, and create derivative works based on the copyrighted work — or to authorize others to do any of these activities.[3] These broad rights represent a starting point for copyright owners to determine when and how others may use their works.[4] Under this section, copyright owners may authorize schools and libraries to use their copyrighted works on whatever terms the copyright owners deem acceptable, including without compensation.

Like many participants in our economy, publishers and authors have been negatively impacted by economic stresses inflicted by COVID-19. Many publishers and authors have responded to the crisis by engaging in efforts to ensure that readers, students, and others continue to be able to access their works, even as businesses remain closed and large parts of the country

---

[2] U.S. COPYRIGHT OFFICE, CIRCULAR 21: REPRODUCTION OF COPYRIGHTED WORKS BY EDUCATORS AND LIBRARIANS (2014), https://www.copyright.gov/circs/circ21.pdf.
[3] 17 U.S.C. § 106.
[4] Letter from Maria A. Pallante, Register of Copyrights, to Reps. Marsha Blackburn, G.K. Butterfield, Doug Collins, and Ted Deutch, at 3 (Aug. 3, 2016), https://www.copyright.gov/laws/hearings/fcc-set-top-box-proposal.pdf.

are covered by stay-at-home orders.[5] Many publishers have expanded online access to digital books and articles to students, educational institutions, or the general public, in some cases making some or all of their titles freely available. A few examples include:

- Cambridge University Press, which has made over 700 textbooks available online to students through their university library, regardless of whether they were previously purchased;
- Cengage, which has provided students with free access to all its digital platforms and eBooks for the remainder of the spring semester;
- Macmillan Learning, which has provided free access to its online platforms through the rest of the term to college instructors who have adopted their print titles; and
- Running Press, which is making free art projects and storytime videos available on its website and social media channels.[6]

Other publishers and authors, such as Penguin Random House and J. K. Rowling, have provided "read-along" licenses to permit teachers to read works to students online.[7]

Nonprofit entities and cultural institutions have also engaged in efforts to expand online access to educational and other digital materials during the pandemic. Examples of such efforts include the following:

- In a recent survey of public libraries, 74% report that they have continued, added, or expanded online services like e-books and streaming media, while 61% have added virtual programming for their patrons;[8]
- The digital library JSTOR has expanded institutional access, including providing access to its entire collection to institutions, regardless of the institution's licensing agreement; it has provided free access to select journal articles to the general public and increased its free read-online access limit from 6 to 100 articles per month "[t]o support independent researchers at a time when they are unable to get to physical libraries;"[9]
- Many museums and national libraries have launched resource pages and made parts of

---

[5] As of May 13, 2020, a number of states have begun to loosen restrictions on travel and commerce, but nearly half remain under "stay-at-home" orders. Sarah Mervosh, Jasmine C. Lee, Lazaro Gamio & Nadja Popovich, *See Which States Are Reopening and Which Are Still Shut Down*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/states-reopen-map-coronavirus.html (last updated May 13, 2020). *See generally CDC COVID Data Tracker*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/covid-data-tracker/index.html (last updated May 13, 2020) (tracking COVID-19 spread in the United States).

[6] These and many other publisher initiatives are collected on the Association of American Publishers website. *See What Publishers Are Doing to Help During the Coronavirus Pandemic*, ASS'N OF AM. PUBLISHERS, https://publishers.org/aap-news/covid-19-response/ (last visited May 13, 2020).

[7] Morgan Gstalter, *J.K. Rowling Grants Open License for Teachers Reading "Harry Potter" Online During Coronavirus Pandemic*, THE HILL (Mar. 21, 2020, 11:03 AM), https://thehill.com/blogs/blog-briefing-room/news/488794-jk-rowling-grants-open-license-for-teachers-reading-harry.

[8] *Public Libraries Respond to COVID-19: Survey of Response & Activities*, PUB. LIBRARY ASS'N, http://www.ala.org/pla/issues/covid-19/surveyoverview (last visited May 13, 2020).

[9] *Expanded Access to JSTOR During COVID-19 Crisis*, JSTOR (Apr. 15, 2020), https://about.jstor.org/news/expanded-access-to-jstor-during-covid-19-crisis/.

3

their collections available online, including the Library of Congress[10] and the Smithsonian here in the United States;[11] and

- The American Alliance of Museums launched the Museum Distance Learning Repository to collect online resources from art, history, science, and children's museums, as well as zoos and other cultural institutions.[12] As of May 13, the repository contained links to over 700 free resources that can be narrowed by such options as target age range, content area, and time required.[13]

The Copyright Office is encouraged by the collaborative efforts undertaken to date among copyright owners, libraries, educational institutions, and others and appreciates their continued efforts to explore ways to ensure researchers, students, and other readers can continue to access works during this crisis, including through easy to understand licensing, opt-in open access models, and mutually accepted best practices and guidance.

### B.    Section 108 Exceptions for Libraries and Archives

Section 108 of the Copyright Act provides exceptions to a copyright owner's rights specifically applicable to libraries and archives for certain core activities.[14] These exceptions are conditioned on a number of requirements, including that the library or archives must be open to the public and the reproduction and distribution of works may not be for the purposes of direct or indirect commercial advantage.[15]

Several provisions in section 108 permit the reproduction of a work for the purpose of preserving or replacing a copy in a library's or archives' collections. Section 108(b) permits copying unpublished works for preservation or for deposit in another library or archives for research. Section 108(c) permits making copies of published works to serve as replacement copies for the original. And section 108(h) permits copying and other uses of certain works in their last 20 years of copyright protection for preservation, scholarship, or research.

Other provisions allow libraries and archives, under certain conditions, to reproduce and distribute copies of all or part of a copyrighted work held in their collections at the request of a user or another library or archive. Section 108(d) permits the reproduction and distribution "of no more than one article or other contribution to a copyrighted collection or periodical issue,

---

[10] *Library of Congress: Engage!*, LIBRARY OF CONGRESS, https://loc.gov/engage/ (last visited May 13, 2020).

[11] *Smithsonian Cares*, SMITHSONIAN, https://www.si.edu/online (last visited May 13, 2020).

[12] Sarah Jenkes, *Introducing the Museum Distance Learning Repository*, AM. ALL. OF MUSEUMS (Apr. 20, 2020), https://www.aam-us.org/2020/04/20/introducing-the-museum-distance-learning-repository/.

[13] The Museum Distance Learning Repository is available at https://sites.google.com/view/museum-distance-learning/home.

[14] 17 U.S.C. § 108. The exceptions in section 108 work in tandem with fair use. 17 U.S.C. § 108(f)(4) ("Nothing in this section . . . in any way affects the right of fair use as provided by section 107"). Separately, as noted in the Office's 2017 Section 108 Discussion Document (discussed below), the Office recommends adding museums to the list of institutions eligible for section 108 exceptions.

[15] 17 U.S.C. § 108(a).

or . . . of a small part of any other copyrighted work."[16] Section 108(e) permits the reproduction and distribution of an "entire work, or . . . a substantial part of it . . . if the library or archives has first determined, on the basis of a reasonable investigation, that a copy or phonorecord of the copyrighted work cannot be obtained at a fair price."[17] Both exceptions require that the copy become the property of the user and that the library has no notice that the copy will be used "for any purpose other than private study, scholarship, or research."[18]

These exceptions only apply to "isolated and unrelated reproduction or distribution of a single copy . . . of the same material on separate occasions."[19] They do not apply when a library or archives "is aware or has substantial reason to believe that it is engaging in the related or concerted reproduction or distribution of multiple copies" of the same material, whether at one time or over a period of time.[20] Nor do they apply to a library or archives that "engages in the systematic reproduction or distribution of single or multiple copies" of a work.[21]

Section 108 has been periodically updated by Congress. In 1998, as part of the Digital Millennium Copyright Act ("DMCA"), Congress amended the section to allow libraries and archives "to take advantage of digital technologies when engaging in specified preservation activities."[22] Among other changes, the "replacement copy" exception in section 108(c) was amended to "permit[] such copies or phonorecords to be made in digital as well as analog formats."[23] But the amendment expressly prohibited remote or online access to such copies; the Senate Committee Report explained, "any copy of a work that the library or archive makes in a digital format must not be made available to the public in that format except for use on the premises of a library or archives in lawful possession of such copy."[24]

The Copyright Office has engaged in ongoing efforts to examine potential reforms to section 108 for over a decade.[25] In the mid-2000s, it convened a Section 108 Study Group with

---

[16] *Id.* at § 108(d).

[17] *Id.* at § 108(e).

[18] *Id.* at § 108(d)(1), (e)(1).

[19] *Id.* at § 108(g).

[20] *Id.* at § 108(g)(1).

[21] *Id.* at § 108(g)(2). Section 108(g)(2) provides further, "[t]hat nothing in this clause prevents a library or archives from participating in interlibrary arrangements that do not have, as their purpose or effect, that the library or archives receiving such copies or phonorecords for distribution does so in such aggregate quantities as to substitute for a subscription to or purchase of such work."

[22] S. Rep. No. 105-190, at 60 (1998), https://www.congress.gov/105/crpt/srpt190/CRPT-105srpt190.pdf.

[23] *Id.* at 61.

[24] *Id.* The Senate Committee Report explained, "this proviso is necessary to ensure that the amendment strikes the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the potential harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location." S. Rep. No. 105-190 at 61-62.

[25] *See* U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the Register of Copyrights (2017), https://www.copyright.gov/policy/section108/discussion-document.pdf ("Section 108 Discussion Document"); U.S. Copyright Office & Library of Congress, The Section 108 Study Group Report (2008), http://www.section108.gov/docs/Sec108StudyGroupReport.pdf ("The Section 108 Study Group Report").

5

the Library of Congress' National Digital Information Infrastructure and Preservation Program, which issued a final report in March 2008 recommending several amendments to section 108.[26]

The Study Group report included discussion of issues on which the Study Group could not reach consensus. One such area was whether to depart from the balance Congress struck in the DMCA and permit remote access to digital replacement copies, provided that doing so "can be conditioned in such a way as to protect rights holders' markets from potential harm that might otherwise result."[27] The Study Group report catalogued arguments for and against permitting remote access.[28]

The Copyright Office revisited section 108 most recently in 2017, when it issued a Discussion Document to review developments and issues raised over the past decade, outline the Office's current views and proposals on the various revision issues, and present and explain model statutory language for a new section 108.[29] The model statutory language retained the current section 108(c) prohibition on providing remote access to electronic replacement copies of published works.[30] It did, however, propose expanding the section 108(b) exception for creating preservation or security copies of works not disseminated to the public to allow remote access, by a single user at a time, for a limited time, to electronic copies of such works.[31]

The Office is happy to provide any follow-up that may be desired regarding the recommendations made in the Section 108 Discussion Document as Congress considers issues related to online access to works in library collections during the COVID-19 outbreak, as well as any additional considerations regarding modernizing the section 108 exceptions.

## C.    Section 110 Exceptions for Distance Learning

The Copyright Act includes provisions designed to facilitate distance learning. Since 1976, the Copyright Act has included a provision that allows teachers in nonprofit educational institutions to publicly display or perform copyrighted works in the course of face-to-face teaching activities.[32] The Technology, Education, and Copyright Harmonization Act (the "TEACH Act"), enacted in 2002, was designed to provide similar authorization to educators and government bodies who were teaching remotely.[33] The TEACH Act "allows students and teachers to benefit from deployment in education of advanced digital transmission technologies

---

[26] THE SECTION 108 STUDY GROUP REPORT at i–ii.

[27] *Id.* at 57.

[28] *Id.* at 58–60.

[29] SECTION 108 DISCUSSION DOCUMENT at 1–4.

[30] *Id.* at 32-33.

[31] *Id.* at 26. The Office introduced the statutory language "dissemination to the public" to replace "publication" as a distinguishing factor for how a work is treated under Section 108, explaining, "[w]ith the rise of digital media and the internet, the distinction between published and unpublished, as legal terms of art, has become difficult to parse." *Id.* at 24.

[32] 17 U.S.C. § 110(1).

[33] Pub. L. No. 107-273, § 13301, 116 Stat. 1910 (2002) (codified as 17 U.S.C. §§ 110(2), 112(f) (2005)).

6

like the Internet, while introducing safeguards to limit the additional risks to copyright owners that are inherent in exploiting works in a digital format."[34]

As explained in a recent Copyright Office blog entry posted when schools began transitioning to distance learning in March, the TEACH Act explicitly permits performances of nondramatic literary works and nondramatic musical works, performances of "reasonable and limited portions" of any other work, and displays of the amount of any work "typically displayed in the course of a live classroom session" if the educational institution through which the course is offered meets certain requirements.[35] First, the TEACH Act contemplates that the public performance or display of the copyrighted material is an "integral part of a class session" provided by a governmental body or an accredited nonprofit educational institution that offers "systematic mediated instructional activities."[36] Additionally, the government body or educational institution must take a number of steps to minimize the risk that the copyrighted works will be further distributed, including making efforts to limit the transmission of the copyrighted works to individuals officially enrolled in the course, preventing students from retaining copies of the work for longer than the "class session," and instituting a robust copyright policy.[37] The TEACH Act allows hard copy works to be converted by educators into digital formats for use in distance learning only if the amount is limited to the amount permitted to be publicly performed or displayed under section 110(2) and no digital version of the work is reasonably available.[38]

For example, pursuant to the TEACH Act, if a school district meets the requirements, an elementary school teacher may display a picture book he is reading in a video to be viewed by all students in his class because it is typical for elementary school teachers in live classroom settings to display all pages of a picture book. Likewise, a university professor may digitally display limited movie clips to illustrate a particular concept relating to a course, just as she would do in a live setting, if the university meets the requirements of the TEACH Act.

## II.    FIRST SALE DOCTRINE

Another doctrine that could potentially apply to schools and libraries during this period is the first sale doctrine. Copyright's first sale doctrine is what permits, among other things, libraries to lend physical copies of copyrighted works to patrons without the need to obtain the permission of copyright owners or make royalty payments. The doctrine is codified under section

---

[34] H.R. REP. No. 107-687, at 2 (2002), https://www.congress.gov/107/crpt/hrpt687/CRPT-107hrpt687.pdf.
[35] David Welkowitz, *TEACHing From a Distance and Copyright Considerations*, COPYRIGHT: CREATIVITY AT WORK (Mar. 17, 2020), https://blogs.loc.gov/copyright/2020/03/teaching-from-a-distance-and-copyright-considerations/ (quoting 17 U.S.C. § 110(2)). The Act excludes works that are marketed specifically for use as digital instructional activities and performances or display of copies "not lawfully made and acquired" under the U.S. Copyright Act, if the educational institution "knew or had reason to believe" that they were not lawfully made and acquired. 17 U.S.C. § 110(2).
[36] *Id.*
[37] *Id.*
[38] 17 U.S.C. § 112(f)(2).

109 of the Copyright Act.[39] Under the first sale doctrine, a copyright owner does not retain the legal right to control the resale or other distribution of copies or phonorecords of a work that have been lawfully sold.[40]

The question arises whether this exception applies in the digital world; that is, whether a "digital first sale" doctrine permits libraries, for example, to "lend" copies of ebooks via digital transmission, without permission of the copyright owner, the same way they lend physical copies of books to patrons.

The Copyright Office has previously considered the application of the first sale doctrine to copies of works transmitted digitally. In its 2001 DMCA Section 104 Report, the Office said,

> Section 109 limits a copyright owner's exclusive right of distribution. It does not, by its terms, serve as a defense to a claim of infringement of any of the other exclusive rights. The transmissions that are the focus of proposals for a "digital first sale doctrine" result in reproductions of the works involved. The ultimate product of one of these digital transmissions is a new copy in the possession of a new person. Unlike the traditional circumstances of a first sale transfer, the recipient obtains a new copy, not the same one with which the sender began. Indeed, absent human or technological intervention, the sender retains the source copy. This copying implicates the copyright owner's reproduction right as well as the distribution right.

> Section 109 provides no defense to infringements of the reproduction right. Therefore, when the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement.[41]

---

[39] 17 U.S.C. § 109. This section provides, in part, "[n]otwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord." The first sale doctrine is an extension of the Copyright Act's principle that "[o]wnership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202.

[40] Separately, 17 U.S.C. § 202 provides "[t]ransfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object."

[41] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 79-80 (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. The Office reiterated this conclusion in its 2016 report on the Making Available Right in the United States, saying, "the first sale doctrine protects only distribution by the owner of a particular copy or phonorecord . . . of that copy or phonorecord. By contrast, a digital file transfer creates a new copy or phonorecord on the transferee's computer." U.S. COPYRIGHT OFFICE, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES 22 n.94 (2016) (internal quotation marks omitted), https://www.copyright.gov/docs/making_available/making-available-right.pdf.

8

In 2016, the Department of Commerce Internet Policy Task Force ("IPTF") published a white paper that addressed three issues at the intersection of copyright law and internet policy, including "the relevance and scope of the first sale doctrine in the digital environment."[42] The IPTF accepted the Copyright Office's conclusion that the first sale doctrine did not apply to digital transmissions and declined to recommend extending the doctrine to apply to digital transmissions of copyrighted works.[43]

The Second Circuit subsequently considered the question of digital first sale in *Capitol Records v. ReDigi*.[44] There, record label plaintiffs alleged that ReDigi's operation of an online marketplace for the resale of lawfully purchased digital music files resulted in unauthorized reproduction and distribution of plaintiffs' works. ReDigi argued, in part, that the resale of digital music files was permitted under the first sale doctrine. It asserted that, from a technical standpoint, because its system ensured that no additional copies of a work were created during its transfer process, it did not make a reproduction of the works under the copyright law. The court rejected ReDigi's first sale argument, holding that the online marketplace resulted in the reproduction of works during the course of its operations, and thus was not permitted under section 109. The court cited to the Office's DMCA Section 104 report as support for its conclusion.[45]

## III. FAIR USE

Finally, and importantly, uses of copyrighted works that are not authorized by any of the above-discussed provisions of the Copyright Act could potentially be found to be non-infringing under the fair use doctrine. Section 107 of the Copyright Act provides that "the fair use of a copyrighted work, including such use by reproduction in copies . . . is not an infringement of copyright."[46] The statutory preamble lists several illustrative, but not limitative, potentially fair uses, including use "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."[47] In determining whether the use of a copyrighted work is fair, a court must consider four factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

---

[42] DEPARTMENT OF COMMERCE IPTF, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES iii (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf. The Department of Commerce IPTF is led by the U.S. Patent and Trademark Office (USPTO) and the National Telecommunications and Information Administration (NTIA). The IPTF White Paper was the result of a multi-year review that included input gathered through a public meeting at the USPTO, multiple public roundtables, and written comments from stakeholders and the general public.
[43] *Id.* at 58.
[44] *Capitol Records, LLC v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018).
[45] *Id.* at 659–60.
[46] 17 U.S.C. § 107.
[47] *Id*.

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.[48]

These factors "are not meant to be exclusive."[49]

The final step in the fair use analysis is to weigh the four statutory factors and any other relevant information in light of the purpose of copyright.[50] The Constitution grants Congress the power to "promote the Progress of Science and useful Arts" by giving authors the exclusive right to their writings for a limited time.[51] The Supreme Court has recognized that providing them with an exclusive opportunity to profit from the sale or licensing of their works is "intended to motivate the creative activity of authors."[52] Ultimately, too, copyright "serves the purpose of enriching the general public through access to creative works."[53] Thus, each factor "stands as part of a multifaceted assessment of the crucial question: how to define the boundary limit of the original author's exclusive rights in order to best serve the overall objectives of the copyright law to expand public learning while protecting the incentives of authors to create for the public good."[54]

Because fair use requires an individualized analysis and weighing of all relevant factors, courts vary widely in how they weigh the factors and ultimately rule on fair use. The Copyright Office provides a number of resources to help the public understand the principles and application of fair use. The Office maintains the Fair Use Index, which is a project undertaken by the Office in support of a 2013 initiative of the White House Office of the Intellectual Property Enforcement Coordinator.[55] This regularly updated, searchable index summarizes significant court opinions ruling on fair use issues; currently 227 opinions are indexed. The Fair Use Index is a valuable resource in educating the public about the types of uses of copyrighted materials courts have determined to be fair or not fair. The Office also provides general information about fair use and a short video explaining fair use concepts on its website.[56] Additionally, Circular 21 provides detailed information, including extensive excerpts of relevant legislative history,

---

[48] *Id.*

[49] *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 560 (1985).

[50] *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).

[51] U.S. CONST. art. I, § 8, cl. 8.

[52] *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984).

[53] *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994).

[54] *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015) ("*Google Books*").

[55] The Fair Use Index is available at https://www.copyright.gov/fair-use/fair-index.html.

[56] *More Information on Fair Use*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/fair-use/more-info.html (last visited May 13, 2020); *Learning Engine Video Series: Fair Use*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/learning-engine/ (last visited May 13, 2020).

intended to assist librarians and educators considering whether reproduction of copyrighted materials for education and research purposes may constitute fair use.[57]

## A. Factor One: Purpose and Character of the Use

The first factor, the purpose and character of the use, requires consideration of both whether the secondary use is commercial and whether, and to what extent, it is "transformative," which is to say "whether the new work merely supersedes the objects of the original creation, . . . or instead adds something new, with a further purpose or different character."[58]

The goals of promoting scholarship and education are explicitly identified in the statute as favored purposes.[59] However, that does not mean that all uses of copyrighted works for educational purposes are fair uses.[60] It is generally understood that many uses of copyrighted works by schools and universities must be licensed.[61]

Using a work in a manner that serves a different function than the original is transformative.[62] In contrast, simply reproducing a work in a new format is not transformative.[63] Specifically, courts have held that reproducing the text of physical books in digital format is not

---

[57] U.S. Copyright Office, CIRCULAR 21: REPRODUCTION OF COPYRIGHTED WORKS BY EDUCATORS AND LIBRARIANS (2014), https://www.copyright.gov/circs/circ21.pdf.

[58] *Campbell,* 510 U.S. at 579 (internal quotations omitted).

[59] 17 U.S.C. § 107.

[60] *See Cambridge Univ. Press v. Albert*, 769 F.3d 1232, 1263–64 (11th Cir. 2014) ("[A]llowing some leeway for educational fair use furthers the purpose of copyright by providing students and teachers with a means to lawfully access works. . . But, as always, care must be taken not to allow too much educational use, lest the court undermine the goals of copyright by enervating the incentive for authors to create the works upon which students and teachers depend."); H.R. REP. No. 94–1476, at 66–67 (1976), https://www.copyright.gov/history/law/clrev_94-1476.pdf ("[A] specific exemption freeing certain reproductions of copy-righted works for educational and scholarly purposes from copyright control is not justified."); Linda Starr, *Is Fair Use a License to Steal?*, EDUCATION WORLD (2015), https://www.educationworld.com/a_curr/curr280b.shtml.

[61] *See Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) (holding that reproduction of significant portions of copyrighted works for use in course packets was not fair use); *Marcus v. Rowley*, 695 F.2d 1171 (9th Cir. 1983) (holding that reproduction of 12 pages of book for use in educational booklet was not fair use even though the work was used for a nonprofit educational purpose).

[62] *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) (holding that the use of images in search engine was transformative because it served purpose of pointing users to sources rather than entertainment, aesthetic or informative purposes of the original photographs); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 819 (9th Cir. 2003) (copying of images for display as thumbnail image in search results is transformative because the thumbnail images serve the purpose of improving access to information online and the original images serve aesthetic and illustrative purposes).

[63] *See, e.g., Kelly,* 336 F.3d at 819 (distinguishing the use at issue, which the court found to be a fair use, from activities like "reproducing music CDs in computer MP3 format," in which "both formats are used for entertainment purposes"); *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998) (reformatting radio broadcasts to make them available by phone was not transformative); *UMG Recordings, Inc. v. MP3.com, Inc.,* 92 F.Supp.2d 349, 351 (S.D.N.Y.2000) (finding that reproduction of audio CD into computer MP3 format did not transform the work); *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) (finding that the use of copyrighted work that "merely repackages or republishes the original" is unlikely to be a fair use).

11

transformative unless the change in format results in new *uses* for the work.[64] Additionally, because textbooks and research monographs are created for educational purposes, offering those materials for educational purposes would not serve a different purpose than the original.

## B.   Factor Two: Nature of the Work

The second fair use factor directs a court to consider "the nature of the copyrighted work."[65] Whether a work is published or unpublished has historically been one consideration, although Congress amended section 107 in 1992 to add "[t]he fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all above factors."[66] Courts also consider whether a work is creative or informational. The Supreme Court has observed "that some works are closer to the core of intended copyright protection than others."[67] Consequently, "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."[68] The second fair use factor is likely the least important of the four factors, and it rarely plays any significant role in a fair use analysis.[69]

Somewhat distinct from unpublished and published works are "out-of-print" works— works that had previously been published but are currently unavailable in the marketplace. The legislative history for the second fair use factor suggests that there may be "more justification" for reproducing an out-of-print work, but at the same time, "the existence of organizations licensed to provide photocopies of out-of-print works at reasonable cost is a factor to be considered."[70] The case law addressing a work's print status under the second factor is mixed.[71]

---

[64] *Oracle America, Inc. v. Google LLC*, 886 F.3d 1179, 1201 (Fed. Cir. 2018) ("[M]oving material to a new context is not transformative in and of itself—even if it is a sharply different context.") (internal quotation marks omitted); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97–101 (2d Cir. 2014) (reproducing books in format that makes them readable by people with print disabilities is not transformative but digitization of books to create search function identifying the page numbers on which a term is found within a work and the number of times the term appears on each page is transformative).

[65] 17 U.S.C. § 107(2).

[66] An Act to amend Title 17, United States Code, relating to fair use of copyrighted works, Pub. L. No. 102-492, 106 Stat. 3145 (1992), https://www.govinfo.gov/content/pkg/STATUTE-106/pdf/STATUTE-106-Pg3145.pdf#page=1.

[67] *Campbell*, 510 U.S. at 586.

[68] *Harper & Row*, 471 U.S. at 563.

[69] *See Google Books*, 804 F.3d at 220 (citing WILLIAM F. PATRY, PATRY ON FAIR USE § 4.1 (2015)).

[70] S. REP. No. 94–473, at 64 (1975), https://www.copyright.gov/history/law/clrev_94-473.pdf.

[71] *Compare Meeropol v. Nizer*, 560 F.2d 1061, 1070 (2d Cir. 1977) ("The fact that the Rosenberg letters have been out of print for 20 years does not necessarily mean that they have no future market which can be injured. The market for republication or for sale of motion picture rights might be affected by the infringing work."), *with Triangle Publ'ns, Inc. v. Knight-Ridder Newspapers, Inc.*, 626 F.2d 1171, 1176 n.14 (5th Cir.1980) ("[I]f the copyrighted work is out of print and cannot be purchased, a user may be more likely to prevail on a fair use defense."), *and Peter Letterese & Assocs. v. World Inst. of Scientology Enters.*, 533 F.3d 1287, 1314 (11th Cir. 2008) (distinguishing works withdrawn from the market because of "dearth of sales" from works affirmatively withdrawn from the market by the copyright owner for other reasons, and concluding works of the latter variety do not favor defendants' claim of fair use); *see also* 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:140 (2020).

12

## C. Factor Three: Amount and Substantiality of Portion Used

The third factor considers the amount and substantiality of the portion used in relation to the copyrighted work as a whole.[72] The key to this factor is whether the secondary use employs more of the copyrighted work than is necessary, and whether the copying was excessive in relation to any valid purposes asserted under the first factor.[73] As such, copying an entire work often weighs against a finding of fair use.[74] If it were necessary to copy the entire copyrighted work to achieve the purpose of the secondary use, the third factor would not weigh against a finding of fair use.[75]

## D. Factor Four: Effect of the Use on the Value of the Copyrighted Works

The fourth fair use factor directs courts to consider "the effect of the use upon the potential market for or value of the copyrighted work."[76] The Supreme Court has said this factor is "undoubtedly the single most important element of fair use."[77] In applying the fourth factor, the focus is on whether widespread conduct similar to the conduct of the alleged infringer "would adversely affect the *potential* market for the copyrighted work."[78] The examination of potential markets is not without limit; courts generally only consider "traditional, reasonable, or likely to be developed markets" when assessing the fourth factor.[79] This inquiry includes not only market harm to the original work, but also harm to the market for derivative works.[80]

Two recent cases illustrate the overlap between the third and fourth fair use factors in digitization cases, where the risk that the digitized version will serve as a market substitute for the original work increases as the amount of the work that is made accessible to the public increases. In *Authors Guild v. Google, Inc.*, Google copied tens of millions of books to create a search function that allowed users to determine the number of times a specific term appeared and to view limited "snippets" of works containing the search terms.[81] In evaluating a service that it determined "test[ed] the boundaries of fair use," the court concluded the use was a fair use

---

[72] 17 U.S.C. § 107.

[73] *Campbell,* 510 U.S. at 586–87.

[74] *Wall Data, Inc. v. L.A. County Sheriff's Dept.*, 447 F.3d 769, 780 (9th Cir. 2006) (defendant's verbatim copying of entire copyrighted work weighed against finding of fair use); *Worldwide Church of God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110, 1118 (9th Cir. 2000) ("While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use.") (internal quotation marks omitted).

[75] *HathiTrust*, 755 F.3d at 98.

[76] 17 U.S.C. § 107(4).

[77] *Harper & Row*, 471 U.S. at 566.

[78] *Id.* at 568 (1985) (emphasis in original) (*quoting Sony Corp. of Am.*, 464 U. S., at 451); *see also Campbell*, 510 U.S. at 590.

[79] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929–930 (2d Cir. 1994); *see also* 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:152 ("Judge Pierre Leval has rightly observed, 'By definition, every fair use involves some loss of royalty revenue because the secondary user has not paid royalties.' This means that contrary to copyright owners' belief that all uses can be licensed and should not therefore be fair use, the ability to license does not equate with negatively weighing the fourth factor against the defendant. Such an approach would eliminate much of what has always been regarded as fair use, or as noninfringement.").

[80] *Harper & Row*, 471 U.S. at 568.

[81] *Google Books*, 804 F.3d at 222.

13

because, in addition to the search engine functionality being transformative, the public display of limited snippets of the works was unlikely to harm the value of the copyrighted works.[82] The court emphasized that the strict limitations Google imposed on the snippet function played a key role in its decision, noting that "[t]he larger the quantity of the copyrighted text the searcher can see and the more control the searcher can exercise over what part of the text she sees, the greater the likelihood that those revelations could serve her as an effective, free substitute for the purchase of the plaintiff's book."[83]

Similarly, in *Authors Guild, Inc. v. HathiTrust*, the court held that the HathiTrust's creation of digital copies of books to develop a search function that allowed users to determine how many times and on what pages a specific term appeared in a work was a fair use.[84] The court stressed that the public was not able to view any portion of the text from the underlying copyrighted works and that the digital library did "not add into circulation any new, human-readable copies of any books."[85]

## IV.   NATIONAL EMERGENCY LIBRARY

### A.   Background

Schools, colleges, universities, and public libraries, the sources through which many people obtain reading materials, have shuttered their physical locations because of closures related to the COVID-19 crisis (although many continue to operate on a more limited basis online). According to the Internet Archive, approximately 650 million books in public libraries that are normally accessible to the public are now inaccessible, and some teachers were unable to distribute copies of class sets of books before schools were closed.[86] In light of these circumstances, on March 24, 2020, the Internet Archive launched what it calls the "National Emergency Library," through which it provides free electronic access to scanned versions of

---

[82] *Id.* at 206, 223–24.

[83] *Id.* at 222. The Second Circuit reiterated this point in *Fox News Network v. TVEyes, Inc.*, 883 F. 3d 169, 179 (2d Cir. 2018), saying, the third factor "clearly favors Fox because TVEyes makes available virtually the entirety of the Fox programming that TVEyes users want to see and hear. . . . In this respect, the TVEyes Watch function is radically dissimilar to the service at issue in *Google Books*.").

[84] *HathiTrust*, 755 F.3d 87, 103. Relying heavily on legislative history that specified that copying a book to make it accessible to a blind person was a fair use, the court also held that HathiTrust's provision of access to the full text of copyrighted works solely to patrons who certified that they had a print disability was a fair use. *Id.* at 102 (citing H.R. REP. No. 94–1476, at 73).

[85] *Id.* at 97.

[86] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/; Wendy Hanamura, *Teachers and the National Emergency Library: Stories from the Frontlines of Online Schooling*, INTERNET ARCHIVE (Apr. 13, 2020), http://blog.archive.org/2020/04/13/teachers-the-national-emergency-library-stories-from-the-frontlines-of-online-schooling/; *see also Public Libraries Respond to COVID-19: Survey of Response & Activities*, PUBLIC LIBRARY ASS'N (Apr. 9, 2020), http://www.ala.org/pla/issues/covid-19/surveyoverview (survey of public libraries found 98% had closed their buildings to the public).

books for access by an unlimited number of users through June 30, 2020 or "the end of the US national emergency," whichever is later.[87]

The Internet Archive's collection contains scanned versions of approximately 1.4 million books.[88] Before March 24, the Internet Archive provided public access to the collection under what proponents have called a Controlled Digital Lending ("CDL") model, through which the number of digital versions a particular work that users may access at one time is limited to the number of physical copies of the work a lender has in its possession.[89] Under a CDL model, if the number of users interested in accessing a digital copy of the work exceeded the number of physical copies of the work, a waiting list is set up for that work. The Internet Archive cites a White Paper on Controlled Digital Lending of Library Books ("*CDL White Paper*") and a Position Statement on Controlled Digital Lending authored by academic librarians, clinical law professors, and the Internet Archive's policy counsel providing legal justifications for the CDL model.[90]

Starting on March 24, the Internet Archive suspended all waiting lists so that each digital copy can be checked out by an unlimited number of users simultaneously. Users may check out up to ten works at a time, each of which can be checked out for a fourteen-day period, at which point it can be checked out again.[91] As noted in your letter, rather than seek permission from authors or publishers prior to posting digital copies of the works or removing the waiting lists, the Internet Archive requires that authors affirmatively opt out of the program to have their books removed from the collection.[92]

The Internet Archive concedes that the National Emergency Library is an "extraordinary step," one it claims is justified due to the "unprecedented need" for access to reading and research materials due to the closing of local libraries and self-quarantine.[93] It claims that removing waiting lists will "put books in the hands of people who need them, supporting

---

[87] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/.

[88] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

[89] *Id.*

[90] DAVID R. HANSEN & KYLE K. COURTNEY, A WHITE PAPER ON CONTROLLED DIGITAL LENDING OF LIBRARY BOOKS 21 (2018), https://osf.io/preprints/lawarxiv/7fdyr/ ("CDL WHITE PAPER"); Lila Bailey, Kyle K. Courtney, David Hansen, Mary Minow, Jason Schultz & Michelle Wu, *Position Statement on Controlled Digital Lending* (2018), https://controlleddigitallending.org/statement.

[91] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

[92] *Id.*

[93] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/.

15

emergency remote teaching, research activities, independent scholarship, and intellectual stimulation while universities, schools, training centers, and libraries are closed."[94]

The Internet Archive states that the books in the National Emergency Library "focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook," and which therefore would not be publicly available when schools and libraries are closed.[95] However, the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists. The National Emergency Library collection includes many books for which ebooks are available commercially, and often through local libraries, such as:

- thrillers by authors such as Stephen King, Dean Koontz and Jeffrey Archer;
- several books from the *Diary of a Wimpy Kid* series;
- *The Song of Solomon* and several books by Toni Morrison;
- *The Handmaid's Tale* by Margaret Atwood; and
- *Steve Jobs* by Walter Isaacson

Individual authors, as well as The Authors Guild and the Association of American Publishers, have criticized the National Emergency Library and argued that the project infringes their copyrights.[96]

The Internet Archive admits that it "didn't engage with the creator community and the ecosystem in which their works are made and published" prior to removing its waiting lists.[97] After the Internet Archive launched its program, at least two academic publishers provided

---

[94] *National Emergency Library FAQs*, INTERNET ARCHIVE (Apr. 22, 2020), https://help.archive.org/hc/en-us/articles/360042654251-National-Emergency-Library-FAQs.

[95] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

[96] *Internet Archive's National Emergency Library Harms Authors*, THE AUTHORS GUILD (Mar. 27, 2020), https://www.authorsguild.org/industry-advocacy/internet-archives-uncontrolled-digital-lending/; *Comment from AAP President and CEO Maria Pallante on the Internet Archive's "National Emergency Library"*, ASS'N OF AM. PUBLISHERS (Mar. 27, 2020), https://publishers.org/news/comment-from-aap-president-and-ceo-maria-pallante-on-the-internet-archives-national-emergency-library/; *see also* Colson Whitehead (@colsonwhitehead), TWITTER (Mar. 28, 2020), https://twitter.com/colsonwhitehead/status/1243932648973709313; Neil Gaiman (@neilhimself), TWITTER (Mar. 28, 2020), https://twitter.com/neilhimself/status/1244087854063468544; N. K. Jemisin (@nkjemisin), TWITTER (Mar. 29, 2020), https://twitter.com/nkjemisin/status/1244289290080788483; Roxane Gay (@rgay), TWITTER (Mar. 28, 2020), https://twitter.com/rgay/status/1244014637407809536.

[97] Brewster Kahle, *The National Emergency Library – Who Needs It? Who Reads It? Lessons From the First Two Weeks*, INTERNET ARCHIVE (Apr. 7, 2020), http://blog.archive.org/2020/04/07/the-national-emergency-library-who-needs-it-who-reads-it-lessons-from-the-first-two-weeks/.

permission to the Internet Archive to post digital versions of their works that were in the National Emergency Library collection until June 30, 2020, under certain conditions.[98]

## B.    Is the National Emergency Library Permitted by the First Sale Doctrine?

As discussed above, the Copyright Office has concluded that the first sale doctrine does not permit the creation and digital transmission of a file.[99] This position has been accepted by the Department of Commerce's Internet Policy Task Force[100] and is consistent with the Second Circuit's decision in *Capitol Records v. ReDigi*.[101] Because a new copy of a work is created when the Internet Archive lends a work to a user, the Internet Archive would appear to be unable to rely on the first sale doctrine as the legal basis for its actions.[102]

## C.    Is the National Emergency Library a Fair Use?

As discussed above, a fair use analysis must consider each of the four statutory factors and then weigh the factors as well as any other relevant information in light of the purpose of copyright.[103] The Office has tried to identify some key issues that may be relevant to considering whether the Internet Archive's copying, publicly displaying, and distributing the copyrighted works is a fair use. Again, the Office offers this analysis as requested to aid your consideration based on facts as the Office currently understands them, but does not wish to get ahead of actions taken by private parties.

With respect to the first factor, the purpose and character of the use, the Internet Archive makes the works in the National Emergency Library available for free, such that the use of the copyrighted works is non-commercial. The Internet Archive's stated purpose for its copying is to allow people to access reading material while universities, schools, and libraries are closed due to the coronavirus.[104] While the goals of promoting scholarship and education are explicitly identified in the statute as favored purposes, as explained above, that alone does not establish fair use. The types of materials included in the National Emergency Library, which include Stephen

---

[98] John Sherer & Dean Smith, *Cooperation and the Creation of a National Public Library*, UNC PRESS BLOG (Apr. 15, 2020, 3:00 PM), https://uncpressblog.com/2020/04/15/cooperation-and-the-creation-of-a-national-emergency-library/ (discussing Statement of Cooperation between Internet Archive and Duke University Press and UNC Press).
[99] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 79–80 (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf; U.S. COPYRIGHT OFFICE, THE MAKING AVAILABLE RIGHT IN THE UNITED STATES 22 n.94 (2016), https://www.copyright.gov/docs/making_available/making-available-right.pdf.
[100] DEPARTMENT OF COMMERCE IPTF, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 58 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.
[101] *ReDigi*, 910 F. 3d at 659–660.
[102] The Office notes that a separate reproduction is made when a book is initially digitized. This reproduction would similarly not be excused by the first sale doctrine, and unless some other exception applies, could constitute infringement.
[103] *Campbell*, 510 U.S. at 577–78.
[104] Chris Freeland, *Announcing a National Emergency Library to Provide Digitized Books to Students and the Public*, INTERNET ARCHIVE (Mar. 24, 2020), http://blog.archive.org/2020/03/24/announcing-a-national-emergency-library-to-provide-digitized-books-to-students-and-the-public/.

King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes.

The Internet Archive claims that the vast majority of books in its collection were published more than twenty years ago and are not generally available electronically.[105] The Internet Archive does not explain if it verified whether any of the works in its collection, or works that include substantially equivalent information, were available to the public in digital formats prior to including those books in its collection or removing its waiting lists. The argument that the Internet Archive's purpose was to make available materials that would otherwise be unavailable does not apply to any books that were available in digital formats at the time of the copying.[106]

If the analysis is limited to those books in the archive that are offered for educational purposes and that were previously unavailable in digital formats, the evaluation under the first factor would involve weighing the non-commercial, educational purpose of the copying against the non-transformative nature of the use. Offering access for educational purposes to works like research monographs, originally intended to educate, is not transformative. Here, the complete text of books has been reproduced and posted in digital format without adding anything new to the works, or providing the type of search functionality that has been deemed transformative in other digitization cases.[107] Indeed, the *CDL White Paper* takes no position on whether digitizing entire works is transformative, explaining that the drafters could not agree on that issue, contending instead that the non-commercial nature and educational purposes of CDL are sufficient for the first factor to weigh in favor of fair use.[108]

An analysis of the second factor would be fact-specific, as each work (or at least category of works) would need to be evaluated independently. The works in the National Emergency Library vary in terms of how close they are "to the core of intended copyright protection."[109] Some are works of creative fiction, while others may be factual or informational works. Although a focus on out-of-print works might in some circumstances favor fair use under this factor,[110] it does not appear that this was the focus of the National Emergency Library's collections; rather, the focus was on "materials published during the twentieth century, the vast

---

[105] Chris Freeland, *Internet Archive Responds: Why We Released the National Emergency Library*, INTERNET ARCHIVE (Mar. 30, 2020), http://blog.archive.org/2020/03/30/internet-archive-responds-why-we-released-the-national-emergency-library/.

[106] The *CDL White Paper* also argues that "CDL's purpose aligns closely with the statutory purpose of the first sale doctrine," which should weigh in a library's favor with respect to the first factor. CDL WHITE PAPER at 21. As discussed above, the argument that CDL is analogous to a digital first sale doctrine applies only if the library limits the number of copies it lends to the number of physical copies it possesses of a book. As the Internet Archive has removed this limitation, this argument is not relevant here.

[107] *See, e.g., Google Books*, 804 F.3d 202; *HathiTrust*, 755 F.3d 87; *Perfect 10*, 508 F.3d 1146.

[108] CDL WHITE PAPER at 21.

[109] *Campbell*, 510 U.S. at 586.

[110] *See supra* note 71.

majority of which are not commercially available in electronic form ('e-book')."[111] No mention of the works' overall availability is made.

With respect to the third factor, the amount and substantiality of the portion of the original work used, the *CDL White Paper* argues that it is necessary to copy the entire book to achieve the purpose of providing digital access to the work, such that the copying is not excessive in relation to the library's purpose.[112] It also argues that the library prevents users from making additional copies of or further distributing the book and limits the duration for which a user can access a book.[113] Consideration of this factor and the fourth factor may be informed by recent digitization cases *HathiTrust* and *Google Books*; those courts emphasized that the defendants had not made the full text of the copied works visible to the public, which reduced the risk of defendants' copies serving as market substitutes for the original works.[114] The Copyright Office has also consistently expressed doubt that providing digital access to complete works can be considered a fair use.[115]

There appears to be disagreement among stakeholders over whether the analysis of market harm under the fourth fair use factor should consider the Internet Archive's activities as roughly analogous to physical lending by libraries, or whether the markets for physical lending and ebook licensing to libraries are distinct.[116] Under the former line of argument, if digital lending is seen as akin to physical lending, then any market harm would be outside the scope of consideration in connection with this factor, pursuant to the first sale doctrine in the Copyright Act. The Office is not aware of any courts that have embraced this approach, and the Second Circuit squarely rejected it in *ReDigi*.[117] In addition, the Office has previously noted significant differences between lending physical and online lending that are "directly relevant to the balance between copyright owners and users in section 109."[118]

---

[111] Letter from Brewster Kahle, Founder and Digital Librarian, Internet Archive, to Sen. Thom Tillis (Apr. 10, 2020), https://www.publishersweekly.com/binary-data/ARTICLE_ATTACHMENT/file/000/004/4367-1.pdf.

[112] CDL WHITE PAPER at 21.

[113] *Id*. This applicability of this argument is somewhat limited with respect to the National Emergency Library, as the Internet Archive is allowing multiple, simultaneous users to access the work at the same time, and allowing users to re-checkout a particular work for the duration of its operation.

[114] *Google Books*, 804 F.3d at 222; *HathiTrust*, 755 F.3d at 97.

[115] *See, e.g.,* SECTION 108 DISCUSSION DOCUMENT at 15 ("[T]here remain many essential library and archives activities that may not be authorized by fair use. . . —specifically in the area of distribution of [full-text] copies of works to users."); U.S. COPYRIGHT OFFICE, ORPHAN WORKS AND MASS DIGITIZATION: A REPORT OF THE REGISTER OF COPYRIGHTS 101 (2015), https://www.copyright.gov/orphan/reports/orphan-works2015.pdf ("[T]here is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety."); U.S. COPYRIGHT OFFICE, LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT 23 (2011), https://www.copyright.gov/docs/massdigitization/ USCOMassDigitization_October2011.pdf ("[T]he large scale scanning and dissemination of entire books is difficult to square with fair use").

[116] *Compare, e.g.*, *Controlled Digital Lending Is Neither Controlled nor Legal*, THE AUTHORS GUILD (Jan. 8, 2019), *with* CDL WHITE PAPER at 23-26.

[117] *ReDigi*, 910 F. 3d at 649.

[118] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 82–85 (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ("Time, space, effort and cost no longer

Regardless, this analogy is not squarely applicable to the National Emergency Library. The National Emergency Library lacks the controls cited by the *CDL White Paper* as necessary to mitigating market harm; rather than limiting the total number of copies in any format in circulation to the number of physical copies the library lawfully owns and lending each digital version only to a single user at a time, the Internet Archive has suspended waitlists, allowing an unlimited number of users to borrow any given title simultaneously.

If, instead, the relevant market is the ebook market, the analysis changes. There currently exists a market where publishers and authors license their works to libraries for the purpose of digitally "lending" them to patrons. It is an established market; major publisher Hachette, for example, first began providing ebooks to libraries in 2001.[119] And since 2014, all the "Big Five" publishers have been licensing all titles in their ebook collections to U.S. libraries.[120] The terms and prices of these licensing agreements vary by publisher and title.[121] The fourth factor analysis might focus on whether the creation and distribution of digital versions of these works would affect this market, and also how, if such conduct became widespread, it would affect this market. The National Emergency Library may seek to demonstrate that there are not currently digital versions of the works in question available in the marketplace.[122] Although the fourth fair use factor requires looking at the potential market of a work[123] and the Supreme Court has said that "[t]his inquiry must take account not only of harm to the original but also of harm to the market for derivative works,"[124] the Eleventh Circuit has held that the unavailability of digital permissions for a work "'favor[s]' fair use" under the fourth factor.[125] Thus, this factor might favor fair use for some, but not necessarily all, of the works contained in the National Emergency Library.

## D. Exigent Circumstances and Fair Use

As discussed above, consideration of a fair use defense requires an individualized analysis and weighing of all relevant factors. Any analysis would need to take into account that the Internet Archive suspended its waitlists during a time of international crisis. Pointing to a

---

act as barriers to the movement of copies, since digital copies can be transmitted nearly instantaneously anywhere in the world with minimal effort and negligible cost.").

[119] *See* Randall Stross, *Publishers vs. Libraries: An E-Book Tug of War*, N.Y. TIMES (Dec. 24, 2011), https://www.nytimes.com/2011/12/25/business/for-libraries-and-publishers-an-e-book-tug-of-war.html.

[120] Matt Enis, *Technology: Vendors Talk Ebook Future*, LIBRARY JOURNAL, Sept. 1, 2014.

[121] *See, e.g.*, DEPARTMENT OF COMMERCE IPTF, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 61 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf ("Some publishers offer perpetual licenses permitting an unlimited number of loans (sometimes limited to one user at a time), while others have limits of one or two years, or 26 or 52 loans, after which renewal would be required.").

[122] Although they acknowledged not having confirmed this fact before making each work available.

[123] 17 U.S.C. § 107(4).

[124] *Harper & Row*, 471 U.S. at 568.

[125] *Cambridge Univ. Press*, 906 F.3d at 1295 (describing the district court's holding, which the court held was correct).

"temporary and significant need" caused by the closing of physical libraries, the Internet Archive suggests that the COVID-19 crisis provides additional legal justification for its actions.[126]

The waiver or relaxation of certain legal obligations or duties during times of emergency such as the COVID-19 pandemic is not without precedent. In the copyright context, for example, Congress included provisions in the CARES Act that authorize the Register of Copyrights to temporarily adjust timing provisions in the Copyright Act if she determines that a national emergency is generally disrupting the normal operation of the copyright system.[127] Similarly, during World War II, Congress authorized the President to grant extensions of time to foreign copyright owners to comply with the Copyright Act's manufacturing clause requirements.[128] But these responses involve changes expressly enacted by Congress through its legislative powers.

Section 107 does not expressly provide for consideration of exigent circumstances when analyzing fair use. That said, the four factors that courts shall consider are "illustrative and not limitative."[129] Courts at times have considered factors beyond the four statutory factors when assessing fair use, although we are not aware of cases which have considered the presence of emergency conditions as part of a fair use analysis.[130] If exigent circumstances are factored into a fair use analysis, it does not necessarily follow that they would provide an unconditional expansion of the scope of fair use. One might also look at whether the use goes beyond addressing the asserted need that arises from the exigency. For example, one might consider a use that provides access to works to a specific affected community more favorable to fair use than one that provides widespread access to works to the public at large.

There is undoubtedly a strong public interest in ensuring continued access to educational materials in this unprecedented time, which could weigh in favor of fair use. While the Internet Archive's goal of making research and educational materials publicly available may be laudable, so is respect for copyright. It would be imprudent to excuse widespread copying due to a national emergency without considering the possible repercussions on copyright law and copyright owners. There is also a strong public interest in ensuring that authors are able to financially survive the coronavirus crisis to be able to continue to produce creative works. Alongside serious challenges to teachers and students thrust into a distance-learning environment with little to no

---

126 Letter from Brewster Kahle, Founder and Digital Librarian, Internet Archive, to Sen. Thom Tillis (Apr. 10, 2020), https://www.publishersweekly.com/binary-data/ARTICLE_ATTACHMENT/file/000/004/4367-1.pdf.

127 CARES Act, Pub. L. No. 116-136, § 19011 (2020). Exercising this authority, the Register has since adjusted certain deadlines relating to copyright registration and notices of termination in specific cases for persons unable to comply due to the COVID-19 national emergency and temporarily tolled certain timing provisions during the period of disruption caused by the pandemic.

128 Act of September 25, 1941, Pub. L. No. 77-258, 55 Stat. 732 (1941), https://www.loc.gov/law/help/statutes-at-large/77th-congress/session-1/c77s1ch421.pdf.

129 Section 107 provides, "In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include. . . ." Section 101 of the Copyright Act states "The terms 'including' and 'such as' are illustrative and not limitative."

130 See 4 WILLIAM F. PATRY, PATRY ON COPYRIGHT § 10:156 (2020) ("Examples of other factors include privacy interests in the case of unpublished works, defendant's good faith or lack thereof, attribution (as indicative of 'propriety'), 'wrongful denial of exploitative conduct towards the work of another,' deliberate distortion of the meaning of the original, and the plaintiff's misuse of his or her copyright to suppress unfavorable comment.").

preparation, writers who were already surviving on meager salaries prior to the pandemic have had their livelihoods severely threatened by the cancellation of book tours and speaking engagements as well as the loss of side jobs and freelance work. A court would almost certainly also take into account the effect the Internet Archive's secondary use could have on writers and publishers.

It seems it would have been beneficial for the Internet Archive to engage with writers and publishers prior to launching the National Emergency Library to discuss the contemplated parameters for the project and determine their willingness to participate. As noted above, some publishers affirmatively opted-in to the project after it was launched, although on somewhat altered terms.[131] Going forward, the Internet Archive may explore opportunities for collaboration with writers and publishers, for example by allowing them to opt into making digital versions of their works publicly available for a certain period under specified conditions.

## Conclusion

The Copyright Office appreciates your engagement with these issues. We are hopeful that we have provided guidance in this response that will be helpful in working with schools and libraries seeking to make their materials available during this unprecedented pandemic and in evaluating questions you have received regarding the Internet Archive's National Emergency Library. Should Congress consider these issues in the longer term, we direct your attention to our previous work on section 108,[132] extended collective licensing,[133] orphan works, and mass digitization[134] as potentially helpful starting points.

Please do not hesitate to contact me if you need any additional information.

Respectfully Submitted,

Maria Strong
Acting Register of Copyrights and Director
U.S. Copyright Office

---

[131] *See* John Sherer & Dean Smith, *Cooperation and the Creation of a National Public Library*, UNC PRESS BLOG (Apr. 15, 2020, 3:00 PM), https://uncpressblog.com/2020/04/15/cooperation-and-the-creation-of-a-national-emergency-library/ (discussing Statement of Cooperation between Internet Archive and Duke University Press and UNC Press).

[132] SECTION 108 DISCUSSION DOCUMENT.

[133] *Mass Digitization Pilot Program*, U.S. COPYRIGHT OFFICE, https://www.copyright.gov/policy/massdigitization/.

[134] U.S. COPYRIGHT OFFICE, ORPHAN WORKS AND MASS DIGITIZATION: A REPORT OF THE REGISTER OF COPYRIGHTS 101 (2015), https://www.copyright.gov/orphan/reports/orphan-works2015.pdf; U.S. COPYRIGHT OFFICE, LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT 23 (2011), https://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf; U.S. COPYRIGHT OFFICE, REPORT ON ORPHAN WORKS (2006), https://www.copyright.gov/orphan/orphan-report-full.pdf.

# McNamara Declaration
# Exhibit 173

| | |
|---|---|
| **From:** | Alan Harvey |
| **Sent:** | Saturday, March 28, 2020 7:26 PM EDT |
| **To:** | Chris Freeland |
| **Subject:** | Fwd: IA and SUP |

Chris,

You and I have spoken in the past, so I thought it only fair to send you some context.

You weren't copied on Chris Butler's note, but thought you should see it, and my response.

A week or so ago there seemed to only be a handful of our titles available on IA. Now there are over 1500, which is entirely unacceptable. Moreover, proceeding this way, without any consultation at all, has thoroughly alienated virtually the entire publishing industry. You're going to have to do an awful lot from here to gain anyone's trust. Including mine. And it should start by taking our content down immediately.

I've already been in touch with our general counsel. I'm hoping not to need to engage them, but will do so next week if the titles don't come down quickly.

As additional background for you, we have all been voluntarily working with EBSCO, ProQuest, JSTOR, Overdrive, etc., to open up access to our content. This was done by mutual agreement and on terms we all found acceptable, varying by publisher. IA simply grabbed everything without any discussion and the bad will is now oozing through us all.

Alan

Begin forwarded message:

**From:** Alan Harvey ████████@stanford.edu>
**Subject: Re: IA and SUP**
**Date:** March 28, 2020 at 4:05:14 PM PDT
**To:** Internet Archive <info-reply@archive.org>
**Cc:** Greta Lindquist ████████@stanford.edu>

Chris,

A simple search of the metadata for "Stanford University Press" pulls up over 1500 titles, virtually all of which are still in print, still for sale, and still under copyright.

We are not required to provide you with a complete list in order for you to undertake a removal of these titles. They are all in direct violation of copyright laws and I request that they be removed immediately.

We will check on the site regularly to see what is still live, and we expect you to put a system in place to ensure that none of these titles is re-posted by a different user.

I am reaching out to Stanford's General Counsel this weekend to ensure that this violation is registered and the takedown is enforced,

Alan

On Mar 28, 2020, at 2:01 PM, Internet Archive <info-reply@archive.org> wrote:

CONFIDENTIAL

INTARC00436106

Dear Alan,

Thank you for emailing us. I would like to assist in processing your request. Would it be possible to get a spreadsheet of titles with ISBNs and/or archive.org identifiers? This would be helpful for the process - e.g., where there are imprints we might not readily recognize or for avoiding removal of any works in the public domain or for which rights have otherwise shifted.

We will perform a good faith effort to remove all editions based on your list from the National Emergency Library and inform you when this has been undertaken.

Sincerely,
Chris Butler
Office Manager
archive.org

On 3/26/20 12:34 PM, Chris Freeland wrote:

> Dear Alan, I'm cc:ing info@archive.org, which handles takedown requests.
>
> Chris
>
> --
> Chris Freeland
> Director of Open Libraries
> Internet Archive
> ██████████@archive.org
> @chrisfreeland
> ████████████████
>
>
> On 3/26/20 2:28 PM, Alan Harvey wrote:
>
>> Dear Chris,
>> I am making a formal request to exclude all Stanford University Press content from the National Emergency Library that is being created at the Internet Archive. I do not see much SUP content on there right now, but do not wish to have any new content added.
>> We do not grant those rights to our content, and do not agree that the current coronavirus emergency constitutes an argument for copyright violation.
>> To support the community during this crisis, we are in the process of making all our content more liberally available through the existing library aggregators, and responding to individual requests for content access.
>> Best,
>> Alan
>>
>> ===
>> Dr Alan Harvey

CONFIDENTIAL

INTARC00436107

Director
Stanford University Press

CONFIDENTIAL

INTARC00436108

# McNamara Declaration

# Exhibit 174

| From: | Douglas Armato |
|---|---|
| Sent: | Tuesday, March 31, 2020 11:28 AM EDT |
| To: | ████████ @archive.org |
| CC: | Peter Berkery |
| Subject: | Zoom Meeting Today |

Hi Chris,

I'm not sure I can attend today's noon CST Zoom meeting on the "National Emergency Library" but could you send me an invite in case I can? If I can make the call, it will be mostly as an observer.

As you know, I'm a longtime fan of the work that the Internet Archive does, but the National Emergency Library goes further than we can legally or ethically allow. I've consulted with the Office of the General Counsel here and our Rights and Contracts Manager, Jeff Moen, has sent a takedown notice and information to the IA yesterday. Anything you can do to expedite the takedown process for all Minnesota content would be much appreciated. I'd be happy to discuss making limited Minnesota content available as part of the National Emergency Library, understanding that we *always* consult authors or rights holders before making such decisions — indeed, we've just done a round of that for course books we've made openly available for emergency course use on our Manifold OA platform. We'd also need some kind of binding legal agreement.

All best wishes // Doug


====

Douglas Armato
Director
The University of Minnesota Press
111 Third Avenue South, Suite 290
Minneapolis, MN 55401
████████

During the COVID-19 outbreak, University of Minnesota Press is operating remotely and all departments remain open for business. Books are available for sale online through your local independent bookseller, Barnes & Noble and Amazon, and on our website upress.umn.edu (Please note: Our Press warehouse at Chicago Distribution Center is currently closed and availability is limited). Thank you for your support.

CONFIDENTIAL

INTARC00437003

# McNamara Declaration

# Exhibit 175

| From: | Mary Rasenberger |
|---|---|
| Sent: | Sunday, April 26, 2020 2:34 PM EDT |
| To: | ████@archive.org |
| CC: | DOUGLAS PRESTON |
| Subject: | RE: Meeting |

Thanks for getting back to me Brewster. I sincerely hope you and your family are doing alright.

That is fine if you do not want to speak again, but hear me out first. I was responding to your friend Katie Hafner who suggested we speak and thought we could have a productive conversation. And I was reminded yesterday because NWU said that they are setting up a call with you and the coalition they have formed on CDL. One of our staff or I will likely listen in, but I don't know how productive it will be since it will be led by NWU who tend toward copyright maximalism, which is not true of the AG under my leadership. My goal as ED of the AG with respect to copyright is simple - to make sure authors who want compensation for use of their works are sufficiently compensated in one form or another, so they can keep on writing—and at the same time that they have access to others' works. For instance, we support an extended collective licensing scheme that would include all writers unless they opt out and pay them the writers micro fees for the use of their work. That would be a good way to get some of the money you have received from major foundations back into authors' hands.

Many authors whose books you have in OL really and truly are suffering terribly right now – and many were prior to the COVID crisis. Your staff earns tenfold what many of them earn. Sometimes I think you don't believe us on that point, but it is sadly all too true. I cannot overemphasize it enough. If you could find it in your heart to direct some of the many millions you have for the project back into the authors' hands, we could work with you to make that happen.

For the record, the call you and I had was with our then-president Jim Gleick and you had your lawyer present. There was no deposition-like questioning. You kept saying you wanted to support authors and we were asking questions in good faith to try to understand what you meant. We went into the call thinking that you were really interested in licensing works from authors and helping put more money into authors' pockets, and kept asking questions to get at what you meant. But, after additional correspondence with you, we sadly had to conclude that it was all smoke and mirrors. You are very good at making it sound like you are doing good, and I believe you honestly mean to. But then why not actually do good and show respect for authors by recognizing their rights? I know there are some authors – almost all academic, with the exception of one or two evangelists – who want their books given away by OL, and that is great. They can allow you to do so. Many more authors like OL for research, and it would be a great service, if it were licensed and allowed those who want to be compensated to receive micro payments for when their books are lent out, or payment for inclusion of their books in OL.

We had worked out a model that would allow libraries and others to do what OL is doing, but on a licensed basis – with respect to books authors own rights to. We can help clear those rights. We needed minimal funding for it, and Jim and I had approached you with the idea that you would work with us in good faith and help set that up and use it instead of ignoring authors' rights and welfare. We would still like to pursue that.

All the best,
Mary

CONFIDENTIAL

INTARC00400154

**From:** Brewster Kahle ████████████████
**Sent:** Saturday, April 25, 2020 12:16 AM
**To:** Mary Rasenberger ████████████ @authorsguild.org>
**Subject:** Re: Meeting

Mary--

We talked before, and I felt deposed by a lawyer, which you are, and therefore not a good idea for layman (and against some lawyer ethics rules as I understand it); and so I talked with multiple of your board members with no apparent effect.

We are actively working with others and are making great progress. Wish us all luck, we are all trying to get a digital world that works for everyone.

Be safe in these crazy times,

-brewster

On 4/24/20 10:55 AM, Mary Rasenberger wrote:

Hi Brewster, I am following up on my email from the 2nd about setting up a time to talk.

Best,
Mary

**From:** Mary Rasenberger
**Sent:** Thursday, April 2, 2020 1:19 PM
**To:** ████████ @archive.org
**Cc:** DOUGLAS PRESTON ███████ @me.com>; Katie Hafner ██████████████
**Subject:** Meeting

Dear Brewster,

Katie Hafner (copied) suggested that we set up a time to talk, which we would be happy to do. I suggest a video meeting. I can set up a zoom. Please let us know what times would work for you.

Also, I was meaning to email this morning anyway to dispel any rumors you have heard that the Authors Guild is planning to bring suit. The Guild is not; we cannot possibly afford a litigation. We

CONFIDENTIAL
INTARC00400155

were financially stressed as you know before COVID-19 and having to cancel our gala means a loss of over a quarter of the revenue in our budget. We are instead addressing this bold infringement by letting authors know how they can request IA take their books down, and we hope to appeal to your decency in asking you to shut this ill-planned (even if well-intended) initiative down. There are plenty of other sources for books for students and teachers right now. We can help you point people to them.

I look forward to hearing back from you.
All the best,
Mary

Mary E. Rasenberger
Executive Director
The Authors Guild
31 East 32nd Street, 7th Floor
New York, NY 10016
███████████
███████████@authorsguild.org

CONFIDENTIAL

INTARC00400156

McNamara Declaration
Exhibit 176

| From: | Dye, Skip on behalf of Dye, Skip ▮▮▮▮@penguinrandomhouse.com> |
|---|---|
| To: | Bresson, Hugo |
| CC: | Fleming, Kristen |
| Sent: | 4/9/2020 9:24:46 AM |
| Subject: | RE: School and Library Request Approvals |

No they should not!

Thanks,

Skip

**From:** Bresson, Hugo ▮▮▮▮@penguinrandomhouse.com>
**Sent:** Thursday, April 9, 2020 9:04 AM
**To:** Dye, Skip ▮▮▮▮@penguinrandomhouse.com>
**Cc:** Fleming, Kristen ▮▮▮▮@penguinrandomhouse.com>
**Subject:** RE: School and Library Request Approvals

Hi Skip,

These titles were *Interview with the Vampire* by Anne Rice (ISBN 9780307575852) and *Lolita* by Vladimir Nabokov (ISBN 9780307744029). Should either of these titles be available on IA/DPLA?

https://www.publishersweekly.com/pw/by-topic/digital/copyright/article/82861-authors-guild-aap-outraged-by-ia-s-national-emergency-library.html

Best,
Hugo

Hugo Bresson
Library Sales
Penguin Random House
1745 Broadway, New York NY 10019
▮▮▮▮
▮▮▮▮@penguinrandomhouse.com

**From:** Dye, Skip ▮▮▮▮@penguinrandomhouse.com>
**Sent:** Thursday, April 9, 2020 6:40 AM
**To:** Bresson, Hugo ▮▮▮▮@penguinrandomhouse.com>
**Cc:** Fleming, Kristen ▮▮▮▮@penguinrandomhouse.com>
**Subject:** RE: School and Library Request Approvals

What were these titles?

**From:** Alexis Petric-Black ▮▮▮▮@rakuten.overdrive.com>
**Sent:** Wednesday, April 8, 2020 6:28 PM
**To:** Bresson, Hugo ▮▮▮▮@penguinrandomhouse.com>
**Cc:** Dye, Skip ▮▮▮▮penguinrandomhouse.com>; Fleming, Kristen ▮▮▮▮penguinrandomhouse.com>
**Subject:** RE: School and Library Request Approvals

Hi Hugo,

Update for you on the two MOBIUS requests – the school will not be moving forward with a purchase.  They

Highly Confidential - Attorneys' Eyes Only

PRH0029336

cited that they needed the materials more urgently and the professor was able to find both titles on the Internet Archive / DPLA site with simultaneous checkout so they used those versions.

Best,
Alexis

**Alexis Petric-Black**
*Director, Content Strategy & Publisher Account Services*
Phone: +1 216-573-6886 x 1305
Fax: +1 216-573-6888
████████@rakuten.overdrive.com

**Rakuten OverDrive** *The Leading Digital Reading Platform for Libraries & Schools*
World Headquarters | One OverDrive Way | Cleveland, Ohio 44125  USA
www.overdrive.com    Proud to be a Certified B Corp

Confidentiality Notice:  This email and any attachments are OverDrive Confidential for the sole use of the intended recipient.  Any review, copying, or distribution of this email and attachments by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete any copies of this email.

---

**From:** Bresson, Hugo ████████@penguinrandomhouse.com>
**Sent:** Tuesday, April 7, 2020 1:27 PM
**To:** Alexis Petric-Black ████████k@rakuten.overdrive.com>
**Cc:** Dye, Skip ████████@penguinrandomhouse.com>; Fleming, Kristen ████████@penguinrandomhouse.com>
**Subject:** School and Library Request Approvals

Hi Alexis,

Hope you and yours are doing well! Attached please find approvals on a few recent school requests. This includes MOBIUS, Bainbridge, Wild Rose.

Also included in this file are the requests from Akron Public regarding two titles from our client publishers. At the time these requests were submitted to me, we did not have class set pricing from our client publishers. As these titles are now available for class set pricing, will that cover the needs of the school? I've included the class set price for your reference.

Thank you so much!

Best,
Hugo

Hugo Bresson
Library Sales
Penguin Random House
1745 Broadway, New York NY 10019
P ████████
████████@penguinrandomhouse.com

Highly Confidential - Attorneys' Eyes Only

PRH0029337

# McNamara Declaration
# Exhibit 177

| From: | Brewster Kahle |
| --- | --- |
| Sent: | Tuesday, April 14, 2020 7:39 PM EDT |
| To: | ███████@authorsalliance.org; Pam Samuelson |
| CC: | Lila Bailey |
| Subject: | National Emergency Library and Congress |
| Attachments: | signature.asc |

Brianna and Pam,

Hope all is well.

We hear that the Authors Guild is going to be meeting with some staffers about copyright matters, and possibly about NEL as well. I thought I would alert you to this, as the Authors Alliance, I think, was formed to be at the table when these discussions were happening.

Not sure what can be done from California during a Pandemic, but maybe it is a zoom thing like everything else these days.

-brewster

CONFIDENTIAL
INTARC00399901

# McNamara Declaration
# Exhibit 178

Page 1
About Us | Authors Alliance
https://www.authorsalliance.org/about/#advisory



OUR MISSION    OUR DIRECTORS    OUR STAFF    OUR ADVISORY BOARD    OUR FOUNDING MEMBERS

AUTHORS ALLIANCE

About Us

📷 Martin Adams

## Mission

The mission of Authors Alliance is to advance the interests of authors who want to serve the public good by sharing their creations broadly. We create resources to help authors understand and enjoy their rights and promote policies that make knowledge and culture available and discoverable.

READ MORE ABOUT OUR ISSUES

## Board of Directors



**Carla Hesse** is a Professor of History at the University of California, Berkeley. A fellow of the American Academy of Arts and Sciences since 2009, she is a specialist in modern European History and the history of communication.



**Alison Mudditt** is the CEO of the Public Library of Science (PLOS). Her experience includes leadership positions at UC Press, SAGE Publications, Blackwell Publishers, and Taylor & Francis.



**Thomas Leonard** is University Librarian Emeritus and a Professor of Journalism Emeritus at the University of California, Berkeley. He has served as the President of the Association of Research Libraries and as an Associate Editor of American National Biography.



**Pamela Samuelson** is a Professor of Law at the University of California, Berkeley and a Co-Director of the Berkeley Center for Law & Technology.



**MacKenzie Smith** is the University Librarian and Vice Provost of Digital Scholarship at the University of California, Davis. She is one of the nation's leading experts in digital libraries.



**Jeffrey MacKie-Mason** is the University Librarian and Chief Digital Scholarship Officer at the University of California, Berkeley. He has joint appointments as a professor in the School of Information and in the Department of Economics.



**Molly Van Houweling** is a Professor of Law and a Co-Director of the Berkeley Center for Law & Technology at the University of California, Berkeley, School of Law. She serves as Chair of the Board of Directors of Creative Commons.

## Staff



**Dave Hansen** is the Executive Director of Authors Alliance. He holds a JD and an MSLS from UNC Chapel Hill and is a copyright attorney licensed to practice in North Carolina.



**Rachel Brooke** is a Senior Staff Attorney at Authors Alliance. She holds a JD from NYU School of Law and is a copyright attorney licensed to practice in California.

## Advisors

**Peter Baldwin**
Professor of History at UCLA

**danah boyd**
Principal Researcher at Microsoft Research, Founder of Data & Society, and Visiting Professor at New York University

**Amy Brand**
Director of the MIT Press

**Paul Brest**
Former Hewlett Foundation President; Professor of Law, Emeritus, and former Dean, Stanford Law School

**Michael Eisen**
Professor of Genetics, Genomics, and Development at UC Berkeley and PLOS Cofounder

**Edward Felten**
Robert E. Kahn Professor of Computer Science and Public Affairs and Director of the Center for Information Technology Policy at Princeton University

**Michael Geist**
Professor of Law and the Canada Research Chair in Internet and E-commerce

**Danny Kingsley**
Researcher and administrator in Scholarly Communication

**Donald Lamm**
Former President and Chairman, W.W. Norton Publishing Company

**Lawrence Lessig**
Roy L. Furman Professor of Law and former Director of the Edmond J. Safra Center for Ethics at Harvard University

**Jonathan Lethem**
Novelist, essayist, short story writer, and the Roy

**Randy Schekman**
Howard Hughes Investigator and Professor of Cell and Developmental Biology at UC Berkeley, Nobel Laureate in Physiology or Medicine

**Sidonie Smith**
Lorna G. Goodison Distinguished Professor of English and Women's Studies at the University of Michigan

**Harold Varmus**
Co-founder of Public Library of Science, Nobel Laureate in Physiology or Medicine

Page 2
About Us | Authors Alliance
https://www.authorsalliance.org/about/#advisory

**Paul Courant**
Arthur F. Thurnau Professor of Economics and Information, Harold T. Shapiro Collegiate Professor of Public Policy, and former Dean of Libraries at the University of Michigan

**Robert Darnton**
Harvard University Librarian Emeritus, and Carl H. Pforzheimer Professor of History Emeritus

**Cory Doctorow**
Novelist, activist, blogger, and journalist

Law at the University of Ottawa Faculty of Law

**Katie Hafner**
Writer and journalist

**Lewis Hyde**
Poet, essayist, translator, cultural critic, and former Professor of Creative Writing at Kenyon College

**Brewster Kahle**
Digital Librarian and Founder of the Internet Archive

**Kevin Kelly**
Senior Maverick Editor and founding Executive Editor at Wired Magazine

Edward Disney Professor in Creative Writing at Pomona College

**Robert Pinsky**
39th Poet Laureate of the United States, Founder of the Favorite Poem Project, and Professor of Creative Writing at Boston University

**Margaret Jane Radin**
Henry King Ransom Professor of Law Emerita at University of Michigan

**Eric von Hippel**
T. Wilson (1953) Professor in Management and Professor of Management and Systems Engineering at MIT

**Jonathan Zittrain**
Professor of Law and Computer Science at Harvard University, and Co-Founder and Director of the Berkman Center for Internet and Society

## Founding Members

**Jasmine Abdel-khalik**
UMKC School of Law

**Alessandro Acquisti**
Carnegie Mellon University

**Prue Adler**
Association of Research Libraries

**Julie Ahrens**
Stanford Law School, Center for Internet & Society

**Ivy Anderson**
California Digital Library

**Jonas Anderson**
American University Washington College of Law

**Patricia Aufderheide**
American University

**Margo Bagley**
Emory University School of Law

**Eric Bakovic**
UC San Diego

**Jack Balkin**
Yale Law School

**Jonathan Band**

**Ann Bartow**
University of New Hampshire School of Law

**Barton Beebe**
NYU School of Law

**Steven Bellovin**
Columbia University

**Yochai Benkler**

**Bob Berring**
UC Berkeley Law

**Mario Biagioli**
UC Davis

**James Boyle**
Duke University School of Law

**Oren Bracha**
University of Texas School of Law

**Annemarie Bridy**
University of Idaho College of Law

**Tobias Buckell**

**Dan Burk**
UC Irvine

**Brandon Butler**

**L. Jean Camp**
Indiana University

**Michael Carrier**
Rutgers Law School

**A. Michael Froomkin**
University of Miami School of Law

**Laura Gasaway**
University of North Carolina School of Law

**Steve Gass**
MIT

**Andy Gass**

**Paul Geller**

**Ilana Gershon**
Indiana University

**Shubha Ghosh**

**Rebecca Giblin**
Faculty of Law, Monash University, Australia

**James Gibson**
University of Richmond School of Law

**Jen Jack Gieseking**
University of Kentucky

**Dan Gillmor**

**Bobby Glushko**
University of Toronto

**Eric Goldman**
Santa Clara University School of Law

**Jennifer Granick**
Stanford Center for Internet and Society

**James Grimmelmann**
Cornell Law School

**Seda Gürses**
KU Leuven

**Bronwyn Hall**
UC Berkeley, Emerita

**David Hansen**
Duke University

**Paul Heald**
University of Illinois

**Laurence R. Helfer**
Duke University

**Don Herzog**
University of Michigan

**Robert Heverly**
Albany Law School

**Laura A. Heymann**
William & Mary Law School

**Peter Hirtle**
Harvard University

**Adam Hochschild**

**Arlie Hochschild**

**Kinch Hoekstra**
UC Berkeley

**Jack Lerner**

**Karen Levy**
Cornell University

**Roger Levy**
MIT

**Yvette Joy Liebesman**
St. Louis University School of Law

**Jacqueline Lipton**
Authography LLC

**Jessica Litman**
University of Michigan

**Lydia Loren**
Lewis & Clark Law School

**Brian Love**
Santa Clara University School of Law

**Glynn Lunney**
Texas A&M University School of Law

**Michael Madison**
University of Pittsburgh

**Matthew J.X. Malady**

**Lara Markstein**

**Alice Marwick**
UNC Chapel Hill

**Stephen Maurer**
UC Berkeley

**Mark McKenna**
Notre Dame Law School

**Corynne McSherry**

**Hiram Meléndez-Juarbe**

**Kate Miltner**
USC Annenberg School for Communication and Journalism

**Joseph Mornin**
Cooley LLP

**Calvin Morrill**
UC Berkeley

**Lateef Mtima**
Institute for Intellectual Property and Social Justice

**Bryce Newell**
University of Oregon

**Annalee Newitz**
Author and journalist

**Peter Norvig**
Google

**Paul Ohm**
Georgetown Law School

**Ruth Okediji**
Harvard Law School

**Dotan Oliar**

**Julie Samuels**
Tech:NYC

**Sharon Sandeen**
Mitchell Hamline School of Law

**Joshua Sarnoff**
DePaul University College of Law

**AnnaLee Saxenian**
UC Berkeley

**Rich Schneider**
UC San Francisco

**Jason Schultz**
NYU School of Law

**Michael Scott**
Southwestern Law School

**Jeffrey Selbin**
UC Berkeley Law

**Lea Shaver**
Indiana University

**Jonathan Sheehan**
UC Berkeley

**Stuart Shieber**
Harvard University

**Stephen M. Silberstein**

**Jessica Silbey**
Northeastern University

**Luca Simeone**
Aalborg University

**Aram Sinnreich**
American University

**David Sklansky**
Stanford Law School

**Kevin Smith**
University of Kansas

**Daniel Solove**
George Washington University Law School

**Tricia Soto**
Menlo College

**Christopher Sprigman**
New York University School of Law

**Peter Stansky**
Stanford University

**Philip Stark**
UC Berkeley

**Scott Stern**
MIT Sloan School

**Ali Sternburg**

**Victoria Stodden**

**Mitch Stoltz**
Electronic Frontier Foundation

Michael Carroll
American University
Washington College of Law

Cathryn Carson
UC Berkeley

Alissa Centivany
Western University,
Ontario

Margaret Chon
Seattle University School
of Law

Dan Cohen
Digital Public Library of
America

Julie Cohen
Georgetown Law

Cindy Cohn

Michele Collu

Robert Cooter
UC Berkeley Law

Ray Corrigan
The Open University, UK

Carys Craig
Osgoode Hall Law School,
York University

Jessie Daniels
City University of New York

Primavera De Filippi
Berkman Center for
Internet & Society

Stacey Dogan
Boston University School
of Law

Paul Duguid
UC Berkeley School of
Information

Niva Elkin-Koren
Haifa Center for Law and
Technology, University of
Haifa Faculty of Law

Cynthia Fuchs Epstein
Graduate Center, City
University of New York

Sharon E. Farb
UCLA

Kathleen Fitzpatrick
Michigan State University

Karl Fogel
QuestionCopyright.org

Roger Ford
University of New
Hampshire School of Law

Sarah Warshauer
Freedman
UC Berkeley

Brett Frischmann
Villanova University

Chris Hoofnagle
UC Berkeley Law

Martin Husovec

Tim Hwang

Steven Jamar
Professor of Law and
Associate Director,
Howard Intellectual
Property Program

Peter Jaszi
American University
Washington College of Law

Jennifer Jenkins

Michael Jordan
UC Berkeley

Eran Kahana
Stanford Law School;
Maslon LLP

Brian Kahin
MIT

Amy Kapczynski

Ethan Katsh
National Center for
Technology and Dispute
Resolution

Ariel Katz
University of Toronto
Faculty of Law

Christopher Kelty
UCLA

John Leslie King

John Kingdon
University of Michigan

Kirsten Kingdon

Pushpa Kumar
Lakshmanan
Faculty of Law, University
of Delhi, India

Airi Lampinen
Stockholm University

Michael Landau
Georgia State University
College of Law

Susan Landau
Tufts University

Amy Landers
Drexel University School of
Law

Alex Leavitt
Facebook Research

Edward Lee
IIT Chicago-Kent College of
Law

Mark Lemley
Stanford Law School

University of Virginia
School of Law

Harlan Onsrud
University of Maine School
of Computing and
Information Science

Kurt Opsahl
Electronic Frontier
Foundation

Nina Paley

John Palfrey
Phillips Academy, Andover

Aaron Perzanowski
Case Western Reserve
University School of Law

Jim Pitman
UC Berkeley

Ethan Pollock
Brown University

Jedediah Purdy
Columbia Law School

Laura Quilter
University of
Massachusetts Amherst

Kevin Quinn
University of Michigan

Justin Reich
MIT

Jerome Reichman
Duke Law School

Blake Reid
Samuelson-Glushko
Technology Law and Policy
Clinic, Colorado Law

Chris Ridder
Ridder, Costa & Johnstone
LLP

Jorge Roig
Touro Law Center

Daniel Rosenberg
University of Oregon

Betsy Rosenblatt
Whittier Law School

Jennifer E. Rothman
Loyola Law School, Loyola
Marymount University

Brian Rowe
Seattle University Law &
University of Washington
Information School

Daniel Rubinfeld
UC Berkeley Law

Matthew Sag
Loyola University of
Chicago School of Law

Katherine Strandburg
New York University
School of Law

Peter Suber
Harvard University

Stephen Sugarman
UC Berkeley Law

Nicolas Suzor
Queensland University of
Technology

Alexander Tabarrok
George Mason University

Stefan Tanaka
UC San Diego

Audrey Thorne

Denise Troll Covey
Carnegie Mellon University

Samuel Trosow
University of Western
Ontario

Lokman Tsui

Rebecca Tushnet

Paul Uhlir

Jennifer M. Urban

Siva Vaidhyanathan

Barbara van Schewick
Stanford Law School

Robert Walker

Kimberlee Weatherall
University of Sydney

Jonathan Weiler
UNC Chapel Hill

Phil Weiser
University of Colorado Law
School

Steven Weissman
UC Berkeley Law

Yana Welinder
IFTTT

Heather Whitney
NYU

John Willinsky
Stanford University

Esther Wojcicki
Palo Alto Schools

Martha Woodmansee
Case Western Reserve
University

Christina Xu

Peter Zhou
UC Berkeley

Diane Zimmerman
New York University
School of Law

# McNamara Declaration
# Exhibit 179

| From: | Brianna Schofield |
|---|---|
| Sent: | Monday, March 30, 2020 12:06 PM EDT |
| To: | Lila Bailey; Pam Samuelson |
| CC: | Pam Samuelson; Chris Freeland |
| Subject: | Re: Authors Alliance take on NEL? |

Hi Lila,

I haven't heard directly from our members about the National Emergency Library, but I've followed the mixed public reaction of course. As Pam said, Authors Alliance is not planning to endorse the NEL. (I hope you got my email last week on this topic?)

If you'd like to hear a bit more about our decision, I'm happy to find a time to talk by phone. Just let me know.

Hope you're well!

Best,
Brianna

On 3/29/20 8:47 PM, Lila Bailey wrote:

> Thanks for the quick response, Pam. We absolutely do appreciate your personal support on this one!
>
> Brianna, if you have anything further on reactions from your members, we'd be interested in hearing them.
>
> Thanks!
>
> All best,
>
> Lila
>
> On 3/29/20 5:17 PM, Pam Samuelson wrote:
>
>> I will leave it to Brianna to say whether we've heard anything from members about it. The board has discussed the issue and I don't believe we will do a blog on it. I stuck my neck out on this issue, but the organization is focused on other issues.
>>
>> Sent from my iPad
>>
>>
>> On Mar 29, 2020, at 5:00 PM, Lila Bailey <██@archive.org> wrote:

CONFIDENTIAL

INTARC00462974

Hi Brianna and Pam,

The response to the National Emergency Library has been overwhelmingly positive, though as I'm sure you've seen we're getting pushback from the expected places. I'm curious if you have heard anything from your members, and whether Authors Alliance might be up for supporting us with a blog post?

Thanks for considering it, and happy to hop on the phone if you'd like to discuss.

All best and hope you're both sheltering well.

-Lila

--
Brianna Schofield
Executive Director
Authors Alliance
www.authorsalliance.org

CONFIDENTIAL

INTARC00462975

# McNamara Declaration
# Exhibit 180

## Internet Archive Blogs

*A blog from the team at archive.org*



anniversary.archive.org

Blog    Announcements    25th Anniversary    archive.org    About    Events    Developers    Donate



### The National Emergency Library – Who Needs It? Who Reads It? Lessons from the First Two Weeks

Posted on April 7, 2020 by Brewster Kahle



At a time when every day can feel like a month, it's hard to believe that the National Emergency Library has only existed for two weeks. Recognizing the unique challenges of connecting students and readers with books now on shelves they cannot reach, the Internet Archive loosened the restrictions on our controlled digital lending library to allow increased lending of materials. Reactions have been passionate, to say the least—linked by teachers able to access our virtual stacks, concern by authors about the program's impact, and fundamental questions about our role as a library in these dire times when one billion students worldwide are cut off from their classrooms and libraries.

For those of you who are being introduced to us for the first time due to the National Emergency Library: Welcome! The doors of the Internet Archive have been open for nearly 25 years and we've served hundreds of millions of visitors—we've always got room to welcome one more. And for those of you who have tracked our evolution through the years, we know you have questions.

When we turned off waitlists for our lending library on March 24th, it was in response to messages and requests we'd been getting from many sources—librarians who were closing their doors in response to lockdowns, school teachers who were concerned their students could no longer research and discovery through the primary sources they had on campus, and organizations we respected who knew we had the capability to fill an unexpected gap. A need that we knew we could provide quickly in response.

We moved in "Internet Time" and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published. We hear your concerns and we've taken action: the Internet Archive has added staff to our Patron Services team and we are responding quickly to the incoming requests to take books out of the National Emergency Library. While we can't go back in time, we can move forward with more information and insight based on data the National Emergency Library has generated thus far.

The Internet Archive takes reader privacy seriously, so we don't have specific analytics or logs to

### Recent Posts

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

### Recent Comments

- Superman on July Book Talk: The Library: A Fragile History
- aho on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

### Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music

News
Newsletter
Open Library
Past Event
Software Archive
Technical
Television Archive
Upcoming Event
Video Archive
Wayback Machine – Web Archive
Web & Data Services

Archives

[Select Month]

Meta

Log in
Entries feed
Comments feed
WordPress.org

share (we [took the government to court] to assure we didn't have to do that,) but we do have some general information that may be of use to authors, publishers and readers about the ways patrons are using the National Emergency Library. We will be sharing more in the coming weeks of this crisis.

**Majority of books are borrowed for less than 30 minutes**

Even with a preview function where readers can see the first few pages of a book, most people who go through the check out process are looking at the book for less than 30 minutes, with no more interactions until it is automatically returned two weeks later. We suspect that fewer than 10% of books borrowed are actually opened again after the first day (but we have more work to do to confirm this). Patrons may be using the checked-out book for fact checking or research, but we suspect a large number of people are browsing the book in a way similar to browsing library shelves.

**The total number of books that are checked out and read is about the number of books borrowed from a town library**

Trying to compare a physical check-out of a book with a digital check-out is difficult. Assuming that the number of physical books borrowed from a library corresponds to digitally borrowed books that are read after the first day, then the Internet Archive currently lends about as many as a US library that serves a population of about 30,000.

Our usage pattern may be more like a serendipitous walk through a bookstore or the library stacks. In the real world, a patron takes a book off the shelf, flips through to see if it's of interest, and then either selects the book or puts it back on the shelf. However, in our virtual library, to flip fully through the book you have to borrow it. The large number of books that have no activity beyond the first few minutes of interaction suggest patrons are using our service to browse books.

**90% of the books borrowed were published more than 10 years ago, two-thirds were published during the 20th century**

The books in the National Emergency Library were published between 1925 and 5 years ago, because books older than that are in the public domain—out of copyright and fully downloadable. Books newer than 5 years are not in the National Emergency Library. Unlike the age of most books in bookstores, the books readers are borrowing are older books, with 10% being from the last 10 years. Two-thirds of these books were published during the 20th century.

And when people find what they need, it solves a problem, such as this subject librarian who found a book published in 1975:



*I just found a book that student was looking, for as an ebook on the National Emergency Library 'Indeginous African Architecture'* [https://t.co/Hing7QgvuG#architecture](https://t.co/Hing7QgvuG#architecture) [@UniLincolnArts](https://twitter.com/UniLincolnArts) [pic.twitter.com/9p8KjGBoMK](https://pic.twitter.com/9p8KjGBoMK)

— Oonagh🌿 (@GCWOonagh) [April 6, 2020](https://twitter.com/GCWOonagh/status/1247092845)

**A bit of Fun: Some of the least common subject catagories of borrowed books**

These subject tags come from library catalog records and other annotations by organizations such as ISKME, as done with the Universal School Library collection, assigned to aid search and discovery of resources for educators.

- Cookery (Oysters)
- Oysters — New York (State) — New York.
- Counterrevolutions — Cuba — History — 20th century
- Biological warfare — United States
- Korean War, 1950-1953 — Biological warfare
- Religion — Controversial literature
- Monotheism
- Mental illness — In adolescence
- Tohono O'Odham Indians — Folklore
- Pima Indians — Folklore
- Saratoga Campaign, N.Y., 1777
- Job analysis
- Bible. English Revised – Texts
- Missing women
- Amnell, Kahlen (Fictitious character)
- Women amnesiacs

We'll continue to glean and share what we can as this project continues and we hope that the needs that gave rise to the National Emergency Library come to an end soon.

Posted in Announcements, News | Tagged NEL | 53 Replies

← Happy 404 Day!

Teachers & the National Emergency Library: Stories from the Frontlines of Online Schooling →

### 53 thoughts on "The National Emergency Library – Who Needs It? Who Reads It? Lessons from the First Two Weeks"


**ada024744@adams12.org**
April 7, 2020 at 6:18 pm

Is it possible to use a book or primary source for multiple checkouts for example as an educator, can I check out a source and have my entire class access it through my Google Classroom (which is password protected) for educational purposes?
Thank you

Pingback: 1,426,434 Million Books: The Internet Archive Launches the "National Emergency Library to Provide Digitized Books to Students and the Public" | LJ infoDOCKET


**اهنگ**
April 7, 2020 at 8:58 pm

Hello, thank you for submitting this article


**Chris**
April 7, 2020 at 10:31 pm

I found this wonderful initiative because of the recent furor around closed libraries, so I'm not familiar with the general workings of the lending library. However, if people are borrowing books just to browse and decide if they want to read it, shouldn't this indicate that previews be allowed? Either the first chapter (like Amazon) or select pages (like Google Books).

(Disclaimer: I do not know if a preview function exists on this site already.)


**JeromeM573**
April 8, 2020 at 1:35 am

Why did the number of books will decline in the coming weeks until June 30? And then, is that true that number of borrowed books that previously removed were some of them back to normal for the increasing number of borrowed books?



**Declan Lawton**

April 8, 2020 at 2:20 pm

I really appreciate the collection you have shared. This will be in the interest of most of people.



**The Ocean Man**

April 8, 2020 at 4:14 pm

"Patrons may be using the checked-out book for fact checking or research, but we suspect a large number of people are browsing the book in a way similar to browsing library shelves."

I wouldn't be surprised if they're loading it on to say, a Kindle or similar ebook reader and reading it there. I know plenty of people do that with other library borrowed ebooks. On another note I love the library, it has a lot of interesting technology related books.



**Mushiii hussain**

April 8, 2020 at 7:32 pm

Thanks for great tool & Information



**Mori**

April 9, 2020 at 5:39 pm

Hi
Thanks for this good article
I really love archive.org and come in site everyday 🙂
Good Luck Guys.



Susanne Besecker

April 10, 2020 at 2:10 pm

What a gargantuan undertaking! As an educator, I thank you. As a citizen in shelter-in-place, I can see you have provided me with a place I can spend many hours carousing through and this will help ease the stress of this scary time. I came in search of books on my "WANT TO READ" list and found quite a few but had no idea you also collected so many other items and was pleasantly surprised. I thank you for your hard work on this and sincerely appreciate the efforts you have made to save so many artifacts of our current and recently past civilization. Even though this site may cause our current chain bookstores some financial hardship, this resource is nothing short of AMAZING! Benjamin Franklin would be so pleased.



**Naturatensi**

April 11, 2020 at 3:20 am

thank you so much for this informative blog I really appreciate. keep it up.



**Trip Kashmir**

April 11, 2020 at 4:00 am

Thanks for sharing such a valuable post, It is need of hour. as all the world is under lock down.



gold

April 11, 2020 at 6:18 am

thank you for the emergency library and everything you guys do



**vigraviton**

April 11, 2020 at 3:12 pm

hey Team Thanks For this, you guys are awesome

A-3632



**Samuel Akanido**
April 11, 2020 at 6:42 pm

I wouldn't be surprised if they're loading it on to say, a Kindle or similar ebook reader and reading it there. I know plenty of people do that with other library borrowed ebooks. On another note I love the library, it has a lot of interesting technology related books.



**thanks**
April 11, 2020 at 10:24 pm

borrowed and returned in 5mins coz need to wanna check the contents, which is inaccessible.



ایران تولا
April 12, 2020 at 5:14 am

I really appreciate the collection you have shared. This will be in the interest of most of people.



**Jay**
April 12, 2020 at 7:04 am

For newcomers, be aware that the Internet Archive is not above censorship on their own site (which is weird for a company that is so big about transparency and information availability). They are also weirdly comfortable developing relationships with amoral, dishonest companies like the people behind Brave (founded by the guy ousted from Mozilla for wanting to violate users privacy, and because of his contributions to bigoted organizations). When considering donations, please consider that you may be supporting a group of people who you may consider bigoted and dishonest — they are certainly willing to develope software with such people, which to me undermines their organizations claim to integrity and dedication to the public good. FYI.



**imran**
April 12, 2020 at 1:49 pm

Special tahnks for the emergency library and everything you guys do



**digitaliveworld**
April 12, 2020 at 1:51 pm

its really amazing thank you for the emergency library



**Dareel Willi**
April 12, 2020 at 1:53 pm

Appricationg on this level of post about National Emergency Library we really need this kind of info



**digitaliveworld**
April 12, 2020 at 1:59 pm

I really amazing info regarding National Emergency you have shared



**Prostamid**
April 12, 2020 at 4:46 pm

Hey, thanks for submitting this article. really



**Ryan**
April 12, 2020 at 6:58 pm

Is there any way for kids to use it without having to register, or to register using their school provided Google accounts? I have a fourth grade teacher who wants to use a book that's in the Emergency Library, but I'm hoping there's a way to get it to them without registering.

 **Topmusics**
April 18, 2020 at 8:12 pm

there any way for kids to use it without having to register, or to register using their
school provided Google accounts? I have a fourth grade teacher who wants to use a

 **köpek maması**
April 12, 2020 at 11:30 pm

Thank you so much

 **jojo**
April 13, 2020 at 4:44 am

It was very useful information. Thanks for sharing it.

 **Aman**
April 13, 2020 at 9:08 am

Hey, It was amazing to go through your post, that was really so useful and informative!

 **Tractor Guru**
April 13, 2020 at 10:52 am

Your content is very good and the posts that you share are also very good. Thank you!

 **Amapiano**
April 13, 2020 at 11:01 am

Thanks for this. The world needs help..

 **Studydriller**
April 13, 2020 at 4:12 pm

Nice one. Very informative article.

 **wptarahcom**
April 13, 2020 at 5:43 pm

I really appreciate the collection you have shared. This will be in the interest of most of
people.I really appreciate the collection you have shared. This will be in the interest of most of
people.

 **wptarahcom**
April 13, 2020 at 5:44 pm

I really appreciate the collection you have shared. This will be in the interest of most of people.

 **wptarah**
April 13, 2020 at 5:47 pm

Internet Archive responds: Why we released the National Emergency

 **boss**
April 13, 2020 at 7:04 pm

really great article happy to read this.

 **Carol Simon Levin**
April 13, 2020 at 8:13 pm

A-3634

"Who needs it?" Everyone! The teacher, whose classroom set of a title is locked up in her class-room… The scholar whose academic library is closed and needs to research a subject that isn't well covered on the web…. The reader who longs to read/re-read an old favorite in this chal-lenging time…. The grandparent who would like to connect with their grandchild by reading a title together… The virtual bookgroup whose members can't each request a copy of the book from a branch of their local library but still want to read and discuss and escape/relate to literature….

I am an author, storyteller, historical researcher and children's librarian and want to say how thrilled I am to see this resource available. As an author, I can understand the concern of au-thors and publishers that they might be losing revenue but I hope most will look at the big pic-ture. The majority of the books in this collection are out-of-print so they are not actually losing sales (and they have the option of removing their books from this site). What this site is actu-ally doing is virtually opening the doors to many of the titles currently locked down in inacces-sible libraries, classrooms, university offices and the like.

In a time of (inter)national emergency when literally billions of students around the world lack access to libraries and many families are losing loved ones or jobs and are worried about rent & food money, this library is a ray of hope making everyone's lives just a little bit easier. And, who knows, it could even expose kids, teens, and adults to authors they might get excited about — making them want to purchase (or ask their library to purchase) a title they love or the next title an author releases!

I have recommended this library to teachers, librarians, families and friends…and I have put my money where my mouth is, uploading my book "Remembering the Ladies: From Patriots in Petticoats to Presidential Candidates" to the library to make it more accessible during this time. If so inclined, people can buy a paper copy (or donate to a voting-rights organization) but the important thing is that people have access.

Thank you National Emergency Library!
Carol Simon Levin http://www.tellingherstories.com

---



**Pinta A.**
April 13, 2020 at 8:31 pm

Can the IA please clarify a point?

[quote]
then the Internet Archive currently lends about as many as a US library that serves a popula-tion of about 30,000.
[/quote]

Sorry, does this mean that the IA lends out books to 30,000 "different" users? Or rather, does it mean that the IA lends out books "proportionate" to a library serving a population of 30,000. What I mean is: a library serving 30,000 people isn't likely to lend books to all of them (I would be surprised to learn that more than 2/3 of the population actually borrowed books).

I apologise if I am being obtuse, but it seems to me that a reader could potentially interpret it either way.

---



**Brewster Kahle** `Post author`
April 14, 2020 at 3:08 am

We mean that the IA lends out books "proportionate" to a library serving a population of 30,000. There is an attempt at an equivalence to how people read online to check-ing out books from a library, so it is a guess, but it is an honest attempt.

---



**Pinta A.**
April 14, 2020 at 5:48 am

[quote]
We mean that the IA lends out books "proportionate" to a library serving a population of 30,000.
[/quote]

Ah, right. Thank you for the clarification.

[quote]
There is an attempt at an equivalence to how people read online to checking out books from a library, so it is a guess, but it is an honest attempt.
[/quote]

And a much appreciated one. I would like to think that I am not the only IA patron who finds these "big picture" blog posts valuable, both for the glimpse behind the scenes they offer and, especially, the opportunity they afford readers to see how they, too, are a part of all this.

Perhaps, with so many people currently isolated, such blog posts might help them to feel a bit less alone. No small thing at a time like this.

There is an attempt at an equivalence to how people read online to checking out books from a library, so it is a guess, but it is an honest attempt.

Pingback: Teachers & the National Emergency Library: Stories from the Frontlines of Online Schooling | Internet Archive Blogs



ایران نوا
April 14, 2020 at 6:53 am

This will be in the interest of most of people



الکترونیک
April 19, 2020 at 6:43 am

God willing, we will all get rid of covid 19 sooner



**QUADRI SULAIMON**
April 15, 2020 at 12:40 pm

I found this wonderful initiative because of the recent furor around closed libraries, so I'm not familiar with the general workings of the lending library. However, if people are borrowing books just to browse and decide if they want to read it, shouldn't this indicate that previews be allowed? Either the first chapter (like Amazon) or select pages (like Google Books).



**Brewster Kahle** `Post author`
April 19, 2020 at 1:02 am

We hoped the preview would slow down borrowing to just peek at the book, and maybe we should change the parameters. you are right.



**QUADRI SULAIMON**
April 16, 2020 at 8:09 pm

very nice post i love it

https://beatspice.co



**SJ Dhyani**
April 18, 2020 at 3:44 pm

Thanks for the initiative. i think it will help most of the students in this critical time.



**Ahangtop**
April 18, 2020 at 8:13 pm

there any way for kids to use it without having to register,



**Brewster Kahle** `Post author`
April 19, 2020 at 1:00 am

Yes, we are working with school districtions now on how to pre-register easily and in bulk. Maybe this would be helpful for you. Please write to info@archive.org



**ايران نوا**
April 19, 2020 at 4:16 am

is that true that number of borrowed books that previously removed were some of them back to normal for the increasing number of borrowed books?



**SJ Dhyani**
April 20, 2020 at 7:49 am

While other critical needs such as health, water and sanitation are being responded to, educational needs cannot be forgotten and these have an equally detrimental impact if left unaddressed. Thanks for the information



**دانلود آهنگ اسماعیل ستوده**
April 20, 2020 at 2:33 pm

to a library serving a population of 30,000. What I mean is: a library serving 30,000 people isn't likely to lend books to all of them (I would be surprised to learn that more than



**دانلود آهنگ اسماعیل ستوده**
April 20, 2020 at 2:35 pm

water and sanitation are being responded to, educational needs cannot be forgotten and these have an equally detrimental impact if left unaddressed. Thanks for the information



**Douglas Keen**
April 20, 2020 at 10:22 pm

We have been using archive.org since 2014 for our son's home-education . In six years we have built a massive electronic library of more than 2,000 of the best books in the English language plus a plethora of educational videos. The archive has played a very, very,very important role in our son's education and we never cease to thank God for Mr. Khale and his excellent library.

Comments are closed.

*Proudly powered by WordPress*

Case 1:20-cv-04160-DGK-OTW Document 961-198 Filed 07/07/22 Page 1 of 9

# McNamara Declaration
# Exhibit 181

# Internet Archive Blogs

*A blog from the team at archive.org*



Blog    Announcements    25th Anniversary    archive.org    About    Events    Developers    Donate

## Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending

Posted on June 10, 2020 by Brewster Kahle



Within a few days of the announcement that libraries, schools and colleges across the nation would be closing due to the COVID-19 global pandemic, we launched the temporary National Emergency Library to provide books to support emergency remote teaching, research activities, independent scholarship, and intellectual stimulation during the closures.

We have heard hundreds of stories from librarians, authors, parents, teachers, and students about how the NEL has filled an important gap during this crisis.

Ben S., a librarian from New Jersey, for example, told us that he used the NEL "to find basic life support manuals needed by frontline medical workers in the academic medical center I work at. Our physical collection was closed due to COVID-19 and the NEL allowed me to still make available needed health informational materials to our hospital patrons." We are proud to aid frontline workers.

Today we are announcing the National Emergency Library will close on June 16th, rather than June 30th, returning to traditional controlled digital lending. We have learned that the vast majority of people use digitized books on the Internet Archive for a very short time. Even with the closure of the NEL, we will be able to serve most patrons through controlled digital lending, in part because of the good work of the non-profit HathiTrust Digital Library. HathiTrust's new Emergency Temporary Access Service features a short-term access model that we plan to follow.

We moved up our schedule because, last Monday, four commercial publishers chose to sue Internet Archive during a global pandemic. However, this lawsuit is not just about the temporary National Emergency Library. The complaint attacks the concept of any library owning and lending digital books, challenging the very idea of what a library is in the digital world. This lawsuit stands in contrast to some academic publishers who initially expressed concerns about the NEL, but ultimately decided to work with us to provide access to people cut off from their physical schools and libraries. We hope that similar cooperation is possible here, and the publishers call off their costly assault.

## Recent Posts

- Building a Better Internet: Internet Archive Convenes DC Workshop
- July Book Talk: The Library: A Fragile History
- Save our Safe Harbor, continued: Internet Archive Supports Libraries and Nonprofits in Submission to the Copyright Office
- June Book Talk: The Catalogue of Shipwrecked Books
- GITCOIN Grants: Donate a Few Tokens, Defend a Public Treasure

## Recent Comments

- Superman on July Book Talk: The Library: A Fragile History
- aho on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Superman on Building a Better Internet: Internet Archive Convenes DC Workshop
- Patrick Winn on Building a Better Internet: Internet Archive Convenes DC Workshop

## Categories

- 78rpm
- Announcements
- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News

Controlled digital lending is how many libraries have been providing access to digitized books for nine years. Controlled digital lending is a legal framework, developed by copyright experts, where one reader at a time can read a digitized copy of a legally owned library book. The digitized book is protected by the same digital protections that publishers use for the digital offerings on their own sites. Many libraries, including the Internet Archive, have adopted this system since 2011 to leverage their investments in older print books in an increasingly digital world.

We are now all Internet-bound and flooded with misinformation and disinformation—to fight these we all need access to books more than ever. To get there we need collaboration between libraries, authors, booksellers, and publishers.

Let's build a digital system that works.

Posted in Announcements, News | Tagged CDL, NEL | 51 Replies

← Four commercial publishers filed a complaint about the Internet Archive's lending of digitized books

Impacts of the temporary National Emergency Library and controlled digital lending →

**51 thoughts on "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending"**

Pingback: Temporary National Emergency Library to Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending | LJ infoDOCKET


**Whitney B**
June 10, 2020 at 5:37 pm

HathiTrust's model is based on library's owning a copy of the resource. Since IA doesn't have record of what library's own, could you please clarify exactly how your short-term model will work after June 16th? Thank you!

Pingback: Internet Archive: Temporary National Emergency Library to close 2 weeks early – RightsTech Project


Adam
June 10, 2020 at 7:26 pm

Phew. I was worried that copyright holders could be merciless.


**Mark Bilby**
June 10, 2020 at 8:36 pm

Related blog posts in support of the NEL and CDL:
https://calschol.com/2020/06/08/claremont-school-of-theology-donates-250000-books-to-the-open-library/
https://calschol.com/2020/06/02/a-second-call-to-solidarity-with-the-national-emergency-library-time-for-a-boycott/
https://calschol.com/2020/05/06/in-defense-of-the-national-emergency-library-a-call-to-library-solidarity-and-partnership-with-the-internet-archive/


**Mark Bilby**
June 10, 2020 at 8:41 pm

Related blog posts in support of the NEL and CDL:
https://calschol.com/2020/06/08/claremont-school-of-theology-donates-250000-books-to-the-open-library/
https://calschol.com/2020/06/02/a-second-call-to-solidarity-with-the-national-emergency-library-time-for-a-boycott/
https://calschol.com/2020/05/06/in-defense-of-the-national-emergency-library-a-call-to-library-solidarity-and-partnership-with-the-internet-archive/

- Newsletter
- Open Library
- Past Event
- Software Archive
- Television Archive
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

**Archives**

Select Month

**Meta**

- Log in
- Entries feed
- Comments feed
- WordPress.org

Pingback: [Activists rally to save Internet Archive as lawsuit threatens site | Bitcoin news and cryptocurrency news aggregator.](#)



**wall-street**
June 10, 2020 at 11:11 pm

WOW! A million as gift? The bitcoin guy is insanely helpful.

Pingback: [Activists rally to save Internet Archive as lawsuit threatens site - KogoCrypto](#)

Pingback: [Activists rally to save Internet Archive as lawsuit threatens site - Geezwild](#)



Frances Grimble
June 11, 2020 at 5:22 am

And, um, don't traditional libraries actually "pay" to lend copyrighted books as e-books? Instead of scanning without paying or getting permission?



**Brewster Kahle** `Post author`
June 11, 2020 at 5:39 am

Try reading about Controlled Digital Lending– it is an interesting and useful path forward– a path with many winners.

[https://controlleddigitallending.org/](#)



**Edward Hasbrouck**
June 11, 2020 at 7:03 pm

Dear Brewster:

We have read what you *say* about "Controlled Digital Lending". We've also looked at what you and the Internet Archive actually *do*, and what you have publicly demonstrated, the heart of which is the unencrypted, uncontrolled "One Web Page for Every Page of Every Book", which has none of the purported "controls" described as part of CDL:

[https://nwu.org/what-is-the-internet-archive-doing-with-our-books/](#)

You say that the lawsuit by publishers "attacks the concept of any library owning and lending digital books". But that's not true. The lawsuit attacks the idea of making digital copies (first digital images of pages of printed books, then derivative e-books and audio files, then an additional copy for each reader or listener) without permission. "Lending " does not involve making copies, and is not implicated by this lawsuit or authors' objections to what your unauthorized copying.

Most rights to digital copying of works included in printed books, especially out-of-print books, are either held by authors (not publishers), or can be reverted from print publishers to authors on authors' request (although that process is much more difficult than it should be, and authors would welcome your support for reform of the reversion provisions of the Copyright Act).

If you don't like the terms offered by former print publishers of past print editions of books in which those works were included, and the rights to the digital copying you want to do are held (or could be) by authors, why keep complaining to print publishers rather than trying to work with authors?

You say that, "To get there we need collaboration between libraries, authors, booksellers, and publishers." But you chose to embark on "One Web Page for Every Page of Every Book" and your other projects for making and distributing unauthorized copies of our work without any collaboration with authors.

Authors have accompanied our critique of what the Internet Archive is doing with our works, and our call for dialogue, with a variety of specific proposals, including these:

https://nwu.org/book-division/cdl/faq/#faq40

We've also asked the Internet Archive specific questions about what the Internet Archive is doing to help us understand and assess how we might collaborate. But we've gotten no response to any of those proposals or questions. The unwillingness to collaborate has been entirely on the part of the Internet Archive. If you are now willing to work with us, that's good news, and we look forward to receiving your initial responses to the proposals we have made and the initial clarifying questions we have asked.

If you want to "build a digital system that works", you will need to start talking to authors about how to build a platform through which (A) authors can provide pointers to existing digital version of these works, and/or author contact info for those who want to license republication or other copying, and (B) authors who want to do so can offer to license the rights you want, with some menu of options for terms and prices. There are many details to work out, to make sure that the platform helps libraries and accommodates and doesn't interfere with the diversity of authors' existing business models. But negotiation between the Internet Archive, libraries, and authors is the only way to get what you want.

Yours in hope for genuine dialogue,

Edward Hasbrouck
(Co-Chair, Book Division, National Writers Union)

---

 ایران نوا
June 11, 2020 at 7:06 am

I was worried that copyright holders could be merciless.

---

 **рмdci**
June 11, 2020 at 8:08 am

Giving up a little is a great concept — except when the charity is made with other people's property.

I never had any love for those publishing houses, but Internet Archive has no right to give away what isn't theirs to give away.

I DO think that copyright laws require some revision, but Internet Archive is always a step too far.

---

 پارسی موزیک
June 11, 2020 at 9:26 am

In my opinion, the old libraries They have to pay a fee As a loan to e-books
As someone who has read a lot of books, I've always been a fan of e-books

---

 **Don**
June 11, 2020 at 2:47 pm

The best thing about IA is that it does not discriminate non-US citizens.

Hathitrust restricted books are only available via US-library or educational access.
https://www.hathitrust.org/etas-approved-libraries

Project Gutenberg has blocked Germany from viewing the Gutenberg web site.

IA is in fact the largest library that can be accessed from all over the world, exactly what the world needs.

---

 **Nemo**
June 12, 2020 at 6:44 am

And exactly what publishers don't want, because they believe that copyright is a right to infinite market segmentation to maximise profits and reduce the general welfare as much as possible, as made clear in the text of their complaint. Too bad such a right is nowhere to be seen in any country's constitution.



**Michael Capobianco**
June 11, 2020 at 8:15 pm

There are many problems with that statement, but the fact is that the IA has never practiced Controlled Digital Lending and only uses that white paper as a distraction for what is really been doing, even before the "National Emergency Library". https://nwu.org/what-is-the-internet-archive-doing-with-our-books/ Would CDL as defined in Brewster Kahle's link be okay with authors? That's a question for another time because it's not what they are doing, but one of the first things they should recognize is that not all books are the same, that there's no one size fits all model, and that authors have to be consulted with and believed about how their businesses are being hurt.



**plz**
June 11, 2020 at 9:31 pm

Please don't die archive.org dying would kill me



**Andy Spencer**
June 11, 2020 at 9:59 pm

Having looked at the search result for the latest offered english language titles at the Temporary National Emergency Library, which are from 2013, I would like to see the publishers demonstrate their commercial damages for these offered books.

In the first place I don't think the majority of these books are still for sale by the publishers. And judging from the titles and themes they will likely never be published again.

And in the second place I don't think any of these books still offered had any significant sales in 2020 leading up to the Corona crisis. The publishers should show sale figures for each of these titles for the two or three months preceding the Temporary National Emergency Library to substantiate their grievance.



**Rafael**
June 11, 2020 at 11:30 pm

A new york times article led me to Archive.org, and when I signed up I thought this is too good to be true. The majority of the books I've checked out are hard to find and not available at my local library. When I read a couple about the dissatisfied publishers and authors complaining about copyright infringement about a month ago, I knew it was only a matter of time before the corporate world would interfere with archive.org's benevolence.

The daily journal printed an article recently about the filed lawsuit and I was waiting to what the next step is. I sadden to hear that the digital libraries existence is being challenged.

I'll keep a vigilant eye and band with my fellow archive.org members in solidarity.



**Roland**
June 12, 2020 at 12:35 am

I've benefitted from the digital lending.

When I decided to try programming in Visual Basic for MS DOS, there were no online resources. The program was relevant for a short period of time and became quickly obsolete before the rise of the internet.

But lo and behold the internet archive had a how-to book that I could borrow. It was such a valuable resource. One I think my local library would not have had.

Page 6
Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending - Internet Archive Blogs
https://blog.archive.org/2020/06/10/temporary-national-emergency-library-to-close-2-weeks-early-returning-to-traditional-controlled-digital-lending/

The one-at-a-time borrowing is fair, and I hope they drop the lawsuit. Or that if they don't, you fight it and help set a precedent.

What it's the point of preserving these texts if you can't share them with those who want to read them?



**Goldwater Cheng**
June 12, 2020 at 3:59 am

The Internet Archive has done the world an enormous favor by digitizing books, especially old, out-of-print books and making them accessible worldwide. As an avid reader living in Thailand (and traveling around Asia prior to COVID-19), I'm ever so grateful for its service.

The publishers' actions are denying readers around the globe access to printed books – books not digitized nor sold outside the USA. There would be no means of buying and having them shipped during a pandemic lockdown, when countries had sealed up borders and suspended international flights. I was beyond ecstatic when I found books I needed – digitized and available for loan – at the Open Library!

Those publishers who value profit more than universal and timeless access should also know that a vast number of their books simply aren't purchasable on Kindle or Google or Apple stores because they are not digitized. Driving Internet Archive into bankruptcy – for the sake of a few more dollars – helps ensure their respective name goes down poorly in posterity. Their actions against a visionary, historic effort deserve boycotts for generations to come. The writers who join them, however lofty their works yet distastefully penny wise – are no exception. I've decided not to buy or read their books from now.

And I would wholeheartedly join any petition to sustain and support the Internet Archive and Open Library. The COVID-infiltrated world now needs it more than ever before.



**Melissa Finn**
June 12, 2020 at 4:36 am

The NEL saved me and my research project at a critical time when my city's multiple university libraries shutdown and materials weren't available as e-books on any other archive that I could access. I am indebted to the NEL in providing the public with access to these materials during the Covid-19 shutdown. Thank you.

Pingback: Internet Archive Calls For End to Publishers' Lawsuit, Announces Early Closure of Emergency Library * TorrentFreak


**icreate**
June 12, 2020 at 10:57 am

We are now all Internet-bound and flooded with misinformation and disinformation—to fight these we all need access to books more than ever. To get there we need collaboration between libraries, authors, booksellers, and publishers.

That's true!!



**LeGrange**
June 12, 2020 at 3:52 pm

What worries me, and it worries a lot of us, is that you may have bet the company without any need or any compensating reward worth the risk. And that, regardless of your early cessation of the provocation, you may lose, and IA will be lost.

You had no need to take such a huge risk.



**Charles Smyth**
June 12, 2020 at 7:06 pm

Publishers are not flush with profits, so not unreasonably, look to get whatever returns are available. Many books are no longer in print, or are only available from a variety of commercial sources, and for which, the publisher and the author receive zero payment. The problem is that, due to technology, a traditional model is no longer viable for publishers and authors to

depend upon.



**Mitchell Golden**

June 12, 2020 at 10:10 pm

Can you tell me if the publishers sent a cease and desist letter before suing? Did it just come out of the blue?



**Kenneth Shartz**

June 13, 2020 at 5:58 am

Does traditional controlled digital lending mean that we will still be able to access this collection, as long as someone else is not currently reading a book we want to read?



طراحی وب سایت

June 13, 2020 at 11:16 am

Thanks for the info
Books are very valuable and instructive



ایران نوا

June 13, 2020 at 11:33 am

HathiTrust's model is based on library's owning a copy of the resource. Since IA doesn't have record of what library's own, could you please clarify exactly how your short-term model will work after June 16th? Thank you!



**Stacy**

June 13, 2020 at 5:01 pm

The NEL was a lifeline during school and library closures this spring. Thank you for your hard work.



**Sheila Page**

June 14, 2020 at 10:50 am

It might be useful to tell your users about this, and not leave them to find out from NYT, etc. I have had nothing from you.



**Sam**

June 14, 2020 at 8:11 pm

Instead of demanding payment per book would a subscription model work where the Internet Archive pays the publishers an annual free and can then lend their books?

I suppose the costs would be prohibitive.

The internet archive falling would be tragic.



**JP**

June 15, 2020 at 6:18 am

I love the fact that IA is non-discriminatory, that it is open to all and doesn't differentiate between citizens of the US and the world. What the NEL was doing was something great and am sorry to hear that it is closing 2 weeks earlier than planned. When people are suffering and dying through out the world, it seems mean that the publishers are worried about their profits. And these are not small, indie publishers but publishing giants whose business wasn't going to fold up in a matter of months. Sad.

Pingback: The Internet Archive has ended its 'emergency library' early – Your Corner Enterprise

Pingback: The Internet Archive has ended its 'emergency library' early - Inquirio News

A-3645

Pingback: The Internet Archive has ended its 'emergency library' early - Techlawyer Blog

Pingback: The Internet Archive has ended its 'emergency library' early – Abdouls Corner Market

Pingback: Internet Archive Will End Its Program for Free E-Books | Core Alpha

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal? - Get Tech News

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal? – EveryNON

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal? - TOP NEWS PLUS

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal? - WWZTV

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal? : The Gray Wolf

Pingback: Is Web Archive's unrestricted lending of 1.four million books authorized? : The Gray Wolf

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal? - Know 24 News

Pingback: Is Internet Archive's unrestricted lending of 1.4 million books legal?

Pingback: Is Internet Archive's unrestricted lending of 1.4 million… - Book Publishing

Comments are closed.

Proudly powered by WordPress

McNamara Declaration

Exhibit 182

| From: | Mike Furlough |
|---|---|
| Sent: | Friday, September 4, 2020 6:14 PM EDT |
| To: | Chris Freeland |
| Subject: | Re: October event |

Chris,

I've been thinking a lot about this, hence my long delay.

I do want to be supportive of IA because I think our interests and mission are aligned, in spite of what some have suggested in the past.  I also believe it's in  everyone's interest if the publishers suit went away.  It poses a real danger not just to what is being defined as controlled digital lending but fair use in general, and to the degree this gets set up in court as an argument over what a "real" library is -- that's very risky for you, for us, and many others.  We don't need that adjudicated in court or regulated through statute.

That said--I don't think it's a good idea for me to take part in this, but I have an idea to suggest. First let me explain my thinking.

I know that this session will need to be positioned as part of the public campaign y'all are pursuing right now, e.g., the lawsuit is a threat against all libraries to take away a fundamental right to lend.  I think it is still possible that we could get yanked into a suit--yours or a new one-- if the publishers wanted to do it.  I'm not as worried about this now as I was earlier in the summer, but who knows.  But I've been thinking about what I would say about ETA.  If I am asked to define the difference between what we have done and what you have done and are now doing, I will end up pointing out that we have put a good many more *controls* on the service than you did for NEL or for ongoing lending.  Ultimately if you want to talk about different models of providing access to copyrighted works, we're going to end up talking about a risk analysis.   I may have to end up directly contrasting some things, which would implicitly suggest a criticism of your approach.  And we made some very different decisions -- when we did our legal analysis it pointed us in directions that are quite different from those you have taken. And we did not feel that the methods you were employing were ones *we* could defend.  We didn't think we could rely on the same legal theories that you were relying on.  I'd rather keep all that to ourselves and not be quoted or paraphrased as suggesting that your actions are NOT defensible, especially at your own party.

We have our own members meeting coming up within a week of the Leaders Forum.  But I wonder if, after the month of October, we could work with a third group (SPARC?  CNI? Other?) to hold a session that was focused more on the policy environment that can ensure access and less on detailing variations on digital lending.   That may be less interesting to you, but that policy environment could/should include more clearly delineated copyright exceptions for libraries to provide digital access to copyrighted works. I don't have his super well thought out, but let me know what you think about this.

Sorry to be cagey, and also to leave this to a written email on the eve of a week I'll be "out of the office."   But I will be glad to talk in a week or so if you wish.

**CONFIDENTIAL**

INTARC00448939

mike

On Thu, Aug 20, 2020 at 10:57 AM Chris Freeland <█████████@archive.org> wrote:
Mike - I watched the HathiTrust webinar last week (2 weeks ago? time has no meaning, as I've taken to saying, "every day is Tuesday "). Great job and great engagement during & after the session. We included it in our weekly digital library newsletter and it was the top story that users clicked on, even over our lead story with banner image. It's amazing how effective webinars & virtual events have become in our new distributed library environment...

...which brings me to the topic at hand. We host our annual Library Leaders Forum in October, which has traditionally been an in-person event in San Francisco, scheduled alongside our annual Internet Archive celebration and evening party. That, of course, is all cancelled this year. Instead, we're planning a 3 week virtual event with interactive sessions on October 6, 13 & 20. Our working title for the event is "Digital Lending in a Pandemic" and each session will be focused on a theme of Policy, Community, Impact. For the Community session, tentatively planned for 10am-12pm PDT Oct 13, we are wanting to have a panel conversation with the digital libraries and implementors that are mobilizing new services - your ETAS, Project ReShare's CDLI community, and our own Open Libraries.

I understand from our previous conversations that you have a fully justified and understandable reason for being deliberate in what conversations you join. I would love to find a way to craft a session description & scope that would make Hathi feel comfortable in participating. Is that even in the realm of possibility? Happy to chat in person, wanted to write it out and pass to you for asynchronous consideration.

Hope you are well,

Chris


--
Chris Freeland
Director of Open Libraries
Internet Archive
████████████@archive.org
@chrisfreeland
███████████2


--
Mike Furlough
Executive Director
HathiTrust Digital Library

CONFIDENTIAL

INTARC00448940

CONFIDENTIAL

INTARC00448941

# McNamara Declaration
# Exhibit 183

| From: | Dye, Skip on behalf of Dye, Skip ███ @penguinrandomhouse.com> |
|-------|---------------------------------------------------------------|
| To: | Shodin, Stephen |
| Sent: | 4/9/2020 2:42:07 PM |
| Subject: | did you see this.... |

### Influential Senator Tells Internet Archive They Are Acting Outside of the Law

Reaffirming that no serious or informed person believes the Internet Archive's self-proclaimed "National Emergency Library" is legal, the chair of the Senate Judiciary Committee's subcommittee on intellectual property, Senator Thom Tillis of North Carolina, sent a letter to IA founder Brewster Kahle.

"I am not aware of any measure under copyright law that permits a user of copyrighted works to unilaterally create an emergency act," Tillis writes. "Indeed, I am deeply concerned that your 'Library' is operating outside of the boundaries of the copyright law that Congress has enacted and alone has jurisdiction to amend." Tillis notes, "I deeply value access to copyright works, but that access must be provided within the bounds of the law--even during a national emergency."

Needless to say, the Federal Courts have consistently endorsed the same position. As Judge Denny Chin reminded us when he rejected the Google Book Settlement in 2011 (a scheme which the Internet Archive objected to), "the Supreme Court has held that 'it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." [*Eldred v. Ashcroft*, 2003] Similarly, in *Sony v. Universal City Studios*, 1984, the Supreme Court reaffirmed it is "Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors or to inventors in order to give the public appropriate access to their work product." The Court also said in that ruling, "Repeatedly, as new developments have occurred in this country, it has been the Congress that has fashioned new rules that new technology made necessary."

And the Copyright Act itself speaks to the Internet Archive's current mischief as well: "When an individual author's ownership of a copyright, or any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under the copyright, shall be given effect under this title, except as provided under title 11."

Meanwhile, for an example of what a more appropriate "emergency" library provision looks like, have a look at the "emergency temporary access" service from the **HathiTrust**. It carries many limitations, starting with only "students, faculty, and staff as designated by the affected institution. Most particularly, it maintains access ratios in proportion to the number of physical copies already owned by a given library that are temporarily inaccessible: "Access to items is 1-1; 1 copy on the member library shelf, 1 individual access to the digital copy; 2 copies, 2 concurrent users of the digital item."

## Skip Dye

SVP, Library Sales and Digital Strategy
SVP, Sales Operations
**Penguin Random House**
1745 Broadway
NY, NY 10019
████

Confidential

PRH0070363

McNamara Declaration

Exhibit 184



Home   About ▾   Collections   Help   Feedback

LOG IN

Search words about or within the items   All Fields ▾   🔍 Search HathiTrust

◉ Full-text   ○ Catalog   ☑ Full view only

Advanced full-text search   Advanced catalog search   Search tips

Our Membership   Our Digital Library   Our Collaborative Programs   Our Research Center   Help
HathiTrust Digital Library   Welcome to HathiTrust!

Search website   Find

About › Our Digital Library › Emergency Temporary Access Service

## Emergency Temporary Access Service

Overview
Main Features
Library and Patron Eligibility
Item Access
Summary Service Terms
Information for Members
Information for Users
Approved Libraries
ETAS Continuation/Deactivation Information
More information

### Overview

The Emergency Temporary Access Service permits special access for HathiTrust member libraries that suffer an *unexpected* or *involuntary, temporary disruption* to normal operations, such as closure for a public health emergency, requiring the library to be closed to its patrons, or otherwise restrict print collection access services.

The service makes it possible for member library patrons to obtain lawful access to specific digital materials in HathiTrust that correspond to physical books held by their own library. The Emergency Temporary Access Service will enable many HathiTrust member libraries to continue supporting the teaching, learning, and research mission of their institutions during said disruption in service.

### Main Features

For qualifying libraries that have implemented the service, the Students, Faculty, and Staff at their library may take advantage of the expanded access for a limited time depending on the operational status of their library. They will have:

- **Continued access to the scholarly record of print collections** held by their home institution with a digitized copy in HathiTrust.

- **Reading access to the book online, within a web browser.**

- **Ability to "check out" a copy for a limited period of time** with an auto-renew feature for books still in use. Access to items is 1-1; 1 copy on the member library shelf, 1 individual access to the digital copy; 2 copies, 2 concurrent users of the digital item.

- **Support for using the service** through the HathiTrust User Support Team at feedback@issues.hathitrust.org.

### Library and Patron Eligibility

- The service is currently available by request to all HathiTrust member libraries that have experienced *unexpected* or *involuntary, temporary* disruption to normal operations, requiring it to be closed to the public, or otherwise restrict collection access services.

- Only the Students, Faculty, and Staff as designated by the affected institution are permitted access to eligible items when logged-in to HathiTrust.

- Specific terms apply for multi-branch libraries and state systems. See the complete Terms of Service.

Current list of approved libraries

### Item Access

Through the Emergency Temporary Access Service, users may access a digitized copy in HathiTrust that matches an item held in their institution's library. The data used to determine which items match derives from print holdings data that libraries submit as part of the library's membership process. Updates to this data are submitted periodically. Users will not have access to items that are not held by their member library. Users will continue to have access to the millions of items that are in the public domain or that are open with a Creative Commons license.

### Summary Service Terms

Services will be provided at HathiTrust's sole discretion, based on a fair use analysis and an implementation to ensure lawful access under copyright law.  Before HathiTrust can implement Emergency Temporary Access Services, HathiTrust will evaluate a Library's request to determine whether the situation qualifies. Factors to be taken into account include whether the institution can accurately identify students, faculty and staff during HathiTrust's login process, and whether HathiTrust has sufficient information to identify the Library's collection. HathiTrust and member libraries using this temporary service will abide by guiding principles and agree to Terms of Service, though no formal signature is required.

Read complete Terms of Service.

**For Member Libraries: Get started and find help**

Information for Members: Requesting ETAS & Support Materials

Emergency Temporary Access Services must be requested by the affected member library. Once HathiTrust has evaluated the request and verified that the emergency situation qualifies, then HathiTrust Digital Library systems will be updated to enable the emergency access for your library. ETAS is a temporary service. Emergency access will end when regular access to the library's physical collection is restored.

**Our Digital Library**

- Digital Collection Principles
- Emergency Temporary Access Service
  - ETAS Terms of Service
  - ETAS: Information for Members
  - ETAS Approved Libraries
  - ETAS: Information for Users
- Searching, Reading, Building Collections, and Accessibility
- Technology, Standards, and Specifications
- Getting Content Into HathiTrust
- HathiTrust Metadata Management System
- Data Availability and APIs
- Policies
- Statistics and Visualizations
- HathiTrust Personas

**For Library Users: Get started and find help**

Information for Users: Accessing Items via ETAS

If your library has enabled the Emergency Temporary Access Service through HathiTrust, click on the link above for instructions on how to discover and read copyrighted books from your library's own collection.

Not sure if your library has enabled it? Check this list of HathiTrust members who currently have access to this service: https://www.hathitrust.org/etas-approved-libraries

**More information**

FAQ— For Member Libraries
FAQ — For Users
Approved Libraries
Terms of Service
HathiTrust Response to COVID-19

Printer-friendly version

Home   About   Collections   Help   Feedback   Accessibility   Take-Down Policy   Privacy   Contact

# McNamara Declaration
# Exhibit 185



Google

toni morrison beloved free read

All | Shopping | Images | News | Videos | More | Tools

About 3,560,000 results (0.57 seconds)

https://www.oasisacademysouthbank.org › Curriculum PDF

**Beloved_by_Toni_Morrison.pdf - Oasis Academy South Bank**

Acclaim for **Toni Morrison's Beloved** ... it slapped me: I was happy, **free** in a way I had never been, ever. ... You got ten minutes I'll do it for **free**.
256 pages

https://www.yumpu.com › document › view › toni-mor...

**Toni Morrison - Beloved (gnv64).pdf - ymerleksi - home - Yumpu**

**Toni Morrison - Beloved** (gnv64).pdf - ymerleksi - home. **READ**. Sixty million and moreI will call them my people, which were not my people;and her **beloved**, ...

https://docs.google.com › file › view

**Toni Morrison - Beloved (gnv64).pdf - Google Drive**

**Toni Morrison - Beloved** (gnv64).pdf - Google Drive ...

https://www.matermiddlehigh.org › auto › 2012/11/16

**Beloved by Toni Morrison - Mater Academy Charter Middle ...**

No information is available for this page.
Learn why
156 pages

https://www.bookbrowse.com › excerpts › book_number

**Read free excerpt of Beloved by Toni Morrison - BookBrowse**

A poignant, magical book about the hurt that can run through a family and the moments that offer us the rare chance to start again. ... A lucid and moving debut ...

https://www.bayaprobooks.com › Banned Books

**Beloved (Vintage International) PDF Book Free Download**

**Tony Morrison** is an American writer, essayist, college professor, editor, and novelist. Her famous novel is **Beloved** (Vintage International).

https://archive.org › details › beloved0000morr

**Beloved : Morrison, Toni, author : Free Download, Borrow, and ...**

Feb 25, 2021 — ... and its aftermath is **Toni Morrison's** greatest novel, a dazzling achievement, and the most spellbinding **reading** experience of the decade.

https://archive.org › details › belovednovel00morr

**Beloved : a novel : Morrison, Toni : Free Download, Borrow ...**

Jan 5, 2010 — A brutally powerful, mesmerizing story ... **read** it and tremble. At the center of **Toni Morrison's** fifth novel, which earned her the 1988 ...

http://lovefreenovels.com › Romance › page

**Beloved (Toni Morrison Trilogy #1) - Written By - Reading free ...**

**Beloved** (**Toni Morrison** Trilogy #1)Online **read**: **Beloved** (**Toni Morrison** Trilogy #1) Corinne Michaels To my husband, my anchor, my **beloved**.

https://openlibrary.org › works › Beloved

**Beloved (1998 edition) | Open Library**

Mar 2, 2022 — **Beloved** by **Toni Morrison**, **Toni Morrison**, unknown edition, ... 4.10 ·; 10 Ratings; 106 Want to **read**; 4 Currently **reading**; 14 Have **read**.

Case 1:20-cv-04160-JGK-OTW Document 96-207 Filed 07/07/22 Page 2 of 6

Rating: 4.1 · 10 reviews

## Related searches ⋮

| | |
|---|---|
| beloved toni morrison **full text** | toni morrison beloved **sparknotes** |
| beloved **pdf part 1** | **how many pages in** beloved **by** toni morrison |
| beloved **by** toni morrison **summary pdf** | beloved **summary** |
| beloved **pdf part 2** | beloved **(novel)** |

*In response to a complaint we received under the US Digital Millennium Copyright Act, we have removed 1 result(s) from this page. If you wish, you may read the DMCA complaint that caused the removal(s) at LumenDatabase.org.*

1 2 3 4 5 6 7 8 9 10     Next

**Central Park West Historic District, New York, NY -** Based on your places (Home) **-** Update location

Help     Send feedback     Privacy     Terms

A-3658



About 965,000,000 results (0.42 seconds)

This search may be relevant to recent activity:       Your Search activity    Feedback

free ebooks *library*

https://www.free-ebooks.net ⋮

### Free-eBooks.net | Download free Fiction, Health, Romance ...

**Free-eBooks**.net is the internet's #1 source for **free eBook** downloads, eBook resources & eBook authors. Read & download eBooks for Free: anytime!

Login · Not a member? Sign up here · Join FREE · Browse all eBooks

https://www.gutenberg.org ⋮

### Project Gutenberg: Free eBooks

Project Gutenberg is a library of over 60,000 **free eBooks**. Choose among free epub and Kindle eBooks, download them or read them online.

Search and Browse · Top 100 · Feeds of new eBooks · About

### People also ask ⋮

Where can I get an ebook for free?

What is the best website for free ebooks?

Is there a free ebook library?

Feedback

https://www.bookbub.com › ebook-deals › free-ebooks ⋮

### Free Ebooks - BookBub

| Plucking One String | Club Shadowlands | Sign Off | Vengeance |
| The Lost Art of Reverie | Deliver Me | Cliffhanger | Dirty Billionaire |
| Evidence of Trust | Possession | Burned | The Way Home |

https://reedsy.com › discovery › blog › free-ebooks ⋮

### The 25 Best Places to Find Free Ebooks in 2022 - Reedsy

Apr 1, 2021 — The 25 Best Places to Find **Free Ebooks** in 2022 · 1. Amazon Kindle Store · 2.

Apple Book Store · 3. Google Play Bookstore · 4. Barnes & Noble Online.

https://www.openculture.com › free_ebooks ⋮

### 800 Free eBooks for iPad, Kindle & Other Devices - Open ...

This collection features 800 **free eBooks**, mostly classics, that you can read on your computer, Kindle, iPad or smart phone. It includes great works of ...

https://manybooks.net ⋮

### Manybooks: 50000+ Free eBooks in the Genres you Love

Great selection of modern and classic books waiting to be discovered. All **free** and available in most ereader formats.

https://www.mashable.com › Life › Digital Culture ⋮

### 12 places to find the best free e-books for thrifty bookworms

Jul 14, 2021 — 1. Google eBookstore · 2. Project Gutenberg · 3. Open Library · 4. Internet Archive · 5. BookBoon · 6. ManyBooks.net · 7. **Free Ebooks** · 8. LibriVox.

https://www.google.com/search?q=free+ebooks&rlz=1C1GCEB_enUS917US917&sxsrf=ALiCzsYh2SAJzkvq63IwCsLcZOtcLI0ZoQ%3A16545445008…       1/3

https://www.weareteachers.com › download-free-ebooks ⋮

### 25 Ways Kids Can Read Free eBooks - WeAreTeachers

Mar 10, 2021 — Wondering **Where to Download Free eBooks**? This list provides 25 resources that
are great for teachers, parents, and distance learning.

https://openlibrary.org ⋮

### Welcome to Open Library | Open Library

... editable library catalog, building towards a web page for every book ever published. Read,
borrow, and discover more than 3M books for **free**.
You've visited this page many times. Last visit: 10/15/21

https://www.ebooks.com › en-us › free ⋮

### Free eBooks

Results 1 - 10 of 397 — **Free ebooks** from eBooks.com. A selection of our top-selling, ageless
classics. The wisdom of ages is here.

Ad · https://www.scribd.com/ ⋮

### The Largest Digital Library - Try Us Free for 14 Days

Access millions of **ebooks**, audiobooks, magazines, and more. Plus **free** premium services. The
best books and audiobooks are waiting for you on Scribd. Try it now, **free**.
Scribd's Book List · Fiction Ebooks · Explore Audiobooks · Scribd Originals · About Scribd

## Related searches ⋮

Where to download new books for free                                          ⌃



Project        Open Library      Manybooks         Bookboon        LibriVox
Gutenberg

→        See more

What to read online                                                           ⌄

Free books app                                                                ⌄

Book reading services                                                         ⌄

Feedback

free ebooks **pdf**                          **where to download** free ebooks
                                             **illegal**

ebooks free **download**                     free ebooks **for kindle**

free ebooks **reddit**                       **project gutenberg**

free ebooks **net**                          free ebooks **for students**

1 2 3 4 5 6 7 8 9 10        Next

A-3660

**Central Park West Historic District, New York, NY** - Based on your places (Home) - Update location

Help    Send feedback    Privacy    Terms

A-3661

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**DEFENDANT INTERNET ARCHIVE'S NOTICE OF**
**MOTION FOR SUMMARY JUDGMENT**

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

PLEASE TAKE NOTICE that upon the accompanying Memorandum of Law in Support of Defendant Internet Archive's Motion for Summary Judgment; Defendant Internet Archive's Statement of Undisputed Material Facts Pursuant to L.R. 56.1; Declaration of Joseph Gratz in Support of Defendant's Motion for Summary Judgment, with exhibits; Declaration of Brewster Kahle in Support of Defendant's Motion for Summary Judgment, with exhibits; Declaration of Dr. Imke Reimers in Support of Defendant's Motion for Summary Judgment, with exhibits; Declaration of Dr. Rasmus Jørgensen in Support of Defendant's Motion for Summary Judgment, with exhibits; Declaration of Susan Hildreth in Support of Defendant's Motion for Summary Judgment, with exhibits; Declaration of Laura Gibbs; Declaration of Benjamin Saracco; Declaration of Lauren Sherman; Declaration of Daniel Smith; and all prior pleadings, orders, and proceedings herein, Defendant Internet Archive, by its attorneys, hereby moves this Court for an order pursuant to Rule 56 of the Federal Rules of Civil Procedure granting its motion for summary judgment with respect to all claims in this matter.

PLEASE TAKE FURTHER NOTICE that, pursuant to the scheduling ordered entered by this Court on January 21, 2022 (ECF No. 70), opposing papers, if any, must be served upon the undersigned on or before September 2, 2022; and reply papers, if any, must be served on or before October 7, 2021. Any oral argument will occur on a date and at a time designated by the Court.

Dated: July 7, 2022                     DURIE TANGRI LLP

                                        By: _____/s/ Joseph C. Gratz_____
                                            Joseph C. Gratz (*Pro Hac Vice*)
                                            Jessica E. Lanier (*Pro Hac Vice*)
                                            Aditya V. Kamdar (*Pro Hac Vice*)
                                            Annie A. Lee (*Pro Hac Vice*)

217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

2

**CERTIFICATE OF SERVICE**

   I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

               */s/ Joseph C. Gratz*
               JOSEPH C. GRATZ

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

*REDACTED* **DEFENDANT INTERNET ARCHIVE'S RULE 56.1 STATEMENT**
**OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

Defendant Internet Archive respectfully submits this statement of material facts under Local Rule 56.1 in support of its motion for summary judgment.

1.      The Internet Archive is a 501(c)(3) public charity.  Declaration of Joseph C. Gratz submitted herewith ("Gratz Decl.") Ex. A (Stipulation of Undisputed Facts ("Stipulation")).

2.      The guiding mission of the Internet Archive is to provide universal access to all knowledge.  Declaration of Brewster Kahle submitted herewith ("Kahle Decl.") ¶ 4.

3.      In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.  *Id.* ¶ 5.

4.      The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals.  *Id.* ¶ 6.

5.      One of the Internet Archive's first projects was to archive every public webpage on the fledgling World Wide Web.  Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine.  The Wayback Machine has become a crucial database for journalists, researchers, lawyers, and courts.  *Id.* ¶ 7.

6.      The Internet Archive works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.  *Id.* ¶ 8.

7.      The Internet Archive has been a member of the American Library Association since 2000.  The Internet Archive is also an affiliate member of the Boston Library Consortium, and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks.  *Id.* ¶ 9.

1

8.  In December 2006, the State of California formally recognized the Internet Archive as a library, making it eligible to receive funding under the Library Services and Technology Act and qualifying it for E-Rate, a federal program that provides discounts to schools and libraries to ensure they are able to obtain affordable telecommunications services. *Id.* ¶ 10.

9.  In mid-2007, the Internet Archive was awarded a Library Services and Technology Act grant for its Open Library project (openlibrary.org)—an effort to create a comprehensive library book catalog with a webpage for every book published. *Id.* ¶ 11.

10.  The Internet Archive has also received grant funding from the Institute of Museum and Library Services ("IMLS"), an independent federal agency whose mission is to support museums, libraries, and related organizations. For example, in 2017, the Internet Archive received a grant under the IMLS's Laura Bush 21st Century Library Program. In order to receive this grant, the Internet Archive had to qualify as a library or library-related organization. *Id.* ¶ 12.

11.  This lawsuit concerns the Internet Archive's implementation of Controlled Digital Lending ("CDL"), through which the Internet Archive digitizes its print books and lends them digitally to its patrons. Compl., ECF No. 1.

12.  In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending. Kahle Decl. ¶ 13.

13.  In November 2011, the Internet Archive's digital lending effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA"). *Id.* ¶ 14.

2

14.     As of this filing, the Internet Archive contains more than three million books available for borrowing in its collection.  *Id.* ¶ 15.

15.     The Internet Archive launched and expanded this program on the basis that it is fair use.  *Id.* ¶ 16.

16.     In developing and maintaining this belief, the Internet Archive and its Digital Librarian, Brewster Kahle, relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library—each copyright scholars known to the Internet Archive to be respected in their fields.  The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."  *Id.*

17.     The Internet Archive and Mr. Kahle also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law professor and librarian at the Georgetown Law Center.  Lila Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement.  The Internet Archive understood all co-authors of the *Position Statement* to be well-respected copyright scholars.  Dozens of copyright law professors and scores of libraries and library associations became signatories to the statement, including the Association of Research Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and

3

the Chief Officers of State Library Agencies, representing the state librarians of all fifty states. *Id.* ¶ 17.

18.    The Internet Archive—or another 501(c)(3) public charity it works closely with, Open Library of Richmond—lawfully acquires print books by purchase or donation that it wishes to make available for digital lending. Kahle Decl. ¶ 18; Gratz Decl. Ex. A (Stipulation).

19.    Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities. Kahle Decl. ¶ 19.

20.    The Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the 127 Works in Suit ("Works in Suit"). Gratz Decl. Ex. A (Stipulation).

21.    The Internet Archive sends print books to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe. Gratz Decl. Ex. B ¶¶ 80–82 (Suppl. Expert Rpt. of Ian Foster) .

22.    The print book is then placed in archival storage, and its specific location is carefully tracked. Gratz Decl. Ex. B ¶ 83 (Suppl. Expert Rpt. of Ian Foster).

23.    Print books stored in the physical archive facilities are non-circulating; it is not available to be accessed in its print form. Kahle Decl. ¶ 20.

24.    The digital images of the book are processed and formatted, and if the book meets certain criteria set by Internet Archive policies, it is then made available for digital lending to one registered patron at a time. Gratz Decl. Ex. B ¶¶ 80, 111–25 (Suppl. Expert Rpt. of Ian Foster).

25.    Anyone can become a patron of the Internet Archive—and digitally borrow books—for free by signing up for an Internet Archive account. (Internet Archive has policies,

4

not relevant here, for terminating accounts.)  Kahle Decl. ¶ 21; Gratz Decl. Ex. B ¶ 19 (Suppl. Expert Rpt. of Ian Foster).

26.     Doing so grants them a digital library card that lets them borrow up to ten books at a time from the collection, for limited periods of up to fourteen days.  Kahle Decl. ¶ 22.

27.     The Internet Archive offers its patrons several ways of engaging with a book they have borrowed.  Gratz Decl. Ex. B ¶¶ 31, 35–36 (Suppl. Expert Rpt. of Ian Foster).

28.     The patron can read the book in their web browser through a tool called BookReader.  *Id.* ¶ 31.

29.     BookReader lets patrons flip through a book's pages, zoom in on a book's images, enlarge the book's text for easier reading, and search through the book.  Kahle Decl. ¶ 23.

30.     When finished, the patron may return the book.  Gratz Decl. Ex. B ¶ 32 (Suppl. Expert Rpt. of Ian Foster).

31.     Otherwise, the loan will automatically expire at the end of the loan period.  At that point, the patron is no longer able to access the book, and it is once again available to be borrowed.  Kahle Decl. ¶ 24.

32.     Instead of reading books in their web browsers, patrons can choose to download an encrypted PDF or encrypted ePub version of the book onto their computer or device.  Gratz Decl. Ex. B ¶¶ 35–36 (Suppl. Expert Rpt. of Ian Foster).

33.     These files are secured using the same security system that Plaintiffs use to secure digital files of Plaintiffs' books:  a type of "digital rights management" or "DRM" software created by Adobe.  Gratz Decl. Ex. C, Deposition Transcript of Steve Potash ("Potash Dep. Tr.") 81:1–82:5.

34.     The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.  Kahle Decl. ¶ 25.

35.     The Internet Archive does not digitally loan all books it has scanned.  Instead, it implements a number of policies that limit the books available for digital lending.  *Id.* ¶ 26.

36.     As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive.  *Id.* ¶ 27.

37.     It is the Internet Archive's policy not to lend books published within the previous five years.  Gratz Decl. Ex. B ¶¶ 113, 123 (Suppl. Expert Rpt. of Ian Foster).

38.     This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers.  Kahle Decl. ¶ 28.

39.     Dr. Imke Reimers analyzed revenue patterns of works on the USA Today Top 150 Bestsellers List.  Declaration of Imke Reimers submitted herewith ("Reimers Decl.") Ex. 1 ¶¶ 9, 20–24 (Reimers Expert Rpt.).

40.     Between 1994 and 2021, only 21% of the book appearances on the USA Today weekly bestseller list first appeared at least 52 weeks earlier.  *Id.* ¶¶ 9, 21–24.

41.     Between 1994 and 2021, only 8% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than two years earlier.  *Id.*

42.     Between 1994 and 2021, only 2% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than five years earlier.  *Id.*

43.     For titles that enter the Top 150 bestseller list, approximately 90% of sales occur in the first five years after publication.  *Id.* ¶¶ 9, 28.

6

44.     Books published by HarperCollins that are less than a year old account for between 37% and 40% of all units sold between 2017 and 2019 and 34% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. D (HC0030132).

45.     Books published by Penguin Random House that are less than a year old account for between 47% and 52% of all units sold between 2017 and 2019 and 43% in 2020.  Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. E (PRH0072194).

46.     Books published by Hachette that are less than two years old account for between 70% and 73% of all units sold between 2017 and 2019 and 65% in 2020.  Reimers Decl. Ex.1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. F (HACHETTE0012377).

47.     Based on the available data, most of the Works in Suit behave consistently with the patterns of the works on the USA Today Top 150 Bestsellers List in that sales drop off quickly after publication and most sales occur within five years after a book is published. Reimers Decl. Ex. 1 ¶¶ 9, 21, 26–28 (Reimers Expert Rpt.); *Id.* Ex. 2 ¶¶ 10, 11 (Reimers Reply Rpt.).

48.     Peak sales for most titles occur within one to two years after the date of the first publication of the title.  Reimers Decl. Exs. 1 ¶¶ 20, 28 (Reimers Expert Rpt.) & 2 ¶¶ 9–15 (Reimers Reply Expert Rpt.).

49.     As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the Market*—were made available for digital lending.  The mistake was rectified as soon as the Internet Archive realized the error.  Kahle Decl. ¶ 29.

50.     Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library.  *Id.* ¶ 30.

7

51.     First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage. *Id.* ¶ 31; Gratz Decl. Ex. B ¶ 130 (Suppl. Expert Rpt. of Ian Foster).

52.     Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners—from the University of Arizona to the Delaware County District Library in Ohio—to contribute their own non-circulating copies of that book toward the number of lendable copies. Even if a partner library has multiple copies of a particular book, the Internet Archive counts only one additional copy per library. Kahle Decl. ¶ 32; Gratz Decl. Ex. B ¶¶ 130, 141 (Suppl. Expert Rpt. of Ian Foster).

53.     For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then the Internet Archive would loan *Little House on the Prairie* to up to four patrons at a time. Each concurrent loan would thus still be associated with one non-circulating physical copy. If all four copies of *Little House on the Prairie* were checked out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in. Kahle Decl. ¶ 33.

54.     Many libraries other than the Internet Archive digitally loan print books. *See, e.g.*, HathiTrust, *Emergency Temporary Access Service*, at https://www.hathitrust.org/ETAS-Description (describing a system by which more than 200 academic libraries enabled digital lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon University Libraries, *Introducing Controlled Digital Lending*, at https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending (describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled*

8

A-3674

*Digital Lending at Michigan State University*, at

https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, at https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of Controlled Digital Lending*, at https://www.niso.org/standards-committees/is-cdl (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold"); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, at https://librarytechnology.org/pr/25314 (describing organization for librarians working to implement CDL in their respective libraries).

55.     Digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.  Kahle Decl. ¶ 34.

56.     Digital lending is also particularly helpful for brief or spontaneous access to books—for example, for checking citations or references, or looking up discrete facts—that wouldn't be worth a trip to a brick-and-mortar library.  *Id.* ¶ 35.

57.     The International Federation of Library Associations and Institutions has observed, in its position statement on the subject, that CDL "has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws."  Gratz Decl. Ex. G

9

(https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf).

58.     Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship.  Kahle Decl. ¶ 36.

59.     Writers use books they have borrowed from the Internet Archive as a resource for inspiration or research for their own works.  Declaration of Laura Gibbs submitted herewith ("Gibbs Decl.") ¶¶ 5, 8.

60.     The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries.  Kahle Decl. ¶ 37.

61.     In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available books related to the incarceration of Japanese Americans during World War II.  *Id.* ¶ 40.

62.     The Wikipedia article on the Internment of Japanese Americans currently cites and links to 20 books available via CDL from the Internet Archive.  *Id.* & Ex. 9 at 70 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

63.     There are 202,026 citations in Wikipedia articles in English that link to books available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different books.  Kahle Decl. ¶ 39 & Ex. 9 at 1 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

64.     The Wikipedia article on World War II cites, and links to, 48 different CDL books.  Kahle Decl. ¶ 38 & Ex. 9 at 2–4 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

10

65. A partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages. Kahle Decl. Ex. 9 at 1-337 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

66. In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive. Kahle Decl. ¶ 44.

67. At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus. Gratz Decl. Exs. H (https://www.ala.org/pla/issues/covid-19/march2020survey) & I (https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03).

68. School districts reached out to the Internet Archive concerned that students and teachers could no longer physically access books—including hundreds of copies of assigned books that the school had already purchased. Kahle Decl. ¶ 42.

69. Libraries reached out to the Internet Archive worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away. *Id.* ¶ 43.

70. By the Internet Archive's estimation—based on data from the federal Institute of Museum and Library Services—the closure of libraries took 650 million books out of circulation. *Id.* ¶ 44.

71. Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio. Since all of the libraries were closed, the

11

Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place. *Id.* ¶ 45.

72. The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently. *Id.* ¶ 46.

73. Adam Silverman, one of HarperCollins's Rule 30(b)(6) designees, testified that it took a month—from April to May of 2020—to negotiate a pandemic-related special request with the Chicago Public School System. Gratz Decl. Ex. J, Deposition Transcript of Adam Silverman ("Silverman Dep. Tr.") 270:6–273:14.

74. The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US national emergency, whichever is later." Kahle Decl. ¶ 47 & Ex. 12.

75. Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library. Kahle Decl. ¶ 48 & Ex. 7.

76. There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled, "The National Emergency Library Is a Gift to Readers Everywhere." Gratz Decl. Ex. K.

77. The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was fair use. Kahle Decl. ¶ 49.

78. The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries. *Id.* ¶ 50.

12

79.     When the University of Oklahoma campus shut down in spring of 2020, students no longer had access to physical library books.  Gibbs Decl.  ¶ 4.

80.     Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the pandemic closures.  *Id.*

81.     Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system.  *Id.* ¶ 5.

82.     Ms. Gibbs has since retired from teaching but regularly writes about African folktales available to borrow through the Internet Archive.  *Id.* ¶ 7.

83.     Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started.  Declaration of Lauren Sherman submitted herewith ("Sherman Decl.") ¶ 7.

84.     In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive.  *Id.*

85.     When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation.  Declaration of Daniel Smith submitted herewith ("Smith Decl.") ¶ 4.

86.     Mr. Smith turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time.  *Id.* ¶ 5.

13

87.     Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. Declaration of Benjamin Saracco submitted herewith ("Saracco Decl.") ¶ 7.

88.     In March 2020, the governor ordered buildings, including academic libraries, to be closed.  *Id.* ¶ 8.

89.     Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state.  *Id.* ¶ 9.

90.     With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals, such as the *Basic Life Support for Healthcare Providers and the Advanced Cardiovascular Life Support Provider Manual*, available for borrowing from the Internet Archive via CDL.  *Id.*

91.     Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time.  Kahle Decl. ¶ 51 & Exs. 14–17.

92.     The largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, which had at most 888 concurrent loans.  That figure represents the sum of the peak concurrent loan numbers for each of the editions of that book which were available for borrowing.  Gratz Decl. Ex. B ¶ 196; *id.* at Ex. T3 (Suppl. Expert Rpt. of Ian Foster).

93.     There are over 9,000 public library systems in the United States alone.  *Id.* Ex. L (https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey).

94.     Virtually every library was closed during the NEL.  *Id.*

14

95.     More than 888 public libraries in the United States have a copy of *The Lion, the Witch, and the Wardrobe*. *Id.* Ex. M (https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231).

96.     Although the NEL was slated to end on June 30, 2020, the Internet Archive shut it down two weeks early—on June 16, 2020—after this lawsuit was filed.  Kahle Decl. ¶ 52.

97.     The Plaintiffs are among the largest and most profitable book publishers in the United States.  Gratz Decl. Ex. N, Deposition Transcript of Skip Dye ("Dye Dep. Tr.") 369:20–370:7; *see also id.* Ex. O (https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html).

98.     In recent years, Plaintiffs' profits have increased.  *Id.* Exs. P–R (Excerpt of Bertelsmann 2018, 2019, 2021 Annual Reports), Exs. S–T (Excerpts of Wiley 2020, 2021 Form 10-K), Ex. U–V  (Excerpts of News Corp. 2019, 2021 Annual Report), Ex. W–Y  (Excerpts of Lagardere 2018, 2020, 2021 Registration Document).

99.     In 2020 and 2021, the publishing industry as a whole enjoyed record profits for electronic and physical formats of books.  Gratz Decl. Ex. Z ("*A Year for the (Record) Books in Publishing*" describing 2020 profits), Ex. AA ("*America's Biggest Publishers Keep Posting Profits*" describing 2021 profits); Ex. BB ("*In Surprise Ending for Publishers: In 2020, Business Was Good*" describing 2020 profits).

100.     When the four Plaintiffs filed suit against the Internet Archive in June of 2020, they selected the Works in Suit.  Compl. Ex. A, ECF No. 1-1.

101.     The Works in Suit include non-fiction and fiction works and works from many genres (fantasy, children's, psychology, science, sports, biography, and others).  *Id.* ¶¶ 21, 22.

15

102.    All of the Works in Suit were published prior to being digitized and loaned by the

Internet Archive.  Kahle Decl. ¶ 28 (all of the Works in Suit were made available for borrowing

after lawfully acquired—bought or donated—new or used physical copies of the Works in Suit

were digitized and the Internet Archive does not acquire physical copies of books that have not

been published); *see also* Compl. ¶¶ 6, 21, ECF No. 1.

103.    Plaintiffs sell physical copies of books to libraries and to readers.  *See* Gratz Decl.

Ex. CC, Deposition Transcript of Josh Marwell ("Marwell Dep. Tr.") 59:3–9.

104.    Plaintiffs license electronic copies of books ("ebooks") to libraries and readers.

Gratz Decl. Ex. C, Potash Dep. Tr. 141:20–142:9.

105.    Licensed ebooks are distributed to patrons of libraries that have purchased

licenses via "aggregators."  Gratz Decl. Ex. N, Dye Dep. Tr. 36:20–37:8; 86:14–18.

106.    There are multiple licensing structures for ebooks.  One is a "one copy/one user"

or "perpetual access" model that allows libraries to lend out one copy at a time to patrons for a

discrete period of time, with no expiration from the licensing libraries' digital collection.  Gratz

Decl. Ex. C, Potash Dep. Tr. 49:4–50:2; *id.* Ex. N, Dye Dep. Tr. 120:22–121:7.

107.    The "perpetual access" model is not currently in use by Hachette, HarperCollins,

or Penguin Random House for ebooks made available through aggregators to public libraries.

ECF No. 92 ¶¶ 61, 65 (Declaration of Ben Sevier); ECF No. 94 ¶¶ 30, 32 (Declaration of Chantal

Restivo-Alessi); ECF No. 95 ¶¶ 69, 75 (Declaration of Jeffrey Weber); Gratz Decl. Ex. C, Potash

Dep. Tr. 50:3–53:9.

108.    Another type of license is metered access by time.  Under this model, a library has

the ability to loan an ebook to patrons for a discrete period of time, commonly two years, to an

ebook title.  Gratz Decl. Ex. C, Potash Dep. Tr. 44:17–24.

16

109.     Another type of license is metered access by the number of check-outs, commonly twenty-six checkouts.  Under this model, a library has the ability to loan an ebook to patrons until that copy of an ebook has been borrowed twenty-six times.  *Id.*

110.     Plaintiffs do not sell ebooks to libraries outright.  Kahle Decl. ¶ 53

111.     The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).  *Id.*

112.     The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them).  *Id.* ¶ 54.

113.     Plaintiffs have declined each time the Internet Archive has asked to buy ebooks. Id. ¶ 55.

114.     The ███████ aggregator is OverDrive, which has about ████ of the market share of the library ebook market in the United States.  Gratz Decl. Ex. C, Potash Dep. Tr. 196:5–12.

115.     One of the ways OverDrive offers ebooks for reading is through its Libby application.  *See* https://www.overdrive.com/apps/libby; Gratz Decl. Ex. C, Potash Dep. Tr. 82:19–24.

116.     From March 2017 until March 23, 2020 (i.e., prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ███████ of the number of checkouts of the Works in Suit from OverDrive.  Declaration of Rasmus Jørgensen submitted herewith ("Jørgensen Decl.") Ex. 1 ¶ 36 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster); *id.* Ex. DD (OverDrive_Supp_002).

117.     Looking at data from 2017–2020, which includes the period of time when the NEL was operational, the total loan volume of Works in Suit from the Internet Archive was ███

████ of the number of OverDrive checkouts for the Works in Suit. Jørgensen Decl. Ex. 1 ¶¶ 8, 35 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster).

118.    The expert reports of Drs. Reimers and Jørgensen conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit. Jørgensen Decl. Ex. 1 ¶ 8 (Jørgensen Expert Rpt.); Reimers Decl. Ex. 1 ¶ 9 (Reimers Expert Rpt.).

119.    Dr. Reimers analyzed the change of the Amazon rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL. Reimers Decl. Ex. 1 ¶¶ 36–54 (Reimers Expert Rpt.).

120.    Amazon rankings are a good proxy for the market for print sales because using ranking data controls for factors that affect the physical book retail market as a whole and because Amazon makes up at least 50% of the market share for print books. Reimers Decl. Ex. 1 ¶¶ 35, 36, 41–43 (Reimers Expert Rpt.).

121.    When editions of the Works in Suit were first made available for borrowing from the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to other books. Reimers Decl. Ex. 1 ¶¶ 10, 38, 47 (Reimers Expert Rpt.).

122.    When the Works in Suit were removed from the Internet Archive after this lawsuit was filed, their print sales slightly worsened relative to other books. Reimers Decl. Ex. 1 10, 38, 49, 50 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

123.    Historical Amazon data is only publicly available for print books—not for ebooks. Reimers Decl. Ex. 1 nn.33, 36 (Reimers Expert Rpt.); *id.* Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

18

124.     Because there is not publicly available commercial performance data about ebooks, and because Plaintiffs declined to produce the monthly performance data the Internet Archive requested, Dr. Reimers was unable to make similar calculations regarding the sales of consumer ebooks.  Reimers Decl. Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

125.     The Internet Archive requested monthly commercial performance data for the Works in Suit for the time period from 2011 to 2020.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

126.     Plaintiffs declined to produce the requested monthly data.  Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 3 n.1, ECF No. 49.

127.     Each book began to be available for digital lending on a particular known date, so having monthly commercial performance data would allow a comparison of the commercial performance before that particular date with the commercial performance after that date.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

128.     Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020.  Hachette produced annual data for 2015 to 2019.  Gratz Decl. ¶ 43; *see also* Gratz Decl. Ex. JJ (HACHETTE0002474) & Ex. KK (HACHETTE0002475).

129.     For its Works in Suit, HarperCollins produced annual data for 2017 to 2020.  Gratz Decl. ¶ 44; *see also* Gratz Decl. Ex. LL (HC0010272).

130.     For its Works in Suit, Penguin Random House produced annual data for 2010 to 2020.  Gratz Decl. ¶ 45; *see also* Gratz Decl. Ex. MM (PRH0025907)

131.     For its Works in Suit, Wiley produced annual data for 1996 to 2020.  Gratz Decl. Ex. 46; *see also* Gratz Decl. Ex. NN (WILEY0005650)

19

132.    The Internet Archive requested data about the commercial performance of all Plaintiffs' books, broken down by month, since 2011.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47.

133.    This data would allow a comparison of the commercial performance of books that were available for digital lending with books that were not available for digital lending.  *Id.*

134.    Plaintiffs refused to provide data about books other than the Works in Suit.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47; Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 1, 3, ECF No. 49.

135.    The Internet Archive requested that Plaintiffs produce monthly commercial performance data about a set of books Plaintiffs regarded as comparable to the Works in Suit, but Plaintiffs refused.  Gratz Decl. ¶ 42.

136.    The National Emergency Library provided an opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit.  Reimers Decl. Ex. 1 ¶¶ 34, 35, 37 (Reimers Expert Rpt.); Jørgensen Decl. Ex. 1 ¶ 49 (Jørgensen Expert Rpt.).

137.    Dr. Reimers observed the Amazon rankings for the Works in Suit relative to when the NEL was launched.  Reimers Decl. Ex. 1 ¶¶ 34, 48–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

138.    The Amazon rankings for the Works in Suit improved by approximately 2% at the time the NEL was launched.  The Amazon rankings held steady while the NEL was in effect. Then, around the time that most Works in Suit were removed from the Internet Archive, the rankings reverted to their pre-NEL levels.  However, the Works in Suit behaved similarly the year prior at the same time of the year.  In sum, the Amazon rankings of the Works in Suit did

20

not undergo a statistically significant decrease relative to when the NEL was launched. Reimers Decl. Ex. 1 ¶¶ 51–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

139. Dr. Reimers concluded that these observations signified that the NEL did not depress Plaintiffs' unit sales of physical formats of the Works in Suit. Reimers Decl. Ex. 1 ¶¶ 10, 53 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.) .

140. Dr. Jørgensen observed the change in OverDrive checkouts for the Works in Suit after the shutdown of the NEL and effective removal of the Works in Suit from the Internet Archive. He observed that after the closure of the NEL, the number of OverDrive check-outs of the Works in Suit ██████████████████████████████████████████████████ ███████████. Jørgensen Decl. Ex. 1 ¶¶ 49–53 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 17 (Jørgensen Reply Rpt.).

141. Dr. Jørgensen concluded that the evidence was not consistent with Plaintiffs' theory that the Internet Archive's loan volume of the Works in Suit reduced digital lending through OverDrive. *Id.*

142. Dr. Jørgensen also analyzed whether the closure of the NEL impacted Hachette's book sales of the Works in Suit. Jørgensen Decl. Ex. 1 ¶¶ 54–58 (Jørgensen Expert Rpt.).

143. Dr. Jørgensen was unable to analyze whether the closure of the NEL impacted all four of the Plaintiffs' sales of the Works in Suit because Hachette was the only Plaintiff—despite the Internet Archive's requests—to produce monthly sales data for 2020 for each of its Works in Suit. Jørgensen Decl. Ex. 1 ¶ 54 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 40 (Jørgensen Reply Rpt.); Gratz Decl. ¶¶ 42–46.

144. When the Internet Archive shut down the NEL, Hachette did not see increases in paperback or ebook sales of the Works in Suit. Rather, Hachette's sales of the Works in Suit

contracted approximately 21% between the second and third quarter of 2020 for paperbacks and approximately 29% between the second and third quarter of 2020 for ebooks.  Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.).

145.    Dr. Jørgensen concluded this simultaneous contraction was not indicative that the Internet Archive's lending of Hachette's Works in Suit acted as market substitutes.  Jørgensen Decl. Ex. 1¶¶ 57–58 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶¶ 17–18 (Jørgensen Reply Rpt .)

146.    Dr. Prince made no attempt to quantify the effect of the Internet Archive's digital lending on Plaintiffs.  Gratz Decl. Ex. EE, Deposition Transcript of Jeffrey Prince ("Prince Dep. Tr.") 52:16–53:21, 54:9–16, 202:23–203:10, 230:3–8.

147.    Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues.  Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13; *id.* Ex. FF, Deposition Transcript of Allison Lazarus ("Lazarus Dep. Tr.") 27:9–12; 38:12–22; *id.* Ex. GG, Deposition Transcript of Chantal Restivo-Alessi ("Restivo-Alessi Dep. Tr.") 224:7–225:9; *id.* Ex. HH, Deposition Transcript of Alan Pavese ("Pavese Dep. Tr.") 55:3–16.

148.    Even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions.  They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.  Declaration of Susan Hildreth submitted herewith ("Hildreth Decl.") Ex. 1 ¶ 106 (Hildreth Expert Rpt.).

149.    With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products. *Id.* ¶ 109.

150.    There have been no instances of a library paying for access to fewer ebook copies of a title—or buying fewer copies of a physical book for a title—where that title is available for borrowing through CDL, either from the IA or from another library. *Id.* Ex. 2 ¶ 8 (Hildreth Reply Rpt.).

151.    Most libraries stive to spend their entire annual materials allocation within the fiscal year in which funds were allocated. In fact, it is highly unusual for a library not to spend the entire allocation each year. *Id.* Ex. 1 ¶ 71 (Hildreth Expert Rpt.).

152.    Libraries help readers discover books—through purposeful searching as well as accident or "serendipity." Readers can browse physical shelves of libraries and a library's online catalog. Hildreth Decl. Ex. 1 ¶¶ 34, 35, 39 (Hildreth Expert Rpt.).

153.    Libraries generally begin lending a book as soon as it is published. Hildreth Decl. ¶ 5.

Dated:  July 7, 2022                                 DURIE TANGRI LLP

                                                  By: _____/s/ Joseph C. Gratz_____
                                                       Joseph C. Gratz (*Pro Hac Vice*)
                                                       Jessica E. Lanier (*Pro Hac Vice*)
                                                       Aditya V. Kamdar (*Pro Hac Vice*)
                                                       Annie A. Lee (*Pro Hac Vice*)
                                                       217 Leidesdorff Street
                                                       San Francisco, CA 94111
                                                       (415) 362-6666
                                                       jgratz@durietangri.com
                                                       jlanier@durietangri.com
                                                       akamdar@durietangri.com
                                                       alee@durietangri.com

23

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

24

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

> */s/ Joseph C. Gratz*
> JOSEPH C. GRATZ

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY   :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                      :        Case No. 1:20-cv-04160-JGK

                Plaintiffs,

                                        :

-against-

                                        :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                    :

                Defendants.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### PLAINTIFFS' MEMORANDUM OF LAW OF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**
Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley*
*& Sons, Inc. and Penguin Random House LLC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 5

   A.   The Publishers Invest Heavily in Publishing Books in all Formats................................... 5
   B.   The Commercial and Library Ebook Markets are Thriving ................................ 6
   C.   Internet Archive's Website Is Stocked with Bootleg Copies of the Works and Millions of Other In-Copyright Books ................................................................................................ 9
   D.   The Goal of Internet Archive Is to Make Unauthorized Ebook Editions of Every Book Ever Published Available for Anyone in the World with an Internet Connection to Read for Free ........................................................................................................................ 12

ARGUMENT .................................................................................................................. 18

I.     INTERNET ARCHIVE HAS INFRINGED PLAINTIFFS' COPYRIGHTS ................. 18

II.    INTERNET ARCHIVE'S INFRINGEMENT IS NOT FAIR USE ................................ 19

   A.   Factor One – The Purpose and Character of the Use........................................................ 20

      1.   Internet Archive's Publication of Bootleg Ebooks on its Website Is Not Transformative ........................................................................................................ 21
      2.   Internet Archive's Claimed Non-Profit Status Does Not Support Fair Use ............. 25

   B.   Factor Two – The Nature of the Copyrighted Work........................................................ 28
   C.   Factor Three – The Amount and Substantiality of the Use .............................................. 29
   D.   Factor Four – The Effect of Internet Archive's Uses on the Potential Market for the Works in Suit ................................................................................................................ 29

      1.   Lost Fees from the Internet Archive ...................................................................... 30
      2.   Market Substitution: IA Offers A Competing Substitute, Leading to Potential Lost Ebook Sales to Libraries and Consumers .................................................................. 33

   E.   Aggregate Assessment of the Four Factors ..................................................................... 39

III.   THE NATIONAL EMERGENCY LIBRARY WAS NOT FAIR USE............................ 42

CONCLUSION................................................................................................................ 42

CERTIFICATION OF COMPLIANCE ............................................................................ 44

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records v. Napster,*
   239 F.3d 1004 (9th Cir. 2001) ...................................................................22

*Andy Warhol Found for the Visual Arts, Inc. v. Goldsmith,*
   11 F.4th 26 (2d Cir. 2021) ...............................................................20, 34

*AP v. Meltwater U.S. Holdings, Inc.,*
   931 F. Supp. 2d 537 (S.D.N.Y. 2013)...............................................22, 31

*Authors Guild v. Google, Inc.,*
   804 F.3d 202 (2d Cir. 2015)....................................................... *passim*

*Authors Guild v. HathiTrust,*
   755 F.3d 87 (2d Cir. 2014).................................................................21, 24

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
   448 F.3d 605 (2d Cir. 2006)..................................................................33

*Campbell v. Acuff-Rose Music,*
   510 U.S. 569 (1994)................................................................... *passim*

*Capital Records v. ReDigi, Inc.,*
   910 F.3d 649 (2d Cir. 2018)....................................................... *passim*

*Davis v. Gap, Inc.,*
   246 F.3d 152 (2d Cir. 2001)......................................................20, 31, 33

*Disney Enters. v. VidAngel,*
   869 F.3d 848 (9th Cir. 2017) ...........................................................24, 25

*Dr. Seuss Enters., L.P. v. ComicMix LLC,*
   983 F.3d 443 (9th Cir. 2020) ..............................................................20

*Eldred v. Ashcroft,*
   537 U.S. 186 (2003)................................................................................41

*Folsom v. Marsh,*
   9 F. Cas. 342 (Cir. Ct. Mass. 1841) ...................................................25

*Fox News Network, LLC v. TVEyes, Inc.,*
   883 F.3d 169 (2d Cir. 2018).......................................................... *passim*

ii

*Google v. Oracle Am.*,
141 S. Ct. 1183 (2021) ................................................................................20, 40

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ....................................................................................... *passim*

*Infinity Broad. Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998)...............................................................24, 29, 34

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
166 F.3d 65 (2d Cir. 1999)........................................................................22

*Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*,
868 F. Supp. 2d 962 (C.D. Cal. 2012) ..................................................27

*Oracle Corp. v. SAP AG*,
765 F.3d 1081 (9th Cir. 2014) ................................................................33

*Penguin Grp. (USA) v. Am. Buddha*,
2015 WL 11170727 (D. Ariz. May 11, 2015) ..........................................26, 30, 35

*Ringgold v. Black Entm't TV, Inc.*,
126 F. 3d 70 (2d Cir. 1997)........................................................... *passim*

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012) ............................................................ *passim*

*Sony BMG Music Entm't v. Tenenbaum*,
672 F. Supp. 2d 217 (D. Mass. 2009) ..................................................37

*Sony Corp of Am. v. Universal City Studios*,
464 U.S. 417 (1984)...........................................................................22, 23

*Twin Peaks Prods. v. Publ'ns Int'l Ltd.*,
996 F.2d 1366 (2d Cir. 1993)..........................................................31, 34

*UMG Recordings, Inc. v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000)...............................................24, 31

*United States v. Am. Soc'y of Composers, Authors & Publishers*,
599 F. Supp. 2d 415 (S.D.N.Y. 2009).............................................22, 31

*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*,
342 F.3d 191 (3d Cir. 2004)..............................................................22

*Weissman v. Freeman*,
868 F.2d 1313 (2d Cir. 1989)..........................................................26, 27

iii

*Worldwide Church of God v. Phila. Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) .................................................................................27

**Statutes**

Copyright Act...................................................................................................... *passim*

**Other Authorities**

Letter from The Register of Copyrights to Senator Tom Udall dated May 15, 2020.............................24

Report Of The Register Of Copyrights 101 (2015),
    https://www.copyright.gov/orphan/reports/orphan-works2015.pdf .......................................40

Rule 56 of the Federal Rules of Civil Procedure ..........................................................1

U.S. Constitution, Article I, § 8, cl. 8 .........................................................................19

iv

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC ("PRH") (collectively, the "Publishers") respectfully submit this memorandum of law in support of their motion for summary judgment against defendant Internet Archive ("IA") pursuant to Rule 56 of the Federal Rules of Civil Procedure on Plaintiffs' causes of action for copyright infringement.

## PRELIMINARY STATEMENT

The Publishers bring this lawsuit on behalf of themselves and their authors to put an end to the Internet Archive's mass-scale copyright infringement of tens of thousands of their books. Masquerading as a not-for-profit library, Internet Archive digitizes in-copyright print books on an industrial scale and distributes full-text digital bootlegs for free. Internet Archive has amassed a collection of more than three million unauthorized in-copyright ebooks – including more than 33,000 of the Publishers' commercially available titles – without obtaining licenses to do so or paying the rightsholders a cent for exploiting their works. Anybody in the world with an internet connection can instantaneously access these stolen works via IA's interrelated archive.org and openlibrary.org websites (collectively, the "Website"). Having scaled up its operations since the complaint was filed, IA now "lends" bootleg ebooks to users approximately 25 million times a year. Plaintiffs' Statement of Undisputed Material Facts ("SUMF"), ¶249. IA urges libraries to use its Website instead of licensing authorized library ebooks from the Publishers, literally telling them "You Don't Have to Buy it Again!" SUMF¶383. In short, the Website offers infringing copies of the Publishers' works that directly compete with the Publishers' well-established markets for authorized consumer and library ebooks. As Sandra

1

Cisneros – the acclaimed author of *The House on Mango Street,* a Work in suit – observes, "Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of living from their pen."  SUMF¶12.

No case has held or even suggested that IA's conduct is a lawful fair use.  As the Second Circuit stated in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 225 (2d Cir. 2015) ("*Google Books*"): "If Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong." Yet Internet Archive assumes that all "information should be free" and has searched for years to find a legal rationale for its radical infringements.  Around 2018, it helped manufacture and market a theory called "controlled digital lending" or "CDL," which was developed with no input from authors or publishers and without the imprimatur of Congress.  Directly contradicting the idea that copyright protects a bundle of divisible rights, IA posits that it is lawful for a library to make digital copies of any print book it acquires and distribute that digital copy over the internet, without a license, as long as (a) the library uses digital rights management ("DRM") technology to prevent additional copying, and (b) the library "only loan[s] simultaneously the number of [print] copies that it has legitimately acquired."  SUMF¶436.  Regardless of whether it actually complies with CDL – and it does not – Internet Archive's practice of CDL violates fundamental principles of copyright law, and undermines market incentives necessary to spur the creation of new works.

"An author's right to control and profit from the dissemination of her work ought not to be evaded by conversion of the work into a different form."  *Google Books*, 804 F.3d at 225.  As *Google Books* reaffirms, the republication of an original print work in ebook format creates a

A-3698

derivative work, and the exclusive right to publish and monetize derivative works belongs to the rightsholder, not Internet Archive. *Id*. at 215. IA nonetheless argues that broader principles in the "first sale doctrine" codified at 17 U.S.C. §109 should transform its mass digitization scheme into fair use. But the Second Circuit rejected that theory in *Capital Records v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018), holding that the first sale doctrine does not protect "unauthorized reproduction" of works.

Internet Archive also argues that its mass infringement serves the public interest, at various times claiming that its Website helps reading disabled or rural populations, or makes available the "missing" 20th century of non-digitized books, or uses technology to improve the efficiency of delivering content. SUMF¶¶509-522, 530-540. The undisputed evidence now shows that only a tiny percent of its users are visually impaired (and that population is well-served by HathiTrust or market innovations); IA does not even track rural readers and ignores the considerable geographic reach of authorized library ebooks; and the vast majority of IA's in-copyright books were published after 1980 and many are widely available through lawful ebook channels. *Id*. Nor do IA's actions provide efficiencies in delivering content that do not otherwise exist. IA's own expert confirms that there is a well-established library ebook market efficiently serving millions of readers. SUMF¶168. Indeed, three of the Publishers estimate that between 35% to 50% of Americans who read an ebook use free library copies, rather than purchasing a commercial ebook. SUMF¶¶174-180. IA's ebooks are no more "efficient" than the authorized ebooks that libraries license – except the authorized ebooks generate revenue for authors and publishers.

3

In sum, Defendant's copying and distribution of the 127 works in suit (the "Works") is copyright infringement (POINT I, *infra*).  Internet Archive cannot bear its burden of establishing an affirmative defense of fair use under the four-factor test (POINT II, *infra*).  IA fails the crucial first factor because there is nothing transformative about repackaging and republishing commercially available, in-copyright books to achieve the same purpose for which they were originally published: to be read.  Nor does nonprofit status excuse blatant infringement, especially since IA trades off the authors' scholarship, and since IA engages in commercial activities to such an extent that, as its own Director of Finance testified, "every single page of the Archive is monetized."  SUMF¶349.  The second and third factors also weigh against fair use because the Works are highly creative and IA republishes them in their entirety.  Finally, under the fourth factor, it cannot be plausibly disputed that IA's ebooks are free substitutes that compete with authorized ebooks and thereby cause potential market harm to Plaintiffs, including the "lending" fees IA refuses to pay and market substitution for library and retail ebook sales. These harms would be disastrously compounded if  IA's activities became unrestricted and widespread.  For similar reasons, IA's National Emergency Library program during the start of COVID was not fair use (POINT III, *infra*).

To be clear, this lawsuit does not intend to foreclose the possibility that the unlicensed use of a particular work may be fair use in extenuating circumstances, such as the digital preservation or occasional e-loan of a clearly orphaned work.  Further, the Association of American Publishers ("AAP") has long supported legislative modernization of Section 108 of the Copyright Act regarding library digitization to address preservation needs.  But Internet Archive has gone far beyond what any calibrated exception might allow by appropriating every in-

copyright work it can find without license or payment. In doing so, it ignores the publishing ecosystem, including one that supports a thriving market for library ebooks – which Publishers worked hard to create. Plaintiffs respectfully request that their motion for summary judgment be granted.

<div align="center">

**FACTUAL BACKGROUND**

</div>

**A.      The Publishers Invest Heavily in Publishing Books in all Formats**

The Publishers finance a complex chain of investment to put books in the hands of readers. SUMF¶¶10-26. From identifying new works, paying author advances, providing editorial guidance, creating marketing and sales strategies, underwriting operations, and innovating digital technologies, formats, and delivery modes, the Publishers spend millions of dollars to make books available to the public. *Id.*

At the same time, the Publishers bear the financial risk of publishing. SUMF¶13. They seek to ameliorate that risk by nurturing long-term revenue streams for their books. SUMF¶¶27-68. The life cycle of each book is unique and its commercial success (or failure) is driven by countless factors – many not within the publisher's control and many that may change over the life of the book's copyright protection. *Id.*

Given this uncertainty, the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago. SUMF¶¶38-62. As well as generating vital royalties for authors, backlists drive Publishers' profits and provide steady, relatively predictable income that supports the publication of new works. *Id.* To cite just two examples, the Works Toni Morrison's *Bluest Eye* or Zora Neal Hurston's *Their Eyes Were*

<div align="center">

5

</div>

*Watching God* have generated millions of dollars over decades, which not only compensates the authors (and their heirs) but helps fund subsequent generations of classic works. SUMF¶46.

The Publishers regularly acquire the exclusive rights to publish literary works in print and digital formats, including hardcover, paperback, mass market, audiobook and ebook. SUMF¶¶63-68. Each format is a distinct product geared to different (sometimes overlapping) channels and sold under different terms that correspond to each format's unique qualities. *Id.* The Publishers' author agreements recognize these differences by delineating the rights for each format separately and setting different royalty rates for each one. *Id.*

Publishers and authors historically have been paid, and need to be paid, for each format they publish, just as rightsholders in other creative industries, *e.g.*, music or film, depend on numerous formats to target different market channels. SUMF¶¶63-68. Publishers will have little incentive to invest in new formats like ebooks and their related markets, and less incentive to publish new titles, if third parties can unilaterally transform print books into digital books *en masse*, republish them for anybody on the internet, and pay rightsholders nothing for doing so. *Id.*

**B.** **The Commercial and Library Ebook Markets are Thriving**

Controlled digital lending, as practiced by Internet Archive, collapses the boundaries between physical books and ebooks. SUMF¶¶432-447. CDL's basic tenet is that a non-profit entity that owns a physical book can scan that book and distribute the resulting ebook as a proxy for the physical copy. *Id.* But this ignores that ebooks are a fundamentally different product from physical books. SUMF¶¶76-92. Print books are physical objects that need to be physically

transported from place to place, which costs time and money. *Id*. They occupy space on shelves and libraries generally need to replace them as they deteriorate over time. *Id*.

Ebooks, on the other hand, are digital files that readers typically download from the internet and consume on personal computers or devices. *Id*. Ebooks are infinitely replicable, can last ages without degrading and can be distributed worldwide instantaneously at minimal cost. *Id*. Ebook readers need not travel to bookstores or libraries; instead, they can download ebooks at all hours from their home, office, or on the go. *Id*.

Starting in the late 1990's, the Publishers invested millions in developing authorized mechanisms for distributing ebooks. SUMF¶¶66-68, 94. Mindful of the havoc wrought on the music industry by piracy and the uncontrolled appropriation of digital content, the Publishers developed a sustainable market for affordable ebooks with critical controls, including limiting commercial ebooks to one user account. *Id*. The popularity of ebooks grew rapidly after the release of dedicated e-readers like Amazon's Kindle (2007) and Apple's iPad (2010) and represented 12-15% of the book market by 2020. SUMF¶102. Today the Publishers publish virtually every new adult trade book, as well as the bulk of their backlists, in ebook form. SUMF¶108.

Starting a decade ago, the Publishers offered ebooks to libraries via "one-copy, one user" licenses – *i.e.*, libraries pay for ebook files that may be "checked out" by one patron at a time, as opposed to multiple patrons reading simultaneously. SUMF¶¶127-128. The Publishers deeply value  libraries, recognizing that they foster public literacy, serve local communities, and increase the visibility of authors through book clubs, author talks, and other creative means of

reader involvement. SUMF¶¶115-116. Libraries support authors by paying for print books and ebooks. SUMF¶113.

The Publishers enter into agreements with aggregators (*i.e.*, distributors) such as OverDrive, who in turn license the ebooks to libraries and manage the relevant platforms. SUMF¶¶158-182. Critically, library licenses strictly limit distribution of the book to patrons entitled to access that library's physical collections, namely a public library's local residents or students, faculty and staff affiliated with academic libraries. *Id.* These community restrictions serve Publishers' need to control distribution and ensure that libraries cater to their tax-paying populations. The Works are all licensed to libraries in ebook form. SUMF¶112.

The library ebook market has exploded over the last decade. SUMF ¶164. In 2012, OverDrive processed 70 million total digital checkouts (including both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million. SUMF ¶164. During that same time span, the number of different titles checked out by patrons via OverDrive also increased exponentially. SUMF ¶165. The Publishers' annual revenue from the library ebook market, which is shared with authors, has risen to hundreds of millions of dollars, simultaneously establishing an important market channel for many titles and serving a more digital public. SUMF¶169.

Library ebooks are so prevalent that initial analyses by two of the Publishers suggest that 39-50% of Americans who read ebooks currently read library ebooks for free, rather than purchasing commercial ebooks. SUMF¶¶174-182. The convenience of library ebook lending – particularly the ability to check ebooks out instantaneously, anytime and anywhere – makes it a highly attractive proposition to consumers who might otherwise purchase ebooks. *Id.* Moreover,

8

library ebooks offer comparatively good value: one Publisher found that between 2017 and 2020, library ebooks accounted for 50% of total ebook reads but brought in only 13% of total ebook revenue. SUMF¶¶177-180.

The success of authorized library ebooks depends on licensing terms that balance the benefits ebooks confer on library communities with the economic interests of authors. SUMF¶¶113-182. As the market economics have changed, the Publisher's licensing models have evolved (and continue to change). *Id.* Today, the four Publishers each offer somewhat different licensing terms. All offer a One-Copy/One User model – with the restriction referenced above that only *bona fide* patrons of the licensing library can borrow the ebook. *Id.* Some Publishers limit the license to a one or two year term (during which time there is no limit on the number of times the ebook can be read). SUMF¶¶134, 147. Another allows ebooks to circulate 26 times over an unlimited time period. SUMF¶135-140. The Publishers all offer academic libraries a perpetual term, while one permits perpetual licenses for all libraries. SUMF¶¶130-132. Two of the Publishers also include a Pay-Per-Use model, which is a one-time circulation to a single patron at a significantly reduced fee, while another experiments with subscription models. SUMF¶¶141-146, 191. During the COVID lockdown, the Publishers stepped in to help libraries and schools meet increased demand for ebooks. SUMF¶¶187-197.

**C.** **Internet Archive's Website Is Stocked with Bootleg Copies of the Works and Millions of Other In-Copyright Books**

Internet Archive was founded in 1996 by its current Chairman Brewster Kahle with the stated goal of providing "universal access" to all published books by allowing anyone in the world with an internet connection to download ebook editions, free and on demand. SUMF¶¶215-235. Striving initially for 4 million free ebooks on its Website, IA launched a

9

massive scanning project in which print books were copied and uploaded to its Website without authorization. SUMF¶¶236-269. By doing this on an industrial scale, IA has created a Website that distributes free full-text copies of each Work, together with more than 33,000 other in-copyright books published by the four Publishers in print and digital form. *Id.*

IA's Website now hosts more than 3 million unauthorized in-copyright books and effectuates approximately 70,000 "borrows each day," which translates to 25 million "borrows" a year – without compensating the books' authors. SUMF¶¶248-249. IA claims that the Website primarily collects books from the "20th Century Black Hole," meaning that the "vast majority" are older works that "do not have a commercially available ebook." SUMF¶553. But IA's own current data shows that 78.9% of the in-copyright books on its Website were published after 1980 and only 6.2% were published before 1963. SUMF¶517. IA knowingly adds boatloads of ebooks to its Website that the Publishers already offer in authorized digital formats. SUMF¶522.

The experience of reading a book on IA's Website is highly similar to borrowing or acquiring the Publishers' authorized ebooks. SUMF¶¶523-529. Searching Google for terms like "free ebooks," or "Toni Morrison Beloved free read" yields results containing links to IA's Website on the first page, above links to platforms offering the Publishers' authorized library ebooks. SUMF ¶256. Unlike libraries that restrict access to geographic or academic communities, IA "lend[s] to the world." SUMF¶236-269. Anyone can register as a member of IA's Website – and read free ebooks on their devices in a matter of seconds – simply by submitting a valid email address. SUMF¶¶236-238. Nor is the Website academically focused, as IA suggests. The Website touts titles in a range of popular categories – including Romance,

10

Thrillers, "Books we Love" and "Trending Books."  SUMF¶514-16.  IA's own internal documents admit that "reality has it that we are competing for eyeballs with" Amazon and OverDrive (SUMF¶¶524-25), and the Website's homepage strongly resembles the landing page for OverDrive users:



SUMF¶514 (comparing IA homepage to Detroit Public Library Overdrive homepage).

Users of IA's Website can check out ebooks of their choice by clicking the BORROW button, just as they would check out an authorized ebook via OverDrive.  SUMF¶¶207-209.  IA provides ebooks in PDF and ePUB versions and boasts that its PDF versions are "High Quality."

11

SUMF¶¶277.  At the time of the complaint, the default loan period was for 14 days.

SUMF¶¶251-252.  Post-litigation, IA switched to a default that allows users to read an ebook for

one-hour loans that can be repeated indefinitely subject to availability.  *Id.*  Downloads for 14

days are still permitted for titles when IA owns more than one copy (on its own or in

combination with partner libraries), which appears to be the case for approximately one third of

the ebooks on IA's Website.  SUMF¶¶253, 261.  Further, IA admits that entire books can

"absolutely" be read on the Website, and evidence demonstrates users want to (and do) read

books in whole or substantial part – as they are encouraged to do by the openlibraries.org

website ("Read Free Library Books Online").  SUMF¶256.  IA's library expert admitted that

"certainly some [ebooks] could be read in an hour."  SUMF ¶258.

The 127 Works – which run the gamut from literary classics by authors such as C.S.

Lewis to thrillers, romances, children's books and the non-fiction books of Malcolm Gladwell –

were all scanned and posted on the Website by Internet Archive.  SUMF¶¶198-209.  Between

2017 and 2020 alone, the 127 Works were checked out more than 46,000 times on IA's Website.

SUMF¶203.  If these checkout rates are extrapolated across the 33,000 titles published in print

and digital form by the Publishers and posted without authorization on the Website, this would

mean that IA's bootleg versions of the Publishers' ebooks were read many millions of times –

without any payment to authors – in a three-year period alone. SUMF¶¶586-587.

**D.     The Goal of Internet Archive Is to Make Unauthorized Ebook Editions of
         Every Book Ever Published Available for Anyone in the World with an
         Internet Connection to Read for Free**

To finance its massive digitization agenda, IA has long operated a fee-based business

where libraries pay to scan physical books from their collections – which IA does either onsite or

by shipping the books to offshore scanning centers where they can be scanned cheaply. SUMF¶¶289-290. Under the standard terms of IA's Library Digitization Agreement, both IA and the libraries obtain an ebook which IA can "post … on the Internet Archive Website." SUMF¶291-293. Internet Archive made approximately $35 million from scanning books between 2011 and 2020. SUMF¶289.

IA's appetite for physical books to digitize for its Website was not sated by scanning library collections because most libraries, "based on copyright concerns," would not allow IA to scan in-copyright books. SUMF¶297-299. Undaunted by such concerns, IA looked to acquire in-copyright physical books to scan via purchase or donation. SUMF¶300-309. IA keeps those print books in shipping containers that are inaccessible to the public (unlike libraries open to the public). SUMF¶310-321.

Today, Internet Archive's primary source of print books is the world's largest used bookstore, the for-profit Better World Books ("BWB"). SUMF¶¶322-345. BWB is a "pipeline" that "provide[s] a steady stream of books to be digitized by Internet Archive." SUMF¶338. IA received about one million in-copyright books from BWB from 2013 to 2019, but it "want[ed] more of the flow." SUMF¶330. Kahle told a potential investor that he hoped to acquire "7 million [new titles] over the next few years" and that "[t]he successful operation of BWB will provide funding back to the Internet Archive to help ensure that it can continue to deliver free services to the world …." SUMF¶¶330-332. A shell company controlled by Brewster Kahle acquired BWB in 2019 and installed Kahle as chairman of the board. SUMF¶¶333-338. Since the acquisition of BWB, IA and BWB have developed commercial "synergies," including

13

"purchase from Better World Books" links on the Website. SUMF¶¶339-350. As IA's Director of Finance put it, "every single page of the [Internet] Archive is monetized." SUMF¶349ff.

By 2017, Internet Archive was applying for a large grant from the MacArthur Foundation to support its actions (which it did not receive). SUMF¶¶400-431. To try to provide legal cover, in May 2017, IA convened a group of friendly copyright scholars to address the "copyright uncertainty" surrounding its practices. *Id*. The result was a September 2018 White Paper which manufactured a "concept" and called it "controlled digital lending" – without input from authors, publishers, the public, or congressional deliberation. *Id*. At the same time, IA spearheaded a Statement on CDL to provide an easy summary. *Id*.

As IA acknowledges, the "most critical" component of controlled digital lending is the "owned to loaned ratio," which supposedly allows libraries to create and "circulate a digitized title in place of a physical one in a controlled manner." SUMF¶¶436, 476. The White Paper stresses that "libraries must truly exercise *control* in the process." SUMF¶443 (emphasis added). Steps must be taken to ensure that "[w]hen the digital copy is being read by a patron … the corresponding physical copy is restricted and unavailable for consultation." *Id*. IA's own advisor on the CDL project, the copyright expert Peter Jaszi, wrote that IA's Statement of CDL is a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursuing the strategy" and that CDL "serve[s] the institutional interests of the IA." SUMF¶430. Further, IA did not change its practices after the Second Circuit's decision in *ReDigi*, which its own outside counsel admitted "calls into question the theoretical underpinnings of CDL." SUMF¶460.

14

As IA embraced its newly coined legal theory around 2018, it all but discarded CDL's "critical" "owned to loaned ratio" by implementing the confusingly named "Open Libraries project" to magnify the broad reach of its Website.  As IA recognized at the time, "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist" and are thus in high demand.  SUMF¶356.  Through a practice known as "overlap analysis," the Open Libraries project allows Internet Archive to increase the number of concurrent loans it can make of works without scanning or owning more physical books. SUMF¶366.  "Partner libraries" send IA data listing all the books in their collection, which Internet Archive runs against its Website's catalogue.  SUMF¶365.  Every time there is a match, IA increases the lending cap for that ebook on the Website by one copy – regardless of the number of copies of the work physically owned by IA.  SUMF¶¶367-.  As IA admits, there are no upper limits to the number of copies available for concurrent lending via the overlap analysis – the project potentially could allow IA to make 10,000 or more concurrent loans of any one title.  SUMF¶¶368.

Since its Open Libraries project began, Internet Archive has added 81 "Partner Libraries" (mostly academic libraries) and, via this project, added almost 3 million copies to lend ebooks against.  SUMF¶389-91.  Internet Archive also encourages libraries to populate their websites with links directing patrons to ebooks on IA's Website.  SUMF¶¶393-96.  IA openly markets the Open Libraries project with promises that Partner Libraries no longer need to license ebooks: joining as a Partner Library "ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format."  SUMF¶382.  Or, as it pithily suggests, "You Don't Have to Buy It Again."  SUMF¶383.

15

The Open Libraries project effectively turned Internet Archive into a centralized hub, which increases the number of books it loans beyond the number of physical copies it actually holds by counting millions of physical books in libraries scattered across the country. SUMF¶¶366-68. Under IA's current CDL practices, the maximum number of ebooks that it loans does not equal the number of physical copies in IA's *own* collection. SUMF¶¶368. This compounds the infringement of the Works by significantly increasing the number of concurrent loans permitted. SUMF¶367. Likewise, the patrons of each Partner Library, and any other library, linking to IA's Website can read far more copies of a title than the library physically owns. SUMF¶482. Indeed, IA expressly stated that it does not restrict lending to the patrons of particular libraries because it "lend[s] to the world." SUMF¶542.

Similarly, IA does not "dictate" or exercise any "control" over its Partner Libraries to make sure there is compliance with the "owned to loan" ratio. SUMF¶¶493-508. As IA admitted, it has "no way of knowing . . . whether the physical and digital copies of a book were in circulation simultaneously." SUMF¶495. Neither in the one-page agreement for Partner Libraries, nor in practice, does IA require Partner Libraries to ensure that the physical books in their collections, which are counted towards concurrent lending caps on IA's website, remain unavailable while the ebook is checked out. SUMF¶374. And IA knows that some libraries do *not* suppress circulation of their physical books and "are taking the approach that they don't need to suppress circulation" because the likelihood is "slim" that IA's digital copies and all their physical copies "would be checked out at the same time." SUMF¶493.

In sum, CDL provides no legal cover for Internet Archive's massive infringement, and further, the undisputed evidence establishes that IA's compliance with even the most critical

16

principles of CDL is a charade. This was most evident when, on March 24, 2020, IA dispensed with core CDL principals by launching a "National Emergency Library" ("NEL"), purportedly to address COVID-19 shutdowns. SUMF¶541. The NEL, which offered the same pool of ebooks previously available through CDL, abandoned the owned-to-loaned concept entirely. SUMF¶542. Unlimited free ebooks were made available because, IA admitted, "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19." SUMF¶548. The Copyright Office promptly issued a written letter to Congressman Udall raising doubts over the NEL's legality. SUMF¶¶551-52. IA ended the NEL on June 10, 2020, ten days after the Publishers filed this action, returning to its version of "traditional controlled digital lending." SUMF¶570.

For each iteration of its Website, Internet Archive refused to back down despite knowing that copyright owners – publishers, authors, rights organizations – strongly objected to the unauthorized republication of their work. SUMF¶¶448-60. Thousands of emails and letters have been sent by authors and publishers objecting to IA's infringements, including those with concrete evidence of "significant damage." SUMF¶¶622-635. Each of the four Publishers in this action has demanded the removal of thousands of their authors' works from IA's Website. SUMF¶¶622-33. IA not only failed to permanently remove books owned by complaining authors and Publishers, it increased the scope and scale of its Website. SUMF¶¶247-50, 264-69. Since this action was filed, IA has massively increased its infringement, adding more than two million in-copyright titles, with daily circulation of ebooks doubling, and the number of users increasing from 2.6 million to over 5.9 million. SUMF¶250. IA even added over 19,000 copies

17

of the Publishers' books to its Website after they filed suit.  SUMF ¶581.  In short, IA knowingly and willfully engages in industrial-scale copyright infringement.

## ARGUMENT

## I.  INTERNET ARCHIVE HAS INFRINGED PLAINTIFFS' COPYRIGHTS

The Publishers have satisfied the *prima facie* elements of copyright infringement, namely (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant.  The Publishers each hold exclusive publishing rights in the Works in Suit pursuant to 17 U.S.C. §106, including ebook rights, and the Works were timely registered with the Copyright Office.  SUMF ¶¶210-14.

The Publishers have established infringement because Internet Archive admits that it "digitally scanned physical books embodying the Works" and "provided … patrons with … digital versions of physical books embodying the Works" via its Website.  SUMF ¶¶242-45.  This conduct infringes five of the Publishers' exclusive rights.  First, Internet Archive violates the reproduction right (§106(1)) by creating multiple digital copies of every book scanned.  *Id.* Second, IA violates the right to prepare derivative works (§106(2)) by "recasting" the Publishers' print books into an ebook format.  *Google Books*, 804 F.3d at 215.  *See also id.*  Third, IA infringes the distribution right (§106(3)) by distributing ebook copies of the Works to its users via the Open Library.  *Id.*  Fourth, the public performance right (§106(4)) is violated by the "read aloud" function IA offers on its Website.  SUMF ¶276.  And fifth, IA has visibly shown the

18

Works to users through its in-browser viewer and thus infringed the Publishers' display right (§ 106(5)). *Id.*[1]

## II.     INTERNET ARCHIVE'S INFRINGEMENT IS NOT FAIR USE

Internet Archive's sole justification for infringing millions of in-copyright books is that its actions are fair use. They are not. IA freerides on the authors' literary contributions and aggressively competes with the Publishers' authorized digital works by republishing its own unlicensed ebooks in full, including over 30,000 titles that the four Publishers already market to libraries and retail consumers. This is the very opposite of fair use. The Copyright Clause embedded in the U.S. Constitution, art. I, § 8, cl. 8, demonstrates that "the Framers intended copyright … to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

Pursuant to 17 U.S.C. § 107, "the fair use of a copyrighted work, including … for purposes such as criticism, comment, news reporting, teaching[,] … scholarship, or research, is not an infringement of copyright." While these listed categories "have an illustrative and not limitative function … the illustrative nature of the categories should not be ignored," and IA's Website does not fall under any of them. *Ringgold v. Black Entm't TV, Inc.*, 126 F. 3d 70, 78 (2d Cir. 1997). Courts ultimately determine fair use by assessing and balancing four factors:

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

---

[1] Internet Archive is also liable for secondary copyright infringement because it contributed to, induced and vicariously caused direct infringement by users obtaining ebooks on the website. SUMF¶209.

19

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  Fair use may be resolved on summary judgment where, as here, the material facts are not in dispute.  *Google v. Oracle Am.*, 141 S. Ct. 1183, 1199-1200 (2021) ("[T]he ultimate question whether … facts showed a fair use is a legal question for judges to decide ….").

"Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it."  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018); *Andy Warhol Found for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 37 (2d Cir. 2021) (citation omitted), *cert. granted*, No. 21-869 (U.S. Mar. 28, 2022); *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 459 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2803 (2021).  Internet Archive cannot shoulder its burden of demonstrating that the four factors weigh in favor of fair use, whether viewed individually or in combination.

### A.     Factor One – The Purpose and Character of the Use

The first factor has been called the "heart of the fair use inquiry" (*Davis v. Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001)), and is "focused chiefly on the degree to which the use is 'transformative.'"  *Goldsmith*, 11 F.4th at 37.  The first factor weighs heavily against IA because there is no transformative purpose or legally cognizable justification for its infringements.

20

### 1. Internet Archive's Publication of Bootleg Ebooks on its Website Is Not Transformative

There is nothing transformative about Internet Archive's Website because it merely "repackage[s] [and] republish[es]" the full text of Publishers' books in unauthorized digital formats and publishes them for free, competing with the Publishers' authorized ebooks. *Authors Guild v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).

The Supreme Court instructs that "[t]he central purpose of [the transformativeness] investigation is to see . . . whether the new work 'supersede[s] the objects' of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994) (internal citations omitted). Where, as here, "the purpose of the challenged use is ... the same … purpose for which the [original] is sold, the defendants' use has indeed 'superseded the objects' of the original" and is not transformative. *Ringgold*, 126 F.3d at 79. And when a "text that contains protectable expression is included in another work, solely to convey the original text to the reader without adding any comment or criticism, the second work may be said to have supplanted the original because a reader of the second work has little reason to buy a copy of the original." *Id.*

The Internet Archive's republication of unauthorized ebook editions of the Works is a quintessential non-transformative use because the bootleg copies serve the exact same expressive "purpose" for which the originals are sold and licensed – *i.e.*, providing readers content to use and enjoy. Here, IA scans the Publisher's books in their entirety and publishes the resulting ebook on a Website whose homepage invites users to "Read Free Library Books Online."

21

SUMF¶256.  IA "makes no change in the copyrighted work.  It provides neither criticism, commentary, nor information about it."  *ReDigi*, 910 F.3d at 661.[2]

In an effort to gin up a transformative purpose, the Internet Archive seizes upon language in *TVEyes*, 883 F.3d at 177-78, and *ReDigi*, 910 F.3d at 661, suggesting that a secondary use may be transformative if it "expands [the] utility" of the original (despite the holdings in each case that there was no fair use).  More specifically, IA argues that its Website "utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." *ReDigi*, 910 F.3d at 661 (citing *Sony Corp of Am. v. Universal City Studios*, 464 U.S. 417 (1984)).  In other words, IA argues that "[d]igital lending of library books is more efficient than physical lending...."  Dkt. 79 (IA Pre-Motion Ltr.), 2.  So true, but *authorized* ebooks licensed through the vast library market provide the exact same efficiencies. SUMF¶¶80-88, 117.

Internet Archive conveniently ignores that Judge Leval's *ReDigi* decision provides "[e]xamples of such utility-expanding transformative uses," which make abundantly clear that IA's activities are not consistent with fair use.  *ReDigi*, 910 F.3d at 661.  Transformative "utility-expanding" uses involve copying that achieves a fundamentally different purpose from the original – most typically a previously-unavailable "full-text searchable database and public

---

[2] *See also Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 342 F.3d 191, 200 (3d Cir. 2004); *AP v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 552 (S.D.N.Y. 2013); *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 71-72 (2d Cir. 1999); *United States v. Am. Soc'y of Composers, Authors & Publishers* ("*ASCAP*"), 599 F. Supp. 2d 415, 424 (S.D.N.Y. 2009).

search function." *Id.* Notably, the transformative functions "did not allow users to read the texts" in full, but rather involved the snippets in *Google Books* or a database used to detect plagiarism (*iParadigms*). *Id.* (citing other examples).

Nor does *ReDigi*'s reference to *Sony* support IA's "utility" argument. *Id.* (citing 464 U.S. at 448-55).[3] In *Sony*, the Supreme Court held that the manufacturer of Betamax home video recorders was not liable for contributory copyright infringement when home dwellers recorded broadcast television shows to facilitate home viewing at a more convenient time (*i.e.*, "time-shifting"). *Sony*, 464 U.S. at 442. *Sony* held that the first factor tipped in favor of fair use because "time-shifting for private home use" "merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Id.*, 464 U.S. 417. *ReDigi* and *TVEyes* emphasize that the home-video recording in *Sony* was transformative "because the improved delivery was to one entitled to receive the content." *ReDigi,* 910 F.3d at 661; *TVEyes*, 883 F.3d at 177.

IA's Website bears no relation to the "single, noncommercial home viewing" at issue in *Sony* because IA is not converting books to digital formats for its own personal convenience, but is rather systematically republishing millions of unauthorized, in-copyright ebooks and disseminating them to the world. SUMF¶¶203-209, 215-345. Moreover, unlike television channels broadcasting free content over the airwaves ("in [their] entirety free of charge"), libraries and retail consumers pay Publishers to access authorized ebook copies – and Internet

---

[3] *Cf. TVEyes*, 883 F.3d at 188-90 (Kaplan, J., concurring) ("I certainly do not find within *Sony* the idea that efficiency-enhancing technology is transformative.").

Archive has not been "invited" to consume this content for free. SUMF¶¶128-29, 201. *See*

*A&M Records v. Napster*, 239 F.3d 1004, 1019 (9th Cir. 2001) (finding *Sony* to be "inapposite"

because its time shifting did not "involve distribution of the copyright material to the general

public").

Further, the Second Circuit's decision in *Google Books* makes explicitly clear that "the

recasting of a novel as an e-book" constitutes the creation of a derivative work, which is a right

accorded to the rightsholder and is *not* a "transformative use." *Google Books*, 804 F.3d at 215

("While such changes can be described as transformations, they do not involve the kind of

transformative purpose that favors a fair use finding"). This is in keeping with longstanding

precedent that the first factor weighs heavily against infringers who do nothing more than

"change[] the format" of a preexisting work. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104,

108 n.2 (2d Cir. 1998). *See also Disney Enters. v. VidAngel*, 869 F.3d 848, 862 (9th Cir. 2017)

(courts "unanimously reject the view that space-shifting is fair use under § 107" and holding it

was not fair use to "make[] illegal copies of pre-selected movies [on discs] and then sell[]

streams … in a different format than that in which they were bought."); *HathiTrust*, 755 F.3d at

96 ("Added value or utility is not the test: a transformative work is one that serves a new and

different function from the original work and is not a substitute for it.").[4] In short, IA's "utility"

argument does not comport with the law.

---

[4] *See also UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (service that
"simply repackage[d] those recordings to facilitate their transmission through another medium" was not
transformative); Letter from The Register of Copyrights to Senator Tom Udall dated May 15, 2020 at 11-
12 (hereinafter "Copyright Register/Internet Archive Letter") ("[S]imply reproducing a work in a new

Finally, the artificial strictures of CDL – which IA does not even follow – do not magically convert IA's derivative use into a transformative one. IA's adoption of arbitrary and ever changing restrictions that loosely imitate some – while ignoring others – of the Publishers' terms for library ebooks merely confirms that IA's ebooks are near perfect market substitutes for authorized ebooks. SUMF¶¶351-574. In *ReDigi* the defendant had a resale platform for digital music files that operated on principles roughly akin to a 1:1 own-to-loan ratio, but that did not rescue its fair use argument. *ReDigi*, 910 F.3d at 653-55. *See also Vidangel*, 869 F.3d at 861 ("Vidangel's purchases of discs . . . does not excuse its infringement.")

Here, by trampling on the Publishers (and authors) rights, Internet Archive by definition "unreasonably encroach[es] on the commercial entitlements of the rights holder." *ReDigi*, 910 F.3d at 661. This is one of the "exceedingly obvious" cases of unlawful copyright infringement recognized by Justice Story where "the whole substance of one work has been copied from another" and used for the exact same expressive purpose as the Publishers' authorized products. *Folsom v. Marsh*, 9 F. Cas. 342, 344 (Cir. Ct. Mass. 1841).

### 2. Internet Archive's Claimed Non-Profit Status Does Not Support Fair Use

The first factor also considers "whether [the] use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). While Internet Archive contends that it is a nonprofit library that lends books for free, it does not get a free pass for copyright infringement because of its tax status and decision not to charge users. *Penguin Grp. (USA) v. Am. Buddha*,

---

format is not transformative. Specifically, courts have held that reproducing the text of physical books in digital format is not transformative unless the change in format results in new *uses* for the work.").

25

2015 WL 11170727, at *4-5 (D. Ariz. May 11, 2015). First, IA does not exist for a "nonprofit *educational purpose*[]." It indisputably does not use the Works to teach students in a structured manner, like a school or university does. Further, the Website substantially consists of general interest books – including romances, thrillers and fantasy novels which are not inherently "educational." SUMF¶¶514-16. Nor does IA add anything of educational value to its bootleg ebooks – like criticism or scholarship. SUMF¶¶281-82. Finally, as the Second Circuit has made clear, "there is … no reason to presume categorically that a nonprofit educational purpose should qualify as a fair use" because the "publication of educational materials would be substantially curtailed if such publications could be freely copied for nonprofit educational purposes." *Google Books*, 804 F.3d at 219 n.20.

The evidence also shows that IA engages in significant commercial undertakings, all in service of finding ways to expand its free ebook Website without paying rightsholders. The determination of whether a use is commercial "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from the exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. Under the correct analysis, "the profit/non-profit distinction is context specific, not dollar dominated" (*Weissman v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)), and courts consider things like increased standing in the community or indirect financial gains like donations. *See, e.g.*, *Am. Buddha*, 2015 WL 11170727, at *4 (noncommercial status of online library rejected where the website solicited donations and stood to gain recognition and financial support via the posting of the books); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012) (church official's posting of religious texts on website qualified as commercial because

defendant "benefitted by being able to provide, free of cost, the core text of the Works to members of the Orthodox faith, and by standing to gain at least some recognition within the Orthodox religious community for providing electronic access").[5]

Internet Archive actively uses its Website to attract new members, solicit donations and bolster its contention that it has standing in the library community. SUMF¶¶378-88. Even more telling, IA has grown the Website by engaging in a host of activities that its own Director of Finance deemed "commercial" – like its scanning business that generated tens of millions of dollars. SUMF¶¶289-99. Indisputably "commercial" is IA's effective ownership of and entanglement with Better World Books, an enormous for-profit company. SUMF¶¶322-45. The for-profit activities conducted by BWB are integral to IA's operations. *Id.* As Kahle wrote to a potential investor before, he hoped BWB would be "*profitable*" because "the successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world." SUMF¶331 (emphasis added). BWB also commits significant resources to running the "book pipeline" that syphons millions of books away from BWB so that IA can digitize them in offshore scanning centers. SUMF¶¶338-345. This has enabled IA to ramp up to its goal of digitizing one million books per year. SUMF¶332.

---

[5] *See also Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000) (same); *Northland Family Planning Clinic, Inc. v. Ctr. for Bio-Ethical Reform*, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012) (commercial use where infringing videos "generated traffic to the anti-abortion websites" and defendants thus "appropriated the copyrighted material to advance their own message"); *Weissmann*, 868 F.2d at 1324.

27

The highly commercial "synergies" between IA and BWB are hallmarks of commercial activity, like the "Purchase at Better World Books" buttons that appear at the top of the browser window on the Website whenever a book is checked out. SUMF¶346. This link drives users to BWB, where they can pay for a used copy and generate revenue to be reinvested in acquiring more books for IA to digitize. SUMF¶347. And BWB pays IA every time a user clicks the "Purchase" link. *Id*. As IA's Director of Finance admitted, practically every webpage on the Website is "monetized" because it contains the "Purchase" button or a link inviting users to donate money directly to Internet Archive. SUMF¶¶346-50. The Supreme Court makes clear that "the less a use provides transformative value, the more its commercialism will weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. IA's patently non-transformative copying of the Works, coupled with its many commercial elements, decidedly stacks the first factor against fair use.

**B.      Factor Two – The Nature of the Copyrighted Work**

The second factor weighs strongly against fair use because the Works are fiction and non-fiction books – *i.e.*, "creative expression" – that "fall[] within the core of the copyright's protective purposes." *Campbell*, 510 U.S. at 586. This is self-evident for the many Works of fiction, including award winning books by Sylvia Plath, Cormac McCarthy, and J.D. Salinger. No less worthy of protection are the non-fiction Works, which are not fact-bound "directories" but more akin to "elegantly written biograph[ies]." *Harper & Row*, 471 U.S. at 563 (citation omitted). As the Second Circuit stated in *Google Books*, 804 F.3d at 220, "[w]hile each of the three Plaintiffs' books in this case is factual, we do not consider that as a boost to Google's claim

28

of fair use." Accordingly, the second factor weighs equally strongly against fair use for all 127 Works.

### C. Factor Three – The Amount and Substantiality of the Use

"The third factor, amount and substantiality… used, recognizes that the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad.*, 150 F.3d at 109. While the "use of the entirety of a [work] is not necessarily inconsistent with a finding of fair use," there is likewise no question that wholesale copying, as here, clearly "tends to disfavor a finding of fair use." *ReDigi*, 910 F.3d at 662; *see also Campbell*, 510 U.S. at 587-88 ("A work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original."). "The Copyright Office has ... consistently expressed doubt that providing digital access to complete works can be considered a fair use." Copyright Register/Internet Archive Letter at 19. Thus, the third factor weighs heavily against fair use. *See TVEyes*, 883 F.3d at 179 ("[Third factor] clearly favors Fox because TVEyes makes available virtually the entirety of the Fox programming that TVEyes users want to see and hear.").

### D. Factor Four – The Effect of Internet Archive's Uses on the Potential Market for the Works in Suit

The fourth factor focuses on "the effect of the use upon the *potential* market for or value of the copyrighted work." *Ringgold*, 126 F.3d at 80 (emphasis in original) (quoting 17 U.S.C. §107(4)). The relevant inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row*, 471 U.S. at 568. A secondary use that "competes in the rightsholder's market as an effective substitute for the original … impedes the purpose of copyright to incentivize new creative works by enabling their creators to profit from

29

them." *ReDigi*, 910 F.3d at 662. Critically, this factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (citation omitted).

The first and fourth factors are closely linked. Id. at 591. "[W]hen a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur." *Id.* (internal citation, quotation marks and alterations omitted). This observation is not limited to commercial uses as courts have found it applies equally to nonprofit websites distributing literary works for free (outside of the educational context). *See, e.g.*, *Am. Buddha,* 2015 WL 11170727, at *6; *Gregory*, 689 F.3d at 64.

Courts have recognized two related but distinct species of fourth factor market harm – lost licensing revenue from the defendant and market substitution – and both are relevant here.

### 1. Lost Fees from the Internet Archive

First, Internet Archive harms the Publishers by failing to pay them fees for the distribution of their works. Under settled law, there is market harm when the infringer engages in "exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562. "The fourth factor will favor [the Publishers] if [they] can show a traditional, reasonable, or likely to be developed market for licensing" and failure by the infringer to pay a customarily paid fee. *Ringgold*, 126 F.3d at 81 (citation and internal quotation marks omitted). In *TVEyes*, the Second Circuit found market harm when a media monitoring

service failed to pay Fox for the distribution of its news clips. "It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."  883 F.3d at 180 (citation omitted).  *See also Davis*, 246 F.3d at 165 ("If a copier of protected work, instead of obtaining permission and paying the fee, proceeds without permission and without compensating the owner, it seems entirely reasonable to conclude that the owner has suffered damages to the extent of the infringer's taking without paying what the owner was legally entitled to exact a fee for."); *Meltwater*, 931 F. Supp. 2d at 559  ("By refusing to pay a licensing fee to AP, Meltwater not only deprives AP of a licensing fee in an established market for AP's work, but also cheapens the value of AP's work by competing with companies that *do* pay a licensing fee ....").[6]

The Second Circuit further held in *Ringgold* that, in order to establish loss of customary license fees, the Publishers are "not required to show a decline in the number of licensing requests" from third parties or lost sales. *Ringgold*, 126 F.3d at 81 n.16.  Nor would a potential increase in sales change that conclusion: "Even if the unauthorized use of plaintiff's work in the televised program might increase poster sales, that would not preclude [plaintiff's] entitlement to a licensing fee." *Id.* at n.16; *see also Twin Peaks Prods. v. Publ'ns Int'l Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (promoting discoverability of original work is irrelevant).

This species of market harm is easily established here.  IA's library expert testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and

---

[6] *See also ASCAP*, 599 F. Supp. 2d at 432; *UMG Recordings*, 92 F. Supp. 2d at 352.

31

"is predicated on licensing revenues that are paid by libraries to entities like OverDrive." SUMF¶577. And IA has consistently held itself out as a "non-profit library" that offers users "millions of free books" (and "ebooks" specifically), but it has never paid the fees that libraries customarily pay to provide precisely the same service: free short-term ebook loans. SUMF¶¶286-88. The lost fee revenues for the 33,000 of Plaintiffs books on the Website are huge. SUMF¶¶575-88. Given IA's failure to pay customary license fees, the fourth factor favors the Publishers. *See Ringgold*, 126 F.3d at 81; *TVEyes*, 883 F.3d at 180.

This conclusion is underscored by the fact that Internet Archive undermines the Publishers' digital strategy. Revenues from *all* formats are critical to preserving the incentives for Publishers (and their authors) to create new books and invest in new technologies. SUMF¶¶63-68. Print books have never been sold (or priced) with the expectation that they will become ebooks readily capable of no-cost worldwide distribution. *Id.* Given the inherent differences between ebooks and print books, it is critical to protect the Publishers' exclusive right to tailor appropriate terms for each market and format, including limiting library ebook loans to local community members and metering limitations based on time or number of circulations. *See* 7-9, *infra*. IA circumvents all those carefully designed restrictions – and compounds the lost licensing revenues – by lending ebooks on terms of its own devising – including global distribution, setting lending caps according to the number of books owned by Partner Libraries and foregoing metering. SUMF¶¶351-77.

Nor does this conclusion conflict with "the danger of circularity in considering whether the loss of potential licensing revenue should weigh the fourth factor in favor" of fair use. *Ringgold*, 126 F.3d at 81. The Second Circuit "avoid[s] the vice of circularity by considering only traditional, reasonable, or likely to be developed markets when considering a challenged use

32

upon a potential market" – and authorized library and retail ebook markets certainly qualify. *Id.* (citation omitted). Moreover, the "vice of circularity" arises in cases where the secondary use is transformative and thus justifies the non-payment of a fee – but IA's copying is blatantly non-transformative. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006). And IA cannot undermine a finding of lost fees and hence market harm by arguing that the Publishers refuse to "sell" (vs. license) ebooks on terms it is willing to accept. This is because "[h]ypothetical-license damages assume rather than require the existence of a willing seller and buyer." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014); s*ee also Davis*, 246 F.3d at 165 ("[W]hether the infringer might in fact have negotiated with the owner or purchased at the owner's price is irrelevant.").

In short, IA's failure to pay fees, when libraries customarily pay fees to lend ebooks, establishes market harm without more.

### 2. Market Substitution: IA Offers A Competing Substitute, Leading to Potential Lost Ebook Sales to Libraries and Consumers

Viewed from another angle, the Publishers have suffered market harm because IA's Website "offers the marketplace a significantly competing substitute for the [Works]." *Google Books*, 804 F.3d at 222. If public and academic libraries and consumers use the Website to access complete copies of the Works and over 30,000 of the Publishers' other titles, rather than acquiring authorized ebooks, the Publishers will experience significant potential lost ebook revenues in these markets and harm to the value of their works. SUMF¶¶580-88, 589-620. Moreover, the Open Libraries project greatly increases the harm (which will grow exponentially if condoned) because the project turns IA into a centralized hub, which counts millions of additional copies of print books located in libraries scattered across the country towards IA's

lending caps. SUMF¶¶362-77. In short, Internet Archive offers a competing substitute for the Publishers' ebooks, creating the "likelihood that potential purchasers may opt to acquire the [Internet Archive's] copy in preference to the original." *Google Books*, at 223. IA distributes the Publishers "copyrighted material in a market that [the Publishers], as the copyright owner, [are] exclusively entitled to exploit. . . . [Defendant] *replaces* [Plaintiffs] as the supplier of those [ebooks] to meet the demand of [its] customers. This is precisely the kind of harm the fourth factor aims to prevent." *Infinity Broad.*, 150 F.3d at 111; *Twin Peaks*, 996 F.2d at 1377 (fourth factor focuses on whether the Defendant "competes in markets in which [the Publishers have] a legitimate interest"); *ReDigi*, 910 F.3d at 662.

To prevail, the Publishers do not need to present evidence of specific lost revenue – a near-impossible task to reliably perform given that each Work has a unique lifecycle and its revenue is impacted by innumerable factors that change over time. SUMF¶¶27-29, 59-62. The Second Circuit "ha[s] never held that the rightsholder bears the burden of showing actual market harm" to establish unlawful market substitution "[n]or would [it] so hold." *Goldsmith*, 11 F.4th at 49. Further, "[a] rule that would require a victim of infringement to delay taking action to defend its copyright until actual (and perhaps irreparable) harm had accrued would run contrary to the very purpose of the Copyright Act." *Gregory*, 689 F.3d at 64 n.23 (citation omitted). Instead, the question is whether the IA's complete ebooks "could usefully serve as a competing substitute for the original." *Google Books*, 804 F.3d at 221-22.

Thus, for example, in *American Buddha*, the nonprofit website distributing free unauthorized scanned copies of Penguin's books argued that the fourth factor weighed in its favor because Penguin "failed to present financial data regarding the market harm caused by

34

American Buddha's publication of the Works."  The district court rejected that argument,

holding that because American Buddha "offered identical or near-identical versions of the

creative Works on its Website for the precise purpose for which [the plaintiff] had created the

Works in the first place," it had "harmed their potential market value."  2015 WL 11170727, at

*6.  "In addition, unrestricted and widespread conduct of the sort engaged in by American

Buddha would essentially gut the potential market for the Works.  'If anyone could freely access

the Works ... the plaintiff would have no market in which to try and publish ....'"  *Id.* (quoting

*Gregory*, 689 F.2d at 65).

Here, the relevant market is the Publishers' market for ebooks, particularly the library

and retail channels.[7]  Since the Publishers' have established themselves as major players in a

thriving ebook market (SUMF¶¶93-182), Internet Archive's publication of unauthorized,

complete ebook editions of the Works for reading purposes is sufficient to establish potential

market substitution without more.  Once again, *Google Books* is instructive.  The Second Circuit

noted that even transformative copying would cause market harm "if done in a manner that

results in the widespread revelation of sufficiently significant portions of the original as to make

available a significantly competing substitute."  *Google Books*, 804 F.3d at 223.  While Google

Books' snippets were deemed too brief and disjointed to "threaten the rights holders," the

---

[7] For purposes of this motion only, the Publishers do not address whether IA harms its markets for print

books or audiobooks – although they do not concede that there was no harm to those markets and reserve

the right to establish such harm at later proceedings.

Second Circuit made plain that publication of entire books would give rise to a "strong" claim of infringement. *Id*. at 223-25.

Internet Archive's own documents and testimony confirm the obvious – that its ebooks are capable of acting as a substitute for the Publishers' authorized ebook editions (and are often intended as such). While IA periodically proclaims without any evidence that its users only quickly browse their ebooks, internal documents show that IA's users read books via the Website – which is no surprise. SUMF¶¶256-62. An employee of IA has referred to the Website as providing "Similar Services" to library aggregators and stated that Internet Archive "competes for eyeballs" with Amazon and OverDrive. SUMF¶¶524-25. And IA cajoles libraries to use its Website instead of authorized library ebooks in presentations urging libraries to join the Open Libraries project. SUMF¶378. For example:

- IA says its Open Libraries model "*ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format*."

- IA's click-through agreement with its Open Libraries partners explicitly states: "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."

- In a document titled "Maximizing institutional investment in print resources through controlled digital lending," IA summarizes its offer to turn print books into ebooks as *"You Don't Have To Buy It Again."*

- Yet another Internet Archive presentation summed up the benefits of joining the Open Libraries Project as follows:

36



SUMF¶¶379-388.

These documents are irrefutable proof that IA causes (and will cause) harm to the Publishers and their authors. They necessarily experience lost library ebook revenues when libraries do not "purchase the same content again" in an electronic format and instead make use of ebooks on IA's Website that were created from scanning print books. Further, courts recognize the common sense conclusion that "[i]t is difficult to compete with a product offered for free.… Even if every download does not represent a lost sale, … it is plain that consumers who regularly pay for [content] would shift to free downloads if given the chance." *Sony BMG Music Entm't v. Tenenbaum*, 672 F. Supp. 2d 217, 231 (D. Mass. 2009).

The testimony of Internet Archive's own witnesses underscore this market harm. IA's library expert testified that it is her "expert opinion that libraries will spend less money on licensing the e-Book editions of the particular titles that were provided through CDL." SUMF¶¶526-27. That would be a direct loss for the publisher and author of that title. Multiple third party witnesses proffered by IA also testified that they have used IA's Website to access ebooks that they could have read as an authorized library ebook (for example, through their

37

university library).  SUMF¶¶528-29.  Lower patron demand ultimately depresses library ebook acquisitions and thus royalties to rightsholders.  SUMF¶¶526-29.

Finally, there is no question that "unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (citation omitted).   Since courts must focus on the prospective impact of unrestricted and widespread infringement, not just historic lost sales, it is highly significant that Internet Archive has far more members and views today than in June 2020 when the Works were taken down and has plans for further significant expansion.  SUMF¶¶247-50.  Moreover, in similar cases where the defendants have provided free copies of all (or substantially all) of a work, courts regularly assume that "unrestricted and widespread conduct of the sort engaged in by the defendant" would result in a substantial adverse impact.  *See, e.g.*, *Gregory*, 689 F.3d at 65 ("If anyone could freely access the Works, … the Monastery would have no market in which to try and publish, disseminate or sell its translations . . . . and to reap the fruits of its labor.").

Indeed, it is not difficult to envision that allowing Internet Archive to continue its current trajectory would cause devastating consequences for the Publishers.  Aided by its industrial scanning apparatus and book pipeline, IA can realistically achieve its goal of offering 80% of all books currently residing in libraries within the decade.  SUMF¶406.  Lending caps are simultaneously ballooning thanks to the ingestion of partner libraries' catalogues via the overlap analysis, and there is a real risk that waitlists will be reduced further.  SUMF¶¶389-92.  While fewer than 15 public libraries now act as partner libraries in the Open Libraries program, presumably because of copyright concerns, their "widespread" participation would vastly

38

increase the number of IA's copies of the type of trade books published by the Plaintiffs. SUMF¶¶367-69. IA's data indicates that more titles and more available copies attracts more users to its Website, which will inevitably depress demand for authorized library and retail ebooks. SUMF¶¶544-46. Given that Internet Archive currently has 25 million borrows a year, the realistic prospect of a few hundred million "borrows" a year would clearly cause substantial harm to the Publishers' potential markets for the Works. In a world in which there is "unrestricted and widespread conduct" of the sort engaged in by IA, other nonprofit entities (some opportunistically branded as libraries) would compete against the Publishers with their own unauthorized digital products, scanned from the millions of print books currently circulating. SUMF¶¶69-75, 620. (Nor would there be any reason to limit the Court's ruling to books. The same principle could be used to create a "universal media library" from currently unused CDs, DVDs and video games.) It is evident to the Publishers from their decades of experience and basic economic common sense that the unregulated growth of centralized databases offering millions of free ebooks would cause substantial losses and seriously imperil their ability to publish new books, support authors with a reliable stream of royalties and invest in new publishing technologies like authorized library ebooks. SUMF¶¶589-621. The fourth factor weighs heavily against fair use.

### E. Aggregate Assessment of the Four Factors

The factors weigh strongly against fair use, both singularly and in the aggregate. Internet Archive engages in commercial operations to scan millions of highly creative books in their entirety and posts the resulting copies on its Website for the quintessentially non-transformative purpose of providing users with free reading material, thus violating the Publishers' valuable

39

right to create derivative works and causing market harm. SUMF¶¶215-635. As the Copyright Office stated in a report about mass digitization, "there is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety."[8] This case should be no exception.

Internet Archive's position that the Website's public benefit – namely its promotion of broad, free access to books – outweighs the rights of the Publishers and their authors is without merit.[9] The Supreme Court's observation in *Harper & Row* fittingly governs: "Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." 471 U.S. at 569. Thus, courts in the copyright context have only permitted categorical exceptions to copyright law in limited circumstances, none of which apply here: *e.g.*, where the challenged works are transformative or incorporated by official legal codes, where there is no existing market for distribution of the work, or where, in a teaching or research setting, an academic or similar institution distributes limited excerpts of a work for the advancement of research or education. Copyright law would be a nullity if Internet Archive's generic public interest argument prevailed. "If every volume that was in the public interest could be pirated

---

[8] U.S. Copyright Office, Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101 (2015), https://www.copyright.gov/orphan/reports/orphan-works2015.pdf.

[9] The Supreme Court recently considered public benefits as part of the fourth factor analysis in a case involving the copying of highly functional computer code, but it warned that this may not "always [be] relevant to the application of fair use" and suggested that the sole focus on such an inquiry would be on the benefits of a transformative use. *Oracle Am.*, 141 S. Ct. at 1206.

away by a competing publisher … the public soon would have nothing worth reading." *Harper & Row*, 471 U.S. at 559 (citation and alteration omitted).

Likewise, any effort by IA to argue that it is sound public policy to employ the fair use analysis to advance the spirit of the first sale doctrine, despite violating its terms, cannot stand after *ReDigi*. As Judge Leval stated, the first sale doctrine codified at 17 U.S.C. §109 is a provision of the Copyright Act in which "Congress has taken control, dictating both policy and the details of its execution" and Congress determined that first sale does not extend to unauthorized *reproductions*. 910 F.3d at 664. Given Congress' clear intent, and since courts "are poorly equipped to assess the inevitably multifarious economic consequences" of changes in the law, courts should not "substitute their judgment for that of Congress" on this issue. *Id.* at 663-64. Any such interference with Congress' explicit legislation would be particularly inappropriate here since a subcommittee of the House Judiciary Committee recently conducted a "comprehensive [ ] review" of the Copyright Act, including a June 2014 hearing on the first sale doctrine in a digital age, but ultimately did not revise §109. SUMF§403-05.

The public is best served by putting an end to IA's mass infringement. "The economic philosophy behind the [Copyright] [C]lause ... is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors." *Eldred v. Ashcroft*, 537 U.S. 186, 214 (2003) (citation omitted). The ability of copyright law to incentivize the creation of new works will be profoundly undermined if Internet Archive devalues books further by continuing its mission to put bootleg copies of every book it can acquire on the Website.

41

## III.  THE NATIONAL EMERGENCY LIBRARY WAS NOT FAIR USE

The National Emergency Library was not a fair use for the same reasons that IA's practice of CDL is not fair use, plus more.  While COVID-19 was a historic emergency, copyrights were not suspended and access to authorized library ebooks continued.  As the Copyright Office noted in a letter casting significant doubt on the legality of the NEL, the general population of authors struggled during this time and were heavily reliant on royalty income from their copyrights.  Copyright Register/Internet Archive Letter at 21-22.  Further, as that letter reiterated, "publishers and authors … responded to the crisis by engaging in efforts to ensure that readers, students, and others continue[d] to be able to access their works .…"  *Id.* at 2.  These efforts included new terms, discount prices and free ebooks for approved classroom use.  SUMF¶187-97.

Ultimately, the NEL underscores IA's conviction that it is the final arbiter of how the Publishers' books are published in digital formats, which turns copyright on its head.  IA does not feel bound even by the limitations it has imposes on itself.  SUMF¶542.   Whatever version of "controlled digital lending" it is currently using, the Internet Archive's "universal access" scheme violates fundamental principles of copyright law and should be halted.

### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant their motion for summary judgment against Internet Archive with respect to the causes of action set forth in the Complaint.

Dated: New York, New York  
July 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*

Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
  lindasteinman@dwt.com
  jackbrowning@dwt.com
  jessefeitel@dwt.com
  carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
  scott@oandzlaw.com
  danae@oandzlaw.com

*Attorneys for Hachette Book Group,*
*Inc., HarperCollins Publishers LLC,*
*John Wiley & Sons, Inc., and Penguin*
*Random House LLC*

43

**CERTIFICATION OF COMPLIANCE**

As counsel of record to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC, I hereby certify that this brief complies with the type-volume limitations set forth in this Court's Individual Rule II.D and complies with all formatting requirements set forth therein. I am relying upon the word count function of the word-processing system (Microsoft Word), which indicates that 11,870 words appear in the brief, except for the portions excluded from the word count by Rule II.D.

/s/ Elizabeth A. McNamara
_____
Elizabeth A. McNamara

44

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | ORAL ARGUMENT REQUESTED |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**DECLARATION OF JOSEPH C. GRATZ IN SUPPORT OF DEFEDANT INTERNET ARCHIVE'S MOTION FOR SUMMARY JUDGMENT**

I, Joseph C. Gratz, declare as follows:

1.     I am an attorney licensed to practice in the state of California, and represent for Defendant Internet Archive in this matter. I make this declaration from personal knowledge, and if called to testify, I could and would testify competently to the facts stated herein.

2.     Attached hereto as **Exhibit A** is a true and correct copy of the Stipulation of Undisputed Facts entered into by the parties to this matter on June 10, 2022.

3.     Attached hereto as **Exhibit B** is a true and correct copy of excerpts from the Supplemental Expert Report of Prof. Ian Foster, served in this matter on March 31, 2022.

4.     Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the corrected transcript of the deposition of Steve Potash, taken in this matter on January 31, 2022.

5.     Attached hereto as **Exhibit D** is a true and correct copy of a document produced by Plaintiff HarperCollins Publishers LLC, in this matter assigned Bates number HC0030132.

6.     Attached hereto as **Exhibit E** is a true and correct copy of a document produced by Plaintiff Penguin Random House LLC, in this matter assigned Bates number PRH0072194.

7.     Attached hereto as **Exhibit F** is a true and correct copy of a document produced by Plaintiff Hachette Book Group, Inc., in this matter assigned Bates number HACHETTE0012377.

8.     Attached hereto as **Exhibit G** is a true and correct copy of the Position on Controlled Digital Lending issued on June 2, 2021, by the International Federation of Library Associations and Institutions, available at https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf.

1

9.      Attached hereto as **Exhibit H** is a true and correct copy of the Public Libraries Association's post entitled, "Public Libraries Respond to COVID-19: Survey of Response & Activities," available at https://www.ala.org/pla/issues/covid-19/march2020survey.

10.     Attached hereto as **Exhibit I** is a true and correct copy of an article posted on March 6, 2020 (updated on October 13, 2021) to the website of *EducationWeek* entitled "Map: Coronavirus and School Closures in 2019-2020," available at https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03.

11.     Attached hereto as **Exhibit J** is a true and correct copy of excerpts from the transcript of the deposition of Adam Silverman, taken in this matter on December 6, 2021.

12.     Attached hereto as **Exhibit K** is a true and correct copy of an article by Jill Lepore published in *The New Yorker* on March 26, 2020, entitled "The National Emergency Library Is a Gift to Readers Everywhere," available at https://www.newyorker.com/books/page-turner/the-national-emergency-library-is-a-gift-to-readers-everywhere.

13.     Attached hereto as **Exhibit L** is a true and correct copy of a Public Libraries Survey from the website of the Institute of Museum and Library Services, available at https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

14.     Attached hereto as **Exhibit M** is a true and correct copy of an entry on WorldCat for *The lion, the witch, and the wardrobe*, available at https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231.

15.     Attached hereto as **Exhibit N** is a true and correct copy of excerpts from the transcript of the deposition of Skip Dye, taken in this matter on November 18, 2021.

2

16.     Attached hereto as **Exhibit O** is a true and correct copy of an article by Jim Milliot dated February 24, 2017, posted to the website of *Publishers Weekly* entitled, "Ranking America's Largest Publishers", available at https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html.

17.     Attached hereto as **Exhibit P** is a true and correct copy of excerpts from the 2018 Annual Report of Bertelsmann.  The entire document is available at https://www.bertelsmann.com/media/investor-relations/annual-reports/bertelsmann-annual-report-2018-finance-engl.pdf.

18.     Attached hereto as **Exhibit Q** is a true and correct copy of excerpts from the 2019 Annual Report of Bertelsmann.  The entire document is available at https://www.bertelsmann.com/media/investor-relations/annual-reports/annual-report-2019-financial-information-2.pdf.

19.     Attached hereto as **Exhibit R** is a true and correct copy of excerpts from the 2021 Annual Report of Bertelsmann.  The entire document is available at https://www.bertelsmann.com/media/investor-relations/annual-reports/annual-report-2021.pdf.

20.     Attached hereto as **Exhibit S** is a true and correct copy of excerpts from the 2020 Form 10-K filed by John Wiley & Sons, Inc. with the United States Securities and Exchange Commission.  The entire document is available at https://investors.wiley.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=14241927.

21.     Attached hereto as **Exhibit T** is a true and correct copy of excerpts from the 2021 Form 10-K filed by John Wiley & Sons, Inc. with the United States Securities and Exchange Commission.  The entire document is available at https://investors.wiley.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=15076679.

3

22.     Attached hereto as **Exhibit U** is a true and correct copy of excerpts from the 2019 Annual Report of News Corp.  The entire document is available at https://www.annualreports.com/HostedData/AnnualReportArchive/n/NASDAQ_NWS_2019.pdf .

23.     Attached hereto as **Exhibit V** is a true and correct copy of excerpts from the 2021 Annual Report of News Corp.  The entire document is available at https://newscorp.com/wp-content/uploads/2021/10/News-Corp-2021-Annual-Report.pdf.

24.     Attached hereto as **Exhibit W** is a true and correct copy of excerpts from the English-language version of 2018 Universal Registration Document filed by Lagardère with the French government.  The entire document is available at https://www.lagardere.com/fichiers/fckeditor/File/actionnaires%20individuels/assemblee_generale/2019/Documents/190405_Lagardere_Reference_Document_Fiscal_Year_2018.pdf.

25.     Attached hereto as **Exhibit X** is a true and correct copy of excerpts from the English-language version of 2020 Universal Registration Document filed by Lagardère with the French government. The entire document is available at https://www.lagardere.com/fichiers/fckeditor/File/Relations_investisseurs/Publications/2021/Rapport_Annuel/210531_URD_2020_EN.pdf.

26.     Attached hereto as **Exhibit Y** is a true and correct copy of excerpts from the English-language version of 2021 Universal Registration Document filed by Lagardère with the French government.  The entire document is available at https://www.lagardere.com/fichiers/fckeditor/File/actionnaires%20individuels/assemblee_generale/2022/URD/220405_Lagardere_SA_URD_EN.pdf.

4

27.     Attached hereto as **Exhibit Z** is a true and correct copy of an article by James Milliot dated January 29, 2021, posted to the website of *Publishers Weekly* entitled, "A Year for the (Record) Books in Publishing", available at https://www.publishersweekly.com/pw/by-topic/industry-news/bookselling/article/85453-a-year-for-the-record-books.html.

28.     Attached hereto as **Exhibit AA** is a true and correct copy of an article by James Milliot dated April 1, 2022, posted to the website of *Publishers Weekly* entitled, "America's Biggest Publishers Keep Posting Profits", available at https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/88925-america-s-biggest-publishers-keep-posting-a-profit.html.

29.     Attached hereto as **Exhibit BB** is a true and correct copy of a *New York Times* article by Elizabeth Harris dated December 29, 2020 (updated October 4, 2021) entitled "Surprise Ending for Publishers: In 2020, Business Was Good", available at https://www.nytimes.com/2020/12/29/books/book-publishing-2020.html.

30.     Attached hereto as **Exhibit CC** is a true and correct copy of excerpts from the transcript of the deposition of Josh Marwell, taken in this matter on December 3, 2021.

31.     Attached hereto as **Exhibit DD** is a true and correct copy of a document produced in this matter pursuant to subpoena by non-party Overdrive, Inc., assigned Bates number OverDrive_Supp_002.

32.     Attached hereto as **Exhibit EE** is a true and correct copy of excerpts from the transcript of the deposition of Jeffrey Prince, taken in this matter on June 9, 2022.

33.     Attached hereto as **Exhibit FF** is a true and correct copy of excerpts from the transcript of the deposition of Alison Lazarus, taken in this matter on November 12, 2021.

5

34.    Attached hereto as **Exhibit GG** is a true and correct copy of excerpts from the transcript of the deposition of Chantal Restivo-Alessi, taken in this matter on December 1, 2021.

35.    Attached hereto as **Exhibit HH** is a true and correct copy of excerpts from the transcript of the deposition of Alan Pavese, taken in this matter on December 10, 2021.

36.    Attached hereto as **Exhibit II** is a true and correct copy of excerpts from the September 3, 1976, United States House of Representatives Report No. 94-1476, "Copyright Law Revision."

37.    Attached hereto as **Exhibit JJ** is a true and correct copy of a document produced by Plaintiff Hachette Book Group, Inc. in this matter assigned Bates number HACHETTE0002474.

38.    Attached hereto as **Exhibit KK** is a true and correct copy of a document produced by Plaintiff Hachette Book Group, Inc. in this matter assigned Bates number HACHETTE0002475.

39.    Attached hereto as **Exhibit LL** is a true and correct copy of a document produced by Plaintiff HarperCollins Publishers LLC in this matter assigned Bates number HC0010272.

40.    Attached hereto as **Exhibit MM** is a true and correct copy of a document produced by Plaintiff Penguin Random House LLC in this matter assigned Bates number PRH0025907.

41.    Attached hereto as **Exhibit NN** is a true and correct copy of a document produced by Plaintiff John Wiley & Sons, Inc. in this matter assigned Bates number WILEY0005650.

42.    The Internet Archive propounded the following Requests for Production on each Plaintiff, but Plaintiffs did not produce the requested commercial performance data.

a.　　For each Work-in-Suit, Documents sufficient to show on a monthly basis the amount of Your revenue, expenses, and profits related to that Work.  (RFP No, 20)

b.　　Documents sufficient to show on a monthly basis, beginning when You obtained any copyright interests in any Work-in-Suit, Your total revenues, profits, expenses, cash-on-hand, and debt. (RFP No. 22)

c.　　For each Work-in-Suit, Documents sufficient to show the number of physical copies embodying the Work-in-Suit, divided by distribution channel in the most granular manner available. To the extent You obtained interest in a Work-in-Suit from June 2011 to June of 2020, the Internet Archive seeks documents sufficient to show this data on a monthly basis. To the extent You obtained interest in a Work-in-Suit before 2011, the Internet Archive will accept documents sufficient to show annual data.  (RFP No. 60)

d.　　For each Work-in-Suit, Documents sufficient to show the number of ebooks embodying the Work-in-Suit and the number of ebook loans, divided by distribution channel in the most granular manner available. To the extent You obtained interest in a Work-in-Suit from June 2011 to June of 2020, the Internet Archive seeks documents sufficient to show this data on a monthly basis. To the extent You obtained interest in a Work-in-Suit before 2011, the Internet Archive will accept documents sufficient to show annual data.  (RFP No. 62)

e.　　Documents sufficient to show the number of all physical books, divided by distribution channel in the most granular manner available, beginning when You obtained any copyright interest in any Work-in-Suit. The Internet Archive seeks documents sufficient to show this data on a monthly basis for the time span of June 2011 to June 2020. To the extent responsive information predates 2011, the Internet Archive will accept documents sufficient to show annual data.  (RFP No. 64)

7

f. Documents sufficient to show the number of all ebooks and the number of ebook loans, divided by distribution channel in the most granular manner available, beginning when You obtained any copyright interest in any Work-in-Suit. The Internet Archive seeks documents sufficient to show this data on a monthly basis for the time span of June 2011 to June 2020. To the extent responsive information predates 2011, the Internet Archive will accept documents sufficient to show annual data. (RFP No. 65)

g. Documents sufficient to show the income You received from sales of physical books, divided by distribution channel in the most granular manner available, beginning when You obtained any copyright interest in any Work-in-Suit. The Internet Archive seeks documents 9 sufficient to show this data on a monthly basis for the time span of June 2011 to June 2020. To the extent responsive information predates 2011, the Internet Archive will accept documents sufficient to show annual data. (RFP No. 66)

h. Documents sufficient to show the income You received from any transaction relating to ebooks, including without limitation sales, licenses, or loans of ebooks, divided by distribution channel in the most granular manner available, beginning when You obtained any copyright interest in any Work-in-Suit. The Internet Archive seeks documents sufficient to show this data on a monthly basis for the time span of June 2011 to June 2020. To the extent responsive information predates 2011, the Internet Archive will accept documents sufficient to show annual data. (RFP No. 67)

43. Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020. Gratz Decl. Ex. JJ (HACHETTE0002475). Hachette produced annual data for 2015 to 2019. *Id.* Ex. KK (HACHETTE0002474).

8

44.     For its Works in Suit, HarperCollins produced annual data for 2017 to 2020. *Id.*
Ex. LL (HC0010272).

45.     For its Works in Suit, Penguin Random House produced annual data for 2010 to
2020. *Id.* Ex. MM (PRH0025907).

46.     For its Works in Suit, Wiley produced annual data for 1996 to 2020. *Id.* Ex. NN
(WILEY0005650).

47.     None of the Plaintiffs produced the requested sales or revenue information for
titles that are not Works in Suit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 2022, in San Francisco, California.


                              */s/ Joseph C. Gratz*
                              JOSEPH C. GRATZ

9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

</div>

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC <br><br> Plaintiffs, <br><br> v. <br><br> INTERNET ARCHIVE and DOES 1 through 5, inclusive <br><br> Defendants. | Case No. 1:20-CV-04160-JGK |

**STIPULATION REGARDING UNDISPUTED FACTS**

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley"), and Penguin Random House LLC ("PRH") (together, "Plaintiffs") and Defendant Internet Archive ("Internet Archive") (collectively, "Parties"), by and through their respective counsel of record, hereby stipulate as follows:

The following facts are undisputed for purposes of the Parties' summary judgment motions.

1.      The Internet Archive and Open Library of Richmond are both duly organized nonprofit entities that have been designated as 501(c)(3) public charities by the IRS.

2.      The Internet Archive or Open Library of Richmond owns at least one lawfully made print copy of each of the 127 Works in Suit.

3.      Hachette Book Group, Inc. holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Hachette Book Group, Inc. is identified as the publisher.

4.      HarperCollins Publishers LLC holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which HarperCollins Publishers LLC is identified as the publisher.

5.      Penguin Random House LLC holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Penguin Random House LLC is identified as the publisher.

1

6. John Wiley & Sons, Inc. holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which John Wiley & Sons, Inc. is identified as the publisher.

7. Each of the 127 Works in Suit was registered with the United States Copyright Office within the time period required to recover statutory damages and attorneys' fees under 17 U.S.C. § 412 with respect to the allegations set forth in the Complaint.

**IT IS SO STIPULATED.**

Dated: June 10, 2022    DAVIS WRIGHT TREMAINE LLP

By: _____
ELIZABETH A. MCNAMARA (SBN 1930643)
LINDA STEINMAN (SBN 2137305)
JOHN M. BROWNING (SBN 5213038)
JESSE FEITEL (SBN 5481403)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
(212) 489-8230
lizmcnamara@dwt.com
lindasteinman@dwt.com
jackbrowning@dwt.com
jessefeitel@dwt.com

OPPENHEIM + ZEBRAK, LLP
MATTHEW J. OPPENHEIM (NY SBN 4314605)
SCOTT A. ZEBRAK (NY SBN 5620125)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
(202) 450-3958
matt@oandzlaw.com
scott@oandzlaw.com

Attorneys for Plaintiffs
HACHETTE BOOK GROUP, INC.,

2

A-3755

HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and PENGUIN
RANDOM HOUSE LLC

Dated: June 10, 2022                    DURIE TANGRI LLP

By:         */s/ Joseph C. Gratz*
        JOSEPH C. GRATZ (*Pro Hac Vice*)
        JESSICA E. LANIER (*Pro Hac Vice*)
        ADITYA V. KAMDAR (*Pro Hac Vice*)
        ANNIE A. LEE (*Pro Hac Vice*)
        217 Leidesdorff Street
        San Francisco, CA 94111
        (415) 362-6666
        jgratz@durietangri.com
        jlanier@durietangri.com
        akamdar@durietangri.com
        alee@durietangri.com

        ALLYSON R. BENNETT (*Pro Hac Vice*)
        953 East 3rd Street
        Los Angeles, CA 90013
        (213) 992-4499
        abennett@durietangri.com

        ELECTRONIC FRONTIER FOUNDATION
        CORYNNE MCSHERRY (*Pro Hac Vice*)
        KIT WALSH (*Pro Hac Vice*)
        CARA GAGLIANO (*Pro Hac Vice*)
        815 Eddy Street
        San Francisco, CA 94109
        (415) 436-9333
        corynne@eff.org
        kit@eff.org
        cara@eff.org

        Attorneys for Defendant
        INTERNET ARCHIVE

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

*/s/ Joseph C. Gratz*

JOSEPH C. GRATZ

</div>

4

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and
PENGUIN RANDOM HOUSE LLC

　　　　　　　　　　Plaintiffs,

　　　v.

INTERNET ARCHIVE and DOES 1 through
5, inclusive

　　　　　　　　　　Defendants.

Case No. 1:20-CV-04160-JGK

<u>**SUPPLEMENTAL EXPERT REPORT OF PROF. IAN FOSTER**</u>

**March 31, 2022**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1

# Table of Contents

I.   INTRODUCTION ................................................................................. 3

II.  QUALIFICATIONS ............................................................................. 4

    A. Educational Background ................................................................ 5

    B. Publications and Patents ................................................................ 6

    C. Honors and Awards ...................................................................... 6

III. THE INTERNET ARCHIVE'S BOOK SYSTEM IN CONTEXT ................. 7

IV. ACCESSING BOOKS IN THE BOOK SYSTEM ................................... 9

    A. User's-perspective walkthrough ....................................................... 9

    A.1 Main Internet Archive site .......................................................... 9

    A.2 Access from Partner Library Sites .................................................. 25

    A.3 Access from the Internet ............................................................. 27

    A.4 Access from Better World Books ..................................................... 27

    A.5 The Open Library Site ................................................................. 28

    B. Technical implementation supporting access to books ............................. 33

    B.1 IA control over concurrent access to a scan ......................................... 36

    B.2 National Emergency Library ......................................................... 39

    B.3 Security Issues ......................................................................... 40

V.  BACKEND ELEMENTS OF THE BOOK SYSTEM ................................ 41

    A. Adding books ............................................................................ 41

    B. Making books lendable ................................................................. 50

    C. Increasing concurrent lending limits for books: Open Libraries project and overlap analyses ......................................................................... 55

    D. Takedown processing .................................................................. 65

    E. Metadata maintenance ................................................................. 68

VI. PLAINTIFFS' WORKS ..................................................................... 74

    A. Data and scan productions ............................................................ 74

    B. Associating WIS with scans .......................................................... 77

    C. History of Internet Archive's Usage of Works-in-Suit ............................. 80

    D. Recently provided materials regarding usage patterns—general and of WIS ...... 84

    E. The works-in-suit are members of a much larger population of Plaintiffs' works that Internet Archive scanned and provides to users ................................. 92

VII. IA's Response to Takedown Notices and the Complaint .............................. 104

VIII. A Look At Specific Examples, And Impact, Of Bad Metadata ...................... 113

IX. Summary of Certain Opinions ............................................................. 118

**Table of Appendices, Exhibits, and Produced Materials**

Appendices
- Appendix A – List of Documents Reviewed
- Appendix B – Ian Foster CV
- Appendix C – Notes on Methodology for Preparing Tabulation Table
- Appendix D – Notes on Methodology for Comparing Plaintiffs' Catalogs with IA's inlibrary Collection
- Appendix E – Glossary
- Appendix F – Take Down Notices

Exhibits
- Exhibit A – The metadata returned for the IA scan with identifier "isbn_9780143120544"
- Exhibit B – Contents of IA's Denver Public Library directory (denverpubliclibrary-ol_files.xml)
- Exhibit C – List of Scans and Works-in-Suit for which Web Log Data indicate usage of "Read Aloud" feature
- Tabulation–Related Exhibits: T1 – T10

Produced Materials
- Catalog Data – Plaintiffs' catalogs, including PRH July 2014 catalog, and Ex. A to Complaint
- Code – Programs used to generate exhibits and findings described in report
- Exhibits – Charts, Tabulation file (TSV and XLSX versions), and IndexCards (T10) file generated by Code
- GeneratedData – Data files and charts output by Code
- ia – Command-line tool developed by IA, used by programs in Code
- IA_data_productions – CSV and JSON files produced by IA and Bates index of IA's production of CSV, JSON, and PDF/TXT files
- index_card_template – Microsoft Word template file for Exhibit T10
- RUNALL.sh – Top-level program to run programs in Code
- WorkingFiles – Files retrieved from IA by programs in Code and output of programs in Code
- Exhibit_C_Project: Programs and data underlying findings in Exhibit C
- PRH_Takedown_Project: Data files

2-1

## I.  **INTRODUCTION**

1.  My name is Ian Foster. I am the Arthur Holly Compton Distinguished Service Professor of Computer Science at the University of Chicago and a Distinguished Fellow, Senior Scientist, and Division Director at Argonne National Laboratory.

2.  For time spent in connection with study and analysis in this matter, I will be compensated in the amount of $600 per hour. For time spent in connection with testifying in this matter, I will be compensated in the amount of $600 per hour. My compensation does not depend on either the outcome of this case or any issue related to it.

3.  Plaintiffs in this action have asked me to conduct a technical analysis concerning Defendant Internet Archive's digitization of print books and use of the resulting digital books. My assignment includes providing an overview of that analysis and considering the following five questions:

- Where does copying and distribution of books occur within Internet Archive's processes?

- What is the history of Internet Archive copying and distributing the books listed in the Complaint?

- How has Internet Archive copied and used books from Plaintiffs' respective in-print catalogs?

- How has Internet Archive's distribution of digitized books evolved over time?

- Are Internet Archive's methodologies for digitizing print books and then lending the resulting digital books well-developed and reliable from a technological perspective?

4.  In my report, I use the term "IA" to refer to Defendant Internet Archive.

5.  In conducting my analysis, I have accessed IA's online services at different times since 2020 and reviewed the materials listed in Appendix A to this report. In the event that new

3

material and information becomes available to me, I may supplement or revise my findings and opinions.

6. The observations and conclusions set forth below are based upon my specialized knowledge, education, and experience, as applied to the facts and circumstances of this case. If called upon, I would testify as to the matters contained herein.

7. Between now and such time that I may be asked to testify, I expect to continue my review, evaluation, and analysis of information generated during discovery, as well as of relevant evidence presented before and/or at trial. I also may review any expert reports submitted by IA's expert(s). I reserve the right to amend or supplement this report, as necessary and as acceptable to the Court. I also reserve the right to develop materials and exhibits as appropriate for use in helping to demonstrate and explain my opinions, including in the event that I am asked to testify at trial or other hearings or proceedings. Examples of such visual aids and demonstratives may include slides, as well as videos and animated or computer-generated video.

8. I have given deposition testimony or been cross-examined at trial in two cases over the past four years:

- SEVEN Networks, LLC v. Apple Inc., Case No 2:19-cv-00115 (E.D. Texas)

- American Broadcasting Companies, Inc. et al. v. David R. Goodfriend and Sports Fans Coalition NY, Inc., Case No. 19-cv-7136 (S.D.N.Y.)

## II.     QUALIFICATIONS

9. I summarize here my educational background, career history, publications, and other relevant qualifications. My full curriculum vitae is attached as Appendix B to this report.

4

**A. Educational Background**

10. I hold a Bachelor of Science (B.Sc. Hons I) degree in Computer Science from the University of Canterbury (Christchurch, New Zealand), and a Doctor of Philosophy (Ph.D.) degree in Computer Science and Diploma of Imperial College from Imperial College (London, United Kingdom).

11. My work as a computer scientist has been at the intersection of computing and the sciences. My work has produced both practical technologies that have seen wide adoption and concepts and methods that have proven influential in research and education.

12. My research interests span a range of topics in parallel, distributed, and data-intensive computing. A unifying theme of these topics is a desire to use the power of rapid communication to accelerate discovery, whether by linking people with remote computers and data, accelerating complex computational processes, or enabling distributed virtual teams. I often build sophisticated artifacts (software and distributed systems) in order to apply, evaluate, and disseminate new concepts and methods.

13. A major focus of my research since the mid-1990s has been the methods and technologies for resource sharing in networked environments. In 1995, I led software research and development for the I-WAY wide-area distributed computing experiment, which connected supercomputers, databases, and other specialized resources at 17 sites across North America. In 1996, I founded the Distributed Systems Laboratory at Argonne and the University of Chicago, where I established the multi-institutional Globus project, which developed core technologies for resource discovery, scheduling, configuration, security, data access, and execution in high-performance networked environments. The resulting technologies formed the basis for many

5

national and international "Grid" projects funded by DOE, NASA, NSF, the European Union, and the UK eScience Program.

14. With the emergence of large-scale commercial clouds ("grids with a business model") in the 2000s, and the growing importance of large digital data in science, my research in distributed computing has increasingly focused on methods for outsourcing and automating research data management tasks. This effort has led to the development of cloud-based Globus services, which are seeing broad adoption both in the U.S. and internationally.

15. I have served as Principal Investigator (PI) or Co-PI on projects connected to the National Computational Science Alliance; the National Science Foundation (NSF) Community Development of Globus Software (CDIGS) project; the Department of Energy (DOE) Center for Enabling Distributed Petascale Science (CEDPS); the DOE/NSF Open Science Grid and the NSF TeraGrid; and other DOE and NSF programs. I am currently PI for the DOE Robust Analytic Models for Science at Extreme Scales (RAMSES) project and the DOE Codesign Center for Online Data Analysis and Reduction (CODAR).

**B. Publications and Patents**

16. I have published eight books, over 300 journal articles, and over 300 articles in conference and workshop proceedings. My publications have been cited more than 130,000 times. A list of my publications is provided in Appendix B to this report.

**C. Honors and Awards**

17. I am an elected Fellow of the American Association for the Advancement for Science, the Association for Computing Machinery, the British Computer Society, and the Institute of Electrical and Electronic Engineers. My awards include the Lovelace Medal of the British Computer Society, the IEEE-CS Goode Award, the IEEE-CS Charles Babbage Award, the IEEE

Tsutomu Kanai Award, the IEEE TCSC Award for Excellence in Scalable Computing, and the inaugural ACM HPDC Lifetime Achievement Award. I have received honorary doctorates from the University of Canterbury, New Zealand, and CINVESTAV, Mexico.

### III.     THE INTERNET ARCHIVE'S BOOK SYSTEM IN CONTEXT

18. IA offers several different online services.[1] My focus in this report is on IA's services pertaining to books and the technological implementation of these services, which I refer to as the "Book System." The Book System comprises both frontend elements (web pages) via which users interact with the system, and backend components for, among other things, digitizing print books, maintaining a catalog of digitized books, and maintaining the system.

19. The scale of IA's Book System is vast: IA has already created digital books that are wholesale copies of millions of physical books of all types, including fiction and non-fiction. IA disseminates the digital books to registered users of its website. Anyone, located anywhere in the world, can sign up for a free account with IA and receive free access to complete copies of books that are currently commercially available.

20. I begin this report with a user's-perspective walkthrough of accessing books from IA, followed by a technical look at how this access is implemented. I then proceed to cover key backend elements. Though the technical analysis may seem complicated, the process of obtaining digital books from IA is seamless to the user. Any Internet-connected user can quickly sign up for an IA account and within moments obtain digital books in whole for reading.

21. IA's Book System contains both digital copies of books uploaded by users and digital books generated by IA by scanning physical books. I restrict my analysis here to the latter content.

---

[1] Internet Archive Projects: see https://archive.org/projects.

22. IA's Book System contains both digital copies of books that are in the public domain and digitized modern books that are still under copyright protection. I restrict my analysis here to the latter content, which appears within an area of IA's website that IA describes as its "inlibrary" (or "Books to Borrow") collection.

23. A premise to how IA operates its Book System is that IA generally restricts the number of scanned copies of a particular book accessible from its website at any one time to not more than the number of physical copies of that book that IA and its partner libraries believe they own. IA calls this a 1:1 "owned to loan ratio." Below, I explore IA's technical approach to that concept, including IA's use of what it calls its "Open Libraries" program with partner libraries, under which IA lends multiple copies of a single scan of a particular book at a time based on the number of print copies that the partner libraries have reported to be in their possession. I also explore the history of IA's copying and distribution of Plaintiffs' literary works generally and works-in-suit ("WIS") specifically.

24. At the outset, it is important to recognize that IA has made changes to its Book System over time, including during this litigation. The size of the inlibrary collection has grown significantly within the past few years. IA's approach to providing users with access to digital books has also changed and could change further at any time. For instance, shortly after the litigation was filed in June 2020, IA introduced the concept of 1-hour loans rather than just 14-day loans. Prior to June 2020, each loan of a digitized book in the inlibrary collection was for a 14-day period only. By way of another example, for a roughly three-month period that commenced on or about mid-March 2020, IA announced what it termed a "National Emergency Library" whereby IA altered how its website operates, so that IA could distribute a virtually

8

limitless number of copies of any book in its collections, no matter the number of print copies on hand.

## IV.    ACCESSING BOOKS IN THE BOOK SYSTEM

**A. User's-perspective walkthrough**

25. A user may approach the Book System in a variety of ways. Two significant ways are via the main IA website (https://archive.org) (the "IA Site") and IA's Open Library site (https://openlibrary.org) ("OL Site"). Users may also arrive at the Book System through an internet search or via hyperlinks on a partner library's website, the website of IA's affiliate, Better World Books, or other websites that link to books hosted on the IA Site.

### A.1 Main Internet Archive site

26. The IA Site's home page, shown in *Figure 1*, provides access to a variety of IA's services. The header includes a "BOOKS" tab that, when clicked, prominently shows icons for "Books to Borrow" and "Open Library": *see Figure 2*. The first icon leads to a page for the "Books to Borrow" collection of electronic books on the main IA Site, as shown in *Figure 3*. The second leads to the distinct OL Site, which I describe in more detail in the next section. The BOOKS tab also includes links for "Featured" and "Top" collections, including "All Books."

9



*Figure 1: IA Site home page, at https://archive.org. Note the "Books" item in the upper left menu bar.*



*Figure 2: Expanding the "Books" menu item in Figure 1 reveals two IA book services: "Books to Borrow" and "Open Library."*

10



*Figure 3: The Books to Borrow main page, at https://archive.org/details/inlibrary, as of February 21, 2022.*

27. IA organizes its various content into "collections." The "Books to Borrow" page provides access to digitized books within the "inlibrary" collection, which the page shown in *Figure 3* reported as holding 3,211,204 items as of Feb 21, 2022. The collection is named "inlibrary" because its earlier version was a literal "In-Library Lending" program, in which scans were provided to users of computers physically located within libraries partnering with Internet Archive.[2] In 2011, the details page for the inlibrary collection described it as "Books available to patrons physically present in designated libraries."[3] IA's Wayback Machine online repository tracks the appearance of the inlibrary collection URL at different points in time. While the inlibrary collection currently contains over 3 million scanned copies of books: on May 26, 2020, in the week before the Plaintiffs filed this lawsuit, the collection contained 1,476,344 scans; on

---

[2] Mills Deposition Transcript, October 14, 2021, 223:14-224:5; Pls. Ex. 26 (INTARC00333600).
[3] https://web.archive.org/web/20110205033744/https://archive.org/details/inlibrary.

11

A-3770

April 1, 2019, the collection contained 965,499 scans; and on April 1, 2018, the collection contained 648,117 scans.[4]

28. The text at the top of the page notes that "Books in this collection may be borrowed by logged in patrons. You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans."[5] The description at the "About" icon on the "Books to Borrow" page, at

https://archive.org/details/inlibrary?tab=about, indicates:

> Books in this collection may be borrowed by logged in patrons. You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans.
>
> Please note that works in this collection are protected by copyright law (Title 17 U.S. Code) and copying, redistribution or sale, whether or not for profit, by the recipient is not permitted unless authorized by the rightsholder or by law.
>
> See FAQs about borrowing books.
>
> Libraries can participate in our Open Libraries program and lend these digital titles to their patrons by filling out our online form.

29. Users can use the search feature on the "Books to Borrow" page to locate titles within that collection. Apart from that search interface, users can employ other techniques to find books, including browsing through lists of books grouped into various "Topics and Subjects."

30. For example, as shown in *Figure 4*, a search within Books to Borrow for "*Triumph of the City Glaeser*" returns a single result, represented by a thumbnail image of the book's cover, its title (*Triumph of the City*), and the author's name (Edward Glaeser). Clicking on the thumbnail

---

[4] *See*, respectively, https://web.archive.org/web/20200526033334/https://archive.org/details/inlibrary; https://web.archive.org/web/20190401081136/https://archive.org/details/inlibrary; and https://web.archive.org/web/20180401011942/https://archive.org/details/inlibrary.

[5] As I explain below, until June 2020, the IA Site's functionality enabled downloads of any borrowed book into Adobe Digital Editions. During this case, in June 2020, IA changed its system to introduce 1-hour loans for some books, with copies borrowed on 1-hour loans available only for online viewing in your browser.

12

image or associated text for this title takes the user to the web page at address "https://archive.org/details/isbn_9780143120544," an address that comprises three components: the domain at which the page is hosted ("archive.org"); the word "details"; and a unique identifier assigned by Internet Archive to this scan, "isbn_9780143120544."



*Figure 4: A search on the IA Site's "Books to Borrow" page for "Triumph of the City Glaeser" reports 1 result.*

31. Visiting the web page at https://archive.org/details/isbn_9780143120544 displays the reader screen shown in *Figure 5*, in which the user can read the book. This "BookReader application" allows the user to use the arrow keys on their keyboard, or to click on navigation buttons in the reader, to move to different pages in the book (*see Figure 6*). The menu in the bottom right allows the user to toggle between viewing a single page, two pages at a time, or many pages at once, and also to listen to the book, as described below.

13



*Figure 5: Selecting the Glaeser title in Figure 4 takes me to the IA Site's page for that title, at https://archive.org/details/isbn_9780143120544.*



*Figure 6: Clicking on the "forward" arrow in the lower right pages me through successive pages of the book.*

32. IA requires users to be logged in to an IA account to access many of its functions, including full access to free copies of complete digital books in the inlibrary collection. For example, if I navigate forward through *Triumph of the City* without logging in, I am soon told to "use your free account to borrow this book and gain access to all pages" (*Figure 7*).[6] At the top of the screen, I see a "Log In and Borrow" button. If I log in, this is replaced by a "Borrow for 1 hour" button (with text beside it noting that it is "Renewable every hour, pending availability");

---

[6] Anyone can sign up for account at the IA Site by providing just an email address, "screen name," and password. A verification mail is sent to the supplied email address, and once the user clicks on a link included in that email, the account is usable.

14

clicking on the right of that button also gives me the option of requesting a 14-day loan, as shown in *Figure 5*. Once I click on the "Borrow for 1 hour" button, I can access the remainder of the book (*Figure 9*). Note that in contrast to the limited previews provided by Google Books (https://books.google.com), IA provides access to every page in a book once users have logged in. As seen at the top of *Figure 9*, I have the options, once I have borrowed for an hour, to either "Return now" or "borrow for 14 days."



*Figure 7: After a few pages, I am told that one needs to "use your free account to borrow this book and gain access to all pages."*



*Figure 8: Once I log in, I am presented with a button "Borrow for 1 hour."*

15

Case 1:20-cv-04160-JGK-OTW Document 200-2 Filed 07/07/22 Page 182 of 283

16



*Figure 9: Once I log in and "Borrow for 1 Hour," I can view the rest of the book. Note also the "Return now" and "Borrow for 14 days" buttons.*

33. The BookReader app on the IA Site also has a "Read Aloud" feature. As shown in *Figure 10*, a user can click on the headphones icon in the lower right to activate this feature. The sentences being read along are highlighted, and controls at bottom center allow them to pause reading, move forward and backwards, and control reading speed.



*Figure 10: The BookReader app allows the user to request audio playback, by clicking the headphones icon visible in the lower right. The screen then highlights each sentence as it is read aloud.*

34. Scrolling down the screen from the text viewer shown in *Figure 9* reveals information about the book (*Figure 11*), including text on "DOWNLOAD OPTIONS" (*Figure 12*). Users can download the book as an EPUB file or a PDF files A "14 day loan [is] required to access EPUB and PDF files." There is also a special format, the "ENCRYPTED DAISY" file, for print-disabled users.



*Figure 11: Scrolling down the screen from Figure 9 reveals various descriptive information about the book.*



*Figure 12: Zooming in on the "DOWNLOAD OPTIONS" in Figure 11 reveals that "print-disabled users" can download an "ENCRYPTED DAISY" file, but that other users must obtain a 14-day loan before downloading.*

17

35. Clicking first on "Return now" (to end my 1-hour loan) and then on "borrow for 14 days" starts a 14-day loan, with the number of days remaining noted at the top of the page (*Figure 13*). I can then continue to read the full text of the book in my browser, but without the need to renew the loan every hour. Alternatively, I am now presented with additional "DOWNLOAD OPTIONS" (*Figure 14*), namely "ENCRYPTED ADOBE EPUB" and "ENCRYPTED ADOBE PDF." Clicking on the latter results in a file download to my computer, which I can open in the "Adobe Digital Editions 4.5" application. The scanned book is then in my Adobe Digital Editions "Library" (*Figure 15*), from where I can open and read it on my computer (*Figure 16*) and a variety of other devices. As IA explains (*Figure 14*), the PDF has "High Quality Page Images" whereas the EPUB is a "Smaller File" that "May Contain Errors."

36. In more detail, a request to download "ENCRYPTED ADOBE" (EPUB or PDF) results in the download of a small token file, with an ".acsm" extension. Opening that file on my computer launches the Adobe Digital Editions application, which downloads the encrypted PDF or EPUB file. Within Adobe Digital Editions, I can ask to see the location ("show in folder") of the downloaded encrypted file (for a PDF download of *Triumph of the City*, this is a 24MB file).



*Figure 13: I can borrow "Triumph of the City" for 14 days.*

18



*Figure 14: Once I have borrowed the book "Triumph of the City" for 14 days, the "DOWNLOAD OPTIONS" (center right) changes to include additional options.*



*Figure 15: Once I have downloaded and opened the ".acsm" file, I see "The Triumph of the City" in my Adobe Digital Editions library.*



*Figure 16: I can then click on the book in my library to read it on my computer.*

19

37. Multiple users can obtain and read copies of the same IA scan of a book at the same time. For example, I verified that I could log in to the IA Site with two other accounts and obtain a second and third 14-day loan for *Triumph of the City*, for a total of three 14-day loans active at the same time. (I did not try more than three accounts total.)

38. Each digital book that users access via the IA Book System is actually a copy of a scan of a physical work. Each scan is identified by a unique identifier generated by IA. For example, the web page shown in *Figure 5* has internet address, https://archive.org/details/isbn_9780143120544. Here, the prefix "isbn_9780143120544" corresponds to the IA identifier for this specific scan of the book, *Triumph of the City*.

39. While a search for the title *Triumph of the City* reveals only a single scan, other titles may have several. For example, a search for "*Rogue Lawyer* Grisham" reveals eight scans: see *Figure 17*.



*Figure 17: A search for '"Rogue Lawyer" Grisham' indicates eight matching scans.*

40. I determine, by visiting each, that these eight scans have the identifiers listed in Table 1, and that while all are available for 1-hour loans, only four are available for 14-day loan. For each

20

of the four scans that support 14-day loans, I used three different accounts to request multiple 14-day loans at the same time. As shown in the third column of the table, I was able to obtain three concurrent loans of three scans, but for the scan with identifier "roguelawyer0000gris_q8q2" I could only obtain one, after which I was presented with two options: a 1-hour loan, or to be added to a waitlist (Figure 18, Figure 19).

*Table 1: The eight scans that I found associated with the book "Rogue Lawyer" by John Grisham.*

| Identifier | Loan availability | Number of concurrent 14-day loans achieved |
|---|:---:|:---:|
| roguelawyernovel0000gris | 1 hour | |
| roguelawyer0000gris_u4k1 | 1 hour | |
| roguelawyer0000gris_p8i2 | 1 hour | |
| roguelawyer0000gris_h5b8 | 1 hour | |
| roguelawyer0000gris_q8q2 | 1 hour, 14 days | 1 |
| roguelawyer0000gris_d3l1 | 1 hour, 14 days | 3 |
| roguelawyer0000gris_x5h7 | 1 hour, 14 days | 3 |
| roguelawyer0000gris | 1 hour, 14 days | 3 |



*Figure 18: I find that the scan with identifier "roguelawyer0000gris_q8q2" is not available for 14-day loan. I can either request a 1-hour loan, or ask to be placed on the waitlist for a 14-day loan.*

21



*Figure 19: When I ask to join the waitlist for a 14-day loan of a scan, I see this message.*

41. Information about other scans for the same title is also provided when one visits the details page for a particular scan. For example, the screen displayed for the *Rogue Lawyer* scan with identifier "roguelawyernovel0000gris" (only available for 1-hour loan: *Figure 20*) provides, immediately below it, pointers to seven other scans of the same title (*Figure 21*).



*Figure 20: When I accessed the scan with identifier roguelawyernovel0000gris, I see that it is available only for 1-hour loan.*

22



*Figure 21: Scrolling down the screen for the scan in shows pointers to other scans of the same title.*

42. To summarize the behaviors seen for *Triumph of the City* and *Rogue Lawyer*:

- *Triumph of the City* has only one digital book in IA's inlibrary collection but permits at least three concurrent 14-day loans.

- *Rogue Lawyer* has eight digital books in IA's inlibrary collection, of which four allowed for only 1-hour loans, three allowed for at least three concurrent 14-day loans, and one allowed for only one 14-day loan.

43. IA explains its lending policies as follows:[7]

> Patrons now have a choice in selecting the loan period when they borrow a book. Patrons can choose a short-term access for 1 hour, or a longer 14-day loan. If we only have 1 copy of that edition of a book, it is only available for 1 hour loan. If we have more than one copy of a book, it can be checked out for either 1 hour or 14 days, depending on availability. If there are no copies available for 14-day loans, users can join a waitlist. There is no waitlist available for books that only offer 1-hour loans.

44. Consistent with this description, it appears that each row in the table above corresponds

to a different scan of the book with title *Rogue Lawyer* and that IA has only one copy of each of

---

[7] https://help.archive.org/hc/en-us/articles/360016554912-Borrowing-From-The-Lending-Library-A-Basic-Guide.

23

the four scans corresponding to the first four rows. For the scans corresponding to the other four rows, IA apparently believes it has more than one copy.

45. To support "print-disabled users" (*i.e.*, persons who cannot effectively read print), IA allows such users to download an "ENCRYPTED DAISY" file. Digital Accessible Information System (DAISY) is a technical standard for digital audiobooks and other texts.[8] It allows for the content of a text to be enhanced with a range of information to allow to listen to the text, navigate its contents, and search within the text. An "Encrypted DAISY" uses the DAISY Protected Digital Book (PDTB) encryption standard[9] to encrypt the book's content so that a decryption key is required to access that content. Information about how qualified users can obtain such a key is accessible by clicking on the "Get print disability access" when viewing a book page (*Figure 22*).

---

[8] ANSI/NISO Z39.86-2005 (R2012), Specifications for the Digital Talking Book,
http://www.daisy.org/z3986/2005/Z3986-2005.html.
[9] The National Library Service for the Blind and Print Disabled, Specification 1205, Protected Digital Talking Book,
https://www.loc.gov/nls/about/organization/standards-guidelines/contract-specifications/.



*Figure 22: Clicking on the link labeled "Get print disability access" in Figure 8 takes the user to this page.*

### A.2 Access from Partner Library Sites

46. Certain libraries integrate links to the IA Site into their website search systems, so that users searching for certain titles are directed to the IA Site. Dartmouth Library is an example of one such library. *Figure 23* shows me accessing, from the Dartmouth Library search page, the familiar *Triumph of the City*.

25



*Figure 23: From top to bottom: I search for Triumph of the City book on Dartmouth Library web site; I am told that the full text is located in Open Libraries; I access the book on IA.*

26

### A.3 Access from the Internet

47. Internet search engines index IA Site pages that correspond with IA's scans of books. Thus I can also use simple internet searches to locate digital books contained in the inlibrary collection on the IA Site. For example, *Figure 24* shows how a Google search for "Archive The man who loved books" returns the link to the book's page on the IA Site as its first response.



*Figure 24: Locating a book on the IA Site via a simple Internet search.*

### A.4 Access from Better World Books

48. Links to the IA Site are also integrated into an online books platform called Better World Books ("BWB"), which is owned by an affiliate (Better World Libraries) of Internet Archive.[10] BWB offers users seeking to purchase a new or used book the option to download or display it instead via IA for free. For instance, the webpage where BWB offers books (new and used) for sale also includes a "Borrow" button to obtain a "Digital edition from Internet Archive."[11] Clicking on that button takes the user to the details page on the OL Site.[12]

---

[10] https://press.betterworldbooks.com/for-the-love-of-literacy/.
[11] https://www.betterworldbooks.com/product/detail/Triumph-of-the-City---How-Our-Greatest-Invention-Makes-Us-Richer--Smarter--Greener--Healthier--and-Happier-9780143120544.
[12] https://archive.org/details/isbn_9780143120544.

**A.5 The Open Library Site**

49. The other prominent icon on the IA Site, as seen in *Figure 2*, takes the user to https://openlibrary.org (*Figure 25*), an affiliated website, the "OL Site", also operated by IA. The OL Site supplies a broad range of information on individual books. The OL Site claims that is "building towards a web page for every book ever published."[13]



*Figure 25: The OL Site home page, accessible at https://openlibrary.org.*

50. Each page is comparable to a card in a library card catalog. For example, when I search for *The Triumph of the City* at https://openlibrary.org, I see one result; clicking on that result takes me to the address:

https://openlibrary.org/works/OL19873317W/Triumph_of_the_City_How_Our_Greatest_Inventi on_Makes_Us_Richer_Smarter_Greener_Healthier_and_Happier?edition=ia%3Aisbn_97801431 20544. This long URL comprises several components:

- The web address for the OL Site, https://openlibrary.org;

---

[13] As stated at the bottom of https://openlibrary.org.

28

- The string "works";

- The string "OL19873317W," which constitutes the Open Library identifier for the work "Triumph of the City";

- The title of the work as a string, with underlines replacing spaces, "Triumph_of_the_City_How_Our_Greatest_Invention_Makes_Us_Richer_Smarter_Greener_Healthier_and_Happier"; and

- The OL Site identifier for a specific scan of this work, "isbn_9780143120544."



*Figure 26: The OL Site home page, accessible at https://openlibrary.org*

51. In general, OL Site identifiers have the format "OLnnnnnnnnW" or "OLnnnnnnnnM," where the "n"s are digits. A terminal character of "W," as seen in the example just given, indicates that the identifier is for a work; a terminal character of "M" indicates that the identifier is for a specific edition of a work. For example, visiting the web page for the work with identifier, OL19873317W (i.e., https://openlibrary.org/works/OL19873317W) indicates that the OL Site has information about six editions of this work. As a first example, *Figure 27* shows the OL web page for the book "The Triumph of the City" mentioned above in the discussion of

29

"Books to Borrow." Note how this page refers to "6 editions" of the work. This feature illustrates an important difference between what are superficially quite similar pages on Books to Borrow and the OL Site. Each OL Site web page is for a specific book, which may have several editions; in contrast, each web page on Books to Borrow—on the IA Site—is for a scan of a specific edition of a published book. This difference is also evident in how web pages are named. The OL Site page has internet address https://openlibrary.org/books/OL24607166M, with OL24607166M being the Open Library edition ("M") for the book. Actually visiting that page takes the user to the page https://openlibrary.org/books/OL24607166M/Triumph_of_the_City, which states that it is "[a]n edition of Triumph of the City" and provides a link to "view 6 editions."



*Figure 27: OL Site page for the book "Triumph of the City" by Edward Glaeser.*

30

52. The OL Site *Triumph of the City* web page shown immediately above provides various catalog information about the title, including a description, and also information about a specific edition: its ISBN, number of pages, publisher, etc. There are also links that offer the user the opportunity to "Preview," "Borrow," or "Listen [to]" the book. These are all links directly to the IA Site's "Books to Borrow" BookReader app that I described earlier, albeit with slightly different behaviors.

53. If I select "Preview" I see a small BookReader window, as shown in *Figure 28*. I can navigate forward, but only a limited number of pages are visible, as I also saw when I accessed the book from the IA Site's "Books to Borrow" collection when I was not logged in. At the bottom of the preview window is a link, "See more about this book on Archive.org"; clicking this takes me to the IA Site's details page for the scan, at address https://archive.org/details/isbn_9780143120544: the same page shown in *Figure 5*.



*Figure 28: The OL Site preview feature allows a user to see the content of a digital copy hosted on IA.*

54. If I select "Borrow" on the OL Site *Triumph of the City* web page, I am prompted to log in: see *Figure 29*. Note that I am asked to "Please enter your Internet Archive email and password to access your Open Library account." I see a link with accompanying text saying "Not a member of Open Library? Sign up now." Clicking there takes me to a page with at its head the words "Complete the form below to create a new Internet Archive account" and towards the

31

A-3790

bottom, a tick box that I can select if "I want to receive news, announcements, and resources from the Internet Archive, the non-profit that runs Open Library" and then the statement "By signing up, you agree to the Internet Archive's Terms of Service." I conclude that the accounts used by the IA Site and OL Site are essentially the same, at least to the extent that an account with the OL Site will also enable the holder to "borrow" books from the inlibrary collection on the IA Site.[14]



*Figure 29: Clicking "Borrow" on the web page for "Triumph of the City" takes the user immediately to a login page.*

55. Once I have logged in, I am immediately taken to a 1-hour loan for *Triumph of the City* in the IA Site's BookReader: see *Figure 30*. The view is slightly different than that seen in *Figure 9*, but only because BookReader is opened in "theater view":

https://archive.org/details/isbn_9780143120544/page/3/mode/2up?view=theater rather than

https://archive.org/details/isbn_9780143120544/page/3/mode/2up. As when accessing the scan from the IA Site, I see buttons that I can use to return the loan—or, if the scan supports it (which *Triumph of the City* does), request a 14-day loan.



---

[14] This observation is confirmed in Cheng Deposition Transcript, December 3, 2021, 75:16-76:4.

32

*Figure 30: Once the user is logged in, they are taken immediately to a 1-hour loan.*

56. If I select the "Listen" option on the OL Site's *Triumph of the City* web page, the same things happen. If I remain logged in, I go straight to the BookReader, where I can select the "Read Aloud" feature.

57. In summary, the OL Site maintains a large number of web pages, each of which—in a manner akin to a card in a library card catalog—provides information about a published work and associated editions of that work. Many of these pages include links to copies ("scans") of specific editions that are available electronically from the IA Site. Links to preview, borrow, or listen to a book lead to the IA Site's BookReader application. Borrowing requires an account with the IA Site (or OL Site).

## B. Technical implementation supporting access to books

58. I now discuss some aspects of the technical implementation of the Book System and how it supports access to, and dissemination of, digital books. As discussed above, these digital books are copies ("scans") of print books.

59. IA assigns each distinct scan of a book a unique identifier, such as the identifier "isbn_9780143120544" noted above for *Triumph of the City*. I discuss ISBNs in more detail at Appendix C.

60. Internally, IA maintains a mapping from each such identifier to the associated digital copy plus various information about the book that the scan represents, the scanning process, and so forth: what is referred to collectively as "metadata." Some of the metadata associated with a scan can be seen on the "details" page for the scan, accessible at the internet address:

```
https://archive.org/details/<scan-identifier>
```

33

which for the scan discussed in this paragraph is:

> `https://archive.org/details/isbn_9780143120544`

A more complete set of metadata is accessible at:

> `https://archive.org/metadata/<scan-identifier>`

which for the scan discussed in this paragraph is:

> `https://archive.org/metadata/isbn_9780143120544`

61. The latter metadata can also be obtained by using an interactive client program provided by IA for installing and running on a user's computer. This client program, "ia" (https://archive.org/services/docs/api/internetarchive/)[15], allows a user to request metadata for a specific scan via the following command:

> `ia metadata <identifier>`

Thus, one can request the metadata for the scan discussed previously by running:

> `ia metadata isbn_9780143120544`

This command returns the document (in JavaScript Objection Notation, or JSON) shown in Exhibit A to this report. The following is some of the information to be found in this document:

- Conventional bibliographic information, such as author ("creator": line 377), title (line 364), publisher (line 378), publication year, ISBNs (lines 348-352), subject (lines 462-499), and description (lines 413-449).

- Information about the scanning process, such as scanner (line 503), operator (line 504), and scandate (line 514).

- Information (although, as discussed below, incomplete) about "loans" (lines 531-536).

---

[15] Jason Scott, "The IA Client – The Swiss Army Knife of Internet Archive", http://blog.archive.org/2019/06/05/the-ia-client-the-swiss-army-knife-of-internet-archive/, June 5, 2019.

- Image about "holdings" in partner libraries (lines 536-804).

62. As mentioned above, IA allows for multiple digital items to be organized into groupings called "collections." A collection has a set of digital items, an administrator, and permissions settings controlling who can access its items.[16]

63. Two collections of relevance to this report are the "inlibrary" and "printdisabled" collections. Items in both of these collections are what IA calls "access restricted."[17] Access is limited in the sense that a user must be logged in to the IA Site (or OL Site) and potentially also satisfy other constraints (e.g., have borrowed the book for "inlibrary"). Thus, for the "inlibrary" collection, a user must log in and then "borrow" a scan in order to view or listen to a copy of that scan. Once a user has logged in, whether or not they can borrow a specific "inlibrary" scan depends primarily on the number of copies that IA has recorded as being available for that scan, due either to the existence of a physical copy under its control or (as explained below) due to a partner contributing a copy to lend,[18] and the number of other concurrent loans for that scan. The loan is allowed if the number of currently active loans for the requested scan is less than the number of copies of that digital book that IA has recorded as being available for lending. (IA also places limits on the number of concurrent loans that a single user has in progress.)[19]

64. Note that there are several different concepts here. What a publisher might call a "work" or a "book" is the literary work—a unique sequence of words by an author, with an associated title. Works are published in different mediums (*e.g.*, print books, ebook, audiobooks). Even within a given medium, such as print books, they may be published in different formats (*e.g.*, hardcover, paperback, large print). Further, there may be several different "editions" of a book,

---

[16] *See* Appendix E.
[17] Cheng Tr. 43:55-44:6 and 45:10-13.
[18] Cheng Tr. 31:1-8 and 31:19-22.
[19] Cheng Tr. 81:15-22. *See also* LendingACL.php, line 112 (INTARC00152169).

which contain new or additional material, such as a new foreword. An IA scan is inevitably of a specific physical book and thus of a specific edition. For a particular work, IA may create multiple scans of the same or different editions.

### B.1 IA control over concurrent access to a scan

65. In general, any scan in the "inlibrary" collection is available for access by a registered IA user: that is, by any individual who has created an account on the IA Site (or the OL Site). Whether a user can access a particular scan at a particular point in time is determined by the "maximum eligible concurrent loan limit" that IA has defined for that scan, and the number of accesses to that scan that are currently in progress: in IA's terminology, the number of active 1-hour and 14-day loans for the scan. In general, according to the architecture of IA's Book System, except other than when IA chooses to proceed differently, or has incorrect metadata, the number of concurrent accesses should not exceed the maximum eligible concurrent loan limit.

66. IA sets the concurrent loan limit for a particular scan to 1 plus a "number contributed by partners." I expand on the complete process later, but the overall idea is that the "1" corresponds to the physical copy of a particular book that IA has recorded that it possesses, and has scanned, and the "number contributed by partners" corresponds to physical copies of the same edition of the same book thought to be located on the partners' bookshelves or stacks. The following table illustrates these concepts with a concrete example. In the example, there are two works ("A by B" and "C by D"). The first work has two editions, with different ISBNs (ISBNs "X" and "Y") and the second has one (ISBN "Z"). IA has one physical copy for each of the three editions, each of which it has scanned to create a unique scan. Based on its own copies, IA would permit one concurrent loan each for each of the three ISBNs. Based on information provided by partners about other physical copies in their libraries, IA increases its lending limits to a total of eight

36

A-3795

concurrent copies of "A by B" (five for ISBN "X" and three for ISBN "Y") and two concurrent copies of "C by D."

| "Work" | ISBNs | IA Copies | Scans | Partner Contributed Copies | Maximum Eligible Concurrent Loan Limit |
|--------|-------|-----------|-------|----------------------------|----------------------------------------|
| A by B | X | 1 | 1 | 4 | 5 |
| A by B | Y | 1 | 1 | 2 | 3 |
| C by D | Z | 1 | 1 | 1 | 2 |

67. The "copies contributed by partners" is thus a vital element of IA's approach to disseminating digital copies of scans in its inlibrary collection, in that IA uses this information to justify increasing its maximum eligible concurrent loan limit beyond the number of copies of a book that IA believes it owns. IA obtains this information from partners via a process called "overlap analysis," which I discuss in more detail below.

68. IA uses overlap analysis to compare a list of items that metadata indicate are present in IA's "inlibrary" collection with a list of items that metadata indicate are present in a collection of books that a partner library intends to "make available" to IA, to determine which items are found in the metadata associated with both collections. This comparison is performed on the basis of metadata, not the physical items; thus, it is only as accurate as the metadata that IA maintains itself, or that is provided to it by third parties. Furthermore, the analysis assumes that works with matching metadata are interchangeable, regardless of their physical condition. To determine which scans in the "inlibrary" collection match with works found in a particular partner's collection, IA obtains from the partner a list of items thought to be in the partner's collection, and then performs overlap analysis. Thus, for example, if the metadata for the "inlibrary" collection includes a record for "ISBN X" and the metadata for an Open Libraries

37

partner P includes a record with the same ISBN, then overlap analysis would identify "ISBN X" as an overlap.

69. As noted earlier, the Book System on the IA Site supports both 1-hour loans and 14-day loans. (Initially, only 14-day loans were supported; 1-hour loans—also referred to as "session loans"—were introduced in June 2020.[20]) 14-day loans are offered if IA has set the book's maximum eligible concurrent loan limit to be more than one. If the maximum eligible concurrent loan limit is 1 only, the Book System permits only 1-hour loans.

70. A consequence of the "maximum eligible concurrent loan limit" is that a user request to access a copy of a scan may be declined. IA's Book System then allows a user to be placed on a "waitlist," to be notified when the scan is available.

71. My prior statements about how the IA Site implements loans are based on public material and deposition testimony. To further investigate, I also examined the programming language files used to implement the loan logic in the IA Site. The file "*LendingACL.php*" provides information on the lending process. To be lendable, a scan must be in the "inlibrary" collection.[21] The code then determines how many copies can be loaned by counting the number of ISBN matches in different collections.[22] Specifically, it counts one for each collection in which the scan is located.[23]

72. Apart from concurrent access to items in its inlibrary collection, IA also allows access to certain works without restriction: specifically, books that are in the public domain, or that IA has obtained permission to distribute. Those books, along with books from the inlibrary collection, are contained in the Internet Archive Books collection. *See* https://archive.org/details/books. As

---

[20] Cheng Tr. 49:17-50:2 and 155:10-157:13.
[21] LendingACL.php, line 478 (INTARC00152169).
[22] Petabox-lending/www/common/Lending/README.md, line 60 (INTARC00152169).
[23] LendingACL.php, lines 483-499 (INTARC00152169).

an example of a freely available book, a scan of the public domain Macmillan 1907 edition of "Alice in Wonderland" is available on the IA Site with identifier "alicesadventures00carr3." A user can access this scan at https://archive.org/details/alicesadventures00carr3, where they can read it, listen to it, and download a PDF or EPUB (and other formats), all without signing in or requesting a "loan." This characteristic of a scan is specified by metadata.[24]

## B.2 National Emergency Library

73. IA disabled its restrictions on the number of concurrent loans limits for books in the "inlibrary" collection during a period in 2020, a program that IA referred to as the "National Emergency Library." (IA's implementation of this mechanism involved not disabling the restrictions but rather artificially raising the number of "contributed items" to be considered when determining whether to grant a request to access a scan to a high number[25]—but the effect was in practice the same. IA personnel have also described the National Emergency Library as "suspending waitlists.")

74. I examined the maximum number of concurrent loans for the scans associated with the WIS, as indicated by the data produced by IA, during three periods in 2020, namely before, during, and after the National Emergency Library. To conduct this analysis, I had to choose start and end dates for the National Emergency Library. An IA web page states that the National Emergency Library launched on March 24, 2020, and closed on June 16, 2020.[26] However, I see evidence that it launched somewhat earlier: specifically, IA data shows that for certain works, waitlists disappeared before March 24, 2020: for example, the scan with identifier "catcherinrye00salirich" had a waitlist of 12 on March 17, 2020, but 0 on March 18, 2020. Thus,

---

[24] Cheng Tr. 74:8-15.
[25] Cheng Tr. 143:2-24.
[26] http://blog.archive.org/national-emergency-library/.

to be conservative in terms of characterizing behavior before and after the National Emergency Library period, I chose a start date of March 17, 2020 and a stop date of June 16, 2020, with the NEL period being inclusive of these start and stop dates. For the end date, I see in supplied source code a definition of a "Cutoff date for NEL loans" as 2020-06-16 20:00:00 (a comment states that this time is GMT).[27]

### B.3 Security Issues

75.  I use the term "BookReader" to refer to IA's in-browser book reader application. This application is constructed to run in a user's web browser. It allows the user to *preview* any scan in the inlibrary collection, and to *read* or *listen to* all of a scan for which the user has a 1-hour or 14-day loan.

76.  When the user navigates through the scan, BookReader requests page images from the IA Site one at a time, and displays them in the web browser when the user is previewing or reading; when the user has requested to listen to the text, the IA Site delivers small amounts of text to the BookReader, which uses the browser's native text to speech capability to generate audio from optical character recognition (OCR) text provided by the underlying Book System.[28] Regardless of whether text is displayed visually or read aloud, the user can read or hear the entire book, increment by increment, in the BookReader.

77. The fact that the Book System delivers page images to the BookReader opens up the possibility of a user capturing those images to create a permanent copy of the book that IA has "lent" to them for a limited time. This is certainly possible: A user can manually perform a

---

[27] Lending.inc, line 56 (INTARC00152169).
[28] Cheng Tr. 209:23-210:9 and 46:3-9.

screen capture of each page as it is displayed on their screen, and then reassemble the book from those screen captures. However, this process is cumbersome.

78. A user could also attempt to automate this screen capture process. A security audit observed that, at least at the time of the audit, two aspects of the protocol used by the BookReader to retrieve pages allows for such automation.[29] First, the Book System assigned names to successive images in sequence, so that a program could easily be written to generate URLs for all images in a book. Second, the Book System does not guard against a user sending a sequence of requests for images from outside the browser, using the cookie supplied for browser authentication.

## V.  BACKEND ELEMENTS OF THE BOOK SYSTEM

79. There are several backend elements that support the ability for users to access copies of books. IA has changed the system over time and continues to make changes; it can change the rules at any time, such as seen with the introduction and removal of the National Emergency Library ("NEL"); the addition of 1-hour loans; and the expansion of digitize-and-lend to include the Open Libraries initiative. Indeed, the name "inlibrary" derives from IA's original rollout of providing digital copies of books under a technological requirement that the user must be "in the library" rather than the IA Site providing copies to anyone, anywhere.

### A. Adding books

80. IA acquires physical books and digitizes them by taking digital photographs of their

---

[29] Archive.org BookReader Content Security Audit, Fred Chasen, 5/31/2019. 44_INTARC00152110_VOL0003.

covers and all of their pages.[30] It uses custom-built "Scribe" workstations for this purpose. The scanning process generates images of each page of the book in JPEG format, from which IA then generates copies of the scanned book in various formats, including EPUB, PDF, and DJVU.[31] This process is also called "scanning" the book, and the resulting digital version is referred to as a "scan."

81. IA has Scribe workstations dispersed at locations throughout the United States and other countries, often embedded within libraries. IA also arranges for companies in the Philippines and Hong Kong (or mainland China), which both have at least ten Scribe machines, to digitize books on IA's behalf.[32]

82. IA has developed various versions of Scribe machines, but their key components are similar. The Table Top Scribe, for example, consists of a frame containing two cameras and a V-shaped cradle in which the operator places a book for photographing.[33] The book's pages are turned and photographed individually.



*Figure 31: A Scribe device for digitizing books. Source:*
*https://archive.org/download/tabletopscribesystem/Entrypage5.png*

---

[30] The various steps in the digitization process are described in a document titled "Internet Archive Book Digitization Process" dated April 23, 2015 (Pls. Ex. 17, PLAINTIFFS0000818). This document and related information can be found via the "Partner Documents" page at https://archive.org/details/partnerdocs.
[31] Cheng Tr. 59:18-60:2.
[32] Mills Tr. 34:15-35:4, 131:17-132:07 and 209:4-21.
[33] https://archive.org/details/tabletopscribesystem.

83. The digitization process is non-destructive. After photography, IA ships the physical book to a storage facility and places it in a container with a "Box ID" number.[34]

84. IA assigns each scan a unique identifier, which is a short alphanumeric string. In some cases, this scan identifier reflects to some degree the title and author, such as in the case of "psiloveyou0000aher" corresponding to a scan of *PS, I Love You* by Cecelia Ahern (WIS #1). In other cases, the scan identifier is based on an ISBN, such as with the scan identifier "isbn_9780965738408" for a scan of *A Short History of Nearly Everything* by Bill Bryson (WIS #9). Some scan identifiers are more difficult to interpret at a glance than others. In some cases, apparently due to error, the scan identifier bears no relation to the content of the scan. For example, "harrypotterhalfb00rowl_0" is the identifier for a scan of *The Intelligent Investor* by Benjamin Graham (WIS #39).

85. For each scan, IA maintains metadata records. These records can be said to be "attached" to the scan within IA's system; that is, the metadata are associated with the scan identifier. These metadata include a number of operational facts, such as the model of camera used and the date of the scan, as well as the Box ID of the scanned book.

86. IA also attaches to each scan metadata regarding the content of the book, such as its title, author, date, and publisher. If IA has received the book from a library, the library may supply this metadata. If the library does not provide this information, or if the book has been obtained from some other source, IA typically obtains the metadata independently from a service called WorldCat (https://www.worldcat.org). This involves a manual search of WorldCat by the book's ISBN number or title and author, and a manual selection of the right result.[35]

---

[34] This storage step occurs for books that IA itself has acquired. Some scans originate from books provided to IA by a partner library for scanning.
[35] Mills Tr. 182:15-183:6.

43

87. Subsequently, as needed, authorized IA staff can use an internal tool on the IA Site known as Meta-manager to review and revise metadata for scans. Policies and procedures pertaining to use of Meta-manager and quality assurance generally are described in a document titled "Quality Assurance (QA) Process."[36] This tool allows staff to set a "curatestate" of "No Errors = Approved," "Minor Errors = Approved," and "Major Errors = Freeze." The document suggests a verbal warning to a scanning operator whose scans receive more than five major codes or ten minor codes in a week. Errors are given different codes and grouped by severity into "red," "yellow," and "green" levels, where "red" means "fix or gut the book." Among the errors classified as red is code 140, "Book and metadata do not match." I describe issues with IA metadata in more detail in a separate section below.

88. Photography of the book using a Scribe machine results in a set of digital image files in the JP2 (JPEG 2000) format. IA uploads them to its servers in California "right after imaging".[37] On IA servers, the filenames carry the suffix "orig" to indicate these are the original images. This is a **first** digital copy of the book.

89. IA then processes the original JP2 image files, carrying out a number of steps to yield files for users of the Book System.

90. First, IA rotates, crops, and performs other image adjustments as necessary to the original JP2 files. This yields a **second** digital copy of the book, in the form of a second set of JP2 files. I will refer to this as the set of adjusted images.[38]

---

[36] Pls. Ex. 19 (INTARC00140477).
[37] Mills Tr. 167:25-168:24.
[38] The "Background Processing" section of Pls. Ex. 17 (PLAINTIFFS0000818) may be read as indicating the adjusted images ("processed masters") are further compressed to an "access format" set of JP2 files, though this is unclear. As discussed below with respect to Defendant's production of the multiple formats it maintains (in the case of two representative scans), only two sets of JP2 files appear to be retained by IA. I thus will not distinguish a third set.

91. IA then proceeds to use the adjusted images to create several more copies. It also delivers the adjusted images to users one image at a time as they page through books using BookReader on the IA Site.

92. IA combines the adjusted images into a single PDF file. The PDF file contains a few more pages than the book, because it counts photographs of both sides of the front and back covers, plus any unnumbered pages at the front and back of the book, as pages. This PDF file is a **third** copy of the book.

93. IA generates an encrypted version of the PDF. This is the file IA distributes for reading with the Adobe Digital Editions application. This is a **fourth** copy of the book. The encryption functions to prevent reading of the PDF using unauthorized applications.

94. IA uses optical character recognition (OCR) software to extract text from the images of the pages. This software automatically identifies characters and their positions on each page and generates a purely textual, as opposed to image-based, copy of the book's content. The text is stored in simple, readable form in a file with filename extension "_djvu.txt". This is a **fifth** copy of the book. The characters and data on their positions on the pages also are stored in two formats designed for use by software; these files have filename extensions "_djvu.xml" and "_abbyy." These are **sixth** and **seventh** copies of the book.[39]

95. In addition to the PDF, IA generates another version for download in a format known as EPUB. This version is a composite of text from the OCR process and images (such as figures and illustrations). IA also creates an encrypted version of the EPUB file that can be read only with Adobe Digital Editions application. These are **eighth** and **ninth** copes of the book.

---

[39] The text and positional data derived from the OCR process is used by BookReader's Read Aloud feature. As described earlier, software in the web page converts the text to speech word-by-word on the user's device. Passages are highlighted as they are read aloud. This is made possible by the positional data. IA also uses the extracted text to support a feature by which a user can search for terms within the book.

96.  IA also creates a copy in the DAISY format, which as discussed earlier, is a version for use by print-disabled users. This copy relies upon the text extracted from the OCR process. IA also generates an encrypted version of the DAISY copy. These are **tenth** and **eleventh** copies of the book.

97.  In addition to the above, IA also copies its photograph of the book's cover into a low-resolution "thumbnail" image.

98.  In some cases, IA inserts an Internet Archive "bookplate" page into the beginning pages of the scan indicating the book was digitized by IA.[40] Other than that, IA scans the complete book and without adding any content to the book.[41]

99.  I have described the copies that IA creates for books in the inlibrary collection. Additional copies in other formats may be available for the books outside that collection that users can view without a loan or permanently download.

100. IA refers to the technical creation of these multiple copies as the "derive" process, because the various copies are derived from the original photos of the book taken with the Scribe machine. More generally, IA uses the term "republishing" to refer to the full process, including manual quality assurance steps, of moving from the original images to the copies made available to users.[42]

101. For books in the inlibrary collection, any user at any time may access a few page images in BookReader as a preview. Upon taking a 14-day or 1-hour loan, a user can access the remainder of the page images in BookReader, play the text copy as speech within BookReader, and download the encrypted PDF and EPUB copies. A print-disabled user additionally can

---

[40] Pls. Ex. 17 (PLAINTIFFS0000818).
[41] Mills Tr. 175:05-16.
[42] Mills Tr. 165:22-166:18.

download the encrypted DAISY copy. The other copies IA has created, such as the original images and the unencrypted PDF, are not available to users.

102. In this matter, IA produced to Plaintiffs sets of copies in multiple formats for two different scans. The first set, designated INTARC00463344, contains files pertaining to the scan identifier "howidiscoveredpo0000nels" for the book *How I Discovered Poetry* by Marilyln Nelson (work-in-suit #80). These include the original images, the adjusted images, PDF, encrypted PDF, encrypted EPUB, three text versions (_abbyy, _djvu.txt, and _djvu.xml), and a cover thumbnail image, plus some ancillary files. The second set, designated INTARC00463345, contains the same sorts of files pertaining to the scan identifier "returnofgeorgewa0000lars" for the book *The Return of George Washington* by Edward J. Larson (work-in-suit #60).

103. IA produced to Plaintiffs 254 PDF and 125 TXT files for 379 scans in response to Plaintiffs' request for documents pertaining to the WIS in this matter. Collectively, I will refer to these PDF and TXT files as the scan files. These are not the same as the unencrypted PDF files and text files that IA generates in the republishing process. Specifically, the PDF files appear to be the result of taking the unencrypted PDFs yielded by republishing, converting them into black-and-white, and adding Bates numbers to each page. The TXT files appear to be the result of applying OCR to a scan, but through an OCR operation distinct from the OCR that occurs in the republishing process.[43]

**Use of Library Genesis**

104. The metadata for one of the scan files that IA produced to Plaintiffs in discovery indicates the contributor of the book is "Library Genesis." This is the name of a notorious

---

[43] The TXT file in the scan file production for returnofgeorgewa0000lars at INTARC00111472 is not identical to any of the text versions (from republishing) in the multi-format production for this item at INTARC00463345, suggesting the TXT scan files are results of a distinct OCR process.

website offering free access without license to large numbers of digital copies of books and scientific journal articles, for permanent download.[44] In a case brought by publishing company Elsevier, the U.S. District Court for the Southern District of New York in 2017 awarded $15 million in damages in a copyright infringement judgment.[45]

105. The Library Genesis-contributed scan in question is for *Song of Solomon* by Toni Morrison (WIS #78), and it has scan identifier "songsolomon00morr_536." The metadata file (INTARC465463.json) that IA produced for this scan is unique among the other metadata files produced in that it contains a section named "genlib" containing many fields and an external identifier named "urn:libgen." The value of that external identifier is "778000/df5492f1897f7801fd5ce4538f838c03." The Library Genesis site offers a PDF copy of *Song of Solomon* at

http://libgen.rs/book/index.php?md5=DF5492F1897F7801FD5CE4538F838C03. The fact that the "libgen" external identifier matches with the Library Genesis URL for the work indicates the external identifier refers to the item on the Library Genesis site.

106. The Library Genesis item page indicates the PDF for *Song of Solomon* was added to the site at 4:00 PM on February 4, 2012. The IA metadata file lists the same time and date as IA's scan date for the file (IA's metadata also are reflected in its details page for this scan at https://archive.org/details/songsolomon00morr_536). These facts together strongly suggest that IA obtained the scan via download from the Library Genesis website rather than by photographing a physical book. IA adopted the date of addition to the Library Genesis site as its

---

[44] https://www.vice.com/en/article/pa7jxb/archivists-are-trying-to-make-sure-a-pirate-bay-of-science-never-goes-down.
[45] https://www.publishersweekly.com/pw/by-topic/digital/content-and-e-books/article/74058-elsevier-awarded-15m-in-lawsuit-against-pirate-sites.html and https://cip2.gmu.edu/wp-content/uploads/sites/31/2017/06/Elsevier-v-Sci-Hub-Judgment.pdf.

date of the scan. Consistent with this, the scan has no Box ID number, indicating IA does not have a physical source copy in storage.

107. It is significant that the Library Genesis URL contains the string "DF54…" indicated by the IA metadata as the "libgen" external identifier for the book. This string also occurs in IA's "genlib" metadata as the MD5 value of the scan. "MD5" is the name of a conventional hash algorithm that generates a short alphanumeric string that uniquely identifies a file. Downloading this PDF by using a link from the Library Genesis site and using a standard tool to calculate its MD5 value, I find it is df5492f1897f7801fd5ce4538f838c03, just as in the IA metadata and Library Genesis URL. This PDF has the same number of pages (555) and appears identical in layout to the Bates-stamped scan file INTARC463610_VOL0018.pdf that IA produced to Plaintiffs for this scan. In fact, the layout of the book, including the format of the table of contents (which includes an entry for "Title Page"), suggest it was derived from an ebook edition of *Song of Solomon* rather than a print edition.

108. IA's metadata file (INTARC465463.json) indicates that IA generated encrypted PDF and EPUB files for this scan, such as it does for scans added to the inlibrary collection and thus made available for borrowing. Further, the metadata indicate the scan was matched against a copy of *Song of Solomon* held by St Mary's County Library ("stmaryscountylibrary" appears in the "holdings" value for the scan). That this item was the subject of an overlap analysis implies that IA had included it within its inlibrary collection for users to borrow, because the code for the overlap analysis compares the library's data to IA's data on the basis of the contents of IA's inlibrary collection.

109. The IA details page for this scan of *Song of Solomon* indicate it was uploaded by Aaron Ximm on July 7, 2013 and added to the IA site on July 17, 2013. The collection details page at

49

https://archive.org/details/librarygenesis states that Aaron Ximm was the creator of this

"librarygenesis" collection on June 5, 2013, and that it has contained a total of 920,630 items,

although it is empty today. This collection is titled "Internet Books" and described as "Digitized

books from the Internet." Aaron Ximm is an IA employee.[46]

110. There exists a second Library Genesis collection on the IA Site today that is not empty,

although it appears its contents are books in the public domain. This "Library Genesis – Open"

collection with 14,745 scans is at https://archive.org/details/librarygenesis_open. This page

indicates the collection was created by Jeff Kaplan on April 2, 2019. Jeff Kaplan is an IA

employee.[47] The metadata for scans in this collection indicate "Library Genesis" as their

contributors and include "urn:libgen" external identifiers. As with the *Song of Solomon* example,

these facts suggest these scans were obtained from the Library Genesis site.

**B. Making books lendable**

111. After IA adds a scan to the Book System, it may decide to make the scan available for

lending, which means it is available for reading either on the IA Site or on the user's device for a

limited time, either one hour or fourteen days. To make a scan lendable, IA assigns the scan to

the "inlibrary" collection, also known as the "Books to Borrow" collection. IA accomplishes this

assignment by updating the "collection" metadata item attached to the scan. The "collection"

item consists of a list of one more IA collections to which the scan belongs.

112. When a new book is scanned, it is typically first placed in an access-restricted collection

called the "print-disabled" collection.[48] From there, it may be moved to the "inlibrary"

---

[46] Mills Tr. 262:1-5; Kahle Deposition Transcript, December 9, 2021, 209:8-14.
[47] Mills Tr. 146:10-14; Butler Deposition Transcript, December 8, 2021, 55:19-56:11 and 58:7-58:20.
[48] Mills Tr. 66:6-18.

collection. Books may be removed from the "inlibrary" collection in response to take down requests.[49]

113. A document titled "Notes about Book Collections and Availability" dated July 27, 2018 and authored by Alexis Rossi, describes several key collections, including the inlibrary collection.[50] It states that only Alexis Rossi or Jeff Kaplan should manually add a scan to the inlibrary collection, and it provides a list of criteria for assignment. Of particular note, according to the document, the scan must have a Box ID beginning with "IA" indicating that IA holds a copy of the physical book in storage. The date of the book must be "between 1925 (inclusive) and ~5 years ago." I take this to refer to the book's publication date (see further discussion below). That is, the document indicates scans of books published prior to 1925 or within the past five years should not be made available for lending. The document notes that "Some creators, collections, publishers, and specific books are excluded" from the inlibrary collection. The list includes some other criteria tangential to the focus of this report.

114. I have observed that IA sometimes deviates from the date criteria set forth in the document described in the prior paragraph. Here are two examples involving a WIS where IA scanned a book and put it within its inlibrary collection much sooner:

- The identifier allpresidentswom0000levi is a copy of the book *All the President's Women: Donald Trump and the Making of a Predator* by Barry Levine and Monique El-Faizy (WIS #69). The book was published in 2019,[51] and the IA metadata also reflects that the book was published in 2019.[52]

- The identifier manwhosolvedmark0000zuck is a copy of the book *The Man Who Solved the Market: How Jim Simons Launched the Quant Revolution* by Gregory

---

[49] Cheng Tr. 85:13-15.
[50] INTARC00471120.
[51] https://www.amazon.com/All-Presidents-Women-Donald-Predator-ebook/dp/B07NVJX6YZ (Oct. 22, 2019 publication date). *See also* INTARC00103471 (published in 2019).
[52] AG0000373 (depicting scan in the inlibrary collection in May 2020).

Zuckerman (WIS #127). The book was published in 2019,[53] and the IA metadata also reflects that the book was published in 2019.[54]

115. The same document states that a script runs hourly to assign books to the inlibrary collection. I understand that IA's source code production INTARC00472030 to contain the version of this software current as of the January 31, 2022 date of production.

116. This "inlibrary script" production consists of three files: (1) **run.sh**, a script that serves as the starting point for the process. It runs the other two programs, which do the real work, starting with (2) **get_books_to_add_to_inlibrary_browserlending.py**. This program generates a list of scans to be added to the inlibrary collection. The third program, (3) **add_to_inlibrary_browserlending.py**, actually adds the scans identified by program (2) to the inlibrary collection. Below, I discuss these two programs in more detail.

117. Program (2), **get_books_to_add_to_inlibrary_browserlending.py**, implements criteria for determining whether a book should be added to the inlibrary collection. These criteria include those described above and, again, other requirements tangential to this report. In what follows, I describe key points in the process.

118. First, the program executes a function named **get_results**, defined at line 5760. This uses IA's Meta-manager service (described in the section above) to search for scans meeting various criteria, including having a Box ID beginning with "IA" or "ia" (line 5791) and a date ranging from 1927 to 2016, inclusive (lines 5799, 5769, and 11–14). This date is the publication date of the scanned book as maintained in IA's metadata for the scan.[55]

---

[53] https://www.amazon.com/Man-Who-Solved-Market-Revolution/dp/073521798X/ref=sr_1_1?Adv-Srch-Books-Submit.x=30&Adv-Srch-Books-Submit.y=13&qid=1645712951&refinements=p_66%3A9780735217980&s=books&sr=1-1&unfiltered=1 (November 5, 2019 publication date). *See also* INTARC00108054 (published in 2019).
[54] AG0003624 (depicting scan in the inlibrary collection in May 2020).
[55] B. Cheng Decl., 2-14-2022, para. 45.

119. Next, the program executes a function named **filter_results**, defined at line 5830. This function iterates through all scans found by **get_results** in the previous step. For each such scan, the program obtains metadata from the IA Site. Among other steps, the program checks whether the scan's title metadata (that is, the title of the scanned book) is on a list of titles to exclude (see line 5856–5857). If the title is on the list, the scan is not added to the inlibrary collection. This list consists of 123 titles set forth between lines 53 and 175 of the program. I note that these titles match the titles of the 127 WIS. Some of the WIS are members of series for which the leading part of the title is the same between different works (for example, the WIS contain three different works with titles that start with "Big Nate"). Therefore, 123 titles suffice to cover the 127 WIS in this implementation. This title-exclusion feature thus appears to be in use only to ensure that scans of the WIS in this matter are not again added to the inlibrary collection.

120. Next, the program checks whether the scan's ISBN metadata (that is, the ISBN numbers that Internet Archive has associated with the scanned book) are on a list of ISBN numbers to exclude (see lines 5861–5862). If so, the scan is not added to the inlibrary collection. The function **get_isbn_exclude_list** beginning at line 17 fetches this exclusion list from the IA Site, where it exists as a collection named "specialproject_exclude_list." I understand that IA's counsel has stated that this list is not accessible to the public and that this list will be produced to Plaintiffs. I will review this list when it is produced.

121. Next, the program checks whether the scan's publisher metadata (that is, the publisher of the scanned book) is on a list of publishers to exclude (see lines 5866–5871). If so, the scan is not added to the inlibrary collection. In addition, the "source" metadata field for the scan is set as "removed" so that the scan will not be found by the **get_results** function in the future. The list of publishers to exclude is present within the source code at lines 185–204, where eighteen