# 23-1260

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 17 OF 26 (A-4077-A-4344)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM
DANAE TINELLI
SCOTT A. ZEBRAK
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW,
5th Floor
Washington, DC 20016

ELIZABETH A. MCNAMARA
LINDA J. STEINMAN
JOHN M. BROWNING
JESSE M. FEITEL
CARL MAZUREK
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|----------|------|----------|---------------|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

2

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| **Vol. 5** | | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| **Vol. 6** | | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | | **Vol. 7** | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

14

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | **Vol. 16** | | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | **Vol. 17** | | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| **Vol. 22** | | | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| **Vol. 23** | | | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# EXHIBIT J

ATTORNEYS EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5     HACHETTE BOOK GROUP, INC.,
       HARPERCOLLINS PUBLISHERS LLC,
 6     JOHN WILEY & SONS, INC., and
       PENGUIN RANDOM HOUSE LLC,
 7
                     Plaintiffs,
 8
             vs.                    No. 1:20-cv-04160-JGK
 9
       INTERNET ARCHIVE and DOES 1
10     through 5, inclusive,
11               Defendants.
       _____/
12
13
14              -- ATTORNEYS' EYES ONLY --
15
16    VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS OF
17       HARPERCOLLINS PUBLISHERS LLC BY ADAM SILVERMAN
18              Remote Zoom Proceedings
19                 New York, New York
20              Monday, December 6, 2021
21
22
23    REPORTED BY:
24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25    Pages 1 - 276                      Job No. 4867842

                                             Page 1
```

ATTORNEYS EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5     HACHETTE BOOK GROUP, INC.,
       HARPERCOLLINS PUBLISHERS LLC,
 6     JOHN WILEY & SONS, INC., and
       PENGUIN RANDOM HOUSE LLC,
 7
                    Plaintiffs,
 8
              vs.                    No. 1:20-cv-04160-JGK
 9
       INTERNET ARCHIVE and DOES 1
10     through 5, inclusive,
11                  Defendants.
       _____/
12
13
14              -- ATTORNEYS' EYES ONLY --
15
16          Videotaped Rule 30(b)(1) and 30(b)(6)
17     depositions of HarperCollins Publishers LLC by
18     ADAM SILVERMAN, taken on behalf of Defendants, Remote
19     Zoom Proceedings from New York, New York, beginning at
20     10:32 a.m. Eastern Daylight Time and ending at 7:54 p.m.
21     Eastern Daylight Time, on Monday, December 6, 2021,
22     before Leslie Rockwood Rosas, RPR, Certified Shorthand
23     Reporter No. 3462.
24
25
```

ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4         DAVIS WRIGHT TREMAINE LLC

 5         BY: LINDA STEINMAN, ESQ.

 6         1251 Avenue of the Americas, 21st Floor

 7         New York, New York 10020

 8         (212) 603-6409

 9         lindasteinman@dwt.com

10

11

12    FOR THE DEFENDANT INTERNET ARCHIVE:

13         DURIE TANGRI LLP

14         BY: JESSICA E. LANIER, ESQ.

15         217 Leidesdorff Street

16         San Francisco, California 94111

17         (415) 362-6666

18         jlanier@durietangri.com

19

20

21    Also Present:

22         Andrew Jacobs, Esq. (HarperCollins Inhouse Counsel)

23         John Macdonell, Videographer

24         Chelsea Gilchrist, Concierge

25
```

Page 3

```
1    the study, were there any methodological approaches that

2    you disagreed with in terms of getting to that finding?

3         A.  I have no expertise in putting together studies

4    like this, so methodologically, I wouldn't have any

5    specifics, no.                                      19:48:12

6         Q.  Okay.  Switching gears a little bit here, were

7    you involved in negotiating COVID-related special

8    requests in spring and summer of 2020?

9         A.  Business development received -- kind of fielded

10   a number of requests from various of our, kind of,    19:48:36

11   aggregators, you know, library channel as well as K-12.

12        Q.  Okay.

13        A.  And I -- yes.

14        Q.  Do you recall negotiating with the Chicago

15   Public School System for access to a couple of titles?  19:48:57

16        A.  I do remember that.  I don't recall the

17   specifics.  I know that it was in the immediate period

18   when COVID had struck and they were looking to be able to

19   provide titles to their students with the school

20   locations closed, and I believe there were three or four  19:49:17

21   books that had been wanted initially.

22             (Exhibit 264, HC0015518 - 36, was marked for

23             identification by the Concierge electronically.)

24        Q.  BY MS. LANIER:  Okay.  Let's take a quick look

25   at Exhibit 264, and this is a long email thread, and I     19:49:25
```

Page 270

Veritext Legal Solutions
866 299-5127

A-4081

1    promise you we're not going to do a long guided tour of

2    it.  I'm mainly interested in a couple of dates in this

3    email thread, so just let me know when you have it up and

4    we will commence the guided tour.

5        A.  I have it up.                                    19:49:46

6        Q.  Okay.  So let's scroll all the way down to the

7    bottom, and it might take your computer a second to load.

8    Mine's still loading.

9        A.  Yeah, mine is as well.

10       Q.  Okay.  So let's go to page -- excuse me -- 17 of   19:50:04

11   the PDF, near the bottom of page 17, and just let me know

12   when that comes up for you.

13       A.  For clarity, is that the email from Laura Bunn

14   on April 10th at 2:23 p.m.?

15       Q.  It is.                                            19:50:26

16       A.  Yes.

17       Q.  Okay.  So you've anticipated my question, which

18   was -- well, actually, maybe you haven't.

19           Based on your recollection of this negotiation,

20   and if you need a moment, your review of Laura's email,    19:50:44

21   was April 10th the first day where you became aware of

22   this Chicago Public School System request?

23       A.  Yes.  Looking at the email, this appears to be

24   the first time she raised it with me.

25       Q.  Okay.  Now, let's scroll all the way up to the    19:51:09

Page 271

```
 1    top, page 1 of the PDF, and take a moment and review page

 2    1 and 2 of the PDF, and just let me know when you're

 3    done.

 4         A.   Okay.

 5         Q.   Okay.   So let's go back to the top of page 1,        19:51:50

 6    and can you tell me what date that email is?

 7         A.   May 4th.

 8         Q.   Of 2020?

 9         A.   Sorry, yes.   May 4th of 2020.

10         Q.   That's okay.                                         19:52:07

11              And do you see that this email is from

12    Candacey Jones?

13         A.   "Candacey."

14         Q.   "Candacey."   Okay.   Great.

15              And the first full sentence of her email is,        19:52:18

16    "We're happy to handle the paperwork."

17         A.   Correct.

18         Q.   At this point, based on your recollection and

19    your review of the first two pages of this PDF, were the

20    negotiations for this particular project with the Chicago    19:52:37

21    Public School System complete by May 4th?

22              MS. STEINMAN:   Objection.

23              THE WITNESS:   I'm not sure when Candacey

24    completed it.   Candacey works in a different department

25    at HarperCollins that handles bulk sales.                     19:52:57
```

Page 272

Veritext Legal Solutions
866 299-5127

A-4083

ATTORNEYS EYES ONLY

1    Q.  BY MS. LANIER:  Okay.

2    A.  So I'm not sure the speed with which they were

3  able to implement.

4    Q.  Okay.  So implementation wouldn't necessarily

5  have happened May 4th.  It might have happened a little          19:53:09

6  bit later?

7    A.  Again, it's possible.  I don't know when the

8  contract was executed or when files were made available.

9    Q.  Got it.  Okay.

10       Was it typical during the pandemic for special          19:53:24

11  requests from school systems to take nearly a month to

12  negotiate?

13    A.  This one did.  I don't recall any others and

14  their time frame.

15    Q.  Okay.                                                   19:53:53

16       MS. STEINMAN:  Jesse, I'll give you another

17  question or so, but I think we're over.

18       MS. LANIER:  Okay.  Actually, I don't need the

19  extra moment.  I am done with my questioning.

20       Mr. Silverman, I want to thank you so much for          19:54:12

21  your time today.  I know that getting deposed is not fun

22  or particularly pleasant, but I hope it hasn't been too

23  terrible for you, and really appreciate your time today,

24  sir.

25       THE WITNESS:  Thank you.                                 19:54:29

Page 273

```
 1   STATE OF CALIFORNIA      ) ss:

 2   COUNTY OF MARIN          )

 3

 4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6          That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21   this 8th day of December, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 276

A-4085

# EXHIBIT K

Case 1:20-cv-04160-JGK-OTW  Document 88-1 Filed 07/07/22  Page 2 of 4

# THE NATIONAL EMERGENCY LIBRARY IS A GIFT TO READERS EVERYWHERE



**By Jill Lepore**

March 26, 2020



This week the Internet Archive, in San Francisco, announced—and, in the blink of an eye, opened—the National Emergency Library, a digital collection of 1.4 million books. Until June 30th, or the end of the national emergency in the United States ("whichever is later"), anyone, anywhere in the world, can check books out of this library—for free. As Brewster Kahle, the digital librarian at the Internet Archive, wrote in an online announcement, if you can afford to buy books, please buy books! Bookstores still need your business. But, by God, if you can't afford them, or if the books you need aren't in any bookstore, and, especially, if you are one of the currently more than one billion students and teachers shut out of your classroom, please: sign up, log on, and borrow!

*The Council on Books in Wartime, founded in 1942, effectively gave away over a hundred million books to U.S. servicemembers.* Photograph from Getty

Meanwhile, not to be sneezed at is the sheer pleasure of browsing through the titles. "How to Succeed in Singing." "Interesting Facts about How Spiders Live." "An Introduction to Kant's Philosophy." Those are all from 1925. Nearly all the books in the collection come from the last century or so. I looked up "Proust," which brought up four hundred and forty-eight titles. You can read Beckett on Proust, or Bloom on Proust, or just "On Proust." I found about a hundred more books about moose, mainly children's books, including a Dr. Seuss book, "Thidwick, the Big-Hearted Moose," but also an illuminating natural history from 1955, "North American Moose" ("the first comprehensive book of its type"), by a curator from the Department of Mammalogy at the Royal Ontario Museum. I did also look up books with the word "virus" in the title. Blech. I do not recommend this search. Still, if you sort the virus books by reverse publication date, and only look at the jackets, you get a freaky little mini-history of the visual iconography of virality. It passes the time.

Is this legal? All this falls under fair use, at least for the duration, is the thinking here. As the copyright lawyer Kyle Courtney has pointed out, libraries have copyright superpowers that they can use in an emergency like this one. Other collections should follow Kahle's lead. Factiva, JSTOR: unlock the gates.

Has this ever happened before? Not that I know of, but maybe there's a book in the National Emergency Library that will contradict me. It reminds me a little, though, of the Council on Books in Wartime, a collection of libraries, booksellers, and publishers, founded in 1942. William Warder Norton, of W. W. Norton & Company, was chair of the council, which issued a statement declaring that "books are useful, necessary, and indispensable." F.D.R. agreed, writing to Norton, "a war

of ideas can no more be won without books than a naval war can be won without ships." The council picked over a thousand volumes, from Virginia Woolf's "The Years" to Raymond Chandler's "The Big Sleep," and sold the books, around six cents a copy, to the U.S. military, as Armed Services Editions, books for soldiers and sailors and Army nurses and anyone else in uniform. As Yoni Appelbaum wrote in *The Atlantic* a few years ago, the council effectively gave away more than a hundred and twenty million books—their very best titles—and created a nation of readers. Emily Graff, who was, a long time ago, a student of mine but who is now an editor at Simon & Schuster, once went to the council's archives at Princeton to read the letters written to the council by servicemen and women. One ship captain wrote, "We live on books."

But the council did even more than give away books. It also commissioned the Pulitzer Prize-winning poet Stephen Vincent Benét to write a play about the Nazi book burnings in Berlin, in 1933. On the ninth anniversary of the book burnings, in May, 1942, Benét's "They Burned the Books" was broadcast on NBC radio. Toward the beginning, a narrator asks, "Why bother about books?"

> This battle is not just a battle of lands,
> A war of conquest, a balance-of-power war.
> It is a battle for the mind of man,
> Not only for his body. It will decide
> What you, and you, and you, can think and say,
> Plan, dream, and hope for in your inmost minds
> For the next thousand years.
> Decide whether man goes forward toward the light,
> Stumbling and striving, clumsy—but a man!—
> Or back to the dark ages, the dark gods,
> The old barbaric forest that is fear.

Two days later, the council held a symposium, in the New York Times Hall. You can read the proceedings in a book digitized by the Internet Archive. And a year later, on the tenth anniversary of the book burnings, the council launched a national campaign that included a performance on the steps of the New York Public Library, at noon on May 10, 1943, when a thousand New Yorkers gathered between the library lions, Patience and Fortitude, to watch. Ralph Bellamy, a dashing movie star, read from Benét's play. This is why we bother about books.

The Council on Books in Wartime did one thing more. It ran a radio program, which I bet Brewster Kahle and the Internet Archive and the National Emergency Library would really like. It was called "Books Never Die."



*Jill Lepore*, a staff writer at The New Yorker, is a professor of history at Harvard. Her books include "*These Truths: A History of the United States*" and "*If Then: How the Simulmatics Corporation Invented the Future*."

More:     Coronavirus     Books     Internet Archive     Reading

Culture at Home During the Coronavirus

# BOOKS & FICTION

Get book recommendations, fiction, poetry, and dispatches from the world of literature in your in-box. Sign up for the Books & Fiction newsletter.

E-mail address

A-4088

Case 1:20-cv-04160-JGK-OTW Document 96-13 Filed 07/07/22 Page 4 of 4

Your e-mail address            **Sign up**

By signing up, you agree to our <u>User Agreement</u> and <u>Privacy Policy & Cookie Statement</u>.

---

## Read More

---

ANNALS OF CULTURE

## WHAT OUR CONTAGION FABLES ARE REALLY ABOUT

In the literature of pestilence, the greatest threat isn't the loss of human life but the loss of what makes us human.

# EXHIBIT L

Case 1:20-cv-04160-JGK-OTW Document 100-12 Filed 07/07/22 Page 2 of 6

Home  >  Data  >  Data Catalog  >  Public Libraries Survey

# Public Libraries Survey



| Research & Evaluation | ⟩ |
| **Data Catalog** | ⌄ |
| **Public Libraries Survey** | ⌄ |
| Report Your PLS Data | |
| State Library Administrative Agency Survey | ⟩ |
| Public Needs for Library and Museum Services Survey | |
| Museum Data Files | |
| Administrative Discretionary Grant Data | |
| Heritage Health Information Survey (HHIS) | |
| Social Wellbeing Report | |
| State & County Economic Status & Broadband Statistics | |
| Library Search & Compare | |
| About the Numbers | |

The Public Libraries Survey (PLS) examines when, where, and how library services are changing to meet the needs of the public. These data, supplied annually by public libraries across the country, provide information that policymakers and practitioners can use to make informed decisions about the support and strategic management of libraries. Browse research briefs and over 25 years of research publications about the Public Libraries Survey (PLS).

**Purpose:** The survey provides statistics on the status of public libraries in the United States.

**Coverage:** The data are collected from approximately 9,000 public libraries with approximately 17,000 individual public library outlets (main libraries, branches, and bookmobiles) in the 50 states, the District of Columbia, and outlying territories.

**Content:** Data includes information about library visits, circulation, size of collections, public service hours, staffing, electronic resources, operating revenues and expenditures and number of service outlets. Learn more about PLS data element definitions.

**Frequency:** Collected annually since 1988. (Data files are available since 1992.)

**Methods:** At the state level, PLS is administered by Data Coordinators, appointed by the chief officer of the state library agency from each state or outlying area. State Data Coordinators collect the requested data from local public libraries and report these data to us via a web-based reporting system.

**Use:** PLS data are useful to researchers, journalists, the public, local practitioners, and policymakers at the federal, state, and local levels, and are used for planning, evaluation, and policy making. Download the datasets in multiple formats below, or use our online Library Search & Compare tool to find a library and browse the latest available data.

## About the Data Files

The data files available on our web site are public-use data files. These files have had some data removed to protect the confidentiality of individually identifiable survey respondents. Public-use data files are publicly available without restriction, and do not require a license. Survey data are coded or aggregated without individually identifiable information. Data that could be directly identified with one individual (salaries and wages for librarians for a library with one librarian, for example) are removed.

A small proportion of the data that has been collected are in restricted-use data files, which contain individually identifiable information, which is confidential and protected by law. For more information on restricted-use data files, please contact us.

# About the Documentation Files

The documentation files include information on survey design, imputation, and data suppression; record layouts; and appendices containing the survey questionnaire and data definitions. The record layouts (usually in one or more appendices) provide:

- **Variable names:** This is the field name (also called the data element name).
- **Field lengths and start positions:** Use these to import data from the ASCII-format file into other software applications. They indicate where each field starts in the record and how long it is.
- **Data types:** This is the type of data (numeric, text, date, etc.) in the field.
- **Descriptions:** Gives the definition or more detail about the field or variable.

## FY 2020

The FY 2020 PLS data collection is currently underway. We expect to release data files in early Summer 2022.

## FY 2019

Data Files – CSV (ZIP 3 MB), SAS (ZIP 4 MB), and SPSS (ZIP 5 MB)
Documentation (ZIP 2.55 MB)
Public Libraries in the United States: Findings from the FY 2019 Public Libraries Survey **NEW!**
Supplementary Tables List (XLS 22 KB)

- Tables 1-6A: Number and Percentage of Public Libraries by Select Characteristics (XLS 116 KB)
- Tables 7-13A: Public Library Revenue and Expenses (XLS 124 KB)
- Tables 14-25A: Public Library Services, Resources, and Programs (XLS 465 KB)
- Tables 26-27A: Public Library Staffing (XLS 50 KB)
- Tables 28-28A: Size of Public Libraries (XLS 32 KB)
- Tables 29-43: State Rankings on Key Variables (XLS 106 KB)

## FY 2018

- Data Files - CSV (ZIP 3.1 MB), SAS (ZIP 3.9 MB), and SPSS (ZIP 4.6 MB)
- Supplementary Tables (PDF 3MB), Supplementary Tables Excel (ZIP 593 KB)
- Documentation (PDF 2.7 MB)
- Research Brief (PDF 342 KB)

## FY 2017

- Data Files - CSV (ZIP 3.1MB), SAS (ZIP 3.8MB), and SPSS (ZIP 4.8MB)
- Documentation (PDF 1.9MB)
- Annual Report Volume 1, Volume 2
- Rural Libraries in America: An Infographic Overview
  State Detail Tables: Rural Libraries in America (Download Excel: XLSX 84KB) (Download PDF 163KB)
- Supplementary Tables (PDF 2.9MB)
- State Profiles
- News Release - July 16, 2020
- News Release - November 30, 2020

## FY 2016

The FY 2016 PLS shows that public libraries continue to evolve to meet changing community needs. More than 171 million registered users, representing over half of the nearly 311 million Americans who lived within a public library service area, visited public libraries over 1.35 billion times in 2016. Public libraries offered half a million more programs in 2016 than in 2015; 113 million people attended 5.2 million programs in 2016. In addition, the number of electronic materials continued to grow, with public libraries offering over 391 million e-books to their patrons in the United States.

- Data Files - CSV (ZIP 3.12MB), SAS (ZIP 3.87MB), and SPSS (ZIP 4.85MB)
- Documentation (PDF 4.35MB)
- Annual Report
- Supplementary Tables (PDF 4.6MB), User Note 1 (PDF 41KB), and User Note 2 (PDF 42KB)
- State Profiles
- Data Element Definitions (PDF 1.4MB)

## FY 2015

The FY 2015 PLS shows that the trends noted in previous years are continuing. Nearly 311 million Americans lived within a public library

service area in 2015, an increase from 306 million in 2014. Public libraries offered 4.7 million programs in 2015, attended by 106 million people, 4 million more attendees than the previous year. In addition, the number of electronic materials, including audio, video and e-books, continued to grow, increasing by over 50 percent between 2014 and 2015.

- Data Files - CSV (ZIP), SAS (ZIP), and SPSS (ZIP)
- Documentation (PDF 1.9MB)
- Annual Report
- State Profiles (PDF 6.3MB)
- Supplementary Tables (PDF 4.4MB) and User Note (PDF 53KB)
- Data Element Definitions (PDF 1.4MB)
- News Release - August 2, 2018

## FY 2014

The 2014 PLS shows libraries continuing to adapt to 21st century needs and a growing population. More than 306 million Americans lived within a public library service area in 2014, compared to 305 million in 2013. Libraries offered more children and young adult programs, with an estimated 5 million more Americans attending library programs compared to the previous year. In addition, the number of downloadable audio, video, and electronic books available to the public grew significantly.

- Data Files - CSV (ZIP) and SAS (ZIP)
- Documentation (PDF)
- Annual Report
- Supplementary Tables (PDF)
- Data Element Definitions (PDF)

## FY 2013

The 2013 PLS shows libraries are responding to changing 21st century needs. PLS FY 2013 provides aggregated local, state and national information about the nation's 9,000 public libraries and their 16,500 branches and bookmobiles. Ninety-six percent of the population, or 305 million people, lived within a public library service area in 2013, and Americans made an average of almost four million visits each day to public libraries that year.

- Data Files - CSV (ZIP) and SAS (ZIP)
- Geospatial Data Files - ESRI shapefile (ZIP), GeoJSON (ZIP), and KML (ZIP)
- Documentation (PDF)
- Annual Report (PDF)
- Supplementary Tables
- Data Element Definitions (PDF)
- News Release - March 15, 2016

## FY 2012

In 2012, Americans made 1.5 billion trips to public libraries in the United States—the equivalent of more than 4.1 million visits each day, indicating there is a high demand for the resources and services of the nation's approximate 9,000 public libraries. FY 2012 was characterized by stabilization. After postrecession declines in visitation, circulation, revenue and staffing, these measures of public library use and resources remained similar to prior year levels.

- Data Files - CSV (ZIP) and SAS (ZIP)
- Documentation (PDF)
- Annual Report (PDF)
- Supplementary Tables
- State Profiles
- Fact Sheet (PDF)
- Data Element Definitions (PDF)
- News Release - January 26, 2015

## FY 2011

There were 1.53 billion in-person visits to public libraries in FY 2011—equivalent to over 4.2 million visits each day. The FY 2011 PLS also shows how library service is fundamentally changing. Reductions in physical visits to the library are associated with investments in e-materials such as e-books, which may indicate that services are moving online, allowing people to perform library transactions such as checking availability of materials, checking them out and returning them online.

- Data Files - CSV (ZIP) and SAS (ZIP)
- Documentation (PDF) and User Note (PDF)
- Annual Report (PDF)

A-4093

- [Research Brief on Small and Rural Libraries](#)
- [Supplementary Tables](#)
- [State Profiles](#)
- [Fact Sheet](#) (PDF)
- [Data Element Definitions](#) (PDF)
- [News Release](#) - June 18, 2014

## FY 2010

In 2010, there were 8,951 public libraries in the 50 states and the District of Columbia with 17,078 public library branches and bookmobiles. These public libraries served 297.6 million people throughout the United States, a number that is equivalent to 96.4 percent of the total U.S. population. The FY 2010 PLS shows how libraries are doing more with less—with local government taking on a larger funding role as state support declines.

- Data Files - [CSV](#) (ZIP) and [SAS](#) (ZIP)
- [Documentation](#) (PDF)
- [Annual Report](#) (PDF)
- [State Profiles](#)
- [Fact Sheet](#)
- [Supplementary Tables](#)
- [Data Element Definitions](#) (PDF)
- [News Release](#) - January 22, 2013

## FY 2009

- Data Files - [CSV](#) (ZIP) and [SAS](#) (ZIP)
- [Documentation](#) (PDF)
- [Annual Report](#) (PDF)
- [Data Element Definitions](#) (PDF)

## FY 2008

- Data Files - [CSV](#) (ZIP) and [SAS](#) (ZIP)
- [Documentation](#) (PDF), [User Note](#) (PDF), and [Bridge Study of Imputation Methods](#) (PDF)
- [Annual Report](#) (PDF)
- [Data Element Definitions](#) (PDF)

## FY 2007

- Data Files - [CSV](#) (ZIP) and [SAS](#) (ZIP)
- [Documentation](#) (PDF) and [User Note](#) (PDF)
- [Annual Report](#) (PDF)
- [Research Brief on 10-Year Service Trends](#) (PDF)
- [Data Element Definitions](#) (PDF)

## FY 2006

- Data Files - [CSV](#) (ZIP) and [SAS](#) (ZIP)
- [Documentation](#) (PDF)
- [Annual Report](#) (PDF)
- [Special Report on 5-Year Trends](#) (PDF)
- [Data Element Definitions](#) (PDF)

## FY 2005 PLS and Earlier

Please note that the [National Center for Education Statistics](#) (NCES) conducted the FY 2005 and earlier surveys and produced the data files and reports.

| Fiscal Year | Data Files | Documentation | Reports | Data Element Definitions |
|---|---|---|---|---|
| 2005 | [CSV](#) (ZIP) and [SAS](#) (ZIP) | [Documentation](#) (PDF) | [Annual Report](#) (PDF) | [Definitions](#) (PDF) |
| 2004 | [CSV](#) (ZIP) and [SAS](#) (ZIP) | [Documentation](#) (PDF) | [Annual Report](#) (PDF) | [Definitions](#) (PDF) |
| 2003 | [CSV](#) (ZIP) and [SAS](#) (ZIP) | [Documentation](#) (PDF) | [Annual Report](#) (PDF) | [Definitions](#) (PDF) |

A-4094

7/5/22, 12:51 PM
Case 1:20-cv-04160-JGK-OTW Document 96-3 Filed 07/07/22 Page 5 of 6
Public Libraries Survey | Institute of Museum and Library Services



| Fiscal Year | Data Files | Documentation | Reports | Data Element Definitions |
|---|---|---|---|---|
| 2001 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |
| 2000 note | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |
| 1999 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |
| 1998 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |
| 1997 | CSV (ZIP) and SAS (ZIP) | Documentation | Annual Report | |
| 1996 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |
| 1995 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) and Research Brief (PDF) | |
| 1994 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |
| 1993 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) and Special Report (PDF) | |
| 1992 | CSV (ZIP) and SAS (ZIP) | Documentation (PDF) | Annual Report (PDF) | |

Note: The electronic codebook and database (ZIP) are available for FY 2000.

Annual reports, but not data files, are available for PLS FY 1991 (PDF), FY 1990 (PDF), and FY 1989 (PDF).

CONTACT US

202-653-4657

imlsinfo@imls.gov

955 L'Enfant Plaza North, SW, Suite 4000, Washington, D.C. 20024-2135

Viewers & Players

FOIA

No FEAR

Privacy & Terms of Use

EEO

Accessibility

Open Government

Office of Special Counsel

USA.gov

# EXHIBIT M



Search WorldCat

[                    ]

[Search]

Advanced Search   Find a Library



Cite/Export    Print    E-mail    Share    Permalink

Add to list    Add tags    Write a review    Rate this item: 1  2  3  4  5

# The lion, the witch, and the wardrobe

| | |
|---|---|
| Author: | C S Lewis; Pauline Baynes |
| Publisher: | New York : HarperCollins, 1994. |
| Edition/Format: | Print book : Fiction : Juvenile audience : English : 1st HarperCollins ed   View all editions and formats |
| Summary: | Four English schoolchildren find their way through the back of a wardrobe into the magic land of Narnia and assist Aslan, the golden lion, to triumph over the White Witch, who has cursed the land with eternal winter. |
| Rating: | based on 3 rating(s) 0 with reviews - Be the first. |
| Subjects | Narnia (Imaginary place) -- Juvenile fiction. |
| | Fantasy fiction -- Juvenile fiction. |
| | Witches -- Juvenile fiction. |
| | View all subjects |
| More like this | User tags   User lists   Similar Items |

**Get a Copy**

| | |
|---|---|
| Find a copy in the library | |
| AbeBooks | $1.23 |
| Amazon | $12.39 |
| Better World Books | $15.67 |

## ⊟ Find a copy in the library

**Enter your location:** [94549] [Find libraries]
Submit a complete postal address for best results.

Displaying libraries 1-6 out of 4307 for all 615 editions (94549)     Show libraries holding **just this edition** or narrow results by **format**

« First ‹ Prev 1 **2** 3 Next › Last »

| | Library | Held formats | Distance | |
|---|---|---|---|---|
| 1. | **Saint Mary's College Library** St. Albert Hall Moraga, CA 94575 United States | 📖 Book | 3 miles MAP IT | Library info Add to favorites |
| 2. | **UC Berkeley Libraries** Berkeley, CA 94720 United States | 📖 Book | 7 miles MAP IT | Library info Add to favorites |
| 3. | **Holy Names University Library** Cushing Library Oakland, CA 94619 United States | 📖 Book | 8 miles MAP IT | Library info Ask a librarian Add to favorites |
| 4. | **Mills College** F. W. Olin Library Oakland, CA 94613 United States | 📖 Book | 9 miles MAP IT | Library info Ask a librarian Add to favorites |
| 5. | **Benicia Public Library** Benicia, CA 94510 United States | 📖 Book | 11 miles MAP IT | Library info Ask a librarian Add to favorites |

Case 1:20-cv-04160-JGK-OTW Document 103-15 Filed 07/07/23 Page 3 of 6

| 6. | **Mechanics' Institute Library** |  Book | 17 miles | Library info |
|---|---|---|---|---|
| | San Francisco, CA 94104 United States | | MAP IT | Add to favorites |

‹‹ First ‹ Prev 1 **2** 3 Next › Last ›› 

## Details

| Genre/Form: | Fantasy |
|---|---|
| | Fantasy fiction |
| | Fiction |
| | Juvenile works |
| | Juvenile fiction |
| | Romans, nouvelles, etc. pour la jeunesse |
| | Romans, nouvelles, etc |
| **Material Type:** | Fiction, Juvenile audience |
| **Document Type:** | Book |
| **All Authors / Contributors:** | C S Lewis; Pauline Baynes |

Find more information about: | C S Lewis ▾ | Go

| **ISBN:** | 9780060234812 0060234814 9780060234829 0060234832 9780064471046 0064471047 9780590254762 0590254766 9780760795811 0760795819 9781413146240 1413146244 9781413146257 1413146252 0060277246 9780060277246 |
|---|---|
| **OCLC Number:** | 28291231 |
| **Target Audience:** | Middle School.; 940 |
| **Description:** | 189 pages : illustrations, map ; 24 cm. |
| **Contents:** | Lucy looks into a wardrobe -- |
| | What Lucy found there -- |
| | Edmund and the wardrobe -- |
| | Turkish delight -- |
| | Back on this side of the door -- |
| | Into the forest -- |
| | A day with the Beavers -- |
| | What happened after dinner -- |
| | In the Witch's house -- |
| | The spell begins to break -- |
| | Aslan is nearer -- |
| | Peter's first battle -- |
| | Deep magic from the dawn of time -- |
| | The triumph of the Witch -- |
| | Deeper magic from before the dawn of time -- |
| | What happened about the statues -- |
| | The hunting of the White Stag. |
| **Responsibility:** | C.S. Lewis ; illustrated by Pauline Baynes. |
| **More information:** | Contributor biographical information  Publisher description  Publisher description |

**Abstract:**

Four English schoolchildren find their way through the back of a wardrobe into the magic land of Narnia and assist Aslan, the golden lion, to triumph over the White Witch, who has cursed the land with eternal winter.

## Reviews

A-4098

Case 1:20-cv-04160-JGK-OTW Document 103-15 Filed 07/07/22 Page 4 of 6

## User-contributed reviews

Add a review and share your thoughts with other readers.          Be the first.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### GoodReads Reviews   (61)

#### Review from goodreads.com
by Patrick   (GoodReads user published 2015-12-31 )   ★★★★★

**813** of  **813** people found this review helpful

This is the first book where I chronicled my thoughts as I read through it with my son. I don't know how easy it is for y'all to access the record of those here on Goodreads, but if you're looking for a detailed account of my thoughts on the book, you can look there.

I'll say this. I've read a lot of<a href="https://www.goodreads.com/review/show/1447783261">more...</a>

#### Review from goodreads.com
by Miranda   (GoodReads user published 2020-12-10 )   ★★★★★

**450** of  **450** people found this review helpful

<blockquote> <img src='https://i.gr-assets/images/S/compressed.photo.goodreads.com/hostedimages/1589734946i/29494799._SX540_.jpg' width='400' height='225' alt='description' class='gr-hostedUserImg'/>

If you've ever wondered which literary world would be the best to live in, wonder no longer, cause there's a <b><u><a href='https://youtu.be/SREpUj0py9o' rel='nofollow noopener'>BookTube Video</a></u></b> to answer that! </blockquote><b> <u>The Written Review</u> </b>:<blockquote> <i>One day, you will be old enough to start reading fairytales again.</i> </blockquote>It's like C.S. Lewis was speaking to me. I never read these as a c<a href="https://www.goodreads.com/review/show/2177558627">more...</a>

#### Review from goodreads.com
by Sean Barrs   (GoodReads user published 2020-04-11 )   ★★★★★

**422** of  **422** people found this review helpful

<b> <i>"If ever they remembered their life in this world it was as one remembers a dream." </i> </b>

The real world is boring; it's mundane, unimaginative and dry. So humans create fantasy as a means of escape. We watch movies or go to the theatre to see something more interesting than the standard realities of <a href="https://www.goodreads.com/review/show/854534560">more...</a>

Read more GoodReads user reviews   »

## Tags

Add tags for "The lion, the witch, and the wardrobe".

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**All user tags**   (2)

View most popular tags as: tag list | tag cloud

**favorite**   (by 2 people)

**narnia**   (by 1 person)

## Similar Items

A-4099

Case 1:20-cv-04160-JGK-OTW Document 96-139 Filed 07/07/22 Page 5 of 6

**Related Subjects:** (28)

[Narnia (Imaginary place) -- Juvenile fiction.](#)

[Fantasy fiction -- Juvenile fiction.](#)

[Witches -- Juvenile fiction.](#)

[Aslan the Lion (Fictitious character) -- Juvenile fiction.](#)

[Winter -- Juvenile fiction.](#)

[Magic -- Juvenile fiction.](#)

[Good and evil -- Juvenile fiction.](#)

[Magic -- Fiction.](#)

[Animals -- Fiction.](#)

[Fantasy.](#)

[Fantasy -- Juvenile literature.](#)

[Narnia (Lieu imaginaire) -- Romans, nouvelles, etc. pour la jeunesse.](#)

[Sorcières -- Romans, nouvelles, etc. pour la jeunesse.](#)

[Hiver -- Romans, nouvelles, etc. pour la jeunesse.](#)

[Animaux -- Romans, nouvelles, etc.](#)

[JUVENILE FICTION / Action & Adventure.](#)

[JUVENILE FICTION / Classics.](#)

[JUVENILE FICTION / Fantasy & Magic.](#)

[Animals.](#)

[Fantasy fiction.](#)

[Good and evil.](#)

[Magic.](#)

[Narnia (Imaginary place)](#)

[Winter.](#)

[Witches.](#)

[Narnia (Imaginary place) -- Fiction.](#)

[Good and evil -- Fiction.](#)

[Children -- Fiction.](#)

---

**User lists with this item** ([31](#))

[Children's & Young Adult Books](#) (226 items)
  by [BLCLibrary](#)  updated 2020-03-24

[Read](#) (12 items)
  by [loerkm](#)  updated 2019-12-29

[Movies based on books](#) (58 items)
  by [aheim@shc.edu](#)  updated 2019-05-21

[Family List](#) (491 items)
  by [mjycao](#)  updated 2019-05-13

[2018 Great American Read](#) (83 items)
  by [MikkLib07](#)  updated 2018-06-08

A-4100

A-4101

# EXHIBIT N

1               UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3  -------------------------------------------x

4  HACHETTE BOOK GROUP, INC.,

    HARPERCOLLINS PUBLISHERS LLC,

5  JOHN WILEY & SONS, INC., and

    PENGUIN RANDOM HOUSE LLC,

6

7               Plaintiffs,

8  vs.                   Case No.

                     1:20-cv-04160-JGK

9

    INTERNET ARCHIVE and DOES 1

10 through 5, inclusive,

11             Defendants.

12 -------------------------------------------x

13

14     VIDEOTAPED RULE 30(B)(1) AND RULE 30(B)(6)

15       DEPOSITION OF HACHETTE BOOK GROUP

16        CORPORATE DESIGNEE: SKIP DYE

17         Remote Zoom Proceedings

18        Thursday, November 18, 2021

19

20

21

22 Job No. 4867650

23 Reported By: Lynne Ledanois, CSR 6811

24 Pages 1 - 390

25

                                Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3    ---------------------------------------------x
 4    HACHETTE BOOK GROUP, INC.,
      HARPERCOLLINS PUBLISHERS LLC,
 5    JOHN WILEY & SONS, INC., and
      PENGUIN RANDOM HOUSE LLC,
 6
 7                      Plaintiffs,
 8    vs.                          Case No.
                                   1:20-cv-04160-JGK
 9
      INTERNET ARCHIVE and DOES 1
10    through 5, inclusive,
11                    Defendants.
12    ---------------------------------------------x
13
14           Videotaped deposition of SKIP DYE,
15      taken in Lewes, Delaware, commencing at
16      10:35 EST a.m., on Thursday, November 18,
17      2021 before Lynne Ledanois, Certified
18      Shorthand Reporter No. 6811
19
20
21
22
23
24
25
```

                                        Page 2

```
 1                REMOTE APPEARANCES

 2

 3   Counsel for the Plaintiffs:

 4                 DAVIS WRIGHT TREMAINE LLP

 5                 BY:  LINDA STEINMAN

 6                 Attorney at Law

 7                 4530 Wisconsin Avenue, NW

 8                 5th Floor

 9                 Washington, D.C. 20016

10                 lindasteinman@dwt.com

11

12   Counsel for the Defendant Internet Archive:

13                 DURIE TANGRI LLP

14                 BY: JESSICA E. LANIER

15                    CORYNNE McSHERRY

16                 Attorneys at Law

17                 217 Leidesdorff Street

18                 San Francisco, California 94111

19                 jlanier@durietangri.com

20   ALSO PRESENT:

21   John MacDonnell, Videographer

22   Chelsea Gilchrist, Veritext Tech

23   Carolyn Foley, In-House Counsel Penguin Random

24   House

25
```

Page 3

```
 1    website to their, as they call them,        11:08AM
 2    patrons?                                     11:08AM
 3         Q    Yes.                               11:08AM
 4         A    Yes, I'm aware of the             11:08AM
 5    lending library.                             11:08AM
 6         Q    Okay.  Is PRH aware of any        11:08AM
 7    quantifiable effect that the Internet        11:08AM
 8    Archive's digital lending library has        11:08AM
 9    had on PRH's revenues from books?            11:08AM
10         A    I'm aware of, as I work with      11:09AM
11    my customers, I know that they -- many      11:09AM
12    of my libraries that we work with also      11:09AM
13    offer and reference the Internet            11:09AM
14    Archive, that their books are               11:09AM
15    available there.                             11:09AM
16              So I'm aware of the lending       11:09AM
17    and it does affect our sales because        11:09AM
18    then the libraries don't purchase           11:09AM
19    those e-Books from us.                       11:09AM
20         Q    Okay.  When you say              11:09AM
21    "customers," what are you referring         11:09AM
22    to?                                          11:09AM
23         A    The aggregators act as our       11:09AM
24    party to sell to libraries.  So the        11:09AM
25    libraries would be the customers to        11:09AM
```

Page 36

```
 1    the aggregators.                          11:09AM
 2        Q     Got it.  So when you used       11:09AM
 3    "customers" in your previous answer,      11:09AM
 4    were you referring to aggregators or      11:09AM
 5    libraries?                                11:09AM
 6        A     I'm referring to the            11:09AM
 7    aggregators working with the              11:09AM
 8    libraries.                                11:10AM
 9        Q     Got it.  So you said a          11:10AM
10    moment ago that you're aware -- I'm       11:10AM
11    just reading the transcript here, that    11:10AM
12    you're aware of the lending and it        11:10AM
13    does affect our sales because the         11:10AM
14    libraries don't purchase those e-Books    11:10AM
15    from us.                                  11:10AM
16            Is that documented, that          11:10AM
17    effect of sales that you've observed?     11:10AM
18        A     Documented -- do you -- I'm     11:10AM
19    sorry, what do you mean by                11:10AM
20    "documented"?                             11:10AM
21        Q     I mean, is this -- let me       11:10AM
22    back up a little bit.                     11:10AM
23            Is this the kind of thing         11:10AM
24    that is anecdotally reported to you or    11:10AM
25    is there data to support the statement    11:10AM
```

Page 37

| | | |
|---|---|---|
| 1 | relationship with Open | 12:15PM |
| 2 | Library/Internet Archive" is the rest | 12:15PM |
| 3 | of that sentence. | 12:15PM |
| 4 | Q    Right.  So do you recall | 12:15PM |
| 5 | what -- do you recall what their view | 12:15PM |
| 6 | of ownership was, DPLA, as you | 12:15PM |
| 7 | described in this email? | 12:15PM |
| 8 | A    At the time, I know -- I | 12:15PM |
| 9 | don't know how it's described in this | 12:15PM |
| 10 | email.  I know that their view at this | 12:16PM |
| 11 | time, they had an ownership view, | 12:16PM |
| 12 | meaning the library bought the e-Book, | 12:16PM |
| 13 | not licensed the e-Book. | 12:16PM |
| 14 | And we don't sell directly | 12:16PM |
| 15 | to libraries.  We sell to aggregators, | 12:16PM |
| 16 | who then license our content to them. | 12:16PM |
| 17 | So they wanted to bypass that | 12:16PM |
| 18 | relationship with stuff. | 12:16PM |
| 19 | Q    And PRH's position is that | 12:16PM |
| 20 | when an e-Book is conveyed to a | 12:16PM |
| 21 | library, the library does not own that | 12:16PM |
| 22 | e-Book; is that right? | 12:16PM |
| 23 | A    The library has a license | 12:16PM |
| 24 | relationship between their aggregator | 12:16PM |
| 25 | and them, not with Penguin Random | 12:16PM |

Page 86

```
 1    Internet Archive instead of going          12:38PM

 2    through their legitimate means.            12:38PM

 3        Q      Does PRH have any data to       12:38PM

 4    suggest that fluctuations in               12:38PM

 5    circulation or revenue are tied to         12:38PM

 6    titles being available on the Internet     12:38PM

 7    Archive?                                   12:38PM

 8            MS. STEINMAN:  Objection.          12:38PM

 9        Go ahead.                              12:38PM

10            THE WITNESS:  It's just            12:39PM

11        common knowledge.  If it's             12:39PM

12        available someplace else -- if         12:39PM

13        somebody is looking for it and         12:39PM

14        it's available someplace else for      12:39PM

15        them to check out, because it's        12:39PM

16        not available from the library, it     12:39PM

17        stands to reason that people who       12:39PM

18        are wanting to read it will            12:39PM

19        download it where they can get it.     12:39PM

20            That patron, if they can't         12:39PM

21        find it on their library's             12:39PM

22        website, will go to Internet           12:39PM

23        Archive and see it there and           12:39PM

24        download it.                           12:39PM

25
```

Page 106

```
 1   BY MS. LANIER:                                12:39PM
 2        Q    Do you have evidence that          12:39PM
 3   that occurred?                               12:39PM
 4        A    I would say it's common            12:39PM
 5   sense that if a reader wants to read,        12:39PM
 6   they're going to try to find how to          12:39PM
 7   read the book.                               12:39PM
 8        Q    Okay.  So you don't have           12:39PM
 9   evidence then apart from common sense?       12:39PM
10            MS. STEINMAN:  Objection.           12:39PM
11       Go ahead, Skip.                          12:39PM
12            THE WITNESS:  I don't               12:39PM
13       have -- I don't have any evidence.       12:39PM
14   BY MS. LANIER:                               12:39PM
15        Q    We sort of started talking         12:39PM
16   about this a little bit, but I do want       12:39PM
17   to talk about other factors that might       12:40PM
18   affect how a title would perform both        12:40PM
19   in terms of revenue and circulation.         12:40PM
20            Might the fact that -- I'll         12:40PM
21   list some ideas.  You tell me if that        12:40PM
22   might affect a title or not.                 12:40PM
23            The identity of the author          12:40PM
24   and whether the author has published a       12:40PM
25   book before?                                 12:40PM
```

Page 107

```
 1    about the University of Georgia, they        12:52PM
 2    have academic libraries at the              12:52PM
 3    University of Georgia.                       12:52PM
 4          So those libraries are                 12:52PM
 5    affiliated with an academic school of        12:52PM
 6    learning.  Usually they are funded by        12:52PM
 7    the school and/or state depending upon       12:52PM
 8    the type of institution they are, the        12:52PM
 9    type of academic library that they           12:52PM
10    are.                                          12:53PM
11      Q     And last but certainly not           12:53PM
12    least, what is a school library?             12:53PM
13      A     A school library is most              12:53PM
14    associated with K through 12.  But it        12:53PM
15    could be pre-K as well.                      12:53PM
16          This is a public school                12:53PM
17    scenario where you have children who         12:53PM
18    go to school and it's a library that's       12:53PM
19    located in that school or libraries.          12:53PM
20    The school can have multiple libraries        12:53PM
21    that's in their school system.               12:53PM
22      Q     Okay.  Are you familiar with         12:53PM
23    the term "perpetual access model"?           12:53PM
24      A     Yes, I am.                            12:53PM
25      Q     What is that?                         12:53PM
```

Page 120

```
 1      A      Perpetual access model is      12:53PM
 2   where the library in our case, the      12:53PM
 3   institution would actually work with    12:53PM
 4   an aggregator and then they would        12:53PM
 5   purchase the license right to have       12:53PM
 6   that in perpetuity to use and to         12:53PM
 7   license one book at a time.              12:53PM
 8      Q      And it is a license, it is     12:54PM
 9   not a sale in that the library does      12:54PM
10   not own the e-Book copy?                 12:54PM
11      A      Again, the relationship is     12:54PM
12   not between me and that library, it's    12:54PM
13   between the aggregator and that          12:54PM
14   library, so the aggregator's             12:54PM
15   relationship is what they have.          12:54PM
16           And most often, as I             12:54PM
17   understand it, it is a license           12:54PM
18   relationship that's made up of many      12:54PM
19   responsibilities related to that, not    12:54PM
20   only the rendering of the book.          12:54PM
21      Q      Under the perpetual access     12:54PM
22   model, does the aggregator own the       12:54PM
23   copy of the e-Book?                      12:54PM
24           MS. STEINMAN:  Objection.        12:54PM
25           THE WITNESS:  So the             12:54PM
```

Page 121

```
1       left?                                7:19PM
2             MS. LANIER:  I'm trying to     7:19PM
3       get through my questions.  But       7:19PM
4       it's difficult with the repeated     7:19PM
5       standing objections, so --           7:19PM
6             MS. STEINMAN:  In terms of      7:19PM
7       the official count here, how much    7:19PM
8       time do we have left?  I'm very      7:19PM
9       hungry.                              7:19PM
10            VIDEOGRAPHER:  The time on      7:19PM
11      the record as of now is six hours,   7:19PM
12      45 minutes.                          7:19PM
13            MS. LANIER:  Excellent.        7:19PM
14      Q      Okay.  Are you familiar with  7:19PM
15   the term "big five" in publishing?      7:19PM
16      A      I'm sorry, Jesse, you broke   7:19PM
17   up at the end of that phrase.  Did you  7:19PM
18   say -- what did you say?  Repeat,       7:19PM
19   please.                                 7:19PM
20      Q      No problem.  Are you          7:19PM
21   familiar with the term "big five" in    7:19PM
22   publishing?                             7:19PM
23      A      I'm familiar with that term.  7:20PM
24      Q      What does that term mean?     7:20PM
25      A      The term means the big five   7:20PM
```

Page 369

A-4113

```
 1    largest publishers in the United        7:20PM
 2    States.                                  7:20PM
 3        Q      Do you know who are the big    7:20PM
 4    five?                                    7:20PM
 5        A      It would be Penguin Random      7:20PM
 6    House, Hachette, Macmillan,              7:20PM
 7    HarperCollins and Simon & Schuster.      7:20PM
 8        Q      Have you heard publishers      7:20PM
 9    who are not part of that group           7:20PM
10    referred to as a farm team?              7:20PM
11        A      Excuse me?                     7:20PM
12        Q      Have you heard from the        7:20PM
13    publishers who are not part of the big   7:20PM
14    five referred to as a farm team?         7:20PM
15        A      No, I have not heard that.     7:20PM
16        Q      Okay.  Do you have any -- do   7:20PM
17    you have any concerns about this         7:21PM
18    merger if it goes through?               7:21PM
19            MS. STEINMAN:  Objection.         7:21PM
20        Mr. Dye, have you had                 7:21PM
21        communications with counsel on       7:21PM
22        this subject?                        7:21PM
23            THE WITNESS:  I had               7:21PM
24        communications with counsel --       7:21PM
25        with counsel on this subject.        7:21PM
```

                                        Page 370

```
1              I, LYNNE M. LEDANOIS, a Certified
2      Shorthand Reporter of the State of
3      California, do hereby certify:
4              That the foregoing proceedings were
5      taken before me at the time and place herein
6      set forth; that a record of the proceedings
7      was made by me using machine shorthand which
8      was thereafter transcribed under my
9      direction; that the foregoing transcript is a
10     true record of the testimony given.
11             Further, that if the foregoing
12     pertains to the original transcript of a
13     deposition in a Federal Case, before
14     completion of the proceedings, review of the
15     transcript [X] was [] wasn't requested.
16             I further certify I am neither
17     financially interested in the action nor a
18     relative or employee of any attorney or party
19     to this action.
20             IN WITNESS WHEREOF, I have this
21     date subscribed my name.
22  Dated: 11/22/2021
23
24                    Lynne Marie Ledanois
                    LYNNE MARIE LEDANOIS
25                    CSR No. 6811

                                    Page 387
```

Veritext Legal Solutions
866 299-5127

A-4115

# EXHIBIT O



SUBSCRIBE: PRINT | DIGITAL | LOGIN | SITE LICENSE ACCESS

FREE NEWSLETTERS

SELF-PUB **booklife** | JOBZONE | THE MILLIONS | U.S. BOOK SHOW

Search Publishers Weekly

NEWS | REVIEWS | BESTSELLERS | CHILDREN'S | AUTHORS | ANNOUNCEMENTS | DIGITAL | INTERNATIONAL | OPINION

Obituaries | Book Deals | Financial Reporting | Page to Screen | Bookselling | Awards & Prizes | Publisher News | Comics | Business Deals | Shows & Events

Cooking | People | Religion | Audio Books | Manufacturing | Marketing | PW Tip Sheet | Licensing | U.S. Book Show | News Briefs

Home > News > Publisher News

QUICKLINKS

National Accounts Manager, YUP - Yale University - New Haven, CT.      NEXT JOB ▸

# Ranking America's Largest Publishers

The publisher of Harry Potter was the sixth-largest trade publisher last year based on unit sales through BookScan

By Jim Milliot | Feb 24, 2017

Like 66    Share    Tweet     Comments    SUBSCRIBE by the Month



*Courtesy Penguin Random House*

Anyone even remotely interested in book publishing knows who the Big Five trade publishers are—if not necessarily in what order they rank. For the record, Penguin Random House sold the most units through NPD BookScan outlets last year, followed by HarperCollins. Simon & Schuster was in third place; last week, S&S reported that its worldwide revenue was $767 million in 2016, down 1.8% from 2015. The Hachette Book Group was #4 in units sold in 2016, a total that includes units from the Perseus Books Group, which Hachette bought last March. Macmillan rounded out the top five.

What is more of a mystery is which is the sixth-largest trade house. The company that finished behind the Big Five in 2016, based on unit sales made at retailers that report to BookScan, was Scholastic.

## RELATED STORIES:

- PW issue Contents
- More in News -> Publisher News
- More in articles by Jim Milliot

Request permission to reprint this article.

The company had 33 titles hit *PW*'s Children's Frontlist Fiction bestseller list last year, including the top-selling print book of 2016: J.K. Rowling's *Harry Potter and the Cursed Child*, which sold 4.4 million units. And, while a number of books on the list were Potter-related, a host of other books did well in the year, including new books in the company's Baby-Sitters Club Graphix line. In all, Scholastic's trade sales (which excludes book fairs and clubs) were $318 million in the 12-month period ended Nov. 30, 2016.

## FREE E-NEWSLETTERS

Enter e-mail address
☑ PW Daily ☑ Tip Sheet

In seventh place was Disney, another children's publisher that had a good run with bestsellers last year, particularly in the frontlist fiction category It had 25 books reach the Children's Frontlist Fiction bestseller list, led by six Star Wars titles and six books by author Rick Riordan.

## MORE FROM PW



**Summer Reads 2022**



**PW Picks: Books of the Week**



**New Pub Dates for Forthcoming Books**



**10 Essential Works of Fabulist Fiction**

## FEATURED REVIEWS



**LET NO ONE SLEEP**

*Juan José Millás, trans. from the Spanish by Thomas Bunstead. Bellevue, $16.99 trade paper (208p) ISBN 978-1-942658-94-8*

$165.6 million in its trade division in 2016, was #8 on the units-sold list. Workman was in ninth place. Among its titles that sold more than 100,000 print copies last year were *Atlas Obscura: An Explorer's Guide to the World's Hidden Wonders* (which sold about 172,000 copies through BookScan outlets) and *What to Expect When You're Expecting* (which sold more than 138,000 copies). Claiming the 10th spot on the list was Sterling, the publishing subsidiary of Barnes & Noble.

Publishers in the 11th through 20th places were a mix of independent presses (such as Norton, Kensington, Chronicle, Sourcebooks), divisions of larger companies (Dover, owned by LSC Communications), children's publishers (Candlewick), and religion houses (B&H Publishing, Tyndale). John Wiley's #12 spot on the list reflects sales of its business books and other trade-oriented titles to general retailers, rather than its educational materials.

Both Dover and Sterling continued to do well with adult coloring books in 2016, although sales in the category cooled compared to 2015. B&N said that because of strong adult coloring book demand, sales of Sterling titles to retailers other than B&N were almost 22% higher in fiscal 2016 than in fiscal 2015.

B&H occupied the 19th spot on the ranking due in part to strong sales of *Fervent*, which sold about 306,000 units last year, and *The Battle Plan for Prayer*, which sold approximately 157,000 copies.

## Largest Trade Publishers By Units Sold, 2016*

| Rank | Publisher |
|------|-----------|
| 1 | Penguin Random House |
| 2 | HarperCollins |
| 3 | Simon & Schuster |
| 4 | Hachette Book Group |
| 5 | Macmillan |
| 6 | Scholastic |
| 7 | Disney Publishing Worldwide |
| 8 | Houghton Mifflin Harcourt |
| 9 | Workman |
| 10 | Sterling |
| 11 | John Wiley and Sons |
| 12 | Abrams |
| 13 | Dover |
| 14 | Candlewick |
| 15 | W.W. Norton |
| 16 | Kensington |
| 17 | Chronicle |
| 18 | Sourcebooks |
| 19 | B&H Publishing |
| 20 | Tyndale House |

*Based on purchases made through outlets tracked by NPD BookScan

*\* This ranking and article were updated on July 31 after NPD discovered that it had double-counted unit sales of Sourcebooks's young adult titles. Eliminating the double-counting dropped Sourcebooks from 10th to 18th place on the ranking.*

A version of this article appeared in the 02/27/2017 issue of *Publishers Weekly* under the headline: The Answer is... Scholastic

## ALSO ON PW



**PW's 150th Anniversary Issue**



**Check Out Our Podcasts! more...**



**Meet 'Ava's Demon'**



**This Week's Starred Reviews**

## MOST POPULAR

- Summer Reads 2022
- HarperCollins Union Authorizes Strike
- Writers to Watch Fall 2022
- The 10 Best Emily Dickinson Poems
- The 10 Best Haruki Murakami Books
- Book Deals: Week of July 4, 2022
- Why Is the Penis Shaped Like That? PW Talks with Jesse Bering
- The 10 Best Kurt Vonnegut Books
- The 7 Weirdest Sex Stories of the Ancient World
- This Week's Bestsellers: July 4, 2022
- The ALA Annual Conference Returns with Solid Attendance

## BESTSELLERS

View by genre:
Top 10 Overall     more

**1** Where the Crawdads Sing
Delia Owens, Author

**2** It Ends with Us
Colleen Hoover, Author

**3** It's Not Summer Without You (Reprint) (Reprint)
Jenny Han, Author

**4** We'll Always Have Summer (Reprint) (Reprint)
Jenny Han, Author

**5** Summer I Turned Pretty (Reprint) (Reprint)
Jenny Han, Author

About Us | Contact Us | Submission Guidelines | FAQ | Subscriber Services | Advertising Info | Terms of Use | Privacy Policy | Do Not Sell | Calls for Info | Editorial Calendar |
Archives | Press |

© PWxyz, LLC. All rights reserved.

**News**
Obituaries
Book Deals
Financial Reporting
Page to Screen
Bookselling
Awards & Prizes
Publisher News
Comics
Business Deals
Shows & Events
Cooking
People
Religion
Audio Books
Manufacturing
Marketing
PW Tip Sheet
Licensing
U.S. Book Show

**Reviews**
Fiction
Mystery/Thriller
Sci-Fi/Fantasy/Horror
Romance/Erotica
Comics
Poetry
Inspirational Fiction
Nonfiction
Lifestyle
Religion
Children's
Web Exclusive
BookLife

**Bestsellers**
Bio & Autobio
Children's Frontlist
Fiction
Children's Picture
Books
Comics
Fantasy
Food & Drink
Hardcover Frontlist
Fiction
Hardcover Frontlist
Nonfiction
History & Poli-Sci
Mass Market Frontlist
Mystery
Religion Fiction
Religion Nonfiction
Romance
Science Fiction
Top 10 Overall
Trade Paper Frontlist

**Children's**
Authors
Book News
Industry News

**Authors**
Profiles
Interviews
Why I Write
BookLife

**Announcements**
Adult Announcements
Children's
Announcements
Religion Listings
On-Sale Calendar
Galley Talk

**Digital**
Devices
Copyright
Retailing
Conferences
Content / e-books
Apps
Digital Marketplace

**The Roundup**

**International**
Deals
News
Trade Shows
Frankfurt Book Fair
London Book Fair
Sharjah Book Fair
China Showcase
Translation Database

**Job Zone**
**Job Moves**

**Opinion**
ShelfTalker
Soapbox
Editorials
Common Core
Open Book



Case 1:20-cv-04160-JGK-OTW Document 71 Filed 11/02/20 Page 1 of 5

# EXHIBIT P

# Annual Report 2018



**BERTELSMANN**

## Results Breakdown

| in € millions | 2018 | 2017 |
|---|---|---|
| Operating EBITDA by division | | |
| RTL Group | 1,402 | 1,478 |
| Penguin Random House | 528 | 521 |
| Gruner + Jahr | 140 | 145 |
| BMG | 122 | 104 |
| Arvato | 377 | 320 |
| Bertelsmann Printing Group | 85 | 118 |
| Bertelsmann Education Group | 37 | 3 |
| Bertelsmann Investments | (3) | (3) |
| Total operating EBITDA by division | 2.688 | 2,686 |
| Corporate/Consolidation | (102) | (50) |
| Operating EBITDA from continuing operations | 2,586 | 2,636 |
| Amortization/depreciation, impairments/reversals of intangible assets and property, plant and equipment not included in special items | (670) | (657) |
| Special items | (296) | (83) |
| EBIT (earnings before interest and taxes) | 1,620 | 1,896 |
| Financial result | (216) | (219) |
| Earnings before taxes from continuing operations | 1,404 | 1,677 |
| Income tax expense | (301) | (472) |
| Earnings after taxes from continuing operations | 1,103 | 1,205 |
| Earnings after taxes from discontinued operations | 1 | (7) |
| Group profit or loss | 1,104 | 1,198 |
| attributable to: Earnings attributable to Bertelsmann shareholders | 753 | 776 |
| attributable to: Earnings attributable to non-controlling interests | 351 | 422 |

generated by France amounted to 13.2 percent (previous year: 13.4 percent). In the United Kingdom, the revenue share was 6.5 percent (previous year: 6.8 percent). The share of total revenues generated by the other European countries amounted to 18.9 percent compared to 18.7 percent in the previous year. The revenue share generated by the United States was 22.0 percent (previous year: 20.5 percent), and the other countries achieved a revenue share of 6.2 percent (previous year: 6.6 percent). This means that the share of total revenues generated by foreign business was 66.8 percent (previous year: 66.0 percent). Year on year, there was a slight change in the ratio of the four revenue sources (own products and merchandise, services, advertising, rights and licenses) to overall revenue.

## Operating EBITDA

Bertelsmann achieved operating EBITDA of €2,586 million in the financial year 2018 (previous year: €2,636 million). The 1.9 percent drop is attributable to negative exchange rate effects and capital gains for real estate sales realized in the previous year. BMG, Arvato and Bertelsmann Education Group posted substantially improved earnings. The EBITDA margin decreased to 14.6 percent (previous year: 15.3 percent).

Operating EBITDA at RTL Group was down 5.1 percent to €1,402 million (previous year: €1,478 million). The previous year's value included a high capital gain from the sale of commercial buildings. Without this effect, the increase was 1.3 percent, driven by higher contributions from RTL Belgium, Groupe M6 and Fremantle. Operating EBITDA at Penguin Random House rose by 1.3 percent to €528 million (previous year: €521 million). Gruner + Jahr's operating EBITDA decreased by 3.4 percent to €140 million (previous year: €145 million) due to declining advertising and circulation revenues in the core businesses in Germany and France. BMG's operating EBITDA increased by 17.3 percent to €122 million (previous year: €104 million), attributable to continued business expansion. Arvato achieved operating EBITDA of €377 million (previous year: €320 million). The strong increase of 17.8 percent reflects improved earnings in all four business areas. Operating EBITDA at Bertelsmann Printing Group declined by 28.0 percent to €85 million (previous year: €118 million) due to declining volumes and the persistent pressure on prices. Operating EBITDA at Bertelsmann Education Group increased significantly to €37 million (previous year: €3 million). Relias in particular posted high earnings growth. Bertelsmann Investments' stakes are generally not consolidated, so that in most cases no operating results are disclosed for this division.

A-4122

## Penguin Random House

Penguin Random House recorded organic revenue growth of 1.3 percent in the 2018 financial year. Negative exchange rates effects were more than offset by a strong bestseller performance, acquisitions and growth in digital audio downloads.

Including Verlagsgruppe Random House, the German publishing group wholly owned by Bertelsmann, the division increased its revenues by 1.9 percent to €3.4 billion in 2018 (previous year: €3.4 billion). The book group's operating EBITDA increased by 1.3 percent to €528 million (previous year: €521 million). The EBITDA margin was once again high, at 15.4 percent (previous year: 15.5 percent).

The strongest growth drivers were audiobooks, which grew substantially in all the core markets, as well as the publication of former US First Lady Michelle Obama's memoir "Becoming." The book, which was launched simultaneously in 31 languages in mid-November 2018 under the direction of Crown Publishing, stormed the bestseller lists and sold more than seven million copies across all formats in the six weeks to the end of the year.

Penguin Random House announced the increase of its stake in the Brazilian publishing house Companhia das Letras to 70 percent. The publishing portfolio was also expanded with the acquisition of the nonfiction publisher Rodale Books in the United States and the Hindi-language paperback publisher Hind Pocket Books in India. In Singapore, the group established its new Penguin Random House South East Asia unit. Penguin Random House also invested in the expansion of direct relationships with readers and continued to optimize its retail supply chain.

In the United States, the book publishing group placed 481 titles on the "New York Times" bestseller lists last year, 69 at number one. Besides the top title, "Becoming" by Michelle Obama, major sellers included "The President Is Missing" by Bill Clinton and James Patterson, "12 Rules for Life" by Jordan B. Peterson and "The Reckoning" by John Grisham. More than 11 million copies of children's book classics by Dr. Seuss were sold.

Penguin Random House UK recorded stable revenues in 2018, with growth in digital formats and license revenues. The group's British imprints published 39 percent of the Top 10 titles on the "Sunday Times" weekly bestseller lists. The year's bestsellers included "Becoming" by Michelle Obama and "12 Rules for Life" by Jordan B. Peterson, as well as "Jamie Cooks Italy" by Jamie Oliver and "Diary of a Wimpy Kid: The Meltdown" by Jeff Kinney.

Penguin Random House Grupo Editorial increased its revenues in 2018 and expanded its children's book and audiobook offering for the Spanish-speaking world. Its bestselling titles

were "La desaparición de Stephanie Mailer" by Joël Dicker, "Tú no matarás" by Julia Navarro and "Sabotaje" by Arturo Pérez Reverte.

In Germany, Verlagsgruppe Random House maintained its market-leading position, growing both its revenues and earnings. The publishing group had 386 titles on the "Spiegel" bestseller lists, including 20 at number one. Their top-selling title was Michelle Obama's memoir, "Becoming." In 2018, the publishing group purchased Der Audio Verlag, thereby expanding its audiobook publishing program.

Numerous Penguin Random authors won prestigious awards, including Michael Ondaatje, who received the Golden Man Booker Prize for "The English Patient" as the best work of fiction among the 50 Man Booker Prize winners through five decades.

**Revenues by Region** in percent (without intercompany revenues)



15.6 Other countries
7.5 Germany
0.4 France
10.7 United Kingdom
8.4 Other European countries
57.4 United States

**Revenues by Category** in percent



2.6 Services
1.6 Rights and licenses
95.8 Own products and merchandise

**Revenue Breakdown**



€3.4 billion -4.2% 4.8% 1.3% €3.4 billion

Exchange rates / Portfolio and other effects / Organic growth

2017 · Change · 2018

A-4123

# Notes

## Segment Information (Continuing Operations)

| in € millions | RTL Group | | Penguin Random House | | Gruner + Jahr | | BMG | | Arvato | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 | 2018 | 2017 | 2018 | 2017 | 2018 | 2017 |
| Revenues from external customers | 6,494 | 6,358 | 3,424 | 3,359 | 1,420 | 1,493 | 542 | 504 | 4,033 | 3,754 |
| Intersegment revenues | 11 | 15 | – | – | 20 | 20 | 3 | 3 | 67 | 69 |
| Divisional revenues | 6,505 | 6,373 | 3,424 | 3,359 | 1,440 | 1,513 | 545 | 507 | 4,100 | 3,823 |
| Operating EBITDA | 1,402 | 1,478 | 528 | 521 | 140 | 145 | 122 | 104 | 377 | 320 |
| EBITDA margin[1] | 21.5% | 23.2% | 15.4% | 15.5% | 9.7% | 9.6% | 22.5% | 20.5% | 9.2% | 8.4% |
| Impairment (-)/reversals (+) on intangible assets and property, plant and equipment | (105) | (3) | – | – | (46) | (32) | – | – | (6) | (2) |
| Results from investments accounted for using the equity method | 58 | 69 | (2) | – | 9 | 8 | – | – | 7 | 9 |
| Invested capital | 6,438 | 6,564 | 2,370 | 2,309 | 667 | 690 | 1,885 | 1,816 | 1,619 | 1,673 |

As of January 1, 2018, the new accounting standards IFRS 9 Financial Instruments and IFRS 15 Revenue from Contracts with Customers were applied for the first time. In accordance with the transitional provisions of IFRS 9 and IFRS 15, prior year comparatives have not been adjusted. Further details are presented in the section "Impact of New Financial Reporting Standards." Further details on segment reporting are presented in note 26 "Segment Reporting."
1) Operating EBITDA in percent of revenues.
2) The business development of Bertelsmann Investments is determined primarily on the basis of EBIT. EBIT amounted to €96 million (previous year: €141 million).

## Reconciliation to Operating EBITDA (Continuing Operations)

| in € millions | 2018 | 2017 |
|---|---|---|
| EBIT from continuing operations | 1,620 | 1,896 |
| Special items | | |
| – impairment on goodwill and other intangible assets with indefinite useful life as well as gains from business combinations | 173 | 30 |
| – adjustment to carrying amounts on assets held for sale | 6 | 4 |
| – impairment on other financial assets at amortized cost | – | 20 |
| – impairment and reversals on investments accounted for using the equity method | 2 | 50 |
| – results from disposals of investments | (6) | (182) |
| – fair value measurement of investments | (157) | (15) |
| – restructuring and other special items | 278 | 176 |
| Amortization/depreciation, impairment and reversals on intangible assets and property, plant and equipment | 847 | 691 |
| Adjustments on amortization/depreciation, impairment and reversals on intangible assets and property, plant and equipment included in special items | (177) | (34) |
| Operating EBITDA from continuing operations | 2,586 | 2,636 |

As of January 1, 2018, the new accounting standards IFRS 9 Financial Instruments and IFRS 15 Revenue from Contracts with Customers were applied for the first time. In accordance with the transitional provisions of IFRS 9 and IFRS 15, prior year comparatives have not been adjusted. Further details are presented in the section "Impact of New Financial Reporting Standards."

# EXHIBIT Q



Annual Report 2019

BERTELSMANN

## Results Breakdown

| in € millions | 2019 | 2018 |
|---|---|---|
| Operating EBITDA by division | | |
| RTL Group | 1,439 | 1,402 |
| Penguin Random House | 561 | 528 |
| Gruner + Jahr | 157 | 140 |
| BMG | 138 | 122 |
| Arvato | 549 | 377 |
| Bertelsmann Printing Group | 68 | 85 |
| Bertelsmann Education Group | 84 | 37 |
| Bertelsmann Investments | (1) | (3) |
| Total operating EBITDA by division | 2,995 | 2,688 |
| Corporate/Consolidation | (86) | (102) |
| Operating EBITDA from continuing operations | 2,909 | 2,586 |
| Amortization/depreciation, impairments/reversals of intangible assets and property, plant and equipment not included in special items | (930) | (670) |
| Special items | (154) | (296) |
| EBIT (earnings before interest and taxes) | 1,825 | 1,620 |
| Financial result | (309) | (216) |
| Earnings before taxes from continuing operations | 1,516 | 1,404 |
| Income tax expense | (426) | (301) |
| Earnings after taxes from continuing operations | 1,090 | 1,103 |
| Earnings after taxes from discontinued operations | 1 | 1 |
| Group profit or loss | 1,091 | 1,104 |
| attributable to: Earnings attributable to Bertelsmann shareholders | 729 | 753 |
| attributable to: Earnings attributable to non-controlling interests | 362 | 351 |

66.8 percent). Year on year, there was a slight change in the ratio of the four revenue sources (own products and merchandise, services, advertising, rights and licenses) to overall revenue.

## Operating EBITDA

Bertelsmann achieved operating EBITDA of €2,909 million in the financial year 2019 (previous year: €2,586 million). The increase of 12.5 percent is basically attributable to method effects caused by applying the new IFRS 16 Leases financial reporting standard (+€274 million). In particular Gruner + Jahr, BMG, Arvato and Bertelsmann Education Group posted a substantial percentage growth in earnings. The EBITDA margin rose to 16.1 percent (previous year: 14.6 percent).

Initial application of the new IFRS 16 Leases financial reporting standard had a positive impact on operating EBIDTA in all divisions. Operating EBITDA at RTL Group was up 2.7 percent to €1,439 million (previous year: €1,402 million), due especially to an increased profit contribution from Fremantle. Operating EBITDA at Penguin Random House rose by 6.2 percent to €561 million (previous year: €528 million). Operating EBITDA at Gruner + Jahr increased by 12.1 percent to €157 million (previous year: €140 million). BMG's operating EBITDA increased by 12.7 percent to €138 million

(previous year: €122 million), also attributable to continued business expansion. Arvato achieved operating EBITDA of €549 million (previous year: €377 million). The strong growth of 45.7 percent also resulted from noticeable organic growth, especially in the Supply Chain Solutions (SCS) business area. Operating EBITDA at Bertelsmann Printing Group declined by 19.6 percent to €68 million (previous year: €85 million) due to declining volumes and the persistent pressure on prices. Operating EBITDA at Bertelsmann Education Group increased significantly to €84 million (previous year: €37 million). This was due to portfolio effects and organic profit growth, especially at Relias. The investments of Bertelsmann Investments are generally not consolidated, so operating earnings are not usually reported for this division.

## Special Items

Special items in the financial year 2019 totaled €-154 million compared to €-296 million in the previous year. They consist of impairments on goodwill and other intangible assets with indefinite useful lives amounting to €-27 million (previous year: €-173 million), impairments on investments accounted for using the equity method amounting to €-51 million (previous year: €-2 million), impairments on other financial assets at amortized cost amounting to €-9 million (previous year: –),

A-4127

## Penguin Random House

Penguin Random House saw significant growth in 2019 thanks to numerous bestsellers and market share gains in several markets. Including Germany's Verlagsgruppe Random House, Penguin Random House increased its revenues by 6.2 percent to €3.6 billion (previous year: €3.4 billion). Operating EBITDA increased by 6.2 percent to €561 million (previous year: €528 million), also due to the initial application of the new IFRS 16 accounting standard. At 15.4 percent, the EBITDA margin once again reached a high level (previous year: 15.4 percent). In December, Bertelsmann announced its acquisition of full ownership of Penguin Random House.

Penguin Random House published the three biggest-selling adult titles of the year in the largest book market, the United States: "Where the Crawdads Sing" by Delia Owens sold over four million copies across all formats; Tara Westover's autobiographical debut "Educated" and Michelle Obama's "Becoming" each sold more than two million copies. Published in 46 languages, the memoir by the former US First Lady has sold 13 million copies worldwide since its November 2018 publication.

Audiobooks were a growth driver once again, with revenue increases in the double-digit percentiles in most markets. Penguin Random House strengthened its portfolio by acquiring several publishers, including the Little Tiger Group in the United Kingdom, a stake in the leading US independent publisher Sourcebooks, Ediciones Salamandra in Spain, and the global publishing rights for the prolific bestselling children's author Eric Carle ("The Very Hungry Caterpillar").

In the United States, Penguin Random House placed 496 titles on the "New York Times" bestseller lists, 61 at number one. Additional number-one bestselling titles for the group were "The Water Dancer" by Ta-Nehisi Coates, "The Testaments" by Margaret Atwood and "The Guardians" by John Grisham. Dr. Seuss' children's book classics sold more than 10 million copies.

Penguin Random House UK also had a very strong publishing performance, and revenue grew significantly. The publishers placed 43 percent of all the titles on the "Sunday Times" bestseller lists. Their top-selling titles included "Veg" by Jamie Oliver, "Becoming" by Michelle Obama and "The Testaments" by Margaret Atwood. The publishing group increased its market share, strengthened its international sales and expanded its audio business.

Penguin Random House Grupo Editorial improved its market position in the Spanish-speaking world with positively performing businesses and acquisitions; revenues showed strong growth. Its biggest bestsellers were "Sinceramente" by Cristina Fernández de Kirchner, "Sidi" by Arturo Pérez-Revert and "Largo Pétalo de Mar" by Isabel Allende.

Munich-based Verlagsgruppe Random House enhanced its market-leading position with a strong bestseller performance and rising backlist revenues. It placed 414 titles on the "Spiegel" bestseller lists, 23 of them at #1. The year's top-selling titles were "Die Sonnenschwester" ("The Sun Sister") by Lucinda Riley, "Der Ernährungskompass" ("The Diet Compass") by Bas Kast and "Die Suche" by Charlotte Link.

Numerous Penguin Random House authors won prestigious awards, including Olga Tokarczuk, the Nobel Prize winner in Literature; Abhijit Banerjee and Esther Duflo, who were awarded the Nobel Prize in Economic Sciences; Saša Stanišić, who won the German Book Prize; and Margaret Atwood and Bernardine Evaristo, who together won the 2019 Booker Prize.

**Revenues by Region** in percent (without intercompany revenues)



16.3 Other countries
7.3 Germany
0.2 France
11.3 United Kingdom
8.8 Other European countries
56.1 United States

**Revenues by Category** in percent



2.7 Services
1.4 Rights and licenses
95.9 Own products and merchandise

**Revenue Breakdown**



€3.4 billion   2.8%   1.9%   1.5%   €3.6 billion
Exchange rates   Portfolio and other effects   Organic growth
2018   Change   2019

A-4128

## Notes
### Segment Information (Continuing Operations)

| in € millions | RTL Group 2019 | RTL Group 2018 | Penguin Random House 2019 | Penguin Random House 2018 | Gruner + Jahr 2019 | Gruner + Jahr 2018 | BMG 2019 | BMG 2018 | Arvato 2019 | Arvato 2018 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues from external customers | 6,586 | 6,494 | 3,636 | 3,424 | 1,319 | 1,420 | 597 | 542 | 4,112 | 4,033 |
| Intersegment revenues | 65 | 11 | – | – | 36 | 20 | 3 | 3 | 63 | 67 |
| Divisional revenues | 6,651 | 6,505 | 3,636 | 3,424 | 1,355 | 1,440 | 600 | 545 | 4,175 | 4,100 |
| Operating EBITDA | 1,439 | 1,402 | 561 | 528 | 157 | 140 | 138 | 122 | 549 | 377 |
| EBITDA margin[1] | 21.6% | 21.5% | 15.4% | 15.4% | 11.6% | 9.7% | 23.0% | 22.5% | 13.2% | 9.2% |
| Impairment (-)/reversals (+) on intangible assets, property, plant and equipment and right-of-use assets | (3) | (105) | – | – | (1) | (46) | – | – | (9) | (6) |
| Results from investments accounted for using the equity method | 64 | 58 | 2 | (2) | 10 | 9 | – | – | 10 | 7 |
| Invested capital | 6,735 | 6,438 | 2,582 | 2,370 | 619 | 667 | 1,927 | 1,885 | 1,894 | 1,619 |

Further details on segment reporting are presented in note 27 "Segment Reporting."
1) Operating EBITDA in percent of revenues.
2) The business development of Bertelsmann Investments is determined primarily on the basis of EBIT. EBIT amounted to €107 million (previous year: €96 million).

### Reconciliation to Operating EBITDA (Continuing Operations)

| in € millions | 2019 | 2018 |
|---|---|---|
| EBIT from continuing operations | 1,825 | 1,620 |
| Special items | | |
| – impairment on goodwill and other intangible assets with indefinite useful life as well as gains from business combinations | 27 | 173 |
| – adjustment to carrying amounts on assets held for sale | 7 | 6 |
| – impairment (+)/reversals (-) on other financial assets at amortized cost | 9 | – |
| – impairment (+)/reversals (-) on investments accounted for using the equity method | 51 | 2 |
| – results from disposals of investments | (90) | (6) |
| – fair value measurement of investments | (143) | (157) |
| – restructuring and other special items | 293 | 278 |
| Amortization/depreciation, impairment and reversals on intangible assets, property, plant and equipment and right-of-use assets | 1,051 | 847 |
| Adjustments on amortization/depreciation, impairment and reversals on intangible assets, property, plant and equipment and right-of-use assets included in special items | (121) | (177) |
| Operating EBITDA from continuing operations | 2,909 | 2,586 |

A-4129

# EXHIBIT R



# Annual Report 2021

**BERTELSMANN**

### Revenues by Division

| in € millions | Germany | International | 2021 Total | Germany | International | 2020 Total |
|---|---|---|---|---|---|---|
| RTL Group | 2,248 | 4,389 | 6,637 | 1,958 | 4,059 | 6,017 |
| Penguin Random House | 281 | 3,749 | 4,030 | 277 | 3,525 | 3,802 |
| Gruner + Jahr | 753 | 298 | 1,051 | 769 | 366 | 1,135 |
| BMG | 40 | 623 | 663 | 46 | 556 | 602 |
| Arvato | 1,851 | 3,184 | 5,035 | 1,666 | 2,716 | 4,382 |
| Bertelsmann Printing Group | 787 | 532 | 1,319 | 833 | 529 | 1,362 |
| Bertelsmann Education Group | 3 | 280 | 283 | 2 | 299 | 301 |
| Bertelsmann Investments | 2 | 6 | 8 | 4 | 8 | 12 |
| Total divisional revenues | 5,965 | 13,061 | 19,026 | 5,555 | 12,058 | 17,613 |
| Corporate/Consolidation | (245) | (85) | (330) | (221) | (103) | (324) |
| Continuing operations | 5,720 | 12,976 | 18,696 | 5,334 | 11,955 | 17,289 |

due to portfolio and exchange-rate adjustments. Organic growth was 6.4 percent. The investments of Bertelsmann Investments are generally not consolidated, so revenue is not usually reported for this division.

There were slight changes in the geographical breakdown of revenues compared to the previous year. The share of revenues generated in Germany was 30.6 percent compared to 30.9 percent in the previous year. The revenue share generated by France amounted to 11.0 percent (previous year: 11.9 percent). In the United Kingdom, the revenue share was 7.0 percent (previous year: 6.5 percent). The share of total revenues generated by the other European countries was 20.6 percent, compared to 19.3 percent in the previous year. The revenue share generated by the United States was 23.3 percent (previous year: 24.8 percent), and the other countries achieved a revenue share of 7.5 percent (previous year: 6.6 percent). This means that the share of total revenues generated by foreign business rose slightly to 69.4 percent (previous year: 69.1 percent). Year on year, there was a slight change in the ratio of the four revenue sources (own products and merchandise, services, advertising, rights and licenses) to overall revenue.

### Operating EBITDA

Bertelsmann achieved a record operating EBITDA of €3,241 million in the financial year 2021 (previous year: €3,143 million). The previous-year period included high capital gains from real-estate transactions. Despite that, the Group recorded a 3.1 percent increase in earnings. Strong earnings growth in the TV and production business, in the book publishing business as well as in the service businesses of Majorel and Arvato Supply Chain Solutions more than offset ongoing expenditure on expanding the streaming area at RTL Group. At 17.3 percent, the EBITDA margin reached a high level once again (previous year: 18.2 percent).

Operating EBITDA at RTL Group improved on the previous year, rising 24.1 percent to €1,361 million (previous year: €1,097 million). This rise was primarily driven by a strong recovery in the TV advertising markets and positive business performance by Fremantle's global content production business. Operating EBITDA at Penguin Random House rose by 9.2 percent to €755 million (previous year: €691 million), thanks in particular to continued growth in the US business as well as the sustained growth in audio. Operating EBITDA

**Consolidated Revenues by Region** in percent



7.5 Other countries
23.3 United States
20.6 Other European countries
30.6 Germany
11.0 France
7.0 United Kingdom

**Consolidated Revenues by Category** in percent



38.2 Services
21.6 Advertising
16.7 Rights and licenses
23.5 Own products and merchandise

A-4132

## Results Breakdown

| in € millions | 2021 | 2020 |
|---|---|---|
| Operating EBITDA by division | | |
| RTL Group | 1,361 | 1,097 |
| Penguin Random House | 755 | 691 |
| Gruner + Jahr | 134 | 127 |
| BMG | 144 | 137 |
| Arvato | 825 | 662 |
| Bertelsmann Printing Group | 60 | 55 |
| Bertelsmann Education Group | 86 | 89 |
| Bertelsmann Investments | (11) | (10) |
| Total operating EBITDA by division | 3,354 | 2,848 |
| Corporate/Consolidation | (113) | 295 |
| Operating EBITDA | 3,241 | 3,143 |
| Amortization/depreciation, impairments/reversals of impairment losses on intangible assets and property, plant and equipment not included in special items | (880) | (918) |
| Special items | 963 | 51 |
| EBIT (earnings before interest and taxes) | 3,324 | 2,276 |
| Financial result | (352) | (339) |
| Earnings before taxes | 2,972 | 1,937 |
| Income tax expense | (662) | (478) |
| Group profit or loss | 2,310 | 1,459 |
| attributable to: Earnings attributable to Bertelsmann shareholders | 1,800 | 1,152 |
| attributable to: Earnings attributable to non-controlling interests | 510 | 307 |

at Gruner + Jahr was 5.9 percent higher at €134 million (previous year: €127 million). The AppLike Group as well as the advertising and sales business in particular recorded a positive earnings performance. At BMG, operating EBITDA grew 5.4 percent to €144 million (previous year: €137 million) as the company profited from continued strong growth in music streaming. Arvato recorded an operating EBITDA of €825 million (previous year: €662 million). This increase of 24.6 percent primarily reflects continued strong earnings growth at the customer experience company Majorel and in the Supply Chain Solutions business area. Operating EBITDA at Bertelsmann Printing Group rose 9.7 percent to €60 million (previous year: €55 million). At Bertelsmann Education Group, operating EBITDA was down 2.6 percent to €86 million (previous year: €89 million) primarily as a result of exchange rate effects. The investments of Bertelsmann Investments are generally not consolidated, so operating earnings are not usually reported for this division.

### Special Items

Special items in the financial year 2021 totaled €963 million compared to €51 million in the previous year. They consist of impairments or reversals of impairment losses on investments accounted for using the equity method amounting to €2 million (previous year: €-62 million), impairments on other financial assets at amortized cost amounting to

€-1 million (previous year: €-26 million), adjustments of the carrying amounts of assets held for sale amounting to €-6 million (previous year: –), results from disposals of investments amounting to €786 million (previous year: €410 million), fair value measurement of investments of €483 million (previous year: €59 million), as well as restructuring expenses and other special items totaling €-301 million (previous year: €-214 million). During the reporting period, there were no impairments on goodwill and other intangible assets with indefinite useful lives, compared with €-116 million in the previous year. The strong increase in results from disposals of investments is particularly due to the disposal of SpotX. The increase in the fair value measurement of investments is particularly due to companies in the Bertelsmann Investments portfolio.

### EBIT

EBIT amounted to €3,324 million in the financial year 2021 (previous year: €2,276 million) after adjusting operating EBITDA for special items totaling €963 million (previous year: €51 million) and amortization, depreciation, impairments and reversals of impairment losses on intangible assets, property, plant and equipment and right-of-use assets totaling €-880 million (previous year: €-918 million), which were not included in the special items.

A-4133

## Penguin Random House

Penguin Random House increased its revenues and operating result in 2021, thanks to numerous successful new releases, robust backlist sales and continued high demand for digital audiobooks. Penguin Random House generated €4.0 billion in revenues during the reporting year, up 6.0 percent from the previous year's €3.8 billion. Operating EBITDA rose 9.2 percent to €755 million (previous year: €691 million). The EBITDA margin increased to 18.7 percent (previous year: 18.2 percent).

The year's best-selling books included backlist titles such as "Atomic Habits" by James Clear, with more than 3.5 million copies sold by its English-language and German publishers across all formats, "Greenlights" by Matthew McConaughey, which sold nearly two million additional copies in print, e-book and audiobook, and "A Promised Land," the first volume of Barack Obama's presidential memoirs. The most popular new publications included "How to Avoid a Climate Disaster" by Bill Gates and three volumes of poetry by Amanda Gorman, which together sold more than one million copies following the poet's high-profile reading at the inauguration of US President Joe Biden.

Penguin Random House publishers each placed numerous titles on the bestseller lists of the "New York Times" in the United States, the "Sunday Times" in the United Kingdom and "Spiegel" in Germany. The publishing group established new publishing imprints in several markets.

In May, the UK Competition and Markets Authority (CMA) approved Penguin Random House's proposed acquisition of Simon & Schuster; a US Department of Justice challenge to the deal is scheduled to be heard in the US federal court during the financial year 2022.

The book group continued its investments in distribution and fulfillment logistics in 2021. This enabled Penguin Random House to meet rising demand for its titles despite significant pandemic-related production and delivery bottlenecks, while at the same time offering more efficient delivery times to book retailers. Penguin Random House also advanced the capturing of consumer data in order to expand its direct-to-consumer marketing.

Penguin Random House US enjoyed a successful publishing and business year. Its biggest bestseller was "Atomic Habits" by James Clear, published in 2018; new releases such as "The Judge's List" by John Grisham, "The 1619 Project" created by Nikole Hannah-Jones and the New York Times Magazine, and "Go Tell the Bees That I Am Gone" by Diana Gabaldon also achieved high sales.

In the British book market, Penguin Random House UK was successful with titles such as "The Thursday Murder Club" and "The Man Who Died Twice" by Richard Osman,

"The Very Hungry Caterpillar" by Eric Carle and, again, "Atomic Habits" by James Clear. Penguin Random House Grupo Editorial benefited from continued growth in online sales and a strong backlist catalog. Top titles included "El Italiano" by Arturo Pérez-Reverte and "De Ninguna Parte" by Julia Navarro. The Spanish-language publishing group founded Penguin Kids, and also strengthened its position in the children's and young adult book segment with the acquisition of the Molino publishing house. It merged its Portuguese publishing activities with Editora 20/20 to form the new Penguin Random House Grupo Editorial Portugal.

In the German-speaking countries, Penguin Random House Verlagsgruppe maintained its leading market position; online sales in particular increased. Best-selling titles in their respective categories were "Über Menschen" by Juli Zeh (fiction hardcover), "Das Kind in Dir muss Heimat finden" by Stefanie Stahl (nonfiction paperback) and "Der Gesang der Flusskrebse" by Delia Owens (fiction paperback).

**Revenues by Region** in percent (without intercompany revenues)



15.4 Other countries
6.9 Germany
0.3 France
11.8 United Kingdom
9.1 Other European countries
56.5 United States

**Revenues by Category** in percent



3.2 Services
1.5 Rights and licenses
95.3 Own products and merchandise

**Revenue Breakdown**



€3.8 billion · -1.8% Exchange rates · 0.5% Portfolio and other effects · 7.3% Organic growth · €4.0 billion
2020 · Change · 2021

## Notes
### Segment Information

| in € millions | RTL Group 2021 | RTL Group 2020 | Penguin Random House 2021 | Penguin Random House 2020 | Gruner + Jahr 2021 | Gruner + Jahr 2020 | BMG 2021 | BMG 2020 | Arvato 2021 | Arvato 2020 |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues from external customers | 6,533 | 5,939 | 4,029 | 3,801 | 1,032 | 1,102 | 661 | 599 | 4,960 | 4,315 |
| Intersegment revenues | 104 | 78 | 1 | 1 | 19 | 33 | 2 | 3 | 75 | 67 |
| Divisional revenues | 6,637 | 6,017 | 4,030 | 3,802 | 1,051 | 1,135 | 663 | 602 | 5,035 | 4,382 |
| Operating EBITDA | 1,361 | 1,097 | 755 | 691 | 134 | 127 | 144 | 137 | 825 | 662 |
| EBITDA margin[1] | 20.5% | 18.2% | 18.7% | 18.2% | 12.7% | 11.2% | 21.7% | 22.7% | 16.4% | 15.1% |
| Impairment (–)/reversals (+) on intangible assets, property, plant and equipment and right-of-use assets | (1) | (16) | (5) | – | – | (77) | – | (1) | (19) | (12) |
| Results from investments accounted for using the equity method | 27 | 32 | 7 | 2 | 14 | 4 | – | – | 9 | 11 |
| Impairment (–)/reversals (+) on investments accounted for using the equity method | 2 | (62) | – | – | – | – | – | – | – | – |
| Invested capital | 6,851 | 6,547 | 2,605 | 2,326 | 341 | 474 | 1,969 | 1,801 | 1,910 | 1,785 |

Further details on segment reporting are presented in note 27 "Segment Reporting."
1) Operating EBITDA as a percentage of revenues.
2) The business development of Bertelsmann Investments is presented primarily on the basis of EBIT. EBIT amounted to €316 million (previous year: €1 million).

### Reconciliation to Operating EBITDA

| in € millions | 2021 | 2020 |
|---|---|---|
| EBIT (earnings before interest and taxes) | 3,324 | 2,276 |
| Less special items | | |
| Impairment on goodwill and other intangible assets with indefinite useful life as well as gains from business combinations | – | (116) |
| Adjustment to carrying amounts on assets held for sale | (6) | – |
| Impairment (-)/reversals (+) on other financial assets at amortized cost | (1) | (26) |
| Impairment (-)/reversals (+) on investments accounted for using the equity method | 2 | (62) |
| Results from disposals of investments | 786 | 410 |
| Fair value measurement of investments | 483 | 59 |
| Restructuring and other special items | (301) | (214) |
| Less amortization/depreciation, impairment and reversals on intangible assets, property, plant and equipment and right-of-use assets | (909) | (1,040) |
| Less adjustments on amortization/depreciation, impairment and reversals on intangible assets, property, plant and equipment and right-of-use assets included in special items | 29 | 122 |
| Operating EBITDA | 3,241 | 3,143 |

A-4135

# EXHIBIT S

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC  20549

# FORM 10-K

(Mark One)

☒   ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended:  April 30, 2020

OR

☐   TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____
Commission file number  001-11507

# JOHN WILEY & SONS, INC.

(Exact name of Registrant as specified in its charter)

| New York | 13-5593032 |
|---|---|
| State or other jurisdiction of incorporation or organization | I.R.S. Employer Identification No. |
| 111 River Street, Hoboken, NJ | 07030 |
| Address of principal executive offices | Zip Code |

(201) 748-6000
Registrant's telephone number including area code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $1.00 per share | JW.A | New York Stock Exchange |
| Class B Common Stock, par value $1.00 per share | JW.B | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

## Item 6. Selected Financial Data

| Dollars (in millions, except per share data) | For the Years Ended April 30, [(a)(b)(c)] | | | | |
|---|---|---|---|---|---|
| | **2020** | **2019** | **2018** | **2017** | **2016** |
| Revenue, net | $ 1,831.5 | $ 1,800.1 | $ 1,796.1 | $ 1,718.5 | $ 1,727.0 |
| Impairment of goodwill and intangible assets [(d)] | 202.3 | — | 3.6 | — | — |
| Operating (Loss) Income [(e)] | (54.3) | 224.0 | 231.5 | 211.5 | 188.1 |
| Net (Loss) Income | (74.3) | 168.3 | 192.2 | 113.6 | 145.8 |
| Working Capital [(f)] | (312.3) | (379.8) | (394.3) | (428.1) | (111.1) |
| Contract Liabilities in Working Capital [(f)] | (520.2) | (519.1) | (486.4) | (436.2) | (426.5) |
| Total Assets | 3,168.8 | 2,948.8 | 2,839.5 | 2,606.2 | 2,921.1 |
| Long-Term Debt | 765.7 | 478.8 | 360.0 | 365.0 | 605.0 |
| Shareholders' Equity | 933.6 | 1,181.3 | 1,190.6 | 1,003.1 | 1,037.1 |
| Per Share Data | | | | | |
| (Loss) Earnings Per Share | | | | | |
| Basic | $ (1.32) | $ 2.94 | $ 3.37 | $ 1.98 | $ 2.51 |
| Diluted | $ (1.32) | $ 2.91 | $ 3.32 | $ 1.95 | $ 2.48 |
| Cash Dividends | | | | | |
| Class A Common | $ 1.36 | $ 1.32 | $ 1.28 | $ 1.24 | $ 1.20 |
| Class B Common | 1.36 | 1.32 | 1.28 | 1.24 | 1.20 |

(a) See Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations," for a discussion of the factors that contributed to our consolidated operating results for the three years ended April 30, 2020.

(b) On May 1, 2018, we adopted the U.S. accounting standard regarding revenue recognition ("Topic 606," or "ASC 606"). The adoption of Topic 606 did not have a material impact to our consolidated results of operations.

(c) On May 1, 2019, we adopted the U.S. accounting standard regarding leases ("Topic 842") which required us to recognize a right-of-use asset ("ROU") and lease liability for all leases with terms of more than 12 months and provide enhanced disclosures. Refer to Note 2, " Summary of Significant Accounting Policies, Recently Issued, and Recently Adopted Accounting Standards," in the Notes to Consolidated Financial Statements for more information.

(d) During the fourth quarter of fiscal year 2020, we recorded non-cash charges for impairment of goodwill and intangible assets totaling $202.3 million. See Note 11, "Goodwill and Intangible Assets," for further discussion of our goodwill and identifiable intangible assets.

(e) Due to the retrospective adoption on May 1, 2018 of Accounting Standards Update ("ASU") 2017-07, "Compensation—Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost," total net benefits (costs) of $8.1 million and $(5.3) million related to the non-service components of defined benefit and other post-employment benefit plans were reclassified from Operating and Administrative Expenses to Interest and Other Income for the years ended April 30, 2018 and 2017, respectively. Total net benefits related to the non-service components of defined benefit and other post-employment benefit plans were $8.8 million for the year ended April 30, 2019.

(f) The primary driver of the negative working capital is unearned contract liabilities related to subscriptions for which cash has been collected in advance. Cash received in advance for subscriptions is used by us for a number of purposes including funding: acquisitions, debt repayments, operations, dividend payments, and purchasing treasury shares. The contract liabilities will be recognized as income when the products are shipped or made available online to the customers over the term of the subscription period.

24

Index

| ACADEMIC & PROFESSIONAL LEARNING: | | Year Ended April 30, | | % Change Favorable (Unfavorable) | Constant Currency % Change Favorable (Unfavorable) |
|---|---|---|---|---|---|
| | | 2019 | 2018 | | |
| **Revenue:** | | | | | |
| Education Publishing | $ | 372,018 | $ 401,607 | (7)% | (6)% |
| Professional Learning | | 331,285 | 338,508 | (2)% | (1)% |
| **Total Academic & Professional Learning** | | 703,303 | 740,115 | (5)% | (4)% |
| | | | | | |
| Cost of Sales | | 195,331 | 209,951 | 7% | 6% |
| Operating Expenses | | 343,859 | 357,976 | 4% | 2% |
| Amortization of Intangibles | | 16,709 | 16,303 | (2)% | (3)% |
| Restructuring Charges (see Note 7) | | 1,139 | 8,244 | 86% | 86% |
| Publishing Brand Impairment Charge | | — | 3,600 | 100% | 100% |
| | | | | | |
| **Contribution to Profit** | | 146,265 | 144,041 | 2% | 3% |
| Restructuring Charges (see Note 7) | | 1,139 | 8,244 | | |
| Publishing Brand Impairment Charge | | — | 3,600 | | |
| **Adjusted Contribution to Profit** | | 147,404 | 155,885 | (5)% | (4)% |
| Depreciation and Amortization | | 68,126 | 72,274 | | |
| **Adjusted EBITDA** | $ | 215,530 | $ 228,159 | (6)% | (4)% |
| Adjusted EBITDA Margin | | 30.6% | 30.8% | | |

**Revenue:**

Academic & Professional Learning revenue decreased 5% to $703.3 million on a reported basis, and 4% on a constant currency basis as compared with the prior year. The decrease was primarily due to a decline in book publishing due to a continued shift in market demand for print products. This decline was partially offset by an increase in volume of test preparation and certification product offerings, an increase in WileyPLUS mainly due to the timing of revenue recognition, and an increase in Professional Assessment services and Corporate Learning.

**Adjusted EBITDA:**

On a constant currency basis, Adjusted EBITDA decreased 4% as compared with the prior year. This decrease was primarily due to lower revenues, partially offset by lower cost of sales due to a decrease in inventory costs and to a lesser extent, book composition and product development amortization expense, as well as lower operating expenses, including employee related costs, content related costs and, to a lesser extent, technology costs.

35

Index

A-4139

| EDUCATION SERVICES: | Year Ended April 30, | | % Change Favorable (Unfavorable) | Constant Currency % Change Favorable (Unfavorable) |
|---|---|---|---|---|
| | 2019 | 2018 | | |
| **Revenue:** | | | | |
| Education Services | $ 157,549 | $ 119,131 | 32% | 32% |
| **Total Education Services Revenue** | 157,549 | 119,131 | 32% | 32% |
| | | | | |
| Cost of Sales | 104,831 | 73,239 | (43)% | (43)% |
| Operating Expenses | 55,754 | 40,805 | (37)% | (37)% |
| Amortization of Intangibles | 9,847 | 5,092 | (93)% | (93)% |
| Restructuring Charges (see Note 7) | 389 | 1,894 | 79% | 79% |
| | | | | |
| **Contribution to Profit** | (13,272) | (1,899) | # | # |
| Restructuring Charges (see Note 7) | 389 | 1,894 | | |
| **Adjusted Contribution to Profit** | (12,883) | (5) | # | # |
| Depreciation and Amortization | 18,117 | 13,112 | | |
| **Adjusted EBITDA** | $ 5,234 | $ 13,107 | (60)% | (61)% |
| Adjusted EBITDA Margins | 3.3% | 11.0% | | |

\# Not meaningful

**Revenue:**

Education Services revenue increased 32% to $157.5 million on a reported and on a constant currency basis as compared with the prior year. The increase was mainly driven by the impact of the acquisition of Learning House on November 1, 2018 which contributed $31.5 million in revenue, and to a lesser extent, higher revenue in the legacy Education Services business.

**Adjusted EBITDA:**

On a constant currency basis, Adjusted EBITDA decreased 61% as compared with the prior year. This decrease was mainly driven by higher costs of sales due to the incremental impact of the acquisition of Learning House and higher marketing related costs of $8.1 million, due to the legacy Education Services business primarily due to increased investments to support revenue growth; and to a lesser extent, higher composition and product development amortization. In addition, higher operating expenses were due to the incremental impact of the acquisition of Learning House; and to a lesser extent, an increase in sales related and technology costs.

**Legacy Education Services Partners and Programs:**

As of April 30, 2019, we had 39 university partners and 276 programs under contract.

**CORPORATE EXPENSES:**

Corporate Expenses for the year ended April 30, 2019 decreased 8% to $168.8 million as compared with the prior year. On a constant currency basis and excluding restructuring charges, these expenses decreased 1%. This decrease was primarily due to lower employment related costs, including incentive compensation costs, partially offset by higher stock-based compensation expense of $2.3 million and costs associated with strategic planning of $1.4 million.

**FISCAL YEAR 2021 OUTLOOK**

The isolation measures related to COVID-19 continue to impact the Research and Education businesses, with uncertainties about student enrollments, university budgets, and corporate spending. Wiley cannot confidently predict the extent or duration of the impact of the pandemic on its operating results and is therefore not providing fiscal year 2021 outlook. We are also withdrawing our fiscal year 2022 targets given such limited visibility.

**John Wiley & Sons, Inc. and Subsidiaries**
**CONSOLIDATED STATEMENTS OF (LOSS) INCOME**
**Dollars in thousands, except per share data**

| | For the Years Ended April 30, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Revenue, net | $ 1,831,483 | $ 1,800,069 | $ 1,796,103 |
| Costs and Expenses | | | |
| Cost of sales | 591,024 | 554,722 | 531,024 |
| Operating and administrative expenses | 997,355 | 963,582 | 953,222 |
| Impairment of goodwill and intangible assets | 202,348 | — | 3,600 |
| Restructuring and related charges | 32,607 | 3,118 | 28,566 |
| Amortization of intangibles | 62,436 | 54,658 | 48,230 |
| Total Costs and Expenses | 1,885,770 | 1,576,080 | 1,564,642 |
| Operating (Loss) Income | (54,287) | 223,989 | 231,461 |
| Interest Expense | (24,959) | (16,121) | (13,274) |
| Foreign Exchange Transaction Gains (Losses) | 2,773 | (6,016) | (12,819) |
| Interest and Other Income | 13,381 | 11,100 | 8,563 |
| (Loss) Income Before Taxes | (63,092) | 212,952 | 213,931 |
| Provision for Income Taxes | 11,195 | 44,689 | 21,745 |
| Net (Loss) Income | $ (74,287) | $ 168,263 | $ 192,186 |
| (Loss) Earnings Per Share | | | |
| Basic | $ (1.32) | $ 2.94 | $ 3.37 |
| Diluted | $ (1.32) | $ 2.91 | $ 3.32 |
| Weighted Average Number of Common Shares Outstanding | | | |
| Basic | 56,209 | 57,192 | 57,043 |
| Diluted | 56,209 | 57,840 | 57,888 |

See accompanying Notes to Consolidated Financial Statements.

55

A-4141

# EXHIBIT T

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

# FORM 10-K

(Mark One)

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: April 30, 2021

OR

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____
Commission file number  001-11507

# JOHN WILEY & SONS, INC.

(Exact name of Registrant as specified in its charter)

| New York | 13-5593032 |
|---|---|
| State or other jurisdiction of incorporation or organization | I.R.S. Employer Identification No. |
| 111 River Street, Hoboken, NJ | 07030 |
| Address of principal executive offices | Zip Code |

(201) 748-6000
Registrant's telephone number including area code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|---|---|---|
| Class A Common Stock, par value $1.00 per share | JW.A | New York Stock Exchange |
| Class B Common Stock, par value $1.00 per share | JW.B | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

**Operating Income (Loss), Adjusted Contribution to Profit (CTP) and Adjusted EBITDA:**

Operating income for the year ended April 30, 2021 was $185.5 million compared with the prior year operating loss of $54.3 million. The increase in operating income was primarily due to the prior year impairment of goodwill and intangibles assets of $202.3 million as described below and, to a lesser extent, an increase in revenue. This was partially offset by an increase in cost of sales, and operating and administrative expenses and, to a lesser extent, an increase in amortization of intangible assets as described above.

Adjusted CTP and Adjusted EBITDA on a constant currency basis and excluding restructuring charges and the impairment of goodwill and intangible assets, increased 20% and 16% respectively, as compared with the prior year. The increase in Adjusted CTP and Adjusted EBITDA was primarily due to revenue performance described above, partially offset by higher cost of sales and, to a lesser extent, an increase in operating and administrative expenses. In addition, the increase in Adjusted CTP was partially offset by higher depreciation and amortization.

*Adjusted CTP*

Below is a reconciliation of our consolidated US GAAP Operating Income (Loss) to Non-GAAP Adjusted CTP:

| | Year Ended April 30, | | | |
|---|---|---|---|---|
| | **2021** | | **2020** | |
| **US GAAP Operating Income (Loss)** | $ | 185,511 | $ | (54,287) |
| Adjustments: | | | | |
| Restructuring and related charges | | 33,310 | | 32,607 |
| Impairment of goodwill | | — | | 110,000 |
| Impairment of Blackwell trade name | | — | | 89,507 |
| Impairment of developed technology intangible | | — | | 2,841 |
| **Non-GAAP Adjusted CTP** | $ | 218,821 | $ | 180,668 |

*Adjusted EBITDA*

Below is a reconciliation of our consolidated US GAAP Net Income (Loss) to Non-GAAP EBITDA and Adjusted EBITDA:

| | Year Ended April 30, | | | |
|---|---|---|---|---|
| | **2021** | | **2020** | |
| **Net Income (Loss)** | $ | 148,256 | $ | (74,287) |
| Interest expense | | 18,383 | | 24,959 |
| Provision for income taxes | | 27,656 | | 11,195 |
| Depreciation and amortization | | 200,189 | | 175,127 |
| **Non-GAAP EBITDA** | | 394,484 | | 136,994 |
| Impairment of goodwill and intangible assets | | — | | 202,348 |
| Restructuring and related charges | | 33,310 | | 32,607 |
| Foreign exchange transaction losses (gains) | | 7,977 | | (2,773) |
| Other income | | (16,761) | | (13,381) |
| **Non-GAAP Adjusted EBITDA** | $ | 419,010 | $ | 355,795 |

**Interest Expense:**

Interest expense for the year ended April 30, 2021 was $18.4 million compared with the prior year of $25.0 million. This decrease was due to a lower weighted average effective borrowing rate, partially offset by higher average debt balances outstanding, which included borrowings for the funding of acquisitions in fiscal years 2021 and 2020.

**Foreign Exchange Transaction (Losses) Gains:**

Foreign exchange transaction losses were $8.0 million for the year ended April 30, 2021 and were due to the unfavorable impact of the changes in exchange rates on US dollar cash balances held in the UK to fund the acquisition of Hindawi, and the net impact of changes in average foreign exchange rates as compared to the US dollar on our third-party accounts receivable and payable balances.

## FISCAL YEAR 2022 OUTLOOK

Given positive market trends and Wiley's favorable momentum, the Company anticipates revenue growth to continue to accelerate in fiscal year 2022, with organic growth anticipated for all segments.

- **Revenue Outlook:** Wiley expects consolidated revenue to exceed $2 billion for the first time in Wiley's history, with mid-to-high single digit growth anticipated for Research Publishing & Platforms, low-single digit growth for Academic & Professional Learning, and low-teens growth for Education Services.
- **Adjusted Earnings Outlook:** Wiley expects profit gains from revenue growth to be tempered by investments to accelerate growth initiatives, as well as higher travel and event expenses due to the resumption of in-person business activities. Adjusted EPS performance is expected to be moderated by higher depreciation and amortization expense associated with acquisitions and investments, and a higher effective tax rate in the range of 22% - 23%, from 20.5% in fiscal year 2021.
- **Free Cash Flow Outlook:** Wiley expects strong cash from operations to be partially offset by higher capital expenditures. We anticipate capital expenditures in fiscal year 2022 to be in the range of $120 million - $130 million as compared with $103 million in fiscal year 2021, the non-recurrence of a $21 million US tax refund received in fiscal year 2021, and higher annual incentive compensation payments related to fiscal year 2021 performance.

*(amounts in millions, except Adjusted EPS)*

| Metric | Fiscal Year 2021 Actual | Fiscal Year 2022 Outlook |
|---|---|---|
| Revenue | $1,942 | $2,070 to $2,100 |
| Adjusted EBITDA | $419 | $415 to $435 |
| Adjusted EPS | $2.92 | $2.80 to $3.05 |
| Free Cash Flow | $257 | $200 to $220 |

## LIQUIDITY AND CAPITAL RESOURCES:

Principal Sources of Liquidity

We believe that our operating cash flow, together with our revolving credit facilities and other available debt financing, will be adequate to meet our operating, investing, and financing needs in the foreseeable future. There can be no assurance that continued or increased volatility in the global capital and credit markets will not impair our ability to access these markets on terms commercially acceptable in the future. In addition, our liquidity could be adversely impacted by COVID-19 due to the continued impact on our customers, including cash collections. We do not have any off-balance-sheet debt. We will continue to pursue attractive opportunities to add scale and provide enhanced tech-enabled services in research and online education.

As of April 30, 2021, we had cash and cash equivalents of $93.8 million, of which approximately $90.3 million, or 96% was located outside the US. Maintenance of these cash and cash equivalent balances outside the US does not have a material impact on the liquidity or capital resources of our operations. Notwithstanding the Tax Cuts and Jobs Act of 2017 (the Tax Act), which generally eliminated federal income tax on future cash repatriation to the US, cash repatriation may be subject to state and local taxes or withholding or similar taxes. In addition, as a result of Brexit, certain tax benefits applicable to distributions from subsidiaries of our UK companies were eliminated or reduced effective January 1, 2021. Since April 30, 2018, we no longer intend to permanently reinvest earnings outside the US. We have recorded a $2.5 million liability related to the estimated taxes that would be incurred upon repatriating certain non-US earnings.

On May 30, 2019, we entered into a credit agreement that amended and restated the existing agreement (Amended and Restated RCA). The Amended and Restated RCA provides for senior unsecured credit facilities comprised of a (i) five-year revolving credit facility in an aggregate principal amount up to $1.25 billion, and (ii) a five-year term loan A facility consisting of $250 million. The agreement contains customary affirmative and negative covenants, including a financial covenant in the form of a consolidated net leverage ratio and consolidated interest coverage ratio.

As of April 30, 2021, we had approximately $821.6 million of debt outstanding, net of unamortized issuance costs of $0.5 million, and approximately $664.8 million of unused borrowing capacity under our Amended and Restated RCA and other facilities. Our Amended and Restated RCA contains certain restrictive covenants related to our consolidated leverage ratio and interest coverage ratio, which we were in compliance with as of April 30, 2021.

39

A-4145

# EXHIBIT U



Annual Report
2019

Select Market ("Nasdaq") under the trading symbols "NWSA" and "NWS," respectively, and CHESS Depositary Interests ("CDIs") representing the Company's Class A and Class B Common Stock are listed on the Australian Securities Exchange ("ASX") under the trading symbols "NWSLV" and "NWS," respectively. More information regarding the Company is available on its website at *www.newscorp.com*, including the Company's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), which are available, free of charge, as soon as reasonably practicable after the material is electronically filed with or furnished to the Securities and Exchange Commission ("SEC"). The information on the Company's website is not, and shall not be deemed to be, a part of this Annual Report or incorporated into any other filings it makes with the SEC.

**Special Note Regarding Forward-Looking Statements**

This document and any documents incorporated by reference into this Annual Report, including "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations," contain statements that constitute "forward-looking statements" within the meaning of Section 21E of the Exchange Act and Section 27A of the Securities Act of 1933, as amended. All statements that are not statements of historical fact are forward-looking statements. The words "expect," "estimate," "anticipate," "predict," "believe" and similar expressions and variations thereof are intended to identify forward-looking statements. These statements appear in a number of places in this document and include statements regarding the intent, belief or current expectations of the Company, its directors or its officers with respect to, among other things, trends affecting the Company's financial condition or results of operations and the outcome of contingencies such as litigation and investigations. Readers are cautioned that any forward-looking statements are not guarantees of future performance and involve risks and uncertainties. More information regarding these risks, uncertainties and other important factors that could cause actual results to differ materially from those in the forward-looking statements is set forth under the heading "Item 1A. Risk Factors" in this Annual Report. The Company does not ordinarily make projections of its future operating results and undertakes no obligation (and expressly disclaims any obligation) to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law. Readers should carefully review this document and the other documents filed by the Company with the SEC. This section should be read together with the Consolidated Financial Statements of News Corporation (the "Financial Statements") and related notes set forth elsewhere in this Annual Report.

**BUSINESS OVERVIEW**

The Company's five reporting segments are described below. For information regarding revenues generated by the principal products and services of each segment, refer to "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations."

|  | For the fiscal year ended June 30, 2019 | |
|---|---|---|
|  | Revenues | Segment EBITDA |
|  | (in millions) | |
| News and Information Services | $ 4,956 | $ 417 |
| Subscription Video Services | 2,202 | 380 |
| Book Publishing | 1,754 | 253 |
| Digital Real Estate Services | 1,159 | 384 |
| Other | 3 | (190) |

**News and Information Services**

The Company's News and Information Services segment consists primarily of Dow Jones, News Corp Australia, News UK, the *New York Post* and News America Marketing. This segment also includes Unruly, a global video

2

Segment EBITDA is the primary measure used by the Company's chief operating decision maker to evaluate the performance of, and allocate resources within, the Company's businesses. Segment EBITDA provides management, investors and equity analysts with a measure to analyze the operating performance of each of the Company's business segments and its enterprise value against historical data and competitors' data, although historical results may not be indicative of future results (as operating performance is highly contingent on many factors, including customer tastes and preferences).

Total Segment EBITDA is a non-GAAP measure and should be considered in addition to, not as a substitute for, net income (loss), cash flow and other measures of financial performance reported in accordance with GAAP. In addition, this measure does not reflect cash available to fund requirements and excludes items, such as depreciation and amortization and impairment and restructuring charges, which are significant components in assessing the Company's financial performance. The Company believes that the presentation of Total Segment EBITDA provides useful information regarding the Company's operations and other factors that affect the Company's reported results. Specifically, the Company believes that by excluding certain one-time or non-cash items such as impairment and restructuring charges and depreciation and amortization, as well as potential distortions between periods caused by factors such as financing and capital structures and changes in tax positions or regimes, the Company provides users of its consolidated financial statements with insight into both its core operations as well as the factors that affect reported results between periods but which the Company believes are not representative of its core business. As a result, users of the Company's consolidated financial statements are better able to evaluate changes in the core operating results of the Company across different periods. The following table reconciles Net income (loss) to Total Segment EBITDA for the fiscal years ended June 30, 2019 and 2018:

|  | For the fiscal years ended June 30, | |
|---|---|---|
|  | 2019 | 2018 |
| (in millions) | | |
| Net income (loss) | $ 228 | $(1,444) |
| Add: | | |
| Income tax expense | 126 | 355 |
| Other, net | (33) | 324 |
| Interest expense, net | 59 | 7 |
| Equity losses of affiliates | 17 | 1,006 |
| Impairment and restructuring charges | 188 | 351 |
| Depreciation and amortization | 659 | 472 |
| Total Segment EBITDA | $1,244 | $ 1,071 |

The following table sets forth the Company's Revenues and Segment EBITDA for the fiscal years ended June 30, 2019 and 2018:

|  | For the fiscal years ended June 30, | | | |
|---|---|---|---|---|
|  | 2019 | | 2018 | |
| (in millions) | Revenues | Segment EBITDA | Revenues | Segment EBITDA |
| News and Information Services | $ 4,956 | $ 417 | $5,119 | $ 397 |
| Subscription Video Services | 2,202 | 380 | 1,004 | 173 |
| Book Publishing | 1,754 | 253 | 1,758 | 239 |
| Digital Real Estate Services | 1,159 | 384 | 1,141 | 401 |
| Other | 3 | (190) | 2 | (139) |
| Total | $10,074 | $1,244 | $9,024 | $1,071 |

51

**Book Publishing** (17% and 19% of the Company's consolidated revenues in fiscal 2019 and 2018, respectively)

| | For the fiscal years ended June 30, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Change | % Change |
| (in millions, except %) | | | | Better/(Worse) |
| Revenues: | | | | |
| Consumer | $ 1,679 | $ 1,664 | $ 15 | 1% |
| Other | 75 | 94 | (19) | (20)% |
| **Total Revenues** | **1,754** | **1,758** | **(4)** | — |
| Operating expenses | (1,174) | (1,178) | 4 | — |
| Selling, general and administrative | (327) | (341) | 14 | 4% |
| **Segment EBITDA** | **$ 253** | **$ 239** | **$ 14** | **6%** |

For the fiscal year ended June 30, 2019, revenues at the Book Publishing segment decreased $4 million as compared to fiscal 2018. The decrease was primarily due to the $65 million impact of the adoption of the new revenue recognition standard, the absence of $28 million in revenues from the sublicensing agreement for J.R.R. Tolkien's *The Lord of the Rings* trilogy recognized in fiscal 2018 and the $27 million negative impact of foreign currency fluctuations. These decreases were partially offset by strong frontlist and backlist sales in the Christian publishing category, primarily titles by Rachel Hollis including *Girl, Wash Your Face* and *Girl, Stop Apologizing*, as well as the success of *Homebody: A Guide to Creating Spaces You Never Want to Leave* by Joanna Gaines in the general books category and *The Hate U Give* by Angie Thomas in the children's books category. Digital sales increased 7% compared to fiscal 2018, driven by growth in downloadable audiobook sales, and represented 20% of Consumer revenues during the fiscal year ended June 30, 2019.

For the fiscal year ended June 30, 2019, Segment EBITDA at the Book Publishing segment increased $14 million, or 6%, as compared to fiscal 2018, primarily due to the mix of titles.

**Digital Real Estate Services** *(*12% and 13% of the Company's consolidated revenues in fiscal 2019 and 2018, respectively)

| | For the fiscal years ended June 30, | | | |
|---|---|---|---|---|
| | 2019 | 2018 | Change | % Change |
| (in millions, except %) | | | | Better/(Worse) |
| Revenues: | | | | |
| Circulation and subscription | $ 49 | $ 56 | $ (7) | (13)% |
| Advertising | 122 | 139 | (17) | (12)% |
| Real estate | 908 | 858 | 50 | 6% |
| Other | 80 | 88 | (8) | (9)% |
| **Total Revenues** | **1,159** | **1,141** | **18** | **2%** |
| Operating expenses | (167) | (138) | (29) | (21)% |
| Selling, general and administrative | (608) | (602) | (6) | (1)% |
| **Segment EBITDA** | **$ 384** | **$ 401** | **$(17)** | **(4)%** |

For the fiscal year ended June 30, 2019, revenues at the Digital Real Estate Services segment increased $18 million, or 2%, as compared to fiscal 2018. Revenues at Move increased $32 million, or 7%, to $484 million in fiscal 2019 from $452 million in fiscal 2018, primarily due to higher Real Estate revenues resulting from growth in leads and higher yield, partially offset by lower non-listing advertising revenues. At REA Group, revenues increased $8 million, or 1%, to $674 million in fiscal 2019 from $666 million in fiscal 2018. The higher revenues were primarily due to an increase in Australian residential depth revenue driven by price increases, improved penetration and favorable product mix, as well as the acquisition of Hometrack Australia, partially offset by the $56 million negative impact of foreign currency fluctuations and softness in listing volumes which

54

A-4150

The following table sets forth the Company's reported Revenues and Segment EBITDA for the fiscal year ended June 30, 2019 and pro forma Revenues and Segment EBITDA for the fiscal year ended June 30, 2018:

| | For the fiscal years ended June 30, | | | |
| | 2019 | | 2018 | |
| (in millions) | Revenues | Segment EBITDA | Revenues | Segment EBITDA |
| | As Reported | | Pro forma | |
|---|---|---|---|---|
| News and Information Services | $ 4,956 | $ 417 | $ 5,119 | $ 397 |
| Subscription Video Services | 2,202 | 380 | 2,544 | 545 |
| Book Publishing | 1,754 | 253 | 1,758 | 239 |
| Digital Real Estate Services | 1,159 | 384 | 1,141 | 401 |
| Other | 3 | (190) | 2 | (139) |
| Total | $10,074 | $1,244 | $10,564 | $1,443 |

***Subscription Video Services (pro forma)*** (22% and 24% of the Company's consolidated revenues in fiscal 2019 and 2018, respectively)

| | For the fiscal years ended June 30, | | | |
| | 2019 | 2018 | Change | % Change |
| (in millions, except %) | As reported | Pro forma | Better/(Worse) | |
|---|---|---|---|---|
| Revenues: | | | | |
| Circulation and subscription | $ 1,926 | $ 2,210 | $(284) | (13)% |
| Advertising | 215 | 268 | (53) | (20)% |
| Other | 61 | 66 | (5) | (8)% |
| **Total Revenues** | **2,202** | **2,544** | **(342)** | **(13)%** |
| Operating expenses | (1,476) | (1,499) | 23 | 2% |
| Selling, general and administrative | (346) | (500) | 154 | 31% |
| **Segment EBITDA** | **$ 380** | **$ 545** | **$(165)** | **(30)%** |

For the fiscal year ended June 30, 2019, revenues at the Subscription Video Services segment decreased $342 million, or 13%, as compared to fiscal 2018. The revenue decrease was primarily due to the $181 million negative impact of foreign currency fluctuations and lower subscription revenues resulting from lower broadcast subscribers and changes in the subscriber package mix, partially offset by $46 million of higher revenues from Foxtel Now and Kayo.

For the fiscal year ended June 30, 2019, Segment EBITDA at the Subscription Video Services segment decreased $165 million, or 30%, as compared to fiscal 2018. The decrease in Segment EBITDA was primarily due to the lower revenues discussed above, $95 million of higher sports programming and production costs, mainly related to Cricket Australia and the National Rugby League, and approximately $30 million in higher marketing costs related to Kayo, partially offset by lower entertainment programming costs, customer service and installation costs and overhead expenses.

## LIQUIDITY AND CAPITAL RESOURCES

### Current Financial Condition

The Company's principal source of liquidity is internally generated funds and cash and cash equivalents on hand. As of June 30, 2019, the Company's cash and cash equivalents were $1.64 billion. The Company expects these elements of liquidity will enable it to meet its liquidity needs in the foreseeable future, including repayment of indebtedness. The Company also has available borrowing capacity under the Facility (as defined below) and

**NEWS CORPORATION**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Segment EBITDA may not be comparable to similarly titled measures reported by other companies, since companies and investors may differ as to what items should be included in the calculation of Segment EBITDA.

Segment EBITDA is the primary measure used by the Company's chief operating decision maker to evaluate the performance of and allocate resources within the Company's businesses. Segment EBITDA provides management, investors and equity analysts with a measure to analyze the operating performance of each of the Company's business segments and its enterprise value against historical data and competitors' data, although historical results may not be indicative of future results (as operating performance is highly contingent on many factors, including customer tastes and preferences).

|  | For the fiscal years ended June 30, | | |
|---|---|---|---|
|  | 2019 | 2018 | 2017 |
|  | (in millions) | | |
| Revenues: |  |  |  |
| News and Information Services | $ 4,956 | $ 5,119 | $5,069 |
| Subscription Video Services | 2,202 | 1,004 | 494 |
| Book Publishing | 1,754 | 1,758 | 1,636 |
| Digital Real Estate Services | 1,159 | 1,141 | 938 |
| Other | 3 | 2 | 2 |
| Total Revenues | $10,074 | $ 9,024 | $8,139 |
| Segment EBITDA: |  |  |  |
| News and Information Services | $ 417 | $ 397 | $ 412 |
| Subscription Video Services | 380 | 173 | 123 |
| Book Publishing | 253 | 239 | 195 |
| Digital Real Estate Services | 384 | 401 | 324 |
| Other | (190) | (139) | (172) |
| Depreciation and amortization | (659) | (472) | (449) |
| Impairment and restructuring charges | (188) | (351) | (927) |
| Equity losses of affiliates | (17) | (1,006) | (295) |
| Interest (expense) income, net | (59) | (7) | 39 |
| Other, net | 33 | (324) | 135 |
| Income (loss) before income tax expense | 354 | (1,089) | (615) |
| Income tax expense | (126) | (355) | (28) |
| Net income (loss) | $ 228 | $(1,444) | $ (643) |

|  | For the fiscal years ended June 30, | | |
|---|---|---|---|
|  | 2019 | 2018 | 2017 |
|  | (in millions) | | |
| Depreciation and amortization: |  |  |  |
| News and Information Services | $223 | $223 | $283 |
| Subscription Video Services | 292 | 107 | 32 |
| Book Publishing | 42 | 52 | 52 |
| Digital Real Estate Services | 97 | 87 | 78 |
| Other | 5 | 3 | 4 |
| Total Depreciation and amortization | $659 | $472 | $449 |

148

# EXHIBIT V



Annual Report
2021

statements" within the meaning of Section 21E of the Exchange Act and Section 27A of the Securities Act of 1933, as amended. All statements that are not statements of historical fact are forward-looking statements. The words "expect," "will," "estimate," "anticipate," "predict," "believe" and similar expressions and variations thereof are intended to identify forward-looking statements. These statements appear in a number of places in this document and include statements regarding the intent, belief or current expectations of the Company, its directors or its officers with respect to, among other things, trends affecting the Company's financial condition or results of operations, the Company's strategy and strategic initiatives and the outcome of contingencies such as litigation and investigations. Readers are cautioned that any forward-looking statements are not guarantees of future performance and involve risks and uncertainties. More information regarding these risks and uncertainties and other important factors that could cause actual results to differ materially from those in the forward-looking statements is set forth under the heading "Item 1A. Risk Factors" in this Annual Report. The Company does not ordinarily make projections of its future operating results and undertakes no obligation (and expressly disclaims any obligation) to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law. Readers should carefully review this document and the other documents filed by the Company with the SEC. This section should be read together with the Consolidated Financial Statements of News Corporation (the "Financial Statements") and related notes set forth elsewhere in this Annual Report.

## BUSINESS OVERVIEW

The Company's six reporting segments are described below.

|  | | For the fiscal year ended June 30, 2021 | |
| --- | --- | --- | --- |
|  | | Revenues | Segment EBITDA |
|  | | (in millions) | |
| Digital Real Estate Services | $ | 1,393 | $ 514 |
| Subscription Video Services | | 2,072 | 359 |
| Dow Jones | | 1,702 | 332 |
| Book Publishing | | 1,985 | 303 |
| News Media | | 2,205 | 52 |
| Other | | 1 | (287) |

## Digital Real Estate Services

The Company's Digital Real Estate Services segment consists of its 61.4% interest in REA Group, a publicly-traded company listed on ASX (ASX: REA), and its 80% interest in Move. The remaining 20% interest in Move is held by REA Group.

### *REA Group*

REA Group is a market-leading digital media business specializing in property, with operations focused on property and property-related advertising and services, as well as financial services.

#### *Property and Property-Related Advertising and Services*

REA Group advertises property and property-related services on its websites and mobile apps across Australia and Asia. REA Group's Australian operations include leading residential, commercial and share property websites realestate.com.au, realcommercial.com.au and Flatmates.com.au. Additionally, REA Group operates media display and data services businesses, serving the display media market and markets adjacent to property, respectively. For the year ended June 30, 2021, average monthly visits to realestate.com.au were more than 121.9 million. Launches of the realestate.com.au app increased 49% to 55.0 million average monthly launches in fiscal 2021 as compared to the prior year, with consumers spending almost four times longer on the app than any other property app in Australia according to Nielsen Digital Content Ratings. Realcommercial.com.au remains Australia's leading commercial property site across website and app. In fiscal 2021, the realcommercial.com.au app was launched 12.7 times more than the nearest competitor, and consumers spent 10.4 times longer on the realcommercial.com.au app based on Nielsen Digital Content Ratings data. Flatmates.com.au is the largest site for share accommodation in Australia, with average monthly visits of almost 2.9 million and more than 300,000 new members during fiscal 2021.

Realestate.com.au and realcommerical.com.au derive the majority of their revenue from their core property advertising listing products and monthly advertising subscriptions from real estate agents and property developers. Realestate.com.au and

The following table sets forth the Company's Revenues and Segment EBITDA by reportable segment for the fiscal years ended June 30, 2021 and 2020:

| | For the fiscal years ended June 30, | | | | |
| | 2021 | | 2020 | | |
| (in millions) | Revenues | Segment EBITDA | Revenues | Segment EBITDA | |
|---|---|---|---|---|---|
| Digital Real Estate Services | $ 1,393 | $ 514 | $ 1,065 | $ 345 | |
| Subscription Video Services | 2,072 | 359 | 1,884 | 323 | |
| Dow Jones | 1,702 | 332 | 1,590 | 236 | |
| Book Publishing | 1,985 | 303 | 1,666 | 214 | |
| News Media | 2,205 | 52 | 2,801 | 53 | |
| Other | 1 | (287) | 2 | (158) | |
| **Total** | **$ 9,358** | **$ 1,273** | **$ 9,008** | **$ 1,013** | |

*Digital Real Estate Services (*15% and 12% of the Company's consolidated revenues in fiscal 2021 and 2020, respectively)

| | For the fiscal years ended June 30, | | | |
| | 2021 | 2020 | Change | % Change |
| (in millions, except %) | | | Better/(Worse) | |
|---|---|---|---|---|
| Revenues: | | | | |
| Circulation and subscription | $ 25 | $ 36 | $ (11) | (31)% |
| Advertising | 126 | 98 | 28 | 29 % |
| Real estate | 1,153 | 862 | 291 | 34 % |
| Other | 89 | 69 | 20 | 29 % |
| **Total Revenues** | **1,393** | **1,065** | **328** | **31 %** |
| Operating expenses | (182) | (172) | (10) | (6)% |
| Selling, general and administrative | (697) | (548) | (149) | (27)% |
| **Segment EBITDA** | **$ 514** | **$ 345** | **$ 169** | **49 %** |

For the fiscal year ended June 30, 2021, revenues at the Digital Real Estate Services segment increased $328 million, or 31%, as compared to fiscal 2020. Revenues at Move increased $168 million, or 36%, to $641 million for the fiscal year ended June 30, 2021 from $473 million in fiscal 2020, primarily driven by higher real estate revenues due to the factors discussed below and the absence of an estimated $15 million of discounts offered to customers in response to COVID-19 during fiscal 2020. The referral model and the traditional lead generation product both benefited from higher lead and transaction volumes. The referral model also benefited from higher average home values and referral fees and generated approximately 29% of total Move revenues. The traditional lead generation product saw continued strong demand from agents, driving improvements in sell-through and yield. At REA Group, revenues increased $160 million, or 27%, to $752 million for the fiscal year ended June 30, 2021 from $592 million in fiscal 2020. The higher revenues were primarily due to the $80 million positive impact of foreign currency fluctuations, an increase in Australian residential depth revenue driven by strong national listings and the $13 million impact from the acquisition of Elara.

For the fiscal year ended June 30, 2021, Segment EBITDA at the Digital Real Estate Services segment increased $169 million, or 49%, as compared to fiscal 2020. The increase in Segment EBITDA was primarily driven by the $100 million and $67 million higher contributions from Move and REA Group, respectively, resulting from the higher revenues discussed above and the $40 million positive impact of foreign currency fluctuations, partially offset by higher employee costs at both Move and REA Group, an $18 million increase in marketing costs at Move and the $17 million negative impact from the acquisition of Elara. Fiscal 2021 included approximately $12 million of transaction costs related to current year acquisitions.

NEWS CORPORATION

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

| | For the fiscal years ended June 30, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| | (in millions) | | |
| Revenues: | | | |
| Digital Real Estate Services | $ 1,393 | $ 1,065 | $ 1,159 |
| Subscription Video Services | 2,072 | 1,884 | 2,202 |
| Dow Jones | 1,702 | 1,590 | 1,549 |
| Book Publishing | 1,985 | 1,666 | 1,754 |
| News Media | 2,205 | 2,801 | 3,407 |
| Other | 1 | 2 | 3 |
| Total Revenues | $ 9,358 | $ 9,008 | $ 10,074 |
| Segment EBITDA: | | | |
| Digital Real Estate Services | $ 514 | $ 345 | $ 378 |
| Subscription Video Services | 359 | 323 | 379 |
| Dow Jones | 332 | 236 | 208 |
| Book Publishing | 303 | 214 | 252 |
| News Media | 52 | 53 | 182 |
| Other | (287) | (158) | (155) |
| Depreciation and amortization | (680) | (644) | (659) |
| Impairment and restructuring charges | (168) | (1,830) | (188) |
| Equity losses of affiliates | (65) | (47) | (17) |
| Interest expense, net | (53) | (25) | (59) |
| Other, net | 143 | 9 | 33 |
| Income (loss) before income tax expense | 450 | (1,524) | 354 |
| Income tax expense | (61) | (21) | (126) |
| Net income (loss) | $ 389 | $ (1,545) | $ 228 |

| | For the fiscal years ended June 30, | | |
| --- | --- | --- | --- |
| | 2021 | 2020 | 2019 |
| | (in millions) | | |
| Depreciation and amortization: | | | |
| Digital Real Estate Services | $ 101 | $ 93 | $ 97 |
| Subscription Video Services | 332 | 283 | 292 |
| Dow Jones | 119 | 113 | 103 |
| Book Publishing | 36 | 33 | 42 |
| News Media | 84 | 115 | 120 |
| Other | 8 | 7 | 5 |
| Total Depreciation and amortization | $ 680 | $ 644 | $ 659 |

A-4157

# EXHIBIT W



**REFERENCE DOCUMENT**
including the Annual Financial Report

**FISCAL YEAR 2018**

 **CHAPTER 5** - Net assets, financial position and results

## 5.1 SEGMENT INFORMATION

### 2018 income statement

| | Lagardère Publishing | Lagardère Travel Retail | Lagardère Active | Lagardère Sports and Entertainment | Other Activities | Total |
|---|---|---|---|---|---|---|
| Revenue | 2,263 | 3,673 | 895 | 438 | - | 7,269 |
| Inter-segment revenue | (11) | - | - | - | - | (11) |
| **Consolidated revenue** | **2,252** | **3,673** | **895** | **438** | **-** | **7,258** |
| Other income from ordinary activities | 7 | 25 | 46 | - | 5 | 83 |
| **Total income from ordinary activities** | **2,259** | **3,698** | **941** | **438** | **5** | **7,341** |
| **Recurring operating profit (loss) of fully consolidated companies** | **190** | **119** | **75** | **30** | **(13)** | **401** |
| Income from equity-accounted companies before impairment losses | 1 | 2 | 1 | - | - | 4 |
| **Recurring operating profit (loss)** | **191** | **121** | **76** | **30** | **(13)** | **405** |
| Restructuring costs | (21) | (6) | (44) | (8) | - | (79) |
| Gains (losses) on disposals | - | (3) | 207 | - | 1 | 205 |
| *Disposals of assets* | - | *(3)* | *207* | - | *1* | *205* |
| *Fair value adjustments due to change in control* | - | - | - | - | - | - |
| Impairment losses[*] | - | (4) | (40) | (2) | (1) | (47) |
| *Fully consolidated companies* | - | *(4)* | *(40)* | *(2)* | *(1)* | *(47)* |
| *Equity-accounted companies* | - | - | - | - | - | - |
| Amortisation of acquisition-related intangible assets | (5) | (59) | - | (2) | - | (66) |
| Acquisition-related expenses | - | (2) | (3) | - | (2) | (7) |
| Purchase price adjustments | - | 2 | 1 | (5) | - | (2) |
| **Profit (loss) before finance costs and tax** | **165** | **49** | **197** | **13** | **(15)** | **409** |
| **Items included in recurring operating profit (loss)** | | | | | | |
| Depreciation and amortisation of property, plant and equipment and intangible assets | (31) | (111) | (8) | (51) | (1) | (202) |
| Cost of share option plans | (3) | (2) | (5) | (1) | (2) | (13) |

(*) Impairment losses on goodwill, property, plant and equipment and intangible assets.

A-4160

# EXHIBIT X

# UNIVERSAL REGISTRATION DOCUMENT

including the Annual Financial Report

**FISCAL YEAR 2020**





UNIVERSAL REGISTRATION DOCUMENT / **FISCAL YEAR 2020**

# 2020 KEY FIGURES (CONT.)

**Key figures by division**

| (in millions of euros) | Lagardère Publishing | Lagardère Travel Retail | Other Activities[*] | Non-retained scope[**] |
|---|---|---|---|---|
| Revenue | 2,375 | 1,720 | 229 | 115 |
| Recurring operating profit of fully consolidated companies | 246 | (353) | (47) | (1) |
| Free cash flow | 223 | (452) | (44) | 17 |

[*] Lagardère News, Lagardère Live Entertainment, Lagardère Paris Racing and the Group Corporate function.
[**] Lagardère Sports and Lagardère Studios.

**Breakdown of 2020 revenue by geographic area**



Latin America, Middle East and Africa **3%**
France **28%**
Asia-Pacific **9%**
Western Europe **25%**
United States and Canada **25%**
Eastern Europe **10%**

**Breakdown of workforce at 31 December 2020**

| | Executives | | Managers | | Other employees | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Women | Men | Women | Men | Women | Men | Women | Men | Women Men |
| Lagardère Publishing | 213 | 152 | 1,851 | 1,075 | 2,201 | 1,462 | 4,265 | 2,689 | 6,954 |
| Lagardère Travel Retail | 73 | 118 | 1,310 | 1,208 | 11,557 | 5,089 | 12,940 | 6,415 | 19,355 |
| Other Activities | 11 | 21 | 421 | 422 | 143 | 208 | 575 | 651 | 1,226 |
| **Group** | 297 | 291 | 3,582 | 2,705 | 13,901 | 6,759 | 17,780 | 9,755 | 27,535 |

## 1.4.1  LAGARDÈRE PUBLISHING

### A) PRINCIPAL ACTIVITIES AND MAIN MARKETS

The world's third-largest trade book publisher for the general public and educational markets[1] (number one in France[2], number two in the United Kingdom[3], number three in Spain[4], and number four in the United States[5]), Lagardère Publishing is a federation of publishing companies with a large degree of editorial independence. They are united by common management rules, a concerted effort to expand in digital activities, a coordinated strategy in respect of the global distribution giants, and the same high standards required of the people appointed to positions of responsibility in each company.

Since its foundation in 1826, Hachette Livre has consistently sought to publish, sell and distribute high quality innovative books that satisfy its readers' thirst for knowledge, culture and entertainment. The company's employees, who contribute to the growth and ongoing success of this division, continue to pursue this goal.

Hachette Livre has a well-balanced, diversified portfolio that covers much of the editorial spectrum (Education, General Literature, Illustrated Books, Partworks, Dictionaries, Youth Works, Mobile Games, Board Games, Distribution, etc.). Publishing is predominantly in the three main language groups: English, Spanish and French. The portfolio offers new bases for expansion by geographic area and business line, allowing Lagardère Publishing to capitalise on the most buoyant segments and the most dynamic markets.

The division's business model is present throughout the entire book publishing/distribution value chain. Thanks to its highly reputed publishing houses and brand names, it is able to draw the fullest benefit from its close relationships with authors, the expertise of its sales force, the rigorous logistics organisation of its distribution network and the commitment of its highly trained employees.

The autonomy of the publishing houses, which are independent and fully responsible for their own creative processes and editorial decisions, encourages both creativity and internal competition. The large degree of autonomy that Hachette Livre allows each of its operating divisions is one of the key factors of its success, since each division of Lagardère Publishing forms a federation of small and medium-sized independent publishing houses with their own corporate culture and specific – not to mention unique – editorial tone.

Each publishing house is responsible for relations with its own authors. Excellent individual relationships enable publishers to control the copyright portfolio and offer seamless supply to the paperback sector. In France, they also give rise to merchandising opportunities.

Central management functions in turn enable Hachette Livre to devise an aligned strategy in digital technologies, negotiate from a better position with large accounts and suppliers, and leverage economies of scale.

These combined assets make Hachette Livre France's leading publishing group, ahead of such prominent competitors as Editis, Gallimard-Flammarion, Albin Michel and Média-Participations. Hachette Livre ranks number one in the fragmented General Adult Literature market, and first in literature for Youth and Illustrated Books, as well as in the traditionally more concentrated Textbook and Dictionaries segments.

Outside France, Hachette Livre conducts its business alongside competitors such as Pearson, Penguin Random House, Scholastic, Simon & Schuster, HarperCollins, Planeta and Holtzbrinck. In just a few years, it has succeeded in moving up from thirteenth to third position among private capital publishers worldwide.

Most of its new publications are also published in France, the United Kingdom and the United States in digital formats that are marketed in the form of e-books on every platform and, increasingly, as downloadable audiobooks. Hachette Livre has begun to diversify into mobile and board games, to explore new, fast-growing entertainment territories.

#### A.1  IN FRANCE[6]

General Literature comprises prestigious publishing houses such as Grasset, Fayard, Stock, Calmann Lévy and Lattès. Each is prominent in a specific domain, but competes with the Group's other publishing houses and with rival publishing groups' brands. Le Livre de Poche, which releases paperback reprints for all of the division's publishing houses as well as for many non-Group publishers, is today France's leading source of general literature paperbacks.

Hachette Illustré covers the entire range of illustrated works. It is number one in France for both practical guides (Hachette Pratique and Marabout) and travel guides (Hachette Tourisme and Le Routard). Hachette Illustré is also number one in the high-quality illustrated book market with two prestigious publishers, Editions du Chêne and Hazan, and in youth works (Hachette JD, Hachette Jeunesse, Hachette Romans, Deux Coqs d'Or, Gautier-Languereau and Le Livre de Poche Jeunesse). Hachette Livre boasts valuable editorial assets in this market, including characters such as Babar, Noddy, Asterix and Fantômette.

In Textbooks, Hachette Livre is the leading publisher in France[7] thanks to two separate entities: Hachette Éducation and the Alexandre Hatier group and, following its acquisition in 2020, Le Livre Scolaire. These entities include such reputed publishers as Hachette, Hatier, Didier and Foucher and other strong brands (Bled, Bescherelle, Passeport, Littré and Gaffiot), enabling Hachette Livre to occupy a leading position on the extra curricular book segment.

In Reference and Dictionaries, famous assets include the brands Larousse, Hachette and Harrap's. Hachette Livre is number one in France for both monolingual and bilingual dictionaries. With its international reputation, Larousse generates around 30% of its revenue outside France, and is particularly well established as a brand in Spanish-language books.

---

(1) World publishing rankings prepared internally by Hachette Livre based on:
- the annual financial reports of the groups in question (most cases);
- rankings appearing each year in *Livres Hebdo* (rankings prepared with Rüdiger Wischenbart Content and Consulting, and generally used subsequently in partnership with *The Bookseller*, *Publishers Weekly* and *Buchreport*), and which are sometimes based on direct contacts with the groups in question (i.e., when annual financial reports are not available);
- the ranking, which takes into account private publishing companies in the Textbook market (excluding professional, and scientific, technical and medical publishing) and general interest (Trade).
(2) Source: internal analyses based on statistics from the GfK survey panel and the data from the education group of the French publishers association.
(3) Source: internal data based on Nielsen BookScan in the United Kingdom.
(4) Source: internal estimates.
(5) Source: internal analyses based on NPD BookScan in the United States.
(6) Hachette Livre's competitive positions reflect data provided by the GfK panels to which the division subscribes.
(7) Source: internal estimates.



A-4164



The Academic and Professional activity includes Dunod-Armand Colin, the leader in France's higher education market.

Distribution for Hachette Livre and other non-Group publishing houses under exclusive contracts is carried out through a distribution network managed from the national centre in Maurepas. Hachette Livre handles 230 million copies per year and supplies more than 15,000 bookshops, online booksellers, speciality stores, newsagents, news stands and supermarkets in France. Hachette Livre Distribution, the number one distributor in France, also operates in Belgium, Switzerland and French-speaking Canada.

### A.2 OUTSIDE FRANCE[1]

In 2020, Hachette UK was the United Kingdom's second-largest publisher, with 13.7%[2] of the print trade book market through nine divisions: Octopus for illustrated books; Orion; Hodder & Stoughton; John Murray Press; Headline; Little, Brown and Quercus for general literature, plus Bookouture since 2017; and Hachette Children's Group in the youth works segment.

These divisions and their range of brand names have also enabled Hachette Livre to develop operations in Australia, New Zealand, Ireland, India (where it is number two in the market), Singapore and the English-speaking Caribbean.

Hachette Livre is also a key player in the textbook market with Hodder Education, which ranks third in the market.

Lastly, Hachette Livre has a distribution business in the United Kingdom and, since 2019, a new, highly automated warehouse in Didcot.

Hachette España has been the third-largest publisher in Spain since Santillana's acquisition by Penguin Random House, and ranks as the leading publisher of textbooks through Anaya and Bruño. These two publishing houses are key players in the Education market, as well as in the extra-curricular books, General Adult Literature and youth works segments. It is also very well established in Latin America, through its Larousse, Anaya, Bruño, Alianza, Algaida, Barcanova, Xerais and Salvat brands. In Mexico, Hachette Livre is one of the leading textbook publishers, under the Larousse and Patria brands.

In the United States, Hachette Book Group is the fourth-largest trade book publisher thanks to imprints such as Grand Central Publishing, Little, Brown and Company, as well as Little, Brown Books for Young Readers in the youth works segment; FaithWords and Worthy Books in the religious segment; Orbit in science fiction; Perseus in non-fiction; and Mulholland in crime fiction.

Hachette Livre also has distribution operations in the United States.

Partworks are published by the Collections division, and are sold per issue in news stands and by subscription. The Collections division has expanded internationally: Partworks are now published in 16 languages and 36 countries through subsidiaries based in France, the United Kingdom, Italy, Spain, Poland, Japan, Argentina and Russia. This activity's marketing skills and capacity to create new products rigorously tested for compatibility with each market have made it the world leader, and a driving force behind Hachette Livre's overall performance.

Worldwide, Hachette Livre is represented either directly or indirectly in more than 70 countries across its various business lines and its 150 brands.

---

(1) Source: internal data, based on Nielsen BookScan in the United Kingdom, GfK in Spain and NPD BookScan data in the United States.
(2) Source: Nielsen.

*Lagardère*  **CHAPTER 1** - Overview of the Group

## B)  OPERATIONS DURING 2020

Contribution to consolidated revenue in 2020: €2,375 million (€2,384 million in 2019).

### Breakdown of revenue by activity

|  | **2020** | 2019 |
|---|---|---|
| Education | **13.6%** | 14.6% |
| Illustrated Books | **14.0%** | 13.1% |
| General Literature | **44.7%** | 43.4% |
| Partworks | **11.2%** | 12.3% |
| Other (including Reference and Distribution) | **16.5%** | 16.6% |
| **Total** | **100%** | 100% |

### Breakdown of revenue by geographic area

|  | **2020** | 2019 |
|---|---|---|
| France | **27.9%** | 29.3% |
| United Kingdom | **18.0%** | 16.3% |
| United States | **26.5%** | 25.5% |
| Spain | **5.5%** | 6.0% |
| Other | **22.1%** | 22.9% |
| **Total** | **100%** | 100% |

In 2020, the global publishing market was hit by the Covid-19 health crisis, but the impact varied by region and led to growth in demand in all of Lagardère Publishing's geographic markets except France.

In France, the first lockdown, from March to May, weighed heavily on book sales, but was followed by a sharp rebound in June that continued into the second half. Overall, the market ended the year down 1.8%[1] in value.

In Spain, the textbook market declined after several regions cancelled their new textbook procurement programmes. The Trade market, on the other hand, held up well against the health crisis and the impact of the successive lockdowns, enabling total market value to edge up 0.8%[1] over the year.

In the English-speaking markets, e-book sales rose sharply in response to the various lockdowns, while audiobooks extended their spectacular growth across every market. Print book markets also rose during the year, by 5.5%[2] in the UK and 8.2%[3] in the US, led by online sales.

Against this backdrop, in 2020, Lagardère Publishing reported revenue of €2,375 million, down a slight 0.4% as reported and 0.8% like-for-like, and recurring operating profit of €246 million, up 12%. The increase in profit despite the decline in revenue reflected the cost-cutting plans immediately deployed in response to the Covid-19 crisis and the growth in digital formats.

Lagardère Publishing is pursuing the same strategy built on eight core objectives:

**1.** constantly explore new growth opportunities by making the high value-creating acquisitions needed to maintain the division among the top-ranking publishing groups worldwide, which is an essential advantage conferring extra influence in negotiations with major customers. These acquisitions may also extend to related segments such as Board Games, in a commitment to reaching consumers who are shifting from books to other forms of entertainment;

**2.** spread risks across a significant number of markets and market segments to smooth the cyclical effects specific to each one;

**3.** concentrate acquisitions and the creation of new subsidiaries in countries belonging to language areas that offer critical mass in terms of potential markets;

**4.** offer publishing subsidiaries broad editorial independence to foster creativity, rapid response and team motivation, and therefore the ability to attract and retain the talented people who are the foundation of the division's organisation and success. This talent is what enables our publishers to discover, support and successfully develop the work of their authors;

**5.** actively seek out international bestsellers able to attract an extensive readership in all of the division's markets;

**6.** manage distribution both as a cost centre and a strategic link in the book value chain, in all of the division's markets;

**7.** continue to invest heavily in digital technologies to understand and satisfy authors, booksellers and readers more effectively;

**8.** selectively invest in high-growth markets.

---

(1) Source: GfK (by value).
(2) Source: Nielsen BookScan (by value).
(3) Source: NPD BookScan (by volume).





## B.1 IN FRANCE

In France, the health crisis and the successive lockdowns adversely impacted revenue, which declined by 0.4% in 2020 in every segment except General Literature.

Hachette Education and the Alexandre Hatier Group, for example, suffered from the fact that high school curricula were less extensively reformed than in 2019 (a single level revamped over the year), as well as from a steep decline in sales of French as a foreign language (FLE) textbooks due to the health crisis.

Illustrated Books also saw revenues soften due to a very sharp drop in sales of travel guides and the lack of a new *Asterix* album in 2020. The other divisions, such as how-to books, youth works and manga, all demonstrated very firm resilience.

Lastly, General Literature had a good year despite the closure of bookstores for several weeks. Le Livre de Poche, for example, reported higher revenue in a declining market. This was also the case for large-format publishers, in particular Fayard, led by the publication of Barack Obama's *A Promised Land* and new novels by Aurélie Valognes and Virginie Grimaldi, and Calmann-Lévy, with the publication of Guillaume Musso's *La vie est un roman*, the reissue of his *Skidamarink* and the publication of new works by Marie-Bernadette Dupuy. In addition, Stock enjoyed a good year, winning the Grand Prix du Roman, the Académie française's literary prize, for *La grande épreuve* by Étienne de Montety, while Grasset published Vanessa Springora's *Consent*, one of the year's most impactful titles. Lastly, Lattès benefited from the popularity of Olivia Ruiz's first novel, *La commode aux tiroirs de couleurs*.

## B.2 OUTSIDE FRANCE

### United States

In an environment shaped by a sharp 8.2%[1] increase in the print book market and robust growth in e-books and audiobooks, Hachette Book Group (HBG) reported higher revenue in 2020.

The year saw the market success of Andrzej Sapkowski's The Witcher saga, published by Orbit and developed into a series by Netflix, and the publication of Stephenie Meyer's new novel, *Midnight Sun*.

In addition, books on the theme of identity and racism came into high demand in the wake of the Black Lives Matter movement.

Lastly, digital audio and e-books pursued their spectacular growth in 2020, as the successive lockdowns drove gains of 21% and 16%, respectively, that staunched the recent-year erosion in sales.

### United Kingdom and the Commonwealth

Hachette UK enjoyed a record year in 2020, with growth of 16.3%[2] in a trade print book market up 5.5%[2].

The e-book and audio formats were major contributors to this performance, with strong growth of 21% and 50%, respectively.

Like Hachette Book Group, Hachette UK benefited from the success of *The Witcher* saga and the publication of *Midnight Sun*, but also from the release of the new J.K. Rowling novel, The Ickabog. More broadly, new title sales, particularly at Orion and Little, Brown, rose sharply in 2020 despite the lockdowns.

In addition, the Education business saw a slight contraction in market share after schools remained closed for several months.

### Spain and Latin America

Following completion of the curriculum reform cycle initiated by the Organic Law for Improvement of the Quality of Education (LOMCE), changes in majorities in both national and regional parliaments, as well as budgetary constraints in the regions, have generated a certain degree of buying hesitation, which was aggravated by the health crisis in 2020.

This prompted several regions to forego the procurement of new textbooks, causing the Education business to report lower revenues for the year.

Hachette España held up better in General Literature, boosted by the success of Woody Allen's *A propósito de nada* and, more generally, the remarkable performance of the Alianza publishing house.

In Latin America, Larousse Mexico and Patria suffered from a steep fall in sales to Mexican private schools and in the Trade segment, in a country hard hit by the health crisis. Only government sales remained resilient.

### Partworks

Partworks sales declined as a result of the health crisis, which had a severe impact on Latin American countries. In addition, business in France suffered from Presstalis' difficulties in the first quarter. On the other hand, sales in Japan and Germany showed stronger resistance.

## B.3 OBJECTIVES AND ACHIEVEMENTS IN 2020

Lagardère Publishing expected sales to decline somewhat in 2020, due to the lack of a new *Asterix* album and the more limited high school curriculum reform programme than in 2019.

This forecast was upended by the health crisis which, from March 2020 onwards, severely impacted the division's business, particularly in France and Spain. The rebound that began in France in June, and the remarkable resilience of the English-speaking geographies to both the health crisis and the lockdown restrictions fully offset the revenue shortfalls in the March to May period and kept revenue almost in line with 2019.

At €246 million, consolidated recurring operating profit rose by a robust €26 million (up 12%), buoyed by the ambitious cost-cutting plans deployed as early as March in every geography, as well as by the strong growth in the percentage of digital formats in the sales mix. As a result, the improvement in margins was particularly remarkable at Hachette Book Group and Hachette UK.

Partworks, where the division is world leader, also demonstrated the resilience of their business model.

Lastly, the merits of diversifying into board games were clearly evidenced when the division delivered organic growth of 15% in 2020.

## C) OUTLOOK

Lagardère Publishing has entered 2021 with the publication of a new *Asterix* album, but without the prospect of any curriculum reform and an unprecedented degree of uncertainty due to the Covid-19 crisis.

In this environment, the division plans to pursue its strategy of diversifying into board games, which are enjoying strong growth with a business model that is very similar to book publishing.

It will also continue to make targeted acquisitions in its core publishing business, as it did in 2020 with the purchase of Le Livre Scolaire in France and Laurence King Publishing in the United Kingdom.

(1) Source: NPD BookScan (by volume).
(2) Source: Nielsen BookScan (by value).

## 5.1 SEGMENT INFORMATION

### 2020 income statement

| | Lagardère Publishing | Lagardère Travel Retail | Other Activities | Total target scope | Assets sold and disposals pending completion at Lagardère Active | Total | Lagardère Sports |
|---|---|---|---|---|---|---|---|
| Revenue | 2,379 | 1,720 | 229 | 4,328 | 115 | 4,443 | 84 |
| Inter-segment revenue | (4) | - | - | (4) | - | (4) | - |
| Consolidated revenue | 2,375 | 1,720 | 229 | 4,324 | 115 | 4,439 | 84 |
| Other income from ordinary activities | 4 | 18 | 21 | 43 | (2) | 41 | 2 |
| Total income from ordinary activities | 2,379 | 1,738 | 250 | 4,367 | 113 | 4,480 | 86 |
| Recurring operating profit (loss) of fully consolidated companies | 246 | (353) | (47) | (154) | (1) | (155) | (2) |
| Income (loss) from equity accounted companies before impairment losses | 2 | (59) | (1) | (58) | - | (58) | - |
| Restructuring costs | (9) | (36) | (10) | (55) | - | (55) | (3) |
| Gains (losses) on disposals | - | - | (6) | (6) | (1) | (7) | (14) |
| Disposals of assets | - | - | (6) | (6) | (1) | (7) | (14) |
| Fair value adjustments due to change in control | - | - | - | - | - | - | - |
| Impairment losses[(*)] | (20) | (106) | (6) | (132) | (19) | (151) | - |
| Fully consolidated companies | (20) | (106) | (6) | (132) | (19) | (151) | - |
| Amortisation of acquisition-related intangible assets | (7) | (97) | - | (104) | - | (104) | - |
| Expenses related to acquisitions and disposals | (4) | - | (1) | (5) | - | (5) | - |
| Purchase price adjustment | - | 3 | - | 3 | - | 3 | - |
| Impact of IFRS 16 on concession agreements | - | (17) | - | (17) | - | (17) | - |
| Gains and losses on leases | - | 171 | - | 171 | - | 171 | - |
| Depreciation of right-of-use assets | - | (401) | - | (401) | - | (401) | - |
| Decrease in lease liabilities | - | 175 | - | 175 | - | 175 | - |
| Interest paid on lease liabilities | - | 32 | - | 32 | - | 32 | - |
| Changes in working capital relating to lease liabilities | - | 6 | - | 6 | - | 6 | - |
| Profit (loss) before finance costs and tax | 208 | (665) | (71) | (528) | (21) | (549) | (19) |
| Items included in recurring operating profit (loss) of fully consolidated companies | | | | | | | |
| Depreciation and amortisation of property, plant and equipment and intangible assets | (36) | (138) | (10) | (184) | (3) | (187) | (5) |
| Depreciation of right-of-use assets – Buildings and other | (32) | (16) | (23) | (71) | (1) | (72) | (3) |
| Cost of free share plans | (3) | (1) | (1) | (5) | - | (5) | - |

(*) Impairment losses on goodwill, property, plant and equipment and intangible assets.



## 2019 income statement

| | Lagardère Publishing | Lagardère Travel Retail | Other Activities | Total target scope | Assets sold and disposals pending completion at Lagardère Active | Total | Lagardère Sports |
|---|---|---|---|---|---|---|---|
| Revenue | 2,395 | 4,264 | 288 | 6,947 | 275 | 7,222 | 470 |
| Inter-segment revenue | (11) | - | - | (11) | - | (11) | - |
| **Consolidated revenue** | **2,384** | **4,264** | **288** | **6,936** | **275** | **7,211** | **470** |
| Other income from ordinary activities | 6 | 31 | 38 | 75 | 9 | 84 | |
| **Total income from ordinary activities** | **2,390** | **4,295** | **326** | **7,011** | **284** | **7,295** | **470** |
| **Recurring operating profit (loss) of fully consolidated companies** | **220** | **152** | **(11)** | **361** | **17** | **378** | **64** |
| Income (loss) from equity accounted companies before impairment losses | 1 | 4 | 1 | 6 | - | 6 | - |
| Restructuring costs | (12) | (14) | (15) | (41) | (1) | (42) | *(20)* |
| Gains (losses) on disposals | - | (1) | 142 | 141 | (7) | 134 | - |
| *Disposals of assets* | - | *(1)* | *142* | *141* | *(8)* | *133* | - |
| *Fair value adjustments due to change in control* | - | - | - | - | *1* | *1* | - |
| Impairment losses[(*)] | - | (6) | (2) | (8) | (26) | (34) | *(234)* |
| *Fully consolidated companies* | - | *(6)* | *(2)* | *(8)* | *(26)* | *(34)* | *(234)* |
| Amortisation of acquisition-related intangible assets | (6) | (79) | - | (85) | - | (85) | *(1)* |
| Expenses related to acquisitions and disposals | (1) | (2) | - | (3) | (1) | (4) | *(6)* |
| Purchase price adjustment | (1) | (1) | - | (2) | - | (2) | *(2)* |
| Impact of IFRS 16 on concession agreements | - | 60 | - | 60 | - | 60 | |
| *Gains and losses on leases* | - | *3* | - | *3* | - | *3* | |
| *Depreciation of right-of-use assets* | - | *(475)* | - | *(475)* | - | *(475)* | |
| *Decrease in lease liabilities* | - | *460* | - | *460* | - | *460* | |
| *Interest paid on lease liabilities* | - | *64* | - | *64* | - | *64* | |
| *Changes in working capital relating to lease liabilities* | - | *8* | - | *8* | - | *8* | |
| **Profit (loss) before finance costs and tax** | **201** | **113** | **115** | **429** | **(18)** | **411** | **(199)** |
| **Items included in recurring operating profit (loss) of fully consolidated companies** | | | | | | | |
| Depreciation and amortisation of property, plant and equipment and intangible assets | (34) | (130) | (11) | (175) | (5) | (180) | *(60)* |
| Depreciation of right-of-use assets – Buildings and other | (32) | (15) | (24) | (71) | - | (71) | *(12)* |
| Cost of free share plans | (3) | (2) | (1) | (6) | - | (6) | *(1)* |

(*) Impairment losses on goodwill, property, plant and equipment and intangible assets.


A-4169

# EXHIBIT Y

# UNIVERSAL REGISTRATION DOCUMENT
including the Annual Financial Report

**FISCAL YEAR 2021**





# UNIVERSAL REGISTRATION DOCUMENT

## including the Annual Financial Report

**Fiscal Year 2021**

**Lagardère SA**

A French joint-stock corporation (*société anonyme*) with share capital of €860,913,044.60

Registered office: 4 rue de Presbourg, 75016 Paris – France

Telephone: +33 (0)1 40 69 16 00

Registered with the Paris Trade and Companies Registry under number 320 366 446

Website: www.lagardere.com



The Universal Registration Document was filed on 18 March 2022 with the French financial markets authority (*Autorité des marchés financiers – AMF*) as competent authority under Regulation (EU) 2017/1129 without prior approval pursuant to article 9 of said Regulation.

The Universal Registration Document may be used for the purposes of an offer to the public of securities or admission of securities to trading on a regulated market if approved by the AMF, together with any amendments, if applicable, and a securities note and summary approved in accordance with Regulation (EU) 2017/1129.

The Universal Registration Document including the Annual Financial Report is a translation into English of the Annual Financial Report/Universal Registration Document, prepared in xHTML format and issued in French, and is available on the website of the AMF and of the Company.

*Lagardère*





**No. 3** CONSUMER PUBLISHING GROUP WORLDWIDE

**No. 1** PUBLISHING GROUP IN FRANCE

**No. 1** PUBLISHER OF PARTWORKS WORLDWIDE

| Revenue | Operating margin | Employees |
|---|---|---|
| **€2,598m** | **13.5%** | **6,919** |









over **200**
PUBLISHING BRANDS



over **115,000**
TITLES IN DIGITAL FORMAT



**16,000**
NEW RELEASES

**REVENUE
BY BUSINESS**



General Literature **42%**
Partworks **11%**
Other (including Reference and Distribution) **18%**
Education **12%**
Illustrated Books **17%**

**REVENUE
BY GEOGRAPHIC AREA**



France **30%**
United Kingdom **17%**
United States **25%**
Spain **5%**
Other **23%**

2021 Universal Registration Document  **5**

business, broaden the Elle branded business, grow the radio stations and diversify the revenue stream.

► **Lagardère Live Entertainment**, which is active in two segments:

– producing concerts (Florent Pagny, -M-, Jean-Louis Aubert, Jacques and Thomas Dutronc, Kev Adams, etc.) and shows (*Salut les copains*, *Les Choristes*, etc.);

– managing entertainment venues (Folies Bergère, Casino de Paris, Arkéa Arena and Arena du Pays d'Aix).

The live entertainment business was severely impacted by the Covid-19 pandemic and the health precautions mandated by the French government. However, as venues reopened, business

gradually recovered over the second half of the year. This meant that the concert and live show production business was able to resume for artists under contract with Lagardère Live Entertainment. In addition, more than 200 performances were organised in the venues it manages.

Given the persistence of the health crisis, the outlook for 2022 is still uncertain. Nevertheless, as of late December 2021, there were many 2022 dates booked in Lagardère Live Entertainment venues and several tours by artists managed by the division were already scheduled.

## 1.4.1   LAGARDÈRE PUBLISHING

### A) PRINCIPAL ACTIVITIES AND MAIN MARKETS

The world's third-largest Trade publisher for the general public and educational markets[1] (number one in France[2], number two in the United Kingdom[3], number three in Spain[4], and number four in the United States[5]), Lagardère Publishing is a federation of publishing companies with a large degree of editorial independence. They are united by common management rules, a concerted effort to expand in digital activities, a coordinated strategy in respect of the global distribution giants, and the same high standards required of the people appointed to positions of responsibility in each company.

Since its foundation in 1826, Hachette Livre has consistently sought to publish, sell and distribute high quality innovative books that satisfy its readers' thirst for knowledge, culture and entertainment. The Company's employees, who contribute to the growth and ongoing success of the division, continue to pursue this goal.

Hachette Livre has a well-balanced, diversified portfolio (Education, General Literature, Illustrated Books, Partworks, Dictionaries, Youth Works, Board Games, Mobile Games, Distribution, etc.). Publishing is predominantly in the three main language groups: English, Spanish and French. The portfolio offers new bases for expansion by geographic area and business line, allowing Lagardère Publishing to capitalise on the most buoyant segments and the most dynamic markets.

The division's business model is based on its publishing/distribution value chain. Thanks to its highly reputed publishing houses and brand names, it is able to draw the fullest benefit from its close relationships with authors, the expertise of its sales force, the rigorous logistics organisation of its distribution network (leader in France) and the commitment of its highly trained employees.

The autonomy of the publishing houses, which are independent and fully responsible for their own creative processes and editorial decisions, encourages both creativity and internal competition. The large degree of autonomy that Hachette Livre allows each of its operating divisions is one of the key factors of its success, since each division of Lagardère Publishing forms a federation of small and medium-sized independent publishing houses with their own

corporate culture and specific – not to mention unique – editorial tone.

Each publishing house is responsible for relations with its own authors. Excellent individual relationships enable publishers to control the copyright portfolio and offer seamless supply to the paperback sector. In France, they also give rise to merchandising opportunities.

Central management functions in turn enable Hachette Livre to devise an aligned strategy in digital technologies, negotiate from a better position with large accounts and suppliers, and leverage economies of scale.

These combined assets make Hachette Livre France's leading publishing group, ahead of competitors such as Editis, Madrigall, Albin Michel and Média Participations. Hachette Livre ranks number one in the General Literature paperback market, and first in Youth Works and Illustrated Books, as well as in the traditionally more concentrated Textbook, Travel and Dictionaries segments.

Outside France, Hachette Livre conducts its business alongside competitors such as Pearson, Penguin Random House, Scholastic, Simon & Schuster, HarperCollins, Planeta and Holtzbrinck. In just a few years, it has succeeded in moving up from the thirteenth to the third position among private capital publishers worldwide.

Most of its new publications are also published in France, the United Kingdom and the United States in digital formats that are marketed in the form of e-books on every platform and, increasingly, as downloadable audiobooks. Hachette Livre has begun to diversify into Board Games and Mobile Games, to explore new, fast-growing entertainment territories.

---

(1) World publishing rankings prepared internally by Hachette Livre based on:
- the annual financial reports of the groups in question (most cases);
- rankings appearing each year in *Livres Hebdo* (rankings prepared with Rüdiger Wischenbart Content and Consulting, and generally used subsequently in partnership with *The Bookseller*, *Publishers Weekly* and *Buchreport*), and which are sometimes based on direct contacts with the groups in question (i.e., when annual financial reports are not available);
- the ranking, which takes into account private publishing companies in the Textbook market (excluding professional, and scientific, technical and medical publishing) and general interest (Trade).
(2) Source: data from the GfK survey panel in France and the education group of the French publishers association.
(3) Source: internal analyses based on Nielsen BookScan in the United Kingdom.
(4) Source: data from the GfK survey panel in Spain.
(5) Source: data from NPD BookScan in the United States.



## A.1 IN FRANCE[(1)]

General Literature comprises prestigious publishing houses such as Grasset, Fayard, Stock, Calmann Lévy and Lattès. Each is prominent in a specific domain, but competes with the Group's other publishing houses and with rival publishing groups' brands. Le Livre de Poche, which releases paperback reprints for all of the division's publishing houses, as well as for many non-Group publishers, is today France's leading source of General Literature paperbacks. Lastly, Audiolib publishes audiobooks in CD and digital formats.

Hachette Illustré covers the entire range of Illustrated Books. It is number one in France for both Lifestyle (Hachette Pratique and Marabout) and Travel guides (Hachette Tourisme and Le Routard). Hachette Illustré is also number one in the high-quality illustrated book market with three prestigious publishers, Éditions du Chêne, EPA and Hazan, and in Youth Works (Hachette Jeunesse Disney, Hachette Jeunesse, Hachette Romans, Deux Coqs d'Or, Gautier-Languereau and Le Livre de Poche Jeunesse). Hachette Livre boasts valuable editorial assets in this market, including characters such as Asterix, Babar, Noddy and Fantômette.

In Textbooks, Hachette Livre is the leading publisher in France[(2)] thanks to Hachette Éducation and the Alexandre Hatier group and, following its acquisition in 2020, Le Livre Scolaire. These entities include such reputed publishers as Hachette, Hatier, Didier and Foucher and other strong brands (Bled, Bescherelle, Passeport, Littré and Gaffiot), enabling Hachette Livre to occupy a leading position on the extra-curricular book segment.

In Reference and Dictionaries, famous assets include the Larousse, Hachette and Harrap's brands. Hachette Livre is number one in France for both monolingual and bilingual dictionaries. With its international reputation, Larousse generates around 25% of its revenue outside France, and is particularly well established as a brand in Spanish language books.

The Academic and Professional division includes Dunod-Armand Colin, the leader in France's higher education market. In 2021, the acquisition of French publisher Maxima expanded the division's market coverage in books about business (management, marketing, finance, etc.), private wealth management (estate planning, stock market investing, etc.) and business-related self help.

Distribution for Hachette Livre and other non-Group publishing houses under exclusive contracts is carried out through a distribution network managed from the national centre in Maurepas. Hachette Livre handles around 245 million copies per year and supplies more than 15,000 bookshops, online booksellers, speciality stores, newsagents, news stands and supermarkets in France, while at the same time providing a high level of service with deliveries to booksellers in 24 or 48 hours. Hachette Livre Distribution, the number one distributor in France, also operates in Belgium, Switzerland and French speaking Canada.

## A.2 OUTSIDE FRANCE[(3)]

In 2021, Hachette UK was the United Kingdom's second-largest publisher, with 13.3%[(4)] of the print Trade book market through nine divisions: Octopus for Illustrated Books; Orion; Hodder & Stoughton; John Murray Press; Headline; Little, Brown; Quercus and Bookouture for General Literature; and Hachette Children's Group in the Youth Works segment.

These divisions and their brands have also enabled Hachette Livre to develop operations in Australia, New Zealand, Ireland, India, Singapore and the English-speaking Caribbean.

Hachette Livre is also a key player in the textbook market with Hodder Education, which ranks second in the market.

Lastly, Hachette Livre has a distribution business in the United Kingdom and, since 2019, an automated warehouse in Didcot (Oxfordshire).

Hachette España is the third-largest publisher in Spain and ranks as the leading publisher of textbooks through Anaya and Bruño. These two publishing houses are key players in the Education market, as well as in the extra-curricular books, General Adult Literature and Youth Works segments. It is also very well established in Spanish-speaking markets through its Larousse, Anaya, Bruño, Alianza, Algaida, Barcanova, Xerais and Salvat brands. In Mexico, Hachette Livre is one of the leading textbook publishers, under the Larousse and Patria brands.

In the United States, Hachette Book Group is the fourth-largest Trade book publisher thanks to imprints such as Grand Central Publishing, Little, Brown and Company, as well as Little, Brown Books for Young Readers in the Youth Works segment, FaithWords and Worthy Books in the religious segment, Orbit in science fiction, Perseus in non-fiction, Mulholland in crime fiction, etc. In 2021, the acquisition of Workman Publishing, a specialty publisher of youth works, illustrated books and non-fiction, strengthened Hachette Book Group's position in high-potential segments that fit well with the catalogues of the division's other imprints.

Hachette Livre also has distribution operations in the United States.

Partworks are published by the Hachette Collections division, and are sold per issue in news stands and by subscription. The Hachette Collections division has expanded internationally: Partworks are now published in 16 languages and 37 countries through subsidiaries based in France, the United Kingdom, Italy, Spain, Poland, Japan and Russia. This activity's marketing skills and capacity to create new products rigorously tested for compatibility with each market have made it the world leader, and a driving force behind Hachette Livre's overall performance.

Worldwide, Hachette Livre is represented either directly or indirectly in more than 70 countries across its various business lines and its 200 brands.

---

(1) Hachette Livre's competitive positions reflect data provided by the GfK panels to which the division subscribes.
(2) Source: internal estimates.
(3) Source: internal data, based on Nielsen BookScan in the United Kingdom, data from the GfK panel in Spain and NPD BookScan in the United States.
(4) Source: Nielsen.

## B) OPERATIONS DURING 2021

Contribution to consolidated revenue in 2021: €2,598 million (versus €2,375 million in 2020).

### Breakdown of revenue by activity

|  | 2021 | 2020 |
|---|---|---|
| Education | 12.5% | 13.6% |
| Illustrated Books | 17.1% | 14.0% |
| General Literature | 41.8% | 44.7% |
| Partworks | 11.4% | 11.2% |
| Other (including Reference and Distribution) | 17.2% | 16.5% |
| **Total** | **100%** | **100%** |

### Breakdown of revenue by geographic area

|  | 2021 | 2020 |
|---|---|---|
| France | 29.6% | 27.9% |
| United Kingdom | 17.3% | 18.0% |
| United States | 25.4% | 26.5% |
| Spain | 5.2% | 5.5% |
| Other | 22.5% | 22.1% |
| **Total** | **100%** | **100%** |

The global publishing market enjoyed sustained growth in every geographic area in 2021, with particularly buoyant demand in such segments as Youth Works and Illustrated Books.

In France, where the market ended 2020 down slightly after a first half impacted by strict lockdown measures and a robust rebound as from June, demand rose by a vibrant 22.1%[1] in value in 2021 and ended the year 19.9%[1] ahead of 2019.

Growth in Spain was more mixed, with sluggish demand in Education due to the lack of curriculum reform during the year and faster momentum in the Trade market, led by strong sales of Youth Works and graphic novels. Overall, the market ended the year up 16.3% in value.

In the English-speaking markets, print book sales rose by 3.6%[2] in the United Kingdom and by 8.9%[3] in the United States, with sustained growth in online sales. Downloadable audiobooks also pursued their robust growth, while e-book sales, which had soared during the lockdowns in 2020, flattened out during the year, especially in the United States.

Against this backdrop, Lagardère Publishing reported revenue of €2,598 million, up 9.4% as reported and 8.1% like-for-like, and recurring operating profit of €351 million, up 43%. The division's leading positions in fast-growing market segments, combined with major bestsellers, enabled it to capture favourable market trends in every geographic area. In addition, cost discipline and a favourable sales mix helped to improve division margins.

Lagardère Publishing is pursuing the same strategy built on nine core objectives:

**1.** constantly explore new growth opportunities by making the high value-creating acquisitions needed to maintain the division among the top-ranking publishing groups worldwide, which is an essential advantage conferring extra influence in negotiations with major customers. These acquisitions may also extend to related segments such as Board Games, in a commitment to reaching consumers who are shifting from books to other forms of entertainment;

**2.** spread risks across a significant number of markets and market segments to smooth the cyclical effects specific to each one;

**3.** concentrate acquisitions and the creation of new subsidiaries in countries belonging to language areas that offer critical mass in terms of potential markets;

**4.** offer publishing subsidiaries broad editorial independence to foster creativity, rapid response and team motivation, and therefore the ability to attract and retain the talented people who are the foundation of the division's organisation and success. This talent is what enables our publishers to discover, support and successfully develop the work of their authors;

**5.** actively seek out international bestsellers able to attract an extensive readership in all of the division's markets;

**6.** manage distribution both as a cost centre and a strategic link in the book value chain, in all of the division's markets;

**7.** continue to invest heavily in digital technologies to understand and satisfy authors, booksellers and readers more effectively;

**8.** selectively invest in high-growth markets;

**9.** an ambitious CSR strategy aimed at promoting a more ecological and inclusive development model.

---

(1) Source: GfK (by value).
(2) Source: Nielsen BookScan (by value).
(3) Source: NPD BookScan (by volume).



## B.1  IN FRANCE

In France, the business recorded strong growth in 2021 across all segments except Education.

Hachette Education, the Alexandre Hatier group and Le Livre Scolaire suffered from the lack of curriculum reform during the year and a decline in demand for extra-curricular works, primarily due to the cancellation of final baccalaureate exams. Note, however, that the Alexandre Hatier group's Youth Works publishers Rageot and Didier Jeunesse delivered solid gains, led by a number of bestsellers in a buoyant market.

The Illustrated Books segment reported record high revenue in 2021, lifted by the release of a new Asterix album (*Asterix and the Griffin*) in October and by rising demand coupled with major bestsellers. The Lifestyle imprints made a positive contribution to revenue growth, thanks to bestsellers and sustained cookbook sales. This was also the case for manga, which benefitted from the success of the *Attack on Titan* series and, more broadly, a very favourable market dynamic, driven in part by the wider distribution of Culture Pass vouchers in the spring.

Larousse also reported higher revenue, with a sharp gain in the Lifestyle segment supported by strong sales of influencer titles (including *T12S – Transformation 12 semaines*) and the continued popularity of cookbooks.

Lastly, General Literature continued to grow following an already exceptional performance in 2020. Over the year, Le Livre de Poche's paperback sales rose to record heights and Audiolib saw an increase in downloads of its audiobooks. Large-format publishers also enjoyed higher revenue, particularly Grasset with the success of Delphine Horvilleur's essay *Vivre avec nos morts* and Laetitia Colombani's new novel *Le cerf-volant*. In addition, Stock had a good year-end with the success of Clara Dupont-Monod's *S'adapter*, which won three awards (Prix Goncourt des lycéens, Prix Femina and Prix Landerneau des lecteurs). After the release of two titles by Guillaume Musso in 2020, Calmann-Lévy's revenue was stable in 2021, which saw the publication of Laurent Gounelle's new novel, *Intuitio*, and the success of Guillaume Musso's latest, *L'inconnue de la Seine*. Similarly, Lattès capitalised on E.L. James's new novel, *More Grey*, and the success of *Impressions et lignes claires*, the political essay by Edouard Philippe and Gilles Boyer. Conversely, Fayard saw revenue decline from 2020, when it was boosted by the publication of the French translation of the first volume of Barack Obama's memoirs, *A Promised Land*.

## B.2  OUTSIDE FRANCE

### United States

Hachette Book Group (HBG) reported a 3.7% increase in revenue in 2021, excluding the impact of consolidating Workman Publishing.

Business at Orbit and Little, Brown Books for Young Readers declined during the year due to the lack of bestsellers on a par with those released in 2020 (*The Witcher* and *Midnight Sun* respectively).

However, the other imprints reported growth thanks to a dense release schedule at Grand Central Publishing (with titles by singer Billie Eilish, Admiral William H. McRaven and actor Jamie Foxx), at Little, Brown and Company (with the release of *The President's Daughter*, the second novel co-written by Bill Clinton and James Patterson) and at religious imprint FaithWords. In addition, after being heavily impacted by the health crisis in 2020, Perseus enjoyed a rebound in business led by strong sales of backlist titles and a decline in returns.

The year also saw the acquisition in late September of Workman Publishing, a speciality publisher of youth works, illustrated books and non-fiction.

Lastly, sales of downloadable audiobooks declined by 7% in 2021. This was attributable to the unfavourable comparison with an exceptionally strong 2020, when successive lockdowns spurred demand for digital formats and certain titles enjoyed unprecedented success in audio format (notably *The Witcher* saga by Andrzej Sapkowski and *Talking to Strangers* by Malcolm Gladwell). Similarly, e-book sales fell by an even steeper 21% for similar reasons, plus declining demand.

### United Kingdom and the Commonwealth

After an excellent 2020, Hachette UK delivered a record year in 2021 with like-for-like growth of 2.5% in a Trade print book market up 3.6%[1].

The gains primarily stemmed from (i) strong Youth Works sales at Hachette Children's Group, led by the success of backlist titles in Leigh Bardugo's Grisha saga (which was developed into a Netflix series), and (ii) the publication of a new J. K. Rowling title in a buoyant market. Overseas sales also rose during the year, particularly in Australia, where they had been dampened by the drastic lockdown measures in 2020. The Adult Trade imprints turned in a more mixed performance, with Orion hurt by the lack of any bestsellers on a par with *The Witcher* in 2020, but robust growth at John Murray Press, thanks to the success of Billy Connolly's autobiography, *Windswept & Interesting*, and at Hodder & Stoughton, supported by the sustained growth in backlist sales.

Following a 2020 impacted by prolonged school closures, the Education segment also rebounded on firm demand during the assessment period when schools reopened in spring 2021. Lastly, the business was strengthened during the year by the acquisition of two textbook publishers, Illuminate Publishing and John Catt Educational.

Sales in the Digital business were mixed, with audiobooks gaining 12% but e-books sliding 6.4% after a 2020 that amid hard lockdowns was very favourable to the format.

### Spain and Latin America

Sales in Spain rose over the year, buoyed by sustained demand in General Literature, which benefitted from Bruño's release of a new Asterix album. In addition, all the Trade imprints reported higher revenue. Lastly, the final quarter saw the creation of a new Commercial Fiction imprint, Contraluz, which will strengthen the Spanish organisation's positioning in the Trade segment.

Business in the Education segment was generally sluggish year-on-year due to the absence of any curriculum reform and a certain amount of buyer hesitation following enactment of the Ley Orgánica de Modificación de la Ley Orgánica de Educación (LOMLOE), which provides for curriculum reforms beginning in 2022.

In Latin America, after a first half shaped by a steep decline in business and an upsurge in returns during the prolonged school closures, a gradual recovery in the second half enabled Larousse Mexico and Patria to end 2021 in growth. In addition, the organisation was rationalised with the goal of positioning it more effectively to seize the growth opportunities offered by the market.

### Partworks

Following a 2020 impacted by the health crisis in every geographic area and by Presstalis' difficulties in France, Partworks sales improved strongly over the year, with revenue gains in France, Japan and Latin America.

---

(1) Source: Nielsen BookScan (by value).

## 5.2 PRESENTATION OF THE FINANCIAL POSITION AND CONSOLIDATED FINANCIAL STATEMENTS OF LAGARDÈRE SA



**Comments on the Lagardère SA consolidated financial statements at 31 December 2021**

The consolidated financial statements have been prepared in accordance with International Financial Reporting Standards (IFRS), as described in note 1 to the consolidated financial statements, "Accounting principles".

In 2018, the Group launched a strategic refocusing around two priority divisions (Lagardère Publishing and Lagardère Travel Retail), and around its Other Activities business (Lagardère News and Lagardère Live Entertainment). The Group restructured in 2019 in the wake of the successive disposals of Lagardère Active and Lagardère Sports assets.

Its internal reporting is now based on a **target business scope**, comprising:

▸ **Lagardère Publishing** which includes the Group's Book Publishing and e-Publishing businesses, covering such areas as Education, General Literature, Illustrated Books, Partworks, Dictionaries, Youth Works, Board Games, Mobile Games and Distribution.

▸ **Lagardère Travel Retail** which consists of retail operations in transit areas and concessions in three business segments: Travel Essentials, Duty Free & Fashion, and Foodservice.

The target scope also includes "**Other Activities**", which groups together Lagardère News (Paris Match and Le Journal du Dimanche magazine titles, Europe 1, RFM and Virgin Radio stations, and the Elle brand licence), Lagardère Live Entertainment, Lagardère Paris Racing, and the Group Corporate function. The Corporate function is used primarily to report the effect of financing obtained by the Group and the net operating costs of Group holding companies.

**Lagardère Sports** was sold on 22 April 2020 and **Lagardère Studios** on 30 October 2020.

**Assets sold relating to the former Lagardère Active division (Lagardère Studios)** and **Lagardère Sports** were separately monitored up to the date of their sale.

The main changes in the scope of consolidation between 2020 and 2021 are described in note 4 to the consolidated financial statements.

### 5.2.1 CONSOLIDATED INCOME STATEMENT

| (in millions of euros) | 2021 | 2020 |
|---|---|---|
| Revenue | 5,130 | 4,439 |
| Recurring operating profit (loss) of fully consolidated companies [*] | 249 | (155) |
| Income (loss) from equity-accounted companies [*] | 1 | (58) |
| Non-recurring/non-operating items | (184) | (336) |
| *of which impact of IFRS 16 on concession agreements* [**] | *(25)* | *(17)* |
| Profit (loss) before finance costs and tax | 66 | (549) |
| Finance costs, net | (64) | (76) |
| Interest expense on lease liabilities | (68) | (74) |
| Income tax benefit (expense) | (22) | 31 |
| Profit (loss) from discontinued operations | 2 | (20) |
| Profit (loss) for the period | (86) | (688) |
| Attributable to: | | |
| - Owners of the Parent | (101) | (660) |
| - Minority interests | 15 | (28) |

(*) Recurring operating profit of fully consolidated companies is an alternative performance measure taken from the segment information section of the consolidated financial statements (see reconciliation in note 5 to the consolidated financial statements), and is defined as the difference between profit (loss) before finance costs and tax and the following income statement items:
• income (loss) from equity-accounted companies;
• gains (losses) on disposals of assets;
• impairment losses on goodwill, property, plant and equipment, intangible assets and investments in equity-accounted companies;
• net restructuring costs;
• items related to business combinations:
  - acquisition-related expenses,
  - gains and losses resulting from purchase price adjustments and fair value adjustments due to changes in control,
  - amortisation of acquisition-related intangible assets;
• specific major disputes unrelated to the Group's operating performance;
• items related to leases and to finance sub-leases:
  - excluding gains and losses on leases,
  - excluding depreciation of right-of-use assets under concession agreements,
  - including decreases in lease liabilities under concession agreements,
  - including interest paid on lease liabilities under concession agreements,
  - including changes in working capital relating to lease liabilities under concession agreements.
(**) Before impairment losses.
(***) Including gains and losses on leases.

Items appearing in the Annual Financial Report are cross-referenced with the following symbol **AFR**



**192** 2021 Universal Registration Document

Revenue for the Lagardère group came in at €5,130 million for 2021, up 15.6% as reported and up 18.6% like-for-like[1].

The difference between consolidated and like-for-like revenue is essentially attributable to a €29 million negative foreign exchange effect, partly reflecting the depreciation of the US dollar (negative €47 million impact) and the appreciation of pound sterling (positive €20 million impact). The €78 million negative scope effect relates chiefly to the impact of the disposal of Lagardère Studios and the acquisitions by Lagardère Publishing of Workman Publishing in September 2021 and Laurence King Publishing in September 2020.

**Revenue for Lagardère Publishing** totalled €2,598 million, up 9.4% as reported and up 8.1% like for like. The substantial revenue growth at Lagardère Publishing reflects strong demand from readers of all ages for all types of content (especially manga and graphic novels) and media in all geographic areas.

The difference between consolidated and like-for-like revenue is attributable to the combined impact of a €8 million negative foreign exchange effect resulting mainly from the depreciation of the US dollar, and a €39 million positive scope effect, due notably to the acquisitions of Workman Publishing and Laurence King Publishing.

In France, revenue for the division leapt by 13.8% in 2021. General Literature sales were driven by a host of successful titles across all of the publishing houses, and Illustrated Books also saw strong growth during the year, especially Lifestyle and Youth Works such as manga and graphic novels (with the publication of Asterix and the Griffin in October and the success of the Attack of the Titans series at Pika). Reader demand for these publications also boosted Distribution revenue with third-party publishers. As expected, Education was the only segment on the retreat, due to the lack of curriculum reform.

In the United Kingdom, the 2.5% increase on the exceptional prior-year revenue performance was driven by front and backlist momentum in Youth Works and Adult Trade titles.

In the United States, sustained growth of 3.7% was achieved on the back of major editorial successes in 2020, driven by a favourable release schedule and hit titles in the Youth Works segment. Distribution activities also benefited from a dynamic third party publisher market.

In Spain/Latin America, revenue grew by 5.0% thanks to brisk momentum in Spain – especially in the Trade segment, underpinned by the release of *Asterix and the Griffin* – and to the upturn in sales in the second half of the year in Mexico.

Revenue from sales of Partworks surged by 13.9%, thanks to successful backlist collections and new releases in the first half of 2021 in all geographic areas.

Following an exceptionally strong year for digital formats due to successive full lockdowns, E-books accounted for 7.7% of total Lagardère Publishing revenue in 2021, while digital audio books represented 3.8% of revenue (9.5% and 4.3%, respectively in 2020).

**Revenue for Lagardère Travel Retail** totalled €2,290 million, up 33.1% as reported and up 34.3% like for like. The difference reflects a negative foreign exchange impact of €21 million, attributable to the depreciation of the US dollar.

In France, revenue for the division jumped by 25.7% year on year due to the gradual pick-up in national and regional travel as restrictions were eased.

The EMEA region (excluding France) advanced by 18.8% year on year also under the impetus of the partial resumption of travel, led by countries with large domestic networks, especially rail stations (Romania, Czech Republic and Bulgaria).

North America recorded steep revenue growth of 72.5% year on year, driven by the recovery in domestic air traffic which gathered pace throughout the year.

Asia-Pacific revenue was up 28.7% year on year, thanks to sharp 63.4% growth in China lifted by consumer demand and network expansion, which more than offset the decline in sales in the Pacific region in the wake of border closures.

**Revenue for Other Activities** totalled €242 million, up 5.7% on a reported basis and up 6.9% like for like. The difference is due to a negative scope effect of €2 million.

Lagardère News sales were up 4.5%. Press revenue advanced by 2.9%, driven by a good advertising performance. Entertainment activities were up by 19.1%, benefiting from the easing of restrictions in various countries, coupled with international advertising campaigns and a more diverse revenue stream. On the other hand, Radio revenue edged back by 1.7% due to lower audience figures resulting from the trend towards home working.

**Recurring operating profit of fully consolidated companies** amounted to €249 million, up sharply by €404 million on 2020.

**Lagardère Publishing reported €351 million in recurring operating profit**, up sharply by €105 million on 2020 and corresponding to an operating margin of 13.5%. This record margin was driven by business growth, a favourable sales mix and disciplined cost control.

**Lagardère Travel Retail** reported negative recurring operating profit of fully consolidated companies of €81 million, a €272 million improvement on 2020, with the flow-through ratio standing at 11.8% versus 2019 on a reported basis. The better-than-expected performance reflects the major efforts undertaken by the division over the period to control its costs and optimise opening hours when stores reopened.

Costs were slashed by €1,698 million in 2021 compared to 2019. The decrease in the cost base included a €563 million reduction in fixed costs – of which €381 million relating to fixed lease payments for concessions – mainly by renegotiating terms on concessions, adapting point-of-sale operations in line with air traffic trends, adjusting payroll costs and cutting other overhead costs.

**Other Activities posted a recurring operating loss of €21 million**, a €26 million year-on-year improvement that was mainly attributable to the more favourable business environment and cost-cutting measures still in place. As announced, corporate costs were reduced significantly to €45 million in 2021, representing a €25 million decrease compared to 2019.

**Income from equity-accounted companies** (before impairment losses) came in at €1 million in 2021, versus a loss of €58 million in 2020, with the improved performance stemming from the gradual business recovery at Lagardère Travel Retail in an environment that remains challenging, particularly at Société de Distribution Aéroportuaire, Relay@ADP and Lagardère & Connexions.

**Non-recurring/non-operating items** represented net expense of €184 million in 2021, comprising:

▸ €17 million in **impairment losses against property, plant and equipment and intangible assets**, including €15 million at Lagardère Travel Retail, mainly due to point-of-sale closures, the non-renewal and termination of concessions, particularly in the United States, and €2 million concerning the impairment of Casino de Paris goodwill at Lagardère Live Entertainment;

▸ €115 million in **amortisation of intangible assets and costs attributable to acquisitions and disposals**, including €101 million for Lagardère Travel Retail, mainly relating to concession agreements in North America (Paradies Lagardère, HBF and Vino Volo), Italy (Rome airport and Airest) and Belgium (IDF); and €14 million for Lagardère Publishing;

---

(1) Based on constant Group structure and exchange rates.



▸ €44 million in **restructuring costs**, including €33 million for Other Activities in connection with the costs of converting Lagardère SCA into a joint-stock company, and reorganisation costs at Lagardère News, Lagardère Publishing (€9 million) and Lagardère Travel Retail (€2 million);

▸ a net €17 million **gain on disposals**, corresponding mainly to the sale of minority interests in Glénat and J'ai Lu at Lagardère Publishing;

▸ the €25 million negative **impact of applying IFRS 16 on concession agreements**, of which €30 million at Lagardère Travel Retail (including gains and losses on leases). This includes the straight-line depreciation of right-of-use assets, partially offset by proceeds from certain reductions in fixed lease payments in 2021.

In 2020, non-recurring/non-operating items represented a net negative amount of €336 million, including (i) €7 million in net disposal losses; (ii) €55 million in restructuring costs, mainly in connection with the restructuring and layoff measures introduced at Lagardère Travel Retail due to the health crisis; (iii) €106 million in amortisation of intangible assets and expenses relating to acquisitions of consolidated companies, of which €94 million at Lagardère Travel Retail relating to concession agreements; (iv) €151 million in impairment losses, including impairment of concession agreements in Rome and Belgium at Lagardère Travel Retail, impairment of assets in Spain and Latin America at Lagardère Publishing, impairment of Bataclan goodwill and impairment of audiovisual production assets (relating to the sale of Lagardère Studios); and (v) the negative €17 million impact of applying IFRS 16 to concession agreements at Lagardère Travel Retail.

As a result of the above, the **profit before finance costs and tax** came out at €66 million for 2021, versus a loss of €549 million one year earlier.

**Net finance costs** amounted to €64 million in 2021, down on the 2020 figure despite the higher cost of debt resulting from the refinancing carried out in late 2020 and October 2021. The improvement in this caption reflects the receipt of dividends from non-consolidated investments in 2021 and the fact that the impairment losses recognised on loans at Lagardère Travel Retail in the comparative year did not recur in 2021.

**Interest expense on lease liabilities** represented €68 million in 2021, versus €74 million in 2020. The €6 million decrease in this item results from the decrease in lease liabilities at Lagardère Travel Retail following the renegotiation of its leases.

In 2021, **income tax expense** amounted to €22 million, an increase of €53 million compared to 2020, further to the business recovery in all geographic areas, especially the United States. In 2020, income tax expense also included deferred tax income arising on tax losses for the period and impairment losses against concession agreements at Lagardère Travel Retail.

In 2021, the €2 million in **profit from discontinued operations** includes changes in provisions for vendor warranties and the outstanding balance of costs related to the sale of Lagardère Sports. In 2020, this item included the disposal losses and earnings at Lagardère Sports up until its sale in April 2020.

**Profit (loss) attributable to minority interests** in 2021 amounted to €15 million, versus a loss of €28 million attributable to minority interests in 2020. The year-on-year change chiefly reflects the sharp rebound in Lagardère Travel Retail's earnings.



**Lagardère** **CHAPTER 5** - Net assets, financial position and results

## 5.1 SEGMENT INFORMATION

### 2021 income statement

| | Lagardère Publishing | Lagardère Travel Retail | Other Activities | Total target scope | Assets sold and disposals pending completion at Lagardère Active | Total | *Lagardère Sports* |
|---|---|---|---|---|---|---|---|
| Revenue | 2,604 | 2,290 | 242 | 5,136 | - | 5,136 | - |
| Inter-segment revenue | (6) | - | - | (6) | - | (6) | - |
| Consolidated revenue | 2,598 | 2,290 | 242 | 5,130 | - | 5,130 | - |
| Other income from ordinary activities | 5 | 12 | 24 | 41 | | 41 | - |
| Total income from ordinary activities | 2,603 | 2,302 | 266 | 5,171 | | 5,171 | - |
| Recurring operating profit (loss) of fully consolidated companies | 351 | (81) | (21) | 249 | - | 249 | - |
| Income (loss) from equity accounted companies before impairment losses | 7 | (6) | - | 1 | | 1 | - |
| Restructuring costs | (9) | (2) | (33) | (44) | | (44) | - |
| Gains (losses) on disposals | 16 | - | 1 | 17 | | 17 | *2* |
| *Disposals of assets* | *16* | *-* | *1* | *17* | | *17* | *2* |
| *Fair value adjustments due to change in control* | *-* | *-* | *-* | *-* | | *-* | *-* |
| Impairment losses[*] | - | (15) | (2) | (17) | | (17) | - |
| *Fully consolidated companies* | *-* | *(15)* | *(2)* | *(17)* | | *(17)* | *-* |
| Amortisation of acquisition related intangible assets | (7) | (90) | - | (97) | | (97) | - |
| Expenses related to acquisitions and disposals | (7) | (5) | - | (12) | | (12) | - |
| Purchase price adjustment | - | (6) | - | (6) | | (6) | - |
| Impact of IFRS 16 on concession agreements | 5 | (30) | - | (25) | | (25) | - |
| *Gains and losses on leases* | *5* | *126* | *-* | *131* | | *131* | *-* |
| *Depreciation of right-of-use assets* | *-* | *(307)* | *-* | *(307)* | | *(307)* | *-* |
| *Decrease in lease liabilities* | *-* | *142* | *-* | *142* | | *142* | *-* |
| *Interest paid on lease liabilities* | *-* | *5* | *-* | *5* | | *5* | *-* |
| *Changes in working capital relating to lease liabilities* | *-* | *4* | *-* | *4* | | *4* | *-* |
| Profit (loss) before finance costs and tax | 356 | (235) | (55) | 66 | - | 66 | *2* |
| Items included in recurring operating profit (loss) of fully consolidated companies | | | | | | | |
| Depreciation and amortisation of property, plant and equipment and intangible assets | (41) | (137) | (11) | (189) | - | (189) | - |
| Depreciation of right-of-use assets – Buildings and other | (32) | (14) | (21) | (67) | - | (67) | - |
| Cost of free share plans | (3) | (2) | (2) | (7) | - | (7) | - |

(*) Impairment losses on goodwill, property, plant and equipment and intangible assets.

**222** 2021 Universal Registration Document

## 2020 income statement

| | Lagardère Publishing | Lagardère Travel Retail | Other Activities | Total target scope | Assets sold and disposals pending completion at Lagardère Active | Total | Lagardère Sports |
|---|---|---|---|---|---|---|---|
| Revenue | 2,379 | 1,720 | 229 | 4,328 | 115 | 4,443 | *84* |
| Inter-segment revenue | (4) | - | - | (4) | - | (4) | - |
| **Consolidated revenue** | **2,375** | **1,720** | **229** | **4,324** | **115** | **4,439** | *84* |
| Other income from ordinary activities | 4 | 18 | 21 | 43 | (2) | 41 | *2* |
| **Total income from ordinary activities** | **2,379** | **1,738** | **250** | **4,367** | **113** | **4,480** | *86* |
| **Recurring operating profit (loss) of fully consolidated companies** | **246** | **(353)** | **(47)** | **(154)** | **(1)** | **(155)** | *(2)* |
| Income (loss) from equity accounted companies before impairment losses | 2 | (59) | (1) | (58) | - | (58) | - |
| Restructuring costs | (9) | (36) | (10) | (55) | - | (55) | *(3)* |
| Gains (losses) on disposals | - | - | (6) | (6) | (1) | (7) | *(14)* |
| *Disposals of assets* | *-* | *-* | *(6)* | *(6)* | *(1)* | *(7)* | *(14)* |
| *Fair value adjustments due to change in control* | *-* | *-* | *-* | *-* | *-* | *-* | *-* |
| Impairment losses[(*)] | (20) | (106) | (6) | (132) | (19) | (151) | - |
| *Fully consolidated companies* | *(20)* | *(106)* | *(6)* | *(132)* | *(19)* | *(151)* | *-* |
| Amortisation of acquisition-related intangible assets | (7) | (97) | - | (104) | - | (104) | - |
| Expenses related to acquisitions and disposals | (4) | - | (1) | (5) | - | (5) | - |
| Purchase price adjustment | - | 3 | - | 3 | - | 3 | - |
| Impact of IFRS 16 on concession agreements | - | (17) | - | (17) | - | (17) | - |
| *Gains and losses on leases* | *-* | *171* | *-* | *171* | *-* | *171* | *-* |
| *Depreciation of right-of-use assets* | *-* | *(401)* | *-* | *(401)* | *-* | *(401)* | *-* |
| *Decrease in lease liabilities* | *-* | *175* | *-* | *175* | *-* | *175* | *-* |
| *Interest paid on lease liabilities* | *-* | *32* | *-* | *32* | *-* | *32* | *-* |
| *Changes in working capital relating to lease liabilities* | *-* | *6* | *-* | *6* | *-* | *6* | *-* |
| **Profit (loss) before finance costs and tax** | **208** | **(665)** | **(71)** | **(528)** | **(21)** | **(549)** | *(19)* |
| **Items included in recurring operating profit (loss) of fully consolidated companies** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Depreciation and amortisation of property, plant and equipment and intangible assets | (36) | (138) | (10) | (184) | (3) | (187) | *(5)* |
| Depreciation of right-of-use assets – Buildings and other | (32) | (16) | (23) | (71) | (1) | (72) | *(3)* |
| Cost of free share plans | (3) | (1) | (1) | (5) | - | (5) | - |

(*) Impairment losses on goodwill, property, plant and equipment and intangible assets.

| NOTE 6 | REVENUE |
|---|---|

Revenue for the Lagardère group came in at €5,130 million for 2021, up 15.6% as reported and up 18.6% like for like.

The like-for-like change in revenue is calculated by comparing:

▶ 2021 revenue to exclude companies consolidated for the first time during the year, and 2020 revenue to exclude companies divested in 2021;

▶ revenue for 2020 and revenue for 2021 adjusted based on the exchange rates applicable in 2020.

The difference between consolidated and like-for-like revenue is essentially attributable to a €29 million negative foreign exchange effect, partly reflecting the depreciation of the US dollar (negative €47 million impact) and the appreciation of pound sterling (positive €20 million impact). The €78 million negative scope effect chiefly relates to the sale of Lagardère Studios in October 2020. This was countered by the favourable impact of Lagardère Publishing's acquisition of Workman Publishing in September 2021 and of Laurence King Publishing in September 2020.

E-books accounted for 7.7% of total Lagardère Publishing revenue in 2021 (9.5% in 2020), while digital audiobooks represented 3.8% of revenue (4.3% in 2020).

Revenue breaks down as follows by business and by division:

| | 2021 | 2020 |
|---|---|---|
| **Lagardère Publishing** | **2,598** | 2,375 |
| General Literature | **1,085** | 1,061 |
| Illustrated Books | **443** | 332 |
| Education | **325** | 323 |
| Partworks | **297** | 265 |
| Other | **448** | 394 |
| **Lagardère Travel Retail** | **2,290** | 1,720 |
| Travel Essentials | **998** | 752 |
| Duty Free & Fashion | **795** | 598 |
| Foodservice | **497** | 370 |
| **Other Activities** | **242** | 229 |
| Press | **108** | 100 |
| French Radio | **96** | 100 |
| Other | **38** | 29 |
| **Lagardère Active – non-retained assets** | **-** | 115 |
| Audiovisual Production | **-** | 115 |
| **Total** | **5,130** | 4,439 |

A-4183

Revenue breaks down as follows by country and by division:

| | 2021 | 2020 |
|---|---|---|
| **Lagardère Publishing** | **2,598** | 2,375 |
| France | **767** | 662 |
| United States and Canada | **734** | 689 |
| United Kingdom, Ireland and Oceania | **527** | 499 |
| Spain | **136** | 131 |
| Other Europe | **222** | 196 |
| Other | **212** | 198 |
| **Lagardère Travel Retail** | **2,290** | **1,720** |
| Europe, Middle East and Africa (excluding France) | **887** | 748 |
| United States and Canada | **690** | 413 |
| France | **427** | 341 |
| China | **240** | 145 |
| Other Asia-Pacific | **46** | 73 |
| **Other Activities** | **242** | **227** |
| France | **199** | 193 |
| Asia-Pacific | **15** | 14 |
| Western Europe | **15** | 14 |
| United States and Canada | **13** | 6 |
| **Lagardère Active – non-retained assets** | **-** | **115** |
| France | **-** | 53 |
| Western Europe | **-** | 62 |
| **Total** | **5,130** | **4,437** |

A-4184

# EXHIBIT Z

PW
PUBLISHERS WEEKLY

SELF-PUB  booklife.    JOBZONE    THE MILLIONS    U.S. BOOK SHOW

SUBSCRIBE: PRINT + DIGITAL | LOGIN | SITE LICENSE ACCESS
FREE NEWSLETTERS

Search Publishers Weekly

NEWS | REVIEWS | BESTSELLERS | CHILDREN'S | AUTHORS | ANNOUNCEMENTS | DIGITAL | INTERNATIONAL | OPINION

Obituaries | Book Deals | Financial Reporting | Page to Screen | Bookselling | Awards & Prizes | Publisher News | Comics | Business Deals | Shows & Events |

Cooking | People | Religion | Audio Books | Manufacturing | Marketing | PW Tip Sheet | Licensing | U.S. Book Show | News Briefs

Home > News > Bookselling

QUICKLINKS

Acquisitions Editor Professional Resources - Teacher Created Materials - Minneapolis,    NEXT JOB ▶

# A Year for the (Record) Books in Publishing

Unit sales hit an all-time high at BookScan in 2020

By Jim Milliot | Jan 29, 2021

Like 709    Share    Tweet     Comments    SUBSCRIBE by the Month



photo credit: bookmarked

Combined print book and e-book sales hit 942 million units in 2020 at outlets that report to NPD BookScan, a 9% increase over 2019 and the most unit sales recorded in a single year by BookScan since the service was created in 2004. In a webinar held last week, Kristen McLean, executive director of NPD Books, said the gain was due to a combination of strong sales of both print and digital books.

Print sales rose 8.2% over 2019, the largest annual increase since 2005, and the print total of 751 million units sold was the highest since 2009, the year before e-books started to become a meaningful part of the book business. E-book unit sales, as measured by NPD's PubTrack Digital service, rose 12.6% over 2019 and were at their highest level since 2015, when 208 million units were sold (e-book sales figures for November and December are projections).

McLean attributed the improvement in e-book sales to several factors, including their immediate availability when stores were locked down and people were doing lots of shopping online. Adult fiction had the largest sales increase among e-book categories, followed by adult nonfiction, and McLean said she expects digital sales to continue to do well in 2021.

An important driver of print book sales last year was the continuing increase in backlist sales, McLean said. Backlist titles accounted for 67% of all print units purchased in 2020, up from 63% the year before. In 2010, backlist accounted for only 54% of all unit sales. McLean noted that the increased popularity of online shopping was a major reason in the growth of backlist, since it is easier to find backlist books than it is to discover new titles online.

RELATED STORIES:

- PW issue Contents
- More in News -> Bookselling
- More in articles by Jim Milliot

Request permission to reprint this article.

FREE E-NEWSLETTERS

## MORE FROM PW



Summer Reads 2022

PW Picks: Books of the Week

New Pub Dates for Forthcoming Books

10 Essential Works of Fabulist Fiction

## FEATURED REVIEWS

Enter e-mail address
☑ PW Daily ☑ Tip Sheet
SUBSCRIBE  More Newsletters

Selling 2020 virtual and hard drove sales to unstable heights before falling off immediately after the onset of the pandemic. The low point was the week of April 12 (the week after Easter), when 2020 sales were down 3.5% compared to the similar period in 2019. After that, sales rose steadily for the remainder of the year, including during the nine-week holiday period, when they were up 12% over 2019. The holiday shopping pattern was very different in 2020 compared to most years, McLean said, as more customers shopped early. Sales were also exceptionally strong after Christmas.

During the course of the year, book sales came in waves, McLean said, pointing to the big jump in juvenile nonfiction purchases soon after schools locked down in the spring, followed by increasing sales early in the summer tied to the Black Lives Matter movement, as well as gains in adult fiction driven by summer reads. Political books did well in early fall, and the year closed with a good selection of holiday titles, plus Barack Obama's blockbuster, *A Promised Land*.

Looking at 2021, McLean said some of the trends that were accelerated by the pandemic last year will continue. According to NPD's Checkout service (which measures receipts across a wide range of retailers), online sales rose 43% in 2020. McLean believes a large portion of consumers who shopped online for the first time in 2020 will continue to shop online this year, because of its convenience and the fact that physical retailers are unlikely to fully reopen until the summer and fall. The slow vaccination rollout is also likely to cause more "upheaval" in the physical retail market, as stores that hung on through the holidays may find it difficult to bounce back. McLean sees mass market retailers, who did well with books last year, continuing to champion books—especially children's titles.

Among the categories that BookScan predicts will do well this year are cooking and travel, the latter of which was battered in 2020 but is expected to rebound. As for sales overall, McLean said it will be a "challenge" for unit sales in 2021 to top last year's levels. She said a better indicator of the industry's momentum will be comparisons to the more normal year of 2019.



A version of this article appeared in the 02/01/2021 issue of *Publishers Weekly* under the headline: A Year for the (Record) Books

**ALSO ON PW**

 PW's 150th Anniversary Issue
 Check Out Our Podcasts! more...
 Meet 'Ava's Demon'
 This Week's Starred Reviews



FALL OUT
Carrie Stuart Parks. Thomas Nelson, $16.99 trade paper (336p) ISBN 978-0-7852-3985-7

PREVIOUS    NEXT

## MOST POPULAR
- Summer Reads 2022
- HarperCollins Union Authorizes Strike
- Writers to Watch Fall 2022
- The 10 Best Emily Dickinson Poems
- The 10 Best Haruki Murakami Books
- Book Deals: Week of July 4, 2022
- Why Is the Penis Shaped Like That? PW Talks with Jesse Bering
- The 10 Best Kurt Vonnegut Books
- This Week's Bestsellers: July 4, 2022
- The ALA Annual Conference Returns with Solid Attendance
- The 7 Weirdest Sex Stories of the Ancient World

## BESTSELLERS
View by genre: Top 10 Overall    more
1 Where the Crawdads Sing — Delia Owens, Author
2 It Ends with Us — Colleen Hoover, Author
3 It's Not Summer Without You (Reprint) (Reprint) — Jenny Han, Author
4 We'll Always Have Summer (Reprint) (Reprint) — Jenny Han, Author
5 Summer I Turned Pretty (Reprint) (Reprint) — Jenny Han, Author

About Us | Contact Us | Submission Guidelines | FAQ | Subscriber Services | Advertising Info | Terms of Use | Privacy Policy | Do Not Sell | Calls for Info | Editorial Calendar | Archives | Press |

© PWxyz, LLC. All rights reserved.

**News**
Obituaries
Book Deals
Financial Reporting
Page to Screen
Bookselling
Awards & Prizes
Publisher News
Comics
Business Deals
Shows & Events
Cooking
People
Religion
Audio Books
Manufacturing
Marketing
PW Tip Sheet
Licensing
U.S. Book Show

**Reviews**
Fiction
Mystery/Thriller
Sci-Fi/Fantasy/Horror
Romance/Erotica
Comics
Poetry
Inspirational Fiction
Nonfiction
Lifestyle
Religion
Children's
Web Exclusive
BookLife

**Bestsellers**
Bio & Autobio
Children's Frontlist
Fiction
Children's Picture
Books
Comics
Fantasy
Food & Drink
Hardcover Frontlist
Fiction
Hardcover Frontlist
Nonfiction
History & Poli-Sci
Mass Market Frontlist
Mystery
Religion Fiction
Religion Nonfiction
Romance
Science Fiction
Top 10 Overall
Trade Paper Frontlist

**Children's**
Authors
Book News
Industry News

**Authors**
Profiles
Interviews
Why I Write
BookLife

**Announcements**
Adult Announcements
Children's
Announcements
Religion Listings
On-Sale Calendar
Galley Talk

**Digital**
Devices
Copyright
Retailing
Conferences
Content / e-books
Apps
Digital Marketplace

**The Roundup**

**International**
Deals
News
Trade Shows
Frankfurt Book Fair
London Book Fair
Sharjah Book Fair
China Showcase
Translation Database

**Job Zone**
**Job Moves**

**Opinion**
ShelfTalker
Soapbox
Editorials
Common Core
Open Book



# EXHIBIT AA




**PW**
PUBLISHERS WEEKLY

SUBSCRIBE: PRINT + DIGITAL | LOGIN | SITE LICENSE ACCESS
FREE NEWSLETTERS

SELF-PUB booklife. | JOBZONE | THE MILLIONS | U.S. BOOK SHOW

Search Publishers Weekly

NEWS | REVIEWS | BESTSELLERS | CHILDREN'S | AUTHORS | ANNOUNCEMENTS | DIGITAL | INTERNATIONAL | OPINION

Obituaries | Book Deals | Financial Reporting | Page to Screen | Bookselling | Awards & Prizes | Publisher News | Comics | Business Deals | Shows & Events |

Cooking | People | Religion | Audio Books | Manufacturing | Marketing | PW Tip Sheet | Licensing | U.S. Book Show | News Briefs

Home > News > Publisher News

QUICKLINKS

Acquisitions Editor Professional Resources - Teacher Created Materials - Minneapolis, | NEXT JOB ▶

# America's Biggest Publishers Keep Posting Profits

By Jim Milliot | Apr 01, 2022

Like 37    Share    Tweet    💬 **Comments**    **PW** SUBSCRIBE by the Month


photo credit: Books and Books

The second year of a global pandemic was not enough to stop the country's four largest trade publishers from posting impressive gains in earnings in 2021 over 2020. The largest gain came at Simon & Schuster, whose operating income soared 51.1% in the year. Lagardère publishing, parent company of Hachette Book Group, saw recurring EBIT jump 42.7%, while HarperCollins had a 15.5% increase in EBITDA.

Penguin Random House's operating EBITDA increased 9.2%, on a 6% rise in revenue. Global revenue at PRH increased to €4 billion, and earnings were €755 million, parent company Bertelsmann reported. The company's margin improved to 18.7%, from 18.2% in 2020. The U.S. accounted for 56.5% of total revenue (about $2.51 billion at the current exchange rate), down from 58.6% in 2020.

Bertelsmann limited its comments on the pending purchase of Simon & Schuster to noting that a decision in the trial with the Department of Justice, which is challenging the acquisition, is expected later this year. In his annual letter, global PRH CEO Markus Dohle said PRH outperformed the markets in Brazil, Canada, India, and South Africa, adding that "our Spanish-language territories, and our global DK business, delivered a standout year through growth in online sales and its rich backlist." He attributed the worldwide financial gains to a rebound in sales at physical bookstores, while noting the continued shift to online sales—which, he said, led to an increase in backlist sales.

**RELATED STORIES:**

- PW issue Contents
- More in News -> Publisher News
- More in articles by Jim Milliot

In his letter, Dohle wrote that PRH "will mobilize around these developments to realize our 2022 ambitions," which include achieving "organic growth through excellence in content and reach." He promised that PRH will invest in authors and stories and "double down on addressing consumer needs in publishing's ever-changing marketplace."

MORE FROM PW


**Summer Reads 2022**


**PW Picks: Books of the Week**


**New Pub Dates for Forthcoming Books**


**10 Essential Works of Fabulist Fiction**

FEATURED REVIEWS

Request permission to reprint of this article.

## FREE E-NEWSLETTERS

Enter e-mail address

☑ PW Daily ☑ Tip Sheet

**SUBSCRIBE**   More Newsletters

said, offsetting a decline of 1.8% due to unfavorable currency translations. PRH's distribution business contributed 3.2% of worldwide revenue in 2021.

In its annual report, Bertelsmann touched on some overall publishing achievements in 2021. Penguin Random House US, Bertelsmann said, "enjoyed a successful publishing and business year." The division's biggest bestseller was *Atomic Habits* by James Clear, which was published in 2018, while new releases such as *The Judge's List* by John Grisham, *The 1619 Project*, and *Go Tell the Bees That I Am Gone* by Diana Gabaldon also had high sales.

Bertelsmann noted that, across its entire book group, it continued its investments in distribution and fulfillment logistics in 2021, which enabled PRH "to meet rising demand for its titles despite significant pandemic-related production and delivery bottlenecks." The company said it also gathered more consumer data "in order to expand its direct-to-consumer marketing."

Though HC's revenue was up 17.8% last year, its margin slipped from 15.2% to 14.9%. HC reported slower earnings growth in the fourth quarter of 2021, due to what parent company News Corp said was an "increase in manufacturing and freight costs exacerbated by supply chain pressures." In the calendar year, helped by the addition of the Houghton Mifflin Harcourt trade group, revenue topped $2.1 billion. (News Corp operates on a fiscal year ending June 30, and HC's sales in fiscal 2021 were just under $2 billion.)

At Lagardère Publishing, revenue was €2.6 billion ($2.9 billion at the current exchange rate), and recurring EBIT was €351 million (almost $400 million)—a jump of 42.7%. Excluding one-time items, such as $27 million from the purchase of Workman Publishing, sales rose 8.1%. Sales and profits were both records, Lagardère said. In the U.S., sales at HBG rose 3.7%, excluding the contribution from Workman.

HBG CEO Michael Pietsch said the publisher's results were bolstered by good sales growth at physical stores as well as at its international accounts. He added that results were further boosted "by high sell-through, a significant increase in hardcover sales in our adult divisions, exciting growth for Running Press's Minis program, and an excellent year for our distribution business." The U.S. and Canada accounted for 28% of Lagardère's sales, down from 29% in 2020.

Lagardère's financial outlook for 2022 is cautious, with revenue expected to be flat—even with the addition of Workman. The company based the forecast on its belief that as lockdowns ease, people will resume a variety of activities, which could cut into reading time and book buying. Earnings are expected to decline from 2021 due to "less favorable market trends," including "inflationary pressure on costs." As a result, Lagardère projects that its margin will fall to about 11%.

With solid sales throughout much of the year, revenue at Simon & Schuster rose 10% over 2020 to just under $1 billion, while operating income jumped 52%, to $213 million. "It was an extraordinary year for all of our groups," CEO Jonathan Karp told *PW*. The two fastest-growing divisions were the company's distribution group, where sales jumped 50%, and its international unit, which had a 25% increase. Both divisions benefited from strong sales of manga; S&S is the worldwide distributor for Viz Media, and the graphic novel publisher had 49 titles reach *PW*'s trade paperback bestseller list in 2021.

S&S's adult group saw a 4% sales increase, led by its Atria publishing group, which is home to TikTok sensations Colleen Hoover and Taylor Jenkins Reid. Sales in the children's group increased 7%. Total digital sales were flat, as a 9% decline in e-book sales was offset by a 11% increase in audiobook sales.

Karp said S&S has done a good job in keeping costs under control, and noted that significantly lower returns contributed to the big earnings gain. As a result, S&S's margin jumped to 21.4%, from 15.6% in 2020.



| Operating Performance, 2020–2021 ($ and € in millions) | | | |
|---|---|---|---|
| **HarperCollins** | | | |
| | **2020** | **2021** | **Change** |
| Total Sales | $1,821.0 | $2,146.0 | 17.8% |
| EBITDA | $277.0 | $320.0 | 15.5% |
| Margin | 15.2% | 14.9% | – |

THE LANGUAGE OF SEABIRDS

*Will Taylor. Scholastic Press, $17.99 (256p) ISBN 978-1-338-75373-8*

‹PREVIOUS          NEXT›

## MOST POPULAR

- Summer Reads 2022
- HarperCollins Union Authorizes Strike
- Writers to Watch Fall 2022
- The 10 Best Emily Dickinson Poems
- The 10 Best Haruki Murakami Books
- Book Deals: Week of July 4, 2022
- Why Is the Penis Shaped Like That? PW Talks with Jesse Bering
- The 10 Best Kurt Vonnegut Books
- This Week's Bestsellers: July 4, 2022
- The ALA Annual Conference Returns with Solid Attendance
- The 7 Weirdest Sex Stories of the Ancient World

## BESTSELLERS

*View by genre:*

Top 10 Overall          more

1  **Where the Crawdads Sing**
   Delia Owens, Author

2  **It Ends with Us**
   Colleen Hoover, Author

3  **It's Not Summer Without You (Reprint) (Reprint)**
   Jenny Han, Author

4  **We'll Always Have Summer (Reprint) (Reprint)**
   Jenny Han, Author

5  **Summer I Turned Pretty (Reprint) (Reprint)**
   Jenny Han, Author

| Lagardère | | | |
|---|---|---|---|
| | 2020 | 2021 | Change |
| Total Sales | €2,375.0 | €2,598.0 | 9.4% |
| Recurring EBIT | €246.0 | €351.0 | 42.7% |
| Margin | 10.3% | 13.5% | – |

| Penguin Random House | | | |
|---|---|---|---|
| | 2020 | 2021 | Change |
| Total Sales | €3,802.0 | €4,030.0 | 6.0% |
| Operating EBIT | €691.0 | €755.0 | 9.2% |
| Margin | 18.2% | 18.7% | – |

| Simon & Schuster | | | |
|---|---|---|---|
| | 2020 | 2021 | Change |
| Total Sales | $901.0 | $993.0 | 10.2% |
| Operating Income | $141.0 | $213.0 | 51.1% |
| Margin | 15.6% | 21.4% | – |

SOURCE: COMPANY REPORTS, PUBLISHERS WEEKLY

A version of this article appeared in the 04/04/2022 issue of *Publishers Weekly* under the headline: Profitably Publishing

**ALSO ON PW**



**PW's 150th Anniversary Issue**



**Check Out Our Podcasts! more...**



**Meet 'Ava's Demon'**



**This Week's Starred Reviews**

About Us | Contact Us | Submission Guidelines | FAQ | Subscriber Services | Advertising Info | Terms of Use | Privacy Policy | Do Not Sell | Calls for Info | Editorial Calendar | Archives | Press |

© PWxyz, LLC. All rights reserved.

**News**
Obituaries
Book Deals
Financial Reporting
Page to Screen
Bookselling
Awards & Prizes
Publisher News
Comics
Business Deals
Shows & Events
Cooking
People
Religion
Audio Books
Manufacturing
Marketing
PW Tip Sheet
Licensing
U.S. Book Show

**Reviews**
Fiction
Mystery/Thriller
Sci-Fi/Fantasy/Horror
Romance/Erotica
Comics
Poetry
Inspirational Fiction
Nonfiction
Lifestyle
Religion
Children's
Web Exclusive
BookLife

**Bestsellers**
Bio & Autobio
Children's Frontlist
Fiction
Children's Picture Books
Comics
Fantasy
Food & Drink
Hardcover Frontlist Fiction
Hardcover Frontlist Nonfiction
History & Poli-Sci
Mass Market Frontlist
Mystery
Religion Fiction
Religion Nonfiction
Romance
Science Fiction
Top 10 Overall
Trade Paper Frontlist

**Children's**
Authors
Book News
Industry News

**Authors**
Profiles
Interviews
Why I Write
BookLife

**Announcements**
Adult Announcements
Children's
Announcements
Religion Listings
On-Sale Calendar
Galley Talk

**Digital**
Devices
Copyright
Retailing
Conferences
Content / e-books
Apps
Digital Marketplace

**The Roundup**

**International**
Deals
News
Trade Shows
Frankfurt Book Fair
London Book Fair
Sharjah Book Fair
China Showcase
Translation Database

**Job Zone**
**Job Moves**

**Opinion**
ShelfTalker
Soapbox
Editorials
Common Core
Open Book

# EXHIBIT BB

The New York Times | https://www.nytimes.com/2020/12/29/books/book-publishing-2020.html

# Surprise Ending for Publishers: In 2020, Business Was Good

With people stuck at home and so many other activities shut down, a lot of reading — or at least a lot of book buying — happened this year.

 **By Elizabeth A. Harris**

Published Dec. 29, 2020   Updated Oct. 4, 2021

Like everybody else, book publishers will be happy to see the end of 2020. But for many of them, the year has brought some positive news, which has been as welcome as it was surprising: Business has been good.

With so many people stuck at home and activities from concerts to movies off limits, people have been reading a lot — or at least buying a lot of books. Print sales by units are up almost 8 percent so far this year, according to NPD BookScan. E-books and audiobooks, which make up a smaller portion of the market, are up as well.

"I expect that at the end of the year, when you look at the final numbers," Madeline McIntosh, chief executive of Penguin Random House U.S., said of the industry, "it will have been the best year in a very long time."

When the United States slammed shut in March, book sales dropped sharply, but the dip didn't last. While some parts of the industry have continued to struggle, like bookstores and educational publishers, publishing executives say that demand came rushing back around June.

Many of these sales went to Amazon, but big-box stores, especially Target, also did well. As essential businesses that sold things like groceries, they were allowed to stay open through the lockdowns. Dennis Abboud, chief executive of ReaderLink, a book distributor to major chains like Walmart, Target and Costco, said his company's online sales nearly quadrupled over last year.

"It was really a tale of two cities," Mr. Abboud said. "The beginning of the year was mega soft, and the end of the year was mega strong."

Even though the number of people commuting has plummeted this year, audiobook revenue is up more than 17 percent over the same period in 2019, according to the Association of American Publishers, and e-book sales, which had been declining for the past several years, are up more than 16 percent.

There have been a few particularly powerful themes in book selling this year. The Black Lives Matter protests following the killing of George Floyd at the end of May caused a rush on books about race and antiracism. Bookstores had trouble keeping titles in stock like "How to Be an Antiracist," by Ibram X. Kendi, and "So You Want to Talk About Race," by Ijeoma Oluo.

Political books, especially about President Trump, have also performed well. That was a particular boon for Simon & Schuster, which published some of the biggest presidential tell-alls of the year, including Mary L. Trump's "Too Much and Never Enough," which sold more than 1.35 million copies in its first week. Former

A-4194

Case 1:20-cv-04160-JGK-OTW Document 200-35 Filed 07/07/23 Page 3 of 5

President Barack Obama's memoir, "A Promised Land," published by Crown, an imprint of Penguin Random House, has sold more than 3.3 million copies in North America since it was published last month, and it has also been a best seller in countries like Germany, France, Brazil and Sweden.

But the strength in the general-interest publishing market has gone beyond a few titles and categories. New books, which in industry-speak are called the frontlist, have sold well, but so have older titles.



Glennon Doyle's memoir "Untamed," published in March, spent most of the year on the best-seller list. Karsten Moran for The New York Times

"There have been frontlist successes like 'A Promised Land' or 'Untamed,' absolutely," Ms. McIntosh said of Mr. Obama's book and a memoir by Glennon Doyle. "But things like 'The Very Hungry Caterpillar' have sold more copies than we have in the past. It's just this remarkable lift of the whole market."

Publishing executives have long described their business as recession-proof. Books, after all, are relatively cheap for the amount of time you spend with them. NPD BookScan said the market remained stable after the 2008 recession, dipping just 4 percent when unemployment started to peak in 2009 and regaining ground the following year. The challenges this time, however, felt more extreme, with social distancing and restrictions at warehouses, vast lockdowns and a rapid economic meltdown.

But supply chain problems, like capacity issues at large printing companies — which have been tricky to manage and are ongoing — have not ground the system to a halt. The restrictions of the pandemic, meanwhile, shaved away some of the competition. A person can watch only so much Netflix, and there weren't a lot of other options.

A-4195

Case 1:20-cv-04160-CKK-RTW Document 200-35 Filed 07/07/22 Page 4 of 5

"The competition for leisure time, that equation has changed over the pandemic," said Don Weisberg, the chief executive of Macmillan. "How that comes back will be a strong indicator of the future."

Parts of the book world have struggled. With many churches and other houses of worship closed, the sale of religious books has dropped, according to BookScan, and the travel category has tanked by more than 40 percent in print. (Young adult fiction, on the other hand, and books on home and gardening are up more than 20 percent.)

Publishers with big educational divisions have also had a more difficult road than general interest publishers. Houghton Mifflin Harcourt, for example, announced in October that it was cutting 22 percent of its work force.

Independent bookstores have had an extraordinarily difficult year. Many were closed to foot traffic for months, and scrambled to turn their stores into fulfillment centers for online orders, something they were never built to do on a significant scale. Some stores reported to the American Booksellers Association earlier this year that their sales were down at least 40 percent. But Allison K. Hill, the trade organization's chief executive, said the last few weeks have been encouraging.

"The stakes were very high going into the holiday season," she said. "We won't really know where everybody stands until the holiday season is completely finished."



Although Barnes & Noble struggled in 2020, its chief executive said things have not been as dire as expected.  Chang W. Lee/The New York Times

Barnes & Noble has also struggled in some areas — James Daunt, its chief executive, describes the performance of its New York City stores as "frankly, a total disaster." But overall, he said, things have not been as dire as expected, and — in part because of job cuts and other cost-cutting measures — he expects this year to be more profitable than last. Nearly 5,000 employees who had worked fewer than six months with the company, most of them part time, were laid off this year. More than 100 people in the central office were also let go.

The company's stores outside of cities are now performing well, and its online business got a boost when, early in the pandemic, Amazon deprioritized books and other items so it could focus on medical supplies and household staples.

A-4196

Case 1:20-cv-04160-CKK-GTW Document 200-35 Filed 07/07/22 Page 5 of 5

"Barnes & Noble benefited from the fact that Amazon, at the outset of the pandemic, was just overwhelmed," Mr. Daunt said. "People discovered it actually isn't a monopoly. There's another big player out there. We've held on to that business."

Even for publishers who have done well, concerns about bookstores, particularly those that aren't part of chains, weigh on them. Readers are less likely to discover a great book they've never heard of while shopping online, but a bookseller or staff picks table might introduce them to a tote bag full of new titles.

"Our sales are way up in 2020, miraculously," said Dan Simon, the founder and publisher of Seven Stories Press, an independent publisher. "However, when you talk about introducing new voices, which is arguably the most important thing we do, I think that's suffered in 2020 a lot."

The individual person-to-person sales that happen in bookstores can't be easily replaced online, he said. "That's where we end the year, with a question mark."

*Follow New York Times Books on Facebook, Twitter and Instagram, sign up for our newsletter or our literary calendar. And listen to us on the Book Review podcast.*

A-4197

# EXHIBIT CC

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 6    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 7

                    Plaintiffs,

 8

              vs.                      No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11                  Defendants.

      _____/

12

13

14              -- ATTORNEYS' EYES ONLY --

15

16    VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS OF

17        HARPERCOLLINS PUBLISHERS LLC BY JOSH MARWELL

18                Remote Zoom Proceedings

19                 New York, New York

20               Friday, December 3, 2021

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 257                    Job No. 4867775

                                         Page 1
```

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5     HACHETTE BOOK GROUP, INC.,

       HARPERCOLLINS PUBLISHERS LLC,

 6     JOHN WILEY & SONS, INC., and

       PENGUIN RANDOM HOUSE LLC,

 7

                   Plaintiffs,

 8

               vs.                    No. 1:20-cv-04160-JGK

 9

       INTERNET ARCHIVE and DOES 1

10     through 5, inclusive,

11                 Defendants.

       _____/

12

13

14              -- ATTORNEYS' EYES ONLY --

15

16         Videotaped Rule 30(b)(1) and 30(b)(6)

17     depositions of HarperCollins Publishers LLC by

18     JOSH MARWELL, taken on behalf of Defendants, Remote Zoom

19     Proceedings from New York, New York, beginning at

20     10:58 a.m. Eastern Standard Time and ending at 6:46 p.m.

21     Eastern Standard Time, on Friday, December 3, 2021,

22     before Leslie Rockwood Rosas, RPR, Certified Shorthand

23     Reporter No. 3462.

24

25
```

Page 2

ATTORNEYS EYES ONLY

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4         DAVIS WRIGHT TREMAINE LLC

 5         BY: LINDA STEINMAN, ESQ.

 6         1251 Avenue of the Americas, 21st Floor

 7         New York, New York 10020

 8         (212) 603-6409

 9         lindasteinman@dwt.com

10

11

12    FOR THE DEFENDANT INTERNET ARCHIVE:

13         DURIE TANGRI LLP

14         BY: JESSICA E. LANIER, ESQ.

15         217 Leidesdorff Street

16         San Francisco, California 94111

17         (415) 362-6666

18         jlanier@durietangri.com

19

20

21    Also Present:

22         Andrew Jacobs, Esq. (HarperCollins Inhouse Counsel)

23         John Macdonell, Videographer

24         Chelsea Gilchrist, Concierge

25
```

Page 3

A-4201

```
 1    commerce part in that sense.

 2         Q.  Got it.  Okay.

 3              Is there a -- a separate sales or commerce

 4    department that contends with physical sales to libraries

 5    as opposed to digital transactions with libraries?        12:04:50

 6         A.  Physical books to library are also sold through

 7    wholesalers, Baker + Taylor being one of the major ones.

 8    Ingram has a piece of it, and there's a lot of other

 9    smaller players that get involved.

10         But the best way, I think, to think of it is        12:05:09

11    that we have a library marketing department when's job it

12    is to drum up buzz about our authors and our books and

13    looking for opportunities.

14         So it's -- you know, they'll -- that's their --

15    that's their focus.                                       12:05:25

16         Q.  Got it.  Okay.

17         And we're almost done with this document, I

18    promise.  Just a couple more questions.

19         The "Academic" heading just below library, do

20    you see that?                                             12:05:41

21         A.  Yes.

22         Q.  What does "Academic" refer to in the context of

23    this email?

24         A.  Again, we -- this is a subset of our department

25    that focuses on marketing to professors to adopt our      12:05:55
```

Page 59

```
 1    STATE OF CALIFORNIA      ) ss:

 2    COUNTY OF MARIN          )

 3

 4             I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5    hereby certify:

 6             That the foregoing deposition testimony was

 7    taken before me at the time and place therein set forth

 8    and at which time the witness was administered the oath;

 9             That testimony of the witness and all objections

10    made by counsel at the time of the examination were

11    recorded stenographically by me, and were thereafter

12    transcribed under my direction and supervision, and that

13    the foregoing pages contain a full, true and accurate

14    record of all proceedings and testimony to the best of my

15    skill and ability.

16             I further certify that I am neither counsel for

17    any party to said action, nor am I related to any party

18    to said action, nor am I in any way interested in the

19    outcome thereof.

20             IN WITNESS WHEREOF, I have subscribed my name

21    this 6th day of December, 2021.

22

23

24

25             LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 254

A-4203

**Exhibit DD to Gratz Declaration**

**Filed Under Seal**

**(A-4204)**

# EXHIBIT EE

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3   -------------------------------------------------x

 4   HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

 5   JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

 6

 7              Plaintiffs,

 8   vs.                    Case No. 1:20-cv-04160-JGK

 9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11

12              Defendants.

13   -------------------------------------------------x

14

15      *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

16

17    REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

18                    JEFFREY PRINCE

19               Thursday, June 9, 2022

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 5255194


                                          Page 1
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3    ---------------------------------------------x

 4    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 5    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 6

 7                 Plaintiffs,

 8    vs.                    Case No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11

12                 Defendants.

13    ---------------------------------------------x

14

15         Videotaped deposition of JEFFREY PRINCE,

16    taken in Bloomington, Indiana, commencing at

17    10:04 a.m. Eastern, on Thursday, June 9, 2022 before

18    Lynne Ledanois, Certified Shorthand Reporter No.

19    6811

20

21

22

23

24

25    ///
```

                                          Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    REMOTE APPEARANCES

 2

 3     Counsel for the Plaintiffs:

 4                    DAVIS WRIGHT TREMAINE LLP

 5                    BY:  LINDA STEINMAN

 6                    Attorney at Law

 7                    4530 Wisconsin Avenue, NW

 8                    5th Floor

 9                    Washington, D.C. 20016

10                    lindasteinman@dwt.com

11

12     Counsel for the Defendant Internet Archive:

13                    DURIE TANGRI LLP

14                    BY: JOSEPH C. GRATZ

15                       JESSICA LANIER

16                    Attorneys at Law

17                    217 Leidesdorff Street

18                    San Francisco, California 94111

19                    jgratz@durietangri.com

20                    jlanier@durietangri.com

21

22

23

24     ALSO PRESENT:

25     David West, Videographer
```

Page 3

A-4208

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    BY MR. GRATZ:                                          11:20AM

 2         Q    You have that document before you in paper

 3    form, Dr. Prince?

 4         A    Yes, I do.

 5         Q    What is the difference between a market     11:20AM

 6    harm analysis and damages analysis?

 7         A    I haven't laid out the full details of that.

 8    But I guess at a high level, the damages analysis, as

 9    we discussed before, I'm looking at quantifying what

10    the damage was of different nature to an affected      11:20AM

11    party.

12              Here what I -- in the market harm

13    analysis, I'm talking about different ways in which

14    plaintiffs were harmed by Internet Archive's

15    actions.                                               11:21AM

16         Q    Did you attempt to quantify that harm?

17              MS. STEINMAN:  Objection.

18              THE WITNESS:  I did not put a figure on

19    it, no.

20    BY MR. GRATZ:                                          11:21AM

21         Q    Why not?

22         A    My understanding is that was not part of the

23    scope of my report or the burden of my report.

24         Q    Is that something that you would have been

25    able to do with the information that was available     11:21AM
```

Page 52

Veritext Legal Solutions
866 299-5127

A-4209

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    to you if that had been something that you                    11:21AM

2    understood to be part of the scope of your report?

3                MS. STEINMAN:  Objection.

4                THE WITNESS:  I'm not sure.  I didn't

5    attempt to do that, so I'm not sure how that would            11:21AM

6    have gone if I had tried to do that.

7    BY MR. GRATZ:

8         Q    Is the reason that you did not attempt to

9    quantify the harm that you identified in your report

10   that you did not consider such quantification to be           11:22AM

11   within the scope of what you were being asked to do

12   in this matter?

13               MS. STEINMAN:  Objection.  Go ahead.

14               THE WITNESS:  Yes, I think that's a fair

15   way of putting it.  My understanding was that the             11:22AM

16   burden was on the other side to establish there was

17   not harm.

18               So on my end, what I was asked to do is to

19   discuss, amongst other things, what the different

20   natures of harm were and the reasoning why those             11:22AM

21   would be there.

22   BY MR. GRATZ:

23        Q    Does your report identify the size in

24   numbers of any of those harms?

25               MS. STEINMAN:  Objection, the document           11:23AM

                                                          Page 53

```
 1      speaks for itself.                              11:23AM

 2             THE WITNESS:  Again, I don't recall

 3      putting forth a figure for any of the individual

 4      harms that I put out.  I think there's information

 5      that may provide relevant information towards that,   11:23AM

 6      but I don't believe I put forth a specific figure

 7      for any of them.

 8      BY MR. GRATZ:

 9          Q    Do you have any opinions about the size in

10      numbers of any of those harms?                      11:23AM

11             MS. STEINMAN:  Objection.

12             THE WITNESS:  I believe that -- again, I

13      didn't give specific numbers, but I've indicated in

14      various places in the report that there's reason to

15      believe that those numbers are not de minimis.  But   11:23AM

16      I don't give a specific figure.

17      BY MR. GRATZ:

18          Q    Do you have any other opinions about the

19      size of those harms other than the ones we've talked

20      about already?                                       11:24AM

21             MS. STEINMAN:  Objection.

22             THE WITNESS:  Again, I think in the report

23      it's indicating that there's reason to believe that

24      the harm that was already experienced was

25      non-trivial.  And then also as I lay out in the      11:24AM
```

<div align="right">Page 54</div>

1    not teach because I was running the department and an    4:36PM

2    institute.

3         I will be stepping down from the institute

4    this summer and then I'll be stepping down as chair

5    next year.                                              4:36PM

6         And so my steady state is I would teach

7    three classes a year, but that's been disrupted

8    because of my administrative roles.

9    Q    Do you spend more time on your expert

10   witness work and consulting work or on your            4:36PM

11   teaching?

12   A    As I said, now anything I do would be more

13   than teaching because I'm not teaching right now.

14   That would not be the case when I'm back to a

15   three-course load.                                      4:36PM

16        The other major component of my job is

17   research, which actually takes up most of my time.

18   Q    That was going to be my next question.

19        About what percentage of your time do you

20   spend on your consulting work, including expert        4:36PM

21   witness testimony?

22   A    Somewhere in the neighborhood of 20 percent.

23   Q    In your work on your expert report, did

24   you attempt to numerically estimate the size of the

25   effect you believe Internet Archive's controlled      4:38PM

                                        Page 202

1    digital lending had on publisher's revenues?          4:38PM

2                MS. STEINMAN:  Objection, asked and

3    answered.

4                THE WITNESS:  I did not try to quantify

5    that, no.                                              4:38PM

6    BY MR. GRATZ:

7         Q    Do you know whether that effect would be

8    positive or negative?

9         A    I laid out the economic reasoning that I

10   believe points to it being detrimental, having harm.   4:38PM

11        Q    But you don't know whether that economic

12   reasoning, in fact, played out in that way; right?

13                MS. STEINMAN:  Objection.

14                THE WITNESS:  I don't have the numerical

15   estimates on that.  I think it's -- whatever its       4:39PM

16   economic reasoning or general theoretical arguments,

17   to the extent that the premises are sensible and

18   credible, I believe that the conclusions then

19   reasonably follow.  And I believe those assumptions

20   were credible.                                          4:39PM

21   BY MR. GRATZ:

22        Q    It is possible that upon examination of

23   the data through an econometric analysis, it would

24   turn out that the effect was either zero or positive

25   with respect to publishers' revenues?                   4:39PM

                                            Page 203

```
 1        Q    When you say "likely" here, are you making     5:36PM
 2   an empirical claim?
 3        A    I'm not putting a quantification on it.
 4   This is I believe what I would consider theoretical
 5   reasoning, that you're in -- in such a scenario, it's    5:37PM
 6   likely or probable that a library that sees less
 7   interest in its e-Books is going to be less inclined
 8   to purchase licenses for those e-Books.
 9        Q    In other words, where you say that this is
10   likely, your view is that that result is the one         5:37PM
11   that would be predicted by economic theory but you
12   don't have specific empirical knowledge of an actual
13   probability?
14             MS. STEINMAN:  Objection.
15             THE WITNESS:  I don't put forth an actual       5:37PM
16   probability.  I think what this is acknowledging is
17   it may not always be the case.
18             There might be instances where the demand
19   still would be similar, but under these
20   circumstances, it's reasonable to think that it's a      5:38PM
21   probable outcome that the demand would decline.
22   BY MR. GRATZ:
23        Q    In your last answer, you said, "it may not
24   always be the case," but it's also true that it may
25   not ever be the case; is that right?                     5:38PM
```

Page 230

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       I, LYNNE M. LEDANOIS, a Certified
2    Shorthand Reporter of the State of California, do
3    hereby certify:
4       That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that a record of the proceedings was made by me
7    using machine shorthand which was thereafter
8    transcribed under my direction; that the foregoing
9    transcript is a true record of the testimony given.
10      Further, that if the foregoing pertains to
11   the original transcript of a deposition in a Federal
12   Case, before completion of the proceedings, review
13   of the transcript [] was [X] wasn't requested.
14      I further certify I am neither financially
15   interested in the action nor a relative or employee
16   of any attorney or party to this action.
17      IN WITNESS WHEREOF, I have this date
18   subscribed my name.
19
20
21   Dated: June 13, 2022
22
23
24              *Lynne Marie Ledanois*
              LYNNE MARIE LEDANOIS
25              CSR No. 6811

                        Page 268

A-4215

# EXHIBIT FF

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5     HACHETTE BOOK GROUP, INC.,
       HARPERCOLLINS PUBLISHERS LLC,
 6     JOHN WILEY & SONS, INC., and
       PENGUIN RANDOM HOUSE LLC,
 7
                    Plaintiffs,
 8
          vs.                        No. 1:20-cv-04160-JGK
 9
       INTERNET ARCHIVE and DOES 1
10     through 5, inclusive,
11                  Defendants.
       _____/
12
13
                  -- ATTORNEYS' EYES ONLY --
14
15        VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITION
16         OF HACHETTE BOOK GROUP, INC., BY ALISON LAZARUS
17                   Remote Zoom Proceeding
18                    Rye Brook, New York
19                 Friday, November 12, 2021
20
21
22
23     REPORTED BY:
24     LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25     Pages 1 - 254                      Job No. 4867752
```

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,
      HARPERCOLLINS PUBLISHERS LLC,
 6    JOHN WILEY & SONS, INC., and
      PENGUIN RANDOM HOUSE LLC,
 7
                  Plaintiffs,
 8
            vs.                      No. 1:20-cv-04160-JGK
 9
      INTERNET ARCHIVE and DOES 1
10    through 5, inclusive,

11                Defendants.
      _____/

12

13

14              -- ATTORNEYS' EYES ONLY --

15

16          Videotaped Rule 30(b)(1) and Rule 30(b)(6)

17    depositions of HACHETTE BOOK GROUP, INC., BY

18    ALISON LAZARUS, taken on behalf of Defendants, Remote

19    Zoom Proceeding from Rye Brook, New York, beginning at

20    10:02 a.m. Eastern Standard Time and ending at 6:18 p.m.

21    Eastern Standard Time, on Friday, November 12, 2021,

22    before Leslie Rockwood Rosas, RPR, Certified Shorthand

23    Reporter No. 3462.

24

25

                                            Page 2
```

```
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:

 4        DAVIS WRIGHT TREMAINE LLP

 5        BY: ELIZABETH A. MCNAMARA, ESQ.

 6             JOHN M. BROWNING, ESQ. (P.M. only)

 7        1251 Avenue of the Americas, 21st Floor

 8        New York, New York 10020

 9        (212) 489-8230

10        lizmcnamara@dwt.com

11        jackbrowning@dwt.com

12

13   FOR THE DEFENDANTS:

14        DURIE TANGRI LLP

15        BY: JESSICA E. LANIER, ESQ.

16        217 Leidesdorff Street

17        San Francisco, California 94111

18        (415) 362-6666

19        jlanier@durietangri.com

20

21   Also Present:

22        Min Lee, Hachette Book Group

23        Corynne McSherry, Internet Archive

24        John Macdonell, Videographer

25        Chelsea Gilchrist, Concierge
```

<div align="right">Page 3</div>

```
 1    determine whether the Internet Archive's digital lending

 2    program has had any effects on Hachette's revenues from

 3    books?

 4         A.   Can you repeat the question?  I'm sorry.

 5         Q.   Sure.  No problem.                          10:27:11

 6         Has Hachette conducted any analysis to determine

 7    the Internet Archive's digital lending program -- excuse

 8    me -- strike that.

 9         Has Hachette conducted any analysis to determine

10    whether the Internet Archive's digital lending program   10:27:29

11    has had any effect on Hachette's revenue from books?

12         A.   Not that I'm aware of.

13         Q.   Is Hachette aware of any other digital lending

14    program apart from the Internet Archive?

15         MS. MCNAMARA:  Objection.  Vague.                 10:27:54

16         THE WITNESS:  Should I -- shall I answer?

17         MS. MCNAMARA:  Yes.

18         THE WITNESS:  Okay.

19         We work with public libraries and academic

20    institutions to enable digital lending.                10:28:12

21         Q.   BY MS. LANIER:  Is Hachette aware of any

22    libraries or similar institutions that digitize physical

23    books and make those scans available to patrons for

24    borrowing?

25         A.   No.                                          10:28:33
```

Page 27

```
1        that.

2               Is Hachette able to use that data to perform any

3        analysis about the effect of library eBook lending on

4        library retail sales?

5               MS. MCNAMARA:  Objection.  This is very        10:45:58

6        confusing.  Do you understand the question, Alison?

7               THE WITNESS:  No.  I was just going to say I'm

8        not sure what you mean about library retail sales because

9        libraries aren't retailers.

10          Q.  BY MS. LANIER:  That was a verbal error on my    10:46:12

11       part.  Thank you for giving me a chance to clarify.

12              What I was trying to ask, but inartfully, is

13       whether Hachette is able to use the types of data we were

14       just talking about to analyze the effect of library eBook

15       lending on retail sales of eBooks.                      10:46:29

16          A.  We -- we do try to do that.  It's -- it's, you

17       know, speculative because you can't truly directly make

18       that correlation, meaning, again, I -- we can't tell, you

19       know, why somebody borrowed a book versus buying the

20       book.  So we look at the trends to try to understand      10:46:58

21       what's happening in both markets, and we do use that data

22       to inform our decision making.

23          Q.  BY MS. LANIER:  When you say "to inform our

24       decision making," what do you mean by that?

25          A.  Looking at our approach to the retail eBook       10:47:21
```

Page 38

Veritext Legal Solutions
866 299-5127

A-4221

ATTORNEYS EYES ONLY

```
 1   STATE OF CALIFORNIA      ) ss:

 2   COUNTY OF MARIN          )

 3

 4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6        That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9        That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16        I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20        IN WITNESS WHEREOF, I have subscribed my name

21   this 18th day of November, 2021.

22

23

24

25        LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 251

A-4222

# EXHIBIT GG

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4     HACHETTE BOOK GROUP, INC.,

5     HARPERCOLLINS PUBLISHERS LLC,

6     JOHN WILEY & SONS, INC., and

7     PENGUIN RANDOM HOUSE LLC,

8                   Plaintiffs,

9          vs.                    Case No.

10    INTERNET ARCHIVE and DOES     1:20-cv-04160-JGK

11    1 through 5, inclusive,

12                   Defendants.

      _____/

13

14              -- ATTORNEYS' EYES ONLY --

15

16     VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS OF

17    HARPERCOLLINS PUBLISHERS LLC, BY CHANTAL RESTIVO-ALESSI

18                 Remote Zoom Proceedings

19                  New York, New York

20              Wednesday, December 1, 2021

21

22    REPORTED BY:

23    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

24    Job No. 4867798

25    Pages 1 - 283
```

                                        Page 1

A-4224

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4     HACHETTE BOOK GROUP, INC.,

 5     HARPERCOLLINS PUBLISHERS LLC,

 6     JOHN WILEY & SONS, INC., and

 7     PENGUIN RANDOM HOUSE LLC,

 8                  Plaintiffs,

 9            vs.                    Case No.

10     INTERNET ARCHIVE and DOES     1:20-cv-04160-JGK

11     1 through 5, inclusive,

12                  Defendants.

       _____/

13

14               -- ATTORNEYS' EYES ONLY --

15

16         Videotaped Rule 30(b)(1) and 30(b)(6)

17     depositions of HARPERCOLLINS PUBLISHERS LLC, BY CHANTAL

18     RESTIVO-ALESSI, taken on behalf of Defendants, Remote

19     Zoom Proceedings from New York, New York, beginning at

20     10:31 a.m. Eastern Standard Time and ending at 6:58 p.m.

21     Eastern Standard Time, on Wednesday, December 1, 2021,

22     before Leslie Rockwood Rosas, RPR, Certified Shorthand

23     Reporter No. 3462.

24

25

                                                   Page 2
```

```
 1                        APPEARANCES:

 2

 3    FOR THE PLAINTIFFS:

 4         DAVIS WRIGHT TREMAINE LLC

 5         BY: LINDA STEINMAN, ESQ.

 6         1251 Avenue of the Americas, 21st Floor

 7         New York, New York 10020

 8         (212) 603-6409

 9         lindasteinman@dwt.com

10

11    FOR THE DEFENDANT INTERNET ARCHIVE:

12         DURIE TANGRI LLP

13         BY: JESSICA LANIER, ESQ.

14         217 Leidesdorff Street

15         San Francisco, California 94111

16         (415) 362-6666

17         jlanier@durietangri.com

18

19    Also Present:

20         Andrew Jacobs, Esq. (HarperCollins Inhouse Counsel)

21         Tony Nokes, Videographer

22         Chelsea Gilchrist, Concierge

23

24

25

                                                    Page 3
```

1    be consumers going less to libraries, you know.  It could

2    be so many things.  Because they might go somewhere else,

3    including Internet Archive.  Who knows?  Could be a lot

4    of things.

5        Q.  Okay.  Okay.                                17:18:50

6        So let's look at -- actually, strike that.

7        Did HarperCollins do any analysis of the growth

8    rates for US library and the growth rates for US retail

9    to determine whether there was a relationship between

10   those two figures?                                 17:19:10

11       A.  Yeah.  I mean, this partly does it.  So this

12   looks at the retail trends on this format.  So it looks

13   at what was happening in eBooks, and then what was at

14   retail and then what was happening in libraries.  And

15   clearly, they might be a piece of, you know, substitution  17:19:32

16   going on here as well.

17       Q.  Okay.  Why do you say "clearly"?

18       A.  Well, there might be.  Not clearly.  There might

19   be there might be a piece of substitution because it's

20   always hard to define specifically cause and effect,  17:19:49

21   but --

22       Q.  Okay.

23       A.  -- it can be a contributor.

24       Q.  Okay.  What suggests to you that substitution is

25   a possibility here?                                17:19:58

Page 224

```
 1        A.  Well, if you -- if you have one element going up
 2   and another one going down, and you have readers that are
 3   a finite number, you might think that they might
 4   substitute one with another.  They might go to a library
 5   and not, you know, getting their eBook for free versus          17:20:18
 6   buying it.
 7        Q.  Okay.
 8        A.  But there's no -- you know, there's no factual
 9   analysis.  It's just one inference one could make.
10        Q.  Got it.  Okay.                                          17:20:31
11        All right.  Let's look at Exhibit 189.
12        A.  189.  Whoops.
13        Q.  So I don't know about you, but mine started
14   scroll over to blank cells?
15        A.  Yeah.  Mine, too.  That's why I was like what is        17:20:59
16   this.
17        Q.  Okay.  Have you seen this document before?
18        A.  Yes.
19        Q.  What is it?
20        MS. STEINMAN:  Could you just give me one                   17:21:09
21   second.  I'm downloading.
22        MS. LANIER:  Oh, sure.  No problem.
23        MS. STEINMAN:  Okay.  I'm ready.
24        Q.  BY MS. LANIER:  Okay.  What is this document?
25        A.  This is sales in units again by title, of the          17:21:20
```

Page 225

```
 1   STATE OF CALIFORNIA     ) ss:

 2   COUNTY OF MARIN         )

 3

 4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6          That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21   this 3rd day of December, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 283

A-4229

# EXHIBIT HH

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 6    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 7

                   Plaintiffs,

 8

           vs.                      No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11                 Defendants.

      _____/

12

13

14              -- ATTORNEYS' EYES ONLY --

15

16    VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS OF

17         JOHN WILEY & SONS, INC., BY ALAN PAVESE

18              Remote Zoom Proceedings

19              East Durham, New York

20              Friday, December 10, 2021

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 278                   Job No. 4867787


                                      Page 1
```

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 6    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 7

                   Plaintiffs,

 8

           vs.                    No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11              Defendants.

      _____/

12

13

14              -- ATTORNEYS' EYES ONLY --

15

16    Videotaped Rule 30(b)(1) and 30(b)(6) depositions of

17    JOHN WILEY & SONS, INC., by ALAN PAVESE, taken on behalf

18    of Defendants, Remote Zoom Proceedings from East Durham,

19    New York, beginning at 10:41 a.m. Eastern Standard Time

20    and ending at 7:14 p.m. Eastern Standard Time, on Friday,

21    December 10, 2021, before Leslie Rockwood Rosas, RPR,

22    Certified Shorthand Reporter No. 3462.

23

24

25

                                              Page 2
```

ATTORNEYS EYES ONLY

```
1    APPEARANCES:

2

3    FOR THE PLAINTIFFS:

4         DAVIS WRIGHT TREMAINE LLC

5         BY: LINDA STEINMAN, ESQ.

6         1251 Avenue of the Americas, 21st Floor

7         New York, New York 10020

8         (212) 603-6409

9         lindasteinman@dwt.com

10

11

12   FOR THE DEFENDANT INTERNET ARCHIVE:

13        DURIE TANGRI LLP

14        BY: JESSICA E. LANIER, ESQ.

15        217 Leidesdorff Street

16        San Francisco, California 94111

17        (415) 362-6666

18        jlanier@durietangri.com

19

20

21   Also Present:

22        Kevin Kim, Esq. (Wiley Inhouse Counsel)

23        John Macdonell, Videographer

24        Chelsea Gilchrist, Concierge

25                                          09:33:03
```

Page 3

```
 1    that it was difficult to -- given the complexities of the

 2    market, to pinpoint the cause of unexpected revenue,

 3    either higher or lower.  Has Wiley been able to pinpoint

 4    any fluctuations in revenue to the Internet Archive?

 5            MS. STEINMAN:  Objection.                    12:13:17

 6            Go ahead, Alan.

 7            THE WITNESS:  So pinpoint -- the data is not

 8    there.  We do know it's happening, but to precisely

 9    measure it is very complex, so we are estimating, and,

10    you know, we do know that piracy and stealing does hurt   12:13:35

11    the commercial market, so we do know that it's happening,

12    and we do rely on those general estimates of industry

13    impact, you know, when we're trying to quantify things,

14    because, again, you know, people performing illicit

15    activity and unauthorized activity don't report it.  It   12:13:58

16    doesn't lend itself to precision.

17        Q.  BY MS. LANIER:  Have you heard the Internet

18    Archive referred to as a library?

19        A.  I have heard that, yes.  I don't agree with it,

20    but I have heard it.                                 12:14:25

21        Q.  Okay.  Why don't you agree with it?

22        A.  Because it doesn't function the way a library

23    functions in almost any way.  I mean, it functions much

24    more closely to a pirate site.

25        Q.  Okay.  In what way does the Internet Archive  12:14:37
```

Page 55

ATTORNEYS EYES ONLY

```
1    STATE OF CALIFORNIA      ) ss:

2    COUNTY OF MARIN          )

3

4         I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5    hereby certify:

6         That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9         That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16        I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20        IN WITNESS WHEREOF, I have subscribed my name

21   this 13th day of December, 2021.

22

23

24

25        LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 275

# EXHIBIT II

| 94TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT No. 94-1476 |
|---|---|---|

# COPYRIGHT LAW REVISION

SEPTEMBER 3, 1976.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. KASTENMEIER, from the Committee on the Judiciary, submitted the following

# REPORT

together with

ADDITIONAL VIEWS

[To accompany S. 22]

The Committee on the Judiciary, to whom was referred the bill (S. 22) for the general revision of the copright law, title 17 of the United States Code, and for other purposes, having considered the same, report favorably thereon with an amendment in the nature of a substitute and recommend that the bill as amended do pass.

The amendments are as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

SEC. 101. Title 17 of the United States Code, entitled "Copyrights", is hereby amended in its entirety to read as follows:

## TITLE 17—COPYRIGHTS

| Chapter | Sec. |
|---|---|
| 1. Subject Matter and Scope of Copyright | 101 |
| 2. Copyright Ownership and Transfer | 201 |
| 3. Duration of Copyright | 301 |
| 4. Copyright Notice, Deposit, and Registration | 401 |
| 5. Copyright Infringement and Remedies | 501 |
| 6. Manufacturing Requirement and Importation | 601 |
| 7. Copyright Office | 701 |
| 8. Copyright Royalty Commission | 801 |



### Chapter 1.—SUBJECT MATTER AND SCOPE OF COPYRIGHT

Sec.
101. Definitions.
102. Subject matter of copyright : In general.
103. Subject matter of copyright : Compilations and derivative works.
104. Subject matter of copyright : National origin.
105. Subject matter of copyright : United States Government works.
106. Exclusive rights in copyrighted works.
107. Limitations on exclusive rights : Fair use.
108. Limitations on exclusive rights : Reproduction by libraries and archives.
109. Limitations on exclusive rights : Effect of transfer of particular copy or phonorecord.
110. Limitations on exclusive rights : Exemption of certain performances and displays.
111. Limitations on exclusive rights : Secondary transmissions.
112. Limitations on exclusive rights : Ephemeral recordings.

65

recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service. Clause (2) of the definition of "publicly" is applicable "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."

## Section 107. Fair Use

### General background of the problem

The judicial doctrine of fair use, one of the most important and well-established limitations on the exclusive right of copyright owners, would be given express statutory recognition for the first time in section 107. The claim that a defendant's acts constituted a fair use rather than an infringement has been raised as a defense in innumerable copyright actions over the years, and there is ample case law recognizing the existence of the doctrine and applying it. The examples enumerated at page 24 of the Register's 1961 Report, while by no means exhaustive, give some idea of the sort of activities the courts might regard as fair use under the circumstances: "quotation of excerpts in a review or criticism for purposes of illustration or comment; quotation of short passages in a scholarly or technical work, for illustration or clarification of the author's observations; use in a parody of some of the content of the work parodied; summary of an address or article, with brief quotations, in a news report; reproduction by a library of a portion of a work to replace part of a damaged copy; reproduction by a teacher or student of a small part of a work to illustrate a lesson; reproduction of a work in legislative or judicial proceedings or reports; incidental and fortuitous reproduction, in a newsreel or broadcast, of a work located in the scene of an event being reported."

Although the courts have considered and ruled upon the fair use doctrine over and over again, no real definition of the concept has ever emerged. Indeed, since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts. On the other hand, the courts have evolved a set of criteria which, though in no case definitive or determinative, provide some gauge for balancing the equities. These criteria have been stated in various ways, but essentially they can all be reduced to the four standards which have been adopted in section 107: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work."

These criteria are relevant in determining whether the basic doctrine of fair use, as stated in the first sentence of section 107, applies in a particular case: "Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section,

251-757 O - 77 - 5

A-4238

163

in these situations the burden of proving willfulness rests on the copyright owner and that of proving innocent rests on the infringer, and that the court must make a finding of either willfulness or innocence in order to award the exceptional amounts.

The "innocent infringer" provision of section 504(c)(2) has been the subject of extensive discussion. The exception, which would allow reduction of minimum statutory damages to $100 where the infringer "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright," is sufficient to protect against unwarranted liability in cases of occasional or isolated innocent infringement, and it offers adequate insulation to users, such as broadcasters and newspaper publishers, who are particularly vulnerable to this type of infringement suit. On the other hand, by establishing a realistic floor for liability, the provision preserves its intended deterrent effect; and it would not allow an infringer to escape simply because the plaintiff failed to disprove the defendant's claim of innocence.

In addition to the general "innocent infringer" provision clause (2) deals with the special situation of teachers, librarians, archivists, and public broadcasters, and the nonprofit institutions of which they are a part. Section 504(c)(2) provides that, where such a person or institution infringer copyrighted material in the honest belief that what they were doing constituted fair use, the court is precluded from awarding any statutory damages. It is intended that, in cases involving this provision, the burden of proof with respect to the defendant's good faith should rest on the plaintiff.

### SECTIONS 505 THROUGH 509. MISCELLANEOUS PROVISIONS ON INFRINGEMENT AND REMEDIES

The remaining sections of chapter 5 of the bill deal with costs and attorneys' fees, criminal offenses, the statute of limitations, notification of copyright actions, and remedies for alteration of programming by cable systems.

Under section 505 the awarding of costs and attorney's fees are left to the court's discretion, and the section also makes clear that neither costs nor attorney's fees can be awarded to or against "the United States or an officer thereof."

Four types of criminal offenses actionable under the bill are listed in section 506: willful infringement for profit, fraudulent use of a copyright notice, fraudulent removal of notice, and false representation in connection with a copyright application. The maximum fine on conviction has been increased to $10,000 and, in conformity with the general pattern of the Criminal Code (18 U.S.C.), no minimum fines have been provided. In addition to or instead of a fine, conviction for criminal infringement under section 506(a) can carry with it a sentence of imprisonment of up to one year. Section 506(b) deals with seizure, forfeiture, and destruction of material involved in cases of criminal infringement.

Section 506(a) contains a special provision applying to any person who infringes willfully and for purposes of commercial advantage the copyright in a sound recording or a motion picture. For the first such offense a person shall be fined not more than $25,000 or imprisoned for not more than one year, or both. For any subsequent offense a person shall be fined not more than $50,000 or imprisoned not more than two years, or both.

**Exhibit JJ to Gratz Declaration**

**Filed Under Seal**

**(A-4240)**

# Exhibit KK to Gratz Declaration
# Filed Under Seal
# (A-4241)

**Exhibit LL to Gratz Declaration**

**Filed Under Seal**

**(A-4242)**

# Exhibit MM to Gratz Declaration

# Filed Under Seal

# (A-4243)

**Exhibit NN to Gratz**

**Declaration**

**Filed Under Seal**

**(A-4244)**

DocuSign Envelope ID: 848994FA-D941-4B2D-AB3D-33653C351135

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

## DECLARATION OF LAUREN SHERMAN

*CONFIDENTIAL*

I, Lauren Sherman, declare as follows:

1.     I am an educator based in Seattle, Washington.

2.     I have been teaching high school English since around August 2009. I have a bachelor's degree from Santa Clara University in English with an emphasis in Shakespeare Studies, and a minor in Gender Studies. I hold a master's degree in Literature & Culture from Oregon State University, and a master's degree in Teaching, English Education (5-12) from Western Governors University.

3.     Since around August 2014, I have taught English at a private Catholic high school in Seattle, Washington. The courses I have taught include English 10, Honors English 10, Honors English 11, and AP English 12, to 10th, 11th, and 12th graders. I have also served as a technology leader, helping to pilot new programs for computer use within the learning environment, and served on the diversity committee to discuss, troubleshoot, and implement policies within the school environment to support and address a diverse high school population. The school has a library which provides teachers and students access to physical books, and online resources such as the JSTOR digital library of academic journals, books, and primary sources, the Gale Virtual Reference Library, and Bloom's Literature Online. Though the school does not provide assigned books to all students—the onus is on students to obtain the books they need at the beginning of the year—the school library occasionally provides, upon request by a teacher, access to a few copies of books by purchasing physical books or OverDrive subscriptions. The library copies are intended for circumstances where a student may need temporary library access to a book, for example when purchasing books is difficult for a student due to their financial circumstances.

4.     I first learned about the Wayback Machine during my undergraduate education.

5.     The first time I discovered the Internet Archive's lending library was in 2018. I

had assigned one of my classes to read *Jane Eyre* by Charlotte Brontë. Upon Googling for

additional resources, I found a pamphlet from 1856, titled "A Brief Summary in Plain Language

of the Most Important Laws Concerning Women: Together with a Few Observations Thereon."

I assigned the pamphlet to my class for additional reading by providing the Internet Archive link.

The pamphlet was a valuable resource that provided important context on the public discourse

regarding women's rights at the time *Jane Eyre* was written.

6.     At the start of the COVID-19 pandemic, the school shifted to a fully remote

model whereby all classes were taught using Microsoft Teams video conferencing.  On or about

February 2020, students were no longer permitted on campus and the school instructed students

to take home materials from their lockers for the next few weeks.  I personally instructed my

students to take home any materials they would need for the rest of the unit of study, covering

*The Great Gatsby* and Emily Wilson's translation of *The Odyssey*.  I estimated remote learning

would last another 4-6 weeks.  When it became clear we would be teaching and learning

remotely longer than 4-6 weeks, I became concerned that we would not be able to cover the

assigned material in the subsequent units because students did not have access to their lockers.

For safety reasons, the school campus was closed to students.  I also knew that some of my

students who normally relied on the public library and school library for books were not able to

do so because those libraries were also closed during the pandemic for safety reasons.

7.     One book I taught during the COVID-19 pandemic was *Much Ado About*

*Nothing*, a comedic play by William Shakespeare, which I have taught several times over the

years.  I had assigned the book at the start of the year to each of my four English 10 classes. I had

about 22 students in each of my English 10 classes, and so approximately 88 students who

needed the book.  When I have taught *Much Ado About Nothing* in the past, I have typically used

the Folger's edition, which provides notes on Shakespeare's original text.  In my experience, the notes in Folger's edition is crucial to student comprehension of Shakespeare's text.  I had assigned the Folger's edition in my students' book lists at the beginning of the school year before the start of the COVID-19 pandemic, and so the expectation was that, by the time we began that unit, the students would have their own copy of, or access to, the book.  As the unit approached, I took a virtual poll in my classes and learned that about 50% of my English 10 students did not have the book at home.  It is my understanding that they did not have the book at home because, even though they had purchased the book, it was in their school lockers, which they were forbidden from accessing.  Because approximately half of my students did not have access to the book, I searched for and found the Folger's edition of the book with notes on the Internet Archive.  I also discovered that in reaction to the closure of schools, libraries, and bookstores across the country during the COVID-19 pandemic, the Internet Archive had temporarily lifted its restrictions on the number of people who could borrow a digitized book at one time.  I therefore provided the Internet Archive link to the Folger's edition of *Much Ado About Nothing* with notes to my students as an option for access, in addition to other options including re-purchasing another copy of the book, downloading the full text from Folger's website without the notes, or attempting to check out the book digitally from the public library.  To the best of my knowledge, I believe some of my students used the Internet Archive link for my class.  I also used the Internet Archive version to share my screen during a remote class where I normally would use a document camera in class to project a book excerpt for class discussion.

8. During the COVID-19 pandemic, I also recommended the Internet Archive's lending library to a student who was looking for resources from the 1920s for a thesis regarding fashion and *The Great Gatsby*.

9.      Prior to the COVID-19 pandemic, I did not consider using the Internet Archive's lending library to provide access to assigned books for my classes because the number of copies available for access at once, as well as the borrowing time limits, were too restrictive for the classroom setting.

10.      In my experience, physical books are superior to digital books in the classroom setting.  Over the years, I have observed that student attention decreases when using digitized books and it is more difficult for students to take useful notes when using digitized books.  Accordingly, in the classroom, I strongly prefer physical books over digital books.

11.      I do not support the use of piracy sites to gain access to books.  I teach my students to avoid piracy sites by instructing them to avoid websites that allow the user to download, without having to return, the full text of a book, and websites that show frequent advertisements or otherwise look illegitimate.

12.      As a teacher and an avid reader myself, I have always respected the rights of authors and publishers.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 8, 2022 in  Seattle, Washington.

LAUREN SHERMAN

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

</div>

A-4250

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>    Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>    Defendants. | Case No. 1:20-CV-04160-JGK |

## DECLARATION OF BENJAMIN H. SARACCO

*CONFIDENTIAL*

I, Benjamin H. Saracco, declare as follows:

1.      I am a Research & Digital Services Librarian at a hospital library affiliated with a medical school in New Jersey.

2.      I have been a professional librarian since around June 2009.  I have a bachelor's degree in Biology from Stockton University.  I hold a Master of Library Science from Queens University and a Master of Arts in Instructional Technology degree from Stockton University.  From my education and more than a decade of experience as a professional librarian, including at numerous public libraries, I consider the Internet Archive to be a library.

3.      I first learned about the Internet Archive while obtaining my Master of Library Science over a decade ago.  In that program, students and instructors commonly used and discussed the Internet Archive as a reputable resource for materials online.  For instance, at least one of my class syllabuses referred to the Internet Archive as an available reference tool.  As a student, I also used the Internet Archive's website to publicly host my thesis project presenting an online digital library of baking cookbooks.

4.      From around June 2009 to May 2012, I worked for the New York Botanical Garden in a Digital Projects Librarian position partially funded by the Institute of Museum and Library Services (IMLS).  In that position, I worked in partnership with the Internet Archive to digitize rare books for the botanical garden.  I also advised the library on digitization hardware, software, and metadata digital preservation practices, and I served as an administrator for the library's interlibrary loan program.

5.      From around May 2012 to March 2015, I worked for the Atlantic City Free Public Library as a Digital & Information Services Librarian and managed all electronic resources, including our eBook collections.

6.      From around April 2015 to June 2017, I worked for the New Jersey State Library & Thomas Edison State University as a New Jersey Reference & Electronic Resources Librarian. The Internet Archive was a resource I relied on to perform my job responsibilities at the state library.  For instance, I used the Internet Archive to pilot a service that automatically crawled certain state government websites and contributed to and administered an online repository of New Jersey state government documents, pursuant to NJ Rev State § 52:14-25.1 (2013).

7.      In my current role, the academic medical and hospital library I work in serves doctors, nurses, residents, and other healthcare workers in the associated hospital, and also the students, faculty, and staff of the associated medical school.  For medical students, the medical school provides all required materials in an ebook format.  Our library thus primarily stocks only physical books that we do not make available in the ebook format.

8.      The start of the COVID-19 pandemic was an extremely stressful time for me and my colleagues at the hospital library.  In March 2020, the Governor of New Jersey Phil Murphy signed an executive order that closed all academic libraries.  I remember being flooded with requests from medical students, nurses, and doctors for information during that time, particularly information about COVID and COVID patient care to address the high rates of hospitalization in the state.  I personally reached out to the New Jersey Secretary of State's office to inquire if the executive order applied to academic hospital libraries, but was told that even under such dire circumstances, the executive order also applied to hospital libraries like ours.  Therefore, we closed down our book lending services, and all physical books in our library were no longer available to medical students, nurses, and doctors.

9.      Some of the most commonly checked out physical materials in our library are training materials for patient care.  After we closed the library pursuant to the executive order, I

2

received multiple requests for at least two such materials: the Student Manual for Basic Life Support (BLS) for Healthcare Providers and the Advanced Cardiovascular Life Support Provider Manual. The Student Manual for Basic Life Support (BLS) for Healthcare Providers is a manual published by the American Heart Association that is used to train medical students to handle life-threatening emergencies, for example by giving CPR or using an automated external defibrillator (AED) in cases of cardiac arrest. The Advanced Cardiovascular Life Support Provider Manual, also published by the American Heart Association, builds on the BLS manual but teaches more advanced skills to treat patients in life-threatening circumstances. I searched for ebook versions of these materials in our database and did not find any. Believing I had no other quick options, I directed people to the materials on the Internet Archive, available at

https://archive.org/details/blsforhealthcar000amer and

https://archive.org/details/advancedcardiova0000unse_m9r8, respectively. I understood at the time that the versions on the Internet Archive were older than the versions we had in physical circulation. As a librarian I cannot know with certainty what our materials are ultimately used for in the hospital, but at the time, I was under the impression that the healthcare workers who were requesting these materials might be using them to treat COVID-19 patients admitted to our affiliated hospital.

10.     Around the same time, my colleagues and I brainstormed solutions to make our physical books available. We rushed to set up a scheduled book pick up service so that students, nurses, and doctors could still access the physical books in our collection. Through the webpage, users could sign up to pick up books by appointment. Each book was sanitized before lending and quarantined and disinfected upon return. It took approximately 2-4 weeks to set up the webpage and the processes to lend out our books. Without the Internet Archive, the Student

DocuSign Envelope ID: FEBCAB22-539D-4C73-940B-1312435E4B35V

Manual for Basic Life Support (BLS) for Healthcare Providers and the Advanced Cardiovascular Life Support Provider Manual would not have been available through our library at all until the book pick up service became available. Even when the book pick up service began, the rate of people borrowing books through that service was much slower than our usual rate of borrowing in the library. I believe that may have been due to public perception at the time that surface contamination of COVID created a high risk of infection.

11.    Also around the Spring of 2020, I received a request from a faculty member in the medical school's human cadaver gross anatomy laboratory for certain materials. Because the school had shut down to students, the laboratory had to shift to remote learning. I provided a demonstration over Zoom of how to use the Internet Archive's lending library to search for materials that might be useful for the curriculum.

12.    Before and during the pandemic, on multiple occasions, I have also directed students in the medical school's Scholars' Workshop to the Internet Archive. I understand that workshop includes a capstone project for students in their fourth year that will sometimes require a student to perform historical medical research for their projects. I have directed multiple students in that workshop to the Internet Archive's lending library to aid their research efforts. Without the Internet Archive in those circumstances, I would have directed the students to public libraries or other resources available in our catalogues.

13.    From my education and professional experiences as a librarian, especially during the start of the COVID-19 pandemic, I know the Internet Archive is an extremely valuable resource for the public. I have immense respect for the important work they are doing to ensure access to information through a digital medium.

4

14.     As a professional librarian of over 12 years, I have been trained to and have always respected the rights of authors and publishers.  In my view, the Internet Archive's lending library is consistent with those rights.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on _____5/10/2022_____ in Camden, New Jersey.

DocuSigned by:

*Benjamin Saracco*

1496D0017930A303

_____
BENJAMIN H. SARACCO

5

A-4256

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

</div>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and
PENGUIN RANDOM HOUSE LLC

                Plaintiffs,

    v.

INTERNET ARCHIVE and DOES 1 through
5, inclusive

                Defendants.

Case No. 1:20-CV-04160-JGK

## DECLARATION OF LAURA GIBBS

*CONFIDENTIAL*

DocuSign Envelope ID: 4FC56D29-3489-4FE4-B2E5-85989E7E6A7A

I, Laura Gibbs, declare as follows:

1.      I am a retired university instructor living in Austin, Texas.

2.      Before my retirement in May 2021, I taught Humanities courses at the University of Oklahoma for over 20 years in the College of Arts and Sciences; for most of those years I taught fully online.  I have a bachelor's degree in Classical and Slavic Languages from the University of California, Berkeley, and a Master of Philosophy in European Literature from Oxford University.  I also have a Ph.D. in Comparative Literature from the University of California, Berkeley.

3.      I first learned about the Internet Archive in the Fall of 1998.  At that time, as a graduate student working on my dissertation, I was excited to find literary texts and reference works online.  Later, in the Fall of 1999 when I began teaching at the University of Oklahoma, I sought out public domain books to share with my students, reducing the need for them to have to buy course materials.  Then, when I taught my first fully online course in 2002, I relied completely on online public domain books, using online book repositories like the Internet Archive, Project Gutenberg, and Sacred Texts Archive.  Over the next 20 years, I relied heavily on the Internet Archive in my teaching for public domain course reading materials, and also as a research source for my students.  I also conducted extensive research at the Internet Archive myself, using its public domain Latin books online for my research into Latin fables and proverbs.

4.      At the start of the COVID-19 pandemic in the Spring of 2020, the University of Oklahoma abruptly shut down its campus, including its main campus library.  Students no longer had access to the library books I had placed on reserve to supplement our online reading materials.  When my students could no longer access the physical books they would normally be able to borrow from the campus library, I looked to the educators and librarians I follow at

1

Twitter to learn about alternative resources; that was when I first heard about the Internet

Archive's lending library program.  Previously, I had used the Internet Archive only for public

domain materials; I had not been aware of the lending library which, as I learned, makes books

available for borrowing via controlled digital lending.  When I saw that I could find non-public-

domain books at the Internet Archive that my students could borrow, I realized I had a solution

to the pandemic crisis:  students could check out books for our courses at the Internet Archive in

basically the same way they had checked out the books we had on reserve in the campus library.

For instance, in the Epics of Ancient India class I was teaching in the Spring of 2020, students

could access important resources for our course like books by Devdutt Pattanaik, including his

book *Jaya* (available at https://archive.org/details/jayaillustratedr0000patt), and by Chitra

Divakaruni, including her book *Palace of Illusions* (available at

https://archive.org/details/palaceofillusion0000diva).  I discovered, in fact, by using the Internet

Archive, that the Internet Archive had additional books by these important Indian authors that we

did not even have in our campus library, and also referred my students to some of those,

including Divakaruni's books *Neela, Victory Song* (available at

https://archive.org/details/neelavictorysong00diva) and *The Conch-Bearer* (available at

https://archive.org/details/conchbearernovel00diva).

     5.     In the Fall of 2020, the University of Oklahoma reopened its campus, including

the library.  As a result, I returned to using the books that we had on reserve in the library, as

before.  But now I also knew that I could find books at the Internet Archive available via

controlled digital lending that were not available in our campus library.  That meant I was able

to, and did, refer my students to the Internet Archive for books that were relevant to their reading

interests and research projects but which were not available to them locally.  For instance, I

<center>2</center>

DocuSign Envelope ID: 4FC56D29-3489-4FE4-B2FF-85989E7E6A7A

referred a student working on a class project to *El Adivino* by Rosana Faria (available at https://archive.org/details/eladivinocuentop0000unse), which was not available through the campus library.

      6.     In addition to teaching, I am also a published author. I have published multiple books with traditional publishers like Oxford University Press; those books are still in print and they are each available for purchase on Amazon and at other booksellers. In more recent years, I have self-published my own books using Creative Commons licenses; there are now over a dozen of my self-published books available on the Internet Archive (https://archive.org/details/@lauragibbs?query=%22laura+gibbs%22). For instance, in March 2022, I published a book titled *A Reader's Guide to African Folktales at the Internet Archive* based on African folklore books available at the Internet Archive: I have made my book available on the Internet Archive (https://archive.org/details/guideafricafolktales). By my count, approximately 80% of the African folklore books I reference in my book are available for borrowing via controlled digital lending.

      7.     When I retired from teaching in May 2021, I started a new blog, Laura's Bookshelf (https://lkgbooks.blogspot.com/), where I blog about books at the Internet Archive, both public domain books and also books available for borrowing via controlled digital lending. My focus has been on African Diaspora folktales, and I've blogged about over 400 Internet Archive books so far (https://lkgbooks.blogspot.com/p/newest-books.html), approximately 75% of which by my count are available for borrowing via controlled digital lending.

      8.     Controlled digital lending significantly improved my ability to teach about traditional world cultures, especially the cultures of India and Africa. In my retirement, I am trying to raise awareness of these online resources so that other educators and the general reading

public will know about the resources available to them online.  In my research specifically, public domain materials about Africa and about India come from a colonial time and thus reflect very limited perspectives on Indian and African cultures.  Without more recent publications, especially publications by African and by Indian authors, the public domain materials alone cannot convey a full understanding of these vital and vibrant world cultures.  This is why I blog about controlled digital lending books available at the Internet Archive:  I discovered this resource only late in my teaching career, and now I hope to raise awareness of this online opportunity so that other teachers can learn about controlled digital lending and then recommend the best books online in their own disciplines to their students.

9.      Outside of my work, I am an avid reader and maintain a large home library.  I buy new books every week, both from used booksellers and also from the Amazon Kindle store, and every month I acquire new audiobooks from Audible.  I have never chosen not to purchase a book because it was available on the Internet Archive.  Just the opposite in fact:  I often buy books that I have learned about by discovering them at the Internet Archive.  I have no intention to stop purchasing books because of their availability on the Internet Archive.  Instead, the Internet Archive has significantly increased my book reading and book purchasing.

10.      I consider ebooks to be very different from the scans of physical books the Internet Archive makes available on its website.  To me, an ebook is typically a Kindle book that I can read on my phone whose text I can highlight using the Kindle software.  The ability to make the text font extra-large on the Kindle is also a big help to me.  That is not possible with books I borrow from the Internet Archive.  I cannot read the Internet Archive's page scans on my phone, for example, and the reading experience is very clunky by comparison to a true ebook that consists of digitized text.  The scans of a physical book, however, preserve certain historical

4

DocuSign Envelope ID: 1FC56D29-3489-4EE4-B2EE-85989E7E6A7A

elements that a Kindle book does not. For example, I sometimes find books at the Internet Archive that contain an inscription from the author or marginalia that a reader added to the physical copy before it was acquired by the Internet Archive.

11. I am an ardent supporter of the Internet Archive's efforts in book digitization and lending. From my own experiences over those two decades, I know the Internet Archive's services provide an immensely important platform that helps to ensure global access to information in the digital age.

12. As a teacher, an author, and an avid reader, I have always respected the rights of authors and publishers. In my view, the Internet Archive's lending library is consistent with those rights.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on _____5/10/2022_____ in Austin, Texas.

_____

LAURA GIBBS

5

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

</div>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC.,<br>HARPERCOLLINS PUBLISHERS LLC,<br>JOHN WILEY & SONS, INC., and<br>PENGUIN RANDOM HOUSE LLC<br><br>        Plaintiffs,<br><br>   v.<br><br>INTERNET ARCHIVE and DOES 1 through<br>5, inclusive<br><br>        Defendants. | Case No. 1:20-CV-04160-JGK |

**DECLARATION OF DANIEL SMITH**

I, Daniel Smith, declare as follows:

1.      I am a student at the University of Cambridge in Cambridge, United Kingdom, where I am due to graduate with a Ph.D. in Political Science in 2022.  On March 18, 2022, I successfully defended my doctoral dissertation.  In 2017, I received a Master of Arts degree in Political Science with distinction from the University of Essex in Colchester, United Kingdom.  I graduated *cum laude* with a Bachelor of Arts degree in History from Stony Brook University in Stony Brook, New York in 2015.

2.      As a student, I spent the period from 2017 to 2022 researching and writing my dissertation.  My dissertation—titled "'*The False Song of Globalism*': Anti-Globalist Politics and Ideology in the United States from 1945 to 2000"—examines the history of right-wing anti-globalist populism in the United States.  In writing my dissertation, I relied on a variety of books, articles, and primary source materials.

3.      Before the COVID-19 pandemic, many of the materials I relied on were available through the University of Cambridge's extensive library collection, which made both physical books and electronic books available.  Though I relied on a number of electronic sources for my dissertation, I enjoy being in libraries and browsing the stacks and I prefer to use physical books for my research.

4.      However, in March 2020, I left the United Kingdom to return to the United States due to the COVID-19 pandemic to be closer to my family. The University Library shut down and I would have been unable to utilize the Cambridge University Library's physical holdings if I had stayed in Cambridge. Suddenly, a critical resource I had depended upon to research and write my dissertation was not available.  On top of my academic stresses, I caught COVID-19 in April 2020 and many people I knew became sick.

5.      Because of the lack of access to the books and materials I needed to complete my

1

thesis, I turned to the Internet Archive. The Internet Archive had a large collection of both primary sources and books relevant to my research. I had first become aware of the Internet Archive several years before the onset of the COVID-19 pandemic, in part because of its collection of primary source documents that were relevant to my area of research into 20th century right-wing movements. As just one example, the Internet Archive hosts a large collection of historic FBI field notes and files—retrieved through Freedom of Information Act requests by an independent scholar named Ernie Lazar—about various right-wing intellectuals, activists, and organizations. I don't know of any other resources that provide access to so many important and rare documents—as well as books, audio, video, and other media—all in one place. Without the Internet Archive's collections, I would have had to travel to physical archives around the country and sift through many old boxes to find the primary historical materials that I used in my thesis, which would have been extremely costly and time consuming.

6.      The Internet Archive also offered books through its lending library that I could not otherwise access through Cambridge during the pandemic because university's library buildings were closed. In April 2020, I signed up for a free Internet Archive account so I could borrow those books for my research. These books were primary or secondary sources related to right-wing ideologies and groups. In short, because of the Internet Archive, I had ready access to dozens of books I needed for my dissertation that I otherwise would not have had access to. Without the Internet Archive during this stressful time, I would not have been able to finish my dissertation on time, and likely would have needed to extend my Ph.D. by a year or two.

7.      A useful aspect of the Internet Archive's collection of both books and primary sources is that I was able to read and confirm information or quotations easily. As part of my research process, I usually did not have to read an entire book—just a chapter or a particular

DocuSign Envelope ID: 433E9AGD-9GE1-4D98-BB21-GE39B946ABGB

passage.  The Internet Archive's resources made that research process easy and efficient.

8.     Without the variety of resources available through the Internet Archive's collections, my dissertation would not have been the same—it would have been worse.  I am immensely grateful to the Internet Archive for providing these resources, especially during the COVID-19 pandemic.  I firmly believe the Internet Archive is providing an important public service for students and researchers like me.

9.     Though I have not yet decided what to do with my Ph.D. dissertation, I am open to the idea of uploading it to the Internet Archive for others to read.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on _____5/23/2022_____ in Miami, Florida.

_____
DANIEL SMITH

3

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

</div>

4

DocuSign Envelope ID: C9D8450D-E054-45C8-A1A4-5A2435E2CB67

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**DECLARATION OF BREWSTER KAHLE IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S MOTION FOR SUMMARY JUDGMENT**

DocuSign Envelope ID: C9D8450D-F054-45C8-A1A4-5A3435562CB6

I, Brewster Kahle, declare as follows:

1.      I make this declaration from personal knowledge, and if called to testify, I could and would testify competently thereto.

2.      I founded the Internet Archive in 1996.  I currently serve as its Digital Librarian and Chair of the organization's Board of Directors.

## I.      THE INTERNET ARCHIVE

3.      The Internet Archive is a 501(c)(3) public charity.

4.      The guiding mission of the Internet Archive is to provide universal access to all knowledge.

5.      In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.

6.      The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals.

7.      One of the Internet Archive's first projects was to archive every public webpage on the fledgling World Wide Web.  Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine.  The Wayback Machine has become a crucial database for journalists, researchers, lawyers, and courts.

8.      The Internet Archive works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.

9.      The Internet Archive has been a member of the American Library Association since 2000.  The Internet Archive is also an affiliate member of the Boston Library Consortium, and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks.

DocuSign Envelope ID: C9D8450D-E054-4508-A1A4-5A2435562CB6

10.     In December 2006, the State of California formally recognized the Internet Archive as a library, making it eligible to receive funding under the Library Services and Technology Act and qualifying it for E-Rate, a federal program that provides discounts to schools and libraries to ensure they are able to obtain affordable telecommunications services.

11.     In mid-2007, the Internet Archive was awarded a Library Services and Technology Act grant for its Open Library project (openlibrary.org)—an effort to create a comprehensive library book catalog with a webpage for every book published.  A true and correct copy of the grant is attached as **Exhibit 1**.

12.     The Internet Archive has also received grant funding from the Institute of Museum and Library Services ("IMLS"), an independent federal agency whose mission is to support museums, libraries, and related organizations.  For example, in 2017, the Internet Archive received a grant under the IMLS's Laura Bush 21st Century Library Program.  In order to receive this grant, the Internet Archive had to qualify as a library or library-related organization.  A true and correct copy of the IMLS webpage recording the awarding of the 2017 grant is attached at **Exhibit 2**.

## II.     THE INTERNET ARCHIVE'S IMPLEMENTATION OF CONTROLLED DIGITAL LENDING

13.     In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending.  A true and correct copy of the Internet Archive blog post I reviewed announcing this program is attached as **Exhibit 3**.

14.     In November 2011, the Internet Archive's digital lending effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA").  A true and correct copy of this endorsement is attached as **Exhibit 4**.

DocuSign Envelope ID: C9D8450D-E054-45C8-A1AA-5A2435525B61

15.     As of this filing, the Internet Archive has more than three million books available for digital borrowing in its collection.

16.     The Internet Archive launched and expanded this program on the basis that it is fair use.  In developing and maintaining this belief, I relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library—each copyright scholars known to me and my colleagues to be respected in their fields.  A true and correct copy of the White Paper is attached as **Exhibit 5**.  The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."

17.     I also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law professor and librarian at the Georgetown Law Center.  Lila Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement.  My colleagues and I understood all co-authors of the *Position Statement* to be well-respected copyright scholars.  Dozens of copyright law professors and scores of libraries and library associations became signatories to the statement, including the Association of Research Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and the Chief Officers of State Library Agencies, representing the state librarians of all fifty states.  Attached are true and correct copies of the Position Statement as **Exhibit 6** and the list of signatories as **Exhibit 7**.

3

**A.      Scanning and storing books**

18.      The Internet Archive—or another 501(c)(3) public charity it works closely with, Open Library of Richmond—lawfully acquires print books by purchase or donation that it wishes to make available for digital lending.

19.      Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.

20.      Print books stored in the physical archive facilities are non-circulating; they are not available to be accessed in their print form.

**B.      Lending experience**

21.      Anyone can become a patron of the Internet Archive—and digitally borrow books—for free by signing up for an Internet Archive account.  (Internet Archive has policies, not relevant here, for terminating accounts.)

22.      Doing so grants them a digital library card that lets them borrow up to ten books at a time from the collection, for limited periods of up to fourteen days.

23.      A patron can read the book in their web browser through a tool called BookReader.  BookReader lets patrons flip through a book's pages, zoom in on a book's images, enlarge the book's text for easier reading, and search through the book.

24.      A loan will automatically expire at the end of the loan period.  At that point, the patron is no longer able to access the book, and it is once again available to be borrowed.

25.      The Internet Archive uses Adobe DRM to encrypt PDF and ePub formats of books that patrons can download.  The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.

4

### C. Lending policies

26.     The Internet Archive does not digitally loan all of the books it has scanned. Instead, it implements a number of policies that limit the books available for digital lending.

27.     As relevant here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive or Open Library of Richmond.

28.     It is the Internet Archive's policy not to lend books published within the previous five years.  This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers.

29.     As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the Market*—were made available for digital lending.

30.     Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library.

31.     First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage.

32.     Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners—from the University of Arizona to the Delaware County District Library in Ohio—to contribute their own non-circulating copies of that book toward the number of lendable copies.  Even if a partner library has multiple copies of a particular book, the Internet Archive counts only one additional copy per library.

33.     For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then *Little House on the Prairie* could be digitally loaned to up to four patrons at a time.  Each concurrent loan would thus still be associated with one non-

A-4275

circulating physical copy.  If all four copies of *Little House on the Prairie* were checked out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in.

### D.      Benefits to the public

34.      Over the course of the last decade, I have spoken with and heard stories from our patrons.  I have learned that digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.

35.      I have also learned that digital lending is particularly helpful for brief or spontaneous access to books—for example, for checking citations or references, or looking up discrete facts—that wouldn't be worth a trip to a brick-and-mortar library.

36.      Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship.

37.      The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries.  A true and correct copy of an Internet Archive blog post I wrote about this project is attached as **Exhibit 8**.

38.      Attached hereto as **Exhibit 9** is a document prepared at my direction and with my participation compiling information regarding Wikipedia citations to books available to borrow from the Internet Archive via CDL.  It accurately reflects a subset of the links from English-language Wikipedia articles to books available to borrow from the Internet Archive via CDL.

DocuSign Envelope ID: C9D8450D-E054-45C8-A1A4-5A2435562EB6

39.     There are 202,026 links in Wikipedia articles in English to books available to borrow from the Internet Archive via CDL.  Those links lead to 88,284 different books available to borrow from the Internet Archive via CDL.

40.     In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available books related to the incarceration of Japanese Americans during World War II.  A true and correct copy of an Internet Archive blog post I reviewed is attached as **Exhibit 10**.

41.     In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive.  A true and correct copy of an Internet Archive blog post I reviewed is attached as **Exhibit 11**.

## III.     THE NATIONAL EMERGENCY LIBRARY

42.     At the beginning of the COVID-19 pandemic, school districts reached out to the Internet Archive concerned that students and teachers could no longer physically access books— including hundreds of copies of assigned books that the school had already purchased.

43.     Libraries reached out to us worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away.

44.     By our estimation based on data from the federal Institute of Museum and Library Services, with the closure of libraries, 650 million books were out of circulation.

45.     Hearing these pleas and understanding our unique technological capacity to take immediate action, we proposed temporarily lifting the technical controls enforcing its one-to-one ratio.  Since all of the libraries were closed, I believed there were sure to be more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even

without technical enforcement of the one-to-one ratio.  (We closely monitored borrowing behavior, and I continue to believe that the number of concurrent loans of a given book by Internet Archive via the National Emergency Library ("NEL") at any given time never exceeded the number of print copies then rendered inaccessible to readers due to the health emergency.)

46.     The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently.

47.     The Internet Archive launched the NEL on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US national emergency, whichever is later."  A true and correct copy of a blog post announcing the NEL that I reviewed is attached as **Exhibit 12**.

48.     The Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library in advance of its launch.  A true and correct copy of the statement of support that I co-authored is attached as **Exhibit 13**.

49.     We believed then, and believe now, that under those unique circumstances, operating the NEL was fair use.

50.     The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries.

51.     Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time.  A true and correct copy of blog posts collecting such stories that I reviewed are attached as:

8

DocuSign Envelope ID: C9D8460B-F954-4608-A1A4-F43136526581

- **Exhibit 14** ("Teachers & the National Emergency Library: Stories from the Frontlines of Online Schooling," April 13, 2020)

- **Exhibit 15** ("Impacts of the temporary National Emergency Library and controlled digital lending," June 11, 2020)

- **Exhibit 16** ("More Impacts of the National Emergency Library," June 22, 2020)

- **Exhibit 17** ("Even More Impacts of the National Emergency Library and Controlled Digital Lending," August 10, 2020)

52.     The Internet Archive shut down the NEL on June 16, 2020.

## IV.     EBOOK PURCHASING

53.     The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).

54.     The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them).

55.     Several times over the past ten years, I have personally asked major publishers, including Plaintiffs, if they would sell ebooks to Internet Archive (rather than license them). Plaintiffs have declined each time I have asked.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on July 7, 2022, in San Francisco, California.



_____
BREWSTER KAHLE

A-4279

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

<div align="right">

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

</div>

# EXHIBIT 1

California State Library            LSTA GA Page 1
Budget Office
P.O. Box 942837          LSTA GRANT AWARD #40-6881
Sacramento, CA 94237-0001

Project Title:      OpenLibrary.org: One Webpage per Book
System/Agency:    Internet Archive

## CONSOLIDATED APPLICATION
## NOTIFICATION OF GRANT AWARD

### Library Services and Technology Act

I. The recipient designated above hereby certifies to the California State Library, for a grant of funds in the amount of      $342,925. This block grant will provide library services as set forth in the LSTA Service Project Application as approved and/or as amended by the California State Librarian.

### TERMS AND CONDITIONS

The recipient agency and its named or designated fiscal agent hereby assures the California State Library that:

     1. It is mutually understood between the parties that this grant award may have been written before ascertaining the availability of congressional appropriation of funds, for the mutual benefit of both parties in order to avoid program and fiscal delays which would occur if the grant award were executed after that determination was made.

     2. This grant award is valid and enforceable only if sufficient funds are made available to the State by the United States government for the Fiscal Year 07/08 for the purposes of this program. In addition, this grant award is subject to any additional restrictions, limitations, or conditions enacted by the Congress or any statute enacted by the Congress which may affect the provisions, terms or funding of this grant award in any manner.

     3. It is mutually agreed that if the Congress does not appropriate sufficient funds for the program, this grant award shall be amended to reflect any reduction in funds.

     4. The California State Library has the option to amend the grant award to reflect any reduction of funds.

     5. Upon the grant award approval by the State Librarian, one (1) completed set of this CONSOLIDATED APPLICATION NOTIFICATION OF GRANT AWARD and RECIPIENT CERTIFICATION will be sent to the subgrantee. Such copy shall be the officially approved agreement for the conduct of the approved project.

     6. "Subgrantee" means the government or other legal entity to which a subgrant is awarded and which is accountable to the grantee for the use of the funds provided.

     7. The subgrantee will make reports to the State Librarian in such form and containing such information as may be required to enable the California State Library to perform its duties. The subgrantee will keep such records and afford such access as the California State Librarian, California State Library may find necessary to assure the correctness and verification of such reports.

INTARC00137129

California State Library
Budget Office
P.O. Box 942837
Sacramento, CA  94237-0001

LSTA GRANT AWARD #40-6881

Project Title:        OpenLibrary.org: One Webpage per Book
System/Agency:    Internet Archive

## CONSOLIDATED APPLICATION
## NOTIFICATION OF GRANT AWARD, LSTA (continued)

8.  The control of funds and title to property derived therefrom shall be in a subgrantee agency for the uses and purposes provided; a subgrantee agency will administer such property and funds and shall apply funds only for the purposes for which they were granted.

9.  The expenditure under this program will not be used to supplant subgrantee effort.

10. This aggreement is entered into under provisions of the Library Services and Technology Act, Public Law 104-208 on September 30, 1996; and Congressional Record - House, H11644-H11728 on September 28, 1996, H12266-H12267 on October 3, 1996; and 45 CFR 1183, Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, October 1, 1994.

11.  Performance of the provisions of this agreement is subject to the conditions and availability of funds as awarded by the State Librarian under said Act.

12.  The sheets marked CERTIFICATIONS REGARDING LOBBYING; DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS; AND DRUG-FREE WORKPLACE REQUIREMENTS and ASSURANCES are attached hereto and incorporated herein.

13.  The terms of this agreement shall be from upon execution to and including June 30, 2008.  But shall be subject to termination by either party by giving written notice to the other party at least thirty (30) days prior to the effective date of termination.

In the event this agreement is so terminated, the subgrantee shall deliver to the State Librarian copies of all reports and/or materials prepared up to the date of termination, and the State Librarian shall determine, and pay the subgrantee for the necessary and appropriate expenditures and obligations to the date of termination which have not been covered by prior installments heretofore paid to the subgrantee.  If funding has been advanced to the subgrantee, any unobligated balances, as determined by the State Librarian, shall be returned to the State Library within 60 days of the notice of termination.

14. The State Librarian is empowered to review, audit, and inspect the project for compliance with this agreement.

## LIMITATION OF EXPENDITURE

Expenditure for all projects must conform to the approved budget, as amended, and with applicable Federal and State laws and regulations.

INTARC00137130

California State Library
Budget Office
P.O. Box 942837
Sacramento, CA 94237-0001

LSTA GRANT AWARD #40-6881

Project Title:      OpenLibrary.org: One Webpage per Book
System/Agency:   Internet Archive

## CONSOLIDATED APPLICATION
## NOTIFICATION OF GRANT AWARD, LSTA, continued

Any of the sums listed as approved and/or amended appearing under the categories in the approved budget may be adjusted by the authorized project personnel of the subgrantee to increase any allotment not more than 10% with the understanding that there will be corresponding decreases in the other allotments so that the total amount paid by the California State Library to the subgrantee under this agreement shall not exceed $342,925 and shall be expended/encumbered in the period ending **June 30, 2008.**

## REPORTS AND CLAIMS

It is the responsibility of the recipient of these instructions to see that the proper individual to supply the required reports and claims receives the instructions and makes the required reports and claims to the California State Library.

   I.  The subgrantee shall be responsible for the submission of quarterly Narrative Reports, unless otherwise noted in the State Librarian's award letter, on the progress and activities of the project, in triplicate, to the California State Library within 30 days following the end of each quarter.

  II.  The subgrantee shall submit quarterly Financial Reports, in triplicate to the California State Library. These reports are to reflect the expenditures made by the subgrantee under the agreement. The financial reports are to be submitted within 30 days following the end of the quarter.

  III.  To obtain payment hereunder the subgrantee shall submit authorized claims provided by the California State Library for that purpose, on each of the following mentioned dates for payment, and the California State Library agrees to reimburse the Library as soon thereafter as State fiscal procedures will permit.

  IV.  The final 10% of the grant award is payable only if the grant recipient fulfills all project reporting requirements and returns all unspent grant funds by the time time specified in the award. Failure to provide timely reports is a serious breach of a grant recipient's administrative duty under the award, which may result in federal audit exceptions against the state and the loss of LSTA funds. The State Librarian may extend the final deadline for good cause. Request for extension beyond the final deadline of June 30 must be received at least 30 days prior to that deadline at the State Librarian's office.

Payment will be provided to cover the expenditures incurred by the subgrantee for the project in the following manner:

| | |
|---|---|
| $154,316 | upon execution of the agreement and submission of claim by fiscal agent |
| $154,316 | on or about October 30, 2007 |
| $34,293 | on the submission of all reporting and return of funds |

If the amount of payment made by the California State Library shall exceed the actual expenses during the term of this agreement, as reflected in the financial reports to be filed by the subgrantee, the subgrantee shall refund to the California State Library the amount of such excess payment.

**INTARC00137131**

A-4284

LSTA GA Page 4

California State Library
Budget Office
P.O. Box 942837
Sacramento, CA 94237-0001

LSTA GRANT AWARD #40-6881

Project Title: OpenLibrary.org: One Webpage per Book
System/Agency: Internet Archive

## NONDISCRIMINATION CLAUSE ADDENDUM

1. During the performance of this grant award, the recipient, subgrantee and its contractors shall not deny the grant award's benefits to any person on the basis of religion, color, ethnic group identification, sex, age, physical or mental disability, nor shall they discriminate unlawfully against any employee or applicant for employment because of race, religion, color, national origin, ancestry, physical handicap, mental disability, medical condition, marital status, age (over 40) or sex. Subgrantee shall insure that the evaluation and treatment of employees and applicants for employment are free of such discrimination.

2. Subgrantee shall comply with the provisions of the Fair Employment and Housing Act (Gov. Code, Section 1290 et. seq.), the regulations promulgated thereunder (Cal. Admin. Code, Tit. 2, Sections 7285.0 et. seq.), the provisions of Article 9.5, Chapter 1, Part 1, Division 3, Title 2 of the Government Code (Gov. Code, Sections 11135-11139.5), and the regulations or standards adopted by the awarding state agency to implement such article.

3. Subgrantee or recipient shall permit access by representatives of the Department of Fair Employment and Housing and the awarding state agency upon reasonable notice at any time during the normal business hours, but in no case less than 24 hours notice, to such of its books, records, accounts, other sources of information and its facilities as said Department or Agency shall require to ascertain compliance with this clause.

4. Recipient, subgrantee and its contractors shall give written notice of their obligations under this clause to labor organizations with which they have a collective bargaining or other agreement.

5. Subgrantee shall include the nondiscrimination and compliance provisions of this clause in all contracts to perform work under the grant award.

INTARC00137132

California State Library
Budget Office
P.O. Box 942837
Sacramento, CA 94237-0001

LSTA GRANT AWARD #40-6881

Project Title:     OpenLibrary.org: One Webpage per Book
System/Agency:     Internet Archive

## CERTIFICATION REGARDING LOBBYING FOR
## GRANTS AND COOPERATIVE AGREEMENTS

This certification is a prerequisite for making or entering into a grant or cooperative agreement over $100,000. Upon the acceptance of the grant award the subgrantee as required by Section 1352, Title 31 of the U.S. Code certifies to the best of his or her knowledge and belief, that:

1.     No Federal appropriated funds have been paid or will be paid, by or on behalf of the subgrantee, to any person for influencing or attempting to influence an officer or employee of Congress, or an employee of a Member of Congress in connection with the making of any Federal grant, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal grant or cooperative agreement.

2.     If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal grant or cooperative agreement, the subgrantee shall complete and submit Standard Form - LLL, 'Disclosure Form to Report Lobbying,' in accordance with its instructions.

3.     The subgrantee shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subgrants, contracts under grants and cooperative agreements, and subcontracts) and that all subrecipients shall certify and disclose accordingly.

INTARC00137133

LSTA Control #    F-15

## LSTA GRANT AWARD DOCUMENTATION
### Budget Citation BA 07, Item 6120-211-0890

LSTA Award #:    40-6881                          Approval Date:  07/10/07

Project Title:    OpenLibrary.org: One Webpage per Book

Subgrantee:    Internet Archive

Funding Start Date: ** upon execution **

Approved Funds:  $342,925                    Term:  upon execution - 6/30/08

Payments:       $154,316      upon execution of agreement        Schedule No.
                $154,316      on or about October 30, 2007        Schedule No.
                $34,293       on completion of all reporting      Schedule No.
                              requirements and return of abatements

Appropriation Encumbered (designate where applicable)      For:   FY   07/08
                                                                   WP   06

Federal Fund  Trust  PCA #:  92980        Code:  702      Vendor Code:   M212

Catalog number from Federal Catalog of Domestic Assistance#45.310

Matching:       State: 34%      Federal: 66%

| BUDGET CATEGORY | APPROVED BUDGET | REVISED | REVISED |
|---|---|---|---|
| SALARIES & BENEFITS | $91,750 | | |
| MATERIALS | | | |
| OPERATING EXPENSES | $130,000 | | |
| EQUIPMENT | $90,000 | | |
| INDIRECT COSTS | $31,175 | | |
| TOTAL | $342,925 | | |

INTARC00137134

ASSURANCES

The applicant assures and certifies that it will comply with the regulations, policies, guidelines and requirements, as they relate to the application, acceptance and use of Federal funds for this federally assisted project. Also the Applicant assumes and certifies:

1. It possesses legal authority to apply for the grant; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body, authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

2. It will comply with Title VI of the Civil Rights Act of 1964 (P.L. 88-352) and in accordance with Title VI of that Act, no person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the applicant receives Federal financial assistance and will immediately take any measures necessary to effectuate this agreement.

3. It will comply with Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d) prohibiting employment discrimination where (1) the primary purpose of a grant is to provide employment or (2) discriminatory employment practices will result in unequal treatment of persons who are or should be benefiting from the grant-sided activity.

4. It will comply with Section 504 of the Rehabilitation Act of 1973, as amended, 20 U.S.C. 794, which prohibits discrimination on the basis of handicap in programs and activities receiving Federal financial assistance.

5. It will comply with Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. 1681 et seq., which prohibits discrimination on the basis of sex in education programs and activities receiving Federal financial assistance.

6. It will comply with the Age Discrimination Act of 1975, as amended, 42 U.S.C 6101 et seq., which prohibits discrimination on the basis of age in programs or activities receiving Federal financial assistance.

7. It will comply with requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (P.L. 91-646) which provides for fair and equitable treatment of persons displaced as a result of Federal and federally-assisted programs.

8. It will comply with the provisions of the Hatch Act which limit the political activity of employees.

9. It will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act, as they apply to hospital and educational institution employees of State and local governments.

10. It will establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by desire for private gain for themselves or others, particularly those with whom they have family, business, or other ties.

11. It will give the sponsoring agency or the Comptroller General trough any authorized representative the access to and the right to examine all records, books, papers, or documents related to the grant.

12. It will comply with all requirements by the Federal-sponsoring agency concerning special requirements of law, program requirements, and other administrative requirements.

13. It will insure that the facilities under its ownership, lease or supervision which shall be utilized in the accomplishment of the project are not listed on the Environmental Protection Agency's (EPA) list of violating facilities and that it will notify the Federal grantor agency of the receipt of any communication from the Director of the EPA Office of Federal Activities indicating that a facility to be used in the project is under consideration for listing by the EPA.

14. It will comply with the flood insurance purchase requirements of Section 102(a) requires, on or after March 2, 1975, the purchase of flood insurance in communities where such insurance is available as a condition for the receipt of any Federal financial assistance for construction or acquisition purposes for use in any area that has been identifies by the Secretary of the Department of Housing and Urban Development as an area having special flood hazards. The phrase "Federal financial assistance" includes any form of loan, grant, guaranty, insurance payment, rebate, subsidy, disaster assistance loan or grant, or any other form of direct or indirect Federal assistance.

15. It will assist the Federal grantor agency in its compliance with Section 106 of the National Historic Preservation Act of 1966 as amended (16 U.S.C. 470), Executive Order 11593, and the Archeological and Historic Preservation Act of 1966 (16 U.S.C. 469a-1 et seq.) by (a) consulting with the State Historic Preservation Officer on the conduct of investigations, as necessary to identify properties listed in or eligible for inclusion in the National Register of Historic Places that are subject to adverse effects (see 36 CFR Part 800.8) by the activity, and notifying the Federal grantor agency of the existence of any such properties, and by (b) complying with all requirements established by the Federal grantor agency to avoid or mitigate adverse effects upon such properties.

# EXHIBIT 2



Home > Advanced Search > RE-85-17-0060-17

# Internet Archive

Log Number: **RE-85-17-0060-17**

**Program:** Laura Bush 21st Century Librarian Program

**Fiscal Year:** 2017

**Federal Funds :** $338,940

**City:** San Francisco

**State:** CA

The Internet Archive will train 15 public librarians on using web archives to capture historically valuable web materials documenting their local communities. Participating librarians will receive intensive training in a variety of web archiving topics through in-person and online trainings, professional support from experts on web archiving in public libraries, and cohort-based activities. Training materials will also be made freely available online for reuse by others. participants' institutions will be provided with five-year subscriptions to the Internet Archive's Archive-It service, resulting in the long-term preservation of over 35 terabytes of web-published community history materials. This project will increase the capacity of public libraries nationwide to participate in web archiving and document their community history.

**Project Proposals**

| | |
|---|---|
| re-85-17-0060-17-full-proposal-documents.pdf | 781.66 KB |
| re-85-17-0060-17-preliminary-proposal.pdf | 124.48 KB |

INSTITUTE of **Museum** and **Library** SERVICES

**CONTACT US**

202-653-4657 | imlsinfo@imls.gov

955 L'Enfant Plaza North, SW, Suite 4000, Washington, D.C. 20024-2135

Viewers & Players | FOIA | No FEAR | Privacy & Terms of Use | EEO | Accessibility | Open Government | Office of Special Counsel | USA.gov

1/1

# EXHIBIT 3



# Internet Archive Blogs

*A blog from the team at archive.org*

# In-Library eBook Lending Program Launched

Posted on February 22, 2011 by jeff kaplan

**Internet Archive and Library Partners Develop Joint Collection of 80,000+ eBooks To Extend Traditional In-Library Lending Model**

San Francisco, CA – Today, a group of libraries led by the Internet Archive announced a new, cooperative 80,000+ eBook lending collection of mostly 20th century books on OpenLibrary.org, a site where it's already possible to read over 1 million eBooks without restriction. During a library visit, patrons with an OpenLibrary.org account can borrow any of these lendable eBooks using laptops, reading devices or library computers. This new twist on the traditional lending model could increase eBook use and revenue for publishers.



"As readers go digital, so are our libraries," said Brewster Kahle, founder and Digital Librarian of the Internet Archive. "It's fabulous to work with such a great group of 150 forward-thinking libraries." (See the list of participating libraries below.)

This new digital lending system will enable patrons of participating libraries to read books in a web browser. "In Silicon Valley, iPads and other reading devices are hugely popular. Our partnership with the Internet Archive and OpenLibrary.org is crucial to achieving our mission – to meet the reading needs of our library visitors and our community," said Linda Crowe, Executive Director of the Peninsula Library System.

A recent survey of libraries across North America was conducted by Unisphere Research and Information Today, Inc. (ITI). It reported that of the 1,201 libraries canvassed, 73% are seeing increased demand for digital resources with 67% reporting increased demand for wireless access and 62% seeing a surge in demand for web access.

American libraries spend $3-4 billion each year on publishers' products. "I'm not suggesting we spend less, I am suggesting we spend smarter by buying and lending more eBooks," asserts Kahle. He is also encouraging libraries world-

A-4292

wide to join in the expansion of this pool of purchased and digitized eBooks so their patrons can borrow from this larger collection.

## How it Works

Any OpenLibrary.org account holder can borrow up to 5 eBooks at a time, for up to 2 weeks. Books can only be borrowed by one person at a time. People can choose to borrow either an in-browser version (viewed using the Internet Archive's BookReader web application), or a PDF or ePub version, managed by the free Adobe Digital Editions software. This new technology follows the lead of the Google eBookstore, which sells books from many publishers to be read using Google's books-in-browsers technology. Readers can use laptops, library computers and tablet devices including the iPad.



## What Participating Libraries Are Saying

The reasons for joining the initiative vary from library to library. Judy Russell, Dean of University Libraries at the University of Florida, said, "We have hundreds of books that are too brittle to circulate. This digitize-and-lend system allows us to provide access to these older books without endangering the physical copy."

Digital lending also offers wider access to one-of-a-kind or rare books on specific topics such as family histories – popular with genealogists. This pooled collection will enable libraries like the Boston Public Library and the Allen County Public Library in Indiana to share their materials with genealogists around the state, the country and the world.

"Genealogists are some of our most enthusiastic users, and the Boston Public Library holds some genealogy books that exist nowhere else," said Amy E. Ryan, President of the Boston Public Library. "This lending system allows our users to search for names in these books for the first time, and allows us to efficiently lend some of these books to visitors at distant libraries."

"Reciprocal sharing of genealogy resources is crucial to family history research. The Allen County Public Library owns the largest public genealogy collection in the country, and we want to make our resources available to as many people as possible. Our partnership in this initiative offers us a chance to reach a wider audience," said Jeffrey Krull, director of the Allen County Public Library.

Publishers selling their eBooks to participating libraries include Cursor and OR Books. Books purchased will be lent to readers as well as being digitally preserved for the long-term. This continues the traditional relationship and services offered by publishers and libraries.

"Libraries are our allies in creating the best range of discovery mechanisms for writers and readers—enabling open and browser-based lending through the Internet Archive means more books for more readers, and we're thrilled to do our part in achieving that," said Richard Nash, founder of Cursor.

A-4293

John Oakes, founder of OR Books said, "We're always on the lookout for innovative solutions to solve the conundrum of contemporary publishing, and we are excited to learn about the Internet Archive's latest project. For us, it's a way to extend our reach to the crucial library market. We look forward to the results. "



**For More Information**

Here are a few eBooks that are only available to people in participating libraries.

Libraries interested in partnering in this program should contact: info@archive.org.

To use this service, please visit a participating library: www.openlibrary.org.

For a list of participating libraries, see below.

###

**List of Participating Libraries**

Aboite Branch Library, Allen County Public Library

Dupont Branch Library, Allen County Public Library

Georgetown Branch Library, Allen County Public Library

Grabill Branch Library, Allen County Public Library

Hessen Cassel Branch Library, Allen County Public Library

Little Turtle Branch Library, Allen County Public Library

Main Library, Allen County Public Library

Monroeville Branch Library, Allen County Public Library

New Haven Branch Library, Allen County Public Library

Pontiac Branch Library, Allen County Public Library

Shawnee Branch Library, Allen County Public Library

Tecumseh Branch Library, Allen County Public Library

Waynedale Branch Library, Allen County Public Library

Woodburn Branch Library, Allen County Public Library

Adams Street Branch Library, Boston Public Library

Brighton Branch Library, Boston Public Library

Charlestown Branch Library, Boston Public Library

Codman Square Branch Library, Boston Public Library

Connolly Branch Library, Boston Public Library

Dudley Branch Library, Boston Public Library

East Boston Branch Library, Boston Public Library

Egleston Square Branch Library, Boston Public Library

Faneuil Branch Library, Boston Public Library

Fields Corner Branch Library, Boston Public Library

Grove Hall Branch Library, Boston Public Library

Honan-Allston Branch Library, Boston Public Library

Hyde Park Branch Library, Boston Public Library

Case 1:20-cv-04160-JGK-OTW Document 105-35 Filed 07/07/22 Page 5 of 8

Jamaica Plain Branch Library, Boston Public Library

Lower Mills Branch Library, Boston Public Library

Mattapan Branch Library, Boston Public Library

North End Branch Library, Boston Public Library

Orient Heights Branch Library, Boston Public Library

Parker Hill Branch Library, Boston Public Library

Roslindale Branch Library, Boston Public Library

South Boston Branch Library, Boston Public Library

South End Branch Library, Boston Public Library

Uphams Corner Branch Library, Boston Public Library

Washington Village Branch Library, Boston Public Library

West End Branch Library, Boston Public Library

West Roxbury Branch Library, Boston Public Library

Internet Archive

MBLWHOI Library, Marine Biological Laboratory, Woods Hole Oceanographic Institution

Atherton Library, Atherton, California

Bay Shore Library, Daly City, California

Belmont Library, Belmont, California

Brisbane Library, Brisbane, California

Burlingame Public Library, Burlingame, California

Burlingame Library Easton Branch, Burlingame, California

Cañada College Library, Redwood City, California

College of San Mateo Library, San Mateo, California

East Palo Alto Library, East Palo Alto, California

Fair Oaks Library, Redwood City, California

Foster City Library, Foster City, California

Grand Avenue Branch Library, South San Francisco, California

Half Moon Bay Library, Half Moon Bay, California

Hillsdale Branch Library, San Mateo, California

John Daly Library, Daly City, California

Marina Public Library, San Mateo, California

Menlo Park Library, Menlo Park, California

Menlo Park Library Belle Haven Branch, Menlo Park, California

Millbrae Library, Millbrae, California

Pacifica Sanchez Library, Pacifica, California

Pacifica Sharp Park Library, Pacifica, California

Portola Valley Library, Portola Valley, California

Redwood City Public Library, Redwood City, California

Redwood Shores Branch Library, Redwood City, California

San Bruno Library, San Bruno, California

San Carlos Library, San Carlos, California

San Mateo Public Library, San Mateo, California

A-4295

Schaberg Library, Redwood City, California

Serramonte Main Library, Daly City, California

Skyline College Library, San Bruno, California

South San Francisco Public Library, South San Francisco, California

Westlake Library, Daly City, California

Woodside Library, Woodside, California

Anza Branch, San Francisco Public Library

Bayview/Anna E. Waden Branch, San Francisco Public Library

Bernal Heights, San Francisco Public Library

Chinatown/Him Mark Lai Branch, San Francisco Public Library

Eureka Valley/Harvey Milk Memorial Branch, San Francisco Public Library

Excelsior, San Francisco Public Library

Glen Park Branch, San Francisco Public Library

Golden Gate Valley Branch, San Francisco Public Library

Ingleside Branch, San Francisco Public Library

San Francisco Public Library, Main

Marina, San Francisco Public Library

Merced Branch Library, San Francisco Public Library

Mission, San Francisco Public Library

Mission Bay, San Francisco Public Library

Noe Valley/Sally Brunn Branch, San Francisco Public Library

North Beach Branch, San Francisco Public Library

Ocean View, San Francisco Public Library

Ortega, San Francisco Public Library

Park Branch, San Francisco Public Library

Parkside, San Francisco Public Library

Portola Branch, San Francisco Public Library

Potrero Branch, San Francisco Public Library

Presidio Branch, San Francisco Public Library

Richmond/Senator Milton Marks Branch, San Francisco Public Library

Sunset, San Francisco Public Library

Visitacion Valley, San Francisco Public Library

West Portal, San Francisco Public Library

Western Addition, San Francisco Public Library

The Urban School of San Francisco

Augustana Campus Library, University of Alberta

Bibliothèque Saint-Jean (BSJ), University of Alberta

Cameron Library, University of Alberta

Herbert T. Coutts (Education & Physical Education) Library, University of Alberta

Rutherford Library, University of Alberta

John A. Weir Memorial Law Library, University of Alberta

John W. Scott Health Sciences Library, University of Alberta

Winspear Business Reference Library, University of Alberta

Architecture and Fine Arts Library, University of Florida

Education Library, University of Florida

Health Science Center Library, University of Florida

Borland Library, University of Florida

Veterinary Medicine Reading Room, University of Florida

Allen H. Neuharth Journalism and Communications Library, University of Florida

Library West, University of Florida

Marston Science Library, University of Florida

Mead Library, University of Florida

Music Library, University of Florida

Smathers Library (East), University of Florida

Robarts Library, University of Toronto

Gerstein Science Information Centre, University of Toronto

Centre for Reformation and Renaissance Studies, Victoria University

E J Pratt Library, Victoria University

Emmanuel College Library, Victoria University

Posted in Books Archive | 11 Replies

---

**11 thoughts on "In-Library eBook Lending Program Launched"**

Pingback: Tweets that mention In-Library eBook Lending Program Launched | Internet Archive Blogs -- Topsy.com

Pingback: Internet Archive Launches New eBook Lending Program - eBookNewser

Pingback: In-Library eBook Lending Program Launched « MPLIC Reference Highway

Pingback: Group of Libraries Launch eBook Lending Program « Legal Research Plus



**Dicas Google**

March 30, 2011 at 10:38 pm

It´s a good idea, that´s a good way to avoid google monopoly in ebooks

Pingback: Noe Valley Real Estate » Buyers Agents VS Sellers Agents

Pingback: eBook Webinar with Jo Budler Part 2 « lybrarian

A-4297

Case 1:20-cv-04160-JGK-OTW Document 95-35 Filed 07/07/22 Page 5 of 8

Pingback: 3 million texts for free | Internet Archive Blogs

Pingback: ALA Annual 2011: Internet Archive's In-Library Lending Program Signs 1,000 Libraries

Pingback: 3 Million Texts for Free | Break The Glass Ceiling

Pingback: In-Library eBook Lending Program | Web Search Guide and Internet News

Comments are closed.

A-4298

# EXHIBIT 4



Chief Officers of
State Library Agencies

## CHIEF OFFICERS OF STATE LIBRARY AGENCIES
201 East Main Street, Suite 1405 | Lexington, KY 40507 | Phone: 859-514-9151 | www.cosla.org

*President*
**Lamar Veatch**
State Librarian
Georgia Public Library Service

*Vice President/President-Elect*
**Ann Joslin**
State Librarian
Idaho Commission for Libraries

*Secretary*
**Margaret Conroy**
State Librarian
Missouri State Library

*Treasurer*
**David Goble**
Director and State Librarian
South Carolina State Library

*Director*
**Jo Budler**
State Librarian
State Library of Kansas

*Director*
**Michael York**
State Librarian
New Hampshire State Library

*Immediate Past President*
**Susan McVey**
State Librarian
Oklahoma Department of Libraries

November 28, 2011

Brewster Kahle, Digital Librarian
The Internet Archive
Internet Archive
300 Funston Avenue
San Francisco, CA 94118

Dear Brewster:

I am pleased to send you two signed copies of the Cooperative Agreement between the Internet Archive and the Chief Officers of State Library Agencies.

The members of COSLA, meeting in Santa Fe at our Annual Meeting on October 26th, unanimously approved the recommendation of our COSLA E-Book Task Force to enter into an alliance with the Internet Archive by means of this Agreement.

As President of COSLA I am excited about the opportunity for our organization to work more closely with the Internet Archive to make more e-books more widely available to library users throughout the country. I understand that our E-Book Task Force will be scheduling meeting with Robert Miller in the near future to plan our next steps under the terms of the Agreement.

Please sign both copies of the agreement and return one to:

Laura Singler-Adams, Association Director
Chief Officers of State Library Agencies
201 East Main Street, Suite 1405
Lexington, KY 40507

On behalf of COSLA I want to thank you for agreeing to work with us to advance our common goals.

Sincerely,

Lamar Veatch
President

Attachment

INTARC00137190

COOPERATIVE AGREEMENT
BETWEEN
THE CHIEF OFFICERS OF STATE LIBRARY AGENCIES
AND
THE INTERNET ARCHIVE

This agreement is between the Chief Officers of State Library Agencies ("COSLA") and the Internet Archive.

WHEREAS, COSLA is an organization of the chief officers of state and territorial agencies designated as the state library administrative agency and responsible for statewide library development in the 50 states, the District of Columbia, and territories of the United States; and,

WHEREAS, COSLA's purpose is to identify and address issues of common concern and national interest; to further state library agency relationships with the Federal government and national organizations; and to initiate cooperative action for the improvement of library services to the people of the United States; and,

WHEREAS, the Internet Archive is an organization founded to build an Internet library for the purpose of offering permanent access for researchers, scholars, people with disabilities and the general public to historical collections in digital format;

NOW THEREFORE, the parties hereby agree, on a nonexclusive basis, as follows:

COSLA and the Internet Archive affirm the vision statement adopted by COSLA that "through libraries, America seamlessly accesses comprehensive content in any format," and that to this end COSLA and the Internet Archive will form an alliance to bring about a national library system that offers public access to ebooks at no charge from every public library in the U.S.

COSLA and the Internet Archive will work together to develop and promote the Internet Archive's Open Library as a means to provide an existing collection of approximately 100,000 ebooks to all U.S. residents through their public libraries.

COSLA and the Internet Archive will work together toward the goal of adding another 1 million ebooks to the Open Library collection by jointly pursuing all possible funding opportunities to scan or purchase additional books.

COSLA and the Internet Archive will work together to create a physical archive of at least one copy of each published book by encouraging libraries to send books being deaccessioned to the Internet Archive.

COSLA and the Internet Archive will work together to improve the user experience with discovery and use of ebooks from the Open Library, working with providers of integrated library systems in public libraries and by other means.

Accepted and agreed to by the authorized representatives of the parties:

FOR COSLA

Lamar Veatch, President

11/28/2011
Date

FOR THE INTERNET ARCHIVE

Brewster Kahle, Digital Librarian

11/28/2011
Date

11/1/11

INTARC00137191

# EXHIBIT 5

# A White Paper on Controlled Digital Lending of Library Books

David R. Hansen & Kyle K. Courtney[1]

TABLE OF CONTENTS

I.   THE 20TH CENTURY BOOK PROBLEM .................................................... 4
II.  THE LEGAL FRAMEWORK: FIRST SALE AND FAIR USE ......................... 7
III. CONTROLLED DIGITAL LENDING AS FAIR USE ................................... 9
IV.  TAKEAWAYS: SYSTEM DESIGN AND RISK MITIGATION .................... 32
V.   CONCLUSION ........................................................................................ 42

This paper is about how libraries can legally lend digital copies of books. It explains the legal and policy rationales for the process— "controlled digital lending"— as well as a variety of risk factors and practical considerations that can guide libraries seeking to implement such lending. We write this paper in support of the *Position Statement on Controlled Digital Lending*,[2] a document endorsed by many libraries, librarians, and legal experts. Our goal is to help libraries and their lawyers become more comfortable with the concept by more

---

[1] *These institutional affiliations are for identification purposes only.* David R. Hansen is Associate University Librarian for Research, Collections & Scholarly Communications at Duke University Libraries. Kyle K. Courtney is Copyright Advisor and Program Manager at Harvard Library's Office for Scholarly Communication.

We're grateful for comments and suggestions from a number of people including Lila Bailey, Anne Gilliland, Mary Minow, Rachael Samberg, Pamela Samuelson, Jason Schultz, Kevin Smith, and Michelle Wu. Thanks also to staff, participants, and attendees who helped hone our thoughts in sessions we held on this topic at the 2018 American Association of Law Libraries Annual Meeting, the 2018 Kraemer Copyright Conference, the Lillian Goldman Law Library at Yale University, the 2018 Copyright First Responders Pacific Northwest workshop, and the 2018 University Information Policy Officers Meeting hosted by The Ohio State University Libraries. We also offer our profound thanks to Lacey Chrabaszcz, OSC Copyright Fellow, for her careful editing and *Bluebook* expertise.

© 2018 David Hansen and Kyle Courtney. This paper is licensed for reuse under a Creative Commons Attribution 4.0 International License, https://creativecommons.org/licenses/by/4.0/.

[2] We are both contributors to that statement. We wrote this paper independently, with comments and input from selected *Statement* drafters, signatories, and other parties.

fully explaining the legal rationale for controlled digital lending, as well as situations in which this rationale is the strongest.

For this paper we define "controlled digital lending" (CDL) just as the *Statement* does:

> CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner. Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation. For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization. Essentially, CDL must maintain an "owned to loaned" ratio. Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time. Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies.[3]

Thus, CDL would permit circulation of copies equal to those that had been legitimately acquired by the participating libraries. When the digital copy is being read by a patron, however, the corresponding physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one. A library can lend a physical book to a patron through standard circulation or to another library through interlibrary loan. What CDL does do is shift that lending to a new format that opens up access possibilities for readers with disabilities, physical access limitations, research efficiency needs, or other needs for digitally-accessible content.

A CDL system is not a brand-new concept. There are multiple versions of CDL-like systems currently being used in libraries. The idea was first explored in the pioneering article "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries"[4] by Michelle Wu, Professor of Law and Law Library Director at Georgetown University School of Law. Later, the Internet Archive created the "Open Library: Digital Lending Library" project, which has

---

[3] *Position Statement on Controlled Digital Lending by Libraries* (hereafter "*Statement*") available at https://controlleddigitallending.org/statement

[4] Michelle M. Wu, *Building a Collaborative Digital Collection: A Necessary Evolution in Libraries*, 103 LAW LIBR. J. 527 (2011). See also Michelle M. Wu, *Piece-by-Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use*, 36 LEGAL REF. SERV.Q. 51 (2017).

Page   2

successfully utilized a unique CDL-like system for the past 8 years.[5] Multiple libraries have now harnessed the same CDL system and partnered with Internet Archive to loan their digital copies of books. These partners include large library systems such as the Boston Public Library, to smaller specialized libraries such as the Allen County Public Library, which houses the largest genealogical collection of any public library in the country.[6] And, most recently, Georgetown Law Library launched its own CDL service.[7]

At its core, CDL is about replicating with digital lending the legal and economically significant aspects of physical lending. To do so, we libraries must truly exercise *control* in the process. The *Statement* identifies six specific requirements to do so. It states that for CDL, libraries should:

> (1) ensure that original works are acquired lawfully;
> (2) apply CDL only to works that are owned and not licensed;
> (3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio);
> (4) lend each digital version only to a single user at a time just as a physical copy would be loaned;
> (5) limit the time period for each lend to one that is analogous to physical lending; and
> (6) use digital rights management to prevent wholesale copying and redistribution.

Our principal legal argument for controlled digital lending is that fair use—an "equitable rule of reason"[8]—permits libraries to do online what they have always done with physical collections under the first sale doctrine: lend books. The first sale doctrine, codified in Section 109 of the Copyright Act, provides that anyone who legally acquires a copyrighted work from the copyright holder receives the right to sell, display, or otherwise dispose of that particular copy, notwithstanding the interests of the copyright owner. This is how libraries loan books. Additionally, fair use ultimately asks, "whether the copyright law's goal

---

[5] See Open Library, https://openlibrary.org (last visited Sept. 13, 2018). See also Geoffrey A. Fowler, *Libraries Have a Novel Idea*, WALL ST. J. (June 29, 2010), https://www.wsj.com/articles/SB10001424052748703279704575335193054884632.

[6] Internet Archive, *Digital Lending Library*, Internet Archive Blogs (June 28, 2010), https://blog.archive.org/2010/06/28/digital-lending-library [https://perma.cc/R4A2-QUW6].

[7] American Association of Law Libraries, *Transforming Our Libraries from Analog to Digital: A Vision For 2020*, American Association of Law Libraries Webinar, https://www.aallnet.org/recording/transforming-libraries-analog-digital-vision-2020/ [https://perma.cc/Q9AB-AEW4].

[8] H.R. REP. No 94-1476, 94th Cong., 2d Sess 65 (1976).

of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[9] In this case we believe it would be. Controlled digital lending as we conceive it is premised on the idea that libraries can embrace their traditional lending role to the digital environment. The system we propose maintains the market balance long-recognized by the courts and Congress as between rightsholders and libraries,[10] and makes it possible for libraries to fulfill their "vital function in society"[11] by enabling the lending of books to benefit the general learning, research, and intellectual enrichment of readers by allowing them limited and controlled digital access to materials online.

## I.    THE 20TH CENTURY BOOK PROBLEM

For decades, libraries and cultural institutions have sought to provide greater access to their collections with the hope of reaching a broader and more diverse set of readers.[12] A confluence of technological advances and expanding copyright protection have driven the problem.

Copyright terms are now extremely long (95 years or more for many published works), "formalities" that once required rightsholders to take action to obtain and retain rights have been eliminated, rights are infinitely divisible among private parties causing uncertainty about ownership, and the quantity of copyright-eligible works has exploded with the technological ability to easily and quickly create and publish new works.[13]  Librarians now puzzle over questions such as whether a work is actually still protected by copyright (did the rightsholder comply with applicable U.S. copyright formalities?), who owns

---

[9] *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 608 (2d Cir. 2006).

[10] For users generally, the House Judiciary Committee Report on the 1976 Copyright Act explains that under section 109(a), "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose." H.R. Rep. No. 94-1476, § 109, at 79 (1976). The Copyright Act in several other places identifies special considerations with respect to libraries. *See* 17 U.S.C. § 108 (specific exceptions to reproduce and distribute for libraries and archives); 17 U.S.C. § 504(c)(2) (special damage exceptions for libraries and archives).

[11] U.S. COPYRIGHT OFFICE, DMCA SECTION 104 REPORT 105 (2001), https://perma.cc/59TU-2NKJ [hereinafter, DMCA SECTION 104 REPORT].

[12] For example, Project Gutenberg is a volunteer effort to digitize and archive cultural works, to "encourage the creation and distribution of books." It was founded in 1971 by Michael S. Hart and is the oldest digital library. See http://www.gutenberg.org/. Others efforts include the HathiTrust digital library, https://www.hathitrust.org/, OpenLibrary, http://openlibrary.org/, and—with a corporate partner—Google Books, https://books.google.com/.

[13] In the context of the "orphan works" problem, these and related causes are explained in more detail in David R. Hansen, *Orphan Works: Causes of the Problem* (Berkeley Digital Library Copyright Project White Paper No. 3, 2012), https://ssrn.com/abstract=2038068.

digital rights (publisher or author?), and whether the rightsholder can be found (or is the work an orphan?). Attempting to clearly answer those questions on a title-by-title basis has proven costly,[14] making full digital access for large numbers of works based on rightsholder permission difficult. Particularly for books and other published materials for which there was once an active market, libraries have not yet been able to provide broad full-text access online.[15]

Many 20th Century books are not available for purchase as new copies in print or as digital versions online.[16] Libraries would like to provide digital access, but many rightsholders have not offered those titles for sale in that format. The morass of rights management, combined with the orphan works problem and the ever-increasing copyright length, has made it complicated to see a path forward to broad digital access.

For modern libraries with users whose research and information use patterns mean they look to digital access first,[17] this means that a whole world of research is effectively invisible to a variety of types of users. For some, the inability to physically travel to a library because of their remote physical location, economic wherewithal, or homebound limitations means that physical lending is not practical.  For others, physical access is a matter of great inefficiency in their research and learning. For users with print disabilities—those who currently

---

[14] *See, e.g.,* Cornell University Library, Response to the Notice of Inquiry Concerning Orphan Works (Mar. 23, 2005), https://perma.cc/NZ8W-UWMK (spending $50,000 in staff time to identify rightsholders for 198 books); Carnegie Mellon University Libraries, Response to Notice of Inquiry about Orphan Works 2 (Mar. 22, 2005), https://perma.cc/95XW-TV4Z (similar). *See also* Maggie Dickson, Due Diligence, Futile Effort: Copyright and the Digitization of the Thomas E. Watson Papers, 73 AM. ARCHIVIST 626 (2010), https://perma.cc/QD2X-F3D8 (reporting on similar efforts in the context of special collections). The same is true in jurisdictions with relative clarity about what steps are necessary for such a search. *See* Victoria Stobo, Kris Erickson, Aura Bertoni & Flavia Guerrieri, *Report 3: Current Best Practices among Cultural Heritage Institutions when Dealing with Copyright Orphan Works and Analysis of Crowdsourcing Options* (EnDOW Report 3, May 2018), https://perma.cc/SQH8-H3CT ("This study shows that digitization remains a paradox for [cultural heritage institutions]. Rights clearance in particular remains expensive and ranges considerably depending on the nature of the work and the approach taken by the institution.").

[15] In contrast, U.S. libraries have increasingly relied on fair use to provide full-text access to archival and special collections materials for which original markets are more clearly limited. *See* DAVID R. HANSEN, DIGITIZING ORPHAN WORKS: REDUCING LEGAL RISKS FOR OPEN ACCESS TO COPYRIGHTED ORPHAN WORKS, 111 (Kyle K. Courtney & Peter Suber eds., Harvard Library 2016), https://dash.harvard.edu/handle/1/27840430 (listing 30 different online digital collections in which libraries have openly disclosed the likely orphan status of their materials and their reliance on fair use as a basis for online digital access).

[16] *See* Paul J. Heald, *How Copyright Keeps Works Disappeared,* 11 J. EMPIRICAL L. STUDIES 829 (2014).

[17] *See, e.g.,* John Palfrey & Urs Gasser, *Born Digital: Understanding the First Generation of Digital Natives* (Basic Books, 2010).

have some digital access to print collections due to the fair use holding in the *HathiTrust* case which addressed copying and access of books for print-disabled users[18] — access is currently hampered by hurdles that require users to self-identify disabilities and request special access to digital copies. For a large research library, this means holdings of millions of volumes, already purchased at a cost of hundreds of millions of dollars, are not accessible in a format that is more meaningful and easier to use for many researchers today.[19]

For books primarily from the mid-20th Century, presumptively still protected by copyright, but not currently available in electronic form from their rightsholders, we believe CDL holds significant promise. We also believe the legal rationale for lending these works is among the strongest of all types of works.[20] Some of these books may well be described as "orphaned," without identifiable owners. Others may have identifiable owners, but are in practice neglected, unavailable in the digital marketplace and with no plan for revitalization in modern formats. For all, it means that they are not fully meeting the basic goals of copyright to promote "the Progress of Science and the useful Arts."[21] Their unavailability online benefits neither creators nor the reading public.

So, how can libraries provide access? First, we start with a detailed look at the two fundamental copyright law doctrines that already empower libraries to fulfill their missions: first sale and fair use.

---

[18] *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014) (finding it fair use for the HathiTrust digital library to provide access to print-disabled patrons under a system which requires patrons to "submit documentation from a qualified expert verifying that the disability prevents him or her from reading printed materials" before gaining access).

[19] Some of the most popular, commercially-viable books remain in print and are available in a variety of formats. For many 20th Century books, however, the window for commercial viability passes only a few years after first publication. Several copyright scholars have studied the phenomenon. *See* William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright*, 70 U. CHI. L. REV. 471, 474 (2003); Paul J. Heald, *Property Rights and the Efficient Exploitation of Copyrighted Works: An Empirical Analysis of Public Domain and Copyrighted Fiction Bestseller*s, 92 MINN. L. REV. 1031 (2008).

[20] Controlled digital lending may be well adapted to other types of library lending, for example of serials, or of audio or audiovisual works, or even archival materials. The same principles may also support other related activities such as users' donation of ebooks to libraries. The market dynamics and use scenarios that those situations raise are different enough that we believe they merit separate treatment in a subsequent paper. *See* Paul J. Heald, *The Demand for Out-of-Print Works and their (Un)Availability in Alternative Markets* (Illinois Public Law and Legal Theory Research Papers Series No. 14-31, 2014), http://papers.ssrn.com/abstract=2409118 (noting differences between the book markets and music markets).

[21] U.S. CONST., art. I, § 8, cl. 8.

## II.    THE LEGAL FRAMEWORK: FIRST SALE AND FAIR USE

Section 106 of the Copyright Act enumerates the basic bundle of rights granted to copyright owners: the exclusive right to control reproduction of the work, public distribution of the work, public performances, public displays, and creation of derivative works.[22] For individuals who want to lend or resell copies of works they have purchased, the rightsholder's exclusive right to control public distribution[23] is potentially problematic. But, the rights granted in Section 106 are limited by a number of statutory exceptions. Section 109, the statutory first sale doctrine, is one such provision.[24]  It states that "[n]otwithstanding the provisions of section 106(3) [the public distribution right], the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."[25]

### A.  First Sale Doctrine

Entire industries and enterprises are built upon the first sale doctrine. Libraries were built on it. eBay relies on the provision when it permits users to sell copyright protected works through its site,[26] used record stores similarly rely on it to distribute copies they have acquired, college bookstores buy and sell used textbooks based on this doctrine, and libraries rely on it to lend physical books in their collections. The first sale doctrine balances the rights of copyright owners to distribute with those of purchasers to dispose of their copies as they wish. Without it, copyright holders could enforce rights in the "secondary market," which would impact selling, loaning, or gifting any copyrighted work. The rationale is that "once the copyright owner places a copyrighted item in the stream of commerce by selling it, he has exhausted his exclusive statutory right to control its distribution."[27]

A critical limitation in the text of Section 109 is that it only allows the "owner of a copy" to "sell or otherwise dispose" of that particular copy. With distribution of physical copies, such as lending a print book to a library user, that framework works well enough. But to date, courts and legal scholars have

---

[22] 17 U.S.C. § 106.

[23] *Id.* ("copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending").

[24] 17 U.S.C. § 109 (2018). Although the first sale doctrine has been cast as primarily a matter of statutory law, it has a more expansive, common-law pedigree. *See* Aaron Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 UCLA L. Rev. 889, 912-22 (2011).

[25] *Id.* at § 109(a).

[26] *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1180 (9th Cir. 2011).

[27] *Quality King Distributors, Inc. v. L'anza Research Intern., Inc.*, 523 U.S. 135, 152 (1998).

struggled to identify what is a "particular" copy in the digital realm.[28] Is the transfer of a digital copy from one device to another the transfer of a particular copy or the creation of a new copy? While we wait for the courts to sort out this statutory interpretation issue, libraries that seek to utilize CDL should still be able to apply the first sale doctrine's rationale in the fair use context.

Much of the literature on first sale applied in the digital environment recognizes that library lending raises unique concerns requiring special treatment.[29] Though other use scenarios are certainly possible, we view library lending uses as special, as detailed in the sections below, and of all uses among the most likely to be justified under a fair use rationale. Indeed, several libraries have already engaged in limited CDL for years without issue, indicating perhaps a tacit acknowledgement of the strength of their legal position.[30] So, while the concept of digital first sale may have many potential applications, our focus is on a narrow and specialized use by libraries. We limit our analysis to non-commercial, controlled, digital lending by U.S. libraries of digitized copies of print books held in their collections.[31]

B. *Fair Use*

That brings us next to fair use. Fair use applies to uses implicating any or all of the copyright holder's exclusive rights, including both public distribution and the right to control reproductions.[32] Like the first sale doctrine, fair use is widely used and entire industries (e.g., home recording device manufacturers, search engines, filmmakers, publishers ) rely on it.[33] Described as an "equitable rule of

---

[28] *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 649 (S.D.N.Y. 2013).

[29] DMCA SECTION 104 REPORT, *supra* note 11, at 104-105 (addressing library specific issues); U.S. PATENT & TRADEMARK OFFICE, WHITE PAPER ON REMIXES, FIRST SALE, AND STATUTORY DAMAGES 48, 50 (2016), https://perma.cc/RJ7Z-5REZ [hereinafter USPTO FIRST SALE STUDY], Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal, Capitol Records, LLC v. Redigi Inc., Case No. 16-2321-cv (2d Cir. 2016), https://perma.cc/79AL-649N; Michelle Wu, *Piece by Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use*, 36 LEGAL REF. SERV. Q. 51 (2017), https://doi.org/10.1080/0270319X.2017.1359059.

[30] Geoggrey A. Fowler, *Libraries Have a Novel Idea*, WALL ST. J. (June 29, 2010) https://perma.cc/H4H3-ZJXZ (describing efforts by the Internet Archive, Boston Public Library and others to engage in digital lending activities).

[31] Fair use is a US legal concept. Our analysis is limited to U.S. law.

[32] 17 U.S.C. § 107 (2018)(Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work . . . is not an infringement of copyright.").

[33] *See, e.g.*, COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION, FAIR USE IN THE U.S. ECONOMY: ECONOMIC CONTRIBUTION OF INDUSTRIES RELYING ON FAIR USE (2017), https://perma.cc/EGH4-N88D (summarizing industries reliant on fair use).

Page   8

reason," fair use was developed by the courts beginning in the 1800s.[34] In 1976 Congress codified the doctrine in Section 107 of the Copyright Act, which provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research is not copyright infringement."[35] Those examples are "illustrative and not limitative" however.[36] To apply the doctrine, Congress identified four non-exclusive factors that courts and users should consider:

"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work."[37]

Those four statutory factors must not be "treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright."[38]  Ultimately, the fair use inquiry asks, "whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."[39] The next section examines how this flexible doctrine of fair use, together with first sale, supports CDL.

## III.   CONTROLLED DIGITAL LENDING AS FAIR USE

The basic concept of applying first sale principles to digital transactions is not new, either as justified under the first sale doctrine alone, as fair use, or through some combination of the two together. The U.S. Copyright Office, in 2001, studied the issue of "digital first sale," soliciting comments that exhibited a range of views about whether the first sale doctrine does or should be made to apply to digital transactions. In part because the use of digital technology was so new at

---

[34] *See Folsom v. Marsh*, 9. F. Cas. 342 (C.C.D. Mass. 1841); Matthew Sag, *The Pre-History of Fair Use*, 76 BROOKLYN L. REV. 1371 (2011).

[35] 17 U.S.C. § 107 (2018).

[36] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577–78 (1994).

[37] 17 U.S.C. § 107 (2018)

[38] *Campbell,* 510 U.S. at 577–78 (1994).

[39] *Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 608 (2d Cir. 2006).

Page   9

the time, and despite hearing strong arguments and evidence from advocates on both sides of the issue, the Office concluded that it does not and should not apply to digital transactions, mostly because the technology in 2001 was unable to sufficiently guarantee the "owned to loaned" ratio. Instead, it was simply a good faith effort to "forward and delete" copies on a case-by-case basis.[40] More recently, the United States Department of Commerce studied the issue itself and released a white paper in 2016 expressing its own conclusion: the technology and licensing markets were not yet adequately developed, leading it to adopt a "wait and see approach."[41] Scholarship on "digital first sale" and related concepts has flourished in recent years.[42] And most recently *Capitol Records v. ReDigi, LLC,* has raised the question of how these doctrines apply to a commercial, digital resale market for mp3s.[43]

Again, the literature on digital first sale recognizes that library most likely will require special treatment.[44] Other use scenarios are possible, and, as detailed below, we view library lending uses as special. And we also believe that these library uses, of all the varying digital uses, are among the most likely to be justified under a fair use rationale. Several libraries have already engaged in limited CDL for years without issue.[45] It can be inferred that this fact indicates a

---

[40] DMCA SECTION 104 REPORT, *supra* note 11, at 80, 90 ("[W]hen the owner of a lawful copy of a copyrighted work digitally transmits that work in a way that exercises the reproduction right without authorization, section 109 does not provide a defense to infringement" and "we recommend no change to section 109 at this time").

[41] USPTO FIRST SALE STUDY, *supra* note 29, at 58 (examining a wide range of potential applications, including library uses, but ultimately concluding that "we cannot at this time recommend extending the first sale doctrine to apply to digital transmissions of copyrighted works.").

[42] For some representative work, see Aaron Perzanowski & Jason Schultz, *Digital Exhaustion*, 58 UCLA L. REV. 889 (2011); R. Anthony Reese, *The First Sale Doctrine in the Era of Digital Networks*, 44 B.C. L. REV. 577, 584 (2003); Victor F. Calaba, *Quibbles 'n Bits: Making A Digital First Sale Doctrine Feasible*, 9 MICH. TELECOMM. TECH. L. REV. 1 (2002).

[43] 934 F. Supp. 2d 640 (2013), on appeal, Case No. 16-2321-cv (2d Cir. 2016). The district court in this case concluded that neither first sale nor fair use applied, though its analysis on the latter was abbreviated and the case is currently on appeal before the Second Circuit Court of Appeal.

[44] DMCA SECTION 104 REPORT, *supra* note 11, at 104-105 (addressing library specific issues); USPTO FIRST SALE STUDY, *supra* note 29, at 48, 50; Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal, Capitol Records, LLC v. Redigi Inc., Case No. 16-2321-cv (2d Cir. 2016), https://perma.cc/79AL-649N; Michelle Wu, *Piece by Piece Review of Digitize-and-Lend Projects Through the Lens of Copyright and Fair Use*, 36 LEGAL REF. SERV. Q. 51 (2017), https://doi.org/10.1080/0270319X.2017.1359059.

[45] Geoggrey A. Fowler, *Libraries Have a Novel Idea*, WALL ST. J. (June 29, 2010) https://perma.cc/H4H3-ZJXZ (describing efforts by the Internet Archive, Boston Public Library and others to engage in digital lending activities).

Page 10

tacit acknowledgement of the strength of their legal position. Our focus is on these narrow and specialized use by libraries. Again, we limit our analysis to non-commercial, controlled, digital lending by U.S. libraries of digitized copies of print books held in their collections.[46]

In applying fair use, not every factor in the analysis will be highly relevant in every situation.[47] As we will show, for CDL, the first factor, "purpose and character of the use," and the fourth factor "effect on the potential market" are the most significant.

### A. The Purpose and Character of the Use

Under the first fair use factor, "purpose and character of the use," two characteristics of CDL stand out, weighing this factor in favor of fair use: 1) CDL's purpose aligns closely with the statutory purpose of the first sale doctrine, and 2) the noncommercial, temporary, character of the use to fulfill research and learning purposes are aligned with the statutory examples of fair use as well as the underlying purposes of the copyright system to disseminate knowledge.

#### 1. CDL's Alignment with the Statutory Purpose of First Sale

The core concept with CDL is that it closely mimics the economic transaction that Congress has already provided for through the first sale doctrine under Section 109. The purpose of the use with CDL is to fulfill the statutory objectives and balance of rights already identified by Congress in Section 109, effectuating that balance considering a new technological use not contemplated at the time Section 109 was enacted.[48] The crux of the proposition is that the purpose and intent of Section 109 should positively influence the "purpose and character" assessment in the fair use analysis.[49]

---

[46] Fair use is a US legal concept. Our analysis is limited to U.S. law.

[47] *See Kienitz v. Sconnie Nation LLC,* 766 F.3d 756, 759 (7th Cir. 2014) (in a case involving a t-shirt that used a mayor's official photograph in protest to his decision to shut down their annual block party, dismissing two of the four factors as having not much "bite in this litigation," "[t]he other statutory factors don't do much in this case.").

[48] Section 109(a) was enacted in 1976. Congress has requested study of potential changes, but has not substantially modified its text since. See Pub. L. 105–304, title I, § 104, Oct. 28, 1998, 112 Stat. 2876, requiring a study on Section 109 (and 117) and their effect on electronic commerce and associated technology.

[49] For a more detailed discussion, see Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use,* 59 J. COPYRIGHT SOC'Y U.S.A. 453 (2012) (discussing at length the interaction between Section 108—library and archives exceptions—with fair use). *See also at* Jonathan Band, *The Impact of Specific Exceptions on Fair Use: An Update,* 63 J. COPYRIGHT SOCY. U.S.A. 325 (2016).

The Copyright Act does not address how fair use should interact with other provisions of the law.[50] In fact, rightsholders have in some cases argued that if a specific statutory exception exists, that specific exception should preclude application of the more general doctrine of fair use. When raised, courts have largely rejected that argument. For example, in *Sega Enterprises Ltd. v. Accolade, Inc.,*[51] Sega argued that the presence of a specific statutory exception regarding computer programs (Section 117) precluded Accolade from asserting a fair use defense for copying and disassembling Sega's computer program. The Ninth Circuit found Sega's argument "verges on the frivolous."[52] The court instead construed Section 117 and fair use together, the former defining a "a narrow category of copying that is lawful per se" and the latter establishing a broader "defense to an otherwise valid claim of copyright infringement." "The fact that Congress has not chosen to provide a per se exemption to section 106 for disassembly does not mean that particular instances of disassembly may not constitute fair use."[53]

As a matter of copyright policy, the presence of a specific copyright exception (or, in some cases, other provisions of federal law) provides persuasive evidence of the kinds of purposes that should be favored in the fair use assessment.[54] What better evidence of the types of uses that align with the goals of the copyright than those most similar to ones Congress has specifically authorized? While not extensively litigated, a number of cases indicate that this is the right approach, which we review here to give a sense of the strength of this position.

In *Authors Guild v. HathiTrust*, for example, one of the uses that the Authors Guild claimed was infringing was HathiTrust's digitization and full-text access to millions of volumes of in-copyright books for print-disabled users. In assessing HathiTrust's fair use defense, the Second Circuit looked closely at legislative history[55] as well as other provisions of the law that spoke to access for the disabled. The Court cited the Americans with Disabilities Act as evidence of "Congress reaffirm[ing] its commitment to ameliorating the hardships faced by

---

[50] One exception is Section 108(f)(4), which provides that the provisions of that nothing in that section, addressing specific library and archives preservation and access copying, "in any way affects the right of fair use as provided by section 107 [fair use]."

[51] 977 F.2d 1510, 1521 (9th Cir. 1992). The plaintiffs in *Authors Guild v. HathiTrust,* 755 F.3d 87, 94 (2d Cir. 2014) raised a similar argument with respect to the role of Section 108 and 107.

[52] *Sega Enters. Ltd. v. Accolade,Inc.*, 977 F.2d 1510, 1520-21 (9th Cir. 1992).

[53] *Id.* at 1521.

[54] Band, *supra* note 49, at 459.

[55] *HathiTrust*, 755 F.3d at 102.

Page 12

the blind and print disabled."[56] The court also relied on Section 121 of the Copyright Act, which permits "authorized entities" to make accessible copies for the print disabled, as illustrating "Congress's intent that copyright law make appropriate accommodations for the blind and print disabled."[57]

Some courts have pointed to broader policy objectives, both within and outside of the copyright act, as influencing the purpose and character analysis. For example,[58] in *Swatch Group Management Services Ltd. v. Bloomberg, L.P.*, Swatch argued that Bloomberg infringed its rights when it recorded and distributed a private conference call reporting earnings information from a foreign company.[59] Ultimately concluding that the use was fair, the Second Circuit cited Securities and Exchange Commission ("SEC") public disclosure regulations as significant in assessing the purpose and character of Bloomberg's use. The court found that Bloomberg's purpose in obtaining and disseminating the recording at issue was to make important financial information about Swatch Group available to investors and analysts. "That kind of information is of critical importance to securities markets. Indeed, as Bloomberg points out, the SEC has mandated that when American companies disclose this kind of material nonpublic information, they must make it available to the public immediately. *See* Regulation FD, 17 C.F.R. § 243.100."[60]

The U.S. Copyright Office has also cited specific copyright exceptions as positively influencing the fair use assessment. Under Section 1201 of the copyright act, every three years the Office is required to make recommendations about proposed exceptions to Section 1201's prohibition on circumvention of technological protection measures.[61] Under that provision, the Office must assess for each proposed exception whether users of the class of works are likely to be adversely affected by the anti-circumvention provision in their "ability to make noninfringing uses."[62] The Office has traditionally provided in-depth analysis of the lawfulness of the proposed uses. In its 2015 recommendations, the Office pointed to the basic purpose of other provisions as favorably affecting the

---

[56] *Id.*

[57] *Id.*

[58] Another example is *Am. Inst. of Physics v. Winstead PC*, 3:12-CV-1230-M, 2013 WL 6242843, at *9 (N.D. Tex. Dec. 3, 2013) (copying of scientific articles as evidence of prior art in patent examination weighs the purpose and character assessment in favor of fair use in part because "Defendants' copying of NPL contributes to an efficient patent system").

[59] *Swatch Group Mgt. Servs Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 82 (2d Cir. 2014).

[60] *Id.*

[61] 17 U.S.C. § 1201 (2018).

[62] 17 U.S.C. § 1201(a)(1)(c).

purpose and character assessment under the first fair use factor. Those include looking to Section 1201 exceptions for interoperability, Section 110 exceptions for nonprofit public performances and teaching, and Section 117 exceptions for computer program adaptation.[63]

For CDL, the purpose of the use is one that intends to mirror the basic purpose of first sale as embodied in Section 109. In *Kirtsaeng v. John Wiley & Sons, Inc.*, the Supreme Court recognized, "for at least a century the "first sale" doctrine has played an important role in American copyright law."[64] It has a "common-law doctrine with an impeccable historic pedigree," that limits a rightsholders ability to restrain subsequent dispositions, facilitating competition "to the advantage of the consumer"[65] and freeing the courts "from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods."[66]

As technology and markets have shifted, libraries employing CDL seek to use technology to hold up that same balance of rights while allowing users to access materials in formats that are most meaningful to them today. CDL promotes consumer choice in formats and platforms, while avoiding dragging courts into the thicket of restrictions and rights conflicts that would require extensive litigation to resolve.[67] CDL also preserves the balance of rights carved out by Congress through Section 109 by requiring libraries to have legitimately acquired their own copies and limiting access to digital surrogate copies on terms consistent with ownership of the physical copy. Under CDL, if one copy is purchased, a library can only lend one copy—either print or physical—out to a user at a time.

As appealing as the pure application of the principles of first sale to digital distribution may be, we recognize that standing alone, such uses may not tilt the "purpose and character" analysis in favor of the use in all circumstances. There are no cases on point directly addressing the interaction between Section 109 and

---

[63] U.S. COPYRIGHT OFFICE, SECTION 1201 RULEMAKING: SIXTH TRIENNIAL PROCEEDING TO DETERMINE EXEMPTIONS TO THE PROHIBITION ON CIRCUMVENTION (2015), https://www.copyright.gov/1201/2015/registers-recommendation.pdf.

[64] *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 539 (2013). See also *Impression Prod., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. __, 137 S. Ct. 1523 (2017) (noting the importance of first sale in the patent context as well).

[65] *Id.*

[66] *Id.*

[67] *See* Molly Shaffer Van Houweling, *Author Autonomy and Atomism in Copyright Law*, 96 VA. L. REV. 549 (2010); *See also Random H., Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), aff'd, 283 F.3d 490 (2d Cir. 2002) (resolving contractual dispute between publisher and author over ownership of e-book rights).

Page 14

fair use. There are a few cases in the commercial context that come close, however. Those cases are primarily negative, though as we explain below we believe they are distinguishable from CDL applications, and one case is currently on appeal. First, *Capitol Records, LLC v. ReDigi Inc.,* a district court decision currently on appeal. Capitol sued for copyright infringement over ReDigi's online service that facilitated resale of used digital music files. ReDigi's MediaManager software would allow an owner of a music file to upload their files to a "Cloud Locker," deleting the copy from the user's device and saving a copy to the cloud. Upon sale through the ReDigi marketplace, the file would be downloaded to the purchaser and simultaneously deleted from the Cloud Locker.[68] The district court in that case assessed both ReDigi's fair use defense and a defense based on Section 109. It did not, however, assess the two provisions together. On Section 109's direct applicability, the court noted that the provision "by its own terms [is] limited to assertions of the public distribution right. . . ReDigi's service violates Capitol's reproduction right [and so] the first sale doctrine does not apply. . . ."[69]

For fair use, the *ReDigi* court was fairly dismissive of the purpose factor, focusing almost exclusive on the commerciality of the program. The analysis was brief and considered almost none of the arguments laid out above. In honing in on the commerciality of the use, the court found that the purpose and character of the use weighed against a fair use finding.[70] The court found the use to be "an essential component of ReDigi's commercial enterprise," and that the use was not "transformative."[71] Overall, the court concluded that fair use did not apply. While *ReDigi* is in some ways factually analogous to CDL, the district court's fair use analysis was so cursory and the future of that case so uncertain (the case is currently on appeal and awaiting a decision from the Second Circuit Court of Appeals) that its direct application for CDL remains far from clear.[72]

In a few other cases, defendants have tried unsuccessfully to employ an analogous "format shifting" defense, wherein physical copies were purchased, and digital access metered to users based on the number of copies purchased. For instance, in *Wall Data Inc. v. Los Angeles County Sheriff's Dept*, the L.A. Sheriff's Department purchased licenses for 3,663 copies of Wall Data's software. To make

---

[68] Capitol Records, LLC v. *ReDigi Inc.,* 934 F. Supp. 2d 640, 645-46 (S.D.N.Y 2013) (The court rejected ReDigi's argument that "technological change has rendered its literal terms ambiguous" and so the court should construe the statute under Section 109 in favor of its use.).

[69] *Id.* at 655.

[70] *Id.*

[71] *Id.*

[72] *Capitol Records, LLC v. ReDigi Inc.,* Case No. 16-2321-cv (2d Cir. 2016).

Page 15

installation more efficient, the Sheriff's Department installed the software on all department computers (6,007 in total), but limited access to the software to a number of user accounts less than the total licenses purchased. In rejecting the Sheriff Department's fair use defense, the court did not explicitly consider first sale in its assessment, but focused instead on a few key characteristics: the use was not "transformative,"[73] the use did not generally advance "public knowledge," or otherwise "enrich[] the general public through access to creative works," and the use was considered commercial, largely because it was made in effort to save the expense of purchasing an authorized copy from the known vendor.[74]

More recently, in *Disney Enterprises, Inc. v. VidAngel, Inc.*, Disney sued VidAngel over its streaming video service, which provided access to edited copies of Disney films. For each user, VidAngel would purchase a physical DVD on behalf of the user, which VidAngel then copied, edited and streamed to the user online. Like in *Wall Data*, the court did not consider how the principles of the first sale doctrine help establish the "purpose and character" of the use under fair use. VidAngel conceded that its use was commercial, and the court did not consider the use to be transformative. Like with *Wall Data*, the streams were provided for videos with known copyright owners who themselves license rights to competing streaming services.[75]

One way these cases are distinguished is just that the issue was not raised; except for *ReDigi* (where the issue was only obliquely argued), first sale and the purpose and character assessment were not raised by the litigants or addressed by the court. The argument was not presented. Another, more significant distinguishing factor is that all three cases involved commercial uses, both in the specific application and in connection with a broader, functioning market place for the works used. This brings us to the second characteristic of CDL that we believe tilts the first factor analysis decidedly in favor of fair use: Libraries engaging in CDL are doing so for non-commercial research and learning purposes.

2.     CDL's Non-commercial Research and Learning Purpose

Unlike commercial resale or streaming markets, library use of CDL is non-commercial and designed to promote public benefits by facilitating research and learning. The fair use statute explicitly instructs courts to look at "whether such

---

[73] *Wall Data Inc. v. Los Angeles County Sheriff's Dept.*, 447 F.3d 769, 778–79 (9th Cir. 2006).

[74] *Id.*

[75] *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861-62 (9th Cir. 2017).

use is of a commercial nature or is for nonprofit educational purposes."[76] And the Supreme Court has explained, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."[77]

Libraries engaging in CDL, as we envision it, will not generate monetary profit. Given the costs of digitizing, building and maintaining the technical infrastructure necessary to lending digitally and controlling physical copies, and personnel time used to restrict print copies when its digital equivalent is circulating, libraries may spend considerable sums with no compensation. To be sure, libraries and their users would stand to benefit from CDL. We would not propose it if they did not. But under the CDL model we envision, libraries have already paid the customary price, and CDL limits access to a work to one person at a time. Further, when 20th century books are in question, no market has emerged for digital access to the majority of these books, meaning that no digital access would otherwise be possible.

Libraries engaging in CDL are doing so to enable broad availability of knowledge for the purpose of promoting research, scholarship and learning. These are uses specifically mentioned as examples of fair use by Congress in the statute,[78] and are at the core of the constitutional purpose of the copyright system. Library lending is a critical conduit for those activities, which courts have recognized. For example, in a 1973 case before the U.S. Court of Claims, a non-profit library's role in supporting scientific research by providing copies of articles to researchers was held to weigh strongly in favor of fair use.[79] Even

---

[76] 17 U.S.C. § 107 (2018).

[77] *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 562 (1985). *See also Sundeman v. Seajay Socy., Inc.,* 142 F.3d 194, 203 (4th Cir. 1998) (finding that where an archives provided a copy of an unpublished manuscript to a researcher, the purpose of the use favored fair use where there was no commercial or exploitative motive for the use).

[78] 17 U.S.C. §107. As stated above, most courts have addressed these examples as merely illustrative. A handful of courts have indicated that uses within these categories means that the "purpose and character" analysis presumptively falls in favor of fair use, though that presumption has not been adopted by most circuits. *See* NXIVM Corp. v. Ross Inst., 364 F.3d 471, 477 (2d Cir. 2004) ("[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107.") (quoting Wright v. Warner Books, Inc., 953 F.2d 731, 736 (2d Cir. 1991)).

[79] *Williams & Wilkins Co. v. United States,* 487 F.2d 1345, 1354 (Ct. Cl. 1973), aff'd by an equally divided court, 420 U.S. 376 (1975). In this case Williams & Wilkins challenged the National Library of Medicine's photocopying practices for medical researchers. The U.S. Court of Claims observed the significance that "NIH and NLM are non-profit institutions, devoted solely to the advancement and dissemination of medical knowledge which they seek to further by the challenged practices, and are not attempting to profit or gain financially by the photocopying . . . the medical researchers who have asked these libraries for the photocopies are in this particular

Page 17

much more recently in a case in which the facts indicated an otherwise uncompelling fair use assertion, the non-commercial educational purpose of library distribution was found by the 10th Circuit Court of Appeals to be "at the heart of the protection of fair use."[80]

Courts have often considered the broader public benefit of the use as well,[81] favoring uses that "typically involve[] the development of art, science, and industry."[82] CDL contributes substantial broad benefits to public knowledge by allowing the public, for the first time, to access particular materials digitally. For public libraries, especially when these collections have been purchased by tax dollars, it is in the public's best interest to have modern access to these works, which were purchased for their benefit.

In summary, we view the purpose and character of the use for CDL to be favored because the purpose is aligned with the principles of another statutory exception (section 109), while the use itself is temporary, non-commercial and leading to important public benefits in research and learning.

### 3.    Concerns

Our goal with this paper is to give libraries and their counsel as complete a view of the law regarding CDL as we can. So, it's fair to note a couple of points of concern under the first factor analysis. The first is, despite the strong trend found in the above cases favoring library and educational use, there are a limited number of library fair use cases from which to draw guidance. These include some cases involving academic or scholarly uses in which courts have held that the first factor did not favor the use.[83] Although libraries rely on fair use routinely, the small number of cases means that when applying a doctrine based

---

case (and ordinarily) scientific researchers and practitioners who need the articles for personal use in their scientific work . . . On both sides–library and requester–scientific progress, untainted by any commercial gain from the reproduction, is the hallmark of the whole enterprise of duplication. . . . This is important because it is settled that, in general, the law gives copying for scientific purposes a wide scope." *Id.*

[80] *Diversey v. Schmidly*, 738 F.3d 1196, 1203 (10th Cir. 2013) (ultimately concluding that the reproduction and distribution of a confiscated, unpublished dissertation by university officials was not fair use).

[81] *Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992).

[82] *Sundeman v. Seajay Socy., Inc.*, 142 F.3d 194, 203 (4th Cir. 1998) (citing *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir.1966)).

[83] *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989) (professors' verbatim copying of an academic work was not fair use, partly because "the profit/nonprofit distinction is context specific, not dollar dominated"; a professor can "profit" through citation and enhanced academic reputation); *see also Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1117–18 (9th Cir. 2000).

on caselaw development, there is some uncertainty. This is a general caution, and could be said for any new application of fair use to library practice.[84] Further, in many ways this is a testament to the low level of risk libraries generally face; libraries seldom attract lawsuits, and on CDL specifically, there are no lawsuits that reflect negatively on the core principles of CDL.

The second and more considerable point of concern is that CDL is not clearly transformative. In recent years, U.S. courts have focused increasingly on whether an alleged fair use is "transformative,[85]" which is, if it "adds something new, with a further purpose or different character, altering the first with new expression, meaning or message."[86] Use of a quotation from an earlier work in a critical essay to illustrate the essayist's argument is a classic example of transformative use. In mass digitization cases involving books—*Google Books and HathiTrust,* for example—courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses such as text and data mining.

However, even if CDL is not transformative,[87] we believe the purpose and character still strongly weighs in favor of a fair use finding. The courts have been clear that "[w]hile a transformative use is generally more likely to qualify as fair use, 'transformative use' is not absolutely necessary for a finding of fair use.'"[88] In *HathiTrust,* for example, the Second Circuit found that libraries providing full-text access to print-disabled users was not transformative.[89] "The Authors state that they 'write books to be read (or listened to).' . . . By making copies available in formats accessible to the disabled, [HathiTrust] enables a larger audience to read those works, but the underlying purpose of [HathiTrusts's] use is the same as the authors original purpose."[90]

Nevertheless, the court concluded that that the use was fair, and favored under the first fair use factor in part because of is alignment with other

---

[84] *See* Pamela Samuelson, *Unbundling Fair Uses*, 77 FORDHAM L. REV. 2537, 2580 (2009) (reviewing the bulk of fair use caselaw to date and observing that "[t]here is relatively little caselaw on fair use in educational or research settings.").

[85] *See* Patricia Aufderheide & Peter Jaszi, *Reclaiming Fair Use* 86-98 (2d Ed. 2018) (describing ascendancy of the transformative use analysis).

[86] *Campbell v. Acuff Rose Music, Inc.,* 510 U.S. 569, 579 (1994).

[87] There was no agreement among the *Statement* drafters on this point, which is why it takes no position on this matter.

[88] *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (quoting from *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 17, 84 (2d Cir. 2014) and *Campbell*, 510 U.S. at 579).

[89] *HathiTrust*, 755 F.3d at 101.

[90] *Id.*

statutorily favored purposes under Section 121. The court in *Swatch* similarly expressed doubts about whether the use was transformative, but nevertheless concluded that the public benefit and information dissemination purposes—aligned as the Court noted with SEC regulatory guidance—was a favored purpose.[91]

*HathiTrust* is particularly instructive for CDL because like HathiTrust, the use here is aligned with other Congressionally-sanctioned information policies, the use is non-commercial, and it is aimed at opening up access to readers for research and learning purposes. "Transformative use" is a critical part of the fair use assessment, but is not necessary. Indeed, the vast majority of routine academic, educational, and personal study uses are likely not transformative—multiple copies made for classroom use, reproductions of a work for home study, replication of a work into a different format for later consultations— they all happen in large numbers every day and are in most cases not "transformative" but nonetheless permissible. In cases such as with CDL, where the purpose of the use so well aligns with the overall purposes of the Act, transformative use considerations should not override.

> ### B.    The Nature of the Work

The second fair use factor, "the nature of the copyrighted work," has rarely played a significant role in the overall fair use assessment. Several recent cases have explicitly denied its significance, finding variously that it may be "of limited usefulness,"[92] is "rarely found to be determinative,"[93] and is "of relatively little importance" in the case at hand.[94] Traditionally, however, courts have used the second factor to examine whether the work used falls at the "core of intended copyright protection"[95] or closer to its fringes.  Use of works of a more scientific or scholarly nature have weighed in favor of fair use;[96] "the law generally

---

[91] *Compare Swatch Group Mgt. Servs Ltd. v. Bloomberg L.P.*, 742 F.3d 17, 29 (2d Cir. 2014) (Bloomberg did not transform Swatch's work), amended and superseded by Swatch Group Mgt. Services Ltd. v. Bloomberg L.P., 756 F.3d 73, 85 (2d Cir. 2014) (Swatch's use gave it an "arguably transformative" character).

[92] *HathiTrust*, 755 F.3d at 98.

[93] *Id.* at 102 (quoting *Davis v. Gap, Inc.*, 246 F.3d 152, 175 (2d Cir.2001).

[94] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1270 (11th Cir. 2014).

[95] *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994).

[96] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 925 (2d Cir. 1994) (use of scientific journal articles was favored under the second factor); *Penelope v. Brown*, 792 F. Supp. 132, 137 (D. Mass. 1992) (use of scholarly work favored); *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1270 (11th Cir. 2014) (informational educational works may be favored for use under second factor, *but* one

Page 20

recognizes a greater need to disseminate factual works than works of fiction or fantasy."[97] Use of works that incorporate significant unprotectable elements is also favored.[98] Courts have found that the second factor weighs against the use for unpublished works for which the owner intentionally withheld publication in anticipation of some later public release. Use in those cases risks undercutting the economic incentives that are at the core of the copyright system by allowing others to scoop the initial publication of the work. Similarly, courts have found that use of out-of-print works that are unavailable in the marketplace would tend to weigh in favor of the use under the second factor.[99]

For CDL, application of the second factor in the abstract is difficult. Library collections include a wide variety of works for which CDL may be used, some of which will fare more or less favorably under the second factor. Given the limited usefulness of this factor in the overall fair use assessment, we do not believe the nature of the work should be determinative. Nevertheless, some considerations about the nature of the selected works may be helpful for libraries that seek to bolster their overall fair use assertion. These considerations may include applying CDL to works that are out of print, either in print or digitally; of a scholarly or scientific nature, as opposed to popular literature or fiction works; compilations of data (e.g., city directories); works with significant unprotectable elements (e.g., genealogical materials). We offer some operational suggestions about these practices in Part IV of this paper.

###### C.    The Amount and Substantiality of the Work Used

The third factor looks at the "amount and substantiality of the work used." More than any other factor, the assessment under the third factor has tended to gravitate toward numerical guidelines, though courts have shunned their use.[100] The clear implication is that the more content of the original used, the less likely

---

should look closely at "evaluative, analytical, or subjectively descriptive material" in such a work which may rebalance the second factor either neutrally or against the use).

[97] *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 563 (1985).

[98] *Sega Enterprises Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1526 (9th Cir. 1992).

[99] *Harper & Row,* 471 U.S. at 553 ("If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it.") (quoting S. Rep. No. 94-473, at 64 (1975)); *Hofheinz v. A & E Television Networks,* 146 F. Supp. 2d 442, 447–48 (S.D.N.Y. 2001) (use of trailer for a film released nearly 50 years earlier and not available on the market was favored under the second factor); *Maxtone-Graham v. Burtchaell,* 803 F.2d 1253, 1264 n.8 (2d Cir. 1986) ("[a] key, though not necessarily determinative, factor in fair use is whether the work is available to the potential user"); *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters.,* 533 F.3d 1287, 1313–14 (11th Cir. 2008). *But see Basic Books, Inc. v. Kinko's Graphics Corp.,* 758 F. Supp. 1522, 1533 (S.D.N.Y. 1991).

[100] *Cambridge Univ. Press v. Patton,* 769 F.3d 1232, 1272 (11th Cir. 2014).

the use is to be fair; lengthier reuse would tend to compete with the original. However, courts have clearly tied the assessment under the third factor to the purpose and character assessment.[101] Courts held on many occasions that use of an entire work, when necessary to fulfill a valid purpose, does not weigh against the use.[102] What matters is how the amount used aligns with an acceptable purpose under the first factor. "The extent of permissible copying varies with the purpose and character of the use."[103]

For CDL, the purpose of the use is to enable full-text access to books, so readers can read them online. Arguably, that means the entire work is used. However, CDL does place limits on use of the work; it imposes temporal limits on use (loans are not indefinite) and calls for technological controls on copying that limit further dissemination. These limitations are in many ways similar, for example, to situations in which search engines have been found to have made fair use with low-resolution images.[104] Technical restrictions on reuse of the files limit their ability to be reused for purposes beyond those intended by the lending library. So, the third factor should be neutral or weigh in favor of the use because copying the entire work is necessary for the purpose of lending, and controls on reuse effectively place limitations on the "amount" of the work the user obtains access to.

---

[101] *Authors Guild, Inc. v. HathiTrust,* 755 F. 3d 87, 96 (2d Cir. 2014) ("In weighing this factor, we assess the quantity and value of the material used and whether the amount copied is reasonable in relation to the purported justification under the first factor.").

[102] *See, e.g., Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 460 (1984) ("the fact that the entire work is reproduced … does not have its ordinary effect of militating against a finding of fair use"); *Bouchat v. Baltimore Ravens Ltd. Partn.,* 737 F.3d 932, 943 (4th Cir. 2013), as amended (Jan. 14, 2014) (use of entire work allowable to achieve permissible purpose); *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009); *Chicago Bd. of Educ. v. Substance, Inc.,* 354 F.3d 624, 629 (7th Cir. 2003) ("there is no per se rule against copying in the name of fair use an entire copyrighted work if necessary"); *Sundeman v. Seajay Socy., Inc.,* 142 F.3d 194, 206 (4th Cir. 1998) (amount and substantiality factor weighed in favor when copy provided to researcher was complete copy because for her scholarly work she "needed access to either the original or an entire copy").

[103] *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S.569, 586-87 (1994).*See also Bill Graham Archives v. Dorling Kindersley Ltd.,* 448 F.3d 605, 613 (2d Cir. 2006) (finding the third factor favored the use when displaying "reduced versions of the original images and intermingled these visuals with text and original graphic art." "[C]ourts have concluded that [copying an entire work] does not necessarily weigh against fair use because copying the entirety of a work is sometimes necessary to make a fair use of the image. . . . Adopting this reasoning, we conclude that the third-factor inquiry must take into account that the "the extent of permissible copying varies with the purpose and character of the use.").

[104] *See Perfect 10, Inc. v. Amazon. com, Inc.,* 508 F. 3d 1146 (9th Cir. 2007); *Kelly v. Arriba Soft Corp.,* 336 F. 3d 811 (9th Cir. 2003).

Page  22

### D.    Market Harm

The fourth fair use factor is tied closely together with the first factor analysis. It asks courts to examine "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."[105] The fourth factor analysis looks at "not only the . . .  market harm caused by the particular actions of the alleged infringer," but also the market harm that would result from "unrestricted and widespread conduct of the [same] sort."[106]

In conducting the analysis, courts have looked at not only market effects for the particular work in the format used, but also at effects on the much broader set of potential licensing markets that may have been usurped by the use.[107] The scope of the relevant licensing markets is not unlimited, however. Courts have acknowledged that examining licensing markets introduces a degree of circularity; in theory the fact that a use was made at all indicates a potential licensing market that the rightsholder could have exploited. So, courts have limited the analysis to only licensing markets that are "traditional, reasonable, or likely to be developed."[108]

Like the first factor analysis, the fourth factor is at its core tied back to the underlying purpose of the copyright system; when examining potential market substitution, the question is would the use "cause *substantial* economic harm such that allowing it would frustrate the purposes of copyright by materially impairing [the rightsholders'] incentive to publish the work?"[109]

For CDL, the primary reason why the market harm factor weighs in favor of the use is because the market effect of CDL is nearly identical to the market effect already favored under the first sale doctrine. For the works at issue, the controls that CDL requires ensure that the use closely matches the market effect that the rightsholder was already compensated for upon first sale of the book. A secondary consideration, but one that we feel is powerful and where the case for CDL is strongest, that at least for the 20th Century books which make up the bulk

---

[105] Authors Guild v. *Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015).

[106] *Campbell*, 510 U.S. at 590 (internal quotation marks and alteration omitted).

[107] *Bill Graham Archives*, 448 F.3d at 614.

[108] *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994) ("It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor.").

[109] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1276 (11th Cir. 2014).

Page  23

of materials that would benefit from CDL, there is not a functioning market in place to be harmed.

### 1. The "First Sale" Market Effect

The "market harm" analysis is tied closely together with assessment of the purpose of the use under the first factor, informing how courts should view the market purportedly being harmed in connection with the one(s) a copyright owner intends to enter and has a right to control. For example, the Copyright Act does not grant a copyright owner the right to control negative commentary or criticism of its work,[110] uses favored under the first factor. If criticism results in lost sales, is not the type of harm recognized under the fourth fair use factor.

The first sale doctrine itself is intended as a limit on the scope of markets that rightsholders can control. After the "first sale" of the work, rightsholders may no longer place controls on resale, lending, or other restraints on alienation of copies transferred.[111] So, while CDL may have some effect on a potential market for the work—a user may theoretically borrow a digital copy that is derived from one purchased in print by a library rather than pursue the rightsholder to purchase a digital license—such uses are within the balance of use rights granted to owners of copies. Thus, CDL does not negatively affect the market any differently than the uses already permitted by libraries when lending books physically.

The six controls identified in the CDL *Statement* identify specifically the ways in which CDL achieves the same market effect that physical "first sale" transactions do. The first two controls are that libraries should (1) "ensure that original works are acquired lawfully," and (2) "apply CDL only to works that are owned and not licensed" meaning that books must have been lawfully acquired and not subject to additional restrictions, just as a library would be required to lawfully acquire a physical book—typically, through a purchase in which the rightsholder is compensated—so would a library engaging in CDL be required to ensure the same.

---

[110] *Campbell,* 510 U.S. at 590.

[111] *See, e.g., Disney Enterprises, Inc. v. Redbox Automated Retail, LLC,* CV 17-08655 DDP (AGRx), 2018 WL 1942139, at *6 (C.D. Cal. Feb. 20, 2018) ("Disney's copyrights do not give it the power to prevent consumers from selling or otherwise transferring the Blu-ray discs and DVDs contained within Combo Packs. Disney does not contend otherwise. Nevertheless, the terms of both digital download services' license agreements purport to give Disney a power specifically denied to copyright holders by § 109(a). RedeemDigitalMovies requires redeemers to represent that they are currently "the owner of the physical product that accompanied the digital code at the time of purchase," while the Movies Anywhere terms of use only allow registered members to "enter authorized ... Digital Copy codes from a Digital Copy enabled ... physical product that is owned by [that member].").

The third and fourth CDL controls are that libraries should (3) "limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio)," and (4) "lend each digital version only to a single user at a time just as a physical copy would be loaned." These controls ensure that libraries lending digital copies don't get more than what they bargained for. A library that owns a single copy of a book could only lend a single copy out at a time. If the digital version is checked out and viewed by a patron, the corresponding physical version must be restricted and controlled (e.g., placed in locked stacks or taken out of circulation entirely). Likewise, mimicking the restraints on physical materials in which only one user can typically check out and read a physical book at a time, only one user would be permitted to check out and read the digital book at any given time.

Finally, the fifth and sixth controls are that libraries should (5) "limit the time period for each lend to one that is analogous to physical lending," and (6) "use technical restrictions to prevent copying and redistribution." Those controls, especially the deployment of DRM, ensure that just as with physical books, the digital copies are effectively still in control of the library and cannot (without illegal action on the part of the user) proliferate into additional copies.

From a single transaction standpoint, the library making the CDL use must still have acquired legitimately the book in physical format before lending. What CDL does is allow a change of the format in which that lend is made. When the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one. Similarly, for the aggregated effect question—what if everyone did it?—the analysis is not radically different; any library engaging in CDL would still be required to own a copy of the work, meaning that the market effect would look roughly the same.

We acknowledge that these controls do not address the full range of market concerns raised by others. In the context of broader debates about digital first sale, the primary objections raised by rightsholders were related to market disruption. The two primary collections of these objections are the 2001 U.S. Copyright Office report addressing digital first sale, and a similar and updated 2016 U.S.P.T.O report.[112] In their respective context, both reports were intended to advise Congress on whether to pass new legislation specifically enacting a new digital first sale law. And, in the few cases where these issues have been raised in litigation (most recently in cases involved mp3 sales and streaming

---

[112] DMCA SECTION 104 REPORT, *supra* note 11; USPTO FIRST SALE STUDY, *supra* note 29.

videos) courts have found it necessary to address the issues raised in those reports.[113]

Those reports raise three additional concerns that may differentiate digital lending from physical lending, that: 1) digital distribution eliminates transactional friction inherent in physical loans; 2) digital copies don't degrade like physical works; and 3) digital distribution raises security and piracy risks. We address each below. Ultimately, we conclude that none should pose an obstacle to well-designed controlled digital lending system. While we do not believe libraries implementing CDL must respond to these concerns, a conservative CDL system may take these factors into account. We identify ways to do so in Part IV of this paper.

> a) *"Digital distribution eliminates transactional friction inherent with physical loans."*

Movement of a copy from one location to another takes time; vehicles must drive and deliver copies, acting as a "natural brake on the effect of resales on the copyright owner's market."[114] For libraries, it takes time for returned books to make their way back on to shelves, and to check them out again to the next patron. For loans out to patrons in other locations, interlibrary loan adds an additional layer of delay. For digital transactions factors such as time and space no longer act as major impediments to transfer. The question is, should they, in order to more closely mimic the physical lending environment that exists with print?

By its terms, the Copyright Act does not grant rightsholders a right to transactional friction, nor does the Copyright Act freeze in time the historical conditions under which copies are bought and sold or lent. Amazon has dramatically altered the used book market, removing barriers to the flow of those books. Amazon (or libraries) using drones to deliver physical books to one's doorstep yet faster is no less an impingement on a rightsholder's market than a digital transaction that moves a copy yet more quickly. Such advancements have already occurred; advances in interlibrary loan services such as RapidILL and BorrowDirect mean books now move quickly and seamlessly between libraries in dramatically less time than in the 1970s when the Copyright Act was enacted.[115] Certainly other actors—FedEx, the fuel suppliers, physical book

---

[113] Capitol Records, LLC v.*ReDigi Inc.,* 934 F. Supp. 2d at ; *Disney Enters. Inc. v. Redbox Automated Retail LLC, No. 17-CV-8655,* 2018 WL 1942139, at *7-9 (C.D. Cal. Feb. 20, 2018).

[114] DMCA Section 104 Report, *supra note* 11, at 83.

[115] See RapidILL, http://rapidill.org/ (last visited September 14, 2018); BorrowDirect, http://www.borrowdirect.org/ (last visited September 14, 2018) (3-5 day delivery for materials across a federated catalog of 90 million plus volumes from the Ivy Plus libraries).

Page 26

inventory system manufacturers—may suffer with digital lending. But those markets do not belong to the copyright holder.

We do acknowledge, however, that the first sale doctrine was developed by the courts and embraced by Congress in the context of a physical environment where transaction costs were high. The USPTO in its recent white paper declining to recommend development of a broad conception of "digital first sale" stated that that "[t]o the extent that library lending involves library patrons 'willing and able to wait their turn for the limited loans and use of library materials,' [ ] the inefficiencies built into lending processes may avoid crossing the line of competing with the commercial market."[116] So, while transactional friction may not be necessary for CDL, an implementation that added it could reduce risk for libraries.

> b) *"Digital copies don't degrade like physical works."*

A second, broader, market harm concern is that digital works don't degrade like physical works. With that argument is the implicit suggestion that, like the friction discussed above, degradation was implicitly calculated into the balance of rights Congress arrived at when codifying the first sale doctrine. For one, this argument fails to appreciate that for long-term digital copies do degrade and require significant effort to maintain.[117] Redundancy is a standard requirement for the preservation of digital copies, requiring multiple storage locations, the technology of which needs to be upgraded and replaced every few years. Systems need to be migrated periodically, and platforms updated to interact with current technology. HathiTrust, for example, reports replacing storage hardware every 3-4 years.[118] All are potential failure points at which the particular copy of the work can degrade, sometimes spectacularly. So, the stored digital copy used for lending does degrade over time and in reaction to use, just in ways that are not entirely analogous to the more gradual and straightforward entropy of the physical book.

Those facts aside, to our knowledge no court has ever tied the application of the first sale doctrine to a required, planned degradation of the format in which the copy exists. Libraries can lend brand new books in perfect condition just as they can older, tattered ones, many of which are repaired and rebound by library

---

[116] USPTO FIRST SALE STUDY, *supra* note 29, at 70.

[117] *See, e.g.,* Bairavasundaram, Lakshmi N., Andrea C. Arpaci-Dusseau, Remzi H. Arpaci-Dusseau, Garth R. Goodson, and Bianca Schroeder, *An Analysis of Data Corruption in the Storage Stack,* ACM TRANSACTIONS ON STORAGE (TOS) 4, no. 3 (2008): 8, DOI: 10.1145/1416944.1416947 ("An important threat to reliable storage of data is silent data corruption.").

[118] *HathiTrust Trustworthy Repository Audit and Certification (TRAC),* HATHITRUST.ORG (2011), https://www.hathitrust.org/trac.

Page 27

staff or volunteers. Since the first recognition of the first sale doctrine over 100 years ago, the advent of acid-free paper, improved binding technology, media such as microform and magnetic tape and other innovations have extended the life of physical works dramatically.[119] In that time neither Congress nor the courts have altered the balance of rights in response to degradation. What's more, libraries engage in systematic preservation and conservation work to prevent or stop degradation. Driven in part by a lack of market availability, libraries repair, strengthen, and rebind many books in their collections, in large part because replacements cannot be purchased.[120] So as applied to CDL, we don't find degradation as a distinctive digital feature to be a compelling point. The idea has no connection to the statutory or judicial development of the rationale for first sale, and it fails to account for how digital storage and transmission do encounter degradation that is consistent with (if not more severe than) physical degradation.

### c) "Digital distribution raises unique security and piracy risks"

Finally, the third market-harm concern is that digital distribution raises greatly increased risks of piracy. In its 2001 report addressing digital first sale, the U.S. Copyright Office concluded that "the concerns about expanding first sale to limit the reproduction right, harm to the market as a result of the ease of distribution, and the lessened deterrent effect of the law that could promote piracy, outweigh the pro-competitive gains that might be realized from the creation of a digital first sale doctrine."[121] In its 2016 White Paper addressing digital first sale, the USPTO noted similar concerns.[122] The argument is that digital distribution is inherently more prone to negative market effects through

---

[119] *See*, Library of Congress, The Deterioration and Preservation of Paper: Some Essential Facts (n.d.), http://www.loc.gov/preservation/care/deterioratebrochure.html ("If mass deacidification treatment is carried out while the paper still has significant measurable strength, and the treated items are then stored under proper conditions, these once-acidic items are projected to remain in usable condition for several centuries, rather than becoming brittle and unusable in only fifty to one hundred years.").

[120] For example, in one recent survey with just 69 responding institutions, the Association for Library Collections & Technical Services found that respondents provided conservation treatment of a variety of levels to over 200,000 volumes of books and bound volumes. *See* ALCTS, Annie Peterson, Holly Robertson, and Nick Szydlowski, *Preservation Statistics Survey Report FY2015* (2016), http://www.ala.org/alcts/sites/ala.org.alcts/files/content/resources/preserv/presstats/FY2015/FY2015PreservationStatistics.pdf.

[121] DMCA SECTION 104 REPORT, *supra* note 11 ("Asserting, by analogy, that an online digital transmission is the same as a transfer of a material object ignores the many differences between the two events. Digital transmission has a much greater effect on the market for copies provided by the copyright owners. It is also accompanied by a greatly increased risk of piracy.").

[122] USPTO FIRST SALE STUDY, supra note 29, at 51.

Page 28

piracy because works can be copied and distributed with ease. Courts have taken security concerns seriously. In *Authors Guild v. HathiTrust*, for example, the Second Circuit gave considerable attention to the security precautions *HathiTrust* had put into place for the digitized volumes in its collection.[123]

Digital distribution of copyrighted works is exceedingly common. For CDL, we see the risks as no greater than any other digital transaction. Publishers regularly license electronic books for digital distribution without any discernable market premium added to account for the additional risk of impermissible downstream copying. For libraries, security issues should be taken seriously, which they are by design through the six CDL controls described above. Like the approach taken by HathiTrust, the repository of digital copies must be secured from unintended access. Going even beyond the *HathiTrust* case, CDL would require physical access to works be restricted as well, while digital copies are lent. In addition, the files lent must be controlled in some significant way (e.g., using DRM) that will prevent the patron from retaining perpetual or unrestricted access to the file. Other digital first sale scenarios that involve permanent transfer of files from one party to another, such as sale of mp3s, have struggled with how to effectively implement "forward-and-delete" technology.[124] For libraries lending works, the solution is potentially much easier; lending technology for distribution of licensed e-books is well established. Many publishers use and are comfortable with security implemented through systems like Overdrive, or using Adobe Digital Editions. For CDL, the most effective and defensible approach may be to use those very same copy and piracy controls that publishers themselves employ for distribution of their licensed e-book content.

### 2. Market Failure for 20th Century Books

Finally, a secondary but important reason why CDL would fare well under the market harm analysis is because it addresses a broad market failure, particularly with respect to the 20th century books that are generally not available in digital formats. It's precisely the kind of consideration fair use is equipped to address.[125] While we believe CDL has broader applications than just to these books, the significance of the market failure is so severe that we believe it

---

[123] *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014).

[124] *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 645 (S.D.N.Y. 2013).

[125] The seminal article on fair use addressing market failure was written by Wendy Gordon in 1982, sparking a wave of scholarship on the ways in which fair use may take into account ideas of market failure both generally and for specific use cases (e.g., parody). Wendy Gordon, *Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and its Predecessors*, 82 COLUM. L. REV. 1600 (1982).

deserves special consideration. For these 20th century books, we believe the fair use argument is strongest.

The most significant market failure for these books is with truly orphaned works—i.e., books for which the rightsholder cannot be identified or located after a diligent search.[126] For those works, market failure is confirmed through the diligent search, which demonstrates the insurmountable transaction costs just in *searching* for the rightsholder. But the 20th century book market suffers from market failure even when owners are known. Failure of rightsholders to exploit the e-book market likely has many causes. Some of those are production-related transaction costs, some are due to the complex thickets of rights associated with each work,[127] and some are likely due just to competing priorities. In all such cases, books are not commercially available in digital form. High transaction costs make it economically unviable for a willing rightsholder and a willing user to negotiate for a sale.

The Copyright Act does not require rights holders to sell their works in the marketplace; they do not face a "use it or lose it" regime of protection.[128] Beyond the threshold question of protection, even within the fair use analysis, courts have found valid reasons why market harm analysis should weigh against the use when the copyright owner may have had creative or economic reasons for holding back the work.[129] Yet, courts have held that failure to exploit the market can be evidence of lack of market harm under the fourth fair use factor. For example, in *Cambridge University Press v. Patton*, a group of publishers sued Georgia State University, claiming that university-uploaded excerpts of books to

---

[126] *See* Jennifer Urban, *How Fair Use Can Help Solve the Orphan Works Problem*, 27 BERKELEY TECH. L.J. 1379, 1404 -09 (2012).

[127] *See* Pamela Samuelson, *Google Book Settlement as Copyright Reform*, 2011 WISC. L. REV. 479, 495-99 (identifying uncertainty over ownership of e-book rights as contributing to the development of the Google Books Search Settlement, which have provided e-access to millions of books). *See also Random H., Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613 (S.D.N.Y. 2001), aff'd, 283 F.3d 490 (2d Cir. 2002) (resolving contractual dispute between publisher and author over ownership of e-book rights).

[128] Nor must copyright owners sue for each infringement. For example, in concluding that the doctrine of laches is rarely available to copyright defendants, the Supreme Court in *Petrella v. Metro-Goldwyn-Mayer, Inc.* explained: "If the rule were, as MGM urges, 'sue soon, or forever hold your peace,' copyright owners would have to mount a federal case fast to stop seemingly innocuous infringements, lest those infringements eventually grow in magnitude." The Copyright Act's statute of limitations and accrual rules "avoids such litigation profusion. It allows a copyright owner to defer suit until she can estimate whether litigation is worth the candle." 134 S. Ct. 1962, 1976 (2014).

[129] *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir.2012) ("current desire or ability to avail themselves of the market" was irrelevant to the question of potential market harm); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145–46 (2d Cir.1998) (finding market harm and noting that "copyright law must respect that creative and economic choice").

Page 30

the course e-reserves practices constituted copyright infringement.[130] For many of those excerpts, the publishers failed to make licenses for electronic copies available. The Eleventh Circuit found this significant in weighing the fourth factor:

> ...if a copyright holder has not made a license available to use a particular work in a particular manner, the inference is that the author or publisher did not think that there would be enough such use to bother making a license available. In such a case, there is little damage to the publisher's market when someone makes use of the work in that way without obtaining a license, and hence the fourth factor should generally weigh in favor of fair use.[131]

In so concluding, the Eleventh Circuit framed its analysis in terms of the incentive effects of copyright; in this case, whether allowing the use would "frustrate the purposes of copyright by materially impairing Defendant's incentive to publish the work."[132] The Supreme Court has endorsed that approach:

> ...[t]he purpose of copyright is to create incentives for creative effort. Even copying for noncommercial purposes may impair the copyright holder's ability to obtain the rewards that Congress intended him to have. But a use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create. The prohibition of such noncommercial uses would merely inhibit access to ideas without any countervailing benefit.[133]

---

[130] Note that in *Cambridge Univ. Press v. Patton,* the district court found fair use even where the excerpts were distributed with no control over the physical original nor any limitation on the number of students who could view the copy at any given time, making the market effect potentially more severe than what would be experienced with CDL. 769 F.3d 1232 (11th Cir. 2014).

[131] *Id.* at 1277. Untapped markets have been cited as persuasive evidence of no or minimal market harm in other cases as well. *Sony Corp of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 451–55 (1984) (no market for home video recording for time-shifting); *Kelly v. Arriba Soft Corp.,* 336 F. 3d 811, 821–22 (9th Cir. 2002); *Field v. Google Inc.,* 412 F. Supp. 2d 1106, 1122 (D. Nev. 2006) (no evidence a "market for licensing search engines to access Web pages through 'cached' links"). *See also Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 592 (1994) (market for licensing critical commentary of copyrighted work is unlikely).

[132] *Id.* at 1276.

[133] *Sony Corp. of Am.* 464 U.S. at 450–51. For large numbers of books in research libraries, the incentives of U.S. copyright protection played no role in their creation. Millions were in the public domain immediately upon publication until that public domain status was rescinded many years later under the Uruguay Round Agreements Act. 17 U.S.C. § 104A (2018).

Page 31

For print-only books, the potential e-book market has been available for nearly 20 years. Publishers have by and large not exploited that market, for various reasons. Libraries and readers have been waiting,[134] but at this point it cannot be said to be a "reasonable, or likely to be developed"[135] market. Publishers have largely not even maintained a print market presence, allowing books to devolve to out-of-print status quickly. Several studies have suggested that copyright may reduce the availability of books generally.[136]

So, for books published in this time period as a whole, there is a strong argument that they collectively represent a market failure. Part of that failure is due to high costs of determining commercial availability for any given work. The costs of searching and identifying which works are out of print, orphaned, or not available in e-book format is costly itself. However, we believe that there is sufficient data for assessment of commercial availability that can be leveraged for CDL to maximize the case that these particular titles within this 20th century focus are unavailable either in print or electronically. Those, we believe, present the very best case for CDL uses.

## IV.    TAKEAWAYS: SYSTEM DESIGN AND RISK MITIGATION

Libraries thinking about CDL will encounter risk, both positive and negative. On the positive side, we believe there is a significant upside: CDL helps libraries fulfill their missions in the broadest sense, using technology to increase effective, non-discriminatory access to collections for our users, and the world. Libraries have faced existential challenges for decades - "Is the library dead?" - but have survived in part because of their responsiveness to new technology. As new generations of information consumers expect immediate digital access to collections--along with those who have always needed but not been given digital access—libraries that fail to make their substantial collections available face anew the risk of becoming irrelevant or at least minimally effective in users' eyes. How can we help those users find and use the millions of volumes of the past century

---

[134] *See* Paul J. Heald, *The Demand for Out-of-Print Works and their (Un)Availability in Alternative Markets* (Illinois Public Law and Legal Theory Research Papers Series No. 14-31, 2014), http://papers.ssrn.com/abstract=2409118

[135] Am. Geophysical Union v. *Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994).

[136] William M. Landes & Richard A. Posner, *Indefinitely Renewable Copyright*, 70 U. CHI. L. REV. 471, 474 (2003)("[O]nly a tiny fraction of the books ever published are still in print; for example, of 10,027 books published in the United States in 1930, only 174, or 1.7 percent, were still in print in 2001"); Paul J. Heald, *How Copyright Keeps Works Disappeared,* 11 J. EMPIRICAL L. STUDIES 829, 832 (2014) ("Surprisingly, eBooks do not provide a significant alternative marketplace for out-of-print books. For example, only 36 percent of 162 bestselling books from 1923–1932 currently had eBook editions in 2014, and only one of the eBooks in that data set represented an out-of-print bestseller.").

Page  32

(which makes up the bulk of many library collections) if we cannot get materials to them in the modern (digital) formats they need?

For negative risk, there are three primary types we worry about: 1) the risk that a library is sued in the first place, 2) the risk that the library loses the lawsuit, and 3) the risk of consequences in the face of defeat in a lawsuit. For each aspect of risk, libraries should make an honest assessment of their risk tolerance, accompanied by advice from legal counsel about how to match some of the ideas presented above and below with that risk profile.

For risk of being sued, it's not necessarily about the law itself. The issues are actually about time, resources, and reputational harm in defending a lawsuit. A lawsuit can take a tremendous amount of time. For example, the Georgia State e-reserves case (*Cambridge University Press v. Patton*) has now entered its 10th year of litigation.[137] Lawsuits are rarely resolved in a few months. There can be years of pre-trial action after the complaint is filed. There could be challenges to the pleadings through the motion process, which add additional delay. Answering questions, producing documents, or taking testimony can often take months or years, even before you get to trial. Although the reality is that most lawsuits do not go to trial,[138] the cost of litigation can be high, and these costs often depend on the issues involved and the location of the trial. Attorneys' fees and costs to go through the process from complaint, right up to trial, can range in the tens of thousands of dollars, and, if it does go to trial, that expense can easily double. [139]

Second, the risk that the library loses in court is primarily addressed by the strength of the legal position under fair use, the framework of which is addressed in Part III. The analysis is also general—case law in particular jurisdictions may be more or less favorable—and it doesn't fully take into account some of the particular facts and design choices (addressed below) that libraries may choose to implement to further enhance their position. And again, we caution that there are no fair use cases that square precisely with this use scenario, and so libraries entering this space must embrace a certain degree of legal ambiguity. But, the analysis above shows that there is a good faith, reasonable basis for concluding that such uses constitute fair uses.

---

[137] *Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014).

[138] "[P]erhaps up to 97% of cases are resolved by means other than by trial." Barkai, Kent and Martin, *A Profile of Settlement*, 42 COURT REVIEW: THE JOURNAL OF THE AMERICAN JUDGES ASSOCIATION 34 (2006).

[139] *See* AIPLA, REPORT OF THE ECONOMIC SURVEY 36; I–175 (2013) (reporting that litigation with less than $1 million at stake costs on average around $150,000 through the discovery process). While we primarily address risks associated with legal action, CDL may raise many other types of reputational, institutional, and political risks that libraries should carefully consider.

Page 33

Finally, there is the question of what happens if the library loses the lawsuit. Typically, the plaintiff would request that the court enter an order for an injunction or damages, or, on occasion, both against the losing party. Statutory damages are the major concern.[140] Unlike most other jurisdictions, under U.S. law, infringements of works registered with the copyright office (most published books are) can carry a damage award within a statutory pre-set range of up to $150,000 per work infringed in cases of willful infringement.[141]

However, for libraries there is some good news to limit risk exposure. First, Congress created a special provision to protect for teachers, librarians, archivists, public broadcasters and the nonprofit institutions with which they are associated from liability when they believed and had reasonable grounds for believing that the use they were making was a fair use. In that case that statute instructs that the court "shall remit statutory damages." [142] Given the public benefit and generally good faith approach to this issue, it's also important that courts, in applying this provision, may avoid "mechanical application of the statutory damage provision of the Copyright Act" when it would "lead[] to absurd results." [143] The statute "provide[s] the courts with reasonable latitude to adjust recovery to the circumstances of the case, thus avoiding some of the artificial or overly technical awards resulting from the language of the existing statute."[144]

Second, some institutions may benefit from sovereign immunity, a doctrine that protects states from federal court interference, derived in part from the Eleventh Amendment to the United States Constitution.[145] Eleventh amendment sovereign immunity, though not absolute, shields state actors from damage

---

[140] In the few recent cases litigated against libraries, plaintiffs have not sought statutory damage awards. However, statutory damages award are large and have been awarded in other cases. 17 U.S.C. § 504(c) (setting damage ranges up to $150,000 per work infringed).

[141] For CDL, it seems unlikely that a court would find infringement to be "willful."

[142] 17 U.S.C. § 504(C)(2) ("The court shall remit statutory damages in any case where an infringer believed and had reasonable grounds for believing that his or her use of the copyrighted work was a fair use under section 107, if the infringer was: (i) an employee or agent of a nonprofit educational institution, library, or archives acting within the scope of his or her employment who, or such institution, library, or archives itself, which infringed by reproducing the work in copies or phonorecords; or (ii) a public broadcasting entity which or a person who, as a regular part of the nonprofit activities of a public broadcasting entity (as defined in section 118(f)) infringed by performing a published nondramatic literary work or by reproducing a transmission program embodying a performance of such a work.").

[143] *Doehrer v. Caldwell*, 1980 U.S. Dist. LEXIS 10713, *2.

[144] *Id.* (quoting S. Rep. No. 94–473, 94th Cong., 2d Sess).

[145] "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State" U.S. CONST. AMEND. XI

Page 34

awards in federal court.[146] Because sovereign immunity limits the judicial power of the federal judiciary under Article III of the Constitution, absent a valid retraction of that sovereign immunity by Congress, "a State will ... not be subject to suit in federal court unless it has consented to suit, either expressly or in the plan of the convention."[147]  While Congress has attempted to abrogate states' immunity from liability for federal copyright law violations,[148] over a dozen cases have found those attempts to be ineffective, including appellate decisions from the Eleventh, Fifth, and most recently the Fourth Circuits.[149] Sovereign immunity can be an important factor in assessing the risk of adopting a CDL program. Presently, state and tribal governments and their related departments such as state university libraries, museums, or archives, are immune from damage awards. Of course, plaintiffs could still bring a suit. Sovereign immunity also lowers the risk of such a suit because the outcome may have little reward—there is no money in it for litigants.

While some risks such as exposure to damages may be minimized by sovereign immunity or the statutory damages exception, libraries can also be proactive to minimize risk with CDL by implementing some additional system design and library policies, as well as selecting materials to be lent using CDL with an eye toward risk. We conclude with several practical ideas about how to do so:

### A.    System Design and Library Policies

The six basic system design elements identified in the *Statement* and introduced at the outset of this paper are, we believe, all that are necessary to make a compelling legal case for CDL.[150] There are, however, several other

---

[146] See *Nevada v. Hall*, 440 U.S. 410, 420 n. 19 (1979).

[147] *Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775, 779 (1991).

[148] In 1990, Congress passed the Copyright Remedy Clarification Act (CRCA), 17 U.S.C. § 511, as part of an effort by Congress to attempt to remedy imbalances between private and state institutions caused by Eleventh Amendment sovereign immunity in the intellectual property arena. It declared that "any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity" shall not be immune under either the Eleventh Amendment for violation of the exclusive rights of copyright holders. 17 U.S.C. § 511(a).

[149] "We conclude that in enacting the Copyright Remedy Clarification Act, Congress satisfied neither requirement [to abrogate Eleventh Amendment sovereign immunity]." Allen v. Cooper, No. 17-1522, 2018 WL 3352378, at *7 (4th Cir. July 10, 2018); Natl. Ass'n of Boards of Pharm. v. Bd. of Regents of the U. System of Georgia, 633 F.3d 1297 (11th Cir. 2011); Rodriguez v. Texas Commn. on the Arts, 199 F.3d 279 (5th Cir. 2000). *See also* Issaenko v. U. of Minnesota, 57 F. Supp. 3d 985, 1007 (D. Minn. 2014) (citing a dozen cases).

[150] The six design principles state that libraries should:

design features that may reduce risk and enhance the fair use position, primarily by enhancing the argument that CDL does not pose an undue market harm. These design elements attempt to make CDL mimic even more closely the physical environment and attendant friction reuse, as well as the security limitations that physical lending currently requires.

One way is to introduce additional artificial "friction" into the system, for example, is by extending the time between digital lends, more closely mirroring how physical books are lent and returned. For books that would typically take 24 hours to make their way back on to the shelves after being returned, that might be an appropriate waiting time for digital copies as well. For reserve materials that rapidly move in and out of the shelves with little wait, a shorter period may be appropriate to mimic the realities of a physical lend. Libraries may even want to take in user geography—if a user borrows a book while located further away, add more time in between the next loan than if the user is located next door—or other factors that have historically slowed the flow of physical works.

A conservatively designed CDL system could also introduce characteristics that mimic physical degradation. For example, a library might introduce lending limits based on library experience with physical lending. If a physical book could be expected to circulate 2,000 times before it degrades, the library could place the same limit on circulation of the digital copy. For many books, this could pose little practical challenge. Large research libraries hold many books that have circulated very seldom in print,[151] and so for many obscure materials ever hitting a maximum loan threshold may be unlikely (though we recognize, digital availability may itself drive lending). For such an implementation, it would be important for libraries to develop good data on how long an average book actually circulated before it degrades to the point it can no longer be used. Library experience and publisher expectations seem to diverge significantly on

---

(1) ensure that original works are acquired lawfully;

(2) apply CDL only to works that are owned and not licensed;

(3) limit the total number of copies in any format in circulation at any time to the number of physical copies the library lawfully owns (maintain an "owned to loaned" ratio);

(4) lend each digital version only to a single user at a time just as a physical copy would be loaned;

(5) limit the time period for each lend to one that is analogous to physical lending; and

(6) use digital rights management to prevent wholesale copying and redistribution.

[151] *See* Allen Kent et al. *Use of Library Materials: The University of Pittsburgh Study* (1979) (indicating that fewer than 40% of books purchased in the preceding 10 years had circulated at all, and predicting that fewer than 2% ever would); Cornell University Library, Report of the Collection Development Executive Committee Task Force on Print Collection Usage 2 (2010) (approximately 55% of monographs purchased since 1990 have never circulated).

Page 36

this; Harper Collins at one point believed that 26 loans was all that an average book would handle before it degraded,[152] while libraries lending some books (e.g., books placed on reserve) will regularly see lending run into the thousands before degradation occurs.

Libraries may also pay special attention to controlling both digital and physical copies. While all applications of CDL should restrict access to physical copies while the digital is lent, some practical strategies may ensure that such restrictions are especially rigorously followed. For libraries with open stacks, this may mean rapidly removing books from open circulation if they are digitized and lent. For others, a more reliable method may be to only lend books whose physical manifestations are already tightly controlled, either in closed stacks or off-site storage.

Libraries may also limit who they will lend digital copies to as an additional way to limit the overall reach of the copy and therefore the potential market effect. Libraries serve particular communities of users--an academic library primarily serves its students and faculty, a public library serves its local residents—and so the rationale would be that digital lending should be made equivalent to the same group of users who would have access to the physical materials. While many libraries make their collections available broadly to many users, user-group considerations may mean that libraries will want to think carefully about issues such as who their core users are and, for example, how lending to partner libraries in local or regional consortia with deeply integrated print collections may work, as opposed to users at libraries with more distant interlibrary loan arrangements. In any case, the aim would be to make collections more accessible for those who would ordinarily, already be entitled to access.

In addition, libraries may apply more or less restrictive controls on what users can do with copies while they are lent to them. Ordinarily, a borrower of a physical book can make photocopies, scans, or other basic reproductions, usually for private study or minimal further sharing. Practicality usually limits users from reproducing the entire physical work over again. While all CDL systems should implement some type of technological protection measures to prevent wholesale copying, libraries that seek to take a conservative approach to CDL may seek to limit any copying at all, while others may allow users to reproduce or print a small selection from the work.

Finally, libraries may choose to limit access to books based on feedback from rightsholders about specific materials loaned through CDL. While ultimately the

---

[152] Jacket Copy, *HarperCollins' 26-checkout Limit on Libraries' Ebooks Starts Today,* March 7, 2011, http://latimesblogs.latimes.com/jacketcopy/2011/03/harpercollins-library-ebook-checkout-limit.html.

Page 37

rationale for CDL remains the same regardless of a rightsholder objection, libraries may choose to limit risk and exposure to litigation by employing a takedown policy and including in their system design a mechanism for rightsholders to communicate about books that they would prefer not be lent. Many libraries already employ such policies with digitized collections, particularly those that include materials from unknown or unlocatable owners. For CDL, extending those policies may be a natural and simple way to defuse risk before it culminates in a potentially costly dispute.

### B.   Collection Choices

The choice in what books are selected for CDL can also play a significant role in risk mitigation. Book candidates with the lowest risk—and the strongest fair use argument, though those analyses are not necessarily tied together—are generally those with the lowest likelihood of market exploitation. Our analysis above pays special attention to 20th century books generally, but there are several subcategories of works that libraries may select for CDL that would yield further reduction of risk.

#### 1.   Old Books and the Public Domain

There is some practical risk mitigation in selecting older titles for digitization.[153] In addition to aiding in the likelihood that the market is significantly diminished, many older works may in fact be in the public domain, subject to no copyright restrictions on use at all. Because the public domain analysis can be time consuming and costly,[154] for libraries that are unable to undertake a full public domain analysis to each work, using older works as a proxy in combination with a CDL strategy may be an effective way to minimize copyright-related risks.

For published books, there are a few ways to approximate which works are more likely to be in the public domain than others. One is to focus on books first published in the United States, since many of the rules that place published

---

[153] There is also a compelling argument that the fair use case should become stronger the further along the work is in its copyright term. *See*  Joseph P. Liu, *Copyright and Time: A Proposal,* 101 MICH. L. REV. 409 (2002); Justin Hughes, *Fair Use Across Time*, 43 UCLA L. REV. 775 (2003); William F. Patry & Richard A. Posner, *Fair Use and Statutory Reform in the Wake of Eldred*, 92 CAL. L. REV. 1639 (2004).

[154] For an excellent and thorough guide, see Melissa Levine et al., *Finding the Public Domain: Copyright Review Management System Toolkit* (2016), https://doi.org/10.18665/sr.289081.

Page  38

works into the public domain do not apply to works first published abroad.[155] Another is to focus on books within that subset that were published before 1989, since books published before that date must have complied with U.S. copyright notice requirements (the © on the title page, or similar) to obtain protection.[156] A third is to look at U.S. books only published before 1963. Copyright for U.S. works published before that date must have been renewed with the U.S. Copyright Office to have continued protection. Very few rightsholders filed for renewal.[157] Finally, a most conservative library might focus just on books in their last 20 years of copyright protection—books published before 1943—for which the library is willing to do a reasonable investigation to determine if the book is still commercially available. When Congress extended copyright protection by 20 years in the 1998 Copyright Term Extension Act, it granted libraries special rights to use works in that extended term under Section 108(h).[158]



---

[155] *See* Copyright Term and the Public Domain in the United States, Cornell University Library Copyright Information Center (updated January 10, 2018), https://copyright.cornell.edu/publicdomain.

[156] 17 U.S.C. § 401 (2018); Berne Convention Implementation Act of 1988, P.L. 100-568 (1988).

[157] Jamie Carlsteon et al., *Copyright Renewal of U.S. Books Published in 1932: Re-analyzing Ringer's Study to Determine a More Accurate Renewal Rate for Books,* 79 College & Research Libraries 697 (2018), https://doi.org/10.5860/crl.79.5.697 (studying books published in 1932 and concluded that renewal rates were likely between 26 and 33 percent).

[158] 17 U.S.C. § 108(h) (2018); Elizabeth Townsend Gard, *Creating a Last Twenty (L20) Collection: Implementing Section 108(h) in Libraries, Archives and Museums* (October 2, 2017), http://dx.doi.org/10.2139/ssrn.3049158.

Selecting books based on date of publication does not guarantee the that work is in the public domain, but it is an efficient way to use readily available bibliographic data to increase the chances, which in combination with CDL as an access strategy could lower overall risk of making those books digitally available.

## 2.    Out of Print and Off the Market

The phrase "out of print" does not mean "out of copyright." In fact, many out of print works may still be under copyright. However, the out of print status of a book is meaningful for the fair use analysis. A key, though not necessarily determinative factor in fair use is whether or not the work is available to the potential user. If the work is out of print and unavailable for purchase through normal channels, the user may have more justification for reproducing it."[159] A library might lower risk by selecting works for CDL implementation that are clearly not available in the marketplace, either "in print" from the publisher or electronically as a licensed e-book. Selecting these works has the practical risk mitigation strategy of also reducing the risk that anyone will bring suit in the first place—if the work is not currently exploited by its owner, chances stand to be higher that whoever that owner is isn't particularly concerned with use of it by libraries.

How to actually determine which books are not currently commercially exploited requires some investment of time and resources.  Databases such as Bowker's Books in Print, and online searches through Amazon or Addall.com may be sufficient to give an indication that titles are no longer exploited through normal commercial channels. For older books, especially those without ISBNs, searches are more challenging.[160]

A second and far more severe category of "off the market" books are orphan works, which are works protected by copyright but which a user cannot, after a diligent search, identify the copyright holder.[161] Although there have been

[159] S.Rep. No. 94–473 (1975); *Maxtone–Graham v. Burtchaell*, 803 F.2d 1253, 1264 n. 8 (2d Cir. 1986) (out-of-print status of copyrighted book supports fair use determination); *see also* Part III(D)(2) (market failure for 20th century books should favor fair use determination).

[160] Low risk works published in the 1920s through the 1960s, if they have not been reissued after 1970, would not have an ISBN number, and so there is likely no present commercial exploitation. *See* Elizabeth Townsend Gard, "Creating a Last Twenty (L20) Collection: Implementing Section 108(h) in Libraries, Archives and Museums" (October 2, 2017). Available at SSRN: https://ssrn.com/abstract=3049158 or http://dx.doi.org/10.2139/ssrn.3049158

[161] *See* Library of Cong., Copyright Office, Notice of Inquiry: Orphan Works & Mass Digitization, 77 Fed. Reg. 64555 (Oct. 22, 2012), https://perma.cc/6MHS-FZAH . (defining an orphan work as "an original work of authorship for which a good faith, prospective user cannot readily identify and/or locate the copyright owner(s) in a situation where permission from the copyright owner(s) is necessary as a matter of law."). *See also* HANSEN, *supra* note 15.

several legislative proposals in the U.S. to facilitate use of orphan works, none have passed and orphan works do not have special legislative status under U.S. law. Orphan works, as described by the Supreme Court, are "older and more obscure works with minimal commercial value."[162] But with copyright owners that are difficult or impossible to track down, Justices Breyer and Alito lament the "[u]nusually high administrative costs" that "threaten to severely limit distribution and use of those works…which, despite their characteristic lack of economic value, can prove culturally invaluable."[163]

Determining which works may be orphaned is potentially hard. However, it is clear that librarians, information professionals who are experts at searching for materials and determining provenance, are among the best suited to conduct such searches.[164] With the research tools available, such as the online versions of the CCE and the Stanford Renewal Database, searching for the rightsholder for a potential orphan has been aided by the digital availability of these works. And, most recently, the U.S. Copyright Office released its registration card catalog online, which could make discovery of a registered work and its potential rightsholder even more effective.[165]

### 3. Non-fiction and Factual Works

Finally, a third collection characteristic that may reduce risk and enhance the fair use position is for libraries to focus their CDL efforts on works that are non-fiction or primarily factual. As a way to enhance the fair use position, the "nature of the work" factor tends to weigh more in favor of uses of works that are further from the core of what copyright was designed to protect. While courts have not placed significant weight on this factor, it still stands as a potential area for collection selection to enhance the fair use argument and lower risk.

Libraries have many choices. They may choose heavily factual or scientific books, or merely books that are categorized as non-fiction. They might also choose to apply CDL to books that incorporate significant amounts of non-

---

[162] *Golan v. Holder*, 565 U.S. 302, 355 (2012) (Breyer, with whom Alito joined, dissenting).

[163] *Id.*

[164] We do not believe libraries should adhere to rigid search standards that have been implemented in other jurisdictions, though they may provide useful guidance. Experience so far in those jurisdictions has shown that those search standards, rather than reliance on the reasoned expertise of information search professionals in line with general best practices, is not efficient or effective. *See* U.K. Intellectual Property Office, *Orphan Works Dilligent Search Guidance for Applicants*, (March 2018), https://www.gov.uk/government/publications/orphan-works-diligent-search-guidance-for-applicants. *See also* Aura Bertoni, Flavia Guerrieri & Maria Lillà Montagnanim, *Requirements for Diligent Search in 20 European Countries* (ENDOW REPORT 2, JUNE 2017), http://diligentsearch.eu/wp-content/uploads/EnDOW%20Report%202.pdf.

[165] U.S. Copyright Office, Virtual Card Catalog (n.d.) https://vcc.copyright.gov/

protectable materials. Genealogical works, for example, or un-illustrated cookbooks may tend to include many materials unprotected by copyright. Similarly, works that incorporate significant quantities of U.S. government authored works (which are unprotectable in the United States)[166] may also be targeted under the same rationale.

## V.    CONCLUSION

Controlled digital lending offers an incredible opportunity for opening up access to library collections. The *Statement* illustrates a growing list of libraries and librarians who support CDL as a concept.  We acknowledge that law is not entirely settled. There are no cases directly on point, and some contrary authority in the context of commercial activities. Yet, there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use. We conclude that a library is acting within fair use if it digitizes and lends to users the full text of a copyrighted book, provided it does so within carefully implemented limits and safeguards (i.e. all the controls identified in the *Statement*), and provided that the library's primary purpose for making and using the digitized book is limited to uses that are within the distribution and related rights that all libraries have under the first sale doctrine, as applicable to the original book in the collection.

---

[166] 17 U.S.C. § 105 (2018).

Page  42