# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

### JOINT APPENDIX (PUBLIC) – VOLUME 20 OF 26 (A-4871-A-5140)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM     ELIZABETH A. MCNAMARA
DANAE TINELLI              LINDA J. STEINMAN
SCOTT A. ZEBRAK         JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP   JESSE M. FEITEL
4530 Wisconsin Avenue, NW,   CARL MAZUREK
5th Floor                   DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016       1251 Avenue of the Americas, 21st Floor
                                New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **<u>Vol. 3</u>** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| **Vol. 4** | | | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| **Vol. 5** | | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| **Vol. 6** | | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | **Vol. 7** | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | Exhibit 33 – Email From Penguin Random House | A-1735 |
|  |  | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
|  |  | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
|  |  | Exhibit 36 – Takedown Notices | A-1745 |
|  |  | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
|  |  | **Vol. 8** |  |
|  |  | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
|  |  | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
|  |  | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
|  |  | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
|  |  | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
|  |  | Exhibit 43 – Open Library Webpage | A-1832 |
|  |  | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
|  |  | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
|  |  | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
|  |  | **Vol. 9** |  |
|  |  | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
|  |  | Exhibit 47 – Internet Archive's Webpage | A-2157 |
|  |  | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

11

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

13

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

15

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

19

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

23

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

**Page Intentionally Left Blank**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN
WILEY & SONS, INC., and PENGUIN RANDOM
HOUSE LLC,

Plaintiffs

v.

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,

Defendants

CASE NO. 1:20-cv-04160

# REPLY EXPERT REPORT OF
# RASMUS JØRGENSEN, PH.D.

May 27, 2022

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# CONTENTS

I. **INTRODUCTION** ....................................................................................................2
   A.   QUALIFICATIONS AND EXPERIENCE..........................................................2
   B.   ASSIGNMENT ...........................................................................................2
   C.   MATERIALS CONSIDERED .........................................................................3
   D.   INDEPENDENCE AND COMPENSATION DISCLOSURE .................................3

II. **SUMMARY OF OPINIONS** ...................................................................................4

III. **DR. PRINCE ASSERTS WITHOUT EVIDENCE THAT PLAINTIFFS HAVE BEEN SIGNIFICANTLY HARMED** .................................................................................5

IV. **THE CLOSING OF THE NATIONAL EMERGENCY LIBRARY DEMONSTRATES THAT INTERNET ARCHIVE'S DIGITIZED BOOK LOANS DID NOT SUBSTITUTE FOR PLAINTIFFS' BOOK SALES OR OVERDRIVE'S DIGITAL LENDING** ...................................7

V. **DR. PRINCE'S REBUTTAL OPINIONS ARE FUNDAMENTALLY FLAWED** .............................9
   A.   DATA ON OVERDRIVE CHECKOUTS PROVIDES RELEVANT INFORMATION FOR TESTING PLAINTIFFS' THEORY OF COMPETITIVE SUBSTITUTES ...............................9
   B.   AS ACKNOWLEDGED BY DR. PRINCE, THE DATA PROVIDED BY OVERDRIVE DOES NOT IDENTIFY INCREMENTAL REVENUE PER CHECKOUT .........................11
   C.   DR. PRINCE'S ESTIMATE OF PLAINTIFFS' LICENSE REVENUE COLLECTED THROUGH OVERDRIVE IS NOT "MORE APPROPRIATE" .........................12
   D.   CONTRARY TO DR. PRINCE'S INSINUATIONS, THE CLOSING OF NEL PROVIDES RELEVANT AND RELIABLE EVIDENCE ON THE MARKET IMPACT OF INTERNET ARCHIVE'S ACCUSED DIGITAL LENDING OF THE WORKS-IN-SUIT .........................14

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A-4873

# I.    Introduction

## A.    Qualifications and Experience

1.    I am an economist and Senior Consultant at NERA Economic Consulting ("NERA"). NERA is a global firm of economists dedicated to applying economic, finance, and quantitative principles to complex business and legal issues.  I obtained my BSc, MSc, and PhD in Economics from University of Copenhagen. Prior to joining NERA, I was a Postdoctoral Research Fellow at Yale University and Professor of Economics at University of Copenhagen, where I taught undergraduate and graduate courses in econometric analysis and international economics.  My research has appeared in leading peer-reviewed scientific journals, including the *American Economic Review*, and I have served as a peer reviewer for a dozen of the principal scientific journals in Economics.  At NERA, my practice focuses on the economics of intellectual property, antitrust economics, and calculating economic damages in commercial disputes. On February 25, 2022, I provided an initial expert report in this matter.[1] My updated CV is attached as **Exhibit 18** to this report.  I have not testified as an expert in any other litigation.

## B.    Assignment

2.    Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons ("Wiley"), and Penguin Random House LLC ("Penguin Random House") (collectively, "Plaintiffs") allege that the Internet Archive ("IA" or "Defendant") has infringed their copyrights by scanning, reproducing, and distributing digital copies of in-copyright print books through its digital lending library.[2]  The suit brought by Plaintiffs against IA is based on a list of in-copyright works that IA allegedly infringed through its digital lending library.[3]  This list includes a total of 127 book titles ("Works-in-Suit").[4]

---

[1] Expert Report of Rasmus Jørgensen, Ph.D., *Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC v. Internet Archive*, United States District Court, Southern District of New York, February 25, 2022 ("Initial Jørgensen Report" or "my initial report").

[2] Complaint, *Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc.,* and *Penguin Random House LLC, v. Internet Archive* and *DOES 1 through 5*, United States District Court, Southern District of New York, Case No: 1:20-cv-04160, June 1, 2020 ("Complaint"), ¶¶ 2-3, 6, 75, 114-115.

[3] Complaint, ¶¶ 3, 20.

[4] Complaint, Exhibit A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

3.      As noted in my initial report, I was asked by Durie Tangri LLP ("counsel"), counsel for Defendant, to provide an independent opinion to assist the Court regarding matters on which expert assistance may be required in this litigation.  Specifically, I have been asked to offer opinions on the following four topics:  i) the amount of Internet Archive's digital lending of the Works-in-Suit relative to other digital libraries over time; ii) the peak monthly loan totals for each of the Works-in-Suit during the period in which the National Emergency Library was in operation; iii) the impact of the Internet Archive's use of the Works-in-Suit on the actual digital lending market based on available information from the Internet Archive and OverDrive; and iv) the impact of the Internet Archive's use of the Works-in-Suit on Plaintiffs' sales across book formats.

4.      I have now been asked to respond to issues raised by Plaintiffs via the Rebuttal Expert Report of Jeffrey T. Prince, Ph.D., filed on April 29, 2022 ("Prince Rebuttal Report").

## C.      Materials Considered

5.      The opinions in this report are based on my professional training and experience, as well as my review of the Complaint, publicly available documents, discovery materials (including deposition transcripts and exhibits), and data and documents that are in the evidentiary record.[5]

6.      In addition to the materials listed in Exhibit 2 of my initial report, I have listed in **Exhibit 19** any new materials I have considered in forming the opinions contained in this report. The specific information upon which I have relied is cited in the footnotes of the report.

## D.      Independence and Compensation Disclosure

7.      I am an independent expert.  I have no affiliation with any of the parties involved in the above-captioned matter.  I also have no affiliation with counsel for Plaintiffs or Defendant, nor with the Court.

8.      NERA was retained by counsel according to our ordinary retention terms. NERA is compensated based on time actually spent; my hourly time is billed at $560 per hour. Neither

---

[5] Throughout this report, I use terms (such as to denote documents or depositions) as defined in my initial report.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

my nor NERA's compensation depends in any way on the outcome of my analyses or of this case.

## II.   Summary of Opinions

9.      After a careful review of the Prince Rebuttal Report, none of Dr. Prince's arguments cause me to change any of my conclusions.  In particular, the evidence, as presented in my initial report, is not consistent with Plaintiffs' and Dr. Prince's claims that Internet Archive's accused digital lending of the Works-in-Suit substituted for Plaintiffs' print and ebook sales, nor with library ebook lending through OverDrive.

10.     In addition, I find that Dr. Prince's analyses and opinions are flawed and unreliable for the following principal reasons:

- Dr. Prince asserts without evidence that Plaintiffs have been harmed.  The Prince Rebuttal Report purports to present a "logical framework" for assessing the effects of IA's accused conduct on Plaintiffs.[6]  Based on this framework, Dr. Prince simply draws an unsubstantiated conclusion that any infringement of the Works-in-Suit must necessarily cause harm to Plaintiffs without offering any analysis or evidence to support such a conclusion.  (Section III)

- Dr. Prince mischaracterizes my analysis that uses the closing of the National Emergency Library ("NEL") to test for Plaintiffs' purported theory of competitive substitutes.  Contrary to his assertions, my proposed methodology presents relevant and reliable evidence on the potential effects of IA's accused digital lending on Plaintiffs' sales by comparing two closely related time periods—one period in which IA offers digitized book loans of the Works-in-Suit to the following period in which consumers no longer have that option.  (Section VI)

---

[6] Prince Rebuttal Report, ¶ 55.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

- Dr. Prince's assertion that it is "incorrect" to compare Internet Archive's accused digital lending to that of OverDrive is in direct conflict with Plaintiffs' and Dr. Prince's position that Internet Archive acted as an unlicensed aggregator displacing ebook lending through other aggregators. (Section V.A)

- Dr. Prince claims that my initial report "underestimates" the library ebook revenues Plaintiffs collect through their partnership with OverDrive. However, Dr. Prince's alternative estimates exaggerates Plaintiffs' revenue by including audiobook sales which are not at-issue in this matter. (Sections V.B and V.C)

- Dr. Prince's assertion that other market conditions changed around the time of the closing of NEL is contradicted by the very market-wide statistics on which Dr. Prince bases his opinions. This evidence is further confirmation that my initial report presents relevant estimates of potential substitution effects, if any, based on an appropriate and reliable methodology. (Section V.D)

11. In this report, I address only the main complaints Dr. Prince raises against my analysis and opinions in this matter. The fact that I do not address any particular claim made by Dr. Prince regarding my opinions should not be construed as accepting that claim.

12. I reserve the right to supplement my opinions and analysis should relevant new information become available over the course of this litigation.

## III. Dr. Prince Asserts Without Evidence That Plaintiffs Have Been Significantly Harmed

13. Dr. Prince asserts that Plaintiffs have suffered significant harm from the alleged copyright infringement by Internet Archive because of its digitized book loans of the Works-in-Suit.[7] According to the Prince Rebuttal Report, Plaintiffs have been harmed in numerous ways,

---

[7] Prince Rebuttal Report, ¶¶ 29-30, 71.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

5

including harms owing to "lost license fees, lost sales, and reduced revenue as a result of any downward effect on market prices . . . ."[8]  Yet Dr. Prince has presented no evidence or analysis attempting to quantify the purported harm, if any, to Plaintiffs' ability to "make money from their creative works."[9]

14.    Rather, the Prince Rebuttal Report takes for given that "infring[ing] versions of products that are distributed free of charge on the Internet often substitute for the purchases of an original product . . . ."[10]  That is, Dr. Prince makes no distinction between the allegedly infringing conduct by IA and the potential market harm caused by that conduct.  Instead, Dr. Prince simply draws an unsubstantiated conclusion that any copyright infringement of the Works-in-Suit must necessarily cause harm to Plaintiffs without offering any analysis or evidence to support such a conclusion.

15.    As recognized by Dr. Prince, well-accepted methods for assessing harm include contrasting the economic position of the Plaintiffs but-for the allegedly infringing conduct with the Plaintiffs' economic position observed in the actual world.[11,12]  However, Dr. Prince has not offered any substantive analysis or evidence that identifies the incremental revenues that Plaintiffs would likely have made, if any, in a properly defined but-for scenario.  Instead, Dr.

---

[8] Prince Rebuttal Report, ¶ 54.

[9] Prince Rebuttal Report, ¶¶ 29-30.

[10] Prince Rebuttal Report, ¶ 30.

[11] Prince Rebuttal Report, ¶ 82 ("To determine whether or not IA's conduct caused harm to the Plaintiffs, one would have to generate reasonable estimates of Plaintiffs' revenues from the sale and licensing of ebooks and print books to libraries and consumers under a but-for scenario in which the only difference in market conditions is that IA did not infringe Plaintiffs' copyrighted works").

[12] The concept of a but-for world for quantifying damages is explained in the Reference Manual on Scientific Evidence as "[t]he characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper action in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved. Because the but-for scenario differs from what actually happened only with respect to the harmful act and exclude any change in the plaintiff's value arising from other sources. Thus, a proper construction of the but-for scenario and measurement of the hypothetical but-for plaintiff's value by definition includes in damages only *caused* by the harmful act." See Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence*, Third Edition, Washington, DC: The National Academies Press, 2011, p. 423.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

6

Prince makes several contradictory assertions about the potential sources of harm that Plaintiffs purportedly have suffered.[13]

16.  Although Dr. Prince was asked to "[a]ssess the effect of Internet Archive's alleged infringing conduct on Plaintiffs," the Prince Rebuttal Report presents no actual evidence or analysis of the potential lost sales or other harms to the Plaintiffs which are attributable to IA's digital library lending.[14]  Instead, Dr. Prince simply asserts without evidence that any infringement of the Works-in-Suit must necessarily cause harm to Plaintiffs.

## IV.  The Closing of the National Emergency Library Demonstrates that Internet Archive's Digitized Book Loans Did Not Substitute for Plaintiffs' Book Sales or OverDrive's Digital Lending

17.  Dr. Prince has presented no analysis or evidence regarding Plaintiffs' ability to capture incremental sales in a but-for world in which IA's digitized book loans are no longer available to consumers.  That is, Dr. Prince has not assessed to what extent, if any, that IA's accused digital library lending substituted for any of the Plaintiffs' book offerings (across formats and segments).  In contrast, my initial report explicitly analyzed how the Plaintiffs' ebook sales and paperback book sales changed in response to the distinct event in which IA closed the National Emergency Library and removed the Works-in-Suit from its digital lending library.[15]  This analysis—which my initial report referred to as a natural experiment—was designed specifically to assess the degree of substitutability between IA's accused digital library lending of the Works-in-Suit and Plaintiffs' ebook and paperback book sales of the same titles. The Initial Jørgensen Report investigated this question by comparing changes in the outcomes of interest between the second and third quarter of 2020—i.e., two quarters that immediately followed each other and that also marked a significant shift in IA's digital lending policies for

---

[13] Prince Rebuttal Report, ¶¶ 29-30, 54-57, 70. Dr. Prince's contradictory assertions include claiming that IA has failed to pay Plaintiffs for the rights to distribute the Works-in-Suit as part of its digital lending library, while also claiming that IA's accused conduct likely caused Plaintiffs lost sales. See Prince Rebuttal Report, ¶ 56 ("by scanning a print book, putting the digitized copy . . . on its [website] and distributing it, and failing to pay the Plaintiffs a fee for the digital distribution rights, IA harms the Plaintiffs."), and Prince Rebuttal Report, ¶ 101 ("[T]here were potential revenues that Plaintiff Publishers lost as a result of Internet Archive's actions.").

[14] Prince Rebuttal Report, ¶ 7.

[15] Initial Jørgensen Report, ¶¶ 54-58.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the Works-in-Suit.  In Q2, the National Emergency Library was up and running for most of the quarter.  In fact, more than half of IA's accused digitized book loans during 2017-2020 were lent out during NEL.[16]  By Q3, IA had decided to end NEL and effectively removed the Works-in-Suit from its digital lending library.  Consequently, the natural experiment considered in my initial report examines the changes in Plaintiffs' ebook and paperback book sales during a time in which IA went from offering concurrent digitized book loans of the Works-in-Suit that were not limited in number to offering virtually none.  To the extent that IA's digitized book loans of the Works-in-Suit acted as a competing substitute for the Plaintiffs' sales, one would expect to detect this effect following the closing of NEL.  Moreover, this natural experiment is analogous to the but-for methodology discussed above as it compares two closely related time periods—one in which IA offers digitized loans of the Works-in-Suit and one in which consumers no longer have that option.  As stated in my initial report, the evidence is not consistent with Plaintiffs' purported theory of competitive substitutes.[17]  That is, the evidence is not consistent with significant lost sales (i.e., harm) to Plaintiffs.

18.     My initial report tested also for possible substitution effects between IA's and OverDrive's digital lending of the Works-in-Suit following the closing of NEL using the natural experimental methodology discussed above.  For this specific distribution channel, the evidence is not consistent with Plaintiffs' purported theory that IA's digitized book loans act as substitutes for digital lending of the Works-in-Suit through OverDrive.[18]  Dr. Prince claims that "[d]uring the time period of the so-called 'National Emergency Library,' when the Internet Archive abandoned the 1:1 own-to-loan and all waitlists for books, market harm likely was even greater."[19]  However, my initial report demonstrates that the National Emergency Library, in which IA did not limit the number of concurrent loans by technical means, had no measurable impact on digital lending of the Works-in-Suit through OverDrive or on Plaintiffs' paperback and ebook sales of the titles at-issue.

---

[16] Initial Jørgensen Report, **Exhibit 4**.

[17] Initial Jørgensen Report, ¶¶ 54-58.

[18] Initial Jørgensen Report, ¶¶ 47-53.

[19] Prince Rebuttal Report, ¶ 9.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# V.   Dr. Prince's Rebuttal Opinions Are Fundamentally Flawed

19.     Dr. Prince presents several inconsistent and misguided rebuttal opinions in his report. As discussed below, Dr. Prince's critiques of my initial report are unfounded and fundamentally flawed.

### A.   Data on OverDrive Checkouts Provides Relevant Information for Testing Plaintiffs' Theory of Competitive Substitutes

20.     According to the Prince Rebuttal Report, IA is "akin to a library ebook aggregator"[20] and its digitized book loans act, according to Dr. Prince, as free substitutes for the digital lending offered by OverDrive and other aggregators.[21]  However, Dr. Prince has presented no empirical analysis of the demand for IA's digitized books loans and his assertions regarding a potential substitutability between IA's and OverDrive's digital library lending offerings are not informed by any actual evidence.[22]

21.     In contrast, my initial report analyzed the extent to which IA's digitized book loans acted as a competing substitute for OverDrive's ebook loans using actual digital lending data from IA and OverDrive.[23]  Dr. Prince claims that my initial report does not "discuss or attempt to justify" the choice to analyze OverDrive checkout data as opposed to OverDrive revenue data.[24]  This rebuttal point raised by Dr. Prince is flawed and contradicts basic economic theory.

22.     In his report, Dr. Prince conjectures that when a free "competing product enters the market, economists generally expect to observe a shift in consumer demand toward the free good," while also noting that the shift in demand will be "determined by consumers' perceptions

---

[20] Prince Rebuttal Report, ¶ 14 ("Internet Archive describes itself as a library. IA also serves a function akin to a library ebook aggregator (a centralized entity that makes short-term 'loans' or distributions of ebooks published by many different publishers to users, with DRM protection to prevent further copy by the user)") (footnote omitted).

[21] Prince Rebuttal Report, **Section III.B** and ¶¶ 27-28 ("if two products are highly differentiated, the demand for the higher-priced and higher-quality incumbent may be little affected by the presence of a zero-price alternative. On another extreme, if two products are identical, when a zero-priced competing product enters the market, it displaces *all* of the demand for the higher-priced product. The introduction of a zero-priced substitute of the sort effected by IA is more consistent with limited, rather than high, product differentiation. Therefore, it likely displaces legal sales.") (footnotes omitted).

[22] See, e.g., Prince Rebuttal Report, ¶ 28 and fn. 86.

[23] Initial Jørgensen Report, ¶¶ 8, 47-53.

[24] Prince Rebuttal Report, ¶ 80.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of the degree of substitutability (*i.e.*, similarity) between the higher-priced product and the free product."[25] Dr. Prince goes on to define substitute products as "two good such that if the price of one increases, more of the other good will be demanded."[26] That is, basic demand theory, as summarized by Dr. Prince, considers changes in demand in terms of the quantities demanded. Consequently, my initial report analyzes these very economic variables—i.e., units of demand for IA's and OverDrive's digital library lending—to test for potential substitution effects in accordance with the economic framework outlined by the Prince Rebuttal Report.

23.     Unlike Dr. Prince, my initial report offers opinions based on actual data on digital library lending available in the evidentiary record. The Initial Jørgensen Report outlines a methodology for quantifying the number of digitized book loans of the Works-in-Suit using data produced by IA.[27] Dr. Prince has not challenged this methodology, nor my finding that IA patrons digitally borrowed the Works-in-Suit about 57,000 times between 2017 and 2020.[28]

24.     Dr. Prince further claims that I am "incorrect to compare Internet Archive's loans in relation to OverDrive lending because relative statistics obfuscate the total volume of Internet Archive's loans."[29] That is, on one hand, Dr. Prince opines that IA is "akin to a library ebook aggregator" whose digital offerings act as "substitutes" for OverDrive's digital lending services, yet he also claims that it is "incorrect" to compare the digital library lending across the two platforms. In this case, Dr. Prince's rebuttal opinion is misguided and contradicted by his own characterization of IA's alleged conduct. To the extent that Plaintiffs and Dr. Prince accuse IA of acting as an aggregator, it is appropriate to contrast the activities of one entity to another similarly positioned entity.[30] The relative volume statistics presented in my initial report are doing just that. However, to the extent that Dr. Prince is of the opinion that it is "incorrect" to

---

[25] Prince Rebuttal Report, ¶¶ 26-27.

[26] Prince Rebuttal Report, ¶ 26, fn.79.

[27] See, e.g., Initial Jørgensen Report, fn. 83 and **Exhibit 3**.

[28] I understand that Dr. Foster, one of Plaintiffs' experts, have found "a total of 46,305 total loans of the Works in Suit" between March 2017 and September 2020. See Prince Rebuttal Report, fn. 275.

[29] Prince Rebuttal Report, ¶ 101.

[30] Although Dr. Prince opines that it is "incorrect" to compare IA's digitized book loans to OverDrive's ebook checkouts, the Prince Rebuttal Report goes on to reference that very statistics when describing IA's activities during the National Emergency Library. As such, Dr. Prince appears to opine that relative volumes are only relevant when used by him. See Prince Rebuttal Report, ¶ 108 ("Dr. Jørgensen's report indicates that during the three-month period of the National Emergency Library, the relative volume of Internet Archive's unauthorized distributions was, on average, 11% . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

compare IA's loan volume to OverDrive's checkouts for the Works-in-Suit, it must be because Dr. Prince considers the two entities to offer non-substitute products—which would contradict the entire premise of Dr. Prince's opinions. For these reasons, Dr. Prince is incorrect to challenge the relative volume statistics presented in my initial report.

25.     The Initial Jørgensen Report analyzed the 127 Works-in-Suit for which there is relevant *and* available data from IA and OverDrive in the evidentiary record. As stated in my initial report, I was asked to analyze the amount of Internet Archive's digital lending of the Works-in-Suit relative to other digital libraries over time, among other things.[31]  Dr. Prince incorrectly opines that the Jørgensen Initial Report understates IA's loan volume by "not consider[ing] the 33,003 Works titles published by the Plaintiffs on [IA's website] in digital and print form . . . ."[32]  In this case, Dr. Prince's challenge is inappropriate and highly speculative. As stated in my initial report, my assignments were limited to the 127 Works-in-Suit listed by the Plaintiffs in their suit against IA. Moreover, it would be inappropriate and highly speculative to offer opinions about titles that are not in the suit (and for which the parties have not produced relevant data and documents on during discovery).[33]

### B.     As Acknowledged by Dr. Prince, the Data Provided by OverDrive Does Not Identify Incremental Revenue per Checkout

26.     Dr. Prince makes several contradictory and false statements about my initial report's use and analysis of the revenue data provided by OverDrive. First, Dr. Prince incorrectly claims that I did not "rely on OverDrive revenue data that was produced in this matter."[34]  However, the OverDrive data that Dr. Prince refers to is listed among the materials

---

[31] Initial Jørgensen Report, ¶ 3.

[32] Prince Rebuttal Report, ¶ 108.

[33] Dr. Prince notes, moreover, that his assessment of the potential harms that Plaintiffs purport to have suffered applies to all of Plaintiffs' works available through IA's digitized book lending at present or in the future. That is, Dr. Prince offers opinions that are not tethered to the facts of the case and are therefore speculative. See Prince Rebuttal Report, ¶ 55 ("The approach I discuss in this section is a logical framework for understanding not only how IA's conduct affects Plaintiffs with respect to the Works in Suit, but also how IA's challenged conduct affects the Plaintiffs for their other works that IA is distributing without authorization"). See also Prince Rebuttal Report, ¶ 66 ("My analysis also includes the impact of Internet Archive's actions as a result of further widespread conduct by Internet Archive or similar conduct by other market participants, including if the court were to condone IA's conduct.").

[34] Prince Rebuttal Report, ¶ 80 and fn. 215.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

considered in **Exhibit 2** of the Initial Jørgensen Report.[35] ███████████████████
████████████████████████████████████████████████████████████
████████████████████ ██ ██████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████ ██ ███████████████████
████████████████████████████████████████████████████
████████████████████ ██ ████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████ Dr. Prince even
acknowledges the "complex relationship between checkouts and revenues from library sales."[39]

27.     The Initial Jørgensen Report analyzed the impact of IA's accused digital lending
on OverDrive checkouts of the Works-in-Suit, which is not only appropriate for testing
Plaintiffs' and Dr. Prince's purported theory of competing substitute products (see **Section V.A**),
it is also based on consistent and reliable OverDrive checkout data produced in this matter.  Dr.
Prince asserts without evidence that Plaintiffs' purported harm should be measured in terms of
*lost sales.* █████████████████████████████████████████████████████
████████████████████████████████████████████

## C.     Dr. Prince's Estimate of Plaintiffs' License Revenue Collected Through OverDrive Is not "More Appropriate"

28.     Dr. Prince claims that my initial report "underestimates Plaintiff Publishers'
revenues from library ebooks collected through OverDrive."[40]  I disagree.  The Initial Jørgensen
Report showed that the Works-in-Suit generated ███████████████ in OverDrive revenue
between 2017-2020 (i.e., over the full period in which OverDrive revenue data is available).[41]

---

[35] See also Initial Jørgensen Report, **Exhibits 3, 4, 6a, 6b, 7a, 7b, 8a, 8b, 9a, and 9b.**

[36] Prince Rebuttal Report, fn. 214.

[37] Initial Jørgensen Report, ¶¶ 25-29.

[38] Initial Jørgensen Report, ¶ 29.

[39] Prince Rebuttal Report, ¶ 80.

[40] Prince Rebuttal Report, ¶ 101.

[41] Initial Jørgensen Report, ¶ 35.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



29.     The Prince Rebuttal Report purports to report a "more appropriate alternative estimate based on Plaintiffs' actual sales" using sales data produced by the Plaintiffs.  Dr. Prince claims that Hachette, Penguin Random House, and HarperCollins have combined sales to OverDrive of approximately $1.56 million between 2017 and 2020.[45]  However, his proposed estimate overstates Plaintiffs' revenues, as Dr. Prince includes Plaintiffs' OverDrive sales from audiobooks.[46]  Dr. Prince uses this sales figure to challenge the revenue estimates presented in my initial report, yet he has not established that the revenue data produced by OverDrive omits any sales that Plaintiffs' sales would include.  That is, Dr. Prince has not provided any evidence to justify that his "alternative estimate" is a more reliable measure of Plaintiffs' revenues.  As such, Dr. Prince has done nothing more than identify a potential discrepancy in the evidentiary

---

[42] Initial Jørgensen Report, ¶ 24.

[43] Initial Jørgensen Report, ¶ 35.

[44] 

[45] Prince Rebuttal Report, ¶ 105.

[46]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

13

A-4885

record.  Moreover, this estimate does not inform any of the opinions I have reached in this matter.[47]

### D.   Contrary to Dr. Prince's Insinuations, the Closing of NEL Provides Relevant and Reliable Evidence on the Market Impact of Internet Archive's Accused Digital Lending of the Works-in-Suit

30.     The Prince Rebuttal Report incorrectly portrays the opinions offered in my initial report as "unreliable" because my empirical methodology, according to Dr. Prince, fails to account for other relevant market factors.[48]  As discussed below, Dr. Prince's rebuttal opinions are unfounded and, in several instances, based on misrepresentations of my initial report and the basic facts of this matter.

31.     According to Dr. Prince, the Initial Jørgensen Report fails to distinguish "the causal effect of IA's conduct and other causal factors unrelated to IA's conduct over the same period of interest."[49]  I disagree.  The experiment considered in my initial report analyzed and contrasted *changes* in IA's digitized books loans of the Works-in-Suit from Q2 to Q3 in 2020 to *changes* in, e.g., OverDrive's digital lending by title over the same time period.  This before-and-after comparison is a well-accepted and common statistical approach that accounts for other relevant factors that are approximately unchanged across the two periods.[50]

32.     The Prince Rebuttal Report claims that the book industry in general, and Plaintiffs in particular, were impacted by a myriad of changing market conditions in 2020, including the COVID-19 pandemic, kids attending virtual school from home, the Black Lives Matter movement, a nationwide focus on racial justice issues, the closing and re-opening of libraries and brick-and-mortar stores, a spike in demand for books on certain leisurely topics (e.g., cooking, children's activity books), the U.S. presidential election, supply chain issues, and general macroeconomic conditions.[51]  Despite Dr. Prince's proposed laundry list of potential confounding factors, his report presents no actual analysis or alternative modelling that

---

[47] See, e.g., the summary opinions of the Initial Jørgensen Report.

[48] Prince Rebuttal Report, ¶ 85.

[49] Prince Rebuttal Report, ¶ 82.

[50] American Bar Association (ABA) Section on Antitrust Law, *Econometrics*, second edition, ABA Publishing, 2014, p. 302.

[51] Prince Rebuttal Report, ¶¶ 77, 82-84.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

14

challenges the empirical evidence presented in my initial report. Moreover, in most instances, Dr. Prince has not even attempted to quantify or otherwise measure the effects of the market factors he claims to be important. As such, Dr. Prince's rebuttal opinions amount to nothing more than conjecturing with no reasonable basis in facts.

33. Dr. Prince further asserts that a "quantitative model of harm to Plaintiffs from IA's conduct" should account for seasonality.[52] The Prince Rebuttal Report goes on to explain that one should "consider the possibility that to the extent the demand for Plaintiffs Works in Suit declined ████████████████, some of it could be attributed to the end of the academic year and school-required reading."[53] In support of this claim, Dr. Prince presents ebook sales statistics produced by the Association of American Publishers ("AAP") for the titles included in the "Children's and Young Adult" segment. ████████████████████

████████████████████████████████████ █ ████ ████
████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████ As such, the evidence is utterly inconsistent with Dr. Prince's opinion. Furthermore, the monthly sales statistics reported by the AAP for 2019 are not indicative of strong seasonal trends in the ebook sales of Children's and Young Adult titles, thus providing further support for the empirical analysis presented in my initial report.

---

[52] Prince Rebuttal Report, ¶ 83.

[53] Prince Rebuttal Report, ¶ 83.

[54] Prince Rebuttal Report, fn. 222.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



34.     The Prince Rebuttal Report claims that the "re-opening of physical libraries and bookstores" during the summer of 2020 were also important sources of changing market conditions between Q2 and Q3 in 2020.[56]  However, Dr. Prince presents no direct evidence in support of these statements.  The Prince Rebuttal Report merely notes that only one percent of libraries were fully open with no restrictions by mid-May in 2020, with another 62 percent of libraries being fully closed.[57]  Still, Dr. Prince presents no evidence demonstrating to what extent these conditions had changed by Q3 2020, including whether traditional library lending of the Works-in-Suit increased, if at all, between Q2 and Q3.

35.     Dr. Prince further asserts that ebook sales slowed down around the time that libraries and bookstores were re-opening—which Dr. Prince claims to have happened during the summer of 2020.[58]

---

[56] Prince Rebuttal Report, ¶ 84.

[57] Prince Rebuttal Report, fn. 230.

[58] Prince Rebuttal Report, ¶ 84.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

16



36.     In sum, Dr. Prince claims that a myriad of market conditions changed in 2020—which he then incorrectly contends that my initial report failed to consider.[61] However, the AAP sales statistics considered by Dr. Prince show just a slight decline in the overall ebook market between Q2 and Q3 in 2020. Moreover, the ebook sales statistics from 2019, which Dr. Prince points to in support of seasonality, show an absence of seasonal trends.[62] As such, the evidence presented in the Prince Rebuttal Report affirms that the overall ebook market was relatively stable between Q2 and Q3. ██████████████████

████████████████████████████████████
█████████████ ██ ████████████████████
████████████████████████████████████
████████████████████████████████████████
███████████████████████

37.    ████████████████████████████
████████████████████████████████████
████████████████████████████████████

---

[59] Prince Rebuttal Report, fn. 231.

[60] Prince Rebuttal Report, fn. 231.

[61] ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████

[62] See **Figure 1**.

[63] Prince Rebuttal Report, ¶¶ 9, 50, 59, 72.

[64] OVERDRIVE000000003.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

■ [65] In comparison, the Prince Rebuttal Report shows a decline of less than three percent in the overall ebook market, which accounts for every one of the changing conditions that Dr. Prince purports to have taken place.[66] █████████████████████████████████████████████████ ████████████████████████████ As such, none of Dr. Prince's purported "other market factors" change the opinions stated in my initial report.

38.    As stated in my initial report, one would expect to find consistent increases in OverDrive checkouts for the Works-in-Suit following the closing of the National Emergency Library under Plaintiffs' purported theory that IA's digitized book loans acted as "competitive substitutes" for OverDrive's digital lending. Instead, the evidence, as reported in my initial report, shows ██████████████████████████████████████████████████████ [67] Therefore, the evidence is not consistent with Plaintiffs' theory that IA's digitized book loans of the Works-in-Suit reduced digital lending through OverDrive. ███████████████████████ ███████████████████████████████████████████████████████████████████████ ██████████████████ The Initial Jørgensen Report concluded therefore that the closing of NEL was not associated with "increased ebook sales to Hachette, as one would expect according to Plaintiffs' purported theory of 'competing' substitutes."[68]

39.  ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █ ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ █ ███

---

[65] Initial Jørgensen Report, **Exhibit 5**, and Backup Materials.

[66] Prince Rebuttal Report, fn. 231.

[67] Initial Jørgensen Report, ¶¶ 50-53, **Exhibits 14** and **15**.

[68] Initial Jørgensen Report, ¶¶ 58, **Exhibits 17a** and **17b**.

[69] ████████████████████████████████████████████████████████████████████

[70] Initial Jørgensen Report, **Exhibit 16a**.

[71] Initial Jørgensen Report, ¶¶ 57.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████████
████████████████████████████████

40. Dr. Prince asserts that my initial report "did not examine the effect of IA's conduct on any other plaintiff besides Hachette."[73] Contrary to Dr. Prince's claims, my initial report was not able to test Plaintiffs' purported theory of competing substitutes, except in the case of Hachette, due to the limited data produced in this matter by HarperCollins, Penguin Random House, and Wiley.[74] As stated in my initial report, it is not possible to examine the effects of NEL, if any, on Plaintiffs' book sales using the annual data that HarperCollins, Penguin Random House, and Wiley have produced in this matter since the closing of NEL happened in mid-2020.[75]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I respectfully reserve the right to update the conclusions expressed above should additional information become available to me.

_____
Rasmus Jørgensen, Ph.D.
May 27, 2022

---

[72] See, e.g., the summary opinions of the Initial Jørgensen Report.

[73] Prince Rebuttal Report, ¶ 80.

[74] Initial Jørgensen Report, ¶ 54.

[75] Initial Jørgensen Report, ¶ 54.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A-4891





**EXHIBIT 18**

# Rasmus Jørgensen, Ph.D.

Dr. Jørgensen is a Senior Consultant in NERA's Intellectual Property Practice, where he provides economic research and analysis to support complex litigation. His areas of focus are conducting damages analysis in the context of patent infringement, misappropriation of trade secrets, breaches of contract, and anticompetitive behavior. Dr. Jørgensen has expertise in applying rigorous economic and econometric methods to calculate lost profits, reasonable royalty, and economic damages in a wide range of industries, including aerospace, consumer goods, transportation, pharmaceuticals, and power generation.

## Education

**University of Copenhagen**
Ph.D., Economics, 2011
M.Sc., Economics, 2009
B.Sc., Economics, 2005

**Princeton University**
Visiting graduate student, 2008-2010

## Professional Experience

**NERA Economic Consulting**
2019-        Senior Consultant

**University of Copenhagen**
2014-2019    Assistant Professor
Taught courses in Statistics, Econometrics, and International Trade for undergraduate and graduate students.

2013-2014    **University of Copenhagen**
Postdoctoral Research Fellow

2011-2013    **Yale University**
Postdoctoral Research Fellow

EXHIBIT 18

## Written Testimony

> Expert Report of Rasmus Jørgensen, Ph.D., *Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC v. Internet Archive*, United States District Court, Southern District of New York, February 25, 2022.

## Honors and Professional Activities

Fulbright Scholarship, Princeton University, 2008.

Postdoctoral Research Grant, Independent Research Fund Denmark, 2011.

The Invisible Hand Award (teacher of the year award), University of Copenhagen, 2014.

## Publications

"Does Temporary Generic Competition Have a Lasting Impact on Branded Drug Sales?" (with D. Blackburn), NERA White Paper, 2021.

"The Wage Effects of Offshoring: Evidence from Danish Matched Worker-Firm Data" (with D. Hummels, J.R. Munch and C. Xiang), *American Economic Review*, 104(6), 2014.

"Understanding Cross-country differences in Export Premia" (with Joachim Wagner, et al.), *Review of World Economics*, 144(4), 2008.

"Defining and Measuring Entrepreneurship" (with J. Iversen and N. Malchow-Møller), *Foundations and Trends in Entrepreneurship*, 4(1), 2008.

## Referee

*American Economic Journal: Applied Economics, Canadian Journal of Economics, Danish Journal of Economics, Economic Inquiry, European Economic Review, Industrial Relations, Journal of Economic Behavior & Organization, Journal of Human Resources, Journal of Labor Economics, Labour Economics, Oxford Bulletin of Economics and Statistics, Review of International Economics, Review of World Economics, Scandinavian Journal of Economics, the Economic Journal.*

DocuSign Envelope ID: 87C38C54-DE05-4D5A-A821-3F2E248438AF

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC <br><br>               Plaintiffs, <br><br>    v. <br><br> INTERNET ARCHIVE and DOES 1 through 5, inclusive <br><br>              Defendants. | Case No. 1:20-CV-04160-JGK |

**DECLARATION OF IMKE REIMERS, PH.D.**

I, Imke Reimers, Ph.D., declare as follows:

1.      I am a tenured Associate Professor of Economics at Northeastern University specializing in industrial economics with a focus on digital markets and intellectual property. My qualifications are described in Paragraphs 1-3 of my Opening Expert Report and the CV attached thereto as Exhibit A.

2.      I was engaged by the Internet Archive, the Defendant in this lawsuit, to serve as an expert in this case. I submit this declaration based on my personal knowledge and in support of the Internet Archive's motion for summary judgment. If called upon as a witness, I could and would completely testify to the truth of each statement herein.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of my Opening Expert Report, served February 25, 2022, and excerpts of its exhibits. That document contains a true, correct, and accurate statement of opinions I have formed in this matter, and the basis for those opinions.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of my Rebuttal Expert Report, served May 27, 2022, and excerpts of its exhibits. That document contains a true, correct, and accurate statement of opinions I have formed in this matter, and the basis for those opinions.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on ___7/6/2022___ in ___Mannheim___, ___Germany___.

_____
IMKE REIMERS, PH.D.

1

A-4895

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*

JOSEPH C. GRATZ

2

A-4896

**Page Intentionally Left Blank**

DocuSign Envelope ID: B0B44055-8F08-4A00-8607-A9D4E26C237F

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>      Plaintiffs,<br><br>  v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>      Defendants. | Case No. 1:20-CV-04160-JGK |

**EXPERT REPORT OF IMKE REIMERS, PH.D.**

**ATTORNEYS' EYES ONLY**

DocuSign Envelope ID: B0B44055-8F08-4A00-8C07-A9D4E26C257F

## <u>TABLE OF CONTENTS</u>

**Page**

I.      QUALIFICATIONS AND STATEMENT OF ASSIGNMENT ........................................1

II.     SUMMARY OF CONCLUSIONS..................................................................................4

III.    DATA ..............................................................................................................................6

IV.     ANALYSIS ......................................................................................................................7

    A.      The Book Publishing Industry in Recent Years ......................................................7

    B.      The Life Cycle of a Book's Sales .........................................................................10

    C.      The Role of Libraries and Their Interaction with Book Publishing ....................18

    D.      The Effect of the Internet Archive on Print Book Sales .......................................20

i

## I.    QUALIFICATIONS AND STATEMENT OF ASSIGNMENT

1.      I am an associate professor of economics at Northeastern University in Boston, Massachusetts ("Northeastern").  I began working at Northeastern in 2014 as an assistant professor, and I was promoted to an associate professor (with tenure) in 2020.  At Northeastern University, I have been teaching undergraduate economics classes in microeconomic theory and applied econometrics as well as a Ph.D.-level course in which I introduce students to the frameworks of industrial organization.  In addition, I have supervised several Ph.D. students in writing their dissertations.

2.      Prior to joining Northeastern, I received my Bachelor of Science degree in mathematics and economics in 2008 from the University of Nebraska, my Master of Arts degree in economics from the University of Minnesota in 2012, and my Ph.D. in economics, also at the University of Minnesota, in 2013.  After finishing my Ph.D. and before joining Northeastern, I spent one year as the Economics of Digitization post-doctoral fellow at the National Bureau of Economic Research ("NBER"), where I participated in the planning of activities for the NBER Digitization and Copyright Initiative and helped curate a website aimed at improving access to datasets related to the economics of digitization.

3.      My main area of research is industrial economics with a focus on digital markets and intellectual property.  More specifically, I have written and published six papers on various topics around book publishing in peer-reviewed economics and management science journals, as well as four other papers on digital markets and enforcement of intellectual property rights—especially copyrights.  Much of my research involves studying how digitization has changed access to information about products, firms, and consumers, and how these changes affect the profitability of firms as well as the well-being of consumers—the ability of readers to purchase and read books they enjoy.  For example, in my dissertation, I studied the impact of the 1998

1

Copyright Term Extension Act on the availability of books that were affected by the extension.[1]

I found that books that continued to be protected by copyright were significantly less likely to be available than comparable books that had moved into the public domain, and that potential gains to copyright holders were not large enough to offset losses to consumers.  In other work on the book publishing industry, I found that piracy takedown notices that were directed at individual or small-scale infringers were effective in raising ebook sales.[2]  In more recently published works, I focused on the role that information plays for both publishers and consumers.  In one paper, I found that improvements in the information environment for potential readers—via Amazon star ratings–help them make better purchasing decisions.[3]  In another paper, I found that publishers' advances to authors have begun to better reflect an author's ex-post success in terms of book sales for genres that are most affected by self-publishing, suggesting that publishers have also been able to benefit from the information made available via digital markets.[4]  I continue to work on topics around book publishing, including studies of the role impacts of Google Books and the changing role of libraries.  My curriculum vitae, which includes a list of publications I authored, is attached as **Exhibit A**.

---

[1] See Reimers, Imke. "Copyright and generic entry in book publishing." *American Economic Journal: Microeconomics* 11.3 (2019): 257-84.

[2] See Reimers, Imke. "Can private copyright protection be effective? Evidence from book publishing." *The journal of law and economics* 59.2 (2016): 411-440.

[3] See Reimers, Imke, & Joel Waldfogel. "Digitization and pre-purchase information: the causal and welfare impacts of reviews and crowd ratings." *American Economic Review* 111.6 (2021): 1944-71.

[4] See Peukert, Christian & Imke Reimers. "Digitization, Prediction, and Market Efficiency: Evidence from Book Publishing Deals." *Management Science* (2022).

4.      I have not testified under oath on any matter in the past—either at trial or at deposition.  I am being paid $300 per hour for my work on this case.  Payment is not contingent on my opinion expressed.

5.      Apart from the drafting of this expert report, I do not have a connection or affiliation with Plaintiffs or Defendant, the Internet Archive.

6.      I have been asked by counsel for the Internet Archive to evaluate and describe the following:

a.      The economic performance and growth of the publishing industry while the Internet Archive's digital lending program was in operation—especially (i) from 2017 to June 2020, the month in which this lawsuit was initiated, and (ii) when the National Emergency Library ("NEL") was in effect (March 24, 2020 through June 16, 2020);

b.      The commercial life cycle of a book relative to the date of publication; and

c.      The relationship between a title's availability through the Internet Archive's digital lending program and that title's commercial performance, with a particular focus on older books—those on the backlist.

7.      This report is based on my analysis of the materials I have reviewed to date. Specifically, I have collected granular sales ranking data from Amazon's website for the set of titles listed in the Complaint, I have reviewed academic and trade publications, and I am drawing on research and data that I have worked on as an independent researcher prior to this case.  My work in this matter is ongoing, and I reserve the right to supplement my opinions and analysis should any additional information become available to me.  I also intend to review any additional information or reports that may be submitted by Plaintiffs and their experts, and I reserve the right to prepare a reply expert report.  I have also reviewed documents provided to me by counsel

3

DocuSign Envelope ID: B0B44055-8F08-4A00-8G07-A9D4E26G357F

for the Internet Archive.  A list of the materials I have considered in reaching my opinions is attached to this expert report as **Exhibit B**.

8.     I understand that this case concerns Plaintiffs' allegations of copyright infringement against the Internet Archive, including Plaintiffs' contention that the Internet Archive's digital lending library depresses their revenues from the 127 books listed in the complaint (the "Works in Suit").  I also understand that two systems of digitized lending are being challenged in this lawsuit.  One is Controlled Digital Lending as practiced by the Internet Archive's digital lending library.  And the other is the NEL.  Controlled Digital Lending as I understand it is a system of digitizing physical books and loaning those digitized versions out to patrons on an owned-to-loaned ratio.  In other words, if more patrons want at a given time to borrow a digitization than the number of physical copies an institution owns and has included in the digital lending program, the excess number of patrons must wait until a digitized copy is checked in before accessing the book.  I understand that the NEL, which was operational for approximately three months in 2020 as a response to the COVID-19 pandemic, did not enforce the owned-to-loaned ratio and that while the NEL was in effect, patrons did not have to wait to borrow a book.

## II.    SUMMARY OF CONCLUSIONS

9.     I have reached the following conclusions:

a.     Ebook sales have decreased steadily over the last five to ten years, with no evidence that the decrease in sales and revenues was spurred by the operation of the Internet Archive's digital lending program.  Though there has been considerable growth of ebook sales starting in 2008, this growth has halted around 2013, and ebook sales declined from just under 473 million units in 2014 to just under 336 million units by 2019, according to the Association of

DocuSign Envelope ID: B0B44055-8F08-4A00-8607-A9D4E26C237F

American Publishers ("AAP").[5]  Print book sales, on the other hand, have remained relatively stable since 2014.  Consequently, the share of ebook sales among all book sales has decreased steadily since 2014, from about 17.5% in 2014 to about 12% in 2019.

      b.    A large proportion of book sales—for both print and ebooks—occurs in the first few years after a title's publication.  I provide information on the sales decay for relatively successful titles—those that reach the weekly top 150 USA Today bestseller lists.[6]  Between 1994 and 2021, of all book appearances on the weekly bestseller lists, only 21% are of books that first appeared at least 52 weeks earlier, only 8% include books that debuted on the lists more than two years earlier, and only 2% of the listings are for books that are more than five years old.  While this is indirect evidence, direct evidence from the publishers suggests similar patterns.  HarperCollins, Penguin Random House, and Hachette report that between 33% and 60% of their unit sales during the period for which annual data was provided.[7]  Because only a small fraction of each publisher's catalog was published in the past year, the share of each individual book's revenues that occurs in the first year is likely much larger than the share of the sales across the catalog that is attributed to books that are less than one year old.  In addition, annual sales of the Works in Suit suggest similar decreases in a book's lifetime sales, where sales in the first five years after an edition's publication account for up to 90% of lifetime sales.

---

[5] Annual AAP StatShot Reports (AAP001108; AAP001131).

[6] See, for example, "Best-Selling Books," *USA Today*, available at https://www.usatoday.com/entertainment/books/best-selling/week/2021/1/page/1/.

[7] Data are from HC0030132, PRH0072194, and HACHETTE0012377.  The reasoning for using data from Hachette, HarperCollins, and Penguin Random House for this observation—but not Wiley—is explained more fully below.

5

10.     Based on my analysis of the Works in Suit, I have reached the following conclusions:

a.     I find no evidence that availability of these titles for borrowing from the Internet Archive's digital lending program depressed book sales of print books through other channels.[8]  In particular, I find no evidence that sales rankings for print books of the Works in Suit at Amazon worsened (as in, moved away from a ranking of 1) when the works were made available through the Internet Archive.  I also find no evidence that the launch of the NEL depressed sales.

b.     By contrast, I find some (weak) evidence that taking the Works in Suit off the Internet Archive hurt the Amazon sales rankings of their print editions slightly.  This finding suggests that physical embodiments of the Works in Suit had lower sales after they were removed from the Internet Archive, relative to other books on Amazon and compared to the weeks before the books were taken down.

## III.    DATA

11.     To conduct my analyses, I draw on data from several sources.  In addition to industry sales figures obtained through trade publications, deposition transcripts and exhibits to those depositions, and documents produced by the AAP, I collected (i) weekly top 150 book bestseller lists from 1994 to 2021 through USA Today, and (ii) daily Amazon sales rankings and

---

[8] As I explain below, I focus my analysis on print books because title-specific data for ebook sales were not available at a granular enough level to enable me to draw reliable conclusions. In addition, and equally important, granular ebook sales data are not available for other titles, which were not available at the Internet Archive, so there is no proper group of titles to compare changes in sales. Because book readership may have changed for other reasons over time, this makes it difficult to establish a causal relationship between availability at the Internet Archive and sales through other channels. Still, an analysis that focuses on physical book sales is relevant because print book sales continue to make up a large majority of unit sales and revenue for most books, as I summarize in Paragraph 10a and lay out in more detail in Paragraphs 34 – 54.

6

other product characteristics for 1,260 print editions of the Works in Suit through the website

Keepa (www.keepa.com).  This website (Keepa) provides application programming interface

("API") access to histories of daily sales rankings, prices, star ratings, and marketplace

availability for specific books.  In order to collect this information from Keepa, one has to search

for specific book identifiers (either the ISBN-13 or the ISBN-10).[9]  I provide information on all

additional sources and details on data collection below.

## IV.    ANALYSIS

### A.    The Book Publishing Industry in Recent Years

12.     The arrival of ebooks substantially changed the market for books.  Because of

ebooks, people interested in reading a book no longer had to physically visit a bookstore or wait

for a book to be delivered from an online retailer.  Ebooks enabled instant gratification:  readers

could choose a book online and immediately download it to their ereading device.  This had the

potential to change how books were primarily purchased.

13.     In addition, the arrival and rise of self-publishing platforms such as Kindle Direct

Publishing (2007, concurrent with the introduction of the Kindle ereader) and Smashwords

(2008) posed a threat to publishers by providing authors a direct channel to reach potential

readers.  However, annual sales data from the AAP suggest that traditional publishers were able

to keep their sales high throughout this period of change.[10]

---

[9] This website has been used in a series of academic works, including two papers that I have written.  For instance, I have used this website in a paper on the effects of Amazon star ratings and professional book reviews on book sales, which was published in 2021 in the American Economic Review.

[10] Annual AAP StatShot Reports (AAP001108; AAP001131; AAP000804).

14.     The 2007 introduction of Amazon's Kindle ereader made ebooks a viable alternative to their physical counterparts.  Although other ereading devices had been available to consumers earlier, the Kindle ereader presented a much-improved reading experience due to its use of E Ink technology, which produces a paper-like display that requires very little battery power because it does not require the screen to be backlit.  Moreover, Amazon's Kindle Store made it easy to download ebooks straight to the Kindle after purchase.

15.     From 2008 to 2013, ebook sales reached about 242 million units.[11] According to the annual AAP StatShot reports, total ebook unit sales decreased steeply from 2014 to 2016, from 472.7 million units (and $3.2 billion in revenue) to 366.1 million units ($2.2 billion in revenue).[12]  After 2016, the rate at which ebook sales were declining slowed but the decline did not stop until 2020:  ebook unit sales continued to decrease over the next three years, landing at 335.7 million units ($1.94 billion in revenue) in 2019.  In 2020, ebook revenue increased to $2.12 billion.[13]  From 2016 to 2020, revenue from ebooks decreased by 8.5%.

16.     Sales of physical books have changed coinciding with the arrival of ebooks.  Between 2008 (the arrival of the Kindle ereader) and 2012, annual sales of print books fell from

---

[11] I am not aware of any resources that track ebook sales prior to 2008.  Ebook unit sales for the years 2008 to 2013 are obtained from *Statista*, available at https://www.statista.com/statistics/426799/ebook-unit-sales-usa/, which reports data from Nielsen, the NPD Group, and Publishers Weekly.  Ebook unit sales and revenues for the years 2014 to 2019 are obtained from the AAP Annual StatShot Reports for 2018 and 2019, as produced in this lawsuit by the AAP (AAP001108; AAP001131).  The AAP reports significantly higher levels of ebook sales than Statista, likely because the reporting methodology differs from secondary sources like Nielsen, the NPD Group, and Publishers Weekly.  For example, the number/identity of the reporting publishers or the included book categories (e.g., trade books, higher education) may vary across these sources.

[12]  AAP001108; AAP001131.

[13] AAP000804 at 5.  The 2020 AAP Annual StatShot report lists revenues but not industry unit sales by format.

778 million to 591 million units.[14]  This suggests that some consumers may have begun to buy ebooks instead of physical books, and the two formats may therefore be substitutes for one another.

17.    According to the Annual AAP StatShot reports from 2019 and 2020,[15] which contain information for print format sales across all book categories from 2014 to 2019, whereas ebook sales decreased over this time period, print sales remained either flat or increased slightly. Annual hardcover book sales, for instance, increased from 548.7 million units ($5.12 billion in revenue) in 2014 to 614 million units ($5.94 billion in revenue) in 2019, and revenue from hardcover books increased sharply in 2020, to $6.31 billion.  Considering hardcover, paperback, and mass market paperback formats of physical books together, physical unit sales decreased slightly over the same period, from 2.30 billion units in 2014 to 2.17 billion units in 2019, although revenue *increased* slightly over this period, from $11.2 billion in 2014 to $12.0 billion in 2019.

18.    Two conclusions emerge from the above analysis.  First, any potential expectations of ebook sales surpassing print sales did not come to fruition by 2020.  Ebook sales made up less than 20% of the total unit sales between 2014 and 2019:  the share of unit sales that was attributed to ebooks was 17.5% in 2014 and decreased to 12.1% in 2019.  Because ebooks tend to be less expensive than print books, the share of *revenue* from ebooks is even smaller than

---

[14] Print book unit sales for the years 2008 to 2013 are obtained from *Statista*, available at https://www.statista.com/statistics/422595/print-book-sales-usa/, which reports data from Nielsen and NPD Bookscan as well as Publishers Weekly and purports to include data for about 85% of physical book sales.  From the source, it is unclear whether these data include all print sales or only certain formats and categories.  For example, it is unclear whether these data are limited to trade books or also include higher education books.

[15] AAP001108; AAP001131; AAP000804.

9

DocuSign Envelope ID: B0B44055-8E98-A099-8697-A9D4F36G257F

ebooks' share of unit sales, decreasing from 11.6% in 2014 to 7.5% in 2019, and rising to 8.2% in 2020.  Over the same period, the share of hardcover, paperback, and mass market unit sales among all publishing sales fluctuated between 62% and 68%, and their share of revenues increased from 40% in 2014 to 46% in 2019 and 48% in 2020.[16]

19.     Second, whereas sales of ebooks and sales of print books have fluctuated relative to each other between 2008 and 2019, total sales across physical and ebook formats remained roughly the same over this period, with a slight downward trend.  The AAP StatShot reports show that total unit sales across hardcover, paperback, mass market, and ebook formats decreased by 7.7% from 2014 (2.23 billion units) to 2019 (2.06 billion units).

### B.     The Life Cycle of a Book's Sales

20.     Analysis of any possible effect the Internet Archive might have on print or ebook sales needs to incorporate the timing of the digitization of a title relative to its original publication.  The vast majority of titles are digitized and made available for borrowing from the Internet Archive's lending library at least five years after their original publication date.[17]  As analysis in the balance of this section shows, peak sales for most titles occur within one to two years after the date of first publication.  Accordingly, when most works become available for borrowing from the Internet Archive's lending library, they are well past the peak of their sales.

21.     I examined the life cycle of a book's sales in three ways.  First, I examined the weekly Top 150 best-selling books for all weeks from 1994 to 2021, as reported by *USA*

---

[16] According to the annual AAP StatShot reports, instructional material accounts for the vast majority of the remaining format sales.

[17] See Internet Archive notes about book collections and availability, INTARC00151319.

*Today*.[18]  These lists are helpful because they are based on sales of both print and electronic editions of a title and because they allow for a detailed (weekly) breakdown of title ages. Second, I supplement this analysis with information provided by three of the publishers that breaks down unit sales and revenues for the catalog of front list titles (as defined by each publisher) and backlist titles (as defined by each publisher).[19]  Third, I examine the annual change in unit sales for the Works in Suit to document the distribution of specific titles' sales patterns across multiple years.

22.    Because I do not have access to granular sales data for a large set of individual titles over a long period of time, I collected a long series of the weekly Top 150 best-selling titles, from 1994 to 2021, from USA Today's bestseller lists.  These lists allow me to determine the approximate ages of each title on the lists.[20]  In turn, this allows me to examine how long

---

[18] See, for example, "Best-Selling Books," *USA Today*, available at
https://www.usatoday.com/entertainment/books/best-selling/week/2021/1/page/1/.

[19] I did not see catalog-wide revenue data separately for front list and backlist catalogs for Wiley. There is some variation in the way Plaintiff publishers define backlist.  For instance, Hachette defines backlist as books published two or more years ago, front list as books published within one year, and prior year published as books published between the front list and backlist terms. Sevier Dep. Tr. 63:4–67:3.  Penguin Random House, Wiley, and HarperCollins define backlist as books over a year old and front list as books younger than one year.  Weber Dep. Tr. 101:21–104:9; Pavese Dep. Tr. 215:21–217:9; Restivo-Alessi Dep. Tr. 56:10–13.  To avoid confusion, I refer not to front list or backlist but to the time relative to publication.  Revenue information broken down by front list and backlist titles was available for HarperCollins and Hachette.

[20] I approximate each title's age by the time (in weeks) since its first appearance on the USA Today bestseller list.  I do this because the title's original publication date is not listed in the USA Today bestseller lists and would therefore have to be searched for each individual title.  A spot check of the true publication dates of all 150 bestsellers in one week (March 20, 2020) suggests that this is a reasonable approximation:  the correlation between ranking debut dates and original publication dates is 0.83, which means that the ranking debut dates and original publication dates are closely related and move similarly and in the same direction (for instance, if one increases, then the other likely also increases).  If the correlation were 1, then I know exactly by how much the other variable will move and that the variables would move in the same way. A correlation of 0.83 suggests a relatively close but not perfect relationship.

DocuSign Envelope ID: B0B44055-8F98-A100-8627-A9D4F36G357F

books tend to keep their sales high enough to remain on the list.  For illustration, in each year, I observe 7,800 bestseller entries:  52 weeks, times 150 entries per week.  In 2004, 5,413 of those entries were originally published in 2012.  This could be either because books are most popular right after their release, or because books published in 2012 were of a higher quality (and therefore more popular) than books from previous years.  To determine the role of sales decay (rather than quality differences across publication years), I then follow how many entries in the following years are made up by books that were originally published in 2012.  I find that between 12 and 24 months after their debut, only 1,049 of the entries are from the 2012 cohort—a decrease of over 80%.  Five to six years after their debut, only 97 entries remain on the bestseller list, 2.2% of the original 5,413.

23.     There is a similar decline in the number of bestseller entries over time across all cohorts (debut years).  Focusing on debut years before 2016 to ensure that I observe at least five years of sales history for all books, I find that the number of entries for books that are 1–2 years old is only 23% as large as the number of entries for books that are less than one year old; and that ratio decreases rapidly as books continue to age:  books between two and three years account for only 8.7% as many entries as those less than one year old.  After five years, that ratio decreased to 2.7% of those under one year old.  Figure 1 illustrates this average decrease in the number of bestseller appearances in the years after a book's first appearance.  Unless sales for bestselling titles decline at a faster rate than those for non-bestsellers, and there is no evidence to suggest this is so, this large decrease is suggestive of rather rapid declines in sales within less

DocuSign Envelope ID: B0B44055-8E98-4A00-8607-A9D4E36G257F

than five years after initial publication—which suggests that this pattern holds true for the Works in Suit.[21]



**Figure 1: Average number of USA Today Top 150 Bestseller appearances per year since first appearance, relative to the first year**

24. Paragraph 23 above shows averages across bestseller cohorts but does not directly account for the possibility that some cohorts are inherently more successful than others. In a more formal approach, I estimate a regression which controls for factors that make some cohorts more successful than others. This allows me to focus on the decay of bestseller entries for each

---

[21] Although I am not aware of evidence that the sales trajectories of bestsellers behave differently from those of non-bestsellers, I cannot rule this out. I provide evidence of similar sales decreases at the title level for the Works in Suit in Paragraph 27 below.

individual cohort.[22]  The regression provides estimates of the number of bestseller entries in each year after a book's debut on the bestseller list.  I illustrate the results in Figure 2, in which I plot the share of bestseller entries that have already happened (y axis) by the book's age (x axis).  For example, the value of 0.62 in year 0 implies that—on average, and after accounting for differences in popularities—62% of a book's bestseller appearances happen within the first year.  After four years, I find that 88% of all bestseller entries have already occurred, indicating that only 12% of the times that books appear on the bestseller lists occur more than five years after their debut.

---

[22] Formally, I estimate a fixed effects regression model.  To do this, I create a dataset that summarizes the number of entries for each bestseller debut cohort in each year after their debut (in other words, the number of times a title appears on the bestseller list in the year following its publication).  I then estimate, for each title the number of bestseller entries per year since the title's debut, with a set of indicator variables (fixed effects).  The purpose of this analysis is to control for circumstances where certain titles (cohorts) have longer than normal popularity.  For example, an indicator variable for debut year 2004 will take on the value 1 for observations that describe the debut year 2004 and a value of 0 for all other debut years.  One can think of these fixed effects as separate y-intercepts for each debut year.  This is what allows me to identify changes in the number of entries as books age.

14

DocuSign Envelope ID: B0B44055-8E98-A409-8697-A9D4E36G257F



**Figure 2: Cumulative share of USA Today bestseller list appearances by year since first appearance (for all bestselling books originally appearing before 2013).**

25.     Revenue reports made available by Plaintiffs are largely in line with the above analysis. For example, HarperCollins reports that sales of books that were published less than a year prior among print books accounted for between 37% and 40% of all units sold between 2017 and 2019, and this fraction dropped to 34% in 2020. [23] Penguin Random House reports that between 2017 and 2019 books published less than a year prior accounted for 52% to 47%, and 43% in 2020.[24] Hachette reports that between 2017 and 2019, the total share of revenues accounted for by titles published at most two years prior was between 70% and 73%, and the share fell to 65% in 2020.[25] At Hachette, the share of revenue relative to the life of a title that is

---

[23] See HC0030132.

[24] See PRH0072194.

[25]See HACHETTE0012377.

15

A-4914

due to titles less than two years old is smaller for ebooks (around 60%) and larger for physical formats (74% to 77% in 2017 to 2019, and 69% in 2020). Note, though, that only a small fraction of each publisher's catalog was published in the past year—indeed a small fraction is ever published in a given year. Therefore, the share of each individual book's revenues that occurs in the first year is likely much larger than the share of a publisher's sales across its catalog that is attributed to books that are less than one year old.

26.     I also observe annual unit sales and revenue for the Works in Suit. For the Works in Suit that are published by Penguin Random House, I observe sales for individual book editions from 2010 to 2020; for Hachette, I observe similar information for the years 2015 to 2019; for HarperCollins, I observe title and edition performance from 2017 to 2020; and for Wiley, I observe information for a wider range of years (from 1996 to 2021), but the data cover very few (less than ten) ISBNs before 2007.[26] For each of the editions for which I am able to observe all sales since their publication, I calculate the share of total sales (up to the year 2020) that occurred in each year since publication. For example, for each Penguin Random House book edition that is published in 2010, I calculate the total unit sales from 2010 to 2020, and I then calculate the share of these sales that occurred in 2010, 2011, and so on. ████████████████████
████████████████████████████████████████

27.     ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[26] See PRH0025907; HACHETTE0002474; HC0010272; and WILEY0005650.



DocuSign Envelope ID: B0B44055-8F98-4A00-8687-A9D4E36C257F

17

DocuSign Envelope ID: B0B44055-8F98-4A00-8687-A9D4E36G257F

█████████████████████████████████████

███████████████████████████████████████

███████████████████

28.    To summarize, my analyses suggest that—at least for titles that enter the Top 150 bestseller lists and for most of the Works in Suit—around 90% of their sales occur in the first five years after their publication.

C.    **The Role of Libraries and Their Interaction with Book Publishing**

29.    Libraries have traditionally played a large role in making print copies available to the public, and most public libraries have embraced ebook holdings and circulation as well.  The Institute of Museum and Library Services ("IMLS") performs an annual survey of public libraries, in which it asks, among others, about the library's number of physical book and ebook holdings, as well as the number of instances of circulation of each format.  Data from these annual Public Library Surveys ("PLS") are available at the IMLS website.[30]  According to the 2019 PLS—the most recent available survey—library expenditures on print formats amounted to $497 million in 2019, and library expenditures on electronic content was reported at $257.1 million.  Library expenditures on print formats remained quite stable between 2014 and 2019, ranging from $497 million to $507.5 million.  Library expenditures on electronic formats, on the other hand, increased by over 50% over the same period, from $166.7 million in 2014 to $257.1 million in 2019.

30.    Library expenditures increased in recent years, but library expenditures as a share of the total publishing market remain low.  Combining data from the PLS with the annual AAP

---

[30] See "Public Libraries Survey," *IMLS*, available at https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.  The survey for 2020 is still underway as of January 26, 2022.

DocuSign Envelope ID: B0B44D55-8F98-4A00-8687-A9D4E36G257F

StatShot reports, I find that library expenditures on physical formats accounted for only 4.1% to 4.5% of total publisher revenue from hardcover, paperback, and mass market formats between 2014 and 2019.  The share of library expenditures among all ebook revenue is higher, ranging from 5.1% in 2014 to 13.3% in 2019.

31.     There is little hard evidence on the effect of libraries on book sales.  This is because a credible analysis of such a relationship needs data on both detailed library holdings and circulation as well as local sales data of the same book.[31]  In addition, such an analysis requires that the holdings at the library change for reasons other than an (anticipated) increase in demand.  For example, a library might decide to purchase copies of a book on the history of the Olympics shortly before the start of the Olympics because it expects interest for that topic and title to increase.  Then, we might see a rise in sales for the book concurrent with an increase in its library holdings.  However, this positive correlation would describe a trend in interest, rather than a causal effect of library holdings on book sales.

32.     Finding a setting that avoids these title-level common trends is difficult, but changes in the availability of a title at the Internet Archive can provide such a setting.  Titles may have been made available at the Internet Archive following the five-year-post-publication rule imposed by the Internet Archive rather than due to any expectations in demand.  In addition, the Works in Suit were taken off the Internet Archive in response to takedown notices sent by or on behalf of Plaintiffs, and there is no evidence that readership for these works changed for other reasons at this time.  I take advantage of this setting in Section D below.

---

[31]This is because patrons of a particular library are more likely to purchase books from retailers convenient to (which sometimes means physically close to) them.

33.     To summarize, I find in this section that libraries make up a small fraction of the overall publishing market, but that the share of library expenditures for ebooks has increased in recent years.

**D.      The Effect of the Internet Archive on Print Book Sales**

34.     It is possible that changes in the availability of a title at the Internet Archive affected sales through other channels in a meaningful way.  Any analysis that tries to quantify the effects of availability at the Internet Archive on sales of a title is complicated by the possibility of concomitant changes in demand for the particular book and for reading in general that are unrelated to the book's availability at the Internet Archive.  This would be particularly evident in any analysis of the effect of the Internet Archive's NEL on book sales.

35.     The NEL coincided with an unprecedented shock to the market for books.  The COVID-19 pandemic may have increased the demand for books because people spent more time at home.[32]  Therefore, one cannot simply look at absolute changes in sales.  One way to circumvent this issue is to compare changes in sales for the Works in Suit to changes in sales of similar books.  However, identification of such "similar" books is difficult:  one would have to identify books with similar sales trajectories.  Moreover, granular (e.g., weekly) sales data for "similar" books are not readily available.  Therefore, I employed a different strategy and dataset.

36.     Rather than examine absolute changes in sales, I examined how sales rankings changed for the Works in Suit.  Rankings are by their very nature relative to other books, so there is no need to collect detailed sales data for a comparison group of "similar" books.  I obtained

---

[32] Revenue data from the AAP's Monthly StatShot reports (AAP000865 and AAP000925) support this idea for ebooks: trade ebook revenue rose from $83 million in February 2020 to $113 million in May of that year. Over the same period in the previous year, ebook revenue fell rather than rose, from $87 million in February to $82 million in May, suggesting that the rise in 2020 did not just reflect a seasonal trend.

daily sales ranking data from Amazon for hardback and paperback editions of all Works in Suit through the web service Keepa.com, which I introduced in Paragraph 11 above.[33] The data collection procedure dictates that I search for specific ISBNs, rather than a bulk download of rankings for all books. Therefore, I am limiting the analysis to a well-defined set of titles that is known to have been available through the Internet Archive's digital lending library, and for which the date of changes in availability (addition to the Internet Archive as well as removal from the Internet Archive) are well-defined: the Works in Suit. I followed the sales rankings of the print editions of these titles before and after their availability on the Internet Archive changed (see Paragraph 37, immediately below).[34] For example, I would obtain ranking and price histories for one edition of Cecilia Ahern's *PS, I Love You* by downloading the underlying information from https://keepa.com/#!product/1-0007184158.

37. For the purposes of my analysis, there are three dates on which a book's status on the Internet Archive changes: (1) the date the book was first made available for lending through the digital lending library (CDL date), (2) the date the NEL was introduced (NEL date), and (3) the date the book was removed from the digital lending library (removal date). All three dates pose a distinct shift in the nature of availability of a title at the Internet Archive, and such

---

[33] Amazon allows Keepa to track (daily) rankings, prices, availability through its marketplace, and ratings for a large number of products. However, Keepa does not track this information for ebooks. For that reason, I am limiting this analysis to the effects of the Internet Archive on physical book rankings. These rankings reflect an edition's rank among all physical books at Amazon. That is, they are not genre-specific.

[34] While we know for certain that the Works in Suit were available through the Internet Archive's digital lending library, we don't know whether books with similar sales rankings were available. If none of the other books were available, then the analysis provides a clean measure of the effect of the Internet Archive on Amazon sales ranking. If many of the other titles were also available, then my estimated effects will be lower bounds of the true effects. That is, the estimated effects will be closer to zero than the true effects.

21

DocuSign Envelope ID: B0B44055-8E08-4A00-8607-A9D4E36C357F

distinct shifts (rather than gradual changes) help me identify the effects of such availability on the title's unit sales. While the CDL date and the removal date are title-specific (most of the Works in Suit have a removal date of June 2, 2020)[35], the NEL launched for *all titles*, including the Works in Suit, on March 24, 2020. I examined how the rankings for all print formats of a book changed around each of these dates.

38. In summary, I found no evidence that leads me to conclude that a book's addition to the Internet Archive's CDL or the launch of the NEL effected a change (in any direction) in rankings of the Works in Suit. However, I found some weak evidence of a worsening (as in, moving farther from the highest ranking of 1) of a book's Amazon ranking after the title was no longer available for borrowing from the Internet Archive. Below, I explain how I arrived at these findings.

39. <u>Data collection</u>: The data collection consists of two steps: (1) For each of the Works in Suit, I created a list of ISBNs for all its print editions;[36] (2) For each of these editions, I collected daily Amazon ranking, price, and rating histories from Keepa. To perform the first step, I used Goodreads to obtain all editions of each title.[37] For example, for "Gone Girl" I obtained all ISBNs on the Goodreads website, available at:

---

[35] INTARC00474639.

[36] Recall that I am only looking at print editions because ranking histories for electronic versions are not available. Because print sales continue to outweigh ebook sales by a large margin (see Paragraphs 16–19 above), the analysis still captures a large part of each title's sales.

[37] Goodreads is a social book cataloging website in which users can register and review books. The site has millions of members. By 2012, it had already shelved 395 million books. See "These are Top 25 Book Reviewers on Goodreads," *Forbes*, available at https://www.forbes.com/sites/markfidelman/2012/10/16/goodreads-ceo-these-top-25-book-reviewers-represent-the-future-infographic/, (Oct. 16, 2012). Goodreads thus provides a good starting point for creating a list of ISBNs for a set of titles.

https://www.goodreads.com/work/editions/13306276?utf8=%E2%9C%93&per_page=100. I recorded the ISBNs of all hardcover and paperback editions, dropping editions of other formats because daily ranking data are not available for them. Then, to perform the second step, I used Keepa's API to search for and collect ranking histories for the remaining ISBNs. The API allows me to search for each individual ISBN at a time, and it provides ranking histories going back in time as far as to March 2011 for some editions. I found ranking and other information for a total of 1,260 editions for 118 titles.[38]

40. <u>Potential shortcomings of the data:</u> The resulting dataset provides daily sales rank information on Amazon, which allows me to examine the immediate and medium-term effects of changes in availability at the Internet Archive well, but the nature of this dataset has some potential shortcomings. First, the dataset only captures part of the market. Whereas the dataset is almost comprehensive for hardcover and paperback versions, it does not capture electronic books. Thus, any interpretation of the results should be limited to print books.

41. Second, the dataset only captures sales through Amazon, not through other channels. Media and technology analyst Benedict Evans reports that Amazon had at least a 50% market share for print books in 2019.[39] If sales for the Works in Suit—relative to other books— did not evolve differently at Amazon than at other outlets, this limitation does not affect the results.

42. Third, the dataset reports daily sales rankings rather than unit sales. In my analysis (described below), I work with these ranking data because they are "true" in the sense

---

[38] Keepa does not track all editions and titles, so that the dataset does not include the full set of 127 Works in Suit.

[39] See "What's Amazon's market share?," *Benedict Evans*, available at https://www.ben-evans.com/benedictevans/2019/12/amazons-market-share19, (Dec. 19, 2019).

DocuSign Envelope ID: B0B44055-8F08-A400-8697-A9D4F36G257F

that they are not approximated. However, when I quantify the estimated effects of availability at the Internet Archive, I will translate these rankings into "pseudo-sales" data. To do this, I use a formula proposed by Reimers and Waldfogel (2021), who created such a translation based on information about weekly Top 100 print bestsellers in 2018 from NPD Bookscan along with Amazon ranking data for some of those editions. Their formula is: unit sales = 10,167 * rank^(-0.45).[40] This formula suggests a relatively steep drop in sales as a book's ranking deteriorates (moved farther away from the highest ranking of 1). If, for example, a book's ranking on a given day at Amazon is 10, then the formula suggests 10,167 * 10^(-0.45) = 3607 units of the book are sold on that day. For a book that is ranked 100th at Amazon, I approximate its unit sales on that day to be 1,280.

43. <u>Analysis of the effects of availability on Amazon sales rankings:</u> Amazon's rankings do not represent a snapshot of sales on one day but rather represent the sum of book sales from a previous period of several (unspecified) days. That is, rankings on Amazon are based on a *moving average* of book sales in the past. In my analysis, I account for this moving-average property. Specifically, I control for the effects of past rankings, which allows me to focus on the effect of Internet Archive availability on sales on a particular day. The econometric method I use for this is a regression analysis, in which I regress the natural log of a book's Amazon ranking on a specific day on information about its concurrent availability on the Internet

---

[40] See page 1957 of Reimers, Imke & Joel Waldfogel. "Digitization and pre-purchase information: the causal and welfare impacts of reviews and crowd ratings." *American Economic Review* 111.6 (2021): 1944–71. The main assumption for arriving at the formula is that the relationship between Amazon rankings and sales can be described by a power law, whereby a relative change in one ranking is associated with a proportional relative change in sales, independent of the initial rank. In other words, sales vary as a power of rankings. This is a common assumption in the academic literature when describing the relationship between rankings and sales.

Archive (this is the variable that I am most interested in) as well as its previous ranking (to account for the fact that a book's ranking depends on its previous ranking as well as its concurrent sales) and a polynomial function of the book's age (the number of months since its publication).[41]

44. Broadly speaking, my analysis allows me to capture the effect of changes in a book's availability through the Internet Archive on the Amazon sales ranking of its editions. The regression goes beyond a simple correlation between availability and rankings. Rather, it is a *conditional* correlation: I include information about the edition's age as well as the identity of the title in order to condition on these variables. For example, for the October 2009 hardcover edition of *What the Dog Saw*, I compare its Amazon sales ranking shortly before and shortly after the book becomes available at the Internet Archive. That is, instead of comparing sales rankings across different books, I can focus in on each individual book as its availability at the Internet Archive's lending library changes.

45. <u>Results – Controlled Digital Lending:</u> To estimate the effect of changing availability of a Work in Suit on the sales ranking of its print editions, I obtained—for all Works in Suit—the date on which any version of the title first was made available through CDL through

---

[41] Formally, I estimate the following regressions equation with daily data for all editions of the Works in Suit: $\ln(rank_{jt}) = \theta \ln(rank_{jt-1}) + f(time\ since\ pub_{jt}) + \beta\ afterIA_{jt} + v_i + \epsilon_{jt}$, where $afterIA$ indicates whether the title has been made available at the Internet Archive, and $f(time\ since\ pub_{jt})$ describes a 3rd order polynomial: $\alpha_1 time + \alpha_2 time^2 + \alpha_3 time^3$. The regression equation I am using here closely follows Reimers, I. & Waldfogel, J. "Digitization and Pre-Purchase Information: The Causal and Welfare Impacts of Reviews and Crowd Ratings," *American Economic Review,* 111.6 (2021): 1944–71. The coefficient $\beta$ describes the conditional correlation between a title's availability at the Internet Archive and the natural log of its ranking. Mathematically, this allows me to create a connection between an edition's change in availability on the Internet Archive and a percentage change in its ranking, through: % change in ranking $= (e^{\beta} - 1) \times 100\%$.

the Internet Archive's lending library.[42] I then estimated a regression of the form described in the previous two paragraphs, using daily ranking data of all editions for the Works in Suit. Based on these regressions, I estimated the coefficient $\beta$ from footnote 41 (the coefficient that describes the conditional relationship between Internet Archive availability and the Amazon sales rank) to be $\beta = +0.0024$. Taking the estimated coefficient at face value, the regression implies that the book's rank increases (worsens) by about 0.24%. However, as I explain below, the result is not statistically significant.[43]

46. Because this result is based on a sample of books, rather than the universe of all books, this coefficient is estimated with some uncertainty. I can express this uncertainty with the standard error of the coefficient, which is 0.0017. The coefficient and standard error together provide information about the statistical significance of the coefficient. Roughly speaking, if the standard error (the square root of the variance) is large compared to the size of the coefficient, then we cannot say with certainty that the coefficient is different from zero. In other words, we cannot say with certainty that there is a relationship between a change in a book's availability at the Internet Archive and the Amazon sales rankings of its print editions because a coefficient of zero indicates no effect. To illustrate the statistical significance of the coefficients, I will use 95% confidence intervals. My coefficient and standard error imply that, if one were to estimate

---

[42] INTARC00474639.

[43] In addition, the estimated coefficient varies depending on the set of data that I include and the choices of control variables. Here I present a "conservative" estimate that is based on all available ranking data. In Exhibit C, I present a Table that shows the estimated coefficients using a wide range of included time periods around each edition's CDL date. In Exhibit D, I also present the estimated coefficients from regressions that use (1) three months before and after the change in availability, and (2) one month before and two months after the change. Exhibit D also includes the estimated coefficients of regressions studying the other two changes in availability (NEL, and removal from the Internet Archive). In Paragraph 46 below, I provide a more flexible specification that removes some of the reliance on assumptions.

this regression 100 times (on 100 different samples), 95 of the 100 coefficients are expected to range between -0.0010 (for a rank improvement of 0.10%) and +0.0057 (for a worsening of 0.57%).[44] Because this interval includes zero, I cannot statistically reject the possibility that availability at the Internet Archive has no effect on a book's ranking, and thus the result is not statistically significant.

47.     Any effects of a change in a book's availability through the Internet Archive on Amazon print book rankings may vary over time. For example, knowledge about the book's availability on the Internet Archive could spread slowly so that potential readers only learn about it several weeks after the book's digitization and availability for borrowing. I test this in Figure 3. Rather than aggregating all weeks before and after a title became available at the Internet Archive, I now examine changes in a book's ranking in each week before and after its inclusion in the Internet Archive. I present the estimated differences in a book's Amazon ranking in each week (from 20 weeks before inclusion to 30 weeks after it) relative to the week before the title became available, in Figure 3. In short, the figure shows no statistically significant effect of CDL on rankings. Rather, there may be larger changes in rankings associated with events other than the book's inclusion at the Internet Archive.[45] Because the

---

[44] I choose 95% confidence intervals, which describes whether a coefficient is statistically significant at the 5% level, because this is the standard cutoff for statistical significance in the economics literature. If the confidence interval is relatively narrow (in other words, the range of calculated numbers is small), the coefficient is precisely estimated. If that interval includes zero, we cannot reject the hypothesis that the true coefficient is zero.

[45] Note that the reversed y-axis captures the inverse relationship between rankings (where low values—close to 1—are good) and sales (where high values are good). As a rule of thumb, in all pictures, values toward the top of the graph imply better rankings (higher sales), and values toward the bottom of the graph represent worse rankings (lower sales).

DocuSign Envelope ID: B0B44055-8F98-A009-8697-A9D4F36G257F

initial change in Amazon rankings occurred before the change in availability, I cannot connect these ranking changes cleanly to the title's addition to CDL.



**Figure 3: Estimated Change in Sales Rank due to the Internet Archive's CDL, for each week before and after the book's addition**

48.    <u>Results – Removal from the Internet Archive:</u>  The filing of this lawsuit provided another distinct change in the availability of the Works in Suit on the Internet Archive:  many of the Works in Suit were removed from all lending at the Internet Archive on June 2, 2020 (before the NEL terminated), and some were removed shortly after the termination of the NEL.  The removal of the books from the Internet Archive was arguably not driven by immediate changes in the demand for these titles but rather a response to the filed suit.  Therefore I can study the effects of this removal of a title on the Amazon sales rankings of its print editions directly.

49.    To study these changes, I repeat the analysis from just above.  In Figure 4, I plot the estimated differences in a book's Amazon ranking in each week around the book's removal

28

A-4927

from the Internet Archive, relative to the week immediately preceding its removal.[46]  The figure suggests two things.  First, the coefficients seem to increase slightly leading up to the book's removal from the Internet Archive (red line).  This suggests a possibility that the Works in Suit had slightly more sales, relative to other titles, leading up to their removal.  While this period coincides with the titles' availability, I do not have enough information to connect the relative sales increase to the NEL.  Second, the estimated rankings drop (worsen) almost immediately after the book's removal from the Internet Archive.  That is, when the books are no longer available on the Internet Archive, their unit sales at Amazon decrease relative to other books.  Regression analyses based on the regression equation in Footnote 41 suggest a worsening of the Amazon rank between 1% and 2% when the work is taken down, with relatively narrow confidence intervals, especially as I consider narrow time frames (a few weeks) around a work's removal.  I show the estimated coefficients from two such regressions in Exhibit D.  Taken at face value, this is at least suggestive evidence that availability of a book at the Internet Archive does not hurt its sales.

---

[46] This figure is analogous to Figure 3 above, using the weeks around a book's removal from the Internet Archive instead of the weeks around its addition to CDL.

DocuSign Envelope ID: B0B44055-8F08-4A00-8687-A9D4F36G357F



**Figure 4: Estimated Change in Sales Rank due to removal from the Internet Archive's CDL, for each week before and after the book's removal**

50.     There is a possibility that this estimated negative effect of the removal from the Internet Archive is driven by seasonal patterns. Most of the Works in Suit were taken off the Internet Archive in June 2020. If the Works in Suit naturally experienced a drop in their sales around the beginning of summer, then the coefficients I estimated would simply reflect a seasonal change in their sales (relative to other books), rather than an effect of the Internet Archive. To test whether the effect of the removal that I estimated above was in fact driven by seasonal changes in the works' readership, I perform a "placebo" analysis: I pretend that each book's removal from the Internet Archive ("treatment") happened exactly one year before its true removal date, and I examine changes in Amazon sales ranks for the Works in Suit around

30

A-4929

that "placebo treatment" date.[47]  Figure 5 shows the estimated changes in Amazon sales

rankings.  Comparing Figures 4 and 5 shows that sales rankings worsened more after the true

removal (Figure 4) than after the placebo removal a year prior to that date (Figure 5), although a

worsening of the ranking cannot be ruled out after the placebo removal either.  This suggests that

the true removal indeed had an effect on Amazon sales rankings.



**Figure 5:  Estimated Change in Sales Rank due to placebo removal from the Internet Archive's CDL, where the placebo removal happened exactly one year prior to the book's true removal**

51.    Results – NEL:  The third change in a book's online availability happened when

the NEL was launched.  The NEL launched on March 24, 2020, making books even more

accessible on the Internet Archive than before by temporarily lifting the owned-to-loaned waitlist

---

[47] Note that I do not perform a placebo analysis for the effects of a book's inclusion in CDL because placebo tests are generally performed to examine whether an estimated effect is due to chance, but I found no effect of CDL to begin with.

parameter of CDL. Although this change in a book's availability at the Internet Archive can be seen as relatively small, it is possible that the improved availability during the NEL had a distinct effect on the unit sales of print editions. I examined this possibility using the same framework as above, but instead of examining how the sales rank changed after the entire addition to or removal from the Internet Archive, I now examine how the sales rank for the Works in Suit changed when they became more readily available, due to the NEL.

52.     Again, I examined changes in the Amazon ranking of the Works in Suit in each week around the launch of the NEL. I present the estimated ranking differences in each week (from 20 weeks before launch to 30 weeks after it), relative to the week before the NEL launch, in Figure 6. The figure is analogous to Figures 3 and 4, with a different focal date. It suggests that, whereas sales rankings of the Works in Suit did not trend upward or downward before the NEL launch (the first vertical line in the chart), their rankings improved significantly—by about 2%—almost immediately after the launch, and rankings remained improved throughout their NEL tenure. After about 12 weeks—around the time that most Works in Suit were removed from the Internet Archive's lending library (June 2, 2020)—their Amazon rankings seemed to revert toward their original levels within a few weeks.

DocuSign Envelope ID: B0B44055-8E08-A400-8607-A9D4E36G257F



**Figure 6: Estimated Change in Sales Rank due to the Internet Archive's NEL, for each week around its launch. The first red line indicates the launch of the NEL, the second line indicates its shutdown.**

53.     The improvement in the rankings for the works in suit could be due to the NEL, but they might also be due to seasonal effects. Here, I repeat the placebo test from Figure 5. In particular, I impose a "placebo" NEL launch date one year before the true launch, and I examine how Amazon sales rankings for the Works in Suit change around this placebo date (March 24, 2019). If there are no seasonal trends in the rankings of the Works in Suit around springtime, then the estimated coefficients the placebo launch should be close to zero. However, Figure 7 shows that the estimated coefficients—and therefore the estimated rankings for the Works in Suit—also improved in March of 2019, with size effects similar to the improvements observed in March 2020. Thus, because Figures 6 and 7 look quite similar to each other, I cannot conclude that the NEL had either a positive or a negative effect on the Amazon sales rankings of print editions.

33

A-4932



**Figure 7: Estimated Change in Sales Rank due to the Internet Archive's NEL, for each week around its launch. The first red line indicates the launch of the NEL, the second line indicates its shutdown.**

54.    <u>The size of the effect relative to lifetime sales:</u>  In the above paragraphs, I

document no clear change in Amazon rankings for the Works in Suit as they become available

through CDL (CDL date) or as their availability improves further with the launch of the NEL.

By contrast, I present weak evidence of a small but statistically significant worsening of the

Amazon ranking when a book is removed from the Internet Archive.  Note, however, that the

vast majority of books are made available on the Internet Archive five years or more after their

original publication.  Based on my analysis in Section B, it is unlikely that either positive or

negative effects related to a title's availability on the Internet Archive account for a large share of

a book's lifetime sales.  For example, if only 10% of a book's lifetime sales typically occur later

than the first five years after its publication (as is suggested by my analysis of lifetime sales

above), then a (hypothetical, permanent) 2% change in sales after 5 years would indicate only a

34

0.2% change in the book's lifetime sales. But, as noted above, there is no evidence to suggest that the availability of the Works in Suit on the Internet Archive adversely affected their sales.

55.     Conclusions:

a.     The share of ebook sales has decreased steadily since 2014, but there is no evidence that this decline over the last five to ten years is related to the Internet Archive's digital lending program.

b.     Sales of an edition of a title tend to decrease rapidly after the first year. Sales in the first five years after an edition's publication account for up to 90% of its lifetime sales. Most of the Works in Suit behaved consistently with this observed pattern.

c.     My analysis of the effects of availability at the Internet Archive on Amazon sales rankings of print versions of the Works in Suit leads me to draw two conclusions. First, I find no statistically significant evidence that a book's inclusion on the Internet Archive's lending library or the launch of the NEL hurt or harmed its sales on Amazon. Second, I find some weak evidence that a book's removal from the Internet Archive is associated with lower (worse) rankings of print editions at Amazon.

Dated:  February 25, 2022

_Imke Reimers, Ph.D._

IMKE REIMERS, PH.D.

35

DocuSign Envelope ID: B0B44055-8E08-4A00-8687-A9D4E26C257F

# Exhibit A

Curriculum Vitae
Spring 2022

IMKE C. REIMERS

**Academic Appointments:**

Associate Professor (with tenure), Department of Economics, Northeastern University, Summer 2020 – present
Fellow, Center for Advanced Studies, Ludwig Maximilian University Munich – Spring 2021
Assistant Professor, Department of Economics, Northeastern University, Fall 2014 – Spring 2020
Postdoctoral Research Fellow, National Bureau of Economic Research, Fall 2013 – Summer 2014

Faculty Affiliate, Digital, Analytics, Technology and Automation (DATA) Initiative, Northeastern University

**Education:**

| Degree | Field | Institution | Year |
|--------|-------|-------------|------|
| Ph.D. | Economics | University of Minnesota | 2013 |
| M.A. | Economics | University of Minnesota | 2012 |
| B.Sc. | Mathematics and Economics | University of Nebraska (high distinction) | 2008 |

**Publications**

"Digitization, Prediction and Market Efficiency: Evidence from Book Publishing Deals" with Christian Peukert, *Management Science* (2022)

"Digitization and Pre-Purchase Information: The Causal and Welfare Effects of Reviews and Crowd-Based Ratings" with Joel Waldfogel, *American Economic Review,* 111.6 (2021), 1944-71

"The Impacts of Telematics on Competition and Consumer Behavior in Insurance" with Benjamin Shiller, *Journal of Law and Economics*, 62.4 (2019), 613-32

"Copyright and Generic Entry in Book Publishing," *American Economic Journal: Microeconomics,* 11.3 (2019), 257-84

"Do Coupons Expand or Cannibalize Revenue? Evidence from an E-market" with Claire (Chunying) Xie, *Management Science*, 65.1 (2018): 286-300.

"Examining Regulatory Capture: Evidence from the NHL" with Gregory DeAngelo and Adam Nowak, *Contemporary Economic Policy*, 36.1 (2018), 183-91

"Are Public and Private Enforcement Complements or Substitutes? Evidence from High Frequency Data" with Gregory DeAngelo and Brad Humphreys, *Journal of Economic Behavior and Organization*, 141 (2017): 151-63

"Throwing the Books at Them: Amazon's Puzzling Long-Run Pricing Strategy" with Joel Waldfogel, *Southern Economic Journal*, 83.4 (2017): 869-85 (runner-up, Georgescu-Roegen Prize for Best Article in the Southern Economic Journal 2017.)

"Can Private Copyright Protection be Effective? Evidence from Book Publishing" *Journal of Law and Economics*, 59.2 (2016): 411-440

"Storming the Gatekeepers: Digital Disintermediation in the Market for Books" with Joel Waldfogel, *Information Economics and Policy*, 31 (2015): 47-58

**Select Working Papers**

"Digitization and the Demand for Physical Works: Evidence from the Google Books Project" with Abhishek Nagaraj

"Does Amazon Exercise its Market Power? Evidence from Toys R Us" with Leshui He and Benjamin Shiller

"Visibility of Technology and Cumulative Innovation: Evidence from Trade Secrets Laws" with Bernhard Ganglmair

"The Digital Challenge to Public Libraries" with Joel Waldfogel

"Home Sweet Home? Covid-19, Stadium Attendance and Efficiency in Sports Betting Markets" with James Dana

**Invited Seminars and Conference Presentations (including scheduled)**

2022     Harvard Law School; Boston University; University of Toronto; Stanford University; Paris Seminar on the Economics of Digitization; University of Colorado

2021     Rotterdam School of Management; Harvard Business School; University of Pittsburgh; ZEW Mannheim; Digital Economy Workshop, Munich, Germany (panelist and discussant); International Industrial Organization Conference; Bureau of Labor Statistics; ZEW Conference on Information and Communication Technologies (discussant); Department of Justice; Georgetown University; National University Singapore; Brandeis University; OECD; RISE4 Workshop, Max Planck Institute Munich (discussant); University of East Anglia; University of Giessen

2020     13th Digital Economics Conference, Toulouse School of Economics, Toulouse, France; Boston College (canceled); 8th Annual Intellectual Property Law Conference, Austin, TX (canceled); University of Colorado, Boulder (canceled); NBER Summer Institute Digitization Meeting; IP Day, Technology & Policy Research Institute, Boston University; 13th Annual USPTO-Northwestern Innovation Economics Conference (discussant); Technology & Declining Economic Dynamism, Technology & Policy Research Institute, Boston University; Ringvorlesung, Department of Economics, University of Mannheim; CAS Research Group, LMU Munich, Germany; MaCCI-ZEW Workshop on Economics of Innovation, Mannheim, Germany (discussant)

2019     AEA Meetings, Atlanta, GA; 12th Digital Economics Conference, Toulouse School of Economics, Toulouse, France; NBER Economics of Digitization Winter Meeting, Palo Alto, CA; Lafayette College; International Industrial Organization Conference, Boston, MA; 8th ZEW Conference on the Economics of Innovation and Patenting, Mannheim, Germany; Munich Summer Institute, Munich, Germany; NBER Summer Institute, Innovation Meeting; Tufts University; Pennsylvania State University; Queen's University; Workshop on the Economics of Fixed Book Price Systems, Giessen, Germany; University of Luxembourg

2018     11th Digital Economics Conference, Toulouse School of Economics, Toulouse, France; NBER productivity lunch, Cambridge, MA; NBER Economics of Digitization Winter Meeting, Palo Alto, CA; International Industrial Organization Conference, Indianapolis, IN; Roundtable on Empirical Methods in Intellectual Property, Northwestern Pritzker School of Law, Chicago, IL; Munich Summer Institute, Munich, Germany; Society for Economic Research on Copyright Issues, Toronto, Canada; Platform Strategy Research Symposium, Boston University, Boston, MA (discussant); NBER Summer Institute (poster); Bates College; Roundtable on Copyright Issues, Notre Dame University, South Bend, IN; National Association for Business Economics TEC, San Francisco, CA; University of Connecticut

2017    Dartmouth Winter IO Conference, Hanover, NH; Copyright and Technology Conference, New York, NY; NBER productivity lunch, Cambridge, MA; MIT Press, Cambridge, MA; International Industrial Organization Conference, Boston, MA; Harvard Business School Workshop on Innovation in a Global Economy, Boston, MA; 8th SEARLE Conference on Internet Commerce and Innovation, Chicago, IL; ZEW Conference on Information and Communication Technologies, Mannheim, Germany; Western Economic Association Annual Meeting, San Diego, CA

2016    AEA Meetings, San Francisco, CA; Annual Scientific Seminar on Competition and Regulation in Infrastructure and Digital Markets, Florence, Italy; International Industrial Organization Conference, Philadelphia, PA; Rijksuniversiteit Groningen; Southern Economic Association Annual Meeting, Washington, DC.

2015    NBER productivity lunch; International Industrial Organization Conference, Boston; Strategic Business Management & Economic Research Conference, Boston; ZEW Conference on Information and Communication Technologies, Mannheim, Germany; NBER Summer Institute (poster); University of Calgary Empirical Microeconomics Workshop, Banff, AB, Canada; Southern Economic Association Annual Meeting, New Orleans, LA

2014    NBER productivity lunch; Eastern Economic Association Annual Meetings, Boston, MA; Workshop on Digital Media Markets and the Modernization of Copyright in the EU, Brussels, Belgium; International Industrial Organization Conference, Chicago, IL; Rijksuniversiteit Groningen, ZEW Conference on Information and Communication Technologies, Mannheim, Germany; North American Summer Meetings of the Econometric Society, Minneapolis, MN; Frankfurt Book Fair; Workshop on the Interaction Between Legal and Pirated Book Sales, Seville, Spain

2013    Kansas State University, Rensselaer Polytechnic Institute, Northeastern University, Dartmouth College, Rijksuniversiteit Groningen, University of Bremen, Massachusetts Institute of Technology


**Honors and Awards**

Finalist, College of Social Sciences and Humanities Outstanding Teaching Award, Northeastern University, 2020
Postdoctoral Fellowship, Digitization and Copyright Initiative, National Bureau of Economic Research. 2013
Graduate Research Program Partnership Dissertation Fellowship, University of Minnesota. 2012
Distinguished Instructor, Department of Economics, University of Minnesota. 2010
Distinguished Teaching Assistant, Department of Economics, University of Minnesota. 2009, 2010
Silverman Fellowship, Department of Economics, University of Minnesota. 2008-2009
NCAA Postgraduate Fellowship, National Collegiate Athletic Association 2008
Phi Beta Kappa, Gamma Chapter of University of Nebraska, Lincoln, Nebraska 2008 – present

## Teaching

Northeastern University
>    Microeconomic Theory (undergraduate)
>    Applied Econometrics (undergraduate)
>    Framework of Industrial Organization (Ph.D.)

University of Minnesota:
>    Industrial Organization and Antitrust Policy (undergraduate)
>    Principles of Macroeconomics (undergraduate)
>    Applied Econometrics (Ph.D., teaching assistant)
>    Principles of Microeconomics (undergraduate, teaching assistant)
>    Development Economics (undergraduate, teaching assistant)

Guest lectures:
>    Massachusetts Institute of Technology, HEC Lausanne, Brandeis University, Northeastern (Network Sciences), Suffolk University

## Advising

**PhD** (all at Northeastern University, committee member unless otherwise specified):

>    Diana Li (expected 2024, main advisor)
>    Yanli Liu (expected 2023, main advisor)
>    Philip Rubin-Streit (expected 2023, main advisor)
>    Yanchi Zou (expected 2023)
>    Andrew Kearns (expected 2022, co-main advisor)
>    Farzaneh Nekui (expected 2022)
>    Arvind Sharma (expected 2022)
>    Yunus Yilmas (2021, Economist, Analysis Group)
>    Tuan Nguyen (2021, Economist, RSM US)
>    Richeng Piao (2021, Lecturer, Northeastern University)
>    Robert Bradley (2020, Head of Research, State Street)
>    Carlos Casso Dominguez, (2020, Lecturer, Boston University)
>    Shuang Wang (2020, Economist, Amazon)
>    Joanna Fister (2019, Federal Communications Commission)
>    Ngoc Ngo (2019, Competition Dynamics)
>    He Wang (2019, Assistant Professor, Beijing Sport University)
>    Hanchun Zhang (2019, Researcher at Harvard Business School)
>    Pukar KC (2018, JP Morgan Chase)
>    Nehan Naim (2018, Assistant Professor, College of Environmental Science and Forestry, SUNY Syracuse)
>    Lihua Han (2016, Discover Financial Services)

**MA** thesis advisor (all at Northeastern University):
>    Xiaonan Qin, Sinan Inan

**Undergraduate** thesis supervisor (all at Northeastern University):
>     Yi Fang, Ryan Megahey, Paul Molander, Andrew Wehner

**Other Service activities**

**Ad hoc referee:**
American Economic Journal: Policy; American Economic Review; Information Systems Research; International Journal of Industrial Organization; Journal of Economics and Management Strategy; Journal of Industrial Economics; Journal of Law, Economics and Organization; Journal of Law and Economics; Journal of Political Economy; Journal of Public Economics; Management Science; RAND Journal of Economics; Review of Economics and Statistics; Quantitative Marketing and Economics; Economic Inquiry; Economics; Information Economics and Policy;  International Journal of Economics and Business; International Journal of Services and Operations Management; Journal of Cultural Economics; Journal of Regulatory Economics; Journal of Media Economics; Journal of Risk and Insurance; Oxford Economic Papers; Review of International Economics; Southern Economic Journal


**Other:**
At Northeastern:
> Member, faculty search committee, Northeastern University, 2013 – 2014
> Co-organizer, Economics Department Seminar, Northeastern University, 2014 – 2020
> Member, CSSH Collaborative Research Award Committee, Northeastern University, 2020
> Member, PhD admissions committee, Northeastern University, 2021 – 2022

Profession:
> Guest Co-Editor, Information Economics and Policy, Special Issue on catastrophic events, 2021
> Member, Program Committee, 20th International Industrial Organization Conference, 2022
> Member, Scientific Committee, 20th ZEW Conference on the Economics of Information and
>> Communication Technologies, 2022
> Editorial Board, Marketing Science, 2022-present

DocuSign Envelope ID: B0B44055-8F08-4A90-8C97-00D5E26C25E5

# Exhibit C

Table 1: Estimated coefficients from regressions of a book's Amazon sales rank on its availability through CDL (varying time windows)

|  | (1) 10 days | (2) 20 days | (3) 30 days | (4) 60 days | (5) 90 days | (6) 180 days | (7) 365 days |
|---|---|---|---|---|---|---|---|
| Post CDL | -0.00285 | -0.0111 | 0.00846 | 0.0183** | 0.00923 | 0.00196 | 0.000843 |
|  | (0.0195) | (0.0142) | (0.0117) | (0.00835) | (0.00685) | (0.00487) | (0.00349) |
| Lagged log-rank | 0.475*** | 0.572*** | 0.609*** | 0.684*** | 0.709*** | 0.736*** | 0.760*** |
|  | (0.0128) | (0.00843) | (0.00654) | (0.00421) | (0.00333) | (0.00225) | (0.00153) |
| Edition age (mos) | 0.0402 | 0.0750*** | 0.0174 | -0.000743 | 0.00325 | 0.00489*** | 0.00537*** |
|  | (0.0684) | (0.0257) | (0.0141) | (0.00519) | (0.00284) | (0.00102) | (0.000378) |
| (Edition age)2 | -7.88e-05 | -0.000158 | -4.02e-05 | -4.46e-06 | -1.15e-05 | -6.25e-06 | -9.87e-06*** |
|  | (0.000422) | (0.000160) | (8.65e-05) | (3.26e-05) | (1.78e-05) | (6.33e-06) | (2.32e-06) |
| (Edition age)3 | -5.53e-07 | -1.91e-07 | -6.62e-08 | -1.73e-08 | 2.22e-08 | 4.17e-09 | 6.32e-09*** |
|  | (4.08e-07) | (1.60e-07) | (8.98e-08) | (3.95e-08) | (1.99e-08) | (6.32e-09) | (2.30e-09) |
| Observations | 5,216 | 10,035 | 15,121 | 30,195 | 44,793 | 90,395 | 178,753 |
| R-squared | 0.986 | 0.985 | 0.984 | 0.984 | 0.983 | 0.983 | 0.982 |

**Notes**: Coefficients from regressions of log-rankings on the post-CDL indicator and control variables. All regressions include fixed effects (indicator variables) for each edition. Column headings indicate the number of days around the change in the edition's CDL availability that are included in the regression. Standard errors in parentheses. Statistical significance is indicated by stars: *** $p<0.01$, ** $p<0.05$, * $p<0.1$

DocuSign Envelope ID: B0B44055-8F08-4A90-8C97-A9D4E26C2575

# Exhibit D

Table 2: Estimated coefficients from regressions of a book's Amazon sales rank on its availability at the Internet Archive

| | CDL | | IA removal | | NEL | |
|---|---|---|---|---|---|---|
| | (1)<br>3 mos | (2)<br>1/2 mos | (3)<br>3 mos | (4)<br>1/2 mos | (5)<br>3 mos | (6)<br>1/2 mos |
| Post CDL | 0.00923<br>(0.00685) | 0.0116<br>(0.00893) | | | | |
| Post IA removal | | | 0.0274***<br>(0.00657) | 0.0120<br>(0.00859) | | |
| Post NEL | | | | | -0.0266***<br>(0.00552) | -0.0230***<br>(0.00811) |
| Lagged log-rank | 0.709***<br>(0.00333) | 0.649***<br>(0.00515) | 0.706***<br>(0.00310) | 0.617***<br>(0.00497) | 0.734***<br>(0.00254) | 0.697***<br>(0.00419) |
| Edition age (mos) | 0.00325<br>(0.00284) | 0.00703<br>(0.00490) | 0.0178***<br>(0.00267) | 0.0232***<br>(0.00459) | -0.00146<br>(0.00217) | -0.00769<br>(0.00652) |
| (Edition age)2 | -1.15e-05<br>(1.78e-05) | | -7.46e-05***<br>(1.08e-05) | | 1.13e-05<br>(8.96e-06) | 3.97e-05<br>(2.77e-05) |
| (Edition age)3 | 2.22e-08<br>(1.99e-08) | | 6.09e-08***<br>(1.26e-08) | | -2.51e-08**<br>(1.03e-08) | -6.91e-08**<br>(3.18e-08) |
| Observations | 44,793 | 22,244 | 52,209 | 25,374 | 71,923 | 29,839 |
| R-squared | 0.983 | 0.984 | 0.980 | 0.978 | 0.984 | 0.984 |

**Notes:** Coefficients from regressions of log-rankings on the post-CDL indicator and control variables. All regressions include fixed effects (indicator variables) for each edition. The first two columns report estimated effects of the title's inclusion in CDL; the next two columns show estimated effects of the title's removal from the Internet Archive; the last two columns show estimated effects of the NEL. Odd-numbered columns use 3-month windows around the focal date, and even-numbered columns use the one month before and two months after the focal date. Standard errors in parentheses. Statistical significance is indicated by stars: *** p<0.01, ** p<0.05, * p<0

**Page Intentionally Left Blank**

DocuSign Envelope ID: 5A922A71-AAA1-4EC8-84B9-278384DB305B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>      Plaintiffs,<br><br> v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>      Defendants. | Case No. 1:20-CV-04160-JGK |

**REBUTTAL EXPERT REPORT OF IMKE REIMERS, PH.D.**

**ATTORNEYS' EYES ONLY**

# TABLE OF CONTENTS

Page

I. PROFESSOR PRINCE CLAIMS I IGNORE THE EFFECT OF THE INTERNET ARCHIVE ON E-BOOK SALES. ...................................................................1

II. THE ANALYSIS OF THE EFFECT ON AMAZON SALES RANKS ...........................1

III. THE ANALYSIS OF LIFETIME SALES ...................................................................9

IV. OTHER SCHOLARSHIP ........................................................................................17

V. SUMMARY ...........................................................................................................19

i

After completing my initial expert witness report on February 25, 2022, I received a copy of the expert witness report of Jeffrey T. Prince. The Internet Archive asked me to review this expert witness report and to determine whether I should rebut any portion of it. I indeed do find that Professor Prince's report warrants a rebuttal. I therefore wish to provide, below, my rebuttal.

## I. PROFESSOR PRINCE CLAIMS I IGNORE THE EFFECT OF THE INTERNET ARCHIVE ON E-BOOK SALES.

1. A main point raised by Dr. Prince is that my analysis excludes the effects of the Internet Archive on e-book sales (e.g., Prince Rpt. ¶¶ 79 & 81, ¶ 35 n.113). I agree that this would be nice to include. However, public, granular data on e-book sales do not exist, and, though it is my understanding that the Internet Archive requested such data, the publishers did not provide e-book data by month dating back to the time at which Plaintiffs acquired rights in the Works in Suit.[1] I would be happy to add an analysis of the effect on e-book sales if data were made available. I note that Dr. Prince did not offer analysis of e-book sales.

## II. THE ANALYSIS OF THE EFFECT ON AMAZON SALES RANKS

2. Dr. Prince claims that my analyses on the effect of the Internet Archive on print book sales on Amazon are misleading. He points out three reasons why he thinks my analysis may be misleading: (1) there could be other events related to a particular book that drove

---

[1] *See* ECF No. 47 (IA's letter brief to court explaining the need for monthly data about the Works in Suit and the need for monthly data about works not at issue); *see also id.* at 3 ("Hachette, Penguin Random House, HarperCollins, and Wiley have produced annual commercial performance data for the works-in-suit. They do not contend that monthly data does not exist; they contend only that producing monthly data would be more difficult, so they have not produced it. . . . Monthly data is necessary because each book began to be available for digital lending on a particular known date, so it makes sense to compare the commercial performance *before* that particular date with the commercial performance *after* that date. Purely annual data does not provide enough detail, particularly because sales of a particular book change so drastically within a year."); *see also* ECF No. 49 (Plaintiffs' response letter brief).

1

demand—examples include marketing efforts (Prince Rpt. ¶¶ 83, 85 & 90) and supply chain issues (*id.* ¶ 89), and general trends in demand, such as a growing interest in racial justice (*id.* ¶¶ 87–88); (2) ranking data at Amazon do not explicitly capture sales on a particular day (*id.* ¶ 92); and (3) it is possible that the timing of availability of a book through the Internet Archive was driven by expectations of particularly high demand (*id.* ¶ 93).  In the following paragraphs, I respond to these points.

3.      The first point that Dr. Prince raises is the lack of controls for other events that may have happened around the time of a title's inclusion in the Internet Archive.  If these events increased the demand for a title independently of its availability at the Internet Archive, then the fact that I could not find a negative effect of availability at the Internet Archive on print sales may be hiding a combination of a negative effect of the Internet Archive and a positive effect of the other events. As set forth below, however, I do not believe that the hypothetical confounders identified by Dr. Prince affect the outcome of my analysis.

4.      The first set of possible confounders revolves around title-specific promotions and marketing efforts. Dr. Prince mentions the possibility of newly released editions (Prince Rpt. ¶ 90), promotions that are related to prices (*id.* ¶¶ 83, 90) and star ratings (*id.* ¶ 90), and movie releases (*id.* ¶ 83).  Finally, he raises possible supply chain issues (*id.* ¶ 89) as a further explanation.  None of these seem to explain my initial findings, that I can't identify a negative effect of availability on the Internet Archive on print unit sales:

a.      Newly released editions are unlikely to positively affect the sales of existing editions of a title.  In fact, they would be more likely to decrease sales of existing editions because they can be seen as close substitutes and could compete for (or "cannibalize") sales from existing editions.  Note

2

DocuSign Envelope ID: 5A922A71-AAA1-4EC8-84B9-278384DB395B

DocuSign Envelope ID: 5A922A71-AAA4-4EC8-84B9-278384DB395B

that in my original report, I specifically estimated the effect of availability

at the Internet Archive on the demand for book editions, rather than titles,

so that Dr. Prince's concern about the effect of releases of new editions for

the Works in Suit on my analysis is unfounded.

b.  Dr. Prince raises concerns that demand for an edition may have changed

due to price decreases or changes in Amazon star ratings. While changes

in Amazon star ratings are unlikely to arise from any book-specific

promotions unless, perhaps, someone elicited fake reviews in order to

raise the ratings, prices may be designed to increase demand. I have

information on daily prices and star ratings, as well as the number of

reviews, so I can perform my analysis again taking this information into

account. Specifically, I re-ran the original regressions but added price,

average star ratings, and the number of reviews as control variables to the

regression equation. While the original equation examined the "effect" of

Internet Archive availability on an edition's Amazon rankings without

controlling for possible changes in prices and ratings, this new regression

(with the "control variables") explicitly holds prices and ratings constant.[2]

To illustrate the impact of adding these control variables, I examine the

effect of availability through the Internet Archive's Controlled Digital

---

[2] Mathematically, one can think of the coefficient on Internet Archive availability as a partial derivative with respect to availability. We treat all other variables in the equation as constants and examine what happens to rankings when we raise availability by one unit. In the original regression, there were no other variables, which implies that I allowed prices and ratings to vary rather than keep them fixed. Here, I include these other variables and they are therefore held constant for the identification of the coefficient on Internet Archive availability.

Lending Program on rankings.  Without these control variables (in my

original report), I found a coefficient of 0.0024 (and a standard error of

0.002).  This effect was not statistically distinguishable from zero, as I

explained in my original report.[3]  When I add the control variables, the

coefficient becomes -0.0002 (with a standard error of 0.002) – a number

even closer to zero, and even less distinguishable from zero.[4]  That is, the

addition of the control variables does not make a difference.

c.   Dr. Prince also mentions the possibility of film and TV adaptations (Prince

Rpt. ¶ 83).  While this would only be of concern if the timing of these

adaptations coincides with the timing of changes in availability at the

Internet Archive, I searched on Google for each title together with the

word "adaptation" to identify books that were adapted into TV shows or

movies between 2011 and 2021.[5]  Removing these titles from the analysis

---

[3] While the coefficient is not distinguishable from zero, the point estimate suggests a 0.24% worsening in rankings.

[4] Taking the point estimate as given, it would suggest an improvement in rankings of 0.02%.

[5] When the initial search for a title suggested there might be a TV or movie adaptation, I searched more deeply to identify potential matches. Using this approach, I identified 19 such titles: *A Dance with Dragons; Caliban's War; Daring Greatly; Escape from Mr. Limoncello's Library; Fallen; Gone Girl; I Funny; If I Stay; Leviathan Wakes; Middle School the Worst Years of my Life; Night Watch; Simon vs. the Homo Sapiens Agenda; Station Eleven; The Extraordinary Education of Nicholas Benedict; The Innocent Man; The Miseducation of Cameron Post; The Mysterious Benedict Society; The Mysterious Benedict Society and the Perilous Journey; The One and Only Ivan*.  Note that this list might not be exhaustive or may include a book title that was not adapted because a movie's title may be different from the book's title (e.g., *Simon vs. the Homo Sapiens Agenda* was adapted into a movie called *Love, Simon*; and *A Dance with Dragons* is technically a prequel to the *Game of Thrones* TV series). While my list may be imperfect, Dr. Prince does not make any attempt to identify titles associated with adaptations.  If such a list were made available, I would be happy to incorporate it.

4

A-4951

DocuSign Envelope ID: 5A922A71-AAA1-4EC8-84B9-278284DB325B

does not change my results in a meaningful way.  For example, if I drop all editions of these titles and repeat the analysis from above (with price and ratings controls), I now find a coefficient of -0.0016, with a standard error of 0.002.  The estimated coefficient suggests a 0.16% improvement in rankings due to the controlled digital lending program, although again this estimated effect is not statistically distinguishable from zero.  Because this coefficient is very close to that in Paragraph 4b, I conclude that movie and TV adaptations of a title do not seem to drive the results.

d.    Finally, it is unclear to me why Dr. Prince's argument of supply chain issues poses a problem for my analysis.  There is one pattern that could lead me to miss a negative effect of Internet Archive availability on sales by not accounting for supply chain issues:  if these supply chain issues only apply to other books that compete for similar rankings as the Works in Suit, but not the Works in Suit themselves.  I don't see a reason why this would be the case.  Note here that my use of rankings is helpful, because many events that affect the entire industry (like supply chain issues) only pose a threat to my identification strategy if they affect the Works in Suit differently from comparable books.  Again, I find this unlikely, and Dr. Prince provides no reason to think that it would affect some books differently than others.[6]

---

[6] In Paragraphs 84 and 89, Dr. Prince refers in footnotes to an article that was published in October 2021 – long after changes in Internet Archive availability took place for the Works in Suit.

5.      A second set of confounders includes possible changes in overall interest for a genre or subject.  For example, in 2020 public interest in topics around racial justice and the election may have raised demand for books on these topics (Prince Rpt. ¶¶ 87–88).  If the Works in Suit are disproportionately likely to cover these topics (compared to other books), and if these books became disproportionately available at the Internet Archive shortly before these jumps in interest, then it is possible that I would falsely find a positive or null sales effect of Internet Archive availability.  This concern is unlikely to affect my analysis of the effects of controlled digital lending availability because there was no one particular date on which all books were added and thus the timing of Internet Archive availability relative to shifts in interest in, say, racial justice would vary across titles.  Still, I can address this concern by examining different genres.  In particular, the Keepa data that I described in my initial report include information on a book's genre, which allows me to distinguish between fiction and nonfiction books.  Concerns about changing interest in topics seem most salient for nonfiction books:  beyond TV and movie adaptations or idiosyncratic reasons for notoriety of a particular book (such as some news event relating to the book's author)[7], the interest in fiction books is unlikely to see large shocks several years after their original publication, whereas nonfiction books may discuss certain topics for which interest rises for other reasons.  To address the possibility that my results are due to large changes in interest, I repeat my analysis after dropping all editions of nonfiction books.[8]  Across all analyses, the main result remains robust even when I drop nonfiction books:  Considering the 30 days before an event and the 60 days after the event, I find coefficients that are very close to

_____

[7] ███████████████████████████████████████████████████
███████████████████████████████

[8] I identify 295 editions as nonfiction books in my dataset.  The editions and their Amazon identifiers (ASINs) are included as Attachment C to this report.

zero in size and statistically indistinguishable from zero for both addition to and removal from controlled digital lending.[9]  The estimated effect of the National Emergency Library continues to suggest a strong improvement in rankings but is subject to the same concerns as the analyses in my initial report:  the placebo analysis that chooses a placebo National Emergency Library date one year earlier shows similar trends, so while the National Emergency Library fairly clearly did not *reduce* print book sales, I cannot conclude that the National Emergency Library *increased* print book sales.

6.     Dr. Prince's second main issue around the analysis of the effect of IA availability on rankings at Amazon was that these rankings are not a reliable measure of sales (Prince Rpt. ¶ 92).  Dr. Prince argues that because Amazon is vague in describing its algorithm for sales rankings, it is possible that rankings are not based on sales revenue.  Note here that rankings are likely based on unit sales rather than sales revenue—in fact there is academic work that points to this relationship.[10]  However, the assertion that authors can manipulate Amazon sales rankings through marketing schemes (*see* Prince Rpt. n.256) is irrelevant here unless authors of the Works in Suit (or the pertinent Plaintiffs) exerted additional effort to increase sales after the works were made available at the Internet Archive, and more so than for works written by other authors.  I find this unlikely.  Note that even if this were an issue, the fact that I look at rankings would not exacerbate it because the rankings are a function of unit sales.

---

[9] The estimated coefficient on inclusion in controlled digital lending is 0.015 (standard error = 0.011), and the estimated coefficient on removal from controlled digital lending is 0.009 (standard error = 0.011).  Both are close to zero, and I cannot conclude that they are different from zero.

[10] *See* Chevalier, Judith, and Austan Goolsbee. "Measuring prices and price competition online: Amazon. com and BarnesandNoble. com." *Quantitative Marketing and Economics* 1.2 (2003): 203-222.

7.  I agree with Dr. Prince that for my analysis to uncover causal relationships, I have to ensure that the decision to make a book available for digital lending was unrelated to (expectations of) periods of particularly high demand (Prince Rpt. ¶ 93).  While I have little reason to believe that availability for digital lending was driven by anything other than the passing of the five-year period and digitization capacity constraints at the Internet Archive, I am adding to this discourse here by referring to depositions that showed that digitization was done with no regard to a title's concurrent or impending demand but rather after a certain delay has passed.[11]  In fact, by relying on testimony that confirms that the Internet Archive made titles available for digital lending solely on the basis of which titles were available, the argument for an exogenous change in digital availability in my report is arguably stronger than many other analyses in other, peer-reviewed papers.  For example, in my 2016 paper on the effects of private copyright protection—which Dr. Prince discusses in some detail in his report—I confirm the exogeneity of piracy protection in two ways.  First, I rely on conversations with people who worked at the anti-piracy company that was the subject of my 2016 paper, who suggested that the identity of titles did not play a role in determining the order of protection.  Second, I used Google Trends search volume to show that the overall title interest (measured in monthly Google searches rather than direct demand information) is not correlated with the timing of piracy

---

[11] Mills Dep. 82:6-12 ("Q.  Do you know generally how in-copyright books were selected for digitization in sort of the early years in which Internet Archive was digitizing in-copyright books?  A.  I would say availability in terms of donations to the Internet Archive for acquisitions by the Internet Archive."); *see also id.* 71:13-72:1, 90:12-91:11.

Note also that from my own work on Google Books digitization (Nagaraj, Abhishek and Reimers, Imke, "Digitization and the Demand for Physical Works: Evidence from the Google Books Project," SSRN Working Paper (Apr. 12, 2021)), which Dr. Prince mentions in his report), we also learned that no attention was paid to which books were digitized first, but rather that focus was placed on making books available digitally as quickly as possible.

protection.  The direct sworn testimony regarding the decision to make books available for digital lending here eliminates the need for that sort of analysis.

8.       A related point raised by Dr. Prince is that I did not "formally test the change in sales with season" between the period of my analysis and the placebo period (Prince Rpt. ¶ 91).  Because my analysis uses (relative) rankings rather than (absolute) sales, the concern about changes in sales across seasons is alleviated.  For example, I do not need to account for periods of particularly high book sales (such as Christmas) because *all* books likely see increases in demand and rankings describe sales relative to other books.  Still, I can allow for the possibility that the Works in Suit are particularly popular during certain times of the year.  I do this in a new analysis that further extends the original analysis. In particular, in addition to the control variables for an edition's price and ratings, I now include a control variable for each month of the year.  Much like a control variable for the price allows me to look at the effect of Internet Archive availability while holding the price constant, the control variables for each month of the year allow me to examine the effect of digital lending by Internet Archive while holding fixed the month of year—in other words, to control for the seasonality of demand for the Works in Suit.  Adding these additional controls, I now find that the coefficient on the Internet Archive availability through Controlled Digital Lending is -0.0007 (standard error = 0.002).  Again, the estimated effect is very small (equivalent to a ranking improvement of 0.07%), and not statistically distinguishable from zero.  In addition to finding no evidence that seasonality affected my estimates, I note that Dr. Prince also did not perform any analysis on the role of seasonality.

III.    THE ANALYSIS OF LIFETIME SALES

9.       Dr. Prince also comments on my analysis of the lifetime sales of the works in suit. He makes the following points: (1) one cannot talk about a book's lifetime sales while the book

9

A-4956

is still being sold (Prince Rpt. ¶ 114); (2) the relevant margin is not that of an individual title's sales progression, but rather the share of sales of the publisher's entire catalog that can be attributed to "old" books (*id.* ¶ 110); (3) one should look at the lifetime sales of a title, starting from the publication of its first edition, rather than the lifetime sales of an edition (*id.* ¶¶ 110 n.282 & 115); and (4) it would be more appropriate to consider revenue rather than unit sales to discuss market harm (*id.* ¶ 115).  In the following paragraphs, I respond to each of these points.

10.     While I agree that one cannot talk about a title's lifetime sales when the title still sees positive sales today (Prince Rpt. ¶ 114), I believe my analysis of the sales decay in the first ten years is valuable.  This seems like a semantic point rather than a substantive one:  instead of calling it lifetime sales, I am happy to change my wording to lifetime sales *to date*.  Still, I believe the analysis is informative.  In fact, the analysis in my initial report can be used to create lower and upper bound estimates of the share of a book edition's sales that occur in the first five years after original publication.  For example, in my initial report I examined the sales trajectory of the editions of the Works in Suit by Penguin Random House that were published in 2010, between 2010 and 2020.[12]  I found that on average 90% of an edition's unit sales occurred in years 0 to 5 after its publication, and only 10% in the following five years.  Note here that Dr. Prince pointed out in Paragraph 115 that I reported the sales share in years 0 to 5, i.e., the first six years, relative to the first 11 years.  My representation requires additional explanation because the "first" year after publication is not easily defined.  For example, for editions that were published in January, one would expect many sales in the first year.  By contrast, if an edition was published in December, the "first-year" sales might better be reflected in the following

---

[12] Recall that I used editions published in 2010 to ensure that I would observe the entirety of the first five years since publication.  *See* Paragraph 13 below that explains the implications of using the publication dates of editions rather than titles.

calendar year.  In my original report, I used years zero to five, assuming that the first year was

the year *after* publication.  If I instead consider the years zero to four relative to the first 11

years, the share at Penguin Random House is 86%.  A similar concern could apply to my

analysis of the remaining publishers.  For these, I used the more conservative measure (the first

year was the year of publication, even if the edition was published in December) to begin with,

and a more liberal interpretation would have significantly raised the "first-year" share.

Specifically, for Hachette, the share of unit sales that occurred in years zero to one, relative to

years zero to three, was 78%, rather than 65%; and for HarperCollins, the share of unit sales that

occurred in years zero to one, relative to years zero to three, would be 82%, rather than 74%.

      11.     Based on the numbers for the Works in Suit from Penguin Random House, we

can provide bounds for the share of unit sales that occur in the first five years compared to, say,

the first 50 years.[13]  This is an extension to my initial analysis.  The upper bound of this five-

year share is 86%—this would be the case if no units were sold more than 11 years after an

edition's publication.  I can create a lower bound of the five-year share by assuming that unit

sales remain constant after the first five years, so that annual average sales in years six through

11 are equal to average annual sales in years 12–50.  If this is accurate, then the "lifetime" share

(defining the lifetime as 50 years) of unit sales that occur in the first five years would be 45%.[14]

Because an edition's unit sales in subsequent years are unlikely to fall below zero or rise above

---

[13] Here, to remain very conservative, I will use years zero to four to define the first five years.

[14] To calculate this share, I divided the 90% from the first five years by the sum of all "shares" from the years six – 50.  Because the first five years account for 86% of the 11-year share, the next six years account for 14%.  Per year, this would be $14/6 = 2.33\%$.  Now suppose these 2.33% extend for each year from year six to 50 – i.e., 45 years.  This would imply that sales from year six to 50 would be $45*2.33\% = 105\%$ of the total sales in the first 11 years.  Now I can compare sales in the first five years (86% of the 11-year total) with sales in the next 45 years (105%).  As a percent of the total, the first five years make up $86 / (86 + 105) = 45\%$.

the level of previous years, the true share of sales in the first five years is likely between 45% and 86% for most titles.

12.     Dr. Prince also asserts that the damages to publishers are more accurately described as a share of sales of the entire catalog, rather than on a title-by-title basis (Prince Rpt. ¶¶ 110-111).  While I agree that the share of first-five-year sales relative to a publisher's entire catalog is relevant, I did not have access to this type of information.[15]  The shares of "backlist" sales that Dr. Prince mentions in Paragraphs 52 and 111 (and which I also mentioned in my initial report) are irrelevant here, because the publishers define the "backlist" as titles that are more than one or two years old, not more than five years old.[16]  However, I did not receive any information—nor am I aware of publicly available information—about the share of sales from books that are between two and five years old.  Because information for the relevant time spans on the catalog was not available, I focused on information that was available:  the share of an edition's sales that occurred in the first few years of the edition's availability for sale or license.

13.     Dr. Prince further contested that a *title's* lifetime sales trajectory is different from an *edition's* lifetime sales trajectory, and that looking at book editions was the wrong dimension (Prince Rpt. ¶ 115).  Here, I respond to this comment in several ways:

    a.     I chose to use edition sales merely for data availability reasons.  Other than Wiley, the longest time series of edition-level and title-level sales (or revenue) data I had available was from 2010 (Penguin Random House).  If

---

[15] *See* ECF Nos. 47, 49.

[16] Hachette defines backlist as books published two or more years ago, front list as books published within one year, and prior year published as books published between the front list and backlist terms.  Sevier Dep. 63:4-67:3.  Penguin Random House, Wiley, and HarperCollins define backlist as books over a year old and front list as books younger than one year.  Weber Dep. 101:21-104:9; Pavese Dep. 215:21-217:9; Restivo-Alessi Dep. 56:10-13.

I want to know the share of sales that happened in the first five years after a title's initial publication, I am limited—as Dr. Prince correctly points out—to titles that were originally published in 2010.  For Penguin Random House, for example, this includes two titles in the Works in Suit.  Two titles are not enough to make meaningful inference about any sales trajectories more generally.  Instead, I opted to follow sales of specific editions, which allowed me to increase the number of data points on which to base my findings.  I understand that the Internet Archive requested data from publishers going back to the times at which Plaintiffs acquired rights in the Works in Suit and that Plaintiffs declined to produce such information.

b.   Note that my decision to look at editions is unlikely to bias the sales decay over time in favor of finding a larger decay.  In fact, it seems more likely that my estimate of the sales decay over time is lower than the true decay.  Whereas sales for a *title* likely peak early and then decrease rather quickly, sales of a subsequent edition—perhaps several years after the initial publication – may never experience the same spike in demand early on because those who were most eager to read the book would have already bought an earlier edition.  That is, if anything, my analysis under-estimates the sales decay and therefore the share of a title's sales that occur in the first five years.

c.   To illustrate differences in the sales decay for the first editions versus later editions, one could look at the different editions for *Theodore Boone: Kid*

13

*Lawyer*, which Dr. Prince pointed out (Prince Rpt. ¶ 115) to be one of the two Penguin Random House titles of the Works in Suit that were originally published in 2010.  The hardcover edition of *Theodore Boone* was published in May 2010, and its sales (and revenues) in 2010 and 2011 accounted for 96% of its total sales (and revenues) from 2010 to 2020.  Three other editions of the title were published in 2011 (one mass market paperback and two e-books).  For those, sales (revenue) in 2011 and 2012 accounted for 70% (71%) of their total sales (revenues) from 2011 to 2020.[17]

    d.    Because I observe sales and revenue for Penguin Random House books from 2010 to 2020, I can also compare the sales and revenue decay for the first and later editions of other titles that were originally published after 2010.  In a supplementary analysis of the editions' lifetime sales, I keep titles with an original publication date after 2009 and which have subsequent editions in later years before 2016, to allow for sufficient observations to measure sales decay.  I follow unit sales and revenue for all editions of these titles in their first five years.  For the initial editions of these titles, I find that the average share of unit sales (revenue) in the first two years – compared to the first five years—was 75% (77%), whereas the same share was 67% (67%) for editions published in later years.  This

---

[17] Note that all print and ebook editions of the other 2010 title, *Who Was Jackie Robinson*, were published in 2010, which prevents me from examining whether the sales decay for the first editions is different from the sales decay for later editions.

DocuSign Envelope ID: 5A922A31-AAA4-4508-84B0-27838598395B

suggests that the original editions indeed see faster sales decay than later editions.

   e.   Dr. Prince also mentioned two specific titles which had relatively high sales several years after their original publication (Prince Rpt. ¶ 110): *Daring Greatly*, and *A Dance with Dragons*, sales for both were likely bolstered by releases of related TV shows.  Note that the sales trajectories for these titles are likely outliers, particularly because they of their connections to television series.  (This is bolstered by Dr. Prince's own suggestion, discussed above, that a movie or television adaptation of a work might lead to an increase in sales.)

14.   Dr. Prince also posits that the relevant margin is on the publishers' sales revenue rather than unit sales (Prince Rpt. ¶ 115).  In my initial report, I used unit sales for two reasons.  First, I did not believe the choice to use unit sales as opposed to revenues would make a large difference because the prices that publishers receive per unit of a specific edition remain quite constant.   Second, unit sales are a more appropriate indicator of consumer demand and whether units of digitized books serve as substitutes for either e-books or physical books.  Still, in this reply report, I test my claim that the choice between unit sales and revenues does not drive my results by repeating my analysis using revenue information.  For the Works in Suit at Penguin Random House, the share of unit sales in the first five years as opposed to the first 11 years was 86%.  The share of revenues over the same time span was 85%.  For the Works in Suit at Hachette, I had found that 65% of the five-year unit sales occur in the first year (although this number rises to 79% if I drop audio books).  If I instead report the same share in terms of revenues, it is 66% if I include audiobooks and 79% if I drop them.  For HarperCollins, the

15

equivalent share of unit sales reported in my initial report was 74%. If I instead report the share in terms of revenue, it is 72%. I summarize these shares in the table below. The differences between the trajectory of unit sales and that of revenues is very small for three of the four plaintiffs, and for the fourth (Wiley), it is moderate in magnitude.

| Publisher[18] | Share definition | Unit sales | Revenue |
|---|---|---|---|
| Penguin Random House | First 5 years rel. to 11 | 86% | 85% |
| Hachette | First year rel. to first 5 | 79% | 79% |
| HarperCollins | First year rel. to first 4 | 74% | 72% |
| Wiley | First 5 years rel. to 12 | 56% | 46% |

15.    Note here that in my initial report (¶¶ 9 & 25) I also reported the shares of sales (or revenue) of backlist titles. There, I reported the share of unit sales for HarperCollins because its spreadsheets listed unit sales rather than revenues (and for print books only).[19] For Hachette and Penguin Random House, I reported revenue shares, because their spreadsheets did not list unit sales.[20] Because my *title-level analysis* just above suggests that unit sales and revenue shares are very closely related, I do not believe that this inconsistency in the way the data was made available to me affects my conclusions.

---

[18] This analysis excludes audiobooks. *See* Prince Rpt. ¶ 43 ("My analysis and opinions focus on the sale and licensing of print and ebook formats to the library and retail markets. There are other formats, including audiobooks, and other markets, such as schools, which are outside the scope of my analysis.").

[19] See HC0030132.

[20] See HACHETTE0012377 and PRH0072194.

## IV.   OTHER SCHOLARSHIP

16.     In addition to his comments about my analyses, Dr. Prince analyzes other
scholarship, including some of my own.

17.     In Paragraph 32, Dr. Prince reports that most (29 out of 33) peer-reviewed studies
summarized in Danaher, Smith and Telang (2020) find that sharing of unauthorized media harms
legal media sales.  This is consistent with what I report in my 2016 paper.  However, most of the
works surveyed in the paper by Danaher et al. discuss the music and movie industries, which are
different from book publishing.  In fact, the paper by Danaher *et al.* only reports on one study on
the book publishing industry—mine.  The industry setting matters.  For example, Dr. Prince cites
a paper by Stanley Liebowitz in his footnote 94, which suggests that different types of media are
consumed differently.  In a working paper (Nagaraj and Reimers (2021)), which Dr. Prince
mentions in his report, I argue that the case for book publishing can be different from those for
music and movies.  For example, if the quality of the digitized version is lower than that of the
original, then people might check out the digital version in order to decide if they want to buy the
full book.  In footnote 94*,* Dr. Prince mentions that consumers are more likely to purchase a
product after consuming the free version if the product is likely to be consumed multiple times,
such as in music as opposed to movies.  Books likely fall somewhere between the two, because it
usually takes much longer to read a book than it takes to watch a movie.

18.     Even within an industry, different studies find different effects of free, digital
provision of works.  The fact that most but not all studies find harmful effects indicates that the
effects of digital sharing can vary on a case-by-case basis as well as depending on the type of
media at issue.  Therefore, the question of whether the conduct of the Internet Archive harms
publishers cannot be answered by looking at the effects of digital distribution in settings and

industries that are different from the Internet Archive. For that reason, I attempted to specifically study the effect of availability at the Internet Archive.

19. Dr. Prince also discusses a paper I published in 2016 in the Journal of Law and Economics (*see*, e.g., Prince Rpt. ¶¶ 29-30). The results in my 2016 paper could be indicative of the effects of availability at the Internet Archive if the Internet Archive's conduct was akin to that of the infringers I studied. But, based on my understanding, that is not the case. In my 2016 paper, I report that 69.8% of infringing content in my dataset is found on cyberlockers (Internet hosting services designed to host users' files) and that "most" of the infringing content is in HTML and PDF formats. Dr. Prince points out that the format in which content is displayed thus is likely to look similar to the content made available at the Internet Archive (*id.* ¶ 35).[21] However, a few things are different between the setting in my 2016 paper and the Internet Archive. First, the digital lending interface at the Internet Archive has more of an appearance of a library than the cyberlocker hosts, as it allows people to *borrow* titles for limited time periods rather than to keep them on their computers indefinitely. The fact that one does not *own* the book when reading it via Internet Archive can diminish the experience of reading it, making consumers more likely to purchase a full edition later. Second, in my 2016 paper, I cannot distinguish what type of content leads to harm because my variable of interest describes whether the company has found an infringing website for the title at all, and not which type of content was taken down. If e-book sales only increased after a certain type of content was removed, and

---

[21] Note here that Dr. Prince also mentions a working paper by Abhishek Nagaraj and me (*id.* ¶ 38), in which I find that digitization through the Google Books project can in fact increase sales of physical book editions. While I agree that the set of books in that study is sufficiently different from the Works in Suit, the format of the digital content is quite similar to that at the Internet Archive. This at least suggest that the format itself is not enough to draw a clear conclusion from my 2016 study.

if that content is different from that offered through the Internet Archive, then I cannot draw inferences from that study either.[22]  Third, I am not able to compare the scale (and number of site visitors) of the Internet Archive to that of the infringing sites in my 2016 paper.  If traffic to the infringing sites in my 2016 paper was higher than traffic to each book's page on the Internet Archive, then the Internet Archive might have been too small to cause a sales decrease.  Fourth, in my 2016 paper I report that on average titles have a total of 88 infringing sites.  It is likely that removing one site has little effect on sales through other channels.  Fifth, the types of books that I studied in my 2016 paper may be different from the Works in Suit, including consumers' willingness to pay positive prices for them.

20.     Because all five features could lead to different effects of availability at the Internet Archive on book sales, a separate analysis on the specific effects of the Internet Archive seemed prudent.  Again, I would be happy to perform a similar analysis on e-book sales if the data were made available to me.

## V.     SUMMARY

In summary, while I agree with some of the points that Dr. Prince made, I incorporated these points in new analyses.  These new analyses confirm my opinion from my initial report.

Dated: May 27, 2022

_Imke Reimers, Ph.D._
IMKE REIMERS, PH.D.

---

[22] In my 2016 study, Figure 3 shows that ebook sales only increase about five months after protection begins.  I did not match this timing with the types of content being taken down.

19

A-4966

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**DECLARATION OF SUSAN H. HILDRETH**

I, Susan H. Hildreth, declare as follows:

1.      I have served as a library administrator at the local, state, and federal level during my career spanning over forty-eight years.  My additional qualifications are described in Paragraphs 1-7 of my Opening Expert Report and my CV attached as Attachment A thereto.

2.      I was engaged by the Internet Archive, the Defendant in this lawsuit, to serve as an expert in this case.  I submit this declaration based on my personal knowledge and in support of the Internet Archive's motion for summary judgment.  If called upon as a witness, I could and would completely testify to the truth of each statement herein.

3.      Attached hereto as **Exhibit 1** is a true and correct copy of my Opening Expert Report, served February 25, 2022, and excerpts of its exhibits.  That document contains a true, correct, and accurate statement of opinions I have formed in this matter, and the basis for those opinions.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of my Rebuttal Expert Report, served May 27, 2022, and excerpts of its exhibits.  That document contains a true, correct, and accurate statement of opinions I have formed in this matter, and the basis for those opinions.

5.      Libraries generally begin lending a book as soon as it is published.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on _____7/6/2022_____ in ____Walnut Creek (CA____, _____.

_____
SUSAN H. HILDRETH

1

A-4968

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2022 the within document was filed with the Clerk of the

Court using CM/ECF which will send notification of such filing to the attorneys of record in this

case.

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

2

A-4969

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

## EXPERT REPORT OF SUSAN H. HILDRETH

## ATTORNEYS' EYES ONLY

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION ...........................................................................................1

    A.   Background and Qualifications.............................................................1

II.   SUMMARY OF OPINIONS ........................................................................4

III.   BACKGROUND ON LIBRARY SERVICES .............................................5

    A.   The Role of Libraries in the Twenty-First Century .................................5

    B.   Print Collection Investment ..................................................................5

    C.   Patron Demand for Digital Access ........................................................7

         1.   In-person Visits to Libraries ........................................................8

         2.   Circulation of Digital Items Including Ebooks .........................10

         3.   Ebook Availability .....................................................................11

         4.   Digital Discovery ......................................................................14

IV.   LEVERAGING LIBRARIES' EXISTING COLLECTIONS TO SERVE THE PUBLIC .....................................................................................................16

    A.   Interlibrary Loans, Special Collections, and the Sharing of Library Resources ............................................................................................16

    B.   Controlled Digital Lending ..................................................................19

    C.   The Internet Archive is a Library that Practices CDL ...........................21

V.   LIBRARY FINANCES ...............................................................................22

    A.   Organization and Funding...................................................................22

    B.   Library Budget Trends .......................................................................26

    C.   Components of Library Budgets ...........................................................28

    D.   Acquisition Budgets............................................................................29

VI.   PRINT MATERIALS CIRCULATION/ACQUISITION ............................32

    A.   Circulation of Print Materials ..............................................................32

    B.   Collection Management ......................................................................34

VII.   EBOOK ACQUISTION CHALLENGES ...................................................36

i

A.     Ebook Access Models.................................................................38

B.     Challenges in Acquiring and Managing Ebook Collections.................................40

VIII.     CDL'S IMPACT ON LIBRARY SPENDING..................................................41

ii

DocuSign Envelope ID: 525627C1-336C-4574-B909-5E5BF89A5894

# I.  INTRODUCTION

## A.  Background and Qualifications

1.      My name is Susan H. Hildreth.  I have served as a library administrator at the local, state, and federal level during my career spanning over forty-eight years.  I am currently working as a library consultant, focusing on library executive recruitment, strategic planning, organizational review, and community engagement.  I served as the Interim Director for the Sonoma County, California, Library from July 2018 to March 2019.  In my last permanent position, I served as the inaugural Distinguished Practitioner in Residence, a Gates Foundation-funded professorship at the University of Washington Information School designed to infuse curriculum with skill building relevant to the twenty-first century library and bring theory and practice together for an impactful student experience.

2.      I also served as the Director of the federal Institute of Museum and Library Services ("IMLS") from 2011 to 2015.  I was appointed to this post by President Barack Obama and confirmed by the United States Senate.  In this position, I administered a $250 million annual budget and worked with library organizations, other federal agencies, foundations, and interested stakeholders to develop partnerships to leverage federal investments in libraries and museums.  I also provided advice to the Obama Administration and Congress on information policy and was responsible for the annual national data collection of public libraries and national census of museums.  I worked closely with the Federal Communications Commission and the National Telecommunications and Information Administration to ensure that broadband capacity and digital literacy were available for all, with a specific focus on underserved communities and at-risk populations.

3.      Following the completion of my term at IMLS, I served as the Aspen Institute Fellow for the Dialogue on the Future of Public Libraries, an initiative funded by the Gates

Foundation.  I provided advice to this program that explored and championed new thinking on U.S. public libraries, developing concrete actions to transform public libraries to serve a more diverse, mobile, and connected society, with a specific focus on the impact of the digital revolution on access to information, knowledge, and the conduct of daily life.

4.      I served as the State Librarian of California from 2004 to 2009.  I was appointed to this post by Governor Arnold Schwarzenegger and confirmed by the California State Senate. In this position, I was responsible for the annual distribution of over $16 million in federal funding and $59 million in state funding as well as library service development for the 181 public library systems serving over 37 million residents at that time.  I also supervised a $350 million public library construction bond program and a $128 million cultural facilities bond program.

5.      I have also served as the City Librarian for both the Seattle Public Library and the San Francisco Public Library.  Both library systems are widely recognized as international leaders in library programming, service delivery, facility design, and innovation.  Prior to these posts, I held a number of leadership positions in public libraries in California and New Jersey. Although I have led large and complex public libraries, I have also worked in small, single-facility organizations and library systems serving rural communities.

6.      I have been active in professional library and literacy associations throughout my career.  Most recently, I served as the Treasurer of the American Library Association ("ALA") from 2016 to 2019.  ALA is the largest library association in the United States, with 57,000 members, an annual budget of $45 million, and an endowment of over $63 million.  I also served as President of the Public Library Association, a division of ALA, in 2007, and as President of the California Library Association in 2004.  During my career, I have presented and/or

2

participated with colleagues in a number of professional programs. I served as a founding member and chair of the Library of Congress Literacy Awards Advisory Board from 2012 to 2021 and served as a board member and governance chair for the Reach Out and Read Board, a pediatric literacy intervention program.

7.     I have a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services. I have served on the Advisory Council of the Panorama Project since 2018 and have provided advice on the impact libraries have on book discovery, promotion, and sales. I am thus well-qualified to provide information and expert opinion on libraries and their operations. I have provided my resume (see Attachment A).

8.     I have a high-level understanding of the case. I was informed that several major publishers have asserted that the controlled digital lending ("CDL") model used by the Internet Archive's Digital Lending Library ("Digital Lending Library") results in an infringement of copyright. I am being compensated at the rate of $150 per hour for my time. I have reviewed documents, deposition transcripts in this case, and have interviewed several library professionals (see Attachment B) who have in-depth knowledge of CDL and/or work closely with print and digital acquisitions as well as a wide variety of ebook platforms and aggregators.

9.     There are no cases in which, during the past four years, I have testified as an expert at trial or by deposition. My work in this case is ongoing. I reserve the right to supplement my analysis if additional information becomes available to me. I intend to review reports submitted by Plaintiffs' experts, and I reserve the right to prepare a reply expert report at the appropriate time.

## II.   SUMMARY OF OPINIONS

10.   I have been asked to provide expert opinions regarding library processes, service trends, patron behavior, and library finances, particularly acquisitions and the impacts of ebook licensing models on library services.

11.   In brief, my opinions are that:

- In the twenty-first century, libraries strive for improved patron access to knowledge and to adapt to increasing patron demand for digital access.  To do so, libraries must leverage their investments in their print collections.  See Section III.

- Patrons by and large prefer to browse or sample a title, digital or print, before making the decision to borrow it.  See Section III.

- Libraries have shared their physical collections through interlibrary loans and regional resource-sharing for many years.  Interlibrary lending is a way for libraries to conserve resources and focus acquisition-based spending on works their patrons are most likely to frequently request.  See Section IV.

- The growing practice of CDL by libraries is but one method libraries use to leverage their existing physical collection to better serve the reading population.  The Digital Lending Library is one example.  See Section IV.

- Library budgets are both limited and finite.  Libraries strive to maximize their acquisition budgets to meet patron demand, but acquisition budgets are often one of the few discretionary line items in a library budget and so may be constrained based on other required library expenses.  Library budgets for acquisition of works are never large enough to meet patron demand.  See Section V.

- As to physical book acquisitions, libraries initially buy multiple copies of popular titles, and then subsequently reduce the number of copies in their collection of a title.  Sometimes reduction happens when a physical copy wears out or is damaged, and other times a reduction happens when libraries sell or giveaway additional copies of a title after demand for that title has decreased.  Libraries seldom buy replacement copies of a title.  Demand for popular titles diminishes rapidly, and one-to-one replacement would not be a good use of a library's limited acquisition budget.  Moreover, libraries can and do make small repairs (example: taping a torn page) to damaged physical copies.  Only a small percentage of a library's acquisition budget is spent purchasing new replacement copies of a title.  See Section VI.

- Ebooks have presented particular challenges for libraries.  Patron demand for ebooks has been increasing.  But, when libraries pay for the ability to loan ebooks to patrons, libraries pay only for a temporary license.  The purchase of ebook

4

licenses therefore does not add to a libraries' permanent collection. Moreover, ebook collection management requires heavy use of libraries' staff resources. In many cases it takes more staff resources to manage library ebook licensing systems than it does to manage physical collections. See Section VII.

- CDL does not result in less library spending on books. Libraries spend all of their allocation budgets each period. If a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books. See Section VIII.

## III. BACKGROUND ON LIBRARY SERVICES

### A. The Role of Libraries in the Twenty-First Century

12. Provision of access to information is the primary goal of the twenty-first century library, yet libraries have expanded far beyond that primary role. Libraries serve as meeting places for community members, workforce development centers for the unemployed or under-employed, family learning centers for literacy support for all ages, telehealth venues for patients who do not have access to personal devices or wifi, and go-to partners for a myriad of services that reflect the needs and aspirations of their communities.

### B. Print Collection Investment

13. The primary role of libraries for many years was the development and curation of print collections. These collections were initially developed to provide educational materials to improve the lives of patrons. As communities changed and additional formats of resources evolved, libraries expanded their collections to include recreational reading materials, serials (magazines), children's materials, and varying formats, i.e. paperbacks, audio-visual materials, etc.[1] No matter what the format, libraries have worked to develop collections that present

---

[1] Michael Kevane & William A. Sundstrom, The Development of Public Libraries in the United States, 1870–1930: A Quantitative Assessment. Information & Culture: A Journal of History, 117–144 (2014).

current and balanced viewpoints on a wide variety of critical topics. Collections are developed to address general informational needs of the community yet are also focused on topics that are of *particular interest* to the community. For instance, if the community being served is the headquarters of a specific industry, the collection could reflect deep resources regarding that industry. If the community is the birthplace of a famous individual, materials regarding that person's life could be included in the collection. Library collections are always a balance of materials of general interest and topics that may be of specific interest to the community.

14. Public libraries are distinct from other types of libraries in that their mandate is to serve the public's information needs generally. Public libraries lend materials—including books—to their patrons, and they also maintain collections of reference materials, many of which are not available for check-out. Public libraries typically focus on acquiring and making available materials of general interest to the public and materials that will be popular with patrons.

15. Another key role libraries play is preservation. Many libraries have collections that focus on local history or collections that are unique to their community or region, as noted above. Moreover, libraries are often responsible for maintaining local archives including governmental documents. While libraries can and do preserve physical embodiments of works, libraries also use digitization—particularly in circumstances where the physical condition of a work is deteriorating or the work or its contents are not widely available elsewhere (for example: works in a library's "special collections"). Also, libraries with multiple branches that purchase many copies of titles at a time, will strive to retain the "last copy" when the title has outlived its popularity.

16.     Library preservation activity is primarily focused on print collections, either by taking special care of print books and/or digitizing it.  Preservation of digital materials is more challenging for public libraries, due to the equipment required for preservation of digital materials as well as the need to monitor and address changes in digital formats and platforms— both of which are expensive.

17.     Resource-sharing and convenient borrowing are hallmarks of impactful library services.  When libraries share resources, whether a patron is borrowing a mystery or a cookbook, the patron does not have to use or travel to the nearest local branch to obtain the material.  Models for regional resource-sharing and cooperative access among neighboring libraries have been prevalent throughout the United States since the early 1970s.  As an example, in the greater New York metropolitan region, as long as you live, work, own property, or go to school in New York state, you can obtain a free library card at the New York Public Library ("NYPL," serving the Bronx, Manhattan, and Staten Island), the Brooklyn Public Library, and the Queens Public Library.  With your Queens Public Library card, you can visit NYPL in person or virtually, obtain an ecard or traditional library card, and borrow materials from NYPL.

**C.     Patron Demand for Digital Access**

18.     Patron behavior and their interaction with libraries and their resources have changed significantly over the last several years.  As the availability of electronic resources has increased, the ability of patrons to access those resources online has also increased.  The use of ebooks and digital content increased even more rapidly as a result of COVID-19.  Although many libraries have provided ebooks for a number of years, the pandemic accelerated discovery

7

of digital resources[2] by eager (and desperate) readers who were stuck at home during the

pandemic.

19.     Libraries collect many statistics, yet these statistics may not demonstrate all

emerging use patterns.  For instance, libraries document their total number of registered

borrowers but, at least at this point in time, the IMLS, which collects data annually from public

libraries, does not differentiate between borrowers who use only electronic resources (digital

borrowers), those who use only print resources, and those who use both.  In fiscal year ("FY")

2020 (July 2019 – June 2020), the California State Library ("CSL")[3] began collecting data on

whether libraries had issued ecards prior to COVID-19 and during COVID-19.  51.6% of

libraries reported issuing ecards prior to the pandemic, and a whopping 90.8% of libraries

reported that they began issuing ecards during the pandemic and will continue to do so.[4]

### 1.     In-person Visits to Libraries

20.     Over the last ten years, the number of patrons coming into libraries in person has

decreased.  All U.S. public libraries are required to provide an annual report of statistics to their

---

[2]  The pandemic also appears to have increased the number of libraries who now offer digital library cards (ecards) so that patrons can sign up to borrow resources online and obtain their traditional library card when they visit their library in person.  Some libraries also offer an "instant digital card" that is provided in cooperation with OverDrive.  As described by Mr. Steve Potash, founder and CEO of OverDrive, Inc., in his deposition, "Instant digital card is a service select libraries have enabled to provide readers in their communities access to digital books using their cell phone to authenticate them."  Potash Dep. Tr. 94:10–13, Jan. 31, 2022.

[3]  The CSL provides detailed and in-depth analysis of statistics it collects.  Other states do not necessarily provide this level of analysis, and I am most familiar with the statistics collections and trends in California public libraries.  Having been responsible for the national data collection program, I know that trends in other states are similar to trends seen in the California data.

[4]  California State Library Statistics Portal, *Summary Report, 2019-2020*, (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

8

state library agency, and all the state library agencies are required to provide those statistics to IMLS, where a summary of that data is compiled into the annual Public Libraries Survey. The California State Library, for example, provides information regarding the five and ten-year library use trends. A picture of trends at the national and state level is provided in these annual statistical reports. Please note that the persons represented in this data are the number of persons that are served by a public library. This is a higher number than library patrons as not all persons are registered patrons in a library system. A sample of that data is shown in the chart below:

| Fiscal Year | Average library visits per person (national) | Average library visits per person (California)[5] |
| --- | --- | --- |
| FY 2020 | Not yet available | 3.46 |
| FY 2019 | 3.9[6] | 4.98 |
| FY 2015 | 4.28[7] | 5.88 |
| FY 2011 | 5.1[8] | 6.28 |

21.     California State Library trend data shows that per person visits have decreased by half—from 6.28 in FY 2011 to 3.46 in FY 2020. (The national visit statistics are not yet available for FY 2020.) There is little doubt that statistics for FY 2021 visits will demonstrate continued decline in in-person library visits, due to prolonged pandemic-related library closures

---

[5] California State Library Statistics Portal, *Library Visits per Capita*, (2022), https://ca.countingopinions.com/pireports/report.php?4753b73dacc5b971763b4de81b0650f9&live.

[6] Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* 3 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[7] Institute of Museum and Library Services, *Public Libraries in the United States: Fiscal Year 2015* viii (July 2018), https://www.imls.gov/sites/default/files/publications/documents/plsfy2015.pdf.

[8] Institute of Museum and Library Services, *Public Libraries in the United States Survey: Fiscal Year 2011* at 16 (June 2014), https://www.imls.gov/sites/default/files/legacy/assets/1/AssetManager/PLS2011.pdf.

DocuSign Envelope ID: 52562761-336C-4F71-80D9-FF5BF09A5984

and related restrictions. Over the past decade, there has been an increased need for libraries to serve their patrons remotely, and the availability of digital resources has enhanced that trend.

### 2. Circulation of Digital Items Including Ebooks

22. It is also clear that the circulation of digital items has increased significantly over the recent years. The CSL began collecting data on the use of electronic materials in 2012–2013. Data is shown in the chart below:

| Fiscal Year | Median Circulation | Average Circulation |
|---|---|---|
| FY 2020[9] | 61,050 | 447,039 |
| FY 2016[10] | 21,410 | 224,673 |
| FY 2013[11] | 8,912 | 103,075 |

23. The median and average circulations for electronic materials are derived from the total electronic materials circulation reported by each library in a fiscal year. In FY 2013, in my experience with libraries, this large disparity between the median and average circulation demonstrates that many libraries had barely begun to build their electronic collections whereas larger institutions with more resources were acquiring electronic resources quickly. In this seven-year period (from FY 2013 to FY 2020), there were significant increases in the circulation of electronic materials.

---

[9] California State Library Statistics Portal, *Circulation 2019-20* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764f d90dc05f83&live.

[10] California State Library Statistics Portal, *Circulation 2015-16* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b031 3240656d821&live.

[11] California State Library Statistics Portal, *Circulation 2012-13* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764f d90dc05f83&live.

DocuSign Envelope ID: 525627E1-336C-4F74-80D8-EE5BF09A5984

24.     The IMLS survey has recently begun to separately report electronic circulation from print/total circulation.  Data is shown in chart below:

| Fiscal Year | Total electronic circulations nationwide in U.S. | Per person electronic circulation |
|---|---|---|
| FY 2019[12] | 343 million | 1.1 |
| FY 2018[13] | 294 million | 0.93 |

25.     This data shows there was a 14% increase in ebook circulation *in just one year*. Additional data on electronic collections is shown below:

| Electronic Materials (IMLS) | Ebooks per person |
|---|---|
| FY 2017[14] | 1.5 |
| FY 2013[15] | 0.4 |

26.     This data shows there was a 74% increase in electronic materials in library collections over a four-year period.

### 3.     Ebook Availability

27.     Libraries are one of the first and best examples of sustainable institutions.  They are built on the concept of sharing and reuse of materials for the public good.  Patrons never "own" materials they access—they have the privilege of using them at no charge for a limited

---

[12]  Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* at 4 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[13]  Lisa M. Frehill et al., Institute of Museum and Library Services, *Public Libraries Survey: Fiscal Year 2018* at 4 (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/fy2018_pls_tables.pdf.

[14]  1 Institute of Museum and Library Services, *Public Libraries in the United States: Fiscal year 2017* at 12 (June 2020), https://www.imls.gov/sites/default/files/publications/documents/publiclibrariesintheunitedstatessurveyfiscalyear2017volume1.pdf.

[15]  *Id.*

11

period of time. Based on my experience working in libraries, most libraries have similar check-out periods for materials in all formats, normally 2–3 weeks. Most libraries provide at least one "renewal" check-out period for a time period that is the same as the initial loan period if there are no other requests for that item. Some libraries provide automatic renewal if an item is not returned by its due date, which is convenient for the patron and counts as a circulation. Most licensed ebooks are not eligible to be renewed, either automatically or by the patron, because of the high demand and limited supply of that format.

28.     There are times when libraries may limit circulation periods on items. A good example would be limiting holiday books at Christmastime to a one-week check-out. At times, formats have had limited check-out times. For instance, when videotapes were in high demand years ago, those items had limited circulation periods. When CDs and DVDs were in great demand, those formats also had limited circulation periods. Limiting circulation periods based on format or seasonal factors is not a current practice in most libraries.

29.     Meeting patron demand for all types of materials is always a challenge in libraries. Libraries maintain long waiting lists when patrons want to borrow books and ebooks, and the library does not have sufficient copies to meet that demand. Because of this imbalance of supply and demand, libraries often limit the number of books or ebooks patrons can borrow. Of course, patrons must be registered as a borrower in good standing to obtain material in person or virtually from the library.

30.     The Digital Lending Library follows similar procedures as other libraries. Patrons must be registered as borrowers; they may borrow digital books for a fourteen-day period and

DocuSign Envelope ID: 525627S1-336C-AF74-B8D3-EF5BF09A5984

then access to the content expires.  They can borrow up to ten books at a time and can request specific titles.[16]

31.    The traditional process of checking out and returning library materials can be time-consuming.  A traditional check-out of a physical resource required a physical trip to the library—taking up the patron's and the library staff's time.[17]

32.    Providing patron access to digital content including ebooks is much simpler. Without a trip to the library, the ebook can be downloaded onto a variety of devices and is ready for use as soon as it is accessible.  The ebook can be returned to the library as soon as the patron is finished with the item and prior to its due date.  When the loan period is completed, patron access is automatically no longer available.  (This virtually eliminates the situation common to the check-out and return process for print books—where a waitlist for a popular title is prolonged due to a patron's late return of a book.)  Borrowing ebooks is faster and more straightforward with much less "friction" than borrowing print materials.

33.    The circulation function has become highly automated in recent years—for physical and digital resources.  Digital resources checkout in most cases needs no staff intervention or assistance, and, for physical resources, many libraries have implemented self-check-out equipment and have automated sorting systems to re-shelve books to reduce the time staff spends facilitating patron check-outs.  In addition to increasing efficiency, these systems

---

[16]  One-hour loans are also available.  Those are discussed below on page 15.

[17]  Many libraries now have equipment that allows the patron the opportunity to personally check out their own material (self-check) but this process still requires a physical visit to the library.

decrease the staff injuries associated with the handling of physical materials.[18]  Ebooks eliminate

staff injury entirely in addition to the other efficiencies discussed here.

### 4. Digital Discovery

34.     One of the most impactful experiences a library can offer its patrons is the

discovery of new ideas, information, and formats.  Sometimes discovery occurs as the result of

purposeful searching, and sometimes discovery occurs by accident or serendipity.  Librarians

may classify materials with standard organization systems such as Dewey Decimal or Library of

Congress; and they may also organize materials by subject matter related to specific needs of the

communities they serve.

35.     Many patrons relish browsing the actual physical shelves for new authors, fiction,

genres, or non-fiction books that may relate to a topic of interest for them or a topic new to their

knowledge.  Browsing and discovery are also available through the library's online catalog.

Although patrons are not touching the actual material, they can browse by format, by audience

(i.e. kids, teens, job-seekers), world languages, reading recommendations, and, of course, the

more traditional subject search that provides access to materials based on primary subjects,

somewhat similar to searching card catalogs many years ago.  Library discovery platforms

provide patrons the opportunity to have lists of materials they want to read, they have read, or are

in the progress of reading.  There are many intuitive online services to manage a patron's

personal reading.

36.     The discovery function for print and ebooks is different.  Depending on the

platforms that are being used to provide ebooks, the patron may have to check on several

---

[18] Richard W. Boss, ALAIR, *Materials Handling Systems for Libraries* (Sept. 7, 2010),
https://alair.ala.org/bitstream/handle/11213/258/Materials%20Handling%20Systems.pdf?sequen
ce=95

different online locations in addition to the library's online catalog to determine if specific ebooks are available for borrowing. Librarians are constantly asking for seamless access to digital materials.[19]

37.    Although ebook discovery can be challenging for libraries to facilitate, once discovered, digital content may be sampled to determine if the patron wants to borrow the material. For example, OverDrive offers a sampling feature that provides approximately 10% of the digital content in an ebook.[20]

38.    The Digital Lending Library offers the feature of one-hour of browsing of digital books. The one-hour digital browsing enables patrons to have access to the entire digital content of the digital book and allows them to determine if they want to borrow the digital book. If they don't borrow the digital book after the one-hour browsing period, the book is immediately checked back in and then made available for another potential reader.[21]

39.    Once the patron has access to the library holdings information, if they wanted a new fiction title or discovered a new author and wanted to read more of their work, the patron, when doing an online search, which is most common, would see that the library had a print copy and/or ebook version of the title. Depending on a patron's reading format preference, they might

---

[19]  There are some new offerings in this category. SimplyE, used by the New York Public Library, is a discovery system that interacts with a variety of ebook platforms and is beginning to be used as a digital search tool in libraries throughout the United States.

[20]  Mr. Steve Potash, founder and CEO of OverDrive, Inc, in his deposition noted that the sampling feature "enable(s) users to preview a title or to sample the book." Potash Dep. Tr. 97:8–9, Jan. 31, 2022. The amount of the sample varies depending on the ebook. In his deposition, Mr. Potash stated "In some cases with an eBook you might get not much because the whole thing is a 24-page board book, and then there are some where it seems like it's 100 pages. So it varies." *Id.* at 97:14–17.

[21]  Internet Archive, *Borrowing Books Through Open Library* (Sept. 13, 2021), https://openlibrary.org/help/faq/borrow#how.

place a request on the available print copy and physically retrieve it from the library. Or, if they preferred ebooks, hopefully they could download the content immediately on their device and avoid traveling to the library to retrieve the item. Particularly with popular titles and bestsellers, though the library may have both print and ebook copies of the title, all the copies are in use. Libraries have limits on the number of requests any patron can place on print books (normally fifty to one hundred); and many libraries have lower limits on the number of ebook requests (often ten to fifteen) due to the limited inventory of ebooks libraries can afford.

## IV. LEVERAGING LIBRARIES' EXISTING COLLECTIONS TO SERVE THE PUBLIC

### A. Interlibrary Loans, Special Collections, and the Sharing of Library Resources

40. Although libraries attempt to provide materials that their patrons want and need, this is not possible in all cases. As noted above, regional resource-sharing is common and enables patrons to borrow materials from libraries other than their primary library or the library that is geographically closest to them. Interlibrary loan is a service that addresses the situation where the patron's primary library does not have the material the patron wants. Interlibrary loan is a service that has been in place since at least 1212 when monks began developing collections for loan to other monasteries. In the late 1890's, Joseph C. Rowell, University of California, Berkeley's first full-time university librarian, established one of the first U.S. interlibrary loan systems that began as a relationship between the University of California campuses and other libraries. The framework for that system remains in place today: 1) borrowing (recipient) libraries are responsible for securing and returning books; 2) borrowing (recipient) librarians must keep detailed records of patron receipt and usage; and 3) rare or frequently used texts are

16

loaned at the discretion of the librarian.[22]  Resource-sharing among all types of libraries was

identified as a national priority when the Library Services Act was passed in 1956 and resulted in

the creation of regional cooperative library systems or consortia comprised of libraries from

neighboring geographic areas that participated in resource-sharing and interlibrary loan.[23]

41.    Although interlibrary loan is a valuable service, it can be a labor-intensive process

that requires much personal interaction and processing to enable borrowing materials from

libraries other than the patron's primary library.  The patron must contact their primary library

and work with a library staff member either in person or virtually to complete a request form.

Then the library staff member has to complete a form to generate the request from the owning

library, process the request when the material is received, contact the patron to let them know

that their requested material is available, and then facilitate the actual check-out.  When the book

is returned, the borrowing library has to complete the process in reverse.

42.    Some libraries participate in unmediated library loan.  Unmediated interlibrary

loan is a service in which the patron can request the material online without requiring staff

intervention at the point of the request.  One example is Link+, a service which allows patrons,

with no staff mediation, to request material not available at their local library.  This service is

available in California and Nevada, providing access to a catalog of materials from over 70

participating libraries, with access to over 9 million titles from academic, public, and special

libraries.  Patrons can place requests directly, no forms required, using a single online catalog

---

[22]  Nick Ripatrazone, Literary Hub, *InterLibrary Loan Will change Your Life* (Aug. 7, 2019),
https://lithub.com/interlibrary-loan-will-change-your-life/.

[23]  Library Services Act, Pub. L. No. 84-597, 70 Stat. 293 (1956),
https://www.govinfo.gov/content/pkg/STATUTE-70/pdf/STATUTE-70-Pg293.pdf.

DocuSign Envelope ID: 525627C1-336C-4F74-80D9-5E5BF09A5984

from the library, home or office at any time. For a variety of reasons, including the support of library system platforms, this service is not consistently available in the U.S.

43.     Interlibrary loan is an amazing service for patrons searching for print materials, but the service is not currently possible with licensed ebooks. The licensing agreements that most publishers extend to aggregators like OverDrive, who then pass those requirements onto library customers, do not allow for borrowing or sharing of ebooks beyond the subscribing libraries' users. In other words, most of these licenses prevent libraries from lending ebooks to other libraries.[24]

44.     Most libraries have non-circulating collections of physical items. Libraries have collections that are unique, rare, specialized or in such delicate condition that these materials are not available for circulation. Access to these materials may be given under controlled conditions in which the library staff monitors the patron's use of the material for a limited period of time. Researchers often want to be able to see the actual physical documents—the primary source material—for their topic of interest. Even the condition of the book, notes in the columns, damages or stains, can reveal significant information that's of value to researchers.

45.     Most libraries with these "special collections" have digitized, with the greatest of care, as much of this unique material as possible. Libraries often offer digitized material in the first instance, in order to limit the potential for damage to the print material. The availability of digitized materials has made a huge difference in the accessibility of this specialized and unique content. These digitized materials are not similar to ebooks that are accessed freely by patrons for convenient use.

---

[24] One exception to this is Bibliotheca, an international library vendor, which supports ebook sharing between different libraries through its "cloudLibrary" platform which is currently being tested.

46.     Libraries also have reference collections comprised of print material that is not loaned due to the cost of the book, the necessity to have constant access to the book by staff to respond to inquiries, and the format of the documents, often weekly unbound paper issues that are collected in binders for patron use.  Most reference materials are available online and are able to be updated in real time, unlike print materials that are often updated on a much less frequent basis.

**B.      Controlled Digital Lending**

47.     CDL is a method that allows libraries to loan print books to digital patrons in a "lend like print" fashion.  Through CDL, libraries use technical controls to ensure a consistent "owned-to-loaned" ratio, meaning the library circulates the exact number of copies of a specific title it owns, regardless of format, putting controls in place to prevent users from redistributing or copying the digitized version.  Controlled Digital Lending by Libraries (controlleddigitallending.org) includes a 2018 position paper on CDL.[25]  The paper provides an interpretation of United States copyright law for libraries implementing traditional lending functions using digital technology that balances the public benefit of this service while protecting the interests of private rights holders.  Many libraries and individuals support this statement, including Boston Public Library, Los Angeles Public Library, Multnomah County (OR) Library, San Francisco Public Library, Sacramento Public Library, and the Metropolitan New York Library Council, that includes Brooklyn Public Library, Queens Public Library, and New York Public Library.[26]

---

[25]  *Position Statement on Controlled Digital Lending* (Sept. 2018), https://controlleddigitallending.org/statement.

[26]  *Signatories to the Position Statement on Controlled Digital Lending by Libraries*, https://controlleddigitallending.org/signatories.

DocuSign Envelope ID: 52562761-336C-4F74-80D9-5E5BF09A5984

48.     Ex Libris, a major integrated library system vendor in the academic library

integrated library system market, is promoting the value of using CDL in libraries.  According to

Ex Libris, key reasons for libraries to implement CDL are:

- Items are more accessible to patrons;

- Digital formats allow for enhanced functionality;

- Digital formats can aid in preservation of materials; and

- Digital lending reduces environmental impact.[27]

49.     The International Federation of Library Associations and Institutions ("IFLA")

also released a statement on CDL in 2021.[28]  IFLA represents library members throughout the

world and strongly supports CDL.  IFLA identified three key principles that support the use of

CDL:

- Freedom to acquire and lend represents a core function of the work of libraries;

- Digital uses should have at least the same flexibility as physical ones; and

- It is acceptable to make use of more than one copyright exception or limitation at
  a time.

50.     IFLA notes that CDL is based on exceptions and limitations or "user rights" in

copyright law, in contrast to market-based licensing solutions.  IFLA believes that there is a

strong socio-economic case for enabling CDL in libraries around the world.  Where desirable

---

[27] Ex Libris, *Implementing Controlled Digital Lending (CDL) Responsibly and Effectively: A Primer for Librarians*, at 3, https://page.exlibrisgroup.com/hubfs/HQ_General/Ex%20Libris%20Controlled%20Digital%20Lending%20White%20Paper.pdf?hsLang=en

[28] IFLA, *Position on Controlled Digital Lending* (June 2, 2021), https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf.

and widely-shared principles are respected (libraries' ability to freely acquire and lend, the technological neutrality of law, and the possibility to combine exceptions), CDL's legal basis supports the wider public interest.

51. CDL has become an accepted practice for libraries. The use of CDL leverages the significant investment that libraries have made in developing well-rounded print collections that provide access to information their communities need. Collections that are important to be available to patrons but may not be in constant demand can be available digitally, based on the library's ownership of the print copy. Libraries are able to digitize the physical copy of a book they own, control the access to the print copy, often by putting the book in storage, and make the digital copy available to a patron, with the print copy still being owned by the library though not accessible. When accessed, these materials have limited use periods, similar to check-out times for print materials. The Digital Lending Library provides this service for their patrons.

52. Providing equitable and convenient access to digital and print materials is foundational for libraries to fulfill their primary mission of information-sharing which ultimately contributes to successful communities. CDL is a practice that supports and enhances that information-sharing function and is part of a foundation for a sustainable library ebook ecosystem.

### C. The Internet Archive is a Library that Practices CDL

53. There are many definitions of libraries. The ODLIS defines a library as "[a] collection or group of collections of books and/or other print or nonprint materials organized and maintained for use (reading, consultation, study, research, etc.)."[29] The definition of a "public

---

[29] Joan M. Reitz, ODLIS: Online Dictionary of Library and Information Science, *Library*, (2004), https://products.abc-clio.com/ODLIS/odlis_about.aspx.

21

library" per the IMLS Federal-State Cooperative Program ("FSCS") for data collection includes the following elements: 1) organized collection of materials; 2) paid staff; 3) schedule when services are available; 4) facilities to support collections; and 5) supported in whole or in part public funds.[30]

54.     The Digital Lending Library provides services to its patrons that are similar to the services other libraries provide their patrons.  The Digital Lending Library provides an organized collection of material for use, with paid staff and facilities providing 24/7 access to content.  Under any of these definitions, the Digital Lending Library is a library.

## V.     LIBRARY FINANCES

### A.     Organization and Funding

55.     Public libraries are organized and funded in a variety of ways from a myriad of revenue sources—with local funding providing the greatest share of revenue for most.  The organization, funding mechanisms, and revenue sources for libraries vary widely throughout the country.

56.     Library organization varies from state to state.  In California, for example, libraries are generally organized and funded in the following ways:[31]

- County libraries supported by funds dedicated for library purposes;

- County libraries supported by non-dedicated funds;

---

[30]  Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* 1 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf..

[31]  For an in-depth analysis of California public library organization and funding, California Public Library Organization 2013 is an excellent primer.  The report was issued in 2013, and the organizational and funding information in the report has not changed significantly since its publication.

A-4994

DocuSign Envelope ID: 52562761-336C-4F71-88D8-FE5BF09A5984

- Municipal (city) libraries supported by non-dedicated funds;

- Independent district libraries supported by funds dedicated for library purposes; and

- Joint Powers Authority ("JPA") libraries organized according to an agreement between the governing boards of two or more governmental entities which may have a mix of dedicated and non-dedicated support.

57. Each state has its own unique framework for organizing libraries. In Maryland, library services can only be provided by a county library system.[32] Types of public libraries in New York State include Association Public Libraries, Municipal Public Libraries, School District Public Libraries, and Special Legislative District Public Libraries.

- An association public library is a private corporation established by the members of the association. It contracts with a unit of local government to provide library service to the residents of that jurisdiction and is supported by public funds.

- A municipal public library is formed either by a vote of the governing body of a municipality (village, town, city, or county) or by a public referendum to serve the residents of the municipality and is supported by public funds.

- A school district public library is organized to serve the residents who live within the boundaries of a given school district (hence the name). The library and the library board are independent of the school district and the school board.

- A special district public library is created by a special act of the New York State Legislature and a local public vote, to serve all or part of one or more

---

[32] The exception to this is the Enoch Pratt Free Library in Baltimore, which serves as a resource to all libraries in Maryland.

23

A-4995

municipalities as defined by the special legislation and is supported by public funds.[33]

58. Most libraries are supported with general public funds that are managed by a municipality (a city or county, whichever serves as the host agency for the library). These funds are budgeted annually to support the operations of the library by actions of the governing body and are not specifically earmarked for the library. In some cases, there are dedicated funds for the library that are often a result of voter-approved taxes. These dedicated funds may come from additional property tax levies, sales taxes, hotel or transient occupancy taxes, or other forms of revenue. Some of these revenue sources are established in perpetuity yet most of these special sources are time-limited, requiring regular elections for continuation or may be subject to caps on amount of taxes that can be levied. Often you will find a combination of general property tax support supplemented by an additional revenue source for library operations. There also may be unique funding sources for library-related capital projects.

59. The amount of funding for libraries varies greatly. IMLS collects data annually on library funding. Data is shown in the chart below:

**Sources of Library Funding (Per Capita)**

| FY 2019 IMLS[34] | Total | Federal | State | Local | Other |
|---|---|---|---|---|---|
| Average | $44.88 | $0.12 | $2.99 | $38.55 | $3.21 |
| New York | $79.65 | $0.25 | $3.27 | $65.54 | $10.59 |
| California | $43.74 | $0.08 | $0.53 | $40.73 | $2.40 |

---

[33] Rebekkah Smith Aldrich, Handbook for New Public Library Directors in New York State, 18–19 (2010), http://midhudson.org/directors_handbook.pdf.

[34] Institute of Museum and Library Services, *Public Libraries Survey* "FY 2019: Table 8. Total per capita operating revenues of public libraries" (2021), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

24

| FY 2019 IMLS[34] | Total | Federal | State | Local | Other |
|---|---|---|---|---|---|
| Texas | $22.44 | $0.07 | NA | $21.53 | $0.83 |

60.     This data shows per person operating revenues aggregated at the state level.  The primary source of funds for all public libraries is local, with state and federal funds providing limited support.  Funds in the "other" category include monetary gifts and donations received in the current year, interest, library fines, fees for library services, or grants.  There are disparities in available funding at all levels.

61.     Funding levels can depend on local economic conditions, local priorities, or non-discretionary services that must be provided.  Unlike police or fire protection, library services are discretionary and not required to be provided by governmental entities.  Based on my experience, I have seen that the discretionary nature of library services results in inconsistent funding levels that are often in competition with local services that are required or seen as more critical for the community.  For instance, during difficult budget times in 2016, the Kern County (California) District Attorney suggested that all branch libraries be closed to fund law enforcement.[35] Although the libraries did not close in this situation, there are other situations where libraries and their patrons suffer funding and service losses.

62.     Most libraries operate on a fiscal year[36] that is set by their host agency.  Depending on the source of funds, the library may or may not be able to retain funds if they were

---

[35]  Jeffrey Hess, KVPR, *Kern County Libraries Face Uncertain 2017* (Dec. 20, 2016), https://www.kvpr.org/education/2016-12-20/kern-county-libraries-face-uncertain-2017.

[36]  A common fiscal year for public institutions is July through June, yet there are some jurisdictions that operate on a calendar fiscal year or the federal fiscal year, which is October through September.

allocated in a fiscal year and not all spent in that fiscal year. In other words, for most sources of funding libraries have to spend their budget each year. They lose any leftover money.

63.     Libraries with dedicated taxes usually can retain or "carryover" any unspent funds from one fiscal year to the next whereas libraries with general, non-specific support are likely to be required to return any unspent funds from a fiscal year to the host agency. If libraries are allowed to "carry over" unspent funds, they have additional flexibility to allocate funds. Independent library districts have their own taxing authority and can manage funds as they determine most appropriate for their services. These districts have more stable and predictable funding patterns compared to libraries that are affiliated with their local cities or counties.[37]

## B.     Library Budget Trends

64.     In reviewing budget trends for libraries, the IMLS Public Libraries Survey provides clear comparisons. The most recent information available in the IMLS survey is from FY 2019 (July 2018 – June 2019). Comparisons in revenues and expenditures per person based on data for all public libraries in the U.S. can be reviewed in the chart below:

**Comparisons in Revenue and Expenditures for U.S. Public Libraries**

| Fiscal Year | Total Revenue | Revenue per Person | Total Operating Expenditure | Expenditure per Person |
|---|---|---|---|---|
| FY 2019[38] | $14.2 B | $44.88 | $13.3 B | $41.90 |
| FY 2015[39] | $12.42 B | $39.94 | $11.62 B | $37.38 |

---

[37] Lisa Peet, Library Journal, *Holding Pattern: Budgets and Funding* (Feb. 16, 2018), https://www.libraryjournal.com/story/holding-pattern-budgets-funding.

[38] Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public Libraries in the United States: Results from the FY 2019 Public Libraries Survey* at 3 (Aug. 2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[39] Institute of Museum and Library Services, *Public Libraries in the United States: Fiscal Year 2015* at viii (July 2018), https://www.imls.gov/sites/default/files/publications/documents/plsfy2015.pdf.

| Fiscal Year | Total Revenue | Revenue per Person | Total Operating Expenditure | Expenditure per Person |
|---|---|---|---|---|
| FY 2011[40] | n/a | $38.09 | n/a | $35.83 |

65.     Both total and per person revenues and operating expenditures have increased over the last nine years but not significantly.  The revenues and expenditures over a five-year period have increased by about 13%.  Increases in library budgets, both revenue and expenditures, vary.  In 2018, the predicted increase for public library budgets was 1.9%, slightly better than the 2017 prediction of 1.4%, but not beating the predicted 2018 inflation rate of 2.38%.[41]  Assuming a 1.5% annual average budget increase for most libraries, this five-year period would have resulted in a 7.5% increase for most libraries.  Please note that these are national averages and the per person revenues and expenses can vary greatly depending on the economic resources of the local area.  For instance, in FY 2020 in California, the Beverly Hills Public Library reported the highest per person expenditures in the state at $390.15 while the Pomona Public Library reported the lowest per person expenditures in the state at $5.33.[42]

66.     Libraries have faced a number of funding-related challenges in the last ten to fifteen years.  Libraries suffered reduced funding in the "great recession of 2008-09" when many public agencies were challenged.  Some libraries recovered within the next ten years.  Often

---

[40]  Deanne W. Swan et al., Institute of Museum and Library Services, *Public Libraries in the United States Survey: Fiscal Year 2011* at 29 (June 2014), https://www.imls.gov/sites/default/files/legacy/assets/1/AssetManager/PLS2011.pdf.

[41]  Lisa Peet, Library Journal, *Holding Pattern: Budgets and Funding* (Feb. 16, 2018), https://www.libraryjournal.com/story/holding-pattern-budgets-funding.

[42]  California State Library Statistics Portal, *Total Expenditures per Capita* (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

recovery for these libraries was achieved by voter-approved tax measures.  Other libraries have

continued to suffer from reduced funding which negatively impacted their services.

67.     Aside from funding challenges, the explosion of digital media has been trying for

libraries.  Given budget constraints, the movement to provision of digital materials and the

equipment to enable access to those materials has completely re-ordered the service balance that

libraries must provide and the resource allocation to address that balance.  There are still patrons

who want to read print books and don't see technology or digital materials as their primary

method of engaging in the world.  Libraries struggle to serve these patrons as well as patrons

who have embraced digital media.

### C.     Components of Library Budgets

68.     The Public Libraries Survey FY 2019 shows that staff salaries and benefits

represent 67% of most library budgets, the largest type of expense of all of the categories.[43]  In

FY 2019, libraries spent $4.51 per person on library collections materials or acquisitions

representing 11% of their operating budgets.[44]  Libraries strive to spend 15–20% of their budgets

on library materials, yet most libraries are practically able to allocate 5–10% of their annual

budget to collections.  Because the acquisition budgets are so limited, regardless of budget

flexibility due to source of funding, most material allocations are practically spent by the end of

each fiscal year.  With staffing and materials costs representing about 78% of most library

budgets, the remaining 22% is stretched to cover equipment, broadband connectivity, facility

maintenance, capital projects, and vehicles, as well as other ongoing expenses, i.e. insurance

---

[43]  Michael Pelczar et al., Institute of Museum and Library Services, *Characteristics of Public
Libraries in the United States: Results from the FY 2019 Public Libraries Survey* at 5 (Aug.
2021), https://www.imls.gov/sites/default/files/2021-08/fy19-pls-results.pdf.

[44]  *Id.*

costs. Often, if the library is part of a city or county, they may be charged administrative costs for general operational services, i.e., human resources, financial management, and legal counsel.

**D.  Acquisition Budgets**

69.  With the limited funding for acquisitions, decisions for allocation of those resources must be made carefully. Here are categories of acquisition expenditures for libraries:

- "Standing orders"—annual orders for magazines (both print and digital) and reference materials;

- Fiction collections in digital and print formats—children, teen, adult;

- Non-fiction collections in digital and print formats—children, teen, adult;

- Non-print physical items—CD's DVD's, videos, streaming service subscriptions;

- Objects to loan—"library of things", tools, games; and

- Replacements/binding of damaged/lost materials or periodicals.

70.  Libraries struggle to balance the acquisition of print and digital materials. The division of the allocation of the budget between print and digital media is influenced by both the cost of materials and patron demand. The determination of effective format often depends on the specific user and type or book/material.

71.  Most libraries strive to spend their entire annual materials allocation within the fiscal year in which funds were allocated. In fact, it is highly unusual for a library not to spend the entire allocation each year. A possible consequence of not spending that budget could be that the following year's allocation is reduced by the unspent amount or more. As stated earlier, depending on how the library is organized and/or funded, they may be able to "carry over" unspent funds for the next fiscal year but in most cases the library may lose access to any funds not spent in the fiscal year allocated. The inability to retain unspent funds can result in

29

A-5001

acquisition decisions that are focused on short-term rather than long-term priorities, for example, meeting immediate patron demand rather than planning for the permanent collection.

72. Most libraries now develop separate budgets for acquisitions of physical and digital materials. The IMLS Public Libraries Survey data demonstrates that the average percentage of acquisition budgets spent on print and digital materials has changed over the last eight years. Data is shown in the chart below[45]:

**Materials Expenditures Per Year**

| Fiscal Year | Print average percentage | Digital average percentage |
|---|---|---|
| FY 2019[46] | 52.4 | 31.1 |
| FY 2016[47] | 56.1 | 25.3 |
| FY 2011[48] | 65.4 | 14.3 |

73. The funds spent on digital materials have increased by 46% over the last eight years.

---

[45] Please note that these percentages do not add to 100 as there are smaller percentages of expenditures spent on serial subscriptions and other types of materials that are not reflected in the chart.

[46] Institute of Museum and Library Services, *Public Libraries Survey* "FY 2019: Table 11. Total collection expenditures of public libraries and percentage distribution of expenditures, by type of expenditure and state: Fiscal year 2019" (2021), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey.

[47] Institute of Museum and Library Services, *Public Libraries Survey* "FY 2019: Table 26. Number of paid full-time-equivalent (FTE) staff in public libraries, by type of position; percentage of total FTE librarians and total FTE staff with ALA-MLS degrees; and number of public libraries with ALA-MLS librarians, by state: Fiscal year 2019" (2019), https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey

[48] Institute of Museum and Library Services, *Public Libraries Survey* "Table 25, Total collection expenditures of public libraries and percentage distribution of expenditures, by type of expenditure and state: Fiscal year 2011" https://www.imls.gov/sites/default/files/fy2011_pls_tables_20-30a.pdf.

74.     Commensurate with this, the balance of materials in library collections has also
been shifting.  California State Library data demonstrates these shifts.  Data is shown in the chart
below:

**Materials Per 1,000 Persons**

| Fiscal Year | Books | Ebooks |
|---|---|---|
| FY 2020[49] | 3,925 | 7,111 |
| FY 2016[50] | 4,075 | 1,651 |
| FY 2011[51] | 4,188 | 154 |

75.     The average number of ebooks per 1,000 persons has increased tremendously
during the recent four-year period, with a huge jump of 77% from FY 2016 to FY 2020.
Remember that there were very limited ebook collections prior to the mid-2000's, so these
percentage increases will be very large.  Print materials have decreased over the last nine years
by about 6%.  The size of long-standing print collections is much larger than ebook collections
so the reduction in size will be at a much smaller percentage.  Although specific data is difficult
to find, the majority of all public library collection expenditures were focused on print materials
until the most recent ten to twelve year period.

76.     Again, California State Library data show the following:

---

[49]  California State Library, *Collection 2019-20* (2022),
https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=626437c4d376728d7b031
3240656d821&live.

[50]  *Id.* at *Collection 2015-16.*

[51]  *Id.* at *Collection 2010-11.*

**Average Items Held by Libraries**

| Fiscal Year | Print Materials | Ebooks |
|---|---|---|
| FY 2020[52] | 294,224 | 191,899 |
| FY 2016[53] | 327,302 | 63,121 |

77.     Please note that print materials are the total number of books held on June 30 of the report year.  Books are non-serial printed publications (including music and maps) that are bound in hard or soft covers, or in loose-leaf format.  The average number of print materials and ebooks in library collections is changing, with the number of print materials decreasing and the number of ebooks increasing.  As noted previously, California data is useful as California is a large state with similar average spending levels to other states.

## VI.     PRINT MATERIALS CIRCULATION/ACQUISITION

### A.     Circulation of Print Materials

78.     California State Library data also show that the circulation of print materials has decreased.  Data is shown in the chart below:

**Circulation for all Physical Items Available at Libraries**

| Fiscal Year | Median Circulation | Average Circulation |
|---|---|---|
| FY 2020 – physical items[54] | 252,824 | 716,955 |
| FY 2016 – physical items[55] | 398,777 | 1,057,035 |
| FY 2011 – total[56] | 449,598 | 1,322,931 |

---

[52]  California State Library Statistics Portal, *Summary Report, 2019-20*, (2022), https://ca.countingopinions.com/pireports/report.php?bd779312f73ab509cdef26ddf21a92b6&live.

[53]  *Id.* at *Summary Report, 2015-16*.

[54]  California State Library Statistics Portal, *Circulation 2019-20* (2022), https://ca.countingopinions.com/pireports/view_dashboard.php?pkey=8d4d9320c8ce1ae36c764fd90dc05f83&live.

[55]  *Id.* at *Circulation 2015-16.*

[56]  *Id.* at *Circulation 2010-11.*

32

79.     Although these numbers are not totally comparable to each other due to the California State Library using total circulation statistics in FY 2011 (which does not separate physical from electronic items), decreases in the circulation of print materials are clear.  The median physical item circulation in FY 2020 decreased by 37% from the FY 2016 circulation; and the FY 2020 average physical item circulation decreased by 33% from the FY 2016 circulation.

80.     IMLS recently published a detailed study[57] on the use and cost of public library materials, comparing data from public libraries throughout the U.S. collected in FY 2014 and FY 2018, prior to the pandemic.  Key findings include the following:

- Although median circulation of physical materials per person decreased 16% nationally from FY 2014 to FY 2018, the median circulation of electronic materials per person increased *by nearly 150%*; and

- From FY 2014 to FY 2018, median per person spending on physical materials decreased by 6%, while median per person spending on electronic materials increased 31%.

81.     The COVID-19 pandemic has had a tremendous impact on library circulation tendencies.  A timely article in the *San Francisco Chronicle* on December 5, 2021 showed that total circulation for the San Francisco Public Library for FY 2021 fell by 23%.  Note that all libraries were closed as of March 2020 and patrons were not welcomed back into many buildings until May 2021.  Circulation of physical items dropped by 64% while circulation of digital items increased by 29%.  The increase in digital circulation was not a new phenomenon—since 2017,

---

[57]  Institute of Museum and Library Services, *The Use and Cost of Public Library Materials: Trends Before the COVID-19 Pandemic* (Jan. 2021), https://www.imls.gov/sites/default/files/2021-02/pls_fy18_research_brief.pdf.

A-5005

digital circulation had been increasing by 25–31% each year. Although digital circulation increases may lessen to some extent when services are completely restored, the extensive use of digital materials in the "new normal".[58]

### B. Collection Management

82.     Library collections are constantly changing, with new materials added, older materials withdrawn or "weeded," and in-demand titles replaced—a true ecosystem of content. The most common challenge of collection management is dealing with multiple copies of best-selling titles. Most libraries develop a "requests to copies" ratio that informs their purchasing decisions or patterns. Although these ratios may vary, a fairly common one is five to six holds (or persons waiting on a waitlist) for every print or ebook copy purchased or licensed.

83.     For print materials, particularly best-sellers, libraries will usually purchase a significant number of copies in response to patron requests. The spike in demand for popular titles usually happens at the same time in all libraries so the option of borrowing best-sellers via interlibrary loan is not feasible. But libraries will not need the number of copies they initially purchased because, in my experience with libraries, the demand for the best sellers usually decreases within six months to one year after publication.

84.     When the book's popularity has diminished, the library will review the condition of all the copies, keep a small number of copies in the best condition, and weed or discard the remaining copies. For these reasons, libraries will rarely purchase replacement copies of a title. In fact, it is more common for the libraries to find ways to remove excess copies of once-best sellers.

---

[58]  Nami Sumida, San Francisco Chronicle, *The Pandemic Transformed San Francisco's Libraries. This Data Shows How* (Dec. 5, 2021), https://www.sfchronicle.com/sf/article/How-the-pandemic-transformed-San-Francisco-s-16667414.php

DocuSign Envelope ID: 52562761-336C-4F71-88D9-FE5BF09A5984

85.     The number of circulations for copies of some of these best-sellers could go from ten circulations to fifty or sixty, given the longevity of the popularity of the title.  Circulations depend on a number of factors:  1) A large number of copies were purchased in anticipation of heavy use and that use did not occur; 2) A copy could have been damaged after a few uses and was taken out of circulation; or 3) A title was extremely popular and remained in good condition for a number of uses.  Limited copies of new or best-selling books in the best condition after their popularity has waned are kept due to space constraints of the library and/or to provide a supply of replacement copies if a library supports collections in other facilities.

86.     When the copies are withdrawn from a library's circulation collection, one of the key goals of the library is to repurpose those copies.  There are a number of processes that libraries are able to utilize to manage withdrawn materials, ranging from donating materials to library support groups for sales, donating materials to non-profit institutions or schools, sending materials to libraries in countries that have limited collections, and/or disposing of the materials in a sustainable manner.

87.     In some cases, physical books are repaired or rebound—particularly if they are out of print or of special interest to the library.  Most libraries do not have the capacity to make extensive repairs of material and find that purchasing replacements is a more efficient option.

88.     If materials are rebound, the cost is borne by the library, with the library either having staff or a bindery bind the material and have use of the bound item as long as it lasts.  The library does not have to pay the publisher to extend the life of a rebound book which the library owns, unlike the situation with ebooks where libraries must pay publishers for extended access to

35

A-5007

DocuSign Envelope ID: 52562761-336C-4F71-80D9-FE5BF99A5984

ebooks. In any case, most libraries spend a very small percentage of their acquisitions budget on purchasing new replacement copies or binding existing copies of books.[59]

## VII.   EBOOK ACQUISTION CHALLENGES

89.     For ebooks, the collection management process is somewhat different than with print materials. These differences are not due to anything inherent about ebooks but result from the limitations imposed by publishers regarding the terms on which they are willing to make ebooks available to libraries. In contrast to print books, most publishers do not permit libraries to own ebooks. Publishers will only license access to most ebooks, including to libraries.

90.     Publishers have developed a wide variety of licensing models including access metered based on amount of time, the number of loans, or combinations of factors; subscriptions to bundles of titles with varying use and time limitations; pay per use; simultaneous access; and other models as well. These models can be confusing and challenging for libraries to navigate.

91.     Many libraries obtain their digital content through OverDrive, Inc., a major library ebook platform that often serves as the broker between publishers and libraries. Mr. Steve Potash, founder and CEO of OverDrive, Inc. noted in his deposition, "We advocate to all suppliers to consider and enable OverDrive to have all models. So our input is advocacy that libraries should have the options to look at a title or group of titles and have flexible opportunities to acquire permission for lending. So we strongly recommend all of the models, including simultaneous access, and more recently are getting more (suppliers) to enable that permission."[60] When asked why Mr. Potash would support this approach, he responded,

---

[59] Libraries might purchase used books as replacement copies, but only in the case of a very rare or otherwise unavailable book.

[60] Potash Dep. Tr. 48:1–8, Jan. 31, 2022.

36

"Because we want to serve all communities and enable all readers of all ages, all genres, and libraries have a variety of budgets or other strategies. So we stand with libraries so they can have as many of the options for the library to evaluate the best way to build their collections."[61]

92.     In most licensing agreements, publishers allow libraries to have access to ebooks with specifically limited timeframes and/or publishers may impose additional charges as ebooks circulate. When licenses are about to expire, the library must determine if they want to retain access to the title and renew the licensing agreement or forego access to the title. The library also must determine if they want to retain access for a limited number of copies of the ebook and retain access for some copies and forego access for other copies.

93.     Access decisions regarding ebook copies are a constant challenge for library staff. The condition of the material is not a defining factor for what to acquire; it is the amount of demand and cost of access that are key considerations in how to allocate the acquisition budget for ebooks.

94.     Access to ebooks is not always in the hands of the library staff. Publishers may not provide library access to new digital content at its initial publishing date. A publisher can withdraw an ebook from its collection or change the terms of access. In regard to a publisher requiring a term limit for access to digital content, Mr. Potash noted in his deposition that "If we no longer have permission from the rights holder, we would be no longer offering that title in our offering . . ."[62] Authors may also change their publishing houses which results in possible limitations/changes in access to that author's materials previously published by another publisher.

---

[61] *Id.* at 48:11–17.

[62] *Id.* at 66:7–9.

95.     Libraries may create digital copies of print books that they own.  These digitization decisions may be made on the condition or content of the print material.  The decisions could also be made on space or capacity available to the library.  For instance, if a library had an extensive collection of local government documents that were important for that community but would not be digitized by any other institution and/or might take up valuable public space in their print format, that library may determine that digitizing those documents is the best method for preservation and long-term access.  In any case, most libraries do not have the capacity to create digitized copies of materials and are required to outsource that process to other institutions with that capacity (such as Internet Archive) or other commercial companies.

### A.     Ebook Access Models

96.     With the increased demand for ebooks, libraries have faced significant challenges in acquiring those materials.  The prices and acquisition/subscription models for ebooks are far different from the world of print books.  In acquiring print materials, libraries pay for physical items that they own in perpetuity.  Often, libraries purchase print materials through an aggregator or book jobber, i.e. Baker and Taylor or the Ingram Content Group, where they receive a pre-negotiated discount for specific types of materials.

97.     Ebook acquisitions are much more challenging than print book acquisition.  The variety of access models for ebooks, i.e. access metered by time, number of checkouts, pay per use, etc., can be difficult for a library to manage.  Also, the content and user audience can impact which model might work best for the specific ebook collection.  Mr. Potash noted in his deposition that the one copy/one user model was in place "[a]pproximately (from) 2006 for a period of at least 10 years."[63]  The one copy/one user model, which is an access model that gives

---

[63]  *Id.* at 52:18–19.

libraries permanent access to an ebook, was much simpler for libraries to manage than the variety of licensing models in place currently.[64]

98.     Libraries also use electronic platform aggregators to access ebooks.  OverDrive, as noted previously, and Baker and Taylor's Axis 360 are platforms that many libraries use. Additional costs may be incurred by libraries to provide patron access to these platforms.  Also the cost of access to an ebook for the library is normally three to five times higher than the retail cost of the ebook for an individual customer.[65]  (This price mark-up does not exist for print books.)

99.     When publishers introduced ebooks to the mainstream library marketplace, a common subscription model was one digital copy/one user at a time, with no time or use limitations.  This model was similar to print library acquisitions although the libraries never owned a copy of the digital content.  In contrast to the one user/one copy model, publishers adopted models where metered licenses were limited by time and/or number of uses.

100.     Currently, publishers offer only limited options for one copy/one use (permanent access) licensing, and the pricing may be higher than pricing for other models.  Some libraries are fortunate enough to have the resources to pay for permanent access to digital content.  But, even if the library has the resources to purchase permanent access, many publishers are not offering a perpetual access model for that digital content at all.  In any case, the digital access is still more expensive than the purchase of a print copy.

---

[64]  "Every time a title is added, it has a metered access component. So it added overhead and workflow (for library staff) as a component of offering the material."  *Id.* at 53:20–23.

[65]  Denver Public Library, *Libraries and eBooks: An Introduction* (Oct. 30, 2019), https://www.denverlibrary.org/blog/books-research/lauren/libraries-and-ebooks-introduction.

101.    Publishers claim that the higher price of a digital asset reflects the fact that there is not physical wear and tear on the ebook, in contrast to a print book that may become damaged or worn out from constant use and would be replaced at additional cost to the library and revenue to the publisher.  Based on my knowledge and experience, that rationale does not align with library practice.  Most libraries provide access to print and ebook versions of most popular titles. In the case of popular print books, where the library may purchase multiple copies of the same title, the library would keep copies in the best condition for long-term use after the popularity wanes and not necessarily buy any replacement copies.  In the case of ebooks, libraries acquire multiple licenses or bundles of ebooks to meet patron demand and, as that demand wanes, they reduce the number of copies or access points they include in their inventory.

### B.    Challenges in Acquiring and Managing Ebook Collections

102.    Acquiring and managing ebook collections is difficult, time-consuming, and expensive for library staff.  As noted by Mr. Potash in response to a question regarding library ebook licenses with time limits, "it imposes more work for librarians . . . librarians have to -- instead of buying a book once for their collection in ebook form, have to engage in additional transactions upon expiration of the term" and "[m]aking decisions on which books to select, forecasting demand over the next 24-month period."[66]

103.    Library staff must understand and determine if a publisher's access model is useful, appropriate, and affordable for the library's collection and patron use patterns.  They have to constantly be mindful of when access to specific ebooks will end and determine if that access should be extended and/or how many copies of the ebook should be retained.  In contrast to the cost of purchasing print materials, the cost of licensing for ebooks is a recurring expense rather

---

[66]  Potash Dep. Tr. 61:1–11, Jan. 31, 2022.

than a one-time expense. Publishers' digital content access models make it very difficult to establish or maintain a permanent collection which is one of the primary goals of a library. Although the collection is always changing, the ability to obtain permanent ownership and/or permanent access to specific materials is critical.

104.    For libraries with limited resources, the provision of a diverse ebook collection that meets patron demand can be very difficult. Libraries cannot totally abandon purchase of print materials to be able to support their ebook collections. Availability of mid-list or lesser-known authors or titles may be limited because most resources have to be allocated to costs for multiple copies of best-selling, popular ebook titles. The "pay per circulation always available" access model, i.e Kanopy or Hoopla, can be extremely challenging. Because the library cannot predict the usage level of the materials, they cannot estimate with clear knowledge the cost of content provided through this access model. Some libraries have developed usage parameters for these pay per circulation collections, i.e. each card holder can have a certain number of downloads per week. These use limits may be required for budget predictability, but they are not positive experiences for the patron who does not understand the metering of access to digital material.

105.    The ability to meet patron demand for digital content has stretched the capacity of materials budget in most libraries. Many small and large libraries rely, in part, on private support for digital content collections from their library friends groups, foundations, or other private funders. This private support has historically been used by libraries for programming or other supplementary services but is increasingly directed to basic licensing of library ebooks.

## VIII.   CDL'S IMPACT ON LIBRARY SPENDING

106.    Because library acquisition budgets are limited and scarce, the existence of CDL does not result in less spending than what has been allocated for materials acquisitions. In fact,

even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions. They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.

107.    As noted previously, library acquisitions budgets represent an average of 11% of most library budgets. For institutions dedicated to providing access to print and digital content, this is a rather sad state of affairs. The aspirational acquisition budget is 15–20% of the annual operating budget, almost twice what is spent on materials currently and a goal achieved by very few institutions. Library budgets are constrained primarily by the amount of funding that must be spent on staffing (67% on average) which represents a key service component of a successful library as well as the materials collections. Libraries also must make significant investments in provision of safe and secure facilities as well as up-to-date information technology infrastructure and equipment. Because of these required expenses, the materials budget, which is discretionary compared to other expenditures, is often used as the budget balancer on an annual basis— meaning that where reductions must be made to balance the budget, those reductions are often made to the materials budget.

108.    Yet even in light of its discretionary nature, the materials allocation remains the heart of the library's expenditures. Librarians diligently spend their limited materials budgets as effectively as possible, regularly searching for the best prices for materials, determining the most affordable collection balance that is responsive to patron demand, and always on the look-out for grant opportunities to augment their capacity to obtain materials.

109.     In light of the priority of materials acquisition and the current state of limited budgets for those materials, libraries would not reduce their materials budgets if reliance on CDL for certain digital content reduced their spending on the particular titles that were provided through CDL.  On the contrary, the libraries would immediately find other ways to allocate those precious resources, through purchase of ebook licenses or print copies of other titles.  With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products.  This flexibility would provide for the increased expenditures for digital and print content, as libraries would recalibrate their spending patterns to continue to most effectively meet the needs of their patrons, without any net effect on their total expenditures on publishers' products.

Dated: February 25, 2022

SUSAN H. HILDRETH

43

A-5015

# ATTACHMENT A

## SUSAN H. HILDRETH

**PROFESSIONAL EXPERIENCE**

**Library Consultant  Variety of public sector clients              4/19 – current**

Focusing on executive recruitment, strategic planning, organizational review and broadband adoption. Recent projects include:

- Boise (ID) Public Library Strategic Plan, 2021 – 2023
- Placer County Library (CA) Organizational Assessment, 2021 – 2022
- Cooperative Personnel Services (CA) – Executive Recruitment and Organizational Analysis, 2020 -
- NTIA Merit Reviewer, Broadband USA Tribal Libraries Program, 2021
- Wisconsin Community Engagement/Leadership Training, 2020 – 2021
- Humboldt County Library (CA) Strategic Plan, 2020
- Tacoma Public Library (WA) Strategic Plan, 2020
- Feasibility Study to Establish Carpinteria Municipal Library (CA), 2020

**Interim Director          Sonoma County Library                  7/18 – 3/19**
**                          Rohnert Park, CA**

Served as interim director and primarily responsible for identifying a permanent director and managing library operations.

**Distinguished            University of Washington               8/16 – 6/18**
**Practitioner              Information School**
**In Residence             Seattle, WA**

Inaugural appointee to this Gates-funded position (Professor of Practice) designed to infuse curriculum with skill building relevant to the 21st century library and bring theory and practice together for an impactful student experience.
- Taught courses in library management, community engagement and advocacy
- Served as guest lecturer in library management, community engagement and future of libraries – 2020-21

**Treasurer                 American Library Association           6/16 – 6/19**
**                          Chicago, IL**

**Aspen Fellow              Aspen Institute, Washington, DC        3/15 – 12/19**
**                          Communications/Society Program**

Provided counsel on issues related to public libraries and represented the Institute's Dialogue on the Future of Public Libraries.

1

**Executive Director    Peninsula Library System                3/15 – 6/16**
**Pacific Library Partnership**
**The Califa Group**

Responsible for the operation of the Peninsula Library System that supports the online library system for public libraries in San Mateo County, CA; the Pacific Library Partnership, a consortium of public libraries in the greater San Francisco Bay area; and the Califa Group, a non-profit organization that provides aggregated procurement services and other statewide programs for California libraries.

**Director         Institute of Museum and Library Services        1/11 – 1/15**

Responsible for the operation of the Institute, a federal agency that provides support for the nation's museums and libraries. Appointed by President Obama and confirmed unanimously by Senate.

- Administer a $250 million annual budget, including $150 million in population-based grants to states for libraries and $100 million in competitive grants for museums and libraries. Work with library organizations, foundations and other interested stakeholders to develop partnerships to leverage federal investments.
- Advise Administration and Congress on information policy. Responsible for annual national data collection of public libraries and national census of museums.
- Work closely with Federal Communications Commission and National Telecommunications and Information Administration to ensure that broadband capacity and digital literacy is available for all with specific focus on underserved communities and populations
- Work closely with other federal agencies to leverage the capacity and potential of libraries and museums to strengthen communities.

**City Librarian              The Seattle Public Library        2/09 – 1/11**

Responsible for the operation of The Seattle Public Library, including the world-famous Central Library (363,000 sf), 26 branches and Mobile Services, serving 600,000 people.  Annual circulation is over 11.2 million from a collection of over 2.5 million items, with a staff of 565 FTE.  Annual operating budget is $50 million with an additional $3 million in private funds.

- Report to the Library Board of Trustees, a five-member policy-making body appointed by the Mayor and confirmed by the City Council.
- Serve as Library's liaison and ex-officio board member of The Seattle Public Library Foundation and the Friends of The Seattle Public Library.
- Responsible for development of Library's strategic plan and management of a highly successful enterprise during a period of limited resources.

2

DocuSign Envelope ID: 52562761-336C-4E74-88D8-EE5BF09A5984

**State Librarian**       **California State Library**       **8/04 – 2/09**
Responsible for the operation of the California State Library, including library services for the Executive Branch, the Legislature and all state employees. Collection is 2.7 million items, with a staff of 178 FTE.  2008/09 operating budget was $75 million. Appointed by Governor Arnold Schwarzenegger July 2004 and confirmed by the State Senate April 2005.

- Responsible for annual distribution of over $16 million in federal funding and $59 million in state funding.
- Responsible for library service development activities for 181 public library systems serving over 37 million residents.
- Supervised a $350 million public library construction bond program.
- Supervised a $128 million cultural facilities bond program.

**City Librarian**       **San Francisco Public Library**       **3/01 – 6/04**
**Acting City Librarian**       **San Francisco Public Library**       **2/00 – 3/01**
**Deputy City Librarian**       **San Francisco Public Library**       **7/98 – 2/00**
Responsible for the operation of the San Francisco Public Library, including the Main Library (376,000 sf), 26 branches and two bookmobiles, serving 800,000 people.  Annual circulation was over 6 million from a collection of over 2 million items, with a staff of 650 FTE.  2003/04 operating budget was $58 million.  Began serving in the capacity of Acting City Librarian in May 1999, when the City Librarian suffered a massive stroke. Mayor Willie Brown made the official City Librarian appointment in March 2001.

- Reported to Library Commission, Library's policy-making body, and Mayor.
- Served as Library's liaison and ex-officio board member of the Friends and Foundation of the San Francisco Public Library.
- Developed successful $106 million branch bond program renovating 19 branch libraries and building five new facilities.
- Responsible for execution of a post-occupancy evaluation of the Main Library and implementation of modifications to address key issues in the evaluation.
- Responsible for development of Library's strategic plan.

**Planning Consultant**       **California State Library**       **12/96 – 7/98**
Responsible for assisting California public libraries in utilizing appropriate planning techniques to effectively develop, organize, administer and manage public library services. Analyzed current planning and management methodologies in public libraries, identified future trends, designed programs and training events to strengthen abilities of public library administrators to make informed decisions.

**Deputy Library Director**       **Sacramento Public Library**       **12/91 – 11/96**
Responsible for fiscal, personnel and facilities services for the Sacramento Public Library, including the Central Library (165,000 sf), 23 branches and two bookmobiles, serving over one million people.  Annual circulation was over four million from a collection of over two million items, with a staff of 200.  1995/96 operating budget was $15 million.

- Reported to Library Director and was member of Management Team.
- Responsible for annual budget preparation and planning for additional funding.
- Served as member of team that planned and implemented the reorganization of the Library as a Joint Powers Authority of the City and County of Sacramento.

A-5018

**County Librarian**        **Placer County Library, CA**        **5/89 – 12/91**
**Assistant County Librarian** **Placer County Library, CA**      **9/88 – 5/89**
Responsible for daily operation of a county library system, including the Main Library in
Auburn, ten branches and a bookmobile. Annual system circulation was over 500,000 from a
collection of over 180,000 items, with a staff of 40. 1990/91 operating budget was $1.5 million.

- Initiated development, with citizens committee, of first Long-Range Plan.
- Awarded $1.5 million state construction funds for Granite Bay Branch, 1991.
- Planned major upgrade of automated system and expansion of Main Library.

**Library Director**        **Benicia Public Library, CA**       **10/84 – 9/88**
Responsible for daily operation of a small, independent library. Annual circulation of 110,000,
collection of 40,000 items, with a staff of 5.

- Established and worked closely with first Friends of the Library.
- Established state-funded adult literacy program in 1987.
- Established citizens' Library Building Committee to design new library.

**Central Services Librarian**   **Yolo County Library, CA**      **7/81 – 10/84**
Responsible for the Central Services Program, including acquisitions, cataloging, processing,
inter-library loan and branch services, supporting 7 branches with 6.5 FTE.

**Davis Branch Librarian**      **Yolo County Library, CA**      **2/80 – 7/81**
Responsible for operation of busiest branch in the county system.

**Branch Librarian**        **Edison Township Library, NJ**     **7/73 – 12/78**
Responsible for operation of a busy branch in a growing suburban community.

**PUBLICATIONS SINCE 2012**

Ask, Listen, Empower: Grounding Your Library Work in Community Engagement, ALA
Publishing, 2021; Co-author with Erica Freudenberger, "Empowering Communities: From
Public Trust to Impact" (Chapter 2); "Culture Shift: The Path to Becoming Community-
Centered" (Chapter 8)

Co-creating MLIS Curriculum for Cultural Competence and Community- Driven Learning:
Making Progress for the Future of Libraries, University of Washington Information School, 2018

Library Management Problems Today: Case Studies, Rowman & Littlefield, 2021:" A Failure to
Communicate" (Chapter 18)

Library 2020: Today's Leading Visionaries Describe Tomorrow's Libraries, Scarecrow Press,
2013; "Community" (Chapter 15)

**PROFESSIONAL ACTIVITIES/AWARDS**

Please note that professional and community activities were limited during my tenure as a Presidential appointee 2011-2015.

Budget and Finance Committee, American Library Association. 2021-2022
Syracuse University Library Advisory Board, Member, 2009-2011, 2015 - present
Library of Congress Literacy Awards, Advisory Board Chair, 2012-2021
Reach Out and Read California Advisory Board, 2021 - present
Reach Out and Read National Board, 2015-2020
Panorama Project Advisory Council, 2018-present
University of Washington Information School, Library Advisory Board, Member, 2009-2011, 2016 – June 2018
Library Council of Washington, Board Member, 2010-2011, 2016 – June 2018
Corporation for Education Network Initiatives in California (CENIC) Board, Member, 2015-2017
Freedom to Read Foundation, Board Member, 2009-2011
Public Library Association (PLA) Endowment Committee, Chair, 2009-2010
PLA Leadership Task Force, Member, 2006-2011
PLA Vice-President, President, Past-President, 2006-2008
ALA Councilor At-Large, ALA Council, 2002-2005
PLA Board, Library Development Cluster, Member, 2000-2003
CLA President, 2004, Treasurer, 1995-2000

California Library Association (CLA) Library Hall of Fame, 2019
California Emerging Technology Fund Champion, 2014
Association of Rural and Small Libraries Champion, 2014
Distinguished Public Service Award, State University of New York, Albany, NY, 2012
SF Municipal Fiscal Advisory Committee Public Managerial Excellence Award, 2000
CLA First Annual Member of the Year, 1993
Public Library Delegate to White House Conference on Libraries, 1991

**EDUCATION**
**Master's in Business Administration**, Rutgers University, Newark, NJ         December 1979
**Master's in Library Science**, State University of New York, Albany, NY    May 1973
**Bachelor of Arts cum laude**, Syracuse University, Syracuse, NY         June 1972

**ATTACHMENT B**

**LIST OF INDIVIDUALS INTERVIEWED**

Michael Blackwell, Director
ReadersFirst Leadership Group
St. Mary's County Library
23630 Hayden Farm Lane, Leonardtown, MD  20650

Nick Buron, Chief Librarian/Senior Vice President
Queens Public Library
89-11 Merrick Blvd., Jamaica, NY  11432

Shellie Cocking, Chief of Collections and Technical Services
San Francisco Public Library
100 Larkin St., San Francisco, CA  94102

Erica Freudenberger, Outreach and Marketing Consultant
Southern Adirondack Library System
22 Whitney Place, Saratoga Springs, NY  12866

Nate Hill, Executive Director
Metropolitan New York Library Council
599 11th Ave., New York, NY  10036

Paula MacKinnon, Executive Director
Califa Group, 330 Townsend St., #133, San Francisco, CA  94107

Mary Minow, Consultant, LibraryLaw.com
Board Member, Institute of Museum and Library Services
Chicago, IL

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                      Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                      Defendants. | Case No. 1:20-CV-04160-JGK |

**REPLY EXPERT REPORT OF SUSAN H. HILDRETH**

**ATTORNEYS' EYES ONLY**

       After completing my initial expert witness report on February 25, 2022, I received a copy of the expert witness report of Jeffrey T. Prince. The Internet Archive ("IA") asked me to review this expert witness report and to determine whether I should rebut any portion of it. I indeed do find that Dr. Prince's report warrants a rebuttal. I therefore wish to provide, below, my rebuttal.

       1.     Dr. Prince observes in his report that there are a number of transaction costs to consumers (by which I believe he means library patrons) entailed in borrowing a book from a library. Specifically he says: "Although consumers [patrons] do not pay a library to borrow a book, they incur transactions costs in the borrowing of a book. These costs include the effort of having to sign up for a library membership, the time a consumer must spend finding the work on the library's website, possibly having to wait for another patron to return a digital loan before the work is available to borrow, and a limit on the amount of time the borrower may retain the book before it must be returned to the lender." Prince Rpt. ¶ 61 (footnote omitted).

1

2.      Based on my understanding of the functionality of the IA's Digital Lending Library, each of these transaction costs are also present when a patron borrows a digitized book from the IA.  See Hildreth Rpt. ¶¶ 30, 54.  Before checking out a book from the IA's Digital Lending Library, an individual must sign up as a patron of the IA.[1]  The patron must then search the IA website for the title.[2]  The patron must then wait for an available digitized copy to be checked back in.[3]  Finally, a work checked out from the IA is automatically checked back in after the loan period expires.[4]

3.      In my Opening Report, I noted that demand for digital resources, especially, ebooks was increasing.  Hildreth Rpt. ¶¶ 22-26.  I also noted that demand for ebooks currently exceeds supply.  *E.g.*, *id.* ¶ 39 ("[M]any libraries have lower limits on the number of ebook requests (often ten to fifteen) due to the limited inventory of ebooks libraries can afford.").  Because the demand for ebooks is increasing as rapidly as it is, it is highly improbable that libraries would redirect portions of their reallocation budget to products other than ebooks/books. I have seen no evidence—anecdotal or empirical—to suggest otherwise.[5]  As Michael Blackwell,[6] Director of St. Mary's County Library, Maryland, confirmed:  "If we had more funding, we would put it back into more ebook licenses.  If the publishers slashed the prices by

---

[1] Internet Archive, Borrowing Books Through Open Library (Sept. 13, 2021), https://openlibrary.org/help/faq/borrow#how.

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] See Hildreth Dep. 257:1-258:8.

[6] Michael Blackwell also leads the Readers First Initiative.

2

DocuSign Envelope ID: 11DE57D8-59F4-4497-98A9-D76369D9B201

half, we get twice the number. Demand is high. The issue is that currently licensing is making it nearly impossible to sustain what we have even now."[7]

4.     Dr. Prince observes that the IA's Digital Lending Library "likely" decreased the number of print book sales and the number of ebook licenses to libraries because the increased supply of digital books for borrowing "likely" reduced patron demand to borrow print books. See Prince Rpt. ¶ 60. I have seen no evidence—empirical or anecdotal—to suggest that the IA's Digital Lending Library has caused other libraries to purchase fewer physical books or to license fewer ebooks.

5.     Dr Prince, in several places in his report, mischaracterizes the opinions I offer in my first report. Prince Rpt. ¶¶ 9, 58, 69, 73, 75, 76. Specifically Dr Prince stated:

- "Ms. Hildreth acknowledges that the Internet Archive's conduct likely caused plaintiffs lost revenues from licensing fees and sales of the Works in Suit to libraries." *Id.* ¶ 9.

- "Displaced library sales are consistent with Ms. Hildreth's expert report, where she states that 'a library decided not to license a title because digitized print copies are available for borrowing under CDL . . . .'" *Id.* ¶ 58.

- "Likewise, even if many public libraries were to become 'partner libraries' of Internet Archive or other equivalent websites and/or IA were to become a central repository, the number of concurrent copies of a title freely available 'to borrow' on IA or similar websites would skyrocket; libraries would no longer need to obtain a considerable number of legal backlist ebooks titles to serve their communities because they could link to IA or similar websites as an alternative to their purchase of authorized ebook licenses, as explained by Ms. Hildreth." *Id.* ¶ 69.

- "IA's library expert Ms. Hildreth's [sic] appears to acknowledge that IA's conduct likely harmed rightsholders." *Id.* ¶ 73.

- "Ms. Hildreth opines that if IA's conduct 'reduced the necessity of lending those titles via licensed ebooks . . . [libraries] would reallocate their spending away from ebook licensing for those titles . . .' Ms. Hildreth's admission that Internet Archive's conduct likely caused lost licensing sales of the Works in Suit to

---

[7] Email from Michael Blackwell to author (May 5, 2022) (on file with author).

3

DocuSign Envelope ID: 11DEE7D8-59E4-4497-98A9-D76369D9B201

libraries is an admission that IA's conduct harms market participants, including the publishers and the authors of the Works in Suit." *Id.* ¶ 75 (alterations in Prince Rpt.).

- "Although [Ms. Hildreth] acknowledges that IA's conduct likely harmed Plaintiffs . . . ." *Id.* ¶ 76.

Each of these characterizations is incorrect. The portions of my report he cites for his statements are Paragraphs 11 and 106.[8]

Paragraph 11 stated in full:

> In brief, my opinions are that:
>
> • In the twenty-first century, libraries strive for improved patron access to knowledge and to adapt to increasing patron demand for digital access. To do so, libraries must leverage their investments in their print collections. See Section III.
>
> • Patrons by and large prefer to browse or sample a title, digital or print, before making the decision to borrow it. See Section III.
>
> • Libraries have shared their physical collections through interlibrary loans and regional resource-sharing for many years. Interlibrary lending is a way for libraries to conserve resources and focus acquisition-based spending on works their patrons are most likely to frequently request. See Section IV.
>
> • The growing practice of CDL by libraries is but one method libraries use to leverage their existing physical collection to better serve the reading population. The Digital Lending Library is one example. See Section IV.
>
> • Library budgets are both limited and finite. Libraries strive to maximize their acquisition budgets to meet patron demand, but acquisition budgets are often one of the few discretionary line items in a library budget and so may be constrained based on other required library expenses. Library budgets for acquisition of works are never large enough to meet patron demand. See Section V.

---

[8] Professor Prince misrepresents the contents of Paragraph 11 of my report in a number of places in his report, including Paragraph 69, where he suggests that an increase in the number of the IA's partner libraries would cause the number of concurrent copies of a title to "skyrocket."

• As to physical book acquisitions, libraries initially buy multiple copies of popular titles, and then subsequently reduce the number of copies in their collection of a title. Sometimes reduction happens when a physical copy wears out or is damaged, and other times a reduction happens when libraries sell or giveaway additional copies of a title after demand for that title has decreased. Libraries seldom buy replacement copies of a title. Demand for popular titles diminishes rapidly, and one-to-one replacement would not be a good use of a library's limited acquisition budget. Moreover, libraries can and do make small repairs (example: taping a torn page) to damaged physical copies. Only a small percentage of a library's acquisition budget is spent purchasing new replacement copies of a title. See Section VI.

• Ebooks have presented particular challenges for libraries. Patron demand for ebooks has been increasing. But, when libraries pay for the ability to loan ebooks to patrons, libraries pay only for a temporary license. The purchase of ebook licenses therefore does not add to a libraries' permanent collection. Moreover, ebook collection management requires heavy use of libraries' staff resources. In many cases it takes more staff resources to manage library ebook licensing systems than it does to manage physical collections. See Section VII.

• CDL does not result in less library spending on books. Libraries spend all of their allocation budgets each period. If a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books. See Section VIII.

Paragraph 106 stated in full:

Because library acquisition budgets are limited and scarce, the existence of CDL does not result in less spending than what has been allocated for materials acquisitions. In fact, even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions. They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.

5

DocuSign Envelope ID: 11DEE7D8-59E4-4497-9849-D76959D9B201

6.      Nowhere in either paragraph, or, for that matter, anywhere in my report, do I state that I believe it is "likely" that the IA's Digital Lending Library harmed rightsholders (including Plaintiffs).  Nor do I state anywhere in my report, nor do I hold the view, that the IA's Digital Lending Library has *in fact harmed* rightsholders or would in fact harm rightsholders if its operations scaled up.  Nowhere in either paragraph, or, for that matter, anywhere in my report, do I state, nor do I hold the view, that the IA's Digital Lending Library "likely caused plaintiffs lost revenues from licensing fees and sales of the Works in Suit to libraries."  Prince Rpt. ¶ 9.  Nor do I state anywhere in my report, nor do I hold the view, that the IA's digital lending would cause Plaintiffs to lose revenue from libraries if its operations scaled up.  Nor do I state anywhere in my report, nor do I hold the view, that public libraries becoming partner libraries with the IA would result in libraries no longer needing "to obtain a considerable number of legal backlist ebooks titles to serve their communities because they could link to IA or similar websites as an alternative to their purchase of authorized ebook licenses, . . . ."  *Id.* ¶ 69.  In fact, I do not mention partner libraries at all in my report.  In Paragraph 58 of his report, Dr. Prince omits a key part of my report—the word "if."  The full sentence from which he quotes is as follows (italicized portions are portions Dr. Prince omits):  "*If* a library decided not to license a title because digitized print copies are available for borrowing under CDL, *a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title—or on purchasing print books*."  Hildreth Rpt. ¶ 11.  These omitted passages make clear that my opinion is that *in the event* a library decided not to license a title due to additional availability of that title under CDL, the library would use the money it saved to acquire another title, either as an ebook or a print book.  In Paragraph 75 of his report, too, Dr. Prince omits key portions of a passage to change its meaning.  The full sentences from which he quotes are as follows

6

(italicized portions are portions Dr. Prince omits): "*In fact, even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries*, libraries *would not spend less money on acquisitions.* They would reallocate their spending away from ebook licensing for those titles *being accessed through CDL and would spend more on ebook licensing for newer titles or on print books*." Hildreth Rpt. ¶ 106. These omitted passages make clear that my opinion is not that the IA's conduct likely caused lost licensing sales, as Dr. Prince claims.

7.      I am not an economist, and, as I stated at my deposition, I do not have an opinion as to whether Plaintiffs suffered any economic harm as a result of the IA's Digital Lending Library:

> Q:  Do you have a general opinion, Ms. Hildreth, as to whether the plaintiffs have suffered any economic harm as a result of the Digital Lending Library?
>
> A.  I'm challenged in answering that question because I feel that it would be better answered through economists' research.  I don't feel that I have a qualification to specifically answer that question.[9]

8.      To the contrary, my opinion, based on decades as a library professional, is that the IA's Digital Lending Library (and the practice of CDL by other libraries) affirmatively assists libraries, who own the copy of a physical book they have lawfully acquired, and readers, whose tax dollars support public libraries who purchase physical books and pay for ebook licenses. Moreover, I am unaware of any instance of a library paying for access to fewer ebook copies of a title—or buying fewer copies of a physical book for a title—where that title is available for

---

[9] Hildreth Dep. 45:20-46:4.

borrowing through CDL, either from the IA or from another library.  I note that Dr. Prince does not point to any instances of this, either.

9.      Dr. Prince notes in his report that the availability of a title through CDL from the IA has "likely devalued Plaintiff Publishers' products in several ways."  See Prince Rpt. ¶ 63.  I have not observed lower prices of physical copies or ebook copies of titles with respect to transactions with libraries.  Indeed, based on my decades of experience as a library professional and based on my current work with libraries as a consultant, materials costs for these formats are only increasing for libraries.

Dated: May 27, 2022

_Susan H. Hildreth_

SUSAN H. HILDRETH

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>Plaintiffs,<br><br>v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>Defendants. | Case No. 1:20-CV-04160-JGK |

**RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED IN SUPPORT OF PLAINITFFS' MOTION FOR** <u>**SUMMARY JUDGMENT**</u>

4891-8421-5847v.16 0092453-000002

# TABLE OF CONTENTS

I.     THE PARTIES................................................................................................ 1

     A.    Plaintiffs Hachette, HarperCollins, PRH, and Wiley............................... 1

     B.    Defendant Internet Archive...................................................................... 2

     C.    This Action............................................................................................... 2

II.    THE BOOK PUBLISHING INDUSTRY ..................................................... 3

     A.    Books Are Not Self-Generating............................................................... 3

     B.    The Publishers Make It Possible For Thousands Of Authors To Write Books For A Living By Paying The Upfront Costs Of Book Publishing ................................... 4

     C.    The Publishers Provide Financial Support to Authors............................. 4

     D.    The Publishers Invest in Generating an Audience for Each New Book ................ 5

     E.    By Exercising the Exclusive Rights Granted By Each Author, Publishers Generate Revenue to Invest in New Books ..................................... 6

          1.    The Publishers Depend on Steady Revenue from Backlist Titles, Over Decades of Time ................................................ 7

          2.    Revenue from the Sale of Books in All Formats Incentivizes the Publishers' Creation of New Books .......................................... 12

III.   WITH DISTINCT PRICING, TERMS, AND CONDITIONS, THE PUBLISHERS INVESTED IN THE CREATION OF A VIABLE EBOOK MARKET ........................ 13

     A.    In the Shadow of Rampant Music Piracy, The Publishers Developed Terms to Make Ebooks Available to the Public..................................... 13

     B.    Factors Considered by the Publishers When Developing the Ebook Market....... 14

     C.    The Publishers Have Made Significant Financial Investments to Create a Viable Ebook Market.................................................. 16

     D.    Ebooks Benefit Consumers and the Publishers ................................... 19

IV.   DEVELOPMENT OF THE PUBLISHERS' LIBRARY EBOOK MARKET................. 20

     A.    The Role of Public Libraries in American Life ................................... 20

     B.    Hachette ................................................................................................ 24

     C.    HarperCollins......................................................................................... 24

     D.    PRH........................................................................................................ 26

     E.    Wiley ..................................................................................................... 26

4891-8421-5847v.16 0092453-000002

i

F. The Publishers' Library Ebook Market Provides Americans with Millions of Free Ebooks ............................................................................................ 28

V. THE PUBLISHERS MAKE EBOOKS BROADLY ACCESSIBLE TO PERSONS WITH DISABILITIES AND RESPOND QUICKLY IN EMERGENCY CIRCUMSTANCES ................................................................................ 32

 A. The Publishers' Efforts to Serve the Blind and Print Disabled People ................ 32

 B. The Publishers' Response to the COVID-19 Pandemic ....................................... 33

VI. INTERNET ARCHIVE'S USE OF THE PUBLISHERS' REGISTERED WORKS ...... 35

 A. The Works in Suit ................................................................................................ 35

 B. Internet Archive's Use of the Works in Suit ........................................................ 36

 C. Copyright Registration and Ownership ............................................................... 37

VII. THE INTERNET ARCHIVE'S EBOOK LENDING WEBSITE ................................... 38

 A. Internet Archive's Evolution and Stated Goals ................................................... 38

 B. The Internet Archive Ebook Lending Service At Issue in This Lawsuit .............. 41

 C. User Experience of the Internet Archive's Website ............................................. 45

 D. Evolution of Internet Archive's Infrastructure To Lend Ebooks Through its Website ............................................................................................................... 47

  1. Internet Archive Partners With Libraries to Scan Their Collections ........ 48

  2. Internet Archive Acquires Print Books from Other Sources ................... 50

  3. Internet Archive Preservation of Physical Books ................................... 51

 E. Internet Archive's Relationship With and Eventual Acquisition of Better World Books ................................................................................................................... 52

 F. "Monetized" Aspects of the Internet Archive Website ......................................... 56

 G. Internet Archive's Creates the "Open Libraries" Project ..................................... 57

  1. Imposing and Then Removing Geographic Limitations on Ebook Lending ................................................................................................................ 57

  2. Expanding the Number of Concurrent Ebook Loans Available on the Website ................................................................................................... 58

 H. Establishing the Open Libraries Project ............................................................... 59

 I. Marketing the Open Libraries Project to Prospective Libraries ........................... 61

 J. Growth of Internet Archive's Partner Libraries ................................................... 64

 K. Encouraging Libraries to Provide Links to Internet Archive's Website .............. 65

 L. Internet Archive's Overlap Analysis ................................................................... 65

4891-8421-5847v.16 0092453-000002

VIII. DEVELOPMENT OF THE "CONTROLLED DIGITAL LENDING" THEORY .......... 66

   A. Development of the Statement and White Paper ..................................... 66

   400. Prior to about 2018, IA did not rely on a model called "Control Digital Lending" to support its scanning and republication of in-copyright books. (McN Decl. ¶77.)66

   B. Publication of The Statement and White Paper in September 2018 ..................... 71

   C. Initial Criticism of the Statement and White Paper .............................. 74

   D. Criticism of the Statement and White Paper Following the *ReDigi* Decision ...... 75

   E. Signatories to the CDL Statement .......................................................... 76

   F. Internet Archive's Reliance on the Statement and White Paper .......................... 77

   G. The Statement, White Paper As Applied to Internet Archive's Activities .......... 79

      1. The Owned-to-Loan Ratio ......................................................... 79

      2. Controls over Partner Library Operations .................................. 81

IX. INTERNET ARCHIVE'S POLICY RATIONALES ....................................... 84

   A. Providing Missing 20th Century Books .................................................... 84

      1. Internet Archive and Authorized Library Ebook Aggregators ................ 86

   B. Providing Access to Print-Disabled Patrons ........................................... 88

X. NATIONAL EMERGENCY LIBRARY ........................................................ 90

XI. THE IMPACT OF THE INTERNET ARCHIVE ON THE MARKET FOR THE PUBLISHERS' WORKS ............................................................................... 96

   A. Lost Customary Fee from Internet Archive ........................................... 96

   B. Lost Library Ebook Sales ....................................................................... 99

   C. Lost Consumer Ebook Sales .................................................................. 102

   D. Inadequate Protection of Intellectual Property .................................... 104

XII. INTERNET ARCHIVE'S SCANS, WHILE ENTIRELY LEGIBLE, FALL SHORT OF THE QUALITY OF AUTHORIZED EBOOKS. THE PUBLISHERS' ENFORCEMENT OF RIGHTS AGAINST INTERNET ARCHIVE ....................................... 104

4891-8421-5847v.16 0092453-000002

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC ("PRH") (collectively, the "Plaintiffs" or "Publishers") respectfully submit this statement pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York, in support of the Publishers' Motion for Summary Judgment against Defendant Internet Archive on Plaintiffs' causes of action for copyright infringement. The material facts[1] as to which there is no genuine issue to be tried are as follows:

## I. THE PARTIES

### A. Plaintiffs Hachette, HarperCollins, PRH, and Wiley

1. The Plaintiffs are four of the leading book publishers in the United States.

2. Hachette is a publishing company based in New York. The history of Hachette in the United States stretches back nearly two centuries, to the 1837 founding of Little, Brown and Company ("Little Brown"). Hachette works with bestselling authors who have been awarded Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals and Nobel Prizes. Last year, Hachette published more than 1,400 adult titles in print and digital format, 300 books for young readers and 450 audio book titles. Sevier Decl. ¶5.

3. HarperCollins is a publishing company based in New York. HarperCollins has more than 200 years of history in the book publishing industry, with a current catalog of in-print

---

[1] The facts provided in this Rule 56.1 Statement are set forth in the declarations of Sandra Cisneros, sworn to on July 5, 2022 ("Cisneros Decl."), Dr. Ian Foster, sworn to on June 29, 2022 ("Foster Decl."), Elizabeth A. McNamara, sworn to on July 7, 2022 ("McN Decl."), Tracy Offner, sworn to on February 7, 2022 ("Offner Decl."), Benjamin Sevier, sworn to on July 7, 2022 ("Sevier Decl."), Chantal Restivo-Alessi, sworn to on July 1, 2022 ("R-A Decl."), Alan Pavese, sworn to on June 30, 2022 ("Pavese Decl."), Jeffrey Weber, sworn to on July 2, 2022 ("Weber Decl.") submitted herewith, and any exhibits annexed to the aforementioned declarations, as well as the Publishers' Complaint ("Compl.") and Internet Archive's Answer ("Ans.").

works that exceeds 50,000. Writing in virtually every genre, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among others. R-A Decl. ¶5.

4. PRH is a publishing company based in New York. Its history stretches back to the mid-nineteenth century founding of several venerable imprints – including Putnam (1838, publisher of Herman Melville and Edgar Allan Poe), Dutton (1852, publisher of H.G. Wells and Gore Vidal) and Frederick Warne & Co. (1865, publisher of the Beatrix Potter books). The global PRH portfolio contains more than 275 independent imprints, which annually publish approximately 15,000 new titles per year. Each year PRH sells roughly 800 million books across print books, audiobooks, and ebooks formats. Weber Decl. ¶2.

5. Wiley is a publishing company based in Hoboken, New Jersey. The company was founded in 1807 and focuses on publishing scientific and medical works in print and digital formats. Wiley publishes over 2,000 new books each year and currently offers over 120,000 titles in its catalog.(Pavese Decl. ¶¶2,9.)

**B. Defendant Internet Archive**

6. Internet Archive was founded in 1996 by Brewster Kahle, who remains its leader. (McN Decl. ¶28.)

**C. This Action**

7. This action concerns the unauthorized reproduction and distribution of in-copyright ebooks on Internet Archive's interrelated archive.org and openlibrary.org websites (collectively, the "Website"). (McN Decl. ¶1.)

2

8.      Internet Archive offers several other different online services, including the Wayback Machine.  This action does not challenge those other online services, including the Wayback Machine.  (McN Decl. ¶30.)

9.      Instead, this action concerns the "Books to Borrow" portion of the Website, on which Internet Archive provides its users with digital versions of physical books in their entirety. (McN Decl. ¶1.)

## II.      THE BOOK PUBLISHING INDUSTRY

### A.      Books Are Not Self-Generating

10.      Books have long been essential to our society. Fiction and non-fiction alike, they transport us to new worlds, broaden our horizons, provide us with perspective, reflect the evergrowing knowledge of humanity in every field, spark our imaginations and deepen our understanding of the world. Yet, books are not self-generating. They are the product of training and study, talent and grit, perseverance and creativity, investment and risk, and untold hours of work.  Compl. ¶4; Ans. ¶4.

11.      Books generally require a significant creative investment by authors.  Often, it may take years for an author to write a single book.  (Sevier Decl. ¶13; R-A Decl. ¶54; Weber Decl. Pavese Decl. ¶12; Cisneros Decl. ¶5.)

12.      Authors may rely on revenue streams from advances and royalties paid by publishers to support them during the writing process and for years after their books are published. (Sevier Decl. ¶17, 22; R-A Decl. ¶55; Weber Decl. ¶29; Cisneros Decl. ¶9.)   The author Sandra Cisneros has stated that "Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of living from their pen." (Cisneros

4891-8421-5847v.16 0092453-000002

Decl. ¶16.)

**B.    The Publishers Make It Possible For Thousands Of Authors To Write Books For A Living By Paying The Upfront Costs Of Book Publishing**

13.    The Publishers invest in authors and their books by bearing the upfront costs that are required to get a book published and sold through various book markets.  For this reason, the Publishers bear most of the financial risk associated with book publishing.  Book publishers have no guarantee that they will recoup their investment in any particular title.  (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶55-56; Weber Decl. ¶¶26-28; Pavese Decl. ¶12.)

14.    The Publishers collectively spend hundreds of millions of dollars each year in costs in connection with the books they publish.  (Sevier Decl. ¶15; Weber Decl. ¶26.)

**C.    The Publishers Provide Financial Support to Authors**

15.    For the Works in suit, the Publishers typically pay each author of a new work a non-refundable advance against future royalties.  The amount of the advance varies, and the author can use the advance to cover living or other expenses while they work on writing the book.  (Sevier Decl. ¶17; R-A Decl. ¶55.)

16.    Per their publishing agreements,  authors are generally are not required to refund the advance – even if the book never earns enough revenue to "earn out" the advance.  (Sevier Decl. ¶17; R-A Decl. ¶55.)

17.    The advance payments are recouped, if at all, from sales of the books.(Sevier Decl. ¶30; R-A Decl. ¶55.)

18.    The Publishers employ editors, who are literary professionals that select new works for acquisition and work with their authors to provide editorial advice to improve the text, and other support.   (Cisneros Decl. ¶8; Sevier Decl. ¶¶7, 16, 19; R-A Decl. ¶¶7, 56;Weber Decl. ¶26.)

4

19.     The Publishers also hire copy editors to correct grammar, spelling and ensure consistency throughout a particular work.  Additionally, the Publishers maintain art departments and illustrators to design book covers and legal departments that work with authors on pre-publication review and on defending the Publishers' works.  (Sevier Decl. ¶¶20-21; R-A Decl. ¶56; Cisneros Decl. ¶8.)

20.     The Publishers employ design professionals to layout print and digital editions of the books they publish.  (Sevier Decl. ¶20; R-A Decl. ¶56.)

21.     For audiobooks, the Publishers employ a separate production process involving the reading and recording of a title.  (Sevier Decl. ¶20.)

**D.     The Publishers Invest in Generating an Audience for Each New Book**

22.     The Publishers devote resources to marketing their books.  Marketing can continue for the life cycle of a book and is not limited to its initial publication.(Cisneros Decl. ¶8; R-A Decl. ¶56; Sevier Decl. ¶23; Weber Decl. ¶26)

23.     The Publishers each maintain sales departments that promote the sales of the titles in the Publishers' catalogue.  (Sevier Decl. ¶¶24-25; R-A Decl. ¶56; Weber Decl. ¶26.)

24.     The Publishers respective marketing departments engage in a broad range of promotional activities, which may include social media campaigns, website development, trade and consumer advertising; distribution of review and promotional copies of the book to members of the media and influential readers; in-store displays and other placement promotions; and author tours and readings.  (Sevier Decl. ¶¶23, 27; R-A Decl. ¶56.)

25.     The Publishers' respective sales departments work on sales of their titles across the different channels or markets that books are published in, including retail outlets, wholesalers, and

5

aggregators that sell to libraries. (Sevier Decl. ¶¶24-35; R-A Decl. ¶56.)

26.　　The Publishers also undertake the costs of distributing books in all the formats they have rights to, which includes printing costs associated with the creation of print books.  (Sevier Decl. ¶29; Weber Decl. ¶27.)

### E.　　By Exercising the Exclusive Rights Granted By Each Author, Publishers Generate Revenue to Invest in New Books

27.　　The commercial success of any book is uncertain.  (Weber Decl. ¶28; Sevier Decl. ¶34.)

28.　　The sales of any one book are driven by numerous factors.  Every book is unique and has a unique life cycle.  (Sevier Decl. ¶¶34, 80; Weber Decl. ¶28, 88.)

29.　　These factors include seasonality, school uses, marketing, relevance of topics of current interest, pricing of the work and competing works, supply chain issues and other factors. (Sevier Decl. ¶80.)

30.　　In 2020, COVID, the Black Lives Matter movement, and the presidential primaries and election had an impact on individual book sales and licenses that different by title.  (Sevier Decl. ¶81.)

31.　　Title revenue figures, and library checkouts, alone do not indicate the cause of an increase or decrease.  (Sevier Decl. ¶¶80-81; Weber Decl. ¶88.)

32.　　The Publishers are incentivized to maximize long term revenue from every book they publish because the sales of successful books pay for upfront investments in new books. (Pavese Decl. ¶14; Sevier Decl. ¶¶37-38; R-A Decl. ¶¶34-38; Weber Decl. ¶¶29-32.)

33.　　 The authors of the Works in Suit assigned to the Publishers the exclusive rights to publish their Works in certain formats – including print, ebook and often audio.  The publishing

4891-8421-5847v.16 0092453-000002

agreement for the Works in Suit also grant rights for the Works in defined geographic areas, typically either the entire world or the United States. (Pavese Decl. ¶13; Sevier Decl. ¶31; R-A Decl. ¶57; Weber Decl. ¶29; McN Decl. ¶8.)

34. These exclusive rights derive from copyright law, which was designed to provide authors an incentive to write books by giving them a limited monopoly over sales once their books are published. (R-A Decl. ¶58.)

35. The Publishers' ability to generate income derives from their ability to exclusively exercise certain rights they obtain from authors including: (a) the right to sell books for their copyright term; and (b) the right to collect separate income streams for each different format. (Weber Decl. ¶30; R-A Decl. ¶57; Sevier Decl. ¶8.)

36. Some of the profits the Publishers receive from books they publish are used to pay the costs of publishing new authors or books. (Weber Decl. ¶29; Sevier Decl. ¶30; R-A Decl. ¶63; Pavese Decl. ¶14.)

37. Some of the profits the Publishers receive from books they publish are used to develop new technologies or improve current technologies associated with various format they publish the works in, like ebooks or audiobooks. (Pavese Decl. ¶15; R-A Decl. ¶2; Weber Decl. ¶29.)

### 1. The Publishers Depend on Steady Revenue from Backlist Titles, Over Decades of Time

38. All but two of the Works in Suit were published more than five years before this action was commenced. (McN Decl. ¶115.)

39. Depending on the Publisher, backlist books are defined as titles that were first published more than either one or two years ago. (Sevier Decl. ¶36; R-A Decl. ¶60; Weber Decl.

7

¶30.)  The vast majority of the Works in Suit were published more than five years ago, and some were published decades ago.  (McN Decl. ¶115; R-A Decl. ¶¶64-65; Weber Decl. ¶21.)

40.    The Works in Suit continue to earn revenues and are significant books for the Publishers.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

41.    The Publishers' backlist catalogs provide revenue that helps them invest in new works and/or new authors.  (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶58-68; Weber Decl. ¶¶29-32; Pavese Decl. ¶14.)

42.    Year over year, many of the Works in Suit sell thousands of copies and generate significant annual revenues, including in ebook form.  Each of the Publishers' revenues for the Works in Suit are reflected in their sales records produced in this action.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

43.    Many of the Works in Suit were first published decades ago and several have become literary classics or are well-known, highly regarded titles, including for example *The Lord of the Flies* by William Golding, *Song of Solomon* and *The Bluest Eye* by Toni Morrison, *The Catcher in the Rye* by J.D. Salinger, and *The House on Mango Street* by Sandra Cisneros.  (Weber Decl. ¶¶21-22; McN Decl. ¶7.)

44.    The Publishers rely on backlist titles like the Works in Suit to generate revenue year on year for sometimes decades after first publication.  These revenues can offset the costs of new books that underperform or result in a loss.  (Sevier Decl. ¶37; R-A Decl. ¶¶61-68; Weber Decl.¶¶30-31; Pavese Decl. ¶14.)

45.    A review of the sales revenues for the Works in Suit demonstrates the Publishers' reliance on books published more than five years ago for substantial revenue.  (Pavese ¶19; R-A

Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)  For example, HarperCollins first published the C. S. Lewis novel *The Lion, the Witch and the Wardrobe* (The Chronicles of Narnia)" in 1950.  Over the course of the last 72 years, the book has been named to TIME Magazine's 100 Best Young-Adult Books of All Time and 100 best English-language novels published since 1923.  Since 1950, sales from the title have generated HarperCollins over $47.5 million in revenue.  (R-A Decl. ¶45.)

46.     Another Work in Suit published by HarperCollins, Zora Neale Hurston's "*Their Eyes Were Watching God*," a classic of the Harlem Renaissance and Hurston's best-known work, was originally published in 1937.  Between 1992 and 2020, HarperCollins sold more than five million copies of the title, earning the company over $38 million in net sales.  (R-A Decl. ¶65.)

47.     The classic *Little House in the Big Woods*, published in 1932 as the first book in the "Little House" series, earned HarperCollins over $7 million in net sales between 1992 and 2020.  (R-A Decl. ¶65.)

48.     Even those titles bringing in smaller sums of revenue are important to each Publisher on a cumulative basis and remain important to their authors or estates, on an individual basis.  (Weber Decl. ¶30.)

49.     Revenue from backlist titles for three of the Publishers has matched or exceeded the revenue for frontlist books in certain years.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

50.     For Hachette, revenue from the sale of backlist ebook titles exceeded frontlist ebook revenue in 2019 and 2020.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

51.     One backlist title published by Hachette in 1951, "Catcher in the Rye," generated tens of millions of dollars in sales between 1999 and 2020.  (Sevier Decl. ¶37.)

9

52.     Between 2017 and 2020, PRH's backlist revenue exceeded its revenue from frontlist titles (i.e., books published within the last year).   This is so despite that the fact that in that same period of time, PRH published bestselling frontlist biographies of First Lady Michelle and President Barack Obama (2018 and 2020, respectively).  (Weber Decl. ¶32.)

53.     Backlist book revenue makes up more than 60% of HarperCollins' annual print book revenue from the sale of all adult and children's titles.  (R-A Decl. ¶61.)

54.     Between 2017 and 2020, the number of backlist library ebook units sold by HarperCollins exceeded the number of frontlist library ebook units sold.  For example, in 2020, HarperCollins sold approximately 700,000 frontlist units versus 3.3 million backlist units.  (R-A Decl. ¶61.)

55.     The majority of Hachette's most successful books do not earn the bulk of their earnings in the first five years.  Rather, they earn revenue over the course of many years or even decades after the publication date.  (Sevier Decl. ¶36.)

56.     Backlist sales are also important because books may not achieve their full commercial potential in their first year of publication.  It may take years for a book to start selling in large quantities for a number of different (and sometimes unpredictable) factors.  (Weber Decl. ¶31.)

57.     Even books that were critically well-received when published may see significant jumps in revenue well after they were first published, including author life events.   (Sevier Decl. ¶80; Weber Decl. ¶31.)   For example, the death of author Toni Morrison in August 2019 corresponded with a significant jump in library ebook checkouts and associated revenue for works authored by Ms. Morrison.

10

58.     Sales of a particular work may go up or down based on other external factors.  For instance, sales of a title can increase rapidly if a news story brings a particular subject into prominence or if an author receives an award or sudden fame or if a popular movie version of a book is released.  (Sevier Decl. ¶¶38, 80; R-A Decl. ¶67.)

59.     For example, the book "Crazy Rich Asians" by Kevin Kwan was first published by PRH in 2013.  When a motion picture adaptation of the film was released in 2018, library ebook checkouts for the title through OverDrive, the library ebook aggregator, increased by a factor of over nine.  (McN Decl. ¶115; Weber Decl. ¶31.)

60.     An author may not "break out" before publishing multiple books and when an author does achieve success later in their career, the Publishers will usually see a significant uptick in revenue from their earlier works, even if those works did not sell well when first released.  (Sevier Decl. ¶38; R-A Decl. ¶67.)

61.     The book *The 5 Simple Fixes That Will Make You Healthy, Fit, and Eternally Awesome* by Darin Olien, was published by an imprint of HarperCollins in February 2015.  For the first five years after it was published, the ebook title had been checked out by library patrons across the United States in the low double-digits (and sometimes in the single digits) each month.  Then, in July 2020, checkouts spiked, eventually resulting in nearly 700 checkouts in September 2020 alone.  (McN Decl. ¶116.)

62.     The increased interest in the book, over five years after its publication, coincided with the July 2020 release of the Netflix series "Down to Earth with Zac Efron," in which the  actor Zac Efron promoted the "5 Simply Fixes" book at the beginning of each episode.  (McN Decl. ¶116.)

11

### 2. Revenue from the Sale of Books in All Formats Incentivizes the Publishers' Creation of New Books

63.     The Publishers' right to collect revenue from the sale of their books in each format – and to control the terms and conditions governing each format – can make it possible for the Publishers to support authors and invest in the next generation of books.  (R-A Decl. ¶68; Sevier Decl. ¶48; Weber Decl. ¶¶36.)  And, just as in the music and film industries, every format is a different product geared to different (sometimes overlapping) channels and sold under different terms that correspond to each format's unique qualities.  (R-A Decl. ¶12.)

64.     The Publishers' publishing agreements for the Works in Suit, produced in this action, generally include specific royalty rates payable to the author based on the format of the book, channel of distribution, and other factors.  The agreements for the Works in Suit show that the authors will receive specific and generally different royalty rates for the different formats the book is published in, e.g., hardcover, trade paperback, mass market paperback, ebook, and/or audio book.  (Sevier Decl. ¶18; Weber Decl. ¶34; R-A Decl. ¶12.)

65.     Because each of the publishing agreements for the Works in Suit include different royalty rates for different formats of the Works, the Publishers and their authors are paid on sales of each format that a book is published in.  (Sevier Decl. ¶39; R-A Decl. ¶¶12, 57.).

66.     Over the last three decades, the Publishers have collectively invested millions of dollars in developing new formats and markets to deliver their works in the digital age, including ebooks.  (Weber Decl. ¶¶53-82; R-A Decl. ¶¶11-24; Sevier decl. ¶¶45-48; Pavese Decl. ¶¶11-20.)

67.     The Publishers' investments over the last three decades have contributed to the development and success of ebooks and audiobooks. Digital works (ebooks and audiobooks) are distinct book formats from print books.  (Weber Decl. ¶¶53-82; R-A Decl. ¶¶17-24; Sevier Decl.

12

¶45-48; Pavese Decl. ¶¶11-20.) Ebook pricing, both commercial and library ebooks, is distinct from the prices of print books. The different pricing is based on the fact that the different formats (print books vs. ebooks) are used differently in the commercial and library markets and is a control mechanism that helps to make the distribution of ebooks economically sustainable. (Weber Decl. ¶¶46-49.)

68.      The development of ebooks and audiobooks have been a benefit for the public and the new format have allowed the Publishers to reach different audiences. (Sevier Decl. ¶41; Weber Decl. ¶¶53-54.)

## III.    WITH DISTINCT PRICING, TERMS, AND CONDITIONS, THE PUBLISHERS INVESTED IN THE CREATION OF A VIABLE EBOOK MARKET

### A.      In the Shadow of Rampant Music Piracy, The Publishers Developed Terms to Make Ebooks Available to the Public

69.      In the late 1990's and early 2000's, the music industry witnessed the growth and eventual dominance of file sharing sites like Napster, Limewire, and Kazaa. (R-A Decl. ¶15.)

70.      Napster, for example, allowed users to search for virtually any popular song and download an unauthorized, unrestricted MP3 music file onto the user's computer for free. (R-A Decl. ¶15.)

71.      The record companies had not yet developed an authorized alternative for consumers to access digital music when the file sharing sites, like Napster, became popular. By the time the music industry took legal action against the file sharing sites or took steps to create an easily accessible alternative, the pirate sites had proliferated. (R-A Decl. ¶15.)

72.      Countless unauthorized MP3 files had already been uploaded and shared on the Internet with users around the world. Consumers had already been presented with a popular

13

alternative that presented no barrier to an unauthorized and free copy of a song. (R-A Decl. ¶15.)

73.     After these services were identified as copyright infringers and ordered to cease operations, the music publishing industry largely embraced authorized streaming services as a primary means to deliver music files over the Internet. These streaming services offer a subscription model, which makes streaming music affordable for many consumers, while preventing against the proliferation of free illegal copies. (R-A Decl. ¶16.)

74.     It has been reported that this streaming model tends to disproportionality favor the most popular music artists while less popular artists are less favored and often get mere fractions of a cent per stream. (R-A Decl. ¶16.)

75.     While these streaming services offered an alternative to piracy and afforded the record companies with a modicum of control, it came at the expense of artist revenue. (R-A Decl. ¶16.)

**B.     Factors Considered by the Publishers When Developing the Ebook Market**

76.      By around 2002, the Publishers began to enter the digital book market. They worked to develop a sustainable digital book market in which they could offer affordable ebooks but with critical controls. (R-A Decl. ¶17; Weber Decl. ¶56.)

77.     The nature of the digital medium dictated that distribution be reasonably limited so as not to threaten the Publishers' overall book markets. (R-A Decl. ¶17; Weber Decl. ¶¶65-69; Pavese Decl. ¶¶22-24.)

78.     The experience of the music industry also taught the Publishers that it was critical to prevent pirates from illegally converting print works into digital works to be widely distributed on the Internet, including for free. (R-A Decl. ¶17.; Weber Decl. ¶55; Pavese Decl. ¶20.)

14

79.     While ebooks display the same text as print books and both are used by consumers to read the same underlying work, there are several key differences between these two formats that informed the Publishers' development of discrete terms and conditions and pricing for ebooks. (R-A Decl. ¶18; Weber Decl. ¶¶38-42.)

80.     An ebook is a digital file that consists of specially formatted text that readers typically download to their personal computers or devices from either commercial sites (like Amazon books) or from their local library (often via OverDrive).  (Weber Decl. ¶39; Sevier Decl. ¶¶20, 25.)

81.     Ebooks generally do not degrade.  Ebooks generally do not get damaged or lost. (Weber Decl. ¶39; Sevier Decl. ¶53; R-A Decl. ¶21.)

82.     Readers do not have to travel to a bookstore or library to obtain ebooks.  Whether commercial ebooks or ebooks obtained from their library, readers can download ebooks at any time from their home, office, or on the go.  (Weber Decl. ¶39; Sevier Decl. ¶54; R-A Decl. ¶20.)

83.     Ebooks contain technological features that enhance the reader's experience, including text digitized for an electronic device.  Ebooks also allow readers to interact with the works by running searches across the text or even reading in the dark. Ebooks also make it easier to carry multiple books.  A reader can carry multiple ebooks on a single device without the burden of carrying multiple print copies.  (Weber Decl. ¶39; R-A Decl. ¶20.)

84.     By contrast, print books are tangible objects.  They need to be physically moved from place to place, costing time and money that both increase with distance.  Over time, they can exhibit wear and tear.  (R-A Decl. ¶19; Weber Decl. ¶38.)

85.     There is a practical limit to the number of people who are able to access – *i.e.*, hold

4891-8421-5847v.16 0092453-000002

in hand and read – a print book as a material object.  (R-A Decl. ¶19; Weber Decl. ¶38.)

86.     The same characteristics of an ebook that make the format so attractive to consumers present a potential risk for both authors and the Publishers.  (R-A Decl. ¶21; Weber Decl. ¶41.)

87.     First, an unrestricted digital file containing the text of a book could be repeatedly and rapidly reproduced and distributed to Internet users around the world at no or minimal cost.  (R-A Decl. ¶21; Weber Decl. ¶41.)

88.     Second, a digital file does not deteriorate as pages in a physical book do, and ebooks take up negligible physical space.  (R-A Decl. ¶21; Weber Decl. ¶39.)

89.     The Publishers considered these characteristics when they developed business models that set limits on the broad dissemination capabilities of an electronic file so as not to decimate their broader book markets.  (R-A Decl. ¶21; Pavese Decl. ¶5; Weber Decl. ¶¶38-42.)

90.     The Publishers distribute ebooks under a different model than print books.  (R-A Decl. ¶¶22-23, 28-41; Weber Decl. ¶¶42-49; Pavese Decl. ¶¶21-31.)

91.     When projecting possible revenues from a book, the Publishers take into account that they will receive revenues from each of the formats they publish the book in, including hardcover, paperback, ebook and/or audiobook.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶¶20, 46.)

92.     Print books are not priced with the expectation that they will be distributed in both print and digital formats.  (R-A Decl. ¶2.)

**C.     The Publishers Have Made Significant Financial Investments to Create a Viable Ebook Market**

93.     Each of the Publishers have played a role in the development of new digital book

16

formats designed to reach new audiences. (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

94.     Starting in the late 1990's and continuing into the early 2000's, each of the Publishers began investing in the development of authorized mechanisms for distributing ebooks. (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

95.     For example, some of the divisions of what is now PRH began in the late 1990's to invest in creating authorized mechanisms for distributing digital books in order to create viable products for consumers to read as an affordable alternative to using pirate websites.(Weber Decl. ¶56.)

96.     At the same time, Random House, Inc. ("Random House") (a predecessor of PRH) and Wiley, together with publisher McGraw Hill, were members of the Open Ebook consortium that designed the original standard format for ebooks that evolved into the ePub ebook format that was launched in 2007 and remains in wide use today. (Weber Decl. ¶57.)

97.     By 2000, Random House had invested more than $5 million into the development of ebook publishing software and pledged to invest $10 million more within the next three to five years after that. (Weber Decl. ¶57.)

98.     The Publishers distribute commercial ebooks to paying consumers with restrictions geared to the nature of the digital medium. (Sevier Decl. ¶45; Weber Decl. ¶43; R-A Decl. ¶¶22-23.)

99.     Several of the Publishers use an agency model for distributing commercial ebooks. The Publishers' retained agents, which include Amazon or Barnes & Noble, impose terms and conditions on those downloading commercial ebooks and restrict them to one user account.(Weber

17

Decl. ¶43; R-A Decl. ¶23; Sevier Decl. ¶45.)

100.    For example, the Terms of Use set by Amazon in connection with ebooks purchased through its Kindle platform state as follows:

> Use of Kindle Content. Upon your download or access of Kindle Content and payment of any applicable fees . . ., the Content Provider grants you a non-exclusive right to view, use, and display such Kindle Content an unlimited number of times . . ., solely through a Kindle Application or as otherwise permitted as part of the Service, solely on the number of Supported Devices specified in the Kindle Store, and solely for your personal, non-commercial use.  Kindle Content is licensed, not sold, to you by the Content Provider." Further, the Amazon Terms of Use provide under "Limitations" that the purchaser "may not sell, rent, lease, distribute, broadcast, sublicense, or otherwise assign any rights to the Kindle Content or any portion of it to any third party. . . .

(R-A Decl. ¶23.; Weber Decl. ¶43.)

101.    The Publishers also required, and still do require, that entities distributing their ebooks to the public use DRM technology to ensure that the digital book files are limited to one user account at a time.  (Sevier Decl. ¶¶45-46; Weber Decl. ¶43; R-A Decl. ¶23.)

102.    In or around the early 2000's, PRH began distributing ebook editions of selected books to consumers through specialized electronic retail platforms.  The popularity of ebooks then grew rapidly after the release of dedicated e-readers like Amazon's Kindle (2007) and Apple's iPad (2010).  (Pavese Decl. ¶19; R-A Decl. ¶30; Sevier Decl. ¶44; Weber Decl. ¶59.)

103.    Consumers pay for an ebook that they download from an authorized e-vendor, whether or not they read the whole book or only consult a small portion of it.  (McN Decl. ¶10.)

4891-8421-5847v.16 0092453-000002

**D. Ebooks Benefit Consumers and the Publishers**

104. Since the early 2000's, millions of consumers have acquired authorized ebooks published by the Plaintiffs. (R-A Decl. ¶24.)

105. While the figures have varied over time, in fiscal year 2021, ebooks constituted approximately 14% of HarperCollins' U.S. book revenue (not including audiobooks). (R-A Decl. ¶24.)

106. For Penguin Random House, by 2020, retail ebooks constituted somewhere between 12 and 15% of the book market. (Weber Decl. ¶5.)

107. For Hachette, in 2021, ebook revenue from the retail and library channels made up approximately 15% of their business. (Sevier Decl. ¶46.)

108. Today, the Publishers offer virtually all of their new titles in ebook format. The exceptions tend to be for books that are not well-suited to the digital realm (like certain children's books or cookbooks), or reprints of books originally published by other publishers for which the Publishers do not have the digital rights. (Sevier Decl. ¶46; R-A Decl. ¶24; Weber Decl. ¶60; Pavese Decl. ¶18.)

109. In 2007, Random House had only approximately 3800 ebook titles available and Penguin had approximately 300 ebook titles available. Today, virtually all original titles in the adult trade books category published by PRH are available as an ebook, including the 48 Works in Suit published by PRH. (Weber Decl. ¶60.)

110. The Publishers invested time and money to publish their backlist titles as ebooks. In several cases, the Publishers had to separately acquire ebook rights from its authors where older publication agreements did not encompass these right. Once they acquired the ebook rights, the

19

Publishers published the works as ebooks.  (Sevier Decl. ¶47; Weber Decl. ¶60.)

111.     As a result, the vast majority of each of the adult trade titles in each Publisher's

backlist catalog are also now published as ebooks.  (Weber Decl. ¶60; R-A Decl. ¶24; Sevier Decl.

¶47.)

112.     Each Work in Suit is available as a commercial ebook.  Each Work in Suit was

available as a commercial ebook when Internet Archive first scanned and posted the Work on its

Website for distribution.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**IV.     DEVELOPMENT OF THE PUBLISHERS' LIBRARY EBOOK MARKET**

    **A.     The Role of Public Libraries in American Life**

113.     Public and academic libraries in the United States spend billions of dollars each

year – typically from local tax revenue – on obtaining books for patrons to access for free.  For

example, public libraries spent almost $1.5 billion on physical and ebooks in 2019.  (McN Decl.

¶11.)

114.     The history of libraries lending print books stretches back hundreds of years.  Under

this lending model, the Publishers sell copies of print books to libraries, or to wholesalers serving

the library market, who in turn sell to libraries.  (R-A Decl. ¶26; Weber Decl. ¶43.)

115.     Many public libraries provide services to their local communities, ranging from a

curated selection of books and communications geared towards the interests and needs of

community members, to services like free internet and community-tailored tutoring sessions.

Public libraries also promote literacy.  (R-A Decl. ¶25.)

116.     Public libraries often increase the visibility of the Publishers' works, including

through author visits, book clubs, creating virtual and physical displays to promote certain book

4891-8421-5847v.16 0092453-000002

for different occasions, and/or email marketing directed to the interests of local library patrons. (R-A Decl. ¶27; Sevier Decl. ¶¶49-50.)

117. Each of the Publishers make their ebooks available to libraries through library distributors (or "aggregators"), who license the Publishers' ebooks to libraries, and each of the Works in Suit were available as ebooks from libraries. (R-A Decl. ¶28; Sevier ¶10l; Weber Decl. ¶6; Pavese Decl. ¶3.)

118. The Publishers' sales records produced in this action track the revenues earned when library aggregators obtained each of the Works in Suit for licensing to libraries. (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.) Further, OverDrive maintained records capturing the number of library ebook checkouts for the Works in Suit between 2017 and 2020, as well as OverDrive's revenue for ebooks of the Works in Suit acquired by libraries from OverDrive during this time period. (McN Decl. ¶11.)

119. The largest aggregator is OverDrive, which licenses authorized ebooks to more than 14,000 public and academic libraries for free distribution to their patrons. (McN Decl. ¶11.)

120. The authorized library ebook market is governed by licensing terms that the Publishers have developed over many years, and continue to refine to this day. (Weber Decl. ¶77.)

121. The music, movie, and television industry also utilize licensing terms to make digital goods available to the public. (R-A Decl. ¶28.)

122. The specific terms of the Publishers' various licensing models are enforced in the library aggregators' licenses to libraries. (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

123. As part of this licensing regime, the four Publishers require that a library or library

21

consortia can lend each Publisher's ebooks only to its own verified library members. For example, public libraries often restrict lending to local residents with a library card. For school and university libraries, lending is often restricted to their students, professors, and staff. (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

124.   For example, Wiley's Ebook Distribution Agreement with ProQuest defines an "Authorized User" as follows: "For public libraries:  library staff, individual residents of Customer's reasonably defined geographic area served, and walk-in patrons while they are on site" and "For schools and other academic institutions:  currently enrolled students, faculty, staff and visiting scholars, as well as walk-in patrons while they are on-site. (Pavese Decl. ¶23.)

125.   In Wiley's agreement with library ebook aggregator OverDrive, Wiley requires OverDrive to "require participating [libraries] to take reasonable measures to ensure that only Authorized Patrons of their libraries . . . may access the offline or download collection" and that "OverDrive will require that participating [libraries] provide it the right to audit their access control systems." (Pavese Decl. ¶23.)

126.   The Publishers also require that each library aggregator employ approved DRM and other security measures to ensure that only one-user account can access each copy of a Publisher's ebook, and to prevent the unauthorized copying or distribution of ebook files.  (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

127.   Starting in the early 2000's, and still today, each of the Publishers made library ebooks available on a "one-copy, one-user"  licensed basis. This license terms allows multiple library patrons to check out a single copy successively, subject to the community-based limitations described above and DRM restrictions. Each of the Publishers initially offered this model with a

4891-8421-5847v.16 0092453-000002

perpetual term.  (Sevier Decl. ¶51; R-A Decl. R-A Decl. ¶¶30; Weber Decl. ¶68; Pavese Decl. ¶¶5, 22.)

128.    Under the one-copy, one user model, libraries pay a license fee when they select a title for their collection.   (Weber Decl. ¶76; R-A Decl. ¶¶33, 37; Pavese Decl. ¶5; Sevier Decl. ¶¶68, 74.)  The library pays the same license fee regardless of whether library patrons read the entire ebook or short excerpts.  (McN Decl. ¶10.)

129.    The same is true for commercial ebook licenses:  like print books, a purchaser pays for the work regardless of whether the purchaser actually reads any or all of the book.  (McN Decl. ¶10.)

130.    As library ebooks became increasingly more popular, HarperCollins, Penguin Random House, and Hachette each determined that a perpetual term for its one-copy, one-user model was not serving the economic interests of its authors.  They each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  (Sevier Decl. ¶65; R-A Decl. ¶¶30-32; Weber Decl. ¶¶71-75.)

131.    These three Publishers currently offer a one-copy, one-user model with a perpetual term to academic libraries.  Academic libraries have different needs and lending patterns than public libraries.  (Sevier Decl. ¶68; R-A Decl. ¶40; Weber Decl. ¶77.)

132.    Wiley maintains a one-copy, one user model with perpetual access for its trade books that it makes available to all libraries as ebooks.  (Pavese Decl. ¶¶5, 25-26.)

133.    Today, each of the Publishers offer somewhat different licensing terms for library ebooks:

4891-8421-5847v.16 0092453-000002

**B.**     **Hachette**

134.     In 2019, Hachette adopted a two-year term for its one-copy, one user model for library patrons to access its trade ebooks, which remains in effect today.  At the end of two-years from the date of purchase, the terms governing this lending model state that "the Digital Book will expire and will no longer be available … unless repurchased."  (Sevier Decl. ¶¶65-68.)

**C.**     **HarperCollins**

135.     In 2011, HarperCollins adopted a one-copy, one-user model with a total of 26 circulations ("26-Circ Model"), which remains in effect today.  (R-A Decl. ¶¶32-35.)

136.     Under the 26-Circ Model, a library ebook is available for twenty-six circulations. Once the twenty-six circulations are exhausted, the library can decide whether to re-order the ebook for an additional twenty-six circulations, or use their resources to buy other titles.  (R-A Decl. ¶32.)

137.     For many years, HarperCollins priced the 26-Circ model at the same price as the suggested retail price for print books; currently it is priced at slightly more than the suggested retail price for print books.  (R-A Decl. ¶33.)

138.     HarperCollins enacted this model with the intention that it be similar to the economics that govern the sale of print books that show wear and tear from usage and need to be replaced or are lost over time.  (R-A Decl. ¶33.)

139.     The price per circulation of a library ebook under the 26-Circ Model is lower than the price of a commercial ebook.  (R-A Decl. ¶33.)

140.     The 26-Circ Model generated just over $3.45 million in revenue for HarperCollins in fiscal year 2014; by fiscal year 2019, the model generated over $9.95 million.  (R-A Decl. ¶35.)

24

141. In 2017, HarperCollins adopted an additional library distribution model to supplement its 26-Circ Model, the Pay-Per-Use model ("PPU Model"), which remains in effect today. (R-A Decl. ¶36.)

142. Under this model, libraries offer their patrons an opportunity to borrow an ebook from HarperCollins' catalog and pay a fee for a single, individual use only when a particular title is checked out by a patron. (R-A Decl. ¶36.)

143. Currently, all HarperCollins titles qualify for the PPU Model twelve months after the initial publication date. Libraries also retain the option to obtain these backlist titles under the 26-Circ Model as well. (R-A Decl. ¶36.)

144. The PPU Model allows a library to license the right to a single circulation of an ebook for a small percentage of the price of an ebook license under the 26-Circ Model. (R-A Decl. ¶36.)

145. The PPU Model addresses two needs in the library channel. First, smaller libraries with few members that are less likely to fully exhaust all twenty-six circulations in the standard model can access a broader catalog for their patrons and manage their budgets on a month-to-month basis. Second, larger libraries that have focused on widely read titles can provide their patrons with access to a much broader selection of books at a lower cost: if only a few members of a public library are interested a book, the library can obtain ebook copies for that handful of individuals at a price point lower than the 26-Circ Model. (R-A Decl. ¶36.)

146. In fiscal year 2018, just after it was introduced, the model generated $154,789 in revenue for HarperCollins. By fiscal year 2020, HarperCollins earned over $2 million in revenue from library ebook checkouts via the PPU Model. (R-A Decl. ¶33.)

25

**D.    PRH**

147.    In 2018, PRH adopted a two-year metered model for library patrons to access its trade ebooks, which remains in effect today.  Through one of PRH's aggregator partners, a library obtains a license to make one copy of an ebook available to patrons on a "one-copy, one-user" basis, but for "a limited term of two (2) years from the time that each such copy is first purchased and available for lending by that institution…"  At the end of the two-year period, the ebook copy "will expire" and the library must obtain another copy if it wants to keep lending that ebook through the aggregator's platform.  (Weber Decl. ¶75.)

**E.    Wiley**

148.    For its trade titles, Wiley continues to offer libraries a one-copy, one-user model or one-copy, three-users model, both with a perpetual term.  Under these models, when a library obtains a license for one ebook copy of a Wiley title, only one – or three – users at a time can access that copy.  A library's license to lend out the copy under the terms of the license does not expire.  The one-copy, one-user and one-copy, three-users model are Wiley's most popular lending models for its trade ebooks.  (Pavese Decl. ¶22.)

149.    Wiley developed these models largely with the interests of academic libraries in mind.  (Pavese Decl. ¶25.)

150.    Academic libraries are the primary customers of Wiley's science and academic-focused titles, which make up the majority of its catalog. While all libraries exist to serve patrons and expand access to information, academic libraries have a slightly different mission than their public counterparts.  Academic libraries highly prioritize the building of long-term collections, whereas public libraries often weed their collections.  Further, professors and college students tend

26

4891-8421-5847v.16 0092453-000002

to make somewhat different uses of academic-focused ebooks than the general public does with trade ebooks in the public library context. (Pavese Decl. ¶25.)

151.  As a result of these differences, a perpetual licensing model is particularly attractive to academic libraries. Although Wiley adopted a perpetual term for its one-copy, one-user and one-copy, three users models with academic libraries in the forefront of its mind, Wiley has concluded that it is simpler for the company to offer a perpetual term for all ebook titles, including trade book titles, licensed to all libraries (including public libraries) under these models. (Pavese Decl. ¶¶25-26.)

152.  Wiley sets the digital list price for its library ebooks on the one-copy, one-user model at the same price as its print list price. (Pavese Decl. ¶24.)

153.  Although Wiley, because of its principal role as an academic publisher, licenses its trade book ebooks to all libraries for a perpetual term at the same price as a print book, in a fashion closely akin to the acquisition of print books, the Internet Archive posts thousands of Wiley books on its Website along with the other Publishers' books. (Pavese Decl. ¶8.)

154.  Because Wiley's books largely serve the academic community, the company also has worked with the leading academic-focused aggregators EBSCO and ProQuest to develop additional and unique lending models that serve the specific needs of libraries and readers of Wiley's science-focused and other titles. (Pavese Decl. ¶¶3-4, 27-30.)

155.  For instance, Wiley works with these library ebook aggregators to offer subscription-based models. These subscription models offer libraries to prospect of paying for students to have unlimited access to a large volume of ebooks. Three of the Works in Suit published by Wiley are available under these subscription models. (Pavese Decl. ¶¶28-29.)

27

156. Wiley also works with its aggregator partners to offer a "Concurrent User Access Model," which is specifically designed to account for the frequent but brief use of titles in academic settings. Under that model, content is available for a maximum of 365 "uses" within a particular year. A use is defined to exclude a brief consultation of less than 10 minutes. (Pavese Decl. ¶30.)

157. Likewise, Wiley offers a number of "Short Term Loans" – ranging from one-day, seven-day, 14-day, and 28-day periods – where a library purchases access to a title for only that specific period of time. (Pavese Decl. ¶30.)

### F. The Publishers' Library Ebook Market Provides Americans with Millions of Free Ebooks

158. In addition to the Publishers' investments in the ebook format, the library ebook aggregators have invested in the creation of convenient platforms and applications that can be used by library patrons to download free ebooks to their devices anywhere there is an internet connection. (Weber Decl. ¶68, 82; R-A Decl. ¶¶42-43.)

159. For example, the country's leading library ebook aggregator, OverDrive, has developed the Libby app for public libraries. (Weber Decl. ¶82; R-A Decl. ¶¶42.)

160. Using the Libby app, a library patron can enter her local library card information and be granted instant access to that library's ebook holdings. (R-A Decl. ¶42.)

161. The library patron may check out and access library ebooks using the app. If a title is not available, a patron may place a hold on the book and receive a notification when the title is available to be checked out. (R-A Decl. ¶42.)

162. Several other leading aggregators have developed similar platforms and applications for patrons to use to access library ebooks. (Weber Decl. ¶68.)

4891-8421-5847v.16 0092453-000002

163.    The authorized library ebook market has provided library members across the United States with hundreds of millions of ebooks.  (Weber Decl. ¶10; McN Decl. ¶11.)

164.    The number of licensed library ebooks checked out via OverDrive was ███████ in 2010, but this increased ██████ to nearly ████████ checkouts in 2020.  (McN Decl. ¶11.)  Additionally, in 2012, OverDrive processed 70 million total digital checkouts (which includes both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million.  (McN Decl. ¶11.)

165.    During that same ten-year time span, the number of different titles that were checked out by patrons via OverDrive increased exponentially from ██████ to more than ██████. (McN Decl. ¶11.)

166.    According to the American Library Association, more than 93% of libraries in the United States lend ebooks to their patrons.  (Weber Decl. ¶10.)  In 2020, more than 100 public library systems exceeded one million digital checkouts via OverDrive.  (Weber Decl. ¶10.)

167.    According to the Institute of Museum and Library Services ("IMLS"), an independent federal agency that provides library grants, museum grants, policy development, and research, between FY 2014 and FY 2018, the percentage of libraries offering electronic collection materials increased from 80 percent to 90 percent.  (Weber Decl. ¶11.)  The IMLS data further reflects that the biggest growth in ebook adoption between 2014 and 2018  was "among rural libraries (14 percent) compared to other locales (between 1 and 8 percent).  (Weber Decl. ¶11.)

168.    Internet Archive's library expert, Susan Hildreth, testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive."  (McN Decl. ¶9.)

29

169.     The Publishers' annual revenue from the library ebook market has increased from only a few million to hundreds of millions of dollars in less than a decade.  (Weber Decl. ¶8.)

170.     For example, in 2010, PRH earned over $5 million from U.S. digital library sales, which includes both ebooks and digital audio.  By 2020, that figure had grown to over $83 million.  Ebooks currently generate $59 million for PRH from library channels.  (Weber Decl. ¶8.)

171.     From January 2017 and August 2019, approximately 25% of PRH's annual ebook revenue was generated from U.S. digital library sales; the remaining approximately 75% of revenue was generated from retail channels.  (Weber Decl. ¶64.)

172.     HarperCollins earned $46.91 million in revenue from ebooks in the United States library market between 2015 and 2020.  Library ebook licenses also make up an increasing percentage of HarperCollins' overall ebook revenue.  In fiscal year 2015, library ebook licenses in the United States constituted 2.3% of HarperCollins' total U.S. ebook revenue.  By fiscal year 2020, that share grew substantially to 7.4% and reached 12.9% of all U.S. ebook revenue by mid-2021.  As of mid-2021, HarperCollins earned over $19 million in revenue from library ebook licenses in the United States.  (R-A Decl. ¶48.)

173.     The numbers of Americans reading authorized free ebooks from the library has increased more than the number of people purchasing ebooks in the retail market.  (Sevier Decl. ¶57; R-A Decl. ¶50.)

174.     Three of the Publishers have performed analyses to determine the proportion of ebook readers in the United States who access authorized ebooks for free from a library, as compared with purchasing a commercial ebook.  (Sevier Decl. ¶¶55-59; Weber Decl. ¶¶6, 64; R-A Decl. ¶50.)

4891-8421-5847v.16 0092453-000002

175. In 2020, PRH performed a preliminary study using nearly 87,000 titles first published by the company between January 2017 and August 2019 and compared library checkouts via OverDrive with commercial ebooks purchased from Amazon and other retail platforms. The study determined that library patrons checked out the ebook titles 34.3 million times, which accounted for approximately 39% of all ebook reads for these titles. Which means that, of all the Americans reading PRH ebooks available during this nearly three year time period, 39% obtained the ebook for free from a library. (Weber Decl. ¶¶6, 64.)

176. Moreover, the 39% percent of eBook reads from library patrons accounted for only 25% of PRH's total ebook revenue for that same time period, with the remaining approximately 75% of ebook revenue coming from consumers that purchased their ebooks. (Weber Decl. ¶¶6, 64.)

177. In a 2021 study, Hachette looked at three years of data comparing the number of authorized ebook circulations of its titles to library patrons via OverDrive, as compared with the number of consumers purchasing their ebooks. It found that between 2017 and 2020, library ebook circulations made up, on average, 50% of "reads." In other words, the study reflected that half of the people who read Hachette's ebooks are library readers who obtained the ebooks for free. (Sevier Decl. ¶¶55-56.)

178. The study also reflected that, although library ebooks made up 50% of reads, library ebooks brought in only 13% of total ebook revenue for Hachette; the remaining approximately 87% of revenue was generated from retail channels. (Sevier Decl. ¶56.)

179. Hachette's analysis also concluded that since 2017, the percentage of their consumer reads has been shifting from retail towards library, especially for backlist. Of all HBG

31

backlist ebooks either purchased or checked out in 2020, 38% were bought at retail and 62% checked out from libraries. (Sevier Decl. ¶57.)

180.     Finally, the study reflected that in the year 2020, library ebooks brought in 16% of total ebook revenue for Hachette. During the same year, 57% of the people who read Hachette's ebooks were library readers who obtained the ebooks for free. (Sevier Decl. ¶56.)

181.     In 2021, through its 26-Circ and PPU models, HarperCollins made over 63 million ebook checkouts available to library patrons through its library ebook sales, exceeding retail ebook sales by more than 30 million. This figure reflects all potential check-outs under the 26-Circ model, not actual check-outs. (R-A Decl. ¶50.)

182.     While HarperCollins made more "reads" available through library ebook sales than through retail sales, library ebook revenue accounted for approximately 10-15% of the company's ebook revenue in 2021. (R-A Decl. ¶50.)

## V.     THE PUBLISHERS MAKE EBOOKS BROADLY ACCESSIBLE TO PERSONS WITH DISABILITIES AND RESPOND QUICKLY IN EMERGENCY CIRCUMSTANCES

### A.     The Publishers' Efforts to Serve the Blind and Print Disabled People

183.     The Publishers make efforts to ensure that their ebooks are available in a format accessible to the blind and visually disabled, at no cost to those patrons. (Sevier Decl. ¶71; R-A Decl. ¶51; Pavese Decl. ¶.)

184.     Hachette and HarperCollins make their works available through Bookshare, which is the world's largest accessible online library for people with print disabilities. Bookshare makes its services available, free of charge, to all qualifying students in the United States through an award from the U.S. Department of Education, Office of Special Education Programs. (Sevier

32

Decl. ¶51; R-A Decl. ¶51.)

185.    As a result, Bookshare is free for all qualified U.S. students.  Individuals who are not students or international patrons can pay a nominal annual fee for their membership. Bookshare makes content available through a range of assistive technologies, including braille readers, text to speech and ebooks.  If a reader requested title is print exclusive or has never yet been available in ebook format, the Publishers produce a special PDF exclusive to Bookshare for the unique purpose of fulfilling this obligation to readers.  (Sevier Decl. ¶51.)

186.    For the general population, the Publishers also produce ebooks with the typical features of type resizing, page magnification, and screen contrast so readers can adjust the text to their preference.  (R-A Decl. ¶52; Sevier Decl. ¶71.)

**B.      The Publishers' Response to the COVID-19 Pandemic**

187.    Starting in March 2020, as the COVID-19 pandemic caused various shutdowns, the Publishers enacted programs and new lending models to assist libraries and schools to meet the increased demand for ebooks.  (Sevier Decl. ¶70; Weber Decl. ¶¶79-80; R-A Decl. ¶41.)

188.    During the pandemic, many public libraries in the United States were provided with time-limited federal funding under the American Rescue Plan Act that could be directed towards obtaining library ebooks for patrons.  Some of the Publishers adjusted their models to allow libraries to qualify for this funding.  (R-A Decl. ¶41; Weber Decl. ¶79.)

189.    PRH implemented two library ebook models in the spring of 2020.  (Weber Decl. ¶79.)

190.    First, PRH created a one-year metered model under which libraries can purchase a license to access an ebook title on a one-copy, one-user basis for half the digital list price than the

4891-8421-5847v.16 0092453-000002

company's standard two-year model. (Weber Decl. ¶79.)

191.    Second, PRH created a pay-per-use model. If a library participates in this model, the patrons of that library are given the option to access a one-time, time-limited loan of any ebook in PRH's catalog. Each time a title is checked out through this model, the library pays 10% of the standard digital list prince under PRH's standard two-year library ebook model. (Weber Decl. ¶80.)

192.    Starting in the beginning of the pandemic, Hachette adopted protocols under which teachers and professors could obtain up to 250 codes for their students to use to obtain ebooks that could be read in lieu of physical copies that were inaccessible. (Sevier Decl. ¶70.)

193.    In response to the pandemic, Hachette also provided discount ebooks to academic libraries on a case-by-case basis, either under a simultaneous use option that allowed up to twenty students to read a single copy of an ebook for two months for $20, or through a discounted one-copy, one user model where a library would be charged $3 for each ebook copy, for a three-month access period. (Sevier Decl. ¶70.)

194.    During the pandemic, HarperCollins temporarily instituted a prorated, time-metered model for libraries to make HarperCollins' ebooks available to their patrons. The company developed this model with the intent to allow libraries to spend their time-limited federal funding on licensed ebooks. (R-A Decl. ¶41.)

195.    At the start of the pandemic, HarperCollins reduced prices on approximately 1,000 popular backlist trade and children's ebook titles for several months. (R-A Decl. ¶41.)

196.    HarperCollins also expanded the titles in the PPU model at this time. While the PPU Model had previously been confined to books published more than eighteen months ago, the

34

company moved up the time frame for frontlist books to enter the PPU Model to six months post-publication.  (R-A Decl. ¶41.)

197.    Additionally, starting in the beginning of the pandemic, HarperCollins extended permission to authors, educators, and librarians to read the company's titles online and on video. (R-A Decl. ¶41.)

## VI.    INTERNET ARCHIVE'S USE OF THE PUBLISHERS' REGISTERED WORKS

### A.    The Works in Suit

198.    The Publishers brought this suit as to each of the 127 literary works listed in Exhibit A (the "Works") to their Complaint.  (McN Decl. ¶7.)

199.    The 127 Works in Suit range from well-known titles like *The Bell Jar* and *Lord of the Flies,* to groundbreaking titles, like Zora Neale Hurston's *Their Eyes Were Watching God* or Toni Morrison's *Bluest Eye,* to popular non-fiction and fiction titles, like Malcolm Gladwell's *Blink,* Gillian Flynn's *Gone Girl,* Ann Patchett's *Commonwealth,* and George R.R. Martin's *A Dance with Dragons* (from the *Game of Thrones* series), to classic children's titles, like the *Big Nate* or *Lemony Snicket* books, to biographies, to romance novels, like CJ Redwine's *Defiance,* and Patrick Lencioni's best-selling management books.  (McN Decl. ¶7; Weber Decl. ¶¶21-22; Sevier Decl. ¶73; R-A Decl. ¶6; Pavese Decl. ¶18.)

200.    For each of the Works in Suit, the Publishers obtained from each author the exclusive rights to publish the underlying work in multiple formats, including hardcover, paperback, and ebook formats.  (McN Decl. ¶8.)

201.    All 127 Works in Suit are available as authorized ebooks, which retail consumers pay to read and libraries pay to license so that they can be loaned for free to their patrons.  (Sevier

35

4891-8421-5847v.16 0092453-000002

Decl. ¶9; Weber Decl. ¶20; R-A ¶20; Pavese Decl. ¶18.)

202.    Over the three years prior to this action, the Works in Suit collectively generated over $1 million in library ebook revenues alone for the respective Publishers and their authors. (Weber Decl. ¶23; R-A ¶49.)

**B.      Internet Archive's Use of the Works in Suit**

203.    The Works in Suit were checked out on Internet Archive's Website 46,307 times between March 2017 and approximately September 2, 2020.  (Foster Decl. ¶104.)  As of May 2020, Internet Archive provided registered users of its website with digital versions of the physical books embodying the Works in Suit.  (Offner Decl. ¶14.)

204.    Digital versions of each of the Works in Suit could be accessed on Internet Archive's website using a standard Internet Archive account.  A specially qualified account held be someone with a print disability was not necessary to access the Works in Suit.  (Offner Decl. ¶6.)

205.    The Internet Archive generates a "details" page for each book listed on its website, with a separate URL.  (Offner Decl. ¶8.)

206.    As of May 2020, each of the Works in Suit had a "details" page with a separate URL on the Internet Archive's website.  (Offner Decl. ¶14.)

207.    As of May 2020, while on the "details" pages for all of the Works in Suit, a user could click a button labeled "Borrow".  (Offner Decl. ¶11.)

208.    As of May 2020, after clicking the "Borrow" button on the "details" pages for all of the Works in Suit, a user would obtain access to each full book for 14 days.  (Offner Decl. ¶14.)

4891-8421-5847v.16 0092453-000002

209.    For all of the Works in Suit, once a user accessed each full book, a user could:

•    Scroll through and read the book within the Internet Archive website's online book-reader interface;

•    Utilize the listen feature, called "Read this book aloud," of the Internet Archive website's online book-reader interface to hear an audio rendering of each book; and

•    Use the download feature to download each full book from Internet Archive website, for access on a computer using Adobe Digital Editions.  The download feature allowed for downloads in both PDF and ePUB formats.

(Offner Decl. ¶12.)

### C.    Copyright Registration and Ownership

210.    Hachette holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Hachette is identified as the publisher.  (McN Decl. ¶8.)

211.    HarperCollins holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which HarperCollins is identified as the publisher.  (McN Decl. ¶8.)

212.    Penguin Random House holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Penguin Random House is identified as the publisher. (McN Decl. ¶8.)

213.    Wiley holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the

37

Complaint for which Wiley is identified as the publisher. (McN Decl. ¶8.)

214. Each of the 127 Works was registered with the United States Copyright Office within the time period required to recover statutory damages and attorneys' fees under 17 U.S.C. § 412 with respect to the allegations set forth in the Complaint. (McN Decl. ¶8.)

## VII. THE INTERNET ARCHIVE'S EBOOK LENDING WEBSITE

### A. Internet Archive's Evolution and Stated Goals

215. Internet Archive endorses the phrase "Universal Access to All Knowledge." (McN Decl. ¶27.)

216. Internet Archive was founded in 1996 by Brewster Kahle, who currently serves as its Chairman. (McN Decl. ¶28.)

217. Mr. Kahle is a computer scientist who sold two technology companies in the 1990s, one to AOL and another to Amazon. (McN Decl. ¶28.)

218. The considerable profits from those sales were used, in part, to fund the Kahle/Austin Foundation, which Kahle runs as President with his wife and which reported assets worth approximately $120 million in 2019. (McN Decl. ¶28.)

219. Internet Archive is a 501(c)(3) corporation. (McN Decl. ¶29.)

220. In a 2017 grant application, Internet Archive stated that it has a guaranteed source of philanthropic support to sustain its basic services in perpetuity." (McN Decl. ¶29.)

221. Internet Archive's activities are in large part funded by Mr. Kahle's various entities, including the Kahle/Austin Foundation. IA's former Director of Finance Jacques Cressaty testified that Mr. Kahle "would use various ways of channeling these funds [to IA]" including via the Kahle/Austin Foundation. (McN Decl. ¶29.)

4891-8421-5847v.16 0092453-000002

222.   Government funding made up only 1.8% of Internet Archive's revenue between 2011 and 2020.  (McN Decl. ¶29.)

223.   Mr. Kahle wrote in a March 1, 1997 article for *Scientific American* that "the continued reduction in price of data storage, and also data transmission, could lead to interesting applications as all the text of a library, music of a radio station, and video of a video store become cost effective to store and later transmitted in digital form."  (McN Decl. ¶31.)

224.    In approximately 2000 or 2001, Internet Archive started uploading public domain books to its Website in order to "build[] a digital library".  (McN Decl. ¶31.)

225.    The Google Books service  at issue in *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015), allowed users to search through and read "snippets" of books, but did not allow users to access the complete text of a book.  (McN Decl. ¶¶33-34.)

226.   In a December 20, 2006 article, Mr. Kahle was quoted as saying "[t]he whole Google Books Search looks like Amazon's Search Inside the Book.  Let's go open with these collections.  These are beautiful books."  (McN Decl. ¶33.)

227.   About a year later, Internet Archive announced that "together with the Boston Public library and the Woods Hole Library,  it would start scanning out-of-print but in-copyright works to be distributed through a digital interlibrary loan system."  (McN Decl. ¶34.)

228.   In contrast, a *New York Times* article stated that "Google scans copyrighted works as well, but it does not allow users to read the full text of those books online, and it allows publishers to opt out of the program."  (McN Decl. ¶34.)

229.   Mr. Kahle has stated that he sees Internet Archive's activities in connection with the Website as a "rebellious" act that "SIMPLY ASSUME[s]" that Internet Archive "can perform

39

a function in the online environment that [libraries] routinely perform in the physical print environment." (McN Decl. ¶15.)

230. Today, subject to its claim that it does not post books published within the last five years, Internet Archive scans any in-copyright books it acquires and posts ebook versions of those titles on its Website. (McN Decl. ¶35.)

231. Internet Archive does not always comply with its five year limitation. For example, two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the IA's Website that same year. (McN Decl. ¶115.)

232. Internet Archive has set public goals for the number of in-copyright books it would like to make available for borrowing as ebooks on the Website. For example, in March 2018, Internet Archive announced that its short-term goal is to digitize more than four million in-copyright books and add them to the Website. (McN Decl. ¶36.)

233. Then, eight months after this lawsuit was filed, Internet Archive announced that it had added its two millionth in-copyright book to the Website on February 3, 2021. (McN Decl. ¶36.)

234. IA currently lists more than 3 million in-copyright books on its Website. If IA continues to add in-copyright books at a similar rate, it is on track to meet its four million-book milestone within a year. (McN Decl. ¶36.)

235. In an August 2011 article in *The Guardian*, Mr. Kahle stated that he has a "realistic goal of 10 million books – the equivalent of a major university library." (McN Decl. ¶36.)

4891-8421-5847v.16 0092453-000002

B.     **The Internet Archive Ebook Lending Service At Issue in This Lawsuit**

236.     At present, anybody in the world with an Internet connection and a valid email account can obtain an account to access any of the millions of ebooks available on IA's Website. (McN Decl. ¶3.)

237.     Chris Freeland, Internet Archive's Director of Open Libraries, testified that any person can "sign up" for free access to the Website "from anywhere in the world" by entering "[b]asic contact information including [an] email address."  (McN Decl. ¶3.)

238.     According to Mr. Freeland, Internet Archive "[l]end[s] to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into [controlled digital lending] by particular users."  (McN Decl. ¶3.)

239.     The Publishers commenced this copyright infringement action on June 1, 2020, alleging that Internet Archive was infringing the 127 Works in Suit.  (McN Decl. ¶7.)

240.     An analysis of the Website shows that over 33,000 in-copyright books published by the Publishers in print and digital form are available on the Website.  (McN Decl. ¶7.)

241.     The Works in Suit are a fraction of the more than 33,000 in-copyright books published by the Publishers that Internet Archive has posted as ebooks on the Website without authorization, license or any compensation.  (McN Decl. ¶7; Foster Decl. ¶¶112-118.)

242.     Internet Archive scanned physical books published by the Plaintiffs and "republishes" ebook editions on the Website.  (McN Decl. ¶13.)

243.     The Publishers have not granted Internet Archive permission to scan their physical books to create digital copies.  (McN Decl. ¶13.)  The Plaintiffs have not granted Internet Archive permission to distribute these unauthorized ebook editions on the Website.  (McN Decl. ¶13.)

41

244. Internet Archive admits that it lacks permission from the Publishers to engage in these activities. (McN Decl. ¶13.)

245. Mr. Freeland testified that Internet Archive does not "pay royalties in connection with the digitization of [each author's] work" or "pay authors royalties for making their books available for free" on the Website. (McN Decl. ¶37.)

246. Mr. Freeland testified that Internet Archive does not "license materials" for its Website. (McN Decl. ¶12.)

247. When this lawsuit was filed in June 2020, Internet Archive admitted in its Answer to the Complaint that "more than 1.3 million books are available on archive.org for one patron to borrow at a time." (McN Decl. ¶1.)

248. Since June 2020, the number of in-copyright ebooks available on the Website has increased to over 3.2 million. (McN Decl. ¶1.)

249. The Website effectuates about 70,000 "borrowing events" per day – which amounts to 25 million per year. (McN Decl. ¶2.)

250. As of July 2022, IA's Website reflects that it has 5.9 million users. This figure was 2.6 million when this action was filed in June 2020. (McN Decl. ¶2.)

251. According to Internet Archive, at the time this action was filed, any user who logged in with a valid Internet Archive account could "borrow" for free in-copyright ebooks for a period of 14 days. (McN Decl. ¶4.)

252. After this action was filed, Internet Archive changed it practices and now its default option allows valid users to "borrow" free in-copyright ebooks for a period of one hour. (McN Decl. ¶4.)

42

253. Internet Archive still offers users the ability to "borrow" a book for 14 days if the title is available for concurrent lending by more than person at once. Each title has a lending cap based on the number of concurrent loans of the work is allowed at one time. If the lending cap for a particular ebook title has been exceeded, the user goes on a waitlist until it becomes available. (McN Decl. ¶4.)

254. Internet Archive has indicated that it offers "High Quality Page Images" of the books available for reading or downloading on its Website. (McN Decl. ¶4.)

255. One of Internet Archive's experts, Dr. Imke Reimers, testified that the quality of the scans were "fine," "quite similar to the Google Books scans" and sufficiently clear to serve as a "potential substitute" for authorized library or commercial ebooks. (McN Decl. ¶4.)

256. Internet Archive invites its users to read the ebooks on the Website. For example, the top of the home page of openlibrary.org invites readers to "Read Free Library Books Online." (McN Decl. ¶5.) Internet users who search Google for terms like "free ebooks," "borrow ebooks" or "Toni Morrison beloved free read" will see links to Internet Archive's Free Ebook Website on the first page of results, above any links to platforms offering the Plaintiffs' authorized library ebooks. (McN Decl. Exhibit 185.)

257. Mr. Kahle testified that once an ebook is checked out, a user can "flip through or read all the pages, absolutely." (McN Decl. ¶4.)

258. Internet Archive's library expert admitted that "certainly some [ebooks] could be read in an hour." (McN Decl. ¶4.)

43

259.    Internet Archive is aware that at least some of its users use the Website to read books in full.  In June 2020, when Internet Archive changed its default loan period from 14 days to 1 hour, it received complaints from users.  (McN Decl. ¶5.)

260.    For example, one user asked the Internet Archive, "How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading."  (McN Decl. ¶5.)

261.    As of July 2020, there are more than 1.1 million ebooks listed for 14-day downloads on the Website.  (McN Decl. ¶4.)

262.    For the books that are available on the Website for one hour loans only, the top of the page view tells users that the loans are "[r]enewable every hour, pending availability."  (McN Decl. ¶6.)

263.    Internet Archive's dissemination of ebooks on its Website has expanded in recent years.  (Foster Decl. ¶18.)

264.    The number of ebooks that Internet Archive makes available for lending on its Website has increased from (a) 648,117 scans on April 1, 2018; (b) 965,499 scans on April 1, 2019; (c) 1,476,344 scans on May 26, 2020; and (d) 3,211,204 scans on February 19, 2022. (Foster Decl. ¶18.)

265.    The data further reflects an increase in Internet Archive's scanning of the Publishers' works in 2020 and 2021 after the Publishers filed suit in June 2020, as compared to prior years.  (Foster Decl. ¶18.)

266.    Since this action was filed, Internet Archive has added a total of 2,993 in-copyright works published by Hachette for lending on the Website.  (Foster Decl. ¶118, Figure 11.)

44

267.     Since this action was filed, Internet Archive has added a total of 4,171 in-copyright works published by HarperCollins for lending on the Website.  (Foster Decl. ¶118, Figure 12.)

268.     Since this action was filed, Internet Archive has added a total of 9,558 in-copyright works published by PRH for lending on the Website.  (Foster Decl. ¶118. Figure 13.)

269.     Since this action was filed, Internet Archive has added a total of 2,622 in-copyright works published by Wiley for lending on the Website.  (Foster Decl. ¶118, Figure 14.)

**C.     User Experience of the Internet Archive's Website**

270.     The Website's home page includes a "BOOKS" tab that, when clicked, prominently shows icons for "Books to Borrow" and "Open Library." The first icon leads to a page for the "Books to Borrow" collection of electronic books on the Website. The second icon leads to the Openlibrary.org page, which is a component of Internet Archive's Website.  (Foster Decl. ¶21.)

271.      Internet Archive organizes its various content into "collections." The "Books to Borrow" page provides access to digitized books within the "inlibrary" collection, reported as holding 3,211,204 items as of Feb 21, 2022 and presently at over 3.4 million  (Foster Decl. ¶21; McN Decl. ¶1.)

272.     Clicking on the "About" icon on the "Books to Borrow" page toggles to text explaining that "Books in this collection may be borrowed by logged in patrons. You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans." The description at the "About" icon on the "Books to Borrow" page, at https://archive.org/details/inlibrary?tab=about, also indicates:

> Please note that works in this collection are protected by copyright
>
> law (Title 17 U.S. Code) and copying, redistribution or sale, whether

4891-8421-5847v.16 0092453-000002

> or not for profit, by the recipient is not permitted unless authorized
>
> by the rightsholder or by law.

(Foster Decl. ¶23.)

273.  Until June 2020, the Website functionality enabled downloads of any borrowed book into Adobe Digital Editions.  After this action was filed, in June 2020, Internet Archive changed its system so that only 14 day loans allowed downloads of the books.  The 1-hour loans are available for online viewing in your browser.  (Foster Decl. ¶24.)

274.  Users can presently use a search feature on the "Books to Borrow" page to locate titles within the collection.  Apart from that search interface, the Internet Archive groups books into various "Topics and Subjects" for users to find a book.  (Foster Decl. ¶24.)

275.  The Internet Archive requires users to be logged in to an Internet Archive account to access many of its functions, including full access to free copies of complete digital books in the inlibrary collection.  (Foster Decl. ¶27.)

276.  The "BookReader application" allows the user to use the arrow keys on their keyboard, or to click on navigation buttons in the reader, to move to different pages in the borrowed book.  The BookReader app on the Website also has a "Read Aloud" feature, which a logged in user can activate for a borrowed book by clicking on headphones icon in the BookReader.  The feature converts the text to audio and plays it aloud.  (Foster Decl. ¶28.)

277.  With a 14-day loan, the user is presented with text providing for additional "DOWNLOAD OPTIONS" including "ENCRYPTED ADOBE EPUB" and "ENCRYPTED ADOBE PDF" (with "High Quality Page Image").  Clicking on the latter results in a file download to a user's computer, which can be opened in the "Adobe Digital Editions 4.5" application. The

4891-8421-5847v.16 0092453-000002

scanned book is then in the user's Adobe Digital Editions "Library," from where the user can open and read it on a computer and a variety of other devices, including an iPad. (Foster Decl. ¶30.)

278.    Depending on the number of concurrent loans allowed, multiple users can obtain and read copies of the same Internet Archive scan of a book at the same time. (Foster Decl. ¶31.)

**D.    Evolution of Internet Archive's Infrastructure To Lend Ebooks Through its Website**

279.    Internet Archive has developed technology to facilitate its practice of obtaining physical books and of scanning those books in order to distribute the resulting ebooks on its Website. (McN Decl. ¶38.)

280.    According to Mr. Kahle's "Universal Access to Knowledge" speech in 2006, Internet Archive had by that time "developed [its] own little book scanner to get the cost per page – if you were to scan inside the United States – down to ten cents." (McN Decl. ¶39.)

281.    That machine, known as a Scribe, photographs the pages of books, which are turned manually by an operator raising and lowering a V-shaped pane of glass that keeps the pages flat. (McN Decl. ¶39.)

282.    The photographs of each page of the book are run through software developed by Internet Archive, also called Scribe, to create digital copies of print books. The Scribe machine and software are collectively known as the Scribe system. (McN Decl. ¶39.)

283.    Internet Archive subsequently created "digitization centers," where operators run multiple Scribe machines to scan high volumes of books. Around 2009, Internet Archive partnered with a company called Data Datum to scan books in China. (McN Decl. ¶40.)

284.    Internet Archive also operates scanning centers in the United States, United Kingdom and Canada. (McN Decl. ¶40.)

47

285.    In 2019, IA opened a "superscanning" center in Cebu, Philippines that receives shipping containers full of books and digitizes them for inclusion on the Website.  (McN Decl. ¶40.)

286.    Using these facilities, as of about 2021, Internet Archive scans about 3,500 books a day, which amounts to 1.28 million books annually.  (McN Decl. ¶40.)

287.    Internet Archive does not license ebooks and does not pay any royalties to authors or publishers in connection with its digitizing and posting books on its Website for free. (McN Decl. ¶12.)

288.    Instead,  Internet Archive stocks its Website by scanning and digitizing physical books that it obtains primarily via two channels – (1) by partnering with libraries to scan their collections, and (2) acquiring print books.  (McN Decl. ¶41.)

### 1.    Internet Archive Partners With Libraries to Scan Their Collections

289.    Internet Archive enters into contracts with certain libraries to scan their collections as part of a "commercial" book scanning business.  IA's book scanning business has generated more than $35 million of income since 2011.  (McN Decl. ¶42.)

290.    Participating libraries enter into an agreement to provide IA with print books from their collections to scan, which can be done on premises or offsite.  The scanning process keeps the book intact and, once scanned, the physical books return to the library for further circulation. (McN Decl. ¶42.)

291.    Under standard terms in the Scanning Agreement, Internet Archive "provide[s] one digital copy of each digitized [book] … to the Library and will retain additional Digital Copies. Internet Archive will post Digital Copies on the Internet Archive in a newly created sub-

48

collection… The Digital Copies will be freely available from Internet Archive via HTTP, Torrent or a similar method." (McN Decl. ¶43.)

292.    The terms further state that both the library and Internet Archive "may freely use their Digital Copies … in any manner" that is "permitted under applicable copyright law," including "reproducing, displaying, storing, modifying, or distributing the Digital Copies." (McN Decl. ¶43.)

293.    Internet Archive engaged in marketing to invite libraries to participate in a scanning project.  For example, Internet Archive produced a flier inviting libraries to "Digitize your Collections [a]t one of our Regional Digitization centers or on your Table Top Scribe locally" that promises "[u]nlimited downloads of your items, with perpetual access.  Keep and distribute copies!" (McN Decl. ¶42.)

294.    The majority of the books Internet Archive scanned from library collections were in the public domain, but some books are in-copyright.  (McN Decl. ¶43.)

295.    Mr. Freeland first testified that in-copyright books scanned from library collections cannot be checked out on its Website.  (McN Decl. ¶43.)

296.    But, after he was shown an example of a work scanned from the collection of the Boston Public Library that apparently was available for borrowing, Mr. Freeland testified that in-copyright "books may well be available for lending on archive.org that were obtained via scanning agreement..." (McN Decl. ¶43.)

297.    According to Internet Archive, libraries were apparently reluctant to allow IA to scan in-copyright books because of "copyright concerns."  (McN Decl. ¶¶44-45.)

298.     Mr. Kahle stated in a July 2019 blog post that Internet Archive "has worked with

49

500 libraries over the last 15 years to digitize 3.5M books.  But based on copyright concerns the selection has often been restricted to [public domain] books."  (McN Decl. ¶44.)

299.    Internet Archive's former Director of Finance, Jacques Cressaty, also testified that, by 2016, "our library partners ran out of books that were out of copyright, so pre-1923, and they're reluctant to give us books that were in copyright."  (McN Decl. ¶43.)

**2.    Internet Archive Acquires Print Books from Other Sources**

300.    To obtain physical books to scan, Internet Archive has looked to sources outside of libraries that have executed scanning agreements.  Internet Archive has gathered some books from donations, including  "about 500,000 books" by 2011.  (McN Decl. ¶45.)

301.    Internet Archive also purchased books that its scanning contractor, "Datum Data," had obtained "through their connections in China."  (McN Decl. ¶45.)

302.    Internet Archive has no policy in place to assess whether a particular physical book in its collection is a counterfeit copy before making a digital copy of the book and making that digital copy available for lending.  (McN Decl. ¶45.)

303.    Internet Archive has also obtained books by absorbing entire library collections.  In 2020, the defunct Marygrove College donated its entire collection of "70,000 books" and other works.  (McN Decl. ¶46.) (

304.    The materials in the Marygrove College collection were packed for shipping, digitized and resulting ebook copies were posted on the Website.  (McN Decl. ¶46.)

305.    Internet Archive also has operated a book sponsorship program that allows users to contribute money towards the purchase and scanning of particular books they want to see added to the Website.  (McN Decl. ¶47.)

50

306.     Mr. Cressaty testified that, "[i]f you have a book that you are interested in having a digital copy of …, you can send us money or you can send us a book plus a donation to cover the cost of … the digitization of that book."  (McN Decl. ¶47.)

307.     Mr. Cressaty further testified that "the donor gives Internet Archive money in excess of the price of the book, and that money covers the purchase of the book and its scanning."  (McN Decl. ¶47.)

308.     Internet Archive also has funded its projects with donations of bitcoin.  For instance, Internet Archive received "$1M in Bitcoin" from the anonymous donor behind the "Pineapple Fund."  (McN Decl. ¶48.)

309.     Internet Archive testified that "there's no way you can tell" where this money is coming from and the source "could be ISIS, for all you know."  (McN Decl. ¶48.)

### 3.     Internet Archive Preservation of Physical Books

310.     The physical books Internet Archive obtains are typically packed into shipping containers and sent to offshore digitization facilities in Cebu or China, where they are rendered into ebooks by the Scribe system.  (McN Decl. ¶49.)

311.     The books are then shipped back to facilities operated by IA's affiliates, where they "are stored in double-stacked shipping containers in … physical archive facilities in Richmond, CA and Pennsylvania."  (McN Decl. ¶49.)

312.     Unlike the physical books in the collections of public libraries, the physical books Internet Archive "preserves" in shipping containers are not available to the public.  (McN Decl. ¶49.)

313.     The books and the facilities housing the shipping containers are legally owned by

51

a separate entity, Open Library of Richmond Inc. ("OLR"). (McN Decl. ¶50.)

314.  Mr. Kahle testified that "the Open Library of Richmond [] is actually the organization that stores and owns the books." (McN Decl. ¶50.)

315.  Internet Archive does not own the physical books that it makes available on its Website. (McN Decl. ¶50.)

316.  According to Internet Archive's 990 tax form, Open Library of Richmond paid Internet Archive a $4,840,000 grant in 2016. (McN Decl. ¶50.)

317.  Mr. Kahle is the principal officer of Open Library of Richmond. He funds the entity from his personal finances. (McN Decl. ¶50.)

318.  Internet Archive has a number of other affiliate companies in addition to OLR. (McN Decl. ¶50.)

319.  During his deposition, Mr. Cressaty referred to these companies as the "Kahle/Austin Empire." (McN Decl. ¶50.)

320.  These companies own Internet Archive's "headquarters, warehouses and some distributed data centers. (McN Decl. ¶50.)

321.  According to Internet Archive, these companies were created "[a]s a strategy to mitigate risk." (McN Decl. ¶50.)

### E.  Internet Archive's Relationship With and Eventual Acquisition of Better World Books

322.  In or about 2013, Internet Archive started sourcing physical books to scan and post on its Website from the for profit, used book retailer, Better World Books ("BWB"). BWB has obtained nearly 400 million print books, including from libraries discarding (or what Internet Archive describes as BWB's "weeding") unwanted copies. (McN Decl. ¶51.)

52

323.    In April 2013, Internet Archive and BWB drafted a memorandum of understanding, which stated that ██████████████████████████████████████████████████████████ ██████████████████████████████████████████ (McN Decl. ¶51.)

324.    Internet Archive would periodically identify print books that it wanted to acquire based on what was available from BWB's inventory, which BWB either donated or sold to IA for a modest fee.  (McN Decl. ¶52.)

325.    In a 2016 email from Brewster Kahle to BWB's Director, Strategic Sales & Partnerships, for instance, Mr. Kahle stated that Internet Archive had identified "about 13k books that were … 'desirable' for us" from BWB's list  and offered to purchase those "books for $1 each."  (McN Decl. ¶52.)

326.    Eventually, in 2018 Internet Archive sent a "wish list" containing approximately "1.5M ISBNs" for BWB to run against its list to determine which books were available.  (McN Decl. ¶53.)

327.    In that same message, Mr. Kahle and Freeland "agreed that our best path to millions of books is arm-in-arm with BWB…"  (McN Decl. ¶53.)

328.    By April 2018, IA was ████████████████████████████████████████ ████████████████  (McN Decl. ¶53.)

329.    In the fall of 2018, Internet Archive started exploring the possibility of acquiring Better World Books.  In an email sent to Kahle on November 12, 2018, the founder of BWB wrote that ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

53

██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████ (McN Decl.
¶54.)

330.    On April 17, 2020, Mr. Kahle wrote in an email to a potential investor that Better World Books "get[s] 30 million books a year, and sell[s] 10 million – the others are donated or recycled.  We want more of the flow… This is a bold move and our library colleagues believe it can help rearrange how books work in the library field in general: libraries buy books, and now consign or donate them to BWB, the new non-profit would keep 1 copy for digitization and preservation, the rest get sold.  This is what BWB does already, but we would ramp this up.  As a self sustaining business, this will keep the books flowing year after year."  (McN Decl. ¶55.)

331.    In the same message, Mr. Kahle also wrote that "they are a going concern and hopefully even profitable.  If they generate money then they could pay for the digitization…" and that "The successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world…"  (McN Decl. ¶55.)

332.    Finally, Mr. Kahle wrote that Internet Archive would obtain "maybe 7 million [books] over the next few years" (*id*.) at a rate of "1mm books per year."  (McN Decl. ¶55.)

333.    In June 2019, Internet Archive via affiliated entities acquired Better World Books.  According to the Executive Vice President and General Counsel of Better World Books, Ms. Patton-Schmidt, ████████████████████████████████████████████

██████████████████████████████████████████
███████████████████████████████████████ (McN Decl. ¶56.)

4891-8421-5847v.16 0092453-000002

334.    Mr. Kahle used funds from his personal fortune to fund the transaction.  The funds passed through OLR before the funds were received by Better World Books.  (McN Decl. ¶56.)

335.    As part of the transaction, OLR ███████████████████████████████ ████████████████████████████████████████████ (McN Decl. ¶56.)

336.    Under the terms of the acquisition Better World Libraries – a 501(c)(3) corporation controlled by Kahle – became the sole shareholder of Better World Books.  (McN Decl. ¶56.)

337.     Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire."  (McN Decl. ¶56.)

338.    Internet Archive announced the acquisition on November 6, 2019 in a blog post.  The post stated that "[t]his new relationship will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books… Any book that does not yet exist in digital form will go into a pipeline for further digitization, preservation and access."  (McN Decl. ¶57.)

339.    Internet Archive and Better World Books have explored and adopted a number of what the two entities have described as "synergies" – or "ways that BWB could work with IA and its affiliates to make both business perform better."  (McN Decl. ¶58.)

340.    For instance, webpages for books on the Better World Books website are provided with links to "borrow" those books from the Internet Archive's Website.  (McN Decl. ¶58.)

341.    According to BWB's Ms. Patton-Schmidt, following its acquisition, Better World Books ████████████████████████████████████████████████.  (McN Decl. ¶60.)

55

342.    Ms. Patton-Schmidt further testified that "Better World Books has vast management experience in libraries e-commerce and supply chain management that can be beneficial to IA."  (McN Decl. ¶60.)

343.    Ms. Patton-Schmidt testified that between 2020 and 2021, ████████████ ████████████████████████████████████████████████████ ████████████████████████████ (McN Decl. ¶60.)

344.    Between the acquisition in July 2019 and September 12, 2021, Better World Books has identified and packed up more than 2.8 million books from Internet Archive's "wishlist." (McN Decl. ¶61.)

345.    Many of these books have been shipped off to the Cebu scanning center for digitization, posted on the IA's Website, and set for eventual delivery to the facilities operated by IA affiliates for "preservation."  (McN Decl. ¶61.)

### F.    "Monetized" Aspects of the Internet Archive Website

346.    Webpages for ebooks on the Internet Archive's Website contain links to purchase that title from Better World Books, including a "Purchase at Better World Books" button that appears at the top of the window when users read an ebook on IA's ebook browser.  (McN Decl. ¶61.)

347.    Internet Archive receives a payment from Better World Books every time a user clicks on a link on the Internet Archive's Website to purchase a used book from Better World Books' website.  (McN Decl. ¶59.)

348.    The webpages on IA's Website also include links to "Donate" to the Internet Archive.  (McN Decl. ¶59.)

56

349.    As Internet Archive's former Director of Finance testified, "every single page of the Archive is monetized."  (McN Decl. ¶61.)

350.    The screenshot below reflects the Website's "Donate" option.



(McN Decl. ¶59.)

**G.      Internet Archive's Creates the "Open Libraries" Project**

**1.      Imposing and Then Removing Geographic Limitations on Ebook Lending**

351.    The limits placed by Internet Archive on how the ebooks on its Website have changed over time.   Initially, Internet Archive had "80,000+" in-copyright ebooks in its "In-Library eBook Lending Program. (McN Decl. ¶63.)

352.    In an email from this time, Internet Archive's Office Manager stated that the ebooks could "only be borrowed by a patron of a physical library that participates in [Internet Archive's] program" and that the ebooks must be "access[ed] through our site from the physical library's network."  (McN Decl. ¶63.)

353.    Later, Internet Archive removed any geographical limits so that anybody in the world with an Internet connection could access in-copyright books on the Website. (McN Decl. ¶64.)

354.    Internet Archive has not reinstated any geographic limits since this initial phase.

4891-8421-5847v.16 0092453-000002

(McN Decl. ¶64.)

### 2.  Expanding the Number of Concurrent Ebook Loans Available on the Website

355.   In or about 2018, Internet Archive began what it called its "Open Libraries" project. Prior to that time, IA limited the number of concurrent loans on any one title to the number of physical copies of the title owned by IA (or an affiliated entity).  (McN Decl. ¶67.) (¶70)

356.   On November 13, 2018, Mr. Freeland published a blogpost stating that this "own one, loan one principle" based on the books Internet Archive owned was "viable, but limited," and "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist and become part of a major news story."  (McN Decl. ¶65.)

357.   Two years before Internet Archive started the Open Libraries project, in October 2016, Mr. Kahle issued a statement titled "Transforming Our Libraries into Digital Libraries:  A digital book for every physical book in our libraries."  (McN Decl. ¶66.)

358.   In that statement, Mr. Kahle proposed a "collaborative effort [with libraries] to select and digitize the most useful books of the 20th and 21st centuries, and to build a robust system to circulate the resulting e-books to millions, and eventually billions of people."  (McN Decl. ¶66.)

359.   According to the statement, Mr. Kahle sought to achieve this goal by collaborating with libraries "to digitize the materials efficiently, minimizing duplication, and lend the texts with the same limitations placed on physical books."  (McN Decl. ¶66.)  Mr. Kahle wrote that "Internet Archive could create a circulation system that would administer the lending [for libraries].  In effect, then, each library can choose from a variety of methods to lend digital versions of the physical books in their collection.  This would keep the local libraries in control but leverage the

58

convenience of a cloud-based system that others maintain and update." (McN Decl. ¶66.)

360.    To accomplish this, Mr. Kahle stated that, "in each library's online catalog, when a digital version of a book exists [on Internet Archive], we can include a web-link on the record for the physical book, giving readers the ability to browse the book on screen or to borrow it from the convenience of their homes. In this way, we can smoothly enhance a library's collection, from analog to digital, at scale. . . . To build this future, we will need the participation of multiple sectors to bring thousands of libraries digital." (McN Decl. ¶66.)

361.    According to Mr. Kahle, this "collaborative digital library collection and circulations system," "could help deliver e-books to millions of patrons with a flip of a digital switch." (McN Decl. ¶66.)

### H.    Establishing the Open Libraries Project

362.    The concept identified in Mr. Kahle's 2016 statement would eventually be named the "Open Libraries" project. (McN Decl. ¶67.)

363.    According to Internet Archive, this program allows libraries to "pool[] their physical collections" with Internet Archive "in order to make more lendable copies of digital books available to their users and the world." (McN Decl. ¶67.)

364.    According to its website, the purpose of the Open Libraries project is "to increase lending counts" on IA's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches." (McN Decl. ¶67.)

365.    Under this system, a library participating in the Open Libraries project – known as a "Partner Library" – sends its catalogue to Internet Archive to "run an overlap analysis that

59

compares [ISBN numbers for] their physical holdings with our digital holdings."  (McN Decl. ¶68.)

366.    Internet Archive does not make new scans of the libraries' books identified by the overlap analysis.  Internet Archive does not take possession of the print book owned by the Partner Library.  (McN Decl. ¶68.)

367.    Rather, every time a book in the Partner Library's catalogue matches an ebook on IA's Website, Internet Archive "just increases by one the number of concurrent checkouts of that book" permitted on the Website.   (McN Decl. ¶68.)

368.    According to Mr. Freeland, Internet Archive does not "set any upper limit to the number of copies available via concurrent lending."  As a result, the overlap analysis dictates that "if a hundred partner libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously."  (McN Decl. ¶68.)

369.    Mr. Freeland testified that if there were "a thousand libraries that had the same book and put them into controlled digital lending," then one thousand users would be able to view the ebook scan on the Website."  (McN Decl. ¶68.)

370.    In order to become a Partner Library in the Open Libraries project, libraries need to submit an "online form."  (McN Decl. ¶69.)

371.    That form states that "Internet Archive's Open Libraries project offers the prospect of making every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."  (McN Decl. ¶69.)

372.    According to the Open Libraries Form Agreement, Partner Libraries that participate in the project agree to "share their catalog of books with the number of copies of each book with

60

the Internet Archive." (McN Decl. ¶69.)

373.    The Open Libraries Form Agreement imposes no substantive restrictions on the Partner Libraries' use of the physical books that match the ebooks on the Website. (McN Decl. ¶69.)

374.    The Open Libraries Form Agreement imposes no contractual requirement that the Partner Library remove the print book from circulation when the Internet Archive is lending out an ebook correlated with that print book. (McN Decl. ¶69.)

375.    The Open Libraries Form Agreement provides that any partner "Library may integrate links to the borrowable Books in their catalog and other services. The Internet Archive will add books to the collections offered on the Internet Archive's sites." (McN Decl. ¶69.)

376.    It is currently free for libraries to become Partner Libraries. (McN Decl. ¶70.)

377.    Mr. Kahle has stated that "it would be understandable if we charged libraries that did not contribute digitization or backend services for access to digital books. It would be equally understandable to charge a one-time transfer fee to libraries that wanted to store their own local copies" of the ebooks on the IA Website. (McN Decl. ¶70.)

**I.        Marketing the Open Libraries Project to Prospective Libraries**

378.    Internet Archive has marketed the Open Libraries project to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining "free ebooks for your patrons" with "no cost involved." (McN Decl. ¶71.)

379.    Mr. Freeland sent an email to the Associate Dean of University of Oklahoma Libraries stating that "[t]he main offer we have in hand with the Open Libraries today is the ability to match your physical holdings with the 1.1M in-copyright books we have *already* digitized

4891-8421-5847v.16 0092453-000002

and where there's a match, provide you back a link to the digitized book." (McN Decl. ¶71.)

380.    In another instance, an Internet Archive representative sent a librarian an email stating that the Open Libraries project "can leverage controlled digital lending to provide your patrons with free ebooks of your physical collections.  As an Open Libraries, we match your in-copyright holdings with our digital holdings and serve free ebooks where they overlap.  Join Open Libraries, access free ebooks – so simple, we had to share!"  (McN Decl. ¶71.)

381.    Mr. Freeland gave a presentation entitled "Open Libraries Introduction & Internet Archive programs" that included the following slide:



(McN Decl. ¶71.)

382.    The notes to a slide for a separate presentation that Mr. Freeland gave to libraries stated that the Open Libraries project "ensures that a library will not have to buy the same content over and over, simply because of a change in format."  (McN Decl. ¶71.)

383.    Another presentation about the Open Libraries project by Mr. Freeland was titled "Maximizing institutional investments in print resources through controlled digital lending" – with the subtitle, "Or, You Don't Have to Buy it Again!"  (McN Decl. ¶71.)

4891-8421-5847v.16 0092453-000002

384. In 2019, a vendor acting on behalf of Internet Archive sent an email to one of the subscribers to its Library.Link Network, the Evergreen Indiana Library Consortium, with a subject line of "Free eBooks for Indiana Evergreen." (McN Decl. ¶71.) That email stated that "Open Libraries provides a way for you to offer digitized books to your patrons for free" and that joining as a partner would "bring this added value to your libraries." (McN Decl. ¶71.)

385. In another instance, the same representative sent an email message to libraries asking whether they "would like to participate and get free ebooks for your end users." (McN Decl. ¶71.)

386. The same vendor sent a librarian an email inviting them to join the Open Libraries project, which stated that the "1, 2, 3 of it is, once you sign the form we do the rest… would you like to participate and get free ebooks for your end users?... Internet Archive now offers FREE ebooks for all Library.Link libraries when you participate in the Open Libraries Controlled Digital Lending (CDL) project." (McN Decl. ¶71.)

387. Internet Archive's Website contains a video of a July 14, 2021 presentation entitled "Implementation & Integration: CDL for All Libraries" that describes controlled digital lending as a "[l]ow risk, reasonable solution that preserves legal and fiscal value in collections" and contains the following slide:

4891-8421-5847v.16 0092453-000002



(McN Decl. ¶71.)

388.     Internet Archive gave a presentation at the 2019 Library Leaders Forum that summarized the "[s]teps to participate in Open Libraries: Join Open Libraries, Share your catalog, Overlap study, Integrate links back into your catalog, Lend digital books to your patrons."  (McN Decl. ¶71.)

**J.     Growth of Internet Archive's Partner Libraries**

389.     At the 2020 Library Leaders summit, Mr. Kahle announced that "2.8M copies" of in-copyright books were added to concurrent lending counts through the Open Libraries' project. (McN Decl. ¶72.)

390.     Mr. Freeland testified that the number of books added through overlap analysis has increased since that time.  (McN Decl. ¶72.)

391.     Chris Freeland testified that Internet Archive had 81 Partner Libraries as of December 2021.  (McN Decl. ¶72.)

392.     As of December 24, 2021, Internet Archive's Objections and Responses to Plaintiffs' Second Set of Interrogatories stated that 62 Partner Libraries contributed books to the

4891-8421-5847v.16 0092453-000002

overlap analysis and 13 of those were public libraries. (McN Decl. ¶72.)

### K. Encouraging Libraries to Provide Links to Internet Archive's Website

393. Many libraries – both Partner Libraries and other libraries – have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their library websites. (McN Decl. ¶73.)

394. For instance, the Georgetown University Law Library's catalog features the language "Full text availability" next to a particular title and presents a link to access the "full text" of the title through "Internet Archive Controlled Digital Lending." (McN Decl. ¶73.)

395. Likewise, the Dartmouth College Library's catalog entry for "The Catcher in the Rye," which is one of the Works in Suit, features a link to access an ebook version through the Internet Archive's Website. (McN Decl. ¶73.)

396. Many other unaffiliated libraries have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their main library websites, including public library systems in New York, California, and elsewhere. (McN Decl. ¶74.)

### L. Internet Archive's Overlap Analysis

397. According to Mr. Freeland, for each Partner Library that contributes its catalogue for overlap analysis, the Internet Archive gets "an additional copy to lend" of every matching book "without … having to incur the cost associated with scanning." (McN Decl. ¶75.)

398. Mr. Freeland testified that "[a]s a result of the Internet Archive implementing overlap analysis … wait lists [have] been reduced on" the Website "for certain titles." (McN Decl. ¶75.)

399. Mr. Freeland testified that "the more books Internet Archive has been able to obtain

and scan" through the Internet Archive's acquisition of Better World Books, "the greater likelihood there would be matches in the overlap analysis with potential partner libraries." (McN Decl. ¶75.)

## VIII.  DEVELOPMENT OF THE "CONTROLLED DIGITAL LENDING" THEORY

### A.  Development of the Statement and White Paper

400.  Prior to about 2018, IA did not rely on a model called "Control Digital Lending" to support its scanning and republication of in-copyright books. (McN Decl. ¶77.)

401.  As Mr. Kahle stated in the "Universal Access to Knowledge" speech he gave in 2006, Internet Archive had "found that if you put things out there in a nonprofit setting, it works for people in the sense that they don't gripe. The idea of opt-out as opposed to opt-in – putting it up and then if somebody complains, taking it down – works very well in these sorts of communities. I would suggest being a bit bold and making things available..." (McN Decl. ¶77.)

402.  By 2015, the Copyright Office had issued a report concluding that "[t]here is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety." (McN Decl. ¶78.)

403.  In the prior year, a subcommittee of the Judiciary Committee of the House of Representatives held hearings about the first sale doctrine, including on whether to adopt a digital first sale doctrine. (McN Decl. ¶78.)

404.  Groups including the Association of American Publishers strongly opposed the adoption of a digital first sale doctrine. (McN Decl. ¶78.)

66

405.    While the subcommittee announced unrelated reforms for the Copyright Office and the Congress passed the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, the Copyright Act was not amended to recognize a digital first sale defense.  (McN Decl. ¶78.)

406.    In 2017, Internet Archive applied for a $100 million grant from the MacArthur Foundation.  According to its application, Internet Archive intended to use the grant to "turn 80% of library collections digital by 2023."  (McN Decl. ¶79.)

407.    Lila Bailey, Internet Archive's in-house policy counsel, testified that "as part of the grant proposal, barriers to solving the problem are identified.  One of the significant barriers to libraries being able to loan out their digital collections was … copyright uncertainty, lack of clarity in the law."  (McN Decl. ¶79.)

408.    Ms. Bailey further testified that "the MacArthur Grant Challenge" is "what precipitated having a meeting in May of 2017 concerning Controlled Digital Lending."  (McN Decl. ¶79.)

409.    Accordingly, the Internet Archive convened what it described as the "Open Libraries Copyright Workshop" on May 23 and 24, 2017 to "consider the digitize and lend model that the Internet Archive is proposing to expand through the MacArthur Foundation's 100%Change grant."  (McN Decl. ¶79.)

410.    The Workshop was led by one of IA's advisors for the grant, the copyright scholar Pamela Samuelson, and was "modeled after a meeting that she did around the Google books case." (McN Decl. ¶79.)

4891-8421-5847v.16 0092453-000002

411.    According to Ms. Bailey's testimony, Ms. Samuelson "wanted to basically have an open discussion, an academic discussion with other scholars and library practitioners who understood how libraries were engaging in this practice." (McN Decl. ¶80.)

412.    The participant roster for the Workshop submitted as part of the MacArthur Foundation Application included Ms. Bailey, Mr. Kahle, two other Internet Archive employees, two of the lawyers that have appeared for IA in this action (Joseph Gratz and Corynne McSherry) and several other individuals who would later participate in formulating a digital lending theory – including David Hansen, Kyle Courtney, Jason Schultz, Mary Minow and Michelle Wu. (McN Decl. ¶80.)

413.    Ms. Bailey testified that she was not aware of "any copyright lawyers who represent copyright creators at this panel." (McN Decl. ¶80.)

414.    At a dinner shortly after the Workshop, Ms. Bailey "started talking about the idea of writing something up" with Courtney, Hansen and Wu. (McN Decl. ¶81.)

415.    Michelle Wu was a Georgetown University law professor and librarian who was another advisor to Internet Archive for the McArthur Grant and, according to Internet Archive, "crafted the legal theory behind Controlled Digital Lending." (McN Decl. ¶81.)

416.    Ms. Wu also was retained by Internet Archive as its counsel, but did not reveal that affiliation in her letter submitted in support of IA's MacArthur grant application. (McN Decl. ¶81.)

417.    Kyle Courtney is a Copyright Advisor at Harvard University and David Hansen was the Lead for Copyright and Information Policy and Associate University Librarian at Duke University. (McN Decl. ¶81.)

4891-8421-5847v.16 0092453-000002

418.    Ms. Bailey described Wu, Courtney and Hansen as "[f]riends of the Internet Archive."  (McN Decl. ¶81.)

419.    According to Ms. Bailey, at the May 2017 dinner, Ms. Bailey, Mr. Courtney, Mr. Hansen and Ms. Wu decided to draft "something short and easy for a non-lawyer to understand about the legal underpinning of Controlled Digital Lending."  (McN Decl. ¶81.)

420.    The group subsequently decided that there should also be a "white paper" that would address the legal issues more fully.  (McN Decl. ¶81.)

421.    The MacArthur Foundation rejected the Internet Archive's application for the $100 million grant in September 2017.  (McN Decl. ¶82.)

422.    The primary drafters of a statement describing controlled digital lending (the "Statement") emerged as Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Wu, Mary Minow, and Jason Schultz.  (McN Decl. ¶82.)

423.    Mr. Courtney and Mr. Hansen were also subsequently selected to draft a white paper on controlled digital lending (the "White Paper").  (McN Decl. ¶82.)

424.    Mr. Courtney and Mr. Hansen sent a draft of the White Paper to Ms. Bailey prior to publication for her edits and comments.  (McN Decl. ¶82.)

425.    When Mr. Freeland was asked about the status of the White Paper, he wrote in an email that "IA is officially NOT leading the effort for the sake of being impartial."  (McN Decl. ¶82.)

426.    In its MacArthur grant application, Internet Archive wrote that a "working group willing to craft a joint statement" about controlled digital lending had formed after the May 2017

69

meeting in San Francisco, that the group's work "is now in progress[,]" and that "[t]his critical area of work is led by Internet Archive's legal counsel, Lila Bailey." (McN Decl. ¶79.)

427.    When Ms. Bailey was informed that the release of the White Paper may be delayed, she wrote in an email to Mr. Courtney, Mr. Hansen, Ms. Wu, and Ms. Minow and Schultz to the group to say that "[t]he Internet Archive has more than an academic interest in this moving forward" and that "it will be a complete failure and waste of our time if it's not released by [an upcoming IA event]. I'm just being real about the impact of delay on my client (and potentially on my job if this isn't done… seriously guys)." (McN Decl. ¶83.)

428.    Other scholars were consulted during the project for their thoughts on the draft Statement, including Peter Jaszi, a copyright expert and advisor to the Internet Archive who attended the Workshop. (McN Decl. ¶84.)

429.    An Internet Archive blog post refers to Mr. Jaszi as one of Bailey's "heroes." (McN Decl. ¶84.)

430.    Mr. Jaszi wrote to at least one librarian to warn them that the draft Statement was a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursing the strategy" and that controlled digital lending "serve[s] the institutional interests of the IA." (McN Decl. ¶84.)

431.    Additionally, library copyright expert Kenneth Crews wrote in an email responding to a draft of the Statement to say that "CDL use is NOT identical to current physical lending" and that if physical copies of books "are still available for non-circulating use, one could argue that you have doubled the number of readable and useable copies." (McN Decl. ¶85.)

70

### B.      Publication of The Statement and White Paper in September 2018

432.     The Statement and White Paper on controlled digital lending were published simultaneously in September 2018 on the website. https://controlleddigitallending.org/ (the "CDL Website").  (McN Decl. ¶86.)

433.     Ms. Bailey testified that she was part of the "collaborative effort" that resulted in the publication of the Statement and White Paper on the CDL Website.  (McN Decl. ¶79.)

434.     The Statement lists as co-authors Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Minow, Mr. Shultz, and Ms. Wu.  (McN Decl. ¶86.)

435.     The Statement does not disclose that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March or 2018.  (McN Decl. ¶86.)

436.     The Statement includes the following statement:

"Properly implemented, CDL enables a library to circulate a digitized title in place of a physical one in a controlled manner.  Under this approach, a library may only loan simultaneously the number of copies that it has legitimately acquired, usually through purchase or donation.  For example, if a library owns three copies of a title and digitizes one copy, it may use CDL to circulate one digital copy and two print, or three digital copies, or two digital copies and one print; in all cases, it could only circulate the same number of copies that it owned before digitization.  *Essentially, CDL must maintain an 'owned to loaned' ratio*.  Circulation in any format is controlled so that only one user can use any given copy at a time, for a limited time.  Further, CDL systems generally employ appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies."

71

(McN Decl. ¶86.)

437.    The Statement further claims that "there are two main areas of copyright law that support CDL: the principle of exhaustion and the fair use doctrine."  (McN Decl. ¶87.)

438.    The Statement states that the "first sale" doctrine allows creating and lending digital files of the physical books because "any time there is a lawful transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or 'exhausted.'"  (McN Decl. ¶87.)

439.    The Statement makes the proposition that "fair use and copyright exhaustion can work together to effectuate CDL practices."  (McN Decl. ¶87.)  The Statement  acknowledges that there is no "directly analogous case on point" to support this proposition.  (McN Decl. ¶87.)

440.    The Statement states that controlled digital lending is not unlawful because the "purposes of library lending … all focus on socially beneficial outcomes that favor fair use" and because there is no market harm "because properly implemented CDL programs maintain an 'owned to loaned ratio' that is comparable to physical lending."  (McN Decl. ¶87.)

441.    The White Paper acknowledges that there is a "considerable point of concern that CDL is not clearly transformative."  (McN Decl. ¶88.)

442.    The White Paper states that in "mass digitization cases involving books – *Google Books* …, for example – courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses, such as text and date mining."  (McN Decl. ¶88.)

443.    The White Paper emphasizes, in italicized text, that "libraries must truly exercise *control* in the process."  (McN Decl. ¶89.)

4891-8421-5847v.16 0092453-000002

444. The White Paper states that "[w]hen the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one." (McN Decl. ¶89.)

445. The White Paper states that libraries must "ensure that original works are acquired lawfully," "lend each digital version only to a single user at a time just as a physical copy would be loaned," "limit the time period for each lend" and "use digital rights management to prevent wholesale copying and redistribution." (McN Decl. ¶89.)

446. The White Paper includes several "risk mitigation" measures that controlled digital lenders can implement to further reduce legal risk, including:

- adding artificial "friction" by extending the time between digital lends, more closely mirroring how physical books are lent and returned;

- "introduce characteristics that mimic physical degradation[,]" by, as the White Paper explains, "plac[ing] the same limit on circulation of the digital copy" that would approximate the number of times a print book would be circulated before it degrades;

- limiting the audience to "particular communities of users" (*e.g.*, students of an academic institution or "local residents") "to limit the overall reach of the copy and therefore the potential market effect;"

- only distributing older works published pre-1989 and public domain books;

- only distributing out-of-print or orphan works; and

- only distributing highly factual books.

(McN Decl. ¶90.)

73

447.  Internet Archive's Policy Counsel testified that Internet Archive does not practice any of the risk mitigation measures listed in the White Paper.  (McN Decl. ¶90.)

**C.      Initial Criticism of the Statement and White Paper**

448.  The Statement and the White Paper was criticized by groups including the Association of American Publishers ("AAP") and the Authors Guild.  (McN Decl. ¶91.)

449.  On February 4, 2019, the AAP released a "Statement on Flawed Theory of 'Controlled Digital Lending'" which stated that "AAP strongly disagrees with the analysis of the White Paper and its call to libraries to copy and transmit entire books to the public in disregard of the law.  CDL not only rationalizes what would amount to systematic infringement, it denigrates the incentives that copyright law provides to authors and publishers to document, write, invest in, and disseminate literary works for the benefit of the public ecosystem."  (McN Decl. ¶91.)

450.  On January 8, 2019, the Authors Guild released a statement entitled "Controlled Digital Lending is Neither Controlled nor Legal."  (McN Decl. ¶92.)

451.  The Authors Guild statement explained that Internet Archive had "started rejecting notices sent by Guild members asking for unauthorized digital copies of their books to be taken down, citing that it 'operates consistently with the "Controlled Digital Lending [sic].'"  (McN Decl. ¶92.)

452.  The Authors Guild statement stated that Internet Archive's "threat to author income and the ebook market comes from two directions: 1) unauthorized scanning and e-lending of books that were previously published only in physical formats would usurp the market for creating new ebook versions; and 2) instead of purchasing library ebook licenses (which are more expensive

74

than consumer editions for good reason), libraries would simply digitize the print book from their collection, depriving authors and publishers of important licensing income." (McN Decl. ¶93.)

453. "Needless to say," the statement continued, "if Internet Archive's plans to expand Open Library to all libraries are realized, it would eventually decimate the market for library ebooks, put a massive dent in the ebook market in general, and usurp authors' rights to bring their older works back to the market." (McN Decl. ¶93.)

454. In several email messages, Mr. Freeland responded to similar complaints about CDL from an English authors' union. After Tom Blake, a librarian at the Boston Public Library, forwarded him emails from the union's chief executive complaining that CDL "prevent[s] authors [from] making a living by licensing the content of [their] work," Mr. Freeland wrote, "Nice that they included their real interest: 'negotiate and purchase lending licenses from the copyright owners.'" (McN Decl. ¶94.)

**D.     Criticism of the Statement and White Paper Following the *ReDigi* Decision**

455. In December 2018, the Second Circuit issued its decision in *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018), in which the Court held that "[u]nauthorized reproduction is not protected by" the first sale doctrine and that "the making of such reproductions is not a fair use." (McN Decl. ¶95.)

456. Jonathan Band, who is counsel for the American Library Association ("ALA"), submitted an amicus brief to the Second Circuit in *ReDigi* on behalf of Internet Archive, the ALA and others. (McN Decl. ¶96.)

75

457.    The brief submitted by Mr. Band was in support of the defendant, ReDigi, and urged the Second Circuit to hold that ReDigi's practices were covered by the first sale doctrine or fair use.  (McN Decl. ¶96.)

458.    The brief explained that "A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library."  (McN Decl. ¶96.)

459.    After the *ReDigi* decision was issued, Mr. Band published an article stating that it "raises questions concerning the viability of Controlled Digital Lending … by libraries," which "must be carefully reevaluated in light of this decision."  (McN Decl. ¶96.)

460.    In that article, Mr. Band warned that "the decision calls into question the theoretical underpinnings of CDL.  Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment.  Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis."  (McN Decl. ¶96.)

**E.    Signatories to the CDL Statement**

461.    Academic libraries make up the majority of signatories to the Statement. (McN Decl. ¶98.)

462.    Of the 9,000 public libraries in the United States only a handful endorsed the Statement.  (McN Decl. ¶98.)

463.    Copyright experts Mr. Band, Mr. Crews and Mr. Jaszi did not sign on as a signatory to the Statement.  (McN Decl. ¶98.)

464.    The American Library Association did not sign on as a signatory to the Statement. (McN Decl. ¶98.)

76

465.    The MIT Press had previously allowed IA to digitize a selection of backlist books. (McN Decl. ¶98.)

466.    The MIT Press did not sign on as a signatory to the Statement.  In an email, a representative from the MIT Press told Internet Archive that it would not be a signatory to the Statement because "being able to monetize digital sales of trade books and text books is currently a significant part of what allows us to survive as an [open access] friendly mission driven publisher."  (McN Decl. ¶98.)

**F.    Internet Archive's Reliance on the Statement and White Paper**

467.    Starting in about 2019, Internet Archive began to reference the Statement and White Paper in its outreach to libraries in connection with the Open Libraries project.  (McN Decl. ¶99.)

468.    For example, in a November 2018 email to a prospective Partner Library in Oregon, Mr. Freeland wrote that "[l]ast October, "a group of copyright scholars, including Michelle Wu from Georgetown Law, Kyle Courtney from Harvard Library, Dave Hansen from Duke University Libraries, and Lila Bailey from Internet Archive worked together on two documents meant to help libraries understand the legal framework for our digital lending, described as 'controlled digital lending.' Those two documents have been released [on the CDL Website]."  (McN Decl. ¶99.)

469.     Internet Archive published a blog post on July 29, 2020 stating that "CDL is a respectful and secure way to bring the breadth of our library collections to digital leaners… Publishers are seeking to shut this library down, claiming copyright law does not allow it.  Our response is simple:  Copyright law does not stand in the way of libraries' rights to own books, to digitize their books, and to lend those books to patrons in a controlled way."  (McN Decl. ¶99.)

4891-8421-5847v.16 0092453-000002

470.    Internet Archive convened a panel at the Boston Public Library "to seek to educate the public on the work of the Internet Archive and Open Libraries" and the event description stated that "[t]hrough controlled digital lending, libraries can make twentieth century scholarship available that is largely absent from their digital holdings in a way that respects the rights of authors and publishers."  (McN Decl. ¶99.)

471.    A July 1, 2019 blogpost by Mr. Kahle stated that "[w]e believe that every library can transform itself into a digital library.  If you own the physical book, you can choose to circulate a digital version instead."  (McN Decl. ¶99.)

472.    In another blogpost, the Internet Archive referenced a February 11, 2021 "mythbusting" panel that "dispelled myths about CDL" by "[e]mphasizing the limited and controlled aspect of the practice" and explaining that "[t]he 'fair use' section of the law allows libraries to responsibly lend materials, and experts say logically includes both print and digital works."  (McN Decl. ¶99.)  The blogpost also states that "[t]he law makes no mention of the amount of material that can be made available under 'fair use,' so for libraries to fulfill their purpose they can make complete books – whether in print or digital – available to patrons."  (McN Decl. ¶99.)

473.    Another Internet Archive presentation entitled "How Controlled Digital Lending Works for Libraries" contained a slide stating that "Controlled digital lending is a longstanding widespread library practice that you can use to help your patrons access digitized books.  The Internet Archive has more than 1.8M digitized books you can claim & offer your patrons today.  Your library can participate by joining Open Library."  (McN Decl. ¶99.)

4891-8421-5847v.16 0092453-000002

474.    Internet Archive does not indemnify Partner Libraries for liability arising from its infringement.  As Mr. Freeland wrote to a librarian at Duke University, Mr. Kahle "generally gets allergic to indemnification clauses…"  (McN Decl. ¶100.)

475.    At least four Partner Libraries have withdrawn from the Open Libraries project since this action was filed.  (McN Decl. ¶100.)

**G.    The Statement, White Paper As Applied to Internet Archive's Activities**

**1.    The Owned-to-Loan Ratio**

476.    According to Mr. Freeland, the owned-to-loaned principle is the "most critical" principle of CDL.  (McN Decl. ¶101.)

477.    According to the Statement, to comply with the "owned-to-loan" principle,  a "library may only loan simultaneously the number of copies that it has legitimately acquired." (McN Decl. ¶101.)

478.    According to the Internet Archive, the overlap analysis conducted as part of the Open Libraries project enables libraries to "pool[] their physical collections in order to make more lendable copies of digital books available…" (McN Decl. ¶101.)

479.    Mr. Freeland described this practice in an email to a librarian, where he stated that "libraries put one copy in for our matched records (even if you have multiple copies), and those counts are added to a pool for a given book.  When a patron checks out a book, they are checking out a copy from the pool, not an individual library; for a variety of reasons, including reader privacy, we don't connect the circulation back to an individual library." (McN Decl. ¶101.)

79

480.    Mr. Kahle testified that a match under the overlap analysis will "increase the number of concurrent borrowers by one, independent of the number that [the partner library] ha[s] in the library." (McN Decl. ¶102.)

481.    Mr. Kahle testified that that if three Partner Libraries contributed a book to the concurrent lending count under an overlap analysis and one of those libraries, for instance the MIT Library, only had one physical copy, three MIT patrons would be able to read the ebook on the Website at once. (McN Decl. ¶102.)

482.    Mr. Freeland testified that the overlap analysis allows Partner Libraries to loan more copies than they individually own. (McN Decl. ¶102.)

483.    According to Mr. Freeland, "If the Internet Archive possessed one copy of Catcher in the Rye and then [a] partner library had one copy" that was added from its system, "and then another partner library added a third copy to the Open Library system, there would be available for concurrent borrowing from Internet Archive users of three copies." (McN Decl. ¶102.)

484.    Under its current system, "[a]ll users have equitable access to the materials [Internet Archive] lend[s]. When a library adds a copy into [the] lending counts, that book can be checked out by any user." (McN Decl. ¶103.)

485.    Internet Archive has stated that non- Partner Libraries can integrate links to Internet Archive ebooks into their websites. For example, in a 2020 blogpost, Internet Archive stated that, "To be clear, you don't have to join the program to access our books. Anyone can link to our books right now." (McN Decl. ¶103.)

80

486.    A librarian at Fordham University contacted Internet Archive in July 2020 about the possibility of "digitiz[ing] approximately 450 volumes … to support CDL for distance learning." (McN Decl. ¶104.)

487.    The Fordham librarian stated that "[t]hese are largely or entirely in-copyright books, so the scans could not be made public, and will only be released to our users in proportion to the number of physical copies which we have embargoed." (McN Decl. ¶104.)

488.    In response, Mr. Freeland replied "[t]hat's not how our implementation of CDL currently works – we lend to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into CDL by particular users, so there's no way for us to limit use to only your patrons.  Happy to discuss further on a call." (McN Decl. ¶104.)

489.    In 2019, Mr. Freeland received an inquiry from Wendy Knapp, the Deputy Director of Indiana State Library, asking whether its copies of a particular book, *Slaughterhouse Five*, "would be added to the total number of copies in OpenLibrary.org" or whether those books would start "a new waitlist just for Indiana patrons…" (McN Decl. ¶105.)

490.    Mr. Freeland responded that the Indiana State Library's copies "would decrease the waitlist and be loaned to all users" of IA's website. (McN Decl. ¶105.)  Indiana's Deputy Director responded that her Library "still have hesitation around the idea that a format shift has not been indisputably set as a fair use" and declined to join as an Open Libraries Partner Library. (McN Decl. ¶105.)

## 2.    Controls over Partner Library Operations

491.    The White Paper instructs that "libraries must truly exercise *control* in the process." (McN Decl. ¶106.)

4891-8421-5847v.16 0092453-000002

492.    The Open Libraries Form contains no provisions on how libraries implement CDL because Internet Archive considers this to be a "local decision." (McN Decl. ¶106.)

493.    In response to an email from a librarian expressing "concern[] about being in compliance," Mr. Freeland wrote that "how libraries limit circulation for books in CDL is a local decision made by the library… [Some] libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all our digital copies and all the physical copies across our network of partners are all checked out at the same time." (McN Decl. ¶106.)

494.    Mr. Freeland testified that Internet Archive "was aware … that some partner libraries did not suppress circulation when they agreed to bec[o]me a partner library and put their books into controlled digital lending." (McN Decl. ¶106.)

495.    Mr. Freeland testified that Internet Archive has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously." (McN Decl. ¶107.)

496.    Mr. Freeland testified that Internet Archive does not know how Partner Libraries store the physical books counted in the overlap analysis. (McN Decl. ¶107.)

497.    Mr. Freeland testified that Internet Archive is also aware that even if a library puts a physical book into a non-circulating reference collection, it could be read in the library while the ebook equivalent is checked out. (McN Decl. ¶107.)

498.    Internet Archive does not employ a technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating. (McN Decl. ¶107.)

82

499.    Mr. Freeland testified that Internet Archive has never "taken any action against a library that did not suppress circulation properly."  (McN Decl. ¶107.)

500.    Mr. Kahle testified that "monitoring" libraries would amount to "hav[ing] people going and snooping around," which it will not do.  (McN Decl. ¶107.)

501.    According to the Open Libraries Form, Internet Archive requires Partner Libraries to submit their catalogues on a "quarterly" basis so that Internet Archive can re-run the overlap analysis to periodically add new books that the library acquired and subtract books that dropped out of the collection as a result of weeding.  (McN Decl. ¶108.)

502.    Mr. Freeland testified that in first years of the Open Libraries project, it did not "require updates at a specific time frame" and "sometimes Internet Archive did annual updates" depending on "the library's preferences."  (McN Decl. ¶108.)

503.    Mr. Freeland testified that Internet Archive does not employ any measures to ensure the accuracy of the catalogues it receives; Internet Archive "depends on our partners for verifying the data."  (McN Decl. ¶108.)

504.    According to Mr. Freeland's testimony, while Internet Archive began to run the overlap analysis on a monthly basis after this action was filed, it still does not require Partner Libraries  to inform it when they weed out books and no longer physically own the titles.  (McN Decl. ¶108.)

505.    Mr. Freeland testified that it was possible the concurrent lending count for an ebook could exceed the number of Partner Libraries with that physical book in their collection, if a library discarded a print copy at any time after that library has engaged in the overlap analysis.  (McN Decl. ¶108.)

83

506. Mr. Kahle testified that Internet Archive also does not "audit library collections to ensure that the library still owns the physical copy it's lending against" because, according to Mr. Kahle, the "Internet Archive doesn't snoop around dumpsters or things." (McN Decl. ¶108.)

507. Internet Archive's overlap analysis has resulted in errors that have led to inaccurate concurrent loan caps due to certain inaccurate or not properly organized data and metadata.(Foster Decl. ¶88.)

508. The Internet Archive has stated that "Open Library's book catalog has millions of books and thousands of data errors. Sometimes author names are misspelled, book covers are missing, or works and authors are duplicated or conflated." (McN Decl. ¶109.)

## IX. INTERNET ARCHIVE'S POLICY RATIONALES

### A. Providing Missing 20th Century Books

509. Internet Archive asserted in the first paragraph of the Executive Summary to its application for the $100 million McArthur Foundation grant that "there's almost a century of knowledge still living only on the printed page, missing from our digital shelves." (McN Decl. ¶111.)

510. In 2018, Mr. Kahle wrote to the Librarian of Congress, Carla Hayden, stating that controlled digital lending was "a way to get 20th century books onto the net respectfully." (McN Decl. ¶111.) In that email, Kahle also forwarded a blog post by Mr. Courtney and Mr. Hansen to the Librarian of Congress, Carla Hayden, stating that the goal of controlled digital lending is "particularly to help address access to the large number of books published in the '20th Century black hole' that have little hope of otherwise being made available to readers" (McN Decl. ¶111.)

511.    The Internet Archive has stated that the "black hole" refers to the gap between the date when books enter the public domain (currently 1926) and "the 1990s."  (McN Decl. ¶111.)

512.    Mr. Kahle stated in the "Transforming Our Libraries into Digital Libraries" paper that "[t]he Internet Archive, working with library partners, proposes bringing millions of books online, through purchase or digitization, starting with the books most widely held and used in libraries and classrooms."(McN Decl. ¶112.)

513.    Mr. Kahle continued by stating that, "[f]or the books we can not [sic] buy in electronic form, I am proposing a collaborative effort to select and digitize the most useful books of the 20th and 21st centuries."  (McN Decl. ¶112.)

514.    The homepage for Internet Archive's Website lists books in categories like "Trending Books," "Romance," "Thrillers," "Kids," "Classic Books" and "Books We Love." (McN Decl. ¶113.)  The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebooks via OverDrive.  (McN Decl. ¶118.)

515.    There is no category on the homepage for "Lost 20th Century Books."  (McN Decl. ¶113.)

516.    The "program lead for OpenLibrary.org," Michael "Mek" Karpeles, confirmed that "there are tens of thousands of readers on Open Library who are looking for romance novels, self-help books, kids books, and modern thrillers."  (McN Decl. ¶113.)

517.    Internet Archive's breakdown of ebooks by publication date on its Website shows that 78.9% of the in-copyright books were published after 1980 and only 6.2% of those books were published before 1963.  (McN Decl. ¶114.)

85

518.    Internet Archive has represented to the Court that it "limits its digital lending to books published in the past five or more years."  (McN Decl. ¶115.)

519.    Two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the IA's Website that same year.  (McN Decl. ¶113; Foster Decl. ¶69.)

520.    Mr. Freeland  testified that Internet Archive "add[s] ebooks" to the Website that are "available to purchase commercially or to license to libraries."  (McN Decl. ¶117.)

521.    Mr. Freeland testified that Internet Archive does not take steps "to make sure that the books they add to the Open Libraries projects are not yet available in digital form" and does not "instruct libraries to segregate out books that are otherwise available in digital form."  (McN Decl. ¶117.)

522.    The 127 Works in Suit – which are all available as authorized library ebooks – were republished as unauthorized ebooks on the Website; the Website has also posted 33,000 other titles available from the Publishers in digital formats.  (McN Decl. ¶115; *See* Foster Decl. ¶¶112-117; Pavese Decl. ¶18; R-A Decl. ¶49; Sevier Decl. ¶9; Weber Decl. ¶60)

### 1.    Internet Archive and Authorized Library Ebook Aggregators

523.     The home page of openlibrary.org resembles the interface that public library patrons use to read authorized ebooks via OverDrive; both pages display rows of thumbnail book covers available to be "borrowed," organized into categories of general interest such as "Trending" books.  (McN Decl. ¶118.)

524.    Internet Archive has acknowledged that its Website competes with distributors of the Publishers' authorized ebooks.  Mr. Karpeles wrote an email stating  that "reality has it that we

86

are competing for eyeballs with Amazon, Goodreads (45M monthly users), Overdrive, OCLC Worldcat, and countless other websites…" (McN Decl. ¶119.)  Mr. Karpeles reiterated this statement during his deposition.  (McN Decl. ¶119.)

525.  Mr. Karpeles also created a document listing the library ebook aggregators OverDrive and Hoopla, as well as the ebook retail platforms Amazon and Google Books – all of which license the Publishers' works – as "similar services" to Internet Archive.  (McN Decl. ¶119.)

526.  Internet Archive's library expert, Susan Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL."  (McN Decl. ¶120.)

527.  Ms. Hildreth further testified that "I think it could be likely that with CDL materials meeting some patron requests, the result that [sic] the library would not necessarily have to license the specific title to make patron demand, they would be able and it is likely that they would purchase additional e-materials … to meet other patron demand." (McN Decl. ¶120.)  Ms. Hildreth acknowledged "that a specific author would not receive a royalty for a specific title" if revenue was shifted in this way.  (McN Decl. ¶120.)

528.  A user of the Website testified that he read an ebook on Internet Archive's Website that he could have read in an authorized ebook format through his university library because "it didn't matter to me … whether I was using Internet Archive or [the authorized platform]… [I]t didn't … matter to me.  Or it didn't factor into my thinking because I was more concerned with getting these materials I needed…"  (McN Decl. ¶121.)

4891-8421-5847v.16 0092453-000002

529.    Another Internet Archive user who writes blogs distributing links to ebooks on Internet Archive testified that she would not add links to authorized ebook platforms, in part because "[t]he Internet Archive is reaching a potentially broader audience than the North Carolina Digital Library." (McN Decl. ¶121.)

### B.    Providing Access to Print-Disabled Patrons

530.    Internet Archive has stated that the ebooks on its Website serve the needs of print disabled users.  For example, it stated in the Executive Summary of the MacArthur Foundation application that "[w]orking with US libraries and Benetech, operator of the world's largest digital library for people with disabilities that impact reading, the Internet Archive (IA) will bring millions of free digital ebooks to billions of people.  For the blind, ebooks are a lifeline…"  (McN Decl. ¶122.)

531.    The vast majority of Internet Archive users are not print disabled; only 2 print disabled users were added in 2017 and, by 2021, there were only 10,891 such users – which is less than 0.2% of the accounts currently registered with the Website.  (McN Decl. ¶122.)

532.    The needs of print disabled readers are served by HathiTrust, which "provides print-disabled patrons with versions of all of the [20 million +] works contained in its digital archive in formats accessible to them" – and HathiTrust truly focuses on the print disabled by prohibiting the general population from accessing full ebooks.  (McN Decl. ¶122; *Authors Guild, Inc., v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014).)

533.    Internet Archive also stated in the Executive Summary of their application for the MacArthur Foundation grant that by "digitizing millions of books, we unlock them for communities with limited or no access" – particularly "people in rural areas."  (McN Decl. ¶123.)

88

534.    Mr. Freeland testified that Internet Archive does not target particular geographic locations because "someone could sign up from anywhere in the world." (McN Decl. ¶123.)

535.    Mr. Freeland testified that it would not know whether a user checking out an ebook from the Website "was coming from New York City or coming from some small town in Upstate New York" because Internet Archive only maintains "state- or country-level" geographic data about users. (McN Decl. ¶123.)

536.    When commenting on the Statement, the library copyright expert Kenneth Crews noted that the argument that CDL is necessary to serve individuals in rural areas is "not very convincing. Many rural communities are well served. Sometime[s] the biggest need is in the cities, where parking is miserable, and realistically students and profs are doing their research at home." (McN Decl. ¶124.)

537.    The founder of OverDrive testified that "many of the public libraries that are [his] customers … serve rural communities," "serve disabled communities," "serve poor communities or impoverished communities" – including by OverDrive making donations when appropriate. (McN Decl. ¶124.)

538.    National data indicates that rural communities have seen more growth and value from authorized library ebooks than libraries serving more densely populated districts. (McN Decl. ¶124.)

539.    Internet Archive also asserted in its Answer to the Complaint that the ebooks on its Website can be used for data or text mining. (Ans. at p. 2.)

4891-8421-5847v.16 0092453-000002

540. Mr. Freeland testified in his capacity as Internet Archive's 30(b)(6) witness on this topic that he does not know "what percentage of users engage" in those practices and knows of only three projects that could be described as datamining. (McN Decl. ¶126.)

## X. NATIONAL EMERGENCY LIBRARY

541. On March 24, 2020, Internet Archive launched a "National Emergency Library" in the wake of COVID-19 pandemic shutdowns of libraries. (McN Decl. ¶127.)

542. According to Mr. Kahle, the National Emergency Library drew from the same pool of ebooks that were previously available on the Website, but it "suppressed the wait-list function" – *i.e.*, "[d]id away with the one-to-one ratio." (McN Decl. ¶127.) The blog post announced that "we lend to the world" (McN Decl. ¶127.)

543. Mr. Freeland testified that Internet Archive "did away with waitlists" and "did away with the one-to-one ratio" by raising the cap on concurrent loans to 10,000. (McN Decl. ¶128.)

544. Demand for ebooks on IA's Website increased after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels. (McN Decl. ¶128.)

545. For example, as of September 2019, IA reported over 2.7 million total "Members" of the Website; by April 2022, that figure had nearly doubled to over 5.5 million. (McN Decl. ¶128.)

546. As of March 2020, IA reported that the number of "ebooks borrowed" "over the last 28 days" on the Website was 41,296; by July 2022, the number of ebooks borrowed over the last 28 days is listed as over 349,984 – a more than eightfold increase. (McN Decl. ¶128.)

90

547.    Mr. Freeland testified that Internet Archive did not require users of the National Emergency Library "to certify that they were directly impacted by COVID-19" to access Internet Archive's ebooks on demand and without waitlists.  (McN Decl. ¶129.)

548.    Ms. Bailey wrote that the Internet Archive did not put in place any such requirement because "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19."  (McN Decl. ¶129.)

549.    Internet Archive offered rightsholders an option to "opt-out" of the National Emergency Library, but Mr. Freeland testified that when an author would send such an opt-out request, books that "were taken out of the National Emergency Library, … were not taken out of controlled digital lending."  (McN Decl. ¶129.)

550.    Mr. Freeland testified that Internet Archive was aware that there were "copyright concerns" about the National Emergency Library.  (McN Decl. ¶130.)

551.    Senator Tom Udall of New Mexico wrote to Maria Strong, the U.S. Register of Copyrights, to urge her "to examine the National Emergency Library that has been organized by the Internet Archive which is operating without typical library license and is causing authors in New Mexico concern about the integrity of their copyrights."  (McN Decl. ¶130.)

552.    Senator Udall noted that "[s]ince the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties."  (McN Decl. ¶130.)  But given the National Emergency Libraries distribution of ebooks without payment, he had "heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time."  (McN Decl. ¶130.)

91

553.     In response, Register Strong wrote that, despite the Internet Archive's claim "that the books in the National Emergency Library 'focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook,' and which therefore would not be publicly available when schools and libraries are closed[,]" "the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists." (McN Decl. ¶131.)

554.     Register Strong also wrote that "The types of materials included in the National Emergency Library, which include Stephen King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes." (McN Decl. ¶132.)

555.     Two days after the launch of the National Emergency Library, the Director of Stanford University Press made "a formal request to exclude all [its] content from the National Emergency library." (McN Decl. ¶133.)

556.     The Director explained that "[w]e do not grant those rights to our content, and do not agree that the current coronavirus emergency constitutes an argument for copyright violation. To support the community during this crisis, we are in the process of making all our content more liberally available through the existing library aggregators, and responding to individual requests for content access." (McN Decl. ¶133.)

557.     In a subsequent email to Mr. Freeland, the Stanford University Press Director stated Internet Archive's practices were "entirely unacceptable" given that "IA simply grabbed

4891-8421-5847v.16 0092453-000002

everything without any discussion and the bad will is now oozing through us all."  (McN Decl. ¶133.)

558.    On March 31, 2020, the Director the University of Minnesota Press wrote an email to Mr. Freeland stating that "the National Emergency Library goes further than we can legally or ethically allow."  (McN Decl. ¶134.)

559.    After acknowledging that takedown requests had been sent, Mr. Freeland stated that he would "be happy to discuss making limited Minnesota content available as part of the National Emergency Library, understanding that we *always* consult authors or rights holders before making such decisions – indeed, we've just done a round of that for course books we've made openly available for emergency course use on our Manifold OA platform.  We'd also need some kind of binding legal agreement."  (McN Decl. ¶134.)

560.    On April 2, 2020, the Executive Director of the Authors Guild, Mary E. Rasenberger, wrote to Mr. Kahle to "set up a time to talk" about the National Emergency Library.  (McN Decl. ¶135.)According to the email, she wanted to "dispel any rumors you have heard that the Authors Guild is planning to bring suit.  The Guild is not; we cannot possibly afford a litigation.  We were financially stressed as you know before COVID-19 and having to cancel our gala means a loss of over a quarter of the revenue in our budget.  We are instead addressing this bold infringement by letting authors know how they can request IA to take their books down, and we hope to appeal to your decency in asking you to shut this ill-planned (even if well-intentioned) initiative down.  There are plenty of other sources for books for students and teachers right now. We can help you point people to them."  (McN Decl. ¶135.)

93

561.    Mr. Kahle responded to this message by writing, "We talked before, and I felt deposed by a lawyer, which you are, and therefore not a good idea for layman [sic] (and against some lawyer ethics rules as I understand it); and so I talked with multiple of your board members with no apparent effect.  We are actively working with others and are making great progress.  Wish us all luck, we are all trying to get a digital world that works for everyone."  (McN Decl. ¶136.)

562.    The Internet Archive did not respond to public complaints by the AAP.  (McN Decl. ¶136.)

563.    On April 8, 2020, PRH approved a request by a school for special COVID-19 class set pricing for *Interview with the Vampire* by Anne Rice and *Lolita* by Vladimir Nabokov.  (McN Decl. ¶137.)

564.    But PRH was informed by OverDrive that "the school will not be moving forward with a purchase.  They cited that they needed the materials more urgently and the professor was able to find both titles on the Internet Archive / DPLA site with simultaneous checkout so they used those versions."  (McN Decl. ¶137.)

565.    On April 14, 2020, Mr. Kahle wrote an email to the Executive Director of the Authors Alliance and Pamela Samuelson (who sits on its Board of Directors) to notify them that "the Authors Guild is going to be meeting with some staffers [in Congress] about copyright matters, and possibly about NEL as well.  I thought I would alert you to this, as the Authors Alliance, I think, was formed to be at the table when these discussions were happening."  (McN Decl. ¶138.)

566.    Mr. Kahle is on the Advisory Board to the Authors Alliance, and Dave Hansen, one of the White Paper's co-authors, is on the Staff.  (McN Decl. ¶138.)

94

567.    Internet Archive asked the Authors Alliance to endorse the National Emergency Library but according to an email response, the Authors Alliance "didn't support the NEL [National Emergency Library]."  (McN Decl. ¶138.)

568.    Mr. Kahle posted a blogpost on April 14, 2020 entitled "The National Emergency Library – Who Needs It?  Who Reads It?  Lessons from the First Two Weeks."  (McN Decl. ¶139.)

569.    In the blogpost, Mr. Kahle wrote that "[W]e moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published. We hear your concerns and we've taken action: the Internet Archive has added staff to our Patron Services team and we are responding quickly to the incoming requests to take books out of the National Emergency Library. While we can't go back in time, we can move forward with more information and insight based on data the National Emergency Library has generated thus far."  (McN Decl. ¶139.)

570.    The Internet Archive ended the National Emergency Library on June 10, 2020, ten days after the Publishers filed this action and two weeks before the earliest possible date Internet archive had previously announced for its closure.  (McN Decl. ¶140.)

571.    According to the blog post, Mr. Kahle announced that Internet Archive would return to "traditional controlled digital lending" pursuant to overlap analysis, which it continues to practice to this day.  (McN Decl. ¶140.)

572.    On September 4, 2020, the Executive Director of HathiTrust, Mike Furlough, declined an invitation from Kahle to speak on a panel called "Digital Lending in a Pandemic." (McN Decl. ¶141.)

4891-8421-5847v.16 0092453-000002

573. During COVID-19, HathiTrust expanded access to its ebooks in the wake of school library closures but imposed, among other restrictions, limits to ensure that only students of the institutions affected could read those works. (McN Decl. ¶141.)

574. Mr. Furlough declined the invitation to speak because "[i]f I am asked to define the difference between what we have done and what you have done and are now doing, I will end up pointing out that we have put a good many more *controls* on the service that you did for NEL or for ongoing lending … I may have to end up directly contrasting some things, which would implicitly suggest a criticism of your approach. And we made some very different decisions – when we did our legal analysis, it pointed us in directions that are quite different from those you have taken. And we did not feel that the methods you were employing were ones *we* could defend. We didn't think we could rely on the same legal theories that you were relying on. I'd rather keep all that to ourselves and not be quoted or paraphrased as suggesting that your actions are NOT defensible, especially at your own party." (McN Decl. ¶142.)

## XI. THE IMPACT OF THE INTERNET ARCHIVE ON THE MARKET FOR THE PUBLISHERS' WORKS

### A. Lost Customary Fee from Internet Archive

575. The Internet Archive has scanned, posted and distributed the Works in Suit for short term loans to its users without authorization from the Publishers. (McN Decl. ¶13.)

576. The Internet Archive has not paid the Publishers or their authors any fees for their use and distribution of the Works in Suit. (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

577. As stated by the Internet Archive's expert witnesses, Susan Hildreth, there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is

96

predicated on licensing revenues that are paid by libraries to entities like OverDrive." (McN Decl. ¶9.)

578.    When a library obtains an ebook from an authorized aggregator (like OverDrive) that is published by one of the Publishers for lending to its patrons, that Publisher earns a fee. (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

579.    The Internet Archive holds itself out a "non-profit library." (McN Decl. ¶¶1, 77; R-A Decl. ¶70.)

580.    The Internet Archive does not pay the Publishers the fees paid by libraries engaged in short-term loans of ebooks. (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

581.    IA added over 19,000 of the Publishers' books to its Website after the Publishers filed suit.(Foster Decl. ¶118, Figures 11-14.)

582.    In addition to the Works in Suit, the Internet Archive is distributing ebooks for additional works in each of the Publishers' respective catalogs:

a.    Internet Archive distributes 4,519 titles published by Hachette, which constitutes 34.6% of the titles currently published by Hachette in print and digital form. (Foster Decl. ¶117.)

b.    Internet Archive distributes 7,055 titles published by HarperCollins, which constitutes 36.7% of the titles currently published by HarperCollins in print and digital form. (Foster Decl. ¶117.)

c.    Internet Archive distributes 16,496 titles published by Penguin Random House, which constitutes 35.8% of the titles currently published by Penguin Random House in print and digital form. (Foster Decl. ¶117.)

97

d.   Internet Archive distributes 4,933 titles published by Wiley, which constitutes 15.5% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

583.   The percentage is higher if one looks at books initially published more than five years ago.  For these books:

e.   Internet Archive distributes 4,220 titles published by Hachette, which constitutes 54.6% of the titles currently published by Hachette in print and digital form.  (Foster Decl. ¶117.)

f.   Internet Archive distributes 15,746 titles published by Penguin Random House, which constitutes 48.4% of the titles currently published by Penguin Random House in print and digital form.  (Foster Decl. ¶117.)

g.   Internet Archive distributes 4,889 titles published by Wiley, which constitutes 21.3% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

584.   Internet Archive has not paid the Publishers the fee customarily paid by libraries engaged in library ebook lending for each of these additional titles.  (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

585.   The Publishers earn substantial fees from the library ebook market.  For example, between 2017-2020, the 48 Works in Suit published by PRH generated approximately $1.23 million in U.S. library ebook revenue.  (Weber Decl. ¶49.)  During the same time period, the 33 Works in Suit published by HarperCollins generated over $768,000 in revenue from the license of library ebooks.  In short, for these 88 Works in Suit, the two Publishers earned almost $2 million in library ebook revenues.  (R-A Decl. ¶49.)

586.   By extrapolation, the Publishers earn many millions in library ebook revenues for the 33,000 works published by them in print and digital form that are posted on the Internet

4891-8421-5847v.16 0092453-000002

Archive.  (R-A Decl. ¶49.)

587.    It would cost Internet Archive millions of dollars to license authorized library versions of the Works in Suit and the Publishers' 33,000 other titles that currently reside on the Internet Archive for national, unlimited distribution without a metering limit.  (R-A Decl. ¶71; Weber Decl. ¶84.)

588.    Both the number of the Publishers' titles being distributed by the Internet Archive, and the number of its members and borrows has grown over time, including since this lawsuit was filed.  (*See supra* ¶¶544-547.)

## B.    Lost Library Ebook Sales

589.    Internet Archive provides libraries and their patrons with a free alternative to licensed ebooks from the Publishers' authorized library ebook aggregators.  Internet Archive provides an option not to pay the fees for authorized library ebooks.  (R-A Decl. ¶¶75-79; Pavese Decl. ¶32; Weber Decl. ¶¶85-86, 88, 90-93; Sevier Decl. ¶¶76-77.)

590.    Internet Archive provides short term ebook lending to users.  (McN Decl. ¶¶4-5, 13; R-A Decl. ¶75.)

591.    Authorized library ebook aggregators – working pursuant to agreements with the Publishers – also provide short term ebook lending to users.  (McN Decl. ¶11; R-A Decl. ¶75.)

592.    By providing short term ebook lending on the internet, Internet Archive and authorized library ebook aggregators perform a similar function.  (McN Decl. ¶¶117-121; R-A Decl. ¶75.)  Internet Archive does not compensate the Publishers and authorized library lending does compensate the Publishers.  (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶¶75-76; Sevier Decl. ¶74; Weber Decl. ¶84.)

4891-8421-5847v.16 0092453-000002

593. By creating ebooks through the scanning of the Publishers' print books, the Internet Archive enables public and academic libraries to avoid certain licensing restrictions that each Publisher has devised for the library ebook market. (Pavese ¶¶23, 34; R-A Decl. ¶¶2, 29,75; Sevier Decl. ¶67; Weber Decl. ¶70.)

594. Internet Archive does not restrict the users of its Website to identified community residency or academic credentials; rather, Internet Archive distributes its ebooks on its Website without a limiting term (such as for two years) or a limiting number of circulations (like 26). (McN Decl. ¶¶4, 6, 62; R-A Decl. ¶75.)

595. Multiple libraries have links to IA's Website on their websites. (*See supra* at ¶¶393-396.)When a library puts a link on its website sending its local patrons to the IA's Website, the ebooks available on the Website are not authorized for lending by the Publishers. (McN Decl. ¶13.)

596. When a library puts a link on its website sending its local patrons to IA's Website, that library's local patrons may have the ability to borrow from a collection of ebooks not available in its own local library's collection. (McN Decl. ¶¶104, 108; R-A Decl. ¶76.)

597. Susan Hildreth, Internet Archive's library expert, stated in her report that libraries engage in CDL "to leverage their existing physical collection" to obtain ebooks. (McN Decl. ¶14.)

598. When libraries leverage their existing physical collections to obtain ebooks, they do not pay for authorized ebooks. (McN Decl. ¶14; R-A Decl. ¶78.)

599. Ms. Hildreth also stated in her report that "if a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title – or on

4891-8421-5847v.16 0092453-000002

purchasing print books." (McN Decl. ¶14.)

600.　If a library decides not to license an ebook title from authorized ebook aggregators because digitized print copies are available for borrowing under CDL and uses the money on another ebook title, that other ebook title may not be written by the same author or published by the same publisher as the first title. (McN Decl. ¶14.; R-A Decl. ¶¶75; 78.)

601.　Ms. Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL." (McN Decl. ¶14.)

602.　As a result, the Publisher and author will receive less money from the library for those particular titles. (McN Decl. ¶14.)

603.　The Internet Archive's Open Libraries Agreement form explicitly states, "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own." (McN Decl. ¶69.)

604.　The Publishers experience lost potential ebook license revenues when a library makes their collection digital by using a physical volume that they own, rather than obtaining an authorized ebook license for a fee from an authorized ebook aggregator. (R-A Decl. ¶78.)

605.　The Internet Archive has advised libraries that they need not spend money on authorized ebooks because their patrons can instead access ebook titles on the Internet Archive's Website and/or use their print copies to leverage them into digital copies. (*See supra* at ¶¶380; 597-98; R-A Decl. ¶78.).

606.　For example, in presentations to libraries, Internet Archive has explained that its model "ensures that a library will not have to repurchase the same content repeatedly simply

101

because of a change in format."  (McN Decl. ¶71; R-A Decl. ¶78.)

607.    As another example, in a document titled "Maximizing institutional investment in print resources through controlled digital lending," Internet Archive summarizes its project as "Or, You Don't Have To Buy It Again."  (McN Decl. ¶71; R-A Decl. ¶78.)

608.    The Publishers experience lost revenues when a library does not "repurchase the content again" via an authorized ebook license and instead makes use of the Internet Archive's ebook for its patrons.  (R-A Decl. ¶78.)

609.    As of June 2020, when the Works in Suit were removed from the Internet Archive, it had fewer members and monthly loans than today.  (*See supra* ¶¶544-547.)

610.    If the Internet Archive's conduct continues or other similar websites follow its example and its practices become widespread, there will be more free ebooks to satisfy user demand.  (R-A Decl. ¶¶76-79; Weber Decl. ¶50.)

611.    There are many millions of print books housed in libraries nationwide.(McN Decl. ¶11.; R-A Decl. ¶79.)

612.     While fewer than 15 public libraries now act as Partner Libraries in the Open Libraries project, their widespread participation would increase the number of IA's copies of the type of trade books published by the Plaintiffs.  (McN Decl. ¶72.)

613.    The Publishers price and sell print based on the assumption that they are material objects with limited distribution capabilities.  (R-A Decl. ¶22; Sevier Decl. ¶40; Weber Decl. ¶42.)

**C.    Lost Consumer Ebook Sales**

614.    A consumer who wishes to read a particular book can read or download the ebook for free from IA's Website rather than obtaining the ebook from Amazon, B&N.com, or the

4891-8421-5847v.16 0092453-000002

Publishers' other e-vendors for a fee. (Sevier Decl. ¶¶9, 75; R-A Decl. ¶80; Weber Decl. ¶¶87-93.)

615. If a consumer obtained an ebook from Amazon, B&N.com, or the Publishers other e-vendors, the consumer would pay a fee for the work. (R-A Decl. ¶80.) If the same consumer instead obtains the ebook from IA's Website, they would not pay a fee for the work. (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

616. The Publishers employ anti-piracy vendors. This retention is informed by the belief that the distribution of free unauthorized digital copies of their book on internet websites leads to lost sales revenue. (Pavese ¶20; R-A Decl. ¶81; Sevier ¶21; Weber ¶17.)

617. Hachette's study of library and commercial ebook sales from 2017 to 2020 shows that its library ebook reads are increasing, while its retail ebook sales are declining. This study includes data which shows, for instance, that revenues for certain writers who have had steady commercial ebook sales has gone down while the circulation numbers for their library ebooks have gone up. (Sevier Decl. ¶¶57; 58-59.)

618. This study suggests that free short term lending of ebooks may potentially serve as a substitute for the acquisition of commercial ebooks. (Sevier Decl. ¶59.)

619. These trends in the Hachette study show that members of the public are increasingly using free ebook options, such as from libraries. (Sevier Decl. ¶¶55-59; *see also* Weber Decl. ¶64.)

620. If there were widespread and unrestricted adoption of the conduct practiced by Internet Archive, that would lead to a greater supply of copies of each backlist ebook title available for free short term loan from internet websites, with reduced or no waitlists. (R-A Decl. ¶81;

4891-8421-5847v.16 0092453-000002

Weber Decl. ¶¶90-93.)

**D.    Inadequate Protection of Intellectual Property**

621.    The Foster Declaration provides examples in which the Internet Archive has made metadata errors or other mistakes with assorted ramifications, including instances in which in-copyright books have been treated as public domain, or titles have been confused.   (Foster Decl. ¶88; Weber Decl. ¶89; Sevier Decl. ¶78.)

**XII.    INTERNET ARCHIVE'S SCANS, WHILE ENTIRELY LEGIBLE, FALL SHORT OF THE QUALITY OF AUTHORIZED EBOOKS.   THE PUBLISHERS' ENFORCEMENT OF RIGHTS AGAINST INTERNET ARCHIVE**

622.    The Plaintiffs or their representatives have sent copyright notices to Internet Archive identifying unauthorized copies of the Plaintiffs' works to be removed.  (Foster Decl. ¶119.)

623.    Internet Archive failed to remove or disable access to certain of the alleged infringements cited in copyright notices that the Plaintiffs or their representatives sent before the lawsuit, both for some of the Works in Suit and for other works published by the Plaintiffs. (Foster Decl. ¶122.)

624.    On July 23, 2014, "PRH emailed its catalog to Internet Archive in an Excel spreadsheet, demanding that IA remove "[u]nauthorized, scanned versions of Penguin Random House titles being lent to patrons... immediately."  (Weber Decl. ¶17.)

625.    The email added that the "attached file includes both print and eBook isbn for all Random House titles, and print isbns (only) for Penguin titles. It includes close to 60,000 unique isbns. Please let us know the time frame in which we can expect these titles to be removed, and if you need anything additional from us to facilitate this process."  (Weber Decl. ¶17.)

4891-8421-5847v.16 0092453-000002

626. In response, the Internet Archive provided assurances that it would comply with this demand; Internet Archive's Office Manager stated that "We've been disabling lending access to our list of items with matching ISBN metadata that also have either an Ebook ISBN or 'Y' in the 'Ebook Eligible' column on your spreadsheet. I will confirm when this has been completed." (Weber Decl. ¶17.)

627. Of the 58,754 ISBNs listed in the July 2014 PRH catalog, 35,413 (60.3%) remain in PRH's current commercial catalog, and 23,341 (39.7%) do not. (Prince Decl. ¶134.)

628. Today, the Internet Archive makes nearly half of the books listed in the 2014 PRH catalog available for lending on the Website; the Website currently makes available (a) 47.1% (16,681 of 35,413) of the 2014 catalog books that are in PRH's current catalog; (b) 48.7% (11,366 of 23,341) of the 2014 catalog books that are not in PRH's current catalog; and (c) 47.7% (28,047 of 58,754) of all 2014 catalog books. (Prince Decl. ¶134.)

629. Likewise, in 2018, counsel for HarperCollins sent Internet Archive a letter "demand[ing] that you immediately disable the 'Borrow eBook' function for our books still under copyright." (R-A Decl. ¶83.)

630. Internet Archive did not comply with this cease and desist letter. (R-A Decl. ¶83.)

631. As a result, HarperCollins instructed its anti-piracy vendor to send takedown notices to Internet Archive for hundreds of links to in-copyright works on the Website. Despite these notices, Internet Archive has continued to upload and make thousands of HarperCollins works available for lending. (R-A Decl. ¶83.)

632. Other Plaintiffs or their representatives have sent copyright notices to IA identifying unauthorized copies of Plaintiffs' works to be removed. (Pavese Decl. ¶6; Sevier Decl.

4891-8421-5847v.16 0092453-000002

¶82).

633.   Internet Archive failed to remove or disable access to certain of the alleged infringements cited in those notices, both for the Works in Suit, and for other works.  (Foster Decl. ¶122.)

634.   Internet Archive has also received requests from authors requesting that their books be removed from the Website.  For example, Internet Archive received an email from an author writing "from a little farm house in Tasmania where [she had] existed on a meager writer income for the past ten years in order to support my two children as a single mother," who told IA that it was "stealing" from her by posting her books and had imperiled her ability to "feed [her] kids and pay [her] house loan."  (McN Decl. ¶24.)

635.   In that same message, the author asked "[c]ould you please consider an agreement between myself and my publishers that will offer remuneration for any future lendings.  If not could you remove [my] titles from your system."  "Incidentally," the email continued, "I noticed Girls Night In 4 was listed… the authors in that collection gave those stories over for free to support the War Child charity.  I'm concerned that [a] valuable charity is missing out on sales.  Could you also please consider within your heart and soul if what you are doing is honourable [sic] towards authors.  We all love books and we all love sharing books, but the original creator needs to be paid at some stage in your system."  (McN Decl. ¶24.)

Dated: New York, New York
       July 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning

106

Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC*

4891-8421-5847v.16 0092453-000002