# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 21 OF 26 (A-5141-A-5364)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM    ELIZABETH A. MCNAMARA
DANAE TINELLI          LINDA J. STEINMAN
SCOTT A. ZEBRAK        JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP   JESSE M. FEITEL
4530 Wisconsin Avenue, NW,   CARL MAZUREK
5th Floor              DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016    1251 Avenue of the Americas, 21st Floor
                       New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

### Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | **Vol. 4** | | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | **Vol. 5** | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | **Vol. 6** | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | **Vol. 7** | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

13

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | **Vol. 16** | | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | **Vol. 20** | | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | **SUPPLEMENTAL DECLARATION OF ELIZABETH A. MCNAMARA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO INTERNET ARCHIVE'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

Pursuant to 28 U.S.C. § 1746, I, **ELIZABETH A. MCNAMARA**, declare as follows:

1.      I am an attorney duly admitted to practice law before this Court and a partner of Davis Wright Tremaine LLP, counsel for plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House ("PRH") (collectively, "Plaintiffs" or "Publishers") in the above-captioned action.  I submit this declaration in support of the Plaintiffs' Opposition to Internet Archive's Motion for Summary Judgment (the "Opposition").  Except as otherwise indicated, I make this declaration based on discovery in this case, as referenced by citation, or my personal knowledge.

2.      On December 24, 2021, IA served its Objections and Responses to Plaintiffs' Second Set of Interrogatories.  (A true and correct copy of Defendants' Response to Interrogatory No. 21 is attached hereto as Exhibit 1.)

3.      Annexed hereto as Exhibit 2 is a true and correct copy of excerpts from the transcript of the December 1, 2021 deposition of Chantal Restivo-Alessi.

4.     Annexed hereto as Exhibit 3 is a true and correct copy of excerpts from the transcript of the November 19, 2021 deposition of Jeffrey Weber.

5.     Annexed hereto as Exhibit 4 is a true and correct copy of excerpts from the transcript of the December 10, 2021 deposition of Alan Pavese.

6.     On May 25, 2020, Dr. Imke Reimers, together with Dr. Abhishek Nagaraj, published a draft article titled "Digitization and the Demand for Physical Works: Evidence from the Google Books Project." (A true and correct copy of Exhibit 4 to the Deposition of Dr. Reimers, reflecting the May 25, 2020 draft of the article, is annexed hereto as Exhibit 5.) The draft article was published on SSRN. *See id.*

7.     Annexed hereto as Exhibit 6 is a true and correct copy of excerpts from the transcript of the November 12, 2021 deposition of Alison Lazarus.

8.      Annexed hereto as Exhibit 7 are true and correct copies of  spreadsheet produced by OverDrive in this action, reflecting OverDrive checkout and revenue data.

9.     On August 9, 2021, Internet Archive filed a letter requesting a pre-motion discovery conference regarding a contemplated motion to compel the Publishers to produce, *inter alia*, additional financial data, including monthly sales data for the Works in Suit and sales data for works other than the Works in Suit.  Plaintiffs filed their response on August 12, 2021 stating the reasons why it should not be compelled to produce this data.  Ultimately, Internet Archive agreed to withdraw those requests voluntarily as part of a global agreement between the parties resolving various discovery disputes.  On January 14, 2022, the parties filed a joint letter informing the Court that they had "resolved the various issues identified in [the August 9, 2021 letter]."  (True and correct copies of the August 9 and 12, 2021 and the January 14, 2022 letters are attached hereto as Exhibit 8.)

2

10. On January 28, 2022, IA served its Second Amended Privilege Log. (A true and correct copy of the entries from IA's Second Amended Privilege Log asserting privilege over documents described as "Communication concerning attorney advice on CDL legal strategy" or "Communication concerning attorney advice on NEL legal strategy" is attached hereto as Exhibit 9.)

11. Annexed hereto as Exhibit 10 is a true and correct copy of excerpts from the transcript of the October 18 and 19, 2021 deposition of Lila Bailey.

12. In response to the COVID-19 pandemic, a small number of academic libraries instituted or participated in digital lending programs, which IA identifies in its motion:

    a. According to its website, HathiTrust provided access to digital materials for "member libraries that have experienced *unexpected* or *involuntary, temporary* disruption to normal operations, requiring it to be closed to the public, or otherwise restrict collection access services." *See Emergency Temporary Access Service*, HATHITRUST, https://www.hathitrust.org/ETAS-Description, (last visited Sept. 2, 2022) (emphasis in original).

    b. According to its website, Carnegie Mellon University provided its members digital access "[f]or the first 6 weeks of Fall [2020]" to "60 individual titles for virtual course reserve." *Introducing Controlled Digital Lending*, CARNEGIE MELLON UNIVERSITY, https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending, (last visited Sept. 2, 2022).

    c. According to a presentation by Erin Weller and Joan Lindsay of Michigan State University, Michigan State University provided its members digital

access to "206 different texts," citing the pandemic as a rationale. *See* Erin Weller and Joan Lindsay, *Case Study on Implementation of CDL*, MICHIGAN STATE UNIVERSITY, (Jan. 21, 2021), slides 2 and 14, https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl.

d.  According to an article in the International Journal of Librarianship by Qinghua Xu, Leon Lin and Xiaohan Wu of NYU Shanghai, NYU Shanghai instituted a "temporary . . . implementation of CDL." *See* Qinghua Xu, Leon Lin and Xiaohan Wu, *Implementing Controlled Digital Lending with Google Drive and Apps: A Case Study at the NYU Shanghai Library*, INT'L JOURNAL OF LIBRARIANSHIP, (July 10, 2021), https://journal.calaijol.org/index.php/ijol/article/view/193.

e.  According to its website, Miami University implemented a "short-term lending service" that provided digital access to its members in connection with "efforts to address concerns about physical distancing on campus during the time of the COVID-19 pandemic." *See Limited Online Library Access Lending Service*, MIAMI UNIVERSITY, https://www.lib.miamioh.edu/use/borrow/lola/, (last visited Sept. 2, 2022).

f.  According to its website, CalTech developed a digital lending system "to help Caltech students and faculty continue their studies and work during the global COVID-19 pandemic." *See Caltech Digital Library Borrowing System*, CALTECH DIBS, https://caltechlibrary.github.io/dibs/, (last visited Sept. 2, 2022).

4

g. According to its website, the University of Florida implemented a digital

lending program in response to the "struggle[] to provide access to print

collections during the pandemic." *See Sustaining Access Responsibly with*

*Controlled Digital Lending*, AFFORDABLE UF,

http://affordabletexts.ufl.edu/sustaining-access-responsibly-with-controlled-

digital-lending/, (last visited Sept. 2, 2022).

13. Annexed hereto as Exhibit 11 is a true and correct copy of a blogpost by Brewster

Kahle dated April 27, 2021 and entitled *Internet Archive Launches New Pilot Program for*

*Interlibrary Loan*, which is available at http://blog.archive.org/2021/04/27/internet-archive-

launches-new-pilot-program-for-interlibrary-loan/.

14. Annexed hereto as Exhibit 12 is a true and correct copy of excerpts from the

transcript of the October 22, 2021 deposition of Jacques Cressaty.

15. Internet Archive has, as part of its wider mass digitization and distribution

program, posted unauthorized ebook versions of the following works that are also available as

authorized library ebooks: *The Glass Castle*, *The Hunger Games*, *Beyond Magenta: Transgender*

*Teens Speak Out*, *Catch-22*. (True and correct copies of OverDrive webpages offering each of

these books are annexed hereto as Exhibit 13.)

16. Internet Archive's patron witness Laura Gibbs testified that she relied on Internet

Archive to provide students with ebooks via Internet Archive's Website that were also available

as authorized library ebooks – including Chitra Banerjee Divakaruni's *Palace of Illusions*,

*Neela: Victory Song* and *The Conch-Bearer*. (True and correct copies of OverDrive webpages

offering each of these books are annexed hereto as Exhibit 14.)

5

17.     Annexed hereto as Exhibit 15 is a true and correct copy of excerpts from the transcript of the March 15, 2022 deposition of Benjamin Saracco.

18.     Annexed hereto as Exhibit 16 is a true and correct copies of the webpage *Signatories to the Position Statement on Controlled Digital Lending by Libraries*, CONTROLLED DIGITAL LENDING BY LIBRARIES, https://controlleddigitallending.org/signatories, (last visited September 2, 2022).

19.     Annexed hereto as Exhibit 17 is a true and correct copy of an email chain produced in this action bearing bates number HC0015518.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on September 2, 2022.

_/s/ Elizabeth A. McNamara____
ELIZABETH A. MCNAMARA

6

# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**DEFENDANT INTERNET ARCHIVE'S OBJECTIONS AND RESPONSES TO**
**PLAINTIFFS' SECOND SET OF INTERROGATORIES**

CONFIDENTIAL

**INTERROGATORY NO. 21:**

Do you contend that Plaintiffs' claims are barred in whole or in part by the fair use doctrine and, if so, please state the basis for that contention.

**RESPONSE TO INTERROGATORY NO. 21:**

In addition to its General Objections, the Internet Archive objects to this Interrogatory as vague and ambiguous, specifically with regard to the terms "Plaintiffs' claims." The Internet Archive understands Plaintiffs' claims to arise out of the digital lending features applied to the Internet Archive's inlibrary collection with respect to the Works identified in Exhibit A to Plaintiffs' Complaint, and provides this Response based on that understanding. The Internet Archive objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, work-product doctrine, common-interest privilege, or any other applicable privilege or protection.

Subject to and without waiving the foregoing General and Specific Objections, the Internet Archive responds as follows:

The Internet Archive contends that Plaintiffs' claims are barred by the fair use doctrine. Specifically:

With respect to the first fair use factor under 17 U.S.C. § 107, the purpose and character of use, the purpose and character of the use here favors fair use, for reasons including:

- That the digital lending is not commercial in nature favors fair use;

19

- That the digital lending supports teaching, research and scholarship favors fair use;

- That the digital lending is performed using a scan created from a copy owned by a participating library, including Internet Archive or Open Library of Richmond, favors fair use;

- That the copy that was scanned was lawfully made favors fair use;

- That the digital lending uses technology that is effective in preventing patrons from making or distributing copies of the borrowed material favors fair use;

- That the digital lending utilizes technology to improve the efficiency of delivering content, by delivering it in a more convenient and usable form to one who has an entitlement to receive the content, without unreasonably encroaching on the commercial entitlements of the rights holder, makes the use transformative and favors fair use;

- With respect to controlled digital lending ("CDL"), that the digital lending is performed on a one-to-one, owned-to-loaned basis with copies owned by Open Library of Richmond or other participating libraries favors fair use;

- With respect to controlled digital lending ("CDL"), that the digital lending is performed on a one-to-one, owned-to-loaned basis with non-circulating physical copies favors fair use;

- With respect to the National Emergency Library program ("NEL"), that the digital lending was performed on a one-to-one owned to loaned basis with copies owned by libraries whose physical collections were at that time unavailable to patrons (due to physical facility closures necessitated by the COVID-19 pandemic and

20

A-5150

resulting public health emergency) favors fair use; and

- With respect to the National Emergency Library program ("NEL"), that the digital lending occurred for a brief and defined period during a public health emergency that affected safe access to physical books favors fair use.

With respect to the second fair use factor under 17 U.S.C. § 107, the nature of the copyrighted work, that factor here favors fair use, for reasons including:

- That the digital lending is performed with respect to material of which copies have been published and sold to the public for several years, those copies now owned by non-profit libraries, favors fair use.

With respect to the third factor under 17 U.S.C. § 107, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, that factor here favors fair use, for the reasons including:

- That the amount used is necessary to accomplish the favored purposes of the digital lending favors fair use;

- That the digital lending is performed only with respect to material appearing in copies owned by a participating library, including Internet Archive or Open Library of Richmond, favors fair use; and

- Where only a small portion of a work is consulted by a particular user in connection with a particular digital loan, that favors fair use.

With respect to the fourth factor under 17 U.S.C. § 107, the effect of the use upon the potential market for or value of the copyrighted work, that factor here favors fair use, for the reasons including:

- That the digital lending has a similar effect on the market for or value of the

21

CONFIDENTIAL

copyrighted work as physical lending favors fair use;

- That the digital lending has no negative effect on sales or licenses of the copyrighted works favors fair use;

- That the digital lending has public benefits favors fair use.  For example, digital lending of books is more convenient for some members of the public than physically lending those same books owned by libraries;

- That the public benefits relate to copyright's concern for the creative production of new expression favors fair use; and

- That the public benefits are comparatively important when compared with any dollar amounts lost by the plaintiffs, taking into account as well the nature of the source of the loss, favors fair use.

That copyright law's goal of promoting the progress of science and useful arts would be better served by allowing the use than preventing it favors fair use.

The Internet Archive's investigation is ongoing.  To the extent necessary, the Internet Archive will amend or supplement this Response as discovery continues.

**INTERROGATORY NO. 22:**

**RESPONSE TO INTERROGATORY NO. 22:**

22

Archive will amend or supplement this Response as discovery continues.


Dated: December 24, 2021              AS TO OBJECTIONS
                                      DURIE TANGRI LLP

                        By: _____

JOSEPH C. GRATZ (          )
JESSICA E. LANIER (        )
ADITYA V. KAMDAR (       )
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com

ALLYSON R. BENNETT (        )
MOON HEE LEE (        )
953 East 3rd Street
Los Angeles, CA 90013
(213) 992-4499
abennett@durietangri.com
mlee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
CORYNNE MCSHERRY (       )
KIT WALSH (        )
CARA GAGLIANO (       )
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

INTERNET ARCHIVE


27

A-5153

**PROOF OF SERVICE**

I am employed in Los Angeles County, State of California, in the office of a member of

the bar of this Court, at whose direction the service was made.  I am over the age of eighteen

years, and not a party to the within action.  My business address is 953 East 3rd Street, Los

Angeles, CA 90013.

On December 24, 2021, I served the following documents in the manner described

below:

**DEFENDANT INTERNET ARCHIVE'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' SECOND SET OF INTERROGATORIES**

☑      BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy
through Durie Tangri's electronic mail system from mlee@durietangri.com to the
email addresses set forth below.

On the following part(ies) in this action:

Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
lizmcnamara@dwt.com
lindasteinman@dwt.com
jackbrowning@dwt.com
jessefeitel@dwt.com
carlmazurek@dwt.com

Attorneys for Plaintiffs
HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

Mathew J. Oppenheim
Scott A. Zebrak (pro hac vice)
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016

28

matt@oandzlaw.com
scott@oandzlaw.com

Attorneys for Plaintiffs
HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC

 I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on December 24, 2021, at Los Angeles, California.

             _____

              Moon Hee Lee

29

# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 2

ATTORNEYS' EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4     HACHETTE BOOK GROUP, INC.,

 5     HARPERCOLLINS PUBLISHERS LLC,

 6     JOHN WILEY & SONS, INC., and

 7     PENGUIN RANDOM HOUSE LLC,

 8              Plaintiffs,

 9          vs.                    Case No.

10     INTERNET ARCHIVE and DOES    1:20-cv-04160-JGK

11     1 through 5, inclusive,

12              Defendants.

       _____/

13

14              -- ATTORNEYS' EYES ONLY --

15

16     VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS OF

17     HARPERCOLLINS PUBLISHERS LLC, BY CHANTAL RESTIVO-ALESSI

18              Remote Zoom Proceedings

19              New York, New York

20              Wednesday, December 1, 2021

21

22     REPORTED BY:

23     LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

24     Job No. 4867798

25     Pages 1 - 283
```

                                              Page 1

ATTORNEYS' EYES ONLY

```
 1        Q.  Okay.  At a high level?

 2        A.  Not really, no.

 3        Q.  Okay.  Are you aware of any impact on the

 4    revenue of those titles coinciding with their

 5    availability for borrowing from the Open Library?      14:44:06

 6        A.  Well, I -- I think this is a matter of, you

 7    know, general -- general principles.  So if we start from

 8    the fact that we're not receiving any income like we

 9    normally do for distribution to libraries, in the case of

10    the Internet Archive, so there clearly is a loss of that   14:44:33

11    income because we're not being paid.

12            And then in addition to that, you know, the

13    libraries themselves, I believe, are linking to the

14    website, and therefore, they're not buying copies either

15    in 26 circs or in pay per use.                        14:44:52

16            And then, finally, the consumer might be

17    downloading -- as I said at the beginning of my -- you

18    know, of this long day, you know, this -- they might be

19    downloading it from the website or they might, and

20    therefore, they won't buy that product.               14:45:14

21            So I can't -- you know, I can't give you a

22    specific number, and I don't follow those titles, but it

23    goes -- to me, it seems like a no-brainer that we would

24    have loss of sales resulting from those three examples.

25            You know, the consumers not purchasing or not      14:45:32
```

Page 141

Case 1:20-cv-04160-JGK-OTW Document 1033-5 Filed 08/02/24 Page 1 of 7
Case 1:20-cv-04160-JGK-OTW Document 96-25 Filed 07/07/22 Page 46 of 211
ATTORNEYS' EYES ONLY

1    reading in a library, the library linking out and not

2    buying the product via the distributor from us, and the

3    distributor not paying us.

4         Q.  And the distributor not paying you, can you --

5         A.  So the distributor would be, you know, if          14:45:50

6    Internet Archive considers itself a distributor to

7    libraries, then it would have to pay us the same way

8    OverDrive or Hoopla or others pay us for every single

9    product that they then in turn make available to

10   libraries.                                                  14:46:13

11        Q.  You mentioned libraries that link to the

12   Internet Archive.  Can you elaborate on that a little

13   bit?

14        A.  Yes.  So I believe there are libraries that are

15   linking to the Internet Archive for their fulfillment of   14:46:32

16   their, you know, eBook.  And, you know, that is clearly

17   in -- you know, that's clearly a replacement of a sale

18   that would happen by -- you know, of an availability of a

19   product that would happen by a library distributor to a

20   library.                                                    14:46:58

21        Q.  How many libraries that lend HarperCollins

22   titles have a link to the Internet Archive's website?

23        A.  I don't know the specifics.  I -- I assume

24   Internet Archive does, though.  So if they were to give

25   us that list and tell us how many titles from our catalog  14:47:13

Page 142

```
 1     have been used and how many times they've been downloaded

 2     without payment to us, that would make it possible for us

 3     to quantify any damage.

 4          Q.  Why do you assume the Internet Archive has a

 5     list of libraries that link to it?                         14:47:36

 6          A.  Well, because, you know, I run websites, and I

 7     know that to put a link on a website, you have to know

 8     about that -- you know, a link is something you actively

 9     manage.

10          Q.  But if it's on a library website, wouldn't the   14:47:57

11     library be managing that link?

12          A.  Yeah, but it would link to somewhere else;

13     right?  So I think there is a transmission.

14          Q.  I see.

15               And you -- you said earlier that you believe    14:48:13

16     that libraries link to the Internet Archive.  What is

17     that belief based on?

18          A.  I've seen some screen shots, and I've also

19     seen -- you know, yeah.  That's pretty much it.  I've

20     seen some screen shots.                                    14:48:33

21          Q.  Okay.  So what investigation or analysis, if

22     any, has HarperCollins conducted to determine whether the

23     availability of its titles on the Internet Archive have

24     affected revenue for those titles?

25               MS. STEINMAN:  Objection.                        14:48:58
```

Page 143

```
 1              Go ahead.
 2              THE WITNESS:  I think, as I said before, I
 3    haven't or Harper hasn't done any specific analysis.
 4    Because in order to do specific analysis, you need to
 5    obtain specific data.  However, I think the principle      14:49:14
 6    that our content is available for free and not being paid
 7    for, not for -- to us, not to our authors, is clearly
 8    damage in itself.
 9              I don't have to prove the quantum to know that
10    I'm missing on a sale.  I know that I'm missing on that     14:49:35
11    sale.  Now how much am I missing?  That's the quantum,
12    not the sale itself.
13       Q.  BY MS. LANIER:  Forgive me if I'm not hearing
14    it.  Are you saying "quantum," like Q-U-A-N- --
15       A.  Quantum like -- sorry, this is my Italian thing,    14:49:51
16    but like amount, is maybe the right term in English.
17       Q.  Okay.  Got it.
18              That was not meant to be a -- I was just wanting
19    to make sure I was hearing the word right.
20       A.  Yeah, sorry.  No, sorry.  I do have to apologize     14:50:06
21    because sometimes I go into another language.
22       Q.  Certainly no need to apologize.
23              Okay.  Does -- does HarperCollins provide free
24    copies of physical books to promote a title?
25       A.  Yes, we do --                                       14:50:40
```

                                                    Page 144

A-5161

ATTORNEYS' EYES ONLY

```
 1   STATE OF CALIFORNIA    ) ss:

 2   COUNTY OF MARIN        )

 3

 4         I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6         That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9         That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16         I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21   this 3rd day of December, 2021.

22

23

24

25         LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 283

A-5162

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 3

ATTORNEYS EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 6    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 7

              Plaintiffs,

 8

          vs.                    No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11              Defendants.

      _____/

12

13              -- ATTORNEYS' EYES ONLY --

14

15    VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS

16         OF PENGUIN RANDOM HOUSE BY JEFF WEBER

17              Remote Zoom Proceedings

18              Ho-Ho-Kus, New Jersey

19              Friday, November 19, 2021

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 290                    Job No. 4867863

                                          Page 1
```

```
 1    this issue?

 2         A.   Yes.

 3         Q.   What is that person's name?

 4         A.   Her name is Madison Forsander.

 5         Q.   Would you mind spelling that last name for me?      17:02:12

 6         A.   Sure.  F-O-R-S-A-N-D-E-R.

 7         Q.   Okay.  And you had mentioned in your testimony

 8    some variables impacting PRH's ability to tell when

 9    the -- when PRH titles were available for borrowing from

10    the Internet Archive; is that accurate?                       17:02:42

11         A.   Oh, you mean like the specific dates; is that

12    what you mean?  Like when it would go up and --

13         Q.   Yes.  So -- yes.

14         A.   Right.

15         Q.   So what I was asking was just whether you had --   17:02:52

16    was it correct that you had testified that there were

17    variables impacting PRH's ability to ascertain when

18    titles were available on the Internet Archive for

19    borrowing?

20         A.   Right.  Specifically, we don't know exactly when    17:03:08

21    things go up.  It's -- it's -- it's left up to us to find

22    it.

23         Q.   So has PRH, all of that context notwithstanding,

24    has PRH observed a change in revenues for the titles that

25    are involved in this lawsuit coinciding with availability     17:03:27
```

Page 202

ATTORNEYS EYES ONLY

1  for borrowing, as best PRH can ascertain, from the

2  Internet Archive?

3      A.  Well, I guess the way I would answer that is we

4  know for a fact that the Internet Archive is presenting

5  themselves as an aggregator, and aggregators that we deal  17:03:49

6  with pay us.

7          So we know that right off the bat, there's a --

8  there's -- there's revenue that we should have that we're

9  not having.  Because they act on their own.  They don't

10  pay us.  They don't actually act the way an aggregator  17:04:06

11  should.

12          Secondarily, we know that they're out there

13  talking to libraries and telling them that somehow that

14  this scanning thing is somehow a legitimate way for them

15  to source copies, and we now see that there are libraries  17:04:21

16  that right next to an OverDrive checkout button will have

17  a button there that says "get from the Internet Archive."

18          So we could have had more revenues right there

19  from -- from a legitimate aggregator, but instead it's

20  going to the Internet Archive.  17:04:37

21          And then I guess third what we can see is that

22  there's consumers who may otherwise purchase those books

23  that are now being offered this as like a free

24  alternative in a way that the author doesn't get

25  compensated, the publisher doesn't get compensated, and  17:04:55

Page 203

```
 1    there's always going to be people who are willing to just

 2    take the free alternative, especially if it's presented

 3    with kind of a -- the way the Internet Archive does it,

 4    which is like this facade of legitimacy, where they're

 5    actually making people feel like they're not stealing        17:05:11

 6    when they are.

 7            So, yes, there's always going to be kind of

 8    piracy or whatever, but I think this goes another step

 9    further, where it -- they take it another step where they

10    try to make both the library feel like they're doing          17:05:23

11    something that's protected, which it's not, and then they

12    also try to make consumers feel like okay about

13    downloading these things for free, where, again, the

14    author's not being compensated, the publisher's not being

15    compensated and they don't have the right to make these       17:05:39

16    copies.

17            So I guess if you're looking for a way for me to

18    say how we are harmed by this or where there's revenue

19    that we should have had that we don't, I think that's the

20    way I would answer it, which is:  It's pretty clear to me     17:05:50

21    that what they're doing is taking revenue away from us.

22            Can I tell you exactly how much?  No.  But I can

23    tell you it's substantial, and I can tell you that if the

24    Internet Archive did not exist, that we think we would

25    have more revenues than we do.                                17:06:08
```

Page 204

1        And then further, I guess I could tell you that

2    if other people took it upon themselves to behave the way

3    that the Internet Archive does, the market would collapse

4    in on itself.

5        And this kind of goes further to my point        17:06:19

6    earlier when I talked about how we look at things on --

7    we look at things not on a format-by-format basis.  We

8    look at it as the content as a whole.

9        We've seen examples elsewhere in other countries

10    where if one format becomes dominant and you get less    17:06:33

11    revenue for that format, the entire market collapses.

12    The hardcovers come with it, the paperbacks come with it.

13        So I think there's -- this is more than just

14    like can I determine exactly to the cent at any given

15    time what it is.  This is really about almost existential    17:06:49

16    harm that can be brought -- brought by this.

17        So I don't -- I don't -- I don't think there's

18    any way to say it other than that.

19        Q.  Okay.  Lots to unpack in that answer, and I've

20    got a couple of followup questions.        17:07:05

21        A.  Sure.

22        Q.  But I did want to circle back to my original

23    question, which was:  With respect to revenues from the

24    titles that are at issue in this lawsuit, that are PRH

25    titles, has PRH observed a change in revenue for those    17:07:18

                                        Page 205

```
 1    titles relative to when they were available for borrowing

 2    from the Internet Archive?

 3            MS. STEINMAN:  Objection.  Asked and answered.

 4            THE WITNESS:  So, yeah, I'll say it again.  I

 5    mean, for every title that is available at any point in        17:07:33

 6    the Internet Archive, one, at a minimum, if the Internet

 7    Archive was behaving as a legitimate aggregator, we

 8    should have been paid -- paid for those copies, and the

 9    author should have been compensated.

10            Two, a library should have been paying them for        17:07:46

11    it, also.  So the library should have -- should have

12    actually transacted so that there would have been some --

13    some recompense, too.

14            And then three, they're offering consumers who

15    may otherwise have purchased the book something for free       17:07:59

16    that they couldn't have gotten.

17            So that's going to be the case for every book

18    that they put on there.  There's the ones that are in

19    this lawsuit and every book that they put on there that

20    they shouldn't that's on our copyright as well.               17:08:09

21            MS. LANIER:  So I'm going to have to object to

22    that answer is not responsive because what I'm asking is

23    whether PRH has observed changes in revenues from the

24    titles that are implicated in this lawsuit, and it sounds

25    like from your answer that there actually has not been an      17:08:30
```

Page 206

1    observed change in revenues from those titles, and I've

2    asked this question a couple times, and I'll give you one

3    more shot to answer it.

4        Q.  Has PRH observed a change in revenues from those

5    titles?                                                    17:08:45

6        MS. STEINMAN:  Objection.  Asked and answered.

7        THE WITNESS:  PRH has noticed that the Internet

8    Archive is not -- is not compensating authors or

9    publishers for the content that they rightly deserve to

10   get compensated for.                                       17:08:56

11       We see that they're basically just taking it and

12   using -- and making illegal copies to serve their own

13   purposes.

14       So they should be -- they should be -- they

15   should be paying us as an aggregator if they were at all   17:09:07

16   legitimate.  They should be not -- not putting out to

17   libraries that suddenly a physical book can become an

18   eBook and just be copied by whoever it likes.  Like

19   that's -- that's -- that's just not the way this works.

20   An eBook and a physical book are two different things       17:09:22

21   with two very different rules.

22       And secondarily, they shouldn't be offering a

23   free option to consumers.

24       MS. LANIER:  Okay.  I'll object again to that

25   answer as nonresponsive, but we'll move on because I want   17:09:35

Page 207

```
 1    their website.

 2         Is it accurate that you testified about that

 3    earlier?

 4         A.  Yes.

 5         Q.  Do you have evidence that patrons of those        17:12:15

 6    libraries are visiting the Internet Archive's website

 7    from those links?

 8         A.  I don't.

 9         Q.  Okay.  Do you have evidence that patrons are

10    using the Internet Archive to the exclusion of using       17:12:31

11    libraries -- other libraries in which they have

12    membership?

13         MS. STEINMAN:  Objection.  That was really

14    unclear.  Can we rephrase that?

15         MS. LANIER:  Sure.                                    17:12:47

16         Q.  Do you have evidence that patrons are borrowing

17    books from the Internet Archive to the exclusion of

18    borrowing books from other libraries in which they might

19    be members?

20         MS. STEINMAN:  Objection.                             17:13:00

21         Go ahead, Jeff.

22         THE WITNESS:  I think just the fact that the

23    Internet Archive's link is put next to a legitimate

24    aggregator's link or a legitimate library's link is proof

25    enough.  I think -- I think it's -- it's reasonable to     17:13:14
```

A-5171

```
 1     assume that if -- if there's -- if there's holds on that,

 2     but yet the Internet Archive says that they can do it at

 3     the same time in there that that's -- that's -- that's

 4     technically something that should have gone to a hold or

 5     maybe another copy purchased through a legitimate source.      17:13:33

 6           So I think it's reasonable to assume that that's

 7     exactly what's happening.

 8        Q.  BY MS. LANIER:  Do you have any evidence to

 9     support your assumptions that that's happening?

10        A.  My evidence is that they're on these sites, and      17:13:44

11     they're there -- that they are making the offer.  I doubt

12     a library would put it up there if no one wanted it and

13     if no one was clicking on it.

14           And we've -- we've seen, even from the -- the

15     documents that we've gotten from the Internet Archive, if      17:14:00

16     you just go on the Internet Archive right now, you can

17     see that there are lends and there are borrows or however

18     they phrase it.

19           So it's clear that people are borrowing from --

20     from these -- if that's the way to even put it.  They're      17:14:14

21     bootlegging from these documents that are uploaded there.

22     So it's clear that there's action.

23        Q.  Okay.  Anything else?

24           MS. STEINMAN:  What was our question?  What was

25     the "anything else" talking to?                                17:14:33
```

```
 1              MS. LANIER:  Fair enough.

 2        Q.  Any evidence to support your assumptions that

 3   that's happening, which is that borrowing from the

 4   Internet Archive occurs at the expense of borrowing from

 5   a library?                                       17:14:47

 6        A.  So I'm glad that you said that it's at the

 7   expense of borrowing from a library because I think

 8   that's -- that's the -- the main point that we're trying

 9   to make here, is that there are legitimate ways to borrow

10   from a library, and the Internet Archive is not one of   17:15:04

11   them.

12              So I think -- I think that's -- that's what the

13   proof is, the fact that they -- they present themselves

14   as some kind of aggregation solution and that -- that

15   they go up against an OverDrive or a Bibliotheca or a     17:15:22

16   Baker & Taylor, who is out there being done correctly,

17   it's being done to our specs.  It's being done -- it's

18   being done with regard to territory restrictions that are

19   in force.  It's actually serving a community.  I think --

20   I think that's what the proof is.                         17:15:39

21        Q.  Okay.  And you testified in a previous answer to

22   one of my questions that you couldn't tell how much the

23   damage was, but it was substantial.

24              Do you recall saying that?

25        A.  Yes.                                             17:15:53
```

Page 212

```
1        Q.  And my question to you is:  If you don't know

2    how much, how do you -- how are you able to say the

3    damage is substantial?

4        A.  I mean, it's pretty clear to me because, again,

5    if -- if everyone behaved the way the Internet Archive is    17:16:07

6    behaving and they just pretended that somehow having a

7    copy of a physical book gave them the right to digitize

8    it and distribute it, the market would just collapse in

9    on itself.  That doesn't take much imagination to -- to

10   realize it's the truth.                                      17:16:25

11           So, I mean, in stages, the more popular they

12   get, the bigger the problem will be.  But I think that's

13   just what the damage is.  It's just there -- it would be

14   incredibly hard for an author or a publisher to get the

15   revenue that they're due for the work that they put into    17:16:43

16   it if suddenly it was possible for just one place to

17   decide that they could take a copy, perhaps a used copy

18   of a physical book, digitize it, and then distribute it

19   to as many people as they feel is -- is justified in

20   their own mind.                                              17:17:00

21       Q.  Have you ever visited the Internet Archive.org?

22       A.  I have.

23       Q.  Have you ever borrowed a book from Archive.org?

24       A.  I've borrowed one, yes.

25       Q.  What book did you borrow?                            17:17:10
```

Page 213

ATTORNEYS EYES ONLY

```
 1          A.  That's a good question.  I don't remember what

 2     it was.  It may have been The Lost Symbol by Dan Brown.

 3          Q.  Okay.  Did you borrow that for personal reasons?

 4          A.  No.

 5          Q.  Okay.  Why did you borrow it?            17:17:26

 6          A.  I wanted to see what the -- the experience was.

 7          Q.  Okay.  And what -- what did you think about the

 8     experience?

 9          A.  I mean, honestly, it made me angry the entire

10     time I was doing it.                             17:17:44

11          Q.  Okay.

12          A.  It was -- it was pretty clear to me what they

13     were doing.  It was pretty clear to me that it -- that

14     was a self-justified way to somehow prop themselves up

15     as -- as something they're not.                 17:17:55

16              I think the entire time I was doing that I was

17     thinking about, you know, our author, who I just

18     downloaded something for free, that he should have been

19     compensated for.

20              The entire time I was doing it, I was thinking  17:18:06

21     about public libraries that -- that do support us and

22     that do advertising campaigns on our behalf.  They do

23     marketing with us.  They do -- they do reads and

24     community events.

25              I was thinking -- I was thinking about the      17:18:20
```

Page 214

A-5175

```
 1    consumer who just did that one click who could have had

 2    the same experience that I did and would have spent money

 3    on that book so that we were compensated correctly.  And

 4    that's -- that's what I thought the entire experience.

 5    It honestly -- it made me very angry.                    17:18:37

 6            And I -- and I don't see how anyone could

 7    self-justify this to themselves.

 8        Q.  Under the two-year access model that is normally

 9    in place, does PRH receive additional revenue for a

10    checkout from a library?                                 17:18:57

11        A.  Meaning once -- once the library has paid

12    initially to buy it, is there ever --

13        Q.  Yes.

14        A.  No.  It's an upfront payment.

15        Q.  Okay.  What did you think about the quality of   17:19:07

16    the scan of The Lost Symbol that you borrowed?

17        A.  I think it was -- it was not as good as an eBook

18    that we would put out, but I think it's probably good

19    enough for those who are willing to make the tradeoff and

20    get something for free that they could have otherwise     17:19:26

21    paid for.

22        Q.  So if given your druthers, you would read an

23    eBook of The Lost Symbol rather than the digitized book

24    you checked out?

25            MS. STEINMAN:  Objection.                        17:19:40
```

Page 215

ATTORNEYS EYES ONLY

```
1    STATE OF CALIFORNIA      ) ss:

2    COUNTY OF MARIN          )

3

4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5    hereby certify:

6          That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9          That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16         I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21   this 22nd day of November, 2021.

22

23

24

25         LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 287

A-5177

# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 4

ATTORNEYS EYES ONLY

```
 1            IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 6    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 7

              Plaintiffs,

 8

          vs.                    No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11            Defendants.

      _____/

12

13

14            -- ATTORNEYS' EYES ONLY --

15

16   VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITIONS OF

17        JOHN WILEY & SONS, INC., BY ALAN PAVESE

18             Remote Zoom Proceedings

19             East Durham, New York

20            Friday, December 10, 2021

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25   Pages 1 - 278                 Job No. 4867787

                                         Page 1
```

```
 1   changes in revenue you may have observed with titles?

 2            MS. STEINMAN:  Objection.

 3            THE WITNESS:  I'm sure -- well, I don't think

 4   we've printed the cover upside down.  I don't think any

 5   of those authors have been accused of plagiarism.  Trying      12:06:11

 6   to go backwards.  You know, there's definitely been COVID

 7   impacts.  There's definitely been piracy impacts.  What

 8   else was on the list of -- did I -- does that cover any

 9   of them?  Anything that I cited that I didn't just

10   answer?                                                        12:06:37

11       Q.  BY MS. LANIER:  So let's -- let's go back a

12   little bit, and I'll try to walk this through a little

13   more step by step, so it's -- doesn't put the onus

14   entirely on you.

15       A.  Yeah.                                                  12:06:49

16       Q.  That's probably fair; right?

17            So has Wiley observed any unexpected changes in

18   revenue, either higher than expected or lower than

19   expected, for titles that are involved in this lawsuit?

20            MS. STEINMAN:  Objection.                             12:07:06

21            Go ahead, Alan.

22            THE WITNESS:  So we have experienced loss of

23   revenue due to piracy.  Titles in this lawsuit have been

24   pirated, so, yes, there is definitely impact, you know,

25   on the titles-in-suit.                                         12:07:24
```

Page 51

```
1        Q.  BY MS. LANIER:  Okay.  So when you say "due to

2    piracy," what data do you have that shows that depressed

3    revenue is related to piracy?

4            MS. STEINMAN:  Objection.

5            THE WITNESS:  Go back to the answer millennia of      12:07:40

6    just everyday experience that when commercial products

7    are stolen, they cannot be -- the commercial market does

8    not function.

9        Q.  BY MS. LANIER:  Okay.  Anything else?

10       A.  So as a general concept, so we also have lots of      12:07:57

11   industry data showing that there is hundreds of millions

12   of dollars of impact to the publishing industry from

13   pirated content and illicit markets that have, you know,

14   damaged publishers, authors, legitimately functioning

15   aggregators.                                                   12:08:20

16       Q.  Okay.  When you say "industry data," are you

17   referring to any specific studies or analyses?

18       A.  Some, yeah.  I think there's some common I'll

19   call them third-party entities like Nielsen, who have

20   done estimates in, you know, recent years on the impact     12:08:42

21   of piracy, a number of them.  Folks like Perlego, who has

22   been in the industry and also sort of looked at roughly a

23   $300 million impact several years ago.  You know, I would

24   consider those industry estimates of piracy.

25       Q.  Okay.  So Nielsen, Perlego.  Anything else?         12:09:03
```

Page 52

```
 1        A.  Those are two common ones that, you know -- but

 2   no.

 3        Q.  Okay.  And when revenue either exceeds or is

 4   below expectations, how closes is Wiley able to get in

 5   pinpointing the source of that change?              12:09:31

 6            MS. STEINMAN:  Objection.

 7            THE WITNESS:  With precision?

 8        Q.  BY MS. LANIER:  Yes.

 9        A.  It's a bit difficult, so it's a complex

10   estimation.  As you might imagine, people who steal    12:09:46

11   things don't always report how much they've stolen and

12   how often they've stolen it, so it's always difficult to

13   try and get data on, you know, illegally functioning

14   markets and distribution networks, so we do perform and

15   rely on estimates like the one Nielsen did to try and   12:10:10

16   find out information that people don't want found out.

17        Q.  Okay.  And a couple of answers ago you used the

18   phrase, or term I should say, "legitimately functioning

19   aggregators."  Can you tell me a little bit what you mean

20   by that?                                               12:10:33

21        A.  Yeah.  So aggregators that are licensed and

22   authorized to distribute our content within the terms and

23   conditions and pricing that we have agreed to have them

24   distributed, as opposed to pirate sites, and I would

25   argue the Internet Archive, who is operating unauthorized 12:10:52
```

Page 53

ATTORNEYS EYES ONLY

```
 1      illegal aggregation of our content outside of the

 2      author's and the publisher's functioning commercial

 3      markets and intended distribution.

 4          Q.  Okay.

 5          A.  I would consider that illegitimate.        12:11:08

 6          Q.  Okay.  Could you explain a bit -- and forgive me

 7      if I'm again needing a vocabulary lesson.  Your phrase

 8      "the Internet Archive, who is operating unauthorized

 9      illegal aggregation," can you explain a little bit what

10      you mean by that?                                  12:11:38

11          MS. STEINMAN:  I think he said an unauthorized.

12          MS. LANIER:  I thought I said unauthorized, but

13      if I didn't --

14          THE WITNESS:  Unauthorized is -- yeah.  Yeah,

15      unauthorized.                                      12:11:47

16          So basically, there is no legal duplication of

17      our digital content permissible, and the Internet Archive

18      is creating illegal digital copies that are not authored

19      for use, not authorized to be allowed for use by the

20      people they're copying from -- them from.  So there is,  12:12:12

21      you know, a complete copyright infringement that is in

22      use by Internet Archive to aggregate -- air quotes,

23      sorry -- our content illegally, unauthorized and

24      illicitly.

25          Q.  BY MS. LANIER:  And you testified a moment ago    12:12:49
```

Page 54

ATTORNEYS EYES ONLY

```
 1            You know, when we get repeated chattering about

 2    a certain thing that, you know, organizationally it

 3    crosses a perceptible threshold of:  Hey, we all agree

 4    this is definitely going to kill us.  You know, those

 5    are -- you know, those are the ones that we are, you      16:26:24

 6    know, actively engaging, documenting and aligning with

 7    the legal team to strategize on how to address to protect

 8    us and the authors.

 9       Q.  In Wiley's view, was that threshold crossed with

10    the Internet Archive by the National Emergency Library?   16:26:42

11       A.  By the National Emergency Library?  Yes.  Just

12    yes.

13       Q.  Okay.  And you -- so I just want to close the

14    loop on this library scanning and loaning issue.

15            So you mentioned anecdotal evidence, and we       16:27:02

16    talked a little bit about chatter.  Anything else?

17       A.  No.

18            MS. STEINMAN:  Objection.

19       Q.  BY MS. LANIER:  Was your answer "no"?  Forgive

20    me.                                                       16:27:14

21       A.  It was no.

22       Q.  Okay.  Is Wiley aware of any studies or analysis

23    concerning the effect that library lending has on

24    revenues from books in a retail setting?

25       A.  Yes, on a couple of levels.  So, you know, we've   16:27:35
```

```
 1    talked about piracy.  It's -- we consider it piracy.  We
 2    don't even separate Controlled Digital Lending -- I'm
 3    using air quotes because it's not a thing that we
 4    recognize.  It's stealing.  Illegally duplicating digital
 5    works that have no right to be duplicated.              16:27:54
 6         So we do lump it in to estimating the impact of
 7    stealing.  And those $300 million estimates that the
 8    industry has come up with, you know, within the last
 9    several years are probably reasonable assumptions of the
10    very significant impact.  We call it 5 percent of the    16:28:16
11    industry in most respects.
12         So if those were done in 2018, five years ago,
13    this was probably hurting us by 15 million.  It's
14    probably 20, 25 million in damages now.  You know, we're
15    just taking our approximate share of the industry and    16:28:32
16    assuming that we're, you know, the same amount of piracy.
17         You know, every one of these units that you've
18    stolen would have been paid for.  So those are all units
19    that, you know, would have been, you know, properly
20    crediting authors and publishers and distributors and    16:28:51
21    aggregators with, you know, if they had gone through the
22    proper legal commercial channels.
23         So every unit there is -- you know, we have the
24    price-per-unit data here and the list price data.  We can
25    apply that to say that, you know, each one of those is    16:29:07
```

Veritext Legal Solutions
866 299-5127

```
 1      damaging the author, is damaging the publisher, is

 2      damaging the aggregators who are trying to do this the

 3      right way.  And so we would add those forms.

 4           And, you know, as we were saying, you know,

 5      every unit of something stolen is something that, you      16:29:23

 6      know, the functioning market could have properly

 7      monetized in a way that the law, sort of, affords them

 8      the opportunity to do.

 9           So stealing is one way of estimating it.  We

10      know that a stolen thing is, you know, a sale foregone    16:29:39

11      and that $300 million worth of estimated stolen things

12      is, you know, a reasonable estimation of the industry's

13      impact.

14           Q.  So my question was about libraries, not your

15      characterization of what the Internet Archive does.       16:29:56

16           A.  Okay.

17           Q.  So has Wiley reviewed any studies or analysis

18      that look into the effect between library lending and

19      revenues from eBooks in a retail setting?

20           A.  Legal library lending?  Or at least what I would  16:30:13

21      call legal library lending?  You're saying --

22           Q.  Let's start -- I will say public libraries,

23      academic libraries, K through 12 libraries, as we've been

24      discussing them earlier today.

25           A.  But those are the entities, not the actions.      16:30:27
```

Veritext Legal Solutions
866 299-5127

```
1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5   hereby certify:

6        That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9        That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16       I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20       IN WITNESS WHEREOF, I have subscribed my name

21  this 13th day of December, 2021.

22

23

24

25       LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

Page 275

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 5

# Digitization and the Demand for Physical Works:
# Evidence from the Google Books Project

Abhishek Nagaraj          Imke Reimers
UC Berkeley-Haas          Northeastern University
`nagaraj@berkeley.edu`    `i.reimers@northeastern.edu`

May 25, 2020

**Abstract**

The digital era promised to deliver a centralized repository of all pre-existing knowledge through mass digitization. However, concerns about cannibalizing demand for physical works have led publishers and authors to block the realization of this vision. We investigate the effect of mass digitization on demand for physical works using novel data tracking the timing of the digitization of individual books from Harvard University's libraries through the Google Books project. Digitization hurt loans within Harvard but increased sales of physical editions by about 35%, especially for less popular works. Rather than cannibalizing demand for physical works, mass digitization could increase demand for them, while also increasing their diffusion online.



Electronic copy available at: https://ssrn.com/abstract=3339524

1

# 1   Introduction

Digitization and the advent of the Internet have dramatically expanded access to information goods such as books, movies and music (Brynjolfsson et al., 2003; Forman et al., 2009; Greenstein et al., 2013; Waldfogel, 2017). The benefits of digital access are particularly salient in the publishing industry where text-search technology promotes discovery of previously unknown works and where a sizable back-catalog of potentially valuable printed works is hard to access (Aguiar and Waldfogel, 2018; McCabe and Snyder, 2015). Since licensing and digitizing millions of these works on a case-by-case basis is not possible, proponents of digitization have invested in mass digitization, i.e. unlicensed digitization of the entire catalog of printed works ever published. Organizations such as Google (through Google Books), the Hathi Trust and the Internet Archive have spent tens of millions of dollars and over ten years digitizing the world's books. Acting like a modern-day Library of Alexandria, these mass digitization efforts have the potential to stimulate demand for less popular works, increase knowledge diffusion and amplify follow-on innovation and creativity (Furman et al., 2018; Furman and Stern, 2011; Samuelson, 2011).

Despite the technological progress and financial investment, there still exists no single digital repository that provides access to the catalog of printed human knowledge. Google Books, for example, has a repository of over 25 million digitized works but "nobody is allowed to read them" (Somers, 2017).[1] Mass digitization projects have failed to take off because they have been blocked by book publishers and authors who are concerned that digital and free access to their works could cannibalize demand for material in print. In fact, copyright holders have fiercely litigated mass digitization projects and the dispute has even been presented in front of the US Supreme Court.[2] To counter claims of cannibalization, proponents of mass digitization have argued that rather than providing a substitute, digitization increases awareness and stimulates demand for physical copies and ultimately benefits copyright holders.[3] If this counter-argument holds merit, the negative effects of digitization on the demand for printed works might be low and digitization might be a win-win for all parties; it could benefit consumers and pave the way for knowledge diffusion while proving to be an underappreciated strategy to increase demand for physical works for publishers and authors.

Building on the legal debate, we develop a simple theoretical framework that suggests that the overall effect of mass digitization on demand for physical works is ambiguous. According to this framework, even if digitization cannibalizes demand for physical works, this effect should be less severe for less popular

---

[1] Even though Google Books is operational, it provides access to only a limited sample of works it has digitized.

[2] The Supreme Court ultimately declined to hear the case.

[3] In line with both arguments, a 2012 survey of users of a Norwegian digitization effort found that 20% of respondents purchased a book after first finding it on the depository, whereas 18% reported that they did not (Josevold, 2016).

Electronic copy available at: https://ssrn.com/abstract=3339524

2

books, and greater for readers who have access to alternate search technology (for example, patrons of Harvard libraries). To shed light on these predictions, the heart of our analysis attempts to provide empirical estimates of whether and to what extent mass digitization of pre-existing knowledge harms demand for physical works. We focus on the Google Books project, which was launched in 2004 to digitize all works ever created and which was the pre-eminent mass digitization project. Google Books digitized existing works and made them available online for free (providing access to "snippets" for in-copyright works and full-text access to other works), and included an interface for in-text search to facilitate discovery. The project was launched in partnership with Harvard University's Widener library (and a handful of others). Harvard provided a variety of works in the public domain including fiction as well as scholarly texts about topics such as US history, economics, law and philosophy to be digitized by Google. We focus on these public domain works in our analysis. While the legal debate about digitization is broad and also focuses on whether snippet or partial access cannibalizes demand for in-copyright works, our setup analyzes whether full text access to public domain works stimulates demand for physical works. If we find that full-text access does not reduce the sales of physical works, purely snippet access is unlikely to promote cannibalization as well. Our setting therefore offers a conservative test for the cannibalization hypothesis.

We leverage a natural experiment made possible through access to proprietary data from Harvard Libraries, including the date on which a particular work was digitized by Google. Book digitization at Harvard's Widener Library took over five years, and while the order of digitization of books was not deliberately randomized, it was not explicitly selective either and did not prioritize the most interesting books for early digitization. Rather, our fieldwork and quantitative data on the physical location of digitized books in Widener suggest that digitization proceeded on a "shelf-by-shelf" basis and was driven by convenience. We therefore exploit variation in the timing of digitization across books, as well as variation in their overall digitization status, to evaluate the impact of digitization on the demand for physical works in a difference-in-differences analysis with book and year fixed effects. We also present additional analyses that exploit the micro-geography of the Widener library and precise positioning of digitized and non-digitized books on library shelves.

We combine data from three sources for our analysis. First, we collect data on library loans and physical locations within the Harvard system between 2003 and 2011. Even though the library contains hundreds of thousands of books, most are never loaned. Our analyses focus on 88,006 books that had at least one loan in the sample period (and are robust to using a smaller sample of books with at least one loan before the start of digitization). Second, for a subset of 9,204 books (in English with at least four total loans), we obtain

3

Electronic copy available at: https://ssrn.com/abstract=3339524

weekly US sales data on all related editions from the NPD (formerly Nielsen) BookScan database. The sales data must be manually collected and matched, which restricts the size of this sample. Finally, while most of our analyses are on the demand side, digitization could also improve supply by bringing out-of-print books back to life via new physical editions. Accordingly, we also collect data from the Bowker Books-In-Print database on the arrival of new editions and their suggested prices.

Figure 1 (which uses a subset of the baseline sample) foreshadows our key results. We compare US books in our data published between 1903-1922, which were in the public domain and hence digitized, and books published between 1923-1942, which were not.[4] We examine the likelihood of increased loans (panel i) and increased sales (panel ii) between the years 2003 and 2004 (before digitization) and 2010 and 2011 (after digitization), averaged by publication year. Figure 1 shows a discontinuous and sharp change in the outcome variables across the 1923 threshold, with loans increasing and sales decreasing when moving from the (digitized) pre-1923 group to the (non-digitized) post-1923 group. Digitization therefore seems to increase marketwide demand by enabling discovery, but hurt demand within Harvard, where alternate discovery mechanisms are likely already available and digitization was less relevant. Further, the darker and the lighter bars are relatively flat within their particular groups and jump only around the 1923 cutoff, suggesting a causal role of digitization in shaping these outcomes.

Moving beyond this cross-sectional comparison, our baseline difference-in-differences analyses also suggest that the impact of digitization on demand is negative when considering internal readership at Harvard but is positive when considering sales. In our preferred specification, digitization lowers the number of checkouts within Harvard by about 37% but increases sales by about 34%, or about 200 units annually at the mean. Alternatively, digitization reduces the probability that a book will be loaned at least once in a year by about 33% but increases the likelihood of at least one sale by 92%. We further find that the positive effect of digitization on sales is significantly greater for less popular books. In line with our predictions, our results suggest that the effects of digitization are most significant for less popular books and for readers without access to alternate ways to search for books (such as Harvard's internal catalog system), providing some support for the discovery mechanism.

We confirm our findings in a series of robustness checks and tests of the validity of the research design. Using our location data, we show that our results are robust to using a "twins" sample that consists of pairs of scanned and unscanned books adjacent to each other in Widener's shelves and hence covering the same subject. Our results are also robust to excluding outliers, and titles scanned in certain library locations or

---

[4]Harvard did not permit digitization of US books published after 1923 due to copyright restrictions.

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5192

years that threaten the validity of our research design. An additional robustness check, a regression disconti-nuity regression inspired by Figure 1, provides similar results. Finally, while our results are consistent with the discovery mechanism, digitization could also have affected demand indirectly if publishers responded by increasing the number of in-print editions or reducing prices. We find that digitization leads to an uptick of new in-print editions through other publishers, likely making these books more easily available to con-sumers. However, this improved availability (and any associated change in book prices) explains only a small fraction of the increased overall sales due to digitization, further reinforcing the importance of the discovery mechanism.

Our study makes several key contributions. First, our results provide much-needed empirical evidence around the potential "market replacement" effect of Google Books as argued by copyright holders in *Author's Guild vs. Google (2013)* and about the market effects of mass digitization projects more generally. Our results suggest that concerns about cannibalization, especially when applied to less popular works, are likely overblown. The key policy implication is that digitization might not only offer the possibility of free and easy online access, but it might also increase discovery and demand for physical copies, especially for less popular and out-of-print works. For managers in the publishing industry, these results suggest that at least for the set of less popular books, blocking mass digitization projects (even if they do not offer any di-rect source of revenue) might do more harm than good. Further, our results also suggest that publishers and authors should consider supplying their books in digital format, at least in snippet form, with the expectation that such access will boost the sales of physical works.

Second, we contribute to the large literature analyzing the impact of digital distribution on offline sales channels and cross-channel cannibalization more generally (Aguiar (2017); Chen et al. (2018); Ghose et al. (2006); Smith and Telang (2009) and many others). We add to this work by focusing on the market for books which has been relatively "understudied" (Chen et al., 2018) in the digitization and information systems literature. Our study complements recent evidence which finds that when publishers explicitly withold ebook versions, they do not hurt sales of physical copies (Chen et al., 2018). We do so by providing large sample evidence to suggest that unlicensed distribution by a third-party through a mass digitization initiative can in fact stimulate demand for physical products across various types of books. We also complement past work in the music industry which finds that easing sharing restrictions could be especially helpful for less popular producers and research on the effects of digitization for the long tail, more generally (Brynjolfsson et al., 2006, 2011; Zhang, 2016).

Finally, we contribute to the emerging literature at the intersection of digitization and copyright policy

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5193

by examining the effects of weakening copyright restrictions on the market for books. This work has looked at the effect of copyright on the supply and pricing of works (Giorcelli and Moser, 2016; Li et al., 2018) as well as follow-on creativity (Watson, 2017; Nagaraj, 2017; Heald, 2007). Our work adds to this research by focusing on the spillovers of a weaker copyright regime in the digital realm (as implied by unlicensed mass digitization projects) on the market for physical books. Our research suggests that cross-channel effects of copyright restrictions could be important, although this topic has been largely underemphasized in the copyright literature. Further, our finding that mass digitization increases the number of new in-print editions complements past work by showing that weak copyrights can improve the physical diffusion of knowledge (Reimers, 2019).

## 2   The Google Books Project: A Brief Background

The Google Books project (originally known as the Google Print Library Project)[5] was announced by Google in December 2004. At the project's inception, Google partnered with Harvard University's library (along with a few other key partners) to digitally scan books from their collections. Soon after these works were scanned, they were made available on the Google Books website for the general public.[6] The site provided access to the full-text of public domain books (including books published in the US before 1923) but only a "snippet" (i.e. limited) view for in-copyright material. Further, an important feature of the site was the ability to search through the entire text of all scanned books.

Soon after its launch, the Google Books project was met with staunch opposition from the Authors Guild and the Association of American Publishers, who filed class action suits against Google for copyright violation.[7] Authors and publishers were particularly concerned about Google's unauthorized distribution of their works, a problem that was compounded by the possibility that digital distribution could cannibalize physical sales. In an online statement, the Authors Guild claimed that "Google Books can create a very real negative economic impact on the books it has digitized ... rather than drive researchers to buy books, readers for many books can find all they need on Google Books."[8] Google Books' major defense was centered on the idea of fair use and the notion that browsing books may promote the downstream sales of digitized material.[9] The argument here was that Google Books' digitization efforts "increase[d] the visibility of in

---

[5] https://googleblog.blogspot.com/2004/12/all-booked-up.html
[6] While Google Books was not the only project digitizing works, it was by far the most comprehensive and ambitious project of its time.
[7] See Samuelson (2009), and https://googleblog.blogspot.com/2008/10/new-chapter-for-google-book-search.html.
[8] https://www.authorsguild.org/where-we-stand/authors-guild-v-google/, Accessed April 4, 2019
[9] See Authors Guild vs. Google (SDNY 2013), https://h2o.law.harvard.edu/collages/34596 for more information on the case.

Electronic copy available at: https://ssrn.com/abstract=3339524

and out of print books, and generate[d] book sales,"[10] and that it was "designed to help you discover books, not read them from start to finish."[11] Further, this argument that digitization can help readers discover works was particularly relevant for books that were less popular, but which were still of interest for readers (for example, because they were of scholarly interest or historical significance). In other words, since the market for books is one where match quality is quite important (Ellison and Ellison, 2018), potential readers might discover a book relevant to them via Google Books, and then go ahead and purchase a physical copy of the book, thereby stimulating sales. Empirical evidence on either side of the debate is sparse.

The suits were eventually settled (publishers) or rejected (authors), but the process lasted over a decade before an appeal by the Authors Guild was rejected in the Second Circuit. As an upshot of these intense legal battles, as of 2018, the Google Books project remains a far cry from the original ambitions behind its founding. As one commentator puts it, "somewhere at Google there is a database containing 25-million books" that is inaccessible to the general public (Somers, 2017). Similar projects launched by non-profit organizations, such as the Hathi Trust and Project Gutenberg, have also been hampered by legal restrictions. Thus, while the small number of "born digital" works printed in the modern era do have digital editions provided by copyright holders (Chen et al., 2018), the vast majority of historical works have been excluded from the potential benefits of digital access.

In the legal debates, the question of whether the digitization of books can reduce demand for physical works depends on two counteracting forces: the discovery effect of Google Books due to increased awareness and searchability, and the substitution effect of digital distribution as a competitor for existing, physical products. We clarify this theoretical tension with a simple conceptual framework in Appendix A, as depicted visually in Appendix Figure D.1. As we clarify in this framework, some consumers who would otherwise consume analog copies will switch to digital versions (perhaps because they have a taste for digital consumption, and because it is free), driving the substitution effect. On the other hand, some consumers may start consuming the analog version for the first time, after digitization lowers search costs for books. This is likely to happen if they were made aware of a book through Google Books' search engine and prefer to purchase physical copies rather than read online. This second mass of consumers will drive the discovery effect. The net effect of digitization depends on the magnitude of these two margins.

We argue that the tradeoff between substitution and discovery differs for different margins of books and consumers. Notably, for popular books, already well-known to consumers (e.g. *The Wealth of Nations*),

---

[10]See http://googlepress.blogspot.com/2004/12/google-checks-out-library-books.html.
[11]https://web.archive.org/web/20041214092414/http://print.google.com/

Electronic copy available at: https://ssrn.com/abstract=3339524

the substitution effect is likely to dominate. On the other hand, obscure books are likely to benefit from discovery, and unlikely to face the costs of substitution. The effect of Google Books on demand should therefore be more positive for less popular books. Similarly, for consumers within Harvard, who already benefit from access to search technology (through Harvard's librarians and internal catalog system) the substitution effect is likely to dominate the discovery effect. Therefore, we expect digitization to have a greater positive effect on demand when considering market-wide sales, while for loans within Harvard, the effect is likely much smaller, and even negative. A finding that digitization increases demand for less popular books, but does not increase demand within Harvard, would be in line with the discovery mechanism put forth by Google Books. Our empirical analysis sheds light on these predictions as well.

## 3    Data and Research Design

### 3.1    Google Books and Harvard Libraries' Natural Experiment

Given the unclear legal environment around digitization and copyright when the project began, Harvard's participation in the Google Books project was limited to out-of-copyright works from Harvard's prestigious Widener Library. Under the Copyright Term Extension Act of 1998, it is clear that works published in the United States before the year 1923 are in the public domain and US books published before this year were therefore provided for scanning. Since this cutoff date would not change until long after the digitization was completed, books from after 1923 were not digitized. Different cutoff dates were applied to international books in determining their inclusion in the scanning effort.

The digitization effort proceeded as follows. The Google Books project set up a scanning facility in the Greater Boston area to process the books from the Harvard libraries. For the purposes of the scanning effort, Google Books was assigned a special library patron code, and books were "loaned" to Google under this special code to be taken to the scanning facility. Once the book was scanned, it was returned to the library and made available on the Google Books website after a short delay, usually within a few weeks (personal communication, December 2011).

Google Books took over five years (from 2005 to 2009) to complete its large-scale scanning project at Harvard. In our baseline analysis, we rely on this variation in the timing of the scanning project to estimate the impact of digitization on eventual readership and sales, along with book and year fixed effects. Further, an analysis of book locations within Widener (that we present later in this paper) indicates that the order in which books were scanned was primarily driven by convenience rather than an explicit selection mechanism. Specifically, books were scanned on a shelf-by-shelf and wing-by-wing basis until all out-of-copyright books

8

Electronic copy available at: https://ssrn.com/abstract=3339524

in the relevant sections were processed, a claim we further examine by analyzing differences in pre-trends between digitized and non-digitized works.

## 3.2   Data

The data we obtain from Harvard contain the entire record of over 250,000 books from the Harvard libraries' holdings that were scanned, as well as a similar number of works published between 1923 and 1943 that were not scanned. For these books, we collect data from three sources. First, we possess proprietary checkout data, which allows us to infer total loans within Harvard, as well as the date when the book was checked out by Google Books for digitization. Using these data, we construct our baseline sample, which includes all 88,006 books that were checked out at least once between 2003-2011.[12] Our sample of 88,006 books provides a representative sample of works available at Google Books. It includes works of fiction as well important historical texts. A large number of subject areas are represented in our sample: about 9% of books in US history, 5% in Economics, and 3.5% each in British Law, Philosophy, Slavic Studies and American Literature.

Second, we obtain access to NPD (formerly Nielsen) BookScan, which provides sales information for printed books. NPD tracks book sales using scanner data from a large panel of retail booksellers including major bookstore chains, discount retailers such as Costco, and major online retailers like Amazon. They claim to track about 85% of total retail sales.[13] Because our data from Harvard do not contain global unique identifiers (i.e., ISBNs), we (and a team of research assistants) manually search NPD BookScan for each book title to find suitable matches, aggregating sales of all editions for each title by calendar year. Given the tedious data collection process, we search for sales data for the subset of all English-language books in the underlying dataset with at least four loans, for a total of 9,204 titles. Because NPD BookScan does not explicitly list books with no recorded sales, we impute zero sales for titles that do not explicitly appear in the BookScan database. The results are robust to excluding these titles from the analysis.

Third, we collect data on the number of in-print editions of all works from the Bowker Books-in-Print database. This database tracks all registered editions of a particular work that are available in print. We match the 88,006 books in our sample to this database, finding matches for almost 25,000 unique titles with in-print editions.[14] Combined, the Harvard libraries data on book digitization and loans, the NPD BookScan

---

[12]Since this sample definition might be problematic because it conditions on one of our dependent variables, we examine robustness of our analysis to using only books with at least one loan *before* digitization and show that all results carry through.

[13]See Berger et al. (2010) and https://tinyurl.com/y94qpsqt, accessed June 26, 2018.

[14]Note that one reason we do not find more matches with the Bowker Books-in-Print database is because they might be works not intended for a commercial audience, e.g. dissertations.

9

Electronic copy available at: https://ssrn.com/abstract=3339524

data on book sales, and the Bowker Books-in-Print database on editions allow us to characterize the impact of digitization on the demand for physical works within Harvard (loans) and in the market (sales), as well as on their availability. This is, to our knowledge, the first dataset that matches the digitization status of works with data on their sales and in-print status.

We organize the data into a balanced panel at the book-year level between 2003 and 2011. These data contain loans information for 88,006 books, including 50,263 books that were deemed not in the public domain and hence not digitized, and 37,743 that were. Of the ones that were digitized, 5,764 were scanned in 2005, 7,449 in 2006, 8,769 in 2007, 13,207 in 2008, and 2,546 in 2009.

The variables of interest are summarized in Table 1 Panels A (book-level) and B (book-year level). In any given year, an average book has 0.25 loans, sells about 554 copies, and adds 0.36 editions, although the median value for all three outcomes is zero. Over the entire sample, books are loaned on average 2.23 times and have sales of almost 5000. The skewed nature of demand for the books in our sample leads us to study the impacts of digitization not only on the intensive margin – how many copies are consumed – but also on the extensive margin: will a work be read at all?

Each year, an average book in our dataset has a probability of being checked out at Harvard's Widener library of 17%, although this probability depends on the book's scan status. Books that are never digitized have a probability of 17.8%, while books that are digitized have a probability of 19.3% before their digitization but only 11% after their digitization. Conversely, books that are never scanned have an average annual probability of being sold of 16%, whereas those that are scanned have a probability of only 8.5% before their digitization and 24.1% after it. These differences are indicative of large potential impacts of digitization.

### 3.3 Testing the Validity of the Natural Experiment

Our difference-in-differences approach relies on the assumption that books digitized early experienced similar demand trends as books digitized later. Since the timing of book digitization was not explicitly random, it is important to examine what possible sources of selection might exist. In our analyses, we include book fixed effects and book-category × year fixed effects in different specifications in addition to testing for pre-trends in analyses of the annual impact of digitization. In this section, we identify challenges to the research design and motivate additional robustness checks.

First, we obtain the library call numbers for the titles in our sample, which helps us map a particular book to its exact location in one of twenty possible stacks within Harvard's Widener library. We are able

10

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5198

to match about 81% of all scanned books to an exact stack within the library. Using these unique data, we examine the assertion that the timing of a book's digitization is largely based on its physical location. Figure 2 plots a heatmap of book digitization by library stack location (y-axis) over time (x-axis). The colors are based on the percent of books digitized in a given month as a fraction of the total number of books digitized between 2005-2009 in a given stack. The bluer the zone, the higher the percent of books from that stack that were digitized in that time period.[15] For example, 73% of scanned books in the B West stack were scanned in mid 2007, which is indicated by the bright blue spot on the heatmap for this stack. As the series of blue spots along the diagonal indicates, almost every stack has a single time period when a large percent of their books are digitized and this time period varies from stack to stack. This supports our interpretation that books were digitized based on their stack location. One notable exception is Pusey 3, which has no single time period when a majority of its books were digitized. This might be because Pusey 3 is a large stack, remotely located several floors underground the main floors. We examine the robustness of our analysis to excluding books in this stack.

Next, we examine pre-digitization demand (i.e. in 2003-2004) for books based on the year in which they were scanned. If the timing of scanning is random, then measures of pre-digitization demand should be unrelated to the timing of digitization. Accordingly, we regress the number of pre-digitization loans and sales on indicators for the year of digitization after accounting for subject and library location dummies. The results are presented in Figure 3. This figure suggests that pre-digitization sales and loans in scanned years 2006-2009 are largely unrelated to the year of digitization, providing validation for the research design. However, books digitized in the first year of digitization (2005) seem to have a higher number of loans than books digitized later. This in itself is not problematic given that we employ book fixed effects. Regardless, we examine the robustness of our design to excluding all books digitized in 2005.

In sum, our analyses provide support for the idea that the digitization process was driven by shelf location, except for the Pusey 3 stack and for books digitized in 2005. As we will show, the additional tests motivated by these concerns are in line with our baseline results and further reinforce the research design.

## 4   Results

We compare the evolution of loans and sales for titles that were scanned and made available on Google Books with the evolution of titles that were not (yet) digitized in a difference-in-differences setting. For-

---

[15]The stacks are sorted from bottom to top by the month in which the highest percent of books in their stacks were digitized.

Electronic copy available at: https://ssrn.com/abstract=3339524

mally, we estimate equations of the form

$$Y_{it} = \alpha + \beta PostScanned_{it} + \gamma_i + \mu_t + \varepsilon_{it}, \tag{1}$$

where $PostScanned_{it}$ is an indicator that is 1 if book $i$ has been made available on Google Books before year $t$, and $\gamma_i$ and $\mu_t$ are book and year fixed effects, respectively. The dependent variable, $Y_{it}$, denotes book- and year-specific measures of demand (loans and sales). To account for the discrete nature and low average values of the dependent variables, we assume that the error term $\varepsilon_{it}$ follows a Poisson distribution, and we therefore estimate the model in a maximum likelihood estimation. Poisson models for count data rely on rather weak assumptions and are appropriate (and commonly used) in our context with skewed dependent variables (Wooldridge, 1999). In a second set of baseline analyses, we estimate a similar specification using a linear probability model (LPM) where $Y_{it}$ is either $1(sales_{it} > 0)$ or $1(loans_{it} > 0)$. That is, we examine the likelihood that a book will have any sales or loans in a given year after digitization. In robustness checks, we estimate similar models using Log-OLS and hyperbolic-sine OLS specifications as well.

### 4.1 Loans and Sales

Table 2 Panel A displays the results from the Poisson (columns 1 and 2) and LPM (columns 3 and 4) specifications. Columns 1 and 3 show that digitization through Google Books has a highly significant negative impact on demand at Harvard's libraries. Column 1 suggests that making the book available on Google Books decreases Harvard library loans by about 36.7% ($= e^{-0.457} - 1$). Further, the likelihood that a book will have any loans decreases by 6.3 percentage points (column 3). At the mean across scanned books before their digitization (19.3%), this corresponds to a 32.7% increase in the likelihood of a loan each year. These results are highly statistically significant and in line with the prediction that for consumers with access to search technology (such as Harvard students and faculty), digitization largely displaces demand for physical alternatives.

Now we turn to examining the sales results, which estimate the *market-wide* effects of digitization, including to consumers who may not have easy access to search institutions. Unlike loans, sales through traditional channels increase after digitization. The Poisson estimates (column 2) suggest an increase in sales of 34.5% ($= e^{0.297} - 1$) per year due to digitization (p-value 0.053). Similarly, the likelihood of making at least one sale increases by 7.8 percentage points (p-value less than 0.001), or by 91.8% at the mean. Overall, this analysis indicates that, while digitization might reduce demand for those with access to Harvard's libraries, the *market-wide* impact is positive and significant.

12

Electronic copy available at: https://ssrn.com/abstract=3339524

## 4.2   Timing of the Impact

We next allow for a flexible time structure to estimate the annual changes in a book's demand relative to its digitization year. Specifically, we estimate

$$Y_{it} = \alpha + \Sigma_z \ \beta_z (scanned)_i \times 1(z) + \gamma_i + \mu_t + \varepsilon_{it}, \qquad (2)$$

where $\gamma_i$ and $\mu_t$ represent book and time fixed effects, respectively, $(scanned)_i$ equals one for all books that were eventually scanned, and $z$ represents the "lag," or the number of years that have elapsed since a book was first digitized.[16] We estimate this equation corresponding to the linear probability models estimated in Table 2.

Figure 4 illustrates the estimates for $\beta_z$ for the loans and sales outcomes. Two points are clear from this analysis. First, there are no significant pre-trends in terms of the likelihood of being loaned or sold in a given year between books that already were and are yet to be scanned. If anything, loans for yet-to-be scanned books are increasing just prior to digitization. Second, it seems like the negative effect of digitization on loans and the positive effect on sales are quite persistent and long-lasting, and kick in soon after digitization. These graphical results lend support to the validity of the research design and to the interpretation that digitization had a causal impact on reduced demand within Harvard and increased sales through other channels.

## 4.3   Separating Effects for Popular Books

The positive market-wide impact of digitization suggests a strong role for the discovery effect in driving demand. We investigate the discovery mechanism further by examining whether the Google Books project differently impacts books of different popularity levels. We repeat the analyses from Table 2 Panel A, with an additional interaction term of the Post-Scanned variable with an indicator that equals 1 for books in the 90th percentile of pre-2005 loans. This definition identifies all books that were checked out at Harvard's libraries more than once in 2003-2004 as popular. Here, we implicitly assume that the interest within Harvard is a proxy for the book's popularity, an assumption supported by the fact that within the sales sample, popular books sell twice as much as less popular books on average. As we show below, our results are largely robust to different definitions of popularity.

Table 2 Panel B presents estimates from this exercise. Consistent with expectations, the effect of dig-

---

[16]For books digitized before July in a given year, the lag variable equals one in the first year of digitization, while for books digitized in July or after, the lag variable is set to one in the calendar year after the year of digitization.

13

Electronic copy available at: https://ssrn.com/abstract=3339524

itization on demand is less positive for popular books. Columns 1 and 3 indicate that all digitized books see a significant decrease in loans compared to books that were not digitized or digitized later. However, the impact is significantly more negative for popular works, which experience a decrease of about 62% ($= e^{-0.362-0.599} - 1$) compared to a decrease of 30% for less popular books, according to the point estimates in column 1. Alternatively, while the likelihood that a book is checked out decreases by about 3.4 percentage points for less popular books, for more popular books this estimate is over 28 percentage points.

When considering sales, less popular books experience an almost 42% increase in sales – consistent with facilitated discovery outweighing substitution – whereas the impact on sales of more popular books is muted, with an (imprecisely) estimated increase of about 16%. In other words, for the vast majority of books, the positive effect on demand through discovery outweighs the negative effect of substitution, and we find no support for authors' and publishers' concerns about the cannibalization of their work. When considering the likelihood of making at least one sale, both popular and less popular books benefit from digitization. In fact, it seems like a larger share of popular books benefits from digitization in terms of making at least one sale. This result is likely due to the fact that our estimates measure percentage point changes, rather than percentages, and the least popular works are particularly unlikely to be sold at all. We view this result as less instructive for policy given that making at least one sale is less meaningful for publishers of popular books, which sell on average over 700 copies a year according to our data.

## 4.4  Robustness Checks

To further bolster our baseline estimation, we present results from several robustness checks, including estimating alternate specifications, limiting the sample, accounting for the role of new editions in driving increased demand, and accounting for the potential endogeneity of the timing of digitization.

**Alternate Specifications:** Table 3 presents estimates from a set of alternate specifications and subsamples. Columns 1-4 show estimates from OLS specifications where the dependent variable is either $\ln(Y_{it} + 1)$ (columns 1-2), or the hyperbolic sine, $Asinh(Y_{it})$, to address potential issues from inflating the dependent variable. These results are largely in line with the baseline analysis, and the coefficients of interest are even more statistically significant. The next four columns of Table 3 present results from our baseline specifications estimated on subsamples of our data. Columns 5-6 present results using a sample that drops extreme outliers – eight titles with more than 900,000 lifetimes sales.[17] The results again remain consistent with the baseline analysis, although the magnitude on the sales coefficient is smaller.

---

[17]This cutoff represents a rather large gap in lifetime sales between included and excluded books. Results are robust to other cutoffs.

Electronic copy available at: https://ssrn.com/abstract=3339524

**Twins Sample:** Columns 7-8 of Table 3 rely on a "twins" sample of books constructed as follows. From our larger sample, we choose pairs of scanned and unscanned titles, located right next to each other on Widener's shelves as per their call numbers. Because books are sorted by subject areas, two books that are located next to each other should cover the same subject and are usually quite similar. This "twins" exercise leaves us with a total of 36,024 books – 18,012 books that were scanned and 18,012 that were not.[18] The remaining scanned and unscanned books cover almost identical subject codes and very similar pre-digitization demand: on average, scanned books sold 394 copies per year and unscanned books sold 402 units per year (t-value of their difference = 0.07). Estimates from regressions similar to our baseline specifications are presented in columns 7-8 of Table 3 and an event-study analysis similar to Figure 4 for the twins sample is presented in Figure D.2. These estimates from the twins sample are largely consistent with the baseline results, with slightly smaller absolute effects but the same statistical significance.

**Additional Robustness Checks:** Finally, our difference-in-differences analysis merits a few additional checks. First, our sample of books includes all books checked out at Harvard at least once between 2003 and 2011, which is potentially problematic given that digitization affects the likelihood of being checked out in the first place. Accordingly, in Appendix Table D.1, we explore the robustness of our baseline results to including only those books that were checked out at least once pre-digitization (in 2003-2004). We find our results are robust.

Second, we account for the potential endogeneity of the timing of digitization in Table 4. In Panel A we add year by location fixed effects (rather than simple year fixed effects) to control for inherent differences in trends between different Harvard stacks. Similarly, our analysis of the research design suggested that books digitized in 2005 and those in the Pusey 3 collection might be systematically different from books digitized in later years or located elsewhere. Accordingly, Panel B of Table 4 estimates the baseline models by dropping these subsets of titles. In all approaches, we find that the overall results remain highly robust.

Finally, we explore robustness to the definition of popular works in Appendix Table D.2. We vary the popularity cutoff between zero and six loans before 2005 and add a popularity measure based on pre-digitization sales for the sales analysis. All results are consistent with those in the main analysis. Overall, these checks help build further confidence in the difference-in-differences results.

---

[18]For example, this approach drops all unscanned books that are located between two other unscanned books.

15

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5203

## 4.5   Accounting for Editions

While our analysis so far has focused on how digitization affects demand, it is also possible that digitization affects the supply of physical editions. We consider the possibility that Google Books enables publishers to create and publish more and higher-quality copies of public domain books, allowing consumers to buy editions that did not exist previously. We first estimate the impact of digitization through Google Books on the availability of *new* editions in the market, analogous to the estimations in the baseline analyses. We then examine whether the changes in sales can be attributed to improved availability through new editions.

Table 5 presents these results. Columns 1-2 show the impact of digitization on a book's availability and find that titles become available in more new editions after their digitization, with an average increase of 71% ($= e^{.538} - 1$) (column 1). When considering the stock of editions (column 2), titles become more likely to be available at all, with an increase in that likelihood of 18.6 percentage points, against a baseline of 11.3%. Momentarily setting aside the question of whether these new editions drive the increase in sales, this result in itself is quite interesting. It suggests that publishers might face fixed costs of accessing or digitizing public domain works for in-print editions and mass digitization projects could encourage publishers to produce a greater variety of physical copies.

Turning to the question of how the supply of new editions influences downstream readership, columns 3-6 of Table 5 estimate the impacts of digitization on use, now controlling for the number of newly introduced editions of the work.[19] Columns 3-4 control for new editions linearly, while columns 5-6 provide more flexible controls, including dummy variables for each number of new editions and combining observations with more than eight editions in one group.[20] These estimates show that new editions do have a small direct impact on demand. However, despite controlling for this effect, the impact of digitization on loans and sales remains statistically significant and similar in magnitude.

While we do not possess systematic price data for our entire sample, we do obtain prices at the edition level from the Bowker data. In Appendix Section B and Table D.4, we explore whether the estimated increase in sales could be offset by a decrease in prices. We document a small decrease in prices that is an order of magnitude lower than our estimate for the increase in sales. Further, this decrease in prices seems to be largely driven by the increase in the number of editions. Therefore, controlling for editions also helps to adjust for any possible price channel driving the sales effect.

---

[19]We treat all titles without a match in the Bowker database as a title with zero editions. As table D.3 in the appendix shows, our results are unchanged if these titles are dropped from the analysis.

[20]This aggregation affects 0.7% of all data.

Electronic copy available at: https://ssrn.com/abstract=3339524

### 4.6 Exploiting the Discontinuity Around 1923

Our main analysis relies on the timing variation in the digitization of books across Harvard. But as foreshadowed in our discussion of Figure 1, we can exploit another source of variation to evaluate the effects of digitization on demand. Specifically, when working with Google, Harvard allowed US books to be digitized only if they had been published before 1923, since these books were reliably out of copyright. We exploit this sharp cutoff to examine whether loans and sales of books published right before this cutoff changed considerably compared to books published right after, once the digitization process had been completed.

Here, we consider all US books that were published 20 years before and after 1923. This amounts to 38,225 titles, of which we have sales data for 6,755. These data are used to construct Figure 1, which suggests a causal role for digitization in shaping the effect we observe on both loans and sales. In Appendix C, we estimate regression-discontinuity models inspired by the descriptive evidence in Figure 1. The results from this analysis are qualitatively identical and quantitatively very similar to those from our main specifications. While we prefer our baseline panel estimates given the clean pre-trends and the reliance on the entire sample, the regression discontinuity design provides an additional source of robustness for our central results.

## 5 Discussion

Our empirical analysis shows that mass digitization projects may increase rather than decrease the sales of physical works. The positive effect of mass digitization on demand is weaker for more popular books and when considering loans among a select population (Harvard library patrons) who already have access to search technology. These results are consistent with the mechanism that mass digitization allows readers to discover new works, some of whom subsequently choose to consume the physical product.

Our findings inform how changes in representation and aggregation of works shape management strategy in the publishing industry (Adner et al., 2018). Many publishers are opposed to mass digitization projects driven by concerns around cannibalization. This is a reasonable reaction given that mass digitization projects typically digitize work without the publisher's consent and without explicit licensing fees that would generate direct revenue. Our work shows, however, that mass digitization also has the potential to drive discovery and demand for a given work (partially due to its ability for full-text search). In fact, our results suggest that such discovery effects can be large enough to increase the total sales of physical copies. Note that we study public domain books that are provided in their entirety for digital consumption, and the potential for cannibalization is high. For in-copyright works, mass digitization projects like Google Books

17

Electronic copy available at: https://ssrn.com/abstract=3339524

provide only "snippet" views, which allow for the full power of text-based discovery but mute incentives for cannibalization. In such contexts, the positive impacts should only get stronger.

Further, our results suggest that the positive effects of digitization on demand for physical works is larger for less popular books. Even if publishers are wary of mass digitization projects in general, they might consider a selective strategy where less popular books, which are at a lower of risk cannibalization, are searchable in digital, online repositories, potentially for free. Similarly, our results suggest that authors, who might care about the diffusion of their work (beyond a purely financial consideration), and authors who have written books with no active market would do well to consider mass digitization to bring their work "back to life." Finally, beyond mass digitization, our results also point to the value of programs like Amazon's "Look Inside" feature that digitizes works and makes them searchable by potential readers. Even publishers and authors averse to mass digitization in general would do well to consider the value of digitization through such programs on a case-by-case basis.

Our results also have implications for ongoing legal and policy debates on the design of copyright law for the digital age. First, we provide causal, empirical evidence for the theoretical debate about whether mass digitization cannibalizes sales or promotes discovery. By some calculations, about 12,686 copyrighted books are available to be digitized for every year between 1923-1936 (Reimers, 2019). Not only might these books be made available for digital access, but according to our results digitization might also increase the sales of their physical editions by about 16% for popular books and 42% if they are more obscure. Therefore, our results help strengthen the value proposition of mass-digitization projects such as Google Books, the Hathi Trust or the Internet Archive. The benefits to welfare and follow-on innovation and creativity from such access might be substantial (Biasi and Moser, 2018; Furman et al., 2018). Digitization also significantly and strongly impacts the probability that a book is in print at all, increasing the probability that a book is available by 18 percentage points. With over 25 million books digitized by Google Books, and with over 60,000 books available at Project Gutenberg, we point to the benefits of digitization on this dimension as well.

Our work is not without limitations. Our evidence is based on a sample of relatively older books. This sample is representative of the large sum of human knowledge and the central focus of many current digitization projects facing copyright restrictions. As such, our results are directly applicable to the analysis of a number of ongoing mass digitization initiatives across the world. However, our experiment is somewhat different than one where only access to "snippets" is provided. Even though our conservative test is quite informative for this question as well, future work should look directly at how snippet-access affects demand

Electronic copy available at: https://ssrn.com/abstract=3339524

for printed works. Further, our results can be interpreted as being driven by readers who discover works in a digital form but have strong preferences for physical consumption. This is consistent with past work that has argued that consumers are "more tied to their mode of consumption (digital or physical) than they are to a particular product" (Chen et al., 2018, p.29). However, our results might become somewhat smaller as tastes change and consumers become more familiar with digital consumption. Finally, while the heterogeneous effects of digitization we present are consistent with the discovery mechanism (and not with changes in supply or prices), we do not have data from Google Books on precisely how consumers search and discover new material. Future work should analyze granular search data to further understand how digital availability affects consumer demand in creative industries.

To conclude, our study clarifies the important role of digitization in enabling discovery. We hope these findings provide some strategic guidance to publishers on navigating mass digitization projects and help rekindle efforts to get humanity one step closer to a digital Library of Alexandria.

19

Electronic copy available at: https://ssrn.com/abstract=3339524

# References

Adner, R., P. Puranam, and F. Zhu (2018). Special issue of strategy science: Strategy in the digital era. *Strategy Science*.

Aguiar, L. (2017). Let the music play? free streaming and its effects on digital music consumption. *Information Economics and Policy 41*, 1–14.

Aguiar, L. and J. Waldfogel (2018). Quality predictability and the welfare benefits from new products: Evidence from the digitization of recorded music. *Journal of Political Economy 126*(2), 492–524.

Berger, J., A. T. Sorensen, and S. J. Rasmussen (2010, March). Positive Effects of Negative Publicity: When Negative Reviews Increase Sales. *Marketing Science 29*(5), 815–827.

Biasi, B. and P. Moser (2018, December). Effects of Copyrights on Science. SSRN Scholarly Paper ID 2542879, Social Science Research Network, Rochester, NY.

Brynjolfsson, E., Y. Hu, and D. Simester (2011). Goodbye pareto principle, hello long tail: The effect of search costs on the concentration of product sales. *Management Science 57*(8), 1373–1386.

Brynjolfsson, E., Y. Hu, and M. D. Smith (2003). Consumer surplus in the digital economy: Estimating the value of increased product variety at online booksellers. *Management Science 49*(11), 1580–1596.

Brynjolfsson, E., Y. J. Hu, and M. D. Smith (2006). From niches to riches: Anatomy of the long tail. *Sloan Management Review 47*(4), 67–71.

Chen, H., Y. J. Hu, and M. D. Smith (2018). The Impact of E-book Distribution on Print Sales: Analysis of a Natural Experiment. *Management Science*.

Ellison, G. and S. F. Ellison (2018). Match quality, search, and the internet market for used books. Technical report, National Bureau of Economic Research.

Forman, C., A. Ghose, and A. Goldfarb (2009). Competition between local and electronic markets: How the benefit of buying online depends on where you live. *Management science 55*(1), 47–57.

Furman, J. L., M. Nagler, and M. Watzinger (2018). Disclosure and Subsequent Innovation: Evidence from the Patent Depository Library Program. Technical report, National Bureau of Economic Research.

Furman, J. L. and S. Stern (2011, August). Climbing atop the Shoulders of Giants: The Impact of Institutions on Cumulative Research. *American Economic Review 101*(5), 1933–1963.

Ghose, A., M. D. Smith, and R. Telang (2006). Internet exchanges for used books: An empirical analysis of product cannibalization and welfare impact. *Information systems research 17*(1), 3–19.

Giorcelli, M. and P. Moser (2016, December). Copyrights and Creativity: Evidence from Italian Operas. SSRN Scholarly Paper ID 2505776, Social Science Research Network, Rochester, NY.

Greenstein, S., J. Lerner, and S. Stern (2013). Digitization, innovation, and copyright: What is the agenda? *Strategic Organization 11*(1), 110–121.

Heald, P. J. (2007). Property rights and the efficient exploitation of copyrighted works: an empirical analysis of public domain and copyrighted fiction best sellers. *UGA Legal Studies Research Paper* (07-003).

Electronic copy available at: https://ssrn.com/abstract=3339524

Josevold, R. (2016). A National Library for the 21st century knowledge and cultural heritage online. *Alexandria 26*(1), 5–14.

Li, X., M. MacGarvie, and P. Moser (2018). Dead Poets' Property-How Does Copyright Influence Price? *The RAND Journal of Economics 49*(1), 181–205.

McCabe, M. J. and C. M. Snyder (2015). Does online availability increase citations? theory and evidence from a panel of economics and business journals. *The Review of Economics and Statistics 97*(1), 144–165.

Nagaraj, A. (2017, July). Does Copyright Affect Reuse? Evidence from Google Books and Wikipedia. *Management Science 64*(7), 3091–3107.

Reimers, I. (2019). Copyright and generic entry in book publishing. *American Economic Journal: Microeconomics*.

Samuelson, P. (2009). Legally Speaking: The Dead Souls of the Google Book Search Settlement. *Communications of the ACM 52*, 28.

Samuelson, P. (2011). The Google Book Settlement as Copyright Reform. *Wis. L. Rev.*, 479.

Smith, M. D. and R. Telang (2009, June). Competing with Free: The Impact of Movie Broadcasts on DVD Sales and Internet Piracy1. *MIS Q. 33*(2), 321–338.

Somers, J. (2017). Torching the Modern-Day Library of Alexandria. *https://www.theatlantic.com/technology/archive/2017/04/the-tragedy-of-google-books/523320/*.

Waldfogel, J. (2017). How Digitization Has Created a Golden Age of Music, Movies, Books, and Television. *Journal of Economic Perspectives 31*(3), 195–214.

Watson, J. (2017). What is the Value of Re-use? Complementarities in Popular Music.

Wooldridge, J. M. (1999). Distribution-free estimation of some nonlinear panel data models. *Journal of Econometrics 90*(1), 77–97.

Zhang, L. (2016). Intellectual property strategy and the long tail: Evidence from the recorded music industry. *Management Science 64*(1), 24–42.

21

Electronic copy available at: https://ssrn.com/abstract=3339524

# 6 Tables and Figures

**Tables**

Table 1. **Summary Statistics**

**Panel A: Book-Level**

|  | Mean | Std. Dev. | Median | Min | Max |
|---|---|---|---|---|---|
| Scanned (0/1) | 0.43 | 0.49 | 0.00 | 0 | 1 |
| Year Scanned | 2006.98 | 1.19 | 2007.00 | 2005 | 2009 |
| Total Loans (2003-11) | 2.23 | 5.33 | 1.00 | 1 | 1130 |
| Total Sales (2003-11) | 4990.54 | 56486.76 | 0.00 | 0 | 1965285 |
| Total Editions (2003-11) | 3.21 | 14.85 | 0.00 | 0 | 842 |
| Popular (0/1) | 0.12 | 0.32 | 0.00 | 0 | 1 |

**Panel B: Book-Year Level**

|  | Mean | Std. Dev. | Median | Min | Max |
|---|---|---|---|---|---|
| Post-Scanned (0/1) | 0.19 | 0.39 | 0.00 | 0 | 1 |
| Loans | 0.25 | 0.89 | 0.00 | 0 | 189 |
| Sales | 554.50 | 6839.49 | 0.00 | 0 | 626610 |
| Any Loans (0/1) | 0.17 | 0.37 | 0.00 | 0 | 1 |
| Any Sales (0/1) | 0.16 | 0.37 | 0.00 | 0 | 1 |
| Annual Editions | 0.36 | 2.90 | 0.00 | 0 | 542 |

*Note:* This table lists summary statistics for the full sample. Observations in Panel A are at the book-level for 88,006 books in the main sample with at least one loan over the study period. Observations in Panel B are at the book-year level for a balanced panel of 792,054 observations (88,006 books over 9 years from 2003 to 2011). Scanned: 0/1 for books that have been digitized in the time period 2003 to 2011. 37,743 books were digitized by the Google Books project and statistics for the Year Scanned variable are calculated from this subset. Sales data were collected for a subset of 9,204 books and summary statistics are from this subgroup. Popular = 1 for books that had more than one loan before the digitization program started (i.e., in 2003 and 2004). Any Loans and Any Sales are indicators = 1 if a book was loaned or sold at least once in a given year. See text for more details.

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5210

Table 2. **Estimates for the Impact on Loans and Sales**

**Panel A. Overall Impact**

|  | Poisson | | OLS | |
| --- | --- | --- | --- | --- |
|  | (1)<br>Loans | (2)<br>Sales | (3)<br>Any-Loans | (4)<br>Any-Sales |
| Post-Scanned | -0.457***<br>(0.0175) | 0.297*<br>(0.153) | -0.0629***<br>(0.00167) | 0.0782***<br>(0.00481) |
| Book FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |
| N | 792054 | 82836 | 792054 | 82836 |

**Panel B. Heterogenous Effects by Popularity**

|  | Poisson | | OLS | |
| --- | --- | --- | --- | --- |
|  | (1)<br>Loans | (2)<br>Sales | (3)<br>Any-Loans | (4)<br>Any-Sales |
| Post-Scanned | -0.362***<br>(0.0206) | 0.349*<br>(0.190) | -0.0341***<br>(0.00170) | 0.0670***<br>(0.00625) |
| Post Scanned x Popular | -0.599***<br>(0.150) | -0.201<br>(0.221) | -0.246***<br>(0.00368) | 0.0244***<br>(0.00900) |
| Book FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |
| N | 792054 | 82836 | 792054 | 82836 |

*Note:* This table presents estimates from Poisson and OLS (LPM) models evaluating the overall impact of book digitization on loans and sales (Panel A), and the heterogeneous impact of book digitization on loans and sales for popular books as compared to the rest (Panel B). In columns (1) and (3) of both panels, the sample includes a balanced panel of 88,006 books over 9 years (2003-2011) for a total of 792,054 observations. In columns (2) and (4), the sample includes a balanced panel of 9,204 books over the same time period for a total of 82,836 observations. Loans represents the number of times a book has been loaned in a given year within the Harvard system. Sales is the number of sold copies of that title in a year. Any-Loans and Any-Sales are indicators = 1 if a book has been loaned or sold at least once in a given year, respectively. Post-Scanned equals one in all years after a book has been digitized. Popular equals one for books that had more than one loan before the digitization program started (i.e., in 2003 and 2004). Book and year fixed effects are included in all models. Standard errors are in parentheses, clustered at the book level.

23

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5211

Table 3. **Robustness Checks: Alternate Specifications**

| | Log OLS | | Asymptotic sine OLS | | Poisson, no outliers | | Poisson, twins | |
|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| | Ln(Loans) | Ln(Sales) | Asinh(Loans) | Asinh(Sales) | Loans | Sales | Loans | Sales |
| Post-Scanned | -0.0445*** | 0.0421*** | -0.0676*** | 0.0696*** | -0.457*** | 0.146* | -0.383*** | 0.245 |
| | (0.00108) | (0.0126) | (0.00192) | (0.0146) | (0.0175) | (0.0827) | (0.0197) | (0.177) |
| Book FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 792054 | 82836 | 792054 | 82836 | 791982 | 82764 | 324216 | 32328 |

*Note:* This table evaluates robustness to alternate specifications and sensitivity to dropping certain observations. Loans represents the total number of times a book has been loaned in a given year. Sales is the number of sold copies of that title in a year. Post-Scanned equals one for all years after a book has been digitized. The first two columns provide zero-inflated Log-OLS estimates (i.e., the dependent variable is $Ln(Loans_{it} + 1)$ or $Ln(Sales_{it} + 1)$), and the next two columns provide OLS estimates using the hyperbolic sine of loans and sales as the dependent variables. The remaining four columns present Poisson estimates on subsamples of the main dataset: columns (5-6) drop all books with more than 900,000 lifetime sales, and columns (7-8) include only matched pairs (digitized and not) that are located exactly next to each other.

24

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5212

Table 4. **Accounting for Potential Endogeneity of Digitization Timing**

### Panel A. Including Time × Library Location Fixed Effects

|  | Poisson | | OLS | |
|---|---|---|---|---|
|  | (1) Loans | (2) Sales | (3) Any-Loans | (4) Any-Sales |
| Post-Scanned | -0.466*** | 0.277*** | -0.0613*** | 0.0770*** |
|  | (0.0127) | (0.0917) | (0.00170) | (0.00487) |
| Book FE | Yes | Yes | Yes | Yes |
| Year-location FE | Yes | Yes | Yes | Yes |
| N | 792054 | 26493 | 792054 | 82836 |

### Panel B. Dropping Books Digitized in 2005 or Located in Pusey 3

|  | Drop 2005-scanned | | | | Drop Pusey 3 | | | |
|---|---|---|---|---|---|---|---|---|
|  | (1) Loans | (2) Sales | (3) Any-Loans | (4) Any-Sales | (5) Loans | (6) Sales | (7) Any-Loans | (8) Any-Sales |
| Post-Scanned | -0.484*** | 0.364** | -0.0566*** | 0.0879*** | -0.450*** | 0.300* | -0.0606*** | 0.0774*** |
|  | (0.0145) | (0.172) | (0.00175) | (0.00553) | (0.0185) | (0.156) | (0.00186) | (0.00528) |
| Book FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 740340 | 75807 | 740340 | 75807 | 638802 | 67464 | 638802 | 67464 |

*Note:* This table replicates the regressions from Panel A of Table 2, explicitly accounting for the potential endogeneity issues raised in Section 3. In addition to book fixed effects, Panel A interacts the year fixed effects with indicators for each of the twenty Widener locations (plus "unknown location") to control for demand trends within each location. It utilizes the balanced panel of all 88,006 titles in the main analysis (9,204 in the sales sample).

Panel B drops different subsets of the main dataset. The first four columns drop all titles that were digitized in 2005, leaving us with balanced panels of 82,260 titles in the loans regression and 8,423 titles in the sales analysis. The last four columns drop all books in Pusey 3, with 70,978 books remaining in the loans data and 7,496 in the sales data. Book and year fixed effects are included in all models in Panel B. Standard errors are in parentheses, clustered at the book level.

Electronic copy available at: https://ssrn.com/abstract=3339524

25

A-5213

Table 5. **Robustness Checks: Accounting for Editions**

|  | Direct Effect | | Accounting for Editions | | | |
|---|---|---|---|---|---|---|
|  | (1) Editions | (2) Any-Editions | (3) Loans | (4) Sales | (5) Loans | (6) Sales |
| Post-Scanned | 0.538*** (0.0371) | 0.186*** (0.00174) | -0.478*** (0.0150) | 0.225* (0.131) | -0.473*** (0.0151) | 0.299* (0.160) |
| Editions |  |  | -0.00517*** (0.00155) | 0.00789*** (0.00239) |  |  |
| Edition Grp. FE | – | – | – | – | Yes | Yes |
| Book FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 222003 | 792054 | 792054 | 26586 | 792054 | 26586 |

*Note:* This table investigates the role of new edition releases in driving the main effect. Columns (1) and (3)-(6) present estimates from Poisson models, and column (2) shows a linear probability model. Editions represents the number of new editions available in print. Any-Editions = 1 if an edition is available at all in a given year. Edition Grp. FE includes ten fixed effects for the number of new editions (starting at zero, with a common FE for all books with 8+ editions). Book and year fixed effects are included in all models. Standard errors in parentheses, clustered at the book level.

Electronic copy available at: https://ssrn.com/abstract=3339524

26

A-5214

**Figures**

Figure 1. **Comparing Change in Demand for Pre-1923 and Post-1923 Books**



*Note:* This figure explores the impact of the digitization program on a cross-sectional sample of English language books originally published between 1904-1942, of which only those published before 1923 are digitized due to copyright restrictions. This includes 38,225 books with loans data, and 6,755 books with sales data. For each book, we calculate the change in the number of loans and sales in the 2010-2011 period (after digitization) as compared to the 2003-2004 period (before digitization). We then plot the share of books in each publication year that increase their loans (or sales) on the y-axis and the publication year itself on the x-axis. Books published after 1923 (which were not scanned) are indicated in black, and those before are indicated in gray.

Figure 2. **Timing of Book Digitization By Library Shelf Location**

*Note:* This figure provides an illustration of the timing of book digitization by shelf location for 30,839 (of 37,317) scanned books for which we know the exact shelf location in Harvard's Widener library. For each shelf location, we calculate the percent of books digitized in a given calendar month; the bluer the rectangle the higher percent of books from that location are digitized in that month. Shelves are sorted in ascending order (from bottom to top) of the month in which the maximum percent of their books were digitized. See text for more details.

Electronic copy available at: https://ssrn.com/abstract=3339524

27

A-5215

Figure 3. **Residualized Pre-Digitization Demand by Scan Year**



*(i) 2003-04 Loans*  　　　　　　　　　　 *(ii) 2003-04 Sales*

*Note:* This figure presents coefficients on the years of digitization from title-level regressions of pre-2005 demand on subject dummies, library location dummies, and year-of-digitization dummies, for all books in the dataset. The dependent variable denotes total loans of book $i$ in 2003 and 2004 (Panel $i$) and total sales of book $i$ in 2003 and 2004 (Panel $ii$). We plot coefficients for each year of digitization, including 95% confidence intervals (using robust standard errors). The omitted category is books that were not scanned.

Figure 4. **Time-Varying Estimates of the Impact of Digitization**



*(i) Any-Loans*  　　　　　　　　　　 *(ii) Any-Sales*

*Note:* This figure provides visual illustrations of the event study specification: $Y_{it} = \alpha + \Sigma_z \beta_z (scanned)_i \times 1(z) + \gamma_i + \mu_t + \varepsilon_{it}$, where $\gamma_i$ and $\mu_t$ represent book and time fixed effects, respectively, for book $i$ and year $t$, $(scanned)_i$ equals one for all books that were eventually scanned and $z$ represents the "lag," or the number of years that have elapsed since a book was first digitized (= 0 in the year before digitization). The main dependent variables here are Any-Loans (panel ($i$)) or Any-Sales (panel ($ii$)). The chart plots values of $\beta_z$ for different values of $z$.

28

Electronic copy available at: https://ssrn.com/abstract=3339524

# Online Appendix

## A Conceptual Framework

We introduce a simple motivating model that describes the consumer's decision to obtain the analog product with and without a free digital provider. As we show below, whether the arrival of a digital provider increases or decreases analog demand depends on two parameters: the search costs of finding a particular book, and the individual value from digital products.

Let $b$ denote the book (which identifies its popularity), and let $s \in \{a, d\}$ be the seller (analog or digital, respectively). Consumer $i$'s utility from buying book $b$ through seller $s$ is given as

$$u_{bs}^i = V_{bs}^i - c_b^i,$$

where $V_{bs}^i$ is the book-specific monetary value, that is, the utility the reader gets from obtaining the book less its price. For any book, the analog value $V_{ba}$ is fixed across consumers, but the digital value $V_{bd} \sim f[0, \bar{V}]$. Some consumers strongly value digital consumption (either due to taste or low cost), while others do not (perhaps because they have an aversion to digital copies or face transaction costs).

The search cost $c_b^i$ depends on the book's popularity. For example, *Wealth of Nations* is well known, so that search costs are low for most consumers, whereas consumers may only find out about other titles through (costly) search. Across all consumers, the book-specific search cost is represented by a distribution $c_b \sim f[0, B]$, where the average search cost for less popular books is larger than that for more popular ones. The introduction of the digital provider decreases search costs to zero for all books, markets, and consumers because the digital provider introduces well-developed institutions for discovery.[21]

### The consumer's decision

We distinguish between the utilities obtained in three cases: buying from an analog seller before digitization, buying from the analog seller after digitization, and buying from the digital seller after digitization.

Consumer $i$'s utility from an analog seller when there is no digital provider can be written as

$$u_{ba}^{i,pre} = V_{ba} - c_b^i. \tag{3}$$

Because there is no digital option ($u_{bd}^{i,pre}$ is not defined), a consumer will buy the analog product if and only

---

[21]The intuition of the model holds even if search costs are lowered rather than eliminated.

Electronic copy available at: https://ssrn.com/abstract=3339524

if $V_{ba} - c_b^i \geq 0$. After digitization, the search cost is eliminated. The consumer's utility from an analog seller is now

$$u_{ba}^{post} = V_{ba}, \tag{4}$$

and if the consumer were to choose the digital option, her utility would be

$$u_{bd}^{i,post} = V_{bd}^i. \tag{5}$$

With a digital option present, consumer $i$ purchases the analog product if and only if the utility from doing so is larger than that from obtaining the free digital version, or $V_{ba} - V_{bd}^i \geq 0$.

The above equations suggest that the impact of free digital provision on analog demand depends on each consumer's search cost $c_b^i$ and their valuation for the digital option $V_{bd}^i$. Figure D.1 illustrates the tension. For all consumers $i$ with $c_b^i > V_{ba} > V_{bd}^i$, digitization enables the book's discovery because the previously high search cost is removed, and it leads to an analog sale that would not have otherwise happened. In contrast, for consumers with $V_{bd}^i > V_{ba} > c_b^i$, digitization did not lead to new discovery. Instead, the consumer substitutes the analog product for the digital provider. If both $c_b^i$ and $V_{bd}^i$ are larger (or smaller) than $V_{ba}$, the introduction of the digital provider will not change the consumer's decision to buy the analog version.

The *market-wide* impact of the digital provider on analog sales depends on the distributions of search costs and of preferences for the digital option. If many consumers have high search costs, the discovery effect likely dominates and digital provision increases sales. But if search costs are generally low, for example with well-known books or when search institutions are otherwise readily available, the substitution effect may prevail and digitization likely cannibalizes analog demand.

## B  The Impact on Prices

The main text shows that digitization through Google Books leads to an increase in the number of editions as well as in the units sold per book, and the improved availability itself does not explain the increase in sales. The increase in unit sales might also be driven by a decrease in prices, perhaps due to increased competition from the Google Books version and the new editions. If such decreases in prices are large enough, then digitization could lead to decreases in revenues despite the increase in sales.

While we do not have price information in the sales sample, we do have some price information from Bowker's Books-in-Print sample, which allows us to test whether and how digitization impacted the sug-

30

Electronic copy available at: https://ssrn.com/abstract=3339524

gested retail prices of new editions. We treat each newly published edition as an observation, and we estimate the edition's suggested retail price as a function of the title's digitization status at the time of the edition's publication, in addition to indicator variables for the edition's year of publication and for each title. Formally, we estimate

$$Y_{jit} = \alpha + \beta \, PostScanned_{jit} + \gamma_i + \lambda_t + \varepsilon_{jit}, \tag{6}$$

where $Y_{jit}$ is the suggested retail price (or its log) of edition $j$ of title $i$, which was published in year $t$. In addition, $PostScanned_{jit}$ is an indicator that equals 1 if title $i$ was digitized before the year $t$ in which edition $j$ was published, and $\gamma_i$ and $\lambda_t$ are title and publication year indicators, respectively. In additional checks, we add controls for the number of available editions for title $i$.

Table D.4 depicts the results from these regressions. They suggest that Google's digitization program had at most a small impact on prices of new editions. While the OLS regressions in columns 1-2 show no significant effect on the absolute prices of new editions, the log-OLS regression in column 3 finds that digitization decreases an edition's price by about 1.7% (p-value = 0.08), a small effect compared to that of digitization on sales.[22] However, the coefficient decreases and loses statistical significance after including the number of available editions as an (endogenous) additional control (column 4). These results suggest that digitization impacts edition prices mostly through its effect on availability. Because the availability of editions does not fully explain the positive impact of digitization on sales (panel B of Table 3), neither would a decrease in prices.

## C   Regression Discontinuity

The main analysis takes advantage of variation in the timing and status of digitization across all books in the Harvard Widener library system. An underlying assumption in these analyses is that books that are digitized are inherently similar to books that are not, or not yet, digitized. However, whether a book is digitized at all is a function of the book's copyright status. Throughout the time period of our study, all works that were originally published before 1923 are in the public domain and hence digitized, whereas works from 1923 and later were still protected by copyright and hence not digitized.

This discontinuity in copyright status is due to the most recent copyright extension in the United States. The 1998 Copyright Term Extension Act retroactively extended the copyright term for all protected works by twenty years, from 75 to 95 years for the works in our dataset. This extension provides a sharp, exogenous discontinuity in the ex-post digitization status for works originally published around 1923. Beyond their

---

[22]The negative effect on prices is slightly larger for more popular books.

31

Electronic copy available at: https://ssrn.com/abstract=3339524

digitization status, however, nothing changed systematically for just one group of titles over the time period in our study. Thus, were it not for the digitization of the older works between 2005 and 2009, one might expect analog demand for these titles to evolve similarly for works originally published on both sides of the 1923 cutoff.

We therefore examine how demand changed from 2003/04 (before any works were digitized) to 2010/11 (after digitization was completed) in a regression discontinuity design that formalizes the patterns shown in Table 1 in the main text. Formally, we utilize the jump in digitization around the original publication year 1923 to estimate regression equations of the form

$$Y_i = \alpha + \beta Digitized_i + k(year_i) + \varepsilon_i, \tag{7}$$

where $Y_i$ describes various measures of the change in book $j$'s demand (library checkouts or sales) from 2003/04 to 2010/11, including the absolute unit changes, an asymptotic sine transformation of these changes, and an indicator that is one if there is an increase in book $i$'s demand.[23] Moreover, $Digitized_i$ is an indicator variable that is 1 if the book was digitized, which is a deterministic function of the book's original year of publication. We define $k(year_i)$ as a quadratic function of the book's publication year, centered around 1923. The bandwidth in each specification is its mean-squared-error optimal bandwidth.

Table D.5 shows the results from these specifications. The first three columns show results for changes in the Harvard library checkouts, and the last three columns focus on changes in sales. All results support those in the main text: treatment through digitization leads to a decrease in the number of library checkouts, and an increase in marketwide sales. The estimated absolute effects on loans are very similar to those in the main regressions, with Harvard library loans decreasing by about 0.2 units per two-year period (or 0.1 units per year, as in column 1 of Table 3). Estimated annual sales effects are a little larger, at about 290 units (compared to 115 units in column 2 of Table 3), although the percentage effects of around 28% are very comparable to the main findings. These results are robust to different bandwidths and functional forms of the publication year. Figure D.3 further plots the annual coefficients of the regressions on the likelihood of increased demand (analog to columns 3 and 6 in Table D.5). It illustrates that books originally published before 1923 and therefore digitized by Google Books are significantly less likely to see an increase in loans and significantly more likely to experience an increase in sales.

---

[23] We use an asymptotic sine transformation instead of the more common log transformation because one would naturally expect many negative changes in demand, and dropping these may bias results (note that our dependent variable is the *change* in demand).

32

Electronic copy available at: https://ssrn.com/abstract=3339524

# D   Appendix Tables and Figures

### Table D.1. **Baseline Estimates Using Subset of Books With At Least One Loan Before 2005**

|  | Poisson | | OLS | |
| --- | --- | --- | --- | --- |
|  | (1)<br>Loans | (2)<br>Sales | (3)<br>Any-Loans | (4)<br>Any-Sales |
| Post-Scanned | -0.681***<br>(0.0287) | 0.165<br>(0.103) | -0.0252***<br>(0.00197) | 0.0834***<br>(0.00605) |
| Book FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |
| N | 287523 | 53388 | 287523 | 53388 |

*Note:* This table presents estimates from Poisson and OLS (LPM) models evaluating the overall impact of book digitization on loans and sales. The estimations replicate those from Panel A of Table 2 in the main text, but include only books that were checked out at least once pre-digitization (2003/04). This provides a balanced panel of 31,947 books in the loans estimations (columns 1 and 3), and of 5,932 books in the sales regressions (columns 2 and 4). Loans represents the number of times a book has been loaned in a given year within the Harvard system. Sales is the number of sold copies of that title in a year. Any-Loans and Any-Sales are indicators = 1 if a book has been loaned or sold at least once in a given year, respectively. Post-Scanned equals one in all years after a book has been digitized. Book and year fixed effects are included in all models. Standard errors are in parentheses, clustered at the book level.

33

Electronic copy available at: https://ssrn.com/abstract=3339524

Table D.2. **Estimates by Popularity: Different Cutoffs**

**Panel A. Impact on Loans**

| | Popularity Cutoff: Pre-2005 Loans | | | |
|---|---|---|---|---|
| | >0 | >2 | >4 | >6 |
| Post-Scanned | -0.119*** | -0.419*** | -0.445*** | -0.454*** |
| | (0.0339) | (0.0133) | (0.0130) | (0.0151) |
| Post Scanned x Popular | -0.933*** | -0.458** | -0.409* | -0.225 |
| | (0.0983) | (0.182) | (0.229) | (0.282) |
| Book FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |
| N | 792054 | 792054 | 792054 | 792054 |

**Panel B. Impact on Sales**

| | Popularity Cutoff: Pre-2005 Loans | | | | Pre-2005 Sales |
|---|---|---|---|---|---|
| | >0 | >2 | >4 | >6 | >0 |
| Post-Scanned | 0.401* | 0.341* | 0.305** | 0.297* | 0.994*** |
| | (0.211) | (0.187) | (0.154) | (0.154) | (0.373) |
| Post Scanned x Popular | -0.278 | -0.185 | -0.628*** | -0.124 | -0.701* |
| | (0.228) | (0.223) | (0.157) | (0.217) | (0.399) |
| Book FE | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes |
| N | 82836 | 82836 | 82836 | 82836 | 82836 |

*Note:* This table presents estimates from Poisson models evaluating the heterogeneous impact of book digitization on loans (Panel A) and sales (Panel B) for popular books as compared to the rest. In Panel A (loans), the sample includes a balanced panel of 88,006 books over 9 years (2003-2011) for a total of 792,054 observations; in Panel B (sales), the sample includes data on 9,204 books over the same time period for a total of 82,836 observations. Loans represents the number of times a book has been loaned in a given year within the Harvard system. Sales is the number of sold copies of that title in a year. Post-Scanned equals one in all years after a book has been digitized. Popularity cutoffs are according to the number of library loans before the digitization program started (i.e., in 2003 and 2004). One exception, in column 5 of Panel B, the cutoff is based on sales in 2003 and 2004. Book and year fixed effects are included in all models. Standard errors are in parentheses, clustered at the book level.

34

Electronic copy available at: https://ssrn.com/abstract=3339524

A-5222

Table D.3. **Accounting for editions, Using Confirmed Matches**

| | Direct Effect | | Accounting for Editions | | | |
| | (1) Editions | (2) Any-Editions | (3) Loans | (4) Sales | (5) Loans | (6) Sales |
|---|---|---|---|---|---|---|
| Post-Scanned | 0.538*** (0.0371) | 0.121*** (0.00345) | -0.389*** (0.0228) | 0.264* (0.136) | -0.389*** (0.0229) | 0.345** (0.167) |
| Editions | | | -0.00384** (0.00150) | 0.00888*** (0.00258) | | |
| Edition Grp. FE | – | – | – | – | Yes | Yes |
| Book FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes |
| N | 222003 | 222003 | 222003 | 17406 | 222003 | 17406 |

*Note:* This table repeats the analyses from Table 5, dropping all titles that did not generate a match with the Bowker database. Columns (1) and (3)-(6) present estimates from Poisson models, and column (2) shows a linear probability model. Editions represents the number of new editions available in print. Any-Editions = 1 if an edition is available at all in a given year. Edition Grp. FE includes ten fixed effects for the number of new editions (starting at zero, with a common FE for all books with 8+ editions). Book and year fixed effects are included in all models. Standard errors in parentheses, clustered at the book level.

Table D.4. **Impact of Digitization on Prices of New Editions**

| | OLS | | Log OLS | |
| | (1) Price | (2) Price | (3) Ln(Price) | (4) Ln(Price |
|---|---|---|---|---|
| Post-Scanned | -0.00438 (0.775) | 0.106 (0.777) | -0.0174* (0.00996) | -0.0143 (0.00998) |
| Editions | | 0.0220*** (0.00585) | | 0.000638*** (0.000110) |
| Book FE | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes |
| N | 280240 | 280240 | 280115 | 280115 |

*Note:* This table presents estimates from OLS and log-OLS models evaluating the overall impact of book digitization on prices of new editions. The estimation is on the edition-level, including all 280,115 editions published between 2003 and 2011 that we matched between the titles in Harvard's library system and the Bowker Books-in-Print directory. Post-Scanned equals one in all years after a book has been digitized. Book and year indicators are included in all models. Standard errors are in parentheses, clustered at the title level.

35

Electronic copy available at: https://ssrn.com/abstract=3339524

Table D.5. **Regression Discontinuity Estimates**

| | Loans | | | Sales | | |
|---|---|---|---|---|---|---|
| | (1)<br>Loans | (2)<br>Asinh(Loans) | (3)<br>Increase | (4)<br>Sales | (5)<br>Asinh(Sales) | (6)<br>Increase |
| Digitized | -0.219***<br>(0.0297) | -0.144***<br>(0.0175) | -0.0641***<br>(0.00781) | 577.4<br>(450.8) | 0.277**<br>(0.126) | 0.159***<br>(0.0229) |
| N | 47902 | 47902 | 47902 | 8016 | 8016 | 8016 |

*Note:* This table presents results from regression discontinuity estimations on the title level. The dependent variables are functions of the changes in analog demand (loans in columns 1-3, and sales in columns 4-6) between 2003/04 (before digitization) and 2010/11 (after digitization). In columns 1 and 4, it is the absolute change in analog demand; columns 2 and 5 use the asymptotic sine of that change; and columns 3 and 6 use an indicator that is 1 if analog demand has increased. The independent variables of interest, *Digitized*, is an indicator that is 1 if the book was digitized (i.e. originally published before 1923). A quadratic function of the publication year is included. The bandwidth in each specification is the MSE-optimal bandwidth. Robust standard errors in parentheses.

Figure D.1. **Theoretical Framework: Decision to Consume Analog vs. Digital**



*Note:* This figure provides an illustration of predictions from the theoretical framework. The framework models an individual customer $i$'s decision to purchase an analog version of the book (a physical copy) as a function of his or her search costs $c_b^i$ (x-axis) and preference for digital copies $V_{bd}^i$ (y-axis) for book $b$. $V_{ba}$ is the valuation of book $b$ if bought from the analog seller.

36

Electronic copy available at: https://ssrn.com/abstract=3339524

Figure D.2. **Time-Varying Estimates of the Impact of Digitization – Twins Sample**



*(i) Any-Loans*     *(ii) Any-Sales*

*Note:* This figure is analogous to Figure 4 in the main text, using only titles for which we identified a "twin" title. It reports annual coefficients of the event study specification: $Y_{it} = \alpha + \Sigma_z \beta_z (scanned)_i \times 1(z) + \gamma_i + \mu_t + \varepsilon_{it}$, where $\gamma_i$ and $\mu_t$ represent book and time fixed effects, respectively, for book $i$ and year $t$, $(scanned)_i$ equals one for all books that were eventually scanned and $z$ represents the "lag," or the number of years that have elapsed since a book was first digitized ($= 0$ in the year before digitization). The main dependent variables here are Any-Loans (panel $(i)$) or Any-Sales (panel $(ii)$). The chart plots values of $\beta_z$ for different values of $z$.

Figure D.3. **Annual Estimates of Regression Discontinuity**

*(i) Estimated Likelihood of Increased Loans*     *(ii) Estmated Likelihood of Increased Sales*



*Note:* This figure presents event-study estimates of the likelihood that a book sees increased analog demand (loans or sales) as a function of its original year of publication. Only those books published before 1923 are digitized due to copyright restrictions. The dependent variable is an indicator that is 1 if analog demand (loans or sales) for the book was higher in 2010/11 than in 2003/04, and the independent variables of interest are indicators for the year in which a book was originally published. We plot coefficients for each year of original publication, including 95% confidence intervals (using robust standard errors). A cubic fitted line is included for illustration, and the MSE-optimal bandwidth is chosen.

Electronic copy available at: https://ssrn.com/abstract=3339524

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 6

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5      HACHETTE BOOK GROUP, INC.,

        HARPERCOLLINS PUBLISHERS LLC,

 6      JOHN WILEY & SONS, INC., and

        PENGUIN RANDOM HOUSE LLC,

 7

                     Plaintiffs,

 8

             vs.                         No. 1:20-cv-04160-JGK

 9

        INTERNET ARCHIVE and DOES 1

10      through 5, inclusive,

11                   Defendants.

        _____/

12

13

                      -- ATTORNEYS' EYES ONLY --

14

15       VIDEOTAPED RULE 30(B)(1) AND 30(B)(6) DEPOSITION

16        OF HACHETTE BOOK GROUP, INC., BY ALISON LAZARUS

17                 Remote Zoom Proceeding

18                  Rye Brook, New York

19                Friday, November 12, 2021

20

21

22

23      REPORTED BY:

24      LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25      Pages 1 - 254                      Job No. 4867752


                                            Page 1
```

ATTORNEYS EYES ONLY

```
 1              Has Hachette conducted any analysis regarding
 2      the effect of library lending on physical book revenues?
 3          A.  We have no -- no, we haven't.  There's no way to
 4      do that.
 5          Q.  Tell me a little bit about why there's no way to    10:41:58
 6      do that.  What does that mean?
 7          A.  You can't determine what somebody didn't buy.
 8      So if somebody borrows a book from a library, we don't
 9      know that they'll -- under different circumstances, they
10      might have bought a book, a physical book instead.          10:42:24
11      There's just no way to measure sales you didn't get.
12          Q.  Same question but with respect to eBook revenue.
13              Has Hachette conducted any analysis about the
14      effect of library lending on eBook revenue?
15          A.  Yes, we have.                                       10:42:47
16          Q.  Okay.  What kind of analysis?
17          A.  We've compared our retail sales rates and
18      corresponding -- corresponding rates of library reads,
19      what we would call circulations.  So we look at the rate
20      of circulations going up, let's say, and look at the rate   10:43:14
21      of retail eBook sales going down and, you know.
22              So we do that kind of analysis.  And in that
23      case, we -- we have the data to -- to look at those two
24      types of sales.
25          Q.  How often is that kind of analysis conducted?       10:43:35
```

Page 36

A-5228

```
 1        A.  We do a kind of short monthly analysis on

 2    library circulation, and then a bigger analysis like that

 3    would be maybe every six months.

 4        Q.  And the monthly analysis of circulation is

 5    compared to monthly revenues?                          10:44:01

 6        A.  It's really looking at the rate of circulation,

 7    let's say, this year compared to last year or -- yeah,

 8    that's generally what we're looking at.

 9        Q.  Okay.  But when you conduct the analysis

10    monthly, are you looking at, for example, if you were     10:44:22

11    looking at June of 2021, would you be comparing to June

12    of 2020?

13        A.  Yes, or maybe even June 2019.  Sometimes more

14    than one year.

15        Q.  And could you explain a little bit about how the  10:44:43

16    library circulation monthly data is analyzed with respect

17    to the revenue data that you have?

18        A.  So libraries will, you know, buy a copy of an

19    eBook, and then they can lend it numerous times over the

20    course of the term, the two-year term.  So we look at the  10:45:10

21    revenue versus the circulations and come up with a -- you

22    know, a cost-per-circ estimate, and that's something we

23    compare over time to understand the financial trends in

24    lending.

25        Q.  Okay.  How does that data -- actually, strike      10:45:37
```

Page 37

ATTORNEYS EYES ONLY

```
 1    that.

 2            Is Hachette able to use that data to perform any

 3    analysis about the effect of library eBook lending on

 4    library retail sales?

 5            MS. MCNAMARA:  Objection.  This is very          10:45:58

 6    confusing.  Do you understand the question, Alison?

 7            THE WITNESS:  No.  I was just going to say I'm

 8    not sure what you mean about library retail sales because

 9    libraries aren't retailers.

10        Q.  BY MS. LANIER:  That was a verbal error on my    10:46:12

11    part.  Thank you for giving me a chance to clarify.

12            What I was trying to ask, but inartfully, is

13    whether Hachette is able to use the types of data we were

14    just talking about to analyze the effect of library eBook

15    lending on retail sales of eBooks.                       10:46:29

16        A.  We -- we do try to do that.  It's -- it's, you

17    know, speculative because you can't truly directly make

18    that correlation, meaning, again, I -- we can't tell, you

19    know, why somebody borrowed a book versus buying the

20    book.  So we look at the trends to try to understand      10:46:58

21    what's happening in both markets, and we do use that data

22    to inform our decision making.

23        Q.  BY MS. LANIER:  When you say "to inform our

24    decision making," what do you mean by that?

25        A.  Looking at our approach to the retail eBook       10:47:21
```

Page 38

ATTORNEYS EYES ONLY

```
 1    market, how we might market our books there, working with
 2    our library vendors to help promote certain types of
 3    titles that might be underperforming.  So just general,
 4    you know, market data, trying to understand where there
 5    are opportunities and where we -- we might want to          10:47:46
 6    rethink something.
 7         Q.  Does the term "cannibalized" get used with
 8    respect to -- strike that.
 9            Are you familiar with the term "cannibalized" in
10    terms of revenues and sales in that context?               10:48:07
11         A.  Yes.
12         Q.  Is Hachette concerned or Hachette -- has
13    Hachette expressed concerns about the effect that
14    libraries have on retail sales of books?
15         A.  Yes, we've had -- we've had some concerns as the  10:48:28
16    lending trend have gone up and the retail trends have
17    gone down.
18         Q.  But beyond the analysis that -- that we've
19    discussed today, is there any additional analysis or
20    investigation into whether libraries actually do           10:48:54
21    cannibalize sales of books?
22            MS. MCNAMARA:  Objection.  Vague, ambiguous.
23            THE WITNESS:  Again, there are limits to what
24    we're able to understand and get data for, and so we are
25    constantly looking at our sales in all channels and        10:49:15
```

Page 39

A-5231

1    trying to understand what's happening in the marketplace

2    to the best of our ability, but there are limits to the

3    depth and detail that we have access to.

4        Q.  BY MS. LANIER:  You mentioned trends of eBook

5    retail sales and trends of library eBook circulation.          10:49:37

6    Has it been your observation in the last, let's say from

7    2017 or so on, that decreases in eBook revenue correspond

8    to increases in library circulation of eBooks?

9        A.  It's been my observation that as library lending

10   has become more popular and the circulations have gone up      10:50:12

11   that retail sales for eBooks have gone down, yes.

12       Q.  But as you have testified before, you don't know

13   for sure if there is a causal relationship between those

14   two things that are occurring at the same time?

15       MS. MCNAMARA:  Objection.  Mischaracterizes her           10:50:36

16   testimony.

17       THE WITNESS:  To the best of our ability to

18   interpret the data that we have, we think there is maybe

19   a causal relationship.

20       Q.  BY MS. LANIER:  What about the data makes you          10:50:49

21   think there is a causal relationship between those two

22   things?

23       A.  The -- the rise in circulation statistics for,

24   in particular, you know, kind of popular frontlist

25   authors and the corresponding decline in what we would        10:51:14

Page 40

```
 1     call à la carte sales for those authors of retail in

 2     eBook format.

 3          Q.  But what about the rise in circulation

 4     statistics and the decline in à la carte sales makes you

 5     think, makes you conclude or makes you believe that there     10:51:39

 6     is a causal relationship between those two things?

 7          A.  Again, you know, we can't prove it, but there

 8     don't seem to be other, you know, significant extenuating

 9     factors that would, you know, create such a drastic

10     shift.  Although there are other things happening in the     10:52:07

11     marketplace that may have an impact, it's just that we

12     don't have the data to support that.

13          Q.  Okay.  When you said there are other things

14     happening in the marketplace, are you thinking of

15     anything specific?                                            10:52:28

16          A.  Things like the -- you know, the Kindle

17     Unlimited program might be one.  Piracy is another.

18     Those -- those are the two that kind of come to mind.

19          Q.  And this is very possibly a dumb question so

20     forgive me:  But what is the Kindle Unlimited program?       10:52:50

21          A.  It's a subscription -- an eBook subscription

22     program that Amazon offers with -- you pay a flat monthly

23     fee and you get unlimited digital reading.  Hachette does

24     not participate in that program.

25          Q.  Excuse me.  And when we've been talking about       10:53:21
```

Page 41

```
 1    in and let me know what you interpret that sentence to

 2    mean.

 3         A.   "IA not only conflates print books and eBooks,

 4    it ignores the well-established channels in which

 5    publishers do business with bookstores, e-commerce       11:03:58

 6    platforms, and libraries, including for print and eBook

 7    lending."

 8              MS. MCNAMARA:  And I caution the witness that

 9    you should look at the context.  You don't just be

10    directed at a particular sentence.  Make sure that you   11:04:14

11    have an opportunity to understand the context of the

12    document.

13              THE WITNESS:  Yes.

14              MS. LANIER:  She's absolutely right.  I was

15    remiss in not giving you enough time to look at the whole 11:04:24

16    document.  Please do so if that's helpful to you.

17              THE WITNESS:  Yes, please.  Thank you.

18              Okay.  So I'm sorry, can you repeat the original

19    question?

20         Q.  BY MS. LANIER:  Certainly.                      11:06:34

21              So in the paragraph that starts "and willfully

22    ignoring the Copyright Act" --

23         A.   Uh-huh.

24         Q.   -- what does the phrase "conflates the separate

25    markets and business models made possible by the         11:06:47
```

Page 48

Veritext Legal Solutions
866 299-5127

A-5234

| 1 | statutes, incentives, and protections" mean to you? |
| 2 | A.  It means that Internet Archive is creating an |
| 3 | eBook from a print book, and those are two separate |
| 4 | formats, two separate business models that we support for |
| 5 | our authors and that we do not think of as one item that       11:07:15 |
| 6 | can be shared.  There are two distinct ways of reading |
| 7 | that we treat very separately. |
| 8 | Q.  And in the next paragraph, the one that starts, |
| 9 | "This lawsuit is not about the occasional transmission," |
| 10 | do you see that paragraph?                                     11:07:45 |
| 11 | A.  Uh-huh. |
| 12 | Q.  Have you had a chance to read that paragraph |
| 13 | yet? |
| 14 | A.  Yes. |
| 15 | Q.  Do you see the phrase towards the -- it's the             11:07:52 |
| 16 | second line from the bottom of the page, and it says: |
| 17 | "Purposely denigrating their commercial value." |
| 18 | Do you see that phrase? |
| 19 | A.  Let me get there. |
| 20 | Q.  Sure.                                                     11:08:08 |
| 21 | A.  Yes, I see it. |
| 22 | Q.  Does Hachette have any evidence that the |
| 23 | Internet Archive has purposely denigrated the commercial |
| 24 | value of books? |
| 25 | A.  Well, by making scans of print books, that -- we          11:08:44 |

Page 49

```
1    believe that is purposefully denigrating the commercial
2    value.  EBooks have their own commercial value that
3    authors are entitled to receive royalties from, and print
4    books have a different set of terms that authors receive
5    royalties from.                                      11:09:08
6         So by creating scans and treating them as from a
7    print book that wasn't purchased from us and an eBook
8    that wasn't purchased from us, it does denigrate their
9    commercial value, and it makes it free to the consumer
10   without restriction, without them paying for it or being  11:09:28
11   a library member.
12        Q.  To Hachette, the scanning of the physical book
13   is the purposeful denigration of the commercial value of
14   the book?
15        MS. MCNAMARA:  Objection.                        11:09:49
16        Just a second.
17        Objection.  That's willfully misrepresents the
18   witness' testimony.
19        MS. LANIER:  That willfully misrepresents my
20   question, actually.                                   11:09:56
21        Please go ahead.
22        MS. MCNAMARA:  Well --
23        THE WITNESS:  It isn't -- it's the scanning, but
24   also making available a digital copy that wasn't
25   authorized by us, that isn't protected by -- that isn't,  11:10:10
```

Page 50

Veritext Legal Solutions
866 299-5127

```
 1      you know, under our auspices as a copyrighted format.  So

 2      it's -- it's just taking an item and turning it into

 3      something else that wasn't authorized or doesn't comply

 4      with our terms of sale and our approach to the

 5      marketplace.                                        11:10:32

 6          Q.  BY MS. LANIER:  Are you finished with your

 7      answer?

 8          A.  Uh-huh.

 9          Q.  I wasn't able to tell.

10          So apart from scanning and making available for   11:10:44

11      borrowing, does Hachette have other grounds for thinking

12      that the Internet Archive is purposely denigrating the

13      commercial value of books?

14          A.  I have to think about that for a second.

15          The availability, the premise behind the          11:11:22

16      Internet Archive's making eBooks available on the site in

17      the way that they do denigrates our standard business

18      practices, and I think to the consumer presents a very

19      different kind of lending experience that doesn't support

20      copyright, doesn't support our authors, doesn't support  11:11:53

21      our relationship with libraries, and in fact, is very

22      counter to how we try to conduct business in a very clear

23      and collaborative way with our existing eBook partners.

24          Q.  Could you scroll to HACHETTE0011118, please.  It

25      will be the last page in this document.                11:12:23
```

Page 51

ATTORNEYS EYES ONLY

```
 1   STATE OF CALIFORNIA      ) ss:

 2   COUNTY OF MARIN          )

 3

 4           I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

 5   hereby certify:

 6           That the foregoing deposition testimony was

 7   taken before me at the time and place therein set forth

 8   and at which time the witness was administered the oath;

 9           That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16           I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20           IN WITNESS WHEREOF, I have subscribed my name

21   this 18th day of November, 2021.

22

23

24

25           LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

                                                Page 251
```

# Exhibit 7 to McNamara Supplemental Declaration

# Filed Under Seal (A-5239)

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 8

# Durie Tangri

Joseph C. Gratz
415-376-6407 (direct)
415-362-6666 (main)
jgratz@durietangri.com

August 9, 2021

**VIA ECF**

Hon. John G. Koeltl
U.S. District Judge
Daniel Patrick Moynihan
United States Courthouse
Courtroom 14A
500 Pearl St.
New York, NY 10007-1312

Re: *Hachette Book Group, Inc. et al. v. Internet Archive*
　　Case No. 1:20-CV-04160-JGK

Your Honor:

Pursuant to Local Civil Rule 37.2, Defendant Internet Archive respectfully requests a pre-motion discovery conference regarding a motion to compel the production of information regarding the commercial performance of books published by Plaintiffs.

In the above-captioned lawsuit, Plaintiffs contend that the Internet Archive infringed Plaintiffs' copyrights by the non-profit digital lending of library books. The Internet Archive maintains that the challenged lending constitutes fair use under 17 U.S.C. § 107.

In considering fair use, one factor courts consider is "the effect of the use upon the potential market for or value of the copyrighted work." Plaintiffs claim that the Internet Archive's digital library lending has a negative effect on the market for or value of the works. The Internet Archive disagrees, and wishes to bring forward evidence showing that lending had little or no effect on the commercial performance of the books being lent, compared to books that were not lent. "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). The Internet Archive submits this letter-motion in order to gather that evidence.

Specifically, in order to show that lending had little or no effect on commercial performance, the Internet Archive wishes to compare the commercial performance of books that were available for digital lending with books that were not available for digital lending. The Internet Archive has requested data

Hon. John G. Koeltl
August 9, 2021
Page 2

about the commercial performance[1] of all of Plaintiffs' books, broken down by month, since 2011. Plaintiffs have provided some commercial performance data, but (1) Plaintiffs have refused to provide data about books other than the works-in-suit, and (2) the data they have provided is not broken down by month.  For reasons explained below, Plaintiffs can and should produce this data, and the Internet Archive asks that this Court compel them to do so.

> **A.  Commercial performance data about books other than the works-in-suit is necessary to understand whether lending had any effect on commercial performance.**

In order to argue that the challenged library lending practice did not affect commercial performance, one needs commercial performance data not only for the books that were lent out, but also of other books that were not loaned.  Without that data, the Internet Archive has nothing to compare.  *See, e.g.*, *Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 261 (S.D.N.Y. 2008) (granting motion to compel production of data about all videos not accused of infringement because such data was necessary "to compare the attractiveness of allegedly infringing videos with that of non-infringing videos.").

Plaintiffs object that data about other books would be irrelevant.  They have argued that, because there are too many other factors that could affect their commercial performance, the data won't show whether the Internet Archive's digital library lending affected commercial performance.  We have no doubt that Plaintiffs will press that line of argument in cross-examination of the Internet Archive's witnesses, but such estimates are a necessary part of litigation about alleged copyright infringement.  *See, e.g.*, *Davis v. The Gap, Inc.*, 246 F.3d 152, 166–67 (2d Cir. 2001) ("Many of the accepted methods of calculating copyright damages require the court to make uncertain estimates in the realm contrary to fact.").  Plaintiffs' line of argument provides no justification for withholding the data necessary to perform the comparison in the first place.

Plaintiffs also object that producing data about *all* other books would be unduly burdensome, because there are only 127 works-in-suit.  The Internet Archive agrees that the comparison does not require each and every book; instead, it requires, for each work-in-suit, one or more comparable books that were not available for digital lending at the same time as that work-in-suit.  One way to identify potentially comparable books would be to identify books whose commercial performance was very similar before either book was made available for digital lending.  But Plaintiffs, who are in possession of the data one would need to do that analysis, have declined to identify books they regard as comparable—because, as discussed above, they take the position that no book is comparable to any other book.  Given this refusal, Plaintiffs must produce data about all books, so that the Internet Archive can identify books it

---

[1]The types of commercial performance data the Internet Archive seeks are: the number of physical copies embodying works by distribution channel, the prices for those physical copies, the number of ebooks embodying works by distribution channel, the number of ebook loans divided by distribution channel, prices for any transaction related to ebooks, income from sales of physical books by distribution channel, and income from ebook transactions by distribution channel.  RFPs 20-22, 60-67.

Hon. John G. Koeltl
August 9, 2021
Page 3

regards as comparable, and the parties can then debate, on a level playing field, whether such books are or are not comparable.

Nor is there any particular burden in retrieving the information requested. This is commercial data stored in databases, indexed by book. Plaintiffs were able to provide data about the works-in-suit by accessing such databases; this motion simply seeks the result of querying the same systems for a larger set of books.

> **B.** **Plaintiffs must produce *monthly* commercial performance data, not just annual data.**

Hachette, Penguin Random House, HarperCollins, and Wiley have produced annual commercial performance data for the works-in-suit. They do not contend that monthly data does not exist; they contend only that producing monthly data would be more difficult, so they have not produced it. Indeed, Hachette produced monthly data for 2020, but not for the other requested years. And, of course, as discussed above, Plaintiffs have not produced any data for books that are not works-in-suit.

Monthly data is necessary because each book began to be available for digital lending on a particular known date, so it makes sense to compare the commercial performance *before* that particular date with the commercial performance *after* that date. Purely annual data does not provide enough detail, particularly because sales of a particular book change so drastically within a year. (*The New York Times* publishes its bestseller lists weekly, after all, for this reason.)

Monthly data is also necessary because one issue in the case is whether commercial performance was affected differently during the National Emergency Library. This was the approximately three-month period, during the first wave of shelter-in-place orders that shuttered schools and libraries, when the Internet Archive made books available for lending without imposing the strict one-to-one "paper-copies-owned-to-digital-copies-loaned" ratio it imposes during normal operations. Without monthly data, there is no way to tell whether that short-lived emergency practice affected commercial performance.

For the reasons explained above, and pursuant to Local Rule 37.2 and Your Honor's Individual Practices Paragraphs 1F and 2B, Defendant respectfully requests a pre-motion conference with the Court to discuss: Plaintiffs' production of monthly commercial performance data since 2011 for all of their books in print during that period.

Respectfully submitted,



Joseph C. Gratz

JCG:co



21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Elizabeth A. McNamara**
(212) 489-8230 tel
(212) 489-8340 fax

lizmcnamara@dwt.com

August 12, 2021

<u>**VIA ECF**</u>

Hon Ona T. Wang
United States District Court
500 Pearl Street
New York, NY 10007
Wang_NYSDChambers@nysd.uscourts.gov

Re:  *Hachette Book Group, Inc. et al. v. Internet Archive*, 1:20-CV-04160-JGK

Dear Magistrate Judge Wang:

We represent plaintiffs Hachette Book Group, Inc, HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC ("Plaintiffs").  Plaintiffs respectfully submit this response to the August 9, 2021 letter motion filed by Internet Archive ("IA").

This lawsuit involves IA's industrial-scale copying and online distribution of Plaintiffs' and others' in-copyright books.  IA operates an illegal ebook distribution service that threatens to destroy the legal library ebook market and otherwise harm consumer book sales if left unchecked.  IA accumulates millions of hard copies of copyrighted books as cheaply as possible, scans them, and distributes digital scans of the entire book without a license to anyone in the world who signs up to IA's website.  IA argues that this is legal fair use under a manufactured theory called "controlled digital lending."

While Plaintiffs understand that IA has copied and distributed thousands of their books without authorization, this copyright infringement action identifies a representative subset of 127 books that are all currently licensed or sold as ebooks (the "Works in Suit"), ranging from classics by Zora Neale Hurston and J.D. Salinger to contemporary thrillers and romances.

Plaintiffs have produced a vast wealth of detailed sales and related financial data concerning the Works in Suit, totaling over 670,000 rows of data in Excel.  Now, after the close of document discovery and on the eve of depositions, IA seeks to compel the production of "commercial performance data," broken down by month, distribution channel, price and income, for *all* other books published by the Plaintiffs since 2011 – an undertaking that would involve a massive amount of data concerning more than 500,000 titles.

And IA makes this extraordinary demand in order to rifle through an enormous reservoir of highly proprietary data concerning books that are *not* the Works in Suit, all in an effort to somehow select "for each work in suit, one or more comparable books that were not available for digital lending" on IA's system.  Dkt. 47, 2.  In other words, because the significant financial data already provided concerning the Works in Suit apparently does not support IA's theory on

**DWT.COM**
Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.

Hon. Ona T. Wang
August 12, 2021
Page 2

market harm, IA wants access to millions of data points concerning Plaintiffs' entire book catalogues. IA argues it is entitled to do this in order to see if any evidence might exist to support the inherently incredible theory that copying entire books and distributing them to any member of the public worldwide upon demand does not compete with Plaintiffs' sales of the same books. Even worse, IA's quest rests on the palpably false theory that it can quantify the harm caused by its infringement by comparing the sales of completely different books. Books are not interchangeable widgets and marketplace performance is driven by countless indeterminate and changing facts.

In short, Defendant's letter motion should be denied because the enormous and costly burden to Plaintiffs far outweighs the negligible value (if any) of the evidence sought, especially given the lack of legally relevant results that it will yield and the delays it will cause to the case.

### THE DATA IA SEEKS IS NOT MATERIAL AND CREATES A MASSIVE BURDEN

Plaintiffs' books are distributed to millions of readers around the world through many legal channels, including a thriving market for library ebook lending. Plaintiffs sell or license ebooks to library aggregators, who provide ebook platforms that millions of library patrons use to borrow ebooks on their devices for free, instantaneously and lawfully, from any location, subject to certain limitations.

The fourth factor of the fair use analysis examines the potential market harm from Defendant's action. IA argues that it needs sales data or comparables "to argue that the challenged library lending practice did not affect commercial performance" of the Works in Suit. This argument wrongfully cabins and misinterprets the fourth factor of the fair use analysis and evidences a false assumption about what drives book sales.

The fourth factor looks beyond lost sales and focuses instead on "the effect of the [infringing use] upon the *potential* market for or value of the copyrighted work." 17 U.S.C. §107(4). "Critically, it requires consideration of 'not only … the market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" *Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 179-80 (2d Cir. 2018) (quoting *Campbell v. Acuff-Rose*, 510 U.S. 569, 590 (1994)).

Here, IA self-evidently harms Plaintiffs' existing markets by refusing to pay the customary fees that aggregators pay to distribute the same ebooks to library borrowers. The market harm compounds as others engage in the activity, destroying the vibrant market for licensed library ebook lending that currently exists. None of the requested data, or so-called "comparables," is necessary to or even related to this category of market harm.

Nor is the demanded sales data necessary to demonstrate potential market harm by showing that the "secondary use competes in the rightsholder's market as an effective substitute for the original." *Capital Records v. ReDigi Inc*, 910 F.3d 649, 662 (2d Cir. 2018). Over and over the Second Circuit has recognized that a non-transformative use of a work – as here – is likely to be "an effective substitute for the original." *Id*. at 662-63; *Authors Guild v. Google Inc.*,

Hon. Ona T. Wang
August 12, 2021
Page 3

804 F.3d 202, 223, 225-26 (2d Cir. 2015) (a book publisher would have a "strong" claim of market harm if their "claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public").

Even if sales data is the yardstick IA elects to focus on, to the extent that inquiry is relevant, Plaintiffs have already produced hugely detailed sales data relating to the Works in Suit for many years before and during IA's infringement.[1]  Seeking an additional "comparable" set of sales data for half of million other books is not only burdensome in the extreme, it is irrelevant.

*First*, IA's argument that there is no burden in producing the data is preposterous. Contrary to IA's suggestion that this information is available at the flip of a switch, the request would require Plaintiffs to pull masses of data from multiple databases, stitch it together and figure out a way to transfer enormous datasets in a way that they do not do in the ordinary course of business.  An analyst for one Plaintiff estimated that it would take his entire team several weeks or months working full time to compile the requested information – which would amount to hundreds of millions, if not billions, of rows of data.  The demand seeks access to data in a manner that lies far outside the bounds of how data is accessed, amassed or referenced by the Plaintiff publishers in the ordinary course of business and would involve incalculable employee time and significant resources. IA offers no precedent where a similar demand was allowed.[2]

*Second*, since books are not fungible widgets, the entire project rests on a false premise. There is no such thing as a "comparable book" – even if "comparable" is defined as some undefined period of sales data.  Should *Catcher in the Rye* have similar sales to a best-selling cookbook, no one could plausibly contend the two works were "comparable."  Moreover, sales vary dramatically over different periods of time, depending on countless events (*e.g.*, an author dies; the book is made into a movie; it receives a great review or is selected by a state for its curriculum).  No control group can begin to equate sales data.

In short, it is impossible to calculate the market harm of IA's infringement based on the crude comparison IA proposes because there are innumerable reasons why one book sells more copies than another that have nothing to do with IA's infringement.  IA's demand for this massive data rests on no coherent foundation.  It should be denied.

Respectfully submitted,


/s/ Elizabeth A. McNamara

---

[1] IA demands monthly sales data for the Works in Suit.  Plaintiffs have already produced monthly sales data from Hachette for 2020 and HarperCollins for a number of the works; the rest of the data reflects annual sales.  To produce additional monthly sales is both burdensome and not necessary.

[2] IA cites the inapposite *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008).  Despite IA's misleading parenthetical, that court's order compelling YouTube, the *defendant*, to produce a minimal quantity of data concerning certain non-infringing videos to support *plaintiffs'* infringement is irrelevant to IA's demand for billions of rows of data for every work published by Plaintiffs in the last decade.

Hon. Ona T. Wang
August 12, 2021
Page 4


cc:     Counsel of Record (via ECF)



21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Elizabeth A. McNamara**
(212) 603-6437 tel
(212) 379-5237 fax

lizmcnamara@dwt.com

January 14, 2022

Hon. Ona T. Wang
United States District Court
Southern District of New York
500 Pearl Street
New York, N.Y. 10007-1312

Re:     *Hachette Book Group, Inc. et al. v. Internet Archive et al.*,
        1:20-CV-04160-JGK (S.D.N.Y)

Dear Judge Wang:

        Pursuant to this Court's order at the December 2, 2021 conference (Dkt. 62), we write on behalf of all parties to provide the Court with a status report concerning the discovery disputes before the Court. At the December 2 conference, three letter motions were before the Court: Defendant's August 9, 2021 letter motion (Dkt. 47), Defendant's October 29, 2021 letter motion (Dkt. 54), and Plaintiffs' November 19, 2021 letter motion (Dkt. 58) (together, the "Letter Motions").

        We are pleased to inform the Court that, subject to meaningful compliance with the agreements reached, which are memorialized in a separate document, the parties have resolved the various issues identified in the Letter Motions, together with related discovery disputes. More specifically, the parties have agreed that in lieu of additional depositions, certain witnesses will provide declarations addressing identified issues/questions, and have agreed that certain additional documents will be produced (if available). Further, the parties have agreed that particular non-party depositions (and related document discovery) will occur at mutually agreed times outside the close of fact discovery pursuant to the Scheduling Order.

        Finally, the parties have mutually agreed on the attached proposed revisions to the current scheduling order dated September 8, 2021 (Dkt. 51), as amended by this Court at the December 2, 2012 conference (Dkt. 60). Because the Court extended the fact discovery deadline, it becomes necessary to also grant an extension of other case deadlines to ensure that the parties have sufficient time to complete expert discovery and summary judgment briefing.[1] The parties

_____

[1] Pursuant to this Court's Individual Rule I.e., the parties state that they requested two amendments of the case deadlines in this action. These requests were both granted. *See* Dkt. 44, 51.

**DWT.COM**

Anchorage | Bellevue | Los Angeles | New York
Portland | San Francisco | Seattle | Washington, D.C.
4895-8366-6185v.4 0092453-000002

Hon. Ona T. Wang
January 14, 2022
Page 2

also have adjusted the schedule to address the anticipated nature of expert testimony and briefing. We attach as Exhibit A the current scheduling order. We attach as Exhibit B the proposed dates for the Second Revised Scheduling Order. All parties respectfully request that the Court so-order this new proposed schedule.

Thank you for your consideration of this request.

Respectfully submitted,

Davis Wright Tremaine LLP

/s/ Elizabeth A. McNamara

Elizabeth A. McNamara


cc:    Counsel of Record (via ECF)

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

[~~PROPOSED~~] REVISED SCHEDULING ORDER

After reviewing the Letter Motion dated September 7, 2021 and for good cause shown,

the Court hereby orders that the following schedule will govern this civil action:

| | |
|---|---|
| Deadline to complete fact depositions (close of fact discovery) | Friday December 17, 2021 |
| Deadline to complete expert reports: issues on which each party bears the burden of proof | Thursday January 14, 2022 |
| Deadline to serve rebuttal expert reports: issues on which each party does not bear the burden of proof, but not limited to responding to the opening reports. Any response to the opening reports must be contained in the rebuttal reports, however. | Friday February 25, 2022 |
| Deadline to serve reply reports. Reply reports are limited to responding to the rebuttal reports. | Friday March 25, 2022 |
| End of all discovery | Friday April 1, 2022 |

1

| Deadline for dispositive motions | Friday April 29, 2022 |
| Briefs in opposition to dispositive motions due | Friday June 10, 2022 |
| Reply briefs in further support of dispositive motions due | Friday July 8, 2022 |

**SO ORDERED.**

Dated: _____9/8/21____, 2021

Honorable John G. Koeltl
United States District Judge

2

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

## [PROPOSED] REVISED SCHEDULING ORDER

After reviewing the Joint Letter dated January 14, 2022 and for good cause shown, the

Court hereby orders that the following schedule will govern this civil action:

| | |
|---|---|
| Deadline to complete fact depositions (close of fact discovery). | January 31, 2022 |
| Deadline to complete expert reports on issues on which each party bears the burden of proof (the "Opening Reports"). | February 25, 2022 |
| Deadline to complete expert reports on issues on which each party does not bear the burden of proof, but not limited to responding to the opening reports (the "Rebuttal Reports"). Any response to the Opening Reports must be contained in the Rebuttal Reports, however. | April 29, 2022 |
| Deadline to serve reply reports to the Rebuttal Reports. Reply reports are limited to responding to the Rebuttal Reports. | May 27, 2022 |
| End of all discovery, including expert depositions. | June 10, 2022 |
| Deadline for dispositive motions. | July 7, 2022 |
| Filings in opposition to dispositive motions due. | September 2, 2022 |

1

A-5254

| Reply filings in further support of dispositive motions due. | October 7, 2022 |
|---|---|

**SO ORDERED.**

Dated: _____, 2022

_____

Honorable Ona T. Wang
United States Magistrate Judge

# Exhibit 9 to McNamara Supplemental Declaration

# Filed Under Seal (A-5256)

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 10

Page 146

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5   HACHETTE BOOK GROUP, INC.,
     HARPERCOLLINS PUBLISHERS LLC,
 6   JOHN WILEY & SONS, INC., and
     PENGUIN RANDOM HOUSE LLC,
 7
                 Plaintiffs,
 8
             vs.                      No. 1:20-cv-04160-JGK
 9
     INTERNET ARCHIVE and DOES 1
10   through 5, inclusive,
11              Defendants.
     _____/
12
13
14
15   VIDEOTAPED RULE 30(B)(6) DEPOSITION OF INTERNET ARCHIVE
16                     BY LILA BAILEY
17                      Volume 2
18               Remote Zoom Proceedings
19               San Francisco, California
20               Tuesday, October 19, 2021
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Job No. 4842007
```

Page 215

1   answer.

2        Q.  BY MS. MCNAMARA:  Did you have any discussion

3   with Brewster Kahle about the content of the draft white

4   paper?

5             MR. GRATZ:  I'm sorry, objection.  Vague as to

6   time.

7        Q.  BY MS. MCNAMARA:  Prior to the publication of

8   the paper.

9             MR. GRATZ:  Okay.  And then same caution to the

10  witness regarding attorney-client communications.

11            If you can answer the question based only on

12  non-privileged conversations, you can answer; otherwise,

13  I instruct you not to answer.

14            THE WITNESS:  I don't recall having any such

15  conversations.

16       Q.  BY MS. MCNAMARA:  Okay.  Turning back again to

17  the first page of the white paper, do you see that it

18  includes that there are five different -- in the table of

19  contents, five different topics of the paper?

20       A.  I do.

21       Q.  And Topic 4 is "Takeaways:  System Design and

22  Risk Mitigation"?

23       A.  I see that.

24       Q.  And since you have looked at the paper, I

25  presume you have read that section?

Page 254

1   STATE OF CALIFORNIA      ) ss:

2   COUNTY OF MARIN          )

3

4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5   hereby certify:

6          That the foregoing deposition testimony was

7   taken before me at the time and place therein set forth

8   and at which time the witness was administered the oath;

9          That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16         I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20         IN WITNESS WHEREOF, I have subscribed my name

21  this 25th day of October, 2021.

22

23

24

25         LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Veritext Legal Solutions
www.veritext.com                                         888-391-3376

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 11

Page 1
Internet Archive Launches New Pilot Program for Interlibrary Loan – Internet Archive Blogs
http://blog.archive.org/2021/04/27/internet-archive-launches-new-pilot-program-for-interlibrary-loan/

# Internet Archive Blogs

*A blog from the team at archive.org*



| Blog | Announcements | 25th Anniversary | archive.org | About | Events | Developers | Donate |

## Internet Archive Launches New Pilot Program for Interlibrary Loan

Posted on April 27, 2021 by Brewster Kahle



*Photo by Alfons Morales on Unsplash*

The pandemic has resulted in a renewed focus on resource sharing among libraries. In addition to joining resource sharing organizations like the Boston Library Consortium, the Internet Archive has started to participate in the longstanding library practice of interlibrary loan (ILL).

Internet Archive is now making two million monographs and three thousand periodicals in its physical collections available for non-returnable fulfillment through a pilot program with RapidILL, a prominent ILL coordination service. To date, more than seventy libraries have added the Internet Archive to their reciprocal lending list, and Internet Archive staff are responding to, on average, twenty ILL requests a day. If your library would like to join our pilot in Rapid, please reach out to Mike Richins at Mike.Richins@exlibrisgroup.com and request that Internet Archive be added to your library's reciprocal lending list.

If there are other resource sharing efforts that we should investigate as we pilot our ILL service, please reach out to Brewster Kahle at brewster@archive.org.

Posted in Announcements, Books Archive, News | Tagged ill |

← Introducing 50+ New Public Library          Getting Started at the Internet Archive →



Search

### Recent Posts

- September Book Talk: The History of the Computer, Sep 15 (virtual)
- Book Talk: Surveillance State, Sep 14 (in-person)
- Introducing the 2022 DWeb Fellows
- Library Leaders Forum 2022: Registration now open
- Launching Legal Literacies for Text Data Mining – Cross Border (LLTDM-X)

### Recent Comments

- mib on Book Talk: Surveillance State, Sep 14 (in-person)
- Dejan on September Book Talk: The History of the Computer, Sep 15 (virtual)
- aho on Book Talk: Surveillance State, Sep 14 (in-person)
- Jan Savanyu on Book Talk: Surveillance State, Sep 14 (in-person)
- Ken Fisher on Book Talk: Surveillance State, Sep 14 (in-person)

### Categories

- 78rpm
- Announcements

Members of the Internet Archive's Community

Webs Program

- Archive Version 2
- Archive-It
- Audio Archive
- Books Archive
- Cool items
- Education Archive
- Emulation
- Event
- Image Archive
- Jobs
- Lending Books
- Live Music Archive
- Movie Archive
- Music
- News
- Newsletter
- Open Library
- Past Event
- Software Archive
- Technical
- Television Archive
- Uncategorized
- Upcoming Event
- Video Archive
- Wayback Machine – Web Archive
- Web & Data Services

## Archives

Select Month

## Meta

- Log in
- Entries feed
- Comments feed
- WordPress.org

Proudly powered by WordPress

# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 12

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4

 5    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 6    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 7

               Plaintiffs,

 8

          vs.                    No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11               Defendants.

      _____/

12

13

14

15         VIDEOTAPED RULE 30(b)(6) AND PERSONAL

16            DEPOSITION OF JACQUES CRESSATY

17            Remote Zoom Proceedings

18            San Francisco, California

19            Friday, October 22, 2021

20

21

22

23    REPORTED BY:

24    LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25    Pages 1 - 276                    Job No. 4857811
```

Page 214

```
1              MS. LANIER:  Great.

2              THE VIDEOGRAPHER:  We are off the record.  The

3     time is 3:16 p.m.

4              (Recess.)

5              (Exhibit 90, INTARC00137129 - 135, marked for

6              identification electronically by counsel.)

7              (Exhibit 91, INTARC00137136 - 39, marked for

8              identification electronically by counsel.)

9              (Exhibit 92, Letters from USAC Schools &

10             Libraries Division, marked for identification

11             electronically by counsel.)

12             (Exhibit 93, INTARC00137116 - 128, marked for

13             identification electronically by counsel.)

14             THE VIDEOGRAPHER:  We are back on the record.

15    The time is 3:30 p.m.

16        Q.  BY MR. BROWNING:  Good to see you again,

17    Mr. Cressaty.  When we left off, we were trying to upload

18    Exhibit 90.  We have now succeeded.  Could you open up

19    that document, please?

20             Do you have it in front of you?

21        A.  It's uploading.

22        Q.  Great.

23        A.  Okay.

24        Q.  Mr. Cressaty, have you seen this document

25    before?
```

```
 1       A.  Yes, I have.

 2       Q.  What is it?

 3       A.  This is a grant from LSTA to Internet Archive.

 4       Q.  And I'm going represent to you that this is the

 5   grant that was referred to in the letter marked as

 6   Plaintiffs' Exhibit 89, the State of California.  Does

 7   that make sense to you?

 8            MS. LANIER:  Objection.  Foundation.

 9            THE WITNESS:  Are you talking about the previous

10   letter?

11       Q.  BY MR. BROWNING:  So just to recap, Plaintiffs'

12   Exhibit 89 was a letter from the California State Library

13   announcing that Internet Archive had been given LSTA

14   funding.  This document, Plaintiffs' 90, I am

15   representing to you that it is the notification of grant

16   award for the grant that was referred to in the letter we

17   were previously discussing.

18            Do you have any reason to believe that's not the

19   case?

20            MS. LANIER:  Objection.  Calls for speculation.

21            THE WITNESS:  I don't know.  I assume so.

22       Q.  BY MR. BROWNING:  Just seeing if I can find a

23   date there which might help us.

24            Could you go to page 5 PDF?  It's got a heading

25   "LSTA Grant Award Documentation."
```

Page 216

1          Do you see that?

2      A.  I'm sorry?

3      Q.  Do you see the page with the heading "LSTA Grant

4  Award Documentation" on page 5 of 7?

5      A.  Yes.  Yes, I see it.  Yeah.

6      Q.  Great.

7          And do you see below that it says, "Approval

8  date," July 10, 2007?

9      A.  No.  This is -- yeah, July 10th.  Yes.

10     Q.  Could you do me a favor and hit on your

11  browser -- in the bottom left corner there's a button

12  that says previous file.  Would you hit previous file,

13  please?

14         And let me know when you can see Plaintiffs'

15  Exhibit 89.

16     A.  Okay.

17     Q.  Okay.  Do you in the first paragraph of the text

18  it says that the LSTA funding is for July 1, 2007, to

19  June 30th, 2008?

20     A.  I do.

21     Q.  Does it, therefore, stand to reason that

22  Plaintiffs' 90 is a confirmation of that grant award,

23  since the dates aligned?  You previously agreed with me

24  that the approval date was July 2007.

25     A.  It does, but it's also confirmation that

1    Internet Archive is a library.

2         Q.  I understand that's your position, but I think

3    we're on the same page, which is the letter on -- as

4    Exhibit 89 is related to the grant on 90.  I think we can

5    agree on that; right?

6         A.  Let me go back to the other one.

7         Q.  Okay.

8         A.  Okay.

9         Q.  Great.  And then, Mr. Cressaty, back on

10   Plaintiffs' Exhibit 90, is this an example of a

11   restricted grant, as we previously used and defined that

12   term?

13             MS. LANIER:  Objection.  Scope.

14             THE WITNESS:  It is restricted as to what the

15   money is supposed to be used for.

16        Q.  BY MR. BROWNING:  What is it supposed to be used

17   for?

18        A.  To provide one web page per book.

19        Q.  And to your knowledge, does the one web page per

20   book project required in this document have anything to

21   do with the lending library.

22             MS. LANIER:  Objection.  Scope.

23             THE WITNESS:  My understanding is that

24   OpenLibrary.org is a card catalog.

25        Q.  BY MR. BROWNING:  That's my understanding as

Page 218

1  well, so is it your understanding that this grant was to

2  build the card catalog?

3      A.  I would say yes.

4      Q.  Great.

5          And the card catalog is separate from the

6  lending library, which actually allows you to go a step

7  further and borrow books; right?

8          MS. LANIER:  Objection.  Scope.

9          THE WITNESS:  That, I don't know.

10     Q.  BY MR. BROWNING:  Okay.  But on the basis of

11  this document, there is nothing in here that causes you

12  to believe that the funding was provided for Controlled

13  Digital Lending or the lending library; right?

14         MS. LANIER:  Objection.  Scope.

15         THE WITNESS:  I don't know that Controlled

16  Digital Lending existed in 2007.

17     Q.  BY MR. BROWNING:  I can represent to you that it

18  did not, and so I think that answers my question.

19         On page 3 of this document do you see at the

20  bottom of -- let me know when you're there.

21         Okay.  The first heading, "Consolidated

22  Application Notification."  The bottom of that first

23  paragraph says, "The total amount paid by the California

24  State Library to the subgrantee," i.e. Internet Archive,

25  "under this agreement shall not exceed $342,000 and

1    change and shall be expended/encumbered in the period

2    ending June 30, 2008."

3            Do you see that?

4        A.  Is that the first paragraph on that page 3?

5        Q.  Yes.  It's the end of that first paragraph on

6    page 3.  Sorry.  I was a bit unfair.  I started in the

7    middle of a sentence, but it's the time period that I'm

8    most interested in.

9        A.  Okay.

10       Q.  So if I'm understanding that correctly, and

11   correct me if I'm wrong, this grant was time limited and

12   the money was to be used on or before June 30th, 2008;

13   correct?

14       A.  That is correct.

15           MS. LANIER:  Objection.  Scope.

16       Q.  BY MR. BROWNING:  Great.

17           MR. BROWNING:  Carl -- or actually, we've

18   already -- we've preloaded this one, so Carl doesn't need

19   to do anything.

20       Q.  Jacques, could you go back into the shared

21   folder and please open up Exhibit 91.

22           Oh, my apologies.  We're actually going to be

23   looking at a different exhibit entirely.  Stand by,

24   please.

25           Okay.  Back in the Marked Exhibits folder,

```
                                                      Page 276

  1   STATE OF CALIFORNIA    ) ss:

  2   COUNTY OF MARIN        )

  3

  4          I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

  5   hereby certify:

  6          That the foregoing deposition testimony was

  7   taken before me at the time and place therein set forth

  8   and at which time the witness was administered the oath;

  9          That testimony of the witness and all objections

 10   made by counsel at the time of the examination were

 11   recorded stenographically by me, and were thereafter

 12   transcribed under my direction and supervision, and that

 13   the foregoing pages contain a full, true and accurate

 14   record of all proceedings and testimony to the best of my

 15   skill and ability.

 16          I further certify that I am neither counsel for

 17   any party to said action, nor am I related to any party

 18   to said action, nor am I in any way interested in the

 19   outcome thereof.

 20          IN WITNESS WHEREOF, I have subscribed my name

 21   this 28th day of October, 2021.

 22

 23

 24

 25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462
```

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 13

Page 1
The Glass Castle by Jeannette Walls - OverDrive: ebooks, audiobooks, and more for libraries and schools
https://www.overdrive.com/media/286580/the-glass-castle





Page 1
The Hunger Games by Suzanne Collins - OverDrive: ebooks, audiobooks, and more for libraries and schools
https://www.overdrive.com/media/859111/the-hunger-games











# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 14

Page 1
The Palace of Illusions by Chitra Banerjee Divakaruni - OverDrive: ebooks, audiobooks, and more for libraries and schools
https://www.overdrive.com/media/147868/the-palace-of-illusions



Page 2
The Palace of Illusions by Chitra Banerjee Divakaruni - OverDrive: ebooks, audiobooks, and more for libraries and schools
https://www.overdrive.com/media/147868/the-palace-of-illusions

Copyright 2022 - All rights Reserved

Privacy Policy | Terms & Conditions | Accessibility | Cookie settings



Page 1
Victory Song by Chitra Banerjee Divakaruni · OverDrive: ebooks, audiobooks, and more for libraries and schools
https://www.overdrive.com/media/1860530/victory-song









SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 15

```
                                            Page 1

  1                  Benjamin H. Saracco

  2

  3          IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF NEW YORK

  4

  5                       - - -

  6

     HACHETTE BOOK GROUP, INC.,:  Civil Action
  7  ET AL,                    :  No. 1:20-cv-04160-JGK
                               :
  8            Plaintiffs,     :
                               :
  9        vs.                 :
                               :
 10  INTERNET ARCHIVE, ET AL,  :
                               :
 11            Defendants.     :
 12                       - - -
 13
                   TUESDAY, MARCH 15, 2022
 14
 15                       - - -
 16
 17
 18     Remote Zoom Videotaped Deposition of
 19  BENJAMIN H. SARACCO, taken pursuant to Notice,
 20  in New Jersey, commencing at approximately
 21  11:06 a.m., on the above date, before Rose A.
 22  Tamburri, RPR, CM, CCR, CRR, USCRA Speed and
 23  Accuracy Champion and Notary Public.
 24
 25                       - - -
```

Page 252

1    library was closed, I already knew as a matter

2    of fact through regular, you know, going to

3    work every day and fielding questions in

4    emails that the BLS and ACLS manuals, for

5    whatever reason decided by my library's

6    administration, were made available through

7    physical copies.

8              MR. BROWNING:  Understood.

9              Bill, could you put up Tab 11,

10   please.

11             (Whereupon, a document was marked,

12   for identification purposes, as Saracco

13   Exhibit 11.)

14             MR. BROWNING:  And let me know

15   when you can see this.

16             THE WITNESS:  I have it.

17   BY MR. BROWNING:

18      Q.   So this is Saracco Exhibit 11, I'm

19   going to represent to you, is a web page I

20   accessed, either yesterday or the day before,

21   on the American Heart Association's website.

22   It says, "ACLS Provider Manual eBook."

23             I am going to represent to you,

24   Ben, this is an eBook version of the Advanced

25   Cardiovascular Life Support book.  My question

Page 253

```
 1   is this:
 2               Have you ever seen this web page
 3   before?
 4       A.   I don't ever recall ever seeing this
 5   exact web -- this exact web page.
 6       Q.   If you had seen -- sorry, go ahead.
 7   I didn't mean to interrupt you.
 8       A.   No, that was all.
 9       Q.   Okay.
10               And I am going to represent to you
11   that this is a page through which you can
12   purchase a version of the -- the ACLS manual
13   eBook.
14               Do you have any reason to doubt
15   that?
16       A.   No.  And I will amend my previous
17   testimony.  So before I was right when I said
18   it was the American Heart Association, so that
19   makes me think that maybe in some time past, I
20   had seen this website and -- because how else
21   would I -- well, I could have seen the cover
22   of a book also that would let me know that,
23   but I just want to be fair that I don't want
24   to make that statement.
25       Q.   Yeah.
```

Page 254

1    A.   Make -- that there's -- there's
2  possibility -- I mean, I visit hundreds of
3  websites a day for books when I search for a
4  book, and it's possible I've seen this website
5  before.
6    Q.   Totally -- totally understood.
7         But, I mean, I guess -- I guess
8  what I'm getting at is, at the time we were
9  discussing when you directed patrons or
10  students to the Internet Archive, to the best
11  of your recollection, as you sit here today,
12  you were not available -- you were not aware
13  that the ACLS provider manual was available as
14  an eBook; is that right?
15    A.   You broke up a bit there.  I was not
16  aware that what?
17    Q.   That this ACLS provider manual was
18  available as an eBook?
19    A.   Well, it wasn't available as eBook on
20  the platform that we had.
21    Q.   Yep.
22         But do you ever -- and I am not --
23  I don't mean you, personally, here, but are
24  there ever times where people who are
25  authorized to talk with publishers to see if

they can get preferential access to eBooks or licensed eBooks?

A. Preferential access? I'm not sure what that means.

Q. Strike that. That's a terrible question.

Are there ever times where people who are not you, but representatives of the library, negotiate with publishers for eBooks?

A. They negotiate for platforms that contain eBooks.

Q. Okay.

A. And it's possible in one of those platforms -- a lot of times, these eBooks are in packages or bundles. Again, this is not my area of professional duties, so I can't really speak as to how that works and how they -- they do that.

But yes, they certainly subscribe to platforms that might make it available. You know, sometimes vendors -- I mean, we have 6 to 8,000 employees at Cooper Health, you know, 20,000 student enrollment at Rowan University, not counting any -- any of the staff. There's a lot of factors that go into

Page 256

 1  whether a vendor would even want to make

 2  materials available to you sometimes.  So

 3  again, it's not my area of expertise.

 4      Q.   Sure.

 5      A.   But, yeah.

 6      Q.   But to the best of your knowledge,

 7  nobody at Rowan University reached out to the

 8  American Heart Association while your library

 9  was closed down to ask for free copies of the

10  eBook?

11      A.   For free copies?

12      Q.   Correct.

13          MS. LEE:  Objection to form.

14          THE WITNESS:  I'm sorry, could you

15  repeat the question?  I didn't hear part of

16  it.

17          MR. BROWNING:  Sure.  So let me --

18  let me preface with another representation.

19  BY MR. BROWNING:

20      Q.   Are you aware that during the

21  pandemic, certain publishers offered either

22  free or discounted copies of eBooks to cover

23  for books that were -- physical books that

24  were unavailable?

25      A.   EBooks, no, I'm not familiar with it.

Page 257

1  I know some of the databases made, like, free

2  access for a period of time.  I can't tell you

3  a specific example, but I sort of vaguely

4  remember a couple of databases doing that.

5      Q.  So I guess the question I was asking

6  is, are you aware of anyone from Rowan

7  University contacting the American Heart

8  Association and asking for free or discounted

9  copies of the ACLS provider manual eBook to

10  replace the locked-down physical copies?

11      A.  During COVID, did anybody reach out

12  to them and ask for free copies?

13      Q.  Right.

14      A.  No.  I -- I -- I -- I certainly

15  didn't and I don't know of anyone else that

16  did that.  And I think that that would be not

17  standard practice.  I think it's, you know,

18  publishers -- I -- I don't think that that

19  would be standard practice, just asking for

20  free things from publishers.

21      Q.  Okay.

22          MR. BROWNING:  And, Bill, could

23  you put on Tab 13B.  It's a spreadsheet.

24          (Whereupon, a document was marked,

25  for identification purposes, as Saracco

Page 318

```
 1              C E R T I F I C A T E
 2
 3         I do hereby certify that I am a
    Notary Public in good standing, that the
 4  aforesaid testimony was taken before me,
    pursuant to notice, at the time and place
 5  indicated; that said deponent was by me duly
    sworn to tell the truth, the whole truth, and
 6  nothing but the truth; that the testimony of
    said deponent was correctly recorded in
 7  machine shorthand by me and thereafter
    transcribed under my supervision with
 8  computer-aided transcription; that the
    deposition is a true and correct record of the
 9  testimony given by the witness; and that I am
    neither of counsel nor kin to any party in
10  said action, nor interested in the outcome
    thereof.
11
          WITNESS by hand and official seal
12  this 15th day of March, 2022.
13
14
15                          Notary Public
16
17                          Job No. MW5127536
18
19
20
21
22
23
24
25
```

SUPPLEMENTAL McNAMARA DECLARATION

EXHIBIT 16

9/2/22, 4:28 PM

Case 1:20-cv-04160-JGK-OTW Document 108-1 Filed 07/07/22 Page 2 of 12
Signatories to the Position Statement on Controlled Digital Lending by Libraries

# Signatories to the Position Statement on Controlled Digital Lending by Libraries

**Institutional**

**Anabaptist Mennonite Biblical Seminary Library**

**Asociación Nacional de Bibliotecarios, Archivistas y Afines de Venezuela (ANBAA)**

**Association of Research Libraries**

**Association of Southeastern Research Libraries (ASERL)**

**Better World Books**

**Center for Research Libraries (CRL)**

**Chief Officers of State Library Agencies**

**City University of New York Office of Library Services**

**Clemson University**

**College of Staten Island, CUNY**

**Colorado Alliance of Research Libraries**

**Cornell University Library**

**Council of Connecticut Academic Library Directors (CCALD)**

**Digital Library Federation**

**Florida Virtual Campus (FLVC)**

**Fondazione Casa di Oriani - Ravenna**

**Harvard Graduate School of Education Gutman Library**

**Ithaca College Library**

**James Madison University**

**James Madison University**

**Johns Hopkins University Libraries**

**Kalamazoo College Library**

A-5293

LaGuardia Community College Library Department

Legal Information Preservation Alliance (LIPA)

Lehigh University Library

Lore Media Inc

Metropolitan New York Library Council

New York Theological Seminary

Open Humanities Press

Ruth Enlow Library of Garrett County

San Francisco Public Library

SCELC

South Central Regional Library Council

SPARC

SportsLibrary.org

St. Mary's County Library

Substance Abuse Librarians & Information Specialists (SALIS)

Texas A&M University

The Council of Connecticut Academic Library Directors (CCALD)

UC Riverside Library

UC Santa Barbara

UConn Library

University of Oklahoma Libraries

University of Colorado – Boulder

Ursula C. Schwerin Library, NYC College of Technology, City University of New York

Vermont Mutual Aid Society

Individual

Matt Abbott
Hamilton Public Library
Manager, Collections & Extension Services

Yasmine Abou-El-Kheir
Chicago Theological Seminary

A-5294

Director, Lapp Learning Commons

**Maria Aghazarian**
Swarthmore College Libraries
Scholarly Communications Librarian

**Jaime Anderson**
Sonoma County Library
Collection Services Division Manager

**Neal Baker**
Earlham College
Library Director

**Alexis Beaman**
University of Oklahoma Libraries
Interlibrary Loan Manager

**Howard Besser**
New York University
Professor of Cinema Studies & Founding Director of Moving Image Archiving & Preservation

**James Anthony Carneiro**
Self
Digital Lending Advocate

**Daniel Clarkson Fisher**
Western University
MLIS student

**Daniel Clarkson Fisher**
Western University
MLIS student

**Perry Collins**
University of Florida
Scholarly Communications Librarian

**Lindsay Cronk**
University Of Rochester
Head of Collection Strategies and Scholarly Communications

**Tony Del Monaco**
Hamilton Public Library
Director, Finance & Facilities

**Melinda Dolan**
Phillips Exeter Academy Library
Systems Coordinator Librarian

A-5295

**Tinghui Duan**
Friedrich Schiller University Jena
Mr.

**Tinghui Duan**
Friedrich Schiller University Jena, Germany
Research Assistant

**Ellen Dubinsky**
University of Arizona
Scholarly Communication Librarian

**Corie Dugas**
NELLCO Law Library Consortium, Inc.
Executive Director

**Heather Edmonds**
New England College of Optometry Library
Director of Library Services

**Nancy Falciani-White**
McGraw-Page Library, Randolph-Macon College
Library Director

**Joshua Finnell**
Colgate University
Interim Associate University Librarian

**Arturo E. García Niño**
Universidad Veracruzana, México
Doctor en Historia y estudios Regionales, Profesor Investigador

**Justin A. Gardner**
APH Migel Collection
Special Collections and Cataloging Librarian

**Nicholas Gardner**
Potomac State College
Library Director

**Laureano Gomez**
Metabiblioteca
Librarian

**Cheryl Gowing**
University of Miami
Assoc.,Dean, Library Information Systems & Facilities

**Stephanie Gross**

A-5296

Yeshiva University
Librarian

**Kristen Heldmann**
Emporia State University
graduate student

**Robert Heyer-Gray**
University of California, Davis
Head of Collection Strategies

**Robert Heyer-Gray**
University of California, Davis
Head of Collection Strategies

**Adrian Ho**
University of Kentucky Libraries
Director of Digital Scholarship

**Alex R. Hodges**
Harvard University
HGSE Faculty & Director, Gutman Library

**Ulysses Jaen**
Ave Maria Law
Director & Associate professor

**Brian Kaggwa**
Bromley&co
Founder

**Mothupi Kgatshe**
Guluva - Online
Editor-at-Large

**Rebekah Kim**
California Academy of Sciences
Head Librarian

**Matthew Kopel**
Cornell University Library
Copyright Specialist

**Breac Krash**
University of Massachusetts Amherst
Associate Dean, Content & Discovery, Univesity Libraries

**Cindy Kristof**
Kent State University

A-5297

Head, Copyright & Scholarly Communication

**Renee Kuhles**

Austin Community College

Faculty Librarian

**Shruti Kulkarni**

Evangelical Lutheran Church in America

Ms.

**Sue Kunda**

Western Oregon University

Scholarly Communication and Social Science Librarian

**Meghan Kwast**

California Lutheran University

Head of Collection Management Services

**Lawrence Lessig**

Harvard Law School

Roy L. Furman Professor of Law and Leadership

**Allison R Lightfoot**

Story Library at Central Baptist College

Public Services Librarian

**Adriene Lim**

University of Maryland, College Park

Dean of University Libraries

**Joe Lucia**

Temple University

Dean of Librariws

**Stavros Macrakis**

Travel Guide Systems

Founder

**Peter Mahler**

The Mahler-Vidal Archives

Curator

**David B. Malone**

Calvin University

Dean of the Library

**Amada MARCOS**

IE University

Dean of Librarians

A-5298

**Howard C Marks**
Midland College
Director, Learning Resource Center

**Stephen Marsh**
Ontario Tech University
Associate Professor of Trust Systems

**Daria Masia**
Brent Libraries
Ms

**Maurine McCourry**
Hillsdale College
Library Director

**Brian McMillan**
University of Western Ontario
Director, Music Library

**Laura McShane**
Cleveland Public Library
Librarian

**Rebecca Meng**
Memorial Sloan Kettering Cancer Center
Librarian, Document Delivery Services

**Karen Milligan**
Hamilton Public Library
Manager, Local History & Archives

**Silvio Muñoz**
Vicens Vives
International Business Director

**Victoria Murgante**
Essa Public Library
Public Service Representative

**Rebecca L Nesvet**
University of Wisconsin
Dr

**Bethany Nowviskie**
Digital Library Federation
Director, Digital Library Federation

**James O'Donnell**

A-5299

Arizona State University
University Librarian

**Jim O'Donnell**
Arizona State University
University Librarian

**Romy Otayek**
Coop HEC
Libraire

**Leah Prescott**
Georgetown University Law Library
Associate Law Librarian for Digital Initiatives and Special Collections

**Raghavendra K R**
National Institute Of Fashion Technology, Bengaluru
Head Resource Centre

**Kenn Rabin**
Fulcrum Media Services
Owner

**Dr. Priya Rai**
National Law University Delhi, India
Head, Justice T.P.S. Cahwla Law Library

**Barbara J Ramsay**
University of WI Law Library
Evening / Weekend Supervisor

**Wilhelmina Randtke**
Florida Academic Library Services Cooperative
Digital Library Services and Open Educational Resources Coordinator

**Rebecca Richardson**
Purdue University Libraries
Assistant Dean for Collections and Access

**Rebecca Richie**
Eternity Bible College
Director of Student Resources

**Michael Rodriguez**
University of Connecticut Library
Collections Strategist

**Robert Roose**
Spokane Public Library

A-5300

Support Services Director

**Aida Rudnik**
Hamilton Public Library
Manager, Technical Services

**Karen Rupp-Serrano**
University of Oklahoma Libraries
Associate Dean, Scholarly Communication and Resources

**Austin Schertz**
Better World Books
Director of Development

**Simone Schloss**
Teachers College Columbia University
Assistant Acquisitions Librarian

**Jeff Sharpe**
Internet Archive
Senior Digitization Manager

**Dr. Akash Singh**
National Law University Delhi
Assistant Librarian

**Robin N Sinn**
Johns Hopkins University
Coordinator, Office of Scholarly Communication

**Geoffrey Skinner**
Sonoma County Library
Librarian

**Monica Socol**
Hamilton Public Library
Manager, Digital Technology Services

**Stephen Spong**
Centennial College
Copyright Services Librarian

**Michelle Sprague**
Goffstown Public Library
Adult Services & Outreach Library Assistant

**Laurisa Stubblefield**
Boley Law Library, Lewis and Clark Law School
Circulation and Resource Sharing Librarian

Peter Suber
Harvard University
Director, Office for Scholarly Communication

Laurie Taylor
University of Florida
Senior Director for Library Technology and Digital Strategies

Michelle Tian
Princeton University
Ms

Samuel Trosow
University of Western Ontario; Faculty of Law and Faculty of Information & Media Studies
Associate Professor

Michelle M. Trumbo
Legal Information Preservation Alliance
Executive Director

Matt Upson
Oklahoma State University Libraries
Associate Dean, Research & Learning Services

Patrick R. Wallace
Middlebury College
Digital Projects & Archives Librarian

Lisa Radha Weaver
Hamilton Public Library
Director Collections and Program Development

Aly Wepplo
The Community Library, Ketchum
Media and Digital Librarian

Andrew White
Wesleyan University
University Librarian

NANCY ZANDER
ILLINOIS WESLEYAN UNIVERSITY
PROFESSOR EMERITI

A-5302

 (https://creativecommons.org/licenses/by/4.0)    Creative Commons Attribution (CC-BY)
creativecommons.org/licenses/by/4.0

(https://creativecommons.org/licenses/by/4.0)

A-5303

# SUPPLEMENTAL McNAMARA DECLARATION

# EXHIBIT 17

**From:** Jones, Candacey
**To:** Silverman, Adam; Rosen, Andrea
**Sent:** 5/4/2020 10:56:30 AM
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

We're happy to handle the paperwork. We'll ask the digital accounting team to create a proforma for these titles/quantities that Mackin can use to remit payment.

Thanks,
Candacey

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, May 01, 2020 9:40 AM
**To:** Jones, Candacey <Candacey.Jones@HARPERCOLLINS.com>; Rosen, Andrea <Andrea.Rosen@HARPERCOLLINS.com>
**Subject:** FW: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Looks like we are set to go.  Do you want to handle paperwork?

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Friday, May 1, 2020 9:11 AM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

Good news! It sounds like CPS will move forward with these two titles.

Best,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540  |  f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin
Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Thursday, April 30, 2020 12:56 PM
**To:** Laura Bunn <laura.bunn@mackin.com>

Highly Confidential - Attorneys' Eyes Only

A-5305

HC0015518

**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

OK. We really can't go below where we are now.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Thursday, April 30, 2020 1:33 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam.

Thanks for the explanation. CPS was hoping to pay ▮▮▮▮ per title purchased through Mackin, but now that I know ▮▮▮▮ is owed to HarperCollins from Mackin on each title, we will need to determine what price we can offer them.

I'll let you know if we're able to make this work.

Best,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin
Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Thursday, April 30, 2020 12:26 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

The price quoted is the wholesale cost to HarperCollins. Bulk sales do not work utilize a DLP and discount rate, HarperCollins is offering a deep wholesale discount. Based on anticipated usage the cost per unit is as follows,
Pride:

New Kid

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Thursday, April 30, 2020 12:56 PM



Highly Confidential - Attorneys' Eyes Only

HC0015519

A-5306

**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam.

Thanks so much! We can guarantee that access will be capped at the numbers below for the respective titles.

To clarify, Mackin will charge CPS ████ per title for the access period, and then Mackin will pay HarperCollins per our standard reseller discount ████ per title.
Please confirm I have that correct and we'll move forward with the quote.

Thanks again!



**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

---

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Thursday, April 30, 2020 11:45 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

It looks like we can move forward.  For clarity, HarperCollins is able to proceed if CPS and Mackin are committing to paying ████ each book in the program regardless of what's downloaded and that they will cap Pride at 104,733 students and New Kid  80,662 students.

Adam

---

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Thursday, April 30, 2020 12:30 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Thank you!



**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

Highly Confidential - Attorneys' Eyes Only

HC0015520

A-5307

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Thursday, April 30, 2020 11:14 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Sorry, let me check.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Thursday, April 30, 2020 12:13 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

I'm checking in to see if you have an answer for CPS? They are eager for us to send them a quote.

Thanks,
Laura

**Laura Bunn**
**Publisher Relations & B2B Coordinator**

p 800.245.9540  |  f 800.369.5490  |  w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Wednesday, April 29, 2020 4:28 PM
**To:** 'Silverman, Adam' <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Thank you for the update.

**Laura Bunn**
**Publisher Relations & B2B Coordinator**

p 800.245.9540  |  f 800.369.5490  |  w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Wednesday, April 29, 2020 3:44 PM
**To:** Laura Bunn <laura.bunn@mackin.com>



Highly Confidential - Attorneys' Eyes Only

A-5308

HC0015521

**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

I just got off the phone with m colleagues. If not by end of business today I will have an answer tomorrow morning.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Wednesday, April 29, 2020 4:32 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

Thanks so much for the update!

In case it helps your conversation. We learned today that CPS will only need access through 6/17, which is shorter than the 8-week period they originally asked for. This does not affect the ▮▮▮ per title pricing they are requesting.

Also, sorry I didn't check already, but can you confirm that we will still get our standard ▮▮▮ reseller discount on this purchase?

Thanks again,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Wednesday, April 29, 2020 2:02 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

I am speaking with my colleagues at 4 PM and will get back to you asap.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Wednesday, April 29, 2020 8:48 AM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Highly Confidential - Attorneys' Eyes Only

HC0015522

A-5309

HC0015523

**Importance:** High

Hi Adam,

Sorry to follow up so soon, but we are hoping to get an answer ASAP. CPS wanted to get a quote yesterday and they intend to place their order as soon as they have it.

Please feel free to give me a call if you have any questions.

Best,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Tuesday, April 28, 2020 2:21 PM
**To:** 'Silverman, Adam' <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools
**Importance:** High

Hi Adam,

Thank you so much for your patience in waiting to hear from CPS. The district decided that they would like to purchase two of the four HarperCollins titles they were looking at, PRIDE and NEW KID, at ███ per title for 8-week multi-user access. The 8 weeks would begin on the date that the titles become available in their MackinVIA account. Mackin will ensure usage does not exceed the 104,733 students who need access to PRIDE and the 80,662 students who need access to NEW KID.

Please let us know if it is okay to move forward at this pricing. We need to issue CPS a formal quote before they can make their purchase, and they need the quote ASAP.

Thanks again for all of your help and patience throughout this process!

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Thursday, April 23, 2020 12:21 PM

Highly Confidential - Attorneys' Eyes Only

A-5310

**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

No worries.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Thursday, April 23, 2020 1:19 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

Sorry for the delay. Our rep is talking to Chicago today and should have their decision by the end of the day tomorrow. If they want to proceed with just two titles, we will be able to put a cap on usage—what quantity would you want us to cap it at?

Thanks again for all your help throughout this process. It has been lengthier than we hoped, but we think we're finally getting there!

Best,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Monday, April 20, 2020 1:13 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

As we are now discussing two books would it be possible to agree to a cap on usage? We can build in some extra so CPS has enough to meet its needs.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Monday, April 20, 2020 10:18 AM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Thanks, Adam!

Highly Confidential - Attorneys' Eyes Only

HC0015524

A-5311

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Monday, April 20, 2020 8:56 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

I hope you had a good weekend.  Let m check.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Monday, April 20, 2020 9:24 AM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam.

I hope you had a great weekend!

After our rep's meeting with Chicago on Friday, the district had a question: They would like to know if HarperCollins would consider ¼ of the ████ for a single title instead of all 4. They're most interested in POET X and NEW KID and wondering if they did just these two titles if it would be ████ each.

Please let me know.

Thanks,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Laura Bunn <laura.bunn@mackin.com>

Highly Confidential - Attorneys' Eyes Only

A-5312

**Sent:** Friday, April 17, 2020 3:18 PM
**To:** 'Silverman, Adam' <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Great, thanks Adam. Our rep's meeting with CPS was pushed back to 4:00pm CST today, so hopefully we'll have an update for you soon.

Thanks again for all your help!

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

---

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, April 17, 2020 12:13 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Correct.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Friday, April 17, 2020 1:06 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

That's totally understandable. I'll confirm that we will be able to get you a usage report at the end of the 8-week period should CPS agree.

Just to confirm next steps:
• Mackin will propose multi-user access for all four titles for 8 week for ▉▉▉▉ total
• If CPS is interested, you'll take that pricing back for approval

Does that look correct to you?

Thanks!

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

Highly Confidential - Attorneys' Eyes Only

HC0015526

A-5313

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, April 17, 2020 12:02 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

That is fine. We would like to get a usage report at the end of the program – this would just be how many students in total read each book. We would not want any personal information or data related to reading. Just a topline we can give the authors at the end.

Before I take this back for approval can you confirm CPS will accept these terms?

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Friday, April 17, 2020 12:57 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

You would not have to worry about the general public gaining access. Only CPS students who have MackinVIA accounts would be able to access the titles, even if they are multi-user.

Does that help clarify things?

Thanks!

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540  | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, April 17, 2020 11:45 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

Our concern is making sure that only district students can access. We do not want the general public to have access.

adam

Highly Confidential - Attorneys' Eyes Only

HC0015527

A-5314

From: Laura Bunn <laura.bunn@mackin.com>
Sent: Friday, April 17, 2020 12:42 PM
To: Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
Subject: RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam.

Yes, that is all correct. I do want to comment quick on your use of "verified students". If we give open/multi-user access to all students in the district, our platform does not have a way to only give access to the 80,662 students who need access to NEW KID, for example. There is a chance other students in the district could access that title, too. At the same time, it is not likely that all 80,662 middle grade students would actually read the book.

I just wanted to make sure you knew that, but giving multi-use access, we will not be able to police users.

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

From: Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
Sent: Friday, April 17, 2020 11:37 AM
To: Laura Bunn <laura.bunn@mackin.com>
Subject: RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Sure.

I just want to get clarity, as we cannot keep going back to authors. My understanding from our emails is that moving the offer to a one-time license payment for the same amount would be in line with how CPS wants to structure this.  HarperCollins would:
1. License each of the four titles
2. CPS would enable open access for verified students
3. There would be no fee for each student based on accessing the title
4. Program runs 8 weeks

Adam

From: Laura Bunn <laura.bunn@mackin.com>
Sent: Friday, April 17, 2020 12:34 PM
To: Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
Subject: RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam.

I am available at 1:30pm EST if that works for you?

Thanks,
Laura

Highly Confidential - Attorneys' Eyes Only

HC0015528

A-5315

Case 1:20-cv-04160-JGK-OTW   Document 166-17   Filed 09/02/22   Page 13 of 20

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, April 17, 2020 11:27 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

Can you speak at 1:00 PM EST?  I want to be clear on what we need to review.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Friday, April 17, 2020 11:44 AM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools
**Importance:** High

Hi Adam,

Thank you so much for letting me know.

I just got off the pheon with our Chicago rep. who talked with the district this morning. They are very adamantly wanting multi-use access at the district level and will not go for a pay per use/2¢-checkout model.

I know the HarperCollins team has put in a lot of work getting pricing for CPS already, and we really appreciate all your help. However, in order to still be part of our proposal to CPS, we need to know if you would be able to put a price on multi-user access for 8 weeks.

They are really wanting multi-user access at the district level, but if you came up with a per-building price, we think they would be open to that as well. I'm including the number of students and buildings that would access the titles again below.

| CPS TITLES NEEDED | | | | |
|---|---|---|---|---|
| TITLE | AUTHOR | ISBN | # OF STUDENTS NEEDING ACCESS (THROUGHOUT DISTRICT) | # OF SCHOOLS NEEDING ACCESS |
| PRIDE | ZOBOI, IBI | 9780062564078 | 104,733 | 93 |
| NEW KID | CRAFT, JERRY | 9780062691217 | 80,662 | 421 |
| POET X | ACEVEDO, ELIZABETH | 9780062662828 | 104,733 | 93 |

Highly Confidential - Attorneys' Eyes Only

HC0015529

A-5316

ALLEGEDLY | JACKSON, TIFFANY D | Case 1:20-cv-04160-JGK-OTW | Document 166-17 | Filed 09/02/22 | Page 14 of 20
9780062422668 | 04,733 | 93

I'm very sorry for all the bumps in the road with this request. Please let me know if you think HarperCollins will be able to come up with multi-user pricing. We know there are some steps on your side that need to be taken to determine pricing and do not expect you to have it ready today, but our rep has another meeting with CPS at 2:00pm, so please let us know if you think you'll be able to offer multi-user pricing by then.

Thanks again, and please let me know if you have any questions. We appreciate all your consideration and help on this!!

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin
Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, April 17, 2020 8:56 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

All of the authors have approved.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Wednesday, April 15, 2020 3:40 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

Yes, this is more of a bookkeeping issue than anything since we can't support customers paying by checkout. We sell your titles as 26-checkout, so when the customer purchases a copy, they have that title in their MackinVIA account until it's been checked out 26 times. If they buy 2 copies, they have the title until it's been checked out 52 times (since 26 x 2 is 52).

To look at just one title, for instance, we'd propose that CPS would purchase 3,102 copies of NEW KID to get close to the number of checkouts they'd need in total. Please keep in mind that we have yet to discuss with CPS exactly how many checkouts they do need since their goal was to get simultaneous access.

Highly Confidential - Attorneys' Eyes Only

A-5317

HC0015530

**★ NEW KID by CRAFT, JERRY**

GRAPHIC NOVEL/26 CHECKOUT SUBSCRIPTION/SINGLE-USER EBOOK

9780062691217

2019  HARPERCOLLINS EBOOKS

Title Match: **E**

Dewey 741.5  **RL** 2.9  **IL** 4-7  **Lexile** GN320L  **AR** 2.9 MG **PV:**2.5 **00606**EN  **RC** 3.1 **PV:**6 76438

**$12.99**

MackinVIA Ebook Single-user
26 checkout

☐ Add to List

Please let me know if this is not making sense. It´s really just a technical issue on our side based on the way we sell your titles.

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540  |  t 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin
Classic packages. Learn more.

**From:** Silverman, Adam <Adam_Silverman@HARPERCOLLINS.com>
**Sent:** Wednesday, April 15, 2020 2:28 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

I know this is time sensitive so I wanted to respond as soon as possible. I am a little confused. Are you proposing to purchase copies on the 26 circulation model and the loan concurrently? I believe this is more of a bookkeeping issue but want to make sure I understand.

Adam

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Wednesday, April 15, 2020 3:22 PM
**To:** Silverman, Adam <Adam_Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

I discussed this with my team, and we would like to move forward with making this proposal to CPS. The only issue is that Mackin does not support a "pay per use" model as you describe below; however, we do sell your titles as a 26-checkout model, so I have converted what you propose to fit that model below. Please let me know if this doesn't make sense. Calculations below are based on the idea that CPS will want to purchase one checkout per student.

**CPS TITLES NEEDED 4/13 - 6/13**

A-5318

Highly Confidential - Attorneys' Eyes Only

HC0015531

| TITLE | ISBN | # OF STUDENTS NEEDING ACCESS (THROUGHOUT DISTRICT) | # OF CHECKOUTS NEEDED | # OF 26-CHECKOUT COPIES NEEDED (# OF CHECKOUTS / 26) |
|---|---|---|---|---|
| PRIDE | 9780062564078 | 104,733 | 104,733 | 4028 |
| NEW KID | 9780062691217 | 80,662 | 80,662 | 3102 |
| POET X | 9780062662828 | 104,733 | 104,733 | 4028 |
| ALLEGEDLY | 9780062422668 | 104,733 | 104,733 | 4028 |

The total number of checkouts needed in this scenario is 394,861. Based on your offer, that would mean:

- The first 50,000 checkouts at ▮
- The remaining 344,861 checkouts at ▮
- **CPS's total cost would be** ▮

Please let us know if it's okay to make this proposal with the 16-checkout option to CPS. Also, since the district would essentially be purchasing 394,861 checkouts, can you please confirm that the students would still be able to redeem the checkouts at 6/13? That will likely make this proposal more appealing to CPS if they are unsure of how many checkouts they'll actually need for this 8-week period.

Thanks!

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.



**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Wednesday, April 15, 2020 11:50 AM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

HarperCollins would like to propose the following for the requested titles for an estimated 400K redemptions

- The first 50k redemptions cost ▮
  - ○ Minimum purchase required
- The remaining 350k at ▮
  - ○ Paid based on usage
  - ○ Cost ▮ for all 350K
- Total cost of ▮

I am happy to discuss.

Adam

Highly Confidential - Attorneys' Eyes Only

HC0015532

A-5319

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Wednesday, April 15, 2020 9:10 AM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

Of course. Thanks so much for considering this!!

Best,
Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540  |  f 800.369.5490  |  w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin
Classic packages. Learn more.

---

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Tuesday, April 14, 2020 7:55 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** Re: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

Thanks for your follow-up. We discussed late this afternoon and will get back to you and CPS shortly with a proposal.

Best,
Adam

Get Outlook for iOS

---

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Tuesday, April 14, 2020 8:11 PM
**To:** Silverman, Adam
**Subject:** RE: [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Hi Adam,

Thank you again for considering the request below from Chicago Public Schools. They now understand that you are likely unable to provide multi-user access at the district level for free. However, they are requesting your consideration and hoping you would provide a quote and offer your best possible price for temporary multi-user access for an 8-week period. They also want you to know that they most certainly intend on purchasing large quantities of single-user titles for fall 2020.

Please send us a price for each title that would allow for multi-user access at the district level for an 8-week period. Please note that they would also consider a 4 (or more) week option if you are willing to consider it.

Highly Confidential - Attorneys' Eyes Only

HC0015533

A-5320

Case 1:20-cv-04160-JGK-OTW   Document 166-17   Filed 09/02/22   Page 18 of 20

Thanks again for your help with this onetime special request.

Best,

Laura

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540 | f 800.369.5490 | w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin
Classic packages. Learn more.

**From:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Sent:** Friday, April 10, 2020 1:27 PM
**To:** Laura Bunn <laura.bunn@mackin.com>
**Subject:** [EXTERNAL] RE: Important Digital Request from Chicago Public Schools

Laura,

Let me review and get back to you.

**From:** Laura Bunn <laura.bunn@mackin.com>
**Sent:** Friday, April 10, 2020 2:23 PM
**To:** Silverman, Adam <Adam.Silverman@HARPERCOLLINS.com>
**Subject:** Important Digital Request from Chicago Public Schools
**Importance:** High

Dear Adam,

We have a very unique and important request from the Chicago Public Schools who have asked us to reach out to you on their behalf. CPS's ELA department is hoping that you will strongly consider offering a temporary, "one time" complimentary multi-user license type for the title(s) listed below during the time period of 4/13/20 to 6/13/20. This special request will provide vital educational support for their students and staff during this challenging time of necessary distance learning.

In return for the complimentary, multi-user access to your titles during this short time, CPS promises to purchase quantities of your single-user titles for their fall programs. The actual purchase numbers could likely be in the hundreds or thousands of single-user copies because these, or newer titles, will be fully incorporated into the curriculum for the fall of 2020.

Highly Confidential - Attorneys' Eyes Only

A-5321

HC0015534

Case 1:20-cv-04160-JGK-OTW   Document 166-17   Filed 09/02/22   Page 19 of 20

In addition to the promised fall 2020 purchases, partnering with CPS during this difficult time presents an additional potential for ongoing digital sales. CPS's ELA department has established a long-term goal of switching entirely over to digital resources, and they also have many shorter-term initiatives that they plan to support though digital purchases of your publications.

We understand that a multi-user license type is not something you offer. We also understand that giving complimentary access to the entire district for an 8-week period is a huge favor to ask, both on the part of Chicago Public Schools and Mackin. However, given the unusual world circumstances, reasonably short access period, and future sales opportunities, we sincerely hope that you will consider making this special dispensation for all the students, teachers and administrators of the Chicago Public Schools.

Please let us know if you are willing agree to this one-time special request and provide the following titles with multi-user access for CPS for just two months (4/13/20 – 6/13/20) knowing that the newer titles (and potentially more) listed below will likely be purchased in hundreds or thousands of copies for fall 2020. If you can agree to provide access, please sign and return the attached form to laura.bunn@mackin.com.

| CPS TITLES NEEDED 4/13 - 6/13 | | | | |
|---|---|---|---|---|
| TITLE | AUTHOR | ISBN | # OF STUDENTS NEEDING ACCESS (THROUGHOUT DISTRICT) | # OF SCHOOLS NEEDING ACCESS |
| PRIDE | ZOBOI, IBI | 9780062564078 | 104,733 | 93 |
| NEW KID | CRAFT, JERRY | 9780062691217 | 80,662 | 421 |
| POET X | ACEVEDO, ELIZABETH | 9780062662828 | 104,733 | 93 |
| ALLEGEDLY | JACKSON, TIFFANY D | 9780062422668 | 104,733 | 93 |

| PROMISE TO PURCHASE TITLES FALL 2020 | | |
|---|---|---|
| TITLE | AUTHOR | ISBN |
| PUNCHING THE AIR | ZOBOI, IBI | 9780062996503 |
| CLASS ACT | CRAFT, JERRY | 9780062885524 |
| WITH THE FIRE ON HIGH | ACEVEDO, ELIZABETH | 9780062662859 |
| LET ME HEAR A RHYME | JACKSON, TIFFANY D | 9780062840349 |
| GROWN | JACKSON, TIFFANY D | 9780062840370 |

Highly Confidential - Attorneys' Eyes Only

A-5322

HC0015535

We respectfully request that you respond as soon as possible as CPS is eager to make these important eBooks available to their students. Thank you in advance for your consideration and willingness to be creative partners as we strive to assist our mutual customers in these unprecedented times.

Randal and Kitty Heise
Owners of Mackin Educational Resources

**Laura Bunn**
Publisher Relations & B2B Coordinator

p 800.245.9540  |  f 800.369.5490  |  w mackin.com
3505 County Rd 42 W, Burnsville, MN 55306

To support your distance learning programs, we are offering FREE Mackin Classic packages. Learn more.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Confidentiality Notice: This E-Mail is intended only for the use of the individual or entity to whom it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you have received this communication in error, please do not distribute and delete the original message. Please notify the sender by E-Mail at the address shown. Thank you for your compliance.

HC0015536

A-5323

Highly Confidential - Attorneys' Eyes Only

**Pages Intentionally
Left Blank
A-5324 to A-5364**