# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 23 OF 26 (A-5612-A-5882)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM     ELIZABETH A. MCNAMARA
DANAE TINELLI     LINDA J. STEINMAN
SCOTT A. ZEBRAK     JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP     JESSE M. FEITEL
4530 Wisconsin Avenue, NW,     CARL MAZUREK
5th Floor     DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016     1251 Avenue of the Americas, 21st Floor
    New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

### Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

2

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | | **Vol. 5** | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | | **Vol. 6** | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | **Vol. 7** | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

8

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

11

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **_Vol. 17_** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| **Vol. 22** | | | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| **Vol. 23** | | | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

Case 1:20-cv-04160-JGK-OTW   Document 107-4   Filed 07/07/22   Page 28 of 298

# Prince Declaration

# Exhibit 4

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4    --------------------------------

                                    )

5    HACHETTE BOOK GROUP, INC.,      )

     et al.,                         )

6                                    )

                       Plaintiff     )

7                                    )

     vs.                             )   C.A. No. 1:20-CV-041160-JGK

8                                    )

                                     )

9    INTERNET ARCHIVE, et al.,       )

                                     )

10                     Defendant     )

                                     )

11   --------------------------------

12

13               HIGHLY CONFIDENTIAL

14         ZOOM VIDEOTAPED DEPOSITION OF

15             IMKE C. REIMERS, PH.D.

16             FRIDAY, JUNE 3, 2022

17             10:13 a.m. - 6:40 p.m.

18             BOSTON, MASSACHUSETTS

19

20

21

22

23   Reported by:  Sandra A. Deschaine, SCR, RPR,

24   CLR, CRA

25   Job No. 5255420.

1    the number of books that had been sold,

2    number of units that had been sold of any

3    title?

4         A.   Yes, that was what we needed to do

5    for that paper.

6         Q.   And the focus of the paper was not

7    our Amazon book sales rankings representative

8    of the full market?

9         A.   That is correct.

10        Q.   Okay.  Under the materials

11   considered, when you listed the various

12   things you looked at to write your expert

13   report, one of the things you looked at was

14   the sales records for all of the works in

15   suit, correct?

16        A.   Which sales records did you mean?

17        Q.   So all four publishers for the 127

18   works in suit, they each provided the sales

19   figures for their books, correct?

20             MR. GRATZ:  Maybe it's easier with

21        the term "the sales figures," but you

22        can answer.

23        A.   Yeah, so -- yes, yes, they

24   provided some annual sales figures for

25   varying lengths of years, yes.

Page 36

1   BY MS. STEINMAN:

2        Q.   Perfect.  Yes.  Okay.

3             And would it be fair that nobody

4   can simply look at those sales figures and

5   determine the impact of the Internet Archive,

6   because of all the other reasons why sales of

7   a particular title can go up or down?

8             MR. GRATZ:  Objection, incomplete

9        hypothetical and vague.

10       A.   Yes, to determine the effect of

11  the Internet Archive, one would have to

12  control for other factors that might have

13  happened.

14            MS. STEINMAN:  Okay.  I'd like to

15       introduce, as Exhibit Number 3, an

16       article that you wrote called "Can

17       Private Copyright Protection Be

18       Effective?  Evidence from Book

19       Publishing" by Imke Reimers, Journal of

20       Law and Economics May 2016.

21  (Exhibit 3, HeinOnline, Can Private

22  Copyright Protection Be Effective?  Evidence

23  from Book Publishing, by Imke Reimers,

24  Journal of Law and Economics May 2016, marked

25  for identification.)

Page 45

1    about -- well, 126 titles that I'm following.

2    BY MS. STEINMAN:

3        Q.   Most of those books were

4    originally published several years ago, going

5    back as far as the first half of the 20th

6    Century, correct?

7             If you look at page 416 of your

8    article, that will help you out.

9        A.   Yeah, I found it right now.  Yes.

10   Thank you.

11       Q.   Is that accurate that, quote,

12   "Most of the works were originally published

13   several years ago, going back as far as the

14   first half of the 20th Century, although all

15   titles are still protected by copyright"?

16            Is that accurate?

17       A.   Yes, that's what it says in the

18   text.

19       Q.   And in the middle of page 416, it

20   says that RosettaBooks list, quote, "consist

21   largely of backlist titles ranging from

22   well-known classics to works that are less

23   well-known today.  Most of its titles were

24   originally published more than a decade ago."

25            Is that accurate?

1          A.    Yes.

2          Q.    And so these titles were similar

3     in publication dates to the titles on the

4     Internet Archive Books to Borrow collection,

5     correct?

6                MR. GRATZ:  Objection, lacks

7          foundation, vague.

8          A.    Yes.  They -- to the extent that

9     they were also several years old, yes.

10    BY MS. STEINMAN:

11         Q.    Were there any other differences

12    between the titles that you were looking at

13    published by RosettaBooks and the works in

14    suit in this case?

15               MR. GRATZ:  Lacks foundation.

16         A.    I mean -- my guess is that there's

17    no big overlap, if any, across the titles.

18    The types of titles might be similar.

19         Q.    Okay.  Fair enough.

20               So in your article you look to see

21    the impact when the publishers' agent sent

22    takedown notices to websites making

23    unauthorized distributions of the titles, and

24    also requests the search engines to delist

25    the unauthorized websites, correct?

Page 50

1    iPads, it is better if they are able to read

2    them on their iPads than if they're not.

3         Q.    What was your understanding --

4    going back to your 2016 article.  What was

5    your understanding of why people were going

6    to these websites with the unauthorized

7    content?  Was it your understanding that they

8    were going there to read the books?

9         A.    I don't know why they would go,

10   but that was -- would be my assumption.

11        Q.    And, to your knowledge, is there

12   anything materially different about the type

13   of user that was getting unauthorized copies

14   from the pirate websites in your 2016 study

15   as compared to users of the Internet

16   Archive's free digital library.

17        A.    I don't know anything about the

18   users of either of them.  I -- yeah, no.  I

19   just don't know who goes to those websites.

20   I don't observe any IP addresses or anything

21   else about them.

22        Q.    #But, sitting here today, you have

23   no reason to believe, if people go to the

24   pirate websites to read an e-book, you have

25   no evidence, sitting here today, that they

HIGHLY CONFIDENTIAL

Page 56

```
1    page 417.
2         Q.   Okay.   In your article, you
3    concluded that, after publishers, agents, and
4    takedown notices and delisting requests, that
5    those piracy protections made it more
6    difficult for the members of the public to
7    find the free unauthorized digital books,
8    correct?
9         A.   Yes, that is correct.
10        Q.   And you determined that these
11   piracy protections had a significant impact
12   on the sales of e-books, correct?
13        A.   Yes, this is what I found, for
14   example, in Table 2.
15        Q.   In other words, you found that
16   when members of the public had more
17   difficulty getting a free e-book from an
18   unauthorized website, some of them were
19   willing to pay money to buy the e-book,
20   correct?
21        A.   That is correct, although the
22   level of increased difficulty is -- I don't
23   know how much more difficult it had become
24   there.
25        Q.   I'm sorry.  I didn't follow.
```

Page 58

1    is a net decrease in the number of pirate

2    websites and in which, say, Google doesn't

3    list the pirate websites, in those

4    circumstances, some consumers will pay to buy

5    an e-book since they can't get it for free

6    from the pirate website?

7                  MR. GRATZ:  Lacks foundation.

8    BY MS. STEINMAN:

9         Q.   Let me rephrase.  I can see I --

10   let me make it more easier for you.

11              When I say when members of the

12   public have more difficulty getting a free

13   e-book, all I'm saying is that the piracy

14   protections have succeeded and made it harder

15   to find.

16              So if it's harder to find, some

17   people are going to -- you found that some

18   people are going to pay for the commercial

19   e-book?

20        A.   Yes, that was my interpretation in

21   the paper, yes.

22        Q.   On page 421 -- on the bottom of

23   page 421, you found, quote, "Electronic books

24   can be regarded as the closest substitute for

25   pirated versions...physical editions of the

Page 71

1        calls for speculation.

2        A.   So my answer is that -- yeah, I

3   can't quite tell because it depends on how

4   people learn about the books.  And if people

5   learn about the books, say, via Goodreads or

6   something like that, then I don't know how

7   much of a difference these larger

8   budgeting -- or larger marketing budgets

9   make.

10             MS. STEINMAN:  Okay.  Since our

11        tape is about to run out.  Let's take a

12        short break.  I know that you want to

13        leave by 7:30.  So we're going to try to

14        keep breaks short and lunch short since

15        I share your goal to end by 7:30.  So

16        let's take, say, a five-minute break.

17             THE VIDEOGRAPHER:  Okay.  Going

18        off the record.  The time is 11:48 a.m.

19        This is the end of media unit 1.

20   (Recess taken at 11:48 a.m. to 11:58.)

21             THE VIDEOGRAPHER:  We are back on

22        the record.  The time is 11:58 a.m.

23        This is the beginning of Media Unit 2.

24   BY MS. STEINMAN:

25        Q.   Would you please turn to your

HIGHLY CONFIDENTIAL

Page 72

1    rebuttal report, which should be Exhibit 2?

2        A.    Yep.

3        Q.    And if you would go to paragraphs

4    17 through 19.

5        A.    Okay.

6        Q.    Do those paragraphs contain all of

7    the reasons why the results of your 2016

8    paper are not indicative, in your view, of

9    the effects of the Internet Archive on the

10   plaintiffs?

11       A.    I'm not sure if they contain all

12   of the reasons.  They contain the reasons I

13   could think of.

14       Q.    Are there any other reasons that

15   come to mind?

16       A.    None that I could think of so far.

17       Q.    The first reason is that, "The

18   digital lending interface at the Internet

19   Archive has more of an appearance of a

20   library than the cyberlocker hosts as it

21   allows people to borrow titles for limited

22   time periods rather than keep them on their

23   computers indefinitely.  The fact that one

24   does not own the book when reading it via

25   Internet Archive can diminish the experience

HIGHLY CONFIDENTIAL

1    of reading it, making consumers more likely

2    to purchase a full edition later."

3              Is that an accurate quote from

4    your report?

5         A.   Yes, that's what it says in

6    paragraph 19.

7         Q.   Do you have any support that you

8    can cite for your second sentence?

9         A.   No, I don't have any empirical

10   evidence of that.

11        Q.   Are you aware that at the time of

12   suit, the Internet Archive allowed its users

13   to download a book for 14 days?

14        A.   I read those terms when I reviewed

15   the Prince report.

16        Q.   And are you aware that currently

17   the Internet Archive allows users to download

18   a book for 14 days so long as they have more

19   than one copy?

20        A.   I don't think I knew the exact

21   terms.

22        Q.   Are you aware that the Internet

23   Archive allows users to take an e-book out

24   again if they haven't finished it?

25             MR. GRATZ:  Lacks foundation.

Page 74

1        A.   Yes, that has been my experience
2   when I borrowed a book.
3   BY MS. STEINMAN:
4        Q.   And are you aware that many public
5   libraries loan books for around 14 days?
6        A.   Yes, that is my understanding, 14
7   days or 3 weeks.
8        Q.   Would you agree with me that, in
9   many instances, people can read a book in 14
10  days?
11             MR. GRATZ:  Lacks foundation,
12        incomplete hypothetical.
13        A.   In several instances, yes.
14  BY MS. STEINMAN:
15        Q.   Would it be accurate to say that
16  the fact that one does not own the book, when
17  reading it via the Internet Archive, means
18  that some consumers are more likely to
19  purchase a full edition later on, but that
20  other consumers may use the Internet Archive
21  as a substitute for purchasing a full edition
22  later on?
23             MR. GRATZ:  Objection, vague,
24        lacks foundation.
25        A.   So this, I think, is another

Page 75

1    empirical question, where it's possible that

2    what you're saying is correct, but if I don't

3    see the data to study this or to examine

4    this, I don't know what people are doing.

5    BY MS. STEINMAN:

6            Q.    Let's turn to your second reason.

7                   You said, quote, "Second, in my

8    2016 paper, I cannot distinguish what type of

9    content leads to harm because my variable of

10   interest describes whether the company has

11   found an infringing website for the title at

12   all and not which type of content was taken

13   down.  If e-book sales only increased after a

14   certain type of content was removed and if

15   that content is different from that offered

16   through the Internet Archive, then I cannot

17   draw inferences from that study either."

18                  Do you see that?

19           A.    Yes, I do.

20           Q.    What different content were you

21   contemplating here?

22           A.    I was referring to the type of

23   piracy website; for example, cyberlockers or

24   peer-to-peer platforms or the format of the

25   book that the piracy site was in.

Page 76

1      Q.   Okay.  As we sit here today, do

2   you know of any material differences between

3   the formats of the books in the 2016 article

4   and the Internet Archive?

5           MR. GRATZ:  Lacks foundation,

6       calls for speculation.

7       A.   Yeah, I don't quite know what the

8   2016 article -- what exactly the formats of

9   the books were except that I think --

10  (Reporter clarification.)

11      A.   Oh, the formats, format.

12           I think it says it in the 2016

13  article.  I'm happy to take a look again.

14  BY MS. STEINMAN:

15      Q.   Yes, take a look.  As I recall, it

16  says that most of them were scans, not ripped

17  e-books.

18           MR. GRATZ:  Objection.

19  (Reporter clarification.)

20           MS. STEINMAN:  Not ripped e-book

21      files.

22           MR. GRATZ:  Objection, lacks

23      foundation, misstates the content of the

24      document.

25      A.   Yeah, so on page 415 in my 2016

Page 77

1    article, I state -- and you mentioned that
2    earlier, sorry, thank you -- "Most book
3    contents, 65 percent is either HTML or PDF
4    format."  That makes it, you know, two-thirds
5    and one-third something else.
6              What I don't know -- actually, I
7    apologize, it's -- we talked a little too
8    much.  Can you remind me of the exact
9    question again?
10   BY MS. STEINMAN:
11        Q.   Yes.
12              Is there anything materially
13   different about the content of the pirate
14   websites that you studied in 2016 and the
15   content on the Internet Archive?
16              MR. GRATZ:  Lacks foundation,
17        calls for speculation.
18        A.   Okay.  Thank you.
19              I don't know.  I don't know what
20   content -- which exact types of content were
21   taken down for my 2016 study, and, therefore,
22   I don't know if there was anything materially
23   different.
24   BY MS. STEINMAN:
25        Q.   Let's look at your third reason.

Page 78

1          Third -- this is, again, a quote,
2    "Third, I am not able to compare the scale
3    (and number of site visitors) of the Internet
4    Archive to that of the infringing sites in my
5    2016 paper.  If traffic to the infringing
6    sites in my 2016 paper was higher than
7    traffic to each book's page on the Internet
8    Archive, then the Internet Archive might have
9    been too small to cause a sales decrease."
10          So your view is that if the
11    traffic to the infringing sites in your 2016
12    paper was higher than traffic to each book's
13    page on the Internet Archive, then the
14    Internet Archive might have been too small to
15    cause a sales decrease; is that correct?
16        A.   Yes, that's what it says in my
17    report.
18        Q.   What, if anything, do you know
19    about the scale of the traffic to the
20    infringing sites in your 2016 paper?
21        A.   I don't know anything about that
22    scale.
23        Q.   Would you agree that scale matters
24    to the ability to detect a sales change?
25             MR. GRATZ:  Lacks foundation,

Case 1:20-cv-04160-JGK-OTW Document 167-4, Filed 09/02/22 Page 218 of 108

Page 80

```
 1    sites.  It is likely that removing one site
 2    has little effect on sales through other
 3    channels."
 4              If there were 88 websites that
 5    were clones of the Internet Archive, do you
 6    think there would be an impact on the
 7    publishers' sales through authorized
 8    channels?
 9              MR. GRATZ:  Lacks foundation,
10         calls for speculation.
11         A.   I'll have to kind of give the same
12    answer here as well.
13              Only if the -- if the Internet
14    Archive and -- you know, is a valuable
15    substitute to the other products and -- yeah,
16    no, that's -- only then is it possible.
17    BY MS. STEINMAN:
18         Q.   Okay.  I will move on, and we'll
19    come back to this at a later time.
20              Let's talk about controls in your
21    2016 article.
22              You looked at several control
23    variables in the 2016 article, which is
24    Exhibit 3, to make sure that your results
25    were sound, correct?
```

1          A.    That is correct.

2          Q.    And do you consider control

3     variables to be important for a study to be

4     reliable?

5          A.    That depends a lot on the setting

6     of the study.  It depends on the data and how

7     they are built and what other parts are

8     automatically controlled for.

9          Q.    If you would look at page 422,

10    please.

11         A.    Yep.

12         Q.    And, again, this is page 422 of

13    your 2016 article.

14              At the top of the page, it says,

15    quote, "Of course, Table 2 does not take into

16    account several factors that may contribute

17    to an increase in e-book sales around the

18    time that a title becomes protected.  It

19    could be that a move into protection

20    coincides with the publication of a new

21    edition of a title, with title and

22    age-related fluctuations in demand or with

23    price promotions."

24              Do you see that?

25         A.    Yes, I do.

1      Q.   So if I understand you correctly,
2   it's plausible that if the publication --
3   that the publication of a new edition might
4   affect e-book sales for a title at a given
5   point in time, and so you have to look at
6   that?
7               MR. GRATZ:  Objection, vague.
8         Misstates the content of the document.
9   BY MS. STEINMAN:
10      Q.   Is a new edition something that
11   might plausibly impact e-book sales at -- you
12   know, at a specific point in time?
13               MR. GRATZ:  Incomplete
14         hypothetical.  You can answer.
15      A.   Yes.  When we have -- when we look
16   at a title's unit sales, it is often sensible
17   to control for things like additional
18   editions.
19   BY MS. STEINMAN:
20      Q.   And you controlled for this factor
21   in your 2016 article, Yes?
22      A.   Yes, I did.
23      Q.   Okay.  In this case, you looked at
24   the Internet -- the potential impact of the
25   Internet Archive on publishers' Amazon sales

HIGHLY CONFIDENTIAL

Page 83

1   rankings at three points in time:  One, when

2   the work was first made available on the

3   Internet Archive; second, when the National

4   Emergency Library started; and, third, when

5   the work in suit was removed from the

6   Internet Archive, correct?

7           A.   That is correct.

8           Q.   And did you control for the

9   publication of new editions for each one of

10  those three time periods?

11          A.   No, I did not.

12          Q.   Okay.  Back to your 2016 article.

13              In your 2016 article, you said

14  that you wanted to look at title and

15  age-related fluctuations in demand.

16              What -- could you explain further

17  what those are, what you mean by that?

18          A.   So I'm just looking at Table 3 for

19  that.

20              Yeah, okay.  So the age -- the age

21  specific fluctuations, these are the

22  variables that I include at the -- toward the

23  bottom of Table 3, where we have title age in

24  months and title H-squared.  This is a way

25  for me to control essentially for the fact

1    that the sales trajectory can change for a

2    title over time, and it can change so -- in a

3    nonlinear way where maybe the decay is

4    quicker at first and then kind of peters off

5    or something like that.  That's -- having

6    these extra control variables in this

7    regression helps me account for these

8    fluctuations over time.

9            The title-specific fluctuations --

10   now, again, I wrote this paper several years

11   ago, but my understanding and my guess is

12   that what I meant by that is what I wrote in

13   the table notes.  At the end of the table

14   notes, I write that "All regressions include

15   title and monthly time fixed effects."

16           These title fixed effects are

17   essentially controlling for, you know, the

18   fact that some titles are just inherently

19   more popular than other titles.  So, for

20   example, the Space Odyssey might be more

21   popular overall than some other title, whose

22   name I can't remember.

23           And having these fixed effects,

24   that basically gives us a -- you know, a

25   different baseline level of sales for each of

Page 85

1    these titles.  And we need to control for
2    that, and, therefore, I controlled for that
3    here.
4          Q.   Do title and age fluctuations --
5    I'm sorry.  Let me start again.
6               Do title and age-related
7    fluctuations in demand plausibly affect the
8    e-book sales for a title at any given point
9    in time?
10         A.   I'm sorry.  I'm a little tripped
11   up by the word "affect" in this context.
12         Q.   Why don't I use the word "impact."
13              Do title and age-related
14   fluctuations in demand plausibly impact the
15   e-book sales for a title at a given point in
16   time?
17              MR. GRATZ:  Objection, incomplete
18        hypothetical.
19         A.   The two are very closely related.
20   The fluctuations and demand show up as
21   fluctuations in sales.
22   BY MS. STEINMAN:
23         Q.   And in your 2016 paper, you
24   accounted for title-specific fluctuations and
25   demand by controlling for that factor using

Page 86

1   Google trend search volume, correct?

2        A.   Yes.

3        Q.   And did you, you know, control for

4   title-specific fluctuations in other ways as

5   well?

6        A.   So I controlled with the search

7   volume and the general trends in sales

8   trajectories.

9        Q.   Okay.  Did you control for title

10  and age-related fluctuations in demand in

11  your analysis of the Amazon sales rankings in

12  your expert reports in this case?

13       A.   Yes, I did.  In both reports, in

14  the main report -- or in the initial report

15  and also in the rebuttal, I had the same, in

16  that case, edition age controls in the

17  regressions, so similar to the title age

18  controls that I had in the 2016 article.

19            And as a response to Dr. Prince's

20  report, I did include the number of ratings

21  as well as the average star rating as an

22  additional control.

23            The number of ratings on Amazon

24  is -- seems like a good proxy for these title

25  demand fluctuations, which I controlled for

Page 87

1    with the Google search volume in my 2016

2    paper.

3         Q.   And did you do any other controls

4    related to title and age-related fluctuations

5    in the expert reports?

6         A.   In my rebuttal report, I also

7    controlled for prices.

8         Q.   But I'm talking about title and

9    age-related fluctuations.

10        A.   So, again, I did have the --

11   sorry.  Can you actually explain then what

12   you mean with the title and age related?

13        Q.   I'm using it in the same sense as

14   you used it in your 2016 article.

15             MR. GRATZ:  Lacks foundation,

16        vague without looking at a particular

17        portion of that article.

18        A.   Yeah, so I'm looking at Section

19   5.2 again in that article.  And I think I'll

20   just have to read it a little more closely to

21   answer that.

22   BY MS. STEINMAN:

23        Q.   Go ahead.

24   (Witness reviewing document.)

25        A.   So the problem that I have here in

Page 88

1    answering your question, is I don't see where

2    I actually define title and age-related

3    fluctuations.  I just see how I respond to

4    them in the article.

5            Q.   Okay.  And did you perform the

6    same controls for title and age-related

7    fluctuations in your expert reports as you

8    did in the 2016 article?

9            A.   No, I did not use the exact same

10   controls.

11           Q.   So you mentioned that you looked

12   at Amazon star rankings.  Those are just the

13   stars that consumers put on Amazon to say

14   whether they like or don't like a book,

15   right?

16               MR. GRATZ:  Objection.  Vague in

17          its use of the term "rankings," which,

18          Linda, I'm not sure is what you meant to

19          say.

20               MS. STEINMAN:  It is not.  Okay.

21          Why don't I just ask Dr. Reimers.

22   BY MS. STEINMAN:

23           Q.   What are Amazon star ratings?

24           A.   Better, yes.  Sorry.

25               So I had  two controls for these

HIGHLY CONFIDENTIAL

Page 89

1    ratings in my rebuttal report.  The one was

2    the average star rating, so some number

3    between, say, 1 and 5.

4              I also had a separate control in

5    that rebuttal that accounts for the number of

6    reviews that are underlying that average star

7    rating.  This number of reviews that are

8    underlying the star rating should be closely

9    related to the overall interest for this

10   title; and, in fact, it is specifically

11   Amazon-related rather than relatively broad.

12        Q.   Star ratings are added to Amazon

13   by consumers, correct?  A consumer read the

14   book or doesn't even read the book, and they

15   write a review on Amazon and give the book a

16   couple stars between 1 and 5; is that right?

17        A.   Yes.  Many of the reviews

18   underlying these ratings are by people who

19   have bought the book on Amazon.  As far as I

20   know, I'm about maybe 80 percent sure of

21   this, that you don't have to have bought the

22   product on Amazon in order to leave a review.

23        Q.   And on what basis do you contend

24   that the number of reviews by consumers, who

25   are giving star ratings, correlates with the

Page 90

1    title and age-related fluctuations in demand?

2            Do you have any empirical evidence

3    of that?

4        A.    I don't have any firsthand

5    empirical evidence of this.  But we do

6    often -- sorry.  Let me say that second part

7    again.

8            It is -- in my field, it is -- it

9    has been -- sorry.  Let me try one more time.

10           In my field in the past, people

11   have used reviews or new reviews, in fact, as

12   a proxy for demand or, in fact, even as a

13   proxy for sales of a product.

14       Q.    And have any of those people

15   provided empirical evidence that the number

16   of individuals reviewing a book on Amazon

17   directly correlates with the sales of a book?

18       A.    I don't know for certain, although

19   I could even imagine that I have provided

20   some evidence to that extent.

21       Q.    But, as you sit here today, you

22   don't remember that?

23       A.    I would have to look at a -- at my

24   2021 report with Dr. Waldfogel on the

25   pre-purchase information.  There might be a

Page 102

1          foundation in its use of the word
2          "still."  Misstates the content of the
3          document.
4          A.   Yeah, so it's -- so we were -- we
5    were mostly talking about Google Books in
6    this case, so that means I'm -- and, in fact,
7    as I think I stated earlier, I was only
8    tangentially familiar really with the
9    Internet Archive up until around then.  So I
10   can't -- at that point, I wasn't familiar
11   with the scale of the Internet Archive.
12   BY MS. STEINMAN:
13        Q.   Fair enough.
14             Let's look at Section 5 of your
15   paper titled "Discussion."
16        A.   Okay.
17        Q.   Tell me when you're there.
18        A.   I'm there.
19        Q.   Okay.  The second paragraph toward
20   the bottom of the page, could you read the
21   sentence beginning "Many publishers are
22   opposed"?
23             The two sentences.  Do you see
24   that?
25        A.   Yes, I see that.

Page 103

1          So those -- yeah, that text reads
2    "Many publishers are opposed to mass
3    digitization projects driven by concerns
4    around cannibalization.  This is a reasonable
5    reaction, given that the mass digitization
6    projects typically digitize work without the
7    publishers' consent and without explicit
8    licensing fees that would generate direct
9    revenue."
10         Q.   Okay.  Can you explain what you
11   meant by publishers' concerns about
12   cannibalization in this paragraph?
13         A.   So it's been a while since I've --
14   you know, since that draft of it, so I'm --
15   you know, I'll have to put my 2020 hat on
16   here.
17         So with cannibalization, I mean,
18   what we usually mean, as economists at least
19   and my -- I would assume that that's what I
20   meant here as well, is that -- is the
21   possibility that a different -- or in this
22   case, that a different -- another edition or
23   a different edition of a title could displace
24   sales of an original edition of the same
25   title.

Page 104

1      Q.   So if we were to put it in the

2   context of the Internet Archive, that the

3   Internet Archive could potentially displace

4   sales of the book publishers' authorized

5   books.

6           MR. GRATZ:  Objection, lacks

7           foundation.  Misstates the content of

8           the document, vague.

9      A.   If we -- yes, and -- sorry, one

10  second.

11  BY MS. STEINMAN:

12     Q.   All I'm asking is --

13     A.   There is the possibility exactly

14  that these digitization efforts, for example,

15  Internet Archive, could displace sales.

16     Q.   Okay.  And can you explain for the

17  record what explicit licensing fees you were

18  referencing in the passage that you read?

19           "This is a reasonable reaction

20  given that mass digitalization projects

21  typically digitize work without the

22  publishers' consent and without explicit

23  licensing fees that would generate direct

24  revenue."

25     A.   So, again, it's been a while, but

1   I would think that this is a -- yeah, just a
2   reference to these digitization -- mass
3   digitization efforts not paying publishers a
4   licensing fee to then distribute the books.
5   (Reporter clarification.)
6               THE WITNESS:  To then distribute
7         the books.
8   BY MS. STEINMAN:
9         Q.   The plaintiff publishers usually
10  get paid fees by libraries lending digital
11  books, right?
12              MR. GRATZ:  Lacks foundation.
13        A.   Yes, that's my understanding.
14  BY MS. STEINMAN:
15        Q.   In your expert report, you did not
16  address the plaintiffs' loss of these
17  licensing fees, correct?  That was not one of
18  the things you looked at?
19              MR. GRATZ:  Objection, lacks
20        foundation, incomplete hypothetical.
21        A.   No, I did not look at the direct
22  amount of money that publishers would have
23  gotten from just the licensing of the books.
24  BY MS. STEINMAN:
25        Q.   Okay.  Let's move to the later

1    Amazon's print sale rankings?  If you were
2    going to explain this to the jury, what is an
3    Amazon print sale ranking?
4          A.   So the Amazon print sales
5    rankings, in general, show, you know, our --
6    give us an idea about how many books have
7    been sold over some period of time in the
8    past, with, you know, higher rankings,
9    meaning more books have been sold.
10         Q.   So, in other words, the book
11   that's listed as number 1, presumably, Amazon
12   has determined that that book has the most
13   sales of any book.  Is that what it
14   determines?
15         A.   So the term "the most sales" is a
16   little vague.  It's, you know, over some
17   period of time in the past, where more recent
18   sales are weighted more heavily.
19         Q.   Does Amazon publish their
20   algorithm?
21         A.   Not that I know.  I haven't seen
22   it.
23         Q.   And for any number of reasons,
24   could it be something other than a straight
25   calculation of the actual sales ranking of a

Page 123

1    book as compared with other titles; is there

2    some discretion in there?

3              MR. GRATZ:  Vague.

4         A.    So there's some -- a possibility

5    that Amazon bases its sales rankings on

6    something other than sales, although all

7    academic work that I'm aware of treats Amazon

8    sales rankings as a function of Amazon sales.

9    BY MS. STEINMAN:

10        Q.    Okay.  Now, Amazon print sales

11   rankings don't necessarily tell you how much

12   revenue a title is making, correct?

13        A.    That is correct, they are likely

14   related but not necessarily the same.

15        Q.    Okay.  So let's say on week number

16   1, number 10 on the list is a legal thriller

17   by John Grisham, and then let's say on week

18   number 2, Michelle Obama's autobiography

19   #"Becoming" is released, and it sells a huge

20   number of copies and it debuts at number 1 on

21   the list.

22              Assuming that no other big books

23   come out that week, that would bump John

24   Grisham's legal thriller to number 11 on the

25   list, right?

HIGHLY CONFIDENTIAL

Page 124

1      A.   Under those assumptions, yes.
2  Actually, sorry, let me -- let me take that
3  back.
4           Under those assumptions, that is
5  likely, although, of course, sales of the
6  other books could have also changed.
7      Q.   Let's assume the sales of all of
8  the books stayed the same.  The only thing
9  that happened was Michelle Obama released her
10  beautiful autobiography and it shot to
11  number 1 on the list.
12      A.   Okay.
13      Q.   That doesn't necessarily mean that
14  the revenues from John Grisham's legal
15  thriller had gone down, correct?
16      A.   That is correct.
17      Q.   In fact, they could have either
18  remained the same or gone up.  It's just that
19  Michelle Obama's book was selling zillions of
20  copies?
21      A.   That is correct.
22      Q.   So Amazon print sales rankings are
23  not an exact predictor of revenue?
24      A.   They are not a -- they're not a
25  direct predictor of revenue.

Page 126

1    rankings?

2         A.    That is correct.

3         Q.    Okay.  Do you consider Amazon's

4    print sale rankings to be representative of

5    the entire market of all the plaintiff -- all

6    the plaintiffs' customers?

7              MR. GRATZ:  Vague.

8         A.    So, again, there's -- so on one

9    hand I -- in my report, in fact, I refer to

10   somebody else who mentions that Amazon does

11   account for 50 percent of the market,

12   approximately.  Being more specific about the

13   total effect -- or how representative Amazon

14   is with regard to the other share or the

15   share that is not -- that does not come from

16   Amazon, I can't really say much about that

17   because I don't observe those data.

18   BY MS. STEINMAN:

19        Q.    For your review of the Amazon

20   data, to be a reliable measure of the impact

21   of the Internet Archive, wouldn't it be

22   critical that the Amazon print sale rankings

23   are representative of the entire market?

24        A.    I want -- I want to look at -- I

25   wrote something about that in my initial

1    report.  I would just like to kind of look at
2    that.
3         Q.   Absolutely.
4    (Witness reviewing document.)
5         A.   Yeah, so the biggest thing that I
6    need to worry about is -- and this, by the
7    way, in paragraph 41 of my initial report, is
8    that -- that the evolution of sales is
9    different on Amazon than it is through other
10   channels.  While I don't have data to support
11   that they are the same, I also don't have a
12   reason to believe they are different.
13        Q.   Okay.  But you certainly did not
14   do any empirical study to determine whether
15   the Amazon print sale rankings is
16   representative of the entire market?
17        A.   Again, the only thing -- as I
18   mentioned earlier this morning, I think, the
19   only thing that I have done, which was in the
20   past, was look for a connection between
21   Amazon sales rankings and the best seller
22   unit sales that are on a weekly level.
23   Beyond that, I haven't done anything.
24        Q.   Okay.  Amazon print sale rankings
25   do not include library channel sales,

Page 128

1    correct?

2            MR. GRATZ:  Lacks foundation.

3        A.   I believe that is correct.  Again,

4    we don't know exactly what underlies Amazon's

5    sales rankings.

6    BY MS. STEINMAN:

7        Q.   Amazon's sales rankings, I assume,

8    reflect books sold on Amazon.  Is that your

9    understanding?

10       A.   Well, that's my assumption.

11       Q.   Fine.  So Amazon print sale

12   rankings don't include books sold at big box

13   stores like Costco, correct?

14       A.   Again, that's -- yeah, that is my

15   assumption as well.

16       Q.   And Amazon print books -- print --

17   Amazon print sale rankings do not include

18   sales from publishers to wholesalers like

19   Baker & Taylor or Ingram, correct?

20       A.   Again, that is -- that is my

21   assumption as well.

22       Q.   And Amazon's print sales rankings

23   do not include book sales by independent

24   bookstores.  Is that your assumption?

25       A.   Yes, it is as well.

Page 147

1        Exhibit 10?

2              MS. STEINMAN:  You know what, I

3        had the wrong one.  I'm sorry.

4              Thank you, Joe.

5    BY MS. STEINMAN:

6        Q.   In the upper right-hand corner, do

7    you see the date September 2, 2019?

8        A.   Yes, I see that, uh-huh.

9        Q.   And if you look at the -- in the

10   center of the document -- this is from, you

11   know, Open Libraries, this is from the

12   Internet Archive -- it lists the number of

13   members as of September 2, 2019.

14              Could you read that number into

15   the record?

16       A.   Do you mean the total number of

17   members?

18       Q.   The total number of members, yes.

19       A.   Okay.  So the total number of

20   members, if I look at the right row here,

21   it's 2,753,827.

22       Q.   And if you would go to the next

23   page.

24       A.   Okay.

25       Q.   The next page is dated

1    September 7th, 2020.

2              Do you see that?

3         A.   Yes, I do.

4         Q.   Could you read into the record the

5    total number of members as of September 7th,

6    2020?

7         A.   The total -- sorry.  It is now

8    listed as new members rather than -- so,

9    yeah, the row just starts at new members.

10        Q.   You're right.

11        A.   But the new number of members is

12   3,971,611.

13        Q.   Okay.  And if you would turn to

14   the next page, please, which is dated

15   September 2, 2021.  Could you read the total

16   number of new members as of that date,

17   please?

18        A.   September 2nd, 2021, I see the

19   total members as 4,799,436.

20        Q.   If you would go to the next page.

21   As of April 25, 2022, how many new members

22   did the Internet Archive Open Library have?

23             MR. GRATZ:  Objection, vague.

24        A.   On April 25th, 2022, the total

25   number of members was 5,354,735.

HIGHLY CONFIDENTIAL

Page 149

1    BY MS. STEINMAN:

2         Q.    So the member -- the number of

3    members of the Internet Archive Open Library

4    has increased from 2.7 million in 2019 to 5.3

5    million currently, correct?

6              MR. GRATZ:   Lacks foundation.

7    BY MS. STEINMAN:

8         Q.    According to the Internet

9    Archive's website here.

10        A.    Yes, according to the Internet

11   Archive's website, the total number of

12   members has increased since September 2019.

13        Q.    Okay.  And when many of the

14   works-in-suit were first made available on

15   the Internet Archive, are you aware that it

16   had far fewer monthly borrows than in 2020 or

17   currently?

18        A.    I haven't previously looked at the

19   number of borrows.

20        Q.    Okay.

21             MS. STEINMAN:   So let's introduce

22        Exhibit Number 11, please.

23   (Exhibit 11, Open Library is yours, marked

24   for identification.)

25   BY MS. STEINMAN:

Page 150

1      Q.    Tell me when you have it up.

2      A.    Okay.  I have it up.

3      Q.    Okay.  The first page from the

4   Open Library Internet Archive web page --

5   website is dated May 21, 20- -- 2011.

6          Do you see that in the upper

7   right-hand corner?

8      A.    I do, yes.

9      Q.    And in the middle of the page, on

10   the far right, in forest green, do you see

11   the number of e-books borrowed in the last 28

12   days?

13      A.    Yes, I do.

14      Q.    And could you read that number

15   into the record?

16      A.    That number is 4,355 e-books

17   borrowed.

18      Q.    Correct.  So it's 4,355 e-books

19   borrowed over the last 28 days, correct?

20      A.    Yes.

21      Q.    Okay.  Could you go to the next

22   page, please?

23      A.    Yep.

24      Q.    This document from the Internet

25   Archive Open Library, is dated May 24, 2013,

Case 1:20-cv-04160-JGK-OTW Document 167-4, Filed 09/02/22 Page 48 of 108

Page 151

1    correct?

2         A.   Yes.

3         Q.   And how many e-books were borrowed

4    over the last 28 days, as of that day?

5         A.   As of May 24th, 2013, 58,955

6    e-books were borrowed -- were borrowed over

7    the last 28 days.

8         Q.   Okay.  And if you would turn to

9    the next page.

10              As of May 31st, 2015, what does

11   the Internet Archive website say about how

12   many e-books were borrowed over the prior 28

13   days?

14        A.   On that date, that number is

15   95,677.

16        Q.   Okay.  And if you turn to the next

17   page, dated May 30th, 2017, what does the

18   Internet Archive Open Library's web page

19   indicate are the number of monthly borrows,

20   as of the prior 28 days?

21        A.   On that date, the number of

22   e-books borrowed is a hundred and -- sorry --

23   103,637.

24        Q.   Okay.  And as of May 31, 2020, for

25   the Internet Archive Open Library web page,

HIGHLY CONFIDENTIAL

Page 152

1   how many e-books does it indicate were

2   borrowed over the prior 28 days?

3          A.   On that date, the number is

4   470,763.

5          Q.   So when the -- many of the

6   works-in-suit were first made available on

7   the Internet Archive, it had far fewer

8   monthly borrows, correct?

9               MR. GRATZ:   Objection.  Vague in

10          its use of the term "it."

11  BY MS. STEINMAN:

12         Q.   Okay.  When many of the

13  works-in-suit were first made available on

14  the Internet Archive, the Internet Archive

15  had far fewer monthly borrows, correct?

16         A.   In 2011, the total number of

17  borrows across the entire website was much

18  smaller, yes.

19         Q.   In fact, it was 4,000,

20  approximately, as compared to 470,000 in May

21  of 2020, correct?

22         A.   Yes.  Again, across all of the

23  books that were available at the time, yes.

24         Q.   And indeed, even in -- as of 2015,

25  it had significantly fewer borrowers -- books

1    borrowed than the current -- than in 2020,

2    correct?  It had 95,000 as opposed to

3    470,000.

4    (Reporter clarification.)

5    BY MS. STEINMAN:

6         Q.   95,000 as opposed to 470,000

7    borrows in the last 28 days.

8         A.   Yes.  Again, across the entire

9    catalog, the number of borrows has increased,

10   as you said, from about 95,000 to 470,000

11   from 2015 to 2020.

12             MS. STEINMAN:  I'd like to

13        introduce Exhibit 13, please.

14             This is actually going to be

15        Exhibit 12.  It's Exhibit T8 to

16        Professor Ian Foster's supplemental

17        report, Jesse.

18   (Exhibit 12, Exhibit T8 to Professor Ian

19   Foster's Supplemental Report, marked for

20   identification.)

21             MS. STEINMAN:  So we're

22        introducing as Exhibit Number 12 a

23        document which is Exhibit #T8 to

24        Professor Ian Foster's supplemental

25        report.

Page 154

1          THE WITNESS:  Okay.

2     BY MS. STEINMAN:

3          Q.   Since you mentioned that you had

4     not read Professor Foster's supplemental

5     report, I will represent to you that this

6     exhibit indicates the number of additions to

7     the Internet Archive's copies of the work.

8     So, for example, if the Internet Archive

9     owned two copies of a work, and the partner

10    libraries in the Open Libraries program

11    contributed additional copies of the work,

12    that's what is reflected in the last column

13    of this document that says "Additions to

14    maximum eligible concurrent loans."  So those

15    are ones contributed by the Open Library.

16          MR. GRATZ:  Objection, lacks

17          foundation.  I object to counsel's

18          representation regarding anything on

19          this exhibit, in light of Dr. Foster's

20          testimony that it contains errors in the

21          column that was identified by counsel

22          and that that column was calculated

23          incorrectly.

24          MS. STEINMAN:  Okay.  Then we will

25          proceed based on hypotheticals.

1   BY MS. STEINMAN:

2        Q.   Let us assume, simply for the

3   purposes of this exercise, that these numbers

4   are correct.

5             If the Internet Archive has, for

6   example, 30 copies of a work available for

7   loan currently, that's a different -- it will

8   have a different impact on publishers than if

9   it has, say, one copy available for loan.

10             Would you agree with that?

11             MR. GRATZ:   Objection, lacks

12        foundation, calls for speculation,

13        incomplete hypothetical.

14        A.   Yeah, I can't say anything about

15   this because I don't know, in the first

16   place, without data whether the -- whether

17   the Internet Archive has an effect at all.

18             Based on my analysis on the Amazon

19   sales rankings, I could not confirm any

20   effect of the Internet Archive, and,

21   therefore, I don't know if one book has an

22   effect or if -- or if 30 books has a larger

23   effect or an effect at all, yeah.

24   BY MS. STEINMAN:

25        Q.   Would you agree with me that given

1             THE REPORTER:  I'm sorry, ma'am.
2        Can I ask you to repeat that answer?
3        A.   So I looked at -- all of the
4    works-in-suit are works that I looked for on
5    KEEPA, K-E-E-P-A.
6    BY MS. STEINMAN:
7        Q.   And were there any works-in-suit
8    that you could not find on KEEPA?
9        A.   I state that in my initial report.
10        Q.   If I recall, there were only a few
11   you couldn't include.
12        A.   That -- that is also my
13   recollection.
14             It is -- in my initial report, in
15   paragraph 39, I state that I found ranking
16   and other information for a total of 1200
17   editions for 118 titles.
18        Q.   And do you know what titles were
19   not included?
20        A.   No, I don't know that.
21        Q.   Okay.  With that as a
22   clarification, let me still ask my question.
23             Would you agree with me that given
24   the increase in the number of the Internet
25   Archive's members over the last decade, as

HIGHLY CONFIDENTIAL

Page 160

1  well as an increase in the number of borrows,
2  a steady increase both in the number of
3  members and a steady increase in the number
4  of borrows on the Internet Archive over the
5  last decade, that when you looked at when a
6  works was first made available, that is not a
7  reliable measure of the impact of the
8  Internet Archive in 2020?
9            MR. GRATZ:  Objection, vague.
10       A.   So the number of members and the
11  number of borrows across the entire website
12  are an incomplete statistic for me to base my
13  number -- base my answer on.  It depends on
14  how many people looked at the specific
15  works-in-suit.
16            And, you know -- and, yes,
17  that's -- that's why I'm -- yeah.  Actually,
18  strike that.  That's my answer.
19  BY MS. STEINMAN:
20       Q.   If you had been looking more
21  generally, would you agree with me that the
22  impact of the Internet Archive is likely to
23  vary based on the number of its members and
24  the number of its borrows?
25            MR. GRATZ:  Objection, vague,

HIGHLY CONFIDENTIAL

1       lacks foundation, calls for

2       speculation.

3       A.   Again, especially the number of

4  members doesn't seem like a sufficient

5  statistic for me to look at here.  It's -- I

6  would be more interested -- yeah, so -- it

7  depends on the number of -- first, if

8  anything, it depends on the number of

9  visitors specifically to a title; and,

10  second, if I find a null effect for -- in my

11  analysis, there is no reason to believe that

12  there is going to be a positive or negative

13  or a nonzero effect later on without

14  additional analysis.

15  BY MS. STEINMAN:

16       Q.   Okay.

17       MS. STEINMAN:  Let's introduce,

18       please, Jesse, as Exhibit 13, Exhibit T4

19       from the Foster report.

20  (Exhibit 13, Exhibit T4 to Ian Foster's

21  report, marked for identification.)

22       THE VIDEOGRAPHER:  And,

23       Ms. Steinman, just while we're doing

24       that, we're again about 10 minutes away

25       from needing to take a short break to

Page 167

1    made available.  In fact, I looked at time

2    periods lasting from just 10 days to a full

3    year after the book was made available in

4    Exhibit C. -- after the book was made

5    available at the Internet Archive in my

6    Exhibit C to my original report.

7         Q.   Okay.  Let's look at paragraph 46

8    of your report.

9         A.   Yes.

10         Q.   Okay.  I'm going to quote it.

11              "To illustrate the statistical

12    significance of the coefficients, I will use

13    a 95 percent confidence level.  My

14    coefficient and standard error imply that if

15    one were to estimate this regression a

16    hundred times on a hundred different samples,

17    95 of a hundred coefficients are expected to

18    range between negative 0.0010 (for a rank

19    improvement of 0.10 percent) and plus 0.0057

20    for a worsening of 0.57 percent."

21              Now, again, I'm not an economist,

22    and I want to make sure I understand what

23    that means.

24              Does that mean that you have a 95

25    percent confidence level that in the period

Page 168

1    after each of the works-in-suit were made

2    available on the Internet Archive, their

3    print sale rankings on Amazon fell within the

4    range of a .1 percent improvement in sales

5    ranking and a .57 percent sales decline in

6    sales ranking?

7            A.   So, again, as a econometrician, I

8    want to be a little careful with the wording.

9            Generally, that is the gist of it.

10   I cannot be -- the idea is that if I were to

11   run this analysis, say, a hundred times on a

12   hundred different samples that look like this

13   one, 95 of those 100 results from those

14   analyses would fall in that range.  The

15   others we can think of as outliers.

16           With all of that said, we can say,

17   yeah -- yes, with that said, we can kind of

18   think of this as a, yeah, there's a 95

19   percent confidence that it falls into this

20   range.

21           Q.   Phew.  I at least got it.

22           Okay.  So it's within the range,

23   that after the Internet Archive made a work

24   in suit available, its Amazon sales ranking

25   got worse; in other words, the work in suit

Page 169

1  sold less books?

2       A.   Yes.  It is within this confidence

3  interval I have positive values, which would

4  imply a worsening of rankings, which we would

5  like to translate into fewer books sold.

6       Q.   So it's within your 95 percent

7  confidence range that the Internet Archive

8  potentially cannibalized sales of the print

9  versions of the works-in-suit?

10       A.   So within my 95 percent confidence

11  interval, I have both values that suggest

12  fewer sales but also values that suggest more

13  sales.  I cannot conclude from this, in

14  either direction, whether we have more or

15  fewer sales.

16       Q.   Okay.  So let's say one of the

17  lesser-known works-in-suit had an Amazon

18  print sale ranking of 10,000.

19         If it declined in sales rankings

20  by .5 percent, which is your lowest number,

21  it would move to a sales ranking of 10,050;

22  is that right?  Have I understood that

23  properly?

24       A.   If that .5 percent value that you

25  claim -- that you report here were to apply

Page 177

1 had this statistically significant positive
2 effect; and, therefore, I wanted to be a
3 little more careful in my interpretation of
4 my -- of these results.
5 Q. Okay. In paragraph 49, which is,
6 again, discussing the results of the removal
7 from the Internet Archive of the
8 works-in-suit, you say -- you review your
9 evidence, and then you say, "Taken at face
10 value, this is at least suggestive evidence
11 that availability of a book at the Internet
12 Archive does not hurt its sales."
13 Why did you stick in the words
14 "taken at face value"?
15 A. Again, any -- any regression we
16 run, any coefficient that we find is unlikely
17 to be the true effect to -- exactly on the
18 point.
19 Now, because each of my
20 coefficients comes with this confidence
21 interval, I want to be a little careful in --
22 in how I interpret and how I report these
23 results.
24 Taken at face value, given the
25 confidence intervals, it seems unlikely that

Page 178

1 the availability hurts sales, but I can't

2 rule it out entirely, by the nature of

3 statistics.

4     Q.   So your study of the Amazon print

5 sales rankings in your expert reports doesn't

6 definitively prove that the Internet Archive

7 does not cannibalize the plaintiff

8 publishers' print book sales?

9         MR. GRATZ:  Objection, vague.

10     A.   Any statistical analysis is --

11 statistical analyses aren't set up to

12 definitively prove anything, so -- including

13 this one.

14 BY MS. STEINMAN:

15     Q.   And, once again, we discussed this

16 earlier, but your sales of the Amazon print

17 sales rankings don't provide reliable

18 evidence on the subject of whether the

19 Internet Archive cannibalizes the plaintiff

20 publishers' e-book sales?

21     A.   That is correct, because the

22 formats are different, and, therefore, one

23 would need an analysis with the right data to

24 do that.

25     Q.   Of course.

1          Okay.  Let's move on to a new

2     topic, control factors.

3          A.   Okay.

4          Q.   #Paragraph 34 of your report says,

5     "Any analysis that tries to quantify the

6     effects of availability at the Internet

7     Archive on sales of a title is complicated by

8     the possibility of concomitant changes in

9     demand for the particular book and for

10    reading in general that are unrelated to the

11    book's availability at the Internet Archive."

12          Would you agree with me that that

13    statement applies to all of your measures,

14    that you have to make sure that the changes

15    that you're looking at weren't caused by

16    something else?

17          A.   And by all of my measures, what do

18    you mean with all of my measures?

19          Q.   The first one is when the book

20    became available on the Internet Archive, the

21    second is when the NEL started, and the third

22    is when the book came off of the Internet

23    Archive.

24          A.   All right.  Thank you for

25    clarifying.

1              I agree that one needs to control

2       for all of -- for these concomitant changes.

3       Although the threat stemming from potential

4       confounding factors varies across these

5       different measures.

6              Q.   So there's a big difference

7       between correlation and causation, right?

8              A.   That is what much of my field

9       tries to disentangle, yes.

10             Q.   Okay.  In the first expert report,

11      is it fair to say that you did not control

12      for any other factors, other than

13      seasonality, in connection with your look at

14      the start of the NEL and the removal of the

15      works-in-suit?

16             MR. GRATZ:  Objection, vague.

17             A.   So in my first analysis, I

18      controlled for the identity of the edition

19      and, hence, the title, as well as the ages of

20      the editions.  Beyond that and beyond

21      controls that -- beyond the controls that my

22      analysis of rankings provides inherently, I

23      believe that I had no other control

24      variables.

25      BY MS. STEINMAN:

1      Q.   Okay.  Let's -- in your rebuttal

2   report, you focus largely on the addition of

3   the titles -- I'm sorry.

4           In your rebuttal report, you

5   focused largely on theory Number 1, mainly

6   the impact when the Internet Archive first

7   put a book up.  And it seems to me you

8   performed the following controls:  One,

9   price; two, Amazon star rankings --

10      A.   Ah --

11      Q.   -- ratings -- Amazon star ratings;

12   three, Amazon reviews, the number of Amazon

13   reviews; four, film and TV adaptations; five,

14   you compared fiction versus nonfiction; and,

15   six, you look at month of the year.

16           Were there any others?

17      A.   I'll have to look very briefly --

18      Q.   Of course.

19      A.   -- if that's all I did.

20           I believe you're correct.  I think

21   those are -- those were the controls I added.

22      Q.   Excellent.  Okay.

23           I'm going to give you a bit of a

24   long list here.

25           Can you confirm that you did not

 1    run controls for theory Number 1 -- again,

 2    which is when the work was first put up on

 3    Internet Archive -- that you did not run

 4    controls for the following:  One, any title

 5    marketing efforts by the author and

 6    publisher?

 7         A.    Could you give me an example of a

 8    title marketing effort?

 9         Q.    Sure.

10               An advertising campaign or a

11    social media campaign or a sweepstake.

12         A.    Okay.  Thank you.

13               That is correct, I did not control

14    for those.

15         Q.    And is it correct that you did not

16    control for any press, mainstream press?

17         A.    That is correct.

18         Q.    And is it correct that you did not

19    control for any author appearances?

20         A.    That is correct as well.

21         Q.    And is it correct that you did not

22    control for any retail marketing or placement

23    changes; in other words, putting a book in

24    the front of the bookstore?

25         A.    That is correct.

Page 183

1   Q. And is it correct that you did not

2 control for publication of other books by the

3 author entering the market?

4   A. That is also correct.

5   Q. And is it correct that you did not

6 control for any awards for the title or

7 author?

8   A. That is also correct.

9   Q. And is it correct you did not

10 control for any social media regarding the

11 title?

12   A. That is also correct.

13   Q. And is it correct that you did not

14 control for Google trends -- or let me

15 rephrase that.

16   Is it correct that you did not

17 look at Google trends, as you had done in

18 your other two articles?

19   A. That is also correct.

20   Q. And is it correct that you did not

21 control for any instances in which there had

22 been what's called a community read or a

23 whole university had read a book or other

24 similar reasons for large bulk purposes?

25   A. That is also correct.

1          Q.    Is it correct that you did not
2    control for any new book covers; in other
3    words, if the publisher had decided to put a
4    new cover on a book in an attempt to increase
5    sales?
6          A.    I'm not sure that happens for the
7    same edition or if that would become a new
8    edition.
9          Q.    I will represent to you that
10   sometimes there's a change in a book cover
11   without it making a new edition.
12               If that's the case --
13         A.    I did not control for that.
14         Q.    Perfect.
15               Did you control for title-related
16   fluctuations in demand, for other reasons?
17         A.    So some of my analyses and some of
18   my control variables and subsample analyses
19   got potential title-level fluctuations in
20   demand.
21         Q.    And that was the number of Amazon
22   star ratings and reviews, correct?
23         A.    The number of Amazon reviews
24   mostly, yes.  And also analyses where, for
25   example, I dropped the nonfiction titles,

1    which might have been more likely to
2    experience these fluctuations in demand,
3    especially for these works that had been
4    out -- had been originally published a few
5    years ago.
6            Q.   And did you do any other controls
7    for title-related fluctuations in demand?
8            A.   Beyond the general controls that
9    we've mentioned and the function of time
10   since the edition's release, I did not
11   control for title fluctuations in demand.
12           Q.   Okay.  And did you control for any
13   age-related fluctuations in demand?
14           A.   So I have the edition age and the
15   edition age squared in my analysis.
16           Q.   Okay.  Let's turn to some of your
17   other focuses.
18                You looked at under number --
19   theory number 2 and theory number 3, you
20   looked at the impact of a work -- the impact
21   of the start of the National Emergency
22   Library and the impact of the works being
23   removed from the Internet Archive in and
24   around June 2020.
25           A.   Around that date, given --

HIGHLY CONFIDENTIAL

Page 186

1    (Reporter clarification.)

2         A.   Oh, I said around that date.  And

3    Exhibit 9 tells you the exact date of when a

4    title was removed.

5    BY MS. STEINMAN:

6         Q.   Most of those were in June 2020,

7    correct?

8         A.   Most but not all of them, yes.

9         Q.   Okay.  Let's talk about COVID.

10             You state, in paragraph 35, the

11   COVID-19 pandemic was, quote, "an

12   unprecedented shock to the market for books,"

13   correct?

14        A.   Sorry.  You're in my initial

15   report again; is that --

16        Q.   Yes.  I'm sorry to bounce around.

17   Yes, paragraph 35 of your initial report.

18        A.   In paragraph 35.  No.

19        Q.   Maybe I'm wrong.  Do I have the

20   wrong one?

21        A.   That is where I refer -- I thought

22   you were quoting me, but you weren't, right?

23             Okay.  I apologize.  Yes, you're

24   correct.

25        Q.   Not always.

Page 187

1          Isn't it true that the pandemic
2     had very complex impacts on the book
3     publishing industry that varied over time and
4     that would have affected different titles
5     differently?
6               MR. GRATZ:  Lacks foundation.
7          A.   So the -- the pandemic had -- most
8     likely had a large impact on the book
9     publishing industry as a whole.  I am not
10    sure how the pandemic itself had different
11    impacts on different titles at different
12    times.
13    BY MS. STEINMAN:
14         Q.   Let's say, for example, that --
15    let me strike that.  I'll -- strike that.
16    Let me ask this question:  In either your
17    first report or your rebuttal report, when
18    you were looking at the impact of the start
19    of the NEL and you were looking at the
20    removal of the works-in-suit from Internet
21    Archive, you did not control for the complex
22    impact of COVID on different titles, did you?
23               MR. GRATZ:  Lacks foundation.
24          Lacks foundation.
25    BY MS. STEINMAN:

Page 188

1      Q.   Go ahead.

2      A.   So I controlled for it in indirect

3  ways.

4      Q.   Other than looking at the

5  distinction between fiction and nonfiction,

6  did you control for the impact of COVID on

7  your measures 2 and 3, namely, when the NEL

8  started and when the works-in-suit were

9  removed from the Internet Archive?

10     A.   So let me just clarify that.  By

11 looking at rankings, I have taken out -- I

12 have controlled for the overall effect on the

13 industry, right?  I'm comparing relative

14 sales and not overall changes in sales.

15          Beyond that and beyond removing

16 the nonfiction titles in a separate analysis,

17 the only control that might capture or that

18 could capture potential differences in these

19 effects of the pandemic, the only controls

20 that could capture those, if they exist, are

21 captured in prices and ratings and the number

22 of reviews.

23     Q.   So is it fair to say that,

24 assuming that COVID impacted different books

25 differently, including within their

HIGHLY CONFIDENTIAL

Page 189

 1    respective genres, that you would not be

 2    picking that up in your analyses?

 3         A.   So under the assumption that -- or

 4    if this were the case, that some -- that the

 5    books, especially in the works-in-suit, were

 6    affected differently from other books that

 7    had similar demands, that is not explicitly

 8    captured beyond the measures that I've

 9    mentioned.

10         Q.   Okay.  Let's look at some of the

11    reasons, COVID-related, impacts-related,

12    raised by Dr. Prince.

13              Let's assume that some of --

14    several of the works-in-suit are the types of

15    books assigned in high school and middle

16    school to students, works like The Catcher in

17    the Rye and Nine Stories by Salinger.  And

18    let's assume, when schools closed, those

19    books got stuck at school and kids did not

20    have access to them.  And let's assume that

21    their parents bought replacement copies so

22    their kids could read the books assigned in

23    schools.  And school, as we all know, ends in

24    the United States in and around May or June,

25    and kids then have a summer vacation.

Page 190

```
 1              Isn't it plausible that for those
 2      types of titles that are assigned in schools,
 3      that their sales would have declined in the
 4      summer of 2020 because of this COVID impact?
 5                   MR. GRATZ:  Lacks foundation,
 6           incomplete hypothetical.
 7           A.   So under the assumption that the
 8      works-in-suit are disproportionately books
 9      that are read in school, and that the
10      students were not able to recover the books
11      from school, and parents then went on Amazon
12      to buy these books, under those three
13      assumptions, one would expect for those
14      titles that were read -- that were read in
15      school, the -- one would expect demand to
16      increase because of COVID.
17      BY MS. STEINMAN:
18           Q.   So it would increase in the spring
19      of 2020 and then decline in the summer of
20      2020, under this hypothetical?
21           A.   So this is clearly a hypothetical.
22           Q.   It is.
23           A.   But also it's unclear to me why
24      people would continue buying books -- buying
25      these books in May and not just have them --
```

Page 191

1    have bought them in March.

2         Q.   Was school still in session in May

3    in most places in the United States?

4         A.   So the answer to that is probably

5    yes.  Although -- but the question that I --

6    the part of this that I'm tripping over or

7    that I'm -- yeah, that I'm tripped up over, I

8    think I said, is why people still buy books

9    in late May for a -- for a semester that's

10   about to end and a book that is something

11   like The Catcher in the Rye.

12        Q.   Okay.  Have you read the press

13   articles cited in Professor Prince's report

14   showing that during COVID there were -- there

15   was a shift in the types of books and the

16   genre of books that were very popular?

17        A.   I have not read those articles.

18        Q.   Do you have any reason to doubt

19   that those shifts occurred?

20        A.   I'd be happy to read the articles

21   now.  I'm not sure what titles these articles

22   are referring to.

23        Q.   But, as you sit here today -- and

24   you did read Professor Prince's report, even

25   if not the articles -- do you have any basis

1    at this point to contest his presentation

2    that during COVID there was a shift in the

3    types of books and the genre of books that

4    people were buying?

5              MR. GRATZ:   Lacks foundation,

6         calls for speculation.

7              A.   Exactly.  So the thing that I'm --

8    I'm not -- sorry.  Let me try that again.

9              This is one of those things where

10   I, as a researcher, I would like to see the

11   data.  I can't just wholeheartedly confirm

12   this; I can't deny it either.  I would like

13   to look at the data and see how demand

14   overall shifted for different genres or

15   different types of books.

16   BY MS. STEINMAN:

17             Q.   I can certainly understand that.

18             And my only question is, you know,

19   as you sit here today, and I realize you

20   haven't looked at the data, but as you sit

21   here today, do you have any information that

22   would contradict, you know, Professor

23   Prince's presentation that there was a shift

24   in the various types of books and genres in

25   terms of popularity during the COVID time

```
 1    period?
 2              MR. GRATZ:  Vague, lacks
 3         foundation, calls for speculation.
 4         A.   I mean, I can neither contradict
 5    him nor can I agree with him.
 6    BY MS. STEINMAN:
 7         Q.   Perfect.  That's all I'm asking.
 8         A.   Okay.
 9         Q.   Assuming that the article cited by
10    Professor Prince was correct, that historical
11    fiction books became increasingly popular in
12    June 2020, that would have decreased the
13    Amazon print sale rankings of the
14    works-in-suit, which I will represent to you
15    do not include many works of historical
16    fiction, correct?
17              MR. GRATZ:  Lacks foundation,
18         vague.
19         A.   So with decreased rankings, you
20    meant made the rankings worse?
21         Q.   Yes, I'm sorry.  Let me say -- let
22    me repeat the question.  You're absolutely
23    right.  It's so hard with these Amazon
24    rankings.
25              If, for example, historical
```

HIGHLY CONFIDENTIAL

Page 194

1 fiction books became increasingly popular in

2 June 2020, the Amazon print rankings of the

3 works-in-suit would have gone up, meaning

4 that sales went down, correct?

5     MR. GRATZ:  Lacks foundation,

6   calls for speculation.

7   A. And as you said previously,

8 because the works-in-suit do not include

9 historical fiction.

10 BY MS. STEINMAN:

11   Q. Correct.  Right.  We're going to

12 assume that for this question.

13   A. So assuming that, this is still

14 not a given, because each book competes

15 against different books, essentially with

16 relatively similar sales.  For those books in

17 the works-in-suit that are not near

18 historical fiction books, it's -- the mere --

19 you know, let's call it fact here, but this

20 assertion that historical fiction demand

21 increased would not have affected the Amazon

22 rankings of books that weren't competing with

23 those historical fiction books.

24   Q. Could you explain that further?

25 Are you saying that the Amazon sales rankings

Page 195

1    are grouped by genre?

2         A.   They're not grouped by genre.

3    They're grouped by sales.  But if no

4    historical fiction book has similar sales

5    numbers as a work-in-suit, then that book

6    increasing its sales may not have an effect

7    on the ranking of the work-in-suit.

8         Q.   Okay.  So I still am lost.

9              Does Amazon throw everything into

10   one pot and just list from top to bottom all

11   of the books in terms of their sales ranking?

12        A.   So to the extent that we've talked

13   about Amazon sales rankings and to the extent

14   that I know how Amazon sales rankings work, I

15   understand Amazon sales ranking to be based

16   on the sales in recent time periods, and all

17   editions or all book editions that are

18   physical are subject to the same rankings; so

19   yes, all books are in the same ranking group,

20   so to speak.

21        Q.   Okay.  So let's -- frankly, let's

22   do it, I think it would be easier with the

23   Black Lives Matter book -- books.

24        A.   Sure.

25        Q.   Let's say hypothetically George

1    Floyd is killed, he's murdered, the Black

2    Lives Matter movement explodes; and,

3    hypothetically, let's say 100 books that, in

4    one way or another, pertain to race suddenly

5    become the top 100 best-selling books in the

6    Amazon print rankings.

7           Isn't that going to push down the

8    Amazon print sales ranking of a book about

9    yoga?

10           MR. GRATZ: Objection. Calls for

11        speculation. Vague, lacks foundation,

12        incomplete hypothetical. You can

13        answer.

14       A. So under this assumption that

15    there is an event in 2020 that would lead 100

16    books about racial justice moving to spots 1

17    to 100, in the Amazon sales rankings, then

18    each of the -- each of the remaining books

19    would lose -- would have a worsening of its

20    ranking by the number of books that were

21    previously listed behind -- behind that

22    specific book that were -- that then moved

23    into the top 100.

24       Q. So when a topic becomes of

25    significant interest, it can impact the

Page 197

1    Amazon sales rankings of books?

2              MR. GRATZ:  Lacks foundation,

3         calls for speculation, incomplete

4         hypothetical.

5              You can answer.  Sorry.

6         A.   Which books are you referring to

7    here, the Amazon sales rankings of books?

8    BY MS. STEINMAN:

9         Q.   I'll start again.

10             If a given genre or topic becomes

11   of much greater interest than it was

12   previously, in June 2020, that can have an

13   impact on the rankings -- the Amazon print

14   sales rankings of books that are not in the

15   hot category or genre?  The nonhot books will

16   have a higher Amazon sales ranking, meaning a

17   worsening of sales?

18        A.   If such an event -- yes, if such

19   an event happens that makes books of one

20   particular subject matter very popular, the

21   increases of sales of those books would lower

22   or worsen the ranking of other books.

23        Q.   In the Amazon print ranking?

24        A.   Yes.

25        Q.   Okay.  In your rebuttal report,

```
 1   paragraph 5 -- I'm sorry, let me start
 2   earlier.
 3            We have established, have we not,
 4   that other than for distinguishing between
 5   fiction and nonfiction, you did not otherwise
 6   control for the impact of COVID, for the
 7   reasons you have explained, right?
 8       A.    Beyond that distinction of fiction
 9   and nonfiction and the other control
10   variables that help control for
11   title-specific fluctuations, I did not
12   control for COVID.
13       Q.    Okay.  And in paragraph 5 of your
14   rebuttal report, you state, quote, "Concerns
15   about changing interest in topic seem most
16   salient for nonfiction books:  Beyond TV and
17   movie adaptations or idiosyncratic reasons
18   for notoriety of a particular book, such as
19   some news event relating to the book's
20   author, the interest in fiction books is
21   unlikely to see large shocks several years
22   after their original publication, whereas
23   nonfiction books may discuss certain topics
24   for which interest rises for other reasons."
25            And my question for you is, do you
```

Page 199

1    have any evidence for this conclusion?

2         A.   And "by this conclusion," you mean

3    the difference --

4         Q.   The conclusion that non -- that

5    fiction books are unlikely to see large

6    shocks several years after their original

7    publication?

8              MR. GRATZ:  Objection.  Misstates

9         the content of the document.

10        A.   I don't have any data evidence on

11   this.

12   BY MS. STEINMAN:

13        Q.   Do you think that -- do you have

14   any friends who read fictional works about

15   plagues and viruses during COVID?

16        A.   Do I have friends?  No.

17             MR. GRATZ:  Objection.  It assumes

18        facts.

19   BY MS. STEINMAN:

20        Q.   Would it surprise you to learn

21   that historical fiction became very popular

22   during COVID as reported in the article cited

23   in Dr. Prince's report?

24        A.   I mean, increases in demand or in

25   interest for viruses would not surprise me

Page 200

1    when COVID happened.

2        Q.   Okay.  Let's talk about supply

3    chain issues.  There were supply chain issues

4    of all of sorts during COVID?  Yes?

5        A.   I'm not quite sure when the supply

6    chain issues really became significant.

7        Q.   Okay.  Did you -- did you look

8    into whether the publishers experienced

9    worker shortages in their warehouses in the

10   summer of 2020?

11       A.   No, I did not look into that.

12       Q.   Did you look into whether the

13   publishers experienced trucking shortages in

14   the spring and summer of 2020?

15       A.   I did not look into that either.

16       Q.   Did you look into whether the

17   publishers had difficulties getting their

18   print books reprinted when stock on a

19   particular title ran low in the spring or

20   summer of 2020?

21       A.   No, I did not look into that

22   either.

23       Q.   Now, supply chain issues can

24   impact different books differently.  For

25   example, let's say book A, the publisher had

1    a lot of stock, and book B, the publisher ran

2    out of stock during the spring or summer of

3    2020.

4              Would you agree with me that

5    supply chain issues can affect different

6    titles differently?

7         A.    They can affect different titles

8    differently.

9         Q.    Okay.  Let move to Black Lives

10   Matter.  I know that you looked, at certain

11   points in time, at the USA Today best seller

12   lists.

13             Are you aware that the best seller

14   list -- USA Today best seller list became

15   studded with books addressing Black Lives

16   Matter topics in the summer of 2020?

17        A.    I believe Dr. Prince mentioned

18   that in his report.  Is that correct?

19        Q.    That is correct.

20        A.    So based on that, I have no reason

21   not to believe him.

22        Q.    And did your study examine the

23   impact of Black Lives Matter on the Amazon

24   print rank -- print sales rankings in the

25   summer of 2020?

HIGHLY CONFIDENTIAL

Page 202

1        A.   Again, beyond the analysis in

2   which I had dropped the nonfiction books, I

3   did not specifically look at the Black Lives

4   Matter.

5        Q.   Would you agree with me that the

6   presence of many best-selling books on Black

7   Lives Matter issue or racial justice issues

8   or, frankly, race issues more generally, in

9   the summer of 2020, would be a potentially

10  plausible explanation for the 1 to 2 percent

11  decline in Amazon print sale rankings for the

12  works-in-suit in the summer of 2020?

13            MR. GRATZ:   Lacks foundation.

14       A.   I just want to look briefly at my

15  rebuttal report for that.

16  BY MS. STEINMAN:

17       Q.   Take your time.

18       A.   So this would -- any increase in

19  social justice books that -- or in demand for

20  social -- sorry, let me do this again.

21            I'm sorry.  I'm thinking through

22  an analysis right now.  That's what's causing

23  a bit of a delay.

24            So -- well -- sorry, there it is.

25  Okay.  The other analysis.

1          A 1 to 2 percent decrease in

2     rankings would have to -- for a 1 to 2

3     percent decrease in ranking to be explained

4     by an increase in demand for social justice

5     books, that would require a lot of social

6     justice books displacing the works-in-suit

7     and the works-in-suit not also getting any

8     bump in demand at the same time.

9          Q.   Okay.

10              MS. STEINMAN:  Let's introduce

11          Exhibit 14 -- is that the right

12          number? -- which are 2020 USA Today

13          best-selling lists from May, June and

14          July.

15     (Exhibit 14,  Best selling books list:  USA

16     Today's Top 150 Weekly best sellers, marked

17     for identification.)

18              THE WITNESS:  Okay.  Okay.

19     BY MS. STEINMAN:

20          Q.   Why don't I give you just a few

21     minutes look to through these 14 pages, which

22     are the USA Today top 50 -- top 150 weekly

23     best sellers for a couple of months in the

24     summer of 2020.

25          A.   Okay.  Yep.  Thank you.

Page 204

1          Q.    Would it be fair to say that these

2    USA Today top 150 best seller lists for May,

3    June, and July showed that book purchasers

4    had a very significantly enhanced interest in

5    race?

6                MR. GRATZ:  Lacks foundation,

7          vague, calls for speculation.

8          A.    So one thing is I only see the

9    top 20, not the top 150.

10         Q.    Yes --

11         A.    There's only a few books here.  I

12   don't know how many more books about race

13   might have shown up at all.  I don't know

14   that.  I mean, I do see a couple of books

15   that showed up in June that did not show up

16   earlier, yes, about race, yeah.

17         Q.    And in June, July -- in June,

18   July -- June and July, there are a

19   significant number of books in the top 20

20   that are books about race, aren't there?

21                MR. GRATZ:  The document speaks

22         for itself, lacks foundation.

23   BY MS. STEINMAN:

24         Q.    Let's look, for example, at --

25   let's see, what page is this? -- the week of

HIGHLY CONFIDENTIAL

Page 205

1    June 12.

2          A.    June 12th.

3               MR. GRATZ:  What page of the

4          exhibit are we looking at?

5               MR. FEITEL:  It's page 13 of the

6          PDF.

7               MR. GRATZ:  Great.  Thank you.

8               THE WITNESS:  Thank you.

9          Okay.

10   BY MS. STEINMAN:

11         Q.    The number 1 book White Fragility:

12   Why It's So Hard for White People to Talk

13   about Racism.  Now that's a book about racial

14   justice, yes?

15         A.    It most likely is, yes.

16         Q.    Okay.  And the third book on the

17   list, How to Be an Antiracist, by Ibram

18   Kendi, that's a book focused on race,

19   correct?

20         A.    It seems that way, yes.

21         Q.    And the fourth book, So You Want

22   to Talk About Race, and that's a book about

23   race and racism, yes?

24         A.    Yes.

25         Q.    The fifth book on the list is Me

Page 206

1    and White Supremacy, Combat Racism, Change

2    the World, and Become a Good Ancestor.

3            Would you agree with me that

4    that's a book about race?

5        A.   I would agree with you, yes.

6        Q.   And the book that's seventh on the

7    list, Where The Crawdaddy [sic] Sings is a

8    fiction book about an African American

9    family, yes?

10           MR. GRATZ:  Lacks foundation.

11       A.   I haven't read this book, although

12   it's been a best seller for a long time

13   before that as well.  Yeah.  I've missed my

14   chance.  Or I still have a chance to read it.

15   I haven't yet.

16       Q.   Okay.  The eighth book, Between

17   the World and Me, by Ta-Nehisi Coates, the

18   author writes of the nation's history and

19   racial crisis in the form of a letter to his

20   son.  And that's a book about race, isn't it?

21       A.   It seems like it, yes.

22       Q.   Book number 13, The New Jim Crow,

23   by Michelle Alexander, Mass Incarceration in

24   the Age of Colorblindness.  I read that book.

25   I can tell you that it's all about the unfair

Page 207

1   disproportionate incarceration of the black

2   community.

3           That's a book about race, isn't

4   it?

5       A.   Yes.

6       Q.   The Color of Law, number 16 on the

7   list, A Forgotten History of How Our

8   Government Segregated America.

9           Is that a book about race?

10      A.   Yes.

11      Q.   The World Needs More Purple

12  People, it's a children's book with the

13  theme -- I appreciate it's geared toward

14  children, but would you agree with me that's

15  a book that's trying to encourage children to

16  not be -- not view people by their color?

17           MR. GRATZ:  Lacks foundation.

18      A.   I haven't read it, but it's about

19  including others.

20  BY MS. STEINMAN:

21      Q.   Okay.  Do you think it would be

22  fair to say that in -- during the week of

23  June 12, 2020, that the best seller -- the

24  top 20 of the best seller list was dominated

25  by books about race?

HIGHLY CONFIDENTIAL

```
1              MR. GRATZ:  Lacks foundation.
2         A.   I think you listed nine books off
3     the top 20 that had to do with racism.
4     BY MS. STEINMAN:
5         Q.   And that's pretty substantial
6     given --
7              MR. GRATZ:  Lacks -- lacks
8         foundation.
9         A.   Yeah.  Whatever substantial means.
10    BY MS. STEINMAN:
11        Q.   Would you agree with me that
12    suddenly, at this time period, race became a
13    topic of great interest to the American
14    reading public?
15        A.   So -- I mean, based on these data,
16    which are limited to the top 20, you know,
17    there was an increase in reading interest in
18    the top 20 for the -- for the topic of racial
19    justice from, say, May to June in 2020.  I
20    don't know what happened in 2019 or
21    something.
22        Q.   Right.  And you did not control
23    for that in your report?
24        A.   Not beyond the measures that I've
25    mentioned.
```

HIGHLY CONFIDENTIAL

Page 209

1          Q.   You also had presidential
2    primaries and the presidential election of
3    Donald Trump and Joe Biden in the fall of
4    2020.  It was a big year.
5               Did you control -- would you agree
6    that those issues garnered tremendous
7    attention in this country?
8          A.   Yes, I agree that -- yes, people
9    in this country were quite interested in the
10   outcome of that election.
11         Q.   And did you control for the impact
12   of those events on the Amazon print sale
13   rankings of the works-in-suit?
14              MR. GRATZ:  Lacks foundation
15         and -- well, lacks foundation with
16         respect to what books were included in
17         the analysis.
18   BY MS. STEINMAN:
19         Q.   Let me clarify that my question is
20   confined to the works-in-suit.
21              When you ran your analyses of the
22   impact of the Internet Archive on the
23   works-in-suit, did you control for the
24   presidential primaries and election?
25         A.   So I'm hesitant to answer this

```
 1    control -- sorry, in interest from one day to
 2    another.
 3         Q.   Okay.  You wrote an article on --
 4    with Joel Waldfogel titled Digitization and
 5    Prepurchase Information:  The Causal and
 6    Welfare Impacts of Reviews and Crowd Ratings
 7    in the American Economic Review, correct?
 8         A.   Yes, I believe that was the title,
 9    yes.
10         Q.   Okay.  In this article you
11    concluded that Amazon's star ratings impacted
12    book sales, correct, those are consumer
13    stars?
14         A.   That is correct, those are the
15    stars from, say, 1 to 5.
16         Q.   And just putting that in a broader
17    category, consumer Amazon star ratings are --
18    in essence, they fall in the larger category
19    of good publicity for a book?
20              MR. GRATZ:  Objection, lacks
21         foundation.
22         A.   This is what Dr. Prince called it
23    as well.
24    BY MS. STEINMAN:
25         Q.   Yes, and would you agree; is that
```

HIGHLY CONFIDENTIAL

Page 214

1    fair?

2              MR. GRATZ:  It lacks foundation.

3         A.   I'm not sure how it really is

4    publicity, but -- yeah, but the word itself

5    doesn't bother me, exactly.

6    BY MS. STEINMAN:

7         Q.   Okay.  In your expert report, you

8    did not control for either good publicity or

9    bad publicity of any sort for the

10   works-in-suit, correct?

11             MR. GRATZ:  Objection.  Vague in

12        its use of the term "good publicity," or

13        bad publicity."

14   BY MS. STEINMAN:

15        Q.   We'll call it favorable publicity

16   or critical publicity.

17             MR. GRATZ:  Same objection.

18   BY MS. STEINMAN:

19        Q.   Okay.  I'll rephrase.

20             In your expert reports, you did

21   not control for a press that positively

22   reflected on a book or author or press that

23   negatively criticized a book or author,

24   correct?

25        A.   So this seems like one thing that

1   you mentioned previously about mainstream

2   press, for example.

3            It is correct that I did not

4   control for these.  I did not expect that to

5   be a big factor for titles that have been

6   around for a while.

7            Q.   And have you done any research

8   into whether publishers engage in publicity

9   that impacts book sales?

10            A.   I don't currently remember that --

11   whether -- if I've done that.  I don't

12   remember that.

13            Q.   Would it be surprising to you to

14   learn that if publishers engage in publicity

15   efforts and marketing efforts for a book,

16   that they often lead to increased sales of a

17   title?

18                 MR. GRATZ:  Objection, compound.

19            A.   This is, again, something that --

20   I would like to do the analysis to see if

21   it -- if it affects sales.  Given that, that

22   I haven't done the analysis and I would like

23   to do it, it wouldn't exactly surprise me if

24   it did.

25   BY MS. STEINMAN:

HIGHLY CONFIDENTIAL

Page 216

1      Q.   Okay.  I had earlier asked you

2   about whether you ran this -- never mind.

3   Strike that.

4           MS. STEINMAN:  You know what?

5        Let's take a five-minute break.

6           MR. GRATZ:  All right.

7           THE WITNESS:  Okay.  Sounds

8        good.

9           THE VIDEOGRAPHER:  Going off the

10       record.  The time is 4:32 p.m.  This is

11       the end of Media Unit 4.

12   (Recess taken at 4:32 p.m. to 4:43 p.m.)

13           THE VIDEOGRAPHER:  We're back on

14       the record.  The time is 4:43 p.m.  This

15       is the beginning of Media Unit 5.

16       (Reimers5 audio)

17   BY MS. STEINMAN:

18       Q.   Earlier in our conversation, I had

19   reviewed a long list of potential controls.

20   We had discussed them in relation to your

21   first area of inquiry, namely, what happened

22   when Internet Archive first put the books,

23   the works-in-suit on the Internet Archive.

24           Now I'm going to focus on the

25   second two measures, namely, the beginning of

Case 1:20-cv-04160-JGK-OTW Document 267-34 Filed 09/02/22 Page 118 of 108

1    the National Emergency Library, and number 3,

2    the removal of the books from the Internet

3    Archive.

4             Would you confirm that you did not

5    run the following controls for your analyses

6    looking at the effect of the start of the

7    National Emergency Library and the removal of

8    the works-in-suit from Internet Archive on

9    the Amazon print sales rankings for the

10   works-in-suit?

11            You did not control for the topic

12   of the work-in-suit, correct?

13        A.   I did not control for the topic

14   beyond the general control for the title.

15        Q.   And what do you mean by the

16   "general control for the title"?

17        A.   The editions overall demand

18   that -- that we talked about this variable

19   that allows demand for one edition to be

20   higher than demand for another edition, where

21   each edition gets its own variable, and

22   therefore, its own baseline level of

23   popularity, which editions fully encompass

24   topics.

25        Q.   So that's controlling for the

Page 218

1  edition of a given title.  In other words, if

2  one -- yeah, if The Catcher in the Rye was

3  released in 12 different editions of mass

4  market and -- that's what you're talking

5  about, correct?

6        A.   Yes, so each edition of those gets

7  its own popularity baseline.

8        Q.   Okay.  But other than for breaking

9  it out by edition as opposed to title, did

10  you control for the topic of the

11  work-in-suit?

12        A.   So these variables fully control

13  for general differences in topic, but --

14  yeah, like they control for general

15  differences in topics, right.  If we have a

16  different baseline for, you know, The Catcher

17  in the Rye than for Lion, the Witch and the

18  Wardrobe or, you know, advanced Religion for

19  Dummies, or something, and then, you know,

20  these variables that I include control for

21  the differences in these -- in these topics.

22        Q.   In other words, you're looking at

23  each individual work-in-suit individually?

24        A.   I'm not sure what that means.

25             In the regression, I use all

1    editions together, but I allow each edition
2    to be different from other editions.
3        Q.    Okay.  In other words, you're
4    running your analysis based on each edition
5    of the work, the mass market edition or the
6    paperback edition with one cover and the
7    paperback edition with a different cover?
8        A.    Yes, as I state in paragraph 39 of
9    my initial report, yes, I use a total of
10   1,260 editions.  They all are entered into
11   this analysis.
12       Q.    Okay.  But you haven't -- I
13   appreciate that the books relate to different
14   topics.  But, other than that, you haven't
15   controlled for the impact of an increased
16   interest in some particular new topic?
17       A.    That is correct, yes.
18       Q.    Okay.  And you have not
19   controlled -- again, looking at your analysis
20   of the impact of the Internet Archive during
21   the start of the National Emergency Library
22   or the removal of the works-in-suit from the
23   Amazon print sales rankings, you did not look
24   at the -- focus on whether the publishers had
25   ended any title marketing efforts, correct?

Page 220

1          A.    That is correct.
2          Q.    And you did not look at any time
3     lapses from public mentions, including press?
4          A.    That is correct.
5          Q.    And you did not look at any time
6     lapses from author appearances?
7          A.    That is correct as well.
8          Q.    And you did not look at the end of
9     any retailer marketing or placement changes,
10    correct?
11         A.    That is correct, yeah.
12         Q.    And you did not look at the end of
13    a boost from an earlier award or title for a
14    book or author?
15         A.    No, I did not.
16         Q.    And you did not look at the end of
17    any social media impacts?
18         A.    Correct.
19         Q.    And you didn't look at any decline
20    of a book from a TV show or adaptation,
21    correct?
22         A.    That is correct.
23         Q.    Okay.  And you did not look at
24    Google Trends?
25         A.    That is correct as well.

HIGHLY CONFIDENTIAL

Page 221

1      Q.   And other than for the topics

2   you -- the controls you've identified, you

3   didn't look at other title-related

4   fluctuations in demand?

5      A.   That is correct.

6      Q.   Is it plausible that there were

7   other -- is it plausible that there were

8   other impacts, other than the Internet

9   Archive, on the works-in-suit that would have

10   impacted their Amazon print sales rankings in

11   the spring and summer of 2020?

12      A.   So we discussed the possibility

13   of, say, racial justice -- changes in

14   interest of racial justice, et cetera.  These

15   possibilities apply.  It's not clear whether

16   these -- you know, whether these

17   possibilities change the rankings of the

18   works-in-suit differently from the -- you

19   know, from other books that are not in my

20   analysis.

21      Q.   Okay.  In your rebuttal report at

22   paragraph 7 -- I'll let you get there.  You

23   state, quote, "I agree with Dr. Prince that

24   for my analysis to cover causal relationship,

25   I have to ensure that the decision to make a

```
 1    I don't know exactly which titles -- the
 2    editions come from that -- inform these
 3    numbers.
 4              Now, what I did to come up with
 5    the 45 percent number, is I took these years
 6    5 through 11 and took the average annual
 7    sales of years 5 through 11, and I assumed
 8    that these average annual sales in years 5
 9    through 11 continued to be the same number up
10    until year 50.
11              So what I did there is I assumed
12    that these books -- I assumed that all of
13    these books are evergreens, in the sense that
14    their demand remains constant starting in
15    year -- you know, just after the first five
16    years.  That is if all books are evergreens.
17         Q.   Okay.  I follow you.
18         A.   Moving this to the title level
19    would not -- would not decrease my 45 percent
20    level.  In fact, if I had the data, I would
21    be quite confident that the first five -- the
22    five-year share is larger than 45 percent.
23         Q.   Okay.  Let's look at your decision
24    to focus on editions.
25              Isn't it true that editions often
```

1    get replaced or sidelined even though revenue
2    for an overall title remains very strong?
3         A.   I don't know how often editions
4    get moved out of the -- out of the market.
5         Q.   Okay.  Are you aware that it's
6    customary for trade book publishers to
7    release a paperback edition one year after
8    the hard cover publication?
9         A.   I'm aware that there's a lag, yes,
10   for the paperback, uh-huh.
11        Q.   And when, a year after the book's
12   initial publication, the trade paperback
13   comes back -- comes out, that usually
14   significantly reduces the sales of the hard
15   cover but not the title as a whole.
16             Are you aware of that?
17        A.   I'm not sure I've seen studies
18   about the effect of, you know, paperback
19   release on hard cover editions.  But, in
20   general, you know, the effect of one edition
21   on the other is going to be different from
22   the effect of adding an edition to be some of
23   demands from the two editions.
24        Q.   Do you know of anything to
25   contradict the notion that when a trade

HIGHLY CONFIDENTIAL

Page 263

1   paperback comes out a year after initial
2   publication, that that generally reduces the
3   sales of the hard cover but not the title as
4   whole?
5           A.   I don't have any data to predict
6   or confirm that.
7           Q.   Okay.
8           A.   Or I haven't looked at data --
9   (Reporter clarification.)
10               THE WITNESS:  Or I haven't looked
11          at data that would allow me to confirm
12          or -- yeah.
13  BY MS. STEINMAN:
14          Q.   Let's say -- I'm sorry.  Confirm
15  or -- go ahead.
16          A.   Yeah, I forgot what I said.
17  Confirm or deny that statement or disagree.
18          Q.   Let's say a publisher decides to
19  put a new introduction into a book, say, Lord
20  of the Flies; and isn't it true that they
21  will come out with the new edition and the
22  sales of the prior edition will plummet, even
23  though the demand for the book remains either
24  at the same level or higher?
25          A.   I have no data to tell me that the

1    sales would, as you say, plummet or change in

2    any way for the -- I haven't looked at data

3    that would tell me how the sales for the

4    previous edition change.

5           Q.    Okay.  Let's -- let me give you a

6    hypothetical, then.

7                 Let's assume that when the

8    publisher decides to come out with a new

9    trade paperback edition of a book, for

10   example, Lord of the Flies, they stop

11   distributing the older one with the ugly

12   cover, and they only distribute the copy with

13   the new beautiful cover.

14                Wouldn't you agree with me that

15   that renders it -- that renders your review

16   of editions unreliable?  You're not looking

17   at the total demand for the title; you're

18   looking for the demand for the edition, which

19   has effectively been put out of print by the

20   publisher so that they -- so that they're

21   distributing the one with the new beautiful

22   cover?

23           A.    So in your hypothetical scenario,

24   where the initial edition is taken out of

25   distribution altogether, if that is the case,

HIGHLY CONFIDENTIAL

Page 265

1    then looking at that initial edition and

2    sales for that initial edition does not

3    accurately describe the demand for the title.

4         Q.   Okay.  And going back to the

5    issuance of the trade paperback when -- a

6    year after the hard cover.

7              If I am correct that the

8    introduction of a cheaper trade paperback

9    reduces the sale of the more expensive hard

10   cover but not the overall revenue for the

11   title, that would also skew your analysis,

12   correct?

13             MR. GRATZ:  Objection, vague.

14        A.   That depends on how the

15   paperback -- on whether the paperback edition

16   changes -- or the introduction of the

17   paperback edition changes the sales of the

18   hard cover edition.

19   BY MS. STEINMAN:

20        Q.   Yes.

21             So let's assume, in our

22   hypothetical, that it does.  Let's assume

23   that when a more reasonably priced trade

24   paperback comes out a year after initial

25   publication, that the hard cover sales, which

Page 266

1     are more expensive, go down, but that the
2     overall revenue for the title remains stable
3     or goes up.
4              If that is the case, doesn't that
5     skew your analysis here, which is based on
6     editions rather than titles?
7              MR. GRATZ:  Lacks foundation,
8         incomplete hypothetical.
9              You can answer.
10        A.   So -- I mean, under your
11    assumptions, which are we have a hard cover
12    book, and later on we have a paperback book
13    which displaces sales by the hard cover
14    back -- hard cover edition but also generates
15    more revenue than the hard cover edition, if
16    that happens, then just looking at sales of
17    the hard cover edition provides a -- gives me
18    an answer that does not reflect the sales of
19    the title.
20             THE REPORTER:  Counsel, are we
21        going to take a break soon?  I'm going
22        to need one fairly soon.
23             MS. STEINMAN:  Yes, we're going to
24        take a break right now.
25             THE VIDEOGRAPHER:  Going off the

```
 1          record.  The time is 6:00 p.m.  This is
 2          the end of Media Unit 5.
 3    (Recess taken at 6:00 p.m. to 6:14 p.m.)
 4               THE VIDEOGRAPHER:  We're back on
 5          the record.  The time is 6:14 p.m.  This
 6          is the beginning of Media Unit 6.
 7    BY MS. STEINMAN:
 8          Q.   Let's turn our attention, please,
 9    to Exhibit 8, which is Dr. Jorgensen's expert
10    report, please.
11          A.   Okay.
12          Q.   Did you review Dr. Jorgensen's
13    expert report?  Did you read it?
14          A.   I did not read it very carefully.
15    I looked it over.
16          Q.   And Dr. Jorgensen looks at the
17    impact of the Internet Archive when the
18    National Emergency Library ended and when the
19    Internet Archive took down the works-in-suit
20    in June 2020, correct?
21          A.   Yes, he looked at how --
22               Sorry.  Can you repeat that?
23    Sorry.
24          Q.   He looked at the impact of the
25    Internet Archive when the National Emergency
```

HIGHLY CONFIDENTIAL

Page 268

1    Library ended and when the Internet Archive

2    took down the works-in-suit in June 2020?

3          A.    Yeah, he looked at how library

4    living changed around those times, yes.

5          Q.    Okay.  And he also looked at the

6    Hachette works-in-suit, correct?

7                MR. GRATZ:  Lacks foundation.

8    BY MS. STEINMAN:

9          Q.    He looked at the difference in the

10   Q2 and Q3 2020 Hachette sales?

11               MR. GRATZ:  Lacks foundation.

12         A.    Are those the ones we've looked at

13   earlier today?

14   BY MS. STEINMAN:

15         Q.    Yes.

16         A.    He's looked at those, then, yes.

17         Q.    Okay.  And my understanding is

18   that Dr. Jorgensen has looked at the

19   following four data points, during Q2 and Q3

20   2020.

21               These data points are as follows:

22   One, he concludes that the 127 works-in-suit

23   had lower OverDrive checkouts than average.

24               MR. GRATZ:  Objection, vague.

25         Misstates the content of the document.

HIGHLY CONFIDENTIAL

Page 269

BY MS. STEINMAN:

    Q.   Okay.  He finds that the approximately 25 Hachette works-in-suit had lower e-book sales and print sales in Q3 than in Q2; he finds that in 2019, industry wide, young adult book sales did not go down in Q3.

        And his fourth data point is AAP statistics that show that although e-book sales across the market were going down in Q3, the decline in e-book sales industry-wide was nowhere near as steep as the Hachette works-in-suit.

        Is that a fair summary of his data points?

        MR. GRATZ:  Lacks foundation.

    A.   I have to admit, I'd have to -- if you can guide me to the exact spots where these are in the report.

BY MS. STEINMAN:

    Q.   Sure.  So some of these, I must confess, are in his rebuttal report.

        Did you read his rebuttal report?

    A.   I only read the summary of his rebuttal report.

    Q.   Okay.  So let's do it this way.

1    Let's -- I'm going to give you, you know,

2    this as a hypothetical.  So I'll do it again

3    because there was a lot to digest.

4           A.    Thank you.  Yeah, I was looking

5    while you were talking, too, so I appreciate

6    it.

7           Q.    Yeah.

8                 So let's assume that these are his

9    four data points.  One, that the 127

10   works-in-suit had lower OverDrive checkouts

11   in Q3 2020 than the average books on

12   OverDrive.

13          A.    Okay.

14          Q.    Two, the approximately 25 Hachette

15   works-in-suit had lower e-book and print

16   sales in Q3 than Q2 2020.

17          A.    Lower print and e-book sales you

18   said?

19          Q.    Yes.

20          A.    In Q3 of 2020 compared to?

21          Q.    Q2.

22          A.    Thank you.

23          Q.    The third point is that in 2019,

24   young -- 2019, not '20, young adult book

25   sales across the industry did not go down in

Page 271

1    Q3.

2         A.    Okay.

3         Q.    And, four, that AAP's statistics

4    show that in Q3 2020 --

5         A.    Uh-huh.

6         Q.    -- there was a decline in e-book

7    sales, but it was only a 3 percent decline,

8    whereas the 25 Hachette works-in-suit had a

9    10 percent decline on average in e-book

10   sales.

11        A.    Okay.

12        Q.    And let's assume that

13   Dr. Jorgensen did not do any further

14   controls.

15        A.    Okay.

16        Q.    Okay.  Assuming those facts, which

17   I understand may or may not be accurate, but

18   assuming those facts, do you think that is

19   sufficient data to determine the impact of

20   the Internet Archive on the plaintiffs'

21   sales?

22             MR. GRATZ:  Objection, vague,

23        incomplete hypothetical.

24        A.    These data alone -- now, again, I

25   apologize, I probably should have spent more

Page 272

1    time on the report.

2           These data just by themselves, I

3    would have to -- I would have to think hard

4    about where -- how we can get the -- a causal

5    relationship off the Internet Archive on --

6    on sales in general.

7    BY MS. STEINMAN:

8        Q.   And is that because there are

9    other explanations of what might have caused

10   these sales declines for the plaintiffs'

11   works?

12          MR. GRATZ:  Lacks foundation and

13      vague in its reference to the prior

14      question.

15       A.   Yeah, so -- sorry.  So this by

16   itself could be explained by -- these trends

17   can be explained by several or by -- you

18   know, by varying differences, you know,

19   across publishers.  Now, I don't know what

20   those differences could be.

21   BY MS. STEINMAN:

22       Q.   Okay.  Let's look at Jeff Prince's

23   report, which is Exhibit 7.

24       A.   Uh-huh.

25       Q.   And let's go to paragraph 96.

HIGHLY CONFIDENTIAL

Page 283

1    COMMONWEALTH OF MASSACHUSETTS
2    SUFFOLK, SS.

3

4        I, Sandra A. Deschaine, Registered
     Professional Reporter and Notary Public
5    within and for the Commonwealth of
     Massachusetts at large, do hereby certify
6    that the Zoom videotaped deposition of Imke
     C. Reimers, Ph.D., in the matter of Hachette
7    Book Group, Inc., et al., vs. Internet
     Archive, et al., via Zoom, on June 3, 2022,
8    taken and transcribed by me; that the witness
     provided satisfactory evidence of
9    identification as prescribed by Executive
     Order 455 (03-13) issued by the Governor of
10   the Commonwealth of Massachusetts; that the
     transcript produced by me is a true record of
11   the proceedings to the best of my ability;
     that the witness is reading and signing; that
12   I am neither counsel for, related to, nor
     employed by any of the parties to the action
13   in which this deposition was taken, and
     further that I am not a relative or employee
14   of any attorney or counsel employed by the
     parties thereto, nor financially or otherwise
15   interested in the outcome of the action, on
     this 5th day of June 2022.

16
17
18

19                   Sandra A. Deschaine
20                   Registered Professional Reporter
21
22
23
24

     My Commission Expires:
25   July 5, 2024

Prince Declaration

Exhibit 5

Page 1

1                UNITED STATES DISTRICT COURT

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3    --------------------------------------------------x

4    HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

5    JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

6

7                    Plaintiffs,

8    vs.                      Case No. 1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11

12                   Defendants.

13   --------------------------------------------------x

14

15      REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

16                       SUSAN HILDRETH

17                   Monday, May 17, 2022

18

19

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 5228055

```
1          MS. McNAMARA:  Jessie, and I would suggest
2     to you we have had a strict rule in these
3     depositions that you do not have speaking
4     objections.
5          You can say objection to form.  You can
6     say, you know, something like vague.  But you get
7     into specifics, you're coaching the witness and I
8     ask you to stop.
9          MS. LANIER:  Well, I respectfully object
10    to your classification of my objections as coaching
11    the witness.  I also don't think that was a speaking
12    objection.
13         I'd just ask you to rephrase the question,
14    please.
15         MS. McNAMARA:  I'll ask the witness to do
16    so, not you.
17       Q    Ms. Hildreth --
18         MS. McNAMARA:  Can we have read back the
19    last question?
20         (Discussion off the record.)
21         (Requested testimony read by the reporter.)
22         MS. LANIER:  Same objection.
23    BY MS. McNAMARA:
24       Q    Can you answer the question, Ms. Hildreth?
25       A    I understand that a specific author would
```

1  not receive a royalty for a specific title.  I am

2  looking at the situation in my mind more globally in

3  terms of overall what royalties would go to not a

4  specific author but a number of authors.

5          So that's my response to that.

6      Q    If the specific title that was available

7  through CDL was Catcher in the Rye by J.D. Salinger,

8  let's say, and you would agree that then the

9  Salinger estate would not receive a royalty if that

10 work was available via the Internet Archive and CDL?

11         MS. LANIER:  Objection, calls for

12 speculation.

13         THE WITNESS:  I'd have to know the context

14 of that question and I mean -- frankly, I'd have to

15 know the context of the question and there could be

16 many other avenues for obtaining access to

17 The Catcher in the Rye than purely relying

18 necessarily on CDL or the Digital Lending Library

19 for it.

20 BY MS. McNAMARA:

21     Q    Do you have a general opinion,

22 Ms. Hildreth, as to whether the plaintiffs have

23 suffered any economic harm as a result of the

24 Digital Lending Library?

25     A    I'm challenged in answering that question

Page 47

1      A     My opinion is not necessarily based on fact.

2   But from what I know of the e-book demand for --

3   generally in public libraries in the CD O or available

4   at a Digital Lending Library is a factor there.

5            But the demand for e-books and the revenue

6   that publishers and authors have had from the

7   expansion of the e-book market in public libraries

8   would lead me to the opinion that publishers and

9   authors are receiving -- are receiving funds as a

10  result of e-books in the library marketplace.

11     Q     The question really was not whether they

12  are receiving funds in the library marketplace,

13  because as I understand your testimony, you

14  recognize that there is a thriving e-book licensing

15  market for libraries; isn't that right?

16     A     Yes.

17     Q     And it's a thriving e-book market that has

18  increased in recent years; isn't that right?

19     A     Correct, yes.

20     Q     And that e-book market is predicated on

21  licensing revenues that are paid by libraries to

22  entities like OverDrive; is that right?

23     A     Correct, yes.

24     Q     And CDL does not pay those same licensing

25  revenues or Internet Archive's CDL practices do not

```
                                              Page 48
 1   pay those same licensing revenues, isn't that right?
 2           MS. LANIER:  Objection, compound.
 3   BY MS. McNAMARA:
 4       Q    You can answer the question.
 5       A    Yes, as far as I understand, yes.
 6       Q    They do not pay those licensing revenues?
 7       A    Yes.
 8       Q    Now, let's turn to your qualifications
 9   that support your expert report.
10           You indicate that you are currently a
11   library consultant; is that right?
12       A    Yes.  Could I ask if you're referring to a
13   certain part of the report that I should be referring
14   to?
15       Q    I believe Paragraph 1 you say --
16       A    Oh, okay.
17       Q    -- "I am currently working as a library
18   consultant."
19       A    Yes.
20       Q    You say that you're currently working as a
21   library consultant focusing on library executive
22   recruitment, strategic planning, organizational
23   review and community engagement; is that right?
24       A    Yes.
25       Q    Is that a full-time occupation?
```

Page 195

```
1    budget for e-books was being serviced through CDL,
2    then if I understand your testimony correctly, they
3    would redirect that -- those acquisition funds to
4    other services provided by the library; is that
5    right?
6              MS. LANIER:  Objection, vague.
7              THE WITNESS:  Again, I would want to look
8    at the context that -- of the library services, the
9    neighborhood, the community.  They might determine
10   that they wanted to spend more funds on languages
11   in -- on non-world languages to enhance their
12   collection.
13             They might decide that they would spend,
14   if additional funds were available, on community
15   outreach, which would not necessarily be part of the
16   acquisitions budget.
17             But the point that I would like to try to
18   be clear about is I do not think that because a
19   library might be able to achieve some of its
20   acquisitions content through CDL, I don't think that
21   the initial reaction to that at the local level
22   would be to reduce the library budget by a
23   commensurate amount.
24   BY MS. McNAMARA:
25        Q    I understand that.  But I also understand
```

Page 196

1   from your testimony that what the funding entity,

2   whether it be state or local would do, would be to

3   redirect those funds to other services; is that

4   correct?

5           MS. LANIER:  Objection, vague.

6           THE WITNESS:  I stated that -- and I would

7   continue to assert that the funds could well be used

8   for further different types of acquisitions.  They

9   also could be used for other types of services.

10          You would have to look at the specific

11  context to make that determination.  I don't think

12  it's a situation where you can make a global

13  statement or a generalized statement.

14  BY MS. McNAMARA:

15      Q    In Paragraphs 65 and 66 of your report,

16  you indicate that library budgets have generally

17  increased over the last ten years; is that right?

18      A    That's correct.

19      Q    Are you aware that during the pandemic,

20  libraries were awarded federal stimulus money?

21      A    Yes.

22      Q    Do you know approximately how much

23  stimulus money was awarded?

24      A    I don't want to make a guess, an uninformed

25  guess, no.

Page 197

 1        Q     Does $250 million sound approximately

 2    correct?

 3              MS. LANIER:  Objection, asked and

 4    answered.

 5    BY MS. McNAMARA:

 6        Q     Do you know the answer?

 7        A     The reason why I hesitate to agree to

 8    250 million is that's a very similar amount to the

 9    block grant funding for the states.

10              That could be the amount.  But I'm sorry,

11    I didn't follow that closely, so I don't have

12    specific knowledge.

13        Q     Are you aware that the money awarded via

14    the federal stimulus package was used for libraries

15    to license e-books?

16        A     I don't -- I would not -- it would not be

17    unreasonable if that were an eligible expense.  I

18    don't know that for certain.

19        Q     Are you aware that some publishers adapted

20    their terms so that the money from the federal

21    stimulus package could be spent on licensing

22    e-books?

23              MS. LANIER:  Objection, calls for

24    speculation.

25              THE WITNESS:  I'm not aware that that

1   happened, but that would be wonderful if it

2   happened.

3   BY MS. McNAMARA:

4        Q    In Paragraph 67 you say, "There are still

5   patrons who want to read print books and don't see

6   technology or digital materials as their primary

7   method of engaging in the world."

8             Do you see that?

9        A    Yes.

10       Q    Do you know what, if anything, Internet

11  Archive offers to patrons who do not want to engage

12  with digital media?

13       A    I'm not aware of what they do to provide --

14  to service patrons that don't want to deal with

15  digital media.

16       Q    Okay.  Your report discusses acquisition

17  budgets.

18            Are you familiar with that?

19       A    Yes.

20       Q    I believe that's in -- starts in

21  Paragraph 69 of your report.

22       A    Yes.

23       Q    Your report indicates that there are a

24  number of different things that -- other than books

25  that libraries purchase with their acquisition

Page 199

 1   budgets, including magazines and reference

 2   materials, nonprint physical content like CDs or

 3   DVDs or videos or streaming services and also

 4   objects to loan including libraries of things, tools

 5   and games.

 6           Do you see that?

 7      A    Yes.

 8      Q    And these are all materials that libraries

 9   may purchase with their acquisition budgets; is that

10   correct?

11      A    Yes.

12      Q    What are library of things?

13      A    Oh, the library of things is a service that

14   libraries are providing where they purchase games,

15   tools, different kinds of creative activities.  So

16   they actually loan like a tool or a game as opposed to

17   loaning a print or an e-copy of something.

18      Q    Do you know with regard to these things

19   that you can acquire through the acquisition

20   budgets, whether it be magazines or CDs or DVDs or

21   videos or tools or games, do you know whether any of

22   those things are available or subject to CDL?

23           MS. LANIER:  Objection, vague.

24           THE WITNESS:  I really don't know.  I

25   don't -- I don't know.

1          And the one that I have -- I have no idea

2    if there would be some kind of CDL implication with

3    the streaming services.  But I don't think that CDL

4    is subject to these other categories.

5    BY MS. McNAMARA:

6        Q    Do you know of any libraries that have

7    elected to rip and distribute DVDs on an

8    owned-to-loaned basis?

9          MS. LANIER:  Objection, vague.

10          THE WITNESS:  Could you repeat the

11    question?

12    BY MS. McNAMARA:

13        Q    Are you aware of a practice where you

14    could take a DVD and rip it and create a copy of it?

15          MS. LANIER:  Same objection.

16          THE WITNESS:  Well, first of all, CDs and

17    DVDs are really being phased out of libraries in

18    lieu of streaming services.

19          I do not know of libraries that have done

20    that practice with DVDs.

21    BY MS. McNAMARA:

22        Q    Wouldn't the same principle arguably apply

23    to DVDs as books if the library could leverage it in

24    some fashion to make it available to its users?

25          MS. LANIER:  Objection, vague, lacks

 1    foundation.

 2            THE WITNESS:  I don't feel qualified to

 3    respond to that question.

 4    BY MS. McNAMARA:

 5        Q    If libraries can leverage their print

 6    collections of books through a CDL, could that free

 7    up money in the acquisition budget for these nonbook

 8    categories?

 9        A    It certainly could do that.  It could also

10    free up money for fiction and nonfiction in print and

11    digital formats as well as some of these other

12    categories.

13    BY MS. McNAMARA:

14        Q    You would agree that if they were able to

15    leverage print collections through CDL and they

16    freed up some acquisition budget, they could use

17    that money to buy movies; is that right?

18        A    They would probably use that money to

19    support access to streaming services.  And I also

20    think they would use that for acquisition of

21    additional digital or print materials.

22            The lion's share, if you will, or the

23    largest share of these materials budgets are

24    allocated to fiction and nonfiction print and

25    digital.  So I would imagine that additional funds

Page 202

1    could go there.

2            They could also go to these other

3    categories, but the other categories are not the

4    primary categories in the acquisition budgets.

5        Q    But you agree that the acquisition -- the

6    fund freed up through CDL could go to purchasing

7    video games or other nonbook categories; isn't that

8    right?

9            MS. LANIER:  Objection, asked and

10   answered.

11           THE WITNESS:  Yes, they could.

12   BY MS. McNAMARA:

13       Q    So doesn't that undermine your thesis that

14   libraries will spend the same amount of money on

15   books and e-books regardless of whether CDL is

16   implemented?

17           MS. LANIER:  Objection, vague.

18           THE WITNESS:  As I said previously, the

19   materials budget has many different elements in it

20   and although it could be that if funds were freed

21   up, they'd be used to add some tools to the tool

22   lending library, there's -- depending on the context

23   and the requirements of the users, because the large

24   share of collections are in fiction and nonfiction

25   digital and print, I think it's just as likely, if

Page 203

```
 1   not more likely, that those funds would be used to
 2   buy additional e or print copies materials.
 3   BY MS. McNAMARA:
 4        Q    But you're speculating on that, aren't
 5   you?
 6             MS. LANIER:  Objection, mischaracterizes
 7   prior testimony.
 8             THE WITNESS:  Because the -- because
 9   libraries have had -- over the last ten years, they
10   have shifted their budgets to obtain more and more
11   e-content and e-books, and they have not ever really
12   been able to satisfy in most cases the demand for
13   e-books, I don't feel that it's complete speculation
14   to say that e-books are one of the most
15   highly-demanded items in this acquisitions budget
16   and that it would be -- it would not be unusual that
17   more e-books were added because e-books I think
18   they've reduced -- they're reducing expenses for
19   print format.  They are increasing expenses for
20   digital format and they do not have sufficient money
21   in those budgets to address all the requests for
22   digital formats.
23             So I think it's highly likely that
24   additional funds would be allocated to digital
25   format purchases.
```

Page 216

1          MS. LANIER:  Objection, vague, calls for
2     speculation.
3          THE WITNESS:  I don't have knowledge that
4     would help inform my answer whether they would or
5     wouldn't do that.
6     BY MS. McNAMARA:
7      Q    My question wasn't whether they would or
8     wouldn't do it.
9          I was saying since you've agreed nothing
10    binds them to five years, they could change that
11    tomorrow if they wanted; isn't that right?
12         MS. LANIER:  Same objection and asked and
13    answered.
14         THE WITNESS:  It's not unreasonable that
15    they could do that.  But I am not -- there is no
16    reason for me to believe that they necessarily would
17    do that.
18    BY MS. McNAMARA:
19     Q    The reallocation -- I mean, you say in the
20    next sentence, "They would reallocate their spending
21    away from e-book licensing for those titles being
22    accessed through CDL and would spend more on e-book
23    licensing for newer titles or on print books."  Is
24    that correct?
25     A    Yes.

1     Q    Again, what is the basis for your

2  contention that libraries would reallocate their

3  spending away from the titles that are available

4  through CDL and instead use that same money for

5  newer titles or on print books?

6     A    Again, I would refer to my practice and

7  experience of acquisitions approaches in libraries

8  where they were -- are always trying to obtain

9  additional copies of e-books and/or new print books.

10     Q    And so in this scenario that you're

11  describing in Paragraph 106, the library would no

12  longer be paying licenses for the e-books that are

13  available via CDL; is that right?

14          MS. LANIER:  Objection, vague.

15          THE WITNESS:  Yes, that's correct.

16  BY MS. McNAMARA:

17     Q    And the spending on e-book licensing,

18  either the new books or on print books, would be for

19  different works, would it not?

20          MS. LANIER:  Objection, vague.

21          THE WITNESS:  I think in some cases it

22  would be for different works.

23  BY MS. McNAMARA:

24     Q    Is your argument here in Paragraph 106

25  that the publishers will not suffer any financial

Page 218

1   harm because libraries have a fixed amount of money

2   to spend on acquisitions every year and will

3   inevitably spend it all?

4           MS. LANIER:  Objection, vague.

5           THE WITNESS:  My position here is that in

6   most circumstances, the library would spend all of

7   its materials acquisitions budget on e-books or

8   print books and, therefore, even though the spending

9   might be in somewhat different formats, the

10  publishers would receive revenues from those

11  acquisitions.

12  BY MS. McNAMARA:

13      Q    But you've agreed that they would not

14  receive revenue for the works that they are

15  obtaining through CDL; isn't that right?

16          MS. LANIER:  Objection, asked and answered

17  and mischaracterizes previous testimony.

18          THE WITNESS:  Yes.

19  BY MS. McNAMARA:

20      Q    In Paragraph 106 you're talking about

21  libraries generally; is that correct?

22      A    I'm talking about specifically really my

23  experience in public libraries.

24      Q    And again, do you feel comfortable with

25  your expert opinion that what you're stating in

Page 225

1    Q    Internet Archive is not primarily funded

2    by tax dollars, are they?

3            MS. LANIER:  Objection, calls for

4    speculation.

5            THE WITNESS:  I don't know all of their

6    revenue sources, but I don't think the primary

7    sources are public dollars.

8    BY MS. McNAMARA:

9    Q    To the degree that e-books are available

10   through CDL on Internet Archive, the user is not

11   getting the benefit of any original acquisition or

12   payment of tax dollars by Internet Archive, are

13   they?

14           MS. LANIER:  Objection, vague.

15           THE WITNESS:  I would say correct.

16   BY MS. McNAMARA:

17   Q    Paragraph 107 of your report, you indicate

18   in the last sentence, "Because of these required

19   expenses, the materials budget, which is

20   discretionary compared to other expenditures, is

21   often used as the budget balancer on an annual

22   basis - meaning that where reductions must be made

23   to balance the budget, those reductions are often

24   made to the materials budget."

25           Do you see that?

Page 226

1    A    Yes.

2    Q    Are you suggesting that acquisition

3  budgets are at particular risk of being squeezed

4  because they are discretionary?

5         MS. LANIER:  Objection, vague as to

6  "squeezed."

7         THE WITNESS:  I am suggesting that it is

8  not uncommon that required expenses -- legally

9  required expenses, say insurance or updating of fire

10  equipment or a variety of expenses that are required

11  to keep a building open to the public may take

12  priority over expenses allocated to materials.

13  BY MS. McNAMARA:

14    Q    In Paragraph 109 of your report, you

15  indicate that "In light of the priority of materials

16  acquisition and the current state of limited budgets

17  for those materials, libraries would not reduce

18  their materials budgets if reliance on CDL for

19  certain digital content reduced their spending on

20  the particular titles that were provided through

21  CDL."

22         Do you see that?

23    A    Yes.

24    Q    Is it your expert opinion that libraries

25  will spend less money on licensing the e-book

Page 259

1      Q     Do you have data that is available to you

2  that would cover e-books licensing should CDL become

3  common in the 9,000 -- what was it, 9,000?

4      A     9,000 systems.

5      Q     The 9,000 library systems, do you know of

6  any data that would indicate what these 9,000

7  libraries would do with regard to reallocation of

8  their resources should they all start to employ CDL?

9      A     I don't have any immediate awareness of data

10 in terms of the 9,000 library systems.  There could be

11 some kind of analysis done on a couple of sample

12 libraries to see what the trends might be.

13     Q     Do you know whether any public library has

14 done -- has created data concerning their

15 reallocation of e-book licenses when they use CDL?

16     A     I'm not aware of any that have done that.

17     Q     And we've established in your testimony

18 that a relative handful of public libraries are

19 actually using CDL; isn't that right?

20           MS. LANIER:  Objection, vague and

21 mischaracterizes previous testimony.

22           THE WITNESS:  I would say that we can

23 agree in terms of public libraries that have signed

24 on to the CDL statement, that's a limited number.

25 And there hasn't been a data set created as far as I

Page 260

```
 1   know that has determined what public libraries are
 2   or not using CDL.
 3   BY MS. McNAMARA:
 4        Q    And -- but we also did look -- in addition
 5   to the public libraries that signed on to the
 6   controlled digital lending statement, we looked at
 7   the public libraries that have been identified as
 8   partner libraries with Internet Archive.
 9             Do you recall that?
10        A    Yes.
11        Q    Do you recall that there were
12   approximately six or seven public libraries that
13   have become partner libraries with the Internet
14   Archive?
15        A    Yes.
16        Q    So any data set arising out of the
17   practices of those six or seven libraries, do you
18   believe that that would be representative of the
19   9,000 public libraries that exist in the United
20   States?
21             MS. LANIER:  Objection, vague, lacks
22   foundation.
23             THE WITNESS:  If I were to attempt to do
24   an analysis, which I'm not necessarily going to do,
25   I would not feel that I had to be bound by either
```

Page 261

1    the signatories to the controlled digital lending

2    statement or the partner libraries in terms of who

3    is using CDL to access and review the kind of

4    information that we're talking about.

5            I would want to determine some kind of a

6    sampling that had a large, medium, small library

7    using CDL to do a very simple analysis.

8    BY MS. McNAMARA:

9        Q    And how would you conduct that sample

10   analysis with today's data?

11       A    I would have to think about that.  I have

12   not developed a plan for that.

13       Q    But are you planning to do such an

14   analysis?

15           MS. LANIER:  Objection, asked and

16   answered.

17           THE WITNESS:  I really have to think about

18   it and I'm not committed to do doing that.

19   BY MS. McNAMARA:

20       Q    I'm not asking you whether you're

21   committed, Ms. Hildreth.

22           I'm trying to understand that if you were

23   to conduct such an analysis, how would you go about

24   getting that data and conducting an analysis that

25   could be deemed to be representative of the 9,000

Page 262

1    public libraries in the United States?

2            MS. LANIER:  Objection, vague.

3            THE WITNESS:  I think it could be very

4    challenging to do that analysis.  I think what you

5    could come up with is a sampling that might identify

6    a trend.

7            But at this point the data collection is

8    not universally done so that you would have a

9    statement and could represent what might be

10   happening in most public libraries in the U.S.

11   BY MS. McNAMARA:

12       Q    Thank you.

13            You were asked the question:  Do you know

14   whether the availability of books on the Digital

15   Lending Library has, in fact, had any effect on

16   demand for e-book licenses?

17            You said:  I don't know.

18            Do you see that -- I mean do you

19   understand that?

20       A    Yes, I understand that.

21       Q    So you can't say that the availability of

22   e-books on the Digital Lending Library has had no

23   demand for e-book licenses, can you?

24            MS. LANIER:  Objection, vague.

25            THE WITNESS:  I can say that I don't know

Page 266

1      I, LYNNE M. LEDANOIS, a Certified

2   Shorthand Reporter of the State of California, do

3   hereby certify:

4      That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that a record of the proceedings was made by me

7   using machine shorthand which was thereafter

8   transcribed under my direction; that the foregoing

9   transcript is a true record of the testimony given.

10      Further, that if the foregoing pertains to

11   the original transcript of a deposition in a Federal

12   Case, before completion of the proceedings, review

13   of the transcript [X] was [] wasn't requested.

14      I further certify I am neither financially

15   interested in the action nor a relative or employee

16   of any attorney or party to this action.

17      IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20

21   Dated: May 19, 2022

22

23      *Lynne Marie Ledanois*

24      _____

        LYNNE MARIE LEDANOIS

25      CSR No. 6811

Prince Declaration

Exhibit 6




DATE DOWNLOADED: Thu Jun  2 12:43:02 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Imke Reimers, Can Private Copyright Protection Be Effective: Evidence from Book
Publishing, 59 J.L. & ECON. 411 (2016).

ALWD 7th ed.
Imke Reimers, Can Private Copyright Protection Be Effective: Evidence from Book
Publishing, 59 J.L. & Econ. 411 (2016).

APA 7th ed.
Reimers, I. (2016). Can private copyright protection be effective: evidence from book
publishing. Journal of Law & Economics, 59(2), 411-440.

Chicago 17th ed.
Imke Reimers, "Can Private Copyright Protection Be Effective: Evidence from Book
Publishing," Journal of Law & Economics 59, no. 2 (May 2016): 411-440

McGill Guide 9th ed.
Imke Reimers, "Can Private Copyright Protection Be Effective: Evidence from Book
Publishing" (2016) 59:2 JL & Econ 411.

AGLC 4th ed.
Imke Reimers, 'Can Private Copyright Protection Be Effective: Evidence from Book
Publishing' (2016) 59(2) Journal of Law & Economics 411

MLA 9th ed.
Reimers, Imke. "Can Private Copyright Protection Be Effective: Evidence from Book
Publishing." Journal of Law & Economics, vol. 59, no. 2, May 2016, pp. 411-440.
HeinOnline.

OSCOLA 4th ed.
Imke Reimers, 'Can Private Copyright Protection Be Effective: Evidence from Book
Publishing' (2016) 59 JL & Econ 411

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*

Exhibit
0003

# Can Private Copyright Protection Be Effective? Evidence from Book Publishing

Imke Reimers    *Northeastern University*

## Abstract

Digitization has impacted publishing, news, and entertainment industries in recent years by lowering the cost of access. With the option to download creative works legally, however, come the possibility of doing so illegally and the issue of how to protect copyrighted works effectively. Public (legislative) and formal (legal) efforts to prevent copyright infringements have been controversial or inefficient. The book industry showcases an alternative approach in which private companies use relatively inexpensive network surveillance to protect individual titles. I estimate the effectiveness of such protection on legal sales of books that become protected using a difference-in-differences approach. I find a protection-related increase in sales of electronic books—the closest substitute for online piracy—of more than 14 percent, with effectiveness depending on popularity, genre, and search frequency. Most of the increase is due to prevention of casual infringements rather than professional piracy.

## 1. Introduction

Digitization has significantly decreased the costs of creating and distributing cultural goods in media industries, and it has started to do the same in other industries as well (for example, using three-dimensional [3-D] printing). The collapse of traditional costs has increased the quantity and variety of products available to consumers. The wider variety is expected to increase the level of competition and lower prices further. Consequently, it is affecting firms' and artists' profitability. By themselves, these changes shift surplus from producers to consumers.

Digitization has had another effect though. As the legal distribution of creative works has become cheaper and easier, so has the illegal distribution of these

I am grateful to James Dana, John Kwoka, Gerard McCullough, and Joel Waldfogel for useful feedback and advice. I would like to thank an anonymous referee and seminar participants at Northeastern University, the University of Groningen, the Centre for European Economic Research Conference on Information and Communication Technologies, the University of Minnesota, the Institute for Prospective Technological Studies Workshop on the Interaction between Legal and Pirated Book Sales, the University of Zurich, and the National Bureau of Economic Research productivity lunch for helpful suggestions that improved the paper. Finally, I thank RosettaBooks and Digimarc for generously providing data to support this research.

[*Journal of Law and Economics*, vol. 59 (May 2016)]
© 2016 by The University of Chicago. All rights reserved. 0022-2186/2016/5902-0014$10.00

works. Recent academic studies show that illegal distribution displaces legal sales in media industries, even though modern technology has made monitoring and regulation of illegal activity more feasible. Thus, the question of what is the best intellectual property strategy becomes extremely important for each artist, firm, and distributor and in each industry. To what extent can works be effectively protected from piracy, what should this protection look like, and who should enforce it?

Many well-known efforts to protect copyright have been public, or legislative, in nature, with mixed success and reception. Other efforts have been legal in nature, often attempting to protect the entire industry at once—an effort that can be very costly. A less formal type of protection, private copyright protection that targets individual works, has received less attention but might have clear advantages. Most important, the ability to target a subset of works could make the effort to prevent infringement more efficient.

The book publishing industry provides a setting that allows me to analyze such an effort to protect a work's copyright. In the book publishing industry, targeted copyright protection efforts are led by private companies that are hired by publishers to search the Internet for infringing content specific to protected titles. Protection from piracy is title and publisher specific rather than industry wide. It is initiated by publishers and authors rather than by public officials, and the firms attempt to remove infringing content without the involvement of courts, which further lowers the costs of protection.

I estimate the effect of such a private antipiracy effort on legal book sales. I use a novel data set consisting of monthly electronic book (e-book) sales of titles that are offered exclusively in electronic format by one publisher (RosettaBooks) and those titles' weekly physical sales from January 2010 to December 2013. The data set includes the intensity level and success rate of protection from piracy (hereafter, piracy protection) over the same time period through Digimarc, a large piracy protection company. I follow sales of each title in the publisher's catalog before and after its title-specific piracy protection begins in a difference-in-differences setting. I check whether (and by how much) sales rise or fall when protection for a title begins relative to the sales of other titles that become protected at another time.

In this analysis, I take advantage of the facts that initiating protection of a work is a relatively labor-intensive process that was implemented in shifts over several months by Digimarc and that RosettaBooks seemed unaware that the order in which titles were submitted might affect its profits. I further use data from Google Trends to provide evidence that the timing of protection is exogenous and consistent. Here I take advantage of the fact that the Internet search volume likely reflects consumers' interest in a work, whereas it should be uncorrelated with the timing and level of piracy protection, at least before protection begins.

A large and growing literature addresses the effect of file sharing in media industries (see Smith and Telang [2012] for a detailed description; see Peitz and Waelbroeck [2006a] for a review of the theoretical literature). While some early

work indicates that there is no significant effect (Oberholzer-Gee and Strumpf 2007), most recent work finds that legal sales are significantly displaced by pirated versions (Zentner 2006; Rob and Waldfogel 2006; Liebowitz 2008; Waldfogel 2010; Danaher, Smith, and Telang 2015). In the music industry, the negative effect of file sharing on legal sales can in part be attributed to the arrival of Napster in 1999, a file-sharing website that revolutionized the industry. The first legal option to download music did not appear until almost 4 years later, when Apple sold its first songs through the iTunes Store in May 2003.

More recently, research on file sharing has turned to determining whether antipiracy efforts can be effective, taking as a given that piracy likely harms sales in an industry. Most efforts to protect creative works have been legislative, and many have been controversial. Consider, for example, the Internet blackout to campaign against the Stop Online Piracy Act (SOPA; H.R. 3261, 112th Cong. [2011]) and the Protect Intellectual Property Act (PIPA; S. 968, 112th Cong. [2011]) in January 2012.[1] Similarly, the French Parliament passed the Creation and Internet Law, an antipiracy law more commonly known as HADOPI, in 2009 (Loi 2009-669 du 12 juin 2009 favorisant la diffusion et la protection de la création sur internet [Journal Officiel de la République Française [J.O.] [Official Gazette of France], June 13, 2009, p. 9666]). This bill introduced a three-strikes policy in which consumers of illegal music were blocked from the Internet after two warning notices. While Danaher et al. (2014) find that awareness of this law increased legal music sales on iTunes, the bill faced controversy as France's Constitutional Council declared access to the Internet a basic human right, and the bill was finally revoked in July 2013.

Most legal efforts to prevent piracy tend to be broad in scope as well. In the movie industry, the abrupt shutdown of the cyberlocker Megaupload in January 2012 had a significant positive effect on box office revenues and digital movie sales of popular works, but the shutdown did not have a positive effect on box office revenues of less well-known works (Peukert, Claussen, and Kretschmer 2013; Danaher and Smith 2014). In music, the Recording Industry Association of America made legal threats against file sharers, which decreased the level of file sharing, although a substantial number of illegal files remain available (Bhattacharjee et al. 2006). Another effort by the major music labels to control secondary distribution of content through digital rights management (DRM) does seem to have a positive effect on sales (Zhang 2014).[2]

Legal efforts to prevent copyright infringement face less controversy than legislative efforts, but it is not clear if the gains from such protection outweigh the effort that is exerted to protect a work, especially when protection is broad. I address these questions by examining the effectiveness of a less formal form of pi-

[1] The acts aimed to facilitate the combating of online copyright infringement by (among other measures) barring advertising networks from conducting business with infringing sites, barring Web search engines from linking to those sites, and requiring Internet service providers to block access to them.

[2] Digital rights management restricts consumers' ability to copy (and thus redistribute) the content they have purchased.

racy protection—one in which private firms offer surveillance of piracy activity for specific titles—by comparing the resulting increases in revenue with the costs of protection. My work thus lends support to Luo and Mortimer (2015), who find that private enforcement in the form of ex post infringement settlement requests for stock photography can indeed be successful. I show that these attempts can lead to increases in revenue that outweigh the cost of protection, especially when legal action can be avoided.

In particular, I find that the effect of piracy protection on legal sales of books depends on the popularity of the title, the type of work, and the format of the edition. While physical formats are not affected by piracy protection, closer substitutes for online piracy such as legally distributed e-books see a mean differential protection-related increase in sales of at least 14 percent. My results suggest that the effect is driven more by the delisting of links from search engines than by a decrease in piracy sites offering the titles. This indicates that casual offenders are more easily deterred than serious pirates. Moreover, this type of piracy protection increases e-book revenue by up to 10 times the cost of protection. I find that private and targeted piracy protection can be effective, and if the right set of works is protected with an appropriate level of intensity, this protection can even be cost-efficient.

The remainder of the paper proceeds as follows. Section 2 provides background on the publishing industry and the role of piracy. I describe the data in detail in Section 3, and I describe my empirical strategy and provide evidence that the effect is identified in Section 4. I show results for the effectiveness and efficiency of protection in Section 5, and I examine the mechanism by which protection works in Section 6. I conclude with policy implications in Section 7.

## 2. Industry Background and Piracy Protection

The recorded-music industry faced challenges from digitization when the Napster file-sharing service was introduced in 1999. Since then, digitization has posed challenges to all media industries, and it will likely pose challenges in nonmedia industries as well, as digitization (for example, 3-D printing) becomes more widely used. Some of these challenges can be attributed to increased competition through free (pirated) versions.

The effects of file sharing and the effort to stop it are not yet well studied for book publishing, as digitization in this industry has lagged behind other media industries.[3] While e-books can be read on computers and have therefore been available for over a decade, they are most useful to consumers when read on small hand-held devices, such as e-book readers or tablet computers. Sony released e-book readers as early as 2004, but the first widely adopted e-reading de-

---

[3] Hardy, Krawczyk, and Tyrowicz (2014) report on a field experiment in which they limited piracy for a set of more recent book titles in Poland. While they find that piracy can in fact be limited, they do not find an effect of such action on legal sales. My paper looks at a different set of titles and a slightly more comprehensive protection strategy. While their strategy consists only of takedown notices, my strategy includes requests to delist links from search engines.

vice was Amazon's Kindle, which was introduced in November 2007, when there was no widespread option to download content illegally. The e-reader and e-book markets have grown quickly since then. The share of US adults owning an e-book reader grew from 2 percent in April 2009 to 24 percent in September 2013, and the share of adults owning either an e-reader or a tablet (or some viable method for consuming e-books) reached 50 percent in January 2014 (see Sterling 2014). Electronic books have similarly become increasingly popular. While e-books held a negligible market share among fiction books before 2007, about half of the weekly *USA Today* top 150 best-selling books had been sold primarily as e-books by late 2012 (see Waldfogel and Reimers 2015).

Online piracy has been relatively concentrated in other content industries. Although many book titles are available on well-known piracy sites (for example, peer-to-peer networks such as Piratebay), the book industry does not face one large file-sharing service, as was the case with Napster in the music industry.[4] Book files are smaller than music and movie files, which makes it convenient to store e-books as intact files. Thus, much of the infringing content is located on websites rather than on peer-to-peer networks, which makes tracking and removing illegal content more feasible.

The small file size of books may also lead to fewer dedicated pirates. Most book content (65 percent) is either in HTML or pdf format—formats that are easy to upload and download but can detract from the reading experience. Only 20 percent of the infringing content in my data set is clearly recognizable as being in an e-book format, perhaps because these formats have additional protection against copying (for example, DRM).[5]

In the book publishing industry, copyright protection involves two major steps: requesting that search engines delist the link to the infringing content and demanding the site's host remove the pirated content directly. The two actions target different types of pirates. Consumers who are deterred by changes to search results are likely casual pirates, while more serious pirates are less likely to rely on search engines to find content. Sivan, Smith, and Telang (2014) show for the movie industry that the presence of links to pirated material in search results strongly affects the piracy behavior of consumers.

This paper follows titles that become protected by Digimarc, one of the industry's largest antipiracy services.[6] Its piracy protection strategy includes an automated crawling process to find suspected pirated content. Sites with confirmed pirated content are subject to two types of treatment: the company sends requests to the search engines Google and Yahoo! to delist the links, and it sends takedown notices to the provider of the illegal content, essentially until the content is

---

[4] Peer-to-peer networks are created when two or more computers are connected and share resources without going through a separate server computer.

[5] It is not obvious why pirates offer infringing content for books, as offering this content is not typically monetized. Many suppliers of pirated content list entertainment, a sense of community, and popularity as the main motivators for offering such content.

[6] The service was introduced by Attributor, which was acquired by Digimarc in December 2012. It is now known as Digimarc Guardian.

removed. These two actions affect different types of pirates. Delisting from search engines prevents casual consumers of illegal content—those who rely on search engines to find illegal content—from reading pirated versions, while removing infringing material has a better chance of diverting more experienced pirates—those who know where to find pirated content anyway. Protection continues as long as the title is under contract.

Digimarc has added most of the major US publishing houses as clients over the past few years. The publishing companies include HarperCollins and Macmillan (both signed in 2010, although Macmillan now uses another service), Simon & Schuster (2011), and Random House (2013, now Penguin Random House). In addition, it added several smaller publishers. RosettaBooks, which signed with the company in June 2011, is one of those publishing houses.

RosettaBooks has secured exclusive rights to publish electronic versions of over 600 titles.[7] Its list consists largely of backlist titles, ranging from well-known classics (including, among others, works by Kurt Vonnegut, Arthur C. Clarke's *Space Odyssey* books, and Stephen Covey's *The Seven Habits of Highly Effective People*) to works that are less well known today. While most of its titles were originally published more than a decade ago, RosettaBooks also carries some original titles that are available only in electronic format.

Protection for RosettaBooks' full catalog was due to begin in June 2011. Although the entire catalog came under protection on the same date, the implementation occurred in shifts, and the timing was not coordinated with the publisher. When asked why titles became protected in shifts, an employee of Digimarc relayed that the timing with which titles came under protection was related to capacity constraints rather than strategic decisions.[8] In addition, according to this account, the publisher was not aware of any capacity constraints at the time.[9]

### 3. Data

I follow the demand for and piracy protection of a set of book titles over 4 years, from 2010 to 2013. The underlying data set consists of 653 titles whose electronic versions are exclusively published through RosettaBooks.[10] Most of the works were originally published several years ago, going back as far as the first

[7] While electronic editions are published only by RosettaBooks, physical editions are released by other publishers.
[8] The employee stated: "I am afraid we do not have concrete reasons why titles were protected in shifts. . . . It took some doing before we had a regular ONIX feed set up and it appears that the global catalog was added in shifts, where large blocks were ingested in batches rather than the entire catalog being added in one shot. I think we actually got a flat file or two before the full feed, and then deltas following the initial large feed with anything that wasn't on the first list. Why it was broken down that way isn't something we have much explanation for, apart from saying this is how it was supplied to us, and it took a while before it was complete" (Blair Elefant, Digimarc senior relationship manager, e-mail correspondence with the author, July 28, 2015).
[9] I am especially grateful for the recommendations of an anonymous referee who suggested a number of econometric tests to establish exogeneity of the timing in support of this e-mail message. These tests and the affirmative results are described in Sections 4 and 5.
[10] For the full catalog, see RosettaBooks, Ebooks A–Z (http://www.rosettabooks.com/ebooks-a-z/).

Table 1
Effect of Takedown Notices

|  | N | Mean | SD | Min | Max |
|---|---|---|---|---|---|
| Sites per title | 251 | 87.899 | 183.025 | 1 | 1,984 |
| Notices per site | 20,041 | 1.596 | 1.259 | 0 | 29 |
| Success | 20,041 | .835 | .371 | 0 | 1 |
| Success after first notice | 20,041 | .745 | .436 | 0 | 1 |
| Time until success (days)[a] | 16,739 | 17.834 | 56.433 | 0 | 857 |

[a] For sites with infringing content that was successfully removed.

half of the 20 century, although all titles are still protected by copyright. There also are a few titles that were published in the past 15 years. My analysis includes the subset of 251 titles for which pirated content was found between 2011 and 2013.

On the demand side, I use the Nielsen BookScan database to observe weekly sales data for physical book formats: hardcover, trade paperback, mass-market paperback, and audio versions. While these sales data date back to 2002, I focus on the time period from January 2010 to December 2014. These data include all editions of the title that are listed by Nielsen. I also observe monthly e-book unit sales at the title level directly through RosettaBooks (the exclusive publisher of the titles' e-books) from July 2011 to December 2013. These editions are sold through Amazon, Apple's iBooks Store, and Barnes and Noble. The publisher carries a few popular titles that sell far more than 100,000 copies annually and some that sell fewer than 1,000. On average, editions sell close to 3,000 copies a year, although this varies by format, with trade paperbacks and e-books being the most popular formats.

On the piracy dimension, I obtained detailed information from Digimarc. I observe when the title came under contract to be protected, the date that each illegal link to each title was found, when takedown notices were sent to websites offering specific titles, and when the pirated content was taken down. The titles in my data set have 24 different protection start dates between August 2011 and November 2013. Digimarc searches for titles at three different frequency levels, depending on the amount of piracy that is found. The search frequency of a title can vary over time, although it does not do so often.

Table 1 shows summary statistics for all titles that were protected during the observed time period. The antipiracy service appears to have some success in reducing file sharing, and this success comes reasonably quickly. Over 50 percent (10,417) of all infringing content is taken down within 1 week of being found. Yet it is possible that not all websites are found and that taking down content on one website will simply lead to another one showing up to offer the same title (on the emergence of new piracy sites when content on one is removed, see Aguiar, Claussen, and Peukert [2015] and Danaher, Smith, and Telang [2015]). The fact that Digimarc finds close to 88 sites per title on average, and that pirated content on over 83 percent of those is successfully removed, indicates that the company



**Figure 1.** Piracy of *I Am Legend*

affects the online book piracy landscape, at least for the titles that RosettaBooks offers. The relatively high success rate may be due to the nature of piracy in book publishing. Because e-book files are small, there are more small sites with infringing material, and the operators of such sites may be more easily intimidated by takedown notices.[11] Moreover, since offering pirated content is not usually monetized, pirates have no direct incentives to continue offering the content.

The number of detected piracy sites with infringing content that has not been removed increases on average over time because not all takedown notices are successful. Figure 1 illustrates the statistics for Richard Matheson's *I Am Legend*.[12] The number of active sites decreases at times. For example, while there is a spike in piracy in late December 2011 with up to 36 infringing sites (December 21), some of the copyrighted content on these has been successfully removed by January 2012, with only 23 active sites by January 1. In early 2014, though, 50 infringing sites can be found. This variation allows me to use the net change in the number of sites as a measure of the success of takedown notices.

---

[11] Overall, 69.8 percent of infringing content in my data set is found on cyberlockers (Internet hosting services designed to host users' files), most of which is in HTML and pdf formats, while only 18 percent is found on peer-to-peer networks. Peer-to-peer networks are notoriously difficult to contain, with a success rate of only 65 percent, compared with 87 percent for cyberlockers.

[12] The facts that I do not observe the number of sites with infringing content before protection and that the number of active sites detected increases over time make it difficult to use protection as an instrument for the level of piracy. I instead estimate the effect of protection itself.

The Google Transparency Project and the website Chilling Effects (now Lumen) track which links have been subject to delisting requests. Most of the links are in fact removed from the search engine. Between May 2013 and September 2014, only 358 of Digimarc's 10,198 requests (3.5 percent) regarding RosettaBooks were not honored. However, there is no information about which links remained active and, more important, when the link was delisted, although the delisting typically takes place within hours.

I use two more sources to collect additional information about each title's interest level (popularity) and quality. To measure each title's popularity at any given time, independent of its piracy level, I collected the Google search history for all titles and authors from January 2011 to December 2013 through Google Trends. While Google Trends does not provide absolute counts of search queries, it allows me to compare the relative interest levels across time and across search queries.[13] I collected information about the quality of titles using the crowd-sourced online book database Goodreads. The mean (median) number of reviews for the titles in my analysis is 4,855 (483) for e-books and 20,821 (1,500) for physical books, and the mean (median) star rating (on a scale from 1 to 5) is 3.75 (3.75) for e-books and 3.85 (3.86) for physical books. I use this information when disentangling the effect of piracy on different types of titles. Finally, I use information about site traffic from Alexa Internet, Inc., to approximate the actual level of piracy in robustness checks.

## 4. Empirical Strategy and Identification

In an ideal experiment that determines the effect of piracy protection, the econometrician assigns titles randomly across groups and protects one set of titles. I observe a quasi experiment in which the timing of protection adoption across titles is uncorrelated with the returns to protection. Although protection for all of RosettaBooks' titles was contracted for at the same time, the order in which the protection was applied was determined by when each title was submitted, and the order of submission was independent of a title's characteristics.[14] The marginal effect of online piracy protection on book sales is then the change in sales of the treated titles as compared with the change in sales of the group of titles that were not yet treated. The empirical strategy takes advantage of the change in protection in a difference-in-differences analysis. The log of the (observed) unit sales $q_{it}$ of title $i$ in time period $t$ is a function of the work's observable characteristics and its protection status in that time period.

The effect of piracy protection is identified because I observe sales of titles when they are protected and when they are not protected. Since implementation of piracy protection occurred at different times for different titles, it is unlikely that any changes in sales when a title moved into piracy protection are due to

---

[13] I use the variation on those dimensions to support my claims of exogeneity of protection in Section 5.4.

[14] I provide evidence of this independence in Section 5.4.

an exogenous time-dependent shock that affected the overall demand for books. Moreover, a change in the level of piracy for one title is unlikely to directly affect legal demand for another title (although it might affect the level of piracy for other titles). I estimate the effect of piracy protection as

$$\log(q_{it}^k) = \boldsymbol{X}_{it}'\beta + \alpha \times \text{Protection}_{it} + \boldsymbol{\delta}_i^k + \boldsymbol{\mu}_t^k + \varepsilon_{it}, \tag{1}$$

where $q_{it}^k$ denotes the unit sales of title $i$ in week $t$ in format $k$, with $k \in$ {hardcover, trade paperback, mass-market paperback, audiobook, and e-book}, and $\boldsymbol{X}_{it}$ includes time-varying characteristics of titles including recent editions, age, average sales prices, and the search volume on Google (the readers' interest in the title).[15] Finally, Protection$_{it}$ is a dummy variable that equals one if the title is under piracy protection in week $t$. The effect of piracy protection on legal book sales is given by $\alpha$, where piracy protection causes a change in legal sales of $e^\alpha - 1$ percent.[16] The log specification assumes that piracy changes sales by a common percentage rather than by a common absolute amount. This controls for differences in absolute sales levels across titles.

I also make use of the fact that I observe unit sales of over 120 titles (depending on format) over an extended time period (170 weeks for physical books and 30 months for e-books) by controlling for title $i$ and format $k$ ($\boldsymbol{\delta}_i^k$) and by adding time fixed effects ($\boldsymbol{\mu}_t^k$), which are allowed to vary across formats (e-books have become more popular over time). The title fixed effects pick up the overall popularity of the title, the genre, and the author. Time fixed effects control for changes over time that affect all titles similarly, such as changes in the economic environment or the release of a new e-reader or tablet.

In additional specifications, I use the overall protection and a measure for the effectiveness of takedown notices as my independent variables of interest to identify the leading mechanism behind the success of piracy protection. I also estimate the role of intensity of protection: the effect of different levels of search for infringing content. I then separate the effect of piracy protection on sales of well-known works and less well-known works and sales of fiction and nonfiction titles to determine what types of works are more likely to benefit from protection.

## 5. Results

I follow unit sales for different formats of the titles from January 2010 to January 2014 (physical sales) and from July 2011 to December 2013 (e-book sales). I estimate several versions of equation (1) for different formats and sets of titles.

---

[15] I control for readers' interest instead of using an instrumental variables approach in which I estimate a title's protection status as a function of readers' interest in the first stage because readers' interest is not a good predictor of a title's protection status.

[16] As I observe some periods with no physical sales for some titles, I use $\log(q_{it}^k + .00001)$ as the dependent variable for physical formats. In that case, the marginal effect is interpreted with a bias. The bias understates the true effect but goes to 0 quickly (the bias is $\Delta q/q(q + .0001)$). The estimation of e-book sales does not require this adjustment, as I do not observe time periods with no sales.

Table 2
Baseline Results: Titles Moving into Piracy Protection

| | | Paperback | | | |
|---|---|---|---|---|---|
| | Hardcover | Trade | Mass Market | Audio | E-Book |
| Protection | −.0649 | −.167 | .103 | .342 | .144[+] |
| | (.338) | (.192) | (.136) | (.415) | (.0768) |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,104 |
| $R^2$ | .024 | .043 | .039 | .041 | .081 |
| Titles | 60 | 88 | 59 | 43 | 126 |

**Note.** Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. The percentage change in unit sales as a result of protection is calculated as $e^{\beta_{Protection}} - 1$. All regressions include title fixed effects.

[+] $p < .1$.

### 5.1. Baseline: Piracy Protection

Table 2 shows the baseline estimation results for all titles that moved into protection at some point during the observed time period, with at least 2 months on and off protection. The independent variable of interest is an indicator variable that equals one if the title is under contract with Digimarc. I treat a title as protected in all time periods after the first piracy site is found, regardless of the number of sites that are found and/or from which content is taken down in any given time period. The dependent variable is the log of unit sales of format $k$ of title $i$ in time period $t$. Note that the number of titles varies across formats because some titles are not available in all formats.

Table 2 shows that the effect of piracy protection on legal book sales depends on the edition's format. Electronic books can be regarded as the closest substitutes for pirated versions. Piracy protection has a large and statistically significant positive effect (at 10 percent) on sales of e-books. Moving a title into piracy protection increases e-book sales by 15.5 percent ($=e^{.144} - 1$).[17] Physical editions of a title, on the other hand, are not necessarily close substitutes for free electronic versions of the same title. Consequently, the effect of piracy protection is insignificant at the 10 percent level for the physical formats (including audiobooks) and negative (but highly insignificant) for hardcover books and trade paperbacks. More generally, the effect on physical formats is estimated very imprecisely, which leads me to focus much of my analysis on e-books.

[17] The remainder of the paper reports the extrapolated percentage change in sales, while the tables report the estimated coefficients. Note that I cluster standard errors by title to account for common group effects and to reduce the potential for overstating significance due to serial correlation (see Bertrand, Duflo, and Mullainathan 2004). The number of titles is large, so any nonnormality of the errors is not a big concern (see Donald and Lang 2007). Note also that this positive effect of protection is robust to different definitions of protection. See Appendix Section A1.

### 5.2. Additional Controls

Of course, Table 2 does not take into account several factors that may contribute to an increase in e-book sales around the time that a title becomes protected. It could be that a move into protection coincides with the publication of a new edition of that title, with title- and age-related fluctuations in demand, or with price promotions.

A new edition of a book can direct attention to the title and spur demand. An increase in legal sales is expected even if we also expect more piracy. But if a publisher releases a new hardcover edition, competition for the other formats increases, which has a negative effect on sales of those formats. To determine if legal sales (and hence the inferred effect of piracy protection) are driven by recently published editions or by the title's age, I add three indicator variables that equal one if a new electronic, print, or audio edition was published in the 2 months prior to the month in question and a quadratic function of title's age (in months) to equation (1). I further account for title-specific fluctuations in demand by controlling for the title's and author's Google Trends search volume in the estimation and for the total number of active piracy sites detected.

Finally, the publisher can adjust a book's price. Oestreicher-Singer and Sundararajan (2010) show that DRM has an economically significant effect on pricing decisions for digital content, and it is possible that piracy protection does as well. Since preventing piracy effectively limits the level of competition in the market, theory predicts a resulting increase in prices. If this is the case, then the positive effect of piracy protection on unit sales would be countered by a negative effect of higher prices on unit sales, and the above results would underestimate the true effect of piracy. If, on the other hand, prices decrease when a title is protected, then the results reported above will be overestimated: my estimates would reflect a combination of piracy protection and lower prices.[18] An unreported difference-in-differences analysis with e-book prices as the dependent variable indicates that e-book prices decreased by 5.3 percent as a result of a move into piracy protection. This effect is significant at the 10 percent level. A negative correlation between prices and protection would indicate that the results above overestimate the effect of piracy protection. I therefore control for prices in the analysis as well.

Table 3 shows that a recently published electronic edition increases e-book demand for a title, regardless of the specification. The effect of piracy protection on e-book sales remains similar in size and significance as I add more control variables. Even when I control for the average sales price (column 3), the effect of pi-

---

[18] A decrease in prices as the level of competition decreases is counterintuitive at first, but it is possible. When a zero-price file-sharing option is available, the publisher of the higher-quality, non-zero-price option may target high-valuation consumers exclusively. Without the low-quality competitor, the publisher can target all types of consumers but may have to lower its price to reach the low-valuation consumers. See Petrin (2002) for a structural analysis of this effect in the car industry. Alternatively, piracy protection increases the publisher's awareness of the zero-price competitor in the first place.

Case 1:20-cv-04160-JGK-OTW Document 207-6 Filed 09/02/22 Page 258 of 32

Table 3
**Effect of Piracy Protection on E-Book Sales**

| | E-Book Sales | | | E-Book Revenue |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| Protection | .153[+] | .177* | .147* | .157* |
| | (.0775) | (.0830) | (.0613) | (.0638) |
| Recent e-book | .244* | .273** | .388** | .351** |
| | (.104) | (.103) | (.0785) | (.0811) |
| Recent print | −.366 | −.371 | .160 | −.0130 |
| | (.320) | (.335) | (.175) | (.199) |
| Recent audio | .247 | .256 | .270[+] | .265 |
| | (.249) | (.238) | (.157) | (.174) |
| Title search volume | | .0154 | .00911 | .0112 |
| | | (.00934) | (.00714) | (.00776) |
| No title interest | | −.139 | −.109 | −.119 |
| | | (.359) | (.258) | (.287) |
| Author search volume | | .0000571 | −.000661 | −.000427 |
| | | (.000812) | (.000861) | (.000818) |
| No author interest | | −.203** | −.394** | −.332** |
| | | (.0638) | (.105) | (.0863) |
| Active sites | | −.0198[+] | −.0108 | −.0138 |
| | | (.0113) | (.00876) | (.00851) |
| Title age (months) | | .0229* | −.00611 | .00332 |
| | | (.00869) | (.00646) | (.00637) |
| Title age$^2$ | | −.00000857 | .0000263** | .0000150* |
| | | (.00000929) | (.00000719) | (.00000746) |
| Log price | | | −1.483** | |
| | | | (.155) | |
| Observations | 3,104 | 3,049 | 3,049 | 3,049 |
| $R^2$ | .084 | .091 | .480 | .127 |
| Titles | 126 | 121 | 121 | 121 |

**Note.** Robust standard errors are clustered by title. Results for the dependent variables are in log e-book sales or log e-book revenue. Recent editions equal one if an edition was published in the previous 2 months. Title and author search volume data are normalized such that Arthur C. Clarke's *2001: A Space Odyssey* has a search volume of 100 in January 2011. Variables for no title and no author interest equal one if there was not enough search volume for Google Trends to record a number. All regressions include title and monthly time fixed effects.

[+] $p < .1$.
* $p < .05$.
** $p < .01$.

racy protection remains similarly strong and significant at the 5 percent level and leads to a 15.8 percent increase in unit sales. Column 3 also shows that consumers are relatively price elastic with a price elasticity of $-1.48$. I also estimate the impact of protection on e-book revenue and find that e-book revenue increases by 17 percent when a title becomes protected.

The remaining coefficients are reasonable as well. One would expect e-book sales to increase when a new e-book edition is published, while a new print edition (a competing format) could move demand away from the electronic edition.

Audio editions, on the other hand, may serve as complements to e-books.[19] Moreover, when a title's Google search volume is higher, it tends to sell more units. The negative coefficients on the number of active piracy sites confirm that these sites provide substitutes for legal e-book sales. After year-month fixed effects are added, the fact that the titles in the data set become older over time does not seem to affect sales much. The positive coefficient on the square of the title age suggests that demand for more recent titles is more likely to decrease in the time period of the analysis, while demand for older titles leveled off even more by 2011.

### 5.3. Costs, Benefits, and Efficiency

Private copyright protection can indeed be effective, at least for the e-books in my data set. Furthermore, piracy protection can be efficient in the sense that the benefits to the publisher, authors, and the piracy protection service outweigh their costs. In 2010, RosettaBooks' total revenue was over $1.5 million across more than 300 books (see Deahl 2011). Since then, the number has likely increased significantly, as e-books have become more popular and RosettaBooks has substantially increased its catalog. Taking the annual revenue of $1.5 million as a given, I find that RosettaBooks' revenue would increase by $255,000 if all works benefited equally from piracy protection. Of course, pirated content was found for only 228 titles (of 673), so RosettaBooks' total revenue likely increased by less than that. Since the reported revenue of $1.5 million corresponds to a catalog of approximately 300 titles, one might assume that the incremental revenue from the 228 titles for which piracy was found is $193,800 ($=255,000 \times 228/300$).[20]

This benefit needs to be compared with the costs of protection. To the publisher, this cost is the fee it pays to the antipiracy company—a simple transfer of wealth. For the antipiracy company, the marginal cost of protecting the publisher consists of several dimensions in addition to the fixed costs of running the company. The publisher-specific marginal costs of protection include the development of scraping scripts, manual discovery of infringing content (by emulating the behavior of pirates), approval of the links that have been identified as infringing (for example, to negotiate fair-use situations), and enforcement (sending notices, monitoring, legal escalation, and so on). I can make inferences about these publisher-specific costs, as RosettaBooks' titles account for .26 percent of all links that Digimarc found in the previous year, which amounts to 823 hours of incremental operational work to protect the publisher.[21]

The revenue to the publisher and authors (as royalties) increases by approximately $194,000. At an hourly wage at the US average of around $25, the incremental cost to the antipiracy company of protecting the publisher's titles

---

[19] For example, one might listen to an audiobook in a car and continue to read the e-book version at home.

[20] This is a conservative estimate, as the pirated titles are likely more popular than those that are not pirated.

[21] Of course, this measure does not include Digimarc's overhead and fixed costs of operating. The true amount of time needed to protect the RosettaBooks catalog would be larger.

amounts to \$20,575—not much more than 10 percent of the increase in revenue. At the minimum wage, this cost would of course be even lower. These calculations suggest that the benefits to the publisher and authors outweigh the marginal costs to the antipiracy company by a large margin. Whether these benefits also outweigh the fixed (overhead) costs of running the antipiracy company and the potential losses in consumer surplus due to the removal of the zero-price pirated option is beyond the scope of the available data, although it is reasonable to assume that the overhead costs associated with a surveillance operation of this sort are small, especially when they are distributed over several publisher-clients.

### 5.4. Evidence Supporting the Exogeneity of Protection

The identification strategy assumes that the timing of piracy protection is uncorrelated with factors that determine the outcome of interest—in this case, the log of unit sales. Of course, a publisher may be more interested in protecting titles that have recently gained popularity than in protecting those that do not attract much interest from readers. For example, RosettaBooks would have liked to increase piracy protection for Richard Matheson's 1954 novel *I Am Legend* when it was adapted as a blockbuster movie in 2007. The change in legal book sales would then be the result of a combination of two effects: an increase in demand due to the movie's promotional effect on the novel and the change in demand from a change in piracy protection.

I deal with this problem in several ways. First, in addition to controlling for a large list of demand shifters, I use a list of older titles—most were published before 2000—so it is unlikely that a change in demand is caused by title-specific market shocks. Second, conversations with representatives of RosettaBooks and Digimarc suggest that the timing of protection was not determined by the publisher. Third, I use Google Trends data to provide two types of evidence that the timing of protection is not correlated with the variation in interest across titles or within titles over time, implicitly assuming that a title's search volume is indicative of demand shocks but is not affected by the timing of piracy protection, at least before protection begins. I find no correlation across titles in overall search volume and the timing of protection. I also find no correlation across time in search volume and the time of protection.

To test whether the decision to have a title protected early is a result of its overall popularity, I plot the title's mean monthly Google Search volume over the observed time frame against the month in which the title moved into protection, with values normalized to a January 2011 search volume of 100 for Arthur C. Clarke's *2001: A Space Odyssey*. Figure 2 shows that, over the observed time period, the mean search volume of titles that were protected earliest (between September and December 2011) was not higher than that of titles that moved into protection later. In addition, the unconditional correlation between the titles' average monthly search volume and the month in which they become protected is positive and close to 0 at .05. This suggests that RosettaBooks did not strategically

426    The Journal of LAW & ECONOMICS



**Figure 2.** Titles' search volume

move titles for which it expected to extract the highest revenue into protection first.

To test whether the decision to protect a title is driven by sudden spikes in readers' interest in it, I regress each title's search volume in a given month on a quadratic function of the time (in months) before and after it moved into protection. One would expect the coefficient on the linear term to be negative simply because readers' interest likely decreases over time. The coefficient on the quadratic term, on the other hand, provides information about readers' interest level around the start of piracy protection. If readers' interest in a title spikes around the date it moves into protection, one would expect the coefficient on the quadratic term to be negative, but if there is no spike in readers' interest, the coefficient should be close to 0 or even positive.

Table 4 shows that the coefficient of interest is indeed close to 0, or even positive, which suggests that readers' interest is higher in months that are further from protection. This effect is not a result of recent editions being published or title-specific trends, as the regression includes title and month fixed effects and indicators that equal one if an edition of the title was recently published. The pattern holds for title search volume and author search volume and when limiting the range to 6 months before and after the start date (column 1). There is no evidence that readers' interest spikes around the start date of protection.

Table 4
Google Search Volumes for Titles and Authors around the
Start Date of Piracy Protection

|  | Title | | | Author |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| Timing | −.0894 | −.0326 | −.0309 | −.118** |
|  | (.0832) | (.0263) | (.0195) | (.0287) |
| Timing$^2$ | .00297 | .00169 | .00127 | .00704** |
|  | (.00296) | (.00164) | (.00124) | (.00260) |
| Year-month fixed effects | Yes | Yes | No | Yes |
| Observations | 2,234 | 3,314 | 3,314 | 3,314 |
| $R^2$ | .034 | .023 | .014 | .035 |

Note. Robust standard errors are clustered by title. In column 1 the sample is restricted to the 6 months before and after the start date of protection. All regressions include title fixed effects and controls for recent edition. $N = 126$ titles.

** $p < .01$.

## 6. The Process of Protection

The above results establish that the informal, targeted type of copyright protection that is commonly used in the book publishing industry can increase legal sales by more than the cost of protection. In what follows, I examine the mechanisms that make this protection effective.

### 6.1. Measuring the Speed of the Impact of Protection

To analyze the promptness with which protection from piracy takes effect, I employ a regression discontinuity strategy in which I use the time (in months) before and after protection starts (around the cutoff) as the explanatory variable of interest, as in equation (2):

$$\log(q_{it}) = X'_{it}\beta + \left(\sum_{m \in M} \alpha_m \times 1[t - \text{Protection\_start} = m]\right) + \delta_i^k + f(t) + \varepsilon_{it}, \quad (2)$$

where Protection_start is the first month of protection; $X_{it}$ includes the title's age, recent editions, title and author search volume, and the average sales price; $\delta_i^k$ includes title format indicators, and $f(t)$ represents a linear time trend.

In Figure 3, month 0 corresponds to the month immediately before protection starts, and month 1 is the first month of protection. The figure shows a statistically significant increase in sales in months 5 and 6 of protection, which indicates that it takes quite some time to find and deactivate enough infringing content. This also suggests that the age and popularity of a title plays an important role when determining the effectiveness of protection. Piracy is likely to reemerge more slowly for older titles, so the antipiracy efforts have a chance to catch up with pirates. Piracy protection is most effective for titles whose demand has leveled off, as new illegal content is less likely to emerge.

Figure 3 provides additional evidence of the exogeneity of piracy protection.



**Figure 3.** Protection and e-book sales

If piracy protection is endogenous, demand for the title will likely be unusually large in the time periods leading up to piracy protection. This does not appear to be the case for the e-books (or other formats) in my data set, as the coefficient on the log of unit sales leading up to protection is close to 0 and does not vary significantly before protection starts.[22]

### 6.2. Separating the Effects of Delistings and Takedowns

The above estimates show the combined effect of two actions: delisting links from search engines and taking down infringing content on piracy sites. To examine which of these two actions makes piracy protection effective, I add another explanatory variable to equation (1): the direction of the change in the number of active sites for title $i$ compared with the previous time period. A decrease in

---

[22] To alleviate remaining concerns, I repeat this analysis for titles that were originally published more than 20 years ago—titles for which a sudden spike in demand is less likely—and obtain almost identical results. I also estimate the regression with year-month indicators instead of a linear time trend, and the results remain unchanged. In addition, I add linear pre- and postprotection trends, and I add title-specific linear time trends in other regressions. The effect of protection remains robust in direction, magnitude, and statistical significance. Finally, in Section A2 I report the results of a placebo test in which I artificially set the start date of protection several months before the actual start date and show that the effect of protection disappears.

Table 5
Effect of Delistings and Takedown Notices

| | Hardcover | Paperback | | Audio | E-Book |
| | | Trade | Mass Market | | |
|---|---|---|---|---|---|
| Delistings | .121 | −.137 | .156 | .223 | .147* |
| | (.352) | (.182) | (.155) | (.394) | (.0613) |
| Successful takedowns | .0501 | −.0462 | .127 | .0536 | .0139 |
| | (.124) | (.0863) | (.110) | (.179) | (.0738) |
| Log price | | | | | −1.482** |
| | | | | | (.155) |
| Title search volume | No | No | No | No | Yes |
| Author search volume | No | No | No | No | Yes |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,049 |
| $R^2$ | .035 | .046 | .047 | .060 | .480 |
| Titles | 60 | 88 | 59 | 43 | 121 |

**Note.** Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. All regressions include title fixed effects and controls for recent edition, title age, and active site. Controls for search volume are included for e-books because search volume information is available only at the monthly level for many titles.

* $p < .05$.

** $p < .01$.

the number of active sites indicates that takedown notices were successful in that time period, while an increase in active sites would indicate that more pirated content emerged than was removed. In that case, the only successful component of protection is the delisting of links from search engines. I further control for the overall supply of piracy sites by including the number of detected sites with infringing content that has not yet been taken down for each title in addition to the controls used in Section 5.2.

The relative effect of takedown notices and delistings can be inferred from the relative size and significance of the two coefficients of interest. When a title is under contract to be protected but more content emerges than is taken down, any effect must be due to the delisting of links. If more infringing content is successfully removed than emerges, the estimated effect is a combination of delistings and takedowns. Table 5 reports the effects of each action. It suggests that delistings have a stronger effect on e-book sales than takedowns do. The coefficient on delistings remains almost unchanged compared with the results in Table 3, increasing e-book sales by 15.8 percent. On the other hand, a successful attempt to take down infringing content (a decrease in the number of sites for a title) leads to a small and imprecisely estimated additional increase (1.4 percent) in e-book sales. These results are not surprising, as takedown notices are successful for only 8.7 percent of the title-month combinations under protection.

The relative success of delistings suggests that casual pirates are more easily deterred. A copyright protection strategy that targets casual pirates may be more effective than one that targets more serious pirates. The difference between the

Table 6
Effect of Priority Levels on Sales

| | Hardcover | Paperback | | Audio | E-Book |
|---|---|---|---|---|---|
| | | Trade | Mass Market | | |
| Low | −.381 | −1.010* | −.937 | −.0247 | .0748 |
| | (.242) | (.397) | (.932) | (.506) | (.0837) |
| Medium | .207 | −.328 | −.915 | .929⁺ | .0165 |
| | (.632) | (.357) | (.741) | (.483) | (.0824) |
| High | .00515 | −.109 | .544** | −.188 | .407** |
| | (.251) | (.159) | (.194) | (.377) | (.150) |
| Log price | | | | | −1.476** |
| | | | | | (.155) |
| Title search volume | No | No | No | No | Yes |
| Author search volume | No | No | No | No | Yes |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,049 |
| $R^2$ | .035 | .051 | .062 | .064 | .483 |
| Titles | 60 | 88 | 59 | 43 | 121 |

Note. Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. Low-priority titles are searched for once a month, medium-priority titles are searched for once a week, and high-priority titles are searched for daily. All regressions include title fixed effects and controls for recent edition, title age, and active site. Controls for search volume are included for e-books because search volume information is available only at the monthly level for many titles.
⁺ $p < .1$.
* $p < .05$.
** $p < .01$.

coefficients is insignificant at the 10 percent level, however, and the interaction of both actions may be critical for the success of piracy protection. Again, neither type of protection significantly affects physical book sales.[23]

### 6.3. Intensity of Piracy Protection

Digimarc protects titles with three levels of priority as guided by the observed level of piracy. Websites are crawled approximately once a month for titles that are assigned a low priority, while medium-priority protection corresponds to crawling about once per week, and high priority means the title is searched for every day. One might assume that high-priority titles are about seven times as costly to protect as medium-priority titles. Do those differences in costs outweigh differences in effectiveness?

Table 6 shows that daily crawling has a much larger positive effect than more sporadic crawling. When a title is protected with high priority, e-book sales increase significantly, with a point estimate of 50.2 percent. The effect for medium-priority protection is an order of magnitude smaller. The trend holds true for mass-market paperbacks—a format that can be seen as a close substitute for on-

[23] The findings are robust to different definitions of successful takedowns. I show in Section A3 that the results remain almost identical when I use a measure of site traffic instead of the number of sites with infringing content to determine whether takedown notices are successful.

line piracy—and to some extend for the other formats as well. High-intensity protection is at least the most effective, and it might be the most (cost-)efficient as well.

Of course, the decision to assign a certain priority level to a book in a given time period introduces another type of endogeneity. The more a title's copyright is infringed, the more regularly the antipiracy company will search for it, and the more effort its protection requires. In the analysis, I control for the level of piracy (the number of active sites) and for the overall level of readers' interest in the title and author (Google search volume) in addition to the controls for recent editions and the title's age. The fact that the difference is large even after controlling for the various measures of piracy and overall interest suggests that high-frequency crawling indeed is more effective than low-frequency crawling. Titles that are protected more intensely benefit more from protection than those that are searched for less frequently.

### 6.4. Different Types of Titles

The above results show the overall effects of piracy protection on unit sales and the mechanisms behind such effects, but book piracy can impact different titles in different ways. The effectiveness of piracy protection depends on the title's popularity and the readers it attracts. I explore these differences here. I first analyze the ways in which the effect of piracy protection depends on the title's popularity. I then explore the role of genre.

Piracy affects legal sales through two counteracting channels. The illegal versions can steer consumers away from legal options (displacement effect), but the consumer may also be more likely to hear about a product if free versions are more readily available, which potentially increases legal sales (promotional effect). The relative extent of these effects depends on the past success of a title and its (perceived) quality. If a title has been well known for many years, it does not rely on an additional promotional effect of pirated versions. For well-known and successful titles, book piracy mostly displaces sales of legal editions. On the other hand, titles that are not very well known rely more heavily on word-of-mouth advertising. For those titles, a free pirated version of the book could spur demand for the title by making it accessible to more people. My results support this idea in part, although the displacement effect outweighs the promotional effect for all types of works.

I use the number of Goodreads reviews to proxy for how well known a title is. For instance, Stephen Covey's *The Seven Habits of Highly Effective People* has 162,647 reviews on Goodreads, while the median e-book title in my data set has 483 reviews.[24] I use this variation across titles to separately identify the two effects by interacting the protection term with an indicator that equals one if the work

---

[24] These are the numbers of reviews as of August 2, 2014.

The Journal of LAW & ECONOMICS

### Table 7
#### Effect of Piracy on Displacement and Promotion

| | Hardcover | Paperback | | Audio | E-Book |
| --- | --- | --- | --- | --- | --- |
| | | Trade | Mass Market | | |
| Popular | .227 | −.146 | .440+ | .421 | .185+ |
| | (.426) | (.217) | (.239) | (.436) | (.106) |
| Obscure × Good | −.182 | −.149 | .861** | −.245 | .103 |
| | (.378) | (.356) | (.151) | (.359) | (.0856) |
| Obscure × Bad | −.167 | −.114 | −1.994* | −.912 | .131 |
| | (.408) | (.926) | (.991) | (1.036) | (.0818) |
| Log price | | | | | −1.480** |
| | | | | | (.153) |
| Title search volume | No | No | No | No | Yes |
| Author search volume | No | No | No | No | Yes |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,049 |
| $R^2$ | .035 | .046 | .066 | .062 | .480 |
| Titles | 60 | 88 | 59 | 43 | 121 |

**Note.** Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. All regressions include title fixed effects and controls for recent edition, title age, and active site. Controls for search volume are included for e-books because search volume information is available only at the monthly level for many titles.
+ $p < .1$.
* $p < .05$.
** $p < .01$.

is well known in equation (1). I treat a title as well known if it has more than 500 reviews and as obscure if it has fewer reviews.[25]

The size and direction of this promotional effect depend on the title's quality. If the title is considered to be good (its readers like it), the promotional effect is expected to be positive and rather strong. If, on the other hand, the title is considered to be bad (its readers do not like it), a reader may discourage others from buying the book. This is especially likely for more obscure titles. I interact a measure of quality with the protection variables for the obscure titles in a triple-differences analysis. I treat a title as good if its Goodreads rating is above 3.8—the mean of the titles' ratings across all formats.

Table 7 summarizes the effect of piracy protection on well-known titles and on those that are more obscure. As expected, the effect on e-book sales of popular titles is larger than that on more obscure titles, although the difference is not significant at the 10 percent level. Sales of popular titles increase by 20.3 percent, while sales of more obscure titles increase by just over 10 percent, although this effect is estimated less precisely. This difference supports the notion that there may be a promotional effect for obscure titles, while sales of well-known titles mostly face a displacement effect of piracy. The work's quality, in contrast, does not significantly change the effect of piracy protection, perhaps because informa-

[25] Using Goodreads reviews rather than sales numbers as a measure of popularity helps avoid one source of endogeneity, as sales are the outcome of interest.

tion about quality is readily available through the Internet (for instance, through Goodreads). The results are robust to different cutoff points for popularity and quality.

Finally, while a title's popularity is correlated with the priority with which it is protected, these two measures are not perfectly correlated: .25 percent of the low-priority searches are for well-known titles (according to my measure), and 11 percent of the high-priority searches are for obscure titles. This suggests that the intensities in Section 6.3 capture more than just systematic differences due to the titles' popularity. Moreover, comparing the differences in the effectiveness of protection in Section 6.3 and here, one can see that high-frequency protection increases sales beyond what would be expected simply from being a more popular title. Given the large differences, it seems plausible that daily protection is the most efficient.

The effect of piracy protection further depends on the types of consumers that the work attracts. Some genres benefit more than others from word-of-mouth advertising. In the extreme case, the demand for textbooks likely remains constant over time (as long as the number of students remains unchanged), so piracy mostly displaces book sales without creating much additional demand. On the other extreme, the appeal of a suspense novel by an unknown author is very unclear ex ante.

I observe data for several fiction and nonfiction books.[26] If demand for nonfiction is more certain than that for fiction, one would expect the effect of piracy protection to be larger for nonfiction works. Table 8 shows the effect of piracy protection on both genres. The estimation now includes interaction terms of piracy protection and indicator variables for the two types of works. Editions of nonfiction titles benefit more from piracy protection than those of fiction titles for all formats, although the difference is statistically insignificant at the 10 percent level throughout.

## 7. Conclusion and Policy Implications

Digitization has significantly lowered the cost of production and distribution of cultural goods over the past decade. This has resulted in large shifts in market structure and competitive behavior, which has led to an increase in the variety of products that can be consumed. Some of these new products infringe the copyrights of existing works. Economists have shown that file sharing and online piracy have had large impacts on media industries. As a result, making the protection of a copyright in such industries effective and efficient is a focus among academics and policy makers alike.

While current issues surrounding copyright pertain mostly to software and media goods, questions about piracy and copyright enforcement will likely gain importance in the future as more products are digitized, for example, via 3-D

---

[26] The list of RosettaBooks' titles includes more fiction than nonfiction works: 85 percent of the e-books and 74 percent of the physical editions in the analysis are fiction.

The Journal of LAW & ECONOMICS

Table 8
Effect of Piracy Protection by Genre

|  | Hardcover | Paperback | | Audio | E-Book |
|  |  | Trade | Mass Market |  |  |
|---|---|---|---|---|---|
| Fiction | −.192 | −.236 | .129 | .214 | .138* |
|  | (.275) | (.244) | (.148) | (.443) | (.0663) |
| Nonfiction | .863 | .0537 | .524+ | .275 | .215* |
|  | (.748) | (.222) | (.308) | (.860) | (.0104) |
| Log price |  |  |  |  | −1.483** |
|  |  |  |  |  | (.155) |
| Title search volume | No | No | No | No | Yes |
| Author search volume | No | No | No | No | Yes |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,049 |
| $R^2$ | .038 | .047 | .048 | .060 | .480 |
| Titles | 60 | 88 | 59 | 43 | 121 |

Note. Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. All regressions include title fixed effects and controls for recent edition, title age, and active site. Controls for search volume are included for e-books because search volume information is available only at the monthly level for many titles.

+ $p < .1$.
* $p < .05$.
** $p < .01$.

printing. One of the biggest issues is who should carry the burden of protecting copyrighted works—government, the firms selling the works, or other firms (for example, private firms, Internet service providers, or search engines).

Thus far, most efforts have been legislative or at least formal and broad in nature, with mixed reception and success. Many governmental (legislative) attempts have faced significant opposition among the public, with several bills being shelved before their introduction (for example, SOPA and PIPA in the United States) or partially revoked (for example, HADOPI in France). Although legal efforts have been less controversial, they can be quite costly, as many efforts were intended to protect entire industries (for example, the shutdown of Megaupload), and most involved expensive lawsuits.

The book publishing industry demonstrates a rather different approach—one in which private companies provide surveillance of individual works. This type of protection is less likely to be controversial, and costly court proceedings can largely be avoided. Whether piracy protection is effective in this setting may indicate whether private action can prevent copyright infringement. Even more, if we know what types of works are most likely to benefit from copyright protection, policy makers and enforcers can make protection more cost-efficient. This paper offers insights into the cost-effectiveness of protection on three dimensions: the types of pirates offering and consuming these works, the effort levels used to protect works from piracy, and the types of works that are protected.

First, the book publishing industry may be particularly well suited for piracy

protection. The small file sizes of digital books compared with other media products make offering and consuming pirated content particularly easy. As a result, one might expect more casual pirates on both the demand and the supply sides of piracy. Casual suppliers are more likely to be intimidated into removing the content, as can be seen in the high success rate of takedown notices for content on cyberlockers and general websites compared with peer-to-peer networks. On the demand side, much of the effectiveness of piracy protection can be attributed to the removal of links to infringing content on search engines—presumably a search channel most often used by casual pirates. Since a request to delist a link from search engines can be sent relatively easily, a more efficient copyright protection strategy could target these channels rather than attempt to have the content removed, especially since such attempts can become quite costly if they lead to legal escalation.

Second, protection has the largest effect when it is intense and infringing content is searched for, delisted, and removed frequently. The differences in effectiveness may outweigh differences in costs, although a direct comparison is beyond the scope of this study.

Finally, for well-known works and those by popular authors, online piracy poses a threat mainly to physical book sales, while authors who are less established may see a promotional effect in addition to the displacement effect (see Peitz and Waelbroeck 2006b). My results support this idea, although the displacement effect of piracy outweighs the promotional effect regardless of the type of work.[27]

I analyze a particular set of titles: those originally published several years ago and not necessarily the current top sellers. The dynamics that affect demand are different for recently published titles than for titles that have been available for a long time. The time it takes for protection to have an effect is especially long when considering the sales patterns of recently published works, as titles typically are most successful right after publication. Piracy protection may be most effective for works whose sales have leveled off and where new piracy is less likely to emerge quickly. Future research should therefore examine whether copyright protection can also be effective for more recent works.

## Appendix

### Additional Robustness Checks

My main results are robust to small changes in the definition of the success of protection. They are also robust to specifications that include interactions of time fixed effects with dummy variables for types of titles. In what follows, I present in more detail results that have different interpretations of protection and its suc-

---

[27] Nevertheless, the promotional effect of free online versions is assumed by emerging authors who turn to offering free excerpts of their titles on their own websites. This strategy allows authors to control the level of sampling and promotion, whereas they have little to no control over online piracy.

Table A1
Effect of Sporadic Piracy Protection

|  | Hardcover | Paperback | | Audio | E-Book |
|---|---|---|---|---|---|
|  |  | Trade | Mass Market |  |  |
| Protection | .0476 | .00358 | .236* | −.0122 | .132** |
|  | (.167) | (.0921) | (.0874) | (.178) | (.0445) |
| Log price |  |  |  |  | −1.483** |
|  |  |  |  |  | (.156) |
| Title search volume | No | No | No | No | Yes |
| Author search volume | No | No | No | No | Yes |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,049 |
| $R^2$ | .034 | .046 | .048 | .059 | .480 |
| Titles | 60 | 88 | 59 | 43 | 121 |

Note. Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. Protection is in effect if content on at least one infringing site is removed. All regressions include title fixed effects and controls for recent edition, title age, and active site. Controls for search volume are included for e-books because search volume information is available only at the monthly level for many titles.
  * $p < .05$.
  ** $p < .01$.

cess and the results of a placebo test on the timing of protection. The result for the effectiveness of protection is robust to these alternative specifications.

### A1. Robustness Check: Protection When Infringing Content Is Removed

My main analysis assumes that a title is constantly protected. That is, Digimarc constantly searches the Internet for infringing content and constantly removes the links to it. However, Digimarc searches the Internet for some of the titles more sporadically (once a week or once a month). It is also possible that Digimarc does not find some of the links to infringing content. A title is protected only when the company actively and successfully tries to limit piracy.

Table A1 shows the estimation results when protection is in effect during the time periods when infringing content is taken down. This is a stricter definition of piracy protection, so larger effects may be expected.

While the effect remains insignificant for most physical formats, it becomes significant (at 5 percent) for mass-market paperbacks. This format constitutes the cheap, low-quality paperback versions that can be found at airport bookstores. These are closer substitutes for free pirated versions than, for example, hardcover editions, and the significant positive effect is not surprising. Interestingly, the effect on e-books is smaller than it is under the assumption of constant protection. The effect remains largely significant, however, which indicates again that the estimates in the main analysis are consistent. Since titles move in and out of protection, there is less concern about path dependency of the treatment variable.

Table A2
**Placebo Test: E-Book Sales with Artificial Start Dates for Piracy Protection**

|  | (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|---|
| Protection | .0893 | .146 | .0420 | −.0178 | .0348 |
|  | (.100) | (.0970) | (.0862) | (.0873) | (.102) |
| Log price | −1.185** | −1.178** | −1.185** | −1.339** | −1.709** |
|  | (.165) | (.163) | (.166) | (.256) | (.283) |
| Months early | 2 | 3 | 4 | 5 | 6 |
| Observations | 1,233 | 1,227 | 1,215 | 1,158 | 1,111 |
| $R^2$ | .442 | .444 | .444 | .447 | .472 |
| Titles | 102 | 100 | 97 | 83 | 75 |

Note. Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. All regressions include controls for recent edition, title age, active site, and title and author search volumes.

** $p < .01$.

## A2. Robustness Check: Placebo Test

Despite the controls in the main estimation, there may be concern that the results pick up additional effects that are not accounted for and remain unobservable. Figure 3 suggests that unit sales right before protection begins are not significantly higher than those in the preceding months, although the coefficients are estimated quite imprecisely.

Here I address these concerns more directly by testing whether books that are about to move into protection already see an increasing sales trend compared with books that move into protection later. I exclude all data points after the title goes into protection and set the placebo protection date 2–6 months before the actual protection date. The analysis then is the same as in equation (1). Table A2 shows that while the coefficient on placebo protection is positive for most artificial start dates, it is much less so than in the main specification and never statistically significant. Even if this estimation were to suggest an upward trend in sales prior to the start date of protection, this trend does not explain the large, statistically significant effect that is estimated in the main specification. Protection remains cost-efficient when comparing this net effect to the costs of protection.

## A3. Robustness Check: Site Traffic as a Measure of Success

Section 6.2 uses the change in the number of available infringing sites to identify the effects of delistings and takedown notices. It is possible, though, that those sites with infringing content that is successfully removed do not receive a lot of traffic anyway. In that case, takedown notices are not as successful as they appear.

I proxy for traffic to the infringing content by using site-ranking information from Alexa Internet, Inc., as retrieved on September 25, 2014. This company provides traffic data, global rankings, and other information about millions of websites (the lowest observed ranking in my data set is 18,943,656). Note that



**Figure A1.** Active piracy sites and estimated traffic for *I Am Legend*

Table A3
**Effect of Delistings and Takedowns: Traffic to Infringing Content**

|  | Hardcover | Paperback | | Audio | E-Book |
|---|---|---|---|---|---|
|  |  | Trade | Mass Market |  |  |
| Under contract | .0951 | −.137 | .182 | .249 | .135* |
|  | (.350) | (.183) | (.145) | (.395) | (.0596) |
| Successful takedowns | .0587 | .00624 | .00966 | .00321 | .0231 |
|  | (.126) | (.0762) | (.0918) | (.161) | (.0722) |
| Traffic to active sites | .131 | .0899 | .337 | −.433 | .119 |
|  | (.421) | (.168) | (.207) | (.444) | (.188) |
| Log price |  |  |  |  | −1.484** |
|  |  |  |  |  | (.155) |
| Time fixed effects | Weekly | Weekly | Weekly | Weekly | Monthly |
| Observations | 9,350 | 13,506 | 8,714 | 6,630 | 3,049 |
| $R^2$ | .033 | .046 | .048 | .060 | .480 |
| Titles | 60 | 88 | 59 | 43 | 121 |

**Note.** Robust standard errors are clustered by title. Results for the dependent variables are in logs of unit sales. Takedowns are considered successful if the imputed site traffic to the infringing content is lower at the end of the weekly or monthly time period than at the end of the previous time period. All regressions include title fixed effects and controls for recent edition and title age. Controls for search volume are included for e-books because search volume information is available only at the monthly level for many titles.

* $p < .05$.
** $p < .01$.

the sites reported on Alexa.com are the host sites to the infringing links, which means that I do not observe traffic to the infringing content itself.

I use the inverse of the host site's ranking, assuming that traffic on the Internet follows a Pareto distribution and that traffic to the infringing content is proportional to traffic to the main site. Figure A1 shows that traffic to infringing sites is not perfectly correlated with the number of active infringing sites. Here I estimate the two effects, treating takedown notices as successful if the estimated traffic to infringing content for a title, rather than the number of infringing sites, decreases in a given time period.

Table A3 shows that the relative effects of delisting a site and of a successful attempt to remove infringing content are similar to those found when using the number of active infringing sites (Table 5). The effect of delistings again appears to be much stronger, although the difference remains statistically insignificant at the 10 percent level.

## References

Aguiar, Luis, Jörg Claussen, and Christian Peukert. 2015. Online Copyright Enforcement, Consumer Behavior, and Market Structure. Working Paper No. 2015/01. European Commission, Institute for Prospective Technological Studies, Seville.

Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan. 2004. How Much Should We Trust Differences-in-Differences Estimates? *Quarterly Journal of Economics* 119:249–75.

Bhattacharjee, Supid, Ram D. Gopal, Kaveepan Lertwachara, and James R. Marsden. 2006. Impact of Legal Threats on Online Music Sharing Activity: An Analysis of Music Industry Legal Actions. *Journal of Law and Economics* 49:91–114.

Danaher, Brett, and Michael D. Smith. 2014. Gone in 60 Seconds: The Impact of the Megaupload Shutdown on Movie Sales. *International Journal of Industrial Organization* 33:1–8.

Danaher, Brett, Michael D. Smith, and Rahul Telang. 2015. The Effect of Piracy Website Blocking on Consumer Behavior. Working paper. Carnegie Mellon University, Department of Economics, Pittsburgh.

Danaher, Brett, Michael D. Smith, Rahul Telang, and Siwen Chen. 2014. The Effect of Graduated Response Anti-piracy Laws on Music Sales: Evidence from an Event Study in France. *Journal of Industrial Economics* 62:541–53.

Deahl, Rachel. 2011. Rosetta Books Comes of Age. *Publishers Weekly,* July 11. http://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/47933-rosetta-books-comes-of-age.html.

Donald, Stephen G., and Kevin Lang. 2007. Inference with Difference-in-Differences and Other Panel Data. *Review of Economics and Statistics* 89:221–33.

Hardy, Wojciech, Michał Krawczyk, and Joanna Tyrowicz. 2014. Internet Piracy and Book Sales: A Field Experiment. Working Paper No. 23. University of Warsaw, Faculty of Economics, Warsaw.

Liebowitz, Stan J. 2008. Research Note: Testing File Sharing's Impact on Music Album Sales in Cities. *Management Science* 54:852–59.

Luo, Hong, and Julie Holland Mortimer. 2015. Copyright Enforcement: Evidence from

Two Field Experiments. Working Paper No. 16-024. Harvard Business School, Boston.

Oberholzer-Gee, Felix, and Koleman Strumpf. 2007. The Effect of File Sharing on Record Sales: An Empirical Analysis. *Journal of Political Economy* 115:1–42.

Oestreicher-Singer, Gal, and Arun Sundararajan. 2010. Are Digital Rights Valuable? Theory and Evidence from Ebook Pricing. Working Paper No. 06-01. New York University, Center for Digital Economy Research, New York.

Peitz, Martin, and Patrick Waelbroeck. 2006a. Piracy of Digital Products: A Critical Review of the Theoretical Literature. *Information Economics and Policy* 18:449–76.

———. 2006b. Why the Music Industry May Gain from Free Downloading—the Role of Sampling. *International Journal of Industrial Organization* 24:907–13.

Petrin, Amil. 2002. Quantifying the Benefits of New Products: The Case of the Minivan. *Journal of Political Economy* 110:705–29.

Peukert, Christian, Jörg Claussen, and Tobias Kretschmer. 2013. Piracy and Movie Revenues: Evidence from Megaupload: A Tale of the Long Tail? Working paper. Ludwig Maximilian University of Munich, Faculty of Economics, Business Administration and Information Technology, Munich.

Rob, Rafael, and Joel Waldfogel. 2006. Piracy on the High C's: Music Downloading, Sales Displacement, and Social Welfare in a Sample of College Students. *Journal of Law and Economics* 49:29–62.

Sivan, Liron, Michael D. Smith, and Rahul Telang. 2014. Do Search Engines Influence Media Piracy? Evidence from a Randomized Field Study. Working paper. Carnegie Mellon University, Heinz School of Public Policy and Management, Pittsburgh.

Smith, Michael D., and Rahul Telang. 2012. Assessing the Academic Literature regarding the Impact of Media Piracy on Sales. Working paper. Carnegie Mellon University, Heinz School of Public Policy and Management, Pittsburgh.

Sterling, Greg. 2014. Pew: 50 Percent in US Now Own Tablet or E-Reader. *Marketing Land,* January 16.

Waldfogel, Joel. 2010. Music File Sharing and Sales Displacement in the iTunes Era. *Information Economics and Policy* 22:306–14.

Waldfogel, Joel, and Imke Reimers. 2015. Storming the Gatekeepers: Digital Disintermediation in the Market for Books. *Information Economics and Policy* 31:47–58.

Zentner, Alejandro. 2006. Measuring the Effect of File Sharing on Music Purchases. *Journal of Law and Economics* 49:63–90.

Zhang, Laurina. 2014. Intellectual Property Strategy and the Long Tail: Evidence from the Recorded Music Industry. Working paper. Western University, Ivey Business School, London, ON.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY   :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                     :        Case No. 1:20-cv-04160-JGK

               Plaintiffs,

                                       :

-against-

                                       :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                    :

               Defendants.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS

      Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC

("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC

("PRH") (collectively, the "Publishers") pursuant to Local Rule 56.1(b) of the United States

District Court for the Southern District of New York, submit this Response to Defendant Internet

Archive's Rule 56.1 Statement of Material Facts (each paragraph of which is referred to herein

as a "Statement"). The Publishers submit this Response solely for purposes of the Internet

Archive's pending Motion for Summary Judgment and reserve the right to challenge the

purported truth of any statements made in the Internet Archive's Rule 56.1 Statement of Material

Facts at any trial of this action.[1]

      1.      The Internet Archive is a 501(c)(3) public charity. Declaration of Joseph C. Gratz

submitted herewith ("Gratz Decl.") Ex. A ¶1 (Stipulation of Undisputed Facts ("Stipulation")).

---

[1] Unless otherwise noted, this Response uses the same abbreviations and capitalized terms as those set

forth in the Publishers' Rule 56.1 Statement of Material Facts (ECF No. 113).

**Publishers' Response**:  Undisputed.

2.      The guiding mission of the Internet Archive is to provide universal access to all knowledge.  Declaration of Brewster Kahle submitted herewith ("Kahle Decl.") ¶ 4.

**Publishers' Response**:  Undisputed.

3.      In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information.  *Id.* ¶ 5.

**Publishers' Response**:  Undisputed that Internet Archive has distributed millions of copies of unauthorized ebooks and other works, but not material and vague as to the meaning of "preserved, curated, and made available much of humanity's most important information."

4.      The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals.  *Id.* ¶ 6.

**Publishers' Response**:  Undisputed that Internet Archive has millions of users and has partnered with certain institutions, but otherwise disputed.  Lacks foundation because Internet Archive provides no evidence supporting the claim that it is "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals," whereas there is evidence to show that a relatively small proportion of libraries have endorsed or joined Internet Archive's in-copyright ebook lending initiatives – and doubts have been raised about their legality.  *See* Rule 56.1 Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment, ECF 107 ("Pubs. SUMF") ¶¶77-109.  Also this Statement is not material and is vague as to the meaning of "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals."

5.      One of the Internet Archive's first projects was to archive every public webpage

on the fledgling World Wide Web.  Today, over a quarter century of web history is preserved

and accessible through the Internet Archive's Wayback Machine.  The Wayback Machine has

become a crucial database for journalists, researchers, lawyers, and courts.  Kahle Decl. ¶ 7.

**Publishers' Response**:  Undisputed, but not material because the Wayback Machine is

not at issue in this action.

6.      The Internet Archive works with libraries, museums, universities, and the public

to preserve and offer free online access to texts, audio, moving images, software, and other

cultural artifacts.  Kahle Decl. ¶ 8.

**Publishers' Response**:  Undisputed for the purpose of this motion only.  Lacks

foundation because Internet Archive provides no evidence supporting the claim that it "works

with libraries, museums, universities, and the public to preserve and offer free online access to

texts, audio, moving images, software, and other cultural artifacts."

7.      The Internet Archive has been a member of the American Library Association

since 2000.  The Internet Archive is also an affiliate member of the Boston Library Consortium,

and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks.

Kahle Decl. ¶¶ 9.

**Publishers' Response**:  Undisputed, but not material and incomplete since Internet

Archive's participation in the OCLC and Rapid ILL interlibrary loan networks is limited to

scholarly monographs and/or periodicals.  *See* Supplemental Declaration of Elizabeth A.

McNamara dated September 2, 2022 ("Suppl. McN Decl."), Ex. 11.

8.      In December 2006, the State of California formally recognized the Internet

Archive as a library, making it eligible to receive funding under the Library Services and

Technology Act and qualifying it for E-Rate, a federal program that provides discounts to

3

schools and libraries to ensure they are able to obtain affordable telecommunications services. Kahle Decl. ¶ 10.

**Publishers' Response**:  Undisputed that the California State Librarian Susan Hildreth sent Internet Archive a letter in December 2006 referring to Internet Archive as a library eligible to receive LSTA funding and E-Rate funding, but not material since it long pre-dates IA's controlled digital lending program and vague as to the meaning of "the State of California formally recognized the Internet Archive as a library."

9.      In mid-2007, the Internet Archive was awarded a Library Services and Technology Act grant for its Open Library project (openlibrary.org) – an effort to create a comprehensive library book catalog with a webpage for every book published.  Kahle Decl. ¶ 11.

**Publishers' Response**:  Undisputed, but not material because the "Open Library project" referenced in this Statement was implemented specifically to build a "card catalog" of webpages for books, not for any activity related to controlled digital lending, and the funding expired before Internet Archive started scanning and distributing in-copyright books.  Suppl. McN Decl. Ex. 12 (Cressaty Tr. 214:16-219:14).  A clarification is also required: the "Open Library project" referred to in the above Statement is different from the "Open Libraries" project that is at issue in this action (the "Open Libraries Project"), which was launched in or about 2018, without LSTA funding, "to increase lending counts" on Internet Archive's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches."  Declaration of Elizabeth A. McNamara, ECF 96 ("McN Decl.") ¶¶67-68, 103.

10.      The Internet Archive has also received grant funding from the Institute of Museum and Library Services ("IMLS"), an independent federal agency whose mission is to

support museums, libraries, and related organizations.  For example, in 2017, the Internet

Archive received a grant under the IMLS's Laura Bush 21st Century Library Program.  In order

to receive this grant, the Internet Archive had to qualify as a library or library-related

organization.  Kahle Decl. ¶ 12.

**Publishers' Response**:  Undisputed, but incomplete and not material because the IMLS

funding cited above was awarded for purposes unrelated to the in-copyright book distribution

scheme at issue in this action.  Kahle Decl. ¶12, Ex. 2.

11.     This lawsuit concerns the Internet Archive's implementation of Controlled Digital

Lending ("CDL"), through which the Internet Archive digitizes its print books and lends them

digitally to its patrons.  Complaint, ECF No. 1 ("Compl.").

**Publishers' Response**:  Undisputed that this lawsuit involves IA's implementation of

CDL, but incomplete because the lawsuit is not only limited to Internet Archive's lending of

digital scans of "its print books" – *i.e.*, print books that Internet Archive owns and/or maintains

possession of.  Since the Internet Archive began directing its efforts towards the Open Libraries

Project in 2018, it has become a central hub and libraries participating in the project – each

known as a "Partner Library" – send their catalogues to Internet Archive for overlap analysis.

McN. Decl. ¶¶67-68, 103.  Internet Archive does not make new scans of books in Partner

Library collections that it has already scanned (nor does it take possession of the matching print

editions in the Partner Library's collections); rather, every time a book in the Partner Library's

catalogue matches an ebook on the Website through the overlap analysis, Internet Archive

increases by one the number of concurrent checkouts of that book permitted on the Website and

lends its digital scan against physical copies that remain in the possession of the Partner Library

(the "Open Libraries Process").  *Id.*

5

12. In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending. Kahle Decl. ¶ 13.

**Publishers' Response**: Undisputed, but not material and incomplete since Internet Archive initially restricted its scanning of in-copyright works to out-of-print books and it loaned books on an "in-library" basis in 2011 – meaning that the ebooks were accessible only to accredited users of a participating physical library's network – but subsequently abandoned these limitations. McN Decl. ¶¶34-35, 63-64.

13. In November 2011, the Internet Archive's digital lending effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA"). Kahle Decl. ¶ 14.

**Publishers' Response**: Undisputed, but not material and incomplete since the "digital lending effort" referenced in this Statement, which was geographically limited and pre-dated widespread adoption of authorized library ebook lending, bears no resemblance to Internet Archive's current "digital lending effort," where Internet Archive now acts as a central hub and lends out digital copies based on the number of print copies in the possession of each of its "Partner Libraries" without ever taking possession of the matching print editions in each libraries' collection. McN Decl. ¶¶67-68, 103; Declaration of Jeffrey Weber, ECF 95 ("Weber Decl.") ¶10.

14. As of this filing, the Internet Archive contains more than three million books available for borrowing in its collection. Kahle Decl. ¶ 15.

**Publishers' Response**: Undisputed.

15. The Internet Archive launched and expanded this program on the basis that it is

6

fair use.  *Id.* ¶ 16.

**Publishers' Response**:  Disputed but not admissible.  Whether the Internet Archive's activities constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).  And this Statement lacks foundation since Internet Archive withheld documents regarding advice concerning fair use of its practices based on privilege.  Suppl. McN Decl. Ex. 9.  Moreover, Kahle Decl. ¶¶16 and 17 cite only the *White Paper* and *Position Statement* concerning CDL, both published in 2018, as the basis for Kahle's purported good faith belief in IA's fair use defense.  Kahle Decl. Exs. 5, 6.  But IA's infringement of in-copyright books pre-dates 2018 and therefore IA did not "launch" its program in reliance on such publications.  McN Decl. ¶¶62-64.  Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Further, it is disputed that Internet Archive "launched and expanded this program on the basis that it is fair use" since there is contrary evidence that Internet Archive knew or should have known that its conduct was not fair use.  McN Decl. ¶¶77-109.

16.     In developing and maintaining this belief, the Internet Archive and its Digital Librarian, Brewster Kahle, relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library – each copyright scholars known to the Internet Archive to be respected in their fields.  The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use."  Kahle Decl. ¶ 16.

7

**Publishers' Response**: Disputed but lacks foundation, states a legal conclusion and not admissible for the reasons set forth in Statement 16, which is incorporated herein by reference.

17.     The Internet Archive and Mr. Kahle also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law professor and librarian at the Georgetown Law Center.  Lila Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement.  The Internet Archive understood all co-authors of the *Position Statement* to be well-respected copyright scholars.  Dozens of copyright law professors and scores of libraries and library associations became signatories to the statement, including the Association of Research Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and the Chief Officers of State Library Agencies, representing the state librarians of all fifty states.  *Id.* ¶ 17.

**Publishers' Response**:  Disputed but inadmissible.  Lacks foundation since Brewster Kahle could not have relied on the *Position Statement* referenced above in developing and maintaining his belief that Internet Archive's scanning and distribution of in-copyright ebooks was fair use  because Internet Archive engaged in those activities from at least 2011 – seven years before the *Position Statement* was published in 2018.  Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Also incomplete because the Statement omits that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March of 2018 (McN Decl. ¶86) and because the Boston Public Library and Los Angeles Public Library no

8

longer appear as signatories on the version of the *Position Statement* posted on line as of the date of this filing.  Suppl. McN Decl. Ex. 16.

18.      The Internet Archive – or another 501(c)(3) public charity it works closely with, Open Library of Richmond – lawfully acquires print books by purchase or donation that it wishes to make available for digital lending.  Kahle Decl. ¶ 18; Gratz Decl. Ex. A (Stipulation).

**Publishers' Response**:  Undisputed.

19.      Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  Kahle Decl. ¶ 19.

**Publishers' Response**:  Undisputed, but vague as to the meaning of "many."

20.      The Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the 127 Works in Suit ("Works in Suit").  Gratz Decl. Ex. A (Stipulation).

**Publishers' Response**:  Undisputed.

21.      The Internet Archive sends print books to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe.  Gratz Decl. Ex. B ¶¶ 80–82 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but vague as to the meaning of "carefully turns."

22.      The print book is then placed in archival storage, and its specific location is carefully tracked.  Gratz Decl. Ex. B ¶ 83 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but vague as to the meaning of "carefully tracked."

23.      Print books stored in the physical archive facilities are non-circulating; it is not available to be accessed in its print form.  Kahle Decl. ¶ 20.

**Publishers' Response**:  Undisputed.

24.      The digital images of the book are processed and formatted, and if the book meets

9

certain criteria set by Internet Archive policies, it is then made available for digital lending to one registered patron at a time.  Gratz Decl. Ex. B ¶¶ 80, 111–25 (Suppl. Expert Rpt. Of Ian Foster).

**Publishers' Response**:  Undisputed, with the clarification that the only current "criteria set by Internet Archive policies" is that Internet Archive claims not to post books published within the last five years, which is a non-binding policy that it intermittently violates.  McN Decl. ¶35.

25.     Anyone can become a patron of the Internet Archive – and digitally borrow books – for free by signing up for an Internet Archive account.  (Internet Archive has policies, not relevant here, for terminating accounts.)  Kahle Decl. ¶ 21; Gratz Decl. Ex. B ¶ 19 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed.

26.     Doing so grants them a digital library card that lets them borrow up to ten books at a time from the collection, for limited periods of up to fourteen days.  Kahle Decl. ¶ 22.

**Publishers' Response**:  Undisputed, but incomplete and misleading because the fourteen day loans can be renewed indefinitely depending upon demand for the title in question.  This Statement is also vague as to "digital library card."

27.     The Internet Archive offers its patrons several ways of engaging with a book they have borrowed.  Gratz Decl. Ex. B ¶¶ 31, 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, but vague as to the meaning of "several ways of engaging."

28.     The patron can read the book in their web browser through a tool called BookReader.  *Id.* ¶ 31.

10

A-5786

Case 1:23-04160-JGK-OTW Document 168 Filed 09/02/22 Page 218 of 61

**Publishers' Response**:  Undisputed.

29.     BookReader lets patrons flip through a book's pages, zoom in on a book's images, enlarge the book's text for easier reading, and search through the book.  Kahle Decl. ¶ 23.

**Publishers' Response**:  Undisputed.

30.     When finished, the patron may return the book.  Gratz Decl. Ex. B ¶ 32 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed.

31.     Otherwise, the loan will automatically expire at the end of the loan period.  At that point, the patron is no longer able to access the book, and it is once again available to be borrowed.  Kahle Decl. ¶ 24.

**Publishers' Response**:  Undisputed, but incomplete and requiring clarification that users can renew their loans of books indefinitely subject to demand for the title from other users.

32.     Instead of reading books in their web browsers, patrons can choose to download an encrypted PDF or encrypted ePub version of the book onto their computer or device.  Gratz Decl. Ex. B ¶¶ 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed.

33.     These files are secured using the same security system that Plaintiffs use to secure digital files of Plaintiffs' books:  a type of "digital rights management" or "DRM" software created by Adobe.  Gratz Decl. Ex. C, Deposition Transcript of Steve Potash ("Potash Dep. Tr.") 81:1–82:5.

**Publishers' Response**:  Disputed.  In the deposition testimony cited above, Mr. Potash confirms that "one of [the]" methods of digital rights management software utilized by

11

OverDrive is Adobe Digital Editions. Potash Dep. Tr. 81:1–82:5. But the deposition testimony does not confirm that each of the "Plaintiffs use" this same software. *Id.* Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

34.     The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended. Kahle Decl. ¶ 25.

**Publishers' Response**: Undisputed.

35.     The Internet Archive does not digitally loan all books it has scanned. Instead, it implements a number of policies that limit the books available for digital lending. *Id*. ¶ 26.

**Publishers' Response**: Undisputed for the purposes of this motion only, subject to the clarification that the only current "polic[y]" is that Internet Archive claims to not post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶35. The Statement is also vague and lacks foundation. No admissible evidence is cited to support the Statement the IA "implements a number of policies that limit the books available for digital lending. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

36.     As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive. Kahle Decl. ¶ 27.

**Publishers' Response**: Disputed. The Internet Archive makes ebooks available for digital lending based on print books that are owned by and in the physical possession of its Partner Libraries, not the Internet Archive. McN Decl. ¶¶67-68, 103. Since the Internet Archive began directing its efforts towards the Open Libraries Project in 2018, the Internet Archive now

12

acts as a central hub lending a single ebook scan against physical books owned by Partner Libraries via the Open Libraries Process. *Id.* Furthermore Open Libraries Director Chris Freeland acknowledged that the Website may contain books that were scanned from the collections of libraries like the Boston Public Library, and not Internet Archive's collection. *Id.* ¶43.

37.    It is the Internet Archive's policy not to lend books published within the previous five years. Gratz Decl. Ex. B ¶¶ 113, 123 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed, with the clarification that the Internet Archive does not always comply with its voluntary and non-binding five year limitation. For example, two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the Internet Archive's Website that same year. McN Decl. ¶¶35, 115.

38.    This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers. Kahle Decl. ¶ 28.

**Publishers' Response**:  Undisputed, but not material and vague as to the meaning of "a belt-and-suspenders accommodation to publishers."

39.    Dr. Imke Reimers analyzed revenue patterns of works on the USA Today Top 150 Bestsellers List. Declaration of Imke Reimers submitted herewith ("Reimers Decl.") Ex. 1 ¶¶ 9, 20–24 (Reimers Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Reimers purported to analyze the USA Today Top 150 Bestseller List but disputed that these rankings are equivalent to revenue. Declaration of Jeffrey T. Prince dated September 2, 2022 ("Prince Decl."), ¶¶29, 60.

40.    Between 1994 and 2021, only 21% of the book appearances on the USA Today

weekly bestseller list first appeared at least 52 weeks earlier. *Id.* ¶¶ 9, 21–24.

**Publishers' Response**:  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

41.     Between 1994 and 2021, only 8% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than two years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Publishers' Response**:  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

42.     Between 1994 and 2021, only 2% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than five years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Publishers' Response**:  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

43.     For titles that enter the Top 150 bestseller list, approximately 90% of sales occur

in the first five years after publication. Reimers Expert Rpt. ¶¶ 9, 21–24.

**Publishers' Response**: Disputed, but not material and misleading because this Statement suggests that the Publishers are only concerned with sales in the first five years after publication of a book and conflates unit sales and revenues. The Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62; *see also* Prince Decl. ¶81. This Statement is also misleading and lacks foundation because Dr. Reimers only purported to analyze bestseller list data going back to 1994 and her analysis thus does not have any relevance to book sales before that date. Expert Report of Imke Reimers, Ph.D., ECF 109-1 ("Reimers Report"), ¶ 9.

44.     Books published by HarperCollins that are less than a year old account for between 37% and 40% of all units sold between 2017 and 2019 and 34% in 2020. Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. D (HC0030132).

**Publishers' Response**: Disputed. *See* Prince Decl. ¶81; Prince Decl. Ex. 1 ("Prince Report") ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

45.     Books published by Penguin Random House that are less than a year old account for between 47% and 52% of all units sold between 2017 and 2019 and 43% in 2020. Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. E (PRH0072194).

**Publishers' Response**: Disputed. *See* Prince Decl. ¶81; Prince Report ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

15

46.     Books published by Hachette that are less than two years old account for between 70% and 73% of all units sold between 2017 and 2019 and 65% in 2020.  Reimers Decl. Ex.1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. F (HACHETTE0012377).

**Publishers' Response**:  Disputed.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115.  This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

47.     Based on the available data, most of the Works in Suit behave consistently with the patterns of the works on the USA Today Top 150 Bestsellers List in that sales drop off quickly after publication and most sales occur within five years after a book is published. Reimers Decl. Ex. 1 ¶¶ 9, 21, 26–28 (Reimers Expert Rpt.); *Id.* Ex. 2 ¶¶ 10, 11 (Reimers Reply Rpt.).

**Publishers' Response**: Disputed and lacks foundation.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115.  Reimers does not do an analysis of each Work in Suit concerning its sales starting from the years since it was first published. Reimers Report ¶ 27.  And the record evidence shows that Works in Suit include numerous perennial sellers – like *Catcher in the Rye, The Lion, the Witch, and the Wardrobe, The Bell Jar, Little House on the Prairie, Lord of the Flies, The House on Mango Street,* or *Song of Solomon,* for example – that have generated significant income far beyond the first few years after publication.  Declaration of Ben Sevier, ECF 92 ("Sevier Decl."), ¶¶34-38; Declaration of Chantal Restivo-Alessi, ECF 94 ("R-A Decl.") ¶¶6, 63-68.  Thus it is erroneous to claim that the majority of sales revenue for most of the Works in Suit takes place within five years after a book is published when a book remains available for purchase in subsequent years and generates significant sales in subsequent years. The claim that "most sales" of a particular book "occur within five years after a book is

16

published" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Prince Report ¶110. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works. Prince Report ¶111. Additionally, vague as to the meaning of "most of the Works in Suit."

48.    Peak sales for most titles occur within one to two years after the date of the first publication of the title. Reimers Decl. Exs. 1 ¶¶ 20, 28 (Reimers Expert Rpt.) & 2 ¶¶ 9–15 (Reimers Reply Expert Rpt.).

**Publishers' Response**: Disputed. It is erroneous to claim that the majority of sales peak within one to two years of first publication when a book remains available for purchase in subsequent years. The claim that "[p]eak sales" of a particular book "occur within one to two years after the date of the first publication of the title" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Weber Decl. ¶¶30-32; R-A Decl. ¶¶59-68; Sevier Decl. ¶¶34-38. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works. *Id.* Additionally, this Statement is vague as to the meaning of "most titles."

49.    As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the*

17

A-5793

*Market*—were made available for digital lending. The mistake was rectified as soon as the Internet Archive realized the error. Kahle Decl. ¶ 29.

**Publishers' Response**: Undisputed, with the clarification that Internet Archive "realized the error" only after this action was filed identifying the Works in Suit referenced above. Compl., Ex. A.

50. Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library. *Id.* ¶ 30.

**Publishers' Response**: Undisputed.

51. First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage. *Id.* ¶ 31; Gratz Decl. Ex. B ¶ 130 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**: Undisputed.

52. Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners – from the University of Arizona to the Delaware County District Library in Ohio – to contribute their own non-circulating copies of that book toward the number of lendable copies. Even if a partner library has multiple copies of a particular book, the Internet Archive counts only one additional copy per library. Kahle Decl. ¶ 32; Gratz Decl. Ex. B ¶¶ 130, 141 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**: Undisputed, but incomplete and with the clarification that Internet Archive does not take physical possession or ownership of the matching print edition in the Partner Library's collections, and Internet Archive acknowledges that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously" – and Internet

Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating.  McN Decl. ¶¶68, 107.  And lacks foundation with respect to the claim that Delaware County District Library in Ohio is a Partner Library because it was not disclosed as such in response to relevant interrogatory requests.  McN Decl. Ex. 114, Interrogatory No. 12.  The Statement is also misleading because early iterations of the Open Library Project increased lending counts according to the total number of physical books of a given title in the library's collection, not by one book per library only.  McN Decl. ¶¶65-67.

53.     For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then the Internet Archive would loan *Little House on the Prairie* to up to four patrons at a time.  Each concurrent loan would thus still be associated with one non-circulating physical copy.  If all four copies of *Little House on the Prairie* were checked out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in.  Kahle Decl. ¶ 33.

**Publishers' Response**:  Undisputed except Publishers dispute that "each concurrent loan would thus still be associated with one-noncirculating physical copy."  Internet Archive has not put in place any technical measures to ensure that "[e]ach concurrent loan would thus still be associated with one non-circulating physical copy;" specifically, the Internet Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating – and it has acknowledged that it has "no way of knowing whether a book … was

19

being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously." McN Decl. ¶107.

54. Many libraries other than the Internet Archive digitally loan print books. *See, e.g.*, HathiTrust, *Emergency Temporary Access Service*, at https://www.hathitrust.org/ETAS-Description (describing a system by which more than 200 academic libraries enabled digital lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon University Libraries, *Introducing Controlled Digital Lending*, at https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending (describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled Digital Lending at Michigan State University*, at https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, at https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of Controlled Digital Lending*, at https://www.niso.org/standards-committees/is-cdl (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold"); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, at https://librarytechnology.org/pr/25314 (describing organization for librarians working to implement CDL in their respective libraries).

**Publishers' Response**: Undisputed that "libraries other than the Internet Archive digitally loan print books" but disputed that the Internet Archive's activities are the same as

those followed by the libraries referenced in this Paragraph. *See* Suppl. McN Decl. ¶12. This Statement is further misleading because the websites cited in this Statement reflect that these programs are each limited to lending from collections of university libraries and provide access only to members of those universities and, in some cases, restrict lending to limited course materials; additionally, the cited programs were specifically implemented in response to access issues precipitated by the COVID-19 pandemic, not in the regular course of business. *Id.* This Statement is also vague with respect to the phrase "many libraries."

55.     Digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books. Kahle Decl. ¶ 34.

**Publishers' Response**:  Undisputed, but not material because the vast majority of Internet Archive users are not print disabled (less than 0.2% of the accounts currently registered with the Website are for print disabled people, and the needs of print disabled readers are already served by HathiTrust), and because Internet Archive does not target users in particular geographic locations (it admits that whenever an ebook it checked out on its website, it does not know the geographic location of the person who checked out that ebook). McN Decl. ¶¶122-23. Also not material because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook market , which Internet Archive's own expert testified is "thriving" and "has increased in recent years." McN Decl. ¶9.

56.     Digital lending is also particularly helpful for brief or spontaneous access to books – for example, for checking citations or references, or looking up discrete facts – that wouldn't be worth a trip to a brick-and-mortar library. *Id.* ¶ 35.

**Publishers' Response**: Undisputed, but not material and incomplete because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years." McN Decl. ¶9.

57.     The International Federation of Library Associations and Institutions has observed, in its position statement on the subject, that CDL "has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws." Gratz Decl. Ex. G (https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf).

**Publishers' Response**: Undisputed, but with the clarification that the document cited in the Statement above is not specifically directed at the Internet Archive's activities. Gratz Decl. Ex. G. Furthermore, this document states that "[c]ontrolled digital lending provides an alternative to a licensing approach, and so a means of redressing the balance" – which provides additional support for the Publishers' argument that the Internet Archive offers a competing substitute which will result in potential lost revenue from licensing ebooks to consumers in the Publishers' commercial market and to patrons in the Publishers' library markets. *Id*.

58.     Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship. Kahle Decl. ¶ 36.

**Publishers' Response**: Undisputed, but incomplete and not material because Internet Archive's "digital lending" does not "promote education, research, preservation, and scholarship" in any way that is not already promoted through the Publishers' existing library

22

ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years." McN Decl. ¶9.

59.     Writers use books they have borrowed from the Internet Archive as a resource for inspiration or research for their own works. Declaration of Laura Gibbs submitted herewith ("Gibbs Decl.") ¶¶ 5, 8.

**Publishers' Response**: Undisputed, but incomplete and not material because authorized library ebook versions of the Works in Suit and other titles available through the Publishers' authorized ebook market, which Internet Archive's own expert testified is "thriving" and "has increased in recent years" (McN Decl. ¶9), equally serve "as a resource for inspiration or research."

60.     The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries. Kahle Decl. ¶ 37.

**Publishers' Response**: Undisputed, but incomplete and not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense. Suppl. McN Decl. Ex. 1. Additionally, vague as to the meaning of "resources like Wikipedia" because this Paragraph only references Wikipedia and no other "resources" or websites.

61.     In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available books related to the incarceration of Japanese Americans during World War II. *Id.* ¶ 40.

**Publishers' Response**: Undisputed, but incomplete and immaterial to the extent that

Internet Archive obtained permission from the copyright owner to digitize any of the materials referenced above. *See* Kahle Decl. Ex. 10.

62. The Wikipedia article on the Internment of Japanese Americans currently cites and links to 20 books available via CDL from the Internet Archive. *Id.* & Ex. 9 at 70 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Publishers' Response**: Undisputed, but not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense. Suppl. McN Decl. Ex. 1.

63. There are 202,026 citations in Wikipedia articles in English that link to books available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different books. Kahle Decl. ¶ 39 & Ex. 9 at 1 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Publishers' Response**: Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

64. The Wikipedia article on World War II cites, and links to, 48 different CDL books. Kahle Decl. ¶ 38 & Ex. 9 at 2–4 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Publishers' Response**: Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

65. A partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages. Kahle Decl. Ex. 9 at 1-337 (Wikipedia Citations to Books Available to Borrow from Internet Archive

24

via CDL).

**Publishers' Response**:  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

66.     In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive.  Kahle Decl. ¶ 44.

**Publishers' Response**:  Undisputed, with the clarification that the citation in the Statement should be to Kahle Decl. ¶41 (not ¶44), but not material because books cited in the article supporting the above Statement (Kahle Ex. 11) are available as authorized ebooks – including *The Glass Castle*, *The Hunger Games*, *Beyond Magenta: Transgender Teens Speak Out* and *Catch-22*.  Suppl. McN Decl. ¶ 15.

67.     At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus.  Gratz Decl. Exs. H (https://www.ala.org/pla/issues/covid-19/march2020survey) & I (https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03).

**Publishers' Response**:  Undisputed, but vague with respect to "many months."

68.     School districts reached out to the Internet Archive concerned that students and teachers could no longer physically access books – including hundreds of copies of assigned books that the school had already purchased.  Kahle Decl. ¶ 42.

**Publishers' Response**:   Undisputed for the purposes of this motion only, but not admissible.  This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

69.     Libraries reached out to the Internet Archive worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away. *Id.* ¶ 43.

**Publishers' Response**:  Undisputed for the purposes of this motion only but not admissible.  This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

70.     By the Internet Archive's estimation – based on data from the federal Institute of Museum and Library Services – the closure of libraries took 650 million books out of circulation. *Id.* ¶ 44.

**Publishers' Response**:  Undisputed, but with the clarification that "650 million books" refers only to print books, because ebooks may be downloaded for free by library patrons anywhere there is an internet connection, including during the start of the pandemic when many public libraries were closed to the public.  Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

71.     Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio.  Since all of the libraries were closed, the Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place.  Kahle Decl. ¶ 45.

**Publishers' Response**:  Undisputed that "Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio."  Whether "all of the libraries were closed" or whether there were "more non-circulating copies locked up … than would be borrowed via the Internet Archive" is unsubstantiated speculation and is not a material fact.  And the issue of

whether "there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place" is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded. *See Nadel*, 57 F. Supp. 3d at 293 n. 6.

72. The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently. *Id.* ¶ 46.

**Publishers' Response**: Undisputed that Internet Archive put in place a program intended to "address this problem quickly[,]" but whether or not "[t]he Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently" is unsubstantiated speculation and is not a material fact.

73. Adam Silverman, one of HarperCollins's Rule 30(b)(6) designees, testified that it took a month – from April to May of 2020 – to negotiate a pandemic-related special request with the Chicago Public School System. Gratz Decl. Ex. J, Deposition Transcript of Adam Silverman ("Silverman Dep. Tr.") 270:6–273:14.

**Publishers' Response**: Undisputed, but incomplete and misleading because the deposition testimony and the exhibit displayed during this portion of testimony (Exhibit 264, HC0015518) reflects that HarperCollins responded attentively to the special request. Suppl. McN Decl. Ex. 17. Indeed, after HarperCollins secured permission from the relevant authors, the aggregator negotiating on behalf of the school district responded with additional demands and even apologized for the delay, which was not caused by HarperCollins. *See id.* at HC0015523 ("Hi Adam, Thank you so much for your patience in waiting to hear from CPS.").

74. The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US

national emergency, whichever is later." Kahle Decl. ¶ 47 & Ex. 12.

**Publishers' Response**: Undisputed.

75. Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library. Kahle Decl. ¶ 48 & Ex. 7.

**Publishers' Response**: Undisputed, with the clarification that the citation above should be to Kahle Decl. Ex. 13 (not Ex. 7), that "more than 100 institutions signed a statement in support of the National Emergency Library" but disputed that "[p]rior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement," because this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

76. There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled, "The National Emergency Library Is a Gift to Readers Everywhere." Gratz Decl. Ex. K.

**Publishers' Response**: Undisputed that the Internet Archive accurately references the title of an article published by *The New Yorker*, but disputed that the National Emergency Library had widespread public support because the evidence shows that the Internet Archive was aware that there were "copyright concerns" about the National Emergency Library, and groups including the U.S. Register of Copyrights, authors, advocacy organizations that support the rights and interests of authors, and librarians across the United States made public statements or sent private messages to Internet Archive questioning the legality of the National Emergency Library. McN Decl. ¶¶130-142. Further, the article published in *The New Yorker* is inadmissible for the truth of statements referred to therein, as it is an out-of-court statement by a non-party in

violation of Local Rule 56.1(d) and thus must be disregarded for that purpose.

77.     The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was fair use.  Kahle Decl. ¶ 49.

**Publishers' Response**:  Disputed.  The facts show that Internet Archive believed or had reason to believe that the NEL was not fair use.  McN Decl. ¶¶77-109.  The ultimate question of whether the Internet Archive's activities actually did constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and any suggestion that the NEL was fair use as a matter of fact must be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).

78.     The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries.  *Id.* ¶ 50.

**Publishers' Response**:  Disputed.  The question of whether the NEL "benefitted teachers, students, researchers, and readers" is a legal question subsumed by the fair use inquiry, as is the question of whether the NEL "benefits" the individuals listed above by striking the balance necessary to achieve the Copyright Act's purpose of incentivizing the creation and dissemination of books.  Such a legal conclusion is inappropriate for a Rule 56.1 statement.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).  Moreover, whether or not "The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries" is unsubstantiated speculation and is not a material fact.

79.     When the University of Oklahoma campus shut down in spring of 2020, students no longer had access to physical library books.  Gibbs Decl. ¶ 4.

**Publishers' Response**:  Undisputed, but incomplete and not material because campus lockdowns did not affect the availability of authorized ebooks available to students through the University of Oklahoma collections.  Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl.

29

¶¶41-43.

80.　Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the pandemic closures.　*Id.*

**Publishers' Response**:　Undisputed, but incomplete because books cited by Laura Gibbs – including Divakaruni's *Palace of Illusions*, *Neela: Victory Song* and *The Conch-Bearer* – are all available as authorized library ebooks. Suppl. McN Decl. ¶16.

81.　Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system.　*Id.* ¶ 5.

**Publishers' Response**:　Undisputed, but incomplete for the same reasons set forth in the Publishers' Response to Statement 80, which is incorporated herein by reference.

82.　Ms. Gibbs has since retired from teaching but regularly writes about African folktales available to borrow through the Internet Archive.　*Id.* ¶ 7.

**Publishers' Response**:　Undisputed.

83.　Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started.　Declaration of Lauren Sherman submitted herewith ("Sherman Decl.") ¶ 7.

**Publishers' Response**:　Undisputed.

84.　In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive.　*Id.*

30

**Publishers' Response**: Undisputed.

85.    When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation.  Declaration of Daniel Smith submitted herewith ("Smith Decl.") ¶ 4.

**Publishers' Response**:  Undisputed that Smith could not access physical books from Cambridge University libraries when those facilities were closed, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

86.    Mr. Smith turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time.  *Id.* ¶ 5.

**Publishers' Response**:  Undisputed that Smith accessed materials for his dissertation via Internet Archive's website, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

87.    Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. Declaration of Benjamin Saracco submitted herewith ("Saracco Decl.") ¶ 7.

**Publishers' Response**:  Undisputed.

88.    In March 2020, the governor ordered buildings, including academic libraries, to be closed.  *Id.* ¶ 8.

**Publishers' Response**:  Undisputed, but the Publishers object that this proposed "fact" is

31

A-5807

not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

89.     Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state.  *Id.* ¶ 9.

**Publishers' Response**:  Undisputed that Mr. Saracco stated that he received "multiple requests" for the *Student Manual for Basic Life Support* and the *Advanced Cardiac Life Support Provider Manual* in the declaration cited in Statement 89, but the Publishers object that this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Saracco Decl. ¶8. This Statement is also misleading because Mr. Saracco did not testify that the requests for these materials were, as a matter of fact, related to "COVID-19 and relevant patient care" or "to address the high rate of hospitalization in the state." Saracco Decl. *Id.*  Rather, Saracco testified that "[a]s a librarian I cannot know with certainty what our materials were ultimately used for in the hospital, but at the time, I was under the impression that healthcare workers that were requesting these materials might be using them to treat COVID-19 patients admitted to our affiliated hospital" – which lacks foundation and is pure speculation.  *Id*.

90.     With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals, such as the <u>*Basic Life Support*</u> for *Healthcare Providers and the* <u>*Advanced Cardiovascular Life Support Provider Manual*</u>, available for borrowing from the Internet Archive via CDL.  *Id.*

**Publishers' Response**:  Undisputed, but incomplete and misleading because *Basic Life Support* is available as an authorized ebook and Benjamin Saracco testified that the *Advanced*

*Cardiovascular Life Support Provider Manual* was available as an authorized ebook and, to his knowledge, his library never requested permission to provide free or discounted access during the pandemic. Suppl. McN Decl. Ex. 15 (Saracco Tr. 252:18-257:21).

91.     Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time. Kahle Decl. ¶ 51 & Exs. 14–17.

**Publishers' Response**: Undisputed, but whether or not "[d]ozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time" is not a material fact.

92.     The largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, which had at most 888 concurrent loans. That figure represents the sum of the peak concurrent loan numbers for each of the editions of that book which were available for borrowing. Gratz Decl. Ex. B ¶ 196; *id.* at Ex. T3 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**: Undisputed, but misleading because this figure incorporates data from the calendar year 2020, not just the period when the NEL was active.

93.     There are over 9,000 public library systems in the United States alone. *Id.* Ex. L (https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey).

**Publishers' Response**: Undisputed.

94.     Virtually every library was closed during the NEL. *Id.*

**Publishers' Response**: Undisputed that many physical libraries were closed to physical visitors during the NEL, but with the clarification that "[v]irtually every library was closed

33

during the NEL" is misleading because libraries maintained their digital presence during the NEL and made authorized ebooks available to be downloaded for free by library patrons anywhere there is an internet connection. Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

95.     More than 888 public libraries in the United States have a copy of *The Lion, the Witch, and the Wardrobe*. Gratz Decl. Ex. Ex. M (https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231).

**Publishers' Response**: Undisputed, but inadmissible because Exhibit M to the Gratz Declaration is not admissible for the truth of the referenced statement, in violation of Local Rule 56.1(d), as it is an out-of-court statement by a non-party (*i.e.*, hearsay). Additionally, this Statement is misleading because Exhibit M to the Gratz Declaration appears to only concern physical copies of *The Lion, the Witch and the Wardrobe*, and does not account for authorized ebook copies.

96.     Although the NEL was slated to end on June 30, 2020, the Internet Archive shut it down two weeks early – on June 16, 2020 – after this lawsuit was filed. Kahle Decl. ¶ 52.

**Publishers' Response**: Undisputed, but with the clarification that in a blog post announcing the creation of the NEL, the Internet Archive stated that the NEL "will run through June 30, 2020, or the end of the US national emergency, whichever is later." McN Decl. Ex. 168.

97.     The Plaintiffs are among the largest and most profitable book publishers in the United States. Gratz Decl. Ex. N, Deposition Transcript of Skip Dye ("Dye Dep. Tr.") 369:20–370:7; *see also id.* Ex. O (https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html).

34

**Publishers' Response**: Undisputed.

98.    In recent years, Plaintiffs' profits have increased.  Gratz Decl. Ex.  Exs. P–R (Excerpt of Bertelsmann 2018, 2019, 2021 Annual Reports), Exs. S–T (Excerpts of Wiley 2020, 2021 Form 10-K), Ex. U–V  (Excerpts of News Corp. 2019, 2021 Annual Report), Ex. W–Y (Excerpts of Lagardere 2018, 2020, 2021 Registration Document).

**Publishers' Response**: Undisputed, but not material and vague with respect to "recent years."

99.    In 2020 and 2021, the publishing industry as a whole enjoyed record profits for electronic and physical formats of books.  Gratz Decl. Ex. Z ("*A Year for the (Record) Books in Publishing*" describing 2020 profits), Ex. AA ("*America's Biggest Publishers Keep Posting Profits*" describing 2021 profits); Ex. BB ("*In Surprise Ending for Publishers: In 2020, Business Was Good*" describing 2020 profits).

**Publishers' Response**: Undisputed, but not material.

100.    When the four Plaintiffs filed suit against the Internet Archive in June of 2020, they selected the Works in Suit.  Compl. Ex. A, ECF No. 1-1.

**Publishers' Response**: Undisputed.

101.    The Works in Suit include non-fiction and fiction works and works from many genres (fantasy, children's, psychology, science, sports, biography, and others).  *Id.* ¶¶ 21, 22.

**Publishers' Response**: Undisputed.

102.    All of the Works in Suit were published prior to being digitized and loaned by the Internet Archive.  Kahle Decl. ¶ 28 (all of the Works in Suit were made available for borrowing after lawfully acquired – bought or donated – new or used physical copies of the Works in Suit were digitized and the Internet Archive does not acquire physical copies of books that have not

been published); *see also* Compl. ¶¶ 6, 21, ECF No. 1.

**Publishers' Response**: Undisputed, but with the clarification that it is not clear how it would be practically feasible for the Internet Archive or any other entity to "digitize[] and loan[]" a book before that book is "published" and that Kahle has publicly stated that the Website should ultimately make "the bulk of unpublished things … universally accessible." McN Decl. Ex. 49, p. 2 (punctuation omitted).

103.    Plaintiffs sell physical copies of books to libraries and to readers.  *See* Gratz Decl. Ex. CC, Deposition Transcript of Josh Marwell ("Marwell Dep. Tr.") 59:3–9.

**Publishers' Response**: Undisputed, but with the clarification that Plaintiffs do not sell physical books to libraries directly but rather via wholesalers.  Weber Decl. ¶43.

104.    Plaintiffs license electronic copies of books ("ebooks") to libraries and readers. Gratz Decl. Ex. C, Potash Dep. Tr. 141:20–142:9.

**Publishers' Response**: Undisputed, but with the clarification that the Plaintiffs do not license ebooks to libraries directly; rather, the Publishers enter into agreements with aggregators (*i.e.*, distributors) such as OverDrive, who in turn license the ebooks to libraries and manage the relevant platforms.  McN Decl. ¶11; R-A Decl. ¶75; Sevier Decl. ¶ 42 n.2.

105.    Licensed ebooks are distributed to patrons of libraries that have purchased licenses via "aggregators."  Gratz Decl. Ex. N, Dye Dep. Tr. 36:20–37:8; 86:14–18.

**Publishers' Response**: Undisputed, with the clarification that library ebook aggregators license the Publishers' ebooks to libraries according to set terms and conditions designed to enforce the various models that each Publisher has selected for that market, including terms that permit the Publishers to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing, as well as terms that limit reproduction,

distribution, and that reinforce the requirements for digital rights management software to prevent piracy. Weber Decl. ¶44.

106.    There are multiple licensing structures for ebooks. One is a "one copy/one user" or "perpetual access" model that allows libraries to lend out one copy at a time to patrons for a discrete period of time, with no expiration from the licensing libraries' digital collection. Gratz Decl. Ex. C, Potash Dep. Tr. 49:4–50:2; *id.* Ex. N, Dye Dep. Tr. 120:22–121:7.

**Publishers' Response**: Undisputed that there are multiple licensing structures for ebooks and that one is a "one copy/one user" structure that allows libraries to lend out one copy at a time to one patron at a time for a discrete period of time. A license obtained under the "one copy/one use" model can have a perpetual term or a metered term, including a time-limited term Further, the same clarification about license terms set forth in the Publishers' Response to Statement 105 applies and is incorporated by reference herein.

107.    The "perpetual access" model is not currently in use by Hachette, HarperCollins, or Penguin Random House for ebooks made available through aggregators to public libraries. ECF No. 92 ¶¶ 61, 65 (Declaration of Ben Sevier); ECF No. 94 ¶¶ 30, 32 (Declaration of Chantal Restivo-Alessi); ECF No. 95 ¶¶ 69, 75 (Declaration of Jeffrey Weber); Gratz Decl. Ex. C, Potash Dep. Tr. 50:3–53:9.

**Publishers' Response**: Undisputed, with the clarification that HarperCollins, Penguin Random House, and Hachette each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively. R-A Decl. ¶¶30- 32; Weber Decl. ¶¶71-75; Sevier Decl. ¶65. Accordingly, any time a public library purchased an ebook with a perpetual license term pursuant to the licensing terms offered by HarperCollins, Penguin Random House, and Hachette up until 2011, 2018, and 2019, respectively, that library continues to maintain the title in its

collection and may lend it to patrons on a one-copy, one-user basis in perpetuity. *See* Sevier

Decl. ¶68. The Publishers further state that Hachette, HarperCollins, and Penguin Random

House each currently offer a one-copy, one-user model with a perpetual term to academic

libraries because academic libraries have different needs and lending patterns than public

libraries, and that Wiley maintains a one-copy, one user model with perpetual access for its trade

books that it makes available to all libraries as ebooks, including public libraries  Sevier Decl.

¶68; R-A Decl. ¶40; Weber Decl. ¶77; Declaration of Alan Pavese, ECF 93 ("Pavese Decl."),

¶¶5, 25-26.

108.    Another type of license is metered access by time.  Under this model, a library has

the ability to loan an ebook to patrons for a discrete period of time, commonly two years, to an

ebook title. Gratz Decl. Ex. C, Potash Dep. Tr. 44:17–24.

**Publishers' Response**:  Undisputed, with the same clarifications about license terms set

forth in the Publishers' Response to Statement 105 and 106, which are incorporated by reference

herein. .

109.    Another type of license is metered access by the number of check-outs,

commonly twenty-six checkouts.  Under this model, a library has the ability to loan an ebook to

patrons until that copy of an ebook has been borrowed twenty-six times. *Id.*

**Publishers' Response**:  Undisputed, with the clarification that library ebook aggregators

license the Publishers' ebooks to libraries according to set terms and conditions designed to

enforce the various models that each Publisher has selected for that market, including twenty-six

circulation model.  Weber Decl. ¶44. These terms permit the Publishers to exercise control over

the digital files to set the limited extent of usage, which is determined in relation to the pricing,

as well as terms that limit reproduction, distribution, and that reinforce the requirements for

digital rights management software to prevent piracy.  *Id.*; R-A Decl. ¶¶21-23.

110.    Plaintiffs do not sell ebooks to libraries outright.  Kahle Decl. ¶ 53.

**Publishers' Response**:  Undisputed, but with the clarification that the Publishers understand the term "sell . . . outright" to mean the sale of "non-encrypted" files without any contractual preconditions on their further use.  *See* McN Decl. ¶12.  The Publishers – together with other book publishers, music, and movie companies – cannot agree to those terms because providing digital platforms with unprotected files – with no technical security measures or legally binding agreement limiting the purchaser's use of the file – invites unrestricted copying and distribution of the files, with predictably devastating results on the market for that work. Sevier Decl. ¶¶42-43, 61-64; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.  Unrestricted digital files are not sold commercially or to libraries.  *Id.*  Further, the Internet Archive has identified only a handful of publishers that have agreed to sell ebook files on these terms – the literary press 11:11 and the affiliated anarchist publishers PM Press and AK Press – and has cited no documentary evidence to establish that Internet Archive's purchase of those materials amounts to an "outright" sale.  McN Decl. Ex. 5 (Kahle Depo. Tr. 139:23-140:12).

111.    The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).  *Id.*

**Publishers' Response**:  Undisputed, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

112.    The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them).  *Id.* ¶ 54.

**Publishers' Response**:  Undisputed with the same clarification regarding the term "purchase" as provided for the term "sell" in Statement 110, but not material and with the

39

objection that whether "[t]he Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them)" is purely hypothetical and not admissible.

113.    Plaintiffs have declined each time the Internet Archive has asked to buy ebooks. Id. ¶ 55.

**Publishers' Response**:  Undisputed with the same clarification regarding the term "buy" as provided for the term "purchase" in Statement 112, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

114.    The ▮▮▮ aggregator is OverDrive, which has about ▮▮▮ of the market share of the library ebook market in the United States.  Gratz Decl. Ex. C, Potash Dep. Tr. 196:5–12.

**Publishers' Response**:  Undisputed that OverDrive is the largest library ebook aggregator for public libraries.

115.    One of the ways OverDrive offers ebooks for reading is through its Libby application.  *See* https://www.overdrive.com/apps/libby; Gratz Decl. Ex. C, Potash Dep. Tr. 82:19–24.

**Publishers' Response**:  Undisputed.

116.    From March 2017 until March 23, 2020 (*i.e.*, prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ▮▮▮ of the number of checkouts of the Works in Suit from OverDrive.  Declaration of Rasmus Jørgensen submitted herewith ("Jørgensen Decl.") Ex. 1 ¶ 36 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster); *id.* Ex. DD (OverDrive_Supp_002).

**Publishers' Response**:  Undisputed for purposes of this motion only that, on average,

40

the number of checkouts of the Works in Suit by Internet Archive was ████ of the number of checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the time period cited above, but (a) there was significant variability in this percentage among the Works in Suit; (b) percentages such as this mask absolute numbers; (c) during this time period, Internet Archive had fewer members, borrows and concurrent copies available to loan than it does currently; (d) if CDL were legal and became more widespread, the percentage of checkouts on Internet Archive as compared with OverDrive would substantially increase, as would the impact on the Publishers; and (e) this Statement is not material to the ultimate issue of whether the Publishers suffered market harm, including but not limited to in the form of lost revenue from ebook licenses.  *See* Prince Decl., *passim*; The Publishers' Memorandum of Law in Opposition to Internet Archive's Motion for Summary Judgment ("Publishers' Opposition Brief"), Section V.  It is also not material because it is no defense to copyright infringement for the infringer to argue that its infringing copies make up only a small proportion of some market or customer segment.  *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 568 (1985) ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work.) (internal quotations and citation omitted).

117.    Looking at data from 2017-2020, which includes the period of time when the NEL was operational, the total loan volume of Works in Suit from the Internet Archive was ██ ████ of the number of OverDrive checkouts for the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶ 8, 35 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster).

**Publishers' Response**:  Undisputed for purposes of this motion only that, on average,

the number of checkouts of the Works in Suit by Internet Archive was ▮▮▮▮▮ of the number of checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the time period cited above, but the Publishers object to this Statement as non-material and misleading for the reasons set forth in their Response to Statement 116, which are incorporated herein by reference.

118. The expert reports of Drs. Reimers and Jørgensen conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit. Jørgensen Decl. Ex. 1 ¶ 8 (Jørgensen Expert Rpt.); Reimers Decl. Ex. 1 ¶ 9 (Reimers Expert Rpt.).

**Publishers' Response**: Disputed. As a preliminary matter, neither Dr. Reimers nor Dr. Jorgensen reached an actual conclusion that "Internet Archive's lending practices had no negative effects on the market for the Works in Suit." *See, e.g.*, Expert Report of Rasmus Jorgensen, ECF 108-1 ("Jorgensen Report") ¶ 8; Reimers Report, Section D.; Prince Decl. Ex. 3 (Reimers Tr. 178) (conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything."); Prince Decl., Section III(C).

The Publishers further dispute and object to the expert opinions set forth in Statement 118 because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons (which are henceforth referred to, collectively, as the "Expert Opinion Objection"). The Publishers dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book. The expert opinions of Dr. Jorgensen and Dr. Reimers are inadmissible because, *inter alia*, they are unreliable and based on

42

insufficient facts and impermissibly flawed principles and methods (which also have not been reliably applied), for all the reasons set forth in the Prince Declaration and the Publishers' Opposition Brief (Section V), including but not limited to the failure to adequately control for other factors. In the event of a trial, the Publishers will file a *Daubert* motion to strike the opinions of Dr. Jorgensen and Dr. Reimers under Federal Rule of Evidence 702. *See, e.g.*, *City of Providence v. Bats Global Markets*, 2022 WL 902402 at \*12-13 (S.D.N.Y. 2022); *Lamarr-Arruz v. CVS Pharmacy*, 2017 WL 4277188 at \*10 (S.D.N.Y. 2017); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 at \*10-11 (S.D.N.Y. 2014). Further, while the Publishers do not dispute the record facts regarding Internet Archive "loans" of the Works in Suit, OverDrive check-outs of the Works in Suit, Hachette sales records or verified Amazon print rankings of the Works in Suit on which the Internet Archive's experts base their analysis, the conclusions of the IA experts regarding whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement. See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at \*3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts"); Local Rule 56.1(d); Prince Decl. Ex. 4 (Reimers Tr. 178:4-13) (testimony from Dr. Reimers conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything.").

119.     Dr. Reimers analyzed the change of the Amazon rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL. Reimers Decl. Ex. 1 ¶¶ 36–54 (Reimers Expert Rpt.).

**Publishers' Response**: Undisputed that Dr. Reimers purported to analyze the change of

43

the Amazon print book rankings of the Works in Suit relative to when each edition of a Work in

Suit was made available for lending through the NEL, but incomplete and misleading to the

extent that it suggests that Dr. Reimers reliably measured the change or the impact on relevant

markets. Prince Decl. Sections III(A) and III(C). The Publishers also clarify that Dr. Reimers

opined that she "cannot conclude that the NEL had either a positive or negative effect on the

Amazon sales rankings of print editions" since she found earlier seasonal trends with similar size

effects for the Works in Suit. Reimers Report ¶¶51-53. Further, the Publishers assert the Expert

Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in this Statement 119 are inadmissible – and

should be disregarded pursuant to Local Rule 56.1(d).

120.    Amazon rankings are a good proxy for the market for print sales because using

ranking data controls for factors that affect the physical book retail market as a whole and

because Amazon makes up at least 50% of the market share for print books. Reimers Decl. Ex. 1

¶¶ 35, 36, 41–43 (Reimers Expert Rpt.).

**Publishers' Response**:  Disputed but not admissible and not material.  Amazon rankings

for print books of the Works in Suit are not relevant to the ultimate issue of whether IA

negatively affected revenue from licensing and sales to U.S. libraries and consumers.  This

Statement is also incomplete and misleading because Dr. Reimers did not perform any analysis

to justify her belief that Amazon print book rankings "are a good proxy" for the market for print

sales and fails to account for the fact that unit sales are not interchangeable with revenue figures.

Prince Decl. ¶60; Prince Decl. Ex. 4 (Reimers Tr. 122-24, 126-28).  Further, the Publishers assert

the Expert Opinion Objections from their Response to Statement 118, and incorporate them by

reference herein, and object that the expert opinions set forth in Statement 120 are inadmissible –

and should be disregarded pursuant to Local Rule 56.1(d).

121.    When editions of the Works in Suit were first made available for borrowing from the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to other books.  Reimers Decl. Ex. 1 ¶¶ 10, 38, 47 (Reimers Expert Rpt.).

**Publishers' Response**:  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 121 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Further, this Statement is not an accurate summary of Dr. Reimers cited expert report.  Dr. Reimers did not reach an actual conclusion on this measure and her range of likely results included a harmful impact on the Works in Suit's Amazon print sales rankings after they were first made available for borrowing from the Internet Archive via CDL.  Prince Decl. ¶¶59-60; *see also* Reimers Report ¶¶ 38, 46 ("[W]e cannot say with certainty" whether people buy fewer or more copies after a Work is uploaded).

122.    When the Works in Suit were removed from the Internet Archive after this lawsuit was filed, their print sales slightly worsened relative to other books.  Reimers Decl. Ex. 1 10, 38, 49, 50 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 122 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Further, this Statement mischaracterizes Dr. Reimer's cited report, in which she only examined Amazon print rankings (not print sales) and only claimed that she found "some (weak) evidence that taking the Works in Suit off the Internet Archive hurt the Amazon sales rankings of their print editions slightly."  Reimers Report

¶10).  Further, this Statement is also not material because Amazon rankings for print books are not relevant to the ultimate issue of whether IA negatively affected revenue from print sales and do not directly translate into revenue.

123.    Historical Amazon data is only publicly available for print books – not for ebooks.  Reimers Decl. Ex. 1 nn.33, 36 (Reimers Expert Rpt.); *id.* Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  Undisputed for purposes of this motion only that Amazon does not make the same historical ranking data publicly available for ebooks as it does for print books, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.

124.    Because there is not publicly available commercial performance data about ebooks, and because Plaintiffs declined to produce the monthly performance data the Internet Archive requested, Dr. Reimers was unable to make similar calculations regarding the sales of consumer ebooks.  Reimers Decl. Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Reimers did not perform an analysis based on publicly available consumer ebook data, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.  Further, the Publishers dispute that Dr. Reimers was unable to perform calculations regarding the impact of the Internet Archive on the Publishers' commercial ebooks because of any failure on their part to produce any documents. The Internet Archive voluntarily agreed to withdraw its request for additional monthly data.  *See* Suppl. McN Decl. ¶9; *id*. Ex. 8, p. 9 ("We are pleased to inform the Court that, subject to

46

A-5822

meaningful compliance with the agreements reached, which are memorialized in a separate document, the parties have resolved the various issues identified in the Letter Motions, together with related discovery disputes.").  This Statement is also incomplete and misleading because a comparison by Dr. Reimers of the commercial performance of the Works in ebook form before a particular date with the commercial performance after that date would not demonstrate whether the market for a particular Work in Suit was harmed by the Internet Archive given the inability of Internet Archive's experts to impose sufficient controls to discount extraneous factors and account for the fact that the sales of every book are unique.  Prince Decl. ¶¶35-86.  Any suggestion that the Publishers improperly deprived Internet Archive of necessary data is further misleading because Internet Archive obtained voluminous data about both the Works as well as "books other than the Works in Suit" published by the four Plaintiff Publishers and by other book publishers that partner with OverDrive from a third-party subpoena to OverDrive; specifically, the Internet Archive received data reflecting monthly revenues and digital checkouts for the Works in Suit and more than 300 other books as well as checkout figures for current OverDrive public and academic library customers located in the United States, on an annualized basis for each year from 2010 through 2020, and on a monthly basis for each month in the calendar year 2020.  Suppl. McN Decl. Ex. 7.

125.    The Internet Archive requested monthly commercial performance data for the Works in Suit for the time period from 2011 to 2020.  Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Publishers' Response**:  Undisputed, but not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

47

126.    Plaintiffs declined to produce the requested monthly data. Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 3 n.1, ECF No. 49.

**Publishers' Response**: Undisputed that the Publishers "declined to produce the requested monthly data," but incomplete and misleading because Publishers had "already produced monthly sales data from Hachette for 2020," because producing the requested information would have been extremely burdensome due to the fact that the Publishers did not keep their data in the form requested and because the Publishers had already produced a vast wealth of detailed sales and related financial data. Suppl. McN Decl. Ex. 8, pp. 5-7. This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

127.    Each book began to be available for digital lending on a particular known date, so having monthly commercial performance data would allow a comparison of the commercial performance before that particular date with the commercial performance after that date. Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Publishers' Response**: Disputed but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement. This Statement is also incomplete and misleading because "a comparison of the commercial performance before that particular date with the commercial performance after that date" would not demonstrate whether the commercial ebook market for a particular Work in Suit was harmed given the inability of Internet Archive's experts to impose adequate controls to discount extraneous factors or account for the fact that the sales of every book are unique. Prince Decl. ¶¶35-86; Weber Decl. ¶28. This Statement is also not material, incomplete and misleading for the reasons set forth in the

48

Publishers' Response to Statement 124, which are incorporated herein by reference.

128.    Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020.  Hachette produced annual data for 2015 to 2019.  Gratz Decl. ¶ 43; *see also* Gratz Decl. Ex. JJ (HACHETTE0002474) & Ex. KK (HACHETTE0002475).

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

129.    For its Works in Suit, HarperCollins produced annual data for 2017 to 2020. Gratz Decl. ¶ 44; *see also* Gratz Decl. Ex. LL (HC0010272).

**Publishers' Response**:  Undisputed that HarperCollins produced annual data at least for 2017 to 2020, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

130.    For its Works in Suit, Penguin Random House produced annual data for 2010 to 2020.  Gratz Decl. ¶ 45; *see also* Gratz Decl. Ex. MM (PRH0025907).

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

131.    For its Works in Suit, Wiley produced annual data for 1996 to 2020.  Gratz Decl. Ex. 46; *see also* Gratz Decl. Ex. NN (WILEY0005650).

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are

incorporated herein by reference.

132.    The Internet Archive requested data about the commercial performance of all Plaintiffs' books, broken down by month, since 2011.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47.

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

133.    This data would allow a comparison of the commercial performance of books that were available for digital lending with books that were not available for digital lending.  *Id.*

**Publishers' Response**:  Disputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

134.    Plaintiffs refused to provide data about books other than the Works in Suit.  Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47; Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 1, 3, ECF No. 49.

**Publishers' Response**:  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement124, which are incorporated herein by reference.

135.    The Internet Archive requested that Plaintiffs produce monthly commercial performance data about a set of books Plaintiffs regarded as comparable to the Works in Suit, but Plaintiffs refused.  Gratz Decl. ¶ 42.

**Publishers' Response**:  Undisputed, but incomplete and misleading because the Publishers' declined to produce the requested data because that would be "burdensome in the

50

extreme" and "irrelevant" given the reality that, "since books are not fungible widgets," there "is no such thing as a 'comparable book.'" Suppl. McN Decl. Ex. 8, p. 6. This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

136.    The National Emergency Library provided an opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit.  Reimers Report ¶¶34, 35, 37; Jorgensen Report ¶49.

**Publishers' Response**:  Undisputed that the National Emergency Library provided a potential opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit but only (a) under the then-current level of usage of the IA's Website and (b) if the study were done in a reliable fashion, including by accounting for other factors affecting the market for each Work in Suit.  *See* Prince Decl. ¶¶76-85.

137.    Dr. Reimers observed the Amazon rankings for the Works in Suit relative to when the NEL was launched.  Reimers Decl. Ex. 1 ¶¶34, 48–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶3–8 (Reimers Reply Expert Rpt.).

**Publishers' Response**:  This Statement is essentially identical to Statement 119 and the Publishers' Response thereto is incorporated by reference here.

138.    The Amazon rankings for the Works in Suit improved by approximately 2% at the time the NEL was launched.  The Amazon rankings held steady while the NEL was in effect. Then, around the time that most Works in Suit were removed from the Internet Archive, the rankings reverted to their pre-NEL levels.  However, the Works in Suit behaved similarly the year prior at the same time of the year.  In sum, the Amazon rankings of the Works in Suit did

51

not undergo a statistically significant decrease relative to when the NEL was launched. Reimers Decl. Ex. 1 ¶¶ 51–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Publishers' Response**: Disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 138 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement misrepresents the findings in Dr. Reimers' cited Expert Report and Reply Expert Report regarding her analysis of the impact of the NEL on the Amazon print rankings of the Works in Suit, including her ultimate conclusion – which was that she "cannot conclude [based on this data] that the NEL had either a positive or a negative effect on the Amazon sales rankings of print editions." *See, e.g.*, Reimers Report ¶¶48-54. This Statement is also incomplete and not material because Dr. Reimers merely observed Amazon rankings for print books of the Works in Suit, which are not relevant to the ultimate issue of whether IA negatively affected revenue from licensing and sales to U.S. libraries and consumers, including in ebook format. Prince Decl. ¶¶29-34.

139. Dr. Reimers concluded that these observations signified that the NEL did not depress Plaintiffs' unit sales of physical formats of the Works in Suit. Reimers Decl. Ex. 1 ¶¶ 10, 53 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Publishers' Response**: Disputed but inadmissible, misleading, incomplete and not material for all the reasons set forth in the Publishers' Response to Statement 138, which are incorporated by reference herein, including the Expert Opinion Objections.

140. Dr. Jørgensen observed the change in OverDrive checkouts for the Works in Suit after the shutdown of the NEL and effective removal of the Works in Suit from the Internet Archive. He observed that after the closure of the NEL, the number of OverDrive check-outs of

52



the Works in Suit ████████████████████████████████████████████████████

████████████ Jørgensen Decl. Ex. 1 ¶¶ 49–53 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 17

(Jørgensen Reply Rpt.).

**Publishers' Response**:  Undisputed that Dr. Jorgensen observed the OverDrive

checkouts for the Works in Suit in June 2020, ████████████████████████████

████████████████████████████████████████████████████, but the

Publishers dispute any implication that Dr. Jorgensen established that this result was caused by

the Internet Archive's actions or the NEL.  Further, this Statement is incomplete and misleading

because, as Dr. Jorgensen admits, checkout frequency does not directly translate to revenue for

library ebooks licenses, which are frequently based on a term of years or 24 circulations.  Prince

Decl. ¶¶29-33; Reply Expert Report of Rasmus Jorgensen, Ph.D, ECF 108-2 ("Jorgensen

Reply"), ¶26; Prince Decl. Ex. 3 (Jorgensen Tr. 101:3-19).  The Publishers also assert the Expert

Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in Statement 140 are inadmissible – and

should be disregarded pursuant to Local Rule 56.1(d).

141.    Dr. Jørgensen concluded that the evidence was not consistent with Plaintiffs'

theory that the Internet Archive's loan volume of the Works in Suit reduced digital lending

through OverDrive.  *Id.*

**Publishers' Response**:  Disputed but inadmissible.  The Publishers assert the Expert

Opinion Objections from their Response to Statement 118, and incorporate them by reference

herein, and object that the expert opinions set forth in Statement 141 are inadmissible – and

should be disregarded pursuant to Local Rule 56.1(d).

142.    Dr. Jørgensen also analyzed whether the closure of the NEL impacted Hachette's

book sales of the Works in Suit.  Jørgensen Decl. Ex. 1 ¶¶ 54–58 (Jørgensen Expert Rpt.).

**Publishers' Response**:  Undisputed that Dr. Jorgensen purported to analyze whether the closure of the NEL impacted Hachette's paperback and ebook sales of their Works in Suit, but incomplete and misleading to the extent that it suggests that Dr. Jorgensen reliably analyzed the impact of the closure of the NEL on these sales.  Prince Decl.  ¶¶35-53.

143.    Dr. Jørgensen was unable to analyze whether the closure of the NEL impacted all four of the Plaintiffs' sales of the Works in Suit because Hachette was the only Plaintiff – despite the Internet Archive's requests – to produce monthly sales data for 2020 for each of its Works in Suit.  Jørgensen Decl. Ex. 1 ¶ 54 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 40 (Jørgensen Reply Rpt.); Gratz Decl. ¶¶ 42–46.

**Publishers' Response**:  Undisputed that Dr. Jorgensen did not perform analysis based on monthly sales data for the Works in Suit published by PRH, HarperCollins or Wiley, but this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

144.    When the Internet Archive shut down the NEL, Hachette did not see increases in paperback or ebook sales of the Works in Suit.  Rather, Hachette's sales of the Works in Suit contracted approximately 21% between the second and third quarter of 2020 for paperbacks and approximately 29% between the second and third quarter of 2020 for ebooks.  Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.).

**Publishers' Response**:  The Statement recited above is disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 144 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Statement 144

54

also does not accurately summarize the content of the cited Jorgensen Expert Report.

145.    Dr. Jørgensen concluded this simultaneous contraction was not indicative that the Internet Archive's lending of Hachette's Works in Suit acted as market substitutes.  Jørgensen Decl. Ex. 1¶¶ 57–58 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶¶ 17–18 (Jørgensen Reply Rpt.).

**Publishers' Response**:  The Statement recited above is disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 145 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Statement 144 also does not accurately summarize the content of the cited Jorgensen Expert Report.

146.    Dr. Prince made no attempt to quantify the effect of the Internet Archive's digital lending on Plaintiffs.  Gratz Decl. Ex. EE, Deposition Transcript of Jeffrey Prince ("Prince Dep. Tr.") 52:16–53:21, 54:9–16, 202:23–203:10, 230:3–8.

**Publishers' Response**:  Undisputed that Dr. Prince did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on the Plaintiffs, but Dr. Prince did "la[y] out the economic reasoning that [he] believes[s] points to it being detrimental, having harm" (Prince Decl. Ex 2 (Prince Tr. 203:7-10); *see also* Prince Decl. ¶¶15-19; Prince Report ¶¶54-65) and indicated that the harm would be substantial, including if Internet Archives practices scaled up or became widespread.  Prince Decl. ¶¶76-86; Prince Report ¶¶66-72.   This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendant's conduct were to become widespread.  17 U.S.C. §107; *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169,

55

176 (2d Cir. 2018) ("Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it.").

147.    Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues.  Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13; *id.* Ex. FF, Deposition Transcript of Allison Lazarus ("Lazarus Dep. Tr.") 27:9–12; 38:12–22; *id.* Ex. GG, Deposition Transcript of Chantal Restivo-Alessi ("Restivo-Alessi Dep. Tr.") 224:7–225:9; *id.* Ex. HH, Deposition Transcript of Alan Pavese ("Pavese Dep. Tr.") 55:3–16.

**Publishers' Response**:  Undisputed that the Plaintiffs did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on Plaintiffs, but the filed Declarations of Jeffery Weber and Chantal Alessi-Restivo state that IA's failure to pay the Plaintiffs fees for its lending of ebooks amount to millions of dollars (Weber Decl. ¶84; R-A Decl. ¶¶70-71) and the Publishers all testified repeatedly they believe that Internet Archive harms their book sales based on extensive experience in the publishing field and common sense.  *See, e.g.*, Suppl. McN Decl. Ex. 2 (R-A Tr. 141:3-141:11); *id* Ex. 3 (Weber Tr. 202:23-203:11, 205:22-206:9, 207:4-23, 214:3-24); *id* Ex. 4 (Pavese Tr. 51:11-54:24, 190:22-192:13); *id* Ex. 6 (Lazarus Tr. 48:3-51:23); Weber Decl. Ex. 26 (Dye Tr. 372:25-374:23).  This Statement that "Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues" also misrepresents the Publishers' testimony.  *See, e.g.*, Suppl. McN Decl. Ex. Ex. 6 (Lazarus Tr. 36:5-41:24).  This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendants conduct were to become widespread.  17 U.S.C.  §107; *TVEyes, Inc.*, 883 F.3d at 176.

148.    Even if you were to assume that CDL reduced the necessity of lending those titles

via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions. They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books. Declaration of Susan Hildreth submitted herewith ("Hildreth Decl.") Ex. 1 ¶ 106 (Hildreth Expert Rpt.).

**Publishers' Response**: Undisputed that if books "became easier to lend electronically through CDL for all libraries, … they would reallocate their spending away from ebooks licensing for those titles being accessed through CDL." Disputed that "libraries would not spend less money on acquisitions" and "would spend more on ebook licensing for newer titles or on print books." Ms. Hildreth further testified that if a library were to forgo purchasing an ebook license for a particular title because that title was available through CDL, the author and publisher of that title would not receive the payment they would have received had the library purchased an authorized edition – which means that authors and publishers would be harmed even if the libraries reallocated money to purchasing other authorized ebooks. McN Decl. Ex. 19 (Hildreth Tr. 44:24-45:4). Ms. Hildreth also testified that libraries could reallocate budgets to non-book purchases (*e.g.*, DVDs and games) and that discretionary acquisition budgets are constantly under pressure – which means that local authorities could reduce funding for acquiring books if CDL reduced demand for authorized ebooks. Suppl. McN Decl. Ex. 5 (Hildreth Tr. 198:23-203:25; 225:17-226:12).

The Publishers further dispute and object to disputed portions of the expert opinions of Ms. Hildreth set forth in Statement 148 *supra* because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons. The Publishers

dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book.  Any such opinion from Ms. Hildreth is inadmissible because, *inter alia*, Ms. Hildreth lacks the expertise necessary to state an opinion about the conduct of all libraries nationwide and did not arrive at her conclusions by any kind of objective process, let alone the kind of sound methodology required for expert testimony.  Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Expert Report of Susan H. Hildreth, ECF 110-1 ("Hildreth Report"), ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.  And at her deposition, Ms. Hildreth testified that she did not have access to any relevant data from any of the 9,000 public library systems in the United States that could possibly support her specious conclusion.  Prince Decl. Ex. 5 (Hildreth Depo. Tr. 259:1-262:6). In the event of a trial, the Publishers reserve the right to file a motion to strike portions of Ms. Hildreth's expert reports under Federal Rule of Evidence 702.  *See* Fed. R. Evid. 702(1) (expert testimony must be "based upon sufficient facts or data"); *Johnson Elec. N.Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000).  Further, Ms. Hildreth's opinions about whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement.  See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts");  Local Rule 56.1(d).

149.    With CDL in place in libraries throughout the United States, libraries would have

additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products.  Hildreth Decl. ¶ 109.

**Publishers' Response**:  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

150.     There have been no instances of a library paying for access to fewer ebook copies of a title – or buying fewer copies of a physical book for a title – where that title is available for borrowing through CDL, either from the IA or from another library.  *Id.* Ex. 2 ¶ 8 (Hildreth Reply Rpt.).

**Publishers' Response**:  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

151.     Most libraries strive to spend their entire annual materials allocation within the fiscal year in which funds were allocated.  In fact, it is highly unusual for a library not to spend the entire allocation each year.  *Id.* Ex. 1 ¶ 71 (Hildreth Expert Rpt.).

**Publishers' Response**:  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.  This proposed "fact" is also not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.

152.     Libraries help readers discover books – through purposeful searching as well as accident or "serendipity."  Readers can browse physical shelves of libraries and a library's online

catalog. Hildreth Decl. Ex. 1 ¶¶ 34, 35, 39 (Hildreth Expert Rpt.).

**Publishers' Response**: Undisputed.

153. Libraries generally begin lending a book as soon as it is published. Hildreth Decl. ¶ 5.

**Publishers' Response**: Disputed but not admissible. Vague and lacks foundation. This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion. This Statement is also incomplete and misleading because libraries continue to purchase books in paper and ebook editions long after first publication – as is the case with decades old Works in Suit such as *Their Eyes Were Watching God*, Catcher *in the Rye* and *Lord of the Flies*.

Dated: New York, New York
September 2, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        jessefeitel@dwt.com
        carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

60

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Hachette Book Group,
Inc., HarperCollins Publishers LLC,
John Wiley & Sons, Inc., and Penguin
Random House LLC*

61

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

HACHETTE BOOK GROUP, INC.,       :
HARPERCOLLINS PUBLISHERS LLC, JOHN  :    Case No. 1:20-cv-04160-JGK
WILEY & SONS, INC., and PENGUIN      :
RANDOM HOUSE LLC,           :
                                 :
               Plaintiffs,     :
                                 :
          - against -       :
                                 :
INTERNET ARCHIVE and DOES 1 through 5,  :
inclusive,                      :
                                 :
             Defendants.    :

------------------------------------------------------------------x

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INTERNET
ARCHIVE'S MOTION FOR SUMMARY JUDGMENT**

DAVIS WRIGHT TREMAINE LLP
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email:   lizmcnamara@dwt.com
         lindasteinman@dwt.com
         jackbrowning@dwt.com
         jessefeitel@dwt.com
         carlmazurek@dwt.com

OPPENHEIM + ZEBRAK, LLP
Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email:   matt@oandzlaw.com
         scott@oandzlaw.com
         danae@oandzlaw.com

*Attorneys for Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC,
John Wiley & Sons, Inc. and Penguin Random House LLC*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ........................................................................................... 2

I.    CONTROLLED DIGITAL LENDING IS NOT A DEFENSE TO COPYRIGHT INFRINGEMENT ........................................................ 2

    A.    Congress and the Copyright Office Have Repeatedly Considered and Rejected a Digital First Sale Right ....................................... 3

    B.    The Second Circuit and Other Courts Rejected the Premises of Internet Archive's Expansive CDL Theory ................................. 4

        1.    The Owned-To-Loaned Ratio Does Not Save IA ........................... 4

        2.    *ReDigi* Rejected Internet Archive's Argument that Fair Use Can Expand the Statutory First Sale Doctrine .............................. 6

    C.    The Facts Disprove Internet Archive's Presentation of CDL as a Widespread and Lawful Practice ............................................. 9

        1.    Internet Archive Grossly Inflates the Prevalence of CDL ............. 9

        2.    Internet Archive Does Not Obey CDL's Core Principles ............. 11

II.    FACTOR ONE WEIGHS IN FAVOR OF PLAINTIFFS .................................. 13

    A.    IA's Infringement Is Not Transformative ................................. 13

    B.    IA Ignores the Commercial Aspects of Its Website and Operations ........ 15

III.    FACTOR TWO WEIGHS IN FAVOR OF PLAINTIFFS .................................. 16

IV.    FACTOR THREE WEIGHS IN FAVOR OF PLAINTIFFS .............................. 17

V.    FACTOR FOUR WEIGHS IN FAVOR OF PLAINTIFFS ............................... 18

    A.    Internet Archive Fails to Pay Fees that Libraries Customarily Pay to Lend Plaintiffs' Ebooks ....................................................... 18

    B.    Undisputed Evidence Establishes that IA Offers A Competing Substitute Resulting in Potential Lost Ebook Sales .................................. 20

        1.    IA's Experts Do Not Rebut the Evidence of Market Harm .......... 25

i

2.    Jorgensen's Analysis is Unreliable ................................................ 26

3.    Reimers Provides Limited and Unreliable Testimony................. 28

VI.    INTERNET ARCHIVE IS NOT ENTITLED TO REMITTANCE OF
STATUTORY DAMAGES UNDER SECTION 504 ........................................... 30

CONCLUSION............................................................................................................. 33

CERTIFICATION OF COMPLIANCE ..................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*A&M Records v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ..............................................................14

*Arista Records v. Lime Grp.*,
2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)........................................32

*Association of Am. Publishers, Inc. v. Frosh*,
2022 WL 484926 (D. Md. Feb. 16, 2022) ..............................................3

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014).....................................................7, 8, 13, 17

*Authors Guild v. Google*,
804 F.3d 202 (2d Cir. 2015)......................................................1, 15, 17

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006)..................................................................15

*Bureau of Nat'l Literature v. Sells*,
211 F. 379 (W.D. Wash. 1914)................................................................7

*Campbell v. Acuff-Rose Music*,
510 U.S. 569 (1994)...............................................................................13

*Capitol Records, LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018)........................................................ *passim*

*City of Providence v. Bats Global Markets*,
2022 WL 902402 (S.D.N.Y. 2022).......................................................18

*De Fontbrune v. Wofsy*,
39 F.4th 1214 (9th Cir. 2022) ...............................................................16

*Disney Enterprises v. VidAngel*,
869 F.3d 848 (9th Cir. 2017) ..............................................................5, 6

*Doan v. American Book Co.*,
105 F. 772 (7th Cir. 1901) ......................................................................7

*Fox News Network v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018).......................................................... 13, 17

iii

*Harper & Row Publishers v. Nation Enters.*,
   471 U.S. 539 (1985) ...................................................................................................17

*In re Electronic Books Antitrust Litigation*,
   2014 WL 1282298 (S.D.N.Y. 2014) .........................................................................18

*Infinity Broad. Corp. v. Kirkwood*,
   150 F.3d 104 (2d Cir. 1998) ....................................................................6, 13, 16, 23

*Lamarr-Arruz v. CVS Pharmacy*,
   2017 WL 4277188 (S.D.N.Y. 2017) .........................................................................18

*On Davis v. The Gap*,
   246 F.3d 152 (2d Cir. 2001) ......................................................................................20

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014) ...................................................................................20

*Penguin Grp. (USA) v. Am. Buddha*,
   2015 WL 11170727 (D. Ariz. May 11, 2015) ...........................................................16

*Ringgold v. Black Entm't Television*,
   126 F.3d 70 (2d Cir. 1997) ...................................................................................20, 21

*Soc'y of Holy Transfiguration Monastery v. Gregory*,
   689 F.3d 29 (1st Cir. 2012) .................................................................................16, 24

*Sony Corp. of Am. v. Universal City Studios*,
   464 U.S. 417 (1984) ...................................................................................9, 13, 14, 17

*Twin Peaks Prods., Inc. v. Publ'ns Int'l*,
   996 F.2d 1366 (2d Cir. 1993) ....................................................................................23

*UMG Recordings v. MP3.com, Inc.*,
   92 F. Supp. 2d 349 (S.D.N.Y. 2000) ..........................................................................6

*Worldwide Church of God v. Phila. Church of God*,
   227 F.3d 1110 (9th Cir. 2000) ...................................................................................17

**Federal Statutes**

17 U.S.C.
   § 106 ...........................................................................................................................2
   § 107 .....................................................................................................................5, 22
   § 108 .....................................................................................................................8, 31
   § 109 ................................................................................................................. *passim*
   § 504 .....................................................................................................30, 31, 32, 33

**Rules**

F.R.E. 702 ...........................................................................................................18

**Other Authorities**

144 Cong. Rec. H.7074 (1998) .............................................................................3

Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* 58 (2016) ............................................................4

S. Rep. 105-190 (1998) .......................................................................................31

U.S. Copyright Office, Library of Cong., Digital Millennium Copyright Act §104 Report vi (2001) .............................................................................................4

v

**PRELIMINARY STATEMENT**

Internet Archive concedes that it directly infringed the Works in Suit, which are but a small sample representing its unauthorized scanning and distributing of millions of ebooks. IA's only defense rests on a manufactured doctrine, "controlled digital lending" ("CDL"). IA argues CDL "is fundamentally the same as traditional library lending" and should be treated as a fair use since it "furthers the ends of copyright's exhaustion doctrine" (also known as the first sale doctrine, codified at 17 U.S.C. §109). ECF No. 106 ("IA Br.") at 1, 15. This position is a study in blind denial that ignores established law and undisputed facts. Perhaps most astonishing, IA essentially disregards *ReDigi*, in which the Second Circuit held that (1) unauthorized reproduction is "not protected by §109"; (2) the fair use doctrine cannot be used to expand the statutory scope of §109; and (3) ReDigi's actions were unlawful even though it used technology to avoid increasing the number of music files in circulation, a practice akin to CDL's central principle. *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 659 (2d Cir. 2018). Nor does Internet Archive even acknowledge the cases that prohibit format shifting in similar settings or the Second Circuit's warning that demonstrates that the Plaintiffs have a "strong" case against IA for republishing entire unauthorized ebooks on a vast scale. *Authors Guild v. Google*, 804 F.3d 202, 226 (2d Cir. 2015); ECF No. 99 ("Pubs. Br.") at 2-3.

Internet Archive's motion is similarly disingenuous with the facts. It blithely ignores, for instance, the commercial aspects of IA's business (including its symbiotic relationship with Better World Books ("BWB")) and clear market harms felt by the Publishers and their authors, including IA's failure to pay millions in lost fees. In the end, IA displays contempt for authors, like Sandra Cisneros, who rely on copyright to secure their livelihoods.

Ultimately, IA's motion (buttressed by *amicus* briefs) amounts to a policy argument that seeks to undercut the Copyright Act and Congressional policymakers, as well as reverse

1

controlling precedent. Such "a ruling … would exceed the proper exercise of the court's authority." *ReDigi*, 910 F.3d at 664. IA cannot carry its burden to establish fair use, and its motion for summary judgment should be denied, as should its motion for remittance of statutory damages.

**ARGUMENT**

**I.    CONTROLLED DIGITAL LENDING IS NOT A DEFENSE TO COPYRIGHT INFRINGEMENT**

Internet Archive nominally moves for summary judgment on fair use grounds, but its entire defense for "loaning … books over the Internet" is rooted in an expansive conception of the first sale doctrine that the Second Circuit and Congress have explicitly rejected. As IA tacitly admits, the Copyright Act's first sale exception does not permit the creation, via reproduction, of millions of unauthorized ebooks. To the contrary, §109(a) states that "notwithstanding the provisions of section 106(3)" – the distribution right – "the owner of *a particular copy* … is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of *that copy*." 17 U.S.C. §109 (emphasis added). IA likewise acknowledges the Second Circuit's holding in *ReDigi* "that because the statute addresses distribution but not reproduction, Section 109(a) does not provide an independent defense to a reproduction claim." IA Br. at 20 n.3 (citing *ReDigi*, 910 F.3d at 664). In other words, IA recognizes that the text of the Copyright Act does not contain a broad "exhaustion rule" that permits its practice of CDL.

In an awkward attempt to sidestep these insurmountable hurdles, Internet Archive argues that "CDL helps fulfill *the goals* of copyright's exhaustion doctrine" and thus "the fair use doctrine steps in to ensure that the substance of the common-law exhaustion rule survives technological changes in the way copyright works are loaned and read." IA Br. at 19-20

2

(emphasis added). This audacious argument fails for many reasons – not least because the Second Circuit expressly rejected the idea that there is a hidden exhaustion doctrine that extends the boundaries of §109.

### A. Congress and the Copyright Office Have Repeatedly Considered and Rejected a Digital First Sale Right

Having conceded that §109 does not protect CDL, Internet Archive asks this Court to bypass the statutory text and interpose a digital exhaustion doctrine that, according to IA, was accidentally omitted from the Copyright Act. The crux of IA's argument is that codification of §109 "predated the spread of copyrighted works" and thus inadvertently failed to account for "the reproduction right that is implicated by digital lending." IA Br. at 19. But IA and its *amici* brazenly ignore that Congress repeatedly has considered and declined to amend §109 to encompass digital works. *ReDigi*, 910 F.3d at 659; *Association of Am. Publishers, Inc. v. Frosh*, 2022 WL 484926, at *1 n.1 (D. Md. Feb. 16, 2022).

In 1998, the U.S. implemented the WIPO Internet Treaties through the Digital Millennium Copyright Act. During DMCA proceedings, the concept of a "digital first sale" doctrine was raised and rejected, including a provision that would have made the further dissemination of digital files contingent on the deletion of the original copy after transmission. The presiding Chairman explained that this would remove contractual controls placed by the copyright holder and would "pos[e] so great a burden on a copyright owner so as to undermine the incentive to create works which is the driving force behind the Copyright Act."[1]

---

[1] 144 Cong. Rec. H.7074 (1998), https://www.congress.gov/105/crec/1998/08/04/CREC-1998-08-04-pt1-PgH7074-3.pdf.

3

In 2001, at the request of Congress, the Register of Copyrights delivered a "multi-year evaluation" on whether §109 should be updated due to "existing and emergent technology," which included a review of comments from the public, academia, libraries, copyright organizations and copyright owners. *ReDigi*, 910 F.3d at 659 (citing U.S. Copyright Office, Library of Cong., Digital Millennium Copyright Act §104 Report vi, 79-80 (2001)). The Register concluded that §109 should not be amended and Congress left §109 unchanged. *Id.*

More recently, the House Judiciary Committee conducted a "comprehensive [ ] review" of the Copyright Act, including a June 2014 hearing on digital first sale, and §109 again remained unchanged. SUMF¶¶403-05. Thereafter, a 2016 White Paper by the Department of Commerce's Internet Policy Task Force recommended against expanding §109, finding that "the risks to copyright owners' primary markets as described by the Copyright Office in its 2001 Report do not appear to have diminished...." Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* 58 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf. The lack of a digital first sale doctrine is thus no accident.

**B.**     **The Second Circuit and Other Courts Rejected the Premises of Internet Archive's Expansive CDL Theory**

        **1.**     **The Owned-To-Loaned Ratio Does Not Save IA**

Internet Archive effectively asks this Court to embrace CDL by recognizing a hidden "exhaustion" right beyond the text of the Copyright Act, but the courts have rejected analogous efforts to bend copyright law to suit technology companies pushing theories similar to IA's "owned-to-loaned" ratio, the core of its CDL theory. The defendant in *ReDigi*, for instance, developed a program that allowed users to "resell" legally-acquired digital music files through a process intended to mimic the resale of physical phonorecords. The system deleted the original

4

file from the seller's computer at the same time as a copy was made on ReDigi's servers. 910 F.3d at 652-54. Echoing the core principle of CDL – that the physical book is never in use at the same time as its digital copy – ReDigi argued its program ensured that each digital file never existed in more than one place simultaneously. *Id.*

The Second Circuit rejected ReDigi's first sale and fair use arguments, holding that the measures ReDigi took to avoid increasing the total number of copies in existence did "not rebut or nullify the fact that" ReDigi's program unquestionably created new copies of each work, violating the plaintiffs' exclusive right of reproduction. *Id.* at 657-58. The Second Circuit's proscriptions apply with even greater force to CDL. While *ReDigi* involved digital-to-digital duplication, CDL transgresses a step further by converting physical books into digital ebooks. This is classic format shifting (sometimes called space-shifting), which is repeatedly rejected by courts.

In *Disney Enterprises v. VidAngel,* 869 F.3d 848 (9th Cir. 2017), for example, the Ninth Circuit forcefully rejected an analogous claim by an online streaming service that made movies and television shows more "family friendly" by removing "objectional" content. The company purchased "multiple authorized DVDs or Blu-ray discs" for each movie in its service, which it then converted to a live streaming format that filtered out objectionable material. 869 F.3d at 853-54. In order to view a movie, a customer was required to temporarily "purchase" a disc, which could be returned after viewing. *Id.* In other words, every movie streamed to a customer was streamed against a lawfully-acquired copy on a disc. Nonetheless, the Ninth Circuit easily rejected VidAngel's first sale argument and its argument that such format-shifting constituted fair use. 869 F.3d at 856-57, 860-62. As the Ninth Circuit declared: "The reported decisions unanimously reject the view that space-shifting is fair use under §107." *Id.* at 862. It

5

underscored the Register of Copyright's conclusion that "[t]he law of fair use ... does not sanction broad-based space-shifting or format-shifting." *Id.*

*UMG Recordings v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000), similarly involved an online music service that permitted subscribers to store and listen to music on lawfully-acquired CDs via the Internet.  In order to operate the service, the defendant purchased tens of thousands of CDs and converted them to MP3 files.  Subscribers were required to prove that they owned the CD.  Despite the veneer of a "lawfully acquired" foundation – similar to CDL – Judge Rakoff found defendant's fair use argument "indefensible."  He held that "unauthorized copies ... being retransmitted in another medium [is] an insufficient basis for any legitimate claim of transformation."  92 F. Supp. 2d at 351.  While MP3.com, like IA, tried to argue that its service benefited the public, Judge Rakoff proclaimed that, "defendant's 'consumer protection' argument amounts to nothing more than a bald claim that defendant should be able to misappropriate plaintiffs' property simply because there is a consumer demand for it.  This hardly appeals to the conscience of equity."  *Id.* at 353; *see also Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 & n.2 (2d Cir. 1998).

In sum, the case law ignored by IA teaches that the mere possession of a corresponding physical copy does not magically make it lawful to engage in unauthorized reproduction and distribution of the underlying work.  IA does not have the unilateral right to "misappropriate plaintiffs' property" (*id.*) and reap the benefits of digital media with total disregard for the Publishers' carefully balanced licensing terms governing ebooks.

### 2. *ReDigi* Rejected Internet Archive's Argument that Fair Use Can Expand the Statutory First Sale Doctrine

Having acknowledged that §109 does not protect CDL, Internet Archive argues that the fair use doctrine "steps in" to allow the "substance of the common-law exhaustion rule" to

inform the fair use analysis.  IA Br. at 19-20.  To further this argument, IA falsely asserts that the "*ReDigi* court did not address the impact of the exhaustion doctrine on the fair use inquiry." *Id.* n.3.  In reality, the Second Circuit not only rejected each argument IA puts forth, it also specifically considered and rejected amicus briefs that IA and its *amici* in this action submitted in *ReDigi* to make precisely the same exhaustion arguments they rehash here.

*First*, Internet Archive asserts that §109 does not "abrogate the common-law principle favoring the ability of the owner of a copy to freely give, sell, or lend it." *Id.* at 19-20.  Then, citing to a 1901 case, *Doan v. American Book Co.*, 105 F. 772 (7th Cir. 1901), IA argues that the "common-law doctrine of exhaustion can encompass reproduction of copyrighted material in some circumstances." *Id.* at 21.  But the 120-year old *Doan* decision merely held that the first sale doctrine allowed owners of a book to copy and replace its cover in order to "maintain the book as nearly as possible in its original condition" – which is not remotely comparable to IA's mass digitization scheme.  More fundamentally, *ReDigi* explicitly rejected the notion that a common-law first sale doctrine expands the narrow limits of §109.  To make this point, Judge Leval cited a case that is materially indistinguishable from *Doan – Bureau of Nat'l Literature v. Sells*, 211 F. 379 (W.D. Wash. 1914) – as an example of a common law decision that did not survive §109.  *ReDigi*, 910 F.3d at 664 ("Congress, in promulgating §109(a), adopted a narrower conception [of first sale].").

*Second*, Internet Archive argues that CDL is a favored use under the fair use inquiry because it "advances the purposes of narrow statutory exceptions," namely the concededly inapplicable first sale doctrine.  IA Br. at 20.  In support of this point, IA cites to *Authors Guild, Inc. v. HathiTrust*, where the Second Circuit held that a program making books available to the blind was a favored fair use, even if it did not satisfy the strict language of the Chafee

Amendment permitting certain copying for the blind. 755 F.3d 87, 102 (2d Cir. 2014). Yet, IA made the exact same argument to the Second Circuit in the *amicus* brief it (and other *amici* submitted in *ReDigi*, which contended that ReDigi's service furthered the general purpose of §109 and was thus a favored use under *HathiTrust*. *See* ECF No. 96 ("McN Decl.") Ex. 137 ("IA ReDigi Br.") at 5-16. Judge Leval firmly rejected this argument, and declined to adopt IA's conception of the animating spirit of first sale in order to create a "fundamental entitlement, without regard to the terms of §109(a)." 910 F.3d at 664. As he explained, "such a ruling would exceed the proper exercise of the court's authority" since §109 is a statutory provision in which Congress "has taken control, dictating both policy and the details of its execution." 910 F.3d at 664.[2] In short, fair use is not a vehicle to expand §109 contrary to the will of Congress.

A decision recognizing Internet Archive's practice of CDL as fair use also would undermine the Congressional intent behind the limited exceptions that permit libraries to copy lost or damaged books under §108. Despite claiming to be a library, IA notably includes no mention of §108 – understandably because the systematic creation and distribution of digital copies of millions of books readily available for authorized acquisition is far removed from the provision's careful boundaries. Yet, together with the first sale doctrine, these are the very sections of the Copyright Act that primarily effectuate Congress' "intent to secure libraries' right to lend books they own." IA Br. at 20.

Fundamentally, what IA seeks is not application of the law as it stands, but rather for the Court to fashion a defense to infringement that does not currently exist. To this end, IA and its

---

[2] IA's own outside counsel wrote that *ReDigi* "raises questions concerning the viability of Controlled Digital Lending ... by libraries." SUMF¶¶456-60.

*amici* trumpet the supposed "magnitude of the public benefit that flows from CDL."[3]  IA Br. at 7, 24.  Again, *ReDigi* foreclosed this policy-first approach.  As Judge Leval observed, courts are "poorly equipped to assess" the broad implications of copyright policy or weigh its alleged benefits against drawbacks.  *ReDigi*, 910 F.3d at 664; *see also Sony Corp. of Am. v. Universal City Studios,* 464 U.S. 417, 431 (1984) (acknowledging the "recurring theme" of the "judiciary's reluctance to expand the protections afforded by . . . copyright without explicit legislative guidance").  Respectfully, we urge this Court to "reject the invitation to substitute [its] judgment for that of Congress."  *ReDigi*, 910 F.3d at 664.

### C.  The Facts Disprove Internet Archive's Presentation of CDL as a Widespread and Lawful Practice

#### 1.  Internet Archive Grossly Inflates the Prevalence of CDL

Having failed to establish that CDL is permissible under copyright law, Internet Archive and its *amici* present CDL as a *fait accompli*, contending that "[l]ibraries have been practicing CDL in one form or another for more than a decade, and hundreds of libraries use it to lend books digitally today."  IA Br. at 1; *see also* ECF No. 146 ("Wu Br.") at 11-14; ECF No. 142 ("Library Futures Br.") at 3, 7-9.

Yet the evidence proves that the current version of CDL is a recent phenomenon.  While IA began "lending" public domain or out-of-print books on a small scale from about 2011, it only distributed them on library networks or within limited geographical areas.  SUMF¶¶224,

---

[3] The *amicus* briefs eschew legal argument and are filled instead with thinly supported prescriptions for public policy that courts are ill-equipped to assess, with only three of the six briefs even bothering to cite *ReDigi* or argue CDL is permitted under copyright law.  Further, IA *amici* are largely barely-disguised surrogates of IA with whom it collaborated extensively on manufacturing the legal theories at issue in this litigation.  *See* Plaintiffs' Opposition to Requests for Leave to Appear as *Amici Curiae* (ECF No. 138).

227, 352.  Over the years, many libraries were reluctant to allow IA to scan in-copyright books because of "copyright concerns."  *Id.* ¶¶297-299.  IA's digitization and lending capacity only began to grow exponentially in 2018-19 with the purchase of BWB and the launch of IA's Open Libraries project.  *Id.* ¶¶232-233, 333, 355, 338.  Even so, only 62 Partner Libraries contributed books to the Open Libraries project out of the 9,000 library systems in the United States, encompassing some 15,000 branches, with a mere 13 of those being public libraries.  Simply put, there is no evidence that CDL is a longstanding and widespread practice – particularly with respect to public libraries, only a handful of which endorsed IA's statement on CDL.  *Id.* ¶¶392, 462.

The only evidence IA and its *amici* identify to support their grandiose contention of widespread CDL adoption is a few academic programs.  *See* IA Br. at 31-32; Library Futures Br. at 7-8.[4]  But closer inspection reveals that these programs are all highly restricted.  Each of the CDL programs is limited to lending from collections of university libraries and providing access only to members of those universities; none involve a library making its collection freely available to the world.  Further, the programs were implemented not in the regular course of

---

[4] Contrary to Library Futures' brief, the Boston Library Consortium of academic libraries appears to be only studying CDL at this stage.  *See Boston Library Consortium to implement controlled digital lending for interlibrary loan*, BOSTON LIBRARY CONSORTIUM, https://blc.org/news/120355.

business, but in response to access issues precipitated by COVID.[5]  Even then, a number of these programs provided access only to very limited works within the libraries' collections.[6]

### 2.    Internet Archive Does Not Obey CDL's Core Principles

Even if CDL somehow were fair use – and it is not – Internet Archive's actions are still infringement because it defies the most basic principle of its own theory – *i.e.*, the "owned-to-loaned" ratio.  IA argues, at bottom, that its use of technical controls to "enforce a one-to-one owned-to-loaned ratio, is fair use" because this ensures that the user who reads an ebook on the Website "is the one person in the world who is then borrowing that particular, bought-and-paid-for library book."  IA. Br. at 1, 7, 14, 18.

The record belies these claims, beginning with the assertion that IA merely "lend[s] *its* books to its patrons."  *Id.* at 1, 4 (emphasis added).  Starting in 2018, and increasingly since then, IA has assumed the mantle of a national library that lends books owned by other libraries.  Specifically, IA "partners" with libraries nationwide under the Open Libraries project, runs "overlap analysis" to identify books that IA scanned already, and counts those books from *partner* collections towards the number of ebooks available for concurrent loans on the Website.  Pubs. Br. at 15-16; IA Br. at 7.  In effect, IA adopts the "royal we" by counting Partner Libraries' books towards its own  "owned-to-loaned" ratio.

---

[5] HathiTrust and a handful of university libraries, for instance, first enacted CDL programs specifically in response to the pandemic and tightly conditioned these programs on library closures.  *See* Supplemental Declaration of Elizabeth A. McNamara ("Suppl. McN Decl."), ¶12.

[6] Carnegie Mellon University and Michigan State University offered 60 titles and 206 course-related titles, respectively, for CDL.  *See id*.

Further, IA cannot claim, as it does, that lending limits are "backstopped by strong technical protections" after admitting it has "no way of knowing ... whether the physical and digital copies of a book [are] in circulation simultaneously." IA Br. at 1; SUMF¶495. Far from verifying whether Partner Libraries have taken physical copies out of circulation, IA even concedes its awareness that certain Partner Libraries do *not* remove the physical books from their shelves. SUMF¶494; ¶¶504-506. The upshot is that IA cannot ensure it abides by its own generous conception of the owned-to-loaned principle. SUMF¶479.

Finally, IA abandoned any façade of fair use when it removed the pretense of the owned-to-loaned ratio and set aside all lending limits to implement the grandly-titled National Emergency Library. SUMF¶¶542-43; *see also* ECF No. 90-9 (Foster Decl. Ex. 6) at 4. IA makes the remarkable argument that even this use complied with the spirit of the owned-to-loaned principle because nationwide library closures "took 650 million books out of circulation" and "there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive." IA Br. at 9. In other words, IA unilaterally conferred on itself the right to lend against *every physical library book in the United States*. IA never explains who granted it such a lofty status. Surely, neither Congress nor the Copyright Office, which frowned on its practices, designated IA the "national library" of the United States. SUMF¶¶551-554.

This presumptuous argument represents the logical end point of the Open Libraries project: to enable Internet Archive to appoint itself the *de facto* national (or global) digital library with the power to distribute as many ebooks simultaneously as there are physical books on the shelves of the 9,000 library systems throughout the country and those beyond its shores (or at least as many libraries that become Partner Libraries if the Court greenlights CDL). This

12

makes a mockery of the pretense that CDL is a "controlled" method for distributing ebooks. The Court should declare it to be the blatant infringement that it is.

## II. FACTOR ONE WEIGHS IN FAVOR OF PLAINTIFFS

### A. IA's Infringement Is Not Transformative

No other rationale offered by Internet Archive supports fair use. The central problem with IA's fair use defense is that there is absolutely nothing transformative about simply "repackag[ing] [and] republish[ing]" the full text of the Publishers' books in unauthorized digital formats and disseminating them worldwide. *HathiTrust*, 755 F.3d at 96; *see also, e.g.*, *Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018); *Infinity*, 150 F.3d at 108. IA fails to cite the Supreme Court's definition of transformativeness, presumably because it destroys its argument. The core focus is "whether the new work supersede[s] the objects of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell v. Acuff-Rose Music,* 510 U.S. 569, 579 (1994); *see also ReDigi*, 910 F.3d at 660-61. Here, IA's ebooks add nothing new and are distributed to be read, which serves the same purpose as the original.

Internet Archive relies on *Sony*, and the discussion of *Sony* in *TVEyes* and *ReDigi*, to argue that it has expanded the utility of the Works, but it cannot shoehorn CDL into that very different setting. *Sony* involved "the private, home use of VCRs for recording programs broadcast on the public airwaves without charge"; "the primary use of the [Betamax] machine for most owners was 'time-shifting'—the practice of recording a program to view it once at a later time, and thereafter erasing it." *Sony*, 464 U.S. at 423. As the Supreme Court noted, the case posed "no issue concerning the transfer of tapes to other persons, the use of home-recorded tapes for public performances, or the copying of programs transmitted on pay or cable television systems." *Id.* at 425.

13

In stark contrast, IA is an organization systematically republishing millions of unauthorized, in-copyright ebooks and loaning them out 25 million times a year to the general public. Thus, while *Sony* posed "*no* issues concerning the transfer of tapes to other persons," IA's whole purpose is "the transfer of [ebooks] to other persons." *Id.* Thus *Sony* is distinguishable, as it was in *Napster*, because the time-shifting in *Sony* "exposed the material only to the original user" and "did not also simultaneously involve distribution of the copyrighted material to the general public." *A&M Records v. Napster*, 239 F.3d 1004, 1019 (9th Cir. 2001).

Further, unlike television channels broadcasting free content to anyone with a television set, the Publishers require payment from purchasers of print books and authorized ebooks – and thus this is not a case where Internet Archive is "entitled to receive the content" it misappropriates. *ReDigi*, 910 F.3d at 661. *Sony* specifically noted that that case did not involve "the copying of programs transmitted on pay or cable television systems." 464 U.S. at 425. No court has ever suggested that the limited right to record broadcast television for private consumption can justify the systematic scanning and worldwide distribution of millions of ebooks that are already available via library licensing programs, with fees and controls tailored to that market. ECF No. 95 ("Weber Decl.") ¶70; *ReDigi*, 910 F.3d at 661.

Internet Archive also tries to squeeze into *Sony* by asserting that "CDL makes the delivery more efficient than physically handing or mailing that same print book" (IA Br. at 17), but this misses the crucial point that IA's ebooks are no more "efficient" than the millions of authorized ebooks that libraries already license. This argument only underscores that ebooks are distinct products with advantages that print books cannot match, which is precisely why the Publishers invested tens of millions of dollars to develop digital publishing technologies,

infrastructure, licensing models and pricing structures for ebooks in retail and library markets. Pubs. Br. at 6-9.

Finally, Internet Archive suggests that Wikipedia links to its ebooks render its entire CDL program fair use. But this is not the primary function of IA's Website and this peripheral use does not justify the distribution of entire ebooks.[7] Moreover, IA's Wikipedia links are not like the snippets in *Google Books* because anyone who follows a link to IA's Website can read the full book.

In sum, IA fails the "heart of the fair use inquiry" because CDL is not transformative. *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

**B. IA Ignores the Commercial Aspects of Its Website and Operations**

Internet Archive also argues unconvincingly that its practice of "CDL is wholly noncommercial" because IA is "a 501(c)(3) public charity lending books for personal and noncommercial reading by individual members of the public." IA Br. 16. This conclusion stunningly ignores the deep commercial entanglements between IA and BWB, a for-profit company effectively owned and operated by Brewster Kahle.

As a threshold matter, the Second Circuit has held that "there is … no reason to presume categorically that a nonprofit educational purpose should qualify as a fair use." *Google Books*, 804 F.3d at 219 n.20. That would give *carte blanche* to more than a million tax exempt entities to infringe copyrighted material. More fundamentally, IA's global distribution of millions of general interest books, from romances to thrillers, for anyone to read for any reason does *not* serve the type of "educational purpose" recognized under the Copyright Act, such as teaching.

_____

[7] This argument is so extraneous that IA did not even mention it in its interrogatory responses explaining the basis for its fair use defense. Suppl. McN Decl. Ex 1 at 19-22.

15

*Penguin Grp. (USA) v. Am. Buddha*, 2015 WL 11170727, at *4-5 (D. Ariz. May 11, 2015). *See* Pubs. Br. at 25-26.

Next, Internet Archive takes the indefensible position that its activities are "not commercial in nature" because it "does not charge patrons any fees." IA Br. 16. But the commerciality analysis turns on whether the infringer "stands to gain recognition and financial support through its posting of the works online." *Am. Buddha*, 2015 WL 11170727, at *4; *see also Soc'y of Holy Transfiguration Monastery v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012). Here, it is undisputed that IA "monetized" every webpage on which the Works appear, including by featuring buttons that invite users to "Purchase" copies from its affiliate BWB. Pubs. Br. 26-27. Nor can IA whitewash the many other manifestly commercial elements of its enterprise – including its multi-million dollar book scanning business, its effective purchase of BWB, the world's biggest for-profit used book store, to secure a "book pipeline" and the "synergies" developed with BWB to channel "funding back to the Internet Archive to ensure that it can continue to deliver free services to the world." *Id.* at 27.

Last, Internet Archive asserts in conclusory fashion that its "[p]atrons' borrowing and private reading is … noncommercial in nature" (IA Br. at 16), but the law is clear that the "end-user's utilization of the product is largely irrelevant" to the analysis. *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1224 (9th Cir. 2022); *Infinity*, 150 F.3d at 109 n.3.

## III. FACTOR TWO WEIGHS IN FAVOR OF PLAINTIFFS

Internet Archive argues that the second factor is neutral because the 127 Works in Suit "are of many different types," but this grab-bag approach ignores that the Works include seminal books of American literature, from Elie Wiesel to Malcolm Gladwell to Toni Morrison. IA Br. at 22. All of the Works are fiction and non-fiction books containing "subjective descriptions and portraits … whose power lies in the author's individualized expression," and should receive

16

maximum protection under the second factor. *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 563-64 (1985); *see also Worldwide Church of God v. Phila. Church of God*, 227 F.3d 1110, 1118 (9th Cir. 2000). Moreover, contrary to IA's contention, *Google Books* does not support its position. There, the Second Circuit held the second factor to be neutral "not because Plaintiffs' works are factual, but because the secondary use transformatively provides valuable information about the original." 804 F.3d at 220. Here, IA's use is not transformative.

Finally, Internet Archive's claims to limit its Website to books published more than five years ago do not aid its cause. IA Br. at 22-23. For one, this is an arbitrary, self-imposed rule which IA intermittently violates and could change at any time. *See* McN Decl. ¶35. More critically, IA's justification totally ignores that the Publishers rely – and are entitled to rely – on the critical revenue generated by backlist book sales over the full copyright term, which produce vital royalties for authors and steady income that enables the Publishers to assume the risk of publishing new works. SUMF¶¶32-37.

## IV. FACTOR THREE WEIGHS IN FAVOR OF PLAINTIFFS

The third factor weighs heavily against fair use because IA does not rebut the heavy presumption that wholesale copying clearly "tends to disfavor a finding of fair use." *ReDigi*, 910 F.3d at 662; *see also TVEyes*, 883 F.3d at 179. IA claims that its copying aligns with *Sony*, *HathiTrust* and *Google Books*, where the "copying of the entire copyrighted work was necessary to effectuate the favored purpose and character of the defendant's use." IA Br. at 23. But IA's global ebook distribution scheme is far removed from the limited "favored purposes" found in those actions – such as recording free television broadcasts at home, enabling accredited blind users to access texts, or operating a search engine for books displaying short snippets. The third factor cannot be neutral given IA's avowed purpose, which is to allow anybody in the world with an Internet collection to read every book ever published for free.

17

## V.    FACTOR FOUR WEIGHS IN FAVOR OF PLAINTIFFS

The fourth factor weighs heavily in favor of the Publishers.  IA sidesteps the damning record evidence against it and brazenly misrepresents that "the publishers have not offered any evidence that Internet Archive's digital lending, or anyone else's, has cost them one penny in revenue."  IA Br. at 2.  And IA wrongly implies both that the burden of proof is on the Publishers and that the relevant inquiry is to prove special damages, not market harm, while at the same time ignoring that market harm need only be "potential" and can result from scaled-up, widespread conduct.  *See* Pubs. Br. at 20, 29-41.  Finally, IA grossly overstates the limited and unreliable conclusions of its experts, which should be disregarded by the Court.  *See* Declaration of Jeffrey T. Prince ("Prince Decl."), *passim*.[8]

### A.    Internet Archive Fails to Pay Fees that Libraries Customarily Pay to Lend Plaintiffs' Ebooks

The Publishers have put forth two types of market harm.  The first is that Internet Archive, which holds itself out as a library, distributed ebooks on short term loans without paying the Publishers the licensing fees that they receive from the existing market for library ebooks.  Pubs. Br. at 30-33; Suppl. McN Decl. Exs. 2 ("R-A Tr.") at 141:3-141:11, 142:4-

---

[8] In the event of a trial, the Publishers will move under F.R.E. 702 to exclude Rasmus Jorgensen's and Imke Reimers' testimony, as well as select portions of Susan Hildreth's opinions, since they are unreliable and based on insufficient facts and impermissibly flawed principles and methods (which also have not been reliably applied), including for all the reasons set forth herein and in the Prince Declaration, including the failure to adequately control for other factors.  *City of Providence v. Bats Global Markets*, 2022 WL 902402, at *12-13 (S.D.N.Y. 2022);  *Lamarr-Arruz v. CVS Pharmacy*, 2017 WL 4277188, at *10 (S.D.N.Y. 2017); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 at *10-11 (S.D.N.Y. 2014).

142:10, 144:2-144:12; 3 ("Weber Tr.") at 202:23-203:11, 205:22-206:9, 207, 214; 4 ("Pavese

Tr.") at 51-54, 191-92; 6 ("Lazarus Tr.") at 48-51; Prince Decl. Ex. 5 ("Hildreth Tr.") at 47:11-

48:7.  The Publishers have already lost out on millions of dollars in lost fees from IA.

SUMF¶586.  If IA is allowed to scale up its operations, the Publishers would lose additional

significant revenues.  SUMF¶¶575-88; Prince Decl. ¶¶5-8.  This market harm is patently

obvious.

     In its defense, Internet Archive suggests that *somebody* paid the Publishers for a print

edition of each Work and that is sufficient.  IA Br. at 1, 30.  But Publishers "do not price print

books with the expectation that they will serve as both print books and ebooks readily capable of

free worldwide distribution" (ECF No. 94 ("R-A Decl.") ¶2), and it is elementary copyright law

that copyrights are divisible, and rightsholders are entitled to the proceeds of all formats, which

in turn incentivizes investment in new formats.  *See* Section I(B)(1), *supra*.[9]

     Next, IA argues that although it invites users to "Read Free Library Books Online,"  the

Court should ignore the Publishers' "traditional, reasonable, or likely to be developed" library

ebook market by which they receive millions in license fees.  *See* Pubs. Br. at 29-39.  Instead, IA

asserts the relevant market is CDL, and "[t]here is no traditional market for publishers to license

borrowing via CDL."  IA Br. at 32.  This smoke and mirrors does not work.  Of course there is

no "market for publishers to license borrowing via CDL" since the whole theory of CDL is

---

[9] IA's expert Reimers herself stated in a publicly posted draft article that, "[m]any publishers are opposed
to mass digitization projects .…  *This is a reasonable reaction*, given that the mass digitization projects
typically digitize works without the publisher's consent and *without explicit licensing fees that would
generate direct revenue*."  Suppl. McN Decl. Ex. 5 (emphasis added) at 17; *see also* Prince Decl. Ex. 4
("Reimers Tr.") at 102-105.

19

predicated on the assumption that no license is necessary if IA or its library partners own the same book in a physical format. No defendant can define the relevant market as its own form of infringement. If the Court accepted that untenable proposition, any infringer could tip the fourth factor in their favor merely by claiming the market for infringing products is distinct from the market for the legal product.

Finally, IA's suggestion that there is no licensing market because IA refuses to license ebooks conflicts with the well-accepted premise that a copyright owner can recover damages whether or not the infringer would have agreed to the owner's terms. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014); *On Davis v. The Gap*, 246 F.3d 152, 165 (2d Cir. 2001). In sum, this form of market harm alone suffices to tilt the fourth factor heavily in the Publishers' favor. *Ringgold v. Black Entm't Television*, 126 F.3d 70, 81 & n.16 (2d Cir. 1997).

### B. Undisputed Evidence Establishes that IA Offers A Competing Substitute Resulting in Potential Lost Ebook Sales

Internet Archive also harms the Publishers by offering a competing substitute for authorized ebooks, leading to potential lost revenues from both public and academic libraries and consumers.[10] IA principally responds that, "[i]n a copyright lawsuit against a practice that has continued for years, one would expect the copyright holder to be able to point to some metric showing that the defendant's conduct harmed them." IA Br. at 25. Once again, IA ignores the evidence showing the fallacy of this contention.

---

[10] *See* SUMF¶¶255, 378-88, 617-20; R-A Tr. at 141-43; Weber Tr. at 202-07, 210-15; Pavese Tr. at 51-54. IA's selective quotation of out-of-context snippets from Publisher testimony distorts it. *See, e.g.*, Weber Decl. Ex. 26 ("Dye Tr."); Lazarus Tr. at 36-41.

20

*First*, there is indisputable evidence of market harm that is more powerful than the admittedly "weak" and unreliable statistical evidence produced by IA's experts. ECF No. 109-1 ("Reimers Report") ¶¶38, 54. IA distributes the full ebook, often for a 14-day loan. The record establishes that IA users frequently read these ebooks (SUMF ¶¶256-62; 236-69; 259-60) – providing input like, "I was reading Daniel Silva's Gabriel Allon [thriller] series on [IA]." McN Decl. Ex. 14 and SUMF¶¶259-60. And IA identifies itself as competing for eyeballs with Amazon and Overdrive. SUMF¶524.[11] Further, as the Second Circuit has recognized, the "basic market [for books] is the one-time reader." *Ringgold*, 126 F.2d at 79. IA's harm is compounded by the fact that it has greatly increased the number of titles it offers from each of the Publishers since it removed the Works in Suit in June 2020, now distributing a total of 33,000 works (SUMF¶¶240, 522); for Penguin Random House, this is a stunning 48.4% of titles in its catalog first published through 2015. SUMF¶583.f.

Moreover, the evidence is particularly strong with respect to library ebooks. IA has launched campaigns urging public and academic libraries to use its Website instead of licensing authorized ebooks. SUMF¶¶379-388. As IA's Open Libraries agreement explicitly states, its mission is to: "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own." SUMF¶603. IA cannot plausibly argue that its actions will have no effect on library ebook revenues when it engages in a systematic effort to convince libraries to use the Open Libraries project as a substitute for paying for authorized ebooks. In short, after launching its multi-year campaign, IA cannot say to this Court, "No, really, we didn't mean it." Moreover, many libraries (both Partner Libraries and

---

[11] For example, the record shows a school was negotiating a classroom license with PRH for two ebook titles when the school informed OverDrive that it would instead use IA's Website. SUMF¶¶563-64.

unaffiliated libraries) have begun incorporating links to the IA Website into their online library catalogs or library websites.[12]

It is basic economic theory, and self-evident, that "when a free (zero-priced) competing product enters the market, economists generally expect to observe a shift in consumer demand toward the free good and thus a downward shift in demand for existing goods."  Prince Decl. ¶¶10-11.  Both sides also agree that, as Reimers (IA's expert) has written, "[r]ecent academic studies show that illegal distribution displaces legal sales in media industries," and that "most recent work finds that legal sales are significantly displaced by pirated versions," with one study by Reimers showing an increase in sales by at least 14 percent on average following anti-piracy measures.[13]  In that study, as in this case, the infringing copies were largely scans of print books, not hacked ebook files, and featured backlist titles.[14]  While Reimers has tried to distance her earlier findings from this matter, she relies on pure speculation to do so.[15]  Given the academic research, it would require "a considerable amount of reliable evidence" to claim that IA's Website does not displace sales.  Prince Decl. ¶14.  As detailed below, IA and its experts provide nothing of the kind.  *Id.* at ¶¶14, 24-86.

*Second*, §107 looks not at actual past harm but at "the effect of the use upon the *potential market* for *or value* of the copyrighted work."  As detailed in the Publishers' moving brief (Pubs. Br. at 33-36), IA distributes the Publishers "copyrighted material in a market that [the

---

[12] *See* SUMF¶¶393-396; Prince Decl. ¶16.

[13] Prince Decl. Ex. 6 ("Reimers 2016"), at 412-14, 421, 433; *see also* Reimers Tr. at 56:2-24, 58:11-21. *See also* Prince Decl. Ex. 1 ("Prince Report") ¶¶30-38.

[14] Reimer 2016 at 415-16; Reimers Tr. at 45-46, 50.

[15] *See* Reimers Tr. at 71:25 – 78:22.

Publishers], as the copyright owner, [are] exclusively entitled to exploit…. [Defendant] *replaces* [Plaintiffs] as the supplier of those [ebooks] to meet the demand of [its] customers.  This is precisely the kind of harm the fourth factor aims to prevent."  *Infinity*, 150 F.3d at 111; *Twin Peaks Prods., Inc. v. Publ'ns Int'l*, 996 F.2d 1366, 1377 (2d Cir. 1993) (fourth factor focuses on whether the Defendant "competes in markets in which [the Publishers have] a legitimate interest").

     *Third*, given the nature of the book market and the relative volume of IA loans, it would be exceedingly difficult to create a reliable "metric" that isolates lost sales attributable to Internet Archive and tunes out all the other factors impacting sales figures for an individual Work at any given point in time.  Prince Decl. ¶85.  The difficulty of this Sisyphean task is underscored by the striking failure of IA's experts to adequately control for relevant factors.  *Id.* ¶¶35-86.  As the Sevier Declaration explains, "[o]ur long term experience teaches us that each title is unique, and there are myriad reasons why its sales or library checkouts in any particular format may go up or down over two quarters in a particular year.  In most circumstances this makes it difficult, if not impossible, to isolate the impact of any one factor among the hundreds impacting a title's sales and checkout figures at any given point." ECF No. 92 ("Sevier Decl.") ¶80; *see also* Weber Decl. ¶88.

     Moreover, as IA acknowledges, "[t]he lending numbers from the Internet Archive for the Works in Suit" – which were all removed by mid-2020 – "are small relative to the size of the library market for ebooks."  IA Br. at 25; s*ee also* ECF No. 109-2 ("Reimers Reply Report") ¶19 (suggesting that before 2020, "the Internet Archive might have been too small to cause a sales decrease").  While this does not mean there was no material harm from IA's 57,000 unauthorized loans, it does make it harder to create an accurate metric measuring that harm.  Prince Decl.

23

¶¶83-85.  However, in the two years since the Works were removed, IA has seen a meteoric rise in members, monthly loans, and concurrent copies available for loan under the Open Libraries project.  SUMF¶¶247-50, 351-99, 544-45, 609; *see also id.* ¶546 (showing *eightfold* increase of books borrowed over 28-day period between March 2020 and July 2022).

Given these escalating numbers, it is no surprise that Internet Archive fails to adequately address the harm to the Publishers if its conduct or similar conduct were to become widespread.  A rightsholder is not required to "delay taking action to defend its copyright until actual (and perhaps irreparable) harm had accrued."  *Gregory*, 689 F.3d at 64 n.23.

Internet Archive tries to downplay the future harm of ubiquitous CDL by arguing that if the Publishers experienced no quantifiable reduction in library checkouts or consumer revenues during the short NEL period, when IA distributed unlimited copies of the Works in Suit, then the Publishers will suffer no harm if CDL "became widespread."  IA Br. at 13.  Even accepting IA's premise for the sake of argument, this is an indefensible conclusion.

"Widespread conduct" includes the scenario in which Internet Archive succeeds in its quest to become a central repository of ebooks – in effect, a national or global digital library – and becomes much better known to the public.  *See* SUMF¶¶232-35, 355-61.  If the Court were to condone its activities, IA could substantially expand the number of Partner Libraries in the Open Libraries project from 65 currently to thousands.  Not only could thousands of new Partner Libraries contribute "concurrent copies" to increase the loan count, they and other libraries would be able to link from their website card catalogs as a viable alternative to purchasing authorized ebook licenses from the Publishers.  Prince Report ¶¶ 66, 68-69 & nn.169, 170, 194; SUMF¶¶378-96.  As libraries around the country increasingly relied on IA to lend millions of backlist titles in digital form, the loss of revenues from these public and academic libraries, as

well as from consumers, would create substantial market harm to publishers and authors. Prince Decl. ¶¶76-80; SUMF¶608-612, 620. Likewise, other organizations could opportunistically brand themselves a library and harm Plaintiffs by performing similar functions. This scenario is far removed from the brief NEL period in Spring 2020. "At the extreme end of the spectrum, there would be a scenario in which IA were known to all libraries and all consumers and had free unauthorized digital books of all published backlist titles, with a sufficient number of copies to meet worldwide demand without wait lists." Prince Decl. ¶78. This would "destabilize [the book] industry" – and other media industries vulnerable to the same scheme. Weber Decl. ¶¶92-93.

### 1. IA's Experts Do Not Rebut the Evidence of Market Harm

Nothing that IA's experts state overcomes this evidence of market harm. First, none of IA's three experts perform an analysis of whether the Publishers lost revenues from public and academic libraries because IA supplanted their authorized library ebook market. Reimers focuses solely on the consumer print book market. Hildreth states that she does not have an opinion on whether IA caused Plaintiffs economic harm. (ECF No. 110-2 ("Hildreth Reply Report") ¶7). Meanwhile, she concluded that "libraries 'would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books.'" IA Br. at 33. This is a tacit admission that publishers and authors affected by this "reallocation" necessarily lose revenue. Indeed, even Hildreth conceded that libraries participating in CDL could reallocate money spent on library ebooks to movies, CDs, and video games. Hildreth Tr. at 195:25-203:25; *see also id.* at 216:19-218:18; Prince Decl. ¶¶26-28. Similarly, IA's theory that CDL does not harm incentives to create because it merely shifts library ebook expenditures from backlist books to new books completely misunderstands that backlist revenue serves a critical purpose for publishers distinct

from frontlist revenue, and that many authors rely on a steady income over time. SUMF¶¶38-62; ECF No. 89 ("Cisneros Decl.") ¶9.

As for Jorgensen, he merely reviewed Overdrive *check-outs* of the Works during Q2 and Q3 of 2020. Library check-outs do not equate with the impact of IA's conduct on library ebook licensing *revenue* because of the complex relationship between checkouts and revenues from library ebook licenses – which Jorgensen admits. ECF No. 108-2 ("Jorgensen Reply Report") ¶¶26-27; Prince Decl. ¶¶31-33. Most ebook licenses are in effect for two years or 26 circulations and licenses are based on annual library budgetary cycles, so check-outs for two quarters would say little about license revenues. Prince Decl. ¶31; Prince Decl. Ex. 3 ("Jorgensen Tr.") at 101. Notably, although Overdrive revenue data was produced in this matter,[16] Dr. Jorgensen chose not to analyze it.

### 2. Jorgensen's Analysis is Unreliable

While not on point, Jorgensen's analysis of Overdrive check-outs should be disregarded by the Court as unreliable, as should his analysis of consumer ebook and paperback sales for the fewer than 30 Hachette titles that are Works in Suit. Jorgensen starts from the premise that the Works were removed from IA's Website in June 2020, which coincided with the end of the NEL, and then makes a grand leap, concluding that because on average the Overdrive check-out data and Hachette sales figures for the Works happened to go down (although, as he admits, with "considerable variation"[17]) between Q2 and Q3 of 2020 – and declined more than industry-wide figures for the entire market – the evidence is not consistent with the Publishers' claims that IA's distribution of the Works substituted for Plaintiffs' sales. (*See*, *e.g.*, Jorgensen Tr. at 90 -94, 96-

---

[16] *See* Suppl. McN Decl. Ex. 7.

[17] ECF No. 108-1 ("Jorgensen Report") ¶38.

97 for summary of his limited data points.)  But Jorgensen's analysis does not show causality; instead, it relates only to correlation.  *See* Prince Decl. ¶¶35-53.  The life cycle of every book is unique, as innumerable factors may affect its success across formats and throughout the years, ranging from broad macroeconomic factors and changing topics of public interest, to marketing and pricing, to the reactions of press and readers, to school adoptions and whether school is in session, to global interest and film adaptations.  *See* SUMF¶¶27-29, 59-62.  Jorgensen ignores all these other factors, rendering it impossible for him to reliably separate out the impact of IA's NEL in Q3 2020.  Prince Decl. ¶¶35-53; Jorgensen Tr. at 106-143, 159-160.  Jorgensen did not even look at whether the Works had historically varied sales by season (*id.* at 108:20 – 110:18) – even though Reimers performed a seasonality check for these same Works showing that in the prior year, Amazon print sale rankings for the Works also experienced a notable spike in Q2 (Reimers Report ¶53) – which should have sent Jorgensen back to the drawing board.

Even worse, Dr. Jorgensen failed to control for the unprecedented macroeconomic effects occurring in the two quarters in 2020 that were his focus, including the complex impacts of COVID on the book industry, which varied by title, and the Black Lives Matter movement and the Presidential election season, which shifted reader interests.  Prince Report ¶¶83-85, 94-99; SUMF¶30.  Jorgensen's own graph suggests that in Q3 2020, the Publishers' library ebook checkouts for many of the Works were declining from the prior quarter simply because they were reverting to pre-pandemic levels, as physical libraries and bookstores began to re-open and lockdowns lifted – and thus that the decline in check-outs demonstrates nothing about the impact of IA's NEL.  Prince Decl. ¶¶47-48.



Jorgensen's analysis is so unreliable that even IA's expert Reimers was forced to acknowledge in her deposition that the sales and checkout trajectories on which Jorgensen based his conclusions could be explained by several factors or varying differences across publishers and that one would have to "think hard" about "how [one] can get ... a causal relationship off of the Internet Archive on ... sales in general" based on "these data just by themselves."[18]

### 3. Reimers Provides Limited and Unreliable Testimony

As for Reimers, her focus is very narrow, her conclusions are limited, and her results are also unreliable.

---

[18] Reimers Tr. at 267:8 - 272:20, Prince Decl. ¶39. *See also* Reimers Tr. at 35:10 -36:13; Reimers Report ¶35 (admitting that in light of the impact of COVID, "one cannot simply look at absolute changes in sales").

Critically, Reimers only analyzes the purported impact of IA on Amazon *print* sales rankings for the Works and does not analyze *ebook* revenues in any market. This is a glaring omission, given her own research concluding that ebooks are the "closest substitute" to free infringing digital scans of print books and that print books are not "close substitutes." Prince Decl. ¶34.[19] Further, Amazon print sales rankings are an odd focus – as Reimers admits, they are based on an unknown algorithm, do not necessarily correlate with revenue, and do not include major market segments including independent bookstores, wholesalers and Big Box stores, and Reimers did nothing to confirm that they reliably reflect the broader market, while Exhibits 16a and 16b to Jorgensen's Report suggest they may not. Reimers Tr. at 122-124, 126-128. Finally, although Reimers has more controls in her study than Jorgensen, her controls are still insufficient – including because she, too, focuses primarily on 2020 but does not adequately control for the impact of COVID or the Black Lives Matter ("BLM") movement. Prince Decl. ¶¶54-75; Reimers Tr. at 80-90, 179-209, 213-221.

While IA's brief repeatedly proclaims that its expert reports "demonstrate" "that no [market] harm has occurred" (IA Br. at 25), such hyped-up causal statements bear no relation to Reimers' conclusions. *See* Reimers Tr. at 178:4-13 (conceding that "statistical analyses aren't set up to definitively prove anything … including" the "study of the Amazon print sale rankings in [her] expert report."). Reimers conducts three analyses, which IA's brief inaccurately describes. First, Reimers examined IA's impact on Amazon print rankings after the Works were made available on IA's website. While IA's Brief misleadingly states as fact that "the available

---

[19] While IA tries to blame the Publishers for Reimers' and Jorgensen's lack of additional financial information, IA voluntarily withdrew its requests for such information in exchange for the Publishers' withdrawal of other requests. Suppl. McN Decl. Ex. 8.

29

data shows that people don't buy fewer copies of a book when that book is available for borrowing via CDL" (IA Br. at 24), Reimers had far less certitude: her range of likely results included a *harmful* impact on the Works' Amazon print rankings when posted on IA's Website. Reimers Report ¶46; Reimers Tr. at 167-169; Prince Decl. ¶¶57-58. Moreover, Foster Declaration Exhibit 6 shows that approximately half of the Works were first made available on IA before 2018, before it significantly scaled up. Further, this says nothing about the impact of IA if CDL becomes ubiquitous in the future. Prince Decl. ¶61.

Next, Reimers looked at the time period after the Works were removed from the NEL, and found a decline of 1-2% in the Works' Amazon print rankings – which, of course, could have been caused by many factors. Prince Decl. ¶¶68-75. While IA's Brief tries to make this sound determinative, Reimers admits that this evidence is "*weak*" (Reimers Report ¶38) and that "I cannot rule … out entirely" that IA hurt the Publishers' sales (Reimers Tr. at 177-5-178:13).

Finally, Reimers looked at Amazon print sale ranking for the Works after the launch of the NEL. Although she found an improvement in ranking, she had to toss out these results after finding a similar improvement in ranking in March 2019, suggesting that "seasonality" was the cause. Reimers Report ¶53; Prince Decl. ¶¶43, 66-67 & n.5.

In sum, all four factors of the fair use inquiry reinforce that Internet Archive has no fair use defense.

## VI. INTERNET ARCHIVE IS NOT ENTITLED TO REMITTANCE OF STATUTORY DAMAGES UNDER SECTION 504

As a last resort, in a tacit concession of liability, IA argues that it is entitled to remittance of statutory damages. IA Br. at 35-37. Section 504 of the Copyright Act directs courts to remit statutory damages where the infringer is an employee or agent of a library who "infringed by reproducing the work in copies," and "believed and had reasonable grounds for believing" that

30

its use of the work was a fair use.  17 U.S.C. §504(c)(2).  While IA's Section 504 argument is premature on this liability motion, it fails for several independent reasons.

*First*, §504's remittance provision applies only to employees of libraries who infringe a work "by reproducing the work in copies."  17 U.S.C. §504(c)(2).  It therefore only remits statutory damages for infringement of the reproduction right, and offers no cover for IA's infringement of the distribution, public display or public performance rights.

*Second*, the exemption is for physical libraries and does not extend to IA.  When enacting the DMCA, Congress addressed what type of institution qualifies as a §108 library and "ma[de] clear that … the term 'libraries' and 'archives' as used and described in this provision still refer to such institutions only in the conventional sense of entities that are established as, and conduct their operations through, physical premises."  S. Rep. No. 105-190, 62 (1998).  It pointedly declined to extend the exemptions "to online digital 'libraries' … that exist only in the virtual (rather than physical) sense," citing concern that "[t]he ease with which such sites are established online literally allows anyone to create his or her own digital 'library'"  *Id.*  In short, Congress foresaw the danger of expanding library exemptions to entities like IA, and determined that such unregulated institutions should not receive special dispensation based merely on their self-identification as libraries in the digital realm.

*Third*, IA cannot rely on its alleged belief in the lawfulness of its conduct because it has asserted privilege to block discovery on this very question.  *See, e.g.*, Suppl. McN Decl. Ex. 9 ("IA Priv. Log"), *passim* (asserting privilege over numerous communications, including to and from Michelle Wu, concerning "attorney advice on CDL legal strategy" and "attorney advice on NEL legal strategy").  "[A] party may not assert that it believed its conduct was lawful, and simultaneously claim privilege to block inquiry into the basis for the party's state of mind."

31

A-5874

*Arista Records v. Lime Grp.*, 2011 WL 1642434, at *3 (S.D.N.Y. Apr. 20, 2011) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)). Accordingly, a party who claims attorney-client privilege over communications about the legality of its conduct is barred from defending itself based on a belief that the conduct was lawful – even where, as here, the party does not explicitly invoke attorney advice as the basis for its belief. As the court explained in *Arista*, "it would be unfair for a party asserting contentions of good faith to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions." *Id.* The logic of *Arista* is directly applicable here. IA deprived the Publishers of the ability to assess the content of the advice IA received about the legality of its unprecedented actions making it impossible for Publishers or this Court to assess whether IA had "reasonable grounds" for believing its activities constituted fair use for the purposes of §504.

*Fourth,* IA's argument that it had a good-faith belief that CDL was fair use rests entirely on Brewster Kahle's reliance on the White Paper and/or the Position Statement on CDL. Yet by the time these documents were published in September 2018, IA had been distributing in-copyright books for years (SUMF¶¶226-35, 351, 624-35) and had been operating its Open Libraries project for several months. ECF No. 96-7 (McN Decl. Ex. 7, "Freeland Tr.") at 106:1-4; *see also* Suppl. McN Decl. Ex. 10 ("Bailey Tr.") at 215:2-15. Moreover, IA had been notified repeatedly over the years by the Publishers and others that its activities infringed their copyrights. SUMF¶¶624-35. And IA ignored the advice of its own counsel for the *ReDigi amicus* brief that the Second Circuit's decision raised serious questions about the legality of CDL. SUMF¶¶457-60. Moreover, the record emphatically demonstrates that IA did *not* follow the practices prescribed in the White Paper. *See supra* at 11-13. If anything, the White Paper and Statement provide strong evidence that IA did not "reasonably believe" its CDL or NEL

32

practices were permissible under copyright law since IA deviated in crucial respects from the framework that ostensibly justified them.  In the end, IA's supposed "good faith" is the ultimate fact question and, if IA is not precluded from relying on §504, the record is replete with contrary evidence.

## CONCLUSION

Plaintiffs respectfully request that the Court deny Internet Archive's motion for summary judgment, and grant Plaintiffs' motion for summary judgment with respect to the causes of action set forth in the Complaint.

Dated:  New York, New York
        September 2, 2022

DAVIS WRIGHT TREMAINE LLP

/s/ Elizabeth A. McNamara
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email:  lizmcnamara@dwt.com
       lindasteinman@dwt.com
       jackbrowning@dwt.com
       jessefeitel@dwt.com
       carlmazurek@dwt.com

OPPENHEIM + ZEBRAK, LLP

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email:  matt@oandzlaw.com
       scott@oandzlaw.com
       danae@oandzlaw.com

33

*Attorneys for Plaintiffs*
*Hachette Book Group, Inc., HarperCollins*
*Publishers LLC, John Wiley & Sons, Inc.,*
*and Penguin Random House LLC*

34

# CERTIFICATION OF COMPLIANCE

As counsel of record to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC, I hereby certify that this brief complies with the type-volume limitations set forth in this Court's Individual Rule II.D and complies with all formatting requirements set forth therein. I am relying upon the word count function of the word-processing system (Microsoft Word), which indicates that 9,990 words appear in the brief, except for the portions excluded from the word count by Rule II.D.

/s/ Elizabeth A. McNamara

_____

Elizabeth A. McNamara

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                Defendants. | Case No. 1:20-CV-04160-JGK |

**DECLARATION OF JOSEPH C. GRATZ IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

| | |
|---|---|
| ELECTRONIC FRONTIER FOUNDATION | DURIE TANGRI LLP |
| Corynne McSherry (*Pro Hac Vice*) | Joseph C. Gratz (*Pro Hac Vice*) |
| Kit Walsh (*Pro Hac Vice*) | Jessica E. Lanier (*Pro Hac Vice*) |
| Cara Gagliano (*Pro Hac Vice*) | Aditya V. Kamdar (*Pro Hac Vice*) |
| 815 Eddy Street | Annie A. Lee (*Pro Hac Vice*) |
| San Francisco, CA 94109 | 217 Leidesdorff Street |
| (415) 436-9333 | San Francisco, CA 94111 |
| corynne@eff.org | (415) 362-6666 |
| kit@eff.org | jgratz@durietangri.com |
| cara@eff.org | jlanier@durietangri.com |
| | akamdar@durietangri.com |
| | alee@durietangri.com |
| | |
| | Attorneys for Defendant |
| | INTERNET ARCHIVE |

I, Joseph C. Gratz, declare as follows:

1.      I am an attorney licensed to practice in the State of California, and represent Defendant Internet Archive in this matter.  I make this declaration from personal knowledge, and if called to testify, I could and would testify competently to the facts stated herein.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of Exhibit 4 to the transcript of the deposition of Steve Potash, taken in the instant action on January 31, 2022.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the transcript of the deposition of Andrea Mills, taken in the instant action on October 14, 2021. Cited testimony has been highlighted for the Court's convenience.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the transcript of the deposition of Ginger Patton-Schmitt, taken in instant action on December 6, 2021.  Cited testimony has been highlighted for the Court's convenience.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of excerpts from the transcript of the deposition of Michael "Mek" Karpeles, taken in the instant action on October 27, 2021.  Cited testimony has been highlighted for the Court's convenience.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the transcript of the deposition of Susan Hildreth, taken in the instant action on May 17, 2022. Cited testimony has been highlighted for the Court's convenience.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of the signed errata to the transcript of the deposition of Susan Hildreth.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of the Judgment issued by the Court of Justice of the European Union on November 10, 2016, in *Vereniging Openbare Bibliotheken v Stichting Leenrecht*, Case C-174/15.

1

9.      Attached hereto as **Exhibit 8** is a true and correct copy of the Opinion of the
Advocate General delivered on June 16, 2016, in *Vereniging Openbare Bibliotheken v Stichting
Leenrecht*, Case C-174/15.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2022, in San Francisco, California.


                                        JOSEPH C. GRATZ

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2022 the within document was filed with the Clerk

of the Court using CM/ECF which will send notification of such filing to the attorneys of record

in this case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

3