# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 24 OF 26 (A-5883-A-6004)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM

DANAE TINELLI

SCOTT A. ZEBRAK

OPPENHEIM + ZEBRAK, LLP

4530 Wisconsin Avenue, NW,

5th Floor

Washington, DC 20016

ELIZABETH A. MCNAMARA

LINDA J. STEINMAN

JOHN M. BROWNING

JESSE M. FEITEL

CARL MAZUREK

DAVIS WRIGHT TREMAINE LLP

1251 Avenue of the Americas, 21st Floor

New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

4

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | **Vol. 5** | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | **Vol. 6** | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

6

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | Vol. 7 | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

14

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **_Vol. 17_** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# Exhibit 1 to Gratz Supplemental Declaration

# Filed Under Seal (A-5883-5908)

# EXHIBIT 2

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE SOUTHERN DISTRICT OF NEW YORK

3

         HACHETTE BOOK GROUP, INC.,                )

4        HARPERCOLLINS PUBLISHERS LLC, JOHN        )

         WILEY & SONS, INC., and PENGUIN           )

5        RANDOM HOUSE LLC                           )

                                                   )  Case No.

6                        Plaintiffs,               )  1:20-CV-04160-JGK

                                                   )

7        v.                                         )

                                                   )

8                                                   )

         INTERNET ARCHIVE and DOES 1 through

9        5, inclusive,

10                        Defendants.

         _____

11

12

13

14

                  Videotaped Rule 30(b)(1) and Rule 30(b)(6)

15                   Deposition OF ANDREA ROGINA MILLS

16                      Held via Veritext Virtual

                      Thursday, October 14, 2021

17                        10:30 a.m. EST

18

19

20

21

22        Reported by:

          Carissa Stabbler, Registered Professional Reporter

23

24

25

Page 2

```
 1          Videotaped Rule 30(b)(1) and Rule 30(b)(6)
 2          Deposition of ANDREA ROGINA MILLS was taken on
 3          October 14, 2021, commencing at 10:30 a.m. EST,
 4          held via Veritext Virtual, before Carissa Stabbler,
 5          Registered Professional Reporter.
 6
 7          COUNSEL APPEARING:
 8
 9          For the Plaintiffs:
10             OPPENHEIM + ZEBRAK, LLP
               BY:  Scott A. Zebrak, Esq.,
11                  Rebecca Weissman, Esq.
               4530 Wisconsin Avenue, NW, 5th Floor
12             Washington, DC 20016
               (202) 480-2999
13             scott@oandzlaw.com
               rebecca@oandzlaw.com
14
               DAVIS WRIGHT TREMAINE LLP
15             BY:  Linda Steinman, Esq.,
               1251 Avenue of the Americas, 21st Floor
16             New York, NY 10020
               (212) 489-8230
17             lindasteinman@dwt.com
18
           For the Defendant:
19
               DURIE TANGRI LLP
20             BY:  Joseph C. Gratz, Esq.,
                    Jessica E. Lanier, Esq.,
21                  Annie Lee, Esq.
               217 Leidesdorff Street
22             San Francisco, CA 94111
               (415) 362-6666
23             jgratz@durietangri.com
               jlanier@durietangri.com
24             alee@durietangri.com
25          ALSO PRESENT:   Steve Troncone, Videographer
```

Page 3

1                           I N D E X

2

3          WITNESS:    ANDREA ROGINA MILLS

4                                                      PAGE

5          EXAMINATION BY MR. ZEBRAK.................   13

6

7                     INDEX OF EXHIBITS

8

9          NUMBER/DESCRIPTION                 PAGE/LINE NO.

10    Exhibit 1:  Rule 30(b)(6) Deposition Notice to      20:3

11          Internet Archive.

12

13    Exhibit 2:  Printout of the home page from          49:17

14          openlibrary.org as of  October 13,

15          2021.

16

17    Exhibit 3:  Printout of the various subject         56:2

18          areas for the books that are cataloged

19          across the Open Library website.

20

21    Exhibit 4:  Printout of the "About" tab for         57:8

22          the eBooks and Texts collection on

23          archive.org as of October 12, 2021.

24

25

Page 116

```
1                    Q.   Right.  And so my question to you
2          is are you aware of any policy or procedure that
3          has been in place at Internet Archive to inspect
4          the in-copyright physical book to determine if it's
5          a lawfully made copy as opposed to a counterfeit?
6                    MS. LANIER:  Objection.  Vague.  Calls
7          for a legal conclusion.
8                    THE WITNESS:  So I -- we do -- Internet
9          Archive doesn't have a policy document for the
10         Scribe operator to look at a physical book and make
11         a determination as to whether it's a legal copy.
12                   But for our modern digitization
13         activities, the operator either scans or inputs
14         ISBN, that is, if it's printed on a book, and there
15         is a check that is done as to whether that is a
16         valid ISBN.  If it's not a valid ISBN, if the check
17         is not accurate, the book is rejected, and we don't
18         scan it.
19                   BY MR. ZEBRAK:
20                   Q.   So if a book is counterfeit and
21         it -- the counterfeiter happened to put the wrong
22         ISBN on the book, the book would be rejected rather
23         than scanned; correct?
24                   MS. LANIER:  Objection.  Vague.
25                   THE WITNESS:  I think there are --
```

Page 117

1    maybe I have two answers to that.  If it's the --
2    that is a basis for us to reject a book.  If the
3    scanned ISBN gleans an incorrect -- non-matching
4    metadata, we don't proceed.  If it's actually
5    determined to be an invalid ISBN, that's another
6    basis for rejection.
7                    BY MR. ZEBRAK:
8                    Q.   Okay.  So Internet Archive has
9    various reasons that it may reject a book for
10   scanning; correct?
11                   A.   That's right, yeah.  We have a --
12   there's -- yes.  It could be physical.  It could be
13   metadata.  It could be invalid ISBN.  There are
14   other reasons.
15                   Q.   But you're not aware of Internet
16   Archive having a policy or procedure to assess
17   whether a book is counterfeit or not; correct?
18                   MS. LANIER:  Objection.  Vague.
19                   THE WITNESS:  I'm not aware of a
20   process specifically targeting counterfeit books.
21                   BY MR. ZEBRAK:
22                   Q.   Right.  So with respect to the
23   processes that you're aware of with respect to
24   Internet Archive's receipt and scanning of
25   in-copyright books, you're not aware of any

Page 154

BY MR. ZEBRAK:

Q.   Ms. Rossi -- strike that.  I think
we were just talking about the name Alexa [sic]
Rossi, and now her name is in my head.  Let's start
again.

Ms. Mills, when modern in-copyrighted
books are received at an Internet Archive
digitization center, is there an API that the
digitization staff member uses to assess whether
that book is a book that Internet Archive wants to
scan?

A.   Yes, there is an API.

Q.   And what's that called?

A.   It's called "Do We Want It."

Q.   The acronym DWWI; is that right?

A.   That's right.

Q.   And do you know other than -- oh,
sorry.  Do you know what determines within that API
whether Internet Archive wants to scan that book?

A.   So my understanding of how that
API works -- not an API expert, but it -- the API,
when an operator either keys in an ISBN, scans a
bar code or -- actually, those are the two
scenarios, checks to see if we, Internet Archive,
has digitized that particular ISBN previously or

Page 155

1    related ISBNs to that book, and it also checks if
2    that ISBN is on a control list that we do not want
3    to scan.
4              Q.   What do you mean when you say the
5    DWWI app considers whether the ISBN is not
6    something that the archive has a scan of yet or
7    whether it's a related ISBN?  What do you mean by
8    the term "related" in that context?
9              A.   So in some cases, the digital
10   catalog record that we have for a particular item
11   has both ISBN 10 and an ISBN 13, for example.  So
12   if we're presented with the ISBN 10, we're also
13   checking to see if we've scanned ISBN 13.
14              The other scenario with related ISBNs
15   is -- as I understand in some cases, it's --
16   there's a Canadian or international ISBN in the
17   U.S. ISBN.
18              So we keep multiple ISBN values in the
19   metadata for a book for some items so that if it's
20   any one of those versions of the ISBN, we -- it's
21   another indicator that we -- if we have a hit, we
22   don't scan that book.  It doesn't need to be the
23   absolute exact ISBN for that book to be flagged as
24   do not scan this book.
25              Q.   So are you familiar with whether a

Page 282

1                    CERTIFICATE OF REPORTER

2

3       CANADA                    )

4       PROVINCE OF ONTARIO    )

5

6                    I, Carissa Stabbler, the officer before

7       whom the foregoing deposition was taken, do hereby

8       certify that the witness whose testimony appears in

9       the foregoing deposition was duly sworn by me;

10                   That the testimony of said witness was

11      taken by me in shorthand, using Computer-Aided

12      Realtime, to the best of my ability and thereafter

13      reduced to written format under my direction;

14                   That I am neither counsel for, related

15      to, nor employed by any of the parties to the

16      action in which the deposition was taken, and

17      further that I am not related or any employee of

18      any attorney or counsel employed by the parties

19      thereto, nor financially or otherwise interested in

20      the outcome of the action.

21

22                   *CStabbler*

23      Carissa Stabbler, RPR

24      Court Reporter

25

# EXHIBIT 3

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF NEW YORK
 3              CAUSE NO. 1:20-cv-04160-JGK
 4
 5   HACHETTE BOOK GROUP, INC.,           )
     HARPERCOLLINS PUBLISHERS, LLC,       )
 6   JOHN WILEY & SONS, INC., AND         )
     PENGUIN RANDOM HOUSE, LLC,           )
 7                                        )
             Plaintiffs,                  )
 8                                        )
                                          )
 9        -vs-                            )
                                          )
10   INTERNET ARCHIVE and DOES 1          )
     through 5, inclusive,                )
11                                        )
             Defendants.                  )
12
13                 ZOOM VIDEOTAPED
14       30(b)(6) DEPOSITION OF GINGER PATTON-SCHMITT
15                   on behalf of
16               BETTER WORLD BOOKS
17       The deposition upon oral examination of GINGER
     PATTON-SCHMITT, a witness produced and sworn before
18   me, Tracy Larimore, RPR, Notary Public in and for
     the County of Allen, State of Indiana, taken on
19   behalf of the Plaintiffs, via Zoom, on the 6th day
     of December, 2021, scheduled to commence at 10:00
20   a.m. pursuant to the Rule 30(b)(6) of the Federal
     Rules of Civil Procedure with written notice as to
21   time and place thereof.
22
23
24
25
```

```
                                              Page 2
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFF(S):
 3        John M. Browning, Esq.
          DAVIS WRIGHT TREMAINE LLP
 4        1251 Avenue of the Americas, 21st Floor
          New York, NY 10020
 5        212.489.8230
          jackbrowning@dwt.com
 6
 7   FOR THE DEFENDANT(S):
     Internet Archive:
 8
          Joseph C. Gratz, Esq.
 9        DURIE TANGRI LLP
          217 Leidesdorff Street
10        San Francisco, CA 94111
          415.362.6666
11        jgratz@durietangri.com
12
13        Hillary Kinsey Lukacs, Esq.
          MORRIS MANNING & MARTIN LLP
14        1600 Atlanta Financial Center
          3343 Peachtree Road, N.E.
15        Atlanta GA 30326
          404.233.7000
16        hlukacs@mmmlaw.com
17
18
19   THE VIDEOGRAPHER: Pete Zinkan
20   ALSO PRESENT: Carissa Narciso, Concierge
21
22
23
24
25
```

Page 3

1                    INDEX OF EXAM

2                                                   Page

  DIRECT EXAMINATION ...........................7

3   Questions by Mr. Browning

  CROSS-EXAMINATION ..........................231

4   Questions by Ms. Lukacs

  REDIRECT EXAMINATION .......................238

5   Questions by Mr. Browning

6

7                  INDEX OF EXHIBITS

8  Deposition Exhibits:                         Page

9  Exhibit 1  Subpoena ..........................9

10  Exhibit 2  BWB_000424 - 25 ..................25

11  Exhibit 3  BWB_000289 - 90 ..................32

12  Exhibit 4  BWB_000255 - 57 ..................71

13  Exhibit 5  BWB_000405 ......................77

14  Exhibit 6  BWB_000294 - 96 ..................86

15  Exhibit 7  BWB_000291 - 93 ..................89

16  Exhibit 8  BWB_000445 ......................93

17  Exhibit 9  BWB_000363 - 65 ..................95

18  Exhibit 10 BWB_000277 - 79 .................106

19  Exhibit 11 BWB_000056 - 157 ................118

20  Exhibit 12 BWB_000249 - 54..................127

21  Exhibit 13 BWB_000420 - 23 .................142

22  Exhibit 14 Lending Library Borrow Button ....145

23  Exhibit 15 BWB_000498 ......................152

24  Exhibit 16 BWB_000499 ......................153

25  Exhibit 17 BWB_000415 - 19 .................161

Veritext Legal Solutions

www.veritext.com                                888-391-3376

Page 27

```
 1      the books?
 2           MS. LUKACS:   Objection to form.
 3   A  It's my understanding that those were the costs
 4      associated with picking, packing, and shipping.
 5   Q  Okay.  And do you know why Better World Books
 6      would want to enter into such a Memorandum of,
 7      of Understanding whereby donating books to
 8      Internet Archive?
 9   A  This is our standard practice to memorialize a
10      donation relationship, not always in this exact
11      form, but typically with some type of agreement.
12   Q  And does Better World Books have other donation
13      arrangements with, with other companies, other
14      than Internet Archive?
15   A  Yes.
16   Q  Can you tell me about those, please?
17   A  Sure.  Books for Africa is one that we have a
18      long-standing relationship.  We have school
19      systems throughout the United States that we
20      have relationships with where we donate books.
21           During COVID, for example, there was a
22      school system, I believe in San Antonio, Texas.
23      And we make donations to prison ministries.  We
24      make donations to battered women's shelters.  We
25      work with, I think it's Barney's Book Barn, is
```

Page 28

```
 1        what it's called, believe it or not, in Chicago.
 2        But they're a not-for-profit that provide books
 3        to students who go to schools with free lunches,
 4        I believe.  So we have a panoply of
 5        relationships where we give and donate books.
 6   Q    And do any of the entities you just named pay
 7        Better World Books for books?
 8   A    There are several entities that pay for the
 9        picking, packing, and shipping.  And there have
10        been instances, if I recall correctly, where an
11        entity, to whom we donate, might want to also
12        purchase from us.
13            And I, I don't remember specific details,
14        but an example would be if a benefactor gave
15        money to one of the charities we support to
16        purchase books.  They might come to us and say,
17        "We'd like to purchase some additional books
18        from you-all."  That has, that has happened in
19        the past.
20   Q    And you, you mentioned that that has happened.
21        Is that a frequent occurrence?  Can you remember
22        how many times that has happened?
23            MS. LUKACS:  Objection to form.
24   A    I cannot --
25   Q    But in the majority --
```

Page 31

1      whom we have a relationship.

2   Q   Understood.

3   A   So this is -- if, if you go on our website, for

4      example, there's a list of people that we donate

5      with.  It's pretty standard for us to get

6      permission to say, "Hey, we do business with

7      you."

8   Q   And, and why does Better World Books want to do

9      that?

10         MS. LUKACS:  Objection to form.

11  A   Part of our donation structure is that we get

12      donations from academic libraries and from

13      public libraries, and these libraries donate

14      books to us through their typical weeding

15      process, and they like to know where those books

16      go, and we like to be able to tell them.

17  Q   All right.  And is it your understanding that

18      providing them with that information will lead

19      to more donations of books?

20         MS. LUKACS:  Objection to form.

21  A   I, of course, don't know what they're thinking

22      or feeling, but I know that in the industry,

23      librarians tend to want to follow the bouncing

24      ball with their donation, to make sure that

25      books aren't ending up in landfills.  So

Page 32

1       whenever we can say, "You're donating to us.
2       We're going to sell what we can.  We're going to
3       donate what we can, and then we're going to
4       recycle."
5             So they, they like more granularity in who
6       we might donate to.  And that's why we're -- we
7       try to list those on our website and be able to
8       share that information when we can.
9    Q  Understood.
10            MR. BROWNING:  Carissa, could you pull up
11      Tab 002, please?
12            CONCIERGE:  Okay.  It's available.
13            (WHEREUPON, Exhibit Number 3, BWB_000289 -
14      90, was marked for identification.)
15   Q  Ms. Patton-Schmitt, let me know when you have it
16      up in front of you.
17   A  Will do.  I have it.
18   Q  Okay.  This is a document Bates-stamped BWB
19      000289.
20            Ms. Patton-Schmitt, have you seen this
21      document before?
22   A  I have.
23   Q  Did you draft it?
24   A  My recollection is that I edited it.
25   Q  Okay.  So you saw this document around January

Page 35

1      the time of this document, but I can tell you
2      that generally speaking, Better World Books is
3      in a position to donate a book, if we can tell
4      from our analytics that we have more copies than
5      we're able to sell.  And purchased books would
6      be those where we don't have more copies than
7      we're able to sell, and we could potentially
8      sell them at some price.
9    Q  And tell me a little bit more about those
10     analytics.  I mean, that sounds pretty
11     sophisticated, but can you just sort of explain
12     how, how -- again, at high-level terms how the
13     analytics --
14   A  Sure.
15   Q  -- worked at Better World Books?
16   A  Sure.  It's really not that complicated.
17     It's -- I think the word analytics to an English
18     major just sounds complicated, right, so we, by
19     tracking our inventory, can tell, over time, how
20     many copies of a book we're going to sell.
21     Let's call -- let's say Harry Potter and the
22     Sorcerer's Stone, right, we know how many copies
23     we get in, we know how many copies we typically
24     sell.  We also know the condition of the books,
25     right?

Page 36

1       If anybody's bought a book online, a used

2    book, you see the condition.  So we can look at

3    that and say, you know what?  In the past ten

4    years, we've sold 100 copies a year of Harry

5    Potter and the Sorcerer's Stone that are very

6    good condition.  We have 300, and they're all

7    fair.  We can donate those.

8       Or we sell 100 a year.  We only have 95.

9    They're all very good, we can sell these.

10   That's it, in a nutshell, from my perspective

11   and understanding.

12  Q   Got it.  But I mean, is that -- are those

13     analytics an important part of Better Worlds'

14     business and how it, how it does business?

15     MS. LUKACS:  Objection to form.

16  A   Yes.  I mean, we, we have to look, all the time,

17     at books on our shelves, just like any retailer,

18     and we have to cull any book that we consider

19     obsolete.  It's not going to sell, or we have

20     too many, because, for us, every spot where a

21     book is stored, is real estate, right?

22     And if we had it taken up by stale real

23     estate, that's a potential opportunity that

24     we're missing for a sale or for donation to, to

25     one of our literacy partners.  So we look

Page 40

1    Q    That, that's fair.

2         But do -- you mentioned before that Better

3    World Books donates to other -- a number of

4    other entities.  Do any of these other entities

5    have a wish list?

6    A    These other entities can give us absolutely

7    parameters.  So for example, when we donated to

8    the school in San Antonio, they might ask us if

9    we have books for third graders that are

10   learning English, right?  Or if we're donating

11   to a male prison, they might have very strict

12   guidelines of what kind of books are and are not

13   allowed in the prison.  You know, you can't send

14   a prisoner a book about how to break out of

15   prison.

16        And so if we're donating to Books for

17   Africa, for example, if they started a high

18   school in an area, they might tell us, "We're

19   looking for chemistry books.  We're looking for

20   biology books."  So every -- not everybody, but

21   a lot of our donors -- I'm sorry, our donation

22   recipients, give us parameters, because the

23   men's prison doesn't want Richard Scarry books

24   and vice versus.

25   Q    Got it.  But it's my understanding, and correct

Page 41

```
 1        me if I'm wrong, that the Internet Archive wish
 2        list asks for specific books.
 3              MS. LUKACS:   Objection.
 4   Q    Are any of your other -- do any of your other
 5        donation recipients provide you with wish lists
 6        that asks for specific books?
 7   A    There have been donation recipients in the past
 8        who have asked for specific titles, yes.
 9   Q    But is it fair to say that's uncommon?
10              MS. LUKACS:   Objection to form.
11   A    I would say it's, it's less frequent than
12        frequent.   I don't -- it -- it's more than
13        uncommon, though --
14   Q    Okay.   So --
15   A    -- you know what I mean?
16   Q    -- so less, less than frequent, more than
17        uncommon?
18   A    Correct.   Yeah.   Yeah.   Somewhere in the sweet
19        spot there.   I mean, it happens.   It happens
20        regularly, so it doesn't surprise me when it
21        happens, but it doesn't happen often.
22   Q    I, I understand that.   But -- and correct me if
23        I'm wrong, but it is also my understanding that
24        Internet Archive sends you this wish list or a
25        wish list on a regular basis is that; is that
```

Page 63

```
 1        grocery store parking lot, and we lease a
 2        parking space to put our drop box.  And we have
 3        agreements that, you know, we're not going to
 4        let the box overflow and those kinds of things.
 5            And we pay, you know, a fee to put the box
 6        there.  And then the individuals come and donate
 7        their box -- their stuff into the boxes, and
 8        then the landlord may say, "Hey, we want 10
 9        percent of the sales from this box to go to our
10        local Red Cross," right?
11   Q    Mm-hmm.
12   A    And so we would, we would do that.  So we have
13        lots of arrangements like that from our sources,
14        public libraries, academic libraries, drop box
15        landlords, where we give a portion of the
16        proceeds back --
17   Q    Uh-huh.
18   A    -- so, you know, we're not buying the books, but
19        we're, we're in a consignment relationship, if
20        you will, to a certain extent.  And then -- not
21        a consignment.  I'm sorry.  A co-sale agreement.
22   Q    Mm-hmm.
23   A    And then we do purchase from thrift and
24        wholesale sometimes.
25   Q    Got it.  But you do also receive books for free
```

Page 70

1    with Morris, Manning & Martin, was the

2    representation for Better World Books, and we

3    spent, in earnest, from at least March of 2019

4    until July 3rd of 2019 negotiating the deal and

5    structuring the deal.  And we closed on July

6    3rd, which allowed us to pay off our onerous

7    lenders, AT Media, which was actually AT Media

8    and Prudential.  They were half and half

9    involved in it.

10        And at that juncture, Better World

11   Libraries purchased their equity for $750,000

12   and opened Library of Richmond, paid off our

13   debt, and then took a promissory note from us

14   for the 16.5, and we were able to pay out all of

15   our shareholders and merge.

16        We had created a -- I think it was called

17   the Qumpus Merger Subsidiary, and we did a

18   merger.  That was the best way to handle our

19   shareholder situation because of the structure

20   that we had in place was to merge.

21        And so now, we have a single shareholder,

22   which is Better World Libraries.

23  Q  And Better World Libraries owns 100 percent of

24     Better World Books; is that right?

25  A  Correct.  Correct.

Page 71

1   Q   And what is Better World Libraries?

2   A   It's a California charity, a 501(c)(3).

3           MR. BROWNING:  And Carissa, could you

4       introduce Tab 4, please?  Are we at Exhibit 4?

5       Sorry to lose count so early.

6           THE WITNESS:  Yeah, I think it's Exhibit 4.

7       Tab 3, maybe, but it --

8           MR. BROWNING:  Yeah, this is not -- I'm

9       realizing this isn't the, the most elegant

10      system, but we'll, we'll get through it.

11          (WHEREUPON, Exhibit Number 4, BWB_000255 -

12      57, was marked for identification.)

13  Q   And if you're confused, you know, if at any

14      point I misspeak or I'm confusing about the

15      exhibits, let me know.  Happy to clarify.

16  A   Will do.

17          CONCIERGE:  Exhibit 4 is now available.

18  Q   Great.  And let me know when you have that up in

19      front of you, Ms. Patton-Schmitt.

20  A   And you can call me Ginger.

21  Q   Oh, thank you.  And we've already established --

22  A   Well --

23  Q   -- that you can call me Jack, right?

24  A   Okay.  You're right, 16.75.  I misspoke earlier,

25      that's right, because it's 17.5 total, that's

Page 80

1     Network, and when it looked like this deal was

2     going to go through, it was decided to change

3     the name to Better World Libraries.

4  Q  And what, if anything, are you aware of this

5     entity, now called Better World Libraries, doing

6     before the merger?  What did it do before --

7        MS. LUKACS:  Objection.

8  Q  -- the merger, is a good question?

9  A  I have no idea.

10 Q  Do you know if it did anything?

11       MS. LUKACS:  Objection to form.

12 A  I don't know.

13 Q  Do you know who controls Better World Libraries?

14       MS. LUKACS:  Objection to form.

15 A  I do know that Better World Libraries has a

16    board.  I believe it's a three-member board as,

17    as we stand here today.

18 Q  And, and do you recall who's on that board?

19       MS. LUKACS:  Objection to form.

20 A  Mekal [ph.] Hall, I believe is on the board, and

21    Jeff Ubois, and Brewster Kahle.

22 Q  And we can take them each in turn, but who are

23    they, start-, starting with Mekal Hall?

24 A  Mekal, I believe, has the title of a director

25    for Better World Libraries.  And Jeff, I know,

Page 81

1       serves a finance function for Better World
2       Libraries, but I'm not sure of either of their
3       specific titles.
4    Q  Okay.  And how about Brewster Kahle?  Who is
5       Brewster Kahle?
6    A  I know he's a director, but I don't know if he
7       has a title beyond that.
8    Q  Okay.  Is he affiliated with the Internet
9       Archive?
10          MS. LUKACS:  Objection to form.
11   A  It's my understanding that he's the digital
12      librarian for Internet Archive, yes.
13   Q  Is it your understanding that Brewster Kahle
14      effectively controls Internet Archive?
15          MS. LUKACS:  Objection to form.
16          MR. GRATZ:  Objection to form.
17          MS. LUKACS:  Yeah.  And I'll just say for
18      the record, that this line of questioning is not
19      one of the topics noticed for the 30(b)(6)
20      deposition.
21          MR. BROWNING:  That's fine.
22   Q  I'm asking in your, your personal capacity what
23      you know about Brewster Kahle, given the
24      prominent role he, he plays for Internet Archive
25      and on the board of this company.

Page 83

1    Q   And Jeff Ubois and Mekal are also affiliated

2         with Internet Archive; is that your

3         understanding?

4    A   I don't know, I don't know for sure if they're

5         affiliated with Internet Archive.  I do know

6         that they're affiliated with Better World

7         Libraries.

8    Q   Uh-huh.  Do you have any reason to believe that

9         they are not affiliated with Internet Archive?

10        MS. LUKACS:  Objection to form.

11   A   Well, I deal with them.  I deal with Mekal

12        directly, with her involvement with Better World

13        Libraries, because, as corporate secretary for

14        Qumpus, will know your client purposes for

15        banking relationships and whatnot, I have to get

16        corporate documents from her.  So I only deal

17        with her in terms of Better World Libraries, and

18        she interfaces with Jeff and gets me what I

19        need.  I don't have any interaction with Jeff or

20        Mekal with Internet Archive.  I only deal with

21        them with Better World Libraries.

22   Q   Got it.  Okay.  And taking you back to Exhibit

23        BWB 5, I just want to make sure I understand

24        what all of these Qumpus subsidiaries do.

25   A   Yeah.  Sure.

Page 86

```
 1        it if we were a disregarded entity, because that
 2        means that their student loans would be
 3        cancelable, and they're not.
 4              And I actually just had to investigate that
 5        for the second time for somebody so that's in --
 6        last week, so that's in the forefront of my
 7        mind.  So, no, I don't think we're
 8        not-for-profit.  And I've worked for
 9        not-for-profit, so no.  We're a socially
10        conscious for-profit.
11    Q   Thank you.
12    A   Sure.
13              MR. BROWNING:  Carissa, could you pull up
14        Tab 5 please?  And I have -- I apologize in
15        advance for the confusion, but this is going to
16        become Exhibit 6.
17              (WHEREUPON, Exhibit Number 6, BWB_000294 -
18        96, was marked for identification.)
19              CONCIERGE:  It's now available.
20              MR. BROWNING:  Thank you.
21    Q   Now, I'm hour-glassing, but I know what it's
22        going to be, so let me know when you see it,
23        because that's the important thing.
24    A   I'm here.
25    Q   Great.  Do you recognize this document?
```

Page 87

1   A   I do.

2   Q   What is it?

3   A   It is the written consent of the sole

4       shareholder of Qumpus, Inc., and it was prepared

5       by Morris, Manning & Martin at, at the time or

6       immediately thereafter, following the merger.

7   Q   And what is the resolution being consented to

8       here?

9   A   Under Georgia law, we needed to show who our

10      directors, who our shareholders were, and this

11      was kind of a cleanup exercise, if you will,

12      showing who owns Qumpus, Inc., and who the board

13      members are going to be for Qumpus, Inc.

14  Q   And so let's start with the board members.  Are

15      the board members Brewster Kahle, Jim Michalko,

16      and Dustin Holland?

17  A   Correct.  And it's -- just for future reference,

18      it's Michalko.

19  Q   Oh, thank you.  That is easier.

20  A   You're welcome.

21  Q   And who is Jim Michalko?

22  A   He formerly was with OCLC, I believe.  He's a

23      well-respected venerated person in the library

24      community.  And so he was brought onto our board

25      and it had been the process in the past that the

Page 88

1      CEO of Better World Books was always one of the

2      board members, so we continued that through.

3          And then, it had always been the process at

4      Better World Books that those who were

5      shareholders were on the board.  And so we used

6      to have a five-person board, because we had one

7      person that represented the common shares, and

8      one person that represented some other

9      investments, and then, you know, on and on.  The

10     people that were invested, our shareholders.

11         And so now that we one shareholder, we have

12     a representative of our one shareholder, our

13     CEO, and then an outside person with the

14     knowledge of the book industry and library

15     industry.

16   Q   Got it.  And then you mentioned the shareholder,

17      the shareholder's Better World Libraries; right?

18   A   Correct.

19   Q   As the sole shareholder, is Better World

20      Libraries entitled to receive dividends or other

21      profits from Better World Books?

22   A   I don't know if they're entitled to receive

23      dividends, but they have not, do not.  That's

24      not anything we discuss.  So entitled is I --

25      you know, is there a world in which they could?

Page 101

```
 1        understand that.  So Better World Libraries --
 2        Better World Books, excuse me, has a literacy
 3        program whereby it donates large quantities of
 4        books to certain organizations; is that --
 5   A    No.  We have a general literacy fund where we
 6        make grants and sometimes people would prefer
 7        in-kind donations over the grant.  So, like, for
 8        example, giving Tuesday was just was past
 9        Tuesday.
10   Q    Right.
11   A    So we have a list of people all over the United
12        States that got our grants.  And I think they
13        ranged from, like, $1,000 to $5,000 --
14   Q    Mm-hmm.
15   A    -- maybe it was $10,000 this year.  I can't
16        remember.  Things were odd with COVID.  But --
17        so Open Library of Richmond received a literacy
18        grant, but they wanted in-kind donations, so we
19        would give them donations of books rather than X
20        number of dollars.
21   Q    Got it.  And so -- and that -- this is
22        postmerger we're talking about; right?
23   A    Correct.
24   Q    Okay.  So one of the ways Open Library of
25        Richmond gets books is through literary -- or
```

Page 241

```
 1    STATE OF INDIANA  )
                        ) SS:
 2    COUNTY OF ALLEN   )

 3            I, Tracy L. Larimore, a Registered
      Professional Reporter and Notary Public in and for
 4    the County of Allen, State of Indiana at large, do
      hereby certify that GINGER PATTON-SCHMITT, the
 5    deponent herein, was by me first duly sworn to tell
      the truth, the whole truth, and nothing but the
 6    truth in the aforementioned matter;

 7            That the foregoing deposition was taken on
      behalf of the Plaintiffs, via Zoom, on the 6th day
 8    of December, 2021, commencing at the hour of 10:00
      a.m., pursuant to the Rules;

 9
              That said deposition was taken down
10    stenographically and transcribed under my direction,
      and that the typewritten transcript is a true record
11    of the testimony given by the said deponent; and
      thereafter presented to said deponent for her
12    signature;

13            That the parties were represented by their
      counsel as aforementioned.

14
              I do further certify that I am a
15    disinterested person in this cause of action; that I
      am not a relative or attorney of any party, or
16    otherwise interested in the event of this action,
      and am not in the employ of the attorneys for any
17    party.

18            IN WITNESS WHEREOF, I have hereunto set my
      hand and affixed my notarial seal this 8th day of
19    December, 2021.

20

21

22
                  Notary Public, State of Indiana
23                    Commission No. 657233
              My Commission Expires August 21, 2022

24

25
```

A-5940

Case 1:20-cv-04160-JGK-OTW  Document 120-4  Filed 09/03/21  Page 1 of 8

# EXHIBIT 4

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2            FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5     HACHETTE BOOK GROUP, INC.,
       HARPERCOLLINS PUBLISHERS LLC,
 6     JOHN WILEY & SONS, INC., and
       PENGUIN RANDOM HOUSE LLC,
 7
                    Plaintiffs,
 8
               vs.                      No. 1:20-cv-04160-JGK
 9
       INTERNET ARCHIVE and DOES 1
10     through 5, inclusive,
11                  Defendants.
       _____/
12
13
14
15
16          DEPOSITION OF MICHAEL "MEK" KARPELES
17                Remote Zoom Proceedings
18               Somerville, Massachusetts
19               Wednesday, October 27, 2021
20
21
22
23     REPORTED BY:
24     LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25
```

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5    HACHETTE BOOK GROUP, INC.,
      HARPERCOLLINS PUBLISHERS LLC,
 6    JOHN WILEY & SONS, INC., and
      PENGUIN RANDOM HOUSE LLC,
 7
 8              Plaintiffs,

 8              vs.                    No. 1:20-cv-04160-JGK
 9
      INTERNET ARCHIVE and DOES 1
10    through 5, inclusive,
11              Defendants.
      _____/
12
13
14
15         Video-recorded deposition of MICHAEL "MEK"
16    KARPELES, taken on behalf of Plaintiffs, Remote Zoom
17    Proceeding from Somerville, Massachusetts, beginning at
18    12:03 p.m. Eastern Daylight Time and ending at 8:47 p.m.
19    Eastern Daylight Time, on Wednesday, October 27, 2021,
20    before Leslie Rockwood Rosas, RPR, Certified Shorthand
21    Reporter No. 3462.
22
23
24
25
```

```
                                                      Page 3
 1   APPEARANCES:

 2

 3   FOR THE PLAINTIFFS:

 4        OPPENHEIM + ZEBRAK, LLP

 5        BY: SCOTT A. ZEBRAK, ESQ.

 6             DANAE TINELLI, ESQ.

 7        4530 Wisconsin Avenue, NW, 5th Floor

 8        Washington, DC 20016

 9        (202) 480-2999

10        scott@oandzlawcom

11        danae@oandzlaw.com

12

13   FOR THE DEFENDANT INTERNET ARCHIVE:

14        DURIE TANGRI LLP

15        BY: ANNIE A. LEE, ESQ.

16             JESSICA E. LANIER, ESQ.

17        217 Leidesdorff Street

18        San Francisco, California 94111

19        (415) 362-6666

20        alee@durietangri.com

21        jlanier@durietangri.com

22

23   Also Present:

24        Emily Walters, Videographer

25
```

```
                                                    Page 4

 1                      I N D E X

 2

 3

 4   WEDNESDAY, OCTOBER 27, 2021

 5

 6   WITNESS                                EXAMINATION

 7   MICHAEL "MEK" KARPELES

 8

 9       BY MR. ZEBRAK                              10

10

11   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

12                       (NONE)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    A.  It depends on the time frame that we're asking

2  about.  I believe there have been sources within this

3  sidebar that haven't used affiliate links in the past.

4  These have.  The order of each of these have changed over

5  time, but your understanding is correct, that there's a

6  statement on the website that says, "Some of the links

7  under this section may result in a commission to the

8  Internet Archive."  I don't see that on this version, but

9  this might be -- it looks like this screenshot is from

10  2020.

11    Q.  And you're aware, though, that when someone

12  clicks on a Better World Books link on a page like this

13  or from OpenLibrary.org and then buys a book from Better

14  World Books, that the Internet Archive receives an

15  affiliate commission; correct?

16    A.  I'm aware that at least on the screenshot that

17  we're seeing here, all three vendors offer an affiliate

18  program that operate comparatively.

19    Q.  And that's Better World Books, Amazon and

20  Bookshop.org.  Internet Archive's relationship with each

21  of those provides Internet Archive with an affiliate

22  commission when from a page like this or Archive.org a

23  user goes to that third-party site and buys the book;

24  correct?

25    A.  It can, correct.

1      Q.  And when you say "it can," do you mean it --

2  that the Archive does receive a commission when that

3  happens?

4      A.  Assuming -- assuming the patron doesn't click on

5  the link and then click on someone else's link and make a

6  purchase, conceivably that would make it so that someone

7  else's affiliate link would be applied.  But to the

8  spirit of your question, I'm assuming that if a patron

9  clicks on Amazon or Bookshop or Better World Books and

10  then they proceed to making a purchase, that that

11  purchase would result in some small commission to the

12  Internet Archive.

13      Q.  All right.  And you have access to the revenue

14  reports from Better World Books, Amazon and Bookshop

15  from -- that report the affiliate commissions; right?

16      A.  I -- last time I checked, I do have access, but

17  it's so infrequently that I've checked any of them that I

18  would have a hard time recalling very much about the

19  specific figures.

20      Q.  Right.  And I'm not going to ask you from memory

21  about the specific figures, but you're aware that

22  Internet Archive receives commissions from Better World

23  Books, Bookshop.org and Amazon when users click from

24  OpenLibrary.org or Archive.org pages and then buy a book;

25  right?

Page 244

1    STATE OF CALIFORNIA      ) ss:

2    COUNTY OF MARIN          )

3

4           I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do

5    hereby certify:

6           That the foregoing deposition testimony was

7    taken before me at the time and place therein set forth

8    and at which time the witness was administered the oath;

9           That testimony of the witness and all objections

10   made by counsel at the time of the examination were

11   recorded stenographically by me, and were thereafter

12   transcribed under my direction and supervision, and that

13   the foregoing pages contain a full, true and accurate

14   record of all proceedings and testimony to the best of my

15   skill and ability.

16          I further certify that I am neither counsel for

17   any party to said action, nor am I related to any party

18   to said action, nor am I in any way interested in the

19   outcome thereof.

20          IN WITNESS WHEREOF, I have subscribed my name

21   this 2nd day of November, 2021.

22

23

24

25          LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Case 1:20-cv-04160-JGK-OTW Document 85 Filed 11/02/20 Page 24 of 11

# EXHIBIT 5

```
                                              Page 1

 1            UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF NEW YORK

 3    ----------------------------------------------x

 4    HACHETTE BOOK GROUP, INC.,

      HARPERCOLLINS PUBLISHERS LLC,

 5    JOHN WILEY & SONS, INC., and

      PENGUIN RANDOM HOUSE LLC,

 6

 7               Plaintiffs,

 8    vs.                    Case No. 1:20-cv-04160-JGK

 9

      INTERNET ARCHIVE and DOES 1

10    through 5, inclusive,

11

12               Defendants.

13    ----------------------------------------------x

14

15      REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

16                    SUSAN HILDRETH

17               Monday, May 17, 2022

18

19

20

21

22

23

24    Reported By: Lynne Ledanois, CSR 6811

25    Job No. 5228055
```

Page 2

1          UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------------------------x

4   HACHETTE BOOK GROUP, INC.,

    HARPERCOLLINS PUBLISHERS LLC,

5   JOHN WILEY & SONS, INC., and

    PENGUIN RANDOM HOUSE LLC,

6

7            Plaintiffs,

8   vs.                    Case No. 1:20-cv-04160-JGK

9

    INTERNET ARCHIVE and DOES 1

10  through 5, inclusive,

11

12            Defendants.

13  ----------------------------------------------------x

14

15          Videotaped deposition of SUSAN HILDRETH,

16  taken in Walnut Creek, California, commencing at

17  9:01 a.m., on Tuesday, May 17, 2022 before Lynne

18  Ledanois, Certified Shorthand Reporter No. 6811

19

20

21

22

23

24

25  ///

```
                                                    Page 3
1                    REMOTE APPEARANCES

2

3    Counsel for the Plaintiffs:

4                 DAVIS WRIGHT TREMAINE LLP

5                 BY:  ELIZABETH McNAMARA

6                     JACK BROWNING

7                 Attorneys at Law

8                 1251 Avenue of The Americas

9                 21st Floor

10                New York, New York 10020

11                lizmcnamara@dwt.com

12                jackbrowning@dwt.com

13

14   Counsel for the Defendant Internet Archive:

15                 DURIE TANGRI LLP

16                 BY: JESSICA LANIER

17                     JOSEPH C. GRATZ

18                 Attorneys at Law

19                 217 Leidesdorff Street

20                 San Francisco, California 94111

21                 jlanier@durietangri.com

22                 jgratz@durietangri.com

23   ALSO PRESENT:

24   David West, Videographer

25   Bill Craddock, Veritext Tech
```

```
                                                    Page 4

  1        I N D E X   O F   E X A M I N A T I O N

  2

  3  Examination by:                               Page

  4      Ms. McNamara                          10, 258

  5      Ms. Lanier                                257

  6

  7

  8

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

Page 226

```
 1      A    Yes.
 2      Q    Are you suggesting that acquisition
 3  budgets are at particular risk of being squeezed
 4  because they are discretionary?
 5           MS. LANIER:  Objection, vague as to
 6  "squeezed."
 7           THE WITNESS:  I am suggesting that it is
 8  not uncommon that required expenses -- legally
 9  required expenses, say insurance or updating of fire
10  equipment or a variety of expenses that are required
11  to keep a building open to the public may take
12  priority over expenses allocated to materials.
13  BY MS. McNAMARA:
14      Q    In Paragraph 109 of your report, you
15  indicate that "In light of the priority of materials
16  acquisition and the current state of limited budgets
17  for those materials, libraries would not reduce
18  their materials budgets if reliance on CDL for
19  certain digital content reduced their spending on
20  the particular titles that were provided through
21  CDL."
22           Do you see that?
23      A    Yes.
24      Q    Is it your expert opinion that libraries
25  will spend less money on licensing the e-book
```

Page 227

1    editions of the particular titles that were provided

2    through CDL?

3                MS. LANIER:   Objection, vague.

4                THE WITNESS:   Yes.

5    BY MS. McNAMARA:

6        Q    In Paragraph 109 you also indicate that

7    "With CDL in place in libraries throughout the

8    United States, libraries would have additional

9    flexibility in what they acquire from publishers,

10   but would not spend any less on publishers'

11   products."

12               Do you see that?

13       A    Yes, I do.

14       Q    When you say, "With CDL in place in

15   libraries throughout the United States," are you

16   referring to what would happen if CDL became more

17   common than it is today?

18               MS. LANIER:   Objection, vague to the form

19   of the question.

20               THE WITNESS:   I'm referring to the

21   situation where CDL would be possibly used by more

22   libraries in the United States than it is today.

23   BY MS. McNAMARA:

24       Q    Do you have any sense as to the percentage

25   of public libraries that use CDL today?

Page 257

1          Q     So, Ms. Hildreth, earlier today
2    Ms. McNamara asked you some questions about how
3    libraries would reallocate spending if they
4    purchased fewer e-books, e-book licenses for books,
5    where those books were available on CDL.
6                Do you remember that?
7          A     Yes, I do.
8          Q     And where titles are available on CDL, do
9    you know whether any libraries have actually
10   purchased further e-book licenses for those titles?
11         A     I don't know.
12         Q     Do you know whether the availability of
13   books through the Internet Archive's Digital Lending
14   Library has, in fact, had any effect on demand for
15   e-book licenses?
16         A     I don't know.
17         Q     And if you wanted to know that, what kind
18   of data would you want to take a look at?
19         A     I would want you to look at the circulation
20   or use data that the library has in relation to the
21   e-books in question.
22         Q     Have you done that?
23         A     I have not done that.
24         Q     Do you have a view as to whether a library
25   would actually purchase fewer e-book licenses for

Page 258

1    titles that it makes available to patrons through

2    CDL?

3        A    I don't have a view on that and I think it

4    would be determined on a case-by-case basis depending

5    on what the libraries' needs would be in terms of

6    their collection.

7            MS. LANIER:  Okay.  Thank you.  That's all

8    I had on redirect.

9                    FURTHER EXAMINATION

10   BY MS. McNAMARA:

11       Q    Ms. Hildreth, this is what happens when

12   lawyers ask their questions, then I get to ask some

13   more.

14           You indicated that you would look at

15   certain information in order to ascertain whether

16   there has been any reduction in e-book licensing; is

17   that right?

18       A    Yes, that's right.

19       Q    Are you undertaking that endeavor?

20       A    At this time, I'm not undertaking that

21   endeavor.

22       Q    Do you plan to undertake that endeavor in

23   connection with any supplemental report that you

24   filed?

25       A    I have not made that decision yet.

Page 264

1    the specific scenario, the question.

2    BY MS. McNAMARA:

3         Q    When a library acquires a series of works

4    through e-book licensing -- strike that.

5              When a library acquires via CDL a series

6    of books, they are not paying licenses for those

7    works; isn't that right?

8              MS. LANIER:  Objection, mischaracterizes

9    the previous testimony and vague.

10             THE WITNESS:  They are not paying for

11   those licenses when they receive or obtain content

12   through CDL.

13             MS. McNAMARA:  Thank you.  That's your

14   testimony.  Then I'm done.

15             Do you have anything else, Jessie?

16             MS. LANIER:  Nothing else.  Thank you.

17             MS. McNAMARA:  Great.  Thank you very

18   much, Ms. Hildreth.  We appreciate it.

19             THE WITNESS:  Okay.

20             THE VIDEOGRAPHER:  This will conclude the

21   deposition Susan Hildreth.  The total number of

22   media units used in the deposition today was eight

23   and will be retained by Veritext Legal Solutions.

24             We're off the record at 4:44 p.m. Pacific

25   time.  Thank you.

Page 266

1        I, LYNNE M. LEDANOIS, a Certified

2   Shorthand Reporter of the State of California, do

3   hereby certify:

4        That the foregoing proceedings were taken

5   before me at the time and place herein set forth;

6   that a record of the proceedings was made by me

7   using machine shorthand which was thereafter

8   transcribed under my direction; that the foregoing

9   transcript is a true record of the testimony given.

10        Further, that if the foregoing pertains to

11   the original transcript of a deposition in a Federal

12   Case, before completion of the proceedings, review

13   of the transcript [X] was [] wasn't requested.

14        I further certify I am neither financially

15   interested in the action nor a relative or employee

16   of any attorney or party to this action.

17        IN WITNESS WHEREOF, I have this date

18   subscribed my name.

19

20

21   Dated: May 19, 2022

22

23   *Lynne Marie Ledanois*

24   _____

        LYNNE MARIE LEDANOIS

25        CSR No. 6811

# EXHIBIT 6

**ERRATA SHEET**

**Deposition of Susan Hildreth – May 17, 2022**
*Hachette Book Group, Inc. et al. v. Internet Archive*, Case No. 1:20-CV-04160-JGK

| Page | Line(s) | Correction | Reason |
|------|---------|------------|--------|
| 1 | 17 | Tuesday, not Monday | Typographical error (not part of transcript) |
| 47 | 3 | "CD O" should be "CDL" | Transcription error |
| 79 | 21 | "Accurate" should be "complete" and "combining" should" be "considering" | Misspoke |
| 103 | 13 | Strike "something like that" | Misspoke |
| 122 | 10 | "for review" should be "for approval" | Misspoke |
| 129 | 16-20 | "Individuals who I know him I believe respect him" should be "Individuals, whom I know and respect, I believe, respect him." | Misspoke |
| 135 | 1 | "of" should be "or" | Transcription error |
| 141 | 4 | "via" should be "to" | Misspoke |
| 195 | 11 | Replace "languages in . . . on non-world languages" with "world languages" New text "more funds on world languages" | Misspoke, transcription error |
| 212 | 5 | "book" should be "books" | Transcription error |
| 214 | 5 | "not a lawful" should be "not lawful" | Transcription error |
| 215 | 10 | "as in as" should be "in as" | Transcription error |
| 217 | 15 | "Yes, that's correct" should be "Yes, that's correct, libraries do not pay license fees for CDL lending." | Misspoke |
| 218 | 18 | "Yes" should be "Yes, the publishers do not receive licensing revenue for CDL lending." | Misspoke |
| 227 | 4 | "Yes" should be "That is possible, yes, but whether it would ever in fact occur would depend on the circumstances." | Misspoke |
| 242 | 12 | "from libraries" should be "for libraries" | Transcription error |

1

| Page | Line(s) | Correction | Reason |
|------|---------|------------|--------|
| 264 | 11 | "those licenses" to "CDL licenses" | Misspoke |
| Passim | | "Jessie" should be "Jesse" | Spelling error |

I, the undersigned, do hereby certify that I have read the foregoing transcript and that, to the best of my knowledge, said testimony is true (with the exception of the following changes listed above).

Signed this 20ᵗʰ day of June 2022.

Susan Hildreth

2

# EXHIBIT 7



# Reports of Cases

## JUDGMENT OF THE COURT (Third Chamber)

## 10 November 2016 *

(Reference for a preliminary ruling — Copyright and related rights — Rental right and lending right in respect of copyright works — Directive 2006/115/EC — Article 1(1) — Lending of copies of works — Article 2(1) — Lending of objects — Lending of a digital copy of a book — Public libraries)

In Case C-174/15,

REQUEST for a preliminary ruling under Article 267 TFEU from the Rechtbank Den Haag (District Court, The Hague, Netherlands), made by decision of 1 April 2015, received at the Court on 17 April 2015, in the proceedings

**Vereniging Openbare Bibliotheken**

v

**Stichting Leenrecht,**

intervening parties:

**Vereniging Nederlands Uitgeversverbond,**

**Stichting LIRA,**

**Stichting Pictoright,**

THE COURT (Third Chamber),

composed of L. Bay Larsen, President of the Chamber, M. Vilaras, J. Malenovský (Rapporteur), M. Safjan and D. Šváby, Judges,

Advocate General: M. Szpunar,

Registrar: M. Ferreira, Principal Administrator,

having regard to the written procedure and further to the hearing on 9 March 2016,

after considering the observations submitted on behalf of:

— Vereniging Openbare Bibliotheken, by P. de Leeuwe and D. Visser, advocaten,

— Vereniging Nederlands Uitgeversverbond, by C. Alberdingk Thijm and C. de Vries, advocaten,

---

* Language of the case: Dutch.



— Stichting LIRA and Stichting Pictoright, by J. Seignette, M. van Heezik, G. van der Wal and M. Kingma, advocaten,

— the Czech Government, by S. Šindelková, D. Hadroušek and M. Smolek, acting as Agents,

— the German Government, by T. Henze, J. Möller and D. Kuon, acting as Agents,

— the Greek Government, by G. Alexaki, acting as Agent,

— the French Government, by D. Segoin, G. de Bergues and D. Colas, acting as Agents,

— the Italian Government, by G. Palmieri, acting as Agent, assisted by S. Fiorentino and A. Collabolletta, avvocati dello Stato,

— the Latvian Government, by I. Kalniņš and D. Pelše, acting as Agents,

— the Portuguese Government, by L. Inez Fernandes and T. Rendas, acting as Agents,

— the United Kingdom Government, by J. Kraehling, acting as Agent, and N. Saunders, Barrister,

— the European Commission, by F. Wilman, T. Scharf and J. Samnadda, acting as Agents,

after hearing the Opinion of the Advocate General at the sitting on 16 June 2016,

gives the following

## Judgment

1   This request for a preliminary ruling concerns the interpretation of Article 4(2) of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society (OJ 2001 L 167, p. 10), and of Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property (OJ 2006 L 376, p. 28).

2   The request has been made in proceedings between Vereniging Openbare Bibliotheken (Public library association; 'the VOB') and Stichting Leenrecht (Lending right foundation; 'the Stichting'), concerning a possible infringement of the exclusive lending right referred to in Article 1(1) of Directive 2006/115.

## Legal context

### International law

3   The World Intellectual Property Organisation (WIPO) adopted the WIPO Copyright Treaty in Geneva on 20 December 1996 ('the WIPO Treaty'). That Treaty was approved on behalf of the European Community by Council Decision 2000/278/EC of 16 March 2000 (OJ 2000 L 89, p. 6).

4   Article 7(1) of that treaty states:

'Authors of:

(i)   computer programs;

(ii)   cinematographic works; and

(iii)   works embodied in phonograms, as determined in the national law of Contracting Parties;

shall enjoy the exclusive right of authorising commercial rental to the public of the originals or copies of their works.'

5   The diplomatic conference that adopted the WIPO Treaty also adopted, among other documents, the 'Agreed statement concerning Articles 6 and 7', which is annexed to that treaty ('the agreed statement annexed to the WIPO Treaty') and is worded as follows:

'As used in these Articles, the expressions "copies" and "original and copies" being subject to the right of distribution and the right of rental under the said Articles, refer exclusively to fixed copies that can be put into circulation as tangible objects.'

*EU law*

Directive 2001/29

6   Recitals 2 and 9 of Directive 2001/29 state:

'(2)   The European Council, meeting at Corfu on 24 and 25 June 1994, stressed the need to create a general and flexible legal framework at Community level in order to foster the development of the information society in Europe. This requires, inter alia, the existence of an internal market for new products and services. Important Community legislation to ensure such a regulatory framework is already in place or its adoption is well under way. Copyright and related rights play an important role in this context as they protect and stimulate the development and marketing of new products and services and the creation and exploitation of their creative content.

…

(9)   Any harmonisation of copyright and related rights must take as a basis a high level of protection, since such rights are crucial to intellectual creation. Their protection helps to ensure the maintenance and development of creativity in the interests of authors, performers, producers, consumers, culture, industry and the public at large. Intellectual property has therefore been recognised as an integral part of property.'

7   Article 1(2)(b) of that directive provides:

'Except in the cases referred to in Article 11, this Directive shall leave intact and shall in no way affect existing Community provisions relating to:

…

(b)   rental right, lending right and certain rights related to copyright in the field of intellectual property;

…'

8    Article 4 of that directive, entitled 'Distribution right', provides:

'1. Member States shall provide for authors, in respect of the original of their works or of copies thereof, the exclusive right to authorise or prohibit any form of distribution to the public by sale or otherwise.

2. The distribution right shall not be exhausted within the [European Union] in respect of the original or copies of the work, except where the first sale or other transfer of ownership in the [European Union] of that object is made by the rightholder or with his consent.'

Directive 2006/115

9    Directive 2006/115 codified and repealed Council Directive 92/100/EEC of 19 November 1992 on rental right and lending right and on certain rights related to copyright in the field of intellectual property (OJ 1992 L 346, p. 61).

10   Recitals 2 to 5, 7, 8 and 14 of Directive 2006/115 are worded as follows:

'(2)   Rental and lending of copyright works and the subject matter of related rights protection is playing an increasingly important role in particular for authors, performers and producers of phonograms and films. Piracy is becoming an increasing threat.

(3)   The adequate protection of copyright works and subject matter of related rights protection by rental and lending rights as well as the protection of the subject matter of related rights protection by the fixation right, distribution right, right to broadcast and communication to the public can accordingly be considered as being of fundamental importance for the economic and cultural development of the [European Union].

(4)   Copyright and related rights protection must adapt to new economic developments such as new forms of exploitation.

(5)   The creative and artistic work of authors and performers necessitates an adequate income as a basis for further creative and artistic work, and the investments required particularly for the production of phonograms and films are especially high and risky. The possibility of securing that income and recouping that investment can be effectively guaranteed only through adequate legal protection of the rightholders concerned.

…

(7)   The legislation of the Member States should be approximated in such a way as not to conflict with the international conventions on which the copyright and related rights laws of many Member States are based.

(8)   The legal framework of the [European Union] on the rental right and lending right and on certain rights related to copyright can be limited to establishing that Member States provide rights with respect to rental and lending for certain groups of rightholders and further to establishing the rights of fixation, distribution, broadcasting and communication to the public for certain groups of rightholders in the field of related rights protection.

…

(14)  It is also necessary to protect the rights at least of authors as regards public lending by providing for specific arrangements. However, any measures taken by way of derogation from the exclusive public lending right should comply in particular with Article 12 of the Treaty.'

11  Article 1 of that directive provides:

'1.  In accordance with the provisions of this Chapter, Member States shall provide, subject to Article 6, a right to authorise or prohibit the rental and lending of originals and copies of copyright works, and other subject matter as set out in Article 3(1).

2.  The rights referred to in paragraph 1 shall not be exhausted by any sale or other act of distribution of originals and copies of copyright works and other subject matter as set out in Article 3(1).'

12  Article 2(1) of Directive 2006/115 provides:

'For the purposes of this Directive the following definitions shall apply:

(a)  "rental" means making available for use, for a limited period of time and for direct or indirect economic or commercial advantage;

(b)  "lending" means making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when it is made through establishments which are accessible to the public;

…'

13  Article 6(1) of Directive 2006/115 provides:

'Member States may derogate from the exclusive right provided for in Article 1 in respect of public lending, provided that at least authors obtain a remuneration for such lending. Member States shall be free to determine this remuneration taking account of their cultural promotion objectives.'

*Netherlands law*

14  Article 10(1) of the Auteurswet (Law on Copyright) of 23 September 1912 ('the Aw') provides:

'For the purposes of this Law, "literary, scientific or artistic works" shall mean:

1°.  books, brochures, newspapers, periodicals and other written material;

…

and, in general, any product in the literary, scientific or artistic domain, expressed by any means and in any form.'

15  Article 12 of the Aw provides:

'1.  The disclosure of a literary, scientific or artistic work shall include:

…

3°  The rental or lending of all or part of a copy of a work, with the exception of works of architecture and works of applied arts, or a reproduction thereof, put into circulation by the rightholder or with his consent;

…

3. "lending", within the meaning of paragraph 1(3°), means making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when it is made through establishments which are accessible to the public.

…'

16  Under Article 15c(1) of the Aw:

'Lending, as defined in Article 12(1)(3°), of all or part of a copy of a literary, scientific or artistic work, or a reproduction thereof, put into circulation by the rightholder or with his consent, shall not constitute an infringement of the copyright in that work, provided that fair remuneration is paid by the person who carries out that lending or arranges for it to be carried out. …'

**The dispute in the main proceedings and the questions referred for a preliminary ruling**

17  The VOB represents the interests of all public libraries in the Netherlands.

18  Those libraries lend out books in physical format and, in return, pay a lump sum to the Stichting, which is the foundation designated by the Minister for Justice (Netherlands) to collect lending right payments.

19  The Stichting distributes the lending right payments which it collects to rightholders through collective management organisations, such as the Stichting LIRA, which is responsible for the management of rights relating to literary, dramatic and dramatico-musical works, and the Stichting Pictoright, which is responsible for the management of rights relating to visual works such as works created by plastic artists, photographers, illustrators, designers and architects.

20  Under the Netherlands legislation, the amount of the lending right payment is set by the Stichting Onderhandelingen Leenvergoedingen ('the StOL'), a foundation designated for that purpose by the Minster for Justice.

21  While the question as to whether or not the digital lending of an electronic book comes within the scope of Article 15c of the Aw had been discussed within the StOL since 2004, the StOL's management board finally decided, in a meeting held on 24 March 2010, to answer that question in the negative.

22  In addition, at the request of the Ministry of Education, Culture and Science (Netherlands), the Instituut voor Informatierecht van de Universiteit van Amsterdam (Institute for information law of the University of Amsterdam, Netherlands) and the consultancy firm SEO drafted a report which also concluded that the digital lending of electronic books by libraries did not come within the scope of that exception.

23  On the basis of that report, the Netherlands Government drew up draft legislation on libraries providing for the creation of a national digital library for the remote digital lending of electronic books. That draft legislation is based on the premiss that the digital lending of electronic books does not come within the scope of that exception.

Case 1:20-cv-04160-JGK-OTW Document 120-7 Filed 09/02/22 Page 28 of 14

24 At present, public libraries make electronic books available via the internet, on the basis of licensing agreements with rightholders.

25 The VOB is challenging that draft legislation and has therefore brought proceedings before the referring court in which it seeks a declaration that, essentially, the current Law on Copyright already covers digital lending.

26 In those circumstances, the Rechtbank Den Haag (District Court, The Hague) decided to stay the proceedings and to refer the following questions to the Court for a preliminary ruling:

'(1) Are Articles 1(1), 2(1)(b) and 6(1) of Directive 2006/115 to be construed as meaning that "lending" as referred to in those provisions also means making copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature available for use, not for direct or indirect economic or commercial advantage, via a publicly accessible establishment

— by placing a digital copy (reproduction A) on the server of the establishment and enabling a user to reproduce that copy by downloading it on to his/her own computer (reproduction B),

— in such a way that the copy made by the user when downloading (reproduction B) is no longer usable after a limited period, and

— in such a way that other users cannot download the copy (reproduction A) on to their computers during that period?

(2) If Question 1 is to be answered in the affirmative: does Article 6 of Directive 2006/115 and/or any other provision of EU law preclude Member States from imposing on the application of the restriction on the lending right included in Article 6 of Directive 2006/115 a condition that the copy of the work made available by the establishment (reproduction A) must have been brought into circulation by an initial sale or other transfer of ownership of that copy within the European Union by the rightholder or with his consent within the meaning of Article 4(2) of Directive 2001/29?

(3) If Question 2 is to be answered in the negative: does Article 6 of Directive 2006/115 lay down other requirements for the source of the copy (reproduction A) provided by the establishment, for instance the requirement that the copy was obtained from a lawful source?

(4) If Question 2 is to be answered in the affirmative: is Article 4(2) of Directive 2001/29 to be construed as meaning that the initial sale or other transfer of ownership of material as referred to in that provision also means making available remotely by downloading, for use for an unlimited period, a digital copy of copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature?'

**Consideration of the questions referred**

*The first question*

27 By its first question, the referring court asks, in essence, whether Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115 must be interpreted as meaning that the concept of 'lending', within the meaning of those provisions, covers the lending of a digital copy of a book, where that lending is carried out by placing that copy on the server of a public library and allowing the user concerned to

reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.

28  It must be noted that Article 1(1) of Directive 2006/115, which provides that 'Member States shall provide … a right to authorise or prohibit the … lending of originals and copies of copyright works, and other subject matter', does not specify whether the concept of 'copies of copyright works', within the meaning of that provision, also covers copies which are not fixed in a physical medium, such as digital copies.

29  In addition, Article 2(1)(b) of that directive defines 'lending' as making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when that lending is made through establishments which are accessible to the public. However, it does not follow from that provision that the subject matter referred to in Article 1(1) of that directive must also include intangible objects, such as those of a digital nature.

30  In those circumstances, it is appropriate, first of all, to examine whether that are grounds to justify the exclusion, in all cases, of the lending of digital copies and intangible objects from the scope of Directive 2006/115.

31  In that regard, in the first place, it follows from recital 7 of Directive 2006/115 that 'the legislation of the Member States should be approximated in such a way as not to conflict with the international conventions on which the copyright and related rights laws of many Member States are based'.

32  The conventions which that directive must respect include, in particular, the WIPO Treaty, to which the European Union and all the Member States are parties.

33  Consequently, it is necessary to interpret the concepts of 'objects' and 'copies', for the purposes of Directive 2006/115, in the light of the equivalent concepts in the WIPO Treaty (see, by analogy, judgment of 15 March 2012, *SCF*, C-135/10, EU:C:2012:140, paragraph 55).

34  According to the agreed statement annexed to the WIPO Treaty, the concepts of 'original' and 'copies', in Article 7 of that treaty, in relation to the right of rental, refer 'exclusively to fixed copies that can be put into circulation as tangible objects'. It follows that intangible objects and non-fixed copies, such as digital copies, are excluded from the right of rental.

35  It is therefore necessary to interpret the concept of 'rental', in Article 2(1)(a) of Directive 2006/115, as referring exclusively to tangible objects, and to interpret the concept of 'copies', in Article 1(1) of that directive, as referring, as regards rental, exclusively to copies fixed in a physical medium.

36  That said, although the title of Directive 2006/115 refers, in certain language versions, to the 'rental and lending right', in the singular, and although, as a rule, that directive governs jointly the various aspects of that right which constitute the systems of rental and lending, it nevertheless does not follow that the EU legislature necessarily intended to give the same meaning to the concepts of 'objects' and 'copies', whether with regard to the rental system or to the lending system, including public lending within the meaning of Article 6 of that directive.

37  First, recitals 3 and 8 of that directive, in certain language versions, do not refer to the 'rental and lending right' in the singular, but rather to the rental and lending 'rights', in the plural.

38  Secondly, as can be seen from Article 2(1)(a) and (b) of Directive 2006/115, the EU legislature sought to define the concepts of 'rental' and 'lending' separately. Thus the subject matter of 'rental' is not necessarily identical to that of 'lending'.

39  It follows from the foregoing that although, as can be seen from paragraph 35 of the present judgment, intangible objects and non-fixed copies, such as digital copies, must be excluded from the rental right, governed by Directive 2006/115, so as not to be in breach of the agreed statement annexed to the WIPO Treaty, neither that treaty nor that agreed statement preclude the concept of 'lending', within the meaning of that directive, from being interpreted, where appropriate, as also including certain lending carried out digitally.

40  In the second place, it must be recalled, as mentioned in paragraph 9 of the present judgment, that Directive 2006/115 codifies and reproduces, in substantially identical terms, the provisions of Directive 92/100. The preparatory work preceding the adoption of Directive 92/100 does not support the conclusion that lending carried out in digital form should be excluded, in all cases, from the scope of that directive.

41  It is true that the explanatory memorandum on the Proposal for a Council Directive on rental right, lending right, and on certain rights related to copyright (COM(90) 586 final) mentions the European Commission's desire to exclude the making available by way of electronic data transmission from the scope of Directive 92/100.

42  However, it must be noted, in the first place, that it is not evident that the Commission intended to apply such an exclusion to digital copies of books. The examples mentioned in that explanatory memorandum related exclusively to the electronic transmission of films. Moreover, at the time when that explanatory memorandum was drawn up, digital copies of books were not used to such an extent that it can validly be presumed that they had implicitly been taken into account by the Commission.

43  In the second place, it must be noted that the desire voiced by the Commission in that explanatory memorandum finds no direct expression in the actual text of the proposal which led to the adoption of Directive 92/100 or in that directive.

44  It follows from the foregoing considerations that there is no decisive ground allowing for the exclusion, in all cases, of the lending of digital copies and intangible objects from the scope of Directive 2006/115.

45  That conclusion is, moreover, borne out by the objective pursued by Directive 2006/115. Recital 4 of that directive states, inter alia, that copyright must adapt to new economic developments such as new forms of exploitation. Lending carried out digitally indisputably forms part of those new forms of exploitation and, accordingly, makes necessary an adaptation of copyright to new economic developments.

46  In addition, to exclude digital lending entirely from the scope of Directive 2006/115 would run counter to the general principle requiring a high level of protection for authors.

47  While it is true that that general principle appears only implicitly in recital 5 of Directive 2006/115, it is nevertheless emphasised in Directive 2001/29, recital 9 of which states that any harmonisation of copyright must take as its basis 'a high level of protection'.

48  Thus, such a general principle must be taken into account in interpreting directives which, like Directive 2006/115, are intended to harmonise the various aspects of copyright while having a more limited aim than that of Directive 2001/29.

49  In view of the conclusion set out in paragraph 44 of the present judgment, it must next be verified whether the public lending of a digital copy of a book, carried out in conditions such as those indicated in the question referred, is capable of coming within the scope of Article 6(1) of Directive 2006/115.

50 In that respect, it must be noted that, although Article 6(1) of Directive 2006/115 — as a derogation from the exclusive lending right laid down in Article 1 of that directive — must, according to the Court's settled case-law, be interpreted strictly, the fact remains that the interpretation given must also enable the effectiveness of the exception thereby established to be safeguarded and its purpose to be observed (see, to that effect, judgments of 4 October 2011, *Football Association Premier League and Others*, C-403/08 and C-429/08, EU:C:2011:631, paragraphs 162 and 163, and of 1 December 2011, *Painer*, C-145/10, EU:C:2011:798, paragraph 133).

51 Given the importance of the public lending of digital books, and in order to safeguard both the effectiveness of the derogation for public lending referred to in Article 6(1) of Directive 2006/115 ('the public lending exception') and the contribution of that exception to cultural promotion, it cannot therefore be ruled out that Article 6(1) of Directive 2006/115 may apply where the operation carried out by a publicly accessible library, in view of, inter alia, the conditions set out in Article 2(1)(b) of that directive, has essentially similar characteristics to the lending of printed works.

52 In the present case, as can be seen from the wording of the question referred, the dispute in the main proceedings concerns the lending of a digital copy of a book, carried out by placing it on the server of the public library and allowing the user concerned to reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.

53 Such an operation must be regarded as having — in view, inter alia, of the conditions established in Article 2(1)(b) of Directive 20016/115 — essentially similar characteristics to the lending of printed works, since, first, the limitation of simultaneous downloads to a single copy implies that the lending capacity of the library concerned does not exceed that which it would have as regards a printed work and, secondly, that lending is made for only a limited period.

54 In view of all the foregoing considerations, the answer to the first question is that Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115 must be interpreted as meaning that the concept of 'lending', within the meaning of those provisions, covers the lending of a digital copy of a book, where that lending is carried out by placing that copy on the server of a public library and allowing a user to reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.

*The second question*

55 By its second question, the referring court asks, in essence, whether Article 6 of Directive 2006/115 and/or any other provision of EU law must be interpreted as precluding a Member State from making the application of Article 6(1) of Directive 2006/115 subject to the condition that the digital copy of a book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29.

56 In that regard, first of all, although it follows from the very wording of Article 4(1) and (2) of Directive 2001/29 that Member States are to provide for authors the exclusive right to authorise or prohibit any form of distribution to the public, by sale or otherwise, of the original of their works or of copies thereof, and that that distribution right is exhausted within the European Union only where the first sale or other transfer of ownership in the European Union of that object is made by the rightholder or with his consent, it follows from Article 1(2)(b) of that directive that the latter leaves intact and in no way affects the provisions of EU law relating to the lending right.

Case C-20-cv-04160-JGK CTWT Document 17237 35116-609/02/229 Page 12 of 14

57 It follows that Article 4(2) of Directive 2001/29 is not relevant to the interpretation of Article 6(1) of Directive 2006/115.

58 Next, Article 1(2) of Directive 2006/115 provides that the exclusive lending right, laid down in Article 1(1) of that directive, is not exhausted by any sale or other act of distribution of originals and copies of copyright works.

59 The Court has already held that forms of exploitation of a protected work, such as public lending, are different in nature from a sale or any other lawful form of distribution, since the lending right remains one of the prerogatives of the author notwithstanding the sale of the physical medium containing the work. Consequently, the lending right is not exhausted by the sale or any other act of distribution, whereas the distribution right may be exhausted, but only and specifically upon the first sale in the European Union by the rightholder or with his consent (see, to that effect, judgment of 6 July 2006, *Commission* v *Portugal*, C-53/05, EU:C:2006:448, paragraph 34 and the case-law cited).

60 It should be noted, lastly, that Article 6(1) of Directive 2006/115 is intended to balance the interests of authors, on the one hand, and cultural promotion — which is an objective of general interest underlying the public lending exception and justifying the possibility for Member States to derogate, under that provision, from the exclusive right laid down in Article 1 of that directive as regards public lending — on the other hand. In that context, at least the authors must receive remuneration for that lending.

61 Article 6(1) of Directive 2006/115, read in conjunction with recital 14 of that directive, which indicates that it is necessary to protect authors' rights as regards public lending, and in view of the requirements flowing from the general principle imposing a high level of protection for authors, mentioned in paragraphs 47 and 48 above, must be regarded as laying down only a minimum threshold of protection for authors required when the public lending exception is being implemented. It follows that the Member States cannot be prevented from setting, where appropriate, additional conditions such as to improve the protection of authors' rights beyond what is expressly laid down in that provision.

62 In the present case, the national legislation lays down an additional condition for the application of the public lending exception, referred to in Article 6(1) of Directive 2006/115. That condition requires that the digital copy of a book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29.

63 As the Advocate General has rightly pointed out, in point 85 of his Opinion, unlike the case where a lending right is acquired with the consent of the author, in the case where the lending right arises under the exception laid down in Article 6(1) of Directive 2006/115, by way of derogation from that consent requirement, its application to some works could prejudice the legitimate interests of authors.

64 Consequently, a condition, such as that at issue in the main proceedings — according to which, in the context of the public lending exception, the Member States may require that a digital copy of a book subject to such lending must have first been put into circulation by the rightholder or with his consent — is capable of reducing the risks referred to in the previous paragraph and therefore of improving the protection of authors' rights in the implementation of that exception. Consequently, such an additional condition must be considered to be in accordance with Article 6(1) of Directive 2006/115.

65 In view of the foregoing, the answer to the second question is that EU law, and in particular Article 6 of Directive 2006/115, must be interpreted as not precluding a Member State from making the application of Article 6(1) of Directive 2006/115 subject to the condition that the digital copy of a

book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29.

*The third question*

66 By its third question, the referring court asks, in essence, whether Article 6(1) of Directive 2006/115 must be interpreted as precluding the public lending exception laid down therein from applying to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an unlawful source.

67 In that regard, first of all, although the wording of Article 6(1) of Directive 2006/115 does not expressly set out any requirement that the source of the copy made available by the public library must be lawful, nevertheless one of the objectives of that directive is to combat piracy, as can be seen from recital 2 thereof.

68 To accept that a copy lent out by a public library may be obtained from an unlawful source would amount to tolerating, or even encouraging, the circulation of counterfeit or pirated works and would therefore clearly run counter to that objective.

69 Next, the Court has already held, with regard to the private copying exception laid down in Article 5(2)(b) of Directive 2001/29, that that exception does not cover the case of copies made from an unlawful source (judgment of 10 April 2014, *ACI Adam and Others*, C-435/12, EU:C:2014:254, paragraph 41).

70 In that respect, the Court has held that copyright holders cannot be required to tolerate infringements of their rights which may accompany the making of private copies. If the Member States had the option of adopting legislation which also allowed reproductions for private use to be made from an unlawful source, it would clearly be detrimental to the proper functioning of the internal market. The application of such national legislation might unreasonably prejudice copyright holders (see, to that effect, judgment of 10 April 2014, *ACI Adam and Others*, C-435/12, EU:C:2014:254, paragraphs 31, 35 and 40).

71 All of those arguments relating to the private copying exception appear relevant to the application of the public lending exception and may therefore be transposed, by analogy, to the context of Article 6(1) of Directive 2006/115.

72 In view of the foregoing, the answer to the third question is that Article 6(1) of Directive 2006/115 must be interpreted as meaning that it precludes the public lending exception laid down therein from applying to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an unlawful source.

*The fourth question*

73 In view of the answer given to the second question, it is not necessary to answer the fourth question, since the latter was submitted only in the event of a negative answer to the second question.

**Costs**

74 Since these proceedings are, for the parties to the main proceedings, a step in the action pending before the national court, the decision on costs is a matter for that court. Costs incurred in submitting observations to the Court, other than the costs of those parties, are not recoverable.

On those grounds, the Court (Third Chamber) hereby rules:

1. **Article 1(1), Article 2(1)(b) and Article 6(1) of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property must be interpreted as meaning that the concept of 'lending', within the meaning of those provisions, covers the lending of a digital copy of a book, where that lending is carried out by placing that copy on the server of a public library and allowing a user to reproduce that copy by downloading it onto his own computer, bearing in mind that only one copy may be downloaded during the lending period and that, after that period has expired, the downloaded copy can no longer be used by that user.**

2. **EU law, and in particular Article 6 of Directive 2006/115, must be interpreted as not precluding a Member State from making the application of Article 6(1) of Directive 2006/115 subject to the condition that the digital copy of a book made available by the public library must have been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the holder of the right of distribution to the public or with his consent, for the purpose of Article 4(2) of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society.**

3. **Article 6(1) of Directive 2006/115 must be interpreted as meaning that it precludes the public lending exception laid down therein from applying to the making available by a public library of a digital copy of a book in the case where that copy was obtained from an illegal source.**

[Signatures]

# EXHIBIT 8



*Reports of Cases*

OPINION OF ADVOCATE GENERAL
SZPUNAR
delivered on 16 June 2016[1]

**Case C-174/15**

**Vereniging Openbare Bibliotheken**
v
**Stichting Leenrecht**
(Request for a preliminary ruling

from the Rechtbank Den Haag (District Court, The Hague, Netherlands))

(Copyright and related rights — Rental and lending right in respect of copyright works — Directive 2001/29/EC — Directive 2006/115/EC — Electronic books — Public libraries)

**Introduction**

1. Libraries are one of civilisation's most ancient institutions, predating by several centuries the invention of paper and the emergence of books as we know them today. In the 15th century, they successfully adapted to, and benefited from, the invention of printing and it was to the libraries that the law of copyright, which emerged in the 18th century, had to adjust. Today we are witnessing a new, digital revolution, and one may wonder whether libraries will be able to survive this new shift in circumstances. Without wishing to overstate its importance, the present case undeniably offers the Court a real opportunity to help libraries not only to survive, but also to flourish.

2. Indeed, it is a commonplace to say that digital technology and the advent of the internet have had a profound effect on many areas of activity, including creative work and, in particular, literature. The introduction of electronic books has significantly altered both the publishing sector and readers' habits, and this is just the beginning. While electronic books may never replace printed books, the fact remains that, for certain categories of book and on certain markets, the volume of electronic book sales equals or surpasses the volume of printed book sales and some works are published only in digital format.[2] Similarly, some readers, and they are ever more numerous, are leaving aside printed books and turning to electronic reading devices. Very young readers may never have accustomed themselves to printed books.

---

1 — Original language: French.

2 — For example, Stephen King's *Riding the Bullet* (Simon & Schuster, 2000) or *Starość Aksolotla* (*The Old Axolotl*) by Jacek Dukaj (Allegro, 2015).



3. If libraries are unable to adapt to this trend they risk marginalisation and may no longer be able to fulfil the task of cultural dissemination which they have performed for thousands of years. The institution of a regulatory framework to accommodate the modernisation of the way in which libraries operate has, for some time, been a subject of intense debate, both among stakeholders and in legal theory.[3] The question of whether — and if so on what legal basis — libraries may lend electronic books is at the heart of this debate. The present case will enable the Court to provide a judicial answer to that question.

**Legal framework**

*EU law*

Directive 2001/29/EC

4. Article 1 of Directive 2001/29/EC of the European Parliament and of the Council of 22 May 2001 on the harmonisation of certain aspects of copyright and related rights in the information society,[4] entitled 'Scope', provides, in paragraph 2(b) thereof:

'Except in the cases referred to in Article 11 [making technical adjustments to certain directives in the field of copyright], this directive shall leave intact and shall in no way affect existing Community provisions relating to:

…

(b) rental right, lending right and certain rights related to copyright in the field of intellectual property.'

5. Article 2 of that directive, entitled 'Reproduction right', provides, under point (a):

'Member States shall provide for the exclusive right to authorise or prohibit direct or indirect, temporary or permanent reproduction by any means and in any form, in whole or in part:

(a) for authors, of their works.'

6. Article 3 of the same directive, entitled 'Right of communication to the public of works and right of making available to the public other subject matter', provides in paragraph 1 thereof:

'Member States shall provide authors with the exclusive right to authorise or prohibit any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access them from a place and at a time individually chosen by them.'

---

3 — To give just a few examples, see Davies, P., 'Access v. contract: competing freedoms in the context of copyright limitations and exceptions for libraries' in *European Intellectual Property Review*, 2013/7, p. 402; Dreier, T., 'Musées, bibliothèques et archives: de la nécessité d'élargir les exceptions au droit d'auteur' in *Propriétés intellectuelles*, 2012/43, p. 185; Dusollier, S., 'A manifesto for an e-lending limitation in copyright' in *Journal of Intellectual Property, Information Technology and E-Commerce Law*, 2014/5(3); Matulionyte, R., 'E-lending and a public lending right: is it really a time for an update?' in *European Intellectual Property Review*, 2016/38(3), p. 132; Siewicz, K., 'Propozycja nowelizacji prawa autorskiego w zakresie działalności bibliotek' in *Zeszyty naukowe Uniwersytetu Jagiellońskiego. Prace z prawa własności intelektualnej*, 2013/122, p. 54; Zollinger, A., 'Les bibliothèques numériques, ou comment concilier droit à la culture et droit d'auteur' in *La semaine juridique. Entreprise et affaires*, 2007/25, p. 18.

4 — OJ 2001 L 167, p. 10.

ECLI:EU:C:2016:459

7. Article 4 of Directive 2001/29, entitled 'Distribution right', provides as follows:

'1. Member States shall provide for authors, in respect of the original of their works or of copies thereof, the exclusive right to authorise or prohibit any form of distribution to the public by sale or otherwise.

2. The distribution right shall not be exhausted within the Community in respect of the original or copies of the work, except where the first sale or other transfer of ownership in the Community of that object is made by the rightholder or with his consent.

8. Lastly, Article 5 of Directive 2001/29, entitled 'Exceptions and limitations', provides in paragraphs 1(b) and 2(c) thereof:

'1. Temporary acts of reproduction referred to in Article 2, which are transient or incidental [and] an integral and essential part of a technological process and whose sole purpose is to enable:

…

(b)  a lawful use

of a work or other subject matter to be made, and which have no independent economic significance, shall be exempted from the reproduction right provided for in Article 2.

2. Member States may provide for exceptions or limitations to the reproduction right provided for in Article 2 in the following cases:

…

(c)  in respect of specific acts of reproduction made by publicly accessible libraries, educational establishments or museums, or by archives, which are not for direct or indirect economic or commercial advantage.'

Directive 2006/115/EC

9. Article 1 of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property,[5] entitled 'Object of harmonisation', provides:

'1. In accordance with the provisions of this Chapter [Chapter I, entitled "Rental and lending right"], Member States shall provide, subject to Article 6, a right to authorise or prohibit the rental and lending of originals and copies of copyright works, and other subject matter as set out in Article 3(1).

2. The rights referred to in paragraph 1 shall not be exhausted by any sale or other act of distribution of originals and copies of copyright works and other subject matter as set out in Article 3(1).'

10. Article 2 of that directive, entitled 'Definitions', provides in paragraph 1(b) thereof:

'For the purpose of this Directive the following definitions shall apply:

…

---

5 — OJ 2006 L 376, p. 28.

(b) "lending" means making available for use, for a limited period of time and not for direct or indirect economic or commercial advantage, when it is made through establishments which are accessible to the public.'

11. Article 3 of the same directive, entitled 'Rightholders and subject matter of rental and lending right', provides, in paragraph 1(a) thereof:

'The exclusive right to authorise or prohibit rental and lending shall belong to the following:

(a) the author in respect of the original and copies of his work.'

12. Lastly, Article 6 of the directive, entitled 'Derogation from the exclusive public lending right', provides, in paragraphs 1 and 3 thereof:

'1. Member States may derogate from the exclusive right provided for in Article 1 in respect of public lending, provided that at least authors obtain a remuneration for such lending. Member States shall be free to determine this remuneration taking account of their cultural promotion objectives.

…

3. Member States may exempt certain categories of establishments from the payment of the remuneration referred to in paragraphs 1 and 2.'

*Netherlands law*

13. The Law on Copyright (Auteurswet) institutes the lending right in Article 12(1)(3) and Article 12(3). The derogation for public lending is instituted in Article 15c(1) of that law.

**The facts, the procedure and the questions referred for a preliminary ruling**

14. There is a lively debate in several Member States, including the Netherlands, concerning the lending of electronic books by libraries. Further to a report commissioned by the Netherlands Ministry of Education, Culture and Science, it was concluded that the lending of electronic books did not fall within the scope of the exclusive lending right for the purposes of the provisions transposing Directive 2006/115 into Netherlands law. Consequently, the lending of electronic books by public libraries cannot benefit from the derogation provided for in Article 6(1) of that directive, which has also been transposed into Netherlands law. A draft law on libraries, based on that premiss, has been drawn up by the government.

15. However, the applicant in the main proceedings, Vereniging Openbare Bibliotheken ('VOB'), an association of which every public library in the Netherlands is a member, does not concur with that view. It is persuaded that the relevant provisions of Netherlands law must also apply to digital lending. Consequently, it has instituted proceedings before the referring court against Stichting Leenrecht, a foundation entrusted with collecting the remuneration due to authors under the public lending derogation and the defendant in the main proceedings, for a declaratory judgment holding, in substance, first, that the lending of electronic books falls within the scope of the lending right, secondly, that the making available of electronic books for an unlimited period of time constitutes a sale for the purposes of the provisions governing the distribution right and, thirdly, that the lending of electronic books by public libraries against the payment to authors of a fair remuneration does not constitute copyright infringement.

ECLI:EU:C:2016:459

16. VOB states that its action concerns lending under the system which the referring court describes as 'one copy one user'. Under that system, the electronic books at a library's disposal may be downloaded by a user for a lending period during which those books will not be accessible to other library users. At the end of the period, the book in question will automatically become unusable for the borrower in question and may then be borrowed by other users. VOB has also stated that it wishes to limit the scope of its action to 'novels, collections of short stories, biographies, travelogues, children's books and youth literature'.

17. The interveners in the main proceedings are Stichting Lira ('Lira'), an organisation which collectively manages rights and represents the authors of literary works and Stichting Pictoright ('Pictoright'), an organisation which collectively manages rights and represents the creators of visual artworks, both of which support the form of order sought by VOB, and Vereniging Nederlands Uitgeversverbond ('NUV'), a publishers' association, which supports the contrary view.

18. The Rechtbank Den Haag (District Court, The Hague, Netherlands) considers that its response to VOB's application depends upon the interpretation of provisions of EU law and has referred the following questions to the Court of Justice for a preliminary ruling:

'(1) Are Articles 1(1), 2(1)(b) and 6(1) of Directive 2006/115 to be interpreted as meaning that "lending" within the meaning of those provisions includes the making available for use of copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature, other than for direct or indirect economic or commercial advantage, by a publicly accessible establishment

— by placing a digital copy (reproduction A) on the server of the establishment and enabling a user to reproduce that copy by downloading it onto his own computer (reproduction B),

— in such a way that the copy made by the user when downloading (reproduction B) is no longer usable after the expiry of a given period, and

— in such a way that other users cannot download the copy (reproduction A) onto their computers during that period?

(2) If question 1 is answered in the affirmative, does Article 6 of Directive 2006/115 and/or any other provision of EU law preclude Member States from making the application of the restriction on the lending right referred to in Article 6 of Directive 2006/115 subject to the condition that the copy of the work made available by the establishment (reproduction A) has been put into circulation by a first sale or other transfer of ownership of that copy in the European Union by the rightholder or with his consent, within the meaning of Article 4(2) of Directive 2001/29?

(3) If question 2 is answered in the negative, does Article 6 of Directive 2006/115 impose other requirements concerning the source of the copy (reproduction A) made available by the establishment, such as a requirement that the copy has been obtained from a legal source?

(4) If question 2 is answered in the affirmative, is Article 4(2) of Directive 2001/29 to be interpreted as meaning that the "first sale or other transfer of ownership" of material referred to in that provision includes the making available for use, remotely by downloading, for an unlimited period, of a digital copy of copyright-protected novels, collections of short stories, biographies, travelogues, children's books and youth literature?'

19. The order for reference was received at the Court on 17 April 2015. Written observations were lodged by VOB, NUV, Lira and Pictoright, the German, Greek, French, Italian, Latvian, Portuguese and United Kingdom Governments and the European Commission. A hearing was held on 9 March 2016 which was attended by VOB, NUV, Lira and Pictoright, the Czech, Greek and French Governments and the Commission.

**Assessment**

20. The national court has referred four questions for a preliminary ruling. The first of them is of capital importance, since it raises the issue of whether or not the lending of electronic books may fall within the scope of Directive 2006/115. If that first question is answered in the negative, the other questions will no longer be relevant. I shall therefore focus my analysis on the first question. The second, third and fourth questions concern the conditions which electronic books must fulfil in order potentially to be lent under the public lending derogation. I shall deal with them briefly together.

*The first question*

Preliminary observations

21. By its first question, the national court asks, in substance, whether Article 1(1) of Directive 2006/115, read together with Article 2(1)(b) of that directive, is to be interpreted as meaning that the making available to the public, for a limited period of time, of electronic books by public libraries falls within the scope of the lending right enshrined in Article 1.

22. In accordance with the subject matter of the main proceedings, as defined in the application lodged by VOB, the referring court restricts its question to 'novels, collections of short stories, biographies, travelogues, children's books and youth literature'. However, whilst I can accept that the issue before the Court in the present case is confined to electronic books, to the exclusion of the other categories of subject matter protected by the lending right,[6] I find it difficult to circumscribe that issue in the way that the referring court does. Indeed, the category of literary works which the referring court identifies is not, in my opinion, determined by reference to any objective criteria such as might justify a different legal treatment of that category of works. The Court's answer to the first question referred for a preliminary ruling must therefore apply, without distinction, to works of all types that exist in the form of an electronic book.

23. It is, in my opinion, vital that the interpretation of Directive 2006/115 should meet the needs of contemporary society and make it possible to reconcile the various interests at stake. At the same time, that interpretation must be consistent with the European Union's international obligations and the reasoning underlying other acts of EU law in the field of copyright. I shall now address those various issues.

---

6 — Differential treatment does appear to be permitted by the wording itself of Article 6 of Directive 2006/115, paragraph 2 of which contemplates the possibility of not applying the lending right to phonograms, films and computer programs, subject to the introduction of remuneration for authors. Moreover, since phonograms (including audio books) and videograms are usually recorded on a physical device, the fact that they are included, in that form, within the scope of the lending right does not cause a problem. That, however, is manifestly not the case with electronic books, which are normally distributed only through downloading.

ECLI:EU:C:2016:459

*The axiological basis for an interpretation of Directive 2006/115 that reflects current interests*

24. Directive 2006/115 is not a new normative act. It is, in fact, a codification of Council Directive 92/100/EEC of 19 November 1992 on rental right and lending right and on certain rights related to copyright in the field of intellectual property,[7] which is one of the first two acts of secondary law in the field of copyright.[8] In so far as concerns the lending right, Directive 92/100 was never substantially altered, neither when it was codified by Directive 2006/115 nor prior to that. The provisions governing the lending right currently in force are therefore essentially the same as those adopted in 1992.

25. It is, I think, undeniable that, at that time, the EU legislature did not contemplate the inclusion of the lending of electronic books within the concept of lending of Directive 92/100, if for no other reason than because the technology for commercially viable electronic books was then only in its infancy. Moreover, in so far as the Commission expressly stated, in its explanatory memorandum to that directive, that the directive did not apply to the making available to the public of works via electronic data transmission (downloading), it was referring solely to phonograms and videograms.[9] It did not even mention the downloading of books.

26. Does that mean that the provisions of Directive 2006/115 must still be interpreted today in such a way as to exclude the lending of electronic books from the concept of lending for the purposes of that directive? I think not, for three sets of reasons.

27. First of all, I take the view that it is imperative to give legal acts an interpretation which takes into account developments in technology, markets and behaviour and not to fix such acts in the past by adopting too rigid an interpretation.[10]

28. An interpretation of this kind, which might be described as 'dynamic' or 'evolving', is, in my opinion, necessary, particularly in fields where technological progress has a profound effect, such as copyright. Indeed, technological progress today is so rapid that it easily outstrips the legislative process, such that attempts to adapt legal provisions by that means are often defeated, with legal acts becoming obsolete the moment they are adopted or shortly thereafter. Directive 2006/115 is itself a perfect illustration of the phenomenon. Its provisions on renting, which were intended to regulate the market for the renting of cassettes, CDs and DVDs, are now outdated because the renting of phonograms and videograms, at least on the European market, has all but given way to online availability.[11] The anachronistic character of obsolete legal rules is a common source of interpretative problems, uncertainty and juridical lacunae. In such cases, only an adjusted judicial interpretation will be able to ensure the effectiveness of the legislation in question in a sector experiencing such rapid technological and economic development.

---

7 — OJ 1992 L 346, p. 61.

8 — The other being Council Directive 91/250/EEC of 14 May 1991 on the legal protection of computer programs (OJ 1991 L 122, p. 42).

9 — COM(90) 586 final, pp. 33 to 35. Similarly, academic authorities who accepted that the directive applied to digital lending and renting did not contemplate its application to books, but only to phonograms and videograms. 'Digital' renting was, in their eyes, more akin to a type of television broadcast 'video on demand' (see Reinbothe, J., von Lewinsky, S., *The EC directive on rental and lending rights and on piracy*, Sweet & Maxwell, London, 1993, pp. 41 and 42).

10 — The fact that the United States Constitution of 1787 can still apply and the fact that certain clauses of the Magna Carta of 1215 can still be part of the legal order of the United Kingdom of Great Britain and Northern Ireland is due in part to the fact that the interpretation they are given is not of the era of George Washington or of King John, but one that has been adapted to modern times.

11 — This phenomenon of accelerated obsolescence also affects academic writing, one author observing 'Looking at a book written ... 15 years ago, entitled *Internet and the Law*, my own book on interactive television of 5 years ago, and an article on the conservation of works on the Internet of 3 years ago, I note with regret how out of date they have become' (Markiewicz, R., 'Internet i prawo autorskie — wykaz problemów i propozycje ich rozwiązań' in *Zeszyty naukowe Uniwersytetu Jagiellońskiego. Prace z prawa własności intelektualnej*, 2013/121, p. 5). What might one say then of a directive the original version of which is almost 25 years old?

29. Such an approach also seems to be consistent with the legislature's intentions when adopting EU laws in the field of copyright. Indeed, recital 4 of Directive 2006/115 states that 'copyright … must adapt to new economic developments …'. That same desire to adapt to new technological and economic developments is also apparent from recitals 2, 5 and 8 of Directive 2001/29, which remains the principal act of EU law in the field of copyright. How could such adaptation and 'updating' of legislative provisions be achieved other than by giving them an adequate interpretation?

30. The lending of electronic books is the modern equivalent of the lending of printed books. I do not concur with the argument put forward in this case that there is a fundamental difference between electronic books and traditional books, or between the lending of electronic books and the lending of printed books. Clearly, electronic books take a different format, one that is perhaps more convenient is certain situations (and less so in others) and support certain functions, such as text searching and translation, that printed books cannot. Those characteristics are nevertheless secondary and their importance will depend on the subjective preferences of each user. The same applies to the argument that the fundamental advantage of digital lending lies in the fact that it does not require the user physically to go to a library, since it is a remote process. One could legitimately reply that some people prefer to go to a library, for the human contact.

31. However, what is in my opinion decisive is the objective element: in borrowing a book, either traditional or electronic, from a library a user wishes to acquaint himself with the content of that book, without keeping a copy of it at home. From that point of view there is no substantial difference between a printed book and an electronic book or between the methods by which they are lent.

32. The interpretation of Directive 2006/115 must therefore take that reality into account and align the legal framework for the lending of electronic books with that for the lending of traditional books.

33. Secondly, the main purpose of copyright is to protect the interests of authors. It is not by chance that, in the main proceedings, the organisations which represent the interests of authors, Lira and Pictoright, have intervened in support of the form of order sought by VOB. This might seem paradoxical, but it is a consequence of the market forces which currently prevail in the field of lending electronic books.

34. Indeed, such a market does exist and libraries do indeed lend books in electronic form. However, since this type of lending is not regarded as being covered by the concept of lending for the purposes of Directive 2006/115, it cannot benefit from the derogation for public lending provided for in Article 6(1) of the directive. The lending of electronic books is therefore arranged under licensing agreements concluded between libraries and publishers. For a specially negotiated fee, publishers will make available to libraries electronic books which the libraries then have the right to lend to users. According to the assertions of Lira and Pictoright, these contractual relationships are principally of benefit to publishers or other intermediaries in the electronic book trade, while no adequate remuneration is received by authors.

35. If, on the other hand, digital lending were regarded as falling within the scope of Directive 2006/115, and thus within the scope of the derogation provided for in Article 6(1) thereof, authors would as a result receive remuneration, in accordance with the requirement laid down in that provision, in addition to that generated by the sale of books and independently of agreements concluded with publishers.

36. Not only would an interpretation of Directive 2006/115 according to which digital lending fell within the concept of 'lending' not be detrimental to the interests of authors, it would also make it possible for their interests to be protected better than they can be in the current climate, which is governed solely by the laws of the market.

8

37. Thirdly and lastly, the considerations which lead me to favour an interpretation of Directive 2006/115 that takes technological developments into account are those which I mentioned in the introductory part of this Opinion. Since time immemorial, libraries have lent books without having to seek authorisation. Some of them, legal deposit libraries, have not even had to purchase their own copies. That may be explained by the fact that books are not regarded as an ordinary commodity and that literary creation is not a simple economic activity. The importance of books for the preservation of, and access to culture and scientific knowledge has always taken precedence over considerations of a purely economic nature.

38. Today, in the digital age, libraries must be able to continue to fulfil the task of cultural preservation and dissemination that they performed when books existed only in paper format. That, however, is not necessarily possible in an environment that is governed solely by the laws of the market. First, libraries, and public libraries especially, do not always have the financial means to procure electronic books, with lending rights, at the high prices demanded by publishers. That applies especially to libraries operating in disadvantaged areas, where their role is most important. Secondly, publishers and intermediaries in the electronic book trade are often reticent to conclude agreements with libraries to enable them to lend electronic books. In fact, they fear that such lending will be detrimental to their interests in that it will reduce sales or prevent them from developing their own business models for making material available for a limited period of time. Consequently, they either contractually limit the opportunities which libraries have of lending electronic books, for example by stipulating a maximum number of loans or a period after publication of a book during which it may not be lent, or they refuse to enter into such contractual relations with libraries. [12]

39. Without the privileges which flow from a derogation from the exclusive lending right, libraries are therefore in danger of no longer being able to perpetuate, in the digital environment, the role which was always theirs in the era of printed books.

40. For the reasons which I have set out above, I am of the opinion that it is necessary, when interpreting the concept of 'lending' for the purposes of Directive 2006/115, not to be bound by what might have been in the mind of the EU legislature when it initially adopted the directive (that is to say, Directive 92/100), but instead to give a definition which is in step with developments in technology and in the market since that time. It is now necessary to analyse whether such an interpretation indeed follows from the wording of the provisions of Directive 2006/115 itself and whether it is consistent with other European Union legal texts in the field of copyright and with the European Union's international obligations.

---

12 — For more extensive information on how digital lending works, see the report by Mount, D., for Taalunie, Bibnet and Bibliotheek.nl, *A Review of Public Library E-Lending Models*, December 2014 (http://stichting.bibliotheek.nl), cited by Lira and Pictoright in their written observations. See also the European Bureau of Library, Information and Documentation Associations (EBLIDA) position paper *The Right to E-read*, May 2014, www.eblida.org; Davies, P., op. cit.; Dusollier, S., op. cit.; the International Federation of Library Associations and Institutions (IFLA) 2014 eLending Background Paper, www.ifla.org; Fischman Afori, O., 'The Battle Over Public E-Libraries: Taking Stock and Moving Ahead' in *International Review of Intellectual Property and Competition Law*, 2013, p. 392; Matulionyte, R., op. cit.; and, concerning the American market, O'Brien, D.R., Gasser, U., Palfrey, J., 'E-books in Libraries, A Briefing Document developed in preparation for a Workshop on E-Lending in Libraries', *Berkman Center Research Publication* No 2012-15.

The consistency of the proposed interpretation with the texts in force

– The wording and structure of Directive 2006/115

41. In order to analyse whether the proposed interpretation follows from the wording and structure of Directive 2006/115, it is necessary first of all to take account of the objectives of the exclusive lending right and of the derogation from that right for public lending. In so far as the exclusive lending right is concerned, its objective is to ensure that authors receive adequate remuneration from this form of exploitation of their works. Given that the exploitation of electronic books by way of lending is a reality, it seems to me entirely coherent for that form of lending to be included within the scope of the exclusive lending right.

42. In so far as concerns the objective of the public lending derogation, I have already set out the arguments which, in my opinion, militate in favour of allowing public libraries to benefit from that derogation in connection with the lending of electronic books. [13]

43. Secondly, it is necessary to consider whether the wording of Directive 2006/115 permits an interpretation of its provisions on lending which includes the lending of electronic books. It may be recalled that Article 1(1) of that directive provides that 'Member States shall provide … a right to authorise or prohibit the … lending of *originals and copies* of copyright works …'. [14] It could, therefore, be argued that the mention of originals and copies restricts the scope of the lending right to works that are recorded on a physical medium, with which they are lent. That would exclude electronic books, which are usually made available via electronic data transmission or downloading and thus without any connection to the physical medium. [15] However, I do not think that such an interpretation is correct.

44. In my opinion, copies, for the purposes of the provision under consideration, must not be equated solely with physical copies of a work. Indeed, a copy is merely the result of an act of reproduction and a work exists only in the form of the original and the copies thereof, which are the result of the reproduction of the original. While traditional copies, in the case of books in printed form, are necessarily contained in a physical medium, that is not so of electronic copies. It is also interesting to note that the French-language version of the proposal which led to Directive 92/100 did not use the term 'copie, but 'reproduction'. [16] To assert that the reproduction of a work does not consist in the creation of a copy would be contrary to the logic underlying copyright.

45. Nor do I think that the fact that Article 2(1)(b) of Directive 2006/115, in the French-language version, refers to the lending of 'objets' can preclude an interpretation of the directive which includes the lending of electronic books. First of all, the addition of this word 'objets' does not appear in all language versions. On the contrary, most versions merely refer to 'lending'. [17] Secondly, Directive 2006/115 uses the term 'objets' to designate all the subject matter of the rental and lending right, which is listed in Article 3(1) thereof. [18] The word therefore has no independent meaning other than that which, in so far as works are concerned, is conveyed by the terms 'original' and 'copies'.

---

13 — See, in particular, points 33 to 39 of this Opinion.

14 — My emphasis.

15 — The physical medium is initially the server of the establishment which makes the electronic book available and then the computer or other digital equipment of the user. The connection with the physical medium is therefore broken during the transmission.

16 — COM(90) 586 final (OJ 1991 C 53, p. 35). This analysis is also corroborated by the German-language version of Directive 2006/115, which employs the term 'Vervielfältigungsstück', which evokes the act of reproduction ('Vervielfältigung' — see Article 2 of the German version of Directive 2001/29). See also, to that effect, Gautrat, P., 'Prêt public et droit de location: l'art et la manière' in *RTD Com.*, 2008, p. 752 (paragraph 16).

17 — See, for example, the German-, Polish- and English-language versions of the directive.

18 — Namely, originals and copies of works, fixations of performances, phonograms and films.

46. Thirdly, as regards the argument raised by the French Government that the principle that exceptions must be interpreted strictly militates against broadening the scope of the concept of 'lending' to include the lending of electronic books, it should be observed that the issue here is the interpretation not of an exception but of the rule, that is to say the scope of the lending right provided for in Article 1(1) of Directive 2006/115.

47. Furthermore, as regards the derogation provided for in Article 6(1) of Directive 2006/115, it must be borne in mind that, while exceptions to copyright must be interpreted strictly, their interpretation must nevertheless enable the effectiveness of the exception to be safeguarded and permit observance of the exception's purpose. [19] Too restrictive an interpretation of the concept of lending would undermine the effectiveness and purpose of the derogation in so far as the lending of electronic books is concerned.

48. For those reasons, I think that an interpretation of the concept of lending which includes the lending of electronic books is contrary to neither the objective nor the wording of Directive 2006/115.

– Coherence within the copyright system under EU law

49. In the present case, it has been argued by NUV and the German and French Governments that broadening the scope of application of the concept of 'lending' for the purposes of Directive 2006/115 to include the lending of electronic books would be inconsistent with other European Union legal texts in the field of copyright, and principally with Directive 2001/29. They allege, first of all, a terminological incompatibility, inasmuch as certain terms, such as 'copy' and 'object' are used in ways that are incompatible with the concept of digital lending. Secondly, such a broad interpretation of the concept of lending would conflict with the right of communication to the public and the right to make works available to the public, enshrined in Article 3 of Directive 2001/29. According to that argument, the lending of electronic books falls within the scope of the right to make works available to the public, from which there is no derogation of the kind provided for in Article 6(1) of Directive 2006/115. Consequently, the inclusion of digital lending in Directive 2006/115 and the application of the derogation would be an infringement of Article 3 of Directive 2001/29.

50. In so far as the first of those arguments is concerned, I must observe that, if the principle of perfect terminological consistency within European Union copyright law had to be applied unconditionally, it would then be necessary to adopt the definitions of certain concepts, such as 'copy', 'sale' and 'distribution', given by the Court of Justice in its judgment in *Usedsoft*. [20] Indeed, that judgment, delivered by the Grand Chamber and concerning the interpretation of Directive 2009/24/EC of the European Parliament and of the Council of 23 April 2009 on the legal protection of computer programs, [21] is the only judgment to date in which the Court has interpreted certain concepts of copyright law in the context of the digital environment.

51. Thus, on the basis of provisions which use substantially the same terminology as Directive 2001/29, [22] the Court held that what was downloaded via the internet was a *copy* of a work, in that case a computer program, [23] and that such downloading, accompanied by a user licence of indefinite duration, constituted a *sale* of the copy in question entailing the exhaustion of the right to distribute that copy. [24]

---

19 — See, in particular, judgments of 4 October 2011 in *Football Association Premier League and Others*, C-403/08 and C-429/08, EU:C:2011:631, paragraph 163, and 3 September 2014 in *Deckmyn and Vrijheidsfonds*, C-201/13, EU:C:2014:2132, paragraph 23.

20 — Judgment of 3 July 2012, C-128/11, EU:C:2012:407.

21 — OJ 2009 L 111, p. 16.

22 — The principal terms in question being 'copy', 'reproduction' and 'sale'.

23 — Judgment of 3 July 2012 in *Usedsoft*, C-128/11, EU:C:2012:407, in particular paragraphs 35, 37 and 47.

24 — Judgment of 3 July 2012 in *Usedsoft*, C-128/11, EU:C:2012:407, paragraphs 47 and 48.

52. In accordance with the principle of terminological consistency, rigorously applied, the term 'copy' used in both Directive 2001/29 and Directive 2006/115 ought to be understood as including digital copies with no physical medium. That same principle would also afford a simple solution to the problem, widely debated by legal theoreticians and present also in this case, of the exhaustion of the distribution right following a sale by electronic data transmission. Indeed, Article 4(2) of Directive 2001/29 is formulated, in substance, in identical terms to Article 4(2) of Directive 2009/24 and consequently it ought, in principle, to be interpreted in identical fashion.

53. If, on the other hand, it was considered that the same terms may, in the context of Directive 2001/29, be interpreted differently from the way in which the Court interpreted them in its judgment in *Usedsoft* in the context of Directive 2009/24, then I see no reason why that same 'terminological autonomy' should not apply in the relationship between Directive 2001/29 and Directive 2006/115.[25]

54. I must also add that, in my view, the judgment in *Art & Allposters International*[26] neither calls into question nor limits in any way the conclusions which follow from the *Usedsoft* judgment. The former judgment concerned the transfer of a work by means of a chemical, rather than a digital process directly from one physical medium (paper) to another physical medium (canvas). It was in that context that the Court held in that judgment that, in establishing the distribution right, the EU legislature wished to give authors control over the initial marketing in the European Union of *each* tangible object incorporating their work,[27] whereas the replacement of the medium resulted in the creation of a new (tangible) object[28] and there could therefore be no question of exhaustion of the distribution right.[29] However, that case in no way touched upon the question of whether the distribution right could be exhausted after the transfer of ownership of a digital copy of a work.

55. In so far as concerns the second argument mentioned in point 49 above, which concerns the right of communication to the public and the right to make works available to the public, suffice it to observe that Directive 92/100 predates Directive 2001/29 and that the latter directive, in accordance with recital 20 and Article 1(2)(b) thereof, leaves intact and in no way affects provisions of EU law already in force relating, inter alia, to the lending right provided for in Directive 92/100 (codified by Directive 2006/115). Directive 92/100 therefore constitutes a *lex specialis* vis-à-vis Directive 2001/29. Moreover, the same argument was raised in the case which gave rise to the judgment in *Usedsoft* and the Court responded to it in similar fashion.[30] The classification of the lending of electronic books as 'lending' for the purposes of Directive 2006/115 would therefore not be in contradiction with Article 3 of Directive 2001/29.

56. It has also been argued that the lending of electronic books implies, in addition to the act of lending in the strict sense, acts of reproduction on the part of both the library and the user, which could infringe the exclusive right of authors to authorise or prohibit such reproduction, enshrined in Article 2 of Directive 2001/29.

25 — This assertion does not appear to me to be invalidated by the very recent judgment of 31 May 2016 in *Reha Training* (C-117/15, EU:C:2016:379). In that case, the Court was asked to rule on an alleged difference in interpretation, in the case-law, of the concept of 'communication to the public' within the context of Directive 2001/29 and that of Directive 2006/115. Repeating the wording of a previous judgment, the Court held that the concepts used by the two directives at issue must have the same meaning, unless the EU legislature has, in a specific legislative context, expressed a different intention (paragraph 28). However, the fact that the concept of 'communication to the public' must be interpreted in the same way in the context of those two directives seems to me to be in no way disputed. Moreover, the summary of the previous case-law, contained in paragraphs 35 to 52 of the judgment in *Reha Training*, shows no inconsistency in the interpretation of that concept. However, concerning the concept of 'copy', the legislature stated clearly, in recital 29 of Directive 2001/29, the specific context in which that notion is used in that directive, namely that of the distribution right, the exhaustion of which cannot occur because of online distribution. However, such a limitation of the concept of 'copy' — which includes, in my view, digital copies (see point 44 of this Opinion) — is unnecessary with regard to the lending right governed by Directive 2006/115 because, in any event, that right cannot be exhausted, irrespective of how the concept of 'copy' is defined.

26 — Judgment of 22 January 2015, C-419/13, EU:C:2015:27.

27 — Judgment of 22 January 2015 in *Art & Allposters International*, C-419/13, EU:C:2015:27, paragraph 37.

28 — Ibid., paragraph 43.

29 — Ibid., paragraph 49 and operative part.

30 — Judgment of 3 July 2012 in *Usedsoft*, C-128/11, EU:C:2012:407, paragraph 51.

57. However, in so far as concerns reproductions made by libraries, they are, in my opinion, covered by the exception to the reproduction right provided for in Article 5(2)(c) of Directive 2001/29, read in the light of the Court's judgment in '*Technische Universität Darmstadt*'.[31] That provision provides for an exception to the reproduction right for 'specific acts of reproduction made by publicly accessible libraries … which are not for … economic … advantage'. In the abovementioned judgment, the Court held that that exception could apply so as to enable libraries to complete acts of communication to the public under another exception, provided for in Article 5(3)(n) of Directive 2001/29.[32] By analogy, the exception under Article 5(2)(c) of the same directive ought to come into play to enable libraries to benefit from the derogation from the lending right provided for in Article 6(1) of Directive 2006/115.

58. In so far as concerns the reproduction made by a user on his computer or any other electronic reading device when downloading a book borrowed from a library, that is, in my opinion, covered by the mandatory exception provided for in Article 5(1) of Directive 2001/29. Indeed, such a reproduction is temporary, since the copy made on the user's equipment will be deleted or deactivated automatically at the end of the loan period. It is also incidental and an integral part of a technological process, that is to say, downloading. Lastly, the only purpose of such a reproduction is to enable a lawful use to be made of the work, namely use in the context of a digital loan. Neither does it have any independent economic significance. Such a reproduction therefore fulfils the conditions listed in Article 5(1) of Directive 2001/29, as interpreted in the case-law of the Court.[33]

59. Lastly, the argument has been raised in this case, by the French Government in particular, that the differential treatment, for value added tax purposes, of books in a physical medium and books distributed by electronic data transmission, which the Court accepted in its judgments in *Commission* v *France*[34] and *Commission* v *Luxembourg*,[35] demonstrates that those two book formats are not equivalent. I must nevertheless observe, first of all, that the question in the present case is not whether printed books and electronic books are comparable, but whether the lending of electronic books is equivalent to the lending of traditional books. As I observed in point 31 of this Opinion, the two types of lending are, in my view, equivalent in so far as concerns their essential and objectively relevant characteristics.

60. Secondly, it must be observed that the approach adopted by the Court in those two judgments was based on the wording of provisions of EU law relating to value added tax (VAT) which, in treating supplies provided digitally as services, did not permit the application of a reduced rate of VAT to books having no physical medium. However, lending, whether it is of an electronic book or a printed book, is always a service, and consequently the distinction drawn in the case-law mentioned does not apply.

31 — Judgment of 11 September 2014 in *Eugen Ulmer*, C-117/13, EU:C:2014:2196.

32 — Judgment of 11 September 2014 in *Eugen Ulmer*, C-117/13, EU:C:2014:2196, paragraphs 43 to 46.

33 — See judgments of 4 October 2011 in *Football Association Premier League and Others*, C-403/08 and C-429/08, EU:C:2011:631, paragraphs 161 to 180, and 5 June 2014 in *Public Relations Consultants Association*, C-360/13, EU:C:2014:1195, paragraphs 22 to 52, in particular paragraphs 29 to 33.

34 — Judgment of 5 March 2015, C-479/13, EU:C:2015:141.

35 — Judgment of 5 March 2015, C-502/13, EU:C:2015:143.

61. Moreover, the distinction thus drawn between printed books and digital books raises serious questions concerning its consistency with the principle of tax neutrality, which is the expression in the fiscal sphere of the principle of equality.[36] I would observe that the Commission has recently published an action plan on VAT in which it specifically contemplates the alignment of the VAT rate applicable to digital books and newspapers with that applicable to printed books.[37] That approach confirms the stance taken by the Commission, also in the present case, that electronic books and printed books are in substance equivalent.

62. I conclude from the foregoing considerations that an interpretation of the concept of 'lending' for the purposes of Article 1(1) of Directive 2006/115 which includes the lending of electronic books and thus permits the application of the derogation from the lending right provided for in Article 6(1) of that directive is in no way incompatible or inconsistent with the body of provisions of EU law in the field of copyright.

– Consistency with international obligations

63. The European Union is a contracting party to several international conventions in the field of copyright, in particular the World Intellectual Property Organisation Copyright Treaty (WCT), adopted in Geneva on 20 December 1996.[38] Acts of secondary law must therefore be consistent with — and must also be interpreted consistently with — that treaty.[39] It is therefore necessary to ascertain whether an interpretation of the concept of 'lending' for the purposes of Article 1(1) of Directive 2006/115 that includes the lending of electronic books may be reconciled with the Copyright Treaty.

64. That treaty contains no provisions relating to the lending right. At best, Article 7 thereof deals with the right of commercial rental, that is to say, the rental for remuneration of computer programs, cinematographic works and works embodied in phonograms.[40] Neither public lending nor electronic books are covered by that provision.

65. If lending, or in any event the lending of electronic books, is covered by the Copyright Treaty, it is because it constitutes a specific form of use of the right of communication to the public, enshrined in Article 8 of the treaty.[41] In principle, that right is transposed into EU law by Article 3 of Directive 2001/29. However, Directive 2006/115 constitutes a *lex specialis* vis-à-vis Directive 2001/29, including Article 3 thereof.[42]

66. Article 10(1) of the Copyright Treaty provides that the contracting parties may lay down limitations on and exceptions to the rights enshrined in the treaty, provided that they are restricted to 'special cases that do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the author'. Those conditions are commonly referred to as 'the three-stage test'. In my view, the public lending derogation provided for in Article 6(1) of Directive 2006/115 fulfils, in so far as the lending of electronic books is concerned, those three conditions.

---

36 — See the request for a preliminary ruling lodged by the Polish Constitutional Court in *Rzecznik Praw Obywatelskich* (C‑390/15), currently pending before the Court.

37 — Communication from the Commission to the European Parliament, the Council and the European Economic and Social Committee of 7 April 2016 — Towards a single EU VAT area — Time to decide (COM(2016) 148 final), p. 12.

38 — Treaty approved on behalf of the European Community by Council Decision 2000/278/EC of 16 March 2000 (OJ 2000 L 89, p. 6).

39 — See, to that effect, judgment of 22 January 2015 in *Art & Allposters International*, C‑419/13, EU:C:2015:27, paragraph 38 and the case-law cited).

40 — See Article 7(1) of the Copyright Treaty.

41 — Article 8 provides that '... authors of literary and artistic works shall enjoy the exclusive right of authorising any communication to the public of their works, by wire or wireless means, including the making available to the public of their works in such a way that members of the public may access these works from a place and at a time individually chosen by them'.

42 — See point 55 of this Opinion.

14                                                                                                           ECLI:EU:C:2016:459

67. First, as regards the condition that the exception must relate to special cases, I would observe that the derogation for public lending is restricted in two ways: it does not extend to all forms of communication to the public, but only one particular form, namely lending, or in other words, the making available of works for a limited period of time, and the only beneficiaries of the derogation are establishments (libraries) open to the public which derive no profit from their lending activities. Moreover, the public lending derogation pursues a legitimate aim in the public interest which is, in the broadest terms, universal access to culture.

68. Secondly, as regards the condition that there must be no conflict with a normal exploitation of the work, it has been asserted, in particular by NUV in its observations, [43] that the lending of electronic books by electronic data transmission (downloading), by contrast with the traditional lending of printed books, is so similar to the usual forms of distribution of such books that it does conflict with the normal exploitation of copyright in that it too easily substitutes for the purchase of books on the market. That, it submits, is mainly because, with digital lending, there is no need for the user physically to go to a library and so it is comparable to purchasing over the internet, and because electronic books which are borrowed from libraries do not deteriorate with use and are thus identical in one respect to purchased books, that it to say, they are always 'new'. Furthermore, the ease with which electronic books can be reproduced without any loss of quality increases the risk of usage that goes beyond what is permitted in the context of lending.

69. However, those arguments fail to take into account the other characteristics of the lending of electronic books which distinguish such lending from purchasing. First of all, digital lending is limited in time and thus merely enables a user to acquaint himself with the content of a book, without keeping a copy of it. Next, the opportunities for such lending are limited by the number of copies (digital copies) at a library's disposal and so users are not certain of being able to borrow a given electronic book when they want to. Lastly, several studies show that the lending of books, either traditional or electronic, does not reduce the volume of book sales but may instead increase it by encouraging reading habits. [44]

70. The mere fact that certain electronic book sellers have developed business models similar to digital renting cannot by itself constitute an obstacle to the application of the public lending derogation to electronic books. Indeed, that derogation pursues a legitimate objective in the public interest that cannot be restricted to areas that are not touched by economic activity. Otherwise any lending activity could be displaced by commercial renting, of either tangible or intangible goods, and thus render the derogation entirely redundant.

71. On the other hand, the fact that publishers and intermediaries offer libraries licences for digital lending and are developing their own renting models, in the sense of the making available of works for a limited period of time, demonstrates that digital lending as such does not work against the exploitation of copyright, contrary to what is sometimes asserted.

72. In so far as concerns the risks associated with the lending of electronic books, I would observe that technological protection measures, which today are used universally, such as automatic deactivation of the copy after the expiry of the loan period, print prevention and the blocking of further copying, make it possible to limit those risks substantially.

---

43 — See also Matulionyte, R., op. cit.

44 — Dusollier, S., op. cit., EBLIDA, op. cit., p. 13 and the documents cited, and Matulionyte, R., op. cit. and the documents cited.

73. In any event, it is ultimately up to the Member States, if they wish to introduce the public lending derogation for electronic books, to structure the rules of that derogation in such a way that that form of lending really is the functional equivalent of traditional lending and that it does not conflict with the normal exploitation of copyright. Solutions such as the 'one copy one user' model, at issue in the main proceedings, or the compulsory use of technological protection measures, should make that achievable.

74. Thirdly and lastly, in accordance with the last condition, the derogation must not unreasonably prejudice the legitimate interests of authors. Those interests, in so far as concerns the exploitation of copyrights, are principally economic in nature. In an environment governed solely by the laws of the market, the ability of authors to protect their own interests depends above all on their negotiating power vis-à-vis publishers. Some are certainly capable of obtaining satisfactory terms, others are not, as is demonstrated by the position which Lira and Pictoright have expressed in the present case. Article 6(1) of Directive 2006/115 provides that, where the public lending derogation is introduced, authors should obtain remuneration. Since that remuneration is unconnected with negotiations between author and publisher, not only does it enable the legitimate interests of authors to be safeguarded, but it could also be more advantageous for them.

75. Article 8 of the Copyright Treaty, read together with Article 10 thereof, does not therefore, in my opinion, preclude the concept of lending for the purposes of Article 1(1) of Directive 2006/115 from being interpreted in such a way as to include the lending of electronic books.

76. It could be objected that the terms 'original' and 'copies' used in Directive 2006/115 must be understood in the same way as the terms 'original' and 'copies' used in Articles 6 and 7 of the Copyright Treaty. According to the agreed statement concerning those two articles annexed to the treaty, those terms 'refer exclusively to fixed copies that can be put into circulation *as tangible objects*'.[45] That would therefore exclude the lending of electronic books from the concept of the 'lending of originals and copies' in Directive 2006/115.

77. However, those provisions of the Copyright Treaty concern the right of distribution (Article 6) and the right of commercial rental of subject matter other than books (Article 7). Therefore, I do not think that that agreed statement, applied by analogy to Directive 2006/115, can prevent those terms from being interpreted in a different fashion in connection with a form of exploitation covered by Article 8 of the treaty.

78. Moreover, while the Court held, in its judgment in *Usedsoft*,[46] in connection with the right of distribution of computer programs, which clearly falls within the scope of the agreed statement in question, that the right of distribution and the principle of its exhaustion applied equally to sales by *electronic data transmission* (downloading), then, *a fortiori*, the same could apply in the case of lending, which does not fall within the scope of the distribution right or the lending right.

Conclusion on the first question referred for a preliminary ruling

79. The considerations set out above may be summarised as follows. The lending of electronic books by public libraries is not a project for the future, and still less is it merely 'wishful thinking'. Quite the contrary, it is a phenomenon that actually exists. However, as a result of the restrictive interpretation of the concept of the 'lending right' which is prevalent in the Member States, that phenomenon is entirely subject to the laws of the market, by contrast with the lending of traditional books, which benefits from rules which are favourable to libraries. An adjusted interpretation of the existing legislative framework is therefore necessary, in my opinion, in order to enable libraries to benefit from those same favourable conditions in the contemporary digital environment. Such an interpretation

---

45 — My emphasis.
46 — Judgment of 3 July 2012, C-128/11, EU:C:2012:407.

would not only be in the public interest of access to science and culture, it would also be in the interests of authors. At the same time, it would in no way be contrary to the wording or general structure of the legal texts in force. On the contrary, only an interpretation of that kind will enable those legal texts fully to fulfil the function assigned them by the legislature, which is to adapt the law of copyright to the realities of the information society.

80. I therefore propose that the answer to the first question referred for a preliminary ruling should be that Article 1(1) of Directive 2006/115, read together with Article 2(1)(b) of that directive, is to be interpreted as meaning that the lending right enshrined in Article 1 includes the making available to the public of electronic books by libraries for a limited period of time. Member States that wish to introduce the derogation provided for in Article 6 of the same directive for the lending of electronic books must ensure that the way in which that lending is carried out is not in conflict with the normal exploitation of works and does not unreasonably prejudice the legitimate interests of authors.

*The second to fourth questions*

81. The second to fourth questions referred for a preliminary ruling, which should in my view be analysed together, concern possible requirements as to the source of copies lent by libraries which the national legislature would be entitled to establish when introducing the derogation from the lending right provided for in Article 6(1) of Directive 2006/115 for the lending of electronic books. The referring court wishes to ascertain, in substance, whether that provision is to be interpreted as meaning that the national legislature is authorised to require that copies of electronic books lent by libraries have been put into circulation by a first sale or other transfer of ownership in the European Union by the rightholder or with his consent, within the meaning of Article 4(2) of Directive 2001/29. If that question is answered in the affirmative, the referring court asks whether the making available to the public of an electronic book constitutes such a first sale or other transfer of ownership. If, on the other hand, that question is answered in the negative, the referring court asks the Court of Justice about the possibility of introducing other requirements, such as a requirement that the copy being lent has been obtained from a legal source.

82. According to what the referring court has itself stated in its order for reference, those questions are based on the wording of the current provisions of Netherlands law, which imply such a requirement in the context of the derogation for public lending in so far as printed books are concerned. Thus, by referring to Article 4(2) of Directive 2001/29, the referring court has introduced into the present case the question of the exhaustion of the distribution right. However, I think that the mechanism of exhaustion bears no relation to the lending right, which is what is at issue in this case.

83. Indeed, the lending right, as conceived of in Directive 2006/115, is entirely independent of the exhaustion of the distribution right. First of all, in accordance with Article 1(2) of that directive, the rental and lending rights are not exhausted with the exhaustion of the distribution right. In other words, it is not sufficient merely to purchase a copy of a work in order to be able to lend or rent it freely. It is also necessary to acquire, separately, the right to lend or rent that copy, either by obtaining the consent of the rightholder, under a contract, or pursuant to the derogation for public lending provided for in Article 6 of Directive 2006/115, if that provision has been transposed into national law.

84. Secondly, the acquisition of the right to lend or rent a work is in no way dependent, under Directive 2006/115, on the exhaustion of the distribution right. The right to lend or rent may relate, for example, to works that were never intended for public disclosure, such as manuscripts, doctoral theses and so on.

85. If a lending right or rental right is acquired with the consent of the author, it may be assumed that the author's interests are sufficiently protected. If, on the other hand, the lending right arises under the derogation, its application to works that were never intended to be published could prejudice the legitimate interests of authors, and not just their financial interests. It therefore seems to me to that there is justification for Member States requiring, in the context of the derogation provided for in Article 6(1) of Directive 2006/115, that electronic books that are lent should first have been made available to the public by the rightholder or with his consent. Of course, such a limitation must not be formulated in such a way as to restrict the scope of the derogation, including in so far as concerns the format in which works may be lent.

86. Lastly, as regards the question whether the copy of the work must be from a lawful source, the Court has already held, with regard to the private copying exception provided for in Article 5(2)(b) of Directive 2001/29, that that exception does not require copyright holders to tolerate infringements of their rights which may accompany the making of private copies. Accordingly, that provision must be interpreted as not covering the case of private copies made from an unlawful source.[47]

87. The same interpretation must, in my opinion, prevail, by analogy, to the case of the derogation from the lending right provided for in Article 6(1) of Directive 2006/115 in so far as electronic books are concerned. That is *a fortiori* so since that derogation benefits establishments the great majority of which are public and which may legitimately be expected to pay close attention to observance of the law. That last point, it seems to me, needs no further explanation.

88. I therefore propose that the answer to the second to fourth questions referred for a preliminary ruling should be that Article 6(1) of Directive 2006/115 must be interpreted as not precluding Member States which have introduced the derogation provided for in that provision from requiring that electronic books which are lent under that derogation should first have been made available to the public by the rightholder or with his consent, provided that that limitation is not formulated in such a way as to restrict the scope of the derogation. That provision must also be interpreted as applying solely to electronic books obtained from lawful sources.

### Conclusion

89. In light of all of the foregoing, I propose that the Court's answer to the questions referred by the Rechtbank Den Haag (District Court, The Hague) should be as follows:

(1) Article 1(1) of Directive 2006/115/EC of the European Parliament and of the Council of 12 December 2006 on rental right and lending right and on certain rights related to copyright in the field of intellectual property, read together with Article 2(1)(b) of that directive, is to be interpreted as meaning that the lending right enshrined in Article 1 includes the making available to the public of electronic books by libraries for a limited period of time. Member States that wish to introduce the derogation provided for in Article 6 of the same directive for the lending of electronic books must ensure that the way in which that lending is carried out is not in conflict with the normal exploitation of works and does not unreasonably prejudice the legitimate interests of authors.

(2) Article 6(1) of Directive 2006/115 must be interpreted as not precluding Member States which have introduced the derogation provided for in that provision from requiring that electronic books which are lent under that derogation should first have been made available to the public by the rightholder or with his consent, provided that that limitation is not formulated in such a way as to restrict the scope of the derogation. That provision must be interpreted as applying solely to electronic books obtained from lawful sources.

---

47 — Judgment of 10 April 2014 in *ACI Adam and Others* (C-435/12, EU:C:2014:254, paragraphs 31 and 41).

OPINION OF MR SZPUNAR — CASE C-174/15
VERENIGING OPENBARE BIBLIOTHEKEN

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>                Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>                Defendants. | Case No. 1:20-CV-04160-JGK |

**DECLARATION OF BREWSTER KAHLE IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

DocuSign Envelope ID: 06F79788-FD37-4DB6-A0B4-AD5A53B53508

I, Brewster Kahle, declare as follows:

1.      I make this declaration from personal knowledge, and if called to testify, I could and would testify competently thereto.

2.      I founded the Internet Archive in 1996.  I currently serve as its Digital Librarian and Chair of the organization's Board of Directors.

3.      While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for nearly the entirety of its history.

4.      Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web.  At that time, the Internet Archive focused on hosting public domain books.  Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain.

5.      The Internet Archive began scanning print books in 2004, when it helped form the Open Content Alliance.  This consortium of libraries, universities, and companies—including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft—worked together to preserve and provide online access to digitized books.

6.      A few years later, the Internet Archive launched Open Library, which aimed to become the world's largest catalog of books and to provide free access to public domain books the Internet Archive had scanned.

DocuSign Envelope ID: 06EF6788-ED37-4DB6-A0B4-AD5A53B53508

7.      The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries (from the Boston Public Library to the San Francisco Public Library) with which it partnered—to begin lending books online to patrons, for free, for short periods of time.

8.      Today, the Internet Archive makes more than 3.6 million books available for digital lending, and millions more public-domain books available for permanent download.

9.      The term "Controlled Digital Lending" was first used in or about 2017, but the Internet Archive has been practicing the concept of what we now call Controlled Digital Lending since at least 2011.

10.     A nonprofit that works closely with the Internet Archive, Open Library of Richmond, holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  For simplicity, regarding ownership of print books, in this declaration I use the term "Internet Archive" to refer collectively to the Internet Archive and Open Library of Richmond.

11.     The Internet Archive has implemented limitations on access to books in its digital lending system:  for example, the Internet Archive's physical books do not circulate while the digital version is loaned, the Internet Archive applies controls to what patrons can do with copies while those copies are loaned to them (for instance, patrons cannot copy passages from the borrowed book), and the Internet Archive limits access to books based on feedback from rightsholders about specific materials.

12.     The Internet Archive lends books—again, for free—to patrons for a limited time at its own expense.  Those expenses include purchasing and maintaining equipment, hiring and

paying personnel, and acquisition and storage costs for the physical books that are being digitally loaned. The Internet Archive has spent millions of dollars developing and operating its implementation of Controlled Digital Lending.

13. The Internet Archive strives to keep physical books it owns—as well as the digitized versions—forever. The Internet Archive does not make a digitized book unavailable for lending after a certain amount of time or after a certain number of check-outs.

14. The Internet Archive's book digitizing activities pursuant to agreements with libraries are not a commercial business. The vast majority of scanning relationships the Internet Archive has with libraries involve the scanning of public domain books. These books are not made available for borrowing through the lending library: Internet Archive patrons are able to download public domain materials with no restrictions. Therefore, apart from a few exceptions, books subject to scanning agreements the Internet Archive enters into with libraries are not the books the Internet Archive lends to patrons.

15. Even though ebooks don't degrade in the same way that physical books do, a huge amount of money and effort are required to maintain the integrity of a digital file that constitutes an ebook. These digital files are stored on servers, and the servers that host data at the Internet Archive require constant maintenance and repair. The physical servers themselves range from nearly nine years old to brand new, and components of those servers are replaced regularly when they fail or when they are damaged by electrical or environmental conditions. Currently, a new server with a full set of hard drives costs tens of thousands of dollars. The hard drives in a server fail regularly—on average, two to three drives fail per day out of our fleet of nearly 30,000. This ongoing maintenance requires an operations team consisting of five full-

time employees.  To the extent Plaintiffs suggest that digitized books can be set aside for years without technical maintenance and still be accessed, they are incorrect.

16.     The Internet Archive or Open Library of Richmond lawfully acquire print books by purchasing or receiving a donation.  The Internet Archive digitizes physical books to which we—or Open Library of Richmond—have legal title.

17.     Before digitizing a book it lawfully acquires, the Internet Archive's policy is to ascertain whether the book is one the Internet Archive affirmatively wants to digitize.

18.     The Internet Archive's policy is not to scan books when the ISBN affixed to the book is not valid or when the ISBN yields metadata that does not match the book.

19.     The Internet Archive does not receive a payment from Better World Books every time a user clicks on a link on the Internet Archive's website.  The Internet Archive only receives a small amount from Better World Books each time a user clicks on a link to Better World Books's website *and* the user buys a book from Better World Books using that link.  From the inception of the program (on or about October 18, 2016) through February 10, 2021, the Internet Archive received only $5,561.41 in such revenue.

20.     The Internet Archive, like many non-profits, allows visitors to its website to donate to it.  Donate buttons appear on nearly every page of the Internet Archive's website.  Open Library also encourages its patrons to buy copies of the books it lends from third-party bookstores.  It has links on its book pages that patrons can click on if they are interested in buying the book.  These are "affiliate links."  Books pages on OpenLibrary.org, for instance, often have affiliate links for Better World Books, Amazon, and bookshop.org.  If a patron clicks on one of these links and then uses that link to buy a title from the bookseller, the Internet Archive receives a small amount.

21.     The Internet Archive works with partner libraries through the Open Libraries program to help those libraries provide access to the non-circulating copies of books they own. Only those with an Internet Archive patron account can borrow books through the Internet Archive's digital lending system. And so, if three other libraries have non-circulating copies of a book that they have contributed via the overlap analysis, and Internet Archive owns one copy, a total of four Internet Archive patrons can borrow that book at a time. Those Internet Archive patrons may also be patrons of other libraries (including the libraries who contributed non-circulating copies), or they may not; what matters for the Internet Archive's lending is that they are patrons of the Internet Archive.

22.     Three of the four Partner Libraries who withdrew their books from the Open Libraries program after this lawsuit was filed withdrew as their physical facilities were reopening.

23.     The Internet Archive's agreements with Partner Libraries require overlap analyses to be run at least quarterly. The Internet Archive currently runs overlap analyses monthly.

24.     The Internet Archive does not view itself as a competitor to OverDrive, Amazon, or other similar websites or services. Nor do we offer similar services to these entities' services. We do not license ebooks—to other parties such as patrons or from aggregators or publishers.

25.     Anyone who signs up to be a patron may borrow books from the Internet Archive regardless of other libraries they are patrons of. Any library can link to the Internet Archive.

26.     The Internet Archive is not aware of any instance in which the "owned to loaned" ratio was exceeded as the result of physical access to a physical book owned by a partner library.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on ___9/2/2022___, in San Francisco, California.

_____

BREWSTER KAHLE

6

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2022 the within document was filed with the Clerk

of the Court using CM/ECF which will send notification of such filing to the attorneys of record

in this case.

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ