# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

### JOINT APPENDIX (PUBLIC) – VOLUME 25 OF 26 (A-6005-A-6273)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM     ELIZABETH A. MCNAMARA
DANAE TINELLI     LINDA J. STEINMAN
SCOTT A. ZEBRAK     JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP     JESSE M. FEITEL
4530 Wisconsin Avenue, NW,     CARL MAZUREK
5th Floor     DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016     1251 Avenue of the Americas, 21st Floor
    New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
|  |  | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
|  |  | **Vol. 3** | |
|  |  | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
|  |  | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
|  |  | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
|  |  | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
|  |  | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
|  |  | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
|  |  | Exhibit 1 – Wiley Takedown Notice | A-602 |
|  |  | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
|  |  | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
|  |  | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
|  |  | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
|  |  | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
|  |  | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
|  |  | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
|  |  | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

4

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| **Vol. 5** | | | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| **Vol. 6** | | | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | Vol. 7 | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

11

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
|  |  | Exhibit 112 – Email From Chris Freeland | A-2721 |
|  |  | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
|  |  | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
|  |  | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
|  |  | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
|  |  | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
|  |  | Exhibit 118 – Public Library Screen Captures | A-2769 |
|  | **Vol. 12** |  |  |
|  |  | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
|  | **Vol. 13** |  |  |
|  |  | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
|  |  | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
|  |  | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
|  |  | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
|  |  | Exhibit 124 – Email From Kyle Courtney | A-3276 |
|  |  | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

16

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
|  |  | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
|  |  | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
|  |  | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
|  |  | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
|  |  | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
|  |  | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
|  |  | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
|  |  | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
|  |  | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
|  |  | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
|  |  | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
|  |  | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
|  |  | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
|  |  | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., and
PENGUIN RANDOM HOUSE LLC

Plaintiffs,

v.

INTERNET ARCHIVE and DOES 1 through
5, inclusive

Defendants.

Case No. 1:20-CV-04160-JGK

*REDACTED* **DEFENDANT INTERNET ARCHIVE'S RESPONSE TO PLAINTIFFS'
RULE 56.1 STATEMENT AND ADDITIONAL STATEMENT OF MATERIAL FACTS
IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

# **TABLE OF CONTENTS**

**Page**

EVIDENTIARY OBJECTION TO THE MCNAMARA DECLARATION.................................1

RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT ........................................................3

ADDITIONAL STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT
    INTERNET ARCHIVE'S OPPOSITION TO PLAINTIFFS' MOTION FOR
    SUMMARY JUDGMENT ........................................................................................162

i

Defendant Internet Archive respectfully submits this evidentiary objection to the Declaration of Elizabeth A. McNamara (ECF No. 96); Response to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC's (collectively, "Plaintiffs") Rule 56.1 Statement in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 107); and additional statement of material facts in support of the Internet Archive's opposition to Plaintiffs' motion for summary judgment.

## EVIDENTIARY OBJECTION TO THE MCNAMARA DECLARATION

The Court should disregard portions of the declaration of Plaintiffs' counsel Elizabeth A. McNamara ("McNamara Declaration") (ECF No. 96), filed in support of Plaintiffs' motion for summary judgment against the Internet Archive. The declaration includes improper argument and facts not based on the personal knowledge of Ms. McNamara.

Under Rule 56, a declaration in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). This Court must disregard—and may even strike—portions of a declaration that does not meet these requirements. *See FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 654 (W.D.N.Y. 2017) (citing *United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995)).

The McNamara Declaration contains impermissible statements of argument and fact. *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012) (attorney affirmation with "arguments and factual assertions" was "patently improper in that he could not possibly have personal knowledge of the matters discussed"). Attorney declarations are generally used, "in connection with a summary judgment motion, to place documents produced in discovery before the Court." *Vantage Point*, 266 F. Supp. 3d at 654 (citation omitted). The McNamara

1

Declaration, however, "goes beyond the introduction of documents and veers into legal arguments and factual allegations for which [counsel] has no personal knowledge." *Id.* This Court should disregard the offending portions. *Id.*

Throughout the McNamara Declaration, counsel includes argumentative statements. In Paragraph 14, for example, counsel begins by stating, "Internet Archive's conduct will deprive the Publishers (and their authors) of revenue." After reciting uncited facts and referring to language of one of the Internet Archive's experts, counsel ends with: "This testimony confirms that the logical outcome of [Controlled Digital Lending] is less revenues for the publisher and author of the particular titles IA distributes for free on its website." Beginning and ending a paragraph with conclusions may be a powerful rhetorical device, but, under Rule 56, should be limited to the Plaintiffs' legal brief—not a factual declaration.

The McNamara Declaration's detours into argument get only more frequent. Rather than stating the facts (or purported facts), counsel stretches them, saying that the Internet Archive "admits" it does or doesn't do X and "acknowledges" that it does or doesn't do Y. Counsel delves into partisan analysis, starting paragraphs with "The evidence shows . . . ." and "Nor does the data support . . . ." Indeed, in Paragraph 118, for example, the declaration departs from statements of fact within the declarant's personal knowledge to take the role of advocate ("Any claim that Internet Archive is supposed to be different from aggregators like OverDrive is undermined further by the striking similarity between the two platforms.") and factfinder ("The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebook via OverDrive."). By the end of the McNamara Declaration, even a subheading includes argument: "Internet Archive's Various and Shifting Policy Rationales for Its Activities Are Not Supported by the Evidence."

The McNamara Declaration also contains several statements of fact—often cited verbatim as an undisputed fact in Plaintiffs' Rule 56.1 Statement, as further addressed below—that are accompanied by no citation in support and nor any foundation for counsel's personal knowledge. For example, counsel places herself in the role of others, stating, "Internet Archive users view the Website as a substitute for authorized library ebooks" (¶ 121), and, "Moreover, the needs of print disabled readers are already served by HathiTrust" (¶ 122). Statements such as these are speculative and unsupported and must be disregarded, as "[a]n attorney's affidavit or declaration not based on personal knowledge carries no weight." *Vantage Point*, 266 F. Supp. 3d at 654 (citing cases in support).

The Internet Archive objects to those portions of the McNamara Declaration that are not directly supported by a citation to admissible evidence or for which that declaration does not lay a foundation for Ms. McNamara's personal knowledge of the fact and urges this Court to disregard them.

## RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT[1]

The below response is made for purposes of Plaintiffs' Motion for Summary Judgment, and reflects an effort to avoid factual disputes regarding matters that are not material to that motion, even where the fact as stated by Plaintiffs is misleading or incorrect. That the Internet Archive does not dispute a fact herein does not constitute an admission of that fact for any other purpose.

1. The Plaintiffs are four of the leading book publishers in the United States.

---

[1] The Internet Archive has not imported headings from Plaintiffs' Rule 56.1 Statement. This is not meant to constitute a concession concerning the assertions in those headings.

3

**Response:**  Not disputed (but immaterial).

2.  Hachette is a publishing company based in New York.  The history of Hachette in the United States stretches back nearly two centuries, to the 1837 founding of Little, Brown and Company ("Little Brown").  Hachette works with bestselling authors who have been awarded Pulitzer Prizes, National Book Awards, Newbery Medals, Caldecott Medals and Nobel Prizes. Last year, Hachette published more than 1,400 adult titles in print and digital format, 300 books for young readers and 450 audio book titles.  Sevier Decl. ¶5.

**Response:**  Not disputed (but immaterial).

3.  HarperCollins is a publishing company based in New York.  HarperCollins has more than 200 years of history in the book publishing industry, with a current catalog of in-print works that exceeds 50,000.  Writing in virtually every genre, authors published by HarperCollins have won the Nobel Prize, the Pulitzer Prize, the National Book Award, the Newbery and Caldecott Medals, and the Man Booker Prize, among others.  R-A Decl. ¶5.

**Response:**  Not disputed (but immaterial).

4.  PRH is a publishing company based in New York.  Its history stretches back to the mid-nineteenth century founding of several venerable imprints—including Putnam (1838, publisher of Herman Melville and Edgar Allan Poe), Dutton (1852, publisher of H.G. Wells and Gore Vidal) and Frederick Warne & Co. (1865, publisher of the Beatrix Potter books).  The global PRH portfolio contains more than 275 independent imprints, which annually publish approximately 15,000 new titles per year.  Each year PRH sells roughly 800 million books across print books, audiobooks, and ebooks formats.  Weber Decl. ¶2.

**Response:**  Not disputed (but immaterial).

5. Wiley is a publishing company based in Hoboken, New Jersey. The company was founded in 1807 and focuses on publishing scientific and medical works in print and digital formats. Wiley publishes over 2,000 new books each year and currently offers over 120,000 titles in its catalog. (Pavese Decl. ¶¶2,9.)

**Response:** Not disputed (but immaterial).

6. Internet Archive was founded in 1996 by Brewster Kahle, who remains its leader. (McN Decl. ¶28.)

**Response:** Not disputed (but immaterial).

7. This action concerns the unauthorized reproduction and distribution of in-copyright ebooks on Internet Archive's interrelated archive.org and openlibrary.org websites (collectively, the "Website"). (McN Decl. ¶1.)

**Response:** Not disputed.

8. Internet Archive offers several other different online services, including the Wayback Machine. This action does not challenge those other online services, including the Wayback Machine. (McN Decl. ¶30.)

**Response:** Not disputed (but immaterial).

9. Instead, this action concerns the "Books to Borrow" portion of the Website, on which Internet Archive provides its users with digital versions of physical books in their entirety. (McN Decl. ¶1.)

**Response:** Not disputed.

10. Books have long been essential to our society. Fiction and non-fiction alike, they transport us to new worlds, broaden our horizons, provide us with perspective, reflect the evergrowing knowledge of humanity in every field, spark our imaginations and deepen our

understanding of the world. Yet, books are not self-generating. They are the product of training and study, talent and grit, perseverance and creativity, investment and risk, and untold hours of work. Compl. ¶4; Ans. ¶4.

**Response:** Not disputed.

11. Books generally require a significant creative investment by authors. Often, it may take years for an author to write a single book. (Sevier Decl. ¶13; R-A Decl. ¶54; Weber Decl. Pavese Decl. ¶12; Cisneros Decl. ¶5.)

**Response:** Not disputed (but immaterial).

12. Authors may rely on revenue streams from advances and royalties paid by publishers to support them during the writing process and for years after their books are published. (Sevier Decl. ¶17, 22; R-A Decl. ¶55; Weber Decl. ¶29; Cisneros Decl. ¶9.) The author Sandra Cisneros has stated that "Internet Archive hurts all of the authors whose work it steals and it should be stopped so that it does not threaten anybody else's chances of living from their pen." (Cisneros Decl. ¶16.)

**Response:** Not disputed that "Authors may rely on revenue streams from advances and royalties paid by publishers to support them during the writing process and for years after their books are published." Not disputed that Sandra Cisneros is accurately quoted. Disputed that Ms. Cisneros's quote is true. All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrate that the Internet Archive's digital lending library has no effect on revenues for books. Plaintiffs'

6

Statement of Undisputed Material Facts ("PSMF")[2] ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited thereto). To the extent Ms. Cisneros's quote is being offered as truth, her statement is not admissible evidence. She has not laid a foundation for her knowledge concerning any effects the Internet Archive may have on "all of the authors," and her statements concerning these supposed effects as well as her statements concerning hypothetical future events are speculative. *See Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 306 (2d Cir. 2008) ("The non-moving party [on summary judgment] may not rely on conclusory allegations or unsubstantiated speculation.") (cleaned up).

13. The Publishers invest in authors and their books by bearing the upfront costs that are required to get a book published and sold through various book markets. For this reason, the Publishers bear most of the financial risk associated with book publishing. Book publishers have no guarantee that they will recoup their investment in any particular title. (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶55-56; Weber Decl. ¶¶26-28; Pavese Decl. ¶12.)

**Response:** Not disputed (but immaterial).

14. The Publishers collectively spend hundreds of millions of dollars each year in costs in connection with the books they publish. (Sevier Decl. ¶15; Weber Decl. ¶26.)

**Response:** Not disputed (but immaterial).

15. For the Works in suit, the Publishers typically pay each author of a new work a non-refundable advance against future royalties. The amount of the advance varies, and the author

---

[2] Cites to "PSMF" are to the Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts. Cites to "DSMF" are to the Internet Archive's Rule 56.1 Statement of Material Facts.

can use the advance to cover living or other expenses while they work on writing the book. (Sevier Decl. ¶17; R-A Decl. ¶55.)

**Response:** Not disputed (but immaterial).

16. Per their publishing agreements, authors are generally are not required to refund the advance—even if the book never earns enough revenue to "earn out" the advance. (Sevier Decl. ¶17; R-A Decl. ¶55.)

**Response:** Not disputed (but immaterial).

17. The advance payments are recouped, if at all, from sales of the books.(Sevier Decl. ¶30; R-A Decl. ¶55.)

**Response:** Not disputed (but immaterial).

18. The Publishers employ editors, who are literary professionals that select new works for acquisition and work with their authors to provide editorial advice to improve the text, and other support. (Cisneros Decl. ¶8; Sevier Decl. ¶¶7, 16, 19; R-A Decl. ¶¶7, 56;Weber Decl. ¶26.)

**Response:** Not disputed (but immaterial).

19. The Publishers also hire copy editors to correct grammar, spelling and ensure consistency throughout a particular work. Additionally, the Publishers maintain art departments and illustrators to design book covers and legal departments that work with authors on pre-publication review and on defending the Publishers' works. (Sevier Decl. ¶¶20-21; R-A Decl. ¶56; Cisneros Decl. ¶8.)

**Response:** Not disputed (but immaterial).

20. The Publishers employ design professionals to layout print and digital editions of the books they publish. (Sevier Decl. ¶20; R-A Decl. ¶56.)

8

**Response:** Not disputed (but immaterial).

21. For audiobooks, the Publishers employ a separate production process involving the reading and recording of a title. (Sevier Decl. ¶20.)

**Response:** Not disputed (but immaterial).

22. The Publishers devote resources to marketing their books. Marketing can continue for the life cycle of a book and is not limited to its initial publication.(Cisneros Decl. ¶8; R-A Decl. ¶56; Sevier Decl. ¶23; Weber Decl. ¶26)

**Response:** Not disputed (but immaterial).

23. The Publishers each maintain sales departments that promote the sales of the titles in the Publishers' catalogue. (Sevier Decl. ¶¶24-25; R-A Decl. ¶56; Weber Decl. ¶26.)

**Response:** Not disputed (but immaterial).

24. The Publishers respective marketing departments engage in a broad range of promotional activities, which may include social media campaigns, website development, trade and consumer advertising; distribution of review and promotional copies of the book to members of the media and influential readers; in-store displays and other placement promotions; and author tours and readings. (Sevier Decl. ¶¶23, 27; R-A Decl. ¶56.)

**Response:** Not disputed (but immaterial).

25. The Publishers' respective sales departments work on sales of their titles across the different channels or markets that books are published in, including retail outlets, wholesalers, and aggregators that sell to libraries. (Sevier Decl. ¶¶24-35; R-A Decl. ¶56.)

**Response:** Not disputed (but immaterial).

9

26. The Publishers also undertake the costs of distributing books in all the formats they have rights to, which includes printing costs associated with the creation of print books. (Sevier Decl. ¶29; Weber Decl. ¶27.)

**Response:** Not disputed (but immaterial).

27. The commercial success of any book is uncertain. (Weber Decl. ¶28; Sevier Decl. ¶34.)

**Response:** Not disputed.

28. The sales of any one book are driven by numerous factors. Every book is unique and has a unique life cycle. (Sevier Decl. ¶¶34, 80; Weber Decl. ¶28, 88.)

**Response:** Not disputed.

29. These factors include seasonality, school uses, marketing, relevance of topics of current interest, pricing of the work and competing works, supply chain issues and other factors. (Sevier Decl. ¶80.)

**Response:** Not disputed.

30. In 2020, COVID, the Black Lives Matter movement, and the presidential primaries and election had an impact on individual book sales and licenses that different by title. (Sevier Decl. ¶81.)

**Response:** Not disputed.

31. Title revenue figures, and library checkouts, alone do not indicate the cause of an increase or decrease. (Sevier Decl. ¶¶80-81; Weber Decl. ¶88.)

**Response:** Not disputed.

10

32.  The Publishers are incentivized to maximize long term revenue from every book they publish because the sales of successful books pay for upfront investments in new books.  (Pavese Decl. ¶14; Sevier Decl. ¶¶37-38; R-A Decl. ¶¶34-38; Weber Decl. ¶¶29-32.)

**Response:**  Not disputed (but immaterial).

33.  The authors of the Works in Suit assigned to the Publishers the exclusive rights to publish their Works in certain formats—including print, ebook and often audio.  The publishing agreement for the Works in Suit also grant rights for the Works in defined geographic areas, typically either the entire world or the United States.  (Pavese Decl. ¶13; Sevier Decl. ¶31; R-A Decl. ¶57; Weber Decl. ¶29; McN Decl. ¶8.)

**Response:**  Not disputed.

34.  These exclusive rights derive from copyright law, which was designed to provide authors an incentive to write books by giving them a limited monopoly over sales once their books are published.  (R-A Decl. ¶58.)

**Response:**  This paragraph recites a legal conclusion rather than a fact, which is inappropriate for a Rule 56.1 statement and must therefore be disregarded.  *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2015) (refusing to credit "legal conclusions or conclusory allegations" contained in 56.1 statement).  Further, the cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

35.  The Publishers' ability to generate income derives from their ability to exclusively exercise certain rights they obtain from authors including:  (a) the right to sell books for their copyright term; and (b) the right to collect separate income streams for each different format.  (Weber Decl. ¶30; R-A Decl. ¶57; Sevier Decl. ¶8).

11

**Response:**  Not disputed to the extent the assertions in this paragraph apply to HarperCollins.  Disputed to the extent these assertions purportedly apply to Wiley, Penguin Random House, or Hachette.  First, Mr. Weber (Penguin Random House), Mr. Sevier (Hachette), and Ms. Restivo-Alessi (HarperCollins) have not established a foundation for their knowledge of Wiley's ability to generate income.  Moreover, the cited paragraphs of Mr. Weber's and Mr. Sevier's declarations do not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

36.  Some of the profits the Publishers receive from books they publish are used to pay the costs of publishing new authors or books.  (Weber Decl. ¶29; Sevier Decl. ¶30; R-A Decl. ¶63; Pavese Decl. ¶14.)

**Response:**  Not disputed (but immaterial).

37.  Some of the profits the Publishers receive from books they publish are used to develop new technologies or improve current technologies associated with various format they publish the works in, like ebooks or audiobooks.  (Pavese Decl. ¶15; R-A Decl. ¶2; Weber Decl. ¶29.)

**Response:**  Not disputed (but immaterial).

38.  All but two of the Works in Suit were published more than five years before this action was commenced.  (McN Decl. ¶115.)

**Response:**  Not disputed.

39.  Depending on the Publisher, backlist books are defined as titles that were first published more than either one or two years ago.  (Sevier Decl. ¶36; R-A Decl. ¶60; Weber Decl. ¶30.)  The vast majority of the Works in Suit were published more than five years ago, and some were published decades ago.  (McN Decl. ¶115; R-A Decl. ¶¶64-65;Weber Decl. ¶21.)

12

**Response:** Not disputed.

40. The Works in Suit continue to earn revenues and are significant books for the Publishers. (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**Response:** Not disputed.

41. The Publishers' backlist catalogs provide revenue that helps them invest in new works and/or new authors. (Sevier Decl. ¶¶13-30; R-A Decl. ¶¶58-68; Weber Decl. ¶¶29-32; Pavese Decl. ¶14.)

**Response:** Not disputed.

42. Year over year, many of the Works in Suit sell thousands of copies and generate significant annual revenues, including in ebook form. Each of the Publishers' revenues for the Works in Suit are reflected in their sales records produced in this action. (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**Response:** Not disputed.

43. Many of the Works in Suit were first published decades ago and several have become literary classics or are well-known, highly regarded titles, including for example "The Lord of the Flies" by William Golding, "Song of Solomon" and "The Bluest Eye" by Toni Morrison, "The Catcher in the Rye" by J.D. Salinger, and "The House on Mango Street" by Sandra Cisneros. (Weber Decl. ¶¶21-22; McN Decl. ¶7.)

**Response:** Not disputed (but immaterial).

44. The Publishers rely on backlist titles like the Works in Suit to generate revenue year on year for sometimes decades after first publication. These revenues can offset the costs of new books that underperform or result in a loss. (Sevier Decl. ¶37; R-A Decl. ¶¶61-68; Weber Decl.¶¶30-31; Pavese Decl. ¶14.)

13

**Response:** Not disputed.

45. A review of the sales revenues for the Works in Suit demonstrates the Publishers' reliance on books published more than five years ago for substantial revenue. (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.) For example, HarperCollins first published the C. S. Lewis novel "The Lion, the Witch and the Wardrobe (The Chronicles of Narnia)" in 1950. Over the course of the last 72 years, the book has been named to TIME Magazine's 100 Best Young-Adult Books of All Time and 100 best English-language novels published since 1923. Since 1950, sales from the title have generated HarperCollins over $47.5 million in revenue. (R-A Decl. ¶45.)

**Response:** Not disputed.

46. Another Work in Suit published by HarperCollins, Zora Neale Hurston's "Their Eyes Were Watching God," a classic of the Harlem Renaissance and Hurston's best-known work, was originally published in 1937. Between 1992 and 2020, HarperCollins sold more than five million copies of the title, earning the company over $38 million in net sales. (R-A Decl. ¶65.)

**Response:** Not disputed.

47. The classic *Little House in the Big Woods*, published in 1932 as the first book in the "Little House" series, earned HarperCollins over $7 million in net sales between 1992 and 2020. (R-A Decl. ¶65.)

**Response:** Not disputed.

48. Even those titles bringing in smaller sums of revenue are important to each Publisher on a cumulative basis and remain important to their authors or estates, on an individual basis. (Weber Decl. ¶30.)

**Response:** Not disputed (but immaterial).

14

49.  Revenue from backlist titles for three of the Publishers has matched or exceeded the revenue for frontlist books in certain years.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

    **Response:**  Not disputed.

50.  For Hachette, revenue from the sale of backlist ebook titles exceeded frontlist ebook revenue in 2019 and 2020.  (Sevier Decl. ¶36; R-A Decl. ¶61 & Ex. 1; Weber Decl. ¶32.)

    **Response:**  Not disputed.

51.  One backlist title published by Hachette in 1951, "Catcher in the Rye," generated tens of millions of dollars in sales between 1999 and 2020.  (Sevier Decl. ¶37.)

    **Response:**  Not disputed.

52.  Between 2017 and 2020, PRH's backlist revenue exceeded its revenue from frontlist titles (i.e., books published within the last year).   This is so despite that the fact that in that same period of time, PRH published bestselling frontlist biographies of First Lady Michelle and President Barack Obama (2018 and 2020, respectively).  (Weber Decl. ¶32.)

    **Response:**  Not disputed.

53.  Backlist book revenue makes up more than 60% of HarperCollins' annual print book revenue from the sale of all adult and children's titles.  (R-A Decl. ¶61.)

    **Response:**  Not disputed.

54.  Between 2017 and 2020, the number of backlist library ebook units sold by HarperCollins exceeded the number of frontlist library ebook units sold.  For example, in 2020, HarperCollins sold approximately 700,000 frontlist units versus 3.3 million backlist units.  (R-A Decl. ¶61.)

    **Response:**  Not disputed.

55.  The majority of Hachette's most successful books do not earn the bulk of their earnings in the first five years.  Rather, they earn revenue over the course of many years or even decades after the publication date.  (Sevier Decl. ¶36.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

56.  Backlist sales are also important because books may not achieve their full commercial potential in their first year of publication.  It may take years for a book to start selling in large quantities for a number of different (and sometimes unpredictable) factors.  (Weber Decl. ¶31.)

**Response:**  Not disputed.

57.  Even books that were critically well-received when published may see significant jumps in revenue well after they were first published, including author life events.  (Sevier Decl. ¶80; Weber Decl. ¶31.)  For example, the death of author Toni Morrison in August 2019 corresponded with a significant jump in library ebook checkouts and associated revenue for works authored by Ms. Morrison.

**Response:**  Not disputed.

58.  Sales of a particular work may go up or down based on other external factors.  For instance, sales of a title can increase rapidly if a news story brings a particular subject into prominence or if an author receives an award or sudden fame or if a popular movie version of a book is released.  (Sevier Decl. ¶¶38, 80; R-A Decl. ¶67.)

**Response:**  Not disputed.

59.  For example, the book "Crazy Rich Asians" by Kevin Kwan was first published by PRH in 2013.  When a motion picture adaptation of the film was released in 2018, library ebook

16

checkouts for the title through OverDrive, the library ebook aggregator, increased by a factor of over nine. (McN Decl. ¶115; Weber Decl. ¶31.)

**Response:** Not disputed (but immaterial).

60. An author may not "break out" before publishing multiple books and when an author does achieve success later in their career, the Publishers will usually see a significant uptick in revenue from their earlier works, even if those works did not sell well when first released. (Sevier Decl. ¶38; R-A Decl. ¶67.)

**Response:** Not disputed.

61. The book "The 5 Simple Fixes That Will Make You Healthy, Fit, and Eternally Awesome" by Darin Olien, was published by an imprint of HarperCollins in February 2015. For the first five years after it was published, the ebook title had been checked out by library patrons across the United States in the low double-digits (and sometimes in the single digits) each month. Then, in July 2020, checkouts spiked, eventually resulting in nearly 700 checkouts in September 2020 alone. (McN Decl. ¶116.)

**Response:** Not disputed (but immaterial).

62. The increased interest in the book, over five years after its publication, coincided with the July 2020 release of the Netflix series "Down to Earth with Zac Efron," in which the actor Zac Efron promoted the "5 Simply Fixes" book at the beginning of each episode. (McN Decl. ¶116.)

**Response:** Not disputed (but immaterial).

63. The Publishers' right to collect revenue from the sale of their books in each format —and to control the terms and conditions governing each format—can make it possible for the Publishers to support authors and invest in the next generation of books. (R-A Decl. ¶68; Sevier

17

Decl. ¶48; Weber Decl. ¶¶36.) And, just as in the music and film industries, every format is a different product geared to different (sometimes overlapping) channels and sold under different terms that correspond to each format's unique qualities. (R-A Decl. ¶12.)

**Response:** Not disputed (but immaterial).

64. The Publishers' publishing agreements for the Works in Suit, produced in this action, generally include specific royalty rates payable to the author based on the format of the book, channel of distribution, and other factors. The agreements for the Works in Suit show that the authors will receive specific and generally different royalty rates for the different formats the book is published in, e.g., hardcover, trade paperback, mass market paperback, ebook, and/or audio book. (Sevier Decl. ¶18; Weber Decl. ¶34; R-A Decl. ¶12.)

**Response:** Not disputed.

65. Because each of the publishing agreements for the Works in Suit include different royalty rates for different formats of the Works, the Publishers and their authors are paid on sales of each format that a book is published in. (Sevier Decl. ¶39; R-A Decl. ¶¶12, 57.).

**Response:** Not disputed.

66. Over the last three decades, the Publishers have collectively invested millions of dollars in developing new formats and markets to deliver their works in the digital age, including ebooks. (Weber Decl. ¶¶53-82; R-A Decl. ¶¶11-24; Sevier decl. ¶¶45-48; Pavese Decl. ¶¶11-20.)

**Response:** Not disputed (but immaterial).

67. The Publishers' investments over the last three decades have contributed to the development and success of ebooks and audiobooks. Digital works (ebooks and audiobooks) are distinct book formats from print books. (Weber Decl. ¶¶53-82; R-A Decl. ¶¶17-24; Sevier Decl.

18

¶45-48; Pavese Decl. ¶¶11-20.)  Ebook pricing, both commercial and library ebooks, is distinct

from the prices of print books.  The different pricing is based on the fact that the different

formats (print books vs. ebooks) are used differently in the commercial and library markets and

is a control mechanism that helps to make the distribution of ebooks economically sustainable.

(Weber Decl. ¶¶46-49.)

    **Response:**  Not disputed.

68.  The development of ebooks and audiobooks have been a benefit for the public and

the new format have allowed the Publishers to reach different audiences.  (Sevier Decl. ¶41;

Weber Decl. ¶¶53-54.)

    **Response:**  Not disputed (but immaterial).

69.  In the late 1990's and early 2000's, the music industry witnessed the growth and

eventual dominance of file sharing sites like Napster, Limewire, and Kazaa.  (R-A Decl. ¶15.)

    **Response:**  Not disputed (but immaterial).

70.  Napster, for example, allowed users to search for virtually any popular song and

download an unauthorized, unrestricted MP3 music file onto the user's computer for free.  (R-A

Decl. ¶15.)

    **Response:**  Not disputed (but immaterial).

71.  The record companies had not yet developed an authorized alternative for consumers

to access digital music when the file sharing sites, like Napster, became popular.  By the time the

music industry took legal action against the file sharing sites or took steps to create an easily

accessible alternative, the pirate sites had proliferated.  (R-A Decl. ¶15.)

    **Response:**  Not disputed (but immaterial).

19

72.  Countless unauthorized MP3 files had already been uploaded and shared on the Internet with users around the world.  Consumers had already been presented with a popular alternative that presented no barrier to an unauthorized and free copy of a song.  (R-A Decl. ¶15.)

**Response:**  Not disputed (but immaterial).

73.  After these services were identified as copyright infringers and ordered to cease operations, the music publishing industry largely embraced authorized streaming services as a primary means to deliver music files over the Internet.  These streaming services offer a subscription model, which makes streaming music affordable for many consumers, while preventing against the proliferation of free illegal copies.  (R-A Decl. ¶16.)

**Response:**  Not disputed (but immaterial).

74.  It has been  reported that this streaming model tends to disproportionality favor the most popular music artists while less popular artists are less favored and often get mere fractions of a cent per stream.  (R-A Decl. ¶16.)

**Response:**  Not disputed (but immaterial).

75.  While these streaming services offered an alternative to piracy and afforded the record companies with a modicum of control, it came at the expense of artist revenue.  (R-A Decl. ¶16.)

**Response:**  Not disputed (but immaterial).

76.  By around 2002, the Publishers began to enter the digital book market.  They worked to develop a sustainable digital book market in which they could offer affordable ebooks but with critical controls.  (R-A Decl. ¶17; Weber Decl. ¶56.)

**Response:**  Not disputed (but immaterial).

20

77.  The nature of the digital medium dictated that distribution be reasonably limited so as not to threaten the Publishers' overall book markets.  (R-A Decl. ¶17; Weber Decl. ¶¶65-69; Pavese Decl. ¶¶22-24.)

**Response:**  Not disputed (but immaterial).

78.  The experience of the music industry also taught the Publishers that it was critical to prevent pirates from illegally converting print works into digital works to be widely distributed on the Internet, including for free.  (R-A Decl. ¶17.; Weber Decl. ¶55; Pavese Decl. ¶20.)

**Response:**  Not disputed (but immaterial).

79.  While ebooks display the same text as print books and both are used by consumers to read the same underlying work, there are several key differences between these two formats that informed the Publishers' development of discrete terms and conditions and pricing for ebooks.  (R-A Decl. ¶18; Weber Decl. ¶¶38-42.)

**Response:**  Not disputed.

80.  An ebook is a digital file that consists of specially formatted text that readers typically download to their personal computers or devices from either commercial sites (like Amazon books) or from their local library (often via OverDrive).  (Weber Decl. ¶39; Sevier Decl. ¶¶20, 25.)

**Response:**  Not disputed.

81.  Ebooks generally do not degrade.  Ebooks generally do not get damaged or lost.  (Weber Decl. ¶39; Sevier Decl. ¶53; R-A Decl. ¶21.)

**Response:**  Disputed.  Even though ebooks do not degrade in the same way that physical books do, a huge amount of money and effort is required to maintain the integrity of a digital file that constitutes an ebook.  These digital files are stored on servers, and the servers that host data

21

at the Internet Archive require constant maintenance and repair. The physical servers themselves range from nearly nine years old to brand new, and components of those servers are replaced regularly when they fail or when they are damaged by electrical or environmental conditions. Currently, a new server with a full set of hard drives costs tens of thousands of dollars. The hard drives in a server fail regularly—on average, two to three drives fail per day out of our fleet of nearly 30,000. This ongoing maintenance requires an operations team consisting of five full-time employees. To the extent Plaintiffs suggest that digitized books can be set aside for years without technical maintenance and still be accessed, they are incorrect. Decl. of Brewster Kahle in Supp. of Internet Archive's Opp'n to Pls.' Mot. for Summ. J. submitted herewith ("Kahle Opp'n Decl.") ¶ 15.

82. Readers do not have to travel to a bookstore or library to obtain ebooks. Whether commercial ebooks or ebooks obtained from their library, readers can download ebooks at any time from their home, office, or on the go. (Weber Decl. ¶39; Sevier Decl. ¶54; R-A Decl. ¶20.)

**Response:** Not disputed.

83. Ebooks contain technological features that enhance the reader's experience, including text digitized for an electronic device. Ebooks also allow readers to interact with the works by running searches across the text or even reading in the dark. Ebooks also make it easier to carry multiple books. A reader can carry multiple ebooks on a single device without the burden of carrying multiple print copies. (Weber Decl. ¶39; R-A Decl. ¶20.)

**Response:** Not disputed.

84. By contrast, print books are tangible objects. They need to be physically moved from place to place, costing time and money that both increase with distance. Over time, they can exhibit wear and tear. (R-A Decl. ¶19; Weber Decl. ¶38.)

22

**Response:** Not disputed.

85. There is a practical limit to the number of people who are able to access—i.e., hold in hand and read—a print book as a material object. (R-A Decl. ¶19; Weber Decl. ¶38.)

**Response:** Not disputed.

86. The same characteristics of an ebook that make the format so attractive to consumers present a potential risk for both authors and the Publishers. (R-A Decl. ¶21; Weber Decl. ¶41.)

**Response:** Not disputed.

87. First, an unrestricted digital file containing the text of a book could be repeatedly and rapidly reproduced and distributed to Internet users around the world at no or minimal cost. (R-A Decl. ¶21; Weber Decl. ¶41.)

**Response:** Not disputed.

88. Second, a digital file does not deteriorate as pages in a physical book do, and ebooks take up negligible physical space. (R-A Decl. ¶21; Weber Decl. ¶39.)

**Response:** Not disputed.

89. The Publishers considered these characteristics when they developed business models that set limits on the broad dissemination capabilities of an electronic file so as not to decimate their broader book markets. (R-A Decl. ¶21; Pavese Decl. ¶5; Weber Decl. ¶¶38-42.)

**Response:** Not disputed.

90. The Publishers distribute ebooks under a different model than print books. (R-A Decl. ¶¶22-23, 28-41; Weber Decl. ¶¶42-49; Pavese Decl. ¶¶21-31.)

**Response:** Not disputed.

91. When projecting possible revenues from a book, the Publishers take into account that they will receive revenues from each of the formats they publish the book in, including

23

hardcover, paperback, ebook and/or audiobook.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶¶20, 46.)

**Response:**  Not disputed.

92.  Print books are not priced with the expectation that they will be distributed in both print and digital formats.  (R-A Decl. ¶2.)

**Response:**  Not disputed.

93.  Each of the Publishers have played a role in the development of new digital book formats designed to reach new audiences.  (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

**Response:**  Not disputed (but immaterial).

94.  Starting in the late 1990's and continuing into the early 2000's, each of the Publishers began investing in the development of authorized mechanisms for distributing ebooks. (Weber Decl. ¶¶55-61; R-A Decl. ¶¶13-16; Sevier decl. ¶¶44-48; Pavese Decl. ¶¶11-20.)

**Response:**  Not disputed (but immaterial).

95.  For example, some of the divisions of what is now PRH began in the late 1990's to invest in creating authorized mechanisms for distributing digital books in order to create viable products for consumers to read as an affordable alternative to using pirate websites.(Weber Decl. ¶56.)

**Response:**  Not disputed (but immaterial).

96.  At the same time, Random House, Inc. ("Random House") (a predecessor of PRH) and Wiley, together with publisher McGraw Hill, were members of the Open Ebook consortium that designed the original standard format for ebooks that evolved into the ePub ebook format that was launched in 2007 and remains in wide use today.  (Weber Decl. ¶57.)

24

**Response:**  Not disputed (but immaterial).

97.  By 2000, Random House had invested more than $5 million into the development of ebook publishing software and pledged to invest $10 million more within the next three to five years after that.  (Weber Decl. ¶57.)

**Response:**  Not disputed (but immaterial).

98.  The Publishers distribute commercial ebooks to paying consumers with restrictions geared to the nature of the digital medium.  (Sevier Decl. ¶45; Weber Decl. ¶43; R-A Decl. ¶¶22-23.)

**Response:**  Not disputed.

99.  Several of the Publishers use an agency model for distributing commercial ebooks. The Publishers' retained agents, which include Amazon or Barnes & Noble, impose terms and conditions on those downloading commercial ebooks and restrict them to one user account.(Weber Decl. ¶43; R-A Decl. ¶23; Sevier Decl. ¶45.)

**Response:**  Not disputed (but immaterial).

100.  For example, the Terms of Use set by Amazon in connection with ebooks purchased through its Kindle platform state as follows:

> Use of Kindle Content. Upon your download or access of Kindle
>
> Content and payment of any applicable fees . . ., the Content
>
> Provider grants you a non-exclusive right to view, use, and display
>
> such Kindle Content an unlimited number of times . . ., solely
>
> through a Kindle Application or as otherwise permitted as part of
>
> the Service, solely on the number of Supported Devices specified
>
> in the Kindle Store, and solely for your personal, non-commercial

use.  Kindle Content is licensed, not sold, to you by the "Content

Provider."  Further, the Amazon Terms of Use provide under

"Limitations" that the purchaser "may not sell, rent, lease,

distribute, broadcast, sublicense, or otherwise assign any rights to

the Kindle Content or any portion of it to any third party. . . .

(R-A Decl. ¶23.; Weber Decl. ¶43.)

**Response:**  Not disputed (but immaterial).

101.  The Publishers also required, and still do require, that entities distributing their

ebooks to the public use DRM technology to ensure that the digital book files are limited to one

user account at a time.  (Sevier Decl. ¶¶45-46; Weber Decl. ¶43; R-A Decl. ¶23.)

**Response:**  Not disputed (but immaterial).

102.  In or around the early 2000's, PRH began distributing ebook editions of selected

books to consumers through specialized electronic retail platforms.  The popularity of ebooks

then grew rapidly after the release of dedicated e-readers like Amazon's Kindle (2007) and

Apple's iPad (2010).  (Pavese Decl. ¶19; R-A Decl. ¶30; Sevier Decl. ¶44; Weber Decl. ¶59.)

**Response:**  Not disputed (but immaterial).

103.  Consumers pay for an ebook that they download from an authorized e-vendor,

whether or not they read the whole book or only consult a small portion of it.  (McN Decl. ¶10.)

**Response:**  Not disputed.  However, the cited evidence is not admissible.  This is one of

many examples throughout Plaintiffs' 56.1 Statement where the only support for an assertion is

improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*

*Commc'ns, Inc. v. Common Council of City of Peekskill*, 202 F. Supp. 2d 210, 213 (S.D.N.Y.

2002) (attorney's affidavit or declaration not based on personal knowledge carries no weight);

26

*see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that inadmissible statements in affidavits submitted in support of summary judgment motion are incapable of raising material issues of fact); *Wahad v. FBI*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) (citing *United States v. Alessi*, 599 F.2d 513, 514–15 (2d Cir. 1979)) (when affidavit does not comply with requirements of Rule 56, the offending portions should be disregarded).

104.  Since the early 2000's, millions of consumers have acquired authorized ebooks published by the Plaintiffs.  (R-A Decl. ¶24.)

**Response:**  Not disputed.

105.  While the figures have varied over time, in fiscal year 2021, ebooks constituted approximately 14% of HarperCollins' U.S. book revenue (not including audiobooks).  (R-A Decl. ¶24.)

**Response:**  Not disputed.

106.  For Penguin Random House, by 2020, retail ebooks constituted somewhere between 12 and 15% of the book market.  (Weber Decl. ¶5.)

**Response:**  Not disputed.

107.  For Hachette, in 2021, ebook revenue from the retail and library channels made up approximately 15% of their business.  (Sevier Decl. ¶46.)

**Response:**  Not disputed.

108.  Today, the Publishers offer virtually all of their new titles in ebook format. The exceptions tend to be for books that are not well-suited to the digital realm (like certain children's books or cookbooks), or reprints of books originally published by other publishers for which the Publishers do not have the digital rights.  (Sevier Decl. ¶46; R-A Decl. ¶24; Weber Decl. ¶60; Pavese Decl. ¶18.)

27

**Response:** Not disputed.

109. In 2007, Random House had only approximately 3800 ebook titles available and Penguin had approximately 300 ebook titles available. Today, virtually all original titles in the adult trade books category published by PRH are available as an ebook, including the 48 Works in Suit published by PRH. (Weber Decl. ¶60.)

**Response:** Not disputed.

110. The Publishers invested time and money to publish their backlist titles as ebooks. In several cases, the Publishers had to separately acquire ebook rights from its authors where older publication agreements did not encompass these right. Once they acquired the ebook rights, the Publishers published the works as ebooks. (Sevier Decl. ¶47; Weber Decl. ¶60.)

**Response:** Not disputed.

111. As a result, the vast majority of each of the adult trade titles in each Publisher's backlist catalog are also now published as ebooks. (Weber Decl. ¶60; R-A Decl. ¶24; Sevier Decl. ¶47.)

**Response:** Not disputed.

112. Each Work in Suit is available as a commercial ebook. Each Work in Suit was available as a commercial ebook when Internet Archive first scanned and posted the Work on its Website for distribution. (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)

**Response:** Not disputed.

113. Public and academic libraries in the United States spend billions of dollars each year—typically from local tax revenue—on obtaining books for patrons to access for free. For example, public libraries spent almost $1.5 billion on physical and ebooks in 2019. (McN Decl. ¶11.)

**Response:**  Not disputed.

114.  The history of libraries lending print books stretches back hundreds of years.  Under this lending model, the Publishers sell copies of print books to libraries, or to wholesalers serving the library market, who in turn sell to libraries.  (R-A Decl. ¶26; Weber Decl. ¶43.)

**Response:**  Not disputed.

115.  Many public libraries provide services to their local communities, ranging from a curated selection of books and communications geared towards the interests and needs of community members, to services like free internet and community-tailored tutoring sessions. Public libraries also promote literacy.  (R-A Decl. ¶25.)

**Response:**  Not disputed.

116.  Public libraries often increase the visibility of the Publishers' works, including through author visits, book clubs, creating virtual and physical displays to promote certain book for different occasions, and/or email marketing directed to the interests of local library patrons. (R-A Decl. ¶27; Sevier Decl. ¶¶49-50.)

**Response:**  Not disputed.

117.  Each of the Publishers make their ebooks available to libraries through library distributors (or "aggregators"), who license the Publishers' ebooks to libraries, and each of the Works in Suit were available as ebooks from libraries.  (R-A Decl. ¶28; Sevier ¶10l; Weber Decl. ¶6; Pavese Decl. ¶3.)

**Response:**  Not disputed.

118.  The Publishers' sales records produced in this action track the revenues earned when library aggregators obtained each of the Works in Suit for licensing to libraries.  (Pavese ¶19; R-A Decl. ¶6; Sevier Decl. ¶37; Weber Decl. ¶20.)  Further, OverDrive maintained records

capturing the number of library ebook checkouts for the Works in Suit between 2017 and 2020, as well as OverDrive's revenue for ebooks of the Works in Suit acquired by libraries from OverDrive during this time period. (McN Decl. ¶11.)

**Response:** Not disputed that OverDrive maintains records of library ebook checkouts and its revenue from these library ebook checkouts. Not disputed that, in this case, OverDrive produced records containing ebook revenue and checkout data from 2017 to 2020 for the Works in Suit. Disputed that the Plaintiffs' sales records produced in this case show revenues from the time library aggregators obtained each of the Works in Suit for licensing to libraries. Hachette's sales records show annual revenue data from 2015 to 2019 and monthly data from 2020. Decl. of Joseph C. Gratz in Supp. of Internet Archive's Mot. for Summ. J. ("Gratz Opening Decl.") Exs. JJ & KK, HACHETTE0002474-2475. HarperCollins sales records show annual revenue data from 2017 to 2020. *Id.* Ex. LL, HC0010272. Wiley's sales records show annual revenue from 2001 to 2020. Pavese Decl. Ex. 3, WILEY0005650. Penguin Random House's sales records show annual revenue data from 2010 to 2020. Gratz Opening Decl. Ex. MM, PRH0025907. Plaintiffs' record cites do not support the assertion that they produced revenue data for the Works in Suit beginning when "library aggregators obtained each of the Works in Suit for licensing for libraries." *See* Fed. R. Civ. P. 56(c)(1).

119. The largest aggregator is OverDrive, which licenses authorized ebooks to more than 14,000 public and academic libraries for free distribution to their patrons. (McN Decl. ¶11.)

**Response:** Not disputed.

120. The authorized library ebook market is governed by licensing terms that the Publishers have developed over many years, and continue to refine to this day. (Weber Decl. ¶77.)

30

**Response:** Not disputed.

121. The music, movie, and television industry also utilize licensing terms to make digital goods available to the public. (R-A Decl. ¶28.)

**Response:** Not disputed (but immaterial).

122. The specific terms of the Publishers' various licensing models are enforced in the library aggregators' licenses to libraries. (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

**Response:** Not disputed.

123. As part of this licensing regime, the four Publishers require that a library or library consortia can lend each Publisher's ebooks only to its own verified library members. For example, public libraries often restrict lending to local residents with a library card. For school and university libraries, lending is often restricted to their students, professors, and staff. (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

**Response:** Not disputed.

124. For example, Wiley's Ebook Distribution Agreement with ProQuest defines an "Authorized User" as follows: "For public libraries: library staff, individual residents of Customer's reasonably defined geographic area served, and walk-in patrons while they are on site" and "For schools and other academic institutions: currently enrolled students, faculty, staff and visiting scholars, as well as walk-in patrons while they are on-site. (Pavese Decl. ¶23.)

**Response:** Not disputed.

125. In Wiley's agreement with library ebook aggregator OverDrive, Wiley requires OverDrive to "require participating [libraries] to take reasonable measures to ensure that only Authorized Patrons of their libraries . . . may access the offline or download collection" and that

31

"OverDrive will require that participating [libraries] provide it the right to audit their access control systems." (Pavese Decl. ¶23.)

**Response:** Not disputed.

126. The Publishers also require that each library aggregator employ approved DRM and other security measures to ensure that only one-user account can access each copy of a Publisher's ebook, and to prevent the unauthorized copying or distribution of ebook files. (Sevier Decl. ¶67; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23.)

**Response:** Not disputed that the Publishers require "each library aggregator" to "employ approved DRM and other security measures" or that these measures are designed "to prevent the unauthorized copying or distirbution of ebook files." Not disputed that, as to Hachette, HarperCollins, and Penguin Random House, the applied DRM is designed to prevent access by more than one-user account. Disputed as to Wiley because, as explained in Plaintiffs' Statement of Undisputed Material Facts ("PSMF"), Wiley offers a one-copy, three-users access model. *See* PSMF ¶ 148 and cited authority.

127. Starting in the early 2000's, and still today, each of the Publishers made library ebooks available on a "one-copy, one-user" licensed basis. This license terms allows multiple library patrons to check out a single copy successively, subject to the community-based limitations described above and DRM restrictions. Each of the Publishers initially offered this model with a perpetual term. (Sevier Decl. ¶51; R-A Decl. R-A Decl. ¶¶30; Weber Decl. ¶68; Pavese Decl. ¶¶5, 22.)

**Response:** Not disputed.

128. Under the one-copy, one user model, libraries pay a license fee when they select a title for their collection. (Weber Decl. ¶76; R-A Decl. ¶¶33, 37; Pavese Decl. ¶5; Sevier Decl.

¶¶68, 74.)  The library pays the same license fee regardless of whether library patrons read the entire ebook or short excerpts.  (McN Decl. ¶10.)

**Response:**  Not disputed.

129.  The same is true for commercial ebook licenses:  like print books, a purchaser pays for the work regardless of whether the purchaser actually reads any or all of the book.  (McN Decl. ¶10.)

**Response:**  Not disputed.  However, the cited evidence is not admissible.  The only cited evidence is improper attorney testimony in the form of Ms. McNamara's Declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

130.  As library ebooks became increasingly more popular, HarperCollins, Penguin Random House, and Hachette each determined that a perpetual term for its one-copy, one-user model was not serving the economic interests of its authors.  They each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  (Sevier Decl. ¶65; R-A Decl. ¶¶30-32; Weber Decl. ¶¶71-75.)

**Response:**  Not disputed.

131.  These three Publishers currently offer a one-copy, one-user model with a perpetual term to academic libraries.  Academic libraries have different needs and lending patterns than public libraries.  (Sevier Decl. ¶68; R-A Decl. ¶40; Weber Decl. ¶77.)

**Response:**  Not disputed.

132.  Wiley maintains a one-copy, one user model with perpetual access for its trade books that it makes available to all libraries as ebooks.  (Pavese Decl. ¶¶5, 25-26.)

33

**Response:**  Disputed only to the extent Plaintiffs intend this paragraph to suggest that Wiley only a offers one-copy, one-user model for trade ebooks that it makes available to all libraries.  Wiley offers a one-copy, three-users access model.  *See* PSMF ¶ 148 and cited authority.

133.  Today, each of the Publishers offer somewhat different licensing terms for library ebooks:

**Response:**  Not disputed.

134.  In 2019, Hachette adopted a two-year term for its one-copy, one user model for library patrons to access its trade ebooks, which remains in effect today.  At the end of two-years from the date of purchase, the terms governing this lending model state that "the Digital Book will expire and will no longer be available … unless repurchased."  (Sevier Decl. ¶¶65-68.)

**Response:**  Not disputed.

135.  In 2011, HarperCollins adopted a one-copy, one-user model with a total of 26 circulations ("26-Circ Model"), which remains in effect today.  (R-A Decl. ¶¶32-35.)

**Response:**  Not disputed.

136.  Under the 26-Circ Model, a library ebook is available for twenty-six circulations. Once the twenty-six circulations are exhausted, the library can decide whether to re-order the ebook for an additional twenty-six circulations, or use their resources to buy other titles.  (R-A Decl. ¶32.)

**Response:**  Not disputed.

137.  For many years, HarperCollins priced the 26-Circ model at the same price as the suggested retail price for print books; currently it is priced at slightly more than the suggested retail price for print books.  (R-A Decl. ¶33.)

34

**Response:**  Not disputed.

138.  HarperCollins enacted this model with the intention that it be similar to the economics that govern the sale of print books that show wear and tear from usage and need to be replaced or are lost over time.  (R-A Decl. ¶33.)

**Response:**  Not disputed.

139.  The price per circulation of a library ebook under the 26-Circ Model is lower than the price of a commercial ebook.  (R-A Decl. ¶33.)

**Response:**  Not disputed.

140.  The 26-Circ Model generated just over $3.45 million in revenue for HarperCollins in fiscal year 2014; by fiscal year 2019, the model generated over $9.95 million.  (R-A Decl. ¶35.)

**Response:**  Not disputed.

141.  In 2017, HarperCollins adopted an additional library distribution model to supplement its 26-Circ Model, the Pay-Per-Use model ("PPU Model"), which remains in effect today.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

142.  Under this model, libraries offer their patrons an opportunity to borrow an ebook from HarperCollins' catalog and pay a fee for a single, individual use only when a particular title is checked out by a patron.  (R-A Decl. ¶36.)

**Response:**  Not disputed.

143.  Currently, all HarperCollins titles qualify for the PPU Model twelve months after the initial publication date.  Libraries also retain the option to obtain these backlist titles under the 26-Circ Model as well.  (R-A Decl. ¶36.)

35

**Response:** Not disputed.

144. The PPU Model allows a library to license the right to a single circulation of an ebook for a small percentage of the price of an ebook license under the 26-Circ Model. (R-A Decl. ¶36.)

**Response:** Not disputed.

145. The PPU Model addresses two needs in the library channel. First, smaller libraries with few members that are less likely to fully exhaust all twenty-six circulations in the standard model can access a broader catalog for their patrons and manage their budgets on a month-to-month basis. Second, larger libraries that have focused on widely read titles can provide their patrons with access to a much broader selection of books at a lower cost: if only a few members of a public library are interested a book, the library can obtain ebook copies for that handful of individuals at a price point lower than the 26-Circ Model. (R-A Decl. ¶36.)

**Response:** Not disputed.

146. In fiscal year 2018, just after it was introduced, the model generated $154,789 in revenue for HarperCollins. By fiscal year 2020, HarperCollins earned over $2 million in revenue from library ebook checkouts via the PPU Model. (R-A Decl. ¶33.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1).

147. In 2018, PRH adopted a two-year metered model for library patrons to access its trade ebooks, which remains in effect today. Through one of PRH's aggregator partners, a library obtains a license to make one copy of an ebook available to patrons on a "one-copy, one-user" basis, but for "a limited term of two (2) years from the time that each such copy is first purchased and available for lending by that institution…" At the end of the two-year period, the

36

ebook copy "will expire" and the library must obtain another copy if it wants to keep lending that ebook through the aggregator's platform. (Weber Decl. ¶75.)

**Response:** Not disputed.

148. For its trade titles, Wiley continues to offer libraries a one-copy, one-user model or one-copy, three-users model, both with a perpetual term. Under these models, when a library obtains a license for one ebook copy of a Wiley title, only one—or three—users at a time can access that copy. A library's license to lend out the copy under the terms of the license does not expire. The one-copy, one-user and one-copy, three-users model are Wiley's most popular lending models for its trade ebooks. (Pavese Decl. ¶22.)

**Response:** Not disputed.

149. Wiley developed these models largely with the interests of academic libraries in mind. (Pavese Decl. ¶25.)

**Response:** Not disputed (but immaterial).

150. Academic libraries are the primary customers of Wiley's science and academic-focused titles, which make up the majority of its catalog. While all libraries exist to serve patrons and expand access to information, academic libraries have a slightly different mission than their public counterparts. Academic libraries highly prioritize the building of long-term collections, whereas public libraries often weed their collections. Further, professors and college students tend to make somewhat different uses of academic-focused ebooks than the general public does with trade ebooks in the public library context. (Pavese Decl. ¶25.)

**Response:** Not disputed.

151. As a result of these differences, a perpetual licensing model is particularly attractive to academic libraries. Although Wiley adopted a perpetual term for its one-copy, one-user and

37

one-copy, three users models with academic libraries in the forefront of its mind, Wiley has concluded that it is simpler for the company to offer a perpetual term for all ebook titles, including trade book titles, licensed to all libraries (including public libraries) under these models. (Pavese Decl. ¶¶25-26.)

**Response:** Not disputed.

152. Wiley sets the digital list price for its library ebooks on the one-copy, one-user model at the same price as its print list price. (Pavese Decl. ¶24.)

**Response:** Not disputed.

153. Although Wiley, because of its principal role as an academic publisher, licenses its trade book ebooks to all libraries for a perpetual term at the same price as a print book, in a fashion closely akin to the acquisition of print books, the Internet Archive posts thousands of Wiley books on its Website along with the other Publishers' books. (Pavese Decl. ¶8.)

**Response:** Not disputed that Wiley's "principal role" is as "an academic publisher." Not disputed that Wiley "licenses its trade book ebooks to all libraries for a perpetual term at the same price as a print book." Not disputed that the Internet Archive makes certain of the Publishers' books available for borrowing.

Disputed that Wiley's conveyance of ebooks to aggregators who then convey those ebooks to libraries is "closely akin to the acquistion of print books." Ebooks are licensed, not sold, to libraries, limiting the rights libraries have with respect to those copies (including the right to resell). Ebook licenses—even ones for a perpetual term—restrict libraries from using an ebook as they do a physical book. For instance, a library cannot resell or weed the ebook when demand for the title decreases. As another example, an ebook cannot, without special permission from the publisher or aggregator, be used in interlibrary loan. Hildreth Decl. Ex. 1, Hildreth

38

Expert Rpt. ¶¶ 40-46, 51, 82-88, 89-95, 98-101; *see also* Gratz Opening Decl. Ex. C, Potash Dep

Tr. 141:14-142:24; Decl. of Joseph C. Gratz in Supp. of Opp'n to Pls.' Mot. for Summ J.

submitted herewith ("Gratz Opp'n Decl.") Ex. 1, Potash Dep. Ex. 4 (Scheds. A & F). *See also*

Library Futures Amicus Brief 11, ECF No. 142 ("Several publishers and ebook aggregators

prevent libraries from acquiring eBooks with licensing (or purchasing) terms, making it

impossible for libraries to fully meet their standard access and preservation missions. Often,

eBook licenses offered to libraries come with many restrictions on use and are prohibitively

expensive, or worse, unavailble to libraries at any price.").

154.  Because Wiley's books largely serve the academic community, the company also

has worked with the leading academic-focused aggregators EBSCO and ProQuest to develop

additional and unique lending models that serve the specific needs of libraries and readers of

Wiley's science-focused and other titles.  (Pavese Decl. ¶¶3-4, 27-30.)

**Response:**  Not disputed.

155.  For instance, Wiley works with these library ebook aggregators to offer

subscription-based models.  These subscription models offer libraries to prospect of paying for

students to have unlimited access to a large volume of ebooks.  Three of the Works in Suit

published by Wiley are available under these subscription models.  (Pavese Decl. ¶¶28-29.)

**Response:**  Not disputed.

156.  Wiley also works with its aggregator partners to offer a "Concurrent User Access

Model," which is specifically designed to account for the frequent but brief use of titles in

academic settings.  Under that model, content is available for a maximum of 365 "uses" within a

particular year.  A use is defined to exclude a brief consultation of less than 10 minutes.  (Pavese

Decl. ¶30.)

39

**Response:** Not disputed.

157. Likewise, Wiley offers a number of "Short Term Loans"—ranging from one-day, seven-day, 14-day, and 28-day periods—where a library purchases access to a title for only that specific period of time. (Pavese Decl. ¶30.)

**Response:** Not disputed.

158. In addition to the Publishers' investments in the ebook format, the library ebook aggregators have invested in the creation of convenient platforms and applications that can be used by library patrons to download free ebooks to their devices anywhere there is an internet connection. (Weber Decl. ¶68, 82; R-A Decl. ¶¶42-43.)

**Response:** Not disputed.

159. For example, the country's leading library ebook aggregator, OverDrive, has developed the Libby app for public libraries. (Weber Decl. ¶82; R-A Decl. ¶¶42.)

**Response:** Not disputed.

160. Using the Libby app, a library patron can enter her local library card information and be granted instant access to that library's ebook holdings. (R-A Decl. ¶42.)

**Response:** Not disputed.

161. The library patron may check out and access library ebooks using the app. If a title is not available, a patron may place a hold on the book and receive a notification when the title is available to be checked out. (R-A Decl. ¶42.)

**Response:** Not disputed.

162. Several other leading aggregators have developed similar platforms and applications for patrons to use to access library ebooks. (Weber Decl. ¶68).

**Response:** Not disputed.

40

163.  The authorized library ebook market has provided library members across the United States with hundreds of millions of ebooks.  (Weber Decl. ¶10; McN Decl. ¶11.)

**Response:**  Not disputed.

164.  The number of licensed library ebooks checked out via OverDrive was ███████ in 2010, but this increased ██████ to nearly ████████ checkouts in 2020.  (McN Decl. ¶11.) Additionally, in 2012, OverDrive processed 70 million total digital checkouts (which includes both ebooks and audiobooks); by 2020, the number of total digital checkouts ballooned to 430 million.  (McN Decl. ¶11.)

**Response:**  Not disputed.

165.  During that same ten-year time span, the number of different titles that were checked out by patrons via OverDrive increased exponentially from ██████ to more than ██████.  (McN Decl. ¶11.)

**Response:**  Not disputed.

166.  According to the American Library Association, more than 93% of libraries in the United States lend ebooks to their patrons.  (Weber Decl. ¶10.)  In 2020, more than 100 public library systems exceeded one million digital checkouts via OverDrive.  (Weber Decl. ¶10.)

**Response:**  Not disputed.

167.  According to the Institute of Museum and Library Services ("IMLS"), an independent federal agency that provides library grants, museum grants, policy development, and research, between FY 2014 and FY 2018, the percentage of libraries offering electronic collection materials increased from 80 percent to 90 percent.  (Weber Decl. ¶11.)  The IMLS data further reflects that the biggest growth in ebook adoption between 2014 and 2018  was

41

"among rural libraries (14 percent) compared to other locales (between 1 and 8 percent)." (Weber Decl. ¶11.)

**Response:** Not disputed.

168. Internet Archive's library expert, Susan Hildreth, testified that there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive." (McN Decl. ¶9.)

**Response:** Not disputed.

169. The Publishers' annual revenue from the library ebook market has increased from only a few million to hundreds of millions of dollars in less than a decade. (Weber Decl. ¶8.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). Mr. Weber's Declaration (and Exhibit 2 thereto) shows only that Penguin Random House earned more than $5 million from United States digital library sales in 2010 and more than $83 million in 2020. But digital library sales, for Penguin Random House, "includes both ebooks and digital audio." It is therefore impossible to ascertain, from the evidence cited, how much revenue is attributable to the library ebook market specifically. Moreover, there is no cited evidentiary support for the assertion concerning the Publishers' annual revenue from the library ebook market, and Mr. Weber lacks personal knowledge of the other three Plaintiffs' revenues from the library ebook market.

170. For example, in 2010, PRH earned over $5 million from U.S. digital library sales, which includes both ebooks and digital audio. By 2020, that figure had grown to over $83 million. Ebooks currently generate $59 million for PRH from library channels. (Weber Decl. ¶8.)

**Response:** Not disputed.

42

A-6048

171. From January 2017 and August 2019, approximately 25% of PRH's annual ebook revenue was generated from U.S. digital library sales; the remaining approximately 75% of revenue was generated from retail channels. (Weber Decl. ¶64.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). Paragraph 64 of Mr. Weber's Declaration discusses a Penguin Random House study of "titles published and distributed by [Penguin Random House] and first published between January 2017 and August 2019"—not sales revenues from January 2017 and August 2019 for all titles (which would include at least titles first published before January 2017). Moreover, the exhibit referenced in paragraph 64 of Mr. Weber's Declaration, Exhibit 1, is a voluminous data file, which Mr. Weber cites without providing any guidance as to what information specifically in the data file the court should refer. *See Stein v. N. Assur. Co. of Am.*, 09-cv-1029(TCP)(AKT), 2012 WL 1605365, at *1 n.2 (E.D.N.Y. May 7, 2012) ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.") (citation omitted) (alteration in original).

172. HarperCollins earned $46.91 million in revenue from ebooks in the United States library market between 2015 and 2020. Library ebook licenses also make up an increasing percentage of HarperCollins' overall ebook revenue. In fiscal year 2015, library ebook licenses in the United States constituted 2.3% of HarperCollins' total U.S. ebook revenue. By fiscal year 2020, that share grew substantially to 7.4% and reached 12.9% of all U.S. ebook revenue by mid-2021. As of mid-2021, HarperCollins earned over $19 million in revenue from library ebook licenses in the United States. (R-A Decl. ¶48.)

**Response:** Not disputed.

43

173.  The numbers of Americans reading authorized free ebooks from the library has increased more than the number of people purchasing ebooks in the retail market.  (Sevier Decl. ¶57; R-A Decl. ¶50.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Paragraph 50 of Ms. Restivo-Alessi's (HarperCollins) Declaration only describes data concerning the number of ebook checkouts that were made available to library patrons, not the number of ebook checkouts of HarperCollins ebooks that actually occurred.  Paragraph 57 of Mr. Sevier's (Hachette) Declaration notes only a shift from retail towards library, especially for backlist titles, and notes that 38% of Hachette backlist ebooks were bought at retail and 62% were checked out from libraries.  Neither record cite has laid a foundation for why these data points support the assertion in this paragraph concerning the rate at which each channel of revenue has increased.

Moreover, some of the cited evidence is not admissible.  Paragraph 57 of Mr. Sevier's (Hachette) Declaration cites a Hachette study.  Sevier Decl. Ex. 4.  While the Internet Archive does not dispute that the Mr. Sevier accurately quotes the conclusions of the study, to the extent Plaintiffs offer the study for the truth of its contents, the study is hearsay.  Fed. R. Evid. 801, 802.  *Young v. Daughters of Jacob Nursing Home*, No. 09-CV-7475 (CS), 2011 WL 2714208, at *1 n.1 (S.D.N.Y. July 12, 2011), *aff'd sub nom. Young v. Daughter of Jacob Nursing Home, (D.O.J.)*, 491 F. App'x 263 (2d Cir. 2012) ("It is also settled that exhibits submitted in connection with a summary judgment motion must be authenticated and non-hearsay in order to be considered.").

174.  Three of the Publishers have performed analyses to determine the proportion of ebook readers in the United States who access authorized ebooks for free from a library, as

compared with purchasing a commercial ebook.  (Sevier Decl. ¶¶55-59; Weber Decl. ¶¶6, 64; R-
A Decl. ¶50.)

     **Response:**  Not disputed (but immaterial).

     175.  In 2020, PRH performed a preliminary study using nearly 87,000 titles first
published by the company between January 2017 and August 2019 and compared library
checkouts via OverDrive with commercial ebooks purchased from Amazon and other retail
platforms.  The study determined that library patrons checked out the ebook titles 34.3 million
times, which accounted for approximately 39% of all ebook reads for these titles.  Which means
that, of all the Americans reading PRH ebooks available during this nearly three year time
period, 39% obtained the ebook for free from a library.  (Weber Decl. ¶¶6, 64.)

     **Response:**  Not disputed that in 2020 Penguin Random House "performed a preliminary
study using nearly 87,000 titles first published" by Penguin Random House "between January
2017 and August 2019."  Not disputed that this study "compared library checkouts via
OverDrive with commercial ebooks purchased form Amazon and other retail platforms."

     However, disputed to the extent this paragraph relies on inadmissible evidence.  While
the Internet Archive does not dispute that Mr. Weber (Penguin Random House) accurately
summarizes the conclusions of the study, to the extent the study's conclusions are being offered
for their truth, the study is hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.
Therefore, the cited evidence is not admissible.  Moreover, the exhibit referenced in paragraphs 6
and 64 of Mr. Weber's Declaration, Exhibit 1, is a voluminous data file, which Mr. Weber cites
without providing any guidance as to what information specifically in the data file the Court
should refer.  *See Stein*, 2012 WL 1605365, at *1 n.2 ("[B]ecause nothing in the federal rules
mandates that district courts conduct an exhaustive search of the entire record before ruling on a

motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.") (citation omitted) (alteration in original).

176. Moreover, the 39% percent of eBook reads from library patrons accounted for only 25% of PRH's total ebook revenue for that same time period, with the remaining approximately 75% of ebook revenue coming from consumers that purchased their ebooks. (Weber Decl. ¶¶6, 64.)

**Response:** The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). Paragraphs 6 and 64 of Mr. Weber's Declaration discusses a Penguin Random House study of "titles published and distributed by Penguin Random House and first published between January 2017 and August 2019"—not sales revenues from January 2017 and August 2019 for all titles (which would include at least titles first published before January 2017). Moreover, the exhibit referenced in paragraphs 6 and 64 of Mr. Weber's Declaration, Exhibit 1, is a voluminous data file, which Mr. Weber cites without providing any guidance as to what information specifically in the data file the court should refer. *See Stein*, 2012 WL 1605365, at *1 n.2 ("[B]ecause nothing in the federal rules mandates that district courts conduct an exhaustive search of the entire record before ruling on a motion for summary judgment, district courts are entitled to order litigants to provide specific record citations.") (citation omitted) (alteration in original).

177. In a 2021 study, Hachette looked at three years of data comparing the number of authorized ebook circulations of its titles to library patrons via OverDrive, as compared with the number of consumers purchasing their ebooks. It found that between 2017 and 2020, library ebook circulations made up, on average, 50% of "reads." In other words, the study reflected that

46

half of the people who read Hachette's ebooks are library readers who obtained the ebooks for free. (Sevier Decl. ¶¶55-56.)

**Response:** Not disputed that the study purports to examine "three years of data comparing the number of authorized ebook circulations of its titles to library patrons via OverDrive, as compared with the number of consumers purchasing their ebooks." Not disputed that the study's purported findings were that "between 2017 and 2020, library ebook circulations made up, on average, 50% of 'reads.'"

Disputed to the extent the cited evidence is not admissible. If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1. Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph. Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-2020 at HACHETTE0010912 ("Key Observations"). To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

178. The study also reflected that, although library ebooks made up 50% of reads, library ebooks brought in only 13% of total ebook revenue for Hachette; the remaining approximately 87% of revenue was generated from retail channels. (Sevier Decl. ¶56.)

**Response:** Not disputed that the study purportedly "reflected that, although library ebooks made up 50% of reads, library ebooks brough in only 13% of total ebook revenue for Hachette; the remaining approximately 87% of revenue was generated from retail channels."

Disputed to the extent the cited evidence is not admissible. If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay.

47

Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1. Moreover Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph. Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-2020 at HACHETTE0010912 ("Key Observations"). To the extent the "overview" is being offered for the truth of its content, the "overview" is also hearsay. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

179.  Hachette's analysis also concluded that since 2017, the percentage of their consumer reads has been shifting from retail towards library, especially for backlist. Of all HBG backlist ebooks either purchased or checked out in 2020, 38% were bought at retail and 62% checked out from libraries. (Sevier Decl. ¶57.)

**Response:**  Not disputed that the purported conclusions of the study are that "since 2017, the percentage of [Hachette's] consumer reads has been shifting from retail towards library, especially for backlist. Of all HBG backlist ebooks either purchased or checked out in 2020, 38% were bought at retail and 62% checked out from libraries."

Disputed to the extent the cited evidence is not admissible. If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1. Moreover Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph. Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-2020 at HACHETTE0010912 ("Key Observations"). To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

48

180.  Finally, the study reflected that in the year 2020, library ebooks brought in 16% of total ebook revenue for Hachette.  During the same year, 57% of the people who read Hachette's ebooks were library readers who obtained the ebooks for free.  (Sevier Decl. ¶56.)

**Response:**  Not disputed that the "study reflected that in the year 2020, library ebooks brought in 16% of total ebook revenue for Hachette.  During the same year, 57% of the people who read Hachette's ebooks were library readers who obtained the ebooks for free."

Disputed to the extent the cited evidence is not admissible.  If the conclusions of the study are being quoted or summarized for the truth of the matter asserted, the study is hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his Declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook sales and Circulations[] Overview 2017-2020 at HACHETTE0010912 ("Key Observations").  To the extent the "overview" is being offered for the truth of its contents, the "overview"" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

181.  In 2021, through its 26-Circ and PPU models, HarperCollins made over 63 million ebook checkouts available to library patrons through its library ebook sales, exceeding retail ebook sales by more than 30 million.  This figure reflects all potential check-outs under the 26-Circ model, not actual check-outs.  (R-A Decl. ¶50.)

**Response:**  Not disputed that "in 2021, through its 26-circ and PPU models, HarperCollins made more than 63 million ebook checkouts available to library patrons."  Disputed to this extent the assertions in this paragraph are offered to support an argument that retail sales exceeded checkouts:  Ms. Restivo-Alessi (HarperCollins) does not lay a foundation

49

for using available instead of actual check-outs to show that the number of retail sales exceeded check-outs.

182.  While HarperCollins made more "reads" available through library ebook sales than through retail sales, library ebook revenue accounted for approximately 10-15% of the company's ebook revenue in 2021.  (R-A Decl. ¶50.)

**Response:**  Not disputed.

183.  The Publishers make efforts to ensure that their ebooks are available in a format accessible to the blind and visually disabled, at no cost to those patrons.  (Sevier Decl. ¶71; R-A Decl. ¶51; Pavese Decl. ¶.)

**Response:**  Not disputed (but immaterial).

184.  Hachette and HarperCollins make their works available through Bookshare, which is the world's largest accessible online library for people with print disabilities.  Bookshare makes its services available, free of charge, to all qualifying students in the United States through an award from the U.S. Department of Education, Office of Special Education Programs.  (Sevier Decl. ¶51; R-A Decl. ¶51.)

**Response:**  Not disputed (but immaterial).

185.  As a result, Bookshare is free for all qualified U.S. students.  Individuals who are not students or international patrons can pay a nominal annual fee for their membership.  Bookshare makes content available through a range of assistive technologies, including braille readers, text to speech and ebooks.  If a reader requested title is print exclusive or has never yet been available in ebook format, the Publishers produce a special PDF exclusive to Bookshare for the unique purpose of fulfilling this obligation to readers.  (Sevier Decl. ¶51.)

**Response:**  Not disputed (but immaterial).

50

186.  For the general population, the Publishers also produce ebooks with the typical features of type resizing, page magnification, and screen contrast so readers can adjust the text to their preference.  (R-A Decl. ¶52; Sevier Decl. ¶71.)

**Response:**  Not disputed (but immaterial).

187.  Starting in March 2020, as the COVID-19 pandemic caused various shutdowns, the Publishers enacted programs and new lending models to assist libraries and schools to meet the increased demand for ebooks.  (Sevier Decl. ¶70; Weber Decl. ¶¶79-80; R-A Decl. ¶41.)

**Response:**  Not disputed.

188.  During the pandemic, many public libraries in the United States were provided with time-limited federal funding under the American Rescue Plan Act that could be directed towards obtaining library ebooks for patrons.  Some of the Publishers adjusted their models to allow libraries to qualify for this funding.  (R-A Decl. ¶41; Weber Decl. ¶79.)

**Response:**  Not disputed.

189.  PRH implemented two library ebook models in the spring of 2020.  (Weber Decl. ¶79.)

**Response:**  Not disputed.

190.  First, PRH created a one-year metered model under which libraries can purchase a license to access an ebook title on a one-copy, one-user basis for half the digital list price than the company's standard two-year model.  (Weber Decl. ¶79.)

**Response:**  Not disputed.

191.  Second, PRH created a pay-per-use model.  If a library participates in this model, the patrons of that library are given the option to access a one-time, time-limited loan of any ebook in PRH's catalog.  Each time a title is checked out through this model, the library pays

10% of the standard digital list price under PRH's standard two-year library ebook model. (Weber Decl. ¶80.)

    **Response:**  Not disputed.

    192.  Starting in the beginning of the pandemic, Hachette adopted protocols under which teachers and professors could obtain up to 250 codes for their students to use to obtain ebooks that could be read in lieu of physical copies that were inaccessible.  (Sevier Decl. ¶70.)

    **Response:**  Not disputed.

    193.  In response to the pandemic, Hachette also provided discount ebooks to academic libraries on a case-by-case basis, either under a simultaneous use option that allowed up to twenty students to read a single copy of an ebook for two months for $20, or through a discounted one-copy, one user model where a library would be charged $3 for each ebook copy, for a three-month access period.  (Sevier Decl. ¶70.)

    **Response:**  Not disputed.

    194.  During the pandemic, HarperCollins temporarily instituted a prorated, time-metered model for libraries to make HarperCollins' ebooks available to their patrons.  The company developed this model with the intent to allow libraries to spend their time-limited federal funding on licensed ebooks.  (R-A Decl. ¶41.)

    **Response:**  Not disputed.

    195.  At the start of the pandemic, HarperCollins reduced prices on approximately 1,000 popular backlist trade and children's ebook titles for several months.  (R-A Decl. ¶41.)

    **Response:**  Not disputed.

    196.  HarperCollins also expanded the titles in the PPU model at this time.  While the PPU Model had previously been confined to books published more than eighteen months ago,

52

the company moved up the time frame for frontlist books to enter the PPU Model to six months post-publication.  (R-A Decl. ¶41.)

**Response:**  Not disputed.

197.  Additionally, starting in the beginning of the pandemic, HarperCollins extended permission to authors, educators, and librarians to read the company's titles online and on video. (R-A Decl. ¶41.)

**Response:**  Not disputed (but immaterial).

198.  The Publishers brought this suit as to each of the 127 literary works listed in Exhibit A (the "Works") to their Complaint.  (McN Decl. ¶7.)

**Response:**  Not disputed.

199.  The 127 Works in Suit range from well-known titles like *The Bell Jar* and *Lord of the Flies*, to groundbreaking titles, like Zora Neale Hurston's *Their Eyes Were Watching God* or Toni Morrison's *Bluest Eye*, to popular non-fiction and fiction titles, like Malcolm Gladwell's *Blink*, Gillian Flynn's *Gone Girl*, Ann Patchett's *Commonwealth*, and George R.R. Martin's *A Dance with Dragons* (from the *Game of Thrones* series), to classic children's titles, like the *Big Nate* or *Lemony Snicket* books, to biographies, to romance novels, like CJ Redwine's *Defiance*, and Patrick Lencioni's best-selling management books.  (McN Decl. ¶7; Weber Decl. ¶¶21-22; Sevier Decl. ¶73; R-A Decl. ¶6; Pavese Decl. ¶18.)

**Response:**  Not disputed.

200.  For each of the Works in Suit, the Publishers obtained from each author the exclusive rights to publish the underlying work in multiple formats, including hardcover, paperback, and ebook formats.  (McN Decl. ¶8.)

**Response:**  Not disputed.

53

A-6059

201.  All 127 Works in Suit are available as authorized ebooks, which retail consumers pay to read and libraries pay to license so that they can be loaned for free to their patrons. (Sevier Decl. ¶9; Weber Decl. ¶20; R-A ¶20; Pavese Decl. ¶18.)

**Response:**  Not disputed.

202.  Over the three years prior to this action, the Works in Suit collectively generated over $1 million in library ebook revenues alone for the respective Publishers and their authors. (Weber Decl. ¶23; R-A ¶49.)

**Response:**  Disputed to the extent the cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  There is no cited support for the assertion that the "Works in Suit collectively generated over $1 million in library ebook revenues alone" "over the three years prior to this action" "for . . . their authors."  Further, Plaintiffs do not provide any support for the authors of the Works in Suit making over $ 1 million in library ebook revenue for "the three years prior to this action."  There is therefore not sufficient evidence to show that the Works in Suit generated over $1 million in library ebook revenue.

203.  The Works in Suit were checked out on Internet Archive's Website 46,307 times between March 2017 and approximately September 2, 2020.  (Foster Decl. ¶104.)  As of May 2020, Internet Archive provided registered users of its website with digital versions of the physical books embodying the Works in Suit.  (Offner Decl. ¶14.)

**Response:**  Not disputed, but note that, in both Dr. Foster's Report and in his Declaration, the exact number is 46,305, not 46,307.

204.  Digital versions of each of the Works in Suit could be accessed on Internet Archive's website using a standard Internet Archive account.  A specially qualified account held

be someone with a print disability was not necessary to access the Works in Suit.  (Offner Decl. ¶6.)

**Response:**  Not disputed.

205.  The Internet Archive generates a "details" page for each book listed on its website, with a separate URL.  (Offner Decl. ¶8.)

**Response:**  Not disputed.

206.  As of May 2020, each of the Works in Suit had a "details" page with a separate URL on the Internet Archive's website.  (Offner Decl. ¶14.)

**Response:**  Not disputed.

207.  As of May 2020, while on the "details" pages for all of the Works in Suit, a user could click a button labeled "Borrow".  (Offner Decl. ¶11.)

**Response:**  Not disputed.

208.  As of May 2020, after clicking the "Borrow" button on the "details" pages for all of the Works in Suit, a user would obtain access to each full book for 14 days.  (Offner Decl. ¶14.)

**Response:**  Not disputed.

209.  For all of the Works in Suit, once a user accessed each full book, a user could:

**Response:**  Not disputed.

209.1.  Scroll through and read the book within the Internet Archive website's online book-reader interface;

**Response:**  Not disputed.

209.2.  Utilize the listen feature, called "Read this book aloud," of the Internet Archive website's online book-reader interface to hear an audio rendering of each book; and

**Response:**  Not disputed.

55

209.3. Use the download feature to download each full book from Internet Archive website, for access on a computer using Adobe Digital Editions. The download feature allowed for downloads in both PDF and ePUB formats. (Offner Decl. ¶12.)

**Response:** Not disputed.

210. Hachette holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Hachette is identified as the publisher. (McN Decl. ¶8.)

**Response:** Not disputed.

211. HarperCollins holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which HarperCollins is identified as the publisher. (McN Decl. ¶8.)

**Response:** Not disputed.

212. Penguin Random House holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Penguin Random House is identified as the publisher. (McN Decl. ¶8.)

**Response:** Not disputed.

213. Wiley holds exclusive rights pursuant to 17 U.S.C. § 106, including the right to reproduce (§ 106(1)) and distribute (§ 106(3)), for each of the Works listed on Exhibit A to the Complaint for which Wiley is identified as the publisher. (McN Decl. ¶8.)

**Response:** Not disputed.

214. Each of the 127 Works was registered with the United States Copyright Office within the time period required to recover statutory damages and attorneys' fees under 17 U.S.C. § 412 with respect to the allegations set forth in the Complaint. (McN Decl. ¶8.)

**Response:** Not disputed.

215. Internet Archive endorses the phrase "Universal Access to All Knowledge." (McN Decl. ¶27.)

**Response:** Not disputed (but immaterial).

216. Internet Archive was founded in 1996 by Brewster Kahle, who currently serves as its Chairman. (McN Decl. ¶28.)

**Response:** Not disputed (but immaterial).

217. Mr. Kahle is a computer scientist who sold two technology companies in the 1990s, one to AOL and another to Amazon. (McN Decl. ¶28.)

**Response:** Not disputed (but immaterial).

218. The considerable profits from those sales were used, in part, to fund the Kahle/Austin Foundation, which Kahle runs as President with his wife and which reported assets worth approximately $120 million in 2019. (McN Decl. ¶28.)

**Response:** Not disputed (but immaterial).

219. Internet Archive is a 501(c)(3) corporation. (McN Decl. ¶29.)

**Response:** Not disputed.

220. In a 2017 grant application, Internet Archive stated that it has a guaranteed source of philanthropic support to sustain its basic services in perpetuity." (McN Decl. ¶29.)

**Response:** Not disputed.

221.  Internet Archive's activities are in large part funded by Mr. Kahle's various entities, including the Kahle/Austin Foundation.  IA's former Director of Finance Jacques Cressaty testified that Mr. Kahle "would use various ways of channeling these funds [to IA]" including via the Kahle/Austin Foundation.  (McN Decl. ¶29.)

**Response:**  Not disputed (but immaterial).

222.  Government funding made up only 1.8% of Internet Archive's revenue between 2011 and 2020.  (McN Decl. ¶29.)

**Response:**  Not disputed (but immaterial).

223.  Mr. Kahle wrote in a March 1, 1997 article for Scientific American that "the continued reduction in price of data storage, and also data transmission, could lead to interesting applications as all the text of a library, music of a radio station, and video of a video store become cost effective to store and later transmitted in digital form."  (McN Decl. ¶31.)

**Response:**  Not disputed (but immaterial).

224.  In approximately 2000 or 2001, Internet Archive started uploading public domain books to its Website in order to "build[] a digital library".  (McN Decl. ¶31.)

**Response:**  Not disputed.

225.  The Google Books service at issue in *Authors Guild v. Google, Inc*., 804 F.3d 202 (2d Cir. 2015), allowed users to search through and read "snippets" of books, but did not allow users to access the complete text of a book.  (McN Decl. ¶¶33-34.)

**Response:**  Not disputed.

226.  In a December 20, 2006 article, Mr. Kahle was quoted as saying "[t]he whole Google Books Search looks like Amazon's Search Inside the Book.  Let's go open with these collections.  These are beautiful books."  (McN Decl. ¶33.)

58

**Response:** Not disputed (but immaterial).

227. About a year later, Internet Archive announced that "together with the Boston Public library and the Woods Hole Library, it would start scanning out-of-print but in-copyright works to be distributed through a digital interlibrary loan system." (McN Decl. ¶34.)

**Response:** Not disputed (but immaterial).

228. In contrast, a New York Times article stated that "Google scans copyrighted works as well, but it does not allow users to read the full text of those books online, and it allows publishers to opt out of the program." (McN Decl. ¶34.)

**Response:** Not disputed (but immaterial).

229. Mr. Kahle has stated that he sees Internet Archive's activities in connection with the Website as a "rebellious" act that "SIMPLY ASSUME[s]" that Internet Archive "can perform a function in the online environment that [libraries] routinely perform in the physical print environment." (McN Decl. ¶15.)

**Response:** Disputed to the extent the assertions in this paragraph are misleading (but immaterial). This quote is in the context of discussing Controlled Digital Lending specifically, not the Internet Archive per se: "But you don't always need to break down doors or smash locks to make progress. CDL is also a quiet and powerful little tool that lets libraries do something that might feel rebellious: SIMPLY ASSUME they they can []Perform a function in the online environment that they routinely perform in the physical print environment, in order to ensure that knowledge can be equitable shared." McNamara Decl. Ex. 27 at INTARC00142135. Further, Chris Freeland appears to have given this presentation, not Brewster Kahle. *See* McNamara Decl. Ex. 27 at INTARC00142018.

230.  Today, subject to its claim that it does not post books published within the last five years, Internet Archive scans any in-copyright books it acquires and posts ebook versions of those titles on its Website.  (McN Decl. ¶35.)

**Response:**  Not disputed that the Internet Archive, as a matter of course, does not loan books that have been published within the last five years.  Disputed that the Internet Archive "scans any in-copyright books it aquires and posts ebook versions of those titles on its Website." Before scanning a book it lawfully acquires, the Internet Archive ascertains whether the book is one the Internet Archive affirmatively wants to digitize.  Internet Archive has not yet lawfully acquired, scanned, and made available for digital lending.  Kahle Opp'n Decl. ¶ 17; *see also* Gratz Opp'n Decl. Ex. 2, Mills Dep. Tr. 154:6-155:3.

231.  Internet Archive does not always comply with its five year limitation.  For example, two of the Works in Suit, All the Presidents' Women and The Man Who Solved the Market, were published in 2019 and republished on the IA's Website that same year.  (McN Decl. ¶115.)

**Response:**  Not disputed.

232.  Internet Archive has set public goals for the number of in-copyright books it would like to make available for borrowing as ebooks on the Website.  For example, in March 2018, Internet Archive announced that its short-term goal is to digitize more than four million in-copyright books and add them to the Website.  (McN Decl. ¶36.)

**Response:**  Not disputed.

233.  Then, eight months after this lawsuit was filed, Internet Archive announced that it had added its two millionth in-copyright book to the Website on February 3, 2021.  (McN Decl. ¶36.)

**Response:**  Not disputed.

60

234.  IA currently lists more than 3 million in-copyright books on its Website.  If IA continues to add in-copyright books at a similar rate, it is on track to meet its four million-book milestone within a year.  (McN Decl. ¶36.)

**Response:**  Not disputed.

235.  In an August 2011 article in *The Guardian*, Mr. Kahle stated that he has a "realistic goal of 10 million books—the equivalent of a major university library."  (McN Decl. ¶36.)

**Response:**  Not disputed (but immaterial).

236.  At present, anybody in the world with an Internet connection and a valid email account can obtain an account to access any of the millions of ebooks available on IA's Website. (McN Decl. ¶3.)

**Response:**  Not disputed.

237.  Chris Freeland, Internet Archive's Director of Open Libraries, testified that any person can "sign up" for free access to the Website "from anywhere in the world" by entering "[b]asic contact information including [an] email address."  (McN Decl. ¶3.)

**Response:**  Not disputed.

238.  According to Mr. Freeland, Internet Archive "[l]end[s] to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into [controlled digital lending] by particular users."  (McN Decl. ¶3.)

**Response:**  Not disputed.

239.  The Publishers commenced this copyright infringement action on June 1, 2020, alleging that Internet Archive was infringing the 127 Works in Suit.  (McN Decl. ¶7.)

**Response:**  Not disputed.

61

240.  An analysis of the Website shows that over 33,000 in-copyright books published by the Publishers in print and digital form are available on the Website.  (McN Decl. ¶7.)

**Response:**  Not disputed.

241.  The Works in Suit are a fraction of the more than 33,000 in-copyright books published by the Publishers that Internet Archive has posted as ebooks on the Website without authorization, license or any compensation.  (McN Decl. ¶7; Foster Decl. ¶¶112-118.)

**Response:**  Not disputed that the Works in Suit are not the only books published by Plaintiffs that the Internet Archive loans to its patrons.  Not disputed that the Internet Archive loans books without permission from Publishers.  Not disputed that the Internet Archive does not pay licensing fees to Plaintiffs for lending books.  Disputed that the Publishers do not receive compensation for the books the Internet Archive lends.  Publishers are compensated for the books the Internet Archive digitizes and makes available for lending when the physical copy is sold for the first time.  Gratz Opening Decl. Ex. A, Stipulation of Undisputed Facts ("Stipulation") ¶ 2.  Further, the only support cited for the assertion that the Internet Archive loans books published by Publishers "without . . . any compensation" is improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  (The cites to the Foster Declaration do not reference compensation at all.)

242.  Internet Archive scanned physical books published by the Plaintiffs and "republishes" ebook editions on the Website.  (McN Decl. ¶13.)

**Response:**  Not disputed.

243.  The Publishers have not granted Internet Archive permission to scan their physical books to create digital copies.  (McN Decl. ¶13.)  The Plaintiffs have not granted Internet

62

Archive permission to distribute these unauthorized ebook editions on the Website. (McN Decl. ¶13.)

**Response:** Not disputed.

244. Internet Archive admits that it lacks permission from the Publishers to engage in these activities. (McN Decl. ¶13.)

**Response:** Not disputed.

245. Mr. Freeland testified that Internet Archive does not "pay royalties in connection with the digitization of [each author's] work" or "pay authors royalties for making their books available for free" on the Website. (McN Decl. ¶37.)

**Response:** Not disputed.

246. Mr. Freeland testified that Internet Archive does not "license materials" for its Website. (McN Decl. ¶12.)

**Response:** Not disputed.

247. When this lawsuit was filed in June 2020, Internet Archive admitted in its Answer to the Complaint that "more than 1.3 million books are available on archive.org for one patron to borrow at a time." (McN Decl. ¶1.)

**Response:** Not disputed.

248. Since June 2020, the number of in-copyright ebooks available on the Website has increased to over 3.2 million. (McN Decl. ¶1.)

**Response:** Not disputed.

249. The Website effectuates about 70,000 "borrowing events" per day—which amounts to 25 million per year. (McN Decl. ¶2.)

**Response:** Not disputed.

63

250.  As of July 2022, IA's Website reflects that it has 5.9 million users.  This figure was 2.6 million when this action was filed in June 2020.  (McN Decl. ¶2.)

**Response:**  Not disputed.

251.  According to Internet Archive, at the time this action was filed, any user who logged in with a valid Internet Archive account could "borrow" for free in-copyright ebooks for a period of 14 days.  (McN Decl. ¶4.)

**Response:**  Not disputed.

252.  After this action was filed, Internet Archive changed it practices and now its default option allows valid users to "borrow" free in-copyright ebooks for a period of one hour.  (McN Decl. ¶4.)

**Response:**  Not disputed.

253.  Internet Archive still offers users the ability to "borrow" a book for 14 days if the title is available for concurrent lending by more than person at once.  Each title has a lending cap based on the number of concurrent loans of the work is allowed at one time. If the lending cap for a particular ebook title has been exceeded, the user goes on a waitlist until it becomes available.  (McN Decl. ¶4.)

**Response:**  Not disputed.

254.  Internet Archive has indicated that it offers "High Quality Page Images" of the books available for reading or downloading on its Website.  (McN Decl. ¶4.)

**Response:**  Not disputed.

255.  One of Internet Archive's experts, Dr. Imke Reimers, testified that the quality of the scans were "fine," "quite similar to the Google Books scans," and sufficiently clear to serve as a "potential substitute" for authorized library or commercial ebooks.  (McN Decl. ¶4.)

64

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). Dr. Reimers testified that the Internet Archive's digitized books "vary in quality" and that it was an "empirical question" as to whether digitized books served as "substitutes" for ebooks. McNamara Decl. ¶ 4 & Ex. 11, Reimers Dep. Tr. 21:19-23:11.

256. Internet Archive invites its users to read the ebooks on the Website. For example, the top of the home page of openlibrary.org invites readers to "Read Free Library Books Online." (McN Decl. ¶5.) Internet users who search Google for terms like "free ebooks," "borrow ebooks" or "Toni Morrison beloved free read" will see links to Internet Archive's Free Ebook Website on the first page of results, above any links to platforms offering the Plaintiffs' authorized library ebooks. (McN Decl. Exhibit 185.)

**Response:** Disputed. The only support cited for the sentence in this Paragraph related to Google searches is McNamara Exhibit 185, which is not authenticated by any declaration. *Young*, 2011 WL 2714208, at *1 n.1 ("Exhibits submitted in connection with a summary judgment motion must be authenticated and non-hearsay in order to be considered."). Further, Exhibit 185 does not support the assertion for which it is cited: that generic "Internet users who search Google for terms" will see certain results. Rather, Exhibit 185 appears to depict searches conducted by a logged-in user whose user name begins with "J." Exhibit 185 suggests that this logged-in user has previously conducted searches: The visible Google result states, "This search may be relevant to recent activity." *Id.*, ECF p. 4.

257. Mr. Kahle testified that once an ebook is checked out, a user can "flip through or read all the pages, absolutely." (McN Decl. ¶4.)

**Response:** Not disputed.

258. Internet Archive's library expert admitted that "certainly some [ebooks] could be read in an hour." (McN Decl. ¶4.)

**Response:** Not disputed.

259. Internet Archive is aware that at least some of its users use the Website to read books in full. In June 2020, when Internet Archive changed its default loan period from 14 days to 1 hour, it received complaints from users. (McN Decl. ¶5.)

**Response:** Not disputed.

260. For example, one user asked the Internet Archive, "How come all the books I try to read have a one hour limit? I'm confused and I'd just love to finish a series I'm reading." (McN Decl. ¶5.)

**Response:** Not disputed.

261. As of July 2020, there are more than 1.1 million ebooks listed for 14-day downloads on the Website. (McN Decl. ¶4.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1).[3]

---

[3] To the extent Plaintiffs meant to cite to paragraph 5 rather than 4 of the McNamara Declaration, the cited evidence also does not support the assertion in this paragraph. The McNamara Declaration cites to Exhibit 3 for this assertion, a PDF of the Books to Borrow landing page from archive.org. The Books to Borrow landing page indicates that there are more than 1.1 million ebooks listed for 14-day downloads, but it is not evident from the document that this figure is accurate as of July 2020, rather than the date the landling page was preserved as a PDF. In fact, the document appears to have been saved in July of 2022. *See* ECF p. 5.

66

262.  For the books that are available on the Website for one hour loans only, the top of the page view tells users that the loans are "[r]enewable every hour, pending availability." (McN Decl. ¶6.)

**Response:**  Not disputed.

263.  Internet Archive's dissemination of ebooks on its Website has expanded in recent years.  (Foster Decl. ¶18.)

**Response:**  Not disputed.

264.  The number of ebooks that Internet Archive makes available for lending on its Website has increased from (a) 648,117 scans on April 1, 2018; (b) 965,499 scans on April 1, 2019; (c) 1,476,344 scans on May 26, 2020; and (d) 3,211,204 scans on February 19, 2022. (Foster Decl. ¶18.)

**Response:**  Not disputed.

265.  The data further reflects an increase in Internet Archive's scanning of the Publishers' works in 2020 and 2021 after the Publishers filed suit in June 2020, as compared to prior years.  (Foster Decl. ¶18.)

**Response:**  Not disputed.

266.  Since this action was filed, Internet Archive has added a total of 2,993 in-copyright works published by Hachette for lending on the Website.  (Foster Decl. ¶118, Figure 11.)

**Response:**  Not disputed.

267.  Since this action was filed, Internet Archive has added a total of 4,171 in-copyright works published by HarperCollins for lending on the Website.  (Foster Decl. ¶118, Figure 12.)

**Response:**  Not disputed.

67

268. Since this action was filed, Internet Archive has added a total of 9,558 in-copyright works published by PRH for lending on the Website. (Foster Decl. ¶118. Figure 13.)

**Response:** Not disputed.

269. Since this action was filed, Internet Archive has added a total of 2,622 in-copyright works published by Wiley for lending on the Website. (Foster Decl. ¶118, Figure 14.)

**Response:** Not disputed.

270. The Website's home page includes a "BOOKS" tab that, when clicked, prominently shows icons for "Books to Borrow" and "Open Library." The first icon leads to a page for the "Books to Borrow" collection of electronic books on the Website. The second icon leads to the Openlibrary.org page, which is a component of Internet Archive's Website. (Foster Decl. ¶21.)

**Response:** Not disputed.

271. Internet Archive organizes its various content into "collections." The "Books to Borrow" page provides access to digitized books within the "inlibrary" collection, reported as holding 3,211,204 items as of Feb 21, 2022 and presently at over 3.4 million (Foster Decl. ¶21; McN Decl. ¶1.)

**Response:** Not disputed.

272. Clicking on the "About" icon on the "Books to Borrow" page toggles to text explaining that "Books in this collection may be borrowed by logged in patrons. You may read the books online in your browser or, in some cases, download them into Adobe Digital Editions, a free piece of software used for managing loans." The description at the "About" icon on the "Books to Borrow" page, at https://archive.org/details/inlibrary?tab=about, also indicates:

> Please note that works in this collection are protected by copyright
>
> law (Title 17 U.S. Code) and copying, redistribution or sale,

68

whether or not for profit, by the recipient is not permitted unless

authorized by the rightsholder or by law.

(Foster Decl. ¶23.)

**Response:** Not disputed.

273. Until June 2020, the Website functionality enabled downloads of any borrowed book into Adobe Digital Editions. After this action was filed, in June 2020, Internet Archive changed its system so that only 14 day loans allowed downloads of the books. The 1-hour loans are available for online viewing in your browser. (Foster Decl. ¶24.)

**Response:** Not disputed.

274. Users can presently use a search feature on the "Books to Borrow" page to locate titles within the collection. Apart from that search interface, the Internet Archive groups books into various "Topics and Subjects" for users to find a book. (Foster Decl. ¶24.)

**Response:** Not disputed.

275. The Internet Archive requires users to be logged in to an Internet Archive account to access many of its functions, including full access to free copies of complete digital books in the inlibrary collection. (Foster Decl. ¶27.)

**Response:** Not disputed.

276. The "BookReader application" allows the user to use the arrow keys on their keyboard, or to click on navigation buttons in the reader, to move to different pages in the borrowed book. The BookReader app on the Website also has a "Read Aloud" feature, which a logged in user can activate for a borrowed book by clicking on headphones icon in the BookReader. The feature converts the text to audio and plays it aloud. (Foster Decl. ¶28.)

**Response:** Not disputed.

277.  With a 14-day loan, the user is presented with text providing for additional "DOWNLOAD OPTIONS" including "ENCRYPTED ADOBE EPUB" and "ENCRYPTED ADOBE PDF" (with "High Quality Page Image").  Clicking on the latter results in a file download to a user's computer, which can be opened in the "Adobe Digital Editions 4.5" application. The scanned book is then in the user's Adobe Digital Editions "Library," from where the user can open and read it on a computer and a variety of other devices, including an iPad.  (Foster Decl. ¶30.)

**Response:**  Not disputed.

278.  Depending on the number of concurrent loans allowed, multiple users can obtain and read copies of the same Internet Archive scan of a book at the same time.  (Foster Decl. ¶31.)

**Response:**  Not disputed.

279.  Internet Archive has developed technology to facilitate its practice of obtaining physical books and of scanning those books in order to distribute the resulting ebooks on its Website.  (McN Decl. ¶38.)

**Response:**  Not disputed.

280.  According to Mr. Kahle's "Universal Access to Knowledge" speech in 2006, Internet Archive had by that time "developed [its] own little book scanner to get the cost per page—if you were to scan inside the United States—down to ten cents."  (McN Decl. ¶39.)

**Response:**  Not disputed.

281.  That machine, known as a Scribe, photographs the pages of books, which are turned manually by an operator raising and lowering a V-shaped pane of glass that keeps the pages flat. (McN Decl. ¶39.)

**Response:**  Not disputed.

70

282.  The photographs of each page of the book are run through software developed by Internet Archive, also called Scribe, to create digital copies of print books.  The Scribe machine and software are collectively known as the Scribe system.  (McN Decl. ¶39.)

**Response:**  Not disputed.

283.  Internet Archive subsequently created "digitization centers," where operators run multiple Scribe machines to scan high volumes of books.  Around 2009, Internet Archive partnered with a company called Data Datum to scan books in China.  (McN Decl. ¶40.)

**Response:**  Not disputed.

284.  Internet Archive also operates scanning centers in the United States, United Kingdom and Canada.  (McN Decl. ¶40.)

**Response:**  Not disputed.

285.  In 2019, IA opened a "superscanning" center in Cebu, Philippines that receives shipping containers full of books and digitizes them for inclusion on the Website.  (McN Decl. ¶40.)

**Response:**  Not disputed.

286.  Using these facilities, as of about 2021, Internet Archive scans about 3,500 books a day, which amounts to 1.28 million books annually.  (McN Decl. ¶40.)

**Response:**  Not disputed.

287.  Internet Archive does not license ebooks and does not pay any royalties to authors or publishers in connection with its digitizing and posting books on its Website for free.  (McN Decl. ¶12.)

**Response:**  Not disputed.

288.  Instead, Internet Archive stocks its Website by scanning and digitizing physical books that it obtains primarily via two channels—(1) by partnering with libraries to scan their collections, and (2) acquiring print books.  (McN Decl. ¶41.)

**Response:**  Not disputed.

289.  Internet Archive enters into contracts with certain libraries to scan their collections as part of a "commercial" book scanning business.  IA's book scanning business has generated more than $35 million of income since 2011.  (McN Decl. ¶ 42.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The Internet Archive's book digitizing activities pursuant to agreements with libraries are not a commercial business.  The vast majority of scanning relationships the Internet Archive has with libraries involve the scanning of public domain books.  These books are not made available for borrowing through the lending library: Internet Archive patrons are able to download public domain materials with no restrictions.  Kahle Opp'n Decl. ¶ 14.

290.  Participating libraries enter into an agreement to provide IA with print books from their collections to scan, which can be done on premises or offsite.  The scanning process keeps the book intact and, once scanned, the physical books return to the library for further circulation.  (McN Decl. ¶42.)

**Response:**  Disputed (but immaterial).  Apart from a few exceptions, books subject to scanning agreements the Internet Archive enters into with libraries are not the books the Internet Archive lends to patrons.  Kahle Opp'n Decl. ¶ 14.

291.  Under standard terms in the Scanning Agreement, Internet Archive "provide[s] one digital copy of each digitized [book] … to the Library and will retain additional Digital Copies.

72

Internet Archive will post Digital Copies on the Internet Archive in a newly created sub-collection… The Digital Copies will be freely available from Internet Archive via HTTP, Torrent or a similar method." (McN Decl. ¶43.)

    **Response:** Not disputed.

    292. The terms further state that both the library and Internet Archive "may freely use their Digital Copies … in any manner" that is "permitted under applicable copyright law," including "reproducing, displaying, storing, modifying, or distributing the Digital Copies." (McN Decl. ¶43.)

    **Response:** Not disputed.

    293. Internet Archive engaged in marketing to invite libraries to participate in a scanning project. For example, Internet Archive produced a flier inviting libraries to "Digitize your Collections [a]t one of our Regional Digitization centers or on your Table Top Scribe locally" that promises "[u]nlimited downloads of your items, with perpetual access. Keep and distribute copies!" (McN Decl. ¶42.)

    **Response:** Not disputed.

    294. The majority of the books Internet Archive scanned from library collections were in the public domain, but some books are in-copyright. (McN Decl. ¶43.)

    **Response:** Not disputed.

    295. Mr. Freeland first testified that in-copyright books scanned from library collections cannot be checked out on its Website. (McN Decl. ¶43.)

    **Response:** Not disputed.

    296. But, after he was shown an example of a work scanned from the collection of the Boston Public Library that apparently was available for borrowing, Mr. Freeland testified that in-

73

copyright "books may well be available for lending on archive.org that were obtained via scanning agreement..." (McN Decl. ¶43.)

**Response:** Not disputed.

297. According to Internet Archive, libraries were apparently reluctant to allow IA to scan in-copyright books because of "copyright concerns." (McN Decl. ¶¶44-45.)

**Response:** Not disputed.

298. Mr. Kahle stated in a July 2019 blog post that Internet Archive "has worked with 500 libraries over the last 15 years to digitize 3.5M books. But based on copyright concerns the selection has often been restricted to [public domain] books." (McN Decl. ¶44.)

**Response:** Not disputed.

299. Internet Archive's former Director of Finance, Jacques Cressaty, also testified that, by 2016, "our library partners ran out of books that were out of copyright, so pre-1923, and they're reluctant to give us books that were in copyright." (McN Decl. ¶43.)

**Response:** Not disputed.

300. To obtain physical books to scan, Internet Archive has looked to sources outside of libraries that have executed scanning agreements. Internet Archive has gathered some books from donations, including "about 500,000 books" by 2011. (McN Decl. ¶45.)

**Response:** Disputed. Apart from a few exceptions, books subject to scanning agreements the Internet Archive enters into with libraries are not the books the Internet Archive lends to patrons. Kahle Opp.n Decl. ¶ 14. Further, the cited evidence, improper testimony in the form of Ms. McNamara's Declaration, is not admissible. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

74

301.  Internet Archive also purchased books that its scanning contractor, "Datum Data," had obtained "through their connections in China."  (McN Decl. ¶45.)

**Response:**  Not disputed.

302.  Internet Archive has no policy in place to assess whether a particular physical book in its collection is a counterfeit copy before making a digital copy of the book and making that digital copy available for lending.  (McN Decl. ¶45.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1).  Further, Andrea Mills testified that the Internet Archive's practice was to reject—not scan—a book when either the ISBN on that book is not a valid ISBN or when the ISBN yields metadata that does not match the book.  Kahle Opp'n Decl. ¶ 18; Gratz Opp'n Decl. Ex. 2, Mills Dep. Tr. 116:12-117:6; Gratz Opening Decl. Ex. A, Stipulation ¶ 2.

303.  Internet Archive has also obtained books by absorbing entire library collections.  In 2020, the defunct Marygrove College donated its entire collection of "70,000 books" and other works.  (McN Decl. ¶46.) (

**Response:**  Not disputed.

304.  The materials in the Marygrove College collection were packed for shipping, digitized and resulting ebook copies were posted on the Website.  (McN Decl. ¶46.)

**Response:**  Not disputed.

305.  Internet Archive also has operated a book sponsorship program that allows users to contribute money towards the purchase and scanning of particular books they want to see added to the Website.  (McN Decl. ¶47.)

**Response:**  Not disputed.

306. Mr. Cressaty testified that, "[i]f you have a book that you are interested in having a digital copy of …, you can send us money or you can send us a book plus a donation to cover the cost of … the digitization of that book." (McN Decl. ¶47.)

**Response:** Not disputed.

307. Mr. Cressaty further testified that "the donor gives Internet Archive money in excess of the price of the book, and that money covers the purchase of the book and its scanning." (McN Decl. ¶47.)

**Response:** Not disputed.

308. Internet Archive also has funded its projects with donations of bitcoin. For instance, Internet Archive received "$1M in Bitcoin" from the anonymous donor behind the "Pineapple Fund." (McN Decl. ¶48.)

**Response:** Not disputed.

309. Internet Archive testified that "there's no way you can tell" where this money is coming from and the source "could be ISIS, for all you know." (McN Decl. ¶48.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). The quoted language is from the questioning attorney. *See* McNamara Decl. ¶ 48 & Ex. 45, Cressaty Dep. Tr. 114:12-116:18.

310. The physical books Internet Archive obtains are typically packed into shipping containers and sent to offshore digitization facilities in Cebu or China, where they are rendered into ebooks by the Scribe system. (McN Decl. ¶49.)

**Response:** Not disputed.

311.  The books are then shipped back to facilities operated by IA's affiliates, where they "are stored in double-stacked shipping containers in … physical archive facilities in Richmond, CA and Pennsylvania."  (McN Decl. ¶49.)

**Response:**  Not disputed.

312.  Unlike the physical books in the collections of public libraries, the physical books Internet Archive "preserves" in shipping containers are not available to the public.  (McN Decl. ¶49.)

**Response:**  Not disputed.

313.  The books and the facilities housing the shipping containers are legally owned by a separate entity, Open Library of Richmond Inc. ("OLR").  (McN Decl. ¶50.)

**Response:**  Not disputed.

314.  Mr. Kahle testified that "the Open Library of Richmond [] is actually the organization that stores and owns the books." (McN Decl. ¶50.)

**Response:**  Not disputed.

315.  Internet Archive does not own the physical books that it makes available on its Website.  (McN Decl. ¶50.)

**Response:**  Disputed to the extent this is misleading as worded.  A nonprofit that works closely with the Internet Archive, Open Library of Richmond, holds legal title to and maintains physical possession of many of the print books in its physical archive facilities.  For simplicity, regarding ownership of print books, the Internet Archive uses the term "Internet Archive" to refer collectively to the Internet Archive and Open Library of Richmond.  The Internet Archive or Open Library of Richmond lawfully acquire print books by purchasing or receiving a donation.  The Internet Archive digitizes physical books to which it – or Open Library of

77

Richmond—has legal title. Decl. of Brewster Kahle in Supp. of Internet Archive's Mot. for

Summ. J. ("Kahle Opening Decl.") ¶¶ 18, 19, 27; *see also* Kahle Opp'n Decl. ¶¶ 10, 16.

316.  According to Internet Archive's 990 tax form, Open Library of Richmond paid

Internet Archive a $4,840,000 grant in 2016.  (McN Decl. ¶50.)

**Response:**  Not disputed (but immaterial).

317.  Mr. Kahle is the principal officer of Open Library of Richmond.  He funds the

entity from his personal finances.  (McN Decl. ¶50.)

**Response:**  Not disputed.

318.  Internet Archive has a number of other affiliate companies in addition to OLR.

(McN Decl. ¶50.)

**Response:**  Not disputed.

319.  During his deposition, Mr. Cressaty referred to these companies as the

"Kahle/Austin Empire."  (McN Decl. ¶50.)

**Response:**  Not disputed.

320.  These companies own Internet Archive's "headquarters, warehouses and some

distributed data centers.  (McN Decl. ¶50.)

**Response:**  Not disputed.

321.  According to Internet Archive, these companies were created "[a]s a strategy to

mitigate risk."  (McN Decl. ¶50.)

**Response:**  Not disputed.

322.  In or about 2013, Internet Archive started sourcing physical books to scan and post

on its Website from the for profit, used book retailer, Better World Books ("BWB"). BWB has

78

obtained nearly 400 million print books, including from libraries discarding (or what Internet Archive describes as BWB's "weeding") unwanted copies.   (McN Decl. ¶51.)

    **Response:**  Not disputed.

    323.  In April 2013, Internet Archive and BWB drafted a memorandum of understanding, which stated that ███████████████████████████████████████████████████
████████████████████████████████████  (McN Decl. ¶51.)

    **Response:**  Not disputed.

    324.  Internet Archive would periodically identify print books that it wanted to acquire based on what was available from BWB's inventory, which BWB either donated or sold to IA for a modest fee.  (McN Decl. ¶52.)

    **Response:**  Not disputed.

    325.  In a 2016 email from Brewster Kahle to BWB's Director, Strategic Sales & Partnerships, for instance, Mr. Kahle stated that Internet Archive had identified "about 13k books that were … 'desirable' for us" from BWB's list and offered to purchase those "books for $1 each."  (McN Decl. ¶52.)

    **Response:**  Not disputed.

    326.  Eventually, in 2018 Internet Archive sent a "wish list" containing approximately "1.5M ISBNs" for BWB to run against its list to determine which books were available.  (McN Decl. ¶53.)

    **Response:**  Not disputed.

    327.  In that same message, Mr. Kahle and Freeland "agreed that our best path to millions of books is arm-in-arm with BWB…"  (McN Decl. ¶53.)

    **Response:**  Not disputed.

328. By April 2018, IA was ██████████████████████████████████ ████████████ (McN Decl. ¶53.)

**Response:** Not disputed.

329. In the fall of 2018, Internet Archive started exploring the possibility of acquiring Better World Books. In an email sent to Kahle on November 12, 2018, the founder of BWB wrote that ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(McN Decl. ¶54.)

**Response:** Not disputed.

330. On April 17, 2020, Mr. Kahle wrote in an email to a potential investor that Better World Books "get[s] 30 million books a year, and sell[s] 10 million – the others are donated or recycled. We want more of the flow… This is a bold move and our library colleagues believe it can help rearrange how books work in the library field in general: libraries buy books, and now consign or donate them to BWB, the new non-profit would keep 1 copy for digitization and preservation, the rest get sold. This is what BWB does already, but we would ramp this up. As a self sustaining business, this will keep the books flowing year after year." (McN Decl. ¶55.)

**Response:** Not disputed.

331. In the same message, Mr. Kahle also wrote that "they are a going concern and hopefully even profitable. If they generate money then they could pay for the digitization…"

80

and that "The successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world…" (McN Decl. ¶55.)

**Response:** Not disputed that Mr. Kahle wrote "they are a going concern and hopefully even profitable. If they generate money then they could pay for the digitization . . ." Disputed that Mr. Kahle was the origin for the following quote: "The successful operation of BWB will provide funding back to The Internet Archive to ensure that it can continue to deliver free services to the world . . ." This second quote was a relayed observation from Jim Michalko, memorialized in an email from Mr. Kahle. Further, each of the quotes in this paragraph is from a different email in the thread—not "in the same message." *Compare* McNamara Decl. Ex. 84, Kahle Apr. 18, 2019 email to Baldwin at INTARC00397107-08, *with* Kahle Apr. 19, 2019 email to Baldwin at INTARC00397106 (discussing Michalko's observations).

332. Finally, Mr. Kahle wrote that Internet Archive would obtain "maybe 7 million [books] over the next few years" (*id.*) at a rate of "1mm books per year." (McN Decl. ¶55.)

**Response:** Not disputed.

333. In June 2019, Internet Archive via affiliated entities acquired Better World Books. According to the Executive Vice President and General Counsel of Better World Books, Ms. Patton-Schmidt, ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ (McN Decl. ¶56.)

**Response:** Not disputed that Ms. Patton-Schmidt testified as quoted. Disputed that the "Internet Archive via affiliated entities acquired Better World Books." Better World Books and Better World Libraries (Better World Books's sole shareholder) each have their own independent

81

board.  Neither entity is controlled by the Internet Archive.  Gratz Opp'n Decl. Ex. 3, Patton-Schmidt Dep. Tr. 101:5-20, 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15.  █████ <sup>OMITTED</sup>

██████████████████████████████████████████████████

████████  Further, the only cited evidence for the assertion that the "Internet Archive . . . acquired Better World Books" is improper attorney testimony in the form of Ms. McNamara's Declaration.  *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

334.  Mr. Kahle used funds from his personal fortune to fund the transaction.  The funds passed through OLR before the funds were received by Better World Books.  (McN Decl. ¶56.)

**Response:**  Disputed (but immaterial).  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).

335.  As part of the transaction, OLR ██████████████████████████

████████████████████████████████  (McN Decl. ¶56.)

**Response:**  Not disputed.

336.  Under the terms of the acquisition Better World Libraries – a 501(c)(3) corporation controlled by Kahle – became the sole shareholder of Better World Books.  (McN Decl. ¶56.)

**Response:**  Not disputed that Better World Libraries is the sole shareholder of Better World Books.  Disputed to the extent the cited evidence does not support the assertion that Better World Libraries is a corporation "controlled by Kahle."  *See* Fed. R. Civ. P. 56(c)(1).  Gratz Opp'n Decl. Ex. 3, Patton-Schmidt Dep. Tr. 101:5-20, 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15.  Moreover, the promissory note (McNamara Decl. Ex. 86) is between Open Library of Richmond and Better World Books.

337.  Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire."  (McN Decl. ¶56.)

**Response:**  Disputed.  Better World Books is a 501(c)(3), as is its sole shareholder Better World Libraries.  Each entity has a board with three members.  Gratz Opp'n Decl. Ex. 3, Patton-Schmidt Dep. Tr. 101:5-20; 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15.

338.  Internet Archive announced the acquisition on November 6, 2019 in a blog post. The post stated that "[t]his new relationship will allow Better World Books to provide a steady stream of books to be digitized by the Internet Archive, thereby growing its digital holdings to millions of books…  Any book that does not yet exist in digital form will go into a pipeline for further digitization, preservation and access."  (McN Decl. ¶57.)

**Response:**  Not disputed.

339.  Internet Archive and Better World Books have explored and adopted a number of what the two entities have described as "synergies" – or "ways that BWB could work with IA and its affiliates to make both business perform better."  (McN Decl. ¶58.)

**Response:**  Not disputed.

340.  For instance, webpages for books on the Better World Books website are provided with links to "borrow" those books from the Internet Archive's Website.  (McN Decl. ¶58.)

**Response:**  Not disputed.

341.  According to BWB's Ms. Patton-Schmidt, following its acquisition, Better World Books ███████████████████████████████████████  (McN Decl. ¶60.)

**Response:**  Not disputed.

342.  Ms. Patton-Schmidt further testified that "Better World Books has vast management experience in libraries e-commerce and supply chain management that can be beneficial to IA." (McN Decl. ¶60.)

**Response:**  Not disputed (but immaterial).

343.  Ms. Patton-Schmidt testified that between 2020 and 2021, ███████████ ████████████████████████████████████████████████ ████████████████████████████ (McN Decl. ¶60.)

**Response:**  Not disputed (but immaterial).

344.  Between the acquisition in July 2019 and September 12, 2021, Better World Books has identified and packed up more than 2.8 million books from Internet Archive's "wishlist." (McN Decl. ¶ 61.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Evid. 56(c)(1).  The evidence instead states that 337,540 of the scanned books from this time frame were from the Internet Archive wishlist.  McNamara Decl. ¶ 61 & Ex. 95 at BWB_000420, BWB_000423.

345.  Many of these books have been shipped off to the Cebu scanning center for digitization, posted on the IA's Website, and set for eventual delivery to the facilities operated by IA affiliates for "preservation."  (McN Decl. ¶61.)

**Response:**  Not disputed.

346.  Webpages for ebooks on the Internet Archive's Website contain links to purchase that title from Better World Books, including a "Purchase at Better World Books" button that appears at the top of the window when users read an ebook on IA's ebook browser.  (McN Decl. ¶61.)

84

**Response:** Not disputed.

347. Internet Archive receives a payment from Better World Books every time a user clicks on a link on the Internet Archive's Website to purchase a used book from Better World Books' website. (McN Decl. ¶59.)

**Response:** Disputed. The Internet Archive does not receive a payment from Better World Books every time a user clicks on a link on the Internet Archive's website. The Internet Archive only receives a small amount from Better World Books each time a user clicks on a link to Better World Books's website and the user buys a book from Better World Books using that link. *See* Kahle Opp'n Decl. ¶ 19; *see also* Gratz Opp'n Decl. Ex. 4, Karpeles Dep. Tr. 184:19-185:12.

348. The webpages on IA's Website also include links to "Donate" to the Internet Archive. (McN Decl. ¶59.)

**Response:** Not disputed.

349. As Internet Archive's former Director of Finance testified, "every single page of the Archive is monetized." (McN Decl. ¶61.)

**Response:** Disputed. The evidence cited does not support the assertion in this Paragraph. *See* Fed. R. Civ. P. 56(c)(1). The questioning attorney prompted Mr. Cressaty with the quoted phrase. Moreover, the context of the line of questioning was the "Donate" button. *See* McNamara Decl. ¶ 59 & Ex. 45, Cressaty Dep. Tr. 206:12-208:4.

350. The screenshot below reflects the Website's "Donate" option.

85



(McN Decl. ¶59.)

**Response:** Not disputed.

351. The limits placed by Internet Archive on how the ebooks on its Website have changed over time. Initially, Internet Archive had "80,000+" in-copyright ebooks in its "In-Library eBook Lending Program. (McN Decl. ¶63.)

**Response:** Not disputed.

352. In an email from this time, Internet Archive's Office Manager stated that the ebooks could "only be borrowed by a patron of a physical library that participates in [Internet Archive's] program" and that the ebooks must be "access[ed] through our site from the physical library's network." (McN Decl. ¶63.)

**Response:** Not disputed.

353. Later, Internet Archive removed any geographical limits so that anybody in the world with an Internet connection could access in-copyright books on the Website. (McN Decl. ¶64.)

**Response:** Not disputed.

354. Internet Archive has not reinstated any geographic limits since this initial phase. (McN Decl. ¶64.)

**Response:** Not disputed.

86

355.  In or about 2018, Internet Archive began what it called its "Open Libraries" project. Prior to that time, IA limited the number of concurrent loans on any one title to the number of physical copies of the title owned by IA (or an affiliated entity).  (McN Decl. ¶67.) (¶70)

**Response:**  Not disputed.

356.  On November 13, 2018, Mr. Freeland published a blogpost stating that this "own one, loan one principle" based on the books Internet Archive owned was "viable, but limited," and "for controlled digital lending to work at scale, more physical copies are needed to loan against, especially for titles … that enter the public zeitgeist and become part of a major news story."  (McN Decl. ¶65.)

**Response:**  Not disputed.

357.  Two years before Internet Archive started the Open Libraries project, in October 2016, Mr. Kahle issued a statement titled "Transforming Our Libraries into Digital Libraries:  A digital book for every physical book in our libraries."  (McN Decl. ¶66.)

**Response:**  Not disputed (but immaterial).

358.  In that statement, Mr. Kahle proposed a "collaborative effort [with libraries] to select and digitize the most useful books of the 20th and 21st centuries, and to build a robust system to circulate the resulting e-books to millions, and eventually billions of people."  (McN Decl. ¶66.)

**Response:**  Not disputed.

359.  According to the statement, Mr. Kahle sought to achieve this goal by collaborating with libraries "to digitize the materials efficiently, minimizing duplication, and lend the texts with the same limitations placed on physical books."  (McN Decl. ¶66.)  Mr. Kahle wrote that "Internet Archive could create a circulation system that would administer the lending [for

87

libraries]. In effect, then, each library can choose from a variety of methods to lend digital versions of the physical books in their collection. This would keep the local libraries in control but leverage the convenience of a cloud-based system that others maintain and update." (McN Decl. ¶66.)

**Response:** Not disputed.

360. To accomplish this, Mr. Kahle stated that, "in each library's online catalog, when a digital version of a book exists [on Internet Archive], we can include a web-link on the record for the physical book, giving readers the ability to browse the book on screen or to borrow it from the convenience of their homes. In this way, we can smoothly enhance a library's collection, from analog to digital, at scale. . . . To build this future, we will need the participation of multiple sectors to bring thousands of libraries digital." (McN Decl. ¶66.)

**Response:** Not disputed.

361. According to Mr. Kahle, this "collaborative digital library collection and circulations system," "could help deliver e-books to millions of patrons with a flip of a digital switch." (McN Decl. ¶66.)

**Response:** Not disputed.

362. The concept identified in Mr. Kahle's 2016 statement would eventually be named the "Open Libraries" project. (McN Decl. ¶67.)

**Response:** Not disputed.

363. According to Internet Archive, this program allows libraries to "pool[] their physical collections" with Internet Archive "in order to make more lendable copies of digital books available to their users and the world." (McN Decl. ¶67.)

**Response:** Not disputed.

364.  According to its website, the purpose of the Open Libraries project is "to increase lending counts" on IA's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches." (McN Decl. ¶67.)

**Response:**  Not disputed.

365.  Under this system, a library participating in the Open Libraries project – known as a "Partner Library" – sends its catalogue to Internet Archive to "run an overlap analysis that compares [ISBN numbers for] their physical holdings with our digital holdings."  (McN Decl. ¶68.)

**Response:**  Not disputed.

366.  Internet Archive does not make new scans of the libraries' books identified by the overlap analysis.  Internet Archive does not take possession of the print book owned by the Partner Library.  (McN Decl. ¶68.)

**Response:**  Not disputed.

367.  Rather, every time a book in the Partner Library's catalogue matches an ebook on IA's Website, Internet Archive "just increases by one the number of concurrent checkouts of that book" permitted on the Website.  (McN Decl. ¶68.)

**Response:**  Not disputed.

368.  According to Mr. Freeland, Internet Archive does not "set any upper limit to the number of copies available via concurrent lending."  As a result, the overlap analysis dictates that "if a hundred partner libraries possessed a copy of the same book, the Internet Archive would be able to lend a hundred copies of that book simultaneously."  (McN Decl. ¶68.)

**Response:**  Not disputed.

89

369.  Mr. Freeland testified that if there were "a thousand libraries that had the same book and put them into controlled digital lending," then one thousand users would be able to view the ebook scan on the Website."  (McN Decl. ¶68.)

**Response:**  Not disputed.

370.  In order to become a Partner Library in the Open Libraries project, libraries need to submit an "online form."  (McN Decl. ¶69.)

**Response:**  Not disputed (but immaterial).

371.  That form states that "Internet Archive's Open Libraries project offers the prospect of making every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own."  (McN Decl. ¶69.)

**Response:**  Not disputed.

372.  According to the Open Libraries Form Agreement, Partner Libraries that participate in the project agree to "share their catalog of books with the number of copies of each book with the Internet Archive."  (McN Decl. ¶69.)

**Response:**  Not disputed.

373.  The Open Libraries Form Agreement imposes no substantive restrictions on the Partner Libraries' use of the physical books that match the ebooks on the Website.  (McN Decl. ¶69.)

**Response:**  Not disputed that there are no substantive restrictions on the use of physical books expressly imposed in the Form Agreement.

374.  The Open Libraries Form Agreement imposes no contractual requirement that the Partner Library remove the print book from circulation when the Internet Archive is lending out an ebook correlated with that print book.  (McN Decl. ¶69.)

90

**Response:** Not disputed.

375. The Open Libraries Form Agreement provides that any partner "Library may integrate links to the borrowable Books in their catalog and other services. The Internet Archive will add books to the collections offered on the Internet Archive's sites." (McN Decl. ¶69.)

**Response:** Not disputed.

376. It is currently free for libraries to become Partner Libraries. (McN Decl. ¶70.)

**Response:** Not disputed.

377. Mr. Kahle has stated that "it would be understandable if we charged libraries that did not contribute digitization or backend services for access to digital books. It would be equally understandable to charge a one-time transfer fee to libraries that wanted to store their own local copies" of the ebooks on the IA Website. (McN Decl. ¶70.)

**Response:** Not disputed.

378. Internet Archive has marketed the Open Libraries project to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining "free ebooks for your patrons" with "no cost involved." (McN Decl. ¶71.)

**Response:** Disputed. The cited evidence does not support the assertions in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). The Internet Archive has not marketed the Open Libraries project as a "substitute for paying for authorized ebooks via authorized library ebook aggregators." The only cited evidence for the assertion that the Internet Archive has done so is improper attorney testimony in the form of Ms. McNamara's Declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. As explained above, whether a digitized book in fact acts as a substitute is an "empirical question." *See supra* ¶ 255; *see also* McNamara Decl. ¶ 4 & Ex. 11, Reimers Dep. Tr. 23:4-11.

91

Moreover, the assertions in this paragraph mischaracterize the underlying exhibits (27, 104-113) identified and discussed in the paragraph. This assertion quotes two phrases out of context "free ebooks for your patrons" and "no cost involved." The full quote in which these phrases appear is: "I understand that ASU is not deaccessioning materials at this time, following your storage buildout. Should that change, we would love to work with you on getting those materials digitized and housed in our physical archive. . . . As for our lending collection, we are keen to run an overlap study between the materials you hold in print and those that we have digitized. Where there's a match, we would use your physical inventory to increase our lending counts by 1 for those books. What we would need from ASU is either a MARC dump from your catalog or an ISBN export and then we can run that analysis. As I mentioned there is no cost involved - free ebooks for your patrons." McNamara Decl. Ex. 104 at INTARC00416931. The phrases "no cost" and "free ebooks for your patrons" are therefore used to explain that there is no cost to run the overlap study or to digitize materials that ASU might ultimately "deaccession."

379. Mr. Freeland sent an email to the Associate Dean of University of Oklahoma Libraries stating that "[t]he main offer we have in hand with the Open Libraries today is the ability to match your physical holdings with the 1.1M in-copyright books we have *already* digitized and where there's a match, provide you back a link to the digitized book." (McN Decl. ¶71.)

**Response:** Not disputed.

380. In another instance, an Internet Archive representative sent a librarian an email stating that the Open Libraries project "can leverage controlled digital lending to provide your patrons with free ebooks of your physical collections. As an Open Libraries, we match your in-

92

copyright holdings with our digital holdings and serve free ebooks where they overlap. Join Open Libraries, access free ebooks – so simple, we had to share!" (McN Decl. ¶71.)

**Response:** Not disputed.

381. Mr. Freeland gave a presentation entitled "Open Libraries Introduction & Internet Archive programs" that included the following slide:



(McN Decl. ¶71)

**Response:** Not disputed.

382. The notes to a slide for a separate presentation that Mr. Freeland gave to libraries stated that the Open Libraries project "ensures that a library will not have to buy the same content over and over, simply because of a change in format." (McN Decl. ¶71.)

**Response:** Not disputed.

383. Another presentation about the Open Libraries project by Mr. Freeland was titled "Maximizing institutional investments in print resources through controlled digital lending" – with the subtitle, "Or, You Don't Have to Buy it Again!" (McN Decl. ¶71.)

**Response:** Not disputed.

93

384.  In 2019, a vendor acting on behalf of Internet Archive sent an email to one of the subscribers to its Library.Link Network, the Evergreen Indiana Library Consortium, with a subject line of "Free eBooks for Indiana Evergreen."  (McN Decl. ¶71.)  That email stated that "Open Libraries provides a way for you to offer digitized books to your patrons for free" and that joining as a partner would "bring this added value to your libraries."  (McN Decl. ¶71.)

**Response:**  Not disputed that an Internet Archive vendor emailed the Evergreen Indiana Library Consortium in 2019.  Not disputed that the Evergreen Indiana Library Consortium is a subscriber to Library.Link.  Not disputed that the subject line of this email was "Free eBooks for Indiana Evergreen."  Not disputed that the email contains the quoted phrase:  "Open Libraries provides a way for you to offer digitized books to your patrons for free."  Disputed to the extent this quoted language is being offered for its truth, it is not admissible evidence.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

385.  In another instance, the same representative sent an email message to libraries asking whether they "would like to participate and get free ebooks for your end users."  (McN Decl. ¶71.)

**Response:**  Not disputed.

386.  The same vendor sent a librarian an email inviting them to join the Open Libraries project, which stated that the "1, 2, 3 of it is, once you sign the form we do the rest… would you like to participate and get free ebooks for your end users?... Internet Archive now offers FREE ebooks for all Library.Link libraries when you participate in the Open Libraries Controlled Digital Lending (CDL) project."  (McN Decl. ¶71.)

**Response:**  Not disputed.

94

387.  Internet Archive's Website contains a video of a July 14, 2021 presentation entitled "Implementation & Integration:  CDL for All Libraries" that describes controlled digital lending as a "[l]ow risk, reasonable solution that preserves legal and fiscal value in collections" and contains the following slide:



(McN Decl. ¶71.)

**Response:**  Not disputed.

388.  Internet Archive gave a presentation at the 2019 Library Leaders Forum that summarized the "[s]teps to participate in Open Libraries:  Join Open Libraries, Share your catalog, Overlap study, Integrate links back into your catalog, Lend digital books to your patrons."  (McN Decl. ¶71.)

**Response:**  Not disputed.

389.  At the 2020 Library Leaders summit, Mr. Kahle announced that "2.8M copies" of in-copyright books were added to concurrent lending counts through the Open Libraries' project. (McN Decl. ¶72.)

**Response:**  Not disputed.

390.  Mr. Freeland testified that the number of books added through overlap analysis has increased since that time.  (McN Decl. ¶72.)

**Response:** Not disputed.

391. Chris Freeland testified that Internet Archive had 81 Partner Libraries as of December 2021. (McN Decl. ¶72.)

**Response:** Not disputed.

392. As of December 24, 2021, Internet Archive's Objections and Responses to Plaintiffs' Second Set of Interrogatories stated that 62 Partner Libraries contributed books to the overlap analysis and 13 of those were public libraries. (McN Decl. ¶72.)

**Response:** Not disputed.

393. Many libraries – both Partner Libraries and other libraries – have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their library websites. (McN Decl. ¶73.)

**Response:** Not disputed.

394. For instance, the Georgetown University Law Library's catalog features the language "Full text availability" next to a particular title and presents a link to access the "full text" of the title through "Internet Archive Controlled Digital Lending." (McN Decl. ¶73.)

**Response:** Not disputed.

395. Likewise, the Dartmouth College Library's catalog entry for "The Catcher in the Rye," which is one of the Works in Suit, features a link to access an ebook version through the Internet Archive's Website. (McN Decl. ¶73.)

**Response:** Not disputed.

396. Many other unaffiliated libraries have accepted Internet Archive's offer to incorporate links to ebooks on the IA Website onto their main library websites, including public library systems in New York, California, and elsewhere. (McN Decl. ¶74.)

96

**Response:**  Not disputed.

397.  According to Mr. Freeland, for each Partner Library that contributes its catalogue for overlap analysis, the Internet Archive gets "an additional copy to lend" of every matching book "without … having to incur the cost associated with scanning."  (McN Decl. ¶75.)

**Response:**  Not disputed.

398.  Mr. Freeland testified that "[a]s a result of the Internet Archive implementing overlap analysis … wait lists [have] been reduced on" the Website "for certain titles."  (McN Decl. ¶75.)

**Response:**  Not disputed.

399.  Mr. Freeland testified that "the more books Internet Archive has been able to obtain and scan" through the Internet Archive's acquisition of Better World Books, "the greater likelihood there would be matches in the overlap analysis with potential partner libraries."  (McN Decl. ¶75.)

**Response:**  Not disputed.

400.  Prior to about 2018, IA did not rely on a model called "Control Digital Lending" to support its scanning and republication of in-copyright books.  (McN Decl. ¶77.)

**Response:**  Not disputed that the term "Controlled Digital Lending" was not used before 2018.  (The term was first used in or about 2017.)  Disputed to the extent this paragraph suggests that the model that was eventually called Controlled Digital Lending was not in use before 2018. The Internet Archive has been practicing the concept of what is now called Controlled Digital Lending since at least 2011.  Kahle Opp'n Decl. ¶ 9.

401.  As Mr. Kahle stated in the "Universal Access to Knowledge" speech he gave in 2006, Internet Archive had "found that if you put things out there in a nonprofit setting, it works

97

for people in the sense that they don't gripe. The idea of opt-out as opposed to opt-in – putting it up and then if somebody complains, taking it down – works very well in these sorts of communities. I would suggest being a bit bold and making things available..." (McN Decl. ¶77.)

**Response:** Not disputed that Mr. Kahle is quoted accurately or that the quote is from a 2006 speech called "Universal Access to Knowledge." Disputed to the extent this assertion is misleading: this quote is from a portion of Mr. Kahle's speech discussing discussing archival audio collections. *See* McNamara Decl. ¶ 77 & Ex. 49 at PLAINTIFFS0001113.

402. By 2015, the Copyright Office had issued a report concluding that "[t]here is broad agreement that no colorable fair use claim exists" for "providing digital access to copyrighted works in their entirety." (McN Decl. ¶78.)

**Response:** Not disputed.

403. In the prior year, a subcommittee of the Judiciary Committee of the House of Representatives held hearings about the first sale doctrine, including on whether to adopt a digital first sale doctrine. (McN Decl. ¶78.)

**Response:** Not disputed.

404. Groups including the Association of American Publishers strongly opposed the adoption of a digital first sale doctrine. (McN Decl. ¶78.)

**Response:** Not disputed.

405. While the subcommittee announced unrelated reforms for the Copyright Office and the Congress passed the Orrin G. Hatch-Bob Goodlatte Music Modernization Act, the Copyright Act was not amended to recognize a digital first sale defense. (McN Decl. ¶78.)

**Response:** Not disputed.

98

406. In 2017, Internet Archive applied for a $100 million grant from the MacArthur Foundation. According to its application, Internet Archive intended to use the grant to "turn 80% of library collections digital by 2023." (McN Decl. ¶79.)

**Response:** Not disputed.

407. Lila Bailey, Internet Archive's in-house policy counsel, testified that "as part of the grant proposal, barriers to solving the problem are identified. One of the significant barriers to libraries being able to loan out their digital collections was … copyright uncertainty, lack of clarity in the law." (McN Decl. ¶79.)

**Response:** Not disputed.

408. Ms. Bailey further testified that "the MacArthur Grant Challenge" is "what precipitated having a meeting in May of 2017 concerning Controlled Digital Lending." (McN Decl. ¶79.)

**Response:** Not disputed (but immaterial).

409. Accordingly, the Internet Archive convened what it described as the "Open Libraries Copyright Workshop" on May 23 and 24, 2017 to "consider the digitize and lend model that the Internet Archive is proposing to expand through the MacArthur Foundation's 100%Change grant." (McN Decl. ¶79.)

**Response:** Not disputed (but immaterial).

410. The Workshop was led by one of IA's advisors for the grant, the copyright scholar Pamela Samuelson, and was "modeled after a meeting that she did around the Google books case." (McN Decl. ¶79.)

**Response:** Not disputed (but immaterial).

99

411.  According to Ms. Bailey's testimony, Ms. Samuelson "wanted to basically have an open discussion, an academic discussion with other scholars and library practitioners who understood how libraries were engaging in this practice."  (McN Decl. ¶80.)

**Response:**  Not disputed (but immaterial).

412.  The participant roster for the Workshop submitted as part of the MacArthur Foundation Application included Ms. Bailey, Mr. Kahle, two other Internet Archive employees, two of the lawyers that have appeared for IA in this action (Joseph Gratz and Corynne McSherry) and several other individuals who would later participate in formulating a digital lending theory – including David Hansen, Kyle Courtney, Jason Schultz, Mary Minow and Michelle Wu.  (McN Decl. ¶80.)

**Response:**  Not disputed (but immaterial).

413.  Ms. Bailey testified that she was not aware of "any copyright lawyers who represent copyright creators at this panel."  (McN Decl. ¶80.)

**Response:**  Not disputed (but immaterial).

414.  At a dinner shortly after the Workshop, Ms. Bailey "started talking about the idea of writing something up" with Courtney, Hansen and Wu.  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

415.  Michelle Wu was a Georgetown University law professor and librarian who was another advisor to Internet Archive for the McArthur Grant and, according to Internet Archive, "crafted the legal theory behind Controlled Digital Lending."  (McN Decl. ¶81.)

**Response:**  Not disputed (but immaterial).

416. Ms. Wu also was retained by Internet Archive as its counsel, but did not reveal that affiliation in her letter submitted in support of IA's MacArthur grant application. (McN Decl. ¶81.)

**Response:** Not disputed (but immaterial).

417. Kyle Courtney is a Copyright Advisor at Harvard University and David Hansen was the Lead for Copyright and Information Policy and Associate University Librarian at Duke University. (McN Decl. ¶81.)

**Response:** Not disputed (but immaterial).

418. Ms. Bailey described Wu, Courtney and Hansen as "[f]riends of the Internet Archive." (McN Decl. ¶81.)

**Response:** Not disputed (but immaterial).

419. According to Ms. Bailey, at the May 2017 dinner, Ms. Bailey, Mr. Courtney, Mr. Hansen and Ms. Wu decided to draft "something short and easy for a non-lawyer to understand about the legal underpinning of Controlled Digital Lending." (McN Decl. ¶81.)

**Response:** Not disputed.

420. The group subsequently decided that there should also be a "white paper" that would address the legal issues more fully. (McN Decl. ¶81.)

**Response:** Not disputed.

421. The MacArthur Foundation rejected the Internet Archive's application for the $100 million grant in September 2017. (McN Decl. ¶82.)

**Response:** Not disputed (but immaterial).

101

422.  The primary drafters of a statement describing controlled digital lending (the "Statement") emerged as Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Wu, Mary Minow, and Jason Schultz.  (McN Decl. ¶82.)

**Response:**  Not disputed.

423.  Mr. Courtney and Mr. Hansen were also subsequently selected to draft a white paper on controlled digital lending (the "White Paper").  (McN Decl. ¶82.)

**Response:**  Not disputed.

424.  Mr. Courtney and Mr. Hansen sent a draft of the White Paper to Ms. Bailey prior to publication for her edits and comments.  (McN Decl. ¶82.)

**Response:**  Not disputed.

425.  When Mr. Freeland was asked about the status of the White Paper, he wrote in an email that "IA is officially NOT leading the effort for the sake of being impartial."  (McN Decl. ¶82.)

**Response:**  Not disputed (but immaterial).

426.  In its MacArthur grant application, Internet Archive wrote that a "working group willing to craft a joint statement" about controlled digital lending had formed after the May 2017 meeting in San Francisco, that the group's work "is now in progress[,]" and that "[t]his critical area of work is led by Internet Archive's legal counsel, Lila Bailey."  (McN Decl. ¶79.)

**Response:**  Not disputed (but immaterial).

427.  When Ms. Bailey was informed that the release of the White Paper may be delayed, she wrote in an email to Mr. Courtney, Mr. Hansen, Ms. Wu, and Ms. Minow and Schultz to the group to say that "[t]he Internet Archive has more than an academic interest in this moving forward" and that "it will be a complete failure and waste of our time if it's not released by [an

102

upcoming IA event]. I'm just being real about the impact of delay on my client (and potentially on my job if this isn't done… seriously guys)." (McN Decl. ¶83.)

**Response:** Not disputed (but immaterial).

428. Other scholars were consulted during the project for their thoughts on the draft Statement, including Peter Jaszi, a copyright expert and advisor to the Internet Archive who attended the Workshop. (McN Decl. ¶84.)

**Response:** Not disputed.

429. An Internet Archive blog post refers to Mr. Jaszi as one of Bailey's "heroes." (McN Decl. ¶84.)

**Response:** Not disputed.

430. Mr. Jaszi wrote to at least one librarian to warn them that the draft Statement was a "one-sided puff piece that seriously misrepresents both the state of the law and the risks to institutions of pursing the strategy" and that controlled digital lending "serve[s] the institutional interests of the IA." (McN Decl. ¶84.)

**Response:** Not disputed.

431. Additionally, library copyright expert Kenneth Crews wrote in an email responding to a draft of the Statement to say that "CDL use is NOT identical to current physical lending" and that if physical copies of books "are still available for non-circulating use, one could argue that you have doubled the number of readable and useable copies." (McN Decl. ¶85.)

**Response:** Not disputed.

432. The Statement and White Paper on controlled digital lending were published simultaneously in September 2018 on the website. https://controlleddigitallending.org/ (the "CDL Website"). (McN Decl. ¶86.)

103

**Response:**  Not disputed (but immaterial).

433.  Ms. Bailey testified that she was part of the "collaborative effort" that resulted in the publication of the Statement and White Paper on the CDL Website.  (McN Decl. ¶79.)

**Response:**  Not disputed.

434.  The Statement lists as co-authors Ms. Bailey, Mr. Courtney, Mr. Hansen, Ms. Minow, Mr. Shultz, and Ms. Wu.  (McN Decl. ¶86.)

**Response:**  Not disputed.

435.  The Statement does not disclose that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March or 2018.  (McN Decl. ¶86.)

**Response:**  Not disputed (but immaterial).

436.  The Statement includes the following statement:

> "Properly implemented, CDL enables a library to circulate a digitized title
> in place of a physical one in a controlled manner.  Under this approach, a
> library may only loan simultaneously the number of copies that it has
> legitimately acquired, usually through purchase or donation.  For example,
> if a library owns three copies of a title and digitizes one copy, it may use
> CDL to circulate one digital copy and two print, or three digital copies, or
> two digital copies and one print; in all cases, it could only circulate the
> same number of copies that it owned before digitization.  *Essentially, CDL
> must maintain an 'owned to loaned' ratio.*  Circulation in any format is
> controlled so that only one user can use any given copy at a time, for a
> limited time.  Further, CDL systems generally employ appropriate
> technical measures to prevent users from retaining a permanent copy or

104

distributing additional copies."

(McN Decl. ¶86.)

**Response:**  Not disputed.

437.  The Statement further claims that "there are two main areas of copyright law that support CDL:  the principle of exhaustion and the fair use doctrine."  (McN Decl. ¶87.)

**Response:**  Not disputed.

438.  The Statement states that the "first sale" doctrine allows creating and lending digital files of the physical books because "any time there is a lawful transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or 'exhausted.'"  (McN Decl. ¶87.)

**Response:**  Disputed to the extent the passage is incorrectly quoted.  The accurate quote is "any time there is an authorized transfer of a copy of a copyrighted work, the rights holder's power to control the use and distribution of that copy is terminated or exhausted."  *See* McNamara Decl. ¶ 87 & Ex. 133 at INTARC00458736.  Plaintiffs replaced "authorized" with "lawful."

439.  The Statement makes the proposition that "fair use and copyright exhaustion can work together to effectuate CDL practices."  (McN Decl. ¶87.)  The Statement acknowledges that there is no "directly analogous case on point" to support this proposition.  (McN Decl. ¶87.)

**Response:**  Not disputed.

440.  The Statement states that controlled digital lending is not unlawful because the "purposes of library lending … all focus on socially beneficial outcomes that favor fair use" and because there is no market harm "because properly implemented CDL programs maintain an 'owned to loaned ratio' that is comparable to physical lending."  (McN Decl. ¶87.)

**Response:**  Not disputed.

441.  The White Paper acknowledges that there is a "considerable point of concern that CDL is not clearly transformative."  (McN Decl. ¶88.)

**Response:**  Not disputed.

442.  The White Paper states that in "mass digitization cases involving books – *Google Books* …, for example – courts have largely focused on how those projects enabled transformative access to information by enabling text search, as well as research uses, such as text and date mining."  (McN Decl. ¶88.)

**Response:**  Not disputed.

443.  The White Paper emphasizes, in italicized text, that "libraries must truly exercise *control* in the process."  (McN Decl. ¶89.)

**Response:**  Not disputed.

444.  The White Paper states that "[w]hen the digital copy is being read by a patron, however, the physical copy is restricted and unavailable for consultation, so there is no situation in which the library is getting use of two copies for the price of one."  (McN Decl. ¶89.)

**Response:**  Not disputed.

445.  The White Paper states that libraries must "ensure that original works are acquired lawfully," "lend each digital version only to a single user at a time just as a physical copy would be loaned," "limit the time period for each lend" and "use digital rights management to prevent wholesale copying and redistribution."  (McN Decl. ¶89.)

**Response:**  Not disputed.

446.  The White Paper includes several "risk mitigation" measures that controlled digital lenders can implement to further reduce legal risk, including:

446.1.  adding artificial "friction" by extending the time between digital lends, more closely mirroring how physical books are lent and returned;

**Response:**  Not disputed.

446.2.  "introduce characteristics that mimic physical degradation[,]" by, as the White Paper explains, "plac[ing] the same limit on circulation of the digital copy" that would approximate the number of times a print book would be circulated before it degrades;

**Response:**  Not disputed.

446.3.  limiting the audience to "particular communities of users" (*e.g.*, students of an academic institution or "local residents") "to limit the overall reach of the copy and therefore the potential market effect;"

**Response:**  Not disputed.

446.4.  only distributing older works published pre-1989 and public domain books;

**Response:**  Not disputed (but immaterial).

446.5.  only distributing out-of-print or orphan works; and

**Response:**  Not disputed.

446.6.  only distributing highly factual books.  (McN Decl. ¶90.)

**Response:**  Not disputed.

447.  Internet Archive's Policy Counsel testified that Internet Archive does not practice any of the risk mitigation measures listed in the White Paper.  (McN Decl. ¶90.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Ms. Bailey was only asked about certain risk mitigation measures listed in the White Paper.  The Internet Archive has not implemented the risk mitigation measures Ms. Bailey was questioned about at her deposition (introducing artificial

107

friction; mimicing physical degradation; limiting patrons to particular communities; limiting

loaned works to older works, public domain works, out of print works, or orphan works; and

distributing nonfiction or primarily factual—not "highly factual" works). But the Internet

Archive practices other risk mitigation techniques outlined in the White Paper, including: (i) the

Internet Archive's physical books do not circulate while the digitized book is loaned;

(ii) applying controls to what users can do with copies while loaned (limiting copying, etc.) in

addition to protections to prevent wholesale copying; and (iii) limiting access to books based on

feedback from rightsholders about specific materials. Kahle Opening Decl. ¶¶ 16-17; *see*

McNamara Decl. ¶ 90 & Ex. 123, (White Paper) at INTARC00358280 (listing other risk

mitigation techniques Ms. Bailey was not questioned about at her deposition).

448. The Statement and the White Paper was criticized by groups including the

Association of American Publishers ("AAP") and the Authors Guild. (McN Decl. ¶91.)

**Response:** Not disputed.

449. On February 4, 2019, the AAP released a "Statement on Flawed Theory of

'Controlled Digital Lending'" which stated that "AAP strongly disagrees with the analysis of the

White Paper and its call to libraries to copy and transmit entire books to the public in disregard

of the law. CDL not only rationalizes what would amount to systematic infringement, it

denigrates the incentives that copyright law provides to authors and publishers to document,

write, invest in, and disseminate literary works for the benefit of the public ecosystem." (McN

Decl. ¶91.)

**Response:** The fact that the AAP made this statement is not material. Not disputed that

the AAP released the quoted statement or that the statement is quoted accurately. However, to

the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.

108

Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

450.  On January 8, 2019, the Authors Guild released a statement entitled "Controlled Digital Lending is Neither Controlled nor Legal."  (McN Decl. ¶92.)

**Response:**  Not disputed (but immaterial).

451.  The Authors Guild statement explained that Internet Archive had "started rejecting notices sent by Guild members asking for unauthorized digital copies of their books to be taken down, citing that it 'operates consistently with the "Controlled Digital Lending [sic].'"  (McN Decl. ¶92.)

**Response:**  The fact that the Authors Guild made this statement is not material.  Not disputed that the Authors Guild made the quoted statement or that the statement is quoted accurately.  However, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1. Further, the Authors Guild's theories about what "would" happen are unsupported speculation. *Major League Baseball Props., Inc.*, 542 F.3d at 306.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

109

452. The Authors Guild statement stated that Internet Archive's "threat to author income and the ebook market comes from two directions: 1) unauthorized scanning and e-lending of books that were previously published only in physical formats would usurp the market for creating new ebook versions; and 2) instead of purchasing library ebook licenses (which are more expensive than consumer editions for good reason), libraries would simply digitize the print book from their collection, depriving authors and publishers of important licensing income." (McN Decl. ¶93.)

**Response:** The fact that the Authors Guild made this statement is not material. Not disputed that the Authors Guild made the quoted statement or that the statement is quoted accurately. However, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1. Further, the Authors Guild's theories about what "would" happen are unsupported speculation. *Major League Baseball Props., Inc.*, 542 F.3d at 306. All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books. PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

453. "Needless to say," the statement continued, "if Internet Archive's plans to expand Open Library to all libraries are realized, it would eventually decimate the market for library ebooks, put a massive dent in the ebook market in general, and usurp authors' rights to bring their older works back to the market." (McN Decl. ¶93.)

**Response:** The fact that the Authors Guild made this statement is not material. Not disputed that the Authors Guild made the quoted statement or that the statement is quoted

110

accurately.  However, to the extent this quoted statement is being offered for its truth, the cited

evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Further, the Authors Guild's theories about what "would" happen are unsupported speculation.

*Major League Baseball Props., Inc.*, 542 F.3d at 306.  All available evidence—including the

sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources,

and expert analysis—demonstrates that the Internet Archive's digital lending library has no

effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations

cited therein).

     454.  In several email messages, Mr. Freeland responded to similar complaints about

CDL from an English authors' union.  After Tom Blake, a librarian at the Boston Public Library,

forwarded him emails from the union's chief executive complaining that CDL "prevent[s]

authors [from] making a living by licensing the content of [their] work," Mr. Freeland wrote,

"Nice that they included their real interest:  'negotiate and purchase lending licenses from the

copyright owners.'"  (McN Decl. ¶94.)

     **Response:**  The fact that the English author's union chief wrote to Boston Public Library

is not material.  Not disputed that Tom Blake forwarded Mr. Freeland emails from an English

authors' union.  Disputed that the contents of the email from the English author's union is about

CDL per se.  Moreover, this email is not accurately quoted.  *See* McNamara Decl. Ex. 136 at

INTARC00420085.  Not disputed that Mr. Freeland's email is accurately quoted.  To the extent

the quoted statement of the English author's union chief is being offered for its truth, the cited

evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Moreover, his theories about any purported effects are unsupported speculation.  *Major League*

*Baseball Props., Inc.*, 542 F.3d at 306.  Further, all available evidence—including the sales data

Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

455.  In December 2018, the Second Circuit issued its decision in *Capitol Records, LLC v. ReDigi Inc*., 910 F.3d 649 (2d Cir. 2018), in which the Court held that "[u]nauthorized reproduction is not protected by" the first sale doctrine and that "the making of such reproductions is not a fair use."  (McN Decl. ¶95.)

**Response:**  Not disputed that this decision was issued by the Second Circuit in December of 2018.  Disputed to the extent Plaintiffs suggest this passage applies to all reproductions.  "[S]uch reproductions" is referring specifically to the facts of *ReDigi* not to the digitized books at issue in this case.  *See Capitol Recs., LLC v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018).  The full quote is:  "We conclude that the operation of ReDigi version 1.0 in effectuating a resale results in the making of at least one unauthorized reproduction.  Unauthorized reproduction is not protected by § 109(a).  It violates the rights holder's exclusive reproduction rights under § 106(1) unless excused as fair use.  For reasons explained below, we conclude that the making of such reproductions is not a fair use."  *Id.* at 659.

456.  Jonathan Band, who is counsel for the American Library Association ("ALA"), submitted an amicus brief to the Second Circuit in *ReDigi* on behalf of Internet Archive, the ALA and others.  (McN Decl. ¶96.)

**Response:**  Not disputed.

112

A-6118

457.  The brief submitted by Mr. Band was in support of the defendant, ReDigi, and urged the Second Circuit to hold that ReDigi's practices were covered by the first sale doctrine or fair use.  (McN Decl. ¶96.)

**Response:**  Not disputed.

458.  The brief explained that "A fair use finding in this case would provide libraries with additional legal certainty to roll out innovative services such as the Internet Archive's Open Library."  (McN Decl. ¶96.)

**Response:**  Not disputed.

459.  After the *ReDigi* decision was issued, Mr. Band published an article stating that it "raises questions concerning the viability of Controlled Digital Lending … by libraries," which "must be carefully reevaluated in light of this decision."  (McN Decl. ¶96.)

**Response:**  Not disputed.

460.  In that article, Mr. Band warned that "the decision calls into question the theoretical underpinnings of CDL.  Specifically, CDL relies on the fair use right to replicate the first sale right in the digital environment.  Judge Leval's decision, however, could be read to suggest that the objectives of the first sale right cannot guide the fair use analysis."  (McN Decl. ¶96.)

**Response:**  Not disputed.

461.  Academic libraries make up the majority of signatories to the Statement.  (McN Decl. ¶98.)

**Response:**  Not disputed (but immaterial).

462.  Of the 9,000 public libraries in the United States only a handful endorsed the Statement.  (McN Decl. ¶98.)

**Response:**  Not disputed (but immaterial).

463.  Copyright experts Mr. Band, Mr. Crews and Mr. Jaszi did not sign on as a signatory to the Statement.  (McN Decl. ¶98.)

**Response:**  Not disputed.

464.  The American Library Association did not sign on as a signatory to the Statement. (McN Decl. ¶98.)

**Response:**  Not disputed.

465.  The MIT Press had previously allowed IA to digitize a selection of backlist books. (McN Decl. ¶98.)

**Response:**  Not disputed.

466.  The MIT Press did not sign on as a signatory to the Statement.  In an email, a representative from the MIT Press told Internet Archive that it would not be a signatory to the Statement because "being able to monetize digital sales of trade books and text books is currently a significant part of what allows us to survive as an [open access] friendly mission driven publisher."  (McN Decl. ¶98.)

**Response:**  Not disputed that a representative of the MIT Press made the quoted statement or that the statement is quoted accurately.  However, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

114

467.  Starting in about 2019, Internet Archive began to reference the Statement and White Paper in its outreach to libraries in connection with the Open Libraries project.  (McN Decl. ¶99.)

**Response:**  Not disputed.

468.  For example, in a November 2018 email to a prospective Partner Library in Oregon, Mr. Freeland wrote that "[l]ast October, "a group of copyright scholars, including Michelle Wu from Georgetown Law, Kyle Courtney from Harvard Library, Dave Hansen from Duke University Libraries, and Lila Bailey from Internet Archive worked together on two documents meant to help libraries understand the legal framework for our digital lending, described as 'controlled digital lending.'  Those two documents have been released [on the CDL Website]." (McN Decl. ¶99.)

**Response:**  Not disputed.

469.  Internet Archive published a blog post on July 29, 2020 stating that "CDL is a respectful and secure way to bring the breadth of our library collections to digital leaners… Publishers are seeking to shut this library down, claiming copyright law does not allow it.  Our response is simple:  Copyright law does not stand in the way of libraries' rights to own books, to digitize their books, and to lend those books to patrons in a controlled way."  (McN Decl. ¶99.)

**Response:**  Not disputed.

470.  Internet Archive convened a panel at the Boston Public Library "to seek to educate the public on the work of the Internet Archive and Open Libraries" and the event description stated that "[t]hrough controlled digital lending, libraries can make twentieth century scholarship available that is largely absent from their digital holdings in a way that respects the rights of authors and publishers."  (McN Decl. ¶99.)

115

**Response:**  Not disputed.

471.  A July 1, 2019 blogpost by Mr. Kahle stated that "[w]e believe that every library can transform itself into a digital library.  If you own the physical book, you can choose to circulate a digital version instead."  (McN Decl. ¶99.)

**Response:**  Not disputed.

472.  In another blogpost, the Internet Archive referenced a February 11, 2021 "mythbusting" panel that "dispelled myths about CDL" by "[e]mphasizing the limited and controlled aspect of the practice" and explaining that "[t]he 'fair use' section of the law allows libraries to responsibly lend materials, and experts say logically includes both print and digital works."  (McN Decl. ¶99.)  The blogpost also states that "[t]he law makes no mention of the amount of material that can be made available under 'fair use,' so for libraries to fulfill their purpose they can make complete books – whether in print or digital – available to patrons." (McN Decl. ¶99.)

**Response:**  Not disputed.

473.  Another Internet Archive presentation entitled "How Controlled Digital Lending Works for Libraries" contained a slide stating that "Controlled digital lending is a longstanding widespread library practice that you can use to help your patrons access digitized books.  The Internet Archive has more than 1.8M digitized books you can claim & offer your patrons today. Your library can participate by joining Open Library."  (McN Decl. ¶99.)

**Response:**  Not disputed.

474.  Internet Archive does not indemnify Partner Libraries for liability arising from its infringement.  As Mr. Freeland wrote to a librarian at Duke University, Mr. Kahle "generally gets allergic to indemnification clauses…"  (McN Decl. ¶100.)

**Response:**  Not disputed that Mr. Freeland is accurately quoted or that the quote is from an email to a librarian at Duke University.  Not disputed that the Internet Archive does not indemnify Partner Libraries.  But note that the only cited evidence for this assertion, improper attorney testimony in the form of Ms. McNamara's Declaration, is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.  Further, categorizing the Internet Archive's activity as "infringement" is a legal conclusion, not a fact, which is inappropriate for a Rule 56.1 statement and must therefore be disregarded. *See Nadel*, 57 F. Supp. 3d at 293 n.6.

475.  At least four Partner Libraries have withdrawn from the Open Libraries project since this action was filed.  (McN Decl. ¶100.)

**Response:**  Disputed to the extent the assertions in this paragraph are meant to suggest that four Partner Libraries withdrew from the Open Libraries project as a result of the lawsuit. Three of the four Partner Libraries who withdrew their books from the Open Libraries program after this lawsuit was filed withdrew as their physical facilities were reopening and their physical books became accessible.  Kahle Opp'n Decl. ¶ 22.

476.  According to Mr. Freeland, the owned-to-loaned principle is the "most critical" principle of CDL.  (McN Decl. ¶101.)

**Response:**  Not disputed.

477.  According to the Statement, to comply with the "owned-to-loan" principle,  a "library may only loan simultaneously the number of copies that it has legitimately acquired." (McN Decl. ¶101.)

**Response:**  Not disputed.

478.  According to the Internet Archive, the overlap analysis conducted as part of the Open Libraries project enables libraries to "pool[] their physical collections in order to make more lendable copies of digital books available…" (McN Decl. ¶101.)

**Response:**  Not disputed.

479.  Mr. Freeland described this practice in an email to a librarian, where he stated that "libraries put one copy in for our matched records (even if you have multiple copies), and those counts are added to a pool for a given book.  When a patron checks out a book, they are checking out a copy from the pool, not an individual library; for a variety of reasons, including reader privacy, we don't connect the circulation back to an individual library."  (McN Decl. ¶101.)

**Response:**  Not disputed.

480.  Mr. Kahle testified that a match under the overlap analysis will "increase the number of concurrent borrowers by one, independent of the number that [the partner library] ha[s] in the library."  (McN Decl. ¶102.)

**Response:**  Not disputed.

481.  Mr. Kahle testified that that if three Partner Libraries contributed a book to the concurrent lending count under an overlap analysis and one of those libraries, for instance the MIT Library, only had one physical copy, three MIT patrons would be able to read the ebook on the Website at once.  (McN Decl. ¶102.)

**Response:**  Disputed as phrased.  The MIT patrons in this hypothetical would also need to be Internet Archive patrons in order to borrow the book from the Internet Archive.  Further, the three MIT patrons would only be able to borrow the book from the Internet Archive if all four copies were not already on loan.  McNamara Decl. ¶ 102 & Ex. 5, Kahle Dep. Tr. 204:16-207:15; *see also* Kahle Opp'n Decl. ¶¶ 11, 21, 26.

118

A-6124

482. Mr. Freeland testified that the overlap analysis allows Partner Libraries to loan more copies than they individually own. (McN Decl. ¶102.)

**Response:** Not disputed.

483. According to Mr. Freeland, "If the Internet Archive possessed one copy of Catcher in the Rye and then [a] partner library had one copy" that was added from its system, "and then another partner library added a third copy to the Open Library system, there would be available for concurrent borrowing from Internet Archive users of three copies." (McN Decl. ¶102.)

**Response:** Not disputed.

484. Under its current system, "[a]ll users have equitable access to the materials [Internet Archive] lend[s]. When a library adds a copy into [the] lending counts, that book can be checked out by any user." (McN Decl. ¶103.)

**Response:** Disputed. Exhibit 149 to the McNamara Declaration was not filed. Therefore, this assertion is not supported by admissible evidence.

485. Internet Archive has stated that non- Partner Libraries can integrate links to Internet Archive ebooks into their websites. For example, in a 2020 blogpost, Internet Archive stated that, "To be clear, you don't have to join the program to access our books. Anyone can link to our books right now." (McN Decl. ¶103.)

**Response:** Not disputed.

486. A librarian at Fordham University contacted Internet Archive in July 2020 about the possibility of "digitiz[ing] approximately 450 volumes … to support CDL for distance learning." (McN Decl. ¶104.)

**Response:** Not disputed.

119

487.  The Fordham librarian stated that "[t]hese are largely or entirely in-copyright books, so the scans could not be made public, and will only be released to our users in proportion to the number of physical copies which we have embargoed."  (McN Decl. ¶104.)

**Response:**  Not disputed.

488.  In response, Mr. Freeland replied "[t]hat's not how our implementation of CDL currently works – we lend to anyone with an Internet Archive library card, and there is no way to restrict usage of books put into CDL by particular users, so there's no way for us to limit use to only your patrons.  Happy to discuss further on a call."  (McN Decl. ¶104.)

**Response:**  Not disputed.

489.  In 2019, Mr. Freeland received an inquiry from Wendy Knapp, the Deputy Director of Indiana State Library, asking whether its copies of a particular book, *Slaughterhouse Five*, "would be added to the total number of copies in OpenLibrary.org" or whether those books would start "a new waitlist just for Indiana patrons…"  (McN Decl. ¶105.)

**Response:**  Not disputed.

490.  Mr. Freeland responded that the Indiana State Library's copies "would decrease the waitlist and be loaned to all users" of IA's website.  (McN Decl. ¶105.)  Indiana's Deputy Director responded that her Library "still have hesitation around the idea that a format shift has not been indisputably set as a fair use" and declined to join as an Open Libraries Partner Library. (McN Decl. ¶105.)

**Response:**  Not disputed.

491.  The White Paper instructs that "libraries must truly exercise control in the process." (McN Decl. ¶106.)

**Response:**  Not disputed.

492.  The Open Libraries Form contains no provisions on how libraries implement CDL because Internet Archive considers this to be a "local decision."  (McN Decl. ¶106.)

**Response:**  Not disputed.

493.  In response to an email from a librarian expressing "concern[] about being in compliance," Mr. Freeland wrote that "how libraries limit circulation for books in CDL is a local decision made by the library… [Some] libraries are taking the approach that they don't need to suppress circulation because the likelihood is slim that all our digital copies and all the physical copies across our network of partners are all checked out at the same time."  (McN Decl. ¶106.)

**Response:**  Not disputed.

494.  Mr. Freeland testified that Internet Archive "was aware … that some partner libraries did not suppress circulation when they agreed to bec[o]me a partner library and put their books into controlled digital lending."  (McN Decl. ¶106.)

**Response:**  Not disputed.

495.  Mr. Freeland testified that Internet Archive has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously."  (McN Decl. ¶107.)

**Response:**  Not disputed.

496.  Mr. Freeland testified that Internet Archive does not know how Partner Libraries store the physical books counted in the overlap analysis.  (McN Decl. ¶107.)

**Response:**  Not disputed.

497.  Mr. Freeland testified that Internet Archive is also aware that even if a library puts a physical book into a non-circulating reference collection, it could be read in the library while the ebook equivalent is checked out.  (McN Decl. ¶107.)

121

**Response:** Not disputed.

498. Internet Archive does not employ a technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating. (McN Decl. ¶107.)

**Response:** Not disputed.

499. Mr. Freeland testified that Internet Archive has never "taken any action against a library that did not suppress circulation properly." (McN Decl. ¶107.)

**Response:** Not disputed.

500. Mr. Kahle testified that "monitoring" libraries would amount to "hav[ing] people going and snooping around," which it will not do. (McN Decl. ¶107.)

**Response:** Not disputed.

501. According to the Open Libraries Form, Internet Archive requires Partner Libraries to submit their catalogues on a "quarterly" basis so that Internet Archive can re-run the overlap analysis to periodically add new books that the library acquired and subtract books that dropped out of the collection as a result of weeding. (McN Decl. ¶108.)

**Response:** Disputed. The cited evidence does not support the assertions in this paragraph: Exhibit 153 to the McNamara Declaration is not the Open Libraries Form. *See* Fed. R. Civ. P. 56(c)(1). The only remaining authority for the assertions in this paragraph is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. Further, even though its agreements with Partner Libraries still require at least quarterly overlap analysis, the Internet Archive now runs overlap analysis monthly. Kahle Opp'n Decl. ¶ 23.

122

502.  Mr. Freeland testified that in first years of the Open Libraries project, it did not "require updates at a specific time frame" and "sometimes Internet Archive did annual updates" depending on "the library's preferences."  (McN Decl. ¶108.)

**Response:**  Not disputed.

503.  Mr. Freeland testified that Internet Archive does not employ any measures to ensure the accuracy of the catalogues it receives; Internet Archive "depends on our partners for verifying the data."  (McN Decl. ¶108.)

**Response:**  Not disputed.

504.  According to Mr. Freeland's testimony, while Internet Archive began to run the overlap analysis on a monthly basis after this action was filed, it still does not require Partner Libraries to inform it when they weed out books and no longer physically own the titles.  (McN Decl. ¶108.)

**Response:**  Not disputed.

505.  Mr. Freeland testified that it was possible the concurrent lending count for an ebook could exceed the number of Partner Libraries with that physical book in their collection, if a library discarded a print copy at any time after that library has engaged in the overlap analysis. (McN Decl. ¶108.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  Fed. R. Civ. P. 56(c)(1).  Mr. Freeland in fact testifies that the assertion in this paragraph is "unlikely."  McNamara Decl. Ex. 7, Freeland Dep. Tr. 108:5-109:3.  Moreover, the concurrent lending count can always exceed the number of Partner Libraries with a book because the Internet Archive will have at least one copy of the book to which Partner Libraries contribute additional copies.  Foster Decl. ¶ 42; Gratz Opening Decl. Ex. B, Foster Suppl. Expert Rpt. ¶ 63.

123

506.  Mr. Kahle testified that Internet Archive also does not "audit library collections to ensure that the library still owns the physical copy it's lending against" because, according to Mr. Kahle, the "Internet Archive doesn't snoop around dumpsters or things."  (McN Decl. ¶108.)

**Response:**  Not disputed.

507.  Internet Archive's overlap analysis has resulted in errors that have led to inaccurate concurrent loan caps due to certain inaccurate or not properly organized data and metadata.(Foster Decl. ¶88.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  Fed. R. Civ. P. 56(c)(1).  Foster's Declaration states that overlap analysis "can lead" to errors, not that the overlap analysis "has resulted in errors."  Foster Decl. ¶ 88.

508.  The Internet Archive has stated that "Open Library's book catalog has millions of books and thousands of data errors.  Sometimes author names are misspelled, book covers are missing, or works and authors are duplicated or conflated."  (McN Decl. ¶109.)

**Response:**  Not disputed.

509.  Internet Archive asserted in the first paragraph of the Executive Summary to its application for the $100 million McArthur Foundation grant that "there's almost a century of knowledge still living only on the printed page, missing from our digital shelves."  (McN Decl. ¶111.)

**Response:**  Not disputed (but immaterial).

510.  In 2018, Mr. Kahle wrote to the Librarian of Congress, Carla Hayden, stating that controlled digital lending was "a way to get 20th century books onto the net respectfully."  (McN Decl. ¶111.)  In that email, Kahle also forwarded a blog post by Mr. Courtney and Mr. Hansen to the Librarian of Congress, Carla Hayden, stating that the goal of controlled digital lending is

124

"particularly to help address access to the large number of books published in the '20th Century black hole' that have little hope of otherwise being made available to readers" (McN Decl. ¶111.)

     **Response:** Not disputed (but immaterial).

511. The Internet Archive has stated that the "black hole" refers to the gap between the date when books enter the public domain (currently 1926) and "the 1990s." (McN Decl. ¶111.)

     **Response:** Not disputed.

512. Mr. Kahle stated in the "Transforming Our Libraries into Digital Libraries" paper that "[t]he Internet Archive, working with library partners, proposes bringing millions of books online, through purchase or digitization, starting with the books most widely held and used in libraries and classrooms."(McN Decl. ¶112.)

     **Response:** Not disputed.

513. Mr. Kahle continued by stating that, "[f]or the books we can not [sic] buy in electronic form, I am proposing a collaborative effort to select and digitize the most useful books of the 20th and 21st centuries." (McN Decl. ¶112.)

     **Response:** Not disputed.

514. The homepage for Internet Archive's Website lists books in categories like "Trending Books," "Romance," "Thrillers," "Kids," "Classic Books" and "Books We Love." (McN Decl. ¶113.) The home page of openlibrary.org strongly resembles the interface that public library patrons use to read authorized ebooks via OverDrive. (McN Decl. ¶118.)

     **Response:** Not disputed that openlibrary.org lists books in categories as described. However, the only support for the assertions in the second sentence of this paragraph is improper

attorney testimony in the form of Ms. McNamara's Declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

515.  There is no category on the homepage for "Lost 20th Century Books."  (McN Decl. ¶113.)

**Response:**  Not disputed.

516.  The "program lead for OpenLibrary.org," Michael "Mek" Karpeles, confirmed that "there are tens of thousands of readers on Open Library who are looking for romance novels, self-help books, kids books, and modern thrillers."  (McN Decl. ¶113.)

**Response:**  Not disputed.

517.  Internet Archive's breakdown of ebooks by publication date on its Website shows that 78.9% of the in-copyright books were published after 1980 and only 6.2% of those books were published before 1963.  (McN Decl. ¶114.)

**Response:**  Not disputed.  But note that the calulcation actually demonstrates 77.9% of the in-copyright books were published after 1980.

518.  Internet Archive has represented to the Court that it "limits its digital lending to books published in the past five or more years."  (McN Decl. ¶115.)

**Response:**  Not disputed.

519.  Two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the IA's Website that same year.  (McN Decl. ¶113; Foster Decl. ¶69.)

**Response:**  Not disputed.

520.  Mr. Freeland testified that Internet Archive "add[s] ebooks" to the Website that are "available to purchase commercially or to license to libraries."  (McN Decl. ¶117.)

**Response:** Not disputed.

521. Mr. Freeland testified that Internet Archive does not take steps "to make sure that the books they add to the Open Libraries projects are not yet available in digital form" and does not "instruct libraries to segregate out books that are otherwise available in digital form." (McN Decl. ¶117.)

**Response:** Not disputed.

522. The 127 Works in Suit – which are all available as authorized library ebooks – were republished as unauthorized ebooks on the Website; the Website has also posted 33,000 other titles available from the Publishers in digital formats. (McN Decl. ¶115; *See* Foster Decl. ¶¶112-117; Pavese Decl. ¶18; R-A Decl. ¶49; Sevier Decl. ¶9; Weber Decl. ¶60)

**Response:** Not disputed.

523. The home page of openlibrary.org resembles the interface that public library patrons use to read authorized ebooks via OverDrive; both pages display rows of thumbnail book covers available to be "borrowed," organized into categories of general interest such as "Trending" books. (McN Decl. ¶118.)

**Response:** Not disputed that openlibrary.org lists has thumbnail book covers organized into categories of general interest. However, the only support for these assertions is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

524. Internet Archive has acknowledged that its Website competes with distributors of the Publishers' authorized ebooks. Mr. Karpeles wrote an email stating that "reality has it that we are competing for eyeballs with Amazon, Goodreads (45M monthly users), Overdrive, OCLC

127

Worldcat, and countless other websites…" (McN Decl. ¶119.) Mr. Karpeles reiterated this statement during his deposition. (McN Decl. ¶119.)

> **Response:** Disputed. Not disputed that Mr. Karpeles's email is quoted accurately. Disputed to the extent that the cited evidence does not support the remaining assertions in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). "Competes for eyeballs" is not equivalent to "competing," and Mr. Karpeles testified at his deposition that the Internet Archive was "competing for eyeballs." McNamara Decl. Ex. 157, Karpeles Dep. Tr. 241:15-242:5. Moreover, the Internet Archive does not view itself as a "competitor" to OverDrive, Amazon, or other similar websites or services. Nor does it offer similar services to these entities. It does not license ebooks—to other parties such as patrons or from aggregators or publishers. It digitizes physical books it has lawfully acquired. Kahle Opening Decl. ¶ 18; *see also* Kahle Opp'n Decl. ¶¶ 16, 24.

525. Mr. Karpeles also created a document listing the library ebook aggregators OverDrive and Hoopla, as well as the ebook retail platforms Amazon and Google Books – all of which license the Publishers' works – as "similar services" to Internet Archive. (McN Decl. ¶119.)

> **Response:** Not disputed that Mr. Karpeles created the document titled "Open Library Design Ecosystem." Not disputed that OverDrive, Hoopla, and Amazon, and Google Books are among the entities listed under a heading of "Similar Services" relative to openlibrary.org. McNamara Decl. Ex. 164 at ECF pp. 3-4. Other listed similar services are Librarything, Goodreads, ShelfJoy, Better World Books, Worldcat, Bibliogs, and Digital Library, fivebooks.com, The Free Library, and World Library. *Id.* The cited evidence does not support

the remaining assertion in this paragraph—that OverDrive, Hoopla, Amazon, and Google Books are similar services to the Internet Archive. *See* Fed. R. Civ. P. 56(c)(1).

526. Internet Archive's library expert, Susan Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL." (McN Decl. ¶120.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). The selectively quoted language is from the questioning attorney and mischaracterizes Ms. Hildreth's response and her ultimate expert opinions. *See* Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 226:24-227:4; Gratz Opp'n Decl. Ex. 6, Hildreth errata; Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 106-109.

Ms. McNamara asked: "Is it your expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL?" Ms. Hildreth answered: "That is possible, yes, but whether it would ever in fact occur would depend on the circumstances." Later, when asked, "When a library acquires via CDL a series of books, they are not paying licenses for those works; isn't that right?" Ms. Hildreth testified: "They are not paying for CDL licenses when they receive or obtain content through CDL." Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 264:3-264:12; Gratz Opp'n Decl. Ex. 6, Hildreth errata.

Ms. Hildreth also testified that she did not know whether the availability of books through the Internet Archive's Digital Lending Library had in fact had any effect on demand for e-book licenses and that she did not "have a view" on whether libraries would actually purchase fewer e-book licenses for titles it makes available through CDL. "I think it would be determined on a case-by-case basis depending on what the libraries' needs would be in terms of their collection." *See* Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 257:1-258:6.

129

527.  Ms. Hildreth further testified that "I think it could be likely that with CDL materials meeting some patron requests, the result that [sic] the library would not necessarily have to license the specific title to make patron demand, they would be able and it is likely that they would purchase additional e-materials … to meet other patron demand."  (McN Decl. ¶120.) Ms. Hildreth acknowledged "that a specific author would not receive a royalty for a specific title" if revenue was shifted in this way.  (McN Decl. ¶120.)

**Response:**  Disputed.  The cited evidence does not support the assertion in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  The selectively quoted language mischaracterizes Ms. Hildreth's testimony and expert opinions.  Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 106-109. For instance, Ms. Hildreth also testified that:  "Q. If the specific title that was available through CDL was Catcher in the Rye by J.D. Salinger, let's say, and you would agree that then the Salinger estate would not receive a royalty if that work was available via the Internet Archive and CDL?  MS. LANIER:  Objection, calls for speculation.  THE WITNESS:  I'd have to know the context of that question and I mean -- frankly, I'd have to know the context of the question and there could be many other avenues for obtaining access to The Catcher in the Rye than purely relying necessarily on CDL or the Digital Lending Library for it."  McNamara Decl. Ex. 19, Hildreth Dep. Tr. 45:6-19.

528.  A user of the Website testified that he read an ebook on Internet Archive's Website that he could have read in an authorized ebook format through his university library because "it didn't matter to me … whether I was using Internet Archive or [the authorized platform]… [I]t didn't … matter to me.  Or it didn't factor into my thinking because I was more concerned with getting these materials I needed…"  (McN Decl. ¶121.)

**Response:**  Not disputed.

130

529.  Another Internet Archive user who writes blogs distributing links to ebooks on Internet Archive testified that she would not add links to authorized ebook platforms, in part because "[t]he Internet Archive is reaching a potentially broader audience than the North Carolina Digital Library."  (McN Decl. ¶121.)

**Response:**  Not disputed.

530.  Internet Archive has stated that the ebooks on its Website serve the needs of print disabled users.  For example, it stated in the Executive Summary of the MacArthur Foundation application that "[w]orking with US libraries and Benetech, operator of the world's largest digital library for people with disabilities that impact reading, the Internet Archive (IA) will bring millions of free digital ebooks to billions of people.  For the blind, ebooks are a lifeline…" (McN Decl. ¶122.)

**Response:**  Not disputed.

531.  The vast majority of Internet Archive users are not print disabled; only 2 print disabled users were added in 2017 and, by 2021, there were only 10,891 such users – which is less than 0.2% of the accounts currently registered with the Website.  (McN Decl. ¶122.)

**Response:**  Not disputed.

532.  The needs of print disabled readers are served by HathiTrust, which "provides print-disabled patrons with versions of all of the [20 million +] works contained in its digital archive in formats accessible to them" – and HathiTrust truly focuses on the print disabled by prohibiting the general population from accessing full ebooks.  (McN Decl. ¶122; *Authors Guild, Inc., v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014).)

**Response:**  Not disputed that the quote from *Authors Guild Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014), is accurate.  The cited evidence for the remaining assertions in this

131

paragraph—that "[t]he needs of print disabled readers are served by HathiTrust" and that "HathiTrust truly focuses on the print disabled" is improper attorney testimony in the form of Ms. McNamara's declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. Disputed to the extent that, as phrased, the assertions in this paragraph are misleading. In order to access full books from HathiTrust, patrons with print disabilities "must be affiliated with [a HathiTrust member institution] that has opted-into the program." *HathiTrust*, 755 F.3d at 101.

533. Internet Archive also stated in the Executive Summary of their application for the MacArthur Foundation grant that by "digitizing millions of books, we unlock them for communities with limited or no access" – particularly "people in rural areas." (McN Decl. ¶123.)

**Response:** Not disputed.

534. Mr. Freeland testified that Internet Archive does not target particular geographic locations because "someone could sign up from anywhere in the world." (McN Decl. ¶123.)

**Response:** Not disputed.

535. Mr. Freeland testified that it would not know whether a user checking out an ebook from the Website "was coming from New York City or coming from some small town in Upstate New York" because Internet Archive only maintains "state- or country-level" geographic data about users. (McN Decl. ¶123.)

**Response:** Not disputed.

536. When commenting on the Statement, the library copyright expert Kenneth Crews noted that the argument that CDL is necessary to serve individuals in rural areas is "not very convincing. Many rural communities are well served. Sometime[s] the biggest need is in the

cities, where parking is miserable, and realistically students and profs are doing their research at home." (McN Decl. ¶124.)

**Response:** Not disputed that Mr. Crews is accurately quoted. To the extent Mr. Crews's quote is being offered for its truth, it is not admissible evidence. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

537. The founder of OverDrive testified that "many of the public libraries that are [his] customers … serve rural communities," "serve disabled communities," "serve poor communities or impoverished communities" – including by OverDrive making donations when appropriate. (McN Decl. ¶124.)

**Response:** Not disputed.

538. National data indicates that rural communities have seen more growth and value from authorized library ebooks than libraries serving more densely populated districts. (McN Decl. ¶124.)

**Response:** Not disputed.

539. Internet Archive also asserted in its Answer to the Complaint that the ebooks on its Website can be used for data or text mining. (Ans. at p. 2.)

**Response:** Not disputed.

540. Mr. Freeland testified in his capacity as Internet Archive's 30(b)(6) witness on this topic that he does not know "what percentage of users engage" in those practices and knows of only three projects that could be described as datamining. (McN Decl. ¶126.)

**Response:** Not disputed.

541. On March 24, 2020, Internet Archive launched a "National Emergency Library" in the wake of COVID-19 pandemic shutdowns of libraries. (McN Decl. ¶127.)

**Response:** Not disputed.

542. According to Mr. Kahle, the National Emergency Library drew from the same pool of ebooks that were previously available on the Website, but it "suppressed the wait-list function" – *i.e.*, "[d]id away with the one-to-one ratio." (McN Decl. ¶127.) The blog post announced that "we lend to the world" (McN Decl. ¶127.)

**Response:** Not disputed.

543. Mr. Freeland testified that Internet Archive "did away with waitlists" and "did away with the one-to-one ratio" by raising the cap on concurrent loans to 10,000. (McN Decl. ¶128.)

**Response:** Not disputed.

544. Demand for ebooks on IA's Website increased after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels. (McN Decl. ¶128.)

**Response:** Not disputed that both monthly circulations and the number of total patrons of Open Library are higher now than before March 2020. Disputed to the extent that the assertion that "[d]emand for ebooks on IA's Website increased after lending limits were relaxed" is not supported by admissible evidence. The only support for this assertion is improper attorney testimony in the form of Ms. McNamara's Declaration. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. Plaintiffs have not laid a foundation for why an increase in monthly circulations and an increase in the number of total patrons constitutes an increase in demand.

545. For example, as of September 2019, IA reported over 2.7 million total "Members" of the Website; by April 2022, that figure had nearly doubled to over 5.5 million. (McN Decl. ¶128.)

**Response:** Not disputed.

546.  As of March 2020, IA reported that the number of "ebooks borrowed" "over the last 28 days" on the Website was 41,296; by July 2022, the number of ebooks borrowed over the last 28 days is listed as over 349,984 – a more than eightfold increase.  (McN Decl. ¶128.)

**Response:** Not disputed.

547.  Mr. Freeland testified that Internet Archive did not require users of the National Emergency Library "to certify that they were directly impacted by COVID-19" to access Internet Archive's ebooks on demand and without waitlists.  (McN Decl. ¶129.)

**Response:** Not disputed.

548.  Ms. Bailey wrote that the Internet Archive did not put in place any such requirement because "we don't have the time or staffing to allow us to limit NEL access only to people directly impacted by COVID 19."  (McN Decl. ¶129.)

**Response:** Not disputed.

549.  Internet Archive offered rightsholders an option to "opt-out" of the National Emergency Library, but Mr. Freeland testified that when an author would send such an opt-out request, books that "were taken out of the National Emergency Library, … were not taken out of controlled digital lending."  (McN Decl. ¶129.)

**Response:** Not disputed.

550.  Mr. Freeland testified that Internet Archive was aware that there were "copyright concerns" about the National Emergency Library.  (McN Decl. ¶130.)

**Response:** Not disputed.

551.  Senator Tom Udall of New Mexico wrote to Maria Strong, the U.S. Register of Copyrights, to urge her "to examine the National Emergency Library that has been organized by

the Internet Archive which is operating without typical library license and is causing authors in New Mexico concern about the integrity of their copyrights." (McN Decl. ¶130.)

**Response:** Not disputed.

552. Senator Udall noted that "[s]ince the emergence of e-books, libraries have provided e-books to readers through legally well-established means of paying for licensing fees for e-books that they lend, of which a portion of the licensing fees extend to authors as royalties." (McN Decl. ¶130.) But given the National Emergency Libraries distribution of ebooks without payment, he had "heard from authors who are concerned that such action is not legal and presents additional challenges to them at an economically difficult time." (McN Decl. ¶130.)

**Response:** Not disputed that Senator Udall is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

553. In response, Register Strong wrote that, despite the Internet Archive's claim "that the books in the National Emergency Library 'focus on materials published during the 20th century, the vast majority of which do not have a commercially available ebook,' and which therefore would not be publicly available when schools and libraries are closed[,]" "the Internet Archive does not appear to have verified if any of the works in its collection were available to the public in digital formats prior to including those books in its collection or removing its waiting lists." (McN Decl. ¶131.)

**Response:** Not disputed that Register Strong is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

136

554.  Register Strong also wrote that "The types of materials included in the National Emergency Library, which include Stephen King thrillers and joke books, also suggest that at least some of the materials are likely to be accessed for entertainment rather than educational purposes."  (McN Decl. ¶132.)

**Response:**  Not disputed that Register Strong is accurately quoted.  To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

555.  Two days after the launch of the National Emergency Library, the Director of Stanford University Press made "a formal request to exclude all [its] content from the National Emergency library."  (McN Decl. ¶133.)

**Response:**  Not disputed.

556.  The Director explained that "[w]e do not grant those rights to our content, and do not agree that the current coronavirus emergency constitutes an argument for copyright violation. To support the community during this crisis, we are in the process of making all our content more liberally available through the existing library aggregators, and responding to individual requests for content access."  (McN Decl. ¶133.)

**Response:**  Not disputed that Alan Harvey is accurately quoted.  To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

557. In a subsequent email to Mr. Freeland, the Stanford University Press Director stated Internet Archive's practices were "entirely unacceptable" given that "IA simply grabbed everything without any discussion and the bad will is now oozing through us all."  (McN Decl. ¶133.)

**Response:** Not disputed that Mr. Harvey is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

558. On March 31, 2020, the Director the University of Minnesota Press wrote an email to Mr. Freeland stating that "the National Emergency Library goes further than we can legally or ethically allow." (McN Decl. ¶134.)

**Response:** Not disputed that Douglas Armato is accurately, albeit selectively, quoted. (Mr. Armato also wrote: "I'm a longtime fan of the work that the Internet Archive does, . . . ." McNamara Decl. Ex. 174.) To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

559. After acknowledging that takedown requests had been sent, Mr. Freeland stated that he would "be happy to discuss making limited Minnesota content available as part of the National Emergency Library, understanding that we *always* consult authors or rights holders before making such decisions – indeed, we've just done a round of that for course books we've made openly available for emergency course use on our Manifold OA platform. We'd also need some kind of binding legal agreement." (McN Decl. ¶134.)

**Response:** Not disputed that quote was said. Disputed that the quote is from Mr. Freeland: The quote is from Mr. Armato. Further, to the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

560. On April 2, 2020, the Executive Director of the Authors Guild, Mary E. Rasenberger, wrote to Mr. Kahle to "set up a time to talk" about the National Emergency Library. (McN Decl. ¶135.) According to the email, she wanted to "dispel any rumors you have

heard that the Authors Guild is planning to bring suit. The Guild is not; we cannot possibly afford a litigation. We were financially stressed as you know before COVID-19 and having to cancel our gala means a loss of over a quarter of the revenue in our budget. We are instead addressing this bold infringement by letting authors know how they can request IA to take their books down, and we hope to appeal to your decency in asking you to shut this ill-planned (even if well-intentioned) initiative down. There are plenty of other sources for books for students and teachers right now. We can help you point people to them." (McN Decl. ¶135.)

**Response:** Not disputed that Mary Rasenberger is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

561. Mr. Kahle responded to this message by writing, "We talked before, and I felt deposed by a lawyer, which you are, and therefore not a good idea for layman [sic] (and against some lawyer ethics rules as I understand it); and so I talked with multiple of your board members with no apparent effect. We are actively working with others and are making great progress. Wish us all luck, we are all trying to get a digital world that works for everyone." (McN Decl. ¶136.)

**Response:** Not disputed.

562. The Internet Archive did not respond to public complaints by the AAP. (McN Decl. ¶136.)

**Response:** Disputed. The only support for the assertion in this paragraph is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435.

139

563.  On April 8, 2020, PRH approved a request by a school for special COVID-19 class set pricing for *Interview with the Vampire* by Anne Rice and *Lolita* by Vladimir Nabokov. (McN Decl. ¶137.)

**Response:**  Not disputed.

564.  But PRH was informed by OverDrive that "the school will not be moving forward with a purchase.  They cited that they needed the materials more urgently and the professor was able to find both titles on the Internet Archive / DPLA site with simultaneous checkout so they used those versions."  (McN Decl. ¶137.)

**Response:**  Not disputed.

565.  On April 14, 2020, Mr. Kahle wrote an email to the Executive Director of the Authors Alliance and Pamela Samuelson (who sits on its Board of Directors) to notify them that "the Authors Guild is going to be meeting with some staffers [in Congress] about copyright matters, and possibly about NEL as well.  I thought I would alert you to this, as the Authors Alliance, I think, was formed to be at the table when these discussions were happening."  (McN Decl. ¶138.)

**Response:**  Not disputed (but immaterial).

566.  Mr. Kahle is on the Advisory Board to the Authors Alliance, and Dave Hansen, one of the White Paper's co-authors, is on the Staff.  (McN Decl. ¶138.)

**Response:**  Not disputed (but immaterial).

567.  Internet Archive asked the Authors Alliance to endorse the National Emergency Library but according to an email response, the Authors Alliance "didn't support the NEL [National Emergency Library]."  (McN Decl. ¶138.)

**Response:** Not disputed that the Internet Archive asked the Authors Alliance to endorse the National Emergency Library. Disputed that the Authors Alliance responded that they "didn't support the NEL." The Authors Alliance email states that the Authors Alliance "is not planning to endorse the NEL." *See* McNamara Decl. ¶ 138 & Ex. 179 at INTARC000462974. To the extent the Authors Alliance statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

568. Mr. Kahle posted a blogpost on April 14, 2020 entitled "The National Emergency Library – Who Needs It? Who Reads It? Lessons from the First Two Weeks." (McN Decl. ¶139.)

**Response:** Not disputed that Mr. Kahle posted a blogpost so titled. Disputed to the extent that he did so on April 7, 2020, not April 14, 2020. *See* McNamara Decl. ¶ 139 & Ex. 180.

569. In the blogpost, Mr. Kahle wrote that "[W]e moved in 'Internet Time' and the speed and swiftness of our solution surprised some and caught others off guard. In our rush to help we didn't engage with the creator community and the ecosystem in which their works are made and published. We hear your concerns and we've taken action: the Internet Archive has added staff to our Patron Services team and we are responding quickly to the incoming requests to take books out of the National Emergency Library. While we can't go back in time, we can move forward with more information and insight based on data the National Emergency Library has generated thus far." (McN Decl. ¶139.)

**Response:** Not disputed.

141

570.  The Internet Archive ended the National Emergency Library on June 10, 2020, ten days after the Publishers filed this action and two weeks before the earliest possible date Internet archive had previously announced for its closure.  (McN Decl. ¶140.)

**Response:**  Disputed.  The Internet Archive announced the end of the National Emergency Library on June 10, 2020.  The National Emergency Library was closed on June 16, 2020.  *See* McNamara Decl. ¶ 140 & Ex. 181.

571.  According to the blog post, Mr. Kahle announced that Internet Archive would return to "traditional controlled digital lending" pursuant to overlap analysis, which it continues to practice to this day.  (McN Decl. ¶140.)

**Response:**  Not disputed.

572.  On September 4, 2020, the Executive Director of HathiTrust, Mike Furlough, declined an invitation from Kahle to speak on a panel called "Digital Lending in a Pandemic." (McN Decl. ¶141.)

**Response:**  Disputed (but immaterial).  The invitation to HathiTrust was from Mr. Freeland, not Mr. Kahle, and the event was titled "Digital Lending in a Pandemic."  This was not the title of the panel.  *See* McNamara Decl. ¶ 141 & Ex. 182 at INTARC00448940.

573.  During COVID-19, HathiTrust expanded access to its ebooks in the wake of school library closures but imposed, among other restrictions, limits to ensure that only students of the institutions affected could read those works.  (McN Decl. ¶141.)

**Response:**  Disputed.  The assertions in this paragraph are not supported by the cited evidence.  *See* Fed. R. Civ. P. 56(c)(1).  The cited evidence, both the webpage from HathiTrust and Skip Dye's mail, state that "students, faculty, and staff" may take advantage of the expanded

142

access—not just students. *See* McNamara Decl. Exs. 183 & 184. Further, the cited evidence is not admissible. *See* Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

574. Mr. Furlough declined the invitation to speak because "[i]f I am asked to define the difference between what we have done and what you have done and are now doing, I will end up pointing out that we have put a good many more *controls* on the service that you did for NEL or for ongoing lending … I may have to end up directly contrasting some things, which would implicitly suggest a criticism of your approach. And we made some very different decisions – when we did our legal analysis, it pointed us in directions that are quite different from those you have taken. And we did not feel that the methods you were employing were ones *we* could defend. We didn't think we could rely on the same legal theories that you were relying on. I'd rather keep all that to ourselves and not be quoted or paraphrased as suggesting that your actions are NOT defensible, especially at your own party." (McN Decl. ¶142.)

**Response:** Not disputed that Mr. Furlough is accurately quoted. To the extent this quoted statement is being offered for its truth, the cited evidence is not admissible. Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

575. The Internet Archive has scanned, posted and distributed the Works in Suit for short term loans to its users without authorization from the Publishers. (McN Decl. ¶13.)

**Response:** Not disputed.

576. The Internet Archive has not paid the Publishers or their authors any fees for their use and distribution of the Works in Suit. (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

143

**Response:** Disputed. Publishers and authors have been paid for the copies the Internet Archive uses: They receive payment when the copy used for digitization was sold for the first time. Gratz Opening Decl. Ex. A, Stipulation ¶ 2.

577. As stated by the Internet Archive's expert witnesses, Susan Hildreth, there is a "thriving ebook licensing market for libraries" that "has increased in recent years" and "is predicated on licensing revenues that are paid by libraries to entities like OverDrive." (McN Decl. ¶9.)

**Response:** Not disputed.

578. When a library obtains an ebook from an authorized aggregator (like OverDrive) that is published by one of the Publishers for lending to its patrons, that Publisher earns a fee. (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:** Not disputed.

579. The Internet Archive holds itself out a "non-profit library." (McN Decl. ¶¶1, 77; R-A Decl. ¶70.)

**Response:** Not disputed.

580. The Internet Archive does not pay the Publishers the fees paid by libraries engaged in short-term loans of ebooks. (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:** Not disputed.

581. IA added over 19,000 of the Publishers' books to its Website after the Publishers filed suit. (Foster Decl. ¶118, Figures 11-14.)

**Response:** Not disputed that the Foster Declaration's description of tables of scans of publishers' works following the filing of this lawsuit add up to over 19,000. Disputed to the

144

extent the cited evidence does not support the assertion that each of these scans are separate works. *See* Fed. R. Civ. P. 56(c)(1). The cited evidence only suggests these are separate scans. *See* Foster Decl. ¶ 118, figs. 11-14.

582. In addition to the Works in Suit, the Internet Archive is distributing ebooks for additional works in each of the Publishers' respective catalogs:

**Response:** Not disputed.

582.1. Internet Archive distributes 4,519 titles published by Hachette, which constitutes 34.6% of the titles currently published by Hachette in print and digital form. (Foster Decl. ¶117.)

**Response:** Not disputed.

582.2. Internet Archive distributes 7,055 titles published by HarperCollins, which constitutes 36.7% of the titles currently published by HarperCollins in print and digital form. (Foster Decl. ¶117.)

**Response:** Not disputed.

582.3. Internet Archive distributes 16,496 titles published by Penguin Random House, which constitutes 35.8% of the titles currently published by Penguin Random House in print and digital form. (Foster Decl. ¶117.)

**Response:** Not disputed.

582.4. Internet Archive distributes 4,933 titles published by Wiley, which constitutes 15.5% of the titles currently published by Wiley in print and digital form. (Foster Decl. ¶117.)

**Response:** Not disputed.

583. The percentage is higher if one looks at books initially published more than five years ago. For these books:

**Response:** Not disputed.

145

583.5.  Internet Archive distributes 4,220 titles published by Hachette, which constitutes 54.6% of the titles currently published by Hachette in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

583.6.  Internet Archive distributes 15,746 titles published by Penguin Random House, which constitutes 48.4% of the titles currently published by Penguin Random House in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

583.7.  Internet Archive distributes 4,889 titles published by Wiley, which constitutes 21.3% of the titles currently published by Wiley in print and digital form.  (Foster Decl. ¶117.)

**Response:**  Not disputed.

584.  Internet Archive has not paid the Publishers the fee customarily paid by libraries engaged in library ebook lending for each of these additional titles.  (McN Decl. ¶10; Pavese ¶32; R-A Decl. ¶¶70-71; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:**  Disputed.  Libraries do not "customarily" pay a fee to Publishers for CDL. Gratz Opening Decl. Ex. A, Stipulation ¶ 2.  There is no evidence in the record that any entity has ever paid a license fee for Controlled Digital Lending.

585.  The Publishers earn substantial fees from the library ebook market.  For example, between 2017-2020, the 48 Works in Suit published by PRH generated approximately $1.23 million in U.S. library ebook revenue.  (Weber Decl. ¶49.)  During the same time period, the 33 Works in Suit published by HarperCollins generated over $768,000 in revenue from the license of library ebooks.  In short, for these 88 Works in Suit, the two Publishers earned almost $2 million in library ebook revenues.  (R-A Decl. ¶49.)

146

**Response:**  Not disputed that, from 2017-2020, HarperCollins earned more than $768,000 in revenue from the license of library ebooks of the Works in Suit it publishes. Disputed in that the cited portion of Mr. Weber's Declaration does not support the assertion that "between 2017-2020, the 48 Works in Suit published by PRH generated approximately $1.23 million in U.S. library ebook revenue."  *See* Fed. R. Evid. 56(c)(1).

586.  By extrapolation, the Publishers earn many millions in library ebook revenues for the 33,000 works published by them in print and digital form that are posted on the Internet Archive.  (R-A Decl. ¶49.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Ms. Restivo-Alessi's Declaration only discusses revenue from 2017 to 2020 from library ebook licenses for the Works in Suit published by HarperCollins.  Moreover, Ms. Restivo-Alessi has not established foundation for having knowledge concerning the library ebook revenues for Penguin Random House, Hachette, or Wiley.  Her extrapolation is unsupported speculation.  *Major League Baseball Props., Inc.*, 542 F.3d at 306 ("The non-moving party [on summary judgment] may not rely on conclusory allegations or unsubstantiated speculation.") (cleaned up).  Moreover, all available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly-available sources, and expert analysis—demonstrate that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

587.  It would cost Internet Archive millions of dollars to license authorized library versions of the Works in Suit and the Publishers' 33,000 other titles that currently reside on the

147

Internet Archive for national, unlimited distribution without a metering limit. (R-A Decl. ¶71; Weber Decl. ¶84.)

**Response:** Disputed. The assertions in this paragraph are not supported by admissible evidence. Ms. Restivo-Alessi (HarperCollins) and Mr. Weber (Penguin Random House) have not established foundation for having personal knowledge concerning the cost of or parameters for licensing library ebooks from Hachette or Wiley—with respect to the Works in Suit or any works not at issue, under any type of access model. In addition, HarperCollins, Hachette, and Penguin Random House do not offer any of their trade ebooks to libraries under a perpetual access model. *See* PSMF ¶¶ 124, 127, 130. And none of the Plaintiffs license ebooks for "national, unlimited distribution." *Id.* Therefore, asserting "it would cost" the Internet Archive "millions of dollars" to license library ebooks "for national, unlimited distribution without a metering limit" describes an impossibility and is speculative. *Major League Baseball Props., Inc.*, 542 F.3d at 306. Moreover, this assertion alludes to the commercial performance of of works not at issue. The Internet Archive requested such commercial performance data, but Plaintiffs refused to produce it. ECF Nos. 47 (IA letter to Court requesting discovery conference) & 49 (Plaintiffs' response).

588. Both the number of the Publishers' titles being distributed by the Internet Archive, and the number of its members and borrows has grown over time, including since this lawsuit was filed. (*See supra* ¶¶544-547.)

**Response:** Not disputed.

589. Internet Archive provides libraries and their patrons with a free alternative to licensed ebooks from the Publishers' authorized library ebook aggregators. Internet Archive

148

provides an option not to pay the fees for authorized library ebooks. (R-A Decl. ¶¶75-79; Pavese Decl. ¶32; Weber Decl. ¶¶85-86, 88, 90-93; Sevier Decl. ¶¶76-77.)

**Response:** Disputed. Borrowing library books—whether from the Internet Archive or from a public or academic library—is free to patrons. PSMF ¶ 113. Digitizing physical books is not a "free alternative" for libraries. It lets them lend either the physical book they have or a digital version. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶ 51.

590. Internet Archive provides short term ebook lending to users. (McN Decl. ¶¶4-5, 13; R-A Decl. ¶75.)

**Response:** Not disputed.

591. Authorized library ebook aggregators – working pursuant to agreements with the Publishers – also provide short term ebook lending to users. (McN Decl. ¶11; R-A Decl. ¶75.)

**Response:** Not disputed.

592. By providing short term ebook lending on the internet, Internet Archive and authorized library ebook aggregators perform a similar function. (McN Decl. ¶¶117-121; R-A Decl. ¶75.) Internet Archive does not compensate the Publishers and authorized library lending does compensate the Publishers. (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶¶75-76; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:** Disputed. Library ebook aggregators facilitate library lending of ebooks. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 43, 98. Libraries actually lend those books. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶ 14. Internet Archive behaves similarly to a library, not an aggregator, because it loans books to patrons. Restivo-Alessi Decl. ¶ 76, Sevier Decl. ¶ 77, Weber Decl. ¶¶ 16, 19; Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 43, 98. Publishers are

149

compensated when a physical copy of a book is sold the first time. Gratz Opening Decl. Ex. A, Stipulation ¶ 2.

593. By creating ebooks through the scanning of the Publishers' print books, the Internet Archive enables public and academic libraries to avoid certain licensing restrictions that each Publisher has devised for the library ebook market. (Pavese ¶¶23, 34; R-A Decl. ¶¶2, 29,75; Sevier Decl. ¶67; Weber Decl. ¶70.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). Digitizing physical books allows libraries to lend either the physical book they have or a digital version. The Internet Archive's digital lending library does not "enable" libraries to "avoid certain licensing restrictions" any more than the physical lending of books constitutes avoiding licensing restrictions. *See* Hildreth Decl. Exs. 1 & 2, Hildreth Expert Rpt. ¶¶ 47-54, 106-109 & Reply Expert Rpt. ¶ 8.

594. Internet Archive does not restrict the users of its Website to identified community residency or academic credentials; rather, Internet Archive distributes its ebooks on its Website without a limiting term (such as for two years) or a limiting number of circulations (like 26). (McN Decl. ¶¶4, 6, 62; R-A Decl. ¶75.)

**Response:** Not disputed that the Internet Archive does not "restrict the users of its Website to identified community residency or academic credentials." Disputed to the extent that "without a limiting term" is misleading. The Internet Archive strives to keep physical books it owns—as well as the digitized versions—forever. The Internet Archive does not make a digitized book unavailable for lending after a certain amount of time or after a certain number of check-outs. Kahle Opp'n Decl. ¶ 13.

150

595. Multiple libraries have links to IA's Website on their websites. (*See supra* at ¶¶393-396.) When a library puts a link on its website sending its local patrons to the IA's Website, the ebooks available on the Website are not authorized for lending by the Publishers. (McN Decl. ¶13.)

**Response:** Not disputed.

596. When a library puts a link on its website sending its local patrons to IA's Website, that library's local patrons may have the ability to borrow from a collection of ebooks not available in its own local library's collection. (McN Decl. ¶¶104, 108; R-A Decl. ¶76.)

**Response:** Not disputed, but, for the sake of clarity, anyone who signs up to be a patron may borrow books from the Internet Archive regardless of other libraries they are patrons of. Any library can link to the Internet Archive. Kahle Opp'n Decl. ¶ 25.

597. Susan Hildreth, Internet Archive's library expert, stated in her report that libraries engage in CDL "to leverage their existing physical collection" to obtain ebooks. (McN Decl. ¶14.)

**Response:** Not disputed.

598. When libraries leverage their existing physical collections to obtain ebooks, they do not pay for authorized ebooks. (McN Decl. ¶14; R-A Decl. ¶78.)

**Response:** Disputed. The cited evidence does not support the assertion in this paragraph. *See* Fed. R. Civ. P. 56(c)(1). Further, there is no evidence that any libraries who use Controlled Digital Lending are not paying for authorized ebooks. *See* Gratz Opp'n Decl. Ex. 6, Hildreth errata; Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 226:24-227:4, 257:1-258:8; Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 106-109.

151

599. Ms. Hildreth also stated in her report that "if a library decided not to license a title because digitized print copies are available for borrowing under CDL, a library will use the money it would have spent licensing that title as an ebook on licensing another ebook title – or on purchasing print books." (McN Decl. ¶14.)

**Response:** Not disputed.

600. If a library decides not to license an ebook title from authorized ebook aggregators because digitized print copies are available for borrowing under CDL and uses the money on another ebook title, that other ebook title may not be written by the same author or published by the same publisher as the first title. (McN Decl. ¶14.; R-A Decl. ¶¶75; 78.)

**Response:** Not disputed.

601. Ms. Hildreth testified that it is her "expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL." (McN Decl. ¶14.)

**Response:** Disputed. See response to paragraph 526, above.

602. As a result, the Publisher and author will receive less money from the library for those particular titles. (McN Decl. ¶14.)

**Response:** Disputed. The only support for this assertion is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. Further, Ms. McNamara's theory about what "will" happen is unsupported speculation. *Major League Baseball Props., Inc.*, 542 F.3d at 306 ("The non-moving party [on summary judgment] may not rely on conclusory allegations or unsubstantiated speculation.") (cleaned up). All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from

152

A-6158

publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books. PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein). *See also* response to paragraph 526 above.

603. The Internet Archive's Open Libraries Agreement form explicitly states, "[M]ak[e] every library's collection into a digital collection by allowing a library to lend a digital version of physical volumes they own." (McN Decl. ¶69.)

**Response:** Not disputed.

604. The Publishers experience lost potential ebook license revenues when a library makes their collection digital by using a physical volume that they own, rather than obtaining an authorized ebook license for a fee from an authorized ebook aggregator. (R-A Decl. ¶78.)

**Response:** Disputed. All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis— demonstrates that the Internet Archive's digital lending library has no effect on revenues for books. PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein). See response to paragraph 526 above.

605. The Internet Archive has advised libraries that they need not spend money on authorized ebooks because their patrons can instead access ebook titles on the Internet Archive's Website and/or use their print copies to leverage them into digital copies. (*See supra* at ¶¶380; 597-98; R-A Decl. ¶78.).

**Response:** Not disputed.

606. For example, in presentations to libraries, Internet Archive has explained that its model "ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format." (McN Decl. ¶71; R-A Decl. ¶78.)

153

**Response:**  Not disputed.

607.  As another example, in a document titled "Maximizing institutional investment in print resources through controlled digital lending," Internet Archive summarizes its project as "Or, You Don't Have To Buy It Again."  (McN Decl. ¶71; R-A Decl. ¶78.)

**Response:**  Not disputed that Mr. Freeland gave a presentation titled "Maximizing institutional investment in print resources through controlled digital lending."  Not disputed that the second slide of this presentation reads "Or, You Don't Have to Buy It Again!"  McNamara Decl. Ex. 109.  The assertion that this is how the Internet Archive "summarizes its project" is not supported by the cited evidence.  *See* Fed. R. Civ. P. 56(c)(1).

608.  The Publishers experience lost revenues when a library does not "repurchase the content again" via an authorized ebook license and instead makes use of the Internet Archive's ebook for its patrons.  (R-A Decl. ¶78.)

**Response:**  Disputed.  See response to paragraph 598 above.  All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books.  PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).  Further, the cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1).  Ms. Restivo-Alessi has not laid a foundation for her knowledge of the revenues for library ebooks realized by Penguin Random House, Hachette, or Wiley.

609.  As of June 2020, when the Works in Suit were removed from the Internet Archive, it had fewer members and monthly loans than today.  (*See supra* ¶¶544-547.)

**Response:**  Not disputed.

154

610. If the Internet Archive's conduct continues or other similar websites follow its example and its practices become widespread, there will be more free ebooks to satisfy user demand. (R-A Decl. ¶¶76-79; Weber Decl. ¶50.)

**Response:** Disputed. The cited evidence is not admissible. HarperCollins and Penguin Random House's theories about what "will" happen are unsupported speculation. *Major League Baseball Props., Inc.*, 542 F.3d at 306. All available evidence—including the sales data Plaintiffs produced for the Works in Suit, sales data from publicly available sources, and expert analysis—demonstrates that the Internet Archive's digital lending library has no effect on revenues for books. PSMF ¶¶ 37-49, 97-99, 116-147 (and all exhibits and declarations cited therein).

611. There are many millions of print books housed in libraries nationwide. (McN Decl. ¶11.; R-A Decl. ¶79.)

**Response:** Not disputed.

612. While fewer than 15 public libraries now act as Partner Libraries in the Open Libraries project, their widespread participation would increase the number of IA's copies of the type of trade books published by the Plaintiffs. (McN Decl. ¶72.)

**Response:** Disputed. The only support for the statement "their widespread participation would increase the number of IA's copies of the type of trade books published by Plaintiffs" is improper attorney testimony in the form of Ms. McNamara's Declaration, which is not admissible evidence. *Omnipoint*, 202 F. Supp. 2d at 213; *see also Patterson*, 375 F.3d at 219; *Wahad*, 179 F.R.D. at 435. Moreover, Ms. McNamara's theory about what "would" happen is unsupported speculation. *Major League Baseball Props., Inc.*, 542 F.3d at 306.

613. The Publishers price and sell print based on the assumption that they are material objects with limited distribution capabilities. (R-A Decl. ¶22; Sevier Decl. ¶40; Weber Decl. ¶42.)

**Response:** Not disputed.

614. A consumer who wishes to read a particular book can read or download the ebook for free from IA's Website rather than obtaining the ebook from Amazon, B&N.com, or the Publishers' other e-vendors for a fee. (Sevier Decl. ¶¶9, 75; R-A Decl. ¶80; Weber Decl. ¶¶87-93.)

**Response:** Disputed to the extent that this assertion is misleading. A reader who wishes to read a particular book may also read or download the book for free from a traditional library. *See generally* Hildreth Decl. Exs. 1 & 2, Hildreth Expert Rpt. & Reply Rpt.

615. If a consumer obtained an ebook from Amazon, B&N.com, or the Publishers other e-vendors, the consumer would pay a fee for the work. (R-A Decl. ¶80.) If the same consumer instead obtains the ebook from IA's Website, they would not pay a fee for the work. (McN Decl. ¶13; Pavese ¶32; R-A Decl. ¶70; Sevier Decl. ¶74; Weber Decl. ¶84.)

**Response:** Disputed to the extent that this assertion is misleading. A reader who wishes to read a particular book may also read or download the book for free from a traditional library. *See generally* Hildreth Decl. Exs. 1 & 2, Hildreth Expert Rpt. & Reply Rpt.

616. The Publishers employ anti-piracy vendors. This retention is informed by the belief that the distribution of free unauthorized digital copies of their book on internet websites leads to lost sales revenue. (Pavese ¶20; R-A Decl. ¶81; Sevier ¶21; Weber ¶17.)

**Response:** Not disputed.

156

617.  Hachette's study of library and commercial ebook sales from 2017 to 2020 shows that its library ebook reads are increasing, while its retail ebook sales are declining.  This study includes data which shows, for instance, that revenues for certain writers who have had steady commercial ebook sales has gone down while the circulation numbers for their library ebooks have gone up.  (Sevier Decl. ¶¶57; 58-59.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Civ. P. 56(c)(1). ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  *See* Sevier Decl. Ex. 4 at HACHETTE0010915.

Further, the cited evidence is not admissible to the extent it is being offered for the truth of its contents.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook Sales and Circulations[] Overview 2017-2020.  To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

618.  This study suggests that free short term lending of ebooks may potentially serve as a substitute for the acquisition of commercial ebooks.  (Sevier Decl. ¶59.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Evid. 56(c)(1); *see* McNamara Decl. ¶ 4 & Ex. 11 (whether an item serves as a substitute is an empirical question).  Further, the cited evidence is not admissible to the extent it is being offered for the truth of its contents.  Fed. R. Evid. 801, 802; *Young*, 2011

WL 2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook Sales and Circulations[] Overview 2017-2020.  To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

619.  These trends in the Hachette study show that members of the public are increasingly using free ebook options, such as from libraries.  (Sevier Decl. ¶¶55-59; *see also* Weber Decl. ¶64.)

**Response:**  Disputed.  The cited evidence does not support the assertions in this paragraph.  *See* Fed. R. Evid. 56(c)(1).  Further, the cited evidence is not admissible to the extent it is being offered for the truth of its contents.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.  Moreover, Mr. Sevier's Declaration cites Exhibit 4, an "overview" of the study described in his declaration and in this paragraph.  Sevier Decl. Ex. 4, HBG Library Ebook Sales and Circulations[] Overview 2017-2020.  To the extent the "overview" is being offered for the truth of its contents, the "overview" is also hearsay.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

620.  If there were widespread and unrestricted adoption of the conduct practiced by Internet Archive, that would lead to a greater supply of copies of each backlist ebook title available for free short term loan from internet websites, with reduced or no waitlists.  (R-A Decl. ¶81; Weber Decl. ¶¶90-93.)

**Response:**  Disputed.  The cited evidence is not admissible.  HarperCollins and Penguin Random House's theories about what "will" happen are unsupported speculation.  *Major League Baseball Props., Inc.*, 542 F.3d at 306.

621.  The Foster Declaration provides examples in which the Internet Archive has made metadata errors or other mistakes with assorted ramifications, including instances in which in-copyright books have been treated as public domain, or titles have been confused.  (Foster Decl. ¶88; Weber Decl. ¶89; Sevier Decl. ¶78.)

**Response:**  Not disputed.

622.  The Plaintiffs or their representatives have sent copyright notices to Internet Archive identifying unauthorized copies of the Plaintiffs' works to be removed.  (Foster Decl. ¶119.)

**Response:**  Not disputed.

623.  Internet Archive failed to remove or disable access to certain of the alleged infringements cited in copyright notices that the Plaintiffs or their representatives sent before the lawsuit, both for some of the Works in Suit and for other works published by the Plaintiffs. (Foster Decl. ¶122.)

**Response:**  Not disputed.

624.  On July 23, 2014, "PRH emailed its catalog to Internet Archive in an Excel spreadsheet, demanding that IA remove "[u]nauthorized, scanned versions of Penguin Random House titles being lent to patrons... immediately."  (Weber Decl. ¶17.)

**Response:**  Not disputed.

625.  The email added that the "attached file includes both print and eBook isbn for all Random House titles, and print isbns (only) for Penguin titles.  It includes close to 60,000 unique isbns.  Please let us know the time frame in which we can expect these titles to be removed, and if you need anything additional from us to facilitate this process."  (Weber Decl. ¶17.)

**Response:**  Not disputed.

159

626.  In response, the Internet Archive provided assurances that it would comply with this demand; Internet Archive's Office Manager stated that "We've been disabling lending access to our list of items with matching ISBN metadata that also have either an Ebook ISBN or 'Y' in the 'Ebook Eligible' column on your spreadsheet. I will confirm when this has been completed." (Weber Decl. ¶17.)

**Response:**  Not disputed.

627.  Of the 58,754 ISBNs listed in the July 2014 PRH catalog, 35,413 (60.3%) remain in PRH's current commercial catalog, and 23,341 (39.7%) do not.  (Prince Decl. ¶134.)

**Response:**  Disputed that this fact is supported by a Prince Declaration, which Plaintiff did not file.  Not disputed that it is supported by the Foster Declaration.

628.  Today, the Internet Archive makes nearly half of the books listed in the 2014 PRH catalog available for lending on the Website; the Website currently makes available (a) 47.1% (16,681 of 35,413) of the 2014 catalog books that are in PRH's current catalog; (b) 48.7% (11,366 of 23,341) of the 2014 catalog books that are not in PRH's current catalog; and (c) 47.7% (28,047 of 58,754) of all 2014 catalog books.  (Prince Decl. ¶134.)

**Response:**  Disputed that this fact is supported by a Prince Declaration, which Plaintiff did not file.  Not disputed that it is supported by the Foster Declaration.

629.  Likewise, in 2018, counsel for HarperCollins sent Internet Archive a letter "demand[ing] that you immediately disable the 'Borrow eBook' function for our books still under copyright."  (R-A Decl. ¶83.)

**Response:**  Not disputed.

630.  Internet Archive did not comply with this cease and desist letter.  (R-A Decl. ¶83.)
**Response:**  Not disputed.

631.  As a result, HarperCollins instructed its anti-piracy vendor to send takedown notices to Internet Archive for hundreds of links to in-copyright works on the Website.  Despite these notices, Internet Archive has continued to upload and make thousands of HarperCollins works available for lending.  (R-A Decl. ¶83.)

**Response:**  Not disputed.

632.  Other Plaintiffs or their representatives have sent copyright notices to IA identifying unauthorized copies of Plaintiffs' works to be removed.  (Pavese Decl. ¶6; Sevier Decl. ¶82).

**Response:**  Not disputed.

633.  Internet Archive failed to remove or disable access to certain of the alleged infringements cited in those notices, both for the Works in Suit, and for other works.  (Foster Decl. ¶122.)

**Response:**  Not disputed.

634.  Internet Archive has also received requests from authors requesting that their books be removed from the Website.  For example, Internet Archive received an email from an author writing "from a little farm house in Tasmania where [she had] existed on a meager writer income for the past ten years in order to support my two children as a single mother," who told IA that it was "stealing" from her by posting her books and had imperiled her ability to "feed [her] kids and pay [her] house loan."  (McN Decl. ¶24.)

**Response:**  Not disputed that the Internet Archive has received requests from authors requesting that their books be removed from openlibrary.org.  Not disputed that the email is accurately quoted.  Disputed to the extent that this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

161

635.  In that same message, the author asked "[c]ould you please consider an agreement between myself and my publishers that will offer remuneration for any future lendings.  If not could you remove [my] titles from your system."  "Incidentally," the email continued, "I noticed Girls Night In 4 was listed… the authors in that collection gave those stories over for free to support the War Child charity.  I'm concerned that [a] valuable charity is missing out on sales.  Could you also please consider within your heart and soul if what you are doing is honourable [sic] towards authors.  We all love books and we all love sharing books, but the original creator needs to be paid at some stage in your system."  (McN Decl. ¶24.)

**Response:**  Not disputed that the email is accurately quoted.  Disputed to the extent that this quoted statement is being offered for its truth, the cited evidence is not admissible.  Fed. R. Evid. 801, 802; *Young*, 2011 WL 2714208, at *1 n.1.

### ADDITIONAL STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT[4]

154.  While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for nearly the entirety of its history.  Kahle Opp'n Decl. ¶ 3.

155.  Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web.  Then, the Internet Archive focused on hosting public domain books.  Kahle Opp'n Decl. ¶ 4.

---

[4] The numbering of the paragraphs in this section continues from the Statement of Material Facts the Internet Archive submitted in support of its Motion for Summary Judgment.

162

156.     Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain.  *Id.*

157.     The Internet Archive began scanning print books around 2004 when it helped form the Open Content Alliance, a consortium of libraries, universities, and companies—including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft—that aimed to preserve and provide online access to digitized books.  Kahle Opp'n Decl. ¶ 5.

158.     Within a few years, the Internet Archive launched Open Library, which aimed to become the largest catalog of books, while providing free access to public domain books the Internet Archive had scanned.  Kahle Opp'n Decl. ¶ 6.

159.     The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries it partnered with—to begin lending books online to patrons, for free, for short periods of time.  Kahle Opp'n Decl. ¶ 7.

160.     Now, the Internet Archive has more than 3.6 million books available for digital lending, and millions more public-domain books that can be downloaded and kept, not just borrowed.  Kahle Opp'n Decl. ¶ 8.

161.     Of those millions of items, this lawsuit is about 127 Works in Suit, which are among what Plaintiffs say are the 33,000 books published by Plaintiffs that are available for

163

borrowing from Internet Archive and are also available in digital form, such as via OverDrive. PSMF ¶¶ 240-41.

162.     The Internet Archive lends books—for free—to patrons for a limited time at its own expense.  Those expenses include equipment, personnel, and, especially, acquisition and storage costs for the physical books that are being lent digitally.  The Internet Archive has spent millions of dollars on its digital lending program.  Kahle Opp'n Decl. ¶ 12.

163.     The Internet Archive is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations, including Books for Africa, school systems, prison ministries, and battered women's shelters.  Gratz Opp'n Decl. Ex. 3, Patton-Schmitt Dep. Tr.  27:12-28:5; *see also id*. at 40:2-41:21 (explaining that other donation recipients also have "wish lists" of specific book categories and titles).

164.     From the beginning of the affiliate link program with Better World Books through February 10, 2021, the Internet Archive received only $5,561.41 in such revenue.  Kahle Opp'n Decl. ¶ 19.

165.     Better World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs.  Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections.  Gratz Opp'n Decl. Ex. 3, Patton-Schmitt Dep. Tr. 31:11-16.  When one of those books is sold, a portion of the proceeds goes to the library.  *Id.* 63:12-21.

166.     Better World Books helps libraries recoup some of their investment in their collections while extending the lives of books that may otherwise have been thrown away.  If Better World Books does not believe it can sell a book, it donates it is possible, or, as a last resort, recycles it.  *Id.* 31:21-32:4, 35:1-36:11.

167. Libraries have a long history of resource sharing, including through interlibrary loan programs. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 40-46, 51, 82-88, 89-95, 98-101.

168. The Internet Archive has no evidence that the owned to loaned ratio was exceeded as the result of physical access to a physical book owned by a partner library. Kahle Opp'n Decl. ¶ 26.

169. Libraries regularly repair and re-bind books that are worn, rather than buying new copies from publishers. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 87–88.

Dated: September 2, 2022                           DURIE TANGRI LLP

                                   By:              /s/ Joseph C. Gratz
                                          Joseph C. Gratz (*Pro Hac Vice*)
                                          Jessica E. Lanier (*Pro Hac Vice*)
                                          Aditya V. Kamdar (*Pro Hac Vice*)
                                          Annie A. Lee (*Pro Hac Vice*)
                                          217 Leidesdorff Street
                                          San Francisco, CA 94111
                                          (415) 362-6666
                                          jgratz@durietangri.com
                                          jlanier@durietangri.com
                                          akamdar@durietangri.comp
                                          alee@durietangri.com

                                          ELECTRONIC FRONTIER FOUNDATION
                                          Corynne McSherry (*Pro Hac Vice*)
                                          Kit Walsh (*Pro Hac Vice*)
                                          Cara Gagliano (*Pro Hac Vice*)
                                          815 Eddy Street
                                          San Francisco, CA 94109
                                          (415) 436-9333
                                          corynne@eff.org
                                          kit@eff.org
                                          cara@eff.org

                                          Attorneys for Defendant
                                          INTERNET ARCHIVE

165

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2022 the within document was filed with the Clerk

of the Court using CM/ECF which will send notification of such filing to the attorneys of record

in this case.

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**DEFENDANT INTERNET ARCHIVE'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ..................................................................1

II. ADDITIONAL FACTS ..........................................................................2

III. ARGUMENT.......................................................................................3

    A. The Internet Archive's CDL implementation is a fair use that serves copyright's essential purpose. ...........................................................3

        1. Plaintiffs misstate law and facts relevant to Factor One. ............................3

            a. The Internet Archive's CDL implementation is entirely noncommercial and publicly beneficial. ..........................................4

                i. Receiving $5,561.41 in affiliate link revenue does not make the Internet Archive's lending program commercial...........................................................7

                ii. Receiving money from other libraries for scanning and storing out-of-copyright books does not make the Internet Archive's lending of in-copyright books commercial...........................................................9

                iii. Facilitating digital lending of non-circulating copies owned and stored by other libraries does not affect the analysis.......................................................10

            b. CDL is transformative...............................................10

            c. Transformativeness is not required for the first factor to favor the Internet Archive, particularly given the noncommercial nature of its digital lending and the public benefits it produces. ..................................................13

        2. The second and third factors do not favor Plaintiffs................................14

        3. Plaintiffs misstate law and facts relevant to Factor Four. .........................15

            a. There is no market for licenses to lend books a library already owns. ............................................................15

            b. Loaning books to library patrons one at a time is consistent with economic expectations at the time the publisher sells the book.........................................................16

i

c.     Interference with the publishers' attempts to segment the market is not cognizable harm under the fourth factor. ................18

d.     *Google Books* does not aid Plaintiffs. ...........................................19

e.     The fourth factor looks to what would happen if the defendant's particular practice, with all of its attendant costs and limitations, became widespread. ...................21

B.     The National Emergency Library was also fair use. ...............................23

C.     Arguments raised by Plaintiffs' amici do not affect the outcome in this case. ................................................................................................23

    1.     Many amici raise concerns related to other factual situations not presented by the facts here, and fair use takes into account the particular factual situation before the Court. .............................23

    2.     Section 108 does not limit fair use. ...........................................26

    3.     This case does not present a question for Congress. ..................27

    4.     This case does not turn on international law. ..............................28

       a.     International law does not affect the scope of fair use in the United States. ...............................................................28

       b.     To the extent the Court looks to international law, other governments have found CDL lawful and consistent with treaty obligations. .......................................................29

IV.     CONCLUSION ...............................................................................32

ii

## <u>TABLE OF AUTHORITIES</u>

<b>Page(s)</b>

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
   896 F.3d 437 (D.C. Cir. 2018).......................................................................6, 11

*American Geophysical Union v. Texaco Inc.*,
   60 F.3d 913 (2d Cir. 1994)......................................................................4, 6, 7, 15

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014)...........................................................................7, 26

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015).......................................................................... *passim*

*Bacon v. Avis Budget Grp., Inc.*,
   357 F. Supp. 3d 401 (D.N.J. 2018),
   *aff'd*, 959 F.3d 590 (3d Cir. 2020).........................................................................24

*Bell v. Worthington City Sch. Dist.*,
   No. 2:18-CV-961, 2020 WL 2905803 (S.D. Ohio June 2, 2020)...........................................14

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006).......................................................................5, 13

*Cambridge University Press v. Patton*,
   769 F.3d 1232 (11th Cir. 2014) .................................................................13, 14, 22

*Campbell v. Acuff-Rose Music*,
   510 U.S. 569 (1994)...........................................................................13, 14, 27

*Capitol Recs., LLC v. ReDigi Inc.*,
   910 F.3d 649 (2d Cir. 2018)...............................................................12, 19, 20, 22

*Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001)........................................................................16

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) .....................................................................11, 12

*Doan v. Am. Book Co.*,
   105 F. 772 (7th Cir. 1901) ...........................................................................18

*Fox News Network, LLC v. TVEyes, Inc.*,
   883 F.3d 169 (2d Cir. 2018)....................................................................10, 12, 24

iii

*Google LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021)...............................................................14, 24, 27, 28

*Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*,
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ...................................................................24

*Kruger v. Virgin Atl. Airways, Ltd.*,
    976 F. Supp. 2d 290 (E.D.N.Y. 2013) .................................................................30

*L.A. News Serv. v. CBS Broad., Inc.*,
    305 F.3d 924 (9th Cir. 2002),
    *amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) ...................................13

*Mojave Desert Holdings, LLC v. Crocs, Inc.*,
    844 F. App'x 343 (Fed. Cir. 2021) .......................................................................24

*Oracle v. SAP*,
    765 F.3d 1081 (9th Cir. 2014) ..............................................................................16

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
    No. CV-13-02075-TUC-JGZ, 2015 WL 11170727 (D. Az. May 11, 2015) ...........6

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012)..............................................................................6, 7

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)................................................................................... *passim*

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014).............................................................................10, 13

**Statutes**

17 U.S.C. § 107...........................................................................13, 21, 26, 27

17 U.S.C. § 108.....................................................................................24, 26

**Rules**

S.D.N.Y. Local Rule 56.1 ......................................................................3, 7, 8, 9

**Other Authorities**

Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886,
    as last revised at Paris July 24, 1971, *as amended*, Sept. 28, 1979, Art. 9(2) .........28

Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 2(1) ............28

iv

Brief for Amicus Curiae Law Professors & Scholars in Support of Appellee, *Authors Guild v. Google, Inc.*, 2014 WL 3556331 (July 10, 2014)..........................29

H.R. Rep. No. 94-1476 (1976)..................................................................................12, 27

Judgment, *Vereniging Openbare Bibliotheken v. Stichting Leenrecht*, Case C-174/15 (Nov. 10, 2016) ......................................................................................29

Opinion of Advocate General, *Vereniging Openbare Bibliotheken v. Stichting Leenrecht*, Case C-174/15 (June 16, 2016)........................................................30

Paul Courant et al., *On the Cost of Keeping a Book*, *in* The Idea of Order (Council on Library & Info. Res., Ed. 2010) ..................................................................21

v

Defendant Internet Archive respectfully submits this Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment.

## I. PRELIMINARY STATEMENT

Plaintiffs' motion is thick with accusation and rhetoric, but thin on actual evidence. That may be because the Internet Archive's CDL program seeks to do something major publishers can't imagine: Without seeking payment or profit, improve the value of *physical* books for libraries and their patrons and, in the process, help ensure that libraries can continue to serve their mission in the 21st century. Plaintiffs assume that such a project must harm their efforts to license ebooks—but they do not show it. Indeed, their conflation of licensed ebooks with scanned copies of physical books exposes the real goal of this lawsuit. Plaintiffs would like to force libraries and their patrons into a world in which books can only be accessed, never owned, and in which availability is subject to the rightsholders' whim.

Working with peer libraries around the country, the Internet Archive supports a different model that is more consistent with traditional library practice and better serves the purposes of copyright. Its CDL program has created an extraordinary and growing corpus of books for 21st century readers, fostering the growth of knowledge and culture. And digital lending of physical books costs rightsholders no more or less than, for example, lending books via a bookmobile or interlibrary loan. In each case, the books the library lends are bought and paid for, ensuring that rightsholders receive all of the financial benefits to which they are entitled.

Ebook licensing can be an excellent additional option for libraries, which is why libraries spend millions in rental fees on behalf of their patrons. But it should not be the only option. Copyright law was never intended to be a means to permanently lock up culture or force libraries and readers to depend on the licensing choices of a few publishing behemoths. For the reasons

1

set forth below, and in the Internet Archive's Motion for Summary Judgment, the Court should deny Plaintiffs' Motion.

## II.     ADDITIONAL FACTS

While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for decades. Add'l Statement of Material Facts in Supp. of Def.'s Opp'n to Pls.' Mot. for Summ. J. ("ASMF") ¶ 154. Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web. *Id.* ¶ 155. At that time, the Internet Archive focused on hosting public domain books. *Id.* Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain. *Id.* ¶ 156.

The Internet Archive began scanning print books in 2004, when it helped form the Open Content Alliance. *Id.* ¶ 157. This consortium of libraries, universities, and companies—including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft—worked together to preserve and provide online access to digitized books. *Id.* A few years later, the Internet Archive launched Open Library, which aimed to become the world's largest catalog of books and to provide free access to public domain books the Internet Archive had scanned. *Id.* ¶ 158.

The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries (from the Boston Public Library to the San Francisco Public

Library) with which it partnered—to begin lending books online to patrons, for free, for short periods of time. *Id.* ¶ 159.

Today, the Internet Archive makes more than 3.6 million books available for digital lending, and millions more public-domain books available for permanent download. *Id.* ¶ 160. This lawsuit concerns 127 books among those millions. *Id.* ¶ 161. Plaintiffs claim those 127 books are selected from 33,000 books published by Plaintiffs that are available for borrowing from the Internet Archive and are also available in digital form, such as via OverDrive. Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts ("PSMF") ¶¶ 240–41. While Plaintiffs challenge the digital lending of books that are also available via OverDrive to patrons without print disabilities, they do not challenge any of the Internet Archive's related activities: lending books to those with print disabilities, making short excerpts available in response to links from Wikipedia, lending out-of-print books, or lending in-print books that are not available via OverDrive.

## III.    ARGUMENT

We begin by discussing why the facts and case law do not support Plaintiffs' arguments that the first and fourth fair-use factors weigh against a finding that the Internet Archive's CDL implementation is fair use. After briefly discussing the application of those factors to the National Emergency Library, we respond to arguments raised in amicus briefs supporting Plaintiffs.

### A.    The Internet Archive's CDL implementation is a fair use that serves copyright's essential purpose.

#### 1.    Plaintiffs misstate law and facts relevant to Factor One.

Plaintiffs' Factor One analysis attempts to portray the Internet Archive's digital lending program as a commercial enterprise that merely replicates ebook licensing. That portrayal

cannot be squared with binding precedent or the undisputed facts.

      **a.**    **The Internet Archive's CDL implementation is entirely noncommercial and publicly beneficial.**

Plaintiffs' missteps begin with a manufactured theory of commerciality that relies on the wrong legal standard. The standard that binds this Court is the one set forth in *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994). In that case, the court held that "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues *as a direct consequence* of copying the original work." *Id.* at 922 (emphasis added). Further, "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest." *Id.*

Moreover, the inquiry is not whether the defendant organization itself has commercial aspects (though the Internet Archive does not) but whether *the use in question* is commercially exploitative. In *Texaco*, for example, the fact that a researcher worked for a commercial entity did not, by itself, render his copying of journal articles commercial. Instead, the court considered whether the use in question led to commercial gain for his employer.

Here, Plaintiffs offer no evidence that either the Internet Archive or its digital lending program is a revenue-generating exercise. The Internet Archive is a not-for-profit organization that lends books, for free, to patrons, for a limited time, at its own expense. Those expenses include equipment, personnel, and, especially, acquisition and storage costs for the physical books that are being lent digitally; the Internet Archive has spent millions of dollars on its digital lending program. ASMF ¶ 162.

At the same time, the Internet Archive's CDL implementation "benefits the broader public interest," *Texaco* at 922; *see* IA Opening Br. 7–8. CDL helps libraries carry out their

4

traditional lending activities, consistent with hundreds of years of public policy. Copyright Scholars Amicus Br. 9, ECF No. 141. CDL supports authors by providing them with a research tool and ensuring that their works reach a broad audience—whether or not their publishers choose to invest in keeping their works available. Authors Alliance Amicus Br. 7, 13, ECF No. 144. As amici Intellectual Property Law Professors note, a work accessed through the Internet Archive "is materially more valuable to readers than the original that they can't get, that costs too much, or that they don't know about . . . ." IP Law Professors Amicus Br. 4 (citation omitted), ECF No. 143. Further, "[t]his ability to equalize and share resources is a particularly important function in times of extreme social isolation, such as the global COVID pandemic." *Id.*; *see also Blanch v. Koons*, 467 F.3d 244, 254 (2d Cir. 2006) ("Notwithstanding the fact that artists are sometimes paid and museums sometimes earn money, the public exhibition of art is widely and we think properly considered to 'have value that benefits the broader public interest.'") (citation omitted).

That someone else engages in commercial activity that has aspects in common with a given practice does not make that practice more commercial. For example, in *Sony*, the existence of a market for renting prerecorded videotapes, as opposed to recording movies broadcast on TV, did not render the home videotaping at issue in that case commercial. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-51 (1984); *id.* at 484 (Blackmun, J., dissenting).

Lacking controlling precedent for their legal theory, Plaintiffs look to cases that arise outside of this Circuit. The first, *American Buddha*, is an Arizona case that is easily distinguishable on the facts. It involved a fringe site apparently devoted primarily to publishing the personal musings of its founders, Tara and Charles Carreon. *See*

5

https://web.archive.org/web/20140329000447/http:/www.american-buddha.com/ (archiving the website at issue). While the site purported to provide an "online library" as well, that "library" was nothing like the Internet Archive. Instead, it made digital copies available without restriction. The site had a "donate" button, but, if that were enough to render a use commercial, then almost every use by a nonprofit organization would be considered commercial. *Penguin Grp. (USA) Inc. v. Am. Buddha*, No. CV-13-02075-TUC-JGZ, 2015 WL 11170727, at \*2, \*4 (D. Az. May 11, 2015). As amici IP Law Professors note, that would not serve the purposes of copyright. IP Law Professors Amicus Br. 2–8; *see generally Am. Soc'y for Testing & Materials ("ASTM") v. Public.Resource.Org, Inc.*, 896 F.3d 437, 449 (D.C. Cir. 2018) (use that served nonprofit's mission and was also mentioned in fundraising for that mission "hardly rises to the level" of a "commercial" use). Indeed, many public libraries have a "donate" button on pages where they lend books, including the New York Public Library,[1] the Queens Public Library,[2] and the Brooklyn Public Library.[3] Those buttons do not turn their library lending into a commercial activity.

The second, *Holy Transfiguration*, is a First Circuit Court of Appeals decision that addressed a wide variety of copyright issues raised by a church official's publication of religious texts on a website, also without restriction. *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012). That case contradicts the *Texaco* standard by collapsing

---

[1] https://browse.nypl.org/iii/encore/record/C__Rb21302139 ("Give" link at top).

[2] https://www.queenslibrary.org/book/The-lion,-the-witch-and-the-wardrobe/991270 ("Donate" button at top).

[3] https://www.bklynlibrary.org/item?b=11247559 ("Donate Now" link at bottom).

6

the commercial/noncommercial inquiry, asking merely whether the defendant had "benefitted" in any way from the activity in question. *Id.* at 61. On that theory, virtually every use would be commercial, since every fair user has some reason to want to engage in the fair use. For example, the home taping in *Sony* would be commercial because the user "benefitted" by being able to watch the movie at a time different than it was broadcast, and the use in *HathiTrust* would be commercial because the libraries "benefitted" by being able to fulfill their mission of preserving books and making them available to the print disabled. That circularity is why the Second Circuit Court of Appeals applies a different standard, properly focusing on whether the defendant "capture[d] significant revenues as a direct consequence of copying the original work." *Texaco* at 921.

> ### i. Receiving $5,561.41 in affiliate link revenue does not make the Internet Archive's lending program commercial.

Plaintiffs also paint an inaccurate picture of what the Internet Archive does and how it and its partners operate.

*First*, Plaintiffs misrepresent the nature of the relationship between the Internet Archive and Better World Books, which is far from the commercial partnership that Plaintiffs make it out to be. As an initial matter, the Internet Archive does not "effectively own" Better World Books. *Contra* Publishers' Opening Br. 27. The sole shareholder of Better World Books is Better World Libraries, a nonprofit organization that itself has no owner or shareholders. *See* Internet Archive's Resp. to Pls.' Rule 56.1 Statement of Undisputed Materials Facts submitted herewith ("IA Resp.") ¶ 333. The Internet Archive has no control over Better World Books' business and does not profit from it. *See id.*

Through selective use of facts, Plaintiffs also create the misleading impression that certain aspects of the relationship between the Internet Archive and Better World Books are

7

unique to that partnership. For example, Plaintiffs discuss the books the Internet Archive[4] obtains through Better World Books as if this were a special benefit that only the Internet Archive enjoys. *See* Publishers' Opening Br. 13, 27. Plaintiffs fail to mention, however, that the Internet Archive is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations, including Books for Africa, school systems, prison ministries, and battered women's shelters. ASMF ¶ 163.

Nor is there anything special, much less commercial, about the Internet Archive's inclusion of affiliate links to Better World Books on its website. In this case, the revenue that the Internet Archive received when a book was purchased from Better World Books through these affiliate links—just $5,561.41 from the inception of the program through February 10, 2021. ASMF ¶ 164—is tiny in comparison to the millions of dollars the Internet Archive has spent on developing and operating its digital lending program. *Id.* ¶ 162.

In reality, the Internet Archive and Better World Books are distinct and complementary parts of the library ecosystem. Whereas the Internet Archive is a nonprofit public charity that directly provides free library services to the public, *see generally* IA Opening Br. 3–8, Better

---

[4] A nonprofit that works closely with the Internet Archive, Open Library of Richmond, holds legal title to and maintains physical possession of many of the print books in its physical archive facilities. Defendant's Rule 56.1 Statement of Material Facts ¶ 19. For simplicity, regarding ownership of print books, we use the term "Internet Archive" to refer collectively to the Internet Archive and Open Library of Richmond. It is undisputed that the Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the Works in Suit. *Id.* ¶ 20.

8

World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs.  Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections.  ASMF ¶ 165.  When one of those books is sold, a portion of the proceeds goes to the library.  *Id.*  In this way, Better World Books helps libraries recoup some of their investment in their collections while extending the lives of books that may otherwise have been thrown away.  If Better World Books does not believe it can sell a book, it donates it if possible, or, as a last resort, recycles it.  *Id.* ¶ 166.  Given the nature of Better World Books' business model, working closely with the Internet Archive serves the missions of both organizations—to expand access to books and to support all forms of library lending—not the Internet Archive's bottom line.

> ### ii.  Receiving money from other libraries for scanning and storing out-of-copyright books does not make the Internet Archive's lending of in-copyright books commercial.

*Second*, the Plaintiffs attempt to piece together a case for commerciality by combining unrelated parts of Internet Archive's charitable work.  Separately from the digital lending program at issue in this lawsuit, the Internet Archive scans and digitally stores books owned by other libraries as a service to those libraries.  But the books scanned for other libraries are, by and large, books that are no longer subject to copyright, and are not made available via lending.  It is undisputed that Internet Archive (not other libraries who use Internet Archive's scanning services) owns the books at issue here.  Defendant's Rule 56.1 Statement of Material Facts ("DSMF") ¶¶ 18, 20.  Put another way, these separate scanning services (and the methods by which Internet Archive recoups its costs for them) are simply not at issue here.

9

iii. **Facilitating digital lending of non-circulating copies owned and stored by other libraries does not affect the analysis.**

*Third*, the Open Libraries project does not change the analysis. The Internet Archive is proud to be able to work with other libraries to improve access to their books. Plaintiffs' accusation that the project allows patrons of a given library to access more copies than their local library owns is a red herring; libraries have a long history of resource sharing, such as through interlibrary loan programs, without causing any harm to rightsholders. ASMF ¶ 167. The Internet Archive trusts librarians to comply with CDL's basic own-to-loan requirement, and does not need to peer over the shoulders of the librarians at Georgetown or Johns Hopkins or the Boston Public Library. Tellingly, in the many months of discovery in this case, Plaintiffs never bothered to ask any of the Internet Archive's partner libraries about how they have handled the Works in Suit, which is one reason they have no actual evidence of any mishandling (nor is Internet Archive aware of any). ASMF ¶ 168.

b. **CDL is transformative.**

Plaintiffs also misconstrue the standard for transformativeness. The transformativeness inquiry does not turn on whether the secondary user adds criticism or commentary. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). Transformativeness may also be accomplished by expanding the utility of the work where, as here, "it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018).

*Sony* is directly on point. Like the home viewers in that case, Internet Archive patrons are simply accessing books libraries have purchased in the way that is most efficient for the library and its patrons. If those patrons traveled to a library to check out the physical book, or a

10

library mailed a physical book, no one would blink an eye.  CDL does not involve

"systematically republishing," as the Publishers suggest, Publishers' Opening Br. 23, but rather

systematically delivering a book on a one-to-one basis to the one patron who has borrowed that

book, subject to strict controls.  Indeed, any encroachment on commercial entitlements is even

less here than in *Sony*, where an unlimited number of viewers could choose to time-shift and

share the recordings with any number of friends and family, for months or years after the original

recording was created.

  *ASTM v. Public.Resource.Org* offers additional guidance.  In that case, a non-profit

posted scanned copies of standards that had been incorporated by reference into law in

furtherance of its mission to make the law freely available online.  The standards development

organizations ("SDOs") that claimed copyright in those standards argued, *inter alia*, that Public

Resource's use was not transformative because the SDOs also posted some of the standards on

their own websites, albeit subject to a variety of contractual conditions, and the standards were

also available in some libraries.  On appeal, the D.C. Circuit Court of Appeals held that

"distributing copies of the law for purposes of facilitating public access" could be transformative

where such information was "essential to comprehending one's legal duties."  896 F.3d at 450.

This analysis reflects *Sony*'s approach:  Because the public is subject to the law, the public is

entitled to access it, and making that access more efficient is a transformative use.  Here,

similarly, the one patron who has borrowed a particular library book is entitled to access it, and

making that access more efficient is a transformative use.

  The Ninth Circuit Court of Appeals applied a different understanding of

transformativeness in *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), on

which Plaintiffs rely.  In that case, which addressed a commercial video streaming service, the

court did not apply the understanding of transformativeness (in particular the understanding of *Sony* as a case involving transformative use) applied in *TVEyes* and *ReDigi*, both of which were decided after *VidAngel*. And, of course, the commercial video streaming service at issue in *VidAngel* was not a noncommercial service bringing traditional library lending of print collections to the digital age. Digital lending, unlike commercial video streaming, facilitates the use of books in a host of ways that serve the purposes of copyright, such as helping to correct misinformation and helping librarians and others curate, and make available online, collections of banned books. IA Opening Br. 8. It helps ensure that the public's ability to access books is not subject to the whims of the publishers. Relatedly, it helps ensure that the first sale doctrine can continue to serve its vital public interest purpose in the digital age, in keeping with an unbroken history of protections for library lending. Copyright Scholars Amicus Br. 6–10, ECF No. 141; *see also* H.R. Rep. No. 94-1476, at 79 (1976) ("A library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose.").

Nor does the discussion of transformativeness in *Authors Guild v. Google, Inc.*, 804 F.3d 202, 216-18 (2d Cir. 2015) ("*Google Books*"), answer the transformativeness question here. That case also predates *TVEyes* and *ReDigi*, so it is not surprising that it does not apply the view of *Sony* later developed by the Second Circuit Court of Appeals in those decisions. And the court would have had no occasion to apply that view of *Sony* in any event, because *Google Books* did not involve more efficient delivery of content to one entitled to receive it, but instead dissemination of snippets of content to an unlimited number of members of the public concurrently. *Google Books* at 209-10.

12

> ### c. Transformativeness is not required for the first factor to favor the Internet Archive, particularly given the noncommercial nature of its digital lending and the public benefits it produces.

As discussed above, digital lending is a transformative use that improves the efficiency of the delivery of content to library patrons entitled to access the book they borrowed. But whether or not digital lending is a transformative use, it is a fair use. Not all fair uses are transformative. *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 579 (1994); *see also Swatch Grp. Mgmt. Servs. Ltd.*, 756 F.3d at 84–85; *Blanch*, 467 F.3d at 252 n.3. In *Swatch*, the Second Circuit Court of Appeals concluded that while Bloomberg's distribution of a recorded earnings call was "arguably transformative," the first factor favored fair use "regardless of how transformative" the use was. 756 F.3d at 85. Among the considerations in Bloomberg's favor was the use's news reporting function—a "public purpose" named in the preamble to § 107. *Id.* at 82. Here, the Internet Archive supports multiple such public purposes, including research and education. IA Opening Br. 8, 18–19; DSMF ¶¶ 1–6.

*Cambridge University Press v. Patton* also supports the conclusion that transformativeness is not required for the first factor to favor a particular use. 769 F.3d 1232 (11th Cir. 2014). In *Cambridge University Press*, the infringement claim was predicated on a university policy that allowed professors to make scanned versions of copyrighted materials available to students to access and copy. *Id.* at 1239. On appeal, the court both agreed with the trial judge's determination that the use was not transformative and affirmed its finding that the first factor nonetheless favored fair use. *Id.* at 1267. In reaching this conclusion, the appellate court relied on the noncommercial nature of the use and its provision of "a broader public benefit—furthering the education of students at a public university." *Id.*; *see also L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938–39 (9th Cir. 2002), *amended on denial of reh'g*, 313 F.3d 1093 (9th Cir. 2002) (because news reporting is a "favored purpose" under § 107, first

13

A-6191

factor favored fair use even where minimally transformative at best and commercially motivated); *Bell v. Worthington City Sch. Dist.*, No. 2:18-CV-961, 2020 WL 2905803, at *6–*7 (S.D. Ohio June 2, 2020) (finding first factor favored fair use where use was educational but not transformative).

Here, as in *Cambridge University Press*, the noncommercial nature of the Internet Archive's digital lending program, its support for favored statutory purposes, and the public benefits it produces all tilt the first factor heavily towards fair use. "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021). Indeed, as amici Intellectual Property Law Professors explain, fair use is intended, in large part, to encourage socially beneficial noncommercial uses. IP Law Professors Amicus Br. 2–3. The Internet Archive's digital lending does precisely that. *See, e.g.*, IA Opening Br. 7–8, 18–19; Crews & Smith Amicus Br. 10–11, 13, ECF No. 145.

Moreover, digital lending advances the fundamental purposes of copyright by directly facilitating the creation of new works of authorship. *See* Authors Alliance Amicus Br. 13–15, ECF No. 144; IA Opening Br. 18–19; *see also Campbell*, 510 U.S. at 575 (explaining fair use's role in fulfillment of copyright's purpose). Where a use so squarely advances the policy goals of fair use doctrine and copyright as a whole—without subverting the rightsholders legitimate financial expectations, Section III.A.3.b., *infra*—the first factor favors fair use, whether or not the use is transformative.

### 2. The second and third factors do not favor Plaintiffs.

As discussed in the Internet Archive's Motion for Summary Judgment, the second and third factors also weigh against Plaintiffs' motion. IA Opening Br. 21–24.

14

### 3. Plaintiffs misstate law and facts relevant to Factor Four.

Plaintiffs' fourth-factor analysis rests on the assumption that because the public benefits from digital lending, Plaintiffs must be harmed by it. That view is inconsistent with the factual record and with the decisions of the Second Circuit Court of Appeals.

#### a. There is no market for licenses to lend books a library already owns.

Plaintiffs argue that Internet Archive harms the market for or value of their books because the Internet Archive does not pay the "customary price" for the activities it undertakes. But as discussed in Internet Archive's Opening Brief, IA Opening Br. 29–30, the customary price payable to a publisher to lend a book a library has already purchased is zero. Accordingly, there is no "traditional, reasonable, or likely to be developed" market. *Texaco*, 60 F.3d at 929–30.

There is, of course, also a market to license access to ebooks when a library does not already own a book. But as Dr. Jørgensen's analysis shows, the Internet Archive's activities do not affect that market at all. DSMF ¶¶ 140–41.

Plaintiffs assert that "the 'vice of circularity' only arises in cases where the secondary use is transformative and thus justifies the non-payment of a fee." Publishers' Opening Br. 33. As discussed above, the use at issue here *is* transformative. Section III.A.1.b., *supra*. But the bigger problem with Plaintiffs' argument is that the very case in which that analysis arose, *Texaco*, addressed *non*-transformative copying, and the court still examined whether the claimed licensing market was "traditional, reasonable, or likely to be developed." 60 F.3d at 929–30. If Plaintiffs were right, the court would not have needed to undertake that analysis.

*Texaco* also contradicts Plaintiffs' suggestion that this Court must assume a willing buyer and a willing seller for the license. Again, in *Texaco*, the court did not assume that a market with

a willing buyer and a willing seller existed; instead, it inquired whether such a market was "traditional, reasonable, or likely to be developed." On Plaintiffs' view, that inquiry could never matter, because the court would always assume that such a market exists. Indeed, Plaintiffs' view does not rely on fair use case law at all; rather, they draw from copyright *damages* analyses, which *assume* as their starting point that the defendant is liable for infringement. The fair use analysis, by contrast, determines *whether* the defendant is liable for infringement. *Oracle v. SAP* did not address fair use at all, 765 F.3d 1081 (9th Cir. 2014), and *Davis v. The Gap, Inc.* applied the willing buyer / willing seller approach only with respect to damages, 246 F.3d 152, 167 (2d Cir. 2001).

> **b.    Loaning books to library patrons one at a time is consistent with economic expectations at the time the publisher sells the book.**

Digital lending allows more efficient access to a particular copy of a book than would be possible without digital technology. Specifically, it allows one library patron at a time to borrow a book without the need to travel to a library or wait for a book to come in the mail; that efficiency is one of the reasons digital lending is favored under the first factor. IA Opening Br. 17. To the extent Plaintiffs experience economic harm from digital lending, it is exactly the same source of economic harm they would experience from physical lending: the possibility that some consumers take books out from the library instead of buying them.

Copyright law does not grant publishers the right to limit libraries only to inefficient lending methods, in hopes that those inefficiencies will lead frustrated library patrons to buy their own copies. The fundamental limit, which digital lending does not disturb, is that libraries can only lend as many copies as they own. That patrons have to go to the library is not a fundamental limit; after all, copyright law forbids neither inter-library loans nor bookmobiles. That library staff needs to physically handle books is not a fundamental limit; computerized

16

sorting systems have long since reduced that need. That it takes time to physically move a book from one patron to another is not a fundamental limit; if a library sends books via overnight FedEx rather than handing or mailing them to a patron, that does not work a cognizable harm to publishers, though it makes library lending more efficient.[5] That many libraries choose to only loan books to people in one specific geographical area is not a fundamental limit; the Brooklyn Public Library offers access to its entire digital collection to young adults anywhere in the United States in response to book bans at some local libraries,[6] and the Queens Public Library offers library cards to anyone in the United States for an annual fee.[7] The publishers are well aware of all of these longstanding library practices. That the Internet Archive makes its collection available to every person in every community in America makes Internet Archive more, not less, of a library.

To be sure, publishers would prefer—and might profit from—a world in which they had complete control over library lending and could charge libraries for each additional circulation of a book the library already bought. But their preferences do not tell us anything about the scope of their rights under copyright law.

---

[5] *See, e.g.*, https://www.nypl.org/books-by-mail (offering book lending by mail to homebound patrons); https://www.nysoclib.org/sites/default/files/pdf/BooksByMailPolicy.pdf (offering book lending by mail to all patrons).

[6] https://www.bklynlibrary.org/books-unbanned

[7] https://www.queenslibrary.org/about-us/news-media/blog/2094 ("An eCard only requires a valid email address. It is free if you live, work, go to school or own property in New York State, while it is $50 if you are out of state.").

Nor do publishers have a right to limit libraries to lending a book the library owns only a particular number of times. Books do not come with an expiration date, and libraries regularly repair and re-bind books that are worn, rather than buying new copies from publishers. ASMF ¶¶ 167, 169. Rebinding books so that they last longer is not copyright infringement. *Doan v. Am. Book Co.*, 105 F. 772, 777 (7th Cir. 1901).

Publishers might indeed make more money if they could require libraries to re-buy books after they had been borrowed 26 times. Publishers' Opening Br. 9. But the law does not give publishers that right. Libraries own the books they have purchased, and they have the right to lend them to one patron at a time—even the 27th time.

The existence of a product (OverDrive) that permits libraries to rent access to some books on behalf of their patrons does not affect the analysis. Libraries may offer access to books via OverDrive *instead of or in addition* to lending books they have purchased, and that is a perfectly reasonable choice for libraries to make. But digitally lending books the library bought does not displace OverDrive revenue; they are different things, and the publishers, having chosen to sell books to libraries, should not be able to double-dip.

> ### c. Interference with the publishers' attempts to segment the market is not cognizable harm under the fourth factor.

Plaintiffs complain that their "digital strategy" depends on their ability to dictate the terms on which libraries can loan books. Publishers' Opening Br. 32. This is not a new complaint: As discussed in library scholars' amicus brief, publishers and booksellers have wanted more control over library lending for centuries. Crews & Smith Amicus Br. 13–14. But the law does not permit publishers to dictate the terms on which libraries can loan books to patrons, and it never has. Indeed, the very same arguments would apply to physical lending;

publishers would benefit equally from control of both. But despite decades of pleading, neither Congress nor the courts have given publishers control of either. *See* IA Opening Br. 30.

The Supreme Court rejected a very similar argument in *Sony*. There, movie studios argued that allowing noncommercial copying would upset their carefully calibrated licensing market. *Sony*, 464 U.S. at 483 n.35 (Blackmun, J., dissenting) ("A VTR owner who has taped a favorite movie for repeated viewing will be less likely to rent or buy a tape containing the same movie, watch a televised rerun, or pay to see the movie at a theater."). But the person who taped a movie being broadcast in their area was "entitled to receive" that movie. *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018). The movie studios could gain revenue by renting prerecorded videocassettes to people who were *not* already entitled to access the material (such as people who had not received and recorded a licensed broadcast of it). But the fact that they could not *also* gain revenue by renting prerecorded videocassettes to people who *were* already entitled to access the material did not give rise to a cognizable harm. The right to control noncommercial home taping was not within the copyright holder's monopoly there, just as the right to control noncommercial library lending is not within the copyright holder's monopoly here.

### d.    *Google Books* does not aid Plaintiffs.

Plaintiffs fare no better under the fourth-factor analysis in the *Google Books* case. There, the question was whether the display of small portions of books to an unlimited number of concurrent internet users, by a commercial entity that did not own a copy of the book in question, would substitute for sales of books to those internet users. 804 F.3d at 207, 223–24. The Court of Appeals held that while some market substitution was possible, it would not be sufficiently substantial to tilt the fourth factor against fair use. *Id.* at 224.

19

Crucially, in *Google Books* the alleged harm had to be measured against a baseline of *no alternative access*:  Google did not own copies of the books and could not make them available physically as an alternative to the digital access it provided.  Under those circumstances, "[i]f Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong."  *Id.* at 225.  Here, by contrast, the relevant baseline is *physical library lending*:  Internet Archive and its partners own copies of the books and could loan them to the very same patrons physically as an alternative to the digital access it provides.  With or without CDL, those particular physical copies could be read by one patron at a time; CDL simply makes that lending more efficient.  And that increase in efficiency did not lead to any reduction in book sales, or to any reduction in borrowing from libraries that did not own the book and therefore had to license access via OverDrive.  DSMF ¶¶ 140–45.

That digital lending may substitute for undisputedly noninfringing physical lending of the same books cannot weigh against fair use.  In *Sony*, for example, the copying at issue was a substitute for an alternative that did not involve any copying—namely, watching the movies at the time they were broadcast, rather than at a later time.  That is why, as the *ReDigi* court recognized, it was important that the people watching the recorded movies in *Sony* were already "entitled to receive" those movies by a means everyone agreed was noninfringing.  *ReDigi*, 910 F.3d at 661.

And, at any rate, as discussed in Internet Archive's Opening Brief, any effect—if one existed—would not decrease the amount of money paid to publishers by libraries; it would at most reallocate spending away from older books and toward newer books.  IA Opening Br. 33.

20

For this reason, any market effect would not impact incentives to create or publish new books, and would not be cognizable under the fourth factor. *Id.* 33–34.

Further, even a showing of *some* market effect would not weigh against a finding of fair use. "[T]he possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original." *Google Books*, 804 F.3d at 224. Instead, "[t]here must be a meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Id.* (quoting 17 U.S.C. sec. 107(4)). As the evidence in the record shows, there has been no such effect and, even if many more libraries began practicing CDL, no meaningful or significant effect on the market would occur. IA Opening Br. 26–28; DSMF ¶¶ 119–22, 136–39, 140–45.

> **e.** **The fourth factor looks to what would happen if the defendant's particular practice, with all of its attendant costs and limitations, became widespread.**

The practice at issue here is the Internet Archive's digital lending program, with all its attendant costs and limitations. The fourth factor looks to whether market harm would be likely if *that program* became widespread.

As a practical matter, that is extremely unlikely to occur, given the owned-to-loaned limitation: for every concurrent digital loan, there must be a non-circulating physical copy. Thus, in order to expand the number of concurrent loans even for books that have already been scanned, Internet Archive or partner libraries would need to purchase additional copies from publishers and would need to store those copies. Neither of those is free nor infinitely scalable: while Internet Archive and partner libraries work hard to be efficient, buying and storing books costs money. *See, e.g.*, Paul Courant et al., *On the Cost of Keeping a Book*, *in* The Idea of Order (Council on Library & Info. Res., Ed. 2010), at https://www.clir.org/wp-

21

content/uploads/sites/6/pub147.pdf (analyzing the long-term cost of book storage in various

scenarios).  Those costs are on top of the costs of scanning and maintaining digital storage of the

controlled digital copy used to facilitate lending.

In this respect, CDL is easily distinguishable from the activities at issue in cases finding

market harm.  In *American Buddha*, for example, the defendant did not own a lawfully made

copy for each concurrent user and did not impose any technological restrictions that prevented

further copying.  In *Cambridge*, 769 F.3d at 1239, the university imposed *none* of the controls

applied in the Internet Archive's implementation of CDL.  In *ReDigi*, the defendant did not

prevent the seller of the file from retaining his own copy even after he sold it (unlike Internet

Archive's technology at issue here, which undisputedly prevents patrons from retaining a copy of

a book when their loan period expires).  910 F.3d at 654.  Indeed, the *ReDigi* court recognized

that while the technology then before the court permitted the creation of unauthorized copies,

"other technology may exist or be developed that could lawfully effectuate a digital first sale."

*Id.* at 659.  Without that technology, on those facts, the court found market harm.

In fact, as Dr. Jørgensen's analysis showed, even if Internet Archive's lending scaled up a

great deal, there would be no effect on publishers' markets.  DSMF ¶¶ 140–45.  Given that the

Internet Archive has proffered detailed evidence disproving cognizable market harm, such harm

cannot be assumed; it "must be demonstrated."  *Sony*, 464 U.S. at 451.  Plaintiffs—who have just

had two of the most profitable years in the history of the publishing industry—make no such

demonstration.  Instead, they rely on the speculation that "it is not difficult to envision" a future

in which there was market harm.  Publishers' Opening Br. 38.  This does not suffice.

Publishers claim to have "decades of experience" and to be applying "basic economic

common sense."  Publishers' Opening Br. 39.  The Internet Archive also has decades of

experience lending books (and has seen no market harm thus far), and is also applying basic economic common sense (that digitally lending a particular library book to one patron at a time, has the same economic consequences as physically lending the same book to one patron at a time). The conflict between those positions is resolved by the only empirical evidence before the Court: that Internet Archive's lending—at its current scale or at a much larger scale—has caused and would cause no effect on the market for or value of Plaintiffs' works.

**B.     The National Emergency Library was also fair use.**

The NEL does not undermine the fair use analysis; if anything, it strengthens it. The Internet Archive does not apologize for temporarily filling a desperate public need for books when libraries and schools shut their doors. And as explained in the Internet Archive's Opening Brief, the evidence shows that the NEL did not harm the market for books given the number of physical copies that were taken out of circulation, virtually overnight. IA Opening Br. 26–28, 35.

**C.     Arguments raised by Plaintiffs' amici do not affect the outcome in this case.**

**1.     Many amici raise concerns related to other factual situations not presented by the facts here, and fair use takes into account the particular factual situation before the Court.**

Several of Plaintiffs' amici express concerns about the effect of CDL with respect to works that are notably different from the Works in Suit, and practices notably different from the Internet Archive's:

- The Authors Guild expresses concern about the effect of CDL on out-of-print books, Authors Guild Amicus Br. 15–19, ECF No. 165, but all of the Works in Suit are in-print, PSMF ¶ 40.

23

- The Authors Guild expresses concern regarding third parties who do not practice CDL, such as Library Genesis, *id.* 11–14, but the Court's ruling here will turn on only the particular practices described in the record. *Oracle*, 141 S. Ct. at 1197–98. The Authors Guild argues that "any entity calling itself a library" would benefit from a decision in favor of the Internet Archive. Authors Guild Amicus Br. 11. What makes the Internet Archive a library is not the use of the word "library;" the Internet Archive is a library because it owns an organized permanent collection of materials that it makes available to its patrons for reference or borrowing. Indeed, in another context, this Court recognized that the Internet Archive "is expressly permitted by Congress" to engage in activities set forth in 17 U.S.C. § 108(f)(3), *TVEyes*, 124 F. Supp. 3d at 332 n.4, and the statute expressly permits only "a library or archives" to engage in those activities. 17 U.S.C. § 108(f)(3). *See also, e.g.*, *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 844 F. App'x 343, 346 n.2 (Fed. Cir. 2021) (referring to Internet Archive as "a nonprofit library in San Francisco, California"); *Bacon v. Avis Budget Grp., Inc.*, 357 F. Supp. 3d 401, 431 n.23 (D.N.J. 2018), *aff'd*, 959 F.3d 590 (3d Cir. 2020) ("The Internet Archive is a nonprofit online digital library."); *Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 631 (E.D. Pa. 2007) ("the Internet Archive is a nonprofit organization that has created an online library . . . . Its digital database is equivalent to a paper library, . . . .").

24

- The Copyright Alliance[8] expresses concern regarding owners of copyright in works other than books, such as movies or television programs. Copyright Alliance Amicus Br. 14–16, ECF No. 162. Again, because the fair use analysis is fact-specific, the result here may or may not carry over to cases involving those other types of works, depending on the particular facts of those future cases.

- The Authors Guild expresses concern about what would happen in a situation where an author granted print publication rights separately from electronic publication rights. Authors Guild Amicus Br. 6–7. Here, Plaintiffs hold both the print and electronic publication rights. PSMF ¶ 33. And at any rate, while a copyright holder may separately assign parts of their bundle of rights, that divisibility of rights does not enlarge the bundle or permit control of acts that would otherwise be fair use.

- The Authors Guild expresses concern that lending by the Internet Archive to patrons in countries where libraries pay to lend books they own could reduce the fees paid by libraries in those countries. Authors Guild Amicus Br. 20–21. But international lending is nothing new; indeed, the International Federation of Library Associations ("IFLA") first published its principles for international

---

[8] The Association of American Publishers, which instigated this lawsuit, has a seat on the board of the Copyright Alliance. https://copyrightalliance.org/about/boards/. One of the law firms representing Plaintiffs in this action sits on the Copyright Alliance Legal Advisory Board. *Id.*

25

interlibrary loan in 1954.[9]  Libraries in the United States have never paid for the right to lend books they own, whether to patrons in the United States or abroad. And, indeed, as noted in Internet Archive's Opening Brief, IFLA supports CDL. DSMF ¶ 57.

Thus, because the fair use analysis turns on the facts before the Court, arguments by amici about what might happen in other cases presenting other facts do not affect the outcome here with respect to the Works in Suit.

### 2. Section 108 does not limit fair use.

Both the Copyright Alliance and Plaintiffs' scholar amici argue that the limited scope of Section 108 of the Copyright Act affects Internet Archive's fair use arguments under Section 107 of the Copyright Act.  Copyright Alliance Amicus Br. 18–21; Plaintiffs' Scholars Amicus Br. 9–10, ECF No. 163.  This argument is directly contrary to the express text of Section 108, which states that "Nothing in this section . . . in any way affects the right of fair use as provided by section 107[.]"  17 U.S.C. § 108(f)(4).  Citing this statutory provision, the Second Circuit Court of Appeals rejected this very argument.  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 94 n.4 (2d Cir. 2014) ("[W]e do not construe § 108 as foreclosing our analysis of the Libraries' activities under fair use, and we proceed with that analysis.").

---

[9] International Federation of Library Associations, *International Resource Sharing and Document Delivery: Principles and Guidelines for Procedure*, https://www.ifla.org/wp-content/uploads/2019/05/assets/docdel/documents/international-lending-en.pdf ("First agreed by IFLA 1954").

### 3.     This case does not present a question for Congress.

Both the Copyright Alliance and the scholars writing in support of Plaintiff argue that this case presents a question which should be answered by Congress, not by judicial application of Section 107.  Copyright Alliance Amicus Br. 21–22; Plaintiffs' Scholars Amicus Br. 14–16.

The Supreme Court disagrees.  In its most recent fair use case, the Court recognized "that application of a copyright doctrine such as fair use has long proved a cooperative effort of Legislatures and courts, and that Congress, in [the Court's] view, intended that it so continue."  *Oracle*, 141 S. Ct. at 1208.  As the Court recognized in its prior fair use case, "Congress meant § 107 'to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way' and intended that courts continue the common-law tradition of fair use adjudication."  *Campbell*, 510 U.S. at 577 (quoting H.R. Rep. No. 94-1476, at 66 (1976)).

Moreover, that argument could apply to any fair use case.  All fair use cases could be characterized as an "effort to dispense with the legislative process and enact a self-declared exception from the requirements of the Copyright Act."  Plaintiffs' Scholars Amicus Br. 14.  One could just as easily characterize *Sony* as an effort to enact a self-declared exception for noncommercial videotaping, or *Campbell* as an effort to enact a self-declared exception for parody, or *Oracle* as an effort to enact a self-declared exception for computer interfaces.  But Congress decided to cede the development of fair use to the courts, expressing its intention that "[b]eyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis."  H.R. Rep. No. 94-1476, at 66 (1976).

27

4.  **This case does not turn on international law.**

    a.  **International law does not affect the scope of fair use in the United States.**

Amici International Rightsholders[10] argue that international treaties should influence the Court's analysis here. These amici have raised this same argument in multiple appellate fair use cases. *See, e.g.*, Br. of Amici Curiae "Copyright Thought Leaders" in Support of Petitioners, *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021) (No. 18-956), 2020 WL 1154739; Br. of Amici Curiae Int'l Rightsholders in Support of Appellants, *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) (No. 13-4829), 2014 WL 1509693. The Courts of Appeals and the Supreme Court have always rejected it *sub silentio*; no court has even bothered to mention it in its opinion. *See generally, e.g.*, *Oracle*, 141 S. Ct. 1183; *Google Books*, 804 F.3d 202.

That is for good reason: when it comes to copyright, what matters is Congressional enactments, not the text of the treaties themselves, because the treaties themselves are "not self-executing." Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, § 2(1). Indeed, the very treaty provision on which amici rely expressly says that, "It shall be *a matter for legislation* in the countries of the Union to permit the reproduction of such works in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author." Berne

---

[10] Plaintiff Wiley has a seat on the board of amicus International Association of Scientific, Technical, and Medical Publishers. https://www.stm-assoc.org/about-stm/stm-board/ Plaintiff Penguin Random House has a seat on the Executive Committee of the International Publishers Association. https://www.internationalpublishers.org/about-ipa/governance/executive-committee-members

Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, as last revised at Paris July 24, 1971, *as amended*, Sept. 28, 1979, https://wipolex.wipo.int/en/text/283693, Art. 9(2) (emphasis added). *Other countries* may have decided to require courts to directly apply that "three-step test" to the facts of particular cases. International Rightsholders Amicus Br. 15–16, ECF No. 154. Their choice tells us nothing about what the treaty requires, or what the United States Congress has decided to do with respect to fair use. *See generally* Brief for Amicus Curiae Law Professors & Scholars in Support of Appellee, *Authors Guild v. Google, Inc.*, 2014 WL 3556331 (July 10, 2014) (addressing the same argument made by the same amici in another fair use case).

Indeed there is no reason to believe that the United States intended to hobble the development of fair use in the digital environment. To the contrary, the United States diplomatic delegation underscored during treaty drafting that "it was essential that the Treaties permit the application of the evolving doctrine of 'fair use,' which was recognized in the laws of the United States of America, and which was also applicable in the digital environment." WIPO Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, Geneva, Dec. 2-20, 1996, Summary Minutes, Main Committee I, ¶ 488, WIPO Doc. CRNR/DC/102, pdf. p. 70 (Aug. 26, 1997), at https://www.wipo.int/edocs/mdocs/diplconf/en/crnr_dc/crnr_dc_102.pdf.

   **b.    To the extent the Court looks to international law, other governments have found CDL lawful and consistent with treaty obligations.**

To the extent international law matters, it points very firmly in favor of permitting CDL. For example, the highest court of the European Union has approved the practice. In *Vereniging Openbare Bibliotheken v Stichting Leenrecht*, Case C-174/15 (Nov. 10, 2016) ("*VOB*"), https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX:62015CJ0174, Decl. of Joseph C. Gratz in Supp. of Opp'n to Pls.' Mot. for Summ. J. submitted herewith ("Gratz Opp'n Decl.")

29

Ex. 7, the Court of Justice of the European Union ("CJEU") addressed the question whether CDL was consistent with European laws and treaties regarding lending. The court decided that it was, holding that CDL had "essentially similar characteristics to the lending of printed works, since, first, the limitation of simultaneous downloads to a single copy implies that the lending capacity of the library concerned does not exceed that which it would have as regards a printed work and, secondly, that lending is made for only a limited period." Gratz Opp'n Decl. Ex. 7 ¶ 53.

The CJEU's ruling implicitly embraced the opinion of its Advocate General. Opinion of Advocate General Szpunar, *VOB*, C-174/15 (June 16, 2016), https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX:62015CC0174, Gratz Opp'n Decl. Ex. 8 ("Advocate General Op."). In the CJEU, the Advocate General is a member of the court, appointed under the same procedure as judges, who "represents neither of the parties, but instead provides an independent opinion to the court," *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 300 n.2 (E.D.N.Y. 2013). Here, the Advocate General found that CDL was consistent with the EU's implementation of the three-step test, adopting arguments similar to those made by Internet Archive in this matter, and rejecting many arguments similar to those made by Plaintiff in this matter. Advocate General Op. ¶¶ 66–75

With respect to the first step, "the condition that the exception must relate to special cases," the Advocate General found that a rule permitting digital lending met that requirement because (1) it was limited to "lending, or in other words, the making available of works for a limited period of time"; and (2) it was limited to "establishments (libraries) open to the public which derive no profit from their lending activities." Advocate General Op. ¶ 67a. Further, the

rule permitting CDL "pursues a legitimate aim in the public interest which is, in the broadest terms, universal access to culture." *Id.*

With respect to the second step, the Advocate General found that there was "no conflict with a normal exploitation of the work." *Id.* ¶ 68*; see also id.* 73. There, as here, publishers had argued that digital lending "too easily substitutes for the purchase of books on the market" because "there is no need for the user physically to go to a library" and thus made digital lending, from the perspective of the reader, "comparable to purchasing over the internet." *Id.* ¶ 68. The publishers had also argued that "electronic books which are borrowed from libraries do not deteriorate with use and are thus identical in one respect to purchased books, that it to say, they are always 'new.'" *Id.* The Advocate General rejected these arguments, holding that the restrictions inherent in CDL meant that they did not substitute for purchases of books, because "digital lending is limited in time and thus merely enables a user to acquaint himself with the content of a book, without keeping a copy of it," and "the opportunities for such lending are limited by the number of copies (digital copies) at a library's disposal and so users are not certain of being able to borrow a given electronic book when they want to." *Id.* ¶ 69. The Advocate General also observed that "several studies show that the lending of books, either traditional or electronic, does not reduce the volume of book sales but may instead increase it by encouraging reading habits." *Id.*

The publishers also argued there, as here, that CDL would harm commercial ebook lending services. *Id.* ¶ 70. The Advocate General found that "[t]he mere fact that certain electronic book sellers have developed business models similar to digital renting cannot by itself constitute an obstacle to" permitting nonprofit libraries to practice CDL. *Id.* Because CDL "pursues a legitimate objective in the public interest," he found, it could not be restricted on the

31

basis of publishers' decision to offer a for-profit service with facially similar functionality. *Id.* "Otherwise," he found, "any lending activity could be displaced by commercial renting, of either tangible or intangible goods," and thus all nonprofit lending—even traditional physical lending of books by libraries—might be disallowed because of a possibility it could compete with commercial renting. *Id.*

The Advocate General concluded by observing that implementations of CDL could ensure that digital lending "really is the functional equivalent of traditional lending and that it does not conflict with the normal exploitation of copyright" by adopting "the 'one copy one user' model" and making use of "technological protection measures." *Id.* ¶ 73. He observed that digital lending would not interfere with the legitimate interests of authors. *Id.* ¶ 74. Accordingly, the Advocate General concluded, CDL was consistent with the three-step test. *Id.* ¶ 75.

Thus, far from weighing in Publishers' favor here, an examination of the treatment of CDL by other countries shows that the CJEU and its Advocate General have considered and rejected the arguments advanced by Plaintiffs against CDL, and have expressly found it consistent with copyright treaties.

## IV.   CONCLUSION

Copyright does not stand in the way of a library's right to do what libraries have always done: lend a book it owns to one patron at a time. Plaintiffs' motion for summary judgment should be denied.

32

Dated: September 2, 2022 DURIE TANGRI LLP

By: _____/s/ Joseph C. Gratz_____
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

33

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the following statements are true:

This brief complies with the formatting rules of the Individual Practices of Judge John G.

Koeltl Section II.D and the Court's Order regarding word count (ECF No. 80). It has been

prepared using a proportionally spaced typeface using Microsoft Word 365 Version 2108 in

12-point Times New Roman font and includes 9,735 words.

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

/s/ Joseph C. Gratz
JOSEPH C. GRATZ

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC | Case No. 1:20-CV-04160-JGK |
| Plaintiffs, | |
| v. | |
| INTERNET ARCHIVE and DOES 1 through 5, inclusive | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT INTERNET
ARCHIVE'S MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................. 1

II.  ARGUMENT ....................................................................................... 2

    A.   Internet Archive's Digital Lending Is a Lawful Fair Use. ..................... 2

        1.   Factor One ........................................................................... 2

            a.   The Internet Archive's digital lending program is noncommercial. 2

            b.   The Internet Archive's digital lending program is transformative. . 3

            c.   Digital lending would still be fair use even if it were not transformative. .......................................................... 5

            d.   *ReDigi*, *MP3.com*, and *VidAngel* do not weigh against a finding of fair use here. ................................................. 5

        2.   Factor Two ........................................................................... 7

        3.   Factor Three ........................................................................ 7

        4.   Factor Four .......................................................................... 8

            a.   Plaintiffs present no evidence of market harm beyond the unquantified suppositions of their executives and high-level observations about economic theory. ............................... 8

            b.   Data about the NEL sheds light on what would happen if CDL became widespread. ......................................... 9

            c.   Plaintiffs' expert's critiques of Dr. Reimers and Dr. Jørgensen do not show that their analyses were incorrect or unreliable. ........... 10

                i.   The relatively small number of loans from Internet Archive tends to show that there was no market effect, not that the experts' analyses were unreliable. .................................... 10

                ii.   Measuring units, not dollars, better illuminates whether marketplace substitution occurred. .................................... 11

                iii.   Plaintiffs cannot defeat summary judgment by arguing that the experts should have considered information that Plaintiffs chose to withhold. ............................................ 11

                iv.   Plaintiffs provide no reason to think that taking into account additional factors would make any difference. .... 12

                v.   Controlling for additional factors in fact didn't make any difference. ........................................................ 13

i

B. The publishers' arguments regarding sections 108 and 109 attack a straw man, since the Internet Archive's defense is based on section 107. ...........................13

    1. Section 109 does not limit section 107's protections for digital lending. .14

    2. Neither Congress nor the Copyright Office has ever rejected digital lending. .................................................................................................14

C. Plaintiffs have not raised a genuine issue of material fact regarding Internet Archive's reasonable belief that its actions constituted fair use.........................15

    1. Plaintiffs' claim concerns reproduction, so statutory damages must be remitted. ...............................................................................................16

    2. The Internet Archive is a "library or archives."......................................16

    3. Plaintiffs cannot create a dispute of fact by pointing to unchallenged assertions of privilege............................................................................17

    4. Mr. Kahle identified a number of reasonable grounds that he had for believing that the Internet Archive's actions constituted fair use. ............17

D. Plaintiffs do not substantively address the National Emergency Library. ............18

III. CONCLUSION .............................................................................................19

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
No. 13-CV-1215 (TSC), 2022 WL 971735 (D.D.C. Mar. 31, 2022).......................................9

*American Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ............................................................................................2, 3

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ...................................................................................7, 14, 18

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ..................................................................................*passim*

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006) ............................................................................................2, 5

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ............................................................................................5, 7, 10, 13

*Capitol Records, LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018) ..................................................................................5, 6, 18

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013) ..................................................................................................2

*In re Cnty. of Erie*,
546 F.3d 222 (2d Cir. 2008) ...............................................................................................17

*Disney Enters. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ..........................................................................................5, 6

*Fox News Network, LLC v. TVEyes, Inc.*,
124 F. Supp. 3d 325 (S.D.N.Y. 2015) .................................................................................4

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) .................................................................................3, 4, 6, 18

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) .............................................................................................................7

*Reich v. S. New England Telecomm. Corp.*,
121 F.3d 58 (2d Cir. 1997) ................................................................................................17

*In re Schick*,
    No. 96 B 42902 (SMB), 1998 WL 397849 (S.D.N.Y. July 16, 1998)....................................8

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ........................................................................................3, 4, 6

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014) .................................................................................5

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) .................................................................6

**Rules**

Fed. R. Civ. P. 56(d) .................................................................................................17

**Other Authorities**

Brewster Kahle, *Weaving Books into the Web—Starting with Wikipedia*, Internet
    Archive Blogs (Oct. 29, 2019), https://blog.archive.org/2019/10/29/weaving-
    books-into-the-web-starting-with-wikipedia/ ........................................................5

Brief of Cable News Network, Inc. et al. as Amici Curiae, Nos. 15-3885(L) & 15-
    3886(XAP), 2016 WL 3475399 (S.D.N.Y. June 22, 2016) ....................................4

Consortium of National and University Libraries (Ireland), *Irish Librarians
    condemn publisher Wiley's removal of hundreds of titles from ebook
    collections* (Sept. 20, 2022), https://conul.ie/irish-librarians-condemn-
    publisher-wileys-removal-of-hundreds-of-titles-from-ebook-collections/............................19

Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First
    Sale, and Statutory Damages* (Jan. 2016),
    https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pd......................15

Fight for the Future, *Authors For Libraries*,
    https://www.fightforthefuture.org/Authors-For-Libraries....................................20

George Washington University Libraries, *Important E-Book News for GW
    Faculty and Students* (Oct. 6, 2022), https://library.gwu.edu/Wiley-ebook-
    removal .............................................................................................................19

H.R. Rep. No. 94-1476..............................................................................................16

S. Rep. No. 105-190 (1998)........................................................................................16

U.S. Copyright Office, *DMCA Section 104 Report*, Vol. 1, at 102 (Aug. 2001),
    https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ........................15

Wiley, *Statement on Wiley eBooks Featured in ProQuest Academic Complete Library* (Oct. 5, 2022), https://newsroom.wiley.com/press-releases/press-release-details/2022/Statement-on-Wiley-eBooks-Featured-in-ProQuest-Academic-Complete-Library/default.aspx ........................................................................... 19

## I.     INTRODUCTION

Plaintiffs' Opposition mostly attempts to manufacture a controversy around two undisputed facts: (1) that the Internet Archive's digital lending is a noncommercial service that expands the utility of physical books; and (2) that digital lending has not harmed Plaintiffs' ebook rentals or any other market.

That attempt fails.

As to the first fair use factor, the record shows that the Internet Archive is a non-profit organization that lends books, for free, as part of its noncommercial mission: to expand access to knowledge. Plaintiffs' efforts to muddy the waters by pointing to the Internet Archive's so-called "commercial aspects" run contrary to controlling law in this Circuit and the actual facts of this case.

Similarly, on factor four, no reasonable jury presented with this record could conclude that the Internet Archive's digital lending harms the relevant market. Rather than making use of their unfettered access to more than a decade of empirical data, Plaintiffs simply assert that market harm is "self-evident." When pressed for details, they concede that it is "harder to create an accurate metric measuring that harm" because the Internet Archive's lending has been "small"—but still they insist that, any day now, CDL might "substantially expand" and "meet worldwide demand" of all readers, destroying the book industry. Speculation does not suffice to raise a fact issue, especially where that speculation runs contrary to the affirmative econometric analysis showing that harm is highly unlikely.

All that CDL does, and all it can ever do, is offer a limited, digital alternative to physically handing a book to a patron. Libraries deciding how to meet their patrons' needs for digital access to books are not making a choice between paying ebook licensing fees or getting books for free. Libraries pay publishers under either approach—but digital lending lets libraries

1

make their own decisions about which books to circulate physically, and which to circulate digitally instead.  That choice means that librarians can continue to maintain permanent collections of books, to preserve those books in their original form for future generations, and to lend them to patrons one at a time, as they have always done.  Above all, it means librarians can continue to advance the ultimate purpose of copyright: "the intellectual enrichment of the public." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (citation omitted).

## II.    ARGUMENT

### A.    Internet Archive's Digital Lending Is a Lawful Fair Use.

Plaintiffs' Opposition to the Internet Archive's fair use claim is unpersuasive on all four factors, and even weaker in answering the overarching fair use question: "whether the copyright law's goal of 'promoting the Progress of Science and useful Arts' would be better served by allowing the use than by preventing it." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

#### 1.    Factor One

##### a.    The Internet Archive's digital lending program is noncommercial.

It is hard to imagine a less commercial activity than lending books, for free, to patrons, for a limited time, at the lender's own expense.  That's what the Internet Archive does, and has been doing for more than a decade, consistent with its overall mission: to preserve and promote access to knowledge and culture, including books.

Plaintiffs seek to muddy the waters, by insisting that the Internet Archive has "commercial aspects" and ignoring the binding legal precedent: *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994).  In that case, the court appropriately focused on whether *the use in question* was commercially exploitative, because "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of

2

copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Id.* at 922. Plaintiffs do not apply that standard; instead, they look to cases from other circuits and attempt to manufacture facts that don't match the record. *See* Internet Archive's Opp'n to Pls.' Mot. For Summ. J. ("IA Opp'n Br.") 4–9, ECF No. 173.

> **b.     The Internet Archive's digital lending program is transformative.**

The Internet Archive's digital lending is transformative in the same way that the use in *Sony* was transformative: it "utilize[s] technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018). As the Second Circuit Court of Appeals noted in *Google Books*, a transformative use "communicates something new and different from the original **or expands its utility**, thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild v. Google, Inc.* ("*Google Books*"), 804 F.3d 202, 214 (2d Cir. 2015) (emphasis added).

Plaintiffs attempt to distinguish this view of transformativeness, but their arguments are unpersuasive. Plaintiffs first argue that *Sony* did not involve the distribution of videotapes to others, only the use by the individual who recorded them, while the Internet Archive lends books it owns to its patrons. Plaintiffs' Opp'n to Internet Archive's Mot. for Summ. J. ("Pls.' Opp'n Br.") at 13, ECF No. 169. But that cannot distinguish the *TVEyes* view of *Sony*; TVEyes was held to be transformative under *Sony* precisely because it "enable[d] TVEyes's clients to view [certain] Fox programming." *TVEyes*, 883 F.3d at 177. Thus, the fact that the Internet Archive enables its patrons to borrow books digitally actually shows why the *TVEyes* discussion of transformativeness is directly on point. (The discussion of *Sony* from the out-of-circuit *Napster* case that Plaintiffs cite is not about transformativeness at all.)

3

Plaintiffs next argue that *Sony* and *TVEyes* do not apply because the publishers received payment for the books. Pls.' Opp'n Br. at 14. But in *TVEyes*, the same was true: that case dealt not with free over-the-air television but with "cable services such as Comcast and Cablevision." *Fox News Network, LLC v. TVEyes, Inc.*, 124 F. Supp. 3d 325, 328 (S.D.N.Y. 2015). Plaintiffs insist that a library that purchases a book is not "entitled to receive the content" of that book, and that a library patron that borrows the book is not entitled to read it, Pls.' Opp'n Br. at 14, but do not explain why. Indeed, their own economist, Dr. Prince, disagrees. Decl. of Joseph C. Gratz in Supp. of Internet Archive's Reply, submitted herewith ("Gratz Reply Decl."), Ex. 1 ("Prince Dep. Tr.") at 66:17-67:2.

Plaintiffs also claim that CDL does not "utilize technology to achieve the transformative purpose of improving the efficiency of delivering content," *TVEyes*, 883 F.3d at 177, because other technologies (like OverDrive) *also* improve the efficiency of delivering content. Pls.' Opp'n Br. at 14–15. But the question is not whether the defendant is making the *first and only* use of technology to improve the efficiency of delivering content. Indeed, in *Sony*, the copyright holders had already developed prerecorded videodiscs that also delivered the content efficiently. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 422 (1984). Similarly, in *TVEyes*, other television clipping services provided the same functionality, but that did not alter the court's analysis. *See* Brief of Cable News Network, Inc. et al. as Amici Curiae, Nos. 15-3885(L) & 15-3886(XAP), 2016 WL 3475399 (S.D.N.Y. June 22, 2016), at *13 (discussing other television clipping services).

Finally, Plaintiffs argue that the Internet Archive's digital lending does not "expand [the] utility" of physical books, *Google Books*, 804 F.3d at 214, because the additional uses digital lending enables are, in Plaintiff's view, "peripheral." Pls.' Opp'n Br. at 15. In fact, the ability to

4

"weave books into the web" is both useful and central to the Internet Archive's project: to connect digital learners not just with digital resources like Wikipedia, but with authoritative print sources. *See* Brewster Kahle, *Weaving Books into the Web—Starting with Wikipedia*, Internet Archive Blogs (Oct. 29, 2019), https://blog.archive.org/2019/10/29/weaving-books-into-the-web-starting-with-wikipedia/. For example, digital lending also makes it possible for patrons to access books without having their reading habits tracked by commercial entities, like OverDrive and Amazon, that may not share librarians' traditional commitment—supported by law in some states—to protecting privacy.

### c. Digital lending would still be fair use even if it were not transformative.

Whether or not digital lending is a transformative use, it is a fair use.

Not all fair uses are transformative. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994); *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84–85 (2d Cir. 2014); *Blanch*, 467 F.3d at 252 n.3. In *Swatch*, for example, the Second Circuit Court of Appeals concluded that the first factor favored fair use "regardless of how transformative" the use was. 756 F.3d at 85. Further, its analysis acknowledges that the use in question (news reporting) was a "public purpose" named in the preamble to section 107. *Id.* at 82.

Here, the Internet Archive supports multiple such public purposes, including research and education. Internet Archive's Br. in Supp. Its Mot. for Summ. J. ("IA Opening Br.") at 8, 18–19, ECF No. 106; Defendant's Statement of Material Facts ("DSMF") ¶¶ 1–6, ECF No. 98.

### d. *ReDigi*, *MP3.com*, and *VidAngel* do not weigh against a finding of fair use here.

Plaintiffs cite three cases about situations very different from noncommercial one-to-one digital lending of books a library owns. *See* Pls.' Opp'n Br. at 5–6 (citing *ReDigi*, *MP3.com*, and

*VidAngel*).  None weighs against a finding of fair use here.

Critically, all three cases addressed claims of fair use by defendants who were using the plaintiffs' works for commercial profit.  *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018); *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000); *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017).  Here, by contrast, the Internet Archive is a nonprofit that does not gain any revenue from digital lending.

With respect to *VidAngel*, as discussed in the Internet Archive's Opposition brief, the Ninth Circuit Court of Appeals applied a different understanding of transformativeness than the one adopted in this circuit (in particular, the understanding of *Sony* as a case involving transformative use).  IA Opp'n Br. at 11–12.

The reasons why *ReDigi* and *VidAngel* do not weigh against fair use here are addressed in Internet Archive's Opposition brief.  *See* IA Opp'n Brief at 22 (addressing *ReDigi*); IA Opp'n Br. at 11–12 (addressing *VidAngel*).

Finally, the district court's view of transformativeness in *MP3.com* cannot be reconciled with the Second Circuit Court of Appeals' current view of transformativeness, as expressed in *TVEyes* and *Google Books*, both of which were decided after *MP3.com*.  Judge Rakoff dismissed the extent to which the service at issue "expand[ed] the utility" of the works at issue, as required by *Google Books*, 804 F.3d at 214, and the extent to which it "improve[d]the efficiency of delivering content," as required by *TVEyes*, 883 F.3d at 177, holding instead that regardless of their utility, "[w]hile such services may be innovative, they are not transformative." *MP3.com*, 92 F. Supp 2d at 351.  That is contrary to the current law of this circuit.  That is not to say that the ultimate result in *MP3.com* was wrong; the commerciality of the service, along the remaining factors at issue in that case, could have supported a finding of no fair use in that case.  But the

6

case does not weigh against a finding that nonprofit digital lending of books a library owns is fair use.

### 2. Factor Two

Plaintiffs' claims about the second factor boil down to two points, neither of which is persuasive. *First*, Plaintiffs argue that their choice to sue over "seminal books of American literature," Pls.' Opp'n Br. at 16, affects the analysis. But the same was true in *Google Books* and *HathiTrust,* and in neither case did the court allow plaintiffs' cherry-picking to influence the decision

*Second*, Plaintiffs argue that the publication date of the WIS does not matter because they are entitled to profit from their back catalogues. But that is not the question for this factor; rather, the second factor considers whether the use affects "the author's right to control the first public appearance of his expression." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 564 (1985). There is no such effect in this case

The nature of the work "has rarely played a significant role in the determination of a fair use dispute." *Google Books*, 804 F.3d at 220. The same is true here.

### 3. Factor Three

Contrary to Plaintiffs' argument, there is no "heavy presumption" against fair use where an entire work is used. Instead, courts examine whether the amount of the original work used is "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586; *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). Here, use of the entire work is appropriate and necessary. Like the use at issue in *Google Books,* "not only is the copying of the totality of the original reasonably appropriate to [the Internet Archive's] transformative purpose, it is literally necessary to achieve that purpose." *Google Books*, 804 F.3d at 221. Libraries do not lend snippets; they lend *books*.

7

### 4. Factor Four

Plaintiffs have had access to years of market data and, if that data supported their theory of harm, they would surely have brought it forward. They have not, because they cannot point to a dime they lost or are likely to lose because of Internet Archive's digital lending.

The Internet Archive offered this Court specific empirical evidence showing a lack of market harm. Plaintiffs respond with a theory of harm so vague that it is non-falsifiable, based on nothing more than conjecture. That does not suffice to defeat summary judgment.

     **a.**    **Plaintiffs present no evidence of market harm beyond the unquantified suppositions of their executives and high-level observations about economic theory.**

In support of their contention that the Internet Archive's digital lending substitutes in the marketplace for consumer ebooks and library ebook rentals, Plaintiffs present two sources of authority. They present the testimony of their executives, who feel that the Internet Archive's digital lending *simply must* cause market harm, though Plaintiffs say they have never tried to measure such harm. And they present the testimony of Dr. Prince, who is usually engaged as an expert to perform empirical, econometric analyses, based on data. Prince Dep. Tr. at 20:12-21:18. In this case, though, he was not given any empirical data, and was instructed not to engage in any of his own econometric analysis. *Id.* at 55:22-56:15; 202:23-204:10. Instead, he was instructed to try to explain why the analyses of the Internet Archive's experts, Dr. Jørgensen and Dr. Reimers, might be unreliable. But, critically, he was not given the data he would have needed to tell whether those objections might have changed the results. *Id.* at 203:7-204:10. He was just hired to throw up a cloud of what-ifs—without attempting to show that those what-ifs would matter. *Id.* at 216:6-218:13.

"Speculative and conclusory allegations are insufficient to show that there is a genuine issue for trial." *In re Schick*, No. 96 B 42902 (SMB), 1998 WL 397849, at *6 (S.D.N.Y. July 16,

1998). Plaintiffs' expert posits a variety of theories about other analyses that might lead to different results, but he *didn't do any of them*.

Plaintiffs' expert also imagines some reasons why digital lending might affect the market. But as he admitted, "I mean, you can make theoretical arguments, but then you could also do an empirical analysis to assess that." Prince Dep. Tr. at 93:20-24. When asked whether there were potential sales that Plaintiffs in fact lost, however, he responded: "I don't have empirical evidence of that." *Id.* at 212:21-213:3.

In the fair use context, this kind of conjecture is not enough to send the issue to trial. "One can reasonably expect that if over the last four years market harm was occurring, or was likely to occur, Plaintiffs could provide economic data and analysis showing that to be the case." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, No. 13-CV-1215 (TSC), 2022 WL 971735, at *17 (D.D.C. Mar. 31, 2022) (granting summary judgment on fair use). "The fact that they do not provide any quantifiable evidence, and instead rely on conclusory assertions and speculation long after Defendant first began [the challenged conduct], is telling." *Id.*

### b. Data about the NEL sheds light on what would happen if CDL became widespread.

Plaintiffs' claim that the Internet Archive's analysis understates the potential harm, given how "widespread" the Internet Archive's CDL implementation could become (Pls.' Opp'n Br. at 24–25), does not withstand scrutiny.

- Plaintiffs assert that the Internet Archive might "substantially expand the number of Partner Libraries in the Open Libraries project," Pls.' Opp'n Br. at 24, thereby making available enough copies "to meet worldwide demand without wait lists." *Id.* at 25. But that was precisely the situation during the NEL: the number of Partner Libraries did not limit the number of concurrent loans. Plaintiffs' Statement of Material Facts ("PSMF")

9

¶¶ 542–543, ECF No. 107.

- Plaintiffs worry that libraries "would be able to link from their website card catalogs." Pls.' Opp'n Br. at 24. But Plaintiffs admit that both Open Libraries partners and other libraries already link to the Internet Archive from their website card catalogs. PSMF ¶¶ 393–396.

- Plaintiffs imagine that "other organizations could opportunistically brand themselves a library and harm Plaintiffs by performing similar functions." Pls.' Opp'n Br. at 25. But fair use depends on the use, not the label the user adopts. *See* IA Opp'n Br. at 24.

- Finally, Plaintiffs worry that the Internet Archive's lending program might become "much better known to the public" than it was during the NEL. Pls.' Opp'n Br. at 24. But there was substantial awareness of the NEL, with stories in the New York Times, Los Angeles Times, The New Yorker, NPR, Forbes, Slate, and dozens of other outlets.

Dr. Reimers' and Dr. Jørgensen's analysis of the NEL as a "natural experiment," therefore, appropriately predicted "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (cleaned up).

### c. Plaintiffs' expert's critiques of Dr. Reimers and Dr. Jørgensen do not show that their analyses were incorrect or unreliable.

Instead of presenting their own analysis of the available data, Plaintiffs simply critique the analyses performed by Dr. Reimers and Dr. Jørgensen. Those critiques miss the mark.

### i. The relatively small number of loans from Internet Archive tends to show that there was no market effect, not that the experts' analyses were unreliable.

Plaintiffs contend, Pls.' Opp'n Br. at 23–24, that Dr. Reimers and Dr. Jørgensen's conclusions must be unreliable because the Internet Archive's loan volume is too small. As

10

Plaintiffs point out, the small number of loans meant that in some cases the statistical analysis could not determine whether availability via Internet Archive had a very small positive or a very small negative effect on sales and licensed lending. Pls.' Opp'n Br. at 23-24. But the statistical analysis tells us with great certainty *the thing that matters to the fourth factor:* the effect on the market for or value of the work, whatever direction it went, was exceedingly small or nonexistent. ECF No. 108-01 ("Jørgensen Expert Rpt.") ¶¶ 53, 58; ECF No. 109-01 ("Reimers Expert Rpt.") ¶ 38. That tilts the fourth factor in favor of fair use.

### ii. Measuring units, not dollars, better illuminates whether marketplace substitution occurred.

Plaintiffs complain that the Internet Archive's experts should have examined revenue data, rather than the number of units sold or borrowed by consumers. Pls.' Opp'n Br. at 25, 29. In fact, unit sales are a more reliable indicator of whether the Internet Archive's digital lending impacted the Works in Suit, because unit sales are a better indicator of consumer demand. ECF No. 109-02 ("Reimers Reply Rpt.") ¶¶ 14, 15. And, at any rate, controlling for price did not make a difference to Dr. Reimers' analysis. *Id.*

Dr. Jørgensen analyzed the number of checkouts via OverDrive, rather than the number of dollars, both because the number of borrows is a better indicator of consumer demand and because the nature of Plaintiffs' licensing deals does not allow attribution of revenue to particular borrows. ECF No. 108-02 ("Jørgensen Reply Rpt.") ¶ 26; Gratz Reply Decl., Ex. 2 (Jørgensen Dep. Tr.) at 104:16-105:3.

### iii. Plaintiffs cannot defeat summary judgment by arguing that the experts should have considered information that Plaintiffs chose to withhold.

Plaintiffs argue that Dr. Reimers' and Dr. Jørgensen's analyses are not reliable because they did not directly compare the Works in Suit to other books that were not available for digital

11

lending via the Internet Archive. Pls.' Opp'n Br. 29. Dr. Reimers and Dr. Jørgensen were not able to conduct that analysis because, although the Internet Archive requested data about those other books in discovery, Plaintiffs refused to produce it. The Internet Archive moved to compel, and the Magistrate Judge expressed the view that the data Plaintiffs had already produced should be sufficient: "You don't necessarily need gold-plated Tiffany garden shears, if they even exist, to prune a bush." Status Conference Hearing Tr. at 12:3-4, ECF No. 62. In light of that guidance, the Internet Archive's experts performed statistical analysis on the available data to determine whether there was a market effect, and found that there was no statistical evidence of such an effect. Jørgensen Expert Rpt. ¶ 8; Reimers Expert Rpt. ¶ 10.

For example, Dr. Reimers used Amazon sales ranking data rather than using absolute sales data about books other than the WIS, because Plaintiffs refused to produce that sales data. Plaintiffs' expert then argued using ranking data might render the analysis less precise. ECF No. 167 ("Prince Decl.") ¶ 60. But when asked in deposition what Dr. Reimers should have done differently, Plaintiffs' expert's only solution was to "try to get relevant sales data directly," Prince Dep. Tr. at 225:7-8—precisely what Internet Archive tried to do, and precisely what Plaintiffs prevented.

        **iv.**      **Plaintiffs provide no reason to think that taking into account additional factors would make any difference.**

Plaintiffs float a laundry list of factors that they say the Internet Archive's experts didn't take into account: seasonal changes in book demand, the macroeconomic effects and supply chain issues caused by COVID-19, the Black Lives Matter movement, the 2020 Presidential election, and so on. Critically, Plaintiffs' own expert didn't have any reason to think any of these factors moved the results in any particular direction, or by any particular amount. Prince Dep. Tr. at 217:22-218:6. Nor did he consider *whether* one even could control for those factors. *Id.* at

12

A-6231

216:6-217:21.

###### v. Controlling for additional factors in fact didn't make any difference.

Unlike Plaintiffs' expert, the Internet Archive's experts actually undertook to control for additional factors Plaintiffs identified, where it was possible to do so. For example, in response to the criticism that seasonal differences in sales could affect the results, Dr. Reimers did a new analysis that took seasonality into account. Reimers Reply Rpt. ¶ 8. Before adjusting for seasonality, the estimated effect of availability via the Internet Archive was not statistically distinguishable from zero; after adjusting for seasonality, the effect was still not statistically distinguishable from zero. *Id.* Dr. Jørgensen also examined Plaintiffs' expert's seasonality criticism and found it inconsistent with the data. Jørgensen Reply Rpt. ¶ 33.

Similarly, Plaintiffs' expert said that Dr. Reimers should have controlled for price and book reviews in her analysis of book sales—but when she did so, the estimated effect of availability via the Internet Archive got even *smaller*, and even less distinguishable from zero. Reimers Reply Rpt. ¶ 4(c).

Plaintiffs' expert suggested that unusual amounts of interest in books about racial justice or the election might have affected the results. Observing that those effects would be seen primarily in nonfiction books rather than fiction books, Dr. Reimers performed a new analysis excluding nonfiction books, and found no meaningful change. Reimers Reply Rpt. ¶ 5.

Dr. Reimers and Dr. Jørgensen's reports provide just the kind of "favorable evidence about relevant markets" that weighs in favor of a finding of fair use. *Campbell*, 510 U.S. at 590. Plaintiffs present no opposing analysis of their own. The fourth factor favors fair use.

#### B. The publishers' arguments regarding sections 108 and 109 attack a straw man, since the Internet Archive's defense is based on section 107.

Plaintiffs suggest that this Court may not find fair use if Congress has failed to enact a

13

statutory provision covering that same activity.  Pls.' Opp'n Br. at 2.  This gets the analysis

backwards:  statutory provisions are safe harbors that offer legal certainty.  Fair use allows courts

to review a range of activities not expressly contemplated in the Copyright Act and assess

whether they are consistent with copyright's purpose.  In any event, Congress has never rejected

CDL.

### 1.    Section 109 does not limit section 107's protections for digital lending.

Plaintiffs claim that CDL depends on an "expansive conception of the first sale doctrine."

Pls.' Opp'n Br. at 2.  To the contrary, CDL rests firmly on fair use, as set forth in section 107.

Like section 108, section 109 provides a safe harbor for libraries to use lawfully acquired books,

but it does not displace section 107's additional and often overlapping protections.  *See, e.g.*,

*HathiTrust*, 755 F.3d at 94 n.4 (section 108 does not displace section 107's additional and

overlapping protections).

### 2.    Neither Congress nor the Copyright Office has ever rejected digital lending.

While it has considered and rejected numerous proposals that would require libraries to

pay publishers to lend books they already own, *see* IA Opening Br. at 34, Congress has never

rejected digital lending by libraries.  As discussed below, agency consideration of other

proposals identified by Plaintiffs, Pls.' Opp'n Br. at 3–4, does not weigh against a finding of fair

use.

Plaintiffs turn first to the legislative history of the Digital Millennium Copyright Act.  In

the course of those proceedings, as Plaintiffs note, some groups suggested that Congress should

adopt a specific safe harbor for one species of digital first sale, and that suggestion, along with

many others, was not included in the final legislation.  Pls.' Opp'n Br. 3.  That absence tells us

nothing about Congress's view of the practice at issue here: digitally lending copies of physical

books, at no cost, for limited times and subject to strict controls.

Plaintiffs' reliance on reports from the Copyright Office and the Department of Commerce is equally misplaced. The Copyright Office's 2001 report chose not to recommend expansion of section 109 to encompass a significantly different practice from that at issue here: a general public right to transmit a digital copy of a work, contingent on deletion of the original. Indeed, the report expressly indicates that it is *not* taking a position on "ways to address library issues related to the first sale doctrine": "The fact that we did not recommend adopting a 'digital first sale' provision at this time does not mean that the issues raised by libraries are not potentially valid concerns." U.S. Copyright Office, *DMCA Section 104 Report*, Vol. 1, at 102 (Aug. 2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.

As for the 2016 Department of Commerce report, while that report did not advise changes to section 109, it also recognized that legislative change would not always be necessary to accommodate new uses, and that "the fair use doctrine is a fundamental linchpin of the U.S. copyright system." Dep't of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages*, at 10 (Jan. 2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf. Far from weighing against a finding of fair use, that report recognizes that "the application of fair use to library activities and the digitization of library collections has recently been the subject of attention in the courts," *Id.* at 62 n.381, and recommends "continu[ing] to monitor legal and marketplace developments to ensure that library lending and preservation concerns are addressed." *Id.* at 62.

**C.** **Plaintiffs have not raised a genuine issue of material fact regarding Internet Archive's reasonable belief that its actions constituted fair use.**

If the Court finds that Internet Archive's implementation of CDL or the temporary NEL

15

was not fair use, it should remit statutory damages. Plaintiffs do not raise a genuine issue of material fact regarding remittitur.

### 1. Plaintiffs' claim concerns reproduction, so statutory damages must be remitted.

Plaintiffs contend that the remittitur provision of section 504(c)(2) does not apply where a plaintiff alleges both reproduction and distribution of copies to the public. That interpretation is at odds with the language of the statute and would render the provision a nullity.

*First*, an award of statutory damages does not relate to each particular exclusive right under section 106 separately, but to all of the claimed infringement of a particular work. *See, e.g.*, H.R. Rep. No. 94-1476 at 162 (when "multiple exclusive rights" in a particular work are involved, there is still at most one award of statutory damages). Remittitur is therefore required on Plaintiffs' entire claim.

*Second*, a rule that plaintiffs cannot get statutory damages against libraries and archives for reproduction, but they can get statutory damages for public distribution of the very same copies, would make the provision useless for most purposes. Indeed, the legislative history of this provision makes no reference to a limitation to certain exclusive rights. H.R. Rep. No. 94-1476 at 163. That is likely because one of the main reasons libraries would be making reproductions that they believed to be fair use would be to provide those copies to library patrons—not to shut them away.

### 2. The Internet Archive is a "library or archives."

Neither section 504(c)(2) nor any other part of the Copyright Act defines "library" or "archives" to require physical lending of materials. The legislative history Plaintiffs cite stands only for the proposition that "references to 'the premises of the library or archives' in amended sections 108 (b)(2) and (c)(2) mean only physical premises" as opposed to library websites. S.

16

Rep. No. 105-190, 62 (1998). As to the question whether the Internet Archive is a "library or archives" more generally, that issue is discussed in the Internet Archive's Opposition brief, ECF No. 173 at 24. *See also* DSMF ¶ 8.

### 3. Plaintiffs cannot create a dispute of fact by pointing to unchallenged assertions of privilege.

Plaintiffs argue that because the Internet Archive did not waive the attorney-client privilege regarding communications relating to digital lending, Plaintiffs are relieved of their burden to show that the Internet Archive did not reasonably believe that digital lending was fair use.

Plaintiffs are wrong.

In other contexts, the Second Circuit Court of Appeals has held that the statutory phrase "had reasonable grounds for believing" states an "objective reasonableness" standard. *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997). Where, as here, a statute sets forth "an objective, not a subjective, test," *In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008), the question is whether there were objective grounds for the proposition the defendant believed, not what the defendant subjectively knew or was told. In such circumstances, advice of counsel is irrelevant and "cannot be used to support the defense." *Id.* In order for privileged material to be implicated by a claim or defense, "a party must *rely* on privileged advice from his counsel to make his claim or defense." *Id.* Accordingly, even if Plaintiffs had sought disclosure of Internet Archive's privileged documents or identified them in a Fed. R. Civ. P. 56(d) affidavit, those documents would not have been relevant to the inquiry.

### 4. Mr. Kahle identified a number of reasonable grounds that he had for believing that the Internet Archive's actions constituted fair use.

Plaintiffs assert that the record is "replete" with evidence that shows that the Internet Archive lacked reasonable grounds for its belief that digital lending is a lawful fair use. Again,

their claims do not withstand scrutiny.

Plaintiffs first complain that the Internet Archive started digital lending before the White Paper and the Position Statement were published. But as noted above, the statute sets forth an objective standard, and Plaintiffs have not shown that the state of the law between 2011 and 2018 would have made the Internet Archive belief less reasonable. To the contrary, between 2011 and 2018, courts decided *HathiTrust*, *Google Books*, *Cambridge University Press*, *TVEyes*, and *ReDigi*—which, as discussed in the Internet Archive's motion, all bolster the case that CDL is fair use.

Nor does Jonathan Band's article about the *ReDigi* opinion show a lack of reasonable grounds for the Internet Archive's belief. To the contrary, that article expresses the view that the *ReDigi* opinion "did not address" the argument that "purpose and intent of section 109 should positively influence the 'purpose and character' assessment in the fair use analysis" and that Mr. Band's client—the Library Copyright Alliance, not the Internet Archive—"still believes this theory is correct." McNamara Decl. Ex. 138 at 4–5, ECF No. 96-156.

Finally, Plaintiffs assert that the Internet Archive "did not follow the practices prescribed in the White Paper." Pls.' Opp'n Br. at 32. The White Paper identifies "six basic system design elements" which the White Paper says "are, we believe, all that are necessary to make a compelling legal case for CDL." The Internet Archive's CDL implementation incorporates all six of those elements, and Plaintiffs do not identify how it does not.

### D. Plaintiffs do not substantively address the National Emergency Library.

While Plaintiffs say that the National Emergency Library was "grandly-titled" and say it was "presumptuous" of the Internet Archive to think that the NEL maintained an owned-to-loaned limitation because all of the country's libraries were closed, they do not say, much less show, why that belief was wrong. Accordingly, the Internet Archive's motion should be granted

18

both as to its implementation of CDL and to the NEL.

## III.    CONCLUSION

When they returned to campus this fall, students at Georgetown, George Washington University, and the other members of the Washington Research Library Consortium found 1,379 books published by Plaintiff Wiley could no longer be borrowed in electronic form from those institutions' libraries.[1]  They disappeared from those libraries' virtual shelves, because Wiley decided to stop licensing them to the academic library market as of August 31, 2022.[2]  And according to Plaintiffs' theory in this case, that means libraries could not loan them out digitally at all.  After a public backlash, Wiley restored the titles for the academic year,[3] but the message was sent: the ability of libraries to serve their patrons is subject to publishers' whims.

That is what this case is about: whether the selection of books available from libraries digitally will be chosen by librarians, or instead determined by publishers' unilateral and unreviewable licensing choices.  This Court is being asked to decide whether copyright law gives publishers the power to dictate which books in a library's collection can and cannot be loaned digitally.  As more than a hundred authors whose books are published by Plaintiffs said in a recent open letter: "We fear a future where libraries are reduced to a sort of Netflix or Spotify for

---

[1] George Washington University Libraries, *Important E-Book News for GW Faculty and Students* (Oct. 6, 2022), https://library.gwu.edu/Wiley-ebook-removal.

[2] Consortium of National and University Libraries (Ireland), *Irish Librarians condemn publisher Wiley's removal of hundreds of titles from ebook collections* (Sept. 20, 2022), https://conul.ie/irish-librarians-condemn-publisher-wileys-removal-of-hundreds-of-titles-from-ebook-collections/.

[3] *See* Wiley, *Statement on Wiley eBooks Featured in ProQuest Academic Complete Library* (Oct. 5, 2022), https://newsroom.wiley.com/press-releases/press-release-details/2022/Statement-on-Wiley-eBooks-Featured-in-ProQuest-Academic-Complete-Library/default.aspx.

19

books, from which publishers demand exorbitant licensing fees in perpetuity[.]"[4]  This Court

should grant summary judgment for the Internet Archive, reaffirming that libraries can continue

to carry out their mission in the digital world.

Dated:  October 7, 2022                    DURIE TANGRI LLP


                                           By:                  /s/ Joseph C. Gratz
                                              Joseph C. Gratz (*Pro Hac Vice*)
                                              Jessica E. Lanier (*Pro Hac Vice*)
                                              Aditya V. Kamdar (*Pro Hac Vice*)
                                              Annie A. Lee (*Pro Hac Vice*)
                                              217 Leidesdorff Street
                                              San Francisco, CA 94111
                                              (415) 362-6666
                                              jgratz@durietangri.com
                                              jlanier@durietangri.com
                                              akamdar@durietangri.com
                                              alee@durietangri.com

                                              ELECTRONIC FRONTIER FOUNDATION
                                              Corynne McSherry (*Pro Hac Vice*)
                                              Kit Walsh (*Pro Hac Vice*)
                                              Cara Gagliano (*Pro Hac Vice*)
                                              815 Eddy Street
                                              San Francisco, CA 94109
                                              (415) 436-9333
                                              corynne@eff.org
                                              kit@eff.org
                                              cara@eff.org

                                              Attorneys for Defendant
                                              INTERNET ARCHIVE

---

[4] Fight for the Future, *Authors For Libraries*, https://www.fightforthefuture.org/Authors-For-Libraries (hyperlinks in original); Gratz Reply Decl. ¶ 4 (listing more than 100 signatories and examples of their books published by Plaintiffs).

20

## CERTIFICATE OF COMPLIANCE

I hereby certify that the following statements are true:

This brief complies with the formatting rules of the Individual Practices of Judge John G. Koeltl Section II.D and the Court's Order regarding word count (ECF No. 80). It has been prepared using a proportionally spaced typeface using Microsoft Word 365 Version 2108 in 12-point Times New Roman font and includes 5,974 words.

_/s/ Joseph C. Gratz_
JOSEPH C. GRATZ

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC.,<br>HARPERCOLLINS PUBLISHERS LLC,<br>JOHN WILEY & SONS, INC., and<br>PENGUIN RANDOM HOUSE LLC<br><br>              Plaintiffs,<br><br>    v.<br><br>INTERNET ARCHIVE and DOES 1 through<br>5, inclusive<br><br>              Defendants. | Case No. 1:20-CV-04160-JGK |

**DECLARATION OF JOSEPH C. GRATZ IN SUPPORT OF DEFENDANT INTERNET ARCHIVE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

I, Joseph C. Gratz, declare as follows:

1. I am an attorney licensed to practice in the State of California and represent Defendant Internet Archive in this matter. I make this declaration from personal knowledge, and if called to testify, I could and would testify competently to the facts stated herein.

2. Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the transcript of the deposition of Dr. Jeffrey T. Prince, taken on June 9, 2022.

3. Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the transcript of the deposition of Dr. Rasmus Jørgensen, taken on June 8, 2022.

4. On September 29, 2022, the organization Fight for the Future published an open letter, titled "Authors For Libraries," with hundreds of author signatories. The open letter is available at the following link: https://www.fightforthefuture.org/Authors-For-Libraries. Below is a list of a subset of the letter's signatories, as of October 6, 2022, identifying an example of one of their books published by Plaintiffs or their imprints. Where multiple authors contributed to a book, the signatory is in bold.

1. Neil Gaiman, *American Gods* (2001) (published by William Morrow, an imprint of Plaintiff HarperCollins).

2. Alok Vaid-Menon, *Beyond the Gender Binary* (2020) (published by Penguin Workshop, an imprint of Plaintiff Penguin Random House).

3. Jaya Saxena & **Mattie Lubchansky**, *Dad Magazine* (2016) (published by Quirk Books, an imprint of Plaintiff Penguin Random House).

4. Kyle Lukoff, *Too Bright to See* (2022) (published by Dial Books, an imprint of Plaintiff Penguin Random House).

5. Chuck Wendig, *Dust & Grim* (2022) (published by Little, Brown Young Readers, an

1

imprint of Plaintiff Hachette).

6.  Hanif Abdurraqib, *A Little Devil in America* (2022) (published by Random House Trade Paperbacks, an imprint of Plaintiff Penguin Random House).

7.  Mark Bray, *Antifa* (2017) (published by Melville House, an imprint of Plaintiff Penguin Random House).

8.  Annalee Newitz, *Scatter, Adapt, and Remember* (2014) (published by Anchor, an imprint of Plaintiff Penguin Random House).

9.  Marwan Hisham & **Molly Crabapple**, *Brothers of the Gun* (2018) (published by One World, an imprint of Plaintiff Penguin Random House).

10. Torrey Peters, *Detransition, Baby* (2021) (published by One World, an imprint of Plaintiff Penguin Random House).

11. Hugh Ryan, *The Women's House of Detention* (2022) (published by Bold Type Books, an imprint of Plaintiff Hachette).

12. Baratunde Thurston, *How to Be Black* (2012) (published by Harper Paperbacks, an imprint of Plaintiff HarperCollins).

13. Alyssa Milano, *Safe at Home* (2010) (published by It Books, an imprint of Plaintiff HarperCollins).

14. Franny Choi, *The World Keeps Ending, and the World Goes On* (2022) (published by Ecco, an imprint of Plaintiff HarperCollins).

15. Lawrence Lessig, *Republic, Lost* (2015) (published by Twelve, an imprint of Plaintiff Hachette).

16. Daniel Ellsberg, *Secrets* (2003) (published by Penguin Books, an imprint of Plaintiff Penguin Random House).

2

17. Medea Benjamin, *Don't Be Afraid, Gringo: A Honduran Woman Speaks from the Heart* (1989) (published by Harper Perennial, an imprint of Plaintiff HarperCollins).

18. Roger McNamee, *Zucked: Waking Up to the Facebook Catastrophe* (2019) (published by Penguin Press, an imprint of Plaintiff Penguin Random House).

19. Amanda Palmer, *The Art of Asking: How I Learned to Stop Worrying and Let People Help* (2014) (published by Grand Central Publishing, an imprint of Plaintiff Hachette).

20. Ben Karlin, **David Wain**, et al., *Things I've Learned from Women Who've Dumped Me* (2008) (published by Grand Central Publishing, an imprint of Plaintiff Hachette).

21. John Markoff, *Whole Earth* (2022) (published by Penguin Press, an imprint of Plaintiff Penguin Random House).

22. Sam Sax, *Madness* (2017) (published by Penguin Books, an imprint of Plaintiff Penguin Random House).

23. Nathan Schneider, *Everything for Everyone* (2018) (published by Bold Type Books, an imprint of Plaintiff Hachette).

24. Diana Rosen, *How to Keep a Dream Journal* (2004) (published by Workman, an imprint of Plaintiff Hachette).

25. Emma Copley Eisenberg, *The Third Rainbow Girl: The Long Life of a Double Murder in Appalachia* (2020) (published by Hachette Books, an imprint of Plaintiff Hachette).

26. David J. Farber, *Delivering Internet Connections over Cable: Breaking the Access Barrier* (2002) (published by Plaintiff Wiley).

27. Olivia Gatwood, *Life of the Party* (2019) (published by Dial Press, an imprint of Plaintiff Penguin Random House).

3

28. Jonathan Rosenberg, *Trillion Dollar Coach* (2019) (published by Harper Business, an imprint of Plaintiff HarperCollins).

29. Brink Lindsey, *The Age of Abundance* (2008) (published by Harper Business, an imprint of Plaintiff HarperCollins).

30. Dan Gillmor, et al., *The Cluetrain Manifesto (10th Anniversary Edition)* (2011) (published by Basic Books, an imprint of Plaintiff Hachette).

31. Prisca Dorcas Mojica Rodriguez, *For Brown Girls with Sharp Edges and Tender Hearts* (2021) (published by Seal Press, an imprint of Plaintiff Hachette).

32. Eula Biss, *Having and Being Had* (2021) (published by Riverhead Books, an imprint of Plaintiff Penguin Random House).

33. Scott Carney, *The Red Market* (2011) (published by William Morrow, an imprint of Plaintiff HarperCollins).

34. Robin Marty, *New Handbook for a Post-Roe America* (2021) (published by Seven Stories Press, an imprint of Plaintiff Penguin Random House).

35. Spencer Ackerman, *Reign of Terror* (2022) (published by Penguin Books, an imprint of Plaintiff Penguin Random House).

36. Lucy Bernholz, *Creating Philanthropic Capital Markets: The Deliberate Evolution* (2004) (published by Plaintiff Wiley).

37. Juhea Kim, *Beasts of a Little Land* (2021) (published by Ecco, an imprint of Plaintiff HarperCollins).

38. Julian Randall, *Designing Indoor Solar Products: Photovoltaic Technologies for AES* (2005) (published by Plaintiff Wiley).

39. David Weinberger, *Too Big To Know* (2014) (published by Basic Books, an imprint of Plaintiff Hachette Book Group).

40. David Wondrich, *Imbibe!* (2015) (published by TarcherPerigee, an imprint of Plaintiff Penguin Random House).

41. Ilana Masad, *All My Mother's Lovers* (2021) (published by Dutton, an imprint of Plaintiff Penguin Random House).

42. Micah Sifry, *Is That A Politician In Your Pocket* (2004) (published by Plaintiff Wiley).

43. Douglas Rushkoff, *Bet Back In The Box* (2010) (published by HarperCollins ebooks, an imprint of Plaintiff HarperCollins).

44. Jillian York, *Silicon Values* (2022) (published by Verso, an imprint of Plaintiff Penguin Random House).

45. Ashton Applewhite, *Cutting Loose* (2017) (published by Harper Paperbacks, an imprint of Plaintiff HarperCollins).

46. Bruce Schneier, *Applied Cryptography: Protocols, Algorithms and Source Code in C, 20th Anniversary Edition* (2015) (published by Plaintiff Wiley).

47. Morgan Parker, *Who Put This Song On?* (2021) (published by Delacorte Press, an imprint of Plaintiff Penguin Random House).

48. John Palfrey, *Interop* (2012) (published by Basic Books, an imprint of Plaintiff Hachette Book Group).

49. Jeff Sharlet, *The Family* (2009) (published by Harper Perennial, an imprint of Plaintiff HarperCollins).

50. Adrienne Lawrence, *Staying in the Game* (2020) (published by TarcherPerigee , an imprint of Plaintiff Penguin Random House).

51. Jessie Daniels, *Nice White Ladies* (2021) (published by Seal Press, an imprint of Plaintiff Hachette).

52. Porochista Khakpour, *Sick* (2018) (published by Harper Perennial, an imprint of Plaintiff HarperCollins).

53. Siva Vaidhyanathan, *The Anarchist in the Library* (2005) (published by Basic Books, an imprint of Plaintiff Hachette).

54. Matt Haig, *The Comfort Book* (2021) (published by Penguin Life, an imprint of Plaintiff Penguin Random House).

55. Kate Bornstein, *Gender Outlaw* (2016) (published by Vintage, an imprint of Plaintiff Penguin Random House).

56. Andre Henry, *All the White Friends I Couldn't Keep* (2022) (published by Convergent Books, an imprint of Plaintiff Penguin Random House).

57. Kon Karapanagiotidis, *The Power of Hope* (2018) (published by HarperCollins, an imprint of Plaintiff HarperCollins).

58. Tom Franklin & **Beth Ann Fennelly**, *The Tilted World* (2014) (published by William Morrow Paperbacks, an imprint of Plaintiff HarperCollins).

59. Rebecca MacKinnon, *Consent of the Networked* (2013) (published by Basic Books, an imprint of Plaintiff Hachette).

60. Mike Godwin, *Cyber Rights* (1998) (published by Crown Business, an imprint of Plaintiff Penguin Random House).

61. Jonathan Lazar, Jinjuan Heidi Feng, **Harry Hochheiser**, *Research Methods in Human-Computer Interaction* (2011) (published by Plaintiff Wiley).

6

62. Amy Sample Ward, *Social Change Anytime Everywhere* (2013) (published by Jossey-Bass, an imprint of Plaintiff Wiley).

63. Nikita Gill, *The Girl and the Goddess* (2020) (published by G.P. Putnam's Sons, an imprint of Plaintiff Penguin Random House).

64. Michelangelo Signorile, *It's Not Over* (2016) (published by HarperOne, an imprint of Plaintiff HarperCollins).

65. Mahogany L. Browne, *Vinyl Moon* (2022) (published by Crown Books for Young Readers, an imprint of Plaintiff Penguin Random House).

66. Norman Solomon, ed., *The Talmud: A Selection* (2009) (published by Penguin Classics, an imprint of Plaintiff Penguin Random House).

67. Amanda Joy, *A Queen of Gilded Horns* (2022) (published by G.P. Putnam's Sons Books, an imprint of Plaintiff Penguin Random House).

68. Sonia Guiñansaca, *Somewhere We Are Human* (2022) (published by HarperVia, an imprint of Plaintiff HarperCollins).

69. Barbara Fister, *On Edge* (2008) (published by Dell, an imprint of Plaintiff Penguin Random House).

70. Dana Mele, *People Like Us* (2018) (published by Putnam's Sons Books, an imprint of Plaintiff Penguin Random House).

71. Amy Banks, *Wired to Connect* (2016) (published by TarcherPerigee, an imprint of Plaintiff Penguin Random House).

72. Gabriella Coleman, *Hacker, Hoaxer, Whistleblower, Spy* (2015) (published by Verso, an imprint of Plaintiff Penguin Random House).

7

73. Maureen Johnson, *Truly Devious* (2018) (published by Katherine Tagen Books, an imprint of Plaintiff HarperCollins).

74. Kim Werker, *Crochet Me* (2013) (published by Interweave, an imprint of Plaintiff Penguin Random House).

75. Xiran Jay Zhao, *Iron Widow* (2021) (published by Penguin Teen Canada, an imprint of Plaintiff Penguin Random House).

76. Parmy Olson, *We Are Anonymous* (2013) (published by Back Bay Books, an imprint of Plaintiff Hachette).

77. **Richard F. Forno**, Laura K. Mateczun, Donald F. Norris, *Cybersecurity and Local Government* (2022) (published by Plaintiff Wiley).

78. Emma Robinson, *My Husband's Daughter* (2022) (published by Forever, an imprint of Plaintiff Hachette).

79. Jen Kramer, *Joomla! 24-Hour Trainer* (2011) (published by Plaintiff Wiley).

80. **Gareth Halfacree**, Eben Upton, *Raspberry Pi User Guide, 3rd Edition* (2014) (published by Plaintiff Wiley).

81. Jerry Weinstein, Tom Alston, *Baseball Coach's Survival Guide: Practical Techniques and Materials for Building an Effective Program and a Winning Team* (1998) (published by Plaintiff Wiley).

82. Stephanie Kate Strohm, *Love á la Mode* (2019) (published by Little, Brown, an imprint of Plaintiff Hachette).

83. Jane Hosie-Bounar, *Life Belts* (1993) (published by Delacorte Books for Young Readers, an imprint of Plaintiff Penguin Random House).

8

84. Ellis Weiner, *Yiddish with George and Laura* (2008) (published by Little, Brown, an imprint of Plaintiff Hachette).

85. LJ Alonge (Lanre Akinsiku), *Blacktop: Justin #1* (2016) (published by Grosset & Dunlap, an imprint of Plaintiff Penguin Random House).

86. James Hannaham, *Delicious Foods* (2016) (published by Little, Brown, an imprint of Plaintiff Hachette).

87. Glyn Moody, *Rebel Code* (2002) (published by Basic Books, an imprint of Plaintiff Hachette).

88. Carla Power, *Home, Land, Security* (2021) (published by One World, an imprint of Plaintiff Penguin Random House).

89. Mercedes Lackey, *Beyond* (2021) (published by DAW, an imprint of Plaintiff Penguin Random House).

90. Marilyn Stasio, *Broadway's Beautiful Losers* (1972) (published by Delacorte, an imprint of Plaintiff Penguin Random House).

91. James Lee Burke, *Sunset Limited* (1999) (published by Island Books, an imprint of Plaintiff Penguin RandomHouse).

92. Randy Cassingham, *The True Stella Awards* (2006) (published by Plume, an imprint of Plaintiff Penguin Random House).

93. Barry Wittenstein, *Oscar's American Dream* (2020) (published by Schwartz & Wade, an imprint of Plaintiff Penguin Random House).

94. Alanna Coca, *PreView* (2011) (published by Harlequin, an imprint of Plaintiff HarperCollins).

9

95. Constance Penley, *NASA/TREK* (1997) (published by Verso, an imprint of Plaintiff Penguin Random House).

96. Ross Anderson, *Security Engineering: A Guide to Building Dependable Distributed Systems, 3rd Edition* (2020) (published by Plaintiff Wiley).

97. Joe Cribb, *DK Eyewitness Books: Money* (2016) (published by DK Children, an imprint of Plaintiff Penguin Random House).

98. Cecil Castellucci, *The PLAIN Janes* (2020) (published by Little, Brown, an imprint of Plaintiff Hachette).

99. Mary Doria Russell, *Dreamers of the Day* (2008) (published by Ballantine Books, an imprint of Plaintiff Penguin Random House).

100. Perry Carpenter, *Transformational Security Awareness: What Neuroscientists, Storytellers, and Marketers Can Teach Us About Driving Secure Behaviors* (2019) (published by Plaintiff Wiley).

101. Charlie Connelly, *Constance Street: The true story of one family and one street in London's East End* (2015) (published by HarperElement, an imprint of Plaintiff HarperCollins).

102. Jeff Jarvis, *What Would Google Do?* (2011) (published by Harper Business, an imprint of Plaintiff HarperCollins).

103. C.C. Chapman, *Amazing Things Will Happen: A Real-World Guide on Achieving Success and Happiness* (2012) (published by Wiley, an imprint of Plaintiff Wiley).

104. Eric Nusbaum, *Stealing Home* (2021) (published by PublicAffairs, an imprint of Plaintiff Hachette).

10

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2022, in Rome, Italy.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

11

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Joseph C. Gratz*
JOSEPH C. GRATZ

# EXHIBIT 1

```
1              UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------------------x

4    HACHETTE BOOK GROUP, INC.,

     HARPERCOLLINS PUBLISHERS LLC,

5    JOHN WILEY & SONS, INC., and

     PENGUIN RANDOM HOUSE LLC,

6

7              Plaintiffs,

8    vs.                    Case No. 1:20-cv-04160-JGK

9

     INTERNET ARCHIVE and DOES 1

10   through 5, inclusive,

11

12             Defendants.

13   ---------------------------------------------------x

14

15       *HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*

16

17    REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

18                   JEFFREY PRINCE

19              Thursday, June 9, 2022

20

21

22

23

24   Reported By: Lynne Ledanois, CSR 6811

25   Job No. 5255194


                                      Page 1
```

```
 1    different venue.                                10:25AM

 2             So you have all these patents that

 3    contribute to that standard.

 4             Everyone then has some right to get some

 5    payment for those and there has to be an established  10:25AM

 6    rate as to what is a fair rate for the contributing

 7    patents.

 8             So in this case, Qualcomm was charging a

 9    certain rate for its patent portfolio for Apple to

10    use in its smartphones and Apple disputed that rate,  10:25AM

11    so they were litigating that.

12        Q    What was your involvement in that

13    litigation?

14        A    So my role actually focused on the standard

15    nonessential patents.  So Qualcomm's -- what Qualcomm  10:25AM

16    did was they sold a large portfolio of patents at a

17    single rate.  And that involves standard essential

18    patents and standard nonessential patents.

19             So my focus was on the latter, where I

20    perform various analyses to assess value that those  10:25AM

21    patents provide.

22        Q    What were those analyses?

23        A    This was a combination of surveys and

24    econometric analysis depending on the different

25    technology in play.                              10:26AM
```

                                                    Page 20

```
 1              So to the extent that I could do            10:26AM

 2    econometric analysis using market data, I did that.

 3              In some cases that wasn't feasible, so I

 4    also utilized surveys to get an assessment of value

 5    for different improvements.                           10:26AM

 6         Q    Do you use econometric data in preference

 7    to survey data in assessing questions like the one

 8    that you addressed in the Qualcomm/Apple case?

 9              MS. STEINMAN:  Objection.

10              THE WITNESS:  I'm reluctant to give a        10:27AM

11    blanket answer to that.  I try to use the method

12    that I think is most appropriate given the

13    circumstances.

14              I will say that if I believe market data

15    are adequate, I will go that route.  But oftentimes   10:27AM

16    there are deficiencies and to the extent that those

17    are significant enough, I'm -- I have and am

18    perfectly willing to utilize surveys as well.

19    BY MR. GRATZ:

20         Q    The next case on my list is Apple against   10:27AM

21    WI-LAN.  We talked about WI-LAN against Apple.  This

22    is Apple against WI-LAN.

23              What is the relationship between those two

24    cases on your C.V.?

25         A    So those -- what is the date on that one?   10:28AM
```

Page 21

```
 1    report, one of the things I was asked to do that's      11:24AM

 2    relevant here is thinking about if this behavior

 3    were expanded beyond what was currently done, what

 4    would be the implications of that.

 5            As I say in the report, I think there's         11:24AM

 6    reason to believe that the harm would be quite a bit

 7    more substantial in that case.

 8    BY MR. GRATZ:

 9       Q   Do you have any opinions about the size of

10    those harms other than the ones we've now talked        11:25AM

11    about already?

12            MS. STEINMAN:  Objection.

13            THE WITNESS:  Nothing specific comes to

14    mind, although I reserve whatever -- if there's

15    anything in the report that we have not covered in      11:25AM

16    this what might fall under this umbrella, it would

17    still qualify as my opinion and I would update it

18    with any further information.

19    BY MR. GRATZ:

20       Q   Did you engage in any statistical              11:25AM

21    analysis -- strike that.

22            Did you engage in any econometric analysis

23    to attempt to identify the size of the harms that

24    you discuss?

25       A   I would say in my critiques of Dr. Reimers's 11:26AM
```

Page 55

1    and Dr. Jørgensen's report, the analysis that I did      11:26AM

2    would be consider econometric.

3              I did not put forth an independent model,

4    but I did perform an econometric analysis on their

5    work.                                                     11:26AM

6         Q    Why didn't you put forth your own

7    econometric analysis?

8              MS. STEINMAN:  Objection.

9              THE WITNESS:  Again, my understanding is

10   that the burden was on the other side to establish       11:26AM

11   that there was not harm.

12             So my role was to -- or one of the

13   things -- one of the pieces of the scope of my

14   report was to lay out the economic reasoning for the

15   different types of harm that likely occurred.            11:26AM

16   BY MR. GRATZ:

17        Q    In your report when you discuss

18   Dr. Reimers's and Dr. Jørgensen's analyses, you

19   identify a number of potential confounding factors

20   that in your view should have been taken into            11:27AM

21   account to make their results more accurate; is that

22   right?

23        A    I think that's fair.  I would say, you know,

24   I would say accurate, reliable.

25             To add credibility to the conclusions they     11:27AM

Page 56

| | | |
|---|---|---|
| 1 | mean? | 11:43AM |
| 2 | A    Well, I think I'm contrasting that with | |
| 3 | digital licensing where in those cases, they often | |
| 4 | come with terms of use by the publisher.  So my | |
| 5 | understanding is with the purchase of the physical | 11:43AM |
| 6 | book, there's not such terms of use. | |
| 7 | Q    Do you know why there aren't such terms of | |
| 8 | use with print books that are purchased by | |
| 9 | libraries? | |
| 10 | MS. STEINMAN:  Objection, no foundation. | 11:43AM |
| 11 | THE WITNESS:  I don't want to overstate my | |
| 12 | legal expertise, but I believe it has to do with the | |
| 13 | right of first sale.  So in that case they are | |
| 14 | buying the book, so then they can use it | |
| 15 | accordingly. | 11:44AM |
| 16 | BY MR. GRATZ: | |
| 17 | Q    From an economic point of view, when a | |
| 18 | library buys a print book, is one of the things it's | |
| 19 | getting an entitlement to lend that print book out | |
| 20 | physically? | 11:44AM |
| 21 | A    I believe that that ability comes with a | |
| 22 | purchase. | |
| 23 | Q    And when a library has bought a print book | |
| 24 | and lends that book physically to one of its | |
| 25 | patrons, that patron is entitled to read it; is that | 11:44AM |

Page 66

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    right?                                          11:44AM

 2         A    I believe, yes, they can read the book, yes.

 3         Q    From an economic point of view, when a

 4    library buys a print book, do you have a view as to

 5    whether one of the things it's getting is an        11:45AM

 6    entitlement to lend that print book out digitally?

 7              MS. STEINMAN:  Objection.

 8              THE WITNESS:  My understanding is that

 9    they don't have that right to do that.

10    BY MR. GRATZ:                                     11:45AM

11         Q    That's your understanding based on the --

12    based on copyright law as it's been explained to you

13    by counsel?

14              MS. STEINMAN:  Objection, the witness

15    is -- any conversations between counsel and Prince,  11:45AM

16    Professor Prince are privileged.  So I direct him

17    not to answer.

18              MR. GRATZ:  Let me ask a better question.

19         Q    Do you have any nonprivileged source of

20    that understanding?                                11:45AM

21         A    I believe I reviewed some case law on this

22    in crafting my report that if -- my recollection is

23    that it established that there isn't the right to use

24    or to generate a digital copy when advertising a

25    physical book.                                    11:46AM
```

Page 67

1      Q    What would affect whether that, in fact,      12:45PM

2  occurred?

3      A    I mean, there is a number of elements, I

4  mean, for one, it would depend upon whether those who

5  are recording for their own personal consumption would  12:45PM

6  instead rent or buy if they weren't allowed to do

7  that.  But I don't know the extent to which that's the

8  case.  I haven't done that analysis.

9      Q    Would the incentive to make movies be

10  greater, less or the same in the circumstance where      12:46PM

11  people could not tape movies shown on TV and watch

12  them later?

13          MS. STEINMAN:  Objection.

14          THE WITNESS:  Again, that would depend on

15  what that rule change would imply in terms of the      12:46PM

16  return someone would get on their investment in a

17  movie.  To the extent that that return would go up,

18  that would increase incentives.

19  BY MR. GRATZ:

20      Q    The question whether that return would      12:46PM

21  actually go up is an empirical one?

22      A    I mean, you can make theoretical arguments,

23  but then you could also do an empirical analysis to

24  assess that.

25      Q    In your report, you provide opinions about  12:47PM

                                        Page 93

```
 1    not teach because I was running the department and an    4:36PM

 2    institute.

 3           I will be stepping down from the institute

 4    this summer and then I'll be stepping down as chair

 5    next year.                                                4:36PM

 6           And so my steady state is I would teach

 7    three classes a year, but that's been disrupted

 8    because of my administrative roles.

 9       Q    Do you spend more time on your expert

10    witness work and consulting work or on your              4:36PM

11    teaching?

12       A    As I said, now anything I do would be more

13    than teaching because I'm not teaching right now.

14    That would not be the case when I'm back to a

15    three-course load.                                       4:36PM

16           The other major component of my job is

17    research, which actually takes up most of my time.

18       Q    That was going to be my next question.

19           About what percentage of your time do you

20    spend on your consulting work, including expert          4:36PM

21    witness testimony?

22       A    Somewhere in the neighborhood of 20 percent.

23       Q    In your work on your expert report, did

24    you attempt to numerically estimate the size of the

25    effect you believe Internet Archive's controlled         4:38PM
```

Page 202

```
 1    digital lending had on publisher's revenues?          4:38PM

 2              MS. STEINMAN:  Objection, asked and

 3    answered.

 4              THE WITNESS:  I did not try to quantify

 5    that, no.                                              4:38PM

 6    BY MR. GRATZ:

 7         Q    Do you know whether that effect would be

 8    positive or negative?

 9         A    I laid out the economic reasoning that I

10    believe points to it being detrimental, having harm.  4:38PM

11         Q    But you don't know whether that economic

12    reasoning, in fact, played out in that way; right?

13              MS. STEINMAN:  Objection.

14              THE WITNESS:  I don't have the numerical

15    estimates on that.  I think it's -- whatever its      4:39PM

16    economic reasoning or general theoretical arguments,

17    to the extent that the premises are sensible and

18    credible, I believe that the conclusions then

19    reasonably follow.  And I believe those assumptions

20    were credible.                                        4:39PM

21    BY MR. GRATZ:

22         Q    It is possible that upon examination of

23    the data through an econometric analysis, it would

24    turn out that the effect was either zero or positive

25    with respect to publishers' revenues?                 4:39PM
```

Page 203

| | | |
|---|---|---|
| 1 | MS. STEINMAN: Objection. | 4:39PM |
| 2 | BY MR. GRATZ: | |
| 3 | Q    Is that right? | |
| 4 | A    It's possibly.  I think no one's provided | |
| 5 | credible evidence to demonstrate that to be the case. | 4:39PM |
| 6 | Q    And you did not attempt to engage in that | |
| 7 | econometric analysis to make that determination? | |
| 8 | A    Right, understanding that the burden was on | |
| 9 | the other side to establish there was no harm, I did | |
| 10 | not engage in that. | 4:40PM |
| 11 | Q    I want to turn to Page 66, | |
| 12 | Paragraph 107 -- I'm sorry.  Page 63, Paragraph 107. | |
| 13 | A    Yes. | |
| 14 | Q    And this is in a section titled | |
| 15 | "Dr. Jørgensen's comparison of Internet Archive's | 4:41PM |
| 16 | conduct to OverDrive lending is misleading and | |
| 17 | irrelevant." | |
| 18 | Do you see that? | |
| 19 | A    Yes. | |
| 20 | Q    In Paragraph 107, you write that | 4:41PM |
| 21 | "Moreover, according to Dr. Jørgensen's analysis, | |
| 22 | there was a huge variability in Internet Archive's | |
| 23 | relative checkout volume among the book titles, | |
| 24 | suggesting that some authors might be impacted more | |
| 25 | heavily than the average provided by Dr. Jørgensen." | 4:42PM |

Page 204

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1    (nonzero) sales at least five years after        4:55PM

 2    publication - for USA Today list bestsellers, for

 3    all books published by Plaintiffs, and for the works

 4    in suit - establishes that there were potential

 5    sales that Plaintiff Publishers lost as a result of  4:55PM

 6    Internet Archive's actions."

 7            Do you see that?

 8       A    Yes.

 9       Q    That's an overstatement, isn't it, in that

10    I think you've testified you're not expressing the   4:55PM

11    opinion that lost sales, in fact, occurred but

12    instead that your arguments from economic theory

13    lead one to the conclusion that the conditions were

14    such that one would expect lost sales to have

15    occurred?                                            4:56PM

16            MS. STEINMAN:  Objection.

17            THE WITNESS:  Yes, that's right.  But I

18    don't see how this statement is an overstatement

19    relative to that framework.

20    BY MR. GRATZ:                                        4:56PM

21       Q    Do you know whether there were potential

22    sales that plaintiff publishers, in fact, lost as a

23    result of Internet Archive's actions?

24            MS. STEINMAN:  Objection.

25            THE WITNESS:  Again, I lay out the           4:56PM
```

1    economic reasoning.  I don't have empirical evidence    4:56PM

2    of that.  But this sentence doesn't claim to have

3    empirical evidence of that.

4    BY MR. GRATZ:

5        Q    It's claiming that something, in fact,    4:56PM

6    occurred in the world; isn't it?

7        A    I don't think so.

8        Q    Turning to Paragraph 105, and we may have

9    an opportunity to discuss this later in connection

10    with Dr. Jørgensen's rebuttal report.    4:57PM

11            But in Paragraph 105, you discuss

12    Dr. Jørgensen's estimates of -- related to OverDrive

13    revenue.

14            Do you see that?

15        A    Yes.    4:57PM

16        Q    Did you include or exclude audio book

17    revenues in the analysis set forth in Paragraph 105?

18        A    Well, I believe audio books were in here.

19        Q    Upon having read Dr. Jørgensen's rebuttal

20    report and reflecting on the matter, do you think a    4:58PM

21    better calculation would remove audio books?

22        A    I believe that's right.  I also believe that

23    that doesn't have a major impact on the figures.

24        Q    Have you done that calculation?

25        A    I've discussed it with Analysis Group.  I    4:58PM

Page 213

```
 1    the documents that I requested a moment ago.          5:01PM

 2         Q    Do you think, considering that -- strike

 3    that.

 4              There are a number of potential controls

 5    or rather -- strike that.                              5:02PM

 6              There are a number of potential

 7    confounding factors that you identified in your

 8    report that you criticized Dr. Reimers and/or

 9    Dr. Jørgensen for not taking into account; is that

10    right?                                                 5:02PM

11         A    Yes.

12         Q    Do you have a view as to whether one could

13    do an analysis that takes all of those confounding

14    factors into account?

15         A    Well, I haven't attempted to do the full    5:02PM

16    measure that they tried to do.  I think, you know,

17    there's various ways one might approach the problem.

18              One could try to directly account for all

19    those confounding factors or attempt other ways of

20    conducting an analysis that would effectively deal     5:03PM

21    with the presence of those confounding factors.

22              So I haven't gone through that analysis to

23    determine what might be the optimal path, if one is

24    possible, but that's the kind of things I would

25    consider.                                              5:03PM
```

                                        Page 216

```
 1        Q    Have you concluded whether or not one is      5:03PM

 2   possible; that is, whether it would be possible to

 3   control for the potential confounding factors that

 4   you identified?

 5        A    I haven't done that full assessment and what  5:03PM

 6   the -- what's fully possible here.

 7        Q    For example, one of the potential

 8   confounding factors you identify is awareness of

 9   issues relating to racial justice.

10             Do you recall that?                           5:04PM

11        A    Yes.

12        Q    Do you have any views on how one could

13   control for that factor?

14        A    I haven't fully thought that through, what

15   would be the optimal way to deal with that.           5:04PM

16             I think what I was doing here is just

17   highlighting that that clearly was going on and that

18   one would need to calculate that.

19        Q    Is the same true of the other potential

20   confounding factors that you identified?              5:04PM

21        A    Yes, I think that's fair.

22        Q    Do you have a view as to whether the

23   effects of the confounding factors you identify

24   would go in one direction or the other?

25             MS. STEINMAN:  Objection.                    5:05PM
```

Page 217

```
 1              THE WITNESS:  I mean, that's -- I don't    5:05PM
 2    believe I laid all that out in the report.  I think
 3    a lot of them would tend to, if ignored, downplay
 4    the effects that they are trying to measure.
 5              But I can't say that that's universally    5:05PM
 6    true.  I would want to look at that individually.
 7    BY MR. GRATZ:
 8         Q    Do you have a view as to the size of the
 9    effects of the confounding factors you identify?
10         A    I don't give a numerical value for that, but  5:05PM
11    I think with the reasoning that I have laid out,
12    there's reason to think that their effects could be
13    non-trivial.
14         Q    Turning to Paragraph 80.
15         A    Okay.                                      5:07PM
16         Q    In the last sentence you say, "Moreover,
17    Dr. Jørgensen did not examine the effect of Internet
18    Archive's conduct on any other plaintiff besides
19    Hachette."
20              Do you see that?                           5:07PM
21         A    I do.
22         Q    Do you know why Dr. Jørgensen did not
23    examine the effect on Internet Archive's conduct on
24    any other plaintiff besides Hachette?
25         A    I believe he, in his rebuttal report, may   5:07PM
```

Page 218

```
 1    can identify that would address this criticism?        5:28PM

 2           MS. STEINMAN:  Objection.

 3           THE WITNESS:  I would have to think about

 4    it.  I mean, there are methods that people have

 5    employed to try and assess and account for the size    5:28PM

 6    of the bias.

 7           You know, one could try to get relevant

 8    sales data directly so you don't have the

 9    measurement error issue.  Those are a couple of

10    things to think about, but I haven't fully thought      5:28PM

11    through all the possibilities here.

12    BY MR. GRATZ:

13       Q    Turning to Paragraph 93, I want to ask

14    about the second-to-last sentence here.

15           But let me know when you're ready to            5:29PM

16    answer questions about that sentence.

17       A    Okay.

18       Q    It says, "If it were the case that the 127

19    works in suit were scanned by Internet Archive at a

20    time when they were experiencing increased demand,      5:29PM

21    on average, Dr. Reimers percent failed to control

22    for the possibility that sales would have been even

23    higher in the absence of Internet Archive's

24    conduct."

25           Do you see that?                                 5:29PM
```

                                            Page 225

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1           I, LYNNE M. LEDANOIS, a Certified
 2    Shorthand Reporter of the State of California, do
 3    hereby certify:
 4           That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that a record of the proceedings was made by me
 7    using machine shorthand which was thereafter
 8    transcribed under my direction; that the foregoing
 9    transcript is a true record of the testimony given.
10           Further, that if the foregoing pertains to
11    the original transcript of a deposition in a Federal
12    Case, before completion of the proceedings, review
13    of the transcript [] was [X] wasn't requested.
14           I further certify I am neither financially
15    interested in the action nor a relative or employee
16    of any attorney or party to this action.
17           IN WITNESS WHEREOF, I have this date
18    subscribed my name.
19
20
21    Dated: June 13, 2022
22
23
24                           Lynne Marie Ledanois
                             LYNNE MARIE LEDANOIS
25                           CSR No. 6811


                                         Page 268
```

A-6273