# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## JOINT APPENDIX (PUBLIC) – VOLUME 26 OF 26 (A-6274-A-6461)

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
DIANA L. KIM
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20037
Telephone: (202) 887-6940
JPalmore@mofo.com

*Counsel for Defendant-Appellant Internet Archive*
*Additional Counsel Listed on Inside Cover*

DECEMBER 15, 2023

MATTHEW JAN OPPENHEIM        ELIZABETH A. MCNAMARA
DANAE TINELLI                LINDA J. STEINMAN
SCOTT A. ZEBRAK              JOHN M. BROWNING
OPPENHEIM + ZEBRAK, LLP      JESSE M. FEITEL
4530 Wisconsin Avenue, NW,   CARL MAZUREK
5th Floor                    DAVIS WRIGHT TREMAINE LLP
Washington, DC 20016         1251 Avenue of the Americas, 21st Floor
                             New York, NY 10020

*Counsel for Plaintiffs-Appellees*

---

## Joint Appendix Table of Contents

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 1** | |
| 39 | 10/08/2020 | Stipulation And Protective Order | A-1 |
| 86 | 07/05/2022 | Sealing Order | A-16 |
| 114 | 07/11/2022 | Sealing Order | A-18 |
| | | District Court Docket Sheet | A-19 |
| 219 | 9/11/2023 | Notice Of Appeal | A-49 |
| 1 | 6/1/2020 | Complaint | A-105 |
| 33 | 07/28/2020 | Answer | A-158 |
| 47 | 08/09/2021 | Letter Motion For Local Rule 37.2 Conference | A-186 |
| 62 | 12/24/2021 | Transcript Of Proceedings – 12/2/21 Conference | A-189 |
| 68 | 01/14/2022 | Joint Letter/Status Report Re: Discovery Disputes | A-234 |
| | | Exhibit A – Current Scheduling Order | A-236 |
| | | Exhibit B – Proposed Scheduling Order | A-239 |
| 70 | 01/22/2022 | Revised Scheduling Order | A-242 |
| 87 | 07/07/2022 | Plaintiffs' Motion for Summary Judgment | A-244 |
| 89 | 07/07/2022 | Declaration Of Sandra Cisneros In Support Of Plaintiffs' Motion for Summary Judgment | A-247 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 2** | |
| 90 | 07/07/2022 | Declaration Of Ian Foster In Support Of Plaintiffs' Motion for Summary Judgment | A-254 |
| | | Appendix A – Ian Foster's Curriculum Vitae | A-301 |
| | | [FUS] Exhibit 1 – Numbered List Of 127 Works In Suit | A-347 |
| | | [FUS] Exhibit 2 – Loans For Each Scan That Matches Works In Suit | A-359 |
| | | [FUS] Exhibit 3 – Total Loans For Works In Suit | A-370 |
| | | [FUS] Exhibit 4 – List Of De-Duplicated ISBNs That Match Works In Suit | A-377 |
| | | [FUS] Exhibit 4A – Alternate Version of Exhibit 4 | A-387 |
| | | [FUS] Exhibit 5 – Number Of De-Duplicated ISBNs/Additions To Maximum Eligible Concurrent Loans For Each Work In Suit | A-397 |
| | | [FUS] Exhibit 5A – Alternative Version Of Exhibit 5 | A-404 |
| | | [FUS] Exhibit 6 – Works In Suit Data | A-411 |
| 91 | 07/07/2022 | Declaration Of Tracy Offner In Support Of Plaintiffs' Motion for Summary Judgment | A-421 |
| | | Exhibit A – List Of Internet Archive's URLs | A-448 |
| | | Exhibit B – Internet Archive's Webpages | A-452 |
| | | Exhibit C – Open Library Webpages | A-457 |
| | | Exhibit D – Open Library Webpages | A-461 |
| | | Exhibit E – Open Library Webpages | A-463 |
| | | Exhibit F – Open Library Webpages | A-469 |
| | | Exhibit G – Open Library Webpages | A-471 |
| | | Exhibit H – Open Library Webpages | A-473 |
| | | Exhibit I – Open Library Webpages | A-475 |
| | | Exhibit J – Open Library Webpages | A-477 |
| | | Exhibit K – Open Library Webpages | A-479 |
| 92 | 07/07/2022 | Declaration Of Ben Sevier In Support Of Plaintiffs' Motion for Summary Judgment | A-481 |
| | | [FUS*] Exhibit 1 – Hachette Business Data | A-514 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit 2 – Hachette Backlist Ebook Data | A-515 |
| | | [FUS*] Exhibit 3 – Hachette Sales Data For All Of The Works In Suit | A-516 |
| | | **Vol. 3** | |
| | | [FUS] Exhibit 4 – Hachette Overdrive Data | A-517 |
| | | [FUS] Exhibit 5 – Hachette 2016 Digital Library Terms | A-562 |
| | | [FUS] Exhibit 6 – Hachette's Current Digital Library Terms | A-570 |
| | | [FUS*] Exhibit 7 – Hachette List Of Aggregators | A-577 |
| | | [FUS] Exhibit 8 – Excerpts From Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-578 |
| | | Exhibit 9 – Hachette Takedown Notice | A-580 |
| 93 | 07/07/2022 | Declaration Of Alan Pavese In Support Of Plaintiffs' Motion for Summary Judgment | A-589 |
| | | Exhibit 1 – Wiley Takedown Notice | A-602 |
| | | [FUS*] Exhibit 2 – Wiley Spreadsheet On Trade Books | A-612 |
| | | [FUS*] Exhibit 3 – Wiley's Sales Records For Works In Suit | A-613 |
| | | [FUS] Exhibit 4 – Wiley's Ebook Distribution Agreement With Proquest | A-614 |
| | | [FUS] Exhibit 5 – Wiley's Ebook Agreement With Overdrive | A-631 |
| | | [FUS*] Exhibit 6 – Wiley Spreadsheet Of Key Aggregator Partners | A-634 |
| | | [FUS*] Exhibit 7 – Wiley Spreadsheet | A-635 |
| 94 | 07/07/2022 | Declaration Of Chantal Restivo-Alessi In Support Of Plaintiffs' Motion for Summary Judgment | A-636 |
| | | [FUS*] Exhibit 1 – HarperCollins Ebooks Licenses Spreadsheet | A-667 |
| | | [FUS*] Exhibit 2 – HarperCollins Spreadsheet On U.S. Sales For Works In Suit | A-668 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 3 – Amazon Kindle Store Terms Of Use | A-669 |
| | | [FUS] Exhibit 4 – HarperCollins And Overdrive Agreement | A-674 |
| | | [FUS*] Exhibit 5 – Spreadsheet On 26-Circ Model | A-699 |
| | | [FUS*] Exhibit 6 – HarperCollins Sales To Libraries In All Formats For Works In Suit (2017-2020) | A-700 |
| | | Exhibit 7 – Excerpts From Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-701 |
| | | Exhibit 8 – Open Libraries Agreement | A-705 |
| | | Exhibit 9 – Internet Archive's Presentation At Library Leaders Forum | A-709 |
| | | Exhibit 10 – Internet Archive's Presentation On "Maximizing Institutional Investment In Print Resources Through Controlled Digital Lending" | A-720 |
| | | Exhibit 11 – Internet Archive's And HarperCollins Correspondence | A-738 |
| 95 | 07/07/2022 | [Redacted] Declaration Of Jeffrey Weber In Support Of Plaintiffs' Motion for Summary Judgment | A-744 |
| | | [FUS*] Exhibit 1 – Penguin Random House Ebook Data | A-784 |
| | | [FUS*] Exhibit 2 – Penguin Random House Ebook Data | A-785 |
| | | Exhibit 3 – American Library Association Article, "National Survey Finds Libraries Play Expanded Role in Digital Equity, Bridging Gaps In Access To Technology" (Aug. 31, 2021) | A-786 |
| | | **Vol. 4** | |
| | | Exhibit 4 – Overdrive Press Release (Jan. 7, 2021) | A-788 |
| | | Exhibit 5 – Emails Between Penguin Random House And Internet Archive' | A-792 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 6 – Emails Between Penguin Random House And Internet Archive | A-795 |
| | | Exhibit 7 – Open Libraries Web Page | A-798 |
| | | Exhibit 8 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-802 |
| | | Exhibit 9 – Internet Archive Blog Post, "Temporary National Emergency Library to close 2 weeks early, returning to traditional controlled digital lending" (June 10, 2020) | A-811 |
| | | [FUS] Exhibit 10 – Exhibit 12 To Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-817 |
| | | [FUS] Exhibit 11 – Excerpts From Expert Report of Rasmus Jorgensen (Feb. 25, 2022) | A-819 |
| | | [FUS*] Exhibit 12 – Penguin Random House Sales Records Of Works In Suit | A-821 |
| | | Exhibit 13 – Internet Archive's Library Leaders Forum Presentation | A-822 |
| | | [FUS*] Exhibit 14 – Penguin Random House Annual Investment Spreadsheet | A-1004 |
| | | Exhibit 15 – Amazon Kindle Store Terms Of Use | A-1005 |
| | | Exhibit 16 – Public Libraries Data Spreadsheet | A-1009 |
| | | Exhibit 17 – Article, "Libraries Without Walls For Books Without Pages" By John A. Browning (1993) | A-1022 |
| | | [FUS] Exhibit 18 – Penguin Random House Jan. 1, 2016 Terms Of Sale | A-1029 |
| | | [FUS] Exhibit 19 – Penguin Random House Terms Of Buyback Program | A-1032 |
| | | [FUS*] Exhibit 20 – Penguin Random House Ebook Data | A-1035 |
| | | [FUS] Exhibit 21 – Penguin Random House Oct. 1, 2018 Public Library Terms | A-1036 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit 22 – Penguin Random House Oct. 1, 2018 Academic Library Terms | A-1039 |
| | | [FUS] Exhibit 23 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Feb. 2, 2020) | A-1042 |
| | | [FUS] Exhibit 24 – Penguin Random House Ebook Terms For Classroom Distribution Channel (Jan. 10, 2021) | A-1045 |
| | | [FUS] Exhibit 25 – Penguin Random House Covid-19 Model Terms | A-1048 |
| | | **Vol. 5** | |
| | | Exhibit 26 – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-1050 |
| 96 | 07/07/2022 | [Redacted] Declaration Of Elizabeth A. McNamara In Support Of Plaintiffs' Motion for Summary Judgment | A-1075 |
| | | Exhibit 1 – Complaint | A-1143 |
| | | Exhibit 2 – Answer | A-1201 |
| | | Exhibit 3 – Internet Archive's Webpage | A-1230 |
| | | Exhibit 4 – Declaration Of Brenton Cheng | A-1236 |
| | | Exhibit 5 – Excerpts From Deposition Of Brewster Kahle (Dec. 9, 2021) | A-1240 |
| | | Exhibit 6 – Internet Archive's Webpage | A-1283 |
| | | **Vol. 6** | |
| | | Exhibit 7 – Excerpts From Deposition Of Chris Freeland (Dec. 17, 2021) | A-1287 |
| | | Exhibit 8 – Email From Chris Freeland | A-1347 |
| | | Exhibit 9 – Internet Archive Blog Post, "Libraries lend books, and must continue to lend books: Internet Archive responds to publishers' lawsuit" (July 29, 2020) | A-1351 |
| | | Exhibit 10 – Internet Archive Presentation On "Lending & Book Reader" | A-1354 |
| | | Exhibit 11 – Excerpts From Deposition Of Imke C. Reimers (June 3, 2022) | A-1368 |
| | | Exhibit 12 – Open Library Webpage | A-1373 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 13 – Excerpts From Deposition Of Laura Gibbs (Mar. 24, 2022) | A-1376 |
| | | Exhibit 14 – Internet Archive Communications | A-1386 |
| | | Exhibit 15 – Internet Archive's Webpage | A-1395 |
| | | Exhibit 16 – Internet Archive's Webpage | A-1402 |
| | | Exhibit 17 – Exhibit A To Complaint | A-1405 |
| | | Exhibit 18 – Stipulation Regarding Undisputed Facts (June 10, 2022) | A-1409 |
| | | Exhibit 19 – Excerpts From Deposition Of Susan Hildreth (May 17, 2022) | A-1415 |
| | | Exhibit 20 – Excerpts From Deposition Of Steve Potash (Jan. 31, 2022) | A-1425 |
| | | Exhibit 21A – Press Releases | A-1436 |
| | | [FUS*] Exhibit 21B – Overdrive Data | A-1443 |
| | | [FUS*] Exhibit 22 – Overdrive Data | A-1444 |
| | | Exhibit 23 – Institute Of Museum And Library Studies Data Spreadsheet | A-1445 |
| | | Exhibit 24 – Excerpts From Deposition Of Brenton Cheng (Dec. 3, 2011) | A-1448 |
| | | Exhibit 25 – Internet Archive's Objections & Responses To Plaintiffs' First Set Of Requests For Admission | A-1453 |
| | | Exhibit 26 –Expert Report Of Susan Hildreth (Feb. 25, 2022) | A-1468 |
| | Vol. 7 | | |
| | | Exhibit 27 – Internet Archive's "Everyone Deserves To Learn" Document | A-1527 |
| | | Exhibit 28 – Email Between Mark Stein And Jeff Kaplan | A-1709 |
| | | Exhibit 29 – Email Between Brewster Kahle And Elliot Wrenn | A-1712 |
| | | Exhibit 30 – Email From Wiley To Internet Archive | A-1717 |
| | | Exhibit 31 – Open Library Webpage | A-1720 |
| | | Exhibit 32 – Emails Between Penguin Random House And Internet Archive | A-1724 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 33 – Email From Penguin Random House | A-1735 |
| | | [FUS*] Exhibit 34 – Penguin Random House Spreadsheet | A-1738 |
| | | Exhibit 35 – Email From HarperCollins To Internet Archive | A-1739 |
| | | Exhibit 36 – Takedown Notices | A-1745 |
| | | Exhibit 37 – Author Correspondence To Internet Archive | A-1783 |
| | | **Vol. 8** | |
| | | Exhibit 38 – Author Correspondence To Internet Archive | A-1790 |
| | | Exhibit 39 – Author Correspondence To Internet Archive | A-1815 |
| | | Exhibit 40 – Email From Zane Kesey To Chris Butler | A-1819 |
| | | Exhibit 41 – Open Library Author Page For Ken Kesey | A-1825 |
| | | Exhibit 42 – Author Correspondence To Internet Archive | A-1829 |
| | | Exhibit 43 – Open Library Webpage | A-1832 |
| | | Exhibit 44 – 990-PF Return Of The Kahle/Austin Foundation (2019) | A-1836 |
| | | Exhibit 45 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-1867 |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 1-5) | A-1913 |
| | | **Vol. 9** | |
| | | Exhibit 46 – Internet Archive's Open Libraries Proposal To The MacArthur Foundation (Part 6-8) | A-2062 |
| | | Exhibit 47 – Internet Archive's Webpage | A-2157 |
| | | Exhibit 48 – Scientific American Article, "Archiving the Internet" by Brewster Kahle (1997) | A-2160 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 49 – Brewster Kahle "Universal Access To Knowledge" Speech (2006) | A-2165 |
| | | Exhibit 50 – CNET Article, "Grant Funds Open-Source Challenge To Google Library" (Dec. 20, 2006) | A-2175 |
| | | Exhibit 51 – New York Times Article, "Libraries Shun Deals To Place Books On Web" by Katie Hafner (2007) | A-2190 |
| | | Exhibit 52 – Internet Archive Blog Post, "Internet Archive And Library Partners Develop Joint Collection Of 80,000+ Ebooks To Extend Traditional In-Library Lending Model" (Feb. 22, 2011) | A-2195 |
| | | Exhibit 53 – Internet Archive's Notes About Book Collections And Availability | A-2201 |
| | | Exhibit 54 – Internet Archive Blog Post, "Let's Build A Great Digital Library Together…Starting With A Wishlist" (Mar. 14, 2018) | A-2205 |
| | | Exhibit 55 – Internet Archive Blog Post, "Internet Archive's Modern Book Collection Now Tops 2 Million Volumes" (Feb. 3, 2021) | A-2209 |
| | | Exhibit 56 – The Guardian Article, "Internet Archive Founder Turns To New Information Storage Device – The Book," (Aug. 1, 2011) | A-2218 |
| | | Exhibit 57 – Internet Archive's Webpage | A-2223 |
| | | Exhibit 58 – Excerpts From Deposition Of Andrea Mills (Oct.14, 2021) | A-2227 |
| | | [FUS] Exhibit 59 – Internet Archive Digital Library Grant Application | A-2242 |
| | | [FUS*] Exhibit 60 – Internet Archive's Profit And Loss Statement For 2011-2020 | A-2246 |
| | | Exhibit 61 – Internet Archive's Flyer | A-2247 |
| | | Exhibit 62 – Internet Archive's Scanning Agreement With Providence Public Library | A-2249 |
| | | Exhibit 63 – Internet Archive's Webpage | A-2255 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 64 – Internet Archive Blog Post, "Most 20th Century Books Unavailable To Internet Users – We Can Fix That" (July 1, 2019) | A-2260 |
| | | Exhibit 65 – Internet Archive's Webpage | A-2270 |
| | | Exhibit 66 – Email From Brewster Kahle To Amy Brand | A-2274 |
| | | Exhibit 67 – CNBC Article, "Plagiarism Is Rampant In China, And Its Media Companies Are Raking In Billions" (Jan. 23, 2018) | A-2278 |
| | | Exhibit 68 – Internet Archive Blog Post, "Internet Archive and Library Partners Develop Joint Collection of 80,000. EBooks To Extend Traditional In-Library Lending Model" (Oct. 20, 2020) | A-2286 |
| | | Exhibit 69 – Internet Archive's Webpage | A-2292 |
| | | Exhibit 70 – Internet Archive Blog Post, "Calculating the True Value of A Library that is Free" (Oct. 22, 2019) | A-2298 |
| | | Exhibit 71 – Internet Archive Blog Post, "Pineapple Fund Gifts $1M in Bitcoin to the Internet Archive!" (Dec. 26, 2017) | A-2303 |
| | | Exhibit 72 – Internet Archive Presentation On "How Controlled Digital Lending Works for Libraries" | A-2308 |
| | | **Vol. 10** | |
| | | Exhibit 73 – Internet Archive Presentation On Lending And Digitization Programs | A-2333 |
| | | Exhibit 74 – Open Library Of Richmond Inc. 990 Return (2019) | A-2366 |
| | | Exhibit 75 – Internet Archive's 990 Return (2016) | A-2414 |
| | | Exhibit 76 – Better World Books Webpage | A-2432 |
| | | [FUS] Exhibit 77 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-2435 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 78 – Better World Books Webpage | A-2464 |
| | | [FUS] Exhibit 79 – Draft Memorandum Of Understanding | A-2468 |
| | | Exhibit 80 – Email From Brewster Kahle To Better World Books Director | A-2471 |
| | | Exhibit 81 – Emails Between Chris Freeland And Better World Books Project Manager | A-2473 |
| | | [FUS] Exhibit 82 – Internet Archive Shared Document | A-2477 |
| | | [FUS] Exhibit 83 – Emails Between Brewster Kahle And Xavier Helgesen | A-2480 |
| | | Exhibit 84 – Emails From Brewster Kahle | A-2482 |
| | | Exhibit 85 – Email From Brewster Kahle | A-2488 |
| | | [FUS] Exhibit 86 – Better World Books Financial Agreement | A-2491 |
| | | [FUS] Exhibit 87 – Donation Agreement Between Better World Books And Open Library of Richmond (July 10, 2019) | A-2494 |
| | | Exhibit 88 – Better World Libraries' 990 Return (2019) | A-2497 |
| | | Exhibit 89 – Internet Archive Blog Post, "For the Love of Literacy–Better World Books and the Internet Archive Unite to Preserve Millions of Books" (Nov. 6, 2019) | A-2524 |
| | | [FUS] Exhibit 90 – Better World Books Presentation | A-2533 |
| | | Exhibit 91 – Better World Books Webpage | A-2539 |
| | | Exhibit 92 – Better World Books Preview Page | A-2541 |
| | | Exhibit 93 – Internet Archive Links To Better World Books Webpage | A-2543 |
| | | Exhibit 94 – Better World Books Wikipedia Page | A-2555 |
| | | [FUS] Exhibit 95 – Better World Books Internal Metrics | A-2558 |

11

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 96 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (Feb. 22, 2011) | A-2567 |
| | | Exhibit 97 – Emails Between Chris Butler And Zane Kesey | A-2573 |
| | | Exhibit 98 – Email From Chris Butler To James D. Jenkins | A-2579 |
| | | Exhibit 99 – Email From Library Of Michigan Librarian | A-2585 |
| | | Exhibit 100 – Internet Archive Blog Post, "Wasted: A case study for controlled digital lending" (Nov. 13, 2018) | A-2588 |
| | | Exhibit 101 – Brewster Kahle Statement | A-2594 |
| | | **Vol. 11** | |
| | | Exhibit 102 – Open Library Webpage | A-2605 |
| | | Exhibit 103 – Open Libraries Form Agreement | A-2607 |
| | | Exhibit 104 – Email From Chris Freeland To Librarian At Arizona State University | A-2612 |
| | | Exhibit 105 – Email From Chris Freeland To The Associate Dean Of University Of Oklahoma Libraries | A-2615 |
| | | Exhibit 106 – Email From Jeff Sharpe To Karl Stutzman Of Anabaptist Mennonite Biblical Seminary | A-2621 |
| | | Exhibit 107 – Internet Archive Presentation On "Open Libraries Introduction & Internet Archive Programs" | A-2628 |
| | | Exhibit 108 – Internet Archive's Presentation On "Addressing The 20th Century Gap: Controlled Digital Lending For In-Copyright Material" | A-2656 |
| | | Exhibit 109 – Internet Archive's Presentation On "Maximizing Institutional Investments In Print Resources Through Controlled Digital Lending" | A-2678 |
| | | Exhibit 110 – Email From Lauri McIntosh | A-2696 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 111 – Email From Lauri McIntosh | A-2704 |
| | | Exhibit 112 – Email From Chris Freeland | A-2721 |
| | | Exhibit 113 – Internet Archive Presentation On "Implementation & Integration" | A-2729 |
| | | Exhibit 114 – Defendant Internet Archive's Objections And Responses To Plaintiffs' Second Set Of Interrogatories | A-2732 |
| | | Exhibit 115 – Internet Archive Presentation on "Library Leaders Forum 2020 Partner Summit" | A-2744 |
| | | Exhibit 116 – Screen Captures Of Georgetown Law Library Catalog | A-2762 |
| | | Exhibit 117 – Screen Captures Of Dartmouth College Library Catalog | A-2765 |
| | | Exhibit 118 – Public Library Screen Captures | A-2769 |
| | | **Vol. 12** | |
| | | Exhibit 119 – U.S. Copyright Office, "Orphan Works And Mass Digitization: A Report Of The Register Of Copyrights 101" (2015) | A-2775 |
| | | **Vol. 13** | |
| | | Exhibit 120 – Judiciary Committee Of The House Of Representatives Hearing Transcript | A-3010 |
| | | Exhibit 121 – Excerpts From Deposition Of Lila Bailey (Oct.18 and 19, 2021) | A-3199 |
| | | Exhibit 122 – Internet Archive Blog Post, "Michelle Wu Receives Internet Archive Hero Award for Establishing the Legal Basis for Controlled Digital Lending" (Oct. 20, 2020) | A-3228 |
| | | Exhibit 123 – White Paper On Controlled Digital Lending By Courtney And Hansen | A-3233 |
| | | Exhibit 124 – Email From Kyle Courtney | A-3276 |
| | | Exhibit 125 – Email From Lila Bailey | A-3278 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | **Vol. 14** | |
| | | Exhibit 126 – Email From Lila Bailey | A-3283 |
| | | Exhibit 127 – Email From Chris Freeland | A-3295 |
| | | Exhibit 128 – Email From Lila Bailey | A-3297 |
| | | Exhibit 129 – Email From Wendy Hanamura | A-3304 |
| | | Exhibit 130 – Internet Archive Post, "Implementation & Integration: CDL For All Libraries" (July 14, 2021) | A-3307 |
| | | Exhibit 131 – Email From Peter Jaszi | A-3312 |
| | | Exhibit 132 – Email From Lila Bailey | A-3318 |
| | | Exhibit 133 – Bailey, Courtney, Hansen, Minow, Shultz And Wu Statement (Sept. 2018) | A-3323 |
| | | Exhibit 134 – AAP "Statement On Flawed Theory Of 'Controlled Digital Lending'" | A-3332 |
| | | Exhibit 135 – Author's Guild's Statement On "Controlled Digital Lending Is Neither Controlled Not Legal" | A-3336 |
| | | Exhibit 136 – Emails From Chris Freeland To Boston Public Library Librarian Tom Blake | A-3339 |
| | | Exhibit 137 – Internet Archive's Amicus Brief In *ReDigi* | A-3347 |
| | | Exhibit 138 – Article, "The Implications Of The ReDigi Decision For Libraries" | A-3377 |
| | | Exhibit 139 – Internet Archive Blog Post, "Internet Archive Responds: Why We Released The National Emergency Library" (Mar. 30, 2020) | A-3383 |
| | | Exhibit 140 – Signatories To Position Statement On Controlled Digital Lending By Libraries | A-3390 |
| | | Exhibit 141 – Emails From Amy Brand | A-3394 |
| | | Exhibit 142 – Email From Hansen To Bailey, Wu, Minow, Courtney And Schultz | A-3396 |
| | | Exhibit 143 – Email From Chris Freeland To Janet Snowhill | A-3399 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 144 – Email From Chris Freeland To Kristy Draper | A-3407 |
| | | Exhibit 145 – Internet Archive's Event Description (Feb. 2019) | A-3409 |
| | | Exhibit 146 – Blog Post Titled "Mythbusting Controlled Digital Lending: Community Rallies To Fight Misinformation About The Library Practice" (Feb. 11, 2019) | A-3414 |
| | | Exhibit 147 – Email From Chris Freeland To Duke University Librarian | A-3417 |
| | | Exhibit 148 – Emails Between Chris Freeland And Kevin French | A-3420 |
| | | Exhibit 149 – Not Filed | |
| | | Exhibit 150 – Internet Archive Blog Post, "How Internet Archive and controlled digital lending can help course reserves this fall" (July 30, 2020) | A-3424 |
| | | Exhibit 151 – Emails Between Chris Freeland And Michael Weiss | A-3429 |
| | | Exhibit 152 – Emails Between Chris Freeland And Wendy Knapp | A-3434 |
| | | Exhibit 153 – Open Libraries Form | A-3437 |
| | | Exhibit 154 – Open Library Webpage | A-3474 |
| | | Exhibit 155 – Email From Brewster Kahle To Carla Hayden | A-3478 |
| | | Exhibit 156 – Email From Michael "Mek" Karpeles To Brenton Cheng | A-3481 |
| | | Exhibit 157 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-3484 |
| | | [FUS*] Exhibit 158 – Spreadsheet Of Internet Archive's Publication Year Data | A-3491 |
| | | Exhibit 159 – Internet Archive's Pre-Motion Letter For Motion for Summary Judgment | A-3492 |
| | | [FUS*] Exhibit 160 – Exhibit 13 To Deposition Of Steve Potash | A-3496 |
| | | Exhibit 161 – Men's Health Article, "Darin Olin Is More Than Zac Efron's Travel | A-3497 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Partner In Netflix's Down To Earth" by Adrianna Friedman (Jul. 10, 2020) | |
| | | Exhibit 162 – Email From Brewster Kahle To Carla Hayden | A-3501 |
| | | Exhibit 163 – Overdrive Homepage For Detroit And Austin Public Libraries | A-3504 |
| | | Exhibit 164 – Document Titled "Open Library Design Ecosystem" | A-3515 |
| | | Exhibit 165 – Excerpts From Deposition Of Daniel Smith (Apr. 6, 2022) | A-3524 |
| | | Exhibit 166 – Institute Of Museum And Library Services Report, "The Use And Cost Of Public Library Materials" (2021) | A-3531 |
| | | Exhibit 167 – Rural Public Library Webpages | A-3541 |
| | | **Vol. 15** | |
| | | Exhibit 168 –Internet Archive Blog Post, "Announcing a National Emergency Library to Provide Digitized Books to Students and the Public" (Mar. 24, 2020) | A-3548 |
| | | Exhibit 169 – Screen Captures From The Open Library Stats Page | A-3559 |
| | | Exhibit 170 – Screen Captures From The Open Library Homepage | A-3569 |
| | | Exhibit 171 – Email From Lila Bailey | A-3577 |
| | | Exhibit 172 – Sen. Udall's Letter And Register Strong's Response | A-3581 |
| | | Exhibit 173 – Email From Alan Harvey | A-3606 |
| | | Exhibit 174 – Email From Director The Univ. Of Minnesota Press | A-3610 |
| | | Exhibit 175 – Email From Mary E. Rasenberger | A-3612 |
| | | Exhibit 176 – Emails From Penguin Random House | A-3616 |
| | | Exhibit 177 – Email From Brewster Kahle To Executive Director Of The Authors Alliance And Pamela Samuelson | A-3619 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 178 – Author's Alliance Webpage | A-3621 |
| | | Exhibit 179 – Email From Brianna Schofield To Bailey, Samuelson And Freeland | A-3625 |
| | | Exhibit 180 – Internet Archive Blog Post, "The National Emergency Library – Who Needs It? Who Reads It? Lessons From The First Two Weeks" (Apr. 14, 2020) | A-3628 |
| | | Exhibit 181 – Internet Archive Blog Post, "Temporary National Emergency Library To Close 2 Weeks Early, Returning To Traditional Controlled Digital Lending" (June 10, 2020) | A-3638 |
| | | Exhibit 182 – Email From Mike Furlough | A-3647 |
| | | Exhibit 183 – Email From Skip Dye | A-3651 |
| | | Exhibit 184 – HathiTrust's Emergency Temporary Access Service | A-3653 |
| | | Exhibit 185 – Google Search For "Toni Morrison Beloved Free Read" | A-3656 |
| 97 | 07/07/2022 | Defendant Internet Archive's Motion for Summary Judgment | A-3662 |
| 98 | 07/07/2022 | [Redacted] Defendant Internet Archive's Rule 56.1 Statement | A-3666 |
| 99 | 07/07/2022 | Plaintiffs' Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-3692 |
| 100 | 07/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-3741 |
| | | Exhibit A – Stipulation Of Undisputed Facts (June 10, 2022) | A-3752 |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 1- 53) | A-3758 |
| | | **Vol. 16** | |
| | | Exhibit B – Excerpts From Supplemental Expert Report Of Ian Foster (Mar. 31, 2022) (Pages 54 – 122) | A-3813 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS] Exhibit C – Excerpts From Corrected Transcript Of Deposition Of Steve Potash (Jan. 31, 2022) | A-4041 |
| | | [FUS] Exhibit D – HarperCollins Doc. No. HC0030132 | A-4056 |
| | | [FUS] Exhibit E – Penguin Random House Doc. No. PRH0072194 | A-4058 |
| | | [FUS] Exhibit F – Hachette Doc. No. Hachette0012377 | A-4061 |
| | | Exhibit G – International Federation of Library Associations and Institutions' Position Statement On Controlled Digital Lending (June 2, 2021) | A-4062 |
| | | Exhibit H – Public Library Association Post, "Public Libraries Respond To COVID-19: Survey Of Response & Activities" | A-4068 |
| | | Exhibit I – EducationWeek Article, "Map: Coronavirus And School Closures In 2019-2020" (Mar. 6, 2020) | A-4071 |
| | | **Vol. 17** | |
| | | Exhibit J – Excerpts From Deposition Of Adam Silverman (Dec. 6, 2021) | A-4077 |
| | | Exhibit K – New Yorker Article, "The National Emergency Library Is A Gift To Readers Everywhere" by Jill Lepore (Mar. 26, 2020) | A-4086 |
| | | Exhibit L – Public Libraries Survey From Institute Of Museum And Library Services | A-4090 |
| | | Exhibit M – WorldCat For "The Lion, The Witch, And The Wardrobe" | A-4096 |
| | | Exhibit N – Excerpts From Deposition Of Skip Dye (Nov. 18, 2021) | A-4102 |
| | | Exhibit O – Publisher Weekly Article, "Ranking America's Largest Publishers" by Jim Milliot (Feb. 24, 2017) | A-4116 |
| | | Exhibit P – Excerpts From Annual Report Of Bertelsmann (2018) | A-4120 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit Q – Excerpts From Annual Report Of Bertelsmann (2019) | A-4125 |
| | | Exhibit R – Excerpts From Annual Report Of Bertelsmann (2021) | A-4130 |
| | | Exhibit S – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2020) | A-4136 |
| | | Exhibit T – Excerpts From John Wiley & Sons, Inc.'s SEC Form 10-K (2021) | A-4142 |
| | | Exhibit U – Excerpts From Annual Report Of News Corp. (2019) | A-4146 |
| | | Exhibit V – Excerpts From Annual Report Of News Corp (2021) | A-4153 |
| | | Exhibit W – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2018) | A-4158 |
| | | Exhibit X – Excerpts From The English-Language Version Of Lagardère's Universal Registration Document With French Government (2020) | A-4161 |
| | | Exhibit Y – Excerpts From English-Language Version Of Lagardère's Universal Registration Document With French Government (2021) | A-4170 |
| | | Exhibit Z – Publisher Weekly Article, "A Year For The (Record) Books In Publishing" by Jim Milliot (Jan. 19, 2021) | A-4185 |
| | | Exhibit AA – Publisher Weekly Article, "America's Biggest Publishers Keep Posting Profits" by Jim Milliot (Apr. 1, 2022) | A-4189 |
| | | Exhibit BB – New York Times Article, "Surprise Ending For Publishers: In 2020, Business Was Good" by Elizabeth A. Harris (Dec. 29, 2020) | A-4193 |
| | | Exhibit CC – Excerpts From Deposition Of Josh Marwell (Dec. 3, 2021) | A-4198 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [FUS*] Exhibit DD – Overdrive Doc. No. Overdrive_Supp_002 | A-4204 |
| | | Exhibit EE – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-4205 |
| | | Exhibit FF – Excerpts From Deposition Of Alison Lazarus (Nov. 12, 2021) | A-4216 |
| | | Exhibit GG – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-4223 |
| | | Exhibit HH – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-4230 |
| | | Exhibit II – Excerpts From H.R. Report No. 94-1476 (Sept. 3, 1976) | A-4236 |
| | | [FUS*] Exhibit JJ – Hachette Doc. No. Hachette0002474 | A-4240 |
| | | [FUS*] Exhibit KK – Hachette Doc. No. Hachette0002475 | A-4241 |
| | | [FUS*] Exhibit LL – HarperCollins Doc. No. HC0010272 | A-4242 |
| | | [FUS*] Exhibit MM – Penguin Random House Doc. No. PRH0025907 | A-4243 |
| | | [FUS*] Exhibit NN – John Wiley & Sons Doc. No. Wiley0005650 | A-4244 |
| 101 | 07/07/2022 | Declaration Of Lauren Sherman In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4245 |
| 102 | 07/07/2022 | Declaration Of Ben Saracco In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4251 |
| 103 | 07/07/2022 | Declaration Of Laura Gibbs In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4258 |
| 104 | 07/07/2022 | Declaration Of Daniel Smith In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4265 |
| 105 | 07/07/2022 | Declaration Of Brewster Kahle In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4270 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 1 – Library Services And Technology Act Grant To Internet Archive (2007) | A-4281 |
| | | Exhibit 2 – Institute Of Museum And Library Services Grant To Internet Archive (2017) | A-4289 |
| | | Exhibit 3 – Internet Archive Blog Post, "In-Library eBook Lending Program Launched" (2011) | A-4291 |
| | | Exhibit 4 – Chief Officers Of State Library Agencies Endorsement (2011) | A-4299 |
| | | Exhibit 5 – White Paper On Controlled Digital Lending Of Library Books | A-4302 |
| **Vol. 18** | | | |
| | | Exhibit 6 – Position Statement On Controlled Digital Lending | A-4345 |
| | | Exhibit 7 – List Of Signatories On Position Statement On Controlled Digital Lending | A-4350 |
| | | Exhibit 8 –Internet Archive Blog Post, "Weaving Books Into The Web—Starting With Wikipedia" (Oct. 29, 2019) | A-4357 |
| | | Exhibit 9 – Wikipedia List (Pages 1-239) | A-4367 |
| **Vol. 19** | | | |
| | | Exhibit 9 – Wikipedia List (Pages 240-337) | A-4607 |
| | | Exhibit 10 – Internet Archive Blog Post, "What Happens When Everyone Who Experienced An Event Is Gone?" (Sept. 26, 2019) | A-4705 |
| | | Exhibit 11 – Internet Archive Blog Post, "As Calls To Ban Books Intensify, Digital Librarians Offer Perspective" (Nov. 24, 2021) | A-4713 |
| | | Exhibit 12– Internet Archive Blog Post, "Announcing A National Emergency Library | A-4728 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | To Provide Digitized Books To Students And The Public" (Mar. 24, 2020) | |
| | | Exhibit 13 – Brewster Kahle Statement On "Supporting Waitlist Suspension for Books Loaned by the Internet Archive During the US National Emergency" (Mar. 24, 2020) | A-4741 |
| | | Exhibit 14 – Internet Archive Blog Post, "Teachers & National Emergency Library: Stories From The Frontlines Of Online Schooling" (Apr. 13, 2020) | A-4746 |
| | | Exhibit 15 – Internet Archive Blog Post, "Impacts Of The Temporary National Emergency Library And Controlled Digital Lending" (June 11, 2020) | A-4755 |
| | | Exhibit 16 – Internet Archive Blog Post, "More Impacts Of The National Emergency Library" (June 22, 2020) | A-4763 |
| | | Exhibit 17 – Internet Archive Blog Post, "Even More Impacts Of The National Emergency Library And Controlled Digital Lending" (Aug. 10, 2020) | A-4770 |
| 106 | 07/07/2022 | [Redacted] Defendant Internet Archive's Memorandum of Law In Support Of Defendant's Motion for Summary Judgment | A-4774 |
| 108 | 07/07/2022 | Declaration Of Rasmus Jorgensen In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4819 |
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Rasmus Jorgensen (Feb. 25, 2022) | A-4822 |
| | | **Vol. 20** | |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Rasmus Jorgensen (May 27, 2022) | A-4871 |
| 109 | 07/07/2022 | Declaration Of Imke Reimers In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-4894 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | [Redacted] Exhibit 1 – Opening Expert Report Of Imke Reimers (Feb. 25, 2022) | A-4897 |
| | | [Redacted] Exhibit 2 – Rebuttal Expert Report Of Imke Reimers (May 27, 2022) | A-4945 |
| 110 | 07/07/2022 | Declaration Of Susan H. Hildreth In Support Of Defendant Internet Archive 's Motion for Summary Judgment | A-4967 |
| | | Exhibit 1 – Opening Expert Report Of Susan H. Hildreth (Feb. 25, 2022) | A-4970 |
| | | Exhibit 2 – Rebuttal Expert Report Of Susan H. Hildreth (May 27, 2022) | A-5022 |
| 113 | 07/08/2022 | [Redacted] Plaintiffs' Rule 56.1 Statement | A-5030 |
| **Vol. 21** | | | |
| 166 | 09/02/2022 | Declaration Of Elizabeth A. McNamara In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5141 |
| | | Exhibit 1 – Defendants' Response To Interrogatory No. 21 | A-5147 |
| | | Exhibit 2 – Excerpts From Deposition Of Chantal Restivo-Alessi (Dec. 1, 2021) | A-5156 |
| | | Exhibit 3 – Excerpts From Deposition Of Jeffrey Weber (Nov. 19, 2021) | A-5163 |
| | | Exhibit 4 – Excerpts From Deposition Of Alan Pavese (Dec. 10, 2021) | A-5178 |
| | | Exhibit 5 – Exhibit 4 To Deposition Of Imke Reimers | A-5188 |
| | | Exhibit 6 – Excerpts From Deposition Of Alison Lazarus (Nov. 13, 2021) | A-5226 |
| | | [FUS*] Exhibit 7 – Spreadsheet Of Overdrive Checkout And Revenue Data | A-5239 |
| | | Exhibit 8 – Letters On Pre-Motion Discovery Conference | A-5240 |
| | | [FUS*] Exhibit 9 – Internet Archive's Second Amended Privilege Log | A-5256 |
| | | Exhibit 10 – Excerpts From Deposition Of Lila Bailey (Oct. 18 And 19, 2021) | A-5257 |

23

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| | | Exhibit 11 – Internet Archive's Blog Post Titled "Internet Archive Launches New Pilot Program For Interlibrary Loan" (Apr. 27, 2021) | A-5261 |
| | | Exhibit 12 – Excerpts From Deposition Of Jacques Cressaty (Oct. 22, 2021) | A-5264 |
| | | Exhibit 13 – Overdrive Book Webpages | A-5273 |
| | | Exhibit 14 – Overdrive Book Webpages | A-5278 |
| | | Exhibit 15 – Excerpts From Deposition Of Benjamin Saracco (Mar. 15, 2022) | A-5283 |
| | | Exhibit 16 – Webpage Titled "Signatories To The Position Statement On Controlled Digital Lending By Libraries" (Sept. 2, 2022) | A-5292 |
| | | Exhibit 17 – Emails From HarperCollins | A-5304 |
| | | **Vol. 22** | |
| 167 | 09/02/2022 | [Redacted] Declaration Of Jeffrey T. Prince In Opposition To Defendant Internet Archive's Motion for Summary Judgment | A-5365 |
| | | [Redacted] Exhibit 1 – Expert Report Of Jeffrey Prince (May 25, 2022) | A-5414 |
| | | [Redacted] Exhibit 2 – Excerpts From Deposition Of Jeffrey Prince (June 9, 2022) | A-5523 |
| | | [Redacted] Exhibit 3 – Excerpts From Deposition Of Rasmus Jorgensen (June 8, 2022) | A-5547 |
| | | **Vol. 23** | |
| | | Exhibit 4 – Excerpts From Deposition Of Imke Reimers (June 8, 2022) | A-5612 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (June 8, 2022) | A-5720 |
| | | Exhibit 6 – Exhibit 3 To Deposition Of Imke Reimers | A-5745 |
| 168 | 09/02/2022 | [Redacted] Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-5777 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 169 | 09/02/2022 | [Redacted] Plaintiffs' Memorandum Of Law In Opposition To Defendant's Motion for Summary Judgment | A-5838 |
| 170 | 09/02/2022 | Declaration Of Joseph C. Gratz In Opposition To Plaintiffs' Motion for Summary Judgment | A-5879 |
| | | **Vol. 24** | |
| | | [FUS] Exhibit 1 – Exhibit 4 To Deposition Of Steve Potash (Jan. 31, 2022) | A-5883 |
| | | Exhibit 2 – Excerpts From Deposition Of Andrea Mills (Oct. 14, 2021) | A-5909 |
| | | Exhibit 3 – Excerpts From Deposition Of Ginger Patton-Schmitt (Dec. 6, 2021) | A-5918 |
| | | Exhibit 4 – Excerpts From Deposition Of Michael "Mek" Karpeles (Oct. 27, 2021) | A-5941 |
| | | Exhibit 5 – Excerpts From Deposition Of Susan Hildreth (May 17, 2021) | A-5949 |
| | | Exhibit 6 – Errata To Deposition Of Susan Hildreth | A-5960 |
| | | Exhibit 7 – Judgment From Court Of Justice Of The European Union In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5963 |
| | | Exhibit 8 – Opinion Of Advocate General In *Vereniging Openbare Bibliotheken V Stichting Leenrecht*, Case C-174/15 | A-5977 |
| 171 | 09/02/2022 | Declaration Of Brewster Kahle In Opposition To Plaintiffs' Motion for Summary Judgment | A-5997 |
| | | **Vol. 25** | |
| 172 | 09/02/2022 | [Redacted] Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6005 |
| 173 | 09/02/2022 | Defendant Internet Archive's Memorandum Of Law In Opposition to Plaintiffs' Motion For Summary Judgment | A-6173 |

| Dkt. No. | Date | Document | Appendix Page |
|---|---|---|---|
| 175 | 10/07/2022 | Defendant Internet Archive's Reply Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment | A-6214 |
| 176 | 10/07/2022 | Declaration Of Joseph C. Gratz In Support Of Defendant Internet Archive's Motion for Summary Judgment | A-6242 |
| | | Exhibit 1 – Excerpts From Deposition Of Jeffrey T. Prince (June 9, 2022) | A-6255 |
| | | **Vol. 26** | |
| | | Exhibit 2 – Excerpts From Deposition Of Rasmus Jørgensen (June 8, 2022) | A-6274 |
| 177 | 10/07/2022 | [Redacted] Defendant Internet Archive's Response to Plaintiffs' Counter Statement to Defendant's Rule 56.1 Statement | A-6279 |
| 178 | 10/07/2022 | [Redacted] Plaintiffs' Response To Defendant Internet Archive's Counter Statement to Plaintiffs' Rule 56.1 Statement | A-6367 |
| 179 | 10/07/2022 | [Redacted] Plaintiffs' Reply Memorandum Of Law In Support Of Plaintiffs' Motion for Summary Judgment | A-6381 |
| 189 | 03/28/2023 | Transcript Of Proceedings – 03/20/2023 Hearing | A-6407 |
| 216 | 08/11/2023 | Order | A-6458 |

*Submitted to the Court on flash drive

# EXHIBIT 2

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2

- - - - - - - - - - - - - x
3     HACHETTE BOOK GROUP      :
      INC., HARPERCOLLINS       :
4     PUBLISHERS LLC, JOHN      :
      WILEY & SONS INC.,        :
5     and PENGUIN RANDOM        :
      HOUSE LLC,                :
6                               :
         Plaintiffs,            :   Case No. 1:20-cv-04160
7                               :
      v.                        :
8                               :
      INTERNET ARCHIVE and      :
9     DOES 1 through 5,         :
      inclusive,                :
10                              :
         Defendants.            :
11 - - - - - - - - - - - - - x
12
13
14                      - - -
15              Wednesday, June 8, 2022
16                      - - -
17
18
19 Confidential remote videotaped deposition of RASMUS
20 JØRGENSEN, Ph.D., beginning at 10:08 a.m., before
21 Christina S. Hotsko, RPR, CRR, when were present on
22 behalf of the respective parties:

Page 104

1   that across many titles with many different

2   licensing arrangements, there would not be a

3   one-to-one relationship.

4   BY MS. STEINMAN:

5       Q.  And in your expert report you presented

6   no model to try to correlate, on the one hand,

7   OverDrive checkouts and, on the other hand,

8   revenues for library e-books, correct?

9       A.  Generally speaking, when economists

10  quantify or estimate models, they're trying to fit

11  the data.  And in a circumstance like this where

12  we've concluded that there are complicating

13  factors, it would be hard to pursue a model where

14  the data can't really inform that.

15      Q.  I agree with you.

16          So through no fault of your own, you have

17  not provided any empirical analysis of whether or

18  not the plaintiffs had declining library e-book

19  revenues after the National Emergency Library

20  ended and the works-in-suit were pulled, correct?

21          MR. GRATZ:  Objection.  Vague.

22          THE WITNESS:  It's my understanding that

Page 105

1   the data produced by OverDrive would not shed

2   light on that question, and, as such, I haven't

3   done that analysis.

4          MS. STEINMAN:  Let's introduce, Jesse,

5   Exhibit Number 8, please, the February 25, 2022,

6   expert report of Imke Reimers.

7          (Jørgensen Deposition Exhibit 8 marked

8           for identification and attached to the

9           transcript.)

10  BY MS. STEINMAN:

11         Q.  And when you get a chance, Dr. Jørgensen,

12  if you would look at paragraph 34 of Exhibit 8,

13  Imke Reimers' report.  So paragraph 34.

14         A.  Did you say Exhibit 8?

15         Q.  Yes.  This should be Exhibit 8, the

16  February 25, 2022, expert report of Dr. Reimers.

17  And we're looking at paragraph 34.

18         A.  I'm scrolling there.  Thank you.

19         MR. GRATZ:  While the witness is

20  scrolling, we've been going for about 90 minutes,

21  and I want to make sure that we don't go for too

22  much longer without a break, and maybe even a

Page 241

1              C E R T I F I C A T E

2          I do hereby certify that the aforesaid

3    testimony was taken before me, pursuant to notice, at

4    the time and place indicated; that said deponent was

5    by me duly sworn to tell the truth, the whole truth,

6    and nothing but the truth; that the testimony of said

7    witness was taken by me in stenotypy and thereafter

8    reduced to typewriting under my direction; that said

9    statement is a true record of the proceedings; that I

10   am neither counsel for, related to, nor employed by

11   any of the parties to the action in which this

12   statement was taken; and, further, that I am not a

13   relative or employee of any counsel or attorney

14   employed by the parties hereto, nor financially or

15   otherwise interested in the outcome of this action.

16

17

18

19

20

21

22              CHRISTINA S. HOTSKO, RPR, CRR

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., and PENGUIN RANDOM HOUSE LLC<br><br>               Plaintiffs,<br><br>   v.<br><br>INTERNET ARCHIVE and DOES 1 through 5, inclusive<br><br>               Defendants. | Case No. 1:20-CV-04160-JGK |

*REDACTED* **DEFENDANT INTERNET ARCHIVE'S REPLY TO PLAINTIFFS'**
**RESPONSE TO DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

DURIE TANGRI LLP
Joseph C. Gratz (*Pro Hac Vice*)
Jessica E. Lanier (*Pro Hac Vice*)
Aditya V. Kamdar (*Pro Hac Vice*)
Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

Attorneys for Defendant
INTERNET ARCHIVE

The below reply to Plaintiffs' response to the Internet Archive's Rule 56.1 Statement of Material Facts is made for purposes of the Internet Archive's Motion for Summary Judgment and reflects an effort to demonstrate where purported disputes of fact not actually in dispute.

1.  The Internet Archive is a 501(c)(3) public charity. Declaration of Joseph C. Gratz submitted herewith ("Gratz Decl.") Ex. A ¶1 (Stipulation of Undisputed Facts ("Stipulation")).

    **Plaintiffs' Response:** Undisputed.

    **Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

2.  The guiding mission of the Internet Archive is to provide universal access to all knowledge.  Declaration of Brewster Kahle submitted herewith ("Kahle Decl.") ¶4.

    **Plaintiffs' Response:** Undisputed.

    **Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

3.  In furtherance of that mission, over more than two decades, the Internet Archive has preserved, curated, and made available much of humanity's most important information. *Id.* ¶5.

    **Plaintiffs' Response:**  Undisputed that Internet Archive has distributed millions of copies of unauthorized ebooks and other works, but not material and vague as to the meaning of "preserved, curated, and made available much of humanity's most important information."

    **Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs appear not to dispute their own version of the asserted fact, which they do not support with any evidence in the record.  *See* Local Civil Rule 56.1(d).  Nor is Plaintiffs' statement that the asserted fact is "not material" and "vague" a denial of the asserted fact.

4.  The Internet Archive has become a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals. *Id.* ¶6.

**Plaintiffs' Response:** Undisputed that Internet Archive has millions of users and has partnered with certain institutions, but otherwise disputed. Lacks foundation because Internet Archive provides no evidence supporting the claim that it is "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals," whereas there is evidence to show that a relatively small proportion of libraries have endorsed or joined Internet Archive's in-copyright ebook lending initiatives – and doubts have been raised about their legality. *See* Rule 56.1 Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment, ECF 107 ("Pubs. SUMF") ¶¶77-109. Also this Statement is not material and is vague as to the meaning of "a trusted resource for millions of people and institutions and a model for other archives and libraries with similar goals."

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' claim that the asserted fact lacks foundation is incorrect, as it is supported by the Declaration of Brewster Kahle, the Chair and Digital Librarian who founded the Internet Archive over two decades ago, and his declaration lays a foundation for his personal knowledge of this and other assertions. *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4). Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

5.     One of the Internet Archive's first projects was to archive every public webpage on the fledgling World Wide Web. Today, over a quarter century of web history is preserved and accessible through the Internet Archive's Wayback Machine. The Wayback Machine has become a crucial database for journalists, researchers, lawyers, and courts. Kahle Decl. ¶ 7.

**Plaintiffs' Response:** Undisputed, but not material because the Wayback Machine is not at issue in this action.

3

A-6281

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

6.      The Internet Archive works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts.  Kahle Decl. ¶ 8.

**Plaintiffs' Response:**  Undisputed for the purpose of this motion only. Lacks foundation because Internet Archive provides no evidence supporting the claim that it "works with libraries, museums, universities, and the public to preserve and offer free online access to texts, audio, moving images, software, and other cultural artifacts."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact "[L]acks foundation because Internet Archive provides no evidence" in support is incorrect, as the asserted fact cites to the Declaration of Brewster Kahle in support, and his declaration lays a foundation for his personal knowledge of this and other assertions.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

7.      The Internet Archive has been a member of the American Library Association since 2000. The Internet Archive is also an affiliate member of the Boston Library Consortium, and participates in interlibrary loan via the OCLC and RapidILL interlibrary loan networks. Kahle Decl. ¶¶ 9.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete since Internet Archive's participation in the OCLC and Rapid ILL interlibrary loan networks is limited to scholarly monographs and/or periodicals. See Supplemental Declaration of Elizabeth A. McNamara dated September 2, 2022 ("Suppl. McN Decl."), Ex. 11.

4

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

8.      In December 2006, the State of California formally recognized the Internet Archive as a library, making it eligible to receive funding under the Library Services and Technology Act and qualifying it for E-Rate, a federal program that provides discounts to schools and libraries to ensure they are able to obtain affordable telecommunications services. Kahle Decl. ¶ 10.

**Plaintiffs' Response:**  Undisputed that the California State Librarian Susan Hildreth sent Internet Archive a letter in December 2006 referring to Internet Archive as a library eligible to receive LSTA funding and E-Rate funding, but not material since it long pre-dates IA's controlled digital lending program and vague as to the meaning of "the State of California formally recognized the Internet Archive as a library."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

9.      In mid-2007, the Internet Archive was awarded a Library Services and Technology Act grant for its Open Library project (openlibrary.org) – an effort to create a comprehensive library book catalog with a webpage for every book published.  Kahle Decl. ¶ 11.

**Plaintiffs' Response:**  Undisputed, but not material because the "Open Library project" referenced in this Statement was implemented specifically to build a "card catalog" of webpages for books, not for any activity related to controlled digital lending, and the funding expired before Internet Archive started scanning and distributing in-copyright books. Suppl. McN Decl.

5

Ex. 12 (Cressaty Tr. 214:16-219:14). A clarification is also required: the "Open Library project" referred to in the above Statement is different from the "Open Libraries" project that is at issue in this action (the "Open Libraries Project"), which was launched in or about 2018, without LSTA funding, "to increase lending counts" on Internet Archive's Website by "identify[ing] the overlap in [the library's] physical holdings with our digital holdings and provide free digital books to patrons where there are matches." Declaration of Elizabeth A. McNamara, ECF 96 ("McN Decl.") ¶¶67-68, 103.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

10. The Internet Archive has also received grant funding from the Institute of Museum and Library Services ("IMLS"), an independent federal agency whose mission is to support museums, libraries, and related organizations. For example, in 2017, the Internet Archive received a grant under the IMLS's Laura Bush 21st Century Library Program. In order to receive this grant, the Internet Archive had to qualify as a library or library-related organization. Kahle Decl. ¶ 12.

**Plaintiffs' Response:** Undisputed, but incomplete and not material because the IMLS funding cited above was awarded for purposes unrelated to the in-copyright book distribution scheme at issue in this action. Kahle Decl. ¶12, Ex. 2.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

6

11.     This lawsuit concerns the Internet Archive's implementation of Controlled Digital Lending ("CDL"), through which the Internet Archive digitizes its print books and lends them digitally to its patrons.  Complaint, ECF No. 1 ("Compl.").

**Plaintiffs' Response:**  Undisputed that this lawsuit involves IA's implementation of CDL, but incomplete because the lawsuit is not only limited to Internet Archive's lending of digital scans of "its print books" – *i.e.*, print books that Internet Archive owns and/or maintains possession of. Since the Internet Archive began directing its efforts towards the Open Libraries Project in 2018, it has become a central hub and libraries participating in the project – each known as a "Partner Library" – send their catalogues to Internet Archive for overlap analysis. McN. Decl. ¶¶67-68, 103. Internet Archive does not make new scans of books in Partner Library collections that it has already scanned (nor does it take possession of the matching print editions in the Partner Library's collections); rather, every time a book in the Partner Library's catalogue matches an ebook on the Website through the overlap analysis, Internet Archive increases by one the number of concurrent checkouts of that book permitted on the Website and lends its digital scan against physical copies that remain in the possession of the Partner Library (the "Open Libraries Process"). *Id*.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

12.     In 2011, in partnership with over two dozen library systems including the Boston Public Library, the Internet Archive made an initial collection of more than 80,000 books available for digital lending.  Kahle Decl. ¶ 13.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete since Internet Archive initially restricted its scanning of in-copyright works to out-of-print books and it loaned

7

books on an "in-library" basis in 2011 – meaning that the ebooks were accessible only to accredited users of a participating physical library's network – but subsequently abandoned these limitations.  McN Decl. ¶¶34-35, 63-64.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

13.     In November 2011, the Internet Archive's digital lending effort was unanimously endorsed by all fifty state libraries through the Chief Officers of State Library Agencies ("COSLA").  Kahle Decl.  ¶ 14.

**Plaintiffs' Response:**  Undisputed, but not material and incomplete since the "digital lending effort" referenced in this Statement, which was geographically limited and pre-dated widespread adoption of authorized library ebook lending, bears no resemblance to Internet Archive's current "digital lending effort," where Internet Archive now acts as a central hub and lends out digital copies based on the number of print copies in the possession of each of its "Partner Libraries" without ever taking possession of the matching print editions in each libraries' collection. McN Decl. ¶¶67-68, 103; Declaration of Jeffrey Weber, ECF 95 ("Weber Decl.") ¶10.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

14.     As of this filing, the Internet Archive contains more than three million books available for borrowing in its collection.  Kahle Decl.  ¶ 15.

**Plaintiffs' Response:** Undisputed.

8

A-6286

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

15.     The Internet Archive launched and expanded this program on the basis that it is fair use.  *Id.* ¶ 16.

**Plaintiffs' Response:**  Disputed but not admissible.  Whether the Internet Archive's activities constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded. *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).  And this Statement lacks foundation since Internet Archive withheld documents regarding advice concerning fair use of its practices based on privilege. Suppl. McN Decl. Ex. 9. Moreover, Kahle Decl. ¶¶16 and 17 cite only the *White Paper* and *Position Statement* concerning CDL, both published in 2018, as the basis for Kahle's purported good faith belief in IA's fair use defense. Kahle Decl. Exs. 5, 6. But IA's infringement of in-copyright books pre-dates 2018 and therefore IA did not "launch" its program in reliance on such publications. McN Decl. ¶¶62-64. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, it is disputed that Internet Archive "launched and expanded this program on the basis that it is fair use" since there is contrary evidence that Internet Archive knew or should have known that its conduct was not fair use.  McN Decl. ¶¶77-109.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' argument about the inappropriateness of whether the Internet Archive's lending program is or is not a fair use is a straw man.  The Internet Archive makes no such claim here; rather it asserts as a fact that the Internet Archive launched and expanded its lending program on the basis—the belief, as made clear in the following numbered paragraph—that it is a fair use.

9

The asserted fact does not lack foundation for the reasons stated in the Internet Archive's reply brief, section II.C.3.

Finally, Plaintiffs cite to statements in the McNamara Declaration that includes statements by those that disagree with the Internet Archive's fair use position, but do not support Plaintiffs' own assertion that the Internet Archive "knew or should have known that its conduct was not fair use"—as whether or not the lending program was fair use truly is a legal conclusion inappropriate for a Rule 56.1 response. *Julian v. MetLife, Inc.*, No. 17-CV-957 (AJN), 2021 WL 3887763, at *6 (S.D.N.Y. Aug. 31, 2021).

16.     In developing and maintaining this belief, the Internet Archive and its Digital Librarian, Brewster Kahle, relied on *A White Paper on Controlled Digital Lending of Library Books*, authored by Dave Hansen, then the Associate University Librarian and Lead Copyright & Information Policy Officer for Duke University, and Kyle Courtney, then a copyright advisor for Harvard University Library – each copyright scholars known to the Internet Archive to be respected in their fields. The White Paper concludes that "there are strong arguments supported by caselaw for why CDL, appropriately tailored to reflect physical market conditions, should be permissible under existing law under the doctrine of fair use." Kahle Decl. ¶ 16.

**Plaintiffs' Response:** Disputed but lacks foundation, states a legal conclusion and not admissible for the reasons set forth in Statement 16, which is incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The Internet Archive incorporates its reply to Plaintiffs' response to paragraph 15.

17.     The Internet Archive and Mr. Kahle also relied on the *Position Statement on Controlled Digital Lending*.  This document was co-authored by Mr. Courtney; Mr. Hansen; Mary Minow, then affiliated with the Berkman Klein Center for Internet and Society at Harvard

University; Jason Schultz, a Professor of Clinical Law at New York University School of Law; and Michelle Wu, then a law professor and librarian at the Georgetown Law Center. Lila Bailey, the Internet Archive's most senior lawyer, was also a co-author of this statement. The Internet Archive understood all co-authors of the *Position Statement* to be well-respected copyright scholars. Dozens of copyright law professors and scores of libraries and library associations became signatories to the statement, including the Association of Research Libraries, Boston Public Library, Los Angeles Public Library, the Metropolitan New York Library Council, and the Chief Officers of State Library Agencies, representing the state librarians of all fifty states. *Id.* ¶ 17.

> **Plaintiffs' Response:** Disputed but inadmissible. Lacks foundation since Brewster Kahle could not have relied on the *Position Statement* referenced above in developing and maintaining his belief that Internet Archive's scanning and distribution of in-copyright ebooks was fair use because Internet Archive engaged in those activities from at least 2011 – seven years before the *Position Statement* was published in 2018. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Also incomplete because the Statement omits that Michelle Wu had been engaged as an attorney for Internet Archive from 2017 until at least March of 2018 (McN Decl. ¶86) and because the Boston Public Library and Los Angeles Public Library no longer appear as signatories on the version of the *Position Statement* posted on line as of the date of this filing. Suppl. McN Decl. Ex. 16.

> **Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. The Internet Archive states that it and Mr. Kahle relied on the *White Paper* and the *Position Statement* "in developing and maintaining" its belief that its lending library was fair use.

11

Defendant's Rule 56.1 Statement of Material Facts ("DSMF") ¶ 16–17, ECF No. 98. It is perfectly possible to "develop" and "maintain" a belief regarding an act after first engaging in that act. As the Internet Archive states in its Statement of Material Facts (and as Mr. Kahle supports in his declaration, pursuant to Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4)), the Internet Archive launched and expanded its lending program on the basis that it was fair use, full stop. The Internet Archive and Mr. Kahle developed and maintained that belief by relying on the legal argument and analysis contained within the *White Paper* and the *Position Statement*. Plaintiffs' further statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

18.     The Internet Archive – or another 501(c)(3) public charity it works closely with, Open Library of Richmond – lawfully acquires print books by purchase or donation that it wishes to make available for digital lending. Kahle Decl. ¶ 18; Gratz Decl. Ex. A (Stipulation).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

19.     Open Library of Richmond holds legal title to and maintains physical possession of many of the print books in its physical archive facilities. Kahle Decl. ¶ 19.

**Plaintiffs' Response:** Undisputed, but vague as to the meaning of "many."

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

20.     The Internet Archive or Open Library of Richmond owns at least one lawfully made copy of each of the 127 Works in Suit ("Works in Suit"). Gratz Decl. Ex. A (Stipulation).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

12

21.     The Internet Archive sends print books to a scanning center, where an operator carefully turns and photographs each page using a book-digitization device the Internet Archive developed called a Scribe.  Gratz Decl. Ex. B ¶¶ 80–82 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "carefully turns."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

22.     The print book is then placed in archival storage, and its specific location is carefully tracked.  Gratz Decl. Ex. B ¶ 83 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "carefully tracked."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

23.     Print books stored in the physical archive facilities are non-circulating; it is not available to be accessed in its print form.  Kahle Decl. ¶ 20.

**Plaintiffs' Response:**  Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

24.     The digital images of the book are processed and formatted, and if the book meets certain criteria set by Internet Archive policies, it is then made available for digital lending to one registered patron at a time. Gratz Decl. Ex. B ¶¶ 80, 111–25 (Suppl. Expert Rpt. Of Ian Foster).

**Plaintiffs' Response:**  Undisputed, with the clarification that the only current "criteria set by Internet Archive policies" is that Internet Archive claims not to post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶ 35.

13

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

25.      Anyone can become a patron of the Internet Archive – and digitally borrow books

for free by signing up for an Internet Archive account. (Internet Archive has policies, not

relevant here, for terminating accounts.) Kahle Decl. ¶ 21; Gratz Decl. Ex. B ¶ 19 (Suppl. Expert

Rpt. of Ian Foster).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

26.      Doing so grants them a digital library card that lets them borrow up to ten books

at a time from the collection, for limited periods of up to fourteen days.  Kahle Decl. ¶ 22.

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because the fourteen

day loans can be renewed indefinitely depending upon demand for the title in question. This

Statement is also vague as to "digital library card."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' statement that the asserted fact is "incomplete," "misleading," and "vague" is not a

denial of the asserted fact.  Plaintiffs do not support their assertion with any evidence in the

record.  *See* Local Civil Rule 56.1(d).

27.      The Internet Archive offers its patrons several ways of engaging with a book they

have borrowed.  Gratz Decl. Ex. B ¶¶ 31, 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but vague as to the meaning of "several ways of

engaging."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

14

28.     The patron can read the book in their web browser through a tool called BookReader. *Id.* ¶ 31.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

29.     BookReader lets patrons flip through a book's pages, zoom in on a book's images, enlarge the book's text for easier reading, and search through the book.  Kahle Decl.

¶ 23.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

30.     When finished, the patron may return the book.  Gratz Decl. Ex. B ¶ 32 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

31.     Otherwise, the loan will automatically expire at the end of the loan period. At that point, the patron is no longer able to access the book, and it is once again available to be borrowed.  Kahle Decl. ¶ 24.

**Plaintiffs' Response:**  Undisputed, but incomplete and requiring clarification that users can renew their loans of books indefinitely subject to demand for the title from other users.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "requiring clarification" is not a denial of the asserted fact.

15

32.     Instead of reading books in their web browsers, patrons can choose to download an encrypted PDF or encrypted ePub version of the book onto their computer or device. Gratz Decl. Ex. B ¶¶ 35–36 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

33.     These files are secured using the same security system that Plaintiffs use to secure digital files of Plaintiffs' books: a type of "digital rights management" or "DRM" software created by Adobe. Gratz Decl. Ex. C, Deposition Transcript of Steve Potash ("Potash Dep. Tr.") 81:1–82:5.

**Plaintiffs' Response:**  Disputed.  In the deposition testimony cited above, Mr. Potash confirms that "one of [the]" methods of digital rights management software utilized by OverDrive is Adobe Digital Editions. Potash Dep. Tr. 81:1–82:5. But the deposition testimony does not confirm that each of the "Plaintiffs use" this same software. *Id.* Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs admit they lend books via OverDrive's technical systems (see, e.g., Plaintiffs' Statement of Material Facts ("PSMF") ¶ 161, ECF No. 107).  And as noted in the asserted fact, OverDrive's CEO testified that one of the methods of digital rights management ("DRM") OverDrive uses to lend Plaintiffs' books is Adobe Digital Editions.

34.     The Adobe DRM allows only the authorized patron to download and read the borrowed book using authorized software and prevents the patron from copying or further distributing the book or from accessing it after their loan has ended.  Kahle Decl. ¶ 25.

16

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

35.     The Internet Archive does not digitally loan all books it has scanned. Instead, it implements a number of policies that limit the books available for digital lending. *Id*. ¶ 26.

**Plaintiffs' Response:** Undisputed for the purposes of this motion only, subject to the clarification that the only current "polic[y]" is that Internet Archive claims to not post books published within the last five years, which is a non-binding policy that it intermittently violates. McN Decl. ¶ 35. The Statement is also vague and lacks foundation. No admissible evidence is cited to support the Statement the IA "implements a number of policies that limit the books available for digital lending. Accordingly, this proposed "fact" is not supported by citation to any admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' additional "clarification" and their statement that the asserted fact is "vague" is not a denial of the asserted fact. Plaintiffs' statement that the asserted fact "lacks foundation" and that "[n]o admissible evidence is cited" is incorrect, as the asserted fact cites to the Declaration of Brewster Kahle in support, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4), and in context the "number of policies" are outlined in the following paragraphs of the Internet Archive's 56.1 Statement.

36.     As applicable here, to be available for digital lending, a digital book must have been scanned from a print copy owned by the Internet Archive.  Kahle Decl.  ¶ 27.

**Plaintiffs' Response:** Disputed.  The Internet Archive makes ebooks available for digital lending based on print books that are owned by and in the physical possession of its Partner Libraries, not the Internet Archive. McN Decl. ¶¶ 67-68, 103. Since the Internet Archive

began directing its efforts towards the Open Libraries Project in 2018, the Internet Archive now acts as a central hub lending a single ebook scan against physical books owned by Partner Libraries via the Open Libraries Process. *Id.* Furthermore Open Libraries Director Chris Freeland acknowledged that the Website may contain books that were scanned from the collections of libraries like the Boston Public Library, and not Internet Archive's collection. *Id.* ¶43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs offer no evidence that any of the Works in Suit were not scanned from a print copy owned by the Internet Archive.  *See* Local Civil Rule 56.1(d).

37.     It is the Internet Archive's policy not to lend books published within the previous five years.  Gratz Decl. Ex. B ¶¶ 113, 123 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, with the clarification that the Internet Archive does not always comply with its voluntary and non-binding five year limitation. For example, two of the Works in Suit, *All the Presidents' Women* and *The Man Who Solved the Market*, were published in 2019 and republished on the Internet Archive's Website that same year.  McN Decl. ¶¶35, 115.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

38.     This limitation is intended to exclude from lending the latest bestsellers, as a belt-and-suspenders accommodation to publishers.  Kahle Decl. ¶ 28.

**Plaintiffs' Response:**  Undisputed, but not material and vague as to the meaning of "a belt-and-suspenders accommodation to publishers."

18

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

39. Dr. Imke Reimers analyzed revenue patterns of works on the USA Today Top 150 Bestsellers List. Declaration of Imke Reimers submitted herewith ("Reimers Decl.") Ex. 1 ¶¶ 9, 20–24 (Reimers Expert Rpt.).

**Plaintiffs' Response:** Undisputed that Dr. Reimers purported to analyze the USA Today Top 150 Bestseller List but disputed that these rankings are equivalent to revenue. Declaration of Jeffrey T. Prince dated September 2, 2022 ("Prince Decl."), ¶¶29, 60.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs do not dispute that Dr. Reimers analyzed the USA Today Top 150 Bestseller List. Plaintiffs' purportedly dispute that "these rankings are [not] equivalent to revenue" is not the asserted fact; rather, the asserted fact is that Dr. Reimers analyzed "revenue *patterns*." As Dr. Reimers explains in her reply report, unit sales and revenues are very closely related. Declaration of Imke Reimers ("Reimers Decl.") Ex. 2 ¶¶ 14–15, ECF No. 109-2 ("Reimers Reply Rpt.") (emphasis added).

40. Between 1994 and 2021, only 21% of the book appearances on the USA Today weekly bestseller list first appeared at least 52 weeks earlier. *Id.* ¶¶ 9, 21–24.

**Plaintiffs' Response:** Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF¶¶38-62.

19

A-6297

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

41.     Between 1994 and 2021, only 8% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than two years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF ¶¶ 38-62.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

42.     Between 1994 and 2021, only 2% of the book appearances on the USA Today weekly bestseller list first appeared on the list more than five years earlier.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Undisputed, but not material because the Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works. SUMF ¶¶ 38-62.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

20

43.     For titles that enter the Top 150 bestseller list, approximately 90% of sales occur in the first five years after publication.  Reimers Expert Rpt. ¶¶ 9, 21–24.

**Plaintiffs' Response:**  Disputed, but not material and misleading because this Statement suggests that the Publishers are only concerned with sales in the first five years after publication of a book and conflates unit sales and revenues.  The Publishers are heavily dependent on backlist sales, including revenue from the Works and other books published five or more years ago, as these sales generate vital royalties for authors, drive the Publishers' profits, and provide steady, relatively predictable income that supports the publication of new works.  SUMF¶¶38-62; *see also* Prince Decl. ¶81. This Statement is also misleading and lacks foundation because Dr. Reimers only purported to analyze bestseller list data going back to 1994 and her analysis thus does not have any relevance to book sales before that date. Expert Report of Imke Reimers, Ph.D., ECF 109-1 ("Reimers Report"), ¶ 9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs purport to dispute the asserted fact—that 90% of bestsellers' sales occur in the first five years after publication—but offer no evidence from the record to dispute that fact.  *See* Local Civil Rule 56.1(d).  Rather, Plaintiffs state that the asserted fact is "not material" and "misleading" for reasons irrelevant to the asserted fact, and thus do not deny the asserted fact. Finally, Plaintiffs' statement that the asserted fact "lacks foundation" is incorrect:  Dr. Reimers explains in her report that, because of her lack of "access to granular sales data for a large set of individual titles over a long period of time," she reached her conclusion by analyzing twenty-eight years of available data and comparing her findings with sales data produced by Plaintiffs. Reimers Decl. Ex. 1 ¶¶ 20–28, ECF No. 109-1 ("Reimers Expert Rpt.").

44.     Books published by HarperCollins that are less than a year old account for between 37% and 40% of all units sold between 2017 and 2019 and 34% in 2020. Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. D (HC0030132).

**Plaintiffs' Response:**  Disputed.  *See* Prince Decl. ¶81; Prince Decl. Ex. 1 ("Prince Report") ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute this fact.  Dr. Prince, in his expert report, accepts these calculations as correct (and uses them to support his own calculations).  Declaration of Jeffrey T. Prince ("Prince Decl.") Ex. 1 ¶ 111 n.288, ECF No. 167-01 ("Prince Report").  Plaintiffs' statement that the asserted fact is "misleading" and "not material" is not a denial of the asserted fact, nor are Plaintiffs' statements relevant to the asserted fact as explained in the Internet Archive's reply to Plaintiffs' Response to Paragraph 43.

45.     Books published by Penguin Random House that are less than a year old account for between 47% and 52% of all units sold between 2017 and 2019 and 43% in 2020. Reimers Decl. Ex. 1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. E (PRH0072194).

**Plaintiffs' Response:**  Disputed.  *See* Prince Decl. ¶81; Prince Report ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute this fact.  Dr. Prince, in his expert report, accepts these calculations as correct (and uses them to support his own calculations).  Prince Report ¶ 111 n.288.  Plaintiffs' statement that the asserted fact is "misleading" and "not material" is not a denial of the asserted fact, nor are Plaintiffs' statements

22

relevant to the asserted fact as explained in the Internet Archive's reply to Plaintiffs' Response to Paragraph 43.

46.    Books published by Hachette that are less than two years old account for between 70% and 73% of all units sold between 2017 and 2019 and 65% in 2020. Reimers Decl. Ex.1 ¶¶ 9, 21, 25 (Reimers Expert Rpt.); Gratz Decl. Ex. F (HACHETTE0012377).

**Plaintiffs' Response:**  *See* Prince Decl. ¶81; Prince Report ¶¶109-115. This Statement is also misleading and not material for the reasons set forth in the Publishers' Response to Statement 43, which is incorporated by reference hereto.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute this fact. Dr. Prince, in his expert report, accepts these calculations as correct (and uses them to support his own calculations). Prince Report ¶ 111 n.288. Plaintiffs' statement that the asserted fact is "misleading" and "not material" is not a denial of the asserted fact, nor are Plaintiffs' statements relevant to the asserted fact as explained in the Internet Archive's reply to Plaintiffs' Response to Paragraph 43.

47.    Based on the available data, most of the Works in Suit behave consistently with the patterns of the works on the USA Today Top 150 Bestsellers List in that sales drop off quickly after publication and most sales occur within five years after a book is published. Reimers Decl. Ex. 1 ¶¶ 9, 21, 26–28 (Reimers Expert Rpt.); *Id.* Ex. 2 ¶¶ 10, 11 (Reimers Reply Rpt.).

**Plaintiffs' Response:** Disputed and lacks foundation. *See* Prince Decl. ¶81; Prince Report ¶¶109-115. Reimers does not do an analysis of each Work in Suit concerning its sales starting from the years since it was first published. Reimers Report ¶ 27. And the record evidence shows that Works in Suit include numerous perennial sellers – like *Catcher in the Rye,*

23

*The Lion, the Witch, and the Wardrobe, The Bell Jar, Little House on the Prairie, Lord of the Flies, The House on Mango Street,* or *Song of Solomon,* for example – that have generated significant income far beyond the first few years after publication. Declaration of Ben Sevier, ECF 92 ("Sevier Decl."), ¶¶34-38; Declaration of Chantal Restivo-Alessi, ECF 94 ("R-A Decl.") ¶¶6, 63-68. Thus it is erroneous to claim that the majority of sales revenue for most of the Works in Suit takes place within five years after a book is published when a book remains available for purchase in subsequent years and generates significant sales in subsequent years. The claim that "most sales" of a particular book "occur within five years after a book is published" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Prince Report ¶110. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works.  Prince Report ¶111.  Additionally, vague as to the meaning of "most of the Works in Suit."

    **Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements in response—that "some books" continue to sell many decades after they are published, that "some books" spike later, and that backlist titles are important to Plaintiffs' bottom lines—does not contradict the Internet Archive's asserted fact, supported by expert analysis, that based on the available data, for most of the Works in Suit, sales drop off quickly after publication and most sales occur within the first five years after a book is published.  That Plaintiffs consider "most of the Works in Suit" "vague" is not a denial of the asserted fact.

24

48.     Peak sales for most titles occur within one to two years after the date of the first publication of the title. Reimers Decl. Exs. 1 ¶¶ 20, 28 (Reimers Expert Rpt.) & 2 ¶¶ 9–15 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Disputed.  It is erroneous to claim that the majority of sales peak within one to two years of first publication when a book remains available for purchase in subsequent years. The claim that "[p]eak sales" of a particular book "occur within one to two years after the date of the first publication of the title" ignores the fact that some books continue to have sales for many decades, or that some books spike later in their life cycle (such as lesser-known books made into movies or early undiscovered works by later successful authors). Weber Decl. ¶¶30-32; R-A Decl. ¶¶59-68; Sevier Decl. ¶¶34-38. Backlist titles, including titles originally published more than five years ago, in the aggregate, are significant drivers of Plaintiff Publishers' revenue and business model and represent economic incentives that are necessary to encourage publication and dissemination of new creative works.  *Id*.  Additionally, this Statement is vague as to the meaning of "most titles."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements in response—that "some books" continue to sell many decades after they are published, that "some books" spike later, and that backlist titles are important to Plaintiffs' bottom lines—does not contradict the Internet Archive's asserted fact, supported by expert analysis, that peak sales for "most titles" occur within one to two years of first publication.  That Plaintiffs consider "most titles" "vague" is not a denial of the asserted fact.

49.     As a result of human error, two Works in Suit published in 2019—*All the President's Women: Donald Trump and the Making of a Predator* and *The Man Who Solved the*

*Market*—were made available for digital lending. The mistake was rectified as soon as the Internet Archive realized the error. Kahle Decl. ¶ 29.

**Plaintiffs' Response:** Undisputed, with the clarification that Internet Archive "realized the error" only after this action was filed identifying the Works in Suit referenced above. Compl., Ex. A.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

50. Two factors determine the number of digital copies of a particular book that can be borrowed at any given time from the Digital Lending Library. *Id.* ¶ 30.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

51. First, the Internet Archive makes available one digital copy for each non-circulating print copy of a book it has in archival storage. *Id.* ¶ 31; Gratz Decl. Ex. B ¶ 130 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

52. Second, for any of those books the Internet Archive has made available for CDL, the Internet Archive works with dozens of library partners – from the University of Arizona to the Delaware County District Library in Ohio – to contribute their own non-circulating copies of that book toward the number of lendable copies. Even if a partner library has multiple copies of a particular book, the Internet Archive counts only one additional copy per library. Kahle Decl. ¶ 32; Gratz Decl. Ex. B ¶¶ 130, 141 (Suppl. Expert Rpt. of Ian Foster).

26

**Plaintiffs' Response:** Undisputed, but incomplete and with the clarification that Internet Archive does not take physical possession or ownership of the matching print edition in the Partner Library's collections, and Internet Archive acknowledges that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously" – and Internet Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating. McN Decl. ¶¶68, 107. And lacks foundation with respect to the claim that Delaware County District Library in Ohio is a Partner Library because it was not disclosed as such in response to relevant interrogatory requests. McN Decl. Ex. 114, Interrogatory No. 12. The Statement is also misleading because early iterations of the Open Library Project increased lending counts according to the total number of physical books of a given title in the library's collection, not by one book per library only. McN Decl. ¶¶65-67.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and addition of a "clarification" are not denials of the asserted fact. Further, Plaintiffs' own expert witness, Dr. Ian Foster, acknowledges that Delaware County District Library in Ohio is a partner library. *See* Foster Decl. ¶¶ 83–84, Figure 8, ECF No. 90.

53. For example, if the Internet Archive has one non-circulating physical copy of *Little House on the Prairie*, and three partner libraries have each chosen to contribute a physical copy of *Little House on the Prairie*, then the Internet Archive would loan *Little House on the Prairie* to up to four patrons at a time. Each concurrent loan would thus still be associated with one non-circulating physical copy. If all four copies of *Little House on the Prairie* were checked

out, patrons seeking to borrow *Little House on the Prairie* could join a waitlist until one or more copies were checked back in.  Kahle Decl. ¶ 33.

**Plaintiffs' Response:**  Undisputed except Publishers dispute that "each concurrent loan would thus still be associated with one-noncirculating physical copy." Internet Archive has not put in place any technical measures to ensure that "[e]ach concurrent loan would thus still be associated with one non-circulating physical copy;" specifically, the Internet Archive has not put in place any technological system by which Internet Archive informs Partner Libraries when an ebook in its collection is checked out, or to tell Internet Archive when the physical book is circulating – and it has acknowledged that it has "no way of knowing whether a book … was being read in a particular library at any given time" or "whether the physical and digital copies of the book were in circulation simultaneously."  McN Decl. ¶ 107.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs do not genuinely dispute that the Internet Archive's partner libraries contribute non-circulating copies toward its lending program (¶ 52, above).  While the Internet Archive may not know each of its library partners' circulation statuses at all times, Plaintiffs offer no evidence that an Internet Archive loan was associated with a circulating copy at a partner library.  *See* Local Civil Rule 56.1(d).

54.     Many libraries other than the Internet Archive digitally loan print books. *See, e.g.*, HathiTrust, *Emergency Temporary Access Service*, at https://www.hathitrust.org/ETAS-Description (describing a system by which more than 200 academic libraries enabled digital lending of books in their physical collections during the COVID-19 pandemic); Carnegie Mellon University Libraries, *Introducing Controlled Digital Lending*, at https://www.library.cmu.edu/about/news/2020-10/introducing-controlled-digital-lending

28

(describing use of CDL at Carnegie Mellon); Michigan State University Libraries, *Controlled Digital Lending at Michigan State University*, at https://www.slideshare.net/BaltimoreNISO/weller-and-lndsay-case-study-on-implementation-of-cdl (describing use of CDL at Michigan State); Caltech Library, *Implementing Controlled Digital Lending as a Core Library Service*, at https://www.cni.org/wp-content/uploads/2021/03/CNI_Implementing_Davison.pdf (describing use of CDL at Caltech); National Information Standards Organization, *Interoperable System of Controlled Digital Lending*, at https://www.niso.org/standards-committees/is-cdl (describing standards body's work to establish technical standards for "CDL as a natural extension of existing rights held and practices undertaken by libraries for content they legally hold"); Project ReShare, *Project ReShare and Stanford Libraries Launch Controlled Digital Lending Implementers Group*, at https://librarytechnology.org/pr/25314 (describing organization for librarians working to implement CDL in their respective libraries).

 **Plaintiffs' Response:**  Undisputed that "libraries other than the Internet Archive digitally loan print books" but disputed that the Internet Archive's activities are the same as those followed by the libraries referenced in this Paragraph. *See* Suppl. McN Decl. ¶12. This Statement is further misleading because the websites cited in this Statement reflect that these programs are each limited to lending from collections of university libraries and provide access only to members of those universities and, in some cases, restrict lending to limited course materials; additionally, the cited programs were specifically implemented in response to access issues precipitated by the COVID-19 pandemic, not in the regular course of business. *Id*. This Statement is also vague with respect to the phrase "many libraries."

29

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' manufactured dispute that "the Internet Archive's activities are the same as those followed by the libraries referenced in this Paragraph" is irrelevant to the asserted fact. Plaintiffs' statements that the asserted fact is "misleading" and "vague" are not denials of the asserted fact.

55.     Digital lending is particularly helpful for patrons who live far from a brick-and-mortar library, patrons seeking a book not available from their local library, and patrons who have print disabilities that make it more difficult to hold or read print books.  Kahle Decl. ¶ 34.

**Plaintiffs' Response:**  Undisputed, but not material because the vast majority of Internet Archive users are not print disabled (less than 0.2% of the accounts currently registered with the Website are for print disabled people, and the needs of print disabled readers are already served by HathiTrust), and because Internet Archive does not target users in particular geographic locations (it admits that whenever an ebook it checked out on its website, it does not know the geographic location of the person who checked out that ebook). McN Decl. ¶¶122-23. Also not material because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook market , which Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

56.     Digital lending is also particularly helpful for brief or spontaneous access to books – for example, for checking citations or references, or looking up discrete facts – that wouldn't be worth a trip to a brick-and-mortar library.  *Id.* ¶ 35.

30

**Plaintiffs' Response:**  Undisputed, but not material and incomplete because Internet Archive's "digital lending" does not provide efficiencies in delivering ebook content "for brief or spontaneous access to books" that do not otherwise exist through the Publishers' existing library ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "incomplete" is not a denial of the asserted fact.

57.     The International Federation of Library Associations and Institutions has observed, in its position statement on the subject, that CDL "has helped to fulfil the mission of libraries to support research, education and cultural participation within the limits of existing copyright laws." Gratz Decl. Ex. G (https://repository.ifla.org/bitstream/123456789/1835/1/ifla_position_-_en-_controlled_digital_lending.pdf).

**Plaintiffs' Response:**  Undisputed, but with the clarification that the document cited in the Statement above is not specifically directed at the Internet Archive's activities. Gratz Decl. Ex. G. Furthermore, this document states that "[c]ontrolled digital lending provides an alternative to a licensing approach, and so a means of redressing the balance" – which provides additional support for the Publishers' argument that the Internet Archive offers a competing substitute which will result in potential lost revenue from licensing ebooks to consumers in the Publishers' commercial market and to patrons in the Publishers' library markets. *Id*.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

31

58.     Digital lending also allows the Internet Archive to promote education, research, preservation, and scholarship.  Kahle Decl. ¶ 36.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because Internet Archive's "digital lending" does not "promote education, research, preservation, and scholarship" in any way that is not already promoted through the Publishers' existing library ebook products, which are available via a market that Internet Archive's own expert testified is "thriving" and "has increased in recent years."  McN Decl. ¶9.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

59.     Writers use books they have borrowed from the Internet Archive as a resource for inspiration or research for their own works. Declaration of Laura Gibbs submitted herewith ("Gibbs Decl.") ¶¶ 5, 8.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because authorized library ebook versions of the Works in Suit and other titles available through the Publishers' authorized ebook market, which Internet Archive's own expert testified is "thriving" and "has increased in recent years" (McN Decl. ¶9), equally serve "as a resource for inspiration or research."

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

32

60.     The Internet Archive has made knowledge resources like Wikipedia more reliable by enabling readers to confirm that books cited as authorities actually support the encyclopedia's entries.  Kahle Decl. ¶ 37.

**Plaintiffs' Response:**  Undisputed, but incomplete and not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense. Suppl. McN Decl. Ex. 1. Additionally, vague as to the meaning of "resources like Wikipedia" because this Paragraph only references Wikipedia and no other "resources" or websites.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

61.     In 2019, with funding from the U.S. Department of the Interior, the Internet Archive digitized and made available books related to the incarceration of Japanese Americans during World War II.  *Id.* ¶ 40.

**Plaintiffs' Response:**  Undisputed, but incomplete and immaterial to the extent that Internet Archive obtained permission from the copyright owner to digitize any of the materials referenced above.  *See* Kahle Decl. Ex. 10.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

33

62.     The Wikipedia article on the Internment of Japanese Americans currently cites and links to 20 books available via CDL from the Internet Archive. *Id.* & Ex. 9 at 70 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material because this is not the primary use or function of Internet Archive's Website and the Wikipedia links are sufficiently peripheral that the Internet Archive completely neglected to mention them in its December 2021 interrogatory responses where it stated the basis for its fair use defense.  Suppl. McN Decl. Ex. 1.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

63.     There are 202,026 citations in Wikipedia articles in English that link to books available to borrow from the Internet Archive via CDL, and those links lead to 88,284 different books. Kahle Decl. ¶ 39 & Ex. 9 at 1 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

64.     The Wikipedia article on World War II cites, and links to, 48 different CDL books. Kahle Decl. ¶ 38 & Ex. 9 at 2–4 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

34

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

65.     A partial listing of the CDL books cited in Wikipedia articles, limited to articles that cite 10 or more such books, goes on for more than three hundred single-spaced pages. Kahle Decl. Ex. 9 at 1-337 (Wikipedia Citations to Books Available to Borrow from Internet Archive via CDL).

**Plaintiffs' Response:**  Undisputed, but not material for the same reasons set forth in Publishers' Response to Paragraph 62, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

66.     In 2022, a group of volunteer librarians curated collections of books that have been censored by school districts across the country but are still borrowable from the Internet Archive.  Kahle Decl. ¶ 44.

**Plaintiffs' Response:**  Undisputed, with the clarification that the citation in the Statement should be to Kahle Decl. ¶41 (not ¶44), but not material because books cited in the article supporting the above Statement (Kahle Ex. 11) are available as authorized ebooks – including *The Glass Castle*, *The Hunger Games*, *Beyond Magenta: Transgender Teens Speak Out* and *Catch-22*.  Suppl. McN Decl. ¶ 15.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" and statement that the asserted fact is "not material" is not a denial of the asserted fact.

67.     At the beginning of the COVID-19 pandemic, and for many months thereafter, most schools and libraries were physically closed to prevent the spread of the coronavirus. Gratz

35

Decl. Exs. H (https://www.ala.org/pla/issues/covid-19/march2020survey) & I (https://www.edweek.org/leadership/map-coronavirus-and-school-closures-in-2019-2020/2020/03).

    **Plaintiffs' Response:** Undisputed, but vague with respect to "many months."

    **Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "vague" is not a denial of the asserted fact.

    68.    School districts reached out to the Internet Archive concerned that students and teachers could no longer physically access books – including hundreds of copies of assigned books that the school had already purchased. Kahle Decl. ¶ 42.

    **Plaintiffs' Response:** Undisputed for the purposes of this motion only, but not admissible. This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

    **Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. That school districts reached out to the Internet Archive is supported by the Declaration of Brewster Kahle, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4). Further, the school districts' expressed concerns are being offered for their effect on the Internet Archive and on Mr. Kahle.

    69.    Libraries reached out to the Internet Archive worried about how they could best serve their communities when they could not physically loan out millions of print books now locked away. *Id.* ¶ 43.

    **Plaintiffs' Response:** Undisputed for the purposes of this motion only but not admissible. This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That school districts reached out to the Internet Archive is supported by the Declaration of Brewster Kahle, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).  Further, the school districts' expressed concerns are being offered for their effect on the Internet Archive and on Mr. Kahle.

70.     By the Internet Archive's estimation – based on data from the federal Institute of Museum and Library Services – the closure of libraries took 650 million books out of circulation. *Id.* ¶ 44.

**Plaintiffs' Response:**  Undisputed, but with the clarification that "650 million books" refers only to print books, because ebooks may be downloaded for free by library patrons anywhere there is an internet connection, including during the start of the pandemic when many public libraries were closed to the public. Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

71.     Hearing these pleas, the Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio. Since all of the libraries were closed, the Internet Archive reasoned, there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place.  Kahle Decl. ¶ 45.

**Plaintiffs' Response:**  Undisputed that "Internet Archive proposed temporarily lifting the technical controls enforcing its one-to-one ratio." Whether "all of the libraries were closed" or whether there were "more non-circulating copies locked up … than would be borrowed via the Internet Archive" is unsubstantiated speculation and is not a material fact.  And the issue of

37

whether "there were surely more non-circulating copies locked up in shuttered libraries than would be borrowed via the Internet Archive even without those technical controls in place" is a legal conclusion inappropriate for a Rule 56.1 statement, and must therefore be disregarded. *See Nadel*, 57 F. Supp. 3d at 293 n. 6.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  As Mr. Kahle explains in his declaration, the Internet Archive was in close contact with school districts and libraries, and he therefore had a basis for understanding that each of those libraries was closed, preventing physical access to physical books.  Kahle Decl. ¶¶ 42–45.  That was the Internet Archive's "reason[]" for proposing temporarily lifting the technical controls enforcing its one-to-one ratio.  Further, whether there were more non-circulating library copies than Internet Archive borrows is not a legal conclusion; if it were truly in question, it would be an issue of fact.

72.     The Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently.  *Id.* ¶ 46.

**Plaintiffs' Response:**  Undisputed that Internet Archive put in place a program intended to "address this problem quickly[,]" but whether or not "[t]he Internet Archive was uniquely positioned to be able to address this problem quickly and efficiently" is unsubstantiated speculation and is not a material fact.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  Plaintiffs' claim that the asserted fact is "unsubstantiated speculation" is incorrect, as it is supported by the Declaration of Brewster Kahle, the Chair and Digital Librarian of the Internet Archive.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

73.     Adam Silverman, one of HarperCollins's Rule 30(b)(6) designees, testified that it took a month – from April to May of 2020 – to negotiate a pandemic-related special request with the Chicago Public School System. Gratz Decl. Ex. J, Deposition Transcript of Adam Silverman ("Silverman Dep. Tr.") 270:6–273:14.

**Plaintiffs' Response:** Undisputed, but incomplete and misleading because the deposition testimony and the exhibit displayed during this portion of testimony (Exhibit 264, HC0015518) reflects that HarperCollins responded attentively to the special request. Suppl. McN Decl. Ex. 17. Indeed, after HarperCollins secured permission from the relevant authors, the aggregator negotiating on behalf of the school district responded with additional demands and even apologized for the delay, which was not caused by HarperCollins. *See id.* at HC0015523 ("Hi Adam, Thank you so much for your patience in waiting to hear from CPS.").

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact. Further, the evidence Plaintiffs point to (Suppl. McNamara Decl. Ex. 17, HC0015518, ECF No. 166-17) shows that, while the Chicago Public School system may have caused a delay of a few days, the entire process of negotiating and securing permissions for them took HarperCollins an entire month, in part because of delays caused by HarperCollins itself.

74.     The Internet Archive launched the National Emergency Library ("NEL") on March 24, 2020, intending for this program to "run through June 30, 2020, or the end of the US national emergency, whichever is later." Kahle Decl. ¶ 47 & Ex. 12.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

39

75.     Prior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement, and more than 100 institutions signed a statement in support of the National Emergency Library.  Kahle Decl. ¶ 48 & Ex. 7.

**Plaintiffs' Response:**  Undisputed, with the clarification that the citation above should be to Kahle Decl. Ex. 13 (not Ex. 7), that "more than 100 institutions signed a statement in support of the National Emergency Library" but disputed that "[p]rior to the launch, the Internet Archive consulted with schools and libraries for their input and endorsement," because this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That the Internet Archive consulted with schools and libraries for their input and endorsement prior to the launch of the National Emergency Library is supported by the Declaration of Brewster Kahle. *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

76.     There was also widespread public support, including, for example, an article written by Jill Lepore in *The New Yorker* titled, "The National Emergency Library Is a Gift to Readers Everywhere."  Gratz Decl. Ex. K.

**Plaintiffs' Response:**  Undisputed that the Internet Archive accurately references the title of an article published by *The New Yorker*, but disputed that the National Emergency Library had widespread public support because the evidence shows that the Internet Archive was aware that there were "copyright concerns" about the National Emergency Library, and groups including the U.S. Register of Copyrights, authors, advocacy organizations that support the rights and interests of authors, and librarians across the United States made public statements or sent private messages to Internet Archive questioning the legality of the National Emergency Library.

40

McN Decl. ¶¶130-142. Further, the article published in *The New Yorker* is inadmissible for the truth of statements referred to therein, as it is an out-of-court statement by a non-party in violation of Local Rule 56.1(d) and thus must be disregarded for that purpose.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. That there were individuals and entities that purport to have questioned the legality of the National Emergency Library is not a denial that there was "widespread public support." Further, that Ms. Lepore's article is titled "The National Emergency Library Is a Gift to Readers Everywhere" is not introduced for the truth that the NEL was a gift to readers, but rather for the fact that Ms. Lepore's article demonstrates positive sentiment toward the NEL, including Ms. Lepore's then-existing state of mind.

77.     The Internet Archive believed then, and believes now, that under those unique circumstances, operating the NEL was fair use. Kahle Decl. ¶ 49.

**Plaintiffs' Response:** Disputed. The facts show that Internet Archive believed or had reason to believe that the NEL was not fair use. McN Decl. ¶¶77-109. The ultimate question of whether the Internet Archive's activities actually did constitute fair use is a legal conclusion inappropriate for a Rule 56.1 statement, and any suggestion that the NEL was fair use as a matter of fact must be disregarded. *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014).

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. None of the purported evidence cited to by Plaintiffs demonstrates that the Internet Archive believed that the NEL was not fair use. That the ultimate question of whether the Internet Archive's activities actually constituted fair use is irrelevant.

78.     The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries. *Id.* ¶ 50.

41

**Plaintiffs' Response:** Disputed. The question of whether the NEL "benefitted teachers, students, researchers, and readers" is a legal question subsumed by the fair use inquiry, as is the question of whether the NEL "benefits" the individuals listed above by striking the balance necessary to achieve the Copyright Act's purpose of incentivizing the creation and dissemination of books. Such a legal conclusion is inappropriate for a Rule 56.1 statement. *See Nadel v. Shinseki*, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014). Moreover, whether or not "The NEL benefitted teachers, students, researchers, and readers who could not access their physical schools or libraries" is unsubstantiated speculation and is not a material fact.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Whether the NEL benefitted teachers, students, researchers, and readers is not a legal conclusion. Nor is it unsubstantiated, as it is supported by evidence within and attached to the Declaration of Brewster Kahle (¶¶ 51–51). *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

79.     When the University of Oklahoma campus shut down in spring of 2020, students no longer had access to physical library books. Gibbs Decl. ¶4.

**Plaintiffs' Response:** Undisputed, but incomplete and not material because campus lockdowns did not affect the availability of authorized ebooks available to students through the University of Oklahoma collections. Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact.

42

80.     Humanities instructor Laura Gibbs relied on the Internet Archive to provide her students access to books she had placed on reserve at the campus library before the pandemic closures. *Id*.

**Plaintiffs' Response:**  Undisputed, but incomplete because books cited by Laura Gibbs including Divakaruni's *Palace of Illusions*, *Neela: Victory Song* and *The Conch-Bearer* – are all available as authorized library ebooks. Suppl. McN Decl. ¶16.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

81.     Through her use of the Internet Archive, Ms. Gibbs discovered additional relevant books for her students that were not otherwise available through the University of Oklahoma library system. *Id.* ¶ 5.

**Plaintiffs' Response:**  Undisputed, but incomplete for the same reasons set forth in the Publishers' Response to Statement 80, which is incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" is not a denial of the asserted fact.

82.     Ms. Gibbs has since retired from teaching but regularly writes about African folktales available to borrow through the Internet Archive. *Id.* ¶ 7.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

83.     Half of English teacher Lauren Sherman's tenth grade students had left their copies of the Folger edition of *Much Ado About Nothing* in their lockers, which they were forbidden from accessing after the pandemic started. Declaration of Lauren Sherman submitted herewith ("Sherman Decl.") ¶ 7.

43

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

84. In addition to giving students the option to re-purchase the book or to attempt to access their local public library's digital collection, Ms. Sherman was able to direct them to an online version to borrow through the Internet Archive. *Id.*

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

85. When his university library shut down, Daniel Smith, a Ph.D. student at the University of Cambridge, similarly could not access the books he needed to write his dissertation. Declaration of Daniel Smith submitted herewith ("Smith Decl.") ¶ 4.

**Plaintiffs' Response:** Undisputed that Smith could not access physical books from Cambridge University libraries when those facilities were closed, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized ebooks through Cambridge University's library network. McN Decl. ¶ 121, Ex. 165 (Smith Tr. 73:4-77:16).

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

86. Mr. Smith turned to the Internet Archive, where he was able to borrow primary and secondary source material and complete his dissertation on time. *Id.* ¶ 5.

**Plaintiffs' Response:** Undisputed that Smith accessed materials for his dissertation via Internet Archive's website, but incomplete and misleading because Smith testified that at least one book he accessed through Internet Archive for his dissertation was available as authorized

ebooks through Cambridge University's library network. McN Decl. ¶121, Ex. 165 (Smith Tr. 73:4-77:16).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

87.    Benjamin Saracco is a librarian at a hospital library affiliated with a medical school in New Jersey that serves doctors, nurses, medical students, and other healthcare workers. Declaration of Benjamin Saracco submitted herewith ("Saracco Decl.") ¶ 7.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

88.    In March 2020, the governor ordered buildings, including academic libraries, to be closed. *Id.* ¶ 8.

**Plaintiffs' Response:**  Undisputed, but the Publishers object that this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The asserted fact is supported by the Declaration of Benjamin Saracco, a librarian at a hospital library affiliated with a medical school in New Jersey.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4).

89.    Mr. Saracco received a flood of requests from students, nurses, and doctors for information about COVID-19 and relevant patient care to address the high rate of hospitalization in the state. *Id.* ¶ 9.

**Plaintiffs' Response:**  Undisputed that Mr. Saracco stated that he received "multiple requests" for the *Student Manual for Basic Life Support* and the *Advanced Cardiac Life Support*

45

*Provider Manual* in the declaration cited in Statement 89, but the Publishers object that this proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded.  Saracco Decl. This Statement is also misleading because Mr. Saracco did not testify that the requests for these materials were, as a matter of fact, related to "COVID-19 and relevant patient care" or "to address the high rate of hospitalization in the state." *Id.* ¶8. Rather, Saracco testified that "[a]s a librarian I cannot know with certainty what our materials were ultimately used for in the hospital, but at the time, I was under the impression that healthcare workers that were requesting these materials might be using them to treat COVID-19 patients admitted to our affiliated hospital" – which lacks foundation and is pure speculation. *Id.*

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  The asserted fact is supported by the Declaration of Benjamin Saracco, a librarian at a hospital library affiliated with a medical school in New Jersey.  *See* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4). Mr. Saracco specifically testified that he was "flooded with requests from medical students, nurses, and doctors for information during that time, particularly about COVID and COVID patient care to address the high rates of hospitalization in the state."  Saracco Decl. ¶ 8, ECF No. 102.  Plaintiffs' statement that the asserted fact is "misleading" is not a denial of the asserted fact.

90.    With no access to physical library materials, Mr. Saracco was able to direct doctors and nurses to patient care training manuals, such as the *Basic Life Support for Healthcare Providers and the Advanced Cardiovascular Life Support Provider Manual*, available for borrowing from the Internet Archive via CDL. *Id.*

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because Basic Life Support is available as an authorized ebook and Benjamin Saracco testified that the Advanced

46

A-6324

Cardiovascular Life Support Provider Manual was available as an authorized ebook and, to hisknowledge, his library never requested permission to provide free or discounted access during the pandemic.  Suppl. McN Decl. Ex. 15 (Saracco Tr. 252:18-257:21).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

91.     Dozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time.  Kahle Decl. ¶ 51 & Exs. 14–17.

**Plaintiffs' Response:**  Undisputed, but whether or not "[d]ozens more teachers, students, researchers, parents, and other readers have shared their stories with the Internet Archive about why the NEL served a critical need during an uncertain time" is not a material fact.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not a material fact" is not a denial of the asserted fact.

92.     The largest number of concurrent loans for any Work in Suit was for *The Lion, The Witch, and the Wardrobe*, which had at most 888 concurrent loans. That figure represents the sum of the peak concurrent loan numbers for each of the editions of that book which were available for borrowing. Gratz Decl. Ex. B ¶ 196; *id.* at Ex. T3 (Suppl. Expert Rpt. of Ian Foster).

**Plaintiffs' Response:**  Undisputed, but misleading because this figure incorporates data from the calendar year 2020, not just the period when the NEL was active.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "misleading" is not a denial of the asserted fact.

47

93.     There are over 9,000 public library systems in the United States alone. *Id.* Ex. L (https://www.imls.gov/research-evaluation/data-collection/public-libraries-survey).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

94.     Virtually every library was closed during the NEL.  *Id.*

**Plaintiffs' Response:**  Undisputed that many physical libraries were closed to physical visitors during the NEL, but with the clarification that "[v]irtually every library was closed during the NEL" is misleading because libraries maintained their digital presence during the NEL and made authorized ebooks available to be downloaded for free by library patrons anywhere there is an internet connection. Sevier Decl. ¶70; Weber Decl. ¶¶68, 79-80, 82; R-A Decl. ¶¶41-43.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

95.     More than 888 public libraries in the United States have a copy of *The Lion, the Witch, and the Wardrobe*.  Gratz Decl. Ex. Ex. M (https://www.worldcat.org/title/lion-the-witch-and-the-wardrobe/oclc/28291231).

**Plaintiffs' Response:**  Undisputed, but inadmissible because Exhibit M to the Gratz Declaration is not admissible for the truth of the referenced statement, in violation of Local Rule 56.1(d), as it is an out-of-court statement by a non-party (*i.e.*, hearsay). Additionally, this Statement is misleading because Exhibit M to the Gratz Declaration appears to only concern physical copies of *The Lion, the Witch and the Wardrobe*, and does not account for authorized ebook copies.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. The records of OCLC WorldCat regarding library catalogs are records of a regularly conducted activity (i.e., library cataloging) that fall into the hearsay exception of Fed. R. Evid. 803(6), and is also a "list[] . . . generally relied on by . . . persons in particular occupations," here the occupation of librarianship, under Fed. R. Evid. 803(17).

96.     Although the NEL was slated to end on June 30, 2020, the Internet Archive shut it down two weeks early – on June 16, 2020 – after this lawsuit was filed. Kahle Decl. ¶ 52.

**Plaintiffs' Response:** Undisputed, but with the clarification that in a blog post announcing the creation of the NEL, the Internet Archive stated that the NEL "will run through June 30, 2020, or the end of the US national emergency, whichever is later." McN Decl. Ex. 168.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

97.     The Plaintiffs are among the largest and most profitable book publishers in the United States. Gratz Decl. Ex. N, Deposition Transcript of Skip Dye ("Dye Dep. Tr.") 369:20–370:7; *see also id.* Ex. O (https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/72889-ranking-america-s-largest-publishers.html).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

98.     In recent years, Plaintiffs' profits have increased. Gratz Decl. Ex. Exs. P–R (Excerpt of Bertelsmann 2018, 2019, 2021 Annual Reports), Exs. S–T (Excerpts of Wiley 2020, 2021 Form 10-K), Ex. U–V (Excerpts of News Corp. 2019, 2021 Annual Report), Ex. W–Y (Excerpts of Lagardere 2018, 2020, 2021 Registration Document).

**Plaintiffs' Response:** Undisputed, but not material and vague with respect to "recent years."

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and "vague" is not a denial of the asserted fact.

99. In 2020 and 2021, the publishing industry as a whole enjoyed record profits for electronic and physical formats of books. Gratz Decl. Ex. Z ("*A Year for the (Record) Books in Publishing*" describing 2020 profits), Ex. AA ("*America's Biggest Publishers Keep Posting Profits*" describing 2021 profits); Ex. BB ("*In Surprise Ending for Publishers: In 2020, Business Was Good*" describing 2020 profits).

**Plaintiffs' Response:** Undisputed, but not material.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

100. When the four Plaintiffs filed suit against the Internet Archive in June of 2020, they selected the Works in Suit. Compl. Ex. A, ECF No. 1-1.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

101. The Works in Suit include non-fiction and fiction works and works from many genres (fantasy, children's, psychology, science, sports, biography, and others). *Id.* ¶¶ 21, 22.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

102. All of the Works in Suit were published prior to being digitized and loaned by the Internet Archive. Kahle Decl. ¶ 28 (all of the Works in Suit were made available for borrowing

50

after lawfully acquired – bought or donated – new or used physical copies of the Works in Suit were digitized and the Internet Archive does not acquire physical copies of books that have not been published); *see also* Compl. ¶¶ 6, 21, ECF No. 1.

**Plaintiffs' Response:** Undisputed, but with the clarification that it is not clear how it would be practically feasible for the Internet Archive or any other entity to "digitize[] and loan[]" a book before that book is "published" and that Kahle has publicly stated that the Website should ultimately make "the bulk of unpublished things … universally accessible." McN Decl. Ex. 49, p. 2 (punctuation omitted).

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

103. Plaintiffs sell physical copies of books to libraries and to readers. *See* Gratz Decl. Ex. CC, Deposition Transcript of Josh Marwell ("Marwell Dep. Tr.") 59:3–9.

**Plaintiffs' Response:** Undisputed, but with the clarification that Plaintiffs do not sell physical books to libraries directly but rather via wholesalers. Weber Decl. ¶43.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

104. Plaintiffs license electronic copies of books ("ebooks") to libraries and readers. Gratz Decl. Ex. C, Potash Dep. Tr. 141:20–142:9.

**Plaintiffs' Response:** Undisputed, but with the clarification that the Plaintiffs do not license ebooks to libraries directly; rather, the Publishers enter into agreements with aggregators (*i.e.*, distributors) such as OverDrive, who in turn license the ebooks to libraries and manage the relevant platforms. McN Decl. ¶11; R-A Decl. ¶75; Sevier Decl. ¶ 42 n.2.

51

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

105.    Licensed ebooks are distributed to patrons of libraries that have purchased licenses via "aggregators."  Gratz Decl. Ex. N, Dye Dep. Tr. 36:20–37:8; 86:14–18.

**Plaintiffs' Response:**  Undisputed, with the clarification that library ebook aggregators license the Publishers' ebooks to libraries according to set terms and conditions designed to enforce the various models that each Publisher has selected for that market, including terms that permit the Publishers to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing, as well as terms that limit reproduction, distribution, and that reinforce the requirements for digital rights management software to prevent piracy.  Weber Decl. ¶44.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

106.    There are multiple licensing structures for ebooks. One is a "one copy/one user" or "perpetual access" model that allows libraries to lend out one copy at a time to patrons for a discrete period of time, with no expiration from the licensing libraries' digital collection. Gratz Decl. Ex. C, Potash Dep. Tr. 49:4–50:2; *id.* Ex. N, Dye Dep. Tr. 120:22–121:7.

**Plaintiffs' Response:**  Undisputed that there are multiple licensing structures for ebooks and that one is a "one copy/one user" structure that allows libraries to lend out one copy at a time to one patron at a time for a discrete period of time. A license obtained under the "one copy/one use" model can have a perpetual term or a metered term, including a time-limited term Further, the same clarification about license terms set forth in the Publishers' Response to Statement 105 applies and is incorporated by reference herein.

52

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs do not support the rest of their response with any evidence in the record.  *See* Local Civil Rule 56.1(d).

107.    The "perpetual access" model is not currently in use by Hachette, HarperCollins, or Penguin Random House for ebooks made available through aggregators to public libraries. ECF No. 92 ¶¶ 61, 65 (Declaration of Ben Sevier); ECF No. 94 ¶¶ 30, 32 (Declaration of Chantal Restivo-Alessi); ECF No. 95 ¶¶ 69, 75 (Declaration of Jeffrey Weber); Gratz Decl. Ex. C, Potash Dep. Tr. 50:3–53:9.

**Plaintiffs' Response:**  Undisputed, with the clarification that HarperCollins, Penguin Random House, and Hachette each ceased offering a perpetual term to public libraries in 2011, 2018, and 2019, respectively.  R-A Decl. ¶¶30- 32; Weber Decl. ¶¶71-75; Sevier Decl. ¶65.

Accordingly, any time a public library purchased an ebook with a perpetual license term pursuant to the licensing terms offered by HarperCollins, Penguin Random House, and Hachette up until 2011, 2018, and 2019, respectively, that library continues to maintain the title in its collection and may lend it to patrons on a one-copy, one-user basis in perpetuity. *See* Sevier Decl. ¶68.  The Publishers further state that Hachette, HarperCollins, and Penguin Random House each currently offer a one-copy, one-user model with a perpetual term to academic libraries because academic libraries have different needs and lending patterns than public libraries, and that Wiley maintains a one-copy, one user model with perpetual access for its trade books that it makes available to all libraries as ebooks, including public libraries.  Sevier Decl. ¶68; R-A Decl. ¶40; Weber Decl. ¶77; Declaration of Alan Pavese, ECF 93 ("Pavese Decl."), ¶¶5, 25-26.

53

A-6331

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact.

108.    Another type of license is metered access by time. Under this model, a library has the ability to loan an ebook to patrons for a discrete period of time, commonly two years, to an ebook title.  Gratz Decl. Ex. C, Potash Dep. Tr. 44:17–24.

**Plaintiffs' Response:**  Undisputed, with the same clarifications about license terms set forth in the Publishers' Response to Statement 105 and 106, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of "clarifications" is not a denial of the asserted fact

109.    Another type of license is metered access by the number of check-outs, commonly twenty-six checkouts. Under this model, a library has the ability to loan an ebook to patrons until that copy of an ebook has been borrowed twenty-six times.  *Id.*

**Plaintiffs' Response:**  Undisputed, with the clarification that library ebook aggregators license the Publishers' ebooks to libraries according to set terms and conditions designed to enforce the various models that each Publisher has selected for that market, including twenty-six circulation model. Weber Decl. ¶44. These terms permit the Publishers to exercise control over the digital files to set the limited extent of usage, which is determined in relation to the pricing, as well as terms that limit reproduction, distribution, and that reinforce the requirements for digital rights management software to prevent piracy.  *Id.*; R-A Decl. ¶¶21-23.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact

110.    Plaintiffs do not sell ebooks to libraries outright.  Kahle Decl. ¶ 53.

54

**Plaintiffs' Response:**  Undisputed, but with the clarification that the Publishers understand the term "sell . . . outright" to mean the sale of "non-encrypted" files without any contractual preconditions on their further use. *See* McN Decl. ¶12. The Publishers – together with other book publishers, music, and movie companies – cannot agree to those terms because providing digital platforms with unprotected files – with no technical security measures or legally binding agreement limiting the purchaser's use of the file – invites unrestricted copying and distribution of the files, with predictably devastating results on the market for that work. Sevier Decl. ¶¶42-43, 61-64; R-A Decl. ¶29; Weber Decl. ¶70; Pavese Decl. ¶23. Unrestricted digital files are not sold commercially or to libraries. *Id*. Further, the Internet Archive has identified only a handful of publishers that have agreed to sell ebook files on these terms – the literary press 11:11 and the affiliated anarchist publishers PM Press and AK Press – and has cited no documentary evidence to establish that Internet Archive's purchase of those materials amounts to an "outright" sale.  McN Decl. Ex. 5 (Kahle Depo. Tr. 139:23-140:12).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of a "clarification" is not a denial of the asserted fact

111.    The Internet Archive purchases ebooks from publishers who are willing to sell them outright (rather than license them).  *Id.*

**Plaintiffs' Response:**  Undisputed, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and addition of "clarifications" are not denials of the asserted fact

55

A-6333

112.    The Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them). *Id.* ¶ 54.

**Plaintiffs' Response:**  Undisputed with the same clarification regarding the term "purchase" as provided for the term "sell" in Statement 110, but not material and with the objection that whether "[t]he Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them)" is purely hypothetical and not admissible.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" and addition of "clarifications" are not denials of the asserted fact.  That the Internet Archive would purchase ebooks from Plaintiffs if they were willing to sell them (rather than license them) is supported by the Declaration of Brewster Kahle, *see* Fed. R. Civ. P. 56(c)(1)(A); *id.* 56(c)(4), its founder, Digital Librarian, and Chair and is neither hypothetical nor inadmissible.

113.    Plaintiffs have declined each time the Internet Archive has asked to buy ebooks. *Id.* ¶ 55.

**Plaintiffs' Response:**  Undisputed with the same clarification regarding the term "buy" as provided for the term "purchase" in Statement 112, but not material and subject to the clarifications set forth in the Publishers' Response to Statement 110, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' addition of "clarifications" and statement that the asserted fact is "not material" are not denials of the asserted fact

114.    The ███ aggregator is OverDrive, which has about ███ of the market share of the library ebook market in the United States.  Gratz Decl. Ex. C, Potash Dep. Tr. 196:5–12.

56

**Plaintiffs' Response:** Undisputed that OverDrive is the largest library ebook aggregator for public libraries.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact.

115. One of the ways OverDrive offers ebooks for reading is through its Libby application. *See* https://www.overdrive.com/apps/libby; Gratz Decl. Ex. C, Potash Dep. Tr. 82:19–24.

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**: Plaintiffs do not dispute the asserted fact.

116. From March 2017 until March 23, 2020 (*i.e.*, prior to the NEL), the number of checkouts of the Works in Suit from the Internet Archive was ███████ of the number of checkouts of the Works in Suit from OverDrive. Declaration of Rasmus Jørgensen submitted herewith ("Jørgensen Decl.") Ex. 1 ¶ 36 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs. T5 & T6 (Suppl. Expert Rpt. of Ian Foster); *id.* Ex. DD (OverDrive_Supp_002).

**Plaintiffs' Response:** Undisputed for purposes of this motion only that, on average, the number of checkouts of the Works in Suit by Internet Archive was ███████ of the number of checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the time period cited above, but (a) there was significant variability in this percentage among the Works in Suit; (b) percentages such as this mask absolute numbers; (c) during this time period, Internet Archive had fewer members, borrows and concurrent copies available to loan than it does currently; (d) if CDL were legal and became more widespread, the percentage of checkouts on Internet Archive as compared with OverDrive would substantially increase, as would the impact on the Publishers; and (e) this Statement is not material to the ultimate issue of whether

57

the Publishers suffered market harm, including but not limited to in the form of lost revenue

from ebook licenses. *See* Prince Decl., *passim*; The Publishers' Memorandum of Law in

Opposition to Internet Archive's Motion for Summary Judgment ("Publishers' Opposition

Brief"), Section V. It is also not material because it is no defense to copyright infringement for

the infringer to argue that its infringing copies make up only a small proportion of some market

or customer segment. *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 568 (1985)

("[T]o negate fair use one need only show that if the challenged use should become widespread,

it would adversely affect the potential market for the copyrighted work.) (internal quotations and

citation omitted).

 **Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs' additional statements in response are not denials of the asserted fact.

 117. Looking at data from 2017-2020, which includes the period of time when the

NEL was operational, the total loan volume of Works in Suit from the Internet Archive was

████████ of the number of OverDrive checkouts for the Works in Suit.  Jørgensen Decl.

Ex. 1 ¶¶ 8, 35 & Exs. 4, 6a, 7a, 8a, 9a (Jørgensen Expert Rpt.); Gratz Decl. Ex. B at Exs.

T5 & T6 (Suppl. Expert Rpt. of Ian Foster).

 **Plaintiffs' Response:**  Undisputed for purposes of this motion only that, on average, the

number of checkouts of the Works in Suit by Internet Archive was ████████ of the number of

checkouts of the Works in Suit from OverDrive, one of several library ebook aggregators, for the

time period cited above, but the Publishers object to this Statement as non- material and

misleading for the reasons set forth in their Response to Statement 116, which are incorporated

herein by reference.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' additional statements in response are not denials of the asserted fact.

118.     The expert reports of Drs. Reimers and Jørgensen conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit. Jørgensen Decl. Ex. 1 ¶ 8 (Jørgensen Expert Rpt.); Reimers Decl. Ex. 1 ¶ 9 (Reimers Expert Rpt.).

**Plaintiffs' Response:**  Disputed.  As a preliminary matter, neither Dr. Reimers nor Dr. Jorgensen reached an actual conclusion that "Internet Archive's lending practices had no negative effects on the market for the Works in Suit." *See, e.g.*, Expert Report of Rasmus Jorgensen, ECF 108-1 ("Jorgensen Report") ¶ 8; Reimers Report, Section D.; Prince Decl. Ex. 3 (Reimers Tr. 178) (conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything."); Prince Decl., Section III(C).

The Publishers further dispute and object to the expert opinions set forth in Statement 118 because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons (which are henceforth referred to, collectively, as the "Expert Opinion Objection"). The Publishers dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book. The expert opinions of Dr. Jorgensen and Dr. Reimers are inadmissible because, *inter alia*, they are unreliable and based on insufficient facts and impermissibly flawed principles and methods (which also have not been reliably applied), for all the reasons set forth in the Prince Declaration and the Publishers' Opposition Brief (Section V), including but not limited to the failure to adequately

59

control for other factors. In the event of a trial, the Publishers will file a *Daubert* motion to strike the opinions of Dr. Jorgensen and Dr. Reimers under Federal Rule of Evidence 702. *See, e.g.*, *City of Providence v. Bats Global Markets*, 2022 WL 902402 at *12-13 (S.D.N.Y. 2022); *Lamarr- Arruz v. CVS Pharmacy*, 2017 WL 4277188 at *10 (S.D.N.Y. 2017); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 at *10-11 (S.D.N.Y. 2014). Further, while the Publishers do not dispute the record facts regarding Internet Archive "loans" of the Works in Suit, OverDrive check-outs of the Works in Suit, Hachette sales records or verified Amazon print rankings of the Works in Suit on which the Internet Archive's experts base their analysis, the conclusions of the IA experts regarding whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement. See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts"); Local Rule 56.1(d); Prince Decl. Ex. 4 (Reimers Tr. 178:4-13) (testimony from Dr. Reimers conceding that her "study of the Amazon print sales rankings in [her] expert report" is a statistical analysis that does not "definitively prove anything.").

      **Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

      First, both experts conclude that the Internet Archive's lending practices had no negative effect on the market for the Works in Suit.  *See* Reimers Expert Rpt. ¶ 9 ("I have reached the following conclusion[] . . . [there is] no evidence that the decrease in [ebook] sales and revenues was spurred by the operation of the Internet Archive's digital lending program"); *id.* ("I have reached the following conclusion[] . . . I find no evidence that availability of [the Works in Suit] for borrowing from the Internet Archive's digital lending program depressed book sales of print

books through other channels."); Declaration of Rasmus Jørgensen ("Jørgensen Decl.") Ex. 1 ¶¶ 8, 51, ECF No. 108-01 ("Jørgensen Expert Rpt.") ("Therefore, the evidence is not consistent with Plaintiffs' theory that IA's loan volume of the Works-in-Suit reduced digital lending through OverDrive"). The fact that the Internet Archive's experts made these conclusions is a fact appropriate for a Rule 56.1 statement.

Second, those conclusions are suitable for a Rule 56.1 statement. *See Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 838 (S.D.N.Y. 2018) (rejecting argument, in motion to strike portions of Rule 56.1 statement, that expert opinions are inadmissible). Further, Plaintiffs make no effort to properly exclude them for purposes of summary judgment. Indeed, each of the cases Plaintiffs cites involves a motion to exclude. *See City of Providence v. Bats Global Markets*, *Inc.*, 14-cv-2811 (JMF) 2022 WL 902402 (S.D.N.Y. March 28, 2022) (motion to exclude expert testimony filed simultaneously with motion for summary judgment); *Lamarr-Arruz v. CVS Pharmacy*, *Inc.*, 15-cv-04261 (JGK) 2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017) (motion to exclude expert testimony filed simultaneously with motion for class certification); *In re Elec. Books Antitrust Litig.*, Nos 11MD 2293 (DCL), 12 Civ. 3394 (DLC), 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) (motion to exclude expert testimony from consideration of class certification motion, summary judgment motion, and trial). Here, Plaintiffs make no motion to exclude.

Third, for the reasons set forth in Dr. Reimers' and Dr. Jørgensen's reply reports, Reimers Reply Rpt. ¶¶ 1–20; Jørgensen Decl. Ex. 2 ¶¶ 10, 17–40, ECF No. 108-02 ("Jørgensen Reply Rpt."), Dr. Prince's methodological criticisms are unfounded.

61

119.    Dr. Reimers analyzed the change of the Amazon rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL. Reimers Decl. Ex. 1 ¶¶ 36–54 (Reimers Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Reimers purported to analyze the change of the Amazon print book rankings of the Works in Suit relative to when each edition of a Work in Suit was made available for lending through the NEL, but incomplete and misleading to the extent that it suggests that Dr. Reimers reliably measured the change or the impact on relevant markets. Prince Decl. Sections III(A) and III(C). The Publishers also clarify that Dr. Reimers opined that she "cannot conclude that the NEL had either a positive or negative effect on the Amazon sales rankings of print editions" since she found earlier seasonal trends with similar size effects for the Works in Suit. Reimers Report ¶¶51-53. Further, the Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in this Statement 119 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.  Further, Plaintiffs' purported clarification does not dispute the asserted fact. Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

120.    Amazon rankings are a good proxy for the market for print sales because using ranking data controls for factors that affect the physical book retail market as a whole and

because Amazon makes up at least 50% of the market share for print books.  Reimers Decl. Ex. 1 ¶¶ 35, 36, 41–43 (Reimers Expert Rpt.).

**Plaintiffs' Response:**  Disputed but not admissible and not material.  Amazon rankings for print books of the Works in Suit are not relevant to the ultimate issue of whether IA negatively affected revenue from licensing and sales to U.S. libraries and consumers. This Statement is also incomplete and misleading because Dr. Reimers did not perform any analysis to justify her belief that Amazon print book rankings "are a good proxy" for the market for print sales and fails to account for the fact that unit sales are not interchangeable with revenue figures. Prince Decl. ¶60; Prince Decl. Ex. 4 (Reimers Tr. 122-24, 126-28). Further, the Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 120 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' contention that Amazon rankings are "not relevant" is not a denial of the asserted fact. Plaintiffs' statements that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.  Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

121.    When editions of the Works in Suit were first made available for borrowing from the Internet Archive via CDL, their corresponding print sales at retail did not decline relative to other books.  Reimers Expert Rpt. ¶¶ 10, 38, 47.

**Plaintiffs' Response:**  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference

63

herein, and object that the expert opinions set forth in Statement 121 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement is not an accurate summary of Dr. Reimers cited expert report. Dr. Reimers did not reach an actual conclusion on this measure and her range of likely results included a harmful impact on the Works in Suit's Amazon print sales rankings after they were first made available for borrowing from the Internet Archive via CDL. Prince Decl. ¶¶59-60; *see also* Reimers Report ¶¶ 38, 46 ("[W]e cannot say with certainty" whether people buy fewer or more copies after a Work is uploaded).

**Internet Archive's Reply**: Plaintiffs' do not genuinely dispute the asserted fact. The asserted fact accurately summarizes Dr. Reimers' finding of "no evidence that availability of these titles for borrowing from the Internet Archive's digital lending program depressed book sales of print books through other channels." Reimers Expert Rpt. ¶ 10. Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

122. When the Works in Suit were removed from the Internet Archive after this lawsuit was filed, their print sales slightly worsened relative to other books. Reimers Decl. Ex. 1 10, 38, 49, 50 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:** Disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 122 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement mischaracterizes Dr. Reimer's cited report, in which she only examined Amazon print rankings (not print sales) and only claimed that she found "some (weak) evidence that taking the Works in Suit off the Internet Archive hurt the Amazon sales rankings of their print editions slightly." Reimers Report

¶10). Further, this Statement is also not material because Amazon rankings for print books are not relevant to the ultimate issue of whether IA negatively affected revenue from print sales and do not directly translate into revenue.

**Internet Archive's Reply**: Plaintiffs' do not genuinely dispute the asserted fact. The asserted fact accurately summarizes Dr. Reimers' conclusion. *See* Reimers Expert Rpt. ¶ 49 ("[T]he estimated rankings drop (worsen) almost immediately after the book's removal from the Internet Archive. That is, when the book are no longer available on the Internet Archive, ***their unit sales at Amazon decrease relative to other books***.") (emphasis added). Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

123.   Historical Amazon data is only publicly available for print books – not for ebooks. Reimers Decl. Ex. 1 nn.33, 36 (Reimers Expert Rpt.); *id.* Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Undisputed for purposes of this motion only that Amazon does not make the same historical ranking data publicly available for ebooks as it does for print books, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

124.   Because there is not publicly available commercial performance data about ebooks, and because Plaintiffs declined to produce the monthly performance data the Internet

Archive requested, Dr. Reimers was unable to make similar calculations regarding the sales of consumer ebooks. Reimers Decl. Ex. 2 ¶ 1 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:** Undisputed that Dr. Reimers did not perform an analysis based on publicly available consumer ebook data, but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement. Further, the Publishers dispute that Dr. Reimers was unable to perform calculations regarding the impact of the Internet Archive on the Publishers' commercial ebooks because of any failure on their part to produce any documents. The Internet Archive voluntarily agreed to withdraw its request for additional monthly data. *See* Suppl. McN Decl. ¶9; *id*. Ex. 8, p. 9 ("We are pleased to inform the Court that, subject to meaningful compliance with the agreements reached, which are memorialized in a separate document, the parties have resolved the various issues identified in the Letter Motions, together with related discovery disputes."). This Statement is also incomplete and misleading because a comparison by Dr. Reimers of the commercial performance of the Works in ebook form before a particular date with the commercial performance after that date would not demonstrate whether the market for a particular Work in Suit was harmed by the Internet Archive given the inability of Internet Archive's experts to impose sufficient controls to discount extraneous factors and account for the fact that the sales of every book are unique. Prince Decl. ¶¶35-86. Any suggestion that the Publishers improperly deprived Internet Archive of necessary data is further misleading because Internet Archive obtained voluminous data about both the Works as well as "books other than the Works in Suit" published by the four Plaintiff Publishers and by other book publishers that partner with OverDrive from a third-party subpoena to OverDrive; specifically, the Internet Archive received data reflecting monthly revenues and digital checkouts

66

for the Works in Suit and more than 300 other books as well as checkout figures for current OverDrive public and academic library customers located in the United States, on an annualized basis for each year from 2010 through 2020, and on a monthly basis for each month in the calendar year 2020.  Suppl. McN Decl. Ex. 7.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements that the asserted fact is "not material," "incomplete," and "misleading" is not a denial of the asserted fact.  Plaintiffs' sole dispute concerns whether Plaintiffs failed to produce monthly data requested by the Internet Archive, and Plaintiffs' account is incorrect, as explained in the Internet Archive's reply brief at II.A.4.c.iii.

125.    The Internet Archive requested monthly commercial performance data for the Works in Suit for the time period from 2011 to 2020. Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Plaintiffs' Response:**  Undisputed, but not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete, and misleading" is not a denial of the asserted fact.

126.    Plaintiffs declined to produce the requested monthly data. Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 3 n.1, ECF No. 49.

**Plaintiffs' Response:**  Undisputed that the Publishers "declined to produce the requested monthly data," but incomplete and misleading because Publishers had "already produced monthly sales data from Hachette for 2020," because producing the requested information would

67

have been extremely burdensome due to the fact that the Publishers did not keep their data in the form requested and because the Publishers had already produced a vast wealth of detailed sales and related financial data. Suppl. McN Decl. Ex. 8, pp. 5-7. This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete," "misleading," and "not material" is not a denial of the asserted fact.

127.    Each book began to be available for digital lending on a particular known date, so having monthly commercial performance data would allow a comparison of the commercial performance before that particular date with the commercial performance after that date. Def.'s Req. for Pre-motion Disc. Conf. at 3, ECF No. 47.

**Plaintiffs' Response:**  Disputed but not material because the absence of potentially relevant evidence does not help Internet Archive sustain its burden of proving that the Publishers did not suffer market harm as a result of its infringement. This Statement is also incomplete and misleading because "a comparison of the commercial performance before that particular date with the commercial performance after that date" would not demonstrate whether the commercial ebook market for a particular Work in Suit was harmed given the inability of Internet Archive's experts to impose adequate controls to discount extraneous factors or account for the fact that the sales of every book are unique.  Prince Decl. ¶¶35-86; Weber Decl. ¶28.

This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statements that the asserted fact is "not material," "incomplete," and "misleading" is not a denial of the asserted fact. Further, Plaintiffs do not address—let alone dispute—the fact as stated: that monthly commercial performance data (from before and after a particular date) would allow a comparison of that data before and after that date. Whether or not that comparison demonstrates what Plaintiffs contend is irrelevant to the asserted fact.

128. Hachette was the only Plaintiff to produce monthly data for all of its Works in Suit, but Hachette only produced this data for 2020. Hachette produced annual data for 2015 to 2019. Gratz Decl. ¶ 43; *see also* Gratz Decl. Ex. JJ (HACHETTE0002474) & Ex. KK (HACHETTE0002475).

**Plaintiffs' Response:** Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

129. For its Works in Suit, HarperCollins produced annual data for 2017 to 2020. Gratz Decl. ¶ 44; *see also* Gratz Decl. Ex. LL (HC0010272).

**Plaintiffs' Response:** Undisputed that HarperCollins produced annual data at least for 2017 to 2020, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

69

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

130.    For its Works in Suit, Penguin Random House produced annual data for 2010 to 2020.  Gratz Decl. ¶ 45; *see also* Gratz Decl. Ex. MM (PRH0025907).

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

131.    For its Works in Suit, Wiley produced annual data for 1996 to 2020.  Gratz Decl. Ex. 46; *see also* Gratz Decl. Ex. NN (WILEY0005650).

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

132.    The Internet Archive requested data about the commercial performance of all Plaintiffs' books, broken down by month, since 2011. Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47.

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

133.     This data would allow a comparison of the commercial performance of books that were available for digital lending with books that were not available for digital lending.  *Id.*

**Plaintiffs' Response:**  Disputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so.  *See* Local Civil Rule 56.1(d).  Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

134.     Plaintiffs refused to provide data about books other than the Works in Suit. Def.'s Req. for Pre-motion Disc. Conf. at 1-2, ECF No. 47; Pls.' Resp. to Req. for Pre-motion Disc. Conf. at 1, 3, ECF No. 49.

**Plaintiffs' Response:**  Undisputed, however this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement124, which are incorporated herein by reference.

71

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and misleading" is not a denial of the asserted fact.

135.    The Internet Archive requested that Plaintiffs produce monthly commercial performance data about a set of books Plaintiffs regarded as comparable to the Works in Suit, but Plaintiffs refused.  Gratz Decl. ¶ 42.

**Plaintiffs' Response:**  Undisputed, but incomplete and misleading because the Publishers' declined to produce the requested data because that would be "burdensome in the extreme" and "irrelevant" given the reality that, "since books are not fungible widgets," there "is no such thing as a 'comparable book.'" Suppl. McN Decl. Ex. 8, p. 6. This Statement is also not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete," "misleading," and "not material" is not a denial of the asserted fact.

136.    The National Emergency Library provided an opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit.  Reimers Report ¶¶ 34, 35, 37; Jorgensen Report ¶ 49.

**Plaintiffs' Response:**  Undisputed that the National Emergency Library provided a potential opportunity to observe the effect on the market for the Works in Suit if there were no limits on the number of concurrent borrows for the Works in Suit but only (a) under the then-current level of usage of the IA's Website and (b) if the study were done in a reliable fashion,

72

including by accounting for other factors affecting the market for each Work in Suit. *See* Prince Decl. ¶¶76-85.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

137.    Dr. Reimers observed the Amazon rankings for the Works in Suit relative to when the NEL was launched. Reimers Decl. Ex. 1 ¶¶34, 48–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  This Statement is essentially identical to Statement 119 and the Publishers' Response thereto is incorporated by reference here.

**Internet Archive's Reply**:  The Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 119.

138.    The Amazon rankings for the Works in Suit improved by approximately 2% at the time the NEL was launched. The Amazon rankings held steady while the NEL was in effect. Then, around the time that most Works in Suit were removed from the Internet Archive, the rankings reverted to their pre-NEL levels.  However, the Works in Suit behaved similarly the year prior at the same time of the year.  In sum, the Amazon rankings of the Works in Suit did not undergo a statistically significant decrease relative to when the NEL was launched. Reimers Decl. Ex. 1 ¶¶ 51–54 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible.  The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 138 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Further, this Statement misrepresents the findings in Dr. Reimers' cited Expert Report and Reply Expert Report regarding her analysis of the impact of the NEL on the Amazon print rankings of the Works in Suit, including her

ultimate conclusion – which was that she "cannot conclude [based on this data] that the NEL had either a positive or a negative effect on the Amazon sales rankings of print editions." *See, e.g.*, Reimers Report ¶¶48-54. This Statement is also incomplete and not material because Dr. Reimers merely observed Amazon rankings for print books of the Works in Suit, which are not relevant to the ultimate issue of whether IA negatively affected revenue from licensing and sales to U.S. libraries and consumers, including in ebook format. Prince Decl. ¶¶29-34.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. The asserted fact accurately characterizes Dr. Reimers' findings—including her ultimate conclusion that there is "no statistically significant evidence that a book's inclusion in the Internet Archive's lending library or the launch of the NEL hurt or harmed its sales on Amazon." Reimers Expert Rpt. ¶ 55. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact. Finally, Plaintiffs' "Expert Opinion Objections from their Response to Statement 118" are incorrect for the reasons explained by the Internet Archive in its reply to that statement, which is incorporated here.

139. Dr. Reimers concluded that these observations signified that the NEL did not depress Plaintiffs' unit sales of physical formats of the Works in Suit. Reimers Decl. Ex. 1 ¶¶ 10, 53 (Reimers Expert Rpt.); *id.* Ex. 2 ¶¶ 3–8 (Reimers Reply Expert Rpt.).

**Plaintiffs' Response:** Disputed but inadmissible, misleading, incomplete and not material for all the reasons set forth in the Publishers' Response to Statement 138, which are incorporated by reference herein, including the Expert Opinion Objections.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "not material" is not a denial of the asserted fact. The Internet Archive incorporates its reply to Plaintiffs' response to paragraph

74

138, as well as its reply to Plaintiffs' "Expert Opinion Objections" from their response to paragraph 118.

140.    Dr. Jørgensen observed the change in OverDrive checkouts for the Works in Suit after the shutdown of the NEL and effective removal of the Works in Suit from the Internet Archive.  He observed that after the closure of the NEL, the number of OverDrive check-outs of the Works in Suit ███████████████████████████████████ ██████████████████████  Jørgensen Decl. Ex. 1 ¶¶ 49–53 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 17 (Jørgensen Reply Rpt.).

**Plaintiffs' Response:**  Undisputed that Dr. Jorgensen observed the OverDrive checkouts for the Works in Suit in June 2020, ███████████████████████████████ █████████████████████████████████████, but the Publishers dispute any implication that Dr. Jørgensen established that this result was caused by the Internet Archive's actions or the NEL. Further, this Statement is incomplete and misleading because, as Dr. Jørgensen admits, checkout frequency does not directly translate to revenue for library ebooks licenses, which are frequently based on a term of years or 24 circulations. Prince Decl. ¶¶29-33; Reply Expert Report of Rasmus Jorgensen, Ph.D, ECF 108-2 ("Jørgensen Reply"), ¶26; Prince Decl. Ex. 3 (Jørgensen Tr. 101:3-19). The Publishers also assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 140 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' dispute of "any implication" of the asserted fact and statements that the asserted fact is

75

A-6353

"incomplete" and "misleading" are not denials of the asserted fact. Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

141. Dr. Jørgensen concluded that the evidence was not consistent with Plaintiffs' theory that the Internet Archive's loan volume of the Works in Suit reduced digital lending through OverDrive. *Id.*

**Plaintiffs' Response:** Disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 141 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so. *See* Local Civil Rule 56.1(d). Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

142. Dr. Jørgensen also analyzed whether the closure of the NEL impacted Hachette's book sales of the Works in Suit. Jørgensen Decl. Ex. 1 ¶¶ 54–58 (Jørgensen Expert Rpt.).

**Plaintiffs' Response:** Undisputed that Dr. Jorgensen purported to analyze whether the closure of the NEL impacted Hachette's paperback and ebook sales of their Works in Suit, but incomplete and misleading to the extent that it suggests that Dr. Jorgensen reliably analyzed the impact of the closure of the NEL on these sales. Prince Decl. ¶¶35-53.

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "incomplete" and "misleading" is not a denial of the asserted fact.

143.    Dr. Jørgensen was unable to analyze whether the closure of the NEL impacted all four of the Plaintiffs' sales of the Works in Suit because Hachette was the only Plaintiff – despite the Internet Archive's requests – to produce monthly sales data for 2020 for each of its Works in Suit. Jørgensen Decl. Ex. 1 ¶ 54 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶ 40 (Jørgensen Reply Rpt.); Gratz Decl. ¶¶ 42–46.

**Plaintiffs' Response:**  Undisputed that Dr. Jorgensen did not perform analysis based on monthly sales data for the Works in Suit published by PRH, HarperCollins or Wiley, but this Statement is not material, incomplete and misleading for the reasons set forth in the Publishers' Response to Statement 124, which are incorporated herein by reference.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' statement that the asserted fact is "not material, incomplete and "misleading" is not a denial of the asserted fact.

144.    When the Internet Archive shut down the NEL, Hachette did not see increases in paperback or ebook sales of the Works in Suit. Rather, Hachette's sales of the Works in Suit contracted approximately 21% between the second and third quarter of 2020 for paperbacks and approximately 29% between the second and third quarter of 2020 for ebooks. Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.).

**Plaintiffs' Response:**  The Statement recited above is disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 144 are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d).  Statement 144 also does not accurately summarize the content of the cited Jorgensen Expert Report.

77

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so.  *See* Local Civil Rule 56.1(d).  Rather, Plaintiffs point to the Jorgensen Expert Report, which supports the asserted fact, as it states:  between the second and third quarters of 2020, "the quarter-over-quarter decrease in Hachette's paperback sales of the Works-in-Suit was approximately 21 percent" and "Hachette's ebook sales of the Works-in-Suit decreased by about 29 percent between the second and third quarter of 2020."  Jørgensen Expert Rpt. ¶¶ 57–58.  Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

145.    Dr. Jørgensen concluded this simultaneous contraction was not indicative that the Internet Archive's lending of Hachette's Works in Suit acted as market substitutes. Jørgensen Decl. Ex. 1 ¶¶ 57–58 (Jørgensen Expert Rpt.); *id.* Ex. 2 ¶¶ 17–18 (Jørgensen Reply Rpt.).

**Plaintiffs' Response:**  The Statement recited above is disputed but inadmissible. The Publishers assert the Expert Opinion Objections from their Response to Statement 118, and incorporate them by reference herein, and object that the expert opinions set forth in Statement 145 above are inadmissible – and should be disregarded pursuant to Local Rule 56.1(d). Statement 144 also does not accurately summarize the content of the cited Jorgensen Expert Report.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs claim to dispute the asserted fact but offer no evidence in the record to do so.  *See* Local Civil Rule 56.1(d).  Rather, Plaintiffs point to the Jorgensen Expert Report, which supports the asserted fact, as it states:  "the reduction in IA's loan volume following the closing of NEL happened at the same time as Hachette's paper back sales contracted, which is not indicative of

78

the 'substitution' effect purported by Plaintiffs" and "the reduction in IA's digital lending of the Works-in-Suit published by Hachette between the second and third quarter of 2020 was not associated with increased ebook sales to Hachette, as one would expect according to Plaintiffs' purported theory of 'competing substitutes.'" Jørgensen Expert Rpt. ¶¶ 57–58. Finally, the Internet Archive incorporates its reply to Plaintiffs' response to Paragraph 118 regarding admissibility.

146. Dr. Prince made no attempt to quantify the effect of the Internet Archive's digital lending on Plaintiffs. Gratz Decl. Ex. EE, Deposition Transcript of Jeffrey Prince ("Prince Dep. Tr.") 52:16–53:21, 54:9–16, 202:23–203:10, 230:3–8.

**Plaintiffs' Response:** Undisputed that Dr. Prince did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on the Plaintiffs, but Dr. Prince did "la[y] out the economic reasoning that [he] believes[s] points to it being detrimental, having harm" (Prince Decl. Ex 2 (Prince Tr. 203:7-10); *see also* Prince Decl. ¶¶15-19; Prince Report ¶¶54-65) and indicated that the harm would be substantial, including if Internet Archives practices scaled up or became widespread. Prince Decl. ¶¶76-86; Prince Report ¶¶66-72. This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendant's conduct were to become widespread. 17 U.S.C. §107; *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it.").

**Internet Archive's Reply**: Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs' assertion that the asserted fact is "not material" is not a denial of the asserted fact.

147.    Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues. Gratz Decl. Ex. N, Dye Dep. Tr. 106:3–107:13; *id.* Ex. FF, Deposition Transcript of Allison Lazarus ("Lazarus Dep. Tr.") 27:9–12; 38:12–22; *id.* Ex. GG, Deposition Transcript of Chantal Restivo-Alessi ("Restivo-Alessi Dep. Tr.") 224:7–225:9; *id.* Ex. HH, Deposition Transcript of Alan Pavese ("Pavese Dep. Tr.") 55:3–16.

**Plaintiffs' Response:**    Undisputed that the Plaintiffs did not perform a special damages analysis providing a specific monetary figure quantifying the extent of the harm created by Internet Archive's free ebooks website on Plaintiffs, but the filed Declarations of Jeffery Weber and Chantal Alessi-Restivo state that IA's failure to pay the Plaintiffs fees for its lending of ebooks amount to millions of dollars (Weber Decl. ¶84; R-A Decl. ¶¶70-71) and the Publishers all testified repeatedly they believe that Internet Archive harms their book sales based on extensive experience in the publishing field and common sense. *See, e.g.*, Suppl. McN Decl. Ex. 2 (R-A Tr. 141:3-141:11); *id* Ex. 3 (Weber Tr. 202:23-203:11, 205:22-206:9, 207:4-23, 214:3-24); *id* Ex. 4 (Pavese Tr. 51:11-54:24, 190:22-192:13); *id* Ex. 6 (Lazarus Tr. 48:3-51:23); Weber Decl. Ex. 26 (Dye Tr. 372:25-374:23). This Statement that "Plaintiffs have made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues" also misrepresents the Publishers' testimony. *See, e.g.*, Suppl. McN Decl. Ex. Ex. 6 (Lazarus Tr. 36:5-41:24). This Statement is also not material because the Publishers do not have the burden of proving market harm under the fourth factor, and market harm includes potential harm, including if the defendants conduct were to become widespread.  17 U.S.C.  §107; *TVEyes, Inc.*, 883 F.3d at 176.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.  That the Publishers' representatives, none of whom were offered as experts, claim without support that the Internet Archive cost them "millions" or that their book sales were harmed does not

80

genuinely dispute the asserted fact that Plaintiffs made no attempt to quantify the effect of the Internet Archive's digital lending on their revenues. Nor does Plaintiffs' claim of misrepresented testimony hold up—none of the cited deposition testimony of Ms. Lazarus demonstrates Hachette attempting to quantify the effect of the *Internet Archive's* digital lending on their revenues. Finally, Plaintiffs' statement that the asserted fact is "not material" is not a denial of the asserted fact.

148.     Even if you were to assume that CDL reduced the necessity of lending those titles via licensed ebooks, and even if books more than five years old all became easier to lend electronically through CDL for all libraries, libraries would not spend less money on acquisitions. They would reallocate their spending away from ebook licensing for those titles being accessed through CDL and would spend more on ebook licensing for newer titles or on print books. Declaration of Susan Hildreth submitted herewith ("Hildreth Decl.") Ex. 1 ¶ 106 (Hildreth Expert Rpt.).

**Plaintiffs' Response:**  Undisputed that if books "became easier to lend electronically through CDL for all libraries, … they would reallocate their spending away from ebooks licensing for those titles being accessed through CDL." Disputed that "libraries would not spend less money on acquisitions" and "would spend more on ebook licensing for newer titles or on print books." Ms. Hildreth further testified that if a library were to forgo purchasing an ebook license for a particular title because that title was available through CDL, the author and publisher of that title would not receive the payment they would have received had the library purchased an authorized edition – which means that authors and publishers would be harmed even if the libraries reallocated money to purchasing other authorized ebooks. McN Decl. Ex. 19 (Hildreth Tr. 44:24-45:4). Ms. Hildreth also testified that libraries could reallocate budgets to

81

non-book purchases (*e.g.*, DVDs and games) and that discretionary acquisition budgets are constantly under pressure – which means that local authorities could reduce funding for acquiring books if CDL reduced demand for authorized ebooks. Suppl. McN Decl. Ex. 5 (Hildreth Tr. 198:23-203:25; 225:17-226:12).

The Publishers further dispute and object to disputed portions of the expert opinions of Ms. Hildreth set forth in Statement 148 *supra* because they are inadmissible, and must therefore be disregarded for violating Local Rule 56.1(d), for the following reasons. The Publishers dispute any expert opinion in the above paragraph that purports to establish that Internet Archive did not inflict market harm on the Publishers or impair the value of their copyrights in the Works in Suit or any other book. Any such opinion from Ms. Hildreth is inadmissible because, *inter alia*, Ms. Hildreth lacks the expertise necessary to state an opinion about the conduct of all libraries nationwide and did not arrive at her conclusions by any kind of objective process, let alone the kind of sound methodology required for expert testimony. Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Expert Report of Susan H. Hildreth, ECF 110-1 ("Hildreth Report"), ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion. And at her deposition, Ms. Hildreth testified that she did not have access to any relevant data from any of the 9,000 public library systems in the United States that could possibly support her specious conclusion. Prince Decl. Ex. 5 (Hildreth Depo. Tr. 259:1-262:6). In the event of a trial, the Publishers reserve the right to file a motion to strike portions of Ms. Hildreth's expert reports under Federal Rule of Evidence 702. *See* Fed. R. Evid. 702(1) (expert testimony must be "based upon sufficient facts or data"); *Johnson Elec. N.Am. Inc. v. Mabuchi*

82

*Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000). Further, Ms. Hildreth's opinions about whether or not the Internet Archive had a causal impact on the Publishers' sales and check-outs are merely opinions and not facts suitable for a Rule 56.1 Statement. See, e.g., *Goris v. Breslin*, 2009 U.S. Dist. LEXIS 57108, at *3 (S.D.N.Y. July 6, 2009) (for the purposes of deciding summary judgment, this "court's reliance on … experts' affidavit is limited to the undisputed facts"); Local Rule 56.1(d).

**Internet Archive's Reply**: Plaintiffs' dispute is a mischaracterization of Ms. Hildreth's testimony that is not supported by the cited evidence, as explained in the Internet Archive's response to Plaintiffs' 56.1 Statement (¶¶ 526, 602):

> Ms. McNamara asked: "Is it your expert opinion that libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL?" Ms. Hildreth answered: "That is possible, yes, but whether it would ever in fact occur would depend on the circumstances." Later, when asked, "When a library acquires via CDL a series of books, they are not paying licenses for those works; isn't that right?" Ms. Hildreth testified: "They are not paying for CDL licenses when they receive or obtain content through CDL." Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 264:3-264:12; Gratz Opp'n Decl. Ex. 6, Hildreth errata.

> Ms. Hildreth also testified that she did not know whether the availability of books through the Internet Archive's Digital Lending Library had in fact had any effect on demand for e-book licenses and that she did not "have a view" on whether libraries would actually purchase fewer e-book licenses for titles it makes available through CDL. "I think it would be determined on a case-by-case basis depending on what the libraries' needs would be in terms of their collection." *See* Gratz Opp'n Decl. Ex. 5, Hildreth Dep. Tr. 257:1-258:6.

Further, Ms. Hildreth's opinions are suitable for a Rule 56.1 statement. *See Olin Corp.*, 332 F. Supp. at 838 (rejecting argument, in motion to strike portions of Rule 56.1 statement, that expert opinions are inadmissible). As described in her expert reports, Ms. Hildreth has over forty-eight years of library administration experience, including as the State Librarian of

California and the Director of the federal Institute of Museum and Library Services from 2011 to 2015, where she worked closely with and oversaw data collection about libraries. Hildreth Ex. 1 ¶ 2, ECF No. 110-01. "[E]xperience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, Advisory Committee's Note; *see also Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Finally, Plaintiffs make no effort to properly exclude Ms. Hildreth for purposes of summary judgment. Indeed, each of the cases Plaintiffs cites involves a motion to exclude. *See City of Providence*, 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) (motion to exclude expert testimony filed simultaneously with motion for summary judgment); *Lamarr-Arruz*, 2017 WL 4277188 (S.D.N.Y. Sept. 26, 2017) (motion to exclude expert testimony filed simultaneously with motion for class certification); *In re Electronic Books Antitrust Litigation*, 2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) (motion to exclude expert testimony from consideration of class certification motion, summary judgment motion, and trial). Here, Plaintiffs make no motion to exclude.

149. With CDL in place in libraries throughout the United States, libraries would have additional flexibility in what they acquire from publishers, but would not spend any less money on publishers' products. Hildreth Decl. ¶ 109.

**Plaintiffs' Response:** Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

84

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule 56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

150.    There have been no instances of a library paying for access to fewer ebook copies of a title – or buying fewer copies of a physical book for a title – where that title is available for borrowing through CDL, either from the IA or from another library.  *Id.* Ex. 2 ¶ 8 (Hildreth Reply Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule 56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

151.    Most libraries strive to spend their entire annual materials allocation within the fiscal year in which funds were allocated. In fact, it is highly unusual for a library not to spend the entire allocation each year.  *Id.* Ex. 1 ¶ 71 (Hildreth Expert Rpt.).

**Plaintiffs' Response:**  Disputed but inadmissible for the reasons set forth in the Publishers' Response to Statement 148, which are incorporated by reference herein. This proposed "fact" is also not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7),

she does not cite to any study, data collection, or any other information to support this purely speculative conclusion.

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact. Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule 56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

152.    Libraries help readers discover books – through purposeful searching as well as accident or "serendipity."  Readers can browse physical shelves of libraries and a library's online catalog.  Hildreth Decl. Ex. 1 ¶¶ 34, 35, 39 (Hildreth Expert Rpt.).

**Plaintiffs' Response:** Undisputed.

**Internet Archive's Reply**:  Plaintiffs do not dispute the asserted fact.

153.    Libraries generally begin lending a book as soon as it is published.  Hildreth Decl. ¶ 5.

**Plaintiffs' Response:**  Disputed but not admissible.  Vague and lacks foundation. This proposed "fact" is not supported by admissible evidence, in violation of Local Rule 56.1(d), and must therefore be disregarded. Further, despite Ms. Hildreth's statement that she has "a breadth of experience in the library field, particularly during the impactful transitional years from a primarily print world to the current print/digital balance of all services[,]" (Hildreth Report ¶7), she does not cite to any study, data collection, or any other information to support this purely speculative conclusion. This Statement is also incomplete and misleading because libraries continue to purchase books in paper and ebook editions long after first publication – as is the case with decades old Works in Suit such as *Their Eyes Were Watching God*, Catcher *in the Rye* and *Lord of the Flies*.

86

**Internet Archive's Reply**:  Plaintiffs do not genuinely dispute the asserted fact.

Plaintiffs cite to no evidence in the record in support of their dispute.  *See* Local Civil Rule

56.1(d).  Finally, Plaintiffs' admissibility objections are unfounded and incorrect for the reasons

laid out in the Internet Archive's reply to Plaintiffs' response to paragraph 148.

Dated:  October 7, 2022          DURIE TANGRI LLP

                                      By:_____*/s/ Joseph C. Gratz*_____
                                          Joseph C. Gratz (*Pro Hac Vice*)
                                          Jessica E. Lanier (*Pro Hac Vice*)
                                          Aditya V. Kamdar (*Pro Hac Vice*)
                                          Annie A. Lee (*Pro Hac Vice*)
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666
jgratz@durietangri.com
jlanier@durietangri.com
akamdar@durietangri.com
alee@durietangri.com

ELECTRONIC FRONTIER FOUNDATION
Corynne McSherry (*Pro Hac Vice*)
Kit Walsh (*Pro Hac Vice*)
Cara Gagliano (*Pro Hac Vice*)
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333
corynne@eff.org
kit@eff.org
cara@eff.org

Attorneys for Defendant
INTERNET ARCHIVE

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 7, 2022 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*Joseph C. Gratz*
Joseph C. Gratz

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                        :        Case No. 1:20-cv-04160-JGK

                   Plaintiffs,

                                         :

-against-

                                         :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                         :

                   Defendants.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### PLAINTIFFS' RESPONSE TO INTERNET ARCHIVE'S RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT AND ADDITIONAL STATEMENT OF MATERIAL FACTS

Plaintiffs Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC

("HarperCollins"), John Wiley & Sons, Inc. ("Wiley") and Penguin Random House LLC

("PRH") (collectively, the "Publishers"), pursuant to Local Rule 56.1(b) of the United States

District Court for the Southern District of New York, submit this Response to Defendant Internet

Archive's Response to Plaintiffs' Rule 56.1 Statement and Additional Statement of Material

Facts. *See* Doc. 172 ("IA-RSUMF"). The Publishers submit this Response solely for purposes

of their pending Motion for Summary Judgment and reserve the right to challenge the purported

truth of any statements made in the Internet Archive's Additional Statement of Material Facts at

any trial of this action.[1]

---

[1] Unless otherwise noted, this Response uses the same abbreviations and capitalized terms as

those set forth in the Publishers' Rule 56.1 Statement of Material Facts (ECF No. 113).

**RESPONSE TO INTERNET ARCHIVE'S IMPROPER OBJECTIONS TO CERTAIN OF
PLAINTIFFS' UNDISPUTED STATEMENTS OF FACTS**

Internet Archive disputes a small fraction of the Publishers' Undisputed Statements of

Material Facts (Doc. 113), but the vast majority of these objections are improper and were

clearly formulated to avoid conceding indisputable facts that range from inconvenient to deeply

harmful for Internet Archive. These objections fall roughly into three categories – (1) objections

to the McNamara Declaration, (2) objections to statements based on studies conducted by certain

Plaintiffs and (3) otherwise evasive responses.

*First*, Internet Archive objects to portions of the McNamara Declaration filed in support

of the Publishers' Motion for Summary Judgment (Doc. 96) on the grounds that it "contains

impermissible statements of argument and fact" (*see* IA-RSUMF, 1-3) – but this attack is

unfounded because the paragraphs that IA challenges are garden variety examples of an attorney

setting forth record evidence in a declaration. "It is well established that an attorney's affidavit

can be used, in connection with a summary judgment motion, to place documents produced in

discovery before the Court." *Pace v. Air Liquid Systems Corp.*, 171 F.Supp.3d 254, 272

(S.D.N.Y. 2016). Such declarations are not objectionable simply because they summarize the

evidence to which they cite, or explain its import; to the contrary, "[a]ttorney affidavits are …

allowed a degree of latitude to characterize the evidence by informing the court of the basis for

the summary judgment motion and identifying the portion of the record counsel believes

demonstrates the absence of genuine issues of fact." *Trustees of Local 8A-28A Welfare Fund v.

Am. Group Administrators*, No. 14-cv-1088, 2017 WL 3700899, at *1 (E.D.N.Y. Aug. 25, 2017)

(internal quotes omitted). And, despite IA's objection to what it characterizes as "argumentative

statements" (IA-RSUMF, 2), "[t]he Court is capable of discerning from the [Declaration] what

statements were made on the basis of [McNamara's] firsthand knowledge; what statements are

2

summaries of evidence in the record; and what documents the Court should review in determining the accuracy of those summaries." *Pace*, 171 F.Supp.3d at 272.

Internet Archive nevertheless challenges 14 Statements for being based on "improper attorney testimony in the form of Ms. McNamara's Declaration," but these objections do not withstand scrutiny.[2]  Each of the paragraphs that IA challenges from the McNamara Declaration contains an entirely proper summary of and/or citation to record evidence.  For instance:

- Statement 103 states that "[c]onsumers pay for an ebook that they download from an authorized e-vendor whether or not they read the whole book or only consult a small portion of it."  IA does not dispute this Statement in its Response, but nevertheless objects that this is "one of many examples … where the only support for an assertion is improper attorney testimony in the form of Ms. McNamara's Declaration."  This is false.  In reality, Statement 103 cites Paragraph 10 of the McNamara Declaration, which identifies and summarizes *four documentary exhibits* that set forth the Publishers' consumer ebook terms, which contain no variation depending on how much the consumer actually reads.  *See* McN Decl.

---

[2] The paragraphs of the McNamara Declaration cited in support of two of the challenged Statements (McN Decl. ¶45, cited in Statement 300; and McN Decl. ¶108, cited in Statement 501) contained incomplete or erroneous citations, but nevertheless are fully supported by evidence in the record.  *See* McN Decl. Ex. 56 (containing quotation from McN Decl. ¶45 cited in Statement 300); McN Decl. Ex. 103 (Open Libraries Form, erroneously cited in McN Decl. ¶108 as McN Dec. Ex. 153).

3

¶10, citing Weber Decl. Ex. 21, R-A Decl. Ex. 4, Sevier Decl. Ex. 6, Pavese Decl. Ex. 5.

- Statement 378 states that "Internet Archive has marketed the Open Libraries project to libraries as a substitute for paying for authorized ebooks via authorized library ebook aggregators and as a means of obtaining 'free ebooks for your patrons' with 'no cost involved.'" IA disputes this Statement because "[t]he only cited evidence for the assertion that the Internet Archive has done so is improper attorney testimony in the form of Ms. McNamara's Declaration." But Paragraph 71 of the McNamara Declaration – which is cited in Statement 378 – identifies and appropriately summarizes ten indisputable examples of Internet Archive marketing itself to libraries as an alternative to paying for library ebooks – including quotations from an email the Director of Open Libraries wrote to a library promising "free ebooks for your patrons" with "no cost involved." *See* McN Decl. ¶71(a)-(i).

- Statement 333 states that "Internet Archive via affiliated entities acquired Better World Books." IA once again objects that "the only cited evidence for the assertion that the 'Internet Archive … acquired Better World Books' is improper attorney testimony in the form of Ms. McNamara's Declaration." But this objection disregards the fact that Paragraph 56 of the McNamara Declaration (upon which Statement 333 relies) is not conjecture from Attorney McNamara, but rather a summary of indisputable record evidence demonstrating how IA and its founder gained control and effective ownership of Better World Books. *See* McN Decl. ¶56.

4

The remaining objections to the McNamara Declaration are equally without merit and should be seen for what they are – an attempt to avoid admitting true facts.[3] The Statements should be deemed admitted.

*Next*, Internet Archive "disputes" the results of studies conducted by PRH and HarperCollins – which indicate that a high proportion of total ebook reads are attributable to readers of library ebooks – on the grounds that the "study's conclusions are … hearsay" and based on a "voluminous data file." *See* IA-RSUMF ¶¶175, 177-80.  This objection must be rejected, however, because the studies are records created and maintained in the ordinary course of business, and therefore excepted from the rule against hearsay.  *See* FRE 803(6).  And IA offers no authority to support its bold claim that these conclusions should be disregarded because they are based on "voluminous data."  To the contrary, the Federal Rules of Evidence specifically allow parties to "use a summary … to prove the content of voluminous writings … that cannot be conveniently examined in court."  FRE 1006.

*Finally*, Internet Archive provides evasive Responses that were clearly designed to avoid admitting inconvenient (but indisputable) facts.  For instance:

- Statement 349 states that Jacques Cressaty, IA's 30(b)(6) witness for financial matters, testified that "every single page of the Archive is monetized."  IA disputes this statement on the spurious grounds that "[t]he questioning attorney prompted Mr. Cressaty with the quoted phrase."  For reasons that should be obvious, IA cannot dispute or disavow Mr. Cressaty's testimony simply because the questioning attorney "prompted" a response that resulted in affirmative testimony by the witness, like here.  If this was the law – and it is assuredly not –

---

[3] *See* Responses to Statements 241, 300, 474, 501, 514, 523, 532, 544, 562, 602, and 612.

routine questions and answers in a deposition could be stricken for "prompting" the witness. IA makes similar objections to other Statements in an effort to walk back other pieces of (damning) deposition testimony from its witnesses, which should also be rejected. *See* Responses to Statements 309, 526.

- Statement 337 states that "Kahle is the Chairman of Better World Libraries and a Director of Better World Books, which is controlled by "people affiliated with the Austin Kahle [sic] Empire." (McN Decl. ¶56.)" IA disputes this Statement with the nonresponsive objection that "Better World Books is a 501(c)(3), as is its sole shareholder Better World Libraries. Each entity has a board with three members. Gratz Opp'n Decl. Ex.3, Patton-Schmidt Dep. Tr.101:5-20; 70:23-71:2, 80:4-81:7, 83:1-21, 86:21-88:15." But Better World Libraries' own tax documents describe Kahle as its "Chairman" (McN Decl. Ex. 88, Better World Libraries' 2019 990-PF Return), BWB's 30(b)(6) witness confirmed that Kahle sits on Better World Books' board (Gratz Opp. Decl. Ex.3, Patton-Schmidt Tr. 87:14-18), and IA's 30(b)(6) witness testified that "people affiliated with the Austin Kahle Empire have a controlling interest on the Better World Books' board." McN Decl. Ex. 45 (Cressaty Tr. 249:5-10).

- Statement 524 states that "Internet Archive has acknowledged that its Website competes with distributors of the Publishers' authorized ebooks. IA's witness, Mr. Karpales, wrote an email stating that 'reality has it that we are competing for eyeballs with Amazon … OverDrive … and countless other websites,' and he confirmed at his deposition that IA was "competing for eyeballs" with various

6

entities." IA nonsensically disputes this Statement on the grounds that "'[c]ompetes for eyeballs' is not equivalent to 'competing.'"

- Statement 544 states that "[d]emand for ebooks on IA's Website increased after lending limits were relaxed and, even after those limits were reimposed, key metrics like monthly circulation and number of total members have remained higher than their pre-pandemic levels." IA does not dispute the underlying facts (that monthly circulation and total members increased) but nonetheless disputes this Statement because "Plaintiffs have not laid a foundation for why an increase in monthly circulations and an increase in the number of total patrons constitutes an increase in demand." This is another nonsensical objection because increased circulation and website usage necessarily translates into increased demand for IA's ebooks. Any suggestion to the contrary defies common sense.

In sum, Internet Archive's objections to and/or denials of the above Statements are without basis and the Statements should be deemed admitted. Fed. R. Civ. P. 56(e)(2).

**RESPONSE TO INTERNET ARCHIVE'S ADDITIONAL STATEMENT OF FACTS**

154. While the Internet Archive did not begin digitally lending books until 2011, providing universal access to books has been a part of its mission for nearly the entirety of its history. Kahle Opp'n Decl. ¶3.

**Publishers' Response**: Undisputed.

155. Soon after its founding in 1996, the Internet Archive began hosting other digital content—including digital texts—in addition to its snapshots of the World Wide Web. Then, the Internet Archive focused on hosting public domain books. Kahle Opp'n Decl. ¶4.

**Publishers' Response**: Undisputed but not material.

7

156.  Hundreds of years of literature could fit easily in storage of ever smaller size, and the Internet Archive made a point of demonstrating this in 2002, when it drove its Bookmobile ("1,000,000 Books Inside (soon)") across the country, allowing readers of all ages to access, download, and print books in the public domain.  *Id.*

**Publishers' Response**: Undisputed but not material.

157.  The Internet Archive began scanning print books around 2004 when it helped form the Open Content Alliance, a consortium of libraries, universities, and companies—including the University of California, the University of Toronto, the Smithsonian Institution Libraries, and the National Archives of the United Kingdom, as well as Yahoo, Adobe, HP Labs, and Microsoft— that aimed to preserve and provide online access to digitized books.  Kahle Opp'n Decl. ¶5.

**Publishers' Response**: Undisputed but not material that around 2004 Internet Archive "helped form the Open Content Alliance, a consortium of libraries, universities, and companies … that aimed to preserve and provide online access to digitized books."  Disputed to the extent this Statement implies the Open Content Alliance's scanning of books was analogous to IA's current practice of digitizing and making available in-copyright works without seeking permission from the owners, since the Open Content Alliance focused on making available public domain works, and sought permission from copyright holders before making available in-copyright works.  *See* Katie Hafner, "In Challenge to Google, Yahoo Will Scan Books," NEW YORK TIMES, https://www.nytimes.com/2005/10/03/business/in-challenge-to-google-yahoo-will-scan-books.html.

158.  Within a few years, the Internet Archive launched Open Library, which aimed to become the largest catalog of books, while providing free access to public domain books the Internet Archive had scanned.  Kahle Opp'n Decl. ¶6.

8

**Publishers' Response**: Undisputed but not material because the catalog on Open Library did not distribute in-copyright books.

159. The first decade and a half of improvements to technologies used for scanning print books and displaying their digitized text laid the foundation for the Internet Archive—along with the dozens of other libraries it partnered with—to begin lending books online to patrons, for free, for short periods of time. Kahle Opp'n Decl. ¶7.

**Publishers' Response**: Undisputed for the purpose of this motion only that "improvements to technologies used for scanning print books and displaying their digitized text" made it possible for Internet Archive to begin lending public domain books online to patrons, for free, for short periods of time." Disputed that IA "partnered" with "dozens of other libraries" on the basis that this assertion lacks foundation, because IA provides no evidence supporting this claim, in particular in reference to in-copyright works. The use of the word "partnered" is also vague.

160. Now, the Internet Archive has more than 3.6 million books available for digital lending, and millions more public-domain books that can be downloaded and kept, not just borrowed. Kahle Opp'n Decl. ¶8.

**Publishers' Response**: Undisputed.

161. Of those millions of items, this lawsuit is about 127 Works in Suit, which are among what Plaintiffs say are the 33,000 books published by Plaintiffs that are available for borrowing from Internet Archive and are also available in digital form, such as via OverDrive. PSMF¶¶240-41.

**Publishers' Response**: Undisputed and Internet Archive admits the facts contained in Statement 161. *See, e.g.*, IA-RSUMF ¶¶198-201, 522.

9

162. The Internet Archive lends books—for free—to patrons for a limited time at its own expense. Those expenses include equipment, personnel, and, especially, acquisition and storage costs for the physical books that are being lent digitally. The Internet Archive has spent millions of dollars on its digital lending program. Kahle Opp'n Decl. ¶ 12.

**Publishers' Response**: Undisputed that Internet Archive "lends books—for free—to patrons for a limited time." With regard to the remaining facts in Statement 162, disputed since no foundation is provided for any of these facts which, in any event, are not material. Further, the record shows that at least some of the facts are false, including the suggestion that IA supports its lending program entirely "at its own expense," since it is undisputed that between 2020 and 2021 ██████████████████████████████████████ ████████████████ (IA-RSUMF ¶343), and that Open Library of Richmond ("OLR") – the company that owns and stores the books IA scans and lends (IA-RSUMF ¶313) – received ███ ████████████████████████████████████████████████ ████████████ IA-RSUMF ¶335; *see also* Cressaty Tr. at 269:30-270:24, ██████████ ████████████████████████████████████████████████

163. The Internet Archive is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations, including Books for Africa, school systems, prison ministries, and battered women's shelters. Gratz Opp'n Decl. Ex.3, Patton-Schmitt Dep. Tr. 27:12-28:5; *see also id.* at 40:2-41:21 (explaining that other donation recipients also have "wish lists" of specific book categories and titles).

**Publishers' Response**: Undisputed that Better World Books provides books to a range of non-profit organizations, but misleading to the extent it implies Internet Archive does not have closer ties to, or does not receive greater benefits from, BWB than other "nonprofit

10

organizations." Brewster Kahle, the founder of IA, is also a Director of BWB (Gratz Opp. Decl. Ex. 3, Patton-Schmitt Tr. 87:14-17) and Chairman of its sole shareholder Better World Libraries (McN Decl. Ex. 88; Gratz Opp. Decl. Ex. 3, Patton-Schmitt Tr. 80:18-81:7), and it is undisputed that Open Library of Richmond, an entity "fund[ed] from [Kahle's] personal finances" (IA-RSUMF ¶317), ███████████████████████████████████████████████

███████████████████████████████████████████ (IA-RSUMF ¶333). The evidence also shows that ████████████████████████████████████████████

████████████████████████████ (IA-RSUMF ¶343), ████████████████████████████

████████████████████████████████ Patton-Schmitt Tr. at 29:5-10. In addition, the evidence shows that Open Library of Richmond – the company that owns and stores the books IA scans and lends (IA-RSUMF ¶313) received ████████████████████████████

███████████████████████████████████████████ IA-RSUMF ¶335. ██████████

████████████████████████████████████████████████████████

████████████████ Cressaty Tr. at 269:30-270:24.

164.  From the beginning of the affiliate link program with Better World Books through February 10, 2021, the Internet Archive received only $5,561.41 in such revenue. Kahle Opp'n Decl. ¶19.

**Publishers' Response**: Disputed since the Statement lacks foundation that Internet Archive received only $5,561.41 in revenue from the affiliate link program with Better World Books through February 10, 2021. Further, the Statement is misleading because the undisputed facts show IA receives other benefits from Better World Books, including those referenced in Publishers' Responses to Statements 162-63. *See also* IA-RSUMF ¶¶ 323-47.

11

165.  Better World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs.  Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections.  Gratz Opp'n Decl.Ex.3, Patton-Schmitt Dep. Tr. 31:11-16.  When one of those books is sold, a portion of the proceeds goes to the library.  *Id.* 63:12-21.

**Publishers' Response**: Undisputed but not material that "Better World Books is a for-profit business that has adapted its business model to support libraries and other literacy programs."  Undisputed but not material that "Public and academic libraries across the country actively support Better World Books' model by providing books they have culled from their collections."  Disputed that "[w]hen one of those books [culled from a library's collection] is sold, a portion of the proceeds goes to the library," because the cited evidence does not support this Statement.  In the deposition testimony cited, Ms. Patton-Schmitt merely states that Better World Books "give[s] a portion of the proceeds back" from the sale of various categories of donated books, and provides as an example a scenario in which an individual donating books stipulates that 10 percent of the sales from those books must go to the Red Cross.  Gratz Opp. Decl. Ex. 3, Patton-Schmitt Dep. Tr. 63:5-10.

166.  Better World Books helps libraries recoup some of their investment in their collections while extending the lives of books that may otherwise have been thrown away.  If Better World Books does not believe it can sell a book, it donates it if possible, or, as a last resort, recycles it.  *Id.* 31:21-32:4, 35:1-36:11.

**Publishers' Response**: Undisputed but not material that "If Better World Books does not believe it can sell a book, it donates it if possible, or, as a last resort, recycles it."  Disputed that "Better World Books helps libraries recoup some of their investment in their collections,"

because the cited evidence does not support this statement. In the deposition testimony cited, Ms. Patton-Schmitt does not identify any material benefit that accrues to libraries from Better World Books' sale, donation, or recycling of books.

167. Libraries have a long history of resource sharing, including through interlibrary loan programs. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 40-46, 51, 82-88, 89-95, 98-101.

**Publishers' Response**: Undisputed but not material. Further, the Statement is vague as to the meaning of "long history" and "resource sharing."

168. The Internet Archive has no evidence that the owned to loaned ratio was exceeded as the result of physical access to a physical book owned by a partner library. Kahle Opp'n Decl. ¶ 26.

**Publishers' Response**: Undisputed that Internet Archive has produced "no evidence that the owned to loaned ratio was exceeded as the result of physical access to a physical book owned by a partner library," but not material because IA's purported compliance with the owned to loaned ratio is an element of its fair use defense and IA therefore has the burden of proof on this point. *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) ("Fair use is an affirmative defense" to copyright infringement and IA "bears the burden of proving it."). IA admits that it exercises no control over circulation of the physical copies of books in Partner Libraries that it counts towards its overlap analysis (IA-RSUMF ¶¶ 492-500), has "no way of knowing … whether the physical and digital copies of a book [are] in circulation simultaneously"-(IA RSUMF ¶495), and indeed that it is affirmatively aware that certain Partner Libraries do *not* remove the physical books from their shelves (IA-RSUMF ¶ 494).

169. Libraries regularly repair and re-bind books that are worn, rather than buying new copies from publishers. Hildreth Decl. Ex. 1, Hildreth Expert Rpt. ¶¶ 87–88.

**Publishers' Response**: Undisputed but not material.

Dated: New York, New York

October 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
         lindasteinman@dwt.com
         jackbrowning@dwt.com
         jessefeitel@dwt.com
         carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
         scott@oandzlaw.com
         danae@oandzlaw.com

*Attorneys for Hachette Book Group,*
*Inc., HarperCollins Publishers LLC,*
*John Wiley & Sons, Inc., and Penguin*
*Random House LLC*

14

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

HACHETTE BOOK GROUP, INC.,
HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY :
SONS, INC., and PENGUIN RANDOM HOUSE LLC,

                                    :      Case No. 1:20-cv-04160-JGK

             Plaintiffs,

                                   :

-against-

                                   :

INTERNET ARCHIVE and DOES 1 through 5,
inclusive,                                :

             Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara
Linda J. Steinman
John M. Browning
Jesse Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
       lindasteinman@dwt.com
       jackbrowning@dwt.com
       jessefeitel@dwt.com
       carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**
Scott A. Zebrak (*pro hac vice*)
Matthew J. Oppenheim
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
       scott@oandzlaw.com
       danae@oandzlaw.com

*Attorneys for Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley*
*& Sons, Inc. and Penguin Random House LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 4

I.      THE FIRST FACTOR WEIGHS HEAVILY AGAINST FAIR USE............................... 4

        A.      IA Fails to Demonstrate that CDL Is Transformative ........................................... 5
        B.      IA Fails to Demonstrate that Its Activities Are Noncommercial......................... 11

II.     THE SECOND AND THIRD FACTORS WEIGH HEAVILY AGAINST FAIR USE.. 13

III.    THE FOURTH FACTOR WEIGHS HEAVILY AGAINST FAIR USE ....................... 13

        A.      IA Does Not Disprove that CDL Deprives the Publishers of Customary Licensing
                Fees ..................................................................................................................... 14
        B.      IA Fails to Disprove that Publishers Lose Potential Sales of Authorized Ebooks
                Because of CDL .................................................................................................... 16

IV.     IA'S DEFENSE OF THE NEL CONFIRMS THAT CDL IS NOT FAIR USE............. 20

CONCLUSION....................................................................................................................... 20

CERTIFICATION OF COMPLIANCE ..................................................................................... 22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.,*
    896 F.3d 437 (D.C. Cir. 2018) ........................................................................ 9

*Amer. Geophysical Union v. Texaco,*
    60 F.3d 913 (2d Cir. 1994) ..................................................................... 8, 11, 12

*Authors Guild v. Google,*
    804 F.3d 202 (2d Cir. 2015) ................................................................... *passim*

*Cambridge Univ. Press v. Patton,*
    769 F.3d 1232 (11th Cir. 2014) ................................................................... 10

*Campbell v. Acuff-Rose Music,*
    510 U.S. 569 (1994) ....................................................................... 11, 16, 19

*Capitol Records, LLC v. ReDigi Inc.,*
    910 F.3d 649 (2d Cir. 2018) ................................................................... *passim*

*Fox News Network v. TVEyes, Inc.,*
    883 F.3d 169 (2d Cir. 2018) ................................................................... *passim*

*Harper & Row Pubs., Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) ............................................................................... 4, 12

*Infinity Broadcasting Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998) ......................................................................... 10

*Ringgold v. Black Ent. Television,*
    126 F.3d 70 (2d Cir. 1997) ........................................................................... 14

*Soc. of Holy Transfiguration Monastery v. Gregory,*
    689 F.3d 29 (1st Cir. 2012) ......................................................................... 12

*Sony Corp. v. Universal City Studios,*
    464 U.S. 417 (1984) .............................................................................. *passim*

*Swatch Gp Mgmt Serv. v. Bloomberg,*
    756 F.3d 73 (2d Cir. 2014) ...................................................................... 8, 10

*Telephone Digest v. U.S. Telephone Ass'n,*
    841 F. Supp. 5 (S.D.N.Y. 1993) ................................................................ 13

ii

*UMG Recordings v. MP3.com,*
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)...............................................................3, 8, 18

*WPIX v. Ivi, Inc.,*
    691 F.3d 275 (2d Cir. 2012)...................................................................................4

**Statutes**

17 U.S.C. § 102...................................................................................................3, 15

17 U.S.C. § 107..............................................................................................9, 10, 11

17 U.S.C. § 109.......................................................................................................6

iii

## PRELIMINARY STATEMENT

Internet Archive's opposition to summary judgment reflects a long-overdue retreat from its untenable legal argument – squarely rejected by the Second Circuit in *ReDigi* – that the first sale doctrine animates fair use and justifies the unauthorized reproduction of nearly four million in-copyright ebooks. Other than two passing mentions of "first sale," IA's fatally-flawed exhaustion argument has essentially vanished from its fair use defense of blatant misappropriation. *See* Doc. 173 ("IA-Opp.") 12, 22. IA's about-face is hardly surprising since Congress repeatedly rejected a digital first sale doctrine, and no court has ever held or suggested that the mere possession of physical copies of books – or records or films – allows any party to engage in mass digitization and systematic worldwide distribution of newly created ebooks to the public. Doc. 169 ("Pubs-Opp.") 2-12.

Since Internet Archive has jettisoned the mainstay of its defense, all that remains is a thin veneer of pseudo-legal argument – which boils down to the contention that *Sony* (as interpreted by *TVEyes*) permits a non-profit entity to "improve the value of *physical* books" it owns by reproducing and republishing them "in the way that is most efficient for [a] library and its patrons" to consume. IA-Opp. 1, 10. To restate the obvious: *Sony* permitted individual Betamax owners to record broadcast television for home viewing at convenient times – *i.e.*, time-shifting for personal use. It did not permit anything akin to a technology company systematically scanning millions of books and distributing complete unauthorized ebooks, for free, on an online platform available to anyone in the world. No court has adopted IA's expansive view of *Sony*. *See* Pubs-Opp. 13-14. Clinging to one sentence from *TVEyes*, IA suggests that the Second Circuit interpreted *Sony* to hold that any utility-expanding use is presumptively fair. But IA

1

ignores *TVEyes*' devastating (for IA) holding that the defendant's media monitoring service was "*not* justifiable as a fair use" even though its search capabilities were highly-efficient and significantly more transformative than IA's Website, which offers ebooks-on-demand as a substitute for authorized ebooks. *Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018). IA also suggests that *Google Books*' controlling analysis is irrelevant (*see* IA-Opp. 12), even though the Second Circuit envisaged the scenario at hand and stated that any claim against an infringer who "convert[ed] … books into a digitized form and ma[de] that digitized version available to the public *would be strong*." *Authors Guild v. Google*, 804 F.3d 202, 225 (2d Cir. 2015) ("*Google Books*") (emphasis added). Simply put, IA cannot establish fair use by pointing out the superior efficiency of ebooks over physical books – particularly when authorized ebooks (which IA euphemistically calls an "additional option for libraries") provide the exact same efficiencies. IA-Opp. 1.

Lacking a serious legal defense, Internet Archive resorts to scare tactics. IA suggests publishers will "permanently lock up culture" and cause centuries-old library systems to collapse if IA is not free to willfully copy physical books instead of paying for authorized ebooks. *See, e.g.*, *id*. ("Plaintiffs would like to force libraries and their patrons into a world in which books … can only be accessed, never owned, and in which availability is subject to the rightsholders' whim."). But the Second Circuit considered similar "policy based arguments" in *ReDigi* and told IA (as an *amicus*) that "it is Congress they should persuade" to change the law, not the courts. *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 664 (2d Cir. 2018). IA's fear that the Publishers will withhold books from the public based upon a "whim" is a delusion. To the contrary, the Publishers have *significantly expanded* their offerings. As much as IA downplays

2

the vital role Publishers play, it is undisputed that they pioneered a "thriving" library ebook market through which they distribute virtually their entire catalogues and facilitate hundreds of millions of free loans each year to library users. Doc. 172 ("IA-RSUMF") ¶¶163-68. And this newer market exists side-by-side with the print market, through which the Publishers will continue to sell physical books for libraries to lend alongside authorized ebooks. *Id*.

It is, in fact, IA that "permanently lock[s] up culture" (IA-Opp. 1) by sequestering millions of books in inaccessible shipping containers and suggesting that physical library books should literally be pulled off the shelves to ostensibly comply with CDL. IA-RSUMF ¶312. The Publishers' embrace of authorized library ebooks is the antithesis of this model. The Publishers' forward-looking adoption of licensing programs is consistent with the approach of other creative industries that harness the possibilities of digital technology while mitigating inherent risks – and thus precipitated the profusion of books, movies, television and music instantly available online today in a broad range of formats.

In the end, Internet Archive asks this Court to adopt a radical proposition that would turn copyright law upside down by allowing IA to convert millions of physical books into ebook formats and distribute them worldwide without paying rightsholders. IA admits that digital formats are "materially more valuable to readers" and "more efficient" (IA-Opp. 5, 16), but the law is clear that IA cannot "misappropriate" that value merely because there is "consumer demand for it." *UMG Recordings v. MP3.com,* 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000). Since the purpose of copyright is to incentivize the creation of new works, authors and publishers – not IA – hold the exclusive right to publish their books in all formats and distribute them via select channels. 17 U.S.C. §102. As the Supreme Court observed decades ago, any "infringer may

A-6387

claim to benefit the public by increasing public access to the copyright work," but if books "could be pirated away by a competing publisher[,] the public would soon have nothing worth reading." *Harper & Row Pubs.*, *Inc. v. Nation Enters.*, 471 U.S. 539, 559, 569 (1985). *See also WPIX v. Ivi, Inc.*, 691 F.3d 275, 287-88 (2d Cir. 2012) (public interest favors copyright owners over expanded Internet access).

With briefing completed, the undisputed facts and settled law lead to the inexorable conclusion that IA's practice of CDL is not fair use. Summary judgment should be awarded to the Publishers as to liability for copyright infringement.

## ARGUMENT

## I. THE FIRST FACTOR WEIGHS HEAVILY AGAINST FAIR USE

The pivotal first factor weighs in the Publishers' favor because undisputed material facts demonstrate that IA's digitization and distribution of full copies of books via CDL is not transformative.[1] "To be transformative, a use must do something more than repackage or republish the original copyrighted work" (*TVEyes*, 883 F.3d at 176), and IA fails that test because it does nothing more than republish the original copyrighted work in a format that

---

[1] Internet Archive admits 94% of the Publishers' 635 facts entirely or in large part, including the facts establishing non-transformativeness, the vast majority of facts regarding the Publishers' markets and digital strategies, and the vast majority of facts regarding IA's operations. *See*, *e.g.*, IA-RSUMF ¶¶82-117, 119-45, 154-68, 170, 172, 182-201, 203-14, 242-54, 262-88, 291-299, 316-32, 338-43, 350-77, 379-99, 491-500, 502-03. The few IA responses purporting to dispute facts are based on improper objections. *See* Doc. 178 at 2-7.

4

replicates the functionality of authorized ebooks.  It is also significant (although less important) that IA's use of the Works is commercial in nature.

## A.    IA Fails to Demonstrate that CDL Is Transformative

Faced with the reality that its activities are quintessentially non-transformative, Internet Archive plays fast and loose with facts and law.  Emblematic of this approach is its baseless contention that "CDL does not involve 'systematically republishing,' … but rather systematically delivering a book on a one-to-one basis to the one patron who has borrowed that book, subject to strict controls."  IA-Opp. 11.  But IA explicitly admits that it "*republishes*" unauthorized ebook editions by scanning physical books, including each of the Works, and has used that term internally to describe this process.  IA-RSUMF ¶¶231, 242, 519, 522 (emphasis added).  Since it is undisputed that IA scans and "republishes" books, IA's copying is not transformative by definition.  *TVEyes*, 883 F.3d at 176, quoting *Authors Guild v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014).  *See also Google Books*, 804 F.3d at 226-27 (republication of physical books as ebooks infringes the exclusive right to create derivative works).[2]

Equally disingenuous is Internet Archive's assertion that "*Sony* is directly on point" and dictates that CDL is transformative.  IA-Opp. 10.  *Sony*'s holding was limited to individuals using Betamax recorders for the narrow purpose of "time-shifting for private home use."  *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 446 (1984).  IA nevertheless suggests that, "[l]ike

---

[2] Contrary to IA's brief  (IA-Opp. 3), the Publishers have not conceded the legality of IA's "related" activities except for its distribution of books in the Daisy format for the blind.  The references to Wikipedia citations are a diversionary tactic as the overwhelming purpose of IA's Website is to distribute entire books.  Pubs-Opp. 15.

the home viewers in that case, Internet Archive patrons are simply accessing books libraries have

purchased in the way that is most efficient for the library and its patrons." IA-Opp. 10. The fatal

flaw in this analogy is that, unlike the individuals who engaged in sporadic copying in *Sony*, IA

(not its "patrons") is the one systematically republishing every book it can obtain as an

unauthorized ebook. Nothing in *Sony* suggests that the Supreme Court would have permitted

Sony to record all of the content on broadcast television and loan free copies to Betamax owners

on-demand. Yet the linchpin of IA's transformativeness argument is that *Sony* somehow permits

a technology company to scan millions of print books and post free ebook copies on the Internet

subject to amorphous CDL limitations. This stretches *Sony* far beyond recognition.

Internet Archive misguidedly relies on an observation in *Sony* that Betamax users were

"authoriz[ed] to watch" the television shows they recorded to argue that CDL is lawful because

"the one patron who has borrowed a particular library book is entitled to access it." IA-Opp. 11.

Again, IA improperly conflates the actions of individual users with its mass-digitization project.

Further, while library patrons do have the right to borrow a lawfully acquired physical book, this

right stems from a library's right, as the book's owner, to distribute "that copy" under the first

sale doctrine. 17 U.S.C. §109. But as even IA now agrees, per *ReDigi*, the first sale doctrine

provides no right for a library to reproduce physical books as newly minted ebooks, and thus

IA's users are not "entitled to access" these illegal digital copies.

IA fares no better with its suggestion that *TVEyes* and *ReDigi's* discussion of *Sony*

somehow created a broad rule whereby uses of technology that deliver unlicensed content "more

efficiently" are generally transformative. *First*, these Second Circuit decisions cannot – and do

not purport to – alter the limited (and readily distinguishable) holding in *Sony*. *Second*, IA

6

plucks language from *TVEyes* and *ReDigi* out of context, but ignores the remainder of those decisions – which destroy IA's argument that its practice of CDL is transformative. The crucial fact in *TVEyes*, which IA strategically omits, is that TVEyes' media monitoring service for television broadcasts achieved "the transformative purpose of enhancing efficiency" only "insofar as it enables users to isolate, from an ocean of programming, material that is responsive to their interests and needs." *TVEyes*, 883 F.3d at 177, 185. Critically, the Second Circuit distinguished this "modestly transformative" search function from the feature that displayed lengthy news clips, which the court described as simply "republish[ing] that content unaltered from its original form, with no new expression, meaning or message." *Id*. at 178. The display of TV news clips – like the ebooks-on-demand feature of IA's Website – was *not* transformative because it fulfilled the "same purpose" as the original (*i.e.*, "learning the information reported"). *Id*. Since *TV Eyes* held that there is nothing transformative about distributing the same content as was distributed by the rightsholder, nothing in that decision suggests that the Second Circuit intended to permit format-shifting and global distribution of whole unauthorized ebooks.

*ReDigi* – the decision that Internet Archive dares not mention – further debunks IA's self-serving contention that *Sony* immunizes any infringement that provides "more efficient delivery of content to one entitled to receive it." IA-Opp. 12. Judge Leval cited the same sentence from *TVEyes* about uses that "improv[e] the efficiency of delivering content" but narrowly cabined the category of legitimately "utility-expanding transformative fair uses" by listing specific examples – including copying by search engines that displayed only "tiny, low-resolution thumbnail" images, "copying works into a database used to detect plagiarism" and, per *Sony*, recording "the content of a telecast to enable a single, noncommercial home viewing at a more convenient

time." *ReDigi*, 910 F.3d at 661.[3] IA's wholesale republication of ebooks – which, IA admits,

provide an "excellent additional option" to authorized ebooks (IA-Opp. 1) – fulfills the same

purpose as the original (*i.e.*, reading) and self-evidently lacks the utility-enhancing

transformativeness of *ReDigi*'s examples. Instead, IA's Website is closely analogous to

ReDigi's non-transformative platform that also sought to maintain a kind of one-to-one ratio.

*ReDigi*, 910 F.3d at 661. *See also UMG Recordings*, 92 F. Supp. 2d at 351 ("[R]epackag[ing]

recordings to facilitate their transmission through another medium" is not transformative).

     Next, IA asks the Court to disregard *Google Books* – and its clear instruction that a

"strong" infringement case exists against anyone who republishes entire scanned books –

because, according to IA, the Second Circuit failed to "apply the view of *Sony* later developed"

in *TVEyes* and *ReDigi*. IA-Opp. 12. This novel abrogation argument is belied by the fact that

*TV Eyes* expressly relied on *Google Books*, observing that it "provides the starting point for

analysis." *TVEyes*, 883 F.3d at 174-179. *See also ReDigi*, 910 F.3d at 661 (citing *Google Books*

as the foundation for the notion of utility-expanding transformative uses). Notably, *TVEyes* also

stated that *Google Books* "tested the boundaries of fair use" in mass digitization cases (883 F.3d

at 174) – boundaries which IA willfully transgresses. IA-RSUMF ¶¶225-28. IA similarly seeks

to discount *VidAngel* for failing to apply "the understanding of transformativeness" developed in

---

[3] The Second Circuit has occasionally characterized *Sony* as a "non-transformative use" case. *See, e.g.,*
*Swatch Gp Mgmt Serv. v. Bloomberg,* 756 F.3d 73, 84 (2d Cir. 2014), citing *Campbell v. Acuff-Rose*
*Music*, 510 U.S. 569, 579 (1994)); *Amer. Geophysical Union v. Texaco*, 60 F.3d 913, 920 (2d Cir. 1994)
(citing *Sony* for the proposition that "the Supreme Court appears to have rejected the view that a use must
be transformative. . . to be a fair use").

*TVEyes* and *ReDigi*. IA-Opp. 12, citing *Disney Enterprises v. VidAngel*, 869 F.3d 848 (9th Cir. 2017). Yet *VidAngel* is one of many decisions and authorities, including reports from the Register of Copyrights, rejecting the notion that format-shifting to enhance public access is transformative.[4]

Internet Archive then turns inexplicably to a D.C. Circuit decision about the publication of private technical standards referenced in public laws. IA-Opp. 11, quoting *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ("*ASTM*"). While IA claims that *ASTM* "reflects *Sony*'s approach" (IA-Opp. 11), *ASTM* did not rely on *Sony* in its analysis of the first factor. Instead, the court *rejected* the broad principle that it is always transformative to make a technical standard "more accessible" and narrowly held that a transformative purpose existed only when reproduction of the text's exact language was "essential to comprehending one's legal duties." *ASTM,* 896 F.3d at 450-51. Thus, in addition to being factually distinguishable, *ASTM* is not a "utility expanding transformative fair use[]" case and does not support IA's strained argument. *ReDigi,* 910 F.3d at 661.

Alternatively, Internet Archive looks to *Swatch*, *Cambridge University Press* ("*CUP*") and a handful of other decisions to make a back-up argument that CDL is fair use even if it is not transformative. IA-Opp. 13-14. One of many reasons to distinguish those cases is that the copying there advanced a specific "'public purpose' named in the preamble to §107," while IA's

---

[4] S*ee* Doc. 99 ("Pubs-Mov.") 24, Pubs-Opp. 5-6. *See also* Doc. 96-189 (Letter from Register of Copyrights to Sen. Udall), 11-12 ("[C]ourts have held that reproducing the text of physical books in digital format is not transformative unless the change in format results in new uses for the work.").

practice of CDL does not.  *Id.* at 13, quoting *Swatch*, 756 F.3d at 84-85.  In *Swatch*, for instance, the Second Circuit held that Bloomberg engaged in "news reporting" by "obtaining and disseminating" a recording of a corporation's earnings conference call because the public's interest in hearing what was said (including extemporaneous elements like the tone of the speakers) justified its dissemination.  *Id.*  Similarly, in *CUP*, the university's digitization of course materials advanced the enumerated purpose of "teaching (including multiple copies for classroom use)."  *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1258 (11th Cir. 2014), citing 17 U.S.C. 107.[5]  While IA tries to squeeze into the preamble by asserting that its Website facilitates research and teaching, the mere fact that "a secondary use can facilitate research does not itself support a finding that the secondary use is transformative."  *TVEyes*, 883 F.3d at 178 n.4; *Infinity Broadcasting Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998) (inquiry focuses on defendant's actions, not users).

Finally, Internet Archive's desperation to find a decision – any decision – to support its theory of CDL is exposed by its lengthy discussion of a case before the Court of Justice of the European Union ("CJEU").  IA-Opp. 29-32.  IA cites the Advocate General's brief – which is advocacy, not precedent – to argue that the CJEU's decision endorses the legality of CDL as practiced by IA.  *Id.* at 30-32.  It does not.  The CJEU parsed a Dutch statute requiring libraries to pay authors for every loan of their physical books and held that the same compulsory licensing regime applied to digital loans (Doc. 170-7, 7-10 ) – which is the opposite of the free-books-on-

---

[5] The 11th Circuit found that digitizing book chapters was "not transformative," even for the socially beneficial purpose of providing "reading material for students in university courses."  *Id* at 1262-63.

demand regime IA demands here. Moreover, IA defeats its own argument by asserting that foreign decisions do "not affect the scope of fair use in the United States." IA-Opp. 28.

In sum, the total lack of transformativeness decisively tips the first factor in the Publishers' favor.

### B. IA Fails to Demonstrate that Its Activities Are Noncommercial

Internet Archive reveals its weakness by protesting too much that it is not "a commercial enterprise." IA-Opp. 3-10. "[T]he mere fact that the use is … not for profit does not insulate it from a finding of infringement." *Campbell*, 510 U.S. at 584. Moreover, the extent to which a use is "of a commercial nature or is for nonprofit educational purposes" (17 U.S.C. §107) is a nuanced analysis, not a brightline based on tax status or direct payment. *See Texaco*, 60 F.3d at 921-22. Here, it is undisputed that IA is not an educational institution or creator of educational materials, but rather a company that engages in activities that are unquestionably commercial. *See* Pubs-Mov. 25-28; Pubs-Opp. 15-16.

Internet Archive disingenuously backs away from its entanglements with the for-profit bookseller Better World Books, contending that IA "has no control over Better World Books' business," "does not profit from it" and "is just one beneficiary of a broader Better World Books program that provides books to a range of nonprofit organizations." IA-Opp. 7-8. The undisputed facts tell a different story and prove the existence of a symbiotic relationship: IA stated that its "best path to millions of books is arm-in-arm with BWB" and that "the successful operation of BWB will provide funding back to [IA] to ensure that it can continue to deliver free services to the world"; the BWB "pipeline" provides IA millions of books and BWB ██████ ███████████████████████████████████████████; IA's Website drives users to

11

buy books from BWB and IA receives affiliate revenue from such sales; and Open Library of Richmond (the entity in the Kahle/Austin Empire that owns IA's books) ████████████ ████████████████████████████████████████. IA-RSUMF ¶¶313, 327, 329, 331, 333, 334-45, 343, 346-47.

 No more credible is Internet Archive's contention that the Second Circuit only deems a non-profit company to be commercial if it "captures significant revenues *as a direct consequence* of copying the original work." IA-Opp. 4, quoting *Texaco*, 60 F.3d at 922. *Texaco* does not create a brightline rule requiring proof that the infringement "is a revenue-generating exercise." *Id*. at 4. Instead, the Second Circuit held that the first factor *disfavored* Texaco because it "reaps … some *indirect* economic advantage from its photocopying" of journal articles used in the development of new products. *Texaco*, 60 F.3d at 922 (emphasis added). "Conceptualized this way, it is not obvious why it is fair for Texaco to avoid having to pay at least some price to copyright holders for the right to photocopy the original articles." *Id. See also Harper & Row*, 471 U.S. at 562 ("The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."). IA also suggests that *Holy Transfiguration* is inconsistent with Second Circuit precedent (IA-Opp. 6), but neglects to mention that decision follows a Second Circuit holding for its core holding that "profit, in this context, is … not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages." *Soc. of Holy Transfiguration Monastery v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012), citing *Weissman v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989).

12

Simply put, there is no support for Internet Archive's suggestion that it is "entirely noncommercial" simply because it is a nonprofit entity that does not charge users to read ebooks. *See Telephone Digest v. U.S. Telephone Ass'n*, 841 F. Supp. 5, 10 (S.D.N.Y. 1993) (no fair use "despite USTA's … non-profit status"). The fact that IA is funded by the private wealth of a technology multi-millionaire and other for-profit interests undermines the argument that IA is a purely non-commercial enterprise.

## II. THE SECOND AND THIRD FACTORS WEIGH HEAVILY AGAINST FAIR USE

The second and third factors weigh in the Publishers' favor because IA's copying was "extensive and inclusive of all that is important from a copyrighted work." *TVEyes*, 883 F.3d at 179. Internet Archive does not substantively dispute that every Work IA scanned was expressive (not purely factual) and republished in its entirety. IA nevertheless incorporates an argument from its opening brief that copying entire works is necessary for CDL because "[b]orrowing a book from a library necessarily entails borrowing the whole thing." Doc 106 ("IA-Mov.") 23. But the third factor does not automatically favor infringers who claim they need to reproduce entire works to achieve their goals, regardless of transformativeness or market substitution. To the contrary, wholesale copying of expressive Works weighs against fair use. *See* Pubs-Mov. 29.

## III. THE FOURTH FACTOR WEIGHS HEAVILY AGAINST FAIR USE

Internet Archive does not dispute that it bears the evidentiary burden of disproving market harm. Pubs-Mov. 20. Yet IA does not overcome the Publishers' clear showing that IA causes two forms of market harm – lost license fees to the Publishers and lost potential ebook sales from libraries and consumers.

13

## A. IA Does Not Disprove that CDL Deprives the Publishers of Customary Licensing Fees

Market harm is definitively established, as it was in *TVEyes*, because Internet Archive "depriv[es the Publishers] of licensing revenue" by "providing [the Publishers'] content to [IA's] clients *without* payment to [them]." *TVEyes*, 883 F.3d at 180 (emphasis in original). IA does not dispute that all the Publishers need to do to win the fourth factor is (1) "show a traditional, reasonable, or likely to be developed market for licensing" and (2) establish IA's failure to pay the fee participants in that market customarily pay. *Ringgold v. Black Ent. Television*, 126 F.3d 70, 81 (2d Cir. 1997).

The Publishers have satisfied this test. It is undisputed, and Internet Archive's own expert confirmed, that the Publishers' library ebook market is "thriving" and "predicated on licensing revenues that are paid by libraries to entities like OverDrive" – which have generated tens of millions of dollars for the Publishers. IA-RSUMF ¶168. IA further admits that it uploaded unauthorized ebook copies of each Work to its Website, where they were collectively checked out nearly 50,000 times, but never paid the standard fees that libraries pay to lend ebooks. *Id.* at ¶¶204, 578-80. Likewise, IA admits that it posted more than 33,000 of the Publisher's ebooks on its Website without paying a license fee and plans to expand its operations under this model. IA-RSUMF ¶¶232, 238, 522. These undisputed facts conclusively establish market harm.

In a futile attempt to avoid this inevitable conclusion, Internet Archive asserts that "the customary price payable to a publisher to lend a book a library has already purchased is zero." IA-Opp. 15. No one disputes the truism that libraries can lend lawfully acquired physical books without paying fees. The license fees actually at issue – the ones IA indisputably refuses to pay

14

– are the fees libraries across the country routinely pay to distribute authorized ebooks.[6]
Critically, IA admits that "[p]rint books are not priced with the expectation that they will be
distributed in both print and digital formats" (IA-RSUMF ¶¶93, 613), and concedes that its
ebook formats "improve the value of *physical* books."  IA-Opp. 1.  It is also undisputed that the
Publishers market physical books and library ebooks under entirely distinct models with different
pricing, terms of sale and royalty splits.  IA-RSUMF ¶¶66-67, 90-92.  By purposefully conflating
ebooks with physical books, IA transparently appropriates the benefits of format shifting without
paying the fees customarily paid for authorized library ebook editions.  The assumption that
purchasing a physical book gives IA the right to publish separate ebook products violates the
axiomatic principle that copyright owners have the exclusive right to publish and market books
in different formats of their choosing.  *See Google Books*, 804 F.3d at 225 ("An author's right to
control and profit from the dissemination of her work ought not to be evaded by conversion of
the work into a different form." ); 17 U.S.C. §102.[7]

For the reasons set forth above, the Court need go no further to find significant market
harm and determine that the fourth factor weighs against fair use.

_____

[6] Contrary to IA's unsupported contention, the Publishers do not only license ebooks to libraries "when a
library does not already own a book" (IA-Opp. 15), but in all instances in which the libraries desire a
digital version of the title.  IA-RSUMF ¶117.

[7] Internet Archive also suggests that courts need not "assume a willing buyer and a willing seller for the
license" (IA-Opp. 15), but this is flatly contradicted by *TVEyes*, 883 F.3d at 180 ("[T]he failure to strike a
deal satisfactory to both parties does not give TVEyes the right to copy Fox's copyrighted material
without payment.").

15

**B.    IA Fails to Disprove that Publishers Lose Potential Sales of Authorized Ebooks Because of CDL**

Internet Archive does not disprove that the Publishers lose substantial potential sales of authorized ebooks to libraries and consumers by distributing its own ebook versions to be read in lieu of authorized editions.  IA concedes that the fourth factor, by its terms, looks at IA's effect on the "potential" market for or value of the copyrighted work.  Nor does it rebut the Publishers' moving brief on the governing legal standard.  Pubs-Mov. 33-35.  "Factor Four is necessarily intertwined with Factor One"  (*ReDigi*, 910 F.3d at 662), because a non-transformative "duplication of the entirety of an original … clearly supersedes the objects of the original and serves as a market replacement for it, making it likely that cognizable market harm to the original will occur."  *Campbell*, 510 U.S. at 591 (citations omitted).  In short, what is critical under the fourth factor is the nature of the competing product.  Here, IA republished duplicate copies of the Works and invited the public to "Read [IA's] Free Library Books Online" (Doc. 96-12) – and cannot seriously deny that IA's ebooks "could usefully serve as a competing substitute for the original."  *Google Books*, 804 F.3d at 221-22.

The only "evidence" IA offers to satisfy its burden of proof is Professor Jorgensen's expert report comparing ebook sales and lending data of the Works from two isolated quarters in 2020 – which offers unreliable conclusions and hardly rebuts either the common sense economic principle that users are drawn to free goods as a substitute for paid goods, or the caselaw set forth in the Publishers' moving brief.  *See* Pubs-Opp. 26-28 (rebutting Jorgensen); Pubs-Mov. 34-35 (citing cases).  As these cases confirm, a plaintiff need not produce financial data quantifying lost sales, especially where, as here, IA distributes verbatim copies.  Moreover, the nature of the book market means that there are innumerable factors impacting book sales that make it

16

exceptionally difficult to separate out one causal factor from another. Pubs-Opp. 27-28. Further, IA's loan volume has grown dramatically since IA removed the Works from its Website and, with its Open Libraries project, IA has expanded its lending limits exponentially by leveraging library books from across the country; its goals include further growth. IA-RSUMF ¶¶232-35, 249, 364-76, 389-91, 545-46. The backlist book market is an important, substantial market for the Publishers (*id*. at ¶¶40-54), and the undisputed facts easily demonstrate that IA's Website, which includes full copies of the Works and more than 33,000 of the Publishers' other in-copyright books (IA-RSUMF ¶586), makes it "like[ly] that potential customers may opt to acquire the copy in preference to the original." *Google Books*, 804 F.3d at 223.

More telling, IA admits that it specifically instructs libraries *not* to acquire authorized ebooks by advising "libraries that they need not spend money on authorized ebooks because their patrons can instead access ebooks titles on the Internet Archive's website and/or use their print copies to leverage them into digital copies." IA-RSUMF ¶605. *See also* ¶¶471, 395 ("[E]very library can transform itself into a digital library" by "circulat[ing] a digital version" of the physical books it owns via IA's Website). IA also admits that "many libraries" have integrated links to IA ebooks on their websites. *Id*. at ¶396. And leaving no doubt that IA expects its ebooks to substitute for authorized digital editions, IA tells libraries that it can "leverage controlled digital lending to provide your patrons with free ebooks of your physical collections" – a pitch that IA variously summarizes as "You Don't Have to Buy It Again" and "Cost: $0." *Id*. at ¶¶379-83, 387, 605.

Nor is there any dispute that Website users read IA's free ebooks in full (*id*. at ¶¶257-60) and, in some cases, have done so in lieu of using authorized versions. It is undisputed that PRH

lost at least two ebook deals because customers chose to use IA's Website instead. *Id.* at ¶¶563-64. One IA user read an IA ebook that he could have read in an authorized format through his university because "it didn't matter" where the book came from as long as he was "getting these materials [he] needed." *Id.* at ¶528. Another IA user included links to IA ebooks in her blog rather than ebooks on authorized platforms because IA "is reaching a potentially broader audience." *Id.* at ¶529. IA further admits – as did its expert (IA-RSUMF ¶599) – that CDL "reallocate[s] spending away" from certain books to other books and thus deprives rightsholders of the former books of royalties, which is the definition of market substitution. IA-Opp. 20.

Faced with this irrefutable evidence of market substitution and the likelihood of significant lost revenues as Internet Archive expands, IA makes a handful of evasive arguments that can be dismissed out of hand. *First*, IA suggests that its ebooks are not competing substitutes for authorized library ebooks because "loaning books to library patrons one at a time is consistent with economic expectations at the time the publisher sells the [print] books." IA-Opp. 16. But this argument is untenable after IA's *admission* that "[p]rint books are not priced with the expectation that they will be distributed in both print and digital formats." IA-RSUMF ¶¶92, 613. Ebook formats, as IA puts it, "improve the value of *physical* books" (IA-Opp. 1), and IA's ebooks are free competing substitutes because they "misappropriate[]" this value from the Publishers and their authors. *UMG Recordings*, 92 F.Supp.2d at 352. The hollowness of IA's position on this point is summed up by its concessions that authorized ebook licensing is "an excellent additional option" for libraries that want to use CDL "instead of or in addition to" platforms like OverDrive – which are thinly veiled euphemisms for direct market substitution. IA-Opp. 1, 18.

Next, IA argues that *Google Books* has no applicability because Google did not "own copies of the books" or practice CDL. IA-Opp. 20. But the thrust of *Google Books* is that Google's copying was fair because the "snippet view" does not "provide a significant substitute for the purchase of the author's book" – and the Second Circuit clearly signaled that republishing whole books would constitute substitution. *Google Books*, 804 F.3d at 224-25. Similarly unavailing are IA's efforts to distinguish the fourth factor analysis in *American Buddha*, *CUP* and *ReDigi* on the grounds that the defendants in those cases did not maintain a physical copy of the underlying work. IA-Opp. 22. Nothing in those decisions remotely suggests they would have turned out differently if the defendants had implemented some form of CDL – to the contrary, the Second Circuit found market harm even after ReDigi sought to maintain a form of IA's (inadequately enforced) owned-to-loaned ratio by deleting the original song file before resale. *See* Pubs-Opp. 4-5; IA-RSUMF ¶¶492-506.

Finally, Internet Archive suggests that CDL is not likely to become widespread because maintaining the physical books to lend against is not "free nor infinitely scalable." IA-Opp. 21. This argument misses the point because the correct analysis assumes that infringing conduct will become widespread and does not require the rightsholder to prove it. *Campbell*, 510 U.S. at 590. Further, the contention that IA cannot easily scale up its activities is belied by record evidence that IA can seamlessly increase its lending counts by running overlap analyses on millions of books already sitting on the shelves of nearly 9,000 public libraries that are not currently Open Libraries Partners – which is an acute danger if this Court condones CDL. IA-RSUMF ¶¶364-69, 462. *See also* Pubs-Opp. 24-25 (addressing catastrophic harm caused if IA scales up). IA strains credulity by asserting that it faces logistical constraints when it has added 2.5 million in-

copyright books to its Website since the start of this action and increased the number of concurrent copies available to loan by more than 2.8 million copies under the Open Libraries project. *Id.* ¶¶389, 266-69.

## IV. IA'S DEFENSE OF THE NEL CONFIRMS THAT CDL IS NOT FAIR USE

Internet Archive contends that abandoning the supposedly sacrosanct owned-to-loaned ratio during the NEL period "does not undermine the fair use analysis; if anything, it strengthens it." IA-Opp. 23. By doubling down on the argument that the tenets of CDL can be ignored to serve IA's immediate goals, IA essentially concedes that there are no meaningful controls on its practices. This conclusion is buttressed by admissions that IA does nothing to ensure that its Partner Libraries comply with the owned-to-loaned ratio and knows that some libraries do not follow CDL protocol (IA-RSUMF ¶¶482, 494-506) – yet IA remains unconcerned that CDL "allows patrons of a given library more copies than their local library owns." IA-Opp. 10. These facts expose controlled digital lending for what it is – a cynical branding exercise designed to repackage industrial-scale copyright infringement as a legitimate enterprise. IA's practice of CDL is not fair use and should be stopped.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment with respect to the causes of action set forth in the Complaint.

Dated: New York, New York
      October 7, 2022

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse Feitel
Carl Mazurek

20

1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
      lindasteinman@dwt.com
      jackbrowning@dwt.com
      jessefeitel@dwt.com
      carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak (*pro hac vice*)
Danae Tinelli (*pro hac vice*)
4530 Wisconsin Avenue, NW, 5th Floor
Washington, DC 20016
Phone: (202) 480-2999
Email: matt@oandzlaw.com
      scott@oandzlaw.com
      danae@oandzlaw.com

*Attorneys for Hachette Book Group,
Inc., HarperCollins Publishers LLC,
John Wiley & Sons, Inc., and Penguin
Random House LLC*

21

**CERTIFICATION OF COMPLIANCE**

As counsel of record to Plaintiffs Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc. and Penguin Random House LLC, I hereby certify that this brief complies with the type-volume limitations set forth in this Court's Individual Rule II.D and complies with all formatting requirements set forth therein.  I am relying upon the word count function of the word-processing system (Microsoft Word), which indicates that 5,992 words appear in the brief, except for the portions excluded from the word count by Rule II.D.

/s/ *Elizabeth A. McNamara*

_____
Elizabeth A. McNamara

22

N3K5hacA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   HACHETTE BOOK GROUP, INC., *et*
    *al.*,
4
                    Plaintiffs,
5
            v.                          20 Civ. 4160 (JGK)
6                                       Remote Proceeding
    INTERNET ARCHIVE, *et al.*,
7
                    Defendants.
8
    ------------------------------x
9                                       New York, N.Y.
                                        March 20, 2023
10                                      1:00 p.m.

11  Before:

12                  HON. JOHN G. KOELTL,

13                                      U.S. District Judge

14
                          APPEARANCES
15

16  DAVIS WRIGHT TREMAINE, LLP
         Attorneys for Plaintiffs
17  BY:  ELIZABETH A. McNAMARA

18
    MORRISON & FOERSTER, LLP
19       Attorneys for Defendants
    BY:  JOSEPH C. GRATZ
20

21

22

23

24

25

N3K5hacA

```
 1              (Case called; The Court and all parties appearing

 2    telephonically)

 3              THE COURT:  This is Judge Koeltl.  Who is on the phone

 4    who will be arguing for the plaintiffs?

 5              MS. McNAMARA:  Elizabeth McNamara of Davis Wright

 6    Tremaine, your Honor.  Good afternoon.

 7              THE COURT:  Good afternoon.

 8              And who is on the phone who will be arguing for the

 9    defendant?

10              MR. GRATZ:  Good afternoon, your Honor.  Joe Gratz

11    from Morrison & Foerster for Internet Archive.

12              THE COURT:  OK.  I am familiar with the papers, I will

13    listen to argument.  It is not necessary to repeat everything

14    you said in the lengthy papers.

15              So, unless the parties have otherwise agreed, these

16    are cross-motions for summary judgments.  I will listen to the

17    plaintiff first.

18              MS. McNAMARA:  Thank you, your Honor.

19              At the outset, your Honor, and since you are familiar

20    with the papers I really want to step back and very briefly

21    address two overarching issues central to this action.

22              First, the very foundation to controlled digital

23    lending and Internet Archive's fair use defense is the fiction

24    that physical or print books are one in the same as digital

25    books, that's IA argues that there is no difference between
```

1    someone checking out the print book or a digital version of

2    that same book.  Thus they claim there is no harm, no foul, to

3    engage in the mass reproduction of physical books, transforming

4    them to digital works and distributing them entirely on the

5    Internet.  But IA now admits that the central thesis to CDL is

6    false.  Indeed, to press their transformative use argument, IA

7    argues the exact opposite, that digital books are materially

8    more valuable because they provide greater efficiencies and

9    allow readers to check out books from home or on the go.  But,

10   put simply, the IA cannot have it both ways.  The reality is

11   that Internet Archive, via CDL, is usurping that greater value

12   by creating unauthorized eBooks without paying the customary

13   fees, the exact fees regularly paid by thousands of libraries

14   across the country when they license authorized eBooks, fees

15   that, in turn, compensate authors.  In short, CDL is built on a

16   fallacy that does not withstand scrutiny and this record

17   defeats CDL as a theory and as a fair use.

18         Second, your Honor, no law supports IA's mass

19   duplication and digitization of millions of books to distribute

20   the entire works for the identical purpose that they were

21   originally published:  To be read.  And, for good reason.  If

22   IA's conduct was sanctioned it would eviscerate the rights and

23   controls of the copyright holders.  Indeed, the Second Circuit

24   in *Authors Guild v. Google*, foreshadowed the very fact pattern

25   before this Court and said a claim based on an infringer who

1   converted books into a digitized form and made that digitized

2   version available to the public would be strong.

3        IA is well aware that case after case has rejected

4   mass duplication schemes when they deliver the works for the

5   same purpose as originally published, whether books or music or

6   movies or television.  In short, IA is not asking this Court to

7   enforce or follow the law, it's asking this Court to change the

8   law.  And this is all by design, your Honor.  Brewster Kahle,

9   IA's founder and funder, is on a mission to make all knowledge

10  free and his goal is to circulate eBooks to billions of people

11  by transforming all library collections from analog to digital.

12  But IA does not want to pay authors or publishers to realize

13  this grand scheme and they argue it can be excused from paying

14  the customary fees because what they're doing is in the public

15  interest.  But IA is well aware that this is not the correct

16  forum.

17       The Second Circuit was faced with similar arguments in

18  *Capitol Records v. ReDigi* where IA, as an amici, pressed the

19  Second Circuit to expand the first sale doctrine in Section 109

20  of the Copyright Act via fair use or otherwise, to a digital

21  first sale.  The Second Circuit declined ReDigi's and IA's

22  invitation pointedly saying:  If ReDigi and its champions have

23  persuasive arguments to support the change of law they

24  advocate, it is Congress they should persuade.  We reject the

25  invitation to substitute our judgment for that of Congress.

1          Yet, Internet Archive is back again asking this Court

2     to do what the Second Circuit refused to do.  This Court should

3     reject IA's same invitation.  In short, no facts or laws

4     support IA's fair use defense and it should be summarily

5     rejected.

6          Now I will turn --

7          THE COURT:  Oh.

8          MS. McNAMARA:  Go ahead.

9          THE COURT:  I thought you were done.

10         MS. McNAMARA:  No.  I was going to turn to the four

11    factors and dig in a little deeper, if that's OK, your Honor.

12         THE COURT:  OK.  Briefly.

13         MS. McNAMARA:  OK.  Well, I think the critical thing I

14    want to say on the transformative use issue, your Honor, is

15    that IA admits that it is not engaging in any transformative

16    use in the typical way but it, instead, relies on *Google Books

17    v. TVEyes* and *ReDigi* where it was recognized that if you

18    utilize technology to achieve the transformative purpose of

19    improving the efficiency of delivery of content it can be a

20    fair use, but the problem is that IA ignores the actual

21    holdings of each of those cases that it relies on.  And, even

22    more importantly, it ignores that for a use to be

23    transformative under the utility theory, it only applies where

24    the challenged use served a different function or purpose.  And

25    they admit here that there is no different function or purpose,

1  they are doing precisely what the Second Circuit said you

2  should not do which is to merely re-package or re-formulate the

3  work in the paradigmatic version of a derivative work where the

4  Courts found that was not utilization.

5       Judge Leval specifically reinforced the precise point

6  from *TVEyes* that in order for something to be, to address, to

7  be a utility-expanding use, it needs to have a different

8  function; it cites *HathiTrust* and its search function, or the

9  Fourth Circuit by *Paradigm*, or the *Perfect Pens* case in the

10  Ninth Circuit with the thumbnails, or *Sony*, which of course

11  Internet Archive tries to argue is directly on point.  But, in

12  fact, *Sony* merely dealt with individual one-time time shifting

13  and the Supreme Court made it clear, it defined the term "time

14  shifting" to be a one-time use.  *Sony* did not deal with

15  distribution, it merely dealt with one-time reproduction.  And,

16  in fact, every case that has addressed massive duplication and

17  format shifting, like what Internet Archive is doing here, has

18  found it to be not a fair use.  That's *UMG* out of the Southern

19  District, *Napster* out of the Ninth, the *Gregory* case out of the

20  First, or most importantly I think the *VidAngel* case out of the

21  Ninth Circuit.

22       Internet Archive asks this Court to ignore this

23  consistent body of law because it claims that the Second

24  Circuit has more recently adopted a more expansive view of the

25  transformative uses but, as your Honor is well aware, the

N3K5hacA

1    Second Circuit does not exist on an island with a unique

2    approach, nor has it departed from its consistent holdings

3    finding no fair use when works are duplicated and made

4    available for the precise same purpose as they were originally

5    published whether it be *Infinity*, *Weissman* or *TVEyes* or *ReDigi*.

6         So here, in short, there is really nothing

7    transformative by IA's mass reproduction of plaintiffs' works

8    that now exceed 33,000 and growing and delivering them to the

9    world to be used for the same purpose that the plaintiffs are

10   marketing these works.

11        I don't think I need to touch on the second and third

12   factors, your Honor, which clearly weigh strongly in favor of

13   the plaintiffs.  And on the commercial use issue under the

14   first factor, I would simply note that there is no dispute that

15   IA is using the plaintiffs' works in order to generate more

16   attention, more readership, more users, and those are the

17   precise types of benefits that can be given to a defendant and

18   weigh against them under the commercial use.  As the First

19   Circuit pointedly said, they don't need to line their pockets

20   with money in order to achieve a benefit under the first use.

21   And that's what the --

22        THE COURT:  Can I --

23        MS. McNAMARA:  Sure.

24        THE COURT:  Let me just stop you there just for a

25   moment.

1          MS. McNAMARA:  Sure.

2          THE COURT:  What Second Circuit cases do you rely on

3     to say that the use here was commercial?

4          MS. McNAMARA:  I think the most on point case out of

5     the Second Circuit, your Honor, is *Weissmann v. Freeman* where

6     it was an academic situation and it was recognized that the

7     defendant was not achieving money by appropriating another

8     student's paper and holding it out as his own but it was he was

9     achieving benefits through status, tenure, and the like and

10    that that was sufficient to tilt the first factor on that

11    element against them.

12         THE COURT:  And that's how you would also say that

13    this isn't really a non-profit educational purpose within the

14    meaning of fair use?

15         MS. McNAMARA:  Yes, your Honor.  It is a non-profit

16    entity, although as we have spelled out in great detail in the

17    papers, it has many commercial elements that earn to the

18    benefit of growing their site and so in that way there are

19    commercial benefits as well, whether it be they're entwining

20    with the for-profit entity Federal Books, or the commercial

21    benefits that they achieved by the $35 million in scanning

22    books, but I think mainly it is really that on the backs of the

23    plaintiffs' works they achieve greater recognition and growth

24    and users and that is a benefit under, as I said *Weissmann*, as

25    well out of the Ninth Circuit the *Worldwide Church* which

N3K5hacA

1  recognized growth in membership as well as the *Gregory* decision

2  out of the First Circuit.  And so, for that reason, we would

3  say that the commercial/non-commercial distinction does not

4  benefit Internet Archive in addition to not being

5  transformative.

6          THE COURT:  OK.  Go ahead.

7          MS. McNAMARA:  Turning briefly to market harm, your

8  Honor -- well, I would just say on factors two and three,

9  clearly all the works are highly expressive including some of

10  this country's most iconic works and those are at the core of

11  what the Copyright Act was intended to protect, and there is

12  also no dispute that the entire works are copied and

13  distributed in full so both those factors should weigh in favor

14  of the plaintiff.

15          THE COURT:  You also include non-fiction works

16  including the works in suit, don't you?

17          MS. McNAMARA:  Yes, your Honor.  There are claimed

18  non-fiction works which are equally protected as well as

19  fiction.  It is "Blink" by Malcolm Gladwell and countless other

20  non-fiction works.

21          THE COURT:  OK.  Go ahead.

22          MS. McNAMARA:  Now, on the market harm issue of

23  course, as your Honor is well aware, it intersects with the

24  first factor and whereas here, there is really no

25  transformative use then the market harm is -- and where there

1   is direct substitution which plainly exists here, the market

2   harm necessarily tilts towards the plaintiffs.  But here there

3   is no dispute on the record that the plaintiffs have lost

4   significant, massive, millions of dollars in licensing revenues

5   because IA admits that there is a thriving eBook market where

6   publishers license eBooks to libraries and this market is

7   predicated on licensing revenues.  And there is no dispute that

8   the publishers earn tens of millions of hundreds of millions of

9   dollars in licensing revenues to the library market alone,

10  setting aside the commercial eBook market.  And IA doesn't

11  dispute that it refuses to pay any license fees and it hasn't

12  paid any for the 33,000-plus works of the plaintiffs that exist

13  on their website.  But IA's admissions I think, importantly, do

14  not stop there.  They not only admit that it fails to pay the

15  customary license fees, it also admits that it actively

16  encourages legitimate libraries to not license eBooks.  IA's PR

17  campaign to bring libraries into Open Libraries Project,

18  include such entreaties as *You don't have to buy it twice*

19  expressly telling them to not license the works from the

20  plaintiffs or OverDrive.

21          On this record, therefore, there is no question that

22  there is substantial market harm from lost license fees and

23  this is the precise type of evidence that the Second Circuit

24  considered in *TVEyes* to find that the fourth factor weighed in

25  plaintiff's favor.  And in *TVEyes* --

N3K5hacA

1              THE COURT:  Let me just stop you there.

2              I understand the argument for every scanned copy of a

3      book there is no license fee paid to the publisher and there is

4      no eBook being bought from the publishers.  You say all of

5      that's undisputed.  Wouldn't the defendant say there is no

6      indication that the libraries would have otherwise purchased an

7      eBook so there is no evidence of actual harm?  And on the other

8      hand, there are all of defendants' experts who say there has

9      been no net loss to the publishers because their revenues have

10     been going up, there is no evidence that they have actually

11     lost revenue in terms of the bottom line and you all dispute

12     those assertions in the dueling 56.1 statements.  So, aren't

13     there issues of fact on the question of whether the publishers

14     have in fact been harmed?

15             MS. McNAMARA:  No, your Honor, because as I think you

16     have just -- I think -- very well laid out, there is two forms

17     of harm asserted by the plaintiffs, one is the lost license

18     fees and the fact that they haven't paid license fees for these

19     works is not disputed, they don't dispute that, and it is not

20     disputed that if they had acquired the works that they're

21     distributing via an authorized fashion, those fees would have

22     been paid and the plaintiffs have been deprived of those fees

23     so that harm is real.

24             THE COURT:  Let's stop there just for a moment.

25             There is also no evidence that the defendants would

N3K5hacA

```
 1    have paid those license fees, no evidence that they would have

 2    bought the eBook were it not otherwise available to them for

 3    free, right?

 4             MS. McNAMARA:  Well, if I am understanding you

 5    correctly, are you voicing their position that there is no

 6    licensing market for CDL?

 7             THE COURT:  Either that, or that simply there is no

 8    evidence what the defendants would have otherwise paid to the

 9    plaintiffs for the ability to make the eBook.

10             Do you follow?

11             MS. McNAMARA:  Yes, I do follow, your Honor and --

12             THE COURT:  I fully understand.  I mean I fully

13    understand your argument.  I mean your argument is there is a

14    market for eBooks and that is the relevant market, and by

15    scanning the publishers' works the defendants are depriving the

16    plaintiff of those licensing fees.  But you began this argument

17    by saying this is all undisputed.  Whether there would in fact

18    be licensing fees is a question, isn't it?

19             MS. McNAMARA:  No, your Honor.  I think another way of

20    saying that is would they enter into the license, and that is a

21    question, but that's a question that the Courts resolve in the

22    plaintiff's favor.  That was the very case in *TVEyes*, your

23    Honor, where it was argued, *'Well, we tried to enter into a*

24    *license'* or *'You wouldn't agree to a license with us'*, and the

25    Court says it doesn't matter whether you would agree to the
```

N3K5hacA

1    license that was offered or not.  That's not the issue.  The

2    issue is that the market exists, it is extant, it is thriving,

3    and you are refusing to participate in that market and because,

4    like, let's say you don't like the price or you don't like the

5    terms, the answer to that is not that you steal it.  That is

6    basically IA's answer, is that we don't like that market, we

7    don't want to pay it, it's not in our interest to pay it, and

8    so we are entitled to just duplicate your work without

9    authorization and distribute it to the world.  Well, that isn't

10   the way the law works and it is not the way we work in markets.

11            THE COURT:  OK.

12            MS. McNAMARA:  And --

13            THE COURT:  The other question that I posed is what do

14   you do with all of the alleged statements of undisputed facts

15   that the defendants put forth that there is no ultimate harm to

16   the plaintiffs because their total revenues have been going up,

17   there is no evidence that they would have had a greater bottom

18   line were these scanned books not been available without the

19   license.

20            Follow me?

21            MS. McNAMARA:  Yes, your Honor.

22            First of all, they put forth two experts, one was

23   Dr. Reimers, whose study merely looked at sales of print books

24   based on Amazon best seller lists and this motion addresses the

25   eBook market, both commercial and library.  So, Reimers' study

N3K5hacA

1   is really not even relevant in any way to this analysis.

2           So then with Jorgensen's study, which is what I think

3   you are specifically referencing, they include what they call

4   his natural experiment using data from the few months that the

5   Internet Archive had the National Emergency Library open during

6   the early days of the pandemic when IA threw out any pretense

7   of controls on CDL.  But this natural experiment used by

8   Jorgensen involved the most unnatural data.  Jorgensen takes 25

9   works published by Hachette and compares their checkout data on

10  OverDrive from the second quarter of 2020, when NEL was

11  operating, and the third quarter of 2020, after the lawsuit was

12  filed and the works in suit were removed.  But Jorgensen

13  ignores and provides no controls for the fact that the second

14  quarter of 2020 was when the world was shut down because of

15  COVID and the publishing industry saw an unprecedented increase

16  in eBook sales or licenses as people were stuck at home and

17  were scrambling for books or anything to do.  And as the world

18  began to open up in Q3, the increase that your Honor was just

19  referencing was that was -- that was the increase in Q2.  Once

20  we got to Q3 when they compare it, the sales and checkouts on

21  OverDrive, as well as elsewhere, reverted to norm, thus the

22  supposed average downturn that Jorgensen saw in Q3, which he

23  says shows that there was no harm, can't logically be

24  attributed to or even associated with the National Emergency

25  Library shutdown and that is one of the many glaring problems

N3K5hacA

1      with Jorgensen's.

2              But the Court doesn't have to say, you know, resolve

3      the dispute over admissibility of Jorgensen's work on this

4      motion because the Court has two other means of finding that

5      there is significant market harm that weighs in the plaintiffs'

6      favor.  The first is what I already described was the lost

7      license fees, and the second is as *ReDigi* underscored, that the

8      fourth factor's focus is whether the copying at issue brings to

9      market a competing substitute.  Here there is no dispute that

10     what Internet Archive is offering is a competing substitute if

11     the quality isn't the same as the plaintiffs' authorized eBooks

12     which only underscores why this whole utility of transformative

13     use argument carries so little weight.  But there is no dispute

14     that it is a substitute, people check out the books and can

15     read them which is the very purpose that the plaintiffs provide

16     their works.  Thus, the bottom line is that the law dictates

17     that when there is a free alternative for the essentially the

18     same product and when that becomes widely available, the

19     copyright owner will necessarily suffer.  And case after case

20     recognizes this common sense reality that you cannot compete

21     with free.  That was found in *Napster*, in *ReDigi*, in *Gregory*,

22     and elsewhere.  And it is important, I would say, I think in

23     closing, your Honor, on the license --

24              THE COURT:  Let me just pause there.

25              MS. McNAMARA:  Sure.

N3K5hacA

1          THE COURT:  Your position is you disagree with the

2     defendant's experts, you say that there are disputed issues of

3     fact with respect to the defendant's experts but I don't have

4     to resolve those disputes in connection with this motion.

5          MS. McNAMARA:  Correct, your Honor; because of the

6     fact that they are offering a competing substitute and because

7     of the irrefutable damage and loss of the licensing fees.  And

8     what I wanted to say about the licensing fees, your Honor, is

9     that what exists right now with the Open Libraries Project,

10     only eight or nine public libraries have signed on to join

11     Internet Archive in this endeavor, yet there are more than

12     9,000 library systems in the United States, if even relatively,

13     you know, if a significant percentage of those libraries were

14     to sign on and join Internet Archive in their CDL and their

15     appropriation of works, the damage to the plaintiffs would be

16     extraordinary, it would be massive, and that is precisely the

17     type of looking forward that was done in *TVEyes* with Fox, where

18     they had a nascent market but the Court recognized that there

19     would be millions of dollars in damages if it was given the

20     green light and allowed.  And that is precisely what would

21     happen here, your Honor.  If CDL and Internet Archive's actions

22     were given the green light, the damage to the publishers and

23     damage to creators and the damage to authors would be beyond

24     measure.

25          THE COURT:  What relief do you seek on this motion?

N3K5hacA

```
 1            MS. McNAMARA:  We seek a finding of liability, your

 2   Honor, and the issuance of a permanent injunction.

 3            THE COURT:  Are there any issues with respect to

 4   damage, statutory damages, and the like?

 5            MS. McNAMARA:  Well, your Honor, the plaintiff has

 6   moved on Section 504 under statutory damages which I am happy

 7   to address.  Would you like me to briefly address that?

 8            THE COURT:  No.  I realize that there is a dispute

 9   with respect to that.  My question really goes to the formation

10   of a judgment.  I would have thought that there are issues that

11   couldn't be resolved on this motion with respect to, for

12   example, you say we are looking for an injunction.  What the

13   scope of the injunction would be is something that is really

14   not discussed so far as I can recall in the papers.  The issue

15   of whether there should be statutory damages or whether there

16   is an exception for good faith in this case for statutory

17   damages is something that's argued out but I would have thought

18   that all of the issues with respect to the formation of an

19   appropriate judgment are really not laid out, so far as I could

20   tell, in the papers.  I would have thought that that's a

21   separate issue to be decided subsequently.

22            MS. McNAMARA:  Yes, your Honor.  I mean, I think that

23   I would opine two things or observe two points on that.  Yes, I

24   think the primary purpose of this motion is for liability as a

25   finding of liability.  I would think that with the finding of
```

N3K5hacA

1   liabilities the parties could work together on what judgment

2   might be the appropriate one to issue, and if there are

3   disputed issues surrounding that then we would come before your

4   Honor to hopefully get those resolved in one way or another.

5   But, the primary issue on this motion is liability.  We do

6   think that given the liability and given the irreparable harm,

7   that injunctive relief is fully warranted and could be issued

8   and the parties would be prepared -- or at least we, as the

9   plaintiffs, would be prepared to provide your Honor with

10  proposed language for an injunction.

11            THE COURT:  OK.  Thank you.

12            MS. McNAMARA:  Thank you.

13            THE COURT:  All right.  Let me listen to the

14  defendants.  Mr. Gratz?

15            MR. GRATZ:  Thank you, your Honor.  Good afternoon.

16  Joe Gratz with Morrison & Foerster representing the Internet

17  Archive.

18            We are here today to determine who controls the future

19  of library lending:  Big publishers or librarians.

20            Controlled digital lending allowed libraries to do

21  digitally what they have always done physically:  To loan a

22  book they own to one patron at a time.  Now, loaning a book

23  digitally by its nature involves making copies.  That is why

24  the question in this case is one of fair use rather than an

25  application of Section 109.  The question is whether that

1   copying, which is incidental to loaning the books a library

2   owns, is fair use.  Fair use ensures that copyright extends

3   only as far as is necessary to provide incentives for creation

4   and that it does not extend further.  Allowing libraries to

5   lend books they own to one patron at a time serves copyright's

6   purpose of aiding the creation and dissemination of knowledge.

7   And lending books by more efficient technological means does

8   not offend the purposes of copyright.  Instead, it more

9   effectively furthers those purposes.

10          So, I want to turn now to the first fair use factor

11  and in addressing these I will touch on a number of the points

12  that Ms. McNamara discussed.

13          First, with respect to commerciality, the use is

14  wholly non-commercial.  Internet Archive is a 501(c)(3) public

15  charity and doesn't take in any revenue from digital lending.

16  We aren't doing this to benefit ourselves, like any other

17  library, we are doing this to benefit the public by acquiring

18  books at our own expense and making them available to patrons

19  at our own expense.  Publishers identify some other programs at

20  Internet Archive that do bring in revenue, but those don't have

21  anything to do with lending.

22          To address the *Weissmann* case which that Ms. McNamara

23  identified and cited for the first time in the publishers'

24  reply brief, a few points on that case, your Honor.  First,

25  that was a case between two academics about gaining status and

N3K5hacA

1    tenure and so on, and those things in the academic world are

2    the equivalent of gaining dollars, right?  They translate into

3    dollars in the academic world and that was the basis for the

4    ruling in *Weissmann*, that there was some level of

5    commerciality.  That is not true here, right?  Lots of people

6    want to take books out from our library but that does not make

7    our use commercial and it doesn't cause some monetary benefit

8    to -- ultimately in our job.

9         The last point I want to make on the *Weissmann v.*

10   *Freeman* case is that it predates the Supreme Court's *Campbell*

11   opinion in which the Supreme Court gave us some of sort of the

12   modern guidance about how to speak about commerciality in the

13   context of the first factor.  And so, that's why we don't there

14   I the *Weissmann* case stands for the proposition that any time a

15   fair user has a reason to want to do what they're doing, or

16   ends up in any way along any axis better off because they

17   engaged in fair use, that that means that the fair use was

18   commercial in nature.  That would sweep in almost every

19   non-commercial phase.

20        Second, turning from the commerciality question --

21   unless there is anything your Honor would like to discuss about

22   it -- to the question of transformative rights.

23        This use is transformative and it is transformative in

24   a specific way.  It is transformative in the same way that the

25   use in *Sony* was transformative.  As the *TVEyes* case said, it

N3K5hacA

1   utilizes technology to achieve the transformative purpose of

2   improving the efficiency of delivering content without

3   unreasonably encroaching on the commercial entitlements of the

4   rights holder.  And, as Judge Leval later explained in the

5   *ReDigi* case, that it was achieved without unreasonably

6   encroaching on commercial entitlements of the rights holder

7   because the improved deliveries was to one entitled to receive

8   the content.

9          Libraries are entitled to lend books they own and

10  patrons are entitled to read the books they have borrowed, and

11  for that reason utilizing this technology to more efficiently

12  lend books is a transformative purpose in the Second Circuit as

13  case law.

14         THE COURT:  Could I just stop you there?

15         MR. GRATZ:  Yes, your Honor.

16         THE COURT:  Who do you analogize yourself to in the

17  *Sony* case?  Do you analogize yourself to *Sony* or do you

18  analogize yourself to the home viewer who was otherwise

19  entitled to watch the free television program and who did the

20  time shifting?

21         MR. GRATZ:  So, in sort of technical doctrinal terms,

22  your Honor, I think we are analogous to the home user since

23  they were the one making the copy in that circumstance and we

24  are the ones making the non-commercial copy in this

25  circumstance and we are --

N3K5hacA

 1                THE COURT:  But --

 2                MR. GRATZ:  Yes, your Honor?

 3                THE COURT:  So, if you analogize the library to the

 4      home viewer, it was clear that the home viewer would time shift

 5      in order to be able to view the program at another time, but it

 6      was clear in *Sony* that the Court distinguished that home viewer

 7      from making the copy, if you will, available, to the general

 8      public.  Here, the libraries make the copy which are then

 9      available to anyone who wishes to get a copy under specific

10      terms of the eBook.  That seems to be very different from the

11      individual home viewer who simply time shifts in order to be

12      able to see, at a more convenient time, the program that the

13      home viewer could have otherwise seen at the more awkward time.

14      And --

15                MR. GRATZ:  Two options.

16                THE COURT:  Hold on.  Hold on.  Hold on one SEC?

17                MR. GRATZ:  I'm sorry, your Honor.

18                THE COURT:  It appears that the Courts who have read

19      *Sony* have been careful to limit *Sony* to that individual use

20      rather than availability to the "general public," and it is

21      clear that there was language in *Sony* itself which made it

22      clear that with respect to copyright infringement, it was

23      looking solely at the individual home viewer.

24                Go ahead, your turn.

25                MR. GRATZ:  Placing, your Honor, I think the lens with

1   which to view *Sony* is the lens through which the *TVEyes* and

2   *ReDigi* cases discussed it, and the question that those cases

3   asked is whether the viewer was entitled to do what they were

4   doing to view this, and this was just making that process --

5          THE COURT:  Didn't *ReDigi* and *TVEyes* make it clear

6   that *Sony* was not about distribution to the general public?

7          MR. GRATZ:  Well, so I don't think that *ReDigi* and

8   *TVEyes* drew that line, partially because the way that they

9   talked about *Sony* as was a case of utilizing technology to

10  achieve the transformative purpose of improving the efficiency

11  of delivering consent.  And read that way, that was both -- in

12  the *Sony* situation that was both something that the individual

13  user was doing, whose fair use was being analyzed, and in that

14  situation it was something that *Sony* would do.

15         THE COURT:  But *ReDigi* and *TVEyes*, in both cases,

16  found no fair use.

17         MR. GRATZ:  They did.  They found, on the balancing

18  all of the factors, that there was no fair use, that's right,

19  your Honor, in those commercial situations.

20         THE COURT:  OK.  And *ReDigi*, I thought, made it

21  reasonably clear, that if you copied the entire work and made

22  the entire work available, that would not be fair use.

23         MR. GRATZ:  Well, I don't think that's what *ReDigi*

24  stands for, your Honor.  I think *ReDigi* -- there are certainly

25  situations in which making the entirety available to someone is

N3K5hacA

 1  fair use.  *HathiTrust* gives us one such example.

 2         THE COURT:  And *Google*.  But let's finish with *ReDigi*

 3  before we get to *Google Books*.

 4         OK.  Go ahead.

 5         MR. GRATZ:  Certainly.

 6         The situation in *ReDigi* was one that the Court found

 7  to be minimally transformative and found not to be fair use,

 8  thus the things for which we are reciting *ReDigi* in the context

 9  of our transformative argument is its discussion of *Sony*, in

10  particular its further explanation of the *TVEyes* gloss on *Sony*

11  telling us how the Court of Appeals understands *Sony* in the

12  context of transformativeness.  I agree with you, your Honor,

13  that were we doing what *ReDigi* is doing, that is, operating a

14  commercial service for the resale of digital goods, that would

15  fall directly into *ReDigi*.

16         THE COURT:  So, how do you distinguish, other than by

17  saying it is dicta, the comments by the Court of Appeals in

18  *Google Books* which appeared to say that there would be a strong

19  case for copyright infringement and not fair use if *Google* had

20  not only copied all of the works but made the works available,

21  not simply as a means of searching for individual terms and

22  snippets but a way of accessing the entire work.  There would

23  be a strong case that that would not be fair use.

24         MR. GRATZ:  We don't disagree, your Honor, with the

25  idea that if you take the exact facts of *Google Books*, that is,

N3K5hacA

1    snippets were available to any number of people concurrently at

2    any given time, made available by a commercial company, right?

3    If you take those facts and you sort of enlarge the snippet to

4    the size of the entire book, that would present -- we agree

5    with the Court that that would present a very difficult case

6    for fair use.  That is not what happened here.  This issue is

7    not just that it is dicta, the issue is that it is discussing

8    the situation that doesn't match the facts here and doesn't

9    match the most important fact which is that what Internet

10   Archive is doing is stimulating the limitations of physical

11   lending through its digital lending program, rather than the

12   thing the Second Circuit was talking about in *Google Books*

13   which is making the entire book available to a limited number

14   of people concurrently.

15             THE COURT:  Wait.

16             MR. GRATZ:  And I would add, in *Google Books*, Google

17   didn't own a copy.

18             THE COURT:  But I had thought that one of the points

19   of *Google Books* was to say if you copied the entire work and

20   then made it available, that would be a strong case of

21   copyright infringement and not fair use.  In this case Internet

22   Archive copies the entire work, it has a right to the work, but

23   it has not received a license to duplicate the work, to

24   reproduce the work.  What comparable case is there that a

25   person who has the right to the work, has the author's or

N3K5hacA

1    publisher's right to reproduce the work?  Which is at the core

2    of what IA does.

3              MR. GRATZ:  I point, your Honor -- I'm sorry, your

4    Honor.

5              THE COURT:  No, I appreciate that.  That's one of the

6    problems of a telephone conference but you are very polite and

7    I appreciate it.

8              I realize that in your papers you are trying to

9    analogize to other situations but, at its starkest, what is

10   happening is IA has a book and without a license it reproduces

11   the book, which it then lends out, it lends out the eBook, the

12   scanned copy of the book which it retains.  Is there any

13   comparable case which says that that is permissible fair use?

14             MR. GRATZ:  There is, your Honor.  Obviously I want to

15   start by emphasizing that there would be no need to talk about

16   fair use if there was not a reproduction occurring, right,

17   without a license.  That is the sort of -- that is the reason

18   we are discussing fair use at all, and as to your Honor's

19   question what is the case --

20             THE COURT:  Wait a minute.

21             MR. GRATZ:  I think --

22             THE COURT:  Wait a minute.

23             MR. GRATZ:  I think the closest case is *HathiTrust*.

24             THE COURT:  But that was found not to be fair use.

25             MR. GRATZ:  That was found to be fair use, your Honor.

N3K5hacA

1          THE COURT:  I'm sorry.  Yes, it was, but the entire

2     work was not made available.  Yes, they --

3          MR. GRATZ:  It was, your Honor.

4          THE COURT:  OK.  I will go back.  *HathiTrust* was the

5     predecessor to *Google Books*.

6          MR. GRATZ:  That's right, your Honor, and I want to

7     particularly direct your Honor's attention to the second half

8     off the second fair use analysis in the *HathiTrust* case which

9     is addressing not the situation of developing a searchable

10    database, which is very similar to the *Google Books* situation,

11    but the situation of making available complete books to library

12    patrons where those library patrons had print disability.  And

13    obviously that is not precisely what is going on here because

14    on the one hand they were not limiting the number of copies to

15    the number of copies they had, as we do, to simulate lending,

16    physical lending, but also the --

17         THE COURT:  In *HathiTrust* -- at least my

18    understanding, I will go back and check -- was also a question

19    of the ability to find things in works that had previously been

20    published so the works were put into a database but the

21    database didn't allow users to view any portion of the books

22    that they were searching.  And if that's right, it's not nearly

23    analogous to what IA does here.

24         MR. GRATZ:  I agree.

25         THE COURT:  Here the entire book is available and the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A-6433

N3K5hacA

1    book was not available in *HathiTrust*.

2         MR. GRATZ:  So I agree with your Honor that the book

3    was not available.

4         THE COURT:  I will certainly double-check again

5    *HathiTrust*, but then my question remains for the most

6    analogous -- and of course *HathiTrust* preceded *Google Books*

7    where *Google* had the language from the Court of Appeals that

8    there would be a strong case if the entire work were made

9    available.  But, is there any other case that is closely

10   analogous to what IA does here where a Court has found that's

11   fair use?

12        MR. GRATZ:  I want to begin by just noting, just so

13   your Honor can write it down --

14        THE COURT:  Hold on one second?

15        MR. GRATZ:  Yes.

16        THE COURT:  You are very -- I have said before that

17   you are very good and very polite and I appreciate that, but I

18   also appreciate my question being answered first and then

19   giving me the explanation second.  So, we have gone over

20   *HathiTrust* and the question remains what case do you rely on as

21   most analogous which says that what IA was doing here was fair

22   use.

23        MR. GRATZ:  The most factually analogous case is

24   *HathiTrust* in the factual situation presented at page 101 and

25   thereafter in the case.  I agree with your Honor that the

N3K5hacA

1    factual situation presented in the earlier part of the opinion

2    with respect to a searchable database is not closely analogous

3    to the situation, though I hasten to add Internet Archive has

4    done that as well like *HathiTrust* is engaged in the scanning

5    for the purposes of making a searchable database, as well as,

6    in *HathiTrust*, making the entire book available under

7    particular conditions.

8              THE COURT:  And, as I understand it, the plaintiffs

9    haven't challenged, at least on this motion, those kinds of

10   search.

11             MR. GRATZ:  That's right.  They do not challenge

12   search and I think importantly they challenge only with respect

13   to the 127 books they chose, all of which are available for, in

14   OverDrive.

15             THE COURT:  OK.  Any other case than *HathiTrust*?

16             MR. GRATZ:  If your Honor is looking for factual, sort

17   of very closely analogous factual situations, we think that

18   *HathiTrust*, and particularly the second half of *HathiTrust*,

19   presents the strongest one.  I agree that there have not been

20   many litigated cases about the breadth of non-profit libraries'

21   rights to lend or otherwise make available materials in books

22   they own, in our view that's because there hasn't been much

23   question that libraries making available --

24             THE COURT:  Wait a moment.  Wait a moment.  Wait a

25   moment.  Wait a moment.

```
 1              That, of course, elides the issue to say that this
 2     case is about the ability of a library to lend a book that it
 3     owns.  It ignores whether the library has a right to copy
 4     wholesale, the book, which it otherwise owns.  Does the library
 5     have the right to lend a book that it owns?  Of course.  That's
 6     not the issue in the case.  Does the library have the right to
 7     make a copy of the book that it otherwise owns and then lend
 8     that eBook, which it has made, without a license, and without
 9     permission, to patrons of the library?
10              To formulate the issue in this case as simply does a
11     library have a right to lend a book that it owns elides the
12     issue in the case, doesn't it?
13              MR. GRATZ:  We think these issues are very closely
14     related, your Honor, that is, the question whether a library
15     has a right to lend a book it owns is, we think, a very
16     important one, and we agree with you that the answer is
17     obviously "yes."  We agree that the question whether the
18     library has the right to lend the physical book, physically,
19     does not necessarily answer the question, in every case, does
20     the library have the right to lend to one person digitally when
21     they are not lending out the physical book physically.
22              THE COURT:  Wait, wait, wait.  You keep avoiding the
23     question.  Right?  You avoid the question of whether the
24     library has the right to reproduce the book that it otherwise
25     has a right to possess which is really at the heart of the
```

N3K5hacA

1   case, right?  The publisher has a copyright right to control

2   reproduction so every time you formulate the issue as simply

3   does a library have the right to lend a book that it owns

4   without saying does the library have the right to reproduce

5   that book without a license, without permission, without the

6   payment of a license fee, you ignore the central issue in the

7   case, don't you?

8          MR. GRATZ:  Let me reformulate our position in this

9   way then, your Honor.

10         It is our position, first, that a library has a right

11  to physically lend a book; and second, that a library has the

12  right, under fair use, to make whatever copies are necessary to

13  facilitate digital lending of that book, so long as there is

14  only one patron at a time who can borrow the book for each copy

15  that the library has bought and paid for.

16         THE COURT:  OK.  Let's pause on that then.  What case,

17  do you think, that supports that proposition?  Is it *HathiTrust*

18  at page 101?  OK.  I will go back again to *HathiTrust* which

19  did, of course, precede *Google Books*.  But, any other case

20  which is remotely on point for that proposition?

21         MR. GRATZ:  I think the best case is *HathiTrust* at

22  101.  I think we have discussed the *Sony* case and the extent to

23  which it is or is not analogous, but we think it stands for the

24  proposition that copies that are made in furtherance of doing

25  something that otherwise is ever concededly lawful, getting the

N3K5hacA

1     work to someone who is entitled to see or read it, are copies

2     copying that is privileged under fair use.

3             And there is a further line of case --

4             THE COURT:  Could I just -- why doesn't that

5     completely undercut the copyright holder's right to prevent

6     reproduction other than with a license?

7             MR. GRATZ:  Every fair use involves reproduction

8     without the consent of the copyright holder without a license,

9     and every litigated fair use involves a situation where the

10    copyright holder so strongly disapproves that they have filed

11    suit.  So, the facts that the --

12            THE COURT:  That's a fair point.

13            MR. GRATZ:  And that is why fair use takes into

14    account -- fair use is sort of capacious and takes into account

15    the purpose of the use which, in *Sony*, as here, is getting the

16    work to someone who is entitled to get at it, albeit in a way

17    that the copyright holder does not wish for it to be gotten to

18    that person, there by videotaped time shifting, and here by

19    digitizing and making available a digital copy while

20    withholding a physical copy from circulation.

21            THE COURT:  Go ahead.

22            MR. GRATZ:  And so, your Honor --

23            THE COURT:  Could I --

24            MR. GRATZ:  Go ahead, your Honor.

25            THE COURT:  It is a related point but is it fair that

N3K5hacA

```
1     you are not relying on the first sale doctrine under

2     Section 109?

3                 MR. GRATZ:  It is correct that we are not relying on

4     Section 109.  We think that the common law of exhaustion

5     provides further support for the idea that what we are doing is

6     something that is favored under the first factor because

7     lending a book is one of the incidents of ownership and

8     engaging reproduction that is sort of merely incident to

9     exercising the incidence of ownership is something that common

10    law exhaustion approved of, for example, in the Doan v.

11    American Book case that we cited in the papers.  But it is

12    correct that we are not -- we do not independently rely on

13    Section 109, just on the common law doctrine from which it

14    arose.

15                THE COURT:  OK.  Doan is over a hundred years old.

16    Any other case other than Doan that you rely on for the notion

17    that your concept of reproduction in the common law first sale

18    doctrine supports you in this case?

19                MR. GRATZ:  There are not directly cases on point,

20    your Honor.  The other authority to which we would direct your

21    Honor is the legislative history of Section 109 which indicates

22    that it intends not to disturb the common law and, in

23    particular, reaffirms that libraries are entitled to lend

24    books, although I recognize they are talking about physical

25    lending.  We think that the clear entitlement to make a
```

N3K5hacA

 1    particular book available to a particular patron justifies the

 2    incidental copying that is necessary to do that digitally.

 3             THE COURT:  And *ReDigi* seemed to be fairly clear that

 4    Congress, by adopting 109, has formulated the metes and bounds

 5    of the first sale doctrine and that any other changes should

 6    come from Congress and not from the courts.  So whatever the

 7    legislative history shows with respect to 109, 109 states the

 8    law according to the Court of Appeals that shouldn't be changed

 9    without Congress otherwise amending 109 or passing another

10    statute.

11             MR. GRATZ:  That is right as to a defense under

12    Section 109 and we are not asserting a defense under

13    Section 109.  We are asserting that --

14             THE COURT:  You are saying that the concept behind

15    Section 109 should be read into the fair use factor.

16             MR. GRATZ:  We are, your Honor, in the same way that

17    the concept behind, for example, Section 121 was read into the

18    first fair use factor in the post-page 101 portion of the

19    *HathiTrust* opinion.  There, there was a specific enumerated

20    exception for certain activities because they served a certain

21    purpose and the Court -- and the activity that the defendant

22    engaged in fell outside the specific contours of the statutory

23    language and the Court held that, nonetheless, the existence of

24    that statute was -- that what the defendant was doing was in

25    furtherance of the purposes of that statute even though it fell

1    outside the express bounds of exactly what that statute created

2    a safe harbor for, favored rather than disfavored a finding of

3    fair use and they found fair use there.  We think the same is

4    true here with respect to exhaustion as opposed to Section 121.

5              THE COURT:  OK.  Go ahead.

6              MR. GRATZ:  We hasten to add that we think this use is

7    a favored one whether or not it is transformative because it is

8    not expanding the number of people who can access a given book

9    at a given time and it serves the purpose of copyright, which

10   is to expand access to expressive works without harming the

11   incentives to create those works.  The use at issue gets

12   library books to people who might otherwise not be able to

13   access them and that aids in scholarship and research and

14   promotes the creation and diffusion of knowledge that is

15   discussed at some length in the amicus brief filed by authors

16   who support controlled digital lending, the Authors Alliance

17   brief.

18             Just to close on the first factor, that's why we think

19   the first factor strongly favors a finding of fair use.  As to

20   the second factor, we agree with Ms. McNamara that all

21   different types of works are involved and, as in *Google Books*

22   and *HathiTrust*, we think that makes this factor one of little

23   significance.

24             As to the third factor, the amounts used.  Borrowing a

25   library book necessarily involves borrowing the whole thing and

1    the use of the entirety, as in the back half of *HathiTrust*, is

2    necessary to that favored purpose of making library lending

3    more efficient.

4            If I can turn now to the fourth factor, the effect on

5    the market, this is the unusual case where we could measure

6    whether there is an effect on the market and plaintiffs provide

7    no opposing empirical evidence that there was.

8            You asked Ms. McNamara whether there are issues of

9    fact with respect to harm and in our view there are not and

10   that question is resolved in the defendant's favor.  There is

11   no evidence that the publishers have lost a dime.  They say

12   that in the hypothetical world where the publisher was entitled

13   to get a fee for this they would have gotten a fee for this and

14   they didn't get a fee for this but that simply assumes the

15   conclusion.  Courts don't assume that there is a licensing

16   market.  Courts use the analysis from --

17           THE COURT:  Isn't it plain that there is a market for

18   eBooks?

19           MR. GRATZ:  There is a market for eBooks but that is

20   not the relevant question.  There was, for example, in *Sony*, a

21   market for videotapes of movies but that is not the level of

22   specificity at which the analysis operates.  Here, the relevant

23   question, the relevant economic actor, the person deciding what

24   to do, whether to engage in this use, is the library who owns a

25   book and wants to circulate it to their patrons digitally and

N3K5hacA

1    not circulate it physically.  And from the point of view of

2    such a library, there is no license they can get from the

3    publishers to allow them to scan their book and circulate it

4    digitally.  That is because there has never been a licensing --

5              THE COURT:  But they could buy an eBook or they could

6    license an eBook from the publisher.

7              MR. GRATZ:  That is correct.  And we think it is not

8    dispositive and arguably not relevant because, for example, in

9    *Sony*, the record evidence was that the consumer in question

10   could have purchased a pre-recorded videotape or a laser disk

11   or rented one.  In a way that did not relate to their

12   entitlement to receive that content which is why we think the

13   Second Circuit's focus in interpreting *Sony* is so, you know, is

14   so focused on that the delivery was to one entitled to receive

15   the content, not just anybody.  And so that's why we don't

16   think -- the fact that there is a licensed marked for libraries

17   who don't own a book or a license market for license that has

18   nothing to do with the library owning the book.

19             THE COURT:  But wait a minute.  Why do you define the

20   market that way rather than to simply say a library, whether

21   they own a physical copy or not, has the ability to license an

22   eBook from a publisher.  Rather than to pay that licensing fee

23   to the publisher, some libraries choose to make their own copy

24   and to lend that copy.  Why isn't it self-evident that that

25   deprives the publisher of the fee that the publisher could

1    otherwise obtain from licensing an eBook to that library?

2          MR. GRATZ:  It is because with respect to the copies

3    at issue in the CDL situation, the copies the issue here, the

4    question is not between OverDrive and nothing, right?  The

5    question is between physically lending the book to a particular

6    patron, for which no payment would be due to the publisher, or

7    digitally lending a book to the patron.  The question is not

8    what would happen if they didn't own a book or the patron

9    didn't want it digitally or the patron didn't -- that is, the

10   question is we have got a copy available and we can loan it to

11   a particular patron.  The fact that if we didn't have a copy or

12   regardless whether we have a copy we could get some other, rent

13   a copy and loan it to that patron, we don't think, enters into

14   the analysis.

15         THE COURT:  Why not?

16         MR. GRATZ:  Because the question is what is the

17   alternative.  The alternative, in our situation, is physical

18   lending.  Everyone agrees that instead of -- if a particular

19   patron wants a book we can hand it to them, mail it to them,

20   whatever.  Right?  Bring a bookmobile around to their

21   neighborhood.  That is the relevant alternative not --

22         THE COURT:  Hold on.  Hold on.

23         The library has a desire to lend to a customer or

24   patron an eBook.  The library can, without authorization, make

25   a -- scan the entire book in its collection and lend out that

N3K5hacA

1    eBook or it could purchase a license from the publisher.  It

2    chooses to simply make a copy itself without paying a fee and

3    to lend that copy.  Why is the relevant market then not eBooks?

4         MR. GRATZ:  The relevant market is not eBooks because

5    in the second of your Honor's hypotheticals, the library is not

6    lending a book from its collection.  The library still has and

7    could lend to someone else the physical book in its collection.

8    And so, in that way, the two situations don't precisely line

9    up.

10        THE COURT:  OK.  Is --

11        MR. GRATZ:  It is certainly possible -- I'm so sorry,

12   your Honor.

13        THE COURT:  Thank you.  I didn't mean to interrupt

14   you.

15        Is it fair that your experts don't analyze a market

16   for eBooks?  They come to the conclusion that the existence of

17   Internet Archive has not deprived the publishers of revenues

18   because their revenues have all gone up despite the existence

19   of IA simplified?

20        MR. GRATZ:  Our experts have done both of those two

21   things, your Honor.  They have analyzed the revenues and shown

22   that the revenues have gone up, but in particular, with respect

23   to Dr. Jorgensen's analysis, he analyzed the demand for eBooks

24   through OverDrive to determine whether availability through CDL

25   had any effect on the demand through OverDrive, that is,

N3K5hacA

1    whether there was any substitution between borrowing via

2    OverDrive and borrowing via CDL, or whether, for example

3    hypothetically, all of the lending on CDL if the CDL did not

4    exist would happen, is lending of those physical books or other

5    copies of physical books.  And what Dr. Jorgensen found is

6    there was such effect, that is, when books were available in

7    CDL, made available in CDL, the demand for them from OverDrive

8    did not decrease and when they were removed the demand for them

9    did not increase.  And so, we think that shows -- and the

10    plaintiffs prevent no opposing analysis.  These two things are

11    not market substitutes, or at least to the extent they are

12    market substitutes, that the degree of loss from that

13    substitution is immeasurably small and in our view overwhelmed

14    by the countervailing public benefits of CDL.

15            THE COURT:  OK.

16            MR. GRATZ:  Dr. Jorgensen's analysis, we think, is

17    very important to getting comfortable with the idea that this

18    is not a harm to the publishers but only a benefit to libraries

19    and readers by making something that would have been happening

20    otherwise, that is, the lending of these very same physical

21    copies physically, making that more efficient.

22            If digital lending had caused a hit to plaintiffs

23    revenue that could weigh against fair use and the question

24    there would be what's the reason for the loss.  Right?  If the

25    reason for the loss is cognizable under the fourth factor

N3K5hacA

1   because there is substitution or one that is not cognizable

2   under the fourth factor because it derived -- it had some other

3   source, it is not from substitution.  We don't think we even

4   get there because the magnitude of the effect and the only

5   analysis that is before the Court is zero.

6         I want, just briefly, to respond to a point that

7   Ms. McNamara made about the kinds of harm they are claiming.

8   They are claiming harm from not having engaged with and done

9   these lends through OverDrive instead, and we have been

10  discussing that at some length and why we don't think that is a

11  comparable situation.  And the second thing that Ms. McNamara

12  identified was that, in her view, these are substitutes for one

13  another.  And the point that I want to make with respect to

14  that is a finding that these were substitutes would not answer

15  the question to the fourth factor.  It would answer the

16  question whether any demonstrated harm or any identified harm

17  was cognizable under the fourth factor.  There still has to be

18  some harm there and there has been no evidence of such harm

19  such that taking away CDL from libraries will harm those

20  libraries and their patrons with no countervailing economic

21  benefit to publishers.

22        THE COURT:  But the burden is on the defendants to

23  show lack of harm as the Court of Appeals made it clear in

24  *Warhol*, because it's an affirmative defense and so --

25        MR. GRATZ:  So, your Honor --

N3K5hacA

```
1              THE COURT:  Hold on.  Let me finish on that point.
2              So, irrespective of the lack of evidence of harm, the
3     argument that there is a market for eBooks and for every copy
4     that IA makes of a book, it deprives the publishers of the
5     licensing revenue for that eBook and I would have thought that
6     under Warhol that would be sufficient.  No?
7              MR. GRATZ:  We don't think that it is, your Honor,
8     because there would need to be a reason to think that the
9     publishers were worse off than the situation in which the fair
10    use did not occur at all.  Right?  That is the comparable
11    situation unless there is a sort of -- unless there is a
12    licensing market for that precise thing.  And, as we have been
13    discussing, we don't think there is.  Libraries, in making
14    available books that they own to one patron at a time, do not
15    owe licensing fees.
16             THE COURT:  But libraries do license eBooks from the
17    publishers.  The publishers make a substantial amount of money
18    from licensing eBooks to libraries, right?
19             MR. GRATZ:  They certainly do and we think -- we have
20    no quarrel with that and no quarrel with libraries choosing
21    that, for example, for books that they don't own a copy of or
22    for books that they want to lend out more copies than they own.
23    There are lots of good reasons for a library to engage in
24    licensing with OverDrive.  We think that libraries also can --
25    everyone agrees that libraries can also lend copies they own
```

N3K5hacA

1    physically.  The only question is whether those same lends,

2    those same patrons can be made more efficient using digital

3    technology and that involves inevitably making copies, but that

4    inevitability of making copies in such situations evidently is

5    why fair use is there.  Right?  To make sure that copyright's

6    purpose continues to be served, even where something otherwise

7    would be prima facie because it involves some amount of

8    copyright.

9            I guess the point I want to make in response to your

10   Honor's concerns is I agree that we have been acting as though

11   we have the burden and I think we can assume we have the

12   burden --

13           THE COURT:  Of course.

14           MR. GRATZ:  -- although no Court of Appeals has

15   decided --

16           THE COURT:  It is an affirmative defense, right?

17           MR. GRATZ:  It is an affirmative defense, and in the

18   situation where the use is non-commercial I think it remains an

19   open question where the burdens lie.  The point I want to make,

20   your Honor, it doesn't matter because whatever our burden is we

21   have met it by showing no harm.

22           The thing that I want to raise is imagine

23   hypothetically -- Ms. McNamara will think this is impossible --

24   but I want to imagine, hypothetically, that in fact the

25   publishers were not made worse off by CDL.  Right?  That is,

N3K5hacA

1   every lend through CDL is a lend that if CDL does not exist

2   either would not have occurred at all or would have occurred

3   using a physical copy.  In that situation there is no

4   justification for a ruling that this is not fair use because it

5   benefits the public without causing any harm to rights holders

6   versus the situation where the use did not occur at all.

7           And the second thing I want to raise is that

8   hypothetical is consistent with all of the record evidence.

9   Right?  That is what we think is happening and the plaintiffs

10  have not provided evidence that something else is happening and

11  for that reason, because the Supreme Court has so recently

12  reminded us that under the fourth factor it is important to

13  look at the source of the law and balance the magnitude of that

14  loss against the public benefit of the use.  We think that

15  analysis turns out very clearly in favor of us doing this

16  because the magnitude of the law is infinitesimally small, so

17  small that it cannot be measured, and the public benefit of

18  more efficient library lending is so great.

19          THE COURT:  What case are you relying on for that, by

20  the way?

21          MR. GRATZ:  I am relying on Google v. Oracle,

22  specifically at 1206, that potential loss of revenue is not the

23  whole story, one is to look not just at the amount but also at

24  the source of the law.  And in the *Wright v. Warner Books* case

25  that is quoted in *Warhol*, the analysis of the fourth factor

N3K5hacA

1    requires us to balance the benefit the public will derive if

2    the use is permitted and the personal gain the copyright owner

3    will receive if the use is denied.  That's *Wright v. Warner*

4    *Books* at 739, which is quoted in *Warhol* at page 48.

5              The other case I would point out on that is *MCA v.*

6    *Wilson*, another Second Circuit case, which said that the less

7    adverse effect that an alleged infringing use has on the

8    copyright owner's expectation of gain, the less public benefit

9    need to be shown to justify the use.

10             And then again *Google v. Oracle* directs us to take

11   into account the public benefits the copying will likely

12   produce and whether those public benefits are comparatively

13   important or unimportant when compared with the dollar amounts

14   likely lost, taking into account as well the nature of the

15   source of the loss.  That's *Google v. Oracle* at 1206.

16             THE COURT:  The fact --

17             MR. GRATZ:  And we think that balance turns out very

18   cleanly in our direction.

19             THE COURT:  I was just going to say that the facts of

20   *Google v. Oracle* are a long way away from the facts of this

21   case.  Fair?

22             MR. GRATZ:  They are, your Honor, although I don't

23   think that one can take the Supreme Court's sort of discussion

24   of how to think about fair use as a principle only good for

25   case about particular subject matter.

N3K5hacA

```
 1            THE COURT:  Oh no.  No.  I pay great attention to what
 2    the Supreme Court has to say and apply it as best I can to the
 3    facts of the case before me, so.
 4            MR. GRATZ:  That is what we are all trying to do here,
 5    your Honor.
 6            THE COURT:  OK.  Could you finish up?
 7            MR. GRATZ:  I will.
 8            So, because making library lending of books that
 9    libraries have bought and paid for more efficient serves the
10    purposes of copyright, the Court should rule that CDL, as
11    practiced by the Internet Archive, is fair use.
12            I will be happy to address any of the other issues
13    that we have all discussed today.  We have all filed lots of
14    papers but I would be happy to address anything else that the
15    Court would like to discuss.
16            THE COURT:  No, thank you.  You have covered all of my
17    questions.
18            MR. GRATZ:  Thank you, your Honor.
19            THE COURT:  So, Ms. McNamara?
20            MS. McNAMARA:  Yes, your Honor.
21            THE COURT:  Go ahead.
22            MS. McNAMARA:  Thank you.
23            You have already been very generous with your time and
24    I don't want to keep you much longer, I just have a few points
25    I would like to make in response to some of the arguments made
```

N3K5hacA

1   by Mr. Gratz.

2           The first is that he seeks to distinguish the entire

3   body of law that has consistently held that massive duplication

4   and distribution of works in their entirety is not a fair use.

5   He tried to distinguish that primarily by emphasizing that

6   Internet Archive is a non-profit library.  I direct your

7   attention to the observation in *Google Books*, which I think is

8   instructive.  There, one of the side issues in the case was the

9   fact that Google was going to be returning these digital copies

10  of the books to libraries and the plaintiffs there suggested,

11  well, the libraries might misuse them.  The Second Circuit made

12  clear in *Google Books* that there wasn't evidence in the record

13  to show that the libraries had been misusing them but if it

14  did, they would be liable for infringement.  So I think one can

15  draw from that that the Second Circuit was clearly signaling

16  that if a library engages in mass reproduction and duplication

17  precisely as Internet Archive is doing itself, and trying to

18  get other libraries across the country to do the same, it

19  would, indeed, be infringement and not a fair use.

20          Second of all, your Honor, on the *HathiTrust* case that

21  Mr. Gratz put great weight on, he was shy to say that the

22  limited exception where the Court did allow the distribution of

23  copies was specifically limited to established disabled blind

24  users and that that is a use specifically benefited in the

25  Copyright Act itself, much as news is and why the Second

N3K5hacA

```
 1   Circuit in Swatch made an exception on the one time copying in
 2   the Swatch case.  That is not the case here.  Internet Archive
 3   is massively copying and distributing these entire works to the
 4   entire world without discrimination.  Anybody can sign up and
 5   anybody can get a copy of the work.
 6           Now, next on Sony, I think clearly while Internet
 7   Archive wants to be in the shoes of the user there, they are
 8   the Sony, and Sony made it clear that Sony was not there --
 9   Sony was not involved in the duplication, it was the individual
10   users who were doing, in their homes, doing the one-time
11   copying, no distributing.  So Sony is just not the same on the
12   facts.
13           Then, as to first sale doctrine and the contention
14   that it should still inform the fair use analysis, if not, and
15   give one an entire green light or pass, again, the Second
16   Circuit in ReDigi addressed that issue.  It addressed the
17   comparable case to Doan which is the case the plaintiffs cite
18   on, the Second Circuit cited Sells, which was virtually
19   identical to Doan and dealt with the copying of a cover or
20   making a book physically able to be kind of refurbished so that
21   it could still be duplicated.  And even with that limited kind
22   of restoration of the work, rather than the entire duplication
23   of the works at issue here, the Second Circuit said, Look, when
24   the Congress passed Section 109, they did it in a more
25   concrete, narrow way, and those cases have no application, and
```

1    if you want to change the law, go to Congress.  As I said at

2    the outset, what Internet Archive is trying to do is back here

3    asking your Honor to effectively change the law.

4            Now, next they talk about we have a copy that

5    libraries are free to go and get copies from OverDrive if they

6    don't have a physical book or they want another copy.  But that

7    is not the premise to the massive licensing market that exists

8    here, your Honor.  It serves all libraries when they have

9    digital works, physical works, both, because they have readers

10   want their works in different formats and the libraries are out

11   to serve readers.  And if this was only limited to libraries

12   that didn't own the physical books so they needed to get the

13   digital work, then there would be no reason for their PR

14   campaign saying you don't have to buy it again.  The reason it

15   says "again" is because they're instructing libraries don't

16   license that from the plaintiffs, just engage in CDL and take

17   the work.  That's their point.  And even their own expert,

18   *Hildreth*, gave her expert opinion that libraries will spend

19   less money on licensing eBooks if they're available to CDL.

20   There is no dispute in this record, your Honor, that the

21   plaintiffs suffer and they will suffer massively if CDL were

22   given a green light by the loss of this licensing market, which

23   would necessarily also have a significant impact on the

24   commercial market because, as the basic economic principle and

25   common sense is you cannot compete with free.

N3K5hacA

```
 1          And then, finally, as to the point that we didn't
 2   present any opposing analysis.  We did.  We provided an expert
 3   report, we provided the report by Prince who made it clear that
 4   the damages would be massive.
 5          And, as your Honor correctly pointed out, the burden
 6   of proof on all factors of fair use are on the defendant, not
 7   the plaintiffs, and Mr. Gratz said no Circuit Court has held
 8   that, but in fact the University Press v. Patton case out of
 9   the Eleventh Circuit in 2014 held that it is an affirmative
10   defense and the burden is on the defendant regardless of
11   whether the defendant is a non-profit or educational
12   institution.  And here, of course, that was dealing with an
13   educational institution.  Internet Archive is not an
14   educational institution, they're distributing all manner of
15   books whether it be romance, fantasy, anything.  And to the
16   degree that there is an educational take-away from those works,
17   that is the result of the publishers and authors and the hard
18   work and the creation of those works, not by anything being
19   done by Internet Archive.
20          So, for all of those reasons, your Honor, we again ask
21   that the Court grant the plaintiff's motion for summary
22   judgment and deny Internet Archive's motion for summary
23   judgment.
24          THE COURT:  All right.  Thank you, all.
25          MS. McNAMARA:  Thank you.
```

N3K5hacA

 1          THE COURT:  I will take the motions under advisement.

 2   I appreciated the briefs and I appreciated the arguments.

 3   Thank you, all.  Great.  Bye now.

 4          MS. McNAMARA:  Thank you very much, your Honor.

 5   Bye-bye.

 6          MR. GRATZ:  Thank you, your Honor.

 7          THE COURT:  OK.  Bye.

 8                              o0o

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

HACHETTE BOOK GROUP, INC.,
ET AL.,                                         20-cv-4160 (JGK)

                        Plaintiffs,             ORDER

        - against -

INTERNET ARCHIVE, ET AL.,

                        Defendants.

---

**JOHN G. KOELTL, District Judge:**

The Court has entered the parties' Consent Judgment Subject to Appeal (the "Consent Judgment"). See ECF No. 214-1. The parties' one disagreement with respect to the Consent Judgment is whether "Covered Books," as defined in Paragraph E.1, should include books that are commercially available "in any format" (as the Publishers argue, ECF No. 214-2) or only those commercially available "in any electronic text format" (as Internet Archive argues, ECF No. 214-3). Under the Publishers' proposal, the Consent Judgment would prohibit Internet Archive from distributing unauthorized reproductions of any of the Publishers' print books, including those that the Publishers have chosen not to publish as ebooks. Under Internet Archive's proposal, the Consent Judgment would prohibit Internet Archive only from distributing unauthorized reproductions of the Publishers' print books that, like the 127 Works in Suit, are also available for electronic licensing. The Court adopts the Internet Archive's

position. For the following reasons, the Consent Judgment defines "Covered Book" to extend to books that are "commercially available for sale or license in any electronic text format."[1]

"Injunctive relief should be narrowly tailored to fit specific legal violations," Waldman Pub. Corp. v. Landoll, Inc., 43 F.3d 775, 785 (2d Cir. 1994), and an injunction should not go "beyond the scope of the issues tried in the case," Starter Corp. v. Converse, Inc., 170 F.3d 286, 300 (2d Cir. 1999). This action concerned the unauthorized distribution of a select number of Works in Suit, all of which were "available as authorized ebooks that may be purchased by retail customers or licensed to libraries." Hachette Book Grp., Inc. v. Internet Archive, -- F. Supp. 3d --, 2023 WL 2623787, at *4 (S.D.N.Y. Mar. 24, 2023). That fact was relevant to the Court's conclusion that Internet Archive was liable for copyright infringement. In particular, the Court's fourth-factor analysis emphasized the "thriving ebook licensing market for libraries" and concluded that Internet Archive "supplants the Publishers' place in this market" by

-------------------

[1] All defined words in this Order bear the definitions given to them in Hachette Book Group, Inc. v. Internet Archive, -- F. Supp. 3d --, 2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023). Unless otherwise noted, this Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

2

"bring[ing] to the marketplace a competing substitute for library ebook editions of the Works in Suit." Id. at *13.

Given this, an injunction covering all in-print books, including those the Publishers have not made available for electronic licensing, risks going "beyond the scope of the issues tried in the case." Starter Corp., 170 F.3d at 300. Fair-use inquiries require a "case-by-case analysis," with the results "weighed together[] in light of the purposes of copyright." Fox News Network, LLC v. TVEyes, Inc., 883 F.3d 169, 176 (2d Cir. 2018). Because all the Works in Suit were available in authorized ebook editions, the parties did not brief, and the Court did not decide, whether the unavailability of digital library licensing would affect the fair-use analysis. Internet Archive suggests this distinction could make a difference. ECF No. 214-3 at 3 (citing Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1279 (11th Cir. 2014) (affirming district court's conclusion that fourth factor favored fair use where "there was no evidence in the record to show that a license for digital excerpts was available")). The Publishers argue that the result would be the same even for works without an authorized licensing market because, in analyzing market harm, copyright law must respect a rightsholder's "creative and economic choice" not to "exploit [a] market for derivative works." ECF No. 214-2 at 3 (quoting Castle

3

A-6460

Rock Ent., Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 145–46

(2d Cir. 1998)). What matters here, however, is that this case

did not concern copyrighted works that are not yet available in

electronic form and the parties therefore did not brief the legal

issues related to such works. Accordingly, the Court has narrowly

tailored the injunctive relief in this case to cover only

copyrighted works, like the Works in Suit, that are available

from the Publishers in electronic form.

**SO ORDERED.**

Dated:    New York, New York
          August 11, 2023

                                **John G. Koeltl**
                  **United States District Judge**

4