# 23-1260

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

—against—

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, INCLUSIVE,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* COPYRIGHT SCHOLARS
IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

JASON M. SCHULTZ
SUNOO PARK (*admission pending*)
JAKE KARR
TECHNOLOGY LAW AND POLICY CLINIC
NEW YORK UNIVERSITY SCHOOL OF LAW
245 Sullivan Street #609
New York, New York 10012
(212) 992-7365

*Counsel for* Amici Curiae

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES..........................................................................iii

INTERESTS OF *AMICI CURIAE* ..........................................................1

SUMMARY OF ARGUMENT.....................................................................3

ARGUMENT ...............................................................................................7

    I.    The purpose and character of CDL heavily favor fair use.........................8

        A.    The district court's broad characterization of commercial purpose improperly swept in nonprofit library lending..................8

        B.    Adapting one-to-one library lending to the digital age facilitates access to information, strongly favoring fair use. ........................10

            1.    Facilitating digital library lending furthers the objectives of copyright law, regardless of transformativeness.............11

            2.    CDL is transformative because it makes books available in a more convenient and usable form.................................14

    II.    The publishers failed to demonstrate CDL caused cognizable market harm. ....................................................................................................17

        A.    The district court failed to consider the public benefits of CDL and the risk of harm to the public..................................18

        B.    CDL has a distinct market niche that does not usurp the market for licensed lending ebooks. ..........................................25

            1.    Any market harm caused by CDL is not cognizable under copyright law....................................................................25

            2.    The district court improperly presumed market harm based on the mere existence of a secondary market............28

3.      CDL has a distinct audience which separates it from the market for licensed ebooks.................................................30

4.      The district court failed to consider the possibility of non-substituting market effects.................................................32

CONCLUSION ........................................................................................34

CERTIFICATE OF COMPLIANCE .....................................................35

ii

# TABLE OF AUTHORITIES

**Cases**

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) ........4, 9, 26, 29

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) ........................................................................................29, 30

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437 (D.C. Cir. 2018) ........................................................................................10, 14

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26 (2d Cir. 2021) ..........................................................................................29, 32

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ................10, 14, 15, 16

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ........................11, 20

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ....25

*Bobbs-Merrill Co. v. Straus*, 210 U.S. 339 (1908) ........................................6, 12, 27

*Cambridge Univ. Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014) ................26, 29

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ..............................28, 29

*Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018) ................16, 17

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) ..............................................................6

*Diversey v. Schmidly*, 738 F.3d 1196 (10th Cir. 2013) ...........................................8

*Doan v. Am. Book Co.*, 105 F. 772 (7th Cir. 1901) ................................................12

*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018) ...............15

*Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021) ......................6, 18, 22, 33

*Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160, 2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023)............................................................passim

*Harper & Row, Publishers, Inc. v. Nation Enter.*, 471 U.S. 539 (1985) ...............18

*Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519 (2013)............................passim

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ...............................................................................15, 16, 29

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014) .............................................................10, 11, 32

*Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151 (1975).............................27

*Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512 (7th Cir. 2002) .............................29, 33

*United States v. Paramount Pictures*, 334 U.S. 131 (1948)...................................19

*Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (U.S. Ct. Cl. 1973) ....8, 32

**Statutes**

17 U.S.C. § 107 ..................................................................................................8

17 U.S.C. § 108 ................................................................................................20

17 U.S.C. § 109 .........................................................................................12, 16

17 U.S.C. § 121 .........................................................................................13, 22

42 U.S.C. § 12101 .....................................................................................13, 22

**Other Authorities**

Aaron Perzanowski & Jason Schultz, *Copyright Exhaustion and the Personal Use Dilemma*, 96 Minn. L. Rev. 2067 (2012)....................................................26

iv

Abhishek Nagaraj & Imke Reimers, *Digitization and the Market for Physical Works: Evidence from the Google Books Project*, 15 Amer. Econ. J. 428 (2023) ....................................................................................20, 33

Am. Libr. Ass'n, *Competition in Digital Markets* 2 (2019) .....................................23

Amy Nowakowsky & Kat Voy, *The Ebook Pricing War: The Fight for Control Between Libraries and Publishers*, Open Educ. Alberta (2023) .......................33

Anthony Aycock, *Unauthorized Practice of Law in the Library*, Am. Librs. (Nov. 6, 2019) .....................................................................................19

Ben Ellery & James Beal, *Roald Dahl ebooks 'Force Censored Versions on Readers' Despite Backlash*, Times (Feb. 25, 2023) ...........................................31

Blake Reid, *Copyright and Disability*, 109 Calif. L. Rev. 2173 (2021) ..................21

Bos. Libr. Consortium CDL Working Grp., *Consortial CDL: Implementing Controlled Digital Lending as a Mechanism for Interlibrary Loan* (2021).21, 31

Claire Woodcock, *Publishing Company Starts School Year by Removing over 1,000 E-Textbooks*, Vice (Oct. 5, 2022) .......................................................24, 31

Daniel A. Gross, *The Surprisingly Big Business of Library E-books*, New Yorker (Sept. 2, 2021) ......................................................................24, 31

Elizabeth F. Emens, *Disability Admin: The Invisible Costs of Being Disabled*, 105 Minn. L. Rev. 2329 (2021) .........................................................22

Ericka McIntyre, *For the Love of Libraries: Four Authors on What Makes Libraries Wonderful*, Writer's Dig. (Sep. 23, 2019) .........................................19

Erin M. Watson, *A Comparative Study of Medical ebook and Print Book Prices*, 38 Health Info. & Librs. J. 39 (2021) ................................................................33

Geoffrey A. Fowler, *Want to Borrow That e-book from the Library? Sorry, Amazon Won't Let You.*, Wash. Post (Mar. 12, 2021) .......................................23

H.R. Rep. 94-1476 (1976) ..................................................................................9, 12

v

Jeanne C. Fromer, *Should the Law Care Why Intellectual Property Rights Have Been Asserted?*, 32 Hous. L. Rev. 549 (2016) .................................................27

Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y U.S.A. 453 (2012) .................13

Katherine Klosek*, US Copyright Office Allows Access to E-books for People with Disabilities, but Licenses May Still Restrict Access,* Ass'n Rsch. Librs. (Jan 18, 2022).................................................................................................21

Matt Enis, *Macmillan Announces Two-Month Embargo on Library Ebooks*, Libr. J. (Jun. 25, 2019) ............................................................................7

Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, 40 Legal Reference Servs. Q. 113 (2021) .........................................23

Moya Dillon, *'It Comes Down to Price Gouging': Brock Library Call for Equity on ebooks*, Durhamregion.com (Apr. 13, 2022) ....................................24

Nathan Mealey et al., *The Library Technology Market's Failure to Support Controlled Digital Lending*, Scholarly Kitchen (Oct. 25, 2021)......................31

Nikki Davidson, *Behind E-Books, Libraries Find Restrictions and High Costs*, Gov't Tech. (Jun. 15, 2023) ...................................................................7

Reggie Ugwu, *It's Their Content, You're Just Licensing It*, N.Y. Times (Apr. 4, 2023)..........................................................................................7

Sarah Lamdan et al., *The Anti-Ownership Ebook Economy*, Engelberg Ctr. on Innovation L. & Pol'y (2023).................................................................27, 30

Xiyin Tang, *Privatizing Copyright*, 121 Mich. L. Rev. 753 (2023).......................24

### INTERESTS OF *AMICI CURIAE*[1]

*Amici* are the following eleven copyright scholars who bring their combined expertise to bear on the important fair use issues raised by this case. As copyright scholars and practitioners, *amici* have a significant interest in aiding the Court's consideration of this case.[2]

**Jonathan Askin**, Professor of Clinical Law, Brooklyn Law School; Founder and Director, Brooklyn Law Incubator & Policy Clinic; Faculty Chair and Innovation Catalyst, Brooklyn Law Center for Urban Business Entrepreneurship; Founder and Director, Justice Lab.

**Patricia Aufderheide**, University Professor of Communication Studies, School of Communication, American University; Founder and Senior Research Fellow, Center for Media & Social Impact, American University.

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no person other than *amici* or their counsel contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E).

[2] *Amici* would like to thank law students in NYU's Technology Law and Policy Clinic, including Justin Jin, for their significant contributions to this brief.

1

**Dr Patrick Goold**, Reader in Law, The City Law School, University of London.

**Stacey M. Lantagne**, Professor of Law, Western New England University School of Law.

**Sari Mazzurco**, Assistant Professor of Law, Southern Methodist University Dedman School of Law.

**Sunoo Park**, Assistant Professor, Computer Science, New York University Courant Institute of Mathematical Sciences; Affiliated Interdisciplinary Faculty, NYU School of Law.

**Aaron Perzanowski**, Thomas W. Lacchia Professor of Law, University of Michigan Law School.

**Blake E. Reid**, Associate Professor of Law, University of Colorado Law School; Faculty Director, Telecom and Platforms Initiative at the Silicon Flatirons Center.

**Jason Schultz**, Professor of Clinical Law, New York University School of Law; Director, NYU Technology Law & Policy Clinic; Co-Director, Engelberg Center on Innovation Law & Policy.

**Pamela Samuelson**, Richard M. Sherman Distinguished Professor of Law, University of California at Berkeley; Co-Director, Berkeley Center for Law & Technology.

**Jessica Silbey**, Professor of Law and Yanakakis Faculty Research Scholar, Boston University School of Law; Affiliate Fellow, Information Society Project, Yale Law School; Affiliate Faculty, Center for Innovation in Social Sciences, Boston University.

## SUMMARY OF ARGUMENT

Anywhere in this country, you can walk into a public library and browse a large collection of books. You can even check one out to enjoy at home. Libraries have always been free under copyright law to lend materials they own as they see fit. This is a feature of copyright law, not a bug. The principles of copyright exhaustion and fair use, designed to maintain the balance between incentives to create and public access to knowledge, protect the important social benefits that libraries provide.

As our lives have moved online, libraries have adopted new technologies to help them lend their collections to patrons. But publishers insist that the shift to digital allows them to control how libraries lend out the books they own—a right copyright law has never provided before. The major publishers refuse to sell digital

books to libraries, forcing them to settle for restrictive licenses of digital content
rather than genuine ownership. Moreover, publishers insist they can prevent
libraries from scanning their lawfully purchased physical books and lending the
resulting digital copies. In agreeing with this position, the district court took a
dangerously narrow view of the fair use doctrine and undermined copyright law's
longstanding protection of library lending.

Under the first factor, the district court ignored the long history of nonprofit
library lending when it deemed Internet Archive's activities "commercial."
Controlled Digital Lending (CDL) digitizes the centuries-old practice of lending
books for no fee that courts and Congress have long considered a quintessential
nonprofit use. The district court's overemphasis on fundraising and promotion—
essential activities for any nonprofit organization—"lead[s] to an overly restrictive
view of fair use." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 921 (2d Cir.
1994) (clarifying that "commercial use" means a "direct or immediate commercial
advantage" from copying, not mere attenuated benefits).

In addition, CDL's purpose and character align with the overall goals of
copyright law and expand the utility of works in a transformative manner. CDL is
premised on each library owning a physical copy of a book as a condition for
offering to lend it out in digital form. Courts have long recognized the vital

4

function libraries serve when they lend their collections to patrons, one copy at a time. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 540 (2013) (discussing library lending as furthering constitutional copyright objectives). Historically, library lending has been protected by copyright exhaustion—often called the "first sale" doctrine—in part because it furthers broad public access to information through secondary markets, from used book stores and estate sales to the library lending at issue here. Though CDL does not fit squarely within the statutory definition of the first sale rule, the same rationale supports a finding that the practice is fair use. Similarly, CDL makes it easier for institutions to meet their accessibility obligations to patrons with disabilities, an interest Congress recognizes as important to copyright law. By bolstering the accessibility and convenience of libraries' lawfully owned physical collections, CDL also improves the efficiency of content delivery in a way this Circuit has regularly recognized as transformative.

The district court also erred in its analysis of the fourth factor by neglecting to consider several long-standing public benefits of digital lending, including promoting access to knowledge and facilitating accessibility improvements. These public benefits of CDL are central to copyright law and far outweigh the profits publishers allegedly gain from squeezing library budgets. It additionally failed to

5

consider the harmful transaction costs that publishers impose on libraries and the broader public when digital lending is outlawed. *See Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1208 (2021).

Finally, the district court misunderstood the analysis of market effects. It accepted publishers' conclusory market definition and assertions of harm, but failed to consider the nature of those effects, the proper scope of the market, and copyright's inherent limitations on relevant market harm. When alleged harms stem from secondary markets like lending and resale, copyright recognizes them as necessary parts of its constitutional mandate, *see Kirtsaeng*, 568 U.S. at 540–41, and rejects rightsholders' attempts to assert control over them, *see, e.g.*, *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 350 (1908). What's more, despite distinct audiences for CDL and licensed lending ebooks, the district court lumped them together into a single market, greatly overstating the degree of market harm rights holders might encounter. *See Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013) (finding no market harm because the two artists appealed to different audiences).

The district court's decision threatens libraries' continued survival in the digital age. Even as ebook lending grows, publishers place a wide range of works

beyond the reach of libraries.[3] They embargo new releases, and in some cases, have flatly refused to license titles to libraries.[4] Unless reversed, the decision below will allow publishers to lock down library lending and cut off the easy, free access to a wide range of works that libraries have provided for centuries. This Circuit has the opportunity to reaffirm library lending as a quintessential fair use and protect the critical role libraries play in communities across the country.

## ARGUMENT

The use of CDL by nonprofit libraries is a socially beneficial activity fair use should protect. The district court erred in its analysis of the first and fourth fair use factors. Under the first factor, the opinion below failed to weigh the nonprofit educational nature of CDL in favor of defendants. It also overlooked how CDL expands both access to information and the utility of books in a transformative

---

[3] Nikki Davidson, *Behind E-Books, Libraries Find Restrictions and High Costs*, Gov't Tech. (Jun. 15, 2023), https://www.govtech.com/biz/data/behind-e-books-libraries-find-restrictions-and-high-costs.

[4] *Id.*; Matt Enis, *Macmillan Announces Two-Month Embargo on Library Ebooks*, Libr. J. (Jun. 25, 2019), https://www.libraryjournal.com/story/macmillan-announces-two-month-embargo-on-library-ebooks; Reggie Ugwu, *It's Their Content, You're Just Licensing It*, N.Y. Times (Apr. 4, 2023), https://www.nytimes.com/2023/04/04/arts/dahl-christie-stine-kindle-edited.html.

manner. When analyzing the fourth factor, the district court improperly ignored the public benefits of CDL, omitting consideration of libraries' access-expanding mission and the accessibility improvements CDL makes possible. The court further misunderstood the market effects analysis, applying an effective presumption of market harm without inquiring into the nature of the market, the actual effects of CDL, and the limits of cognizable harm.

I.      **The purpose and character of CDL heavily favor fair use.**

      A.      **The district court's broad characterization of commercial purpose improperly swept in nonprofit library lending.**

Library use of CDL is a non-commercial activity that weighs in favor of fair use. The first factor values uses that serve "nonprofit educational purposes" over those of a "commercial nature." 17 U.S.C. § 107(1). Courts have long held that library activities designed to facilitate public access to information have a nonprofit purpose privileged by this statutory language. *See, e.g.*, *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1354 (U.S. Ct. Cl. 1973) (holding that medical libraries "devoted . . . to the advancement and dissemination" of information could photocopy articles for that purpose under fair use), *aff'd*, 420 U.S. 376 (1975); *Diversey v. Schmidly*, 738 F.3d 1196, 1203 (10th Cir. 2013) (finding that distributing a dissertation within a university library was a "non-

8

commercial, educational purpose at the heart of the protection for fair use"); *see also* H.R. Rep. 94-1476, at 74 (1976) ("[T]he doctrine of fair use applies to library photocopying."). By lending digital books to members of their communities for no fee, libraries employing CDL uphold this nonprofit tradition.

Libraries, like all institutions, need resources to fulfill their missions. The district court's conception of commercial use, however, punished nonprofit organizations for engaging in standard fundraising and publicity necessary to further their socially beneficial activities. The decision below acknowledged defendant-appellant Internet Archive was a nonprofit that did not charge patrons to borrow books, but insisted regardless that IA "profited" from digital lending because it "uses its Website to attract new members, solicit donations, and bolster its standing in the library community." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160, 2023 WL 2623787, at *9 (S.D.N.Y. Mar. 24, 2023). Such superficial analysis contradicts this Circuit's nuanced understanding of commercialism, which requires that courts "differentiat[e] between a direct commercial use and [a] more indirect relation to commercial activity." *Am. Geophysical Union*, 60 F.3d at 921. It is not enough to show that a defendant receives monetary or other benefits in the normal course of business; there must be a "direct or immediate commercial advantage" from use of copyrighted material.

9

*Id.*; *see also Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (refusing to weigh commercial motivations where the challenged copying was "one small part" of a "multifaceted research service"); *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 449 (D.C. Cir. 2018) (rejecting contention that nonprofit's copying was commercial because it was "part of [the organization's] fundraising appeal"). When libraries charge no fee for lending, and in fact *incur* costs by providing that service, their use is noncommercial under the first factor.

**B.    Adapting one-to-one library lending to the digital age facilitates access to information, strongly favoring fair use.**

The purpose and character of CDL is to broaden access to knowledge. Fair use is designed to help courts determine "how to define the boundary limit of the original author's exclusive rights in order to best serve the overall objectives of the copyright law to expand public learning while protecting the incentives of authors to create for the public good." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015). To that end, the district court failed to adequately weigh CDL's contributions to the overall public good. Indeed, CDL's purpose and character favor fair use in two ways: (1) by facilitating library lending, a function that copyright has always recognized as vital; and (2) by expanding the utility of a

10

physical book owned by the library, a use that is transformative under the reasoning of this Circuit's prior decisions.

### 1.    Facilitating digital library lending furthers the objectives of copyright law, regardless of transformativeness.

The district court dismissed CDL under the first factor, stating there is "nothing transformative" about the practice. *Hachette*, 2023 WL 2623787, at *6. As this Circuit has held, transformation is not the exclusive test under the first factor. *See Swatch Grp.*, 756 F.3d at 84. Indeed, the range of purposes supporting fair use is broad: A transformative use such as scanning books to enable full text search qualifies, as does the non-transformative purpose of making content available to print-disabled readers. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014). Publishing the entire recording of an earnings call was found to serve an "important public purpose" because it delivered newsworthy information, "regardless of how transformative" the use was. *Swatch Grp.*, 756 F.3d at 85, 92. What matters is how secondary uses further the overall goals of copyright.

CDL furthers a goal that copyright has long recognized as vital: lending library books to ensure the public benefits from the knowledge and creativity contained within. Naturally, fair use cases dealing with library lending are rare, since the practice of loaning physical books is protected by first sale. *See* 17 U.S.C.

11

§ 109; *Kirtsaeng*, 568 U.S. at 540 (warning that allowing rightsholder-imposed constraints on library lending would "fail to further . . . the Progress of Science and useful Arts" (quoting U.S. Const. art. I, § 8, cl. 8)); *Bobbs-Merrill*, 210 U.S. at 350; *Doan v. Am. Book Co.*, 105 F. 772, 777 (7th Cir. 1901) (holding that first sale permits an owner to reproduce aspects of a book in order to "render [it] serviceable" for future distribution); H.R. Rep. No. 94-1476, at 79 (confirming the first sale provision in § 109 ensures that "[a] library that has acquired ownership of a copy is entitled to lend it under any conditions it chooses to impose"). However, there is plenty of evidence indicating that one-to-one digital lending, even if outside the statutory scope of § 109, should be considered fair use.

CDL updates the long-accepted practice of library lending for the modern reality of digital distribution. When libraries practice CDL, they begin, just as they do when they physically lend a book, with a physical copy they own. Libraries maintain a strict one-to-one ratio of physical books owned to digital copies loaned, ensuring a first sale has already occurred (the copy owned) for each digital copy checked out by a patron (the copy loaned). Instead of examining whether the purpose and character of CDL were similar to physical lending, the district court instead cast aside the principle of first sale as having no bearing on the fair use analysis. *Hachette*, 2023 WL 2623787, at *10–11. But where Congress has

12

recognized a public policy interest by implementing a specific exemption to copyright law—namely, § 109's rationale of expanding public access to works—courts too should recognize that interest as weighing in favor of fair use doctrine under the first factor. *See* Jonathan Band, *The Impact of Substantial Compliance with Copyright Exceptions on Fair Use*, 59 J. Copyright Soc'y U.S. 453, 458–61 (2012). Congress's endorsement of copyright exhaustion, especially in the context of library lending, provides strong evidence in favor of fair use—evidence that the district court ignored.

CDL also promotes another important goal of copyright law by making it easier for libraries to meet their accessibility obligations to disabled readers. *See infra* Section II.A (describing how digitized books can help readers with vision impairment, dyslexia, and other disabilities access content). As this Circuit has noted, Congress has expressed an intent "that copyright law make appropriate accommodations for the blind and print disabled," and purposes which further that intent weigh in favor of fair use. *HathiTrust*, 755 F.3d at 102 (citing 17 U.S.C. § 121). The district court insisted that CDL's public availability negates its potential benefits to disabled readers, but this restrictive view is inconsistent with Congress's strong priority of "ameliorating the hardships" faced by all disabled people. *Id.* (discussing the Americans with Disabilities Act, 42 U.S.C. § 12101).

13

### 2. CDL is transformative because it makes books available in a more convenient and usable form.

Because of its narrow focus on altered content, the district court failed to sufficiently consider other well-established ways in which CDL could be transformative. A use can have a transformative purpose even if it reproduces the work verbatim if it adds value or functionality that serves copyright law's objectives. *See, e.g.*, *Swatch Grp.*, 756 F.3d at 84 ("[A] secondary work 'can be transformative in function or purpose without altering or actually adding to the original work.'" (quoting *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009))); *Public.Resource.Org*, 896 F.3d at 450 (admonishing lower court for inadequately considering whether "distributing copies of the law for purposes of facilitating public access could constitute transformative use"); *Google*, 804 F.3d at 216–17 (holding that digitizing entire books to enable full text search constituted a "highly transformative purpose"). Specifically, CDL fulfills the transformative purpose of expanding the utility of libraries' physical collections by making them more easily accessible to all patrons.

Courts, including this Circuit, have consistently recognized a purpose and character favoring fair use where the defendant "utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without

14

unreasonably encroaching on the commercial entitlements of the rights holder."
*Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018) (citing
*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)). The
paradigmatic example is *Sony*, in which the Supreme Court held that the practice
of recording television programs for home viewing at a later time was a purpose
favoring fair use under the first factor. 464 U.S. at 449. A key thread in the Court's
discussion was that giving viewers the option to watch programs they "had been
invited to witness" on their own schedule would encourage more engagement with
the work. *Id.*

     *Sony* and the long line of cases that follow recognize that allowing a user to
reproduce a copy in order to expand its utility—in a way that does not encroach on
the commercial entitlements of the rightsholder—supports copyright's objective of
advancing public knowledge. *See, e.g.*, *Google*, 804 F.3d at 216–18 (holding that
digitization of entire books and public display of snippets served the "highly
transformative purpose of identifying books of interest to the searcher"); *TVEyes*,
883 F.3d at 177 (finding defendant's product enabled access to "material . . . that
would otherwise be irretrievable, or else retrievable only through prohibitively
inconvenient or inefficient means").

A library employing CDL similarly expands utility by delivering books to patrons who have been invited to read the book in a more convenient form. Digital lending of physical books also does not encroach on the commercial entitlements of the rights holder, as any impact it would have is identical to that of a physical loan. *See* 17 U.S.C. § 109 (the owner of a particular copy is entitled to dispose of it without the permission of the copyright owner).

In its brisk rejection of these arguments, the district court invoked this Circuit's opinion in *ReDigi*, but did not thoroughly engage with its nuances. While the defendant in that case, a marketplace for reselling digital music files, was not a fair user, this Circuit stated that a different defendant in a similar situation might be. *See Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018). Specifically, the Court suggested that "deliver[ing] . . . content in more convenient and usable form to one who has acquired an entitlement to receive the content" would weigh in favor of fair use. *Id.* In that scenario, the defendant would have a transformative purpose that "expands [the work's] utility, thus serving copyright's overall objective of contributing to public knowledge." *Google*, 804 F.3d at 214.

A library employing CDL is that defendant. CDL enhances the convenience and access of an existing, accepted relationship—libraries lending books they own to patrons. *Compare Sony*, 464 U.S. at 449 (recording of television programs to

16

offer a new manner of viewing the programs for those who have established access

to them is utility-expanding fair use), *with ReDigi*, 910 F.3d at 661 (reproduction

of digital audio files to create unauthorized third-party marketplace is not fair use).

The defendant in *ReDigi* did not own copies of the songs it reproduced, whereas

libraries engaging in CDL lawfully purchase a physical book for each digital copy

created. Moreover, unlike the defendant in *ReDigi*, which ran an uncontestably

commercial "remunerative marketplace," 910 F.3d at 661, public libraries are

nonprofit entities engaged in noncommercial uses privileged under the first factor.

The district court disregarded these key distinctions between *ReDigi* and the

present case, which place CDL within the bounds of utility-expanding

transformative uses.

## II.     The publishers failed to demonstrate CDL caused cognizable market harm.

The fourth factor aims to maintain copyright's balance between

incentivizing authors and promoting the public benefits of access. The district

court fumbled this balance. First, it underestimated the public impact of CDL,

disregarding not only the benefits of CDL's improvements to access but also the

risks of undermining statutory rights. It then incorrectly presumed harm to the

publishers' market without considering whether that market is cognizable under

17

copyright, what audience makes up the market, or the effects of CDL within the market.

### A. The district court failed to consider the public benefits of CDL and the risk of harm to the public.

The district court's cursory analysis of public impacts vastly understated CDL's benefits. CDL furthers the public access mission of libraries and helps them meet their accessibility obligations for patrons with disabilities. Furthermore, the district court forgot the Supreme Court's instruction to consider the risk of harm to the public. *See Oracle Am.*, 141 S. Ct. at 1208 (calling for consideration of potential public harm where enforcement of copyright might limit future creativity). These non-monetary effects on society, properly considered, weigh substantially in favor of a finding of fair use. *Id.* at 1206 ("[W]e must take into account the public benefits the copying will likely produce.").

The district court omitted any consideration of the cultural and societal importance of libraries. Libraries are institutions defined by two traditional missions: preservation of and access to knowledge. In carrying out these missions, libraries facilitate the public access that lies at the heart of the Copyright Act's balancing of interests. *See Harper & Row, Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 558 (1985) ("[C]opyright supplies the economic incentive to [both]

create *and disseminate* ideas." (emphasis added)); *United States v. Paramount Pictures*, 334 U.S. 131, 158 (1948) ("It is said that [copyright] serves to induce *release to the public* of the products of [the artist's] creative genius." (emphasis added)). By allowing libraries to expand the utility of their already-owned collections, CDL enables them to more effectively provide public access to books, a substantial public benefit that must be weighed against any market harms.

CDL creates substantial additional benefits through this expansion of access. Expanded lending fosters literacy and new creativity by ensuring democratic and widespread access to bestselling novels, textbooks, historical reference materials, legal resources, and more. Writers take inspiration from the diverse range of books they check out from libraries, nourishing their own creativity with the writing of others. *See, e.g.*, Ericka McIntyre, *For the Love of Libraries: Four Authors on What Makes Libraries Wonderful*, Writer's Dig. (Sep. 23, 2019), https://www.writersdigest.com/be-inspired/for-the-love-of-libraries (chronicling the contributions of libraries to the creativity of four authors). Patrons filing *pro se* litigation often use library legal research guides to prepare their materials. Anthony Aycock, *Unauthorized Practice of Law in the Library*, Am. Librs. (Nov. 6, 2019), https://americanlibrariesmagazine.org/2019/11/06/unauthorized-practice-of-law-in-the-library. On a purely economic level, library lending cultivates a love of reading

19

among patrons, creating future purchasers of books. Abhishek Nagaraj & Imke Reimers, *Digitization and the Market for Physical Works: Evidence from the Google Books Project*, 15 Amer. Econ. J. 428, 455 (2023) (finding through economic analysis that "free digital distribution [including CDL] may increase rather than decrease the sales of physical works"). Congress has recognized the benefits library-enabled access provides, enshrining in statute common library practices like reproduction of works for preservation and distribution of works through interlibrary lending (ILL) regardless of any potential market harm. 17 U.S.C. § 108.

The district court further erred by conflating access with accessibility, avoiding consideration of CDL's potential accessibility benefits. *Hachette*, 2023 WL 2623787 at *15. Increasing *accessibility*, or the quality of being easily used by those with a disability, is a paradigmatic fair use distinct from increasing *access*. *HathiTrust*, 755 F.3d at 102 (concluding that providing books accessible to the print disabled is a fair use). Converting print books into a CDL format allows libraries to more easily make their collections accessible to their print disabled patrons. CDL works lack the interoperability-hampering technical protection measures (TPMs) common among their publisher-licensed counterparts, making them compatible with the variety of accessibility-enhancing programs used by

print-disabled patrons. Katherine Klosek*, US Copyright Office Allows Access to E-books for People with Disabilities, but Licenses May Still Restrict Access,* Ass'n Rsch. Librs. (Jan 18, 2022), https://www.arl.org/blog/us-copyright-office-allows-access-to-e-books-for-people-with-disabilities-but-licenses-may-still-restrict-access.

Libraries using CDL works for remediation are more efficient, as they can lend without worrying about contractual restrictions on distribution and modification imposed by publishers. They thus can spend their budgets on books, rather than the administrative burdens of seeking permission for every work and the costs of legal uncertainty imposed by some publishers' license terms. *Id.* Such efficiency advances the goals of the Chafee Amendment. *See* Blake Reid, *Copyright and Disability*, 109 Calif. L. Rev. 2173, 2199 (2021) (arguing that a desire to eliminate delays in accessibility provision drove the Chafee Amendment). The improved remediation CDL enables is particularly apparent among the many books that still lack a digitally readable copy. Bos. Libr. Consortium CDL Working Grp., *Consortial CDL: Implementing Controlled Digital Lending as a Mechanism for Interlibrary Loan* 5 (2021), https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1208&context=scholcom (noting that only 10% of academic textbooks have ebook editions). Publishers have been slow to close this

accessibility gap, creating a need that libraries have sought to fill with CDL and similar fair uses. The district court's reduction of accessibility to mere "access" thus vastly undersold CDL's public benefit, overlooking decades of Congressional commitment to expanding accessibility. *See* 42 U.S.C § 12101; 17 U.S.C. § 121.

The benefits accessibility brings are not invalidated by the failure to restrict them to those with disabilities. *Hachette*, 2023 WL 2623787, at \*7. Neither publishers nor libraries should be in the business of imposing disability means-testing to limit who can benefit from accessibility-increasing formats like CDL. Importing such fine-grained focus on whether those benefitting are "disabled enough" would run against disability law's emphasis on reducing the administrative burdens associated with disability by promoting universal design. *See* Elizabeth F. Emens, *Disability Admin: The Invisible Costs of Being Disabled*, 105 Minn. L. Rev. 2329 (2021). The process of proving and re-proving disability is a frustrating, time-consuming process that substantially contributes to the burden of disability. Requiring such barriers would substantially *reduce* CDL's public benefits.

The district court also failed to meet its obligation to consider potential *harms* to the public that eliminating CDL as an in-house alternative to current licensing schemes would create. *Oracle Am.*, 141 S. Ct. at 1208. Licensed ebooks

22

impose substantial costs on libraries. Libraries must contend with uncertainty as to the availability of works and the rights associated with them, investing resources deciphering license terms. Publisher licenses vary in what rights they grant, their duration, and what limitations on statutorily-protected rights like ILL they impose. Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, 40 Legal Reference Servs. Q. 113 (2021). Some publishers outright deny libraries licenses for their ebooks. Geoffrey A. Fowler, *Want to Borrow That e-book from the Library? Sorry, Amazon Won't Let You.*, Wash. Post (Mar. 12, 2021), https://www.washingtonpost.com/technology/2021/03/10/amazon-library-ebook-monopoly (describing the now-ended Amazon embargo on library licenses).[5] Others use their bargaining power to price gouge smaller libraries, imposing substantial markups on books, like sequels, that libraries need in order to complete their collections. Moya Dillon, *'It Comes Down to Price Gouging': Brock Library Call for Equity on ebooks*, Durhamregion.com (Apr. 13, 2022), https://www.durhamregion.com/life/it-comes-down-to-price-gouging-brock-

---

[5] *See also* Am. Libr. Ass'n, *Competition in Digital Markets* 2 (2019), http://www.ala.org/news/sites/ala.org.news/files/content/mediapresscenter/CompetitionDigitalMarkets.pdf (describing Amazon's recent decision to stop selling ebooks to libraries).

library-call-for-equity-on-ebooks/article_8949643c-b2d1-59be-9420-

15fa67e17bf6.html.

This opaque, fragmented market creates confusion, increasing library

administrative complexity and overhead management costs. Daniel A. Gross, *The*

*Surprisingly Big Business of Library E-books*, New Yorker (Sept. 2, 2021),

https://www.newyorker.com/news/annals-of-communications/an-app-called-libby-

and-the-surprisingly-big-business-of-library-e-books ("Libraries now pay

OverDrive and its peers . . . to [manage] an increasingly complex system of digital

rights."); *see also* Xiyin Tang, *Privatizing Copyright*, 121 Mich. L. Rev. 753, 781–

82 (2023) (noting chilling effect on rights such as fair use caused by private

ordering of copyright).

Despite these efforts to negotiate the licensed marketplace, libraries risk

losing access to thousands of titles without prior notice whenever publishers

please. *See* Claire Woodcock, *Publishing Company Starts School Year by*

*Removing over 1,000 E-Textbooks*, Vice (Oct. 5, 2022),

https://www.vice.com/en/article/3ad5x8/publishing-company-starts-school-year-

by-removing-over-1000-e-textbooks. By eliminating the ability of libraries to use

CDL as a means of ensuring long-term affordable digital access to their

collections, publishers threaten the core functions of the library—acquiring,

preserving, and sharing information. Avoiding those public harms urges a finding of fair use.

### B. CDL has a distinct market niche that does not usurp the market for licensed lending ebooks.

In accepting appellees' market harm contentions, the district court erred in four ways. First and foremost, it failed to differentiate between cognizable market harms and those harms that copyright accepts. Second, it did not it did not look beyond publishers' conclusory assertions, improperly presuming harm from the mere existence of CDL. Third, it failed to differentiate between the CDL and licensed ebook markets, despite considerable evidence of their distinct purposes and audiences. Finally, it made no distinction between market effects, brushing aside evidence of complementary benefits and omitting discussion of market exit.

### 1. Any market harm caused by CDL is not cognizable under copyright law.

Even assuming there is a properly defined market, the mere existence of licensing arrangements does not prove that CDL harms the market for lending ebooks in a way that is relevant to copyright. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d Cir. 2006) (holding that a non-substituting use was not infringement despite the existence of a licensing market). Licensing "markets" may arise for a variety of reasons, even if the underlying use is fair—to

25

avoid the threat of litigation, to access uncopyrightable service and support, to avoid upfront costs and infrastructure investments, or simply for convenience.

Every fair use, even a paradigmatically transformative one, involves some loss of revenues or licensing markets, but as this Court has noted, such losses are part of copyright's implicit limits. *Am. Geophysical Union*, 60 F.3d at 931 nn.17–18 (distinguishing between a market for copyrighted works and the market for convenience-enhancing derivatives of such works); *see also* Aaron Perzanowski & Jason Schultz, *Copyright Exhaustion and the Personal Use Dilemma*, 96 Minn. L. Rev. 2067, 2115 (2012). Other circuits have also noted that the existence of licensing platforms is not necessarily evidence of market substitution. *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1277 (11th Cir. 2014) (adopting district court's reasoning that the efficiency, reasonable price, and convenience of access to the work factor into a market harm analysis). Copyright does not guarantee rightsholders profits from, or even control over, all markets. *Am. Geophysical Union*, 60 F.3d at 930 ("Only an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable.").

Secondary markets, from resale to library lending, have historically been outside of copyright holder control, allowing those unable to pay full price in the

traditional markets reserved to rightsholders to still access knowledge. *See* Jeanne
C. Fromer, *Should the Law Care Why Intellectual Property Rights Have Been
Asserted?*, 32 Hous. L. Rev. 549, 566–68 (2016). These markets were deliberately
placed outside rightsholder control in order to ensure copyright fulfills its ultimate
aim to "stimulate artistic creativity for the general public good." *Twentieth Century
Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). The Supreme Court has
repeatedly rejected rightsholder attempts to control these markets. *See, e.g.*, *Bobbs-
Merrill*, 210 U.S. at 351 (holding that a book publisher's minimum resale pricing
scheme extended copyright beyond its intended bounds). The 1976 Copyright Act
enshrined these vital protections, despite repeated rightsholder attacks against
secondary markets. *See* Sarah Lamdan et al., *The Anti-Ownership Ebook Economy*,
Engelberg Ctr. on Innovation L. & Pol'y (2023), https://www.nyuengelberg.org/fil
es/the-anti-ownership-ebook-economy.pdf. In *Kirtsaeng*, the Supreme Court
rejected another attempt to use copyright to close a secondary market. It held that
rightsholders, though allowed to set different prices in different countries, could
not use copyright to maintain those prices against arbitrage. 568 U.S. 519. Justice
Breyer, writing for the Court, reaffirmed the deep roots of copyright's common
law principles, strongly emphasizing the limits on rightsholder control. He noted

that copyright owners exercising downstream control despite an initial transaction was an "absurd result." *Id.* at 544, 546, 552.

Copyright grants a limited monopoly to protect *works*, not markets. *See id.*; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 591–92 (1994) (distinguishing between protecting exclusive rights in a work and protecting the value of a work). Publishers seek to upend the balance between rightsholder control and individual rights through contract, abrogating the common law tradition of limited copyright and upsetting the congressional balancing set out in the Copyright Act. Giving rightsholders control of downstream markets would hamper legitimate exercises of property rights, chill creativity, and restrict public access to works. Libraries' ability to lend previously purchased works for no fee has always been accepted under copyright law, and publishers should not be permitted to hamstring that practice in attempting to raise their profits.

**2. The district court improperly presumed market harm based on the mere existence of a secondary market.**

The district court's embrace of the "common sense" argument that a loaned CDL copy competes with the licensed is conclusory reasoning that erroneously minimizes the plaintiff's burden in identifying a relevant market. Accepting a mere indication of a market without a more substantial inquiry into its structure in effect

28

creates an impermissible presumption of market harm. *See Campbell*, 510 U.S. at

591. This is not to say appellees bear the burden of showing market harm. *See*

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir.

2021). But accepting mere assertions of a market without further inquiry would

allow rightsholders to claim market harm from adjacent, not usurping, products.

*See Am. Geophysical Union*, 60 F.3d at 937 (Jacobs, J., dissenting) (noting the

circularity between existence of markets and court decisions).

Other circuits have declined to accept conclusory assertions that merely

point to the existence of a market without inquiry into its contours. *Am. Soc'y for*

*Testing & Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1271 (D.C. Cir.

2023) (rejecting plaintiff's "conclusory assertions" that a market existed); *Patton*,

769 F.3d at 1280 (requiring publishers to establish existence of licensing markets

as they were reasonably expected to have the necessary evidence); *see also Ty, Inc.*

*v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 519 (7th Cir. 2002) (emphasizing the

importance of distinguishing between market substitutes and complements).

Additionally, the Supreme Court has suggested that in cases where use of a

copyrighted work yields societal benefits, copyright holders must demonstrate

"likelihood of harm" beyond mere speculative suggestions. *Sony*, 464 U.S. at 454.

29

This presumption of harm is doubly dangerous in the context of CDL. Not only does it impede libraries' ability to make their own way in the new world of digital lending, but it also uncritically accepts the same incorrect logic of free access harming paid sales that publishers have argued about print collections. Basic library lending has been accused of usurping the thriving print book market for the better part of a century, but the market for new books has yet to collapse. *See* Lamdan et al., *supra*. Given this context, and the fact that CDL has existed for over a decade without any proof that it harmed the market for licensed ebooks, the district court should have conducted a more thorough market analysis. *See Public.Resource.Org*, 82 F.4th at 1271 (noting that the decade and a half history of Public.Resource.Org posting standards cast doubts on claims of significant market injury).

### 3. CDL has a distinct audience which separates it from the market for licensed ebooks.

The stark difference between both the nature of and the audience for CDL works and licensed lending ebooks suggests that they make up two distinct but related markets. Between the one-to-one ratio and the investment in servers and other technology, implementing CDL makes substantial demands on library resources. Nathan Mealey et al., *The Library Technology Market's Failure to*

*Support Controlled Digital Lending*, Scholarly Kitchen (Oct. 25, 2021), https://scholarlykitchen.sspnet.org/2021/10/25/guest-post-the-library-technology-markets-failure-to-support-controlled-digital-lending. These costs disincentivize libraries looking to simply expand their collections via CDL. Rather, CDL appeals to libraries which have already purchased a physical copy seeking to make their day-to-day operations more efficient and their collections more durable. *See* Bos. Libr. Consortium CDL Working Grp., *supra* (emphasizing the current technical and resource challenges with making CDL possible for their current collections). CDL appeals to libraries interested in providing ebooks that will not be arbitrarily removed or edited by publishers. *See, e.g.*, Ben Ellery & James Beal, *Roald Dahl ebooks 'Force Censored Versions on Readers' Despite Backlash*, Times (Feb. 25, 2023), https://www.thetimes.co.uk/article/roald-dahl-collection-books-changes-text-puffin-uk-2023-rm2622vl0; Woodcock, *supra*.

Licensed ebooks, on the other hand, are available upon demand and require very little library investment in new infrastructure. They are generally acquired by libraries looking to expand their collections or looking to meet sudden surges in demand. *See* Gross, *supra*. Further, the high license fees for lending ebooks tends to make them available only to larger consortia and not to smaller library branches. Bos. Libr. Consortium CDL Working Grp., *supra*. Treating the distinct markets for

31

CDL and licensed ebooks as equivalent is an error that runs the risk of creating "circular reasoning" under the fourth factor. *Swatch Grp.*, 756 F.3d at 91.

### 4. The district court failed to consider the possibility of non-substituting market effects.

To the extent the markets for CDL and licensed lending ebooks overlap, the fourth factor focuses on whether a secondary use "usurps the market for the [original] by offering a competing substitute." *Andy Warhol Found.*, 11 F.4th at 48. CDL is not a substitute for licensed lending ebooks, but rather a complementary offering.

CDL provides an alternative to market exit. For many libraries, the relevant choice is not between paying the high fees for licensed ebooks or adopting CDL—as noted above, they serve different audiences, different purposes, and thus different markets. Instead, it is the choice between CDL and not offering any copies of a book to patrons unable to access print collections. *See Williams & Wilkins*, 487 F.2d at 1358 (noting a finding of liability might create no additional revenue and lead to researchers "do[ing] without" information). The high cost of lending ebooks limits the breadth and diversity of library collections, limiting their ability to fulfill their access-expanding mission. Erin M. Watson, *A Comparative Study of Medical ebook and Print Book Prices*, 38 Health Info. & Librs. J. 39

32

(2021). Smaller library systems often do not stock an ebook if the price is too high. Amy Nowakowsky & Kat Voy, *The Ebook Pricing War: The Fight for Control Between Libraries and Publishers*, Open Educ. Alberta (2023), https://openeducationalberta.ca/ciicm/chapter/the-ebook-pricing-war-the-fight-for-control-between-libraries-and-publishers.

The district court also improperly rejected the Internet Archive's proffered evidence of complementary effects. The fact that CDL drives increased demand as readers discover works is not impermissible evidence of benefits to the rightsholder. *See Oracle Am.*, 141 S. Ct. at 1207 (noting copyright holders may "benefit from the broader use" of their work driven by fair use). If anything, this increase in demand suggests that CDL and lending ebooks are complementary markets. *See* Nagaraj & Reimers, *supra* (finding increases in book sales due to the Google Books digitization project, and drawing a parallel between the effects of Google Books and CDL). Complementary products, by definition, do not usurp the market of the original. *See Ty*, 292 F.3d at 517–18 (framing the fair use analysis through the lens of complements and substitutes). By accepting appellee's simplified explanation of market overlap without inquiry into the effect of that overlap, the district court skewed its fourth factor analysis in publishers' favor.

## **CONCLUSION**

The lending role of libraries advances the overall objectives of copyright. CDL allows libraries to continue lending out their collections of purchased books—a right they have always had—in a manner that expands the utility and accessibility of works. By ruling that CDL constitutes a fair use, this Circuit has the opportunity to ensure libraries' continued survival in the digital age.


Dated: December 18, 2023          */s/ Jason M. Schultz*
                                  Jason M. Schultz
                                  Sunoo Park (*admission pending*)
                                  Jake Karr
                                  TECHNOLOGY LAW AND POLICY CLINIC
                                  NEW YORK UNIVERSITY SCHOOL OF LAW
                                  245 Sullivan Street #609
                                  New York, NY 10012
                                  (212) 992-7365
                                  jason.schultz@law.nyu.edu

                                  Counsel for *Amici Curiae*

34

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g)(1) and Fed. R. App. P. 29(a)(4)(G), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) and Local Rule 29.1(c) because it contains 6,853 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word for Mac (Version 16.79.2) in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: December 18, 2023   */s/ Jason M. Schultz*

            Jason M. Schultz

           Counsel for *Amici Curiae*