# 23-1260

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC., JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs–Appellees*,

v.

INTERNET ARCHIVE
*Defendant-Appellant*

DOES 1–5, inclusive,
*Defendants*.

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR *AMICI CURIAE* CENTER FOR DEMOCRACY & TECHNOLOGY, LIBRARY FREEDOM PROJECT, AND PUBLIC KNOWLEDGE IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

Jennifer M. Urban
Samuelson Law, Technology &
  Public Policy Clinic
U.C. Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
(510) 642-7338
jurban@clinical.law.berkeley.edu
*Attorney for Amicus Curiae*

Dated: December 20, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that the Center for Democracy & Technology, Library Freedom Project, and Public Knowledge are non-profit corporations. None has a parent corporation, and no publicly held corporation holds 10% or more of any stock in these *amici curiae*.

December 20, 2023               Respectfully submitted,

                                            /s/ Jennifer M. Urban
                                            Jennifer M. Urban
                                            *Attorney for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES ..................................................... iv

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT .................................................................. 7

I.   Reader Privacy Is a Foundational American Value that Is Necessary for Intellectual Freedom, Reflected in Law, and Safeguarded by Libraries.................................................................. 7

    A.   Reader privacy is an essential component of the constitutional right to receive information and engage in free inquiry. .................... 8

    B.   Libraries' longstanding role as guardians of reader privacy is reflected in law and in established library principles and practices.... 9

II.  Preserving Libraries' Ability to Choose Controlled Digital Lending Preserves Their Ability to Protect the Privacy of Readers Who Borrow Books Digitally.................................................................. 13

    A.   Libraries maintain reader privacy protections when operating in the digital space. .................................................................. 13

III. Preventing Libraries from Using Controlled Digital Lending Would Harm Reader Privacy by Limiting Libraries and Their Patrons to Commercial Digital Lending Aggregators and E-Book Readers. .......... 20

    A.   In sharp contrast to libraries, commercial aggregators and e-book readers undermine reader privacy..............................................21

    B.   Forcing libraries to rely on commercial aggregators' and e-book readers' practices would heighten risks to readers' privacy, intellectual freedom, and data security..............................................26

IV. Preserving Libraries' Ability to Engage in Controlled Digital Lending Is Necessary to Fulfill the Promise of Digital Lending While Protecting Reader Privacy. .................................................................. 32

    A.   Physical lending is not a sufficient alternative to privacy-protective digital lending..............................................32

B.      Commercial aggregators, e-book readers, and publishers are highly unlikely to implement privacy-protective practices in response to library pressure. ..............................................................35

CONCLUSION....................................................................................37

CERTIFICATE OF COMPLIANCE ....................................................39

CERTIFICATE OF SERVICE ..............................................................40

# TABLE OF AUTHORITIES

## Cases

*Authors Guild v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ............................................................3, 6

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) .............................................................6, 33

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
   457 U.S. 853 (1982)............................................................................. 8

*Eldred v. Ashcroft*,
   537 U.S. 186 (2003) ............................................................................ 7

*Fogerty v. Fantasy, Inc.*,
   510 U.S. 517 (1994) ............................................................................ 3

*Golan v. Holder*,
   565 US 302 (2012).............................................................................. 7

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021) ....................................................................... 6

*Kirtsaeng v. John Wiley & Sons, Inc.*,
   579 U.S. 197 (2016) ............................................................................ 3

*Lamont v. Postmaster Gen. of U.S.*,
   381 U.S. 301 (1965) ........................................................................9, 26

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ............................................................................ 3

*Stanley v. Georgia*,
   394 U.S. 557 (1969) ........................................................................9, 26

*United States v. Curtin*,
   489 F.3d 935 (9th Cir. 2007) .............................................................29

*United States v. Rumely*,
  345 U.S. 41 (1953) ............................................................... 8

## Federal Statutes

17 U.S.C. § 107 ...................................................................... 6

17 U.S.C. § 121 ......................................................................33

42 U.S.C. § 12101(7) .............................................................34

## State Statutes

Conn. Gen. Stat. Ann. § 11-25(b) ......................................... 9

N.Y. C.P.L.R. § 4509 .......................................................10, 28

Vt. Stat. Ann. tit. 22, § 172 ............................................10, 28

## Rules

Fed. R. App. P. 29(a)(2) ......................................................... 1

Fed. R. App. P. 29(a)(4)(E) .................................................... 1

## Other Authorities

Aaron Dobbs, *ADE in the Library eBook Data Lifecycle*, Libr. and Info.
  Tech. Ass'n (Oct. 14, 2013),
  https://litablog.org/2014/10/ade-in-the-library-ebook-data-lifecycle/
  [https://perma.cc/7X6E-8DP8] ...........................................31

*About Hyku for Consortia: Repositories at Scale*, Priv. Acad. Libr.
  Network of Ind.,
  https://hykuforconsortia.palni.org/about
  [https://perma.cc/9G87-5UL5]............................................17

*Adobe Responds to ALA on Egregious Data Breach; Some Action Expected by Week of Oct. 20*, Am. Libr. Ass'n (Oct. 13, 2014), https://www.ala.org/news/press-releases/2014/10/adobe-responds-ala-egregious-data-breach-some-action-expected-week-oct-20 [https://perma.cc/EDF4-BM89] ............................................................31

*American Libraries*, Open Libr., https://archive.org/details/americana?tab=collection ..........................18

*American Library Association Reports Record Number of Demands to Censor Library Books and Materials in 2022*, Am. Libr. Ass'n (Mar. 22, 2023), https://www.ala.org/news/press-releases/2023/03/record-book-bans-2022 [https://perma.cc/Q4TT-S4VH] ............................................................30

Anne Klinefelter, *The Role of Librarians in Challenges to the USA PATRIOT Act*, 5 N.C. J.L. & Tech. 219 (2004), https://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=1034&context=ncjolt ............................................................10

April Lambert et al., *Library Patron Privacy in Jeopardy*, 52 Proceedings of the Ass'n for Info. Sci. and Tech. 1 (2015), https://asistdl.onlinelibrary.wiley.com/doi/full/10.1002/pra2.2015.1450 52010044. ............................................................24

Brewster Kahle, *Reader Privacy at the Internet Archive*, Internet Archive Blogs (Oct. 25, 2013), https://blog.archive.org/2013/10/25/reader-privacy-at-the-internet-archive/ [https://perma.cc/ER5H-BXQT] ............................................................18

*Caltech DIBS: Architectural Overview*, Caltech Libr. (Jan. 19, 2023), https://caltechlibrary.github.io/dibs/architecture.html#architectural-overview [https://perma.cc/K3GC-MD7J] ............................................................14

*Caltech DIBS: Caltech Library Digital Borrowing System*, Caltech Libr. (Jan. 19, 2023),
https://caltechlibrary.github.io/dibs/index.html
[https://perma.cc/QL9Q-GYPF]...........................................................15

*Caltech DIBS: System Architecture*, Caltech Libr. (Jan. 19, 2023),
https://caltechlibrary.github.io/dibs/architecture.html
[https://perma.cc/83NK-XX5U]..........................................................16

*Caltech DIBS: The IIIF Server in Detail*, Caltech Libr. (Jan. 19, 2023),
https://caltechlibrary.github.io/dibs/architecture.html#the-iiif-server-in-detail
[https://perma.cc/5EFR-RTN7] ....................................................19, 20

Caltech Library, *DIBS,* GitHub (Jan. 18, 2023),
https://github.com/caltechlibrary/dibs
[https://perma.cc/8688-F465] ...........................................................16

Caralee Adams, *New eBook Protection Software Gaining Popularity Among Publishers and Libraries*, Internet Archive Blogs (Oct. 10, 2022),
https://blog.archive.org/2022/10/10/new-ebook-protection-software-gaining-popularity-among-publishers-and-libraries/
[https://perma.cc/R27H-UHMM] .......................................................15

Charlie Barlow, *Let's Make CDL Boring: Using Controlled Digital Lending for Interlibrary Loan*, Bos. Libr. Consortium (Oct. 12, 2023),
https://docs.google.com/presentation/d/1FW2fKowE4o6taeVXKQOddlv-JhxOEGBz-xVw5v9h9gI/edit#slide=id.g99f2f57a71_0_207...............15

Cindy Cohn & Kathryn Hashimoto, *The Case for Book Privacy Parity: Google Books and the Shift from Offline to Online Reading*, Harv. L. & Pol'y Rev. Blog (May 16, 2010),
https://journals.law.harvard.edu/lpr/online-articles/the-case-for-book-privacy-parity-google-books-and-the-shift-from-offline-to-online-reading/
[https://perma.cc/6L5H-7G33] ...........................................................29

*Code of Ethics*, Am. Libr. Ass'n (Jan. 22, 2023),
https://www.ala.org/tools/ethics
[https://perma.cc/BM6X-CKHB] .......................................................11

Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*,
New Yorker (Sept. 2, 2021),
https://www.newyorker.com/news/annals-of-communications/an-app-called-libby-and-the-surprisingly-big-business-of-library-e-books.................................................................................20, 21, 22

*Data Privacy for SimplyE*, Confluence@NYPL (Dec. 14, 2021),
https://web.archive.org/web/20230310151531/https://confluence.nypl.org/display/SIM/Data+Privacy+for+SimplyE?src=contextnavpagetreemode ...........................................................................................36

David R. Hansen & Kyle K. Courtney, *A White Paper On Controlled Digital Lending Of Library Books*, Libr. Futures (2018),
https://controlleddigitallending.org/whitepaper/
[https://perma.cc/D6XN-UZ4M] ....................................................14, 15

*Experts Assure Library Community that CDL Continues*, SPARC (Oct. 12, 2023),
https://sparcopen.org/news/2023/experts-assure-library-community-that-cdl-continues/#:~:text=
[https://perma.cc/ADH3-UXDJ] ...........................................................14

*FAQ – Controlled Digital Lending*, Libr. Futures,
https://controlleddigitallending.org/faq/
[https://perma.cc/K7NU-9JTS] ...........................................................32

*FAQ*, Palace Project,
https://thepalaceproject.org/faq/
[https://perma.cc/6T7C-4GWR]...........................................................36

*Figgy: PUL's Digital Repository*, Princeton Univ. Libr. Confluence (Oct. 9, 2023),
https://pul-confluence.atlassian.net/wiki/spaces/IT/pages/1933580/Figgy+PUL+s+Digital+Repository
[https://perma.cc/4T29-NNAJ] ............................................................17

*Getting Started with Libby*, Libby Help,
https://help.libbyapp.com/en-us/6103.htm#:~:text=With%20Libby%2C%20you%20can%20borrow,titles%20or%20place%20holds%20instantly
[https://perma.cc/SKW5-QD69] ...........................................................25

*Internet Archive BookReader*, Open Libr.,
https://github.com/internetarchive/bookreader
[https://perma.cc/V2MQ-MR39] ...............................................17, 19, 20

Internet Archive, *BookReader*, GitHub (Nov. 16, 2023),
https://github.com/internetarchive/bookreader
[https://perma.cc/V2MQ-MR39] ...........................................................19

*IT: Technology*, Princeton Univ. Libr. Confluence (Oct. 24, 2023),
https://pul-confluence.atlassian.net/wiki/spaces/IT/pages/1933578/Technology
[https://perma.cc/FPS9-CPTB] ............................................................19

John Friedman & Nadine Farid Johnson, *Banned in the USA: The Growing Movement to Censor Books in Schools*, PEN America (Sept. 19, 2022),
https://pen.org/report/banned-usa-growing-movement-to-censor-books-in-schools/
[https://perma.cc/HRD5-SXHK] ...........................................................30

*Join Open Libraries*, Open Librs.,
http://openlibraries.online/join/
[https://perma.cc/BR34-EVJJ] ............................................................18

Kari Paul, *'They Know Us Better Than We Know Ourselves': How Amazon Tracked My Last Two Years of Reading*, Guardian (Feb. 3, 2020),
https://www.theguardian.com/technology/2020/feb/03/amazon-kindle-data-reading-tracking-privacy
[https://perma.cc/5QKN-AH38].....................................................26, 27

Kasey Meehan et al., *Banned in the USA: The Mounting Pressure to Censor*, PEN America,
https://pen.org/report/book-bans-pressure-to-censor/
[https://perma.cc/9QSS-GPZH] ............................................................30

*Kindle Store Terms of Use*, Amazon (Nov. 30, 2022),
https://www.amazon.com/gp/help/customer/display.html?nodeId=201014950
[https://perma.cc/LYR6-9RVW] ..........................................................25

*Library Bill of Rights*, Am. Libr. Ass'n,
https://www.ala.org/advocacy/intfreedom/librarybill
[https://perma.cc/8F7J-S3U3] .............................................................11

*Library Privacy Guidelines for Library Management Systems*, Am. Libr. Ass'n,
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/privacy
[https://perma.cc/2YNS-RQNT] ....................................................12, 31

Lila Bailey et al., *Position Statement on Controlled Digital Lending by Libraries*, Libr. Futures,
https://controlleddigitallending.org/statement/
[https://perma.cc/REK8-U995]............................................................33

Lila Bailey, *Librarians Share Benefits of Controlled Digital Lending*, Internet Archive Blogs (Aug. 8, 2019),
https://blog.archive.org/2019/08/08/librarians-share-benefits-of-controlled-digital-lending/
[https://perma.cc/JNK7-636Z].....................................................32, 33

Lydia X.Z. Brown et al., *Centering Disability in Technology Policy*, Am. Ass'n of People with Disabilities & Ctr. for Democracy and Tech. (2021), https://cdt.org/wp-content/uploads/2021/12/centering-disability-pl-120821-1125-final.pdf [https://perma.cc/Y5NP-UAS7] ...........................................................33

Margaret Rouse, *Hosting*, Techopedia (Oct. 22, 2012), https://www.techopedia.com/definition/29023/web-hosting ...............17

*Marketplace*, Palace Project, https://thepalaceproject.org/marketplace/ [https://perma.cc/N3V6-WJR9] ...........................................................35

Matt Enis, *NYPL Launches SimplyE App, Integrating Access to Multiple Ebook Vendors*, Libr. Journal (July 15, 2016), https://www.libraryjournal.com/story/nypl-launches-simplye-app-integrating-access-to-multiple-ebook-vendors [https://perma.cc/R9QE-X6LH] ...........................................................36

Nat'l Rsch. Council, *Engaging Privacy and Information Technology in a Digital Age* (2007), https://doi.org/10.17226/11896. ........................................................... 9

Nicholas Rizzo, *State of US Public Libraries – More Popular and Digital Than Ever*, WordsRated (Feb. 17, 2022), https://wordsrated.com/state-of-us-public-libraries/ [https://perma.cc/P7X5-P6HR]...........................................................34

Nikki Davidson, *Behind E-Books, Libraries Find Restrictions and High Costs*, Gov't Tech. (June 15, 2023), https://www.govtech.com/biz/data/behind-e-books-libraries-find-restrictions-and-high-costs ...............................................................34

*OverDrive Privacy Policy*, OverDrive (Jan. 2023), https://company.cdn.overdrive.com/policies/privacy-policy.htm [https://perma.cc/B42X-K3KR] ...........................................................23

*OverDrive Releases 2022 Digital Book Circulation Data and Highlights*,
OverDrive (Jan. 6, 2023),
https://company.overdrive.com/2023/01/06/overdrive-releases-2022-
digital-book-circulation-data-and-highlights/
[https://perma.cc/638A-R5HZ] ...........................................................34

*Partner With Open Library*, Open Libr.,
https://openlibrary.org/partner-with-us.en
[https://perma.cc/FN3P-8MFA].........................................................18

*Print Disability Access – General Information*, Internet Archive,
https://help.archive.org/help/disability-access-general-information/
[https://perma.cc/2MQX-AR4M] ......................................................33

*Privacy and Confidentiality Q&A*, Am. Libr. Ass'n,
https://www.ala.org/advocacy/intfreedom/privacyconfidentialityqa
[https://perma.cc/J2P7-VQL6] ............................................................13

*Privacy Policy for Children*, OverDrive (July 2021),
https://company.cdn.overdrive.com/policies/privacy-policy-for-
children.htm
[https://perma.cc/X8PR-HVK7]...........................................................23

*Privacy Policy*, Barnes & Noble (Jan. 1, 2023),
https://www.barnesandnoble.com/h/help/privacy-policy-complete......25

*Privacy Policy*, Queens Pub. Libr.,
https://www.queenslibrary.org/about-us/library-policies/privacy
[https://perma.cc/TEU2-5D9B] ...................................................12, 13

*Privacy: An Interpretation of the Library Bill of Rights*, Am. Libr. Ass'n,
https://www.ala.org/advocacy/intfreedom/librarybill/interpretations/pr
ivacy
[https://perma.cc/W5A4-X9RJ] ..........................................................11

*Public Libraries Survey*, Inst. of Museum and Libr. Services,
https://www.imls.gov/research-evaluation/data-collection/public-
libraries-survey
[https://perma.cc/HMH4-TP6B] .........................................................34

Rachel V. L. Jones, *Controlled Digital Lending and the Open Library*,
    Libr. Buzz (Mar. 5, 2021),
    https://openlab.citytech.cuny.edu/library/controlled-digital-lending-
    and-the-open-library/
    [https://perma.cc/XU9J-ASJU] ...........................................................18

*Re: Docket Number 2015-3, Mass Digitization Pilot Program*, Internet
    Archive (Oct. 8, 2015),
    https://www.copyright.gov/policy/massdigitization/comments/Internet
    %20Archive.pdf
    [https://perma.cc/9G7M-PNAP] .........................................................18

*Reading with Kindle*, Libby Help,
    https://help.libbyapp.com/en-us/6017.htm
    [https://perma.cc/8LC6-QFX6] ...........................................................24

*ReShare Controlled Digital Lending*, Project ReShare,
    https://projectreshare.org/products/reshare-controlled-digital-lending/
    [https://perma.cc/Z5KX-8ZMT] ..........................................................17

Sara Ana Cemazar, *10 Biggest Advantages of Open-Source Software*,
    Rocket.Chat (Jan. 24, 2022),
    https://www.rocket.chat/blog/open-source-software-advantages
    [https://perma.cc/Q2JZ-U2CX]............................................................17

Sarah Lamdan et al., Engelberg Ctr. on Innovation Law & Policy, *The
    Anti-Ownership Ebook Economy: How Publishers and Platforms Have
    Reshaped the Way We Read in the Digital Age* (2023),
    https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4511975
    [https://perma.cc/PF32-KD8S] .....................................................22, 27

Sarah Lamdan, *Data Cartels: The Companies That Control and
    Monopolize Our Information* (2022) .............................................36, 37

Sarah Lamdan, *Librarianship at the Crossroads of ICE Surveillance*, In
    the Libr. With The Lead Pipe (Nov. 13, 2019),
    https://www.inthelibrarywiththeleadpipe.org/2019/ice-surveillance/
    [https://perma.cc/6BYH-KJTR].....................................................29, 30

*SimplyE*, N.Y. Pub. Libr.,
  https://www.nypl.org/books-music-movies/simplye
  [https://perma.cc/C8LY-9P3Z].............................................................35

SPARC, *Navigating Risk in Vendor Data Privacy Practices: An Analysis
  of Elsevier's ScienceDirect* (2023),
  https://zenodo.org/records/10078610
  [https://perma.cc/9KUZ-D9SZ].......................................................36, 37

*The New York Public Library Privacy Policy*, N.Y. Pub. Libr. (Sept.
  2021),
  https://www.nypl.org/help/about-nypl/legal-notices/privacy-policy
  [https://perma.cc/5DUX-HHR6]................................................ 12, 13, 22

*The Palace Project Launches New Platform and App to Enable
  Equitable Econtent Access*, Palace Project (June 2, 2022),
  https://thepalaceproject.org/the-palace-project-launches-new-platform-
  and-app-to-enable-equitable-econtent-access/
  [https://perma.cc/F9JY-Q3GS].............................................................35

Univ. of Chi. Libr., *dibsiiif*, GitHub (Apr. 18, 2022),
  https://github.com/uchicago-library/dibsiiif
  [https://perma.cc/82LX-CPLU] ...........................................................17

Universal Viewer, *About*, GitHub (Feb. 10, 2022),
  https://github.com/UniversalViewer/universalviewer/wiki/About
  [https://perma.cc/5NMT-7W9K]............................................................19

*What is Readium LCP?*, European Dig. Reading Lab,
  https://www.edrlab.org/readium-lcp/
  [https://perma.cc/8LSJ-G5PS].............................................................15

*What to Do About Laws and Government Actions That Infringe on Civil
  Liberties and Privacy*, Am. Libr. Ass'n (Jan. 26, 2003),
  https://www.ala.org/ala/washoff/WOissues/civilliberties/theusapatriot
  act/patriottips.pdf
  [https://perma.cc/6QDN-N4C6]............................................................29

Yosef Davidowitz, *Open Source Security: Benefits & Drawbacks You Should Know*, Linux Sec. (June 13, 2022), https://linuxsecurity.com/features/open-source-security-key-benefits-drawbacks-you-should-know [https://perma.cc/LG2D-THN4] ..........................................................17

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

The Center for Democracy & Technology ("**CDT**") is a non-profit public interest organization. For more than twenty-five years, CDT has represented the public's interest in an open, decentralized Internet and has worked to ensure that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of privacy rights on the Internet.

Library Freedom Project ("**LFP**") is a non-profit organization that provides training, support, and resources for library workers regarding issues of intellectual freedom and privacy. Through outreach and education, LFP has been a vocal advocate for libraries, patrons, and communities for nearly ten years.

Public Knowledge is a consumer rights organization dedicated to promoting freedom of expression, an open internet, and access to

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part. No party or its counsel, nor any other person, contributed money that was intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

affordable communications tools and creative works. As part of this work, Public Knowledge has advocated before Congress, in courts, and before administrative agencies to support libraries, strengthen and protect fair use, and ensure robust consumer privacy protections.

*Amici*'s sole interest in this case is to assist the Court by highlighting how the loss of controlled digital lending ("**CDL**") as a library lending option would harm reader privacy.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case could profoundly affect longstanding protections for reader privacy and thus affect a core purpose of copyright: public access to information. Copyright is a "means by which an important public purpose may be achieved," namely, "to allow the public access" to knowledge by balancing authors' interests against "society's competing interest in the free flow of ideas [and] information." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). Copyright's "ultimate, primary, intended beneficiary is the public, whose access to knowledge copyright seeks to advance by providing rewards for

---

[2] *Amici* would like to thank Noor Alanizi, Jessica Kwok, and Katherine Wang, students in Berkeley Law's Samuelson Law, Technology & Public Policy Clinic, for significant contributions to this brief.

authorship." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). Indeed, it is "well settled" that the copyright system ultimately serves "the purpose of enriching the general public through access to creative works." *Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994)).

The conditions surrounding access to information are important. As the Supreme Court has repeatedly recognized, privacy is essential to meaningful access to information and freedom of inquiry. But in ruling against the Internet Archive, the district court did not consider one of CDL's key advantages: it preserves libraries' ability to safeguard reader privacy. When employing CDL, libraries digitize their own physical materials and loan them on a digital-to-physical, one-to-one basis with controls to prevent redistribution or sharing. CDL provides extensive, interrelated benefits to libraries and patrons, such as increasing accessibility for people with disabilities or limited transportation, improving access to rare and fragile materials, facilitating interlibrary resource sharing—and protecting reader privacy.

For decades, libraries have protected reader privacy, as it is fundamental to meaningful access to information. Libraries' commitment

is reflected in case law, state statutes, and longstanding library practices. CDL allows libraries to continue protecting reader privacy while providing access to information in an increasingly digital age. Indeed, libraries across the country, not just the Internet Archive, have deployed CDL to make intellectual materials more accessible. And while increasing accessibility, these CDL systems abide by libraries' privacy-protective standards.

Commercial digital lending options, by contrast, fail to protect reader privacy; instead, they threaten it. These options include commercial aggregators—for-profit companies that "aggregate" digital content from publishers and license access to these collections to libraries and their patrons—and commercial e-book platforms, which provide services for reading digital content via e-reading devices, mobile applications ("**apps**"), or browsers. In sharp contrast to libraries, these commercial actors track readers in intimate detail. Typical surveillance includes what readers browse, what they read, and how they interact with specific content—even details like pages accessed or words highlighted. The fruits of this surveillance may then be shared with or sold to third parties. Beyond profiting from an economy of reader

4

surveillance, these commercial actors leave readers vulnerable to data breaches by collecting and retaining vast amounts of sensitive reader data. Ultimately, surveilling and tracking readers risks chilling their desire to seek information and engage in the intellectual inquiry that is essential to American democracy.

Readers should not have to choose to either forfeit their privacy or forgo digital access to information; nor should libraries be forced to impose this choice on readers. CDL provides an ecosystem where all people, including those with mobility limitations and print disabilities, can pursue knowledge in a privacy-protective manner.

CDL allows libraries to protect patron privacy in the digital world, as they have for decades in the physical world. Accordingly, through CDL, libraries help fulfill copyright's core purposes by providing the public with meaningful access to information—free from the chilling effects of intellectual surveillance—through at least three mechanisms. First, privacy-protective, non-profit digital lending by libraries accords with the fair use doctrine by "expand[ing] public learning while protecting the incentives of authors to create for the public good." *Authors Guild v. Google, Inc.*, 804 F.3d at 213. Second, CDL provides the public

benefit of increased access to information and avoids the public harm of chilled inquiry. *See Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1206, 1209 (2021) (explaining the need to consider public benefits when evaluating market harm in the fair use inquiry). And third, CDL supports accessibility for patrons with disabilities, who should not have to sacrifice their privacy in order to fully access information. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014) (internal citations omitted) (noting that Congress has affirmed the importance of "full participation" by people with disabilities and finding that making books accessible for print-disabled patrons is a "valid purpose" under the fair use doctrine).

In addition to furthering copyright's overarching goal of enhancing access to information, CDL supports intellectual inquiry via specific fair use purposes, including "teaching," "research," "scholarship," and "nonprofit educational" inquiry. 17 U.S.C. § 107. All of these purposes are part of copyright's "built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Golan v. Holder*, 565 US 302, 328 (2012). And all represent public benefits that are supported when readers

can explore library materials privately—and that would be harmed if libraries were disallowed from using CDL.

An outcome in this case that prevents libraries from relying on fair use to develop and deploy CDL systems would harm readers' privacy and chill access to information. But an outcome that preserves CDL options will preserve reader privacy and access to information. The district court should have more carefully considered the socially beneficial purposes of library-led CDL, which include protecting patrons' ability to access digital materials privately, and the harm to copyright's public benefit of disallowing libraries from using CDL. Accordingly, the district court's decision should be reversed.

## ARGUMENT

## I.  Reader Privacy Is a Foundational American Value that Is Necessary for Intellectual Freedom, Reflected in Law, and Safeguarded by Libraries.

Libraries have long safeguarded reader privacy, which underpins intellectual freedom, promotes access to information, and is supported by the Constitution and state library privacy statutes.

### A. Reader privacy is an essential component of the constitutional right to receive information and engage in free inquiry.

The First Amendment protects the right to receive information and engage in free inquiry as a "necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867, 872 (1982) (finding unconstitutional a school board's decision to remove books from libraries due to their content, because the First Amendment protects "the right to receive information and ideas"). Reader privacy is essential to free inquiry because surveilling reading habits deters people from seeking information. Accordingly, the First Amendment prohibits government surveillance of reading habits. *See United States v. Rumely*, 345 U.S. 41, 42–43, 48 (1953) (finding unconstitutional a Congressional inquiry into individuals who purchased political books for further distribution); *see also id.* at 57 (Douglas, J., concurring) (discussing how surveilling reader information creates a "chilling effect" on the freedom of inquiry, which hinders free expression).

The Supreme Court has also recognized the right to receive information privately and without deterrence. *See Lamont v. Postmaster*

*Gen. of U.S.*, 381 U.S. 301, 307 (1965) (holding unconstitutional a law requiring mail addressees to affirmatively request receipt of "communist propaganda" because doing so would create a "deterrent effect" on receiving information, which is "at war with the 'uninhibited, robust, and wide-open' debate and discussion that are contemplated by the First Amendment"); *Stanley v. Georgia,* 394 U.S. 557, 565 (1969) (internal citations omitted) (finding it unconstitutional to prohibit possessing "obscene" information, for one has "the right to read or observe what he pleases . . . in the privacy of his own home").

**B.    Libraries' longstanding role as guardians of reader privacy is reflected in law and in established library principles and practices.**

Reflecting these constitutional values and libraries' key role in guarding reader privacy, every state legally protects library patrons' information and library records.[3] For example, Connecticut law protects the confidentiality of "records maintained by libraries that can be used to identify any library user, or link any user to a library transaction, regardless of format." Conn. Gen. Stat. Ann. § 11-25(b)(1) (West 2023).

---

[3] Nat'l Rsch. Council, *Engaging Privacy and Information Technology in a Digital Age* (2007), https://doi.org/10.17226/11896.

New York similarly protects the confidentiality of "library circulation records, computer database searches, interlibrary loan transactions, reference queries . . ." and more. *See* N.Y. C.P.L.R. § 4509 (McKinney 2023). And Vermont law protects the confidentiality of "patron registration records and patron transaction records." Vt. Stat. Ann. tit. 22, § 172 (West 2023).

State patron privacy laws are the result of libraries' longstanding efforts to ensure reader privacy. In the 1970s and 1980s, for example, the Federal Bureau of Investigations initiated the Library Awareness Program, which was a "surveillance effort to track Soviet use of technology information available in American libraries."[4] Concerned about the "chilling effect" the program would have on free inquiry, libraries responded by advocating for state legislation to protect the confidentiality of library records and use, resulting in the patron privacy laws that exist in the United States today.[5]

---

[4] Anne Klinefelter, *The Role of Librarians in Challenges to the USA PATRIOT Act*, 5 N.C. J.L. & Tech. 219, 224 (2004), https://scholarship.law.unc.edu/cgi/viewcontent.cgi?article=1034&context=ncjolt.

[5] *Id.*

10

Libraries' core principles reflect their longstanding practice of guarding readers' privacy and intellectual freedom. The American Library Association ("**ALA**") Code of Ethics, which dates from 1939, states, "We protect each library user's right to privacy and confidentiality with respect to information sought or received and sources consulted, borrowed, acquired or transmitted."[6] The ALA's Bill of Rights similarly reaffirms libraries' respect for reader privacy, declaring, "Libraries should advocate for, educate about, and protect people's privacy, safeguarding all library use data."[7]

These privacy-protective principles support First Amendment protections for intellectual freedom and access to information.[8] The ALA has translated privacy-protective principles into practical guidelines

---

[6] *Code of Ethics*, Am. Libr. Ass'n (last updated Jan. 22, 2023), https://perma.cc/BM6X-CKHB.

[7] *Library Bill of Rights*, Am. Libr. Ass'n, https://perma.cc/8F7J-S3U3 (last visited Dec. 19, 2023) [hereinafter "ALA Bill of Rights"].

[8] *See Privacy: An Interpretation of the Library Bill of Rights*, Am. Libr. Ass'n, https://perma.cc/W5A4-X9RJ (last visited Dec. 19, 2023) (stating that libraries should safeguard reader privacy by "facilitating, not monitoring, access to information"); *see also* ALA Library Bill of Rights, *supra* note 7 (stating that libraries should safeguard reader privacy by "facilitating, not monitoring, access to information").

libraries can follow, such as minimizing the amount of data collected, allowing users to access their personal data, and destroying data when it is no longer needed.[9]

Beyond principles and guidelines, libraries protect reader privacy through established practices. For example, the New York Public Library's privacy policy states that its "systems only retain the information about [patrons'] borrowing records for the time during which those items . . . are on loan," and loan records are deleted "soon after" the materials are returned.[10] The Queens Public Library's privacy policy similarly states: "At the moment that library material is returned to the library, the link between the customer and the material is broken—that is, the Library's system ceases to retain information on what materials were taken out by whom the moment the item is returned."[11] Additionally, backup records of patron information are deleted every

---

[9] *Library Privacy Guidelines for Library Management Systems*, Am. Libr. Ass'n, https://perma.cc/2YNS-RQNT (last visited Dec. 19, 2023).

[10] *The New York Public Library Privacy Policy*, N.Y. Pub. Libr. (last updated Sept. 2021), https://perma.cc/5DUX-HHR6.

[11] *Privacy Policy*, Queens Pub. Libr., https://perma.cc/TEU2-5D9B (last visited Dec. 19, 2023).

sixty days.[12]

## II. Preserving Libraries' Ability to Choose Controlled Digital Lending Preserves Their Ability to Protect the Privacy of Readers Who Borrow Books Digitally.

### A. Libraries maintain reader privacy protections when operating in the digital space.

Libraries work to maintain reader privacy when using or engaging with digital systems.[13] For example, libraries exercise oversight over patron information, minimize data collection, minimize data transfer to third parties (such as by transferring only a library card number or single sign-on identity and a book's barcode), and regularly delete loan records.[14] Libraries also maintain data security, address Internet and network data collection in their policies, and warn patrons when third parties collect personal information.[15] Library-led controlled digital lending incorporates longstanding library values and practices that protect reader privacy and intellectual freedom.

---

[12] *Id.*

[13] *See Privacy and Confidentiality Q&A*, Am. Libr. Ass'n, https://perma.cc/J2P7-VQL6 (last visited Dec. 19, 2023).

[14] *See The New York Public Library Privacy Policy*, *supra* note 10; *Privacy Policy*, Queens Pub. Libr., *supra* note 11.

[15] *Id.*

Library-led CDL enables libraries to maintain strong reader privacy protections when engaging in digital lending because it preserves library control over the digitized work and the entire digital lending process. In a CDL system, the library scans or otherwise digitizes a book or physical material that it owns.[16] Digital rights management ("**DRM**") software is applied to the digitized material to prevent unauthorized copying and redistribution.[17] A patron requests a loan for the digitized material from the library interface, which is supported by a management system that oversees requests, orchestrates the staff workflow, and authenticates patrons. Next, the library management system pulls the requested material from a repository that grants temporary access to the digitized book. Then, the patron receives access to the loan and can view it on a library e-reading application or browser until the loan expires, at which point access also expires.[18]

---

[16] David R. Hansen & Kyle K. Courtney, *A White Paper On Controlled Digital Lending Of Library Books*, Libr. Futures (2018), https://perma.cc/D6XN-UZ4M.

[17] *Id.*

[18] *Caltech DIBS: Architectural Overview*, Caltech Libr. (last updated Jan. 19, 2023), https://perma.cc/K3GC-MD7J; *Experts Assure Library*

14

Because libraries digitize and lend their own physical materials when using CDL, they maintain control over the format and DRM technology applied to the digitized books.[19] Maintaining control over the digitized books, in turn, allows libraries to maintain privacy protections for their patrons by "removing the need to go through a third-party source."[20] With CDL, libraries also control the infrastructure for accessing and reading digitized books; thus, readers can stay entirely within protected library systems.

For example, Caltech's DIBS ("**Di**gital **B**orrowing **S**ystem"), protects reader privacy throughout the digital lending process.[21] In line

---

*Community that CDL Continues*, SPARC (Oct. 12, 2023), https://perma.cc/ADH3-UXDJ; Charlie Barlow, *Let's Make CDL Boring: Using Controlled Digital Lending for Interlibrary Loan*, Bos. Libr. Consortium (Oct. 12, 2023), https://docs.google.com/presentation/d/1FW2fKowE4o6taeVXKQOddlv-JhxOEGBz-xVw5v9h9gI/edit#slide=id.g99f2f57a71_0_207.

[19] Hansen & Courtney, *supra* note 16; *What is Readium LCP?*, European Dig. Reading Lab, https://perma.cc/8LSJ-G5PS (last visited Dec. 19, 2023).

[20] Caralee Adams, *New eBook Protection Software Gaining Popularity Among Publishers and Libraries*, Internet Archive Blogs (Oct. 10, 2022), https://perma.cc/R27H-UHMM.

[21] *Caltech DIBS: Caltech Library Digital Borrowing System*, Caltech Libr. (last updated Jan. 19, 2023), https://perma.cc/QL9Q-GYPF.

15

with common library privacy standards, DIBS collects only as much patron data as is necessary to facilitate a loan, deletes circulation and user information upon loan completion, and does not track user activity.[22] Its implementation of single sign-on authentication and other measures further safeguard reader privacy by dissociating the user's information from the loan record.[23]

DIBS is also "open-source" software. Accordingly, the entirety of its code can be publicly viewed on GitHub.[24] Open-source software promotes privacy by offering clear documentation and transparency into data retention practices. Further, if the software is not sufficiently privacy-protective, open-source licenses allow libraries to edit the code directly to suit their needs.[25] Open-source software also supports data security

---

[22] *Caltech DIBS: System Architecture*, Caltech Libr. (last updated Jan. 19, 2023), https://perma.cc/83NK-XX5U.

[23] *Id.*

[24] Caltech Library, *DIBS,* GitHub (last updated Jan. 18, 2023), https://perma.cc/8688-F465.

[25] Sara Ana Cemazar, *10 Biggest Advantages of Open-Source Software*, Rocket.Chat (Jan. 24, 2022), https://perma.cc/Q2JZ-U2CX.

16

efforts because anyone can inspect the code and fix vulnerabilities.[26]

Finally, the nature of open-source software allows other libraries to

implement the software themselves,[27] as the University of Chicago

appears to have done by integrating DIBS into its digital lending

system.[28]

Libraries without resources to develop or host[29] their own digital

lending infrastructure may utilize other library-led CDL hosting

_____

[26] *Id.*; Yosef Davidowitz, *Open Source Security: Benefits & Drawbacks You Should Know*, Linux Sec. (June 13, 2022), https://perma.cc/LG2D-THN4.

[27] In addition to DIBS, there are many open-source (and often library-developed) software options available for each step of the CDL workflow. *See, e.g.*, *ReShare Controlled Digital Lending*, Project ReShare, https://perma.cc/Z5KX-8ZMT (last visited Dec. 19, 2023) (entire CDL workflow); *About Hyku for Consortia: Repositories at Scale*, Priv. Acad. Libr. Network of Ind., https://perma.cc/9G87-5UL5 (last visited Dec. 19, 2023) (digital repository); *Figgy: PUL's Digital Repository*, Princeton Univ. Libr. Confluence (last updated Oct. 9, 2023), https://perma.cc/4T29-NNAJ (digital repository); *Internet Archive BookReader*, Open Libr., https://perma.cc/V2MQ-MR39 (last visited Dec. 19, 2023) (file viewer).

[28] Univ. of Chi. Libr., *dibsiiif*, GitHub (last updated Apr. 18, 2022), https://perma.cc/82LX-CPLU.

[29] "Hosting" is the process of providing infrastructure and resources to make a service (such as software, an application, or a website) accessible. Users can access the hosted service without having to manage the underlying infrastructure themselves. *See* Margaret Rouse, *Hosting*, Techopedia (last updated Oct. 22, 2012), https://www.techopedia.com/definition/29023/web-hosting.

systems. These library-led CDL hosts support library privacy practices while allowing libraries to maintain control over their digitized materials. For example, many libraries rely on the Internet Archive's Open Library as a third-party, library-led CDL option.[30] The Open Library collects and deletes data "in line with the principles from the ALA[.]"[31] Currently, the Open Library is implemented by eighteen of the City University of New York libraries, the Library of Congress, the Boston Public Library, and hundreds of other libraries.[32]

Beyond giving libraries agency over lending management, CDL also enables libraries to offer privacy-protective alternatives for *reading* digital materials. DIBS and Princeton University Library's Figgy self-host an open-source file viewer, the Universal Viewer, to allow patrons

---

[30] *See Partner With Open Library*, Open Libr., https://perma.cc/FN3P-8MFA (last visited Dec. 19, 2023); *Join Open Libraries*, Open Librs., https://perma.cc/BR34-EVJJ (last visited Dec. 19, 2023).

[31] Brewster Kahle, *Reader Privacy at the Internet Archive*, Internet Archive Blogs (Oct. 25, 2013), https://perma.cc/ER5H-BXQT.

[32] Rachel V. L. Jones, *Controlled Digital Lending and the Open Library*, Libr. Buzz (Mar. 5, 2021), https://perma.cc/XU9J-ASJU; *American Libraries*, Open Libr., https://archive.org/details/americana?tab=collection (last visited Dec. 19, 2023); *Re: Docket Number 2015-3, Mass Digitization Pilot Program*, Internet Archive (Oct. 8, 2015), https://perma.cc/9G7M-PNAP.

to read digitized materials.[33] The Internet Archive's Open Library offers a similar open-source viewer of its own, called BookReader.[34] Because the Universal Viewer and BookReader run through the user's web browser, library patrons do not need to download any third-party apps or use a commercial e-reading device to read loaned books.[35] DIBS also insulates patrons from third-party tracking by configuring the viewer to contact the DIBS server for all content requests, thereby making the DIBS server the "sole arbiter of loan status and loan duration."[36] Neither library nor patron are forced to cede control to a third-party app or e-reading device in order for the patron to read loaned material (in stark contrast to OverDrive's Libby app, Amazon's Kindle device, or other commercial

---

[33] *Caltech DIBS: System Architecture*, *supra* note 22; *IT: Technology*, Princeton Univ. Libr. Confluence (last updated Oct. 24, 2023), https://perma.cc/FPS9-CPTB; Universal Viewer, *About*, GitHub (last updated Feb. 10, 2022), https://perma.cc/5NMT-7W9K.

[34] Internet Archive, *BookReader*, GitHub (last updated Nov. 16, 2023), https://perma.cc/V2MQ-MR39.

[35] *Caltech DIBS: The IIIF Server in Detail*, Caltech Libr. (last updated Jan. 19, 2023), https://perma.cc/5EFR-RTN7; *Internet Archive BookReader*, Open Libr., *supra* note 27.

[36] *Caltech DIBS: The IIIF Server in Detail*, *supra* note 35.

options, discussed *infra* Section III).[37]

### III. Preventing Libraries from Using Controlled Digital Lending Would Harm Reader Privacy by Limiting Libraries and Their Patrons to Commercial Digital Lending Aggregators and E-Book Readers.

Without CDL, libraries' digital lending options would largely shrink to commercial services—in particular, commercial aggregators (*e.g.*, OverDrive) and e-book readers (*e.g.*, Amazon Kindle). Commercial aggregators include OverDrive, Hoopla, Bibliotheca, and Boundless by Baker & Taylor (formerly Axis360).[38] Aggregators commonly offer e-reading apps through which library patrons can access borrowed materials; for example, OverDrive operates Libby, and Hoopla has its own eponymous app. Alternatively, patrons can elect to read materials borrowed from the aggregator on a separate commercial e-book platform. E-book platforms include Amazon's Kindle, Barnes & Noble's NOOK, and

---

[37] *See id.*; see also *Internet Archive BookReader*, Open Libr., *supra* note 27.

[38] Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*, New Yorker (Sept. 2, 2021), https://www.newyorker.com/news/annals-of-communications/an-app-called-libby-and-the-surprisingly-big-business-of-library-e-books.

Rakuten's Kobo, all of which offer both e-reading devices and apps ("**e-book readers**").

Most libraries rely on commercial aggregators to provide digital content to their patrons.[39] But outside of CDL, library control over digital lending is limited. No matter how privacy-protective libraries' practices are, these commercial actors force libraries to cede some patron information to facilitate digital lending. Worse, they also directly collect large amounts of sensitive information from library patrons, dramatically undermining reader privacy.

> **A.  In sharp contrast to libraries, commercial aggregators and e-book readers undermine reader privacy.**

Commercial aggregators and e-book readers differ sharply from libraries in their incentives and practices regarding reader privacy. Where libraries safeguard reader privacy by limiting the collection and retention of reader data, commercial actors undermine reader privacy by collecting and sharing intimate details about readers' habits. In recent years, sharing—and selling—reader information has become a

---

[39] *Id.*

multibillion-dollar business.[40] Operating with little oversight, commercial entities such as e-book platforms engage with third parties, including data brokers, to profit from sensitive information about readers and reading habits.[41]

From a privacy perspective, a reader borrowing a book via a commercial digital lending aggregator has a dramatically different experience from a reader borrowing a book via a library-led CDL system. In order to "check out" the book, the reader is redirected from the library's system to the aggregator's website or app, where they can access digital books that have been "aggregated" from publishers on the platform. However, because the reader has exited the library's system, "there are limits to the privacy protection the [l]ibrary can provide."[42] Instead, the aggregator's policies, which are typically much more privacy-invasive, govern.

---

[40] Sarah Lamdan et al., Engelberg Ctr. on Innovation Law & Policy, *The Anti-Ownership Ebook Economy: How Publishers and Platforms Have Reshaped the Way We Read in the Digital Age* 45 (2023), https://perma.cc/PF32-KD8S.

[41] *Id.*

[42] *The New York Public Library Privacy Policy*, *supra* note 10.

For example, OverDrive, a market-leading digital lending aggregator,[43] stores substantial information about readers and reading habits, including: lending history, holds, reading progress, bookmarks, highlights, notes, and other online activity.[44] This information is stored "as long as OverDrive deems necessary or as otherwise permitted by applicable law."[45] Alarmingly, OverDrive applies similar policies even to children. Its child-specific privacy policy states that it "may also collect information about a child's online activity, digital content selections, interactions with digital content such as bookmarks, highlights, and notes, reviews and ratings, as well as IP address, device type, unique device data such as device ID, and operating system."[46]

OverDrive is not unique. A study of the privacy policies of five commercial aggregators (including OverDrive) found that all acknowledged collecting data for advertising. Further, all "were deficient

---

[43] Gross, *supra* note 38.

[44] *OverDrive Privacy Policy*, OverDrive (last updated Jan. 2023), https://perma.cc/B42X-K3KR.

[45] *Id.*

[46] *Privacy Policy for Children*, OverDrive (last updated July 2021), https://perma.cc/X8PR-HVK7.

. . . in their stated efforts to enforce their privacy policies and regularly conduct audits."[47] And while four of the five platforms stated that they took steps to ensure the security of users' information, "none provided much information about where records were stored or whether they used cloud services."[48]

Commercial e-book readers then add another level of privacy concern to the borrowing process. After borrowing a book via an aggregator, readers can receive and view the book through an e-book reader (such as an e-reading device, mobile app, or web browser). E-book readers are operated by commercial entities that partner with aggregators and collect vast amounts of reader data. For example, readers can borrow library books through a commercial app, such as OverDrive's Libby, and then "send" an e-book to an e-reader like their Kindle device or mobile app.[49] Accordingly, the reader—already subject

---

[47] April Lambert et al., *Library Patron Privacy in Jeopardy*, 52 Proceedings of the Ass'n for Info. Sci. and Tech. 1 (2015), https://asistdl.onlinelibrary.wiley.com/doi/full/10.1002/pra2.2015.145052 010044.

[48] *Id.*

[49] *See Reading with Kindle*, Libby Help, https://perma.cc/8LC6-QFX6 (last visited Dec. 19, 2023).

to the commercial aggregator's practices—is now also exposed to the e-book reader's privacy practices.[50] And like commercial aggregators, e-book readers' practices invade, rather than protect, reader privacy.

Indeed, readers are surveilled in great detail by commercial e-book readers. For example, Barnes & Noble's privacy policy states that it may collect myriad pieces of information from readers using its NOOK e-book reader, including device identifiers, geolocation, and activity information "such as books opened, date and time of use, time elapsed, page turns, bookmarks, annotations, or customer reviews."[51] Similarly, Amazon's terms of use state that Kindle Software, which includes the Kindle e-reading device, "will provide Amazon with information about your use . . . including information about its interaction with Kindle Content, other content, and the Service (such as your last page read; content that you use, distribute, or archive; your viewing data and search queries[.])."[52] In

---

[50] *Getting Started with Libby*, Libby Help, https://perma.cc/SKW5-QD69 (last visited Dec. 19, 2023).

[51] *Privacy Policy*, Barnes & Noble (last updated Jan. 1, 2023), https://www.barnesandnoble.com/h/help/privacy-policy-complete.

[52] *Kindle Store Terms of Use*, Amazon (last updated Nov. 30, 2022), https://perma.cc/LYR6-9RVW.

one case, a user requested her Kindle data under the California Consumer Privacy Act. To her surprise, Amazon had over 40,000 lines of data about her reading habits. The Kindle had assiduously recorded which pages the user was reading at what times, which lines she highlighted, and which words she looked up, just as Amazon's terms of use acknowledged.[53]

> **B. Forcing libraries to rely on commercial aggregators' and e-book readers' practices would heighten risks to readers' privacy, intellectual freedom, and data security.**

Eliminating CDL as an option would force libraries and readers to rely on privacy-invasive and data-breach-susceptible commercial aggregators and e-book readers. The ensuing threat of surveillance would undermine readers' ability to access information and their willingness to engage in free inquiry, demonstrating the chilling effect the Supreme Court denounced in *Lamont* and *Stanley*. *See Lamont*, 381 U.S. at 307; *Stanley*, 394 U.S. at 565.

---

[53] Kari Paul, *'They Know Us Better Than We Know Ourselves': How Amazon Tracked My Last Two Years of Reading*, Guardian (Feb. 3, 2020), https://perma.cc/5QKN-AH38.

Commercial actors' privacy-invasive surveillance of reader data risks chilling access to information because it exposes readers' habits and inquiries to third parties. All intellectual inquiry deserves privacy; some inquiries can reveal extremely sensitive personal information. For example, Amazon recorded that one reader highlighted an excerpt from Leslie Jamison's *The Recovering: Intoxication and its Aftermath*.[54] Knowing this information could be tracked could make a reader more cautious about or altogether avoid accessing information that suggests a connection to alcohol addiction. And knowing that this indicator could be shared with or sold to third parties could further chill a reader's exploration of such sensitive material.

Unfortunately, the patron privacy laws that protect reading records held by libraries generally do not extend to records held by commercial actors. Though many state laws have been updated "to include email records and electronic book circulation trackers . . . few . . . account for internet-connected ebook platforms and ereaders" not controlled by libraries.[55]  For example, New York's patron privacy statute covers

---

[54] Paul, *supra* note 53.

[55] Sarah Lamdan et al., *supra* note 40, at 56.

"*[l]ibrary* records . . . regarding the users of public, free association, school, college and university *libraries* and *library* systems of this state . . ." N.Y. C.P.L.R. § 4509 (McKinney 2023) (emphasis added). Similarly, Connecticut's statute covers "records maintained by *libraries* that can be used to identify any *library* user, or link any user to a *library* transaction . . ." Conn. Gen. Stat. § 11-25 (West 2023) (emphasis added). Vermont's law likewise covers "a *library's* patron registration records and patron transaction records" and prohibits "the *library's* officers, employees, and volunteers" from disclosing confidential patron records. Vt. Stat. Ann. §§ 172(a)–(b) (West 2023) (emphasis added).

These shortcomings in state patron privacy laws are especially concerning because reading records have historically been the target of government surveillance, a quintessential threat to free, unchilled inquiry. For example, the USA PATRIOT Act lowered government restrictions for accessing library records and was used to surveil Muslim Americans' records post-9/11. Recognizing that "government surveillance creates a chilling effect on library use," librarians organized and

protested the law.[56] Reading habits were similarly subject to government surveillance throughout the Cold War. During the McCarthy hearings, "people were questioned about whether they had read Marx and Lenin and whether their spouses or associates had such books on their shelves. Indeed, '[i]n the 1950s, people with leftist books sometimes shelved them spine to the wall, out of fear that visitors would see and report them.'"[57]

Regrettably, threats to reader privacy are not consigned to history. Today, both government and private actors actively engage in surveillance and censorship. For example, companies providing library research services—including Thomson Reuters and RELX Group (formerly Reed Elsevier)—sell surveillance data to law enforcement bodies like the U.S. Immigration and Customs Enforcement.[58] This form

---

[56] Klinefelter, *supra* note 4; *What to Do About Laws and Government Actions That Infringe on Civil Liberties and Privacy*, Am. Libr. Ass'n (Jan. 26, 2003), https://perma.cc/6QDN-N4C6.

[57] Cindy Cohn & Kathryn Hashimoto, *The Case for Book Privacy Parity: Google Books and the Shift from Offline to Online Reading*, Harv. L. & Pol'y Rev. Blog (May 16, 2010), https://perma.cc/6L5H-7G33 (citing *United States v. Curtin*, 489 F.3d 935, 959 (9th Cir. 2007) (Kleinfeld, J., concurring)).

[58] Sarah Lamdan, *Librarianship at the Crossroads of ICE Surveillance*, In the Libr. With The Lead Pipe (Nov. 13, 2019), https://perma.cc/6BYH-KJTR.

of "big data policing" disparately impacts Muslim, Black, and other marginalized communities that already face hyper-surveillance and over-policing.[59]

Going forward, as more and more books are removed from school libraries, children may turn to their local public libraries to seek out censored titles.[60] If children cannot access these books from public libraries in a privacy-protective manner, libraries may be vulnerable to surveillance, censorship, and punishment.[61] In fact, groups seeking to censor books in schools have also begun targeting digital books in public libraries.[62] As these examples demonstrate, access to information and freedom of inquiry are under threat today, underscoring the need for CDL

---

[59] *Id.*

[60] *See American Library Association Reports Record Number of Demands to Censor Library Books and Materials in 2022*, Am. Libr. Ass'n (Mar. 22, 2023), https://perma.cc/Q4TT-S4VH; Kasey Meehan et al., *Banned in the USA: The Mounting Pressure to Censor*, PEN America, https://perma.cc/9QSS-GPZH (last visited Dec. 19, 2023).

[61] *See* John Friedman & Nadine Farid Johnson, *Banned in the USA: The Growing Movement to Censor Books in Schools*, PEN America (Sept. 19, 2022), https://perma.cc/HRD5-SXHK.

[62] *Id.*

as an option for libraries wishing to protect the private receipt of information.

Readers' privacy is at risk; so is their data security. Commercial e-book readers' and aggregators' habit of collecting, storing, and sharing vast amounts of reader information leaves readers vulnerable to security breaches. (Libraries' minimal collection and retention policies, by contrast, insulate patrons from data breaches.) For example, the Adobe Digital Editions 4.0 e-reading app, which allows users to view and manage commercial e-books across their devices, was breached in October 2014. The breach exposed tens of thousands of readers' data, including usernames and passwords that could provide access to their accounts.[63]

In contrast to Adobe's possible "over-collection and unnecessary retention of sensitive user data," library-led CDL reduces security risks by minimizing the amount of data collected and destroying data when it

---

[63] *Adobe Responds to ALA on Egregious Data Breach; Some Action Expected by Week of Oct. 20*, Am. Libr. Ass'n (Oct. 13, 2014), https://perma.cc/EDF4-BM89.; *see* Aaron Dobbs, *ADE in the Library eBook Data Lifecycle*, Libr. and Info. Tech. Ass'n (Oct. 14, 2013), https://perma.cc/7X6E-8DP8.

is no longer needed.[64]

## IV. Preserving Libraries' Ability to Engage in Controlled Digital Lending Is Necessary to Fulfill the Promise of Digital Lending While Protecting Reader Privacy.

Readers should not have to choose between access to information and privacy—both are necessary to guarantee freedom of inquiry. And in an increasingly digital world, neither physical lending alone, nor libraries' diligent efforts to negotiate for their patrons' privacy, are sufficient to provide meaningful access to information to all.

### A. Physical lending is not a sufficient alternative to privacy-protective digital lending.

Compared to physical lending, digital lending provides readers with more convenient borrowing and reading options, enhanced research and text search functionality, and greater access to rare and fragile materials.[65]

---

[64] *See Adobe Responds to ALA on Egregious Data Breach; Some Action Expected by Week of Oct. 20*, *supra* note 63; *see also Library Privacy Guidelines for Library Management Systems*, *supra* note 9.

[65] Lila Bailey, *Librarians Share Benefits of Controlled Digital Lending*, Internet Archive Blogs (Aug. 8, 2019), https://perma.cc/JNK7-636Z; *FAQ – Controlled Digital Lending*, Libr. Futures, https://perma.cc/K7NU-9JTS (last visited Dec. 19, 2023).

But digital lending is not just "nice to have." It is essential to people for whom access to physical resources is limited or nonexistent. Digital lending can offer magnification and text-to-speech capabilities to accommodate individuals with print disabilities.[66] Digital lending also expands access to library books for many others—patrons with mobility limitations; patrons who must work during library hours; patrons who lack reliable transportation; patrons in rural areas far from the nearest library—anyone with limited ability to get to a library.[67] Copyright law recognizes the importance of copying to provide accessibility for those with disabilities. *See* 17 U.S.C. § 121; *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014) (citing 17 U.S.C. 121 and finding that making books accessible for print-disabled patrons is a "valid purpose" under the fair use doctrine). As this Court pointed out in *HathiTrust*, "Congress declared that 'our Nation's goals regarding individuals with

---

[66] *Print Disability Access – General Information*, Internet Archive, https://perma.cc/2MQX-AR4M (last visited Dec. 19, 2023); *see also* Lydia X.Z. Brown et al., *Centering Disability in Technology Policy*, Am. Ass'n of People with Disabilities & Ctr. for Democracy & Tech. 38 (2021), https://perma.cc/Y5NP-UAS7.

[67] Bailey, *supra* note 65; Lila Bailey et al., *Position Statement on Controlled Digital Lending by Libraries*, Libr. Futures, https://perma.cc/REK8-U995 (last visited Dec. 19, 2023).

33

disabilities are to assure . . . full participation'" in society. *HathiTrust*, 755 F.3d at 102 (quoting 42 U.S.C. § 12101(7)). But limiting digital lending to commercial options would force these patrons to choose between access to library services or their reader privacy.

Indeed, all patrons, not just those with limited access to a library's physical space, should be able to benefit from digital borrowing without sacrificing the right to explore informational materials privately. Modern reading habits increasingly trend toward e-books and digital lending.[68] Reports show that library collections are more digital than ever— libraries are allocating more of their budget toward digital resources, and patron use of digital materials continues to rise.[69]

_____

[68] Nicholas Rizzo, *State of US Public Libraries – More Popular and Digital Than Ever*, WordsRated (Feb. 17, 2022), https://perma.cc/P7X5-P6HR (citing *Public Libraries Survey*, Inst. of Museum and Libr. Services, https://perma.cc/HMH4-TP6B (last visited Dec. 19, 2023); Nikki Davidson, *Behind E-Books, Libraries Find Restrictions and High Costs*, Gov't Tech. (June 15, 2023), https://www.govtech.com/biz/data/behind-e-books-libraries-find-restrictions-and-high-costs) (citing *OverDrive Releases 2022 Digital Book Circulation Data and Highlights*, OverDrive (Jan. 6, 2023), https://perma.cc/638A-R5HZ).

[69] *Id.*

As e-reading becomes the norm, whether for convenience, accessibility, or a simple preference for the electronic medium, libraries must retain the ability to protect all readers' privacy.

## B. Commercial aggregators, e-book readers, and publishers are highly unlikely to implement privacy-protective practices in response to library pressure.

Libraries and library-centered organizations, recognizing the importance of returning control over the digital lending process to libraries, have worked to make library usage of commercial options as privacy-protective as possible. The New York Public Library has developed an e-reading app, SimplyE, that offers access to commercial aggregators' collections without needing to download the aggregators' associated apps.[70] The Palace Project, a non-profit venture between the Digital Public Library of America and LYRASIS, has a similar e-reading app, and its Palace Marketplace endeavors to serve as a library-friendly alternative to commercial aggregators by offering e-book licenses from publishers. *See The Palace Project Launches New Platform and App to*

---

[70] *SimplyE*, N.Y. Pub. Libr., https://perma.cc/C8LY-9P3Z (last visited Dec. 19, 2023).

*Enable Equitable Econtent Access*, The Palace Project (June 2, 2022).[71] Both SimplyE and the Palace Project, as library-led projects, strive to maintain reader-protective and transparent privacy practices.[72]

But despite the involved libraries' extensive efforts, SimplyE and the Palace Project must ultimately rely on commercial third parties, unlike CDL.[73] Patron information may be exposed to commercial parties, with no guarantees that those parties will abide by the privacy standards to which libraries adhere.[74]

---

[71] *See The Palace Project Launches New Platform and App to Enable Equitable Econtent Access*, Palace Project (June 2, 2022), https://perma.cc/F9JY-Q3GS.; *Marketplace*, Palace Project, https://perma.cc/N3V6-WJR9 (last visited Dec. 19, 2023).

[72] *See Data Privacy for SimplyE*, Confluence@NYPL (Dec. 14, 2021), https://web.archive.org/web/20230310151531/https://confluence.nypl.org /display/SIM/Data+Privacy+for+SimplyE?src=contextnavpagetreemode ; *FAQ*, Palace Project, https://perma.cc/6T7C-4GWR (last visited Dec. 19, 2023) (click "For Libraries").

[73] The Palace Project works directly with publishers, which, like commercial aggregators and e-book readers, are investing in privacy-intrusive business practices, posing serious concerns about data collection and reader privacy. *See* SPARC, *Navigating Risk in Vendor Data Privacy Practices: An Analysis of Elsevier's ScienceDirect* 7 (2023), https://perma.cc/9KUZ-D9SZ; *see generally* Sarah Lamdan, *Data Cartels: The Companies That Control and Monopolize Our Information* (2022).

[74] *See FAQ*, Palace Project, *supra* note 72 (click "For Libraries") ("The Palace Project also integrates with existing content providers your

These limitations on libraries' efforts are longstanding and ongoing. Libraries have historically had limited success in negotiating licensing terms that require aggregators, e-book readers, and publishers to adhere to library privacy policies.[75] Further, libraries typically lack the requisite resources to evaluate the full array of vendors' privacy practices and develop effective institutional responses.

Accordingly, despite libraries' ongoing efforts to curtail commercial actors' privacy-invasive practices, CDL remains a crucial option to protect reader privacy while upholding digital lending's benefits to society.

## CONCLUSION

CDL allows libraries to transition to digital lending while maintaining their longstanding commitment to the strong reader

---

library might have an existing relationship with, including OverDrive, Baker & Taylor, Bibliotheca, and BiblioBoard."); Matt Enis, *NYPL Launches SimplyE App, Integrating Access to Multiple Ebook Vendors*, Libr. Journal (July 15, 2016), https://perma.cc/R9QE-X6LH; *see also* SPARC, *Navigating Risk in Vendor Data Privacy Practices*, *supra* note 73, at 30 (noting that many contracts do not include the vendors' privacy policies, which the vendors can unilaterally change).

[75] Lamdan, *Data Cartels*, *supra* note 73, at 59–60; SPARC, *Navigating Risk in Vendor Data Privacy Practices*, , *supra* note 73, at 4.

37

privacy protections that allow the public to confidently access information and engage in intellectual inquiry. Without the CDL option, readers would pay for the benefits of digital lending at the cost of their intellectual privacy. This would chill intellectual inquiry and undermine copyright's overarching purpose of increasing public access to information.

For the foregoing reasons, this Court should reverse the district court's decision below and preserve libraries' ability to offer CDL.

Respectfully submitted,

/s/ Jennifer M. Urban
Jennifer M. Urban
Samuelson Law, Technology &
   Public Policy Clinic
U.C. Berkeley School of Law
353 Law Building
Berkeley, CA 94720-7200
(510) 642-7338
jurban@clinical.law.berkeley.edu

Dated: December 20, 2023    *Attorneys for Amicus Curiae*

38

# CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the word limit of Local Rule 29.1(a)(5) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 6,462 words, and that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), and the formatting requirements of Local Rule 32.1(a).

December 20, 2023                    Respectfully submitted,

                                     /s/ Jennifer M. Urban
                                     Jennifer M. Urban
                                     *Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I, Jennifer M. Urban, an attorney, hereby certify that on December 20, 2023, I caused the foregoing brief to be filed with the Court and to be served upon counsel of record via the Court's ECF system.

December 20, 2023                    Respectfully submitted,

/s/ Jennifer M. Urban
Jennifer M. Urban
*Attorney for Amici Curiae*

40