# 23-1260-cv

## United States Court of Appeals

### *for the*

## Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C., JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

– v. –

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* AUTHORS ALLIANCE, INC. IN SUPPORT OF APPELLANT

RACHEL BROOKE LESWING, ESQ.
AUTHORS ALLIANCE, INC.
*Attorneys for Amicus Curiae*
2705 Webster Street, Suite 5805
Berkeley, California 94705
(703) 217-4968

## CORPORATE DISCLOSURE STATEMENT

Authors Alliance, Inc., a 501(c)(3) nonprofit organization, has no parent corporation. There is no publicly held corporation that owns 10% or more of Authors Alliance's stock.

Dated: December 21, 2023        s/Rachel Brooke Leswing

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................................i

TABLE OF AUTHORITIES .................................................................................. iii

INTEREST OF *AMICUS CURIAE* ..........................................................................1

ARGUMENT ........................................................................................................3

I.     Controlled Digital Lending Maintains Copyright's Balance of Interests and Does Not Reduce Financial Incentives for Authors. ............................8

II.    Controlled Digital Lending Promotes Broad Public Availability to Books in a Format Relevant to Readers. ............................................................16

III.   Controlled Digital Lending Ensures that Books Are Preserved.................20

IV.    Controlled Digital Lending Facilitates Author Research. ..........................24

CONCLUSION .....................................................................................................30

CERTIFICATE OF COMPLIANCE ........................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1995) ......................28

*Am. Soc'y Testing & Materials v. Pub.Resource.Org*,
   82 F.4th 1262 (D.C. Cir. 2023) .............................................................10, 17, 26

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
   11 F.4th 26 (2d Cir. 2021).....................................................................................3

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
   143 S. Ct. 1258 (2023) ........................................................................................10

*Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ........................3, 5

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)......................3, 7, 16

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994) ...................................3, 9

*Capitol Records LLC v. ReDigi*, 910 F.3d 649 (2d Cir. 2018)...............................11

*Fox Film Corp. v. Doyal*, 286 U.S. 123 (1932)....................................................7, 9

*Fox News Network v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018) .............11, 25, 28

*Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539 (1985).........................3

*Random House, Inc. v. Rosetta Books LLC*,
   150 F. Supp. 2d 613 (S.D.N.Y. 2011)................................................................23

*Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984)....3, 6, 7, 16

*Sundeman v. Seajay Soc'y, Inc.,* 142 F.3d 194 (4th Cir. 1998)..............................28

*Twentieth Century Music Corp. v. Aiken*, 422 U. S. 151 (1975)............................16

*U.S. v. Bertelsmann SE & Co. KGAA*, 1:21-cv-02886 (D.D.C. Nov. 15, 2022).......4


**Statutes**

17 U.S.C. § 107 ..................................................................................................8, 28

## Other Authorities

Andrew Albanese, *Survey Says Library Users Are Your Best Customers,*
PUBLISHERS WEEKLY, Oct. 28, 2011, https://www.publishersweekly.com/pw/by-topic/industry-news/publishing-and-marketing/article/49316-survey-says-library-users-are-your-best-customers.html .......................................................13

*Authors Guild Model Trade Book Contract*, AUTHORS GUILD,
https://go.authorsguild.org/contract_sections/4 .................................................14

AUTHORS GUILD, http://www.authorsguild.org, last accessed Dec. 18, 2023.........17

*Authors Speak Out: An Update on the Wiley eBook Situation,* AUTHORS ALL., Oct.
14, 2022, https://www.authorsalliance.org/2022/10/14/authors-speak-out-an-update-on-the-wiley-ebook-situation/ ............................................................4, 19

Blake Brittan, *Authors Group Blast Publishers in Legal Fight with Internet
Archive*, REUTERS, Sept. 29, 2022,
https://www.reuters.com/legal/litigation/author-coalition-blasts-publishers-legal-fight-with-internet-archive-2022-09-29/ ...............................................................6

Brief for Library Futures as Amicus Curiae Supporting Defendants, *Hachette Book
Group, Inc. v. Internet Archive*, No. 20-cv-4160 (S.D.N.Y. Mar. 24, 2023)..8, 27

Caity Weaver, *Does 'The Da Vinci Code' Writer Have a Secret?*, N.Y. TIMES, July
29, 2021, https://www.nytimes.com/2021/07/29/style/dan-brown-advice-book.html ...............................................................................................24

CORNELL UNIVERSITY LIBRARY, REPORT OF THE COLLECTION DEVELOPMENT
EXECUTIVE COMMITTEE TASK FORCE ON PRINT COLLECTION USAGE (2010),
https://ecommons.cornell.edu/handle/1813/45424 ............................................18

Craig Joyce, *The Statute of Anne: Yesterday and Today*, 47 HOUSTON L. R. 779
(2010) ................................................................................................................9

Dept. Com. Internet Policy Task Force, *White Paper on Remixes, First Sale, and
Statutory Damages: Copyright Policy, Creativity, and Innovation in the Digital
Economy* (2016) ...............................................................................................21

Geoffrey A. Fowler, *Want to Borrow that E-book from the Library? Sorry, Amazon
Won't Let You.*, WASH. POST, Mar. 10, 2021,
https://www.washingtonpost.com/technology/2021/03/10/amazon-library-ebook-monopoly/ ...............................................................................................18

H.R. Rep. No. 94–1476 (1976) ........................................................................8, 21

Heather Kelly, *E-Books at Libraries are a Huge Hit, Leading to Long Waits, Reader Hacks and Worried Publishers*, WASH. POST, Nov. 16, 2019, https://www.washingtonpost.com/technology/2019/11/26/e-books-libraries-are-huge-hit-leading-long-waits-reader-hacks-worried-publishers/.........................26

Herbert Mitgang, *Authors Seek Pay for Loan of Books*, N.Y. TIMES, Jan. 2, 1985, https://www.nytimes.com/1985/01/02/books/authors-seek-pay-for-loan-of-books.html ...........................................................................................................12

*Human Rights Organizations Call On 2024 Congress to Investigate Big Tech and Publishing's Stranglehold Over Digital Books,* FIGHT FOR THE FUTURE, https://www.battleforlibraries.com/congress/, last accessed December 19, 2023 5

Jane Friedman, *The Book P&L: How Publishers Make Decisions About What to Publish*, JANE FRIEDMAN BLOG, last updated Sept. 30, 2021, https://www.janefriedman.com/book-pl/ ...........................................................15

Jim Milliot, *Writing Books Remains a Tough Way to Make a Living*, PUBLISHERS WEEKLY, Sept. 29, 2023, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/93301-author-incomes-post-small-gains.html ............................................................................................................16

Judy Rosen, *The Day the Music Burned*, N.Y. TIMES, June 11, 2019, https://www.nytimes.com/2019/06/11/magazine/universal-fire-master-recordings.html........................................................................................................23

LEGAL AID SOCIETY, http://www.legalaidnyc.org, last accessed Dec. 18, 2023.....17

Lis Hartman, *Breaking Down 2021's Bestsellers by Publisher*, PUBLISHERS WEEKLY, Jan. 14, 2022, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/88301-breaking-down-2021-s-bestsellers-by-publisher.html ............................................................................13

National Writers Union et al., *FAQ on Controlled Digital Lending*, Aug. 2019, at 18, https://nwu.org/wp-content/uploads/2019/08/CDL-FAQ-15AUG2019-v104.pdf ..............................................................................................................12

Pamela Samuelson, *Possible Futures of Fair Use*, 90 WASH. L. REV. 815 (2015).21

Press Release, U.S. Dep't of Justice, *Justice Department Reaches Settlement with Macmillan in E-Books Case*, Feb. 8, 2013, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-macmillan-e-books-case. ...................................................................................5

Press Release, U.S. Dep't of Justice, *Justice Department Reaches Settlement with Three of the Largest Book Publishers and Continues to Litigate Against Apple Inc. and Two Other Publishers to Restore Price Competition and Reduce E-book Prices*, Apr. 11, 2012, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-three-largest-book-publishers-and-continues-litigate ............5

Rachel Deahl, *Could Publishers and Agents Agree on a Flat Royalty Rate?*, PUBLISHERS WEEKLY, June 3, 2016, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/70565-could-publishers-and-agents-agree-on-a-flat-royalty-rate.html .......................................................................14

Rebecca Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish,* ATLANTIC, Mar. 30, 2012, https://www.theatlantic.com/technology/archive/2012/03/the-missing-20th-century-how-copyright-protection-makes-books-vanish/255282/ ......................22

Sarah Nicholas, *How Much Do Authors Make Per Book?*, BOOK RIOT, May 11, 2021, https://bookriot.com/how-much-do-authors-make-per-book/ ...................13

*Search Results: The Elements of Style By Strunk and White*, AMAZON KINDLE STORE, https://www.amazon.com/s?k=elements+of+style+by+strunk+and+white&i=digital-text, last accessed Dec. 18, 2023 ................................................................27

*Search Results: The Elements of Style*, INTERNET ARCHIVE, https://archive.org/details/inlibrary?query=the+elements+of+style, last accessed Dec. 18, 2023 ........................................................................................28

*The Consolidation of Publishing Houses, Past and Present*, AUTHORS ALL., Dec. 8, 2021, https://www.authorsalliance.org/2021/12/08/the-consolidation-of-publishing-houses-past-and-present/ ..................................................................22

WIKIPEDIA, http://www.wikipedia.org, last accessed Dec. 18, 2023 ......................17

## INTEREST OF *AMICUS CURIAE*[1]

Authors Alliance is a 501(c)(3) nonprofit that seeks to advance the interests of authors who want to serve the public good by sharing their creations broadly. Authors Alliance has over 2,500 members, including academic authors, novelists, narrative nonfiction authors, journalists, and other authors who share its mission. Its Advisory Board includes two Nobel Laureates, a Poet Laureate of the United States, three MacArthur Fellows, and distinguished professors from leading institutions from across the United States.[2]

Authors Alliance has an interest in this case because our members rely heavily on libraries such as the Internet Archive, both to make their own works available to readers and to access other literary works for their own research. We think it reasonable and expected that libraries will implement systems—such as controlled digital lending ("CDL")—to adapt how they lend books in light of

---

[1] All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no person other than amici or their counsel contributed money intended to fund the preparation or submission of this brief. Fed. R. App. P. 29(a)(4)(E)

[2] Although no Advisory Board members had a role with this brief, nor does the Advisory Board have any decision-making authority for Authors Alliance, in an abundance of caution we disclose that Brewster Kahle serves as one member of Authors Alliance's 31-person Advisory Board. The Authors Alliance Board of Directors and its Advisory Board are publicly listed here: https://www.authorsalliance.org/about/

current technology, and to ensure that authors reach readers. A negative ruling in this case on the legality of CDL would chill those efforts and severely restrict the reach and impact of our work.

# ARGUMENT

Authors Alliance submits this brief to present the Court with a broader picture of authors' incentives and motivations, and to explain why many authors support Internet Archive's controlled digital lending ("CDL") program and others like it.

The main question on appeal is whether CDL is permissible under the doctrine of fair use. Because fair use requires an analysis of its factors "in light of the purposes of copyright," *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 578 (1994) and because one of the primary purposes of the Copyright Act is to provide authors with incentives to create, *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417, 480 (1984), we believe the views of our members and other authors are particularly relevant.

We believe that the district court failed to pay adequate attention to author interests in its opinion, focusing on publishers' role in the publishing ecosystem without critically considering whether author and publisher views are consistently aligned. Indeed, the word "author" is mentioned just 10 times in the court's 10,000+ word, 47-page decision, outside of case names.[3] While commercial publishers may

---

[3] *See* SPA-7 (twice); SPA-15; SPA-18 (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014)); SPA-25 (quoting *Authors Guild, Inc. v. Google, Inc.*, 804 F.3d 202, 216 (2d Cir. 2015); SPA-26 (quoting *HathiTrust*, 755 F.3d at 101; SPA-33 (quoting *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 44 (2d Cir. 2021)); SPA-39; SPA-40 (quoting *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 563 (1985)); SPA-41.

be unified in their belief that CDL is a lost opportunity at obtaining maximum profit, authors themselves have a far more nuanced view.

In fact, many authors strongly oppose the actions of the publishers in bringing this suit because they support libraries and their ability to innovate. Authors rely on libraries to reach readers and many are proud to have their works preserved and made available through libraries in service of the public. Because these publishers have such concentrated market power, *see U.S. v. Bertelsmann SE & Co. KGAA*, 1:21-cv-02886 (D.D.C. Nov. 15, 2022) (documenting oligopoly in trade book publishing), authors that want to reach wide audiences rarely have the negotiating power to retain sufficient control from publishers to independently authorize public access like that at issue here. These publishers have demonstrated in this suit and elsewhere that their interests diverge from authors' on the importance of providing access to readers through libraries. *See Authors Speak Out: An Update on the Wiley eBook Situation,* AUTHORS ALL., Oct. 14, 2022, https://www.authorsalliance.org/2022/10/14/authors-speak-out-an-update-on-the-wiley-ebook-situation/ (authors objecting to Wiley's unilateral decision to remove 1,300+ licensed ebooks from library collections with little notice). Authors thus depend on courts like this one to take seriously their interests and those of the public.[4]

---

[4] Though our brief is focused on the interests of authors, we note that the publishers' stance in this case has raised significant privacy and censorship concerns that

4

Publishers make much of Internet Archive ("IA") disrupting the "ecosystem" and "market equilibrium" for the sale of books online. A-112; A-122. That ecosystem has long been out of balance, due not to the IA's activities, but to these publishers' leveraging of their power to insist on a marketplace in which they exercise almost absolute control over access, preservation, and research.[5] The Copyright Act has never accorded rightsholders the sweeping control that publishers seek, as "in certain circumstances, giving authors [or rightsholders] absolute control over all copying from their works would tend in some circumstances to limit, rather than expand, public knowledge." *Authors Guild v. Google*, 804 F.3d at 211-112. The doctrine of fair use steps in to strike a balance, preserving incentives for authors to

---

negatively affect the broader public interest, as expressed most recently in a joint letter from 25 leading human rights organizations. *Human Rights Organizations Call On 2024 Congress to Investigate Big Tech and Publishing's Stranglehold Over Digital Books,* FIGHT FOR THE FUTURE, https://www.battleforlibraries.com/congress/, last accessed December 19, 2023.

[5] At least three of these four same publishers have exercised their substantial market power to control the ebook market in ways that have limited readership and driven up costs for the public to access and use books. *See, e.g.*, Press Release, U.S. Dep't of Justice, Justice Department Reaches Settlement with Three of the Largest Book Publishers and Continues to Litigate Against Apple Inc. and Two Other Publishers to Restore Price Competition and Reduce E-book Prices Apr. 11, 2012, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-three-largest-book-publishers-and-continues-litigate; Press Release, U.S. Dep't of Justice, Justice Department Reaches Settlement with Macmillan in E-Books Case, Feb. 8, 2013, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-macmillan-e-books-case.

create new works while enabling others to build on the knowledge these works advance. *Sony*, 464 U.S. at 479.

After plaintiffs initiated these proceedings in district court, Authors Alliance sought feedback from Authors Alliance members and other authors to investigate how authors viewed CDL.[6] What we heard was a diversity of views, including strong support for CDL. Those views were later bolstered dramatically by an outpouring of support from authors such as Neil Gaiman, Naomi Klein, Cory Doctorow and other leading authors who signed a public petition from 1,000+ authors supporting libraries' ability to preserve books via CDL and demanding publishers drop this suit and others against libraries. *See* Blake Brittan, *Authors Group Blast Publishers in Legal Fight with Internet Archive*, REUTERS, Sept. 29, 2022, https://www.reuters.com/legal/litigation/author-coalition-blasts-publishers-legal-fight-with-internet-archive-2022-09-29/.

Authors Alliance thus submits this brief in order to demonstrate that neither plaintiffs' representations about authors and their incentives, nor the district court's conclusion about the effect of CDL lending on authors, are accurate. We seek to offer a more nuanced perspective, demonstrating the myriad ways that CDL can help authors reach their goals: while some authors may share plaintiffs' view of CDL as

---

[6] Authors Alliance launched a CDL survey to elicit feedback on CDL from members and other authors in February 2021 and collected responses through April 2022.

inconsistent with their interests, authors are not a monolith, and many support it strongly.

CDL accomplishes core objectives of the copyright system—objectives that benefit authors and readers alike and that maintain the balance of rights as between copyright owners and readers. CDL serves the interests of authors in at least four distinct ways. First, CDL preserves copyright's balance of interests without reducing author incentives to create. Second, CDL enables broad public availability of literary works, helping authors see their own works reach wide audiences and gain exposure. Third, CDL facilitates the preservation of literary works, especially for works that are no longer available commercially. Finally, CDL is an effective and efficient research tool, helping authors access sources they need to create new works of authorship.

Copyright is designed to incentivize new creation while also ensuring that the public benefits from the works of authors. *Fox Film Corp. v. Doyal*, 286 U.S. 123, 127 (1932). The ways in which authors use and rely on CDL—enabling broad public availability, preservation, and research uses of their work—are favored under fair use. Facilitating access to ideas and creativity in literary works by making the works broadly available is in the public interest, and weighs in favor of fair use. *Sony*, 464 U.S. at 429; *HathiTrust*, 755 F.3d at 101. Preserving works for archival purposes is similarly consistent with fair use, ensuring copyrighted works do not disappear, H.R.

Rep. No. 94–1476, at 73 (1976), and indeed this is precisely what CDL's preservation functions achieve. Finally, scholarly research is a prototypical fair use, embedded as it is within the very language of the Copyright Act. 17 U.S.C. § 107 (naming "criticism," "scholarship" and "research" as fair uses). The noncommercial nature of CDL further supports a finding of fair use.

While the copyrighted works at issue in this case are books published by plaintiffs for which library ebook editions are available, we urge the Court to also consider controlled digital lending as a broader practice. In many cases, libraries lend out CDL scans of a particular work because no library ebook edition exists. *See* Brief for Library Futures as Amicus Curiae Supporting Defendants at 13, *Hachette Book Group, Inc. v. Internet Archive*, No. 20-cv-4160 (S.D.N.Y. Mar. 24, 2023). And while that type of use is not at issue in this case, a negative ruling on the legality of CDL in this case would threaten those uses, doing untold harm to access to knowledge.

## I. Controlled Digital Lending Maintains Copyright's Balance of Interests and Does Not Reduce Financial Incentives for Authors.

Authors, not publishers, are at the core of copyright's incentive structure. The temporary monopoly that copyright grants, subject to certain exceptions and limitations, is intended to incentivize new creation while also ensuring the public

benefits "from the labor of authors." *Fox Film Corp.*, 286 U.S. at 127. While publishers serve an important role in the dissemination of knowledge, their incentives and interests differ from authors', and sometimes conflict. While authors write books in order for their books to be read, commercial publishers sell books in order to reap profits. Indeed, the motivation for the passage of the world's first copyright law in 1710 was to protect authors from unscrupulous action by stationers and publishers. Craig Joyce, *The Statute of Anne: Yesterday and Today*, 47 HOUSTON L. R. 779, 783 (2010). When the Supreme Court commanded that the fair use factors be balanced "in light of the purposes of copyright," *Campbell*, 510 U. S., at 578, the purposes to be considered surely include the effect of the use on authors.

In this case, the district court gave no meaningful consideration to those interests or how CDL affects authors in reality. Instead, the court was content to base its conclusions on a number of hypothetical harms that the publishers' offered with no evidentiary support. For example, the district court assumed that when publishers receive revenue for library licensed ebooks, "authors generally are paid," SPA-7 (citing A-5046), but, as discussed further below, under financial structure of today's publishing industry, that is often not the case.

CDL is a socially beneficial use that does not disincentivize the creation of new works of authorship, and the traditional balance of interests and incentive structure in copyright are unharmed by CDL for two main reasons. First, CDL loans

9

are only possible when the lending institution has already purchased a print book, for which an author receives royalties from their publisher if any are due. This undermines plaintiffs' claims that CDL causes market harm to authors by diminishing royalties they receive from library sales, A-151; A-3734-3735, because CDL requires that libraries only loan out the number of CDL copies as print books that have been acquired. Authors have already been compensated for the sale of those books in the traditional way authors have come to expect, with libraries left to then freely distribute those books to users.

Indeed, plaintiffs' filings in the district court did not identify or quantify any concrete financial harm to authors that has occurred as a result of the IA's CDL program, instead assuming such harm. See A-3729 ("Given IA's failure to pay customary licensing fee, the fourth factor favors Publishers")(citations omitted); *Cf. Am. Soc'y Testing & Materials v. Pub.Resource.Org*, 82 F.4th 1262, 1272 (D.C. Cir. 2023) (disapproving of rightsholder's failure to provide "quantifiable evidence" of market harm); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1278-80 (2023) (specifying dollar amounts of lost licensing revenue to demonstrate market harm). The district court adopted this conclusion despite the fact that multiple economists gave evidence to the contrary. SPA-46-50; Brief for Defendant-Appellant Internet Archive, ECF No. 60, at 23 (citing A-4823-4870; A-4898-4944).

The district court concluded that CDL supplants sales and harms the market for the original works under the fourth fair use factor because publishers would prefer to license ebook editions to libraries. SPA-45. *Of course* publishers would prefer reaping a profit through licensing rather than endorse a fair use that does not lead directly to revenue. But it is not the case that a rightsholder is automatically entitled to additional compensation with every new technical format. While some format shifting may be impermissible under the law, fair use supports a wide variety of instances in which users are allowed to shift content to " 'improv[e] the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder' [when] the improved delivery was to one entitled to receive the content." *Capitol Records LLC v. ReDigi*, 910 F.3d 649, 661 (2d Cir. 2018) (quoting *Fox News Network v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018)). Just because publishers have identified a potential monetizable event in the lifecycle of a work does not mean that the Copyright Act must support their efforts to exploit it. Fair use calls for a more probing analysis of the public benefit and purpose of such copying. In this case, the district court gave scant attention to the public benefits of CDL, SPA-49, and simply concluded that because publishers license ebooks to libraries for a profit, CDL necessarily harmed the relevant market, speculating about possible future harms that could arise "if IA's conduct becomes

widespread," or "New organizations like IA . . . emerge to perform similar functions[.]" SPA-44-45.

The precise means and terms of lending to users have traditionally been left to the library to decide; what matters is that each copy of a book that a library holds is already paid for, and they are only using that one copy to the benefit of readers and the public. U.S. law has never required libraries to gain permission or pay for each loan they make, despite the wishes of some rightsholders. *See* National Writers Union et al., *FAQ on Controlled Digital Lending*, Aug. 2019, at 18, https://nwu.org/wp-content/uploads/2019/08/CDL-FAQ-15AUG2019-v104.pdf (calling for the establishment of a national public lending right to "provide[] remuneration [to] authors when books or e-books are borrowed from libraries."); Herbert Mitgang, *Authors Seek Pay for Loan of Books*, N.Y. TIMES, Jan. 2, 1985, https://www.nytimes.com/1985/01/02/books/authors-seek-pay-for-loan-of-books.html (describing proposed federal legislation that would establish a public lending right, supported by rightsholder groups).

The system of free library lending has served authors well for decades, and there is ample evidence that free library access actually drives sales for authors. *See, e.g.,* Andrew Albanese*, Survey Says Library Users Are Your Best Customers,* PUBLISHERS WEEKLY, Oct. 28, 2011, https://www.publishersweekly.com/pw/by-topic/industry-news/publishing-and-marketing/article/49316-survey-says-library-

users-are-your-best-customers.html ("Our data show that over 50% of all library users report purchasing books by an author they were introduced to in the library . . . This debunks the myth that when a library buys a book the publisher loses future sales[.]"). Authors want and need libraries to purchase their books, but the copyright system has never required libraries to pay for those books again and again in order to provide readers with access in formats relevant to them in light of evolving technology.

Second, even if publishers would fare better financially without the availability of CDL programs like IA's, most authors would not. While plaintiffs comprise the bulk of the major U.S. trade publishers and thus dominate the trade market, Lis Hartman, *Breaking Down 2021's Bestsellers by Publisher*, PUBLISHERS WEEKLY, Jan. 14, 2022, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/88301-breaking-down-2021-s-bestsellers-by-publisher.html, most working authors are not published by plaintiffs. Indeed, plaintiffs purport to publish "the most successful and leading authors in the world," A-105, but these authors represent a vanishingly small percentage of working authors. Sarah Nicholas, *How Much Do Authors Make Per Book?*, BOOK RIOT, May 11, 2021, https://bookriot.com/how-much-do-authors-make-per-book/. Authors are not a monolith in terms of their views or motivations for writing books: while some may share plaintiffs' views that CDL is harmful to the publishing ecosystem, many

others support CDL, as evidenced by the feedback Authors Alliance received from its members and other authors.

Even if plaintiffs were correct in arguing that eliminating CDL would enhance publisher revenues, the financial structure of the publishing industry demonstrates that even authors who publish with the plaintiffs are unlikely to share in these spoils. When an author makes a book deal with a trade publisher such as the plaintiffs in this case, they often receive a lump sum advance against royalties. Authors do not receive income from book sales until this advance has earned out—that is, when royalties due to the author from book sales surpass the total advance paid. *Id.*; *see also Authors Guild Model Trade Book Contract*, AUTHORS GUILD, https://go.authorsguild.org/contract_sections/4, last accessed Dec. 18. 2023. For example, if an author receives an advance of $20,000 and is entitled to a 10% royalty rate on book sales, they will not earn out their advance and receive royalty payments from their publisher unless and until that 10% royalty rate yields more than $20,000. Importantly, this arrangement has been designed and implemented by plaintiffs and other publishers, who set contract terms for publication contracts and standardize royalty rates without involvement from authors. Rachel Deahl, *Could Publishers and Agents Agree on a Flat Royalty Rate?*, PUBLISHERS WEEKLY, June 3, 2016, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/70565-could-publishers-and-agents-agree-on-a-flat-royalty-rate.html.

The reality is that for most authors who receive advances, that initial "advance" payment is all they will ever receive for their book. While authors must wait to see if their book will sell widely enough for them to earn out their advance, publishers profit even if an author's advance does not earn out. While statistics are sparse, industry insiders have estimated that approximately 70% of published authors do not earn out their advances. Jane Friedman, *The Book P&L: How Publishers Make Decisions About What to Publish*, JANE FRIEDMAN BLOG, last updated Sept. 30, 2021, https://www.janefriedman.com/book-pl/. For these authors, no income is received beyond the original advance, making the author income question in many cases entirely separate from the book sales question. This demonstrates that the simplistic version of revenue streams for authors espoused by the plaintiffs, and adopted by the district court whereby "authors generally are paid for sales of each format in which a book is published," SPA-7 (citing A-5046), is in many if not most cases inaccurate. In fact, a recent author income survey by the Authors Guild uncovered that in 2022, traditionally published authors (i.e., those that do not self-publish) earned more from nonbook writing-related income than book-related income, Jim Milliot, *Writing Books Remains a Tough Way to Make a Living*, PUBLISHERS WEEKLY, Sept. 29, 2023, https://www.publishersweekly.com/pw/by-topic/industry-news/publisher-

news/article/93301-author-incomes-post-small-gains.html, further minimizing the effect of library ebook licenses on author income.

## II.    Controlled Digital Lending Promotes Broad Public Availability to Books in a Format Relevant to Readers.

Authors want their books to be read. The Copyright Act shares this objective. "Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Twentieth Century Music Corp. v. Aiken*, 422 U. S. 151, 156 (1975). Controlled digital lending supports authorship by facilitating broad public availability of literary works, enabling these works to reach wide, diverse audiences via technology that allows them to efficiently discover and evaluate the contents of those works. Facilitating access to works for readers who are entitled to access but could not otherwise read them is a fair use consistent with the aims of the Copyright Act, *HathiTrust*, 755 F.3d at 101-103, and serves the interests of authors who prioritize seeing their works reach readers so that they may have the maximum impact on public discourse.

Particularly where a use is noncommercial, courts are wary of "inhibit[ing] access to ideas without any countervailing benefit." *Sony*, 464 U.S. at 450. Internet Archive's CDL program, like all library lending, is noncommercial in nature. A recent case in the U.S. Court of Appeals for the D.C. Circuit, *American Society for*

16

*Testing & Materials v. Public.Resource.org* ("*ASTM v. PRO*"), is instructive on the question of commerciality. The court in that case found the online posting of industry standards by a nonprofit organization to be plainly noncommercial, as the nonprofit "disseminates the disputed materials for free." 82 F.4th 1262, 1267 (D.C. Cir. 2023). Internet Archive—also a nonprofit—disseminates CDL scans free of charge on its website, and in fact incurs costs related its scanning operations. A-174 (IA "has employed more than fifty employees to work at locations with Scribe scanners"); A-4784 (describing acquisition, scanning, and storage process using a device IA developed). The district court found IA's use of the works to be commercial because it "uses its Website to attract new members, solicit donations, and bolster its standing in the library community." SPA-31. But the same can be said of many if not most nonprofit organizations, which include donation links on the websites they otherwise use to share content and advance their missions. *See, e.g.*, WIKIPEDIA, http://www.wikipedia.org, last accessed Dec. 18, 2023; AUTHORS GUILD, http://www.authorsguild.org, last accessed Dec. 18, 2023; LEGAL AID SOCIETY, http://www.legalaidnyc.org, last accessed Dec. 18, 2023. Even Public.Resource.org's website includes a donate link, which did not disturb the D.C. Court of Appeals' conclusion that its use was noncommercial.

Without the enhanced public availability CDL provides, some authors could face substantial difficulty reaching readers, particularly in cases in which a publisher

only issues a print version of a book. This is a particular risk for academic works, *see, e.g.,* CORNELL UNIVERSITY LIBRARY, REPORT OF THE COLLECTION DEVELOPMENT EXECUTIVE COMMITTEE TASK FORCE ON PRINT COLLECTION USAGE, 2 (2010), https://ecommons.cornell.edu/handle/1813/45424 (reporting that only 45% of print monographs held by Cornell library and published since 1990 have circulated), which make up many of the books written by Authors Alliance members. When books remain on library shelves and undiscovered by readers, the purposes of copyright are not served. When a publisher only issues the work in physical book form, many readers are effectively unreachable.

Even when a publisher does issue an ebook version, certain publishers restrict a library's ability to acquire digital versions of work altogether, Geoffrey A. Fowler, *Want to Borrow that E-book from the Library? Sorry, Amazon Won't Let You.*, WASH. POST, Mar. 10, 2021, https://www.washingtonpost.com/technology/2021/03/10/amazon-library-ebook-monopoly/; Survey Response ("SR") 12, or place strict controls on when and to whom those libraries can provide access for ebooks that they will license, placing these works out of reach for many readers. Moreover, authors often have no control over whether their publisher decides to issue an ebook edition of their work, nor over whether that publisher decides to license an ebook edition to libraries. One of the plaintiffs in this case, John Wiley & Sons, made headlines in late 2022 when it

abruptly removed over 1,300 ebooks from academic library collections, to the dismay of many authors whose books had been included in the removal. *Authors Speak Out: An Update on the Wiley Ebook Situation*, AUTHORS ALL., Oct. 14, 2022, https://www.authorsalliance.org/2022/10/14/authors-speak-out-an-update-on-the-wiley-ebook-situation/. In an ecosystem where continued availability of library licensed ebooks remains uncertain, and beyond the control of authors, CDL ensures continued availability of works.

Authors Alliance members value seeing their works reach broad audiences, and many survey respondents affirmed that the enhanced availability that CDL provides advances their interest in reaching readers. SR 2, SR 3. One Authors Alliance member explained that their "publisher only issued [their] work in hardcover, didn't print many copies, and priced it so high that . . . [j]ust about the only buyers who could afford [the] book were libraries." SR 8. Without CDL, authors in such situations could be unable to reach readers without the ability to access physical books at libraries due to physical distance or disability. Physical books on library shelves are inherently limited by geographic constraints, further limiting the availability of works like this member's. CDL's role in facilitating access to works of authorship took on particular salience during the COVID-19 pandemic. One survey respondent observed that, during the pandemic, "authors whose writings were available through CDL were more likely to be seen and cited

than those whose works were locked away." SR 4. Authors (and particularly those whose publisher does not make an ebook edition available to libraries) who "want [their] works to have the widest possible readership," SR 2, and "want to see [their] stories out in front of audiences around the world," SR 17, are served by the enhanced broad availability that CDL provides.

Even for readers of print books, CDL access can enhance discoverability. CDL allows those print readers, particularly those who would never have purchased a print copy sight-unseen, to thoroughly evaluate the suitability and relevance of a particular book first. For authors who have as their highest goal seeing their work reach readers, the digital format of CDL greatly enhances the chances of reaching more readers. In these cases, "making the print version of . . . books available through CDL can give readers digital access to [the] work that they wouldn't have otherwise." SR 12.

### III.    Controlled Digital Lending Ensures that Books Are Preserved.

Controlled digital lending enables the preservation of books that are no longer available commercially, ensuring that these works do not disappear into obscurity. Books have short commercial lives compared to the duration of copyright, and once books are no longer available from commercial outlets, they become much less accessible to readers. Indeed, the House of Representatives' Committee on the

20

Judiciary Report on the 1976 Copyright Act revision observes that "the making of duplicate copies for purposes of archival preservation certainly falls within the scope of 'fair use.'" H.R. Rep. No. 94–1476, at 73 (1976); *see also* Pamela Samuelson, *Possible Futures of Fair Use*, 90 WASH. L. REV. 815, 834 n. 125 (2015) (observing that preservation efforts by HathiTrust in *Authors Guild v. HathiTrust* were consistent with the preservation fair use articulated in the House Report). Without CDL, libraries face a difficult choice with fragile, out of print materials: continue to make the original print copies available to users and risk their inevitable destruction, or lock down access to the original, making access difficult or nearly impossible for a large number of potential readers.

CDL allows libraries the freedom to maintain and preserve copies in a way that allows for continued user access. For licensed ebooks, in contrast, questions of whether and how libraries are able to preserve their contents are entirely at the discretion of publishers through their license agreements. Those terms are entirely inadequate for long term preservation and access, especially as formats change rapidly over time and publishers exit the business. Dept. Com. Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages: Copyright Policy, Creativity, and Innovation in the Digital Economy* 48-49 (2016) (Library Association stating that ebook license terms often interfere with libraries' ability to preserve those works). Publishers of ebooks may merge, dissolve, change business

models, or cease library distribution altogether, making them ill-suited for long-term preservation. *See The Consolidation of Publishing Houses, Past and Present*, AUTHORS ALL., Dec. 8, 2021, https://www.authorsalliance.org/2021/12/08/the-consolidation-of-publishing-houses-past-and-present/ (listing ebook publisher consolidations). Ebook publishers also regularly encode their books with digital rights management technology that is specifically designed to thwart efforts to make copies even when the publisher of that ebook is long gone and unavailable to authorize any update to a new format.

Without library preservation, literary works that are no longer available commercially could cease to be accessible to the general public at all. In 2012, law professor Paul Heald demonstrated the phenomenon of older books "disappearing" by studying the number of editions of new books available on Amazon. Rebecca Rosen, *The Missing 20th Century: How Copyright Protection Makes Books Vanish,* ATLANTIC, Mar. 30, 2012, https://www.theatlantic.com/technology/archive/2012/03/the-missing-20th-century-how-copyright-protection-makes-books-vanish/255282/. Heald found that there was a marked decrease in a book's availability for books published from the late 1920s through the 1990s. *Id.* For example, there were many more books published in the 1910s available on Amazon than in the 1990s (presumably since the former category of works had entered the public domain). *Id.* The loss of access to

knowledge that this problem represents demonstrates the need for stronger efforts to preserve literary works so that the knowledge they hold is not lost.

Publishers assert that they alone should have the right to dictate whether titles are available in digital formats. A-121-122. In other creative industries that have fought vociferously to maintain publisher control of preservation while denying the creation of access copies for users, we have seen disastrous results. *Cf.* Judy Rosen, *The Day the Music Burned*, N.Y. TIMES, June 11, 2019, https://www.nytimes.com/2019/06/11/magazine/universal-fire-master-recordings.html (reporting on the millions of lost titles in Universal's 2008 studio fire). To grant rightsholders such control undermines copyright's objective of encouraging the progress of knowledge. Many publishers have not made ebook licenses available for their backlists. Indeed, in many cases it is likely that publishers are unsure if they hold the rights they claim are necessary for such use. *See, e.g.*, *Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 614 (S.D.N.Y 2011) (holding that the publisher's contractual right to "print, publish and sell the work[s] in book form" did not encompass ebook publishing rights). Without CDL programs to fill the gap in availability, older books could fail to be preserved altogether.

When literary works are preserved by libraries and scans are made available to borrow via CDL, the knowledge and ideas they contain are not lost, serving

copyright's goal of facilitating the progress of knowledge and socially productive onward creation. The problem of commercially unavailable books from the 20th century "disappearing" and the effectiveness of CDL as a solution is illustrated by a recent news story about an older, obscure work by a prominent author which the story's author was unable to obtain despite substantial efforts. Caity Weaver, *Does 'The Da Vinci Code' Writer Have a Secret?*, N.Y. TIMES, July 29, 2021, https://www.nytimes.com/2021/07/29/style/dan-brown-advice-book.html. Unable to locate and acquire a physical copy of the book in question, the story's author dubbed the matter a "mystery." *Id.* Yet the work—a satirical dating advice book written by author Dan Brown—was available as a CDL scan from IA's Open Library. CDL can, and does, serve an important preservation function for works that would otherwise fall into obscurity. Within this context, CDL can serve as a potent means of preserving an author's works, ensuring they are not lost even as the work's commercial reach is limited. Survey respondents supported CDL's ability to keep works from disappearing, whether they originated as print books or digital works of authorship. SR 4, SR 14.

## IV.   Controlled Digital Lending Facilitates Author Research.

Finally, controlled digital lending can be a powerful research tool for authors in the process of creating new works of authorship. When a book is only issued in a

print version and not widely held in library collections, authors who need to consult that book for their research purposes are unable to do so unless they happen to live near a library that contains the work. CDL steps in to bridge this gap, allowing authors to access sources they would not otherwise be able to, particularly older works that have gone out of print.

Without CDL, many authors would face obstacles in accessing the research sources they need in order to create new works of authorship, SR 12, particularly in cases where no library ebook edition is available to those authors. Authors with print or mobility disabilities may not be able to access physical books on library shelves or read them in an appropriate format, and such authors are disadvantaged when they are not able to borrow works via CDL. Particularly during the early days of the COVID-19 pandemic, when researchers' ability to access physical books on library shelves was limited, CDL enabled authors to discover and access primary sources they needed to create new works of authorship.

While the district court concluded that IA's CDL scans are "'competing substitute[s]' for library ebook editions[,]" SPA-44 (quoting *TVEyes*, 833 F.3d at 179), CDL scans are distinct from licensed ebooks in form, function, and appearance. Ebooks licensed by plaintiffs in this case are formatted to be read on e-readers. Readers can change the font, text size, spacing, and even the color of the text, and search through the text for key terms. Yet a CDL scan represents a verbatim

copy of a particular edition of a particular physical book. The scan may be read on a browser or through certain software, but it cannot be manipulated the way a licensed ebook can, nor can it be read on many ebook readers. Instead, a CDL scan is analogous to the standards made available through online reading rooms in *ASTM v. PRO*, as it "do[es] not provide equivalent or even convenient access" to the works in question the way an ebook does. 84 F.4th 1262, 1270 (D.C. Cir. 2023). "Among other things, text is not searchable, cannot be printed or downloaded, and cannot be magnified without becoming blurry." *Id.* These circumstances supported the court's conclusion in *ASTM v. PRO* that the use of the copyrighted works was transformative due to its different purpose and character. Similar limitations inherent in IA's CDL copies should support the same conclusion in this case.

Furthermore, even when a researcher is able to access a licensed ebook through their local library, CDL scans are still uniquely valuable as research sources. The long wait times required to check out licensed ebooks at many libraries can make this an unsuitable option for authors wishing to consult multiple books as part of their research. Heather Kelly, *E-Books at Libraries are a Huge Hit, Leading to Long Waits, Reader Hacks and Worried Publishers*, WASH. POST, Nov. 16, 2019, https://www.washingtonpost.com/technology/2019/11/26/e-books-libraries-are-huge-hit-leading-long-waits-reader-hacks-worried-publishers/. Though CDL is a poor substitute for the reading quality of a licensed ebook, the CDL copy gives

researchers a relief valve for quick consults and cite checks, which is consistent with the short checkout time usage data reported by IA. Researchers are able to cite specific page numbers from a print edition when consulting a CDL scan of that print edition, whereas a licensed ebook has different pagination. As explained in the Library Futures amicus brief in the district court proceeding, CDL scans allow an author to consult "a particular past edition of a book" whereas library licensed ebooks are often more limited. Brief for Library Futures as Amicus Curiae Supporting Defendants at 14, *Hachette Book Group, Inc. v. Internet Archive*, No. 20-cv-4160 (S.D.N.Y. Mar. 24, 2023). For example, an author writing about the seminal guide to writing, *The Elements of Style*, by William Strunk Jr. and E.B. White, who wished to consult multiple editions as part of their scholarship, would be limited to only the most recent fourth edition or the original first edition in licensed ebook format, assuming that their library even had licensed ebook editions available. *Search Results: The Elements of Style By Strunk and White*, AMAZON KINDLE                                                                                                          STORE, https://www.amazon.com/s?k=elements+of+style+by+strunk+and+white&i=digital-text, last accessed Dec. 18, 2023. But were that same author to consult IA's Open Library, they could also borrow the second and third editions—which exist only in print copy, and are out of print—as CDL scans. *Search Results: The Elements of Style*,                              INTERNET                              ARCHIVE,

27

https://archive.org/details/inlibrary?query=the+elements+of+style, last accessed Dec. 18, 2023. This undermines the district court's conclusion that IA's use does not "expand[] [the] utility" of the original work." SPA-22 (quoting *TVEyes*, 883 F.3d at 176).

The fact that CDL facilitates this breadth of author research, where conventional licensed ebooks do not, makes it consistent with fair use. Using others' works for research purposes is one of the prototypical fair uses, identified as an example in the preamble to the fair use statute, 17 U.S.C. § 107, and recognized by numerous courts. *See, e.g., Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991). When a particular use facilitates research, fair use is favored even when the use is commercial in nature since this research often serves "a broader public purpose." *Am. Geophysical Union v. Texaco Inc*., 60 F.3d 913, 922 (2d Cir. 1995). Contrary to the conclusions of the district court, CDL is noncommercial in nature, further underscoring that its research function is consistent with fair use.

Libraries have relied on fair use to play an important intermediary role for authors by providing full-text copies for research purposes with appropriate restrictions on reuse similar to those that CDL employs. For example, in *Sundeman v. Seajay Society, Inc.*, the Fourth Circuit found in in favor of the defendant Seajay Society, an archive, when it provided two full-text copies of an unpublished manuscript of *Blood of My Blood* by author Margorie Kinnan Rawlings to another

library and to a literary scholar, Dr. Anne Blythe. 142 F.3d 194, 208 (4th Cir. 1998). As with CDL, the Seajay Society placed careful limits on reuse—"access to the copy was restricted, and photocopying it was prohibited[.]" *Id.* at 199. Also like CDL, Seajay provided the researcher full-text access, which is necessary for scholarly analysis. *Id.* at 206. The Court concluded that Seajay's use in providing a full-text copy to Blythe was fair because it supported the author's underlying research and scholarship, purposes which "serve the public benefit and aid in the development of the arts." *Id*. at 207.

For authors creating new literary works that draw on existing works, the ability to access other authors' works as CDL scans significantly simplifies the research process. Respondents to Authors Alliance's CDL survey voiced their support for CDL as a way to access works about a diverse range of research areas. SR 7, SR 12. While some authors may be able to access hard copies of these works in physical libraries, authors are not always able to physically access these spaces, whether due to print or mobility disability or an author's physical location. For example, for authors writing in languages not spoken in the countries they live in, CDL can be an invaluable way to "read other writers' works, learn new storytelling techniques, and check out resources that help [] improve [the author's] writing[.]" SR 17. Even for authors with regular access to libraries containing primary sources they need to create new works of authorship, CDL enables authors to access a wider

variety of sources than those contained in a single library in many cases. An author's ability to use CDL as a research tool also supports their authorship in its efficiency, as decreasing time needed to track down sources leads to more time for authors to conduct their scholarship, SR 12, contributing to the progress of knowledge.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision of the district court.

Dated: December 21, 2023                    Respectfully submitted,

                                            s/Rachel Brooke Leswing
                                            Rachel Brooke Leswing
                                            Authors Alliance
                                            2705 Webster St., #5805
                                            Berkeley, CA 94705
                                            *Counsel for amicus curiae*

## CERTIFICATE OF COMPLIANCE

I certify that his brief complies with the type-volume limitation of Rule 29(a)(5) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Rule 29.1(c) because it contains 6,661 words, excluding the parts of the brief exempted by Rule 32(f).

I further certify that this brief complies with the typeface requirements of Rule 32(a)(5)(A) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 2016 in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: December 21, 2023                    s/Rachel Brooke Leswing