# 23-1260-cv

## United States Court of Appeals
### *for the*
### Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

— v. —

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICI CURIAE* AMERICAN LIBRARY ASSOCIATION AND ASSOCIATION OF RESEARCH LIBRARIES IN SUPPORT OF NEITHER PARTY

BRANDON C. BUTLER
JASZI BUTLER PLLC
*Attorneys for Amici Curiae*
6218 Georgia Avenue NW,
   Suite 1-445
Washington, DC 20011
(202) 368-7873

**CORPORATE DISCLOSURE STATEMENT
PURSUANT TO RULE 26.1 OF THE
<u>FEDERAL RULES OF APPELLATE PROCEDURE</u>**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae the American Library Association and the Association of Research Libraries state that neither of these entities has a parent corporation and no publicly held corporation has an ownership stake of 10% or more in either entity.

Dated: December 22, 2023

Respectfully submitted,
<u>/s/ Brandon C. Butler</u>
Jaszi Butler PLLC
6218 Georgia Avenue NW Ste 1 - 445
Washington DC 20011-5125
brandon@usefairuse.com

*Counsel for amici curiae American
Library Association and Association
of Research Libraries*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTERESTS OF AMICI CURIAE ...........................................................1

SUMMARY OF ARGUMENT ...............................................................2

ARGUMENT ..................................................................................3

I.    The district court ignored binding precedent, misread the statute, and misapplied other cases in finding the Internet Archive's uses to be "commercial" .......................................4

    A.    Commercial exploitation occurs "when the copier directly and exclusively acquires conspicuous financial rewards" from their use ..............................................6

    B.    Other courts have avoided circularity in determining whether uses were "commercial" under the first factor .............7

    C.    The district court misread *Harper & Row* and relied on outdated and flawed case law in finding IA's uses to be commercial ...................................................................9

II.    Libraries and library users are crucial to the copyright ecosystem, and this Court's decision in this case should preserve their fair use rights .................................................12

    A.    The Copyright Act, including Section 107, shows the importance of library uses in the copyright system .................13

    B.    Courts have recognized fair use in a range of circumstances involving libraries, research, and teaching ...................................................................16

    C.    Libraries rely on fair use for a wide variety of routine and innovative services and projects .........................19

    D.    Libraries need fair use to face important challenges and opportunities in the 21st Century .............................21

III.    Conclusion ........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Inst. of Physics v. Schwegman Lundberg & Woessner, P.A.*,
No. 12-528, 2013 U.S. Dist. LEXIS 124578 (D. Minn. 2013) ....................18

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018)........................................................................9

*American Geophysical Union v. Texaco Inc.*,
60 F. 3d 913 (2d Cir. 1994) ................................................................ *passim*

*Apple Inc. v. Corellium, Inc.*,
No. 21-12835, 2023 U.S. App. LEXIS 11225 (11th Cir. 2023) ............. 18-19

*Authors Guild v. Google, Inc.*,
804 F. 3d 202 (2d Cir. 2015) .......................................................................17

*Authors Guild v. HathiTrust*,
755 F.3d (2d Cir. 2014) ...................................................... 14, 16, 22

*Cambridge Univ. Press v. Becker*,
446 F. Supp. 3d 1145 (N.D. Ga. 2020)........................................................17

*Cambridge University Press v. Patton*,
769 F. 3d 1232 (11th Cir. 2015) .................................................. 7, 8, 17, 18

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994)........................................................................................5

*Eldred v. Ashcroft*,
537 U.S. 186 (2003)........................................................................................4

*Golan v. Holder*,
565 U.S. 302 (2012)........................................................................................4

*Google LLC v. Oracle Am., Inc.*,
141 S. Ct. 1183 (2021)................................................................................5, 16

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
471 US 539 (1985)......................................................................................9, 10

*Island Trees Sch. Dist. v. Pico by Pico*,
457 U.S. 853 (1982)........................................................................................4

*MCA, Inc. v. Wilson*,
  677 F.2d 180 (2d Cir. 1981) ...........................................................................7

*Penguin Grp. (USA) v. Am. Buddha*,
  No. 13-cv-2017, 2015 WL 11170727 (D. Ariz. May 11, 2015) ............. 10-11

*Rogers v. Koons*,
  960 F. 2d 301 (2d Cir 1992) ...........................................................................7

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
  689 F.3d 29 (1st Cir. 2012)...................................................................... 10, 11

*Sundeman v. Seajay Society, Inc.*,
  142 F. 3d 194 (4th Cir. 1998) ......................................................................18

*Swatch Grp. Mgmt. Svces., Inc. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ...........................................................................18

*Weissmann v. Freeman*,
  868 F.2d 1313 (2d Cir. 1989) ................................................................. 10, 11

*White v. West Pub. Corp.*,
  29 F. Supp. 3d 396 (S.D.N.Y. 2014) ...........................................................18

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ................................................................ 10, 11

**Statutes & Other Authorities:**

U.S. Const. art. I, § 8, cl. 8.........................................................................2, 13

17 U.S.C. § 107 ...................................................................................... 14, 20

17 U.S.C. § 108 ............................................................... 13, 14, 16, 19

17 U.S.C. § 108(f)(4) ....................................................................................14

17 U.S.C. § 108(i) .........................................................................................19

17 U.S.C. § 110(1) .........................................................................................13

17 U.S.C. § 110(2) .........................................................................................13

17 U.S.C. § 504(c)(2).....................................................................................13

17 U.S.C. § 512(f)..........................................................................................13

17 U.S.C. § 1201 ...........................................................................................15

17 U.S.C. § 1203(5)(B) ................................................................13

17 U.S.C. § 1506(aa) ...................................................................14

Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 93 Wash. L. Rev. 579 (2018) .............26

ARL, *Code of Best Practices in Fair Use for Academic and Research Libraries* (2012) ................................................................. 19, 22, 24

ARL, *Code of Best Practices in Fair Use for Software Preservation* (Rev. Feb. 2019), https://www.arl.org/wp-content/uploads/2018/09/2019.2.28-software-preservation-code-revised.pdf ....................................................................24

Delegation of the U.S. to the WIPO Standing Committee on Copyright and Related Rights, *Updated Version of The Document "Objectives and Principles for Exceptions and Limitations for Libraries and Archives"* SCCR/44/5 (Nov. 2, 2023) ............................................15

Donald Waters & John Garrett, *Preserving Digital Information, Report of the Task Force on Archiving of Digital Information* (1996) .......................24

H.R. Rep. No. 94-1476 (1976) .......................................................14

Jennifer M. Urban, *How Fair Use Can Help Solve the Orphan Works Problem*, 27 Berkeley Tech. L.J. 1379 (2012) ..............................22

Library of Congress, *Copyright and Other Restrictions*, Prosperity and Thrift ....................................................................20

Matthew Sag, *The New Legal Landscape for Text Mining and Machine Learning*, 66 J. Copyr. Soc'y of the USA 291 (2019) ...................25

NYPL, *What's on the menu? - About* ...........................................21

Paul Heald, *How Copyright Keeps Works Disappeared*, 11 J. Empirical Legal Stud. 829 (2014) ...............................................................23

Phil Salvador, Survey of the Video Game Reissue Market in the United States (1.1) (2023) ....................................................................23

S. Rep. No. 94-473 (1975) .............................................................22

*Society of American Archivists, Orphan Works: Statement Of Best Practices* (Rev. Jun. 17, 2009), https://www2.archivists.org/groups/intellectual-property-working-group/orphan-works-statement-of-best-practices .........................................22

Steve Sande, *NYPL Biblion: World's Fair iPad app a compelling look at yesterday's future*, Engadget (June 8, 2011) ....................................................20

U.S. Copyright Office, Comments of the Library Copyright Alliance on the Inquiry Concerning Artificial Intelligence and Copyright (October 30, 2023) ..............................................................................................26

U.S. Copyright Office, Comments of the University Library of the University of California, Berkeley on Artificial Intelligence Study (October 30, 2023) ..............................................................................................26

U.S. Copyright Office, *Copyright and State Sovereign Immunity* (2021) ...............15

U.S. Copyright Office, *Orphan Works and Mass Digitization* (2015) .............22, 16

U.S. Copyright Office, *Section 108 of Title 17: A Discussion Document of the Register of Copyrights* (2017) ....................................................................16

U.S. Copyright Office, *Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights* (2021) ............................................................................................................15

U.S. Dept. of Commerce Internet Policy Task Force, *Copyright Policy, Creativity, and Innovation in the Digital Economy* (2013) ..........................16

U.S. Dept. of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* (2017) ....................................16

U.S. Patent and Trademark Office, *USPTO Position on Fair Use of Copies of NPL Made in Patent Examination* (2012) ..................................................16

William M. Landes and Richard A. Posner, "Indefinitely Renewable Copyright," 70 U. Chi. L. Rev. 471 (2003) ..................................................23

The American Library Association ("ALA"), established in 1876, is a non-profit professional organization of about 50,000 librarians, library trustees, and other friends of libraries dedicated to providing and improving library services and promoting the public interest in a free and open information society. The Association of Research Libraries ("ARL") is an association of 127 research libraries in the United States and Canada. ARL's members include university libraries, public libraries, and government and national libraries. ARL programs and services promote equitable access to and effective use of recorded knowledge in support of teaching and research. ALA and ARL work collaboratively on copyright issues through the Library Copyright Alliance.

Collectively, these associations represent over 100,000 libraries in the United States employing more than 300,000 librarians and other personnel committed to meeting the needs of their patrons in the digital age. As a result, the associations share a strong interest in the balanced application of copyright law to digital uses that promise to advance our public interest missions. Cultural heritage institutions and the users they serve are especially dependent on a robust and stable

---

[1] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party or its counsel contributed money that was intended to fund preparing or submitting this brief. Nor did any other person contribute money that was intended to fund preparing or submitting this brief.

fair use right. Libraries have engaged actively in the fair use landscape for decades, and remain deeply committed to fair use as a crucial tool to meet challenges and opportunities as we pursue the library mission to serve communities across the country. We file in support of neither party to provide this Court with additional information about the vital role fair use plays in libraries and the urgent need to preserve fair use as a tool that can flex to meet a wide variety of needs in our communities. In particular, we urge this Court to apply its own well-established case law on the first fair use factor and the meaning of "commercial," and to recognize and preserve the wide variety of contexts where fair use will continue to be available to all libraries regardless of the outcome in this case.

## SUMMARY OF ARGUMENT

The fair use doctrine is a vital part of the copyright system, ensuring that the exclusive rights of copyright holders do not frustrate the purpose they are constitutionally required to serve: "to Promote the Progress of Science." U.S. Const. art. I, § 8, cl. 8. As the foremost champions of the public interest in the copyright system, libraries rely on fair use for their everyday functions as well as for innovative programs. It is thus vitally important that this Court give due consideration to the impact of its opinion on not only the use immediately before it,

but also the innumerable other uses that libraries may make now or in the future which may differ meaningfully from the instant case.

The district court's determination that the Internet Archive ("IA") was engaged in a "commercial" use for purposes of the first statutory factor is based on a circular argument that seemingly renders every would-be fair use "commercial" so long as the user benefits in some way from their use. This cannot be the law, and in the Second Circuit it is not. The correct standard is clearly stated in *American Geophysical Union v. Texaco Inc.*, 60 F. 3d 913 (2d Cir. 1994), a case the district court ignored entirely.

In deciding the remainder of the issues in this case, this Court should be mindful of the potential impact on the fair use ecosystem for libraries. That ecosystem includes numerous statutory protections for library fair use, a body of case law that is generally favorable to library fair use, a set of library practices shaped in reliance on good faith applications of fair use, and a set of challenges and opportunities that can only be met by libraries with a robust and flexible fair use doctrine at hand.

## ARGUMENT

Fair use is a "built-in First Amendment accommodation[]" in the copyright system because it provides "latitude for scholarship" and other important social

purposes notwithstanding the economic rights of copyright holders. *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003); *Golan v. Holder*, 565 US 302 (2012). In the absence of fair use and related doctrines, the copyright monopoly would risk running afoul of the Constitution's bar on laws impeding freedom of speech, which includes the right to receive information. *Island Trees Sch. Dist. v. Pico by Pico*, 457 U.S. 853, 867 (1982) ("[W]e have held that, in a variety of contexts, 'the Constitution protects the right to receive information and ideas.'") (citing cases). Libraries are champions of fair use, free speech, and freedom of information, and we cannot meet our vital educational and cultural missions without these copyright limitations. To preserve the fair use rights of libraries, this Court should correct the district court's clear error in characterizing IA's use as "commercial" for purposes of the first factor. If the Appellee publishers prevail on the ultimate question of fairness, this Court should carefully limit its reasoning to the facts in this case, preserving library fair use in meaningfully distinct circumstances.

## I.   The district court ignored binding precedent, misread the statute, and misapplied other cases in finding the Internet Archive's uses to be "commercial."

Although we do not reach the question of whether the IA's uses at issue in this case were fair overall, we strongly disagree with the district court's treatment

of the first fair use factor, specifically its mischaracterization of the "commercial-noncommercial distinction" as turning on whether the user benefited from the use in any way without paying a fee. That analysis is inconsistent with Second Circuit precedent, particularly the careful treatment of "commercial" and "profit" in *Texaco*. It is also viciously circular, needlessly tilting this sub-factor against virtually all would-be fair users. Relatedly, the district court's approach all but erases the "non-profit educational" language from the first factor, reducing "commercial…or non-profit educational" to a "commercial-noncommercial" dichotomy.

Commercial uses are not categorically disfavored in the fair use calculus, nor even in the weighing of the first factor, as "the commercial or nonprofit educational purpose of a work is only one element of the first factor enquiry into its purpose and character." *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 584 (1994). By the same token, uses for non-profit, educational purposes are not categorically fair. However, the Supreme Court has explained: "There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use." *Google LLC v. Oracle Am., Inc.,* 141 S. Ct. 1183, 1204 (2021). The outcome of this subfactor matters. And since each fair use case must be treated individually and the factors considered and weighed together in light of the specific context of the use, courts should be careful to give each element of each

factor its due, rather than forcing every element to point in the same direction. Proper application of *Texaco* and the plain text of the statute avoids circularity and restores balance to this part of the first factor analysis, providing the intended basis for generally favorable treatment of libraries and other non-profit, educational users under this subfactor.

### A. Commercial exploitation occurs "when the copier directly and exclusively acquires conspicuous financial rewards" from their use.

In *Texaco*, this Court explained that "[t]he commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to *capture significant revenues* as a *direct consequence* of copying the original work." 60 F.3d at 922 (emphasis added). It went on to characterize "commercial exploitation" as occurring "when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material." *Id.* It contrasted these uses with favored uses that "produce[] a value that benefits the broader public interest." *Id.* The Court concluded that, "The greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair." *Id.* In reaching this

conclusion, the *Texaco* court cited Second Circuit precedents *Rogers v. Koons*, 960 F. 2d 301, 309 (2d Cir 1992) ("The first factor ... asks whether the original was copied in good faith to benefit the public or primarily for the commercial interests of the infringer."), and *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981) (court is to consider "whether the alleged infringing use was primarily for public benefit or for private commercial gain"). This balanced approach to the definition of "commercial" in the Second Circuit was completely ignored by the district court, which did not discuss *Texaco, Rogers,* or *MCA*. This Court should correct the error and stand by its approach in *Texaco*.

### B. Other courts have avoided circularity in determining whether uses were "commercial" under the first factor

Other courts have recognized, as this Court did in *Texaco*, that not every benefit to the user counts as commercial profit for purposes of the first factor analysis. In *Cambridge University Press v. Patton*, 769 F. 3d 1232, 1265 (11th Cir. 2015), the publisher plaintiffs argued that unlicensed use of library book excerpts in courses at Georgia State University were "for-profit" because the university "exploited" the excerpts without "paying the customary price," and that the university "profited" indirectly from student tuition and the avoidance of license fees. The Eleventh Circuit demurred, explaining that

this reasoning is somewhat circular, and hence of limited usefulness to
our fair use inquiry. Of course, any unlicensed use of copyrighted
material profits the user in the sense that the user does not pay a
potential licensing fee, allowing the user to keep his or her money. If
this analysis were persuasive, no use could qualify as "nonprofit"
under the first factor. Moreover, if the use is a fair use, then the
copyright owner is not entitled to charge for the use, and there is no
"customary price" to be paid in the first place.

*Cambridge University Press*, 769 F.3d at 1265. Instead, the Eleventh Circuit
looked to this Court's analysis in *Texaco*, concluding,

There is no evidence that Defendants capture significant revenues as a
direct consequence of copying Plaintiffs' works. At the same time, the
use provides a broader public benefit—furthering the education of
students at a public university. Thus, we find that Defendants' use of
Plaintiffs' works is of the nonprofit educational nature that Congress
intended the fair use defense to allow under certain circumstances.

*Id.* at 1267.

Similarly, in *Am. Soc'y for Testing & Materials v. Public.Resource.Org,
Inc.*, 896 F.3d 437, 449 (D.C. Cir. 2018), the plaintiffs argued that

Public.Resource.Org was engaged in commercial activity because it made copies freely available to the public who were "the same consumer market" as that served by the publishers, and because doing so is "part of [Public.Resource.Org's] fundraising appeal." To the first point, the D.C. Circuit replied that this "takes too broad a view of when a use is commercial rather than nonprofit," and that "[a]lthough PRO's copies of the technical standards may, in some cases, serve as a substitute for the SDOs' versions, little, if anything, in the record indicates that PRO stands to profit from its reproduction." *Id.* To the second point, the court replied that appealing to the public for support in fundraising "hardly rises to the level of making this a 'commercial' use." *Id.*

### C. The district court misread *Harper & Row* and relied on outdated and flawed case law in finding IA's uses to be commercial.

In finding IA's uses in this case to be "commercial," the district court relied on the formulation in *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985), that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." The district court gave this language a broad, metaphorical reading, treating any benefit as "profit" and any price as "customary." This reading ignores the

context in *Harper & Row*: The Nation had argued that the first factor should not weigh against it because its news reporting was "not *purely* commercial." 471 U.S. at 562 (emphasis added). The Supreme Court responded that an admittedly commercial use like The Nation's does not become less commercial because there are other motives mixed in with monetary gain. There is thus no need to read "profit," "exploitation," and "price" in *Harper & Row* in an expansive or metaphorical way; they refer to The Nation's literal profit from literally selling excerpts from the work at issue in a context where magazines have a literal custom of paying.

The district court cited cases similarly stretching the logic of *Harper & Row* such that the activities of academics and religious organizations were deemed to be "commercial" due to "profits" that were purely metaphorical and reputational, ultimately treating any "advantage or benefit" as if it were equivalent to commercial profit in the fair use analysis. ECF No. 188, at 26-27 (citing *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989); *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 61 (1st Cir. 2012); *Penguin Grp. (USA) v. Am. Buddha*, 2015 WL 11170727 at *4 (D. Ariz. May 11, 2015)). The Eleventh Circuit in *Cambridge* considered these cases and,

recognizing their circularity, chose instead to apply the clearer *Texaco* standard, as should this Court.

The district court's analysis also oscillated between the proper outcome of an individual subfactor inquiry and the overall fair use outcome. For example, in support of its finding that "IA's non-profit status and decision not to charge patrons are not dispositive" of the question of commerciality, the district court quoted from this Court's pre-*Texaco* opinion in *Weissman:* "The absence of a dollars and cents profit does not inevitably lead to a finding of fair use." ECF 188 at 26 (quoting 868 F.3d at 1324). The district court's reliance on these limited propositions, however, was excessively broad and result-oriented: aspects of IA's use can be relevant to the question of commerciality without being "dispositive," and non-commerciality can be recognized and weighed in the fair use calculus without "inevitably leading" to a finding of fair use. The district court's anticipated conclusion on fair use seems to drive the outcome of its analysis of this subfactor, an error that derives from errant dicta in *Weissmann* and other cases on which the district court relied. *See Holy Transfiguration*, 689 F.3d at 61 ("removing money from the equation does not, under copyright law, remove liability for transgressing another's works"); *Worldwide Church*, 227 F. 3d at 1117 ("While the fact that a publication is commercial tends to weigh against fair use, the absence of a commercial use merely eliminates the presumption of unfairness").

## II. Libraries and library users are crucial to the copyright ecosystem, and this Court's decision in this case should preserve their fair use rights.

As this Court evaluates IA's arguments in the context of this dispute, it should keep in mind the numerous and diverse library activities that rely on fair use, and the need to maintain flexibility in fair use in order to protect the constitutional purposes of copyright, including in the context of emerging technologies and those that may be invented in the future. This Court should ensure that its reasoning is narrowly focused on the facts before it and avoid pronouncements on library fair use that would reach circumstances beyond those at issue here.[2] A brief survey of the kinds of library and research uses already recognized as fair use in the courts, the kinds of digital uses underway at libraries around the country, and some of the challenges and opportunities libraries anticipate in the coming century shows the importance of fair use to libraries and our users.

---

[2] The district court's reasoning on the scope of its injunction below is a useful model. See ECF No. 216 at 3 ("an injunction covering all in-print books, including those the Publishers have not made available for electronic licensing, risks going 'beyond the scope of the issues tried in the case'").

**A. The Copyright Act, including Section 107, shows the importance of library uses in the copyright system**

Core library activities, including research, teaching, scholarship, and preservation, are crucial elements of the copyright system. The United States' first federal copyright law, the Copyright Act of 1790, was titled, "An Act for the encouragement of learning…" — a phrase copied verbatim from England's Statute of Anne. Located at the heart of the Constitutional prerogative to advance "the Progress of Science and useful Arts," teaching, scholarship, research, and preservation are singled out repeatedly for special treatment in the current Copyright Act. *See* U.S. Const. art. I, § 8, cl. 8; 17 U.S.C. §108 (statutorily authorized noninfringing uses for libraries and archives); § 110(1) and (2) (statutorily authorized noninfringing uses for classroom teaching); § 121 (statutorily authorized noninfringing uses for people who have print disabilities); § 504(c)(2) (limitation on liability for employees of educational institution, library or archives); § 512(f) (special safe harbor from liability for online uses); § 1201(d) (exemption for libraries, archives, and educational institutions from the prohibition on the circumvention of technological protection measures); § 1203(5)(B) (limitation on liability for libraries, archives, and educational institutions); § 1506(aa) (preemptive opt-out by libraries and archives from claims brought before the Copyright Claims Board). In the context of fair use, Congress similarly

identified "teaching", "research", and "scholarship" in the statutory "preamble" as examples of uses that may be found to be fair. 17 U.S.C. § 107. And while it got short shrift in the district court (which treated it as simply synonymous with "non-commercial"), the first fair use factor directs courts to consider "whether such use is…for nonprofit educational purposes." *Id.*

Fair use has always been integral to library uses of copyrighted works. Before Section 108 was created in the Copyright Act of 1976, libraries relied exclusively on common law fair use to preserve their collections, make copies for patrons, and facilitate other traditional library functions. As this Court recognized in *Authors Guild v. HathiTrust*, Section 108 acknowledges the continuing importance of fair use for libraries, as does its legislative history. 755 F.3d at 94 n. 4 ("[W]e do not construe § 108 as foreclosing our analysis of the Libraries' activities under fair use"); 17 U.S.C. § 108(f)(4) (2022) ("Nothing in this section…(4) in any way affects the right of fair use as provided by section 107"); H.R. Rep. No. 94-1476, at 74 (1976) ("No provision of section 108 is intended to take away any rights existing under the fair use doctrine.").

The federal government continues to recognize the importance of copyright limitations and exceptions favoring the socially beneficial work of libraries in the copyright system. For example, in November 2023 it submitted a document to the

World Intellectual Property Organization intended "to encourage Member States to facilitate the public service role of libraries and archives by adopting carefully crafted exceptions and limitations that enable these institutions to carry out their important public missions." Delegation of the U.S. to the WIPO Standing Committee on Copyright and Related Rights, *Updated Version of The Document "Objectives and Principles for Exceptions and Limitations for Libraries and Archives"* SCCR/44/5, at 1 (Nov. 2, 2023). Among the principles stated in this document: "Reasonable exceptions and limitations can and should establish the framework enabling libraries, archives, and museums to supply copies of certain materials to researchers, scholars, and other users, directly or through eligible intermediary institutions, and accessible either on premises or, with effective digital security measures, remotely, under certain appropriate circumstances." *Id*. at 4.[3]

---

[3] *See also* U.S. Copyright Office, *Section 1201 Rulemaking: Eighth Triennial Proceeding to Determine Exemptions to the Prohibition on Circumvention, Recommendation of the Register of Copyrights* (2021) (recommending rules under 17 U.S.C. § 1201 to enable library fair use of collections materials encumbered with technological protection measures, including for teaching, research, and preservation purposes); U.S. Copyright Office, *Copyright and State Sovereign Immunity* at 74 (2021) (acknowledging that libraries "will generally be able to invoke protection from non-meritorious infringement suits under the Copyright Act's exceptions and limitations"); U.S. Copyright Office, *Section 108 of Title 17: A Discussion Document of the Register of Copyrights* (2017) (recommending updates to 17 U.S.C. § 108 to better enable use of copyrighted materials by libraries, archives, and museums); U.S. Dept. of Commerce Internet Policy Task

## B. Courts have recognized fair use in a range of circumstances involving libraries, research, and teaching

Courts have recognized that fair use applies to a wide variety of library and related research and teaching uses. The Supreme Court in *Google v. Oracle* reiterated the centrality of fair use to core activities supported by libraries, insisting (in the context of computer programs) that the fair use analysis "go further" to avoid an approach that might "severely limit" the scope of fair use in favored circumstances such as "for teaching or research." 141 S. Ct. at 1203. The leading case in this area is *Authors Guild, Inc. v. HathiTrust*, 755 F. 3d 87 (2d Cir. 2014), which involved the digitization of millions of books by a group of research libraries in cooperation with Google, and a variety of subsequent uses made by those libraries. This Court found that enabling full-text search, providing accessible format copies to the print disabled, and facilitating preservation were all

---

Force, *White Paper on Remixes, First Sale, and Statutory Damages* (2017) (recognizing importance of first sale doctrine to library lending); U.S. Copyright Office, *Orphan Works and Mass Digitization* (2015) (acknowledging the role of fair use in supporting library use of orphan works and mass digitization programs); U.S. Dept. of Commerce Internet Policy Task Force, *Copyright Policy, Creativity, and Innovation in the Digital Economy* at 20 (2013) (recommending updates to copyright limitations and exceptions as needed to enable library use of digital technologies); US Patent and Trademark Office, *USPTO Position on Fair Use of Copies of NPL Made in Patent Examination* (2012) (recognizing that fair use permits copying of publications in libraries and archives in connection with proceedings relating to "prior art.").

fair uses of this digitized collection. In another lawsuit against Google resulting from the same project, this Court also recognized that text- and data-mining, for example "furnishing statistical information…about the frequency of word and phrase usage over centuries," was a fair use. *Authors Guild v. Google, Inc*., 804 F. 3d 202, 208 (2d Cir. 2015). Libraries have relied on this holding to support text analysis research at the HathiTrust Research Center and elsewhere.

In the *Cambridge University Press* litigation, the court ultimately found that copying excerpts from academic books for use in graduate seminars was a fair use in the vast majority of instances. *Cambridge Univ. Press v. Becker*, 446 F. Supp. 3d 1145 (N.D. Ga. 2020) (on remand) (finding 89 of 99 uses fair). The Eleventh Circuit had held that "Factor one favors fair use where Defendants' use is for a nonprofit educational purpose by a nonprofit educational institution, even though Defendants' use is nontransformative." *Cambridge*, 769 F. 3d at 1267. In determining whether these uses were fair, the district court applied the four statutory factors to the specific circumstances of each use, including the Eleventh Circuit's holding that the fourth factor asks "whether Defendants' use—taking into account the damage that might occur if 'everybody did it'—would cause *substantial* economic harm such that allowing it would frustrate the purposes of copyright by materially impairing Defendants' incentive to publish the work." *Id.* at 1276 (emphasis in original). The Eleventh Circuit had also held that "Where the

evidence shows there is no significant demand for an excerpt, the likelihood of repetitive use is diminished." *Id.* Accordingly, if works were not offered for license, or if evidence showed there was little demand for such licenses, the fourth factor was adjusted in defendants' favor, usually resulting in a finding of fair use.

Given libraries' favored status and conscientious approach to copyright, lawsuits against them are exceedingly rare. However, cases involving other entities have contributed to the body of law supporting library practices. *See, e.g., Sundeman v. Seajay Society, Inc.*, 142 F. 3d 194 (4th Cir. 1998) (fair use permits providing a copy of a complete manuscript to a literary scholar to facilitate her research, and a partial copy to a library for authentication, to avoid damage to the fragile original); *Am. Inst. of Physics v. Schwegman Lundberg & Woessner, P.A.*, No. 12-528, 2013 U.S. Dist. LEXIS 124578 (D. Minn. 2013) (fair use permits copying, storage, distribution, and related use of research articles in connection with patent prosecution); *Swatch Grp. Mgmt. Svces., Inc. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir. 2014) (fair use permits copying and distribution of audio and transcript of corporate earnings call to facilitate news reporting); *White v. West Pub. Corp.*, 29 F. Supp. 3d 396 (S.D.N.Y. 2014) (fair use permits copying, storage, and distribution of legal briefs as part of legal research databases); *Apple Inc. v. Corellium, Inc.*, No. 21-12835, 2023 U.S. App. LEXIS 11225 (11th Cir. 2023)(fair use permits copying, storage, distribution, display, and related uses of mobile

operating system software to facilitate research access and use of that software). This court's decision should leave room for the continued development of fair use through case law.

## C. Libraries rely on fair use for a wide variety of routine and innovative services and projects

Libraries regularly rely on fair use to perform a wide range of completely non-controversial and socially beneficial practices. Libraries make preservation copies of musical, pictorial, graphic or sculptural works, and motion pictures (works excluded from the preservation provisions of Section 108). *See* 17 U.S.C. § 108(i); ARL, *Code of Best Practices in Fair Use for Academic and Research Libraries* 17-18 (2012) ("Code"), https://www.arl.org/wp-content/uploads/2014/01/code-of-best-practices-fair-use.pdf. Libraries archive websites of significant cultural or historical interest. Code at 26. They reproduce selections from collection materials to publicize their activities or to create physical and virtual exhibitions. *Id*. at 15. Academic libraries copy material into institutional digital repositories and make deposited works publicly available. *Id*. at 23. School libraries make multiple copies of appropriate portions of works for classroom use. 17 U.S.C. § 107.

The Library of Congress, where the Copyright Office resides, relies heavily on fair use. For numerous collections, the Library of Congress states that it is providing online access to items "under an assertion of fair use" if "despite extensive research, the Library has been unable to identify" the rightsholder. *See, e.g.*, Library of Congress, *Copyright and Other Restrictions*, Prosperity and Thrift, http://memory.loc.gov/ammem/coolhtml/ccres.html (last visited Dec. 18, 2023). Similar language appears on the copyright pages of dozens of Library collections and items.

The New York Public Library (NYPL) also relies on fair use to make its collections more accessible and useful to the public. For example, NYPL used fair use in digitizing and showcasing its New York World's Fair 1939-1940 Collection, which contains thousands of items donated to the Library by the now-defunct corporation in charge of the event. After a diligent search for copyright holders, the library made its digital World's Fair materials available in a variety of contexts, including through an iPad app that "truly brought not only the New York World's Fair to life…, but provided excellent context into the historical significance of the event." Steve Sande, *NYPL Biblion: World's Fair iPad app a compelling look at yesterday's future*, Engadget, (June 18, 2011), https://www.engadget.com/2011-06-18-nypl-biblion-worlds-fair-ipad-app-a-compelling-look-at-yesterd.html. The "What's on the menu?" portal makes the NYPL Rare Book Division's

"approximately 45,000 menus dating from the 1840s to the present" available online and, increasingly, searchable, thanks to help from volunteers who "transcribe the menus, dish by dish." NYPL, *What's on the menu? - About*, https://menus.nypl.org/about (last visited Dec. 3, 2023). While some of the collection is in the public domain, a substantial portion is in copyright and has been digitized, published, and transformed into searchable data in reliance on fair use.

These are just a few broad categories and specific examples of socially productive fair use common in libraries today. It is crucial that the doctrine remain open-ended and flexible so that libraries can rely on it now and in the future. As we explain below, we can anticipate some of the challenges and opportunities ahead for libraries and we know fair use will be essential to navigating these and other circumstances libraries cannot currently anticipate but nevertheless must be prepared to face.

### D. Libraries need fair use to face important challenges and opportunities in the 21st Century

Digital technology is creating a constellation of challenges and opportunities for libraries that can only be met with the help of robust fair use rights. For example, the U.S. Copyright Office identified orphan works and mass digitization as "two circumstances in which the accomplishment of [copyright's] goal [to

"Promote the Progress of Science"] may be hindered under the current law due to practical obstacles preventing good faith actors from securing permission to make productive uses of copyrighted works." U.S. Copyright Office, *Orphan Works and Mass Digitization* at 1 (2015). Orphan works are works whose copyright owners cannot be identified or located despite diligent efforts, and mass digitization involves uses at a scale that makes seeking permission "essentially impossible." *Id.* As this Court recognized in *Authors Guild v. HathiTrust*, fair use is available to permit mass digitization and the use of orphan works by libraries in appropriate circumstances. 755 F. 3d at 90 (HathiTrust "contains digital copies of more than ten million works"). *See also* ARL, Code at 4; Society Of American Archivists, *Orphan Works: Statement Of Best Practices* (Rev. Jun. 17, 2009), https://www2.archivists.org/groups/intellectual-property-working-group/orphan-works-statement-of-best-practices; Jennifer M. Urban, *How Fair Use Can Help Solve the Orphan Works Problem*, 27 Berkeley Tech. L.J. 1379 (2012); S. Rep. No. 94-473 at 64 (1975) (Comm. Rep.) ("If the work is 'out of print' and unavailable for purchase through normal channels, the user may have more justification for reproducing it" under fair use.).

The challenge of orphan and out-of-print works warrants particular emphasis. As we see in the examples above, many library collections contain works that are not available in the commercial market. Some archival materials

(corporate records and ephemera like the menus in the NYPL collection, for example) were not created for commercial sale and were never available commercially. For works with an initial commercial life, scholars have shown that they typically disappear from the market long before their copyrights expire, due in part to copyright itself as well as to market forces. *See, e.g.,* Phil Salvador, Survey of the Video Game Reissue Market in the United States (1.1) (2023), https://doi.org/10.5281/zenodo.8161056 ("Only 13 percent of classic video games published in the United States are currently in release"); Paul Heald, *How Copyright Keeps Works Disappeared*, 11 J. Empirical Legal Stud. 829, 830 (2014) ("Shortly after works are created and propertized, they tend to disappear from public view only to reappear in significantly increased numbers when they fall into the public domain and lose their owners."); William M. Landes and Richard A. Posner, "Indefinitely Renewable Copyright," 70 U. Chi. L. Rev. 471, 474 (2003)("[O]f 10,027 books published in the United States in 1930, only 174, or 1.7 percent, were still in print in 2001"). Libraries have an important role to play in ensuring that the end of a work's commercial life is not the end of its availability for research, teaching, and private study. If this Court finds that IA's uses are infringing because of the presence of a commercial market for the works at issue in a particular format, it should clearly distinguish this case from circumstances where there is no such market. *See* ECF No. 216 at 3 ("[T]he parties did not brief,

and the Court did not decide, whether the unavailability of digital library licensing would affect the fair-use analysis."). In such circumstances, libraries may rely on fair use to fulfill their role of ensuring continued access to information.

The publication of new works primarily or exclusively in digital formats also creates important challenges for libraries, who must migrate them from fragile and obsolete storage media to more durable ones in order to ensure long-term preservation and access. Not only the physical media, but also the digital file formats in which works are stored become fragile and obsolete over time. *See generally* Donald Waters & John Garrett, *Preserving Digital Information, Report of the Task Force on Archiving of Digital Information* (1996), https://www.clir.org/wp-content/uploads/sites/6/pub63watersgarrett.pdf. Libraries rely on fair use at every step in a typical digital preservation workflow, from cataloging to access. *See, e.g.,* ARL et al., *Code of Best Practices in Fair Use for Software Preservation* (Rev. Feb. 2019), https://www.arl.org/wp-content/uploads/2018/09/2019.2.28-software-preservation-code-revised.pdf.

Artificial intelligence (AI) is changing the way library users find, access, use, and create information. AI tools are often "trained" using in-copyright materials, a use that copyright scholars generally believe qualifies as a fair use. *See* Matthew Sag, *The New Legal Landscape for Text Mining and Machine Learning*,

66 J. Copyr. Soc'y of the USA 291 (2019). Responsible fair use by libraries can help ensure that the functioning of artificial intelligence tools is accessible, equitable, and in the public interest. *See* U.S. Copyright Office, Comments of the Library Copyright Alliance on the Inquiry Concerning Artificial Intelligence and Copyright (October 30, 2023), https://www.librarycopyrightalliance.org/wp-content/uploads/2023/10/CO-AI-NOI-Final.pdf; U.S. Copyright Office, Comments of the University Library of the University of California, Berkeley on Artificial Intelligence Study (October 30, 2023), https://www.regulations.gov/comment/COLC-2023-0006-8194; Amanda Levendowski, *How Copyright Law Can Fix Artificial Intelligence's Implicit Bias Problem*, 93 Wash. L. Rev. 579 (2018).

## III.    Conclusion

The district court erred in finding IA's use to be "commercial" based on reasoning that is inconsistent with *Texaco*, a key precedent the district court ignored. As this Court evaluates the remaining fair use arguments in this case, it should keep in mind the centrality of fair use to a large and growing body of library practices, crafting an opinion that is narrowly tailored to the facts in this case.

Dated: December 22, 2023   Respectfully submitted,

/s/ Brandon C. Butler
Jaszi Butler PLLC
6218 Georgia Avenue NW Ste 1 - 445
Washington DC 20011-5125
brandon@usefairuse.com

*Counsel for amici curiae American Library Association and Association of Research Libraries*

CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 5,701 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type style.

Dated: December 22, 2023          Respectfully submitted,

/s/ Brandon C. Butler
Jaszi Butler PLLC
6218 Georgia Avenue NW Ste 1 - 445
Washington DC 20011-5125
brandon@usefairuse.com

*Counsel for amici curiae American Library Association and Association of Research Libraries*