# 23-1260

IN THE

# United States Court of Appeals
# for the Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS
PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN
RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

– v. –

INTERNET ARCHIVE,

*Defendant-Appellant,*

– v. –

DOES 1-5, inclusive,

*Defendants.*

On Appeal from the United States District Court
for the Southern District of New York
Case No. 1:20-cv-4160, Hon. John G. Koetl

## BRIEF FOR FORMER AND CURRENT LAW LIBRARY DIRECTORS, PROFESSORS, AND ACADEMICS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT

Max Rodriguez
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(646) 290-7509

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE..........................................................1

SUMMARY OF ARGUMENT.............................................................2

ARGUMENT ...................................................................................4

I.    The District Court did not account for fundamentally different uses in its fair use analysis and thus failed to meet the doctrine's requirement of a case-by-case analysis. ..................................................................................4

    A.    The District Court's merger of multiple different uses renders irrelevant the "purpose and character" of use...................................................4

    B.    Each use case requires a different fair use analysis to determine actual impact. .......................................................................................8

    C.    The District Court's Merger of Uses and Failure to Analyze Each Use Individually Harms Libraries .................................................10

II.    The District Court's merging of distinct uses of digitized works broadens the definition of commerciality and changes customary fair uses into unfair commercial uses. ................................................................................11

III.    Narrowing copyright to an economic theory endangers common uses including library activities that achieve copyright's purpose of increasing public access to information...........................................................................14

    A.    Copyright was established to protect the author only insofar as the protection encouraged publication of works for public access. .....................14

    B.    The District Court's decision makes it risky to engage in common uses that are aligned with copyright's purpose but which may have a commercial impact. ....................................................................................18

C.   The District Court's application of economic theory would chill beneficial fair uses and innovations including libraries' efforts to spread knowledge in their communities. ....................................................................20

CONCLUSION .........................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Associated Press v. Meltwater U.S. Holdings, Inc.*,
  931 F. Supp. 2d 537 (S.D.N.Y. 2013) ................................................................14

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ...............................19

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ........................................................13

*Bouchat v. Baltimore Ravens Ltd. Partnership*,
  737 F.3d 932 (4th Cir. 2013) ..............................................................................14

*Cambridge University Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) ..........................................................................19

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...................................2, 9

*Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) ......................................................8, 9

*Cariou v. Prince*, 784 F. Supp. 2d 337 (S.D.N.Y. 2011) ...........................................8

*Hachette Book Grp., Inc. v. Internet Archive*,
  2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023) ...............................................11, 12

*Harper & Row Publishing, Inc. v. Nation Enterprises*,
  471 U.S. 539 (1985) .............................................................................................8

*Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986) ...............................13

*Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18 (1st Cir. 2000) .........................13

*O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112 (S.D.N.Y. 2021) .................................14

*Sony Computer Entertainment America, Inc. v. Bleem, LLC*, 214 F.3d 1022 (9th
  Cir. 2000) ...........................................................................................................13

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984) ...........................................................................................19

**Statutes**

17 U.S.C. § 108 .......................................................................................................19

17 U.S.C. § 109 ...................................................................................19

17 U.S.C. § 121 ...................................................................................19

**<u>Other Authorities</u>**

Alfred C. Yen, *Restoring the Natural Law: Copyright As Labor and Possession*, 51 OHIO ST. L.J. 517 (1990)...................................................................17

Copyright Enactments: Laws Passed in the United States Since 1783 Relating to Copyright, at 1, Copyright Office Bulletin No. 3 (rev.) (1963)...........................16

Daniel A. Gross, *The Surprisingly Big Business of Library E-Books,* NEW YORKER (Sept. 21, 2021) .............................................................21

David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books* (2018).........................................................11

Dotan Oliar, *Making Sense of the Intellectual Property Clause: Promotion of Progress As A Limitation on Congress's Intellectual Property Power*, 94 GEO. L.J. 1771 (2006) ...................................................................17

Douglas L. Rogers, *Increasing Access to Knowledge Through Fair Use-Analyzing the Google Litigation to Unleash Developing Countries,* 10 TUL. J. TECH. & INTELL. PROP. 1 (2007).........................................22

Edward C. Walterscheid, *Conforming the General Welfare Clause and the Intellectual Property Clause*, 13 HARV. J.L. & TECH. 87 (1999)......................17

Ernestine Rose, *The Public Library in American Life* (1954).................................7

H.R. Rep. No. 94–1476 (1976) ..............................................................18

Jack Schofield, *Amazon Caves to Authors Guild over Kindle's Text-to-Speech Reading*, Guardian (Mar. 1, 2009).....................................................20

Jeanne C. Fromer, *The Intellectual Property Clause's External Limitations*, 61 DUKE L.J. 1329 (2012).................................................................17

Letter from Joel Barlow to the Continental Congress (1783), *Primary Sources On Copyright (1450-1900)* (Lionel Bently & Martin Kretschmer eds.)....................15

Michelle M. Wu, *Defeating the Economic Theory of Copyright: How the Natural Right to Seek Knowledge is the Only Theory Able to Explain the Entirety of Copyright's Balance,* 64 IDEA 1 (forthcoming 2024) ..........................................17

Phillip Wittenberg, *The Protection of Literary Property* (Writer, Inc. rev. ed. 1978) ...................................................................................16

Press Release, Urban Libraries Council, North American Elected Officials Send Message to E-Book Publishers: Price Gouging Public Libraries Is Unacceptable (Nov. 6, 2019) ......................................................................................................22

Robert Spoo, *Without Copyrights: Piracy, Publishing, and the Public Domain* (2013)............................................................................15

Sarah Lamdan, Jason M. Schultz, Michael Weinberg, & Claire Woodcock, New York Univ. Sch. of Law Engelberg Ctr. on Law and Pol'y, *The Anti-Ownership Ebook Economy* (July 2023) ................................................................................23

Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005*, 156 U. PA. L. REV. 549 (2008) ........................21

## Rules

Fed. R. App. P. 29 .....................................................................................................1

## Treatises

1 William F. Patry, *Copyright Law and Practice* 21 (1994)...................................16

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2023) ...................6

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 8 ...................................................................................16

**INTEREST OF AMICUS CURIAE**[1]

*Amici curiae* are the law library directors, professors, librarians, and graduate students identified in Addendum A. *Amici* include librarians who have practical experience and expertise with every library function, including but not limited to interlibrary loan, cataloguing, reference, and systems administration. They have a deep understanding of carrying out these functions to fulfill libraries' public purpose to acquire, preserve, and provide community access to content while balancing and respecting copyright.

*Amici* also value controlled digital lending (CDL) as a tool to accomplish libraries' public purpose. *Amici* as well as libraries, library patrons, readers, and countless others who benefit from libraries may be significantly impacted by this Court's decision in this case.

*Amici's* shared mission to make authors' works accessible to the public depends on the fundamental copyright principles of fair use. *Amici* respectfully submit that the District Court did not conduct the necessary work-by-work analysis in its fair use determination against the Defendant-Appellant Internet Archive

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), counsel for the parties have not authored this brief. The parties and counsel for the parties have not contributed money that was intended to fund preparing or submitting the brief. No person —other than the amicus curiae and their counsel — made financial contributions that were intended to fund preparing or submitting this brief.

("IA"), and also emphasized economic considerations to the exclusion of copyright's public purpose. If affirmed,[2] its decision may widely render CDL and many other common library practices as potential copyright violations.

*Amici* submit this brief in their individual capacity only and not on behalf of any institution with which they are affiliated.

## SUMMARY OF ARGUMENT

The Copyright Act and libraries have a shared purpose: to spread knowledge to the public. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 574 (1994) (noting the purpose of copyright is "[t]o promote the Progress of Science and useful Arts"). Libraries rely on balanced, careful application of the fair use balancing test to achieve that purpose. *Amici* respectfully submit that the District Court's decision collapsed copyright law's multi-part fair-use balancing test into a theory focused primarily on economics. *Amici* further respectfully submit that the District Court's fair-use analysis was broadly applied to Internet Archive's (IA) activities without distinguishing between the many different types of uses of digitized materials at issue in this case.

---

[2] Or, in the alternative, if affirmed without clarification and analysis appropriately engaging in the work-by-work analysis.

The result in this case and the implication for future ones is that not only libraries' various CDL programs but also their other longstanding, customarily permitted activities to distribute knowledge to the public could be considered commercial activities that violate copyright. A library offering standard services to connect the public to authors' works, such as public read-aloud hours, while also conducting usual non-profit activities such as inviting donations through its website could suddenly be targeted for copyright infringement.

In support of the IA, *amici* respectfully submit that this Court should vacate and remand so: (1) the District Court can separately analyze each of the actual uses of the works at issue in this case under the fair use balancing test and carefully restrict their analysis and holding to those actual uses; and (2) the District Court can appropriately weigh access to knowledge and public interest in the fair use balancing test.[3]

*Amici* address three points to help the Court's consideration of this case. *First*, the District Court did not conduct the required work-by-work analysis to determine fair use and failed to account for and appropriately distinguish multiple

---

[3] Again, should this Court decide not to vacate and remand, at minimum *amici* respectfully submit this Court should reject the District Court's flawed analysis and evaluate each work individually considering all the balancing-test factors as a part of its *de novo* review.

distinct uses of digitized materials which have differing methods, purposes, and impact. *Second*, the District Court's analysis drastically expands the definition of commerciality in the fair use balancing test. This expansion will chill many previously legitimate fair uses including by libraries as part of their mission to spread knowledge to the public. *Third*, this expansion of commerciality overrides the purpose of the initial Copyright Act to promote the spread of knowledge. It also counters the Copyright Act's text and Congress' intention to broadly define fair use to require it to be determined based on each use's particular circumstances.

## ARGUMENT

I. **The District Court did not account for fundamentally different uses in its fair use analysis and thus failed to meet the doctrine's requirement of a case-by-case analysis.**

A. **The District Court's merger of multiple different uses renders irrelevant the "purpose and character" of use.**

The district court inappropriately merged over a dozen different uses of copyrighted material found in this case into one fair use analysis, despite differing facts, purposes, and impact. This merger oversimplifies the analysis, resulting in a single conclusion that is not only overly broad, but also contrary to the bedrock principle that alleged violations of fair use must be analyzed on a case-by-case basis.

To illustrate how the district court merged multiple uses and thus failed to properly analyze each in turn, consider the following three uses in this case which appear superficially similar:

Use Case 1: Digital Copy Used in Place of Physical Copy, with Digital Rights Management ("DRM"). Where (1) a digital copy is made of a physical copy and (2) that digital copy is used in place of the physical copy. In this use case, DRM controls are used with respect to the digital copy and the number of copies in use at any given time remains equal to the original number of physical copies owned. This use is where either IA or one of its partner libraries owned a copy of a book, did not make that book available in print form to its patrons to check out, but circulated a digital equivalent instead. Even where multiple copies of a title circulate simultaneously, the first of those to circulate would always be Use Case 1. Since no more copies are used than are legitimately acquired, this use is fair.

Use Case 2: Digital Copy and Physical Copy Both Available to Be Used, with DRM. Where (1) a digital copy is made to correspond with a physical copy, and (2) both the digital copy and the physical copy may circulate simultaneously. In this use case, DRM controls are used with respect to the digital copy and the maximum number of copies in use at any given time is two times the original number of copies owned (i.e., the print copy and the digital equivalent). This use would occur if IA — as an example — had a partner library that kept their owned

physical copy on open shelves while its digital equivalent was also available for circulation on IA's platform. Use Case 2 could be fair use or infringement depending on the case-by-case and use-by-use circumstances.

Use Case 3: Multiple Digital Copies Available to Be Used Simultaneously, with DRM. Where (1) one or more new digital copies are made of a pre-existing digital copy, and (2) all new digital copies may circulate simultaneously even though there are no corresponding owned print copies. In this use case, DRM controls are applied with respect to all digital copies. These digital copies do not correspond to any print copy owned either by IA or any of its partner libraries. This use case may add one or more new digital copies to the market, with no limitations on the simultaneous circulations of new digital copies. Use Case 3 could be fair use or infringement depending on the case-by-case and use-by-use circumstances.

Although Use Cases 1 through 3 appear similar in that a new digital copy or copies are being made, the analysis of each under fair use would, in fact, be quite different. For example, Use Case 1 (Digital Copy Used in Place of Physical Copy) adds no new copy to the market, it simply creates a replacement copy in a different format. Copyright law protects the work, however, not the format. *See* Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.03 (2023). The same number of simultaneous uses are possible both before and after the digital copy is made.

By merging all these uses, the District Court's reasoning functionally jettisoned factor one in the fair use test when it comes to non-transformative uses. Without considering the purpose of the use, all that was left according to this logic was whether the use brings a commercial benefit to the user. But this approach is boundless. After all, every fair use has a commercial benefit as defined by the District Court, in that it always saves the user the costs of paying the copyright owner for the right to reproduce and/or distribute.

The District Court did not distinguish between a replacement copy and an extra copy, despite their objectively different purposes and impacts. And it fails to recognize that libraries — including IA — have a unique and important role in society in how they use copyrighted works, a role without which information access would be restricted to the wealthy or powerful and would make verification of historical fact inaccessible to future generations.

Over centuries, libraries' special role and use of copyrighted works was what allowed them to meet changing societal needs and offer meaningful assistance to disadvantaged populations, whether soldiers abroad, immigrants, the poor, or the elderly and home-bound. *See* Ernestine Rose, *The Public Library in American Life* (1954). Context and purpose matter when assessing alleged infringement, and the fair use test strikes that balance. The District Court's approach, if affirmed, would substantially upset that balance.

As fair use cannot be reasonably assessed without considering the purpose and character of use, each of the uses above deserve independent consideration. Further, in the case of library use, libraries' public responsibilities must be considered in the examination of purpose. No other entity has the same public obligations, and therefore, a library's identity is indispensable to a meaningful factor one analysis.

**B.    Each use case requires a different fair use analysis to determine actual impact.**

Every fair use analysis must be case and fact-specific. *Harper & Row Publishing, Inc. v. Nation Enterprises*, 471 U.S. 539, 595, n.19 (1985) ("The broad language adopting the common-law approach to fair use is best understood as an endorsement of the essential fact-specificity and case-by-case methodology of the common law of fair use."). Because of the requirement that it be fact-specific, a fair use inquiry must examine each allegedly infringing work independently. For example, in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), this Court was presented with thirty paintings that allegedly infringed on a photographer's work. In that case, the district court had conducted a broad fair use analysis of all the works at issue and delivered a sweeping decision that found them all to be infringing. *See Cariou v. Prince*, 784 F. Supp. 2d 337 (S.D.N.Y. 2011), *rev'd in part vacated in part*. In reviewing the lower court's ruling, this Court "observ[ed]"

each of the works and "look[ed] at the artworks and the photographs side-by-side" and found that all but five of them were entitled to protection under fair use. *Cariou*, 714 F.3d at 706-708.

This case involved 127 works at issue whose copyrights had allegedly been infringed. But the District Court, much like the lower court in *Cariou*, failed to parse out the facts and circumstances of each and instead treated all 127 identically for purposes of its fair use analysis. In doing so, the District Court converted fair use's equitable doctrine into a bright-line rule. *See Campbell*, 510 U.S. at 577 ("The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis."). The District Court's non-fact-specific analysis of the uses for each of the 127 works is not only unprecedented but also creates confusion for users, creators, and libraries. That confusion is multiplied in this era of exponential technological advancement and innovation.

As outlined in section I.A., there can be subtle but factually important differences in types of uses. Accordingly, it is possible that each of the 127 works named in the suit could have been impacted differently. For example, if a partner library owned a physical copy of a book that had not been checked out for years but saw increased circulation after creating a digital copy of that book and taking the physical book out of circulation (Use Case 1), it could be argued that the

impact for that book was, in fact, net positive. The earlier lack of use would have eliminated any reason for the owning library to acquire another copy in any format and the new use exposes more people to the book and author. If heavy demand grows from such exposure, this could incentivize the library to acquire additional copies.

The impact on such a book would differ from other books that were in use in print but became simultaneously usable online (Use Cases 2 and 3). Even there, the actual impact differs between those that were used simultaneously in numbers exceeding the number owned, and those where simultaneous use was possible but never exercised (i.e., where circulation records show that only one copy of the book, in either format, was ever checked out at a time). And those impacts further differ from books which may have been checked out in error or consulted briefly for a page citation and returned immediately. One cannot reliably measure impact or potential impact for these 127 books without looking at the actual uses and surrounding circumstances related to each title.

## C. The District Court's Merger of Uses and Failure to Analyze Each Use Individually Harms Libraries

In order to fulfill their missions, many libraries engage only in Use Case 1 (Digital Copy Used in Place of Physical Copy), though each library has its own

implementation of this style of lending and associated safety mechanisms.[4] Use Case 1 is fundamentally distinct from all other uses. Libraries, including IA, carry the societal responsibilities of collecting, sharing, and preserving information for the public, and they require clarity to carry out that mission.  If every use of an unlicensed digitized work is lumped together, despite distinct design differences and impacts, fair use itself loses meaning. Applying the District Court's analysis, a doctrine intended to apply case-by-case analysis instead turns into a generic tool for any use that looks superficially like any other.

II.     **The District Court's merging of distinct uses of digitized works broadens the definition of commerciality and changes customary fair uses into unfair commercial uses.**

By not distinguishing the various types of uses described in section I.A. and weighing their economic rewards and public benefits before concluding that "[t]he commercial-noncommercial distinction… favors the Publishers[]" the District Court appears to say an organization engages in commercial activity if it gains any donations, visibility, or positive press while also using a copyrighted work in a manner not explicitly permitted by the statute or past case. *Hachette Book Grp., Inc. v. Internet Archive*, 2023 WL 2623787, at *9 (S.D.N.Y. Mar. 24, 2023). The

---

[4] *See generally* David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books*, *available at* controlleddigitallending.org/whitepaper (2018).

District Court's conclusion that IA's use of "its Website to attract new members, solicit donations, and bolster its standing in the library community" is commercial activity makes it difficult to identify any uses by any organization that are not commercial. *Id.* at *9. Most nonprofits maintain a public presence, such as a website, and accept donations.

For example, under this broadened definition, public libraries could face copyright infringement claims for displaying a sign inviting Friends of Library memberships during a story hour event where a book is read aloud (public performance). Academic libraries' activities to preserve materials and make them accessible to patrons, such as digitizing materials not in the public domain (e.g., making handwritten materials available for crowd-sourcing transcription) or placing an interlibrary-loaned copy of an article on course reserves, could also put them at risk of liability for infringement, as long as they have a "donate" button on their website. The digitizing and posting of handwritten notes for crowd-sourced transcription (reproduction, distribution, and derivative work) makes the underlying work more usable, allowing it to become searchable and therefore discoverable. Using an interlibrary-loaned copy for course reserves (distribution) uses a copy of an item not owned by the library but legitimately made under § 108 to support classwork.

In contrast to the District Court's analysis, this Court has held that the commerciality factor is primarily concerned with the unfairness that arises when an infringing user "capture[s] significant revenues as a direct consequence of copying the original work." *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) (quoting *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)); *see also Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262 (2d Cir. 1986) (explaining that "[t]he commercial nature of a use is a matter of degree, not an absolute" in finding that "the educational elements...far outweigh the commercial aspects of the book" and holding that copying of interviews in a book was fair use).

Other Circuits also carefully analyze the link between use of copyrighted material and financial reward[5] and some have found it too attenuated. For example, the Fourth Circuit found that use of a logo in a football team's lobby display about

---

[5] *See, e.g.*, *Sony Computer Entertainment America, Inc. v. Bleem, LLC*, 214 F.3d 1022, 1027 (9th Cir. 2000) (holding that a software developer's use of a screenshot of competitor's games in comparative advertising with respect to the balancing test's first factor likely was fair use even though the developer was using it to increase sales because comparative advertising "redounds greatly to the purchasing public's benefit with very little corresponding loss to the integrity of...copyrighted material" *id*.); *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000) (pointing out that "[f]or a commercial use to weigh heavily against a finding of fair use, it must involve more than simply publication in a profit-making venture" before agreeing with the lower court that photographs at issue were not used just as "an ordinary part of a profit-making venture, but with emphasis in an attempt to increase its revenue").

the city's football history was "simply not the type of commercial use frowned upon by § 107" because it was incidental rather than exploitative. *Bouchat v. Baltimore Ravens Ltd. Partnership*, 737 F.3d 932, 948 (4th Cir. 2013).

The District Court's own prior holdings also require a direct link between the infringing use and financial benefit.[6] This District Court's expansion of commerciality in this case threatens core, customary library practices that spread knowledge to the public such as reading books aloud and creating promotional materials for read-alongs.

**III.  Narrowing copyright to an economic theory endangers common uses including library activities that achieve copyright's purpose of increasing public access to information.**

**A.  Copyright was established to protect the author only insofar as the protection encouraged publication of works for public access.**

Early state and federal government actors were concerned that without copyright the public would not have access to authors' writings. As one influential

---

[6] *See, e.g.*, *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 553 (S.D.N.Y. 2013) (requiring "careful exploration of the link between the defendant's precise use of the copyrightable elements of the plaintiff's work and the defendant's financial gain"); *O'Neil v. Ratajkowski*, 563 F. Supp. 3d 112, 130 (S.D.N.Y. 2021) (noting defendant did not "directly and exclusively acquire[ ] conspicuous financial rewards from [her] use of the copyrighted material").

author, Joel Barlow, described in his 1783 letter to the President of the Continental Congress:

> If the passing of statutes similar to this [the 1710 British Statute of Anne] were recommended by Congress to the several States, the measure would be undoubtedly adopted, & the consequences would be extensively happy upon the spirit of the nation, by giving a laudable direction to that enterprising ardor of genius which is natural to our stage of society, & for which the Americans are remarkable. Indeed we are not to expect to see any works of considerable magnitude, (which must always be works of time & labor), offered to the Public till such security be given. There is now a Gentleman in Massachusetts who has written an Epic Poem, entitled "The Conquest of Canaan", a work of great merit, & will certainly be an honor to his country. It has lain by him, finished, these six years, without seeing the light; because the Author cannot risque the expences of the publication, sensible that some ungenerous Printer will immediately sieze upon his labors, by making a mean & cheap improvision, in order to undersell the Author & defraud him of his property.[7]

Piracy by publishers was common at that time and authors were reluctant to release their books to the public without protection against it.[8] This undermined the public interest in encouraging the release of new works for public consumption and in establishing the new nation's literary reputation.

---

[7] Letter from Joel Barlow to the Continental Congress (1783), *Primary Sources On Copyright (1450-1900)* (Lionel Bently & Martin Kretschmer eds.), https://www.copyrighthistory.org/cam/tools/request/showRecord.php?id=record_us_1783b (reproducing original source from The National Archives, Center for Legislative Archives: Papers of the Continental Congress, RG 360.4, 369-373 (No. 78)).

[8] Robert Spoo, *Without Copyrights: Piracy, Publishing, and the Public Domain* (2013) (detailing the scope of print piracy in early American history).

These concerns persuaded the Continental Congress to recommend that states "secure to authors or publishers of any new books not hitherto printed . . . the copy right of such books for a certain time . . ."[9] All states but Delaware followed the recommendation.[10] Most of these states included statutory preambles identifying the public purposes of copyright. 1 William F. Patry, *Copyright Law and Practice* 21 (1994). For example, New Hampshire law states:

> As the improvement of knowledge, the progress of civilization, and the advancement of human happiness, greatly depend on the efforts of ingenious persons in the various arts and sciences; as the principal encouragement such persons can have to make great and beneficial exertions of this nature, must consist in the legal security of the fruits of their study and industry to themselves; and as such security is one of the natural rights of all men, there being no property more peculiarly a man's own than that which is produced by the labour of his mind: Therefore, to encourage the publication of literary productions, honorary and beneficial to the public. . . .

*Id.* (citing Copyright Enactments: Laws Passed in the United States Since 1783 Relating to Copyright, at 8, Copyright Office Bulletin No. 3 (rev.) (1963)).

The federal Constitution's Copyright Clause likewise reflects a societal purpose. U.S. Const. art. I, § 8, cl. 8. Several phrasings without the public purpose

---

[9] Copyright Enactments: Laws Passed in the United States Since 1783 Relating to Copyright, at 1, Copyright Office Bulletin No. 3 (rev.) (1963).

[10] Phillip Wittenberg, *The Protection of Literary Property* 33 (Writer, Inc. rev. ed. 1978).

were proposed but not adopted.[11] The Clause's goal was the spread of knowledge. It sanctioned monopoly merely as a means to achieve that end.[12]

The early state and federal governments intended copyright law to foster a fair environment for books to reach the public, not to protect private profit. The rights granted to authors were based in natural law notions of equity and were intended to give authors an effective weapon against unjust enrichment. This protection ensured the release of information to the public. The opportunity to make money was a by-product and not the primary justification for the state-authorized monopolies created by early copyright statutes.[13]

The District Court's broad definition of commerciality and emphasis on market harm also ignores Congress' intention to retain the equitable aspect of fair use in Section 107. In its report to the House shortly before the 1976 legislation

---

[11] Edward C. Walterscheid, *Conforming the General Welfare Clause and the Intellectual Property Clause*, 13 HARV. J.L. & TECH. 87, 91-92 (1999); Dotan Oliar, *Making Sense of the Intellectual Property Clause: Promotion of Progress As A Limitation on Congress's Intellectual Property Power*, 94 GEO. L.J. 1771, 1776-7 (2006); Jeanne C. Fromer, *The Intellectual Property Clause's External Limitations*, 61 DUKE L.J. 1329, 1345-46 (2012).

[12] Alfred C. Yen, *Restoring the Natural Law: Copyright As Labor and Possession*, 51 OHIO ST. L.J. 517, 528-9 (1990).

[13] *See generally* Michelle M. Wu, *Defeating the Economic Theory of Copyright: How the Natural Right to Seek Knowledge is the Only Theory Able to Explain the Entirety of Copyright's Balance,* 64 IDEA 1 (forthcoming 2024).

codifying fair use passed in that chamber and was sent to Conference Committee, the Judiciary Committee stated:

> The statement of the fair use doctrine in section 107 offers some guidance to users in determining when the principles of the doctrine apply. However, the endless variety of situations and combinations of circumstances that can rise in particular cases precludes the formulation of exact rules in the statute. The bill endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change. Beyond a very broad statutory explanation of what fair use is and some of the criteria applicable to it, the courts must be free to adapt the doctrine to particular situations on a case-by-case basis. Section 107 is intended to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way.

H.R. Rep. No. 94–1476, at 65-66 (1976). The scope of the public's right to access copyrighted information cannot be reduced to market or profit criteria but rather rests on basic fairness principles examined in a balancing analysis.

**B.     The District Court's decision makes it risky to engage in common uses that are aligned with copyright's purpose but which may have a commercial impact.**

Copyright in the real world illustrates that it cannot be solely or even primarily about economics. Works protected by copyright for non-commercial purposes, such as personal pictures, journal entries, fan art, term papers, emails, and blogs, overwhelmingly outnumber the ones created for commercial use. Statutory provisions also explicitly permit many uses that potentially impact sales,

such as resale, donation, lending, and provisions to help the print disabled. *See* 17 U.S.C. §§ 108-109, 121.

An economic theory cannot explain why daily, non-transformative uses are generally tolerated even when they potentially have a market impact, for example mixtapes and lending a DVD recording to a friend. Courts have condoned forms of non-transformative recordings of copyrighted work via a recording device. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 443 (1984). In *Authors Guild, Inc. v. HathiTrust*, the court held that making copyrighted information in digital formats accessible to disabled people was not transformative. 755 F.3d 87, 101-102 (2d Cir. 2014). However, when all four factors were balanced the court found that the digitization of the resources was fair use. *Id.* at 103. Similarly, in *Cambridge University Press v. Patton*, the scanning of copyrighted educational materials for course reserves was found to be non-transformative. However, the educational purpose of the content was enough to tip the balancing test in favor of fair use. 769 F.3d 1232, 126 (11th Cir. 2014). Economic theory is not the primary consideration in the vast majority of everyday copyright uses and is ignored altogether in many. Accordingly, it cannot be the linchpin of fair-use analysis, as the District Court used it.

### C. The District Court's application of economic theory would chill beneficial fair uses and innovations including libraries' efforts to spread knowledge in their communities.

Applying economic theory to fair use chills socially beneficial uses of works even though the author has arguably received fair compensation for their work. Technological advancements have made works more accessible to users in unique and novel ways, but the threat of litigation has stifled progress. For example, a cease-and-desist letter from the Author's Guild prompted Amazon to give authors and publishers the ability to disable text-to-speech features on Kindle e-books.[14] An economic theory of fair use would similarly incentivize copyright holders to attack auto translation as an illegitimate use even where there is not yet any translation for purchase, as translation is also a paradigmatic derivative work. These narrow economic concerns give rise to much more sweeping and significant concerns about harming accessibility and adaptability.

Viewing copyright solely through an economic lens would force libraries to repurchase content they already have acquired rather than spend those funds on

---

[14] Jack Schofield, *Amazon Caves to Authors Guild over Kindle's Text-to-Speech Reading*, Guardian (Mar. 1, 2009), https://www.theguardian.com/technology/blog/2009/mar/01/authors-guild-blocks-kindle-voice.

additional new content for their communities.[15] Neither the public nor authors, both of whom are the intended beneficiaries of copyright, benefit from libraries spending public or community funds on the same content repeatedly instead of acquiring new content. The logical consequence is that the public has access to fewer authors and works, fewer authors get wide exposure, and fewer works are preserved for future generations.

Viewing copyright practice through the capacious lens of the natural right to knowledge rather than the narrow lens of economic theory explains how it balances the right to receive fair payment for knowledge and the right to use knowledge. Society will not tolerate a commercial actor profiting from a work without compensating the creator, but it treats reasonable use (e.g., serenades, picnickers playing music in a public park, singing a song at a local talent show) as non-infringing. These activities are natural outgrowths of consumption and use.[16]

---

[15] Daniel A. Gross, *The Surprisingly Big Business of Library E-Books,* NEW YORKER (Sept. 21, 2021), https://www.newyorker.com/news/annals-of-communications/an-app-called-libby-and-the-surprisingly-big-business-of-library-e-books (describing how and why e-books cost libraries more than hard copy books).

[16] *See* Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005*, 156 U. PA. L. REV. 549, 602 (2008) (describing study's conclusion that defendants' use of copyrighted material for noncommercial purposes significantly influenced federal courts' findings of fair use).

Permitting everyday use supports the spread of knowledge[17] and does not implicate the unjust enrichment principles that underlie copyright. So long as a library simultaneously uses only the same number of copies it has legitimately acquired, it has met the bargain intended by copyright. The author has received just payment for the number of copies of the work in use. The format of use is irrelevant.

## CONCLUSION

The District Court's undifferentiated application of the fair use balancing test to many varied uses of digitized works and its resulting broad determination that IA's activities are commercial threatens to turn not just controlled digital lending but also everyday library activities into potential copyright violations. The decision potentially deprives the public, the ultimate intended beneficiaries of copyright, of the equitable right to reasonably use legitimately acquired content[18]

---

[17] *See* Douglas L. Rogers, *Increasing Access to Knowledge Through Fair Use-Analyzing the Google Litigation to Unleash Developing Countries,* 10 TUL. J. TECH. & INTELL. PROP. 1 (2007) (explaining how the Supreme Court's decisions in *Campbell* and *Sony* found fair use in support of boosting access to works).

[18] Press Release, Urban Libraries Council, North American Elected Officials Send Message to E-Book Publishers: Price Gouging Public Libraries Is Unacceptable (Nov. 6, 2019), https://www.urbanlibraries.org/newsroom/north-american-elected-officials-send-message-to-e-book-publishers-price-gouging-public-libraries-is-unacceptable.

and inhibits the normal use of content.[19]

A library buys a book to lend it. It is a reasonable use to lend the same number of copies of the book as purchased. Closing the door to reasonable use of information legitimately acquired increases information inequity, an outcome contrary to copyright's intended role in furthering societal access to information.

Dated: December 22, 2023
New York, NY

Respectfully submitted,

**POLLOCK COHEN LLP**

By:    */s/ Max Rodriguez*

Max Rodriguez
111 Broadway, Suite 1804
New York, NY 10006
Tel: (646) 290-7509
Max@pollockcohen.com

*Counsel for Amici Curiae*

---

[19] Sarah Lamdan, Jason M. Schultz, Michael Weinberg, & Claire Woodcock, New York Univ. Sch. of Law Engelberg Ctr. on Law and Pol'y, *The Anti-Ownership Ebook Economy* (July 2023), https://www.nyuengelberg.org/files/the-anti-ownership-ebook-economy.pdf.

## ADDENDUM A – LIST OF AMICI CURIAE[20]

Beth Adelman
Director of the Law Library
University at Buffalo School of Law

Kristina J. Alayan
Associate Dean for Library & Technology
University of Maryland Francis King Carey School of Law

Filippa Marullo Anzalone
Associate Dean for Library & Technology Services, Professor of Law
Boston College Law School

Jamie Baker
Associate Dean & Law Library Director, Professor of Law
Texas Tech University School of Law

Brian Barnes
Law Library Director & Associate Professor
Loyola University New Orleans College of Law

Aaron HC Black
Graduate Student, University of Washington

Kincaid C. Brown
Director of the Law Library
University of Michigan Law School

Rob Brownell
Law Librarian, University of Houston Law Center

Devin A. Cheema
Graduate Student, University of Washington

---

[20] Institutions are listed for identification purposes only. All individual signatories are participating in their individual capacity, not on behalf of their institutions.

Scott Childs
Associate Dean for Library & Technology Services
University of Tennessee College of Law

Joseph A. Custer, JD, MLS, MBA
Law Professor, Director Law Library
Case Western Reserve University School of Law

Susan deMaine
Law Library Director and Senior Lecturer
Indiana University Maurer School of Law

Casey D. Duncan
Associate Dean for Legal Information Services
The University of Alabama School of Law, Bounds Law Library

Amy A. Emerson
Assistant Dean for Library and Information Services & Associate Professor of Law
Villanova University School of Law

Kristin Glover
Law Librarian, University of Washington

Rick Goheen
Assistant Dean and Law Librarian
University of Toledo College of Law

Lisa A. Goodman
Executive Professor and Law Library Director
Dee J. Kelly Law Library, Texas A&M University School of Law

Stephanie L. Grace
Graduate Student, University of Washington

Phillip Gragg
Professor of Law, Associate Dean for Library and Information Services
California Western School of Law

Deborah L. Heller
Assistant Dean of the Law Library & Adjunct Professor of Law
Elisabeth Haub School of Law at Pace University

Ulysses N. Jaen
Director & Professor, Ave Maria School of Law

Bethany Mills Jennings
Associate Professor & Legal Information Center Director
Delaware Law School – Widener University.

Billie Jo Kaufman
Law Library Director & Professor of Law

Julie Kimbrough
Interim Director of the Law Library
University of North Carolina School of Law

Melanie Oberlin Knapp
Academic law library director

Michelle LaLonde
Law Library Director and Professor of Law, Wayne State University Libraries

Jane M. Larrington
Law Library Director & Professor of Law, University of Oregon School of Law

Faith Lee
Law Librarian, University of Denver, Sturm College of Law

Richard Leiter
Director of the Law Library & Professor of Law
University of Nebraska College of Law

Pearl McCrea-Welle
Law Librarian, University of Washington

Todd G.E. Melnick
Director, Law Library and Clinical Associate Professor of Law
Fordham University School of Law

Michele C. Meske
Graduate Student, University of Washington

Teresa M. Miguel-Stearns
Associate Dean, Professor of Law, and Director of the Law Library
University of Arizona

Dana Neacsu
Director, Duquesne Kline Law Library| Associate Professor of Legal Skills
Duquesne University School of Law

Kelsey N Nickerson
Graduate Student, University of Washington

Christine Park
Law Librarian, University of Washington

Nichelle Perry
Law Library Director

Brittany Persson
Director of the Library
Brooklyn Law School

Adeen Postar
Library Director and Professor of Practice
AU Washington College of Law

Larry R. Reeves
Associate Dean and Director of the Law Library, Professor of Law
Vanderbilt Law School

Amanda Runyon
Associate Dean and Director of the Biddle Law Library
University of Pennsylvania Carey Law School

Courtney Selby
Associate Dean for Library Services and Professor of Legal Research
St. John's University School of Law

Vicki Szymczak
Law Library Director and Professor of Law
University of Hawaii School of Law

Robert Truman
Paul L. Boley Law Library, Lewis & Clark Law School

Carla Wale
Associate Dean for Information & Technology, Director of Gallagher Law Library,
Director of the MLIS Law Librarianship Program,
Associate Teaching Professor of Law & Information
University of Washington School of Law & Information School

Amanda Watson
Director of the Law Library, Assistant Professor of Law
University of Houston Law Center

Amy Wharton
Law School Library Director

Michael Whiteman
Associate Dean of Library Services; Director of the Robert S. Marx Law Library
University of Cincinnati College of Law

Austin Martin Williams
Director of the Law Library & Professor of Law
Georgetown University Law Center

Alena L. Wolotira
Law Librarian, University of Washington

Jennifer L. Wondracek
Law Library Director and Professor of Legal Research and Writing

Michelle M. Wu
Retired Law Library Director, Professor of Law, and Associate Dean
American Association of Law Libraries' Hall of Fame Inductee

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), as modified by Local Rule 29.1, and 32(a)(7)(B)(ii), as modified by Local Rule 32.1(4)(B), because this brief contains 5,310 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman style.

Dated: December 22, 2023       By:   _/s/ Max Rodriguez_

                                          Max Rodriguez
                                          111 Broadway, Suite 1804
                                          New York, NY 10006
                                          Tel: (646) 290-7509
                                          Max@pollockcohen.com