# 23-1260-cv

## United States Court of Appeals

*for the*

## Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

– v. –

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* NINE LIBRARY ORGANIZATIONS AND 218 LIBRARIANS IN SUPPORT OF DEFENDANT-APPELLANT

YULIYA M. ZISKINA
EBOOK STUDY GROUP
*Attorney for Amici Curiae*
319 Main Street
Biddeford, Maine 04005
(206) 819-1015

CP COUNSEL PRESS    (800) 4-APPEAL • (326154)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* certifies that the nine *amici* organizations on this brief are non-profits. None has a parent corporation, and no publicly held corporation holds 10% or more of any stock in these *amici curiae*.

December 22, 2023

Respectfully submitted,

/s/ Yuliya M. Ziskina
Yuliya M. Ziskina
*Attorney for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

INTERESTS OF *AMICI CURIAE* ............................................................1

SUMMARY OF ARGUMENT ...................................................................4

ARGUMENT ...............................................................................................5

    I.      CDL and its history are based in copyright law and CDL respects the rights of copyright holders by facilitating the lending of legally acquired books .........................................................5

    II.    CDL is a well-established practice in the library community ..............8

    III.   The licensed digital lending market prevents libraries from fulfilling their mission of preservation and providing equitable access to information ...........................................................12

        A.    Conflating books loaned via CDL with licensed ebooks results in a false equivalence and mischaracterizes the relevant market .......................................................................16

            1.    Patrons use CDL scans differently than ebooks .............16

            2.    CDL scans serve vital library functions in a way that licensed ebooks do not............................................18

    IV.   The district court mischaracterized non-profit library activities as commercial uses, resulting in an improper fair use analysis........................................................................................20

CONCLUSION .........................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ........................................................................22

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ......................................................................24

*Comedy III Prod., Inc., v. New Line Cinema*,
  200 F.3d 593 (9th Cir. 2000) .....................................................................24

*Hachette Book Grp., Inc. v. Internet Archive*,
  No. 20-CV-4160 (JGK), 2023 WL 2623787
  (S.D.N.Y. Mar. 24, 2023) ................................................................. *passim*

*Harper & Row v. Nation Enterprises*,
  471 U.S. 562, 105 S. Ct. 2218 (1985) .................................................. 22, 23

*MCA, Inc. v. Wilson*,
  677 F.2d 180 (2d Cir. 1981) ................................................................. 22-23

*Sega Enterprises Limited v. Accolade, Inc.*,
  977 F.2d 1510 (9th Cir. 1992) ...................................................................21


**Statutes & Other Authorities:**

U.S. Const. art. I, § 8, cl. 8 .........................................................................6

17 U.S.C. § 107(1) .....................................................................................20

Annalee Newitz, *Amazon Secretly Removes "1984" from the Kindle*,
  Gizmodo (July 18, 2009, 7:00 PM) .............................................................19

Argyri Panezi, *A Public Service Role for Digital Libraries: The Unequal
  Battle Against (Online) Misinformation Through Copyright Law
  Reform and the Emergency Electronic Access to Library Material*,
  31 Cornell J.L. & Pub. Policy (2021) ..........................................................19

Cindy Long, *One-Quarter of U.S. Students Don't Have What They Need
  for Online Learning*, NEA News (Oct. 21, 2020) .........................................14

*Controlled Digital Lending: Unlocking the Library's Full Potential*,
Library Futures (last visited Nov. 17, 2023) ..................................................18

Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*, The
New Yorker (Sept. 2, 2021)..........................................................................15

David Moore, *Publishing Giants Are Fighting Libraries on E-Books*,
Sludge (Mar. 17, 2022)..................................................................................12

Ellen Paul, *Libraries need fair eBook contract terms,* CT Mirror
(Apr. 3, 2023) ................................................................................................14

Geoffrey A. Fowler, *Libraries Have a Novel Idea*, Wall Street Journal
(June 29, 2010) ................................................................................................7

Iantha Haight & Annalee Hickman Pierson, *The E-Book Wars, State
Legislation, and the Protection of Robust Library Collections*, Law
Library Journal (forthcoming), BYU Law Research Paper No. 23-09
(June 29, 2023) .......................................................................................... 15-16

Jennie Rose Halperin, *Publishers Are Using E-books to Extort Schools
and Libraries*, The Daily Beast (Apr. 18, 2021) ...........................................14

Jenny Rothschild, *Hold On, eBooks Cost How Much? The Inconvenient
Truth About Library eCollections*, Sm@rt B*t(c)hes Trashy Books
(Sept. 6, 2020)............................................................................................ 12-13

Joanna Sei-Ching, *Disparities in Public Libraries' Service Levels Based
on Neighborhood Income and Urbanization Levels: A Nationwide
Study*, 45 Am. Soc'y for Inf. Sci. & Tech. 1 (Jan. 2008) ..............................20

Katelyn Mirabelli, *The Consolidation of Book Publishing in the U.S.: A
Network Graph Study*, Pratt Institute (May 11, 2021) ..................................15

*KKR Completes Acquisition of OverDrive*, OverDrive Blog (June 9, 2020) ..........12

Kun Lin, *Controlled Digital Lending With Existing Tools In The Toolbox:
Alma Digital* (2018)......................................................................................10

Kyle K. Courtney and David R. Hansen, "A White Paper on Controlled
Digital Lending of Library Books" ..................................................................7

Lauren, *Libraries and eBooks: An Introduction*, Denver Public Library
(Oct. 30, 2019).............................................................................................20

Mark O'Connell, *The Marginal Obsession with Marginalia*, New Yorker
(Jan. 26, 2012) ..............................................................................................17

Michelle Wu, "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries," 103 Law Libr. J. 527-551 (2011) ......................... 6-7

Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly 16 (Aug. 24, 2021) ............................................................................... 13

*NISO Awarded Mellon Funding for Controlled Digital Lending Project*, NISO (last visited July 11, 2022) ..................................................... 11

*Preservation Principles*, LOCKSS (last visited Nov. 17, 2023) ............................ 19

*Project LEND*, UC Libraries (last visited Nov. 16, 2023) ....................................... 11

*Publisher Price Watch*, ReadersFirst (last visited Dec. 18, 2023) ......................... 13

Qinghua Xu *et al.*, *Implementing Controlled Digital Lending with Google Drive and Apps Script: A Case Study at the NYU Shanghai Library*, 6 International Journal of Librarianship 37-54 (2021) .................................... 9

Sarah Lamdan, *et al.*, *The Anti-Ownership Ebook Economy How Publishers and Platforms Have Reshaped the Way We Read in the Digital Age,* NYU School of Law (July 2023) ............................................... 15

Shawnda Hines, *ALA turns to Congress as Macmillan ignores public call to reverse library eBook embargo*, ALA News (Nov. 1, 2019) .................... 12

*Testimony on Rhode Island Bill*, ReadersFirst (May 3, 2022) ................................. 14

Wendy J. Gordon, *The 'Why' of Markets: Fair Use and Circularity*, The Yale Law Journal Pocket Part (2007) ............................................................ 24

*White Paper On Remixes, First Sale, And Statutory Damages: Copyright Policy, Creativity, And Innovation In The Digital Economy,* Dept. Com. Internet Policy Task Force 49 (2016) ................................................. 18

# INTERESTS OF *AMICI CURIAE*[1]

*Amici* are the following nine organizations and 218 librarians, archivists, directors, deans, professors, and library staff from across the U.S. who bring their combined expertise and perspective on the library lending issues raised by this case (individuals are listed in the Addendum). As leaders and experts in the field, *amici* have a significant and substantial interest in assisting the Court's consideration of this case.

eBook Study Group is a non-profit grassroots organization dedicated to working with libraries to ensure equitable access to information. Our coalition includes a diverse array of individuals, libraries, library consortia, and non-profit organizations that are committed to supporting the ability for libraries to continue to loan their collections to patrons in the digital era.

Library Futures Project ("LFP"), part of New York University's Engelberg Center on Innovation Law and Policy, is one of the leading digital library policy and advocacy organizations, uncovering and confronting the fundamental policy issues that threaten libraries in the digital age.

---

[1] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party or its counsel contributed money that was intended to fund preparing or submitting this brief. Nor did any other person contribute money that was intended to fund preparing or submitting this brief.

The EveryLibrary Institute ("ELI") is a public policy and tax policy research and training organization focusing on issues affecting the future of public, academic, and school libraries and the profession of librarianship in the United States and abroad.

ReadersFirst is a non-profit organization of nearly 300 libraries representing 200 million readers dedicated to ensuring access to free and easy-to-use ebook content.

The Scholarly Publishing and Academic Resources Coalition ("SPARC") is a non-profit advocacy organization that supports systems for research and education that are open by default and equitable by design. Its members include about 250 libraries and academic organizations across North America.

The Association of Southeastern Research Libraries ("ASERL") is a non-profit library consortium serving 38 research libraries in 11 southeastern U.S. states. Founded in 1956, it is based at Emory University Libraries. ASERL is a leader in research library cooperation, providing important programs and services to support member libraries, the scholarly process, and the library profession.

The Boston Library Consortium ("BLC") is a non-profit organization that empowers a coalition of libraries in the northeastern United States to share knowledge, infrastructure, and resources at scale. BLC's diverse membership

network includes public and private universities, liberal arts colleges, special libraries, a state library, and a large public library.

The Partnership for Academic Library Collaboration & Innovation ("PALCI") Board of Directors is the Board of the nonprofit 501(c)(3) membership organization that originated in 1996 and was incorporated in 1998 as the Pennsylvania Academic Library Consortium, Inc. Today, PALCI's membership has grown to include more than 75 academic and research libraries in Pennsylvania and contiguous states. PALCI's mission is to enable cost-effective and sustainable access to information resources and services. PALCI is known for its highly-regarded EZBorrow consortial interlibrary loan (ILL) service and its strategic content licensing programs. PALCI serves over 800,000 students, faculty, and staff through its member organizations, focusing on collaborative collections, resource sharing services, and innovative technology projects and approaches to library services.

Urban Librarians Unite ("ULU") is a professional organization dedicated to supporting library workers in large urban centers with a special emphasis on worker rights, working conditions, and advocacy.

Individual *amici*, listed in the Addendum, are librarians, archivists, directors, deans, professors, and library staff from across the U.S., including individuals from public libraries, academic libraries, library consortia, archives, special collections,

law libraries, state libraries, as well as other unique libraries and archives, who have a professional interest in the ability of libraries to lend their digital collections.

Based on *amici*'s broad knowledge and expertise in the library world, *amici* are able to provide information that is important to the Court's consideration of how this litigation will affect the ability of libraries to continue to provide open, non-discriminatory access to books and other materials for their readers.

The *amici* have a unique perspective on the issues presented in the case, especially since they have: (1) knowledge of how a modern digital library loaning system works, (2) insight into the use and adoption of digital library loaning, and (3) researched, developed, and published papers and policies advocating for continuing the library's mission in the modern digital era.

## SUMMARY OF ARGUMENT

Controlled Digital Lending ("CDL") is a library practice that allows patrons to borrow digitized versions of physical books that are already owned by the library. It has strong legal foundations grounded in copyright law and fair use. CDL consists of making a scanned copy of a book the library already owns and lending it out on a strict 1:1 basis utilizing rights management software. There are hundreds of institutions and companies around the world that utilize CDL, including libraries, software companies (such as ExLibris), and consortia.

CDL is based in copyright law and respects the rights of copyright holders by acquiring the works legally, while also broadening access to the books that library systems purchase to build their collections. CDL is a well-established practice in the library community. It is a programmatic tool that represents a reasonable, productive, and viable pathway for libraries to focus on their traditional and well-established role in providing access to their acquired collections.

The district court's finding that books loaned via CDL would replace the market for commercially licensed ebooks was flawed. Books loaned via CDL have distinct features and purposes and are not a substitute for commercially licensed ebooks.

The district court erred in its finding that the Internet Archive's Open Libraries program is a "commercial activity" for purposes of fair use. Instead, a library is a non-profit organization that provides access to knowledge and cultural heritage, which is the distinctly non-commercial mission of all libraries.

## ARGUMENT

### I. CDL and its history are based in copyright law and CDL respects the rights of copyright holders by facilitating the lending of legally acquired books.

CDL enhances a library's ability to share works with its patrons and is firmly grounded in copyright law. This aspect of the library mission has been understood for centuries—from common law, through the current Copyright Act,

and within the crucial copyright statutory exceptions. The library mission relies equally on the ability to acquire creative works, thereby serving the economic purpose of copyright, and on the ability to distribute those works to the public "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. In this way, library loaning programs are a core part of copyright law. Library practices reflect a commitment to both the economic and access goals of copyright: purchasing books from publishers, vendors, and authors; adding them to collections; and establishing loaning programs to provide open, non-discriminatory access to the copyrighted content that is legally purchased or acquired, and preserving that work for future generations.

In CDL, the purchased physical book is sequestered from the public as the digital surrogate is loaned to one patron at a time, keeping a 1:1 ratio of owned to loaned materials. The balance described above replicates the carefully protected activity encapsulated in one of the core functions of the library mission: loaning legally acquired books.

The district court inaccurately states that CDL was "invented in 2018 by a group of librarians." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160 (JGK), 2023 WL 2623787, at *2 (S.D.N.Y. Mar. 24, 2023). In fact, the idea for shared digital collecting was first explored in the pioneering article, "Building a Collaborative Digital Collection: A Necessary Evolution in Libraries," by Michelle

Wu, Professor of Law and former Law Library Director at Georgetown University School of Law.[2] Wu developed the concept initially in 2002 to protect her library's print collection from natural disaster—an imperative she faced in rebuilding a library destroyed by flooding. In 2010, the Internet Archive ("IA") partnered with the Boston Public Library and other libraries to begin lending out digitized versions of physical library books to one reader at a time—an early implementation of the practice that would later be called Controlled Digital Lending. Geoffrey A. Fowler, *Libraries Have a Novel Idea*, Wall Street Journal (June 29, 2010).[3] During the first decade that libraries employed CDL practices (initially known as "format shifting" or "digitized lend"), these practices were largely uncontroversial because the collective consensus was that the copyright analysis was a logical outgrowth of fair use and technology available.

The legal underpinnings of the CDL method were then refined, named, and detailed in "A White Paper on Controlled Digital Lending of Library Books," by leading copyright attorneys and scholars, Kyle K. Courtney and David R. Hansen in 2018.[4] The White Paper was written in support of the "Statement on the Controlled Digital Lending of Books," which was not written by a "group of librarians," but rather by numerous nationally recognized lawyers, legal scholars,

---

[2] 103 Law Libr. J. 527-551 (2011), available at https://perma.cc/3TV3-9SJR.
[3] Available at https://perma.cc/6EA5-8ECG.
[4] Available at https://perma.cc/4QME-JUER.

copyright experts, and professors.[5] In 2020—18 years after the concept of CDL was established and 10 years after libraries first started utilizing it—the Publishers sued the non-profit library Internet Archive during a global pandemic that closed the doors of the vast majority of physical libraries in the United States.

## II.     CDL is a well-established practice in the library community.

CDL has become a critical part of library practice in the United States because it provides a reasonable way to offer digital access to libraries' legally acquired collections. Over 100 libraries across the United States rely on a CDL program to distribute their collections, particularly for out-of-print works, reserves, or for works that are less frequently circulated.

CDL library programs have also been enhanced by funding from local, state, and federal organizations. In 2023, the Institute for Museum and Library Services, the independent federal agency that provides library grants, museum grants, policy development, and research, awarded to the Boston Library Consortium ("BLC") a $249,221 National Leadership Grant for Libraries to support the BLC's

---

[5] Some of these experts include, but are not limited to: Mary Minow (intellectual property attorney, library law expert, and Presidential Appointee to the National Museum and Library Services Board); Jason Schultz (Professor of Clinical Law, Director of New York University's Technology Law & Policy Clinic, and Co-Director of the Engelberg Center on Innovation Law & Policy and former Senior Advisor at the at the White House Office of Science and Technology Policy), and Michelle Wu (Professor of Law and Law Library Director at Georgetown University Law Center, Emeritus).

"Controlled Digital Lending for Libraries and Library Consortia" project.[6] BLC has also received funding from the Davis Educational Foundation, which awarded a two-year $215,000 grant for BLC to accelerate the implementation of CDL. Both these federal and private grants support the CDL plans described in BLC's groundbreaking CDL report, "Consortial CDL: Implementing Controlled Digital Lending as a Mechanism for Interlibrary Loan."[7]

Since the COVID-19 pandemic, dozens of libraries have developed in-house CDL systems to increase access to textbooks, reserves, and research materials. These include: NYU Shanghai Library's CDL system, documented in Qinghua Xu et al., *Implementing Controlled Digital Lending with Google Drive and Apps Script: A Case Study at the NYU Shanghai Library*, 6 International Journal of Librarianship 37-54 (2021);[8] Caltech's DIBS ("Digital Borrowing System");[9] University of Florida Libraries' Textbook-focused CDL program;[10] and Miami University in Ohio's LOLA ("Limited Online Library Access").[11] Notably, HathiTrust, a consortium of university libraries, employed a digital loaning solution for its member libraries, called the Emergency Temporary Access Service

---

[6] Available at https://perma.cc/EWK3-R7BV.
[7] Available at https://perma.cc/K9TY-H6H4.
[8] Available at https://perma.cc/RHM7-NDGK.
[9] Available at https://perma.cc/XY7Z-7MTE.
[10] Available at https://perma.cc/ZRU9-4EAK.
[11] Available at https://perma.cc/D9L8-AAKA.

("ETAS"),[12] that was hailed as a successful solution to the access-related problems created by pandemic closures.

Libraries' expanded use of CDL was followed by a rapid formation of new library organizations dedicated to supporting communities to engage with CDL, such as: the Controlled Digital Lending Implementers ("CDLI");[13] Consortial Approaches to Controlled Digital Lending[14] and the CDL Co-op.[15] These organizations have run monthly seminars, maintained active listservs, published papers, and generally provided a supportive network for the community interested in CDL.

Vendors, software developers, and standards organizations have also framed controlled digital lending as the new baseline for digitized access, and have since been writing grants, developing software, and streamlining systems for CDL integration into library work. For example, the Ex Libris Group, a division of Clarivate (a for-profit, publicly traded international corporation) has begun development of a software system to integrate CDL into their customers' libraries. *See* Kun Lin, *Controlled Digital Lending With Existing Tools In The Toolbox: Alma Digital* (2018).[16]

---

[12] Available at https://perma.cc/N28E-NDUZ.
[13] Available at https://perma.cc/7HXC-YC5K.
[14] Available at https://perma.cc/46PK-D3HF.
[15] Available at https://perma.cc/5FDK-N4UN.
[16] Available at https://perma.cc/8PLG-U4VK.

The National Information Standards Organization ("NISO"), a nonprofit membership organization that identifies, develops, maintains, and publishes technical standards, has nearly completed the development of a consensus framework for technical standards to build and implement CDL in libraries. The Andrew W. Mellon Foundation awarded NISO a grant of $125,000 in 2021 to move this CDL framework forward. *NISO Awarded Mellon Funding for Controlled Digital Lending Project*, NISO (last visited July 11, 2022).[17] This working group is composed of practitioners from a number of leading institutions including Columbia University, University of California, Yale University, Lehigh University as well as vendors and publishers such as EBSCO, Ex Libris, and OCLC.[18]

In January 2023, the University of California libraries launched a landmark research project—Project LEND ("Library Expansion of Networked Delivery")—to investigate the potential for expanded lawful, nonconsumptive use of digitized books held by academic and research libraries. The project seeks to analyze all aspects of a digital access program and is funded by the Mellon Foundation. *Project LEND*, UC Libraries (last visited Nov. 16, 2023).[19]

---

[17] Available at https://perma.cc/L3YX-PYH8.
[18] Available at https://perma.cc/5EZ5-GJFH.
[19] Available at https://perma.cc/L7Z4-29BQ.

## III. The licensed digital lending market prevents libraries from fulfilling their mission of preservation and providing equitable access to information.

While the district court found that "there is a thriving ebook licensing market for libraries," *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160 at \*2, most librarians and consumers would say otherwise. It is estimated that Amazon controls more than 85 percent of the ebook market, and a single vendor (OverDrive, Inc.) provides ebooks to over 95 percent of libraries around the country. OverDrive is owned by private equity firm KKR. *KKR Completes Acquisition of OverDrive*, OverDrive Blog (June 9, 2020).[20]

Negotiation for ebook access is virtually nonexistent for libraries. With digital content, publishers control not only the production but also the distribution of materials. Within this power structure, publishers have routinely denied libraries access to content, which is highly uncommon in the analog world. Often, ebook licenses offered to libraries come with many restrictions on use, or worse, are unavailable to libraries at any price. David Moore, *Publishing Giants Are Fighting Libraries on E-Books*, Sludge (Mar. 17, 2022).[21] When they are available, ebooks can cost a library three to 10 times the consumer prices for the same ebook. Jenny Rothschild, *Hold On, eBooks Cost How Much? The Inconvenient Truth About*

---

[20] Available at https://perma.cc/4YWU-LQ8Q.

[21] Available at https://perma.cc/3BFJ-6W69. *See also* Shawnda Hines, *ALA turns to Congress as Macmillan ignores public call to reverse library eBook embargo*, ALA News (Nov. 1, 2019), https://perma.cc/G4YL-WG6R.

*Library eCollections*, Sm@rt B\*t(c)hes Trashy Books (Sept. 6, 2020).[22] In fact, the Publishers charge libraries between a 44 percent (HarperCollins) and a 298 percent (Hachette) markup on licenses for ebooks, as compared with physical books. *Publisher Price Watch*, ReadersFirst (last visited Dec. 18, 2023).[23]

Virtually all libraries hold physical books in their collections that are as old as their own existences, with collections spanning decades. Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly 16 (Aug. 24, 2021).[24] These materials were obtained through gift or for a one-time fee and have been loaned continually since. The only "added" cost during the years of ownership were repair and maintenance. *Id.* Currently, all ebook licenses offered by the top publishers—including those who are parties to this case—expire either after 24 months or 26 checkouts. *Publisher Price Watch*.[25] Most books last significantly longer than 26 uses through standard maintenance and repair, and libraries replace only a very small number of titles. Michelle M. Wu, *The Corruption of Copyright and Returning It to Its Original Purposes*, Legal Reference Services Quarterly 16 (Aug. 24, 2021). To quote Connecticut State Librarian Ellen Paul: "Imagine if all our roads completely disappeared after two years and the Department of Transportation had to build

---

[22] Available at https://perma.cc/KYK5-TNV8.
[23] Available at https://perma.cc/8HRM-SRCC.
[24] Available at https://perma.cc/6W6C-J4EY.
[25] Available at https://perma.cc/8HRM-SRCC.

them all over again… those are the terms and conditions that public libraries… are forced to accept every day…for ebooks." Ellen Paul, *Libraries need fair eBook contract terms*, CT Mirror (Apr. 3, 2023).[26]

The problems with licensed ebook lending especially came to light during the COVID-19 pandemic, when many libraries lacked the ability to lend the physical books they already owned in their collections. According to librarians in Rhode Island, the children's classic *Charlotte's Web* was entirely unavailable in their state due to publisher ebook licensing restrictions. *Testimony on Rhode Island Bill*, ReadersFirst (May 3, 2022).[27] One school library reported paying $27 per student per year for a digital copy of *The Diary of Anne Frank.* Jennie Rose Halperin, *Publishers Are Using E-books to Extort Schools and Libraries*, The Daily Beast (Apr. 18, 2021).[28] The same title can be purchased in print by a library for a one-time price, used without limit, and repaired until the book wears out. In addition, in October 2020, the National Education Association reported that nearly a quarter of students did not have what they needed for online learning. Cindy Long, *One-Quarter of U.S. Students Don't Have What They Need for Online Learning*, NEA News (Oct. 21, 2020).[29] Without CDL, libraries were forced to

---

[26] Available at https://perma.cc/MEL5-VM8X.
[27] Available at https://perma.cc/8MHA-6R9G.
[28] Available at https://perma.cc/VR6A-DJBK.
[29] Available at https://perma.cc/5HS2-G2WS.

abandon their print collections and try to replicate those collections by finding licensing options—in effect paying for these collections again.

With the consolidation of the publishing industry, big publishers have virtually no incentive to offer competitive rates and terms to libraries. A 2023 report from researchers at New York University underscores this claim, finding that both publishers and platform aggregators have circumvented copyright law and centuries of precedent to control and extort the reading public and libraries to maximize profit, often at the expense of authors themselves, who do not see the benefits of these costly licenses. Sarah Lamdan, et al., *The Anti-Ownership Ebook Economy How Publishers and Platforms Have Reshaped the Way We Read in the Digital Age,* NYU School of Law (July 2023).[30] When setting prices, there is no negotiation process. *See* Katelyn Mirabelli, *The Consolidation of Book Publishing in the U.S.: A Network Graph Study*, Pratt Institute (May 11, 2021).[31] As a result, many libraries face financial and practical challenges in making ebooks available to their patrons and are constrained or unable to develop their own digital collections. Iantha Haight & Annalee Hickman Pierson, *The E-Book Wars, State*

---

[30] Available at https://perma.cc/3CKU-RX9P.
[31] Available at https://perma.cc/G52F-NRFT. *See also* Daniel A. Gross, *The Surprisingly Big Business of Library E-Books*, The New Yorker (Sept. 2, 2021), https://perma.cc/D4YZ-7SEJ.

*Legislation, and the Protection of Robust Library Collections*, Law Library Journal (forthcoming), BYU Law Research Paper No. 23-09 (June 29, 2023).[32]

### A. Conflating books loaned via CDL with licensed ebooks results in a false equivalence and mischaracterizes the relevant market.

Throughout its opinion, the district court frequently refers to CDL scans of physical books as "ebooks," but this is a factual mischaracterization. This is not merely semantics, but is rather a crucial distinction, particularly in light of the market analysis. For instance, the district court asserts that IA "simply scans the Works in Suit to become ebooks." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160 at *6. But CDL scans are not "ebooks." They are CDL scans.

#### *1. Patrons use CDL scans differently than ebooks.*

The quality between licensed ebooks and books available via CDL differs significantly, and therefore impacts the potential users of each. Licensed ebooks feature crisp text, customizable font size and layout, and interactive features such as hyperlinks. By contrast, CDL scans lack many of the features and characteristics in licensed ebooks that consumers may seek out. Effectively, a CDL scan is a picture of a book that is used for reference or preservation, while an ebook aims to provide a reading experience that is similar to that of a print book. This makes it more likely that the book will be used primarily by researchers out of necessity, or only briefly, rather than supplanting the reading market for the licensed ebook. A

---

[32] Available at https://perma.cc/QF5Z-R477.

researcher may need to consult a particular past edition of a book, or a specific copy might have scholarly significance that can only be effectively shared via scanning the print book. For example, a digitized print version of a work from a public figure's personal book collection might contain noteworthy marginalia that offers valuable insight into their thoughts, unavailable anywhere else. *See, e.g*., Mark O'Connell, *The Marginal Obsession with Marginalia*, New Yorker (Jan. 26, 2012).[33] A researcher cannot use a licensed ebook in the same way. The low-quality scans (in addition to the digital rights management protections) also make it less likely that downstream bootleggers will make copies of the work.

The crux of the district court's finding was that "it is difficult to compete with a product offered for free," *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160 at *14, referring to the court's assumption that books scanned via CDL risk "eviscerating the rights of authors and publishers to profit." *Id*. at *11. However, much like the myriad examples of free products and services that do not preclude a highly profitable market for their cost-based counterparts, CDL books do not unreasonably impede on the licensed ebook market. For example, despite the broad availability of open source office software, Microsoft and Apple iOS remain highly profitable businesses. This is because products that are free often offer a different user experience than those that are not.

---

[33] Available at https://perma.cc/R7CU-PSVD.

### 2. CDL scans serve vital library functions in a way that licensed ebooks do not.

The current licensing regime makes it impossible for libraries to perform typical library activities, which distinguishes a licensed ebook from a CDL scanned book. CDL provides public benefits beyond merely providing access to libraries' legally acquired collections. The district court mischaracterized the public benefit of CDL by claiming it makes books "widely accessible." *Id*. at *15. However, library systems and their CDL programs provide numerous public benefits beyond access to books, such as: driving economic efficiency by maximizing returns on tax dollars, expanding reliable and equitable education, promoting civil rights for marginalized communities, and many more. *See Controlled Digital Lending: Unlocking the Library's Full Potential*, Library Futures (last visited Nov. 17, 2023).[34] Libraries also place high importance on the need for preserving and maintaining access to works regardless of consumer demand. *White Paper On Remixes, First Sale, And Statutory Damages: Copyright Policy, Creativity, And Innovation In The Digital Economy,* Dept. Com. Internet Policy Task Force 49 (2016).[35]

Because libraries do not own the licensed ebooks that they acquire, publishers often reserve the right to alter or revoke books at will, implicating

---

[34] Available at https://perma.cc/LR6Q-VN3Q.
[35] Available at https://perma.cc/LQ7R-D92W.

serious preservation and censorship concerns. Annalee Newitz, *Amazon Secretly Removes "1984" from the Kindle*, Gizmodo (July 18, 2009, 7:00 PM).[36] CDL gives libraries more control over the integrity of their collections, ensuring their books are not surreptitiously edited or revoked. In the case of a service disruption, having multiple sources of information availability also better ensures that the materials are consistently and reliably available. *Preservation Principles*, LOCKSS (last visited Nov. 17, 2023).[37] In recent years, online misinformation has become rampant, and it is more essential than ever to have access to reliable sources of information. *See* Argyri Panezi, *A Public Service Role for Digital Libraries: The Unequal Battle Against (Online) Misinformation Through Copyright Law Reform and the Emergency Electronic Access to Library Material*, 31 Cornell J.L. & Pub. Policy (2021).[38]

Further, in systems like OverDrive, the long-practiced and legally protected lending practice of interlibrary loan cannot be actualized with licensed ebooks. Most libraries cannot hold onto every book—they have limited budgets and space, and frequently are unable to buy books that are out of print. Interlibrary loan, a practice where libraries lend to one another through a shared catalog, is one of the key methods by which materials are transferred and loaned between libraries and

---

[36] Available at https://perma.cc/38SA-AQ3X.
[37] Available at https://perma.cc/R34U-UHWQ (discussing importance of both distribution and decentralization).
[38] Available at https://perma.cc/R9EQ-G8GH.

provided to the scholars, researchers, students, and other patrons. Due to strict publisher terms in licensing agreements, libraries often cannot lend ebooks to other libraries through interlibrary loan. Lauren, *Libraries and eBooks: An Introduction*, Denver Public Library (Oct. 30, 2019).[39] By fully restricting digital interlibrary loan, all communities face an unnecessary loss of access to a broader range of materials. CDL brings the economic benefits of libraries to the communities most in need. *See* Joanna Sei-Ching, *Disparities in Public Libraries' Service Levels Based on Neighborhood Income and Urbanization Levels: A Nationwide Study*, 45 Am. Soc'y for Inf. Sci. & Tech. 1 (Jan. 2008).[40]

Library-lent CDL scans are not the same market as licensed ebooks. CDL is a feature of ownership, not a substitute for licensing. It is not intended to replace or circumvent a library's existing ebook holdings, but it can serve as a powerful tool for bridging the gap between print and electronic resources for readers and researchers.

## IV. The district court mischaracterized non-profit library activities as commercial uses, resulting in an improper fair use analysis.

The first fair use factor directs courts to consider whether the secondary use "is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Here, the district court found that IA's use was commercial because,

---

[39] Available at https://perma.cc/CED2-7NEB.
[40] Available at https://perma.cc/R5JL-7WJW.

"although it does not make a monetary profit, IA still gains 'an advantage or benefit from its distribution and use of' the Works in Suit," such as "using its Website to attract new members, solicit donations, and bolster its standing in the library community." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160 at *9. It found that virtually any "advantage or benefit," regardless of profit motive, can be "profit." *Id*.

Through its flawed analysis, the district court effectively erases any practical distinction between "benefit" and "profit." Virtually every secondary user making fair use of copyrighted material seeks to "benefit" in some way. The district court presumes that any kind of benefit can be a profit, and therefore any profit can weigh towards a finding of commerciality against fair use. This renders the commercial/non-profit distinction entirely meaningless within the context of the fair use analysis. Indeed, "attracting new members, soliciting donations, and bolstering standing in the library community" (*id*.) all constitute activities that libraries regularly engage in—and it is wholly irrational to characterize such typical library activities as "commercial."

Even if, for the sake of argument, IA sought to financially profit from its activities, it serves numerous important educational purposes that cannot be discounted from the analysis. *See, e.g.*, *Sega Enterprises Limited v. Accolade, Inc.*, 977 F.2d 1510, 1522–23 (9th Cir.1992) (finding first factor in favor of for-profit

company, even though ultimate purpose of copying was to develop competing commercial product, because immediate purpose of copying computer code was to study idea contained within computer program).

*Financial* profit is core to the definition of "profit" within the commercial/non-profit distinction. The district court categorically fails to cite *Am. Geophysical Union v. Texaco Inc.*, a case from this Court that instructs on commerciality within the fair use analysis: "The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to *capture significant revenues* as a direct consequence of copying the original work," and "the greater the *private economic rewards* reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first factor will favor the copyright holder and the less likely the use will be considered fair. 60 F.3d 913, 922 (2d Cir. 1994) (emphasis added) (citing *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231 ("The crux of the profit/nonprofit distinction is ... whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.").

The district court failed to properly consider the nature and objectives of IA. This Court in *Texaco* cautioned that "it is overly simplistic to suggest that the "purpose and character of the use" can be fully discerned without considering the nature and objectives of the user." 60 F.3d at 922. *See also MCA, Inc. v. Wilson*,

677 F.2d 180, 182 (2d Cir.1981) (court is to consider "whether the alleged infringing use was primarily for public benefit or for private commercial gain"). The district court admitted that IA does not "make a monetary profit." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-CV-4160 at *9. But IA, as a library, not only does not make monetary profit, IA does not *seek* to make monetary profit.

The library mission is inherently a public service one: to facilitate equitable and non-discriminatory access (not merely access) to knowledge, absent any profit motive. Such a purpose, providing access to library materials for the public, is inherently non-commercial. By its very nature and privileged status within copyright law, the public service mission of libraries is distinct from that of corporate entities. Thus, libraries like IA require a more nuanced analysis if the court is to rely on copyright case law that involves for-profit entities.

Even so, the commercial/noncommercial distinction the law draws centers not on whether a user intends to line their own pockets, but rather on "whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. 2218. Here, the Internet Archive, as other libraries and nonprofits across the U.S., receives donations of books or funds to aid their mission. The "customary price" has been previously paid to the rights holder when the book was initially purchased.

The district court allows the presence of the licensing market to improperly foreclose a library's fair use of the materials for which it has paid the customary price and already owns. Such a result runs contrary to this Court's guidance that "a copyright holder cannot prevent others from entering fair use markets merely 'by developing or licensing a market.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006).[41] In doing so, the district court commits the fallacy of the circular market theory: because some people pay, everyone should pay, even if some people are eligible to claim fair use. Wendy J. Gordon, *The 'Why' of Markets: Fair Use and Circularity*, The Yale Law Journal Pocket Part (2007).[42]

## CONCLUSION

For the reasons stated above, this Court should reverse the judgment of the district court and protect CDL. Libraries have a long-standing history of supporting the public's access to books. As technology evolves, libraries continually adapt their services to provide access in innovative ways to better serve their patrons, and CDL is such an innovation. Each time libraries have embraced access-expanding innovations, the courts have acknowledged how these practices benefit the public.

---

[41] *See also Comedy III Prod., Inc., v. New Line Cinema*, 200 F.3d 593, 595 (9th Cir. 2000) (declaring that "[T]he fact that other film producers choose to pay Comedy III a fee that they may not have to does not obligate New Line to follow suit, if it is not legally obliged to do so").

[42] Available at https://perma.cc/MH4S-VEK7.

CDL is the next chapter of upholding access and should persist for a new generation of patrons.

Dated: December 22, 2023

Respectfully submitted,
/s/ Yuliya M. Ziskina

Yuliya M. Ziskina
eBook Study Group
319 Main Street
Biddeford, ME 04005
(206) 819-1015

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g)(1) and Fed. R. App. P. 29(a)(4)(G), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) and Local Rule 29.1(c) because it contains 5,338 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word for Mac (Version 16.78.3) in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: December 22, 2023                    /s/ Yuliya M. Ziskina

                                            Yuliya M. Ziskina
                                            eBook Study Group
                                            319 Main Street
                                            Biddeford, ME 04005
                                            (206) 819-1015

                                            *Attorney for Amici Curiae*

**ADDENDUM**

**ADDENDUM — LIST OF AMICI CURIAE**[1]

A.S. Galvan
   Strategist Librarian
   Grand Valley State University Libraries

Abbot Henderson
   Resource Sharing Coordinator, Sr
   Arizona State University

Abby Payeur
   Metadata Librarian
   Phillips Exeter Academy

Abigail Goben
   Associate Professor and Data Management Librarian
   University of Illinois Chicago

Adrian Ho
   Head of Scholarly Communications
   University of Chicago Library

Aimee Gee
   Reference and Online Learning Librarian
   Shenandoah University

Alessandra Seiter
   Community Engagement Librarian
   Harvard Kennedy School

Alex Caracuzzo
   Senior Manager, Baker Research & Data Services
   Harvard Business School

Alex R. Hodges
   HGSE Librarian & Director, Gutman Library
   Harvard University

---

[1] Institutions are listed for identification purposes only. All individual signatories are participating in their individual capacity, not on behalf of their institutions.

Alex Todd
    Executive Director
    Prospect Heights Public Library District

Alexandra Franz-Harder
    Library Assistant
    Ninth Circuit Law Library at the Sandra Day O'Connor Courthouse

Allia Service
    OER Specialist
    University of Oregon

Amy Deschenes
    Head of UX & Digital Accessibility
    Harvard University

Amy Tureen
    Dean of Academic Success Programs
    South Puget Sound Community College

Anali Maughan Perry
    Head, Open Science and Scholarly Communication
    Arizona State University Library

Angela Lee
    Health Sciences Librarian
    Pacific University Oregon

Angela White
    Director of Special Collections
    IUPUI University Library

Ann D. Thornton
    Vice Provost and University Librarian
    Columbia University

Anna Assogba
    Research Librarian
    Harvard University

Anna Van Someren
>Library Analyst for Collections Discovery
>Harvard University Library

Annie Miskewitch
>Executive Director
>Schaumburg Township District Library

Anthony Davis Jr.
>Copyright & Policy Librarian
>California State University, Fullerton

Anthony Kurtz
>University Archivist
>Western Washington University

Beth Ruane
>Library Director
>Northfield Mount Hermon

Beth Williams
>Associate Dean, Robert Crown Law Library & Senior Lecturer in Law
>Stanford University

Brandy Helewa
>Discovery Librarian
>State of Arizona Research Library

Bronson Dowd
>Library Technician - Interlibrary Loan
>University of Washington

Cara Elston
>Bibliographic & Interlibrary Loan Specialist
>Whitworth University

Carmen Mitchell
>Scholarly Communication Librarian
>California State University San Marcos

Carmi Parker
 ILS Administrator/Librarian
 Whatcom County Library System and University of Washington

Carole Correa-Morris
 Senior Director, Resource Management & Delivery
 San Jose State University

Caroline Walters
 Manager of Collection Development
 Harvard Law School Library

Catherine Biondo
 Research Librarian
 Harvard Law School

Charlotte Y. Von De Bur
 Research, Outreach, and Instruction Librarian
 San Francisco State University

Chelcie Juliet Rowell
 Associate Head of Digital Collections Discovery
 Harvard Library

Cheryl Casey
 Full Librarian
 University of Arizona

Chris Bourg
 Director of Libraries
 MIT

Chris Mansayon
 Research Librarian
 Western Oregon University

Chris Ritzo
 Librarian
 Denver Public Library

Chrissy Hursh
> Evening and Weekend Coordinator
> University of Oregon

Christina Sirois
> Executive Director, HKS Library & Research Services & Research Privacy Officer
> Harvard Kennedy School

Christine Fernsebner Eslao
> Metadata Technologies Program Manager
> Harvard Library

Christine Karns
> Circulation/Technical Services Department Head
> Bloomingdale Public Library

Claire Stewart
> Juanita J and Robert E Simpson Dean of Libraries and University Librarian
> University of Illinois Urbana-Champaign

Clem Guthro
> University Librarian
> University of Hawai'i at Manoa

Clement Lin
> Reference & Scholarly Services Librarian
> New York University School of Law Library

Conor Casey
> Head, Labor Archives of Washington, Libraries Special Collections
> University of Washington

Corinna Baksik
> Senior Systems Librarian
> Harvard University

Crystal Willer
	Associate Archivist
	Lewis & Clark College

D. Adam Anderson
	Law Reference Librarian
	University of Oregon Law School

Daniel Dolan-Derks
	Interlibrary Loan Specialist
	Gonzaga University

Daniel Dollar
	Associate University Librarian for Scholarly Resources
	Yale University

DeAnne Luck
	Lecturer, Library Science Program
	Middle Tennessee State Univ

Debby Brauer
	Trustee
	Palatine Public Library District

Diane DAngelo
	Assistant Director for Public Services
	Suffolk University Law School

Dore Minatodani
	Librarian, Hawaiʻi Specialist
	University of Hawaiʻi at Mānoa Hamilton Library

Elissa Mondschein
	Library Services Associate III
	University of Arizona

Elizabeth Borges
	Online Learning Librarian
	San Francisco State University

Elizabeth Mengel
Associate Dean Collections and Academic Services
Johns Hopkins University

Elizabeth Wawrzyniak
Digital Collections Librarian
Gonzaga University

Ellen Dubinsky
Librarian
University of Arizona

Ellen Paul
Executive Director
Connecticut Library Consortium

Elliott Scheuer
Course Materials Specialist
San Francisco State University, J. Paul Leonard Library

Emily Bell
Librarian for Virtual Reference
Harvard Library

Emily Kilcer
Scholarly Communication Librarian
University at Albany

Emily Spracklin
Teaching & Learning Librarian
Western Washington University

Erin Grant
Director, Cataloging and Metadata Services
University of Washington Libraries

Erin M. Winter
Research Data Management Librarian
University of Oregon

Gregory P. Murray
    Director of Digital Initiatives
    Wright Library, Princeton Theological Seminary

Hannah Lee
    Librarian
    California State University Dominguez Hills

Hannah Scates Kettler
    Associate University Librarian
    Iowa State University

Heidi Smith
    Executive Director
    Highland Park Public Library

Hesper Wilson
    Senior Assistant Librarian
    San Francisco State University

Holly Gabriel
    Open Access Librarian
    Southern Oregon University

Holly Thompson
    Library Director
    Rantoul Public Library

Hunter Hobbs
    Access Services Manager
    Pacific Lutheran university

Iantha Haight
    Deputy Director
    Howard W. Hunter Law Library, J. Reuben Clark School of Law
    Brigham Young University

J. Gabe Gossett
    Head of the Hacherl Research & Writing Studio
    Western Washington University

Jaime Taylor
>Discovery & Resource Management Systems Coordinator (Librarian)
University of Massachusetts Amherst

Jaime Valenzuela
>Archivist & Scholarly Communications Lead
University of Arizona

Jan Juliani
>Cataloging & Digital Projects Librarian
Southern Oregon University

Jay L. Colbert
>Library Director
Longy School of Music of Bard College

Jeanette M. Mueller-Alexander
>Librarian
Arizona State University Library

Jeanne L. Pfander
>Associate Librarian
University of Arizona

Jeff D. Corrigan
>Associate Librarian
California State University Monterey Bay

Jennifer G. Rochelle
>Assistant Professor of Practice
University of Arizona

Jenny Silbiger
>State Law Librarian
Hawai'i Supreme Court Law Library

Jessica Chapel
>Chief of Digital & Online Services
Boston Public Library

Jewel Clark
    Web Administrator (IT)
    Arizona State University Library

Jill Hurst-Wahl
    Trustee
    Onondaga County Public Library (NY) Board of Trustees

Jo Bonell
    Director
    Des Plaines Public Library

Joanna Bailey
    Course Reserves Manager
    Western Washington University

Jocelyn Kennedy
    Executive Director
    Farmington Libraries

John David Morgenstern
    Copyright and Scholarly Communications Librarian
    Emory University

John J Doherty
    Librarian
    Northern Arizona University

John R. Beatty
    Faculty Scholarship Outreach Librarian
    Charles B. Sears Law Library, University at Buffalo

John Taylor
    Electronic Resources Specialist
    University of Oregon

Jonathan Grunert
    Scholarly Publishing Librarian
    University at Buffalo (SUNY)

Joyce Ogburn
> Professor of Practice
> University of North Carolina at Chapel Hill

Julia Simic
> Director, Digital Library Services
> University of Oregon

Julie Reyes
> Resource Sharing Coordinator
> Arizona State University

Kael Moffat
> Information Literacy Librarian
> Saint Martin's University (Lacey, WA)

Kai Fay
> Discovery & Access Strategic Projects Manager
> Harvard Library

Kaitlyn Yang
> Circulation/Resource Sharing Manager
> Seattle University School of Law Library

Karen Keesing
> Telehealth Access Librarian
> Hawaii State Public Library System

Kate Emery
> Technical Services Specialist & Archivist, Law Library
> Seattle University School of Law

Kate Levy
> Conservation Technician for Special Collections
> Harvard Library

Kate Nyhan
> Research and Education Librarian
> Yale University

Kate Thornhill
>Public Scholarship Librarian
>University of Oregon

Katherine Holvoet
>Scholarly Communication Librarian
>San Diego State University

Katherine Siler
>Head of Reference Services
>Stanford Law Library

Katherine Wallis
>Acquisitions Coordinator
>Pacific Lutheran University

Kathleen DeLaurenti
>Director, Arthur Friedheim Library
>Johns Hopkins University

Kathryn Lage
>Associate Librarian
>San Jose State University

Katie Zimmerman
>Director of Copyright Strategy
>MIT Libraries

Kenneth Herold
>Head, Library Technology & Digital Strategies
>California State University, Los Angeles

Kenneth J. Peterson
>Executive Director
>Harvard Business School - Baker Library

Kerry Conley
>Director of Communications for Harvard Library
>Harvard University

Kerry Masteller
    Reference and Digital Program Librarian
    Harvard University

Kim P. Nayyer
    Edward Cornell Law Librarian and Professor of the Practice
    Cornell University

Kimberly Springer, PhD, MSI
    Curator, Rare. Book & Manuscript Library
    Columbia University Libraries

Kornelia Tancheva
    Hillman University Librarian and Director, University Library System
    University of Pittsburgh

Krista Anandakuttan
    Librarian
    San Francisco State University

Kristin Buxton
    Head of Science Liaisons
    University of Oregon

Kyle K. Courtney, Esq.
    Director of Copyright and Information Policy
    Harvard University

Laura C. Wood
    Director of the Academy Library
    Phillips Exeter Academy

Laura Long
    Director
    Fremont Public Library District

Laura Quilter
    Copyright & Information Policy Lawyer/Librarian
    University of Massachusetts Amherst

Laurel Eby
> Web Services Librarian
> San Jose State University

Lauren Comito
> Executive Director
> Urban Librarians Unite

Lauren Washuk
> Digitization Services & Lab Manager
> University of Arizona Libraries

Lee Anne Hooley
> Head, Talking Book Library
> Worcester Public Library

Leor Franck
> Digital Archivist
> Phillips Exeter Academy

Leslie Anne Street
> Director of the Library, Clinical Professor of Legal Research
> William & Mary Law School

Leslie Gascon
> Collection & Research Services Librarian
> University of Washington

Lia Horton
> Online Learning Librarian
> University of New Hampshire

Lianne Pang
> Director of Library Services
> Iolani School

Lisa A. Macklin
> Associate Vice Provost and University Librarian
> Emory University Libraries

Lisa Di Valentino
Law & Public Policy Librarian
University of Massachusetts Amherst

Lizabeth (Betsy) Wilson
Dean of University Libraries Emerita
University of Washington Libraries

Lorelei Sterling
Head of Access Services
University of Alaska Anchorage

Lori A. Wienke
Acquisitions & E-Resources Librarian
SUNY Oneonta

Maria Wagner
Library Technology Services Manager
Portland Community College

Mariah S. Lewis
Associate Director for Technology and Digital Initiatives
NYU Law

Marshall Langman
Access Services Specialist
University of Oregon Knight Library

Matt Ogborn
Instruction and Outreach Librarian
Arizona State University

Matthew Doyle
Librarian
California State University, Fresno

Matthew Hales
Librarian
Newman Regional Library District

Matthew Kopel
   Copyright Specialist
   Cornell University

Matthew N. Noe
   Lead Collection & Knowledge Management Librarian
   Harvard Medical School

Matthew Peter Collins
   Reference Librarian
   University of San Francisco, Gleeson Library

Matthew Sherman
   Digital Curation Librarian
   Drexel University

Matthew Testa
   Archivist
   Johns Hopkins University

Meagan Button
   Open Resources Librarian
   Pacific University

Mel DeSart
   Head, Engineering Library and Head, Mathematics Research Library
   University of Washington

Michael Della Bitta
   Engineering Manager
   Harvard University Library Innovation Lab

Michelle Miranda-Thorstad
   User Services Coordinator
   Arizona State University Library

Mike Taylor
   Head, Technology Strategies and Services
   Cline Library, Northern Arizona University

Miranda Shake
    Library Director
    Lakeview College of Nursing

Molly Stothert-Maurer
    Associate Librarian
    Arizona State Museum

Monica Dombrowski
    Executive Director
    Winnetka-Northfield Public Library District

Nancy J. Young
    Reference Librarian
    California State University Northridge

Nicholas Mosher
    Circulation Supervisor
    Santa Clara University

Nicholas Netzel
    Librarian
    Central Catholic High School

Pamela Leffler
    Executive Director
    Morton Grove Public Library

Pamela Nett Kruger
    Librarian
    Meriam Library, California State University, Chico

Patrick Newell
    Librarian
    California State University, Chico

Patrisia Prestinary
    Archivist
    CSU, Fullerton

Quinn Dombrowski
   Co-President, Association for Computers and the Humanities
   Stanford University Libraries

Rachel Bridgewater
   Faculty Librarian
   Portland Community College

Rachel Castro
   Assistant Librarian
   University of Arizona Libraries

Rachel Hogan
   Instruction and Research Librarian for Arts and Digital Humanities
   William & Mary

Rachel Jaffe
   Digital Content Coordinator
   University of California, Santa Cruz

Rebecca Martin
   Senior Associate Director, Collections and Scholarly Communication
   Librarian, Gutman Library
   Harvard Graduate School of Education, Harvard University

Renee Grassi
   Library Director
   Lake Bluff Public Library

Rian Debner
   University Librarian
   University of Western States

Richard Buckingham
   Director of the Law Library and Information Resources; Associate Professor
   of Legal Research
   Suffolk University Law School

River Freemont
	Associate Archivist
	Whitman College and Northwest Archives

Robin Smith
	Library Director
	Zion-Benton Public Library District

Rona Stublefield
	OER & Government Information Specialist
	Southern Oregon University

Ryan Clement
	Associate Dean for Data, Digital Strategies, & Scholarly Communication
	University of Massachusetts Amherst Libraries

Ryan Livergood
	Executive Director
	Warren-Newport Public Library District

Sagan Wallace
	LEAD Evening Supervisor
	Oregon State University

Sam Lohmann
	Reference Coordinator & Information Access Librarian
	Washington State University

Sara Robertson
	Faculty Librarian
	Portland Community College

Sarah Jaramillo
	Associate Director, Collections & Access Services
	New York University Law Library

Sarah McCleskey
	Head of Resource & Collection Services
	Hofstra University

Sarah P. Swanz
>Digital Humanities Librarian
>Washington University in St. Louis

Scott James
>User Services Coordinator
>Arizona State University

Shana Sandor
>Archivist and Digital Projects Specialist
>Southern Oregon University

Shannon Brown
>Electronic Resources Acquisitions Specialist
>University of Oregon

Shawn Heiser
>Librarian
>San Francisco State University

Shelby Hogle
>Circulations Specialist and Page
>Western Washington University and Whatcom County Library System

Stephen Abrams
>Head of Preservation
>Harvard University

Steve Duckworth
>University Archivist
>Oregon Health & Science University

Sue Kunda
>Scholarly Communications Librarian
>Western Oregon University

Sunyeen Pai
>Digital Initiatives Librarian
>Kapiolani Community College

Susan Dove Lempke
Library Director
Lincolnwood Public Library District

Susan Gilroy
Librarian for Undergraduate Writing Programs
Harvard University Library

Susan McKinney
Librarian
St. Joseph Township-Swearingen Memorial Library

Tamara Pilko
Electronic Resources Librarian
University of California Santa Cruz

Teresa Hazen
Department Head
Collection Services, University of Arizona

Terri Messina
Conservation Technician
Harvard University

Tiffany Amschl
Asst. Director
Crete Public Library District

Timothy McGeary
Associate University Librarian for Digital Strategies & Technology
Duke University

Tina Ching
Associate Director for Technical Services
Stanford Law School, Robert Crown Law Library

Tom Lingner
Customer Service Manager, Imaging Services
Harvard Library

Tommy Keswick
    Digital Technologies Development Librarian
    California Institute of Technology

Tory Middlebrooks
    Library Associate 3
    University of Arizona

Tucker Taylor
    Editor
    Journal of Copyright in Education and Librarianship

Victoria Elmwood
    Scholarly Engagement Librarians for the Humanities
    Tulane University

Wendolyn Vermeer
    Associate Dean, Library Collections & Scholarly Communications
    Cal State Fullerton

William Jacobs
    Associate Librarian for STEM
    San Francisco State University

William L. Adamczyk
    Director & Co-Chair Mass. Library Assoc. Legislative Committee
    Milton Public Library

Winston Tabb
    Sheridan Dean of University Libraries, Archives, & Museums, Emeritus
    Johns Hopkins University

Zia Davidian
    Research, Outreach, and Instruction Librarian
    San Francisco State University