# 23-1260

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

HACHETTE BOOK GROUP, INC., HARPERCOLLINS
PUBLISHERS L.L.C., JOHN WILEY & SONS, INC.,
PENGUIN RANDOM HOUSE LLC

Plaintiffs-Appellees,

v.

INTERNET ARCHIVE

Defendant-Appellant,

v.

DOES 1 – 5, INCLUSIVE

Defendants

---

On Appeal from the United States District Court for the Southern
District of New York, Civil Action No. 20-cv-4160 (JGK)

---

## BRIEF OF AMICUS CURIAE HATHITRUST
## IN SUPPORT OF NEITHER PARTY

---

Joseph Petersen
KILPATRICK TOWNSEND &
    STOCKTON LLP
The Grace Building
1114 Avenue of the Americas
New York, New York 10036
(650) 614-6427
*jpetersen@kilpatricktownsend.com*

Sara K. Stadler
KILPATRICK TOWNSEND &
    STOCKTON LLP
The Grace Building
1114 Avenue of the Americas
New York, New York 10036
(404) 532-6908
*sstadler@kilpatricktownsend.com*

*Attorneys for Amicus Curiae HathiTrust*

**CORPORATE DISCLOSURE STATEMENT**
**PURSUANT TO RULE 26.1 OF THE**
**FEDERAL RULES OF APPELLATE PROCEDURE**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amici curiae HathiTrust certifies that it has no parent corporation and has not issued any stock.

Dated:   December 22, 2023                 Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By:  */s/ Joseph Petersen*
Joseph Petersen
Sara K. Stadler
The Grace Building
1114 Avenue of the Americas
New York, New York 10036
(650) 614-6427
(404) 532-6908
*jpetersen@kilpatricktownsend.com*
*sstadler@kilpatricktownsend.com*

*Attorneys for Amicus Curiae*
*HathiTrust*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................ii

STATEMENT OF INTEREST OF AMICUS CURIAE ...........................1

ARGUMENT ....................................................................................2

    I.    Introduction ..........................................................................2

    II.   The District Court's Decision Improperly Equates
         IA's Conduct At Issue With The Concept Of
         "Controlled Digital Lending." ..................................................3

    III.  Specific, Curated Digital Lending Practices
         Observing The "Owned To Loaned" Ratio Have
         Strong Claims to Fair Use. ....................................................7

    IV.  The District Court's Analysis Is Inconsistent With
         This Court's Fair Use Jurisprudence. ...................................10

         a.    *HathiTrust* and *Google* Did Not "Demarcate
               The Boundaries Of Fair Use." .....................................10

         b.    The District Court Erred In Analyzing The
                First Fair Use Factor. ..................................................12

         c.    The District Court Erred In Analyzing The
                Fourth Fair Use Factor. ...............................................14

         d.    The District Court's Presumption That IA's
                "Read Aloud" Function Is Infringing Ignores
               The Plain Text Of the Copyright Act As Well
               As This Court's Ruling In *HathiTrust*. ........................17

         CONCLUSION .................................................................20

# TABLE OF AUTHORITIES

## CASES

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) .............. 11, 12

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ...... passim

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ................... 2, 11

*Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021) .............. 7, 13, 14

*Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (JGK), 2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023) .............. passim

*Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) ......................................................................... 17

*Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ................................................................. 19, 20

*Stewart v. Abend*, 495 U.S. 207, 236 (1990) ............................................ 7

## STATUTES

17 U.S.C. § 106 ......................................................................................... 17

17 U.S.C. § 107 ................................................................................. passim

17 U.S.C. § 108 ........................................................................................... 7

26 U.S.C. § 501(c)(3) ............................................................................... 12

## OTHER AUTHORITIES

*ALA: New Tor Delay On Library eBooks Hurts Readers, Authors And Libraries*, ALAnews (July 19, 2018), https://www.ala. org/news/press-releases/2018/07/ala-new-tor-delay-library-ebooks-hurts-readers-authors-and-libraries .................................. 16

Chris Daley, *How the Library's Digital Borrowing Service (DIBS) Solved a Pandemic Problem*, Caltech Library (Feb. 9, 2022), https://library.caltech.edu/blog/dibs-overview ................................. 9

David R. Hansen & Kyle K. Courtney, *A White Paper On Controlled Digital Lending Of Library Books* (2018), https://controlleddigitallending.org/whitepaper/ ......................... 4, 5

*Emergency Temporary Access Service*, HathiTrust, https://www.hathitrust.org/member-libraries/services-programs/etas/ ............................................................................ 8, 9

H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 1976, 1976 U.S.C.C.A.N. 5659 (Sept. 3, 1976) .................................... 7

@LauraRosenthal, X (formerly Twitter) (Apr. 12, 2020, 8:57PM), https://x.com/LauraRosenthal/status/12495019062186 92608?s=20 .................................................................................. 9

*Sign Up for BARD and BARD Mobile*, Nat'l Library Serv. for the Blind and Print Disabled, Library of Cong., https://www.loc.gov/nls/how-to-enroll/sign-up-for-bard-and-bard-mobile/ .......................................................................... 19

U.S. Const. art. I, § 8, cl. 8 ............................................................ 2, 3

## STATEMENT OF INTEREST OF AMICUS CURIAE [1]

HathiTrust is based in the University of Michigan Library, where it operates library services on behalf of its member libraries. It was founded in 2008, when academic research libraries were in the early stages of digitizing their collections to advance research, teaching, and learning. The current list of members of HathiTrust is located at *Member List*, HathiTrust (2023), https://www.hathitrust.org/member-libraries/member-list/.

HathiTrust's mission is to contribute to research, scholarship, and the common good by collaboratively collecting, organizing, preserving, communicating, and sharing the record of human knowledge. To that end, HathiTrust operates HathiTrust Digital Library, a secure repository of over 18 million digitized library items drawn from the collections of more than 50 depositing libraries. This repository contains works "published over many centuries, written in a multitude of languages, covering

---

[1] The parties have consented to the filing of this brief by Amicus Curiae HathiTrust. Neither a party to this appeal nor its counsel authored this brief in whole or in part, and neither a party, its counsel, nor any person other than Amicus Curiae HathiTrust and its counsel contributed money that was intended to fund preparing or submitting this brief.

almost every subject imaginable." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 90 (2d Cir. 2014) ("*HathiTrust*").

"From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts . . . .'" *Id.* at 95 (alterations in original) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 574 (1994)); *see also* U.S. Const. art. I, § 8, cl. 8). In 2014, this Court held HathiTrust engages in fair use under 17 U.S.C. § 107 when it enables groundbreaking research capabilities that would be impossible with printed texts (such as text mining) and makes works available to individuals with print disabilities. *HathiTrust*, 755 F.3d at 101, 103. HathiTrust submits this brief as amicus curiae to explain how the district court's analysis threatens these and other fair uses by libraries.

## ARGUMENT

## I.    Introduction

Libraries' fundamental purposes are to preserve the cultural record, provide access to works of authorship, and encourage learning to flourish. The sweeping nature of the district court's decision below

threatens libraries' ability to fulfill these purposes because that analysis could be construed as preventing libraries from engaging in fair uses by providing access to the collections they have purchased and own, where such access promotes research or scholarship with no genuine harm to the copyright holder. This would put the district court's opinion directly at odds with this Court's fair use jurisprudence and would be counterproductive to copyright law's ultimate goal of promoting "the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8.

## II. The District Court's Decision Improperly Equates IA's Conduct At Issue With The Concept Of "Controlled Digital Lending."

Perhaps the most pervasive flaw in the district court's reasoning is that it uses Defendant-Appellant Internet Archive's ("IA") specific conduct as a proxy for a broader range of practices under the rubric of "controlled digital lending" (or "CDL"), a moniker libraries use to encapsulate lawfully lending to their patrons works that were digitized from their collections. The White Paper by David R. Hansen and Kyle K. Courtney is an outgrowth of the effort to identify the circumstances under which

libraries, consistent with copyright law, can provide access to digitized copies of physical works in their collections.[2]

The White Paper describes this concept as "enabl[ing] a library to circulate a digitized title in place of a physical one in a controlled manner," thereby "maintain[ing] an 'owned to loaned' ratio" and "employ[ing] appropriate technical measures to prevent users from retaining a permanent copy or distributing additional copies."[3] The White Paper is not prescriptive, beyond its emphasis on the importance of maintaining an "owned to loaned" link between (owned) physical resources and (loaned) digital copies of them.[4] Indeed, "owned to loaned," itself, is not a new concept, nor does it fully describe a particular lending service.

Libraries with large digital collections have worked hard for many years to develop systems for acquiring and thoughtfully managing their digitized versions of physical works within the bounds of copyright law. As the White Paper acknowledged, "[t]here are multiple versions of CDL-

---

[2] David R. Hansen & Kyle K. Courtney, *A White Paper On Controlled Digital Lending Of Library Books* 1 (2018) https://controlleddigital lending.org/whitepaper/ ("White Paper").
[3] *Id.*
[4] *Id.*

4

like systems currently being used in libraries."[5] The White Paper was deliberately drawn broadly to address a range of noninfringing ways in which libraries provide access to digitized works because there is no consensus—even among librarians—as to the specific practices CDL includes and the extent to which those practices are consistent with fair use.

Despite this lack of consensus, nearly everyone involved in these proceedings in the district court equated CDL with IA's particular practices at issue, effectively treating them as one and the same. IA argued that its "implementation of Controlled Digital Lending is fair use."[6] Plaintiffs-Appellees ("Publishers") characterized the concept as a "manufactured" doctrine composed of "artificial strictures."[7] Most amici in the district court joined the conversation because they believed CDL is either categorically infringing or categorically protected as fair use, and urged

---

[5] *Id.*

[6] Redacted Mem. of Law in Support of Def. Internet Archive's Mot. for Summ. J., *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (JGK), Dkt. 106 at 6, 20 (S.D.N.Y. July 7, 2022).

[7] Pls.' Mem. of Law in Support of Mot. for Summ. J., *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (JGK), Dkt. 99 at 19, 30 (S.D.N.Y. July 7, 2022).

the district court to issue a broad ruling on CDL based solely on IA's conduct. Unfortunately, the district court obliged.

The district court's opinion paints with far too broad a brush. Most troubling, the district court asserted, arguably in *dicta*, that organizations (necessarily including libraries) have no "right under fair use to make whatever copies of [their] print books are necessary to facilitate digital lending of that book"—even where "only one patron at a time can borrow the book for each copy that has been bought and paid for." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (JGK), 2023 WL 2623787, at *11 (S.D.N.Y. Mar. 24, 2023) ("*Hachette*"). This is an extraordinarily sweeping statement because it would condemn as infringing a wide range of conduct with strong claims to fair use, as discussed in more detail below.

By failing to confine its analysis to IA's conduct at issue, the district court produced an opinion that reaches the concept of CDL and, with it, the "owned to loaned" ratio as a guiding principle. The district court's analysis therefore casts a cloud over the myriad ways in which libraries routinely preserve, use, and lend digitized copies of physical materials they purchased and own.

The Supreme Court recently described "fair use" as an "'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1196 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). The Court should take this opportunity to emphasize that when it comes to fair use, "each case raising the question must be decided on its own facts." H.R. Rep. No. 94–1476, 94th Cong., 2d Sess. 1976, 1976 U.S.C.C.A.N. 5659, 5679 (Sept. 3, 1976). The curated digital lending practices of HathiTrust's member institutions were not before the district court, they are not before this Court, and they should stand or fall on their own merits.

## III. Specific, Curated Digital Lending Practices Observing The "Owned To Loaned" Ratio Have Strong Claims to Fair Use.

Libraries digitize works of all kinds, both to keep works from deteriorating or being destroyed and to facilitate lawful uses by their patrons, such as those enumerated in 17 U.S.C. § 108, as well as others protected by 17 U.S.C. § 107. HathiTrust's Emergency Temporary Access Service ("ETAS"), for example, permits special access for HathiTrust member li-

braries that suffer an unexpected or involuntary, temporary, and documented disruption to normal operations, such as closure for a public health emergency or natural disaster, requiring the library to be closed to its patrons or to otherwise restrict print collection access services.[8] During the heart of the COVID-19 pandemic when academic libraries were physically closed, ETAS enabled HathiTrust's member library patrons to obtain lawful access to specific digital materials in the HathiTrust Digital Library that correspond to physical books held by their own library.[9]

HathiTrust has collected data from its members' catalogs since 2010, and it can match its digital holdings with its members' physical collections. HathiTrust also strongly controls access to copyrighted works via ETAS, employing technological measures to enforce an "owned to loan" ratio for the library making use of the service. This ensures that the library's users can only access books to which they would ordinarily have access if the library were able to operate normally.

---

[8] *See Emergency Temporary Access Service*, HathiTrust, https://www.hathitrust.org/member-libraries/services-programs/etas/ (last visited Dec. 21, 2023).
[9] *Id.*

ETAS enables HathiTrust's member libraries to continue supporting the research, teaching, and learning missions of their institutions during the unexpected and unavoidable disruptions in service.[10] As Laura Rosenthal, Ph.D., Director for Faculty Leadership and a Professor of the English Department at the University of Maryland, explained, "I did not expect to be doing my final corrections and reference checking for [my] new book in [the COVID-19] pandemic with all of the libraries closed, so huge thanks to @hathitrust for emergency temporary access service and gratitude to @UMDLibraries for facilitating."[11] Since the COVID-19 pandemic, during which ETAS was widely publicized, other academic institutions have created similar programs to ensure access to scholarly works during library closures, including Caltech's Digital Borrowing Service (DIBS).[12]

Based on the evidence of record, IA's Open Library functions differently from ETAS. To identify but one example, IA's partner libraries

---

[10] *Id.*

[11] *See* @LauraRosenthal, X (formerly Twitter) (Apr. 12, 2020, 8:57 PM), https://x.com/LauraRosenthal/status/1249501906218692608?s=20.

[12] *See* Chris Daley, *How the Library's Digital Borrowing Service (DIBS) Solved a Pandemic Problem*, Caltech Library (Feb. 9, 2022), https://library.caltech.edu/blog/dibs-overviewhttps://library.caltech.edu/blog/dibs-overview.

"'contribute' the number of their print copies of the book toward the number of lendable copies on IA's Website," making those copies available to users that are not patrons of the partner libraries themselves. *Hachette*, 2023 WL 2623787, at *3.

Rather than confine its analysis to this use, however, the district court stated Publishers would be "entitled to revenue from all formats of the Works in Suit, regardless [of] whether IA lawfully acquired the Works in print first." *Id.* at *15. While arguably *dicta*, this broad language could be construed as condemning as "unfair" a variety of curated digital lending practices in which libraries loan digitized copies of the owned physical works in their own collections. Like ETAS, many of these practices have strong claims to fair use, and again, none was before the district court in this case.

## IV. The District Court's Analysis Is Inconsistent With This Court's Fair Use Jurisprudence.

### a. *HathiTrust* and *Google* Did Not "Demarcate The Boundaries Of Fair Use."

As discussed above, there exist many curated implementations of digital lending using the "owned to loaned" ratio that would both enable controlled access to copyrighted works and fall comfortably within the boundaries of 17 U.S.C. § 107. The fair use arguments for enabling access

to those works would be compelling, but the district court's decision treats them as essentially the same as IA's specific uses before the court. It then locates both IA's conduct and the "owned to loaned" ratio outside the "boundaries of fair use" by characterizing this Court's decisions in *HathiTrust* and *Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015) ("*Google*"), as having "demarcated" those outer boundaries. *Hachette*, 2023 WL 2623787, at *7 (citation omitted). The district court was mistaken.

Every dispute involving fair use "tests the boundaries" of the doctrine, *see Google*, 804 F.3d at 206, but nothing in *HathiTrust* or *Google* indicates that the conduct in those cases defines the ambit of 17 U.S.C. § 107. *HathiTrust* involved "a full-text searchable database," which this Court termed "a quintessentially transformative use." *HathiTrust*, 755 F.3d at 97. In *Google*, this Court had "no difficulty" concluding the search function involved "a highly transformative purpose" that was "highly convincing"—indeed, the very "sort of transformative purpose described in *Campbell* as strongly favoring satisfaction of the first factor." 801 F.3d at 216, 217, 219 (citing *Campbell*, 510 U.S. at 579).

In fact, the conduct at issue in both *HathiTrust* and *Google* was well **within** the boundaries of fair use. This necessarily means that the same could be true of a variety of other uses libraries might make of digitized copies of copyrighted works—including, in some instances, lending them, as HathiTrust does to patrons who have documented print disabilities. The district court was wrong to suggest otherwise.

> **b.    The District Court Erred In Analyzing The First Fair Use Factor.**

The first fair use factor inquires into "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The district court found IA's conduct commercial because IA "uses its Website to attract new members, solicit donations, and bolster its standing in the library community." *Hachette*, 2023 WL 2623787, at *9.

The overwhelming majority of libraries in the United States engage in most or all of these activities. Indeed, nonprofit entities of every description regularly engage in these activities without losing their tax exempt status under 26 U.S.C. § 501(c)(3); by their very nature, nonprofits must rely heavily on gifts to continue to operate. As IA and other amici

have explained at greater length, if these activities were sufficient to constitute commerciality in this Circuit, the term "commercial" would have no meaning.

The significance of the district court's finding that IA's conduct was commercial cannot be understated. In many instances, whether a use is found commercial can determine whether the first fair use factor favors the plaintiff or the defendant. For example, one of the uses at issue in *HathiTrust* was HathiTrust Digital Library's provision of the works in its digital archive in accessible formats to patrons who have print disabilities. This Court held that use was "not 'transformative,'" but in the context of HathiTrust's indisputably noncommercial use, "providing access to the print-disabled is still a valid purpose." *HathiTrust*, 755 F.3d at 101–02. The Court found this factor favored HathiTrust, and went on to "conclude that the doctrine of fair use allows the Libraries to provide full digital access to copyrighted works to their print-disabled patrons." *Id.* at 102–03. This ***is*** lending digitized works in a library's collection.

As the Supreme Court instructed in *Google v. Oracle*, "[t]he text of § 107 includes various noncommercial uses, such as teaching and scholarship, as paradigmatic examples of privileged copying. There is no doubt

that a finding that copying was not commercial in nature tips the scales in favor of fair use." 141 S. Ct. at 1204. Here, by contrast, the district court attempts to create a standard in which virtually all nonprofit educational purposes would be considered commercial. This error, therefore, pervaded the district court's analysis of the first factor, and this Court should correct it.

### c. The District Court Erred In Analyzing The Fourth Fair Use Factor.

As noted previously, the district court painted with too broad a brush when it stated that an organization has "no . . . right" under 17 U.S.C. § 107 "to make whatever copies of its print books are necessary to facilitate digital lending of that book, so long as only one patron at a time can borrow the book for each copy that has been bought and paid for"—regardless of the organization doing the lending and the circumstances surrounding it. *Hachette*, 2023 WL 2623787, at *11.

The district court's basis for this broad statement were its findings concerning "a 'thriving ebook licensing market for libraries,'" from which it concluded that IA "usurp[s] a market that properly belongs to the copyright-holder." *Id.* at *13, *14 (citations omitted). In the district court's analysis, the facts that "IA and its Partner Libraries once purchased

print copies of all the Works in Suit" was "irrelevant" because "Publishers do not price print books with the expectation that they will be distributed in both print and digital formats." *Id.* at *15 (citation omitted). That is, "Publishers are entitled to revenue from all formats of the Works in Suit, regardless whether IA lawfully acquired the Works in print first." *Id.* at *15.

Having thus defined the "relevant market," the court then found it "***evident***" that IA's conduct caused "cognizable harm" in that market. *Id.* at *14 (emphasis added) (citation omitted). In other words, the district court simply presumed market harm. The same evidence used by Publishers to define a "market" was proof that IA had harmed it.

This analysis is deeply flawed. Market harm must be proven because markets are not theoretical constructs. They often are difficult to define and they often fail (whether by accident or design).[13] HathiTrust

---

[13] For more popular or recently published works, for example, publishers often make digital licenses to libraries prohibitively expensive because publishers would prefer readers to buy books instead of having access to a library copy. In 2018, for example, "Tor, a division of Macmillan, announced without warning that it was immediately beginning to embargo ebook sales of new titles to libraries for four months," apparently because it viewed library lending as adversely affecting sales. *ALA: New Tor Delay On Library eBooks Hurts Readers, Authors And Libraries*, ALAnews

conservatively estimates that: (1) at least 80% of the copyrighted books in its own collections are not currently in print, and most of those books are not available for license in digital format; and (2) at least 50% of copyrighted books in academic libraries are unavailable for sale or digital license.[14] Indeed, many of HathiTrust's collections were deliberately built with great care, and at great expense, because the market for many academic works is fleeting at best.

These challenges cause librarians to spend much time thinking about fair use, in order to give patrons access to copies of works that libraries purchased and own without creating an opportunity for users to substitute a digital copy for a purchased copy. These deliberations include deep consideration of the rights of copyright holders in existing and reasonable markets for their works. Curated digital lending practices observing the "owned to loaned" ratio that do not supplant existing licensing markets allow libraries to preserve artifacts for posterity, and allow

_____

(July 19, 2018), https://www.ala.org/news/press-releases/2018/07/ala-new-tor-delay-library-ebooks-hurts-readers-authors-and-libraries.

[14] Of these volumes, many are physically deteriorating, presenting a serious risk of loss.

the next generations of scholars, researchers, and the public to discover and build upon this enormous store of knowledge.

Providing access to digitized copies of works in such cases promotes research, teaching, and learning with no genuine harm to the copyright holder. Harm should not be presumed simply because the copyright holder defines a "market," without regard to whether the evidence supports a finding that the use at issue "serves as a substitute for the original." *HathiTrust*, 755 F.3d at 100. To hold otherwise would give Publishers the power to establish a "customary price" for **every** lending practice in which libraries regularly engage. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985). This is not the law. *See HathiTrust*, 755 F.3d at 99–100 (rejecting the plaintiffs' "lost opportunity to license" theory of market harm).

### d. The District Court's Presumption That IA's "Read Aloud" Function Is Infringing Ignores The Plain Text Of the Copyright Act As Well As This Court's Ruling In *HathiTrust*.

In asserting that "IA does not dispute that it violated . . . the Publishers' public performance rights, through the 'read aloud' function on IA's website," *Hachette*, 2023 WL 2623787, at *5, the district court broadly misconstrued the relationship between 17 U.S.C. § 106 and 17

U.S.C. § 107 and inadvertently collided with this Court's ruling in *HathiTrust*.

When any defendant raises fair use as a defense, it necessarily asserts that its use is "not an infringement of copyright." 17 U.S.C. § 107. Thus, the district court was mistaken in presuming that IA or any other defendant asserting its fair use rights has conceded any violation. To the contrary, defendants who claim fair use are unambiguously asserting that they made noninfringing uses authorized by Congress in 17 U.S.C. § 107. The district court's misunderstanding of this point impairs its analysis throughout the opinion by presuming an admission of infringement.

This misunderstanding is especially poignant with regard to the court's conclusions about the "read aloud" function, a service designed specifically to provide equitable access for people who have print disabilities. IA's "read aloud" function enables readers who have print disabilities to access the same works as everyone else through IA's BookReader. Just as people who need closed captioning can use that functionality

through their televisions, readers using IA's BookReader can click the headphones icon to experience the book in audio format.[15]

For the district court to presumptively sweep this "'read aloud' *function*," *see Hachette*, 2023 WL 2623787, at \*5 (emphasis added), into its findings of infringement—without any substantive analysis—is to imperil myriad other functions and services that long have enabled people who have disabilities to participate in society, such as closed captioning, refreshable Braille displays, screen readers, and the National Library of the Blind and Print Disabled's BARD functions.[16]

In *HathiTrust*, this Court made clear that providing access to copyrighted works to people who have disabilities is not only a compelling purpose, but it also is consistent with the legislative history of 17 U.S.C. § 107:

> As Justice Stevens wrote for the Court [in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)]: "Making a copy of a copyrighted work for the convenience of a blind person is expressly identified by the House

---

[15] Listen to Charles Darwin's *The Origin of Species* here: https://archive.org/details/originofspecies00darwuoft/mode/2up?view=theater (last visited Dec. 21, 2023).

[16] See *Sign Up for BARD and BARD Mobile*, Nat'l Library Serv. for the Blind and Print Disabled, Library of Cong., https://www.loc.gov/nls/how-to-enroll/sign-up-for-bard-and-bard-mobile/ (last visited Dec. 21, 2023).

Committee Report as an example of fair use, with no sugges-
tion that anything more than a purpose to entertain or to in-
form need motivate the copying."

*HathiTrust*, 755 F.3d at 102 (quoting *Sony*, 464 U.S. at 455 n. 40). This

Court believed this "supports a finding of fair use in the unique circum-

stances presented by print-disabled readers." *Id.* The district court ap-

pears to have given no consideration to this analysis. This Court should

correct this error.

## **CONCLUSION**

Academic libraries respect copyright and do a great deal to encour-

age greater understanding of copyright by students, faculty and staff at

their institutions, including hiring expert copyright librarians and offer-

ing library educational programs. Libraries are active and engaged pro-

ponents of copyright compliance, not "collaborators" in a scheme to vio-

late copyright law, as some amici in the district court suggested.[17]

By using IA's specific conduct as a vehicle to make statements about

the legality of CDL in general, the district court's opinion could be used

to condemn a wide variety of curated lending practices by which libraries

_____

[17] *See* Br. of Amici Curiae Professors and Scholars of Copyright Law in
Support of Pls. and in Opp. to Internet Archive, *Hachette Book Grp., Inc.
v. Internet Archive*, No. 20-cv-4160 (JGK), Dkt. 163, at 7 (S.D.N.Y. Aug.
15, 2022).

lend digitized copies of the works in their physical collections—without any regard for whether publishers offer those works in digital formats (or make them prohibitively expensive for libraries to purchase or license). This ruling has been widely perceived by libraries as a threat to lending of digital copies in general, or even "part of a broader historical push to make libraries obsolete."[18] Neither the record in this case nor the applicable law supports such a result.

Dated:  December 22, 2023

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By:  */s/ Joseph Petersen*

Joseph Petersen
Sara K. Stadler
The Grace Building
1114 Avenue of the Americas
New York, New York 10036
(650) 614-6427
(404) 532-6908
*jpetersen@kilpatricktownsend.com*
*sstadler@kilpatricktownsend.com*

*Attorneys for Amicus Curiae HathiTrust*

---

[18] *See* Kyle Jahner, *Internet Archive Copyright Loss Hits Library Digital Lending*, Bloomberg Law (Mar. 29, 2023), https://news.bloomberglaw.com/ip-law/internet-archive-copyright-loss-will-hit-library-digital-lending.

## CERTIFICATE OF COMPLIANCE

Counsel for Amicus Curiae HathiTrust certifies that this brief complies with the length, spacing, typeface, and style requirements of Federal Rules of Appellate Procedure 29(a)(4)(G), 29(a)(5), and 32(a)(7)(B) and Second Circuit Local Rules 29.1(c) and 32.1(a), and contains 4,029 words excluding the cover page, table of contents, table of authorities, signature block, and certificates of compliance and service.

*/s/ Joseph Petersen*

Joseph Petersen
KILPATRICK TOWNSEND & STOCKTON LLP

*Attorney for Amicus Curiae HathiTrust*