# 23-1260

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC. ET AL.,

PLAINTIFFS-APPELLEES,

v.

INTERNET ARCHIVE, ET AL.,

DEFENDANTS-APPELLANTS,

On Appeal from the United States District Court
for the Southern District of New York
Civil Action No. 1:20-cv-4160, Hon. John G. Koetl

## BRIEF *AMICUS CURIAE* OF FLOOR64, INC. D/B/A THE COPIA INSTITUTE IN SUPPORT OF DEFENDANTS-APPELLANTS

Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone: 202-642-2849
Email: cathy@cgcounsel.com

,
*Counsel for Amici Curiae*

December 22, 2023

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, amicus curiae Floor64, Inc. d/b/a The Copia Institute states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................II

TABLE OF AUTHORITIES ................................................................. IV

STATEMENT OF INTEREST.................................................................6

SUMMARY OF ARGUMENT ................................................................7

ARGUMENT ....................................................................................8

I.     THE DISTRICT COURT DECISION PUTS COPYRIGHT LAW AT
       ODDS WITH THE CONSTITUTION.............................................8

II.    THE DISTRICT COURT DECISION HARMS THE EXCHANGE OF
       KNOWLEDGE AND EXPRESSIVE FREEDOM. .....................................14

CONCLUSION ................................................................................20

CERTIFICATE OF COMPLIANCE........................................................21

CERTIFICATE OF SERVICE .............................................................22

# TABLE OF AUTHORITIES

**Cases**

*Board of Education v. Pico*, 457 U.S. 853 (1982) ....................................................11

*Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, (2020)................................13

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994)............................... 12, 13

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ......................................... 10, 12

*Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, (1991) .....15

*Golan v. Holder*, 132 S.Ct. 873 (2012)...................................................12

*Gonzales v. Raich*, 545 U.S. 1 (2005)....................................................10

*Marbury v. Madison*, 1 Cranch 137 (1803) ..............................................9

*United States v. Morrison*, 529 U.S. 598 (2000) .......................................8

**Statutes**

17 U.S.C. § 107.................................................................................11

8 Anne, c. 19 (1710)..........................................................................14

**Other Authorities**

Cathy Gellis, *Book Review: Danny Dunn and the Homework Machine*, TECHDIRT

   (Apr. 17, 2020) ...........................................................................12

Heather Bellow, *The police officer who searched for a book in a Great Barrington

   classroom also used a body camera. The ACLU has 'deep concerns'*, THE

   BERKSHIRE EAGLE (Dec. 20, 2023) ...............................................17

https://www.ala.org/advocacy/bbooks/book-ban-data ...........................16

Kashmir Hill, *An Internet Veteran's Guide to Not Being Scared of Technology*, NEW YORK TIMES (Jul. 29, 2023)............................................................6

Leslie Postal, *Orange school district pulls 673 books from teachers' classroom shelves*, ORLANDO SENTINEL (Dec. 21, 2023) .....................................................17

Nicole Chavez, *At least 50 groups in the US advocated to ban books in the past year*, CNN (Sept. 19, 2022)................................................................................17

Rachel Treisman, *U.S. book bans are taking a toll on a beloved tradition: Scholastic Book Fairs*, NPR.ORG (Oct. 17, 2023)................................................18

## STATEMENT OF INTEREST[1]

Amicus Copia Institute is the think tank arm of Floor64, Inc., the privately-held small business behind Techdirt.com ("Techdirt"), an online publication that has chronicled technology law and policy for nearly 25 years.[2] In this time Techdirt has published more than 70,000 articles regarding subjects such as freedom of expression and copyright—issues that are at the heart of this matter—and receives more than a million page views per month, with its articles attracting nearly two million reader comments. As a think tank the Copia Institute also produces evidence-driven white papers examining the nuance and assumptions underpinning tech policy. Then, armed with its insight, it regularly files regulatory comments, amicus briefs, and other advocacy instruments on these subjects to help educate lawmakers, courts, and other regulators—as well as innovators, entrepreneurs, and the public—with the goal of influencing good policy that promotes and sustains

---

[1] Pursuant to FRAP 29(a), amicus curiae certifies that all parties have consented to the filing of this brief. Pursuant to FRAP 29(c)(5), amicus curiae further certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and no party or person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

[2] Its founder and owner Michael Masnick was recently profiled in the New York Times. Kashmir Hill, *An Internet Veteran's Guide to Not Being Scared of Technology*, NEW YORK TIMES (Jul. 29, 2023), https://www.nytimes.com/2023/07/29/technology/mike-masnick-techdirt-internet-future.html.

innovation and expression.  Many such filings have implicated the exact same issues as those at the fore of this litigation.

As an enterprise whose business is built around engaging in expressive conduct, copyright policy is highly relevant to its own endeavors, which also heavily depend on the First Amendment protections implicated by this case.  The Copia Institute therefore submits this brief amicus curiae wearing two hats: as a longtime commenter on the issues raised by the litigation, and as a small business whose own expressive freedom is directly injured by the diminishment of fair use wrought by the decision now before this Court for review.

## SUMMARY OF ARGUMENT

In its brief the Defendant-Appellant[3] explains how the district court's decision deviates from previously established fair use doctrine.  Amicus Copia Institute writes to further amplify (1) how these errors put the copyright statute at impermissible odds with the Constitution and (2) how the practical effect of the decision evinces inconsistency with the Progress Clause and First Amendment.

---

[3] This brief focuses on the activities of the Internet Archive.

## ARGUMENT

**I.    The district court decision puts copyright law at odds with the Constitution.**

Over the decades and centuries copyright law in America has often changed form, sometimes dramatically and in raw statutory substance, such as in the shift from the 1909 copyright law to the 1976 version, and sometimes via seminal interpretations by this and other courts. But in any of its many forms copyright law has always had to comply with two Constitutional requirements.

First, Congress's power to legislate is inherently limited to areas articulated by the Constitution as places where it is appropriate for it to act. *See United States v. Morrison*, 529 U.S. 598, 607 (2000) (citing *Marbury v. Madison*, 1 Cranch 137, 176 (1803) ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution. 'The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'"). If Congress acts in a way that is not consistent with that grant of legislative authority, then its legislation is unconstitutional. *Id.* at 602.[4]

The federal authority to implement a system of copyrights is found in the Progress Clause, which empowers Congress to further the progress of sciences and

---

[4] Similarly, should the courts interpret Congress's statutes in a manner that is inconsistent with that grant of authority, it would render the unconstitutional as well. *See* discussion *infra*.

useful arts through systems of limited monopolies, such as copyright. U.S. CONST. art. I, § 8, cl. 8 ("To promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries.").  But if Congress produces a law involving the sort of monopoly described by the Progress Clause that does not further this Constitutional objective to promote the progress of science and useful arts, then that resulting law cannot be rooted in this authority.

The condition for this particular grant of legislative power entitling Congress to pass a copyright law is that its exercise will promote progress, and such an outcome is an important predicate for its exercise of that power to be legitimate. No such conditioning language would have been needed were such an outcome not so closely tied to the reasons why Congress was granted this particular form of legislative power.  *See Marbury v. Madison*, 1 Cranch 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect; and, therefore, such a construction is inadmissible, unless the words require it."). Allowing Congress to grant monopolies is unique among its other legislative domains and on its own rather extraordinary, which would explain why Congress was only endowed with this power with this tempering.

But because this progress-promoting outcome is such an important predicate constraining Congress's ability to implement a copyright law, it means that

Congress cannot simply label anything it wants to do legislatively as copyright-related to automatically make it a product of this grant of legislative authority. If it could then Congress could easily pass a "copyright" law with all sorts of random provisions not even tangentially related to promoting the progress of sciences and useful arts. Its legislative authority would essentially be unbounded. *See Gonzales v. Raich*, 545 U.S. 1, 52 (2005) (O'Connor, J., dissenting) ("[Congress's] authority must be used in a manner consistent with the notion of enumerated powers — a structural principle that is as much part of the Constitution as the Tenth Amendment's explicit textual command."). While the courts have found Congress to have wide latitude to decide how best to promote the progress of science and useful arts in its copyright legislation, *Eldred v. Ashcroft*, 537 U.S. 186, 211-13 (2003), none could allow Congress the power to do the exact *opposite* of promoting progress under this Constitutional authority. Thus, statutory terms that do *not* advance the progress of sciences and the useful arts are inherently unsound Constitutionally, because it is beyond Congress's authority to do something ostensibly involving these monopolies that does not meet that objective, or, worse, directly undermines it.

Congress's hands are also further tied by the First Amendment, which prohibits making a law that impinges on free expression. U.S. CONST. amend. I ("Congress shall make no law […] abridging the freedom of speech"). Crucially,

the right of free expression transcends the bare ability to express oneself.  It also inherently includes a right to read, or, stated more broadly, the right to "receive information and ideas."  *See Board of Education v. Pico*, 457 U.S. 853, 866-67 (1982) (citing cases).  Democracy itself depends on it.  *Id.* at 867.  "[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom."  *Id.* (citing 9 Writings of James Madison 103 (G. Hunt ed.1910) ("A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both.")).   In other words, it offends the First Amendment for state action to keep someone from accessing expression as much as it would for state action to keep someone from expressing it.  *Id.* (quoting Martin v. Struthers, 319 U. S. 141, 319 U. S. 143 (1943) ("The right of freedom of speech and press . . . embraces the right to distribute literature, and necessarily protects the right to receive it.")).   In sum, if the effect of legislation that Congress passes is that it obstructs access to expression, then such legislation would be unconstitutional on that basis as well.

In this case, however, no issue is taken with Congress's legislative drafting, which incorporated into the 1976 Copyright Act, still in effect, language expressly protecting fair use.  17 U.S.C. § 107.  As the courts have found, fair use helps vindicate the First Amendment values promoting discourse within copyright law.

*Golan v. Holder*, 132 S.Ct. 873, 890 (2012); *Eldred*, 537 U.S. at 219-20. Fair use also helps vindicate the goals and purposes of the Progress Clause itself, given how it helps promote the creation of future new works. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) ("The fair use doctrine thus "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.").[5]

The issue with this case is that the district court's decision interpreted this statutory language in a way that now deprives it of its inherent Constitutionality. *See Eldred*, 537 U.S. at 212 ("We have also stressed, however, that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives."). Rather than fostering the exchange of more expression, this interpretation of the fair use factors outright inhibits it by imposing liability upon the very facilitating of that exchange, even though it was done in a way that overtly is intended to vindicate the goal and purpose of copyright law to promote that exchange, and without sufficient justification to excuse the interference with that

---

[5] In this case the record shows how being able to access books via the Internet Archive helps others' expression, such as reference material that can underpin their assertions. In the case of amicus Copia Institute, access to books on the Internet Archive have provided fodder for entire pieces of writing further exploring ideas and topics raised by the original work. *See*, *e.g.*, Cathy Gellis, *Book Review: Danny Dunn and the Homework Machine*, TECHDIRT (Apr. 17, 2020), https://www.techdirt.com/2020/04/17/book-review-danny-dunn-homework-machine/.

exchange.  See discussion Section II *infra*.  Its interpretation thus puts the statute in conflict with both the First Amendment and the goal and purpose of copyright law articulated in the Constitution.  *Campbell*, 510 U.S. at 575 (1994) ("From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.').  Only here it is the district court, not Congress, that has rendered the current copyright statute now unconstitutional.

Courts, however, cannot unilaterally change the effective meaning of statutory text.  *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1738 (2020) ("If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.").  And they especially cannot be permitted to change it in a way that alters its constitutionality.  *See id.* ("[W]e would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.").  *See also id.* at 1753 ("[T]he same judicial humility that requires us to refrain from adding to statutes requires us to refrain from diminishing them.").

For this reason, the decision must be overturned, and in a way that makes clear that the measure of constitutionality for copyright law in any form, regardless of whether the parameters of that law have been crafted by Congress or by the courts, is that it does not chill the exchange of expressed knowledge, as this decision, thanks to its reasoning, does in measurable effect.

## II.    The district court decision harms the exchange of knowledge and expressive freedom.

A world where the district court is right, and what the Internet Archive did was wrong, is a world where copyright law harms the very outcome it was intended to enable. From its roots in the Statute of Anne as a "statute for learning," 8 Anne, c. 19 (1710), to its Constitutional articulation as a policy designed to promote progress, copyright law was designed to accomplish what it is now telling the Internet Archive it cannot do: connect people with knowledge. The essential reality is that the Internet Archive has legally-obtained books, and the public is full of people wanting to read books. This decision stands for the unprecedented proposition that law can stand between them, even though copyright law itself, and the values of the First Amendment, would require otherwise.

In the case of copyright, the law would stand between lenders of books and the reading public even though the very reason for the law would counsel otherwise. We offer creators "limited monopolies for limited times" in order to incentivize them to create. But the whole point of encouraging creation is so the public can get the

benefit of the creation. In situations where they cannot get that benefit because access to the works is obstructed we should want the law to actually help bridge the gap. Yet here it is instead acting as an obstruction itself.

The problem is that the decision focuses on the wrong end of the copyright equation—the exclusive rights of creators—instead of the benefit the public is supposed to receive. It is the wrong emphasis because copyright law is always supposed to be for the benefit of the public, not the creators. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 349 (1991) ("The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'"). The exclusive rights of a copyright holder are, after all, the means of achieving copyright's purpose, not the purpose of the law itself. When considering whether a use is fair, the question should always be analyzed not in terms of whether it in some way might limit a copyright owner's rights—most fair uses do—but whether it would limit the public's. In this case, restricting access to books that could have lawfully been shared in physical form fails the public. And it is thus their rights that have become trammeled, and not in service of anything copyright law is intended to achieve.

It also should never be so easy to use law to take books out of the hands of people who want to read them, which is what the decision is effectively doing by saying no to the Internet Archive's electronic lending of the books it owns. If it is a

result that law can truly justify, it should be clear that the intrusion on the public's rights can be warranted. Here, however, the books were taken away with only the most meager of showings that driving the public of access to these books could be justified. The district court fueled its decision with assumption rather than evidence showing definitive harm to the copyright owner, when the burden should instead have been on copyright owners to show how such an extraordinary act of saying no to the exchange of knowledge could be constitutionally supportable. But such analytical shortcuts should not able to lead to a result that is at essence so extreme and constitutionally discouraged.

Particularly because being too easily able to use law to obstruct access to expression will not stop with copyright law. This decision, where the constitutional hurdle to restrict access to expression has been so low, will only encourage even more of the statutory hijinks and other governmental efforts that have already caused the removal of hundreds if not thousands of books from schools and libraries across the country. In the first eight months of 2023 alone the American Library Association counted 695 attempts to censor library materials, affecting nearly 2000 titles.[6] Eleven states saw challenges to over 100 titles at a time, a substantial increase over historic attacks on books, which tended to happen one at a time.[7] Sometimes

---

[6] *See* https://www.ala.org/advocacy/bbooks/book-ban-data.
[7] *See id.*

these attacks stem from officious neighbors insisting school boards cower to their demands.[8]  In other cases, police have scoured shelves looking to seize books they unilaterally deemed objectionable.[9]  And in several states these and other removal activities are the byproduct of new laws insisting on the removal of books addressing topics the legislatures have decided to disfavor, irrespective of their educational value or literary esteem.[10]

These removals directly offend the First Amendment right to read, taking books away from readers and thus directly impinging on their right to read them. Such deprivations should have a steep hill to climb before they could possibly pass constitutional muster, and there should be heavy burdens placed on those who would take books away from the reading public under the mantle of law before such efforts could be permitted.

---

[8] *See, e.g.*, Nicole Chavez, *At least 50 groups in the US advocated to ban books in the past year*, CNN (Sept. 19, 2022), https://www.cnn.com/2022/09/19/us/book-ban-movement-pen-america-report-reaj/index.html.

[9] *See, e.g.*, Heather Bellow, *The police officer who searched for a book in a Great Barrington classroom also used a body camera. The ACLU has 'deep concerns'*, THE BERKSHIRE EAGLE (Dec. 20, 2023), https://www.berkshireeagle.com/news/southern_berkshires/great-barrington-gender-queer-book-police-ban-classroom-du-bois-middle-school-aclu-rights/article_14ba4abc-9eb9-11ee-83c9-0b3ff1c1b9dd.html.

[10] *See, e.g.*, Leslie Postal, *Orange school district pulls 673 books from teachers' classroom shelves*, ORLANDO SENTINEL (Dec. 21, 2023), https://www.orlandosentinel.com/2023/12/20/ocps-books/.

With the instant case, however, the copyright owners who would seek to deprive the reading public of access to their works themselves faced no such burden. Which opens the door to others who would seek to deprive the reading public of access to works to be able to successfully affect those deprivations without the significant constitutional scrutiny such deprivations require. And in any case the effect is the same: it makes no difference to a reader who took the book away, a censor or a copyright owner; they still can't read it.

And with this decision the Internet Archive, which has the book to lend, can't help them. The bitter irony is that the Internet Archive was itself providing a remedy to the unconstitutional deprivations to readers caused by other state action. The fundamental problem that the Internet Archive solves is how to provide access to books when access is not otherwise possible, whether it is because the school or library with the books is closed for a pandemic, or because their bookshelves are too far away, or because their shelves have been emptied by overzealous censors. True, books sometimes[11] were purchasable and licensable—and the record shows that

_____

[11] And often they were not. Many of the books lent by the Internet Archive are out-of-print, even if they may still be covered by copyright, which is another form of obstructed access. *See*, *e.g.* FN 5, *supra* (referencing the Danny Dunn novel). And some books still in print were not necessarily being sold, thanks to threats by censors. *See*, *e.g.*, Rachel Treisman, *U.S. book bans are taking a toll on a beloved tradition: Scholastic Book Fairs*, NPR.ORG (Oct. 17, 2023), https://www.npr.org/2023/10/17/1206219484/scholastic-book-fair-diversity-book-bans. Even if the specific fair use analysis involving a work for which there is no market opportunity being exploited might differ from the analysis involving one

books were indeed purchased and licensed, even during the National Emergency Library—but requiring readers to have the resources needed to acquire their own personal copies of works before they can be permitted to enjoy them is more than what the copyright statute demands and just another way to obstruct access.

The Internet Archive found a way to route around all these obstructions and fix the essential problem copyright law should want to be fixed: getting books into the hands of people who wanted to read them and making sure that exchange of knowledge can happen. It is an odd thing for the courts to now say no to. Copyright law should want to promote access to works, because it does nothing to promote progress if the law incentives the creation of works that no one can actually enjoy. In this case, enabling the books that were already lawfully readable be read is what copyright law should instead be glad for the Internet Archive to do.

---

where there is, the district court's decision effectively reaches all such uses. And for the reasons explained above, and by Appellant, all such uses should be permissible.

## CONCLUSION

The district court decision should be reversed.

Dated: December 22, 2023

By:  /s/ Catherine R. Gellis__
Catherine R. Gellis, Esq.
3020 Bridgeway #247
Sausalito, CA 94965
Telephone:  202-642-2849
Email: cathy@cgcounsel.com

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.     This Brief of Amicus Floor64, Inc. d/b/a The Copia Institute complies with the word limit of Fed. R. App. P. 29(c)(2) because this brief contains 3423 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: December 22, 2023          By:   /s/ Catherine R. Gellis__

                                               Catherine R. Gellis

                                               *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on December 22, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 22, 2023          By:  /s/ Catherine R. Gellis

                                              Catherine R. Gellis

                                            *Counsel for Amicus Curiae*