# 23-1260

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

**AMICUS CURIAE BRIEF OF INTELLECTUAL PROPERTY LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF APPELLANT**

Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02130
Telephone: 703-593-6759

*Attorney for Amici Curiae*

DECEMBER 15, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE .............. 1

SUMMARY OF ARGUMENT .......................................................................... 1

I.    Nonprofit Library Lending Is a Favored Noncommercial Use. ...................... 3

    A.    Nonprofit Uses Meaningfully Differ from Profit-Seeking Uses by
Promoting Diversity of Thought and Access to Information. ............................ 3

    B.    Broad Definitions of "Commercial" Under Factor One Are Erroneous .... 7

II.    Nonprofit Library Lending Is Presumptively Not Harmful To Markets in
Which the Copyright Owner Has a Legitimate Interest. ....................................... 13

CONCLUSION ................................................................................................... 20

APPENDIX .......................................................................................................... 22

CERTIFICATE OF COMPLIANCE .............................................................. 24

CERTIFICATE OF SERVICE ........................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*American Geophysical Union v. Texaco Inc.*, 60 F.3d 913(2d Cir.1994) ...............3

*American Society for Testing & Materials v. Public.Resource.org, Inc.*, 597 F. Supp. 3d 213 (D.D.C. Mar. 31, 2022)...................14

*American Society for Testing and Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262 (D.C. Cir. 2023) ...............................................7, 14, 17

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023)..9, 11

*Arica Institute, Inc. v. Palmer*, 970 F.2d 1067 (2d Cir. 1992) ...............................15

*Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519 (2d Cir. 1991) (Mahoney, J., concurring)..............................................................14

*Authors Guild v. Google, Inc.*, 804 F.3d 202 (2d Cir. 2015)...................17

*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014)...................18

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006)....10

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006)...................5

*Blanch v. Koons*, 467 F.3d 244 (2d. Cir. 2006)...................15

*Cambridge University Press v. Patton*, 769 F.3d 1232 (11th Cir. 2014).........passim

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) ...................13

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ...................7

*Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060 (9th Cir. 2014)...............14

*Google v. Oracle*, 141 S. Ct. 1183 (2021)...................passim

*Hachette Book Group, Inc. v. Internet Archive*, --- F.Supp.3d ----, 2023 WL 2623787 (S.D.N.Y. Mar. 24, 2023) ...................2

*Harbus v. Manhattan Institute for Policy Research, Inc.*, 2020 WL 1990866 (S.D.N.Y. Apr. 27, 2020)...................5

*Herbert v. Shanley* Co., 242 U.S. 591 ...................10

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003)...................10, 15

*Kerson v. Vermont Law School, Inc.*, 79 F.4th 257 (2023) ...................13

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F. Supp. 1283 (N.D. Cal. 1991)...................16

*Lewis Galoob Toys, Inc. v. Nintendo of America, Inc., 964 F.2d 965* (9th Cir. 1992) ...................16

*National Rifle Ass'n of Am. v. Handgun Control Fed'n of Ohio*, 15 F.3d 559 (6th Cir. 1994)...................5, 14

*Núñez v. Caribbean Intern. News Corp.*, 235 F.3d 18 (1st Cir. 2000)...................15

*Peterman v. Republican National Comm.*, 369 F. Supp. 3d 1053 (D. Mont. 2019) 6, 8

*Philpot v. Media Research Center Inc.*, 279 F.Supp.3d 708 (E.D. Va. 2018) ..........5

*Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381 (6th Cir. 1996) ...............................................................................................................14

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 n.33 (1984) .........7, 13, 16

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73 (2d Cir.2014) .9, 15

*Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570 (S.D.N.Y. 2020) .............16

*Williams & Wilkins Co. v. United States*, 420 U.S. 376 (1975) ...............................6

*Williams & Wilkins Co. v. United States*, 487 F.2d 1345 (Ct. Cl. 1973) .................6

## Statutes

17 U.S.C. §101 .........................................................................................................12

17 U.S.C. §106 .........................................................................................................12

17 U.S.C. §107 ....................................................................................................passim

17 U.S.C. §108 .....................................................................................................1, 10

17 U.S.C. §109 .....................................................................................................1, 10

17 U.S.C. §110 .........................................................................................................10

17 U.S.C. §111 ...................................................................................................10, 11

17 U.S.C. §112 .........................................................................................................10

17 U.S.C. §114 .............................................................................................10, 11, 12

17 U.S.C. §118 .............................................................................................10, 11, 12

17 U.S.C. §121 .........................................................................................................10

17 U.S.C. §121A .......................................................................................................10

17 U.S.C. §1008 ...............................................................................................10, 12

47 U.S.C. 390 ...........................................................................................................12

## Other Authorities

Dan Ariely, *Predictably Irrational* 65 (2009) .......................................................14

Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. Rev. 1 (2004) ...................4

Mark Bartholomew & John Tehranian, *An Intersystemic View of Intellectual Property and Free Speec*h, 81 George Washington Law Review 1, 22 (2013) ....8

Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005*, 156 U. Pa. L. Rev. 549, 602-03 (2008) ..........................................................5

Yochai Benkler, *Through the Looking Glass: Alice and the Constitutional Foundations of the Public Domain*, Law & Contemp. Probs., Winter/Spring 2003, at 173.......................................................................................................4

Black's Law Dictionary (10th ed. 2014) ...................................................................9

Julie E. Cohen, *Copyright and the Perfect Curve*, 53 Vand. L. Rev. 1799, 1816 (2000).................................................................................................................6

Jennifer Femminella, *Online Terms and Conditions Agreements: Bound by the Web*, 17 St. John's J. Legal Comment. 87, 115–18 (2003)..................................18

Laura N. Gasaway, *The New Access Right and Its Impact on Libraries and Library Users*, 10 J. Intell. Prop. L. 269, 299 (2003).......................................................18

Paul Goldstein, *Copyright's Highway: From Gutenberg To The Celestial Jukebox*, 153-54 (rev. ed. 2003)........................................................................................4

Henry B. Hansmann, *The Role of the Nonprofit Enterprise*, 89 Yale L.J. 835, 843-45 (1979)..............................................................................................................3

Lexabear, A Deadly Education: the "dreadlocks" reference has been updated / authorial ability to update books due to modern technology, Reddit.com, https://www.reddit.com/r/Fantasy/comments/leattu/a_deadly_education_the_dre adlocks_reference_has/ (visited Jul. 13, 2022) ...................................................20

Glynn S. Lunney, Jr., *The Copyright Tax*, 68 J. Copyright Soc'y U.S.A. 117 (2021) ...........................................................................................................................16

Thomas Macaulay, Speeches on Copyright 25 (E. Miller ed. 1913) .......................16

William F. Patry & Shira Perlmutter, *Fair Use Misconstrued: Profit Presumptions, and Parody*, 11 Cardozo Arts & Ent. L.J. 667, 680 (1992) ...................................5

Barbara Ringer, Second Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1975 Revision Bill October - December 1975, at 53 (1975)...............................................................................11

Matthew Sag, *Predicting Fair Use*, 73 Ohio St. L.J. 47, 60 (2012).........................8

Kristina Shampanier, Nina Mazar, & Dan Ariely, *Zero as a Special Price: The True Value of Free Products*, 26 Marketing Sci. 742, 742 (2007) ......................14

Janet Sinder, *Correcting the Record: Post-Publication Corrections and the Integrity of Legal Scholarship*, 112 Law Libr. J. 365, 367-68 (2020)................19

Glenn D. Tiffert, *Peering down the Memory Hole: Censorship, Digitization, and the Fragility of Our Knowledge Base*, 124 Am. Hist. Rev. 550 (2019) ..............19

Rebecca Tushnet, *All of This Has Happened Before and All of This Will Happen Again*, 29 Berkeley Tech. L.J. 1447 (2014).......................................................18

Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts After Eldred*, 44 Liquormart, and Bartnicki, 40 Hous. L. Rev. 697, 726 (2003)...4

Webster's New Collegiate Dictionary 226 (1973) ...................................................9

Neil Weinstock Netanel, *Copyright and a Democratic Civil Society*, 106 Yale L.J. 283 (1996)..........................................................................................................4

Neil Weinstock Netanel, *Market Hierarchy and Copyright in Our System of Free Expression*, 53 Vand. L. Rev. 1879, 1907-09 (2000) ...........................................6

iv

**Constitutional Provisions**

Art. I, sec. 1, cl. 8 ..................................................................................1
Art. III, sec. 2, cl. 1.6..............................................................................18

**Legislative History**

11 S. Rep. No. 102-294 (1992) ...............................................................12
1976 U.S.C.C.A.N.....................................................................................11
H.R. Rep. No. 94-1476.......................................................................11, 12

## IDENTITY OF AMICI CURIAE AND INTEREST IN THIS CASE

Amici are scholars whose research and teaching focus is copyright law.[1]

Amici's interest is in the correct development of copyright law.[2]

## SUMMARY OF ARGUMENT

The constitutional goal of copyright protection is to "promote the progress of science and useful arts," Art. I, sec. 1, cl. 8, and the first copyright law was "an act for the encouragement of learning," *Cambridge University Press v. Patton*, 769 F.3d 1232, 1256 (11th Cir. 2014). This case provides an opportunity for this Court to reaffirm that vision by recognizing the special role that noncommercial, nonprofit uses play in supporting freedom of speech and access to knowledge. Congress, in drafting the Copyright Act of 1976, expressly carved out exceptions and limitations that establish different rules for noncommercial, nonprofit uses such as those made by libraries. In section 107, the first fair use factor requires courts to consider whether a use is "of a commercial nature or for nonprofit educational purposes." 17 U.S.C. §107. In section 108, certain archival copies may

---

[1] Institutional affiliations are provided solely for purposes of identification.
[2] Neither the parties nor their counsel have authored this brief, and neither they nor any other person or entity other than counsel for amicus curiae contributed money that was intended to fund preparing or submitting this brief. The parties have consented to the filing of the brief.

be made and distributed, but only so long as "the reproduction or distribution is made without any purpose of direct or indirect commercial advantage." §108. In section 109, the lawful owner of a copy of computer program may rent, lease, or lend that copy to another "for nonprofit purposes by a nonprofit library or nonprofit educational institution" for uses without "direct or indirect commercial advantage." §109. Congress created exceptions for these nonprofit uses because they serve important democratic interests that aren't served elsewhere, are easily suppressed because they aren't supported by the profit motive, and have different market effects than profit-seeking uses.

In this case, the trial court defined commercial use so broadly under the first fair use factor that it conflicts with and undermines all of these exceptions. *Hachette Book Group, Inc. v. Internet Archive*, --- F.Supp.3d ----, 2023 WL 2623787, *9 (S.D.N.Y. Mar. 24, 2023) (finding commerciality because the Internet Archive "uses its Website [generally] to attract new members, solicit donations, and bolster its standing in the library community" and gains some sort of unspecified benefit "although it does not make a monetary profit"). Amici urge this Court to adopt a more straightforward, commonsense, and statutorily grounded distinction between commercial and nonprofit uses in order to maintain the statutory framework Congress so carefully crafted.

I. Nonprofit Library Lending Is a Favored Noncommercial Use.

A. Nonprofit Uses Meaningfully Differ from Profit-Seeking Uses by Promoting Diversity of Thought and Access to Information.

The first fair use factor requires a court to consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. §107. While there are many commercial fair uses, the Internet Archive's digital lending program falls on the specially favored nonprofit, noncommercial side. The District Court therefore erred in interpreting "commercial" so broadly as to encompass the Internet Archive's nonprofit lending

Nonprofit uses do not depend on the profit motive. Nonprofit users cannot internalize all the benefits of their uses through charging a market-set price. *See* Henry B. Hansmann, *The Role of the Nonprofit Enterprise*, 89 Yale L.J. 835, 843-45 (1979). As a result, socially beneficial nonprofit uses, including those that support the "Progress of Science and Useful Arts," will often not occur unless there are special protections in place for them. *See id.* at 877-79; *see also American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir.1994) (distinguishing "commercial exploitation" from fair uses that generate "value that benefits the broader public interest"; distinction turns on "private economic rewards reaped by the secondary user (to the exclusion of broader public benefits)").

Because of these special features of nonprofit uses, they are also consistent with the ultimate constitutional goal of copyright, to promote creative progress. *See Google v. Oracle*, 141 S. Ct. 1183, 1196, 1203, 1208 (2021); *Patton*, 769 F.3d at 1257. They do so by providing access that would otherwise be unavailable. Nonprofit uses enable a richer, more democratic culture that is vibrant and creative precisely because they provide alternatives to commercial exchange for creating and accessing knowledge. *See* Jack M. Balkin, *Digital Speech and Democratic Culture: A Theory of Freedom of Expression for the Information Society*, 79 N.Y.U. L. Rev. 1 (2004); Yochai Benkler, *Through the Looking Glass: Alice and the Constitutional Foundations of the Public Domain*, Law & Contemp. Probs., Winter/Spring 2003, at 173; Neil Weinstock Netanel, *Copyright and a Democratic Civil Society*, 106 Yale L.J. 283 (1996).

Improving access is significant to fair use because democracy requires more than democratically elected leaders; it requires informed democratic culture and knowledge. Freedom to participate in public life requires the resources to participate and the freedom to debate and disagree about meaning of shared culture. And this requires robust nonprofit institutions providing access to the basic elements of culture. Balkin, *supra*, at 34-45, 50-54. A work accessed through the Internet Archive "is materially more valuable to readers than the original that they can't get, that costs too much, or that they don't know about . . . ." Eugene Volokh,

*Freedom of Speech and Intellectual Property: Some Thoughts After Eldred*, 44

Liquormart, and Bartnicki, 40 Hous. L. Rev. 697, 726 (2003); *see also* Paul

Goldstein, *Copyright's Highway: From Gutenberg To The Celestial Jukebox*, 153-

54 (rev. ed. 2003) (uses in schools and libraries "advance copyright's general aim

of promoting cultural and political discourse"). This ability to equalize and share

resources is a particularly important function in times of extreme social isolation,

such as the global COVID pandemic.

Here, the Internet Archive's use was the kind of noncommercial, nonprofit

use that is specially favored under the law. *See National Rifle Ass'n of Am. v.

Handgun Control Fed'n of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) (nonprofit's free

dissemination of work was noncommercial, favoring fair use); *Harbus v.

Manhattan Institute for Policy Research, Inc.*, 2020 WL 1990866 (S.D.N.Y. Apr.

27, 2020) (first factor "weighs decidedly in favor of a finding of fair use" where

copier was 501(c)(3) nonprofit that didn't use copying to solicit donations or

promote sales) (citing *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) ("The

commercial/nonprofit dichotomy concerns the unfairness that arises when a

secondary user makes unauthorized use of copyrighted material to capture

significant revenues as a *direct consequence* of copying the original work.")

(emphasis added) (citation omitted); *Philpot v. Media Research Center Inc.*, 279

F.Supp.3d 708, 718 (E.D. Va. 2018) (freely distributed use by nonprofit favored

fair use); Barton Beebe, *An Empirical Study of U.S. Copyright Fair Use Opinions, 1978-2005*, 156 U. Pa. L. Rev. 549, 602-03 (2008) (finding significant influence of noncommerciality in caselaw; "the fact that a defendant's use is for a noncommercial purpose should be understood, as it appears it already is in practice, strongly to support a finding of fair use"); William F. Patry & Shira Perlmutter, *Fair Use Misconstrued: Profit Presumptions, and Parody*, 11 Cardozo Arts & Ent. L.J. 667, 680 (1992) ("a use for educational purposes in a nonprofit institution not charging any fee" stands "[a]t one extreme of the continuum (the most favorable for the defense)").

By providing the building blocks for future insights, these access-promoting institutions serve the purposes of copyright and the First Amendment. *Williams & Wilkins Co. v. United States*, 487 F.2d 1345, 1358 (Ct. Cl. 1973) (holding that copying, for research purposes, material that is "stimulating or helpful," even if not "crucial," produces important social benefits), *aff'd by an equally divided Court*, 420 U.S. 376 (1975); Julie E. Cohen, *Copyright and the Perfect Curve*, 53 Vand. L. Rev. 1799, 1816 (2000) (noting the connection and potential temporal gap between access and further uses, including transformative uses); Neil Weinstock Netanel, *Market Hierarchy and Copyright in Our System of Free Expression*, 53 Vand. L. Rev. 1879, 1907-09 (2000) (arguing that works shared by many people

have additional value over and above the intrinsic value to the individual consumer).

B. Broad Definitions of "Commercial" Under Factor One Are Inconsistent with the Text, Structure, and History of the Copyright Act.

Special protections for noncommercial, nonprofit use reinforce the First Amendment's protections for speech that could otherwise, without the support of the profit motive, be easily suppressed. *See, e.g.*, *Peterman v. Republican National Comm.*, 369 F. Supp. 3d 1053, 1062 (D. Mont. 2019) (defendant's copying was noncommercial and thus subject to greater First Amendment protection than commercial speech that advertises a product; "[i]t makes sense that fair use doctrine respects [the First Amendment] distinction, as "copyright's purpose is to promote the creation and publication of free expression") (citing *Eldred v. Ashcroft*, 537 U.S. 186, 219 (2003)). Nonprofit uses are a particularly valuable and necessary subset of noncommercial speech, given their distance from marketplace transactions.

Following this logic, the D.C. Circuit recently confirmed that nonprofit activities promoting access to information are noncommercial under the first fair use factor. *American Soc'y for Testing and Materials v. Public.Resource.Org, Inc.*, 82 F.4th 1262, 1267 (D.C. Cir. 2023) (*ASTM II*) ("Public Resource's use is for nonprofit, educational purposes. … Public Resource—which disseminates the

disputed materials for free—is engaged in a nonprofit as opposed to commercial use. … [T]he Supreme Court confirmed the importance of that conclusion: 'There is no doubt that a finding that copying was not commercial in nature tips the scales in favor of fair use.'") (citing *Google*, 141 S. Ct. at 1204 (2021)).

Contrary to the District Court's reasoning, a use does not become "commercial" simply because it may replace a sale or license—that reasoning turns factor one into a mere repetition of factor four, market effect. *See Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 n.33 (1984) (rejecting the argument that a use is necessarily commercial if it replaces a sale); *Patton*, 769 F.3d at 1265 (such "circular" reasoning on commerciality is "of limited usefulness" given that "any unlicensed use of copyrighted material profits the user in the sense that the user does not pay a potential licensing fee"; "[i]f this analysis were persuasive, no use could qualify as 'nonprofit' under the first factor"); *id.* at 1267 (finding that copying for student coursepacks was "nonprofit educational" use favored by Congress, and this was "sufficiently weighty" to tilt first factor in favor of defendants even absent transformativeness); *Peterman*, 369 F. Supp. 3d at 1063 ("[S]elf-interest is not equivalent to commerciality; if [plaintiff's] proposed interpretation of commerciality were adopted, no use would be [non]commercial."); Mark Bartholomew & John Tehranian, *An Intersystemic View of Intellectual Property and Free Speec*h, 81 George Washington Law Review 1,

8

22 (2013) (arguing both that First Amendment doctrine limits the concept of commerciality in speech, and that factor four addresses market harm); Matthew Sag, *Predicting Fair Use*, 73 Ohio St. L.J. 47, 60 (2012) (market effect should not be double-counted).

The plain meaning of "commercial" does not bear the weight that the District Court, and the out-of-circuit precedent on which it relied, gave it. At the time the Copyright Act was enacted, Webster's relevantly defined the adjective "commercial" as "engaged in work designed for the market," "of or relating to commerce," "characteristic of commerce," "viewed with regard to profit," and "designed for a large market," with "commerce" relevantly defined as "the exchange or buying and selling of commodities on a large scale. . . ." Webster's New Collegiate Dictionary 226 (1973). *See also* Black's Law Dictionary (10th ed. 2014) ("commercial" means "[o]f, relating to, or involving the buying and selling of goods ... [r]esulting or accruing from commerce or exchange … while "commercial use" is "[a] use that is connected with or furthers an ongoing profit-making activity"). Recent Supreme Court cases have proceeded on this understanding. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 510 (2023) ("[T]he fact that a use is commercial as opposed to nonprofit is an additional element of the first factor."); *Google*, 141 S.Ct. at 1204 ("The text

of § 107 includes various noncommercial uses, such as teaching and scholarship, as paradigmatic examples of privileged copying.").

Indeed, to implement the distinction between commercial and noncommercial use, this Court has required commercial entities to profit *directly* from their use of a work before weighing commerciality against them in fair use analysis. *See, e.g.*, *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014) (discounting commercial nature of use where "the link between the defendant's commercial gain and its copying is attenuated such that it would be misleading to characterize the use as commercial exploitation") (cleaned up); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006) (defendant did not use images "in its commercial advertising or in any other way to promote the sale of [its] book" and therefore "DK does not seek to exploit the images' expressive value for commercial gain"); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (finding "use of [copyrighted work] was more incidental and less exploitative in nature than more traditional types of commercial use" where commercial defendant did not use works directly to promote itself or sell them).[3] The rule should not be harsher for a nonprofit use.

---

[3] Unlike §107, sections 108 and 109 refer to both "direct" and "indirect" commercial advantage. These provisions codify the holding in *Herbert v. Shanley Co.*, 242 U.S. 591 (1917) (performance of musical works at for-profit restaurant constituted a "for profit" use under 1909 Act even though no separate charge for performance).

The plain text of the Copyright Act also shows that the District Court's

broad reading of "commercial" was in error. Copyright law, like other areas of law,

has long accorded special treatment to nonprofit activities, not just in §107 but in

§108 (library/archive reproductions), §109 (nonprofit lending), §110 (nonprofit

performances), §111 (nonprofit transmissions), §112 (nonprofit ephemeral copies),

§114 (noncommercial educational radio), §118 (noncommercial broadcasting),

§121 & §121A (nonprofit reproductions for people with disabilities); §1008

(noncommercial use for digital musical recordings or analog musical recordings).

As these other areas of the statute show, Congress used "noncommercial" to

encompass "nonprofit," just as the Supreme Court did. *Warhol*, 598 U.S. at 510.[4]

If the Internet Archive's nonprofit activities are "commercial" under factor

one, then either the term would have to have a different meaning in §107 than

anywhere else in the statute—a highly disfavored result— or this Court will have

effectively abolished many of the exceptions in the statute that rely on a distinction

between commercial use, on the one hand, and nonprofit or noncommercial use, on

---

[4] *See also, e.g.*, H.R. Rep. No. 94-1476, at 66, reprinted in 1976 U.S.C.C.A.N. at 5679 (explaining that non-profit educational use fits into a broader examination of factors in fair use analysis, including the "commercial or non-profit character of an activity"); Barbara Ringer, Second Supplementary Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law: 1975 Revision Bill October-December 1975, at 53 (1975) ("[A]lthough the commercial or nonprofit character of a use is not necessarily conclusive with respect to fair use, in combination with other factors, it can and should weigh heavily in fair use decisions.").

the other. *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.") (citation omitted). For example, the extensive statutory provisions in sections 111, 114, and 118 for "noncommercial" radio and broadcasting would be reduced to a null set. Using the district court's definition of "commercial," existing noncommercial broadcasters would be reclassified as "commercial" because they also transmit copyrighted content in the same way as commercial broadcasters do and for which commercial broadcasters pay. But Congress recognized that noncommercial broadcasting, operated by nonprofits, is nonetheless fundamentally different. *See* 17 U.S.C. §114, 118; H.R. Rep. No. 94–1476, at 117 (1976) ("The Committee is cognizant of the intent of Congress, in enacting the Public Broadcasting Act of November 7, 1967 (47 U.S.C. 390 et seq.), that encouragement and support of noncommercial broadcasting is in the public interest. It is also aware that public broadcasting may encounter problems not confronted by commercial broadcasting enterprises, due to such factors as the special nature of programming, repeated use of programs, and, of course, limited financial resources."). So too with §1008's exception for "noncommercial" uses by consumers to copy music, which they instead could have purchased.[5] As this Court

---

[5] Congress intended §1008 to guarantee "the right of consumers to make analog or digital audio recordings of copyrighted music for their private, noncommercial use," S. Rep. No. 102-294, at 30 (1992); *see also id.* at 51-52 ("[A] person who

has recently emphasized, the Copyright Act should be read consistently and for its plain meaning, *Kerson v. Vermont Law School, Inc.*, 79 F.4th 257, 265 (2d Cir. 2023). In this context, that means treating nonprofit, freely disseminated uses as noncommercial.

## II. Nonprofit Library Lending Is Presumptively Not Harmful To Markets in Which the Copyright Owner Has a Legitimate Interest.

In 1984, the Supreme Court established a presumption that noncommercial uses are not harmful to markets in which the copyright owner has a legitimate interest. Although the sale and rental of prerecorded videotapes was not yet a fully developed market, the Court recognized the potential of such a market and nonetheless deemed home taping to be noncommercial. *Sony*, 464 U.S. at 450 n. 33. In noncommercial use cases, it further instructed, the burden is on the plaintiff to show "by a preponderance of the evidence that some meaningful likelihood of future harm exists." *Id.* at 451. Thus, the presumption is rebuttable using ordinary

---

makes a tape of a copyrighted recording for use in his home, car, or portable player, or for a family member would be protected from suit, whereas a person who makes copies of a recording and *sells* them to others would not be protected, but would still have the full range of defenses under copyright law.") (emphasis added). Noncommercial uses need not be private, as the statutory reference to multiple copies for classroom use, §107, makes clear. This conclusion is further reinforced by the extensive definitions of "public" versus private use provided in the statute for purposes of identifying "public" exercises of §106 rights, *see* §101; if noncommercial meant "private" or "not public" there would be no need to do anything other than say so.

evidentiary methods. The problem here is that the plaintiffs did nothing to rebut it, and were relieved of that burden by the District Court's erroneous interpretation of commerciality.

The Supreme Court has never retreated from the presumption that meaningful harm from noncommercial uses is unlikely, despite altering aspects of its analysis of commercial fair uses. *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994). Courts have repeatedly applied the presumption, including in cases of full copying. *See, e.g.*, *Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060, 1069 (9th Cir. 2014) (weighing fourth factor in favor of noncommercial use); *Princeton Univ. Press v. Mich. Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996); *National Rifle Ass'n*, 15 F.3d at 561; *Ass'n of Am. Med. Colls. v. Cuomo*, 928 F.2d 519, 526 (2d Cir. 1991) (Mahoney, J., concurring); *American Society for Testing & Materials v. Public.Resource.org, Inc.*, 597 F. Supp. 3d 213, 238 (D.D.C. Mar. 31, 2022) (finding that fourth factor favored noncommercial defendant for its public distribution), *aff'd*, 82 F.4th 1262, 1271 (D.C. Cir. 2023) .

The presumption makes sense given the different role that nonprofit, noncommercial use plays in allowing access and supporting uses that would not survive in a purely commercial market because users cannot internalize their full benefits, as discussed above.  It is consistent with the strong empirical evidence

that people react very differently to "free" offers, even compared to a cost of only one penny.[6] Users of the Internet Archive are simply unlikely to be paying customers even if the Internet Archive were unavailable, and so the existence of market harm needs to be proven. For similar reasons, including the constraints of institutional budgets and libraries' incentives to offer as broad a range of resources as possible, the hypothesis that institutions would be taking more licenses in the absence of the Internet Archive is unpersuasive absent affirmative evidence.

The presumption against harm further implements the Supreme Court's instruction that the market analysis must "take into account the public benefits the copying will likely produce." *Oracle*, 141 S.Ct. at 1206. Such a presumption against cognizable harm is particularly appropriate in situations in which the copyright owner has already had significant opportunity to exploit its work, interacting with factor two of the fair use analysis. *See, e.g.*, *Swatch*, 756 F.3d at 89 ("[B]ecause Swatch Group publicly disseminated the spoken performance embodied in the recording before Bloomberg's use, the publication status of the

---

[6] Dan Ariely, *Predictably Irrational* 65 (2009) (finding that "free" substantially changes consumption behavior); Kristina Shampanier, Nina Mazar, & Dan Ariely, *Zero as a Special Price: The True Value of Free Products*, 26 Marketing Sci. 742, 742 (2007) (same; 73% were willing to pay 14¢ for a truffle instead of 1¢ for a Hershey's Kiss, but 69% chose the Kiss when the truffle was 13¢ and the Kiss was free; finding that "people appear to act as if zero pricing of a good not only decreases its cost but also adds to its benefits," even where an objective cost-benefit analysis would disagree).

work favors fair use."); *Blanch v. Koons*, 467 F.3d 244, 256 (2d. Cir. 2006); *Kelly*, 336 F.3d at 820 ("The fact that a work is published or unpublished also is a critical element of its nature. Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.") (footnote omitted); *Núñez v. Caribbean Intern. News Corp.*, 235 F.3d 18, 24 (1st Cir. 2000) (fact that photographs had been distributed favored fair use); *Arica Institute, Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (factor two favors fair use where accusing work is "a published work available to the general public"); *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 585 (S.D.N.Y. 2020) (use of a previously published work favors fair use); *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 780 F. Supp. 1283, 1293 (N.D. Cal. 1991) ("The works' published nature supports the fairness of the use."), *aff'd,* 964 F.2d 965 (9th Cir. 1992).

Because copyright is a "tax on readers for the purpose of giving a bounty to writers," *Oracle*, 141 S.Ct. at 1195 (citing Thomas Macaulay, Speeches on Copyright 25 (E. Miller ed. 1913)), it is only justified when it is necessary to provide sufficient incentives to generate new expression. *Sony*, 464 U.S. at 450 ("[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create."); Glynn S. Lunney, Jr., *The Copyright Tax*, 68 J.

16

Copyright Soc'y U.S.A. 117 (2021) (presenting empirical research showing that broad copyright, particularly in digital copies, harms public more than it provides creative incentives). Copyright control is not justified unless the marginal benefit of the control over a use provides that incentive, but previous widely authorized dissemination makes it unlikely that such marginal benefit is present, especially years after initial publication. This fact provides additional support for the well-established rule that a copyright owner's desire and willingness to license does not in itself support a finding of market harm. *See, e.g.*, *Patton*, 769 F.3d at 1276 ("The goal of copyright is to stimulate the creation of new works, not to furnish copyright holders with control over all markets. Accordingly, the ability to license does not demand a finding against fair use.").

In *ASTM II*, for example, the court noted that the plaintiffs' existing distribution mechanisms often allowed individuals to read copies of their codes freely. Given the wide availability of free-to-the-end-user copies, the plaintiffs could not show sufficient *additional* harm to their markets or incentives to tilt the fourth fair use factor against them. *ASTM II*, 2022 WL 971735, at *15 (further noting that evidence that individuals used defendants' nonprofit service did not mean that they would otherwise have paid for access), *aff'd*, 82 F.4th 1262, 1271 (D.C. Cir. 2023).

What was true in *ASTM* is equally true of current sales of physical copies to libraries. Once a library buys a physical copy, the first sale doctrine allows it to distribute that physical copy freely. This is the background against which potential market harm must be compared. *See also Authors Guild v. Google, Inc.*, 804 F.3d 202, 224 (2d Cir. 2015) ("But the possibility, or even the probability or certainty, of some loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original. There must be a *meaningful or significant effect* 'upon the potential market for or value of the copyrighted work.'") (emphasis added) (citing §107); *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014) (relying on Article III standing doctrine to require a showing of market injury that is more than "conjectural" or "speculative"); *Patton*, 769 F.3d at 1282 (factor four "asks whether the market harm caused by Defendants' unpaid copying will *materially impair Plaintiffs' incentive to publish*") (emphasis added).

A presumption against harm is particularly appropriate in the library context, where the putative licensing alternatives regularly come with policies that harm the larger mission of libraries to preserve information and make it available to citizens on a nondiscriminatory basis. *See, e.g.*, Laura N. Gasaway, *The New Access Right and Its Impact on Libraries and Library Users*, 10 J. Intell. Prop. L. 269, 299 (2003) (discussing licenses that restrict libraries' ability to distribute public domain

works digitally); Jennifer Femminella, *Online Terms and Conditions Agreements: Bound by the Web*, 17 St. John's J. Legal Comment. 87, 115–18 (2003) (discussing terms in library contracts that limit interlibrary loan, prevent archiving, and in other ways threaten long-term access to works); *cf. Oracle*, 141 S.Ct. at 1207 (license offered by copyright owner was no substitute for fair use where it would have afforded copyright owner control over "branding and cooperation"); Rebecca Tushnet, *All of This Has Happened Before and All of This Will Happen Again*, 29 Berkeley Tech. L.J. 1447 (2014) (enumerating ways in which license-only models that attempt to substitute for fair use harm free speech, competition, and innovation).

Of particular relevance to libraries and the public interest, digital licensing schemes allow publishers to pull books that they now consider politically sensitive, or replace an initially published version with an edited version, without disclosing what has been removed or changed. This practice destroys the integrity of the public record. *See, e.g.*, Glenn D. Tiffert, *Peering down the Memory Hole: Censorship, Digitization, and the Fragility of Our Knowledge Base*, 124 Am. Hist. Rev. 550 (2019) (documenting the removal of selected issues and articles from an important online database of Chinese scholarship that is most scholars' only means of accessing the scholarship). Such edits "materially distort the historical record but are invisible to the end user," *id.* at 554, and can deceive good-faith researchers

or make objections to the original version look unfounded. *See also* Janet Sinder,

*Correcting the Record: Post-Publication Corrections and the Integrity of Legal*

*Scholarship*, 112 Law Libr. J. 365, 367-68 (2020) (elaborating concerns around

digital post-publication editing and transparency of changes); *id.* at 381 (noting

that post-publication editing without transparency "leaves scholarship open to

manipulation by authors who might want to 'correct' past statements, perhaps for

political reasons (e.g., an author who is applying for a new job or running for

political office). Without a tracking or versioning system in place, authors and

journals are free to change the record to their benefit."); Lexabear, A Deadly

Education: the "dreadlocks" reference has been updated / authorial ability to

update books due to modern technology, Reddit.com,

https://www.reddit.com/r/Fantasy/comments/leattu/a_deadly_education_the_dreadl

ocks_reference_has/ (visited Jul. 13, 2022) (discussing an undisclosed change to a

popular ebook edition in response to criticism). Where licensing "alternatives" are

inferior substitutes to the access and preservation of historical versions allowed by

fair use, they do not weigh in favor of finding market harm.

## CONCLUSION

The Supreme Court has cautioned that courts should balance the fair use

factors in light of the purposes of copyright. Noncommercial uses are favored in

the law for good reason. This Court should recognize their substantial benefits to society and to the foundations of free speech in weighing the fair use factors.

DATED: December 22, 2023
/s/ *Rebecca Tushnet*
Rebecca Tushnet
rtushnet@law.harvard.edu
520 Hauser, Harvard Law School
1575 Massachusetts Avenue
Cambridge, MA 02130
Telephone: 703-593-6759

Attorney for Amici Curiae IP Law Professors

# APPENDIX

## List of *Amici*

*University affiliations for identification purposes only*

Patricia Aufderheide, University Professor, School of Communication, American University

Mark Bartholomew, Professor of Law, University at Buffalo School of Law

Michael A. Carrier, Board of Governors Professor, Rutgers Law School

Zachary Catanzaro, Assistant Professor of Law, St. Thomas University College of Law

Bryan H. Choi, Associate Professor of Law and CSE, The Ohio State University Moritz College of Law

Christine Haight Farley, Professor of Law, American University Washington College of Law

Jim Gibson, Sesquicentennial Professor of Law, University of Richmond School of Law

Patrick Goold, Reader in Law, City Law School, University of London

James Grimmelmann, Tessler Family Professor of Digital and Information Law, Cornell Law School and Cornell Tech

Laura A. Heymann, James G. Cutler Professor of Law, William & Mary Law School

Michael Karanicolas, Executive Director, Institute for Technology, Law & Policy, UCLA

Edward Lee, Professor of Law, Chicago-Kent College of Law

Yvette Joy Liebesman, Professor of Law, Saint Louis University School of Law

Glynn S. Lunney, Jr., University Distinguished Professor, Texas A&M University School of Law

Mark P. McKenna, Professor of Law, UCLA School of Law

Amanda Reid, Faculty Co-Director, Center for Media Law and Policy, University of North Carolina at Chapel Hill

Rebecca Tushnet, Frank Stanton Professor of the First Amendment, Harvard Law School

# CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)—which set the limitation for an amicus brief at one half of the maximum length authorized for a party's principal brief (i.e., 6,500 words)—because, excluding the parts of the brief exempted by Federal Rule 32(f), the brief contains 4,821 words on the basis of a count made by the word processing system used to prepare the brief.

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 6, I hereby certify that this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully submitted,

*/s/ Rebecca Tushnet*
REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2023, a copy of the foregoing is being filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

*/s/ Rebecca Tushnet*
REBECCA TUSHNET
Harvard Law School
1575 Massachusetts Ave.
Cambridge, MA 02138
(703) 593-6759
*Counsel for* Amici Curiae