# 23-1260

## United States Court of Appeals
## for the Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant.*

DOES 1-5, INCLUSIVE,

*Defendants.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF WIKIMEDIA FOUNDATION, CREATIVE COMMONS, AND
PROJECT GUTENBERG LITERARY ARCHIVE FOUNDATION
AS AMICI CURIAE IN SUPPORT OF
DEFENDANT-APPELLANT AND REVERSAL**

JEF PEARLMAN
USC Gould School of Law
IP & Technology Law Clinic
699 Exposition Blvd
Los Angeles, CA 90089-0071
Telephone: (213) 740-7613

*Attorney for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

None of amici curiae Wikimedia Foundation, Creative Commons, Project Gutenberg Literary Archive Foundation have a parent corporation and there is no publicly held corporation that owns 10% or more of any of amici.

Dated: December 22, 2023

JEF PEARLMAN
USC Gould School of Law
IP & Technology Law Clinic
699 Exposition Blvd
Los Angeles, CA 90089-0071
Telephone: (213) 740-7613
jef@law.usc.edu

*Attorney for Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ..........................................................................1

SUMMARY OF ARGUMENT ...............................................................................3

ARGUMENT ...........................................................................................................4

I.    The Funding Nonprofits Need to Function Is Typically Unrelated To and Is Not Used to Acquire Fair Use Content. ...............................................4

    A.    For Nonprofits With Sitewide Donation Models, Fundraising Requests Inevitably Appear on Website Pages With Fair Use Content. ..............................................................................................5

        1.    Fundraising Strategies Are Not Influenced by Fair Use Content. .....................................................................................5

        2.    Whether Nonprofit Platforms Host Fair Use Materials Is Not Influenced by Their Fundraising Strategies. ........................7

    B.    Amici Use Donations to Serve Their Educational Purposes, Including Maintaining Extensive Infrastructure and Hosting. .............9

II.    The District Court Applied an Erroneously Broad Reading of "Commercial" in the First Fair Use Factor. ...................................................12

    A.    Volunteer Participation, Nonprofit Recognition, and Donations Are Traditional Nonprofit Educational Activities That the District Court Improperly Treated as Commercial. ........................................13

    B.    "Monetization" and "Commercialization" Are Not the Same Thing. .................................................................................................17

    C.    For Nonprofits Like Amici, There Is No Nexus Between Secondary Uses and Revenue From Sitewide Donation Links. ........19

    D.    The District Court Omitted Additional Legal Considerations That Favor Nonprofit Educational Use. ....................................................21

III. If Adopted, the District Court's Ruling Could Significantly Limit Nonprofit Organizations' Ability to Make Fair Use. ....................................25

CONCLUSION .......................................................................................................28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ..................................................................22

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ..........................................................................12

*Graham v. Prince*,
265 F. Supp. 3d 366 (S.D.N.Y. 2017) ...............................................21

*Harper & Row, Publrs. v. Nation Enters.*,
471 U.S. 539 (1985) .................................................................... 16, 20

*MCA, Inc. v. Wilson*,
677 F.2d 180 (2d Cir. 1981) ...............................................................24

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
99 F.3d 1381 (6th Cir. 1996) ..............................................................20

*Swatch Grp. Mgmt. Servs. v. Bloomberg LP*,
756 F.3d 73 (2d Cir. 2014) .................................................................19

*United States v. Maria*,
186 F.3d 65 (2d Cir. 1999) .................................................................14

*Weissmann v. Freeman*,
868 F.2d 1313 (2d Cir. 1989) ..................................................... 15, 16, 20

*Whiddon v. Buzzfeed, Inc.*,
638 F.Supp. 3d 342 (S.D.N.Y. 2022) .................................................23

**Statutes**

17 U.S.C. § 107(1) ................................................................ 3, 11, 12, 14

17 U.S.C. § 512 ....................................................................................25

## Other Authorities

*DMCA Takedown Notices*,
    Wikimedia Foundation, https://perma.cc/C9PF-8V9P .......................................26

*DMCA Takedown Notices*,
    X Transparency, https://perma.cc/52WA-NKPH................................................26

Jacob Rogers, *Fairer Than Fair: a History of Fair Use on Wikipedia*,
    Diff (Feb. 26, 2016), https://perma.cc/46FP-CXP2 ................................................8

Jaime Villagomez, *The Finances of Free Knowledge: Lessons in Transparency and Impact*,
    Medium (July 28, 2021), https://perma.cc/WBQ4-HJ7S....................................10

Jenica Jessen, *Where Your Donation Goes*,
    Internet Archive Blogs (Nov. 16, 2020) https://perma.cc/47MM-PACY............11

Michael Hart, *The Project Gutenberg Mission Statement, by Michael Hart*,
    Project Gutenberg, https://perma.cc/47HG-RGV5 ..............................................24

*NonCommercial Interpretation*,
    Creative Commons Wiki, https://perma.cc/4ZEC-ZUVG ..................................18

*Open Knowledge*,
    Wikipedia, https://perma.cc/NP9B-4U32.............................................................1

*Statistics*,
    Wikimedia Commons, https://perma.cc/7C7X-VNR7 .......................................23

*Top Websites Ranking*,
    Similarweb, https://perma.cc/QSJ7-7VCZ...........................................................10

*Where Your Money Goes*,
    Wikimedia Foundation, https://perma.cc/5FU2-CY6L........................................10

*Who We Are*,
    Creative Commons, https://perma.cc/5A6D-G376 ..............................................24

*Wikimedia Foundation Digital Millennium Copyright Act (DMCA) Policy*,
    Wikimedia Foundation, https://perma.cc/X97T-SNCZ .......................................27

*Wikimedia Foundation Mission*,
   Wikimedia Foundation, https://perma.cc/HYB5-XXDQ......................................24

# INTEREST OF AMICI CURIAE

Amici curiae Wikimedia Foundation, Creative Commons, and Project Gutenberg Literary Archive Foundation ("Project Gutenberg") are nonprofit organizations that improve public access to and dissemination of knowledge.[1] Amici seek to bring to the Court's attention significant errors in the district court's approach to fair use and the dangers posed to nonprofits' lawful use of copyrighted works if this Court adopts a similar approach.

Amicus curiae Wikimedia Foundation is based in San Francisco, California, and operates thirteen free-knowledge[2] projects on the internet. Wikimedia Foundation's projects host factual and educational content that is created, edited, and moderated by over 300,000 volunteer contributors per month worldwide. Wikimedia Foundation's most well-known project is Wikipedia—the largest and most-read reference work in history. Wikimedia Foundation maintains a similar mission to Defendant-Appellant Internet Archive: to develop and disseminate free knowledge and educational content under free licenses and in the public domain.

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), amici state that all parties have consented to the filing of this brief. Pursuant to Fed. R. App. P. 29(a)(2)(E), amici state that no party's counsel authored this brief in whole or in part and no person, including no party or party's counsel, contributed money that was intended to fund preparing or submitting this brief.

[2] Free knowledge "is knowledge that is free to use, reuse, and redistribute without legal, social, or technological restriction." *Open Knowledge*, Wikipedia, https://perma.cc/NP9B-4U32.

Amicus curiae Creative Commons is a nonprofit organization based in Mountain View, California that provides open-access licenses that enable copyright owners to encourage the dissemination and reuse of their works. It also advises organizations and individuals on how best to use those licenses. Its clients include the Metropolitan Museum of Art, Khan Academy, and Wikipedia. Creative Commons does not host third-party copyrighted content itself, but instead provides advice and resources to organizations that may do so. Creative Commons also works to promote open knowledge and information sharing.

Amicus curiae Project Gutenberg is a nonprofit organization based in Salt Lake City, Utah. Project Gutenberg provides an online library, offering free access to over 70,000 electronic books, primarily from the public domain. Through its many volunteers, the organization transforms physical copies of public domain books into electronic books covering a wide range of topics. Project Gutenberg's online library—the oldest in the world—is used by teachers, students, other digital collections, and the general public, promoting the free dissemination of knowledge.

Amici are concerned that the district court's approach to fair use could render *any* nonprofit secondary use[3] of copyrighted material "commercial" under the first fair use factor. This, in turn, could severely undermine nonprofit fair use. Under

---

[3] Throughout this brief, we use the phrase "secondary use" to refer to an unlicensed use of copyrighted material which may be lawful under the fair use doctrine.

the district court's approach, a secondary use is likely to be found commercial if a nonprofit solicits donations or stands to gain reputation from its services (as most do). This will likely be true even where, as here, the nonprofit's secondary use and its revenue-generating activities are completely independent from one another. Because the legal distinction between secondary uses "of a commercial nature" and secondary uses "for nonprofit educational purposes" are so critical to amici, this brief focuses solely on the district court's erroneous approach to the first fair use factor. Amici Wikimedia Foundation, Creative Commons, and Project Gutenberg submit this brief to inform the court of the dangers presented by this approach and to urge the court to reject it.[4]

## SUMMARY OF ARGUMENT

The district court's decision contains factual and legal errors that, if endorsed by this Court, could threaten the ability of all nonprofits to make fair use of copyrighted material. In particular, the district court erroneously concluded that Internet Archive's secondary use of copyrighted materials was commercial under 17 U.S.C. § 107(1), erasing the explicit statutory distinction between uses of a "commercial nature" and "nonprofit educational purposes."

---

[4] Amici thank University of Southern California Gould School of Law Intellectual Property and Technology Law Clinic certified law students Zachary Hardy and Anna Higgins for their valuable contributions to this brief.

The district court defined "commercial" under the first fair use factor far too broadly, inextricably linking secondary uses to fundraising even when those activities are, in practice, completely unrelated. In evaluating what constitutes commercial use, the district court misapplied several considerations and ignored other critical considerations. As a result, the district court's ruling threatens nonprofit organizations who make fair use of copyrighted works. Adopting the district court's approach would threaten both the processes of nonprofit fundraising and the methods by which educational nonprofits provide their services.

This Court should reject the district court's approach and explain that, under the correct analysis, ordinary nonprofit activities—including soliciting donations—are not "of a commercial nature" for purposes of the first fair use factor.

## ARGUMENT

## I. The Funding Nonprofits Need to Function Is Typically Unrelated To and Is Not Used to Acquire Fair Use Content.

To understand why the fair uses of copyrighted material by nonprofit free-knowledge organizations are typically not commercial, the Court first needs to understand the donation, fundraising, and fair use strategies of these organizations. Amici, like many other nonprofits with websites, use fundraising strategies that are sitewide and general rather than specific and reactive to whether a page contains fairly used works. Further, amici, like many other nonprofits, use donations not for

private enrichment, but to pay for the infrastructure, employees, and other activities that serve their nonprofit educational purpose.

As detailed in Section II, the district court's disregard of these facts, along with a failure to consider important commerciality criteria, led to an erroneously broad reading of "commercial" that now threatens nearly all nonprofit fair uses.

A.   *For Nonprofits With Sitewide Donation Models, Fundraising Requests Inevitably Appear on Website Pages With Fair Use Content.*

By the nature of their sitewide fundraising models, amici and many other nonprofits will inevitably have donation links appear on website pages that contain fair use content, but not *because* of that content. Wikimedia hosts a massive amount of user-uploaded content and may not even have perfect knowledge of the copyright status of every work it hosts. As a result, it becomes impractical to consider the strength of the fair use argument for every hosted work when developing a fundraising strategy. With a sitewide donation model, a donation banner or button that appears next to such a work does not demonstrate any intent to profit off of it; instead, the connection between the banner or button and the work is likely purely coincidental.

1.   Fundraising Strategies Are Not Influenced by Fair Use Content.

When nonprofits solicit donations on their websites, they typically do not consider whether the pages being used to solicit donations contain fair use content. In fact, because the precise copyright status of user-uploaded works cannot always

be known, it can be infeasible to determine when donations are being solicited on a page that contains fair use content. This is precisely the situation faced by Wikimedia Foundation and other nonprofits like it.

Wikimedia Foundation fundraises for its various projects—including Wikipedia—by asking for donations using banners that appear at the top of its webpages. Wikimedia projects also have links to donate in their sitewide navigation menus. Wikimedia Foundation's fundraising banners are targeted primarily by geography and language (e.g., an English-language campaign for U.S. readers). Wikimedia Foundation also uses common technologies such as "local storage" to track the number of times a banner has been viewed and to minimize disruption to users by hiding banners from users who have already donated or from those who have actively closed them. The above factors are the *only* criteria used to decide whether to show a fundraising banner to a user. Critically, the fundraising banners are agnostic as to the content of the webpages on which they appear; whether those webpages include fair use content has zero influence on the presence or content of fundraising banners.

Project Gutenberg strives for financial independence and relies on outside funding as minimally as possible, but it also invites its users to support its operations through donations. Project Gutenberg's website, like Internet Archive's and Wikimedia Foundation's, contains a link to donate in the sitewide navigation bar.

The donation link appears on virtually every page throughout the site, regardless of how often a user has visited the site. This alleviates the administrative burden of deciding when and where to solicit donations. Indeed, Project Gutenberg does not track which pages contain fair use content, nor does it modify donation options for pages that contain fair use content.

Finally, Internet Archive's donation links are also automatically present throughout its website. A-1906. Thus, while each of these nonprofits implements online donation options somewhat differently, none of their donation options bear any relationship to the content of any specific webpage.

2. Whether Nonprofit Platforms Host Fair Use Materials Is Not Influenced by Their Fundraising Strategies.

The presence of fair use materials does not influence fundraising, and the reverse is also true. Amici's inclusion of fair use material on their websites is not motivated by a desire for increased donations, bolstered standing, or any other purportedly "commercial" benefits that the district court considered. Wikimedia Foundation does not even decide which pages include "non-free content"—the "Wikipedian" term for unlicensed copyrighted content. Instead, the decision of when and where to include non-free content is made by the thousands of volunteer contributors who collectively edit and maintain the Wikimedia projects. All non-free content on Wikimedia projects is then moderated by users using a set of

carefully crafted community-driven guidelines, which were created primarily by users.

Wikimedia Foundation initially established a baseline set of rules for content on the Wikimedia projects, including a requirement that all content (which is contributed and curated by users) not infringe copyright. From there, Wikimedia's user community developed more detailed rules governing the secondary uses of unlicensed content. Jacob Rogers, *Fairer Than Fair: a History of Fair Use on Wikipedia*, Diff (Feb. 26, 2016), https://perma.cc/46FP-CXP2. Users are also the ones who contribute the relevant content and ensure these rules are enforced.

These community-driven rules include heightened requirements more stringent than those required by copyright law. In total, there are a set of ten criteria that all non-free content must meet to be included on the English version of Wikipedia, which goes far beyond the four fair use factors. *Wikipedia:Non-free content*, Wikipedia, https://perma.cc/RLF5-MXL9. Wikipedia's non-free content criteria are deliberately and explicitly "more narrowly defined criteria than apply under [the fair use doctrine]." *Id.* Fundraising plays no part in these criteria. *Id.* As a result of Wikipedia's policies, Wikimedia Foundation estimates that only about 750,000 to 900,000 media files appearing on English Wikipedia rely on fair use.[5]

---

[5] An example of a media file that relies on fair use is a copyrighted corporate logo used in the Wikipedia entry for that corporation.

This is a small amount compared to the over 100 million public domain or freely licensed media files residing on Wikimedia Commons, the Wikimedia project that hosts media files that appear on Wikipedia and other Wikimedia projects.

Project Gutenberg's volunteers decide which public-domain literary works to transform into eBooks, which Project Gutenberg then distributes online for free. Its volunteers have digitized more than 70,000 books since 1971, making its digital library the oldest in the world. Project Gutenberg endeavors to enable as many people as possible to easily read, search, and otherwise digitally interact with literary works in the public domain. Like many digital libraries, Project Gutenberg depends on fair use to carry out its mission, including in reproducing copyrighted materials incidental to public domain works. And as with Wikimedia Foundation, the volunteers' choice of which works to include on its site is made completely independently of fundraising efforts by the nonprofit organization.

For any nonprofit with a sitewide fundraising model, donation banners will inevitably appear on pages that include fair use content. But for nonprofits like amici, fundraising and fair use are completely independent processes carried out by different parties, and any overlap is essentially coincidental.

   B.    *Amici Use Donations to Serve Their Educational Purposes, Including Maintaining Extensive Infrastructure and Hosting.*

Amici and Internet Archive share similar goals—to provide free knowledge services to the public. They all dedicate the vast majority of their resources towards

handling vast amounts of data and web traffic and providing free educational services to the public.

Nonprofits like Wikimedia Foundation must maintain the vast technical infrastructure that their platforms require to function. Jaime Villagomez, *The Finances of Free Knowledge: Lessons in Transparency and Impact*, Medium (July 28, 2021), https://perma.cc/WBQ4-HJ7S. Wikipedia, for example, is consistently ranked in the top ten most visited websites in the world. *Top Websites Ranking*, Similarweb, https://perma.cc/QSJ7-7VCZ. It receives over 15 billion visits per month, and Wikimedia Foundation dedicates its resources largely towards ensuring that those visits are reliable and secure. Villagomez, *supra.* To accommodate so many visits, Wikimedia Foundation puts 43 percent of its donations towards direct website support, which includes costs like internet hosting and engineering improvements. *Where Your Money Goes*, Wikimedia Foundation, https://perma.cc/5FU2-CY6L. This is the largest allocation of Wikimedia Foundation's donations, compared to 32 percent going to community support, 13 percent to administration and governance, and 12 percent to fundraising. *Id.*

Internet Archive also puts much of its donations towards protecting and maintaining its large-scale infrastructure. Jenica Jessen, *Where Your Donation*

*Goes*, Internet Archive Blogs (Nov. 16, 2020) 16, 2020), https://perma.cc/47MM-PACY.

Project Gutenberg similarly uses donations primarily to sustain its operations and carry out its core mission of enabling access to information for as many people as possible. Specifically, Project Gutenberg uses donations to support digitization and distribution activities such as computational infrastructure, content acquisition, personnel, and administration. In essence, donations are part of the organization's effort to ensure that its content will remain free and accessible, including in the event of server outages or organizational disruptions. They are not simply added to some sort of "profit" for Project Gutenberg but are used to promote the goals endorsed by the statutory definition of fair use: furthering "teaching . . ., scholarship, and research." 17 U.S.C. § 107.

Amici's content is entirely free for users to access regardless of whether they have donated. The entirely optional donation process makes it clear that donations support amici's nonprofit educational missions and have nothing to do with content

access.  In other words, donations do not "buy" content or access just as amici do not "sell" content or access.

## II.    The District Court Applied an Erroneously Broad Reading of "Commercial" in the First Fair Use Factor.

In its analysis of the first fair use factor, the district court simultaneously misapplied the law it relied on and failed to capture other important legal considerations.  The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  This factor "relates to the justification for the use" and is one of the most important factors.  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 510 (2023).  The first fair use factor is also adaptive, meaning that when some considerations such as "transformative value" are absent, other considerations, "like the extent of [] commerciality, loom larger."  *Id.* At 531 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994)).

The district court made several errors in evaluating Internet Archive's use.  It mistakenly concluded that additional users, donations, and reputation are "commercial" when they directly serve the organization's nonprofit educational purpose.  It overread "monetization" to encompass any donations, regardless of whether they were related to the use of copyrighted works.  It failed to require any

nexus between the use of the works in question and the purported benefits to Internet Archive. And it found a commercial advantage in simply serving the public.

These errors go to the heart of the district court's decision. While the court did note in passing that Internet Archive received some commissions from Better World Books as part of its controlled digital lending program, this was not the basis of the court's decision. In evaluating the first fair use factor, the district court limited its consideration of commissions to a single statement identifying this relationship followed immediately by a recognition that Internet Archive "does not make a monetary profit." SPA-31-32. The remainder of the district court's analysis and case citations focused solely on donations and non-monetary considerations. *Id.* at 31-32. These commissions are not irrelevant, but for the reasons explained below, did not weigh heavily in the district court's analysis and should not control this Court's ruling either.

Done properly, the first factor analysis shows that the "justification for the use" in this case and ones like it is the nonprofit educational purpose, not profit, and the first factor therefore favors fair use.

A. *Volunteer Participation, Nonprofit Recognition, and Donations Are Traditional Nonprofit Educational Activities That the District Court Improperly Treated as Commercial.*

The district court's characterization of Internet Archive's controlled digital lending program as "commercial" disregards the plain language of the law. The

statute codifying fair use explicitly contrasts "nonprofit educational purposes" with those "of a commercial nature."  17 U.S.C. § 107(1); *see also United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) ("As a general matter, the use of different words within the same statutory context strongly suggests that different meanings were intended").  In its holding, the district court effectively read this contrast entirely out of the law.  Under the district court's analysis, it's hard to imagine what *could* qualify as a non-commercial "nonprofit educational purpose."

The Second Circuit requires courts to weigh "private economic rewards" from the secondary use against the "broader public benefits" of the secondary use.  *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994).  For nonprofits like Internet Archive and amici, however, there is no private economic reward. Nonprofits like Internet Archive and amici are not profit-generating entities formed to create individual wealth or pay dividends to shareholders; they are educational organizations that host information for the benefit of the general public.  As detailed above, providing these benefits costs money.   For example, as hosts, Internet Archive and Wikimedia Foundation incur the costs associated with hosting, and those costs increase as their number of users increases.

The district court incorrectly treated bolstered community standing and increased users as unambiguous indications of non-monetary profits.  For nonprofits like Internet Archive and the amici, however, bolstered community standing and

increased users are not uniformly beneficial; they also directly increase costs. More importantly, even when bolstered community standing and increased users do lead to an increase in donations, and even if that increase in donations exceeds the increase in costs, nonprofits do not distribute such surpluses to shareholders; any surplus is dedicated to their service of the public in accordance with their educational missions.

Amici do not dispute that "the absence of a dollars and cents profit does not inevitably lead to a finding of fair use." SPA-31 (citing *Weissmann v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)). Indeed, some noncommercial uses are not fair ones, and in the right circumstances, non-monetary benefits can be construed as profits that render a use commercial. For example, in *Weissmann*, an academic researcher copied an article in its entirety, replaced the original author's name with their own, and passed the article off as their own research. Unsurprisingly, the secondary use in Weissmann was held to be commercial: someone infringed a work of value solely to advance their own personal standing. That is simply not the case here.

Nonprofits like amici and Internet Archive exist to serve the public good, not to maximize profit, bolster their reputation, or create societal reliance on their services. The secondary uses they make are in service of their free-knowledge

projects and are for nonprofit educational purposes, not their reputations, which favors a finding that these uses are noncommercial in nature.

The district court relied on cases with drastically different non-monetary "profit" motivations to reach its incorrect conclusion about the commerciality of Internet Archive's controlled digital lending program, but did little to explain why those cases applied. *Weissmann* itself recognizes that "the [fair use] doctrine necessitates an 'equitable rule of reason' analysis" and "no generally applicable definition is possible." *Weissmann*, 868 F.2d at 1323 (citations omitted). Instead, "each case raising the question [of fair use] must be decided on its own facts." *Id.* (citation omitted). The fair use activities of nonprofit organizations like Internet Archive and Wikimedia Foundation are plainly distinguishable from the facts of *Weissmann*, and the district court erred in reaching the same conclusion.

The district court also relied on the U.S. Supreme Court's analysis in *Harper & Row*, which explains that "the crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 562 (1985). In *Harper & Row,* The Nation supplanted the copyright holder's commercially valuable right of first publication through news reporting. The Nation, which was *not* a nonprofit organization, argued (unsuccessfully) that its disregard for the

copyright owner's right of first publication was justified by the public benefit of disseminating information slightly sooner. *Id.* The Nation had published the author's copyrighted expression, for profit, without paying the "customary price" that its competitor had already contracted to pay. *Id.* at 542, 562.

The secondary uses in *Weissmann* and *Harper & Row* are fundamentally different from those of nonprofit organizations like Internet Archive and amici, all of whom serve the public knowledge using, among other things, existing published works. For Internet Archive's controlled digital lending program and Project Gutenberg's digital library, there is no "customary price" for lending books. Instead, libraries lend books for free. Likewise, for Wikipedia, there is no "customary price" for including information in an encyclopedia. These projects are simply not "commercial" as described by the *Weissmann* and *Harper & Row* courts. The purpose of the use is educational—not commercial profit.

B.      *"Monetization" and "Commercialization" Are Not the Same Thing.*

The district court overly relied on a statement by Internet Archive's Director of Finance's that "every single page of [Internet Archive] is monetized" as evidence that Internet Archive's controlled digital lending program is "commercial." SPA-31-32. The reality is the opposite.

The district court cited this statement in support of the idea that every secondary use of copyrighted material on Internet Archive's website is commercial

for the purposes of the first fair use factor. *Id.* at 31-32. Read in context, however, Internet Archive's Director of Finance was confirming that "donate" buttons exist at the top of the page and in the navigation bar on every page of Internet Archive's website, *regardless of whether that page is related to controlled digital lending*. A-1906-08. During the deposition, the Director of Finance was asked whether "people using the lending library are given the option via the website to donate money to the Internet Archive," to which the Director of Finance answered that "every single page of the website . . . has a donate button on it." *Id.* at 1906.

Creative Commons provides a set of legal tools to the public including a "non-commercial" license ("BY-NC") which permits use "not primarily intended for or directed towards commercial advantage or monetary compensation." *NonCommercial Interpretation*, Creative Commons Wiki, https://perma.cc/4ZEC-ZUVG. Use of BY-NC material by nonprofits which support themselves through donation buttons is generally considered to fall within this definition. While this is not an identical use of "commercial" as in 17 U.S.C. § 107, it does illustrate a widespread understanding that generalized nonprofit fundraising is fundamentally *not* commercial.

As explained above, the district court's interpretation of "commercial" is so broad as to encompass essentially all nonprofit fundraising. The district court's over-reliance on the term "monetization" compounds this error. Nonprofits need

funding to operate, and often, a principal form of obtaining that funding is through donations. If, as the opinion below suggests, all receipt of donations is "monetization" and monetization is automatically commercial, then all nonprofit secondary uses are commercial. This cannot be correct.

C. *For Nonprofits Like Amici, There Is No Nexus Between Secondary Uses and Revenue From Sitewide Donation Links.*

The district court's holding erroneously treats secondary uses by nonprofit organizations as commercial even when there is no nexus between the use of copyrighted material and the nonprofit's revenue-generating activities. The Second Circuit has "discounted [the commercial] consideration where 'the link between [the defendant]'s commercial gain and its copying is . . . attenuated' such that it would be misleading to characterize the use as 'commercial exploitation.'" *Swatch Grp. Mgmt. Servs. v. Bloomberg LP*, 756 F.3d 73, 83 (2d Cir. 2014) (quoting *Texaco*, 60 F.3d at 922). Indeed, it appears the district court did not even try to identify such a "link" or nexus, let alone successfully identify one.

There are situations where a nonprofit organization's secondary use *could* be deemed commercial if there was a strong enough nexus between the secondary use and revenue-generating activity. For example, if a healthcare-related nonprofit organization was selling t-shirts with a famous cartoon mouse on them, there would be a plausible nexus between that revenue generation and the secondary use. This,

in turn, could make it more likely that the use was commercial under the first fair use factor.

Indeed, several of the cases the district court relied on for its commerciality analysis do feature such a nexus. *See Harper*, 471 U.S. at 562 (The Nation sold more magazines because consumers were enticed by excerpts of an unpublished book); *Weissmann*, 868 F.3d at 1313 (researcher's reputation directly benefited from misappropriated paper); *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1386 (6th Cir. 1996) (college-town copy shop copied book excerpts and sold resulting "coursepacks"). But the situation at hand is different, and no such nexus exists here.

Looking at the secondary uses of nonprofits like Wikimedia Foundation, Project Gutenberg, or Internet Archive, there is almost nothing that could be considered such a nexus. The closest Internet Archive comes is likely in the commissions it received from Better World Books. SPA-14. However, the district court barely mentioned those commissions and provided no legal analysis specific to them, instead focusing on donations and non-monetary considerations. Further, the commissions paid to Internet Archive by Better World Books totaled only $5,561.41 over the course of five years. Br. of Internet Archive, Dkt. No. 60 at 23 (Dec. 15, 2023). In those same five years, Internet Archive spent *millions* of dollars

operating its controlled digital lending program. *Id.* To the extent this creates any nexus between the secondary use and fundraising, it is an exceedingly weak one.

Finally, other areas of copyright law support the nexus requirement. For instance, indirect profits from infringement are only recoverable if there is a causal nexus between the indirect profits and the secondary use. *See, e.g.*, *Graham v. Prince*, 265 F. Supp. 3d 366, 388 (S.D.N.Y. 2017). Indirect profits include exactly the kinds of benefits—including increased donations—that the district court relied on, and these profits are not recoverable by a copyright holder unless there is a nexus between the infringer's secondary use and the infringer's indirect profits. It makes little sense to call a secondary use "commercial" if a copyright owner would not even be entitled to recover the profits from that secondary use were it found to be infringing. This Court should not permit such an approach to persist within the fair use context either.

### D. *The District Court Omitted Additional Legal Considerations That Favor Nonprofit Educational Use.*

The district court's ruling that Internet Archive's secondary use of copyrighted material was commercial also ignored at least three critical considerations: whether the secondary use provided a direct or immediate commercial advantage; whether the secondary use is likely to produce a significant enough change in revenue; and whether the secondary use was for a public benefit or private commercial gain. For nonprofits like Internet Archive and amici, ignoring

these considerations could render all nonprofit uses commercial for any nonprofit that ever solicits donations. By applying the missing criteria from the district court's opinion, we see that they all favor non-commerciality and, in turn, fair use.

First, when evaluating whether a secondary use of copyrighted material qualifies as commercial or noncommercial, courts must consider whether the use creates a direct or immediate commercial advantage, given that the "commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a *direct* consequence of copying the original work." *Texaco*, 60 F.3d at 921-22 (emphasis added). In *Texaco*, researchers' photocopying of a journal article to keep in their offices did not amount to "commercial exploitation" because it did not directly and immediately give Texaco a commercial advantage. *Id.* at 922.

For organizations like Wikimedia Foundation, Project Gutenberg, and the many nonprofit users of Creative Commons BY-NC licensed materials, the secondary use of copyrighted materials does not directly link to their fundraising efforts, and "commercial advantages" are essentially nonexistent. Wikimedia Foundation's fundraising efforts are agnostic regarding the webpages that include fair use material. The inclusion of fair use materials on some of Wikipedia's

webpages is not a significant reason for donors who give to Wikimedia Foundation; the Foundation's mission *is*. These fundraising efforts are therefore noncommercial.

Second, the secondary use of copyrighted materials may constitute a non-commercial purpose when that secondary use is not likely to appreciably change revenue for the organization hosting the secondary use. *See, e.g.*, *Whiddon v. Buzzfeed, Inc.*, 638 F. Supp. 3d 342, 353-54 (S.D.N.Y. 2022). In *Whiddon*, Buzzfeed's use of copyrighted photographs in an article was not considered commercial use because it was "doubtful that the copying of the [p]hotographs led to any appreciable change in revenue from advertising contracts or made readers of the [a]rticle more inclined to purchase the [d]efendant's merchandise." *Id.*

For Wikimedia Foundation, providing free knowledge services is its central goal, and fair use is a smaller component that helps it carry out this central goal, e.g., by allowing the inclusion of a corporation's logo on the Wikipedia article about that corporation. Wikimedia Commons—Wikimedia Foundation's free media repository—contains over 100 million freely-licensed or public domain media files, many of which are featured on Wikipedia, and only about 750,000 to 900,000 of the media files featured on the English version of Wikipedia consist of non-free content. *Statistics*, Wikimedia Commons, https://perma.cc/7C7X-VNR7. This is such a small amount compared to the vast resources on Wikipedia that there is no reason to

think fair use materials create an appreciable revenue change. This supports the conclusion that these types of secondary uses are noncommercial.

Finally, when deciding whether a use is commercial or noncommercial, courts also consider whether it was for private commercial gain. *MCA, Inc. v. Wilson*, 677 F.2d 180, 182 (2d Cir. 1981). In *MCA*, a song in a play infringed the copyright of the song "Boogie Woogie Bugle Boy," in part because the song was written and performed for the private gain of a commercial composer. *Id.* at 185. For Internet Archive and amici, the purpose of their secondary uses is public benefit rather than commercial gain.

Internet Archive's controlled digital lending program served a public benefit by allowing users to borrow e-books when they may not have had physical access to a library with the book or to equipment to assist them with reading a regular book. Wikimedia Foundation, Creative Commons, and Project Gutenberg have overlapping missions where they aim to give people the tools to develop and share free educational content with the public. *Wikimedia Foundation Mission*, Wikimedia Foundation, https://perma.cc/HYB5-XXDQ; *Who We Are*, Creative Commons, https://perma.cc/5A6D-G376; Michael Hart, *The Project Gutenberg Mission Statement, by Michael Hart*, Project Gutenberg, https://perma.cc/47HG-RGV5. For each, their inclusion of fair use materials in projects directly furthers their missions and does not generate private commercial gains.

Ultimately, these nonprofit organizations' fair uses are in furtherance of their nonprofit purposes, do not significantly alter revenues, and do not provide any commercial advantage. In short, they are not commercial.

## III. If Adopted, the District Court's Ruling Could Significantly Limit Nonprofit Organizations' Ability to Make Fair Use.

The district court's analysis of the first fair use factor sweeps essentially *all* secondary use by nonprofits into the "commercial" category. If adopted by this Court, that reasoning could effectively end the ability of nonprofits to make nonprofit educational uses under the first fair use factor, putting at risk their ability to make *any* fair use of third party works. This cannot possibly be the correct scope for the first fair use factor.

Amici recognize that their nonprofit nature does not make them immune from copyright infringement liability, but a decision following the district court's reasoning would severely and improperly limit the ability for nonprofit organizations to use copyrighted materials as fair use in furtherance of their nonprofit purposes. While nonprofits like Wikimedia Foundation, whose content is primarily provided by users, are in large part protected by the DMCA, *see* 17 U.S.C. § 512, this does not eliminate the potential harm. Other nonprofits who directly post content relying on fair use would still be directly in the crosshairs, while organizations like

Wikimedia Foundation could still find it harder to include important educational content because its users would be at risk.

Affirming the district court's analysis would set a precedent that any kind of acclaim, reputation, or donations that a nonprofit earns through an endeavor that contains even incidental overlap with a secondary use would be enough to constitute "commercial use." Every nonprofit requires funding, and it is extremely common for nonprofits to seek donations on nearly every page of their websites. Under the district court's analysis, all secondary uses by these nonprofits are automatically commercial, severely undermining fair use and stymying the nonprofit educational purposes of those organizations.

Because Wikimedia Foundation's projects are comprised of user-generated content, it operates under the DMCA safe harbor and is not liable for infringing content if it complies with the conditions set in 17 U.S.C. § 512, which establishes procedures for copyright holders to request the removal ("takedown") of allegedly infringing works. From January to June 2023, the Wikimedia Foundation received just 29 total takedown requests and granted two of those requests. *DMCA Takedown Notices*, Wikimedia Foundation, https://perma.cc/C9PF-8V9P. Comparatively, the social network X received over 318,000 takedown requests in 2021. *DMCA Takedown Notices*, X Transparency, https://perma.cc/52WA-NKPH. After Wikimedia Foundation receives the notices, it performs a thorough legal analysis of

the request's merits and pushes back if it believes the content is lawful. *Wikimedia Foundation Digital Millennium Copyright Act (DMCA) Policy*, Wikimedia Foundation, https://perma.cc/X97T-SNCZ. Wikimedia Foundation is able to do this careful analysis because it receives such a small number of notices—likely because its editors are so careful about fair use.

Although it is not precisely clear how the district court's analysis would apply to the users who curate and edit Wikipedia, the district court's commerciality analysis would at least create uncertainty for volunteer contributors and editors on Wikipedia. Because those contributors are *not* protected by the DMCA, they may choose to avoid including fair use content altogether. Similarly, rightsholders may begin to submit additional DMCA takedown notices to Wikimedia Foundation if they conclude, based on the district court's reasoning, that encyclopedic uses of copyrighted content on Wikipedia are now considered "commercial" under the first fair use factor. In either case, these effects may result in less information being available on Wikipedia, harming its nonprofit educational purpose because of a non-existent "commercial" interest.

And while Wikimedia Foundation is protected by DMCA, many other nonprofits post their own material and are therefore unprotected. For these organizations, an affirmation of the district court's ruling could limit the amount of fair use content allowed, force them to undergo an intensive process to identify every

instance of fair use and avoid fundraising anywhere nearby, or even force them to remove fair use material altogether. Creating a new process to divorce donation opportunities from pages with fair use content would be a heavy and unnecessary lift for nonprofit organizations, and it is simply not required by copyright law.

Copyright law has consistently supported the notion that both for-profit and nonprofit companies can make noncommercial uses even though they solicit donations. The district court's holding stands apart from existing case law and could create significant new risks for nonprofits. This Court should ensure that its holding does not adopt and amplify these errors.

## CONCLUSION

The district court erred in finding that the secondary uses of copyrighted material in Internet Archive's controlled digital lending program were commercial and for-profit. Adopting the district court's analysis would endanger all nonprofit organizations that accept donations and make fair use of copyrighted works, putting them at risk of copyright liability and harming their nonprofit educational efforts. Amici respectfully request that this Court reject the analysis below and protect the ability of nonprofits to make noncommercial fair use of copyrighted works in furtherance of their nonprofit educational purposes.

Dated: December 22, 2023        Respectfully submitted,

JEF PEARLMAN
USC Gould School of Law
IP & Technology Law Clinic
699 Exposition Blvd
Los Angeles, CA 90089-0071
Telephone: (213) 740-7613
jef@law.usc.edu

*Attorney for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,
AND TYPE-STYLE REQUIREMENTS**

1. This brief complies with the word limit of Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c) because it contains 6,179 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface limitation of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word Version 2310 (Build 16924.20180) in 14-point Times New Roman font.

Dated: December 22, 2023

JEF PEARLMAN
USC Gould School of Law
IP & Technology Law Clinic
699 Exposition Blvd
Los Angeles, CA 90089-0071
Telephone: (213) 740-7613
jef@law.usc.edu

*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 22nd day of December, 2023, I filed the foregoing Brief of Wikimedia Foundation, Creative Commons, and Project Gutenberg Literary Archive Foundation as Amici Curiae in Support of Defendant-Appellant with the Clerk of the United States Court of Appeals for the Second Circuit via the CM/ECF system, which will serve such filing to all registered CM/ECF users.

JEF PEARLMAN
USC Gould School of Law
IP & Technology Law Clinic
699 Exposition Blvd
Los Angeles, CA 90089-0071
Telephone: (213) 740-7613
jef@law.usc.edu

*Attorney for Amici Curiae*