# 23-1260-cv

## United States Court of Appeals
### for the
## Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* INTERNATIONAL PUBLISHERS
ASSOCIATION, FEDERATION OF EUROPEAN PUBLISHERS,
INTERNATIONAL ASSOCIATION OF SCIENTIFIC, TECHNICAL AND
MEDICAL PUBLISHERS, INTERNATIONAL CONFEDERATION OF
SOCIETIES OF AUTHORS AND COMPOSERS, INTERNATIONAL
FEDERATION OF FILM PRODUCERS ASSOCIATIONS,
INTERNATIONAL VIDEO FEDERATION, IFPI, ASSOCIATION OF
CANADIAN PUBLISHERS, BRAZILIAN BOOK CHAMBER,
SINDICATO NACIONAL DOS EDITORES DE LIVROS, AND SYNDICAT
NATIONAL DE L'EDITION IN SUPPORT OF PLAINTIFFS-APPELLEES**

MATTHEW J. KEELEY
MICHAEL BEST & FRIEDRICH
*Counsel for Amici Curiae*
The Wharf
1000 Maine Avenue, SW, Suite 400
Washington, DC 20024
(202) 844-3824
joe.keeley@michaelbest.com

––––––––––––––––––––––––––––––––––––––––––––––––––––––––––––

– v. –

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

––––––––––––––––––––––––––––––––––––––––––––––––––––––––––––

**CORPORATE DISCLOSURE STATEMENT**

The Amici are a collection of international and regional trade bodies based outside of the United States representing copyright and related right holders from a wide range of copyrighted works worldwide.

The International Publishers Association ("**IPA**") is the international federation of national, regional, and specialist book publishers' associations representing all aspects of book and journal publishing globally. IPA actively fights against censorship and promotes copyright, literacy, and freedom to publish on behalf of its member associations and publishers. Established in 1896, its membership comprises 101 organizations from 81 countries. The IPA is based in Geneva, Switzerland and is an accredited observer at the World Intellectual Property Organization ("**WIPO**").

The Federation of European Publishers ("**FEP**") represents 29 national associations of publishers of books, learned journals and educational material, in all formats. FEP members are European publishers and since 2022, the Ukrainian Publishers and Booksellers Association is a guest member.

The International Association of Scientific, Technical and Medical Publishers ("**STM**") is a non-profit international trade association of more than 140 scholarly, scientific, technical, medical, and professional publishers collectively responsible for more than two-thirds of the English-language scholarly and

professional literature. STM works to support the integrity and quality of the scholarly record on behalf of its members, including through anti-piracy activities and interventions in copyright infringement cases. First organized in 1969, STM is based in The Netherlands and has members in Europe, North America, and Asia. STM is an accredited observer at WIPO.

The International Confederation of Societies of Authors and Composers ("**CISAC**") is a non-profit, non-governmental organization based in Paris, France, and is the world's leading network of authors' societies. With 225 member societies in 116 countries, CISAC represents more than five million creators across the world, spanning a wide array of artistic repertoires, including music, audiovisual, drama, literature, and visual arts. CISAC has, over the years, been a staunch advocate for the rights and interests of creators across the globe, seeking to ensure their intellectual property rights are adequately protected.

FIAPF Headquarters ASBL ("**FIAPF**" - International Federation of Film Producers' Associations) is an organization representing the interests of motion picture and television producers worldwide. It consists of 37 member organizations in 29 countries. FIAPF is the only large-scale organization of motion picture and television producers with a global reach, and has extensive experience enforcing intellectual property rights worldwide, particularly in an online context. FIAPF is an accredited observer at WIPO.

The International Video Federation ("**IVF**") represents individual companies and associations representing companies, active in all segments of the film and audiovisual sector in Europe, with a focus on commercial and regulatory matters relevant to the publication of films and audiovisual content on physical carriers as well as via all forms of legal online distribution channels. The IVF is an accredited observer at WIPO.

IFPI is the voice of the recording industry worldwide. IFPI and its National Group network represents the interests of some 8,000 members across the globe, including major and independent labels. Our mission includes the promotion of the value of recorded music, campaigning for rights of record producers and expanding the commercial uses of recorded music through every available channel across the world. IFPI works to make sure that the rights of our members, who create, produce and invest in music, are properly protected and enforced.

The Association of Canadian Publishers ("**ACP**"), founded in 1976, is the voice of Canadian English-language independent book publishers. Its membership consists of approximately 115 Canadian-owned and controlled book publishers from across the country, which range widely in company size and editorial mandate. ACP focuses its resources on advocacy, programs, and projects including: Government and Public Relations, Collaborative Marketing initiatives, Research and Communications, and Professional Development activities.

Brazilian Book Chamber ("**CBL**") is a non-profit association, representing publishers, booksellers, distributors, and other professionals in Brazil for 77 years. CBL promotes access to books and the democratization of reading throughout the country, besides promoting Brazilian literature in the international market. CBL has created and still maintains some of the most important literary events in the country, such as the São Paulo International Book Fair, in addition to the largest and most traditional awards in the Brazilian books sector, the Jabuti Award.

Sindicato Nacional dos Editores de Livros ("**SNEL**") is the representative of publishers in Brazil for over 80 years and plays a crucial role in promoting reading and books, defending the category, and fostering artistic and intellectual production.

Syndicat national de l'édition ("**SNE**") is France's trade association of book publishers. SNE represents approximately 763 member companies whose combined business endeavours account for the bulk of French publishing. SNE represents the French publishing profession and aims at advocating publishers' interests, supporting creativity by defending freedom to publish and promoting the respect of intellectual property rights. SNE is a member of the Federation of European Publishers (FEP) and the International Publishers Association (IPA).

The copyright interests of the Amici are directly impacted by the actions of the defendant. Each of the Amici has a strong interest in the preservation of an

effective copyright system that respects the international requirements of signatory nations to several copyright treaties. The defendant's actions effect the commercial interests of each Amici, both in the United States and worldwide.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES …………………………………………… iii

INTERESTS OF AMICI CURIAE ………………………………….. 1

SUMMARY OF ARGUMENT ……………………………………… 5

ARGUMENT ………………………………………………………… 6

    I.    The Amici Are In Full Agreement With The Lower Court's
            Ruling ……………………………………………………… 6

    II.    The Issues Raised Have Worldwide Impact …………………… 9

    III.    The Case Overlaps With Artificial Intelligence Copyright
            Disputes ………………………………………………… 10

    IV.    There Are Four Primary Treaties That Govern U.S. And
            International Copyright Law ………………………… 12

            A. Upholding the Three-Step Test Contained within the Four
               Treaties is a Requirement for All Treaty Signatories
               Including the U.S. ……………………………………… 13

            B. The Three-Step Test is Key to How U.S. Copyright Laws
               Are Updated ……………………………………………… 15

            C. A Failure of the United States to Follow the Three-Step Test
                Has Already Led to a World Trade Organization Ruling

Against the United States ……………………………………… 16

D. CDL Presents A High Risk of Another U.S. Violation of Its

Berne Obligations …………………………………………… 18

V.    The United States Must Follow its International Treaty

Obligations ...………………………………………………… 19

CONCLUSION ………………………………………………………… 20

# TABLE OF AUTHORITIES

**Cases**

*A.V. ex rel. Vanderhye v. Iparadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) …… 8

*Authors Guild v. Google Inc.*, 804 F.3d 202 (2d Cir. 2015) ………………. 9

*Authors Guild v. OpenAI Inc.*, 1:23-cv-08292 ……………………………… 12

*Campbell v. Acuff-Rose*, 510 U.S. 569 ………………………………….. 7

*Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018) …………….. 8

*Golan v Holder*, 565 U.S. 302, (2012) ………………………………… 18, 19

*Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160
   (S.D.N.Y. Mar. 24, 2023) ……………………………………………… 7, 8

*Murray v. The Charming Betsey*, 6 U.S. 64 (1804) ……………………… 18, 19

*New York Times Company v. Microsoft Corp. and OpenAI, et al*.
   1:23-cv-11195 . ……………………………………………………… 11

*Perfect 10, Inc. v. Amazon.Com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ………. 8

*Sancton v. OpenAI Inc., Microsoft Corporation, et al.* 1:23-cv-10211 ……… 12

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29
   (1st Cir. 2012) ………………………………………………………… 9

*The Intercept Media, Inc. v. OpenAI, Inc* 1:24-cv-01515 ……………………. 11


**Treaties**

Agreement on Trade-Related Aspects of Intellectual Property Rights,
   Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade
   Organization, Annex 1C, 1869 U.N.T.S. 299 ……………………………. 13, 14, 17

Berne Convention for the Protection of Literary and Artistic Works,
   Sept. 9, 1886 (Paris Text 1971, as amended Sept. 28, 1979),
   S. Treaty Doc. No. 99-27……………………………………………. 12, 14, 16, 17

WIPO Copyright Treaty, Dec. 20, 1996, 2186 U.N.T.S. 121……………………. 13

WIPO Performances and Phonograms Treaty, Dec. 20, 1996,
   2186 U.N.T.S. 203 …………………………………………………. 13


**Statutes**

17 U.S.C. §107 ……………………………………………………………. 6

17 U.S.C. §110(5) ……………………………………………………. 16, 17

**Legislation**

Sonny Bono Copyright Term Act, P.L. 105-298, 112 Stat. 2827, 2830-2834
   (1998) …………………………………………………………….. 16

**Other Authorities**

Letter from the Register of Copyrights to Congress, 144 Cong. Rec.
   24338 (1998). ……………………………………………………..16

Mihály Ficsor, *Guide to the Copyright and Related Rights Treaties*
   *Administered by WIPO and Glossary of Copyright and Related Rights*
   *Terms 6* (2004) …………………………………………………… 13

*Report on Orphan Works, A Report of the Register of Copyrights*,
   U.S. Copyright Office, January 2006 ………………………………… 15

Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence,
   Executive Order 14110, 88 Fed. Reg. 75191 (Nov. 1, 2023) ……… 10, 11, 15

U.S. Const. art .II § 2 …………………………………………… 12, 19

World Trade Organization, United States – Section 110(5) of the US Copyright
   Act, Report of the Panel, June 15, 2000 ……………………………... 17

# INTERESTS OF AMICI CURIAE

The Amici are a collection of international and regional trade bodies based outside of the United States representing copyright and related right holders from a wide range of copyrighted works worldwide.[1]

The International Publishers Association ("**IPA**") is the international federation of national, regional, and specialist book publishers' associations representing all aspects of book and journal publishing globally. IPA actively fights against censorship and promotes copyright, literacy, and freedom to publish on behalf of its member associations and publishers. Established in 1896, its membership comprises 101 organizations from 81 countries. The IPA is based in Geneva, Switzerland and is an accredited observer at the World Intellectual Property Organization ("**WIPO**").[2]

The Federation of European Publishers ("**FEP**") represents 29 national associations of publishers of books, learned journals and educational material, in

---

[1] All parties consented to the filing of this brief. No party's counsel authored this brief in whole or in part, and no party or its counsel contributed money that was intended to fund preparing or submitting this brief. Nor did any other person contribute money that was intended to fund preparing or submitting this brief.

[2] Although the Association of American Publishers, Inc. is a member of IPA, it has not participated in the preparation or submission of this brief.

all formats. FEP members are European publishers and since 2022, the Ukrainian Publishers and Booksellers Association is a guest member.

The International Association of Scientific, Technical and Medical Publishers ("**STM**") is a non-profit international trade association of more than 140 scholarly, scientific, technical, medical, and professional publishers collectively responsible for more than two-thirds of the English-language scholarly and professional literature. STM works to support the integrity and quality of the scholarly record on behalf of its members, including through anti-piracy activities and interventions in copyright infringement cases. First organized in 1969, STM is based in The Netherlands and has members in Europe, North America, and Asia. STM is an accredited observer at WIPO.

The International Confederation of Societies of Authors and Composers ("**CISAC**") is a non-profit, non-governmental organization based in Paris, France, and is the world's leading network of authors' societies. With 225 member societies in 116 countries, CISAC represents more than five million creators across the world, spanning a wide array of artistic repertoires, including music, audiovisual, drama, literature, and visual arts. CISAC has, over the years, been a staunch advocate for the rights and interests of creators across the globe, seeking to ensure their intellectual property rights are adequately protected.

FIAPF Headquarters ASBL ("**FIAPF**" - International Federation of Film Producers' Associations) is an organization representing the interests of motion picture and television producers worldwide. It consists of 37 member organizations in 29 countries. FIAPF is the only large-scale organization of motion picture and television producers with a global reach, and has extensive experience enforcing intellectual property rights worldwide, particularly in an online context. FIAPF is an accredited observer at WIPO.

The International Video Federation ("**IVF**") represents individual companies and associations representing companies, active in all segments of the film and audiovisual sector in Europe, with a focus on commercial and regulatory matters relevant to the publication of films and audiovisual content on physical carriers as well as via all forms of legal online distribution channels. The IVF is an accredited observer at WIPO.

IFPI is the voice of the recording industry worldwide. IFPI and its National Group network represents the interests of some 8,000 members across the globe, including major and independent labels. Our mission includes the promotion of the value of recorded music, campaigning for rights of record producers and expanding the commercial uses of recorded music through every available channel across the world. IFPI works to make sure that the rights of our members, who create, produce and invest in music, are properly protected and enforced.

The Association of Canadian Publishers ("**ACP**"), founded in 1976, is the voice of Canadian English-language independent book publishers. Its membership consists of approximately 115 Canadian-owned and controlled book publishers from across the country, which range widely in company size and editorial mandate. ACP focuses its resources on advocacy, programs, and projects including: Government and Public Relations, Collaborative Marketing initiatives, Research and Communications, and Professional Development activities.

Brazilian Book Chamber ("**CBL**") is a non-profit association, representing publishers, booksellers, distributors, and other professionals in Brazil for 77 years. CBL promotes access to books and the democratization of reading throughout the country, besides promoting Brazilian literature in the international market. CBL has created and still maintains some of the most important literary events in the country, such as the São Paulo International Book Fair, in addition to the largest and most traditional awards in the Brazilian books sector, the Jabuti Award.

Sindicato Nacional dos Editores de Livros ("**SNEL**") is the representative of publishers in Brazil for over 80 years and plays a crucial role in promoting reading and books, defending the category, and fostering artistic and intellectual production.

Syndicat national de l'édition ("**SNE**") is France's trade association of book publishers. SNE represents approximately 763 member companies whose

combined business endeavours account for the bulk of French publishing. SNE represents the French publishing profession and aims at advocating publishers' interests, supporting creativity by defending freedom to publish and promoting the respect of intellectual property rights. SNE is a member of the Federation of European Publishers (FEP) and the International Publishers Association (IPA).

The copyright interests of the Amici are directly impacted by the actions of the defendant. Each of the Amici has a strong interest in the preservation of an effective copyright system that respects the international requirements of signatory nations to several copyright treaties. The defendant's actions effect the commercial interests of each Amici, both in the United States and worldwide.

## SUMMARY OF ARGUMENT

The Supreme Court has held that the U.S. should strive to meet its international treaty obligations. Allowing the Internet Archive to operate its Controlled Digital Lending ("**CDL**") system violates the three-step test contained within four critical copyright treaties that the U.S. is a signatory nation to and would give rise to a World Trade Organization complaint that the U.S. would likely lose.

Artificial intelligence (AI) related copyright disputes are growing in number. Controlled digital lending, like that created by the Internet Archive, is likely to be a

high-quality source for works used to train AI models since the difficulty in finding tools to remove their digital rights management technology is minimal.

## ARGUMENT

The Amici strongly support the granting of summary judgement for the plaintiffs by the U.S. District Court for the Southern District of New York. As international publishing organizations, Amici view the issues raised in this case as key to how publishers are able to create new works while maintaining access to existing works. The United States is a major market for all publishers and has been a leader on the rollout of new technologies and business models including e-books. Copyright decisions made by U.S. federal courts and the U.S. Congress have a major impact upon copyright decisions worldwide.

The critical three-step test discussed herein is a core component of the copyright treaty obligations of the United States. Actions by the Internet Archive do not meet the requirements of this test because their archive is available to all users of the Internet, rather than in certain special cases; it directly conflicts with a normal exploitation of the work that publishers undertake; and it unreasonably prejudices the legitimate interests of the author.

## I.      The Amici Are in Full Agreement With The Lower Court's Ruling

Amici support the district court's granting of the plaintiff's motion for summary judgement. The lower court's reasoning thoroughly analyzed the four

factors of fair use codified at 17 U.S.C. §107 as they applied to the facts in this case and found "[e]ach enumerated fair use factor favors the Publishers." *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (S.D.N.Y. Mar. 24, 2023) at 45. Although the Amici do not seek to restate the district court's opinion at length, three portions of the opinion are of particular note.

First, the district court rightly found that the Internet Archive's "wholesale copying and unauthorized lending of digital copies of the Publishers' print books does not transform the use of the books". *Hachette* at 34. Internet Archive e-books did not "add[] something new, with a further purpose or difference character, altering the [originals] with new expression, meaning, or message." *Campbell v. Acuff-Rose*, 510 U.S. 569, 579. The publishing industry has faced countless examples of unauthorized reproduction and distribution of its works on the Internet in the U.S. and around the world. The mere change of a website address as to where these unauthorized copies can be found to "Archive.org" combined with the involvement of a non-profit entity in the reproduction and distribution does not impact the underlying copyright violations.

Second "(w)hat fair use does not allow … is the mass reproduction and distribution of complete copyrighted works in a way that does not transform those works and that creates directly competing substitutes for the originals." *Hachette* at 45. The Internet Archive sought to create an online location for readers of e-books

to acquire e-books on a short time basis through lending. However, publishers are already licensing their works to local libraries for this very purpose and have been doing so for many years. The only aspect of the Internet Archive's CDL effort that was unique was its brazen disregard for the copyrights of publishers. The Second Circuit has recognized in certain circumstances such as the search engine in *Perfect 10, Inc. v. Amazon.Com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) or the plagiarism detection software in *A.V. ex rel. Vanderhye v. Iparadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) that the effort to expand the utility of a work by using technology to "improv[e] the efficiency of delivering content" to "one entitled to receive the content" in a way that does not "unreasonably encroach on the commercial entitlements of the right holder." *Capitol Recs., LLC v. ReDigi Inc.*, 910 F.3d 649, 661 (2d Cir. 2018) can constitute fair use. There is no expansion of utility here. The actions of the Internet Archive encroach upon the commercial entitlements of the rights holder.

Finally, the district court held that "At bottom, IA's fair use defense rests on the notion that lawfully acquiring a copyrighted print book entitles the recipient to make an unauthorized copy and distribute it in place of the print book, so long as it does not simultaneously lend the print book. But no case or legal principle supports that notion. Every authority points the other direction." *Hachette* at 45. Amici are also equally unable to identify any such authority. This Court has previously heard

cases that "test[ed] the boundaries of fair use." *Authors Guild v. Google Inc*., 804

F.3d 202, 206 (2d Cir. 2015). Although this case tests fair use, it does not come

close to the boundaries of it.

This case is not about precise line drawing or interpretation of fair use

principles as applied to narrow portions or potential transformations of a select

number of copyrighted works. Instead, this case is about the devastating impact to

worldwide publishers due to the wholesale reproduction and distribution of entire

copyrighted works with no transformation whatsoever. The district court correctly

saw the case for what it is and ruled decisively for the plaintiffs.

## II.    The Issues Raised Have Worldwide Impact

Although this case involves actions that occurred within the U.S. by

domestic parties, the Amici highlight that the impact of this case is not limited to

within the U.S. See *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689

F.3d 29, 65 (1st Cir. 2012). "If anyone could freely access the Works, electronically

or otherwise, the [plaintiff] would have no market in which to try and publish,

disseminate, or sell its [Works]."

The plaintiffs sell physical copies of their works worldwide and license e-

books in many of them. The Internet Archive's unauthorized reproduction and

distribution of copyrighted works does not solely impact the U.S. market. By

distributing internationally, the Internet Archive hurts international publishers in

the U.S. as well as in their home markets, including many of the Amici's international versions. By design, the Internet Archive is open to Internet users of all nations as it makes clear in the opening sentences of its initial answer to the complaint in the district court,

> The Internet Archive, a 501(c)(3) public charity, is a nonprofit library that has had one guiding mission for almost 25 years: to provide universal access to all knowledge. It is a Library of Alexandria for the twenty-first century that, thanks to digital technologies and the Internet, excels in a way the Library of Alexandria never could. Through the Internet Archive, people who do not live in world capitals can access the same cultural and informational resources as those who do. *Defendant's Answer to the Complaint, p. 1.*

## III. The Case Overlaps With Artificial Intelligence Copyright Disputes

On October 30, 2023, President Biden issued the longest Presidential Executive Order in history, Executive Order 14110, "Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence". The very first sentence of the Executive Order spoke to the impact of artificial intelligence, "Artificial intelligence (AI) holds extraordinary potential for both promise and peril." 88 Fed. Reg. 75191, at 75191. Amici agree. The Executive Order identified eight principles, the second of which stated:

> "Promoting responsible innovation, competition, and collaboration will allow the United States to lead in AI and unlock the technology's

potential to solve some of society's most difficult challenges. This effort requires investments in AI-related education, training, development, research, and capacity, **while simultaneously tackling novel intellectual property (IP) questions and other problems to protect inventors and creators**. …) [emphasis added]." 88 Fed. Reg. 75191, at 75192.

Executive Order 14110 further directs the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office to:

> "within 270 days of the date of this order or 180 days after the United States Copyright Office of the Library of Congress publishes its forthcoming AI study that will address copyright issues raised by AI, whichever comes later, consult with the Director of the United States Copyright Office and issue recommendations to the President on potential executive actions relating to copyright and AI. The recommendations shall address any copyright and related issues discussed in the United States Copyright Office's study, including the scope of protection for works produced using AI and **the treatment of copyrighted works in AI training**." [emphasis added] 88 Fed. Reg. 75191, at 75207.

Although Amici believe that the use of copyrighted works to train AI models is not within the bounds of fair use under 17 U.S.C. §107, many AI companies have taken the opposite view. This fair use question has already been the subject of a large number of copyright infringement cases between rightsholders and artificial intelligence companies including several cases already before the Southern District of New York. *The Intercept Media, Inc. v. OpenAI, Inc* 1:24-cv-01515; *New York*

*Times Company v. Microsoft Corp. and OpenAI, et al.* 1:23-cv-11195;

*Sancton v. OpenAI Inc., Microsoft Corporation, et al.* 1:23-cv-10211; and *Authors Guild v. OpenAI Inc.,* 1:23-cv-08292. The Internet Archive is an obvious source of high-quality works for AI training since these works have been professionally edited and improved by publishers. Entering the terms "Internet Archive DRM" into any search engine results in a number of links to software tools that remove the Internet Archive's DRM technology along with instructions on how to use it. Even if AI training is ultimately determined by U.S. courts to not be a fair use, Amici fear that the Internet Archive's CDL collection has already been used as an AI training tool.

IV.  **There are Four Primary Treaties That Govern U.S. and International Copyright Law**

The U.S. is a signatory to a large number of international treaties that were agreed to by a 2/3 vote of the U.S. Senate pursuant to Article II, Section 2 of the Constitution of the United States. Among these treaties are four treaties on copyright and related rights:

- The Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886 (Paris Text 1971, as amended Sept. 28, 1979), S. Treaty Doc. No. 99-27 (known as the "Berne Convention");

- The Agreement on Trade-Related Aspects of Intellectual Property Rights, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, Annex 1C, 1869 U.N.T.S. 299 (known as "TRIPS"), ratified and implemented in 1995;

- The WIPO Copyright Treaty, Dec. 20, 1996, S. Treaty Doc. No. 105-17 (1997); 2186 U.N.T.S. 121; 36 I.L.M. 65 (1997) (known as "WCT"); and

- The WIPO Performances and Phonograms Treaty, Dec. 20, 1996, S. Treaty Doc. No. 105-17 (1997); 2186 U.N.T.S. 121; 36 I.L.M. 65 (1997) (known as "WPPT").

Each of these treaties imposes obligations on the U.S. to not only protect the copyrights of all rightsholders within the United States, but also to ensure that U.S. rightsholders are given "national treatment" in foreign signatory jurisdictions. *See* Mihály Ficsor, *Guide to the Copyright and Related Rights Treaties Administered by WIPO and Glossary of Copyright and Related Rights Terms 6* (2004). All foreign rightsholders, including the Amici, rely upon these treaties for the legal protection of their works against unauthorized reproduction and distribution.

## A.    Upholding The Three-Step Test Contained Within The Four Treaties Is A Requirement For All Treaty Signatories Including The U.S.

These four treaties effectively shape how each signatory nation designs its national copyright system since countries must avoid violating their treaty

obligations. Because the four copyright treaties cannot anticipate every new copyright policy issue that arises, signatory nations are permitted to adopt limited exceptions to the exclusive rights guaranteed by the treaties.

Under the Berne Convention, members may provide limitations and exceptions to the reproduction right only "in certain special cases, provided that such reproduction does not conflict with a normal exploitation of the work and does not unreasonably prejudice the legitimate interests of the author." Berne art. 9(2). As a result of TRIPS, this three-step test has now expanded to other copyright limitations and exclusions generally. TRIPS art. 13 "Members shall confine limitations or exceptions to exclusive rights to certain special cases which do not conflict with a normal exploitation of the work and do not unreasonably prejudice the legitimate interests of the right holder." An aggrieved signatory nation can bring a complaint before the World Trade Organization (WTO) if it believes that another signatory nation has violated the three-step test by creating a non-compliant exception to their copyright law.

The reproduction and distribution undertaken by the Internet Archive is not limited to special cases since their works are available to all. Their infringing works do conflict with a normal exploitation of each work since there is no need for anyone to obtain a license from an authorized distributor when one can seek out free copies from the Internet Archive from anywhere on the planet with a

connection to the Internet. Finally, the legitimate interests of the Amici are fully prejudiced since the full copies of a work in the same delivery method are available for every work in the Internet Archive as would be obtained from an authorized distributor.

**B.     The Three-Step Test Is Key To How U.S. Copyright Laws Are Updated**

The U.S. Copyright Office which oversees the operation of the copyright system in the United States has long recognized the importance of the three-step test including in its advice to Congress. For example, in January 2005, several Members of Congress asked the U.S. Copyright Office to undertake a comprehensive study of orphan works which are copyrighted works for which the copyright owner is either unknown or not locatable.

In its 127-page report to Congress in January 2006 that recommended specific legislation to address orphan works, the Copyright Office discussed over ten pages the importance of the three-step test to any legislation that would create any new exemption to U.S. copyright law and related remedies. Specifically, the Copyright Office noted "Development of any omnibus orphan works provision must keep in mind the United States' international law obligations that relate to copyright." *Report on Orphan Works, A Report of the Register of Copyrights*, U.S. Copyright Office, January 2006, p. 59.

**C.     A Failure Of The United States To Follow The Three-Step Test Has Already Led To A World Trade Organization Ruling Against the United States**

On October 27, 1998, the Sonny Bono Copyright Term Act was signed into law by President Clinton. P.L. 105-298, 112 Stat. 2827, 2830-2834 (1998) The first title of the Act extended existing copyright term protection in the United States for an additional twenty years, while the second title created a new exception to U.S. copyright law, codified at 17 U.S.C. §110(5), for small retail establishments to play recorded music without the permission of, or payment to, rightsholders. The U.S. Register of Copyright at that time, Marybeth Peters, wrote a letter to Congress highlighting her concerns over the second title of the Act and its lack of conformity with the treaty obligations of the United States, specifically the Berne Convention. In her letter to Congress, Register Peters stated: "My concern is that the proposed amendment to section 110(5) would do further violence to our Berne Convention obligations." 144 Cong. Rec. 24338 (1998).

The legislation was enacted over the Register's objections to the second title. Several months later, this new exception became the subject of a dispute between Europe and the United States that was then heard by the WTO.[3] The WTO

_____

[3] An overview of the timeline and all related materials can be found at https://www.wto.org/english/tratop_e/dispu_e/cases_e/ds160_e.htm.

ultimately ruled against the United States on the grounds that the exception created in Section 110(5) violated the three-step test. The ruling held that the "business" exemption provided for in subparagraph (B) of §110(5) of the U.S. Copyright Act did not meet the requirements of Article 13 of the TRIPS Agreement and was thus inconsistent with Articles 11bis(1)(iii) and 11(1)(ii) of the Berne Convention as incorporated into the TRIPS Agreement by Article 9.1 of that Agreement. World Trade Organization, United States – Section 110(5) of the US Copyright Act, Report of the Panel ("WTO 110(5) Panel Report") June 15, 2000.

Regarding the three-step test, the panel found that a use conflicted with the normal exploitation of a work when "uses, that in principle are covered by that right but exempted under the exception or limitation, enter into economic competition with the ways that right holders normally extract value from that right to the work (i.e., the copyright) and thereby deprive them of significant or tangible commercial gains." WTO 110(5) Panel Report ¶ 6.183. The panel also found that "prejudice to the legitimate interests of right holders reaches an unreasonable level if an exception or limitation causes or has the potential to cause an unreasonable loss of income to the copyright owner." WTO 110(5) Panel Report ¶ 6.229.

Although no U.S. courts are bound by the rulings of, or interpretations by, a WTO panel, U.S. courts have long accepted that should avoid any conflicts with international norms, especially in the case of treaty obligations that the U.S. has

accepted. *Murray v. The Charming Betsey*, 6 U.S. 64 (1804) ("An act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *Golan v Holder*, 565 U.S. 302, 335 (2012) ("Congress determined that U.S. interests were best served by our full participation in the dominant system of international copyright protection ... includ[ing] ensuring exemplary compliance with our international obligations"). Those obligations include ensuring that copyright exceptions and limitations, including fair use, pass the three-step test.

## D. CDL Presents A High Risk of Another U.S. Violation Of Its Berne Obligations

Should this or any Court find that the actions of the Internet Archive are compliant with U.S. copyright law regarding its attempt to operate its CDL system, the risk to the United States losing a dispute brought before the WTO is high given the decision in the Section 110(5) dispute. Although Congressional attention to the three-step test during the 1998 enactment of the exception for recorded music in small retail establishments was low, such discussion did occur during the final floor debate including the inclusion of the Register Peters' letter highlighting her specific concerns over compliance with the three-step test. Similarly, the study surrounding potential orphan works legislation included extensive discussion of compliance with the three-step test.

In contrast, there has been no Congressional discussion of a new exception to U.S. copyright laws for CDL activities undertaken by the Internet Archive. Congress has introduced no legislation related to their actions, nor requested any studies from the Copyright Office about potential CDL legislation. As presented by the plaintiffs and supported by the Amici, a ruling that benefits the Internet Archive will create serious harm to the entire publishing industry worldwide. This harm would not meet the Berne test of a limited narrow exception.

## V.     The United States Must Follow Its International Treaty Obligations

The U.S. treaty obligations are clear. Having been adopted by the required 2/3 majority set forth in the Constitution of the United States, the four copyright treaties and the three-step test cannot be met by allowing the Internet Archive to reproduce and distribute vast amounts of copyrighted books either as a result of a "pandemic emergency" or as an attempt to create something called "controlled digital lending." without overturning the Supreme Court's holdings in *Murray* and *Golan* which the Amici urge the Second Circuit not to do.

# CONCLUSION

The district court did not err in finding that fair use did not apply to the actions of the Internet Archive while also recognizing the harms that would follow if the actions of the Internet Archive were allowed to continue. This Court should uphold the findings of the district court and not run afoul of the three-step test of the four copyright treaties that the United States is a signatory to.

Dated: March 22, 2024                                    Respectfully submitted,


                                                         s/ *Matthew Joseph Keeley*

                                                         Matthew Joseph Keeley
                                                         Michael Best & Friedrich
                                                         1000 Maine Ave, SW, Suite 400
                                                         Washington, DC 20024
                                                         Tel: (202) 844-3824
                                                         Joe.Keeley@michaelbest.com

                                                         *Counsel for Amici Curiae*

**CERTIFICIATE OF COMPLIANCE**

This document complies with the word limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule 32(f), the brief contains 4,318 words on the basis of a count made by the word processing system used to prepare the brief.

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and 6, I hereby certify that this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: March 22, 2024

s/ *Matthew Joseph Keeley*

Matthew Joseph Keeley
Michael Best & Friedrich
1000 Maine Ave, SW, Suite 400
Washington, DC 20024
Tel: (202) 844-3824
Joe.Keeley@michaelbest.com

*Counsel for Amici Curiae*

**CERTIFICATE OF SERIVCE**

I hereby certify that on March 22, 2024, a copy of the foregoing is being

filed electronically with the Clerk of the United States Court of Appeals for the

Second Circuit via the appellate CM/ECF system which will serve such filing to all

parties in the case who are registered CM/ECF users.


Dated: March 22, 2024                                    s/ *Matthew Joseph Keeley*

                                                         Matthew Joseph Keeley
                                                         Michael Best & Friedrich
                                                         1000 Maine Ave, SW, Suite 400
                                                         Washington, DC 20024
                                                         Tel: (202) 844-3824
                                                         Joe.Keeley@michaelbest.com

                                                         *Counsel for Amici Curiae*