# 23-1260

## United States Court of Appeals
## for the Second Circuit

---

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, INCLUSIVE,

*Defendants.*

---

On Appeal from the United States District Court for the Southern District of New York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

---

**BRIEF OF *AMICI CURIAE* THE RECORDING INDUSTRY ASSOCIATION OF AMERICA, THE NATIONAL MUSIC PUBLISHERS' ASSOCIATION, THE MOTION PICTURE ASSOCIATION, INC., AND THE NEWS/MEDIA ALLIANCE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

---

ELAINE J. GOLDENBERG
SARAH WEINER
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW
 Suite 500 E
Washington, DC 20001
Telephone: (202) 220-1114
elaine.goldenberg@mto.com

*Counsel for Amici Curiae*

March 22, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici* make the following disclosures:

The Recording Industry Association of America is a nonprofit corporation that does not have a parent corporation, is not owned in any part by a publicly held corporation, and is not a government entity.

The National Music Publishers' Association has no corporate parents and no publicly traded company owns 10% or more of its stock.

The Motion Picture Association, Inc. has no parent corporations, and no publicly held corporation or other publicly held entity owns ten 10% or more of the Motion Picture Association, Inc.

News/Media Alliance is a nonprofit, non-stock corporation organized under the laws of the Commonwealth of Virginia. It has no parent company.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................... i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ............................................................. iv

INTEREST OF *AMICI CURIAE* ........................................................ 1

INTRODUCTION ....................................................................... 3

ARGUMENT ............................................................................ 6

I.    Digitizing Physical Media And "Lending" It To Users Across The Internet Is Not Fair Use ............................................ 6

    A.    Owning A Physical Copy Of A Work Does Not Entitle The Owner Of That Copy To Make And Distribute Digital Reproductions Of The Work ....................................... 6

    B.    It Is Not Fair Use To Provide Different Licensing Terms Than The Copyright Holder Has Chosen To Offer ............................................................................ 13

        1.    Internet Archive's Use Is Not "Transformative" By Virtue Of Making Works More Widely Available ................................................................. 14

        2.    Internet Archive's Practices Negatively Affect The Licensing Market, Even Though The Copyright Holders Choose Not To Offer The Precise Kind Of License Internet Archive Would Prefer ...................................................................... 20

II.   Adopting Internet Archive's Theory Of Fair Use Would Have Devastating Consequences For The Music Industry, The Movie Industry, The News Media Industry, And Similar Industries ........................................................................ 23

    A.    When Copyright Holders Have Lost The Ability To Control Digital Distribution Of Their Works In The Past, The Results Have Been Disastrous ............................. 23

B.     Internet Archive's Practices Threaten Creative Industries' Ability To Continue Making And Distributing Works ................................................................. 33

CONCLUSION ................................................................................. 38

CERTIFICATE OF COMPLIANCE ................................................. 39

CERTIFICATE OF SERVICE .......................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001).......................................*passim*

*Am. Geophysical Union v. Texaco Inc.*,
60 F.3d 913 (2d Cir. 1994) ....................................... 20

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021)............................................ 21, 36

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ............................................ 6, 15, 16, 37

*Associated Press v. Meltwater US Holdings, Inc.*,
931 F. Supp. 2d 537 (S.D.N.Y. 2013)................................... 31

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ..................................... 7, 8, 15, 17

*Authors Guild v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ....................................... 7

*Cambridge Univ. Press v. Patton*,
769 F.3d 1232 (11th Cir. 2014)............................................ 8

*Capitol Records, LLC v. ReDigi Inc.*,
910 F.3d 649 (2d Cir. 2018) ............................. 10, 11, 16, 17

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017)................................... 12, 17, 18

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ............................. 16, 17, 22, 32

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
471 U.S. 539 (1985)............................................... 36

iv

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
118 F.3d 199 (4th Cir. 1997) .................................................................. 9

*Infinity Broadcast Corp. v. Kirkwood*,
150 F.3d 104 (2d Cir. 1998) ..................................................... 7, 18, 21

*Kirtsaeng v. John Wiley & Sons, Inc.*,
579 U.S. 197 (2016) ............................................................................. 37

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ......................................................... 3, 16, 17, 18

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
756 F.3d 73 (2d Cir. 2014) ................................................................ 16

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
996 F.2d 1366 (2d Cir. 1993) .............................................................. 9

**FEDERAL STATUTES**

17 U.S.C. § 101 ........................................................................................ 7

17 U.S.C. § 106 ........................................................................................ 6

17 U.S.C. § 107(4) .................................................................................. 20

17 U.S.C. § 108 ........................................................................................ 9

17 U.S.C. § 108(c) ................................................................................... 9

**FEDERAL RULE**

Fed. R. App. P. 29(a)(4)(E) ..................................................................... 1

**OTHER AUTHORITIES**

Penelope M. Abernathy, *The State of Local News: The 2023
Report* (2023), *available at* https://localnewsinitiative.
northwestern.edu/projects/state-of-local-news/2023/report/ .............. 31

David Blackburn *et al.*, *Impacts of Digital Video Piracy on the U.S. Economy* 12 (June 2019), *available at* https://www.uschamber.com/assets/documents/Digital_Video_Piracy_June_2019.pdf...............................................30

Andy Chatterley, *The Film and TV Piracy Report 2022* (Feb. 2023), *available at* https://www.ctam.com/wp-content/uploads/MUSO-2022-Film-And-TV-Piracy-Report.pdf...............................................................30

Brett Danaher *et al.*, *Piracy and Copyright Enforcement Mechanisms* (June 2013), *available at* https://www.nber.org/system/files/working_papers/w19150/w19150.pdf..............................................29

Decl. of Tedd Cittadine, *Disney Enterprises, Inc. v. VidAngel, Inc.*, No. 16-cv-04109 (C.D. Cal. Aug. 22, 2016), ECF No. 28 .............................................................................................12

Joshua P. Friedlander & Matthew Bass, *RIAA Mid-Year 2023 Revenue Report*, *available at* https://www.riaa.com/wp-content/uploads/2023/09/RIAA-Mid-Year-2023-Revenue-Report.pdf ..........................................11

Joshua P. Friedlander & Matthew Bass, *Year-End 2022 RIAA Revenue Statistics* (2023), *available at* https://www.riaa.com/wp-content/uploads/2023/03/2022-Year-End-Music-Industry-Revenue-Report.pdf ................................34

Nelson Granados, *How Online Piracy Hurts Emerging Artists*, Forbes (Feb. 1, 2016), *available at* https://www.forbes.com/sites/nelsongranados/2016/02/01/how-online-piracy-hurts-emerging-artists/?sh=8fb59f877741....................................................27

News/Media Alliance, *White Paper: How the Pervasive Copying of Expressive Works to Train and Fuel Generative Artificial Intelligence Systems Is Copyright Infringement and Not a Fair Use* (2023), *available at* https://www.newsmediaalliance.org/wp-content/uploads/2023/10/AI-White-Paper-with-Technical-Analysis.pdf ...................... 32

Norbert J. Michel, *The Impact of Digital File Sharing on the Music Industry: An Empirical Analysis*, 6 Topics in Economic Analysis & Policy 1 (2006) .................................................. 25

Motion Picture Ass'n, *Theme Report 2021*, at 10, *available at* https://www.motionpictures.org/wp-content/uploads/2022/03/MPA-2021-THEME-Report-FINAL.pdf ................................... 33, 34

Mauro Orru, *Google Fined Roughly $270 Million in France Over Dispute With News Publishers*, Wall Street Journal (Mar. 20, 2024), *available at* https://www.wsj.com/business/media/google-fined-eur250-million-in-france-over-dispute-with-news-publishers-1ec8d76c ..................................... 32

Pew Research Ctr., *Fact Sheets: State of the News Media* (Nov. 10, 2023), *available at* http://www.journalism.org/fact-sheet/newspapers/ ............................................... 31

Amedeo Piolatto & Florian Schuett, *Music Piracy: A Case of "The Rich Get Richer and the Poor Get Poorer,"* 24 Information Economics & Policy 30 (March 2012) ............................ 28

Recording Industry Ass'n of America, *U.S. Recorded Revenues by Format*, https://www.riaa.com/u-s-sales-database/ (last accessed March 21, 2024) .................................... 26, 27

Stephen E. Siwek, *The True Cost of Sound Recording Piracy to the U.S. Economy* (Aug. 2007), *available at* https://www.riaa.com/wp-content/uploads/2015/09/20120515_SoundRecordingPiracy.pdf .................................................. 28

Michael D. Smith & Rahul Telang, *Assessing the Academic Literature Regarding the Impact of Media Piracy on Sales* (Aug. 2012), *available at* https://www.riaa.com/reports/assessing-the-academic-literature-regarding-the-impact-of-media-piracy-on-sales/ ....................................................... 24

Joseph Story, III *Commentaries on the Constitution of the United States* 49 (1833)........................................................ 37

U.S. Copyright Office, *Copyright Protections for Press Publishers: A Report of the Register of Copyrights* (2022), *available at* https://www.copyright.gov/policy/publishersprotections/202206-Publishers-Protections-Study.pdf ............................................................................. 32

Hannah Walsh, *SVoD-Only Homes Exceed Pay TV-Only Homes For First Time*, Ampere Analysis (Oct. 24, 2018), https://www.ampereanalysis.com/insight/svod-only-homes-exceed-pay-tv-only-homes-for-first-time ................................. 33

Amy Watson, *Estimated Aggregate Revenue of U.S. Periodical Publishers from 2005 to 2021*, Statista (Dec. 11, 2023), *available at* https://www.statista.com/statistics/184055/estimated-revenue-of-us-periodical-publishers-since-2005/ ............................................................................. 31

Alejandro Zentner, *Measuring the Impact of File Sharing on the Movie Industry: An Empirical Analysis Using a Panel of Countries* (March 22, 2010), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1792615 ............................................................................. 29

Alejandro Zentner, *Ten Years of File Sharing and Its Effects on International Physical and Digital Music Sales* (2009), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1724444 ............................................................................. 25

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are the Recording Industry Association of America, the National Music Publishers' Association, the Motion Picture Association, Inc., and the News/Media Alliance. Each amicus is an industry association that represents the interests of copyright holders in creative works.

The **Recording Industry Association of America** ("RIAA") is a nonprofit trade organization comprised of several hundred companies—ranging from small artist-owned labels to global businesses—that collectively create, manufacture, and/or distribute the majority of sound recordings in the United States. RIAA supports and promotes the creative and commercial vitality of music labels in the United States by, among other things, working to protect the intellectual property and First Amendment rights of artists and record labels.

---

[1] In accordance with Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* confirm that no party or counsel for any party authored this brief in whole or in part, and that no person other than amici or their counsel made any monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

The **National Music Publishers' Association** ("NMPA") is the principal trade association representing American music publishers and songwriters. Taken together, compositions owned or controlled by NMPA's members account for the vast majority of musical compositions licensed for commercial use in the United States. NMPA's mission is to protect, promote, and advance the interests of creators by protecting its members' intellectual-property rights in judicial, legislative, and regulatory arenas.

The **Motion Picture Association, Inc.** ("MPA") is a not-for-profit trade association that serves as the leading advocate of the film, television, and streaming industry around the world. The MPA's member companies are Paramount Pictures Corporation, Sony Pictures Entertainment Inc., Universal City Studios LLC, Walt Disney Studios Motion Pictures, Warner Bros. Entertainment Inc., and Netflix Studios, LLC. The MPA works globally to advance public policies that support creators, protect content, and foster a thriving creative economy.

The **News/Media Alliance** ("N/MA") represents over 2,200 diverse publishers, ranging from the largest publishers to hyperlocal papers, and from digital-only outlets to papers that have printed news since before

the Constitutional Convention. N/MA members account for nearly 90 percent of the daily newspaper circulation in the United States, over 500 magazine brands, and dozens of digital-only properties. The N/MA advocates for newspapers, magazines, and digital publishers on issues that affect them, including intellectual-property rights.

*Amici* and their members have a powerful interest in the proper resolution of this appeal, in which appellant Internet Archive advances a theory of fair use that stretches far beyond both precedent and common sense. Accepting Internet Archive's invitation to break new ground in this area of the law would not only upset longstanding and well-reasoned fair-use principles but also pose a grave risk to *amici*'s members, which depend on copyrights to protect their creative works in an increasingly digital market.

## INTRODUCTION

The "purpose of copyright is to create incentives for creative effort" by giving musicians, songwriters, filmmakers, authors, and other creators exclusive rights over their works for a period of time. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984). Those rights include the right to make reproductions, whether by mechanical

copying or digital reformatting, and the right to control whether and under what conditions those reproductions are made available to the public.

The concept of "fair use" sets an outer limit on creators' rights by recognizing that, at some point, a creator's right to control his or her work must give way to the public's interest in using that work for further creative endeavors. But that doctrine does not permit secondary users simply to offer substitutes for original works—and thereby deny creators just rewards for their creative efforts.

That is precisely what Internet Archive attempts to do here by making unauthorized digital copies of print books and making those copies freely available online. Owning one copy of a copyrighted work does not entitle the owner of that copy to make and distribute additional copies, regardless of what the owner intends to do with their original purchase. Internet Archive seeks to justify its flagrant copying by arguing that its mass digitization program makes it easier and more convenient for libraries to "lend" books to their patrons. But book publishers already offer a similar service in the form of licensed ebooks, and the fair-use doctrine has never permitted secondary users to usurp a

legitimate market for a copyright holder's works by offering an unauthorized substitute work for free.

That is a lesson that the music, movie, television, and news media industries have learned all too well. Beginning with Napster in the late 1990s, and followed by the advent of BitTorrent in the 2000s and illicit streaming and misappropriation in the 2010s, those creative industries have had to grapple with the consistent (yet ever evolving) threat of unauthorized copying and distribution of their works online. Digital piracy has inflicted a huge economic toll on those industries and, by extension, on their ability to invest in new creative works and the artists who make them.

Internet Archive's theory of fair use represents a threat just as grave. If it were fair use to digitize a physical book and distribute it without authorization under the guise of "lending" the file online, then there would be nothing to stop future self-anointed "libraries" from doing the same with music, movies, television shows, and journalism, resulting in what would be, in essence, an unlicensed, free streaming service for copyrighted works of all kinds. Despite Internet Archive's attempts to

pretend otherwise, such "lending" practices are not fair use, but unambiguous copyright infringement.

## ARGUMENT

### I. Digitizing Physical Media And "Lending" It To Users Across The Internet Is Not Fair Use

#### A. Owning A Physical Copy Of A Work Does Not Entitle The Owner Of That Copy To Make And Distribute Digital Reproductions Of The Work

The Copyright Act vests copyright owners with the "exclusive right[]" to make and distribute copies of their works and to make (or license) derivative works. 17 U.S.C. § 106. Until recently, courts undertaking a fair-use analysis sometimes took a broad view of what qualifies as a "transformative" use of a copyrighted work. As the Supreme Court has recently warned, however, "an overbroad concept of transformative use" would inappropriately "narrow the copyright owner's exclusive right to create derivative works." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 529 (2023). As such, "the degree of transformation required to make 'transformative' use of an original must go *beyond* that required to qualify as a derivative." *Id.* (emphasis added).

Internet Archive's practice of converting physical books into ebooks is a classic derivative use.  A derivative use generally involves *"changes of form,"* *i.e.*, "the conversion of a novel into a film," the "recreation of a cartoon character in the form of a three-dimensional plush toy," or the "adaptation of a musical composition for different instruments." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215-16, 225 (2d Cir. 2015) (citing 17 U.S.C. § 101).

Some of the most obvious examples of that kind of derivative use are simple changes in medium, including—as in this case—conversion of a non-digital work into a digital format.  *See, e.g.*, *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104, 108 n.2 (2d Cir. 1998) ("[A] change of format, though useful, is not technically a transformation."); *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir. 2001) ("Courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium.").  For example, courts have consistently held that it is not "transformative" to convert a physical CD or DVD into a digital MP3 or MP4 file, *see A&M Recs.*, 239 F.3d at 1015, or—as Internet Archive does—to "recast[] … a novel as an e-book or an audiobook," *Authors Guild, Inc. v. HathiTrust* (*"HathiTrust"*), 755 F.3d

87, 95 (2d Cir. 2014); *see Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1262 (11th Cir. 2014) (posting scanned excerpts of books to library-managed "electronic reserve system" not transformative). Instead, such digital conversions are "[p]aradigmatic examples of derivative works" because they merely "repackage or republish the original copyrighted work" in an alternative format. *HathiTrust*, 755 F.3d at 95-96.

Attempting to defend its massive "scan-and-share" (*i.e.*, copy and distribute) program, Internet Archive suggests that because it could "lend its [print] books to anyone in the world by shipping the books to them," it should be able to avoid the "burdens of physical transportation" by scanning and sending digital copies instead. IA Br. 31-32. Implicit in Internet Archive's argument is the assumption that owning a *physical copy* of a work entitles its owner to convert that work into a digital format and then distribute the digital copy to others. *See* IA Br. 47 (asserting that Internet Archive merely "lend[s] … book[s] [it] already owns").

That assumption is plainly incorrect. A central premise of the Copyright Act is that copyright holders may sell *copies* of their copyrighted works without simultaneously selling the underlying right to make reproductions of those works or create derivative works from

them.  *See, e.g.*, *Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) ("[I]t is a safe generalization that copyright holders, as a class, wish to continue to sell the copyrighted work and may also wish to prepare or license … derivative works ….").  The corollary is just as true:  one who obtains a single copy of a work is not entitled (without authorization from the copyright holder) to make an additional reproduction, whether in the same medium or a different one, regardless of whether that person intends to lock the original copy away and treat the second version as if it were the original.  *Cf. Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 202-05 (4th Cir. 1997) (library that made replacement copy of destroyed copyrighted work may be liable for copyright infringement unless it satisfies the special requirements of 17 U.S.C. § 108); 17 U.S.C. § 108(c) (library may make replacement copy of a "damaged, deteriorating, lost, or stolen" work only if "an unused replacement cannot be obtained at a fair price" and any replacement copy "that is reproduced in digital format is not made available to the public in that format outside the premises of the library").

Indeed, this Court has already rejected the argument that someone who owns a copy of a work is entitled to make and distribute digital

reproductions—even if that person *destroys* the originally purchased copy at the same time that the reproduction occurs. In *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018) (Leval, J.), the Court considered the copyright problems associated with an online music-resale platform that allowed users to copy "lawfully purchased digital music files" (*e.g.*, from iTunes) onto ReDigi's servers in a series of "packets" while simultaneously deleting those packets from their own computers. *Id.* at 652-54. ReDigi contended that it merely facilitated the "*transfer* of its users' lawfully made phonorecords, rather than the *creation* of new phonorecords," *id.* at 657 (emphasis added), because "the entire file never exist[ed] in two places at once," *id.* at 653-54. This Court disagreed, reasoning that "even if ReDigi effectively compensated" by making "offsetting deletions" of the music files, the process "nonetheless … involve[d] the making of unauthorized reproductions." *Id.* at 658; *see id.* (explaining that courts "are not free to disregard the terms of" the Copyright Act even if "the entity performing an unauthorized reproduction makes efforts to nullify its consequences by" taking "counterbalancing" measures). The Court further concluded that ReDigi's copying was not fair use, as the platform "ma[de] no change in

the copyrighted work" and instead simply created a resale market that "compete[d] with sales of the same recorded music by the rights holder." *Id.* at 661; *see also id.* at 663-64.

As *ReDigi* makes clear, when Internet Archive buys a book, or when a consumer buys a CD or a DVD or a digital music file, that purchase includes only a delimited set of rights. Indeed, the prices of such items reflect the limited scope of the purchaser's entitlement, as copyright holders set different prices for their works depending on the scope of the rights that the purchaser will obtain. In the world of entertainment media, for example, record labels and movie studios have developed a variety of "distribution channels" that provide consumers with an array of options for enjoying their works, including buying or renting physical media (*e.g.*, vinyl records, CDs, DVDs, or Blu-ray discs); subscribing to paid, on-demand streaming services, which includes limited (or temporary) downloads (*e.g.*, Spotify or Netflix); using free, ad-supported streaming services (*e.g.*, ad-supported Pandora or YouTube); purchasing permanent digital downloads (*e.g.*, from iTunes or Amazon Video); or renting media on demand for short-term use (*e.g.*, through cable providers or video-on-demand platforms). *See* Joshua P. Friedlander &

Matthew Bass, *RIAA Mid-Year 2023 Revenue Report*, at 1-2 (2024) (hereinafter "Mid-Year Report") (discussing sources of recorded music revenues), *available at* https://www.riaa.com/wp-content/uploads/2023/09/RIAA-Mid-Year-2023-Revenue-Report.pdf; *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 853 (9th Cir. 2017) (discussing distribution of motion pictures and television shows).  Different distribution channels are subject to different pricing models, which are carefully calibrated to the terms of the license granted.  *See, e.g.*, Decl. of Tedd Cittadine ¶ 14, *Disney Enterprises, Inc. v. VidAngel, Inc.*, No. 16-cv-04109 (C.D. Cal. Aug. 22, 2016), ECF No. 28.[2]  Media publishers, too, often offer tiered subscription pricing that varies depending on whether a consumer is purchasing digital or print delivery (or both).

---

[2] As Mr. Cittadine, Senior Vice President of Digital Distribution at 20th Century Fox Home Entertainment, explained:  "The ultimate success or failure of our business depends on a carefully designed strategy to build demand for our content with consumers across a variety of viewing options provided by our clients.  We therefore negotiate with our clients over *how* (under what conditions), *when* (on what date and for what duration), *what* (which titles) and for *how much* (at what wholesale price) they can obtain the rights to distribute and publicly perform our content."  Decl. of Tedd Cittadine ¶ 14, *Disney Enterprises, Inc. v. VidAngel, Inc.*, No. 16-cv-04109 (C.D. Cal. Aug. 22, 2016), ECF No. 28.

Thus, the fact that Internet Archive has the right to ship a book by mail does not create an implicit right to copy the content of that book and distribute that copy via the Internet. Just as record labels do not sell the right to digitize and distribute the contents of an album when they sell a physical CD, *see A&M Recs.*, 239 F.3d at 1004, book publishers do not sell the right to scan and distribute digital ebooks when they sell a physical print book, *see* Publishers' Br. 8.

### B.   It Is Not Fair Use To Provide Different Licensing Terms Than The Copyright Holder Has Chosen To Offer

Internet Archive attempts to justify its infringing activities by contending that its mass digitization program constitutes fair use. It does so by focusing on what its program ostensibly enables—namely, the ability to digitally transmit an ebook to any member of the public in lieu of sending them a physical book. *See* IA Br. 33. In Internet Archive's estimation, its verbatim copying (and subsequent distribution) of entire books is fair use because the practice "uses technology to make lending more convenient and efficient" and, as a "legal matter," does not offer a substitute for ebooks. IA Br. 31, 35. Those arguments are as alarming as they are wrong.

### 1. Internet Archive's Use Is Not "Transformative" By Virtue Of Making Works More Widely Available

Internet Archive contends that its practice of "[c]ontrolled digital lending" is transformative because it "expands books' utility by improving efficiency of library borrowing." IA Br. 30. But Internet Archive's so-called "controlled digital lending" is, at bottom, just ebook "licensing" on different terms than publishers currently choose to provide.

As the district court's opinion observes, publishers have generally decided not to sell permanent copies of ebooks to libraries.[3] *See* 664 F. Supp. 3d 370, 374 (S.D.N.Y. 2023). A library that wants to offer its patrons the convenience of digital delivery may license ebooks from publishers under various terms—for example, some licenses last for a set period of time, while others expire after a certain number of circulations. *Id.* A library that prefers to own a book outright, on the other hand, may purchase a physical copy directly from the publisher or a wholesaler, *id.*

---

[3] Publishers *do* sell permanent copies of ebooks directly to consumers. *See* IA Br. 47.

at 374, and may subsequently lend that copy to its readers on whatever terms the library sees fit.

It is not transformative for a third party to simply distribute copies of a copyrighted work—whether in its original or digitized form—on more permissive terms than the copyright holder has chosen to offer. Taken to its logical conclusion, Internet Archive's view of transformative use would allow any unlicensed bootlegger to claim fair use anytime it offered a pirated copy of a book, song, or movie to the public more cheaply, or on laxer terms, than licensed competitors.

That is, of course, not the rule, nor should it be. As this Court has explained, "[a]dded value or utility is not" enough to qualify as a transformative use. *HathiTrust*, 755 F.3d at 96. Instead, "a transformative work is one that serves a new and different function from the original work and is not a substitute for it." *Id.*; *see Warhol*, 598 U.S. at 528-29 ("The 'central' question" posed by the first fair-use factor "is 'whether the new work merely supersedes the objects of the original creation (supplanting the original), or instead adds something new, with a further purpose or different character.'" (alterations, citation, and internal quotation marks omitted)). Internet Archive's controlled digital

lending flunks that test, as it "shares the purpose" of preexisting print books and ebooks (*i.e.*, to give readers access to the book's contents), and consequently "provide[s] the public with a substantial substitute for matter protected by" copyright. *Warhol*, 598 U.S. at 531-32 (alterations, citation, and internal quotation marks omitted).

The Supreme Court's decision in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), on which Internet Archive heavily relies, does not change that analysis. *Sony* held that the practice of copying television programming using Betamax video tape recorders was fair use when carried out by home viewers to watch the program at a later time—that is, to "time-shift[] for private home use." 464 U.S. at 447-56. This Court has read *Sony* to stand for the proposition that a "secondary use may be a fair use if" it deploys technology to "'improv[e] the efficiency of delivering content' … to one entitled to receive the content." *ReDigi*, 910 F.3d at 661 (quoting *Fox News Network, LLC v. TVEyes, Inc.* ("*TVEyes*"), 883 F.3d 169, 177 (2d Cir. 2018)); *see, e.g.*, *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (discussing *Sony*).

But this Court's application of *Sony* includes an essential caveat. The secondary use, even if more "efficien[t]," *ReDigi*, 910 F.3d at 661, or "convenient," may be fair use *only if* it does not "unreasonably encroach[] on the commercial entitlements of the rights holder,'" *TVEyes*, 883 F.3d at 178; *accord ReDigi*, 910 F.3d at 661; *see Sony*, 464 U.S. at 449 (stating that "[i]f the Betamax were used to make copies for a commercial or profit-making purpose, such use would presumptively be unfair"); *HathiTrust*, 755 F.3d at 95 ("The [fair-use] doctrine is generally subject to an important proviso:  A fair use must not excessively damage the market for the original by providing the public with a substitute for that original work.").

Internet Archive unreasonably encroaches in just that way by offering a substitute for publishers' print books and ebooks.  And when other secondary users have offered similar "services" in the past, courts have rightly rejected claims that *Sony* justifies their infringement.  For instance, in *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), the streaming service VidAngel purported to "sell" each of its users a unique, physical disc containing a movie or television show, but users never took physical possession of those discs, and users could "sell"

the discs back to VidAngel after streaming "ripped" and content-filtered versions of the works online.  *Id.* at 853-54.  In essence, VidAngel was loaning each item of digitized content to its users for a small streaming fee, as users usually "sold back" their discs (less $1) within hours of initial purchase, and VidAngel on average "re-sold" a given disc to more than a dozen different users.  *Id.* at 854.  The Ninth Circuit rejected VidAngel's claim that it was engaging in fair-use format-shifting, observing that "[t]he reported decisions unanimously reject the view that space-shifting is fair use."  *Id.* at 862; *see also, e.g.*, *Infinity Broadcast*, 150 F.3d at 106, 109 (service that allowed its users to listen "to radio broadcasts originating in various cities throughout the United States" by calling into a telephone line suffered from "total absence of transformativeness").

The Ninth Circuit reached a similar conclusion in *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).  There, the "peer-to-peer" file-sharing site Napster claimed that its service was fair use, in part, because it enabled users to "download[] MP3 music files in order to listen to music [they] already own[ed] on audio CD."  239 F.3d at 1019.  The Ninth Circuit rejected that argument, explaining that unlike the time-shifting in *Sony*, the "space-shifting" made possible by Napster

"simultaneously involve[d] distribution of the copyrighted material to the general public." *Id.*

Internet Archive attempts to distinguish *Napster* on the ground that the file-sharing program "made works available to everyone online simultaneously." IA Br. 34 (emphasis omitted). But Internet Archive's service facilitates nearly the same thing by making an unlimited number of short-term, spontaneous loans available to anyone who asks. *See* IA Br. 6 (only prerequisite to borrowing is "signing up for a free … account"); IA Br. 22 (Internet Archive provides access to books "briefly or spontaneously"); *id.* at 32 (readers can "immediately borrow [a] book and read the cited material"); *id.* at 48 (Internet Archive's activities allow libraries "to build permanent collections"). It makes no difference whether those distributions happen all at once (as with Napster), or one after the other in perpetuity (as with Internet Archive), because both services make unauthorized reproductions freely available to the public. It is not fair use to make and distribute digital copies of copyrighted works online, full stop—regardless of whether the distribution happens simultaneously or seriatim.

### 2. Internet Archive's Practices Negatively Affect The Licensing Market, Even Though The Copyright Holders Choose Not To Offer The Precise Kind Of License Internet Archive Would Prefer

Even if Internet Archive's wholesale copying and distribution were somehow deemed transformative—which it is not—it still would not be fair use. Deciding whether the fair-use doctrine applies also requires courts to consider three other distinct factors, including "the effect of the [secondary] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In assessing such effects, this Court understands the term "potential market" to include "traditional, reasonable, or likely to be developed markets." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929-30 (2d Cir. 1994); *see id.* at 929 (explaining that because "a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work," negative impact on even "*potential* licensing revenues is a proper subject for consideration").

Internet Archive contends that its unauthorized reproductions and distributions of copyrighted works cannot cause "cognizable harm" to book publishers because publishers do not presently "license the ability

to digitally loan books a library (or anyone else) already owns" in print. IA Br. 46-47. That contention misunderstands the law. Whether publishers choose to provide *precisely* the sort of license Internet Archive prefers is beside the point, because publishers *do* provide a thriving market for digital copies of their works, both in the form of paid digital access to their ebooks and in the form of library digital lending. *See* Publishers' Br. 8-11.

Internet Archive clearly wishes that book publishers would offer a different set of licensing options than the ones currently available to libraries. But the fact that publishers do not "choose to make available" the kind of "access" that Internet Archive wants, IA Br. 48, does not entitle Internet Archive to disregard the relevant copyrights and provide such "access" in the publishers' stead. As this Court has explained, the fair-use market-impact "analysis embraces both the primary market for the work and any derivative markets that exist or that its author might reasonably license others to develop, regardless of whether the particular author claiming infringement has elected to develop such markets." *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 48 (2d Cir. 2021); *see, e.g.*, *Infinity Broadcast*, 150 F.3d at 111 ("[T]he

revenues that [defendant] generates for himself come not from a market that is only 'likely to be developed,' but from a market that Infinity currently occupies, albeit in different form." (citation omitted)). Simply put, "the failure to strike a deal satisfactory to both parties does not give [a secondary user] the right to copy [the copyright holder's] copyrighted material without payment." *TVEyes*, 883 F.3d at 180.[4]

Here, the market impact of Internet Archive's activities outweighs any transformativeness that could conceivably exist in those activities. Where transformativeness is "modest at best" but the infringer has "usurped a function for which [the copyright holder] is entitled to demand compensation under a licensing agreement," the fair-use test favors the copyright holder. *TVEyes*, 883 F.3d at 180-81.

---

[4] Internet Archive's unauthorized copying and distribution is especially harmful because it denies the publishers the ability to dictate the security measures that accompany digital distribution of their works. *See* 664 F. Supp. 3d at 374 (discussing publishers' "digital rights management" protocols).

## II. Adopting Internet Archive's Theory Of Fair Use Would Have Devastating Consequences For The Music Industry, The Movie Industry, The News Media Industry, And Similar Industries

The consequences of this appeal reach far beyond books and libraries. Numerous industries that center around creating, distributing, or producing creative materials rely heavily on digital markets, and copyright protections within those markets, for their continued vitality. Deeming Internet Archive's mass reproduction and distribution program to be fair use would no doubt embolden not only Internet Archive itself but also other online platforms to freely "lend" all types of copyrighted works to the public in digital formats. That would catastrophically harm the digital markets on which the music industry, the movie and television industry, the news industry, and similar industries depend to profitably create and distribute their works—and would thereby undermine the incentive for the creation of new works that copyright law exists to protect.

### A. When Copyright Holders Have Lost The Ability To Control Digital Distribution Of Their Works In The Past, The Results Have Been Disastrous

It should come as no surprise that when copyright holders lose control over the digitization and distribution of their copyrighted works,

their revenues suffer.  The music, movie/television, and news industries, which have had to contend with the threat of digital piracy for the last two and a half decades, provide an object lesson about the extraordinary harm that can result from activities like those engaged in by Internet Archive—particularly when those activities are undertaken by numerous groups and individuals.

1.  *Music industry.*  The experience of the music industry—whose financial viability has previously been severely threatened by unauthorized exploitation of copyrighted works through digital copying— is highly instructive.  *See, e.g.*, Michael D. Smith & Rahul Telang, *Assessing the Academic Literature Regarding the Impact of Media Piracy on Sales* 1 (Aug. 2012), *available at* https://www.riaa.com/re-ports/assessing-the-academic-literature-regarding-the-impact-of-media-piracy-on-sales/.

Recorded music revenues increased steadily throughout the 1990s, largely due to growing demand for CDs.  *See* Figure 1 (below).  But in 1999, the music industry's health took a dramatic turn for the worse: revenues began to fall dramatically, and they continued falling throughout the 2000s.  *See id.*

Not coincidentally, 1999 was also the year that the file-sharing site Napster came online. Napster enabled its users to execute "peer to peer" transfers of MP3 files that transferring users had "ripped" from CDs; once downloaded by the receiving user, those files could then be played on users' computers or "burned" onto blank CDs for further play. *A&M Recs.*, 239 F.3d at 1011-12. By maintaining a searchable "library" of music files available for transfer at any given time, *id.* at 1012, Napster created a free digital marketplace that decimated copyright holders' ability to charge for music downloads, *see id.* at 1016-17, and depressed sales of CDs to Napster users who could download those same albums for free, *see, e.g.*, Norbert J. Michel, *The Impact of Digital File Sharing on the Music Industry: An Empirical Analysis*, 6 Topics in Economic Analysis & Policy 1, 11 (2006).

There is no question that the decline in recorded music revenues and the existence of Napster (and similar peer-to-peer networks) were directly linked. One analysis has concluded that peer-to-peer file sharing accounted for at least half, and potentially all, of the decrease in recorded-music revenue in the 2000s. *See* Alejandro Zentner, *Ten Years of File Sharing and Its Effects on International Physical and Digital Music Sales*

1, 17 (2009), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1724444.

**Figure 1: U.S. Recorded Music Revenues by Format[5]**



Although Napster was shut down in 2001, copycat piracy sites persisted in creating an enormous drag on legitimate music sales. As shown in Figure 1, the free fall in music-industry revenues finally leveled off in the early 2010s, but at a level of less than half the annual revenues when compared to the industry's peak. It was not until streaming of music began to overtake physical and digital-download sales that the

---

[5] Recording Industry Ass'n of America, *U.S. Recorded Revenues by Format*, https://www.riaa.com/u-s-sales-database/ (last accessed March 21, 2024).

industry began to truly recover. *See* Figure 1; pp. 11-12, *supra* (discussing various distribution channels used by the music industry, including streaming services such as Spotify). In fact, it was only within the *last few years* that U.S. recorded music revenues finally returned to the high-water mark of 1999. *See* Recording Industry Ass'n of America, *U.S. Recorded Revenues by Format*, https://www.riaa.com/u-s-sales-database/ (last accessed March 21, 2024). They still have not fully recovered on an inflation-adjusted basis. *See id.*

The victims of Napster were not only the record labels and music publishers that owned the copyrights in pirated music. They also included the producers, songwriters, and artists who created that music and whose royalty payments were negatively affected. And critically, among the group of creators who suffered harm were emerging and independent artists, who were less likely to be discovered and promoted by record labels that had to reduce their staffing and for whom sales-driven income is more essential because they are less able to make up for deficits through "side revenues" like live performances and merchandise. *See* Nelson Granados, *How Online Piracy Hurts Emerging Artists*, Forbes (Feb. 1, 2016), *available at* https://www.forbes.com/sites/nelsongranados/

2016/02/01/how-online-piracy-hurts-emerging-artists/?sh=8fb59f877741;

Amedeo Piolatto & Florian Schuett, *Music Piracy: A Case of "The Rich*

*Get Richer and the Poor Get Poorer,"* 24 Information Economics & Policy

30, 31-32, 38 (March 2012) (concluding that piracy may keep less popular

artists "out of the market and therefore reduce musical variety").

The music industry's loss of control over digital copies of

copyrighted works also seriously harmed the economy more generally.

One study has estimated that, in the mid-2000s, U.S.-based music piracy

cost 71,060 jobs, $2.7 billion in lost earnings, and $12.5 billion in total

economic output annually. Stephen E. Siwek, *The True Cost of Sound*

*Recording Piracy to the U.S. Economy* 14-15 (Aug. 2007), *available at*

https://www.riaa.com/wp-content/uploads/2015/09/20120515_

SoundRecordingPiracy.pdf.

2. *Movie and television industry.* The experience of the movie and

television industry tells a similar story.

In the case of that industry, the harm caused by unauthorized

digital copying of copyrighted works first became strongly apparent in

the early 2000s, as a new peer-to-peer file sharing protocol called

BitTorrent came into wide use. BitTorrent "revolutionized movie file

sharing" by making it feasible to download large video files quickly—something that had previously been difficult to accomplish. *See* Alejandro Zentner, *Measuring the Impact of File Sharing on the Movie Industry: An Empirical Analysis Using a Panel of Countries* 3 (March 22, 2010), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id= 1792615. As BitTorrent-enabled piracy grew, video sales stagnated and movie industry revenues declined—falling by 27% between 2004 and 2008. *See id.* at 2, 23. Empirical analysis shows that, had it not been for file-sharing, "video sales would have grown at a pace similar to that observed before the introduction of BitTorrent" and "revenues from video sales would have experienced a substantially larger increase than that observed." *Id.* at 22; *see also* Brett Danaher *et al.*, *Piracy and Copyright Enforcement Mechanisms* 15-20 (June 2013) (surveying peer-reviewed papers on digital movie piracy and concluding that the "vast majority … find that piracy causes a statistically significant decrease in sales"), *available at* https://www.nber.org/system/files/working_papers/ w19150/w19150.pdf.

As the film and television industries started taking advantage of streaming technology, so did the digital pirates. Illicit streaming has now

replaced unauthorized downloading as the primary source of digital video piracy. *See* Andy Chatterley, *The Film and TV Piracy Report 2022*, at 6, 10 (Feb. 2023), *available at* https://www.ctam.com/wp-content/uploads/ MUSO-2022-Film-And-TV-Piracy-Report.pdf. In 2022, there were over 125 *billion* visits to film and television piracy websites, *see id.* at 5, with the United States supplying the largest piracy audience for both films and television, *see id.* at 14, 18.

As with unauthorized music downloads, film and television piracy inflicts significant economic hardship on content creators and the broader economy. One recent study estimates that in 2017, digital video piracy caused revenue losses between $29.2 billion and $71 billion in the U.S. content and distribution sectors, representing a reduction in overall industry revenue of between 11% and 24%. *See* David Blackburn *et al.*, *Impacts of Digital Video Piracy on the U.S. Economy* 12 (June 2019), *available at* https://www.uschamber.com/assets/documents/Digital_ Video_Piracy_June_2019.pdf. That, in turn, caused the loss of up to 560,000 jobs and $115.3 billion in gross domestic product. *See id.* at 14.

3. *News media industry.* Unauthorized use of media-publisher content threatens high-quality journalism in analogous ways—which in

turn threatens journalism's "essential function of democracy." *Associated Press v. Meltwater US Holdings, Inc.*, 931 F. Supp. 2d 537, 553 (S.D.N.Y. 2013) (refusing to permit such an injury by allowing the defendant "to take the fruit of AP's labor for its own profit, without compensating AP").

The news media industry has faced steep challenges over the past two decades. Newspaper circulation and advertising revenues dropped from $57.4 billion in 2003 to an estimated $21.4 billion in 2022, and magazine advertising revenues dropped from $46 billion in 2007 to $26.01 billion in 2021. *See* Pew Research Ctr., *Fact Sheets: State of the News Media* (Nov. 10, 2023), *available at* http://www.journalism.org/fact-sheet/newspapers/; Amy Watson, *Estimated Aggregate Revenue of U.S. Periodical Publishers from 2005 to 2021*, Statista (Dec. 11, 2023), *available at* https://www.statista.com/statistics/184055/estimated-revenue-of-us-periodical-publishers-since-2005/. Almost 2,900 newspapers in the United States have either closed or merged since 2005, and more than two newspapers close each week. *See* Penelope M. Abernathy, *The State of Local News: The 2023 Report* (2023), *available at* https://localnewsinitiative.northwestern.edu/projects/state-of-local-news/2023/report/.

Many challenges relate to co-optation of copyrighted content by large online platforms and other third parties. *See, e.g.*, Mauro Orru, *Google Fined Roughly $270 Million in France Over Dispute With News Publishers*, Wall Street Journal (Mar. 20, 2024), *available at* https://www.wsj.com/business/media/google-fined-eur250-million-in-france-over-dispute-with-news-publishers-1ec8d76c. That co-optation includes blatant reproduction of full-text news articles by third-party websites, overzealous news aggregators, and—more recently—AI products that use copyrighted content to generate material that directly competes with that content. *See, e.g.*, *TVEyes*, 883 F.3d at 173-74; U.S. Copyright Office, *Copyright Protections for Press Publishers: A Report of the Register of Copyrights* 11-16 (2022), *available at* https://www.copyright.gov/policy/publishersprotections/202206-Publishers-Protections-Study.pdf; News/Media Alliance, *White Paper: How the Pervasive Copying of Expressive Works to Train and Fuel Generative Artificial Intelligence Systems Is Copyright Infringement and Not a Fair Use* (2023), *available at* https://www.newsmediaalliance.org/wp-content/uploads/2023/10/AI-White-Paper-with-Technical-Analysis.pdf. Such unlicensed appropriation harms publishers' ability to generate revenue,

including through subscriptions, ad-supported content, metering, and licensing deals.

## B. Internet Archive's Practices Threaten Creative Industries' Ability To Continue Making And Distributing Works

Today, the digital marketplace is more important than ever to the creative industries, as digital media have come to dominate the music, movie/television, and news markets. Customers by and large now pay for access to music, movie/television, and news media in digital formats. In the recorded music market, digital media accounted for 87% of revenues in the first half of 2023, compared to just 11% for physical mediums like CDs and vinyl. *See Mid-Year Report* 1-2. Similarly, digital content accounted for 80% of the U.S. market for movies and television in 2021, while physical media made up just 8%.[6] *See* Motion Picture

---

[6] That figure excludes "pay tv" (*e.g.*, cable and satellite). *See* Motion Picture Ass'n, *Theme Report 2021*, at 16-25, *available at* https://www.motionpictures.org/wp-content/uploads/2022/03/MPA-2021-THEME-Report-FINAL.pdf (discussing the home/mobile entertainment market). A majority of U.S. households subscribe to both pay tv and at least one subscription streaming service (such as Netflix or Disney+); of the households that pay for only one or the other, a majority are streaming-service-only households. *See id.* at 20; Hannah Walsh, *SVoD-Only Homes Exceed Pay TV-Only Homes For First Time*, Ampere

Ass'n, *Theme Report 2021*, at 10, *available at* https://www. motionpictures.org/wp-content/uploads/2022/03/MPA-2021-THEME-Report-FINAL.pdf.

Growth in the digital sector has been driven by streaming, in particular. Streaming in the U.S. music industry—including paid subscriptions, ad-supported services, and digital and customized radio—accounted for $13.3 billion in revenues in 2022 and 84% of the total recorded music market. Joshua P. Friedlander & Matthew Bass, *Year-End 2022 RIAA Revenue Statistics* 1 (2023), *available at* https://www.riaa.com/wp-content/uploads/2023/03/2022-Year-End-Music-Industry-Revenue-Report.pdf. In the U.S. movie and television industry, subscription streaming generated $25.3 billion in revenues in 2021—making up nearly 70% of the combined theatrical and home-entertainment market. *See Theme Report 2021*, at 10, 17.

It is no accident that those industries have moved away from revenue models based on possession of tangible discs or digital files and towards models based on streaming. In fact, that shift was necessitated

_____

Analysis (Oct. 24, 2018), https://www.ampereanalysis.com/insight/svod-only-homes-exceed-pay-tv-only-homes-for-first-time.

by—and a direct response to—the existential threat posed by file-sharing sites and other piracy services.

Internet Archive's attempt to distort the fair-use doctrine to enable its so-called "controlled digital lending" threatens to do to the streaming market what piracy sites did to digital downloads and physical sales in the 2000s. There is no reason to think that such activities will not expand from books to music, movies, and other forms of creative content that can be checked out of brick-and-mortar libraries.

Indeed, Internet Archive's practice of reproducing and distributing books is nearly identical to what Napster enabled its users to do with CDs. The only difference is that Napster users could keep their unlicensed digital copies, while Internet Archive's users must return theirs after two weeks. The popularity of streaming, however, demonstrates that this is a distinction without a difference, because it shows that music listeners and movie watchers are currently far more interested in on-demand access than permanent ownership. If Internet Archive's activities were blessed by this Court and became widespread, there is every reason to think that free, unlicensed "loans" of music, movies, television shows, and other valuable content could substantially

replace paid or ad-based streaming and subscriptions—the lifeblood of those creative industries.

This Court should not be swayed by the fact that Internet Archive is a non-profit organization with the professed mission of "promot[ing] the availability of knowledge and culture." IA Br. 5. Copyright infringement—especially the sort of wholesale copying and online distribution conducted by Internet Archive—hurts copyright holders regardless of the infringers' motivation. *See Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 569 (1985) ("Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work."). Indeed, the fact that the works in question are made available at no cost to users only *exacerbates* the economic injury to copyright holders. *See Warhol*, 11 F.4th at 50 (recognizing that "permitting [free] use" of photographs "would effectively destroy th[e] broader [licensing] market, as, if artists could use such images for free, there would be little or no reason to pay" for them (citation and internal quotation marks omitted)).

Record labels, music publishers, movie/television studios, and news media companies could not even begin to recoup their substantial

investments in making creative works if the sale of a single physical disc or copy entitled an unlimited number of people to view or listen to a digital version of that work across a series of short-term "loans." The economics just do not work. Internet Archive's practice of reproducing and distributing copyrighted material without authorization thus sets a dangerous precedent that, if not stopped, would seriously stifle the creation of not only new books but also new music, films, television, and journalism. Thus, far from "promoting broad public availability of literature, music, and the other arts," *Warhol*, 598 U.S. at 526, *contra* IA Br. 36-37, Internet Archive's theory of fair use threatens the very existence of creative content—exactly the opposite of what copyright law is supposed to accomplish. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 204 (2016) (to accomplish the fundamental copyright-law objective to "enrich[] the general public through access to creative works" it is critical to "encourag[e] and reward[]" those "creations") (citation omitted); Joseph Story, III *Commentaries on the Constitution of the United States* 49 (1833) ("right of depredation and piracy of . . . copyright" means there is "little inducement to prepare elaborate works for the public").

# CONCLUSION

This Court should affirm the district court's order.

DATED:  March 22, 2024      MUNGER, TOLLES & OLSON LLP

By: *Elaine J. Goldenberg*
    ELAINE J. GOLDENBERG
    SARAH WEINER
    MUNGER, TOLLES & OLSON LLP
    601 Massachusetts Avenue NW
     Suite 500 E
    Washington, DC 20001
    Telephone: (202) 220-1114
    elaine.goldenberg@mto.com
    sarah.weiner@mto.com

    *Counsel for Amici Curiae*

# CERTIFICATE OF COMPLIANCE

1.    This petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Local Rule 29.1(c). The body of the petition contains 6,975 words, excluding the portions exempted by rule.

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in New Century Schoolbook 14-point font.

DATED: March 22, 2024        By:   */s/ Elaine J. Goldenberg*
                                   Elaine J. Goldenberg

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2024, I caused the foregoing to be electronically served on all counsel of record via electronic mail through the Court's CM/ECF system. I have also submitted six paper copies to the Court via overnight delivery.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

DATED: March 22, 2024          By: __/s/ *Elaine J. Goldenberg*__
                                                     Elaine J. Goldenberg