# 23-1260-cv

## United States Court of Appeals

*for the*

## Second Circuit

───────◆───────

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

— v. —

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

─────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF 24 FORMER GOVERNMENT OFFICIALS, FORMER JUDGES, AND IP SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

JOSHUA L. SIMMONS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorney for Amici Curiae*

## TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ...................................................................1

SUMMARY OF ARGUMENT ......................................................................1

ARGUMENT ................................................................................................6

     I.     Copyright Promotes the Public Interest by Securing to Creators
          a Marketable Property Right ...............................................................6

     II.    Both Congress and the Courts Have Considered and Rejected
          IA's Proposal to Expand Fair Use to Include Digital First Sale .........10

     III.   Controlled Digital Lending Is Controversial and Uncommon............21

CONCLUSION ...........................................................................................27

ADDENDUM A .........................................................................................29

CERTIFICATE OF COMPLIANCE ........................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ................................................................9

*Am. Geophysical Union v. Texaco Inc.*,
  802 F. Supp. 1 (S.D.N.Y. 1992) .............................................................2

*Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*,
  153 F.3d 155 (4th Cir. 1998) ................................................................16

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018) ...........................................3, 17, 21, 25

*Capitol Records, LLC v. ReDigi Inc.*,
  No. 16 Civ. 2321, 2017 WL 633663 (2d Cir. Feb. 14, 2017) ...............17, 19

*Disney Enters., Inc. v. VidAngel, Inc.*,
  869 F.3d 848 (9th Cir. 2017) ................................................................3

*Eldred v. Ashcroft*,
  537 U.S. 186 (2003)..................................................................2, 6, 7, 10

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) ................................................................9

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021)...........................................................................6

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985).....................................................................*passim*

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  568 U.S. 519 (2013)..............................................................................18

*Mazer v. Stein*,
  347 U.S. 201 (1954)................................................................................6

*MGM Studios, Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)...............................................................................9

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) .................................................... 3

*Weissmann v. Freeman*,
    868 F.2d 1313 (2d Cir. 1989) ............................................................ 6

**Statutes**

17 U.S.C. § 106 ................................................................................. 1, 19

17 U.S.C. §§ 107–22 ............................................................................ 1

Judicial Improvements Act of 1990, Pub. L. No. 101-650, §§ 801–05,
    104 Stat. 5089, 5134 (codified at 17 U.S.C. § 109(b)) ....................... 11

Orrin G. Hatch–Bob Goodlatte Music Modernization Act,
    Pub. L. 115-264, 132 Stat. 3676 (2018) ........................................... 16

**Other Authorities**

Adam Mossoff, *How Copyright Drives Innovation:*
    *A Case Study of Scholarly Publishing in the Digital World*,
    2015 MICH. ST. L. REV. 955 ............................................................... 7

EUIPO, ONLINE COPYRIGHT INFRINGEMENT IN EU 2023, available at
    https://www.euipo.europa.eu/en/publications/online-copyright-
    infringement-in-eu-2023 .................................................................. 12

H.R. Rep. No. 94-1476 (1976) ............................................................ 11

THE FEDERALIST NO. 43, at 271–72 (James Madison)
    (Clinton Rossiter ed., 1961) .............................................................. 2

Letter from Karyn A. Temple Claggett, Acting Register to Copyrights,
    to Reps. Bob Goodlatte and John Conyers, H. Judiciary Comm.,
    Sept. 29, 2017, available at
    https://www.copyright.gov/policy/massdigitization/house-letter.pdf ......... 14, 15

Limited Online Library Access Lending Service, Miami Univ.,
    available at https://www.lib.miamioh.edu/use/borrow/lola/ ............................. 23

Michael D. Smith, *What the Online Piracy Data Tells Us About Copyright Policymaking*, HUDSON INST. (Apr. 17, 2023), available at https://www.hudson.org/intellectual-property/what-online-piracy-data-tells-us-about-copyright-policymaking .............................................9

Press Release, H. Judiciary Comm., Chairman Goodlatte Announces Comprehensive Review of Copyright Law (Apr. 24, 2013), available at https://judiciary.house.gov/media/press-releases/ chairman-goodlatte-announces-comprehensive-review-of-copyright-law ..........................................................................................15

S. Rep. No. 101-265 (1990) ...................................................................12

Supp. Rep. Reg. Copyrights on Gen. Revision U.S. Copyright L.: 1965 Revision Bill, 89th Cong., 1st Sess. (1965), available at https://books.google.com/books?id=65AYAAAAMAAJ...........................11, 12

U.S. CONST. art. I, § 8, cl. 8 ................................................................6

U.S. COPYRIGHT OFF., DMCA SECTION 104 REPORT (2001), available at https://www.copyright.gov/reports/studies/dmca/ sec-104-report-vol-1.pdf ................................................................13, 14

U.S. COPYRIGHT OFF., LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT (2011), available at https://www.copyright.gov/docs/massdigitization/ USCOMassDigitization_October2011.pdf .......................................14

U.S. COPYRIGHT OFF., ORPHAN WORKS AND MASS DIGITIZATION: A REPORT OF THE REGISTER OF COPYRIGHTS (2015), available at https://www.copyright.gov/orphan/reports/orphan-works2015.pdf...................14

US Copyright Law Review, H.R. Judiciary Comm., available at https://judiciary.house.gov/us-copyright-law-review .........................................16

iv

**INTEREST OF AMICI CURIAE**

*Amici Curiae* are 24 former government officials, former judges, and intellectual property scholars who have developed copyright law and policy, researched and written about copyright law, or both.  They are concerned about ensuring that copyright law continues to secure both the rights of authors and publishers in creating and disseminating their works and the rights of the public in accessing these works.  It is vital for this Court to maintain this balance between creators and the public set forth in the constitutional authorization to Congress to create the copyright laws.  *Amici* have no stake in the parties or in the outcome of the case.  The names and affiliations of the members of the *Amici* are set forth in **Addendum A** below.[1]

**SUMMARY OF ARGUMENT**

Copyright fulfills its constitutional purpose to incentivize the creation and dissemination of new works by securing to creators the exclusive rights of reproduction and distribution.  17 U.S.C. § 106.  Congress narrowly tailored the exceptions to these rights to avoid undermining the balanced system envisioned by the Framers.  *See* 17 U.S.C. §§ 107–22.  As James Madison recognized, the

---

[1] The parties have consented to the filing of this brief.  *Amici Curiae* and their counsel authored this brief.  Neither a party, its counsel, nor any person other than *Amici* and their counsel contributed money that was intended to fund preparing or submitting this brief.

"public good fully coincides . . . with the claims of individuals" in the protection of copyright. THE FEDERALIST NO. 43, at 271–72 (James Madison) (Clinton Rossiter ed., 1961). Internet Archive ("IA") and its *amici* wrongly frame copyright's balance of interests as between the incentive to create, on the one hand, and the public good, on the other hand. That is not the balance that copyright envisions.

IA's position also ignores the key role that publishers serve in the incentives copyright offers to authors and other creators. Few authors, no matter how intellectually driven, will continue to perfect their craft if the economic rewards are insufficient to meet their basic needs. As the Supreme Court observed, "copyright law *celebrates* the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge." *Eldred v. Ashcroft*, 537 U.S. 186, 212 n.18 (2003) (quoting *Am. Geophysical Union v. Texaco Inc.*, 802 F. Supp. 1, 27 (S.D.N.Y. 1992)). Accordingly, the Supreme Court and Congress have long recognized that copyright secures the fruits of intermediaries' labors in their innovative development of distribution mechanisms of authors' works. Copyright does not judge the value of a book by its cover price. Rather, core copyright policy recognizes that the profit motive drives the willingness *ex ante* to invest time and resources in creating both copyrighted works and the means to distribute them. In sum, commercialization is fundamental to a functioning copyright system that

achieves its constitutional purpose.

IA's unauthorized reproduction and duplication of complete works runs roughshod over this framework. Its concept of controlled digital lending (CDL) does not fall into any exception—certainly not any conception of fair use recognized by the courts or considered by Congress—and thus violates copyright owners' exclusive rights. Expanding the fair use doctrine to immunize IA's wholesale copying would upend Congress's carefully-considered, repeated rejections of similar proposals.

Hoping to excuse its disregard for copyright law, IA and its *amici* attempt to turn the fair use analysis on its head. They acknowledge that the first sale exception does not permit CDL, as this Court made clear in *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649 (2d Cir. 2018).[2] They also are aware that courts consistently have rejected variations on the argument that wholesale copying, despite a format shift, is permissible under fair use.[3] Nevertheless, IA and its *amici* ask this Court, for the first time in history, to create a first sale-style exemption within the fair use analysis. CDL is not the natural evolution of libraries in the

---

[2] *See* SPA-38 ("IA accepts that *ReDigi* forecloses any argument it might have under Section 109(a)."); Dkt. 60, Brief for Defendant-Appellant Internet Archive (hereinafter "IA Br.") (appealing only the district court's decision on fair use).

[3] *See, e.g.*, *ReDigi*, 910 F.3d at 662; *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 352 (S.D.N.Y. 2000); *see also Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861–62 (9th Cir. 2017).

digital age; rather, like Frankenstein's monster, it is an abomination composed of disparate parts of copyright doctrine. If endorsed by this Court, it would undermine the constitutional foundation of copyright jurisprudence and the separation of powers.

The parties and other *amici* address the specific legal doctrines, as well as the technical and commercial context in which these doctrinal requirements apply in this case, and thus *Amici* provide additional information on the nature and function of copyright that should inform this Court's analysis and decision.

*First*, although IA and its *amici* argue that there are public benefits to the copying in which IA has engaged that support a finding that CDL is fair use, their arguments ignore that copyright itself promotes the public good and the inevitable harms that would result if copyright owners were unable to enforce their rights against the wholesale, digital distribution of their works by IA.

*Second*, IA's assertion of the existence of a so-called "digital first sale" doctrine—a principle that, unlike the actual first sale statute, would permit the reproduction, as well as the distribution, of copyrighted works—is in direct conflict with Congress and the Copyright Office's repeated study (and rejection) of similar proposals. Physical and digital copies simply are different, and it is not an accident that first sale applies only to the distribution of physical copies. Ignoring decades of research and debate, IA pretends instead that Congress has somehow overlooked

digital first sale, yet left it open to the courts to engage in policymaking by shoehorning it into the fair use doctrine. By doing so, IA seeks to thwart the democratic process to gain in the courts what CDL's proponents have not been able to get from Congress.

*Third*, given that there is no statutory support for CDL, most libraries offer their patrons access to digital works by entering into licensing agreements with authors and their publishers. Although a minority of libraries have participated in IA's CDL practice, and a few have filed *amicus* briefs in support of IA in this Court, the vast majority of libraries steer clear because they recognize that wholesale copying and distribution deters the creation of new works. As author Sandra Cisneros understands: "Real libraries do not do what Internet Archive does." A-250 (Cisneros Decl.) ¶12. There are innumerable ways of accessing books, none of which require authors and publishers to live in a world where their books are illegally distributed for free.

No court has ever found that reproducing and giving away entire works—*en masse*, without permission, and without additional comment, criticism, or justification—constitutes fair use. IA's CDL theory is a fantasy divorced from the Constitution, the laws enacted by Congress, and the longstanding policies that have informed copyright jurisprudence. This Court should reject IA's effort to erase authors and publishers from the copyright system.

5

## ARGUMENT

### I. Copyright Promotes the Public Interest by Securing to Creators a Marketable Property Right

When weighing fair use, a court must consider the impact of its holding on the public benefit. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1206 (2021). In so doing, this Court weighs not only the purported benefit of the defendant's use, but also the benefit of incentivizing creation through copyright law. *See Weissmann v. Freeman*, 868 F.2d 1313, 1325–26 (2d Cir. 1989) ("Encouraging authors to use their talents by holding out a promise of reward for their efforts is the surest way to advance the public welfare." (citing *Mazer v. Stein*, 347 U.S. 201, 219 (1954)). As the Supreme Court has noted, "the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985); *see also Eldred*, 537 U.S. at 219 ("[C]opyright's purpose is to *promote* the creation and publication of free expression."). Thus, providing remuneration for the creation of original works is essential to promoting "the Progress of Science and useful Arts[.]" U.S. CONST. art. I, § 8, cl. 8. Indeed, "[r]ewarding authors for their creative labor and 'promot[ing] . . . Progress' are . . . complementary." *Eldred*, 537 U.S. at 212 n.18. The Supreme Court has chided courts that "gave insufficient deference to the scheme established by the Copyright

6

Act for fostering the original works[.]" *Harper & Row*, 471 U.S. at 545–46.

The legal protection of authors' choices of when and how to commercialize their works is fundamental to the incentives to create those works in the first place. As the Supreme Court has recognized, "copyright law *celebrates* the profit motive . . . that ensures the progress of science." *Eldred*, 537 U.S. at 212 n.18.  A functional copyright system must recognize that commercialization of creative works—with the resulting ability of authors to profit—is an integral factor in incentivizing their creation and dissemination, and one which must exist before the public can realize the maximum benefit gained from accessing copyrighted works.

Like other creative works, books benefit society and would not exist in such abundance if rights were not protected.  The publishing industry, through furthering the publication and distribution of copyrighted works, plays an indispensable role in ensuring that authors are able to create new works that contribute to a flourishing society.  As one of our *Amici* has explained, this "commercialization policy—that intermediaries like publishers should be rewarded for their labors in creating the legal and market mechanisms necessary to disseminate works—is essential to the American copyright system."  Adam Mossoff, *How Copyright Drives Innovation: A Case Study of Scholarly Publishing in the Digital World*, 2015 MICH. ST. L. REV. 955, 963.  Indeed, the publishing industry provides security to authors who otherwise would not have the financial

resources or time to monetize their creative works. Revenue from advances and royalties is crucial to sustaining authors and thereby encouraging the creation of valuable works. A-5036 (Pls.' SUF); A-487–88 (Sevier Decl.) ¶¶17, 22; A-654 (Restivo-Alessi Decl.) ¶55; A-756 (Weber Decl.) ¶29; A-249–50 (Cisneros Decl.) ¶9. Publishers expend significant time, effort, and resources in developing creative works and disseminating such works. A-5037 (Pls.' SUF); A-486–91 (Sevier Decl.) ¶¶13–30; A-755–56 (Weber Decl.) ¶¶26–28; A-654–655 (Restivo-Alessi Decl.) ¶¶55–56; A-593 (Pavese Decl.) ¶12. Thus publishers, like authors, depend on financial compensation, such as licensing fees from ebook transactions, to ensure that they can continue to develop and disseminate valuable books that benefit the public.

IA and its *amici* argue that the benefits of CDL outweigh the substantial benefits of incentivizing creation because CDL "expand[s] public access" to copyrighted works. IA Br. 59. This argument makes no sense. It avoids the limitations of current (and long-established) law and inverts the entire predicate of copyright protection—and property rights more generally. A general attempt to make works more accessible is not the kind of benefit that fair use recognizes. As the Supreme Court has observed, "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." *Harper & Row*, 471 U.S. at 569. Such claims do not justify "judicially imposing a 'compulsory

license' permitting unfettered access" to protected works. *Id.* Piracy too expands access, but no court has concluded that indiscriminate file sharing is not copyright infringement. *See MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001).

By depriving authors and publishers of revenues and licensing fees, IA undermines the incentives to create books and thus, harms the public. As the district court found, "[i]t is clear that IA's distribution of ebook copies of the Works in Suit without a license deprives the Publishers of revenues to which they are entitled as the copyright holders." SPA-50 (citing *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 179–80 (2d Cir. 2018)). "Indeed, IA pitches [its CDL-based] Open Libraries project to libraries in part as a way to help libraries avoid paying for licenses." SPA-44 (Pls.' SUF). Consistent with the district court's recognition of these undisputed facts concerning IA's operation, empirical data has demonstrated that online piracy similar to IA's acts of infringement has "harm[ed] creators and rights owners by reducing their revenues, and that this in turn harms consumers because it reduces the quantity and quality of creative output[.]" Michael D. Smith, *What the Online Piracy Data Tells Us About Copyright Policymaking*, HUDSON INST. (Apr. 17, 2023).[4]

---

[4] Available at https://www.hudson.org/intellectual-property/what-online-piracy-data-tells-us-about-copyright-policymaking.

IA claims that usurping the market for ebook licensing and the resulting harm to publishers (and authors) are "minimal harms." IA Br. 60. Yet, as discussed above, the Supreme Court has clearly held that such harm is not trivial, but rather goes to the heart of copyright law's goals. *See Harper & Row*, 471 U.S. at 558; *see also Eldred*, 537 U.S. at 219. The commercialization of copyrighted works is critical to incentivizing the creation of new works that contribute to a flourishing society. Usurping publishers' market for licensing fees weighs against the public benefit. Thus, contrary to IA's claims that CDL furthers the public interest, the widespread adoption of CDL will undermine incentives for authors and publishers to develop new books, and thus deprive the public of valuable creative works.

## II. Both Congress and the Courts Have Considered and Rejected IA's Proposal to Expand Fair Use to Include Digital First Sale

IA's CDL argument asks this Court to engage in judicial policymaking that is inconsistent with the statutory structure Congress designed. As Congress has long understood, the differences between physical and digital media require different standards to protect creators' exclusive rights. Indeed, Congress has already considered and rejected proposals that conflate these standards, which would enable the very exception that IA seeks to create.

In codifying the fair use doctrine in the 1976 Copyright Act, Congress—and the Copyright Office, which led the drafting process—designed the fair use

provisions to accommodate technological developments.  *See* H.R. Rep. No. 94-1476, at 66 (1976).  This flexibility in the fair use analysis does not mean that the drafters intended new situational applications to be unmoored from the Act's core principle of protecting the value of copyrighted works.  The drafters, rather, were wary that technological changes could undermine works' values and for this reason intentionally drafted authors' exclusive rights in broad terms.  *See* Supp. Rep. Reg. Copyrights on Gen. Revision U.S. Copyright L.: 1965 Revision Bill, 89th Cong., 1st Sess., 13–14 (1965) (hereinafter "Supp. Rep.").[5]  The drafters realized that if changes in technology were allowed to weaken authors' rights, "the result in many cases would simply be a free ride at the author's expense."  *Id.*  The flexibility built into the fair use provision, then, originates from the understanding that protection of the exclusive rights enjoyed by authors must be preserved and expanded into new technologies as they arise.

Since that time, lawmakers have regularly considered the effects of digitization on first sale principles.  In 1990, Congress amended Section 109(b) to exempt the rental of computer software from the first sale doctrine, giving authors control over the distribution of software beyond the first sale.[6]  The rationale

---

[5] Available at https://books.google.com/books?id=65AYAAAAMAAJ.

[6] Judicial Improvements Act of 1990, Pub. L. No. 101-650, §§ 801–05, 104 Stat. 5089, 5134 (codified at 17 U.S.C. § 109(b)).  Congress also explained that

11

behind this exemption was to protect authors from the ease with which renters

could make unauthorized reproductions. S. Rep. No. 101-265, at 3 (1990)

("software is easily accessible for modification or copying through the mechanisms

contained in most personal computers"). At that time, "[c]opying a software

program [was] as simple as loading the program from a floppy disc into a personal

computer, inserting another blank floppy disc, and pushing a button." *Id.* As a

result, Congress did not want the first sale doctrine to create an open season on the

software industry. By contrast, Congress declined to extend the exemption to

video game cartridges because they were "relatively inaccessible" and thus

presented a much more difficult task for renters to create unauthorized copies. *Id.*

at 6 ("The software in these cartridges is embedded in the circuits of

microprocessor chips, rather than being encoded in magnetic media."). In short,

Congress explicitly crafted the first sale doctrine to apply only to works for which

the creation of digital copies would be difficult.[7]

   Likewise, in 2001, the Copyright Office concluded in a report to Congress

---

"nothing in this act restricts the ability of copyright owners and users to enter into
license agreements regarding the use of computer programs." S. Rep. No. 101-
265, at 6 (1990).

[7] A recent report by the European Union Intellectual Property Office found that
piracy of publications, a category that contains ebooks and audiobooks, was pirated
more often than films, music, or software. EUIPO, ONLINE COPYRIGHT
INFRINGEMENT IN EU 2023, https://www.euipo.europa.eu/en/
publications/online-copyright-infringement-in-eu-2023.

that the first sale doctrine does not apply to digital copies—nor should it.  U.S. COPYRIGHT OFF., DMCA SECTION 104 REPORT (2001).[8]  The Office addressed arguments of proponents of first sale expansion who sought to include "the transmission and deletion of a digital file" in the provision's scope—the same principal underlying the arguments supporting CDL today.  *Id.* at xviii.  The Office, however, consistent with the rationale of the computer software exemption, noted that there are fundamental differences between physical copies— which degrade with use and require significant time, space, effort, and cost to lend—and digital copies that are easy to store, maintain, and transfer.  *Id.* at xix. Accordingly, it noted, "digital transmissions can adversely [a]ffect the market for the original to a much greater degree than transfers of physical copies."  *Id.*  The Office recommended that Congress *not* expand Section 109 to recognize a "digital first sale" doctrine because this likelihood of harm outweighed the "demonstrated need for the change," notwithstanding the benefit to libraries.  *Id.* at xx–xxi.[9] Rather, it concluded that "[t]he tangible nature of a copy is a defining element of the first sale doctrine and critical to its rationale."  *Id.* at xix.  Without a physical

---

[8] Available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf.

[9] Although the Office recognized the concerns of libraries, it concluded that their issues "ar[o]se from existing business models and are therefore subject to market forces."  *Id.* at xxi.

artifact, the Office found, "transmission of works interferes with the copyright owner's control over the intangible work and the exclusive right of reproduction." *Id.* at xxi.

The Office's recommendations to Congress have remained consistent throughout the rapid expansion of digitization, particularly as it pertains to fair use. In 2011, the Office reported that fair use would be "difficult to square with" a mass digitization project involving "the large scale scanning and dissemination of entire books." U.S. COPYRIGHT OFF., LEGAL ISSUES IN MASS DIGITIZATION: A PRELIMINARY ANALYSIS AND DISCUSSION DOCUMENT 23 (2011).[10] And in 2015, its report concluded that because "it is unlikely that fair use will ever yield the . . . broad use of full-text works . . . online," Congress would instead need to consider a collective licensing regime to facilitate mass digitization of works. U.S. COPYRIGHT OFF., ORPHAN WORKS AND MASS DIGITIZATION: A REPORT OF THE REGISTER OF COPYRIGHTS 5 (2015).[11] After two years of further study, however, the Office recommended Congress *not* pursue such legislation, noting that a licensing scheme would only create a market with uses "for which there is broad agreement that no colorable fair use claim exists." Letter from Karyn A. Temple

---

[10] Available at https://www.copyright.gov/docs/massdigitization/USCOMassDigitization_October2011.pdf.

[11] Available at https://www.copyright.gov/orphan/reports/orphan-works2015.pdf.

Claggett, Acting Register to Copyrights, to Reps. Bob Goodlatte and John Conyers, H. Judiciary Comm., Sept. 29, 2017, at 17 (hereinafter "Temple Letter").[12]  In sum, after considering all the arguments on whether and how to enable legal mass digitization, the Copyright Office told Congress that fair use claims do not justify mass digitization of entire books—and also rejected proposals to expand copyright law to enable the types of uses IA has conducted to compile its digital collection.  *See id.*

Beyond receiving the Copyright Office's recommendations, Congress itself spent years directly investigating similar issues.  In 2013, one of our *Amici*, House Judiciary Committee Chairman Rep. Bob Goodlatte, announced a bipartisan, comprehensive review of copyright law to address the "new challenges" posed by the ebook, including the ability of the public to make works available to consumers around the world "without any compensation for copyright owners," as well as "[e]fforts to digitize our history so that all have access to it."  Press Release, H. Judiciary Comm., Chairman Goodlatte Announces Comprehensive Review of Copyright Law (Apr. 24, 2013).[13]  Over the next three and a half years, the Judiciary Committee held twenty hearings on these topics with testimony from 100 witnesses

---

[12] Available at https://www.copyright.gov/policy/massdigitization/house-letter.pdf.

[13] Available at https://judiciary.house.gov/media/press-releases/chairman-goodlatte-announces-comprehensive-review-of-copyright-law.

and conducted a listening tour "to hear directly from creators and innovators about . . . what changes are needed to ensure U.S. copyright law keeps pace with technological advances." US Copyright Law Review, H.R. Judiciary Comm.[14]

The result of "extensive hearings held by Congress on the issue," along with reports and other fact-finding processes, was that Congress chose *not* to amend Section 109 in response to appeals to revise the first sale doctrine in accounting for digital technologies. *See Brown & Williamson Tobacco Corp. v. Food & Drug Admin.*, 153 F.3d 155, 170 (4th Cir. 1998) (recognizing evidence of congressional inaction as "legislative acquiescence" to existing jurisprudence), *aff'd*, 529 U.S. 120 (2000). Further supporting this point, the reform campaign did lead to congressional action in other areas of copyright law, such as the Orrin G. Hatch–Bob Goodlatte Music Modernization Act, Pub. L. 115-264, 132 Stat. 3676 (2018), which updated protections for audio recordings to account for digital streaming. But Congress, consistent with the Copyright Office's recommendations, took no similar action to expand the fair use or first sale doctrines in response to technological developments. Rather, as the Office noted, more work was needed to develop a "consensus-based legislative framework" that would enable mass digitization projects. Temple Letter at 19.

---

[14] Available at https://judiciary.house.gov/us-copyright-law-review.

As Congress and the Copyright Office declined to adopt these proposals, proponents of expanding these copyright exemptions brought their arguments to the courts. But this Court's holding in *ReDigi* made clear that the policies underlying the first sale doctrine, when grafted onto the fair use analysis, do not magically expand the realm of fair use to permit wholesale, unauthorized digital reproduction simply because the copier "makes efforts to nullify its consequences by the counterbalancing" removal from circulation of the preexisting copies. 910 F.3d at 658. In that case, the defendant argued it was fair use to resell lawfully acquired digital music files. *Id.* at 656. IA supported the defendant in an *amicus* brief that made the same argument it makes here.[15] Nevertheless, this Court rejected it, holding that the defendant's use was inconsistent with the first sale and fair use doctrines. *ReDigi*, 910 F.3d at 660, 664. In this Court's words, "[i]f ReDigi and its champions have persuasive arguments in support of the change of law they advocate, it is Congress they should persuade. We reject the invitation to substitute our judgment for that of Congress." *Id.* at 664.

Rather than taking this Court's admonition to heart, IA and its *amici* pretend that Congress's years of studies, debates, hearings, and drafts were unnecessary

---

[15] *Capitol Records, LLC v. ReDigi Inc.*, No. 16 Civ. 2321, 2017 WL 633663 (2d Cir. Feb. 14, 2017) (Brief of Amici Curiae American Library Association, Association of College and Research Libraries, Association of Research Libraries, and Internet Archive in Support of Reversal) (hereinafter "ReDigi Br.").

17

because CDL has been fair use all along.  CDL proponents ask the Court to bless the same scheme in a different medium—ebooks—at least when veiled in an allegedly noncommercial purpose.  Once again, they ask this Court to substitute its judgment for that of Congress because it is obvious that their arguments will not persuade Congress to change the law.  Lawmakers have consistently rejected the expansion of fair use in the digital age as well as recognition of a separate "digital first sale" limitation, and the same core arguments should fail here as they always have.

Despite the inherent differences in digital and physical formats, IA and its *amici* argue that CDL is fundamentally the same as traditional library lending that supports the core mission of expanding public access to information.  *See, e.g.*, Dkt. 107, Brief of *Amici Curiae* Nine Library Organizations and 218 Librarians at 12 (hereinafter "Ziskina Br.").  But CDL goes far beyond what libraries can do under existing copyright doctrine.  Libraries' traditional ability to loan out physical copies to patrons is possible because of the first sale doctrine, which, as the Supreme Court noted in *Kirtsaeng v. John Wiley & Sons, Inc.*, embodies the "common law's refusal to permit restraints on the alienation of chattels."  568 U.S. 519, 538 (2013).

But the first sale doctrine plays a very different role in the digital realm in two ways: (1) the fact that digital distributions necessarily create new copies in the

process; and (2) the distinction between sales and licenses. First, regardless of any counterbalancing efforts, the reproduction that is inherent in digitally distributing a work violates the author's exclusive right "to reproduce the copyrighted work in copies," 17 U.S.C. § 106(1), foreclosing any possibility of digital first sale as a standalone doctrine without amendment of the Copyright Act. As IA previously has admitted, "the buyer does not end up with the seller's actual copy. Rather, she has a copy of the seller's copy." ReDigi Br. 15–16.

Second, the first sale doctrine, as codified in Section 109(a), applies to only *owners* of particular copies—not mere licensees. Copyright law has long recognized the ability of copyright owners to choose between sales and licenses when marketing their works, and the fact that their ability to control further distribution ends at the first sale contributes to those choices. When licensing ebooks to libraries, publishers build digital lending into the terms of the license agreements because libraries make copies available to numerous patrons. The publishers forgo a significant number of potential sales with these licenses, which is reflected in the price. CDL proponents see this as an imbalance because it treats the market for digital copies differently than the market for physical ones. But copyright law has always distinguished between sales and licenses, and the Copyright Act reflects the understanding that diverse formats call for an array of protections of creators' exclusive rights.

19

IA argues that the advent of new technologies creates an invitation to expand the fair use exception to authors' exclusivity. This is directly contrary to the reason the drafters of the 1976 Copyright Act installed flexibility to account for new technologies—to ensure that creators' rights were *protected* and that their works would retain their value in the face of "unforeseen" advances. Supp. Rep. at 13. Although these drafters warned *against* free-riding through new technologies, there is no doubt that CDL allows IA and others to free ride on copyrighted works at the expense of authors and publishers. For instance, upon finding her books freely available on IA, author Sandra Cisneros stated that she felt "like I had gone to a pawn shop and seen my stolen possessions on sale." A-250 (Cisneros Decl.) ¶11. Expanding fair use to enable wholesale digital reproduction and distribution eviscerates the exclusive rights that are the heart of incentives to create original works and that the Copyright Act intends to preserve for authors—it is completely contrary to the intention of Congress in codifying the fair use provision.

There may yet come a day when Congress sees the need—regardless of the drafters' intention—to expand fair use in response to a shift in technology to preserve the balance between authors' exclusive rights and the public's access to copyrighted works. Mass digitization, and the accompanying push for recognition of a "digital first sale" doctrine, does not fit the bill. Congress has studied and debated the digital first sale concept for years. Its inaction on the topic is not the

product of mere inadvertence—it is an obvious rejection. Given this extensive history, arguments that Congress has not considered the policies underpinning CDL are without merit. Rather than continuing to attempt to persuade Congress to take up their cause as suggested in *ReDigi*, CDL's proponents think the path of least resistance runs through the courts. This Court should stand by its decision in *ReDigi* and refuse to substitute its judgment for that of Congress.

## III.    Controlled Digital Lending Is Controversial and Uncommon

IA and its *amici* contend that CDL is a common practice that IA has utilized for decades, *see* IA Br. 60, and that CDL is "largely uncontroversial," Ziskina Br. 7. These assertions, however, mischaracterize the history of and controversy with CDL. IA did not begin to implement its current form of CDL until quite recently. In addition, CDL is not a well-established practice among libraries. Moreover, throughout its history, CDL has been a controversial practice because of its conflict with core copyright protections. As a result, contrary to what IA and its *amici* suggest, CDL is neither widely practiced nor uncontroversial.

IA and its *amici* contend that "Internet Archive and other libraries have been practicing controlled digital lending for more than a decade without harm to Publishers." IA Br. 60; *see also* Ziskina Br. 8. This assertion is not true. IA did not use the current version of CDL until just a few years ago. Its early digital lending practices were predominantly limited to public domain books. A-5072

(Pls.' SUF).  Moreover, IA included geographical limits to its early digital lending practices, including requiring that ebooks "only be borrowed by a patron of a physical library that participates in [IA's] program" and be "access[ed] through [IA's] site from the physical library's network."  A-5090 (Pls.' SUF); A-2576 (Emails between Chris Butler and Zane Kesey).  Then, IA made a radical change, allowing anyone with an internet connection to access the copyrighted books it copied and digitized.  A-1261 (Kahle Tr.).  Moreover, as the district court found, "IA began expanding significantly its lending capacity of copyright-protected works through the 'Open Libraries' project."  SPA-13.  IA expanded its archive of ebooks from 648,117 scans on April 1, 2018, to 3,211,204 scans on February 19, 2022.  A-5077 (Pls.' SUF); A-260 (Foster Decl.).  Thus, the assertion that IA has practiced CDL for over a decade omits the important context that IA's current version of CDL is a recent, unprecedented expansion of an already problematic practice.

IA's *amici* also allege that CDL is widely used.  Without a single supporting reference or citation, IA's *amici* make the sweeping claim that "[o]ver 100 libraries across the United States rely on a CDL program to distribute their collections, particularly for out-of-print works, reserves, or for works that are less frequently circulated."  Ziskina Br. 8.  IA's *amici* provide no support for this assertion, nor do they specify whether these institutions allegedly relying on CDL programs use

only public domain or out-of-print works, copies of which they own, or circulate to only members of their relevant institutions. Moreover, the vast majority of public libraries, the American Library Association, and the MIT Press have refused to endorse CDL. A-5109–10 (Pls.' SUF). The handful of institutions purportedly using CDL that IA and its *amici* reference are principally limited to temporary measures taken during the pandemic in a university setting for an educational purpose that limit access to the university's faculty, staff, and students. *See* Ziskina Br. 8–9 (and citations therein). For example, although *amici* cite to Miami University's Limited Online Library Access Lending (LOLA) Service, this program was exclusive to Miami University's students and faculty and is described as a "short-term lending service," created "to address concerns about physical distancing on campus during the time of the COVID-19 pandemic." Limited Online Library Access Lending Service, Miami Univ.[16]

The dearth of evidence supporting the adoption of CDL generally—let alone IA's lending practices at issue here—can be explained by the widespread consensus that CDL violates copyright law. Although IA's *amici* claim CDL "[was] largely uncontroversial," Ziskina Br. 7, CDL has always been contentious. IA has admitted that libraries refused to provide it with scans of copyrighted books

---

[16] Available at https://www.lib.miamioh.edu/use/borrow/lola/.

due to "copyright concerns," A-5082 (Pls.' SUF), and IA has known of CDL's copyright concerns for years. IA's former Director of Finance stated that "our library partners ran out of books that were out of copyright . . . and they're reluctant to give us books that were in copyright." A-5083 (Pls.' SUF); A-1898–99 (Cressaty Tr. 174:24-175:2). IA's founder and current Chairman wrote in a "blog post that Internet Archive 'has worked with 500 libraries over the last 15 years to digitize 3.5M books. But based on copyright concerns the selection has often been restricted to [public domain] books.'" A-5083 (Pls.' SUF); A-2260 (IA Blog Post). Because it was aware that CDL was a controversial practice, IA sought ways to legitimize its digital lending program. After applying for a $100 million grant from the MacArthur Foundation to expand its CDL program, IA held the "Open Libraries Copyright Workshop" to "consider the digitize and lend model that the [IA] is proposing to expand through the MacArthur Foundation's 100&Change grant." A-5100 (Pls.' SUF); A-1913 (IA's Open Libraries Proposal to the MacArthur Foundation). After the workshop, IA's attorney, Lila Bailey, led an effort to create a written statement supporting CDL. A-5101–5103 (Pls.' SUF); A-3213 (Bailey Tr. 138:1–19). The resulting publications, *A White Paper on Controlled Digital Lending of Library Books* (the "White Paper") and a related *Statement on CDL*, were immediately criticized by the Association of American Publishers and the Authors Guild for their impact on authors and publishers.

24

A-5107 (Pls.' SUF). These organizations denounced CDL for "denigrat[ing] the incentives that copyright law provides to authors and publishers to document, write, invest in, and disseminate literary works for the benefit of the public ecosystem" and "depriving authors and publishers of important licensing income." A-5107–08 (Pls.' SUF); A-3332–38 (AAP's "Statement on Flawed Theory of 'Controlled Digital Lending'"; Author Guild's "Controlled Digital Lending is Neither Controlled not Legal"). Moreover, the White Paper itself admitted that CDL was likely not a transformative use. A-3252 (noting a "considerable point of concern is that CDL is not clearly transformative").[17]

In addition to CDL being controversial, its supporters—such as IA's own *amicus* counsel in *ReDigi*, Jonathan Band—already have admitted that the Second Circuit's decision in *ReDigi* constituted a repudiation of CDL. In a 2018 blog post, Band commented that "the decision [in *ReDigi*] calls into question the theoretical underpinnings of CDL" and "raises questions concerning the viability of Controlled Digital Lending . . . by libraries," which "must be carefully reevaluated in light of this decision." A-5108–09 (Pls.' SUF); A-3377 ("The Implications of the *ReDigi* Decision for Libraries"). Thus, contrary to the claims of IA's *amici*,

---

[17] IA's *amici* include a co-author of the White Paper, Kyle Courtney (see Ziskina Br., Addendum 13), and "Open Libraries Copyright Workshop" participants, including its organizer, Pamela Samuelson (*see* Dkt. 92, Brief for *Amici Curiae* Copyright Scholars).

there was hardly a "collective consensus" that CDL "was a logical outgrowth of fair use and technology available." Ziskina Br. 7.

IA's version of CDL at issue in this case is particularly controversial, as IA does not bother to comport with the purported legal underpinnings for CDL espoused in the White Paper. The White Paper suggests numerous mitigations to minimize legal risk, such as limiting digital lending to the physical premises of a library or its geographic region. A-3233. Yet IA did not adopt these practices. The district court found that, in contrast to the White Paper's guidelines, IA distributed recent copyrighted materials, did not own many of the physical books that it digitized and lent, and did not follow the "owned to loan" ratio at the heart of CDL. SPA-36–37. Thus, CDL in general, and certainly IA's version of it, is neither a longstanding nor uncontroversial practice.

Far from being uncontested or commonplace, CDL is controversial and seldom used because of the copyright issues inherent in this newfound model of distributing copyrighted works without permission—as highlighted in this litigation. Moreover, IA's own CDL practices are out-of-step with those commonly agreed upon among the few vocal supporters of CDL. Regardless, CDL in any form—whether IA's version or that promoted in the White Paper—is infringing if done at scale. IA and its *amici*'s *post-hoc* attempts to justify its infringement are misleading and untrue.

26

## CONCLUSION

The district court properly found that IA's "defense of fair use fails as a matter of law." SPA-51. In proliferating the "the mass reproduction and distribution of complete copyrighted works in a way that does not transform those works and that creates directly competing substitutes for the originals," SPA-50–51, IA does not further the public interest, but rather undermines incentives to create and disseminate books that benefit society. Thus, its actions are decidedly not protected by fair use. Nor can IA look to the first sale doctrine to defend its actions as Congress and the Copyright Office repeatedly have rejected expanding first sale in ways that might enable IA's practices. Left with no other legal justification for its infringement, IA attempts to characterize CDL as somehow widely accepted, when, in reality, even proponents of CDL have recognized its illegality. As IA has no support for its unprecedented and dangerous arguments in favor of CDL, *Amici* respectfully request that this Court affirm the district court's well-supported conclusion that IA's copying does not qualify as fair use as a matter of law.

Dated: March 22, 2024          Respectfully submitted,

*/s/ Joshua L. Simmons*
Joshua L. Simmons
KIRKLAND & ELLIS LLP
601 Lexington Ave.
New York, NY 10022
Tel: (212) 44604846

*Attorney for Amici Curiae*

# ADDENDUM A

## *Full List of Amici Curiae* [*]

Alden F. Abbott
*Former General Counsel*
United States Federal Trade Commission
*Senior Research Fellow*
Mercatus Center
George Mason University

The Honorable Susan G. Braden
*Chief Judge (Retired)*
United States Court of Federal Claims
*Jurist in Residence*
Center for Intellectual Property x Innovation Policy
Antonin Scalia Law School, George Mason University

The Honorable Ronald A. Cass
*Former Vice-Chairman and Commissioner*
United States International Trade Commission
*Dean Emeritus*
Boston University School of Law

The Honorable Doug Collins
*Former Ranking Member of the House Judiciary Committee*
116th Congress
*Member of the United States House of Representatives (Ga.)*
113th – 116th Congress

Richard A. Epstein
*Laurence A. Tisch Professor of Law*
New York University School of Law
*Peter and Kirsten Bedford Senior Fellow*
Hoover Institution, Stanford University
*James Parker Hall Distinguished Service Professor of Law Emeritus*
University of Chicago Law School

---

[*] Titles and institutions of signatories are for identification purposes only. The signatories are listed in their individual capacities only.

The Honorable Harold Furchtgott-Roth
*Former Commissioner*
United States Federal Communications Commission
*Senior Fellow*
Hudson Institute

The Honorable Bob Goodlatte
*Former Chair of the House Judiciary Committee*
113th – 115th Congress
*Member of the United States House of Representatives (Va.)*
103rd – 115th Congress

Hugh Hansen
*Professor of Law*
Fordham University School of Law

Devlin Hartline
*Legal Fellow*
Hudson Institute

Bowman Heiden
*Visiting Professor*
University of California, Berkeley

Justin (Gus) Hurwitz
*Senior Fellow and Academic Director*
Center for Technology, Innovation & Competition
University of Pennsylvania Carey Law School

Keith N. Hylton
*William Fairfield Warren Distinguished Professor and Professor of Law*
Boston University School of Law

The Honorably Patrick Leahy
*Former Chair of the Senate Judiciary Committee*
107th, 110th – 113th Congress
*Member of the United States Senate (Vt.)*
94th – 117th Congress

Daryl Lim
*H. Laddie Montague Jr. Chair in Law*
Dickinson School of Law
The Pennsylvania State University

Adam J. MacLeod
*Professor of Law*
St. Mary's University School of law

Geoffrey A. Manne
*President and Founder*
International Center for Law & Economics

The Honorable Paul Michel
*Chief Judge (Retired)*
United States Court of Appeals for the Federal Circuit

Adam Mossoff
*Professor of Law*
Antonin Scalia Law School
George Mason University

Ralph Oman
*Former Register of Copyrights*
United States Copyright Office

Seth Oranburg
*Associate Professor of Law*
Franklin Pierce School of Law
University of New Hampshire

Kristen Osenga
*Austin E. Owen Research Scholar and Professor of Law*
University of Richmond School of Law

The Honorable Randall R. Rader
*Chief Judge (Retired)*
United States Court of Appeals for the Federal Circuit

The Honorable Lamar Smith
*Former Chair of the House Judiciary Committee*
112th Congress
*Member of the United States House of Representatives (Tex.)*
100th – 115th Congress

Kristian Stout
*Director of Innovation Policy*
International Center for Law & Economics

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5), the word limit of Local Rule 29.1(c) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,337 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

Dated: March 22, 2024                    */s/ Joshua L. Simmons*
                                          Joshua L. Simmons