# 23-1260

## IN THE

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### FOR THE SECOND CIRCUIT

---

HACHETTE BOOK GROUP, INC., HARPERCOLLINS
PUBLISHERS LLC, JOHN WILEY & SONS, INC.,
PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1–5, inclusive,

*Defendants.*

---

Appeal from the United States District Court for the
Southern District of New York, Civil Action No. 20-cv-4160 (JGK)

---

**BRIEF OF *AMICI CURIAE* PROFESSORS AND SCHOLARS OF
COPYRIGHT AND INTELLECTUAL PROPERTY LAW IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

---

Jacqueline C. Charlesworth
CHARLESWORTH LAW
15671 Royal Ridge Road
Sherman Oaks, CA 91403
917-432-7343
jacqueline@charlesworthlaw.com

*Counsel for Amici Curiae
Professors and Scholars of Copyright and
Intellectual Property Law*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICI CURIAE* ............................................................1

SUMMARY OF ARGUMENT .............................................................2

ARGUMENT ......................................................................................7

    I.   The IA's Claim of Fair Use Was Categorically and Correctly Rejected by the District Court ...................................................7

        A.   The Supreme Court's *Warhol* Decision Reiterates That a Substitutional Use Is Not Transformative............................8

        B.   The IA's Copying Is Not a "Utility-Expanding" Transformative Use ...................................................9

            1.  Second Circuit Precedent Negates IA's Claim of Transformative Purpose .................................................9

            2.  Format-Shifting Is Not a Transformative Fair Use.....................12

        C.   *ReDigi* Confirms the Inapplicability of the First Sale Doctrine to Copying Activities ........................................14

        D.   The Library Exceptions in Section 108 Do Not Remotely Approach the Conduct at Issue Here.................................16

   II.  IA and Its Collaborators Are Not Entitled To Declare Their Own Exception to Copyright Law.................................................17

        A.   Congress Has Reviewed These Issues and Chosen Not To Act .........17

        B.   Only Congress Can Amend the Copyright Act..................................21

            1.  IA and Its Supporters Do Not Speak for Anyone But Themselves.................................................21

i

2. It Is Up to Congress to Decide Copyright Policy ..........................23

CONCLUSION........................................................................................24

ADDENDUM: List of *Amici Curiae*

CERTIFICATES

# TABLE OF AUTHORITIES

**Cases**

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
143 S. Ct. 1258 (2023) ................................................................. 8, 9

*Authors Guild, Inc. v. Google, Inc.*,
804 F.3d 202 (2d Cir. 2015) ................................................... 9, 10, 11

*Authors Guild, Inc. v. HathiTrust*,
755 F.3d 87 (2d Cir. 2014) ..................................................... 9, 10, 11

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) .......................................................................... 5, 8

*Capitol Records, Inc. v. ReDigi, Inc.*,
910 F.3d 649 (2d Cir. 2018) ............................... 4, 5, 14, 15, 23

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...................................................... 12, 13

*Fox News Network, LLC v. TVEyes, Inc.*,
883 F.3d 169 (2d Cir. 2018) ...................................................... 9, 11, 12

*Harper & Row, Publishers v. Nation Enters.*,
471 U.S. 539 (1985) ........................................................................... 22

*Sony Corporation of America v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ........................................................................... 13

*Twentieth Century Music Corp. v. Aiken*,
422 U.S. 151 (1975) ........................................................................... 22

*UMG Recordings, Inc. v. MP3.com, Inc.*,
92 F. Supp. 2d 349 (S.D.N.Y. 2000) ........................................ 12, 13

**Constitution, Statutes, and Rules**

U.S. Const. art. I, § 8, cl. 8 ............................................................... 7

17 U.S.C. § 107 .............................................................................. 2, 8

17 U.S.C. § 108 .................................................................. 16, 20, 21

17 U.S.C. § 109 ..................................................... 2, 3, 4, 14, 15, 19

Copyright Alternative in Small-Claims Enforcement Act, Pub. L. No. 116-260, § 212 (2020) ...................................................................................................19

Orrin G. Hatch-Bob Goodlatte Music Modernization Act, Pub. L. No. 115-264 (2018) ...................................................................................................................19

Fed. R. App. P. 29 .......................................................................................................1

Local Rule 29.1 ........................................................................................................ 1

**Legislative**

*A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2013) ................................................18

*First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014) ...................................................................................................................18

H.R. Rep. No. 14-1976 (1976).................................................................................15

House Judiciary Committee, *US Copyright Law Review* ........................................18

*Preservation and Reuse of Copyrighted Works: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014).....................................................................................18

*The Scope of Fair Use: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014) ...............................................................................................18

**Other**

Authors Alliance website .................................................................................22, 23

The Authors Guild website .....................................................................................23

Lila Bailey et al., *Position Statement on Controlled Digital Lending by Libraries* .................................................................................................3, 4

Controlled Digital Lending website...........................................................3, 4, 5, 17

David Hansen & Kyle K. Courtney, *Controlled Digital Lending of Library Books,* Duke University Libraries (Sept. 28, 2018).............................................................3

David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books* (2018)...........................................................3, 4, 5, 20, 23

U.S. Copyright Office, *DMCA Section 104 Report* (2001) ..............................19, 20

U.S. Copyright Office, *Notice of Inquiry*, 81 Fed. Reg. 36594 (June 7, 2016).......20

U.S. Copyright Office, *Section 108 of Title 17* (2017)............................................21

U.S. Department of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* 61 (2016).........................................20

# INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are the professors and scholars of copyright and intellectual property law identified in the Addendum ("Copyright and IP Law Professors"). The Copyright and IP Law Professors collectively study and teach copyright, intellectual property and related areas of law at academic institutions across the United States. They have no stake in the outcome of this case other than their interest in ensuring that copyright and intellectual property law are interpreted and develop in a manner consistent with their constitutional and statutory foundations so that creativity, dissemination of works, and innovation will continue to flourish.

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E) and Local Rule 29.1(b), *amici curiae* certify that no party or its counsel authored this brief in whole or in part or contributed money intended to fund the preparation or submission of this brief. *Amici* further certify pursuant to Fed. R. App. P. 29(a)(2) that all parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

The Internet Archive ("IA") and its supporting *amici* are unhappy with copyright law because it does not permit them to scan physical books and distribute them over the internet without the permission of the copyright owner. They would prefer a system where they do not have to seek a license or pay the owners of the books for the right to distribute digital copies.

Rather than accept that a license must be obtained from the copyright owner to reproduce or distribute a copyrighted work, the IA, working with representatives from the library community,[2] devised a supposed workaround called "controlled digital lending," or "CDL." According to IA and its collaborators, an institution may digitally reproduce a physical book without a license and distribute the digital copy through an online lending program so long as there is a copy of the physical book somewhere on site at the lending institution or an allied institution. *See* Special Joint Appendix - Volume 1 of 1 (SPA-1 - SPA-53) ("SPA") at SPA-11. IA and other proponents of CDL contend that this is a fair use under section 107 of the Copyright Act when considered in light of copyright's "first sale" doctrine, codified in section 109 of the Copyright Act, which permits libraries to lend out physical books. Br. for Def.-Appellant Internet Archive (Public) ("IA Br.") at 3-4,

---

[2] Though it collaborates with libraries, the IA itself is clearly not a library in the traditional sense.

38.  As confirmed by this Court, however, section 109 does not extend to the distribution of digital copies, and there is no fair use precedent that remotely supports mass copying and digital distribution of books in competition with authorized digital versions.  Two copyright "wrongs" do not make a right.

Nonetheless, to further their goals, IA and its collaborators crafted a "Position Statement" to promote the CDL philosophy and encouraged people in the library community to adopt it.  *See* Lila Bailey et al., *Position Statement on Controlled Digital Lending by Libraries*, https://controlleddigitallending.org/statement (last visited March 20, 2024) ("Position Statement").[3]  The Position Statement is supported by a "White Paper" that was published at the same time.  *See* David R. Hansen & Kyle K. Courtney, *A White Paper on Controlled Digital Lending of Library Books* (2018), https://controlleddigitallending.org/download-statement/ ("White Paper").[4]  The

---

[3] *See also* Controlled Digital Lending, *Learn More About CDL* (webform at Position Statement/Sign the Statement), https://controlleddigitallending.org/sign/ (last visited Mar. 20, 2024) ("CDL website, *Sign the Statement*"); Controlled Digital Lending, *Signatories To The Position Statement On Controlled Digital Lending By Libraries*, https://controlleddigitallending.org/signatories/ (last visited Mar. 21, 2024) (list of signatories at Position Statement/Signatories) ("CDL website, *Signatories*").

[4] *See also* David Hansen & Kyle K. Courtney, *Controlled Digital Lending of Library Books*, Duke University Libraries (Sept. 28, 2018), https://blogs.library.duke.edu/scholcomm/2018/09/28/controlled-digital-lending-of-library-books/ (announcing White Paper and Position Statement).  The White

Position Statement, White Paper and related materials are available on a website dedicated to CDL hosted by the Library Futures project ("CDL website"), which advertises CDL as "allow[ing] libraries to loan print books to digital patrons in a 'lend like print' fashion."  CDL website, *Controlled Digital Lending by Libraries*, https://controlleddigitallending.org/ (last visited Mar. 20, 2024).

While acknowledging some "risk factors," both the Position Statement and the White Paper present CDL as a legally supportable practice.  The Position Statement purports to offer a "good faith interpretation of U.S. copyright law for American libraries" so they "can apply CDL to their collections in order to fulfill their missions."  Position Statement.  The White Paper states that its "goal is to help libraries and their lawyers become more comfortable with the concept [of CDL] by more fully explaining the legal rationale for [CDL], as well as situations in which this rationale is the strongest."  White Paper at 1-2.

The CDL website downplays the significance of judicial decisions that reject the core precepts of CDL.  For example, regarding this Circuit's *ReDigi* decision, which rejected the applicability of section 109 to digital transmissions,[5] the CDL website states:

---

Paper and Position Statement documents drew on earlier work by Michelle M. Wu, director of the Georgetown law library.  *See* White Paper at 2 & n.4.

[5] *Capitol Records, Inc. v. ReDigi, Inc.,* 910 F.3d 649 (2d Cir. 2018) ("*ReDigi*").

> Q: What does the *ReDigi* decision mean for CDL?
>
> A: Proponents for CDL have largely determined that ReDigi does not change the landscape for CDL. If anything, a new test for transformative use articulated by the court could further tip the fair use analysis in CDL's favor, as it arguably "utilizes technology to achieve the transformative purpose of improving delivery of content without unreasonably encroaching on the commercial entitlements of the rights holder."

CDL website, *FAQ*, https://controlleddigitallending.org/faq/ (last visited Mar. 20, 2024) ("CDL website, *FAQ*") (emphasis omitted).  And remarkably, there is no mention on the CDL website of the decision below unequivocally rejecting the supposed rationales for CDL.  Instead, the website FAQ page continues to offer the following reassurances to would-be adherents of CDL (among others):

> Q: Does CDL require the permission of copyright owners?
>
> A: We do not believe so. As the Supreme Court explained in Campbell v. Acuff-Rose Music: "If the use is otherwise fair, then no permission need be sought or granted." Campbell, 510 U.S. 569 at 585 n.18 (defendant had sought and been denied permission). CDL proponents believe that the conversion from one format to another, for a use consistent with a library's mission, and where the copyright owner has already been compensated for a legitimately acquired item, is fair use. For a more detailed analysis, see Kyle K. Courtney & David R. Hansen "A White Paper on Controlled Digital Lending of Library Books."

CDL website, *FAQ*.

Although CDL has been, and continues to be, presented by its supporters as a well-established and legitimate library practice,[6] in reality it is neither sanctioned by the Copyright Act nor supported by legal precedent. As Judge Koeltl's comprehensive opinion confirmed, there is no authority to support the notion that systematic digital scanning of physical books in a library's collection for distribution to the public constitutes a fair use of those books. Indeed, all judicial precedent is to the contrary.

As scholars and teachers of copyright and intellectual property, *amici* Copyright and IP Law Professors take issue with IA and its collaborators' self-implementation of a broad exception to copyright for their own special benefit. Such conduct by private actors is inconsistent with the fair and balanced development of copyright law. The unauthorized reproduction and digital distribution of copyrighted works by IA and others disrupts a significant, well-developed digital licensing market for ebooks and diminishes compensation to rightsholders and authors. A broad exception to copyright protection resulting in such consequences is not something that can or should be enacted through a self-defined policy of parties who stand to benefit.

---

[6] *See, e.g.*, IA Br. at 2 (describing CDL as "a modern, more efficient version of lending that is used by libraries across the country").

IA and those who support CDL are not the arbiters of copyright law. Under the Constitution, the rights and limitations of copyright are established by Congress. U.S. Const. art. I, § 8, cl. 8. It is up to Congress to review and consider potential changes to the Copyright Act. Unlike private actors, Congress has the ability to consult with and weigh the interests of *all* affected stakeholders, and consider how best to achieve the constitutional goal of promoting progress through the protections of copyright.

In seeking to have this Court reverse the decision below, IA and its supporters are asking this Court to legislate a far-reaching exemption from copyright protection that is in conflict with the Copyright Act and all relevant precedent. This Court should decline the invitation and affirm the decision below.

## ARGUMENT

### I. The IA's Claim of Fair Use Was Categorically and Correctly Rejected by the District Court

For the reasons explored at length in the district court's thorough opinion, neither the Copyright Act nor judicial precedent permits unauthorized systematic reproduction and digital distribution of in-copyright books to the public under the guise of fair use. As the district court succinctly observed, "[e]very authority points the other direction." SPA-50. The defects in the IA's most recent iteration of their fair use argument are amply explored in the responsive brief of Plaintiffs-

Appellees.  *See* Br. for Pls.-Appellees [Redacted] at 23-62.  While *amici* do not seek to repeat that discussion here, several fatal flaws in the CDL theory are worth highlighting.

### A. The Supreme Court's *Warhol* Decision Reiterates That a Substitutional Use Is Not Transformative

In the recently decided case *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023) ("*Warhol*"), the Supreme Court addressed whether the Andy Warhol Foundation's licensing of a silkscreen depiction of the musician Prince, based on a photograph by Lynn Goldsmith, was a "transformative" use of Goldsmith's photograph under the first fair use factor of section 107 of the Copyright Act.  *Id.* at 1274-75.  The transformative use inquiry considers whether the secondary use "shares the purpose or character of the original work, or instead has a further purpose or different character."  *Id.* Because, while not identical, either Goldsmith's photo or the Warhol silkscreen could serve as a magazine illustration of Prince, the Court held that the Foundation's licensing of the Warhol version for that purpose was not a transformative use of Goldsmith's work.  *Id.* at 1278-80.  The license thus "'supersede[d] the objects'" of Goldsmith's original photograph, "even if the two [works] were not perfect substitutes."  *Id.* (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).

Especially in light of *Warhol*, there can be no debate as to the nontransformative, substitutional nature of the IA's copying. IA's digital scans allow the reader to access and read the entire copyrighted book—that is, to exploit the work for its intrinsic expressive purpose. As the Supreme Court explained in *Warhol*, such substitution is the "bête noire" of copyright and incompatible with fair use. *See id.* at 1274.

## B. The IA's Copying Is Not a "Utility-Expanding" Transformative Use

### 1. Second Circuit Precedent Negates IA's Claim of Transformative Purpose

Relying on this Court's decisions in *Authors Guild, Inc. v. Google, Inc.,* 804 F.3d 202 (2d Cir. 2015) ("*Google Books*"), *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ("*HathiTrust*") and *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169 (2d Cir. 2018) ("*TVEyes*"), IA contends that its digitization and distribution of physical books is a "utility-expanding" transformative use because "it uses technology to make lending more convenient and efficient." IA Br. at 30-32.

This claim betrays a serious misapprehension of this Court's earlier fair use cases. Both *Google Books* and *HathiTrust* involved copying that resulted in a large database of books that could be searched by users to locate particular words or terms within the books. *Google Books*, 804 F.3d at 208-10; *HathiTrust*, 755 F.3d at 91. In both cases, the panel viewed the search function as transformative

because it added a useful tool distinct from the original purpose of the works. *Google Books*, 804 F.3d at 217; *HathiTrust*, 755 F.3d at 97. But what was also crucial to the Court's determination of fair use in each was the fact that the activities at issue were not substitutional. As this Court explained in *Google Books*: "In *HathiTrust*, notwithstanding the defendant's full-text copying, the search function revealed virtually nothing of the text of the originals to the public." *Google Books*, 804 F.3d at 222; *see also HathiTrust*, 755 F.3d at 97. Similarly, in *Google Books*, "Google … constructed the snippet feature in a manner that substantially protects against its serving as an effectively competing substitute for Plaintiffs' books." *Google Books*, 804 F.3d at 222. In fact, explained the Court, "[i]f Plaintiffs' claim were based on Google's converting their books into a digitized form and making that digitized version accessible to the public, their claim would be strong." *Id*. at 225.

It is less often recalled that the Court also took significant comfort in the strong antipiracy measures both Google and HathiTrust applied to their databases. Recognizing that exposure to hacking or leakage of copies to the public or to other users could likewise have a substitutional effect, the Court noted that Google stored its databases off of the public internet and protected them from disclosure with the same degree of security as it applied to its own confidential information. *See Google Books*, 804 F.3d at 227-28. HathiTrust employed similar safeguards.

*See HathiTrust*, 755 F.3d at 100-01.  Unlike in these scenarios, IA circulates complete copies of books to the general public.

IA's exploitation of copyrighted books is thus the polar opposite of the copying that was found to be transformative in *Google Books* and *HathiTrust*.  IA offers no "utility-expanding" searchable database to its subscribers.  What it *does* offer is access to full-text books as a clearly competing substitute for the versions licensed by book publishers.

The distinction between a transformative and substitutional use is well illustrated by this Court's analysis in the *TVEyes* case.  In contrast to *Google Books*, where the Court found Google's search functionality to be a utility-expanding use, the Court rebuffed TVEyes' attempt to position itself as a socially beneficial "media monitoring" service.  While the Court acknowledged TVEyes' technology to be "modest[ly] transformative," it rejected the service's claim of fair use because, by allowing users to access and view Fox content, TVEyes was "depriv[ing] Fox of revenues to which Fox [was] entitled as the copyright holder." *Id.* at 178,180-81.

Latching on to the finding of "modest" transformativeness rather than the adverse outcome on fair use, IA tries to take comfort in the *TVEyes* opinion.  *See* IA Br. at 30-31.  But by ignoring this Court's overarching conclusion that TVEyes' use was substitutional and not a fair one, in the words of the district court, IA

seriously "distorts the way courts have treated utility expanding transformative uses." SPA-27; *see also* IA Br. at 30-31 (IA disregarding its own quotation of *TVEyes*' observation that Google Books was not "'unreasonably encroaching on the commercial entitlements of the rights holder'" (quoting *TV Eyes*, 883 F.3d at 177)).

### 2. Format-Shifting Is Not a Transformative Fair Use

The argument that converting physical copies into digital formats should be considered a fair use is not a new one and has been repeatedly rejected by courts. In *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000) ("*MP3.com*"), for example, an early online music service purchased tens of thousands of CDs and converted them to MP3 files. *Id.* at 350. The MP3.com service allowed users to listen to the digitized albums if they could "prove" that they already owned a copy of the CD by inserting it into a connected CD-ROM drive or buying it from MP3.com. *Id.* Although both the service and user owned physical copies of the CD, the court held that the copying was not transformative or a fair use, ruling that "defendant's activities on their face invade plaintiffs' statutory right to license their copyrighted sound recordings to others for reproduction." *Id.* at 352.

In *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848 (9th Cir. 2017), the Ninth Circuit rejected an analogous claim by a service that "ripped" Blu-Ray

and DVD discs to create a library of films in which objectionable content had been tagged. *Id.* at 853. Users of the VidAngel service who purchased a Blu-Ray or DVD copy of a film (which was retained by the service and could later be sold back) were then able to stream a sanitized version of that film. *Id.* at 853-54. Despite the fact that the service maintained physical copies of the films it was streaming, the Ninth Circuit strongly disagreed with the service's argument that its "space shifting" of films from physical to digital formats was a transformative fair use, explaining that courts have "unanimously rejected" such claims. *Id.* at 861-63 (citing *MP3.com* and other authority).

Significantly, the defendants in these predecessor cases involving other types of copyrighted works relied on the same logic as IA and its *amici*—that the mere possession of a lawfully acquired physical copy of a work transforms the digital reproduction of that work into a fair use. As those courts, as well as the district court here, correctly held, it does not. *See* SPA-24 n.8.[7]

---

[7] Nor does the Supreme Court's 1984 decision in *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), which addressed private "time-shifting" of broadcast television shows, support IA's fair use claim. In *Sony*, the Court held that individual consumers' recording of free television content for later home viewing was a fair use. *Id.* at 422-23, 449-450, 454-55. That case bears no resemblance to this one, where IA systematically copies and publicly distributes copyrighted works for which libraries and individual consumers would otherwise have to pay.

## C. *ReDigi* Confirms the Inapplicability of the First Sale Doctrine to Copying Activities

As explained above, IA and its supporters seek to rely upon copyright's first sale doctrine, codified in section 109 of the Copyright Act, as a justification for the unauthorized copying they advocate under the guise of CDL. Section 109 provides that the owner of a lawfully made copy of a work may "sell or otherwise dispose of the possession of that copy." 17 U.S.C. § 109(a). By its terms, then, the first sale provision does not authorize the owner of the copy to make another copy in any form. *Id.*

To the extent there could be any question as to whether the limitations of the first sale doctrine apply to digital reproductions, all such doubt was fully dispelled by this Court's decision in *ReDigi*. In that case, the Court held that the defendant's "resale" of digital music files was not protected under the first sale doctrine because the file transfer process necessarily entailed the making of a new copy. *See ReDigi*, 910 F.3d 649, 659. The Second Circuit's commentary on ReDigi's efforts to expand the first sale doctrine beyond its limits is especially pertinent in the current context: "[A]s to the argument that we should read § 109(a) to accommodate digital resales because the first sale doctrine protects a fundamental entitlement, without regard to the terms of § 109(a) … we think such a ruling would exceed the proper exercise of the court's authority." *Id.* at 664. Also significant is that in addition to firmly rejecting ReDigi's first sale defense, the

Court also rejected ReDigi's alternative theory that its copying constituted a fair use, holding that the substitutional effects of ReDigi's unauthorized copies "weigh[ed] powerfully against fair use." *Id.* at 662-63.

Faced with this contrary controlling precedent, IA nonetheless continues to press its first sale argument by repackaging it as a theory of transformative fair use:

> Controlled digital lending is transformative because it expands the utility of books by allowing libraries to lend copies they own more efficiently and borrowers to use books in new ways. There is no dispute that libraries can lend the print copy of a book by mail to one person at a time. Controlled digital lending enables libraries to do the same thing via the Internet—still one person at a time.

IA Br. at 15.

To say that IA should be able to make and lend a digital copy of a book because it already owns a physical copy of the book is simply another way to challenge the limitations of section 109. Whether presented as an interpretation of the first sale doctrine or as a species of fair use, this argument finds no support in the law.[8] In either case, as Judge Koeltl explained, there is simply no authority for

---

[8] Relying on selective quotation of the legislative history of the 1976 Copyright Act, IA and its supporters assert that Congress intended to "protect libraries" by permitting a library that acquires a physical book to lend that copy "'under any conditions it chooses to impose.'" IA Br. at 38 (quoting H.R. Rep. No. 14-1976, at 79 (1976) ("House Report")). But the privilege referenced in the legislative history of section 109 clearly refers to the lending of *physical* copies of books and does not include acts of reproduction. The same passage goes on to clarify that "[u]nder section 202 [of the Act] however, the owner of the physical copy or phonorecord

the proposition that the owner of a physical copy of a book is entitled "to reproduce the entire book without permission, as IA did to the [works at issue]." SPA-35.

### D. The Library Exceptions in Section 108 Do Not Remotely Approach the Conduct at Issue Here

Notably, the Copyright Act contains an entire section devoted to exceptions for reproduction and distribution for libraries and archives that is barely mentioned in IA's brief: section 108. Section 108 is focused on customary library activities such as preservation, interlibrary loans, and research activities involving particular works. *See generally* 17 U.S.C. § 108. Although section 108 does not preempt an independent fair use justification for library activities, 17 U.S.C. § 108(f)(4), it does not remotely suggest it is permissible for a library to engage in systematic reproduction or distribution of copyrighted works as an alternative to licensed uses. To the contrary, the exemptions set forth in section 108 are aimed at "isolated and unrelated reproduction or distribution" of particular works and do not immunize the "concerted reproduction or distribution of multiple copies ... of the same material." 17 U.S.C. § 108(g). The activities carried out through CDL are far afield of the carefully drawn exceptions for libraries enacted by Congress.

---

cannot reproduce or perform the copyrighted work publicly without the copyright owner's consent." House Report at 79.

## II.    IA and Its Collaborators Are Not Entitled To Declare Their Own Exception to Copyright Law

Evidently believing there is strength in numbers, IA and its advisors—sophisticated actors with the benefit of counsel—nonetheless elected not only to itself adopt, but to promote, the CDL model as an acceptable legal construct. They did so in the face of an abundance of precedent that clearly establishes that the systematic reproduction and digital distribution of copyrighted books in the manner they advocate is not permitted under the Copyright Act. Hiding behind the fig leaf of CDL, IA has copied millions of in-copyright books and made them freely available to the public as a substitute for licensed ebooks. *See* SPA-10 (IA's website includes 3.6 million books protected by valid copyrights). More than this, IA and its collaborators have urged adoption of CDL by other institutions, encouraging them to disregard the law as well. *See* SPA-44 (district court's finding that IA pitches CDL "as a way to help libraries avoid paying for licenses"); CDL website, *Sign the Statement*; CDL website, *Signatories*. The fact that IA has persuaded others to join in, however, does not make its conduct any more lawful.

### A. Congress Has Reviewed These Issues and Chosen Not To Act

In recent years, as in the past, Congress has kept a careful eye on evolving digital technologies and their impact on copyright owners and users, including the library community. From 2013 to 2015, the House Judiciary Committee conducted a comprehensive review of the Copyright Act to determine whether there were

17

areas of the law that should be updated, including existing exceptions for fair use and libraries, as well as the first sale doctrine. *See* House Judiciary Committee, *US Copyright Law Review*, https://judiciary.house.gov/us-copyright-law-review (last visited Mar. 21, 2024) (listing hearings, including "The Scope of Fair Use," "Preservation and Reuse of Copyrighted Works," and "First Sale Under Title 17"). The 20 hearings included 100 witnesses representing a wide range of stakeholders, including representatives from the library, publisher, author and user communities. *Id.*[9] Notably, among the witnesses was John Ossenmacher, founder and CEO of ReDigi, who testified on the ReDigi business model. *See First Sale Under Title 17: Hearing Before the Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. 19-20 (2014). After concluding this extensive review of copyright law, Congress determined that

---

[9] *See generally A Case Study for Consensus Building: The Copyright Principles Project: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2013); *The Scope of Fair Use: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014); *Preservation and Reuse of Copyrighted Works: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014); *First Sale Under Title 17: Hearing Before the H. Subcomm. on Courts, Intellectual Property, and the Internet of the Comm. on the Judiciary H.R.,* 113th Cong. (2014). Witnesses from the library community included Laura N. Gasaway of the University of North Carolina School of Law; Gregory Lukow of the Library of Congress; James G. Neal of Columbia University; and Greg Cram of the New York Public Library.

reforms were needed in some areas and declined to take action in others.[10]

Significantly, Congress chose not to alter existing provisions on fair use, first sale, or library exceptions.

Congress has also solicited and received input from the Copyright Office on potential changes to the law, including whether the first sale right of section 109 should be extended to the digital realm. In 2001, at Congress's request, the Copyright Office reviewed the question of digital first sale—which, the Office presciently observed, "entails an exercise of [the] exclusive right [of reproduction] that is not covered by section 109." U.S. Copyright Office, *DMCA Section 104 Report* xviii (2001), https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. After considering comments and testimony from a range of stakeholders, including libraries, the Office recommended against amending the Copyright Act to create such a right. *Id.* at xx. The Office explained that to extend the first-sale doctrine to the digital world would "artificially force[] authors and publishers into a distribution model based on outright sale" and constrain the

---

[10] For example, Congress saw a need to overhaul the music licensing provisions of the Copyright Act to create a new, more efficient process for music streaming services. In 2018 it enacted the Orrin G. Hatch-Bob Goodlatte Music Modernization Act ("MMA"). *See* Pub. L. No. 115-264 (2018). Congress also focused attention on small copyright infringement claims, ultimately resulting in passage of the Copyright Alternative in Small-Claims Enforcement Act ("CASE Act") in 2020. *See* Pub. L. No. 116-260, § 212 (2020).

development of new business models "with a more flexible array of products." *Id.* at 91-92.

Fifteen years later, in 2016, after weighing comments and testimony from the library community (including from Kyle Courtney, one of the authors of the White Paper), book publishers, and others, the U.S. Department of Commerce came to a similar conclusion, recommending against adoption of a digital first sale right. *See* U.S. Department of Commerce Internet Policy Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* 61, 104 (2016), https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.  In so doing, the Task Force observed that online services offer consumers "have the potential to offer advantages not available in the physical world," including "many more options to obtain access to and copies of creative works in a wide variety of formats and on a wide variety of terms and price points." *Id.* at 58.

Section 108, too, has been the subject of study by the Copyright Office and reports to Congress.  In 2016, the Office published a notice of inquiry regarding potential updates to the library exceptions, noting that the Office had led and participated in major discussions on potential changes to section 108 since 2005. U.S. Copyright Office, *Notice of Inquiry*, 81 Fed. Reg. 36594, 36594 (June 7, 2016).  In 2017, the Office issued a followup discussion document, *Section 108 of Title 17*, laying out recommended updates, including the ability to make digital

copies of individual works on request of users under certain conditions.  U.S. Copyright Office, *Section 108 of Title 17*, at 3 (2017), https://www.copyright.gov/policy/section108/discussion-document.pdf.  Contrary to what one might expect, the discussion document explained that "many members of the library and archives communities" were resistant to updating section 108. *Id.* at 1.  It may be for this reason Congress has declined to act in this area for the present.

## B. Only Congress Can Amend the Copyright Act

CDL is not a fair use or an implementation of legitimate first sale rights (or any combination of the two), but a unilateral attempt fundamentally to change copyright law.  This Court should not indulge IA and IA *amici*'s effort to dispense with the legislative process and enact a self-declared exception from the requirements of the Copyright Act.

### 1.  IA and Its Supporters Do Not Speak for Anyone But Themselves

The proponents of CDL openly acknowledge that they do not like publishers' licensing terms and their goal is to avoid paying publishers licensing fees for ebooks.  *See, e.g.*, SPA-44 (citing presentations given by IA to libraries asserting that adopting CDL means "You Don't Have to Buy It Again!" and libraries "will not have to buy the same content over and over") (internal quotations and citations omitted)); IA Br. at 11-12 (expressing dissatisfaction with

licensing terms for ebooks); Br. of *Amici Curiae* Nine Library Organizations and

218 Librarians in Support of Def.-Appellant at 12-16 (same).  But IA and its

supporters are not the only parties with a stake in digital distribution models for

books.  The publishers who invest in new works and authors who write them are

also essential participants in that marketplace.

    As the Supreme Court has emphasized, the aim of copyright is to incentivize

the creation of new works by securing to authors "'a fair return for [their] creative

labor.'"  *Harper & Row, Publishers v. Nation Enters.*, 471 U.S. 539, 558 (1985)

(quoting *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975)).

Significantly, IA does not address the fate of authors within the CDL regime.  The

interests of those whose works it seeks to liberate from copyright are not discussed.

    The sole *amicus* brief in support of IA to consider authors' interests,

submitted by the Authors Alliance, essentially urges that authors should be content

to supply their works to IA for free.  *See* Br. for *Amicus Curiae* Authors Alliance,

Inc. in Support of Appellant ("AA Br.") at 16-20.[11]  Perhaps unsurprisingly, AA is

---

[11] The AA brief takes the position that even though authors will not receive
royalties under CDL, CDL "supports authorship."  *See* AA Br. at 16-17.
According to the AA, authors as a class largely write "to be read."  *Id.* at 16.
Notably, many of AA's members are scholarly authors who do not depend
primarily on income from their writing to sustain themselves.  *See* Authors
Alliance, *About Us*, https://www.authorsalliance.org/about/ (last visited Mar. 20,
2024) ("AA, *About Us*") (AA founding members largely associated with academic
institutions).  In contrast, The Authors Guild, the nation's oldest association of

headed by David Hansen, a co-author of the White Paper, and Brewster Kahle,

IA's founder, sits on its Advisory Board.  *See* White Paper at 1; Authors Alliance,

*About Us*, https://www.authorsalliance.org/about/ (last visited Mar. 20, 2024)

("AA/About Us").

### 2.  It Is Up to Congress to Decide Copyright Policy

The wide-ranging exception sought by IA and its supporters is not a question

for the courts, but Congress.  This is especially the case here, where Congress has

conducted a recent review of the copyright doctrines at issue and declined to act.

As Judge Leval cogently observed in the *ReDigi* case:

> As for whether the economic consequences of adopting ReDigi's
> program are beneficial and further the objectives of copyright, we take
> no position.  Courts are poorly equipped to assess the inevitably
> multifarious economic consequences that would result from such
> changes of law.  So far as we can see, the establishment of ReDigi's
> resale marketplace would benefit some … at the expense of others,
> especially rightsholders ….
>
> ….
>
> If ReDigi and its champions have persuasive arguments in support of
> the change and law they advocate, it is Congress they should
> persuade.

*ReDigi*, 910 F.3d at 664.

---

published authors, believes that authors, like all professionals, should receive fair
payment for their work.  *See* The Authors Guild, *About the Guild*,
https://authorsguild.org/about/ (last visited Mar. 20, 2024); The Authors Guild,
*Authors Guild Principles*, https://authorsguild.org/about/principles/ (last visited
Mar. 20, 2024).

## CONCLUSION

For the foregoing reasons, *amici curiae* Copyright and IP Law Professors respectfully request that the decision below be affirmed.

Dated:  March 22, 2024

Respectfully submitted,

/s/ Jacqueline C. Charlesworth

Jacqueline C. Charlesworth
CHARLESWORTH LAW
15671 Royal Ridge Road
Sherman Oaks, CA  91403
917.432.7343
jacqueline@charlesworthlaw.com

*Counsel for Amici Curiae*
*Professors and Scholars of Copyright and*
*Intellectual Property Law*

# ADDENDUM

## List of *Amici Curiae*[12]

Sandra Aistars
Clinical Professor
Director, Arts and Entertainment Advocacy Clinic
George Mason University Antonin Scalia Law School
Sr. Scholar & Fellow, Copyright Research & Policy
Center for Intellectual Property x Innovation Policy

John F. Duffy
Samuel H. McCoy II Professor of Law
University of Virginia School of Law

Jon M. Garon
Professor of Law and Director, Goodwin Program for Society,
  Technology, and the Law
Nova Southeastern University Shepard Broad College of Law

Joshua Kresh
Interim Executive Director
Center for Intellectual Property x Innovation Policy
George Mason University Antonin Scalia Law School

Philippa Loengard
Lecturer-in-Law
Executive Director
Kernochan Center for Law, Media and the Arts
Columbia Law School

Loren E. Mulraine, J.D.
Professor of Law
Director of Music and Entertainment Law Studies
Belmont University College of Law

---

[12] Institutions are listed for identification purposes only. All signatories are participating in their individual capacity.

Christopher Newman
Associate Professor of Law
George Mason University Antonin Scalia Law School

Seán M. O'Connor
Professor of Law
George Mason University Antonin Scalia Law School
Faculty Advisor & Senior Scholar
Center for Intellectual Property x Innovation Policy

Eric Priest
Professor of Law
University of Oregon School of Law

Zvi S. Rosen
Assistant Professor of Law
Southern Illinois University School of Law

Prof. Mark F. Schultz
Goodyear Tire & Rubber Company Endowed Chair in Intellectual Property Law
Director, Intellectual Property & Technology Law Center
The University of Akron School of Law

Jeff Sedlik
Professor
Art Center College of Design

Bhamati Viswanathan
Faculty Fellow
New England Law | Boston

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5), as modified by Local Rule 29.1, and 32(a)(7)(B)(ii), as modified by Local Rule 32.1(a)(4)(A), because it contains 5,537 words, excluding portions of the brief exempted by Fed. R. App. P. 32(f). The brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman style.

Dated: March 22, 2024

/s/ Jacqueline C. Charlesworth

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and Local Rule 25.1, I hereby certify that on March 22, 2024 I caused the foregoing to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Second Circuit, using the CM/ECF system.  I further certify that to my knowledge all participants in the case are registered CM/ECF users so service on them will be effected through the CM/ECF system.

Dated:  March 22, 2024

/s/ Jacqueline C. Charlesworth