# 23-1260

# United States Court of Appeals

for the

# Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C.,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

– v. –

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR *AMICUS CURIAE* THE COPYRIGHT ALLIANCE IN SUPPORT OF PLAINTIFFS-APPELLEES

NANCY E. WOLFF
ELIZABETH SAFRAN
COWAN, DEBAETS, ABRAHAMS
  & SHEPPARD LLP
*Attorneys for Amicus Curiae*
41 Madison Avenue, 38th Floor
New York, New York 10010
(212) 974-7474

CP COUNSEL PRESS    (800) 4-APPEAL • (328470)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* the Copyright Alliance states that it does not have a parent corporation, and that no publicly held corporation owns 10% or more of *amicus*' stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................C-1

TABLE OF CONTENTS......................................................................................i

TABLE OF AUTHORITIES ............................................................................. iii

INTEREST OF *AMICUS CURIAE*........................................................................1

SUMMARY OF THE ARGUMENT ...................................................................3

ARGUMENT .......................................................................................................7

I.   APPELLANT'S ACTIONS ARE NOT
     SANCTIONED UNDER COPYRIGHT LAW...............................................7

     A.   Appellant's Mass Digitization and
          Distribution of Full Books is Not a Fair Use .......................................7

     B.   Appellant's Actions are Not Allowed
          Under the First-Sale Doctrine...............................................................10

II.  APPELLANT'S ACTIONS, IF ALLOWED, WOULD
     DEVASTATE OTHER CREATIVE INDUSTRIES ...................................12

     A.   Creative Industries Have Undertaken Substantial
          Efforts Towards Digitization and Would Be
          Harmed by Sanctioning Appellant's Actions.......................................13

III. ONLY CONGRESS CAN DECIDE WHETHER AND
     UNDER WHAT CIRCUMSTANCES TO EXPAND
     EXCEPTIONS THAT ALLOW NON-RIGHTSHOLDERS
     TO DIGITIZE AND DISTRIBUTE WORKS ..............................................20

     A.   Congress Alone Has the Authority to Modify
          Section 108's Reproduction Protections ..............................................21

i

B.    Congress Alone Has the Authority to
Expand the First-Sale Doctrine to Permit
Digitizing and Distributing Works .......................................................25

CONCLUSION ..........................................................................................26

CERTIFICATE OF COMPLIANCE .........................................................27

CERTIFICATE OF SERVICE .................................................................28

<u>**TABLE OF AUTHORITIES**</u>

**Cases** **Page(s)**

*A&M Records, Inc. v. Napster, Inc.*,
   284 F.3d 1091 (9th Cir. 2002) ...........................................................14

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
   598 U.S. 508 (2023) ............................................................................8

*Ass'n of Am. Publishers, Inc. v. Frosh*,
   586 F. Supp. 3d 379 (D. Md. 2022) ..................................................25

*Authors Guild, Inc. v. Google, Inc.*,
   804 F.3d 202 (2d Cir. 2015) ...........................................................8–9

*Authors Guild, Inc. v. HathiTrust*,
   755 F.3d 87 (2d Cir. 2014) .............................................................8–9

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994).........................................................................8–9

*Capitol Recs., LLC v. ReDigi, Inc.*,
   910 F.3d 649 (2d Cir. 2018) ..........................................................4, 11

*Close v. Sotheby's Inc.*,
   894 F.3d 1061 (9th Cir. 2018) .........................................................11

*Hachette Book Grp., Inc. v. Internet Archive*,
   664 F. Supp. 3d 370 (S.D.N.Y. 2023) ..........................................7–10

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985)............................................................................6

*McGucken v. Pub Ocean Ltd.*,
   42 F.4th 1149 (9th Cir. 2022) ............................................................8

*Midway Mfg. Co. v. Artic Int'l, Inc.*,
   704 F.2d 1009 (7th Cir. 1983) .........................................................10

**Constitutional Provisions, Statutes, and Rules**

17 U.S.C. § 107 .................................................................7–8

17 U.S.C. § 108 .................................................................21–24

17 U.S.C. § 109(a) ............................................................10

U.S. Const. art. I, § 8, cl. 8..............................................13

**Other Sources**

*2022 | The American Motion Picture And Television Industry Creating Jobs, Trading Around the World*, MPA (Mar. 6, 2024), https://www.motionpictures.org/wp-content/uploads/2024/03/ MPA_Economic_contribution_US_infographic-1.pdf......................................16

*About Spotify*, Spotify, https://newsroom.spotify.com/company-info/ ..................................16

Alicia Wallace, *Covid Hit Nashville Hard. Now the Performing Arts Are Staging a Comeback*, CNN (May 7, 2022), https://www.cnn.com/2022/05/07/economy/ nashville-arts-revival-pandemic/index.html ......................................20

Alison Flood, *Internet Archive Accused of Using Covid-19 as 'An Excuse for Piracy'*, Guardian (Mar. 30, 2020), https://www.theguardian.com/books/2020/mar/30/internet- archive-accused-of-using-covid-19-as-an-excuse-for-piracy ......................20–21

Andrew A. Toole, Ph.D., et al., *Intellectual Property and the U.S. Economy: Third Edition*, USPTO, https://www.uspto.gov/sites/default/files/documents/ uspto-ip-us-economy-third-edition.pdf......................................13–14

Andrew Dalton, *What is a 'Residual,' Anyway? Here's Why Hollywood is on Strike Over Streaming and A.I.*, Fortune (July 19, 2023), https://fortune.com/2023/07/19/what-are-residuals- hollywood-writers-actors-strike-streaming/ ......................................17

*Brief of Screen Actors Guild-American Federation of Television and Radio Artists, et al. as Amici Curiae in Support of Petitioners, American Broad. Cos., Inc. v. Aereo Inc.,*
2014 WL 880972 (U.S. 2014) ............................................................17

Complaint, *UMG Recordings, Inc. v. Internet Archive*,
No. 23-cv-7133 (S.D.N.Y. Aug. 11, 2023)............................................6

*Copyright Industries in the U.S. Economy 2022 Report*, IIPA (Dec. 2022),
https://www.iipa.org/files/uploads/2022/12/
IIPA-Report-2022_Interactive_12-12-2022-1.pdf.................................3

David Newhoff, *Why Internet Archive is in Legal Trouble and Deserves to Be*, The Illusion of More (July 18, 2022),
https://illusionofmore.com/why-internet-archive-
is-in-legal-trouble-and-deserves-to-be/.............................................13

*Engaging With Music 2023*, IFPI (Oct. 2023)
https://www.ifpi.org/wp-content/uploads/2023/12/
IFPI-Engaging-With-Music-2023_full-report.pdf.............................20

Joshua P. Friedlander & Matthew Bass, *RIAA Mid-Year 2023 Revenue Report*, RIAA (Sept. 18, 2023), https://www.riaa.com/wp-content/uploads/2023/09/RIAA-Mid-Year-2023-Revenue-Report.pdf .......14–15

*New Report Illustrates How Modern Record Labels Remade Themselves in the Streaming Era*, Musonomics,
https://musonomics.com/modernlabelreport ....................................15

*Record Companies: Powering the Music Ecosystem*, IFPI,
https://powering-the-music-ecosystem.ifpi.org/................................15

*Residuals*, SAG-AFTRA,
https://www.sagaftra.org/membership-benefits/residuals ..................17

*The Value of a Label*, IFPI Global Music Report 2019,
https://powering-the-music-ecosystem.ifpi.org/download/
GMR_The_Value_of_a_Label.pdf....................................................15

U.S. Copyright Office, DMCA Section 104 Report (2001), available at
https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf ......25

U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the Register of Copyrights (2017), available at https://www.copyright.gov/policy/section108/discussion-document.pdf ....21–24

U.S. Dep't of Com. Internet Pol'y Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* (2016), available at https://www.uspto.gov/sites/default/files/ documents/copyrightwhitepaper.pdf..................................................................25

*Video Games in the 21st Century: The 2024 Economic Impact Report*, ESA, https://www.theesa.com/wp-content/uploads/2024/02/EIR_ESA_2024.pdf ...................................................19

*What Do We Know About 2022 Movie & TV Piracy Trends Worldwide*, Alliance for Creativity and Entertainment, https://www.alliance4creativity.com/wp-content/uploads/ 2023/12/WDWK-2022-worldwide-071223.pdf ................................................18

*What is the Mechanical Licensing Collective (MLC)?*, SongTrust, https://help.songtrust.com/knowledge/ what-is-the-mechanical-licensing-collective-mlc..............................................16

*What We Do*, MPA, https://www.motionpictures.org/what-we-do/safeguarding-creativity/ .......16–18

Pursuant to Federal Rule of Appellate Procedure 29(b), *amicus curiae* the Copyright Alliance respectfully submits this brief in support of plaintiffs-appellees Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC (collectively, "Appellees"). This brief is submitted with consent of all parties.[1]

## INTEREST OF *AMICUS CURIAE*

The Copyright Alliance is dedicated to promoting and protecting the ability of creative professionals to earn a living from their creativity. It is a nonprofit, nonpartisan 501(c)(4) public interest and educational organization and represents the copyright interests of over two million individual creators and over 15,000 industry leading organizations across the entire spectrum of creative industries, including authors, songwriters, musical composers and recording artists, graphic and visual artists, photographers, journalists, documentarians, screen, television and filmmakers, and software developers. The Copyright Alliance's membership encompasses these individual creators and innovators, creative union workers, and small businesses, as well as the organizations and corporations that support and

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no counsel for any party authored this brief in whole or in part, and no party or counsel for any party made a monetary contribution intended to fund the preparation or submission of this brief. Only *amicus curiae* or their counsel made such a monetary contribution that was intended to fund preparing or submitting this brief. Some Copyright Alliance members are, or are affiliates of, Appellees in this matter.

invest in them. The livelihoods of this diverse array of creators and companies depend on the exclusive rights guaranteed by copyright law.

The Copyright Alliance's members rely heavily on copyright law to protect and commercialize their works, which in turn incentivizes the creation of new works and promotes the progress of the arts. The Copyright Alliance and its members have a strong interest in the proper application of copyright law, including with respect to defendant-appellant Internet Archive's ("Appellant") practice of digitizing and distributing entire published books to the public for free, without authorization. While Appellant's infringing activity is already harming existing markets for books, if the practice expands to other copyrighted works, such as music, film, television, and the visual arts, it would extensively harm all creative professionals and undermine the very purpose of copyright.

The Copyright Alliance submits this amicus brief in support of Appellees and to address the broad-reaching legal and practical consequences of Appellant's so-called "Controlled Digital Lending"[2] on creators and owners of copyrighted works. Appellant's activity threatens not only books, the publishing industry, and the

---

[2] While Appellant purports to replace one physical copy with a digital copy under what it calls "Controlled Digital Lending," the lending is not in fact controlled. Appellant admits that it permitted unrestricted distribution of works during the pandemic and is amassing large quantities of books in order to digitize multiple copies of works that are protected by copyright and made commercially available by publishers and authors. *See* Plaintiffs-Appellees' Complaint, *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160, Dkt. 1 at 4–5 (S.D.N.Y. June 1, 2020).

livelihoods of authors and book publishers, but all other types of copyrighted works and creative professionals and industries.[3] Permitting Appellant to scan and distribute large collections of digitized versions of copyrighted works to any user anywhere for free would undermine existing licensing markets and strip creators and rightsholders of their statutory rights to control how they commercialize their works.

The Copyright Alliance also submits this brief to underscore policy issues that support the propriety of Judge Koeltl's correct reading of the law and dictate a rejection of the manufactured expansion of copyright law that Appellant advances in defense of its unauthorized reproduction, display, and distribution of full versions of copyright protected works.

## SUMMARY OF THE ARGUMENT

The Copyright Alliance fully supports the decision of the District Court in finding Appellant's unauthorized wholesale scanning and distribution of copyrighted books does not qualify as a fair use under Section 107 of the Copyright Act and that there is no support for its actions under copyright law. The District Court correctly rejected Appellant's argument that its exploits support the purposes of copyright, emphasizing that Appellant's wholesale scanning of physical works

---

[3] Creative industries employ millions and significantly contribute to the U.S. economy, often outperforming key industrial sectors. *See generally, e.g.*, *Copyright Industries in the U.S. Economy 2022 Report*, IIPA (Dec. 2022), https://www.iipa.org/files/uploads/2022/12/IIPA-Report-2022_Interactive_12-12-2022-1.pdf.

does not constitute fair use because the resulting digitized copies serve the exact same purpose as the works they infringe. The District Court also correctly rejected the distorted argument that the first-sale doctrine under Section 109 of the Copyright Act can be read to support Appellant's position, as analyzed under fair use, by upholding the clear meaning of the doctrine, which does not permit a physical work to be digitized and distributed. *See Capitol Recs., LLC v. ReDigi, Inc.*, 910 F.3d 649, 659–63 (2d Cir. 2018), *cert. denied*, 139 S. Ct. 2760 (2019). The District Court made crystal clear in its holding that Appellant's pursuit of its own policy objectives does not justify its blatant disregard of the plain language of the Act and related caselaw.

Moreover, while Appellant purports to provide the public with content it wants in the format it wants, the District Court correctly noted that the content and format that the public desire are already being provided by Appellees, as evidenced by the thriving market for authorized digital eBooks. This market provides the public access to lawful digital versions of books to license, purchase, or borrow from local libraries. As such, Appellant's exploits amount to a blatant and harmful frontal attack on licensing of copyrighted content under its flawed notion that any entity that casts itself as a "library" should be entitled to make a digital version of any physical book, regardless of the language and legislative history of the copyright law, under the guise of making it easier to access digital versions. The District Court saw through this charade, noting that instead of supporting the goals of copyright, Appellant's

approach, if sustained, would hinder the ability of authors, publishers, and other creators to choose how to commercialize their works.

The District Court rightfully concluded that permitting Appellant to flood the market with unlicensed alternatives and usurp the market for licensed eBooks and other creative works—namely digitally formatted music, film, video games, and visual arts—would destroy incentives to create and distribute new works to the public, jeopardizing entire professional classes of creators. Such creators rely on flourishing licensing markets, which provide a wealth of diverse entertainment and infotainment options, from eBooks and streaming music to films, including documentaries, docuseries, and narrative series within television's resurging Golden Age. The wholesale copying and distribution of copyrighted works is not a fair use but rather constitutes a clear violation of creators' exclusive rights in their creations by those choosing to give away copyrighted works for their own benefit without permission. Nor may Appellant seek to justify its unauthorized actions by turning to the limited preservation rights afforded libraries under Section 108, which only Congress is positioned to expand.

The Copyright Alliance supports affirmance of the District Court's ruling for Summary Judgment in favor of Appellees in all respects. Any other result condones unauthorized activities with far-reaching effects beyond the publishing industry that threaten to damage, if not destroy, entire markets necessary to support the

development of creative works. It may start with books, but could quickly threaten motion pictures, music, video games, and other works that enrich society.[4] We have experienced from our homes over the past few years the vast richness of content that can be enjoyed digitally because of licensing, from operas, concerts, plays, feature films, and documentaries to series, podcasts, and music, in addition to eBooks. Merely considering the music and film industries, each has heavily invested in providing the public with digital content that can be listened to or viewed from any device, anytime, anywhere. The catalog of music and film available in digital format is not limited to works "born digital" but includes works from back catalogs of analog music and film productions that have been carefully digitized and preserved and are now available. Appellant's usurpation of rightsholders' exclusive rights of reproduction and distribution causes harm by eroding existing markets, which expressly contravenes the intent of copyright. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) ("[I]t should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.").

---

[4] Indeed, a coalition of major record labels recently filed a lawsuit against Appellant regarding its blatant infringement of hundreds of thousands of musical recordings via yet another unauthorized wholesale operation to willfully reproduce, digitize, and distribute such works. Complaint, *UMG Recordings, Inc. v. Internet Archive*, No. 23-cv-7133 (S.D.N.Y. Aug. 11, 2023).

Today, only a few libraries may be collaborating with Appellant, but if the Court permits its activities, it is feasible that the country's entire network of libraries could send Appellant their physical books and other collected works, permitting it to "lend" for free thousands of copies of the bestsellers from every artistic industry—books, music, film, and more—flooding the market with unauthorized competing substitutes for lawfully made and licensed digital works. A ruling permitting Appellant's unchecked actions would have devastating, far-reaching effects, which this Court must not allow.

## ARGUMENT

### I. APPELLANT'S ACTIONS ARE NOT SANCTIONED UNDER COPYRIGHT LAW

Appellant's copying and distribution of digitized protected works runs afoul of the protections afforded by the Copyright Act and cannot be supported by any of the Act's lawful exceptions, including fair use and the first-sale doctrine.

#### A. Appellant's Mass Digitization and Distribution of Full Books is Not a Fair Use.

We agree with the District Court that Appellant's mass scanning and distribution of digital versions of physical books falls well outside the fair use defense to copyright infringement. As stressed throughout Judge Koeltl's thorough analysis, the digital copying of physical books and their unauthorized distribution by Appellant does not constitute a fair use under Section 107, failing at every fair

use factor. *See* 17 U.S.C. § 107; *Hachette Book Grp., Inc. v. Internet Archive*, 664 F. Supp. 3d 370, 390–91 (S.D.N.Y. 2023). Critically, the "purpose and character" of Appellant's use is identical to the purpose of the digital copies of books lawfully created by publishers on behalf of authors that are already available in the marketplace, meaning that the first fair use factor favors Appellees. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578–79 (1994); *see also Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 545–46 (2023) (noting that the use of a work is the benchmark for transformativeness and that "the problem of substitution—copyright's bête noire" often arises from using an original work "to achieve a purpose that is the same as, or highly similar to" the original). The fact that Appellant may be efficient at wholesale scanning does not give its copies new purpose or character, nor does providing a work for free that is already available to libraries for licensing or legal acquisition. *See Warhol*, 598 U.S. at 534–36, 540–41 (finding artwork derived from copyrighted photograph not transformative even where it added new expression because, as used in a magazine, the purpose of both works was the same); *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1158–61 (9th Cir. 2022) (rejecting fair use defense where photos were used for exactly the same purpose for which they were lawfully licensed to other users). As emphasized by the District Court, the present matter contrasts with cases such as *Authors Guild v. Google, Inc.* and *Authors Guild, Inc. v. HathiTrust*, in which digitization did qualify

as fair use because it gave the works a new purpose or character,[5] as here, Appellant simply copies and distributes works in digital format, imbuing no new purpose or character. *Hachette*, 664 F. Supp. 3d at 381–83.

Moreover, Appellant's actions create significant market harm under the fourth fair use factor, which considers "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell*, 510 U.S. at 590. As Appellant unlawfully copies and distributes rightsholders' works, it undercuts rightsholders' own ability to choose whether and how to distribute their works in digital formats. As the District Court correctly noted, this usurpation would in turn directly "impede[] the purpose of copyright, which is to incentivize new creative works," for, without the ability to profit from their works, authors and publishers would stop investing in and creating them. *Hachette*, 664 F. Supp. 3d at 388 (internal quotations omitted). By recognizing Appellant's unauthorized scanning for the exploitative practice that it is, the District Court's holding aligns with the overall purpose of copyright, recognizing the far-reaching harm to authors' creativity and the markets for their works.

---

[5] *Google, Inc.* held that Google's mass digitization of copyrighted works qualified as fair use where it provided a transformative search function and snippet display that augmented public knowledge about the works without creating a substantial substitute for them. 804 F.3d 202, 207, 225 (2d Cir. 2015). Meanwhile, *HathiTrust*, found that mass digitization of more than 20 million copyrighted works for purposes of full-text searching and access for individuals with print disabilities was fair use. 755 F.3d 87, 101 (2d Cir. 2014).

Further, because thriving digital markets already exist for books and other copyrighted works, Appellant's actions, if sustained, would also present a threat to the emergence of new technologies, which Congress sought to avoid. Congress specifically designed the Copyright Act to anticipate and grow with emerging technology and formats. *See, e.g.*, *Midway Mfg. Co. v. Artic Int'l, Inc.*, 704 F.2d 1009, 1011 (7th Cir. 1983) ("[T]he legislative history of the Copyright Act of 1976 suggests that 'Congress probably wanted the courts to interpret the definitional provisions of the new act flexibly, so that it would cover new technologies as they appeared, rather than to interpret those provisions narrowly and so force Congress periodically to update the act.'"). It would contravene Congressional intent to upend the foothold of already prospering multimedia digital markets, especially where Congress intended the Act to accommodate their growth.

Whether turning to the black letter law or Congressional intent, it is clear that Appellant's actions find no support under the fair use doctrine.

## B. Appellant's Actions are Not Allowed Under the First-Sale Doctrine.

As the District Court affirmed, Appellant cannot invoke the first-sale doctrine to support copying and reproducing digitized versions of protected works. *Hachette*, 664 F. Supp. 3d at 385. The first-sale doctrine applies only to the disposition of a lawfully owned copy of a work, *see* 17 U.S.C. § 109(a), and does not protect reproductions. Specifically, the doctrine allows the owner of an authorized copy to

sell that copy, without the authority of the copyright owner, but does not permit the owner to make a digital reproduction of a physical copy for purposes of further distribution or resale. *See ReDigi, Inc.*, 910 F.3d at 657 (determining that mass resale of digital music files created a reproduction by purchaser's computer or storage device, against the first-sale doctrine). In other words, format shifting expressly exceeds the limits of the first-sale doctrine.

Nor should the Court expand the first-sale doctrine to permit the mass digitization and distribution of protected works by those who own a particular copy of the work, namely Appellant's approach. Doing so would upend the doctrine's purpose, which aims to protect owners' physical property rights, not permit owners to reproduce entire protected works without permission. *See id.* at 664; *see also Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1070 (9th Cir. 2018) (noting that the first-sale doctrine serves purposes under the common law's "refusal to permit restraints on the alienation of chattels" and to "free[] courts from the administrative burden of trying to enforce restrictions upon difficult-to-trace, readily movable goods"). Reproduction rights remain exclusively within the province of rightsholders under Section 106. Expanding the breadth of the first-sale doctrine to excuse any party in possession of a copyrighted work that copies and redistributes that work would lead to absurd results, flooding the market with copies and drastically disincentivizing authors from creating new works.

## II. APPELLANT'S ACTIONS, IF ALLOWED, WOULD DEVASTATE OTHER CREATIVE INDUSTRIES

Although this case concerns only the 127 books raised by Appellees, if the Court were to accept Appellant's disingenuous and irresponsible theory of copyright law, the harmful—and potentially disastrous—ramifications would impact a broad swath of the Copyright Alliance's membership. There are over 9,000 library systems in the United States, *see* Defendant-Appellant's Rule 56.1 Statement, *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (JGK), Dkt. No. 98 at ¶ 93 (S.D.N.Y. July 7, 2022) ("Def-App's Rule 56.1 Statement"), but most so far have refrained from joining Appellant's project because of legitimate "copyright concerns." *See* Plaintiffs-Appellees' Rule 56.1 Statement, *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160 (JGK), Dkt. No. 113 at ¶ 297 (S.D.N.Y. July 8, 2022). A ruling from this Court that removed those "concerns" likely would open the proverbial floodgates. Hundreds, if not thousands, of those systems—each presumably comprised of many individual branches—would be unencumbered to make available to Appellant their collections, not just of books, but also of music, films, video games, photographic prints, and other copyrighted works. Given Appellant's practice of calculating its reproduction and distribution of copies by the number of its library members, *see* Def-App's Rule 56.1 Statement, ¶¶ 52–53, the prospect of an exponential growth in free copies of copyrighted works is manifest. Even with its current limited library participation, Appellant admits to already

having had 888 copies of a title on loan concurrently, *id.* at ¶¶ 92, 95. As one commentator has observed: "If IA 'partners' with enough libraries, it would then justify mass distribution of the ebooks it makes and, apparently, without any control whatsoever. . . . After [IA] swallows the entire commercial market for ebooks, music, motion pictures, video games, etc. would quickly follow." David Newhoff, *Why Internet Archive is in Legal Trouble and Deserves to Be*, The Illusion of More (July 18, 2022), https://illusionofmore.com/why-internet-archive-is-in-legal-trouble-and-deserves-to-be/. Appellant must not be allowed to proceed on its intended course, leaving entire creative industries' livelihoods hanging in the balance.

## A. Creative Industries Have Undertaken Substantial Efforts Towards Digitization and Would Be Harmed by Sanctioning Appellant's Actions.

The creative industries' adaptation to changing technologies and platforms, incentivized by the protections of the Copyright Act, has sought to promote the "useful Arts" as the Framers intended in the Constitution. *See* U.S. Const. art. I, § 8, cl. 8. Allowing Appellant to misappropriate protected works would risk significant damage to those industries, which according to the U.S. Patent and Trademark Office accounts for at least 63 million U.S. jobs, or 44 percent of all U.S. employment. Andrew A. Toole, Ph.D., et al., *Intellectual Property and the U.S. Economy: Third Edition*, USPTO, at iii https://www.uspto.gov/sites/default/files/documents/uspto-ip-us-economy-third-

edition.pdf [hereinafter Toole, *Intellectual Property*].[6]

The music industry, for example, adopted its own robust digitization practice following the harm incurred during the advent of the digital era. It was one of the first intellectual property sectors to suffer the onslaught of digital freeloaders, as Napster and other internet pirates appropriated wholesale the catalogues of record companies and music publishers, harming not just labels and publishers but the thousands of working songwriters and composers that rely on performance and mechanical royalties from digital content services. Internet piracy deprived all of them a return on their investments in creating, producing, marketing, and distributing music, and denied them just compensation for their creative endeavors. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002).

Beginning in 2015, the industry began to reverse the downtrend in its revenues, however, by leaning into digitization, fueled largely by growth in paid subscription and on-demand streaming. In the first half of 2023, paid subscriptions and on-demand streaming (collectively, $7.0 billion) accounted for 84 percent of all revenues generated by music sales. *See* Joshua P. Friedlander & Matthew Bass, *RIAA Mid-Year 2023 Revenue Report*, RIAA (Sept. 18, 2023),

---

[6] Such industries are also indirectly supported by an additional 15.5 million jobs, an addition of 11 percent of overall employment. Toole, *Intellectual Property*, at iii. Moreover, U.S. industries that intensively use intellectual property accounted for 41 percent of domestic output. *Id.*

https://www.riaa.com/wp-content/uploads/2023/09/RIAA-Mid-Year-2023-Revenue-Report.pdf. For recording artists, as well as music publishers, songwriters, and composers who increasingly rely on mechanical and performance royalties from digital content services rather than physical sales, legitimately licensing these services, including to libraries, constitutes a significant part of their businesses and livelihoods.[7]

These increased revenues enable the industry to invest substantial resources (to wit, $5.8 billion) into developing and marketing artists and repertoire.[8] This encourages new artists to enter the market and create music, benefiting consumers who have embraced these new digital platforms. Record labels have partnered with streaming services like Spotify, Apple Music, and Amazon to provide easy access to any music a consumer might want.[9] Consumers may choose from dozens of services offering vast recording catalogues, as these services pay license fees to the

---

[7] Artists are remunerated—and incentivized to create—through contractual and statutory arrangements, including traditional royalty deals, profit-sharing, and licensing configurations.

[8] *See Record Companies: Powering the Music Ecosystem*, IFPI, https://powering-the-music-ecosystem.ifpi.org/ (last visited Mar. 22, 2024); *The Value of a Label*, IFPI Global Music Report 2019, https://powering-the-music-ecosystem.ifpi.org/download/GMR_The_Value_of_a_Label.pdf (last visited Mar. 22, 2024).

[9] "Record labels have evolved to become music-based entertainment companies, focused on engaging fans with a continuous stream of social, 'snackable' music-based content." *New Report Illustrates How Modern Record Labels Remade Themselves in the Streaming Era*, Musonomics, https://musonomics.com/modernlabelreport (last visited Mar. 22, 2024).

record companies and music publishers, which then pay the songwriters and artists.[10] Without this licensing model, musicians would have no financial incentive or support to continue their craft, and would face serious disincentivizes to creating new music for their fans.

The motion-picture industry is another thriving industry contributing significantly to the economy. The Motion Picture Association ("MPA") estimates that film production employs 2.74 million people nationwide, at over $242 billion dollars in annual wages. *2022 | The American Motion Picture And Television Industry Creating Jobs, Trading Around the World*, MPA (Mar. 6, 2024), https://www.motionpictures.org/wp-content/uploads/2024/03/MPA_Economic_ contribution_US_infographic-1.pdf. The industry also makes large contributions to local economies and accounts for $17 billion in export revenue alone. *Id.*

Permitting libraries to digitize and distribute movie archives to the public for free would significantly harm this vibrant economy. As with books and music, copyright and licensing are linchpins for the industry and essential to "protecting the fundamental rights of creators—and bolstering the policies that protect them—so that [the] industry can continue to ignite the passions of fans everywhere." *What We*

---

[10] *See, e.g.*, *What is the Mechanical Licensing Collective (MLC)?*, SongTrust, https://help.songtrust.com/knowledge/what-is-the-mechanical-licensing-collective-mlc (last visited Mar. 22, 2024); *About Spotify*, Spotify, https://newsroom.spotify.com/company-info/ (Spotify offers over 100 million tracks) (last visited Mar. 22, 2024).

*Do*, MPA, https://www.motionpictures.org/what-we-do/safeguarding-creativity/ (last visited Mar. 22, 2024) [hereinafter *MPA: What We Do*]. A healthy, vibrant industry is critical not just for studios, but for creative artists: the actors, writers, and many others essential to filmmaking. For example, the SAG-AFTRA and Writers Guild of America agreements with film studios provide for residual payments to artists from films' retransmission and redistribution, including online. *See, e.g.*, *Residuals*, SAG-AFTRA, https://www.sagaftra.org/membership-benefits/residuals (last visited Mar. 22, 2024); *see also* Andrew Dalton, *What is a 'Residual,' Anyway? Here's Why Hollywood is on Strike Over Streaming and A.I.*, Fortune (July 19, 2023), https://fortune.com/2023/07/19/what-are-residuals-hollywood-writers-actors-strike-streaming/ [hereinafter "*What is a 'Residual'*"]. Actors and writers note that residuals are "how we live," *What is a 'Residual'*, and provide a "crucial source of income that can often be the lifeblood of the working actor and writer, particularly in difficult economic times and the periods between projects." *Brief of Screen Actors Guild-American Federation of Television and Radio Artists, et al. as Amici Curiae in Support of Petitioners, American Broad. Cos., Inc. v. Aereo Inc.,* 2014 WL 880972, at *31 (U.S. 2014). The lack of the steady income provided by residuals can lead to the loss of health insurance for such professionals, who must earn an annual minimum to qualify for union coverage. *See What is a 'Residual'*. The unauthorized distribution of films would thereby deprive individuals of this critical income stream.

Nor is the film industry immune to intellectual property theft. In 2022, there were approximately 192 billion visits to piracy sites worldwide, with 18.3 billion downloads of pirated films, TV, and video-on-demand; the estimated lost revenue to the U.S. economy each year due to this piracy totaled approximately $30 billion. *What Do We Know About 2022 Movie & TV Piracy Trends Worldwide*, Alliance for Creativity and Entertainment, https://www.alliance4creativity.com/wp-content/uploads/2023/12/WDWK-2022-worldwide-071223.pdf. Meanwhile, pirate website and streaming apps raked in an estimated $1.34 billion in annual revenues through advertising. *Id.* To combat piracy, the industry undertakes ongoing copyright enforcement.[11] Appellant's theory of fair use that permits distributing unauthorized digital copies of works to users would cripple these enforcement efforts by providing pirates with a colorable defense for their thievery. Moreover, it would likely enable online piracy, providing a mine of readily accessible digital copies for the taking.

Judicially expanding the fair use exception to permit unauthorized wholesale copying and distribution of works from an analog format to digital would dramatically and adversely impact all creative industries. The video game industry is another example of an economic powerhouse—estimated to generate more than

---

[11] "To reduce piracy" the "industry's comprehensive approach to protecting both creators and audiences includes . . . enforcement actions" under the Copyright Act. *MPA: What We Do*.

$101 billion in total economic impacts and contributing nearly $66 billion to the U.S. GDP in 2023—that employs many creative individuals.[12] Video games meld technology with visual arts, creativity, storytelling, and entertainment culture, offering new avenues for technological experimentation and innovation. Weakening copyright protection to allow distribution of so-called fair use digital copies of games would displace sales and discourage creative and innovative activities.

Music, film, television, and video gaming are all highly creative industries that rely on copyright to protect their huge investments in developing content and to safeguard the incomes of all who depend on a legitimate market operating under transparent rules. Appellant's distorted theory of copyright law would upend the market's rationality by allowing the distribution of untold numbers of unauthorized digital copies to compete with authorized ones offered for sale or license. These industries' experiences with piracy makes clear that a ruling in favor of Appellant and its notion of "free" competition will devastate revenues and undermine the incentive to create that underlies copyright, as copyright owners could no longer look to the Act for protection. Extrapolating from the music industry's experience of the early 2000s for example, it is not unreasonable to predict that revenues once

---

[12] *Video Games in the 21st Century: The 2024 Economic Impact Report*, ESA at 4, https://www.theesa.com/wp-content/uploads/2024/02/EIR_ESA_2024.pdf (last visited Mar. 22, 2024). The industry directly employs 104,080, while "creat[ing] and support[ing] more than 350,000 total jobs across the U.S. economy." *Id.* at 5, 8.

again would drain away from these industries by free "borrowings" from Appellant's "library." Artists would have less incentive to create, leaving these industries ill-equipped to make the investments needed to develop, market, and distribute artists' creations and consequently depriving the individuals who contribute to those creations of their livelihood.[13]

## III. ONLY CONGRESS CAN DECIDE WHETHER AND UNDER WHAT CIRCUMSTANCES TO EXPAND EXCEPTIONS THAT ALLOW NON-RIGHTSHOLDERS TO DIGITIZE AND DISTRIBUTE WORKS

Appellant scans copyrighted works at an enterprise level. Worse, it attempts to justify its policy of aggressive scanning and distribution of full-print works in knowing contravention of the Copyright Act, using the recent pandemic to frame its digitization of works as a public good.[14] But Appellant ignores the existing efforts

---

[13] An annual report by the International Federation of the Phonographic Industry notes that 29 percent of music consumers turn to copyright infringement to access music online, while 26 percent use stream-ripping sites. *Engaging With Music 2023*, IFPI, (Oct. 2023), https://www.ifpi.org/wp-content/uploads/2023/12/IFPI-Engaging-With-Music-2023_full-report.pdf. It is highly likely that a shift to free distribution from Appellant would disincentivize users from paying for streaming services, such as Spotify Premium or Apple Music, as would be true for motion picture and television streaming.

[14] Appellant's "public good" argument ignores the fact that its COVID-19 practices hurt creators, who were already incredibly hard hit by the pandemic. *See, e.g.*, Alicia Wallace, *Covid Hit Nashville Hard. Now the Performing Arts Are Staging a Comeback*, CNN (May 7, 2022), https://www.cnn.com/2022/05/07/economy/nashville-arts-revival-pandemic/index.html (noting that the U.S. performing arts industry lost more than half of its jobs since March 2020 in big and small city centers alike, with no swift rebound); *see also* Alison Flood, *Internet Archive Accused of Using Covid-19 as 'An Excuse*

of publishers to provide access to many of the same published books in digital format and disregards the harm to creators that results from its actions. *See* Defendant-Appellant's Mem. of Law in Supp. of Mot. for Summ. J., *Hachette Book Grp., Inc. v. Internet Archive*, No. 20-cv-4160, Dkt. 99 at 8–11 (S.D.N.Y. July 7, 2022) ("Def-App's. Mot."). While Appellant attempts to rewrite the law though its misguided lending theory, only Congress can determine whether any such change is necessary.

## A. Congress Alone Has the Authority to Modify Section 108's Reproduction Protections.

Only Congress may expand the exceptions for libraries and archives under Section 108. Resting the decision with Congress, not the courts or any one individual or company, is both by design and crucial, considering that Congress is positioned to undertake the significant research, review, and notice and comment periods that attend statutory changes. Appellant is not a legislative body and cannot simply make its own rules. Moreover, it lacks Congress' incentive to consider the interests of all stakeholders, libraries, and creators, and to undertake precaution to avoid harming existing markets for digital work.[15]

_____

*for Piracy'*, Guardian (Mar. 30, 2020), https://www.theguardian.com/books/2020/mar/30/internet-archive-accused-of-using-covid-19-as-an-excuse-for-piracy. Moreover, with the cessation of pandemic-era shutdowns, Appellant has even less purported justification for its wholesale enterprise.

[15] Section 108 in its current form recognizes the importance of controlling libraries' and archives' making and distributing copies of works so that they do not interfere

Congress, the Library of Congress ("LOC"), and the Copyright Office have long studied balanced Section 108 reforms.[16] All three recognize that the digital era presents new opportunities and challenges, involving balancing the rights of creators with the needs of users. *See generally* Discussion Report. Beginning in 2005, the Copyright Office and LOC initiated an independent committee of distinguished and experienced librarians, copyright owners, archivists, academics, and other experts to

---

with commercial markets. Moreover, it does not provide exceptions based on a library's efficient scanning abilities nor allow distribution of entire works on a mass scale. For example, Section 108(c) permits libraries and archives to make three copies of a work if an existing copy is "damaged, deteriorating, lost or stolen" or if "the existing format in which the work is stored has become obsolete," but even then, only if further conditions are met. 17 U.S.C. § 108. These parameters require the institution to undertake "reasonable effort[s]" to determine that "an unused replacement cannot be obtained at a fair price" and provide assurance that they will not make the digital reproduction available to the public outside their premises. *Id.* Additionally, a format is only deemed "obsolete" if the machine or device necessary to perceive the work "is no longer manufactured or is no longer reasonably available in the commercial marketplace." *Id.*; *see also* U.S. Copyright Office, Section 108 of Title 17: A Discussion Document of the Register of Copyrights 28 (2017), available at https://www.copyright.gov/policy/ section108/discussion-document.pdf ("[T]here is insufficient need for libraries or archives to make preservation copies of published or publicly disseminated copyrighted works where there is no evidence of any significant risk of loss, such as for works readily available on the market") [hereinafter "Discussion Report"].

[16] The Copyright Act allows qualified libraries that meet Section 108's requirements to reproduce and distribute works without a rightsholder's permission under narrowly tailored conditions (i.e., to replace a work that is damaged, destroyed, lost, stolen, or unusable in the existing format), and only when there is no indirect commercial advantage or interference with functional markets. 17 U.S.C. § 108. Appellant is not a qualified library under these parameters, nor can it be considered a library in the first instance.

examine Section 108 in light of digital technologies and "provide findings and recommendations on how to revise the copyright law in order to ensure an appropriate balance among the interests of creators and other copyright holders, libraries and archives in a manner that best serves the national interest." *Id.* at 9–10. Its findings culminated in a Section 108 Report published in 2008, which issued recommendations to Congress for amendments to the current Act that maintained the sought-after balance between rightsholders, libraries, and the public. *Id.* at 10. In 2017, the Register of Copyrights issued its Discussion Report, with recommendations and model statutory language to encompass preservation in a digital era while maintaining restrictions on mass digitization to protect rightsholders and, particularly, encourage thriving markets. *See generally* Discussion Report.

The Discussion Report acknowledged various stakeholders' desire to expand Section 108 to accommodate the public's access to libraries' or archives' wide-ranging collections but recommended doing so in a manner respecting authors' rights. *Id*. at 23. The Report clarified that for a work to be considered "disseminated to the public," dissemination must be authorized by the author or rightsholder. *Id.* at 24.

In the Copyright Office's view, a carefully revised Section 108 would provide stabler ground upon which to base the vitally important work of digital archiving and access for scholars and future generations than reliance on fair use, which

necessarily requires a case-by-case approach.[17] The Discussion Report stressed that the time was ripe to engage in Section 108 reform, but nonetheless, there has been no reform to date. Meanwhile, Appellant has chosen to circumvent Congress, the LOC, and the Copyright Office and instead taken matters into its own hands by creating out of whole cloth a legal fiction they refer to as "Controlled Digital Lending." *See* Def-App's. Mot. at 16. However, Section 108 does not provide exceptions based on the efficiency of the library's scanning abilities, nor does it allow the distribution of entire works on a mass scale.

However, the various competing interests surrounding libraries' and archives' digitization rights require Congressional oversight in order to achieve a balanced result. While Section 108 addresses user requests for copies of works, it expressly balances such requests with the rights of the copyright holders and the need to prevent infringement. Section 108 recognizes the importance of controlling libraries' and archives' making and distributing copies of works so that they do not interfere with commercial markets.

---

[17] *Id.* at 11, 13–14. Prior to hearing witness testimony, Judiciary Committee Chairman Bob Goodlatte noted that "[r]ecently some have suggested that instead of updating section 108 for the digital age, preservation activities should be covered by the fair use provisions of section 107. While it is probably true that there are clear-cut cases in which fair use would apply to preservation activities, fair use is not always easy to determine, even to those with large legal budgets. Those with smaller legal budgets or a simple desire to focus their limited resources on preservation may prefer to have better statutory guidance than exists today." *Id.* at 11.

**B. Congress Alone Has the Authority to Expand the First-Sale Doctrine to Permit Digitizing and Distributing Works.**

Similarly, only Congress has the authority to expand the first-sale doctrine beyond its current exclusive application to physical works. *See, e.g.*, *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 398 (D. Md. 2022) (stating that only Congress could expand the first-sale doctrine to digital copies, not a court or state).

It is clear from the text and history of the Copyright Act that the balance of rights and exceptions surrounding digitization of copyrighted works is to be decided by Congress alone. Agencies, such as the Copyright Office and the Department of Commerce's Internet Policy Task Force, have cautioned Congress not to expand the first-sale doctrine to digital transmission because of the risk of increased infringement, as well as risks to creative industries' primary markets.[18]

Striking the balance between the critical functions of libraries and the importance of preserving the exclusive rights of copyright holders, however, is squarely in the province of Congress and not the courts, and cannot be left in the

---

[18] The Copyright Office recommended against expanding the first-sale doctrine to digital transmissions in part because "[t]he risk that expansion of section 109 [would] lead to increased digital infringement weigh[ed] heavily against such an expansion." U.S. Copyright Office, DMCA Section 104 Report 99 (2001), available at https://www.copyright.gov/reports/studies/dmca/sec-104-report-vol-1.pdf. In 2016, the Department of Commerce's Internet Policy Task Force likewise recommended against expansion of the first sale doctrine to digital transmissions. Dep't of Com. Internet Pol'y Task Force, *White Paper on Remixes, First Sale, and Statutory Damages* (2016) at 58, available at https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf.

hands of one entity. Appellant cannot determine unilaterally the format and distribution method of a copyright owner's work without the owner's authority and consent.

## <u>CONCLUSION</u>

For the reasons set forth above, the Copyright Alliance, as *amicus curiae*, respectfully requests that the Court uphold the decision of the District Court and deny Appellant's appeal.

Dated: March 22, 2024    COWAN, DEBAETS, ABRAHAMS &
            SHEPPARD LLP

         /s/ Nancy E. Wolff
         Nancy E. Wolff
         Elizabeth Safran
         COWAN DEBAETS ABRAHAMS &
         SHEPPARD LLP
         41 Madison Avenue, 38th Floor
         New York, New York 10010
         Tel.: (212) 974-7474
         Fax: (212) 974-8474
         nwolff@cdas.com
         esafran@cdas.com

         *Attorneys for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Fed. R. App. P. 32(g)(1) and Fed. R. App. P. 29(a)(4)(G) that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7) because it contains 6,265 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(f), as counted by Microsoft® Word for Windows (Version 2402), the word processing software used to prepare this brief.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft® Word for Windows (Version 2402) in in a proportionally spaced typeface, 14-point Times New Roman font.

Dated March 22, 2024

/s/ Nancy E. Wolff
Nancy E. Wolff

Attorneys for *Amicus Curiae*

# CERTIFICATE OF SERVICE

I, Nancy E. Wolff, hereby certify that on March 22, 2024, a true and correct complete copy of the foregoing Brief of Amicus Curiae The Copyright Alliance in Support of Plaintiffs-Appellees Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC was timely filed in accordance with FRAP 25(a)(2)(D) and served on all counsel of record via the Court's CM/ECF service pursuant to Local Rule 25.1(h).

/s/ Nancy E. Wolff
Nancy E. Wolff