# 23-1260-cv

## United States Court of Appeals

*for the*

## Second Circuit

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS L.L.C., JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

— v. —

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR *AMICI CURIAE* THE AUTHORS GUILD, INC., AMERICAN PHOTOGRAPHIC ARTISTS, THE AMERICAN SOCIETY FOR COLLECTIVE RIGHTS LICENSING, THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, THE ASSOCIATION OF AMERICAN LITERARY AGENTS, THE CANADIAN AUTHORS ASSOCIATION, THE DRAMATISTS GUILD OF AMERICA, EUROPEAN VISUAL ARTISTS, THE EUROPEAN WRITERS' COUNCIL – FÉDÉRATION DES ASSOCIATIONS EUROPÉENNES D'ECRIVAINS, THE INTERNATIONAL AUTHORS FORUM, THE NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, THE NATIONAL WRITERS UNION, THE NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION, ROMANCE WRITERS OF AMERICA, SISTERS IN CRIME, THE SOCIETY OF AUTHORS, AND THE WRITERS' UNION OF CANADA IN SUPPORT OF APPELLEES**

ROBERT CLARIDA
REITLER KAILAS & ROSENBLATT LLP
*Attorneys for Amici Curiae*
885 Third Avenue, 20th Floor
New York, New York 10022
(212) 209-3050

CP COUNSEL PRESS     (800) 4-APPEAL • (328514)

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, inclusive,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* THE AUTHORS GUILD, INC., AMERICAN PHOTOGRAPHIC ARTISTS, THE AMERICAN SOCIETY FOR COLLECTIVE RIGHTS LICENSING, THE AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, THE ASSOCIATION OF AMERICAN LITERARY AGENTS, THE CANADIAN AUTHORS ASSOCIATION, THE DRAMATISTS GUILD OF AMERICA, EUROPEAN VISUAL ARTISTS, THE EUROPEAN WRITERS' COUNCIL – FÉDÉRATION DES ASSOCIATIONS EUROPÉENNES D'ECRIVAINS, THE INTERNATIONAL AUTHORS FORUM, THE NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, THE NATIONAL WRITERS UNION, THE NORTH AMERICAN NATURE PHOTOGRAPHY ASSOCIATION, ROMANCE WRITERS OF AMERICA, SISTERS IN CRIME, THE SOCIETY OF AUTHORS, and THE WRITERS' UNION OF CANADA each state that they have no parent corporation and that no publicly held corporation has an ownership stake of 10% or more any of the amici curiae entities or any of their respective affiliated entities.

Dated: March 22, 2024        */s/ Robert W. Clarida*
                             *Counsel of Record*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................................. 2

SUMMARY OF ARGUMENT ............................................................................ 2

ARGUMENT ................................................................................................. 6

I.   Open Library Is Not Fair Use ......................................................... 6

    A.   The First Factor Weighs Strongly Against Fair Use Because Open Library's CDL Practices Are Not Transformative and Are Commercial .................................... 6

    B.   The Fourth Factor Weighs Strongly Against Fair Use Because Open Library's CDL Practices Are Certain to Cause Significant Harm to Authors' Incomes. ........................................................... 12

       1.   Open Library Will Decimate the Library Ebook Licensing and Consumer Ebook Markets From Which *Amici*'s Members Derive A Significant Share of Their Incomes. ................................... 14

       2.   The Court Below Correctly Considered the Harm to the Value of the Works if Open Library's CDL Practices Were to Become Widespread and Unrestricted. ...................................................... 15

       3.   Open Library Directly Harms the Market for Back In Print Works and Adversely Impacts Authors' Ability to Reuse Works .................................. 20

          i.   Affirmance Is Necessary to Protect Rights Reversion and the Back In Print Market. ........................... 24

          ii.   Author Income from Back in Print Books and Reuses Is Significant. ..................................... 26

       4.   Open Library Will Deprive Copyright Owners of Royalties Paid For Lending By Non-U.S. Libraries Under the Public Lending Right. ...................... 29

CONCLUSION ...................................................................................................31

APPENDIX .........................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*American Geophysical Union v. Texaco, Inc.*
  60 F.3d 913 (2d Cir. 1994) ...............................................................31

*Andy Warhol Foundation for the Visual Arts v. Goldsmith*,
  598 U.S. 508 (2023) ...................................................... 4, 6, 8

*Authors Guild v. Google, Inc.*,
  804 F.3 202 (2d Cir. 2015) ............................................. 3, 6, 8

*Authors Guild v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) ..............................................3, 6

*Authors Guild, Inc. v. Google,*
  755 F.3d 87 (2d Cir. 2014) ...............................................12

*BMG Music Ent. v. Tenenbaum*,
  672 F. Supp. 2d 217 (D. Mass. 2009)...............................14

*Campbell v. Acuff-Rose Music*,
  510 U.S. 569 (1994) ..........................................................16

*Capitol Records v. ReDigi, Inc.*,
  910 F.3d 649 (2d Cir. 2018) .............................. 6, 7, 10, 11

*Disney Enters. v. VidAngel*,
  869 F.3d 848 (9th Cir. 2017) ..............................................7

*Hachette Book Group, Inc. v. Internet Archive*,
  664 F. Supp. 3d 370 at 388 (S.D.N.Y. 2023). .......................... *passim*

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ..........................................................12

*New York Times Co. v. Tasini*,
  533 U.S. 48 (2001) ...............................................................9

**STATUTES**

17 U.S.C. § 106 ..............................................................................................3

17 U.S.C. §107 ...........................................................................................6, 7

17 U.S.C. §109 .........................................................................................3, 10

17 U.S.C. § 201 ..............................................................................................9

**OTHER AUTHORITIES**

Art. I, Sec. 8 of the Constitution ...............................................................3

*Authors Guild Members Show Importance of Backlist and Back-in-Print Book Sales*, THE AUTHORS GUILD (Mar. 22, 2024), https://authorsguild.org/news/ag-members-show-importance-of-backlist-and-back-in-print-sales/. .......................28

*Authors Guild Survey Shows Drastic 42 Percent Decline in Authors Earnings in Last Decade*, THE AUTHORS GUILD (Jan. 5, 2019), https://www.authorsguild.org/industry-advocacy/authors-guild-survey-shows-drastic-42-percent-decline-in-authors-earnings-in-last-decade/. .........................27

David Hansen & Kyle Courtney, *White Paper on Controlled Digital Lending of Library Books,* https://controlleddigitallending.org/whitepaper (last visited Aug. 10, 2022) ...............................................................................................7

Elizabeth A. Harris, *Decades Old? No Problem: Publisher Makes a Bet on Aging Books*, N.Y. TIMES (May 25, 2023) https://www.nytimes.com/2023/05/24/books/old-books-out-of-print-open-road.html. ................................................................................................22

IBPA, *Release: In New Guide, Publishers Association Defines 8 Types of Publishers and Business Models* – INDEP. BOOK PUBLISHERS ASS'N (Mar. 18, 2024), https://www.ibpa-online.org/news/667704/Release-In-New-Guide-Publishers-Association-Defines-8-Types-of-Publishers-and-Business-Models.htm#:~:text=It%20defines%20the%20eight%20main,Hybrid%20Publishers%2C%20(7)%20Author. ..................................................22

*Introducing The New York Public Library's Scholarly Press Backlist Revival Project*, THE H-NET BOOK CHANNEL (Jan. 17, 2024), https://networks.h-net.org/group/discussions/20020173/introducing-new-york-public-librarys-scholarly-press-backlist-revival...........................................................................23

Jane Friedman, *How the Pandemic is Affecting Book Publishing*, JANE FRIEDMAN (Apr. 20, 2021), https://www.janefriedman.com/how-the-pandemic-is-affecting-book-publishing/...................................................................................14

Jim Parker, *The Public Lending Right and What It Does*, WIPO MAGAZINE (June 2018), https://www.wipo.int/wipo_magazine/en/2018/03/article_0007.html. ....30

Michael Seidlinger, *U.S. Book Show: Publishers Fight Pandemic Blues with Backlist*, PUBLISHERS WEEKLY (May 25, 2021), https://www.publishersweekly.com/pw/by-topic/industry-news/bea/article/86464-u-s-book-show-backlist-strategies-to-build-revenue.html. ...................................................................................................................15

Orphan Works and Mass Digitization, A Report of the Register of Copyright, WL 5821453 (CPY.OFC June 2015) ...................................................................6

Porter Anderson, *Ukraine-Based 'Kiss Library' Under Permanent Injunction in Book Piracy Case*, PUBLISHING PERSPECTIVES (Jan. 4, 2022), https://publishingperspectives.com/2022/01/ukraine-based-kiss-library-under-permanent-injunction-in-book-piracy-case/. .......................................................17

PUBLIC LENDING RIGHT INTERNATIONAL, www.plrinternational.com (last visited Mar. 21, 2024) .......................................30

*Six Takeaways from the Authors Guild 2018 Author Income Survey*, THE AUTHORS GUILD (Jan. 5, 2019), https://www.authorsguild.org/industry-advocacy/six-takeaways-from-the-authors-guild-2018-authors-income-survey/. .......................4

The Authors Guild's Model Trade Book Contract and Commentary, Section 2, Grant of Rights, https://go.authorsguild.org/contract_sections/2. (last visited Mar. 21, 2024). ...................................................................................................9

The Authors Guild's Model Trade Book Contract and Commentary, Section 5, Royalties, https://go.authorsguild.org/contract_sections/5 (last visited Mar. 21, 2024)....................................................................................................................13

*Two Russian Nationals Charged with Running Massive E-Book Piracy Website*,
    U.S. ATTORNEY'S OFFICE (Nov. 16, 2022), https://www.justice.gov/usao-
    edny/pr/two-russian-nationals-charged-running-massive-e-book-piracy-website.
    ......................................................................................................................17

# PRELIMINARY STATEMENT[1]

The Authors Guild, Inc., American Photographic Artists, the American Society for Collective Rights Licensing, the American Society of Media Photographers, the Association of American Literary Agents, the Canadian Authors Association, the Dramatists Guild of America, European Visual Artists, the European Writers' Council – Fédération des Associations Européennes d'Ecrivains, the International Authors Forum, the National Press Photographers Association, the National Writers Union, the North American Nature Photography Association, Romance Writers of America, Sisters in Crime, the Society of Authors, and the Writers' Union of Canada (collectively, "*Amici*") respectfully submit this Memorandum of Law in Support of Plaintiffs-Appellees Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC.

---

[1]  The parties have consented to the submission of this brief by *amici curiae*. Neither the parties nor their counsel have authored this brief, and neither they nor any other person or entity other than counsel for *amici curiae* contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The *Amici* are all organizations that represent the professional interests of writers and other creators. The identity and interests of each of the *amici curiae* are set forth in the attached Appendix.

## SUMMARY OF ARGUMENT

The judgment of the District Court should be affirmed. Defendant-Appellant Internet Archive ("IA") has engaged in willful infringement of Appellees' copyrighted literary works ("Works") on a massive scale. Through its so-called Open Library program ("Open Library"), IA has created a vast unauthorized online database of literary works that anyone in the world can access for free, which differs from the most flagrantly illegal pirate websites only by reason of its residing in a U.S. not-for-profit. IA has reproduced and distributed digital copies of the Works under the pretext that it is merely a library, loaning "books" to its patrons by means of a process it refers to as controlled digital lending, or "CDL" – which in reality is neither controlled nor limited to lending.[2]

As Judge Koeltl held, Open Library is not a fair use. Moreover, it is irreconcilable with several fundamental principles of U.S. copyright law, including

---

[2] This brief does not address the so-called "controlled digital lending" practices of other entities or institutions, but only refers to IA's practices with respect to its Open Library program, which it defends under the rubric of "controlled digital lending."

the statute's recognition of a copyright owner's separate exclusive rights of distribution and reproduction under 17 U.S.C. §106, and the express limitations Congress placed on the first-sale doctrine, which permits distribution, but not reproduction, of lawfully-made physical copies of a work under 17 U.S.C. §109. If Open Library's practices were found legal, any website calling itself a library could copy any in-copyright creative work and "lend" out copies, including in a manner that actually downloads additional copies on users' computers. This would gravely undermine the incentives to authorship that were set forth in Art. I, Sec. 8 of the Constitution, which Congress has codified in the Copyright Act continuously since 1790. A reversal of the decision below would greatly diminish our country's literary and other creative output. IA's policy arguments regarding these statutory provisions must in any event be addressed to Congress, not to this Court.

IA's implausible assertion of fair use merely rehashes arguments that this Court and the U.S. Supreme Court have consistently rejected. Under the first statutory fair use factor, Open Library's digitization and distribution of Appellees' Works is not transformative under the standards this Court articulated in *Authors Guild v. Google, Inc.*, 804 F.3 202 (2d Cir. 2015) ("*Google Books*") and *Authors Guild v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) ("*HathiTrust*") on which IA purports to rely, but instead uses the Works in their entirety for their original intended purpose. As the Supreme Court most recently held in *Andy Warhol Foundation for*

*the Visual Arts v. Goldsmith,* 598 U.S. 508 (2023) ("*Warhol*"), the "central" question under the first factor is "whether the new use served a purpose distinct from the original, or instead superseded its objects." Here, Judge Koeltl correctly held that IA's digitization and distribution of Appellees' Works served no such distinct purpose, but rather "creates directly competing substitutes" for Appellees' Works. IA thus "supplants the Publishers' place" in the ebook licensing market for libraries by offering "complete ebook editions of the Works in Suit without IA's having paid the Publishers a fee to license those ebooks, and [giving] libraries an alternative to buying ebook licenses" from the Appellees. 664 F. Supp. 3d 370 at 388.

IA's infringements have caused and will continue to cause significant harm to *Amici*'s members. Many members' works are part of the "long tail" of older published works that earn much of their revenue from licensed electronic uses rather than sales of new copies. Because authors and many other creators today generally earn so little from their writing,[3] they rely on income from the long tail, and even a seemingly minor reduction in such income will materially impact the authors, visual artists, photographers, and other creators who depend on the income for survival. IA's own expert witness conceded below, *see* Dkt. 203 at 18-19, 49, that libraries will be likely to shift their finite acquisition resources away from ebook licenses for

---

[3] *Six Takeaways from the Authors Guild 2018 Author Income Survey*, THE AUTHORS GUILD (Jan. 5, 2019), https://www.authorsguild.org/industry-advocacy/six-takeaways-from-the-authors-guild-2018-authors-income-survey/.

older titles, if this Court allows them to offer ebooks of those older works to users for free. So the works that IA has unilaterally deemed unworthy of full copyright protection are the very ones whose creators will be most significantly harmed by IA's willful and widespread infringement. Further, creators and their publishers will find it more challenging, if not impossible, to bring older titles back into print, whether in physical or electronic form, if they must compete with free Open Library-generated ebooks from IA. Finally, such free Open Library-generated ebooks will also create a direct market substitute for authorized lending by libraries outside the U.S., which lending – unlike Open Library – generates royalties for creators under the public lending right recognized by most other developed countries.

The Court should harbor no illusions: the ostensibly public-spirited veneer of "library lending" behind which IA seeks to disguise its massive infringement is a Trojan horse. CDL undermines the careful balancing of interests that Congress codified in the Copyright Act and poses a grave threat to the livelihoods of countless individual copyright owners who are members of *Amici*. The District Court's decision should be affirmed in all respects.

## ARGUMENT

### I.     Open Library Is Not Fair Use

The inapplicability of fair use to book digitization technologies such as Open Library is well-settled. In June 2015, the Copyright Office published a report on the subject of orphan works and mass digitization,[4] which specifically considered *inter alia* whether mass digitization by libraries could be entitled to a fair use defense under §107.  The Copyright Office stated at *19 that "there is broad agreement that no colorable fair use claim exists [for] providing digital access to copyrighted works in their entirety." Since that time, the significant fair use decisions that have spoken to these issues, including *Capitol Records v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018) ("*ReDigi*"), *Warhol*, *Google Books, HathiTrust* and, have only reinforced that conclusion.

#### A. The First Factor Weighs Strongly Against Fair Use Because Open Library's CDL Practices Are Not Transformative and Are Commercial.

Open Library is not a transformative use. It is merely a new spin on the much-discredited "space-shifting" or "format-shifting" argument that internet-enabled infringers from *Napster* onward have tried and failed to foist on the courts. As the Ninth Circuit noted in *Disney Enters. v. VidAngel*, 869 F.3d 848, 852 (9th Cir. 2017)

---

[4] Orphan Works and Mass Digitization, A Report of the Register of Copyright, WL 5821453 (CPY.OFC June 2015).

("*VidAngel*"), "[t]he reported decisions unanimously reject the view that space-shifting is fair use under § 107."

Although IA does not employ the vocabulary of space-shifting or format-shifting in this litigation, perhaps because the courts have so often rejected those arguments, Open Library in fact does nothing other than change the format in which a literary work is embodied, so that the *work* (not the *copy* purchased by the library) can be made available to readers in a different location. The so-called White Paper on CDL, upon which IA and its *amici* rely heavily, concedes the point. *See* David Hansen & Kyle Courtney, *White Paper on Controlled Digital Lending of Library Books,* https://controlleddigitallending.org/whitepaper (last visited Aug. 10, 2022) ("White Paper") at 25 ("What CDL does allow is a change of the format in which that lend is made").

Appellants' *Amicus* the Authors Alliance likewise concedes that CDL is simply a "new technical format" to "shift content to improve the efficiency of delivering" that content, (Dkt. 102 at 11, internal quotation marks omitted), citing *ReDigi,* without noting that this Court in *ReDigi* actually rejected the very fair use argument that Appellant makes here. As Judge Koeltl held, the ebooks created by CDL are derivative works of the Appellees' copyrighted literary works. 664 F.Supp.3d 370, 380.

The Supreme Court recently cautioned in *Warhol* that transformative use must not be interpreted so broadly that fair use would negate the author's derivative work right: "To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative." *Warhol* at 529.

With CDL, the alleged transformation does not "go beyond that required to qualify as a derivative," it merely creates a derivative work. Fair use does not extend to such uses, as Judge Koeltl squarely recognized: "What fair use does not allow, however, is the mass reproduction and distribution of complete copyrighted works in a way that does not transform those works and that creates directly competing substitutes for the originals." 664 F. Supp. 3d 370, at 391.

Therefore, Open Library is not a transformative use. This Court in *Google Books* stated explicitly that "recasting of a novel as an ebook," as IA does here, fails to "involve the kind of transformative purpose that favors a fair use finding." *Google Books,* 804 F.3 202 at 215. Because *Google Books* itself began by noting that the case "tests the boundaries of fair use," *id.* at 206, this Court should not expand the definition of transformative use to reach a fact pattern that *Google Books* itself flatly declared to fall outside those boundaries.

The practices of the publishing industry are built around the distinction between print, electronic, audio, and other formats. Authors monetize their

copyrights by granting specific rights to publishers.[5] As provided by the Copyright Act, an author may choose to transfer (usually by "license") her copyright ownership in whole or in part, and may choose to license certain of her exclusive rights, but retain others. *See* 17 U.S.C. § 201. Congress expressly recognized the importance of the divisibility of these exclusive rights by providing, in the text of the statute, that "any subdivision of any of the rights specified by section 106" may be owned separately. 17 U.S.C. § 201(d)(2); *see also New York Times Co. v. Tasini*, 533 U.S. 483, 494 (2001).

Determining how to separate and monetize their bundle of rights requires authors to make careful decisions about how they want their work to be released and exploited (including when, in what territories, and in which formats). In recent years, given the advent of technology that makes reading literary works on electronic devices possible, along with the growing popularity of ebooks, the decision of whether to grant licenses to ebooks and other electronic rights are key considerations for authors and other creators. Whether authors choose to publish with a traditional publisher or self-publish, however, the agreements always specify the precise rights and formats being licensed. IA's actions here undercut that exclusivity and interfere with authors' abilities to separately license their rights.

---

[5] *See* The Authors Guild's Model Trade Book Contract and Commentary, Section 2, Grant of Rights, https://go.authorsguild.org/contract_sections/2. (last visited Mar. 21, 2024).

The Copyright Act allows the owner of a lawfully-made physical copy to dispose of that copy as they wish, 17 U.S.C. §109;[6] IA's logic, however, would extend that rule to allow the recipient of that physical copy to make additional copies of the underlying work in different formats, meaning that a copyright owner would have no ability to license rights separately. Needless to say, such a rule would gut copyright law and the divisibility of rights that is so central to the 1976 Copyright Act.

When an author publishes a literary work, they typically make separate grants of print rights, audio rights, ebook rights, and other rights, whether to different publishers or to one publisher under a single agreement.  Each of the rights granted is taken into account in negotiating the advance paid to the author and the other commercial terms of the publishing contract. IA's offering unauthorized derivative versions of ebooks through Open Library will significantly interfere with authors' abilities to grant exclusive electronic text rights to publishers and other licensees. This material interference is not without financial consequence, as it would severely diminish the value of these rights for authors because authors will no longer have

---

[6] Judge Koeltl was correct to reject Appellants' "common-law first sale" argument, holding that fair use does not provide a back-door basis for ignoring the limits that Congress has placed on the first sale doctrine when it was codified in 17 U.S.C. § 109(a): "any broader scope of the first sale doctrine should be sought from Congress, not the courts." 664 F. Supp. 3d at 385, citing *ReDigi*, 910 F.3d at 664.

the ability to grant exclusive ebook rights to potential licensees and fully exploit their rights in each separate format, which in turn will result in a loss of market opportunity and revenue streams.

By engaging in massive and uncompensated "format-shifting" from print books to ebooks, IA is robbing authors of their right to separately license the rights that Congress created for them. The Authors Alliance *amicus* brief, Dkt. 102 at 12. asserts that libraries have "traditionally" been left to decide the terms under which they lend copies from their collections if "each copy of a book that a library holds is already paid for, and they are only using that one copy to benefit readers and the public." There are two glaring problems with this argument, as applied to the Works in Suit: (1) "each copy" is actually a new electronic copy of the owned copy, and it has not been paid for – the library has not obtained a license from the copyright owner to scan and distribute the electronic copy of the work; and (2) a library engaged in CDL is not only using the "one copy" of the printed work that it "holds," but is creating new, electronic copies to be distributed in lieu of the print copy, as this Court held in *ReDigi*.

Moreover, the use is commercial for purposes of Section 107, because IA has not paid the "customary price" for library ebook lending licenses. Judge Koeltl correctly recognized that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from

exploitation of the copyrighted material without paying the customary price," quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).

The Authors Alliance *amicus* also singles out examples of particular uses that have nothing to do with the dispute in this case, such as preservation and increasing accessibility for readers with disabilities. Dkt. 102 at 19-29. This Court recognized in *Authors Guild, Inc. v. Google,* 755 F.3d 87 (2d Cir. 2014) that fair use can properly be applied to further these laudable purposes, but only in very limited circumstances that do *not* result in the creation of full-text ebooks distributed to the general public that substitute for authorized publications. As Judge Koeltl recognized, this case falls far outside such circumstances. 664 F. Supp. 3d at 381.

Accordingly, the use at issue in this case is not transformative, and is commercial. Therefore the first factor under Section 107 strongly favors Appellees.

## B. The Fourth Factor Weighs Strongly Against Fair Use Because Open Library's CDL Practices Are Certain to Cause Significant Harm to Authors' Incomes.

As the Appellees have documented, *see* Dkt. 203 at 48-59, Open Library's offering of ebooks serves as a direct substitute for authorized sales and licenses of ebooks. As such, it currently causes and is likely to cause even more harm in ensuing years to authorized ebook markets. *Id.* Each lost sale by their publishers causes a direct loss of income for authors. Authors, when publishing through traditional publishers such as Appellees, are generally paid a royalty for each copy sold. The

royalty rate is a percentage of either the list price of the book or the net receipts, with different rates for different formats. Today, most publishers pay authors 25% of the net receipts for all ebooks, including library licenses.[7] Because library licenses are generally more expensive than sales of ebooks to consumers, the author's share is a greater total amount (for instance, a library license to an ebook priced at $35 would result in a royalty of $8.75, as compared to $3.00 for a consumer ebook priced at $12.) Accordingly, authors stand to lose significant income from Open Library's substitution of library licenses if the decision below were to be reversed.

Moreover, Open Library also replaces sales directly to consumers, as many consumers choose free ebooks over purchasing an ebook, and this further results in lost income for authors. *See* Dkt. 203 at 50, citing *BMG Music Ent. v. Tenenbaum*, 672 F. Supp. 2d 217, 231 (D. Mass. 2009). Last and perhaps most importantly from authors' perspective, Open Library's practices, should they become widespread and unrestricted, will eradicate the market for authors to bring their books back into print after publishers have ceased selling the books and the authors have reclaimed their rights.

---

[7] The Authors Guild's Model Trade Book Contract and Commentary, Section 5, Royalties, https://go.authorsguild.org/contract_sections/5 (last visited Mar. 21, 2024).

**1. Open Library Will Decimate the Library Ebook Licensing and Consumer Ebook Markets From Which *Amici*'s Members Derive A Significant Share of Their Incomes.**

As Judge Koeltl recognized, 664 F. Supp. 3d 370 at 388, if CDL becomes widespread libraries will shift finite resources away from acquiring ebook licenses for titles they already hold in print. Instead of purchasing ebooks, libraries will rely on CDL to provide ebooks to their users.  This will greatly reduce ebook sales for backlist books in particular, *i.e.* books published more than one or two years prior. The backlist is an extremely important revenue source for both publishers and authors.  In 2019 backlist books comprised 63 percent of overall US book sales. This figure jumped even higher during the pandemic in 2021 when 67 percent of all US book sales were backlist titles.[8]

In this way, the author will not only be deprived of income from licensing, but the availability of free unlicensed copies will deter library patrons from buying the book in any form. Moreover, if IA's Open Library practices become widespread – which will occur if IA prevails in this suit – every library will be free to start making

---

[8] Jane Friedman, *How the Pandemic is Affecting Book Publishing*, JANE FRIEDMAN (Apr. 20, 2021), https://www.janefriedman.com/how-the-pandemic-is-affecting-book-publishing/.  *See also* Michael Seidlinger, *U.S. Book Show: Publishers Fight Pandemic Blues with Backlist*, PUBLISHERS WEEKLY (May 25, 2021), https://www.publishersweekly.com/pw/by-topic/industry-news/bea/article/86464-u-s-book-show-backlist-strategies-to-build-revenue.html ("The pandemic 'brought the long tail in a big way,' Penguin Random House Publisher Services v-p of marketing Matthew Shatz said.").

digital copies of their holdings instead of licensing ebooks as they now do; and every pirate ebook site will call themselves a library and do the same. The long tail on which authors rely will fizzle out, eviscerating the potential market for authors to bring their books back into print – a market that older authors in particular rely on simply to put food on the table.

When that happens, the harm will extend not just to the exploitation of authors' existing works, but will also disadvantage copyright owners in future contract negotiations, as the availability of a no-cost library ebook option will devalue any ebook rights such copyright owners may be able to convey to publishers. A publisher could not rationally be expected to pay much, if anything, to the author for the right to license ebooks to libraries, if Open Library can make such access universally available without consent by or payment to publishers. Moreover, it will devastate the established marketplaces for authors to sell ebook rights they have retained or reclaimed directly to companies such as Open Road Integrated Media. Accordingly, the disappearance of this market would be devastating for the members of *Amici*.

### 2. The Court Below Correctly Considered the Harm to the Value of the Works if Open Library's CDL Practices Were to Become Widespread and Unrestricted.

Market harm under the fourth factor is much broader than simply adding up specific instances of past harm. Under *Campbell,* the Court must weigh the market

harm that would result if the infringing conduct were to become "unrestricted and widespread." *Campbell v. Acuff-Rose Music*, 510 U.S. 569, 590 (1994). If IA were to prevail in this appeal, then any library, or even anyone who calls themselves a library, could digitize books and make them available to the world through an online platform. If that were the case, libraries would no longer have any need to license ebooks. Indeed, part of IA's plan is to allow libraries to use its ebooks instead of having to license ebooks. As the court below found, IA "pitches" the Open Library project with promises that partner libraries no longer need to license ebooks: joining as a Partner Library "ensures that a library will not have to repurchase the same content repeatedly simply because of a change in format."

Relatively few libraries are currently partner libraries in the Open Library program mainly due to their rightful concerns about copyright. If the Court were to reverse, many other libraries would likely join, further compounding the harm to authors. It is difficult to imagine how a viable library licensing ebook market or even a consumer ebook market could be sustained in that case.

Further, any entity that even *called itself* a library could use a decision condoning Open Library to justify making digital copies of physical books and distributing them as ebooks. And that is exactly what some of the world's most

popular, high-volume pirate sites such as Library Genesis (Libgen),[9] Z-Library,[10] and the now defunct Kiss Library[11] have already done. Far from operating in the shadows, these notorious pirate sites appear prominently in search results and informational articles alongside legal libraries and ebook sources such as Project Gutenberg, Over Drive, and others, see below.[12]

---

[9] Libgen domains are not only the most high-traffic locations for pirate ebook acquisitions, they rank among the most high-traffic locations overall on the global internet.

[10] The notorious Z-Library pirate sites, once among the most high-traffic domains on the web, became the target of a criminal copyright action by the FBI and the Eastern District of New York in 2022, resulting in the apprehension of two of the pirate network's principals and seizure of almost 250 domains. Since then new domains have emerged, and remain popular, often showing up in Google ebook related search queries. *See Two Russian Nationals Charged with Running Massive E-Book Piracy Website*, U.S. ATTORNEY'S OFFICE (Nov. 16, 2022), https://www.justice.gov/usao-edny/pr/two-russian-nationals-charged-running-massive-e-book-piracy-website.

[11] Kiss Library was taken down as a result of a civil lawsuit by author Appellees, Amazon, and Penguin Random House, organized in part by the Authors Guild. *See* Porter Anderson, *Ukraine-Based 'Kiss Library' Under Permanent Injunction in Book Piracy Case*, PUBLISHING PERSPECTIVES (Jan. 4, 2022), https://publishingperspectives.com/2022/01/ukraine-based-kiss-library-under-permanent-injunction-in-book-piracy-case/.

[12] *Top 10 Free eBook Download Site: Free eBooks at Your Fingertips*, UPDF (Dec. 19, 2023), https://updf.com/read-pdf/free-ebook-download/.





The interpolation of the high traffic pirate sites with legitimate library portals in common search results is both a product of elaborate subterfuge[13] by pirate sites – trying to disguise themselves as legitimate libraries – and users' inability to distinguish between legal library lending and illegal downloads. A finding that Open Library's use is fair use would erase the careful distinction courts have made between legitimate library functions and wholly infringing activity and make the pirate sites' deceptions even more convincing.

In sum, the fourth fair-use factor is not a damage calculation but requires the Court to weigh the consequences of its ruling on the library ebook market, which would likely disappear as a source of revenue for many members of *Amici* as well as the entire consumer ebook market, which will likely be gravely damaged as well.

### 3. Open Library Directly Harms the Market for Back In Print Works and Adversely Impacts Authors' Ability to Reuse Works.

The harm that results from Internet Archive's unauthorized scanning and distribution of copyrighted works is not limited to substitution of publisher's library ebook lending licenses or consumer ebooks. A vibrant market exists for older and out-of-print books that are brought back in print, for resales of rights, and for reissues after titles have been retired from a publishers' catalog. *Amici* respectfully ask the court to consider the implications of IA's activities on this market, which may be

---

[13] Pirate sites often have a form for "DMCA" takedowns to deceive users into thinking they're user-generated-content sites with safe harbor protections.

smaller and less prominent than the traditional market for traditional publishers' books, but that is no less significant to author earnings. Authors Alliance *amicus* brief (Dkt. 102 at 15) belittles authors' reliance on income from book sales, but that is because they represent authors who have academic salaries and whose books are to support the author's academic career; whereas commercial authors support themselves through their books and other activities. The fact that many are not paid enough is hardly an argument for making that income even smaller.

IA's activities directly harm authors both by substituting for ebook editions of books that publishers have ceased publishing (referred to as "out of print") and the authors have brought or intend to bring back "in print," whether as an ebook or print book. Authors generally rely on multiple revenue streams to pull together a living, and they are increasingly exploring new ways to revive out of print works when the rights have reverted to them, especially as ebooks. Yet IA denies this market even exists. It claims that copying and distributing "out of print" books is fair use, because, they seem to argue, if the original traditional publisher no longer carries the book, it means there is no market for the work, and hence there can be no harm to the author. This is so far from the reality of today's trade book marketplace where authors can earn good incomes through self-publishing and regularly self-publish older works that the original, traditional publisher ceased publishing, earning meaningful income. In addition to a variety of self-publishing options, there are

many new types of publishers and distributors today that are willing to take on older works. The twentieth century traditional publishing model that focuses on new, front list books is only one slice of today's publishing diverse and varied ecosystem.[14]

Publishers like Open Road Integrated Media have made a business of marketing and distributing older books, including books for which the original print publisher did not obtain ebook rights. Open Road and other ebook publishers have worked with thousands of authors to produce ebook editions of their titles. Open Road published over 250 titles in 2023 that were out of print at the time of publication, and plans to publish a similar number in 2024 and in future years. *See* Elizabeth A. Harris, *Decades Old? No Problem: Publisher Makes a Bet on Aging Books*, N.Y. Times (May 25, 2023) https://www.nytimes.com/2023/05/24/books/old-books-out-of-print-open-road.html.

In addition, libraries have sought ways to license older works to create ebooks for their users – precisely what CDL says needs to be done without permission. *Amicus* The Authors Guild, for example, is actively involved in a project with the

_____

[14] IBPA, *Release: In New Guide, Publishers Association Defines 8 Types of Publishers and Business Models* – Indep. Book Publishers Ass'n (Mar. 18, 2024), https://www.ibpa-online.org/news/667704/Release-In-New-Guide-Publishers-Association-Defines-8-Types-of-Publishers-and-Business-Models.htm#:~:text=It%20defines%20the%20eight%20main,Hybrid%20Publishers%2C%20(7)%20Author.

New York Public Library (NYPL) through which authors' older works can be cleared for authorized ebook publication. The Guild and the NYPL have entered into a series of agreements under which the Guild will identify and secure permissions of books where rights reverted to the author from the author or estate, so that NYPL can make the books available for digital lending. *See Introducing The New York Public Library's Scholarly Press Backlist Revival Project*.[15] In cases where the publisher still owns the rights, the NYPL works with the publishers to secure the necessary rights.

Appellant's false assumption ignores the myriad ways in which authors reuse and reissue works that have gone out of print and to which publishers have reverted rights.

Urging reversal, the Authors Alliance *amicus* brief states that "authors are not a monolith," (Dkt. 102 at 7), and *Amici* do not disagree: Authors Alliance members are very different from Authors Guild members in the degree to which they rely on their writing to earn a living. But that does not support Authors Alliance's call to restrict the statutory protection for *all* authors under the Copyright Act merely because *some* authors – *i.e.* Authors Alliance members – would prefer not to take

---

[15] *Introducing The New York Public Library's Scholarly Press Backlist Revival Project*, THE H-NET BOOK CHANNEL (Jan. 17, 2024), https://networks.h-net.org/group/discussions/20020173/introducing-new-york-public-librarys-scholarly-press-backlist-revival.

advantage of that protection. Copyright law provides copyright owners with that choice — any copyright owner may allow others to disseminate their work without payment, through CDL, Creative Commons licenses, or other means, but this Court should not impose those choices on authors who rely on their writing – and the protections of the Copyright Act – to pay the rent.

### i. Affirmance Is Necessary to Protect Rights Reversion and the Back In Print Market.

Most trade book contracts grant exclusive rights to the publisher for the "duration of copyright" (life of the author plus seventy years), but they also contain a clause known as the reversion of rights or out of print clause, which allows authors to reacquire their rights if the book is out of print or no longer available for sale through normal retail channels or available through the publisher's catalog, or if sales fall below a certain amount.[16] A reversion of rights or out of print clause is a critical component of a publishing contract, and for authors getting rights back is highly consequential because it allows them to exploit the work in myriad other ways to generate income. Each year, the Authors Guild's legal team handles approximately 35-40 reversion of rights matters; literary agents routinely assist their

---

[16] This is a generalization of a "typical" trade book contract. All of the five largest publishers follow this custom with some variation, as do most small and medium sized trade publishers.

clients get rights back, and authors also contact their publishers directly to request reversions.

Self-publishing new editions of books previously published by trade publishers is an increasingly popular way to exploit reverted rights. Typically, the amount an author can expect to earn from the sale of a self-published copy, or even for a download of a single chapter or excerpt, is higher than their trade royalty from an individual sale. The author's royalty for a new traditionally published print book is typically only 5-15% of the list price of the book.[17] From sales of publishers' ebook and digital audio editions, authors typically get a 25% share of the net receipts. By comparison, authors can obtain as much as 35-70% from each sale of a self-published copy. Several models exist today—from self-publishing through Kindle Direct, Apple Books, or Kobo to reissues by niche smaller publishers in genre markets and reading apps—for authors to reissue out of print books as new editions, and earn from them.

Authors working in particular genres such as romance, mystery, horror, and thriller frequently reissue previously published and reverted titles in "boxed sets"

---

[17] Publishers incentivize retailers and bookstores to carry books by offering discount, which can range anywhere between 35% to 50% or higher of the book's list price. For instance, if the author's contract with a publisher states a 10% list price royalty on a book priced at $25, the author gets $2.5 per copy sold. If the contract provides for a 10% royalty on net receipts for a $25 book with a 35% discount to the retailer, the author's payment will be reduced accordingly after taxes and the discount are deducted from the sale price.

with new books or in genre-specific anthologies. Non-fiction authors often reissue titles, which keeps their work relevant and accessible while also contributing to their income. Authors also create first edition digital ebooks of reverted works and in-print works for which an ebook edition was never created (and in both cases which Open Library's "scanned" copies directly pre-empt), as well as audio works. Since 2016, the Authors Guild's "Back in Print" program has republished 215 books by Authors Guild members.

### ii. Author Income from Back in Print Books and Reuses Is Significant.

The total revenue generated by a reissue often may be modest in comparison to when a book first enters the market, but the income authors receive from reissues is far from negligible and can sometimes make the difference between being able to pay the mortgage and falling short. Indeed, the harm to authors from the impact of IA's activities on this market is in some ways more profound than to traditionally published front list. Because the size of the back in print market is relatively small compared to the market for new books, the displacement of even a small number of total potential sales by Open Library has a disproportionate impact on the author's earnings. If a reader who is interested in the book searches for it online and finds an unauthorized scanned copy on Open Library, there will be less of an incentive for the reader to pay for an author's self-published copy, from which the author may stand to gain anywhere between 35-70% of the sale made through a typical online

ebook retailer ($7-$14 for a $20 book). If 100 potential users opt for the unauthorized scan over the authorized copy, then the author has already lost $700-$1400. This amount may seem like a pittance to some, but weighed against the extreme depression in author incomes over the years, it is significant.

According to the 2023 Authors Guild income survey the median writing income of full-time book authors was $10,000 in 2022 and their total median earnings from their book and other author-related income combined was $20,000, which is below the current federal poverty guidelines for a family of three.[18] In this precarious context, even a few hundred dollars per year from reissue earnings amounts to significant earnings. A*micus* The Authors Guild surveyed its members and found that over 67% of the 392 respondents received income from their older books, with 34.6% of authors reporting more than $100,000 from backlist sales over the life of the book. For back-in-print sales, 37% of authors reported receiving more than $10,000 over the life of the book.[19] It shares just a few anecdotes from its members:

---

[18] *Authors Guild Survey Shows Drastic 42 Percent Decline in Authors Earnings in Last Decade*, THE AUTHORS GUILD (Jan. 5, 2019), https://www.authorsguild.org/industry-advocacy/authors-guild-survey-shows-drastic-42-percent-decline-in-authors-earnings-in-last-decade/.

[19] *Authors Guild Members Show Importance of Backlist and Back-in-Print Book Sales*, THE AUTHORS GUILD (Mar. 22, 2024), https://authorsguild.org/news/ag-members-show-importance-of-backlist-and-back-in-print-sales/.

- "Almost 90% of my current income is from my backlist books! Another reason they are important is because of the foreign language contracts I've been able to get for these books that were never translated before. Not only does that generate advances and royalties, but also public lending rights income."

- "I make at least $1,000 per month on my back-in-print titles depending on whether I put the series on sale. That money pays my health insurance as well as my son's."

- "I have a very small retirement and would have to live almost entirely on Social Security if it were not for income from 2 books that went out of print that I am able to publish myself."

- "I am 78 years old and retired from teaching. I have a very small retirement and would have to live almost entirely on Social Security if it were not for income from 2 books that went out of print that I am able to published myself. This income is necessary in part for care for my elderly husband. I am appalled that shameless piracy by the Internet Archive would deprive me of this income, which I deserve as the creator of this work and sorely need for the expenses of old age. I know other writers in the same position."

- "I will die in poverty if I don't have my full copyright to exercise over my entire lifetime to make the money back I lost on having to invest in my career upfront when sales were low, which is common for debut authors. It takes many, many years for us to start making money on our titles. Also many of us now publish digitally first and then use the profit to move into print so our backlist isn't traditional. We need time — our lifetimes to make our money back from the time and cost invested and to make a profit."

- "My husband aged out of his job. If it weren't for my income from backlist and back in print books, we would lose our home and would be homeless. We are older people, in our 50's. We won't have social security in our retirement. We have IRAs, but with modern inflation we don't expect that to last long. The ONLY income we'll have aside from any jobs we're able to get into our 70s and 80s, is my income from my backlist and back-in-print titles."

- "I am the sole breadwinner for my entire family (3 kids). My backlist titles are anywhere from 65-100% of my yearly income every year since 4 years ago."

- "This last year my 13 year old daughter was diagnosed with a chronic, potentially fatal health condition. I was able to take a full year off releasing new books so I could concentrate on taking care of her and navigate her illness, pay for doctor's appointments, etc.. Without my backlist income, we wouldn't have been able to pay our bills this year."

Reissuing previously published works to generate income is by no means restricted to writers. Reissued works provide a substantial source of income for photographers and artists, who license illustrations, designs, and photography for new uses. Visual works and images that become recognizable and popular through prior use are regularly repackaged into commercial products and thereby open new markets for their creators.

## 4. Open Library Will Deprive Copyright Owners of Royalties Paid For Lending By Non-U.S. Libraries Under the Public Lending Right.

Another source of revenue for members of *Amici* is royalty income from the public lending right ("PLR"). Currently, thirty-five countries – including the United

Kingdom, every country in Europe, Canada, Israel, and Australia – support authors, illustrators, photographers, translators, and other creators with cash payments from the national government in compensation for the free library lending of their books.[20] Writing in *WIPO Magazine*, an observer noted in 2018 that "PLR payments make a real difference in authors' lives ..., And PLR can be a life-saver for established and retired writers with long backlists of published works which remain available for loan in public libraries even when their works are out of print."[21]

Even U.S. authors receive a share of PLR royalties collected in certain countries. In just the last three years, the Authors Registry, an affiliate of the Authors Guild, has received $952,466 in PLR fees from just one country, the Netherlands, of which it has thus far paid out $718,583 to individual U.S. authors. While the average payment was $157, over 150 payments to authors were over $1,000, and the largest was $10,864.

If IA's activities were to become widespread, library lending to members of the public in countries that have implemented PLR would inevitably decline, as readers worldwide would access IA's unauthorized frictionless Open Library

---

[20] PUBLIC LENDING RIGHT INTERNATIONAL, www.plrinternational.com (last visited Mar. 21, 2024). An additional twenty-nine countries are in the process of implementing PLR. *Id.*

[21] Jim Parker, *The Public Lending Right and What It Does*, WIPO MAGAZINE (June 2018), https://www.wipo.int/wipo_magazine/en/2018/03/article_0007.html.

substitutes rather than borrowing either print or electronic copies from their local libraries. Such non-U.S. revenues are properly cognizable as market harm under the fourth fair use factor. Not only is this market "traditional, reasonable or likely to develop," *American Geophysical Union v. Texaco, Inc.* 60 F.3d 913, 930 (2d Cir. 1994), it exists and is mandated by law in most of the developed world.

## CONCLUSION

Authors, illustrators, photographers, and other creators of books make a vital contribution to education, to literacy, and to the shared culture on which our society rests. Impoverishing authors threatens to impoverish that culture. Libraries are an essential means by which those contributions are made available to the public, but without the creators, libraries would have nothing to lend. Libraries have always been a crucial part of the overall publishing ecosystem and have always paid for each of the copies they lend out to their users. To sustain the publishing economy that allows authors and other creators to continue to create, they should continue to do so, Appellant's radical break from the consensus of the U.S. Supreme Court and the courts below was correctly rejected by the District Court. For the foregoing reasons, and the reasons set forth in Appellees' Memorandum of Law, the decision of Judge Koeltl should be affirmed in all respects.

Dated: March 22, 2024

Respectfully submitted,

/s/ Robert Clarida
Robert Clarida
**REITLER KAILAS & ROSENBLATT LLP**
885 Third Avenue, 20th Floor
New York, NY 10022
Tel: (212) 209-3044
rclarida@reitlerlaw.com

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,981 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch and Times New Roman.

# APPENDIX

## IDENTITY AND INTEREST OF *AMICI CURIAE*

Founded in 1912, The Authors Guild, Inc. (the "Guild") is a national non-profit association of over 14,000 professional, published writers of all genres including periodicals and other composite works. The Guild works to promote the rights and professional interests of authors in various areas, including copyright, freedom of expression, and fair pay. Many Guild members earn their livelihoods through their writing. Their work covers important issues in history, biography, science, politics, medicine, business, and other areas; they are frequent contributors to the most influential and well-respected publications in every field. The Guild's members are the creators on the front line, fighting for their constitutional rights under copyright to reap financial benefits from their labors.

American Photographic Artists ("APA") is a leading nonprofit organization run by, and for, professional photographers since 1981. Recognized for its broad industry reach, APA works to champion the rights of photographers and image-makers worldwide.

The American Society for Collective Rights Licensing ("ASCRL") is the largest not-for-profit trade association in the United States for photographers and illustrators and is the largest collective management society in the United States for this constituency. ASCRL distributes millions of dollars each year in collective rights revenue to U.S. and foreign authors with works published in the United States. ASCRL is a zealous defender of the primary rights of photographers and illustrators and promotes the collective administration of secondary rights as a means of advancing and preserving the marketplace for its photographer and illustrator members.

The American Society of Media Photographers ("ASMP") is a 501(c)(6) not-for-profit trade association, established in 1944 to protect and promote the interests of professional photographers who earn their living by making photographs intended for publication, licensing fees, and other compensation derived from the bundle of rights arising under the Copyright Act. With more than 6,500 members nationwide working in every genre of photography, ASMP is a leading trade organization representing professional photographers' interests.

The Association of American Literary Agents ("AALA") is a 501(c)(6) organization of over 500 professionals working at literary agencies. By requiring members subscribe to its rigorous Canon of Ethics, AALA upholds the highest ethical standards for agency professionals in U.S. publishing. Recognizing the historically exclusive nature of publishing, the Association is also committed to engendering a more diverse, equitable, participatory, and inclusive publishing community. The Association zealously protects the interests of not only its members but also their clients, the authors, illustrators and literary rights holders whose creative works form the basis for the global publishing industry.

Canadian Authors Association (CAA) is Canada's first and longest-running national writers' organization. Founded in 1921 by Stephen Leacock and other prominent authors of the day, CAA provides writers with a wide variety of programs, services and resources to help them develop their skills in both the craft and the business of writing, enhance their ability to earn a living as a writer, and have access to a Canada-wide network of writers and publishing industry professionals.

CAA is a membership-based organization for writers in all areas of the profession—aspiring, emerging and professional—in every genre and across all writing-related professions. As a not-for-profit national arts service organization

with charitable status, much of what CAA does benefits all writers, whether they are members or are affiliated with us as partners or through other writing groups.

The Dramatists Guild of America is the only professional organization promoting the interests of playwrights, composers, lyricists, and librettists writing for the stage. Established over 100 years ago for the purpose of aiding dramatists in protecting both the artistic and economic integrity of their work, The Dramatists Guild of America continues to educate, and advocate on behalf of, its over 8,000 members. The Dramatists Guild of America believes a vibrant, vital theater is an essential element of this country's ongoing cultural debate, and seeks to protect those individuals who write for the theater to ensure its continued success.

European Visual Artists ("EVA") represents all collective management organizations in the EU which are managing visual repertoire for over 170,000 authors of visual works, including fine arts, photography, illustration, street art, design, and architecture.

The European Writers' Council – Fédération des Associations Européennes d'Ecrivains ("EWC") is the federation of 49 national organisations of professional writers and translators in 31 countries including the EU and EEA, as well as Belarus, Iceland, Norway, Macedonia, Montenegro, Switzerland, and United Kingdom, altogether writing in 34 languages and translated globally. The EWC's member associations represent 220,000 individual authors in the book and text sector in all genres. The EWC is recognised by the European Union, UNESCO, and WIPO.

Since 1977 the EWC defends the professional interests of its represented 220,000 writers and translators in economic, legal and political contexts, their right to remuneration and compensation for their works, their relevance in cultural and social policy, freedom of expression, freedom of association, and the importance of lesser spoken and written languages.

In particular, the EWC champions the diversity of literatures while raising awareness for both the role of authors in society and the need to have their social, moral and economic rights respected in the digital age. This is especially relevant when their numerous translations are distributed digitally, and their legal right to remuneration must be guaranteed.

500,000 works are published in Europe annually. A significant proportion of which are both literary and non-fiction works are distributed in original or translation

in the Anglo-American markets and make a notable contribution to the economic ecosystem. Accordingly, we also focus our attention on safeguarding the legitimate moral and economic interests of our writers and translators in a global context.

International Authors Forum ("IAF") has over 80 member organizations, representing over 700,000 authors and campaigns for their interests in every country from around the globe, including countries in North America, Europe, Africa, Asia, and Oceania. Member organizations include artists societies, writers' unions, audio-visual authors guilds and collecting societies. These represent all types of writers and visual artists including academic, educational and scientific writers, as well as poets, novelists, screenwriters, fine artists, designers and photographers.

Our organization is dedicated to the protection and advancement of authors' rights and interests. The International Authors Forum advocates for balanced copyright and contracting laws that guarantee fair treatment for authors and promotes authors' rights and collective management in order to ensure equitable compensation for authors. It also provides authors' organizations with an international platform for cooperation and networking.

Recognized as a voice for authors on the world stage, our organization participates in international fora, government consultations, litigation, and

conferences. International Authors has a deep understanding of the impact of copyright treaties, jurisprudence and legislation on the global arts, journalism, research, academic writing, and translation industries.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing and distribution of copyrighted works. NPPA's members include television and still photographers, editors, students, and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, NPPA has vigorously promoted and defended the rights of photographers and journalists, including intellectual property rights and freedom of the press in all its forms, especially as it relates to visual journalism.

The National Writers Union ("NWU") is an independent national labor union that advocates for freelance and contract writers and media workers. The NWU includes local chapters as well as at-large members nationwide and abroad. The NWU works to advance the economic conditions of writers and media workers in all genres, media, and formats. NWU membership includes, among others, journalists, fiction and nonfiction book authors, poets, novelists, playwrights,

editors, academic writers, business and technical writers, website and e-mail newsletter content providers, bloggers, social media producers, podcasters, videographers, illustrators, photographers, graphic artists, and other digital media workers. NWU members have created many published book-length works as well as many stories, articles, poems, photographs, illustrations, and other short-form works included in published books and e-books.

The North American Nature Photography Association ("NANPA") is a 501(c)(6) non-profit organization founded in 1994. NANPA promotes responsible nature photography (both stills and video) as an artistic medium for the documentation, celebration, and protection of the natural world. NANPA is a critical advocate for the rights of nature photographers on a wide range of issues, from intellectual property to public land access.

Romance Writers of America ("RWA"), founded in 1980, is a nonprofit trade association, with a membership of more than 4,000 romance writers and related industry professionals, whose mission is to advance the professional interests of career-focused romance writers through networking and advocacy. RWA works to

support the efforts of its members to earn a living, to make a fulltime career out of writing romance—or a part-time one that supplements his/her main income.

Sisters in Crime is the premier crime writing association focused on equity and inclusion in our community and in publishing. Founded in 1986 to represent and advocate for women crime writers, we celebrate and honor this history with our name while we continue to work for all who share our commitment to and love for a vibrant, inclusive community. Our 4,500+ members enjoy access to tools to help them learn, grow, improve, thrive, reinvent if necessary. They also gain a community of supportive fellow writers and readers, both peers to share the peaks and valleys of writing, and mentors to model the way forward.

The Society of Authors is the largest UK trade union for writers. Established in 1884, its membership of more than 12,500 includes writers, illustrators, and literary translators of all kinds and genres. It provides free individual advice to its members, and campaigns and lobbies on the issues that most affect authors.

The Writers' Union of Canada (TWUC) is the national organization of professionally published writers. TWUC was founded in 1973 to work with governments, publishers, booksellers, and readers to improve the conditions of Canadian writers. Now over 2,800 members strong, TWUC advocates on behalf of writers' collective interests, and delivers value to members through advocacy, community, and information. TWUC believes in a thriving, diverse Canadian culture that values and supports writers.