UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 23-1260 _____    _____ Caption [use short title] _____

Motion for: Leave to File Corrected Brief _____

_____

_____

Set forth below precise, complete statement of relief sought:

Plaintiffs-Appellees seek leave to file a corrected brief. ____

_____        Hachette Book Group, Inc. v. Internet Archive

_____

_____

_____

_____

| MOVING PARTY: Hachette Book Group, Inc., John Wiley & Sons, Inc., Penguin Random House LLC, HarperCollins Publishers LLC | OPPOSING PARTY: Unopposed |
|---|---|
| ☑ Plaintiff    ☐ Defendant | |
| ☐ Appellant/Petitioner    ☑ Appellee/Respondent | |

MOVING ATTORNEY: Elizabeth A. McNamara ____        OPPOSING ATTORNEY: Unopposed ____

[name of attorney, with firm, address, phone number and e-mail]

Elizabeth A. McNamara _____        New York, NY 10020 _____

Davis Wright Tremaine LLP _____        Phone: (212) 489-8230 _____

1251 Avenue of the Americas, 21st Fl. ____        Email: lizmcnamara@dwt.com ____

Court- Judge/ Agency appealed from: United States District Court for the Southern District of New York, Hon. John G. Koeltl

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes    ☐ No (explain): _____
_____

Opposing counsel's position on motion:
☑ Unopposed    ☐ Opposed    ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes    ☑ No    ☐ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?    ☐ Yes ☐ No
Has this relief been previously sought in this court?    ☐ Yes ☐ No
Requested return date and explanation of emergency: _____
_____
_____
_____
_____

Is oral argument on motion requested?    ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No If yes, enter date:_____

Signature of Moving Attorney:

/s/ Elizabeth A. McNamara _____ Date: March 29, 2024 ____ Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

Form T-1080 (rev.12-13)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

Plaintiffs-Appellees ("Plaintiffs" or "Publishers") make the following disclosures:

Plaintiff-Appellee Hachette Book Group, Inc. is a wholly owned subsidiary

of Hachette Livre USA, Inc.  Hachette Livre USA, Inc. is a wholly-owned

subsidiary of Lagardère North America Inc.; Lagardère North America Inc. is a

wholly-owned subsidiary of Lagardère Media (formerly Hachette SA); Lagardère

Media is a wholly-owned subsidiary of Lagardère SA, which is traded on the Paris

stock exchange; and more than 10% of Lagardère SA's outstanding stock is owned

by Vivendi SE, which is traded on the Paris stock exchange.

Plaintiff-Appellee John Wiley & Sons, Inc. is a publicly traded

company.  John Wiley & Sons, Inc. has no parent corporation.  BlackRock, Inc. is

a publicly held corporation that owns more than 10% of John Wiley & Sons, Inc.'s

Class A stock.

Plaintiff-Appellee Penguin Random House LLC is a limited liability

company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a

privately held company.   No publicly held corporation owns 10% or more of the

stock of Penguin Random House LLC.

Plaintiff-Appellee HarperCollins Publishers LLC is a limited liability

company whose ultimate parent corporation is News Corporation, a publicly

held company.  Based on public filings, no publicly held company owns 10% or more of News Corporation's Class B voting stock.  T. Rowe Price Associates Inc. owns more than 10% of News Corporation's Class A non-voting stock.

    Dated:  March 29, 2024               */s/ Elizabeth A. McNamara*

Plaintiffs-Appellees Hachette Book Group, Inc., John Wiley & Sons, Inc., Penguin Random House LLC, and HarperCollins Publishers LLC (together, the "Publishers") respectfully move under FRAP 27 and Local Rule 27.1 for permission to file a corrected version of their principal brief.

The Publishers filed and served their principal brief in the above-captioned appeal on March 15, 2024.[1]  On March 25, 2024, counsel for Plaintiff-Appellant Internet Archive ("Internet Archive") sent counsel for the Publishers a letter stating that the Publishers inaccurately described the confidential monetary payment Internet Archive agreed to pay in the parties' stipulated judgment per the terms of the parties' Agreement Regarding Stipulated Monetary Judgment.  At Internet Archive's request, the Publishers respectfully move this Court for leave to file a clean version of the corrected brief annexed hereto as Exhibit A.  The only substantive difference between the corrected brief and the brief previously filed by the Publishers is marked as a redline edit on page 21 and consists of a change of

---

[1] The Publishers filed one version of their principal brief under seal and another redacted version on the public docket.  On March 18, 2024, the Court granted the Publishers motion to redact from their public brief certain summary judgment exhibits and deposition testimony that were designated "Confidential" or "Attorneys' Eyes Only" pursuant to the district court's protective order.  *See* Order Granting Motion to Seal Document, Dkt. 209.  Publishers' proposed corrected brief does not alter any of the redactions in the version previously filed and the Publishers intend to file a redacted version of their corrected brief on the public docket pursuant to the March 18 Order, together with the unredacted version that will be filed under seal.

three words.  The Publishers respectfully request leave to file their corrected brief and substitute it for the version that was previously submitted.

Counsel for Defendant-Appellant Internet Archive has been notified of this motion via e-mail, does not oppose the motion, and does not intend to file a response.  *See* Local Rule 27.1(b).

## CONCLUSION

The Publishers respectfully request leave to file a corrected version of their principal brief under seal, with a redacted public copy of the opening brief to be filed no more than a week thereafter.

Dated: New York, New York
      March 29, 2024

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning
Jesse M. Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Fl.
New York, NY 10020
Phone: (212) 489-8230
Email:  lizmcnamara@dwt.com
       lindasteinman@dwt.com
       jackbrowning@dwt.com
       jessefeitel@dwt.com
       carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim

Scott A. Zebrak
Danae Tinelli
4530 Wisconsin Avenue, NW, 5th Fl.
Washington, DC 20016
Phone: (202) 480-2999
Email:  matt@oandzlaw.com
        scott@oandzlaw.com
        danae@oandzlaw.com

*Attorneys for Hachette Book
Group, Inc., HarperCollins
Publishers LLC, John Wiley &
Sons, Inc., and Penguin Random
House LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit via the CM/ECF system on March 29, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  March 29, 2024             */s/ Elizabeth A. McNamara*

# EXHIBIT A

# 23-1260

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC,
JOHN WILEY & SONS, INC., PENGUIN RANDOM HOUSE LLC,

—against—

*Plaintiffs-Appellees,*

INTERNET ARCHIVE,

*Defendant-Appellant,*

DOES 1-5, INCLUSIVE,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES
## [REDACTED]

SCOTT A. ZEBRAK
MATTHEW J. OPPENHEIM
DANAE TINELLI
OPPENHEIM + ZEBRAK, LLP
4530 Wisconsin Avenue NW
Washington, DC 20016
(202) 480-2999

ELIZABETH A. MCNAMARA
LINDA J. STEINMAN
JOHN M. BROWNING
JESSE M. FEITEL
CARL MAZUREK
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas,
  21st Floor
New York, New York 10020
(212) 489-8230

*Attorneys for Plaintiffs-Appellees*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiffs-Appellees ("Plaintiffs" or "Publishers") make the following disclosures:

Plaintiff-Appellee Hachette Book Group, Inc. is a wholly owned subsidiary of Hachette Livre USA, Inc. Hachette Livre USA, Inc. is a wholly-owned subsidiary of Lagardère North America Inc.; Lagardère North America Inc. is a wholly-owned subsidiary of Lagardère Media (formerly Hachette SA); Lagardère Media is a wholly-owned subsidiary of Lagardère SA, which is traded on the Paris stock exchange; and more than 10% of Lagardère SA's outstanding stock is owned by Vivendi SE, which is traded on the Paris stock exchange.

Plaintiff-Appellee John Wiley & Sons, Inc. is a publicly traded company. John Wiley & Sons, Inc. has no parent corporation. BlackRock, Inc. is a publicly held corporation that owns more than 10% of John Wiley & Sons, Inc.'s Class A stock.

Plaintiff-Appellee Penguin Random House LLC is a limited liability company whose ultimate parent corporation is Bertelsmann SE & Co. KGaA, a privately held company. No publicly held corporation owns 10% or more of the stock of Penguin Random House LLC.

Plaintiff-Appellee HarperCollins Publishers LLC is a limited liability company whose ultimate parent corporation is News Corporation, a publicly-held company. Based on public filings, no publicly held company owns 10% or more of News Corporation's Class B voting stock. T. Rowe Price Associates Inc. owns more than 10% of News Corporation's Class A non-voting stock.

## **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ....................................................1

COUNTER STATEMENT OF ISSUES ON APPEAL ...........................5

COUNTER STATEMENT OF THE CASE....................................6

   A. The Publishers and the Book Publishing Business ........................6

     1. The Publishers Invest Heavily in Authors and Recoup Those Investments by Selling Books in Various Markets ...........................6

   B. IA and CDL ...........................................................11

     1. IA's Practices Have Grown Increasingly Dismissive of Copyright Law ...13

     2. IA Acquires Millions of Books via Commercial Synergies with its For-Profit Affiliate Better World Books...........................16

     3. IA Tells Libraries, "You Don't Have to Buy It Again"...........................18

   C. Procedural History...........................................19

SUMMARY OF ARGUMENT ....................................21

STANDARD OF REVIEW ....................................22

ARGUMENT ....................................22

I.  IA'S CDL PRACTICES ARE NOT FAIR USE ...........................23

   A. Factor One – The Purpose and Character of the Use ....................25

     1. IA's CDL Practices Are Not Transformative...........................25

       a. IA Serves the Same Purposes as the Original...........................25

       b. *Sony*, *ReDigi*, *TVEyes* and Other Cases Misleadingly Cited by IA .......28

iii

2.  IA is Not Within the Limited Categories of Non-Transformative Uses Favored Under the First Factor ..................................................32

3.  IA's CDL Practices Are Commercial..........................................................36

B.  Factor Two – The Nature of the Copyrighted Work .....................................40

C.  Factor Three – The Amount and Substantiality of the Use............................41

D.  Factor Four – The Effect of CDL on the Potential Market for the Works......41

1.  The Publishers' Lost Licensing Fees .........................................................43

2.  IA Offers a Market Substitute for the Publishers' Authorized Ebooks ......47

a.  IA's Expert Reports Do Not Disprove Market Harm............................53

3.  IA's Purported Public Benefits Do Not Outweigh the Market Harm.........58

E.  The Four Factors Weigh Against Fair Use...................................................60

II.  THE NEL WAS NOT FAIR USE ...................................................................60

III.  THE COURT SHOULD NOT NARROW THE DECISION BELOW ..........61

CONCLUSION ......................................................................................................62

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Am. Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1994) ...................................................................38

*Am. Soc. For Testing and Materials v. Public Resource Org.*,
  896 F.3d 437 (D.C. Cir. 2018)........................................................41, 51

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
  598 U.S. 508 (2023).................................................................*passim*

*Associated Press v. Meltwater U.S. Holdings*,
  931 F. Supp. 2d 537 (S.D.N.Y. 2013) ...............................................44

*Authors Guild v. Google, Inc.*,
  804 F.3d 202 (2d Cir. 2015) ....................................................*passim*

*Authors Guild v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014) ................................................26, 27, 32, 33

*Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.*,
  27 F.4th 313 (5th Cir. 2022) ...............................................................33

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ...............................................................45

*Cambridge Univ. Press v. Patton*,
  769 F.3d 1232 (11th Cir. 2014) .........................................................33

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)............................................................30, 40, 43

*Capitol Records, LLC v. ReDigi Inc.*,
  910 F.3d 649 (2d Cir. 2018) ....................................................*passim*

*Castle Rock Entertainment v. Carol Pub. Group*,
  150 F.3d 132 (2d Cir. 1998) ...............................................................46

v

*Disney Enters. v. VidAngel*,
  869 F.3d 848 (9th Cir. 2017) .........................................................................26, 27

*Dr. Seuss Enters. L.P. v. ComicMix LLC*,
  983 F.3d 443 (9th Cir. 2020) .........................................................................41, 43

*FireSabre Consulting LLC v. Sheehy*,
  2013 WL 5420977 (S.D.N.Y. Sept. 26, 2013) .............................................37, 38

*Fox News Network, LLC v. TVEyes, Inc.*,
  883 F.3d 169 (2d Cir. 2018) .......................................................................*passim*

*Google LLC v. Oracle Am., Inc.*,
  141 S. Ct. 1183 (2021) ...................................................................................41, 59

*Harper & Row, Publ'rs v. Nation Enters.*,
  471 U.S. at 563 (1985) ...............................................................24, 40, 41, 60

*Henley v. DeVore*,
  733 F. Supp. 2d 1144 (C.D. Cal. 2010) .............................................................40

*Infinity Broadcasting Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998) ...............................................................23, 26, 54

*Jian Yang Lin v. Shanghai City Corp*,
  950 F.3d 46 (2d Cir. 2020) .................................................................................63

*Northland Fam. Plan. Clinic, Inc. v. Ctr. For Bio-Ethical Reform*,
  868 F. Supp. 2d 962 (C.D. Cal. 2012) ...............................................................39

*NXIVM Corp. v. Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004) .........................................................................42, 48

*On Davis v. Gap, Inc.*,
  246 F.3d 157 (2d Cir. 2001) .........................................................................25, 44

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  2015 WL 11170727 (D. Ariz. May 11, 2015) ......................................37, 39, 49

*Ringgold v. Black Entm't TV, Inc.*,
  126 F.3d 70 (2d Cir. 1997) .......................................................................*passim*

vi

*Society of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012)................................................................39, 48

*Sony BMG Music Ent. v. Tenenbaum*,
    672 F. Supp. 2d 217 (D. Mass. 2009)................................................50

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)................................................................*passim*

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    580 U.S. 405 (2017)................................................................34

*Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014) .......................................................33, 34

*T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*,
    752 F.3d 145 (2d Cir. 2014) .....................................................63

*Telephone Digest v. U.S. Telephone Ass'n*,
    841 F. Supp. 5 (S.D.N.Y. 1993) ..............................................37

*Twin Peaks Prods., Inc. v. Publ'ns Int'l.*,
    996 F.2d 1366 (2d Cir. 1993) ...................................................54

*UMG Recordings, Inc. v. MP3.Com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000) .......................................26, 60

*Worldwide Church of God v. Phila. Church of God, Inc.*,
    227 F.3d 1110 (9th Cir. 2000) ..................................................39

**Federal Statutes**

17 U.S.C. § 106................................................................22

17 U.S.C. § 106(2) ..........................................................2

17 U.S.C. § 107................................................................23, 26, 33, 34

17 U.S.C. § 107(1) ..........................................................37

17 U.S.C. § 108................................................................35

17 U.S.C. § 109................................................................30, 35

17 U.S.C. § 302 .................................................................................53

**Other Authorities**

4 Nimmer on Copyright, §13F.08[2] (2023) ..........................................43

Dep't of Commerce Internet Policy Task Force, White Paper on Remixes, First
    Sale and Statutory Damages, 58 (Jan. 2016). ....................................35

Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued*, 44 U.C.L.A. L. Rev. 1449
    (1997)...................................................................................................30

U.S. Copyright Office, Library of Cong., Digital Millennium Copyright Act §104
    Report vi (2001)..................................................................................35

## PRELIMINARY STATEMENT

The Internet Archive ("IA") operates a mass-digitization enterprise in which it copies millions of complete, in-copyright print books and distributes the resulting bootleg ebooks from its website to anyone in the world for free. Granting summary judgment, the District Court properly held that IA's infringement is not saved by fair use as each of the four factors weighs against IA under longstanding case law. IA owns no copyright interest in the books, but tries to justify its mass-scale infringement through a wholly manufactured theory it calls "controlled digital lending" ("CDL"), arguing that CDL is a "modern, more efficient version of lending that is used by libraries across the country." IA Brief, Dkt. 60 ("IA Br.") at 2. But, as the District Court ruled, there is "no case or legal principle support[ing the] notion" that controlled digital lending constitutes fair use – and "[e]very authority points the other direction." SPA-50. Further, there is no resemblance between IA's conversion of millions of print books into ebooks and the historical practice of lending print books. Nor does IA's distribution of ebooks without paying authors and their publishers a dime conform with the modern practices of libraries, which acquire licenses to lend ebooks to their local communities and enjoy the benefits of digital distribution lawfully.

Whether a defendant's use is transformative is the heart of the fair use analysis. As the District Court rightfully proclaimed, "[t]here is nothing

transformative about IA's copying and unauthorized lending of the 127 works in suit (the "Works"). IA does not reproduce the Works to provide criticism, commentary, or information about them." SPA-23. IA "merely repackages or republishes" the original Works – the antithesis of fair use. *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 177 (2d Cir. 2018). The Supreme Court's recent decision in *Warhol* dismantles IA's concocted CDL theory because it drives home that legitimate fair uses do not serve the same purpose as the original. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 528-32 (2023) ("*Warhol*"). Here, IA's creation and distribution of the bootleg ebooks serves the exact same purpose as the Plaintiff publishers' ("Publishers") works – *i.e.*, enabling people to read the books.

Controlled digital lending is a frontal assault on the foundational copyright principle that rightsholders exclusively control the terms of sale for every different format of their work – a principle that has spawned the broad diversity in formats of books, movies, television and music that consumers enjoy today. The law is clear that "[a]n author's right to control and profit from the dissemination of her work ought not to be evaded by [an infringer's] conversion of the work into a different form." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 225 (2d Cir. 2015) ("*Google Books*"). This commonsense rule is necessary to preserve the copyright owner's exclusive right to create derivative works under 17 U.S.C. §106(2), which

2

includes the exclusive right to publish ebooks and exploit all the benefits digital formats entail. As *Warhol* stressed, "the use of an original [work] must go beyond that required to qualify as a derivative [work]" in order to be transformative and thus susceptible to fair use. *Warhol*, 598 U.S. at 529 (2023). IA's use does not.

Substitution is "copyright's bête noire" (*id.* at 529), but IA refuses to pay the customary price and join the Publishers' thriving market for authorized library ebooks – creating a direct substitution. A-6047-48(¶¶163-68). More than 93% of public libraries across the nation license ebooks, which their patrons have borrowed hundreds of millions of times for free. A-6047(¶166). It is a market that benefits authors, publishers and library patrons alike, but IA refuses to participate.

In the face of overwhelming authority dictating affirmance of the decision below, IA reaches far afield and twists *Sony* beyond recognition in an effort to manufacture some support. But *Sony* only held that it was fair use for users of Betamax machines to "time-shift" free television programs "for *private* home use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 446 (1984) (emphasis added). This bears no resemblance to IA's massive book digitization project systematically distributing bootleg ebooks to the worldwide general public. Further, the Supreme Court's more recent fair use decisions, which (unlike *Sony*) emphasize the centrality of transformativeness, provide the controlling guidance here.

Finally, IA's industrial-scale format-shifting operation fundamentally differs from what public libraries have always done. Public libraries lend out books they have acquired in the formats in which they acquired them. They have never engaged in mass-digitization of millions of commercially available print books and distributed the resulting ebooks to anyone with an internet connection; they have never systematically evaded publishers' terms of sale for specific formats like ebooks; they have never partnered with a used bookstore to funnel books to offshore scanning facilities; and they have never counted books in other far-flung libraries to increase "lending counts." Contrary to IA's suggestion that CDL is a widely accepted practice, relatively few public libraries have endorsed it by enrolling as "partner libraries" contributing to IA's free ebooks website – only 13 of the 9,000 public libraries nationwide, or 0.1%, as of December 2021. A-6102(¶392). Equally telling is the fact that the amicus briefs filed by the American Library Association, the Association of Research Libraries, and HathiTrust are neutral and pointedly decline to support IA.

In short, IA's practice of CDL is radical and unlawful. A decision deeming CDL fair use would have a dire impact on book publishing and all creative industries. Libraries around the country could skirt the current library ebook markets, fundamentally interfering with the Publishers' digital strategies and destabilizing book markets. More broadly, other technology companies could

4

implement their own unchecked mass-digitization programs for books and other media, including movies, music and video games, thus seizing control of digital distribution and misappropriating valuable intellectual property. Indeed, as technology companies "train" generative AI products on vast numbers of books and other media, maintaining legal protection for derivative uses has never been more important. The long-range disruptions in the music industry caused by Napster and other file sharers are a cautionary tale on the dangers of illicit copying that deprives rightsholders of the ability to control their markets. In the end, IA asks this Court to make a policy decision, not one based on the law. But as this Court observed when it rejected similar policy arguments, "courts are poorly equipped to assess the inevitably multifarious economic consequences that would result from . . . changes in [copyright] law." *Capitol Records, LLC v. ReDigi Inc.,* 910 F.3d 649, 664 (2d Cir. 2018).

We respectfully request that this Court affirm the District Court's sound opinion and reject IA's contrived defense.

## COUNTER STATEMENT OF ISSUES ON APPEAL

Whether IA's infringement of the Publishers' Works is fair use based on IA's CDL theories and practices.

5

## COUNTER STATEMENT OF THE CASE[1]

### A.  The Publishers and the Book Publishing Business

#### 1.  The Publishers Invest Heavily in Authors and Recoup Those Investments by Selling Books in Various Markets

Plaintiffs are four of the leading book publishers in the United States and published the 127 works in suit ("Works").  A-6009-11(¶¶1-5).[2]

Publishers perform a critical economic and cultural function in society.  The Plaintiffs collectively spend hundreds of millions of dollars every year to fund the creation and dissemination of books, bearing most of the upfront costs (including advances and editorial, distribution and marketing expenses).  A-6013(¶¶13-14).  These investments are critically important to working authors like Sandra Cisneros because it is "not a foregone conclusion or an easy achievement" to make a "living by [her] pen."  A-247(¶¶2,4,8-10,14-15).

In exchange for these investments, authors grant Publishers exclusive rights to publish their works in a broad range of formats.  A-6017-18(¶¶33-35).  As in the

---

[1] The material facts are undisputed.  IA admits 94% of the Publishers' 635 facts entirely or in large part.  *See e.g.*, A-6005(¶¶82-117, 119-45, 154-68, 170, 172, 182-201, 203-14, 242-54, 262-88, 291-299, 316-32, 338-43, 350-77, 379-99, 491-500, 502-03).

[2]  The sample Works reflect the breadth of the Publishers' offerings, from literary classics such as *Song of Solomon* by Toni Morrison and *Their Eyes Were Watching God* by Zora Neale Hurston to popular bestsellers by John Grisham and James Patterson.  A-1198-99.  They include children's books like *Little House on the Prairie* and Lemony Snicket titles, and acclaimed non-fiction works by Bill Bryson and business guru Patrick Lencioni.  *Id*.

6

music, television and film industries, books are marketed in distinct formats and sold according to different terms that reflect each format's unique characteristics. A-6023-24(¶63); A-6037(¶121). Successful books remain in print for many years and are sold across multiple formats, generating steady streams of reliable income for decades. A-6019-20(¶44). Such "backlist" revenue funds advances to new authors, hedges against losses from unsuccessful titles, and supports investment in new distribution technologies. A-6019(¶41).

### 1. Book Publishers Have Built Thriving Markets for Commercial Ebooks and Library Ebook Lending

The Publishers have invested millions of dollars to develop the technology, licensing terms and security measures required to create viable ebook markets for consumers and library patrons. A-6018(¶37); A-6024(¶66); A-6036-37(¶120). IA's theory of CDL assumes that physical books and ebooks are fungible. IA Br. 3. In reality, they are distinct products with distinct characteristics. A-6024-25(¶67).

Print books are material objects that need shelf space and must be physically transported, requiring significant time and expense. A-6028-29(¶84). Ebooks are digital files that readers download to digital devices from bookseller or library platforms while at home or on the go. A-6027-29(¶¶80-88). Ebook files are infinitely replicable and survive long periods without degrading. A-6027-28(¶81). Critically, ebooks can be distributed worldwide almost instantaneously and at

7

minimal cost.  A-6029(¶87).  As IA concedes, the Publishers do not price print books with the expectation that they will be independently distributed in digital formats.  A-6030(¶92).

The Publishers pioneered sustainable consumer markets for ebooks beginning in the late 1990's.  A-6030(¶94).  Like other content producers, the Publishers license their digital products under terms and controls designed to offset the risks of digital media.  A-6026(¶¶73, 76), A-6037(¶121).  For Plaintiffs' consumer ebooks, the licensing terms and digital rights management requirements ensure that ebook files are only accessible to the specific accounts that purchase them.  A-6032(¶101).  The consumer ebook market exploded with the introduction of e-reader devices such as Amazon's Kindle (2007) and Apple's iPad (2010).  A-6032(¶102).

Starting around a decade ago, the Publishers and aggregators like OverDrive developed an innovative library ebook market that offers ebooks to libraries and library users. A-6015(¶25); A-6035-36(¶¶117-18); A-6038(¶127).  Authorized library ebook lending depends on crucial limitations set by the Publishers.  A-6036-37(¶¶120-23).  First, each library must generally limit ebook distribution to its patrons – *i.e.*, local residents of a public library district or individuals affiliated with an academic library.  A-6037(¶123).  These limitations mirror the physical

8

constraints and economics of traditional library lending, whereby libraries generally buy books to serve their local community. A-6034-35(¶113).

Second, the Publishers impose financial terms that reflect the values inherent in the ebook format, and which also balance the public interest in library ebooks against the danger that library ebooks will cannibalize the consumer ebook market. A-494-96(¶¶39-43); A-642-44(¶¶17-24); A-758-59(¶35); A-770-778(¶¶64-82). The Publishers have continually experimented with terms of sale for library ebooks and continue to adopt innovative models based on feedback from libraries. A-6038-6044(¶¶127-152). The Publishers all offer ebooks to libraries under a "one-copy, one-user" model – allowing each ebook to be "checked out" by one patron at a time. A-6038(¶127). When library ebooks were introduced, Plaintiffs offered such licenses on a perpetual basis, but the Publishers explored different alternatives after public libraries requested less expensive options. A-504-05(¶68); A-6038-39(¶¶127,130).

All four Publishers still offer perpetual licenses to academic libraries. A-6039-40(¶¶131-32). Wiley continues to offer perpetual licenses to public libraries as well (*id*), while the other Publishers either permit ebooks to be loaned unlimited times for a set term of years or permit ebooks to circulate 26 times over an unlimited timespan before requiring renewal. A-6040-43(¶¶134-147). Two Publishers also offer "Pay Per Use" ebooks, where libraries pay a significantly

9

reduced fee for a one-time distribution on demand (a model that works well for niche books). A-6041-42(¶¶141-46); A-6057-58(¶191). The library ebook market is evolving and subject to ongoing negotiations with libraries reflecting each party's competing concerns. *See, e.g.*, A-504-06(¶¶65-70); A-746-50(¶¶5-14).

The authorized library ebook market is thriving – readers have never had more access to free, licensed ebooks than they do today. A-6047-48(¶¶163-168). All of the Works, and virtually all of the Publishers' new books, are published as consumer and library ebooks, as well as the bulk of their backlists. A6033-35(¶¶108-112, 117). The number of ebooks and audiobooks checked out via OverDrive in 2020 was 430 million, a more than 500% increase from 2012. A-6047(¶164). The revenue from library ebooks, which publishers share with authors, has risen to hundreds of millions of dollars per year. A-6048-50(¶¶169-173). Government data shows that public libraries in rural and urban areas acquire substantial electronic materials. A-6047-48(¶67); A-748-49(¶11). Based on their preliminary analyses, two Publishers believe that 39-50% of American ebook consumers read their ebooks for free from libraries rather than paying for their own commercial ebooks. A-6051-53(¶¶174-77). Library ebooks are priced with the purpose of libraries in mind; one Publisher found that library ebooks accounted for 50% of its total ebook reads, but only 13% of its total ebook revenue. A-6052-54(¶¶177-79); *see also* A-6056(¶182).

10

### B. IA and CDL

IA was founded in 1996 by its current chairman Brewster Kahle and is a private entity, without a government charter. A-6063(¶216). In 2006, Mr. Kahle proposed a digital platform that would provide "universal access to all knowledge" – *i.e.*, instant and free online access to "all published … things." A-6076(¶280). To achieve this goal, IA engages in an industrial infringement program – it obtains physical copies of millions of in-copyright books, scans them without authorization in offshore scanning centers, and distributes the resulting ebooks online, where they can be read in full by anyone in the world without any payment to the copyright owner. A-6076-79(¶¶279-292); A-6067(¶¶237-38). IA admits that digital functionality "improve[s] the value of physical books" (A-6179), but claims, under its CDL theory, that IA has the right to appropriate this value without compensating creators or agreeing to standard terms.

The Website offers titles in a range of popular categories – including Romance, Thrillers, and "Trending Books." A-6131-32(¶¶514-16). Searching Google for terms like "free ebooks" or "Toni Morrison Beloved free read" has yielded links to IA's Website on the first page of the search results, above links to Publishers' authorized library ebook platforms. A-6071(¶256).

When this lawsuit started in June 2020, IA's Website offered 1.3 million in-copyright books. A-6069(¶247). Two years later, that number grew to nearly 3.2

million in-copyright books – including more than 33,000 of the Publishers' titles currently available in print and digital form. A-6068-69(¶¶240, 248). As of February 2022, IA effectuated roughly 25 million "borrows" of in-copyright ebooks per year. A-1236-39; A-6069(¶249).

For users, the experience of downloading and reading ebooks from IA is very similar to checking out an authorized library ebook. A-6060-62(¶¶204, 209); A-6071(¶257). Users can read entire works on devices like tablets and e-readers. A-6061-62(¶209); A-6071-72(¶¶257-59). IA provides ebooks in both PDF and ePUB versions and boasts that its PDF versions are "High Quality." A-6076(¶277). IA's users often read its ebooks in whole or substantial part – as they are encouraged to do by the Website ("Read Free Library Books Online"). A-6071-72(¶¶256-58).

Between 2017 and 2020, the 127 Works were checked out more than 46,000 times on IA's Website. A-6060(¶203). Extrapolating these numbers across the 33,000 titles on the Website published in print and digital form by the Publishers, the data suggests that IA's bootleg versions of the Publishers' ebooks were checked out many millions of times in a three-year period alone. A-6153-54(¶¶586-587).

12

### 1. IA's Practices Have Grown Increasingly Dismissive of Copyright Law

Over the last decade, IA has actively enlarged the scope of its distributions. A-6063(¶215); A-6070(¶252); A-6075(¶273); A-6092(¶351). In 2007, IA announced that it would start scanning out-of-print works to be distributed through a digital interlibrary loan system. A-6065(¶227). By 2011, IA had abandoned its out-of-print restriction but limited itself to distributing ebooks on an "in-library lending model." A-6092(¶¶351-52). Around 2014, IA dropped any geographic or community restrictions. A-1103(¶64); A-6092(¶353).

In May 2017, IA convened a cadre of boosters to retroactively address the "copyright uncertainty" around its practices. A-6105-06(¶¶407-13). In September 2018, that group issued a White Paper and statement coining the phrase "controlled digital lending." A-6109-10(¶432); A-6112-13(¶¶441-46).[3] Despite the White Paper's veneer of independence, IA (including its in-house counsel) was actively involved in its development. A-6105-07(¶¶407, 414-20). The "most critical" component of CDL is maintaining the "owned to loaned ratio." – *i.e.*, the notion that libraries in possession of physical books allegedly can make and distribute their own unauthorized ebook copies, but only after implementing measures to

---

[3] Many of these same individuals are associated with amicus briefs supporting IA.

13

ensure that the physical book and the ebook never circulate at the same time.  A-6123(¶476); A-6110-11(¶436); A-6112(¶443).

Although the White Paper relied heavily on the "first sale" doctrine as a legal rationale for CDL, IA did not change its practices even after this Court's decision rejecting a digital first sale doctrine argument in *ReDigi* – despite IA's counsel publicly admitting that *ReDigi* "calls into question the theoretical underpinnings of CDL."  A-6111(¶¶437-39); A-6119(¶¶456-60).

In 2018, IA implemented its "Open Libraries Project" and essentially abandoned even the pretense of maintaining the owned to loaned ratio.  A-6093(¶355).  Under this framework, IA uses an "overlap analysis" to radically expand the number of ebook copies simultaneously available to users on its Website.  A-6095-96(¶¶364-69).  Partner libraries submit data listing all the ISBN numbers for the books in their catalogs (not just non-circulating books), which IA runs against its list of millions of physical books it keeps in shipping containers. *Id.*; *see also* A-6124-25(¶¶478-83).  Every time there is a match, IA permits one more copy of that ebook to be borrowed simultaneously through its Website.  A-6095(¶367).  The overlap analysis turned IA's Website into a centralized hub that lends more books than it or any contributing library actually owns.  A-6094-98(¶¶362-78).  IA acts as a national entity that lends other libraries' books, with

14

the goal of "build[ing] a robust system to circulate the resulting e-books to millions, and eventually billions of people." A-6093-95(¶¶356-64).

As of late 2021, due in part to copyright concerns, only 62 libraries – mostly academic libraries, with only 13 public library districts – had joined the Open Libraries Project. A-6102(¶392). IA admits that it has "no way of knowing whether a book …was being read in a particular [partner] library at any given time" and does not exercise any control over partner libraries to ensure that physical and ebook copies of the same work never circulate simultaneously. A-6127-30(¶¶492-506). IA's one-page form agreement with partner libraries omits any such commitment. A-6096-97(¶¶372-75). Instead, IA takes "the approach that they don't need to suppress circulation" because they believe the likelihood is "slim" that the physical and corresponding digital copies "would be checked out at the same time." A-6127(¶493).

On March 24, 2020, IA lifted all ebook lending caps on its Website when it launched its National Emergency Library ("NEL") in response to the COVID-19 pandemic. A-6139-40(¶¶541-43). While IA acknowledged that this "deviated from [CDL]" (IA Br. at 9-10), it defends itself by claiming that "the number of concurrent borrows would never exceed" the total number of library books nationwide that were inaccessible due to lockdown restrictions. IA Br. at 9-10; A-6141-44(¶¶549-559). These libraries were not consulted, and the Copyright Office

15

promptly issued a letter raising doubts over the NEL's legality. A-6141-44(¶¶551-54).

The Publishers commenced this action on June 1, 2020, challenging both CDL and NEL "lending." IA abandoned the NEL on June 10, 2020 and reimposed lending caps. A-6148(¶¶570-571). But IA has no ceiling on the total number of concurrent copies it can lend, and can ensure instant access to all of its ebooks if it signs up enough partner libraries or obtains enough used books. A-6095-97(¶¶364-76). If all 9,000 public libraries in the country became partner libraries and contributed copies of a particular popular book in their physical collection, more than 9,000 users of the Website could read IA's unlicensed ebook at once. A-6095(¶368).

### 2. IA Acquires Millions of Books via Commercial Synergies with its For-Profit Affiliate Better World Books

IA has exponentially increased its offerings by partnering with a for-profit corporation controlled by Kahle. A-6083-85(¶¶313-21). For many years, IA collected huge quantities of physical books to scan and keep in shipping containers that remain inaccessible to the public. A-6082-83(¶¶310-13). One of its main sources of physical books was Better World Books ("BWB"), the world's largest online used bookstore. A-6084-85(¶¶322-23).

In 2019, Kahle acquired BWB, a for-profit corporation, through a shell company he controlled and installed himself as chairman of the board. A-6086-

16

89(¶¶329-37). As Chairman of both BWB and IA, Kahle has instituted various

"synergies." A-6063(¶216); A-6088-92(¶¶336-50). As he told a potential

investor, he hoped to acquire "7 million" additional books in a few years through

BWB and use BWB's profits to "pay for the digitization" and "provide funding

back to the Internet Archive." A-6086-87(¶¶331-32); A-6089(¶339). BWB spent



between 2020 and 2021 on

A-6090(¶343). An IA affiliate

so that those books can be put on the Website. A-

6088(¶335).

> To complete the commercial loop, IA's Website funnels users to BWB to
generate more revenue for BWB to use to source more books for the IA Website.
A-6090-9(¶¶346-50). As IA's Director of Finance put it, "every single page of the
[Website] is monetized." A-6091(¶349). In addition to a "donate" button and
book sponsorship program, the IA book viewer webpage features a "Purchase at
Better World Books" button. A-6090-91(¶346). Clicking this button takes users to
the BWB website, where they can purchase a used physical copy of that work or
another book – and, in doing so, provide more revenue that BWB can use to keep
the book pipeline to the Website flowing. A-6090-91(¶¶346-47). IA receives a

payment every time a user purchases a book from BWB using the link.  A-6091(¶¶347).

### 3. IA Tells Libraries, "You Don't Have to Buy It Again"

Not only does IA refuse to pay the license fees that libraries pay, it markets its Website to potential partner libraries as a free alternative to authorized ebook lending.  A-6098-6101(¶¶379-88); A-6159-60(¶¶605-07).  IA also encourages libraries to populate their websites with links directing patrons to ebooks on IA's Website, which some libraries have begun to do.  A-6099-6102(¶¶381-96).  In a typical promotion, IA advertises that partnering with IA "ensures that a library will not have to repurchase the same content simply because of a change in format." A-6159-60(¶606).  Another suggested pithily, "You Don't Have to Buy It Again." A-6160(¶607).  An IA employee described its ebook lending Website as a "similar service[]" to OverDrive or Amazon, with whom IA "competes for eyeballs."  A-6133-35(¶¶524-25).  Multiple third-party witnesses testified that they used IA's Website to read ebooks they could have accessed in authorized formats.  A-5145-46(¶¶16-17); A-3535-29.  IA's own library expert testified that it was her "expert opinion that libraries will spend less money on licensing the [authorized] ebook editions of the particular titles that were provided through CDL."  A-6135(¶526).

18

IA has long ignored demands from the Publishers to cease and desist.[4]  A-6114-15(¶¶448-49); A-6165-68(¶¶622-35).  Instead, up until Judge Koeltl's decision, it continued to accelerate its infringing activities.  A-6069-70(¶¶247-52).  After this lawsuit commenced, it added more than two million in-copyright titles (including nearly 20,000 of the Publisher's works), and increased the number of registered users from 2.6 million to approximately 6 million.  A-293-94; A-6069-70(¶¶247-50); A-6160(¶609).

### C.    Procedural History

On March 24, 2023, the District Court (Judge Koeltl) granted Publishers' motion for summary judgment because "fair use does not allow … the mass reproduction and distribution of complete copyrighted works in a way that does not transform those works and that creates directly competing substitutes for the original."  SPA-50-51.

On the first factor, the District Court held that there is nothing transformative about IA's practice of CDL under relevant caselaw, including this Court's "teaching … in *Google Books* that there would be a 'strong' claim for copyright infringement if Google had distributed digitized copies of complete books."  SPA-21-39 (quoting *Google Books*, 804 F.3d at 212).  The District Court

---

[4] The Publishers have not brought suit against IA's program distributing ebooks to the visually disabled.  A-1146.

also rejected IA's claim to be "wholly noncommercial," including because of its reciprocal relationship with its for-profit affiliate BWB.  SPA-31-32.

The District Court held that the second factor favored the Publishers because the Works were creative fiction and non-fiction books.  SPA-40.  It counted the third factor against IA because it copied "the Works wholesale for no transformative purpose" and without justification.  SPA-42.

The District Court ruled that the fourth factor "strongly favors" the Publishers.  SPA-43-50.  The court held that the Publishers met their "initial burden of identifying relevant markets" and that IA "supplants the Publishers' place in th[e library ebook] market" by "offer[ing] users complete ebook editions of the Works in Suit without IA's having paid the Publishers a fee to license those ebooks, and it gives libraries an alternative to buying ebook licenses from the Publishers."  SPA-44, SPA-45 n.11.  The District Court found that IA's experts' "metrics do not begin to meet [IA's] burden to show a lack of market harm" because they failed to show that IA's actions, as opposed to other factors, caused the cited impact on library checkouts or sales of the relevant Works.  SPA-48.

Throughout his decision, Judge Koeltl balanced the interests required by copyright law – including "the public benefits IA's copying will likely produce." SPA-49.  He concluded that any such benefits were outweighed by the harm

20

caused by "depriv[ing] the publishers of revenues to which they are entitled." SPA-50.

The District Court finally held that "[t]he analysis above applies even more forcefully to the [National Emergency Library]." SPA-51.

On August 11, 2023, the District Court entered a stipulated judgment awarding the Publishers a confidential monetary payment ~~sum of damages~~. SPA-1-5. The judgment permanently enjoins IA from engaging in any form of CDL with respect to the Works and any other titles published by the Publishers in ebook form. *Id.*

## SUMMARY OF ARGUMENT

I.      This Court should affirm.  After a thorough review of IA's arguments, Judge Koeltl properly ruled that no legal authority supports IA's CDL rationale. All four factors strongly disfavor fair use.  While IA argues that it is merely "expanding the utility" of print books to allow "borrowers to use books in new ways" (IA Br. at 15), IA instead misappropriates from authors and publishers the "efficiencies" of the digital medium and interferes with their digital strategies for their thriving market in ebooks.  "When a secondary use competes in the rightsholder's market as an effective substitute for the original" – as IA's mass-digitization and distribution of complete verbatim copies do by definition – "it impedes the purpose of copyright, which is to incentivize new creative works by enabling their creators to profit from them." *ReDigi*, 910 F.3d at 662.

21

II.     The NEL is not fair use for the same reasons that IA's CDL practices are not fair use – only more so because IA removed the pretense of "controlled" distribution.

III.     This Court should not narrow the decision below to permit IA to lend its own books.  None of IA's CDL practices are fair use.

## STANDARD OF REVIEW

This Court reviews summary judgment awards *de novo*.  *Warhol*, 11 F.4th at 36.  "While fair use presents a mixed question of law and fact, it may be resolved on summary judgment where, as here, the material facts are not in dispute."  *Id*.

## ARGUMENT

"The Copyright Act encourages creativity by granting to the author of an original work 'a bundle of exclusive rights'" that "includes the rights to reproduce the copyrighted work [and] to prepare derivative works."  *Warhol*, 598 U.S. at 526 (quoting *Harper & Row, Publ'rs v. Nation Enters.*, 471 U.S. 539, 546 (1985)); 17 U.S.C. §106.  It is undisputed that the Publishers own valid copyright interests in the Works and that IA infringed their exclusive rights of reproduction, distribution, performance, and display, and exclusive right to create derivative works, under Section 106 of the Copyright Act.  A-6017-18(¶¶33-35); A-6062-63(¶¶210-214); A-6165(¶¶622-23).

IA raises one defense – fair use – and it fails.

# I.   IA'S CDL PRACTICES ARE NOT FAIR USE

Since "[f]air use is an affirmative defense," IA "bears the burden" of proving it.  *TVEyes*, 883 F.3d at 176; *Warhol*, 11 F.4th at 49.  The preamble to Section 107 offers an "illustrative" list of uses that "reflect 'the sorts of copying that courts and Congress most commonly have found to be fair.'" *Warhol*, 598 U.S. at 528 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)).  "[T]he examples [*e.g.*, "criticism" or "news reporting"] are easily understood, as they contemplate the use of an original work to serv[e] a manifestly different purpose from the work itself." *Warhol*, 598 U.S. at 528.  IA's republication of millions of books does not fall into these favored categories.[5]

To determine whether IA's infringement nevertheless qualifies as fair use, the Copyright Act requires the Court to consider four factors set forth in 17 U.S.C. §107.  "[T]he four statutory fair use factors may not be treated in isolation one from another.  All are to be explored, and the results weighed together, in light of the purposes of copyright." *Warhol*, 598 U.S. at 550-51.  "The more transformative the new work, the less will be the significance of other factors, like commercialism…." *Id*. at 531 (quoting *Campbell*, 510 U.S. at 579).

---

[5] IA cannot establish that it engaged in criticism, research or teaching based on its *users*' activities.  *TVEyes*, 883 F.3d at 178 n.4; *Infinity Broadcasting Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998).

23

Conversely, for non-transformative works, the infringer needs a strong "justification" to have any hope of overcoming the "factors favoring the copyright owner." *Warhol*, 598 U.S. at 531-32 (quoting P. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)). Remarkably, IA essentially ignores two key principles that the Supreme Court emphasized in its recent *Warhol* decision.

First, *Warhol* underscores that fair use reflects a careful "balancing act between creativity and availability" (598 U.S. at 526-27) – and, even when a famed artist altered "the meaning and message" of the plaintiff's photograph, the Court ruled for the rightsholder in order to incentivize creativity. IA's fair use defense disregards this balancing act and is laser focused on the theory that "[c]opyright's 'primary' goal is to provide the public with 'access to knowledge'" – as if any infringement enabling easier access to in-copyright works advances the interests of copyright. IA Br. 19 (*quoting Google Books*, 804 F.3d at 212). Copyright protection, however, was designed to incentivize creative expression and has long been recognized as "the engine of free expression" that guarantees authors a "marketable right to the use of [their] expression." *Harper & Row*, 471 U.S. at 558.

Second, *Warhol* repeatedly stresses that, "[t]he central question under the first factor" is "whether the new use served a purpose distinct from the original, or

instead superseded its objects." 598 U.S. at 542. "In that way, the first factor relates to the problem of substitution – copyright's bête noire." *Id.* at 528. Here, IA's use serves the exact same purpose as the Publishers' use – the purpose of enabling books to be read. *See TVEyes*, 883 F.3d at 178 ("The clients of TVEyes use Fox's news broadcasts for the same purpose that authorized Fox viewers use those broadcasts – the purpose of learning the information reported.").

## A.    Factor One – The Purpose and Character of the Use

The first factor is the "heart of the fair use inquiry." *On Davis v. Gap, Inc.*, 246 F.3d 157, 174 (2d Cir. 2001). While IA subverts this factor by suggesting that a finding of non-commerciality automatically "tips the scales in favor of fair use" (IA Br. 20 (quoting *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1204 (2021)), the Supreme Court's clear directive is that the "central question" must be whether IA's practices are transformative and have another purpose beyond that of the original source work. *Warhol*, 598 U.S. at 527-28 (quoting *Campbell*, 510 U.S. at 579).

### 1.    IA's CDL Practices Are Not Transformative

#### a.    IA Serves the Same Purposes as the Original

The transformativeness inquiry "asks 'whether the new work merely "supersedes" the objects of the original creation … ("supplanting" the original), or

25

instead adds something new, with a further purpose or different character.'" *Id.* at 528 (quoting *Campbell*, 510 U.S. at 579).

There is nothing transformative about IA's CDL practices because it does nothing "more than repackage or republish" the Works. *Authors Guild v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014); *Kirkwood*, 150 F.3d at 108.[6] "IA does not reproduce the Works in Suit to provide criticism, commentary, or information about them." SPA-23. Rather, IA admits that CDL serves a "similar[]" purpose to licensed library ebooks (IA Br. 11, 33) – *i.e.*, to make books available to be read – which precludes transformativeness "even if the two were not perfect substitutes." *Warhol*, 598 U.S. at 536. It is blackletter law that when a book is copied "solely to convey the original text to the reader without adding any comment or criticism, the second work may be said to have supplanted the original because a reader of the second text has little reason to buy a copy of the original." *Ringgold v. Black Entm't TV, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997). Further, multiple courts have counted the first factor against defendants who merely "change[] the format" of a preexisting work. *Kirkwood*, 150 F.3d at 108 n.2.[7]

---

[6] *See also* A-6068(¶242) (IA admission that it "'republishe[d]' ebook editions on the Website").

[7] *See also Disney Enters. v. VidAngel*, 869 F.3d 848, 862 (9th Cir. 2017) (courts "unanimously reject the view that space-shifting is fair use under §107"); *UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) ("[R]epackag[ing] recordings to facilitate their transmission through another

To hold otherwise would destroy the value of the Publishers' exclusive "right to prepare derivative works that transform the original" – which includes the right to publish their authors' works as ebooks. *Warhol*, 598 U.S. at 550. As the Supreme Court recently warned, "an overbroad concept of transformative use, one that includes any further purpose … would narrow the copyright owner's exclusive right to create derivative works. To preserve that right, the degree of transformation required to make 'transformative' use of an original must go beyond that required to qualify as a derivative [work]." *Id*. at 529. IA's "recasting of a novel as an e-book" is a quintessential derivative use, not a "transformative use." *Google Books*, 804 F.3d at 215; *HathiTrust*, 755 F.3d at 95.

IA's supposed adherence to CDL principles does nothing to change this conclusion; without a different purpose from the original, IA's ebooks are not transformative. In *ReDigi* and *VidAngel*, defendants applied principles akin to IA's 1:1 owned-to-loaned ratio, yet the Second and Ninth Circuits found these restrictions irrelevant. *ReDigi*, 910 F.3d at 652-54, 661; *VidAngel*, 869 F.3d at 861 ("Vidangel's purchases of discs" to balance its distribution of unauthorized streamed copies did "not excuse copyright infringement.").

---

medium" is not transformative). As *HathiTrust* stated, "[a]dded value or utility is not the test:  a transformative work is one that serves a new and different function from the original work and is not a substitute for it." 755 F.3d at 96.

### b. *Sony, ReDigi, TVEyes* and Other Cases Misleadingly Cited by IA

Despite this clear law, IA argues that its infringement is fair use under *Sony,* as interpreted by *TVEyes* and *ReDigi*. IA claims its use, which admittedly serves the same purpose as the original, is nonetheless transformative if it "utilize[s] technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." IA Br. 30-31. IA's argument fails.

As a matter of common sense, IA's position is internally contradictory. IA cannot, on one hand, argue that it does what libraries have always done because "physical lending and controlled digital lending" are "substantively the same" (IA Br. 3), while simultaneously contending that CDL is "transformative because it enables uses not possible with print books and physical borrowing." *Id*. at 32. Moreover, IA's ebooks do not create any "uses" or "efficiencies" distinct from those that are undisputedly provided by the authorized library ebooks the Publishers already offer. *See, e.g.*, A-6061-62(¶209).[8]

---

[8] IA's reference to alternative uses of its Website – such as Wikipedia links – is a diversion. Leaving aside the fact that Wikipedia could link to authorized editions, the main purpose of the Website is to enable free access to full books. A-6071(¶256).

28

Nor do the cases IA relies upon support its position. As Judge Koeltl held, *ReDigi* narrowly cabined legitimate "utility expanding" uses to services that bear no resemblance to CDL – including "scanning books to create a full-text searchable database and public search function (in a manner that did not allow users to read the texts)," "copying works into a database used to detect plagiarism" or "displaying tiny, low-resolution thumbnail reproductions of art works to provide links serving as Internet pathways to the appropriate websites containing the originals." *ReDigi*, 910 F.3d at 661; SPA-27. Each of these uses was transformative because (unlike here) it required copying to fulfil a *new* purpose different from the original.

IA vastly overstates *Sony*'s relevance. As Judge Koeltl recognized, *Sony* does not stand for the proposition that a technology company may distribute content "more efficiently by replacing the burdens of physical transportation with the benefits of digital technology." IA Br. 31-32; SPA-26-29. Faced with a contributory liability claim, all *Sony* permitted was Sony's right to sell recording devices for individual viewers of free television broadcasts to "time-shift[] for private home use." *Sony*, 464 U.S. at 449. Nothing in *Sony* suggests that the Supreme Court would have permitted Sony to record all of the content on broadcast television and loan free copies to Betamax users on demand, even under some hypothetical 1:1 "owned to loan ratio." As Judge Koeltl underscored, IA

29

cannot equate itself with either Sony or the home viewers – IA digitizes millions of books and distributes them publicly for free.  SPA-28-29.

Likewise, the "utility expanded" argument IA derives from *Sony* fails because the allegedly "improved delivery" is not "to one entitled to receive the content."  *ReDigi*, 910 F.3d at 661.  Patrons of a library are entitled to borrow a print book under the first sale doctrine set forth in Section 109.  But IA has no right to transform print books into ebooks and distribute them *digitally* without a license – all the more so because IA often provides access to *more* copies of a work than either it or its partner libraries actually own.

This Court should decline IA's invitation to stretch the 1984 *Sony* decision far beyond its facts.  As Judge Leval observed, "[t]he ruling . . . did not purport to define the heart of fair use; rather, it concerned the location of an extreme boundary."  Pierre N. Leval, *Nimmer Lecture: Fair Use Rescued*, 44 U.C.L.A. L. Rev. 1449, 1457 (1997).  *Sony* predates both *Campbell* and *Warhol*, which established transformative uses as the heart of fair use.  *Sony* does not even mention transformativeness, focusing instead on the fourth factor and lack of commerciality.

IA distorts *TVEyes* beyond recognition.  While the decision recognized that TVEyes "republishes th[e] content unaltered from its original form," it held that the media monitoring service was "modest[ly] transformative" only because

30

(unlike IA's ebooks) it served a *different* purpose than the original broadcasts –
namely the operation of a search engine that isolated specific words "from an
ocean of [television] programming" in a situation where the programming "would
otherwise be irretrievable, or else retrievable only through prohibitively
inconvenient or inefficient means." *TVEyes*, 883 F.3d at 177. Even more telling,
IA fails to confront the damning fact that the supposedly analogous service in
*TVEyes* was found to be *not fair use*, in large part because it ultimately fulfilled the
same purpose as the original. *Id*. at 177, 179-81.

Nor can IA meaningfully distinguish many other cases supporting the
Publishers. In *Google Books,* Google digitized a million books for its Google
Books service. The crucial limiting factor dictating fair use was the "brevity of a
single snippet and the cumbersome, disjointed, and incomplete nature" of what
Google displayed to the public in its search results. 804 F.3d at 224. The Second
Circuit made plain that distribution of entire books was prohibited. *Id*. at 225 (if
the "claim were based on Google's converting their books into a digitized form and
making that digitized version accessible to the public, the [publishers'] claim
would be strong."). IA seeks to distinguish *Google Books* on the ground that
Google's snippets were "open to all" simultaneously because it did not employ
CDL. IA Br. at 35. But this distinction appears nowhere in *Google Books*, which
focused instead on the length of the snippets. IA also fails to account for the

31

Second Circuit's emphasis on the transformativeness of Google's search engine, which contrasts sharply with IA's non-transformative ebooks. *Id.*

*HathiTrust* permitted the distribution of ebooks to the print disabled based on factors not present here, but explicitly stated that "providing *expanded access* to the print disabled *is not transformative*." 755 F.3d at 101 (emphasis added). This is because "the underlying purpose is the same as the author's original purpose" even though it "enables a larger audience to read those works." 755 F.3d at 101. Since IA also republishes the Publishers' books for the purported purpose of "providing expanded access," it cannot seriously argue that its practices are transformative under Second Circuit caselaw.

### 2. IA is Not Within the Limited Categories of Non-Transformative Uses Favored Under the First Factor

Next, IA tries to squeeze within the narrow category of cases where the first factor weighs in the infringer's favor even though the use is not transformative. IA seeks to manufacture a justification for its actions by calling itself a library and pointing to provisions of the Copyright Act or other laws supportive of the general mission of libraries (although not CDL). IA Br. 36-39. But these arguments boil down to the simplistic policy argument that CDL is "justified because [it] furthers copyright's purpose of 'promoting broad public availability of literature…'" IA Br. 37 (citing *Warhol*, 598 U.S. at 526). Those arguments fail for numerous reasons.

32

First, the rare cases where the first factor favors a non-transformative use occur where the use is specifically set forth in the legislative history or preamble of 17 U.S.C. §107 or where the plaintiff has no market for the relevant use – or both. Thus, the preamble explicitly cites "teaching (including multiple copies for classroom use)" as a favored use (*id.*), and *Patton* and *Eagle Mountain* both involved the use of copyrighted materials for "teaching" students in school or college. IA Br. 36 (citing *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1263 (11th Cir. 2014); *Bell v. Eagle Mountain Saginaw Ind. Sch. Dist.*, 27 F.4th 313, 323 (5th Cir. 2022)).

Full-text distribution to the print-disabled was permitted in *HathiTrust* only because there was legislative history explicitly stating that "the making of a single copy … by an individual as a free service for … blind persons would properly be considered a fair use under section 107" and because there was no "commercial" market for blind-accessible formats. *HathiTrust*, 755 F.2d at 102 (quoting H.R. Rep. No. 94-1476, at 73 (1976)). Likewise, in *Swatch*, the court found fair use both because Bloomberg's purpose was news reporting (a different purpose than Swatch's), and because Swatch had no market for publishing its private earnings updates. *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 82-87 (2d Cir. 2014). IA fits into none of these categories.

33

As for IA's policy arguments seeking to change the law to permit CDL, the fair use analysis is not a free-for-all policy debate. *See* IA Br. 35-42. Rather, it is a structured analysis anchored by Section 107 and decades of case law. In *ReDigi*, this Court rejected similar "policy-based arguments" in support of a digital first sale right based on fair use, stating that "[c]ourts are poorly equipped to assess the inevitably multifarious economic consequences that would result from such changes in the law." *ReDigi*, 910 F.3d at 664. *See also Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 413-14 (2017) (interpretation of the Copyright Act "is not a free-ranging search for the best copyright policy, but rather 'depends solely on statutory interpretation.'"). This Court cannot substitute its "judgment for that of Congress." *ReDigi*, 910 F.3d at 664. Any interference with Congress' legislative prerogative would be particularly inappropriate here since a Congressional subcommittee conducted a "comprehensive [ ] review" of the Copyright Act in recent years, including a June 2014 hearing on the first sale doctrine in the digital age, but ultimately did not adopt revisions to the Copyright Act that would legalize IA's conduct. A-3015-21; A-6104(¶¶403-05).

IA's references to Sections 108 and 109 of the Copyright Act are unavailing. IA Br. 38-40. Section 108 provides highly limited circumstances in which libraries can make a limited number of digital copies of books, such as for preservation purposes. 17 U.S.C. § 108. While Section 108 does not provide a ceiling for fair

use by libraries, neither does its careful scheme justify IA's systematic, mass-digitization efforts.

Likewise, IA renews its argument that, while Section 109 does not permit the reproduction of lawfully owned works, the general principles underlying the first sale doctrine should somehow infuse the fair use analysis. IA Br. 39-40. As Judge Koeltl observed, this argument was thoroughly debunked by *ReDigi,* 910 F.3d at 664. SPA-36-39. Further, a digital first sale doctrine has been repeatedly rejected by the Register of Copyright, Congress and the Department of Commerce.[9]

In essence, IA's flawed policy argument is that the law must change to "ensure[] that technological innovation allows libraries to improve access to books…" IA Br. 39. But public libraries practicing "traditional library lending" (*id*. at 15) across the country have already implemented this "technological innovation" via the Publishers' *authorized* library ebooks – which serve "'people of diverse geographical, cultural, and socioeconomic backgrounds,'" "'individuals with disabilities,'" and "'residents of rural and urban areas,'" as well as facilitating research. IA Br. 22, 37-38; A-6034-35(¶¶113-15); A-6047-48(¶¶166-67); A-

---

[9] 910 F.3d at 659 (citing U.S. Copyright Office, Library of Cong., Digital Millennium Copyright Act §104 Report vi, 79-80 (2001)); A-6104(¶¶403-05); Dep't of Commerce Internet Policy Task Force, White Paper on Remixes, First Sale and Statutory Damages, 58 (Jan. 2016) available at https://www.uspto.gov/sites/default/files/documents/copyrightwhitepaper.pdf).

6056(¶183). In other words, the Publishers have realized the innovation IA

belatedly champions; IA is merely usurping it.[10] Ultimately, IA's position

conflicts with "the goal of copyright" to "provide an economic incentive to create

original works" by enabling authors to "make a living" and to seek "payment[]" for

typical uses of their work as an "incentive[] to create original works in the first

place." *Warhol*, 598 U.S. at 535, 549.[11]

### 3. IA's CDL Practices Are Commercial

IA argues that the first factor should weigh in its favor because it is a

nonprofit that does not charge users to read its ebooks. This argument fails.

First, in the absence of a transformative use or other legitimate justification,

the commercial/non-commercial component of the first factor carries relatively

---

[10] While IA argues that its practices have a "decade-plus" history (IA Br. 52 n.16, 57), the CDL concept was not formalized until 2018. A-6108-09(¶¶426-32). And despite its puffery, IA submits no evidence that CDL is widely used outside of a small number of academic libraries serving only their own communities (not the general public) in programs largely confined to the COVID period. A-6102(¶392); *see also* citations in Dkt. 107 at 9-10. CDL would radically change public libraries, forcing them to lock away books. Even worse, IA's free Website could syphon revenue away from public libraries because, as IA's own expert testified, local governments are under constant pressure to limit spending on books. A-1500-01(¶¶68-69).

[11] The crux of the library associations' amicus brief is that CDL is a flexible concept that could encompass far more narrow practices than IA's – such as distribution of orphan works or out-of-print books – and would be fair use in those circumstances. Dkts. 105, 130. These arguments are outside the scope of this appeal.

little weight.  *Warhol*, 598 U.S. at 531.  "Just as there is no reason for presuming that a commercial use is not a fair use, . . . there is likewise no reason to presume categorically that a nonprofit educational purpose should qualify as a fair use." *Google Books*, 804 F.3d at 219, n.20.  Without transformativeness, even purely non-commercial uses do not win the first factor.  *FireSabre Consulting LLC v. Sheehy*, 2013 WL 5420977, at *9-10 (S.D.N.Y. Sept. 26, 2013) (first factor disfavored "nonprofit educational" use of work because defendant used the whole work "for the same intrinsic purpose" as the copyright owner).  Courts have routinely decided the first factor against nonprofit organizations or individuals distributing infringing works for free.  *See, e.g.*, *Penguin Grp. (USA) Inc. v. Am. Buddha*, 2015 WL 11170727, at *4 (D. Ariz. May 11, 2015); *Telephone Digest v. U.S. Telephone Ass'n*, 841 F. Supp. 5, 10 (S.D.N.Y. 1993) (no fair use "despite USTA's … non-profit status").

Further, IA cannot argue that it republishes books "for nonprofit *educational* purposes."  17 U.S.C. §107(1) (emphasis added).  Instead, the Website offers the widest selection of books possible for a general audience to read for pleasure as well as scholarship.  A-6131-32(¶¶514-16).  Since IA does not resemble "a teacher using an excerpt of a copyrighted work as part of a limited instructional exercise," the educational purpose subfactor does not weigh in its favor.  *FireSabre*, 2013 WL 5420977 at *10.

37

Third, while commerciality is a matter of degree, IA's practices are distinctly commercial – especially in comparison to public and academic libraries. IA Br. 20. As a threshold matter, IA misleadingly suggests that unauthorized uses "must capture significant revenues as a direct consequence of copying the work" in order to qualify as commercial. IA Br. 20 (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)). While direct payments are clearly "commercial," *Texaco* held that commerciality may also be found when "the link between … commercial gain and … copying is somewhat attenuated." 60 F.3d at 922. There, the first factor weighed *against* fair use notwithstanding the absence of direct payment because "Texaco reaps at least some indirect economic advantage from its photocopying." *Id.*

IA reaps "indirect economic advantage[s]" from synergies with its for-profit affiliate, BWB, which go far beyond soliciting donations from users.[12] Those synergies include ubiquitous buttons inviting IA users to "Purchase [a print copy] at Better World Books," providing free advertising for BWB and a flow of payments to IA from book purchases. A-6090-91(¶¶346-47). BWB, in turn,

██████████████████████████████████████████████

████ for IA's Website. A-6090(¶343); A-6088(¶335); A-6091(¶347). Kahle

---

[12] The Publishers do not contend that a non-profit like Wikipedia is commercial merely because it solicits donations.

himself wrote that he acquired BWB to run it as a book "pipeline" and use its "profits" to fund IA's Website.  A-6086(¶329); A-6089(¶338).

Additionally, courts have held that "profit, in this context, is … not limited simply to dollars and coins; instead, it encompasses other non-monetary calculable benefits or advantages." *Society of Holy Transfiguration Monastery, Inc. v. Gregory,* 689 F.3d 29, 61 (1st Cir. 2012) (citing *Weissman v. Freeman*, 868 F.2d 1313, 1324 (2d Cir. 1989)).  Here, IA reaps an "advantage or benefit from the distribution and use" of the Works.  *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000).  IA "appropriate[s] copyrighted material[s] to advance [its] own message," which is "universal access to all knowledge" and pioneering CDL to justify the creation of the world's largest lending library out of bootleg ebooks.  *Northland Fam. Plan. Clinic, Inc. v. Ctr. For Bio-Ethical Reform*, 868 F. Supp. 2d 962, 979 (C.D. Cal. 2012); A-6063(¶215).  IA thus "derives a benefit" from republishing unauthorized ebooks, rendering its use commercial.  *Northland*, 868 F. Supp. 2d at 979.  *See also Am. Buddha*, 2015 WL 11170727, at *4; *Henley v. DeVore*, 733 F. Supp. 2d 1144, 1159 (C.D. Cal. 2010).[13]

---

[13] The concern that Judge Koeltl's analysis "would render virtually all nonprofit uses commercial" is wildly overblown.  IA Br. 28.  No one suggests that intangible benefits like recognition or attracting members would tip the commerciality factor

In sum, the first factor weighs heavily in the Publishers' favor.

## B.      Factor Two – The Nature of the Copyrighted Work

Under the second factor, the Works "fall[] within the core of the copyright's protective purpose" because they all feature "original[] creative expression." *Campbell*, 510 U.S. at 586.  The Works include books written by acclaimed authors like J.D. Salinger, C.S. Lewis, Malcolm Gladwell, Elie Wiesel, Jon Krakauer, and historians Erik Larson and Edward J. Larson.  A-1198-1200.  IA suggests that the second factor should be neutral, arguing that Judge Koeltl engaged in "speculation" when observing that the non-fiction books "contain subjective descriptions and portraits . . . whose power lies in individualized expression."  IA Br. at 42 (quoting *Harper & Row*, 471 U.S. at 563).  Yet IA does not (and cannot) identify a single Work that fails to meet this standard.  Moreover, the types of works generally considered "non-creative" are things like "sparsely embellished maps and directories" (*Harper & Row,* 471 U.S. at 563), "functional" computer code (*Oracle*, 141 S. Ct. at 1202-03), or "technical standards" ((*Am. Soc. For Testing and Materials v. Public Resource Org*., 896 F.3d 437, 444 (D.C. Cir. 2018) ("*ASTM*")).  All the non-fiction Works – which were selected for publication by leading publishers and chosen by IA for its "Open Library" – are much more

---

against every nonprofit organization that advances its mission by incidentally infringing a copyright.

like an "elegantly written biography" than a dry directory. *Harper & Row*, 471

U.S. at 563.

Contrary to IA's suggestion, no "principle of fair use counsels that the

publication of the copyrighted work weighs in favor of fair use." *Dr. Seuss Enters.*

*L.P. v. ComicMix LLC*, 983 F.3d 443, 456 (9th Cir. 2020).

## C. Factor Three – The Amount and Substantiality of the Use

The third factor weighs strongly in the Publishers' favor. In light of *Google*

*Books*, among many other decisions, the scanning and republication of entire books

of many hundreds of pages for direct distribution dooms IA's claim of fair use.

*See, e.g., ReDigi*, 910 F.3d at 662 (the copying of entire works "tends to disfavor a

finding of fair use."). While wholesale copying is occasionally permitted when

"necessary" to achieve a transformative purpose like creating a search engine

(*Google Books*, 804 F.3d at 221), repackaging and republishing entire books is not

transformative or a justified use listed in the preamble. Judge Koeltl was right to

"collapse[] the first and third factors" (IA Br. at 44).

## D. Factor Four – The Effect of CDL on the Potential Market for the Works

As Judge Koeltl properly found, the fourth factor weighs heavily in the

Publishers' favor. IA bears "the ultimate burden of proving that the secondary use

does not compete in the relevant market." *Warhol*, 11 F.4th at 49. But IA's non-

transformative, digital copies of entire books clearly "usurp[] the market for the

41

[Works] by offering a competing substitute." *Id*. at 48. IA seeks to flip the burden of proof by demanding that the Publishers submit evidence showing that IA has already caused them to lose significant sales of library or consumer ebooks. SPA-45-46 n.11. At every level, that is the wrong analysis, and it ignores the Publishers' clear showing of two forms of market harm.

The fourth factor "analysis embraces both the primary market for the work and any derivative markets that exist or that its author might reasonably license others to develop." *Warhol*, 11 F.4th at 48. "The focus … is on whether defendants are *offering* a market substitute for the original." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 481 (2d Cir. 2004) (emphasis added). The fourth factor is entwined with the first and third factors' emphasis on substitution and "[c]ritically . . . , requires consideration of 'not only the . . . market harm caused by the particular actions of the alleged infringer,' but also the market harm that would result from 'unrestricted and widespread conduct of the [same] sort.'" *TVEyes*, 883 F.3d at 179 (quoting *Campbell*, 510 U.S. at 590). "The mere absence of measurable pecuniary damage does not require a finding of fair use. Instead, factor four is expansive enough to weigh the impact of hypothetical uses beyond defendant's own." 4 Nimmer on Copyright, §13F.08[2] (2023). Finally, "[i]t is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work." *TVEyes*, 883 F.3d at 180.

The Publishers have established two forms of market harm: (1) IA failed to pay the Publishers' customary licensing fees for distributing ebooks of their Works to IA's users for library-style "borrowing"; and (2) IA offered the Publishers' library and consumer customers a free competing substitute to the authorized ebook editions. *See, e.g.*, A-658-64(¶¶69-81); A-778-79(¶¶83-87). Given that IA's non-transformative practices contravene the basic purposes of copyright law, any public benefits purportedly offered by CDL outweigh the harm.[14]

### 1. The Publishers' Lost Licensing Fees

The fourth factor favors the Publishers since IA indisputably appropriated the Works "without payment of a customary licensing fee." *Ringgold*, 126 F.3d at 81. The Publishers easily clear their "initial burden of identifying relevant markets." *Warhol*, 11 F.4th at 49. IA's own library expert admitted that there is a "thriving ebook licensing market for libraries." A-6048(¶168). Likewise it is undisputed that IA never paid the customary license fees that libraries pay to make

---

[14] Citing *Sony*, IA half-heartedly argues that given its allegedly noncommercial use, the burden should fall on the Publishers to make "'a showing by a preponderance of the evidence that *some* meaningful likelihood of future harm exists.'" IA Br. 58 n.20 (quoting *Sony*, 464 U.S. at 417). The Supreme Court specifically rejected this reasoning in *Campbell*, when it clarified that *Sony* "called for no hard evidentiary presumption" based on whether a work is commercial or non-commercial. *Campbell*, 510 U.S. at 584. The "elevation of one sentence from *Sony* to a *per se* rule … runs as much counter to *Sony* itself as to the long common-law tradition of fair use adjudication." *Id*. *See also Warhol*, 11 F.4th at 49; *Dr. Seuss Enters.*, 983 F.3d at 459.

the Publishers' ebooks "available for borrowing" (IA Br. 10) – both for the Works and the approximately 33,000 other books published by the Plaintiffs posted by IA on its Website. A-6068(¶¶240-41). "[T]hat is more than enough" to establish market harm. *Warhol*, 11 F.4th at 49-50.[15] IA's economics experts do not challenge this conclusion. A-5367-69(¶¶5-9).

IA's argument against the Publishers' lost license theory boils down to its conclusory assertion that its "lending offers a distinct service from the publisher's ebook markets, not a substitute, and the fourth factor's market harm analysis cannot be used to preclude such transformative uses." IA Br. 45-47. But this "circular reasoning" argument only works if the Court deems IA's use of the Works to be "transformatively different from [the Works's] original expressive purpose" – as it might be for a scathing parody. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006). *See also Ringgold*, 126 F.3d at 81 (holding that "the vice of circularity" is "avoid[ed]" by considering "only traditional, reasonable or likely to be developed markets"). Since there is nothing transformative about IA's republication of entire in-copyright books (*see* pp. 25-

---

[15] *See also On Davis,* 246 F.3d at 165; *Associated Press v. Meltwater U.S. Holdings,* 931 F. Supp. 2d 537, 559 (S.D.N.Y. 2013); *TVEyes*, 883 F.3d at 180; *Ringgold*, 126 F.3d at 80-81.

27, *supra*), its refusal to pay a customary license fee alone demonstrates market harm.

Further, even assuming *arguendo* that CDL was "modestly transformative," that would not negate the Publisher's "lost license fee" argument. In *TVEyes*, the Court held that the copying was slightly transformative but nevertheless engaged in the fourth factor analysis, holding that the failure to pay a licensing fee weighed strongly against fair use. *TVEyes*, 883 F.3d at 177-78, 180.

None of IA's other scattered arguments fare any better:

• IA argues that somebody has "already paid Publishers to purchase a copy of each book, and the customary price for lending a book one already owns is zero." IA Br. 47. But it is undisputed that the Publishers have a separate ebook market, and the price of print books does not include the separate functionality of the ebook format. A-6029-30(¶¶90, 92).

• IA argues that the Publishers do not have a "traditional" market in CDL, which it casts as a distinct market from the library ebook market. But there is no "traditional" licensing market for borrowing via CDL because the theory rests on the notion that infringement is permitted without a license and no fees need be paid.

• The fact that IA prefers to "own" ebook files, rather than license them as public libraries do (A-1254-55), and IA's related assertion that "libraries cannot

use ebook licenses to build permanent collections" (IA Br. 48), do not move the needle because "the failure to strike a deal satisfactory to both parties does not give [IA] the right to copy [the Publishers'] copyrighted material without payment." *TVEyes*, 883 F.3d at 180.[16]

• IA's argument that CDL allows "access that does not depend on what Publishers choose to make available" (IA Br. 48), ignores that the Publishers offer virtually all of their books as library ebooks and have the exclusive right to determine which books are published in which formats. A-6033-34(¶¶108, 111). *Castle Rock Entertainment v. Carol Pub. Group*, 150 F.3d 132, 145-46 (2d Cir. 1998).

• Contrary to IA's suggestion, under *Ringgold*, rightsholders asserting market harm through "lost license fees" do not need to show a decline in the number of third-party licensing requests or lost sales of their works; instead, market harm exists if the defendant has wrongfully engaged in "exploitation of the copyrighted material without paying the customary price." 126 F.3d at 81 (quoting *Harper & Row*, 471 U.S. at 562).

---

[16] Further, IA's assertion is inaccurate since the Publishers all offer perpetual licenses to academic libraries and Wiley offers them to public libraries as well. A-6039-40(¶¶131-32).

In sum, IA's effort to distinguish between the respective ebook markets fails since, as Judge Koeltl held, "IA's free library ebook model need not mimic the Publishers' licensing schemes in every respect to provide a significantly competing substitute. An accused infringer usurps an existing market 'where the infringer's target audience and the nature of the infringing content is the same as the original.'" SPA-46 (citing *Cariou v. Prince*, 714 F.3d 694, 709 (2d Cir. 2013)).

The Court need go no further to hold that the fourth factor weighs conclusively in the Publishers' favor in light of IA's failure to pay customary license fees. *TVEyes*, 883 F.3d at 180 ("By providing Fox's content to TV Eyes clients *without* payment …, TVEyes is in effect depriving Fox of licensing revenues from TV Eyes or from similar entities.").

## 2. IA Offers a Market Substitute for the Publishers' Authorized Ebooks

Under the second theory, the fourth factor also favors the Publishers because IA "usurps the market" for the original by "offering a competing substitute" to their customers, namely libraries in the library ebook market and consumers in the retail ebook market. *Warhol*, 11 F.4th at 48; *see also NXIVM*, 364 F.3d at 481. Contrary to IA's mantra that the Publishers have failed to provide evidence of past lost sales, the Second Circuit "ha[s] never held that the rightsholder bears the burden of showing actual market harm. Nor would we so hold." *Warhol*, 11 F.4th at 49. IA's statement that *Google Books* requires "meaningful or significant" loss

is also wrenched out of context since the Court was not talking about measurable pecuniary damages for past lost sales, but rather a "meaningful or significant effect 'upon the potential market for or value of the copyrighted work.'" *Google Books*, 804 F.3d at 224.

The proper legal standard is whether IA's ebooks "offer" a competing substitute as an alternative (*Warhol*, 11 F.4th at 49) – *i.e.*, "could usefully serve as a competing substitute for the original" in these markets (*Google Books*, 804 F.3d at 221-22). *See also Gregory*, 689 F.3d at 64 n.23 ("[a] rule that would require a victim of infringement to delay taking action to defend its copyright until actual (and perhaps irreparable) harm had accrued would run contrary to the very purpose of the Copyright Act"); *American Buddha*, 2015 WL 11170727 at *6 (no financial data required to show market harm from website offering free unauthorized ebooks). What is critical under the fourth factor is the nature of the competing product. The central question is whether there has been "widespread revelation of sufficiently significant portions of the original as to *make available* a significantly competing substitute." *Google Books*, 804 F.3d at 223 (emphasis added).

The obvious answer is "yes" for IA's complete, verbatim digital copies of the Publishers' Works and their other 33,000 books. IA cannot seriously dispute it looks to supplant the Publishers' authorized licenses given its marketing campaign promoting CDL as a way for libraries to avoid license fees. It tells libraries they

can lend ebooks at "Cost: $0;" they "don't have to buy" ebooks and do "not have to repurchase the same content … simply because of a change in format." A-6099(¶381); A-6101(¶¶387-88); A-6159-60(¶¶606-07). While IA seeks to downplay its "rhetorical flourishes" (IA Br. 56 n.19), substitution is so self-evident that even its own library expert testified that it was her "expert opinion that libraries will spend less money on licensing the ebook editions of the particular titles that were provided through CDL." A-6135(¶526).[17] As common sense and the foundational academic literature dictate, it is impossible to compete with free. *Sony BMG Music Ent. v. Tenenbaum*, 672 F. Supp. 2d 217, 231 (D. Mass. 2009); A-5433-40(¶¶26-37). IA's offer of a competing alternative to authorized library ebooks is particularly pernicious because IA appropriates to itself the benefits of digital media and evades the licensing restrictions on authorized library ebooks critical to the Publishers' digital strategies, aimed to ensure the long-term viability of publishing.

Likewise, IA cannot seriously contend that it does not offer a potential substitute for commercial ebook purchases, especially given its 25 million borrows

---

[17] She also conceded that libraries participating in CDL could reallocate money spent on ebooks to movies, CDs, and video games. A-5726-5734; *see also* A-5735-5737. IA's library expert was not commissioned to research whether libraries have in fact used IA to substitute for authorized ebooks, and she did not opine on what would happen if IA ramped up its practices. A-5377-79(¶¶26-28); A-4976-77.

a year and continuing exponential growth.  A-6069(¶249).  IA admits that entire

books can "absolutely" be read on the Website, and the evidence demonstrates that

users want to – and do – use the Website to read ebooks – indeed, the top of the

Website's home page is, "Read Free Library Books Online."  A-6071(¶¶256-57).

As this Court has recognized, the "basic market [for books] is the one-time reader."

*Ringgold*, 126 F.3d at 79.

Trying to rebut these arguments, IA states that "library expenditures on

electronic formats increased by more than 50%" between the year before and the

year after "IA launched Open Libraries."  IA Br. 50.  This merely reflects that the

library ebook market is still young and growing, not an absence of market harm.

A-6048-49(¶¶169-71).  "[T]he fact that plaintiff's exploitation of the copyrighted

work . . . remains profitable does not necessarily mean that no harm has been

suffered . . . . It is perfectly possible that plaintiffs' profits would have been

greater, but for the copying in question."  Nimmer, §13F.08 at n.155.

IA cites *ASTM* to argue that the Publishers should be faulted for "not

providing quantifiable evidence" of lost sales.  IA Br. at 56.  Leaving aside the

many cases in this Circuit holding that past actual damages is not the proper legal

inquiry, the defendant's website in *ASTM* only included *outdated* versions of

industry standards incorporated into government regulations – which are uniquely

unhelpful to those seeking to find current best practices.  Thus, there was a

50

significant question, not present here, about whether those outdated versions could harm the ASTM plaintiffs, who "regularly update their standards – including all 185 standards at issue in this appeal." *ASTM*, 82 F.4th at 1271-72.

Further, it is a near-impossible task to prove lost sales resulting from IA's Website simply by looking at sales data for the Works. A-510-12(¶¶80-81). First, sales for individual Works are impacted by hundreds of factors, continually shifting over time, making it exceedingly difficult to isolate any one cause. *Id*.; A-6016(¶¶28-31). And while IA's model is a vital threat to the Publishers, its current scale is still small compared to the substantial ebook market. A-6048(¶¶169-72); A-5411(¶¶85-86). In particular, the vast majority of libraries currently acquire authorized ebooks (A-6047-48(¶167)), undoubtedly to comply with copyright law – but that need would disappear were IA to prevail. Finally, contrary to IA's misleading suggestion that it "has practiced controlled digital lending for over a decade and operated Open Libraries for five years" (IA Br. at 57), IA did not adopt its current practices and begin to ramp up until around 2018-2019, and the Works were removed from the Website by June 2020. A-160; A-6087-88(¶333); A-6093(¶355).

Most critically, the relevant analysis considers the "market harm that would result from 'unrestricted and widespread conduct of the [same] sort'" as the defendant's. *TVEyes*, 883 F.3d at 179 (quoting *Campbell*, 510 U.S. at 590). If this

Court blessed IA's CDL practices, it would open the floodgates to untrammeled infringement that would threaten the viability of the Publishers' library and consumer ebook markets, especially as the public became increasingly aware of the Website. A-5406-08(¶¶76-78). There would be nothing stopping all 9,000 public library districts in the U.S. (if not the world) from joining as partner libraries and/or providing links to IA's Website on their websites. This would, as IA readily admits, raise the concurrent lending caps to practically unlimited levels – thus eliminating even the fig-leaf of control that underpins IA's entire CDL theory. IA Br. 10 n.5. Moreover, following such a ruling, any number of entities outside the library world could start making and distributing electronic copies under a "lending" argument, flooding the market. While the potential for catastrophic market harm should be obvious, the dangers to the Publishers' ebook markets are far from hypothetical, not only because of the historic damage that out-of-control content distribution has wrought on the music and news industries, but because the rapid development of generative AI has unleashed new threats involving both mass reproduction and substitution of literary works and other works of authorship. A-6025-26(¶¶69-75).

Finally, this Court should reject IA's cynical argument that IA mitigates harm by "wait[ing] five years [post-publication] before lending – after most of the book's lifetime sales have already occurred." IA Br. 55. IA's rule is an admission

that IA's ebooks substitute for the authorized versions. Otherwise, it would be pointless. IA's suggestion that the Publishers are only entitled to exclusive rights to their Works for five years rides roughshod over the terms of protection set by the Copyright Act (17 U.S.C. §302) and ignores the undisputed fact that the Publishers rely heavily on the steady revenue from successful backlist books. A-6019-20(¶44).

In sum, IA distributes the Publishers' copyrighted material in a market that the Publishers, as the copyright owners, are exclusively entitled to exploit, and IA looks to replace the Publishers as the supplier of ebooks to its customers. "This is precisely the kind of harm the fourth factor aims to prevent." *Kirkwood*, 150 F.3d at 111; *Twin Peaks Prods., Inc. v. Publ'ns Int'l.*, 996 F.2d 1366, 1377 (2d Cir. 1993) (issue is whether the defendant "competes in markets in which [the Publishers have] a legitimate interest.").

### a. IA's Expert Reports Do Not Disprove Market Harm

IA's claims that its experts provided "substantial, unrefuted evidence showing a *lack* of harm," but this is not the case. IA Br. 49-55. As Judge Koeltl correctly found, the expert testimony that Dr. Jorgensen and Professor Reimers provide "do[es] not begin to meet IA's burden to show a lack of market harm" because it fails to show whether IA *caused* any of the identified shifts in book sales and/or library checkouts of the Works. SPA-47-48; *see also* A-5365-5413. This is

53

not a matter of disputed facts, as IA suggests; rather, the parties dispute the

conclusions to be drawn from the undisputed facts.

Jorgensen.  IA's brief overstates Jorgensen's limited testimony that IA had

"no measurable impact" on authorized ebook markets.  IA Br. 50.  "No measurable

impact" is not the same as expert testimony opining that IA *did not cause* market

substitution – which IA's experts both conspicuously fail to offer.  More

importantly, Jorgensen's analysis does not survive even cursory examination.  A-

5379-80(¶¶29-33); A-5381-94(¶¶35-53).  Jorgensen compared OverDrive

checkouts (not library ebook purchases) for the Works in the second and third

quarter of 2020, as well as consumer ebook and paperback sales for approximately

25 Hachette Works in Q2 and Q3 of 2020.  His "natural experiment" started with

the premise that if IA's Website was a substitute for authorized ebooks during the

NEL period when unlimited concurrent loans were permitted, the Publishers' sales

and checkouts would increase when the NEL ended in June 2020.  A-4840-

45(¶¶47-58).  He noted that *average* checkouts and sales for the Works he studied

went down between the second and third quarter of 2020 – albeit with

"considerable variation" between the various titles – and did so more than some

high-level industry-wide figures.  A-5381-82(¶35).  From here, he made the grand

leap that the data was not consistent with the Publishers' claims that IA offers

market substitutes for their Works.  *Id*.

As Judge Koeltl found, the most obvious flaw in this analysis is that it shows weak correlation (at best), but no causation whatsoever.  SPA-48.  The relevant figures could have gone down in the third quarter of 2020 for countless reasons unrelated to IA's Website, none of which Jorgensen controlled for.  It is undisputed that every book is unique and that innumerable, constantly shifting factors may affect its sales performance at any given time.  A-6016(¶28); A-510-12(¶¶80-81).  Jorgensen's analysis is utterly unreliable because it made *no* attempt to disentangle these myriad factors from effects caused by IA's Website during the brief anomalous period he studied.  A-5384-88(¶¶40-45).  Indeed, Jorgensen did not even control for obvious seasonal variations or the complex and disruptive impact of COVID.  A-5381-94(¶¶35-53); A-5571-5610.[18]  Jorgensen's own graph suggests that OverDrive's library ebook checkouts of the Works in Q3 2020 were declining because they were reverting to pre-pandemic levels after physical libraries and bookstores began to reopen.  A-5389-91(¶¶47-48).[19]

---

[18] A telltale sign of the weakness in Jorgensen's theory is that some of the Works published by Hachette experienced a substantial decline in sales in Q3 2020, making clear that there were market factors at work unrelated to NEL that Jorgensen ignored.  For example, one work was loaned 22 times on NEL, but after it closed, commercial ebook sales plummeted by 4614 units.  A-5393-94(¶¶52-53).

[19] Plaintiffs have added an arrow to Jorgensen's graph to show when Overdrive's loans during COVID peaked, as well as yellow highlighting.



Even Reimers, IA's other expert, acknowledged that the checkout and sales trajectories that formed the basis of Jorgensen's opinion could be explained by multiple factors unrelated to IA and that an expert would have to "think hard" about how to prove "a causal relationship."  A-5384(¶39); A-5714-18.  Since Jorgensen did not even attempt the "hard" work needed to establish causation, Judge Koeltl correctly discounted his testimony.  SPA-47-49.

Reimers:  Reimers' expert opinion has little to no relevance because it only purports to analyze the effect of IA's Website on Amazon sales rankings for *print* editions of the Works, not *ebook* revenues in any market.  This is a glaring problem

56

given her own prior research concluding that print books are *not* "close substitutes" to free ebooks made from unlicensed scans. A-5380-81(¶34). Further, Amazon print rankings are based on an unknown algorithm that may not correlate with revenue, in part because they do not include major market segments including independent bookstores and wholesalers. A-5644-49; A-5397(¶60). And, while Reimers controls for more factors than Jorgensen, her controls are still not sufficient to isolate the effect of IA's Website from the impact of COVID and other macroeconomic events. A-5394-5406(¶¶54-75); A-5667-77; A-5704-06.

IA also oversells Reimer's tepid conclusions. IA Br. 53. For two measures, she merely found "no statistically significant evidence" to establish that market substitution had occurred. A-5395-96(¶¶57-58); A-4925-26(¶46); A-4932-33(¶¶53, 55(c)). As for her analysis of the removal of the Works from IA, she admitted that her evidence was "weak" and only "suggestive" and that she could not rule out entirely that IA hurt the Publishers' sales. *See, e.g.* A-4927-28(¶49); A4934(¶55); A-4928-30(¶50); A-5402(¶68); A-5665-66. All of this is insufficient given that the burden of proof is on IA and that she was analyzing the wrong market. Reimers also acknowledged that her analyses would not apply to a scenario where IA's conduct was more widespread. A-5398(¶61).

In sum, IA's expert testimony comes nowhere near sustaining its burden of proof on the fourth factor. The unmistakable reality, which no expert can refute, is

that IA's free bootleg ebooks, containing the exact, full text of the Works in digital form, "compete in the relevant market" (SPA-45-46, n.11) that belongs to the Publishers and their authors, and can "usefully serve as a competing substitute for the original" (*Google Books*, 804 F.3d at 222).

### 3. IA's Purported Public Benefits Do Not Outweigh the Market Harm

IA's hail-Mary argument on the fourth factor is that its "lending provides significant public benefits" that "far outweigh any minimal harms" to the Publishers.  IA Br. 59-60.  Once again, IA places too much weight on *Sony,* which only involved time-shifting by home dwellers for personal use, and too little emphasis on later decisions that consider the fourth factor in light of the transformativeness of the underlying use.  Under the correct standard, any secondary use that competes "as an effective substitute … impedes the purpose of copyright, which is to incentivize new creative works by enabling their creators to profit from them." *ReDigi*, 910 F.3d at 662; *see also Oracle*, 141 S. Ct. at 1206 ("[V]erbatim copying of the original in its entirety" would "normally conflict with copyright's basic objective:  providing authors with exclusive rights that will spur creative expression.").  As a matter of copyright law, there is no public benefit from IA's short-sighted conception of "universal access," which threatens to destabilize valuable markets for in-copyright works.  A-6063(¶215).

IA never explains why its Website benefits the public beyond suggesting that on-demand free access to everything ever written is good and the Website has been "used to further education, research, and scholarship." IA Br. 60. But the research and scholarship generated by the Works was created by the Publishers and their authors, not IA. As the Supreme Court observed, "[a]ny copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." SPA-49-50 (citing *Harper & Row*, 471 U.S at 569). Copyright law benefits the public by guaranteeing that authors and publishers have the right to get paid for ebook editions of their works, not by idolizing consumer convenience. As the court stated in *UMG Recordings, Inc. v. MP3.Com, Inc.*, "defendant's 'consumer protection' argument amounts to nothing more than a bald claim that defendant should be able to misappropriate plaintiffs' property simply because there is a consumer demand for it. This hardly appeals to the conscience of equity." 92 F. Supp. 2d at 352. IA would have no books to distribute if authors did not write them and publishers did not publish them. As the Supreme Court presciently warned, "[i]f every volume that was in the public interest could be pirated away by a competing publisher … the public soon would have nothing worth reading." *Harper & Row*, 471 U.S. at 559 (citation and alteration omitted).

59

### E.    The Four Factors Weigh Against Fair Use

All four factors weigh decisively against fair use in the aggregate. Ultimately, IA has no right to turn millions of print books into digital books.  It has misappropriated to itself the value of the digital medium, trampling on the exclusive rights of authors and publishers, and interfering with their digital strategies.  In concocting CDL, IA merely seeks to evade the authorized library ebook market, whose terms IA admittedly does not like.  A-1254-57.  Judge Koeltl properly rejected IA's argument that it "has the right under fair use to make whatever copies of its print books are necessary to facilitate digital lending of that book" because it "risks eviscerating the rights of authors and publishers to profit from the creation and dissemination of derivatives of their protected works," and thereby benefit the public with their new creations.  SPA-39.

## II.    THE NEL WAS NOT FAIR USE

The NEL jettisoned all of the owned-to-loaned limitations that supposedly justify CDL.  Ironically, IA faults Judge Koeltl for not "separately applying the factors to that distinct use" (IA Br. 61), when it never performed its own factor-by-factor analysis in its briefs.  A-4812-13; IA Br. 61.  The District Court applied the law correctly when it held the four-factor analysis precluding IA's CDL practices

"applies even more forcefully to the NEL, during which time IA amplified its unauthorized lending." SPA-51.

IA argues that the "justifications for the National Emergency Library differ from those for ordinary controlled digital lending" (IA Br. 61), but it does not identify any law that entitles it to be a benevolent bestower of the Publishers' and their authors' intellectual property. While COVID was an historic emergency, copyrights were not suspended and access to authorized library ebooks continued. *See, e.g.*, A-6057(¶¶187-88). As the Copyright Office noted in a letter casting significant doubt on the NEL's legality, authors were heavily reliant on royalty income from their copyrights during this time. A-3604-05. Further, "publishers and authors … responded to the crisis by engaging in efforts to ensure that readers, students, and others continue[d] to be able to access their works .…" A-3585. These efforts included new terms, discount prices and free ebooks for approved classroom use. A-6057-59(¶¶187-97). Finally, IA's boundless justification argument is fatally undermined by its failure to take *any* steps to ensure that the NEL was limited to students or scholars affected by lockdowns. A-6141(¶¶547-48).

## III. THE COURT SHOULD NOT NARROW THE DECISION BELOW

IA asks this Court to "limit its holding" to allow IA to continue "lending its own books" without counting the "concurrent copies" from its partner libraries, but

this is a last gasp effort to obtain a free pass to continue breaking the law. IA Br. at 62. First, the argument is improper because IA has raised it for the first time on appeal – thus waiving it. *Jian Yang Lin v. Shanghai City Corp*, 950 F.3d 46, 50 n.2 (2d Cir. 2020); *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 168 (2d Cir. 2014). Second, although the Open Libraries program exacerbates IA's infringement, its termination would not change any of the fundamental defects in IA's scheme to evade copyright law. Nor would restricting IA to distributing its own books materially limit the scope of IA's future lending given that its Website already offers nearly 4 million in-copyright titles and that BWB, another Kahle entity, can continue to provide IA with a substantial pipeline of cheap used books to be scanned or counted towards lending caps. This Court should hold unequivocally that all of IA's CDL practices are not fair use.

## CONCLUSION

For the foregoing reasons, the Court should affirm in all respects the decision below granting summary judgment to the Plaintiffs and issuing the permanent injunction.

Dated: New York, New York
March 15, 2024

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*
Elizabeth A. McNamara
Linda Steinman
John M. Browning

62

Jesse M. Feitel
Carl Mazurek
1251 Avenue of the Americas, 21st Fl.
New York, NY 10020
Phone: (212) 489-8230
Email:  lizmcnamara@dwt.com
       lindasteinman@dwt.com
       jackbrowning@dwt.com
       jessefeitel@dwt.com
       carlmazurek@dwt.com

**OPPENHEIM + ZEBRAK, LLP**

Matthew J. Oppenheim
Scott A. Zebrak
Danae Tinelli
4530 Wisconsin Avenue, NW, 5th Fl.
Washington, DC 20016
Phone: (202) 480-2999
Email:  matt@oandzlaw.com
       scott@oandzlaw.com
       danae@oandzlaw.com

*Attorneys for Hachette Book Group, Inc., HarperCollins Publishers LLC, John Wiley & Sons, Inc., and Penguin Random House LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(g), I certify that the foregoing Brief of Plaintiffs-Appellees complies with the requirements of Fed. R. App. P. 32, because it uses a proportionately spaced font, has a typeface of 14 points or more, and contains 13,978 words, excluding those portions of the brief exempted by Fed. R. App. P. 32(f), as determined by the word-count function of Microsoft Word.

Dated: March 15, 2024          */s/ Elizabeth A. McNamara*

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit via the CM/ECF system on March 15, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated:  March 15, 2024          */s/ Elizabeth A. McNamara*