# 23-1260

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

HACHETTE BOOK GROUP, INC., HARPERCOLLINS PUBLISHERS LLC, JOHN WILEY
& SONS, INC., PENGUIN RANDOM HOUSE LLC,

*Plaintiffs-Appellees,*

v.

INTERNET ARCHIVE,

*Defendant-Appellant*,

DOES 1-5, inclusive,

*Defendants*.

Appeal from the United States District Court for the Southern District of New
York, Case No. 1:20-cv-4160, Hon. John G. Koeltl

## REPLY BRIEF FOR DEFENDANT-APPELLANT INTERNET ARCHIVE

JOSEPH C. GRATZ
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105

CORYNNE M. MCSHERRY
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109

JOSEPH R. PALMORE
ADITYA V. KAMDAR
MORRISON & FOERSTER LLP
2100 L Street NW, Suite 900
Washington, DC 20036
Telephone:  (202) 887-6940
JPalmore@mofo.com

DIANA L. KIM
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, CA 94304

*Counsel for Defendant-Appellant Internet Archive*

APRIL 19, 2024

## CORPORATE DISCLOSURE STATEMENT

Internet Archive, a 501(c)(3) nonprofit organization, has no parent corporation.  There is no publicly held corporation that owns 10% or more of Internet Archive's stock.

Dated:  April 19, 2024             _____
                                          s/ Joseph R. Palmore

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ....................................... i

TABLE OF AUTHORITIES ................................................... iv

INTRODUCTION ...........................................................1

ARGUMENT .............................................................3

I.     IA's CONTROLLED DIGITAL LENDING IS FAIR USE ..........................3

    A.     The First Factor Favors Fair Use...........................................3

        1.     IA's free digital library is noncommercial.................................3

            a.     Publishers identify no profit to IA ...................................4

            b.     Publishers apply the wrong framework for assessing commerciality ...............................................6

            c.     Publishers' attempt to diminish the significance of commerciality to the first factor fails .............................7

        2.     Controlled digital lending is transformative .............................8

            a.     Publishers do not meaningfully dispute that expanding utility is transformative .................................8

            b.     Publishers fail to distinguish *Sony* and *TVEyes*...............9

            c.     Publishers unsuccessfully attempt to compare controlled digital lending to fundamentally different practices ........................................................13

            d.     Publishers fail to meaningfully address the other transformative purposes of IA's lending .......................14

        3.     IA's use serves copyright's purposes.......................................15

            a.     Publishers do not deny that the first factor can favor non-transformative uses.................................15

ii

        b.    Publishers' reliance on *ReDigi* ignores the critical difference between fair use and other statutory exceptions ....................................................................16

B.    The Second And Third Factors Carry Little Independent Weight Here ..........................................................................................18

C.    The Fourth Factor Favors Fair Use ......................................19

    1.    IA owes no licensing fee for its controlled digital lending.......19

    2.    IA's controlled digital lending does not supplant Publishers' markets .....................................................21

        a.    Publishers distort IA's burden at summary judgment .........................................................................21

        b.    Publishers do not deny that they presented no evidence of market harm ................................22

        c.    Publishers' attempts to discredit IA's evidence fail.......24

    3.    Publishers cannot deny the public benefits of IA's lending .....28

D.    Balancing The Factors Together, Permitting IA's Use Better Serves Copyright's Purposes............................................................29

II.    THIS COURT SHOULD REMAND FOR RECONSIDERATION OF THE NATIONAL EMERGENCY LIBRARY ............................................30

III.    AT THE LEAST, THIS COURT SHOULD NARROW THE DISTRICT COURT'S HOLDING TO MAKE CLEAR THAT IA's CONTROLLED DIGITAL LENDING OF ITS OWN BOOKS IS FAIR USE.......................................................................................30

CONCLUSION ....................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
 239 F.3d 1004 (9th Cir. 2001) ....................................................................13

*American Geophysical Union v. Texaco Inc.*,
 60 F.3d 913 (2d Cir. 1994) ...................................................................6, 7, 19

*American Society for Testing & Materials v. Public.Resource.Org*,
 82 F.4th 1262 (D.C. Cir. 2023)................................................................22, 25

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
 598 U.S. 508 (2023).............................................................8, 10, 29, 30

*Apple, Inc. v. Corellium, Inc.*,
 No. 21-12835, 2023 WL 3295671 (11th Cir. May 8, 2023) .............................15

*Arica Inst., Inc. v. Palmer*,
 970 F.2d 1067 (2d Cir. 1992) ....................................................................16, 30

*Ass'n of Am. Med. Colleges v. Cuomo*,
 928 F.2d 519 (2d Cir. 1991) ....................................................................21

*Authors Guild, Inc. v. HathiTrust*,
 755 F.3d 87 (2d Cir. 2014) ....................................................................13

*Authors Guild v. Google, Inc.*,
 804 F.3d 202 (2d Cir. 2015) ............................................................7, 13, 14, 30

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
 448 F.3d 605 (2d Cir. 2006) ....................................................................20

*Cambridge Univ. Press v. Patton*,
 769 F.3d 1232 (11th Cir. 2014) ....................................................................7, 19

*Campbell v. Acuff-Rose Music, Inc.*,
 510 U.S. 569 (1994)....................................................................18

*Capitol Records, LLC v. ReDigi, Inc.*,
   910 F.3d 649 (2d Cir. 2018) ....................................................1, 9, 10, 14, 16, 17

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ...............................................................................14

*Fox News Network, LLC v. TVEyes, Inc.*,
   883 F.3d 169 (2d Cir. 2018) ...........................................................8, 9, 10, 11, 19

*Google LLC v. Oracle Am., Inc.*,
   141 S. Ct. 1183 (2021)..................................................................................16, 17

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985)...............................................................................................4

*Harris v. Sharp*,
   941 F.3d 962 (10th Cir. 2019) ............................................................................30

*Hollander v. Steinberg*,
   419 F. App'x 44 (2d Cir. 2011) .............................................................................6

*Nat'l Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*,
   15 F.3d 559 (6th Cir. 1994) ...................................................................................6

*PCTV Gold, Inc. v. SpeedNet*,
   LLC, 508 F.3d 1137 (8th Cir. 2007)....................................................................30

*Ringgold v. Black Ent. Television*,
   126 F.3d 70 (2d Cir. 1997) ..................................................................................22

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)..................................................................6, 8, 9, 10, 25, 30

*Woodman v. WWOR-TV, Inc.*,
   411 F.3d 69 (2d Cir. 2005) ..................................................................................21

## Other Authorities

Fed. R. Civ. Proc. 56(a) ...........................................................................................21

National Information Standards Organization,
   https://www.niso.org/standards-committees/is-cdl (last accessed
   Apr. 17, 2024)....................................................................................... 3=

# INTRODUCTION

Two critical misconceptions underlie Publishers' attempt to rebut Internet Archive's showing of fair use.

*First*, Publishers disregard the key feature of controlled digital lending: the controls that ensure borrowing a book digitally adheres to the same owned-to-loaned ratio inherent in borrowing a book physically. Publishers repeatedly compare IA's lending to inapposite practices that lack this key feature. Controlled digital lending is not equivalent to posting an ebook online for anyone to read or copy (*contra* Resp.Br. 27) or to peer-to-peer file-sharing by companies like Napster (*contra* Resp.Br. 5). Neither practice is based on use of a library's lawfully acquired physical copy, and neither ensures that only the one person entitled to borrow the book (or recording) can access it at a time. Controlled digital lending is also distinct from the digital resale considered in *Capitol Records, LLC v. ReDigi, Inc.*, 910 F.3d 649 (2d Cir. 2018). *Contra* Resp.Br. 35. The former's purpose is nonprofit library lending, while the latter's was commercial resale. Controlled digital lending is fair use, even if these other practices are not. And because of the huge investment required to operate a legally compliant controlled lending system and the controls defining the practice, finding fair use here would not trigger any of the doomsday consequences for rightsholders that Publishers and their amici claim to fear.

1

*Second*, Publishers present an erroneously cramped view of libraries' missions. Libraries do not acquire and lend books solely to make them physically available to patrons within a restricted geographic area. *Contra* Resp.Br. 4, 9. Libraries provide readers more egalitarian access to a wider range of books, overcoming socioeconomic and geographic barriers by sharing resources with other libraries through interlibrary loans. Amicus Br. of Nine Library Organizations and 218 Librarians ("Libraries Br.") at 19-20. They also build permanent collections to preserve books, including older editions, for future generations. *Id.* at 18-19. And they protect reader privacy, preventing disclosure of patron records that could chill access to information. Amicus Br. of Center for Democracy & Technology et al. ("CDT Br.") at 7-13. Libraries, including IA, implemented controlled digital lending because they care about these core aspects of their mission—and recognize that Publishers' restrictive ebook licenses do not advance them.

Properly understood, controlled digital lending simply enables modern libraries to carry out their time-honored missions in the more efficient and effective way digital technologies allow. The outpouring of amicus support—representing libraries, authors, scholars, and many other stakeholders—shows controlled digital lending's established importance. *Contra* Resp.Br. 36 n.10. In fact, controlled digital lending is so entrenched in library practice that the National Information

Standards Organization has issued standards for its implementation.[1]  Affirming the decision below would harm not only IA, but also many other libraries and the publics they serve.

## ARGUMENT

## I.    IA'S CONTROLLED DIGITAL LENDING IS FAIR USE

### A.    The First Factor Favors Fair Use

As IA showed (IABr. 20-42), "the purpose and character of the use" favors fair use because IA's lending is noncommercial, transformative, and supportive of copyright's purposes.

#### 1.    *IA's free digital library is noncommercial*

IA's free digital library is plainly noncommercial.  IABr. 20-29.  Publishers' half-hearted defense of the district court's contrary conclusion ignores—and thus concedes—many of IA's arguments, as well as the undisputed facts on which they rest.  Most fundamentally, Publishers do not deny that IA is a nonprofit organization that neither charges patrons for borrowing books nor earns any other form of profit from such borrowing.  Resp.Br. 37-40.  Calling such a nonprofit use "commercial" twists the word beyond recognition.

---

[1] https://www.niso.org/standards-committees/is-cdl (identifying controlled digital lending as a recommended practice) (last accessed Apr. 17, 2024).

### a. Publishers identify no profit to IA

The district court based its commerciality ruling on three so-called "benefits" to IA: (1) donations, (2) a small payment from bookseller Better World Books ("BWB") when someone buys a book using IA's link, and (3) tangential nonmonetary effects like increased members or improved reputation. SPA-31-32. Publishers do not contend that any of these count as "profit." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).

*First*, Publishers concede that soliciting donations does not render a nonprofit use commercial. Resp.Br. 38 n.12.

*Second*, they do not respond to IA's explanation that its link to BWB generated no profit because the (miniscule) payments were put back into funding IA's lending. IABr. 23-24.[2] Instead, Publishers insist that "synergies" between IA and BWB render IA's nonprofit lending commercial. Resp.Br. 38-39. The district court did not adopt that reasoning—and for good reason. IA and BWB are separate

---

[2] IA did not state that the link "monetize[s]" every page of its website. *Contra* Resp.Br. 17. That quote referred to the donate button (A-1906-08), which Publishers concede is non-commercial (Resp.Br. 38 n.12).

entities.[3]  IA does not control BWB or share in its profits.  The so-called "synergies" are merely ways they work together so that IA can more effectively serve its nonprofit mission.  Many nonprofits do the same, and those partnerships do not transform them into commercial entities.

*Third*, Publishers wisely abandon the district court's erroneous reliance on membership and reputational effects to establish commercial purpose (Resp.Br. 40 n.13), but they attempt to swap in another tangential benefit: the ability to advance IA's message (Resp.Br. 39-40).  That theory still relies on decisions involving the unique contexts of academia and religion.  Resp.Br. 39-40.  As IA explained, those circumstance-specific decisions do not extend to all nonprofits, nor do they suggest that *any* kind of tangential benefit can render a nonprofit use commercial.  IABr. 24-28.  Publishers again had no response.  Many nonprofits advance a message furthering their mission; Publishers would seemingly label them all commercial as a result.  Resp.Br. 40 n.13 (disclaiming this position without any explanation for why it does not logically follow from their message-based view of commerciality).

---

[3] Publishers mischaracterize BWB's ownership.  Resp.Br. 17.  As explained (IABr. 23 n.8), BWB is not owned by IA or Brewster Kahle, but by Better World Libraries, which has no owner.  A-6087-89.  BWB and Better World Libraries are operated by a three-member board.  A-6089.  IA has no control over either entity.  While Kahle has leadership roles in each entity, some overlap in personnel does not undermine the separateness of corporate entities.

### b. Publishers apply the wrong framework for assessing commerciality

Publishers' interpretations of statutory text and this Court's precedent fare no better.

Publishers seem to read Section 107's juxtaposition of "commercial" uses with those for "nonprofit educational purposes" to mean that *only* educational purposes count as non-commercial. Resp.Br. 37-38 (emphasis omitted). Putting aside that IA's use does serve educational purposes (*infra* at 16), there is no such limitation. To the contrary, courts have found many non-educational uses to be non-commercial. *E.g., Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449 (1984) (recording public broadcasting for private use); *Hollander v. Steinberg*, 419 F. App'x 44, 47 (2d Cir. 2011) (use in litigation); *Nat'l Rifle Ass'n of Am. v. Handgun Control Fed. of Ohio*, 15 F.3d 559, 562 (6th Cir. 1994) (lobbying).

Publishers also distort *American Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994). There, a for-profit company's employee copied an article for research that might lead "to the production of commercially valuable products." *Id.* at 922. Yet the Court called the copying merely an "intermediate use" rather than "commercial exploitation" because "the link between Texaco's commercial gain and its copying is somewhat attenuated." *Id.* at 921-22. *Texaco*'s point is not that any indirect economic advantage is commercial. *Contra* Resp.Br. 38. Rather, the Court balanced the for-profit company's profit motive and the attenuated link to that profit

6

and concluded that the use was merely intermediate. *Texaco*, 60 F.3d at 921-22. It would turn commerciality on its head if IA's *nonprofit* use were deemed commercial while *Texaco*'s *for-profit* use was only intermediate.

### c. Publishers' attempt to diminish the significance of commerciality to the first factor fails

Publishers next try to write commerciality out of the analysis altogether, insisting—contrary to Section 107's express language—that a use's non-commercial purpose does not matter when the use is not transformative. Resp.Br. 37. Putting aside that IA's use *is* transformative (*see infra* at 8-15), Publishers rely on cases that support only the unremarkable proposition that nonprofit uses are not "categorically" fair use. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 219 n.20 (2d Cir. 2015) ("*Google Books*"); Resp.Br. 37 (citing district court cases finding no fair use "despite . . . non-profit status" (citation omitted)). But the fair-use inquiry is multi-factorial; no consideration on its own is dispositive. That non-commerciality may sometimes fail to overcome the other factors does not mean it need not be considered or cannot make a difference. *See, e.g., Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1267 (11th Cir. 2014) (finding use's "nonprofit educational nature" "sufficiently weighty that the first factor favors a finding of fair use despite the nontransformative nature of the use").

## 2.  *Controlled digital lending is transformative*

IA's use is transformative because it "expands [books'] utility" by "improving the efficiency" of library lending to one entitled to borrow the book.  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 176-77 (2d Cir. 2018); *see* IABr. 30-35.  There is nothing contradictory about the fact that this transformative use enables libraries to better serve their longstanding mission.  *Contra* Resp.Br. 28.  Controlled digital lending permits libraries to do something they have always done—lend books to one person at a time—but through new, distinct, and more efficient means.

### a. Publishers do not meaningfully dispute that expanding utility is transformative

Publishers call IA's use non-transformative because it does not add commentary or criticism (Resp.Br. 26), but they do not deny that uses can be transformative in other ways.  "[E]xpand[ing] utility" is one such way.  *TVEyes*, 883 F.3d at 176-77 (citing *Sony*, 464 U.S. 417).

Publishers' insinuations notwithstanding (RespBr. 3, 30), *Sony* remains black-letter law.  Neither *Warhol* nor any other fair use case has cast doubt on *Sony*'s fair use conclusion.  And this Court has interpreted *Sony* as recognizing the "transformative purpose of improving efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder." *TVEyes*, 883 F.3d at 177; *contra* Resp.Br. 30 (erroneously contending *Sony* "focus[ed]" on "the fourth factor and lack of commerciality" rather than

8

transformativeness).  That *Sony* did not include the word, "transformative," is immaterial; the substance of precedent controls—not its use or non-use of magic words.  *TVEyes*, 883 F.3d at 177 ("[w]hile *Sony* was decided before 'transformative' became a term of art," it turned on "transformative purpose").

### b. Publishers fail to distinguish *Sony* and *TVEyes*

Publishers' effort to distinguish *Sony* and *TVEyes* fails.

*First*, Publishers erroneously try to limit *Sony* and *TVEyes* to their facts (Resp.Br. 29-30).  But those decisions establish the principle that a use is transformative if it "utiliz[es] technology" to "improv[e] the efficiency of delivering content" to one entitled to receive it.  *TVEyes*, 883 F.3d at 177 (citing *Sony*).  That is what IA does.  IABr. 30-35.  Nothing in those decisions suggests they involved the only possible examples of transformative expansion of utility.  To the contrary, *ReDigi* expressly stated that it was providing "[e]xamples" of what transformative uses "have included" in past cases.  910 F.3d at 661.  It did not purport to "narrowly cabin[]" such uses to only those examples.  *Contra* Resp.Br. 29.  IA thus need not exactly "equate itself with either Sony or the home viewers."  *Contra* Resp.Br. 30.

*Second*, Publishers erroneously claim that *Sony* does not apply to controlled digital lending because it does not deliver the book "to one entitled to receive the content."  Resp.Br.30 (quoting *ReDigi*, 910 F.3d at 661).  Publishers concede that IA's borrowers are entitled to read the content of the book.  *Id.*  They merely quibble

over the form of delivery, claiming that patrons are entitled to borrow the book physically but not read it electronically. *Id.* But what matters is whether the borrowers are "entitled to receive *the content*." *Redigi*, 910 F.3d at 661 (emphasis added). Borrowers need not receive the content in the exact same format and manner; indeed, improving efficiency of delivery often requires changing format. Publishers' argument would disqualify the use at issue in *Sony*: plaintiffs claimed viewers were entitled to view the content when it was broadcast on television but not when it was recorded on tape. *Sony*, 464 U.S at 419-20.

*Third*, Publishers erroneously assert that *TVEyes*' transformativeness finding turned on the use's serving "a *different* purpose than the original broadcasts." Resp.Br. 31 (original emphasis).[4] Publishers focus their analysis on a function not at issue in the decision: TVEyes' search engine. *TVEyes*, 883 F.3d at 176. The decision concerned only the "Watch function," which permitted users to *view* selected broadcasts. *Id.* at 177-78. The Court stated—and Publishers elsewhere concede—that this function served the *same* purpose as the original broadcasts. *Id.*

---

[4] This argument stems from Publishers' overreading of *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508 (2023) as limiting transformative uses to only those with a different purpose. Resp.Br. 23-25. While *Warhol* analyzed the uses' purposes, it did not make that analysis dispositive of the first factor, let alone a requirement for fair use. *Warhol*, 598 U.S. at 528-33.

at 178; *see* Resp.Br. 25.  Yet the Court still found the use transformative.  *TVEyes*, 883 F.3d at 178.

At the same time, Publishers make the contradictory point that *TVEyes* found no fair use because the use served the same purpose as the original.  Resp.Br. 31. That misrepresents *TVEyes*' ultimate holding, which found no fair use based on the third and fourth factors, not the first factor.  883 F.3d at 180-81.  That outcome does not undermine *TVEyes*' finding that the use was transformative under the first factor despite serving the same purpose.

In any event, IA's controlled digital lending program serves a different purpose than physically lending the books it owns.  Although both ultimately enable patrons to read the content, that does not mean the purposes are the same—most uses of a book involve viewing its content.  Controlled digital lending serves a different purpose by permitting libraries to lend the books they own to a broader range of people for whom physical lending would be impractical.

*Finally*, Publishers erroneously claim that controlled digital lending does not expand utility because their ebook licenses already provide the same efficiency. Resp.Br. 28, 36.  That argument reflects Publishers' fundamental misunderstanding of controlled digital lending and the multi-faceted mission of libraries.  Controlled digital lending expands the utility of the physical books libraries already own; licensing access to ebooks cannot do that because it does not allow ownership and,

11

therefore, cannot fully serve library missions the way controlled digital lending does.[5]

For example, controlled digital lending permits libraries to lend books when patrons cannot physically visit the library due to distance or when interlibrary loan is too inefficient to be practical. Publishers' ebook licenses limit such lending by imposing geographic restrictions and prohibiting use in interlibrary loans. A-6037-6038. Controlled digital lending permits libraries to build permanent collections and to archive and lend older books in a form that preserves their original printing. Publishers' ebook licenses cannot serve this preservation mission because they are not photographs of the original editions, and ongoing access depends on Publishers' discretion and is subject to change without notice. IABr. 47-48.[6] And controlled digital lending permits libraries to honor their core commitment to protect patron privacy while borrowing, while ebook licensing does not. CDT Br. 7-13.

---

[5] A perpetual license does not allow ownership. *Contra* Resp.Br. 46 n.16. Publishers' licenses impose restrictions on how ebooks can be used and lent—restrictions they could not impose on books libraries owned. A-6037-38. In any event, three of four Publishers refuse to offer public libraries perpetual licenses. A-6038-43.

[6] Publishers claim to license "virtually" all their books, but they do not deny that Wiley once removed 1,379 books from licensing or that any of them could do so again. Resp.Br. 46; IABr. 48 n.15; A-6238. Nor do they address the loss of access to older editions or books no longer in print.

### c. Publishers unsuccessfully attempt to compare controlled digital lending to fundamentally different practices

Publishers repeat the district court's flawed comparisons between controlled digital lending and practices lacking its controls and purpose.

As IA explained, controlled digital lending is not like posting an ebook online because its purpose is to facilitate more efficient book *borrowing* under traditional library lending principles. IABr. 33. Publishers' arguments that an ebook is a derivative work (Resp.Br. 27) and that merely changing format is not transformative (Resp.Br. 25-26) are thus irrelevant. IA does not claim that scanning a paper book into a digital format is *per se* transformative. Rather, that change is a necessary step to facilitate IA's controlled digital lending, which *is* transformative. And it is IA's lending, not mere scanning, that is at issue here.

Publishers' comparisons to unrestricted file-sharing programs, like Napster, are inapposite for the same reason. Resp.Br. 31-32. Such services do not limit access to the one person entitled to borrow the work at a time. IABr. 34-35; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir. 2001). The same is true of the hypothetical database mentioned in dicta by *Google Books* (804 F.3d at 207) and HathiTrust's archive for the print disabled (*Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 101 (2d Cir. 2014)). Publishers try to minimize the significance of this distinction, noting that *Google Books* did not expressly mention it. Resp.Br. 32. But *Google Books* focused only on the snippets' lengths because that was what

distinguished the use there from a hypothetical commercial database providing full books to millions of people at once. 804 F.3d. at 207. Nothing in that dicta suggests the Court would not have also viewed controlled digital lending as distinguishable from its hypothetical database.

Publishers' comparisons to digital resales are also inapt. The purpose of controlled digital lending's "1:1 owned to loaned ratio" (Resp.Br. 27) is to facilitate preservation, lending, and borrowing—libraries' core mission. The digital first-sale doctrine considered by *ReDigi*, Congress, and the Copyright Office (Resp.Br. 27-28, 35) does not involve an "owned to *loaned* ratio" because it addresses a different purpose: commercial resales, not library preservation and lending. *ReDigi*, 910 F.3d at 652-54; *see Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 853-54 (9th Cir. 2017) (streaming service allowing purchase and sell-back of movies).

### d. Publishers fail to meaningfully address the other transformative purposes of IA's lending

IA's lending serves additional transformative purposes by enabling innovative interactions between books and the Internet, such as cite-checking online resources like Wikipedia. IABr. 22, 32. Publishers dismiss this feature as unimportant because, they claim, it is not IA's library's "main purpose." Resp.Br. 28-29 n.8. But "works rarely have one purpose," so courts "don't ask whether the new product's *only* purpose is transformative," but "whether *a* transformative use may reasonably

14

be perceived." *Apple, Inc. v. Corellium, Inc.*, No. 21-12835, 2023 WL 3295671, at *8 (11th Cir. May 8, 2023) (emphases in original; brackets omitted).

Publishers speculate, without evidence, that Wikipedia could link to their ebooks instead. Resp.Br. 28-29 n.8. But Publishers' licenses' geographic and other restrictions make it difficult for readers to immediately obtain a short-term loan needed to verify the source. A-6037-38. Indeed, the record reflects 202,026 citations from Wikipedia to IA's library (A-3676), but no evidence that Publishers' commercial offerings have or even could be used in this manner.

### 3.    *IA's use serves copyright's purposes*

Even if IA's use were non-transformative, the first factor would still favor fair use because controlled digital lending serves copyright's purposes and important public interests. IABr. 35-42.

#### a. Publishers do not deny that the first factor can favor non-transformative uses

Publishers concede that the first factor can favor non-transformative uses, but they contend this is possible only for uses falling into certain "categories": uses that fall within section 107's preamble, uses supported by legislative history, and uses without a commercial market. Resp.Br. 32-34. These categories find no basis in the statute, with good reason: fair use is a flexible doctrine that rejects this kind of over-simplification. The so-called "preamble" category is particularly inappropriate, given that the Supreme Court has expressly noted that Section 107's preamble

merely lists "examples" of fair uses, which "do not exclude other examples (note the words 'such as')." *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021). The key question is not whether a use fits a listed purpose, but whether copyright's goals "would be better served by allowing the use than by preventing it." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1077 (2d Cir. 1992).

Regardless, IA's library serves section 107's example purposes of "teaching," "research," and "scholarship," just as libraries always have. The record is replete with examples of IA facilitating access to books needed for classroom use and academic research that would not have been possible otherwise. *E.g.*, A-4259-4262; A-5798-5801. Publishers cannot deny that these uses serve the preamble's favored purposes, so they attempt to separate borrowers' uses from IA's lending. Resp.Br. 23 n.5, 60. That distinction fails because IA lends books to facilitate borrowers' educational, research, and scholarship uses. That some books are also borrowed for recreational use (just as they are at all libraries) does not change that fact.

**b. Publishers' reliance on *ReDigi* ignores the critical difference between fair use and other statutory exceptions**

Neither *ReDigi* nor congressional inaction regarding first sale undermines fair use protections for controlled digital lending. *Contra* Resp.Br. 14, 35. As explained above (*supra* at 2, 11, *infra* at 20), controlled digital lending serves a different purpose than commercial resale. Even putting that difference aside, rejection of a digital first-sale defense is irrelevant because IA is not arguing for expansion of first

sale. IA is arguing that its application of controlled digital lending is fair use, which is a flexible, case-specific defense intended to fill gaps left by categorical exceptions like first sale. IABr. 38-40.

*ReDigi* never rejected this argument (*contra* Resp.Br. 35) because *ReDigi* never considered it. Rather, *ReDigi* held (1) that the first-sale defense did not apply to the making of digital copies and (2) that the use in that case—a commercial marketplace for digital resale of music—was not fair use. *Compare* 910 F.3d at 655-60; *with id.* at 660-63. It said nothing about other, fundamentally different uses like nonprofit controlled digital lending. And it did not address whether the principles animating sections 108 and 109, including Congress's special solicitude toward libraries, should be considered under the fair use analysis.

Publishers' suggestion that IA's arguments should be addressed to Congress rather than the Court (Resp.Br. 34) misreads *ReDigi*. *ReDigi* stated that courts cannot expand the first-sale exception to cover digital resales "without regard to" the statutory "terms"; any amendment would be a matter for Congress. 910 F.3d at 664. The Court explained that section 109's first-sale exception is a "provision[] for which Congress has taken control, dictating both policy and the details of its execution." *Id.* But *ReDigi* expressly contrasted the first-sale exception with fair use, for which Congress "l[eft] further such development to the courts." *Id.*; *see Google*, 141 S. Ct. at 1197 (fair use is "flexible" and court-driven). Far from

"interfer[ing] with Congress['s] legislative prerogative" (Resp.Br. 34), judicial consideration of such policy concerns fulfills Congress's design for fair use.

In light of fair use's flexibility and context dependence, the Court can easily reject Publishers' exaggerated claims that reversal here will upend the music, movie, and video game industries. Resp.Br. 4-5. Fair use "calls for case-by-case analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). Thus, recognizing that IA's nonprofit library is fair use does not mean all uses that maintain a similar 1:1 owned-to-loaned ratio must also be fair use. The analysis requires balancing all the factors, including that IA's use is non-commercial, serves important library missions long recognized by Congress, and causes no market harm. A different use, *e.g.,* of a different kind of work in a different industry by a for-profit company, may require a different analysis. *See, e.g.,* Amicus Br. of Recording Industry Ass'n of Am. et al. ("Recording Br.") at 24-30.

## B.    The Second And Third Factors Carry Little Independent Weight Here

Publishers do not dispute that the second factor carries little to no weight here. Resp.Br. 40-41; IABr. 20. Nor do they deny that the district court collapsed the first and third factors (Resp.Br. 41), such that if the district court erred in analyzing the first factor, its third factor analysis was also erroneous.

## C.     The Fourth Factor Favors Fair Use

The fourth factor, market effects, also favors fair use.  IA's controlled digital lending is distinct from Publishers' ebook markets, so IA neither owes a licensing fee for its transformative use nor supplants Publishers' ebooks.  IA introduced substantial evidence proving absence of market harm, and Publishers do not refute it.  IABr. 44-60.

### 1.     *IA owes no licensing fee for its controlled digital lending*

Publishers' argument that IA owed licensing fees for its lending (Resp.Br. 44-47) is circular.  "[I]f the use is a fair use, then the copyright owner is not entitled to charge for the use, and there is no 'customary price' to be paid in the first place." *Patton*, 769 F.3d at 1265.  Thus, copyright holders can claim lost licensing fees as a market harm only if they establish a "traditional, reasonable, or likely to be developed market" for the defendant's use.  *Texaco*, 60 F.3d at 930.

Publishers do not describe any market for controlled digital lending or claim any intent to develop one.  Resp.Br. 46.  That separates this case from *TVEyes*, where the profitability of the defendant's service showed there was a "plausibly exploitable market" "worth millions of dollars" that the plaintiff could reasonably develop and license.  883 F.3d at 180.  Here, in contrast, Publishers cannot demonstrate a profitable market based on IA's non-profit use and assert no intent to pursue a market licensing controlled digital lending.

Instead, Publishers concede they simply want to preclude controlled digital lending altogether. Resp.Br. 46. Their sole argument for doing so turns on the assumption that IA's controlled digital lending falls within their existing ebook licensing market. Resp.Br. 44-45. But they concede, as they must, that this contention fails if IA's use is transformative. Resp.Br. 45; *see Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d Cir. 2006) ("Copyright holders may not preempt exploitation of transformative markets.") (alterations and citation omitted).

As explained above, controlled digital lending serves fundamentally different purposes than Publishers' ebook licenses and thus is not part of Publishers' market. Publishers' licenses cannot serve library missions such as preserving permanent collections, widening reach and resources through interlibrary loans, and protecting patron privacy. *See supra* at 2, 11; IABr. 47-49; CDT Br. 7-13; Libraries Br. 18-20.

Publishers do not deny these differences. Instead, they try to diminish them by claiming that IA's lending need not match their licenses in every respect to act as a substitute. Resp.Br. 47. But these are not minor differences in terms that can be so easily brushed aside. They implicate the use's very nature and purpose, making controlled digital lending "a feature of ownership, not a substitute for licensing." Libraries Br. 20.

### 2. *IA's controlled digital lending does not supplant Publishers' markets*

These same fundamental differences between IA's and Publishers' services also mean that IA's use does not impair Publishers' licensing markets. All the available record evidence confirms this fact.

### a. Publishers distort IA's burden at summary judgment

Contrary to Publishers' claim (Resp.Br. 42), IA does not "seek[] to flip the burden of proof." Rather, IA met its burden by introducing compelling evidence that its lending causes no market harm: Publishers' ebook revenues have grown since IA began its lending, and Drs. Jorgensen and Reimers analyzed IA's lending and found no evidence of any harm to ebook borrowing through OverDrive or to print and ebook sales. IABr. 49-55. Publishers cannot defeat that evidence with mere speculation, so summary judgment should have been granted to IA. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005).

Moreover, to survive summary judgment against it, IA had only to introduce sufficient evidence to create a genuine dispute on market harm. Fed. R. Civ. Proc. 56(a). Unable to deny that IA met that threshold, Publishers attempt to recast market harm as a legal question rather than a factual dispute. Resp.Br. 54. But whether IA has or can be expected to harm Publishers' ebook revenues is plainly a question of fact. *See, e.g., Ass'n of Am. Med. Colleges v. Cuomo*, 928 F.2d 519, 525-26 (2d Cir. 1991) (genuine dispute of fact whether disclosure would affect market value of

work); *Ringgold v. Black Ent. Television*, 126 F.3d 70, 81 (2d Cir. 1997) (triable issue of fact on fourth factor).

### b. Publishers do not deny that they presented no evidence of market harm

Instead of pointing to evidence, Publishers repeat the same speculation they relied on below. They ask the Court to simply assume market substitution based on "the nature of the competing product." Resp.Br. 48-50. But IA explained that its controlled digital lending and Publishers' ebooks serve different purposes and are not interchangeable. *See supra* at 2, 11, *infra* at 20; IABr. 47-49. Thus, just as in *American Society for Testing & Materials v. Public.Resource.Org* ("*ASTM II*"), there is at least a "significant question" as to whether IA's lending could harm Publishers' markets. 82 F.4th 1262 (D.C. Cir. 2023); *contra* Resp.Br. 50-51. Publishers cannot claim that substitution is "self-evident" when the actual evidence shows no substitution. *Contra* Resp.Br. 49.

Publishers' excuses for their lack of evidence are unpersuasive. Their own amici belie the claim that empirical analysis would be "near-impossible." *Contra* Resp.Br. 51-52. In arguing that peer-to-peer file-sharing harmed the music industry, amici identified evidence of decreasing revenues and studies showing that file-sharing accounted for at least half the decrease. Recording Br. 24-28. And in arguing that BitTorrent harmed the movie industry, amici presented empirical analyses showing that revenues decreased 27% and would have grown but for the

introduction of BitTorrent. *Id.* at 28-30. Publishers cannot explain why producing empirical evidence of market harm is impossible for ebooks but not for movies or music.

Publishers' claim that the scope of IA's lending is too small to calculate market harm (Resp.Br. 52-53) is equally unfounded. To start, Publishers ignore the huge increase in fixed costs—purchasing and storing books, building and expanding digital infrastructure, and more—that would necessarily accompany (and impose limits on) any expansion of controlled digital lending. Instead, Publishers contend the existing data cannot capture what would occur if IA's lending truly became widespread. But the National Emergency Library (NEL) refutes that. For purposes of the supposed market harm, NEL was effectively equivalent to the hypothetical scenario Publishers posit—if IA obtained enough partners to "raise the concurrent lending caps to practically unlimited levels." Resp.Br. 52. IA's experts analyzed NEL's near-unlimited availability as a proxy for widespread use and found no evidence of market harm. A-4840-4845; A-4879-4880; A-4934. IA (temporarily and justifiably) "open[ed] the floodgates" (Resp.Br. 52) during NEL, and the record shows precisely what harm resulted: none.

Publishers' remaining arguments are easily dismissed. First, Publishers cannot rely on harms shown by the music and movie industries because they stemmed from fundamentally different conduct. *Contra* Resp.Br. 53. Those harms

were attributed to unrestricted file-sharing, which lacks controlled digital lending's access restrictions. *See supra* at 13-14.

Second, as IA explained (IABr. 56 n.19), its communications materials are merely rhetoric, not evidence of actual market effect. *Contra* Resp.Br. 49.

Third, IA's decision to wait five years before lending is not an admission of substitution (*contra* Resp.Br. 53), but a policy choice balancing multiple factors, including IA's limited resources and the desire to prioritize older books.

Finally, Publishers misrepresent Hildreth's testimony regarding library budgets. Resp.Br. 49-50. She clarified that she did not contend that "libraries will spend less money on licensing the e-book editions of the particular titles that were provided through CDL," but rather that, while this was "possible," "whether it would ever in fact occur would depend on the circumstances." A-5961; A-5954-57. Similarly, while she accepted that it was possible libraries could reallocate money from ebooks to other materials, she did not testify that libraries would actually do so, instead stating it was "highly likely" they would continue to use their funds for ebooks. A-5733-34; A-5956-5957.

### c. Publishers' attempts to discredit IA's evidence fail

Unlike Publishers, IA introduced compelling evidence of the absence of market harm. Publishers' response is again unsupported speculation.

Publishers themselves recognize that the "ebook market is thriving," with no drop in revenues like those seen in the music or movie industries. *Compare* Resp.Br. 10, *with* Recording Br. 24-30. Yet they ask the Court to assume, without support, that their profits could have been even higher without IA's lending. Resp.Br. 50-51. *Compare* Recording Br. 29 (actual empirical analysis showing what movie industry's growth would have been without BitTorrent). In fact, a thriving market by itself is exactly the kind of evidence courts have relied on to find no market harm. *See, e.g., Sony*, 464 U.S. at 454 (no market harm where plaintiffs' market is "more profitable than it has ever been"); *ASTM II*, 82 F.4th at 1271 ("sales have increased").

Publishers' attempts to undermine IA's experts' analyses also fail. Jorgensen found that IA's unlimited lending during NEL had "no measurable impact" on borrowing demand for Publishers' ebooks through OverDrive. A-4880. He also found that closing NEL correlated with a decrease in Hachette's print and ebook sales, rather than the increase that would be expected if IA's lending were a market substitute. A-4844-45. Reimers likewise found that removal of a book from NEL decreased the book's sales ranking on Amazon. A-4927-30. And she found "no statistically significant evidence" that adding a book to IA's library or increased lending through NEL harmed its sales rankings. A-4905, A-4934. IA does not overstate Jorgensen's and Reimers' conclusions: these findings are plainly evidence

supporting the absence of market harm. *E.g.,* A-4879 (Jorgensen concluding "Internet Archive's Digitized Book Loans Did Not Substitute for Plaintiffs' Book Sales or OverDrive's Digital Lending"); A-4905 (similar for Reimers). *Contra* Resp.Br. 54, 58.

Moreover, IA does not need to prove that its lending *improved* Publishers' sales, only that it did not harm them. It makes no sense, then, to talk about proving causation when what is being proved is a negative. Regression analysis asks whether one variable (*e.g.,* IA's heightened lending through NEL) has any statistically significant effect on another variable (*e.g.,* ebook borrowing on OverDrive or Amazon sales rankings). If IA's lending harmed Publishers, the regression should show an effect. *E.g.*, A-4841. The absence of a statistically significant effect, then, supports the contrary conclusion of no market harm. *E.g.*, A-4843-4845. What Publishers mischaracterize as "tepid conclusions" (Resp.Br. 58) is just the language used in statistics to explain the results of regression analyses.[7]

---

[7] Publishers' claim that Reimers described her conclusion as "weak" (Resp.Br. 58) is even more misleading. She did not state that her finding of no evidence of market harm was weak. Rather, she found there was actually "some weak evidence" of the opposite—that a "book's removal from [IA] is associated with lower (worse) rankings of print editions at Amazon." A-4934. Whether that correlation is weak is irrelevant because IA does not need to show that its lending helped Publishers' sales.

Publishers next list allegedly confounding factors for which, they claim, Jorgensen should have controlled.  Resp. 55-56.  Jorgensen applied a "well-accepted and common statistical approach that accounts for other relevant factors" by comparing two closely related time periods (Q2 and Q3 of 2020) over which such other factors are "approximately unchanged."  A-4886; A-4879-4880.  None of Publishers' proposed factors undermine Jorgensen's analysis, unless there is evidence those factors changed between these two adjacent quarters.  And Publishers' expert made no attempt to "quantify or otherwise measure the effects of the market factors he claims to be important."  A-4887; *e.g.,* A-4888 (no evidence of how many libraries opened between Q2 and Q3 or whether traditional lending increased).  To the contrary, Jorgensen identified evidence showing "an absence of seasonal trends," such that "the overall ebook market was relatively stable between Q2 and Q3."  A-4889; *e.g.*, A-4887.

Publishers concede that Reimers controlled for many of the factors they identified, but they claim "her controls are still not sufficient."  Resp.Br. 58; *see* A-4949-4956 (Reimers' discussion of controls).  They do not explain how her controls were lacking or what changes could have been made to her methodology.  Resp.Br. 58.  Especially where Publishers' expert made no attempt to conduct any empirical analysis himself, merely listing supposedly confounding factors without evidence of

whether or how they might affect the relevant analysis is not enough to preclude summary judgment for IA, let alone justify summary judgment against it.

Finally, Publishers question Reimers' methodology for analyzing Amazon rankings for print books. Resp.Br. 57-58. As Reimers explained, Amazon rankings are a reliable indicator because they are likely based on unit sales. A-4954. Moreover, because rankings are relative to sales of other books, they have the advantage of controlling for global changes in the book market. A-4919-4920. Reimers used this method to analyze print sales because Publishers refused to provide the data needed to analyze ebook sales. A-4948. Finally, while Publishers make much of a supposed contradiction with Reimers' prior work, Reimers herself offered five reasons why that prior work was inapposite. A-4965-66.

Importantly, while Publishers criticize Reimers' methodology, they again fail to explain what she should have done instead. Indeed, Publishers' critique rings especially hollow given that Jorgensen used a different methodology to analyze Hachette's print *and ebook* sales and arrived at a similar conclusion. A-4844-45.

### 3.    *Publishers cannot deny the public benefits of IA's lending*

Contrary to Publishers' assertion (Resp.Br. 60), IA explained how its lending benefited the public and provided numerous concrete examples. IABr. 22, 59-60. Publishers cannot claim that they alone created those benefits (Resp.Br. 60) because the students, researchers, and authors who used the works for education, research,

and scholarship would not have reasonably been able to access the books without

IA's lending. *See, e.g.*, A-4259-4262; A-5799-5801.[8]

### D. Balancing The Factors Together, Permitting IA's Use Better Serves Copyright's Purposes

Publishers wrongly suggest that the district court "balanced the interests

required by copyright law" "[t]hroughout [its] decision." Resp.Br. 20. To the

contrary, the decision barely mentions copyright's ultimate purpose of "promoting

broad public availability of literature, music, and the other arts." *Andy Warhol

Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023).

Publishers do not deny that IA's use serves this purpose; instead, they ask the

Court to ignore that service and focus instead on copyright's financial incentives for

creativity. Resp.Br. 24. That argument overreads *Warhol*. When *Warhol* noted

copyright's "balancing act between creativity and availability," it made clear which

way that balance tips: "Creative work is to be encouraged and rewarded, but private

motivation must ultimately serve the cause of promoting broad public availability of

---

[8] Publishers' suggestion that controlled digital lending would "forc[e] [libraries] to lock away books" and "syphon revenue away from public libraries" (Resp.Br. 36 n.10) is baseless. Controlled digital lending is one way libraries can use non-circulating books; libraries are not forced to do anything unless they choose. And there is no evidence that IA's lending decreases library budgets. Contrary to Publishers' misrepresentation, Hildreth's testimony establishes the opposite—"CDL does not result in less library spending on books" because "[l]ibraries spend all of their allocation budgets each period." A-4977.

literature, music, and the other arts." 598 U.S. at 526. The district court's failure to consider the latter contravenes decades of precedent recognizing that rewards are "a secondary consideration" (*Sony*, 464 U.S. at 429), while promoting availability is "primary" (*Google Books*, 804 F.3d at 212). Here, the record shows that the balancing act between these purposes is "better served by allowing the use than by preventing it." *Palmer*, 970 F.2d at 1077.

## II. THIS COURT SHOULD REMAND FOR RECONSIDERATION OF THE NATIONAL EMERGENCY LIBRARY

Publishers do not deny that the district court's NEL ruling depends entirely on its analysis of ordinary controlled digital lending. Resp.Br. 61-62. If the Court reverses the latter, then it should also reverse and remand the former. It need not address Publishers' arguments about the justifications for NEL (Resp.Br. 62), which should be left for the district court in the first instance.

## III. AT THE LEAST, THIS COURT SHOULD NARROW THE DISTRICT COURT'S HOLDING TO MAKE CLEAR THAT IA'S CONTROLLED DIGITAL LENDING OF ITS OWN BOOKS IS FAIR USE

IA did not forfeit its argument that controlled digital lending of its own books is fair use, even if lending based on Open Libraries' overlap analysis was not. *Contra* Resp.Br. 63. That lesser-included argument is encompassed by the broader argument made below that IA's lending, including both of its own books and through Open Libraries, is fair use. *See Harris v. Sharp*, 941 F.3d 962, 980 (10th Cir. 2019); *PCTV Gold, Inc. v. SpeedNet*, LLC, 508 F.3d 1137, 1144 n.5 (8th Cir. 2007).

Publishers' argument that terminating only Open Libraries would not make a difference to the fair use analysis (Resp.Br. 63) is refuted by their own brief. Their arguments rely substantially on IA's overlap analysis and potential for growing partnerships with other libraries. *E.g.,* Resp.Br. 52 (describing "[m]ost critical[]" part of fourth factor as possibility that IA's lending would become "widespread" with "nothing stopping all 9,000 public library districts in the U.S. (if not the world) from joining as partner libraries"). Further, the record does not support Publishers' assumption that controlled digital lending of only IA's own books would allow for substantially increased lending. IA has limited copies of each book (sometimes only one), so multiple libraries cannot rely on IA's website to meet their patrons' needs. And, even putting aside book-buying expenses (Resp.Br. 63), storing them and operating the associated digital infrastructure costs millions of dollars, limiting the number of books and concurrent borrows IA can offer on its own. A-6170.

## CONCLUSION

This Court should reverse and grant summary judgment to IA.

Dated:  April 19, 2024                    Respectfully submitted,


                                          s/ Joseph R. Palmore
JOSEPH C. GRATZ                           JOSEPH R. PALMORE
MORRISON & FOERSTER LLP                   ADITYA V. KAMDAR
425 Market Street                         MORRISON & FOERSTER LLP
San Francisco, CA 94105                   2100 L Street NW, Suite 900
                                          Washington, DC 20036
CORYNNE M. MCSHERRY                       Telephone:  (202) 887-6940
ELECTRONIC FRONTIER FOUNDATION            JPalmore@mofo.com
815 Eddy Street
San Francisco, CA 94109                   DIANA L. KIM
                                          MORRISON & FOERSTER LLP
                                          755 Page Mill Road
                                          Palo Alto, CA 94304

            *Counsel for Defendant-Appellant Internet Archive*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Rule 32.1(a)(4) because it contains 6,996 words, excluding those parts of the brief exempted by Rule 32(f).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2022, in 14-point Times New Roman font.

Dated:  April 19, 2024                          s/ Joseph R. Palmore

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit via the CM/ECF system on April 19, 2024. I have also submitted six paper copies to the Court via overnight delivery the same day.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 19, 2024               s/ Joseph R. Palmore